**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christine A. Okike, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for the Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (*pro hac vice* pending)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*[1] | Chapter 11<br><br>Case No. 22-_____ (___)<br><br>(Joint Administration Requested) |

**DECLARATION OF MARK A. RENZI IN SUPPORT OF DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Mark A. Renzi, hereby declare under penalty of perjury:

1.     Despite their best efforts to stabilize the enterprise and protect clients, the Debtors

are faced with a severe liquidity crunch due to the unprecedented, expedited collapse of FTX

Trading Ltd., West Realm Shires, Inc (dba FTX US), Alameda Research, Ltd. and their affiliates

(together, "FTX").  FTX had been expected to acquire the Debtors before FTX's true financial

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

circumstances were revealed, FTX's then-management team resigned, and FTX free-fell into bankruptcy. Given these circumstances, the Debtors had no choice but to file for chapter 11 relief to protect their clients and preserve the value of their business.

2.      Although the Debtors' exposure to FTX is a major cause of this bankruptcy filing, the Debtors do not face the myriad issues apparently facing FTX. Quite the opposite. Since its founding, BlockFi has been focused on providing best-in-class financial services and offering (sometimes creating) industry-leading protections. BlockFi adopted corporate governance and risk management processes and took several other actions to protect its clients—including reaching a settlement with the U.S. Securities and Exchange Commission (the "SEC") and working diligently to register potentially relevant products and halt the use of products that the SEC was investigating—because doing so was in the best interest of its clients. With extensive financial and regulatory controls in place, the Debtors have worked around the clock with their advisors, including myself, to develop a strategy positioning the Debtors for a successful emergence from these chapter 11 cases.

3.      The Debtors' planning has left them well-positioned to move forward despite the fact that 2022 has been a uniquely terrible year for the cryptocurrency industry, given the collapse of the UST/Luna stablecoin ecosystem and the bankruptcies of Singapore-based cryptocurrency hedge fund Three Arrows Capital and several major cryptocurrency brokerages and exchanges such as Celsius Network Ltd. and Voyager Digital—all before the FTX debacle unfolded over a period of several days earlier this month. These events, individually and collectively, shook the confidence of cryptocurrency investors and caused a market purge, with substantial numbers of investors seeking to pull their funds from any and all cryptocurrency investments. BlockFi was not immune.

4.     While BlockFi has fared better than many of its peers in the market, this confluence of pre-November 2022 events led it to seek an injection of liquidity in an effort to protect its clients from harm.  FTX offered to supply that liquidity through a loan agreement and an option agreement (providing an option to FTX to purchase the equity of BlockFi at a later date) that would protect clients and BlockFi's ability to continue operating as a going concern.  BlockFi accepted this offer to stave off a liquidity crisis and avoid harm to its clients, despite it requiring its executives and employees to sacrifice hundreds of millions of dollars in equity value while continuing to work increasingly hard without the potential upside that equity ownership otherwise offered.

5.     FTX's apparent "rescue," which began in the summer of 2022, stabilized BlockFi. But that was short lived.  Over the past few weeks, exposure to FTX exacerbated rather than cured BlockFi's ailments.  Public reports that began to circulate on November 2, 2022, citing leaked internal financial statements, caused a large volume of withdrawals on FTX specifically and the cryptocurrency markets more generally.  The FTX companies ultimately began filing bankruptcy petitions on November 11, 2022, and have faced simultaneous proceedings in Delaware and New York along with a foreign insolvency proceedings in the Bahamas and Turkey (so far).

6.     BlockFi has substantial exposure to FTX, through the FTX Loan Agreement and FTX Option Agreement (as defined herein), as well as loans that BlockFi made to Alameda Research Ltd. ("Alameda") and cryptocurrencies held on FTX's platform for trading activities which became trapped on FTX's platform due to its bankruptcy filing.  This exposure has created a liquidity crisis.  To again protect its clients' interests, BlockFi took protective measures— including retaining veteran restructuring advisors and pausing account withdrawals—and now files these chapter 11 cases to allow BlockFi to run an orderly process and maximize the value it can deliver to its clients.

7.      BlockFi intends to swiftly bring these chapter 11 cases to an appropriate conclusion and restore liquidity to its firm, preserving and maximizing value for clients.  While open to any alternative that maximizes value, BlockFi is filing a proposed Plan that contemplates a standalone restructuring, predicated on the Debtors' goal to provide clients as close to a full recovery as possible.  A full recovery for creditors would require, among other things, that the Debtors' counterparties and third-party custodians meet their contractual and legal obligations.  While the Debtors are hopeful, the full extent of the fallout from FTX's collapse remains to be determined.

8.      The challenges faced by cryptocurrency firms this year have been unprecedented for the industry.  But BlockFi's careful actions and decisive planning have all been designed to maximize value for stakeholders and will enable it to weather as much of the storm as possible.  These chapter 11 cases are another step in that direction.  BlockFi will continue to do everything possible to protect and deliver value to its clients and position its business for future success.

## Background

9.      I am a Managing Director and the Head of the Corporate Finance Financial Institutions Group for Berkeley Research Group, LLC ("BRG"), the proposed financial advisor to the Debtors.  I submit this declaration in support of the chapter 11 petitions and first-day motions filed by the debtors and debtors in possession (collectively, the "Debtors").

10.      Unless otherwise indicated, the statements set forth in this declaration are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from the BRG team working under my supervision or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional.  I am not being specifically compensated for this testimony other than through payments proposed to be received by BRG as a professional retained by the Debtors.

11.     Since the Debtors engaged BRG on November 12, 2022, I have worked closely with the Debtors' management and other professionals on the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other reports.  I lead the BRG team advising the Debtors.  Thus far, while the FTX collapse has ultimately left the Debtors with no choice but to initiate these chapter 11 cases, I have found the BlockFi management team to be knowledgeable and experienced, diligent, responsible stewards of their stakeholders' assets, each member of which cares deeply about doing the right thing and maximizing value for clients and stakeholders.  To date, I have not found any failure of corporate controls or systems integrity, and I have found BlockFi's financial information to be trustworthy.

12.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2] To minimize the adverse effects on their business and facilitate a "smooth landing" in chapter 11, the Debtors also filed motions seeking certain "first day" relief (the "First Day Motions").

13.     I am over 18 and authorized to submit this declaration on behalf of the Debtors.  If called, I would testify competently as set forth herein.  This Declaration is organized as follows:

- Part I provides a brief overview of the cryptocurrency industry;

- Part II describes the Debtors' historical background and business operations;

- Part III describes the Debtors' prepetition corporate and capital structure; and

- Part IV describes the circumstances leading to the filing of these Chapter 11 Cases and the Debtors' path forward.

In addition, **Exhibit A** addresses the First Day Motions; **Exhibit B** is a structure chart for the Debtors; and **Exhibit C** is a timeline of key events leading to the filing of these chapter 11 cases.

