| | |
|---|---|
| **COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq. (NJ Bar No. 014321986)<br>Warren A. Usatine, Esq. (NJ Bar No. 025881995)<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>(201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com | **HAYNES AND BOONE, LLP**<br>Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)<br>Kenric D. Kattner, Esq. (*pro hac vice* pending)<br>30 Rockefeller Plaza, 26th Floor<br>New York, New York 10112<br>(212) 659-7300<br>richard.kanowitz@haynesboone.com<br>kenric.kattner@haynesboone.com |
| **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (*pro hac vice* pending)<br>Christine A. Okike, P.C. (*pro hac vice* pending)<br>601 Lexington Avenue<br>New York, New York 10022<br>(212) 446-4800<br>jsussberg@kirkland.com<br>christine.okike@kirkland.com | *Proposed Attorneys for Debtors and Debtors in Possession* |

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>                    Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Joint Administration Requested)<br><br>**Hearing Date and Time:** |

# DEBTORS' MOTION FOR
# ENTRY OF AN ORDER (I) APPROVING THE DEBTORS'
# RETENTION PROGRAMS AND (II) GRANTING RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

    The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (the "Motion"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**Relief Requested**

1. The Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"): (a) approving and authorizing the Debtors' proposed key employee retention plan (the "KERP"), (b) approving and authorizing the Debtors' proposed target retention program (the "TRP" and together with the KERP, the "Retention Programs"); (c) authorizing the Debtors to make payments to certain non-insider employees under the Retention Programs; and (d) granting related relief.[2]

**Preliminary Statement**

2. The Debtors operate as a lender in the digital asset space, which, after exponential growth over recent years, now faces unprecedented turmoil. As detailed in the First Day Declaration, the Debtors have been swept into this turmoil following the shocking collapse of FTX Trading Ltd. and its affiliates (together, "FTX"). Even before the collapse of FTX, upheaval in the digital asset space placed the Debtors' ability to retain key employees in jeopardy. Entering bankruptcy exacerbates those challenges. Moreover, the Debtors have very recently taken the extraordinarily difficult step of engaging in a substantial reduction in force in which approximately two-thirds of the Debtors' work force will be terminated. In short, the Debtors have reached a space where retention of remaining employees is not only a priority but an absolute necessity for preserving and growing the value of the estate.

3. The retention challenges facing a digital asset company, let alone one filing for bankruptcy, are myriad. Even compared to peer firms in the digital asset space, the Debtors have a workforce that is exceptionally hard to replace due to their employees' institutional knowledge, understanding of this complex industry, and specialized fit in the Debtors' culture. To attract the

---

[2] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration").

2

very particular type of individual that will be able to perform as a member of the Debtors' workforce, the Debtors have historically provided attractive compensation and bonus packages that typically included option grants commensurate with an employee's position—which, over the course of the last several years, suggested a potential for exponential returns. Now, the Debtors face the challenge of retaining their key employees without that attractive "upside" that existed during the recent boomtimes for digital asset companies.

4.  Even prior to the commencement of these Chapter 11 Cases, the Debtors experienced a significant amount of employee turnover, both in the face of its workforce restructuring as well as voluntary departures. As of the Petition Date, the Debtors' annualized turnover by employee headcount was staggering, and the departed-to-remaining employee turnover year to date amounts to 105.2 percent. This figure accounts for the reductions that took place after a transaction with FTX, which according to its terms, required significant workforce reduction. Additionally, in 2022, the year-to-date cumulative voluntary turnover was 34.8 percent, reflecting a significant increase from the 2021 cumulative voluntary turnover of 17.9 percent.

