**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

---

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' APPLICATION FOR
ENTRY OF AN ORDER (I) AUTHORIZING THE
RETENTION AND EMPLOYMENT OF BERKELEY RESEARCH
GROUP, LLC AS FINANCIAL ADVISORS TO THE DEBTORS,
EFFECTIVE AS OF THE PETITION DATE THROUGH THE CRO
APPOINTMENT DATE, AND (II) AUTHORIZING BERKELEY RESEARCH
GROUP, LLC TO PROVIDE A CHIEF RESTRUCTURING OFFICER AND
<u>ADDITIONAL PERSONNEL, EFFECTIVE AS OF THE CRO APPOINTMENT DATE</u>**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

TO: THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")[2] respectfully state the following in support of this application (this "**Application**"):

### RELIEF REQUESTED

1.     By this Application, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Order**"): (a) authorizing the Debtors to retain and employ Berkeley Research Group, LLC ("**BRG**") in accordance with the terms and conditions set forth in that certain engagement letter dated November 12, 2022, inclusive of the amendment thereto dated November 25, 2022, a copy of which is attached hereto as **Exhibit B** (the "**Initial Engagement Letter**"), effective as of the Petition Date through the CRO Appointment Date; (b) authorizing BRG to provide (i) Mark A. Renzi as Chief Restructuring Officer to the Debtors (the "**CRO**") and (ii) additional staff to support the CRO and assist the Debtors (the "**Additional Personnel**," and together with the CRO, the "**BRG Professionals**") in accordance with that certain engagement letter dated December 27, 2022, a copy of which is attached hereto as **Exhibit C** (the "**CRO Engagement Letter**," and together with the Initial Engagement Letter, the "**Engagement Letters**"), effective as of December 27, 2022, the date that the CRO was appointed (the "**CRO Appointment Date**"); and (c) granting certain related relief.

2.     In support of this Application, the Debtors submit the *Declaration of Mark A. Renzi in Support of Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Berkeley Research Group, LLC as Financial Advisors to the Debtors, Effective as*

---

[2]     All capitalized terms used but not otherwise defined in this Section shall have the same meanings ascribed to them in the Engagement Letters (defined below).

*of the Petition Date through the CRO Appointment Date, and (II) Authorizing Berkeley Research Group, LLC to Provide a Chief Restructuring Officer and Additional Personnel, Effective as of the CRO Appointment Date* (the "**Renzi Declaration**"), attached hereto as **Exhibit D**.

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of New Jersey (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested herein are sections 105, 327(a), 328, 330, 331, 363(b) and 1107(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 2014-1 and 2016-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "**Local Rules**").

## BACKGROUND

*5.*      On November 28, 2022 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases are set forth in greater detail in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "**First Day Declaration**") and is incorporated by reference herein.

6.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   On November 29, 2022, the Court entered an order [Docket No. 42] authorizing procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).   On December 21, 2022, the United States Trustee for the District of New Jersey (the "**U.S. Trustee**") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "**Committee**") [Docket No. 130].   No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

## BRG'S QUALIFICATIONS

7.      Based on the size and complexity of these chapter 11 cases, the Debtors required a qualified and experienced financial advisor with the resources, capabilities, and experience of BRG.   Accordingly, the Debtors seek to engage BRG as financial advisor in connection with the financial advisory services that BRG provided to the Debtors from the Petition Date through the CRO Appointment Date.   Following the Petition Date, in light of the circumstances of these chapter 11 cases—including a significant adjustment of the Debtors' workforce and attendant increased responsibilities for the Debtors' management team—the Debtors determined that the appointment of a CRO was prudent to ensure that these chapter 11 cases progress efficiently towards a value-maximizing resolution.   Therefore, effective as of the CRO Appointment Date and on a go-forward basis, the Debtors seek an order authorizing BRG to provide the CRO to serve the Debtors and the Additional Personnel to support the CRO and assist the Debtors.

8.      BRG, the CRO, and the Additional Personnel have significant qualifications and experience in providing the services contemplated herein.   BRG's Corporate Finance practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing restructuring, transaction advisory, litigation support, solvency, and

valuation assistance and providing a focus on viable solutions that maximize value for companies and creditors, typically in distressed business settings.  BRG has acted as financial advisor, crisis manager, and corporate officer in middle-market to large multinational companies in crisis or those in need of performance improvement in specific financial and operational areas across a wide array of industries.

