**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Deborah Kovsky-Apap (NJ Bar No. 030942003)
875 Third Avenue
New York, NY 10022
(212) 808-2726
deborah.kovsky@troutman.com

*Counsel for the Ad Hoc Committee of
Wallet Account Holders*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*[1]<br><br>Debtors. | Chapter 11 Case No. 22-19361 (MBK)<br><br>(Jointly Administered)<br><br>**HEARING DATE AND TIME:** January 9, 2023, at 10:00 a.m. (EST)<br><br>**OBJECTION DEADLINE:** January 4, 2023, at 4:00 p.m. (EST) (extended by consent) |

**PRELIMINARY OBJECTION OF THE AD HOC COMMITTEE OF WALLET ACCOUNT HOLDERS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS FROM WALLET ACCOUNTS, (B) UPDATE THE USER INTERFACE TO PROPERLY REFLECT TRANSACTIONS AND ASSETS AS OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF**

The Ad Hoc Committee of Wallet Account Holders (the "Ad Hoc Committee"), through its undersigned counsel, submits this limited objection to the motion ("Motion") of the above-captioned debtors-in-possession ("BlockFi" or the "Debtors") for entry of an order authorizing the Debtors (among other things) to reverse completed transactions reflected in the BlockFi app and on its website [Docket No. 121], and respectfully states as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

I.      **PRELIMINARY STATEMENT**

1.      The members of the Ad Hoc Committee appreciate the Debtors' stated position that they prioritize doing right by their customers, and their recognition that "[a]t its core, this means respecting the terms of service governing the relationship between the Debtors and their clients." Motion ¶ 1.

2.      The Ad Hoc Committee agrees with the Debtors that BlockFi has no ownership interest in crypto assets that customers transferred to Wallet accounts, whether from BlockFi Interest Accounts or external wallets. But the Debtors' attempt to reverse transfers from BIA to Wallet that *actually took place* is the very opposite of "respecting the terms of service governing the relationship between the Debtors and their clients" and would rewrite those Terms of Service to massively benefit the Debtors at the expense of their customers.

3.      In addition, the procedural impropriety of the Debtors' motion is prejudicial and unfair to its customers. BlockFi evidently hoped no one would notice its attempt to sneak in a backdoor determination that customer assets are instead property of the estate through a largely evidence-free Motion on just 14 days' notice over the Christmas and New Year holidays. BlockFi is required to seek such determination through an adversary proceeding, giving customers the full protections and safeguards of service of a complaint and summons, reasonable time to respond, the opportunity to take discovery, and a decision by the Court after a trial or other dispositive proceeding.

4.      The members of the Ad Hoc Committee are all ordinary retail customers. The amount that the Debtors seek summarily to seize from them is over $1.6 million – a material amount for ten individuals, representing in some cases very significant portions of their total savings. The fundamental question of their ownership of their crypto assets simply cannot be decided in the cavalier fashion proposed by the Debtors.

5.  If BlockFi actually intends to prioritize "doing right by its clients," it should (i) honor the Terms of Service and recognize all transfers made from BIA to Wallet prior to the Petition Date, and (ii) grant its customers the protections they are entitled to under Bankruptcy Rule 7001.

## II. FACTUAL BACKGROUND

### A. BlockFi's BIA and Wallet Accounts

6.  On February 14, 2022, the Securities and Exchange Commission announced a first-of-its-kind action against a cryptocurrency CeFi platform. The SEC charged BlockFi Lending LLC failing to register the offer and sales of its crypto lending product, the BlockFi Interest Account ("BIA") and with violating the registration provisions of the Investment Company Act of 1940.[2]

7.  Specifically, the SEC found that BIAs are securities under applicable law, and that BlockFi therefore was required to register its offers and sales of BIAs but failed to do so or to qualify for an exemption from SEC registration. Additionally, the SEC found that BlockFi operated for more than 18 months as an unregistered investment company because it issued securities and also held more than 40 percent of its total assets, excluding cash, in investment securities, including loans of crypto assets to institutional borrowers (while misleading customers for more than two years regarding the level of risk in that largely uncollateralized loan portfolio).[3]

---

[2] Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order, *In the Matter of BlockFi Lending LLC*, Admin. Proc. File No. 3-20758 (Feb. 14, 2022) (the "SEC Cease-and-Desist Order"), available at https://www.sec.gov/litigation/admin/2022/33-11029.pdf.

