**LOEB & LOEB LLP**
Daniel B. Besikof (*pro hac vice* forthcoming)
Lindsay S. Feuer
345 Park Avenue
New York, New York 10154
Tel.: (212) 407-4000
dbesikof@loeb.com
lfeuer@loeb.com

*Counsel to Deferred 1031 LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEFERRED 1031 LLC'S INITIAL OBJECTION TO DEBTORS' MOTION FOR
ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR
WITHDRAWALS FROM WALLET ACCOUNTS, (B) UPDATE THE USER
INTERFACE TO PROPERLY REFLECT TRANSACTIONS AND ASSETS
AS OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE
RECONCILIATION OF ACCOUNTS, AND (ID GRANTING RELATED RELIEF**

Deferred 1031 LLC ("Deferred 1031"), by its attorneys, Loeb & Loeb LLP, respectfully

submits this initial objection (the "Objection") to the above-referenced debtors' (the "Debtors")

*Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet*

*Accounts, (B) Update the User Interface To Properly Reflect Transactions and Assets as of the*

*Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

*Related Relief* [Docket No. 121] (the "Motion").  All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

**SUMMARY OF ARGUMENT**

1.      Deferred 1031 agrees that Wallet funds are not estate property and supports the release of Wallet funds as quickly as possible to holders of Wallet accounts.  However, Deferred 1031 opposes the Debtors' efforts to invalidate millions of dollars of transfers from BIA to Wallet after the purported "pause," including a $1 million transfer to Wallet of Gemini dollars ("GUSD") by Deferred 1031 on the morning of November 11, 2022.

2.      The Debtors' argument hinges on the assertion that no coins were actually transferred after the commencement of the purported "pause."  The Motion contains no actual evidence that this assertion is true.  However, the impact on Deferred 1031 and other similarly situated customers of this requested relief is huge.  If the transfer from BIA to Wallet did occur, then $1 million of GUSD in Deferred 1031's Wallet account would not be property of the estate, and Deferred 1031 should be entitled to recover those coins.  If the transfer did not occur, then the Debtors presumably assert that the $1 million GUSD belongs to the estate, not deferred 1031.

3.      This dispute is thus, at bottom, a dispute over who owns the purportedly transferred coins – one that should be determined in an adversary proceeding.  Bankruptcy Rule 7001(2) could not be more explicit.  A debtor must commence an adversary proceeding if it seeks to "determine the validity, priority or extent of a lien or other *interest in property*," with all of the attendant procedural safeguards and protections.  Yet the Debtor teed up its request as a simple motion, giving its adversaries 14-days' notice, which ran over the Christmas and New Year holidays.

4.      In an adversary proceeding, customers like Deferred 1031 would have a meaningful opportunity to test the Debtors' assertions that no coins were transferred.  Such an opportunity is important, since the evidence available to Deferred 1031 suggests that, in fact, the coins actually

2

were transferred.  As discussed below, Deferred 1031 received an e-mail confirming the transfer

had been effectuated.  The transfer was reflected on the Debtors' user interface.  Moreover, the

amount of the claim listed for Deferred 1031 on the Debtors' consolidated list of 50 creditors

reflects exactly the amount of Deferred 1031's BIA account *after* giving effect to the transfer.

5.      Deferred 1031 appreciates that these cases need to move quickly, and Deferred

1031 supports the swift resolution of these cases.  But the need for expedience should not enable

the Debtors to trample on procedural safeguards afforded to participants in bankruptcy cases by

the Bankruptcy Rules.  That having been said, in recognition of the need for prompt resolution of

this issue, Deferred 1031 acknowledges that a different, streamlined procedure for resolving this

issue may be appropriate.  Deferred 1031 thus requests that the Court enter a discovery and briefing

schedule on this issue – one that is swift but fair and that approximates the procedural safeguards

of an adversary proceeding.

## BACKGROUND

6.      Deferred 1031 is a woman-owned business in Dallas Texas, which maintains a

Wallet and a BIA account with the Debtors in which it deposited GUSD – a stablecoin that is

pegged to the U.S. dollar.  On the morning of November 11, 2022, Deferred 1031 successfully

transferred $1 million of GUSD to its Wallet account.  No amounts were actually withdrawn from

the Debtors' platform.

7.      Until the Motion was filed, Deferred 1031 believed its coins remained on deposit

in the Wallet account.  Even now, Deferred 1031 has significant doubts about the accuracy of the

Debtors' assertions that no transactions after the purported "pause" actually occurred or were given

effect.  The information supplied to Deferred 1031 by the Debtors certainly suggests otherwise.

