UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-19361-MBK |
| | . | |
| BLOCKFI INC., et al., | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| Debtors. | . | |
| | . | |
| . . . . . . . . . . . . .. | | |
| BLOCKFI INC., et al., | . | Adversary No. 22-01382-MBK |
| | . | |
| Plaintiffs, | . | |
| | . | |
| vs. | . | |
| | . | |
| EMERGENT FIDELITY | . | |
| TECHNOLOGIES LTD., et al.. | | |
| | . | |
| Defendants. | . | Monday, January 9, 2023 |
| . . . . . . . . . . . . .. | | 10:00 a.m. |

TRANSCRIPT OF HEARING ON THE EMERGENT MOTION
SEEKING AN EXTENSION OF TIME WITH RESPECT TO ANSWERING;
MOTION FOR RELIEF FROM STAY;CONTINUING THE JANUARY 9
TURNOVER COMPLAINT

BEFORE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Haynes and Boone |
| | By:  RICHARD KANOWITZ, ESQ. |
| | 30 Rockefeller Plaza, 26th Floor |
| | New York, NY 10112 |
| | |
| | Haynes and Boone |
| | By:  RICHARD D. ANIGIAN, ESQ. |
| | 2323 Victory Avenue, Suite 700 |
| | Dallas, TX 75219 |
| | |
| Audio Operator | Kiya Martin |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONTINUED):

For the Debtor:              Cole Schotz, P.C.
                            By:  FELICE R. YUDKIN, ESQ.
                            Court Plaza North
                            25 Main Street
                            Hackensack, NJ 07601

For the Official            Brown Rudnick, LLP
Committee of Unsecured      By: ROBERT J. STARK, ESQ.
Creditors:                      JEFFREY L. JONAS, ESQ.
                                KENNETH AULET, ESQ.
                            7 Times Square
                            New York, NY 10036

                            Genova Burns, LLC
                            By: DANIEL M. STOLZ, ESQ.
                            494 Broad Street
                            Newark, NJ 07102

For the United States       Office of the United States Trustee
Trustee:                    By:  JEFFREY SPONDER, ESQ.
                                 LAUREN BIELSKIE, ESQ.
                            One Newark Center
                            Newark, NJ 07102

For George Gerro:           Gorski and Knowlton PC
                            BY: CAROL L. KNOWLTON ESQ.
                            311 Whitehorse Avenue, Suite A
                            Hamilton, NJ 08610

For Samuel Bankman-         Montgomery McCracken, LLP
Fried:                      By:  EDWARD L. SCHNITZER, ESQ.
                            437 Madison Avenue, 24th Floor
                            New York, NY 10022

For FTX Trading Ltd and     Sullivan & Cromwell LLP
Affiliated Debtors:         By: BRIAN D. GLUECKSTEIN, ESQ.
                                JAMES L. BROMLEY, ESQ.
                            125 Broad Street
                            New York, NY 10004

For Marex Capital           Mintz, Levin, Cohn, Ferris, Glovsky
Markets, Inc.                 and Popeo, P.C.
                            By: THERESE M. DOHERTY, ESQ.
                                KAITLIN R. WALSH, ESQ.
                            919 Third Avenue, Suite 38th Floor
                            New York, NY 10022

APPEARANCES (CONTINUED):

For the  Liquidators          Morgan, Lewis & Bockius, LLP
of Emergent Fidelity          By:  MATTHEW C. ZIEGLER, ESQ.
Technologies, Ltd.:           1701 Market Street
                              Philadelphia, PA 19103

                              Morgan, Lewis & Bockius, LLP
                              By:  JOSHUA DORCHAK, ESQ.
                              101 Park Avenue
                              New York, NY 10178

For Marex Capital             Mintz, Levin, Cohn, Ferris, Glovsky
Markets, Inc.:                  and Popeo, P.C.
                              By:  KAITLIN R. WALSH, ESQ.
                                   THERESE M. DOHERTY, ESQ.
                              919 Third Avenue
                              New York, NY 10022

TELEPHONIC APPEARANCES:

For the Debtor:               Cole Schotz P.C.
                              By:  MICHAEL D. SIROTA, ESQ.
                              25 Main Street
                              Hackensack, NJ 07601

                              Kirkland & Ellis LLP
                              By: JOSHUA A. SUSSBERG, ESQ.
                              601 Lexington Avenue
                              New York, NY 10022

For the Official              McCarter & English, LLP
Committee of Unsecured        BY: DAVID J. ADLER, ESQ.
Creditors:                         LISA BONSALL, ESQ.
                              Four Gateway Center
                              100 Mulberry Street
                              Newark, NJ 07102

                              Paul Hastings, LLP
                              By: KEN PASQUALE, ESQ.
                              200 Park Avenue
                              New York, NY 10166

For Samuel Bankman-           Montgomery McCracken, LLP
Fried:                        By:  DAVID M. BANKER, ESQ.
                              437 Madison Avenue, 24th Floor
                              New York, NY 10022

TELEPHONIC APPEARANCES (CONTINUED):

For the Ad Hoc              Troutman Pepper
Committee of Wallet         By: DEBORAH KOVSKY APAP, ESQ.
Account Holders:            4000 Town Center, Suite 1800
                            Southfield, MI 48075


For Silvergate Bank:        Holland & Knight, LLP
                            By: BARBRA RACHEL PARLIN, ESQ.
                            31 West 52nd Street
                            New York, NY 10019


For the United States:      KIRBY MCINERNEY LLP
                            By: SETH SHAPIRO, ESQ.
                            250 Park Avenue, Suite 820
                            New York, NY 10177


                      - - -

1            THE COURT:  On an omnibus hearing date, I wouldn't

2    take appearances.  It would take too long.  But today since

3    it's limited parties, I think it's worthwhile.

4            Let me start with those who are in the courtroom.

5    Let me have appearances.

6            MR. STARK:  Good morning, Your Honor.  Richard

7    Kanowitz, Haynes and Boone, proposed counsel to the debtors and

8    debtors in possession.  With me is my partner, Richard Anigian.

9            MR. ANIGIAN:  Good morning.

10            THE COURT:  Good morning.

11            MS. YUDKIN:  Good morning, Your Honor.  Felice

12    Yudkin, Cole Schotz PC, proposed counsel to the debtors, as

13    well.

14            THE COURT:  Thank you.  Good morning.

15            MR. STARK:  Good morning, Your Honor.  Robert Stark.

16    I'm here with Mr. Jonas and Mr. Aulet from Brown Rudnick.

17    Also, Mr. Stolz from the Genova Burns firm.

18            THE COURT:  The gang's back.  All right.

19            MR. STARK:  The gang is back; proposed counsel for

20    the Official Committee of Unsecured Creditors.

21            THE COURT:  Welcome.

22            MR. STARK:  Thank you.

23            THE COURT:  Good morning.

24            MR. SPONDER:  Good morning, Your Honor.  Jeff Sponder

25    and Lauren Bielskie from the Office of the United States

6

1  Trustee.

2          THE COURT:  All right.  Good morning.

3          Ms. Knowlton, how are you?

4          MS. KNOWLTON:  Good morning, Your Honor.  Carol

5  Knowlton with Gorski and Knowlton appearing on behalf of George

6  Gerro on the Gerro matter.

7          THE COURT:  All right.  Thank you.

8          MR. SCHNITZER:  Good morning, Your Honor.  Edward

9  Schnitzer from Montgomery McCracken Walker & Rhoads on behalf

10 of Samuel Bankman-Fried.

11          THE COURT:  Good morning.

12          MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

13 Glueckstein along with James Bromley from Sullivan and Cromwell

14 on behalf of the FTX Trading and Affiliated Debtors.

15          THE COURT:  Thank you.  Good morning.

16          MR. DORCHAK:  Good morning, Your Honor.  Joshua

17 Dorchak.  With me Matthew Ziegler from Morgan, Lewis & Bockius

18 LLP on behalf of Angela Barkhouse and Toni Shukla who are the

19 joint provisional liquidators of the Emergent-FTX entity,

20 Emergent --

21          THE COURT:  Great.

22          MR. DORCHAK:  -- Fidelity Technologies, LTD.

23          THE COURT:  Thank you; mouthful.

24          MS. DOHERTY:  Good morning, Your Honor.  Therese

25 Doherty, and with me is Kaitlin Walsh from Mintz Levin on

**WWW.JJCOURT.COM**

7

1  behalf of the defendant Marex Capital Markets Limited, formerly

2  known as ED&F Capital Markets Limited.

3          THE COURT:  Great.

4          MS. DOHERTY:  Thank you.

5          THE COURT:  Thank you.

6          Now let me turn to those who are appearing remotely

7  if anyone wants to enter appearance.  During the course of the

8  hearing, if you're appearing remotely and wish to be heard,

9  just use the "hand raise" function.  I'll do my best with my

10 law clerks to spot you and have you be heard.

11         Let me start -- Mr. Gerro, I see your hand raised.

12         MR. GERRO:  (No audible response).

13         THE COURT:  I think you need your speaker on.

14         MR. GERRO:  (No audible response).

15         THE COURT:  I'm still not hearing.  I hope it's -- I

16 don't know if it's on my end.

17         UNIDENTIFIED SPEAKER:  We can hear you, Judge.

18         THE COURT:  Okay.

19         Well, this may be problematic.  I don't know if it's

20 Gerro, Jerro, my apologies, but I'm not hearing you.  I hear

21 others on remote.

22         Let me go back to others, and let's see if it's yours

23 or on our end.

24         Mr. Sirota, good morning.

25         MR. SIROTA:  Good morning, Your Honor.  Michael

1  Sirota, Cole Schotz, PC, co-counsel for the debtors.

2           THE COURT:  And I see Mr. Sussberg.  Good morning.

3           MR. SUSSBERG:  Good morning, Your Honor.  Joshua

4  Sussberg, Kirkland & Ellis, proposed counsel to the debtors.  I

5  would like, if Your Honor's okay with it, to provide a brief

6  status update at the outset.  And I appreciate Your Honor

7  entertaining the remote appearance.  Thank you.

8           THE COURT:  Not a problem.  I'll get to you when

9  we're ready to start.

10          Mr. Adler.

11          MR. ADLER:  Good morning, Your Honor.  David Adler

12  from McCarter & English.  With me on the phone I believe is

13  also Lisa Bonsall.  We are proposed deficiency counsel for the

14  Official Committee.

15          THE COURT:  All right.  Thank you.  Mr. --

16          MR. PASQUALE:  Good morning.

17          THE COURT:  Good morning.

18          Mr. Pasquale, if I'm pronouncing it correct.

19          THE COURT:  You are, Your Honor.  Thank you.

20          Ken Pasquale for the Official Committee of Unsecured

21  Creditors in the FTX Trading case.  I'm with the firm of Paul

22  Hastings.

23          THE COURT:  Great; thank you.  Good morning.

24          Ms. Kovsky-Apap, if -- I know I'm butchering that.

25          MS. KOVSKY APAP:  You actually got it exactly right,

1  Your Honor.  Deb Kovsky, Troutman Pepper, on behalf of an Ad

2  Hoc Committee of Wallet Account Holders.

3           THE COURT:  All right.  Great.

4           And Ms. Parlin.

5           MS. PARLIN:  Good morning, Your Honor.  Barbra

6  Parlin, Holland & Knight, for Silvergate Bank.

7           THE COURT:  Thank you.

8           Well, all right, and I think I've demonstrated why we

9  won't do that again on omnibus days.

10          All right.  So --

11          MR. SHAPIRO:  Your Honor, this is Mr. Shapiro.

12          THE COURT:  Yes.

13          MR. SHAPIRO:  Seth Shapiro.  We are not appearing in

14  the adversary proceeding on behalf of the United States today

15  because we are not a party to that proceeding.  But I did file

16  a notice of appearance in the main case, and I'm here to answer

17  whatever questions the Court might have about the notice of

18  asset seizure that we filed last week in the main bankruptcy.

19  Thank you.

20          THE COURT:  Good.  I'm glad to have your appearance.

21  I certainly think it's going to be relevant.

22          All right.  Mr. Gerro, you want to try it again?

23          MR. GERRO:  Good morning, Your Honor.  I am appearing

24  with audio via remote the phone and on video on the computer.

25  Thank you.

10

1          THE COURT:  All right.  Thank you.

2          Mr. Banker.

3          MR. BANKER:  Good morning, Your Honor.  David Banker,

4 Montgomery McCracken, on behalf of Samuel Bankman-Fried.  Mr.

5 Schnitzer has already appeared in person, and he's now admitted

6 pro hac.  Thank you, Your Honor.

7          THE COURT:  All right.  Thank you.

8          And I think I have everyone.

9          All right.  Let's see.  Now let me turn back to Mr.

10 Sussberg.  We can start with the status since we're here on the

11 second, our second hearing in this case.

12          MR. SUSSBERG:  Yes.  Thank you, Your Honor.

13          And, again, for the record, Joshua Sussberg from

14 Kirkland & Ellis.

15          If I could ask Your Honor to share the presenter role

16 with Mr. Jacobson from my firm, we could put the slides on the

17 screen.

18          THE COURT:  All right.  Maria?

19                         (Pause)

20          THE COURT:  Easier said than done.

21                         (Pause)

22          UNIDENTIFIED SPEAKER:  They're setting up an easel,

23 Josh.

24          MR. SUSSBERG:  The modern marvels of technology.

25          THE COURT:  Well, about 150 remote appearances, it's

11

1   hard find people.

2        MR. SUSSBERG:  Mr. Jacobson, you want to raise your

3   hand.

4        THE COURT:  There he is.

5        All right.  Mr. Jacobson has presenter status.  He

6   just needs to share it on his end.

7        MR. SUSSBERG:  Okay.  And, Your Honor, as you

8   mentioned, today was supposed to be our omnibus second day

9   hearing.  Unfortunately, fortunately, and not criticizing but

10  it took several weeks for the Committee to ultimately be

11  appointed and that was not until December 21st.

12       And, obviously, we want to get off to a good start

13  with our Committee.  They need some time to digest some of the

14  relief that has been sought.  Some will take more time than

15  others.  The goal here is to be as consensual as possible,

16  which I'll talk about.

17       And as a result, we moved the hearing today and much

18  of the relief that we were seeking to next week.  And we'll

19  likely be seeking another hearing from Your Honor for certain

20  relief that I'll get to in a moment.

21       THE COURT:  All right.

22       MR. SUSSBERG:  Mr. Jacobson, if you could share the

23  slides.

24       MR. JACOBSON:  My apologies.  Your Honor, the Zoom is

25  still telling me that the host has disabled participant

12

1  screensharing when I'm trying to share my screen.

2          THE COURT:  All right.  Do we need to take a break

3  and let's see if we have Andrew?

4          Our apologies.  We're just going to take a couple of

5  minute break, get our IT person up here.

