UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esquire
Lauren Bielskie, Esquire
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
Email: jeffrey.m.sponder@usdoj.gov
       lauren.bielskie@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| BlockFi Inc., *et al.*,[1] | : | Case No. 22-19361 (MBK) |
|  | : | jointly administered |
|  | : |  |
| Debtors. | : | Hearing Date: January 17, 2023 at 10:00 a.m. |
|  | : |  |

**OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' RETENTION PROGRAMS AND (II) GRANTING RELATED RELIEF**

The United States Trustee (the "U.S Trustee"), by and through his counsel, and in furtherance of his duties pursuant to 28 U.S.C. §§ 586(a)(3) and (5), respectfully submits this objection (the "Objection") to the Debtors' Motion for Entry of an Order (i) Approving the Debtors' Retention Programs and (ii) Granting Related Relief (Dkt. 21) (the "Bonus Motion").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).

[2] Capitalized terms used herein as defined terms and not otherwise defined shall have those meanings ascribed to them in the Bonus Motion.

1. This Court has jurisdiction to hear and determine this Objection.

2. Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised by this Objection.

## **PRELIMINARY STATEMENT**

4. The Debtors seek approval of a key employee retention plan (the "KERP") and a proposed target retention program ("TRP" and together with the KERP, the "Retention Programs"). *See* Bonus Motion at ¶ 1. The Debtors have designated what appears to be most if not all of their remaining employees including ninety-five (95) employees as Participants in the KERP (the "KERP Participants") and thirty-two (32) employees as Participants in the TRP (the "TRP Participants" and together with the KERP Participants, the "Participants"). *See id.* at ¶ 15. The cost of the KERP is approximately $9,900,129 in the aggregate, and the cost of the TRP is $2,425,000 in the aggregate. *See id.* at ¶ 19. In fact, the Participants under the KERP will receive on average, $104,211.88 as a bonus, and the Participants under the TRP, will receive on average, $75,781.25 as a bonus.

5.  The Bonus Motion fails to identify *any* factual information that would allow for approval. Most significantly, there is no information provided to determine whether any of the Participants are insiders and therefore there is no way to determine if Section 503(c)(1) applies. The Debtors have attempted to bypass the stringent standard of Section 503(c)(1) by seeking relief pursuant to Section 503(c)(3), which is only applicable *if* the participant is not an insider. Although the Debtors assert that none of the Participants are insiders, their support for that assertion is found only in conclusory, self-serving statements included in the Bonus Motion and in charts that were provided to the U.S. Trustee.[3] As such, other parties-in-interest as well as possibly the Court and the Committee can only guess who the Participants might be, and whether they might be able to argue that one or more of the Participants is, in fact, an insider.

6.  Section 503(c)(3) is not without its own strict standards. Among the hurdles that must be met are that bonuses must be justified by the facts and circumstances of the cases as well as the thresholds must be genuinely incentivizing and not solely for the purpose of inducing those insiders to remain with the Debtors' business. As discussed more fully below, the Debtors have failed to meet their burden for many reasons:

> • The bonuses are not tied to any identifiable metric that would enable parties-in-interest and the Court to determine whether the bonus payments are reasonable based on the facts and circumstances of these cases.

---

[3] The U.S. Trustee is not aware if the unredacted charts have been shared with the Court or the Official Committee of Unsecured Creditors (the "Committee"). However, the charts appear to include certain employees and officers who would be considered insiders under section 101(31) and general corporate law. The U.S. Trustee is constrained from identifying the employees that the U.S. Trustee believes to be insiders because of the *Interim Order Granting Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders, and (V) Granting Related Relief.* See Dkt. 53.

> • The Bonus Motion fails to identify the Participants' (1) identities, (2) job titles, (3) job responsibilities, (4) salary and other forms of compensation (current and historical), and (5) supervisors and/or who they supervise.
>
> • The Bonus Motion fails to identify whether the Participants are employed by Debtors or non-Debtor affiliates.
>
> • The Bonus Motion fails to disclose the Debtors' management structure and where the Participants fall within that structure.
>
> • The Bonus Motion fails to provide information regarding the historical bonus structure for any Participant.

