| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **DISTRICT OF NEW JERSEY** <br> Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| BROWN RUDNICK LLP <br> Robert J. Stark, Esq. <br> Kenneth J. Aulet, Esq. <br> Bennett S. Silverberg, Esq. <br> Seven Times Square <br> New York, NY 10036 <br> Telephone: (212) 209-4800 <br> Fax: (212) 209-4801 <br> Email: rstark@brownrudnick.com <br>  kaulet@brownrudnick.com <br>  bsilverberg@brownrudnick.com <br> *Proposed Counsel for the Official Committee of Unsecured Creditors* <br>  -and- <br> GENOVA BURNS LLC. <br> Daniel M. Stolz, Esq. <br> Donald W. Clarke, Esq. <br> Gregory S. Kinoian, Esq. <br> 110 Allen Rd., Suite 304 <br> Basking Ridge, NJ 07920 <br> Telephone: (973) 230-2095 <br> Fax: (973) 533-1112 <br> Email: DStolz@genovaburns.com <br>  DClarke@genovaburns.com <br>  GKinoian@genovaburns.com <br> *Proposed Local Counsel for the Official Committee of Unsecured Creditors* | BROWN RUDNICK LLP <br> Stephen D. Palley, Esq. <br> 601 Thirteenth Street, NW <br> Washington, DC 20005 <br> Telephone: (617)536-1766 <br> Fax: (617)289-0466 <br> Email: spalley@brownrudnick.com |
| In re: <br><br> BLOCKFI INC., *et al.,* <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 22-19361 (MBK) <br><br> Jointly Administered |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC. (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO APPLICATION OF THE
DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF
AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF
MOELIS & COMPANY LLC AS INVESTMENT BANKER, CAPITAL MARKETS
ADVISOR, AND FINANCIAL ADVISOR EFFECTIVE AS OF THE PETITION DATE**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 cases of the above-captioned debtors ("**BlockFi**" or the "**Debtors**"), by and through its undersigned proposed counsel, hereby files this Objection to the *Application of the Debtors and Debtors in Possession for Entry of an Order Authorizing the Retention and Employment of Moelis & Company LLC as Investment Banker, Capital Markets Advisor, and Financial Advisor Effective as of the Petition Date* [Docket No. 139] (the "**Moelis Application**")[2]. In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. This is not an ordinary Chapter 11 proceeding, involving an ordinary business enterprise that, for one reason or another, has become over-leveraged. This case does not immediately present itself as a business "rehabilitation" following traditional Chapter 11 models and methods. BlockFi is not now operational, and it is hard to discern if the company can be "jumpstarted" to a reorganization or sale as a viable going concern. The first order of business in this Chapter 11 case – unlike in virtually every other large Chapter 11 case – is to see if creditors are not better off just letting BlockFi expire.

2. To be clear, the Committee does not yet have a view on that question. Much more diligence is required, and the Committee is working hard to draw a conclusion as soon as possible.

---

[2] All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Moelis Application.

Given the size of the company and the problems inherent in the entire cryptocurrency ecosystem, the Committee will require more time to assess. But, despite the Committee's request for a short adjournment, the Debtors are bent on moving forward now with the Moelis Application. However, without a clear view on whether the services described in the Moelis Application are likely to bring any real value to the estates, it seems premature to sign away such substantial sums.

3. In the context of most other (i.e., ordinary) Chapter 11 cases, the need for the kind of services Moelis offers would be obvious. Not so here. Restructuring investment bankers primarily do three things: (1) raise capital; (2) help value reorganizing businesses and, in turn, help allocate enterprise value among stakeholders under a plan; and (3) run M&A processes for assets or businesses that need to be sold. It is unclear how those services might be helpful here. First, there is no impending need for financing, given that the company converted all non-wallet cryptocurrency to U.S. dollars just before the filing. *See Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 17] (the "**Renzi Declaration**"), at ¶ 99. Second, there is no pressing need for valuation services, given that the Debtors are not now an operating business enterprise and, even if they were, the Debtors' capital structure is flat (i.e., there are very few creditor classes). Third, there is little available data suggesting that an enterprise-wide M&A process has a likelihood of success. To the contrary, the data shows this: The industry is in utter turmoil; potential strategic buyers (i.e., competitors) have been challenged by adverse sector developments; any buyer will assuredly face increased regulatory scrutiny following FTX's descent, which cannot help the bidding dynamic; and, the only recent precedent transaction (i.e., Voyager's sale to Binance) showed limited bidding interest and a very disappointing execution level.

