| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** **DISTRICT OF NEW JERSEY** **Caption in Compliance with D.N.J. LBR 9004-1(b)** | |
| BROWN RUDNICK LLP<br>Robert J. Stark, Esq.<br>Kenneth J. Aulet, Esq.<br>Bennett S. Silverberg, Esq.<br>Seven Times Square<br>New York, NY 10036<br>Telephone: (212) 209-4800<br>Fax: (212) 209-4801<br>Email: rstark@brownrudnick.com<br>      kaulet@brownrudnick.com<br>      bsilverberg@brownrudnick.com<br>*Proposed Counsel for the Official Committee of Unsecured Creditors*<br> -and-<br>GENOVA BURNS LLC.<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Gregory S. Kinoian, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>Telephone: (973) 230-2095<br>Fax: (973) 533-1112<br>Email: DStolz@genovaburns.com<br>      DClarke@genovaburns.com<br>      GKinoian@genovaburns.com<br>*Proposed Local Counsel for the Official Committee of Unsecured Creditors* | BROWN RUDNICK LLP<br>Stephen D. Palley, Esq.<br>601 Thirteenth Street, NW<br>Washington, DC 20005<br>Telephone: (202) 536-1700<br>Fax: (202) 536-1701<br>Email: spalley@brownrudnick.com |
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>Jointly Administered |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC. (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

64952066 v1

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' SUPPLEMENTAL OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' RETENTION PROGRAMS AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 cases of BlockFi, Inc. and its affiliated debtors (collectively, the "**Debtors**," the "**Company**," or "**BlockFi**") respectfully submits this supplemental objection (this "**Supplemental Objection**") to the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief* [Docket No. 21-1] (the "**Motion**")[2] filed November 28, 2022. In support of this Supplemental Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. BlockFi is not now operational. It is not a typical over-leveraged chapter 11 debtor requiring a handful of key personnel to work double-time to hit aggressive operational targets while simultaneously providing information and expertise to buyers and bankruptcy professionals to facilitate restructuring. BlockFi is also not a typical chapter 11 debtor with a secured or DIP lender imposing fiscal restraint. The Committee must fill that role.

2. BlockFi's job first and foremost is to protect the approximately $260 million in cash on hand, including assets that it liquidated from customer accounts approximating $239 million. BlockFi needs employees for two primary reasons: (1) to maintain security and transaction functions to preserve and distribute assets, and (2) <u>maybe</u> to retain the option to sell the business if a buyer emerges.

---

[2] Capitalized terms used in this Supplemental Objection but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

3.  The Committee is deeply concerned that BlockFi now proposes to spend $20-25 million to see if a sale is possible, just as its competitor Voyager nets $20 million from its own months-long sale process.

4.  As the Committee has said before, the question of the day is whether creditors would be better off letting BlockFi expire.[3]  The Committee does not have a view yet on that question.  But the Committee is deeply skeptical that BlockFi needs over a dozen senior executives making a half-million dollars a year apiece, plus over a hundred employees receiving immediate, target-less bonuses worth up to 50% of base salary, and costing up to ▮ of total assets, just to buy time to see whether a sale can emerge.

5.  The Committee briefly set forth its concerns regarding the Debtors' proposed Retention Programs in its objection, filed January 13, 2023 (the "**Initial Objection**"),[4] incorporated herein by reference.  The Committee filed the Initial Objection to preserve its objection rights as the objection deadline had been set for the same day the Committee completed its diligence and submitted a counterproposal to the Debtors, and the Debtors declined to further extend following delivery of the counterproposal.  That counterproposal was rejected and further negotiations have not been fruitful.

6.  The $12.3 million Retention Programs are disproportionate to the Debtors' and estates' actual needs and substantially above market.  The Committee files this Supplemental Objection to further state its legal and factual grounds for opposing the Retention Programs.

---

[3] *See* Docket No. 279 (objection to retention of investment banker).

[4] *The Official Committee of Unsecured Creditors' Objection Regarding Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief*.  Docket No. 280.

7. Again: how much should optionality cost? Between this Motion and the Debtors' proposed retention of Moelis, they are proposing to pay $20-25 million dollars for professionals and employees to explore the option of preserving a business that may be dead in the water.

8. Notably these amounts are notably in addition to, among other things, (a) the **$22.6 million paid to purchase $30 million of directors and officers liability insurance a week before the Petition Date**,[5] (b) the **over $10 million in disclosed BIA withdrawals by insiders within the months preceding the Petition Date**, and (c) the payment of **over $15 million by BlockFi to settle claims against its officers for which BlockFi was not liable**.[6] The victims of the Debtors' "best-in-class" customer protections deserve to see assets preserved for their own benefit, not to protect the Debtors' insiders.

