**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**OMNIBUS REPLY IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
THE DEBTORS' RETENTION PROGRAMS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

submit this omnibus reply to the (a) *Objection of the United States Trustee to Debtors' Motion for*

*Entry of Order (I) Approving Debtors' Retention Programs and (II) Granting Related Relief*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[Docket No. 231] (the "U.S. Trustee Objection"), the *Official Committee of Unsecured Creditors' Objection Regarding Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief* [Docket No. 280] filed by the official committee of unsecured creditors (the "Committee" and the objection, the "Committee Objection"), and *The Official Committee of Unsecured Creditors' Supplemental Objection to Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief* [Docket No. 310] (the "Supplemental Committee Objection," together with the Committee Objection, the "Committee Objections" and together with the U.S. Trustee Objection, the "Objections").

The Objections should be overruled, and the relief requested in the Retention Programs Motion (as defined herein) should be granted. In further support of the Retention Programs Motion, the Debtors state the following:[2]

**Preliminary Statement**

1. The Debtors' ability to continue their dual-track sale and standalone reorganization processes, and ultimately to deliver any outcome other than liquidation in which clients receive cash many years in the future, depends on their existing workforce remaining in place. Each of the Participants provides critical support to the Debtors' operations, which will maximize the value of the estates and inure to the benefit of all stakeholders.

2. The law requires the Court to take into account the facts and circumstances of this case in assessing the Debtors' Retention Programs and determining whether the proposed

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion for Entry of an Order (I) Approving Debtors' Retention Programs and (II) Granting Related Relief* [Docket No. 21] (the "Retention Programs Motion").

Retention Programs are sound exercises of their business judgment. And the facts and circumstances here, unfortunately, are ones that create a near perfect storm of attrition risk.

3. The Retention Programs do not arise in a vacuum. Immediately prior to the Petition Date, the Debtors took the extraordinarily difficult step of engaging in a massive reduction in force (the "RIF") in which approximately two-thirds of the Debtors' entire workforce was terminated. That RIF, while difficult on operations and morale, has and will continue to result in substantial cost savings—cost savings which, on an annual basis, are multiple times the size of the maximum requested relief under the Retention Programs.

4. The Objectors (in particular the Committee) now effectively seek to punish the Debtors for taking that extraordinary cost-saving action, objecting to the Retention Programs for, among other reasons, allegedly extending to too large a percentage of the (massively thinned down) workforce. But that position is ridiculous. Ignoring the RIF does not mean it did not happen: as the Court accurately observed during the first day hearing, "when a company has provided WARN notices to two-thirds of its workforce it's not looking to throw away money, at least I don't view it that way."[3]

5. In truth, the Debtors have retained only the minimum number of employees to operate in these chapter 11 cases and preserve value for all creditors. And the Debtors have reached a point where retention of remaining employees is not only a priority but an absolute necessity for preserving and maximizing the value of the estates. The decisions regarding who to terminate and who to keep were made with careful analysis and the assistance of multiple outside consultants. But ultimately, it is the Debtors that know best what human capital will be necessary to navigate a restructuring in whatever form that takes. The Committee, preferring to substitute

---

[3] 11/29/22 Tr. 79:17-22.

3

its judgment for that of the Debtors, puts forward an objection that, if upheld, would destroy all optionality and predetermine a massively value-destructive path for these cases.

6.      The Debtors' remaining employees have not only taken on many responsibilities from the terminated employees, but they also must now bear the responsibilities that come with navigating a chapter 11 bankruptcy. Not only are they responsible for ensuring compliance with already complex regulatory rules, protecting the platform and the remaining assets, and processing payroll and administrative functions necessary to preserve a business, but the Participants must also prepare for a variety of operational tasks regardless of what restructuring outcome arises.[4] And all of this while under the increased burdens imposed on a Debtor in Chapter 11. Simply put, the Debtors have trimmed down to only key employees, all of whom must stay to maximize the value of the estates, and their responsibilities have never been greater.

