**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and
Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

### DECLARATION OF JOSEPHINE GARTRELL IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' RETENTION PROGRAMS AND (II) GRANTING RELATED RELIEF

I, Josephine Gartrell, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of

perjury:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

1. I am a Senior Director at Willis Towers Watson US LLC ("WTW"). In November 2022, BlockFi Inc. (one of the debtors and, together with the above-captioned debtors in possession in these chapter 11 cases, collectively, the "Debtors") engaged WTW to provide certain compensation consulting services.

2. I am a compensation consultant for companies in and out of bankruptcy and am familiar with the prepetition and postpetition structure of the Debtors' compensation programs, including the Debtors' key employee retention plan (the "KERP") and targeted retention plan ("TRP," and together with the KERP, the "Retention Programs"), as set forth in the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Employee Retention Programs and (II) Granting Related Relief* (the "Motion") [Docket No. 21].[2] My team and I assisted the Debtors in developing the proposed Retention Programs and advised them on, among other things, sizing, participation considerations, and structure of the Retention Programs.

3. I submit this declaration (this "Declaration") in support of the Motion. Except as otherwise indicated, I have personal knowledge of all facts in this Declaration based on my review of the Debtors' business and compensation practices, my research into compensation practices for similarly sized companies, my research into the designs of retention plans approved in comparable chapter 11 proceedings, my significant experience in developing such programs, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors. For the reasons described below, it is my opinion that the Retention Programs are reasonable, consistent with market practice, and generally consistent with my consulting experience with similarly situated companies that have sought relief under chapter 11. If called upon to testify, I could testify competently to the facts and opinions set forth in this Declaration.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

2

**Background and Qualifications**

4.  I received my Juris Doctor from the University of San Diego School of Law in 1998, graduating *magna cum laude* and Order of the Coif. I received my Bachelor of Arts in international business from San Diego State University in 1994. After working as an associate at Gibson, Dunn & Crutcher LLP in the corporate practice, Pillsbury Winthrop Shaw Pittman LLP as an associate in the executive compensation practice, and The Loftin Firm, P.C. as a partner and then of counsel in the corporate practice, I became an executive compensation consultant at the Hay Group LLC in 2014. In 2016, I joined WTW, where I have been employed since.

5.  WTW is an international professional services firm offering a wide variety of services to public and private clients, including expert analysis of executive and management compensation. WTW designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals. WTW focuses on two key business segments: health, wealth, and career & risk and broking.

6.  My responsibilities at WTW primarily involve advising for-profit companies and not-for-profit organizations, specifically regarding executive compensation. I routinely assist public and private companies in various industries with compensation philosophy, pay competitiveness issues, incentive plan design, and other compensation-related analyses. I have participated in the development and design of hundreds of management and employee incentive plans for companies in and outside of bankruptcy.

7.  I have over twenty years of experience in the field of executive, management, and employee compensation. During my tenure at WTW, I have worked closely with a range of companies undergoing financial restructurings to develop a variety of prepetition and postpetition compensation arrangements, including compensation plans and programs for senior executive and

non-executive employees. Specifically, I have led or co-led the review and design of retention programs, and other similar plans in a number of chapter 11 cases, including: *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. July 13, 2022); *In re Mallinckrodt plc*, No: 20-12522 (JTD) (Bankr. D. Del. Apr. 5, 2021); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019); *In re Purdue Pharma L.P.*, No. 19-23646 (SHL) (Bankr. S.D.N.Y. Sept. 15, 2019); *In re Cloud Peak Energy Inc.*, No. 19-11047 (KG) (Bankr. D. Del. July 1, 2019); *In re FULLBEAUTY Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2019); *In re Parker Drilling Co.*, No. 18-36958 (MI) (Bankr. S.D. Tex. Dec. 12, 2018); *In re Aegean Marine Petroleum Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. Nov. 6. 2018); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2018); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 4, 2018); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. June 13, 2018). In my experience, it is critical to assess the facts, circumstances and context around each company's situation in designing retention (and other compensation) programs.

**WTW's Involvement with the Debtors**

8.    The details of WTW's engagement are as follows: The Debtors signed and executed WTW's Statement of Work and Master Services Agreement (collectively, the "Engagement Documents") on November 17, 2022 (the "Engagement Date"). The Engagement Documents delineate the relationship between the parties and identify the Debtors' Retention Programs as a priority.

