**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al*., | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |
| | Judge: Michael B. Kaplan |

## DECLARATION OF CHIEF PEOPLE OFFICER, MEGAN CROWELL, IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' RETENTION PROGRAMS AND (II) GRANTING RELATED RELIEF

I, Megan Crowell, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury:

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

1.      As of October 2022, I became the Chief People Officer of BlockFi Inc. ("BlockFi"). BlockFi, along with certain of its debtor subsidiaries and affiliates, are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").

2.      I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records, including the Debtors' proposed key employee retention plan (the "KERP") and the Debtors' proposed target retention program (the "TRP" and together with the KERP, the "Retention Programs") as set forth in the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief* [Docket No. 21] (the "Retention Programs Motion").

3.      I submit this declaration (this "Declaration") in support of the Retention Programs Motion.[2] Except as otherwise indicated, the statements set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and information obtained from other members of the Debtors' management team and advisors.  I am authorized to submit this Declaration on behalf of the Debtors.  I am over the age of eighteen and, if called upon to testify, I could testify competently to the facts and opinions set forth in this Declaration.

## Qualifications

4.      I am currently the Chief People Officer of BlockFi.  I started at BlockFi as People Operations Manager in July 2019, was promoted to Director of People Operations in February 2020, and was promoted again to Vice President of People in April 2021, until reaching my current position of Chief People Officer in October 2022.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Retention Programs Motion.

5.      I personally built BlockFi's human resources infrastructure, including BlockFi's recruitment team.  The work to build BlockFi's HR infrastructure was complex and challenging, requiring us to build (from the ground up) processes for recruiting, office management, executive administration, employee relations and investigations, employee benefits and compensation, executive compensation, performance management, onboarding and offboarding, core operations, and people analytics.    Through our recruitment team, we grew the organization from approximately 30 employees in 2019 to approximately 900 employees at its peak in August 2021.

6.      I hold a Bachelor's degree in English Language and Literature/Letters from Cornell University.  I started my human resources career at Morgan Stanley as a Human Resources Analyst in June 2013.  I was promoted to a Talent Development Associate in January 2015.  From April to October 2015, I also held the role of a Talent Advisory Associate.  I served as a Talent Development Associate until I left Morgan Stanley in September 2017.

7.      Immediately prior to joining BlockFi, I was a freelance writer and brand strategist from March 2017 to July 2019.  In this role, I advised a variety of companies and entrepreneurs on brand strategy, content development, and copyrighting.  As a freelance writer and brand strategist, I gained insight on start-up development and how consumers interact with products and services.  My experiences with start-up entities positioned me well to start working for BlockFi in July 2019.

8.      All told, I have almost a decade of experience in human resources, professional development, talent recruitment, performance management, and employee relations.  During that time, I have been involved in the creation and operation of multiple employee bonus programs, including retention programs.  While at BlockFi, I have been involved in the analysis of multiple potential transactions and evaluated the impact of each potential path on BlockFi's workforce.

Moreover, since the summer of 2022, I have had to oversee multiple difficult, but necessary, reductions in force at BlockFi.  I am very familiar with the Debtors' employees, the Debtors' historical compensation and bonus structures, and the proposed Retention Programs.  I am well positioned to speak to the Debtors' personnel needs during these chapter 11 cases as I do in summary fashion below in this declaration.

### The Debtors' Employees

9.      Immediately prior to the bankruptcy filing, the Debtors engaged in a considerable reduction in force (a "RIF") resulting in the termination of nearly two-thirds of the total workforce. This RIF followed a separate voluntary separation program under which BlockFi reduced its then-existing staff by approximately 31% shortly following the FTX transaction, as well as an earlier additional RIF under which BlockFi reduced its then-existing staff by approximately 20%.  This most recent RIF will result in substantial cash savings for the Debtors.  In fact, savings from the most recent RIF will exceed the entire maximum amount of the Retention Programs in about four months starting from the Petition Date.  That is to say, our decision to terminate so many employees right before we filed for bankruptcy, resulted in cost savings that dwarf the maximum amounts sought in these Retention Programs.

