| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>Caption in Compliance with D.N.J. LBR 9004-1(b) | |
|---|---|
| BROWN RUDNICK LLP<br>Robert J. Stark, Esq.<br>Kenneth J. Aulet, Esq.<br>Bennett S. Silverberg, Esq.<br>Seven Times Square<br>New York, NY 10036<br>Telephone: (212) 209-4800<br>Fax: (212) 209-4801<br>Email: rstark@brownrudnick.com<br>       kaulet@brownrudnick.com<br>       bsilverberg@brownrudnick.com<br>*Proposed Counsel for the Official Committee of Unsecured Creditors*<br> -and-<br>GENOVA BURNS LLC.<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Gregory S. Kinoian, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>Telephone: (973) 230-2095<br>Fax: (973) 533-1112<br>Email: DStolz@genovaburns.com<br>       DClarke@genovaburns.com<br>       GKinoian@genovaburns.com<br>*Proposed Local Counsel for the Official Committee of Unsecured Creditors* | BROWN RUDNICK LLP<br>Stephen D. Palley, Esq.<br>601 Thirteenth Street, NW<br>Washington, DC 20005<br>Telephone: (202) 536-1700<br>Fax: (202) 536-1701<br>Email: spalley@brownrudnick.com |
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>             Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>Jointly Administered |

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC. (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

64944747 v6
64956290 v1

**LIMITED OBJECTION AND RESPONSE OF
THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR
WITHDRAWALS FROM WALLET ACCOUNTS, (B) UPDATE THE USER
INTERFACE TO PROPERLY REFLECT TRANSACTIONS AND ASSETS
AS OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE
RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 cases of BlockFi, Inc. and its affiliated debtors (collectively, the "**Debtors**," the "**Company**," or "**BlockFi**") respectfully submits this Limited Objection and Response to:

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief*, dated December 19, 2022 [Docket No. 121] (the "**Motion**");[2] and

- *Debtors' Statement with Respect to the Wallet Withdrawal Motion,* dated January 20, 2023 [Docket No. 339] (the "**Statement**").

In support of this Limited Objection and Response, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. To clear up any confusion caused by the Statement, here is precise articulation of the Committee's position on the Motion: Releasing wallet funds to account holders is a good idea, and one that the Committee supports; but, there are certain legal issues that need to be worked through; if the Debtors and the Committee work cooperatively and diligently together, we should be able to achieve consensus as to how wallet funds can and should be returned promptly.

2. The aforementioned legal issues stem from two concerns: transfers into wallet accounts that may be avoidable preferences, and a dispute as to the occurrence or validity of certain

---

[2] Capitalized terms used in this Limited Objection but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

purported transfers. The Committee's position has been that the Debtors should promptly release all wallet accounts that do not raise these issues, holding back – for a short period, to allow for further analysis – wallet funds implicating these concerns. The Committee thought this would not be controversial, given a recent ruling on this very issue in the *Celsius* Chapter 11 case (discussed herein) directing a similar approach.

3. Turns out, the Committee's position annoyed the Debtors, which – without advance warning – filed the Statement. The Statement reads more like a temper tantrum than a thoughtful exposition of legal analysis, and the Committee remains puzzled by this unnecessary pleading. Regardless, the Statement does not accurately reflect the Committee's (i) attitude toward the Motion, (ii) negotiating posture with respect to same, or (iii) how the Committee believes the matter should be resolved. The Committee remains of the view that wallet funds should be released, except where further analysis is needed; and, for those wallet accounts requiring incremental analysis, for just a short period to conduct it.[3]

4. Two weeks ago, the Committee advanced a proposed procedure and timeline for resolving potential issues respecting the wallet accounts, but the Debtors rejected it out of hand citing "technical" obstacles. The Committee did not then, and still does not now, understand the "technical" obstacles. The Committee remains willing to listen, learn, and adjust as reasonably necessary. The Debtors, however, abruptly ended any further discussion on the topic, opting instead to file the Statement.

5. The Committee's suggested approach is reflected in the proposed form of Order attached hereto as <u>Exhibit A</u>. This, again, follows the model directed by Bankruptcy Judge Martin

---

[3] It is worth observing that the Committee includes members that have wallet accounts.

Glenn in the *Celsius* Chapter 11 case. The Committee will continue to keep the phone line open, in case the Debtors want to start talking again.

## RELEVANT FACTUAL BACKGROUND

**I.     General Case Background.**

6.     On November 28, 2022 (the "**Petition Date**"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

7.     On December 21, 2022, the Office of the United States Trustee appointed the Committee. *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 130].

