

**Declaration of Mohsin Meghji, M3 Partners**

*January 2023*

**Experience. Alignment. Results.**

# Biography

I, Mohsin Y. Meghji, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

I am the Managing Partner of M3 Partners, L.P. ("M3"), a financial advisory firm with principal offices at 1700 Broadway, New York, NY 10019, and a proposed financial advisor to the Official Committee of Unsecured Creditors (the "Committee") of the above-captioned Debtors.

I submit this declaration (the "Declaration") in support of The Official Committee of Unsecured Creditors' Supplemental Objection to Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief [Docket 310] (the "Supplemental KERP Objection") and in support of The Official Committee of Unsecured Creditors' Objection to Application of the Debtors and Debtors in Possession for Entry of an Order Authorizing the Retention and Employment of Moelis & Company LLC [Docket No. 279] (the "Moelis Objection"), and in opposition to Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief [Docket No. 21-1] (the "KERP Motion") and to the Application For Retention of Professional Moelis & Company LLC as Investment Banker, Capital Markets Advisor, and Financial Advisor Effective as of the Petition Date [Docket No. 139] (the "Moelis Retention Application").

I am an experienced restructuring professional who has extensive experience in providing restructuring advisory and consulting services across a variety of different industries for over 25 years.  I have a comprehensive understanding of the complex and diverse operational and financial issues that businesses operating in chapter 11, as well as their stakeholders, navigate on their path towards reorganization, sale or liquidation.  My prior experience encompasses a broad range of restructuring related services for debtors, creditors, equity holders, official committees and other stakeholders, including on complex restructuring matters across multiple crypto restructuring and workout transactions. This experience includes: (i) developing, implementing and evaluating business plans; (ii) developing, executing and assessing turnaround strategies; (iii) implementing financial and operational restructurings and debt reorganizations; (v) managing negotiations with companies and stakeholders; (vi) assessing and stabilizing business operations; (vii) improving and managing liquidity; and (viii) providing testimony, as appropriate.

I have advised parties in a variety of capacities, including as CRO and as a financial advisor to Official Committees of Unsecured Creditors, on numerous Chapter 11 cases, including: In re Celsius Network., No. 22-10964 (MG) (Bankr. S.D.N.Y.); In re Barneys New York, Inc., No. 19-36300 (CMG) (Bankr. S.D.N.Y.); In re Sears Holdings Corporation, No. 18-23538 (RDD) (Bankr. S.D.N.Y.) (ECF No. 814); In re Neiman Marcus Group LTD LLC, et al., No 20-32519 (DRJ) (Bankr. S.D. Texas); In re Sanchez Energy Corporation, et al., No. 19-34508 (MI) (Bankr. S.D. Tex.) (ECF No. 704); In re Real Industry, Inc., No. 17-12464 (KJC) (Bankr. D. Del.); and In re Capmark Fin. Grp. Inc., No. 09-13684 (CSS) (Bankr. D. Del.) (ECF No. 451).

Unless otherwise specified, all facts and opinions set forth in this Declaration are based on personal knowledge, information I have received from the Debtors' management team and the Debtors' advisors, from M3 employees working under my supervision, my review of relevant documents and information, and my decades of relevant experience. If called upon to testify, I would testify competently to the facts and opinions set forth in this Declaration. I am over 18 years old and authorized to submit this Declaration on behalf of the Committee.

# Executive Summary

**The Debtors seek permission to spend $21.3 - $24.3 million in estate resources on investment banking transaction fees and an employee retention plan for the option to pursue a sale process and a potential reorganization of the business. This spend is in addition to the Debtors' projected operating cash burn and significant other professional fee spend, and for a business which is presently frozen. The Debtors have not presented a business plan or identified potential costs and capital needs of such a plan, which are necessary to understand the rationale for pursuit of this option. Key challenges posed by the Debtors' restructuring and sale process, include, among others:**

1. Limited digital assets remain to facilitate a platform transaction

2. The Debtors seek to pay $12.3MM in retention payments to their employees despite limited operations

3. The Debtors' proposed employee retention plan is broader and more expensive than other crypto cases

4. There is a limited customer base left to monetize

5. Similar crypto bankruptcy cases have not resulted in realized material "platform value"

6. Sale processes entail significant cost and time in bankruptcy

# 1 Limited digital assets remain to facilitate a platform transaction

The table to the right depicts assets by type and potential treatment in a transaction, marked to EOD 1/14/23 prices by the Debtors, and further adjusted for Debtor estimates of unrealizable amounts as of 1/19/23

