**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and
Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

**DEBTORS' REPLY TO
OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO APPLICATION OF THE
DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF
AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF
MOELIS & COMPANY, LLC AS INVESTMENT BANKER, CAPITAL MARKETS
ADVISOR, AND FINANCIAL ADVISOR EFFECTIVE AS OF THE PETITION DATE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this reply (the "Reply") to the *Objection of the Official Committee of*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

*Unsecured Creditors to Application of the Debtors and Debtors in Possession for Entry of an Order Authorizing the Retention and Employment of Moelis & Company, LLC as Investment Banker, Capital Markets Advisor, and Financial Advisor Effective as of the Petition Date* [Docket No. 279] (the "Objection" and the underlying Debtors' application, the "Application")[2] filed by the Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 cases. In support of this Reply, the Debtors state as follows:

## Reply

1.  The Debtors agree with the Committee that these chapter 11 cases are not ordinary. Given the size of the Debtors' business, domestic and international client base, the complexity of the Debtors' product offerings, the interplay with other ongoing chapter 11 cases in the cryptocurrency space, and the timing of the current industry volatility, the Debtors' chapter 11 cases are much more complex than your typical case. These complexities are precisely why Moelis is uniquely qualified to work with the Debtors to solve the many challenges they currently face and to maximize value for the Debtors and their stakeholders, a fact that the Debtors recognized in engaging them as an advisor. The Debtors have the authority to do so under section 328 of the Bankruptcy Code, which permits debtors to select advisors in their sound business judgment to assist in maximizing the value of the estates for the benefit of all parties in interest, subject to reasonable terms and conditions and Court approval.

2.  The Committee's suggested "wait and see" approach would make a chapter 7 liquidation a *fait accompli*, resulting in immeasurable and irreparable harm to the constituency the Committee seeks to protect. At its core, the Objection reflects a fundamental misunderstanding of

---

[2] All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Objection or Application, as applicable.

the value that creditors may receive under various exit scenarios, the complexities involved in cryptocurrency bankruptcies, the expertise and abilities of Moelis, and how crucial Moelis will be in efforts to bring about a swift and successful resolution to these cases. The Committee attempts to downplay the importance of Moelis to achieving the best outcome available under the circumstances for all parties in interest—including the unsecured creditor body who the Committee's advisors represent. Those efforts are misguided. Moelis' services will be central to executing an effective chapter 11 case, however such case is structured.

3.     As described more fully in its Application, Moelis is simultaneously exploring various alternatives to determine the best outcome reasonably available under the circumstances for the Debtors and their stakeholders including: (a) one or more sales of the Debtors' Mining assets, Customer Platform and Claims; (b) a stand-alone reorganization with or without new capital (which could involve substantial creditor ownership in the *pro forma* business); and (c) a self-liquidation pursuant to which the Debtors will return cryptocurrency and cash to creditors. And although the Committee seems quick to generally disparage "optionality," *see* Objection ¶ 5, the Debtors are fiduciaries for the estates, and therefore cannot simply shut down any path (or paths) that may enhance value to creditors in these chapter 11 cases.

4.     All of those options are on the table and the Debtors are not in a position to dismiss any. Yet denying the Debtors access to necessary advisors with expertise (*i.e.*, someone like Moelis) and the personnel needed to effectuate a different outcome could leave the Debtors with no options other than a chapter 7 liquidation that does *not* return *any* cryptocurrency to customers. Key elements considered in evaluating alternatives include (i) value; (ii) timing of receipt of proceeds; (iii) execution risk; (iv) leakage to the estate (which include fees, time value of money, liquidity discounts relating to monetizing or rebalancing (*i.e.*, purchase and sale of crypto current

to facilitate in-kind distributions under a plan) tokens, tax considerations, ongoing costs to support the businesses, etc.); and (v) other considerations (potentially, for example, distinctions between U.S. and international creditor constituencies). Moelis will be involved in numerous simultaneous and different workstreams to help evaluate those alternatives and ensure swiftest possible execution, including (but not limited to):

- business plan creation and evaluation (including analysis of capitalization);
- design and negotiation of a plan of reorganization (as applicable);
- identification and interaction with strategic and financial investors / purchasers for various assets;
- design of sale processes for various assets;
- interaction and negotiations with any investors / purchasers;
- pro forma capital structure / liquidity evaluation;
- ascribing value to the estate and to customers the options presented in all scenarios described above (or combinations thereof);
- valuation analysis and testimony as necessary as part of any Court approval process, which would likely be necessary to implement a plan of reorganization; and
- interacting and liaising with regulators interested in these cases as well as any new capital providers in both stand-alone and potential sale transactions.

