**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# SUPPLEMENTAL
# DECLARATION OF JARED
# DERMONT IN SUPPORT OF DEBTORS' REPLY
# TO OBJECTION OF THE OFFICIAL COMMITTEE
# OF UNSECURED CREDITORS TO APPLICATION OF THE
# DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF
# AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF
# MOELIS & COMPANY LLC AS INVESTMENT BANKER, CAPITAL MARKETS
# ADVISOR, AND FINANCIAL ADVISOR EFFECTIVE AS OF THE PETITION DATE

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

I, Jared Dermont, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.      I am a Managing Director and head of the Financial Institutions Group (the "FIG Group") at Moelis & Company LLC ("Moelis"), the proposed investment banker, capital markets advisor, and financial advisor to the above-captioned debtors and debtors-in-possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), which has its principal office at 399 Park Avenue, 5th Floor, New York, New York 10022. Among the businesses and products that fall within the purview of the FIG Group are cryptocurrency, banks, asset managers, financial technology, specialty finance, securities exchanges, and insurance companies. I also oversee Moelis' special purpose acquisition company advisory, capital markets businesses, and serve on the Management Committee of the firm.

2.      I am authorized to submit this declaration (the "Declaration") in support of the *Debtors' Reply to Objection of the Official Committee of Unsecured Creditors to Application of the Debtors and Debtors in Possession for Entry of an Order Authorizing the Retention and Employment of Moelis & Company LLC as Investment Banker, Capital Markets Advisor, and Financial Advisor Effective as of the Petition Date* (the "Reply").[2]

3.      I believe that Moelis, with its unique skillset and dedicated case resources, can aid the Debtors in evaluating, launching, and executing a transaction(s) aimed at enhancing value for creditors. The Debtors' failure to have any investment banker would likely cost the Debtors' clients far more than the cost of our proposed engagement. The Official Committee of Unsecured Creditors (the "Committee")'s suggestion that the Debtors wait and see what the future holds

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Reply or in the *Application of the Debtors and Debtors in Possession for Entry of an Order Authorizing the Retention and Employment of Moelis & Company LLC as Investment Banker, Capital Markets Advisor, and Financial Advisor* [Docket No. 139], as applicable.

*without* assistance from a qualified advisor (or a properly incentivized employee base) would risk a chapter 7 liquidation which creates significant risk to creditor recoveries.

4.     The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief, or upon client matter records kept in the ordinary course of business that were reviewed either by me or other employees of Moelis under my supervision and direction.  If called and sworn as a witness, I could and would testify competently to the facts set forth herein.

**I.     Background and Qualifications**.

5.     I have over twenty-five years of investment banking experience advising companies, equity investors, financial vehicles, creditors, and government entities across a broad range of industries and geographies in a broad range of transactions.  Prior to joining Moelis I was a Managing Director at Rothschild, Inc., where I focused on global M&A and restructuring transactions.  I hold a Bachelor of Arts degree in economics from Tufts University.

6.     I have been involved in many notable chapter 11 cases and restructuring assignments, including as proposed lead investment banker in Genesis' chapter 11 reorganization, lead investment banker in Voyager's chapter 11 reorganization, Jason Industries' chapter 11 reorganization, Atrium Companies, Inc.'s chapter 11 reorganization via sale to Golden Gate Capital and Kenner & Company, and Orchard Brands $725 million chapter 11 reorganization; as advisor to the *ad hoc* committee of bond holders in Chemtura's $2.7 billion chapter 11 reorganization; as advisor to the *ad hoc* senior secured noteholders in Neenah Enterprises chapter 11 reorganization; as advisor to the *ad hoc* group of senior unsecured noteholders in Walter Investment Management Corporation's $4.1 billion restructuring; as advisor to the official committee of unsecured creditors of Residential Capital in its $15 billion chapter 11 reorganization; as advisor to New Residential Investment Corporation's $1.2 billion acquisition of select assets from Ditech Holding Corporation pursuant to a section 363 asset sale; and as advisor

to Syncora Guarantee Inc. in American Roads LLC's $840 million pre-packaged chapter 11 reorganization. I have also been involved in numerous restructuring transactions outside of the chapter 11 context, including advising New Residential Investment Corporation in its $600 million recapitalization and restructuring, Ambac Financial Group in its $18 billion restructuring of Puerto Rico's sales tax financing corporation (COFINA), Syncora Guarantee Inc. in its $13.5 billion reinsurance of financial guarantee policies to Assured Guarantee Corporation and other liability management including the sale of its operating business to GoldenTree Asset Management, and MFA Financial, Inc. in its $5.8 billion restructuring of its repurchase agreement portfolio.

