UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esquire
Lauren Bielskie, Esquire
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
Email: jeffrey.m.sponder@usdoj.gov
      lauren.bielskie@usdoj.gov

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BlockFi Inc., *et al.*,[1] | Case No. 22-19361 (MBK) |
| | Jointly Administered |
| Debtors. | Hearing Date: January 30, 2023 at 10:00 a.m. |

**UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES AND RELATED DATES AND DEADLINES, (II) SCHEDULING HEARINGS AND OBJECTION DEADLINES WITH RESPECT TO THE DEBTORS' SALE, DISCLOSURE STATEMENT AND PLAN CONFIRMATION, AND (III) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, files this objection (the "Objection") to the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect to the Debtors' Sale,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).

*Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* (the "Bidding Procedures Motion") (Dkt. 226), and respectfully states:

## I. JURISDICTION, VENUE AND STANDING

1. This Court has jurisdiction to hear and determine this Objection.

2. Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this Objection. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## II. FACTUAL BACKGROUND

**General Case Background**

4. On November 28, 2022 ("Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). *See* Case Nos. 22-19361, 22-19363, 22-19365, 22-19366, 22-19367, 22-19368, 22-19370, 22-19371 and 22-19374 at Dkt. 1.

5. On November 29, 2022, the Court entered an Order directing that these cases be jointly administered. *See* Dkt. 42.

6. The Debtors continue to operate their business(es) as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2

7. No trustee or examiner has been appointed in these chapter 11 cases.

8. On December 21, 2022, the U.S. Trustee appointed an Official Committee of Unsecured Creditors. *See* Dkts. 130 and 131.

9. BlockFi "provide[s] credit services to markets with limited access to simple financial products." *See* Dkt. 17 at ¶ 22. "BlockFi acquires clients by offering custom products and services that enable its clients to meet their financial goals, and continuously expands its product suite to deepen its relationship with its clients over time." *See id.* at ¶ 29. "BlockFi serves retail clients through web and mobile applications, and its products enable individuals and small businesses to store and/or earn interest on, buy and sell, borrow U.S. Dollars secured by, and earn (via credit card rewards program) digital assets." *See id.* at ¶ 30. On the institutional side, "BlockFi provides hedge funds, market makers, proprietary trading firms, trading desks, cryptocurrency miners, exchanges, and corporations with bespoke financing, trading, and treasury solutions relating to digital assets." *See id.*

**Motion to Redact Matrix, Schedules, and Other Documents**

10. The Debtors previously moved before this Court to redact the names and contact information of their clients in all pleadings. *See* Dkt. 4, *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders, and (V) Granting Related Relief* ("Motion to Redact").

11. The Debtors requested this extraordinary relief because of perceived unique threats to the safety of individuals in the cryptocurrency industry, to avoid violations of the UK GDPR and EU GDPR, and to protect the proprietary value of the client list. *See* Dkts. 4 and 337.

12. More particularly, the Debtors argued that "BlockFi clients must not be forced to face risks of cyberattacks, physical threats, and other harm from bad actors who seek to gain access to digital-asset information. The threats are real, not imagined or speculative. The more accessible a BlockFi client's name and personally identifiable information become, the more the client becomes a target." *See* Dkt. 337 at ¶ 2.

13. As additional support for this relief, the Debtors stated:

> privacy and data protection regulations have been enacted in key jurisdiction. The United Kingdom Data Protection Act of 2018 and the United Kingdom General Data Protection Regulation (together the "UK GDPR"), the European General Data Protection Regulation (the "EU GDPR"), and similar laws in other jurisdictions, impose significant constraints on the processing (which includes the transferring or disclosing) of information relating to identified and identifiable individuals (which includes names and home addresses of individuals and individual business contacts) ("Personal Data").
> …
> Violators of the UK GDPR and EU GDPR risk severe penalties. If an organization is found to have processed information in breach of the UK GDPR, the organization may be fined up to the higher of £17,500,000 or 4% of worldwide turnover – i.e., total annual revenues – of the preceding financial year . . . Similarly, for a breach of the EU GDPR, the organization may be fined up to the higher of €20,000,000 of 4% of worldwide annual turnover – i.e., total annual revenues – of the preceding financial year.

*See id.*, ¶¶ 13 and 15.

14. The Debtors stated, "the UK GDPR and EU GDPR may apply to the Debtors, specifically, as certain of the Debtors may be processing data relating to their creditors, including employees, former employees, and individual contract workers, and individual equity holders in the context of an establishment in the United Kingdom or in a member state of the European

4

Economic Area." *See id.*, at ¶ 15. Accordingly, disclosure of personal information "risks violating the UK GDPR and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties." *See id.* at ¶ 16.

