**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Proposed Attorneys for Debtors and Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# DEBTORS' REPLY TO THE UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' BIDDING PROCEDURES MOTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this reply in support of the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

*(III) Granting Related Relief* [Docket No. 226] (the "Bidding Procedures Motion") and in response to the *United States Trustee's Objection to the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect to the Debtors' Sale, Disclosure Statement and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 406] (the "Objection") filed by the United States Trustee for the District of New Jersey (the "U.S. Trustee")[2]. In support of this reply, the Debtors state the following:[3]

### Preliminary Statement

1. The Debtors' goal in these cases is to maximize the value available to their stakeholders, including clients, on as swift of a timeline as possible. The proposed Bidding Procedures are designed to establish an appropriate process to identify the highest and best value for sales of each of the Debtors' Assets. The proposed procedures strike a balance between the time needed to facilitate a competitive marketing and sale process that will deliver as much value as possible to the Debtors' stakeholders with the desire to progress these chapter 11 cases expeditiously. In their design, the Debtors attempted to balance the expectations of potential purchasers in the market with the requirements for notice under the Bankruptcy Code.

2. The Debtors are currently marketing or consider marketing three different categories of assets for a potential sale or monetization: (a) the Debtors' mining assets; (b) the

---

[2] The Committee objection titled the *Limited Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* filed at Docket No. 385 has been fully resolved.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the First Day Declaration, the Bidding Procedures Motion, the Bidding Procedures, the Tichenor Declaration (as defined herein), and the Objection, as applicable.

Debtors' customer platform; and (c) certain claims that the Debtors may hold, among others. To date, the Debtors have reached out to over 200 potential parties about potential transactions for certain of the Debtors' Assets, executed over seventy confidentiality agreements with potential counterparties, and are well-positioned to proceed with sales for each of these asset categories in the immediate future if the Debtors determine that to be the most value-maximizing path forward. The Debtors have also worked closely with the Committee on the proposed Bidding Procedures and have made certain modifications to incorporate their comments, as reflected in the revised form of order filed contemporaneously herewith (the "Revised Proposed Order").

3. The Debtors have also worked closely with the U.S. Trustee in an effort to resolve its Objection over the past week. Those discussions have been productive, and the Debtors and the U.S. Trustee have narrowed many of the issues that were raised in its Objection. The sole remaining issue in contention is the timing of the proposed Bid Protections. More specifically, the U.S. Trustee believes that it is premature to approve Bid Protections when no Stalking Horse Bidder has yet been selected. The U.S. Trustee's position ignores the practical realities the Debtors are facing and the need to act as swiftly as possible in consummating a restructuring transaction. The Debtors are prepared to demonstrate that the Bid Protections, including the amount and timing thereof, are designed to maximize value, are in line with the expectations of buyers in the market, and have been approved by courts in this and other jurisdictions. The ability to designate a Stalking Horse Bidder is essential to allow the Debtors to enter into an auction with certainty, while simultaneously setting a floor for a competitive bidding process. Given the volatility in the cryptocurrency space, time is not on the Debtors' side—the proposed Bidding Procedures, including the proposed Bid Protections, are necessary and astutely tailored to ensure that the Debtors can secure a buyer to maximize the value of their assets.

4. For these reasons, as well as the reasons set forth herein, the Objection should be overruled.

## Reply

I. **The Bidding Procedures Reflect the Debtors' Sound Business Judgment and Are Designed to Maximize Value.**

5. Procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value of the estate and are appropriate in the context of bankruptcy transactions.[4] Courts approve such procedures if they are supported by a sound business justification.[5] The proposed Bidding Procedures permit the Debtors to offer customary Bid Protections to preserve and maximize the value of the Debtors' estates, and such Bid Protections are only offered after a Stalking Horse Notice is filed with the Court, all parties are given notice and an opportunity to object, and an order is entered.[6] These proposed Bidding Procedures were carefully designed to

---

[4] *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 15, 2021) ("The Bidding Procedures . . . are fair, reasonable, and appropriate under the circumstances and designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest."); *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures "intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

[5] *See In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *Schipper*, 933 F.2d at 515 (internal citations and quotations omitted) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also Integrated Res.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures negotiated by a debtor are reviewed under the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

[6] *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("Therefore, we indicated that in considering requests for break-up fees, we would apply the general standard used for all administrative expenses . . . ."); *In re O'Brien Env't Energy, Inc.*,

4

allow the sale process to proceed as expeditiously as possible while also providing notice to such parties as the process develops.

