

**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

Sworn to me this 2nd day of February, 2023

*Ellen Herb*
_____

Ellen Herb
Notary Public, State of New York
No. 01HE6163785
Qualified in New York County
Commission Expires April 2, 2023

# PROOF OF PUBLICATION

February 2, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

 2/2/2023, NYT & NATL, pg B5 _____

 _____

*Larnyce Tabron*

# Self-Driving Car Services Aim to Expand Despite Recurring Mishaps

FROM FIRST BUSINESS PAGE

ices until officials gain a better understanding of the technology and its limitations. The letters were reported earlier by NBC News.

After operating limited services in San Francisco for several months, both companies have requested permission from the California Public Utilities Commission to charge money for driverless rides across the city and around the clock. But until the services are better understood, the city said, it does not want them operating in downtown San Francisco or during peak commuting times in the morning or evening.

"If the commission approves sweeping authorizations for both Waymo and Cruise, the hazards and network impacts caused by planned and unplanned A.V. stops that obstruct traffic could soon affect a large percentage of all San Francisco travelers," one of the letters said.

Both Cruise and Waymo said these letters were an expected part of their efforts to expand services in the city. "We have long appreciated a healthy dialogue with city officials and government agencies in California," said Katherine Barna, a Waymo spokeswoman.

The City of San Francisco declined to comment beyond what it said in its letters. "We welcome any suggestions on safety," said a Cruise spokesman, Aaron McLear.

The letters were the latest in back-and-forth talks among the companies, San Francisco officials and regulators.

Last year, Cruise began offering paid rides in driverless cars in certain parts of San Francisco between 10 p.m. and 5:30 a.m. And Waymo is now offering unpaid rides without drivers. But both companies still need regulatory approval before expanding commercial services without drivers across San Francisco. Waymo began offering paid rides in downtown Phoenix at the end of the year.

In August, Cruise asked the National Highway Traffic Safety Administration, the top federal regulator, to approve widespread tests of a new version of its self-driving car called Origin, which does not include a driver seat or a steering wheel. But San Francisco officials have expressed concern over this plan, too.

The plan, which could put as many as 5,000 of the new vehicles on the streets within two years, makes Cruise's past issues "far more consequential," the city said.





A Waymo autonomous vehicle. Waymo has asked regulators to allow an expansion of its self-driving car service in San Francisco. Right, a Cruise driverless car. Last year, Cruise began offering paid rides in driverless cars in parts of San Francisco between 10 p.m. and 5:30 a.m.

JUSTIN SULLIVAN/GETTY IMAGES
JASON HENRY FOR THE NEW YORK TIMES

If the company does not significantly improve performance of its technologies, it "could quickly exhaust emergency response resources and could undermine public confidence in all automated driving technology."

The autonomous cars can watch for pedestrians, change lanes and make right-hand turns. But they may struggle to deal with more complicated or unusual situations, like unprotected left-hand turns and broken traffic lights that engineers call "edge cases," because they do not happen as frequently as other scenarios.

"Sometimes these cars just need a human to help them out of a tough spot," said Phil Koopman, an engineering professor at Carnegie Mellon University who specializes in autonomous vehicles.

Waymo has operated a driverless service in suburban Arizona since the end of 2020. But that is very different from a congested city.

"If you get disabled on a quiet suburban street, you are not in anyone's way," said Matt Wansley, a professor at the Cardozo School of Law in New York who specializes in emerging automotive technologies. "If you're in the city, it's a big deal."

The Waymo car that blocked traffic in San Francisco last week entered a very complex and busy intersection "due to temporary road closures that precluded use of the intended route," Waymo said.

When a car cannot navigate a situation on its own, remote technicians can send the car additional information that can help it get going again. And if that does not work, the company must send a crew to retrieve the car.

At the end of June, Cruise caused a similar traffic jam in San Francisco. The company had trouble communicating with many of the cars in its fleet, and as they stalled in one area of the city, all lined up in a row, they clogged traffic until technicians arrived and got them moving again.

In September, five stalled Cruise vehicles blocked the path of city bus, delaying its 45 riders for at least 13 minutes. Its cars have also interfered with firefighting efforts in the city, according to the letter from San Francisco officials. One car obstructed a fire truck on its way to a fire. Firefighters shattered another car's window in an effort to prevent it from driving over their fire hoses.

Cruise cars have not caused life-threatening injuries or fatalities.

