**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered)<br><br>**HEARING DATE AND TIME:**<br>**March 23, 2023, at 10:00 a.m. (EST)**<br><br>**ORAL ARGUMENT WAIVED UNLESS**<br>**OBJECTIONS TIMELY FILED** |

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**NOTICE OF HEARING ON THE DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) APPROVING
THE SALE OF CERTAIN OF THE DEBTORS' SELF-MINING ASSETS
FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS
AND ENCUMBRANCES, (II) AUTHORIZING THE DEBTORS TO ENTER
INTO AND PERFORM THEIR OBLIGATIONS UNDER THE ASSET
PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief* (the "Sale Motion") will be held on **March 23, 2023 at 10:00 a.m. (prevailing Eastern Time)** or as soon thereafter as counsel may be heard (the "Hearing") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE** that the Sale Motion sets forth the relevant factual bases upon which the relief requested should be granted.  A proposed order granting the relief requested in the Sale Motion is also submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the Sale Motion shall:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at

www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received on or before **March 16, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served, the Sale Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d) and the relief requested may be granted without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Kroll Restructuring Administration, LLC at https://restructuring.ra.kroll.com/blockfi.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: March 2, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF**
**AN ORDER (I) APPROVING THE SALE OF**
**CERTAIN OF THE DEBTORS' SELF-MINING ASSETS FREE**
**AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS**
**AND ENCUMBRANCES, (II) AUTHORIZING THE DEBTORS TO**
**ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE**
**ASSET PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

TO: THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES
BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state
the following in support of this motion (the "Motion"):

## Preliminary Statement

1.     From the outset of these Chapter 11 Cases, one of the Debtors' key objectives has
been to identify the market value of estate assets for potential sale to third parties.  To that end,
Moelis & Company LLC ("Moelis") conducted extensive outreach to parties interested in each of
the distinct asset packages held by the Debtors.  As contemplated by the Bidding Procedures Order
approved by this Court, the Debtors are engaged in parallel comprehensive marketing processes
designed to promote robust and competitive bidding on each of the available asset packages for
segments of their business.  Now, following these efforts, which resulted in an auction (the
"Auction") held on February 28, 2023, the Debtors are prepared to take a substantial step in
consummating the first of several sales, with this Auction contemplating a sale for a material
portion of the Debtors' physical self-mining equipment and operations related to their digital coin
mining segment (the "Self-Mining Assets").  The efforts leading up to and during the Auction
ultimately led to the execution of an asset purchase agreement with U.S. Farms & Mining
Opportunity Fund LLC ("U.S. Farms" or the "Successful Bidder") that designated U.S. Farms as
the party that provided the highest and best bid for the Self-Mining Assets.  The proposed sale of
the Self-Mining Assets, once consummated and approved by the Court, will generate
approximately $4.675 million dollars to the estate of Debtor BlockFi Lending LLC.

2.     U.S. Farms' bid is designed to acquire each category of the Debtors' Self-Mining
Assets, including: (a) certain self-mining assets located in Norway (the "Norway Self-Mining

Assets"), (b) certain self-mining assets located in the U.S. subject to that certain Gilley Loan

Document (the "Gilley Self-Mining Assets"), and (c) certain of the Debtors' self-mining assets in

the U.S. (the "Blockstream Self-Mining Assets").  U.S. Farms' bid was the highest and best bid

received at the Auction for the totality of the Debtors' Self-Mining Assets, which generates

substantial consideration on a favorable timeline, and is in the best interests of the Debtors' estates.

### **Relief Requested**

3.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Sale Order"): (a) authorizing and approving the Debtors' entry into and

performance under the terms and conditions of the asset purchase agreement, substantially in the

form attached to the Sale Order as Exhibit 1 (the "APA"), whereby the Debtors have agreed to

sell, and the Successful Bidder has agreed to purchase, all of the Debtors' Self-Mining Assets

which were available for purchase at the auction held on February 28, 2023 (including all actions

taken or required to be taken in connection with the implementation and consummation of the

APA, the "Sale"), (b) authorizing and approving the Sale of the Self-Mining Assets free and clear

of any and all liens, claims, interests, and encumbrances, and (c) granting related relief, all in

accordance with the provisions of the *Order (I) Approving the Bidding Procedures and Related*

*Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the*

*Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief*

[Docket No. 441] (the "Bidding Procedures Order") and the APA.[2]

---

[2]    Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the
*Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 17]
(the "First Day Declaration") or the Bidding Procedures Order, as applicable.

**Jurisdiction and Venue**

4.      The United States Bankruptcy Court for the District of New Jersey (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of*

*Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on

September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a

final order in connection with this Motion to the extent that it is later determined that the Court,

absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a) and 363 of title 11 of

the United States Code (the "Bankruptcy Code"), rules 2002 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 6004-1 of the Local Rules

of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

**Background**

7.      On November 28, 2022 (the "Petition Date"), each Debtor filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their

businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth

in greater detail in the First Day Declaration and incorporated by reference herein.

8.      The Debtors are operating their businesses and managing their properties as debtors

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On November 29,

2022, the Court entered an order [Docket No. 42] authorizing procedural consolidation and joint

administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On December 21,

2022, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an

official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 130]. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

**The Proposed Sale**

9.    The Debtors engaged Moelis to conduct a robust, transparent marketing and sale process to solicit proposals for each of the Debtors' assets, including the Self-Mining Assets. To that end, the Debtors and Moelis developed a list of over 140 parties they believed might be interested in consummating a sale transaction for the Debtors' digital coin mining business, including strategic parties, private equity firms, other companies in the cryptocurrency ecosystem, scaled fintech companies, and traditional financial institutions. As part of that process, the Debtors executed over seventy confidentiality agreements with prospective bidders. These prospective bidders were granted access to a virtual data room populated with diligence materials to facilitate their evaluation and assessment of the various assets being marketed, including the Self-Mining Assets. As the Debtors' marketing process progressed, it became evident that the assets should be divided into distinct categories to maximize value—namely, the Debtors' hosting joint venture, mining equipment loans, and the Self-Mining Assets. The Debtors are, as of the time of filing this Motion, continuing to engage with potential purchasers of their joint venture assets, certain mining equipment loans, and the Self-Mining Assets. After consulting with the Committee, the joint venture assets were ultimately excluded from the Auction. The Debtors anticipate continuing that process to determine a value-maximizing path that is in the best interests of the estates with respect to those assets. In addition to the sale of the Self-Mining Assets which are the subject of this Motion, but in connection with the broader sale process conducted by Moelis, the Debtors were able to execute transactions with the borrowers of certain of the mining equipment loans on more

5

favorable terms than any third-party offers, realizing $32.25 million in value for the Debtors estates

(in lieu of exercising rights and remedies in respect of such non-performing loans).[3]

10.     With respect to the Self-Mining Assets available for purchase at the February 28

Auction, the Debtors' robust marketing process ultimately produced five binding bids for all of

the Self-Mining Assets, with seven parties submitting bids for specific machines, which were

divided amongst bids for only either the U.S. Self-Mining Assets or the Norway Self-Mining

Assets.  Throughout the process, the Debtors and their advisors, together with the Committee and

its advisors, engaged with potential bidders to maintain interest, respond to diligence requests, and

increase competitive tension to maximize the value of the Self-Mining Assets.  Specifically,

Moelis and the Debtors endeavored to supplement the virtual data room and answer questions that

the bidders had about the Self-Mining Assets and/or the sale process as a whole.

11.     The Debtors and their advisors, in consultation with the Committee, thoroughly

examined each bid and eventually determined, in the exercise of their business judgement and in

a manner consistent with the exercise of their fiduciary duties, that the sale to the Successful Bidder

would achieve the highest value available under the circumstances for the estates, their clients, and

other stakeholders.   Notably, only the Successful Bidder contemplated becoming the sole

purchaser all of the Self-Mining Assets at once—each of the other bids for the Self-Mining Assets

were joint bids, with parties who sought to purchase some combination of the Norway Self-Mining

Assets and U.S. Self-Mining Assets.  The Debtors and their advisors weighed multiple factors in

determining that a transaction with the Successful Bidder represents the highest value available

---

[3]     *See Order Granting the Debtors Authority to Enter into Restructuring and Settlement Agreement with
Atlas Technology Group LLC* [Docket No. 567], *Order Granting the Debtors Authority to Enter into
Restructuring and Settlement Agreement with Global X Digital, LLC* [Docket No. 566], and *Order
Granting the Debtors Authority to Enter into a Loan Settlement Agreement with Backbone Mining
Solutions LLC* [Docket No. 488].

under the circumstances, including, most prominently, the amount and timing of consideration and the timeframe required to consummate the Sale and full transfer of the Self-Mining Assets.

12.     Over the last several weeks, the Debtors and their advisors worked tirelessly in an effort to consummate the Sale, including weighing the costs and benefits of proceeding to the Auction with or without a Stalking Horse Bidder.  To that end, the Debtors and their advisors held several rounds of meetings with bidders and the Committee's advisors.  Parties exchanged numerous proposals and document markups and engaged extensively on the material terms of a Sale transaction.  Ultimately, the Debtors decided, in consultation with the Committee, that, given the quantum of consideration in the bids received, and based on the timing and notice needed to appoint a Stalking Horse Bidder, that the value-maximizing path forward for the Self-Mining Assets was to proceed to the Auction without a Stalking Horse Bidder.  Nonetheless, the Auction was run swiftly and efficiently, and generated substantial interest in each of the Debtors' asset packages.  Due in no small part to the extensive engagement over the past several months, following the Auction, the Debtors reached agreement and executed the APA with the Successful Bidder.

