**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Charles M. Jones II, Esq. (admitted *pro hac vice*)
Aimee M. Furness (*pro hac vice* pending)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
charlie.jones@haynesboone.com
aimee.furness@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br>BLOCKFI INC., *et al.*,<br>　　　　　　　　　Debtors.[1] | Case No. 22-19361 (MBK)<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>Adv. Pro. No. 23-_____ (MBK) |
| BLOCKFI INC., BLOCKFI TRADING, LLC, BLOCKFI LENDING LLC, BLOCKFI WALLET LLC, BLOCKFI VENTURES LLC, BLOCKFI INTERNATIONAL LTD., BLOCKFI INVESTMENT PRODUCTS LLC, BLOCKFI SERVICES, INC. and BLOCKFI LENDING II LLC<br><br>　　　　　　　　　Plaintiff,<br><br>　　　　　　-against-<br><br>TREY GREENE AND ANTONIE ELAS,<br><br>　　　　　　　　　Defendants. | |

---

[1] The Debtors in these Chapter 11 Cases (the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A)); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

1

**DEBTORS' ADVERSARY COMPLAINT TO EXTEND AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR INJUNCTIVE RELIEF ENJOINING PROSECUTION OF PENDING LITIGATION AGAINST THE DEBTORS' DIRECTORS AND OFFICERS**

BlockFi Inc., BlockFi Trading LLC, BlockFi Lending LLC, BlockFi Wallet LLC, BlockFi Ventures LLC, BlockFi International Ltd., BlockFi Investment Products LLC, BlockFi Services, Inc., and BlockFi Lending II LLC (collectively the "Debtors") bring this Complaint against Trey Greene and Antonie Elas (collectively, the "Adversary Defendants") for an extension of the automatic stay pursuant to § 362(a) or an injunction pursuant to § 105(a) of the Bankruptcy Code. In support of this Complaint, BlockFi respectfully states as follows:

<u>**NATURE OF THE CASE**</u>

1.      Certain of the Debtors' officers, directors, and former employees have been named as defendants in two putative class-action lawsuits – one filed in New Jersey and the other in Massachusetts – related to BlockFi Interest Accounts ("BIAs").  A copy of the New Jersey Complaint is attached as <u>Exhibit "A"</u> hereto (the "*Greene* Lawsuit")[2]; a copy of the Massachusetts Complaint is attached as <u>Exhibit "B"</u> hereto (the "*Elas* Lawsuit")[3] (together, the "Lawsuits").

2.      The *Greene* Lawsuit is brought against certain of the Debtors' directors and officers: Zac Prince (Debtors' CEO and Board Member), Flori Marquez (Debtors' COO and Board Member), Tony Lauro (improperly named as "Tony Laura") (Debtors' Independent Board Member and former CFO), and Jennifer Hill (Debtors' Independent Board Member) (collectively, the "*Greene* D&Os").

---

[2] *Trey Greene v. Zac Prince, Flori Marquez, Tony Laura, Jennifer Hill and Gemini Trading, LLC*, Case No. 2:23-cv-01165-KM-LDW filed in the United States District Court for the District of New Jersey.

[3] *Antonie Elas v. Zac Prince, Flori Marquez, Amit Cheela, David Olsson, and Samia Bayou*, Case No. 1:23-cv-10472-IT filed in the United States District Court for the District of Massachusetts.

65365/0001-44856405v1

3.      Greene asserts claims against the *Greene* D&Os for the offer and sale of securities in violation of Sections 5, 12, and 15 of the Securities Act and Sections 10(b) and 20 of the Securities Exchange Act.  Specifically, Greene alleges that the *Greene* D&Os "exercised such control [over BlockFi] to cause it to engage in the illegal practices described herein and are therefore liable as controlling persons of BlockFi."  *Greene* Complaint, Exhibit "A," ¶¶ 201, 213. Greene alleges that Prince and Marquez violated the New Jersey Uniform Securities Law and that the *Greene* D&Os "substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Blockfi."  *Greene* Complaint, Exhibit "A," ¶ 244.  Finally, Greene asserts violations of New Jersey's Consumer Fraud Act.

4.      The *Elas* Lawsuit is substantially similar.  Both Lawsuits focus on BlockFi's alleged sale of unregistered securities, and both assert claims on behalf of all persons who invested in BIAs from March 4, 2019 through November 2022.  *Elas* Complaint, Exhibit "B," ¶ 94.  Elas asserts claims against certain of the Debtors' directors, officers, and former employees: Prince, Marquez, Amit Cheela (Debtors' CFO), David Olsson (Debtors' former Senior Vice President, Global Head of Institutional Sales), and Samia Bayou (Debtors' former Vice President, Global Head of Private Client) (collectively, the "*Elas* DOEs" and together with the *Greene* D&Os "the DOEs").

5.      The *Elas* Lawsuit includes similar federal securities laws claims as the *Greene* Lawsuit and includes claims for alleged violations of the Massachusetts Uniform Securities Act on behalf of a "subclass" of Massachusetts investors.

65365/0001-44856405v1

6.    The Lawsuits are dependent on, and inextricably intertwined with, the Debtors' alleged conduct.  To prove the claims in the Lawsuits, which arise from the Debtors' alleged sale of unregistered securities, the Adversary Defendants must establish underlying wrongdoing by the Debtors.

7.    This Court should extend the automatic stay pursuant to § 362, or issue an injunction pursuant to § 105 to enjoin the prosecution of the Lawsuits because:

a.    Without an extension of the stay or issuance of an injunction, the Debtors will be exposed to a significant risk of res judicata, collateral estoppel, or evidentiary prejudice.  The Debtors' DOEs' alleged conduct and the legal classification of the BIAs are the foundation for the Lawsuits.  Any judicial decision on the claims in the Lawsuits could be used against the Debtors.

b.    While certain assertions in the Lawsuits are unclear, it appears that they may assert fiduciary duty claims against certain of the Debtors' DOEs, and those (if asserted) would be estate claims that only the Debtors have standing to pursue.

c.    The directors and officers named in the Lawsuits are critical to the restructuring efforts of the Debtors.  Given the fast pace, complicated issues, and anticipated short timetable of these Chapter 11 Cases, the Debtors need their directors and officers focused on the restructuring, not defending multiple putative class action lawsuits.

d.    One or more of the Debtors face indemnification claims if the Lawsuits are allowed to continue.  One or more of the Debtors have contractual indemnification agreements with Prince, Marquez, Lauro, Cheela, and Hill and the BlockFi Bylaws require indemnification of its directors for liabilities incurred in the course of their business as directors.  The indemnification agreements require the advancement of defense costs and expenses so those costs could start accruing immediately.  As such, the Debtors and their estates could be directly affected should the

4

Court permit the Lawsuits to proceed.

e.       Each of the DOEs are entitled to be defended in the Lawsuits by counsel to be paid under the terms of certain insurance policies common to the Debtors and their DOEs.

8.       The Bankruptcy Code provides for stays of litigation to avoid these issues.  This Court has stated that "ample authority exists to conclude that § 362(a), § 105(a), or a court's inherent powers can each serve as independent bases for extension of a stay to nondebtor third parties." *In re LTL Mgmt., LLC*, 638 B.R. 291, 300 (Bankr. D.N.J. 2022).

9.       For these reasons, the Debtors request that the Court extend the automatic stay pursuant to § 362 or issue an injunction pursuant to § 105 to stay or enjoin the prosecution of the Lawsuits against the DOEs until the effective date of a restructuring plan in these Chapter 11 Cases.

## JURISDICTION AND VENUE

8.       This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

9.       This adversary proceeding is a core proceeding within the meaning of one or more subsections of 28 U.S.C. § 157(b).

10.       Venue in this district is proper pursuant to 28 U.S.C. § 1409.

11.       Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Debtors consent to the entry of a final order or judgment by the Bankruptcy Court.  The statutory bases for the relief sought in this Complaint are 11 U.S.C. §§ 105 and 362.

## THE PARTIES

12.       The Debtors are plaintiffs in this adversary proceeding.

13.       Trey Greene is the named plaintiff in the *Greene* Lawsuit.  This Complaint is being served on the attorneys that filed the *Greene* Lawsuit on his behalf.

65365/0001-44856405v1

14.     Antonie Elas is the named plaintiff in the *Elas* Lawsuit. This Complaint is being served on the attorneys that filed the *Elas* Lawsuit on his behalf.

## RELIEF REQUESTED

15.     By this Complaint, the Debtors seek a declaratory judgment to extend the automatic stay under §§ 362(a)(1) or 362(a)(3) to the Lawsuits, or in the alternative, to stay and enjoin prosecution of the Lawsuits pursuant to § 105 of the Bankruptcy Code during the pendency of the Debtors' Chapter 11 Cases.

## FACTUAL BACKGROUND

16.     On November 28, 2022 (the "Petition Date"), BlockFi and its debtor affiliates as debtors and debtors-in-possession each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code thereby commencing the Chapter 11 Cases.

17.     The Debtors are operating their businesses and managing their property as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. On November 29, 2022, this Court entered an order in the main case [Docket No. 42] authorizing the procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Chapter 11 Cases are being jointly administered under lead Case No. 22-19361.

18.     BlockFi Inc. was founded in 2017 by Zac Prince and Flori Marquez to provide credit services to markets with limited access to simple financial products. A detailed description of BlockFi's business operations, capital and debt structure, and the facts and circumstances leading to these Chapter 11 Cases is set forth in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration") (Docket No. 17).

65365/0001-44856405v1

19.     Certain of the Debtors' directors, officers, and former employees have been named as defendants in putative class-actions in New Jersey and Massachusetts.  *See Tony Greene v. Zac Prince, Flori Marquez, Tony Laura [sic], Jennifer Hill And Gemini Trading, LLC,* No. 2:23-cv-01165-KM-LDW (D. N. J. Feb. 28, 2023) and *Antonie Elas v. Zac Prince, Flori Marquez, Amit Cheela, David Olsson, and Samia Bayou,* No. 1:23-cv-10472-IT (D. Mass. Mar. 1, 2023).

20.     The Adversary Defendants assert claims against the DOEs for alleged violations of securities laws and various other alleged state statutory violations.  *See* Exhibit "A" and Exhibit "B."

**A.     *BlockFi's Indemnification Obligations***

21.     One or more of the Debtors has potential indemnification obligations to the defendants in the Lawsuits.

      1.     *Indemnification of Directors pursuant to Bylaws.*

22.     The Amended and Restated Bylaws of BlockFi, Inc. (the "BlockFi Bylaws") obligate it to indemnify "any director made, or threatened to be made, a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of being a director of the corporation or a predecessor corporation or a director or officer of another corporation, if such person served in such position at the request of the corporation."  BlockFi Bylaws, Article 7.6, attached hereto as Exhibit "C."

65365/0001-44856405v1

23.     Further, these indemnification obligations include payment in advance:

Expenses incurred by a director of the corporation in defending a civil or criminal action, suit or proceeding by reason of the fact that he or she is or was a director of the corporation (or was serving at the corporation's request as a director or officer of another corporation) shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation as authorized by relevant sections of the DGCL.

*Id.*

2.      *Indemnification of Directors and Officers pursuant to Indemnification Agreements.*

24.     BlockFi entered into indemnification agreements with Zac Prince and Flori Marquez.  Attached hereto as Exhibit "D" (Prince) and Exhibit "E" (Marquez).

25.     These indemnification agreements state:

Indemnitee shall be entitled to the rights of indemnification provided in this Section l(a) if, by reason of his Corporate Status (as hereinafter defined), the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of the Company. Pursuant to this Section 1(a), Indemnitee shall be indemnified against all Expenses (as hereinafter defined), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him, or on his behalf, in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

26.     BlockFi entered into an Independent Director Compensation Agreement with Jennifer Hill.  Attached hereto as Exhibit "F."

27.     The Section 6(b) of the Independent Director Compensation Agreement requires indemnification:

In the event that Director was or is made a party or is threatened to be made a party to or is involved (including, without limitation, as a witness) in any Proceeding by reason of the fact that Director is or was an independent director of the Company and, whether the basis of such Proceeding is alleged action in an official capacity

8

as an independent director of the Company, or as an officer, employee, trustee or agent of the Company while serving as an independent director of the Company, the Company shall indemnify and hold harmless Director to the fullest extent authorized by Delaware law or any other applicable law or rule, but no less than to the extent set forth herein, against all Expenses.

28.     BlockFi also entered into indemnification agreements with Tony Lauro and Amit Cheela.  Attached hereto as Exhibit "G" (Lauro) and Exhibit "H" (Cheela).  Section (b) of those indemnification agreements state:

In the event that Indemnitee was or is made a party or is threatened to be made a party to or is involved (including, without limitation, as a witness) in any Proceeding by reason of the fact that indemnitee is or was a director of the Company and, whether the basis of such Proceeding is alleged action in an official capacity as a director of the Company, or as a director, officer, employee, trustee or agent of the Company while serving as a director of the Company, the Company shall indemnify and hold harmless Indemnitee to the fullest extent authorized by Delaware law or any other applicable law or rule, but no less than to the extent set forth herein, against all Expenses.

29.     One or more of the Debtors may also have contractual or common-law indemnification obligations to the remaining defendants in the Lawsuits.

**B.      The D&O Insurance Coverage**

30.     The Debtors and their directors and officers share a common Executive and Private Company Liability Insurance Policy.  The Policy provides coverage for claims made against the Debtors and their directors and executives, including, but not limited to, non-indemnified losses of officers and directors under Insuring Agreement (A); losses of the Debtors or those of their directors and officers that the Debtors indemnify, under Insuring Agreement (B); and the Debtors' losses from securities claims, under Insuring Agreement (C).

31.     The Debtors and their officers and directors are entitled to use the proceeds of the Policy for, inter alia, defenses expenses and "settlements; compensatory damages; judgments, including awarded costs, and pre-judgment and post-judgment interest; punitive, exemplary and

9

multiplied damages; civil fines or penalties…; and attorney fees awarded to the prevailing plaintiff's counsel pursuant to a covered judgment," subject to certain standard limitations and exclusions.  If made, such payments would deplete proceeds available to the Debtors' Estates.

**C.    Prosecution of the Lawsuits will be detrimental to the Debtors' Estates**

32.    If the Lawsuits continue, and are not stayed or enjoined, the Debtors' estates and reorganization efforts will be harmed.

33.    First, the Debtors will be exposed to a significant risk of res judicata, collateral estoppel, or evidentiary prejudice if the Lawsuits are allowed to continue.  The Debtors' alleged conduct is the foundation for the allegations in the Lawsuits.  Thus, any judicial decision—whether on the merits or on procedural issues—could be used later against the Debtors.

34.    Second, the Lawsuits create indemnification obligations for one or more of the Debtors.  BlockFi has contractual indemnification obligations to the directors and officers and is bound by its Bylaws to indemnify its directors.  One or more of the Debtors may be subject to state law or common law indemnification claims from the remaining defendants named in the Lawsuits.

35.    Third, the Debtors' directors and officers are critical to any successful restructuring. The directors and officers have the overriding responsibility to shepherd the Debtors through their restructuring with a goal of maximizing the value to be returned to their creditors (including customers similarly situated to the Adversary Defendants), and they will necessarily be distracted from this responsibility if they are obligated to devote time and resources to responding to discovery demands and litigating claims against them.  These Chapter 11 Cases are proceeding at a rapid pace, and the Debtors need their officers and directors focused on the restructuring, not on defending multiple putative class action lawsuits.

65365/0001-44856405v1

36.    Finally, the Debtors and their directors and officers share a common Executive and Private Company Liability Insurance Policy which is property of the Debtors' Estates and will be depleted if the Lawsuits are not stayed.

**FIRST CLAIM FOR RELIEF**
**(§ 362 Declaratory Judgment)**

37.    The Debtors repeat and re-allege the allegations contained in paragraphs 1–36 of this Complaint as if fully set forth herein.

38.    The Debtors seek an order staying the prosecution of the Lawsuits until the effective date of a plan in these Chapter 11 Cases, pursuant to §§ 362(a)(1) or 362(a)(3) of the Bankruptcy Code.

39.    Extension of the stay is warranted because there is an identity of interest between the Debtors and the DOEs in the Lawsuits.

40.    Continued prosecution of the Lawsuits will expose the Debtors to a risk of res judicata, collateral estoppel, or evidentiary prejudice.

41.    Continued prosecution of the Lawsuits will deplete the Executive and Private Company Liability Insurance Policy which is property of the Debtors' Estates.

42.    Extension of the stay is further warranted because continued prosecution of the Lawsuits may expose the Debtors to burdensome discovery obligations.  Discovery from the Debtors would consume significant time and resources, distract management, eviscerate the benefits of the automatic stay, and frustrate their ability to restructure successfully.

43.    Extension of the stay is likewise warranted because continued prosecution of the Lawsuits will expose the Debtors to indemnification claims, further jeopardizing property of the Debtors' estates and the recovery available to creditors.

44.     If the Lawsuits are allowed to continue, the Debtors' prospects for efficiently and effectively monetizing assets and/or confirming their plan will be impaired, thwarting the Congressional purpose of providing the Debtors with a breathing spell from litigation pressures during their efforts to confirm a plan.  Accordingly, the Court should extend the automatic stay to the Lawsuits (or any that are filed in the future that name the DOEs as defendants or respondents).

45.     Based on the foregoing, the Debtors seek a declaratory judgment extending the stay under §§ 362(a)(1) or 362(a)(3) of the Bankruptcy Code to the Lawsuits.

## SECOND CLAIM FOR RELIEF
### (§ 105 Injunctive Relief)

46.     The Debtors repeat and re-allege the allegations contained in paragraphs 1–45 of this Complaint as if fully set forth herein.

47.     The Debtors seek an injunction enjoining the continued prosecution of the Lawsuits under § 105(a) of the Bankruptcy Code until the effective date of a plan or further order of this Court.

48.     Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

49.     Relief under § 105 of the Bankruptcy Code is particularly appropriate in a chapter 11 case when necessary to protect a debtor's ability to effectively confirm a restructuring plan and to preserve the property of the debtor's estates.

50.     For the reasons stated herein, this Court should exercise its authority under § 105 of the Bankruptcy Code to enjoin the prosecution of the Lawsuits.  If the Lawsuits continue, it will

12

harm the Debtors' efforts to efficiently and effectively monetize assets and/or restructure and will interfere with the property of the Debtors' estates.

51.    If the Adversary Defendants are not enjoined from prosecuting the Lawsuits, the Debtors will likely suffer irreparable harm and their ongoing efforts will be threatened, including:

a.    The risk of res judicata, collateral estoppel, evidentiary prejudice, or other findings that could impair the Debtors' ability to defend themselves in subsequent litigation;

b.    Significant indemnification claims against one or more of the Debtors;

c.    Depletion of the Executive and Private Company Liability Insurance Policy;

d.    The fact that the directors and officers will be distracted by the Lawsuits during a time period in which they should be completely focused on shepherding the Debtors through these Chapter 11 Cases; and

e.    Potential discovery obligations that the Debtors will face from the Adversary Defendants and the DOEs.

52.    The Adversary Defendants will suffer little, if any, harm if the Lawsuits are enjoined until the effective date of the Debtors' plan.  The likelihood of irreparable harm to the Debtors in the absence of injunctive relief far outweighs any potential harm to the parties in the Lawsuits.

53.    The issuance of the requested injunction is in the public interest.

54.    Debtors request the injunction issue without bond pursuant to Bankruptcy Rule 7065.

65365/0001-44856405v1

## PRAYER FOR RELIEF

WHEREFORE, the Debtors as Plaintiffs demand judgment against the Adversary Defendants and respectfully request relief as follows:

a.      The entry of a declaratory judgment that the prosecution of the Lawsuits is stayed under Bankruptcy Code §§ 362(a)(1) or 362(a)(3) until the effective date of a restructuring plan or further order of this Court; and/or

b.      In the alternative, the entry of an Order granting an injunction pursuant to Bankruptcy Code § 105(a) enjoining and prohibiting the Adversary Defendants from prosecuting the Lawsuits until the effective date of a restructuring plan or further order of this Court; and/or

c.      Such other relief as this Court deems just and proper under the circumstances.

Respectfully Submitted,

Dated: March 13, 2023                    /s/ *Michael D. Sirota*
                                         _____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

14

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No.
047911992)
Charles M. Jones II, Esq.(admitted *pro hac vice*)
Aimee M. Furness (*pro hac vice* pending)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
charlie.jones@haynesboone.com
aimee.furness@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

65365/0001-44856405v1

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| TREY GREENE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZAC PRINCE, FLORI MARQUEZ, TONY LAURA, JENNIFER HILL and GEMINI TRADING, LLC,<br><br>Defendants. | Case No. |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Trey Greene ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants Zac Prince ("Prince"), Flori Marquez ("Marquez"), Tony Laura ("Laura"), Jennifer Hill ("Hill") ("BFI Defendants") and Gemini Trading LLC ("Gemini") (collectively "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge. Plaintiff believes that substantial additional evidence will be adduced through discovery in support of these claims.

## I.    NATURE OF THE ACTION

1.      This action arises out of the sale of unregistered securities by the crypto company BlockFi, Inc., a New Jersey based company founded by Prince and Marquez and controlled by the BFI Defendants. The unregistered securities sold by the BFI Defendants on behalf of BlockFi were marketed and sold via a steady stream of misrepresentations and material omissions by Prince and Marquez over several years and through intermittent misrepresentations by Defendant Gemini.

2.      From March 4, 2019 to November 10, 2022 (the "Class Period"), BlockFi, a New
Jersey-based financial services company has (directly or indirectly through subsidiaries) offered
and sold BlockFi unregistered BlockFi Interest Accounts ("BIAs") to investors, through which
investors can earn a return from BlockFi which deploys investors' assets in various ways,
including loans of investors' funds crypto made to institutional, corporate and other borrowers,
lending U.S. dollars to retail investors, and by investing in equities and futures. As of March 31,
2021, BlockFi and its affiliates held approximately $14.7 billion in BIA investor assets and had
approximately 572,160 BIA investors, including 391,105 investors in the United States.

3.      BlockFi was collectively valued at over $5 billion at the highest of the crypto-
boom and was one of the largest offerors and sellers of unregistered securities in the form of
yield-bearing accounts to residents of the United States and other countries around the world.[1]

4.      Despite Prince and Marquez' express and implied representations that BIAs were
comparable to federally insured bank products, the BIAs are not savings, brokerage or deposit
accounts protected by Securities Investor Protection Corporation (the "SIPC") or insured by the
Federal Deposit Insurance Corporation  (the "FDIC"). The BIAs are subject to additional risk,
compared to assets held at SIPC member broker-dealers, or assets held at banks and savings
associations, almost all of which carry insurance. Nor were the BIAs registered with the SEC, or
any other securities regulatory authority, nor were they exempted from registration. Marquez and
Prince however created the misleading impression that BIAs were in compliance with all
applicable regulations.

5.      Based on the facts and circumstances set forth herein, the BIAs were securities
because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its

---

[1] *See* https://financefeeds.com/private-fund-slashes-valuation-of-blockfi-e-warrants-to-0/

progeny, and also because BlockFi offered and sold the BIAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934. BlockFi promised BIA investors a variable interest rate, determined solely by BlockFi on a periodic basis, in exchange for crypto assets loaned by the investors, who were told in public statements that they could demand their loaned assets at any time, even though the fine print in documents appear to give BlockFi the right to deny withdrawals or sales of the BIAs. BlockFi thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the BIAs had a reasonable expectation of obtaining a future profit from BlockFi's efforts in managing the BIAs based on BlockFi's statements about how it would generate the yield to pay BIA investors interest. Investors also had a reasonable expectation that BlockFi would use the invested crypto assets in BlockFi's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from BlockFi's efforts. BlockFi offered and sold the BIAs to the general public to obtain crypto assets for the general use of its business, namely, to run its lending and investment activities to pay interest to BIA investors, and promoted the BIAs as an investment. The BFI Defendants caused BlockFi to offer and sell securities without a registration statement filed, or in effect, with the Commission or any states, and without qualifying for an exemption from registration. As a result, the offer and sales of BIAs was in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") and state regulations.

6.     BlockFi's unregistered offers and sales of securities, led the New Jersey Bureau of Securities, on or around July 20, 2021, to issue a cease and desist order to BlockFi, Inc., Blockfi Lending, LLC, and BlockFi Trading, LLC (referred to collectively herein as "BlockFi")

requiring that BlockFi "halt[] the offer and sale of these unregistered securities." The cease and

desist order did not preclude BlockFi "from paying interest on the existing BIAs or refunding

principal to the BIA Investors." Later, over 30 states followed in imposing cease and desist

and/or sanctions and fines on BlockFi.

7.    On or around February 14, 2022, the SEC "charged BlockFi Lending LLC

(BlockFi) with, inter alia, failing to register the offers and sales of its retail crypto lending

product." Further, "[t]o settle the SEC's charges, BlockFi agreed to pay a $50 million penalty,

cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs),

and attempt to bring its business within the provisions of the Investment Company Act within 60

days. BlockFi's parent company also announced that it intended to register under the Securities

Act of 1933 for the offer and sale of a new lending product. In parallel actions then announced,

BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges." In

connection with that announcement, BlockFi's CEO publicly promised that the BIAs would be

registered with the SEC.

8.    In these regulatory proceedings, BlockFi admitted that its accounts were

"unregistered securities."

9.    The unregistered status of the BIAs deprived investors account holders of the type

of information about BlockFi that would be required in SEC mandated disclosures, including

information about the true risk of loss of investor assets, liquidity, holdings concentration of risk,

concentration of borrowers, status of loans to borrowers and BlockFi ability to pay interest and to

return funds to investors pursuant to investors demands for withdrawals. Accordingly, Plaintiff

and the class were deceived into investing in BIAs.

10.    On March 1, 2021, counsel for Plaintiff herein and the class members as the
Court-appointed lead counsel, brought a class action complaint styled *Mangano, individually and
on behalf of all others similarly situated v. BlockFi, et al.*, Case No. 2:22-cv-01112 (the
"*Mangano Action*"), alleging that the BlockFi Platform owned and operated by BLOCKFI, INC.,
BLOCKFI TRADING, LLC, BLOCKFI LENDING, LLC was an unregulated and unsustainable
investment scheme and BlockFi was selling unregistered securities. It was specifically alleged in
detail in that complaint how BlockFi was illegally selling securities and inducing innocent and
unaware investors to invest in the BlockFi Platform.  The *Mangano Action* was later
consolidated and a first amended class action complaint was filed on July 28, 2022. That action
was stayed when BlockFi filed Chapter 11 in November 2022.

11.    The truth about Prince and Marquez' misrepresentations about BlockFi was
revealed beginning on November 11, 2022, when California's financial
regulator revoked BlockFi's lending license for failure to comply with California loan
underwriting standards concerning the creditworthiness of borrowers and their ability to repay
loans. Thereafter, additional disclosures established the extent and materiality of Prince and
Marquez' misrepresentations during the Class Period.

12.    On November 10, 2022, BlockFi announced it would halt customer withdrawals
and freeze account access. Thereafter Plaintiff and class members have had no access to their
investments. BlockFi made this redemption freeze announcement even more permanent and
terrifying for customers when it filed for bankruptcy 18 days later on November 28, 2022,
leaving customers and 100,000 creditors in the lurch, with liabilities and assets ranging from $1
billion to $10 billion. Defendants herein are not subject to the automatic stay.

5

13.     Bankruptcy filings later revealed, *inter alia*, that one of causes of BlockFi's
failure and the loss of investors' fund was that FTX affiliated Alameda had defaulted on $680
million worth of loans to BlockFi. In its bankruptcy filing, BlockFi admitted that its lockdown of
investor accounts and bankruptcy was due to its undisclosed exposure to FTX, a major
cryptocurrency lender that filed a bankruptcy petition on November 16, 2021.[2]

## II.    PARTIES

14.     Plaintiff Trey Greene ("Greene") is a citizen of the State of Georgia. Greene
opened a BIA account from Defendants in the State of Georgia. Greene invested in unregistered
securities from BlockFi in the form of the BIA account. Mr. Greene opened an account with
BlockFi in early 2020 and invested various amounts in Block Fi  account holdings as set forth in
Rider A. Greene never withdrew any amounts of his assets/ investments form Blocjk Fi. Green's
account claims in the bankruptcy court Chapter 11 proceeding for Block Fi values green's
accounts at a tiny fraction of their worth and of his deposits, interest and gains

15.     Zac Prince is the CEO and co-founder of BlockFi and has been the CEO since its
inception in October 2017.[3] He was at all relevant time a director of BlockFi.

16.     Flori Marquez is the COO and co-founder of BlockFi and has been the COO since
its inception in October 2017. She was as all relevant times a director of BlockFi.

17.     During the Class Period, BlockFi Inc.'s Board of Directors consisted of *inter* alia,
Defendants Prince, Marquez, Tony Laura (BlockFi's CFO) and Jennifer Hill (the "BFI
Defendants"). As Officers Directors and co-founders of BlockFi, and persons with discretionary

---

[2] *See* https://www.reuters.com/technology/crypto-lender-blockfi-says-it-has-significant-exposure-ftx-2022-11-14/
(last visited November 16, 2022).

[3] *See* Robert Stevens, BlockFi's Rise and Fall: A Timeline, Coin Desk (https://www.coindesk.com/learn/blockfis-rise-and-fall-a-timeline/ last visited December 6, 2022)

control over Plaintiffs' and other class members' assets, the BFI Defendants also owed fiduciary duties to them including the disclosure of all material information to investors.

18.     Defendant Gemini Trust Company LLC ("Gemini") is a New York based trust company which holds BlockFi's clients' (Plaintiff and class members) cryptocurrency holdings as a "Qualified Custodian" chartered by the New York State Department of Financial Services under Section 100 of the New York Banking law and is subject to NYDFS capital reserve requirements. During the Class Period, both Gemini and BlockFi described themselves as "partners." Tyler Winklevoss, Gemini's CEO is also an owner of BlockFi through its participation in BlockFi's August 2019 Series A funding.  BlockFi "supported" the Gemini Dollar ("GUSD") on BlockFi's platform for BIA accounts and BlockFi has described Gemini as its "institutional partner," since mid-2019 in written statements.

19.     Defendants Marquez and Prince described how Plaintiffs' investments held at Gemini supposedly in "custody of Gemini" were used, contrary to Gemini representations. Marquez and Price said: "We lend out assets deposited into our account at Gemini to highly vetted institutional counterparties;" "Our risk and finance teams review all of our counterparties financials before they become a qualified borrower;"

## III.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367.

21.     Venue is proper under 28 U.S.C. § 1391 because Defendants have their principal place of business in this District and therefore reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

22.     This Court has personal jurisdiction over Defendants because they are subject to general jurisdiction in this District because Defendants' principal place of business is in this District.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

23.     BlockFi was founded in 2017 by Prince and Marquez and launched a public beta version in January 2018. Its business initially consisted of the issuance of loans backed by customers' bitcoin and ether. BlockFi is a financial services company that engages in cryptocurrency and other digital asset trading, lending and borrowing. It uses investors' monies to invest in crypto currencies. BlockFi Trading LLC, BlockFi's wholly owned subsidiary, also controlled by Defendants Prince and Marquez, is a money transmitter which accepts investors monies and digital assets from Plaintiff and class members and transfers said funds to BlockFi for investment in BlockFi Interest Accounts ("BIAs"). BlockFi is the issuer of the BIAs.

24.     BlockFi touted itself as a "Chase Bank powered by crypto", lending "to partners like Susquehanna or Fidelity", "serving its clients and ensuring their funds are safeguarded", and a place where "client funds are safe + accessible."

25.     On or about April 27, 2020, during a podcast called "Going Deep with Aaron Watson," Marquez stated:

> Yeah. So at a high level, you can kind of think of us as a Chase Bank powered by crypto
>
> We're one of the leading providers of assets for banks that want to borrow crypto to fuel those trading strategies.  So we'll lend it out to partners like Susquehanna or Fidelity is big and crypto they'll pay us a yield to borrow that Bitcoin. And then we'll flow that yield through to our clients.
>
> No one in crypto had said let's build a regulated financial services platform. So we were one of the first companies to go out there and start interacting with

8

regulators and try to get licenses so that we could build this the right traditional way.

As a company, we really believe in being simple, transparent, and trustworthy in terms of simplicity.