---

[2]    BlockFi Intl., a company organized in Bermuda, also filed a winding up petition in the Supreme Court of Bermuda (for restructuring purposes only), together with an application for the appointment of joint provisional liquidators on a "light touch provisional liquidation basis" to assist the board of BlockFi Intl. with this restructuring.

I. **Overview of Cryptocurrency**

14.    A cryptocurrency, simply put, is a digital currency. Individuals use cryptocurrencies as a medium of exchange or a store of value.  Cryptocurrency is used to execute transactions on a "blockchain," a digital technology that vets and verifies transactions through a rigorous mathematical process, which presents a use case for a "trustless," decentralized ledger. Each blockchain utilizes a specific cryptocurrency or a limited number of cryptocurrencies to execute transactions (for example, the Ethereum blockchain uses Ether as its cryptocurrency).  A blockchain acts as a digital ledger because it records every single transaction ever made by its "native" cryptocurrency.

15.    Cryptocurrencies themselves are decentralized in that they are not issued by a government or central institution.  Cryptocurrency transactions are also generally anonymous. That said, each transaction is recorded on the blockchain, and certain information about each transaction may be viewed by any individual for free.  It works as follows: a cryptocurrency token denotes a unit of that cryptocurrency and is associated with an ID for that token.  When that token is created and exchanged, the transactions are recorded and associated with the ID on that token's blockchain.  So, an individual may look up the ID of that token to identify the wallet from where the token was sent and the wallet it was sent to.  Because each token is always being traced on the blockchain, it is impossible for that particular token to be duplicated.

16.    All cryptocurrency is stored on the blockchain but can only be accessed by a private "key" held by the cryptocurrency's owner.  Cryptocurrency keys are held in cryptocurrency wallets that allow the owner to easily, and securely, manage the keys to their cryptocurrency assets.

17.    There are thousands of cryptocurrencies, some more prevalent than others.  Two, however, have emerged as industry leaders.

18.     The first is Bitcoin.  Bitcoin ("BTC") is the most successful early cryptocurrency. Because of its success, it is used as a proxy for the cryptocurrency industry much in the same way the S&P 500 is used as a proxy for financial markets at large.  The market capitalization of Bitcoin as of the date hereof is approximately $318 billion.

19.     The second is ether ("ETH"), the native token of the Ethereum blockchain.  Ether is used in ways similar to Bitcoin.  However, the Ethereum blockchain also enables users to create "smart contracts," or simple programs that automatically execute when the contract's conditions are met (for example, distributing funds automatically when a sufficient number of signatures are received).  The market capitalization of ETH as of the date hereof is approximately $149 billion.

20.     Another type of cryptocurrency is a "stablecoin."  A stablecoin is a cryptocurrency "pegged," or tied, to another currency, commodity, or financial instrument.  These are designed to reduce volatility and help facilitate transactions on the blockchain.  The leading example is United States Dollar Coin (or "USDC"), which is pegged 1:1 with the U.S. Dollar.  USDC is collateralized by a pool of cash and short-dated U.S. treasury securities to provide for price stability—for every USDC in circulation, $1 is held as collateral.

21.     There are many other types of cryptocurrencies and other digital assets, each created to serve a particular market purpose.  That said, the above should serve as a sufficient backdrop to understand BlockFi's history and the events that led up to these filings.

## II.     The Company's History and Business Operations

22.     BlockFi Inc. (with its direct and indirect subsidiaries, "BlockFi") was founded in 2017 by Zac Prince and Flori Marquez to provide credit services to markets with limited access to simple financial products.  BlockFi's culture embodies four core values: "Pragmatic Pioneering"; "Clients not Customers"; "Individual Effort, Collective Success"; and "Transparency Builds Trust."  These values have been key drivers of BlockFi's strategy and decision-making, which has

consistently prioritized client protection, stability, and prudent stewardship. BlockFi always endeavored to do things the right way, even when it was difficult, and even when certain of BlockFi's competitors did less to gain a competitive advantage.

23. BlockFi worked to become an industry leader in compliance. Unlike certain competitors, BlockFi never launched its own token to raise funds but instead relied on traditional venture capital. BlockFi was also the first in many states to seek and receive lending licenses to make cryptocurrency-backed loans. As disclosed on its website, https://blockfi.com/licenses, BlockFi was issued 47 licenses for lending, money transmission, operations, and the like by 32 states and D.C., and received a separate Class F Digital Business Assets License from Bermuda.

24. In 2021, several U.S. state regulators as well as the SEC sent inquiries focused on whether BlockFi's interest-bearing accounts were, in fact, securities requiring registration with the SEC. BlockFi resolved these disputes with regulators via settlement and, as part of that agreement, agreed to cease offering the then-existing interest-bearing accounts to clients in the United States. As a result of that settlement, BlockFi developed a new product, "BlockFi Yield," and prepared a Form S-1 for BlockFi Yield to be registered with the SEC. BlockFi is the only cryptocurrency platform to have reached such a settlement with the SEC regarding an interest-bearing cryptocurrency account product and pursued the appropriate regulatory process for approval.

25. BlockFi is also an industry leader in transparency. It posts a quarterly transparency report to update its clients about the assets on BlockFi's platform and how BlockFi manages related liquidity and credit risk. BlockFi's most recent transparency report, published in July 2022, described in detail the firm's assessment of its liquidity risks (as well as its guidelines for managing such risks), credit risks and related exposure, and a fair value assessment for institutional and retail

loans.  This report (available at https://blockfi.com/blockfi-transparency-report-Q2-2022) was and is part and parcel of BlockFi's guiding principle that "Transparency Builds Trust."

26.     Among other things, BlockFi was transparent with clients and investors that funds held in BlockFi Interest Accounts and in the Private Client Program, as well as loan collateral for Retail Client Loans (all discussed below), were going to be used for lending to generate the yields provided to clients.  BlockFi was forthright about what it would and would not do with funds on its platform—in stark contrast to others reported to have done the opposite.[3]

27.     BlockFi experienced rapid growth; between 2019 and March 2022, total trading volume grew from $2 million to more than $23 ***billion*** as of March 2022 (on an LTM basis), while deployable assets grew from $345 million to $14.8 billion, and gross loan originations expanded from $687 million to more than $47 billion.  As BlockFi's business and operations grew, it expanded its management team and employee base, with a focus on hiring experts from other segments of the financial industry to better mature the nascent cryptocurrency business.

28.     As of the Petition Date, BlockFi and its non-Debtor affiliates have approximately 292 employees and 82 independent contractors.  But approximately two-thirds of these individuals received Worker Adjustment Retraining Notification ("WARN") notices before these chapter 11 cases as part of a liquidity-preserving reduction in force.  Having cut expenses and imposed a materially greater burden on those who remain, BlockFi must take immediate action to retain its workforce, as retaining and motivating personnel is critical to maximize value for clients.  BlockFi thus filed on the Petition Date a motion seeking approval of a Key Employee Retention Plan and Targeted Retention Plan to retain remaining non-insider employees and will ask the Court to approve the proposed retention programs at the second-day hearing.