5.  Further, the Debtors' current employees have become exceptionally difficult and expensive to replace. Attracting a technically talented engineer to take a position at a digital asset-based company after the collapse of other key players is nearly impossible, let alone at a company in the midst of restructuring proceedings that undertook two deep-cutting reductions in force over the course of the past year. One might hypothesize that, in the wake of multiple cryptocurrency exchange bankruptcies, alternative employment opportunities have evaporated. Not so. Particularly now, the Debtors' key employees have more alternative job options available to them than ever since the expertise, qualifications, and skills necessary to competently operate a sophisticated digital asset trading platform are in high demand, not only by the Debtors' competitors, but also by hedge funds, traditional finance firms, and technology companies that

seek to hire employees who better understand the volatilities in the digital asset space. The Debtors cannot compete in this competitive recruitment environment without appropriate incentives.

6. The Debtors' recent reductions in force only intensify these challenges. By undergoing the difficult but necessary recent reduction of roughly two-thirds of the workforce, the Debtors will achieve significant cost savings, but also levy additional burdens on their top performing employees. Not only will these employees take on many responsibilities from the terminated employees, but also the responsibilities that come with navigating a chapter 11 bankruptcy. Simply put, the Debtors have trimmed down to only key employees, and they badly need to retain those key employees.

7. In light of the aforementioned, the Debtors have identified crucial non-insider employees to include in their Retention Programs in two categories: (a) those that will receive compensation based on 50% of their base salary (the "Tier 1 Participants") and (b) those that will receive compensation based on 10% of their base salary (the "Tier 2 Participants," together with Tier 1 Participants, the "Participants"). The Debtors believe the Participants must be retained to preserve the value of the Debtors' estates and avoid irreparable harm as the Debtors pursue the value maximizing transactions contemplated by these Chapter 11 Cases. Though the Debtors' trading platform is frozen, the Debtors' employees continue to perform necessary maintenance and updates and prepare the Debtors' platform for post-emergence operations. The Debtors' employees are also working closely with the Debtors' advisors to, among other things, facilitate the administration of these Chapter 11 Cases and satisfy all chapter 11 reporting obligations. Without the continued efforts of the Debtors' employees, the Debtors will not have an operational trading platform or the capability of serving customers at the conclusion of these Chapter 11 Cases. The Debtors' ability to reinitiate and reimagine their operations is crucial to the Debtors' post-

4

emergence success. Accordingly, retaining key employees is critical to the Debtors' reorganizational efforts and, ultimately, the Debtors' viability as a trading platform.

8. Importantly, the Retention Programs comply with the requirements and mandates of the Bankruptcy Code. The Debtors have worked with their advisors, including their independent compensation consultant Willis Towers Watson US LLC ("WTW"), financial advisor Berkeley Research Group, LLC, and external legal counsel Kirkland & Ellis LLP, to develop an incentive plan that is market-based, consistent with competitive practices, and compliant with the Bankruptcy Code (as defined herein), to advise on and structure the proposed Retention Programs. The Debtors and their advisors reviewed market data and analyses regarding compensation levels and program structure. In light of the Debtors' circumstances and restructuring process, the Debtors and their advisors have concluded that implementation of the Retention Programs is appropriate and necessary under the circumstances.

9. The Retention Programs comply with the applicable provisions of the Bankruptcy Code, are similar to retention plans recently approved in recent Chapter 11 Cases across the bankruptcy circuit, are justified by the facts and circumstances of these Chapter 11 Cases and are within the Debtors' sound and reasonable business judgment. For these reasons and the reasons set forth below, the Debtors respectfully request the Court enter an Order authorizing the Debtors to implement the Retention Programs.

**Jurisdiction and Venue**

10. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.). The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court,

5

absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12. The bases for the relief requested herein are sections 105(a), 363(b), and 503(c) of title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

13. On November 28, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth in greater detail in the First Day Declaration, filed substantially contemporaneously herewith and incorporated by reference herein.

14. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

**The Retention Programs**

**I.    Overview.**

15. Of the Debtors' 374 current employees and independent contractors, the Debtors have designated 95 key employees as Participants in the KERP (the "KERP Participants") and 32 key employees as Participants in the TRP (the "TRP Participants"). Those with existing legacy bonus incentives—including those retention programs implemented in the wake of the FTX

transaction—are included in the KERP, while those with no previous legacy bonus incentives are included in the TRP.  The Participants perform a variety of important business functions that are vital to the Debtors' ability to preserve and enhance stakeholder value.  Many of the Participants have developed valuable institutional knowledge regarding the Debtors' operations that would be difficult and expensive to replace, particularly on an expedited basis.  The Participants are also essential to the successful administration of the Debtors' Chapter 11 Cases.  Moreover, the cost of the KERP and the TRP on a Participant-by-Participant basis is likely significantly less than the cost of replacing each Participant.

16. The Debtors believe that the Participants may be motivated to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to, among other things, the elimination of equity compensation pursuant to the FTX transaction, the uncertainty created by the Debtors' ongoing reorganization efforts and the recent, and significant, reduction in force efforts initiated prior to the commencement of these Chapter 11 Cases.  Additionally, the Participants base salary alone would leave them behind market compensation rates.  Accordingly, the Debtors submit that the Retention Programs will increase the likelihood that the Participants are not disadvantaged by recent events, and are properly incentivized to remain with the Debtors during these Chapter 11 Cases, thereby preserving value for the Debtors, their estates, and their stakeholders.  Indeed, without the Retention Programs, the Debtors do not believe they can retain a sufficient number of employees to navigate these cases.

17. The group of employees that makes up the Participants was specifically selected by the Debtors, with the assistance of WTW and their advisors, for their institutional knowledge and ability.  Moreover, in light of the pending reduction in force (approximately two-thirds of the employee workforce), the Participants have been charged with operating the Debtors' business with a fraction of the labor and resources they are accustomed to.  Accordingly, the Debtors submit

that the Retention Programs are vital to motivate the Participants to remain with the Debtors and address their now increased, and all the more difficult, job responsibilities.

18. No Participant is an insider as that is term is defined in section 101(31) of the Bankruptcy Code. Although certain Participants have titles incorporating the word "head," "director," "vice president," or "chief," the Debtors have analyzed the relevant function in determining that no Participant is an "insider" of the Debtors. Specifically, no Participants in the proposed Retention Programs are employees who: (a) are appointed or hired directly by the Debtors' board of directors; (b) exercise managerial control over, or have responsibility for, the Debtors' operations as a whole; or (c) establish the Debtors' overall corporate policy or governance.

## II. The Retention Programs.

19. The cost of the KERP is approximately $9,900,129 in the aggregate, and the cost of the TRP is $2,425,000 in the aggregate, assuming all Participants are successfully retained and earn the proposed payments. The key terms of the Retention Programs are as follows:[3]

- *Participants*: The KERP is limited to 95 non-insider key employees who will remain with the go-forward business, or approximately 25 percent of the Debtors' current workforce (prior to expected reduction in force measures being taken). The TRP is limited to 32 non-insider key employees who will remain with the go-forward business, or approximately 8 percent of the Debtors' current workforce (prior to expected reduction in force measures being taken). Each Participant is a crucial employee that performs, among other things, treasury, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions for the Debtors.

- *Awards*: The Participants' awards represent fixed cash amounts payable based on continued employment of the Participant through the applicable payment dates (except as provided below). The awards are equal to 50 percent of base

---

[3] Any description of the Retention Programs contained in this Motion is provided for purposes of convenience only. In the event of any inconsistency between the summary contained herein and the terms and provisions of the Retention Programs, the terms of the Retention Programs shall control unless otherwise set forth herein, *provided* that the terms relating to the total amount of the Retention Programs and the timing of payments provided in this Motion shall control.

8

salary of Tier 1 Participants (approximately 113 Participants) and 10 percent of base salary of Tier 2 Participants (approximately 14 Participants).

- *Payment Dates*: 50 percent of Tier 1 Participants' awards will be paid immediately, subject to a clawback until the 6-month anniversary of the Court approval date, on the effective date of the Retention Programs, with the remaining 50 percent to be paid at the earlier of the date that is (i) twelve months after the effective date of Court approval of the Retention Programs and (ii) 30 days following emergence from these Chapter 11 Cases. Tier 2 Participants shall receive 100% of the award upon Court approval of the Retention Programs.