9.      BRG's services include forensic analysis, plan development and implementation, and advice on sale/merger transactions.  Moreover, the professionals at BRG have assisted and advised debtors, creditors, creditors' committees, bondholders, investors, and others in numerous bankruptcy cases, including *Voyager Digital Holdings, Inc.; Liberty Power Holdings, LLC; The Collected Group, LLC; CBL & Associates Properties, Inc.; Puerto Rico Electric Power Authority; Murray Metallurgical Coal Holdings, LLC; Diamond Offshore Drilling, Inc.; Sabine Oil & Gas Corporation; Rockdale Marcellus, LLC; Neiman Marcus Group LTD LLC; Aerogroup International (Aerosoles); Sports Authority Holdings, Inc.; Brazos Electric Power Cooperative, Inc.; The Hertz Corporation, LLC; Verity Health System of California, Inc.; Le Tote, Inc.; Stage Stores, Inc.; American Apparel LLC; Specialty Retail Shops Holding Corp. (a.k.a. Shopko); Southern Foods Group; Speedcast International Limited; Destination Maternity Corporation; American Apparel*; *rue21; M & G USA Corporation; Chrysler (a.k.a. Old Carco LLC); Peabody Energy Corporation; Molycorp Inc.; Refco, Inc.; Spiegel Inc.; W.R. Grace; Penson Worldwide; and Dynegy Holdings, LLC*.[3]  BRG's business, experience, and expertise are further described in the Renzi Declaration.

10.     Mr. Renzi, the proposed CRO, is a Managing Director and the Head of the Corporate Finance Financial Institutions Group for BRG.  Mr. Renzi has over twenty years of

---

[3]     The professionals were employed in certain of these engagements prior to joining BRG.

experience in the practice of turnarounds and restructurings.  Further, Mr. Renzi has considerable experience in providing restructuring advisory and restructuring management services in reorganization proceedings, and working with senior management teams in the areas of financial and operational restructuring, loan workouts, and business planning.  Mr. Renzi has advised and served in management positions involving numerous turnaround engagements.  Most recently, Mr. Renzi was the Chief Restructuring Officer of Lucky Brand Dungarees, LLC.

11.      In addition to Mr. Renzi, the Additional Personnel who are expected to support the CRO and assist the Debtors during these chapter 11 cases have significant restructuring and industry experience assisting distressed companies with financial and operational challenges and working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors.  The BRG Professionals will work closely with the Debtors' management and other professional advisors throughout the chapter 11 process.  By virtue of the expertise of its restructuring personnel, BRG, Mr. Renzi, and the Additional Personnel are well qualified to provide services to and represent the Debtors' interests in these chapter 11 cases.  In addition, as a result of performing prepetition advisory work for the Debtors, working closely with the Debtors' management and other professionals, BRG, Mr. Renzi, and the Additional Personnel have acquired significant knowledge of the Debtors' businesses and are familiar with the Debtors' financial affairs, capital structure, operations, and related matters.

12.      For these reasons, BRG, the CRO, and the Additional Personnel are well-qualified and uniquely suited to deal effectively and efficiently with matters that may arise in the context of these chapter 11 cases.  Accordingly, the retention of BRG from the Petition Date through the CRO Appointment Date, and the authorization for Mr. Renzi to serve as CRO with the assistance of the Additional Personnel effective as of the CRO Appointment Date, on the terms and conditions

set forth herein, are necessary and appropriate, in the best interests of the Debtors' estates, creditors, and all other parties in interest, and should be granted in all respects.

## SCOPE OF SERVICES

13.    The Engagement Letters entered into by and between the Debtors and BRG govern their relationship except as explicitly set forth herein or in the proposed Order.   The terms and conditions of the Engagement Letters were negotiated at arm's length and reflect the parties' mutual agreement as to the substantial efforts that will be required under this engagement.