[3] *Id.* ¶¶ 2-4.

8.    Simultaneously with the announcement of the SEC's action, BlockFi agreed to pay $50 million to the SEC and another $50 million to 32 state regulators, and to cease accepting any further investments or funds in the BIAs from US investors.[4]

9.    On January 18, 2022, shortly before its settlement with the SEC and multiple state regulators was finalized, BlockFi announced the launch of its custody service, BlockFi Wallet ("Wallet").[5] Upon information and belief, Wallet was created to give customers who would soon be unable to add or return crypto to their BIAs a reason to keep their assets on the BlockFi platform.

10.    To make the platform as sticky as possible, BlockFi modified its architecture so that customers could no longer withdraw assets directly from a BIA. Instead, all withdrawals first had to be transferred from the customer's BIA to his Wallet.[6] Following such inter-account transfer, the customer could then withdraw assets from the BlockFi platform to an external wallet.[7]

11.    There are significant differences between BIA and Wallet accounts. For both US and non-US BIAs, the Terms of Service provide that "[e]xcept where prohibited or limited by applicable law, BlockFi has the right, without further notice to you, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency . . . with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or

---

[4] *Id.* ¶ 42.

[5] *See* https://blockfi.com/blockfi-expands-retail-suite-with-two-new-product-offerings.

[6] Interest Account Terms (Non-US), available at https://blockfi.com/interest-account-terms ("Non-US Terms of Service"), Section E.1; Interest Account Terms (Existing-US) ("US Terms of Service"), available at https://blockfi.com/interest-account-terms-existing-us, Section C.1.

[7] *See* https://help.blockfi.com/hc/en-us/articles/4416344067092-Requesting-a-Withdrawal-Crypto- ("All Crypto withdrawals must be initiated through your BlockFi Wallet.").

invest such cryptocurrency at its own risk."[8] In other words, as the SEC explained, customers would lend crypto assets to BlockFi in the BIAs in order to earn interest, and BlockFi then exercised legal ownership and control over the loaned assets.[9]

12. By contrast, the Wallet Terms of Service provide that "[t]he title to cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi. . . . Except as required by a valid court order or applicable law, BlockFi shall not sell, transfer, loan, hypothecate or otherwise alienate cryptocurrency held in your BlockFi Wallet unless specifically instructed by you."[10] Assets held in a customer's Wallet do not earn interest.[11]

13. Consistent with BlockFi's undertakings in the settlement of the SEC action, its Terms of Service were revised to warn customers: "**If you are an existing U.S. client, please note that any assets you withdraw from your Crypto Interest Account**[12] **on or after February 14, 2022 will not be eligible for transferring back into your Crypto Interest Account**" (emphasis in original).[13] An email pushed out to US customers on February 14, 2022 reiterated this point, advising customers that "[y]ou are able to move assets into your Wallet to trade, but once moved from BIA to Wallet, they cannot be moved back and they will cease to earn interest."

---

[8] Non-US Terms of Service, Section G.1; US Terms of Service, Section E.1.

[9] SEC Cease and Desist Order, ¶¶ 8-9.

[10] Wallet Terms, https://blockfi.com/wallet-terms ("Wallet Terms of Service"), Section F.

[11] *Id.*, Introduction.

[12] The Terms of Service refer to BIAs as "Crypto Interest Accounts."

[13] US Terms of Service, Section C.1.