Just by way of example, at 2:22 pm, the Debtors sent an e-mail to Deferred 1031 confirming that

Deferred 1031's "assets have been successfully transferred from [its] BlockFi Interest Account

into [its] BlockFi Wallet" and providing details of the transaction. *See* Exhibit A. The Motion

acknowledges that the user interface reflects that the transfer occurred. As late as November 23,

2022, the Debtors' FAQs referred customers, including Deferred 1031, to the Debtors' user

interface for "accurate" account balances. Exhibit B, page 2. Moreover, the *Debtors' List of*

*Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders* [Docket No. 1]

appears to list Deferred 1031 (name is redacted – creditor no. 28) as having a claim of

$2,385,343.00, which is the exact amount reflected on the Debtors' user interface for Deferred

1031's BIA account *after* giving effect to the $1 million transfer to Wallet. *See* Exhibit C

(screenshot of Deferred 1031's user interface with account balances and proof of transfer).

**ARGUMENT**

8.      The Debtors filed for bankruptcy on November 28, 2022. The Debtors waited

approximately three weeks after the filing, until December 19, 2022 and the beginning of the year-

end holiday season, to file the Motion, by which they seek to wipe away millions of dollars of

transactions effected by their customers. The Debtors afforded affected parties just two weeks to

respond, with a major national holiday in each week. Indeed, the Debtors fixed the objection

deadline to the Motion for January 2, 2022, which is itself a national holiday. When Deferred

1031 asked the Debtors for an extension, so it could, among other things, test the factual assertions

in the Motion in due course through discovery, the Debtors granted Deferred 1031 just a single

additional – a day to which Deferred 1031 was already entitled under Bankruptcy Rule 9006.

9.      Worse yet, the Motion is unsupported by any evidence. Presumably, on reply or

even later, the Debtors will submit a declaration purporting to validate the self-serving statements

set forth in the Motion.

10.     Deferred 1031 and the Debtors' other customers deserve better treatment and a

better, more fair process for resolving this important issue, particularly in light of the substantial

evidence that the transfer from BIA to Wallet undertaken by Deferred 1031 actually *did* occur, *see*

¶ 7.  A more fair process for resolving this issue mandated both by principles of basic fairness and

Bankruptcy Rule 7001(2), which requires a determination of this kind to be resolved by adversary

proceeding and would afford affected customers substantial additional procedural safeguards.

11.     At its core, the issue here is whether Deferred 1031 owns the purportedly

transferred coins.  If the coins were transferred to Wallet, the Debtors acknowledge that such coins

are owned by the customers, not the Debtors.  The Debtors claim the coins were not transferred

and presumably assert that the purportedly transferred coins are estate property.[2]

12.     Bankruptcy Rule 7001(2) is crystal clear:  "a proceeding to determine the validity,

priority, or extent of a lien or *other interest in property*," like here, is to be determined by adversary

proceeding.  Adversary proceedings are necessary when dealing with such a critical issue because,

as noted above, adversary proceedings provide important – and greater – procedural safeguards

and protections than those afforded in a contested matter.  *SLW Capital, LLC v. Mansaray-Ruffin*

*(In re Mansaray-Ruffin)*, 530 F.3d 230, 237 (3d Cir. 2008), ("an adversary proceeding provides

the lienholder with 'greater procedural protection,' . . . requiring a complaint and a summons,

providing for an answer and discovery, and generally concluding only after trial or a dispositive

motion.") (quoting *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 451 (2004)).

13.     The requirement for the enhanced procedural protections of an adversary

proceeding is not just some technical nuisance that the Debtors can flout when they feel it is

expedient to do so.  The Third Circuit has made clear that this rule vindicates due process and

fairness principles:  "We hold that the adversary proceeding Rule at issue here is mandatory and

---

[2] Deferred 1031 reserves all rights regarding ownership of the purportedly transferred coins
and any other coins on deposit with the Debtors.

establishes a right to specific process that must be afforded.  Its mandatory nature is grounded in principles of due process[.]"  *Id.* at 238 (3d Cir. 2008).  Indeed, *Mansaray-Ruffin* applies here *a fortiori*, because in that case, the Rule was held to trump even the countervailing finality principles of a confirmed Chapter 13 plan, obviously not a factor here.