6      (Recess at 10:10 a.m./Reconvened at 10:16 a.m.)

7          THE COURT:  All right.  We are ready to go.  I see

8  material up on the screen.

9          Mr. Sussberg, it's your podium.

10          MR. SUSSBERG:  Thank you, Your Honor.  Again, for the

11  record Joshua Sussberg, Kirkland & Ellis.

12          I wanted to provide the Court with a brief status

13  update as well as a preview of some items in our SOFAs and

14  schedules that I think are appropriately served up best in a

15  live conversation, and that's the roadmap as you'll see on

16  slide two.  And we'll get through this fairly quickly so that

17  we can get to the proposed agenda items, which there are two,

18  and Mr. Kanowitz will be handling those for the company.

19          So progress since the first-day hearing, Your Honor,

20  flipping to slide four, and I think this is important.  We

21  talked at the first-day hearing about the path forward.  And

22  obviously, we filed a Chapter 11 plan on a standalone basis on

23  the very first day of the case.  But the thesis all along has

24  been that Moelis and Company, our proposed investment bank,

25  would run a comprehensive marketing process for all,

1  substantially all, or some of the company's assets.

2       And that process is well underway.  As you see on the

3  slide, 106 different parties, both internationally and here

4  domestically, have been contacted and are at various stages of

5  signing confidentiality agreements and ultimately getting

6  access to information.  And as we note at the bottom of the

7  slide, we do intend to file the motion seeking approval of

8  bidding procedures so that we have a very strict and robust

9  process that people can understand and look to as we market

10  these assets.

11       But importantly, and as I'll come back to in the

12  context of Committee discussions, it will be incumbent upon the

13  company to demonstrate from an overall business perspective

14  that there is in fact a potential standalone option.  And the

15  only way in which we'll be able to assess a truly value-

16  maximizing path forward is to understand the viability of that

17  standalone and be able to compare it to the results of the

18  auction process, hence, the need for bidding procedures and

19  hence the need for a lot of work on the company side together

20  with the Committee.  And that will all come in due course.

21       On the next slide, Your Honor, and true to our word,

22  we filed a motion a couple of weeks after the filing to return

23  money that is in the wallet function at the company.  We

24  believe based on the terms of use that the proceeds in dollars

25  and the currency in those wallets is the customer's.  And as a

result, our focus is on clients and getting those clients back
their money.

And we filed that motion to put a stake in the
ground.  We are closely coordinating with the Committee, and
there are some diligence items that are important to navigate,
including a preference analysis assessment and making sure that
we're holding on to funds that otherwise should not be leaving
the system.

And so while we very much would like to have this
heard on an expedited basis, we absolutely respect the
Committee's right to better understand this, the ordinary
course reconciliation, and the like.  And it may be more
difficult than we expected to make certain distributions and
not fully turn on this function.

So we are going to continue to work through this with
the Committee with the goal of being before Your Honor as
quickly as possible so that we could put money back into
clients' pockets.  And we understand that there have been some
objections to this motion.  We will address those in due
course.  I think they could all be reconciled, and we're going
to work with all deliberate speed to get this up in front of
Your Honor with the Committee's support.

Next slide briefly, I just wanted to note we filed
several second-day motions as well as retention applications.
Many of those will be heard next week.  Others will be

1  adjourned dependent upon the Committee's diligence and where

2  they stand as far as the relief is concerned.  But I did want

3  to make sure to note for Your Honor what's to come.  There are

4  some issues where we may have a tussle or two with the United

5  States Trustee, but we are prepared to move forward on all the

6  relief that we've sought, again, on an expedited basis.

7        As I mention on the next slide, the United States

8  Trustee appointed the Clients Committee on December 21st.  Nine

9  individual clients appointed to the Committee.

10       The Committee went and quickly retained professionals

11 as you'll see on the next slide, and the Committee is being

12 represented by Brown Rudnick, M3, Elementis, and Mr. Adler who

13 I apologize I forgot his logo on this slide.

14       Mr. Stark who I know the Court is familiar with, I go

15 back a long time with Mr. Stark.  And we've had our fair share

16 of disputes and disagreements, but there's never been a time

17 where I haven't been able to get to a resolution with Mr.

18 Stark.  And we talked about this case being different than

19 Voyager and Celsius and FTX, and I think true to his word, Mr.

20 Stark is committed to working with us to make that a reality.

21 And I am happy to have him on the other side, again, someone I

22 know, respect, admire, and consider a friend.

23       And we look forward to working with the Committee

24 professionals as well as the Committee because I will not it

25 was important for our management team to be able to sit with

the Creditors Committee at the outset here.  And so the

Committee again appointed on December 21st, we had an in-person

meeting this past Friday at my office.  The entire Committee

was there, all of their professionals.

I think by all accounts everyone who was there

thought it was a very good constructive meeting, and it's the

beginning of what we consider a very very important

relationship unlike a typical committee-debtor relationship

because of what's at stake and how these cases work.  And at

the end of the day, we're serving our clients, and they sit on

this Committee.

So looking forward to working with Mr. Stark and the

Team.  And M3, who we know extremely well led by Mr. Meghji,

and of course Mr. Epp (phonetic).

The next section, Your Honor, is a preview of our

schedules and statements.  We are filing SOFAs and schedules on

the 11th of January.  And my style, as I told Mr. Stark

yesterday, is not to bury a bunch of information in thousands

of pages and have people go on a treasure trove hunt to try to

find what they may or may not think is important.  And so

today, Your Honor, I wanted to preview for you and for everyone

else, I've previewed this for Mr. Stark, some items related to

insiders in the SOFAs and the schedules.

And I think it's important because as we've seen in

some of the other crypto cases, these issues can become

17

1  lightening rods and it sure did in Celsius.  This case as we've

2  said is unlike any of those other cases, and we are a

3  completely transparent operation.  I want to walk Your Honor

4  through exactly what happens and how insiders were treated and

5  went on.

6        On the next slide, I think it's just helpful to level

7  set.  You know, this was the January to November time frame.

8  And, again, remember the company had a settlement, a historic

9  settlement with the SEC back on Valentine's Day of last year,

10  and that was then followed by the Terra Luna collapse which we

11  spent a lot of time talking about, and then the Celsius and

12  Voyager pausing of withdrawals which created mass confusion and

13  obviously contagion throughout the industry.

14        In order to avoid having to halt withdrawals, right,

15  BlockFi entered into an agreement with FTX where FTX on a

16  junior basis backstopped all of our client withdrawals.  And as

17  you'll see, that led us to the ability to process more than $3

18  billion of withdrawals between June 1st when everyone else was

19  pausing their systems and the filing of these cases.

20        The issue and the problem was FTX-related and the now

21  known fraud of FTX.  FTX got into a liquidity crunch.  It's

22  made of token, fell off the Planet Earth, and they filed for

23  bankruptcy on the 10th.  And BlockFi was not long after.

24        On the next slide, and I think this is important, and

25  obviously people could spend time with this.  This will be in

1 our schedules and statements.  And, again, this is a preview.

2 But the management team at this company deployed their personal

3 assets on the platform to trade like all other clients earned

4 interest for store currencies.

5         And what we decided to do in an effort to be

6 completely transparent is put the name of each executive and

7 show the activity in their accounts on the BlockFi system each

8 month through to the filing.  And I want to note, and I don't

9 necessarily ever like to read anything, but the point at the

10 bottom is incredibly important: No member of the BlockFi

11 management team went through any cryptocurrency from the

12 platform after October 14th, 2022.  And no member of BlockFi's

13 management team made a withdrawal greater than .2 BTC in value

14 at any time after August 17th, 2022.

15         Now for those not familiar with Bitcoin, I think the

16 way to conceptualize this if Bitcoin was trading at $20,000, .2

17 BTC would be less than $4,000.  And I think the important

18 takeaway here is that there was no situation where insiders

19 were pulling money off the platform on the eve of or anywhere

20 near this bankruptcy filing.  And that is super important.

21         One other note, and we have a footnote on this slide

22 to this point, but in April of 2022, you'll see a rather large

23 withdrawal by Mr. Prince, the CEO and founder.  That was to pay

24 taxes, and it makes sense.  It was in April, effectuated April

25 15th tax payment.  But we wanted to be crystal clear with the

1  activity and how everything else worked.

2  The rest of the chart when we talk about October and

3  August shows balances decreasing because of the value of BTC,

4  because you see on the slide how much it went down over the

5  course of the year.

6  Next slide, just briefly, I mentioned this before,

7  but all of 2022, this company processed $7.7 billion of

8  withdrawals.  And from June 1st through the platform pause,

9  again, when all the other cryptocurrencies that failed were

10  pausing withdrawals causing mass contagion, we processed $3.3

11  billion of withdrawals.

12  And to put this all in context, as we say at the top

13  of the page, the management team's withdrawals are a tenth of

14  one percent of the $7.7 billion in withdrawals.  So this is not

15  the Celsius case where management extracted value on the eve of

16  the filing.

17  Next slide, this again we talked about, this crypto

18  winner FTX and the fraud that was FTX.  Same thing happens, and

19  I experienced it directly in the Voyager case where FTX stepped

20  in to try to save Voyager only really to try to save itself.

21  But this was a deal that allowed us the ability to process

22  withdrawals for customers all summer in a very confused

23  marketplace.  And, again, this was a $400 million backstop on a

24  junior basis that, again, allowed us to process those

25  withdrawals.

1          I mention this because on the next slide the impact

2    of the FTX transaction was significant on the executives, the

3    employees, and the shareholders.  The only way to raise money

4    at the time was on a junior basis to protect the clients.  But

5    the company was in fact pursuing equity raises and could have

6    pursued senior capital on a secured basis.  But it did the

7    safest the most viable thing, and it took the FTX money which

8    would ultimately lead, as Your Honor knows, to a potential FTX

9    transaction.

10          Importantly, though, the company needed to get

11   stabilized after the FTX infusion.  And it created massive

12   uncertainty amongst the employees.  And you see the 20 percent

13   reduction in force, and you'll understand as we talk about it

14   the value that was lost for this executive team on pieces of

15   paper from an equity standpoint when this company had been

16   valued at six to eight billion just a couple of months before

17   all of this.

18          And so it became important to implement a

19   compensation structure that kept people at the company so we

20   could facilitate what we thought would be an FTX acquisition

21   here in 2023.  And, therefore, as you'll see the next bullet in

22   July of '22, the board of directors approved really a three-

23   prong strategy to help retain key employees.

24          On the next slide you'll see each of the three

25   prongs.  First, I just think it's worth noting that many

1  employees had paid out of their own pockets or otherwise got

2  financing for shares or options that were all rendered

3  worthless by the FTX transaction.  So prong one was to make

4  these people whole and in some instances, grossed up for

5  retention.

6          Number two, the board approved a retention program

7  that you see on the slide, offered an opportunity to earn cash

8  payments because, remember, most of the employees had been

9  compensated in stock or options prior to the FTX transaction.

10 And so up to 50 percent of their base salary could be earned if

11 they not only stayed at the company but met certain companywide

12 goals.

13         And as we note on the bottom, and I think this is

14 important, that retention program was discontinued.  No

15 payments were made to insiders, nor will any be made.  And no

16 insiders are included in our proposed KERP motion which the

17 Committee is in the process of (indiscernible).

18         And number three, Your Honor, BlockFi historically

19 raises compensation with Capital Markets activity, but because

20 of the impact on the FTX transaction from a personal standpoint

21 on all the U.S. employees, increases in base salaries to ensure

22 that people maintained and stayed in their seats became

23 necessary.

24         And so as you'll see on the next slide, the first

25 column is the equity, both vested and unvested, that was lost

1    at the time of the FTX transaction.  And some of the numbers

2    are obviously staggering.  And it's unfortunate, but this is

3    the reality in which we live.

4         We have a second column of 2023 retention payments

5    that were put in place as part of the FTX stabilization post-

6    December transaction. None of these payments will be made.  And

7    then we have a slide and a column talking about salary changes

8    following the FTX transaction, again, to help ensure that we

9    retain critical employees.

10        And as noted at the bottom, the KERP that we are

11   seeking approval of had absolutely no insiders included.  That

12   was by design.

13        Okay.  Slide 17, and, Your Honor, you'll remember

14   this timeline.  We'd attached it to Mr. Renzi's first-day

15   declaration.  And I think this will be helpful in putting the

16   last part of our SOFA schedule preview into appropriate

17   context.  And some of this I've covered, and I won't rehash.

18   But this timeline starts with BlockFi's success and growth back

19   in 2018 through mid-2022 and the crypto winter, if you will,

20   that led to the FTX rescue transaction and the ultimately the

21   filing of these cases.

22        And, again, I want to use this as a preview for the

23   Court and other parties in interest as they're going to see in

24   our schedules and statements certain litigation settlement

25   payments.  And this timeline, which will overlay, will help

1  illustrate those litigation payments and the settlement.

2          Because the terms of the litigation settlement that

3  I'm talking about are confidential, I'm going to refer to the

4  counterparty for the settlement as Counterparty A.  We will

5  share copies with the Committee.  Obviously, we'll share copies

6  with the United States Trustee.  But for public purposes and

7  because of confidentiality arrangements included in our

8  settlement agreements, for today, we will call it Counterparty

9  A.

10         And this timeline demonstrates BlockFi's successfully

11  raised capital via four different rounds of preferred equity

12  financing.  And in July 2021, for example, BlockFi Series E

13  offering was valued at 3.8 billion.  And as we'll talk about

14  and as I mentioned to Your Honor before, in January of 2022,

15  BlockFi received a six to eight-billion-dollar third-party

16  indicative valuation.

17         Now as is typical for companies like BlockFi, many of

18  the BlockFi executives and employees had been compensated

19  heavily in equity.  And that equity, obviously, appeared to be

20  extremely valuable, especially when you attach a six- to eight-

21  billion-dollar valuation to it.

22         So in this context, as again is typical, several

23  different investors approached the company, including

24  Counterparty A.  And they approached several members of the

25  management team and offered different transaction structures to

1  provide BlockFi executives and employees with liquidity in

2  exchange for their equity upside.

3        And as Your Honor is familiar, this is common for

4  early-stage companies, like BlockFi, and can ultimately be a

5  win-win for both sides.  So investors here like Counterparty A

6  are betting that the company will go public or be sold.  And so

7  they proposed to employees that they take some of their equity

8  off the table in exchange for liquidity.  It's also acquiring

9  the equity at a material discount so if the company IPOs or is

10 sold, the counterparty stands to make a significant profit.

11       And the employees, in turn, can reduce their exposure

12 and get some earl liquidity.  And as a result, they're willing

13 to suffer a discount that's demanded by the investor.  And so

14 these types of private security contracts are entered into

15 directly between the employees and the company, and that's

16 important.