7. To require the inclusion of this information as part of a bonus motion is consistent with the customary case-by-case analysis that courts perform to evaluate a key employee retention program. Given that the Bonus Motion provides no way to ascertain the basis for conferring cash awards on the Participants, the Bonus Motion does not provide sufficient information to enable the Court to make an independent determination that the Retention Programs pass muster under the facts and circumstances of these cases.

## BACKGROUND AND RELEVANT FACTS

### A.    The Bankruptcy Cases

8. On November 28, 2022 (the "Petition Date"), BlockFi Inc. ("BlockFi"), BlockFi Trading LLC ("Trading"), BlockFi Lending LLC ("Lending"), BlockFi Wallet LLC ("Wallet"), BlockFi Ventures LLC ("Ventures"), BlockFi International Ltd. ("International"), BlockFi Investment Products LLC ("Investment"), BlockFi Services, Inc. ("Services") and BlockFi Lending II LLC ("Lending II" and together with BlockFi, Trading, Lending, Wallet, Ventures, International, Investment and Services, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or "Code"). *See* Case Nos. 22-19361, 22-19363, 22-19365, 22-19366, 22-19367, 22-19368, 22-19370, 22-19371 and 22-19374 at Dkt. 1.

9.      On November 29, 2022, the Court entered an Order directing that these cases be jointly administered.  *See* Dkt. 42.

10.     On December 21, 2022, the Office of the United States Trustee filed a Notice of Appointment of an Official Committee of Unsecured Creditors.  *See* Dkt. 130.  On December 22, 2022, the Office of the United States Trustee filed an Amended Notice of Appointment of an Official Committee of Unsecured Creditors.  *See* Dkt. 131.

11.     No trustee or examiner has been appointed in these chapter 11 cases.

12.     "BlockFi acquires clients by offering custom products and services that enable its clients to meet their financial goals, and continuously expands its product suite to deepen its relationship with its clients over time."  *See* Dkt. 17 at page 10 of 41.  "BlockFi serves retail clients through web and mobile applications, and its products enable individuals and small businesses to store and/or earn interest on, buy and sell, borrow U.S. Dollars secured by, and earn (via credit card rewards program) digital assets."  *See id.*  BlockFi serves institutional clients such as "hedge funds, market makers, proprietary trading firms, trading desks, cryptocurrency miners, exchanges, and corporations with bespoke financing, trading, and treasury solutions relating to digital assets."  *See id.*

**B.    The Bonus Motion**

13.     On November 28, 2022, the Debtors filed the Bonus Motion.  The Bonus Motion was not accompanied by any declarations supporting the relief requested.

14.     The Debtors seek to pay bonuses to Participants to enable them to "continue to perform necessary maintenance and updates and prepare the Debtors' platform for post-emergence operations.  The Debtors' employees are also working closely with the Debtors'

5

advisors to, among other things, facilitate the administration of these Chapter 11 Cases and satisfy all chapter 11 reporting obligations." *See* Bonus Motion at ¶ 7.

15. The Debtors designated 127 of their 374 employees and independent contractors as Participants – which appears to be most if not all of the Debtors' remaining workforce.[4] *See* Bonus Motion at ¶ 15. According to the Debtors, these proposed Participants "perform a variety of important business functions that are vital to preserve and enhance stakeholder value." *See id.*

16. Additionally, according to the Debtors, "Participants may be motivated to leave the Debtors' employ during the pendency of these Chapter 11 Cases due to, among other things, the elimination of equity compensation pursuant to the FTX transaction, the uncertainty created by the Debtors' ongoing reorganization efforts and the recent, and significant, reduction in force efforts initiated prior to the commencement of these Chapter 11 Cases." *See id.* at ¶ 16.

17. The Debtors admit through the Bonus Motion that "certain Participants have titles incorporating the word "head," "director," "vice president," or "chief." *See id.* at ¶ 18.