4. Against this backdrop, the Moelis Application is not about case "needs." It is about case "options." Moelis will, for example, probe the M&A marketplace to see if a sale of BlockFi <u>might</u> generate some bidding interest. Moelis will help the company design a plan of reorganization, <u>if</u> management can draw up a feasible business plan. And, Moelis will help market esoteric assets (e.g., loans and estate causes of action) <u>if</u> the case parties ultimately think Moelis is the right firm for that kind of job – unlikely, but an option nonetheless.

5. The Committee does not oppose exploring options. Optionality is generally a good thing, especially when the Debtors' future does not today look assured. But, how much should optionality cost? The Debtors think it reasonable for Moelis to charge the estates north of $10 million, trending towards $20 million (payable regardless of outcome), for exploring options. This is where the Debtors and the Committee part company.

6. In this contested matter, the Debtors carry the burdens of proof and persuasion, and the facts "on the ground" simply do not support the relief requested. The Committee had hoped, and continues to hope, that consensus can be reached respecting the Moelis Application. It will continue to interface with the Debtors and Moelis in pursuit of that objective. But, negotiations are a two-way street, and the "I'd rather take my chances with the Court" attitude (instead of good-faith negotiations) is not likely to yield consensus – in this contested matter or any that may follow. If a compromise cannot be achieved, the Committee respectfully requests that the Court deny the relief requested.

**BASES FOR OBJECTION**

**I.     The Proposed Restructuring Terms, In Brief.**

7.     The Moelis Application contemplates the following compensation terms for Moelis:

(a) <u>Retention Fee</u>: $500,000 (to be offset against the Restructuring Fee or the Sale Transaction Fee).

(b) <u>Monthly Fee</u>: $200,000 (after 3 months, 50% of the Monthly Fee to be offset against the Restructuring Fee or the Sale Transaction Fee).

(c) <u>Restructuring Fee</u>: $8,000,000, or $9,000,000 if Moelis has not received a Mining Assets Sale Fee or a Claim Monetization Fee.

(d) <u>Sale Transaction Fee</u>[3]: $8,000,000, or $9,000,000 if Moelis has not received a Mining Assets Sale Fee or a Claim Monetization Fee.

(e) <u>Capital Transaction Fee</u>: 1% of first-lien debt; 3% of junior debt; 4% of equity financing, in each case whether or not the Debtors draw the full amounts committed or apply such amounts to refinance its obligations;

(f) <u>Mining Assets Sale Fee</u>: $500,000 plus 5% of total gross consideration received or to be received in connection with a Mining Assets Sale; and

(g) <u>Claim Monetization Transaction Fee</u>: $500,000 plus 5% of the total gross consideration received or to be received in connection with a Claim Monetization Transaction.

Moelis Application at ¶ 17.

8.     To unpack this, presume the case lasts five months, culminating in a Section 363 sale transaction of the BlockFi assets (excluding the mining assets) yielding just a few million extra dollars to the estates (like the Voyager sale), and all is distributed to customers via a simple plan of liquidation. Not an unlikely case outcome knowing what we know now, and not an outcome where one could objectively say Moelis's work contributed a whole lot. Yet, under that circumstance, Moelis could be entitled to a fee equal to $12.8 million, comprised $800,000 of in

---

[3] As discussed *infra*, ¶ 9, it is unclear to the Committee when, if ever, a Sale Transaction Fee would be incurred.

monthly fees, an $8 million Restructuring Fee, and a $4 million Claim Monetization Transaction Fee. And, since the retention is proposed under Section 328(a), the fee cannot be reassessed later on, given that what is foreseeable today is arguably not "improvident" at the end.