9. The Debtors have not carried their burdens of proof and persuasion to pay massive bonuses to employees untethered to any performance targets whatsoever. There is no reason in law or fact to approve the Retention Programs as proposed. The Committee respectfully requests that the Court deny the Motion.

## RELEVANT BACKGROUND

10. The Motion seeks Court approval, pursuant to Bankruptcy Code sections 363(b)(1) and 503(c)(3), of two Retention Programs, the key employee retention program (KERP) and the target retention program (TRP). The KERP Participants are employees who were to be paid bonuses in February 2023 pursuant to a prepetition bonus plan, while the TRP Participants were never set to receive a bonus under that plan. The Retention Programs would pay bonuses totaling

---

[5] Docket No. 11, Exh. C (motion to continue insurance payments, schedule of prior payments).
[6] *See* Docket No. 243 (statement of financial affairs).

$12.3 million to all the Debtors' remaining non-insider employees and independent contractors, reducing the Debtors' total assets by ▮.

11. Over half the $12.3 million is proposed to be paid immediately. *See* Motion ¶ 19. Of the approximately 127 Participants, the Motion designates 113 (89%) as Tier 1 Participants, who will receive bonuses equal to 50% of base salary. *Id.* ¶¶ 7, 19. The Motion seeks average bonuses of $104,211.88 for the 95 KERP Participants, and $75,781.25 for the 32 TRP Participants.

12. The Debtors propose to pay bonuses to *all* remaining employees except for 13 high-level executives that it believes are the only "insiders" as defined under section 101(31) of the Bankruptcy Code. Notwithstanding the Debtors' unilateral determination regarding insider status, approximately ▮ in bonuses are proposed to be made to senior personnel, with titles such as "Senior Vice President," "Corporate Secretary," and "Vice President."

13. As more fully set forth in the Declaration and analysis attached as <u>Exhibit A</u>, based on a comparable set used by the Debtors' advisor Willis Tower Watson, and recent crypto-related bankruptcy cases, the size and scale of the proposed Retention Programs are out of step with market. In sum, the Committee's financial advisors found that:[7]

> a. Retention plans in comparable cases included bonuses for 7 to 34% of the Debtors' workforce, compared to ▮ proposed here.
>
> b. Average bonus awards per employee in comparable cases were $23,810 to $44,000, compared to ▮ here.
>
> c. Plan costs ran from ▮ of total assets, compared to ▮ in this case.
>
> d. The Retention Programs do not tie bonuses to any meaningful milestones or target metrics.
>
> e. Even taking into account that BlockFi laid off numerous employees prior to the Petition Date, the proposed Retention Programs are significantly more

---

[7] Ranges are the 25th to 75th percentile values in the comparable set.

        expensive than those of BlockFi's competitors, providing a high-end pay-out of 22.5% (Voyager) and 35% (Celsius) compared to the 50% proposed by the Debtors.

    f. In Voyager, the bankruptcy court approved a $1.6 million bonus program covering 34 employees. The debtors were able to accomplish a sale.[8]

    g. In Celsius, the bankruptcy court approved a $2.84 million bonus program covering 59 employees. Celsius remains intact as a debtor-in-possession more than six months after the Petition Date.[9]

14.     BlockFi differs from its competitors Voyager and Celsius in one key respect: unlike those entities, it liquidated nearly all its crypto assets to cash and is using that $239 million in cash to fund the case. As discussed below, the availability of such funds does not necessitate significant multiples of the retention programs proposed in those cases.

## BASES FOR OBJECTION

### I. Applicable Legal Principles

15.     Section 503 of the Bankruptcy Code governs the allowance of administrative expenses "for actual, necessary costs and expenses of preserving a debtor's bankruptcy estate." *See* 11 U.S.C. § 503(b)(1)(A). To obtain Court approval of a bonus plan for non-insider employees, the movant must demonstrate that it is "justified by the facts and circumstances of the case." *See* 11 U.S.C. § 503(c)(3); *In re Dana Corp. ("**Dana II**")*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006). Key employee retention programs "subject to review under § 503(c)—those whose purpose is to retain employees—are severely restricted." *In re Glob. Home Prod., LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007).

---

[8]     *See* Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.) Docket Nos. 212 (KERP motion), 345 (order on KERP Motion), 860 (order authorizing entry into asset purchase agreement).

[9]     *See* Case No. 22-10964 (MG) (Bankr. S.D.N.Y.) Docket Nos. 1425 (KERP motion), 1683 (order).