7.      The Objections are predicated on similar arguments: that the Retention Programs allegedly include insiders as defined by section 101(31) of the Bankruptcy Code (U.S. Trustee Objection ¶ 30; Committee Objection ¶ 6; Supplemental Committee Objection ¶¶ 25-27) and the Debtors do not demonstrate that the Retention Programs are justified in cost or application by the facts and circumstances of these chapter 11 cases. *See* U.S. Trustee Objection ¶¶ 6–7; Committee Objection ¶ 3; Supplemental Committee Objection ¶ 6.[5] These arguments are without merit. No Participant is an "insider." Both the Committee and U.S. Trustee contend that by function of a Participant's title, they should be considered an "insider." U.S. Trustee Objection ¶ 30; Committee

---

[4]     The remaining employees face a myriad of tasks. While it would be impossible to detail these in full, the Debtors' Chief People Officer has summarized them in her declaration. See *Declaration of Chief People Officer, Megan Crowell, in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief*, filed contemporaneously herewith (the "Crowell Declaration") pgs. 12-14.

[5]     The Committee received an extension of the objection deadline but still, minutes before even that expired, filed only a boilerplate objection bereft of substance. *See* Committee Objection. Three days later without consent it then filed the untimely Supplemental Committee Objection. This Reply responds to both.

4

Objection ¶ 6; Supplemental Committee Objection ¶ 12.  But none of the Participants meet any of the factors in an insider analysis, nor can the Objections demonstrate so.

8. The Objections also argue that the Debtors do not demonstrate that the Retention Programs are justified by the facts and circumstances of these chapter 11 cases.  The goal of a retention program is to effectively retain necessary personnel.  The facts and circumstances to evaluate are those that weigh on the necessity of included employees and the attrition risk the Debtors face.  As detailed at length in the Crowell Declaration, the Debtors' face numerous and unique challenges with respect to retention including, but not limited to:

- The Debtors have engaged in three large downsizing operations in 2022, going from more than 800 employees to approximately 130 employees, resulting in legitimate concerns regarding job security;

- The Participants have all previously lost all of their equity in BlockFi (which was a material part of their compensation to begin with), taking away the "upside" opportunity critical to many (this issue was exacerbated by the collapse of FTX as many employees hoped to gain equity in FTX as part of FTX's acquisition of the Debtors);

- Partly to address the loss of that equity upside, the large majority of the Participants were included in a retention program that was to pay out bonuses in February of 2023 merely for remaining employed by BlockFi.  Many of the Participants stayed with BlockFi in large part because of that program and worked for months in reliance on the Company's promise.  But in these bankruptcy proceedings, that program is no longer available at all;

- Despite the turbulence in the cryptocurrency ecosphere, knowledge of cryptocurrency operations remains a highly valued commodity, and many companies outside of the cryptocurrency space continue to poach employees from cryptocurrency companies;[6]

- Voluntary attrition rate has been rising year-over-year and month-over-month including additional attrition since the Petition Date; and

---

[6] Just using recent examples, the Debtors have lost employees in recent weeks to Google, Block (a payment processor formerly known as Square), and Walmart.  The Debtors' employees largely came from industries other than crypto and are now massively marketable inside and outside of the sector having gained valuable experience at a highly respected crypto start-up.

- The Participants in the Retention Program have observed their terminated counterparts receiving 90 days' pay prior to termination, rendering any material reduction to the Retention Programs extremely disincentivizing.

9. The Debtors' Retention Programs are critical to maximizing the value of the Debtors' estates, considering the institutional knowledge of the Participants in this highly specialized and technical field. Many of the remaining tasks, regardless of the form this reorganization takes, require this specialized and/or technical knowledge. Just by way of example, the Debtors' platform is coded in Elixr, which is a highly specialized programing language. Many of the Participants are well versed in Elixr, but finding others outside of the Debtors' workforce who are is nearly impossible. Some of the Participants are also in-house counsel. While their work could potentially be outsourced to Debtor professionals, it would come at a significant cost (likely at multiple times the amount of any KERP payments), of which the Committee professionals are certainly aware. Any alternative to retaining the Participants would result in increased costs and would conflict with the Debtors' duty to maximize value.

10. The Committee's objectives are frankly unclear, and their objection is a lose/lose proposition. The Committee is forcing the Debtors to spend significant sums litigating these issues. If the Debtors prevail (as they should), the estates will certainly suffer given the irresponsible signal sent to the market by a Committee who either does not believe the Debtors' employees will leave absent near-market pay or does not care whether they stay or go. And if the Committee prevails (it should not), it will further destroy value by effectively eliminating options other than a long bankruptcy where warring creditors fight over value culminating with a distribution of (far less) cash, requiring the Debtors to hire back employees (at a premium) to effectuate a restructuring, or both. The Objections should be overruled and the Retention Programs Motion approved.