9.    After WTW was engaged by the Debtors, my team worked tirelessly to quickly understand the Debtors' business strategy and its alignment to compensation programs, assess the current situation, and provide guidance in developing the Retention Programs. At the outset of

4

our engagement, WTW familiarized itself with the Debtors' operations, business, and potential restructuring efforts. The Debtors, the Debtors' other advisors, and WTW discussed, among other things, the Debtors' operational history, ongoing operational needs, financial performance, restructuring process, and various other issues and areas of concern regarding the Debtors' workforce and employee programs. WTW analyzed the structure of the Debtors' prepetition base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

10.   My team and I performed significant due diligence to assist the Debtors in developing the Retention Programs and closely collaborated with the Debtors' management and other advisors to determine which employees were most critical to retain and most at risk of flight absent any retention plan. Employees not deemed to be critical to retain going forward (approximately 66% of the entire employee population at that point) were given notice of termination just prior to the bankruptcy rather than simply left out of the Retention Programs.

11.   The Debtors provided WTW with information concerning their historical compensation structure, recent financial and operational performance, recent reductions in force, and ongoing restructuring efforts. My team and I also discussed the rationale for the proposed Retention Programs with the Debtors and the Debtors' other advisors. WTW's primary goal was to provide an independent assessment of the Debtors' compensation planning that drew directly upon relevant market data as well as my significant experience in designing comparable programs for similarly-situated companies, including companies in chapter 11.

### The Retention Programs Overview

12.   Of the Debtors' 374 pre-petition employees and independent contractors (prior to reduction in force measures being taken), the Debtors designated 90 key employees to participate

5

in the KERP (the "KERP Participants") and 31 key employees to participate in the TRP ("TRP Participants" and, collectively, with the KERP Participants, the "Participants"). Those Participants who were eligible to participate in existing legacy bonus incentive or retention programs are included in the KERP, while those with no previous legacy bonus incentive or retention program eligibility who are nonetheless critical to the Debtors are included in the TRP. The aggregate cost of the KERP is approximately $9,476,887.37, and the aggregate cost of the TRP is approximately $2,306,000.00 assuming all Participants are successfully retained and earn the proposed payments. The key terms of the Retention Programs are as follows:

- *Participants*: The KERP is limited to 90 non-insider key employees who have remained with the go-forward business, or approximately 24 percent of the Debtors' pre-petition workforce (prior to reduction in force measures being taken). The TRP is limited to 31 non-insider key employees who have remained with the go-forward business, or approximately 8 percent of the Debtors' pre-petition workforce (prior to reduction in force measures being taken). Each Participant is a critical employee that performs, among other things, treasury, cash and digital asset management, IT infrastructure, legal, human resources, and other critical functions for the Debtors.[3]

- *Awards*: The Participants' awards represent fixed cash amounts payable based on continued employment of each Participant through the applicable payment dates (except as provided below). The awards are equal to 50 percent of base salary for all tier 1 Participants (approximately 90 Participants) and 10 percent of base salary for all tier 2 Participants (approximately 31 Participants).

- *Payment Dates*: 50 percent of all tier 1 Participants' awards will be paid immediately on the effective date of the Retention Programs, subject to a clawback until the 6-month anniversary of the Court approval date, with the remaining 50 percent to be paid upon the earlier of the date that is (i) twelve

---

[3] Based on my experience and discussions with the Debtors' advisors, I understand that an "insider" for purposes of the Retention Programs refers to the definition under section 101(31) the Bankruptcy Code and that no Participant in the proposed Retention Programs is an employee who: (a) sits on, or directly reports to, the Debtors' board of directors; (b) was appointed or hired directly by the Debtors' board of directors; (c) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (d) directs the Debtors' overall corporate policy or governance. None of the Participants sits on or reports to the Debtors' board, was appointed or hired directly by the board, has responsibility for or managerial control over the Debtors' operations as a whole, or directs the Debtors' overall corporate policy or governance. My understanding is that, as a result, none of the Participants is an "insider" under the Bankruptcy Code.

months after the effective date of Court approval of the Retention Programs or (ii) 30 days following emergence from these chapter 11 cases. All tier 2 Participants shall receive 100 percent of the award upon Court approval of the Retention Programs, subject to a clawback until the earlier of the date that is (i) twelve months after the effective date of Court approval of the Retention Programs or (ii) 30 days following emergence from these chapter 11 cases.