10.     We made the difficult decision to let many excellent workers go as we pared down to only critical employees in areas the Debtors would need to continue operating.[3]  On top of that, the current tumult in the digital asset industry combined with the reality of the Debtors' chapter 11

---

[3]    The Official Committee of Unsecured Creditors (the "Committee") takes us to task for including bonuses for 93% of our workforce.  *See* Supplemental Committee Objection at 13.  Of course, this number is dramatically different when one recognizes that two-thirds of our workforce was let go right before the Petition Date.  I believe it disingenuous to ignore that RIF and to try to punish the Debtors' for taking aggressive cost-saving measures.  Had we not terminated those employees, we would have Retention Programs in the Committee's range in terms of percentage of workforce included, yet we would end up paying out far more than the maximum value of the Retention Programs.

filing leaves the remaining employees understandably concerned about their future. Employees have expressed concerns about the stability of their roles and income, their career development prospects, and the possibility of sudden termination without notice or severance during, or at the conclusion of, these chapter 11 cases. This concern has only increased as we have voluntarily agreed to extend the date upon which the Retention Programs' hearing will occur from January 9th to January 17th to January 24th and now to January 27th (with the Committee now seeking an even longer delay). While we felt these extensions prudent to allow for dialogue with the U.S. Trustee and the Committee, we have experienced both additional personnel loss and increased concern regarding the receipt (and timing) of retention payments.

11.     Each Participant in the Retention Programs performs a vital role at BlockFi including asset management, digital security, finance, legal, accounting, human resources, and other critical functions. The vast majority–if not all–of the Participants have valuable institutional knowledge regarding the Debtors' operations and the digital asset sector that would be nearly impossible to replace, particularly on an expedited basis. This would be true even without the overlay of a chapter 11 filing, but it is especially true while the Debtors operate in bankruptcy with an unclear path forward and no promise of long-term security for workers. Additionally, for the same reasons, we do not believe we could attract the needed caliber of talent, nor adequately train them, with the Debtors' remaining resources, if forced to attempt replace the remaining Participants, and it is hard to imagine doing so for less than the cost of the proposed Retention Programs.

12.     All Participants in the Retention Programs will be critical to the success of the Debtors in a standalone restructuring, a sale process, or any other outcome of these chapter 11 cases. Given the size of the recent RIF, each Participant has taken on additional responsibilities

to provide a greater breadth of coverage within their functional area.  I like to say we have kept

only "utility athletes" on our roster, people who are both hard workers and fundamental to keeping

the operations going – nobody left is just a "coach," instead everyone is pitching in everywhere.

Based on prior discussions, I believe the Committee underestimates the challenges associated even

with a liquidation and dramatically underestimates the need to maintain the thinned-down

workforce the Debtors currently employ.

13.     Notwithstanding the fact that the Debtors' trading, lending, staking, and custody

platform (the "Platform") is frozen, our employees continue to perform maintenance and updates

on the Platform to facilitate a successful reorganization or sale as well as prepare the Platform for

post-emergence operations.  Each Participant is either immersed in work arising from these chapter

11 cases, possesses key institutional knowledge required for the Debtors' successful emergence

from bankruptcy, or both.

14.     It is important to understand that, despite an incredibly turbulent time in the digital

asset industry, the opportunities for Participants elsewhere have not dried up.  The labor market

for employees who possess the qualifications and skills necessary to operate a sophisticated

cryptocurrency trading platform is highly competitive.  The war for talent remains active, and the

Participants have many opportunities inside and outside the cryptocurrency sector.  Individuals

with cryptocurrency experience are attractive to employers in the finance, technology, and

payment platform industries broadly, among others, especially as these industries adapt their

products and services to incorporate cryptocurrency and or related technologies.  Additionally,

most of the Participants have significant experience in other industries and could easily return to

those industries (as we have already seen since filing the Retention Programs Motion).  There is

no greater illustration of this than the fact that, in the midst of the cryptocurrency collapse, the Debtors lost 61 employees due to *voluntary* terminations to pursue alternative employment.