**II.    Company Background.**

8.     BlockFi is a cryptocurrency financial services company. It historically offered, in essence, three products:

(i)    A "Wallet Account" for cryptocurrency storage, by which clients retain full legal title to cryptocurrency held therein;

(ii)   Cryptocurrency trading services, with BlockFi acting as intermediary to crypto markets and collecting a spread against prices available to clients; and

(iii)  Cryptocurrency lending services, funded in some part through retail client deposit accounts such as BIA, by which clients were promised healthy interest rates in exchange for an agreement to transfer title to deposited cryptocurrency to BlockFi for redeployment.

9.     BlockFi's initial disclosures indicate that the Company made its money primarily by point (iii) above: In essence, the Company profited from the spread in interest it collected on

4

loans to third-parties and interest it was obligated to pay on BIAs and similar client deposits.[4] This is risky business, as anyone with rudimentary awareness of America's historical banking industry (e.g., the 1929 bank runs, the 1980's "S&L" crisis, and the 2008 collapse of Washington Mutual) would readily know. Compound that risk with wide value swings in a relatively new cryptocurrency ecosphere.

10. BlockFi, nevertheless, deployed what it described as "best-in-class" client protections, such as (a) policies and protections empowering clients to transfer assets (including accrued interest as paid) from BIAs "immediately" and receive confirmation thereof and (b) terms of service empowering BlockFi to halt trading at will. But, interestingly, BlockFi did not have the capacity to immediately halt transfers on its User Interface. More on this shortly.

11. Following a 2022 settlement with the SEC, BlockFi entered into new terms of service requiring BIA withdrawals into a Wallet Account before any external transfer. Clients were told transfers from BIAs into wallets would be processed "instantly."[5] BlockFi then sent transfer confirmations via email and via web and mobile apps (the User Interface). BlockFi also tracked the transfers on an internal ledger. Motion ¶ 19.

## III. Company Operations and Market Instability.

12. In 2021, cryptocurrency trading levels fell significantly since their market peak in November 2021. Price declines led to client withdrawals across numerous virtual asset service providers. In some cases, these withdrawals stressed insolvent actors, such as FTX and its affiliates

---

[4] For purposes of this Limited Objection, "BIA" shall refer to all such interest-bearing accounts with similar features, including the ability to transfer deposited funds and accrued interest to a Wallet Account as relevant to the Motion. The Debtors' initial disclosures describe a number of products with similar features, including for instance those offered to institutional investors with bespoke terms. The differences between the products are not material to the Motion and this Limited Objection.

[5] Interest Account Terms (Non-US), available at https://blockfi.com/interest-account-terms, Section E.1; Interest Account Terms (Existing-US), available at https://blockfi.com/interest-account-terms-existing-us, Section C.1.

(which are alleged to have misappropriated customer funds) and Celsius and Voyager (which operated a business model like BlockFi's). These entities did not have sufficient cryptocurrency to satisfy withdrawals and are believed to have incurred billions of dollars in losses. They and many other entities in the cryptocurrency industry, including certain borrowers under BlockFi loans, have defaulted.

13. This constrained BlockFi's liquidity.[6] On June 30, BlockFi and FTX entered into the FTX Loan Agreement, which provided BlockFi with up to $400 million in new money financing. Shortly thereafter, the Debtors drew $275 million on the facility with FTX. The Debtors relied heavily upon this financing – and the prospect of an additional $125 million draw – to continue operations through and after 2022.[7]

14. BlockFi had other exposure to FTX. BlockFi lent at least $680 million to FTX-associated hedge fund, Alameda Research, and held another $350 million on the FTX exchange for (presumably) trading purposes.[8] Certain of the Alameda Research loans were later guaranteed and secured by the property of Emergent Fidelity Technologies LTD, another entity associated with FTX and its principals.[9]

15. In sum, by November 2022, BlockFi was dependent on FTX and Alameda Research for its continuing operations.

16. On November 2, 2022, a leaked balance sheet for Alameda Research suggested to the public that the hedge fund's reserves consisted largely of FTX's in-house reward token (FTT),

---

[6] *See Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 17] (the "First Day Declaration") ¶¶ 3-5, 81-91. The Committee is investigating this assertion.

[7] *See* First Day Declaration ¶¶ 71, 89-91;

[8] *See* First Day Declaration ¶ 96; Hr'g. Tr. Nov. 29, 2022 at 32:19-25.

[9] On January 6, 2022, the United States Department of Justice notified the Court of its seizure of the subject property, indicating that competing claims may be subject of a forfeiture proceeding. Docket No. 203. FTX has stated a competing claim, contested by former CEO Sam Bankman-Fried. *See In re FTX Trading Ltd.*, Case No. 22-11068-JTD (Bankr. D. Del.), Docket Nos. 291, 387.

in an amount far greater than had ever been or ever could be traded. In other words, Alameda had no ability to liquidate its reserves and satisfy its obligations on demand.