The only liquid coin assets available to be tra████████ a platform sale total ████████ as of 1/14/23 prices

On November 10, 2023 the Company froze platform operations; prior to filing, it also converted certain of its owned cryptocurrency to $238.9MM in cash

| Asset Category, $MM | Debtor provided | | | Total Adjusted Breakdown | | | |
|---|---|---|---|---|---|---|---|
| | Total Unadjusted | Illustrative Adj.[1] | Total Adjusted | Liquid / To Be Distributed | Sale / Keep | Platform Assets | Total |

## ② The Debtors seek to pay $12.3MM in retention payments to their employees despite limited operations

The Debtors' proposed plan covers all non-executive ▮▮agement or approximately ▮▮ of the remaining workforce and approximating ▮▮ of total annualized pay

These retention programs provide an average payment of $104k for key employee retention program participants and $76k for target retention program participants



| Division | Workforce At 1/1/22 | Current Workforce | Current Annual Salary | Current Avg. Cost Per Employee | Total - Retention Plans | | |
|---|---|---|---|---|---|---|---|
| | | | | | # | $ | % of Base |
| Executive[1] | ▮ | 13 | $5,968,300 | $459,100 | – | – | – |
| Client Success | | | | | | | |
| Engineering | | | | | | | |
| Finance | | | | | | | |
| Growth | | | | | | | |
| Institutions | | | | | | | |
| Legal & Compliance | | | | | | | |
| Operations | | | | | | | |
| People | | | | | | | |
| Private Client | | | | | | | |
| Product | | | | | | | |
| Risk | | | | | | | |
| Security | | | | | | | |
| **Total** | ▮ | **135** | | | | | |

(1) Executive salaries per Schedule of Assets and Liabilities for BlockFi Inc. pages 22 and 23
Source: BlockFi Retention Programs Motion filed November 28, 2022, ▮▮▮▮▮▮

# 3  The Debtors' proposed employee retention plan is broader and more expensive than other crypto cases

The Debtors' proposed plan costs twice as much per employee as in Voyager and Celsius ($99k versus $47-48k)

The proposed plans also include 3.2-3.8x as many workers (as a percentage of workforce included) based on employees at petition date, and ▮▮▮▮▮ larger based on workforce active at the time of the retention programs

The Tier 1 target of 50% of base salary is more than double Voyager's payment, ▮▮▮▮▮▮▮▮ and 43% higher than Celsius' rate (35% of base salary). ▮▮▮▮▮▮▮▮

The Debtors have not provided rationale for why the proposed plans are larger than comparable crypto cases

($ in 000's)

| | | Celsius[1][2][3] | Voyager[4][5] | BlockFi[6] |
|---|---|---|---|---|
| **Headcount** | Employees Pre-Filing | 900 | NA | ▮▮▮ |
| | Employees at Petition Date | 670 | 328 | 374 |
| | Employees at Retention Plan Filing | 167 | 328 | ▮▮▮ |
| | Retention Plan Participants | 59 | 34 | 125 |
| **Salary** | Total Annual Salary for Retention Plan Participants | $9,600 | $7,111 | ▮▮▮ |
| | Average Annual Salary for Retention Plan Participants | $163 | $209 | ▮▮▮ |
| **Costs** | Total Employee Retention Program Costs | $2,840 | $1,600 | $12,326 |
| | Average Retention Program Cost Per Participant | $48 | $47 | $99 |
| **Plan Participants** | Participants as % of Employees at Petition Date | 8.8% | 10.4% | 33.4% |
| | Participants as % of Employees at Retention Plan Filing | 35.3% | 10.4% | ▮▮▮ |
| **% of Base Salary Paid** | Tier 1 Payout | 35.0% | 22.5% | 50.0% |
| | Tier 2 Payout | 25.0% | NA | 10.0% |
| | Tier 3 Payout | 15.0% | NA | NA |
| **% of Participants Per Tier** | Tier 1 % | 35.6% | 100.0% | 88.8% |
| | Tier 2 % | 44.1% | NA | 11.2% |
| | Tier 3 % | 20.3% | NA | NA |