5.  The services of an investment banker (either Moelis or someone else with similar skills and experience) are critical to these cases. Moelis will drive the sale process, interact with bidders, and attempt to generate the highest opportunity possible for the company. Irrespective of the Committee's and its advisors' expressed pessimism, there is material interest in the Debtors' assets and business from buyers. While too soon to tell for certain, the Debtors expect a sale of some or all of their assets to be a meaningful possibility. Further, a stand-alone reorganization, which must be evaluated as a potential alternative, would require the services of a firm like Moelis who has expertise in designing, negotiating, and executing a chapter 11 plan of reorganization; has

the ability to evaluate and sensitize the business plan and capital requirements; and can help raise required capital for funding the reorganization. A self-liquidating plan would involve many similar steps as a stand-alone reorganization (including the re-starting of the BlockFi platform following a complex rebalancing process to deliver in-kind distributions to clients)—and may be accomplished in combination with other contemplated transactions. But again, none of this work is realistic without the services that are proposed to be provided by Moelis.

6. A self-liquidating plan for BlockFi would likely be a hybrid deal where the Debtors monetize their mining assets, either monetize their claims in whole or part or place them in a trust, sell $100 million or more of staked ETH (which may be challenging to "return"), sell a range of assets including BlockFi's customer list, technology platform, intellectual property, and venture investments, and permit the Debtors to seek to enhance value for creditors and optimize creditor recoveries through a range of workstreams such as hedging strategies (*e.g.*, purchase of crypto derivatives to participate in upside crypto price exposure), tax optimization through in-kind approaches, addressing potential distinctions between U.S. and international customers, and other nuanced aspects of an overall transaction. The Debtors would also then need to "rebalance" their cryptocurrency portfolio and complete the tasks necessary to make distributions (hopefully in-kind) to customers through the BlockFi platform. A self-liquidating plan *would* require the services both of Moelis (or some other investment bank with relevant skills) *and* the employees currently engaged at BlockFi.

7. That said, the Debtors recognize that their advisors also need to go about their work efficiently and in a cost-effective manner. And that is precisely why the Debtors provided the Committee with a good faith extension of their deadline to object to the Application in the hopes that, should the Committee have any issues or questions about the Application, the Debtors could

5

address such questions in a constructive, commercial manner, obviating the need for expensive motion practice and a contested hearing. While the Committee alleges that the Debtors had an attitude of "'I'd rather take my chances with the Court,' . . . ," Objection ¶ 6, it was the Committee's advisors that failed to substantively engage on any areas of the proposed engagement, including: (a) whether a Sale Transaction Fee or a Restructuring Fee were mutually exclusive (of course they are); (b) whether Moelis had any qualifications to sell the claim assets (of course they do); or (c) whether the Debtors had available any public data to support Moelis' proposed fee structure (of course they do). Instead of engaging in an ongoing dialogue, however, the Committee instituted a meritless attack on the Debtors' business judgment regarding both selecting Moelis as investment banker and the best path to maximize value for the Debtors' stakeholders.

8. In spite of this, and the Objection as a whole, the Debtors have met the legal standard to obtain this Court's approval of Moelis as its investment banker. The Debtors are entitled to their choice of professional so long as such professional is disinterested and its fees are reasonable. The Debtors and Moelis engaged in good faith, arms'-length negotiations with complete transparency with respect to the tasks Moelis will accomplish and the challenges that they might face in doing so. The result of those negotiations is the proposed fee structure detailed in the Application.