## II.    Moelis Engaged in Arms'-Length Negotiations with the Debtors.

7.    On November 10, 2022, Moelis and the Company began discussions regarding Moelis' retention. Following several days of negotiations, on November 15, 2022, Moelis provided an initial proposal for its proposed fee structure (the "Initial Proposal") to the Company, as reflected in **Exhibit A** attached hereto. Moelis and the Company continued to negotiate and, on November 20, 2022, signed the engagement letter terms on which Moelis and the Company ultimately agreed, as reflected in detail in the Application.

8.    I believe that Moelis' proposed fee structure is the result of good faith, arms'-length negotiations between the Debtors, its advisors, and Moelis. As described in **Exhibit A**, the Debtors successfully negotiated reductions to Moelis' proposal across nearly every fee component, including a reduction of up to $2 million from the Restructuring Fee and Sale Transaction Fee. A comparison of the Initial Proposal versus the negotiated engagement letter terms is set forth in **Exhibit A**.

## III.    Moelis' Fees are Comparable to Those in Similar Engagements.

9.    I believe Moelis' proposed fees to which Moelis may be entitled in this case are consistent with market practice.

10.    In determining what fees to propose, Moelis compared investment banker fees in (i) three (3) chapter 11 cases in which the debtor was a cryptocurrency-related entity, one (1) significant undisclosed crypto restructuring in which Moelis was engaged, and (ii) twenty-nine (29) other chapter 11 cases in which the debtors' prepetition liabilities were between $1.5–2.5 billion.  These comparisons are attached hereto as **Exhibit B**.  As evidenced, each component of Moelis' proposed fee structure in these cases is comparable to or lower than each of the comparable cryptocurrency engagements depicted including an additional two (2) cryptocurrency engagements which were not known to Moelis prior to executing the Engagement Letter, but further demonstrate the reasonableness of Moelis' fees.  Additionally, the proposed Restructuring Fee in these cases falls below the average fees in cases of comparable size.

11.    Comparison of fee structures in other cases is just one metric used by Moelis to determine the appropriate fee structure for any one particular engagement.  In fact, there were several other important factors that Moelis considered when pricing its engagement by the Debtors, including: (a) the time commitment required; (b) the potential length of the case; (c) the complexity of the mandate; (d) the number of Moelis deal team members (including senior bankers) required; (e) the extent to which litigation is likely to be a significant factor in these cases; and (f) the possibility that this assignment precludes Moelis from taking another assignment due to time or other factors.  All of these factors make the fees Moelis is proposing to charge reasonable and in line with market practice.  Moelis currently has fifteen (15) professionals with expertise in Financial Institutions, Cryptocurrency, Blockchain, Claims monetization, Restructuring, and M&A actively engaged on this matter.  Many discussions are ongoing, with Moelis having reached out to more than 200 parties about potential transactions for Mining and Customer Platform assets as of January 24, 2023. Moelis has devoted significant resources (well over one thousand person-

hours thus far) to the Debtors over the past several months to understand the Debtors business, design and launch various workstreams described herein.

12.    The maximum that Moelis could earn in a six-month case is $12.9 million, composed of an $8 million Restructuring Fee, $4 million in transaction fees for both Mining and Claim monetization,[3] and $0.9 million in Monthly Fees, after 50% of last three months is netted against the Restructuring Fee.  If the chapter 11 cases continue for nine months, then the maximum Moelis could earn is $13.2 million.[4]

**IV.    Moelis' Efforts in these Chapter 11 Cases**.

13.    Moelis' efforts up to and including January 9, 2023 are described in detail in the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 226] (the "Bidding Procedures Motion").

14.    Since the filing of the Bidding Procedures Motion, Moelis' efforts have continued in earnest and have resulted in approximately thirty (30) additional potential M&A counterparties executing nondisclosure agreements, bringing the total potential M&A counterparties to more than fifty-five (55) as of the filing of this Declaration.  As of January 24, 2023, Moelis has received

---

[3]    $4 million is a capped fee which could only be achieved through minimum sale proceeds of $70 million in the case of one sale (either Mining or Claims) and $60 million in the case of two sales (both Mining and Claims).

[4]    The Official Committee of Unsecured Creditors ("Committee") asserts in its objection to Moelis' retention that maximum fees in this case are "trending toward $20 million (payable regardless of outcome)."  Committee Objection ¶ 5.  It is unclear why the Committee believes that, but the Committee did not ask any questions about the issue before making that highly incorrect assertion in its Objection.  The Committee's math is wrong by approximately 54%.  Maximum fees are shown on a comparable basis to the framework put forth by the Committee in its Objection.

bids and will continue to receive bids related to mining assets.  Moelis is engaged with a number of potential Customer Platform purchasers demonstrating meaningful interest for these assets.