15. And with regard to the proprietary nature of the client list, the Debtors argued "[t]he Debtors' client list is a valuable asset that, if shared with competitors, would challenge the Debtors ability to reorganize as competitors may try to poach the Debtors' investors." *See id.* at ¶ 19.

**The Bidding Procedures Motion and Requested Bid Protections**

16. On January 9, 2023, the Debtors filed the Bidding Procedures Motion.

17. The Bidding Procedures Motion seeks an order: authorizing and approving bidding procedures; establishing dates and deadlines for a potential pre-confirmation sale of the Debtors' equity and/or assets and scheduling an Auction, if any; and scheduling dates and deadlines for the approval of a disclosure statement, a sale pursuant to Section 363 and/or confirmation of a chapter 11 plan. *See* Dkt. 226.

18. Pursuant to the Bidding Procedures Motion, bids would be required by February 13, 2023, and an Auction could be scheduled for February 17, 2023. *See id.*

19. As of the filing of the Bidding Procedures Motions, the Debtors state that "over thirty-five Potential Counterparties have entered into confidentiality agreements with the Debtors." *See id.* at ¶ 10.

20. The Debtors do not identify a stalking horse bidder, but seek pre-approval of stalking horse bid protections so that "the Debtors have the option of paying or otherwise incurring such obligations[.]" *See id.* at ¶ 30.

21. The Debtors seek approval of prospective bid protections, without any further order of the Court, that would award a yet-to-be-determined bidder with a break-up fee equal to no more

5

than 3% of the yet-to-be-determined purchase price, as well as yet-to-be-determined expense reimbursement. *See id.* at ¶ 26.

**The Debtors' Privacy Policy**

22. The Debtors' Privacy Policy states "We do not sell your Personal Information." *See* Exhibit A at page 6 of 16.

IV. LAW ANALYSIS AND ARGUMENT

*A. The Breakup Fee Should Not Be Approved Prospectively*

23. The Debtors should not be permitted to award bid protections where not only is there no asset purchase agreement, but there are no offers on the table nor is there a potential stalking horse.

24. No bid protections should be provided until there is an actual stalking horse bidder with a *bona fide* asset purchase agreement that is finalized and signed and filed with the Court with a separate hearing to consider allowance of any proposed bid protections with the opportunity for parties in interest to object to same.

25. Bid protections must be sought pursuant to, and analyzed under, Section 503(b) of the Bankruptcy Code. *See Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *Calpine Corp. v. O'Brien Envt'l Energy* (*In re O'Brien Envt'l Energy, Inc.*), 181 F.3d 527 (3d Cir. 1999)). Section 105(a) is not a basis to award an administrative expense. *See In re Woman First Healthcare, Inc.,* 332 B.R. 115, 120-21 (Bankr. D. Del. 2005).

26. The analysis of bid protections under Section 503(b) "must be made in reference to general administrative expense jurisprudence. In other words, the allowability of bid protections, like that of other administrative expenses, depends upon the requesting party's ability to show that

6

the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535; *see In re Energy Future Holdings Corp. ("EFH I")*, 904 F.3d 298, 313 (3d Cir. 2018) ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]").

27. An administrative expense's benefit to the estate "must be *actual*, not hypothetical." *In re Energy Future Holdings Corp. ("EFH II")*, No. 19-3492, 2021 WL 957301 at *10 (3d Cir. Mar. 15, 2021) (emphasis in original) (citing *In re Continental Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992)).

28. A break-up fee may provide a benefit to the estate where (1) assurance of the break-up fee promotes more competitive bidding, such as by inducing a bid that otherwise wouldn't have been made, (2) availability of the break-up fee induces a buyer to perform diligence and set a floor price. *See EFH I*, 904 F.3d at 313-14 (citing *O'Brien*, 181 F.3d at 537).

29. Even if a break-up fee would benefit the estate, the Court is not required to approve it. *See EFH I*, 904 F.3d at 313-14 ("We have never held that bankruptcy courts must allow fees whenever they find that [a break-up fee confers a benefit on the estate.]"). The Court must determine, based on the totality of the circumstances of the case, "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate." *Id.* (citing *O'Brien*, 181 F.3d at 535) (quotation marks omitted).

30. The party requesting bid protections has the burden of showing that the fee is actually necessary to preserve the value of the estate. *See O'Brien*, 181 F.3d at 535.