6.  As noted in the *Declaration of Brian Tichenor in Support of the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* (the "Tichenor Declaration"), the Debtors have already received several bids for their assets and expect to receive additional bids. Moreover, the proposed Bidding Procedures, including prospective Bid Protections afforded to a Stalking Horse, are in line with market and substantially similar to bidding procedures approved in countless other large chapter 11 cases, including recent cases in the cryptocurrency space.[7] There can be no serious dispute that the proposed Bidding Procedures are a valid exercise of the Debtors' sound business judgment.

7.  Initially, the U.S. Trustee objected to the timing and flexibility that the Debtors sought in the Bidding Procedures Motion to designate a Stalking Horse Bidder in their sole discretion in advance of any auction. Objection ¶¶ 23–34. In response, the Debtors revised the proposed Bidding Procedures to provide for a Stalking Horse Notice to be filed with the Court to

---

181 F.3d 527, 535 (3d Cir. 1999) (recognizing that bid protections "encourage a prospective bidder to do the due diligence that is the prerequisite to any bid by assuring the prospective bidder that it will receive compensation for that undertaking if it is unsuccessful").

[7] *See, e.g.*, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y Aug. 5, 2022) (authorizing bid protections with three-day notice and objection period); *In re GVS Texas Holdings I,* LLC, No. 21-31121 (MVL) (Bankr. N.D. Tex. Nov. 10, 2021) (requiring disclosure of bid protections prior to Auction); *In re Alex and Ani, LLC*, No. 21-10917 (CTG) (Bankr. D. Del. July 16, 2021) (permitting approval of bid protections without a hearing on two days' notice of the execution of a stalking horse agreement); *In re Katerra Inc.*, No. 21-31861 (DRJ) (Bankr. S.D. Tex. July 6, 2021) (authorizing bid protections without an identified stalking horse of up to three percent of the purchase price and approving a similar scheduling construct for objections, hearings, etc.); *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (authorizing bid protections subject to approval on an expedited basis); *In re New England Motor Freight*, No. 19-12809 (JKS) (Bankr. D.N.J. Apr. 8, 2019) (authorizing bid protections subject to three-day notice and objection period).

5

approve the designation of a Stalking Horse Bidder, which allows for increased transparency and notice to parties in interest. The Debtors would then seek an order from the Court to permit such party to be a Stalking Horse Bidder prior to the Auction. The Debtors assert that prior to the Auction, Bid Protections need to be afforded to a Stalking Horse Bidder. This framework is in line with bid protections approved by courts in the Third Circuit and elsewhere, is the expectation of any potential purchaser who would seek to become a Stalking Horse Bidder, and remedies the U.S. Trustee's position on timing.

8. The Bid Protections here will serve the same purpose that they regularly serve: providing the Debtors with certainty surrounding a baseline bid, ensuring that a party will elect to become a Stalking Horse Bidder, and properly incentivizing that party to provide that commitment.[8] No other party has taken issue with approval of market and reasonable prospective Bid Protections, including the Committee, with whom the Debtors have negotiated extensively regarding the Bidding Procedures.

9. Moreover, the circumstances of this case are highly indicative of the need for a deliberate and decisive competitive bidding process, a goal for which a Stalking Horse Bidder is instrumental. The recent string of cryptocurrency chapter 11 cases have one common thread: cryptocurrency assets are volatile and expediency is required to maximize value from such assets. The Debtors need the flexibility to secure a Stalking Horse Bidder at the appropriate time to maximize value for their stakeholders. The Debtors are aware that additional time and fees expended by professionals will reduce the value of the assets and ultimate recovery of the Debtors' clients. The ability to designate a Stalking Horse is therefore invaluable, not only because it will

---

[8] *See Energy Future Holdings*, 904 F.3d at 313–14 (recognizing three grounds on which the benefit of bid protections may be shown, including promoting competitive bidding and assuring that a bidder adheres to its bid).

6

provide the Debtors with certainty as to a baseline bid, but also because it will minimize the professional fees and efforts expended in the sale process, which will help the Debtors preserve value and monetize assets as quickly as possible. Any party who would conceivably be a Stalking Horse will likely require the typical bid protections, including the three percent Breakup Fee and reasonable Expense Reimbursement, contemplated by the proposed Bidding Procedures.