In the wake of such incidents, NHTSA, the federal regulator, recently opened an investigation into the company's cars. The agency is concerned that the vehicles "may strand vehicle passengers in unsafe locations, such as lanes of travel or intersections, and become an unexpected obstacle to other road users."

Cruise has repeatedly said it is working to prevent issues. But an independent review of the software systems that manage Cruise's fleet indicated that these software systems were not suited to the kind of widespread services that Cruise hopes to operate.

This review, which was completed last summer and was recently obtained by The New York Times, examined the systems that allow the company to communicate with its vehicles and provide remote assistance when the cars cannot solve problems on their own.

"Core fleet systems have significant stability, responsiveness and scaling challenges which now present fundamental problems for the company," the review said.

Conducted by consultants from IBM, the review said the systems, designed as a way of managing a small fleet of cars that included safety drivers, were not suited to a large fleet where the drivers had been removed.

"Further scaling with current platform will potentially compound existing issues," the review said. "Ability to simultaneously enhance the current platform while stabilizing it is in question."

A new system would require an additional $10 million to $20 million investment and most likely not be completed until the end of this year, according to the review. That is a relatively small expenditure considering the company spent more than $860 million on the development of its technology in the first half of last year.

Mr. McLear, the Cruise spokesman, said the company had fixed or addressed nearly every issue discussed in the review. "It is an outdated report," he said.

Even if Cruise redesigns and rebuilds its management software, there will be times when the company must send a crew to retrieve cars if they get stuck. The same is true of Waymo, a company spokeswoman, Julia Ilina, said. The companies must also send technicians when the cars break down in more traditional ways, such as a flat tire or a traffic accident.

Because of these limitations — and the hundreds of millions of dollars the companies are pouring into research and development — it is unclear how services will become viable businesses.

"The question is: Does this make sense economically?" said Dr. Koopman, of Carnegie Mellon. "They are taking the drivers out of the front of the car. But if they have just as many people in a building waiting for the cars to break, they haven't really solved anything."

---

## Updated ChatGPT Will Cost $20 a Month

**By CADE METZ**

SAN FRANCISCO — In November, OpenAI wowed the world when it released an experimental online chatbot called ChatGPT that could answer questions, write poetry and riff on almost any topic tossed its way.

Now, the tiny San Francisco start-up has announced that it will soon offer a commercial version of the chatbot, ChatGPT Plus, for $20 a month.

Subscribers will receive round-the-clock access to the chatbot, faster responses and access to new features, OpenAI said. The company will continue to offer a free version of the service, which is available to only a limited number of people during peak hours.

ChatGPT is the most prominent example of a new kind of chatbot that has captured the imagination of both the business world and the general public in recent weeks. Google, Meta and various start-ups have built similar systems that are only just beginning to emerge on the internet.

The result of more than a decade of research, these chatbots represent a sea change in the way the computer software is built and used. They are poised to reinvent



ChatGPT has captured the imagination of both the business world and the general public.

IRYNA KHABLIUK/ALAMY

internet search engines like Google Search and Bing, talking digital assistants like Alexa and Siri, and email programs like Gmail and Outlook.

They can also generate digital text that can be repurposed in almost any context. Students are already using ChatGPT to write term papers. Companies are generating email messages and other marketing materials.

But the technology comes with caveats. Because the capabilities of these chatbots are created by analyzing vast amounts of digital text posted to the internet, they cannot distinguish between fact and fiction and can produce text that is biased against women and people of color.

Initially, ChatGPT Plus will be available only to users in the United States. OpenAI has started a waiting list for the service and will begin inviting people on the list to join in the coming weeks.

The company said it would soon expand the service to other countries.

Chatbots like ChatGPT are unusually expensive to operate. In a recent tweet, Sam Altman, OpenAI's chief executive, said the company spent "single-digit cents" serving up each chat on the service. That can quickly add up, considering that more than a million people used ChatGPT in the first few days after its release.

The new subscription service is designed to make some of this money back while the company continues to offer a free version of the chatbot, said Hannah Wong-Silva, a spokeswoman for OpenAI.

---

## U.S. Survey Shows Uptick in Job Openings

**By LYDIA DePILLIS**

The nation's demand for labor only got stronger in December, the Labor Department reported on Wednesday, as job openings rose to 11 million.

That brings the number of posted jobs per available unemployed worker, which had been easing in recent months, back up to 1.9 — not what the Federal Reserve has been hoping for as it seeks to quell inflation.

"It does make you question whether we continue to see that slowing in net job creation," said Kathy Bostjancic, chief economist at the financial services company Nationwide. "There's still a strong demand for workers, and that suggests that the labor market is still running very tight, and too hot."