13.     The following chart summarizes the key terms and conditions of the APA:[4]

| Provision | Summary Description |
|---|---|
| **Parties** | Seller:  BlockFi Lending LLC<br>Buyer: U.S. Farms & Mining Opportunity Fund LLC |
| **Purchase Price** | $4,675,000 |
| **Acquired Assets** | 6,376 Machine Assets<br>*See* APA, Schedule 1.1(a) |
| **Assumed Liabilities** | • On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in |

---

[4]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the APA, the APA shall govern in all respects.  Capitalized terms used in the following summary shall have the meanings ascribed to them in the APA.

| Provision | Summary Description |
|---|---|
| | accordance with Section 2.1, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller(or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"): <br><br> • all Liabilities (including all government charges or fees) arising out of the ownership or operation of the Acquired Assets, in each case, by Purchaser from and after the Closing Date; <br><br> • all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Seller) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes; and <br><br> • without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; and (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period. <br><br> *See* APA, Section 1.3. |
| **Excluded Liabilities** | Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively as the "Excluded Liabilities"). <br><br> *See* APA, Section 1.4. |
| **Holdback Amount** | 10% for Norway Self-Mining Assets; 20% for U.S. Self-Mining Assets <br><br> *See* APA, Section 2.1(b). |
| **Conditions Precedent to Obligations of Purchasers** | • The obligations of Purchaser to consummate the transactions contemplated by the Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions: <br><br> • the representations and warranties of Seller set forth in Article III (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (provided that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect) and (ii) the representations and warranties set forth in Section 3.1 and Section 3.2 (together, the "Fundamental Representation") shall be true and correct in all material |

| Provision | Summary Description |
|---|---|
| | respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;<br><br>• Seller shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing (or will have cured any such breach to the extent necessary to satisfy this condition); and<br><br>• Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.<br><br>*See* APA, Section 7.2. |
| **Conditions Precedent to Obligations of the Sellers** | • The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:<br><br>• the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;<br><br>• Purchaser shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date (or will have cured any such breach to the extent necessary to satisfy this condition); and<br><br>• Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.<br><br>*See* APA, Section 7.3. |
| **Good Faith Deposit** | • Purchaser has made an earnest money deposit with Kroll Restructuring Administration LLC (the "Escrow Agent") in an amount equal to $467,500 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, noninterest-bearing escrow account established by the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.<br><br>• If the Agreement has been terminated by Seller pursuant to Section 8.1(e) or 8.1(g) (or by Purchaser pursuant to Section 8.1(b), 8.1(c) or 8.1(d), in each case in circumstances where Seller would be entitled to terminate the Agreement pursuant to Section 8.1(e) or 8.1(g)), then Seller shall retain the Deposit together with all received investment income, if any.<br><br>• If the Closing occurs, the Deposit shall be transferred to Sellers and shall be applied against payment of the Purchase Price.<br><br>*See* APA, Section 2.2. |

9

| Provision | Summary Description |
|---|---|
| **Fiduciary Out** | • Seller's obligations under the Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in the Agreement or any of the other Transaction Agreements shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.<br><br>*See* APA, Section 5.3. |

14.     In accordance with Local Rule 6004-1(b), the Debtors submit that the Self-Mining Assets are being sold free and clear of any liens, claims, encumbrances, and interests, and the Debtors seek a waiver of the stay imposed by Bankruptcy Rules 6004(h) or 6006(d).

15.     In the Debtors' business judgment, the Sale is fair, reasonable, and the best available option to maximize value for the Debtors and all stakeholders.

## Basis for Relief

**I.     The Sale and Entry Into the APA Should Be Approved.**

16.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to enter into a transaction outside the ordinary course of its business so long as there is a "sound business purpose" that justifies such action.  *See* 11 U.S.C. § 363(b)(1); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) ("[U]nder normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification." (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991))); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task"); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that judicial approval under section 363 of the Bankruptcy Code requires a showing that there is a good business reason); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (same).

17.     The business judgment rule shields a debtor's management team's decisions from judicial second-guessing.  Once a debtor articulates a valid business justification for its actions, courts should "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *In re Global Crossing Ltd.*, 295 B.R. at 744 (Bankr. S.D.N.Y. 2003) (citing *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del. 1994)); *see In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (presuming, based on the business judgment rule, "that in making a business decision the directors of [the debtor] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company" (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985))); *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

18.     Generally, courts have applied four factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided.  *See Lionel*, 722 F.2d at 1071–72 (setting forth the "sound business justifications" requirement); *see also In re Abbotts Dairies*, 788 F.2d 143,145–57 (3d Cir. 1986) (implicitly adopting the articulated business justification test and adding the "good faith" requirement); *In re*

*Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991) ("Once a court is satisfied that there

is a sound business reason or an emergency justifying the pre-confirmation sale the court must also

determine that the trustee has provided the interested parties with adequate and reasonable notice,

that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

19.     Furthermore, section 105 of the Bankruptcy Code provides, in relevant part, that

"[t]he court may issue any order, process, or judgement that is necessary or appropriate to carry

out the provisions of this title."  11 U.S.C. § 105(a); *see In re Enron Corp.*, 335 B.R. 22, 28

(S.D.N.Y. 2005) ("Section 105(a) provides the authority for the bankruptcy court to carry out the

provisions of § 363(b)."); *In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *6, 13 (S.D.N.Y.

July 28, 2003) (same).

### A.    The Proposed Sale is a Sound Exercise of the Debtors' Business Judgment.

20.     Effectuating the Sale and entering into the APA is a sound exercise of the Debtors'

business judgment because it will generate significant proceeds for non-operating assets.  Indeed,

the Debtors sale of the assets for $4.675 million locks considerable value for these Self-Mining

Assets which fluctuate wildly, which is particularly valuable given the volatility that exists in the

cryptocurrency space, and in the digital asset mining industry in particular.  As noted above, the

Debtors and their advisors conducted a robust marketing process that ultimately produced over a

dozen actionable bids for the Self-Mining Assets.  The Debtors and their advisors evaluated the

terms of and benefits of each bid in consultation with the Committee and its advisors, and

determined that the Sale is in the best interest of the Debtors' estates and all parties in interest.

21.     Selling the Self-Mining Assets will relieve the Debtors of ongoing cash outlays and

upkeep costs associated with ownership of such assets.  Furthermore, consummating the Sale now

provides certainty to the Debtors regarding liabilities and obligations incurred through their mining

operations and preserves value that can otherwise go to stakeholders.  As such, the Debtors have determined that the proposed Sale is the best and most cost-efficient option to dispose of the Self-Mining Assets.  In reaching this conclusion, the Debtors acted on an informed basis, in good faith, and with the honest belief that the Sale is in the best interests of the Debtors' estates.

**B.    The Purchase Price is Fair and Reasonable Under the Circumstances.**

22.    The Purchase Price represents a fair and reasonable price for the Self-Mining Assets and provides the highest and best value to the Debtors' estates.  Despite challenging market conditions, the purchase price is the result of a comprehensive marketing process beginning in December 2022 and extensive negotiations with the Successful Bidder.  Accordingly, the Debtors believe that the price is fair and reasonable under the circumstances.  No other party has expressed an interest in buying the Self-Mining Assets on better terms.  Thus, the Debtors believe that the Sale is the highest and best offer under these circumstances.

**C.    The Proposed Sale was Negotiated in Good Faith.**

23.    The Sale is the product of good faith, arms'-length negotiations between sophisticated parties represented by able counsel.  As noted above, the Debtors contacted over 140 prospective purchasers they believed would be well-positioned to consummate the Sale.  This extensive outreach resulted in the execution of over seventy confidentiality agreements, followed by extensive diligence and negotiations.  After receiving each bid, the Debtors and their advisors, in consultation with the Committee and its advisors, carefully analyzed each bid and ultimately determined that the Sale represents the highest value available under the circumstances to dispose of the Self-Mining Assets.  Indeed, the Debtors held the Auction on February 28, 2023, to further maximize the value realizable from each of the interested bidders.  And while an auction alone does not establish that the Sale is being conducted in good faith, it certainly serves as a further

13

"market check" and produced, in the Debtors' reasonable business judgment (after consultation with the Committee), the highest or otherwise best offer for the Self-Mining Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001) (while a "section 363(b) sale transaction does not require an auction procedure . . . the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

24.     Furthermore, the Successful Bidder and the Debtors are wholly unrelated, sharing no officers, directors, shareholders, incorporators, employees or economic interests—other than as embodied in these transactions—in common.   Additionally, the Successful Bidder is not an "insider" as that term is defined in the Bankruptcy Code.  11 U.S.C. § 101(31).

**D.     Adequate Notice of the Sale Has Been Provided.**

25.     The Debtors will provide (or have provided) notice of the proposed Sale to all interested parties.   *See Affidavit of Service* [Docket No. 493]; s*ee also Notice of Auction* [Docket No. 554].  The noticing process described in the Bidding Procedures Order is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Self-Mining Assets.  Accordingly, the proposed Sale of the Purchased Assets satisfies the second prong of the *Abbotts Dairies* standard.

26.     In light of the foregoing, the Sale is a sound exercise of the Debtors' business judgement and in the best interest of the estates and all interested parties and should therefore be approved pursuant to sections 105(a) and 363 of the Bankruptcy Code.

## II.     The Sale Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.

27.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

28.    Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may be assumed Encumbrances under the APA.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

29.    To the extent any Encumbrance that will not be an Assumed Liability, any such Encumbrance satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, the Debtors request authority to convey the assets to the Successful Bidder free and clear of all Encumbrances, other than a Permitted Encumbrance (as defined in the APA), including liens, claims, rights,

interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

### III.     The Proposed Sale is Appropriate Pursuant to Bankruptcy Rule 6004(f).

30.     Bankruptcy Rule 6004(f) authorizes a debtor to sell estate property outside of the ordinary course of business by private sale or public auction.  A court-approved auction process is not required to prove it so under the Bankruptcy Code, Bankruptcy Rules, or Local Rules. *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49–50 (Bankr. S.D.N.Y. 2016) ("[T]here is no rule that . . . asset sales are . . . conditioned on such a requirement [a formal auction], which does not appear in the Bankruptcy Code or Bankruptcy Rules.  Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold.  *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).