*See* https://www.goingdeepwithaaron.com/podcast/flori-marquez

26.     Joshua Farfield a professor at Washington and Lee Law School noted: "These companies are all giving the impression of bank like security"; "These companies want to have customer trust with none of the responsibility that comes with a regulated financial industry. And that just doesn't work." https://www.nytimes.com/2022/12/05/business/cryptocurrency-investors-ftx-blockfi.html. "Ordinary Investors Who Jumped Into Crypto Are Saying Now What?" last accessed February 7, 2023.

27.     BlockFi allowed investors to invest in BIAs by depositing certain eligible cryptocurrencies or cash into accounts at BlockFi. BlockFi then pooled the cryptocurrencies assets of the BIAs together to fund its lending operations and proprietary trading. In exchange for investing in the BIAs, investors are promised a rate of return paid monthly in cryptocurrency. The BIAs were obviously "securities" given their features, terms and conditions and functions. BFI Defendants would not, however, register the BIAs as "securities."

28.     In March 2019, BlockFi expanded its product line to include business accounts. In December 2019, BlockFi launched a crypto-trading product.  Soon thereafter, BlockFi established a trading desk, a crypto trust and began developing its own branded credit cards.

**B.     BlockFi's Investment Products**

29.     BlockFi has offered the following investment products to Plaintiffs and the Class:

- "Wallet" accounts – non-interest bearing accounts ("BlockFi Wallet") to store digital assets supported by BlockFi;"

9

- "Trading" accounts – enables clients to buy, sell and exchange digital assets supported by BlockFi"

- "Retail Client Loans" accounts – enables clients to borrow USD or stable coins [including GUSD] from BlockFi secured by digital asset collateral;"

- "Interest Account" – interest bearing accounts that allow clients to earn interest on BlockFi supported digital assets they transfer to their accounts;"

- "Institutional Client Loans" – "miners, exchanges and trading firms" are allowed to borrow cash or crypto. The source of cash and cryptos available for borrowing are from Plaintiffs and class members' BIA assets.

30.     BFI Defendants knew BlockFi's retail investors were <u>not</u> sophisticated or experienced investors and thus knew that Prince and Marquez' statements and descriptions of BlockFi's structure and products and risks had the capacity to mislead and did mislead investors in BIAs. This is admitted in the Renzi the Declaration of Michael Renzi ("Renzi Decl.") submitted with BlockFi's First Day Motion in the United States Bankruptcy Court for New Jersey, wherein he states: "Understanding the difficulty many individuals face in entering the investment world, BlockFi created web and mobile applications that enabled its retail clients to easily access, trade, borrow and store select digital assets." Renzi at 10, ¶ 31.

31.     All investors in BIA had to "sign up on the BlockFi platform; . . . open an account provided by Debtor BlockFi Trading LLC . . . operated and maintained by BlockFi Wallet LLC" Renzi Decl. p. 10, ¶ 32. "BlockFi clients can also earn money through a BlockFi Interest Account ("BIA") . . . that allow clients to earn interest on supported digital assets. Renzi Decl. p. 13 at 37. "The BIA agreement is with . . . . BlockFi, Inc." Renzi Decl. p. 13 at 39. In addition, for class members who are "BlockFi Private Clients," BlockFi borrows digital assets from clients

10

and these loan agreements are between the BlockFi investor and BlockFi Lending LLC, Renzi p. 14, ¶ 42. Class members can also borrow U.S. dollars or stable coins from BlockFi using their digital assets as collateral, those class members also have agreements with BlockFi Lending LLC.

32. The BlockFi BIA Terms provide that a BlockFi BIA Investor relinquishes control over the deposited cryptocurrency to BlockFi and BlockFi is free to use those assets as it sees fit, including commingling cryptocurrency with those of other BIA Investors, investing those assets in the market, and lending those assets to institutional and corporate borrowers. Without any control over the investments once deposited, the BIA Investors are passive investors.

33. According to the terms of the investment accounts, in purchasing an unregistered BIA, investors:

> [G]rant BlockFi the right, without further notice to [the investor], to hold the cryptocurrency held in [the] account in BlockFi's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

34. Plaintiff and class members can also buy, sell and exchange digital assets through their BlockFi accounts, in such case, Plaintiff and class members have separate "retail trading agreements" with BlockFi trading. Renzi Decl. p. 16 at ¶ 48.

35. The BFI Defendants intentionally set up the foregoing series of entities through which Plaintiffs' and class member assets would pass to avoid having to comply with securities regulations.

11

C.    **Prince And Marquez Make Misleading Statements**
      **About How The BlockFi Investment Products Work**

36.    Prince and Marquez misleadingly stated that Plaintiffs' and class members"

"cryptocurrency in your BlockFi Wallet shall at all times remain with you and shall not transfer

to BlockFi."

37.    During the Class Period, in addition to misrepresenting that BlockFi was similar

to a bank, Prince and Marquez misrepresented the safety of investor assets and BlockFi's risk

management practices. Prince and Marquez had BlockFi misleadingly emphasize the safety of

investors' funds in its "Wallet Accounts." Defendants Prince and Marquez marketed BlockFi as

an investment where investors' assets were "not hypothecated" and "not commingled… with

assets in other BlockFi programs" and that "title…remains with you…" and that "BlockFi shall

not sell, transfer, loan hypothecate or otherwise alienate cryptocurrency held in your BlockFi

wallet…." However, as Prince and Marquez knew and intended, since the overwhelming

majority of BlockFi investors opened BlockFi accounts and made investments specifically to

earn the interest dangled by BlockFi on BIA it was incumbent upon Marquez and Prince to fully

disclose how the BIA investment operated and was constructed and that once Wallet Assets were

used to earn interest for the investor those assets became invested in BIAs.  Prince and Marquez

misleadingly obscured and/or concealed the fact that once an investor sought to earn interest on

their BlockFi investment, the investors' BlockFi investment immediately became eligible to be

rehypothecated, sold, lent, and transferred by BlockFi from their accounts to be used for

BlockFi's profit and/or benefit.

### D.    **Gemini**

38.    Both Gemini and other Defendants here made representations about the investors ease of access to the assets in their accounts because of the role of Gemini as "custodian" of Plaintiff and class members' investments.

39.    BlockFi and Gemini shared common ownership, Gemini was BlockFi's custodian, BlockFi supported the Gemini Dollar ("GDSO") on its platform for BIA customers and BlockFi has described Gemini as its "institutional partner," since mid-2019.

40.    BlockFi custodied investors' assets at Gemini during the Class Period.

41.    As custodian for Plaintiff's and other class members' BlockFi account assets, Gemini owed duties to inform Plaintiff and class members of material facts concerning their accounts and assets.

42.    Gemini publicly described itself as a "global digital asset platform." Consistent with the press release publicized by BlockFi that Gemini and Blockfi were "institutional partners," Gemini Managing Director, Sarah Olsen, said in a BlockFi release dated May 29, 2019, (after BlockFi announced its support for the Gemini Dollar (GUSD) stable coin throughout BlockFi's platform); "…we're excited to support market leaders like BlockFi in their efforts."

43.    Gemini knew of, and acquiesced in, the materially false and misleading statements about the status the safety and accessibility of Plaintiff's and class members' assets at Gemini and about the risks of loss. Gemini supplied materially false and misleading information to BlockFi for use in marketing the BIAs.

44.    As custodian for Plaintiff and other class members bitcoin assets, Gemini had a duty to inform Plaintiff and class members and/or make public the fact that Gemini effected loans to institutional crypto counterparties with Plaintiff and class members custodial funds.

45.     Gemini also made materially false and misleading statements about the status of

Plaintiff and class members custodial funds.

46.     Gemini represented in its Custody Agreement

(https://www.gemini.com/legal/custody-agreement#section-questions lost accessed12/20/223:55

PM): "We will not loan, hypothecate, pledge, or otherwise encumber any assets in your Custody

Account absent General Instructions from you."

47.     Gemini also represented:

> By entering into this Custody Agreement, you agree that you
> intend to create a bailment of Asset with us, and you agree that you
> intend that we be the bank.

*Id*.

48.     Gemini and BlockFi's representations were revealed to be materially false and

misleading when it was disclosed in December 2022 that Gemini halted BlockFi client

withdrawals because of liquidity problems at Genesis Global Capital.

### E.    Prince And Marquez' False Statements About BlockFi's Financial Condition; Risks Of Investing In Its Products; Its Business Model And Risk Management Practices

49.     Defendants Prince and Marquez made material misstatements to Plaintiff and the

class in the offer and sale of BIAs through advertising and general solicitations on BlockFi's

website, social media accounts, YouTube, Twitter and Facebook nd its "Partner Program" and

other offers and promotions.

50.     Throughout the Class Period, Defendants Marquez and Prince made materially

false and misleading statements regarding: (i) liquidity and accessibility of the BIA assets to

investors; (ii) the legal status of ownership of crypto assets held on behalf of its customers,

which assets BlockFi knew or recklessly disregarded could qualify as the property of a

bankruptcy estate, making those assets potentially subject to bankruptcy proceedings in which BlockFi's customers would be treated as the Company's general unsecured creditors; (iii) the nature of the BIAs and whether the BIAs would be required to be registered as securities with the SEC and applicable state regulations; (iv) the risks of a "run" on BlockFi if the crypto market generally, or BlockFi's borrowers specifically, were to experience liquidity, regulatory or credit problems; (v) the risk of, and loss of access, to their BIA account assets due to regulatory and governmental action against BlockFi; (vi) the extent quality and effectiveness of BlockFi's loan underwritings; internal controls; the credit risk of BlockFi borrowers; and the extent of and quality of the "collateral" BlockFi purported to require of its borrowers; (vii) the conflicts of interest between BlockFi, the BlockFi Defendants and Plaintiff and class members; (viii) the sustainability of BlockFi's business model to the extent it was based on the "Grayscale Trade."

51.  **FLORI MARQUEZ**

- **Marquez:** Yeah. So at a high level, you can kind of think of us as a Chase Bank powered by crypto.
- **Marquez:** we're one of the leading providers of assets for banks that want to borrow crypto to fuel those trading strategies. So we'll lend it out to partners like Susquehanna or Fidelity is big and crypto they'll pay us a yield to borrow that Bitcoin. And then we'll flow that yield through to our clients.
- **Marquez:** No one in crypto had said let's build a regulated financial services platform. So we were one of the first companies to go out there and start interacting with regulators and try to get licenses so that we could build this the right traditional way.
- **Marquez:** As a company, we really believe in being simple, transparent, and trustworthy in terms of simplicity.
- **Marquez:** what we do as a business is we take those assets and we lend it to institutional investors like Akuna Capital, Fidelity, and Susquehanna, many of whom are also investors in BlockFi, and they pay us a yield to borrow those assets and we flow that yield through to our retail investors.
- **Marquez:** As leaders and builders, it's our responsibility to be transparent about the lessons we've learned and how we can best move forward.
- **Marquez:**  [C]lient funds are safe + accessible and that BlockFi will continue to grow and build! No client funds are being utilized to pay for the settlement.

52.    In 2020, BlockFi representatives were telling customers, *inter alia*:

(a)  Our counter party credit risk audit is extremely extensive.

(05/29/20)

BlockFi is the only institutionally backed crypto wealth
management platform.

We run or company the right way.

(b)  "We lend out assets deposited into our account at Gemini to highly vetted

institutional counterparties."

(c)  "Our risk and finance teams review all of our counterparties financials before

they become a qualified borrower."

(d)  "Our lending arrangements are typically over collateralized and allow us to

margin call those counterparties on a daily basis."

53.    Within the first few weeks of launching the BIA, BlockFi touted investors'

potential for profit.  On March 20, 2019, BlockFi announced that BIAs experienced significant

growth, including from large firms who participated in BIAs "as a way to bolster their returns."

BlockFi asserted that it "provide[d] the average crypto investor with the tools to build their

wealth," and that it "look[ed] forward to giving even more investors a chance to earn a yield on

their crypto."

54.    The BFI website advertises the BIAs as part of a long-term investment strategy

for investors, claiming that a BIA "provides clients with the ability to earn more crypto while

holding for long-term investments.  Interest is paid monthly and compounds.  This significantly

increases the potential earnings of long-term account holders."

16

55.    The BFI Website includes a chart stating "BlockFi's Interest Account works hardest for you as a long-term investment," which claims to illustrate the projected effect of holding a BIA as a long-term investment:



56.    BlockFi pools these cryptocurrencies together, where according to BlockFi, it (1) reserves a portion of the cryptocurrencies to meet investor withdrawal demands, (2) lends some or all of the balance to third parties, or (3) purchases equities, options, and futures for its own

17

account. BlockFi uses the revenue from those activities to pay the BIA Investors the agreed-upon interest rate, and keeps the remainder for itself as profit.

57.    Despite the true nature of BlockFi's potential for insolvency, "[t]he BFI Website claims that 'BFI is a US regulated entity, and that [BlockFi] play[s] by the rules, to the benefit of [BlockFi] and [its] clients.'"

58.    Instead, Marquez and Prince doubled down with more false promises about "products that are reliable, accessible and trusted," "[C]lient funds are safe + accessible," and "funds are safeguarded."

[1] *See* https://www.cnbc.com/video/2021/03/15/this-crypto-lending-company-offers-credit-services-for-cryptocurrency.html

59.    BlockFi regularly touted the profits investors may earn by investing in a BIA. When announcing the BIA, BlockFi promoted the interest earned, promising "an industry-leading 6.2% [annual percentage yield]," compounded monthly.  BlockFi described it as "an easy way for crypto investors to earn bitcoin as they HODL."[4]

60.    The BFI Website advertises that the BIA "provides market-leading yields to crypto investors" and currently advertises an annual return of up to 7.5% on certain digital assets deposited in a BIA:

---

[4] "HODL" is a purposeful trendy misspelling of "hold" an acronym for "hold on for dear life", denoting buy-and-hold strategies in the context of crypto assets.




61.    The BFI Website contains a page with a detailed presentation of the

cryptocurrencies it accepts for investment into the BIAs and the corresponding interest rates

offered for each type of cryptocurrency deposit:

# Interest Rates

Check here to find the latest rates for interest-earning accounts and loans. Please note that interest
rates, withdrawal limits, and fees are subject to change

## BlockFi Interest Account (BIA)

Annual Percentage Yield (APY)* BlockFi Interest Account clients can deposit their
crypto and earn interest. Paid out at the beginning of every month, the interest
earned by account holders compounds, increasing the annual yield for our clients.
BlockFi uses a tiered Interest Structure. Click here to learn how our tiers work.

| Currency | Amount ** | APY |
|---|---|---|
| BTC (Tier 1) | 0 - 0.25 BTC | 4% |
| BTC (Tier 2) | 0.25 - 5 BTC | 1.5% |
| BTC (Tier 3) | > 5 BTC | 0.25% |
| ETH (Tier 1) | 0 - 5 ETH | 4% |
| ETH (Tier 2) | 5 - 50 ETH | 1.5% |
| ETH (Tier 3) | > 50 ETH | 0.25% |
| LTC (Tier 1) | 0 - 100 LTC | 4.5% |
| LTC (Tier 2) | > 100 LTC | 2% |
| LINK (Tier 1) | 0 - 750 LINK | 3% |
| LINK (Tier 2) | > 750 LINK | 0.5% |
| USDC (Tier 1) | 0 - 50,000 USDC | 7.5% |
| USDC (Tier 2) | > 50,000 USDC | 5% |

| | | |
|---|---|---|
| GUSD (Tier 1) | 0 - 50,000 GUSD | 7.5% |
| GUSD (Tier 2) | > 50,000 GUSD | 5% |
| PAX (Tier 1) | 0 - 50,000 PAX | 7.5% |
| PAX (Tier 2) | > 50,000 PAX | 5% |
| PAXG (Tier 1) | 0 - 5 PAXG | 2% |
| PAXG (Tier 2) | > 5 PAXG | 0.5% |
| USDT (Tier 1) | 0 - 50,000 USDT | 7.5% |
| USDT (Tier 2) | > 50,000 USDT | 5% |
| BUSD (Tier 1) | 0 - 50,000 BUSD | 7.5% |
| BUSD (Tier 2) | > 50,000 BUSD | 5% |
| DAI (Tier 1) | 0 - 50,000 DAI | 8.5%**** |
| DAI (Tier 2) | > 50,000 DAI | 6%**** |
| UNI (Tier 1) | 0 - 750 | 3.75%**** |
| UNI (Tier 2) | > 750 | 1.5%**** |
| BAT (Tier 1) | 0 - 25,000 | 3.65%**** |
| BAT (Tier 2) | > 25,000 | 1.4%**** |

* APYs reflect effective yield based on monthly compounding. Actual yield will vary based on account activity and compliance with BlockFi's terms and conditions. Rates are largely dictated by market conditions, which are a key factor in a company's ability to provide its clients yield on their crypto assets. For more information, please see our Terms of Service. Rates are subject to change. BlockFi will communicate any rate changes prior to these changes taking effect. Digital currency is not legal tender, is not backed by the government, and the BlockFi Interest Account (BIA) is not a bank account nor a brokerage account, and is not subject to FDIC or SIPC protections.

** Although there is no minimum balance required to earn interest, accounts are still subject to Gemini's withdrawal minimums. 0.003 BTC and 0.056 ETH. Withdrawals for balances smaller than these amounts may take up to 30 days to process.

*** BlockFi Interest Accounts are available in most countries worldwide and all U.S. states other than NY

**** Terms Apply

62. BlockFi issued quarterly "Transparency Reports" during the Class Period which

contained numerous materially false and misleading statements as follows:

**BlockFi Wallet**

We provide all of our clients a non-interest bearing account to store supported digital assets (the "Wallet"). Digital assets transferred to a Wallet account are not deployed by us for our revenue generating activities and are instead held in either wallets we control, or with our custodial partners.

BlockFi's core value is Transparency Builds Trust—which is paramount to maintaining and expanding our clients' trust. As such, we view risk management as key to our success. We seek to

monitor and control our risk exposure through an enterprise risk management framework, including by managing liquidity and credit risks that could potentially impact our obligations to clients that have a BIA, or with whom we have a BPC or other type of individually-negotiated borrowing arrangement.

We have established the following guidelines to manage our liquidity risks and available balances of short- term assets:

- We will hold at least 10% of total amounts due to clients upon demand in inventory, ready to be returned to clients.

- We aim to hold at least 50% of total amounts due to clients upon demand either in inventory or in loans that can be called within seven calendar days.

- We aim to hold at least 90% of total amounts due to clients upon demand either in inventory or in loans that can be called back within one year.

As of June 30, 2022, the fair value of our outstanding loans to borrowers was approximately $1.8 billion. We require many, but not all, borrowers to post varying levels of collateral depending on the borrower's credit profile and the size of the loan portfolio. As of June 30, 2022, our net exposure was approximately $0.6 billion. We define net exposure as the sum of our net exposures to individual loan counterparties. Our net exposure to each individual loan counterparty equals the fair value of loans to the counterparty minus the fair value of collateral provided by the counterparty (excluding any amount of the counterparty's collateral that is in excess of the counterparty's loans). The average term of all loans within our loan portfolio is less than one year.

As of June 30, 2022, the fair value of our outstanding loans to institutional borrowers was approximately $1.5 billion. Each institutional client that borrows from us undergoes a credit due diligence process to allow our credit risk underwriting team to establish appropriate credit limits. We have established an internal credit lending policy that generally limits exposure to any one borrower, principal or guarantor based on net exposures, which represents our aggregate exposure to economically related borrowers for approval purposes. Based on our internal credit process, our loan approvals follow a transaction authority and

credit limit matrix, which are based on a counterparty's financial
information and size, business model related to traditional or
digital assets markets, country of domicile, leverage, and other
credit measures.

63.    In other materials made publicly available, BlockFi reported:

**Overview of Risk Management at BlockFi**

The Risk team uses a comprehensive risk management framework
across four key risk areas:

1.    Credit Risk

2.    Liquidity Risk

3.    Market Risk

4.    Enterprise Risk

Credit Risk Management involves a thorough analysis of our
counterparties to understand their financial standing and ongoing
ability to repay loans. A critical aspect of credit risk is managing
concentration to help ensure we don't take on too much risk to any
one single borrower.

As part of the credit analysis process, all institutional
counterparties undergo a full due diligence and underwriting
analysis which includes a review of their operation and financial
statements, with focus on leverage and liquidity. Each client is
assigned an internal credit rating (e.g., Tier 1, 2, or 3) along with a
specific credit limit corresponding to the rating achieved. The
credit evaluation is part of a detailed onboarding process, which
also considers the business model, KYC/AML, organizational
structure, industry dynamics, client reputation, track record, quality
and frequency of financial disclosures, and their general
transparency. For counterparties engaged in trading activities, we
review the risk framework and associated controls. In conjunction
with establishing credit appetite, we typically negotiate a master
loan agreement which may include a number of borrower
covenants, and includes our contractual lender rights.

At BlockFi, unsecured lending appetite is limited to our largest and
most established Tier 1 clients based on the potential of attractive
risk-adjusted returns. Only those clients that have a significant
capital base, verifiable financial position, and a willingness to be

transparent and engaged with us may be afforded an unsecured credit limit.

Our Credit Risk Management team regularly reviews the credit framework, client transactions, and changing market conditions.

As discussed above, we require our Tier 2 and Tier 3 institutional client borrowers, and many of our Tier 1 institutional client borrowers, to post collateral against their loans.

To help ensure we have sufficient risk capital to withstand stressed market conditions and potential counterparty defaults in the loan portfolio, we've designed a custom risk capital model for our digital asset portfolio. The BlockFi model is based on the Basel III Economic Capital Framework, which applies to most major banking institutions worldwide.

64.    Prince and Marquez misled investors by claiming that BlockFi was a "market intermediary" which exempted it from the '40 Act registration requests. However, that representation was false because unlike true "market intermediaries" BlockFi did not make transactions on both sides of the market for "financial contracts."

65.    Prince and Marquez represented that BlockFi loans were "typically" over collateralized when in fact almost 80% of BlockFi's large institutional loans which presented liquidity and concentration of risk damages to BlockFi were not over collateralized. SEC Order 23-23, 25. The aforesaid misrepresentations deprived investors of "complete and accurate information with which to evaluate the risk "to class members investments if BlockFi institutional borrowers defaulted. Order 23, 35.

66.    BlockFi never disclosed any information about the concentration of its crypto counterparties. Neither Plaintiff nor class members had any way to know that BlockFi was working with undercapitalized borrowers such as Celsius, Three Arrow Capital, FTX and Alameda.

24

F.    **Undisclosed Conflicts Threatened The BIA Investments**

67.    BlockFi various functions and services, as well as its diverse array of client's in

the bitcoin – lending ecosystem together with BlockFi's obligation to its shareholders to

maximize profits led to multiple conflicts with Plaintiff and the Class which were undisclosed.

68.    The BFI Defendants concealed the conflicts of interest between BlockFi and its

BIA investors. These conflicts existed because of the way BlockFi had positioned itself in the

crypto currency ecosystem and because of BlockFi's equity investments in Graystone and the

fact that BlockFi was lending investor assets to entities such as FTX, Three Arrows Capital,

Akuna Capital, Fidelity, Alameda Research, Susquehanna and Gemini. BlockFi and those

entities had multilevel relationships with each other as lenders, borrowers, equity owners and co-

investors in Grayscale which conflicted with the interest of Plaintiff and the class. Block Fi's

relationships with other cryptocurrency exchanges, issuers, lenders and borrowers exposed

plaintiff and other class members to the systemic risk in the cryptocurrency eco-system which

was never disclosed to plaintiff and other class members.    The conflicts of interest / systemic

riosk manifested themselves in that BlockFi's business model depended on the continual sale of

BIAs which BlockFi could use to continue lending at a profit over the interest paid on BIAs and

the ability of other cryptocurrency eco-system players to continue to participate . But this

conflicted with the Plaintiff's and class members' interests to have their investment funds be kept

safe and accessible.

69.    BlockFi was heavily invested in Grayscale Securities and its closed end trust

Grayscale Bitcoin Trust ("GBTC").

70.    As a closed end trust, GBTC was a registered security whose "shares" were at Net

Asset Value ("NAV") to investors, including BlockFi.

71.     GBTC cannot be redeemed, it can only be sold in the open market where its price can fluctuate from a premium to NAV to par NAV to a discount to NAV.

72.     Any investors in GBTC including BlockFi, were subject to a six month or more lock up period before the GBTC shares purchased could be sold in the open market.

73.     BlockFi and other institutional investors understood the arbitrage opportunities inherent in buying GBTC at NAV and selling at a premium to NAV. It that became known as the "Grayscale Trade."

74.     By 2020-2021, the Grayscale Trade premium was about 20% providing enormous arbitrage profits to investors, two of the biggest being Three Arrows Capital and BlockFi according to published reports. The extent to which BlockFi's business model depended on the existence of a premium to GBTC over NAV in the marketplace was never disclosed to Plaintiff or class members.

75.     As of the end of 2021, BlockFi and Three Arrows Capital were the two largest holders of GBTC shares collectively owning 58,741,046 shares of GBTC.

76.     This meant that the security of BlockFi's loans to Three Arrows depended on the premium to GBTC's NAV and the value of GBTC depended on BlockFi not selling GBTC in any size to avoid depressing the market and compressing the premium of GBTC's to its NAV or depressing its NAV.

77.     Thus, even though it conflicted with the interests of investors in BlockFi such as Plaintiff and the class, BlockFi was locked into holding and not selling its GBTC even after it came off the mandatory lock up.

78.     On or about early February 2021, while GBTC still traded at a premium to NAV, BlockFi purchases an additional 11.9 million shares of GBTC boosting its stake to 36.1 million

shares. Many of those shares were restricted for six months for shares purchased with BTC and ETH and one year for LTC purchased shares.

79.     On February 24, 2021, the GBTC premium vanished and GBTC began to trade at a discount to NAV. This completely undermined BlockFi's business model Grayscale Fund.

80.     By late 2021, two bitcoin ETFs (GBTC was denied ETF status by the SEC) appeared on the market attracting capital and investors away from GBTC. The depressed market value of GBTC and widened the discount, materially undermining BlockFi's liquidity.

81.     The fact that the Greyscale Trade was a major pillar of BlockFi's business model was demonstrated by its prominent role in 2021 in a fundraising deck of slides. *See* Swan Bitcoin, December 14, 2022 "GBTC was the Genesis of the Crypto Credit Contagion" by Sam Callahan.

### G.     BFI Defendants Concealed The Low Level Of Collateralization Of Loans Made To Institutions With Investors Assets

82.     Prince and Marquez knew that their pitch to investors that BlockFi was like a bank ("Chase") meant that Plaintiff and the class would consider material information to be the level of collateralization of the loans to institutions that BlockFi was making using Plaintiff's and class members' investment monies in the BIAs.

83.     That knowledge and understanding by Marquez and Prince led them to conceal from investors between March 4, 2019 to August 31, 2021 that its institutional loans were not "typically" over collateralized as it stated on multiple websites. In fact in 2019, only 24% of institution loans were over collateralized which fell to 16% in 2020 and 17% in 2021.

84.     These early misrepresentations about the level or risk in BlockFi's loan portfolio and about BlockFi's risk management practices generally misled investors, including Plaintiff and the class.

27

85.     After it stopped misrepresenting <u>levels</u> of collateralization however, the BFI
Defendants continued to misrepresent the quality of collateral.

86.     Although BlockFi reported that the $1 billion loan to Three Arrows Capital was
over-collateralized by 30%, it appeared later that two thirds of that collateral (approximately $1
billion) was bitcoin of indeterminate origin. The other third of the collateral was shares of
Grayscale Bitcoin Trust ("GBTC") itself a crypto investment product. When BlockFi attempted
to liquidate its GBTC collateral, the price plunged. Despite the so-called "over-collateralization"
of the Three Arrows loans, BlockFi CEO announced that BlockFi lost $80,000,000 when it
liquidated the Three Arrows' collateral.

87.     Prince and Marquez's statements about collateralization were also materially false
and misleading for implying that risks of investing in BlockFi were minimal because of its
reported "over-collateralization" without disclosing that BlockFi was exposed to additional
material though its broad range of yield generating activities in addition to borrowing and
lending crypto assets and rehypothecation activity.

88.     These statements were false, misleading, and designed to induce customers to
maintain their BIAs believing customer "funds are safeguarded" on the BlockFi platform.

89.     In reality, Prince and Marquez had exempted its offshore borrowers, like Three
Arrows Capital, whose digital assets were not registered with any U.S. jurisdiction or regulatory
authority and unconstrained by U.S. securities law, from risk mitigation measures and provided
them with significant special treatment, including a virtually unlimited "line of credit" and non-
recourse loans to experiment with highly volatile and speculative cryptocurrencies funded by the
platform's customers.  As a result of this exposure to Three Arrows, BlockFi took a roughly $80
million loss from defaulted loan obligations.

90.     Defendants also exempted another offshore borrower,  hedge fund Alameda
Research, a hedge fund inextricably linked to FTX and Sam Bankman Fried, whose digital assets
were not registered with any U.S. jurisdiction or regulatory authority and unconstrained by U.S.
securities law, from risk mitigation measures and provided them with significant special
treatment, including recklessly entrusting hedge fund Alameda Research with  $680,000,000 in
undercollateralized loans without undertaking even the most basic and fundamental due
diligence, credit check, and gave no regard for Alameda Research's ability to repay debt, except
for receiving "unaudited quarterly financial statements and crypto wallet addresses" and "regular
dialogue with Alameda staff, who 'made ongoing representations regarding its financial
standing, significant equity capital, and unencumbered assets on Alameda's balance sheet."[5]

91.     Plaintiff and the Class were misled because they did not have complete accurate
and truthful information about the risk of BlockFi's loan portfolio and the risk that in the event
of default or decline in values of cryptocurrency value BlockFi would be unable to comply with
its obligations to pay BIA investors the return of assets and accrued interest.

**H.      BFI Defendants Knew That Regulatory Actions Commencing
In July 2021 Made BIAs An Unsafe Investment But
Failed To Disclose The Then Present Level Of Risk**

92.     Prince and Marquez failed to disclose that beginning in January 7, 2021, BlockFi
was contacted by a "Multistate Working Group") ("MWG") a working group of members of the
North American Securities Administrators Association ("NASAA") consisting of state
regulators, which notified BlockFi, Prince and Marquez that the MWG believed that BlockFi
was selling and offering securities which did not comply with state securities laws.

---

[5] *See* https://www.axios.com/2022/11/28/blockfi-alameda-680m-default

93.    BlockFi continued to offer and sell the BIAs without registering them as securities or seeking an exemption from registration.

94.    On July 19, 2021 New Jersey filed a summary cease and desist order alleging that BlockFi was offering and selling unregistered securities in the form of BIAs.

95.    Alabama, Texas, Vermont, Kentucky and Washington followed with their own regulatory proceedings on July 22, 29 and September 23 respectively.

96.    The Arizona Corporation Commission, penalizing BlockFi $943,396, also found that a statement on BlockFi's website also materially overstated the degree to which BlockFi's collateral practices protected its ability to pay investors:

> The Commission found BlockFi failed to comply with Arizona's securities registration requirements and, as a result, investors were sold unregistered securities in violation of state law and deprived of critical information and disclosure necessary to understand the potential risks regarding the BIAs. The Commission found that a statement on BlockFi's website also materially overstated the degree to which BlockFi's collateral practices protected its ability to pay investors.

*See* https://azcc.gov/securities/news/2022/06/30/corporation-commission-joins-with-other-state-securities-regulators-and-the-s.e.c.-to-settle-with-a-digital-asset-lending-platform-for-unlawful-securities-sales.

97.    An Iowa consent order– a document signed by BlockFi's General Counsel – made a similar finding:

> (BlockFi Interest Accounts) investors did not have complete and accurate information with which to evaluate the risk that … BlockFi would be unable to comply with its obligation to pay.

98.    The SEC's Order Instituting Cease-And-Desist Proceedings states that because of BlockFi's "omission about the level of risk in its loan portfolio, BIA investors did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by its institutional borrowers, BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand."

99.     Despite these fines, warnings and guidance from regulators to update their

warnings, disclosures, and collateralization practices, Prince and Marquez refused to heed them.

100.    On or about March 15, 2021, during a CNBC interview, Marquez was asked:

Q: you say that you pay 8.6% on crypto assets in these accounts, how are you generating
that income, it's not off the crypto is it?

A (Marquez): this is actually one of my favorite products.  People can send us cash and it
gets turned into stablecoin or you can send us crypto and what we do as a business is we
take those assets and we lend it to institutional investors like Akuna Capital, Fidelity, and
Susquehanna, many of whom are also investors in BlockFi, and they pay us a yield to
borrow those assets and we flow that yield through to our retail investors.