---

[3]     *See, e.g.,* Coindesk, *Policy* (Nov. 10, 2022), *available at* https://www.coindesk.com/policy/2022/11/10/ftx-violated-its-own-terms-of-service-and-misused-user-funds-lawyers-say/?outputType=amp.

### A.    BlockFi's Client Offerings

29.    BlockFi's business model is client centric, consistent with its core value of "Clients not Customers" and its commitment to prioritizing clients' best interests.  BlockFi acquires clients by offering custom products and services that enable its clients to meet their financial goals, and continuously expands its product suite to deepen its relationship with its clients over time.

30.    Generally, BlockFi has two primary types of clients: retail and institutional.  As described in more detail below, BlockFi serves retail clients through web and mobile applications, and its products enable individuals and small businesses to store and/or earn interest on, buy and sell, borrow U.S. dollars secured by, and earn (via a credit card rewards program) digital assets. On the institutional front, BlockFi provides hedge funds, market makers, proprietary trading firms, trading desks, cryptocurrency miners, exchanges, and corporations with bespoke financing, trading, and treasury solutions relating to digital assets.

### 1.    Retail Clients

31.    Understanding the difficulty many individuals face in entering the investment world, BlockFi created web and mobile applications that enabled its retail clients to easily access, trade, borrow, and store select digital assets.

### a.    BlockFi Wallet

32.    By signing up on the BlockFi platform, BlockFi clients can open an account provided by Debtor BlockFi Trading LLC, which is opened and maintained by Debtor BlockFi Wallet LLC acting for and behalf of BlockFi Trading LLC (a "<u>Customer Wallet Account</u>").  A Customer Wallet Account can be funded either by transferring supported digital assets from a personal wallet to a wallet address provided by BlockFi Trading LLC, which will then immediately record the digital assets to the Customer Wallet Account, or by transferring U.S. dollar fiat

currency via wire or ACH to BlockFi Trading LLC's account at Silvergate Bank, which is used to purchase supported digital assets immediately recorded in the Customer Wallet Account.[4]



33.    Customer Wallet Accounts are non-interest bearing, and the cryptocurrency recorded in a Customer Wallet Account is *not* rehypothecated for lending activities.  Instead, all cryptocurrency recorded in Customer Wallet Accounts is held by BlockFi Wallet LLC in digital wallets (collectively the "<u>WLLC Wallet</u>") such as those provided by Fireblocks or BitGo, or third party custodians.[5]  Only cryptocurrency recorded in Customer Wallet Accounts is held in WLLC Wallets and there is no comingling of this cryptocurrency with assets used in the other BlockFi programs other than, as described below, during the daily true-up period or the initial exchange where cryptocurrency passes through BlockFi Trading[6] on its way to WLLC Wallets.

---

[4]    The exception to this is residents of New York who have a crypto-backed loan but who do not have a BlockFi Wallet account.

[5]    As of the Petition Date, BlockFi Wallet LLC no longer uses third party custodians.  Fireblocks and BitGo provide self-hosted wallet software to their clients.  This software allows customers, such as BlockFi Wallet, to securely manage and retain custody of their private keys and thereby retain full custody of digital assets.  Only BlockFi Wallet (and not Fireblocks or BitGo) can access the private keys and, therefore, control the transfer of crypto in WLLC Wallets.

[6]    In past periods BlockFi Trading also held *de minimis* amounts of inventory designed to facilitate transactions for Wallet customers.  As of the Petition Date, BlockFi Trading no longer holds inventory for trading and all digital assets are held in the WLLC Wallets.

34.    A Customer Wallet Account can be used by retail clients in connection with BlockFi's other products and services.  For example, after opening a Customer Wallet Account, clients can (a) (for non-U.S. clients) direct the transfer of cryptocurrency recorded in their Customer Wallet Account to an interest earning account, (b) buy and sell cryptocurrency on BlockFi's platform, (c) direct transfers of cryptocurrency or fiat cash to the client's personal account, and (d) receive digital asset rewards through the Rewards Card (as defined below).

35.    All transactions involving Wallet Customer Accounts are reflected in the ledger of BlockFi Wallet LLC (the "Wallet Ledger").  Each day, the WLLC Wallets and Wallet Ledger are trued up and any necessary transfers of cryptocurrency to or from the WLLC Wallet are made to bring the WLLC Wallet and the Wallet Ledger into balance to reflect all Customer Wallet Account transactions.  BlockFi Wallet LLC maintains these strict controls to ensure compliance with the BlockFi Wallet Terms of Service, which provide that:

> **The title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi.**  You hereby represent and warrant to us at all times during which you maintain a balance in your BlockFi Wallet that: (i) any cryptocurrency that you transferred into your BlockFi Wallet is owned by you at the time of transfer; and (ii) you are validly authorized to instruct us to carry you transactions relating to your BlockFi Wallet balance and that all transactions initiated with your BlockFi  Wallet are for your own account (or, in the case of business accounts, for your business's account) and not on behalf of any other person or entity.  Except as required by a valid court order or applicable law, BlockFi shall not sell, transfer, loan, hypothecate or otherwise alienate cryptocurrency held in your BlockFi Wallet unless specifically instructed by you.  https://blockfi.com/wallet-terms.

36.    While title to cryptocurrency held in Customer Wallet Accounts does not pass to the Debtors, the Terms of Service do grant the Debtors a security interest in the cryptocurrency to secure any obligations a customer may have in connection with other BlockFi services and products.  Based on these terms, the Debtors intend to seek authority to honor client withdrawal requests from Customer Wallet Accounts during the early stages of these chapter 11 cases.

### b.    BlockFi Interest Accounts

37.    BlockFi clients can also earn money through a BlockFi Interest Account ("BIA"). BIAs are interest-bearing accounts that allow clients to earn interest on supported digital assets. BIA interest is paid in the form of digital assets at variable rates determined at BlockFi's sole discretion.  Before the pause on client withdrawals, a BIA holder could request a complete or partial withdrawal of principal at any time for digital assets of the same number and type as those transferred to the account, subject to the account terms.

38.    BlockFi has the contractual right to redeploy digital assets transferred to a BIA account for its revenue-generating activities.  More specifically, BlockFi has the right, without further notice to a BIA client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any amount of digital assets transferred to a BIA, separately or together with other property, with all attendant rights of ownership, for any period of time and without retaining in BlockFi's possession and/or control a like amount of digital assets.

39.    The BIA agreement is with (and administered by) either BlockFi Inc. (US clients) or BlockFi Intl. (non-U.S. clients).  In February 2022, BIAs of non-U.S. clients were moved from BlockFi Lending to BlockFi Intl., and in April 2022, BIAs of U.S. clients were moved from BlockFi Lending to BlockFi Inc.