- *Termination of Employment*:

    - *Tier 1 Participant:* If a Tier 1 Participant is terminated without cause (including due to death or disability) or resigns for good reason, in each case, within the first 6-month period, the Tier 1 Participant will remain entitled to the retention payment attributable to such first 6-month period (*i.e.*, no clawback will apply). A Tier 1 Participant whose employment is terminated without cause (including due to death or disability) or who resigns for good reason, in each case, within the second 6-month period, will remain entitled to the retention payment attributable to such second 6-month period. A Tier 1 Participant whose employment is terminated for cause or who resigns without good reason during the first 6-month period will be required to repay 100% of the retention payment attributable to such first 6-month period; a Tier 1 Participant whose employment is terminated for cause or who resigns without good reason within the second 6-month period will not be entitled to the retention payment attributable to such second 6-month period.

    - *Tier 2 Participant*: A Tier 2 Participant whose employment is terminated without cause (including due to death or disability) or who resigns for good reason will not be required to repay any portion of the retention payment. A Tier 2 Participant whose employment is terminated for cause or who resigns without good reason will be required to repay 100% of the retention payment.

**III.    Reasonableness of the Retention Programs.**

20.    The Debtors, WTW, and the Debtors' other advisors reviewed the Retention Programs to determine whether the design, structure, and cost of the Retention Programs are reasonable and consistent with market practice. The Debtors designed the Retention Programs with the goal of maximizing the value of their estates for the benefit of all interested parties and

9

ensuring that the Debtors will be able to operate their business in the ordinary course upon emergence from these Chapter 11 Cases.

21. The Debtors worked closely with WTW and their advisors to ensure that the Retention Programs are reasonable compared to recently approved postpetition retention plans. WTW benchmarked comparable businesses with $250 million to $1.5 billion in revenue. Based on this review, the Debtors believe that the total cost of the Retention Programs are reasonable relative to market comparables and in response to the market challenges facing the digital asset marketplace.

22. The Debtors submit that the award opportunities in the Retention Programs reflect a reasonable, market-based approach and are justified under the circumstances of these Chapter 11 Cases. Further, the KERP's total cost of approximately $9,667,129 and the TRP's total cost of approximately $2,425,000 are reasonable in absolute terms when compared to the aggregate costs of key employee plans approved in other Chapter 11 Cases. This is especially true in light of the cost savings that will result from the reduction in force.[4]

**Basis for Relief**

**I.    The Retention Programs are a Sound Exercise of the Debtors' Business Judgment.**

23. The Debtors' implementation of the Retention Programs is a sound exercise of their business judgment. Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of estate property under section 363(b)(1) of the Bankruptcy Code, a debtor must show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. *See, e.g.*, *In re Chateaugay Corp.,* 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b)

---

[4]    The costs associated with the Retention Programs will be realized in approximately 4.3 months.

application must find a good business reason to grant such application); *see also In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Glob. Crossing Ltd.,* 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.,* 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason"); *In re Borders Grp., Inc.,* 453 B.R. 459, 473 (S.D.N.Y. 2011) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment.").

24. Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *see also In re Johns-Manville Corp.,* 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

25. The implementation of the Retention Programs is a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and the interests of all stakeholders in these Chapter 11 Cases. The Participants—along with their skills, knowledge, and hard work—are critical to ensuring that the Debtors continue to maximize stakeholder value. The Participants are familiar with the Debtors' business and have the experience and knowledge necessary to ensure that the Debtors will be able to operate their business in the ordinary course

11

upon emergence from these Chapter 11 Cases. The Debtors cannot easily replace the Participants without adversely affecting the Debtors' operating efficiency and distracting management from the Debtors' restructuring efforts. Accordingly, the Debtors' decision to implement the Retention Programs is a valid exercise of business judgment and in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases.