14.    On November 12, 2022, BRG was engaged as financial advisor to the Debtors pursuant to that certain engagement letter dated November 12, 2022, inclusive of the amendment thereto dated November 25, 2022, a copy of which is attached to the Application as <u>Exhibit B</u> (the "**Initial Engagement Letter**").  Pursuant to the terms of the Initial Engagement Letter, BRG initially agreed to perform the following services ((a)–(h), collectively, the "**Financial Advisory Services**"):

(a)    support the development of restructuring plans, financing, and strategic alternatives for the Debtors;

(b)    prepare various financial analyses to support restructuring alternatives including liquidity forecast, expense levels, and others as necessary;

(c)    provide advice to management on cash conservation measures and liquidity forecasting after analyzing and stress testing weekly cash flows under various scenarios;

(d)    advise the Debtors relative to negotiating with existing lenders and stakeholders;

(e)    participate in board calls as requested;

(f)    assist the Debtors with the communications and negotiations with various third parties to support restructuring alternatives;

(g)    provide such other services as requested or directed by the CFO and CEO, the board of directors of the Debtors (the "**Board**") or other Debtors' personnel as authorized by the foregoing and agreed to by BRG; and

(h)    if a chapter 11 filing were to become necessary, assist the Debtors with activities relating to such bankruptcy including, as appropriate, testimony if requested.

15.    As described above, prior to the Petition Date, the Debtors engaged BRG as financial advisor to facilitate the Debtors' restructuring efforts during these chapter 11 cases.  From the Petition Date until the CRO Appointment Date, BRG provided the Financial Advisory Services to the Debtors.

16.    In the weeks following the Petition Date, however, the Debtors determined that it would be prudent to engage a C-suite level executive with restructuring experience to support the Debtors' management team in light of substantially increased demands on their time and attention in connection with critical workstreams, including, without limitation, (a) chapter 11 reporting requirements, (b) negotiations with multiple groups of stakeholders, (c) initiating and structuring the business for a sale process, (d) navigating the complexities of the chapter 11 process in light of the interplay with the FTX bankruptcy, and (e) general uncertainty in the cryptocurrency markets.  These burdens have only been exacerbated by a significant reduction of the Debtors' workforce in recent weeks.  Specifically, following the Petition Date, in an effort to stabilize the Debtors' businesses and preserve liquidity, the Debtors reduced their employee headcount by approximately two-thirds.  Accordingly, the Debtors swiftly recognized the need for additional expertise beyond BRG's role as financial advisor.

17.    On December 27, 2022, the Debtors entered into an engagement letter with BRG to provide the Debtors with a CRO and authorize the Additional Personnel to support the CRO and assist the Debtors.  Pursuant to the CRO Engagement Letter and effective as of the CRO Appointment Date, Mr. Renzi was designated as CRO.  As CRO, Mr. Renzi reports directly to the Board (as defined below) and the Debtors' disinterested directors.

18.    Pursuant to the CRO Engagement Letter and subject to further order of this Court,

the summary of the services the BRG Professionals expect to perform during the course of

their retention as of the CRO Appointment Date, to support and assist the Debtors throughout the

chapter 11 process (collectively, the "**CRO Services**") is set forth below.[4]

(a)    in consultation with management of the Debtors and subject to the approval of the Board, develop and implement a chosen course of action to preserve asset value and maximize recoveries to stakeholders;

(b)    oversee the activities of the Debtors in consultation with other advisors and the management team to effectuate the selected course of action;

(c)    assist the Debtors and their management in developing cash flow projections and related methodologies and assist with planning for alternatives as requested by Debtors;

(d)    assist the Debtors in preparing for and operating in a chapter 11 bankruptcy proceeding, including negotiations with stakeholders, and the formulation of a reorganization strategy and plan of reorganization directed to preserve and maximize value;

(e)    assist as requested by management in connection with the Debtors' development of their business plan, and such other related forecasts as may be required by creditor constituencies in connection with negotiations;

(f)    provide information deemed by the CRO to be reasonable and relevant to stakeholders and consult with key constituents as necessary;

(g)    to the extent reasonably requested by the Debtors, offer testimony before the Court with respect to the services provided by the CRO and the Additional Personnel, and participate in depositions, including by providing deposition testimony, related thereto; and

(h)    provide such other services as mutually agreed upon by the CRO, BRG and the Debtors.