14. Another difference between BIA and Wallet is that while withdrawals from Wallet to an external address are subject to a delay,[14] a customer's decision to exit BIA and terminate his loan of crypto assets to BlockFi is effectuated instantaneously upon request. BlockFi's Terms of Service for BIAs for both US and non-US customers provide that "[y]ou may make a request for a complete or partial withdrawal of principal from your Crypto Interest Account at any time. Any withdrawal of principal will be **transferred instantly** to your BlockFi Wallet and any withdrawal from your BlockFi Wallet will be subject to BlockFi Wallet Terms" (emphasis added).[15]

15. When a customer transfers crypto assets from BIA to Wallet, the transfer is reflected immediately in the customer's account balance, which can be reviewed on BlockFi's web-based platform and mobile app. The customer also receives an email from BlockFi confirming the transaction, and the transaction appears in the transaction history that the customer can download from the BlockFi platform.[16] As described in the debtors' first day declaration, transactions reflecting Wallet transactions are also reflected on an internal ledger maintained by BlockFi (the "Wallet Ledger").[17]

16. Although the transfer out of BIA and termination of a customer's loan to BlockFi occur instantly pursuant to the unambiguous Terms of Service—and are instantly reflected on

---

[14] Wallet Terms of Service, Section D (stating that BlockFi may require up to seven (7) days to process withdrawal requests).

[15] US Terms of Service, Section C.1; Non-US Terms of Service, Section E.1.

[16] As the Ad Hoc Committee will be prepared to demonstrate at trial, customers are able to download a .csv file from the BlockFi platform showing their full transaction history of deposits, withdrawals, transfers, trades and the payment of interest in BIA.

[17] Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions ("Renzi Dec.") [Docket No. 17], ¶ 35. To be clear, the Wallet Ledger is not a blockchain-type ledger. A blockchain is a trustless, decentralized, public, immutable ledger. The so-called "Wallet Ledger" is a ledger in the old-fashioned sense and is simply part of BlockFi's internal accounting system. Further, the Wallet Ledger is not the only source of information about transfers from BIA to Wallet on BlockFi's platform; as explained above, the transactions also appear in the user interface and customers' transaction histories.

BlockFi's web and mobile platforms—the transfer and loan termination do *not* effectuate any immediate movement of coins from one wallet address to another. In other words, when a customer clicks the button on the app to transfer from BIA to Wallet, that action does not cause the assets thereby "transferred" to be sent automatically from a BIA omnibus wallet to a Wallet omnibus wallet on the BlockFi platform. Instead, according to the Renzi Declaration, the dedicated omnibus wallets used to backstop Wallet assets (collectively, the "Wallet Reserve") and the Wallet Ledger are trued up once a day[18] and any necessary transfers of cryptocurrency to or from the Wallet Reserve are made to bring the Wallet Reserve and the Wallet Ledger into balance to reflect all transactions in and out of Wallet.[19] Thus, there may be a significant lag between the time the transfer takes place and the time the Wallet Reserve is trued up even under ordinary circumstances. That's a feature of the system, not a bug.

17. Nothing in the Terms of Service provides that a customer's transfer out of BIA and into Wallet is delayed until, or dependent upon, BlockFi's update of its accounting system or true-up of the Wallet Reserve. To the contrary, the Terms of Service state that any withdrawal of principal from BIA is transferred "instantly." Assets transferred out of BIA and into Wallet immediately stop accruing interest (even if the Wallet Reserve true-up does not occur until the next day). Likewise, a customer can immediately initiate a withdrawal request from Wallet to an external address (even if the Wallet Reserve true-up has not yet occurred).

---

[18] The Debtors' process for truing up the Wallet Reserve, including whether the true-ups historically really did occur on a daily basis, needs to be fleshed out through discovery.

[19] *Id.*

B. **The Pause That Wasn't**

18. The first ten days of November 2022 saw the collapse of FTX, a crypto exchange that had provided rescue financing to BlockFi earlier in the year and had an option to acquire BlockFi.