14.     The Motion seeks to nullify millions of dollars of transactions – transactions that the Debtors previously (and repeatedly) acknowledged actually occurred – from small businesses like Deferred 1031 and individual customers alike.  Customers, including Deferred 1031, should be afforded the due process protections of an adversary proceeding in making this determination.  This sweeping relief, affecting presumably thousands of customers, should not be granted by unsupported motion on two weeks' notice over the holidays.

15.     Deferred 1031 is not seeking to slow down these chapter 11 cases, and does not come to this Court standing on mere formality.  Accordingly, in the alternative to requiring an adversary proceeding, Deferred 1031 respectfully requests that the Court set an appropriate discovery and briefing schedule that permits all stakeholders a reasonable and meaningful opportunity to test the Debtors' factual assertions in the Motion and respond substantively.

16.     This issue is too important to be brushed under the rug.  The Debtors, in the name of expedience, should not be permitted to strip their creditors of important procedural protections guaranteed to them by Bankruptcy Rule 7001(2).

## JOINDER AND RESERVATIONS OF RIGHTS

17.     Deferred 1031 joins in the other customers' objections to the Motion and reserves the right to be heard on the issues raised therein at the hearing on the Motion.  To the extent that the Court adjourns consideration of the Motion or sets a briefing schedule, Deferred 1031 reserves the right to take discovery and file a supplemental objection articulating separate, additional, and different arguments.

## CONCLUSION

WHEREFORE, Deferred 1031 respectfully requests that the Court deny the Motion, or in

the alternative, adjourn the hearing on the Motion to permit full and fair consideration of it, and

grant such other, further, and different relief as the Court deems appropriate.

Dated: New York, New York
      January 3, 2023

**LOEB & LOEB LLP**

By: */s/ Lindsay S. Feuer*
Daniel B. Besikof (*pro hac vice* forthcoming)
Lindsay S. Feuer
345 Park Avenue
New York, New York 10154
Tel.: (212) 407-4000
dbesikof@loeb.com
lfeuer@loeb.com

*Counsel to Deferred 1031 LLC*

23403364

7

# EXHIBIT A

| | |
|---|---|
| **From:** | BlockFi Support |
| **To:** | Corinne Iadonisi |
| **Subject:** | Internal Transfer Completed from BlockFi Interest Account into BlockFi Wallet |
| **Date:** | Friday, November 11, 2022 2:21:58 PM |



**Deferred 1031, LLC,**

Your assets have been successfully transferred from your BlockFi
Interest Account into your BlockFi Wallet. Please see the transaction
details below.

If you did not initiate this request, please contact us or call us at 646-
779-9688 during business hours (Monday - Friday 9:30am - 5pm ET).
To learn more about BlockFi Wallet click here.

**INTERNAL TRANSFER**

Date: 2022-11-11

Currency: GUSD

Amount: 1000000

Origin: BlockFi Interest Account

Destination: BlockFi Wallet

Thanks,

**The BlockFi Team**



Please do not respond to this email as the inbox is not actively monitored. If you'd like to get in touch, please contact us via our Help Center

2022-11-11 © BlockFi. All rights reserved.

201 Montgomery Street, Suite 263

Jersey City, NJ 07302

Disclaimer:

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with BlockFi are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by BlockFi. Rates for BlockFi products are subject to change.

For more information, please see BlockFi's Terms of Service

Privacy Policy  |  Licenses & Disclosures   |  Help Center  |  Our Blog

# EXHIBIT B





← **Back to blog**



FEATURED

# Responses to Frequently Asked Questions

**Published, 23 November, 2022**

**Share article**

   

Responses to Frequently Asked Questions

We know that our client community has a lot of questions. We are focused on doing the utmost to be transparent around decisions related to our pause, products, and platform activity. Please find below an FAQ with the latest information.

General Questions

- Why did BlockFi pause platform activities?

  - Following the events surrounding FTX, we determined that in the current environment we could no longer operate our business as usual. The most prudent decision for us, in the interest of all clients, was to initiate a pause of many of our platform activities.

- What's next?

  - There are a number of scenarios that may be available to us, and we are doing the work now to determine the best path forward. BlockFi has engaged expert outside advisors that are helping us navigate BlockFi's next steps. Across BlockFi, our team is working tirelessly towards our primary objective of maximizing value for all of our clients, and that will see us explore every strategic option available to us.

- Where can I find information about my account?

  - You can continue to check the BlockFi app for accurate information regarding your account balances. We will continue to share updates regarding changes to our products through our official communication channels, including Twitter and our blog.

- Who can I contact if I have questions?

  - Should you have questions, you are welcome to contact our client success team here. Please note, that due to the volume of client inquiries, response times may be delayed.