17       So as we note and you'll see on the slide, starting

18 at the end of 2021 and then in March and April of '22,

19 BlockFi's board of directors approved -- certain current and

20 former BlockFi execs entered into the first set of private

21 securities contracts with Counterparty A.  And we call these on

22 the slide PSCs on the timeline.

23       In the private securities contracts, Counterparty A

24 promised to make immediate payments to the relevant individuals

25 in exchange for some of their future rights to payment in the

1  event of an IPO or a sale.  And as I mentioned, the first of

2  these agreements were entered into in November of 2021.

3          Again, this appeared to be a win-win for all.  And

4  this was effectively an employee benefit from the company's

5  standpoint because the company facilitated its employees

6  getting value for their equity and taking some of their assets

7  off the table.  And at the time, it appeared the employees were

8  transacting at a material discount.  In January 2022, again, a

9  major investment bank indicated a six- to eight-billion-dollar

10 valuation for the company.

11         At the same time BlockFi was seeking to raise

12 additional capital through the Series F preferred financing

13 that actually never was effectuated, more of BlockFi's current

14 and former employees negotiated PSCs with Counterparty A

15 through April of 2022.  And you'll see that on the next click.

16 And notably and obviously, all of these transactions pre-dated

17 the contagion or anyone's knowledge of what was going to happen

18 in this industry, and that ultimately caused BlockFi its

19 liquidity issues and the bankruptcy filing.

20         Now everything changed as we demonstrate on this

21 slide in May of 2022 when a material downturn in the crypto

22 market began.  The collapse of Three Arrows Capital as we

23 talked about with Your Honor and more generally the crypto

24 winter caused contagion that nobody had understood or ever

25 predicted across the sector and led to material withdrawals

26

1  that we were able to weather through because of the FTX

2  backstop.

3           That sector contagion, as we've talked, about really

4  began in May with the Luna collapse.  And although BlockFi

5  didn't have any direct exposure to Luna, as everybody else

6  started pausing their platforms, BlockFi had immediate requests

7  and massive withdrawals.  And it was industry wide and no one

8  was free from it.

9           The deterioration of the sector had an impact

10 obviously on BlockFi's equity value and Counterparty A's

11 investment which had been made at the end of '21 and in March

12 and April of '22.  To be very clear, and I think this is super

13 important, Counterparty A's recourse against the BlockFi

14 executives was contractually limited to BlockFi's shares

15 themselves.

16          So Counterparty A had no viable claim against anyone

17 or the employees, but it certainly could sue as a contractual

18 party because it had agreed it had no recourse again.  And so

19 what happened in June of 2022?  Counterparty came to BlockFi

20 and threatened to bring unfounded claims against the company

21 directly generally and, in our view, seeking to use expensive

22 burdensome litigation to recoup the value of Counterparty A's

23 unsuccessful investment.

24          The theories that were articulated at the time, and

25 this predates my involvement, but it's been conveyed to me that

1    the theories were vague but generally suggesting that BlockFi

2    should have disclosed more information about the damage to its

3    business caused by sector contagion than it otherwise did.  And

4    as Counterparty theorized, without evidence that BlockFi knew

5    more than it did earlier than it did.

6        But BlockFi had to assess the threats from

7    Counterparty A and at the same time, it entered into the FTX

8    transaction to backstop those customer withdrawals.  Now the

9    transaction with FTX, remember, was hugely helpful to BlockFi

10    clients but disrupted the equity holders.  FTX agreed on that

11    $400-million junior loan, but essentially backstopping the

12    company and wiping out millions and hundreds of millions of

13    dollars in proposed equity value that existed just a few months

14    before.

15        And as a result of that FTX transaction, FTX had

16    appointed an observer to BlockFi's board of directors.  And

17    from FTX's perspective, what FTX said both publicly and

18    privately, and I was witness to this in multiple different

19    arenas, a key benefit of the deal with BlockFi from FTX's

20    perspective was stabilizing not only BlockFi but the sector

21    more broadly.  And that was FTX's goal and Sam Bankman-Fried

22    has stated it over and over again he wanted to be the white

23    knight to try to save the industry when in reality, he was

24    someone in a much darker place trying to save himself.

25        But that being said, the board observer was very

1  concerned that litigation around this issue with Counterparty A

2  would be distracting and potentially impair our ability to not

3  only stabilize the business post the $400-million junior

4  funding but affect the FTX transaction.  And as a result, with

5  the money funded from the FTX transaction, the board considered

6  ways in which a settlement could be effectuated with

7  Counterparty A given that the lawsuit itself could cause harm

8  both to the business and to the employees and at the same time

9  drain resources of the company.

10        So as a result, the threats from Counterparty A were

11  resolved in a confidential settlement agreement that we note

12  was entered into on August 23rd, 2022.  It was between

13  Counterparty A, BlockFi, and each of the executives that were

14  involved.  And the settlement was brought to and approved by

15  BlockFi's then board of directors including disinterested

16  directors at the time.

17        The claims that were advanced, as I mentioned, Your

18  Honor, were directly against BlockFi and that BlockFi had

19  allegedly provided misleading information or not enough

20  information.  We all disagree and dispute.  We thought these

21  claims were specious.  But, again, Counterparty A had no

22  recourse against the individuals, and all they could do was

23  make noise.

24        Due to the structure of the settlement, certain

25  payments, Your Honor, were routed through the executives and

1  ultimately made to Counterparty A.  The payments also created

2  tax liabilities for the executives even though they did not

3  keep the funds.

4         So as you'll see on this slide, and it's essential to

5  understand this, the recipients named on this slide did not

6  keep any funds.  The company agreed to make these settlement

7  payments in some instances directly to the employee but the

8  employee then would pay the taxes associated with the amounts

9  and then distribute the rest to Counterparty A.

10         So when the schedules are filed on Wednesday, there

11  will be a spreadsheet of all payments made and some of those

12  payments will have the numbers on this slide and will say

13  litigation settlement.  The executives again themselves were

14  mere conduits of those payments to fulfill a settlement where

15  BlockFi settled claims made by Counterparty A.

16         And suffice it to say, we, the team at Haynes and

17  Boone and Cole Schotz and now together with the Committee, will

18  be looking at all recourse we have with respect to the

19  approximately $15 million of payments that were made to

20  Counterparty A.  And rest assured, Your Honor, that we will do

21  everything we can to make sure these estates are whole and

22  spared from specious litigation claims.

23         But I did think this was important enough to spend a

24  few minutes walking the Court through, walking our stakeholders

25  through, and really giving everybody a preview of what would

30

1  otherwise be buried in schedules and statements.  We think this

2  is incredibly important.  We think this case is different.  We

3  think this management team is different.

4        And case in point, I think us spending the time being

5  transparent and laying out that there really is nothing for

6  people to see when you understand and peel back the onion was

7  important from our perspective.  And, again, I appreciate Your

8  Honor allowing me the time and to appear via remotely.

9        Thank you, Your Honor.

10        THE COURT:  Thank you.

11        Bear with me.

12        Mr. Sussberg, is there anything additional on the

13  status you wish to say before I go to others in and outside of

14  the courtroom?

15        MR. SUSSBERG:  That is all, Your Honor.   Thank you.

16        THE COURT:  Okay.  Great, thank you.

17        And we'll take down the slides.

18        Thank you.

19        All right.  Let me turn to counsel who are the

20  present.  Committee counsel wish to be heard on the status?

21        MR. STARK:  Your Honor, I did have a few remarks I

22  wanted to make.  Mr. Sussberg stole a little bit of my thunder,

23  but then he went off into a whole lot of really interesting

24  things that I don't have anything to comment on about now as

25  I'm learning about them.

31

1          THE COURT:  As we all are.

2          MR. STARK:  As we all are.

3          Can I have a few minutes, please --

4          THE COURT:  Absolutely.

5          MR. STARK:  -- just to give you our perspective?

6          THE COURT:  Yes.

7          MR. STARK:  Thank you.

8          Again, Robert Stark, proposed counsel to the official
9 Committee of Unsecured Creditors.

10          And I do want to thank Mr. Sussberg, and I'll talk a
11 little bit more about him and their approach in a minute.  But
12 I do think that's helpful.  I'm thankful for it.

13          As Mr. Sussberg said and put on the slide, on
14 December 21, so just before the holiday week, the Official
15 Committee of Unsecured Creditors was appointed.  We do have
16 nine individuals.  They are thoughtful, intelligent individuals
17 with real-life experiences.

18          They're sophisticated on all matters related to
19 crypto.  I'm learning an awful lot from the time that -- we
20 hadn't had a lot of time together, but they're very good at
21 teaching, and I'm learning an awful lot from them already.

22          And they're varied.  They were varied in their
23 investments in terms of the currencies that they invested in
24 and the kinds of accounts they had at BlockFi.  So they're a
25 good representative group, and they are working awfully hard.

32

1   And I wanted to give Your Honor and, frankly, if you'll allow

2   me to use the bully pulpit.

3          THE COURT:  Yeah.

4          MR. STARK:  -- all those who are listening in, we

5   have a good representative, hardworking, intelligent committee.

6   And we're working well together.

7          And I'll continue to update the Court if there's any

8   issues, but I don't anticipate any looking at this group as I

9   have already.

10         We have an attitude or an approach to this case, and

11  again not only for Your Honor but for everyone who is

12  listening.  We're in a new industry here.  We're in a new

13  industry for bankruptcy here.  But there have been a couple of

14  crypto platform bankruptcies that are a prelude for what we're

15  doing here in BlockFi.  And we've studied them, and we've

16  learned from them.  Some are good; some are not so good.

17         One of the lessons that we have learned is that

18  financial platforms as a general matters or perhaps

19  cryptocurrency specific today, don't age well in bankruptcy

20  like a fine wine.  They can be overprocessed.

21         And so moving thoughtfully, diligently, but quickly,

22  being aware of the cost, being aware of the burden, being

23  decisive, and being efficient with the Court's resources and

24  the Chapter 11 resources may be more at a premium here than in

25  any other normal bankruptcy case that we would deal with.  And

1  that is a very significant part of our theme which is whichever

2  path we're going on, be thoughtful and diligent about it but

3  then make a decision and go with it because people are losing

4  money, by the way, and we don't intend to be stuck.

5          We met with the company, as Mr. Sussberg said, on

6  Friday.  We had a full-day meeting with them.  It's good old-

7  fashioned bankruptcy where everybody saw the whites of each

8  other's eyes and we had a very frank and very constructive

9  conversation with the management team and the professional

10 team.  It was a good kickoff meeting.

11         And they shared a great deal of information with us,

12 and they have since that.  And they're clearly being well

13 advised.  Some of the best in the business are on the BlockFi

14 side, and I have very strong personal relationships with these

15 individuals.  I've worked with them, as Mr. Sussberg said, in a

16 number of cases.  And as true to our past experiences together,

17 we're talking the way that we're supposed to in Chapter 11 and

18 we're learning.

19         And the executive team seems to share our view.

20 Thoughtful, diligent, quick, efficient, decisive.  Let's not

21 sit stuck in Chapter 11.  So we all seem to share that view,

22 and that was a theme that was replete to our meeting on Friday

23 and ever since.  We're going to have our disagreements.  That's

24 why we have a V that divides us.  And we're going to try to

25 minimize them.

34

1          We have a shared agreement amongst the professionals

2   and the clients that if we extrapolate litigation and fight

3   over everything, that's not going to be consistent with a

4   shared thematic approach to this Chapter 11 case.  So we're

5   going to try to resolve things where we can.

6          When we have disagreements, we're going to do it in a

7   very professional, fair, and orderly manner so that we get

8   things resolved.  And I think you saw from Mr. Sussberg today

9   the transparency idea is carrying through already.

10          For the customers who are listening in, again,

11   forgive me, Your Honor, for sizing the bully pulpit, but if

12   you'll allow me just to say a few things for those who are

13   listening.

14          THE COURT:  Sure.

15          MR. STARK:  There are many of you, many of them.  And

16   they have lose enormous amounts of money.  And I'm aware, not

17   only from my Committee but from others, that very significant

18   portions of people's own personal savings, retirement accounts

19   and wealth has gone away.  And that is a profound

20   responsibility on this Committee, and we acknowledge it.  We

21   live it every day full-time job.

22          And we're going to do everything we can to get people

23   their money back as soon and as large in dollar quantum as

24   possible and not getting stuck in the mud being decisive and

25   being efficient and keeping costs down and driving this case

1   forward to get people their maximum money.

2           We hired M3 and Elementis you saw on the screen.

3   They are experts as financial advisors and in this particular

4   industry space.  They are working very very hard to learn

5   everything they can how we got here, where we're going --

6   that's very unclear to me right now where we're going -- and

7   how soon and cost efficiently can we get there.  So we're

8   deeply -- already working deeply on that with the company.

9           We're going to be communicating with the customers.

10  We've already set up a Twitter account, and that one is a

11  little new to me so I'm going to learn from this.  We've set up

12  the website.  We are going to be delivering information to the

13  customer group overall.  It's their money, and we're going to

14  be talking to them.  And we want to deliver not only

15  information as we can -- confidentiality restrictions are very

16  important, we're going to honor them scrupulously.  But if we

17  can get information out, we will.  We'll do it timely, and

18  we'll try to be as insightful as we can so that the customer

19  community generally understands what's happening in this case

20  and how it's moving forward.  And we're always ready to speak

21  one on one with any customer who can call us 24/7 and we'll

22  respond promptly.  And we're going to answer all questions.

23          With that, Your Honor, I just open up for any

24  questions Your Honor may have for us.  But we intend to move

25  this case quickly with the other folks on the other side of the

1  aisle in a very consensual way and try to get to resolution as

2  Mr. Sussberg said.  We obviously have a lot to do.

3         THE COURT:  Thank you, Mr. Stark.  Your comments were

4  especially important for those that aren't here today.  I want

5  to address very briefly that the Court is in receipt probably

6  of two to three dozen individual objections that have been

7  filed by customers and with many of them related motions for

8  appearances.  We have done our best, besides the obvious, I

9  read everything.  I'm trying to make that clear to all who

10 filed pleadings, they get read.  They get read by me, they get

11 read by my law clerks.

12        We are doing our best to direct individual customers

13 to the Committee now that it's been formed.  We're also

14 cognizant that there's an Ad Hoc Committee that's been formed

15 with respect to certain issues.  And I'm hoping between those

16 two committees and counsel representing those committees that

17 the concerns and issues that have been raised, often repetitive

18 -- same forms and same briefs and arguments -- can be addressed

19 and supported by counsel so that the Court need not endeavor to

20 allow individual appearances.

21        As much as I look forward to having individual

22 customers shared their views, their concerns, their arguments,

23 at this juncture, I'm asking that it be done on a written

24 platform.  And there's obviously transparency.  They are

25 welcome to watch and engage and engage with counsel for the

1 committees. But it would just be problematic I think for all

2 of us to allow a disruption as far as the court proceedings in

3 having multiple dozens of individuals present views that are

4 shared by those that can represent their views to the Court.

5 So not really for your benefit but for those here as

6 well. But for those that are watching, I'd like the customers

7 to understand that the Court is certainly weighing all of the

8 information that's been provided to the Court subject to

9 arguments that go back and forth. But at this juncture, I'm

10 not authorizing any individual appearances separate and apart

11 from actual pending motion practice or adversary proceedings

12 where parties of course are -- their arguments are going to be

13 entertained.

14 So with that, I don't know, Mr. Stark, is there

15 anything else you wanted to add at this juncture?

16 MR. STARK: Two things.

17 THE COURT: Yes.

18 MR. STARK: Only that we are solicitous of that. If

19 there are customers out there who are in fact interested in

20 filing pleadings to be heard by the Court, it might be better

21 if they just call us first. We would be very honored to

22 receive those calls and see if we can't be helpful and in turn

23 help the Court, if that's responsive to Your Honor's --

24 THE COURT: No, I think that's the best approach and

25 that's what we've been trying to urge them to do.

38

1          MR. STARK:  And, second, I think I may have mistepped

2   on something earlier if you'll allow me just to correct our --

3          THE COURT:  Yes, good.

4          MR. STARK:  And when I was talking earlier about

5   returning people's money to them in sort of quantum and dollar

6   amount, I meant value.  It may be in some respects that

7   returning people in kind is better for tax and other purposes.

8   So I just wanted to make sure the record is clear on that.

9          THE COURT:  No, it's clear and an important issue.

10          MR. STARK:  Yes, Your Honor.

11          THE COURT:  Thank you.  Thank you, counsel.

12          Counsel?

13          MR. KANOWITZ:  Thank you, Your Honor.

14          Richard Kanowitz, Haynes and Boone, proposed counsel

15   for the debtors and debtors in possession.

16          We have two other items on as well as some other

17   housekeeping to discuss, but we could discuss the housekeeping

18   at the end of the hearing.

19          I would ask the Court to hear the Gerro lift-stay

20   motion first and then we could turn to the adversary proceeding

21   issues.

22          THE COURT:  That's fine.  But before we get to the

23   Gerro matter, let me just make sure with respect to the status

24   conference, I didn't know if there's any other party that

25   wanted to be heard.

39

1              Let me start in the courtroom.  I didn't know if the
2    U.S. Trustee, Mr. Sponder, did you wish to be heard on the
3    status?
4              MR. SPONDER:  Thank you, Your Honor.
5              Jeff Sponder from the Office of the U.S. Trustee.
6              Just very briefly, Your Honor, just for the record,
7    United States Trustees continues to discuss with the debtors
8    the final first-day orders, the second-day motions, as well as
9    the retention applications, and we hope to have as much
10   resolved as we can prior to the next hearings.
11             THE COURT:  All right.
12             MR. SPONDER:  Thank you, Your Honor.
13             THE COURT:  Thank you.
14             Ms. Kovsky Apap?
15             MS. KOVSKY APAP:  Good morning, Your Honor.  Deb
16   Kovsky, Troutman Pepper, for the Ad Hoc Committee of Wallet
17   Account Holders.  I would just add my thoughts as far as
18   status, there are individual customers whose interests are
19   aligned with those as the Ad Hoc Committee.  Of course, they
20   should feel free to reach out.  I'm more than happy to speak
21   with them.
22             THE COURT:  Great.  And I thank you for your
23   participation.  I think it will be important.  Anyone else
24   remotely wish to be heard on the status?
25                       (No audible response)

40

1          THE COURT:  All right.  Then I think we're ready.

2  We'll proceed to the Gerro stay relief motion.  Let me have

3  appearances for counsel for the movant.

4          Ms. Knowlton?

5          MS. KNOWLTON:  It's Carol Knowlton of Gorski and

6  Knowlton appearing on behalf of the movant, George Gerro.

7          THE COURT:  All right.  And I see Mr. Gerro.  Who's

8  going to be presenting argument?  Is it you or Mr. Gerro?

9          MS. KNOWLTON:  I am.

10          THE COURT:  You are?  All right.  I think -- is

11  Mr. Gerro's father counsel?

12          MS. KNOWLTON:  Yes.  Mr. Gerro's father was counsel

13  to him in the California case.

14          THE COURT:  Okay.

15          MS. KNOWLTON:  He hasn't --

16          THE COURT:  He hasn't entered --

17          MS. KNOWLTON:  -- filed anything here.  Right.

18          THE COURT:  Okay.  That's what I wanted to clarify.

19          MS. KNOWLTON:  Right.

20          MR. GERRO:  Yes, Your Honor.  I will allow

21  Mrs. Knowlton to present the argument.  I am here just in case

22  I'm called upon or if needed.

23          THE COURT:  All right.  Thank you.

24          Ms. Knowlton, proceed.

25          MS. KNOWLTON:  Yes, Your Honor.  The debtor's

41

1  attorneys have filed both an objection and a surreply.  And in

2  that, their position is we shouldn't waste the money and the

3  time going -- allowing relief from the stay for Mr. Gerro to go

4  to California to have his case heard, because it's -- because

5  there are hundreds of thousands of creditors in this case, and

6  we should just abide by the claims process.  Unfortunately, I

7  don't know that the claims process would be applicable here.

8       Mr. Gerro is -- his point is because of the fact that

9  there is a forum selection clause and a waiver of right to a

10  jury trial in the contract, he needs to go to the California

11  court to have that matter decided.  He went to the California

12  court.  And at the time of the filing of the bankruptcy, there

13  was a court of appeals order or opinion that granted him the

14  right to have his case heard in California, because to do

15  otherwise would possibly deprive him of his right to a jury

16  trial as well as some other unwaivable rights that are present

17  in California but not necessarily present in Delaware or other

18  states.

19       I understand the argument.  I see that this is an

20  enormous case, obviously.  And I heard Mr. Stark.  I heard what

21  he said about having -- have it be economical and efficient.

22  And I agree with that to some extent, except for that fact that

23  this is not an administrative or procedural issue.  This is an

24  issue about waiving his unwaivable right, his absolute right in

25  California to a jury trial on the issues of his case.

42

1   Therefore, I think that it is appropriate to grant him relief

2   from the stay in order to proceed to the Supreme Court of

3   California.

4         The debtors -- when the California Court of Appeals

5   entered their decision that it was actually California that

6   should hear the case, the debtors appealed to the Supreme

7   Court.  And that's what's pending right now.  But right now,

8   that order from the California Court of Appeals is the standing

9   order.  That's the decision.

10        And I know that in their surreply, the debtors

11  submitted hundreds of pages of pleadings.  The one noticeably

12  absent one was that order that the California Court of Appeals

13  provided.  That is already, however -- and maybe that's why

14  they didn't submit it, but it's already in the motion as

15  Exhibit 3.  The original motion that we submitted on behalf of

16  Mr. Gerro has that order in it.

17        And that indicates that the reason that they wouldn't

18  allow it to be heard in Delaware, which is what the contract

19  agreed to, is that they weren't convinced by what the debtors

20  had proposed -- or had submitted, I should say -- they weren't

21  convinced that it would guarantee that Mr. Gerro would get his

22  right to a jury trial and would get any of the other unwaivable

23  rights, that the debtors hadn't submitted enough evidence to

24  show that he would get that.

25        So I understand that we need to be efficient.  I

43

1  understand that things need to be heard promptly.  But the --

2  but I don't know that having it heard in New Jersey or through

3  this Court would make it more efficient or make it heard more

4  promptly.

5           On the one hand, the debtors are saying in some of

6  their papers that we should wait.  We should wait until the

7  claims process is done, that it's premature to do this.  On the

8  other hand, they're saying it would take too long to go to

9  California, because you won't be heard in California for a long

10 time.  You can't have it both ways.

11          One of the reasons Mr. Gerro wanted to file this now

12 was so that he could get started in California so that he

13 wouldn't be too late once the process here is completed and

14 also so that he wouldn't -- by going -- you know, to go through

15 the claims process, he can't then go to California.

16          So our position is that, despite the fact that there

17 are many, many creditors in this case, despite the fact that

18 it -- it's -- yes, it's going to cost money -- it would cost

19 money here.  It would cost money here, because it's going to

20 be -- because the debtors admit it's a disputed claim.  It's

21 going to be a long process.  And it's our position that his

22 right to a jury trial and the other unwaivable rights is

23 something that he shouldn't be deprived of just because there

24 are hundreds of thousands of creditors and because these are

25 procedural matters that, you know, weigh against him.

44

1            THE COURT:  But couldn't each of those hundred

2   thousand creditors make the same argument?  Is there a basis

3   for Mr. Gerro to opt out of the claims process that Congress

4   has implemented, the -- under 502, the allowance process?

5   Isn't this the forum that Congress selected to displace the

6   burden on debtors to litigate claims issues across the country?

7            I mean, that's what I'm struggling with.  And I

8   understand that there are jury rights that have been asserted

9   under state law.  There -- of California.  There are other

10  substantive rights.  You could point to many claims in this

11  bankruptcy in which -- that are bottomed on substantive rights

12  under state law which are at loggerheads with the scheme

13  implemented under the Code.

14            MS. KNOWLTON:  Yes, Your Honor.  I understand that.

15  The thing that's different here is that the agreement that

16  exists between BlockFi and Mr. Gerro has a clause in there --

17  has a jury waiver clause and a forum selection clause, and that

18  makes it Delaware.  And what we're worried about is that in the

19  claims process that you, as the bankruptcy judge, would have to

20  look at that agreement and have to honor that agreement.

21  Whereas the California court's saying, despite that agreement,

22  this should be heard in California.

23            I don't know if there's a solution to that.

24            THE COURT:  Why would this Court come to a different

25  resolution of a conflict of law issue?  Wouldn't that be guided

45

1 by the applicable law, restatement of law as we apply it to

2 which is the choice of law?  You would think all courts would

3 reach the same conclusion.  And I certainly have -- and,

4 Ms. Knowlton, you've litigated in front of me often enough

5 various state law issues, even outside New Jersey --

6            MS. KNOWLTON:  Oh, I know.

7            THE COURT:  -- issues.

8            MS. KNOWLTON:  I know that you can do that, Your

9 Honor.  I'm confident in your ability to do that.  I have been

10 in front of you many times, and I've listened to other cases

11 that you've done.

12            I think what Mr. Gerro is worried about is would you

13 have -- would you feel compelled to comply with the agreement

14 that gives it the Delaware forum.  I think if he were confident

15 that you wouldn't -- and, of course, we can't know that.  We

16 can't know that until we're there.  But if he were confident

17 that you were going to have the decision made in accordance

18 with California law, it -- he wouldn't be as concerned about

19 the fact that he's not in California.

20            THE COURT:  All right.  I interrupted.  Do you have

21 anything else?

22            MS. KNOWLTON:  No, I don't.  I wanted to keep it

23 short and sweet, because I realize that I'm taking up a lot of

24 time here.

25            THE COURT:  No.  We'll make sure it's comprehensive.

46

1 Thank you, Ms. Knowlton.

2          MS. KNOWLTON:  Uh-huh.

3          THE COURT:  I'll give you a chance to respond.

4          Mr. Kanowitz?

5          MR. KANOWITZ:  Thank you, Your Honor.  For the

6 record, Richard Kanowitz, Haynes and Boone, proposed counsel

7 for the debtors and debtors in possession.  I'll be very quick,

8 Your Honor.

9          There is no cause to lift the stay, whether it's a

10 3-part test, a 12-part test.  Mr. Gerro's not a creditor here.

11 There's no money owed.  He's a creditor in the broadest sense

12 of what's defined as a claim in the Bankruptcy Code, because he

13 has a unliquidated, disputed something.

14          We would just ask that Your Honor deny the lift stay

15 motion.  In fact, I think, based on the reply that they filed,

16 they are actually not seeking lift stay.  They're asking Your

17 Honor to give them certain relief and protections that they're

18 not afforded to.

19          We have a supremacy clause.  We have a claims

20 process.  To the extent that Mr. Gerro wants a distribution

21 from this estate, he needs to file a proof of claim.  That will

22 impact certain rights that he has.  We will proceed accordingly

23 at that time.

24          Everything else that he's requested in his papers is

25 premature, and we ask you not to grant it.  Thank you.

1          THE COURT:  Thank you, Mr. Kanowitz.

2          Does the Committee take a position?

3          MR. AULET:  Your Honor, the Committee has not

4    considered this matter at this time.  We do not take a position

5    on this lift stay motion.

6          THE COURT:  All right.  Is there any other party in

7    interest taking a position?

8          Mr. Gerro, your hand is raised.  You have counsel,

9    but I'll give you some latitude.  Did you want to weigh in?

10   Oh, I think you're still muted.  There you go.

11         MR. GERRO:  Yes.  Thank you, Your Honor.  I just

12   wanted to note that the distinguishing factor between this

13   claim and other claims is that the case is already pending.

14   That is a relevant factor for purposes of the abstention

15   doctrines.  Both abstention doctrines apply to cases that are

16   already pending.

17         And also, the rules recognize that a case that's

18   already pending can be removed and proceed as an adversarial

19   proceeding.  So that is another distinguishing factor that

20   distinguishes this claim from the other few disputed claims in

21   this case.

22         THE COURT:  All right.  Thank you.

23         Ms. Knowlton, is there anything else you wanted to

24   add in response?

25         MS. KNOWLTON:  No, Your Honor.  I know my voice

48

1  doesn't carry, and it certainly didn't carry from back there.

2  No, Your Honor.  Thank you.

3          THE COURT:  Oh, all right.

4          I understand the frustrations of a creditor who is in

5  the midst of litigation having it halted as a result of a

6  bankruptcy, but those frustrations are shared in this case by

7  other parties and by creditors who are also looking to assert

8  their rights, even if they hadn't been brought before a court.

9  I am also cognizant that there is a pending litigation.

10         This is -- I am not hearing a motion for remand.  If

11 a matter has been removed at this juncture, I am not addressing

12 abstention issues.  There is certainly a large and significant

13 body of law which addresses both permission and mandatory

14 abstention if litigation is brought by removal before the

15 Court.  What I have is a -- I think Mr. Kanowitz noted, a

16 disputed, unliquidated claim or a potential -- well, I think

17 the debtor acknowledges that they're disputing a claim, and a

18 claim is very broad.  But that's all we have at this juncture.

19         In my view, it would be folly to start lawyers on the

20 path of continuing litigation in other fora -- this may have a

21 bearing down the road -- when we're not sure as to potential

22 distributions in this case.  Certainly, resolution of

23 litigation must take into account is this a 100 percent case;

24 is this a 5 percent case.  That's how you decide whether it

25 makes sense to continue litigation or reach a settlement or

1 even pursue mediation.

2         We are far removed from that stage in this case.  And

3 I appreciate all counsel wanting to get there quickly.  So does

4 the Court, by all means.  But we're not there yet.

5         To allow continued litigation, which from my

6 understanding the focal point is simply where it should be

7 litigated, not -- and no court has reached the substance of

8 the -- of Mr. Gerro's claims or the basis for any defenses.

9 And to spend time and money at this juncture on an appellate

10 process focused on where the case should be litigated where

11 there is a forum that Congress has put in place in light of the

12 Code for allowance and disallowance of claims -- and the

13 ability down the road, if I want to punt, so to speak, and send

14 it out, those options remain.  But it's far too early.

15         And I'm going to deny the motion without prejudice at

16 this juncture, the motion being for stay relief, even with

17 respect to the pending Supreme Court -- California Supreme

18 Court matter.  I am going to direct when the -- that Mr. Gerro,

19 in his discretion and with consultation -- in consultation with

20 counsel, decide whether to file a proof of claim.  And if the

21 claims are filed, we will address those claims as with all

22 claims through the Section 502 allowance process.

23         If the litigation is removed to me, God bless.  We'll

24 address that when the time arises in the appropriate fashion

25 with the appropriate body of law that's applicable.

50

1          At this juncture, the Court will enter an order

2    unless debtor's counsel wants to submit any specific form of

3    order.

4          MR. KANOWITZ:  It's up to you, Your Honor.  I think

5    we have a proposed form of order, but if Your Honor wants to

6    submit -- I mean, enter one by yourself, we're fine with that.

7          THE COURT:  I will look at the order.

8          Ms. Knowlton, why don't --

9          Let me ask, Mr. Kanowitz, why don't you forward a

10   copy again of the proposed order to Ms. Knowlton.  She and her

11   client can review it.  If there's an issue, we can have a

12   conference call.

13         MR. KANOWITZ:  Thank you, Your Honor.

14         THE COURT:  All right.  Thank you.

15         MS. KNOWLTON:  Yes, Your Honor.  Thank you, Your

16   Honor.

17         THE COURT:  Thank you, Mr. Gerro.

18         MR. KANOWITZ:  The next matter, Your Honor, is, in

19   fact, the --

20         THE COURT:  Oh --

21         MR. KANOWITZ:  Yeah.  Sorry.

22         THE COURT:  Oh, let me just --

23         Mr. Gerro?  Do you want to be heard?  Go ahead.  Very

24   briefly.  You need to unmute yourself.

25         MR. GERRO:  Yes.  Your Honor, I wondering if the

1   non-debtor, Scratch, that did not oppose the motion for stay

2   relief -- I was wondering if the Court would entertain allowing

3   the stay to be modified so that it can -- the case can

4   (indiscernible) Scratch only.

5          THE COURT:  I think Scratch is the agent.

6          MR. KANOWITZ:  They --

7          THE COURT:  At this juncture, there is no automatic

8   stay as to them.

9          MR. KANOWITZ:  Correct.  We have not sought to extend

10  the automatic stay, either 362 or 105, to their benefit.  And

11  there's no motion in front of you for Mr. Gerro's request.  If

12  they believe that the stay applies and, in an abundance of

13  caution, they want to make application, they can do so.  I

14  don't know until they file their papers what they put in there.

15  That may be or may not be prejudicial to the debtor's estate.

16         THE COURT:  Counsel, at --

17         MR. GERRO:  Your Honor, we believe --

18         THE COURT:  -- at this juncture, Mr. Gerro, you are

19  free to proceed as you think it's appropriate in consultation

20  with counsel as to Scratch.  It is not a debtor before me.  I

21  think that's the --

22         MR. GERRO:  Thank you, Your Honor.

23         THE COURT:  -- limit of what I can offer you at this

24  juncture.

25         MR. GERRO:  May we put that in the order denying it

52

1  without prejudice, so it would be granting in part, denying in

2  part without prejudice, so that way that the California Supreme

3  Court feels comfortable proceeding without violating the

4  automatic stay?

5          THE COURT:  Well, there hasn't been a motion for stay

6  relief with that entity, I don't believe.

7          MR. GERRO:  Oh, Your Honor, this motion did request

8  the stay relief for that entity.  They were served, and it's --

9  it is in the papers.  It is in the moving papers, Your Honor.

10         THE COURT:  Mr. Stark?

11         MR. STARK:  Your Honor, forgive me.

12         THE COURT:  Yes.

13         MR. STARK:  And I know that we have -- we said we

14  didn't take a position in this.  We can't possibly respond

15  about some litigation that we haven't looked at yet.  It's

16  risky to sort of go ahead and continue a litigation with a

17  co-defendant when one of your defendants, at least allegedly,

18  is a debtor.

19         And I think what I understood Mr. Kanowitz saying is

20  those are the risks you assume if you want to do that.  But we

21  as the Committee, we cannot, without even studying the

22  litigation --

23         THE COURT:  Right.

24         MR. STARK:  -- understanding it and the impacts on

25  the estate, support any sort of an order that allows for

53

1  anything along -- so I'll be a little bit more blunt than

2  Mr. Kanowitz.

3          MR. KANOWITZ:  Your Honor, I'm just concerned about

4  any indemnification rights between our agreement --

5          MR. STARK:  Exactly.

6          MR. KANOWITZ:  -- with Scratch.  The motion is not

7  clear that they were seeking relief against Scratch.  It was

8  against the debtors.  That's why I filed it here.  We would

9  just ask Your Honor just to deny the motion as requested.  And,

10 in fact, maybe now, Your Honor -- I revisit my statement.

11 Maybe you should enter an order so that we don't have satellite

12 litigation over the terms and conditions of what should be a

13 very simple one-page order denying without prejudice --

14         THE COURT:  Yeah.

15         MR. KANOWITZ:  -- the lift stay request.

16         THE COURT:  Well, I think you can enter -- you can

17 work on the order, and it'll be fine.  I'm not going to include

18 in the order any provision relative to Scratch.  I think that

19 if the California Supreme Court or Mr. Gerro wishes to relay

20 the -- this Court's view, I've already given my view.  It's in

21 the transcript.  And so you're free to provide a transcript to

22 the California Supreme Court with respect to my ruling.

23         MS. KNOWLTON:  Thank you, Your Honor.

24         THE COURT:  All right.  Thank you.

25         Thank you, Mr. Gerro.

54

1          MR. GERRO:  Thank you, Your Honor.

2          THE COURT:  You're welcome.  All right.  Let's move

3    on to the -- I think the only remaining, although significant,

4    matter is the pending turnover motion filed by the debtor with

5    the plethora of opposition that's been filed.

6          Mr. Kanowitz or --

7          MR. KANOWITZ:  Your Honor, thank you.  Mr. Anigian

8    will this --

9          THE COURT:  Mr. --

10         MR. KANOWITZ:   -- part of the hearing.

11         THE COURT:  All right.  Thank you.

12         Good morning again, Mr. Anigian.

13         MR. ANIGIAN:  Good morning, Your Honor.  For the

14   record, Rick Anigian with Haynes and Boone, proposed counsel

15   for BlockFi, Inc., BlockFi Lending and BlockFi International.

16   Your Honor, I know that you've read all the papers, so I'm not

17   going to address background facts or the procedural status of

18   this unless you have questions or want me to go into that.

19         THE COURT:  No.  Luckily, there were no football

20   games important yesterday.  Go ahead.

21         MR. ANIGIAN:  I assume you're aware of this, but the

22   collateral since our December 28th hearing has been seized by

23   the government.  What the collateral consists of is

24   approximately 55.2 million shares of Robinhood Markets Inc.

25   common stock.  And there's approximately $21 million of cash.

1 It was all seized by the government from Marex on January 4th.

2         The turnover motion originally sought to protect all

3 the parties who were claiming an interest in the collateral.

4 The collateral has now been secured.  We're not sure it's being

5 protected.  During our December 28th hearing, if you recall,

6 the parties discussed maximizing value of the property for any

7 and all constituents or -- who may ultimately benefit from the

8 funds that were seized.

9         Counsel for BlockFi, FTX, Marex, the emergent JPLs

10 and also Mr. Bankman-Fried had a discussion.  We discussed

11 having an advisor be appointed to give advice as to maximizing

12 value of the collateral.  This was somewhat interrupted by the

13 seizure.  We have had discussions with the government

14 concerning whether we should have an advisor appointed or at

15 least contemplated to give advice as to maximizing the value of

16 the collateral, which we think that's in the best interest of

17 all parties concerned.

18         No agreements have been reached.  Discussions are

19 ongoing.  And BlockFi has reserved all of its rights related to

20 the seizure with respect to actions of the government.

21         One of the purposes of today's -- or the purpose of

22 today's hearing originally was to determine whether the

23 collateral would remain at Marex or whether it would be

24 transferred to a third party, all subject to this Court's

25 jurisdiction.  Notwithstanding that the government has taken

1    possession of the collateral, we still believe there are

2    important matters for the Court to consider today.

3            And what we're asking for today is for the Court to

4    retain jurisdiction over the rights to these disputes as to

5    title, as to rights and priorities in the collateral itself.

6    We would also ask the Court to prohibit the Emergent JPLs in

7    their action in Antigua from furthering -- taking further

8    actions that would impact BlockFi's rights to this collateral.

9    We would ask that the Court prohibit the FTX debtors in their

10   bankruptcy case in Delaware from taking actions with respect to

11   their stay motion that would impact BlockFi.

12           There was also -- we have filed an objection to

13   Mr. Shim's declaration that was filed by the Emergent JPLs in

14   support of their objection, and we would ask that that

15   objection be sustained.

16           Your Honor, the worldwide stay order that you entered

17   on November the 30th has been treated as it had never existed.

18   BlockFi has been measured in not seeking any relief, but it's

19   very concerned that the worldwide stay order has been

20   disrespected.  And if need be, at the appropriate time, we'll

21   file motions for -- contempt motions if necessary.

22           Without this Court enforcing the worldwide stay

23   order, there's going to be complete chaos here as evidenced by

24   all the objections that have been filed in this case.  There

25   have been multiple filings in the FTX proceedings.  There's

57

1  multiple filings in Antigua.  And this is all in addition to

2  the actions that the government has taken in its proceeding

3  with respect to the seizure of the property.

4          At this point, we've got the following parties who

5  asserted interest in this collateral: BlockFi, the FTX debtors,

6  the Emergent JPLs, the Department of Justice,

7  Mr. Bankman-Fried, and possibly the FTX trading JPLs who have

8  filed a motion in the FTX debtors' case but not in this case.

9          BlockFi, as we said on December 28th, is the only

10 documented creditor of Emergent.  We've got a pledge agreement.

11 We've got a filed UCC-1 statement.  Those are presumed to be

12 valid.

13          The FTX debtors, the FTX trading JPLs,

14 Mr. Bankman-Fried, they're all tainted with alleged and

15 admitted fraudulent or criminal activity of Mr. Bankman-Fried,

16 of Ms. Ellison and Mr. Wang.  BlockFi is not.  The Emergent

17 JPLs, they're a creation of litigation that was filed after

18 this bankruptcy proceeding was filed.  The JPLs -- the Antiguan

19 JPLs for Emergent weren't appointed until December the 5th, and

20 their application for appointment wasn't filed until December

21 2nd.  So all of that was after the worldwide stay order was in

22 place.

23          While these claimants may have rights and assert that

24 the BlockFi interest in the collateral is invalid, these are

25 all issues that ultimately be -- need to be decided.  We think

58

1  they should be decided in one forum.  We believe this Court

2  should maintain jurisdiction over that.

3          We will enter into a stipulation with the government

4  that will allow it to reserve all of its rights, and we'll

5  reserve all of our rights.

6          And this Court, we believe, is entitled to maintain

7  jurisdiction, because this was the first filed action involving

8  this collateral.  Under the Princess Lida Doctrine, this Court

9  therefore has jurisdiction over the collateral.  We don't see

10 that there would be any prejudice to any of the parties who are

11 claiming an interest in the collateral from appearing in this

12 court and having this court decide amongst everyone who's

13 entitled to this in terms of priority, title, et cetera.  It

14 may be us.  It may not be us.

15         But all these issues should be decided in one place,

16 and we submit that this is the Court where it should be done.

17 The Court has the right to do this.  It should be the

18 gatekeeper.  It can -- it has these powers under Section 105.

19 It also has inherent powers to conduct proceedings before it in

20 an orderly fashion.

21         And for these issues to be decided, they don't -- we

22 don't need to be proceeding in three different fora in Antigua,

23 in Delaware and here.  In Antigua, we've got big concerns about

24 due process.  And in Delaware, we were the first filed action.

25 We've got the direct claim in these -- in the collateral and,

59

1  therefore, ask that the Court maintain control over the

2  collateral here.

3        THE COURT:  All right.  Would you contemplate -- we

4  have a pending adversary proceeding that ostensibly seeks

5  turnover.  The United States is not a party.  Would the debtor

6  contemplate or is the debtor contemplating amending the

7  complaint --

8        MR. ANIGIAN:  Yes, Your Honor.

9        THE COURT:  -- to add additional parties?

10        MR. ANIGIAN:  Either -- yes, we are.  We need to

11  amend the complaint just because of the actions that have been

12  taken.  We've also sought declaratory relief that BlockFi has

13  priority to the collateral.  And so we would amend that.  There

14  have been -- even in the FTX debtors' objection, they said if

15  necessary they will quickly intervene in this action.

16        THE COURT:  Right.

17        MR. ANIGIAN:  The Emergent JPLs, they can intervene

18  in this action if they want to assert rights in the collateral.

19  With respect to the government, I think we'll reserve our

20  rights.  We haven't fully analyzed whether they need to be a

21  party to this action.  We know that you have certain authority

22  as set forth in your LTL decision with respect to actions that

23  have been taken under an alleged police power.  And we continue

24  to analyze those rights as well.

25        THE COURT:  Well --

60

1          MR. ANIGIAN:  But our --

2          THE COURT:  Right.

3          MR. ANIGIAN:  -- complaint needs to be amended at

4    this point.  If we need to modify our schedule because of the

5    addition of new parties, we're more than happy to do that.

6          THE COURT:  I'm aware of the Committee's motion to

7    intervene into the adversary proceeding.  We could talk about

8    that when we get to scheduling or next steps.

9          Certainly, from the limited notice of seizure that

10   the Court was provided with by the Department of Justice, I

11   believe the position is that the government believes the title

12   to the property is tied to the date of the criminal activity

13   which may or may not -- I mean, I'm certainly today not making

14   any rulings on that -- but may or may not predate a pledge

15   agreement or -- and, clearly, in a two-page notice, there is

16   ample room for discussion as to the rights of third parties in

17   any such property that has been seized.  So it'll be

18   interesting.

19         And I understand Mr. Shapiro is not -- is appearing

20   remotely.  The government is not a party to the pending

21   litigation.  But he'll weigh in as appropriate.  But thank you.

22         Let me hear from then -- why don't we turn to counsel

23   for FTX.

24         MR. GLUECKSTEIN:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1          MR. GLUECKSTEIN:  For the record, Brian Glueckstein,

2   Sullivan & Cromwell, for the FTX debtors.  Your Honor, we did

3   file a response to the motion opposing the actual turnover

4   motion consistent with the Court's scheduling order.  We have

5   not intervened in the adversary proceeding at this point but

6   appreciate Your Honor hearing it this morning.

7          THE COURT:  By all means.

8          MR. GLUECKSTEIN:  Your Honor, it was not entirely

9   clear to us what was going to be sought today.  I think from

10  Mr. Anigian's comments, I don't hear the debtors requesting the

11  relief that's actually contained in the turnover motion which

12  is to move the shares from what was in a neutral brokerage to

13  another brokerage account.  Given the seizure from the United

14  States government, we certainly would submit that that relief

15  is not available.

16         It sounds like what BlockFi is seeking to do is have

17  the Court affirm its jurisdiction.  Certainly there has been an

18  adversary proceeding that's been filed.  There's a schedule to

19  respond to that complaint in the adversary proceeding.

20         Our view at this point, Your Honor, is that we could

21  have a whole discussion if relief is put in front of the Court,

22  a motion put in front of the Court -- as I understand it,

23  there's no -- there's now no relief before the Court today with

24  respect to any of the stay or jurisdictional related issues.  I

25  think it's fair to say there's a difference of opinion -- and I

62

1  don't think it's just necessarily between us and BlockFi -- as

2  to where the ultimate decisions around interest in property

3  potentially should be decided.  I think the government has a

4  view on that that might be different from either one of us.

5          And so it certainly seems to us, Your Honor, that at

6  this point that the seizure by the government here is a very

7  significant event.  The suggestion that we're just going to

8  proceed to adjudicate rights and interests in property that we

9  don't know if the United States government is ever going to

10  release it, in what form it's going to release it, is it going

11  to still be shares, is it going to be cash, when is that going

12  to happen -- all of those are discussions that need to take

13  place.

14          We do agree with Mr. Anigian, and we had a

15  conversation, as he reported, last week about what seems to be

16  the pressing issue here which is ensuring that the value is

17  maximized for creditors.  BlockFi is a very significant

18  creditor in the FTX debtors' bankruptcy cases.  FTX -- one of

19  the FTX debtors is a significant creditor here.

20          But the question around jurisdiction and venue and

21  all of those issues seems to be putting a little bit cart

22  before the horse where the government's in possession of the

23  shares, is in possession of the cash.  We should be, in our

24  view, not litigating at this point rights in ultimate

25  distribution rights in those assets until we figure out what's

1 going to happen with them.

2        And so we do think that it makes sense to continue

3 the discussions around how to ensure that the shares are

4 maximized in value for everybody who has an interest.  But to

5 immediately have this fight around should -- you know, where

6 should evidence effectively be presented and to which court, I

7 think that is something that all of the parties would need to

8 weigh in on on appropriate papers.  And I think there is --

9 there are arguments that there are multiple courts that

10 potentially have jurisdiction.

11        I'm just not sure that all of those issues should be

12 teed up now when we have some real gating issues here that have

13 to be addressed both in terms of ensuring that the asset is

14 maximized and understanding what the government intends to do.

15 If BlockFi is intending to challenge the actions of the

16 government, they would need to, obviously, bring some sort of

17 process to do that.  And if they're seeking to return the

18 status quo to where we were a couple of weeks ago, that would

19 need to play out in front of a court, obviously of competent

20 jurisdiction.

21        So from the FTX debtors' perspective, Your Honor,

22 this is a significant asset.  We disagree with the

23 characterization of BlockFi that we simply have claims against

24 the asset.  The turnover motion and the arguments with respect

25 to the stay that BlockFi have put forward are all premised on

64

1  the idea, of course, that BlockFi has the property interest it

2  says it has.  And there are a number of gating issues there

3  that we just respectfully disagree with.

4          Certainly, we've asserted, the BlockFi -- I'm sorry,

5  the FTX debtors, that we have a direct property interest.  And

6  to the extent we're correct about that, Your Honor, the stay

7  obviously in our case would have attached which was filed three

8  or so weeks before BlockFi filed its case here.

9          So I think all of the arguments that have been put

10  before Your Honor as at least certainly with respect to the

11  competing claims between BlockFi and FTX go to the heart of the

12  merits issues.  Are merits issues ultimately going to have to

13  be resolved at some point?  Presumably yes assuming there's an

14  asset to distribute and the government isn't keeping it or

15  going to argue that it should be, you know, applied some sort

16  of penalty and going to be distributed.

17          But we think this fight around where -- potential

18  fight -- and perhaps over time issues will become clearer, and

19  perhaps processes could be agreed upon on what to do with an

20  asset.  But if we're talking about having an immediate fight,

21  we think it's premature.

22          We think there are gating issues that need to be

23  addressed with the government who is in possession of the

24  collateral.  They are not appearing certainly in this adversary

25  proceeding at this point in time.  And we think the parties

1  should take the time to do that before we unnecessarily press

2  ahead with a jurisdictional fight.

3       THE COURT:  But let me ask this.  And I appreciate

4  the concerns you've raised as far as timing.  And obviously the

5  Court -- I'm interested in hearing what the parties think the

6  next step should be.

7       But until notice of the seizure occurred by the

8  government, there was a pending action in Delaware court -- and

9  this is -- goes far beyond a turf battle among courts.  We're

10 looking at substantive issues here as to the interests and how

11 best to protect the creditors, both BlockFi and FTX's creditors

12 in this matter.  But there was -- there were efforts taken in

13 the Delaware court by your client which would seem on the

14 surface -- and I'm going to ask you to explain -- offend the

15 automatic stay in this court.

16      There is no question that I've seen that BlockFi

17 doesn't base its claim as having a lienholder interest, a

18 security interest in the shares.  Disputed, no doubt, by FTX

19 and by Mr. Bankman-Fried and by the JPL for -- in Antigua.  But

20 we're talking about a lienholder interest, a property interest.

21      And it would seem to me pretty clear under the Code

22 that a debtor's lienholder interest -- let's use simplistic

23 analogy.  If BlockFi asserted that it had a mortgage on a

24 commercial office building, certainly the office building isn't

25 property of the BlockFi estate, but that mortgage is.  And any

1  effort to prevent BlockFi from asserting its rights or any

2  pending action restricting BlockFi from fixing its rights in

3  its collateral certainly to me offends the automatic stay of

4  the debtor in this case.  It's a property interest, a security

5  interest.  Disputed, no doubt.

6        And whether it's this Court or Judge Dorsey or some

7  court in Southern District that decides it, we'll see.  But I'd

8  like to understand how -- and I would pose the same question to

9  the counsel for the JPLs -- how any effort to restrict BlockFi

10 in asserting its collateral interest to determine those

11 interests, to either prevent them -- prevent this debtor from

12 foreclosing on an interest or to seek a determination to fix

13 the extent and validity of an interest, how that doesn't run at

14 loggerheads with the automatic stay.

15       And it would seem that this Court has, under 1334,

16 certainly jurisdiction over the debtor's interest in the

17 collateral which is at issue here.  And I understand FTX takes

18 a different position.  But it seems to be that FTX -- their

19 interest in the collateral is bottomed on -- potential

20 litigation.  I understand that.

21       Mr. Bankman-Fried's interest in the collateral, I --

22 candidly, I'm not sure what it's bottomed on.  And I await to

23 hear that.

24       The liquidated -- the JPL liquidators, they're

25 there -- they're pursuing their responsibility to protect the

67

1  interests of Emergent's creditors, which to my understanding is

2  BlockFi and possibly FTX creditors which we have two courts

3  here in Delaware and New Jersey protecting those interests.

4  With this Court -- and this is a long-winded question.  But

5  with this Court clearly having authority and jurisdiction under

6  28 U.S.C. 1334 and the debtor having a property interest,

7  albeit disputed, a collateral interest, how are these actions

8  pending in other fora, is my question.  And what's the next

9  step, in your view?

10        MR. GLUECKSTEIN:  All right, Your Honor.  Let me

11  address that.

12        THE COURT:  I gave you a mouthful.

13        MR. GLUECKSTEIN:  There is a lot there.  So if I

14  could --

15        THE COURT:  Yeah.

16        MR. GLUECKSTEIN:  If I could unpack that a little

17  bit.  So to be clear, the motion that we filed in Delaware is

18  not asking at this juncture at all to determine the merits of

19  anything.  What we have asked is to enforce the automatic stay

20  of our debtors.

21        Because you're right, Your Honor.  There is a

22  fundamental disagreement here.  All right?  BlockFi has come

23  forward and said we have a collateral interest.  Okay?  The

24  nature of that collateral interest is not only disputed; the

25  existence of it is called into question.  All right?

68

1          And I don't want to argue the facts today, Your

2    Honor.  I don't --

3          THE COURT:  No.  I'm cognizant.

4          MR. GLUECKSTEIN:  I really don't think that's

5    appropriate.

6          THE COURT:  I've read --

7          MR. GLUECKSTEIN:  Okay.  But to be --

8          THE COURT:  -- the briefing, and I understand the

9    bases.

10          MR. GLUECKSTEIN:  Right.  But to be clear, all right,

11   what we have here is BlockFi saying we have an interest in

12   collateral that was granted 24 hours before the FTX debtors

13   filed for bankruptcy.  We have those documents signed by

14   somebody, Ms. Caroline Ellison, who has now pled guilty to

15   fraud.  We have Mr. Bankman-Friend who was involved in that

16   process now contesting whether Ms. Ellison even had the ability

17   to sign the documents that BlockFi is relying on to create that

18   interest in property.

19          Okay?  And so BlockFi is absolutely able to argue

20   those points.  And as I stated earlier, Your Honor, I do

21   believe that there are arguments that there are multiple courts

22   here that could exercise jurisdiction.  And we're not

23   suggesting that this Court is incapable of hearing these

24   issues.

25          The problem, though, Your Honor, is, again, if we're

69

1  correct that we have not just some avoidance claim or

2  fraudulent claim but if we're correct that the property that's

3  now been seized that BlockFi is claiming is their collateral

4  was, in fact, property of our estate when we filed for

5  bankruptcy in earlier November than BlockFi filed, then we

6  believe there's an automatic stay issue with them filing on the

7  first day of their case the adversary proceeding here which

8  Your Honor did not -- that -- those papers -- if we go back to

9  the original complaint and the turnover motion that was the

10 subject of this morning's hearing, nowhere in those papers does

11 BlockFi disclose the relationship of what this is about.  Was

12 this collection on a loan that they had outstanding to Alameda,

13 a very significant loan?  All right?

14          So and we heard this morning in the debtors' update

15 presentation all of the linkage between FTX and BlockFi.  And

16 so to suggest that this is just a collateral holder and we're

17 seeking to enforce our collateral, the facts here are much more

18 complicated than that.  And so, Your Honor, certainly to the

19 extent that the question here is, you know, competing stay

20 issues or stay violations, I -- you know, we're happy to brief

21 those issues.

22          But I do think there's a -- just a practical

23 consideration, right, which ultimately is going to be, is it

24 going to be Your Honor, is it going to be Judge Dorsey, is it

25 going to be a judge in the Southern District of New York

1  potentially as the government has suggested that's going to

2  decide the merits issues?  And it might very well be that the

3  parties can sit down and agree on that, ultimately, in terms of

4  putting some process around it.

5          But I think what -- our concern from the beginning

6  here was that papers were filed, you know, two hours into the

7  BlockFi case which was three-and-a-half weeks after the FTX

8  debtors had filed bankruptcy in Delaware.  We were not named as

9  a defendant in that lawsuit.  We're not even mentioned in that

10 lawsuit.  The issue, of course, now is what do we do about it?

11         And I think what's getting lost in this, Your Honor,

12 is we're talking about 55 million shares of stock and $21

13 million -- 21-or-so-odd-million dollars of stock -- of cash

14 that are in the possession of the United States government.  We

15 haven't heard anything from the United States government other

16 than the statement that they filed in this case, statement --

17 and they made a statement on the record in a status conference

18 in our case last week.

19         They certainly are in possession of those shares.  We

20 know that.  We know that they are going to safeguard them.  But

21 the issue is that Mr. Anigian started his remarks with at the

22 outset today I think -- when we think about next steps and we

23 think about what should happen, from our perspective, we should

24 not be having a dispute about jurisdiction this week or next

25 week.

1          We don't feel the need, frankly, Your Honor, for our

2  motion to go forward in Delaware that's pending if we could all

3  agree that what we're not going to be fighting about right now

4  is jurisdiction.  But what we should do is sit down and talk

5  about how to maximize the value of these assets.  Get an

6  understanding from the United States government to the extent

7  they're willing to discuss with the parties what their

8  intentions are with respect to these assets over the medium

9  term so that we can get some understanding as to whether the

10 parties can get comfortable around the process for ensuring

11 both that those assets are maximized and that when it becomes

12 necessary we have a -- see if we can reach some sort of process

13 about what to do.

14         I certainly don't believe it's in anybody's interest,

15 given that there's -- nobody's going to get possession of these

16 assets in the immediate term -- that seems clear -- to be

17 having the sorts of debates around who filed first, whose stay

18 might be implicated, and what should we do about it.  Because

19 from our perspective, that's not really in anybody's best

20 interest, Your Honor.

21         THE COURT:  Fair enough.  Thank you.

22         MR. GLUECKSTEIN:  Thank you.

23         THE COURT:  Let me hear from counsel -- well, counsel

24 approaching the podium.

25         MR. DORCHAK:  Thank you, Your Honor.  Joshua Dorchak

1  of Morgan Lewis again for the joint provisional liquidators of

2  Emergent.  I think everyone agrees, Your Honor, that the actual

3  relief sought in the motion is mooted or futile or something

4  like that, and I don't need to address it.  Am I correct on

5  that?

6            MR. KANOWITZ:  No, Your Honor.  We don't agree that

7  it's mooted.  We believe it's frustrated and maybe delayed, but

8  it's not mooted.

9            MR. DORCHAK:  Okay.  In that case, I'll start by

10  saying this, Your Honor.  My clients have no legal or practical

11  ability to move these shares that everyone is fighting over or

12  to freeze these shares that everyone is fighting over, to do

13  anything with them.  So the relief -- we can't do anything

14  about it unless the situation changes.  And that's been true

15  since the government took the shares.

16            So I -- actually turning them over to someone we

17  can't do.  So I'll just leave it at that now.  That's enough on

18  that subject.

19            THE COURT:  You can't do it, because they have been

20  seized?

21            MR. DORCHAK:  Right.  Exactly.

22            THE COURT:  Okay.  I just wanted to clarify.

23            MR. DORCHAK:  Not because we don't want to or

24  something.  The most important thing I think I need to address

25  is the idea that even though the Government's taken the shares,

73

1  there's some lingering wrongdoing going on out there.  I

2  certainly have to address what I think was irresponsible

3  over-the-weekend accusations that our -- my clients have been

4  sort of serially violating the automatic stay and acting in

5  contempt of Your Honor, including some comments made at the

6  last hearing.

7        So I need to address that right away, and the easiest

8  way to explain it, I think, is to tell you what's going on in

9  Antigua.  So the joint provisional liquidators were appointed

10 on December 5th.  And the order that appoints them, which is on

11 the record, says that the purposes of the provisional

12 liquidators appointment are to investigate the respondent's

13 affairs and to preserve the value of the respondent's assets

14 for the benefit of those entitled to them pending the

15 determination of the petition to wind up the respondent.

16       So the task of the JPLs is to investigate what

17 happened and to figure out how to amass the assets of the

18 company for the benefit of whoever is entitled to them.

19 There's no predetermination of who's entitled to the benefit of

20 these shares or who owns them.

21       And since being appointed, the JPLs have never asked

22 the Antigua court to make any decision -- make -- whatsoever

23 about who owns these shares or who should get the value of

24 these shares.  As we said the last time we were before you,

25 we're still trying to investigate what even happened.  And we

74

1 have not been sneaking around in the Caribbean behind your

2 back, Your Honor, trying to get some advantage over the BlockFi

3 estate when it comes to these shares.  I hope you believe me

4 when I'm saying that.

5        What's been going on since we were appointed is there

6 was an attack on the authority of the JPLs but -- in the first

7 instance by Samuel Bankman-Fried.  And then BlockFi joined that

8 attack to try and sort of kick my clients off the job.  And we

9 responded to that.  It was purely defensive.

10        And, again, the shares were not at issue.  The shares

11 were in the background, but there's -- there has been no

12 activity in Antigua about these shares.  And the hearing that's

13 scheduled toward the end of January is to get a wind up-order

14 out of the judge.  Again, it doesn't predetermine anything

15 about whose shares these are.

16        So my clients are fiduciaries.  They're --

17        THE COURT:  What is sought in the wind-up order?

18        MR. DORCHAK:  Pardon?

19        THE COURT:  What relief is sought in the wind-up

20 order?

21        MR. DORCHAK:  The wind-up order is sought to conclude

22 the -- to give the joint provisional liquidators the authority

23 to administer the estate for the benefit of stakeholders,

24 presumably the creditors who -- we have to first figure out who

25 that -- who those are, right?  And we're done.  We're holding

1  this asset, to the extent we're holding it -- the government's

2  holding it.  But our ownership of this asset in the hands of

3  these fiduciaries is for the benefit of whoever is entitled to

4  it.

5          And we've never asked for a ruling on who's entitled

6  to these shares away from this Court.  Now, we have questions

7  about where the best forum to do it is, and we've said that out

8  loud.  But we have not taken any affirmative action anywhere to

9  get some other judge besides you to decide this issue.

10          THE COURT:  But in order to effectuate the wind-up,

11  do you not need to take steps to determine the extent and

12  validity of either FTX's interest or BlockFi's interest?

13          MR. DORCHAK:  Sure.  Absolutely, Your Honor.

14          THE COURT:  So there is a competing proceeding going

15  on in another fora which affects -- which -- other fora which

16  affects the rights of this debtor -- I'm not speaking for the

17  FTX debtor, but it would seem to be parallel -- in --

18          MR. DORCHAK:  Your Honor, yes.

19          THE COURT:  -- in assets.  So we have potentially

20  three, if not four, different venues deciding --

21          MR. DORCHAK:  Beside --

22          THE COURT:  -- everybody's respective interests.

23          MR. DORCHAK:  Correct.  Your Honor, of course.  And

24  the estate can't be administered until these issues are

25  decided.  The JPLs in Antigua, as I've said, have not been

1   asking that judge -- just as I -- I feel BlockFi's counsel sort

2   of implied we're down there trying to take this decision away

3   from you.  We haven't asked that judge to make that decision.

4          We came up here as soon as -- with counsel -- by

5   counsel for the JPLs -- came up here and contacted all the

6   counsel for the parties in interest.  And our view was that we

7   should talk about a most -- sort of an efficient way for

8   everyone to get their claims on the table and hash this all

9   out.  We also agree with various people that have said we want

10  the value of the shares to be preserved.

11         We did the opposite of trying to get this decided

12  back down in the Caribbean when nobody was looking.  We came up

13  here and said to Marex, our custodian -- because we do own the

14  shares, technically, Your Honor.  We asked our custodian to

15  freeze the shares, not to give them to us so we could go off

16  and do something with them, to freeze them so that we could

17  talk to the parties in interest.

18         And that was happening.  Now that the government has

19  them, that's changed the playing field a little bit.  We

20  haven't changed our attitude which is that the parties should

21  talk about how to work this out.  So that always has been our

22  position.

23         I want -- I just want this Court to know that there

24  hasn't been any funny business --

25         THE COURT:  No.  I appreciate that.

77

1          MR. DORCHAK:  -- going on.  Almost done.  There was a

2    complaint about a little clause in the order that the judge in

3    Antigua put in for BlockFi to -- if they want to appear at this

4    hearing, which they're welcome to do, at the end of January to

5    provide the Court with a summary of their position, why -- like

6    sort of why they are here.  I understand that that's a local

7    procedural thing that's common in every case.  It's not an

8    attempt to keep BlockFi out of the court in Antigua.  They're

9    welcome to come down there and say whatever they want.

10          And just as a practical matter, Your Honor, we are

11   aware that if we -- even if we did go to the judge in Antigua

12   and get that judge to say, okay, the shares belong to so and so

13   that we may have to come up and contend with all the other

14   judges up here who may have a different opinion.  And so

15   there's -- it wouldn't even have worked if we -- if that was

16   our plan.  I just want to make that clear.

17          So if you ask me what we should do next, I'm going to

18   say the same thing I said before which is we think the --

19   there's seems to be -- the government seizing the shares has

20   caused a sort of -- you know, a reset of some sort.  Okay.  If

21   it means that certain people should be impleaded into this

22   case, fair enough.  We had already asked for more time to

23   respond in this case, because we were trying to figure out

24   what's going on.

25          So it seems like the parties should continue to talk

1  about that.  And if there are rival forums -- I don't know.

2  Maybe it eventually gets litigated if it can't be negotiated.

3  But besides the issue of making the shares have their maximum

4  value, which maybe requires an advisor for a practical issue, I

5  don't think there's a legal issue that requires anything more

6  than some -- there is no legal issue at all that needs to be

7  decided in the near term.

8         I don't think that the JPLs going forward with

9  getting a winding-up order would necessarily change anything.

10  It certainly isn't going to somehow simultaneously decide the

11  outcome of the shares, which of course the -- even the judge in

12  Antigua can't convince the government to do anything with.

13         THE COURT:  Well, and --

14         MR. DORCHAK:  So there's no threat.

15         THE COURT:  So would it make sense to carve out from

16  any wind-up order steps to determine, fix or the extent the

17  validity of any interests in it?

18         MR. DORCHAK:  I can't speak for the judge in Antigua,

19  Your Honor.

20         THE COURT:  Well, no.  I'm throwing that out there.

21         MR. DORCHAK:  But it's, in my mind, perfectly

22  possible that the judge in Antigua would be open to that -- to

23  these key issues disputed amongst a bunch of people up in the

24  United States that maybe that issue should get decided there,

25  and then the affects of that issue are folded into the

1  winding-up order.  But I don't think the judge would be against

2  that.  But, of course, I can't read the judge's mind, Your

3  Honor.

4          We're actually getting a new judge, because the judge

5  that we -- has heard the case so far is --

6          THE COURT:  Good luck.

7          MR. DORCHAK:  -- to be going off the rolls, or

8  whatever the expression is, and a new judge will be coming in.

9  But either way, Your Honor, I just want to -- just -- there's

10 nothing that interesting going on in Antigua, to put it that

11 way.  So that's the main point I wanted to make, Your Honor.

12         THE COURT:  Well, all right.

13         MR. DORCHAK:  And, otherwise, I believe that the

14 motion should be denied, because my clients can't be compelled

15 to turn over something where they literally cannot do that.

16 And that we call get some extra time to talk and see if a lot

17 of people can work out a lot of these procedural issues.

18         THE COURT:  My sympathies to the new judge coming in.

19 Just very briefly -- I know my law clerks are cringing at the

20 thought of me asking this.  But the real important question, is

21 it Antiga (phonetic) or Antigua?

22         UNIDENTIFIED SPEAKER:  Antiga (phonetic).

23         MR. DORCHAK:  The --

24         THE COURT:  Antiga (phonetic).

25         UNIDENTIFIED SPEAKER:  That's what the lawyers in

80

1   Antigua call it.  They call it -- so I'm going to go with that.

2              MR. DORCHAK:  The --

3              THE COURT:  Oh, even that's going to be disputed.

4              UNIDENTIFIED SPEAKER:  Maybe so.

5              MR. DORCHAK:  I'm not taking a position on it myself,

6   Your Honor.  Definitely the Commonwealth community uses Antiga

7   (phonetic) and Antigan (phonetic).

8              THE COURT:  Fair enough.

9              MR. DORCHAK:  But I don't know that we have to follow

10  that.

11             THE COURT:  Thank you, counsel.

12             MR. DORCHAK:  Thank you.

13             THE COURT:  Let me -- before I -- thank you.

14             Is there any other appearances?  Counsel?

15             MR. SCHNITZER:   Thank you, Your Honor.  Edward

16  Schnitzer from Montgomery McCracken on behalf of Samuel

17  Bankman-Fried.  Your Honor, as other people have already

18  stated, we believe the motion is moot because of the seizure.

19  While the seizure was unexpected from our perspective, it did

20  happen.  It has been effectuated.  So if you just simply look

21  at what -- the relief that was requested in the motion as well

22  as the proposed order, it really can't be granted, because the

23  shares and stock are no longer in the possession of Marex.

24             I actually agree with FTX counsel, and it may be the

25  one time only in this case that I will agree with the FTX

81

1   counsel.  But as they said, basically the arguments advanced

2   and relief sought earlier today that you heard was not what was

3   set forth in the motion, and it should be denied.

4           Your Honor, as you saw in our papers, the reason we

5   responded is because the motion was going forward

6   notwithstanding this, so we needed to make our point with

7   respect to the standard for preliminary injunction.  We do not

8   think it's met.

9           I put that forth in our papers.  I believe the JPLs

10  also put that forth.  I won't burden you with repeating what we

11  put forth in our papers.

12          The only thing I wanted to add, Your Honor, is in

13  part of their presentation they said our position was tainted

14  by the fraud of Mr. Bankman-Fried and Ms. Ellison.  I just

15  wanted to make two points, Your Honor.  First of all, I do want

16  to remind everybody -- and, Your Honor, I believe you

17  effectually -- effectively stated this before -- it's alleged

18  fraud.

19          And Mr. Bankman-Friend, he's been accused.  He has

20  his right in court.  We will see what happens.  Ms. Ellison, on

21  the other hand, has pled guilty.  I believe there is a

22  different (sic) there.

23          Lastly, Your Honor, I know you asked, so I thought I

24  would answer the question.  You asked what is

25  Mr. Bankman-Fried's interest.  He is the 90 percent shareholder

1  of Emergent.  I don't believe anyone's disputing that.

2          So my understanding of how things work in Antigua or

3  Antiga (phonetic) -- I'm not sure either the pronunciation.  My

4  understanding of how things work there are similar to how

5  things work here in that after creditors, if there are any

6  creditors, get paid, the interest in a company do belong to

7  equity.  So that is Mr. Bankman-Fried's interest.  It is

8  contingent at this point, although I believe almost everyone's

9  interest here is contingent, because they would actually have

10 to prove they are a creditor.

11          THE COURT:  All right.  Thank you.

12          MR. SCHNITZER:  Thank you, Your Honor.

13          THE COURT:  Counsel for the Committee?

14          MR. AULET:  Good morning, Your Honor.  Kenneth Aulet

15 of Brown Rudnick, proposed counsel for the Committee.  The

16 Committee supports the debtors today.  Our view is that there

17 were two things sought in the turnover motion.  There is the

18 demand to turn over, which, you know, it is what it is today.

19 But there was also a request to enjoin the transfer or use of

20 the collateral pending the Court's resolution of the adversary

21 proceeding.

22          And that is of great importance to the Committee.

23 The Committee does not want these shares going anywhere.  Now,

24 Mr. Bankman-Fried's counsel is in the courtroom.  You can

25 imagine the view of the Committee on Mr. Bankman-Fried having

1   any say in where these shares go.

2           Beyond that, Your Honor, I'll leave it to the

3   debtors.  But we wanted to register that we join the debtors in

4   this motion.

5           THE COURT:  All right.  Thank you.

6           Mr. Shapiro, I'm going to -- oh, before I turn to

7   Mr. Shapiro, counsel for -- somebody probably wants out.  But

8   go ahead.

9           MS. DOHERTY:  Thank you, Your Honor.  Yes, we would

10  like out.  We represent Marex, and I really don't have much

11  more to add to what the counsel today has said.  But as you

12  recall, when we had the hearing before you on the 28th I made

13  very clear that Marex had froze this account on November 10th.

14  It made very clear to all of the interested parties that these

15  assets would not be moved unless and until a court ordered

16  otherwise.

17          And we did get that order by the warrant of seizure

18  on December 30th.  We made all of the parties aware of that

19  warrant before the government actually seized the assets.  And

20  on January 4, Marex fully complied with that warrant, and

21  everything is now in the hands of the government.

22          And I do think what we talked about on the conference

23  on the 28th of December was everybody's interest and the next

24  step should be to maximize the value of those assets.  And I

25  would request that we be let out of this case since we no

84

1 longer are a stakeholder.  And the motion should be denied.

2    THE COURT:  All right.  Thank you.

3    MS. DOHERTY:  Thank you, Your Honor.

4    THE COURT:  All right.  I'd like to turn to

5 Mr. Shapiro.  Good morning if -- yeah, it's still morning for

6 the next three minutes.  I appreciate that the government is

7 not a named party in the adversary proceeding at this juncture.

8 My understanding is that in reading the notice of the seizure

9 that I guess with a pending or contemplated in rem proceeding

10 that's coexistent with the criminal prosecution of

11 Mr. Bankman-Fried the government has seized the shares.

12    It would seem to me that there can be many months and

13 many market changes before the government gets to the point of

14 whether a forfeiture goes into effect.  And the concern that I

15 have, probably shared by every other judge who has this in

16 front of -- these issues in front of them, is that there not be

17 a loss in value of the shares during this time period until

18 ownership, entitlement, whether it be as an owner, as a

19 lienholder or on the basis of forfeiture, is determined by the

20 appropriate court.

21    What are your thoughts on working -- or reaching a

22 consensus with the stakeholders to ensure that the value for

23 the creditor body, all of the -- the retail and larger

24 institutional creditors are furthered?

25    MR. SHAPIRO:  Thank you and good morning, Your Honor.

85

1  As I indicated earlier, the United States is not a party to the

2  adversary proceeding, and I'm not appearing in the adversary

3  proceeding.  But I am here to answer Your Honor's questions, of

4  course, here in court.  And we would greatly appreciate the

5  opportunity to be able to submit a brief in conjunction with

6  any accusations or allegations against the government before

7  Your Honor rules at the appropriate time.

8          In the interim, Your Honor should know that we have

9  been having discussions, some confidential discussions with

10 counsel for the debtors in both this case and the FTX case as

11 well as others.  And hopefully we would be able to resolve

12 these issues.  But if we can't, there will be an appropriate

13 time, hopefully, where Your Honor can hear the arguments of the

14 government as to why we believe that what the government did

15 was appropriate.

16         And of course, ultimately, if the matter went forward

17 in New York in the Southern District, it would be a criminal

18 and/or civil asset forfeiture proceeding.

19         In the interim, as part of the discussions, to answer

20 Your Honor's direct question, that issue that Your Honor has

21 brought up has been the subject of discussions.  And we haven't

22 reached a conclusion yet, so I can't tell Your Honor what that

23 conclusion is.  But we are talking with counsel for the parties

24 about how to address Your Honor's concern.

25         THE COURT:  All right.  Thank you, Mr. Shapiro.

1          Mr. Kanowitz, I -- or Mr. Anigian?

2      (Counsel confer)

3          THE COURT:  Let me -- so I know going forward,

4  Anigian or --

5          MR. ANIGIAN:  Anigan (phonetic).

6          THE COURT:  Anigan (phonetic).

7          MR. ANIGIAN:  Easier than it looks.

8          THE COURT:  Easier than -- Anigian.  All right.

9          MR. ANIGIAN:  Your Honor, a couple of things are

10  really clear.  There's multiple parties claiming interest in

11  this property that likely will be the subject of some

12  government forfeiture action at some point in the future,

13  whether civil, whether criminal.  But before that really can go

14  forward, I mean, there needs to be a resolution of the rights

15  and interests of the parties who are claiming interest in this

16  collateral today.

17          And it's unworkable that it goes forward in these

18  multiple fora.  We filed the first action.  We think that under

19  the Princess Lida Doctrine it should stay in this court.

20          We don't know exactly what's going on in Antigua.  I

21  mean, our local counsel there asked that certain provisions of

22  the order that sets this hearing on January the 27th not be

23  included.  And that request was rejected.  So we believe or at

24  least there's some indication to us that on January 27th the

25  court in Antigua may be deciding what the rights of BlockFi are

1  pursuant to its pledge agreement with Emergent, and we don't

2  think that should go forward.

3         Now, if the Antiguan court wants to go forward with

4  appointing JPLs in some wind-up order, as long as it doesn't

5  impact BlockFi, that's fine with us.  The same in Delaware.  As

6  long as they want to go forward with their stay motion, to the

7  extent that it doesn't impact BlockFi's rights in the

8  collateral, that's okay with us.

9         But I believe they said they're willing to push off

10 that hearing on January 20th.  We don't think that should go

11 forward on that day.

12        With respect to Marex, we haven't released -- BlockFi

13 has claims against Marex, and it will continue to assert those

14 claims.  We don't see a point in waiting for resolution of any

15 criminal actions against Mr. Bankman-Fried and the ultimate

16 filing of some type of forfeiture action before some court,

17 hopefully this one, goes forward and makes some -- at least the

18 parties can move forward with whatever agreements or ultimate

19 fights they have over who's entitled to and what rights and

20 benefits and priorities we have in the collateral.

21        And for those purposes, we would ask that the Court

22 enter an order that takes control over this matter and enjoins

23 any action of the Emergent JPLs in Antigua to the extent

24 they're going to affect BlockFi and the same with respect to

25 the action in Delaware.

1          THE COURT:  All right.  Thank you.

2          I don't see if there's anything else remotely who

3    wishes to be heard on these issues.  I don't see any hands

4    raised.

5          All right.  I think all of the stakeholders and the

6    parties have argued well their respective positions.  These are

7    interesting and challenging issues that I'm sure all the judges

8    appreciate having on their respective plates.

9          At this juncture, it's clear that this Court is not

10   in a position to enter any turnover order of any type.  The

11   shares are being held by the government pursuant to a warrant

12   of seizure.  And the government is not a party to the pending

13   adversary proceeding.  The government wasn't a party to the

14   motion.  And the government -- the U.S. government's actions

15   changed the landscape for all involved here.  So the turnover

16   motion itself is going to be denied without prejudice.

17         I have a pending adversary proceeding in which I

18   would expect the complaint needs to be amended.  It provides

19   for jurisdiction by this Court, and this Court intends to

20   pursue its jurisdiction and authority in the pending adversary

21   proceeding.

22         It is always subject to a consensus, consensual

23   resolution otherwise as to the proper forum for adjudicating

24   the rights here.  But this Court has identified a property

25   interest held by this debtor, subject to dispute but still a

1  property interest under 11 U.S.C. Section 541(a), that is

2  deserving of protection under 11 U.S.C. 362(a).  And this Court

3  is well equipped -- God, that sounds awful, pretentious -- this

4  Court is equipped to handle the litigation going forward if it

5  makes sense to the parties.  And I'll certainly afford the

6  parties the opportunity to brief and argue if such assertion of

7  jurisdiction is inappropriate.

8          But right now, there's a pending adversary

9  proceeding.  I also -- there is also a pending order of this

10 Court which just implements the statutory rights under 362(a)

11 this Court's November 30th -- I think it's been referred to as

12 a worldwide order reinforcing the automatic stay.  The Court

13 intends to enforce that order with the -- either the contempt

14 powers it has or other authority under Section 105 to the

15 extent that there are violations going forward.

16         The doors are open for parties seeking the

17 appropriate relief from the automatic stay.  The Court is

18 cognizant that in this circuit we still view -- we view actions

19 taken in violation of the automatic stay as void ab initio.  I

20 don't believe there's a need to enter an order directing a

21 sister court, including Antiguan court or Delaware court, on

22 what actions they should be taking.  The law is

23 straightforward.  And if there are actions which are

24 challenged, they can be challenged in this Court or other

25 courts as appropriate.

90

1          But at this juncture, I think we need to move forward

2     with the adversary proceeding and motion practice in that

3     adversary proceeding as appropriate to address the needs of the

4     respective parties.

5          With respect to the Committee's motion to intervene,

6     I'm going to schedule that for the 17th.  I think that should

7     probably be resolved through a consent order.  And as to other

8     parties' actions going forward, this Court is here to address

9     the issues as needed.  But there is no specific relief today

10    that I can provide on the pending motion.

11         So, again, the pending motion for turnover is denied

12    without prejudice.  The adversary proceeding continues.  All

13    parties have their respective rights and abilities to make

14    argument wherever you all want to.  All right?

15         Any questions or concerns?

16         MR. KANOWITZ:  For the record, Richard Kanowitz on

17    behalf of the debtors' estate, Your Honor.  No.  We will speak

18    with the parties, including the FTX debtors and the JPLs, to

19    talk about how they want to proceed in the adversary

20    proceeding.

21         We also look forward to talking to them about moving

22    the January 20th hearing or completely withdrawing that motion.

23    Just so you know, January 20th is our 341 meeting in this case.

24    So we're not available that day anyway.

25         But we will discuss with them a constructive way of

1    moving the disputes forward in this Court if possible.  And we

2    will also continue talking to the government about the proper

3    way to handle the seizure and the benefit to the victims.

4         And let's be clear.  I just want to make it clear for

5    the record for everybody.  BlockFi was defrauded by FTX and its

6    affiliates and maybe the insiders of FTX and its affiliates.

7    We are a victim.  FTX is not a victim.  FTX, to the extent the

8    creditors overlap with our creditors, are the victims.

9         And we're here to protect the victims.  And Mr. Stark

10   and his team are well-equipped to assist or work with us to do

11   that.  But that is our fiduciary duty.  The gamesmanship really

12   needs to stop.  As I said to every counsel and as I said to

13   you, Your Honor at the first hearing, we are fiduciaries.  We

14   are here to protect client interest and get them the best

15   value, not to have skirmishes and litigations and gamesmanship

16   over jurisdiction, automatic stay verse automatic stay or

17   something else.

18        So we're going to try to work as cooperatively with

19   all the constituents and adversaries and objectors in this

20   case, in this adversary proceeding, and try to craft something

21   that is sensible, commercial and efficient to have the dispute,

22   as everyone has said, about whether or not BlockFi has a

23   guarantee and a pledge from Emergent and what that means for

24   this estate.  So we're going to endeavor to do that.

25        Two other points just to clean up.  The DOJ has, in

1  fact, served warrants of seizure on BlockFi for certain

2  customers who -- or clients who are obligated to the government

3  to turn over property.  So it's customer property that we're

4  holding.  We don't think we need an order from this Court to

5  actually comply with those seizure orders.

6          But I know Mr. Shapiro is on the phone, and we have

7  had communications about those.  They emanate out of the State

8  of Washington, and there's about two or three clients of ours

9  impacted.  It is client money.  It is not property of the

10 estate money.  And we are going to cooperate and do what we

11 need to do through counsel to turn over that money to the

12 government based on those seizure warrants.

13         THE COURT:  All right.  Thank --

14         MR. KANOWITZ:  Wanted to let you know that.

15         THE COURT:  Thank you.  I appreciate it.

16         MR. KANOWITZ:  And the second thing, I think, that we

17 need to address housekeeping is further dates.  Right now we

18 have January 17th.  We also have January 30th.  But we will

19 need dates, I would believe, in late February and March subject

20 to any other type of proceeding that needs to be brought before

21 Your Honor.

22         THE COURT:  We have a February 21 date already

23 included.

24         MR. KANOWITZ:  I think that --

25         THE COURT:  You think earlier or --

1          MR. KANOWITZ:  I think that a little later since we

2   have January 30th -- or it could be earlier, but that week --

3   the president's week, is vacation among other things.

4          THE COURT:  Okay.

5          MR. KANOWITZ:  So I think that that week is probably

6   not the best week to do it.

7          THE COURT:  Are we scheduling an omnibus date, you

8   think?

9          MR. KANOWITZ:  Yeah.  I think it would be an omnibus

10  date.

11         THE COURT:  Bear with me one second.  So we have

12  1/30.  I am actually away the week of the -- a good chunk of

13  the week of the 13th through the end.  The best I can offer you

14  all is the week of the 6th or, if we're basically

15  eliminating -- well, let me see here.  No.  If we're

16  eliminating the week of the 20th, and the week of -- well, the

17  week of the 13th, I believe, is the president's weekend.  Are

18  we eliminating both those weeks?

19         MR. KANOWITZ:  I think the --

20         MR. STOLZ:  President's weekend's the 20th, Your

21  Honor.

22         THE COURT:  The 20th?

23         MR. KANOWITZ:  Right.  That's why I'm saying that

24  week on the 21st --

25         THE COURT:  Oh.

94

1          MR. KANOWITZ:  -- is an issue --

2          THE COURT:  Okay.

3          MR. KANOWITZ:  -- for certain people, I think,

4   including me.

5                    (Court and clerk confer)

6          THE COURT:  Well --

7          MR. KANOWITZ:  Your Honor, why don't we do this.

8          THE COURT:  You want to --

9          MR. KANOWITZ:  Why don't we caucus the estate parties

10  and get back with chambers.  Because the prior week of the 13th

11  has issues.  The week of the 20th has issues.  And we don't

12  know what we're going to need, potentially.

13         THE COURT:  Yeah.

14         MR. KANOWITZ:  So maybe we keep the 21st.  So --

15         THE COURT:  Let's keep the 21st for now.  It looks

16  like the -- no, not even -- yeah.  Let's leave it for now.

17  We're running out of days.

18         MR. KANOWITZ:  Very good, Your Honor.

19         THE COURT:  Or I'll have to push something else.

20         MR. KANOWITZ:  Yes.  I think that concludes --

21         THE COURT:  If the Third Circuit doesn't rule in LTL,

22  I have a whole day I can move for them.  So we'll see.  All

23  right.  Then just reach out for chambers.

24         MR. KANOWITZ:  We will, Your Honor.  I don't believe

25  we have anything else on the agenda.

95

1          THE COURT:  All right.

2          MR. KANOWITZ:  So we thank you for your time.

3          THE COURT:  Thank you.

4          Mr. Stolz?

5          MR. STOLZ:  Your Honor, Daniel Stolz, proposed local

6   counsel for the Committee.  On the motion to intervene, shall

7   we submit an order shortening time listing it for the 17th?  We

8   submitted it without date, so.

9          THE COURT:  I'll just schedule it.  Let's avoid the

10  paperwork.

11         MR. STOLZ:  Okay.  And will the order -- will Your

12  Honor enter a text order --

13         THE COURT:  Yeah.

14         MR. STOLZ:  -- as to when objections will be filed?

15         THE COURT:  Yeah.  We'll do that.  We're talking

16  about having it on the 17th, correct?

17         MR. STOLZ:  Correct.

18         THE COURT:  So we'll have objections by -- oh, let's

19  see.  The 17th.  Objections by the 16th.

20         MR. STOLZ:  Okay.  And, Your Honor, just so Your

21  Honor knows, we -- the debtor has graciously consented to share

22  Kroll with us, so both the debtor and the Committee will be

23  using one noticing agent so that people won't get confused.

24         THE COURT:  I think that's great.  All right.

25         Anybody else wish to be heard on any matters?  All

1  right, folks.  Thank you for your time.

2              IN UNISON:  Thank you, Your Honor.

3              THE COURT:  Take care.

4              MR. SHAPIRO:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6                         * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

97

# **C E R T I F I C A T I O N**

1

2          We, DIPTI PATEL and LIESL T. SPRINGER, court approved

3  transcribers, certify that the foregoing is a correct

4  transcript from the official electronic sound recording of the

5  proceedings in the above-entitled matter, and to the best of

6  our ability.

7

8  /s/ Dipti Patel

9  DIPTI PATEL, CET-997

10

11  /s/ Liesl T. Springer

12  LIESL T. SPRINGER, CET-685

13  J&J COURT TRANSCRIBERS, INC.   DATE:  January 10, 2023

14

15

16

17

18

19

20

21

22

23

24

25