18. The proposed Retention Programs' awards are equal to fifty percent (50%) of the base salary of Tier 1 Participants, which includes approximately 113 Participants, and ten percent (10%) of Tier 2 Participants, which includes approximately 14 Participants. *See id.* at ¶ 19.

19. The dates for payment of the Retention Programs for Tier 1 Participants are "50 percent immediately, subject to a clawback until the 6-month anniversary of the Court approval date, on the Effective Date of the Retention Programs, with the remaining fifty percent to be paid

---

[4] Approximately two-thirds of the Debtors' workforce received Worker Adjustment Retraining Notification ("WARN") notices before these chapter 11 cases were filed as part of a liquidity preserving reduction in force. *See* Dkt. 17 at ¶ 28. As such, approximately 247 employees and independent contractors received WARN notices leaving approximately 127 employees and independent contractors, which appears to be the same number as Participants in the Retention Programs. In other words, it appears that most if not all remaining employees and independent contractors are Participants under the Retention Programs.

at the earlier of the date that is (i) twelve months after the effective date of Court approval of the Retention Programs and (ii) 30 days following emergence from these Chapter 11 Cases." *See id.* Tier 2 Participants "shall receive 100% of the award upon Court approval of the Retention Programs." *See id.*

20. A Tier 1 Participant whose employment is terminated for cause or who resigns without good reason will be required to repay 100% of the retention payment attributable to the first 6-month period. *See id.* A Tier 1 Participant whose employment is terminated for cause or who resigns without good reason during the second 6-month period will be required to repay 100% of the retention payment attributable to the second 6-month period but may retain the bonus for the first 6-month period. *See id.* A Tier 2 Participant whose employment is terminated for cause or who resigns without good reason will be required to repay 100% of the retention payment. *See id.*

## DISCUSSION

### A. The Statutory Framework

21. Section 503 governs the allowance of administrative expenses "for actual, necessary costs and expenses of preserving a debtor's bankruptcy estate." *See* 11 U.S.C. § 503(b)(1)(A). The two general overriding policies of Section 503 of the Bankruptcy Code are: (i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of the insiders of the estate at the expense of its creditors. *See In re Journal Register Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009) (*citing Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98. 101 (2d Cir. 1960)) (additional citations omitted).

22. Section 503(c)(1) of the Bankruptcy Code prohibits any transfer:

> made to, or an obligation incurred for the benefit of, an insider of
> the debtor for the purpose of inducing such person to remain with

7

    the debtors' business, absent a finding by the court based on evidence in the record that

(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the business; and

(C) either –

    (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

    (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

*See* 11 U.S.C. § 503(c)(1).

    23.    A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements under subdivisions (A), (B), and (C) of Section 503(c)(1) of the Bankruptcy Code to be subject to this subdivision's exception. *See 4 Collier on Bankruptcy* ¶ 503.17 (15th ed. rev. 2007); *see also In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2007) ("*Dana II*") (summarizing the requirements under Section 503(c)(1) of the Bankruptcy Code).

24. Attempts to characterize what are essentially prohibited retention programs as "incentive" programs to bypass the requirements of Section 503(c)(1) of the Bankruptcy Code are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to Section 503(c)(1) of the Bankruptcy Code. *See In re Mesa Air Group, Inc.*, No. 10-10018, 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (*citing In re Dana Corp.*, 351 B.R. 96, 102 n.3 (Bankr. S.D.N.Y. 2006) ("*Dana I*") (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP).").

25. In other words, retention bonuses cannot be paid to insiders absent proof that (1) the insider has a "bona fide job offer from another business at the same or greater rate of compensation;" (2) the services provided by the insider are essential to the survival of the business; and (3) the bonus cannot be more than ten times the mean retention bonus paid to non-management employees in the same calendar year. *See* 11 U.S.C. § 503(c)(1). Because this exacting standard for retention bonuses is difficult to satisfy, most Debtors, including the Debtors here, instead seek authority to pay bonuses to insiders under section 503(c)(3).

26. Section 503(c) of the Bankruptcy Code, added in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), was intended to curtail payments of retention incentives to insiders, including bonuses granted to other employees without factual and circumstantial justification. *See Journal Register*, 407 B.R. at 535; *see also In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234 (Bankr. N.D. Tex. 2009) ("Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expenses during a chapter 11 case") (*citing In re Airway Indus., Inc.,* 354 B.R. 82, 87 n.12 (Bankr. W.D. Pa. 2006))

9

(additional citations omitted); *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007) (the amendments were added to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process."). This section establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business. *See Dana I*, 351 B.R. at 100; 11 U.S.C. § 503(c)(1).

27. The BAPCPA amendments make it abundantly clear that if a proposed payment falls within Section 503(c)(1), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist. *See id.* The effect of Section 503(c) of the Bankruptcy Code was to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before the Court is in a position to determine that retention bonuses should be paid. *See Mesa Air Group*, 2010 WL 3810899, at *2 (*citing Global Home Prods.*, 369 B.R. at 785).

**B.   The Debtors Failed to Establish that Section 503(c) Is Not Applicable to Employees Covered by the Retention Programs**

28. Section 503(c) restricts transfers made to "insiders" of a debtor. *See* 11 U.S.C. § 503(c). The Debtors bear the burden of establishing that the Retention Programs satisfy all of the Code's requirements. *See GT Advanced Tech., Inc. v. Harrington*, 2015 WL 4459502, *5 (Bankr. D.N.H. July 21, 2015) (*citing In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012)). Therefore, the Debtors must satisfy their burden and prove that all the Participants are not "insiders," as defined under 11 U.S.C. § 101(31). The Debtors have not met their burden here. Simply put, statements in the Bonus Motion that none of the Participants are

statutory "insiders" do not provide this Court with an evidentiary basis to make a conclusion on the status of these individuals.[5]

29. While disclosing to the U.S. Trustee that certain Participants hold titles such as "senior vice president," "vice president," "senior director" and "director," the Debtors nevertheless maintain that all such employees are not insiders. The Debtors provide no evidence in the Bonus Motion regarding the specific duties or authority of any of its Participants and simply generalize that the Participants do not have "discretionary control over substantial budgetary amounts or significant control with respect to the Debtors' corporate policies or governance." *See* Bonus Motion at ¶ 37.[6]

30. The potential facts that the Participants may not be classified as executive officers and may not have input in the Retention Programs is not dispositive as to whether the Participants are insiders. Pursuant to the Section 101(31) of the Bankruptcy Code, if a debtor is a corporation, the term "insider" includes an officer of the debtor. *See* 11 U.S.C. § 101(31)(B)(ii). A vice president as an officer is presumptively an insider. *See In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009). Moreover, regardless of title, a person with broad responsibilities over significant aspects of a debtor's business is considered an insider, even if he or she is not a member of senior management. *See id*. at 584 (finding vice presidents who had broad responsibilities over significant aspects of debtor's business, to be insiders); *see also Borders Group*, 453 B.R. at 469 (Bankr. S.D.N.Y. 2011) ("[i]nsider status can

---

[5] Although the Debtors provided information to the U.S. Trustee concerning the Participants, it does not appear that such information has been filed on the docket and it is unclear if such information was disseminated to the Court or the Committee. As the information has been marked confidential, the U.S. Trustee will not disclose such information at this time. As a result, the U.S. Trustee is unable to include those individuals whom he believes to be insiders.

[6] In fact, the charts provided to the U.S. Trustee by the Debtors include certain employees and corporate officers who appear to be insiders under section 101(31). The Debtors have not rebutted this presumption.

also be determined on a case by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs"); *Office of the United States Trustee v. Fieldstone Mortgage Co.*, No. CCB-08-755, 2008 WL 4826291, at *5 (D. Md. Nov. 5, 2008) ("[C]ontrol . . . is an independent additional ground for finding a person an insider, not a feature that officers or directors are required to possess in order to be deemed insiders"); *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996) (definition of insider is illustrative rather than exhaustive); *compare In re Kunz*, 489 F.3d 1072 (10th Cir. 2007) (it is not simply the title "director" or "officer" that renders an individual an insider; rather it is the set of legal rights that a typical corporate director or officer holds).

31. Accordingly, unless the Debtors disclose the Participants, together with a statement as to their job descriptions, and to whom they report, the officers participating in the Retention Programs are presumed to be insiders. *See Foothills Texas, Inc.*, 408 B.R. at 584. Insiders are subject to the requirements of Section 503(c)(1) and the Debtors have neither met their burden of proof under that subsection nor have they rebutted the presumption of insider status absent a more fulsome discussion of the roles and responsibilities of each Participant.

32. Here, it appears that the Debtors include most if not all of their remaining workforce as Participants in the Retention Programs. There is no indication that the Debtors terminated all senior management as part of the workforce reduction announced prior to the bankruptcy. Accordingly, there is no reason to believe that none of the 127 remaining employees and independent contractors are insiders of the Debtors.

33. Because the Debtors have failed to establish that certain of the Participants are not insiders, and because the Debtors have characterized the Retention Programs as entirely for the

purpose of retaining their employees, the insider employees fail to satisfy the requirements of Section 503(c)(1).

    **C.    The Retention Programs Do Not Satisfy Section 503(c)(3)**

34.    The Retention Programs are not justified by the facts and circumstances of these chapter 11 cases and therefore fail the more permissive test of Section 503(c)(3). In order for a bonus plan to pass muster under Section 503(c)(3) of the Bankruptcy Code, the movant must show that it is warranted by "the facts and circumstances of the case." *See* 11 U.S.C. § 503(c)(3); *Dana II*, 358 B.R. at 576. To evaluate whether a proposed bonus plan passes muster under Section 503(c)(3), courts generally consider the following factors outlined in *Dana II*:

> [1] Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?
>
> [2] Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> [3] Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> [4] Is the plan or proposal consistent with industry standards?
>
> [5] What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> [6] Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana II*, 358 B.R. at 576-77.[7]  "'[T]he court must make its own determination that the transaction will serve the interests of creditors and the debtor's estate.'"  *See GT Advanced Tech. Inc*, 2015 WL 4459502, at *7.

### 1. The Retention Programs Do Not Establish a Relationship Between Effort and Outcome

35. The Debtors have not established a nexus between the Retention Programs and the results sought to be achieved.  Even under the less rigorous standards of Sections 503(c)(3) and 363, the benchmarks for the payment of bonuses must be "difficult targets to reach."  *See Dana II*, 358 B.R. at 583.

36. The Bonus Motion fails to establish a relationship between the Retention Programs and the Debtors' need to retain the Participants.  First, the Debtors acknowledge that the "Debtors' trading platform is frozen" but provide no meaningful explanation as to what that means.  *See* Bonus Motion at ¶ 7.  The only information provided by the Debtors in the Bonus Motion is that "employees continue to perform necessary maintenance and updates and prepare the Debtors' platform for post-emergence operations."  *See id.*  This description does not provide for a reasonable relationship between the Participants and the Retention Programs and leaves open questions as to what these employees are actually doing.

37. Second, the KERP/TRP contains no performance metrics.  The only requirement for the payments to Tier 1 Participants is that the Tier 1 Participants remain employed for either

---

[7] Some courts have determined that the standard under Section 503(c)(3) is not different from the business judgment test under Section 363, *see In re Residential Capital, LLC*, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013), nonetheless, courts continue to apply the *Dana II* factors. *See, e.g., Borders*, 453 B.R. at 474 (evaluating an incentive plan under the business judgment standard of Section 363 by applying the factors listed in *Dana II*); *but see In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (standard for approval under Section 503(c)(3) is higher than the business judgment test; if payments to employees outside the ordinary course were only subject to the business judgment test, then the language of Section 503(c)(3) would ostensibly be rendered meaningless).

six (6) or twelve (12) months subject to certain clawbacks. *See id*. at ¶ 19. The Tier 1 Participants receive fifty percent (50%) immediately and the remaining fifty percent (50%) to be paid at the earlier of the date that is 12 months after the effective date of Court approval of the Retention Programs and 30 days following emergence from these Chapter 11 Cases. *See id*. The only requirement for the payments to Tier 2 Participants is that Tier 2 Participants remain employed. *See id.*

38. Emergence from bankruptcy is the goal in every Chapter 11 case, and one which the Participants will need to accomplish as part of their employment and fiduciary duties even in the absence of the Retention Programs. Moreover, although certain employees may assist in the reorganization process, facilitating a successful reorganization is the responsibility of the talented professionals retained or to be retained by the Debtors in these cases. Other than conclusory statements that the services are critical to the Debtors' reorganization, the Debtors failed to provide any specifics establishing the need to retain these Participants and justify additional and confidential bonuses.

### 2. There is Insufficient Evidence to Conclude That the Costs are Reasonable

39. The Bonus Motion appears to rely on the fact that the total cost of the Retention Programs is allegedly "only a fraction of the Debtors' total revenue and liabilities" and therefore is reasonable. *See id*. at ¶ 29. Despite these conclusory statements, no actual analysis is provided in the Bonus Motion. The Debtors failed to establish whether the Retention Programs are reasonable because there is no historical information to evaluate the proposed retention payments.[8] While the Debtors have provided on a confidential basis the salaries of the

---

[8] The Debtors provided the U.S. Trustee with a historical bonus analysis but has not filed such analysis on the docket or filed a declaration in support of such analysis. In any event, the U.S. Trustee cannot disclose such information as it has been marked confidential by the Debtors.

15

Participants, among the Participants are numerous employees who are highly compensated by any measure. In fact, the Participants under the KERP will receive on average, $104,211.88 as a bonus, and the Participants under the TRP, will receive on average, $75,781.25 as a bonus.

       3.       **The Bonus Motion Provides No Basis to Conclude that the KERP/TRP is Consistent with Industry Standards**

40. The Bonus Motion provides mere lip service regarding industry standards. *See* Bonus Motion at ¶ 31. The Debtors assert in the Bonus Motion that they "compared their proposed retention awards for Participants against similarly situated companies in chapter 11." *See id.* at ¶ 32. In addition, the Debtors provide in the Bonus Motion that "WTW engaged in a benchmarking analysis to assist the Debtors with the design of the Retention Programs." *See id.* at ¶ 29. However, the Debtors provided no information comparing the Retention Programs with those in similarly situated companies in chapter 11. Also, the Debtors have not provided a copy of the benchmarking analysis performed by WTW to the U.S. Trustee or filed it on the docket. Further, the Debtors failed to include any facts or cases in the Bonus Motion supporting the Retention Programs as being consistent with industry standard. For these reasons, the Debtors failed to establish that the Retention Programs are justified by the facts and circumstances of these cases.

       4.       **There is Insufficient Evidence Concerning the Debtors' Purported Due Diligence**

41. The Debtors set forth that they performed due diligence in determining the need for the Retention Programs. *See id.* at ¶ 32. Apparently, the Debtors' due diligence consisted of the "Debtors' management team [not disclosed] consulting with key personnel [not disclosed] to determine which employees were most critical to retain and most at risk of flight absent an incentive plan." *See id.* However, the Debtors did not provide any information about the

consultation. In addition, the Debtors then compared the proposed retention awards against similarly situated companies in chapter 11. But no further information is provided concerning the comparison with other similarly situated companies in chapter 11.

42. For these reasons, the Debtors failed to establish that the Retention Programs are justified by the facts and circumstances of this case.

43. The U.S. Trustee reserves any and all rights, remedies and obligations found at law, equity or otherwise to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds or take such other actions as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the Bonus Motion and grant such other relief as may be appropriate and just.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
REGIONS 3 & 9

By:    */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney

Lauren Bielskie
Trial Attorney

Dated: January 10, 2023