9. The retention terms thus liken to a confidence game of old, the "pig in a poke." Sections 328 and 330 are not supposed to work that way, as set forth below.

**III.    The Relief Requested Should Be Denied
Because The Terms Of Retention Are Excessive Given
The Peculiar Case Facts And Moelis's Limited Task Assignments.**

    **A.    Applicable Legal Principles.**

10. Under Section 328(a), a debtor may employ a professional on "reasonable terms and conditions." 11 U.S.C. 328(a) ("The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." (emphasis added)).

11. In assessing "reasonableness," courts have focused on: (i) whether the proposed retention reflects normal business terms in the marketplace; (ii) whether there were arm's-length negotiations between the parties; (iii) whether the retention, as proposed, is in the best interests of the estate; (iv) whether there is creditor opposition to the retention provisions; and – here, of particular import -- (v) whether, given the size, circumstance, and posture of the case, the amount is itself reasonable. *See In re Insilco Techs., Inc.*, 291 B.R. 628, 634 (Bankr. D. Del. 2003).

12. Proposed fee structures for investment bankers require "close scrutiny" to ensure that they meet the reasonableness requirement. *See In re Drexel Burnham Lambert Grp. Inc.*, 133 B.R. 13, 27 (Bankr. S.D.N.Y. 1991). The Court, "in its duties as a gatekeeper, must have a

sufficiently strong record when deciding whether to approve a professional under § 328(a)" in order to determine that the proposed terms are reasonable, and parties seeking to retain professionals must present evidence of such reasonableness, rather than conclusory statements. *See In re Energy Partners, Ltd.*, 409 B.R. 211, 225 (Bankr. S.D. Tex. 2009) (denying application based on lack of evidence of these factors); *In re High Voltage Eng'g Corp.*, 311 B.R. 320, 333-35 (Bankr. D. Mass. 2004) (denying application based on lack of evidence that proposed compensation was reasonable). Moreover, in ruling on a Section 328 application, "a Bankruptcy Court need not approve or reject an application as presented but "may approve the employment of a professional on any terms and conditions that the Court finds necessary to satisfy the requirement of reasonableness." *In re Federal Mogul-Global, Inc.*, 348 F.3d 390, 397 (3d Cir. 2003).

13. The party filing the retention application – here, BlockFi – bears the burdens of proof and persuasion as to whether the application should be granted. *See, e.g., In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 318 (10th Cir. 1994) ("An applicant under § 327(a) has the burden of establishing by application and accompanying affidavit that its chosen professional is qualified."); *In re Energy Partners, Ltd.*, 409 B.R. at 224 (parties filing applications to employ professionals have the burden of proving by a preponderance of the evidence that the proposed professionals' fees are reasonable); *In re Metricom, Inc.*, 275 B.R. 364, 371 (Bankr. N.D. Cal. 2002) (proponent of application has the burden to prove that terms of employment are reasonable).

    **B.    The Debtors Cannot Carry Their Burdens Of
           Proof And Persuasion Respecting The Moelis Application.**

14. **The Sale Transaction And Restructuring Fees.** First, it bears observing that the Moelis Application is unclear as to when, if ever, a Sale Transaction Fee would be incurred. The Moelis Application indicates that "[i]n the event of a Sale Transaction that is consummated pursuant to Section 363 of the Bankruptcy Code, such Sale Transaction shall trigger a

7

Restructuring Fee. To the extent a Transaction is both a Sale Transaction and a Restructuring Transaction, the Debtors shall pay the Restructuring Fee." Moelis Application at ¶ 17. Given that "Sale Transaction" is defined to include the sale "of a significant portion" of the assets of the Debtors, *see* Engagement Letter at 3, the Committee assumes that any Sale Transaction would occur under Section 363 and therefore incur a Restructuring Fee. In any case, any order granting the Moelis Application should be crystal clear that **in no case** will both a Sale Transaction Fee and Restructuring Fee be paid, as the fear of compounding fees has strong basis in today's bankruptcy culture.

15. Second, respecting the Sale Transaction Fee, one would think the size of the fee would be pegged – and thereby justified by reference – to data suggesting that the estates will likely generate more sales proceeds than would be paid for exploring the option. We do not have that. The data, in fact, suggests the contrary. Today: (1) there are several crypto-trading platforms in bankruptcy, all available for purchase in whole or in part; (2) Celsius has been in bankruptcy far longer than BlockFi, and, to date, it has been unable to consummate a transaction with any comprehensive buyer or to find another exit solution; and (3) the collapse of FTX has imposed a massive black cloud over the entire trading industry, from both a customer and legal/regulatory perspective. Moreover, the only precedent transaction available – Binance's recent acquisition of Voyager, a deal that Moelis (working for Voyager) put together – yielded a mere $20 million to the estates, beyond the store of cryptocurrency Voyager sold to Binance dollar-for-dollar.[4] This

---

[4] *See Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Binance US Purchase Agreement and (II) Granting Related Relief*, *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y.) [ECF 775] at ¶¶ 2, 14. From the outsider's view, it would appear that Binance agreed to buy Voyager not because it wanted the platform but because it wanted Voyager's massive stockpile of cryptocurrency and the customer accounts holding that cryptocurrency. BlockFi, in juxtaposition, does not have any cryptocurrency to include in a sale transaction. That is because it converted its entire stockpile into fiat currency just before the filing date. *See* Renzi Declaration at ¶ 99.

is not, in sum, an exciting time to try to sell a cryptocurrency trading and lending platform, and the proposed fee presents an unflattering risk/reward profile for the BlockFi estates.

16.     Third, respecting the Restructuring Fee, the Committee is at a loss to understand what services Moelis will provide that are not otherwise being performed (on an hourly fee basis) by the Debtors' other financial advisor, Berkeley Research Group.  Again, there is no financing to raise; there is no enterprise to value; and, the Debtors do not have a complex corporate/capital structure giving rise to inter-creditor value allocation issues.  Tellingly, the fee is payable even if the case is a straight liquidation, under a plan of liquidation or under Chapter 7.  Given the nature of this case, this attribute of the Moelis Application appears to be just an extrapolation – "we get a great big restructuring fee in other bankruptcies, so we should get one here" – untethered to any actual work that Moelis would be asked to perform or how the case ends up.  Here, in particular, the Committee holds the Debtors to their burdens of proof and persuasion.[5]

17.     **The Monthly Fees**.  As the Court is aware, historically, financial and banking advisors retained in Chapter 11 were all paid on an hourly basis, just like lawyers.  A decade or two ago, bankers started proposing that they be retained (via Section 328(a)) per the non-bankruptcy M&A model, where their fee was strictly a percentage of the "success" realized in the ultimate case transaction.  Then came the monthly fee, as a sort of advance against the "success" fee; as such, the monthly fee was to be fully credited against the ultimate "success" fee.  Then, crediting was diluted, and various incremental fees got added in the feeding frenzy.  Today, it is hard to rationalize how far banker fee structures have migrated from the point of origin.

---

[5]  The Debtors have also not shown the Court or the Committee how they attempted to compare the proposed terms of the Moelis Application to other investment banking professionals, or whether they ran a diligence process at all.

18. In the context of this unusual Chapter 11 case, the Committee is compelled to ask: What work will Moelis provide the Debtors each month that is not otherwise duplicative of the work geared towards the transaction fees? To the Committee, this just appears to be another extrapolation from other cases, untethered to the facts on the ground. If the monthly fees were to be fully credited (as was historically contemplated in the industry), the Committee would have no objection to them. But, that is not what is being proposed.

19. **The Claims Monetization Fee.** Moelis receives a "Claim Monetization Transaction Fee" of $500,000 plus 5% of the total gross consideration received for each sale, in whole or in part, of the "Claim Assets" (e.g., claims against FTX/Alameda and estate causes of action), up to $4 million (which cap encompasses the Mining Asset Sale Fee as well). Presuming, for the sake of argument, that the estates should sell their litigation entitlements to FTX and others (big assumption), what possible competency does Moelis have to serve as a broker for litigation claims? That is not the kind of work that investment banks like Moelis are known to do and, more to the point, there are other trading outfits that are far better known as market makers in these types of assets. *See* Jonathan Randles, *Crypto Customers Sell Claims at a Loss to Avoid Bankruptcy Wait*, Wall St. J., Dec. 28, 2022 (available at https://www.wsj.com/articles/crypto-customers-sell-claims-at-a-loss-to-avoid-bankruptcy-wait-11672177834). The assumption now has to be that, if Moelis is ultimately tasked with marketing such assets, they will do so by reaching out those very market-makers (thus taxing the estates with a double fee) or by undertaking a job that others are better situated (and probably cheaper) to perform.

20. **The Mining Asset Sale Fee**. Moelis receives a "Mining Asset Sale Fee" of $500,000 plus 5% of the total gross consideration received for each sale, in whole or in part, of the "Mining Assets" (e.g., mining equipment, loans to third-party mining companies, and interests in

joint ventures), up to the $4 million cap. The Committee believes that a 5% fee is well above-market for this type and size of transaction, particularly on top of a $500,000 flat fee. As set forth in **Exhibit A**, the Committee suggested a reduction in this fee, which was summarily rejected by the Debtors and Moelis.

### IV.   The Committee's Counterproposal.

21.    The Committee is mindful that there was a time spread between the Chapter 11 filing and Committee appointment, and that debtors do not easily pause their case strategy simply because the Committee, once appointed, wants to ask questions, learn, and understand. But, that is how the system is supposed to work.

22.    The Debtor tasked Moelis with "option exploration" at case inception, and Moelis started working, all before the Committee was appointed. But, they have not gone all that far. More to the point, it does not befit an orderly Chapter 11 process if the position is: We got started, the fee is what it is, go ahead and file your objection, and we will see what the Court does.

23.    Beneath the glass at each counsel's table in the Courtroom is a quote from Abraham Lincoln. The Committee appreciates the sentiment expressed in that quote and embraces it. Time will tell if others do as well.

24.    In the meantime, attached to this Objection as **Exhibit A** is the Committee's counterproposal to Moelis. The Committee remains willing to support the Moelis Application under these revised terms.

### RESERVATION OF RIGHTS

25.    The Committee reserves all rights regarding the Moelis Application and this Objection, including the right to supplement this Objection, raise additional objection points, and submit evidence regarding the Moelis Application, prior to or at the final hearing.

11

## **CONCLUSION**

**WHEREFORE**, for the foregoing reasons, the Committee respectfully request that this Court (i) sustain this Objection, (ii) deny the relief requested in the Moelis Application, and (iii) grant such other and further relief as it deems proper.

Dated: January 13, 2023

By: */s/ Daniel M. Stolz*
**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 230-2095
Fax:     (973) 533-1112
Email:    DStolz@genovaburns.com
          DClarke@genovaburns.com
          GKinoian@genovaburns.com
*Proposed Local Counsel for the Official Committee of Unsecured Creditors*

**Exhibit A**

**Committee Counterproposal**

1. <u>Restructuring Fee</u>: $3 million

2. <u>Sale Transaction Fee</u>: $8 million, payable in the event of the sale of all or substantially all of the assets (other than the Mining Assets and the Claim Assets), even if conducted as part of a plan.  In the event of an entitlement to both a Restructuring Fee and a Sale Transaction Fee, the Sale Transaction Fee would be paid.

3. <u>Claims Sale Fee</u>: Eliminated entirely.

4. <u>Mining Asset Sale Fee</u>: <u>Greater of</u> $100,000 or 4% of gross proceeds

5. <u>Monthly Fee</u>: as proposed

6. <u>Capital Transaction Fee</u>: as proposed