16. In evaluating whether a proposed bonus plan is justified by the facts and circumstances of a given case, courts generally consider the factors set forth in *Dana II*, 358 B.R. at 576-77 (citing, *inter alia*, *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (D. Del. 1999)). Support of constituents, such as creditor's committees, is a "key factor in obtaining court approval of plans challenged under section 503(c)." 4 Collier on Bankruptcy ¶ 503.18 (16th 2022).

17. As set forth below, the proposed Retention Programs fail nearly every element of this standard.

### II. The Relief Requested Should Be Denied Because the Retention Programs Are Excessive Given Limited Debtor Operational Needs and Lack of Option Value.

18. **There is no sound rationale for the Programs.** Optionality is a good thing, but not at any price. Here, the economic proposition from the Debtors is fundamentally unsound: again, Voyager netted $20 million in a recent sale. There has been no showing that BlockFi has prospects for a sale that would net any greater amount. Yet between the Retention Programs and the proposed retention of Moelis as investment banker, the Debtors propose to spend $20-25 million to preserve the option.

19. Moreover, there is no sound judgment in paying six times what your competitors pay for the same deal: Voyager offered a $1.6 million program. Celsius paid employees $2.84 million. There is no indication that those companies floundered because of a lack of employee support (indeed, Voyager achieved a sale – in fact, two sales).

20. In sum, this "option" is costing:

   a. Greater than the amounts netted by a competitor in its recent sale of comparable assets and operations;

   b. Approximately 4-6 times greater in aggregate than amounts paid by similarly situated competitors;



    d.   Two times greater than typical KERP programs in chapter 11 as measured against participant base salary and/or in total dollars per participant.

21. Against these alarming statistics, the Debtors offer little to no evidentiary support. They explain that they already reduced headcount prepetition – but these Programs are comparatively expensive even accounting for layoffs. Additionally, the Debtors' layoffs reflect the lack of business operations rather than simply doing more with less. The Debtors' customer asset base has fallen ▮ from ▮ while headcount has similarly reduced by ▮ from ▮ to 137. In Celsius, headcount was similarly reduced from as high as 900 to 670 by its filing, further fell to 167 when it filed its KERP plan four months later, and the debtors still only targeted 59 employees for retention (35% of headcount at the time and 9% of headcount at filing).

22. The Debtors argue that the total cost of the Programs is only a fraction of their revenue and liabilities, Motion ¶ 29, but the Debtors have next to no revenue against billions in liabilities to customers.

23. The Debtors do have options, and the Committee supports exploring a sale process. But the Debtors must show at least facially sensible judgment. They have not met their burden with respect to this extraordinary relief.

**III.**     **The Debtors' Assertions Concerning Insiders Should Be Tested.**

24. The Debtors' proposal raises two different concerns regarding payments to insiders.

25. First, the Debtors assert that no insiders are participating in the Retention Programs. However, participants include ▮



26. The Debtors have not provided to the Committee sufficient information to substantiate the assertion that these individuals are (a) not insiders and (b) deserving of these substantial payments.

27. Second, while the Debtors have reduced headcount across every department, it is not clear that senior executives faced the same fate prior to the Petition Date. As of January 1, 2022, the Debtors had ▓▓▓▓▓▓ senior executives; they currently have thirteen (13).[11] These individuals earn an average of well over $450,000 per year. Additionally, these executives were awarded 25-122% raises in July 2022, increasing the estate's monthly burn rate by $151k.

28. While the Debtors' senior executive team is not slated to receive immediate bonuses, their large aggregate number and extraordinary compensation packages suggest the need for additional diligence. It is not yet clear what functions these individuals perform, why there are so many, and why they are necessary to the Company going forward. Their presence suggests that the Debtors' headcount reductions may have been insufficient, and their continuing roles likewise suggest that concerns over employee defections during the chapter 11 process (absent payment of generous bonuses) might even be overblown.

**RESERVATION OF RIGHTS**

29. The Committee reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Supplemental Objection, to seek

---



[10] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
[11] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

discovery, to raise additional objections during any hearing on the Motion, and to negotiate and document alternative proposals for relief.

## CONCLUSION

**WHEREFORE**, the Committee respectfully requests that this Court (i) sustain this Supplemental Objection, (ii) deny the relief requested in the Motion, and (iii) grant such other and further relief as it deems proper.

Dated: January 17, 2023

By: _/s/ Daniel M. Stolz_ .
**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 230-2095
Fax:         (973) 533-1112
Email:     DStolz@genovaburns.com
                 DClarke@genovaburns.com
             GKinoian@genovaburns.com
*Proposed Local Counsel for the Official Committee of Unsecured Creditors*