6

**Argument**

I. **The Participants are Non-Insiders, and the Retention Programs Are Not Subject to Section 503(c)(1) of the Bankruptcy Code.**

11. The U.S. Trustee and the Committee assert that some Participants are "insiders" and, as such, the Retention Programs are subject to section 503(c)(1) of the Bankruptcy Code. They are incorrect. No Participant is an insider of the Debtors. *Declaration of Josephine Gartrell in Support of Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief*, filed contemporaneously herewith (the "Gartrell Declaration") ¶ 16; Crowell Declaration at ¶ 33. As set forth in the Retention Programs Motion, the Gartrell Declaration, and the Crowell Declaration, no Participant: (a) sits on, or directly reports to, the Debtors' board of directors; (b) is appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance. Retention Programs Motion ¶ 18, Gartrell Decl. ¶ 12, Crowell Decl. ¶ 33.

12. Although the Bankruptcy Code does not define the term "officer," courts have looked to Black's Law Dictionary as a source of authority. *See In re Borders Grp., Inc.*, 453 B.R. 459, 468 (Bankr. S.D.N.Y. Apr. 27, 2011). Black's Law Dictionary defines an officer of a corporation as "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer." Black's Law Dictionary (11th ed. 2019). An employee's title alone (for example, "Vice President") does not make that employee an insider. *See In re LSC Commc'ns, Inc.*, 631 B.R. 818, 824 (S.D.N.Y. July 9, 2021) (emphasizing that "it is not simply the title of 'director' or 'officer' that renders an individual an insider; rather, it is the set of legal rights that a typical corporate director or officer holds") (quoting *In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 510 (7th Cir. 2011)).

7

This reflects the reality of modern-day corporate America: "[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive." *In re Glob. Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. July 24, 2012) (quoting *Borders Grp.*, 453 B.R. at 469).

13. Courts evaluate whether particular employees are insiders "on a case-by-case basis from the totality of the circumstances, including whether the individual has at least a controlling interest in the debtor or exercises sufficient authority over the debtor so as to qualifiably dictate corporate policy and disposition of corporate assets." *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. Apr. 11, 2013) (citing *In re Velo Holdings Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. June 6, 2012)) (internal quotations omitted). The Debtors submitted evidence describing why each of the Participants does not have the duties or responsibilities of an insider. Gartrell Decl. ¶ 12, Crowell Decl. ¶ 34. The U.S. Trustee and the Committee offer no evidence in response other than the employees' titles.

14. The U.S. Trustee asserts that employees holding a title containing "director" or "vice president" are presumptively insiders, but concedes (as it must) that none of the Participants have broad responsibilities over the Debtors' entire business. The Committee makes the same argument and asserts that "the only evidence provided in support are cursory statements, along with an admission that certain Participants' titles would normally indicate that they *are* insiders." Committee Objection ¶ 6 (emphasis original). The Committee has essentially ignored the information provided to it by the Debtors, including multiple in-person communications where the Debtors made their Chief People Officer available to the Committee professionals for discussions. The Debtors have made clear that any Participant with a "head," "director," or "vice president," title manages only certain aspects of specific departments of the Debtors' business and is removed

8

from general managerial control over, or responsibility for, the Debtors' operations as a whole.[7] Despite the opportunity to review the unredacted job descriptions, the U.S. Trustee and the Committee do not, and cannot, identify any Participant or job descriptions that would indicate they should be considered an "insider."[8]

15. The U.S. Trustee incorrectly asserts that the Debtors failed to provide specific information regarding the identity of the Participants, their job descriptions, and to whom they report. To the contrary, and as noted in the U.S. Trustee Objection, the Debtors provided an unredacted list of the Participants' job titles, job descriptions, supervisors, hiring personnel, corresponding salaries, and proposed Retention Programs awards to the U.S. Trustee. The Debtors also responded to additional questions from the U.S. Trustee and the Committee and made themselves available for discussion. The U.S. Trustee, who did not take the Debtors up on any of their offers to provide additional information, nonetheless continues to assert, without investigation, that the Debtors offered "conclusory, self-serving statements" despite every indication to the contrary. U.S. Trustee Objection ¶ 5.

16. As set forth in the Retention Programs Motion and the Gartrell Declaration, the Participants perform functions such as treasury, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions for the Debtors. Retention Programs Motion ¶ 19; Gartrell Decl. ¶ 12. The Debtors also list their insiders — the Debtors'

---

[7] Crowell Decl. ¶ 33; Retention Programs Motion ¶ 18.

[8] The U.S. Trustee states that it is precluded from identifying the Participants and/or their job descriptions because of the relief granted in the *Interim Order Granting Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders, and (V) Granting Related Relief*. [Docket No. 53]. The U.S. Trustee has also never identified who it is talking about, even informally, when claiming that some unidentified Participants are insiders.

9

c-suite management team actually is responsible for the Debtors' operations — on their website.[9] It is highly unlikely that any company the size of the Debtors would have more than thirteen insiders (other than board members), and *these* are the individuals who fall within the Code's definition. Importantly, neither the U.S. Trustee nor the Committee actually identifies a single person who they believe is both an insider and is a proposed Participant, and the Committee's failure to do so after receiving an extension of the objection deadline and filing two objections (one untimely) is telling. The information provided is sufficiently detailed to establish that each Participant is not an insider and the relief requested does not implicate section 503(c)(1) of the Bankruptcy Code.

## II.    The Retention Programs Are Justified by the Facts and Circumstances of these Chapter 11 Cases.

17. The U.S. Trustee and the Committee argue that the Retention Programs are not justified by the facts and circumstances of these chapter 11 cases. These assertions ignore the reality of the significant attrition the Debtors continue to experience.

18. The Retention Programs are justified in light of, among other things, the nature of the Debtors' business, the need to retain these key employees, and the significant attrition the Debtors have experienced and continue to experience. The Debtors, in consultation with their advisors, including their independent compensation consultant WTW, designed the Retention Programs to avoid further attrition. *See* Gartrell Decl. ¶ 9.

---

[9] https://blockfi.com/team/. Oddly, the Supplemental Committee Objection criticizes certain payments received by these individuals (the Company's actual insiders) prior to the Petition Date. *See* Supplemental Committee Objection ¶¶ 4, 8, 27-28. But those are different people and they are not part of the Retention Programs. The Committee's decision to criticize payments made to other people prepetition within their opposition to the Retention Programs is irrelevant and makes no sense. It is telling, and suggests that the opposition has more to do with animus toward the Company and nothing to do with the clear reality that the Retention Programs are necessary to retain personnel and maximize the value of these estates.

10

19. The risk of Participants resigning is real. Since the Petition Date, at least *eleven* of the Participants have resigned. The Debtors' current headcount represents an over 83 percent decrease from January 1, 2022. Crowell Decl. ¶ 21. If you look at *voluntary* turnover alone, in 2022, the year-to-date cumulative voluntary turnover was 40.3 percent, almost 20 percent higher than the 2021 cumulative voluntary turnover of 17.9 percent. *Id.* Voluntary turnover increased month-over-month in September, October, and November of 2022. *Id.* The employees left positions that must be filled, played key roles in the Debtors' operations, and possessed knowledge that the Debtors cannot afford to lose. The cost and time required to search for, hire, and train new employees is substantial when compared to the cost of the Retention Programs. Moreover, the entire cost of the Retention Programs is only a fraction of the annual savings obtained via the RIF immediately preceding the bankruptcy filing. Crowell Decl. ¶ 9.

20. Failing to retain the Participants would destroy value to the detriment of all stakeholders. Regardless of whether the Debtors pursue a standalone plan or a sale of some or substantially all of their assets (or even a liquidation), the Debtors need the knowledge and skills of the Participants. The Participants continue to perform maintenance, updates, and essential security functions on the platform, including preparation to unfreeze the Debtors' platform and allow customer withdrawals under any endgame scenario. In addition, since the Petition Date, the Participants have, in addition to their primary responsibilities:

- received approximately 100 diligence requests from the Committee and its advisors;
- received numerous diligence requests from potential buyers;
- prepared the Debtors' monthly operating reports required under the Bankruptcy Code;
- prepared schedules of assets and liabilities and statements of financial affairs, each of which totaled tens of thousands of pages; and

- reviewed and analyzed pleadings filed in these chapter 11 cases, including consulting with their advisors.

Simply put, the Participants are critical to maximizing the value of the Debtors' estates and failure to retain the Participants would destroy value for all creditors.

21. While the platform is temporarily frozen, the Participants will soon be required to facilitate distributions to creditors in the event of a sale or reorganization (or even in a self-liquidation) and prepare for any post-emergence operations. The Debtors' platform is coded in the highly technical Elixr program, which requires specialized knowledge and experience to operate. None of these options is likely to be possible if the Debtors experience materially more attrition prior to the determination of their exit strategy. Furthermore, the Debtors are continuing to provide voluminous diligence to the Committee and prospective bidders, a significant undertaking that impacts employees across all departments and, too, would likely become impossible should materially more people leave. A disruption to the Debtors' workforce would negatively impact all of these efforts, leading to a lower recovery and lower distribution to the Debtors' clients.

### III. The Retention Programs Are An Appropriate Exercise of the Debtors' Business Judgement.

22. Courts recognize that satisfying section 503(c)(3) of the Bankruptcy Code requires a showing that the proposed plan is within the Debtors' business judgment. *See Velo Holdings*, 472 B.R. at 212 (noting "the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)"); *see also Borders*, 453 B.R. at 473–74 (evaluating debtors' key employee retention plan under the framework of the business judgment rule); *In re Dana Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. Nov. 30, 2006) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment" test in accordance with section 503(c)(3) of the Bankruptcy Code).

23. In assessing the soundness of the Debtors' business judgment, courts in the Third Circuit have considered the following non-exhaustive list of factors:

(a) Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets?

(b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

(c) Is the scope of the plan fair and reasonable: does it apply to all employees, or if not, does it discriminate unfairly?

(d) Is the plan or proposal consistent with industry standards?

(e) What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry?

(f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana Corp.* at 576–77. All of these standards are satisfied.

24. ***First***, there is a reasonable relationship between the Retention Programs and the results to be obtained—namely, the retention of the Participants through the Debtors' restructuring process. The loss of critical employees could put the Debtors' entire restructuring effort at risk. As a result, the Debtors' management team, with the assistance of their advisors, carefully developed a plan and a process by which the Participants were selected. Two-thirds of the employees were deemed non-critical and were notified of their termination prior to the Petition Date. Given the Debtors' historical turnover rates, recent upheaval in the digital asset space, and the Debtors' very recent reductions in force the Debtors are highly unlikely to be able to retain the remaining key employees absent the Retention Programs.

25. While the Objections express concern that the Retention Programs are not subject to performance metrics, that is not their intent—the goal of the Retention Programs is the ***retention*** of the Participants. The proposed initial Retention Programs payments are subject to a clawback,

and the remaining payments are subject to continued employment with the Debtors and/or confirmation of a plan, which provides an incentive for the Participants to remain with the Debtors' during the pendency of these chapter 11 cases. Furthermore, the U.S. Trustee's contention that "although certain employees may assist in the reorganization process, facilitating a successful reorganization is the responsibility of the talented professionals retained or to be retained by the Debtors in these cases" is patently untrue and denigrates the time and effort the Participants exerted (and continue to exert) in responding to the mountains of diligence requests, assisting with the Debtors' sale and reorganization strategy, and otherwise assisting with the administration of these chapter 11 cases. The suggestion that retained professionals can maximize value here whether or not the Participants stay defies logic and reality.

26. **_Second_**, the costs, both financial and operational, of losing Participants would be far greater than the cost of the Retention Programs. Hiring new employees, even if it were possible, would require the Debtors to incur significant operational and financial costs, costs that would directly undercut the savings the Debtors will receive through the RIF and would likely far exceed the cost of the proposed Retention Programs. Crowell Decl. ¶ 15. Accordingly, the costs are reasonable and well-justified given the size of the Debtors' businesses.[10]

27. **_Third_**, the scope of the Retention Programs is fair and reasonable under the circumstances and does not unfairly discriminate. As discussed above, selecting the Participants was the result of an in-depth process after which two-thirds of the employee base was terminated.

---

[10] The Committee has made "adjustments" to the Debtors' asset base but, whether or not one includes those, the proposed maximum payouts under the Retention Programs (even assuming everyone stays) are a small fraction of the Debtors' current assets. The Committee's suggestion that this investment in preserving the Debtors' employee base to ensure that there are employees in place to execute in a sale, reorganization, or self-liquidation scenario is not wise, and is effectively a statement that shows that it believes a liquidation where creditors only receive cash from a distribution agent to be the case here. The Debtors do not believe that to be a fait accompli and believe they have a fiduciary obligation to maximize value for stakeholders, which can only happen if the employee base remains intact.

The result of that process is the narrowly tailored KERP that applies to ninety of the Debtors' non-insider key employees and the even more narrowly tailored TRP that applies to thirty-one of the Debtors' non-insider key employees, at modest cost considering the devastating economic effect should the Debtors lose the ability to operate without this key talent.  Furthermore, the KERP's aggregate cost of $9,476,887.37 and the TRP's aggregate cost of $2,306,000.00 are reasonable in absolute terms when compared to the aggregate costs of key employee retention plans approved in other chapter 11 cases, and the retention awards expressed as a percentage of salary are consistent with awards in comparable key employee and other retention plans.  Gartrell Decl. ¶ 17.

28.     *Fourth*, the Retention Programs are consistent with industry standards.  The Debtors' management team, none of whom will receive payment under the Retention Programs, in consultation with the Debtors' advisors, developed the Retention Programs after a rigorous analysis.  *See* Gartrell Decl. ¶ 13, Retention Programs Motion ¶¶ 32-33.  In fact, WTW benchmarked the retention plans approved in the cases of (i) seventeen similarly sized companies that filed for chapter 11 from 2017 through 2022 and had approximate prepetition annual revenues of $250 million to $1.5 billion to analyze the KERP, and (ii) twenty-seven similarly sized companies that filed for chapter 11 from 2017 through 2022 and had approximate prepetition annual revenues of $250 million to $1.5 billion to analyze the TRP.  Gartrell Decl. ¶¶ 13-14.  Upon a review of annualized total costs of retention programs, WTW determined that the Retention Programs are within the range of market practice as compared to retention plans proposed and approved at similarly situated companies in chapter 11.  Gartrell Decl. ¶ 17.

29.     The Debtors' Retention Programs generally are positioned on the higher end of the benchmark range to account for recent reductions in force and the highly targeted nature of the Retention Programs.  A higher cost per Participant is consistent with the historically higher base

15

salary in the smaller sample size of digital asset companies. *Id.* at ¶ 18. Regardless, given the Debtors' understanding of attrition rates and the need for retention of Participants, the Retention Programs are justifiable; proceeding without the Retention Plans would render the Participants' base salaries, in the aggregate, 17 percent below market median for target total direct compensation. *Id.* at ¶ 21. That outcome risks a mass exodus that no party in interest in these chapter 11 cases should be willing to risk.

30. ***Fifth***, as discussed in detail above and the Retention Programs Motion, Gartrell Declaration, and Crowell Declaration, the Debtors, in consultation with their advisors, undertook an extensive process to determine the list of proposed Participants and the amount to be paid to each Participant. Accordingly, the Retention Programs were created after significant due diligence and the Debtors' received substantial assistance from independent consultants and advisors. *See* Retention Programs Motion ¶ 32; Gartrell Decl. ¶ 10; Crowell Decl. ¶ 29.

31. The business judgment rule allows the Debtors to consider their business needs and market conditions to make the best decision for stakeholders. The Retention Programs will enhance and preserve value and are justified by the facts and circumstances of these cases.

## Conclusion

Implementing the Retention Programs is necessary and appropriate to maximize value, regardless of the path of these chapter 11 cases. All parties will benefit if the Participants, none of whom are insiders, are incentivized to remain in the Debtors' employ. For the foregoing reasons, as well as the reasons set forth in the Retention Programs Motion, as applicable, the Debtors request that the Court (a) overrule the Objections and (b) enter the relief requested in the Retention Programs Motion.

[*Remainder of page intentionally left blank*]

WHEREFORE for the foregoing reasons, the Debtors request that the Court overrule the Objections and approve the Retention Programs Motion.

Dated: January 23, 2023 /s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and
Debtors in Possession*