- ***Termination of Employment***:

  o ***Tier 1 Participant:*** If a tier 1 Participant is terminated without cause (including due to death or disability) or resigns for good reason, in each case, within the first 6-month period, the tier 1 Participant will remain entitled to the retention payment attributable to such first 6-month period (*i.e.*, no clawback will apply). A tier 1 Participant whose employment is terminated without cause (including due to death or disability) or who resigns for good reason, in each case, within the second 6-month period, will remain entitled to the retention payment attributable to such second 6-month period. A tier 1 Participant whose employment is terminated for cause or who resigns without good reason during the first 6-month period will be required to repay 100 percent of the retention payment attributable to such first 6-month period; a tier 1 Participant whose employment is terminated for cause or who resigns without good reason within the second 6-month period will not be entitled to the retention payment attributable to such second 6-month period.

  o ***Tier 2 Participant***: A tier 2 Participant whose employment is terminated without cause (including due to death or disability) or who resigns for good reason will not be required to repay any portion of the retention payment. A tier 2 Participant whose employment is terminated for cause or who resigns without good reason will be required to repay 100 percent of the retention payment.

### Analysis of the Retention Programs

13. In assessing the KERP, I worked with my team, the Debtors, and the Debtors' other advisors to analyze the retention plans authorized and approved in the chapter 11 cases of the following seventeen similarly-sized companies (the "Comparison Group") that filed chapter 11 petitions from 2017 through 2022 and had approximate prepetition annual revenues of $250 million to $1.5 billion: Appvion, Inc.; Bristow Group Inc.; CBL & Associates Properties, Inc.;

7

Cloud Peak Energy Inc.; Covia Holdings Corporation; Cumulus Media Inc.; Diamond Offshore Drilling, Inc.; DURA Automotive Systems, LLC; EXCO Resources, Inc.; Oasis Petroleum Inc.; Pacific Drilling S.A.; Real Industry, Inc.; Seadrill Limited (2017); Speedcast International Limited; Tidewater Inc.; Westmoreland Coal Company; Whiting Petroleum Corporation.

14. Further, in assessing the TRP, I worked with my team, the Debtors, and the Debtors' advisors to analyze the retention plans authorized and approved in the chapter 11 cases of the following Comparison Group companies that filed chapter 11 petitions from 2017 through 2022 and had approximate prepetition annual revenues of $250 million to $1.5 billion: Aceto Corporation; AcuSport Corporation; Appvion, Inc.; Armstrong Energy, Inc.; Basic Energy Services, Inc. (2021); Brookstone Inc. (2018); Celadon Group, Inc.; Charlotte Russe Holding, Inc.; Ciber, Inc.; Cloud Peak Energy Inc.; Fairway Group Holdings Corp.; Gordmans Stores, Inc.; Gulf Coast Health Care, LLC; Ignite Restaurant Group; Legacy Reserves Inc.; Marsh Supermarkets; Nine West Holdings, Inc.; PHI, Inc.; RadioShack (General Wireless Operations); Real Mex Restaurants, Inc.; RTW Retailwinds, Inc.; Strike, LLC; The McClatchy Company; True Religion Apparel, Inc. (2020); Tuesday Morning Corporation; Voyager Digital Holdings, Inc.; and Welded Construction, L.P.

15. In conducting this analysis, I also relied upon my significant consulting experience in employee compensation generally and the research and design of retention plans more specifically at dozens of other companies.

16. The structure of the proposed Retention Programs comports with my general experience and the findings of my review of retention plans approved in similarly-sized companies. Based on my experience, I also believe that a cash-based Retention Program, generally, aligns a debtor's compensation program with the prevailing market while in chapter 11.

8

Based on my experience, similarly-sized companies operating in the financial services, technology, or general industry would not offer only base salaries as the sole form of compensation to their employees (as the Debtors currently do following the chapter 11 filing), and it is my opinion that the Participants would almost certainly receive incentive opportunities should they leave the Debtors for other jobs. I note the following observations:

- The retention awards are limited to a subset of critical key pre-petition employees whose continued employment is necessary to preserve and maximize the value of the Debtors' estates;

- No Participant is an insider;

- The use of fixed cash retention payouts, expressed as a percentage of salary, is common in retention programs;

- The retention awards, expressed as a percentage of salary, is common in retention programs;

- The installment payout feature is consistent with market practice as a majority of retention programs reviewed by WTW provided awards through installments;

- Companies in bankruptcy frequently make cash retention payments early in the bankruptcy in order to ensure retention and prevent value destruction as employees confront the changed circumstances;

- Companies providing for installment payments frequently provide for initial awards with a clawback and subsequent installment payments (*e.g.*, initial award representing a portion of the total award with a corresponding clawback and subsequent installment award(s) which make up all or a portion of the remainder of the total retention award value);

- Accelerated vesting and payment of retention awards is common in the event of an involuntary termination without Cause, which the Debtors do not anticipate doing but is generally necessary in order for a retention program to have its intended effect.

17. My team and I also reviewed the annualized total costs of the Retention Programs, which are within the range of market practice as compared to retention plans proposed and

9

approved at similarly situated companies in chapter 11 proceedings.[4] Analyzing annual cost is generally within the observed market of other key employee retention plans analyzed by WTW.

| Plan Design | BlockFi | 25th Percentile in Comp. Group | 50th Percentile in Comp. Group | 75th Percentile in Comp. Group | 90th Percentile in Comp. Group |
|---|---|---|---|---|---|
| **Annualized KERP Cost vs. Comparison Group** | | | | | |
| Total Cost ($mm) | $9,900 | $3,545 | $5,928 | $13,733 | $25,291 |
| Cost per Participant | $104,212 | $20,370 | $47,433 | $69,091 | $84,220 |
| Cost as a Percentage of Revenue | 1.98% | 0.5% | 0.7% | 1.5% | 2.5% |
| Cost as a Percentage of Assets | 0.50% | 0.24% | 0.40% | 0.57% | 1.14% |

| Plan Design | BlockFi | 25th Percentile in Comp. Group | 50th Percentile in Comp. Group | 75th Percentile in Comp. Group | 90th Percentile in Comp. Group |
|---|---|---|---|---|---|
| **Annualized TRP Cost vs. Comparison Group** | | | | | |
| Total Cost ($mm) | $2,426 | $825 | $1,341 | $1,617 | $3,191 |
| Cost per Participant | $75,797 | $22,260 | $45,870 | $55,727 | $103,053 |
| Cost as a Percentage of Revenue | 0.49% | 0.16% | 0.22% | 0.33% | 0.48% |
| Cost as a Percentage of Assets | 0.12% | 0.17% | 0.29% | 0.51% | 1.23% |

18. While the cost per Participant is high relative to the comparator group, this is not unreasonable given the recent reductions in force and, therefore, highly targeted nature of the Retention Programs. A higher cost per Participant was also consistent with the historically higher

---

[4] The amounts detailed in the charts referenced herein were effective as of November 27, 2022, the date of the Special Committee meeting to approve such proposed Retention Programs. Since then, eleven Participants have resigned, thus the annualized costs of the Retention Programs are lower than reflected herein. That change only reinforces my analysis that the Retention Programs are consistent with other retention plans and justifiable under the facts and circumstances here.

base salary in the smaller sample size of digital asset companies. Given my understanding of attrition rates and the need for retention of Participants, the Retention Programs are justifiable.

19. In evaluating the reasonableness of the Retention Programs, my team and I also analyzed the retention compensation award opportunities (expressed as a dollar value) relative to competitive normal course incentive opportunities. Specifically, my team evaluated the following two surveys: (i) 2022 Radford Global Compensation Database – Technology,[5] and (ii) the 2022 WTW Financial Services Compensation Survey.[6]

20. I took the following steps to review the proposed award opportunities:

- Participants were segmented into two different criticality tiers, with an average retention award opportunity calculated by tier;

- For each tier, competitive market 25th, 50th, 75th, and 90th percentile incentive compensation opportunities (dollar values) were developed based on similarly paid (on the basis of salary) employees in the proprietary survey;

- The Debtors' average annualized Retention Programs award opportunities by tier were compared to market 25th, 50th, 75th and 90th percentile incentive opportunities from the WTW survey; and

- The relationship between the Debtors' proposed Retention Programs award opportunities and the competitive market benchmarks noted above was determined.

21. Based on my review of the survey and the proposed award opportunities, without the Retention Plans, Participants' total direct compensation opportunities (which would be limited to Participants' base salaries) would be on average 17 percent below market median.

---

[5] Here, WTW filtered for the Tri-state area, the San Francisco Bay area, the greater Seattle area, and Los Angeles/Orange County.

[6] For executive level roles, WTW filtered for companies with assets under $5 billion. For non-executive level roles, WTW's data were adjusted for a geographic differential of +15 percent to accommodate for cost of labor differences in the talent markets in which the Debtors operate. Specifically, the talent markets in Tri-state area, the San Francisco Bay area, Seattle, and Los Angeles.

11

| BlockFi Level | Number of Incumbents | BlockFi Base Variance to Market Target TDC | | | |
|---|---|---|---|---|---|
| | | 25th percentile | 50th percentile | 75th percentile | 90th percentile |
| L11 | 3 | 34% | -19% | -42% | -44% |
| L10 | 5 | -8% | -35% | -58% | -75% |
| L9 | 5 | -7% | -23% | -39% | -60% |
| L8 | 16 | 8% | -9% | -26% | -45% |
| L7 | 8 | -1% | -15% | -29% | -39% |
| L6 | 5 | 13% | -3% | -20% | -38% |
| L5 | 5 | -6% | -20% | -36% | -45% |
| L4 | 5 | 20% | 0% | -21% | -33% |
| L3 | 1 | 10% | -4% | -15% | -26% |
| L2 | 1 | 15% | -2% | -15% | -27% |
| **Aggregate** | **54** | **5%** | **-17%** | **-36%** | **-51%** |

22.    Further, the compensation proposed in the Retention Programs, which includes base salary plus the proposed KERP or TRP compensation) positions the Debtors at 4% below the 75th percentile of market total direct compensation.

| BlockFi Level | Number of Incumbents | BlockFi Restructuring Compensation Variance to Market Target TDC | | | |
|---|---|---|---|---|---|
| | | 25th percentile | 50th percentile | 75th percentile | 90th percentile |
| L11 | 3 | 100% | 21% | -13% | -16% |
| L10 | 5 | 37% | -3% | -37% | -63% |
| L9 | 5 | 40% | 16% | -9% | -41% |
| L8 | 16 | 62% | 36% | 11% | -17% |
| L7 | 8 | 48% | 27% | 6% | -9% |
| L6 | 5 | 70% | 46% | 20% | -7% |
| L5 | 5 | 41% | 20% | -4% | -17% |
| L4 | 5 | 80% | 50% | 19% | 0% |
| L3 | 1 | 65% | 44% | 27% | 11% |
| L2 | 1 | 72% | 47% | 28% | 10% |
| **Aggregate** | **54** | **57%** | **25%** | **-4%** | **-26%** |

23.    The company's challenges are complex given that it terminated nearly 70% of all employees prior to the Petition Date. Therefore, they are unable to pay a Retention Program under which employees have actively worked since July 2022, wiped out all Participants' equity

compensation, and are sitting in a bankruptcy proceeding with an uncertain future. It is unclear why Participants would stay without the Retention Programs.

24. Accordingly, I believe the Retention Programs opportunities are reasonable and appropriate in light of competitive market practice. Based on the market data my team and I reviewed and my significant experience with postpetition non-insider retention programs in other matters, the structure of the Retention Programs is also generally consistent from a key design perspective (such as the frequency of payments, participation levels, and use of cash) of similar non-insider award plans approved on a postpetition basis.

### Conclusion

25. Based on my education, experience, and the work I have done in these chapter 11 cases and in similar chapter cases, I believe that the design, structure, cost, and award opportunities available under the Retention Programs are reasonable given the facts and circumstances of these chapter 11 cases.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 23, 2023  
San Francisco, California

By: */s/ Josephine Gartrell*  
Name: Josephine Gartrell  
Title: Senior Director  
Willis Towers Watson US LLC