15. The reality that we have experienced is that the job market is very active and opportunities for Participants are readily available. In the event additional Participants resign, I believe that the Debtors would struggle to adequately source candidates who could operate the BlockFi platform effectively, severely limiting the Debtors' options in these chapter 11 cases. Moreover, hiring new employees would require the Debtors to incur significant operational and financial costs, costs that would directly undercut the savings the Debtors will receive through the reduction in force and would likely far exceed the cost of the proposed Retention Programs. The Committee, in the Supplemental Committee Objection, muses on the costs of optionality, but ignores the substantial cost to try to rehire a workforce to effectuate whatever restructuring path is followed. Failure to retain the Participants will likely leave BlockFi and creditors without any good options.

16. The Retention Plans are critical to retain the necessary workforce. The Debtors battled high attrition throughout 2022, more than doubling the Debtors' 2021 attrition rates. Widespread concerns regarding the bankruptcy proceedings have already, predictably and unfortunately, led to attrition including important departures as recently as last week. Indeed, between the Petition Date and the filing of this Declaration, eleven employees have resigned, and such resignations have only accelerated in January to date. Key employees continue to receive offers, in some instances, for compensation significantly above their current compensation. Not only are BlockFi employees being recruited within the digital asset industry, but they are also being recruited for opportunities across numerous industries. Just by way of example, BlockFi recently lost key employees to Google, Block (a payment processor f/k/a Square), and Walmart.

These employees were critical parts of the team and possessed deep institutional knowledge of the Debtors' operations.  Approval of the Retention Programs is necessary to prevent significantly more attrition of key employees that would place an unsustainable strain on the Debtors.

### The Debtors' Historical Reductions in Force

17.    The Debtors' recent reductions in force have only intensified existing retention challenges.  By undergoing the recent reduction of roughly two-thirds of the workforce as part of the Debtors' efforts to achieve cost savings, additional burdens have been levied on the Debtors' top performing employees.  This recent RIF is only one of three significant downsizing events that occurred in the latter half of 2022.

18.    In June 2022, due to declining market conditions and the Debtors' investors directive to focus on profitability over growth, the Debtors engaged in a 20% reduction of the existing workforce.  This involuntary reduction resulted in termination of 166 employees, leaving the Debtors with 644 remaining employees.

19.    Then, following a transaction with FTX where the Debtors' agreed to further streamline operations, the Debtors' engaged in a voluntary separation program in July and August 2022 (the "VSP").  As part of the VSP, we identified crucial employees we felt we could not afford to lose and classified them in a "key to retain" population not eligible for the VSP.  We then identified 400 employees eligible for the VSP and, as a result of that program, 199 employees voluntarily left the Debtors' employ.  This resulted in a 31% reduction in the then-existing workforce, leaving the Debtors with 435 remaining employees.  The employees that opted into the VSP were eligible for ten weeks' severance while the "key to retain" population, should any of them choose to leave, were not eligible for any severance.  In exchange for their ineligibility for the VSP, the "key to retain" employees were offered a retention bonus program, described below.

20.    Finally, with the Debtors' bankruptcy filing, we further reduced our then-existing workforce by 61%.  The Retention Programs are designed to retain the 121 non-insider remaining employees of the 814 total employees that were employed by the Debtors on January 1, 2022.  Simply put, the Debtors have trimmed down to only key employees, and it is imperative to retain each of them.

21.    The Debtors' current headcount represents an over 83% decrease from January 1, 2022.  If you look at *voluntary* turnover alone, in 2022, the year-to-date cumulative voluntary turnover was 40.3%, almost 20% higher than the 2021 cumulative voluntary turnover of 17.9%.  Voluntary turnover increased month-over-month in September, October, and November of 2022.

22.    The effects of the Debtors' reductions in force spread beyond headcount reduction.  Prior to the FTX transaction, all employees at BlockFi, including all Participants in the Retention Programs, held equity in the company.  In my experience, the opportunity for "upside" via that equity had been significant in attracting and retaining talent.  The FTX transaction eliminated that upside by wiping out common shareholder value.  In order to address the compensation vacuum created by the destruction of existing employee equity and the high attrition rates, in July 2022, the Debtors instituted a retention bonus program payable to "key to retain" employees still employed with the Debtors as of January 31, 2023.  This retention bonus program was also intended to compensate the "key to retain" population to make up for the fact that they were not eligible for severance under the VSP.  The contemplated bonuses ranged from 20-50% of the employees' salaries[4], of which 80% was a pure retention payment and 20% was a performance-based payment.  This retention bonus program was approved by the Debtors' board of directors

---

[4]    Certain independent members of the Debtor's board of directors did not feel that 20-50% of the employees' salaries was high enough when compared to other start-ups in the digital currency industry.

and announced to the Debtors' employees.  The Debtors' employees, including the Participants, relied on those payments being made in February 2023 in deciding to stay with the company.  The Debtors' bankruptcy filing cancelled that program.  The Retention Programs were designed, in part, to address that hole given extreme frustration from the employee base about the loss of bonus opportunities (on the back of prior frustration about losing equity).  Thus, if the Retention Programs are not approved, employees that decided to stay based on the retention program will almost certainly leave.

23.    In fact, the Debtors scheduled a meeting with their board of directors in November 2022 to renew the retention bonus program.  The Debtors were going to propose to their board an additional retention bonus for employees still employed with the Debtors as of July 2023 in an effort to retain employees through any potential acquisition of the Debtors by FTX.  But the board of directors was never able to consider the extension of the retention bonus program because FTX collapsed just days before the scheduled board meeting.  After FTX filed for bankruptcy, the existing retention bonus program was put on hold and the Debtors entered into these chapter 11 proceedings on November 28, 2022.

24.    As we were designing the Retention Programs heading into the bankruptcy, we were acutely aware that BlockFi's history would make it difficult to retain remaining personnel. These employees have lost their equity, were promised retention payments in February 2023 that are now not going to be paid, were hopeful for additional retention payments in July 2023 that are also not going to be paid, believed that the Debtors would be acquired by FTX prior to FTX's collapse,[5] and have seen an almost 78.9% decrease in personnel since June 2022 resulting in a

---

[5]    While the FTX transaction wiped out existing employee equity, the Participants anticipated that FTX's acquisition of the Debtors would lead to potential equity opportunities within FTX.

demoralizing loss of colleagues and friends. The Participants also know that BlockFi is in bankruptcy and the future is uncertain.

25.     The one thing keeping many of our personnel employed with the Debtors is the promise of a retention program. I know this because I have near daily conversations with Participants who express their views on the importance of the Retention Programs to their continued employment with the Debtors. After all, these Participants have recently seen nearly two-thirds of their fellow employees terminated with three months of pay. The Retention Programs (if approved) offer the possibility of payments equal to six months of pay, but *only* if the Participants work incredibly hard through the end of the chapter 11 process, without assurance there will be a post-chapter 11 future. Put simply, we are facing an uphill battle regarding employee retention, and it is vital to approve the Debtors' Retention Programs in order to retain the Participants.

### The Participants' Increased Responsibilities

26.     Moreover, since the commencement of these chapter 11 cases, and as a result of the recent attrition, the Debtors' employees have assumed the burden of significant chapter 11-related tasks as described below. The below chart, of course, is not comprehensive in terms of the responsibilities of remaining employees. Rather it is offered to provide the Court a summary understanding of why, after significant analysis and consultation with advisors, the Debtors believe they need the current number of employees. The Committee implies that the Debtors have too many employees based on vague comparisons to Voyager and Celsius and based on their statement that "BlockFi is not now operational." But significant work is ongoing, even with the platform "paused," and significant work will be required in any foreseeable restructuring scenario (including a liquidation).

| Department / Field of Work | Chapter 11 Related Tasks | Post "Pause" Ongoing Tasks |
|---|---|---|
| **Operations** | <ul><li>Process SOFA requests.</li><li>Prepare Wallet/BIA adjustments to align with pre- announcement snapshots.</li><li>Continue Interest Accruals for BIA, BPC, and Loans.</li><li>Loan reconciliation.</li><li>Prepare for Loan Watcher.</li><li>Scratch remediation for outstanding loans.</li><li>Investigate, review, and send ACH Proof of Authorizations.</li><li>Review escheatment accounts for fraud.</li></ul> | <ul><li>Maintain, review, and reconcile loan portfolio.</li><li>Calculate interest accruals for BIA, BPC, and loans.</li><li>Investigate, review, and send ACH Proof of Authorizations.</li><li>Review escheatment accounts.</li><li>Continued fraud reviews.</li><li>Vendor contract consolidation and management.</li><li>Invoice tracking and management.</li><li>At some point, process customer withdrawals for wallet, BPC and BIA</li></ul> |
| **Finance** | <ul><li>Prepare materials related to sale of assets.</li><li>Coordinate with potential purchasers of assets.</li><li>Ongoing financial reporting as requested on scheduled and ad hoc basis by interested parties.</li><li>Support cash reporting process and work closely with financial advisors on data collection and report preparation.</li></ul> | <ul><li>Ongoing cash management.</li><li>Cash and PnL forecasting.</li><li>Mining and staking review and oversight.</li><li>Treasury operations.</li><li>Coordinate with key service providers such as banks, exchanges, custodians, wallet providers, etc.</li><li>Support tax documentation preparation for clients.</li></ul> |
| **Legal** | <ul><li>Provide legal guidance on bankruptcy proceedings and related activities.</li><li>Provide oversight of external legal advisors.</li></ul> | <ul><li>Provide legal and regulatory guidance across the company.</li><li>Respond to government legal process regarding client accounts.</li></ul> |
| **Compliance** | <ul><li>Provide ongoing updates to state regulators.</li><li>Evaluate handling of customer funds/collateral in compliance with relevant regulations.</li></ul> | <ul><li>Maintenance and renewal of state licenses.</li><li>Compile customer information in response to government and regulatory inquiries.</li></ul> |
| **Human Resources** | <ul><li>Data pulls and reporting for diligence requests related to current and former employees.</li><li>Field questions regarding all employee matters.</li><li>Manage organizational design to ensure capability to preserve the value of the estate while managing headcount costs.</li><li>Employee communications regarding bankruptcy process.</li></ul> | <ul><li>Payroll oversight and administration.</li><li>Benefits plan management.</li><li>Employee relations matters.</li><li>General employee lifecycle management.</li><li>HRIS management.</li><li>Office management including facilities, lease, and vendor management.</li><li>Executive administration.</li></ul> |

| Department / Field of Work | Chapter 11 Related Tasks | Post "Pause" Ongoing Tasks |
|---|---|---|
| | • Design and administration of employee retention programs. | |
| **Product** | • Prepare product requirements for bankruptcy-related changes.<br>• Facilitate execution of bankruptcy-related platform changes including solution review, requirements analysis, testing and validation, etc.<br>• Enable fraud review for any client activity resulting from bankruptcy proceedings.<br>• Support any data quality, archival, or migration issues.<br>• Participate in vendor management and review. | • Provide subject matter support for platform capabilities and behaviors of various products.<br>• Monitor and ensure platform stability with key partners.<br>• Triage platform/product issues.<br>• Evaluate impacts of requested or proposed platform behaviors.<br>• Facilitate tax and end of year reporting.<br>• Enable fraud review and monitoring of client activities.<br>• Ensure fraud evaluation tools are maintained and available to support client activity. |
| **Institutions** | • Coordinate with legal to close remaining institutional loans.<br>• Trade execution services.<br>• Provide assistance and information for the sales process related to FTX claims, mining loans, etc.<br>• Respond to information requests with respect to institutional lending business. | • Institutional loan monitoring, margin calls, etc.<br>• Communicate with institutional clients. |
| **Engineering** | • Implement platform cost savings and vendor consolidation.<br>• Data analysis and system design preparation for wallet withdrawals.<br>• System / service consolidation to reduce platform costs.<br>• Ongoing user experience updates.<br>• Fulfill bankruptcy-related reporting and data requests. | • Ongoing platform operation.<br>• Ongoing security monitoring and remediation.<br>• Implement updated Taxbit integration necessary for 2022 tax reporting.<br>• Migration planning for mandatory Auth0 platform upgrades. |
| **Security** | • Support ongoing document preservation and document collection efforts.<br>• Monitor and respond to social media and public websites for fraudulent activity.<br>• Monitor and respond to threats of violence against offices and workforce members. | • Monitor and respond to ongoing external attacks including phishing, DDoS, ransomware, and similar against internet-facing infrastructure.<br>• Monitor and respond to insider threats including client data theft, asset theft, intellectual property compromise, etc. |

| Department / Field of Work | Chapter 11 Related Tasks | Post "Pause" Ongoing Tasks |
|---|---|---|
| | • IT support for consultants, legal teams, and advisors.<br>• Decommission and decouple vendors from internal systems.<br>• Safeguard data.<br>• Support the sweeping and safety of assets to minimize third party custody risk. | • Information technology support to enable normal operations including access requests, email, messaging computer support issues, etc.<br>• Manage backup private keys used to control significant cryptocurrency holdings. |
| Client Success | • Review and respond to inbound client inquiries (~850 inquiries per week) and escalations.<br>• Ensure all claims related questions and communications are handled appropriately. | • Fulfill ongoing client account maintenance requests. (~600 requests per week)<br>• Upkeep and maintenance of critical vendor platforms. |
| Marketing | • Coordinate with executives, internal and external legal, and external advisors on communications strategies.<br>• Provide client communications execution across owned and third-party channels. | • Coordinate with executives and legal on external and internal communications strategies.<br>• Provide client communications execution across owned and third-party channels. |

27.     The headcount reductions by department place materially higher burdens on the remaining employees, including the Participants.  Specifically, the reductions in headcount by department for those employees included in the KERP are depicted below:

| Department / Field of Work | Headcount as of January 1, 2022 | Headcount as of Filing this Declaration[6] | Percentage Reduction[7] |
|---|---|---|---|
| Client Success | 95 | 3 | 97% |
| Engineering | 260 | 33 | 87% |
| Finance | 57 | 18 | 68% |
| Growth | 45 | 2 | 96% |
| Institutions | 65 | 11 | 83% |

---

[6]     These totals reflect certain employees that have been given notice of termination or have resigned but are continuing out any relevant notice periods and thus remain on the payroll as of this filing.

[7]     The reduction percentages have been rounded to the nearest whole percentage.

| Department / Field of Work | Headcount as of January 1, 2022 | Headcount as of Filing this Declaration[6] | Percentage Reduction[7] |
|---|---|---|---|
| Legal & Compliance | 72 | 16 | 78% |
| Operations | 56 | 7 | 87% |
| People | 34 | 8 | 76% |
| Private Client | 14 | 1 | 93% |
| Product | 45 | 7 | 84% |
| Risk | 9 | 7 | 22% |
| Security | 48 | 8 | 83% |
| TOTAL | 814[8] | 121 | 85% |

28.     Accordingly, I believe that the Retention Programs are necessary and appropriate to limit the further attrition of key employees.

### Retention Programs Participants

29.     As we prepared to file bankruptcy, my team worked tirelessly on the design of the Retention Programs, especially with respect to making difficult choices about which employees would be critical for the go-forward business.  We did not do this work alone, but rather worked alongside counsel and consultants from Willis Towers Watson US LLC ("WTW") to ensure the Retention Programs were appropriate and would be effective.  Indeed, as we prepared for filing, my team was in contact with our counsel and WTW nearly around-the-clock for several days to ensure we had the most state-of-the-art guidance possible.

30.     Of the approximately 374 then-current employees and independent contractors, the Debtors identified 90 key employees as Participants of the KERP and 31 key employees as Participants in the TRP, who perform a variety of important business functions that are vital to the

---

[8]   This total includes 13 executives who are not included in the proposed Retention Programs.

Debtors' ability to preserve and enhance stakeholder value.  Those with existing legacy bonus incentives—including those retention programs implemented in the wake of the FTX transaction which were cancelled upon the Debtors' chapter 11 filings—are included in the KERP, while those with no previous legacy bonus incentives are included in the TRP.  Without an incentive to remain with the Debtors throughout the chapter 11 process, these key employees are highly likely to leave the company.  Thus, the Debtors require the ability to offer competitive compensation.

31.    The Debtors have identified crucial non-insider employees to include in their Retention Programs in two categories: (a) those that will receive compensation based on 50% of their base salary (the "Tier 1 Participants") and (b) those that will receive compensation based on 10% of their base salary (the "Tier 2 Participants").  I believe that the Participants must be retained to preserve the value of the Debtors' estates and avoid irreparable harm as the Debtors pursue the value maximizing transactions contemplated by these chapter 11 cases.

32.    In determining the appropriate amount of compensation, we took into consideration the fact that the Participants recently saw 225 of their colleagues leave the Debtors as part of the RIF and receive 90 days' notice.  Given the retained employees know they cannot necessarily expect notice or severance should their employment ultimately be terminated at the conclusion of chapter 11 proceedings, the Retention Programs are designed to outperform this 90 day period.  Moreover, even if all Participants were to stay on, the Retention Programs will self-fund within 3.9 months as a result of the savings from the most recent RIF.

**The Retention Programs Are Reasonable and Necessary**

33.    None of the Participants are "insiders" as I understand that term.  Although certain Participants have titles incorporating the word "head," "director," or "vice president," the Debtors have analyzed the relevant function in determining that no Participant is an "insider" of the

16

Debtors.  Specifically, no Participants in the proposed Retention Programs are employees who: (a) are appointed or hired directly by the Debtors' board of directors; (b) report to the Debtors' board of directors; (c) exercise managerial control over, or have responsibility for, the Debtors' operations as a whole; or (d) establish the Debtors' overall corporate policy or governance.

34.     Attached as <u>Exhibit A</u> and incorporated herein by reference, is a comprehensive chart that details the Participants' names, job titles, divisions of the Debtors in which the Participants are employed, salary, and proposed Retention Programs award ranges.  I have reviewed the chart and attest that, based on my knowledge of the Debtors, it is complete and accurate.

35.     I believe that certain Participants will be motivated to leave the Debtors' employ during the pendency of these chapter 11 cases due to, among other things, the uncertainty created by the Debtors' ongoing reorganization efforts.  I believe that preserving each Participant's valuable institutional and technical knowledge is crucial to the Debtors' ability to maximize value. I further believe that the Retention Programs will increase the likelihood that the Participants are properly incentivized to remain with the Debtors during the restructuring process.  In the absence of the Retention Programs, there is a virtual certainty of material further attrition that will limit the Debtors' ability to maximize value for all stakeholders.

36.     In light of the foregoing, I firmly believe that the Retention Programs will increase the likelihood that the Participants are properly incentivized to remain with the Debtors during the restructuring process, thereby preserving value for the Debtors, their estates, and their stakeholders.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 23, 2023                    _/s/ Megan Crowell_____
New York, New York                         Name: Megan Crowell
                                           Title: Chief People Officer of Debtor,
                                           BlockFi Inc.

## Exhibit A

| Last name, First name | Division | Job Title | Salary USD | Retention - USD | KERP/TRP |
|---|---|---|---|---|---|
| | Engineering | | | | KERP |
| | Client Success | | | | KERP |
| | Finance | | | | KERP |
| | Finance | | | | KERP |
| | Finance | | | | TRP |
| | Engineering | | | | KERP |
| | Institutions | | | | KERP |
| | Institutions | | | | KERP |
| | Legal & Compliance | | | | TRP |
| | Operations | | | | KERP |
| | Legal & Compliance | | | | KERP |
| | Product | | | | TRP |
| | Risk | | | | KERP |
| | Risk | | | | KERP |
| | Client Success | | | | KERP |
| | Engineering | | | | KERP |
| | Engineering | | | | KERP |
| | Engineering | | | | KERP |
| | Engineering | | | | KERP |
| | Engineering | | | | KERP |
| | Engineering | | | | KERP |
| | Finance | | | | KERP |
| | Finance | | | | TRP |
| | Finance | | | | KERP |
| | Finance | | | | KERP |
| | Finance | | | | TRP |
| | Growth | | | | KERP |
| | Institutions | | | | KERP |
| | Institutions | | | | KERP |
| | Legal & Compliance | | | | KERP |
| | Legal & Compliance | | | | KERP |
| | Legal & Compliance | | | | KERP |
| | Legal & Compliance | | | | TRP |
| | Operations | | | | KERP |

| | | |
|---|---|---|
| | Operations | KERP |
| | People | KERP |
| | People | KERP |
| | Product | KERP |
| | Risk | TRP |
| | Risk | KERP |
| | Security | TRP |
| | Growth | KERP |
| | Finance | KERP |
| | Finance | TRP |
| | Institutions | KERP |
| | Institutions | KERP |
| | Legal & Compliance | KERP |
| | Legal & Compliance | TRP |
| | Legal & Compliance | KERP |
| | Operations | KERP |
| | People | TRP |
| | Institutions | KERP |
| | People | KERP |
| | People | KERP |
| | Product | KERP |
| | Security | KERP |
| | Engineering | TRP |
| | Engineering | TRP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | TRP |
| | Finance | KERP |
| | Finance | KERP |
| | Finance | KERP |
| | Institutions | KERP |
| | Institutions | KERP |
| | Legal & Compliance | KERP |
| | Legal & Compliance | TRP |
| | People | TRP |

2

| | | |
|---|---|---|
| | Risk | TRP |
| | Security | KERP |
| | Security | TRP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Legal & Compliance | KERP |
| | Finance | KERP |
| | Finance | KERP |
| | People | TRP |
| | Operations | KERP |
| | Product | TRP |
| | Product | TRP |
| | Security | TRP |
| | Security | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | TRP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Engineering | KERP |
| | Finance | TRP |
| | Institutions | KERP |
| | Operations | KERP |
| | Risk | TRP |
| | Product | TRP |
| | Finance | TRP |
| | Engineering | KERP |
| | Legal & Compliance | TRP |
| | People | TRP |
| | Security | TRP |
| | Product | TRP |

| | | | |
|---|---|---|---|
| | Client Success | | KERP |
| | Legal & Compliance | | KERP |
| | Legal & Compliance | | KERP |
| | Legal & Compliance | | KERP |
| | Engineering | | KERP |
| | Finance | | KERP |
| | Institutions | | KERP |
| | Operations | | KERP |
| | Private Client | | KERP |
| | Risk | | KERP |
| | Security | | KERP |