17. On November 6, 2022, the CEO of Binance, an FTX competitor holding an additional tranche of FTT tokens, publicly announced a loss of confidence in the token - and by extension, Alameda and the FTX exchange itself.[10] On November 9, 2022, after a series of combative Twitter exchanges between the principals of Binance and FTX, Binance permanently backed away from FTX.[11] The same day, U.S. regulators announced investigations of FTX and Alameda Research.

18. On November 10, 2022, Alameda Research began winding down operations and FTX announced a likely trading pause. FTX filed for bankruptcy protection the next day.

## IV. <u>BlockFi's Platform Pause.</u>

19. The above-mentioned developments appear to have caught BlockFi off guard. Controversy surrounding the Motion relates, in part, to the Company's inconsistent messaging and technological problems in November 2022.

20. On November 10, 2022 at 9:00 a.m. Eastern, the Company announced via Twitter that "BlockFi will remain fully operational on 11/11 and all crypto transactions, including withdrawals, will continue as normal."[12]

---

[10] @cz_binance, Twitter (Nov. 6, 2022),
https://twitter.com/cz_binance/status/1589283421704290306?cxt=HHwWhIDQ4cC2oo4sAAAA.

[11] @binance, Twitter (Nov. 9, 2022),
https://twitter.com/binance/status/1590449161069268992?cxt=HHwWgMDQ7bvFtJIsAAAA.

[12] @BlockFi, Twitter (Nov. 10, 2022),
https://twitter.com/BlockFi/status/1590705864448495616?cxt=HHwWgMCqicmjqZMsAAAA.

21. Nearly 11 hours later, on November 10, 2022 at 8:16 p.m. Eastern,[13] BlockFi announced via Twitter that "we are not able to operate business as usual…we are limiting platform activity, including pausing client withdrawals as allowed under our Terms."[14] In the Motion, BlockFi calls this the "Platform Pause" as of the "Time Stamp" of its Twitter announcement. Only the following day did the Debtors email and post a website notice of the purported Platform Pause to clients. *See* Motion ¶ 3.

22. The Debtors assert that for several days thereafter, their web and mobile apps (i.e., the "User Interface") continued to facilitate apparent withdrawals from BIA and other accounts, but that the Company did not "true up" or update its internal ledgers regarding the same. *See* Motion ¶ 3.

23. BlockFi apparently continued to send confirmation emails and provide app-based statements confirming that withdrawals had in fact occurred.[15] The Debtors state that its "User Interface continued to improperly reflect the completion" of such withdrawals at the time. Motion ¶ 5. BlockFi, nevertheless and throughout this period, affirmatively stated on its website that account balance information provided through the User Interface was accurate.[16]

24. Objections to the Motion filed by individual creditors who attempted withdrawals between November 10 and the Petition Date suggest that the Debtors may have, in fact, processed

---

[13] The Motion appears to incorrectly describe the time stamp of this action. *See* @BlockFi, Twitter (Nov. 10, 2022), *https://twitter.com/BlockFi/status/1590875997351866368?cxt=HHwWgMDT_c3S9pMsAAAA*.

[14] @BlockFi, Twitter (Nov. 10, 2022), *https://twitter.com/BlockFi/status/1590875997351866368?cxt=HHwWgMDT_c3S9pMsAAAA*.

[15] *See, e.g.*, Docket Nos. 184 ¶ 33, 201 ¶ 7, 182-1 ¶ 3 (customer objections to Motion describing confirmations and User Interface messages); *see also* Motion ¶ 5 ("the User Interface continued to improperly reflect the completion of the Attempted Platform Pause Transactions").

[16] *See* BlockFi, Responses to Frequently Asked Questions, Nov. 23, 2022, available at https://blockfi.com/responses-to-frequently-asked-questions.

the withdrawals.[17] These representations, if proven true, certainly complicate the Debtors' assertion that they "immediately…ceased to record transactions" and were "unable to, and did not, effectuate any transactions on the BlockFi platform" during this period. *See* Motion ¶ 4.

25. The Debtors disclose attempted BIA withdrawals of digital assets worth over $375 million following the Platform Pause Time Stamp. Motion ¶ 27. To state the obvious, that is a lot of money. The Debtors have since sold most of the digital assets attributable to BIAs, including those that might be traced to such withdrawals. Notwithstanding variable rates of exchange, the Debtors' present liquid assets are insufficient to satisfy these withdrawals in any denomination based on the Committee's understanding. This is, in sum, a bit of a mess.

## ARGUMENT

### A. The Motion Should Be Granted To Promptly Return Wallet Funds Where There Are No Concerns.

26. It is axiomatic that the Debtors should not withhold other people's property. The Committee does not have reason to contest the formulaic statement that Wallet Accounts are set up to be customer (not BlockFi) property. To the extent assets in any particular Wallet Account are free of concerns regarding potential avoidance or the viability of Attempted Platform Pause Transactions, then by all means they should be returned without delay.

---

[17] *See, e.g.*, *Obj. of Deferred 1031 LLC's to Debtors' Mot. For Entry of Order*, Docket No. 201, at § 4 ("the amount of the claim listed for Deferred 1031 on the Debtors' consolidated list of 50 creditors reflects exactly the amount of Deferred 1031's BIA account after giving effect to the transfer").

9

### B. The Court Should Briefly Pause Return Of Wallet Funds Where Presently There Are Issues And Concerns.

#### 1. $375 Million of Post-November 10 Transfers Require Diligence And Analysis.

27. The above-described transaction "pause" was not implemented in a clean way. BlockFi said it would not honor withdrawals off of its platform, but it did not clearly say what it would do respecting requested transfers from BIAs to Wallet accounts (it seemingly blocked the former but not the latter). BlockFi also made Twitter statements that may not have been consistent with the underlying user agreements, especially as they may bear on transfer timing.[18]

28. BlockFi allowed transfers on its "front-end" systems, resulting in transfer confirmations delivered to customers during the "post-freeze" period. The vast majority of these transfers may not have been recognized on the "back-end," meaning that a "confirmed" transfer from a BIA into a Wallet account may not have been actually "booked" by the Debtors as actual transfers of legal ownership. This may have legal significance.[19]

29. The Committee has been further advised that few if any assets were segregated for "post-freeze" transfers. There is not, in other words, money sitting in an account earmarked for these Wallet transfers. So, if they are all such transfers are now honored, there will be insufficient cash to distribute to the transferring Wallet holders.[20]

---

[18] The BIA terms of service provide that "[a]ny withdrawal of principal will be transferred instantly to your BlockFi Wallet and any withdrawal from your BlockFi Wallet will be subject to BlockFi Wallet Terms." *See* https://blockfi.com/interest-account-terms-existing-us.

[19] *See, e.g., Barnhill v. Johnson*, 503 U.S. 393 (1992) (holding that for purposes of a transfer by ordinary check, the transfer occurred at the point when both the transferor directed the drawee bank to honor the check and the drawee bank in fact honored the check); *see also In re Citibank August 11, 2020 Wire Transfers*, Case No. 20-CV-6539 (JMF) (S.D.N.Y. Feb. 16, 2021), at p. 54, *vacated and remanded on other grounds sub nom Citibank, N.A. v. Brigade Capital Management, LP*, Case No. 21-487 (2d Cir. Sep. 8, 2022) (reasoning that a creditor receiving a mistaken payment was not required to "credit" the books of the debtor to invoke the discharge-for-value defense, as such an approach would lead to excessive litigation and inconsistent outcomes).

[20] It may be that even if transfers were deemed to occur, bankruptcy principles of equitable distribution require that the Court disregard the Attempted Platform Pause Transactions. *See In re Foster*, 275 F.3d 924 (10th Cir. 2001) (court should not employ "tracing fiction" to reward certain creditors with state law constructive

30. The factual record is incomplete and convoluted, and demands substantial legal analysis before any conclusion can be made as to which transfers should be honored and to whom the money should be distributed. This aspect of the relief requested in the Motion should be paused pending further diligence and legal analysis.

### 2. BIA Withdrawals During The Preference Period Require Diligence And Analysis.

31. As indicated in Paragraph 8 above, customers placed funds in BIAs, which generated interest until redeemed by the depositor. BIA customers were, thus, essentially short-term lenders to the Company. Customer redemptions during the preference period thereby require analysis under Section 547. That is true regardless of whether BIA funds were redeemed into Wallet Accounts or directly to the customer; either way, they are arguably preferential payments.

32. Presume for the sake of argument that, as the Debtors contend, the Platform Pause occurred exactly on the Time Stamp. Presume also that BIA holders transferred millions of dollars into Wallet Accounts at 8:14 p.m. on November 10, 2022. Those creditors may be millions of dollars ahead of those who sought to redeem 60 seconds later. In a similar vein, a customer who relied on BlockFi's representations - that a Platform Pause had been enacted and, therefore, did redeem BIA funds after the purported Platform Pause – end up funding the recovery of the opportunist clients who disregarded the purported Platform Pause tweet and did demand transfer out of BIAs. This feels very much like a preference, and that is particularly true for insiders who may have had advance knowledge of the Company's rapidly developing strategy.

33. The relief requested in the Motion should be paused pending further diligence and legal analysis respecting transfers out of BIAs during the relevant preference period.

---

trust claims where their funds were commingled with those of otherwise similarly situated creditors). Again, this Motion is not the vehicle for a determination on this issue.

### 3. The Committee's Proffered Strategy Finds Support In The *Celsius* Chapter 11 Case.

34. The above-described issues were both addressed in *Celsius*, in two phases. The focus of "Phase 1" was (pertinent to this contested matter) whether the Celsius equivalent of Wallet funds were "property of the estate" and, if not, whether the estate could retain such funds that were subject to presumptive preference claims. *Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues*, Case No. 22-10964-MG (Bankr. S.D.N.Y. Oct. 13, 2022) Docket No. 1044 ¶¶ 5-9. "Phase 2" focused on preference defenses. *Id*. ¶¶ 10-12.

35. *Celsius* acknowledged the potential preference problem and proposed a holdback for transfers made from BIA-equivalent accounts within the 90-day preference period, excluding de minimis amounts.[21] Certain creditors objected. Bankruptcy Court Judge Martin Glenn overruled the objections, observing that holding back proceeds of potentially avoidable transfers obviates the need for immediate litigation under Section 547:

> THE COURT: …No one including me was particularly anxious at this stage to see a compulsory counterclaim of avoidable preference and have to deal with that as well at this stage… would you rather that the Debtor or the Committees tomorrow file a compulsory counterclaim against all of your clients for an avoidable preference?…are you going to force the issue that the Debtor or the Committee has to seek substitute standing, you know, STN standing to file preference claims? Are they going to file it as a not only -- well, a class act, defendant class action, so they name every Custody account holder[?]

Hr'g Tr. Dec. 7, 2022 at 163:2-164:5.

36. The Celsius Debtors agreed on the record and stipulated to withholdings for that reason:

---

[21] *Debtor's Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets held in the Custody Program and Withhold Account and (II) Granting Related Relief* ("Celsius Withdrawal Motion"), Case No. 22-10964-MG (Bankr. S.D.N.Y. Sep. 1, 2022), Docket No. 670 ¶ 4.

12

> MR. KOENIG: We have prima facie preference claims…And at some point in the future we may not, depending on how Your Honor rules in the various defenses…We don't know until we get there. So we'd like to hold onto the assets and preserve value until we get there.

*Id.* at 195:15-196:2 (statement of Christopher Koenig for the Debtors).

37. Celsius also made clear in its motion that it was "not seeking to release any Custody Assets or Withhold Assets to any current or former employees or insiders, or affiliates of any current or former employees or insiders."[22] Both the preference exclusion *and* an employee/insider exclusion were incorporated into the Court's final ruling on *Celsius'* motion to authorize the release of certain funds.[23]

38. When providing informal comments on the Motion to the Debtors, the Committee was mindful that *Celsius* involved similar factual and legal issues as are presented in the Motion. The Committee also considered how Judge Glenn analyzed and resolved these issues. The Committee suggested to the Debtors a similar resolution here. Despite the Debtors' rejection of this proposal, the Committee respectfully asks the Court to adopt it.

## **RESERVATION OF RIGHTS**

39. The Committee reserves all rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Limited Objection, to seek discovery, to raise additional objections during any final hearing on the Motion, and to negotiate and document alternative proposals for relief.

---

[22] Celsius Withdrawal Motion ¶ 6.

[23] *See Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief,* Case No. 22 10964-MG (Bankr. S.D.N.Y. Dec. 20, 2022), Docket No. 1767.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court: grant the relief sought in the Motion with the changes described herein and in the form attached hereto as Exhibit A.

Dated: January 24, 2023

By: */s/ Daniel M. Stolz* .
**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 230-2095
Fax:           (973) 533-1112
Email:      DStolz@genovaburns.com
                DClarke@genovaburns.com
                GKinoian@genovaburns.com
*Proposed Local Counsel for the Official
Committee of Unsecured Creditors*


By: */s/ Kenneth J. Aulet* .
**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Kenneth J. Aulet, Esq.
Bennett S. Silverberg, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Fax:           (212) 209-4801
Email:       rstark@brownrudnick.com

601 Thirteenth Street, NW
Washington, DC  20005
Telephone: (202) 536-1700
Fax:                  (202) 536-1701
Email:       spalley@brownrudnick.com
*Proposed Counsel for the Official
Committee of Unsecured Creditors*