*Footnotes:*

(1)  *Sources include original and revised Key Employee Retention Plan motion (DKT #1426 and #19), Alex Mashinsky First Day Presentation*

(2)  *Celsius' total annual salary reflects the midpoint of participant salary ranges per docket #1426 Exhibit B*

(3)  *Percentage of participants included in each tier is estimated based on award as a percentage of base salary as outlined in Exhibit B of Celsius Docket #1426*

(4)  *Sources include Voyager docket #330*

(5)  *Average annual salary estimated as (total program cost / 22.5% of base salary awarded) divided by* ▮▮▮▮▮▮▮▮▮▮▮▮

*BlockFi sources include: BlockFi docket #21,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6

# ④ There is a limited customer base left to monetize

██████ of customers have an account balance of under $1k

There remain only ██████ users with balances over $1k to monetize in a potential reorganization or platform sale

**Retail Clients by Tier**
*Calculated over period 5/15/22-11/15/22*

*($ in 000's)*

| Tier | Clients | % of Clients | % Cumulative Clients | Average cumulative daily balance (BIA+BPC+Wallet) over L6M | Cumulative L6M Deposit Volume | Cumulative L6M Withdrawal Volume | Cumulative L6M Net Activity | Cumulative L6M Trading Volume | Cumulative L6M Trading Revenue |
|---|---|---|---|---|---|---|---|---|---|
| below $1K | | | | | | | | | |
| $1k to $10K | | | | | | | | | |
| $10K to $50K | | | | | | | | | |
| $50K to 250K | | | | | | | | | |
| $250K to $1M | | | | | | | | | |
| over $1M | | | | | | | | | |
| **Total** | | | | | | | | | |

*Source: Company information prepared for potential sale process -*

**⑤ Similar crypto bankruptcy cases have not resulted in realized material "platform value"**

| | | BlockFi | Cred | Voyager | Celsius |
|---|---|---|---|---|---|
| **Key Client Offerings[1]** | Custody | ✓ | | | ✓ |
| | Interest-Bearing Accounts | ✓ | ✓ | ✓ | ✓ |
| | Retail Loan | ✓ | ✓ | | ✓ |
| | Institutional Loan | ✓ | ✓ | ✓ | ✓ |
| | Other Deployments | ✓ | | ✓ | ✓ |
| | Native Token | | | ✓ | ✓ |
| | Trading/Brokerage | ✓ | | ✓ | ✓ |
| **Selected Stats** | Total Assets: Petition Date[2] | ■■■■■ | $69MM (11/7/20) | $2,335MM (7/1/22) | $4,310MM (7/13/22) |
| | Crypto Assets: Petition Date[3] | ■■■■■ | $12MM (12/30/20 as proxy) | $1,300MM (7/5/22) | $1,750MM (7/13/22) |
| | Headcount: Petition Date[4] | 374 (pre-RIF) | 20 | 328 | 670 |
| **Sale Process[5]** | | • Marketing processes in various stages of preparation and execution | • Marketing process was pursued, pursuant to RSA with a "toggle" to a liquidating plan, and was ultimately terminated<br>• Implemented liquidating plan of reorganization | • FTX transaction terminated<br>• Binance APA provides consideration of $20MM, and obtain crypto assets at FMV (~$1.002B @ 12/19/22) for Voyager customers onboarded | • Sale process ongoing<br>• Sale process timeline has been extended multiple times |
| **Key Dates[6]** | | • Petition Date 11/28/22<br>• Bidding procedures motion filed 1/9/23<br>• Bidding procedures motion provides for 6/19/23 confirmation hearing | • Petition Date 11/7/20<br>• Bidding procedures motion filed 1/18/20<br>• Confirmation date 3/11/21<br>• Effective date 4/19/21 | • Petition Date 7/5/22<br>• Executed FTX APA 9/27/22, and filed stipulation to terminate the agreement 12/9/22<br>• Entered into Binance APA 12/18/22; implement via POR | • Petition Date 7/13/22<br>• Original bidding procedures motion filed 7/25/22 |
| **Transaction Fees[7]** | | • Moelis<br>• $8MM - $9MM; excludes separate fees on non-core asset sales | • Teneo<br>• No transaction fees payable | • Moelis<br>• $11MM | • Centerview<br>• $12MM; excludes separate fees on non-core asset sales |

*Sources and footnotes contained in the following page*

# 5 Footnotes on similar crypto bankruptcy case comparison

(1) Client offerings notes:
    i.   BlockFi: Source – First Day Declaration (docket #17)
    ii.   Cred: Source – First Day Declaration (docket #12), Amended Disclosure Statement (docket #380)
    iii.   Voyager: Source – First Day Declaration (docket #15). Other deployments include staking, and other private investments
    iv.   Celsius: Source – First Day Declaration (docket #23). Other deployments include staking, crypto mining, and various other investments

(2) Total assets as of petition date notes:
    i.   BlockFi: ████████████████████████████████████████████████████████
    ii.   Cred: Source – Disclosure Statement (docket #301). Book value of total assets as of petition date (11/7/20)
    iii.   Voyager: Source – Press Release dated 7/1/22 includes crypto assets held, crypto assets loaned, cash held for customers and crypto collateral received/held (PR Newswire; distributed by Voyager Digital Ltd.)
    iv.   Celsius: Source – First Day Declaration (docket #23)

(3) Crypto assets as of petition date notes:
    i.   BlockFi: ████████████████████████████████████████████████████████████████████
    ii.   Cred: Source – Disclosure Statement (docket #301). Cryptocurrency holdings displayed as of 12/31/20, as a proxy for petition date holdings. Reflects liquid Cryptocurrencies of $5.3MM and illiquid Cryptocurrencies of $6.5MM ($11.8MM in aggregate), as defined therein.
    iii.   Voyager: Source – Voyager First Day Presentation dated 7/8/22
    iv.   Celsius: Source – Celsius First Day Presentation dated 7/18/22. Crypto asset pricing as of 7/14/22. Excludes CEL Tokens

(4) Headcount as of petition date notes:
    i.   BlockFi: Source – First Day Declaration (docket #17). Includes 292 employees and 92 independent contractors, two-thirds of whom received WARN notices prior to the petition date
    ii.   Cred: Source – Wages Motion (docket #11)
    iii.   Voyager: Source –  Motion (docket #330), the Wages Motion incorrectly stated Voyager had 351 employees as of the petition date, this was subsequently corrected in footnote 5 of the Key Employee Retention Plan Motion
    iv.   Celsius: Source – Wages Motion (docket #19)

(5) Sale process notes:
    i.   BlockFi: ██████████████████████████████
    ii.   Cred: Source – Bidding Procedures (docket #65), Confirmation Order (docket #629), Notice of Effective Date (docket #730)
    iii.   Voyager: Source – Second Amended Disclosure Statement (docket #863)
    iv.   Celsius: Source – Various pleadings and orders (docket nos.188, 687, 929, 1046, 1060, 1110, 1713)

(6) Key dates notes:
    i.   BlockFi: Source – Bidding Procedures (docket #226)
    ii.   Cred: Source – Bidding Procedures (docket #65), Confirmation Order (docket #629), Notice of Effective Date (docket #730)
    iii.   Voyager: Source – Second Amended Disclosure Statement (docket #863)
    iv.   Celsius: Source – Various pleadings and orders (docket nos.188, 687, 929, 1046, 1060, 1110, 1713)

(7) Banker transaction fee notes:
    i.   BlockFi: Source – Moelis retention application (docket #139) – reflects Restructuring Fee, reflecting proposed fees for a Restructuring or a platform sale that represents a Restructuring Transaction and a Sale Transaction.
    ii.   Cred: Source – Teneo retention order (docket #261) – no sale was consummated, and no restructuring transaction fee applied. Sale Fee formulation: (i) for transactions under $10mm Enterprise Value (TEV): 6% of TEV and (ii) for transactions over $10mm TEV: the greater of 4% of TEV or $600,000 minimum fee
    iii.   Voyager: Source – Moelis retention order (docket #299) – reflects Restructuring Fee, reflecting fees for a Restructuring or platform sale that represents a Restructuring Transaction and a Sale Transaction.
    iv.   Celsius: Source - Centerview retention order (docket #846) – reflects (i) $12MM Restructuring Fee and (ii) no Sale Transaction Fee payable; Sale Transaction Fee for a Platform Sale is calculated as1.5% of Aggregate Consideration (but no fees payable on account of any sale of cryptocurrency assets or alternative investments); Any Sale Transaction Fees are subject to 50% crediting in excess of $7.5MM)

████████████████████████████████████████

9

# 6  Sale processes entail significant cost and time in bankruptcy

The table at right depicts operating and non-operating cash usage based on the Debtors 13-week cash forecast, with estimated cash flows thereafter based on projected run-rates and Debtor guidance

Cash flows have been analyzed assuming illustrative case timelines between six and twelve months, which result in a range of cash usage of ▮▮▮

| ($ in MM's) | Six Months | Nine Months | Twelve Months |
|---|---|---|---|
| Operating Receipts[1] | | | |
| Operating Disbursements[1] | | | |
| Net Operating Cash Flow[1] | | | |
| Professional Fees[2] | | | |
| Investment Banking Transaction Fees[3] | (12.0) | (12.0) | (12.0) |
| Employee Retention[4] | (12.3) | (12.3) | (12.3) |
| Other Non Operating Outflows[5] | | | |
| **Net Cash Flow (Burn)** | | | |
| Adj. Control Assets[6] | | | |
| Net Cash Burn as a % of Control Assets | | | |
| Professional Fees as a % of Total Cash Outflow[7] | | | |

3.  Assumes payment of Restructuring Fee + $4MM (cap amount) for non-core asset sales
4.  Assumes full $12.3MM retention program costs paid

# Conclusion

- The Debtors seek permission to spend $21.3 - $24.3 million in estate resources on investment banking transaction fees and an employee retention plan for the option to pursue a sale process and a potential reorganization of the business
  - This spend is in addition to the Debtors' projected operating cash burn and significant other professional fee spend, and for a business which is presently frozen

- While a sale or reorganization may be feasible, the extent of the ultimate recovery to creditors is unclear:
  - No business plan or valuation has been provided outlining what a reorganized company could mean or the costs and capital needs of that plan
  - The proposed retention plan does not explain which employees are needed to reorganize versus to sell the platform

- Crypto market conditions make it unclear that there will be sufficient return for these expenditures:
  - Voyager achieved a $20 million sale by transferring approximately $1 billion of digital and other assets – BlockFi has less than ███ of Voyager's platform assets as presented in this report, while the proposed investment banking fees are nearly equal
  - While there are over approximately ███ retail clients, ███ had an account balance under $1k, leaving a much smaller customer base around which to reorganize or monetize

- Decisions on retention programs and investment banking transaction fees should be made in coordination with the Committee in the context of a proposed business plan:
  - Ensuring the personnel critical to executing that business plan or restructuring are retained
  - Aligning fee structures to performance and value created for creditors

*Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.*

/s/ Mohsin Y. Meghji
_____
Mohsin Y. Meghji
Managing Partner, M3 Partners

# Appendix: Supplemental Analysis of Debtor Proposed KERP and TRP

# Supplemental Analysis of Debtor Proposed KERP and TRP: Summary

On November 28, 2022, BlockFi (the "Debtor") filed the Motion regarding its Retention Programs, seeking authority to provide a retention program to 127 of its remaining employees for a total of $12.3MM

113 employees would receive retention bonuses of 50% of base salary and 14 employees would receive retention bonuses of 10% of base salary

**General Background**

- In July 2022, the company awarded a retention program to key employees ▮▮▮▮▮ elated to the FTX transactions to secure the workforce through February 2023, subject to achievement of certain company-wide goals[1] for a total of approximately ▮▮▮▮ - - no payments were made as they were due in February 2023

- BlockFi has proposed a $12.3MM retention plan covering ▮▮▮ of the present workforce (post-RIF completed at filing)

    - KERP – represents payments to 95 employees that were previously part of the legacy bonus programs

    - TRP – represents payments to 32 people not previously included in the legacy bonus programs

- The remaining employees not included in the program represent executive management (as defined by the Debtors)

**Review of Comparable Plans**

- As part of the review of the Debtors' plans, M3 analyzed the comparable set used by the Debtors' advisors Willis Towers Watson (WTW), as well as recent crypto related cases. The proposed plans are materially more expansive and expensive than comparable cases[2]:

    - It should be noted that the retention plans presently contemplated represents approximately ▮▮▮ *of the July 2022 retention program population, but* ▮▮▮ *of its cost*

    - BlockFi proposes bonuses for ▮▮▮ of remaining workers, versus 7-34% in the comparable set (25th-75th percentile)

    - Average payout of ~$99k per person, versus $24-44k in the comparable set (25th-75th percentile)

    - Total plan cost of ▮▮▮▮▮▮ assets[3] versus ▮▮▮▮▮▮ the comparable set (25th-75th percentile)

- Approximately ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, while ▮▮▮▮▮ of retention payments are being made available to senior personnel

*(1) Source: January 9, 2023 Status Conference Presentation*
*(2) Comparable cases based upon benchmark conducted by WTW for the Debtors*

# BlockFi Retention Plan Requests by Seniority and Level



The tables exclude 13 insiders with base salaries averaging $459k

## Summary by Salary Range

| Salary Range | Headcount | Average Salary | Retention Target |
|---|---|---|---|
| >$400K | | | |
| $300-400K | | | |
| $200-300K | | | |
| $100-200K | | | |
| <$100K | | | |
| **Total** | | | |

## Summary by Level
*(Higher Number is More Senior)*

| Salary Range | Headcount | Salary | Average Salary | Retention Target |
|---|---|---|---|---|
| L11 | | | | |
| L10 | | | | |
| L9 | | | | |
| L8 | | | | |
| L7 | | | | |
| L6 | | | | |
| L5 | | | | |
| L4 | | | | |
| L3 | | | | |
| L2 | | | | |
| **Total** | | | | |

# Retention Plan Benchmarking

As part of the benchmarking exercise, the WTW and recent crypto comparable plans were reviewed in terms of key metrics including plan costs to assets, plan cost per person, and percentage of workforce included in the plan

Applying comparable metrics at the 50th and 75th market percentile to the BlockFi situation, results in estimated plan costs ranging from

**Summary of Retention Plan Benchmarking Sample(1)**



**Plan Cost per Person**

| | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|
| | $23,810 | $35,575 | $44,000 |

**% of Workforce Included(2)**

| | 25th Percentile | Median | 75th Percentile |
|---|---|---|---|
| | 7.4% | 15.0% | 34.2% |

**% of Plan Costs to Assets**

**Pro Forma BlockFi Revised Retention Cost**

| Benchmarking Metric | BlockFi | Market Percentile 50th | Market Percentile 75th | Value Multiple Measure | Value Multiple Unit | Potential Plan Cost (Rounded) 50th | Potential Plan Cost (Rounded) 75th |
|---|---|---|---|---|---|---|---|
| Plan as % of Current Workforce(A) | | 15.0% | 34.2% | | Total workforce | | |
| Plan Cost per Participant(B) | | $35,575 | $44,000 | | Plan participants | | |
| Plan as % of Assets (Excl. Cash & Wallet)(C) | | | | | | | |
| Plan as % of Assets (Incl. Cash & Wallet)(D) | | | | | | | |
| **Minimum** | | | | | | | |
| **Average** | | | | | | | |
| **Maximum** | | | | | | | |

*Calculation Math:*
(A) Market percentile plan as % of current workforce * total workforce * ▓▓▓ er participant
(B) Market cost per participant * actual plan participants
(C) Market plan as % of assets * adjusted assets
(D) Market plan as % of assets * unadjusted assets

*Footnotes:*
(1)    Retention plan benchmarking based on WTW report
(2)    % of workforce included accounts for RIFs after filing, where applicable
Source: Company information, WTW Report, court dockets

# Additional Schedules

# People Excluded from Retention Plans

Employees excluded from the Retention Plans include executives, department heads, and BlockFi's in-house counsel

BlockFi's executives received monthly salaries totaling $347k in early 2022 and received raises following the failed FTX transaction

Executive salaries increased 43% following the failed FTX transaction, an increase to BlockFi's burn rate of ~$151k per month

| Name | Role | Function | Pre-FTX Salary | Current Salary[1] | % Inc. | Monthly Salary Pre-FTX | Monthly Salary Current | Inc. to Burn Rate ($) | Inc. to Burn Rate (%) |
|------|------|----------|----------|-----------|--------|---------|---------|-----------|-----------|
| Zac Prince | CEO and Board Member | Executive | $250,000 | $400,000 | 60.0% | $20,833 | $33,333 | $12,500 | 60.0% |
| Flori Marquez | Chief Operating Officer | Executive | 225,000 | 500,000 | 122.2% | 18,750 | 41,667 | 22,917 | 122.2% |
| Amit Cheela | Chief Financial Officer | Executive | 282,000 | 562,000 | 99.3% | 23,500 | 46,833 | 23,333 | 99.3% |
| Jonathan Mayers | General Counsel | In-House Counsel | 350,000 | 562,500 | 60.7% | 29,167 | 46,875 | 17,708 | 60.7% |
| Yuri Mushkin | Chief Risk Officer | Executive | 440,000 | 550,000 | 25.0% | 36,667 | 45,833 | 9,167 | 25.0% |
| Adam Healy | Chief Security Officer | Executive | 420,000 | 525,000 | 25.0% | 35,000 | 43,750 | 8,750 | 25.0% |
| Alexander Grigoryan | Chief Technology Officer | Executive | 350,000 | 500,000 | 42.9% | 29,167 | 41,667 | 12,500 | 42.9% |
| Brian Oliver | General Manager of Institutions | Department Head | 400,000 | 500,000 | 25.0% | 33,333 | 41,667 | 8,333 | 25.0% |
| Robert Loban | Chief Accounting Officer | Executive | 300,000 | 400,000 | 33.3% | 25,000 | 33,333 | 8,333 | 33.3% |
| Andrew Tam | Chief Marketing Officer | Executive | 300,000 | 375,000 | 25.0% | 25,000 | 31,250 | 6,250 | 25.0% |
| Megan Crowell | Chief People Officer | Executive | 270,000 | 375,000 | 38.9% | 22,500 | 31,250 | 8,750 | 38.9% |
| Shannon Allmon | General Manager of Retail | Department Head | 300,000 | 375,000 | 25.0% | 25,000 | 31,250 | 6,250 | 25.0% |
| David Spack | Chief Compliance Officer | Executive | 275,000 | 343,800 | 25.0% | 22,917 | 28,650 | 5,733 | 25.0% |
| **Total** | | | **$4,162,000** | **$5,968,300** | **43.4%** | **$346,833** | **$497,358** | **$150,525** | **43.4%** |

*(1) Current salaries reflect salary increases following the FTX transaction as well as any salary increases related to promotions*

*Source: Company information, BlockFi statements & schedules*

17

# BlockFi Adjusted Assets for Plan Benchmarking

(1)   Control Assets as defined in 1.19.23 UCC Advisor Update Deck, including company / advisor adjustments for collectability based on Debtor guidance; assets do not reflect any intercompany receivables or payables between legal entities. See additional footnotes on page 3

18

# Retention Plans Benchmarking

Relative to the benchmark cases, BlockFi's proposed Retention Plans command a substantial premium across a number of metrics including plan cost per person, participants as a percentage of current workforce, as well as plan as a percentage of assets

Companies in the benchmark include peers from the WTW KERP benchmark plus recent crypto cases (Celsius and Voyager Digital)

| Company | Total Employees At Filing | Total Employees At KERP Plan | Total Assets ($MM) | KERP Participants | Plan Cost ($MM) | Plan as % of Workforce At Filing | At KERP Plan | Plan Cost Per Person ($) | Plan Cost as % of Assets |
|---|---|---|---|---|---|---|---|---|---|
| | 1,350 | 1,350 | | 42 | 1.0 | 3.1% | 3.1% | $23,810 | |
| | 558 | 558 | | 183 | 10.3 | 32.8% | 32.8% | 56,284 | |
| | 490 | 490 | | 155 | 4.9 | 31.6% | 31.6% | 31,613 | |
| | 630 | 140 | | 54 | 1.9 | 8.6% | 38.6% | 34,630 | |
| | 2,505 | NA | | | | | | | |
| | 5,282 | NA | | | | | | | |
| | 2,300 | 2,300 | | 76 | 7.0 | 3.3% | 3.3% | 92,105 | |
| | 800 | 800 | | 51 | 1.9 | 6.4% | 6.4% | 38,047 | |
| | 170 | 170 | | 144 | 3.3 | 84.7% | 84.7% | 22,917 | |
| | 1,606 | 673 | | 125 | 5.5 | 7.8% | 18.6% | 44,000 | |
| | 1,800 | 1,800 | | 288 | 1.3 | 16.0% | 16.0% | 4,522 | |
| | 3,100 | 3,100 | | 125 | 5.5 | 4.0% | 4.0% | 44,000 | |
| | 966 | 966 | | 88 | 4.0 | 9.1% | 9.1% | 45,455 | |
| | 328 | 56 | | 56 | | | | | |
| | 1,732 | 1,732 | | 243 | 5.9 | 14.0% | 14.0% | 24,395 | |
| | 754 | 500 | | 483 | 6.0 | 64.1% | 96.6% | 12,422 | |
| **25th Percentile** | | | | | | 7.4% | 7.4% | **$23,810** | |
| **Median** | | | | | | 10.0% | 15.0% | 35,575 | |
| **75th Percentile** | | | | | | 20.7% | 34.2% | **44,000** | |
| **Comparable Crypto Cases** | | | | | | | | | |
| Celsius | 670 | 167 | $4,310.0 | 59 | $2.8 | 8.8% | 35.3% | $48,136 | 0.1% |
| Voyager Digital | 328 | 328 | 2,335.0 | 34 | 1.6 | 10.4% | 10.4% | 47,059 | 0.1% |
| **Average - Crypto** | | | | | | 9.6% | 22.8% | **$47,597** | 0.1% |
| **BlockFi** | 374 | | | | $12.3 | | | | |

*Note:*

*Celsius and Voyager Digital were added to the sample given their relevance. Total assets based on footnotes provided in page 9*

*Source: Company information, court dockets, WTW Report*

*(1) Information sourced from WTW KERP data set for plan cost and plan cost per participant*

# WTW Benchmarking (KERP)



*Source: WTW Report*

# WTW Benchmarking (TRP)



*Source: WTW Report*

# Disclaimer

This document and the information contained herein ("Document") has been prepared for the informational purposes of authorized Recipients only, and is not intended to provide, and should not be relied on for, investment, lending, tax, legal or accounting advice. Nothing in the Document shall constitute an offer or a solicitation of an offer to buy or sell any products or services or enter into any transaction, including, but not limited with respect to, any securities, financial instruments or other investments or investment advice. Recipients should seek the advice of their own independent professionals prior to making any investment or other decision.

This Document may contain forward-looking statements subject to many variable factors and uncertainties that could cause actual results to differ materially from what is set forth or projected herein. The Document (unless otherwise explicitly stated) is a preliminary draft and subject to change. Notwithstanding the foregoing, M3 prepared this Document as of the date hereof, and assumes no obligation to update or revise it for any reason whatsoever thereafter.

M-III Partners LP ("M3"), Brown Rudnick LLP ("Brown Rudnick"), and Elementus, (collectively "UCC Advisors") makes no representation whatsoever regarding the adequacy of the Document for any purpose. In conducting analysis reflected in this Document, M3 assumed, without verification, the accuracy of information provided to it or obtained from third parties. No UCC Advisor or any representative of the UCC Advisors shall have any liability to any party for any error or omission with respect to any of the information contained herein. The UCC Advisors may have prepared or in the future may prepare other documents that are inconsistent with, and reach different conclusions from, the information presented in this Document. The UCC Advisors assume no obligation to bring such other documents to a Recipient's attention.

The analysis reflected in the Document would not necessarily reveal any material misstatement, omission or error and does not constitute an audit, review, compilation or other attestation service in accordance with Generally Accepted Accounting Principles or other standards established by the American Institute of Certified Public Accountants. The UCC Advisors do not express an opinion or any other form of assurance on any financial or other information. Had the UCC Advisors or another party performed additional work, including more in-depth verification or analysis, other matters might have come to its attention.

Pursuant to Internal Revenue Service Circular 230 (if applicable), be advised that any discussion of U.S. federal tax issues contained or referred to herein is not intended or written to be used, for the purpose of: (A) avoiding penalties that may be imposed under the internal Revenue code; nor (B) promoting, marketing or recommending to another party any transaction or matter addressed.

The UCC Advisors reserves all rights. Nothing in the Document shall be construed as granting any license or right to use any image, trademark or other intellectual property of the UCC Advisors. Unless otherwise indicated, all capitalized terms used herein have the same meaning as in the Agreement.