9. That fee structure is reasonable in light of the complexities of these chapter 11 cases. As discussed herein, and in the *Supplemental Declaration of Jared Dermont* in support of this Reply (the "Supplemental Dermont Declaration"), Moelis' proposed fee structure is well within the range of reasonableness and complies with section 328(a) of the Bankruptcy Code. As an initial matter, comparison to other cases is just one metric used to determine the appropriate fee structure for any one particular engagement. In fact, there were several other important factors

that the Debtors and Moelis considered when negotiating Moelis' engagement including: (a) the time commitment required; (b) the potential length of the case; (c) the complexity of the mandate; (d) the number of Moelis deal team members (including senior bankers) required; (e) the extent to which litigation is likely to be a significant factor in these cases; and (f) the possibility that this assignment precludes Moelis from taking another assignment due to time or other factors. All of these factors make the fees Moelis is proposing to charge reasonable and in line with market practice. Moelis currently has fifteen professionals with expertise in Financial Institutions, Cryptocurrency, Blockchain, Claims monetization, Restructuring and M&A actively engaged on this matter. Many discussions are ongoing, with Moelis having reached out to more than 200 parties about potential transactions already.

10. Moelis has expended significant resources familiarizing itself with the Debtors' businesses and assets, launching and running a marketing process, and working with numerous interested parties that have already expressed interest in value-maximizing transactions. As of January 24, 2023, Moelis has received bids and will continue to receive bids related to Mining assets. Moelis is engaged with a number of potential Customer Platform purchasers demonstrating meaningful interest for these assets. The Debtors can imagine nothing more value-destructive than to restart their arms'-length negotiations with Moelis—or another investment banker—over fees and case strategy at this critical stage of these chapter 11 cases, particularly where the Debtors stand ready to obtain Court approval of their bidding procedures and sale schedule immediately.[3] Delay would add cost and distraction and benefit no one—least of all unsecured creditors. The

---

[3] *See Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors; Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* ¶ 17(a) [Docket No. 226] (the "Bidding Procedures Motion") (requesting that the Court approve a sale schedule including an auction on February 17, 2023 and a hearing to approve a sale resulting therefrom in March).

7

Debtors believe that Moelis is best-suited to maximize value for all stakeholders in these chapter 11 cases and that Moelis' fees are reasonable. The Objection should be overruled and the Application should be approved.

**I.    The Terms of Moelis' Retention Comply with Section 328(a) of the Bankruptcy Code.**

11.    Section 328(a) of the Bankruptcy Code allows a debtor, with the court's approval, to employ a professional person, including an investment banker, "on any reasonable terms and conditions of employment." 11 U.S.C. § 328(a). Accordingly, the appropriate inquiry under section 328(a) of the Bankruptcy Code is "whether taken as a whole, the terms of the retention are fair and reasonable, and the retention is in the best interest of the estate." *In re Joan & David Halpern, Inc.*, 248 B.R. 43, 47 (Bankr. S.D.N.Y. 2000).

12.    When making the determination that a fee structure is reasonable compensation pursuant to section 328(a) of the Bankruptcy Code, courts consider whether a debtor exercised its reasonable business judgment in proposing the fee structure. *See In re Contractor Tech., Ltd.*, No. H-05-3212, 2006 WL 1492250 (S.D. Tex. May 30, 2006) (approving a counsel's contingency fee pursuant to section 328(a) of the Bankruptcy Code because the record supported the assessment that the trustee exercised reasonable business judgment in proposing the contingency fee plan).

13.    Factors courts in this Circuit consider in making such a determination include, but are not limited to:

(a)    whether terms of an engagement agreement reflect normal business terms in the marketplace;

(b)    the relationship between the Debtor and the professionals, *i.e.*, whether the parties involved are sophisticated business entities with equal bargaining power who engaged in an arms'-length negotiation;

(c)    whether the retention, as proposed, is in the best interests of the estate;

8

    (d)    whether there is creditor opposition to the retention and retainer provisions; and

    (e)    whether, given the size, circumstances and posture of the case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk minimization," especially in light of the existence of any other "risk-minimizing" devices, such as an administrative order and/or a carve-out.

*In re Insilco Techs., Inc.*, 291 B.R. 628, 634 (Bankr. D. Del. 2003). "[The] list is not intended to be exhaustive, nor will every factor necessarily be of equal weight, depending upon the circumstances." *Id.*; *see In re Energy Partners, Ltd.*, 409 B.R. 211, 226 (Bankr. S.D. Tex. 2009) (citing *Insilco*, 291 B.R. at 633).

14.    Further, the Debtors had no obligation to select the investment banking firm that quoted the lowest fees, nor avoid the investment banking firm that quoted the highest fees. *See Walton v. Houlihan, Lokey, Howard & Zukin (In re USA Theatre Co.)*, 315 F.3d 217, 230 (3d Cir. 2003) (noting that a court's "reasonableness" inquiry under section 328(a) of the Bankruptcy Code is: "market driven," but not "market-determined"). When analyzing whether a proposed fee structure is "reasonable" under section 328(a) of the Bankruptcy Code, courts have undertaken a fact-specific inquiry that takes into account the market rate. *See In re Niover Bagels, Inc.*, 214 B.R. 291, 294 (Bankr. E.D.N.Y. 1997) ("The flexibility written into [section 328(a) of the Bankruptcy Code] encourages bankruptcy judges to approve compensation arrangements that reflect market conditions and to fashion arrangements suitable to the circumstances of the case before it."). There is no statutory requirement that the proposed fee structure needs to be exactly or below the market mean/median for it to be considered "reasonable" under section 328(a) of the Bankruptcy Code. *See Walton*, 315 F.3d at 230 (noting that a court's "reasonableness" inquiry under section 328(a) of the Bankruptcy Code is "market driven," but not "market-determined"). Nevertheless, Moelis' Transaction Fees are similar to the fees approved

9

by the courts in comparable cryptocurrency debtor restructuring engagements and are reasonable because it reflects "normal business terms in the marketplace." *Insilco*, 291 B.R. at 634.

15. The Committee asserts that Moelis' fees are unreasonably high while simultaneously understating the recoveries Moelis would need to achieve for the estates in order to be eligible for such fees. Importantly, Committee overstates the total fees that Moelis could earn in these chapter 11 cases by approximately ***$7 million***. *See* Objection ¶ 5 ("[t]he Debtors think it reasonable for Moelis to charge the estates north of $10 million, trending towards $20 million (payable regardless of outcome), for exploring options."). The Committee's math is simply wrong by approximately 54%. In fact, the ***maximum*** that Moelis could earn in a six-month case is approximately $13 million, composed of an $8 million Restructuring Fee, $4 million in transaction fees for both Mining and Claim monetization,[4] and $0.9 million in Monthly Fees, after 50% of last three months is netted against the Restructuring Fee. If the chapter 11 cases continue for nine months, then the maximum Moelis could earn is $13.2 million.[5]

II. **The *Insilco* Factors Support Approval of Moelis' Retention Under the Proposed Fee Structure.**

16. As detailed above, courts in the Third Circuit have considered the *Insilco* factors when determining whether (a) the terms of a proposed retention are fair and reasonable and (b) such retention is in the best interest of the estate. *See Insilco*, 291 B.R. at 634. The *Insilco* factors weigh in favor of approval of Moelis' retention and its proposed fee structure.

---

[4] $4 million is a capped fee which could only be achieved through minimum sale proceeds of $70 million in the case of one sale (either Mining or Claims) and $60 million in the case of two sales (both Mining and Claims).

[5] Maximum fee shown on a comparable basis to Objection framework.

10

### A. Whether the terms of Moelis' engagement agreement reflect normal business terms in the marketplace.

17. Moelis' proposed fee structure is "comparable to those generally charged by investment banking firms of similar stature to Moelis and for comparable engagements[.]" *See Insilco*, 291 B.R. at 634 (stating that the "size, circumstances and posture of the case" should be considered when assessing reasonableness). As demonstrated in <u>Exhibit B</u> attached to the Supplemental Dermont Declaration, each component and the total fees to which Moelis may be entitled in this case are consistent with market practice for large, complex cryptocurrency debtor engagements. Accordingly, given that Moelis' proposed fees and fee structure are comparable to those charged by peer investment banking firms in similar cases, such fees reflect normal business terms in the marketplace and are reasonable under section 328(a) of the Bankruptcy Code.

### B. Relationship between the Debtors and Moelis.

18. Moelis' proposed fee structure is the result of good faith, arms'-length negotiations between the Debtors, its advisors, and Moelis. As described in <u>Exhibit A</u> attached to the Supplemental Dermont Declaration, following several days of discussion, the Debtors successfully negotiated reductions to Moelis' proposal across nearly every fee component, including a reduction of up to $2 million from the Restructuring Fee and Sale Transaction Fee. Accordingly, the evidence shows that the terms of Moelis' retention were negotiated by sophisticated, independent parties with equal bargaining power on an arms'-length basis.

### C. Whether Moelis' proposed retention is in the best interests of the Debtors' estates.

19. The Debtors' retention of Moelis is in the best interests of their estates for several reasons.[6] Moelis has already spent several months crafting and executing a marketing process, which has yielded significant interest in the Debtors' Mining assets and Customer Platform. The Debtors have also been working on a sale of certain assets on an immediate timeline.[7] Moreover, Moelis' experience with and knowledge of the Debtors, the crypto industry, and its key players will be vital to the success of the Debtors' restructuring regardless of whether it comes by way of a sale of the Debtor's assets, a chapter 11 self-liquidation, a stand-alone chapter 11 plan, or any other restructuring path. Moelis has contributed significant time and resources to move this case forward, including dedicating fifteen team members (including six managing directors) and tapping other important resources as necessary.

20. Materially modifying the proposed fee structure, which the Debtors have demonstrated is reasonable and in line with the market, risks causing Moelis to need to pare back on time and resources that have already been successfully mobilized toward the Debtors' goal to rapidly return value to their stakeholders. Accordingly, given the substantial work Moelis has already conducted on this case (prior to having its retention approved by the Court) and its invaluable experience, the Debtors' retention of Moelis is in the best interests of the estates.

---

[6] *See Insilco*, 291 B.R. at 635 ("[retention of the pre-petition professionals] is of great advantage to the estate, since the same professionals who assisted the Debtor in preparation for the conduct of this case, substantially in advance of the filings, continue to render services.").

[7] *See generally* Bidding Procedures Motion ¶ 17.

**D. Whether there is creditor opposition to Moelis' retention.**

21. The only objecting party to the Application is the Committee and, as discussed herein, they fundamentally misunderstand the importance of Moelis and the services they will provide to obtain the best outcome for creditors in these chapter 11 cases.

**E. Whether Moelis' compensation is appropriate given the size, circumstances, and posture of the case.**

22. The Committee was correct when it observed that these are not run-of-the-mill bankruptcy cases. In many ways, these cases are measurably more complex and fraught with risk than other large chapter 11 cases. The Committee, however, appears to believe that these factors warrant a *reduction* in Moelis' fees. The Debtors argue, instead, that Moelis and the Debtors, through good faith, arms'-length negotiations, have come to an agreement that fully encompasses the range of risks and complexities present in this case, balanced against the Debtors' fiduciary duty to return maximum value to their stakeholders.

23. Accordingly, the *Insilco* factors weigh heavily in favor of Moelis' retention and support that (a) the terms thereof are fair and reasonable, and (b) such retention is in the best interests of the Debtors' estates.

**III. The Transaction Fees are Reasonable and Should be Approved.**

24. The Debtors met their burden of proof and persuasion when they filed the Application and the Klein Declaration, each of which described, in detail, the reasons why the Debtors believe Moelis' retention on the terms and conditions set forth in the Engagement Letter is appropriate and justified under the circumstances.

25. It is the Committee that has not shown in their Objection how or why the Transaction Fees are not a reasonable exercise of the Debtors' business judgment. The Committee's objections to the Transaction Fees should be overruled on that basis alone.

13

### A. The Sale Transaction Fee and the Restructuring Fee are Reasonable and Should be Approved.

26. *First*, the terms of each of the Sale Transaction Fee and Restructuring Fee were laid out clearly in the Application, as well as the circumstances under which each may be earned. *See* Application ¶¶ 17–19. Pursuant to the Engagement Letter, which is attached as Exhibit A to the proposed order, Moelis earns the Restructuring Fee, not the Sale Transaction Fee, if there is a Sale Transaction (as defined in the Engagement Letter) pursuant to section 363 of the Bankruptcy Code. *See* Engagement Letter at 3. Moelis would have only been able to earn the Sale Transaction Fee if the Debtors had consummated a sale of some or all of their assets *outside* of these chapter 11 cases, as any Sale Transaction within these chapter 11 cases would involve section 363 of the Bankruptcy Code, whether in accordance with an approved sale order or a confirmed chapter 11 plan.

27. *Second*, there is data suggesting that the estates will generate more sale proceeds than would be paid for exploring the option, and, in fact, comparable transactions pointed to by the Committee prove the point. The recent asset purchase agreement entered into between Voyager Digital, LLC ("Voyager") and Binance.US (the "Voyager-Binance US Transaction") in the chapter 11 cases of *In re Voyager Digital Holdings, Inc., et al*,[8] did far more than "yield[] a mere $20 million to the estates," as the Committee suggests. Objection ¶ 15. Rather, in addition to the purchase price of up to $35 million, the Voyager-Binance US Transaction (a) eliminates in excess of *$130 million* in leakage costs that the Voyager debtors would have incurred in a self-liquidation scenario due to the estimated discount in liquidating sizable positions in the

---

[8] The Voyager debtors' chapter 11 cases are currently pending in the United States Bankruptcy Court for the Southern District of New York styled as *In re Voyager Digital Holdings Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. 2022).

14

marketplace to return in-kind distributions to customers and liquidating additional cryptocurrency to fund working capital requirements to complete the work required; (b) provides the most tax efficient route forward at massive benefit to creditors as Binance.US supports 100% of the cryptocurrency coins on the Voyager platform (approximately 20% of the coins on the Voyager platform cannot be withdrawn by customers in a self-liquidation scenario but can be withdrawn by customers from certain third-party exchanges like Binance.US); and (c) reduces the security risks inherent in a self-liquidation.[9]  As set forth in the Voyager disclosure statement, the Voyager-Binance US Transaction is estimated to provide a **6% higher recovery** to creditors than a self-liquidation and a **12%-16% higher return** to creditors than a chapter 7 liquidation.

28. Additionally, the amount of the Sale Transaction Fee in this case is $4 million *lower* than the Sale Transaction Fee approved in *Voyager*—a Sale Transaction Fee that did not draw an objection from the official committee of unsecured creditors in *Voyager*—and $2-4 million *lower* than nearly every other comparable cryptocurrency engagement.  *See* Exhibit B attached to the Supplemental Dermont Declaration (comparing Sale Transaction Fees across seven comparable engagements).

29. Further, the Debtors are significantly encouraged by the interest that Moelis' marketing process has already garnered, with more than fifty-five potential M&A counterparties having executed nondisclosure agreements and gained access to a virtual data room containing volumes of information regarding the Debtors' business operations, finances, and material contracts.  This number has nearly doubled since the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines,*

---

[9] *See* Tr. of Hg. Held Jan. 10, 2023 at 138:18–23, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y Jan. 13, 2022) [Docket No. 864] (stating the debtors' view that a self-liquidation toggle would result in "potentially over $100 million of value leakage").

*(II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 226] on January 9, 2023. As of January 24, 2023, Moelis has received bids and will continue to receive bids related to Mining assets. Moelis is engaged with a number of potential Customer Platform purchasers demonstrating meaningful interest for those assets.

30. ***Third***, the Application is clear on the services Moelis will provide to justify payment of the Restructuring Fee. As described above, in the Application, the Klein Declaration, and the Supplemental Dermont Declaration, Moelis' role and responsibilities in these chapter 11 cases could not be more outcome determinative for the Debtors. Although the Committee alleges that the Restructuring Fee appears to be no more than an "extrapolation" of fees Moelis has requested in other bankruptcies, s*ee* Objection ¶ 16, this argument tacitly admits that the Restructuring Fee is in line with the market, and the fees obtained in similar engagements. In fact, here, the Restructuring Fee is lower than the mean and median fees in similarly sized chapter 11 cases. Supplemental Dermont Declaration Ex. B.

### B. The Monthly Fee is Reasonable and Should be Approved.

31. There is nothing unusual about a standard Monthly Fee which is ultimately credited against other fees,[10] which is, again, in line with prevailing market terms. And again, the Committee has admitted that the Monthly Fee, like the Restructuring Fee and the Sale Transaction Fee, is a normal business term in the marketplace in its Objection. *See* Objection ¶ 7. A review of comparable transactions shows that this is the case. As such, under the circumstances, the Monthly Fee is reasonable.

---

[10] *See* Application ¶ 17(ii) (providing that 50% of the Monthly Fee shall be offset against the Sale Transaction Fee or the Restructuring Fee).

### C. The Claims Monetization Fee is Reasonable and Should be Approved.

32. Moelis has the requisite "competency" to advise on a potential monetization of litigation claims. As set forth in the Supplemental Dermont Declaration, Moelis has been engaged on a range of mandates involving large-scale claims (including multiple $1 billion disputes). *See* Exhibit D attached to the Supplemental Dermont Declaration. In fact, Moelis advertises its claim monetization capabilities on its firm website. *See* https://www.moelis.com/merger-acquisitions/ ("We provide a full suite of strategic advisory services including . . . designing and executing claim monetization solutions."). As further set forth in the Supplemental Dermont Declaration, Moelis has an extensive knowledge of the claims market and its investors, and notwithstanding the allegations of the Committee, has developed a proposed outreach list that is almost completely devoid of market makers.

33. The fact that there are ***perhaps*** other firms that ***could*** provide a service to the Debtors is not relevant to the inquiry of whether the Debtors have exercised their sound business judgment in selecting their own advisor. *Smith*, 507 F.3d at 71 (holding that courts should interfere with debtors' choice of professionals in only the rarest of circumstances). The Committee's argument to the contrary points to an article from the *Wall Street Journal* detailing how some individual customers in other cryptocurrency-related bankruptcy cases have chosen to sell their claims on claims trading markets. Objection ¶ 19.[11] But there is no comparison between buying modest individual customer claims and the services Moelis proposes to perform here. The trading outfits mentioned in this article are not equipped to maximize value for the estate, as these platforms focus on claims significantly smaller than those held by BlockFi, mainly work with retail

---

[11] Citing Jonathan Randles, *Crypto Customers Sell Claims at a Loss to Avoid Bankruptcy Wait*, Wall St. J., Dec. 28, 2022 (available at https://www.wsj.com/articles/crypto-customers-sell-claims-at-a-loss-to-avoid-bankruptcy-wait-11672177834).

investors or small businesses, and regularly process claims in a matter of days. Moelis, on the other hand, provides services that these others cannot: a specialization in structuring and executing claim monetization solutions, with a robust and competitive process designed to optimize recovery. Moelis' services are therefore particularly relevant and valuable to the claims subject to sale in these cases, which are unique and highly complex assets that require significant experience and expertise to maximize value.

### D.   The Mining Asset Sale Fee is Reasonable and Should be Approved.

34. Finally, Moelis' Mining Asset Sale Fee is reasonable under the circumstances and a sound exercise of the Debtors' business judgment. Ultimately, the Committee's arguments to the contrary demonstrate that the Committee objects more to the current market for such assets rather than the particulars of this case. That alone is insufficient to show that Moelis' proposed fees, individually or in the aggregate, are unreasonable, out-of-step with the market, or otherwise objectionable.

35. The Debtors have welcomed and will continue to welcome the Committee's input on a variety of matters in these chapter 11 cases. That input, however, does not take precedence over the Debtors' sound business judgment in selecting its professionals.

### Conclusion

36. As demonstrated, the Application satisfies the reasonableness standard of section 328(a) of the Bankruptcy Code. Accordingly, the Objection should be overruled and the Application granted.

**WHEREFORE**, the Debtors respectfully request that the Court grant the Application, overrule the Objection, and grant related relief.

Dated: January 25, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and
Debtors in Possession*