15.     Moelis also remains actively engaged in evaluating the Company's assets and businesses, in consultation with the Company and its other advisors, to identify other, additional options to return value to the Company's stakeholders.  The full array of the services Moelis continues to render to the Company is detailed in the Application and is summarized in **Exhibit C** attached hereto.

### V.     **Moelis' Claims Monetization Services**.

16.     As set forth on **Exhibit D** attached hereto, Moelis has a dedicated Dispute Advisory Group that provides strategic advice on dispute-related situations and has been engaged on a range of mandates involving large-scale claims (including multiple $1 billion+ disputes).  With respect to the claims held by the Debtors, Moelis has an extensive knowledge of the claims market and its investors, and notwithstanding the allegations of the Committee, has developed a proposed outreach list that is almost completely devoid of market makers (for the avoidance of doubt, no third-party fees are anticipated to be incurred relating to Claims in addition to Moelis' fee).  Moelis specializes in structuring and executing claim monetization solutions and has designed a robust and competitive process to optimize recovery.  Its services are therefore particularly relevant and valuable to the Debtors' claims in this case, which are unique and highly complex assets that are not commoditized and will require significant experience and expertise to maximize value.

### VI.     **The Committee's Objection**.

17.     The Committee's objection and the position statement filed by its proposed financial advisor[5] ("Declaration") oversimplifies the Debtors' situation and underestimates the

---

[5]     Declaration of Moshin Meghji, M3 Partners, filed January 24, 2023.

potential for (and need to evaluate) strategic transactions outside of liquidation to enhance value in this situation.  In fact the Committee's suggested "wait and see" approach would make a chapter 7 liquidation more likely, potentially resulting in harm to the constituency the Committee seeks to protect.

18.    At its core, the objection and Declaration reflects a fundamental misunderstanding of the value that creditors may receive under various exit scenarios, the complexities involved in cryptocurrency bankruptcies, the expertise and abilities of Moelis, and how crucial Moelis will be in efforts to bring about a swift and successful resolution to these cases.  The Committee attempts to downplay the importance of Moelis to achieving the best outcome available under the circumstances for all parties.  Those efforts are misguided.  Moelis' services will be central to executing an effective chapter 11 case, however such is structured.

19.    Moelis is simultaneously exploring multiple alternatives to determine the best outcome reasonably available under the circumstances for the Debtors and their stakeholders: (a) one or more sales of the Debtors' mining assets, customer platform and claims; (b) a standalone reorganization with or without new capital (which could involve substantial creditor ownership in the *pro forma* business); and (c) a self-liquidation pursuant to which the Debtors will return cryptocurrency and cash to creditors.  Although the Committee critiques "optionality," *see* Objection ¶ 5, the Debtors are fiduciaries for the estates, and therefore cannot simply shut down any path (or paths) that may enhance value to creditors in these chapter 11 cases.  I believe that it is possible that any of the paths described above (or some combination thereof) may be determined to be value enhancing in light of the circumstances.

20.    All of those options are on the table and we are not in a position to dismiss any, yet denying the Debtors access to necessary advisors with expertise (i.e., someone like Moelis) and

the personnel needed to effectuate a different outcome could leave the Debtors with no options other than a liquidation that does *not* return *any* cryptocurrency to customers.  Key elements considered in evaluating alternatives include (i) value; (ii) timing of receipt of proceeds; (iii) execution risk; (iv) leakage to the estate (which include fees, time value of money, liquidity discounts relating to monetizing or rebalancing (*i.e.*, purchase and sale of cryptocurrency to facilitate in-kind distributions under a plan) tokens, tax considerations, ongoing costs to support the businesses, etc.); and (v) other considerations (potentially, for example, distinctions between U.S. and international creditor constituencies).  Moelis will be involved in numerous simultaneous and different workstreams to help evaluate those alternatives and ensure swiftest possible execution, including (but not limited to):

- business plan creation and evaluation (including analysis of capitalization);

- design and negotiation of a plan of reorganization (as applicable);

- identification of strategic and financial investors/purchasers for various assets;

- design of sale processes for various assets;

- interaction and negotiations with any investors / purchasers;

- *pro forma* capital structure / liquidity evaluation;

- ascribing value to the estate and to customers the options presented in all scenarios described above (or combinations thereof);

- valuation analysis and testimony as necessary as part of any Court approval process, which would likely be necessary to implement a plan of reorganization; and

- interacting and liaising with regulators interested in these cases as well as any new capital providers in both stand alone and potential sale transactions.

21.    The services of an investment banker (either Moelis or someone else with similar skills and experience) are critical to these cases.  Moelis will drive the sale process, interact with

bidders, and attempt to generate the highest opportunity possible for the company.  Irrespective of

the Committee's and its advisors' expressed pessimism, there is material interest in the Debtors'

assets and business from buyers.  While too soon to tell for certain, we expect a sale of some or all

of the Debtors' assets to be a meaningful possibility. Further, a standalone reorganization, which

must be evaluated as a potential alternative, would require the services of a firm like Moelis who

has expertise in designing, negotiating and executing a chapter 11 plan of reorganization, has the

ability to evaluate and sensitize the business plan and capital requirements, and can help raise

required capital for funding the reorganization.  A self-liquidating plan would involve many

similar steps as a stand-alone reorganization (including the re-starting of the BlockFi platform

following a complex rebalancing process to deliver in-kind distributions to clients)—and may be,

in combination with other transactions.  But again, none of this work is realistic without the

services that are proposed to be provided by Moelis.

22.    A self-liquidating plan for BlockFi would likely be a hybrid deal where the Debtors

monetize their mining assets, either monetize their claims in whole or part or place them in a trust,

sell $100 million or more of staked ETH (which are unlikely to be "returned"), sell a range of

assets including BlockFi's customer list, intellectual property and venture investments, and permit

BlockFi to seek to enhance value for creditors through a range of workstreams such as hedging

strategies (*e.g.*, purchase of crypto derivatives to participate in upside crypto price exposure), tax

optimization through in-kind approaches, addressing potential distinctions between U.S. and

international customers, and other nuanced aspects of an overall transaction.  BlockFi would also

then need to "rebalance" its cryptocurrency portfolio and complete the tasks necessary to make

distributions (hopefully in kind) to customers through the BlockFi platform.  A self-liquidating

plan *would* require the services both of Moelis (or some other investment bank with relevant skills) *and* the employees currently engaged at BlockFi.

23.    The Committee refers to Voyager, another cryptocurrency company going through a restructuring process.  I believe BlockFi is materially more complex.  I also believe there will be more interest in the Debtors assets than we ultimately saw in Voyager for a variety of reasons.  Voyager's initial proposed plan of reorganization involved a transaction with FTX US ("FTX") which would have brought in over $100 million in additional value to customers in addition to the avoidance of costs associated with a self-liquidating plan.  FTX then collapsed into bankruptcy, forcing Voyager back to the drawing board in a highly challenging market damaged by the FTX collapse.  Nevertheless under these challenging circumstances, Voyager, with Moelis' ongoing assistance, was able to find a transaction that will benefit creditors.  The value benefit to Voyager of executing a transaction with Binance as compared to a self-liquidation was estimated in those cases to be over approximately $125 million.

24.    For a variety of reasons BlockFi cannot simply "turn on its platform" and/or "return assets to customers immediately".  I believe that the Debtors would benefit from having Moelis advise them as they evaluate, launch, and execute transactions to resolve these cases and seek to return value to creditors.

I hereby declare under penalty of perjury that the foregoing is true and correct.

January 25, 2023

By:   */s/ Jared Dermont*
      Jared Dermont
      Managing Director
      Moelis & Company, LLC

## **Exhibit A**

**Summary of Proposed Fee Terms versus Final Fee Terms**

## Negotiation of Moelis Fee

M O E L I S & C O M P A N Y

**During engagement discussions, BlockFi negotiated 20% lower Restructuring / Sale Fees, 20% lower Monthly Fees, earlier fee crediting and lower Discrete Asset Sale Fees**

| | Nov 15, 2022<br>Initial Moelis Proposal | Nov 17, 2022<br>Revised Fee Proposal | Nov 18, 2022<br>Revised Fee Proposal | Nov 20, 2022<br>Agreed Engagement Letter Terms |
|---|---|---|---|---|
| **Upfront Retainer** | ▪ $500,000; 100% creditable against Restructuring Fee / Sale Fee | ▪ Agreed | ▪ Agreed | ▪ Agreed |
| **Monthly Fee** | ▪ $250,000 per month; after 6 months 50% credited against the Restructuring Fee / Sale Fee | ▪ Agreed | ▪ Agreed | ▪ Renegotiated to <u>$200,000</u> per month; after <u>3</u> months 50% credited against the Restructuring Fee / Sale Fee |
| **Restructuring Fee / Sale Fee** | ▪ $10,000,000[1] | ▪ <u>$8,000,000</u><br><br>▪ <u>Increases to $9,000,000 if no Mining / Claim Asset Sale Fee has been paid</u> | ▪ Agreed | ▪ Agreed |
| **Other** | ▪ Reasonable fees and expenses<br>▪ Standard indemnity | ▪ Agreed | ▪ Agreed | ▪ Agreed |
| **Discrete Asset Sale Fee** | ▪ [TBD based on further diligence] | ▪ <u>Discrete Asset Sale Fees equating to [•]% of the sale price for the RH Claim and [•]% of the sale price for the Mining Assets</u><br><br>▪ <u>Discrete Asset Sales would be capped at $[•]mm</u> | ▪ <u>$500,000 + 6.0% of gross asset sale value for each sale</u><br><br>▪ <u>Capped at $4,000,000 in aggregate</u> | ▪ $500,000 + <u>5.0%</u> of gross asset sale value for each sale<br><br>▪ Capped at $4,000,000 in aggregate |
| **Capital Transaction Fee, if applicable** | ▪ 1.00% of first lien debt including DIP financing<br>— 50% of DIP fee credited against Restructuring Fee / Sale Fee<br>▪ 3.00% of other debt<br>▪ 4.00% of equity | ▪ Agreed | ▪ Agreed | ▪ Agreed |

1. Moelis initially verbally indicated a proposed $11,000,000 Restructuring Fee - consistent with Voyager's $11,000,000 Restructuring Fee - during a telephonic call with Blockfi, but reduced such fee to $10,000,000 in the written proposal

**<u>Exhibit B</u>**

**Analyses of Comparable Transactions**

## Comparison of Cryptocurrency Debtor Restructuring Engagement Terms

MOELIS & COMPANY

|  | BLOCKFI<br>MOELIS | BLOCKFI<br>INVESTMENT BANK (PROPOSAL) | CELSIUS<br>CENTERVIEW | VOYAGER<br>MOELIS | FTX<br>PWP | CORE SCIENTIFIC<br>PJT | SIGNIFICANT CRYPTO PRIVATE RESTRUCTURING[1] |
|---|---|---|---|---|---|---|---|
| **Retainer Fee** | ▪ $500,000<br>▪ 100% creditable against Restructuring or Sale Fee | ▪ N/A | ▪ N/A | ▪ $600k<br>▪ 100% creditable against first 3 Monthly Fees | ▪ N/A | ▪ N/A | ▪ $500,000<br>▪ 100% creditable against Restructuring Fee or Sale Fee |
| **Monthly Fee** | ▪ $200,000 | ▪ $200,000 | ▪ $250,000 | ▪ $200,000 | ▪ $450,000 | ▪ $200,000 | ▪ $200,000 |
| **Monthly Fee Crediting** | ▪ 50% creditable against first Sale or Restructuring Fee after 3 months | ▪ 50% creditable after 6 months | ▪ 50% creditable after 6 months | ▪ 50% creditable against first Sale Restructuring or Fee | ▪ None | ▪ 50% creditable against Restructuring or Sale Fee after 6 months | ▪ 50% creditable against Restructuring or Sale Fee after 4 months |
| **Restructuring Fee** | ▪ $8,000,000[2]<br>▪ Increases to $9,000,000 if no Mining / Claim Asset Sale Fee has been paid | ▪ $11,000,000 | ▪ $12,000,000 | ▪ $11,000,000 | ▪ $25,000,000 | ▪ $8,000,000 | ▪ $10,000,000 |
| **Sale Transaction Fee** | ▪ $8,000,000[2]<br>▪ Increases to $9,000,000 if no Mining / Claim Asset Sale Fee has been paid | ▪ $11,000,000 | ▪ $12,000,000 | ▪ $12,000,000 | ▪ 1.0% - 2.5%, subject to transaction value[4]<br>▪ 25% of Sale Fees received in excess of $10,000,000 creditable against Restructuring Fee | ▪ $8,000,000 | ▪ $10,000,000 |
| **Mining / Claim Asset Sale** | ▪ $500,000k + 5.0% of gross asset sale value for each sale<br>▪ Capped at $4,000,000 in aggregate | ▪ N/A | ▪ 2.5% of aggregate consideration[3]<br>▪ 50% creditable against Restructuring Fee | ▪ N/A | ▪ N/A | ▪ N/A | ▪ To be negotiated |
| **Capital Transaction Fee** | ▪ Secured / DIP: 1.0%<br>▪ Other Debt : 3.0%<br>▪ Equity: 4.0% | ▪ Senior Debt: 1.0%<br>▪ Junior Debt: 2.5%<br>▪ Equity: 4.0% | ▪ Secured / DIP: 1.0%<br>▪ Junior Debt: 3.0%<br>▪ Equity: 4.0% | ▪ Debt: 2.0%<br>▪ Equity: 4.0% | ▪ Secured: 1.0%<br>▪ Unsecured: 2.5%<br>▪ Equity: 5.0% | ▪ Senior Debt: 1.5%<br>▪ Other Debt : 3.0%<br>▪ Equity: 5.0% | ▪ Secured / DIP: 1.0% |

1. Significant crypto restructuring with an executed engagement letter advised by Moelis & Co
2. Moelis may not receive both a Sale Transaction Fee and a Restructuring Fee (i.e., in the event that a Sale Transaction occurs pursuant to Section 363 of the U.S. bankruptcy code, such Sale Transaction would trigger the Restructuring Fee)
3. Applies to discrete asset sales that do not constitute full platform sale; full platform sale would be captured by the Restructuring Fee
4. Fee percentage varies by transaction value as follows: $0 - $10mm: 0.0%; $10mm - $250mm: 2.5%; $250mm - $500mm: 2.0%; $500mm - $1.0bn: 1.75%; $1.0bn - $2.0bn: 1.25%; greater than $2.0bn: 1.0%

## Select Debtor Investment Banker Fee Comparable Terms ($1.5bn - $2.5bn Prepetition Liabilities)

MOELIS & COMPANY

*($ in thousands)*

| Debtor | Petition Date | Investment Banker | Pre-Petition Total Liabilities | Monthly | Rx ($) | Rx (%) | DIP | Senior | Junior | Equity | Fee Cap |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lumileds | 8/28/2022 | Evercore | $1,724,400 | $175 | $9,250 | 0.54% | 1.25% | 1.25% | 2.50% | 4.00% | NA |
| Altera Infrastructure | 8/12/2022 | Evercore | 1,596,300 | 200 | 14,400 | 0.90% | 1.00% | 1.00% | 2.00% | 3.00% | 18,000 |
| Voyager Digital | 7/5/2022 | Moelis & Company | 1,900,000 | 200 | 11,000 | 0.58% | 2.00% | 2.00% | 2.00% | 4.00% | NA |
| GWG Holdings, Inc.[1] | 4/20/2022 | PJT Partners | 2,016,339 | 175 | 7,750 | 0.38% | 1.00% | 1.00% | 2.00% | 3.00% | NA |
| Alto Maipo | 11/17/2021 | Lazard Frères | 2,076,000 | 150 | 8,304 | 0.40% | NA | NA | NA | NA | NA |
| Riverbed Technology | 11/16/2021 | GLC Advisors & Co. | 1,983,494 | 175 | 8,628 | 0.44% | 1.50% | 1.50% | 2.00% | 4.00% | NA |
| Carlson Wagonlit Travel[2] | 11/11/2021 | Houlihan Lokey | 1,587,000 | 150 | 6,500 | 0.41% | 1.00% | 1.00% | 3.00% | 5.00% | 16,500 |
| PWM Property Management LI | 10/31/2021 | Houlihan Lokey | 2,170,000 | NA | 9,500 | 0.44% | 0.50% | 0.50% | 1.50% | 2.50% | NA |
| GTT Communications | 10/31/2021 | Piper Sandler | 2,015,257 | 175 | 10,000 | 0.50% | 1.00% | 2.00% | 2.50% | 4.50% | NA |
| Corp Group Banking S.A. | 6/25/2021 | Lazard Frères | 1,863,000 | 150 | 4,850 | 0.26% | NA | NA | NA | NA | NA |
| Belk | 2/23/2021 | Lazard Frères | 1,906,900 | 200 | 7,729 | 0.41% | NA | NA | NA | NA | NA |
| Gulfport Energy[4] | 11/13/2020 | Perella Weinberg Partners | 2,410,000 | 150 | 17,000 | 0.71% | 1.00% | 1.00% | 1.00% | 3.00% | 17,000 |
| Oasis Petroleum[5] | 9/30/2020 | Perella Weinberg Partners | 2,265,000 | 150 | 9,750 | 0.43% | 1.00% | 1.00% | 2.00% | 3.00% | 13,500 |
| Garrett Motion Inc.[6] | 9/20/2020 | Perella Weinberg Partners | 1,860,000 | 225 | 15,000 | 0.81% | 1.00% | 1.00% | 2.00% | 4.00% | 24,500 |
| Fieldwood Energy LLC.[7] | 8/3/2020 | Houlihan Lokey | 1,800,000 | 175 | 8,250 | 0.46% | 0.50% | 0.50% | 0.50% | 0.50% | NA |
| Denbury Resources Inc. | 7/30/2020 | Evercore | 2,406,100 | 200 | 10,500 | 0.44% | 1.25% | 1.25% | 1.25% | 2.63% | NA |
| Covia Holdings Corporation | 7/29/2020 | PJT Partners | 1,575,000 | 175 | 9,500 | 0.60% | NA | 1.00% | 2.00% | 4.00% | NA |
| Ascena Retail Group[8] | 7/23/2020 | Guggenheim Securities | 1,600,000 | 200 | 9,000 | 0.56% | NA | 1.00% | 3.00% | 5.00% | NA |
| Pyxus International Inc..[9] | 6/15/2020 | Lazard Frères | 1,512,586 | 150 | 7,500 | 0.50% | 1.00% | 1.00% | 1.00% | 3.00% | NA |
| Skillsoft Corporation[10] | 6/14/2020 | Houlihan Lokey | 2,129,500 | 175 | 6,250 | 0.29% | 1.00% | 1.00% | 2.50% | 5.00% | NA |
| Extraction Oil & Gas | 6/14/2020 | Moelis & Company | 1,700,200 | 150 | 8,000 | 0.47% | 1.00% | 1.50% | 1.50% | 3.00% | 12,750 |
| Centric Brands Holding LLC[11] | 5/18/2020 | PJT Partners | 1,783,600 | 175 | 8,000 | 0.45% | 1.00% | 1.50% | 2.00% | 4.00% | 12,000 |
| Ultra Petroleum Corp. | 5/14/2020 | Centerview Partners | 1,972,300 | 150 | 8,250 | 0.42% | 0.50% | 0.50% | 2.00% | 3.00% | NA |
| Diamond Offshore Drilling Inc. | 4/26/2020 | Lazard Frères | 2,442,000 | 165 | 11,000 | 0.45% | NA | 1.00% | 2.00% | 3.00% | 13,500 |
| American Commercial Lines[13] | 2/7/2020 | Greenhill & Co. | 1,501,600 | 150 | 7,000 | 0.47% | 1.00% | 1.00% | 3.00% | 5.00% | 7,250 |
| Philadelphia Energy Solutions[14] | 7/21/2019 | PJT Partners | 1,750,081 | 150 | 5,000 | 0.29% | 1.50% | 1.00% | 3.00% | 5.00% | NA |
| Bristow Group Inc. | 5/11/2019 | Houlihan Lokey | 1,720,000 | 200 | 9,000 | 0.52% | 0.75% | 1.50% | 3.00% | 6.00% | 17,000 |
| Checkout Holding Corp[15] | 12/12/2018 | Centerview | 1,919,000 | 175 | 12,000 | 0.63% | 1.00% | 1.00% | 3.00% | 5.00% | NA |
| EXCO Resources[16] | 1/15/2018 | PJT Partners | 1,625,000 | 175 | 6,250 | 0.38% | 1.00% | 1.00% | 3.00% | 5.00% | NA |
| **Mean** | | | **$1,890,023** | **$173** | **$9,143** | **0.49%** | **1.03%** | **1.12%** | **2.05%** | **3.74%** | **$15,200** |
| **Median** | | | **1,863,000** | **175** | **8,628** | **0.45%** | **1.00%** | **1.00%** | **2.00%** | **4.00%** | **15,000** |

1.   Sale Fee of $12,000,000
2.   Sale Fee equals to 1.25% of transaction value
3.   $16,500,000 including Monthly Fee
4.   Sale Fee equal to 0.6% of transaction value
5.   Cap of $13,500,000 on Restructuring Fee and Financing Fee
6.   Sale Fee equal to 1.0% of transaction value
7.   Sale Fee equal to $13,000,000; 50% of any Sales Fee in connection with in-court M&A Transaction (or within 9 months of Emergence) shall be creditable against Restructuring Fee
8.   Sale Fee equal to 1.0% of transaction value
9.   If Sale of Control occurs, Sales Fee equals to 1.5% of transaction value, otherwise, Sales Fee equals to the greater of 2.0% or $500,000
10.  In the event of any Sale Transaction, Sale Fee equals to an amount within the range of fees customarily paid to investment bankers of similar standing for similar transactions; 50% crediting of Sales Fee against Restructuring Fee
11.  Sale Fee equal to 1.0% for transaction values up to $375,000,000 and 3.5% for transaction values above $375,000,000
12.  Sale Fee equal to 1.0% of the transaction value; Cap of $12,000,000 on all Restructuring Fees, Transaction Fees, and Capital Raising Fees
13.  Sale Fee equal to the greater of calculation per schedule and $11,000,000; Partial Company Sale Fee equals to the greater of calculation per schedule and $1,000,000; Cap of $13,500,000 on Restructuring, Financing, Sales or Partial Sales Fees
14.  Cap of $1,250,000 on New Capital Fees; Cap of $1,250,000 on New Capital Fees and Expedited Liability Management Transaction Fee; Cap of $7,250,000 on New Capital Fees and Non-Expedited Liability Management Transaction Fee
15.  Sale Fee equal to 1.0% of transaction value
16.  Sale Fee equal to 1.0% of transaction value
17.  Sale Fee equal to 0.75% - 1.00% of transaction value

## Select Debtor Investment Banker Fee Comparable Terms ($1.5bn - $2.5bn Prepetition Liabilities)

MOELIS & COMPANY

**RESTRUCTURING FEE ($MM)**



Mean: $9.1mm
Median: $8.5mm

**RESTRUCTURING FEE TO PREPETITION TOTAL LIABILITIES (%)**



Mean: 0.48%
Median: 0.45%

## Exhibit C

**Summary of Moelis' Role and Services**

## Moelis' Role on the BlockFi Team

M O E L I S & C O M P A N Y

**Moelis would focus on high level strategies and tactics, sourcing new capital (as part of a DIP or longer term), evaluating strategic and financial alternatives including M&A, divestitures and minority investments and valuation of individual assets and broader business(es) in the context of a transaction or stand alone plan and all associated negotiations**

| MOELIS | CRISIS MANAGER / OPERATIONS SUPPORT / MANAGEMENT CONSULTANT |
|---|---|

**MOELIS**

- Strategic alternatives development and review
- Business plan review in light of sourcing capital
- Creating of marketing materials
- Negotiations with creditors and other parties of interest
- Act as liaison between the UCC and various other creditors
- Sourcing capital for standalone transaction
- Capital structure and debt capacity
  - Determine appropriate liquidity today and going forward
  - Evaluate debt capacity
  - Determine appropriate capital structure
  - Exit financing
- Valuation analysis and testimony
- Lead and advise board on M&A
- Interface with investors and buyers
- Determine highest or otherwise best proposal / offer
- Strategic analysis of operational improvements

**CRISIS MANAGER / OPERATIONS SUPPORT / MANAGEMENT CONSULTANT**

- Monitor and analyze liquidity / cash flow, including:
  - 13-week cash flow analysis
  - Actual vs. projected usage of cash
  - Review ongoing monthly performance
- Operating/Business plan analysis
  - Business plan diligence
  - Projections / validation
- Bankruptcy Administration
  - First day motions and general motions
  - Schedules/SOFAs
  - Claims review
  - Intercompany analysis
  - Pension funding status and financial analysis
  - Contract rejections and assumptions
  - MORs; Periodic Reports
- Tax issues
- KEIP / KERP
- Waterfall model

**<u>Exhibit D</u>**

**Selected Claims Monetization Credentials**

### *Moelis Dispute Advisory Group*
## Dispute Advisory Group Overview

M O E L I S & C O M P A N Y

**Moelis provides a full suite of strategic advisory services at all stages of the process**



**1 LEGAL FINANCE**
(e.g., assistance with sourcing legal finance)

**2 LITIGATION SUPPORT**
(e.g., deposition, expert report, testimony)

*DISPUTE RESOLUTION*

**3 ENFORCEMENT & SETTLEMENT**
(e.g., asset valuation, ability-to-pay analysis)

**4 MONETIZATION**
(e.g., sale or financing of claim or asset (pre- or post-settlement))

**5 PROCESS MANAGEMENT**
(e.g., leveraging Moelis' relationships with key stakeholders, representation in negotiations)

**Moelis' Dispute Advisory Group presents a unique combination of skills that few other firms can match, empowering us to create incremental value for our clients**

## *Moelis Dispute Advisory Group*
## Select Credentials

MOELIS & COMPANY

### Moelis is and has been providing differentiated strategic advice in a range of dispute-related situations

---

*Ongoing*

 

**c. $1.5bn**

Litigation support
related to international arbitration
dispute against Venezuela

**Financial Advisor**

---

*Ongoing*



**c. $1bn**

Maximization of value of claim
against Cineworld

**Financial Advisor**

---

*Ongoing*

TESLA

**c. $160mm**

Litigation support related to
derivatives trade facing
JPMorgan

**Financial Advisor**

---

*Ongoing*

**[Aircraft Lessor]**

**[Confidential]**

Monetization of portfolio of
insurance claims arising out of
Russia's invasion of Ukraine

**Financial Advisor**

---

*Ongoing*

**[Construction Co.]**

**[Confidential]**

Monetization of international
arbitration claim

**Financial Advisor**

---

*Ongoing*

**c. $10bn**

Mediation in connection with
PREPA restructuring

**Financial Advisor**

---

*Ongoing*

FannieMae
Freddie Mac

**c. $33bn**

Advisors to select
non-litigating preferred
stockholders

**Financial Advisor**

---

*November 2022*



**c. $224mm**

Litigation support related to
makewhole dispute

**Financial Advisor**

---

*December 2019*



**$500mm**

Settlement agreement of its
international arbitration award
against EGAS and EGPC

**Financial Advisor**

---

*October 2019*



**$150mm**

Platform equity capital raise

**Exclusive Financial Advisor
and Placement Agent**

---

*October 2017*



**c. $2bn**

Litigation support related to a
portfolio of derivatives facing
Lehman Brothers

**Consulting Expert**

---

*August 2013*

**Brookfield**

**c. $1.4bn**

Litigation support related to a
solvency analysis of AIG, Inc.
in connection with derivative
trade termination

**Financial Advisor**