31. In *EFH II*, the United States Court of Appeals for the Third Circuit considered, in the context of a motion to dismiss based upon the sufficiency of the pleading, an administrative

7

expense application submitted by an unsuccessful bidder. Initially, the unsuccessful bidder argued that the lower courts erred in measuring whether its bid had conferred a benefit using hindsight (as opposed to measuring the benefit at the time the bid was submitted). *See EFH II* at *12. The Third Circuit rejected that argument and concluded that, consistent with the well-established Bankruptcy Code policy of limiting administrative expenses, it was "entirely appropriate to consider" the asserted benefit "through the rearview mirror." *Id.*

32. The unsuccessful bidder in *EFH II* also asserted two potential benefits to the process: that it served as a stalking horse bidder, and that its unsuccessful efforts provided a "roadmap" for other viable bids that were later submitted, including the successful bid. *Id.* The Third Circuit rejected the argument that the unsuccessful bidder had stated a plausible argument for allowance of an administrative expense on a theory that its bid served as a catalyst for the submission of other bids, as it was the only bid at the time it was submitted. *Id.* While the bid did not technically establish a "floor" because the estates ultimately accepted a substantially lower offer after the unsuccessful bid fell through, the Third Circuit found that the argument that the bid had provided a "roadmap" for other bids post-termination was a plausible argument in favor of benefit to the estate. *Id.* at *12-13. The Third Circuit remanded the matter in *EFH II* so that a sufficient record could be developed to enable the bankruptcy court to determine, in hindsight, the extent to which the unsuccessful bidder's participation had actually benefitted the estate more than it had harmed the estate. *Id.* at *15.

33. In this case, there is no present stalking horse, so any benefit a stalking horse could provide to the Debtors' estates cannot be determined. Taking up bid protections (or the process for awarding them) before a bid is even in hand, is premature. At this point, the Court cannot predict whether a future bid or bids containing unknown terms submitted by an unidentified bidder will

8

help elicit qualified bids. As a result, the Court does not have a basis to determine that bid protections will confer an "actual" benefit on the Debtors' estates that outweighs any potential harms. In paragraph 2 of the proposed bid procedures order, the Debtors propose a finding that the Debtors "have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of the Debtors' enterprise, including with respect to the proposed procedures for providing Bid Protections as determined by the Debtors in an exercise of their business judgment." This is the type of hypothetical benefit that the Third Circuit rejected in *EHF II*. Consistent with the Third Circuit's latest guidance, the Court should not consider bid protections until there is a sufficient evidentiary record on which to make the legal determinations outlined in *O'Brien* and subsequent Circuit cases.

34. In sum, the Debtors' request for authority to award bid protections should be denied as it undermines this Court's control of administrative expenses.

### B. Under Sections 363(b)(1) and 332 of the Bankruptcy Code, a Consumer Privacy Ombudsman Should Be Required

35. As set forth above, the Debtors offer client services in the cryptocurrency space and have asked this Court to approve the bidding procedures for a potential sale of the business. The Debtors believe their client list is a valuable asset and integral to a potential sale. Accordingly, a sale would include the Debtors' client list and the personally identifiable information of its customers. It is unclear whether potential bidders are receiving unredacted copies of the client list. It is the Debtors' burden to establish that the proposed sale is consistent with the Debtors' Privacy Policy, assuming that Privacy Policy is in lie with the UK GDPR and EU GDPR, or, only after the appointment of a consumer privacy ombudsman can the Court consider the facts, circumstances, and conditions of such proposed sale. *See* 11 U.S.C. § 363(b)(1).

36. The Bankruptcy Code contains provisions designed to protect certain personally identifiable information of consumers in connection with the sale of assets under Section 363(b) of the Bankruptcy Code. Section 363(b)(1) provides that:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of commencement of the case, then the trustee may not sell or lease the personally identifiable information to any person unless –
>
> (A) such sale or lease is consistent with such policy; or
>
> (B) After appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease –
>
>   i. giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
>
>   ii. finding that no showing was made that such sale or such lease would violate applicable non-bankruptcy law.

*See* 11 U.S.C. § 363.

37. Section 332 of the Bankruptcy Code states as follows:

> (a) If a hearing is required under section 363(b)(1)(B), the court shall order the United States trustee to appoint, not later than 7 days before the commencement of the hearing, 1 disinterested person (other than the United States trustee) to serve as the consumer privacy ombudsman in the case and shall require that notice of such hearing be timely given to such ombudsman.
>
> (b) The consumer privacy ombudsman may appear and be heard at such hearing and shall provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of such personally identifiable

>  information under section 363(b)(1)(B). Such information may include presentation of-
>
>  (1) the debtor's privacy policy;
>
>  (2) the potential losses or gains of privacy to consumers if such sale or lease is approved by the court;
>
>  (3) the potential costs or benefits to consumers if such sale or such lease is approved by the court; and
>
>  (4) the potential alternatives that would mitigate potential privacy losses or potential costs to consumers.
>
>  (c) A consumer privacy ombudsman shall not disclose any personally identifiable information obtained by the ombudsman under this title.

*See* 11 U.S.C. § 332.

38. Personally identifiable information is defined in Section 101(41A) of the Bankruptcy Code ("PII"), and includes, among other things, "the first name (or initial) and last name of such individual", "the geographic address of a physical place of residence", and "an electronic address (including an e-mail address) of such individual." *See* 11 U.S.C § 101(41A).

39. Federal Rule of Bankruptcy Procedure 6004(g) requires that any motion for authority to sell or lease PII under section 363(b)(1)(B) of the Bankruptcy Code shall include a request for an order directing the United States Trustee to appoint a consumer privacy ombudsman. *See* Fed. R. Bankr. P. 6004(g). The motion must, at a minimum, be served on any committee appointed under Section 1102 of the Bankruptcy Code, the twenty largest unsecured creditors and such other entities as the court may direct. *See id.* If an ombudsman is appointed, the United States Trustee must file, no later than seven days before the hearing under section 363(b)(1)(B), a notice of appointment. *See id.*

40. The Bidding Procedures Motion anticipates the sale of personally identifiable information. The Debtors' Privacy Policy states "We do not sell your personal information."

41. The Debtors contend the UK GDPR and the EU GDPR applies to them. In the Motion to Redact, the Debtors requested relief from this Court to redact individual's names and addresses, because disclosure of personal information "risks violating the UK GDPR and EU GDPR, exposing the Debtors to potential civil liability and significant financial penalties."

42. The Debtors have not addressed whether the sale of customer information will violate the UK GDPR and EU GDPR.

43. The Debtors' concerns with protecting customer information and in complying with the UK GDPR and EU GDPR were paramount in the Motion to Redact. The Debtors should be just as concerned about protecting customer information and compliance with the UK GDPR and EU GDPR connection with the bidding procedures and a potential sale.

44. Given the Debtors' expressed regard both for the privacy and safety of its clients and the value of the client list to its business, the appointment of a consumer privacy ombudsman should be uncontroversial. However, the Debtors have not agreed to such appointment.

45. The goal here should be the proper treatment of PII and safeguarding consumers' rights in the midst of a sale of assets in bankruptcy. In pursuit of these objectives, and in certain circumstances, the Bankruptcy Code provides for the appointment of a consumer privacy ombudsman. It may be that the transfer of customers' PII to a purchaser is advantageous to both the purchaser and the customer, but to that end, the Bankruptcy Code provides a resource to ensure the proper treatment of customers' PII in making the transfer. Since the Debtors' Privacy Policy provides that the Debtors will not transfer personal information, a consumer privacy ombudsman must be appointed pursuant to Sections 363(b)(1) and 332 of the Bankruptcy Code.

### C. Other Concerns with Bidding Procedures

46. Further, in the event the Motion is granted, the U.S. Trustee requests the following:

    a. Paragraph 7 of the proposed Order should include that notice will be provided and posted at least five (5) business days prior to the auction to Qualified Bidders, the Committee and the U.S. Trustee.

    b. The date for the disclosure statement to be filed should be revised from April 10, 2023 to April 3, 2023 and the deadline to serve the solicitation packages should be reduced from fourteen (14) calendar days to ten (10) calendar days. In addition, the Debtors should be required to file a Certification of Balloting on or before June 16, 2023, at 4:00 p.m. prevailing Eastern Time pursuant to D.N.J. LBR 3018-1(b).

    c. Section E of the Bidding Procedures should provide that the Debtors can choose the minimum bid increments only in consultation with the Committee or with approval of the Court.

    d. Section M of the Bidding Procedures should be revised to include notice of any modifications to be provided to the Committee, and the U.S. Trustee, who shall have the ability to contest such additional terms and conditions through the filing of a motion with the Bankruptcy Court.

## CONCLUSION

WHEREFORE, the United States Trustee respectfully submits that the Court deny the Motion and grant such other relief as the Court deems just and necessary.

Respectfully Submitted,

**ANDREW R. VARA,**
**UNITED STATES TRUSTEE**
**REGIONS 3 & 9**

By: */s/ Jeffrey M. Sponder*
Jeffrey M. Sponder
Trial Attorney

By: */s/ Lauren Bielskie*
Lauren Bielskie
Dated: January 25, 2023                Trial Attorney