10. Although the Debtors have made certain concessions at the request of the U.S. Trustee to ensure the process set forth in the Revised Proposed Order represents a middle ground, the Debtors, in a sound exercise of their business judgment, believe that the proposed Bid Protections, including the amount and timing thereof, reflect the expectations of the market, and are necessary to maximize the value of the Debtors' estates.

## II. The Bidding Procedures Adequately Address Privacy Concerns.

11. Although the Debtors have reached resolution with the U.S. Trustee surrounding the appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) and 332 of the Bankruptcy Code at the appropriate time in these cases, the Debtors need to ensure that certain terms of its privacy policy are reflected accurately in the record. The Objection cites to an incorrect section of the Debtors' privacy policy and does not reflect the relevant terms of their policy. *See* Objection ¶¶ 22, 40. The policy must be read as a whole.[9] Although it is true that the Debtors

---

[9] *See, e.g.*, *Wayne Land and Mineral Group LLC v. Delaware River Basin Commission*, 894 F.3d 509, 528 (3d Cir. 2018) ("We have explained that, for purposes of contract interpretation, [i]f the contract as a whole is susceptible to more than one reading, the fact finder resolves the matter, but if it is unambiguous and can be interpreted only one way, the court interprets the contract as a matter of law.") (internal quotations omitted) (alteration in original); *see also In re Touch Am. Holdings, Inc.*, 2017 WL 1497821, 14 (D. Del. 2017) ("A contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases . . . Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing. . . . [S]pecific clauses of a contract are to be read consistently with the over-all manifest purpose of the parties' agreement. Contracts are also to be interpreted to avoid inconsistencies and to give meaning to all of its terms."); *Benihana of Tokyo, Inc. v. Benihana Inc.*, 59 F. Supp. 3d 654, 600 (D. Del. 2014) ("In such circumstances, courts should 'read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases, and to safeguard against adopting an interpretation that would render any individual provision superfluous.'"); *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 769 F. Supp. 671, 705–06 (D. Del. 1991) ("The Court should not rewrite the

7

do not sell their clients' information to generate marketing revenue,[10] through the policy, the Debtors expressly reserve the ability to transfer customer data in the event of a sale of the Debtors' business.[11]

12. To be clear, the Debtors are committed to protecting all of their clients' data, which the U.S. Trustee acknowledges in the Objection. *See* Objection ¶¶ 41–43. Moreover, the Debtors will always comply with all laws, regulations, or other requirements in connection with any proposed sale transactions, and, despite the aspersions that the Objection implies, this is one of the Debtors' paramount concerns.

13. Under the Bankruptcy Code, a consumer privacy ombudsman must be appointed if there is a sale or lease with the transfer of personally identifiable information ***and*** that transfer is prohibited under the relevant privacy policy. In relevant part, the Debtors' policy contains the two following provisions, both of which contemplate that personally identifiable information may be transferred to a purchaser of the Debtors' business:

- We do not disclose your Personal Information to any third parties, except to those who require access to the data in order to perform their tasks and duties, and ***to share with third parties who have a legitimate purpose for accessing it***;[12] and

---

contract for the parties. It is not the Court's function to change the obligations of the parties under a contract that they saw fit to make. In applying the principles of contract interpretation, the Court must guard against inadvertently reforming a contract under the guise of construction by looking too intently for means of bringing about some ultimate good, thwarting an apparent wrong, or preventing hardship . . . The meaning of words is dependent upon their context, and the contract should be interpreted as a whole.") (internal quotations and citations omitted); *Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (2009) ("A contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases. . . . Courts 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'") (internal citations omitted).

[10] *See* Privacy Policy at 6.

[11] *See id.* at 4, 6.

[12] *Id.* at 4.

- We may share, transfer, allow access, or disclose your Personal Information to our affiliate companies and third parties to . . . ***[t]ransfer information to a purchaser of our business***.[13]

Based on the language above, any transfer of personally identifiable information in these cases would not be prohibited, and an ombudsman is arguably not necessary as the policy clearly contemplates (a) a sale to a third party and (b) a transfer of data to third parties who have a legitimate purpose for accessing it, hence satisfying section 363(b)(1) of the Bankruptcy Code.[14]

14. Indeed, only one of the Debtors' asset packages implicates personally identifiable information. Any potential sale of the Debtors' portfolio of physical mining assets, loans made to third-party mining or hosting companies, interests in joint venture mining operations, and claims against third parties does not implicate clients' personal data.

15. That said, in light of their commitment to preserving customer privacy, and because the U.S. Trustee has made this request, the Debtors are not wholesale opposed to the appointment of a consumer privacy ombudsman. Nevertheless, the Debtors (and based on discussions, the Committee) believe that any such appointment is premature given the current timeline of the

---

[13] *Id.* at 6. For the avoidance of doubt, this section of the privacy policy states in full, "[w]e may share, transfer, allow access, or disclose your Personal Information to our affiliate companies and third parties to: [a]dminister or process a transaction, product, or service you have authorized or requested, or in the context of facilitating the execution of a transaction; [v]alidate client identity as required by applicable laws and regulatory requirements; [f]acilitate the process for opening and maintaining client accounts (Personal Information is shared during the account opening process and shared on an ongoing basis thereafter); [c]arry out or aid in certain functions, including, but not limited to, account processing, surveillance, reconciliation, execution, document retention requirements, and document dissemination; [p]rocess payments that you have authorized; [o]perate, improve, and/or market our services and products; [o]perate, improve, and/or market our services and products; ***[t]ransfer information to a purchaser of our business***; [r]esolve a deficient balance upon account closing or excessive insufficient funds in your account; [d]eliver goods or services relating to promotions and special offers that require us to collect and share your Personal Information (*e.g.*, mailing address); [p]rovide services, including, but not limited to, consulting, sales, client support operations, payment processing, authentication services, and technical support; and [f]or other purposes which may include, but are not limited to, third-party audits, which may require disclosure to third parties about your account or transactions with your prior written permission."

[14] 11 U.S.C. § 363(b)(1)(A).

9

customer platform sale process, which is still in the early stages. Accordingly, the Debtors seek to limit the expenditure of estate resources to pay for a new professional until the appropriate time.

16. The Debtors worked with the U.S. Trustee on acceptable language surrounding its request and will engage in good faith negotiations with respect to timing of the appointment of a consumer privacy ombudsman, as reflected in the Revised Proposed Order.

### III. The U.S. Trustee's Remaining Requests are Unwarranted.

17. The U.S. Trustee's remaining requests surround the timing of a sale process that takes place through a plan. Although the Debtors included a confirmation schedule in the Bidding Procedures, such a schedule will likely be further revised when the Debtors file a motion to approve a disclosure statement and solicitation schedule. Accordingly, the Debtors will continue to engage with the U.S. Trustee on the timing under which the Debtors must serve solicitation packages and certifications of balloting, which timelines need to reflect the practical realities of providing notice to domestic and international creditors in a case of this size.

18. The Objection also asserts that the Debtors should be required to provide and post notice of any Auction at least five business days prior to any such Auction to the Qualified Bidders, the Committee, and the U.S. Trustee, or provides additional consultation or consent rights. This should be denied. As mentioned previously, this is not a normal sale process, and the Debtors need the flexibility to act decisively given the precarious market conditions currently facing the cryptocurrency industry. Thus, a two business days' notice period, the compromise the Debtors reached that is currently contemplated in the Revised Proposed Order, is more in line with the fast nature of these sales. The Debtors remain committed to engaging with the Committee, the U.S. Trustee, and all key stakeholders in these chapter 11 cases with respect to the marketing and sales process contemplated under the proposed Bidding Procedures and will continue to do as these chapter 11 cases progress. But the Revised Proposed Order reflects the realities and commercial

10

considerations that are needed to run an effective sale process. Affording any more leeway, or adding any more obstacles, will create a needless burden for the Debtors in their attempt to maximize value.

19. Accordingly, the Objection should be overruled, and the Court should approve the Bidding Procedures.

## Conclusion

20. For the foregoing reasons, as well as the reasons set forth in the Bidding Procedures Motion and the Tichenor Declaration, the Debtors request that the Court (a) overrule the Objections, (b) enter the proposed Order, and (c) grant such other and further relief that the Court deems just and proper.

*[Remainder of page intentionally left blank]*

Dated: January 29, 2023          /s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Proposed Attorneys for Debtors and
Debtors in Possession*