The 5.5 percent increase in job openings was largely driven by hotels and restaurants, which have been steadily recovering from the pandemic, and jumped sharply to 1.74 million positions posted. Jerome H. Powell, the Fed chair, has been particularly focused on wage inflation in the services sector, but like wages

> *The 5.5% increase was driven by hotels and restaurants.*

more broadly, increases in hourly earnings in private services have been decelerating.

In another sign of confidence among workers, people voluntarily left their jobs at about the same rate as they did in November. Quits as a share of the overall employment base have fallen slightly from 3 percent at the end of 2021, but plateaued over the past few months. Overall, in 2022, about 50 million Americans quit their jobs.

Layoffs were also steady in December, staying at the unusually low level that has prevailed since a spike during the pandemic. While pink slips in the tech industry have mounted swiftly — most recently with 22,000 between Microsoft and Google — the bulk of the separations may have occurred after the labor turnover survey ended.

Other indicators that employers are shedding workers, such as initial claims for unemployment insurance, have also remained very low by historical standards. Those leaving tech jobs, especially with software development and engineering skills, may have found new opportunities so quickly that they didn't file for unemployment benefits.

---

UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY

In re: BLOCKFI INC., et al., Debtors.¹
Chapter 11
Case No. 22-19361 (MBK)
(Jointly Administered)

**NOTICE OF BAR DATES FOR SUBMITTING PROOFS OF CLAIM AND CLAIMS UNDER SECTION 503(B)(9) OF THE BANKRUPTCY CODE AGAINST THE DEBTORS**

PLEASE TAKE NOTICE THAT the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") has entered an order (Docket No. 440) (the "Bar Date Order") establishing **5:00 p.m. prevailing Eastern Time on March 31, 2023** (the "General Claims Bar Date"), as the last date for each person or entity (including individuals, partnerships, corporations, joint ventures and trusts) to submit a Proof of Claim against any of the Debtors listed below (collectively, the "Debtors"). A copy of the Bar Date Order, and any exhibits thereto are available (i) at the Debtors' expense upon request to Kroll Restructuring Administration LLC (the noticing and claims agent retained in these Chapter 11 Cases), by calling (888) 773-0375 for callers in the United States or by calling (646) 440-4371 for callers outside the United States, (ii) for no charge by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/blockfi, or (iii) for a fee via PACER by visiting http://ecf.njb.uscourts.gov.

The Bar Date Order requires that all entities (collectively, the "Claimants") holding or wishing to assert a Claim that arose or is deemed to have arisen prior to November 28, 2022 (the "Petition Date"), against the Debtors ("Claims") to submit a Proof of Claim so as to be actually received by Kroll Restructuring Administration LLC (the "Notice and Claims Agent") on or before the applicable bar date (collectively, the "Bar Dates") as set forth below. None of the Bar Dates described herein apply to any governmental unit. Pursuant to section 502(b)(9) of the Bankruptcy Code, all governmental units shall have at least one-hundred and eighty days from the commencement of these Chapter 11 Cases to submit Claims against the Debtors.

**Debtor Name, Last Four Digits of Tax Identification Number, Case Number:** BlockFi Inc., 0015, 22-19361; BlockFi Trading LLC, 2487, 22-19363; BlockFi Lending LLC, 5017, 22-19365; BlockFi Wallet LLC, 3231, 22-19366; BlockFi Ventures LLC, 9937, 22-19367; BlockFi International Ltd., 2233, 22-19368; BlockFi Investment Products LLC, 2422, 22-19370; BlockFi Services, Inc., 5965, 22-19371; BlockFi Lending II LLC, 0154, 22-19374.

**General Claims Bar Date** (Applicable to 503(b)(9) Claims). All Claimants holding or wishing to assert a Claim must submit a Proof of Claim with respect to such Claim so as to be **actually received** by the Notice and Claims Agent by **March 31, 2023, at 5:00 p.m. prevailing Eastern Time** (the "General Claims Bar Date"), including parties asserting Claims pursuant to section 503(b)(9) of the Bankruptcy Code.

**Governmental Bar Date.** All governmental units holding or wishing to assert a Claim against the Debtors arising (or deemed to arise) before the Petition Date (whether secured, unsecured priority or unsecured non-priority) must submit a Proof of Claim so as to be **actually received** by the Notice and Claims Agent by **May 30, 2023, at 5:00 p.m. prevailing Eastern Time** (the "Governmental Bar Date").

**Supplemental Bar Date.** In the event the Debtors amend or supplement their Schedules, the Debtors shall give notice of any such amendment to the holders of any Claim affected thereby, and such holders shall submit their Claims by the later of (a) the applicable Bar Date and (b) **5:00 p.m. prevailing Eastern Time on the date that is thirty calendar days** after such person or entity is served with notice that the Debtor has amended its Schedules in a manner that affects such person or entity (any such date, a "Supplemental Bar Date").

**Rejection Bar Date.** If you have a Claim arising from the rejection of an executory contract or unexpired lease, you must submit a Proof of Claim based on such rejection on or before the later of (a) the General Claims Bar Date and (b) any date the Court may fix in the applicable order authorizing such rejection and, if no such date is provided, thirty calendar days from the date of entry of such order (the "Rejection Bar Date"). The Debtors will provide notice of the Rejection Bar Date to contract or lease counterparty whose contract or lease is being rejected at the time the Debtors reject any executory contract or unexpired lease.

**When and Where To Submit.** Each Proof of Claim, including supporting documentation, must be submitted so that the Notice and Claims Agent **actually receives** the Proof of Claim on or before the applicable Bar Date by: (i) electronically using the interface available on the Notice and Claims Agent's website at https://restructuring.ra.kroll.com/blockfi; (ii) first-class U.S. Mail, which Proof of Claim must include an original signature, at the following address: BlockFi Claims Processing Center, c/o Kroll Restructuring Administration LLC, Grand Central Station, PO Box 4850, New York, NY 10163-4850, or (iii) overnight mail, or other hand-delivery system, which Proof of Claim must include an original signature, at the following address: BlockFi Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232.

**PROOFS OF CLAIM MUST BE SUBMITTED BY MAIL, BY HAND, OR THROUGH THE NOTICE AND CLAIMS AGENT'S WEBSITE. PROOFS OF CLAIM SUBMITTED BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED AND WILL NOT BE DEEMED TIMELY SUBMITTED.**

**Contents of Proofs of Claim.** Each Proof of Claim must: (i) be written in English; (ii) set forth (A) for any Claim based on cryptocurrency(ies) held in an account on the Debtors' platform, the number of units of each cryptocurrency held in such account and the type of account' and (B) in the case of any other Claim, the amount of such Claim denominated in United States dollars; (iii) conform substantially with the Proof of Claim Form provided by the Debtors or Official Form 410; (iv) be signed or electronically transmitted through the interface available on the Notice and Claims Agent's website at https://restructuring.ra.kroll.com/blockfi by the Claimant or by an authorized agent or legal representative of the Claimant; and (v) unless otherwise consented to by the Debtors in writing, include supporting documentation unless voluminous, in which case a summary must be attached or an explanation provided as to why documentation is not available.² **Please note** that each Proof of Claim must specify by name and case number the Debtor against which the Claim is submitted by selecting the applicable Debtor at the top of the proposed Proof of Claim Form. A Proof of Claim submitted under Case No. 22-19361 or that does not identify a Debtor will be deemed as submitted against BlockFi Inc. A Proof of Claim that names a subsidiary Debtor but is submitted under Case No. 22-19361 will be treated as having been submitted against the subsidiary Debtor with a notation that a discrepancy in the submission exists. The failure to select the correct Debtor on the Proof of Claim Form alone is not a basis to object to the allowability of the Claim; provided that the asserted Claim is otherwise acceptable in all respects and complies with the terms of this Bar Date Order such that the Claim would have been allowed if not for the failure to select the correct Debtor on the Proof of Claim Form.

**Section 503(b)(9) Claims.** Vendors and suppliers of goods may be entitled to request an administrative priority Claim under section 503(b)(9) of the Bankruptcy Code to the extent they delivered, and the Debtor received, goods within the twenty-day period prior to the Petition Date. The Court has deemed the submission of a Proof of Claim as satisfying the procedural requirements for asserting such a Claim under section 503(b)(9) of the Bankruptcy Code. In addition to the other requirements listed above, any Proof of Claim asserting a 503(b)(9) Claim must: (i) include the value of the goods delivered to and received by the Debtors in the twenty days prior to the Petition Date; (ii) attach any documentation identifying the particular invoices for which the 503(b)(9) Claim is being asserted; (iii) attach documentation of any reclamation demand made against the Debtors under section 546(c) of the Bankruptcy Code (if applicable); and (iv) set forth whether any portion of the 503(b)(9) Claim was satisfied by payments made by the Debtors.

**Consequences of Failing to Timely Submit Your Proof of Claim.** Any Claimant who is required, but fails, to submit a Proof of Claim in accordance with the Bar Date Order on or before the applicable Bar Date shall be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or submitting a Proof of Claim with respect thereto). In such event, the Debtors' property shall be forever discharged from any and all indebtedness or liability with respect to such Claim, and such holder shall not be permitted to vote to accept or reject any plan of reorganization filed in these chapter 11 cases or participate in any distribution on account of such Claim or receive further notices regarding such Claim.³

**Reservation of Rights.** Nothing contained in this notice is intended to or should be construed as a waiver of the Debtors' right to: (a) dispute, or assert offsets or defenses against, any submitted Proof of Claim or any Claim listed or reflected in the Schedules as to the nature, amount, liability, or classification of such Claims; (b) subsequently designate any scheduled Claim as disputed, contingent, or unliquidated; and (c) otherwise amend or supplement the Schedules.

**Additional Information.** If you have any questions regarding the Claims process and/or if you wish to obtain a copy of the Bar Date Order (which contains a more detailed description of the requirements for submitting Proofs of Claim), a Proof of Claim form, or related documents, you may do so by visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/blockfi or contacting the Notice and Claims Agent by calling (888) 773-0375 for callers in the United States or by calling (646) 440-4371 for callers outside the United States and writing to the following address: BlockFi Claims Processing Center, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232. Please note that the Notice and Claims Agent cannot advise you regarding how to submit, or whether you should submit, a Proof of Claim.

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

² For the avoidance of doubt, all Claims for cryptocurrency held by any holder must clearly indicate: (a) each type of cryptocurrency held, (b) the number of units of each cryptocurrency held, and (c) the type of account (Wallet, Interest Bearing Account, or Loan Account).

³ Supporting documentation may include, but is not limited to, a .csv report of the claimant's account with the Debtors.

⁴ For the avoidance of doubt, in the event that BlockFi International Ltd. enters into a full liquidation proceeding in Bermuda such that a separate adjudication process becomes necessary, notwithstanding anything contained herein, holders of Claims against BlockFi International Ltd. shall not be automatically barred from asserting such Claims against BlockFi International Ltd. in such liquidation proceedings without further order of the Supreme Court of Bermuda.

UNITED STATES BANKRUPTCY COURT, DISTRICT OF NEW JERSEY

In re: BLOCKFI INC., et al., Debtors.¹
Chapter 11
Case No. 22-19361 (MBK)
(Jointly Administered)

**NOTICE OF BIDDING PROCEDURES, POTENTIAL AUCTION, AND SALE HEARING**

PLEASE TAKE NOTICE that the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") on **November 28, 2022** (the "Petition Date").

PLEASE TAKE FURTHER NOTICE that on January 9, 2023, the Debtors filed a motion (Docket No. 226) (the "Motion") seeking, among other things, the entry of an order approving (a) bidding procedures (the "Bidding Procedures") in connection with the Auction² and sale (the "Sale") of certain of the Debtors' Assets to one or more Successful Bidders, (b) the selection of a Stalking Horse Bidder and the payment of Bid Protections, in certain instances as set forth in the Bidding Procedures, and (c) scheduling dates and deadlines in connection with approval of the Sale (the "Sale Schedule") and the Debtors' Plan process (the "Confirmation Schedule").

PLEASE TAKE FURTHER NOTICE that on January 23, 2023, the Bankruptcy Court entered an order (Docket No. 441) (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, approving the Bidding Procedures, the Sale Schedule, and the Confirmation Schedule.

**Contact Persons for Parties Interested in Submitting a Bid.** The Bidding Procedures set forth in detail the requirements for submitting Qualified Bids and any person interested in making an offer to purchase the Debtors' equity and/or Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids that are submitted in accordance with the Bidding Procedures will be considered by the Debtors.** Any persons interested in making an offer to purchase the Debtors' equity and/or Assets should contact: **(i) Investment Banker to the Debtors:** Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, New York 10022, Attn: Jared Dermont (jared.dermont@moelis.com), Mike DiVanni (michael.divanni@moelis.com), Barak Klein (barak.klein@moelis.com), Brian Tichenor (brian.tichenor@moelis.com); **(ii) Counsel to the Debtors:** Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. (jsussberg@kirkland.com), Christine A. Okike, P.C. (christine.okike@kirkland.com), Francis Petrie (francis.petrie@kirkland.com); and **(iii) Counsel to the Committee:** Brown Rudnick LLP, 7 Times Square, New York, New York 10036, Attn.: Robert J. Stark (rstark@brownrudnick.com), Bennett S. Silverberg (bsilverberg@brownrudnick.com), Kenneth J. Aulet (kaulet@brownrudnick.com), Stephen D. Palley (spalley@brownrudnick.com).

**Obtaining Information.** Copies of the Bidding Procedures Order, the Bidding Procedures, and any other related documents referenced herein may be obtained by contacting Kroll Restructuring Administration LLC, by calling (888) 773-0375 (Toll-Free) or (646) 440-4371 (International) or by visiting https://restructuring.ra.kroll.com/blockfi.

**The Sale Schedule and Confirmation Schedule**
1. The deadline to submit a Qualified Bid (the "Bid Deadline") is **February 20, 2023, at 12:00 p.m. prevailing Eastern Time**.
2. The Auction for the Debtors' equity and/or Assets, if one is necessary, will commence on **February 28, 2023, at 10:00 a.m. prevailing Eastern Time**, at the offices of Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, New York 10022, or at such later time or other place as the Debtors will timely notify Qualified Bidders and the Notice Party Group, including the Office of the U.S. Trustee.
3. The deadline to file an objection with the Bankruptcy Court to the Sale is **March 16, 2023, at 4:00 p.m. prevailing Eastern Time** (the "Sale Objection Deadline").
4. A hearing to consider a Sale pursuant to section 363 of the Bankruptcy Code will be held before the Honorable Michael B. Kaplan of the Bankruptcy Court on **March 23, 2023, at 10:00 a.m. prevailing Eastern Time** or such other date as determined by the Bankruptcy Court.
5. The Debtors will seek to file a Disclosure Statement on or by **April 3, 2023**.
6. The Debtors will seek to establish **May 1, 2023, at 4:00 p.m. prevailing Eastern Time** as the deadline to file an objection with the Bankruptcy Court to the Disclosure Statement (the "Disclosure Statement Objection Deadline"). The notice of a hearing seeking approval of the Disclosure Statement will include the Disclosure Statement Objection Deadline.
7. The Debtors will seek to schedule a hearing to consider the adequacy of the Disclosure Statement, solicitation materials, and scheduling of dates related to confirmation of a Plan before the Honorable Michael B. Kaplan of the Bankruptcy Court on **May 8, 2023, at 10:00 a.m. prevailing Eastern Time**, or such other date as determined by the Bankruptcy Court. The order approving the Disclosure Statement will include the objection and voting deadlines with respect to confirmation of the Plan.
8. The Debtors will seek to establish **June 12, 2023, at 4:00 p.m. prevailing Eastern Time** as the deadline to vote to accept or reject the Plan (the "Voting Deadline") and file an objection with the Bankruptcy Court to confirmation of the Plan (the "Plan Objection Deadline"). The order approving the Disclosure Statement will include the Voting Deadline and the Plan Objection Deadline.
9. The Debtors will seek to schedule a hearing to consider confirmation of the Plan before the Honorable Michael B. Kaplan of the Bankruptcy Court on **June 19, 2023, at 10:00 a.m. prevailing Eastern Time**, or such other date as determined by the Bankruptcy Court.

**Filing Objections to the Sale, the Disclosure Statement, or the Plan.** Any objection to the Sale must (a) be in writing, (b) state with specificity the nature of such objection, (c) comply with the applicable provisions of the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the District of New Jersey, and any case management order entered by the Bankruptcy Court, and (d) be filed with the Clerk of the Bankruptcy Court by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and served upon, so as to be **actually received** on or before the Sale Objection Deadline, including chambers and the Notice Party Group (including the Debtors' counsel).

Upon the failure to file an objection in a timely manner, the objecting party shall be forever barred from asserting any objection to the Sale, including to the Debtors' consummation and performance of the proposed Asset Purchase Agreement if selected as the Successful Bidder.

Any objection to the Disclosure Statement must be filed and served on or before the Disclosure Statement Objection Deadline, as applicable, in accordance with the Bidding Procedures, shall be forever barred from asserting any objection to the Sale, Disclosure Statement, or Plan.³

³ The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

⁴ Capitalized terms used in this notice and not immediately defined have the meanings given to such terms in the Bidding Procedures (as defined herein).

⁵ For the avoidance of doubt, nothing in this Notice shall be deemed to limit any approval or objection rights of the Bermuda Monetary Authority to the extent the Sale implicates any Assets of BlockFi International Ltd. which such Sale may also be subject to approval by the Bermuda Supreme Court.