31.     In an exercise of their sound business judgment, the Debtors have determined that effectuating the Sale through the Auction is appropriate in light of the facts and circumstances of these Chapter 11 Cases and is in the best interest of their estates and all parties in interest.  The Debtors received numerous bids for their Self-Mining Assets and were unable to reach a definitive agreement with just one Qualified Bidder prior to the scheduled Auction.   Given these circumstances, the Debtors believe that the Sale is value maximizing and appropriate under the circumstances.

### IV.     The Successful Bidder Acted in Good Faith and Is Entitled to Full Protections Pursuant to Section 363(m) of the Bankruptcy Code.

32.     Because the Successful Bidder acted in good faith, it is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale. Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a sale
> or lease under such authorization to an entity that purchased or leased such property
> in good faith, whether or not such entity knew of the pendency of the appeal, unless
> such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code protects a purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal.  Purchasers are provided this

protection so long as they purchased the assets in "good faith."  *Id.*  Although the Bankruptcy Code

does not define "good faith purchaser," the Third Circuit, in *In re Abbotts Dairies*, held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good faith
> status at a judicial sale involves fraud, collusion between the Buyer
> and other bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

788 F.2d at 147 (citations omitted).

33.     Here, the Debtors engaged in good faith, arms'-length discussions with the

Successful Bidder to reach an agreement that would be mutually beneficial to both parties.

The Debtors and the Successful Bidder were each represented by separate counsel in connection

with the negotiation and documentation of the APA.  A fair and transparent process, such as that

conducted by the Debtors here, ensures the Sale is at arms'-length, without collusion or fraud, and

entered into in good faith.  The Debtors are prepared to make the appropriate showing at the Sale

Hearing that the APA with the Successful Bidder is a negotiated, arms'-length transaction, in

which the Successful Bidder at all times has acted in good faith under and otherwise in accordance

with such standards.

34.    Accordingly, the Debtors request that the Court determine that Successful Bidder has negotiated and acted at all times in good faith and, as a result, is entitled to the full protections of good faith purchasers under section 363(m) of the Bankruptcy Code.

**V.    Relief Under Bankruptcy Rules 6004(h) Is Appropriate.**

35.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stay under Bankruptcy Rule 6004(h) is waived.

36.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

37.    To maximize the value received for the Self-Mining Assets, the Debtors seek to execute the Sale as soon as possible after the hearing.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h).

## **Waiver of Memorandum of Law**

38.     The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law

## **Reservation of Rights**

39.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## **No Prior Request**

40.     No prior request for the relief sought in this Motion has been made to this or any other court.

## **Notice**

41.      The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable:  (a) the office of the U.S. Trustee for the District of New Jersey; (b) the Committee; (c) the United States Attorney's Office for the District of New Jersey; (d) the Internal Revenue Service; (e)  the U.S. Securities and Exchange Commission; (f) the attorneys general in the states where the Debtors conduct their business operations; (g) the Successful Bidder; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the Debtors request that the Court enter the Sale Order, substantially in the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: March 2, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
t
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

## Exhibit A

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>      Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**ORDER (I) APPROVING THE SALE
OF CERTAIN OF THE DEBTORS' SELF-MINING ASSETS
FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS, INTERESTS
AND ENCUMBRANCES, (II) AUTHORIZING THE DEBTORS TO
ENTER INTO AND PERFORM THEIR OBLIGATIONS UNDER THE
ASSET PURCHASE AGREEMENT, AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through nine (9), is

**ORDERED.**

(Page | 3)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Sale Order") (a) authorizing and approving the Debtors' entry into and performance under the terms and conditions of the asset purchase agreement, substantially in the form attached hereto as **Exhibit 1** (the "APA"), whereby the Debtors have agreed to sell, and U.S. Farms & Mining Opportunity Fund LLC (the "Successful Bidder") has agreed to purchase, all of the Debtors' self-mining assets (the "Self-Mining Assets," and collectively, and including all actions taken or required to be taken in connection with the implementation and consummation of the APA, the "Sale"), (b) authorizing and approving the Sale of the Self-Mining Assets free and clear of any and all liens, claims, interests, and encumbrances, and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 441] (the "Bidding Procedures Order") on January 30, 2023; and the Court having conducted a hearing on the Motion on

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(Page | 4)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief |

March 23, 2023 (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court, having reviewed and considered the Motion and the APA, approved the Bidding Procedures Order, and all objections to the Sale and the APA filed in accordance with the Bidding Procedures Order; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and the APA and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and the APA and having heard the statements in support of the relief requested therein at the Sale Hearing; and this Court having determined that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, **IT IS THEREFORE ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      All objections, statements, or reservation of rights to the Motion or relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court or as resolved in this Sale Order are, except as

(Page | 5)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al*. |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief |

provided in other orders of the Court, hereby overruled on the merits with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein.

3.      The APA is approved, and all of the terms and conditions thereof, and all of the transactions contemplated therein, are approved in all respects. The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

4.      The Debtors are authorized to: (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale without further order of the Court, including the Sale to Successful Bidder of the Self-Mining Assets, in accordance with the terms and conditions set forth in the APA and this Order; and (b) to take all further actions and to execute and deliver the APA and any and all additional instruments and documents that may be (i) reasonably requested by the Successful Bidder for the purpose of assigning, transferring, granting, conveying, and conferring to the Successful Bidder, or reducing to possession, the Self-Mining Assets, (ii) necessary, appropriate, or desirable to the performance of the obligations contemplated by the APA, and (iii) as may be reasonably requested by Successful Bidder to implement the APA and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

(Page | 6)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief |

5.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, upon the closing of the Sale, all of the Debtors' right, title, and interest in and to, and possession of, the Self-Mining Assets shall be transferred to the Successful Bidder free and clear of any and all liens, claims, encumbrances (other than a Permitted Encumbrance, as defined in the APA), and interests, with any such liens, claims, encumbrances, and interests to attach to the proceeds of the Sale in the order of their priority, with the same force, effect, and validity that they had immediately prior to the entry of this Sale Order, subject to any rights, claims, or defenses the Debtors may have with respect thereto.  Such transfer shall constitute a legal, valid, binding, and effective transfer of the Self-Mining Assets.

6.      This Sale Order shall be effective as a determination that, as of the closing of the Sale, (a) no liens, claims, encumbrances, or interests will be assertable against the Successful Bidder or any of its respective assets, including the Self-Mining Assets; and (b) the Self-Mining Assets shall have been transferred to the Successful Bidder free and clear of all liens, claims, encumbrances, and interests.

7.      This Sale Order is and shall be binding upon all persons and entities that may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any property; and each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale.

(Page | 7)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al*. |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief |

8.      The Successful Bidder is deemed to be a good faith purchaser of the Self-Mining Assets.  Pursuant to section 363(m) of the Bankruptcy Code, if this Sale Order is reversed or modified on appeal, such reversal or modification shall not affect the validity of the Sale.  The consideration provided for the Self-Mining Assets under the APA is fair and reasonable, and the Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code or otherwise.

9.      The APA may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or their creditors.

10.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Successful Bidder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.  This Court retains jurisdiction to compel delivery of the Self-Mining Assets, to protect the Successful Bidder and its assets, including the Self-Mining Assets, against any claims and successor and transferee liability and to enter orders, as appropriate, pursuant to sections 105 or 363 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Self-Mining Assets to the Successful Bidder.

(Page | 8)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief |

11.    Notwithstanding anything to the contrary in the Motion, this Sale Order, or any findings announced at the Sale Hearing, nothing in the Motion, this Sale Order, or announced at the Sale Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the rights of the United States Securities and Exchange Commission and the Committee to challenge transactions involving crypto tokens on any basis are expressly reserved.

12.    Notwithstanding the relief granted in this Sale Order and any actions taken pursuant to such relief, nothing in this Sale Order shall be deemed:  (a) an admission as to the validity of any prepetition claim, interest, or lien against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim, interest, or lien on any grounds; (c) a promise or requirement to pay prepetition claims; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) an implication or admission that any particular claim, interest, or lien is of a type specified or defined in the Motion or this Order; (f) an authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (g) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

13.    Notwithstanding the possible applicability of Rules 6004(h), 7062, and 9014 of the Bankruptcy Rules or otherwise, the terms and conditions of this Sale Order shall be effective immediately upon entry and the Debtors and Successful Bidder are authorized to close the Sale immediately upon entry of this Sale Order.

(Page | 9)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al*. |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief |

14.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

15.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

16.     To the extent there are any inconsistencies between the terms of this Sale Order and the APA, the terms of this Sale Order shall control.

## Exhibit 1

**APA**

**ASSET PURCHASE AGREEMENT**

**DATED AS OF MARCH 1, 2023**

**BY AND BETWEEN**

**US FARMS & MINING OPPORTUNITY FUND LLC, AS PURCHASER,**

**AND**

**BLOCKFI LENDING LLC, AS SELLER.**

## TABLE OF CONTENTS

**Page**

**ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES** ........................................................................................**4**

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of the Acquired Assets | 4 |
| 1.2 | Excluded Assets | 5 |
| 1.3 | Assumption of Certain Liabilities | 5 |
| 1.4 | Excluded Liabilities | 5 |
| 1.5 | Non-Assignment | 5 |

**ARTICLE II CONSIDERATION; PAYMENT; CLOSING** ........................................**6**

| | | |
|---|---|---|
| 2.1 | Consideration; Payment | 6 |
| 2.2 | Deposit | 7 |
| 2.3 | Closing | 8 |
| 2.4 | Closing Deliveries by Seller | 9 |
| 2.5 | Closing Deliveries by Purchaser | 9 |
| 2.6 | Withholding | 9 |

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER** .................**10**

| | | |
|---|---|---|
| 3.1 | Organization and Qualification | 10 |
| 3.2 | Authorization of Agreement | 10 |
| 3.3 | Conflicts; Consents | 10 |
| 3.4 | Brokers | 10 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ...........**11**

| | | |
|---|---|---|
| 4.1 | Organization and Qualification | 11 |
| 4.2 | Authorization of Agreement | 11 |
| 4.3 | Conflicts; Consents | 11 |
| 4.4 | Financing | 12 |
| 4.5 | Brokers | 12 |
| 4.6 | No Litigation | 12 |
| 4.7 | Certain Arrangements | 12 |
| 4.8 | Solvency | 12 |
| 4.9 | No Additional Representations or Warranties | 13 |

**ARTICLE V BANKRUPTCY COURT MATTERS** ..............................................**13**

| | | |
|---|---|---|
| 5.1 | Bankruptcy Actions | 13 |
| 5.2 | Sale Order | 14 |
| 5.3 | Approval | 15 |

**ARTICLE VI COVENANTS AND AGREEMENTS** ..............................................**15**

| | | |
|---|---|---|
| 6.1 | Conduct of Business of Seller | 15 |
| 6.2 | Access to Information | 16 |
| 6.3 | Reasonable Efforts; Cooperation | 17 |
| 6.4 | Further Assurances; Receipt of Misdirected Assets | 17 |

# TABLE OF CONTENTS

**Page**

6.5     Insurance Matters ..................................................................................18
6.6     Acknowledgment by Purchaser ..............................................................18

**ARTICLE VII CONDITIONS TO CLOSING**...........................................................**19**

7.1     Conditions Precedent to the Obligations of Purchaser and Seller ...........19
7.2     Conditions Precedent to the Obligations of Purchaser ..........................19
7.3     Conditions Precedent to the Obligations of Seller..................................20
7.4     Waiver of Conditions ............................................................................20

**ARTICLE VIII TERMINATION** ..........................................................................**20**

8.1     Termination of Agreement.....................................................................20
8.2     Effect of Termination ............................................................................22

**ARTICLE IX TAXES** .......................................................................................**22**

9.1     Transfer Taxes ......................................................................................22
9.2     Allocation of Purchase Price...................................................................22
9.3     Cooperation ..........................................................................................23
9.4     Preparation of Tax Returns and Payment of Taxes ................................23

**ARTICLE X MISCELLANEOUS** ........................................................................**24**

10.1    Non-Survival of Representations and Warranties and Certain Covenants;
       Certain Waivers.....................................................................................24
10.2    Expenses ..............................................................................................24
10.3    Notices .................................................................................................24
10.4    Binding Effect; Assignment....................................................................26
10.5    Amendment and Waiver ........................................................................26
10.6    Third Party Beneficiaries .......................................................................27
10.7    Non-Recourse .......................................................................................27
10.8    Severability ...........................................................................................27
10.9    Construction .........................................................................................27
10.10  Schedules .............................................................................................27
10.11  Complete Agreement ............................................................................28
10.12  Specific Performance ............................................................................28
10.13  Jurisdiction and Exclusive Venue ..........................................................28
10.14  Governing Law; Waiver of Jury Trial ......................................................29
10.15  No Right of Set-Off ...............................................................................30
10.16  Counterparts and PDF ..........................................................................30
10.17  Publicity ...............................................................................................30
10.18  Bulk Sales Laws....................................................................................30
10.19  Fiduciary Obligations............................................................................30

**ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS** ........................**31**

11.1    Certain Definitions................................................................................31
11.2    Index of Defined Terms .........................................................................35

**TABLE OF CONTENTS**

                                                                                              **Page**

11.3    Rules of Interpretation ................................................................................36

### INDEX OF EXHIBITS

EXHIBIT A    FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION
             AGREEMENT

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of March 1, 2023, is made by and between US Farms & Mining Opportunity Fund LLC, a Delaware limited liability company ("Purchaser"), and BlockFi Lending LLC, a Delaware limited liability company ("Seller"). Purchaser and Seller are referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used herein shall have the meanings set forth herein or in Article XI.

WHEREAS, on November 28, 2022, Seller, together with BlockFi Inc., a Delaware corporation, BlockFi Trading LLC, a Delaware limited liability company, BlockFi Wallet LLC, a Delaware limited liability company, BlockFi Ventures LLC, a Delaware limited liability company, BlockFi International Ltd., a Bermuda exempted company limited by shares, BlockFi Investment Products LLC, a Delaware limited liability company, BlockFi Services, Inc., a Delaware corporation, and BlockFi Lending II LLC, a Delaware limited liability company (collectively with Seller, the "Debtors"), filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), to be jointly administered for procedural purposes (collectively, the "Bankruptcy Case").

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, intending to be legally bound hereby, Purchaser and Seller hereby agrees as follows:

## ARTICLE I

## PURCHASE AND SALE OF THE ACQUIRED ASSETS;
## ASSUMPTION OF ASSUMED LIABILITIES

1.1    Purchase and Sale of the Acquired Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to, as of the Closing, only the following assets (collectively, the "Acquired Assets"), free and clear of all Encumbrances other than Permitted Encumbrances:

(a)    the cryptocurrency mining equipment set forth on Schedule 1.1(a), together with, to the extent not prohibited by Law, all manufacturer's warranties and records to such equipment set forth on Schedule 1.1(a) (collectively, the "Machine Assets"); provided that Seller shall have the right to retain copies of such warranties and records at Seller's expense.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Seller be deemed to sell, transfer, assign, convey or deliver, and Seller shall retain all right, title and interest to, in and under, all assets of Seller other than the Acquired Assets (collectively, the "Excluded Assets").

1.3     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser shall irrevocably assume from Seller (or with respect to Taxes, if applicable, from Seller's applicable Affiliate) (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller(or with respect to Taxes, if applicable, Seller's applicable Affiliate) shall irrevocably transfer, assign, convey, and deliver to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"):

(a)     all Liabilities (including all government charges or fees) arising out of the ownership or operation of the Acquired Assets, in each case, by Purchaser from and after the Closing Date;

(b)     all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Seller) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes; and

(c)     without duplication: (i) all Taxes with respect to the Acquired Assets for any taxable period (or portion thereof) beginning after the Closing Date; and (ii) all non-income Taxes with respect to the Acquired Assets for any Straddle Period.

1.4     Excluded Liabilities. Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities").

1.5     Non-Assignment. Notwithstanding anything to the contrary in this Agreement, to the extent an Acquired Asset requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Purchaser of Seller's rights over such asset, and such Consent or Governmental Authorization has not been obtained prior to such time as it is to be transferred by Purchaser as an Acquired Asset hereunder, such asset shall not be transferred to, or received by, Purchaser at the Closing. In the event that any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing (or the closing of the Bankruptcy Case, if shorter), Seller and

Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing, or sublicensing to Purchaser any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement, the Sale Order and the Bankruptcy Code. Seller will not be obligated to pay any consideration to any third party from whom such Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     Consideration; Payment.

(a)     The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) cash payments totaling $4,675,000 with respect to the Acquired Assets (the "Cash Payment").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to (i) Seller the Cash Payment, less the Delayed Cash Payment, less $627,500 (the "Holdback Amount"), less the Deposit (the "Closing Date Payment") and (ii) a third party escrow agent pursuant to a customary escrow agreement to be entered into among such agent, Purchaser, and Seller at the Closing, the Holdback Amount, with the Parties sharing the fees of such escrow agent equally.

(c)     No later than the earlier of (i) forty five (45) days after the Closing Date and (ii) the completion of an inspection and testing of the Machine Assets (other than the Delayed Assets) by Purchaser (the period from the Closing Date to the earlier of (i) and (ii), the "Initial Inspection Period"), Purchaser and Seller shall instruct the escrow agent contemplated by Section 2.1(b) to deliver to (A) Seller the Initial Release Amount, if any, and (B) Purchaser the Initial Inspection Deduct, if any. Purchaser shall share the results of its inspection with Seller, and Seller shall be entitled to reasonably object to Purchaser's determinations therein. Any objections that cannot be resolved between the Parties will be submitted to the Bankruptcy Court.

(d)     For purposes of Section 2.1(c):

(i)     "Initial Release Amount" means an amount, not less than $0, that is equal to (A) the Holdback Amount less (B) the Initial Inspection Deduct, if any, less (C) the Delayed Holdback Amount.

(ii)     "Initial Inspection Deduct" means an amount, not greater than the Holdback Amount, representing the value (determined in accordance with Schedule 1.1(a)) of any Machine Assets (other than the Delayed Assets) that are reasonably determined by Purchaser within the Initial Inspection Period to be Non Working Condition Machine Assets or were otherwise not delivered to Purchaser at the Closing; provided that in the event that the Initial Inspection Deduct is less than 2% of the Cash Payment, the Initial Inspection Deduct will be deemed to be $0.

(iii)     "Delayed Holdback Amount" means an amount, if any and not less than $0, equal to the lesser of (A) $220,000 and (B) the Holdback Amount less the Initial Inspection Deduct.

(e)     The Initial Inspection Deduct with respect to (A) Machine Assets located in Norway shall not exceed $307,500 and (B) Machine Assets (other than Delayed Assets) located in the United States shall not exceed $100,000.

(f)     The Closing Date Payment, the Delayed Cash Payment, and any other payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two (2) Business Days prior to the date such payment is to be made.

2.2     Deposit.

(a)     Purchaser has, on or prior to the date hereof, made an earnest money deposit with Kroll Restructuring Administration LLC (the "Escrow Agent") in an amount equal to $467,500 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, noninterest-bearing escrow account established by the Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date.

(b)     If this Agreement has been terminated by Seller pursuant to Section 8.1(e) or 8.1(g) (or by Purchaser pursuant to Section 8.1(b), 8.1(c) or 8.1(d), in each case in circumstances where Seller would be entitled to terminate this Agreement pursuant to Section 8.1(e) or 8.1(g)), then Seller shall retain the Deposit together with all received investment income, if any.

(c)     If this Agreement has been terminated by any Party, other than as contemplated by Section 2.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within five (5) Business Days after such termination.

(d)     The Parties agree that Seller's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will

compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)    If the Closing occurs, the Deposit shall be transferred to Sellers and shall be applied against payment of the Purchase Price.

2.3    Closing.

(a)    The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place remotely via the electronic exchange of documents and signatures at 10:00 a.m. Eastern Time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree in writing. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

(b)    Notwithstanding Section 2.3(a) or anything else herein to the contrary, Seller's right, title and interest in and to the Acquired Assets identified on Schedule 1.1(a) (the "Delayed Assets") shall not be transferred to Purchaser, and Purchaser shall not pay a portion of the Cash Payment equal to $1,100,000 (the "Delayed Cash Payment"), until such time as Seller acquires full legal title to the Delayed Assets, promptly (and in any event within two (2) Business Days) following which Seller shall deliver to Purchaser all of Seller's right, title and interest in and to the Delayed Assets and Purchaser shall deliver to Seller the Delayed Cash Payment (such transactions, the "Delayed Exchange"); provided that in the event that the Delayed Exchange is not completed prior to May 1, 2023, then, at the election of the Purchaser to the Seller in writing, the Parties shall no longer execute the Delayed Exchange and shall have no further obligations with respect thereto or at the election of Seller in writing to Purchaser, either (i) the Parties shall no longer execute the Delayed Exchange and shall have no further obligations with respect thereto or, (ii)(A) Seller may delay such date for up to two (2) additional months, (B) the Delayed Cash Payment will be reduced to $850,000 if the Delayed Exchange is not completed by May 1, 2023 and to $650,000 if the Delayed Exchange is not completed by June 1, 2023, if applicable,  and (C) if the Delayed Exchange is not completed by such delayed date, then the Parties shall no longer execute the Delayed Exchange and shall have no further obligations with respect thereto. In the event that the Delayed Exchange is determined to be eliminated in accordance with the proviso to the immediately preceding sentence, Purchaser and Seller shall, within five (5) Business Days following the later of such determination or the determination of the Delayed Holdback Amount, instruct the escrow agent contemplated by Section 2.1(b) to deliver the Delayed Holdback Amount to Purchaser.

(c)    No later than the earlier of (i) forty five (45) days after the date of the Delayed Exchange, if any, and (ii) the completion of an inspection and testing of the Delayed Assets by Purchaser (the period from the date of the Delayed Exchange, if any, to the earlier of (i) and (ii), the "Delayed Inspection Period"), Purchaser and Seller shall instruct the escrow agent

contemplated by Section 2.1(b) to deliver to (A) Seller the Delayed Release Amount, if any, and (B) Purchaser the Delayed Inspection Deduct, if any. Purchaser shall share the results of its inspection with Seller, and Seller shall be entitled to reasonably object to Purchaser's determinations therein. Any objections that cannot be resolved between the Parties will be submitted to the Bankruptcy Court.

(d)     For purposes of Section 2.3(c):

(i)     "Delayed Release Amount" means an amount, not less than $0, that is equal to (A) the Delayed Holdback Amount, if any, less (B) the Delayed Inspection Deduct, if any.

(ii)     "Delayed Inspection Deduct" means an amount, not greater than the Delayed Holdback Amount, if any, representing the value (determined in accordance with Schedule 1.1(a)) of any Delayed Assets that are reasonably determined by Purchaser within the Delayed Inspection Period to be Non Working Condition Machine Assets or were otherwise not delivered to Purchaser at the Delayed Exchange, if any; provided that in the event that the Delayed Inspection Deduct is less than 2% of the Delayed Cash Payment, the Delayed Inspection Deduct will be deemed to be $0.

2.4     Closing Deliveries by Seller. At or prior to the Closing, Seller shall deliver to Purchaser:

(a)     a bill of sale and assignment and assumption agreement substantially in the form of Exhibit A (the "Assignment and Assumption Agreement") duly executed by Seller;

(b)     an IRS Form W-9 executed by Seller or Seller's regarded owner for U.S. federal income Tax purposes; and

(c)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied.

2.5     Closing Deliveries by Purchaser. At the Closing, Purchaser shall deliver to (or at the direction of) Seller:

(a)     the Closing Date Payment;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser; and

(c)     an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a) and 7.3(b) have been satisfied.

2.6     Withholding. Purchaser shall not be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement, except to the extent resulting from Seller's failure to satisfy its obligations under Section 2.4(b).

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as (i) disclosed in any forms, statements or other documents filed with the Bankruptcy Court or (ii) set forth in the Schedules delivered by Seller concurrently herewith and subject to Section 10.10, Seller represents and warrants to Purchaser as follows.

3.1    <u>Organization and Qualification</u>. Seller is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware.

3.2    <u>Authorization of Agreement</u>. The execution, delivery and performance by Seller of this Agreement and the other Transaction Agreements to which it is a party, and the consummation by Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite limited liability company action and no other limited liability company proceedings on its part are necessary to authorize the execution, delivery and performance by Seller of this Agreement or the other Transaction Agreements and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which Seller is a party have been, or will be, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute, or will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>").

3.3    <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained and (b) the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 3.3 are made, given or obtained (as applicable), neither the execution and delivery by Seller of this Agreement or the other Transaction Agreements, nor the consummation by Seller of the transactions contemplated hereby or thereby, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of Seller's certificate of formation or limited liability company agreement, or other governing documents as applicable, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Contract to which Seller is a party or accelerate Seller's obligations under any such Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller, except, in the case of clauses (ii) and (iii), as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.4    <u>Brokers</u>. Except for Moelis, the fees and expenses of which will be paid by Seller, no broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in

10

connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Seller.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows.

4.1     <u>Organization and Qualification</u>. Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted. Purchaser is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated by this Agreement and the other Transaction Agreements.

4.2     <u>Authorization of Agreement</u>. Purchaser has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party, and the consummation by Purchaser of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Purchaser of this Agreement and the other Transaction Agreements to which it is a party and the consummation by it of the transactions contemplated hereby and thereby. Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Agreements to which it is a party have been, or will be, duly executed and delivered by Purchaser and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitute legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except that such enforceability may be limited by the Enforceability Exceptions.

4.3     <u>Conflicts; Consents</u>. Assuming that (a) requisite Bankruptcy Court approvals are obtained and the delivery of any requisite notices or filings with the Bankruptcy Court and (b) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 4.3</u> are made, given or obtained (as applicable), neither the execution and delivery by Purchaser of this Agreement or the other Transaction Agreements to which it is a party, nor the consummation by Purchaser of the transactions contemplated hereby or thereby, nor performance or compliance by Purchaser with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of Purchaser's certificate of formation or operating agreement or similar organizational documents, (ii) violate any Law or Order applicable to Purchaser or its assets or require Purchaser to file, seek, or obtain any notice, authorization, approval, Order, permit, registration with or

consent of or with any Governmental Body, (iii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Purchaser is a party or by which it or its assets are bound or accelerate Purchaser's obligations under any such Contract, or (iv) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Purchaser or any of its Subsidiaries, except, in the case of clauses (ii) through (iv), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4    Financing. Purchaser has, and at all times from the date hereof through the Closing will have, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement and the other Transaction Agreements, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement and the Transaction Agreements. Purchaser acknowledges that its obligations under this Agreement are not subject to any conditions regarding its ability to obtain financing for any portion or all of the Purchase Price.

4.5    Brokers. There is no investment banker, broker, finder, or other intermediary which has been retained by or is authorized to act on behalf of Purchaser that might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

4.6    No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that seek to prevent, restrain, materially delay, prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or by the other Transaction Agreements or that would, individually or in the aggregate, reasonably be expected to delay the Closing or that would otherwise adversely affect Purchaser's performance of its obligations or covenants under this Agreement or the other Transaction Agreements to which it is a party or the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements to which it is a party.

4.7    Certain Arrangements. As of the date hereof, there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Purchaser Group, on the one hand, and any member of the management of Seller or its board of managers (or applicable governing body of any Affiliate of Seller), any holder of equity or debt securities of Seller, or any lender or creditor of Seller or any Affiliate of Seller, on the other hand, (a) relating in any way to the acquisition of the Acquired Assets, the assumption of the Assumed Liabilities or the transactions contemplated by this Agreement or the Transaction Agreements or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of Seller or any of its Affiliates to entertain, negotiate or participate in any such transactions.

4.8    Solvency. As of the date hereof Purchaser is, and immediately after giving effect to the transactions contemplated hereby and by the other Transaction Agreements, Purchaser shall be, Solvent. "Solvent" means, with respect to any Person, such Person: (a) is able to pay its debts as they become due; (b) owns property that has a fair saleable value greater than the amounts

12

required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities) and (c) has adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Seller. In connection with the transactions contemplated hereby and by the other Transaction Agreements, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured. There are no bankruptcy, reorganization or arrangement Actions pending, being contemplated by or, to the knowledge of Purchaser, threatened against Purchaser.

4.9     No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, Seller acknowledges that neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to Seller by Purchaser.

**ARTICLE V**

**BANKRUPTCY COURT MATTERS**

5.1     Bankruptcy Actions.

(a)     Promptly following the execution of this Agreement by Seller, Seller shall file with the Bankruptcy Court a motion seeking approval of the Sale Order; provided that Seller may modify the motion seeking approval of the Sale Order pursuant to discussions with the United States Trustee assigned to the Bankruptcy Case, the Bankruptcy Court, any creditor or committee representing a group of creditors in the Bankruptcy Case, or any other party in interest, with such modifications being acceptable to Purchaser in its commercially reasonable discretion.

(b)     From the date hereof until the earlier of (i) the termination of this Agreement in accordance with Article VIII and (ii) the Closing Date, Seller shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.

(c)     Purchaser shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Purchaser and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement, and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(d)     Each of Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement or the other Transaction Agreements and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of

13

notices or other communications received by such Party from the Bankruptcy Court with respect to the transactions contemplated by this Agreement or the other Transaction Agreements.

(e)    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder at the Auction, Purchaser shall be required to serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the later of (i) thirty (30) days following the hearing to consider the Sale Order and (ii) such date as this Agreement is otherwise terminated. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Seller may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(f)    Seller and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. Purchaser acknowledges that Seller and the other Debtors must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction. The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order.

(g)    Notwithstanding any other provision of this Agreement to the contrary, Purchaser acknowledges that Seller and its Affiliates and Advisors are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction.

(h)    Nothing in this Section 5.1 shall prevent Seller from modifying the bidding procedures as necessary or appropriate to maximize value for Seller's estate in accordance with Seller's fiduciary obligations.

5.2    Sale Order. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Acquired Assets to Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and the assumption of the Assumed Liabilities on the terms set forth herein, and (iii) the performance by Seller of its obligations under this Agreement, (b) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (c) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental,

successor, or transferee Liability, labor law, de facto merger, or substantial continuity, and (d) find that Purchaser shall have no Liability for any Excluded Liability. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

5.3    Approval. Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order). Nothing in this Agreement or any of the other Transaction Agreements shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1    Conduct of Business of Seller.

(a)    Except (i) as required by applicable Law, Order or a Governmental Body, (ii) as required, limited or prohibited by the Bankruptcy Court, the Bankruptcy Case or the Bankruptcy Code or Seller's debtor-in-possession financing or use of cash collateral, as the case may be, (iii) as expressly contemplated, required or permitted by this Agreement or the other Transaction Agreements, (iv) to the extent related to an Excluded Asset or an Excluded Liability or (v) as set forth on Schedule 6.1, during the period from the date of this Agreement until the Closing (or such earlier date and time on which this Agreement is terminated pursuant to Article VIII), unless Purchaser otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall not:

(i)    sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets, except (A) Ordinary Course dispositions of obsolete, surplus or worn out assets or assets that are no longer used or useful in the conduct of the business of Seller and (B) other sales and leases in the Ordinary Course;

(ii)    grant any Encumbrance (other than Permitted Encumbrances) on any material Acquired Assets other than to secure indebtedness and other obligations in existence at the date of this Agreement (and required to be so secured by their terms); or

(iii)    authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

(b)    Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct Seller's operations or business prior to the Closing, and nothing contained in this Agreement is intended to give Seller, directly or indirectly, the right to control or direct Purchaser's or its Subsidiaries' operations. Prior to the

Closing, each of Purchaser and Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its and its Subsidiaries' respective operations.

6.2     Access to Information.

(a)     From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to Article VIII), Seller (in its discretion) will provide Purchaser and its authorized Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the books and records of Seller, in order for Purchaser and its authorized Advisors to access such information regarding the Acquired Assets and the Assumed Liabilities as is reasonably necessary in order to consummate the transactions contemplated by this Agreement; provided that (i) such access does not unreasonably interfere with the normal operations of Seller, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to Moelis or such other Person(s) as Seller may designate in writing from time to time and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would cause significant competitive harm to Seller if the transactions contemplated by this Agreement are not consummated, (B) would require Seller to disclose any financial or proprietary information of or regarding the Affiliates of Seller or otherwise disclose information regarding the Affiliates of Seller that Seller deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws or the provisions of any agreement to which Seller is bound or would violate any fiduciary duty.

(b)     The information provided pursuant to this Section 6.2 will be used solely for the purpose of consummating the transactions contemplated hereby and by the other Transaction Agreements, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Purchaser will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Purchaser or any of its Advisors. Seller makes no representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.2, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(c)     From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will provide Seller (including, for clarity, any trust established under a chapter 11 plan of Seller or any other successors of Seller) and its Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Purchaser (including for the purpose of better understanding the books and records) and such cooperation and assistance as

shall be reasonably required to enable Seller to complete its legal, regulatory, stock exchange and financial reporting requirements, as applicable, to complete its Tax Returns or for other reasonable business purposes, including the continued administration of the Bankruptcy Cases and remaining assets and liabilities and the investigation, prosecution and defense of all claims, causes of action, lawsuits or demands to which the bankruptcy estates of Seller may have. Unless otherwise consented to in writing by Seller, Purchaser will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller such books and records or any portion thereof that Purchaser may intend to destroy, alter or dispose of. From and after the Closing, Purchaser will, and will cause its employees to, provide Seller with reasonable assistance, support and cooperation with Seller's wind-down (if applicable) and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(d)  Purchaser will not, and will not permit any member of the Purchaser Group to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, its business or the transactions contemplated by this Agreement or the other Transaction Agreements without the prior written consent of Seller for each such contact.

6.3  Reasonable Efforts; Cooperation.

(a)  Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein and by the other Transaction Agreements to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of Seller will not require Seller or any of its Affiliates or Advisors to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition hereunder. Notwithstanding anything herein to the contrary, Purchaser shall take, and shall cause its Affiliates to take, all actions necessary or appropriate to obtain all Governmental Authorizations (including such Governmental Authorizations) and to avoid or eliminate each and every impediment under any applicable Law or otherwise so as to enable the consummation of the transactions contemplated by this Agreement and the other Transaction Agreements to occur as soon as possible (and in any event prior to the Outside Date).

(b)  The obligations of Seller pursuant to this Agreement, including this Section 6.3, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), Seller's debtor-in-possession financing, if any, and Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.4  Further Assurances; Receipt of Misdirected Assets.

(a)      From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such conveyances, notices, assumptions assignments, releases, documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; provided that nothing in this Section 6.4 will prohibit Seller or any Affiliate of Seller from ceasing operations or winding up its affairs following the Closing.

(b)      From and after the Closing, if Seller receives any right, property, or asset that is an Acquired Asset, Seller shall promptly transfer such right, property, or asset to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser receives any right, property, or asset that is an Excluded Asset, Purchaser shall promptly transfer such asset to Seller, and such asset will be deemed the property of Seller held in trust by Purchaser for Seller until so transferred.

6.5      Insurance Matters. Purchaser acknowledges that, upon Closing, all insurance coverage provided in relation to Seller and the Acquired Assets that is maintained by Seller or its Affiliates (whether such policies are maintained with third party insurers or with Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.6      Acknowledgment by Purchaser. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the business, including its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Seller and the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser and the Purchaser Group have relied solely on the results of the Purchaser Group's own independent investigation and verification and have not relied on, are not relying on, and will not rely on, Seller, any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its Affiliates or Advisors in any presentations or other materials, any datasite or virtual data room, or any projections or any information, statements, disclosures or materials, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or any other Seller Party, or any failure of any of the foregoing to disclose or contain any information, except for the representations and warranties of Seller expressly contained in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") (it being understood that Purchaser and the Purchaser Group have relied, are relying, and will rely only on the Express Representations). Without limiting the generality of the foregoing, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that neither Seller, nor any other Person (including the Seller Parties), has made, is making or is authorized to make, and Purchaser, on its own behalf and on behalf of the Purchaser Group, hereby waives, all rights and claims it or they may have against any Seller Party with respect to the accuracy of, any omission or concealment of, or any misstatement with respect to, (1) any potentially material information regarding Seller or any of their assets (including the Acquired Assets), Liabilities

18

(including the Assumed Liabilities) or operations and (2) any warranty or representation (whether in written, electronic or oral form), express or implied, as to the quality, merchantability, suitability or fitness for a particular purpose, or condition of Seller's business, operations, assets, Liabilities, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects or any portion thereof (including any express or implied warranty under Section 8-108 of the Uniform Commercial Code,), except, in each case, solely to the extent expressly set forth in the Express Representations. Purchaser will accept the Acquired Assets and Assumed Liabilities at Closing "as is", "where is" and "with all faults" and without recourse against any Seller Party. Purchaser further acknowledges and agrees that the Machine Assets are being delivered by Seller to Purchaser at the location where they are located on the Closing Date, and Purchaser is solely responsible for the shipment or transport of any such Machine Assets from such location and the maintenance of such Machine Assets at such location pursuant to the terms of the applicable MSA to the extent assumed by Purchaser.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Seller</u>. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, joint written waiver by Seller and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect; and

(b)     the Bankruptcy Court shall have entered the Sale Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     (i) the representations and warranties of Seller set forth in <u>Article III</u> (in each case, other than the Fundamental Representations) shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (x) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (y) to the extent the failure of such representations and warranties to be true and correct as of such dates has not had a Material Adverse Effect (<u>provided</u> that for purposes of the foregoing clauses, the qualifications as to materiality and Material Adverse Effect contained in such representations and warranties shall not be given effect) and (ii) the representations and warranties set forth in <u>Section 3.1</u> and <u>Section 3.2</u> (together, the "<u>Fundamental Representations</u>") shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that such Fundamental Representations that are made as of a specified date need be true and correct in all material respects only as of such date;

(b)      Seller shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by Seller under this Agreement on or prior to Closing (or will have cured any such breach to the extent necessary to satisfy this condition); and

(c)      Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3      Conditions Precedent to the Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)      the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except that representations and warranties that are made as of a specified date need be true and correct only as of such date;

(b)      Purchaser shall not have breached in a manner that is material with respect to the transactions contemplated hereby, taken as a whole, the covenants required to be performed or complied with by it under this Agreement on or prior to the Closing Date (or will have cured any such breach to the extent necessary to satisfy this condition); and

(c)      Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 2.5.

7.4      Waiver of Conditions. Upon the occurrence of the Closing, any condition set forth in this Article VII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Seller may rely on the failure of any condition set forth in this Article VII, as applicable, to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

# ARTICLE VIII

# TERMINATION

8.1      Termination of Agreement. This Agreement may be terminated only in accordance with this Section 8.1. This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Purchaser;

(b)      by written notice of either Purchaser or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 8.1(b) if

20

the issuance of such Order was caused by such Party's breach of its representations, warranties, covenants or failure to perform any of its obligations under this Agreement;

(c)    by written notice of either Purchaser or Seller, if the Closing shall not have occurred on or before April 15, 2023 (the "Outside Date") (or such later date as provided in Section 8.1(f) to the extent applicable); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 8.1(c) if such Party is in material breach or violation of its representations, warranties, covenants or obligations under this Agreement;

(d)    by written notice of either Purchaser or Sellers, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of Seller is appointed in the Bankruptcy Case;

(e)    by written notice from Seller to Purchaser, upon a material breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in Section 7.3(a) or 7.3(b) would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; provided that (i) if such breach is curable by Purchaser then Seller may not terminate this Agreement under this Section 8.1(e) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Seller notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(e) will not be available to Seller at any time that Seller is in material breach of, any covenant, representation or warranty hereunder;

(f)    by written notice from Purchaser to Seller, upon a breach of any covenant or agreement on the part of Seller, or if any representation or warranty of Seller will have become untrue, in each case, such that the conditions set forth in Section 7.2(a) or 7.2(b) would not be satisfied; provided that (i) if such breach is curable by Seller then Purchaser may not terminate this Agreement under this Section 8.1(f) unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies Seller of such breach and (ii) the right to terminate this Agreement pursuant to this Section 8.1(f) will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(g)    by written notice from Seller to Purchaser, if all of the conditions set forth in Sections 7.1 and 7.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Purchaser fails to complete the Closing at the time required by Section 2.3;

(h)    by written notice from Seller to Purchaser, if Seller or the board of managers (or similar governing body) of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its fiduciary duties;

(i)    by written notice of either Purchaser or Seller, if (i) Seller enters into one or more Alternative Transactions with one or more Persons other than Purchaser or the Successful

Bidder or the Backup Bidder at the Auction or (ii) the Bankruptcy Court approves an Alternative Transaction other than with the Successful Bidder or the Backup Bidder; or

(j)  by written notice from Purchaser to Seller, if Purchaser is not the Successful Bidder or the Backup Bidder at the Auction.

8.2  <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, this Agreement shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors, employees, managers, Advisors or shareholders; <u>provided</u> that <u>Section 2.2</u>, <u>Section 6.2(b)</u>, this <u>Section 8.2</u> and <u>Article X</u> shall survive any such termination; <u>provided</u> <u>further</u> that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the transactions contemplated by this Agreement lost by Seller (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Seller) resulting from any willful breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). For purposes of this Agreement, "willful breach" shall mean a deliberate act or a deliberate failure to act regardless of whether breaching was the conscious object of the act or failure to act. Subject to <u>Section 10.12</u>, nothing in this <u>Section 8.2</u> will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

## ARTICLE IX

## TAXES

9.1  <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes.

9.2  <u>Allocation of Purchase Price</u>. For U.S. federal and applicable state and local income Tax purposes, Purchaser, Seller and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the methodology set forth in <u>Schedule 9.2</u> (the "<u>Allocation Methodology</u>"). As soon as commercially practicable, but no later than forty-five (45) days following the determination of the final Purchase Price, Purchaser shall provide a proposed allocation to Seller setting forth the allocation of the Purchase Price (and other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the Allocation Methodology (the "<u>Allocation</u>"). If Seller delivers a written objection within thirty (30) days after receipt of the draft Allocation proposed by Purchaser, then Purchaser and Seller shall negotiate in good faith to resolve any such objection, and, if Seller and Purchaser cannot resolve such dispute within thirty (30) days of Purchaser's receipt of Seller's objection, then an independent nationally recognized accounting firm mutually

22

acceptable to Purchaser and Seller shall resolve such dispute and the resolution of such dispute shall be final and binding on the Parties. The Parties and their respective Affiliates shall file all Tax Returns in accordance with such Allocation (as finally determined under this Section 9.2) and not take any Tax related action inconsistent with the Allocation, in each case, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Code.

9.3    Cooperation. Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes (including in connection with any obligations of Seller under Treasury Regulations Section 1.751-1(a)(3)).

9.4    Preparation of Tax Returns and Payment of Taxes.

(a)    Except as otherwise provided by Section 9.1, Seller shall prepare and timely file all Tax Returns of Seller.

(b)    Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 9.4(a). With respect to any Pre-Closing Tax Period and any Straddle Period, Purchaser shall prepare such Tax Returns consistent with past practice, and shall provide Seller with a draft of such Tax Returns at least thirty (30) days prior to the filing of any such Tax Return. Purchaser shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns.

(c)    Purchaser shall not file any Tax Return, file an amendment to any previously-filed Tax Return, or otherwise take any Tax position or action that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Straddle Period ending on the Closing Date, unless Purchaser receives an opinion from an independent nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than forty-five (45) days' notice of such position before filing any such Tax Return. In the event Seller disagrees with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent nationally recognized accounting firm or law firm for resolution, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Seller, on the other hand. The determination of such independent nationally recognized accounting firm or law firm shall be binding on all Parties and any Tax Return shall be filed consistently with such resolution.

(d)    For all purposes under this Agreement, in respect of any Straddle Period, the portion of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be: (i) in the case of any Tax based upon or related to income and any gross receipts, sales or use Tax, or payroll or receipts Tax, deemed to include the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date; and (ii) in the case of any Taxes other than Taxes specified in clause (i), deemed to include the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

## ARTICLE X

## MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or any other Transaction Agreements will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Purchaser and Seller acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 10.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for five (5) years and (b) are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands, consents, waivers and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail if transmitted prior to 5:00 PM (local time of the recipient) on a Business Day and otherwise on the next Business Day after transmittal (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

US Farms & Mining Opportunity Fund LLC
22 Coronel Way
Sugar Land, Texas 77498

Attention:        Gavin Qu
                  Rahim Noorani
Email:            gavinqu@proton.me
                  rahimsnoorani@gmail.com

with a copy to (which shall not constitute notice):

Croke Fairchild Duarte & Beres
180 N. LaSalle, Suite 3400
Chicago, Illinois 60601
Attention:        Michael Frisch
                  Robert Isham
Email:            mfrisch@crokefairchild.com
                  risham@crokefairchild.com

and

Goldstein & McClintock LLLP
111W. Washington, Suite 1221
Chicago, Illinois 60602
Attention:        Matthew McClintock
Email:            mattm@goldmclaw.com

Notices to Seller:

BlockFi Lending LLC
201 Montgomery Street, Second Floor, Suite 263
Jersey City, NJ 07032
Attention:        Jonathan Mayers
                  Ross Kirschner
                  Usec Rho
Email:            jonathan@blockfi.com
                  ross@blockfi.com
                  usec.rho@blockfi.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:    Joshua A. Sussberg, P.C.
                 Christine A. Okike, P.C.
                 Steve Toth
Email:       joshua.sussberg@kirkland.com
                 christine.okike@kirkland.com
                 steve.toth@kirkland.com

and

Haynes Boone LLP
30 Rockefeller Plaza
26th Floor
New York, NY 10112
Attention:    Matthew Frankle
Email:       matthew.frankle@haynesboone.com

Haynes Boone LLP
2323 Victory Avenue
Dallas, TX 75219
Attention:    Matt Ferris
                 Michael Freeman
Email:       matt.ferris@haynesboone.com
                 michael.freeman@haynesboone.com

     10.4   <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon Purchaser and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; <u>provided</u> that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and Seller, and any attempted assignment or delegation without such prior written consent shall be null and void; <u>provided</u> <u>further</u> that Seller may assign some or all of its rights or delegate some or all of its obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court. In addition, Purchaser may designate, upon two (2) Business Days prior written notice to Seller, any Affiliate that shall, at the Closing, receive any Acquired Asset or pay any portion of the Purchase Price; <u>provided</u> that such designation shall not relieve Purchaser of its obligations and Liabilities hereunder except to the extent actually satisfied by such designee.

     10.5   <u>Amendment and Waiver</u>. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and Seller or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No

waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default. Furthermore, neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties and their permitted successors and assigns any legal or equitable right, remedy, cause of action or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10   Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules and will be deemed a disclosure against any representation or warranty set forth in this Agreement, without the need for repetition or cross reference. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations, warranties, obligations, covenants, conditions or agreements contained herein. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. For the avoidance of doubt, the information contained

in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   Complete Agreement. This Agreement, together with the Confidentiality Agreement and the other Transaction Agreements, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by hereby and thereby and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and the other Transaction Agreements. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12   Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches, or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof and its rights hereunder in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, or other rights and remedies existing in its favor at law or in equity, and (b) the right of specific performance, injunctive relief and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Seller pursuant to this Section 10.12 will be in addition to any other remedy to which it was entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Seller from seeking to collect or collecting damages. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require Seller to remedy any breach of any representation or warranty of Seller made herein.

10.13   Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the

Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 10.3. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

10.14    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE TRANSACTION AGREEMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY TRANSACTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   No Right of Set-Off. Purchaser, on its own behalf and on behalf the Purchaser Group and its and their respective successors and permitted assigns, hereby waives any rights of set-off, netting, offset, recoupment or similar rights that Purchaser, any member of the Purchaser Group or any of its or their respective successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser or the Purchaser Group pursuant to this Agreement, the Transaction Agreements or any other document or instrument delivered by Purchaser or a member of the Purchaser Group in connection herewith.

10.16   Counterparts and PDF. This Agreement, the Transaction Agreements and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail, will be treated in all manner and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

10.17   Publicity. No Party or any of its Affiliates shall issue, and shall cause its Advisors not to issue, any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller (or their respective Affiliates) lists securities; provided that the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof. Notwithstanding anything to the contrary in this Agreement, nothing shall restrict or prohibit Seller or its Affiliates from communicating with their respective employees, customers, suppliers or other business relations.

10.18   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19   Fiduciary Obligations. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, Seller retain

the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of their estates.

## ARTICLE XI

## ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1    Certain Definitions.

(a)    "Action" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, summons, suit, litigation, arbitration, third-party mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, dispute, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body, tribunal or arbitrator.

(b)    "Advisors" means, with respect to any Person, any directors, officers, members, shareholders, equity holders, managers, partners, employees, contractors, subcontractors, investment bankers, financial advisors, accountants, auditors, agents, attorneys, consultants, or other representatives of such Person.

(c)    "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, affairs and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)    "Alternative Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale or disposition of the Acquired Assets (in any form of transaction, whether by merger, sale of assets or equity or otherwise) and/or Assumed Liabilities.

(e)    "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

(f)    "Bidding Procedures Order" means the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 441].

(g)    "Business Day" means any day other than a Saturday, Sunday or other day on which the Federal Reserve Bank located in New York City, New York is closed.

(h)    "Code" means the United States Internal Revenue Code of 1986, as amended.

(i)      "Confidentiality Agreement" means that certain Mutual Nondisclosure Agreement, dated as of December 21, 2022, by and between US Farms and Mining Inc. and BlockFi Inc.

(j)      "Consent" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(k)      "Contract" means any contract, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, or other agreement that is legally binding upon a Person or its property, in each case, other than a purchase order, service order or sales order.

(l)      "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

(m)      "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(n)      "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(o)      "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(p)      "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(q)      "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(r)      "Material Adverse Effect" means a material adverse effect on the Acquired Assets and Assumed Liabilities, taken as whole; provided that none of the following shall

constitute, or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any matter, event, change, development, occurrence, circumstance or effect (each, an "Effect") in, arising from or relating to general business or economic conditions affecting the industry in which Seller and its Affiliates operate, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing or raw materials used, changes in market share or financial results, and other related changes; (ii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, civil protests, riots, protests, the engagement by the United States or other country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States or of any other country; (iii) Effects in, arising from or relating to any fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God, global or national health concern, epidemic, pandemic (whether or not declared as such by any Governmental Body), outbreak of illness or public health event (whether human or animal), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto or any other *force majeure*; (iv) Effects in, arising from or relating to the decline or rise in price of any currency or cryptocurrency or any equipment or supplies necessary to or used in the provision of services by Seller (including any resulting inability to meet customer demands or fulfill purchase orders and any resulting breaches of Contracts); (v) Effects in, arising from or relating to financial, banking, securities or cryptocurrency markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, cryptocurrency or index and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement); (vi) Effects in, arising from or relating to changes in, GAAP or the interpretation thereof; (vii) Effects in, arising from or relating to changes in, Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Body and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing; (viii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Purchaser or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement or requested by Purchaser, (C) Purchaser's failure to consent to any of the actions restricted in Section 6.1 or (D) the negotiation, announcement or pendency of this Agreement or the transactions contemplated hereby, the identity, nature or ownership of Purchaser or Purchaser's plans with respect to the Acquired Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller with employees, customers, lessors, suppliers, vendors or other commercial partners or Governmental Bodies or litigation arising from or relating to this Agreement or the transactions contemplated hereby; (ix) Effects in, arising from or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Purchaser has knowledge as of the date hereof, including any matter set forth in the Schedules or any matter set forth in any filings with the Bankruptcy Court prior to the date hereof; (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller (or any of its assets or properties) is bound, (xi) Effects that arise from any seasonal fluctuations in

the business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Advisors) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Purchaser or its Affiliates with respect to the transactions completed by this Agreement or the financing thereof or any breach by Purchaser of this Agreement; (xiv) the matters set forth on the Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Schedules; or (xv) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the transactions contemplated hereby or thereby, (2) the Sale Order or the reorganization of Seller, or (3) the Bidding Procedures Order; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith.

(s)    "Moelis" means Moelis & Company LLC, a Delaware limited liability company.

(t)    "Non Working Condition Machine Asset" means any Machine Asset that has damaged or broken control boards, hashboards, power supplies, or other essential components such that such Machine Asset produces less than 65% of the nameplate hashrate of such Machine Asset.

(u)    "Order" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(v)    "Ordinary Course" means the ordinary and usual course of operations of the business of Seller taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case and past practice in light of the current pandemic, epidemic or disease outbreak.

(w)    "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets that do not, individually or in the aggregate, adversely affect the operation of the Acquired Assets, (iii) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course for amounts not yet due and payable, (iv) licenses granted on a non-exclusive basis, (v) such other Encumbrances or title exceptions which do not, individually or in the aggregate, materially and adversely affect the operation of the Acquired Assets, (vi) any Encumbrances set forth on Schedule 11.1(w), (vii) restrictions under applicable securities Laws and (viii) any Encumbrances that will be removed or released by operation of the Sale Order.

(x)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Body or other entity or group.

(y) "Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on the Closing Date.

(z) "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(aa) "Sale Order" means the sale Order or Orders (i) approving this Agreement and the terms and conditions hereof, including pursuant to sections 363 and 365 of the Bankruptcy Code and (ii) approving and authorizing Seller to consummate the transactions contemplated hereby.

(bb) "Seller Parties" means Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(cc) "Straddle Period" means any taxable period that includes but does not end on the Closing Date.

(dd) "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(ee) "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(ff) "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(gg) "Transaction Agreements" means this Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement, including the Assignment and Assumption Agreement.

11.2    Index of Defined Terms.

Acquired Assets ............................................4
Agreement.....................................................4
Allocation ...................................................22
Allocation Methodology............................22
Assignment and Assumption Agreement ....9
Assumed Liabilities ......................................5

Backup Bidder ............................................14
Bankruptcy Case ...........................................4
Bankruptcy Code ...........................................4
Bankruptcy Court...........................................4
Cash Payment ...............................................6
Chosen Courts...............................................29
Closing ........................................................8
Closing Date .................................................8
Closing Date Payment ..................................6
Debtors........................................................4
Delayed Assets.............................................8
Delayed Cash Payment .................................8
Delayed Exchange ........................................8
Delayed Holdback Amount ...........................7
Delayed Inspection Deduct...........................9
Delayed Inspection Period............................8
Delayed Release Amount ..............................9
Deposit........................................................7
Effect...........................................................33
Enforceability Exceptions..........................10

Escrow Agent................................................7
Excluded Assets............................................5
Excluded Liabilities .....................................5
Express Representations .............................18
Fundamental Representations....................19
Holdback Amount.........................................6
Initial Inspection Deduct.............................7
Initial Inspection Period..............................6
Initial Release Amount ................................7
Machine Assets............................................4
Outside Date ..............................................21
Parties ........................................................4
Party ...........................................................4
Purchase Price.............................................6
Purchaser.....................................................4
Seller...........................................................4
Solvent ......................................................12
Successful Bidder .......................................14
Transfer Taxes ...........................................22

11.3    Rules of Interpretation. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other Transaction Agreement.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP consistently applied. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or", unless expressly indicated otherwise.

(d)    The words "to the extent" shall mean "the degree by which" and not "if."

(e)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the

reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(f)      Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(g)      The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(h)      All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(i)      All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(j)      Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (a) included in the dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (c) made available upon request, including at Seller's offices.

(k)      Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(l)      Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(m)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

*[Signature page(s) follow.]*

37

[*Signature pages on file*]

# EXHIBIT A

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

*To Come*

# SCHEDULES

## Schedule 1.1(a)

### Machine Assets

| Miner Type | Location | TH/S | Count |
|---|---|---|---|
| S19j Pro | TX | 100 | 180 |
| S19 Pro | TX | 90 | 400 |
| M30S | GA | 88 | 1,000 |
| S19j Pro | Norway | 100 | 2,954 |
| S19 Pro | Norway | 110 | 703 |
| S19[1] | GA | 95 | 372 |
| S19 Pro[1] | GA/KY | 110 | 34 |
| S19j Pro[1] | GA | 104 | 1 |
| S19j Pro[1] | GA | 96 | 82 |
| S19j Pro[1] | ND | 100 | 650 |
| **Total** | | **98** | **6,376** |

[1] Represents machines from Gilley, which have been moved to the Self-Mining Operations component due to foreclosure

"Delayed Assets" means any of the machines listed on this Schedule 1.1(a) that are subject to the Gilley Loan Document or applicable Core Scientific Hosting Contract.:

Pricing for Inspection Deduct
Base price = (total bid amount in USD/total bid units) x units that are <65% nameplate hashrate

a) damaged units are S19 JPROS, deduction = base price * (1+10%)

b) damaged units are M30S, deduction = base price * (1-15%)

c) damaged units are S19 PROS, deduction = base price * (1+25%)

d) damaged units are S19s, deduction = base price * (1-5%)

## Schedule 3.3

### Seller Conflicts; Consents

None.

**<u>Schedule 4.3</u>**

**Seller Conflicts; Consents**

None

**<u>Schedule 6.1</u>**

**Conduct of Business of Seller**

None.

**<u>Schedule 9.2</u>**

**Allocation Methodology**

In accordance with the fair market value of the respective Acquired Assets.

**<u>Schedule 11.1(w)</u>**

**Permitted Encumbrances**

None.