101.    The SEC has concluded that the BIAs were NOT individually tailored to

customers (class members) demands or requests or inquiries. SEC Order at 29, 38-39.

102.    On or about February 6, 2022, Prince personally and publicly assured investors

that:

[C]lient funds are safe + accessible and that BlockFi will continue to grow and
build! No client funds are being utilized to pay for the settlement.



31

## I.    The Materially False And Misleading Nature Of The Representations

103.    Defendants implied through their representations that investors could redeem, withdraw, or close BIA accounts in full on demand.

104.    Defendants improperly pledged loaned class members' securities to fund speculative and risky loans to companies with liquidity problems like a $680,000,000 loan Alameda Research and a $1 billion loan to venture firm Three Arrows Capital, which were not properly disclosed to BlockFi customers.

105.    Indeed, until the truth was revealed and BlockFi was compelled to disclose how it lost hundreds of millions of customer and investor money, neither BlockFi nor its officers or directors ever even hinted, let alone affirmed, that it was engaged in risky, directional, proprietary bets and loans that exposed the Company to tremendous loss by overconcentrating hundreds of millions of dollars to companies or Ponzi schemes with liquidity problems likes Three Arrows Capital and Alameda Research.

106.    BlockFi did not warn or provide notice to class members that (a) it was at a heightened bankruptcy risk; (b) was lending customer money to offshore companies with liquidity problems and illiquid volatile collateral like Alameda Research and Three Arrows; (c) was lending customer money to companies without doing the requisite due diligence, underwriting or credit assessment; (d) was lending customer money to companies which had conflicts of interest with BlockFi and/or in which Prince and Marquez had a direct conflict of interest; (e) that BlockFi may need to register its BIAs. Nor did BlockFi warn customers that by selling/offering the BIAs it may be violating securities laws, subject to enforcement actions, cease-and desist orders, penalties, and lawsuits from every state in the country.

32

107.    Throughout the class period, Defendants regularly provided false and misleading information regarding the security and safety of customer money and/or failed to disclose the highly speculative and risky offshore loans and investments being made with customer money and the true risk and likelihood that BlockFi would declare bankruptcy, freeze customer accounts, and customers would lose all the money in their BlockFi accounts.

108.    BlockFi never disclosed any information about the concentration of its crypto counterparties. Plaintiffs nor class members had any way to know that BlockFi was working with undercapitalized borrowers such as Alameda Research, Three Arrows Capital and others.

109.    BlockFi's opaqueness could have been mitigated and investors spared from decimating losses. Throughout 2020 and 2021 and 2022, BlockFi reused to offer "Proof of Reserves" to its clients (*i.e.* class members) despite the industry trend in that direction stated to industry players such as Lend; Gate.io; Coin shares; Bit MEX; Nexo and Kraken. Proof of Reserves allows clients to individually verify that the client's assets were accounted for.

110.    Defendants also failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders. BlockFi CEO Zac Prince admitted in July 2022 that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

111.    Had investors and class members known or even been warned about their exposure to unregistered securities, potential Ponzi schemes, unstable offshore hedge funds backed by esoteric cryptocurrency, borrowers with no collateral, non-recourse loans, SEC fines, state fines, lawsuits, judgments, consent orders, increased bankruptcy risk, account redemption freezes, and asset loss, they would not have invested with BlockFi.

112.    Leaving account holders in the dark of these known and substantial risks, BlockFi

capitalized on account holder ignorance of these substantial and debilitating risks to profit from

paying artificially low interest payments to class members and eventually siphoning their

accounts to pay for salaries, bonuses, and risk filled investments and loans.

### J.    After BlockFi Revealed A Loss From Its Loans To
### Three Arrows, Prince And Marquez Continues To Mislead Investors

113.    Following the Three Arrows loss, Defendant Prince lied to BlockFi customers

about its exposure to Three Arrows:

> We exercised our best business judgment recently with a large client that failed to meet
> its obligations on an overcollateralized margin loan," CEO Zac Prince tweeted. "We fully
> accelerated the loan and fully liquidated or hedged all the associated collateral.

*See* https://www.coindesk.com/business/2022/06/16/blockfi-liquidated-three-arrows-capital-report/

114.    **ZAC PRINCE**

- **Prince:**  Today's landmark announcement reinforces BlockFi's commitment to serving its clients and ensuring their funds are safeguarded. (Twitter June 21, 2022)
- **Prince:**  As a matter of principle, we fundamentally believe in protecting client funds. Not only because it's absolutely the right thing to do, but this also benefits the ongoing health and adoption of crypto financial services worldwide. (Twitter July 1, 2022)
- **Prince:**  Therefore, it was important to add capital to our balance sheet to bolster liquidity and protect client funds. (Twitter July 1, 2022)
- **Prince:**  This represents the full extent of the impact to BlockFi from 3AC. We have no further exposure and the limited losses we did experience will be absorbed by BlockFi with no impact to client funds. (Twitter July 1, 2022)
- **Prince:** For our clients, absolutely nothing changes in terms of how you experience BlockFi products - but there is now even more upside in the future. (Twitter July 1, 2022)
- **Prince:**  It's time to stop putting @BlockFi in the same bucket / sentence as Voyager and Celesius.  Two months ago we looked the "same".  They shut down and have impending losses. (Twitter July 11, 2022)
- **Prince:**  Putting @BlockFi alongside Celsius and Lehman Brothers in the same sentence is misleading. (Twitter July 12, 2022).

- **Prince:** I'm really impressed with what Sam and the FTX team has done throughout this time in terms of supporting the industry (MSNBC interview July 13, 2022)
- **Prince:** So it's night and day like you can't compare Goldman to Lehman Brothers in terms of how they've continued to operate. And so I think there's an analogy like that. (MSNBC interview July 13, 2022)
- **Prince:** our team didn't miss a beat as we successfully navigated through the turbulence;
- **Prince:** While this is a valid question to ask, there are more important ones to answer - like how does the industry move forward, and will we survive? The short answer is YES, we will survive.

115.     On July 21, 2022, BlockFi made public its Q2 2022 Transparency Report:

Platform Assets and Management of Liquidity and Credit Risks. This report also fraudulently

induced customers into believing their funds are safeguarded in claiming:

> We have established the following guidelines to manage our liquidity risks and available balances of short-term assets:
>
> - We will hold at least 10% of total amounts due to clients upon demand in inventory, ready to be returned to clients.
> - We aim to hold at least 50% of total amounts due to clients upon demand either in inventor or in loans that can be called within seven calendar days.
> - We aim to hold at least 90% of total amounts due to clients upon demand either in inventory or in loans that can be called back within one year.

116.     On or about June 21, 2022, Prince personally and publicly assured investors that:

> Today's landmark announcement reinforces BlockFi's commitment to serving its clients and ensuring their funds are safeguarded.



117. On July 11, 2022, Prince personally and publicly assured investors that:

PSA to journalists + market commentators
It's time to stop putting @BlockFi in the same bucket / sentence as Voyager and Celsius. Two months ago we looked the "same". They shut down and have impending losses.



118. Also on July 11, 2022, Prince personally and publicly assured investors that:

> Hey Meltem :) Just fyi - BlockFi directly holds zero GBTC. The
> Bloomberg data on this is outdated. We have a couple small loans
> (like sub $10M) w/ GBTC as collateral that are in the process of
> winding down



119.    On or about July 12, 2022, in responding to a Twitter thread from Dan Morehead,

CEO of Pantera Capital, Prince personally and publicly assured investors that:

> [Y]our report has some glaring inaccuracies re @BlockFi that I would be remiss
> not to call out…
> Putting @BlockFi alongside Celsius and Lehman Brothers in the same sentence is
> misleading. They were / are bankrupt or insolvent - we are not. I would appreciate
> you editing this if you're open to being more accurate with your writing.
> I think it's important for thought leaders like you to recognize nuance and not make
> inaccurate, negative statements about others in the industry. Hope you will consider
> this feedback pragmatically.



120.    On or about July 13, 2022, Prince gave an interview on MSNBC. Prince started

the interview by claiming:

I just want to start by expressing my sincere condolences to anyone who's been negatively impacted by the platform shutdowns and bankruptcies that we've seen across the space over the last couple months. So the FTX transaction for Block five, we're really excited about it. There's two key parts of this transaction. The first is a 400 million dollar credit facility.

Which importantly, is subordinate to our client funds. The second is an option to acquire BlockFi for up to $240,000,000, which can be exercised at the earliest in the fall of 2023. Now the goal of this deal, from BlockFi's perspective, was to bolster our balance sheet so that we can navigate these market conditions.

From a position of strength. And over the longer term, we see really interesting synergies between the two firms. And I'm really impressed with what Sam and the FTX team has done throughout this time in terms of supporting the industry.

121.    On or about September 6, 2022, Prince personally and publicly assured investors

that:

There are certainly lessons learned, but our team didn't miss a beat as we successfully navigated through the turbulence. Our team is prepared to do whatever we can to ensure that our industry emerges stronger and more transparent.



122.    Also on or about September 6, 2022, Prince personally and publicly assured

investors that:

> Recently I've been asked a lot about how navigated and withstood the hyper volatile
> market back in June. While this is a valid question to ask, there are more important
> ones to answer - like how does the industry move forward, and will we survive?
> The short answer is YES, we will survive. The longer answer relates to HOW do
> we survive and thrive? Crypto has undergone a rapidly condensed version of the
> 2008 financial crisis, and we need to start looking back on lessons learned so we
> can move forward.



123.    On or about September 6, 2022, Marquez personally and public stated:

> As leaders and builders, it's our responsibility to be transparent
> about the lessons we've learned and how we can best move forward.



124.     On or about November 6, 2022, Marquez personally and publicly assured

investors that:

> At the end of the day, our priority is to ensure that all people who want to earn
> interest on their digital assets can do so through a trusted provider like BlockFi.
> While we're limited in what we can say, we can confirm we're having productive
> conversations with regulators as we move through this nuanced process…Zac
> Prince and I are so incredibly proud of the team at @ BlockFi for continuing to
> listen to and learn from our clients so that we can provide digital asset products that
> are reliable, accessible and trusted.



125.    Also on or about November 6, 2022, Marquez personally and publicly assured

investors that:

> Our team is hard at work building products that make managing
> your #crypto wealth easier. Check out all that we accomplished in October.



126.    On December 21, 2022, Caroline Ellison, who was the chief executive of the cryptocurrency hedge fund Alameda Research guilty to federal criminal fraud charges and are cooperating in the prosecution of the disgraced crypto entrepreneur, Sam Bankman Fried.[6]

127.    Before filing for Chapter 11 bankruptcy, it was a necessary element, to continue to persuade, influence and convince the common investor, as cash was getting scarce, to continue

---

[6] See https://www.nytimes.com/2022/12/21/technology/ftx-fraud-guilty-pleas.html

to put their earned money (sometimes life savings) into specifically the BlockFi Platform. To do

this, Prince and Marquez, co-founders and officers of BlockFi, made a plethora of false and

misleading public statements that were broadcast around the country through the internet.

128.    As defendants well knew, they were required to invest it customers' funds

exclusively in safe, highly liquid securities or in other conservative low risk loans and only after

vetting and performing due diligence on target borrowers to ensure customer money would

always be available to withdraw in full on short notice.

129.    Based on materials on BlockFi's website, financial statements, and publicly

available materials, defendants knew, or should have known that BlockFi's guiding investment

objective for customer portfolios was supposed to be preservation of capital and liquidity in even

the most turbulent of market conditions.

### K.    BFI Defendants' Other Wrongful Conduct

130.    Defendants had a duty to properly keep investor or class member funds in a

segregated accounts and have adequate capitalization so that investors could redeem, withdraw,

or close accounts in full on demand and failed to do so.

131.    As a result, it would be impossible for all investors or class members to redeem or

withdraw their funds in full or close their accounts at once on any given time.

132.    Defendants improperly pledged loaned class members' securities to fund

speculative and risky loans to companies with liquidity problems like a $680,000,000 loan

Alameda Research and a $1 billion loan to venture firm Three Arrows Capital, which was not

properly disclosed to BlockFi customers.

133.    Indeed, until the truth was revealed and BlockFi was compelled to disclose how it

lost hundreds of millions of customer and investor money, neither BlockFi nor its officers or

directors ever even hinted, let alone affirmed, it's business and customers assets were fully dependent on companies with liquidity problems likes Three Arrows and Alameda Research.

134.    BlockFi did not warn or provide notice to class members that it was at a heightened bankruptcy risk, was lending customer money to offshore companies with liquidity problems and no collateral like Alameda Research and Three Arrows, was lending customer money to companies without doing the requisite diligence, was lending customer money to companies with which Prince and Marquez had a direct conflict of interest, or that BlockFi may need to register its offers and sales of BIAs. Nor did BlockFi warn customers that it may be violating securities laws, subject to enforcement actions, cease-and desist orders, penalties, and lawsuits from every state in the country.

135.    Defendants failed to disclose that in the event of BlockFi's insolvency and bankruptcy, Plaintiff and class members assets could be available to all creditors to share. Defendants also failed to warn investors that if too many class members sought return of their investment, BlockFi would have to file for bankruptcy.

136.    Had investors and class members known or even been warned about their exposure to unregistered securities, potential Ponzi schemes, unstable offshore hedge funds backed by esoteric cryptocurrency, borrowers with no collateral, non-recourse loans, SEC fines, state fines, lawsuits, judgments, consent orders, increased bankruptcy risk, account redemption freezes, and asset loss, they would not have invested with BlockFi.

137.    Leaving account holders in the dark of these known and substantial risks, BlockFi capitalized on account holder ignorance of these substantial and debilitating risks to profit from paying artificially low interest payments to class members and eventually siphoning their accounts to pay for salaries, bonuses, and risk filled investments and loans.

L.    **BlockFi's Risky Investments With Plaintiff
And Class Members' Assets Caused BlockFi's Demise**

1.    **Three Arrows Capital**

138.    Three Arrow Capital was a Singapore based crypto hedge fund.

139.    Defendants concealed its exposure to Three Arrow Capital to continue to induce investors to buy BlockFi securities. Defendants had an incentive to conceal the risk presented by BlockFi's exposure to Three Arrow Capital because Three Arrow Capital since at least early 2020 has been a "strategic investor" to BlockFi.

140.    Three Arrow Capital became BlockFi's first or second largest borrower client.

141.    Three Arrow Capital commingled accounts of its owners and lenders.

142.    Three Arrow Capital asset base was disproportionately invested in Grayscale Bitcoin Trust ("GBTC").

143.    BlockFi was a significant owner of GBTC increasing its position from $250 million in 2020 to $1.7 billion by February 2021. BlockFi's own GBTC position was at risk because of Three Arrow Capital's own GBTC position.

144.    Three Arrow Capital's GBTC position was subject to serial six month lock-ups thus exposing Three Arrow Capital to price declines with no exit. But by Spring 2021, Three Arrow Capital's GBTC stake had fallen below the value of the coins in the trust.

145.    It has been publicly reported that Three Arrow Capital creditors were reluctant to reveal the true extent of their losses at Three Arrow Capital for fear of inviting increased scrutiny from investors and regulators.

146.    Three Arrow Capital was reluctant to post collateral for borrowed capital and instead offered lenders higher interest rates: 10% or more.

147.    In August 2021, two of Three Arrow Capital's operations manager (and minority partners) left and Three Arrow Capital did not/could not replace their expertise or pickup their workload.

148.    By mid-2021, Three Arrow Capital refused to post bitcoins as collateral but instead pledged its illiquid investment in "Deorbit," a private company. There were also suspicions in the market that Three Arrow Capital had pledged its GBTC stake more than once.

## 2.    Alameda And FTX

149.    BlockFi's lending relationship with Alameda started in 2019 and BlockFi started trading on the FTX platform in 2021.

150.    BlockFi also held $355 million of crypto on FTX.

151.    FTX allowed Alameda to use FTX customer funds to buy FTT tokens to prop up the value of FTT tokens.

152.    Alameda was propped up by an ability to borrow funds from FTX.com for Alameda's trading and investments "without any effective limits" according to FTX new CEO John J. Ray in a declaration filed in the FTX bankruptcy.

153.    BFI Defendants could not have performed any real due diligence on Alameda or else they would have discovered that a major portion of Alameda's assets consisted of loan receivables consisting of promissory notes from Sam Birchman-Friedman for loans to himself from Alameda.

154.    Upon recovery of FTX/Alameda records, John J. Ray III in his declaration in support of the FTX/Alameda chapter 11 petition (In re FTX Trading Ltd D. Del BK 22-11068) described FTX/Alameda financial information as follows:

> "Never in my career have I seen such a complete failure of
>
> corporate controls… compromised systems and… concentration of
>
> control in the hands of a very small group of inexperienced,
>
> unsophisticated and potentially compromised individuals."

155.    BFI Defendants knew that the FTT token which was the collateral supporting the

BlockFi loans to Alameda were illiquid because defendants had access to trading volume and

trading prices for FTT. Thus, defendants could see that the value that Alameda assigned to FTT

tokens was a modest value that was not reliable given the illiquidity in trading of FTT and the

fact that FTX and Alameda owed the majority of FTT tokens.

156.    BFI Defendants had notice of FTX and Alameda's fraudulent activities and

structure via the very detailed factual allegations in the action entitled *Bitcoin Manipulation*

*Abetment LLC v. FTX Trading LTD and Alameda Research et al*, USDC N.D. CA 19-CV-07245

filed on November 2, 2019. That complaint laid out in factual detail commingling,

misappropriation, manipulation of FTX client funds, and lack of controls on procedures to ensure

accurate financial reporting.

157.    Alameda also had loans and payments to insiders in excess of at least $1.38

billion including loans where FTX's CEO signed a loan as both borrower from Alameda and as

CEO of Alameda.

158.    Alameda had no plausible or reliable internal controls. A large percentage of

Alameda's balance sheet assets were in the form of FTT tokens.

159.    FTX had no board of directors or even an accounting department in house.

Neither FTX nor Alameda even performed daily reconciliation of positions on the blockchain.

160.    Alameda did not have complete books or records for its investments or activities.

49

161.   BFI Defendants, but not investors, could have easily discovered Alameda's fraudulent operations because they could learn, or already knew, that FTX customers were directed to wire money to Alameda's account in exchange for bitcoin assets on FTX.

162.   BFI Defendants knew or could have and should have known of the risks presented by Alameda because Alameda balance sheets which were circulating in 2022 showed it.

163.   BFI Defendants misled clients in July in describing the $400 million line of credit from FTX by failing to disclose that the line of credit allowed BlockFi to only draw on FTX's FTT token.

164.   The BlockFi bankruptcy revealed that:

    (i)    Alameda was the recipient of $680 million of loans from BlockFi;

    (ii)    Some of the collateral for BlockFi loans was FTX's Robinhood common stock;

    (iii)    BlockFi held $350 million of FTX crypto currency token: FTT.

165.   It was later revealed that most of Alameda Research assets of reportedly $14.6 billion was mostly the FTT token issued by FTX.

166.   Despite the extensive marketing materials, website, prime time news interviews, social media posts, and other sales gimmicks designed to entice consumers into the BlockFi BIAs, BFI Defendants never once, until it was too late, disclose that it was giving loans to Three Arrows Capital and/or PTX and/or Alameda.

167.   BlockFi's opaqueness could have been mitigated by the BFI Defendants and investors spared from decimating losses. Throughout 2020 and 2021 and 2022, BlockFi reused to offer "Proof of Reserves" to its clients (*i.e.* class members) despite the industry trend in that direction stated to industry players such as Ledn; Gate.io; Coinshares; Bit MEX; Nexo and

Kraken. Proof of Reserves allows clients to individually verify that the client's assets were accounted for.

168.    BFI Defendants also failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders. BlockFi CEO Zak Prince admitted in July 2022 that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

169.    BlockFi's undisclosed rehypothecated financial position profoundly threatened its solvency.

170.    BlockFi admitted in 2022 that there had been "increased withdrawal demand." Eventually BlockFi was forced to admit it needed hundreds of millions of dollars of additional liquidity from outside sources.

171.    While it was looking for emergency financing, BlockFi was offered only financing packages which would subordinate client assets to the new lenders.

172.    In late June 2022, Crypto Exchange FTX provided a $250 million emergency line of credit to BlockFi.  Reportedly, equity investors in BlockFi were "wiped out" and had written off losses.

173.    On April 13, 2022, BlockFi, Incl. assumed the obligations of BlockFi Lending LLC, a wholly owned subsidiary of BlockFi, Inc. under interest bearing accounts and converted the "BlockFi Interest Accounts" to "BlockFi Lending Accounts."

174.    In May 2022, BlockFi reduced the interest rates paid to clients by approximately 50%.

175.     Effective July 1, 2022, BlockFi eliminated the free withdrawal once per month for certain types of digital assets and now charged up to $25 per withdrawal. This change hit class members hard inasmuch as in 2022 over 75% of BlockFi crypto withdrawals were without fees.

176.     Defendants could have known, and likely did know, of the problems with its loans to other crypto entities through monitoring of "on-chain data" which is used by crypto platforms to trace crypto traders and lenders' transactions.

### M.     **BlockFi Bankruptcy**

177.     On November 28, 2022, after the bailout from FTX proved to be a house of cards, BlockFi filed for Chapter 11 bankruptcy, Case No.  3:22-bk-19361.

178.     On November 29, 2022, the Bankruptcy Court granted a motion to extend the time by which the Debtors shall file their Schedules and Statements to January 11, 2023, an additional 30 days beyond the 14-day extension provided for pursuant to Bankruptcy Rule 1007(c).

179.     Also on November 29, 2022, BlockFi counsel told a U.S. bankruptcy judge that the U.S. lawyers representing crypto lending firm BlockFi called the company "the antithesis of FTX."

180.     "This is the antithesis of FTX," Joshua Sussberg, a Kirkland & Ellis lawyer representing BlockFi, said in his opening statement.[7]

181.     In a presentation to the Bankruptcy Court, BlockFi's bankruptcy counsel essentially admitted that all along Defendants Prince and Marquez had been creating the misleading impression that BlockFi was a financial institution by stating: "This has been a

---

[7] See https://news.yahoo.com/blockfi-bankruptcy-hearing-antithesis-ftx-200256698.html

company that was focused on creating an opportunity for people that otherwise don't have access to the financial system."[8] Sussberg added.[9]

182.    Sussberg did not elaborate that the "financial system" to which BlockFi was so desperate to provide access for ordinary people was no more than duping customers into believing their money was safe to earn higher than average interest while BlockFi was taking that money and gambling it on FTX, Alameda Research and Three Arrows Capital, which has been dubbed an offshore [ ] and "Madoff-style Ponzi Scheme",[10] respectively, essentially robbing them of hundreds of millions of dollars leaving thousands of ordinary retail investors "destitute.

183.    Sussberg's argument mirrored the efforts made by BlockFi's bankruptcy declaration on Monday to distance itself from Sam Bankman-Fried's disgraced empire, which filed for Chapter 11 bankruptcy earlier this month.

184.    Seemingly Sussberg made these statements to give the impression that BlockFi would not receive the same "ponzi scheme" label and distance BlockFi from claims that it might be liable for the "misuse of its customers' funds" as FTX was.[11]

185.    In its petition, BlockFi revealed it had more than 100,000 creditors with estimated assets and liabilities of between $1 billion and $10 billion.

---

[8] *Id.*

[9] *Id.*

[10] *See* https://www.coindesk.com/business/2022/06/28/research-firm-fsinsight-accuses-three-arrows-capital-of-running-a-madoff-style-ponzi-scheme/

[11] See https://www.thestreet.com/memestocks/crypto/ftxs-sam-bankman-fried-greatest-ponzi-scheme

186.    In its bankruptcy filings, BlockFi's financial advisor, Berkley Research Group,
through Mark Renzi, said that BlockFi's "exposure to [FTX and Alameda Research] created a
liquidity crises at BlockFi which led to its bankruptcy filing.

187.    In bankruptcy BlockFi admitted for the first time that Three Arrows Corporation
was "one of BlockFi's largest borrower clients" whose collapse "led to material losses for
BlockFi."

## V.    CLASS ALLEGATIONS

188.    Plaintiff brings this action individually and on behalf of the following Class of
persons: All persons or entities in the United States who invested in a BIA account from March
4, 2019 to November 10, 2022 (the "Class Period"). Excluded from the Class are: affiliates of,
corporate officers, members of the boards of directors, and senior executives of BlockFi
Defendants; members of their immediate families and their legal representatives, heirs,
successors or assigns; and any entity in which Defendants have or had a controlling interest.

189.    **Numerosity.** The members of the Class and Subclasses are geographically
dispersed throughout the United States and are so numerous that individual joinder is
impracticable. Upon information and belief, Plaintiff reasonably estimates that there are
hundreds of thousands of members in the Class and Subclasses. Although the precise number of
Class members is unknown to Plaintiff, the true number of Class members is known by
Defendants and may be determined through discovery. Class members may be notified of the
pendency of this action by mail and/or publication through the distribution records of
Defendants.

190.    **Existence and predominance of common questions of law and fact.** Common
questions of law and fact exist as to all members of the Class and Subclasses and predominate

over any questions affecting only individual Class members. These common legal and factual

questions include, but are not limited to, the following:

        (a)     whether the BIAs were unregistered securities under federal and

California law;

        (b)     Whether Defendants' offerings and sales of BIAs violates the registration

provisions of the Securities Act and the California Corporations Code;

        (c)     whether Defendants are liable to Plaintiff, the Class, and Subclasses for

unjust enrichment; and

        (d)     The type and measure of damages suffered by Plaintiff and the Class.

191.    **Typicality.** Plaintiff's claims are typical of the claims of the other members of the

Class in that, among other things, all Class and Subclasses members were similarly situated and

were comparably injured through Defendants' wrongful conduct as set forth herein. Further,

there are no defenses available to Defendants that are unique to Plaintiff.

192.    **Adequacy of Representation.** Plaintiff will fairly and adequately protect the

interests of the Class and Subclasses. Plaintiff has retained counsel that is highly experienced in

complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action

on behalf of the Class and Subclasses. Furthermore, Plaintiff has no interests that are antagonistic

to those of the Class or Subclasses.

193.    **Superiority.** A class action is superior to all other available means for the fair and

efficient adjudication of this controversy. The damages or other financial detriment suffered by

individual Class and Subclass members are relatively small compared to the burden and expense

of individual litigation of their claims against Defendant. It would, thus, be virtually impossible

for the Class or Subclass on an individual basis, to obtain effective redress for the wrongs

committed against them. Furthermore, even if Class or Subclass members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

194.    In the alternative, the Class and Subclasses may also be certified because:

(a)    the prosecution of separate actions by individual Class and Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendant;

(b)    the prosecution of separate actions by individual Class and Subclass members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

# VI.    CAUSES OF ACTION

## COUNT I

### Unregistered Offer and Sale of Securities in Violation of Section 5 of the Securities Act Section 12(1) And Section 15(a) for Controlling Person Liability
### (Against BFI Defendants)

195.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

196.    Prince and Marquez made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

197.    The BIAs are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) (defining "security" to include a "note" and an "investment contract").

198.    Plaintiff and members of the Class purchased BIAs securities through the BlockFi website and/or smartphone application.

15 U.S.C. §§ 77e(a) states:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
>> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
>>
>> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

199.    As discussed above, there was no registration statement in effect related to the BIAs.

200.    By offering and/or selling unregistered BIAs to Plaintiff and Class members, BFI Defendants violated Sections 5, 12 and 15 and are liable to Plaintiff and the members of the Class.

201.    The BFI Defendants by and through their stock ownership of BlockFi and executive and director positions controlled BlockFi and exercised such control to cause it to engage in the illegal practices described herein and are therefore liable as controlling persons of BlockFi.

202.    As a direct and proximate result of BFI Defendants' unregistered offering and sale of BIA securities, Plaintiff and members of the Class suffered damages.

## COUNT II

### Violations of Section 12(a)(2) and Section 15 of the Securities Act
### (Against BFI Defendants)
### For Offering Solicitation And Sale Of Unregistered Securities Through Materially False Solicitations And Controlling Person Liability

203.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

204.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against the BFI Defendants.  This Count is not alleging fraud or intentional conduct or recklessness.

205.    BFI Defendants are "sellers" for purposes 12(a)(2) of the Securities Act pursuant to 17 C.F.R. §230.159A.

206.    BFI Defendants had direct and active participation in the solicitation of Plaintiff's and Class members' purchases and communicated directly with Plaintiff and the Class through

the solicitation materials for their own financial interest and are also a "statutory sellers" under Section 12(a)(2).

207.    Plaintiff and the other members of the Class acquired BIAs solicited and sold pursuant to written materials which were materially false and misleading.

208.    As alleged above, the written materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein as more fully set forth in Count III, infra.

209.    BFI Defendants owed to acquirers of BlockFi securities, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in solicitation and sales materials and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.

210.    Plaintiff and the other members of the Class acquired BIAS securities solicited by and pursuant to the materials described herein and neither Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in those offering documents.

211.    By virtue of these violations, Plaintiff and the other members of the Class have sustained damages.

212.    Less than one year has elapsed from the time that Plaintiff discovered the facts upon which this complaint is based to the time that Plaintiff filed the Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

213.    By and through their stock ownership of BlockFi and positions as officers and/or directors, the BFI Defendants had the power and exercised same to cause BlockFi to engage in the illegal acts described herein and are therefore liable as controlling persons.

## COUNT III

### Violation Of Section 10(b) and 20(a) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder Against All Defendants

214.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

215.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase BIAs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

216.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the BIAs an effort to maintain artificially high market prices for BIAs in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

217.    Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the BIAs.  These defendants employed devices, schemes and artifices to defraud while in possession of material

adverse non-public information and engaged in acts, practices, and a course of conduct as alleged

herein included the making of, or the participation in the making of, untrue statements of

material facts and omitting to state material facts necessary in order to make the statements, in

light of the circumstances under which they were made, not misleading and engaged in

transactions, practices and a course of business which operated as a fraud and deceit upon the

purchasers of BIAs securities during the Class Period.

**<u>Defendants' Scienter</u>**

218.    Defendants could have and should have known, and likely did know, of the

problems with its loans to other crypto entities through monitoring of "on-chain data" which is

used by crypto platforms to trace crypto traders and lenders' transactions.

219.    As early as 2020, Alameda was already notorious for its "complete lack of a risk

management framework" as it was described by Austin Campbell, the former co-head of digital

assets trading at Citigroup, to the Wall Street Journal as publicly reported on January 2, 2023.

220.    Similarly, digital investment firm Arca, wrote in a blog post on the Arca website

in October 2022, that FTX's role as the largest market maker of FTT constituted a "Large

conflict of interest" with "larger" "embedded risk."

221.    In the Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions

and First Day Motions filed November 28, 2022, Renzi stated there were no "failure of corporate

controls or systems integrity" *Id*. at pg. 5, ¶ 11. Accordingly, that sworn statement compels the

inference that BlockFi's controls and systems allowed the BFI Defendants to know and

understand the risks presented by BlockFi's exposure to, transactions with, BAC, FTX and

Alameda. Prince and Marquez scienter is obvious.

222.    The BFI Defendants knew and understood that Alameda's assets used as collateral for BlockFi's loans to Alameda were FTT tokens because, as explained by Renzi in his Declaration: ". . . an individual may look up the ID of that [crypto currency] token to identify the wallet from where the token was sent and the wallet it was sent to." Renzi Decl. pg. 6, ¶ 15.

223.    BFI Defendants had ample scienter-motive to mislead and deceive investors because the influx of class member assets is what drove the value of BlockFi, Inc.'s Preferred Stock and equity and allowed BFI Defendants to cash out of their non-publicly traded equity. From 2019 to 2021, BlockFi Inc. completed five preferred stock financing transactions at ever increasing prices from 1.054 per share to 1.5722 per share to 1.747 per share for the three series of A preferred. The B preferred was priced at 3.79 per share in February 2020; the C preferred was priced at 9.51 per share in September 2020, the D preferred was sold for $58.737 per share in May 2021, and the E preferred was sold for $75.7442 per share in August 2021.

224.    The proceeds of later series of preferred stock were used in part to repurchase previously issued Preferred Stock and common stock for cash. Renzi Decl. p. 24 at ¶ 76.

225.    Defendants participated in this conduct in order to realize unjust returns in the form of income, salary, stock, equity, commissions, compensation, and profits at the risk of bankruptcy and losing customer investment.

226.    For instance, on August 14, 2019, BlockFi filed a Form D Notice of Exempt Offering of Securities.  The Form D provided a total equity offering of 20,470,859 with "$1,000,000 of the gross proceeds will be used to repurchase Common Stock from certain executive officers of the company in a secondary sale transaction."[12]

---

[12] *See* https://www.sec.gov/Archives/edgar/data/1726072/000172607220000001/xslFormDX01/primary_doc.xml

227.    On February 14, 2020, BlockFi filed a Form D Notice of Exempt Offering of
Securities.  The Form D provided a total equity offering of $37,542,812 with "[a]pproximately
$6,940,000.00 of the gross proceeds will be used to repurchase capital stock from certain
executive officers of the company and funds affiliated with certain directors of the company in a
secondary sale transaction."[13]

228.    The BFI Defendants' primary and controlling person liability arises from the
following facts: (i) the Defendants through any by stock ownership, were privy to and
participated in the creation, development and sales of BIAs and (iii) each of these defendants
knew, was aware of, or recklessly disregarded the BlockFi's dissemination of information to the
class that was misleading false or misleading.

229.    Defendants had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain
and disclose such facts, even though these facts were readily available to them.  Defendants'
material misrepresentations and/or omission were done knowingly or recklessly.  Defendants'
materially false and misleading statements and omissions clearly demonstrate that, if they did not
have actual knowledge of the misrepresentations and omission alleged, they were reckless in
failing to obtain such knowledge and deliberately refrained from taking the steps necessary to
determine whether those statements were false or misleading.

230.    The BFI Defendants ("Controlling Defendants") acted as controlling persons of
BlockFi within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By
virtue of their positions and due to their participation in and/or control of the Company's
operations and/or intimate knowledge of the incomplete and misleading statements contained

---

[13] *See* https://www.sec.gov/Archives/edgar/data/1726072/000172607220000001/xslFormDX01/primary_doc.xml

in the Materials filed with the SEC, had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the Materials that Plaintiff contends are materially incomplete and misleading.

231.    Had Plaintiff and the members of the Class known the truth regarding BFI and the BIAs, Plaintiff and the Class would not have purchased the BIAs.  At the very least, Plaintiff and the other members of the Class would not have purchased BIAs at the artificially inflated prices which they paid.

232.    As a result of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

233.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT IV

**Unregistered Offer and Sale of Securities in Violation of
The New Jersey Uniform Securities Law, N.J.S.A. 49:3-60
(Against Defendants Prince And Marquez)**

234.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

235.    Plaintiff brings this claim individually and on behalf of the members of the Class and New Jersey Subclass against Defendants.

236.    The BIAs are securities as defined in N.J.S.A. 49:3-49(m) (defining "security" to include a "note" and an "investment contract").

237.     The BIAs were and are required to be registered with the Bureau pursuant to

N.J.S.A. 49:3-60.

238.     The BIAs have not been registered with the Bureau, are not exempt from

registration, and are not federally covered.

239.     Defendants have offered and sold unregistered securities in violation of N.J.S.A.

49:3-60.

240.     By selling unregistered BIAs to Plaintiff and Class members, Defendants violated

the New Jersey Uniform Securities Law, and are liable to Plaintiff and the members of the New

Jersey Subclass.

241.     As a direct and proximate result of Defendants' unregistered sale of BIA

securities, Plaintiff and members of the Class and Subclass have suffered damages. N.J.S.A.

49:3-71.

## COUNT V

**Aiding and Abetting Breach of Fiduciary Duty Owed To The BFI Defendants By BlockFi**

242.     Plaintiffs repeat and re-allege the allegations contained in preceding paragraphs

above, as if fully set forth herein.

243.     As alleged above, the BFI Defendants breached its fiduciary duties to Plaintiff.

244.     BFI Defendants substantially assisted or encouraged the wrongdoing that

constituted the breach of fiduciary duty owed by  BlockFi by publicly supporting and endorsing

BlockFi and encouraging Plaintiffs to invest in BlockFi and its BIAs; in doing so, Defendants

made material misrepresentations and/or omitted material facts concerning BlockFi to Plaintiffs,

as described above.

245.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the deceptive BlockFi Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiff, and by other actions described in this complaint.

## COUNT VI

### Violation of Consumer Fraud Act,
### N.J.S.A. §§ 56:8–1 et seq.

246.    The allegations contained in the previous paragraphs are incorporated by reference. This Count is brought on behalf of the Class.

247.    The CFA was designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services.

248.    BFI Defendants and Plaintiff are "persons" within the meaning of the CFA. N.J.S.A. § 56:8-1(d).

249.    BFI Defendants' advertising and sale of BIA accounts constitute "advertising" and "sale" of "merchandise" and/or "services" within the meaning of the CFA. N.J.S.A. § 56:8-1(a), (c) and (e).

250.    BFI Defendants' practices described above constitute as "unconscionable commercial practice[s], deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission," and therefore, are unlawful under the CFA N.J.S.A. § 56:8-2.

251.    Plaintiff and the class members have suffered an ascertainable loss of money and property as a result of Defendants' unlawful practices as alleged herein.

252.    Pursuant to N.J.S.A. § 56:8-19, Plaintiff, on behalf of himself and the class, seeks treble damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate legal or equitable relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, demands judgment against the Defendants, jointly, severally or in the alternative, as follows:

a.    An order certifying this matter as a class action under Rule 23;

b.    A judgment for injunctive relief enjoining Defendants from engaging in future violations of the CFA;

c.    A judgment for actual damages under each count alleged herein;

d.    A judgment for compensatory damages under each count alleged herein;

e.    A judgment for treble damages under the Consumer Fraud Act at N.JS.A, 56:8-19;

f.    A judgment for reasonable attorney fees and costs of suit in connection with this action, pursuant to the CFA at N.J.S.A. 56:8-19;

g.    A judgment for a refund of all moneys acquired by Defendants due to unlawful acts, under the CFA at N.J.S.A. 56:8-2.11;

h.    A judgment for pre-judgment and post-judgment interest; and

i.    A judgment for such other and further relief as the Court deems equitable and just.

## NOTICE TO ATTORNEY GENERAL OF ACTION

A copy of this Complaint will be mailed to the Attorney General of the State of New

Jersey within ten (10) days after the filing of the Complaint with the Court, pursuant to N.J.S.A.

56:8-20.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: February 28, 2023                **SQUITIERI & FEARON, LLP**


*/s/ Lee Squitieri*
305 Broadway, 7th Floor
New York, New York 10007
(212) 421-6492
lee@sfclasslaw.com

**MOORE KUEHN, PLLC**
Fletcher Moore
Justin Kuehn
30 Wall Street, 8th Floor
New York, New York 10005
(212) 709-8245
fmoore@moorekuehn.com
jkuehn@moorekuehn.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, **Trey Greene** ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Class Action Complaint and authorizes its filing on his behalf.

2.      Plaintiff did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any action arising under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or cooperate as part of a group of lead plaintiffs, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.      Plaintiff was at all relevant times an investor in Block Fi accounts.

5.      In total, Plaintiff invested $1,586,492.00 in Block Fi via transfer of funds and re-invested over approximately $ 200,00.00  in earned credited interest on his Block Fi accounts and re-invested approximately $ 200,000.00 of capital gains on his Block Fi assets back into Block Fi  without ever effecting any withdrawals out of Block Fi. In addition , plaintiff's losses include accrued but un-credited interest at the rate of 9% per annum  on the total of the balances in his accounts with the total amount subject to discovery.  Plaintiff's assets are frozen and unavailable and their worth is indeterminate and being valued at zero for the purposes of estimating plaintiff's losses here.

6.      During the three-year period preceding the date on which this

1

Certification is signed, Plaintiff has not served or sought to serve as a representative

party on behalf of a class under the federal securities laws.

      7.      Plaintiff agrees not to accept any payment for serving as a representative

party on behalf of the class as set forth in the Complaint, beyond my pro rata share of

any recovery, except such reasonable costs and expenses directly relating to the

representation of the class as ordered or approved by the Court.

      8.      Plaintiff declares under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct.

2/27/2023

Executed this ___ day of February 2023         __               _____

                                           Trey  Greene

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTONIE ELAS, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff<br><br>v.<br><br>ZAC PRINCE, FLORI MARQUEZ, AMIT CHEELA, DAVID OLSSON, and SAMIA BAYOU,<br><br>                    Defendant(s) | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Antonie Elas, ("Elas"), by and through his undersigned attorneys, brings this Class Action against Defendants as alleged in this Complaint (the "Complaint") on his own behalf and on behalf of a class consisting of all persons who invested in BlockFi Interest Accounts ("BIAs") during the Class Period, from March 4, 2019, to and including November 28, 2022 (the "Class"). Defendants are officers and directors of BlockFi, Inc. ("BlockFi") and its affiliates as described herein. BlockFi and its affiliates are presently subject to bankruptcy proceedings filed in November 2022 and are not named as defendants in this case.[1]

## SUMMARY

1.      This is a class action on behalf of a class of investors consisting of all individuals and entities who, during the Class Period, invested in BIAs by transferring U.S. Dollars into a BIA account and were allocated cryptocurrency, or transferred cryptocurrency assets to a BIA account in exchange for interest payments, and who suffered financial injury as a result thereof.

---

[1] To the extent, the conduct of BlockFi and its affiliates are referenced herein, it is solely for the purposes of establishing liability of the BlockFi Individual Defendants.

BlockFi and Defendants unlawfully failed to register BIAs as securities before selling them to individual investors.

2.      As detailed herein, BlockFi BIAs have at all times constituted an offer and sale of unregistered securities.

3.      Moreover, Defendants made repeated false and misleading statements to promote BIAs, including that BIAs were a secure method of collecting interest. In addition, Defendants and BlockFi omitted and concealed material information concerning the risks associated with BIAs. In particular, Defendants and BlockFi concealed information concerning its rampant acts of self-dealing and conflicts of interest specifically with respect to its being beholden to Cameron and Tyler Winkelvoss (the "Winklevosses") who were substantial corporate investors of BlockFi, owned and controlled BlockFi's major custodian of customer assets, Gemini Trust Company, LLC ("Gemini"), and were the issuer of BlockFi default cryptocurrency to BIA account holders, Gemini Dollar. Defendants are sued in their individual capacities and as control persons of BlockFi. No claims are brought against BlockFi or its affiliates.

4.      In addition to the undisclosed risks and conflicts of interest posed by their ties to the Winklevosses, Gemini, and Gemini Dollar, Defendants and BlockFi concealed their leverage and exposure to fraud by FTX Trading, Ltd. ("FTX") and Sam Bankman-Fried's trading firm Alameda Research ("Alameda"). Unbeknownst to Plaintiff and Class members, both BlockFi and its custodian who were holding all of its BIA customer assets, were greatly exposed to the FTX fraud due to loans made and credit extended.

5.      When the crypto markets collapsed as a result of the failure of Three Arrows Capital ("3AC") and the downfall and exposure of Sam Bankman-Fried and FTX in 2022, BlockFi's house of cards collapsed.

6.      On or about November 16, 2022, BlockFi froze withdrawals and refused to honor redemptions from investors for BIAs, resulting in investors, including Plaintiff losing their entire holdings.

7.      John Jay Ray III, who was appointed by the bankruptcy court with the approval of the United States Trustee to oversee the bankruptcy of FTX, testified to the House Committee on Financial Services on December 13, 2022, that what occurred at FTX, was "really just old-fashioned embezzlement."[2]

8.      Mr. Ray further testified that FTX and Alameda did not maintain sufficient or adequate records of their business dealings ("my ability to comment on certain matters today will be materially limited by the state of FTX Group's books and records . . . we are, in many respects, starting from near-zero in terms of the corporate infrastructure and record-keeping that one would expect to find in multi-billion dollar international business").[3]

9.      On November 17, 2022, Mr. Ray stated in a sworn declaration to the District of Delaware Bankruptcy Court that despite having been involved in the bankruptcies of Enron, Residential Capital, Nortel, and Overseas Shipholding:

> Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

---

[2] https://www.cnbc.com/2022/12/13/live-updates-ftx-collapse-house-lawmakers-hold-hearing-following-arrest-of-founder-sam-bankman-fried.html#:~:text=John%20J.,really%20just%20old%20fashioned%20embezzlement (last accessed February 24, 2023).

[3] Testimony of John J. Ray III, CEO, FTX Debtors, *House Financial Service Committee* (Dec 13, 2022).

10.     In addition, Defendants and BlockFi made numerous misleading statements about the safety, security, and overall financial health of BlockFi and assets being held for the benefit of Plaintiff and Class members.

11.     The allegations of this Complaint are based on information that became publicly available only in November 2022 with the bankruptcies of BlockFi and FTX.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this controversy pursuant to 15 U.S.C. § 78aa as this action is a claim under the Securities Act of 1933 and Section 27 of the Securities Exchange Act of 1934. The claims arise out of Sections 5, 11, 12, and 15 of the Securities Act of 1933 and Sections 10(b) and 20 of the Securities Exchange Act of 1934. The Court has supplemental jurisdiction over the action under 28 U.S.C. § 1367.

13.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business[4] here and engaging in activities having an effect in this District.

14.     In connection with the acts and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, courier services, electronic mail ("email"), text messages, WhatsApp, and interstate wire and telephone communications.

## THE PARTIES AND NON-PARTY CORPORATE ENTITIES

---

[4] To date the Commonwealth of Massachusetts alone, not including business and individuals in the Commonwealth, has submitted approximately $600,000.00 in claims against BlockFi in the Bankruptcy proceeding.

15.     Plaintiff Antonie Elas is a resident of Brockton, Massachusetts. Mr. Elas opened a

BlockFi BIA account, operated and controlled by Defendants and BlockFi, from his residence in

Massachusetts. On or about February 9, 2021, Elas made an initial ACH transfer from his U.S.

bank account of $100 to open his BlockFi BIA account. Elas therefore purchased an unregistered

security from BlockFi in the form of a BIA account. As set forth in the attached Certification, he

continued to purchase unregistered securities from BlockFi under false pretenses until January

20, 2022 and received interest up until October 31, 2022.

16.     Upon opening his account, BlockFi gave Elas an allocation of stablecoin to

choose to purchase. The top of the list and default selection was for Gemini Dollar, which at the

time was offering an interest rate of 8.6%.[5] Gemini Dollar, which was owned and controlled by

BlockFi's Custodian Gemini Trust Company, was BlockFi's stablecoin of choice for allocation

in BIAs. Indeed, as set forth in the attached Certification, in total, Elas invested over $439,000

which were allocated to Gemini Dollar. At the time of BlockFi halting withdrawals from BIAs,

Mr. Elas' account holdings were valued at $466,454.44.

17.     BlockFi, a Delaware corporation, filed for bankruptcy on November 28, 2022 in

the Bankruptcy Court for the United States District Court in the District of New Jersey.

BlockFi's principal place of business is in Jersey City, New Jersey. BlockFi is not a defendant in

this case.

18.     BlockFi Lending LLC ("BlockFi Lending") is a Delaware limited liability

corporation, formed in 2018, and is a wholly owned subsidiary of BlockFi, and also has its

principal place of business in Jersey City, New Jersey. BlockFi Lending filed for bankruptcy on

---

[5] https://web.archive.org/web/20210205122834/https://blockfi.com/rates/

November 28, 2022, in the Bankruptcy Court for the United States District Court in the District of New Jersey. BlockFi Lending is not a defendant in this case.

19.    BlockFi Trading LLC ("BlockFi Trading") is a Delaware limited liability corporation, formed in May 2019, and is a wholly owned subsidiary of BlockFi and has its principal place of business in Jersey City, New Jersey. BlockFi Trading filed for bankruptcy on November 28, 2022 in the Bankruptcy Court for the United States District Court in the District of New Jersey. BlockFi Trading is not a defendant in this case.

20.    BlockFi, BlockFi Lending, and BlockFi Trading are together referred to as "the BlockFi Entities."

21.    Defendant Zac Prince ("Prince") co-founded BlockFi in October 2017 for the purpose of providing credit services to the cryptocurrency market. Prince was named CEO of BlockFi. Prince was responsible for all public statements published or emanating from BlockFi, including all those referenced in this Complaint. Among them was that BlockFi should be considered by investors and depositors as a "bank" for those in the cryptocurrency market.

22.    Defendant Flori Marquez ("Marquez") was a co-founder with Prince of BlockFi and in October 2017 Marquez was named COO of BlockFi. Marquez, along with Prince, was responsible for all public statements published or emanating from BlockFi including all those referenced in this Complaint. Among them was that BlockFi should be considered by investors and depositors as a "bank" for those in the cryptocurrency market.

23.    Defendant Amit Cheela ("Cheela") was the BlockFi Chief Financial Officer. Cheela was responsible for overseeing all corporate finance, capital markets, treasury, strategic planning, and corporate development. Cheela was responsible for all public statements about the business of BlockFi within his areas of responsibility.

24.     Defendant David Olsson ("Olsson") was Global Head of Institutional Distribution
of BlockFi until his resignation in September 2022, as the events described in this Complaint
were unfolding and in the days before the fall of BlockFi and its bankruptcy. Olsson was
responsible for all public statements about the business of the BlockFi entities within his area of
responsibility.

25.     Defendant Samia Bayou ("Bayou") was Global Head of Private Client Investors
of BlockFi until her resignation in September 2022, as the events described in this Complaint
were unfolding and in the days before the fall of BlockFi and its bankruptcy. She was
responsible for all public statements about the business of the BlockFi entities within her area of
responsibility.

26.     Defendants Prince, Marquez, Cheela, Olsson, and Bayou are collectively referred
to as "Defendants."

## FACTUAL ALLEGATIONS

27.     BlockFi was founded in 2017 and marketed itself as a "bank" to take deposits and
act as an intermediary as if it were a commercial bank regulated by Federal and State law.
BlockFi stated that it would provide "credit" to others in the crypto market and, as such,
described itself as a bank, indicated it would be prudent with the use of its depositors' money,
and have adequate reserves. According to BlockFi, its "mission" was to "redefine banking":

> Founded in 2017 by Zac Prince and Flori Marquez, the company
> was created with the goal of providing credit services to markets
> with limited access to simple products like a savings account.
> BlockFi sets itself apart from other cryptoasset service providers by
> pairing market-leading rates with institutional-quality benefits. The
> company is the only independent lender with institutional backing
> from investors that include Valar Ventures, Galaxy Digital, Fidelity,
> Akuna Capital, SoFi and Coinbase Ventures. The BlockFi team
> consists of professionals with a deep bench of expertise across
> financial services and technology with offices in New York, New

Jersey, Poland, and Argentina. Additionally, Gemini Trust Company, LLC, a New York trust company regulated by the New York State Department of Financial Services, is BlockFi's primary custodian.[6]

28.     On its website: BlockFi told investors: "Earn more from your crypto. With a BlockFi Interest Account (BIA), your cryptocurrency can earn up to 8.6% APY. Interest accrues daily and is paid monthly. There are no hidden fees, no minimum balances, and no reason to wait."[7]

29.     From the outset, BlockFi did not conduct its activities as a bank would. It did not have adequate reserves and lent its depositors' money out imprudently and without proper due diligence into the credit worthiness of its creditors or with a credit officer responsible for assuring the continued credit worthiness and safely of the loans made. Indeed, the entirety of its business model depended, without disclosure, upon cryptocurrency always increasing when compared with fiat money, that is money issued by governments and backed by the full faith and credit of the government, a tax collecting entity, and issued by law to be accepted within the borders of that country for all transactions and debts. Yet BlockFi did not secure its debts with adequate collateral.

30.     On or about March 4, 2019, BlockFi began to publicize and offer BIAs to the public with acceptance into BIA interest deposits of United States Dollars and/or crypto currency. These BlockFi Interest Accounts offered to pay compound interest, on a month-to-month basis, of 6%-8% at a time when the typical interest rate on a savings or checking account in a bank in the United States was much lower. The interest rate could vary month to month upon

---

6 https://web.archive.org/web/20210429112438/https://www.blockfi.com/mission
[7] https://web.archive.org/web/20210429112438/https://www.blockfi.com/crypto-interest-account

notice to depositors by BlockFi. Depositors could withdraw the accounts or part of the accounts at any time and be paid in United States Dollars.

31.     On March 20, 2019, BlockFi announced that BIAs experienced significant growth, asserting that BIAs "provide[d] the average crypto investor with the tools to build their wealth" and it "look[ed] forward to giving even more investors a chance to earn a yield on their crypto."

32.     On April 1, 2019, BlockFi began to "tier" the interest rates that investors received, initially announcing that "BIA balances of up to and including 25 [Bitcoin] or 500 [Ether] (equivalent to roughly $10,000 and $70,000 respectively) will earn the 6.2% APY interest rate. All balances over that limit will earn a tiered rate of 2% interest."

33.     BlockFi promised BIA investors a variable interest rate, determined by BlockFi on a periodic basis, in exchange for the assets loaned by the investors, who could demand that BlockFi return their loaned assets at any time. BlockFi thus borrowed the assets in exchange for a promise to repay with interest. Investors in the BIAs had a reasonable expectation of obtaining a future profit from BlockFi's effort in managing the BIAs based on BlockFi's statements about how it would generate the yield to pay BIA investors interest. Investors also had a reasonable expectation that BlockFi would use the invested assets in BlockFi's lending and principal investing activity and that investors would share profits in the form of interest payments resulting from BlockFi's efforts. BlockFi offered and sold the BIAs to the general public to obtain assets for the general use of its business, namely, to run its lending and investment activities to pay interest to BIA investors and promoted the BIAs as an investment.

34.     Upon receiving cash deposits into BIAs, BlockFi would convert those into crypto currency for its lending business. It would also accept crypto currency deposits into BIAs for its lending business.

35.     BlockFi represented to its BIA customers, including Plaintiff and the members of the Class, that its transactions were prudent, properly collateralized, and as with any bank, done only after due diligence to assure the credit worthiness of the counterparty, such as FTX and Alameda.

36.     BIA customers, including members of the Class, were ensured that their funds were lent out to "trusted institutional and corporate borrowers. To ensure loan performance, BlockFi typically lends crypto on overcollateralized terms."[8]

37.     Indeed, BlockFi held out to the public, including its BIA customers, that it took an aggressive stance towards risk management and a "thorough analysis of our counterparties to understand their financial standing and ongoing ability to repay loans."[9] "A critical aspect of credit risk is managing concentration to help ensure we don't take on too much risk to any single borrower."[10]

38.     Moreover, to support this risk management philosophy and assuage BIA investors' concerns of the risks associated with their products, BlockFi and Defendants represented on their website that they had "[l]iquidity buffers (a.k.a. funds-on-hand) help to ensure we have sufficient liquidity to support client withdrawal requests, even under periods of elevated withdrawal demand."[11]  BlockFi further stated that it had a "multi-disciplinary team,"

---

[8] https://web.archive.org/web/20190401041158/https://blockfi.com/earn-bitcoin-interest/ (last accessed Feb 10, 2023).
[9] https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed Feb 9, 2023).
[10] *Id.*
[11] *Id.* (emphasis added)

meeting regularly to "ensure we have sufficient liquidity at all times to meet/exceed client expectations…The framework has helped us ensure all client redemption and withdrawal requests to date have been processed…even during periods of extreme stress in crypto and broader financial markets."[12]

39.     Defendant Prince reinforced these falsehoods during a May 2021 appearance on the podcast Modern Finance. During the interview, Prince stated that "[w]e are in the business of risk management at BlockFi." Further downplaying the risk of investing in specifically the BIAs, Prince stated, "[i]n order for any discrete customer at BlockFi to lose money, BlockFi would have to lose all of our money first." "BlockFi's equity is its insurance."[13]

40.     As a matter of fact, it was a complete lack of transparency and upholding of these sham risk management policies that resulted in the systemic losses to Plaintiff and Class members. Indeed, it was in large part the over $1.2 billion in loaned assets tied up in FTX and Alameda which lead to its collapse.[14]

41.     Prior to its fall in November 2022, BlockFi generated the interest paid out to BIA investors by deploying assets in various ways, including loans of crypto to institutional and corporate borrowers, and by investing in equities and futures. As of December 8, 2021, BlockFi and its affiliates held approximately $10.4 billion in BIA investor assets for approximately 572,160 BIA investors, including 391,105 investors in the United States.

42.     At all relevant times, BlockFi represented that it earned interest on the assets borrowed from BIA investors by lending those crypto assets to institutional borrowers.

---

[12] *Id.*
[13] https://modern.finance/episode/block-fi/ (last visited Feb. 9, 2023).
[14] https://financefeeds.com/bitcoin-rally-inflates-blockfis-exposure-to-ftx/

Beginning in September 2020, BlockFi disclosed on its website that it also purchased "SEC-regulated equities and predominantly CFTC-regulated futures using BIA assets."[15]

43.     BIA investors were permitted at any time until November 2022 to withdraw the equivalent of the crypto assets held in their BIAs, with some limitations, and could borrow money in U.S. Dollars against the amount of crypto assets deposited in BIAs.

44.     BlockFi adjusted the interest rates payable on BIAs for particular crypto assets periodically, typically at the start of each month, providing an opportunity for BIA investors to withdraw all or part of the BIA assets.

45.     BlockFi offered and sold the BIA securities to investors, including retail investors, through advertising and general solicitations on its website, www.blockfi.com. BlockFi also promoted distribution of the BIA offering through its social media accounts, including YouTube, Twitter, and Facebook. In addition, through its "partner" program, an affiliate marketing program in which participants could "earn passive income by introducing your audience to financial tools for crypto investors," BlockFi extended its distribution of the BIA securities to retail investors through certain offers and promotions.

46.     BlockFi had marketed the BIA accounts as risk free, yielding 6.2 percent interest, more than depositors at banks could get anywhere else. BlockFi's marketing materials and sales agents said BIA depositor investments were safe and redeemable at any time, and investors took them at their word.[16]

---

[15] https://www.sec.gov/litigation/admin/2022/33-11029.pdf
[16] https://web.archive.org/web/20190716140556/https://blockfi.com/crypto-interest-account/ (last accessed Feb 10, 2023).

47.     BIA investors poured money into BIAs having been led to believe by BlockFi that BlockFi acted as a bank and that the cryptocurrency industry was a stable financial system. But BlockFi lacked the basic protections offered by a brokerage or a bank.[17]

48.     "These companies are all giving the impression of bank like security," said Joshua Fairfield, a professor at Washington & Lee Law School who specializes in technology issues. "These companies want to have customer trust but with none of the responsibility that comes with a regulated financial entity. And that just doesn't work."

49.     BIAs were securities and BlockFi offered and sold the BIAs as investment contracts without registering these securities with the SEC for sale to customers, in violation of Section 5 of the Securities Act of 1933.

50.     BlockFi offered and sold these securities without a registration statement filed or in effect with the SEC.

51.     BlockFi did not have a Securities Act of 1933 registration statement filed or in effect with the SEC for the offer and sale of the BIAs nor did the offer and sale of BIAs qualify for an exemption from registration under the Securities Act.

52.     BlockFi regularly promoted the profits investors could earn, and would earn, by investing in BIA and making monthly investment decision to invest in BIAs. When announcing the BIA, BlockFi promoted the interest earned, promising "an industry – leading 6.2 [annual percentage yield]" compounded monthly. BlockFi described it as "an easy way for crypto investors to earn bitcoin as they HODL" – a purposeful misspelling of "hold" and an acronym as "hold on for dear life," denoting buy and hold strategies in the context of crypto assets.

---

[17] https://www.nytimes.com/2022/12/05/business/cryptocurrency-investors-ftx-blockfi.html (last accessed February 24, 2023).

53. Even when changing the interest rate customers received, BlockFi promoted the yields to investors. On August 27, 2021, BlockFi stated that the adjustments to interest rates are done "with the goal of maintaining great rates for the maximum number of clients."

54. On January 1, 2021, BlockFi advertised that it had "distributed more than $40 million in monthly interest payments to [its] clients."

55. As of November 1, 2021, the interest rates BlockFi paid investors ranged from 0.1% to 9.5% depending on the type of crypto assets and the size of the investment.

56. In July 2021, the New Jersey Bureau of Securities issued a cease-and-desist order, claiming that BlockFi's BIAs were "unregistered securities" and banned BlockFi from creating new BIAs. Shortly thereafter Alabama and Texas issued their own orders, which were followed by Vermont, and Kentucky. Thereafter the SEC opened an investigation which concluded that BlockFi had violated the Securities Act of 1933.

57. In February 2022, BlockFi settled with the SEC for $100 million over the BIAs. It registered with the SEC for new BIA accounts but from mid – February 2022 on, it did not offer the BIAs to new investors in the United States. Existing investors were prevented from adding new money to their BIAs, however they were permitted to continue to accumulate interest in those BIAs and BlockFi continued to announce the month-by-month interest decisions. The existing BIA investors were not provided any information about the registration with the SEC or provided information about the availability of a prospectus or offering statement – neither of which can be located in the files of the SEC. Gary Gensler, Chair of the SEC, is reported to have stated, "[t]oday's settlement makes clear that crypto markets must comply with time-tested securities laws."

58.     As part of the settlement with the SEC, BlockFi promised to cease offering BIAs to new investors in the United States and cease accepting further investments or funds in the BIAs by current U.S. investors.

59.     BlockFi violated its promises, outlined in the settlement with the SEC, by continuing on a monthly basis to operate the BIA accounts. The accounts did not offer immediate repayments, but instead offered a new monthly interest rate for the purpose and intent of inducing the investors to hold the BIA accounts, not close the accounts, and continue to make new investments through promised receipt of monthly interest. BlockFi did so throughout the class period until its bankruptcy.

60.     As part of the settlement with the SEC, BlockFi promised to, within 60 days, comply with Section 7(a) of the Investment Company Act by either: (a) filing a notification of registration pursuant to Section 8(a) of the Investment Company Act and then within 90 days of filing such notification of registration fling a registration statement with the SEC; or (b) completing steps such that BlockFi would no longer be required to be registered under Section 7(a) of the Investment Company Act, all in preparation of a formal public offering on Form S-1 Registration Statement.

61.     In fact, BlockFi did none of these things. It arranged for a company called Akura Trust Company ("Akura") to become an indenture trustee (the "Trustee" under an Indenture ("the Indenture") dated April 14, 2022 related to the BIAs registered on the books and records of BlockFi as owned by investors in the United States. Akura was also to advise the BIA investors of this proposed change in their accounts, provide an offering to accept this arrangement, and properly register the offering documents and make the offering pursuant to SEC regulation. Those steps of notification, offer, and supply of offering documents were never done and the

15

ability of BIA investors to remove their accounts for the accumulated principal and interest was never made.

62. On or about December 9, 2022, BIA account holders were advised for the first time of the existence of Akura and that Akura "intended to file a proof of claim in the bankruptcy case of BlockFi." According to newspaper accounts that proof of claim is for approximately $729 million.[18]

63. Between March 2022 and June 2022, BlockFi's valuation sank by two-thirds to $1 billion. At the end of June 2022, BlockFi reported it held $1.8 billion in open loans and $600 million of exposure.

64. During the summer of 2022, several of BlockFi's major debtors filed for bankruptcy including Three Arrows, Voyager Digital, and Celsius Network.

65. On September 8, 2022, it was announced that three senior executives of BlockFi had resigned including Defendants David Olsson, Global Head of Institutional Distribution, and Samia Bayou, Global Head of Private Client Investors, as well as Shane O'Callaghan, Senior Director of Institutional Sales for Europe, Middle East, and Africa.

66. Although BlockFi's largest debtors, FTX and Alameda, owed it close to $1 billion, instead of insisting on repayments, which neither FTX nor Alameda could do as BlockFi well knew, it accepted a $400 million dollar line of credit from FTX US (of which it drew down $275 million) with the option for FTX US to purchase BlockFi for $25 million then in August 2022 for $15 million, thus disguising its exposure and interconnectedness to FTX and its affiliated companies, including Alameda, and their principles, if certain conditions were not

---

[18] Kevin Simauchi and Hannah Miller, *Crypto Lender BlockFi Goes Bankrupt in Aftermath of FTX Meltdown*, TIME, Nov. 28, 2022. Available at https://time.com/6237142/blockfi-bankruptcy-ftx/.

satisfied, such as receiving SEC clearance to operate its BIAs in the United States, which it had never received.

67.     At the time of these arrangements with FTX and Alameda, some of BlockFi's creditors had sizable positions of ownership with FTX and/or Alameda including Winklevoss Capital, and Galaxy Digital who together were owned $976.8 million by FTX.

68.     Moreover, the Winklevosses were not only major creditors and owners of BlockFi, through the sizeable investments their investment arm, Winklevoss Capital, made in four rounds of venture fundraising BlockFi had offered from 2019 through 2020, as stated above, they were also owners and controllers of Gemini Trust Company, BlockFi's custodian for its BIAs, and owner and issuer of Gemini Dollar its preferred stablecoin. In essence, not only was BlockFi exposed to FTX, but due to the intertwined nature of its relationship, BlockFi was also exposed to Gemini.

69.     Additionally, among BlockFi's financial investors was Morgan Creek Digital which invested $50 million in BlockFi in a Series C round of financing. In September 2022 Morgan Creek tried to raise $250 million to purchase a majority stake in BlockFi. Morgan Creek's plan to rapidly assemble an equity offer was hatched in response to crypto exchange FTX's announcement that it would extend a $250 million credit line to BlockFi. The FTX credit line proposal had a catch for BlockFi's existing shareholders: it gave FTX the option to buy BlockFi "at essentially zero price."[19] If FTX were to exercise this option, it would effectively wipe out all of BlockFi's existing equity shareholders, including management and employees with stock options, as well as all equity investors in the company's previous venture rounds.

---

[19] Tracy Wang, *Morgan Creek is Trying to Counter FTX's BlockFi Bailout, Leaked Call Shows*, Jun. 25, 2022 ( available at https://www.coindesk.com/business/2022/06/25/morgan-creek-is-trying-to-counter-ftxs-blockfi-bailout-leaked-call-shows/).

70.     In November 2022, FTX, Alameda and its affiliates collapsed and filed for
bankruptcy followed shortly thereafter by BlockFi, which in the FTX/Alameda bankruptcy
proceedings claims to be owed approximately $1 billion, much of it investor money in the BIAs.

71.     On November 8, 2022 before halting trading, Defendant Marquez misrepresented
to customers BlockFi's exposure to FTX and BlockFi's ability to operate as normal. Moreover,
Defendant Marquez misled Plaintiff and Class members that the money they had in their BIAs
was not at risk:



72.    On November 11, 2022, a few days after FTX collapsed, BlockFi advised its

customers that they could not withdraw their deposits because BlockFi had "significant

exposure" to FTX, including funds BlockFi had hoped to draw on under its agreement with FTX

and other assets held on the FTX platform.

73.     On November 11, 2022, California's Department of Financial Protection and Innovation revoked BlockFi's lending license.[20]

74.     On November 14, 2022, BlockFi downplayed its exposure to FTX, lulling its customers into a false sense of security. BlockFi told its customers that despite its exposure to FTX "had the necessary liquidity to explore all options."[21] When in reality the exposure to FTX was much greater than it was disclosing to customers.

75.     On November 28, 2022, BlockFi filed for protection under Chapter 11 of the U.S. Bankruptcy Code, citing its exposure to FTX as the reason for its insolvency.

76.     On November 28, 2022, BlockFi Inc. and 8 affiliated debtors (collectively, the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (Trenton). The cases are pending before the Honorable Michael B. Kaplan, and the Debtors have requested that their cases be jointly administered under Case No. 22-19361. In its first-day filing, BlockFi indicated that it had somewhere between $1 billion and $10 billion in total assets, as well as between $1 billion and $10 billion in liabilities. The lender has greater than 100,000 creditors, and about $257 million in cash on hand, some of which it generated by liquidating crypto holdings.

77.     BlockFi has about $355 million in cryptocurrencies currently frozen on the crypto exchange according to a statement made by FTX, attorney Joshua Sussberg to the U.S. Bankruptcy Court on Tuesday, December 13, 2022. The $355 million is on top of another $671

---

[20] https://dfpi.ca.gov/2022/12/19/dfpi-moves-to-revoke-blockfis-ca-financing-law-license/
[21] https://cointelegraph.com/news/blockfi-denies-rumors-that-majority-of-its-assets-were-held-on-ftx (last visited Feb 9, 20203).

million in loan to FTX sister company Alameda Research. Alameda has defaulted on the loan as well.

## FALSE AND MISLEADING STATEMENTS BY BLOCKFI AND DEFENDANTS

78.     BlockFi and Defendants made materially false and misleading statements on its website starting from March 4, 2019, concerning its collateral practices, and therefore, the risks associated with its lending activity. In fact, these collateral practices and those risks were never modified despites changes in representations.

79.     Commencing not later than March 4, 2019, BlockFi operated as an unregistered investment company because of its issuance of BIAs and until its bankruptcy it was an issuer of securities, engaged in the business of investing, reinvesting, owning, holding, or trading in securities and owning investment securities having a value exceeding 40% of its total assets.

### BlockFi and Defendants Misrepresented the Level of Risk in BIA Investments

80.     BlockFi and Defendants made material misrepresentations to BIA investors concerning the level of risk in its loan portfolio. Beginning at the time of the BIA launch on March 4, 2019 and continuing to its bankruptcy filing on November 28, 2022, BlockFi and Defendants made statements in multiple website posts that its institutional loans were "typically" over-collateralized, when in fact, most institutional loans were not. As a result, BlockFi's statement materially overstated the degree to which it secured protection from defaults by institutional borrowers through collateral.

81.     Although BlockFi and Defendants made other disclosures on its website regarding BlockFi's risk management practices, because of the misrepresentation and omission about the level of risk in its loan portfolio, BIA investors did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by its institutional borrowers,

BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand.

**BlockFi Operated as an Unregistered Investment Company**

82.    As the issuer of the BIA, BlockFi is an "issuer" for purposes of the Investment Company Act.

83.    After the launch of the BIA, BlockFi pooled the crypto assets it borrowed, and commingled and rehypothecated these crypto assets received from investors in the BIAs with BlockFi's other assets, including collateral received from institutional borrowers. As BlockFi took ownership of the loaned crypto assets from investors in the BIAs, BlockFi used the commingled assets to, among other things, make loans to institutional and retail borrowers, stake crypto assets, and purchase crypto asset trust shares and interests in private funds.

84.    From at least December 31, 2019 to at least September 30, 2021, BlockFi owned certain investment securities, as defined by Section 3(a)(2) of the Investment Company Act—such as loans of crypto assets and U.S. dollars to counter parties, investments in crypto asset trusts and funds, and intercompany receivables—exceeding 40% of the value of its total assets (exclusive of Government securities and cash items) on an unconsolidated basis. For example, as of December 31, 2020, BlockFi held loans to counter parties valued at over $1.9 billion, investments in crypto asset trusts and funds valued at approximately $1.5 billion, and intercompany receivables valued at approximately $847 million, which together constituted well over 40% of its approximately $4.8 billion in total assets.

85.    As an issuer holding over 40% of the value of its total assets in investment securities from at least December 31, 2019 on, BlockFi was an investment company.

86.    Although BlockFi was an "investment company," it did not register with the SEC as an investment company, meet any statutory exemptions or exclusions from the definition of an investment company, or seek an order from the SEC declaring that it was primarily engaged in a business other than that of investing, reinvesting, owning, holding, or trading in securities, or exempting it from complying with any provisions of the Investment Company Act or the rules thereunder.

**Failures to Comply With the Disclosure Requirements of the Securities Act of 1933 With Respect to the Issuances of the BIAs.**

87.    BlockFi BIAs were an investment, specifically a way for investors to earn a consistent return on crypto assets and to "build their wealth."

88.    BlockFi did not have a registration statement filed or in effect with the SEC for the offers and sales of BIAs, nor did it qualify for an exemption from registration under the Securities Act for those offers and sales.

89.    As a consequence, BIAs were issued without compliance with the law and the investors lacked the protections that the Investment Company Act would have supplied.

90.    From March 2019 through August 2021, BlockFi and Defendants misrepresented on the BlockFi website that its institutional loans were "typically" over-collateralized. In fact, most institutional loans were not.

91.    Furthermore, BlockFi and Defendants, throughout the Class Period, misrepresented risk management practices. These included BlockFi's relationship with FTX and its affiliates, the concentration of its loans to FTX, and the inability of FTX to repay those loans when due. Indeed, when the crypto currency market fell two-thirds during 2022, BlockFi announced an arrangement of a line of credit with FTX and a provision that FTX could buy

BlockFi for as little as $25 million at a time that BlockFi had loaned to FTX BIAs and other customer cryptocurrencies worth approximately $1 billion. Investors in BIAs did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by BlockFi's institutional borrowers, BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand. This false and misleading statement was in the offer and sale of BIAs, and as such was in the offer and sale of deployment of the loaned assets, the BIA investors' fortunes were also linked to those of the promoter, *i.e.*, BlockFi.

92.     Indeed, BlockFi and Defendants had joined a scheme to conceal from the investors of BlockFi the instability of FTX, its financial weaknesses, and its inability to repay BlockFi the loans it made to FTX and its affiliates. Only after FTX filed for bankruptcy protection was the extent of BlockFi's exposure to FTX and its affiliates as well as the lack of necessity for the loan/buyout arrangements made known by BlockFi and FTX in the fall of 2022.

93.     BlockFi and Defendants knew these facts from the due diligence it claimed to carry out as part of its investment protocol or was reckless in not knowing because of the lack of applicable and expected bookkeeping and other financial records at FTX and Alameda.

## CLASS ALLEGATIONS

94.     Plaintiff Elas brings this action individually and on behalf of the following Class consisting of all persons in the United States who purchased or enrolled in a BIA issued by BlockFi or one of its corporate affiliates from March 4, 2019, the date that BlockFi first issued and sold BIA to U.S. investors, to and including November 28, 2022, the date that BlockFi filed for bankruptcy protection. Excluded from the Class are: the Defendants to this action, corporate officers, members of the boards of directors, and senior executives of BlockFi and its affiliates;

members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants and/or BlockFi and any of its affiliates have or had a financial interest such that they or any of them could influence its operations (the "Class").

95.    Plaintiff Elas also brings this action individually and on behalf of the following Class consisting of all persons in Massachusetts who purchased or enrolled in a BIA issued by BlockFi or one of its corporate affiliates from March 4, 2019, the date that BlockFi first issued and sold BIA to U.S. investors, to and including November 28, 2022, the date that BlockFi filed for bankruptcy protection. Excluded from the Class are: the Defendants to this action, corporate officers, members of the boards of directors, and senior executives of BlockFi and its affiliates; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants and/or BlockFi and any of its affiliates have or had a financial interest such that they or any of them could influence its operations (the "Massachusetts Subclass").

96.    **Numerosity.** The members of the Class include approximately 300,000 individual investors who live throughout the United States. Joinder of each member of the Class is impracticable and their individual identities including addresses, contact information and investment interests in BIAs is among the records of the bankrupt entities of BlockFi and its affiliates. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of BlockFi and its affiliates.

97.    **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Class and these common questions can be proved efficiently though a single proceeding and predominate over any questions affecting only individual Class members.

98.     These common legal and factual questions include, but are not limited to, the following:

a)  whether the BIAs were securities required to be registered securities pursuant to the Securities Act of 1933;

b)  whether the offerings and sales of BIAs violated the registration provisions of the Securities Act;

c)  whether BIAs were offered by BlockFi for sale to investors on a month-to-month basis with investors being given the opportunity to accept or not to accept the investment offered and if not accepted received back the principal plus accumulated interest indicated for their BIA accounts at BlockFi;

d)  whether Defendants were controlling persons of BlockFi and responsible for the decision not to register the BIAs or to provide proper offering information such as a prospectus and/or other offering document filed with the SEC;

e)  whether Defendants were controlling persons of BlockFi and responsible for the information provided to potential investors in BIAs on a month to month basis and were further responsible for and acted with recklessness or knowledge of the misrepresentations and misstatements described there in violation of the Securities Act and the Securities Exchange Act of 1934;

f)  whether Defendants are liable to Plaintiff and the Class, for the violations of the federal securities laws alleged herein; and

g)  The type and measure of damages suffered by Plaintiffs and the Class.

99.    **Typicality**. Plaintiff's claims are typical of the claims of the other members of the Class in that, among other things, each Class member is similarly situated and are comparably injured through wrongful conduct alleged herein by one or more of the defendants as alleged herein.

100.    **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel that are experienced in national and complex securities class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class. Furthermore, Plaintiff has no interests that are antagonistic to those of the Class or Subclasses.

101.    **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendants. It would, thus, be economically unfeasible for any member of the Class to bring these claims on an individual basis and to obtain effective redress for the wrongs committed against them particularly as both BlockFi and its affiliates and FTX and its affiliates are in bankruptcy. Furthermore, the court system could not efficiently deal with the 300,000 individual lawsuits filed nationally which in any event could create inconsistent rulings and judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.

### COUNT ONE[22]
### Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder

---

[22] Pursuant to Mass. G. L. Ch. 93A, Plaintiff sent a written demand letter to Defendants on the date of the filing of this Complaint. Should the good faith negotiations resulting from that letter be unsuccessful, Plaintiff reserves the right to amend the complaint to add a claim under 93A.

102.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 102 as if fully set forth herein.

103.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiff and the members of the Class, as alleged herein; and (ii) caused Plaintiff and the other members of the Class to purchase BIAs on a month to month basis, without fully disclosing the risks of the investment including the operations and procedures of BlockFi and the concentration of BlockFi's loans with FTX, for which it allegedly did sufficient due diligence and a bank lending tens of millions of dollars. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

104.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the BIAs in an effort to have funds to lend and in a unsafe and concentrated matter to FTX and its affiliates, primarily Alameda in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

105.    Each Defendant is sued either as a primary participant in the wrongful and illegal conduct alleged herein or as a controlling person of BlockFi and its affiliates, also as alleged below.

106.    Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the BIAs. These Defendants employed devices, schemes and artifices to defraud while in possession of material

28

adverse non-public information and engaged in acts, practices, and a course of conduct alleged

herein including the making of, or the participation in the making of, untrue statements of

material facts and omitting to state material facts necessary in order to make the statements, in

light of the circumstances under which they were made, not misleading and engaged in

transactions, practices, and a course of business which operated as a fraud and deceit upon the

purchasers of BIAs securities during the Class Period.

107.    Defendants misrepresented and failed to disclose it utter failure to comply with

the law of the United States including the federal securities laws under the Securities Act; the

Securities Exchange Act and the Investment Company Act; that was in the business of selling

securities to raise money to lend to other institutions; that it was a bank and not an Investment

Company; that its securities were unregistered; and that it had not provided the Plaintiff and

Class members with the appropriate information required by the federal securities laws prior to

offering and accepting the BIA monthly investments.

108.    Defendants misrepresented and failed to disclose BlockFi's failure to register the

BIA securities under the Securities Act of 1933 and/or the Trust Indenture Act and failed to

provide the potential investors prior to any acceptance of their monthly offerings appropriate

prospectuses or other offering documents filed with the SEC.

109.    Defendants attempted to place all BIAs by United States investors in a Trust

under the Trust Indenture Act and limit or eliminate rights that BIA investors had for direct

actions against BlockFi and Defendants for its failure to prudently invest BIA money.

110.    Defendants failed to disclose any information about the concentration of its crypto

Counterparties including that it had concentrated its investing with FTX and Alameda of

approximately $729 Million or more and could not redeem those investments. Instead

Defendants represented that BlockFi was required to borrow from FTX (that owed it three quarters of a billion dollars or more of BIA money) with an option of FTX to buy BlockFi at less than 4% of what was owed by FTX and Alameda. Neither Plaintiff nor Class members had any way to know that BlockFi was working with undercapitalized borrowers and, in fact, had joined with FTX as a single entity to extract funds from US investors to support FTX, Alameda, and other uncapitalized borrowers such as Celsius, and Three Arrow Capital.

111.    Defendants failed to disclose BlockFi's relationship with FTX or that in agreeing to extend not less than $729 million in credit to FTX and Alameda, BlockFi had not conducted at a minimum a credit analysis or due diligence or if it had done so, it would have found the lack of records, and basis documents required of any business such as FTX and Alameda and that hundreds of millions of dollars of FTX and Alameda invested funds were being diverted to the personal use and for political and charitable contributions some of which were controlled by Mr. Bankman-Fried's father.

112.    Defendants failed to disclose that Winklevoss Capital, a major investor/owner of BlockFi (in the amount of $1.9 billion) was also a major owner of GTC, BlockFi's custodian. GTC is also in the business of lending crypto assets to third parties for fees. Accordingly, GTC had an interest in maximizing its rate of return at the expense of BlockFi investors.

113.    Defendants failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders. BlockFi CEO and Defendant Prince admitted in July 2022 that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

114.    Defendants failed to disclose that BlockFi's lending practices profoundly affected BlockFi's solvency because the "collateral" touted by defendants as a foundation of BlockFi's stability and security was illusory and profoundly threatened its solvency.

115.    Defendants failed to disclose that BlockFi had a $1 billion loan out to Three Arrows Capital for which BlockFi reportedly held collateral that was likely rehypothecated by BlockFi.[23]

116.    Defendants misrepresented BlockFi's business claiming it to be a "bank" and a "market intermediary" which exempted it from the SEC registration requests.

117.    Defendants represented that its loans were "typically" over collateralized when in fact most large institutional loans which presented liquidity and concentration of risk damages to BlockFi of its larger institutional loans, such as to FTX and Alameda were not sufficiently collateralized let alone over collateralized. These misrepresentations deprived "complete and accurate information with which to evaluate the risk" to class members investments if BlockFi institutional borrowers defaulted.

118.    Defendants' statements about collateralization were also materially false and misleading for implying that risks of investing in BlockFi were minimal because of its reported "over-collateralization" which was false in itself and further failed to disclose that BlockFi was exposed to additional material risk though its broad range of yield generating activities in addition to borrowing and lending crypto assets and its rehypothecation activity.

---

[23] While BlockFi later reported that the Three Arrows loan was over-collateralized by 30%, it appeared still later that two thirds of that collateral (approximately $1 billion) was cryptocurrency of indeterminate origin. The other third of the collateral was shares of Grayscale Bitcoin Trust ("GBTC") itself a crypto investment product. When BlockFi attempted to liquidate its GBTC collateral the price plunged. Despite the so-called "over-collateralization" of the Three Arrows loans, BlockFi CEO announced that BlockFi lost $80,000,000 when it liquidated the Three Arrows' collateral.

119.    Defendants' public representations about investors' ability to demand monies
back and/or sell the cryptocurrency were also false.

120.    Defendants' primary and controlling personal liability arises from the following
facts: (i) Defendants through any stock ownership, were privy to and participated in the creation,
development, and sales of BIAs and (ii) each of these Defendants knew, was aware of, or
recklessly disregarded BlockFi's dissemination of information to the class that was misleading
false or misleading.

121.    Defendants had actual knowledge of the misrepresentations and omissions of
material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain
and disclose such facts, even though these facts were readily available to them. Defendants'
material misrepresentations and/or omission were done knowingly or recklessly. Defendants'
materially false and misleading statements and omissions clearly demonstrate that, if they did not
have actual knowledge of the misrepresentations and omission alleged, they were reckless in
failing to obtain such knowledge and deliberately refrained from taking the steps necessary to
determine whether those statements were false or misleading.

122.    Had Plaintiff and the members of the Class known the truth regarding BlockFi,
Plaintiff and the Class would not have invested in the BIAs and or would have not continued to
invest on a monthly basis but would have insisted on the repayment of all principal and interest.

123.    Plaintiff and the members of the Class were unaware of the falsity of such
material misrepresentations and omissions and relied upon them when investing.

124.    Plaintiff and the members of the Class were induced to purchase, hold, and refrain
from liquidating their securities in reliance on Defendants' material misrepresentations and

omissions. As a direct and proximate result of their reliance on Defendants' misstatements and/or

omissions, Plaintiff and the members of the Class suffered damages.

125.    As a result of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

126.    Plaintiff and the members of the Class are entitled to damages and/or recission,

statutory interest, costs and attorneys' fees, less any income received on said securities.

**COUNT TWO**
**Violations of Section 12(a)(2) of the Securities Act of 1933**

127.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1

through 127 as if fully set forth herein.

128.    This Claim is brought pursuant to Sections 12(a)(2) of the Securities Act, on

behalf of Plaintiff and the Class against all Defendants. This Claim for Relief is not premised

upon any allegation of conspiracy, fraud, or intentional or reckless conduct.

129.    BlockFi and its affiliates were at all times during the class period "sellers" for

purposes 12(a)(2) of the Securities Act.

130.    Defendants had direct and active participation in the solicitation of Plaintiff's and

Class members' purchases and communicated directly with Plaintiff and the Class through the

advertisements and materials published by BlockFi for their and BlockFi's own financial interest

and are also "statutory sellers" under Section 12(a)(2).

131.    Plaintiff and the other members of the Class acquired BIAs solicited and sold

pursuant to written materials which were materially false and misleading.

132.    Defendants owed to acquirers of BlockFi's securities, including Plaintiff and the

other Class members, the duty to make a reasonable and diligent investigation of the statements

33

contained in solicitation and sales materials and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.

133.     Plaintiff and the other members of the Class acquired BIAs securities solicited by and pursuant to the advertisements and other solicitation materials described herein and neither Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies, and omissions contained in those offering documents.

134.     By virtue of these violations, Plaintiff and the other members of the Class have sustained damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses.

135.     Less than one year has elapsed from the time that Plaintiff discovered the full extent of the facts alleged in this complaint to the time that Plaintiff filed the Complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

136.     Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

137.     The acts of Defendants violated Section 5 of the Securities Act as further described herein. Accordingly, Defendants are liable to Plaintiff and members of the Class under Section 12(a)(1) for damages, disgorgement of ill-gotten gains, and/or recission.

## COUNT THREE
### Unregistered Offer and Sale of Securities in Violation of Sections 5 of the Securities Act of 1933

138.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1through 138 of this complaint as if set forth in full herein.

139.    Plaintiff brings this claim individually and on behalf of the members of the Class against all Defendants.

140.    Defendants made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

141.    The BIAs are securities within the meaning of Section 2(a)(1) of the Securities Act, Plaintiff and members of the Class purchased BIAs securities through BlockFi and pursuant to an unregistered solicitation by BlockFi and without being offered a prospectus or offering documents registered with the SEC.

142.    BlockFi was required to register BIAs, as securities, with the SEC and to provide Plaintiff and the Class with a prospectus or other proper sales documents before offering the securities for sale.

143.    There was never any registration of the BIAs under the Securities Act, no prospectus or other registered selling documents were provided to the investors in BIAs and, as alleged above, the written materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein as more fully set forth in the first claim for relief and within the factual allegations of this Complaint.

144.    By selling unregistered BIAs to Plaintiff and Class members, Defendants violated the Securities Act and are liable for recessionary damages consisting of all deposits including interest left in the BIAs.

145.    As a direct and proximate result of Defendants' sale of BIA securities, Plaintiff and members of the Class suffered damages and/or are entitled to rescission and/or rescissory damages or out of pocket losses and/or equitable relief as appropriate.

**COUNT FOUR**
**Violations of Section 15 of the Securities Act of 1933 (Control Person Liability)**

146.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1through 146 of this complaint as if set forth in full herein.

147.    Plaintiff brings this claim individually and on behalf of the members of the Class against all Defendants.

148.    Under Section 15 of the Securities Act:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

149.    Defendants, by virtue of their respective office, stock ownership, and/or agreements or understanding, during the Class Period, has the power and authority to direct the management and activities of BlockFi and its employees and to cause BlockFi to engage in the wrongful conduct detailed herein.

150.    Defendants, separately or together, had the power to direct or cause the direction of the management and policies of BlockFi and did so during the Class Period, specifically with respect to the BIA program.

151.    Defendants jointly participated in, and/or aided and abetted, BlockFi's sale and solicitation of securities, including BIAs, in violation Section 5 and 12(a)(1) of the Securities Act.

152.    The Defendants, separately or together, jointly participated in BlockFi's failure to register BIAs and submit registration statements.

153.    As a result of the Defendants' conduct, they are liable to Plaintiff and the members of the Class for damages, disgorgement of ill-gotten gains, and/or recission, as well as costs, attorneys' fees, and interest.

## COUNT FIVE
### Violations of Section 20 of the Securities Exchange Act of 1934 (Control Person Liability)

154.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 154 of this complaint as if set forth in full herein.

155.    Plaintiff brings this claim individually and on behalf of the members of the Class against all Defendants.

156.    Defendants, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of BlockFi and its employees and to cause BlockFi to engage in the wrongful conduct detailed herein, and did so during the relevant time period with the BIA program.

157.    Defendants, separately or together, had the power to direct or cause the direction of the management and policies of BlockFi and did so during the relevant time period with the BIA program.

158.    Defendants had sufficient control or influence to have caused BlockFi to make the actionable misrepresentations and omissions discussed herein and in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

159.    Defendants had sufficient control or influence to have caused BlockFi to register as an exchange and broker-dealer and refrain from effecting the transactions of securities as an unregistered exchange and unregistered broker-dealer in violation of Sections 5 and 15 of the Exchange Act.

160.    As a result of Defendants' conduct, they are liable to Plaintiff and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## COUNT SIX
### Violations of G.L. c. 110A § 410(a) and (b)

161.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 161 of this complaint as if set forth in full herein.

162.    Plaintiff brings this claim individually and on behalf of the members of the Massachusetts Subclass against all Defendants

163.    Plaintiff's and the members of the Massachusetts Subclass' investments in the BIAs constituted "securities" as defined by G.L. c.110A § 401.

164.    In violation of  G.L. c. 110A, § 410(a)(1), Defendants offered to sell, sold, and materially aided in the sale of those securities of BlockFi in Massachusetts to Plaintiff and the members of the Massachusetts Subclass in violation of section 301 because (1) the BIAs were not registered under this chapter; (2) the BIAs were not exempt from registration under section 402; and (3) the BIAs were not a federally covered security.

165.    In the course of selling those securities to Plaintiff and the members of the Massachusetts Subclass, Defendants and BlockFi made factual misrepresentations and omitted

relevant, material facts, in violation of G.L. c. 110A, § 410(a)(2), which makes it unlawful to

offer or sell a security by means of any untrue statement of a material fact or any omission to

state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they are made, not misleading, the buyer not knowing of the untruth

or omission.

166.    Such material misrepresentations and omissions in BIA's offering materials

included, but are not limited to:

a)    Defendants and BlockFi misrepresented and failed to disclose its utter

failure to comply with the law of the United States including the federal

securities laws under the Securities Act; the Securities Exchange Act and

the Investment Company Act; that it was in the business of selling

securities to raise money to lend to other institutions; that it was a bank

and not an Investment Company; that its securities were unregistered and

that it had not provided the Plaintiff and Class members with the

appropriate information required by the federal securities laws prior to

offering and accepting the BIA monthly investments.

b)    Defendants and BlockFi misrepresented and failed to disclose BlockFi's

failure to register the BIA securities under the Securities Act of 1933

and/or the Trust Indenture Act and failed to provide the potential investors

prior to any acceptance of their monthly offerings appropriate

prospectuses or other offering documents filed with the SEC;

c)    Defendants and BlockFi failed to disclose any information about the

concentration of its crypto Counterparties including that it had

concentrated its investing with FTX and Alameda of approximately $729

Million or more and could not redeem those investments. Instead,

Defendants represented that BlockFi was required to borrow from FTX

(that owed it three quarters of a billion dollars or more of BIA money)

with an option of FTX to buy BlockFi at less than 4% of what is was owed

by FTX and Alameda. Neither Plaintiff nor Class members had any way to

know that BlockFi was working with undercapitalized borrowers and, in

fact, had joined with FTX as a single entity to extract funds from U.S.

investors to support FTX, Alameda, and other uncapitalized borrowers

such as Celsius, and Three Arrow Capital.

d) Defendants and BlockFi failed to disclose BlockFi's relationship with

FTX or that in agreeing to extend not less than $729 million in credit to

FTX and Alameda BlockFi had not at a minimum done a credit analysis or

due diligence or if it had done so, it would have found the lack of records,

and basis documents required of any business such as FTX and Alameda

and that hundreds of millions of dollars of FTX and Alameda invested

funds were being diverted to the personal use and for political and

charitable contributions some of which were controlled by Mr. Bankman-

Fried's father.

e) Defendants and BlockFi failed to disclose that Winklevoss Capital, a

major investor/owner of BlockFi (in the amount of $1.9 billion) was also a

major owner of GTC, BlockFi's custodian. GTC is also in the business of

lending crypto assets to third parties for fees. Accordingly, GTC had an

interest in maximizing its rate of return at the expense of BlockFi
investors.

f)   Defendants and BlockFi failed to disclose the intertwined nature of the
crypto lending business with risky and thinly capitalized third parties
through rehypothecation – using borrowers' collateral to borrow more
money/crypto from other lenders. BlockFi CEO and BlockFi Individual
Defendant Prince admitted in July 2022, that BlockFi was negatively
impacted by the troubles at Celsius and Three Arrows Capital.

g)   Defendants and BlockFi failed to disclose that BlockFi's lending practices
profoundly affected BlockFi's solvency because the "collateral" touted by
defendants as a foundation of BlockFi's stability and security was illusory
and profoundly threatened its solvency.

h)   Defendants and BlockFi failed to disclose that BlockFi had a $1 billion
loan out to Three Arrows Capital for which BlockFi reportedly held
collateral that was likely rehypothecated by BlockFi.

i)   Defendants and BlockFi misrepresented BlockFi's business claiming it to
be a "bank" and a "market intermediary" which exempted it from the SEC
registration requests.

j)   Defendants and BlockFi represented that its loans were "typically" over
collateralized when in fact most large institutional loans which presented
liquidity and concentration of risk damages to BlockFi, such as to FTX
and Alameda were not sufficiently collateralized let alone over
collateralized. These misrepresentations deprived investors of "complete

and accurate information with which to evaluate the risk" to class

members investments if BlockFi institutional borrowers defaulted.

k)  Defendants' and BlockFi's statements about collateralization were also

materially false and misleading for implying that risks of investing in

BlockFi were minimal because of its reported "over-collateralization"

which was false in itself and further failed to disclose that BlockFi was

exposed to additional material risk though its broad range of yield

generating activities in addition to borrowing and lending crypto assets

and its rehypothecation activity.

l)  Defendants' and BlockFi's public representations about investors' ability

to demand monies back and/or sell the cryptocurrency were also false.

167.    Plaintiff and the members of the Massachusetts Subclass were unaware of the

falsity of such material misrepresentations and omissions and relied upon them when investing.

168.    Defendants knew or in the exercise of reasonable care should have known that

they and their affiliates had made such material misrepresentations and omissions in the offering

materials.

169.    Under G.L. c. 110A, §410(b), "Every person who directly or indirectly controls a

seller liable under subsection (a), every partner, officer, or director of such a seller, every person

occupying a similar status or performing similar functions, every employee of such a seller who

materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are

also liable jointly and severally with and to the same extent as the seller, unless the non-seller

who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable

care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

170.     Defendants, who are control persons and employees of BlockFi, materially aided in the sale of BIAs by BlockFi and cannot sustain the burden of proof that they did not know and in the exercise of reasonable care could have known of such misrepresentations and omissions, respectively.

171.     Plaintiff and the members of the Massachusetts Subclass were induced to purchase, hold, and refrain from liquidating their securities in reliance on Defendants' material misrepresentations and omissions.

172.     As a direct and proximate result of their reliance on Defendants' misstatements and/or omissions, Plaintiff and the members of the Massachusetts Subclass suffered damages.

173.     Plaintiff and the members of the Massachusetts Subclass demand recission, statutory interest, costs, and attorneys' fees, less any income received on said securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seek judgment as to all counts against Defendants, as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C.     For compensatory and statutory damages in amounts to be determined by the Court and/or jury in an amount of not less than $729 million;

D.    For disgorgement of all monies unjustly held by Defendants and/or profits

unjustly earned;

E.    For prejudgment interest on all amounts awarded;

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: March 1, 2023                    Respectfully submitted,

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

By:   /s/ Stephen J. Teti
Gregg M. Fishbein (*pro hac vice* forthcoming)
Stephen J. Teti (BBO #569332)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
gmfishbein@locklaw.com
sjteti@locklaw.com

Daniel E. Gustafson (*pro hac vice* forthcoming)
Daniel C. Hedlund (*pro hac vice* forthcoming)
David A. Goodwin (*pro hac vice* forthcoming)
Noah L. Cozad (*pro hac vice* forthcoming)
**GUSTAFSON GLUEK PLLC**
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dgoodwin@gustafsongluek.com
ncozad@gustafsongluek.com

Scott David Hirsch (*pro hac vice* forthcoming)
**SCOTT HIRSCH LAW GROUP PLLC**
6810 N. State Road 7
Coconut Creek, FL 33073
Tel: (561) 569-7062
scott@scotthirschlawgroup.com

Fred T. Isquith Sr. (*pro hac vice* forthcoming)
Fred T. Isquith, Jr. (*pro hac vice* forthcoming)
**ISQUITH LAW PLLC.**
220 East 80th Street
New York, NY 10075
Tel: (607) 277-6513
isquithlaw@gmail.com

Adam J. Zapala (*pro hac vice* forthcoming)
Gayatri S. Raghunandan (*pro hac vice* forthcoming)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
graghunandan@cpmlegal.com

Alexander E. Barnett (*pro hac vice* forthcoming)
**COTCHETT, PITRE & McCARTHY, LLP**
40 Worth Street
New York, NY 10013
Telephone: (212) 201-6820
Facsimile: (917) 398-7753
abarnett@cpmlegal.com

Richard Vita (BBO #510260)
**VITA LAW OFFICES, P.C.**
100 State Street, Suite 900
Boston, MA 02109
Tel: (617) 426-6566
rjv@vitalaw.com

*Counsel for Plaintiff*

# EXHIBIT C

**AMENDED AND RESTATED BYLAWS OF**

**BLOCKFI INC.**

**(A DELAWARE CORPORATION)**

# TABLE OF CONTENTS

**Page**

ARTICLE I OFFICES ....................................................................................................1
    1.1     Registered Office ........................................................................1
    1.2     Offices ..........................................................................................1

ARTICLE II MEETINGS OF STOCKHOLDERS .......................................................1
    2.1     Location ........................................................................................1
    2.2     Timing ..........................................................................................1
    2.3     Notice of Meeting ......................................................................1
    2.4     Stockholders' Records ................................................................1
    2.5     Special Meetings ........................................................................2
    2.6     Notice of Meeting ......................................................................2
    2.7     Business Transacted at Special Meeting ...................................2
    2.8     Quorum; Meeting Adjournment; Presence by Remote Means ....2
    2.9     Voting Thresholds ......................................................................3
    2.10   Number of Votes Per Share .......................................................3
    2.11   Action by Written Consent of Stockholders; Electronic Consent; Notice of Action .......................................................................................3

ARTICLE III DIRECTORS ..........................................................................................4
    3.1     Authorized Directors ..................................................................4
    3.2     Vacancies .....................................................................................4
    3.3     Board Authority ..........................................................................5
    3.4     Location of Meetings .................................................................5
    3.5     First Meeting ...............................................................................5
    3.6     Regular Meetings ........................................................................5
    3.7     Special Meetings ........................................................................5
    3.8     Quorum ........................................................................................6
    3.9     Action Without a Meeting .........................................................6
    3.10   Telephonic Meetings ..................................................................6
    3.11   Committees ..................................................................................6
    3.12   Minutes of Meetings ..................................................................6
    3.13   Compensation of Directors ........................................................7
    3.14   Removal of Directors .................................................................7

ARTICLE IV NOTICES ...............................................................................................7
    4.1     Notice ..........................................................................................7
    4.2     Waiver of Notice ........................................................................7
    4.3     Electronic Notice .......................................................................7

ARTICLE V OFFICERS ...............................................................................................8
    5.1     Required and Permitted Officers ...............................................8
    5.2     Appointment of Required Officers ............................................8
    5.3     Appointment of Permitted Officers ..........................................8

5.4     Officer Compensation ....................................................................................... 8
5.5     Term of Office; Vacancies ................................................................................ 8
5.6     Chairman Presides ............................................................................................ 8
5.7     Absence of Chairman ........................................................................................ 9
5.8     Powers of President ........................................................................................... 9
5.9     President's Signature Authority ........................................................................ 9
5.10    Absence of President ......................................................................................... 9
5.11    Duties of Secretary ............................................................................................ 9
5.12    Duties of Assistant Secretary ............................................................................ 9
5.13    Duties of Treasurer .......................................................................................... 10
5.14    Disbursements and Financial Reports ............................................................. 10
5.15    Treasurer's Bond .............................................................................................. 10
5.16    Duties of Assistant Treasurer .......................................................................... 10

ARTICLE VI CERTIFICATE OF STOCK ................................................................... 10
6.1     Stock Certificates ............................................................................................ 10
6.2     Facsimile Signatures ........................................................................................ 11
6.3     Lost Certificates ............................................................................................... 11
6.4     Transfer of Stock ............................................................................................. 11
6.5     Fixing a Record Date ....................................................................................... 11
6.6     Registered Stockholders .................................................................................. 12

ARTICLE VII GENERAL PROVISIONS ...................................................................... 12
7.1     Dividends .......................................................................................................... 12
7.2     Reserve for Dividends ...................................................................................... 12
7.3     Checks .............................................................................................................. 12
7.4     Fiscal Year ....................................................................................................... 12
7.5     Corporate Seal .................................................................................................. 12
7.6     Indemnification ................................................................................................ 12
7.7     Conflicts with Certificate of Incorporation .................................................... 14

ARTICLE VIII TRANSFER RESTRICTIONS ............................................................. 14
8.1     Restrictions on Transfer .................................................................................. 14
8.2     Permitted Transfers ......................................................................................... 14
8.3     Void Transfers ................................................................................................. 15
8.4     Termination of Restriction of Transfer ........................................................... 15
8.5     Legends ............................................................................................................ 15

ARTICLE IX AMENDMENTS ..................................................................................... 15

ARTICLE X LOANS TO OFFICERS ........................................................................... 15

# AMENDED AND RESTATED BYLAWS
## OF
## BLOCKFI INC.

## ARTICLE I
## OFFICES

1.1    **Registered Office**.    The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

1.2    **Offices**.    The corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

2.1    **Location**.    All meetings of the stockholders for the election of directors shall be held in New York, New York, at such place as may be fixed from time to time by the Board of Directors, or at such other place either within or without the State of Delaware as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting; provided, however, that the Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211 of the Delaware General Corporations Law ("DGCL").    Meetings of stockholders for any other purpose may be held at such time and place, if any, within or without the State of Delaware, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof, or a waiver by electronic transmission by the person entitled to notice.

2.2    **Timing**.    Annual meetings of stockholders, commencing with the year 2017, shall be held at such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, at which they shall elect by a plurality vote a Board of Directors, and transact such other business as may properly be brought before the meeting.

2.3    **Notice of Meeting**.    Written notice of any stockholder meeting stating the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, shall be given to each stockholder entitled to vote at such meeting not fewer than ten (10) nor more than sixty (60) days before the date of the meeting.

2.4    **Stockholders' Records**.    The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address (but not the electronic address or other electronic contact information) of each stockholder and the number of shares registered in the name of each

stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the corporation.  In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

2.5    **Special Meetings**.  Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation, may be called by the president and shall be called by the president or secretary at the request in writing of a majority of the Board of Directors, or at the request in writing of stockholders owning at least fifty percent (50%) in amount of the entire capital stock of the corporation issued and outstanding and entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting.

2.6    **Notice of Meeting**.  Written notice of a special meeting stating the place, date and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not fewer than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting.  The means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting shall also be provided in the notice.

2.7    **Business Transacted at Special Meeting**.  Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

2.8    **Quorum; Meeting Adjournment; Presence by Remote Means**.

(a)    *Quorum; Meeting Adjournment*.  The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally notified.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2

(b)    *Presence by Remote Means*.    If authorized by the Board of Directors in its sole discretion, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(1)    participate in a meeting of stockholders; and

(2)    be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (i) the corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation.

2.9    **Voting Thresholds**.    When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the statutes or of the certificate of incorporation, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.10    **Number of Votes Per Share**.    Unless otherwise provided in the certificate of incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote by such stockholder or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

2.11    **Action by Written Consent of Stockholders; Electronic Consent; Notice of Action**.

(a)    *Action by Written Consent of Stockholders.*    Unless otherwise provided by the certificate of incorporation, any action required or permitted to be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing setting forth the action so taken, is signed in a manner permitted by law by the holders of outstanding stock having not less than the number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Written stockholder consents shall bear the date of signature of each stockholder who signs the consent in the manner permitted by law and shall be delivered to the corporation as provided in subsection (b) below.  No written consent shall be effective to take the action set forth therein unless, within sixty (60) days of the earliest dated consent delivered to the corporation in the manner provided above, written consents signed by a

3

sufficient number of stockholders to take the action set forth therein are delivered to the corporation in the manner provided above.

(b)    *Electronic Consent*.    A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the corporation can determine (1) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (2) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission. The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the foregoing limitations on delivery, consents given by telegram, cablegram or other electronic transmission may be otherwise delivered to the principal place of business of the corporation or to an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the Board of Directors of the corporation.

(c)    *Notice of Action*.    Prompt notice of any action taken pursuant to this Section 2.11 shall be provided to the stockholders in accordance with Section 228(e) of the DGCL.

## ARTICLE III
## DIRECTORS

3.1    **Authorized Directors**.    The number of directors that shall constitute the whole Board of Directors shall be determined by resolution of the Board of Directors or by the stockholders at the annual meeting of the stockholders, except as provided in Section 3.2 of this Article, and each director elected shall hold office until his successor is elected and qualified. Directors need not be stockholders.

3.2    **Vacancies**.    Unless otherwise provided in the corporation's certificate of incorporation, as it may be amended, vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced. If there are no directors in office, then an election of directors may be held in the manner provided by statute. If, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of

4

the whole Board of Directors (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least ten percent (10%) of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office.

3.3    **Board Authority**.  The business of the corporation shall be managed by or under the direction of its Board of Directors, which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the certificate of incorporation or by these bylaws directed or required to be exercised or done by the stockholders.

3.4    **Location of Meetings**.  The Board of Directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.

3.5    **First Meeting**.   The first meeting of each newly elected Board of Directors shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order to legally constitute the meeting, provided a quorum shall be present.  In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected Board of Directors, or in the event such meeting is not held at the time and place so fixed by the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors, or as shall be specified in a written waiver signed by all of the directors.

3.6    **Regular Meetings**.  Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

3.7    **Special Meetings**.  Special meetings of the Board of Directors may be called by the president upon notice to each director; special meetings shall be called by the president or secretary in like manner and on like notice on the written request of two (2) directors unless the Board of Directors consists of only one director, in which case special meetings shall be called by the president or secretary in like manner and on like notice on the written request of the sole director.  Notice of any special meeting shall be given to each director at his business or residence in writing, or by telegram, facsimile transmission, telephone communication or electronic transmission (provided, with respect to electronic transmission, that the director has consented to receive the form of transmission at the address to which it is directed).  If mailed, such notice shall be deemed adequately delivered when deposited in the United States mails so addressed, with postage thereon prepaid, at least five (5) days before such meeting.  If by telegram, such notice shall be deemed adequately delivered when the telegram is delivered to the telegraph company at least twenty-four (24) hours before such meeting.  If by facsimile transmission or other electronic transmission, such notice shall be transmitted at least twenty-four (24) hours before such meeting.  If by telephone, the notice shall be given at least twelve (12) hours prior to the time set for the meeting.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting, except for amendments to these Bylaws as provided under Section 9.1 of

5

Article IX hereof.  A meeting may be held at any time without notice if all the directors are present (except as otherwise provided by law) or if those not present waive notice of the meeting in writing, either before or after such meeting.

3.8    **Quorum**.  At all meetings of the Board of Directors a majority of the directors shall constitute a quorum for the transaction of business and any act of a majority of the directors present at any meeting at which there is a quorum shall be an act of the Board of Directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation.  If a quorum is not present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

3.9    **Action Without a Meeting**.  Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing, writings, electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee.

3.10    **Telephonic Meetings**.  Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors or any committee designated by the Board of Directors may participate in a meeting of the Board of Directors or any committee, by means of conference telephone or other means of communication by which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at the meeting.

3.11    **Committees**.  The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it, but no such committee shall have the power or authority in reference to the following matters:  (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval or (ii) adopting, amending or repealing any provision of these bylaws.

3.12    **Minutes of Meetings**.  Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

6

3.13   **Compensation of Directors**.   Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have the authority to fix the compensation of directors.  The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director.  No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.  Members of special or standing committees may be allowed like compensation for attending committee meetings.

3.14   **Removal of Directors**.  Unless otherwise provided by the certificate of incorporation or these bylaws, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

## ARTICLE IV
## NOTICES

4.1   **Notice**.  Unless otherwise provided in these bylaws, whenever, under the provisions of the statutes or of the certificate of incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, addressed to such director or stockholder, at his address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail.  Notice to directors may also be given by telegram.

4.2   **Waiver of Notice**.  Whenever any notice is required to be given under the provisions of the statutes or of the certificate of incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

4.3   **Electronic Notice**.

(a)   *Electronic Transmission*.  Without limiting the manner by which notice otherwise may be given effectively to stockholders and directors, any notice to stockholders or directors given by the corporation under any provision of the DGCL, the certificate of incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder or director to whom the notice is given.  Any such consent shall be revocable by the stockholder or director by written notice to the corporation.  Any such consent shall be deemed revoked if (1) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent and (2) such inability becomes known to the secretary or an assistant secretary of the corporation or to the transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(b)   *Effective Date of Notice*.  Notice given pursuant to subsection (a) of this section shall be deemed given:  (1) if by facsimile telecommunication, when directed to a

7

number at which the stockholder or director has consented to receive notice; (2) if by electronic mail, when directed to an electronic mail address at which the stockholder or director has consented to receive notice; (3) if by a posting on an electronic network together with separate notice to the stockholder or director of such specific posting, upon the later of (i) such posting and (ii) the giving of such separate notice; and (4) if by any other form of electronic transmission, when directed to the stockholder or director.  An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

(c)      *Form of Electronic Transmission*.  For purposes of these bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

## ARTICLE V
## OFFICERS

5.1      **Required and Permitted Officers**.  The officers of the corporation shall be chosen by the Board of Directors and shall be a president, treasurer and a secretary.  The Board of Directors may elect from among its members a Chairman of the Board and a Vice-Chairman of the Board.  The Board of Directors may also choose one or more vice-presidents, assistant secretaries and assistant treasurers.  Any number of offices may be held by the same person, unless the certificate of incorporation or these bylaws otherwise provide.

5.2      **Appointment of Required Officers**.  The Board of Directors at its first meeting after each annual meeting of stockholders shall choose a president, a treasurer, and a secretary and may choose vice-presidents.

5.3      **Appointment of Permitted Officers**.  The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

5.4      **Officer Compensation**.  The salaries of all officers and agents of the corporation shall be fixed by the Board of Directors.

5.5      **Term of Office; Vacancies**.  The officers of the corporation shall hold office until their successors are chosen and qualify.  Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors.  Any vacancy occurring in any office of the corporation shall be filled by the Board of Directors.

## THE CHAIRMAN OF THE BOARD

5.6      **Chairman Presides**.  The Chairman of the Board, if any, shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present.

He or she shall have and may exercise such powers as are, from time to time, assigned to him by the Board of Directors and as may be provided by law.

        5.7      **Absence of Chairman**.  In the absence of the Chairman of the Board, the Vice-Chairman of the Board, if any, shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present.  He or she shall have and may exercise such powers as are, from time to time, assigned to him by the Board of Directors and as may be provided by law.

## THE PRESIDENT AND VICE-PRESIDENTS

        5.8      **Powers of President**.  The president shall be the chief executive officer of the corporation; in the absence of the Chairman and Vice-Chairman of the Board he or she shall preside at all meetings of the stockholders and the Board of Directors; he or she shall have general and active management of the business of the corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect.

        5.9      **President's Signature Authority**.  The president shall execute bonds, mortgages and other contracts requiring a seal, under the seal of the corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the corporation.

        5.10     **Absence of President**.  In the absence of the president or in the event of his inability or refusal to act, the vice-president, (or in the event there be more than one vice-president, the vice-presidents in the order designated by the directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president.  The vice-presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE SECRETARY AND ASSISTANT SECRETARY

        5.11     **Duties of Secretary**.  The secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings of the meetings of the corporation and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required.  He or she shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or president, under whose supervision he or she shall be.  He or she shall have custody of the corporate seal of the corporation and he or she, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his signature or by the signature of such assistant secretary.  The Board of Directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his signature.

        5.12     **Duties of Assistant Secretary**.  The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the Board of Directors (or if

there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## THE TREASURER AND ASSISTANT TREASURERS

5.13    **Duties of Treasurer**.  The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the Board of Directors.

5.14    **Disbursements and Financial Reports**.  He or she shall disburse the funds of the corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the president and the Board of Directors, at its regular meetings or when the Board of Directors so requires, an account of all his transactions as treasurer and of the financial condition of the corporation.

5.15    **Treasurer's Bond**.  If required by the Board of Directors, the treasurer shall give the corporation a bond (which shall be renewed every six years) in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his office and for the restoration to the corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the corporation.

5.16    **Duties of Assistant Treasurer**.  The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the treasurer or in the event of the treasurer's inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

## ARTICLE VI
## CERTIFICATE OF STOCK

6.1    **Stock Certificates**.  Every holder of stock in the corporation shall be entitled to have a certificate, signed by or in the name of the corporation by, the Chairman or Vice-Chairman of the Board of Directors, or the president or a vice-president and the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the corporation, certifying the number of shares owned by him in the corporation.

Certificates may be issued for partly paid shares and in such case upon the face or back of the certificates issued to represent any such partly paid shares, the total amount of the consideration to be paid therefor, and the amount paid thereon shall be specified.

10

If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualification, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

6.2    **Facsimile Signatures**.  Any or all of the signatures on the certificate may be facsimile.  In the event that any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, the certificate may be issued by the corporation with the same effect as if such officer, transfer agent or registrar were still acting as such at the date of issue.

6.3    **Lost Certificates**.  The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed upon the making of an affidavit of that fact by the person claiming the certificate to be lost, stolen or destroyed.  When authorizing such issuance of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

6.4    **Transfer of Stock**.  Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

6.5    **Fixing a Record Date**.  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting;

provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

6.6 **Registered Stockholders**. The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, to vote as such owner, to hold liable for calls and assessments a person registered on its books as the owner of shares and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII
## GENERAL PROVISIONS

7.1 **Dividends**. Dividends upon the capital stock of the corporation, if any, subject to the provisions of the certificate of incorporation, may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property or in shares of the capital stock, subject to the provisions of the certificate of incorporation.

7.2 **Reserve for Dividends**. Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their sole discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purposes as the directors think conducive to the interests of the corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

7.3 **Checks**. All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

7.4 **Fiscal Year**. The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

7.5 **Corporate Seal**. The Board of Directors may adopt a corporate seal having inscribed thereon the name of the corporation, the year of its organization and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or otherwise reproduced.

7.6 **Indemnification**. The corporation shall, to the fullest extent authorized under the laws of the State of Delaware, as those laws may be amended and supplemented from time to time, indemnify any director made, or threatened to be made, a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of being a director of the corporation or a predecessor corporation or a director or officer of another corporation, if such person served in such position at the request of the corporation; provided, however, that the corporation shall indemnify any such director or officer in connection with a proceeding initiated by such director or officer only if such proceeding was authorized by the Board of Directors of the corporation. The indemnification provided for in this Section 7.6 shall: (i) not be deemed

exclusive of any other rights to which those indemnified may be entitled under these bylaws, agreement or vote of stockholders or disinterested directors or otherwise, both as to action in their official capacities and as to action in another capacity while holding such office, (ii) continue as to a person who has ceased to be a director, and (iii) inure to the benefit of the heirs, executors and administrators of a person who has ceased to be a director. The corporation's obligation to provide indemnification under this Section 7.6 shall be offset to the extent of any other source of indemnification or any otherwise applicable insurance coverage under a policy maintained by the corporation or any other person.

Expenses incurred by a director of the corporation in defending a civil or criminal action, suit or proceeding by reason of the fact that he or she is or was a director of the corporation (or was serving at the corporation's request as a director or officer of another corporation) shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation as authorized by relevant sections of the DGCL. Notwithstanding the foregoing, the corporation shall not be required to advance such expenses to an agent who is a party to an action, suit or proceeding brought by the corporation and approved by a majority of the Board of Directors of the corporation that alleges willful misappropriation of corporate assets by such agent, disclosure of confidential information in violation of such agent's fiduciary or contractual obligations to the corporation or any other willful and deliberate breach in bad faith of such agent's duty to the corporation or its stockholders.

The foregoing provisions of this Section 7.6 shall be deemed to be a contract between the corporation and each director who serves in such capacity at any time while this bylaw is in effect, and any repeal or modification thereof shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought based in whole or in part upon any such state of facts.

The Board of Directors in its sole discretion shall have power on behalf of the corporation to indemnify any person, other than a director, made a party to any action, suit or proceeding by reason of the fact that he or she, his testator or intestate, is or was an officer or employee of the corporation.

To assure indemnification under this Section 7.6 of all directors, officers and employees who are determined by the corporation or otherwise to be or to have been "fiduciaries" of any employee benefit plan of the corporation that may exist from time to time, Section 145 of the DGCL shall, for the purposes of this Section 7.6, be interpreted as follows: an "other enterprise" shall be deemed to include such an employee benefit plan, including without limitation, any plan of the corporation that is governed by the Act of Congress entitled "Employee Retirement Income Security Act of 1974," as amended from time to time; the corporation shall be deemed to have requested a person to serve the corporation for purposes of Section 145 of the DGCL, as administrator of an employee benefit plan where the performance by such person of his duties to the corporation also imposes duties on, or otherwise involves services by, such person to the plan or participants or beneficiaries of the plan; excise taxes

13

assessed on a person with respect to an employee benefit plan pursuant to such Act of Congress shall be deemed "fines."

## CERTIFICATE OF INCORPORATION GOVERNS

7.7    **Conflicts with Certificate of Incorporation**.  In the event of any conflict between the provisions of the corporation's certificate of incorporation and these bylaws, the provisions of the certificate of incorporation shall govern.

## ARTICLE VIII
## TRANSFER RESTRICTIONS

8.1    **Restrictions on Transfer**.  No stockholder of the corporation may sell, assign, transfer, pledge, encumber or in any manner dispose of any share of Common Stock of the corporation (the "Common Stock"), including by way of any arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether voluntarily or by operation of law, or by gift or otherwise, other than by means of a Permitted Transfer (as defined below).  If any provision(s) of any agreement(s) currently in effect by and between the corporation and any stockholder conflicts with this Article VIII, this Article VIII shall govern, and the remaining provision(s) of such agreement(s) that do not conflict with this Article VIII shall continue in full force and effect.

8.2    **Permitted Transfers**.  For purposes of this Article VIII, a "Permitted Transfer" shall mean any of the following:

(a)    any transfer by a stockholder of any or all of such stockholder's shares to the corporation;

(b)    any transfer by a stockholder of any or all of such stockholder's shares to such stockholder's immediate family or a trust for the benefit of such stockholder or such stockholder's immediate family;

(c)    any transfer by a stockholder of any or all of such stockholder's shares effected pursuant to such stockholder's will or the laws of intestate succession;

(d)    if a stockholder is a partnership, limited liability company, or corporation, any transfer by such stockholder of any or all of such stockholder's shares to the partners, members, former partners, former members, stockholders, and/or affiliates of such stockholder;

(e)    any transfer of Common Stock issued upon conversion of Preferred Stock of the corporation;

(f)    any transfer of shares approved by the prior written consent of the Board of Directors, including Preferred Director Approval (as defined in the corporation's certificate of incorporation).

Except with respect to the shares of Common Stock transferred under clauses (a) and (e) above, such transferred shares shall remain subject to the transfer restrictions of this Article VIII.

8.3    **Void Transfers**.  Any transfer of shares shall be null and void unless the terms, conditions and provisions of this Article VIII are strictly observed and followed.

8.4    **Termination of Restriction of Transfer**.  The foregoing restriction on transfer shall lapse immediately prior to the corporation's first firm commitment underwritten public offering of its securities pursuant to a registration statement under the Securities Act of 1933, as amended.

8.5    **Legends**.  The certificates representing shares of stock of the corporation shall bear on their face the following legend so long as the foregoing right of first refusal remains in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR IN ANY MANNER DISPOSED OF, EXCEPT IN COMPLIANCE WITH THE BYLAWS OF THE CORPORATION.  COPIES OF THE BYLAWS OF THE CORPORATION MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION."

## ARTICLE IX
## AMENDMENTS

9.1    These bylaws may be altered, amended or repealed, or new bylaws may be adopted by the stockholders or by the Board of Directors, when such power is conferred upon the Board of Directors by the certificate of incorporation at any regular meeting of the stockholders or of the Board of Directors or at any special meeting of the stockholders or of the Board of Directors if notice of such alteration, amendment, repeal or adoption of new bylaws be contained in the notice of such special meeting.  If the power to adopt, amend or repeal bylaws is conferred upon the Board of Directors by the certificate of incorporation, it shall not divest or limit the power of the stockholders to adopt, amend or repeal bylaws.

## ARTICLE X
## LOANS TO OFFICERS

10.1    The corporation may lend money to, or guarantee any obligation of or otherwise assist any officer or other employee of the corporation or of its subsidiaries, including any officer or employee who is a director of the corporation or its subsidiaries, whenever, in the judgment of the Board of Directors, such loan, guarantee or assistance may reasonably be expected to benefit the corporation.  The loan, guarantee or other assistance may be with or without interest and may be unsecured or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the corporation.  Nothing in these bylaws shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

15

## CERTIFICATE OF SECRETARY OF

## BLOCKFI INC.

The undersigned, Zachary Lee Prince, hereby certifies that he is the duly elected and acting Secretary of BlockFi Inc., a Delaware corporation (the "Corporation"), and that the Amended and Restated Bylaws attached hereto constitute the Bylaws of said Corporation as duly adopted by Action by Written Consent in Lieu of Organizational Meeting by the Board of Directors on July 23, 2019.

**IN WITNESS WHEREOF**, the undersigned has hereunto subscribed his name this 23rd day of July, 2019.

_____

Zachary Lee Prince, Secretary

# AMENDMENT NO. 1 TO THE

# AMENDED AND RESTATED BYLAWS

# OF

# BLOCKFI INC.

## (adopted as of February 25, 2021)

The undersigned certifies that he is the duly elected, qualified, and acting Secretary of BlockFi Inc., a Delaware corporation (the "Company") and that Article VIII of the Amended and Restated Bylaws of the Company (the "Bylaws") has been amended to read in its entirety as follows:

"ARTICLE VIII
TRANSFER RESTRICTIONS

8.1    Restrictions on Transfer. Any stockholder holding shares of the Company's capital stock ("Restricted Shares") other than Major Investors, as defined in that certain Fifth Amended and Restated Investors' Rights Agreement by and among the Company and the other parties listed therein dated on or around February 25, 2021 as may be amended from time to time, (any such stockholder, a "Restricted Stockholder") shall not directly or indirectly transfer, sell, assign, lend, grant any option or right of warrant to purchase, pledge, enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of, voting rights or other interests therein, or otherwise in any manner dispose of or encumber, whether voluntarily or by operation of law, or by gift or otherwise ("transfer"), Restricted Shares or any right or interest therein (including, but not limited to, any derivative security or contract based upon such stock) without the prior written consent of the Company, upon duly authorized action by the Board, and such holder otherwise complying with the requirements of this Article VIII.  The restrictions on transfer and ownership of shares set forth in this Article VIII shall be in addition to, and not limited by the provisions of any agreements currently in effect by and between the Company and any stockholder

8.2    Permitted Transfers.  The restriction contained in this Article VIII shall not apply to the following transactions (each, a "Permitted Transfer"):

(i)    any transfer during the Restricted Stockholder's lifetime by gift or pursuant to domestic relations orders to the Restricted Stockholder's immediate family or a trust for the benefit of the Restricted Stockholder or the Restricted Stockholder's immediate family, where "immediate family" as used herein shall mean spouse, spousal equivalent, lineal descendant or antecedent, parent, sibling, stepchild, stepparent, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law (and for avoidance of doubt shall include adoptive relationships);

(ii)    any transfer or deemed transfer effected pursuant to the Restricted Stockholder's will or the laws of intestate succession;

(iii)    any transfer by an entity Restricted Stockholder to an Affiliate (as defined below) of such Restricted Stockholder, where, for purposes of this Article VIII. An "Affiliate" of an entity Restricted Stockholder shall include any individual, firm, corporation, partnership, association, limited liability company, trust or other entity who, directly or indirectly, controls, is controlled by or is under common control with such entity Restricted Stockholder or such entity Restricted Stockholder's principal, including, without limitation, any general partner, managing member, managing partner, officer or director of such entity Restricted Stockholder, such entity Restricted Stockholder's principal or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such entity Restricted Stockholder or such entity Restricted Stockholder's principal;

(iv)    a corporate Restricted Stockholder's transfer of all of its Restricted Shares to a single transferee pursuant to and in accordance with the terms of any *bona fide* merger, consolidation, reclassification of shares or capital reorganization of the corporate Restricted Stockholder, or pursuant to a *bona fide* sale of all or substantially all of the stock or assets of a corporate Restricted Stockholder, provided in each case that such transfer is not essentially simply a transfer of the Restricted Shares without substantial additional assets other than cash or cash equivalents being transferred;

(v)    any repurchase or redemption of Restricted Shares by the Company:  (a) at or below cost, upon the occurrence of certain events, such as the termination of employment or services; or (b) at any price pursuant to the Company's exercise of a right of first refusal to repurchase such Restricted Shares (including the purchase of such Restricted Shares by the Company's assignee), upon duly authorized action by the Board (which shall include the Preferred Director Approval (as defined the Company's Certificate of Incorporation)); or

(vi)    any transfer upon duly authorized action by the Board (which shall include the Preferred Director Approval).

*provided, however*, that each transferee, assignee, or other recipient of any interest in the Restricted Shares shall, as a condition to the transfer, agree to be bound by all of the restrictions set forth in these Bylaws.  Notwithstanding the foregoing exception, a Restricted Stockholder may not transfer any Restricted Shares if prior to consulting with the Company to determine whether such transfer would result in the Company having a class of security held of record by 2,000 (or such other number as may be applicable under the Exchange Act) or more persons, as described in Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Rule 12g5-1 promulgated under the Exchange Act (or any successor provisions thereto), and no such transfer shall be effected if such transfer would result in the Company having a class of security held of

record by 2,000 (or such other number as may be applicable under the Exchange Act) or more persons, as described in Section 12(g) of the Exchange Act and Rule 12g5-1 promulgated under the Exchange Act (or any successor provisions thereto).

8.3 <u>Conditions to Transfers</u>.  As a condition to any transfer, the Company may, in its sole discretion, (i) require in connection with such transfer of Restricted Shares delivery to the Company of a written opinion of legal counsel, in form and substance satisfactory to it or its legal counsel in their respective discretion, that such transfer is exempt from applicable federal, state or other securities laws and regulations, (ii) charge the transferor, transferee or both a transfer fee in such amount as may be reasonably determined by the Company's management in order to recoup the Company's internal and external costs of processing such transfer, due and payable to the Company prior to or upon effectiveness of such transfer, and/or (iii) require such transfer to be effected pursuant to a standard form of transfer agreement in such customary and reasonable form as may be determined by the Company's management from time to time in its discretion.

8.4 <u>Void Transfers</u>.    Any sale or transfer, or purported sale or transfer, of securities of the Company shall be null and void ab initio, and the Company shall not be obligated to recognize any right, title or interest of any person or entity, in securities of the Company unless the terms, conditions, and provisions of this Article VII are strictly observed and followed.

8.5 <u>Termination of Restrictions</u>.  The restrictions on transfer in Article VII shall terminate immediately prior to the closing of a firm commitment underwritten public offering of common stock pursuant to a registration statement filed with, and declared effective by, the United States Securities and Exchange Commission under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

8.6 <u>Legends</u>.  The certificates representing shares of stock of the Company shall bear on their face the following legend so long as the foregoing restrictions on transfer remain in effect:

**"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER AS PROVIDED IN THE BYLAWS OF THE CORPORATION."**

*[Remainder of page intentionally blank]*

IN WITNESS WHEREOF, the undersigned has executed this Amendment No. 1 to the Amended and Restated Bylaws as of the date first written above.

_____
Zachary Lee Prince, Secretary

# EXHIBIT D

## INDEMNIFICATION AGREEMENT

THIS INDEMNIFICATION AGREEMENT (the "**Agreement**") is made and entered into as of July 30, 2019 between BlockFi Inc., a Delaware corporation (the "**Company**"), and Flori Marquez ("**Indemnitee**").

## WITNESSETH THAT:

**WHEREAS**, highly competent persons have become more reluctant to serve corporations as directors or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

**WHEREAS**, the Board of Directors of the Company (the "**Board**") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities.  Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions.  At the same time, directors, officers, and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself.  Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware ("**DGCL**").  The Bylaws and Certificate of Incorporation and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the Board, officers and other persons with respect to indemnification;

**WHEREAS**, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

**WHEREAS**, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company's stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

**WHEREAS**, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

**WHEREAS**, this Agreement is a supplement to and in furtherance of the Bylaws and Certificate of Incorporation of the Company and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

**WHEREAS**, Indemnitee does not regard the protection available under the Company's Bylaws and Certificate of Incorporation and insurance as adequate in the present circumstances, and may not be willing to serve as a director as without adequate protection, and the Company desires Indemnitee to serve in such capacity.  Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that he be so indemnified.

**NOW, THEREFORE**, in consideration of Indemnitee's agreement to serve as a director from and after the date hereof, the parties hereto agree as follows:

1.    Indemnity of Indemnitee.  The Company hereby agrees to hold harmless and indemnify Indemnitee to the fullest extent permitted by law, as such may be amended from time to time.  In furtherance of the foregoing indemnification, and without limiting the generality thereof.

(a)    Proceedings Other Than Proceedings by or in the Right of the Company. Indemnitee shall be entitled to the rights of indemnification provided in this Section l(a) if, by reason of his Corporate Status (as hereinafter defined), the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of the Company.  Pursuant to this Section 1(a), Indemnitee shall be indemnified against all Expenses (as hereinafter defined), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him, or on his behalf, in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

(b)    Proceedings by or in the Right of the Company.  Indemnitee shall be entitled to the rights of indemnification provided in this Section 1(b) if, by reason of his Corporate Status, the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of the Company.  Pursuant to this Section 1(b), Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by the Indemnitee, or on the Indemnitee's behalf, in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; provided, however, if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to the Company unless and to the extent that the Court of Chancery of the State of Delaware shall determine that such indemnification may be made.

(c)    Indemnification for Expenses of a Party Who is Wholly or Partly Successful.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a party to and is successful, on the merits or otherwise, in any Proceeding, he shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.  If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and

2

reasonably incurred by him or on his behalf in connection with each successfully resolved claim, issue or matter. For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

(d)    Indemnification of Appointing Stockholder. If (i) Indemnitee is or was affiliated with one or more venture capital funds that has invested in the Company (an "**Appointing Stockholder**"), (ii) the Appointing Stockholder is, or is threatened to be made, a party to or a participant in any Proceeding, and (iii) the Appointing Stockholder's involvement in the Proceeding results from any claim based on the Indemnitee's service to the Company as a director or other fiduciary of the Company, the Appointing Stockholder will be entitled to indemnification hereunder for Expenses to the same extent as Indemnitee, and the terms of this Agreement as they relate to procedures for indemnification of Indemnitee and advancement of Expenses shall apply to any such indemnification of Appointing Stockholder. The Company and Indemnitee agree that the Appointing Stockholder is an express third party beneficiary of the terms of this Section 1(d).

2.    Additional Indemnity. In addition to, and without regard to any limitations on, the indemnification provided for in Section 1 of this Agreement, the Company shall and hereby does indemnify and hold harmless Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him or on his behalf if, by reason of his Corporate Status, he is, or is threatened to be made, a party to or a participant in any Proceeding (including a Proceeding by or in the right of the Company), including, without limitation, all liability arising out of the negligence or active or passive wrongdoing of Indemnitee. The only limitation that shall exist upon the Company's obligations pursuant to this Agreement shall be that the Company shall not be obligated to make any payment to Indemnitee that is finally determined (under the procedures, and subject to the presumptions, set forth in Sections 6 and 7 hereof) to be unlawful.

3.    Contribution.

(a)    Whether or not the indemnification provided in Sections 1 and 2 hereof is available, in respect of any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against Indemnitee. The Company shall not enter into any settlement of any action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

(b)    Without diminishing or impairing the obligations of the Company set forth in the preceding subparagraph, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall contribute to the amount of Expenses,

3

judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such action, suit or proceeding arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which applicable law may require to be considered.  The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(d)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.     Indemnification for Expenses of a Witness.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a witness, or is made (or asked) to respond to discovery requests, in any Proceeding to which Indemnitee is not a party, he shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

5.     Advancement of Expenses.  Notwithstanding any other provision of this Agreement, the Company shall advance all Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding by reason of Indemnitee's Corporate Status within thirty (30) days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding.  Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to

repay any Expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified against such Expenses.  Any advances and undertakings to repay pursuant to this Section 5 shall be unsecured and interest free.

6.      Procedures and Presumptions for Determination of Entitlement to Indemnification. It is the intent of this Agreement to secure for Indemnitee rights of indemnity that are as favorable as may be permitted under the DGCL and public policy of the State of Delaware.  Accordingly, the parties agree that the following procedures and presumptions shall apply in the event of any question as to whether Indemnitee is entitled to indemnification under this Agreement:

(a)      To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification.  The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification. Notwithstanding the foregoing, any failure of Indemnitee to provide such a request to the Company, or to provide such a request in a timely fashion, shall not relieve the Company of any liability that it may have to Indemnitee unless, and to the extent that, such failure actually and materially prejudices the interests of the Company.

(b)      Upon written request by Indemnitee for indemnification pursuant to the first sentence of Section 6(a) hereof, a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall be made in the specific case by one of the following four methods, which shall be at the election of the Board (1) by a majority vote of the Disinterested Directors, even though less than a quorum, (2) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum, (3) if there are no Disinterested Directors or if the Disinterested Directors so direct, by independent legal counsel in a written opinion to the Board, a copy of which shall be delivered to the Indemnitee, or (4) if so directed by the Board, by the stockholders of the Company.

(c)      If the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 6(b) hereof, the Independent Counsel shall be selected as provided in this Section 6(c).  The Independent Counsel shall be selected by the Board. Indemnitee may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "**Independent Counsel**" as defined in Section 13 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion.  Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit.  If, within twenty (20) days after submission by Indemnitee of a written request for indemnification pursuant to Section 6(a) hereof, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitee to the Company's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such

5

other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 6(b) hereof. The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to Section 6(b) hereof, and the Company shall pay all reasonable fees and expenses incident to the procedures of this Section 6(c), regardless of the manner in which such Independent Counsel was selected or appointed.

(d)     In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(e)     Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise (as hereinafter defined), including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Enterprise. In addition, the knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement. Whether or not the foregoing provisions of this Section 6(e) are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f)     If the person, persons or entity empowered or selected under Section 6 to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall be deemed to have been made and Indemnitee shall be entitled to such indemnification absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law; provided, however, that such sixty (60) day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto; and provided further, that the foregoing provisions of this Section 6(f) shall not apply if the determination of entitlement to indemnification is to be made by the stockholders pursuant to Section 6(b) of this Agreement and if (A) within fifteen (15) days after receipt by the Company of

6

the request for such determination, the Board or the Disinterested Directors, if appropriate, resolve to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within seventy five (75) days after such receipt and such determination is made threat, or (B) a special meeting of stockholders is called within fifteen (15) days after such receipt for the purpose of making such determination, such meeting is held for such purpose within sixty (60) days after having been so called and such determination is made threat.

(g)     Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination.  Any Independent Counsel, member of the Board or stockholder of the Company shall act reasonably and in good faith in making a determination regarding the Indemnitee's entitlement to indemnification under this Agreement.  Any costs or expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(h)     The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty.  In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(i)     The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his conduct was unlawful.

7.     Remedies of Indemnitee.

(a)     In the event that (i) a determination is made pursuant to Section 6 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 5 of this Agreement, (iii) no determination of entitlement to indemnification is made pursuant to Section 6(b) of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) no contribution has been timely made

pursuant to Section 3 hereof, or (vi) payment of indemnification is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification or such determination is deemed to have been made pursuant to Section 6 of this Agreement, Indemnitee shall be entitled to an adjudication in an appropriate court of the State of Delaware, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification. Indemnitee shall commence such proceeding seeking an adjudication within one hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 7(a). The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)      In the event that a determination shall have been made pursuant to Section 6(b) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this Section 7 shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under Section 6(b).

(c)      If a determination shall have been made pursuant to Section 6(b) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this Section 7, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)      In the event that Indemnitee, pursuant to this Section 7, seeks a judicial adjudication of his rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on his behalf, in advance, any and all expenses (of the types described in the definition of Expenses in Section 13 of this Agreement) actually and reasonably incurred by him in such judicial adjudication, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery.

(e)      The Company shall be precluded from asserting in any judicial proceeding commenced pursuant to this Section 7 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court that the Company is bound by all the provisions of this Agreement. The Company shall indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefore) advance, to the extent not prohibited by law, such expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advance of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(f)      Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

8

B5013286.1

8.      <u>Non-Exclusivity; Survival of Rights; Insurance; Primacy of Indemnification; Subrogation.</u>

(a)      The rights of indemnification as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the By-laws, any agreement, a vote of stockholders, a resolution of directors of the Company, or otherwise.  No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his Corporate Status prior to such amendment, alteration or repeal.  To the extent that a change in the DGCL, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Certificate of Incorporation, By-laws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)      To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, officer, employee, agent or fiduciary under such policy or policies.  If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

(c)      In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(d)      The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e)      The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or

B5013286.1

advancement of expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

9.    <u>Exception to Right of Indemnification</u>. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any claim made against Indemnitee:

(a)    for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

(b)    for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of <u>Section 16(b)</u> of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law; or

(c)    Except for actions by the Indemnitee to enforce Indemnitee's rights hereunder, in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation, or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

10.    <u>Duration of Agreement</u>.  All agreements and obligations of the Company contained herein shall continue during the period ending three (3) years after the Indemnitee ceases to be an officer or director of the Company (or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) and shall continue thereafter so long as Indemnitee shall be subject to any Proceeding (or any proceeding commenced under <u>Section 7</u> hereof) by reason of his Corporate Status, whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors and personal and legal representatives.

11.    <u>Security</u>.  To the extent requested by Indemnitee and approved by the Board, the Company may at any time and from time to time provide security to Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral. Any such security, once provided to Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

12.    <u>Enforcement</u>.

(a)    The Company expressly confirms and agrees that it has entered into this Agreement and assumes the obligations imposed on it hereby in order to induce Indemnitee to

serve as an officer or director of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as an officer or director of the Company.

(b)    This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(c)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of expenses under this Agreement.

13.    <u>Definitions</u>.  For purposes of this Agreement:

(a)    "**Corporate Status**" describes the status of a person who is or was a director, officer, employee, agent or fiduciary of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person is or was serving at the express written request of the Company.

(b)    "**Disinterested Director**" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(c)    "**Enterprise**" shall mean the Company and any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that Indemnitee is or was serving at the express written request of the Company as a director, officer, employee, agent or fiduciary.

(d)    "**Expenses**" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery in any Proceeding. Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond, or other appeal bond or its equivalent. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(e)    "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement. The

11

Company agrees to pay the reasonable fees of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(f)     "**Proceeding**" includes any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether civil, criminal, administrative or investigative, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of his or her Corporate Status, by reason of any action taken by him or of any inaction on his part while acting in his or her Corporate Status; in each case whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement; including one pending on or before the date of this Agreement, but excluding one initiated by an Indemnitee pursuant to Section 7 of this Agreement to enforce his rights under this Agreement.

14.     Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.  Further, the invalidity or unenforceability of any provision hereof as to either Indemnitee or Appointing Stockholder shall in no way affect the validity or enforceability of any provision hereof as to the other.  Without limiting the generality of the foregoing, this Agreement is intended to confer upon Indemnitee and Appointing Stockholder indemnification rights to the fullest extent permitted by applicable laws.  In the event any provision hereof conflicts with any applicable law, such provision shall be deemed modified, consistent with the aforementioned intent, to the extent necessary to resolve such conflict.

15.     Modification and Waiver.   No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

16.     Notice By Indemnitee.  Indemnitee agrees promptly to notify the Company in writing upon being served with or otherwise receiving any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification covered hereunder.  The failure to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise unless and only to the extent that such failure or delay materially prejudices the Company.

17.     Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

12

(a)    To Indemnitee at the address set forth below Indemnitee signature hereto.

(b)    To the Company at:

BlockFi Inc.
86 Chambers Street, Suite 205
New York, NY 10007
Attention: Chief Executive Officer

or to such other address as may have been furnished to Indemnitee by the Company or to the Company by Indemnitee, as the case may be.

18.    Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

19.    Headings.  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

20.    Governing Law and Consent to Jurisdiction.  This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. The Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Chancery Court of the State of Delaware (the "**Delaware Court**"), and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Indemnification Agreement on and as of the day and year first above written.

**BLOCKFI INC.**

By: _____

Name: Zachary Lee Prince

Title: President

**INDEMNITEE**

_____

Name:  Flori Marquez

Address:  _____

_____

_____

IN WITNESS WHEREOF, the parties hereto have executed this Indemnification Agreement on and as of the day and year first above written.

**BLOCKFI INC.**

By:_____

Name: Zachary Lee Prince
Title: President

**INDEMNITEE**

_____

Name: Flori Marquez

Address: _____

_____

_____

# EXHIBIT E

## INDEMNIFICATION AGREEMENT

THIS INDEMNIFICATION AGREEMENT (the "**Agreement**") is made and entered into as of December 13, 2017 between BlockFi., a Delaware corporation (the "**Company**"), and Zachary Prince ("**Indemnitee**").

### WITNESSETH THAT:

**WHEREAS**, highly competent persons have become more reluctant to serve corporations as directors or in other capacities unless they are provided with adequate protection through insurance or adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the corporation;

**WHEREAS**, the Board of Directors of the Company (the "**Board**") has determined that, in order to attract and retain qualified individuals, the Company will attempt to maintain on an ongoing basis, at its sole expense, liability insurance to protect persons serving the Company and its subsidiaries from certain liabilities. Although the furnishing of such insurance has been a customary and widespread practice among United States-based corporations and other business enterprises, the Company believes that, given current market conditions and trends, such insurance may be available to it in the future only at higher premiums and with more exclusions. At the same time, directors, officers, and other persons in service to corporations or business enterprises are being increasingly subjected to expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself. Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware ("**DGCL**"). The Bylaws and Certificate of Incorporation and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the Board, officers and other persons with respect to indemnification;

**WHEREAS**, the uncertainties relating to such insurance and to indemnification have increased the difficulty of attracting and retaining such persons;

**WHEREAS**, the Board has determined that the increased difficulty in attracting and retaining such persons is detrimental to the best interests of the Company's stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

**WHEREAS**, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

**WHEREAS**, this Agreement is a supplement to and in furtherance of the Bylaws and Certificate of Incorporation of the Company and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

**WHEREAS**, Indemnitee does not regard the protection available under the Company's Bylaws and Certificate of Incorporation and insurance as adequate in the present circumstances, and may not be willing to serve as a director as without adequate protection, and the Company desires Indemnitee to serve in such capacity. Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that he be so indemnified.

**NOW, THEREFORE**, in consideration of Indemnitee's agreement to serve as a director from and after the date hereof, the parties hereto agree as follows:

1.    <u>Indemnity of Indemnitee</u>. The Company hereby agrees to hold harmless and indemnify Indemnitee to the fullest extent permitted by law, as such may be amended from time to time. In furtherance of the foregoing indemnification, and without limiting the generality thereof.

(a)    <u>Proceedings Other Than Proceedings by or in the Right of the Company</u>. Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section l(a)</u> if, by reason of his Corporate Status (as hereinafter defined), the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding (as hereinafter defined) other than a Proceeding by or in the right of the Company. Pursuant to this <u>Section 1(a)</u>, Indemnitee shall be indemnified against all Expenses (as hereinafter defined), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him, or on his behalf, in connection with such Proceeding or any claim, issue or matter therein, if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe the Indemnitee's conduct was unlawful.

(b)    <u>Proceedings by or in the Right of the Company</u>. Indemnitee shall be entitled to the rights of indemnification provided in this <u>Section 1(b)</u> if, by reason of his Corporate Status, the Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of the Company. Pursuant to this <u>Section 1(b)</u>, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by the Indemnitee, or on the Indemnitee's behalf, in connection with such Proceeding if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; <u>provided</u>, <u>however</u>, if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to the Company unless and to the extent that the Court of Chancery of the State of Delaware shall determine that such indemnification may be made.

(c)    <u>Indemnification for Expenses of a Party Who is Wholly or Partly Successful</u>. Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a party to and is successful, on the merits or otherwise, in any Proceeding, he shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and

2

reasonably incurred by him or on his behalf in connection with each successfully resolved claim, issue or matter.  For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

(d)      Indemnification of Appointing Stockholder.  If (i) Indemnitee is or was affiliated with one or more venture capital funds that has invested in the Company (an "**Appointing Stockholder**"), (ii) the Appointing Stockholder is, or is threatened to be made, a party to or a participant in any Proceeding, and (iii) the Appointing Stockholder's involvement in the Proceeding results from any claim based on the Indemnitee's service to the Company as a director or other fiduciary of the Company, the Appointing Stockholder will be entitled to indemnification hereunder for Expenses to the same extent as Indemnitee, and the terms of this Agreement as they relate to procedures for indemnification of Indemnitee and advancement of Expenses shall apply to any such indemnification of Appointing Stockholder. The Company and Indemnitee agree that the Appointing Stockholder is an express third party beneficiary of the terms of this Section 1(d).

2.      Additional Indemnity.  In addition to, and without regard to any limitations on, the indemnification provided for in Section 1 of this Agreement, the Company shall and hereby does indemnify and hold harmless Indemnitee against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by him or on his behalf if, by reason of his Corporate Status, he is, or is threatened to be made, a party to or participant in any Proceeding (including a Proceeding by or in the right of the Company), including, without limitation, all liability arising out of the negligence or active or passive wrongdoing of Indemnitee. The only limitation that shall exist upon the Company's obligations pursuant to this Agreement shall be that the Company shall not be obligated to make any payment to Indemnitee that is finally determined (under the procedures, and subject to the presumptions, set forth in Sections 6 and 7 hereof) to be unlawful.

3.      Contribution.

(a)      Whether or not the indemnification provided in Sections 1 and 2 hereof is available, in respect of any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against Indemnitee.  The Company shall not enter into any settlement of any action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

(b)      Without diminishing or impairing the obligations of the Company set forth in the preceding subparagraph, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall contribute to the amount of Expenses,

3

judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such action, suit or proceeding arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which applicable law may require to be considered.  The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c)    The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(d)    To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.    Indemnification for Expenses of a Witness.  Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of his Corporate Status, a witness, or is made (or asked) to respond to discovery requests, in any Proceeding to which Indemnitee is not a party, he shall be indemnified against all Expenses actually and reasonably incurred by him or on his behalf in connection therewith.

5.    Advancement of Expenses.  Notwithstanding any other provision of this Agreement, the Company shall advance all Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding by reason of Indemnitee's Corporate Status within thirty (30) days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding.  Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to

repay any Expenses advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified against such Expenses.  Any advances and undertakings to repay pursuant to this <u>Section 5</u> shall be unsecured and interest free.

      6.    <u>Procedures and Presumptions for Determination of Entitlement to Indemnification</u>. It is the intent of this Agreement to secure for Indemnitee rights of indemnity that are as favorable as may be permitted under the DGCL and public policy of the State of Delaware.  Accordingly, the parties agree that the following procedures and presumptions shall apply in the event of any question as to whether Indemnitee is entitled to indemnification under this Agreement:

      (a)    To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification.  The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification. Notwithstanding the foregoing, any failure of Indemnitee to provide such a request to the Company, or to provide such a request in a timely fashion, shall not relieve the Company of any liability that it may have to Indemnitee unless, and to the extent that, such failure actually and materially prejudices the interests of the Company.

      (b)    Upon written request by Indemnitee for indemnification pursuant to the first sentence of <u>Section 6(a)</u> hereof, a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall be made in the specific case by one of the following four methods, which shall be at the election of the Board (1) by a majority vote of the Disinterested Directors, even though less than a quorum, (2) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum, (3) if there are no Disinterested Directors or if the Disinterested Directors so direct, by independent legal counsel in a written opinion to the Board, a copy of which shall be delivered to the Indemnitee, or (4) if so directed by the Board, by the stockholders of the Company.

      (c)    If the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to <u>Section 6(b)</u> hereof, the Independent Counsel shall be selected as provided in this <u>Section 6(c)</u>.  The Independent Counsel shall be selected by the Board. Indemnitee may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "**Independent Counsel**" as defined in <u>Section 13</u> of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion.  Absent a proper and timely objection, the person so selected shall act as Independent Counsel.  If a written objection is made and substantiated, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit.  If, within twenty (20) days after submission by Indemnitee of a written request for indemnification pursuant to <u>Section 6(a)</u> hereof, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by the Indemnitee to the Company's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such

other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 6(b) hereof. The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to Section 6(b) hereof, and the Company shall pay all reasonable fees and expenses incident to the procedures of this Section 6(c), regardless of the manner in which such Independent Counsel was selected or appointed.

(d)    In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(e)    Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise (as hereinafter defined), including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Enterprise. In addition, the knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement. Whether or not the foregoing provisions of this Section 6(e) are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f)    If the person, persons or entity empowered or selected under Section 6 to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall be deemed to have been made and Indemnitee shall be entitled to such indemnification absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law; provided, however, that such sixty (60) day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto; and provided further, that the foregoing provisions of this Section 6(f) shall not apply if the determination of entitlement to indemnification is to be made by the stockholders pursuant to Section 6(b) of this Agreement and if (A) within fifteen (15) days after receipt by the Company of

6

the request for such determination, the Board or the Disinterested Directors, if appropriate, resolve to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within seventy five (75) days after such receipt and such determination is made thereat, or (B) a special meeting of stockholders is called within fifteen (15) days after such receipt for the purpose of making such determination, such meeting is held for such purpose within sixty (60) days after having been so called and such determination is made thereat.

(g)       Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination.  Any Independent Counsel, member of the Board or stockholder of the Company shall act reasonably and in good faith in making a determination regarding the Indemnitee's entitlement to indemnification under this Agreement.  Any costs or expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(h)       The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty.  In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding.  Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(i)       The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his conduct was unlawful.

7.       Remedies of Indemnitee.

(a)       In the event that (i) a determination is made pursuant to Section 6 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 5 of this Agreement, (iii) no determination of entitlement to indemnification is made pursuant to Section 6(b) of this Agreement within ninety (90) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) no contribution has been timely made

7

pursuant to Section 3 hereof, or (vi) payment of indemnification is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification or such determination is deemed to have been made pursuant to <u>Section 6</u> of this Agreement, Indemnitee shall be entitled to an adjudication in an appropriate court of the State of Delaware, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such indemnification.  Indemnitee shall commence such proceeding seeking an adjudication within one hundred eighty (180) days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 7(a)</u>.  The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)    In the event that a determination shall have been made pursuant to <u>Section 6(b)</u> of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this <u>Section 7</u> shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under <u>Section 6(b)</u>.

(c)    If a determination shall have been made pursuant to <u>Section 6(b)</u> of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this <u>Section 7</u>, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)    In the event that Indemnitee, pursuant to this <u>Section 7</u>, seeks a judicial adjudication of his rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on his behalf, in advance, any and all expenses (of the types described in the definition of Expenses in <u>Section 13</u> of this Agreement) actually and reasonably incurred by him in such judicial adjudication, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of expenses or insurance recovery.

(e)    The Company shall be precluded from asserting in any judicial proceeding commenced pursuant to this <u>Section 7</u> that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court that the Company is bound by all the provisions of this Agreement.  The Company shall indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefore) advance, to the extent not prohibited by law, such expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advance of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(f)    Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

8.    Non-Exclusivity; Survival of Rights; Insurance; Primacy of Indemnification; Subrogation.

(a)    The rights of indemnification as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the By-laws, any agreement, a vote of stockholders, a resolution of directors of the Company, or otherwise.  No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his Corporate Status prior to such amendment, alteration or repeal.  To the extent that a change in the DGCL, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Certificate of Incorporation, By-laws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.  No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b)    To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, or agents or fiduciaries of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person serves at the request of the Company, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any director, officer, employee, agent or fiduciary under such policy or policies.  If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

(c)    In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(d)    The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e)    The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or

9

advancement of expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

9.      <u>Exception to Right of Indemnification</u>. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any claim made against Indemnitee:

(a)      for which payment has actually been made to or on behalf of Indemnitee under any insurance policy or other indemnity provision, except with respect to any excess beyond the amount paid under any insurance policy or other indemnity provision; or

(b)      for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of <u>Section 16(b)</u> of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law; or

(c)      Except for actions by the Indemnitee to enforce Indemnitee's rights hereunder, in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation, or (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law.

10.      <u>Duration of Agreement</u>.  All agreements and obligations of the Company contained herein shall continue during the period ending three (3) years after the Indemnitee ceases to be an officer or director of the Company (or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) and shall continue thereafter so long as Indemnitee shall be subject to any Proceeding (or any proceeding commenced under <u>Section 7</u> hereof) by reason of his Corporate Status, whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors and personal and legal representatives.

11.      <u>Security</u>.  To the extent requested by Indemnitee and approved by the Board, the Company may at any time and from time to time provide security to Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral. Any such security, once provided to Indemnitee, may not be revoked or released without the prior written consent of the Indemnitee.

12.      <u>Enforcement</u>.

(a)      The Company expressly confirms and agrees that it has entered into this Agreement and assumes the obligations imposed on it hereby in order to induce Indemnitee to

10

serve as an officer or director of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as an officer or director of the Company.

(b)    This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(c)    The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of expenses under this Agreement.

13.    <u>Definitions</u>.  For purposes of this Agreement:

(a)    "**Corporate Status**" describes the status of a person who is or was a director, officer, employee, agent or fiduciary of the Company or of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that such person is or was serving at the express written request of the Company.

(b)    "**Disinterested Director**" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(c)    "**Enterprise**" shall mean the Company and any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise that Indemnitee is or was serving at the express written request of the Company as a director, officer, employee, agent or fiduciary.

(d)    "**Expenses**" shall include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, participating, or being or preparing to be a witness in a Proceeding, or responding to, or objecting to, a request to provide discovery in any Proceeding. Expenses also shall include Expenses incurred in connection with any appeal resulting from any Proceeding and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, including without limitation the premium, security for, and other costs relating to any cost bond, supersede as bond, or other appeal bond or its equivalent. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(e)    "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder.  Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.  The

11

Company agrees to pay the reasonable fees of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(f)      "**Proceeding**" includes any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether civil, criminal, administrative or investigative, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of his or her Corporate Status, by reason of any action taken by him or of any inaction on his part while acting in his or her Corporate Status; in each case whether or not he is acting or serving in any such capacity at the time any liability or expense is incurred for which indemnification can be provided under this Agreement; including one pending on or before the date of this Agreement, but excluding one initiated by an Indemnitee pursuant to Section 7 of this Agreement to enforce his rights under this Agreement.

14.    Severability.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.  Further, the invalidity or unenforceability of any provision hereof as to either Indemnitee or Appointing Stockholder shall in no way affect the validity or enforceability of any provision hereof as to the other.  Without limiting the generality of the foregoing, this Agreement is intended to confer upon Indemnitee and Appointing Stockholder indemnification rights to the fullest extent permitted by applicable laws. In the event any provision hereof conflicts with any applicable law, such provision shall be deemed modified, consistent with the aforementioned intent, to the extent necessary to resolve such conflict.

15.    Modification and Waiver.    No supplement, modification, termination or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

16.    Notice By Indemnitee.  Indemnitee agrees promptly to notify the Company in writing upon being served with or otherwise receiving any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification covered hereunder.  The failure to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise unless and only to the extent that such failure or delay materially prejudices the Company.

17.    Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

(a)     To Indemnitee at the address set forth below Indemnitee signature hereto.

(b)     To the Company at:

> BlockFi Inc.
> 86 Chamber Street, Suite 205
> New York, NY 10007
> Attention: Chief Executive Officer

or to such other address as may have been furnished to Indemnitee by the Company or to the Company by Indemnitee, as the case may be.

**18.**     <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**19.**     <u>Headings</u>.  The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

**20.**     <u>Governing Law and Consent to Jurisdiction.</u>  This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. The Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Chancery Court of the State of Delaware (the "**Delaware Court**"), and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court, and (iv) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Indemnification Agreement on and as of the day and year first above written.

**BLOCKFI INC.**

By: _____

Name: Flori Marquez

Title: Vice President of Operations

**INDEMNITEE**

_____

Name: Zachary Prince

Address: _____

_____

_____

# **EXHIBIT F**

*Execution Version*

## INDEPENDENT DIRECTOR COMPENSATION AGREEMENT

This **INDEPENDENT DIRECTOR COMPENSATION AGREEMENT** (the "Agreement") is made as of November 22, 2022, by and between BlockFi Inc., a Delaware corporation (the "Company"), and Jennifer M. Hill ("Director").

## BACKGROUND

**WHEREAS,** the Director presently serves on the board of directors of the Company (the "Board").

**WHEREAS,** the Company desires and has requested that Director serve as a member of a special committee of the Board.

**WHEREAS,** the Director has previously been compensated for her service as a member of the Board on terms mutually agreed between the Director and the Company.

**WHEREAS,** the Company and Director seek to modify the terms of Director's compensation.

**WHEREAS,** the Company and Director are entering into this Agreement to induce the Director to serve in the capacity set forth above and to set forth certain understandings between the parties.

## AGREEMENT

1.      [Reserved.]

**2.      TERM**.  The term of this Agreement shall continue until such time as Director resigns or is removed by the equity holders of the Company having the right to designate or remove the Director at any time, with or without cause.

**3.      COMPENSATION**.  For all services to be rendered by Director hereunder, and for so long as Director remains a Director of the Company, the Company agrees to pay Director a monthly fee of ███████, with the first monthly fee due upon execution of this Agreement and each monthly fee thereafter payable on the first of each month.  Additionally, the Company agrees to pay Director a daily fee of █████ for each day that the Director is being deposed, testifying in court and/or spending more than four hours on such day on activities outside the scope of normal board duties.

**4.      EXPENSES**.  In addition to the compensation provided in Section 3 hereof, the Company will reimburse Director for reasonable and documented business-related expenses incurred in good faith in the performance of Director's duties for the Company.  Such payments shall be made by the Company upon submission by Director of a written statement itemizing the expenses incurred.  Such statement shall be accompanied by sufficient documentary matter to support the expenditures.

**5.**      [Reserved.]

6.      **INDEMNIFICATION**.

(a)      **Certain Definitions**.  For purposes of this <u>Section 6</u>, the term:

(i)      **"Expenses"** means all reasonable and documented expenses, liabilities and losses (including, without limitation, attorneys' fees, retainers, expert and witness fees, disbursements and expenses of counsel, judgments, fines, excise taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by Director or on Director's behalf in connection with a Proceeding.

(ii)      **"Proceeding"** means any threatened in writing, pending, actual or completed action, suit, inquiry or proceeding involving or related to the Company, whether civil, criminal, administrative or investigative, whether public or private, and, including any such threatened, in writing pending, actual or completed action, suit, inquiry or proceeding by or in the right of the Company.

(b)      **Indemnification**. In the event that Director was or is made a party or is threatened to be made a party to or is involved (including, without limitation, as a witness) in any Proceeding by reason of the fact that Director is or was an independent director of the Company and, whether the basis of such Proceeding is alleged action in an official capacity as an independent director of the Company, or as an officer, employee, trustee or agent of the Company while serving as an independent director of the Company, the Company shall indemnify and hold harmless Director to the fullest extent authorized by Delaware law or any other applicable law or rule, but no less than to the extent set forth herein, against all Expenses; *provided*, *however*, that the Company shall indemnify Director only if Director provides prompt written notice of the Proceeding to the Company; and *provided*, *further*, that the Company shall indemnify Director only if Director acted honestly and in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on Director by the Company's Organizational Documents and the resolutions of the Company approving Director's appointment and with a view to the best interests of the Company and did not engage in fraud, gross negligence, or willful misconduct and, in the case of criminal Proceedings, Director had no reasonable cause to believe her conduct was unlawful; and *provided*, *further*, that the Company shall indemnify Director in connection with a Proceeding (or claim or part thereof) initiated by Director only if (i) such Proceeding is a suit or other action seeking to enforce Director's right to advancement of expenses and/or indemnification under this Agreement or (ii) such Proceeding (or claim or part thereof) was authorized by the board of directors of the Company.

(c)      **Presumptions**.  If, under Delaware law, the entitlement of Director to be indemnified hereunder shall depend upon whether Director shall have acted in good faith and in a manner Director reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to criminal Proceedings, had no reasonable cause to believe Director's conduct was unlawful, or shall have acted in accordance with some other defined standard of conduct, or whether fees and disbursements of counsel and other costs and amounts are reasonable, the burden of proof of establishing that Director has not acted in accordance with such standard and that such costs and amounts are unreasonable shall rest with the Company, and Director shall be presumed to have acted in accordance with such standard, such costs and amounts shall be conclusively presumed to be reasonable and Director shall be entitled to indemnification unless, and only unless,

2

it shall be determined by a final order of a court of competent jurisdiction (after exhaustion or expiration of the time for filing of all appeals) that Director has not met such applicable standard, with respect to the amount of indemnification, that such costs and amounts are not reasonable (in which case Director shall be indemnified to the extent such costs and amounts are determined by such court to be reasonable).

The provisions of this Section 6(c) shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct, if applicable, under Delaware law.

(d)    **Indemnification When Wholly or Partly Successful**.  Without limiting the scope of indemnification provided in Section 6(b), to the extent that Director is a party to and is successful, on the merits or otherwise, in any applicable Proceeding, Director shall be indemnified to the maximum extent permitted by Delaware law against all Expenses. If Director is not wholly successful in a Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Director against all Expenses actually and reasonably incurred by Director and on Director's behalf in connection with each successfully resolved claim, issue or matter, and shall otherwise indemnify Director to the extent required by Section 6(b).  All Expenses shall be presumed to have been incurred with respect to successfully resolved claims, issues and matters unless, and only unless, based upon the applicable standard (with the burden of proof being on the Company), it shall be determined by a court of competent jurisdiction (after exhaustion or expiration of the time for filing of all appeals) that a portion of such Expenses were incurred with respect to unsuccessfully resolved claims, issues or matters. For purposes of this Section 6(d) and without limitation, the termination of any claim, issue or matter in any Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

(e)    **Suit to Recover Indemnification**. If a claim under Section 6(b) or Section 6(h) of this Agreement is not paid in full by the Company within thirty days after a written claim has been received by the Company, Director may at any time thereafter assert an administrative claim against the Company to recover the unpaid amount of the claim.  The expenses incurred by Director in bringing such claim (whether or not Director is successful) shall be paid by the Company unless a court of competent jurisdiction determines that each of the material assertions made by Director in such suit was not made in good faith and was frivolous.

(f)    **Rights Not Exclusive; Rights Continue**.  The right to indemnification and the payment of expenses incurred in defending any Proceeding in advance of its final disposition conferred in this Agreement shall not be exclusive of, or limit in any manner whatsoever, any other right which Director may have or hereafter acquire under any statute, provision of the Organizational Documents, agreement, vote of equity holders or otherwise.    The indemnification, expense advancement and other rights of Director herein shall continue after Director ceases to be an independent director for so long as Director may be subject to any possible claim for which she would be entitled to indemnification under this Agreement or otherwise as a matter of law, and shall not be amended, modified, terminated, revoked or otherwise altered without Director's prior written consent.

3

**(g)**    **Insurance**.  The Company or one of its affiliates (which, in the case of an affiliate, shall include coverage of directors of the Company) shall maintain insurance to protect the Company and any Director or trustee of the Company against any expense, liability or loss, and such insurance shall cover Director to at least the same extent as any other director of the Company; *provided* that the Company shall maintain customary "director and officer" insurance in form and amounts substantially similar to the insurance maintained by the Company as of the date hereof.  Director shall have the right to receive a copy of any policy for such insurance upon request.

**(h)**    **Advancement of Defense Costs**.    Notwithstanding anything in the Organizational Documents to the contrary, the Company shall also promptly pay Director the expenses actually and reasonably incurred in defending any Proceeding in advance of its final disposition without requiring any preliminary determination of the ultimate entitlement of Director to indemnification; *provided, however*, the payment of such expenses so incurred by Director in advance of the final disposition of any Proceeding shall be made only upon delivery to the Company of an unsecured undertaking in the form attached hereto as **Exhibit A** by or on behalf of Director, to repay (without interest) all amounts so advanced if it shall ultimately be determined that Director is not entitled to be indemnified under this Agreement.

**(i)**    **Subrogation**.  In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Director, who shall, at the Company's expense, execute all papers required and take all action necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

**(j)**    **No Duplication of Payments**.  The Company shall not be liable under this Agreement to make any payment in connection with any applicable Proceeding against Director to the extent Director has otherwise actually received payment (under any insurance policy, contract, agreement, the Organizational Documents, or otherwise) of the amounts otherwise indemnifiable hereunder.

**(k)**    **Contribution**.  If the indemnification provided in Section 6(b) and the advancement provided in Section 6(h) should under Delaware law be unenforceable or insufficient to hold Director harmless in respect of any and all Expenses with respect to any Proceeding, then the Company shall, subject to the provisions of this Section 6 (k) and for purposes of this Section 6(k) only, upon written notice from Director, be treated as if it were a party who is or was threatened to be made a party to such Proceeding (if not already a party), and the Company shall contribute to Director the amount of Expenses incurred by Director in such proportion as is appropriate to reflect the relative benefits accruing to the Company and all of its directors, trustees, officers, employees and agents (other than Director) treated as one entity on the one hand, and Director on the other, which arose out of the event(s) underlying such Proceeding, and the relative fault of the Company and all of its directors, trustees, officers, employees and agents (other than Director) treated as one entity on the one hand, and Director on the other, in connection with such event(s), as well as any other relevant equitable considerations.

No provision of this Section 6(k) shall:  (i) operate to create a right of contribution in favor of Director if it is judicially determined that, with respect to any Proceeding, Director engaged in

fraud, gross negligence, or willful misconduct or (ii) limit Director's rights to indemnification and advancement of Expenses, whether under this Agreement or otherwise.

The Company hereby waives any right of contribution from Director for Expenses incurred by the Company with respect to any Proceeding in which the Company is or is threatened to be made a party; *provided*, *however*, this waiver by the Company shall not be effective should a court of competent jurisdiction finally determine that Director engaged in fraud, will misconduct, or gross negligence which gave rise to such Expenses incurred by the Company.  The Company shall not enter into any settlement of any Proceeding in which the Company is jointly liable with Director (or would be if joined in such Proceeding) unless such settlement provides for a full and final release of all claims asserted against Director and does not contain an admission of wrongdoing by Director.

7.     **MISCELLANEOUS**.  Director confirms that the execution and performance of this Agreement shall not be in violation of any agreement or obligation (whether or not written) that Director may have with or to any person or entity.  If Director knows or has reason to know that any of the statements made herein is not true or will not be true in the future, Director shall immediately report such finding to the Company.  Director hereby acknowledges and agrees that this Agreement shall be an obligation solely of the Company, and Director shall have no recourse whatsoever against the Company's equity holders or any of their respective affiliates with regard to this Agreement.

8.     [Reserved.]

9.     **EFFECT OF WAIVER**.  The waiver by either party of the breach of any provision of this Agreement shall not operate as or be construed as a waiver of any subsequent breach thereof.

10.     **GOVERNING LAW**.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereto shall be determined by, the laws of the state of Delaware without reference to its conflicts of laws principles.

11.     **ASSIGNMENT**.  The rights and benefits of the Company under this Agreement shall not be transferable except by operation of law without Director's consent, and all the covenants and agreements hereunder shall inure to the benefit of, and be enforceable by or against, its successors and assigns.  The duties and obligations of Director under this Agreement are personal and therefore Director may not assign any right or duty under this Agreement without the prior written consent of the Company.

12.     **BINDING EFFECT; SUCCESSORS AND ASSIGNS**.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by each of the parties hereto and their respective successors, assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), heirs and personal legal representatives.  The Company shall require and cause any successor (whether direct or indirect, and whether by purchase, merger, consolidation or otherwise) to all, substantially all, or a substantial part, of the business or assets of the Company, by written agreement in form and substance reasonably satisfactory to Director, expressly to assume and

agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

**13.     SEVERABILITY; HEADINGS**.  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid as applied to any fact or circumstance, it shall be modified by the minimum amount necessary to render it valid, and any such invalidity shall not affect any other provision, or the same provision as applied to any other fact or circumstance.  The headings used in this Agreement are for convenience only and shall not be construed to limit or define the scope of any Section or provision.

**14.     COUNTERPARTS; AMENDMENT**.  This Agreement may be executed in one or more counterparts, each of which shall be considered one and the same agreement. No amendment to this Agreement shall be effective unless in writing signed by each of the parties hereto.

The parties hereto have caused this Agreement to be executed on the date first above written.

[Signature Page Follows]

**BLOCKFI INC.**

By:_____

Name:  Zachary Lee Prince

Title: Chief Executive Officer and President

**DIRECTOR**

By:_____

Name:  Jennifer M. Hill

*[Signature Page to the Independent Director Compensation Agreement]*

**BLOCKFI INC.**

By:_____
Name:  Zachary Lee Prince
Title: Chief Executive Officer and President

**DIRECTOR**

By:_____
Name:  Jennifer M. Hill

[*Signature Page to the Independent Director Compensation Agreement*]

## EXHIBIT A

**Undertaking to Repay**

      The undersigned hereby acknowledges her undertaking to repay any amounts advanced to her by BlockFi Inc., a Delaware corporation (the "Company") under Section 6(h) of the Independent Director Agreement between her and the Company (the "Agreement") in connection with [name of proceeding] (the "Proceeding"), if it is ultimately determined that she is not entitled to be indemnified with respect to the Proceeding under the Agreement.

Dated:_____        By:_____

                                         Name:  Jennifer M. Hill

# EXHIBIT G

DocuSign Envelope ID: 247E8796-B6EA-4782-9EB1-3A95A772G95E

**BlockFi Inc.**
201 Montgomery Street, Suite 263
Jersey City, New Jersey
United States of America

November 25, 2022

**THIS INDEMNIFICATION AGREEMENT** (this **"Agreement"**) is made and entered into as of November 25, 2022, between BlockFi Inc., a Delaware corporation (the "Company"), and Tony Lauro II, a director of the Company ("Indemnitee").

**WHEREAS**, Indemnitee presently serves as a director of the Company;

**WHEREAS**, the Company's organizational documents provide that the Company shall provide the directors and officers of the Company with indemnification to the fullest extent permitted by law;

**WHEREAS**, the Company desires to memorialize the terms of such indemnification pursuant to this Agreement; and

**WHEREAS**, the Indemnitee is willing to act or to continue to act as a director of the Company on the condition that the Company enter into this Agreement.

In consideration of Indemnitee's agreement to serve as a director of the Company from and after the date hereof, the parties hereto agree as follows:

**Indemnification Agreement**

    (a)    **Certain Definitions**. For purposes of this Agreement, the term:

    (i) **"Expenses"** means all reasonable and documented expenses, liabilities and losses (including, without limitation, attorneys' fees, retainers, expert and witness fees, disbursements and expenses of counsel, judgments, fines, excise taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by Indemnitee or on Indemnitee's behalf in connection with a Proceeding.

    (ii) **"Proceeding"** means any threatened in writing, pending, actual or completed action, suit, inquiry or proceeding involving or related to the Company, whether civil, criminal, administrative or investigative, whether public or private, and, including any such threatened, in writing pending, actual or completed action, suit, inquiry or proceeding by or in the right of the Company.

    (b)    **Indemnification**. In the event that Indemnitee was or is made a party or is threatened to be made a party to or is involved (including, without limitation, as a witness) in any Proceeding by reason of the fact that Indemnitee is or was a director of the Company and, whether the basis of such Proceeding is alleged action in an official capacity as a director of the Company,

DocuSign Envelope ID: 247F6796-B6FA-4782-9EB1-3A05A772C95E

or as a director, officer, employee, trustee or agent of the Company while serving as a director of the Company, the Company shall indemnify and hold harmless Indemnitee to the fullest extent authorized by Delaware law or any other applicable law or rule, but no less than to the extent set forth herein, against all Expenses; *provided*, *however*, that the Company shall indemnify Indemnitee only if Indemnitee provides prompt written notice of the Proceeding to the Company; and *provided*, *further*, that the Company shall indemnify Indemnitee only if Indemnitee acted honestly and in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on Indemnitee by the Company's charter, bylaws, articles of incorporation, or other organizational document as applicable (the **"Organizational Documents"**) and the resolutions of the Company approving Indemnitee's appointment and with a view to the best interests of the Company and did not engage in gross negligence, willful misconduct and, in the case of criminal Proceedings, Indemnitee had no reasonable cause to believe his conduct was unlawful; and *provided*, *further*, that the Company shall indemnify Indemnitee in connection with a Proceeding (or claim or part thereof) initiated by Indemnitee only if (i) such Proceeding is a suit or other action seeking to enforce Indemnitee's right to advancement of expenses and/or indemnification under this Agreement or (ii) such Proceeding (or claim or part thereof) was authorized by the board of directors of the Company.

(c)    **Presumptions**. If, under Delaware law, the entitlement of Indemnitee to be indemnified hereunder shall depend upon whether Indemnitee shall have acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to criminal Proceedings, had no reasonable cause to believe Indemnitee's conduct was unlawful, or shall have acted in accordance with some other defined standard of conduct, or whether fees and disbursements of counsel and other costs and amounts are reasonable, the burden of proof of establishing that Indemnitee has not acted in accordance with such standard and that such costs and amounts are unreasonable shall rest with the Company, and Indemnitee shall be presumed to have acted in accordance with such standard, such costs and amounts shall be conclusively presumed to be reasonable and Indemnitee shall be entitled to indemnification unless, and only unless, it shall be determined by a court of competent jurisdiction (after exhaustion or expiration of the time for filing of all appeals) that Indemnitee has not met such applicable standard, with respect to the amount of indemnification, that such costs and amounts are not reasonable (in which case Indemnitee shall be indemnified to the extent such costs and amounts are determined by such court to be reasonable).

The provisions of this Section (c) shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct, if applicable, under Delaware law.

(d)    **Indemnification When Wholly or Partly Successful**. Without limiting the scope of indemnification provided in Section (b), to the extent that Indemnitee is a party to and is successful, on the merits or otherwise, in any applicable Proceeding, Indemnitee shall be indemnified to the maximum extent permitted by Delaware law against all Expenses. If Indemnitee is not wholly successful in a Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee and on Indemnitee's behalf in connection with each successfully resolved claim, issue or matter, and shall otherwise indemnify Indemnitee to the extent required by Section (b). All Expenses shall be

2

DocuSign Envelope ID: 247F8796-B6FA-4782-9EB1-3A95A772C95E

presumed to have been incurred with respect to successfully resolved claims, issues and matters unless, and only unless, based upon the applicable standard (with the burden of proof being on the Company), it shall be determined by a court of competent jurisdiction (after exhaustion or expiration of the time for filing of all appeals) that a portion of such Expenses were incurred with respect to unsuccessfully resolved claims, issues or matters. For purposes of this Section (d) and without limitation, the termination of any claim, issue or matter in any Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

(e)    **Suit to Recover Indemnification**. If a claim under Section (b) or Section (h) of this Agreement is not paid in full by the Company within thirty days after a written claim has been received by the Company, Indemnitee may at any time thereafter assert an administrative claim against the Company to recover the unpaid amount of the claim. The expenses incurred by Indemnitee in bringing such claim (whether or not Indemnitee is successful) shall be paid by the Company unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such suit was not made in good faith and was frivolous.

(f)    **Rights Not Exclusive; Rights Continue**. The right to indemnification and the payment of expenses incurred in defending any Proceeding in advance of its final disposition conferred in this Agreement shall not be exclusive of, or limit in any manner whatsoever, any other right which Indemnitee may have or hereafter acquire under any statute, provision of the Organizational Documents, agreement, vote of equity holders or otherwise. The indemnification, expense advancement and other rights of Indemnitee herein shall continue after Indemnitee ceases to be a director for so long as Indemnitee may be subject to any possible claim for which he would be entitled to indemnification under this Agreement or otherwise as a matter of law, and shall not be amended, modified, terminated, revoked or otherwise altered without Indemnitee's prior written consent.

(g)    **Insurance**. The Company or one of its affiliates (which, in the case of an affiliate, shall include coverage of directors of the Company) shall maintain insurance to protect the Company and any director, officer, or trustee of the Company against any expense, liability or loss, and such insurance shall cover Indemnitee to at least the same extent as any other director of the Company; *provided* that the Company shall use reasonable best efforts to maintain customary director insurance in form and amounts substantially similar to the insurance maintained by the Company as of the date hereof. Indemnitee shall have the right to receive a copy of any policy for such insurance upon request.

(h)    **Advancement of Defense Costs**. Notwithstanding anything in the Organizational Documents to the contrary, the Company shall also promptly pay Indemnitee the expenses actually and reasonably incurred in defending any Proceeding in advance of its final disposition without requiring any preliminary determination of the ultimate entitlement of Indemnitee to indemnification; *provided*, *however*, the payment of such expenses so incurred by Indemnitee in advance of the final disposition of any Proceeding shall be made only upon delivery to the Company of an unsecured undertaking in the form attached hereto as Exhibit A by or on behalf of

DocuSign Envelope ID: 247F8796-B5FA-4782-9EB1-3A95A772C95E

Indemnitee, to repay (without interest) all amounts so advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified under this Agreement.

(i)    **Subrogation**. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall, at the Company's expense, execute all papers required and take all action necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

(j)    **No Duplication of Payments**. The Company shall not be liable under this Agreement to make any payment in connection with any applicable Proceeding against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, contract, agreement, the Organizational Documents, or otherwise) of the amounts otherwise indemnifiable hereunder.

(k)    **Contribution**. If the indemnification provided in Section (b) and the advancement provided in Section (h) should under Delaware law be unenforceable or insufficient to hold Indemnitee harmless in respect of any and all Expenses with respect to any Proceeding, then the Company shall, subject to the provisions of this Section (k) and for purposes of this Section (k) only, upon written notice from Indemnitee, be treated as if it were a party who is or was threatened to be made a party to such Proceeding (if not already a party), and the Company shall contribute to Indemnitee the amount of Expenses incurred by Indemnitee in such proportion as is appropriate to reflect the relative benefits accruing to the Company and all of its directors, trustees, officers, employees and agents (other than Indemnitee) treated as one entity on the one hand, and Indemnitee on the other, which arose out of the event(s) underlying such Proceeding, and the relative fault of the Company and all of its directors, trustees, officers, employees and agents (other than Indemnitee) treated as one entity on the one hand, and Indemnitee on the other, in connection with such event(s), as well as any other relevant equitable considerations.

No provision of this Section (k) shall: (i) operate to create a right of contribution in favor of Indemnitee if it is final judicially determined that, with respect to any Proceeding, Indemnitee engaged in fraud, gross negligence, or willful misconduct or (ii) limit Indemnitee's rights to indemnification and advancement of Expenses, whether under this Agreement or otherwise.

The Company hereby waives any right of contribution from Indemnitee for Expenses incurred by the Company with respect to any Proceeding in which the Company is or is threatened to be made a party; *provided, however*, this waiver by the Company shall not be effective should a court of competent jurisdiction finally determine that Indemnitee engaged in fraud, willful misconduct, or gross negligence which gave rise to such Expenses incurred by the Company. The Company shall not enter into any settlement of any Proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such Proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee and does not contain an admission of wrongdoing by Indemnitee.

(l)    **Governing Law**. This Agreement shall be interpreted in accordance with, and the rights of the parties hereto shall be determined by, the laws of the state of Delaware without reference to its conflicts of laws principles.

DocuSign Envelope ID: 247F8796-B9EA-4782-9EB1-3A65A772C95E

(m)    **Binding Effect; Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by each of the parties hereto and their respective successors, assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), heirs and personal legal representatives.  The Company shall require and cause any successor (whether direct or indirect, and whether by purchase, merger, consolidation or otherwise) to all, substantially all, or a substantial part, of the business or assets of the Company, by written agreement in form and substance reasonably satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(n)    **Severability; Headings**.  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid as applied to any fact or circumstance, it shall be modified by the minimum amount necessary to render it valid, and any such invalidity shall not affect any other provision, or the same provision as applied to any other fact or circumstance.  The headings used in this Agreement are for convenience only and shall not be construed to limit or define the scope of any Section or provision.

(o)    **Counterparts; Amendment**.  This Agreement may be executed in one or more counterparts, each of which shall be considered one and the same agreement. No amendment to this Agreement shall be effective unless in writing signed by each of the parties hereto.

*[Signature page follows]*

5

**IN WITNESS WHEREOF**, the undersigned have accepted and agreed:

**BLOCKFI INC.**

By: _____

Name:  Zachary Prince

Title:  Chief Executive Officer

**INDEMNITEE**

By: _____

Name:  Tony Lauro II

# EXHIBIT H

DocuSign Envelope ID: 5A9D5D63-DEF1-48CA-A3E3-2558B3FA9C0D

**BlockFi Inc.**
201 Montgomery Street, Suite 263
Jersey City, New Jersey
United States of America

November 25, 2022

**THIS INDEMNIFICATION AGREEMENT** (this **"Agreement"**) is made and entered into as of November 25, 2022, between BlockFi Inc., a Delaware corporation (the "Company"), and Amit Cheela, the chief financial officer and treasurer of the Company ("Indemnitee").

**WHEREAS**, Indemnitee presently serves as an officer of the Company;

**WHEREAS**, the Company's organizational documents provide that the Company shall provide the directors and officers of the Company with indemnification to the fullest extent permitted by law;

**WHEREAS**, the Company desires to memorialize the terms of such indemnification pursuant to this Agreement; and

**WHEREAS**, the Indemnitee is willing to act or to continue to act as an officer of the Company on the condition that the Company enter into this Agreement.

In consideration of Indemnitee's agreement to serve as an officer of the Company from and after the date hereof, the parties hereto agree as follows:

**Indemnification Agreement**

(a)    **Certain Definitions**. For purposes of this Agreement, the term:

(i) **"Expenses"** means all reasonable and documented expenses, liabilities and losses (including, without limitation, attorneys' fees, retainers, expert and witness fees, disbursements and expenses of counsel, judgments, fines, excise taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered by Indemnitee or on Indemnitee's behalf in connection with a Proceeding.

(ii) **"Proceeding"** means any threatened in writing, pending, actual or completed action, suit, inquiry or proceeding involving or related to the Company, whether civil, criminal, administrative or investigative, whether public or private, and, including any such threatened, in writing pending, actual or completed action, suit, inquiry or proceeding by or in the right of the Company.

(b)    **Indemnification**. In the event that Indemnitee was or is made a party or is threatened to be made a party to or is involved (including, without limitation, as a witness) in any Proceeding by reason of the fact that Indemnitee is or was an officer of the Company and, whether

DocuSign Envelope ID: 5A9D5D63-DFF4-48CA-A3E3-2F5383F43C0D

the basis of such Proceeding is alleged action in an official capacity as an officer of the Company, or as a director, officer, employee, trustee or agent of the Company while serving as an officer of the Company, the Company shall indemnify and hold harmless Indemnitee to the fullest extent authorized by Delaware law or any other applicable law or rule, but no less than to the extent set forth herein, against all Expenses; *provided*, *however*, that the Company shall indemnify Indemnitee only if Indemnitee provides prompt written notice of the Proceeding to the Company; and *provided*, *further*, that the Company shall indemnify Indemnitee only if Indemnitee acted honestly and in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on Indemnitee by the Company's charter, bylaws, articles of incorporation, or other organizational document as applicable (the **"Organizational Documents"**) and the resolutions of the Company approving Indemnitee's appointment and with a view to the best interests of the Company and did not engage in gross negligence, willful misconduct and, in the case of criminal Proceedings, Indemnitee had no reasonable cause to believe his conduct was unlawful; and *provided*, *further*, that the Company shall indemnify Indemnitee in connection with a Proceeding (or claim or part thereof) initiated by Indemnitee only if (i) such Proceeding is a suit or other action seeking to enforce Indemnitee's right to advancement of expenses and/or indemnification under this Agreement or (ii) such Proceeding (or claim or part thereof) was authorized by the board of directors of the Company.

(c)    **Presumptions**. If, under Delaware law, the entitlement of Indemnitee to be indemnified hereunder shall depend upon whether Indemnitee shall have acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to criminal Proceedings, had no reasonable cause to believe Indemnitee's conduct was unlawful, or shall have acted in accordance with some other defined standard of conduct, or whether fees and disbursements of counsel and other costs and amounts are reasonable, the burden of proof of establishing that Indemnitee has not acted in accordance with such standard and that such costs and amounts are unreasonable shall rest with the Company, and Indemnitee shall be presumed to have acted in accordance with such standard, such costs and amounts shall be conclusively presumed to be reasonable and Indemnitee shall be entitled to indemnification unless, and only unless, it shall be determined by a court of competent jurisdiction (after exhaustion or expiration of the time for filing of all appeals) that Indemnitee has not met such applicable standard, with respect to the amount of indemnification, that such costs and amounts are not reasonable (in which case Indemnitee shall be indemnified to the extent such costs and amounts are determined by such court to be reasonable).

The provisions of this <u>Section (c)</u> shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct, if applicable, under Delaware law.

(d)    **Indemnification When Wholly or Partly Successful**. Without limiting the scope of indemnification provided in <u>Section (b)</u>, to the extent that Indemnitee is a party to and is successful, on the merits or otherwise, in any applicable Proceeding, Indemnitee shall be indemnified to the maximum extent permitted by Delaware law against all Expenses. If Indemnitee is not wholly successful in a Proceeding but is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee and on Indemnitee's behalf in connection with each successfully resolved claim, issue or matter, and shall

DocuSign Envelope ID: 5A9D5D64-DEF4-48CA-A3E3-255383FA3CDD

otherwise indemnify Indemnitee to the extent required by <u>Section (b)</u>. All Expenses shall be presumed to have been incurred with respect to successfully resolved claims, issues and matters unless, and only unless, based upon the applicable standard (with the burden of proof being on the Company), it shall be determined by a court of competent jurisdiction (after exhaustion or expiration of the time for filing of all appeals) that a portion of such Expenses were incurred with respect to unsuccessfully resolved claims, issues or matters. For purposes of this <u>Section (d)</u> and without limitation, the termination of any claim, issue or matter in any Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

(e)    **Suit to Recover Indemnification**. If a claim under <u>Section (b)</u> or <u>Section (h)</u> of this Agreement is not paid in full by the Company within thirty days after a written claim has been received by the Company, Indemnitee may at any time thereafter assert an administrative claim against the Company to recover the unpaid amount of the claim. The expenses incurred by Indemnitee in bringing such claim (whether or not Indemnitee is successful) shall be paid by the Company unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such suit was not made in good faith and was frivolous.

(f)    **Rights Not Exclusive; Rights Continue**. The right to indemnification and the payment of expenses incurred in defending any Proceeding in advance of its final disposition conferred in this Agreement shall not be exclusive of, or limit in any manner whatsoever, any other right which Indemnitee may have or hereafter acquire under any statute, provision of the Organizational Documents, agreement, vote of equity holders or otherwise. The indemnification, expense advancement and other rights of Indemnitee herein shall continue after Indemnitee ceases to be an officer for so long as Indemnitee may be subject to any possible claim for which he would be entitled to indemnification under this Agreement or otherwise as a matter of law, and shall not be amended, modified, terminated, revoked or otherwise altered without Indemnitee's prior written consent.

(g)    **Insurance**. The Company or one of its affiliates (which, in the case of an affiliate, shall include coverage of directors of the Company) shall maintain insurance to protect the Company and any director, officer, or trustee of the Company against any expense, liability or loss, and such insurance shall cover Indemnitee to at least the same extent as any other officer of the Company; *provided* that the Company shall use reasonable best efforts to maintain customary director insurance in form and amounts substantially similar to the insurance maintained by the Company as of the date hereof. Indemnitee shall have the right to receive a copy of any policy for such insurance upon request.

(h)    **Advancement of Defense Costs**. Notwithstanding anything in the Organizational Documents to the contrary, the Company shall also promptly pay Indemnitee the expenses actually and reasonably incurred in defending any Proceeding in advance of its final disposition without requiring any preliminary determination of the ultimate entitlement of Indemnitee to indemnification; *provided*, *however*, the payment of such expenses so incurred by Indemnitee in advance of the final disposition of any Proceeding shall be made only upon delivery to the Company of an unsecured undertaking in the form attached hereto as <u>Exhibit A</u> by or on behalf of

3

Indemnitee, to repay (without interest) all amounts so advanced if it shall ultimately be determined that Indemnitee is not entitled to be indemnified under this Agreement.

(i)    **Subrogation**. In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall, at the Company's expense, execute all papers required and take all action necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

(j)    **No Duplication of Payments**. The Company shall not be liable under this Agreement to make any payment in connection with any applicable Proceeding against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, contract, agreement, the Organizational Documents, or otherwise) of the amounts otherwise indemnifiable hereunder.

(k)    **Contribution**. If the indemnification provided in Section (b) and the advancement provided in Section (h) should under Delaware law be unenforceable or insufficient to hold Indemnitee harmless in respect of any and all Expenses with respect to any Proceeding, then the Company shall, subject to the provisions of this Section (k) and for purposes of this Section (k) only, upon written notice from Indemnitee, be treated as if it were a party who is or was threatened to be made a party to such Proceeding (if not already a party), and the Company shall contribute to Indemnitee the amount of Expenses incurred by Indemnitee in such proportion as is appropriate to reflect the relative benefits accruing to the Company and all of its directors, trustees, officers, employees and agents (other than Indemnitee) treated as one entity on the one hand, and Indemnitee on the other, which arose out of the event(s) underlying such Proceeding, and the relative fault of the Company and all of its directors, trustees, officers, employees and agents (other than Indemnitee) treated as one entity on the one hand, and Indemnitee on the other, in connection with such event(s), as well as any other relevant equitable considerations.

No provision of this Section (k) shall: (i) operate to create a right of contribution in favor of Indemnitee if it is final judicially determined that, with respect to any Proceeding, Indemnitee engaged in fraud, gross negligence, or willful misconduct or (ii) limit Indemnitee's rights to indemnification and advancement of Expenses, whether under this Agreement or otherwise.

The Company hereby waives any right of contribution from Indemnitee for Expenses incurred by the Company with respect to any Proceeding in which the Company is or is threatened to be made a party; *provided, however*, this waiver by the Company shall not be effective should a court of competent jurisdiction finally determine that Indemnitee engaged in fraud, willful misconduct, or gross negligence which gave rise to such Expenses incurred by the Company. The Company shall not enter into any settlement of any Proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such Proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee and does not contain an admission of wrongdoing by Indemnitee.

(l)    **Governing Law**.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereto shall be determined by, the laws of the state of Delaware without reference to its conflicts of laws principles.

DocuSign Envelope ID: 5A9D5D64-DFF1-48CA-A3E3-2E58B3FA9CDD

(m)     **Binding Effect; Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by each of the parties hereto and their respective successors, assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), heirs and personal legal representatives.  The Company shall require and cause any successor (whether direct or indirect, and whether by purchase, merger, consolidation or otherwise) to all, substantially all, or a substantial part, of the business or assets of the Company, by written agreement in form and substance reasonably satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(n)     **Severability; Headings**.  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid as applied to any fact or circumstance, it shall be modified by the minimum amount necessary to render it valid, and any such invalidity shall not affect any other provision, or the same provision as applied to any other fact or circumstance.  The headings used in this Agreement are for convenience only and shall not be construed to limit or define the scope of any Section or provision.

(o)     **Counterparts; Amendment**.  This Agreement may be executed in one or more counterparts, each of which shall be considered one and the same agreement. No amendment to this Agreement shall be effective unless in writing signed by each of the parties hereto.

*[Signature page follows]*

5

**IN WITNESS WHEREOF**, the undersigned have accepted and agreed:

**BLOCKFI INC.**

By: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Name:   Zachary Prince

Title:   Chief Executive Officer

**INDEMNITEE**

By: ▮▮▮▮▮▮▮▮▮▮▮▮

Name:   Amit Cheela