### c.    BlockFi Private Client Program

40.    In addition to BIAs, which generally have standardized terms applicable to all holders, BlockFi provides an individually negotiated interest-bearing borrowing product to eligible clients as part of its BlockFi Private Client suite of products ("BPC").  The BPC product suite permits clients to lend digital assets to BlockFi on individually negotiated terms, which may lead to individually negotiated terms for other products and services.  BPC loan interest is paid in the form of digital assets at a negotiated rate.  A BPC loan may be structured as an "open" term (*i.e.*,

the BPC client may request that BlockFi repay the loan at any time) or a "fixed" term (*i.e.*, the loan has a negotiated maturity date).



41.    BlockFi has the right to redeploy digital assets borrowed under a BPC loan for its revenue-generating activities.  More specifically, BlockFi has the right, without further notice to a BPC client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any amount of digital assets borrowed under a BPC loan, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of digital assets.

42.    BPC loan agreements are with (and administered by) either BlockFi Lending (U.S. clients) or BlockFi Intl. (non-U.S. clients).

### d.    BlockFi Retail Client Loans

43.    BlockFi's retail clients are able to borrow U.S. dollar or stablecoins (e.g., USDC, GUSD, or PAX) from BlockFi secured by certain types of digital asset collateral (BTC, ETH, LTC, or PAXG).   U.S.-based loans are serviced by an outside provider, Scratch, while international-based loans are serviced by BlockFi.  BlockFi's retail loans are collateralized at origination as clients may borrow funds with a value of, generally, up to 50% of their collateral. Interest rates for retail loans are based on the level and type of digital asset collateral.

44.    BlockFi's retail loans are subject to margin calls and/or liquidation based on specified loan-to-collateral value ratios.  If a client with a BIA elects to use as collateral digital assets that have been transferred to BlockFi through the BIA, the digital assets will cease to earn

interest.  Once a client has repaid a retail loan in full, he or she can elect to have the loan collateral returned to their BlockFi Wallet.  For U.S. retail clients, once collateral is released, it cannot be sent to their BIA from the BlockFi Wallet to earn interest.  For non-U.S. retail clients, however, once collateral is released, it can be transferred to the BIA from the BlockFi Wallet to earn interest.

45.    BlockFi has the right to redeploy retail client loan collateral for its revenue-generating activities.  More specifically, BlockFi has the right, without further notice to a retail loan client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any retail client loan collateral, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of assets.

46.    Since March 2022, all non-U.S. client retail loan agreements have first been entered into with BlockFi Lending, and then assigned to BlockFi International (non-U.S. client retail loan agreements entered into before March 2022 were also assigned by BlockFi Lending to BlockFi International.).

### e.    BlockFi Retail Client Trading

47.    BlockFi's retail clients can buy, sell, and exchange digital assets supported by BlockFi.  BlockFi acts as principal in trading transactions with retail clients and may earn a spread from the prevailing market price in these transactions.



48.    Retail trading agreements are with (and administered by) either BlockFi Trading (U.S. clients) or BlockFi Intl. (non-U.S. clients).  BlockFi Trading typically executes trades for all digital assets BlockFi supports in the U.S.  BlockFi Intl. also can execute trades for digital assets BlockFi supports in the U.S., and BlockFi Intl. executes all trades for digital assets BlockFi supports for only non-U.S. clients.

### f.    BlockFi Rewards Card Program

49.    The BlockFi Credit Card Rewards Program (the "Rewards Program") allows certain eligible U.S. clients to earn Points, which are redeemed for cryptocurrency rewards.  To participate in the Rewards Program, eligible clients must: (a) have a BlockFi Wallet; (b) apply for and be issued a BlockFi Rewards Visa® Signature Card (the "Rewards Card"); (c) hold their Rewards Card in good standing; and (d) not be past due by more than two monthly payments on their Rewards Card at the time of earning Points or redeeming such Points.  Clients earn Points, which are redeemed monthly for cryptocurrency at the then-current market price(s) (subject to applicable spreads, charges, or fees), by using the Rewards Card on certain qualifying purchases.

50.    BlockFi's Crypto Rewards Account ("Rewards Account") is a non-interest-bearing account that allows clients to hold cryptocurrency earned from the Rewards Program.  All Rewards are automatically transferred from the Rewards Account to the BlockFi Wallet, monthly.



The Rewards Card

On November 16, 2022, Visa sent BlockFi a letter purporting to terminate the parties' relationship. The Debtors have reserved all rights, but the BlockFi Rewards Visa is no longer active.

## 2.    Institutional Clients

51.    Like retail clients, BlockFi institutional clients can also open a BlockFi Wallet to store digital assets or earn interest through interest earning accounts.  But given the more bespoke needs of its institutional clients, BlockFi also offers a custom suite of services as well.

52.    BlockFi requires institutional clients to complete a rigorous onboarding process, including anti-money laundering and sanctions screenings, before borrowing.  Each client also undergoes credit due diligence, and BlockFi's credit risk underwriting team sets credit limits. Based on the results of BlockFi's diligence process, BlockFi may require borrowers to provide collateral for lending activity ranging from zero to more than 100% of the loan principal (as appropriate).

53.    BlockFi's financing desk enables qualifying institutional clients like hedge funds, market makers, proprietary trading firms, over-the-counter trading desks, and other corporations to obtain digital asset or U.S. dollar financing.  Interest on those loans is typically fixed and payable in kind, monthly in arrears, and durations on those loans are often under a year.

54.    BlockFi also offers institutional clients custom trading services with advanced trading features such as real-time quotes, a variety of order types, and trading algorithms through either voice, a web interface, or application programming interface.  BlockFi either acts as a principal or agent in trading transactions with its institutional clients and may earn a spread from the prevailing market price in connection with these transactions.  As it would with retail client trading, BlockFi would either enter a hedging transaction or internalize the trade itself.

## B.    BlockFi's Approach to Risk Management

55.    In connection with providing the services listed above to clients, BlockFi maintains well-developed, transparent risk management procedures and policies that are described in detail on the firm's website.  *See* https://blockfi.com/in-depth-look-at-blockfis-risk-management.

BlockFi's risk management processes have been enhanced and updated over time as BlockFi has grown and learned from its accumulated experience and expertise.

56.     For example, in 2020 and early 2021, BlockFi experienced losses associated with investments and loans collateralized by Grayscale shares as spreads widened against the price of underlying Bitcoin.   Recognizing the need for better controls, BlockFi reorganized its risk governance, hired a new risk officer and risk management staff, and enhanced the transparency of its procedures and risk protocols.   BlockFi's board of directors established a dedicated Audit and Risk Committee to set risk appetite and manage financial and non-financial risks across BlockFi's institutional and retail businesses.

57.     The Audit and Risk Committee is directly responsible for, among other things:

- overseeing the audit of BlockFi's consolidated financial statements by an independent registered accounting firm;

- considering the adequacy and effectiveness of internal controls;

- reviewing and overseeing BlockFi's policies related to its enterprise risk management framework, setting the risk appetite for the company, and monitoring the company's risk profile, risk exposure and compliance risks; and

- reviewing related party transactions.

58.     The risk management function at BlockFi is independent from BlockFi's core business and reports to the CEO and to the Audit and Risk Committee.   The risk management team uses a comprehensive framework to identify and manage liquidity risk, credit risk, market risk, and enterprise risk, which (again) is publicly disclosed.   Those leading BlockFi's risk management function are veterans of the traditional financial industry with decades of experience in identifying and managing risk in credit and trading operations in accordance with the company's risk governance and risk appetite.

III.    **The Debtors' Prepetition Corporate and Capital Structure**

A.      **The Debtors' Corporate Structure**

59.     As set forth on the structure chart attached as **Exhibit B**, BlockFi Inc. has twelve

wholly-owned subsidiary entities that are organized under the laws of Delaware, Bermuda,

England and Wales, Cayman, and Singapore.  BlockFi Inc. currently directly or indirectly owns

100% of the equity in each of the other Debtors.  BlockFi Inc. also owns 100% of the equity in

non-Debtors BlockFi Holding UK Limited (directly) and BlockFi Cayman LLC, BlockFi UK Ltd.,

and BlockFi Asia PTE Ltd. (indirectly), and 50% of non-Debtor BV Power Alpha LLC.

60.     Before the addition of the Independent Directors, described below, the Board of

Directors of BlockFi Inc. (the "Board") was made up of BlockFi's co-founders Zac Prince and

Flori Marquez, Tony Lauro, who formerly served as BlockFi's CFO, and Jennifer Hill.

61.     The operations of the Debtor entities are interrelated, regularly requiring transfers

and transactions between the different Debtor entities (together, the "Intercompany Transactions").

The primary Debtor entities involved in the Intercompany Transactions are: BlockFi Inc. (a

Delaware entity); BlockFi Trading (a Delaware entity); BlockFi Wallet (a Delaware entity);

BlockFi Lending (a Delaware entity); and BlockFi Intl. (a Bermuda entity).

62.     The intercompany balances generally arise from several different types of

transactions and intercompany agreements (some of which are described above in Section II.A),

such as agreements related to the execution of trades in various cryptocurrencies, intercompany

service agreements, and capital contributions pursuant to capital contribution agreements.  During

the prepetition period, the Debtors tracked these transactions, and their books and records reflect

intercompany balances between entities, including balances believed to be owed and due between

certain of the Debtor entities as of the Petition Date.

63.    Recognizing that the historical Intercompany Transactions and accompanying intercompany balances create the possibility of actual or perceived conflicts between the different entities during the course of these chapter 11 cases, the Debtors took steps to bolster their corporate governance before the Petition Date.   More specifically, the Debtors installed independent directors or managers, as applicable, at each of BlockFi Inc., BlockFi Trading, BlockFi Wallet, BlockFi Lending, and BlockFi Intl. (collectively, the "Independent Directors"), as follows:

| Entity | Independent Director |
|---|---|
| BlockFi Inc. | Scott Vogel & Jennifer Hill[7] |
| BlockFi Lending | Harvey Tepner |
| BlockFi Wallet | Pamela Corrie |
| BlockFi Trading | Alan Carr |
| BlockFi Intl. | Jill Frizzley |

64.    The Independent Directors, with the assistance of Debtors' counsel Kirkland & Ellis LLP, have been tasked with investigating, among other things, any conflict matters, which will include any material Intercompany Transactions from the prepetition period and any insider transactions.  The Independent Directors will assess whether the Intercompany Transactions give rise to any valuable claims against other Debtor entities, as well as determining the validity and proper treatment of any current intercompany balances.

65.    In addition, as described above, BlockFi Intl. is a Bermuda incorporated company and, as such, its board of directors has determined that it would be appropriate, in parallel with these chapter 11 cases, to petition the Supreme Court of Bermuda (the "Bermuda Court") for the appointment of joint provisional liquidators (the "JPLs") pursuant to section 161(e) of Bermuda's

---

[7]    Ms. Hill has been a member of the BlockFi Inc. Board since 2021.  She was appointed to the Special Committee of the BlockFi. Inc. Board along with Mr. Vogel.  Given her prior connection with BlockFi, however, Ms. Hill will recuse herself from the investigation the Special Committee has commenced related to the June 2022 transactions between BlockFi and FTX and any other work that presents an actual or potential conflict.

Companies Act, 1981 in the near term (the "Bermuda Proceedings"). The JPLs will act as officers of the Bermuda Court and will be required to report to the Bermuda Court from time to time on the progress of the parallel chapter 11 proceedings.

66.     The Bermuda Proceedings are being commenced with a view to ensuring that an orderly restructuring of BlockFi Intl. can be undertaken in the chapter 11 cases. The appointment of the JPLs will trigger a stay of proceedings against BlockFi Intl. under Bermuda law, thereby preventing any party from continuing or bringing proceedings during the reorganization process. The terms of the order sought for appointment of the JPLs provides for the continuation of the current management team during this process, with the JPLs overseeing management.

**B.      The Debtors' Capital Structure**

**1.      The FTX Loan Agreement**

67.     On June 30, 2022, BlockFi Inc., as borrower, entered into a loan agreement with West Realm Shires Inc. (d/b/a FTX US, "FTX US"), as lender (the "FTX Loan Agreement"), which provides for loans (the "Loans") to be made to BlockFi Inc. in an amount of up to $400 million outstanding at any time, of which: (a) $300 million is available for general corporate purposes; and (b) $100 million is available solely to fund BlockFi Inc.'s obligations to its clients (the "Client Payment Obligations"). BlockFi Inc.'s obligations under the FTX Loan Agreement are guaranteed by BlockFi Trading and BlockFi Lending (together, the "Guarantors").

68.     The Loans (a) are *pari passu* in right of payment with all other senior unsecured indebtedness of BlockFi Inc. and the Guarantors and (b) rank junior to the Customer Liabilities.[8]

---

[8]     Customer Liabilities are defined as "obligations to clients incurred by [BlockFi Inc., the Guarantors] or any of [their] Subsidiaries in connection with (x) the BlockFi Interest Account, BlockFi Yield, BlockFi Personalized Yield or BlockFi Wallet products, (y) custody arrangements and collateral arrangements relating to loans made to clients and (z) any other similar products or services provided to clients by [BlockFi Inc., the Guarantors] or any of [their] Subsidiaries."

The Loans bear interest at a fixed rate of 5.00% per annum, payable at maturity.  Loans may be made in USDC, the digital asset issued by the Centre Consortium, and are redeemable 1:1 for U.S. dollar, or other digital asset or fiat currency as mutually agreed to between the parties.

69.     BlockFi Inc. is contractually able to borrow under the FTX Loan Agreement, subject to certain funding conditions, until the earlier of (a) June 30, 2027, (b) any earlier termination of the FTX Loan Agreement in accordance with its terms, or (c) the termination or revocation of the FTX Option Agreement (as defined below) (whether by exercise or otherwise). BlockFi Inc. will be required to repay all outstanding amounts under the FTX Loan Agreement on the earlier of June 30, 2027, or any earlier termination of the FTX Loan Agreement in accordance with its terms (the termination or revocation of the FTX Option Agreement will not result in the termination of the FTX Loan Agreement).

70.     As part of the consideration for the FTX Loan Agreement, BlockFi Inc. entered into an option agreement with FTX US and with respect to certain matters, FTX Trading Ltd (the "FTX Option Agreement").  The FTX Option Agreement provides FTX US the unconditional, irrevocable, and exclusive option, but not the obligation, to acquire BlockFi Inc. by requiring BlockFi Inc. to redeem and cancel all equity securities of BlockFi Inc., other than equity securities issued to FTX US.

71.     On November 8, 2022, the Debtors requested an additional $125 million of borrowings pursuant to the terms of the FTX Loan Agreement, which FTX did not provide.  On November 11, 2022, the various FTX entities began to commence voluntary cases under chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware.

72.    As of the Petition Date, there is approximately $275 million of USD stablecoins[9]

Loans outstanding under the FTX Loan Agreement.

### 2.    Common Stock in BlockFi Inc.

73.    BlockFi Inc. has two types of common equity: (a) common stock (the "Common

Stock") and (b) special voting stock ("Special Voting Stock").  As of the Petition Date, BlockFi

Inc. has 6,508,898 shares of Common Stock outstanding and 1 share of Special Voting Stock

outstanding.  The Special Voting Stock was issued to FTX US under the FTX Option Agreement.

### 3.    Preferred Stock in BlockFi Inc.

74.    BlockFi Inc. has ten series of preferred stock (collectively, the "Preferred Stock").

As of the Petition Date, there are 45,312,958 outstanding shares of Preferred Stock outstanding,

which are held by a variety of institutional investors, as follows:

| Type | Total Shares Outstanding |
| --- | --- |
| Series Seed Preferred | 2,833,977 |
| Series Seed-2 Preferred | 1,167,941 |
| Series A-1 Preferred | 3,109,745 |
| Series A-2 Preferred | 127,210 |
| Series A-3 Preferred | 7,753,114 |
| Series B Preferred | 9,837,208 |
| Series C Preferred | 7,642,144 |
| Series D Preferred | 9,739,310 |
| Series E Preferred | 2,442,193 |
| Series E-1 Preferred | 660,116 |

---

[9]    FTX stated in its First-Day Declaration within its bankruptcy filing that BlockFi borrowed $250 million of FTT. *See* Decl. of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Nov. 17, 2022), Dkt. No. 24, ¶ 17.  That statement is incorrect.

75.    Between 2019 to 2021, BlockFi Inc. completed five preferred stock financing transactions to raise capital, as follows:

- ***Series A Preferred Stock***.  From July to August 2019, BlockFi Inc. sold an aggregate of 13,259,229 shares of its Series A-1 preferred stock, Series A-2 preferred stock, and Series A-3 preferred stock.  BlockFi Inc. issued an aggregate of 3,902,716 shares of Series A-1 preferred stock at a price of $1.0641 per share, 190,815 shares of Series A-2 preferred stock at a price of $1.5722 per share, and 9,165,698 shares of Series A-3 preferred stock at a purchase price of $1.7476 per share for an aggregate purchase price of $20.5 million, of which $16.0 million was paid in cash and $4.5 million was paid through the conversion and cancellation of convertible promissory notes and agreements for future equity issued by BlockFi Inc.

- ***Series B Preferred Stock***.  From January to February 2020, BlockFi Inc. sold an aggregate of 9,907,010 shares of its Series B preferred stock, at a cash purchase price of $3.78952 per share, for an aggregate purchase price of $37.5 million.

- ***Series C Preferred Stock***.  From August to September 2020, BlockFi Inc. sold an aggregate of 7,081,821 shares of Series C preferred stock, at a cash purchase price of $9.5138 per share, for an aggregate purchase price of $67.4 million.

- ***Series D Preferred Stock***.  From March to May 2021, BlockFi Inc. sold an aggregate of 9,415,382 shares of Series D preferred stock, at a cash purchase price of $58.737 per share, for an aggregate purchase price of $553.0 million.

- ***Series E Preferred Stock***.  From July to August 2021, BlockFi sold an aggregate of 2,442,193 shares of Series E preferred stock and 660,116 shares of Series E-1 preferred stock, in each case at a cash purchase price of $75.7442 per share, which included 1,551,147 warrants, each of which grants the holder the right to purchase either a share of Series E preferred stock or a share of Series E-1 preferred stock, at the holder's option, in each case at a strike price of $75.7442 per share, for an aggregate purchase price of $235.0 million.

76.    In connection with certain of the foregoing preferred stock financing transactions, BlockFi Inc. repurchased certain classes of Preferred Stock and Common Stock in varying amounts for cash consideration.

IV.    **Events Leading to Bankruptcy**

77.    Many cryptocurrencies experienced significant decline through 2022.  Just by way of example, Bitcoin has slumped approximately 65% year-to-date.  A chart showing the decline in Bitcoin prices between January 1, 2022 and November 25, 2022[10] is copied below:



78.    As investor pessimism grew—exacerbated by the collapse of 3AC (defined below), the Voyager and Celsius bankruptcy filings, and ultimately FTX's implosion—the cryptocurrency industry experienced significant declines.  Declining investor confidence in the industry more broadly led significant numbers of BlockFi's clients to withdraw from its product offerings:



---

10    https://ycharts.com/indicators/bitcoin_price (Nov. 25, 2022)

79.     These market headwinds drove BlockFi to take several actions throughout the year that would enable it to acquire the liquidity necessary to protect its clients' accounts (detailed below). These chapter 11 cases are the latest such action.

80.     For BlockFi, 2022 can be split into two acts that culminated in these filings: first, the overall cryptocurrency industry incidents that led BlockFi to seek additional liquidity, which was ultimately provided by FTX, and second, the collapse of FTX.

### A.     Act One: Overall Industry Pullback

81.     Crypto's 2022 pullback began with the collapse of Luna, a cryptocurrency issued by Terra, an open-source blockchain protocol. Terra issued the cryptocurrency Luna to execute transactions on the Terra blockchain. In early May 2022, Luna was trading at $86 per token and had a market capitalization of approximately $14 billion. Along with Luna, Terra issued TerraUSD ("UST"), an algorithmic stablecoin that was pegged at $1.

82.     On May 7, 2022, $2 billion of UST was unstaked and immediately sold. This dropped UST's price to $0.91. UST holders saw the "de-peg" and rushed to unstake and sell their coins.

83.     Traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in its price. Simultaneously, other traders attempted to repeg Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna and further exacerbated its price decline. In one week, Luna's price fell from $82.55 to $0.000001 per token, eliminating $18 billion of value in the cryptocurrency sector.

84.     Many cryptocurrency-focused hedge funds, and other cryptocurrency companies, owned Luna. Some were unable to sell their Luna under staking agreements and were forced to incur up to a 99% loss on their investment. And approximately a month later, reportedly due in part to the collapse of Luna, a major player in the space, Three Arrows Capital ("3AC") collapsed.

85.     On June 15, 2022, 3AC confirmed that it had suffered at least some loss from the Luna collapse and that it had hired legal and financial advisors to explore potential liquidity solutions.  Shortly thereafter, on June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

86.     In addition to 3AC, several prominent cryptocurrency lenders faced challenges in June and July 2022.  On June 12, 2022, Celsius announced that it was pausing client withdrawals, sparking market volatility and widespread speculation about contagion among cryptocurrency lenders.  On July 1, 2022, Voyager, a cryptocurrency brokerage and lender publicly listed on the Toronto Stock Exchange, announced it was pausing customer trading, deposits, and withdrawals.  On July 5, 2022, Voyager filed for chapter 11.  On July 13, 2022, Celsius also filed for chapter 11.

87.     BlockFi had no direct exposure to Celsius, Luna, Terra, or Voyager, outside of offering clients facing BlockFi International the ability to trade Luna on its retail trading platform.  During this period of market disruption, BlockFi took swift action to de-risk itself of exposure to 3AC, but could not totally evade the harm.  3AC was one of BlockFi's largest borrower clients, and its collapse, along with several other borrowers, led to material losses for BlockFi.  The collapse of UST, along with the halting of withdrawals and bankruptcies of Celsius, Voyager and 3AC, led to significant customer withdrawals from BlockFi.

88.     While BlockFi was able to withstand the loss from 3AC and other borrowers and process all customer withdrawals within the normal periods set forth in its customer agreements, it prudently sought additional liquidity to protect its client accounts into the indefinite future.

89.     BlockFi first attempted to obtain equity financing from third-party investors in a new financing round.  But due to the unfavorable market and investor pessimism, these attempts were unsuccessful.  BlockFi then considered several other potential transactions.  This rapid

financing process led to an offer from FTX to essentially backstop customer withdrawals: FTX US committed to loan up to $400 million notional amount of cryptocurrencies to BlockFi on a junior basis to BlockFi's obligations to its clients, while FTX US received an option to acquire BlockFi, which FTX US would have been permitted to exercise as early as July 2023. The FTX transaction was supported by BlockFi's shareholders, who voted 89% in favor of the transaction.

90.     The offer imposed steep costs on BlockFi personnel and shareholders. To secure liquidity for its clients, BlockFi's executives and employees were required to (and did) sacrifice hundreds of millions of dollars of their own equity value. BlockFi accepted the offer because— for BlockFi's leadership and employees—client protection remains paramount. The offer from FTX was determined to be the best and most viable by BlockFi's management team and Board of Directors. In addition, BlockFi significantly reorganized its workforce, reducing headcount by over 20% in a further effort to protect client value and chart a return to profitability.

91.     Support from FTX, with its highly visible brand, bolstered customer confidence in the strength and safety of BlockFi's platform. And indeed, throughout the summer of 2022, BlockFi maintained its operations while several other trading platforms and exchanges were forced to declare bankruptcy. Unfortunately, FTX's apparent "rescue" was short-lived.

**B.      Act Two: Collapse of FTX and the Debtors' Response**

92.     Before the "rescue" transaction with FTX, BlockFi acted as a lender to Alameda, one of the FTX companies (starting in 2019) and traded on the FTX platform (starting in 2021). The amounts of BlockFi's loans to Alameda have varied over time and typically consisted of digital assets (primarily BTC and ETH) and USD-denominated stablecoins. As part of BlockFi's credit evaluation process, BlockFi received unaudited quarterly financial statements and certain verifiable financial information, such as cryptocurrency wallet addresses, and had regular dialogue

with Alameda staff, who made ongoing representations regarding its financial standing, significant

equity capital, and unencumbered assets on Alameda's balance sheet.

93.    On November 2, 2022, public reports began to circulate citing leaked, internal

financial statements and questioning the health and liquidity of both FTX and Alameda Research.

That and other public reporting began a death spiral for FTX.  Binance, FTX's largest rival, soon

stated that it would liquidate its entire position in FTT, FTX's native exchange token.[11]  Binance's

founder compared FTT to Luna, stating: "Liquidating our FTT is just post-exit risk management,

learning from LUNA.  We gave support before, but we won't pretend to make love after divorce."[12]

After Binance's announcement, many investors followed suit.  In 2 days, FTT fell from trading at

$22.06 to $3.38:



---

[11]    @CZ_Binance, Twitter (Nov. 6, 2022) ("Due to recent revelations that have came to light, we have decided to
liquidate any remaining FTT on our books.")

[12]    @CZ_Binance, Twitter (Nov. 6. 2022)

94.     On November 8, FTX's CEO stated publicly that, among other things, FTX was experiencing a "liquidity crunch" due to user withdrawals.[13]  Hoping to stall the collapse, FTX sought to be acquired by Binance.  While Binance reportedly signed a non-binding letter of intent, it later demurred, stating publicly that "[a]s a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com."[14]  On November 11, FTX began filing for bankruptcy.[15]

95.     The first-day Declaration in FTX's Delaware proceedings would make clear why. Filed on November 17, 2022, the new CEO, John J. Ray III, explained, "[n]ever in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to concentration of control in the hands of a very small group of inexperienced, unsophisticated, and potentially compromised individuals, this situation is unprecedented."[16]

96.     As in the previous episode of market stress, BlockFi took several proactive measures to attempt to limit its exposure to FTX and Alameda through a combination of margin calls and recalls of open-term loans.  In early November 2022, BlockFi made an additional borrowing request per the terms of the FTX Loan Agreement, which was not honored.  Alameda thereafter defaulted on approximately $680 million of collateralized loan obligations to BlockFi, the recovery on which is unknown.

---

[13]   @SBF_FTX, Twitter (Nov. 8, 2022).

[14]   @Binance, Twitter (Nov. 9, 2022).

[15]   @SBF_FTX, Twitter (Nov 11, 2022).

[16]   Declaration of John J. Ray III In Support of Chapter 11 Petitions and First Day Pleadings, *In re FTX Trading LTD.*, No. 22-11068, ¶ 5 (Bankr. D. Del. Nov. 17, 2022).

97.     In response to failures of the FTX companies to meet their obligations to BlockFi, BlockFi again faced a liquidity shortage.  So, to avoid a disorderly series of withdrawals that would harm many clients, on November 10, 2022, BlockFi decided to limit platform activity, including pausing customer withdrawals, as allowed under BlockFi's terms.[17]

98.     The FTX companies began commencing chapter 11 cases in the United States Bankruptcy Court for the District of Delaware early in the morning on November 11, 2022.[18] Recognizing that BlockFi could not due to these and other circumstances restore its liquidity alone, BlockFi's Board and management sought the support of veteran restructuring advisors to navigate its uncertain position, proceeding to engage BRG, Kirkland & Ellis LLP, longtime corporate counsel Haynes and Boone LLP, Cole Schotz P.C. as New Jersey Counsel, and Moelis & Company to assist with contingency planning and liquidity management, among other tasks.  Ultimately, BlockFi, with the aid of its advisors, determined the commencement of these cases was necessary to protect its clients and maximize value for all stakeholders.

99.     In preparation for these chapter 11 cases, BlockFi took steps to liquidate certain of its owned cryptocurrency to bolster available cash to fund its business and administrative costs. Through this process, BlockFi was able to raise $238.6 million of additional cash, for a total unencumbered cash position as of the Petition Date of $256.5 million.  BlockFi currently expects that this cash position will be sufficient to fund the costs of these chapter 11 cases and is not seeking approval of debtor-in-possession financing at this time.

---

[17]    November 11, 2022 BlockFi Update (Nov. 11, 2022), https://blockfi.com/november-11-2022-blockfi-update

[18]    *In re FTX Trading, Ltd.*, No. 22-1068 (JTD) (Bankr. D. Del. Nov. 11, 2022).  Filings of various other entities related to FTX continued for several days.  The first day hearing in the FTX bankruptcy cases occurred on November 22, 2022.

100.    The challenges faced by cryptocurrency firms this year have been unprecedented for their industry.  BlockFi's careful actions and decisive planning offer reason to believe that BlockFi clients may ultimately recover a substantial portion of their investments as BlockFi aims to maximize value for its constituents and position its business for success into the future.

101.    Following the Petition Date, the Debtors will continue to analyze and expeditiously pursue an appropriate exit strategy.  In part because of the careful work, prudent stewardship, and risk management processes implemented by BlockFi prepetition, the Debtors believe they are well-positioned to maximize value for stakeholders.  Accordingly, the Debtors have filed a proposed Plan of Reorganization on the first day of these chapter 11 cases that, if confirmed, would allow the Debtors to emerge as reorganized debtors on the most expedited timetable that is realistic. Recent revelations and things-still-unknown regarding FTX (and the cascading impact thereof on cryptocurrency markets) cloud that path, but the Debtors will fight to maximize client recoveries. The Debtors, with the assistance of their advisors, will also consider all strategic alternatives and third-party solutions that emerge during the course of these cases.

**<u>Evidentiary Basis for Relief Requested in the First Day Motions</u>**

102.    Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Motions seeking relief to minimize the adverse effects of the commencement of these chapter 11 cases on their business and to ensure that their reorganization strategy can be implemented with limited disruptions to operations.

103.    Approval of the relief requested in the First Day Motions is critical to the Debtors' ability to continue operating their business with minimal disruption and thereby preserve value for the Debtors' estates and various stakeholders. I have reviewed each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to make certain essential payments, and otherwise continue their business operations as sought in the First Day Motions.  A list of the First Day Motions is set forth on **<u>Exhibit A</u>** attached hereto and Exhibit A is incorporated herein by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  November 28, 2022

By: */s/  Mark A. Renzi*
Name: Mark A. Renzi

Title: Managing Director and the Head of the Corporate Finance Financial Institutions Group

Berkeley Research Group, LLC

# **EXHIBIT A**

**First Day Motion Support**

## <u>Evidentiary Support for First Day Motions</u>

1.      Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases (the "Chapter 11 Cases").  The First Day Motions include the following:[1]

- **Joint Administration Motion.** *Debtors' Motion for Joint Administration*;

- **Case Management Motion.** *Debtors' Motion to Establish Certain Notice, Case Management and Administrative Procedures*;

- **Creditor Matrix Motion.** *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders and (V) Granting Related Relief*;

- **Schedules/SOFAs Extension Motion.** *Debtors' Motion for Entry of an Order Extending the Time to File Schedules and Statements*;

- **Notice & Agent Application.** *Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date*;

- **Cash Management Motion.** *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use of Existing Business Forms and Records, (B) Maintain Existing Corporate Bank Accounts and Cash Management System, (C) Pay Prepetition Bank Fees Associated with the Cash Management System, and (D) Continue Performance of Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Waiving Certain U.S. Trustee Requirements*;

- **Wages Motion.** *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable*

---

[1]   Capitalized terms used but not defined herein have the meaning ascribed to such terms in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "<u>Renzi Declaration</u>") to which this is attached as <u>Exhibit A</u>.

*Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief;*

- **Insurance Motion.** *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtors to (I) Continue, Renew, or Supplement Insurance Policies, (II) Pay Insurance Premiums Thereon, (III) Continue, Renew, or Supplement the Surety Bond Program, and (IV) Granting Related Relief;*

- **Critical Vendors Motion.** *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Claimants and (II) Granting Related Relief;*

- **Tax Motion.** *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Bankruptcy Code §§ 105(a), 363(b), 507(a)(8), and 541(d);*

- **NOL Motion.** *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief;*

- **Automatic Stay Motion.** *Debtors' Motion Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (II) Granting Related Relief;* and

- **Utilities Motion.** *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366(I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment.*

2.      These First Day Motions seek authority to, among other things, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers to ensure that the Debtors' business operations are not disrupted by the Chapter 11 Cases, and continue the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible.  The Debtors have tailored their requests for immediate relief to those circumstances where the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  An immediate and orderly transition into chapter 11 is

critical to the viability of the Debtors' operations and any delay in granting the relief described in

the First Day Motions would hinder the Debtors' operations and cause irreparable harm.  The

failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would

severely disrupt the Debtors' operations at this important juncture.

3.       I am familiar with the content and substance contained in each First Day Motion

and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate

in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical

element of the Debtors' successful reorganization, and (c) best serves the Debtors' estates.  I have

reviewed each of the First Day Motions and the facts set forth therein are true and correct to the

best of my knowledge.  I incorporate the facts stated in each of the First Day Motions herein in

their entirety by reference.  If asked to testify as to the facts supporting each of the First Day

Motions, I would testify to the facts as set forth in such motions.

*[Remainder of page intentionally left blank]*

<u>**EXHIBIT B**</u>

**Corporate Structure Chart**





## <u>EXHIBIT C</u>

**Timeline of Key Events**