**II.    The Retention Programs Are Justified by the Facts and Circumstances of these Chapter 11 Cases.**

26.    Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Importantly, section 503(c)(3)'s "facts and circumstances" justification test is predicated on a test similar to the business judgment rule. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of the debtors' KERP on basis that debtors showed a "sound business purpose" justified such approval); *In re Borders Grp. Inc.*, 453 B.R. 459, 473–74 (Bankr. S.D.N.Y. 2011) (evaluating debtors' KERP under business judgment rule); *In re Glob. Home Prod., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code (citing *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006))). Accordingly, whether a retention plan is justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtor's business judgment are the same.

27.    In the context of approving compensation programs, courts in the Third Circuit have considered the factors identified in *In re Dana Corp.*, when determining if a compensation proposal and the process for developing it meet the "sound business judgment" test:

12

- Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

- Is the scope of the plan fair and reasonable: does it apply to all employees, or if not, does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 576–77 (Bankr. S.D.N.Y. 2006); *see e.g.*, *In re Glob. Home Prod., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (applying the *Dana* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment); *In re Borders Grp. Inc.,* 453 B.R. at 473–74 (same). No single factor is dispositive, and the Court has discretion to weigh each of these factors based on the specific facts and circumstances before it. *See, e.g.*, *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013). Even the total absence of a factor may be permissible, so long as the interests of the Debtors are sufficiently protected. *See In re Borders Grp., Inc.*, 453 B.R. 459, 477 (finding that the lack of independent counsel was "not fatal" where the presence of other factors ensured "that the [d]ebtors' interests were sufficiently protected."); *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142 (Bankr. E.D.N.Y. 2012) (noting that "the relatively modest size of the proposed bonus payouts made the retention of independent legal counsel economically inefficient."). The Debtors respectfully submit that the proposed Retention Programs satisfy the standard set forth above, each as discussed more fully below.

28.    ***First***, there is a reasonable relationship between the Retention Programs and Debtors' need to retain important employees. The Retention Programs will ensure that the Debtors

13

have the appropriate staff on hand to facilitate the reorganization or sale (whatever comes to pass) and to support the Debtors' operations upon emergence from these Chapter 11 Cases, thereby maximizing value for the Debtors' estates. Despite the fact that the Debtors' trading, and lending custody platform is frozen, the Debtors' employees continue to perform maintenance, updates, and essential security functions to facilitate a successful reorganization or sale as well as prepare the platform for making distributions to creditors and for any post-emergence operations. Failure to retain the Participants would cause the Debtors to incur significant expense and delay in hiring and training replacement employees, which would, in turn, hinder the reorganization to the detriment of all parties in interest. Given the Debtors' historical turnover rates, recent upheaval in the digital asset space, and the Debtors' very recent reductions in force, the Debtors do not believe they will be able to retain these key employees absent the Retention Programs.

29. *Second*, the cost of the Retention Programs is reasonable given the Debtors' balance sheet. WTW engaged in a benchmarking analysis to assist the Debtors with the design of the Retention Programs. The costs associated with the Retention Programs are within the range of market practice as compared to plans proposed and approved at similarly situated companies in chapter 11. Furthermore, the total cost of the Retention Programs is only a fraction of the Debtors' total revenue and liabilities, while the costs, both financial and operational, of losing Participants would be far greater. Accordingly, the costs are reasonable and well-justified given the size of the Debtors' businesses. This is especially true in light of the cost savings that will result from the reduction in force.

30. *Third*, the scope of the Retention Programs is fair and reasonable. As noted herein, the Debtors undertook a careful selection process and received input from their advisors in determining the specific employees that should be eligible. The Debtors have unfortunately had to reduce their workforce down to the most key employees, so the Participants were carefully

14

chosen and represent the portion of the workforce that the Debtors must retain to maximize value for the estate.

31. **Fourth**, the Debtors submit that the Retention Programs are consistent with industry practice. The Retention Programs are cost-effective when compared to retention plans in other, similar chapter 11 cases. With respect to eligibility, metrics, and payout timing, the Retention Programs are similar to other plans recently approved in chapter 11 cases.

32. **Fifth**, the Debtors performed due diligence in determining the need for the Retention Programs. In developing the Retention Programs, the Debtors' management team consulted with key personnel to determine which employees were most critical to retain and most at risk of flight absent any incentive plan. The Debtors then compared their proposed retention awards for Participants against similarly situated companies in chapter 11.

33. **Sixth**, the Debtors relied in part on the independent review of WTW and their other advisors in developing the Retention Programs. Because of this open engagement, the Debtors believe that the interests of their estates have been adequately protected and that the Retention Programs are justified by the facts and circumstances of these Chapter 11 Cases.

34. Accordingly, the Debtors respectfully submit that the Retention Programs satisfy the "sound business judgment standard" identified in *In re Dana Corp*. Indeed, courts in this circuit have routinely granted relief as requested herein. *See, e.g.*, *In re SLT Holdco, Inc.,* No. 20-18368 (MBK) (Bankr. D. NJ. July 22, 2022) (granting the debtors' motion to implement key employee retention program); *In re Dura Automotive Systems, LLC*, No. 19-12378 (KBO) (Bankr. D. Del. Dec. 19, 2019) (same); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Oct. 16, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) (same); *In re American Apparel, LLC,* Case No. 16-12551 (BLS) (Bankr. D. Del. Jan. 4, 2017)

(same); *In re Pacific Sunwear of California, Inc.*, Case No. 16-10882 (LSS) (Bankr. D. Del. May 12, 2016) (same).

**III.    Section 503(c)(1) of the Bankruptcy Code Is Inapplicable to the Retention Programs.**

35.     Because none of the Participants are "insiders" as that term is defined by the Bankruptcy Code, section 503(c)(1) is inapplicable. Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—*i.e.*, those insider plans that are essentially "pay to stay" plans. 11 U.S.C. 503(c)(1). By its terms, section 503(c)(1) of the Bankruptcy Code does not apply where—as is the case here—participants in a retention-based program are not insiders.

36.     Section 101(31) of the Bankruptcy Code provides that where a debtor is a corporation, insiders include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor . . . or (iv) relative of a . . . director, officer or person in control of the debtor." 11 U.S.C. § 101(31)(B). Courts have also concluded that an employee may be an "insider" if such employee "is taking part in the management of the debtor." *In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009). An employee's job title alone does not make such employee an "insider" as defined by the Bankruptcy Code. *See Glob. Aviation*, 478 B.R. at 148 ("The fact that some of the KERP Employees have the word "director" in their titles does not make them insiders. The label an employer chooses to attach to a position is not dispositive for purposes of insider analysis because '[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive.'").

37.     Although certain Participants hold titles including the term "head," "director," "vice president," or "chief," none of the Participants are "insiders," as such term is defined by section 101(31) of the Bankruptcy Code. None of the Participants have discretionary control over substantial budgetary amounts or significant control with respect to the Debtors' corporate policies

16

or governance. Therefore, the Debtors respectfully submit that none of the Participants constitute "insiders" of the Debtors, and the restrictions of section 503(c)(1) of the Bankruptcy Code are inapplicable to the Retention Programs.

### Request of Waiver of Stay

38. To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). As explained herein, the relief requested in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.

### Waiver of Memorandum of Law

39. The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

### Reservation of Rights

40. Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights

to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### No Prior Request

41.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

### Notice

42.     The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the office of the United States Trustee for the District of New Jersey; (b) the Debtors' 50 largest unsecured creditors (on a consolidated basis); (c) the United States Attorney's Office for the District of New Jersey; (d) the Internal Revenue Service; (e) the U.S. Securities and Exchange Commission; (f) the attorneys general in the states where the Debtors conduct their business operations; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: November 28, 2022

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christine A. Okike, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (*pro hac vice* pending)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and Debtors in Possession*