---

[4]    The summaries of the terms of the Engagement Letters in this Application are provided for purposes of convenience only.  Certain of the work streams outlined in the Initial Engagement Letter were completed prior to the Petition Date and/or superseded by the filing of these chapter 11 cases and the CRO Engagement Letter, as applicable.  In the event of any inconsistency between the summaries contained in this Application and the terms and provisions of the Engagement Letters, the terms of the Engagement Letters control unless otherwise set forth in this Application or the Order approving same.

19.     The Debtors submit that the retention of BRG from the Petition Date through the CRO Appointment Date, and the authorization for Mr. Renzi to serve as CRO with the assistance of the Additional Personnel effective as of the CRO Appointment Date on the terms and conditions set forth herein are necessary and appropriate, in the best interest of the Debtors' estates, creditors, and all other parties in interest, and should be granted in all respects.

## NO DUPLICATION OF SERVICES

20.     From the Petition Date through the CRO Appointment Date, BRG coordinated all tasks with counsel to achieve case efficiencies and avoid duplications of efforts.  The Debtors believe it is necessary to employ BRG as its financial advisor for the discrete period of time between the Petition Date and the CRO Appointment date because they rendered the Financial Advisory Services to the Debtors.  In light of BRG's substantial experience and expertise and the complex nature of the Debtors' business and financial affairs, the Debtors believe that BRG was well-qualified to advise them between the Petition Date and the CRO Appointment Date.

21.     On a go-forward basis from the CRO Appointment Date, the services provided by Mr. Renzi and the Additional Personnel will complement, and not duplicate, the services to be rendered by the professionals retained in these chapter 11 cases.  In light of BRG's, Mr. Renzi's, and the Additional Personnel's substantial experience and the complex nature of the Debtors' business and financial affairs, the Debtors believe that BRG, Mr. Renzi, and the Additional Personnel are well-qualified to advise them in these chapter 11 cases.

## BRG'S DISINTERESTEDNESS

22.     With respect to BRG providing the Debtors with the CRO and the Additional Personnel, the Debtors do not believe that BRG is a "professional" whose retention is subject to approval under section 327 of the Bankruptcy Code.

23.     With respect to BRG's retention as financial advisor to the Debtors effective as of the Petition Date until the CRO Appointment Date, the Debtors believe BRG is a professional whose retention is subject to approval under section 327 of the Bankruptcy Code.

24.     To the best of the Debtors' knowledge and based upon and subject to the disclosures made in the Renzi Declaration filed contemporaneously herewith, BRG is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code and the Debtors are satisfied that (i) BRG represents no interest adverse to the Debtors, their estates, or any other party in interest in the matters upon which it is to be engaged and that its employment is in the best interest of the estates; (ii) BRG together with its Managing Directors and Directors do not have any financial interest in or business with the Debtors; (iii) BRG has no connection with the U.S. Trustee or any other person employed in the office of the U.S. Trustee; and (iv) BRG has no connection with the bankruptcy judge approving the employment of BRG as the Debtors' financial advisor.  BRG has not provided, and will not provide, any professional services to any creditors, other parties in interest, or their respective attorneys and accountants with regard to any matter related to these chapter 11 cases.

**TERMS OF BRG'S RETENTION AS FINANCIAL ADVISOR TO THE DEBTORS
FROM THE PETITION DATE THROUGH THE CRO APPOINTMENT DATE**

25.     BRG advised the Debtors that it intends to charge its standard hourly rates for professional services rendered from the Petition Date through the CRO Appointment Date, plus reimbursement of actual and necessary expenses incurred by BRG.  The professional fees shall be calculated by multiplying the hours worked by the standard hourly billing rates in effect for the specific personnel involved.  The hourly rates charged by BRG for the services provided by its personnel differ based upon, among other things, each professional's level of experience, geographic differentials, and types of services being provided.  In the ordinary course of business,

BRG periodically revises its hourly rates to reflect promotions and other changes in personnel responsibilities, increases in experience, and increases in the cost of doing business.  To the extent BRG requires services of its international divisions or personnel from specialized practices, the standard hourly rates for that international division or specialized practice will apply.

26.    BRG has advised the Debtors that its fees will be commensurate with the fees charged to its other clients and in other cases of this size (provided such clients are billed hourly). BRG has also advised the Debtors that it intends to file an application with the Court for allowance of its compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the terms of any order establishing procedures for interim compensation that may be entered in this case.  BRG's compensation for services rendered on behalf of the Debtors shall be fixed by the Court after due application.

27.    For professional services, fees are based on BRG's standard hourly rates.  The proposed rates of compensation, subject to final Court approval, are the customary hourly rates in effect when services are performed by the professionals and paraprofessionals who provide services to the Debtors.    The standard hourly rates effective December 1, 2022, for BRG Professionals that will work on this engagement are as follows:[5]

| Position | Hourly Rate |
|---|---|
| Managing Directors | $1,050 - $1,250 |
| Directors & Associate Directors | $810 - $990 |
| Professional Staff | $395 - $795 |
| Support Staff | $175 - $350 |

These standard hourly rates are subject to periodic adjustment, which shall be noted on the invoices

---

[5]    BRG further notes that hourly rates for certain staff receiving promotions will change effective January 1, 2023, however, all of the rates will remain within the rate ranges delineated above.

for the first time period in which the revised rates become effective.

28.    Consistent with BRG's policy with respect to its other clients, BRG will charge for all other services provided and for other charges and disbursements incurred in rendering services to the Debtors. These customary items include, among other things, travel and lodging expenses, business meals, costs of reproduction, research, communications, BRG's legal counsel, any applicable sales or excise taxes and other direct expenses. Internal costs or overhead costs and document production services (including regular secretarial and word processing time) will not be charged for separately.

29.    The Debtors understand that BRG will request compensation for services rendered to the Debtors from the Petition Date through the CRO Appointment Date in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the U.S. Trustee (the "**U.S. Trustee Guidelines**"), and any applicable orders of this Court.

30.    BRG will also request compensation for any time and expenses (including, without limitation, reasonable legal fees and expenses, except in the case of legal fees pertaining to any fee defense) that may be incurred in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, or other proceedings, including, without limitation, those other than the instant matter, as a result of BRG's performance of these services.

31.    BRG provided prepetition services to the Debtors. In the ninety (90) days prior to the Petition Date, the Debtors paid BRG $1,750,000 for professional services performed and expenses incurred, inclusive of unapplied advance payments, in the amount of $589,353.96 (the "**Cash on Account**"), which BRG holds in retainer, pursuant to the terms of the

Engagement Letters.  As of the Petition Date, no amounts remained outstanding with respect to the invoice(s) issued by BRG.

32.     Due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior, and subsequent to the Petition Date, BRG may have incurred, but not invoiced, fees and reimbursable expenses that relate to the prepetition period.  BRG intends to apply such amounts against the Cash on Account.  As agreed to with the Debtors, the remainder of the Cash on Account will not be segregated by BRG in a separate account and will be held as a general retainer as security for postpetition services and expenses.

33.     No promises have been received by BRG, nor any employee thereof, as to payment or compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code. Except for internal agreements among the employees of BRG regarding the sharing of revenue or compensation, neither BRG nor any of its employees has entered into an agreement or understanding to share compensation with any other entity as described in Bankruptcy Code section 504 and Bankruptcy Rule 2016.

34.     The terms of the BRG's retention and compensation as financial advisor to the Debtors from the Petition Date to the CRO Appointment Date are consistent with and typical of compensation arrangements entered into by BRG and other comparable firms that render similar services.  The Debtors submit that the fee arrangements set forth herein for BRG's retention as financial advisor to the Debtors from the Petition Date through the CRO Appointment Date are fair and reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

**TERMS OF RETENTION FOR THE CRO AND ADDITIONAL PERSONNEL
AS OF THE CRO APPOINTMENT DATE**

35.     Pursuant to the terms of the CRO Engagement Letter, the CRO will receive $180,000 per month for provision of the services in the CRO Engagement Letter.  Additionally,

- 14 -

the fees charged by BRG for Additional Personnel shall be calculated by multiplying the hours

worked by the standard hourly billing rates in effect for the specific personnel involved.  The

hourly rates charged by BRG for the services provided by the Additional Personnel differ based

upon, among other things, each professional's level of experience, geographic differentials, and

types of services being provided.  In the ordinary course of business, BRG periodically revises its

hourly rates to reflect promotions and other changes in personnel responsibilities, increases in

experience, and increases in the cost of doing business.  To the extent BRG requires services of its

international divisions or personnel from specialized practices, the standard hourly rates for that

international division or specialized practice will apply.

36.    The proposed rates of compensation, subject to final Court approval, are the

customary hourly rates in effect when services are performed by the professionals and

paraprofessionals who provide services to the Debtors.  The standard hourly rates effective

December 1, 2022, for Additional Personnel that will work on this engagement are as follows:[6]

| Position | Hourly Rate |
|---|---|
| Managing Directors | $1,050 - $1,250 |
| Directors & Associate Directors | $810 - $990 |
| Professional Staff | $395 - $795 |
| Support Staff | $175 - $350 |

37.    These standard hourly rates are subject to periodic adjustment, which shall be noted

on the invoices for the first time period in which the revised rates become effective.

38.    Consistent with BRG's policy with respect to its other clients, BRG will charge for

all other services provided and for other charges and disbursements incurred in rendering services

to the Debtors.  These customary items include, among other things, travel and lodging expenses,

---

[6]    BRG further notes that hourly rates for certain staff receiving promotions will change effective January 1, 2023, however, all of the rates will remain within the rate ranges delineated above.

business meals, costs of reproduction, research, communications, BRG's legal counsel, any applicable sales or excise taxes, and other direct expenses. Internal costs or overhead costs and document production services (including regular secretarial and word processing time) will not be charged for separately.

39.     Further, as provided in the Engagement Letters, the Debtors have agreed to pay BRG a completion fee (the "**Completion Fee**") in the amount of (i) $750,000 if a *going concern or asset sale* based chapter 11 plan is confirmed (as opposed to a self-liquidating chapter 11 plan) (for the avoidance of doubt, 363 sales which in aggregate do not represent a majority of the assets of the Debtors shall not constitute an asset sale chapter 11 plan), and (ii) an additional $750,000 if a chapter 11 plan is confirmed on or before July 15, 2023.[7] Any earned Completion Fee will be credited against any professional fees incurred by BRG following July 15, 2023.

40.     BRG will also request compensation for any time and expenses (including, without limitation, reasonable legal fees and expenses, except in the case of legal fees pertaining to any fee defense) that may be incurred in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, or other proceedings, including, without limitation, those other than the instant matter, as a result of BRG's performance of these services.

41.     BRG will submit a weekly summary of fees and expenses to the Debtors and will submit biweekly invoices to the Debtors. The Debtors request authority to pay, in the ordinary course of business, all reasonable amounts invoiced by BRG for fees and expenses incurred on or after the CRO Appointment Date.

---

[7]    Milestone date subject to change with the consent of the Debtors if delay is driven by factors outside of BRG's control.

42.     Because BRG is not being employed as a professional under section 327 of the Bankruptcy Code as of the CRO Appointment Date, the Debtors request, on behalf of BRG, that BRG not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.  However, to maintain transparency and to comply with the U.S. Trustee's protocol applicable to the retention of personnel under section 363 of the Bankruptcy Code, BRG shall file reports of staffing, compensation earned, and expenses incurred on a monthly basis by the last day of each month for the previous month (each a "**Staffing Report**") with the Court. Each Staffing Report shall include the names and functions filled by all BRG Professionals assigned to the engagement as well as compensation earned and expenses incurred for the relevant period.  Each Staffing Report shall contain summary charts which describe the services provided, including the number of hours worked by category, identify the compensation earned by each Additional Personnel, and itemize the expenses incurred.  Time records shall (i) be appended to the Staffing Report, (ii) contain detailed time entries describing the task(s) performed, and (iii) be organized by project category.  Where personnel are providing services at an hourly rate, the time entries shall identify the time spent completing each task in half-hour increments; where personnel are providing services at a "flat" rate, the time entries shall be kept in hourly increments.  All compensation shall be subject to review by the Court in the event an objection is filed.  BRG's first Staffing Report shall be filed by February 28, 2023, for the period December 27-31, 2022 and the month of January 2023.

43.     The terms of retention for the CRO and the Additional Personnel are consistent with and typical of compensation arrangements entered into by BRG and other comparable firms that render similar services under similar circumstances.  The Debtors believe that the terms are

reasonable, market-based, and designed to compensate BRG fairly for its work and to cover fixed and routine overhead expenses.

## **USE OF CONTRACTORS**

44.      Notwithstanding anything in this Application to the contrary, to the extent that BRG uses the services of independent contractors or subcontractors (the "**Contractors**") in these cases, BRG shall (i) pass the cost of Contractors through to the Debtors at the same rate that BRG pays the Contractors; (ii) seek reimbursement for actual costs only; (iii) ensure that the Contractors are subject to the same conflict checks and compensation procedures as required for BRG; and (iv) file with the Court such disclosures required by Bankruptcy Rule 2014.

## **INDEMNIFICATIONS**

45.      The Debtors provide BRG with an indemnity as detailed in the Engagement Letters (the "**Indemnity**").  With respect to the Initial Engagement Letter the Indemnity provides that the Debtors shall indemnify and hold harmless BRG, its members, principals, employees, representatives, agents, counsel, and affiliates against any and all losses, claims, damages, liabilities, penalties, judgments, awards, costs, fees, expenses, and disbursements including, without limitation, defending any action, suit, proceeding or investigation (whether or not in connection with proceedings or litigation in which BRG is a party), directly or indirectly, caused by, relating to, based upon, arising out of or in connection with the engagement of BRG or any Services rendered pursuant to this engagement, unless there is a final non-appealable order of a court of competent jurisdiction finding BRG directly liable for gross negligence or willful misconduct.

46.      With respect to the CRO Engagement Letter, the Indemnity provides that the Debtors shall indemnify, hold harmless and defend the CRO, Additional Personnel, and BRG and

its affiliates partners, directors, officers, employees and agents from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with the engagement of the CRO and BRG that is the subject of the CRO Engagement Letter, except such liabilities that result from the gross negligence or willful misconduct of the BRG parties.

47.     The Debtors and BRG believe that the Indemnity is customary and reasonable for engagements of this type and should be approved.

48.     The terms and conditions of the Indemnity were negotiated by the Debtors and BRG at arm's length and in good faith.  The provisions contained in the Engagement Letters, viewed in conjunction with the other terms of the proposed retention, are reasonable and in the best interests of the Debtors, their estates, and creditors in light of the fact that the Debtors require BRG's services to successfully navigate these chapter 11 cases.

## BASIS FOR RELIEF

**A.     This Court Should Permit the Debtors to Retain and Employ BRG as Financial Advisor to the Debtors From the Petition Date Through the CRO Appointment Date Pursuant to Sections 327 and 328 of the Bankruptcy Code on the Terms in the Initial Engagement Letter.**

49.     The Debtors submit that the retention of BRG under the terms described herein is appropriate under sections 327(a), 328, and 1107(b) of the Bankruptcy Code.  Section 327(a) of the Bankruptcy Code empowers the trustee, with the Court's approval, to employ professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."  11 U.S.C. § 327(a).  Section 101(14) of the Bankruptcy Code defines a "disinterested person" as a person that:

(a)     is not a creditor, an equity security holder, or an insider;

(b)     is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(c)     does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason. 11 U.S.C. § 101(14).

50.     Further, section 1107(b) of the Bankruptcy Code provides that "a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case." 11 U.S.C. § 1107(b).  BRG's prepetition relationship with the Debtors is therefore not an impediment to BRG's retention as the Debtors' postpetition financial advisor or the designation of Mr. Renzi as CRO.

51.     Section 328(a) of the Bankruptcy Code authorizes the employment of a professional person "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

52.     Further, Bankruptcy Rule 2014(a) requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014.

53.     The Debtors submit that approval of the retention of BRG effective as of the Petition Date through the CRO Appointment Date is in the best interests of the Debtors and their estates and is a sound exercise of the Debtors' business judgment.  As discussed above and in the Renzi Declaration, BRG has extensive experience and an excellent reputation in providing high quality financial advisory services to debtors and creditors in reorganizations, mergers and

acquisitions, and other restructurings, and in providing prepetition services to the Debtors, BRG has become familiar with the Debtors' business operations, capital structure, financing documents, and other material information.  The Debtors believe that BRG was well-qualified to provide the Services to the Debtors in a cost-effective and efficient manner.

54.    Further, BRG satisfies the disinterestedness standard of section 327(a) of the Bankruptcy Code.

55.    The Debtors submit that the retention and employment of BRG as financial advisor to the Debtors *nunc pro tunc* to the Petition Date, through the CRO Appointment Date, is warranted by the circumstances of these chapter 11 cases.  The Third Circuit has identified "time pressure to begin service" and absence of prejudice as factors favoring *nunc pro tunc* retention. *See, e.g., Matter of Arkansas Co., Inc.*, 798 F.2d 645, 650 (3d Cir. 1986); *Indian River Homes, Inc. v. Sussex Trust Co.*, 108 B.R. 46, 52 (D. Del. 1989), *app. dismissed*, 909 F.2d 1476 (3d Cir. 1990).

**B.    This Court Should Permit the Debtors to Appoint Mr. Renzi as CRO and Utilize the Services of the Additional Personnel Pursuant to Sections 105 and 363 of the Bankruptcy Code.**

56.    Section 363(b) of the Bankruptcy Code permits a Bankruptcy Court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to justify payment of certain

prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring

the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

57.      Additionally, section 105(a) of the Bankruptcy Code provides this Court with the

power to grant the relief requested herein.   Section 105(a) of the Bankruptcy Code codifies a

Bankruptcy Court's inherent equitable powers to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title."   11 U.S.C. § 105(a); *see also*

*United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990); *In re Cont'l Airlines*, 203 F.3d

203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically

enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out

provisions of the Bankruptcy Code").   Indeed, the relief requested herein is consistent with the

relief generally approved by bankruptcy courts.   *See In re K.G. IM, LLC*, 620 B.R. 469, 486–87

(Bankr. S.D.N.Y. 2020) (approving the debtors' application affirming the designation of a chief

restructuring officer pursuant to section 363(b) of the Bankruptcy Code and overruling the

U.S. Trustee's objection that the proposed retention did not abide by Part I.D. of the J. Alix

Protocol where the debtors lacked a board of directors); *In re Nine West Holdings, Inc.*, 588 B.R.

678, 687–88 (Bankr. S.D.N.Y. 2018) (holding the debtors' financial advisor had complied in all

material respects with the J. Alix Protocol, approving the advisor's application to provide the

debtors with an interim chief executive officer and certain additional personnel, and overruling the

U.S. Trustee's objection that retention under section 363(b) of the Bankruptcy Code was improper

because the proposed interim chief executive officer had served as a director of a subsidiary board

within two years of the petition date.   "The Protocol is not a provision of the Bankruptcy Code.   It

is not law, and it is not binding on this Court or any other court."); *In re McDermott Int'l, Inc.*, 614

B.R. 244, 253 (Bankr. S.D. Tex. 2020) (providing that the J. Alix Protocol "is completely

unnecessary" and approving both of the debtors' applications—the first, to designate a chief transformation officer and to provide support personnel, and the second, to employ an affiliated firm as the debtors' financial advisor, both pursuant to section 327(a) of the Bankruptcy Code.).

58.    As set forth above, postpetition, the Debtors recognized that they required additional assistance in light of their significant reduction in force and the additional demands the chapter 11 process placed on their remaining employees.  The decision to appoint Mr. Renzi as CRO, with the assistance of the Additional Personnel, should be authorized because it is a sound exercise of the Debtors' business judgment.  As discussed above and in the Renzi Declaration, Mr. Renzi has extensive experience working with many companies undertaking restructuring efforts, and the Additional Personnel are well qualified and equipped to support the CRO and assist the Debtors.  Mr. Renzi, in his capacity as CRO, and the Additional Personnel, will provide services that are in the best interests of all parties in interest in these chapter 11 cases.

59.    For the foregoing reasons, this Court should grant the relief requested in this Application.

## **NOTICE**

60.    The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable:  (a) the office of the U.S. Trustee for the District of New Jersey; (b) the Committee; (c) the United States Attorney's Office for the District of New Jersey; (d) the Internal Revenue Service; (e) the U.S. Securities and Exchange Commission; (f) the attorneys general in the states where the Debtors conduct their business operations; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper under the circumstances.

December 30, 2022                                        Respectfully submitted,

By: _/s/  Zachary Prince_____
     Zachary Prince
     BlockFi Inc. and its affiliated Debtors
     Chief Executive Officer and President