19. On November 2, 2022 the news site CoinDesk reported that, based on a leaked balance sheet for FTX affiliate Alameda Research, much of the hedge fund's reserves were based on FTT, FTX's own centrally controlled and self-minted token.[20]

20. On November 4, 2022, Changpeng "CZ" Zhao, the CEO of Binance, announced that his company—the largest cryptocurrency exchange in the world—planned to sell its significant FTT holdings. The anticipated dump of a large amount of the thinly-traded token caused the price of FTT to nosedive and the competing CEOs of Binance and FTX to engage in a Twitter war.[21]

21. On November 8, 2022, FTX paused customer withdrawals and reportedly asked Binance for a bailout. Binance signed a non-binding letter of intent to acquire FTX, on the heels of which FTT prices plummeted another 75%.[22]

22. That same day, despite what we now know is BlockFi's massive exposure to FTX and Alameda, BlockFi's founder and chief operating officer Flori Marquez issued the following tweets in a bid to reassure customers:

---

[20] *See* "From powerhouse to plummeting: Here's a timeline of FTX's collapse," *Protocol*, available at https://www.protocol.com/fintech/ftx-collapse-timeline.

[21] *Id.*

[22] *Id.*



23. On November 9, 2022, after just a day of due diligence, Binance backed out of the tentative deal with FTX. CZ told the Wall Street Journal that FTX's "issues are beyond our control or ability to help." The same day, news broke that the SEC was investigating FTX's potential mishandling of customer assets.[23]

24. Nonetheless, on November 10, 2022, BlockFi again sought to reassure its customers with the following tweet at 9:00 a.m.:



---

[23] *See, e.g.*, https://www.reuters.com/technology/us-probes-ftx-over-handling-client-funds-bloomberg-news-2022-11-09/.

25. Moments later, FTX CEO Sam Bankman-Fried began tweeting out his infamous *mea culpa* thread, stating (among other things) "I'm sorry. That's the biggest thing. I f*cked up, and should have done better" and announcing that Alameda Research was shutting down.[24]

26. Approximately 11 hours[25] after its "everything is fine, nothing to see here" tweet, BlockFi did an abrupt about-face and announced that, in light of the news regarding FTX and Alameda, BlockFi would be "limiting platform activity" in some unspecified manner, "including pausing client withdrawals."



---

[24] *See* https://twitter.com/SBF_FTX/status/1590709166515310593.

[25] BlockFi claims that the tweet is time-stamped at 8:15 p.m. on November 10. On Twitter, it appears to have been posted at 8:16 p.m. The Ad Hoc Committee will not quibble about the precise time, however, because—as set forth at length herein—the tweet is completely irrelevant to the question of whether customers actually transferred assets from BIA to Wallet.

27. BlockFi's Terms of Service do not identify Twitter as an official means for communicating with customers. Customers do not need to have Twitter accounts or follow BlockFi on Twitter in order to use BlockFi's services. BlockFi had the ability to push emails out to its customers, yet inexplicably chose not to do so with respect to the decision to pausing withdrawals from the platform.

28. BlockFi did not disable transfers from BIA to Wallet, on either its web-based or mobile platform, on November 10, 2022.

29. On November 11, 2022, the content of the November 10 evening tweet was posted on BlockFi's website.[26] BlockFi did not disable transfers from BIA to Wallet, on either its web-based or mobile platform, on November 11, 2022.

30. On November 14, 2022, BlockFi posted a further update on its website. BlockFi stated that it would "continue to pause many of our platform activities for now." BlockFi did not specify which activities would be paused, nor did it suggest that *all* activities were paused. It further stated that "withdrawals from BlockFi continue to be paused," and asked customers not to submit any deposits to Wallet or BIA.[27] As of November 14, 2022, BlockFi still had not disabled transfers from BIA to Wallet on either its web-based or mobile platform.

31. Nothing in the November 10 tweet or the November 11 and 14 updates advised customers that BIA-to-Wallet transfers were among the activities that were supposed to be frozen. Nor would customers have had any reason to suspect that that was the case, since the

---

[26] *See* November 11, 2022 BlockFi Update, available at https://blockfi.com/november-11-2022-blockfi-update.

[27] *See* November 14, 2022 BlockFi Update, available at https://blockfi.com/november-14-2022-blockfi-update.

Debtors continued to allow customers to use the BlockFi website and app to transfer assets from BIA to Wallet at least until November 18, 2022.[28]

32. According to the Debtors' own Motion, instead of actually halting transfers from BIA to Wallet, they simply stopped truing up the Wallet Reserve.

33. Each member of the Ad Hoc Committee transferred assets from BIA to Wallet between November 10 and November 18, 2022. Each member of the Ad Hoc Committee received an email from BlockFi confirming that the transfer had taken place. Each member of the Ad Hoc Committee was able to see, in the BlockFi app, that assets had moved from BIA to Wallet. The transaction report for each member of the Ad Hoc Committee shows that the assets were removed from BIA. Upon information and belief, the transferred assets immediately ceased earning interest, just as BlockFi's February 14, 2022 email warned would happen.

34. On November 23, 2022, BlockFi updated its "Responses to Frequently Asked Questions" ("FAQ") on its blog. In answer to the question "Where can I find information about my account?" BlockFi advised customers that "[y]ou can continue to check the BlockFi app for **accurate information** regarding your account balances" (emphasis added).[29]

35. Evidently, at least as of November 23, 2022, BlockFi still believed and admitted that customers' Wallet account balances, as reflected on the BlockFi app, were accurate.

**III.    ARGUMENT**

36. None of the Debtors' official or unofficial notices to customers ever advised them that inter-account transfers between BIA and Wallet were being paused. And, in fact, the Debtors

---

[28] Motion ¶ 4. The Debtors' assertion that they were somehow unable to disable transactions on their website and app for *eight days* strains credulity, to say the least, and should be tested in discovery.

[29] FAQ, https://blockfi.com/responses-to-frequently-asked-questions. BlockFi's assertion that the app reflects accurate account balances still appears in the FAQ as of January 4, 2023.

-12-

*failed* to pause those transfers for at least eight days after pausing withdrawals from the platform. The transfers that the Debtors continued to allow are reflected in the app, which the Debtors claim is accurate. The transfers are documented in the transaction history reports that can be downloaded from BlockFi's platform. The transfers were confirmed in emails to customers. Yet the Debtors now claim that those transfers never happened.[30] The request that the Court reverse all Wallet Transfers that occurred after 8:15 p.m. on November 10 (and thus deem those assets property of the Debtors' estates) essentially boils down to the argument that a "transfer" from BIA to Wallet could not "actually take place" unless and until BlockFi updated a specific internal accounting ledger and then trued up the Wallet Reserve.[31] This argument cannot be squared with the plain language of the Terms of Service.

37. "Under New Jersey law,[32] where the terms of a contract are clear and unambiguous, there is no room for interpretation or construction and the courts must enforce those terms as written." *Namerow v. PediatriCare Assocs., LLC*, 461 N.J. Super. 133, 140, 218 A.3d 839, 843 (Ch. Div. 2018). Here, the Terms of Service unambiguously provide that when a customer makes a request to remove his assets from BIA, those assets are "***transferred instantly***" to Wallet. The Terms of Service do not require that BlockFi update its internal accounting ledger[33] or true up the Wallet Reserve in order for a "transfer" to have taken place. All that is needed under the Terms of Service is a request by the customer.

---

[30] Motion ¶ 7 (alleging that none of the transfers from BIA to Wallet "actually took place").

[31] *Id.*

[32] The Terms of Service provide that they are governed by New Jersey law for US clients and Bermuda law for non-US clients. Bermuda law similarly provides that where the language of a contract is "unambiguous on its face," a court "should give the contractual terms their plain meaning without looking outside the terms of the contract." *Columbia Sav. & Loan Ass'n v. Am. Int'l Grp., Inc.*, No. 91 CIV. 0589 (MJL), 1994 WL 114828, at *4 (S.D.N.Y. Mar. 31, 1994) (construing Bermuda law).

[33] The fact that BlockFi failed to update the Wallet Ledger after November 10 is a red herring. The transfers from BIA to Wallet *are* recorded on BlockFi's system since they are documented in the user interface and the downloadable transaction histories and BlockFi is plainly aware of them (after all, BlockFi knows exactly which

38. In this regard, it may be helpful to think of the "transfer" from BIA to Wallet not as the movement of coins but as the alteration of a legal relationship. When customers put their assets in BIA, they lent them to BlockFi and agreed that BlockFi could (temporarily) exercise all rights of ownership over the assets. In exchange, BlockFi paid the customers interest. When a customer requested a transfer of assets out of BIA, he terminated the loan and temporary grant of ownership rights to BlockFi, and BlockFi in turn stopped paying interest. All of that happened instantly—prior to, and independent of, any subsequent movements of coins or true-up of the Wallet Reserve.

39. This reading of the unambiguous language of the Terms of Service also comports with the general rule of construction, followed in New Jersey, that "[t]he most fair and reasonable interpretation imputing the least hardship on either of the contracting parties should be adopted so that neither will have an unfair or unreasonable advantage over the other." *Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 653 (D.N.J. 2018) (quoting *In re Community Med. Ctr.*, 623 F.2d 864, 866 (3d Cir. 1980)). BlockFi would have an enormously unfair and unreasonable advantage over its customers if the Terms of Service were read to mean that customers could not terminate their loans to BlockFi and regain title to their crypto unless and until BlockFi actually performed some back-end activities as to which the customers had no visibility or control (and that appear nowhere in the Terms of Service in any event). That interpretation would give BlockFi the ability to hold customers' assets hostage at will—as, in fact, it is trying to do here.

---

transfers it wants the Court to reverse). For BlockFi to argue that a transfer only counts if it is recorded in the particular way that BlockFi has unilaterally deemed to be "official" is, frankly, a little silly.

-14-

40.     BlockFi's attempt to use its own breach of the Terms of Service to somehow change the terms of that contract in its own favor is particularly egregious.[34] BlockFi emphasizes in its Motion that it needed to maintain strict controls over the true-up of the Wallet Reserve to ensure that it remained in compliance with the Terms of Service.[35] But BlockFi then freely admits that it deliberately stopped truing up the Wallet Reserve after November 10, putting it in violation of the Terms of Service, and asks the Court to find that its willful violation is a basis to retroactively cancel millions of dollars' worth of confirmed transactions by its customers that actually took place pursuant to and in compliance with the Terms of Service. Unsurprisingly, BlockFi cites no case law in support of its position. A violation by BlockFi of the Terms of Service doesn't mean that customers didn't transfer their assets out of the BIA program, terminate their loans of digital assets to BlockFi and regain title to those assets. It just means that BlockFi ought to have subsequently trued up the Wallet Reserve and is now in breach of contract.

41.     Even if the Terms of Service were found to be ambiguous, thus permitting the consideration of extrinsic evidence such as BlockFi's failure to true up the Wallet Reserve,[36] extrinsic evidence "may not be used to flatly contradict [a contract's] language." *Nye v. Ingersoll Rand Co.*, 783 F. Supp. 2d 751, 760–61 (D.N.J. 2011). Here, the contract language says that upon request, assets are "transferred instantly" out of BIA and into Wallet. By the Debtors' own admission, the updating of the Wallet Ledger and true-up of the Wallet Reserve do *not* happen

---

[34] *See, e.g., Harbor Ins. Co. v. Schnabel Found. Co., Inc.,* 946 F.2d 930, 937 n.5 (D.C.Cir.1991) ("[T]he legal definition of chutzpah: chutzpah is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan.").

[35] Motion ¶ 19.

[36] The extrinsic evidence would also have to include BlockFi's FAQ response posted on November 23 and still on its website today, asserting that account balances reflected in the BlockFi app are accurate.

"instantly." If those steps were part of what constitutes a "transfer," then a transfer could never happen "instantly" upon request.

42. Moreover, the facts show that whether the Wallet Reserve has been trued up is irrelevant to whether a transfer "actually took place." The transfer of assets out of BIA (which necessarily meant into Wallet, since that was the only place they could go) was *always* decoupled from the actual transfer of coins to true up the Wallet Reserve, because according to the Debtors that true-up happened, at most, once a day. Indeed, it is entirely plausible that there were instances in which a customer's transfer of assets *never* caused a transfer of coins into the Wallet Reserve, because no true-up was necessary.

43. Consider the following (radically simplified) scenario: Alice transfers 2 BTC from her BIA to her Wallet. The same day, Bob transfers 2 BTC from his Wallet to an external wallet. Suppose that the Wallet Reserve holds 2 BTC, and suppose further that BlockFi effectuates the transfer to Bob's external wallet through a separate wallet used for processing withdrawals (a not-uncommon structure). There is no need for BlockFi to transfer any BTC to the Wallet Reserve, since it already holds 2 BTC—a sufficient amount to cover Alice. Does that mean that Alice's transfer from BIA to Wallet didn't "actually take place," because no coins actually moved from a BIA-dedicated wallet to the Wallet Reserve? Of course not.

44. Another plausible scenario: on Monday, after BlockFi has already completed its daily true-up of the Wallet Reserve, Bob transfers 2 BTC from BIA to Wallet and immediately requests a withdrawal to his external wallet. BlockFi processes the withdrawal on Tuesday, before beginning its daily true-up. By the time the true-up starts, BlockFi has nothing to do: the 2 BTC are already gone. Does that mean Bob's transfer from BIA to Wallet didn't "actually take

-16-

place," because no coins actually moved from a BIA-dedicated wallet to the Wallet Reserve? Of course not.

45. It is also worth considering the flip side of the coin: on Monday, after BlockFi has completed its daily true-up of the Wallet Reserve, Alice (a US customer) transfers 2 BTC from BIA to Wallet. And on Tuesday, before BlockFi starts its true-up, Alice changes her mind. She frantically calls customer service: *I didn't realize I'd be locked out of BIA forever. I want to keep earning interest. Can't you undo the transfer?* Would BlockFi say, "ah yes, even though our regulators have been very firm about this, and even though you clicked the button and we sent you an email confirming that you left BIA, we have not yet trued up the Wallet Reserve so we will pretend the transfer didn't actually take place and will let you back in, and by the way please don't mention any of this to the SEC"? It's hard to imagine BlockFi would.

46. In short, extrinsic facts, if considered by the Court, would only serve to confirm that the actual occurrence of a transfer out of BIA is a separate event from, and not contingent on, the subsequent true-up of the Wallet Reserve.

47. Furthermore, if the Terms of Service are deemed to be ambiguous, any ambiguity must be construed against the drafter, BlockFi. *Portillo*, 323 F. Supp. 3d at 653; *see also Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 170 (D.C. Cir. 1981) (applying Bermuda law and agreeing with appellant that "a document should be construed against the drafting party"). This is especially true of "take it or leave it" contracts of adhesion, such as the Terms of Service. *Maddy v. Gen. Elec. Co.*, 80 F. Supp. 3d 544, 552 (D.N.J.), *aff'd*, 629 F. App'x 437 (3d Cir. 2015) ("[A]ny contract of adhesion, which is a contract entered without any meaningful negotiation by a party with inferior bargaining power, is particularly susceptible to the rule that ambiguities will be construed against the drafter.") (quoting 11 Williston on Contracts § 32:12).

48.     Construing the Terms of Service against BlockFi, customers' loan of digital assets to BlockFi terminated, and the assets were deemed to be transferred out of BIA, not whenever BlockFi got around to performing whatever back-end operations it typically performed, but *as soon as the customer said so.*

## IV.    JOINDER AND RESERVATION OF RIGHTS

49.     The Ad Hoc Committee hereby joins in the other customers' objections to the Motion. In addition, the Ad Hoc Committee reserves the right to amend this Objection, and to assert additional or different arguments, based on new information that it may learn through discovery.

## V.    CONCLUSION

For the foregoing reasons, the Ad Hoc Committee respectfully requests that the Court (i) deny the Debtors' Motion with respect to the reversal of customers' transfers from BIA to Wallet, or (ii) convert the January 9 hearing on the Motion to a status conference to discuss putting a process in place that affords customers the safeguards they would be entitled to in an adversary proceeding, including a fair opportunity to take discovery; and (iii) grant such other relief as the Court deems appropriate.

Dated: January 4, 2023
    New York, New York

Respectfully submitted,

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

/s/ *Deborah Kovsky-Apap*
Deborah Kovsky-Apap
875 Third Avenue
New York, New York 10022
Telephone: 212.808.2726
deborah.kovsky@troutman.com

*Counsel to the Ad Hoc Committee of Wallet Account Holders*