- Will the company contact me by email if there are any changes to my account?

  - Yes. You will continue to receive email updates if there are changes to your account. Please continue to check BlockFi's official communication channels for updates related to our pause, products, and platform activity.

Responses to Frequently Asked Questions

- Does BlockFi hold 100% of client deposits on FTX?

    - The rumors that a majority of BlockFi assets are custodied at FTX are false. However, as shared, we do have significant exposure to FTX and associated corporate entities that encompasses obligations owed to us by Alameda, assets held at FTX.com, and undrawn amounts from our credit line with FTX.US

- What impact does FTX's Chapter 11 have on BlockFi?

    - We were shocked and dismayed by the news regarding FTX and Alameda. We, like the rest of the world, found out about this situation through Twitter. Given the lack of clarity on the status of FTX.com, FTX US, and Alameda, we are not able to operate business as usual.

    - While we will continue to work on recovering all obligations owed to BlockFi, we expect that the recovery of the obligations owed to us by FTX will be delayed as FTX works through the bankruptcy process. We intend to communicate as frequently as possible going forward but anticipate that this will be less frequent than you are used to. Our priority has been and will continue to be to protect our clients and their interests.

    - You can find additional information about FTX's chapter 11 cases here.

- How often will BlockFi provide updates?

    - We intend to communicate as frequently as possible going forward but anticipate that this will be less frequent than what our clients and other stakeholders are used to.

Retail Loan Questions

- What does this mean for my loans and loan collateral?

    - At this time, clients do not have the ability to post new funds to BlockFi. As a result, we are

On November 28, 2022, BlockFi filed voluntary cases under Chapter 11 of the U.S. Bankruptcy Code. Additional information about our filing can be found on our blog here.

onwards and clients will not be charged additional interest if or when a loan enters delinquency after November 11, 2022. Your loan will not be reported as delinquent to any credit bureaus.

    - You are not expected to make a payment at maturity while your loan is on hold and there will be no late fees associated with any payments, including at maturity. Additionally, autopay has been turned off for your account, if it was enabled.

- Should you have questions about this process, you are welcome to contact our client success team <u>HERE</u>.

- Why is my loan showing as delinquent?

  - For US-based customers, our loan servicing provider, <u>Scratch</u>, will show your loans as delinquent on their system, but given the 0% interest rate, your loan will not accrue any interest or late penalties. Your loan will not be reported as delinquent to any credit bureaus. Clients can disregard the automatically generated email from Scratch at the time of maturity notifying them of delinquency on Scratch's system.

- Is BlockFi liquidating retail loans if the loan reaches liquidation loan-to-value ("LTV") while platform activities are paused?

  - At this time, clients do not have the ability to post new funds to BlockFi. As a result, we are putting your loan into administrative forbearance. BlockFi has paused margin call requirements and auto liquidations at predefined loan-to-value levels.

*For further questions, you are welcome to contact our client success team <u>here</u>. As you can imagine, we are receiving an overwhelming number of inquiries and may need some time to get back to you. We will respond as soon as we are able.*

**Last updated on November 23rd, 2022**

BLOCKFI NEWS

**Share article**

   

Products

Institutions

Resources

Company ⌄

Follow Us ⌄

 

Everything you need on-the go

**Download the BlockFi app**



Log in

BlockFi Lending LLC NMLS ID#1737520 | NMLS Consumer Access
BlockFi Trading LLC NMLS ID#1873137 | NMLS Consumer Access

Privacy Policy | Legal | Licenses | Disclosures and Complaints | NMLS Consumer Access

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with BlockFi are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by BlockFi. Rates for BlockFi products are subject to change.

BlockFi Rewards Credit Card: For more information, please see BlockFi's Terms of Service. BlockFi is not a Bank. Cards are issued by Evolve Bank & Trust, Member FDIC, pursuant to a license from Visa® USA Inc. Rewards are not offered by Evolve Bank & Trust and are instead offered and managed by BlockFi.

BlockFi International Ltd. holds a Class F digital assets business license under the Digital Assets Business Act, 2018 (as amended) and is licensed by the Bermuda Monetary Authority to conduct the following digital assets business activities: (i) issuing, selling or redeeming virtual coins, tokens or any other form of digital assets (ii) operating as a digital asset exchange (iii) providing custodial wallet services (iv) operating as a digital asset derivative exchange provider and (v) operating as a digital assets services vendor.

See blockfi.com/terms for more information.

2022 © All Rights Reserved.

# EXHIBIT  C

Proof of account balance:

