UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
IN RE:                      .      Case No. 22-19361-MBK
                            .      (Jointly Administered)
BLOCKFI INC., et al.,       .
                            .
        Debtors.            .
                            .      Thursday, March 23, 2023
. . . . . . . . . . . . .    .      11:29 a.m.
```

TRANSCRIPT OF STATUS CONFERENCE
BEFORE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:            Kirkland & Ellis LLP
                           By:  FRANCIS PETRIE, ESQ.
                           601 Lexington Avenue
                           New York, NY 10022

                           Haynes and Boone
                           By:  RICHARD KANOWITZ, ESQ.
                           30 Rockefeller Plaza, 26th Floor
                           New York, NY 10112

                           Haynes and Boone
                           By:  JORDAN CHAVEZ, ESQ.
                                AIMEE FURNESS, ESQ.
                           2323 Victory Avenue, Suite 700
                           Dallas, TX 75219

For the Plaintiff, Trey    Squitieri & Fearon, Llp
Green:                     BY:  LEE SQUITIERI, ESQ.
                           305 Broadway, 7th Floor
                           New York, NY  10007


Audio Operator             Kiya Martin


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.
_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@jjcourt.com

(609) 586-2311    Fax No. (609) 587-3599

2

**APPEARANCES CONT'D:**

```
For Plaintiff Antonie      Lockridge Grindal Nauen P.L.L.P.
Elas:                      BY:  GREGG M. FISHBEIN, ESQ.
                           100 Washington Avenue South, Ste 2200
                           Minneapolis, MN  55401
```

- - -

**INDEX**

| **EXHIBITS** | **ID.** | **EVD.** |
|---|---|---|
| D1  Declaration of Michael DiYanni of Moelis & Company | 3 | 4 |

1          THE COURT:  Please make use of the raised hand

2  function and I'll be able to identify that you wish to be

3  heard.  I think we have three matters or so on the agenda.  Let

4  me turn to debtors' counsel and ask which matters they wish to

5  pursue first.

6          MR. PETRIE:  That would be me.

7          THE COURT:  All right.

8          MR. PETRIE:  Good morning, Your Honor.  This is

9  Francis Petrie of Kirkland and Ellis, counsel for the debtors.

10         So an amended agenda was actually just filed moments

11 ago at Docket Number 666 that accounts for everything here, but

12 we'll take things in the order that's set out there with the

13 uncontested matters going first.

14         So, Your Honor, the first item we'd like to take up

15 today is the debtors' motion to sell certain self-mining assets

16 under Section 363 of the Bankruptcy Code.  It was filed at

17 Docket Number 571 and is going forward on an uncontested basis.

18         So as Your Honor is aware, in light of the bidding

19 procedures hearing we held in late January, the debtors and

20 their advisors have undergone a process to market several asset

21 packages, including certain digital coin self-mining assets

22 that included a number of physical machines that I'll refer to

23 as like the self-mining assets.

24         As an initial matter, we filed the declaration of

25 Michael DiYanni of Moelis at Docket Number 632 to provide the

1 evidentiary basis in support of the mining sale.  Mr. DiYanni

2 is dialed into the Zoom line and he's available to testify or

3 be cross-examined as needed.  But unless there's any questions,

4 we'd like to admit his declaration into evidence at this time.

5        THE COURT:  I'm prepared to accept the declaration in

6 lieu of direct testimony, unless there's any objection raised

7 by anyone.

8                    (No audible response)

9        THE COURT:  All right.  Thank you.  We'll have it

10 marked as D1.

11            *(Debtors Exhibit D1 is admitted to evidence)

12        MR. PETRIE:  Great.  Thank you, Your Honor.

13        For a brief overview, following the process that we

14 laid out at the bidding procedures hearing, Moelis reached out

15 with initial rounds of outreach and that yielded many

16 indications of interest, which amounted in five binding bids

17 for the entire package of self-mining assets with seven other

18 parties each bidding for specific portions of the self-mining

19 assets.  The debtors, their advisors, and the Committee worked

20 collaboratively throughout the marketing diligence and bidding

21 process to ensure that the auction could be competitive and

22 value maximizing for the debtors' estates.

23        The auction was publicly noticed in accordance with

24 the bidding procedures and was held on February 28th.  Multiple

25 parties submitted competing bids over the course of the day,

1  and it was ultimately very competitive.  Through this process,

2  the debtors and the Committee as a consultation party

3  determined that the bid that was submitted by U.S. Farms

4  contemplated the purchase of the entire package of assets and

5  ultimately was the highest and best offer for all assets.

6          So after productive negotiations with U.S. Farms and

7  in consultation with the Committee, the APA for the sale of the

8  mining assets has been fully negotiated and executed and has

9  been attached to the order as Exhibit 1.  A summary of that APA

10 and the document itself are attached to the motion, but

11 notably, the APA has very few conditions precedent to closing

12 and represents a fast and low risk path to bringing

13 approximately 4.675 million into the debtors' estates.

14         At closing, U.S. Farms will remit the purchase price

15 to the debtors, less the hold-back amount of 627,500, which

16 will be held in escrow pending the inspection and testing of

17 the assets.  The applicable legal standard here is the business

18 judgment rule and entry into this APA is certainly a sound

19 exercise of the debtors' business judgment.  The auction

20 yielded the best return for these assets and will bring

21 millions of dollars into the estates.  The purchase price is

22 fair and reasonable and was arrived at after several weeks of

23 good faith negotiations, including a full auction.

24         Even after the full notice period, no party has filed

25 an objection to the motion and the debtors have not received

1 any comments to the order.  The only remaining item is to gain

2 this Court's approval.

3          With that, unless Your Honor has any questions, the

4 debtors respectfully request that the Court grant the relief

5 sought in the motion and enter the proposed order.

6          THE COURT:  Thank you, Counsel.

7          My understanding is that the Committee supports the

8 proposed transaction as well.  Is there anyone who wishes to be

9 heard with respect to the proposed sale?

10                    (No audible response)

11          THE COURT:  All right.  The Court has reviewed the

12 APA as well as the underlying motion papers and agrees that

13 it's in the best interest of the estate to pursue this

14 transaction.  The Court is prepared to make the necessary

15 findings, including 363(m) findings requested, as well as a

16 waiver of the 6004(h) relief, unless anybody wishes to address

17 those issues separately.

18                    (No audible response)

19          THE COURT:  All right, then.

20          Is there a form of order?

21          MR. PETRIE:  The form of order is attached to it.

22          THE COURT:  The form of order attached to the papers

23 is the final product?

24          MR. PETRIE:  Yes, Your Honor.

25          THE COURT:  All right.  Then, we'll --

8

1          MR. PETRIE:  (Indiscernible), I believe.

2          THE COURT:  We'll have that entered today.

3          MR. PETRIE:  Great.  Thank you, Your Honor.

4          THE COURT:  Thank you, Counsel.

5          MR. PETRIE:  So next, before we jump into the

6  remaining agenda items, I'll take things slightly out of order

7  to provide a brief status update of the debtors' cash

8  management system following our discussions last Monday.  It

9  also feels like much longer than just last Monday that we were

10 having these conversations, as you can imagine.  But the

11 debtors have been working with the U.S. Trustee and the

12 Committee to ensure the safety of all of their funds.

13          We've worked collaboratively with those parties and

14 after many rounds of discussions, the debtors converted the 236

15 million in the money market funds at Silicon Valley Bank into

16 cash and moved that cash to their operating account at Silicon

17 Valley Bridge Bank, as it's now called.  At this time, all

18 deposits at Silicon Valley Bridge Bank, including new deposits,

19 are a hundred percent insured by the FDIC.

20          But for the future, we have opened new bank accounts

21 at a couple of banks, and we're working with each of them to

22 obtain surety bonds and/or pledge collateral as required by the

23 Uniform Depository Agreement.  So we have a permanent solution

24 to house these funds safely.  We intend to bring all debtor

25 funds into compliance with Section 345 as soon as possible.

1          As you can imagine, there's a lot of uncertainty in

2   the banking system right now, and we're attempting to navigate

3   that every day.  With that being said, we do represent that we

4   are attempting to come into compliance with Section 345 as soon

5   as we can, and I believe the U.S. Trustees Office would like to

6   make some comments on the record as well.

7          THE COURT:  All right.  Thank you, again.

8          Ms. Bielskie.  Good morning.

9          MS. BIELSKI:  Good morning, Your Honor.  And thank

10  you.

11         As Counsel said, yes, the U.S. Trustee has been

12  communicating with Counsel over the last about week and a half.

13  Given the representations that the funds at Silicon Valley

14  Bridge Bank are 100 percent insured, including the new

15  deposits, the United States Trustee does not object to the

16  money mark -- well, now that it's been converted, that's news

17  to us as of today, that that fund is now converted to cash and

18  held there with the funds that were already on deposit.

19         The U.S. Trustee also wants to make clear, especially

20  in light of the recent bank failures, that debtors must take

21  steps to ensure the money is held in compliant accounts and

22  compliant accounts are those accounts that are under a

23  depository agreement and are collateralized or bonded by the

24  banks.

25         As such, the U.S. Trustee will continue to work with

1  the debtors, with Silicon Valley Bridge Bank, any successor,

2  and the FDIC to navigate where these funds end up and ensure

3  that such accounts remain protected in the interim.  I do ask

4  the Court that the pending motion be adjourned to the next

5  omnibus hearing date while the debtors continue to take steps

6  to make sure that all of their funds are in compliance with

7  Section 345.

8         THE COURT:  All right.  Is there anyone else who

9  wishes to be heard as far as the status report with respect to

10  cash management?

11              (No audible response)

12         THE COURT:  Then, the pending motion filed by the

13  Trustee will be carried to, I believe April 19th is the next

14  omnibus date.  So --

15         MS. BIELSKI:  Thank you, Your Honor.

16         MR. PETRIE:  Correct, Your Honor.

17         THE COURT:  -- we will carry that Docket Number 599

18  to that date.  And I thank debtors' counsel for the update and

19  the cooperative efforts of the U.S. Trustee's Office in this

20  regard.

21         MS. BIELSKI:  Thank you, Your Honor.

22         THE COURT:  You're welcome.

23         All right.  Let me turn back to debtors' counsel.

24         MR. PETRIE:  Your Honor, now I'll turn the virtual

25  podium over to my co-counsel at Haynes and Boone.

1          MS. CHAVEZ:  Good morning, Your Honor.  Jordan Chavez

2    with Haynes and Boone on behalf of the debtors.

3          I'll be taking up the remaining uncontested matter on

4    the agenda, which is the debtors' motion requesting an

5    extension of time to assume or reject the non-residential real

6    property leases, which was filed at Docket Number 572.

7          We're seeking an additional 90 days, which would

8    bring the deadline to September 25, 2023, based on an initial

9    210 days provided under the amendment to Section 365(d)(4)

10    which, although, as we noted in our motion, had a sunset date

11    of December 27th.  Because this case was filed before the

12    amendment sunset date, we take the position that we have the

13    initial 210 days and would just request an additional 90 days

14    to continue our analysis of those leases and how they might be

15    best assumed or rejected.

16          Depending on the fact that we're running a dual track

17    process in the case, a potential buyer may want to make that

18    determination so we think that September 25th gives us ample

19    time to run that analysis and we would know at that point

20    whether it will be the debtors making an assumption or

21    rejection or an assumption and assignment of those leases.  And

22    we did not receive any comments or objections to the motion.

23          So unless Your Honor has any questions, we would

24    respectfully request that you grant the extension.

25          THE COURT:  All right.  Thank you, Counsel.

1      Is there anyone appearing remotely wishing to be

2  heard?

3                      (No audible response)

4      THE COURT:  Again, I see nobody.  Everybody is quiet

5  today.

6      So for the record, this Court is in agreement with

7  those courts that have addressed the issue with respect to

8  application of the extended 210 day period, notwithstanding the

9  sun setting of the legislation for those cases that were filed

10  in advance of the sunset date.

11     Given that the Court is also willing to extend the

12  requested 90 days which brings us, I think we said

13  September 25, 2023.

14     MS. CHAVEZ:  Yes, Your Honor.

15     THE COURT:  All right.  The Court will -- I believe

16  we have the order already included with the motion package.  Is

17  that correct?

18     MS. CHAVEZ:  Yes, Your Honor.  There have been no

19  changes to the order that was filed with the motion.

20     THE COURT:  All right.  Then, we'll enter that order

21  today as well.  Thank you, Counsel.

22     That would bring us --

23     MS. CHAVEZ:  Thank you, Your Honor.

24     THE COURT:  You're welcome.

25     MS. CHAVEZ:  That would bring us to the order

1  shortening time with respect to the request for temporary

2  restraints relative to the adversary proceeding that's been

3  filed seeking preliminary injunction and other relief.

4           Let me turn to --

5           MS. CHAVEZ:  Yes, Your Honor.

6           THE COURT:  Counsel, are you handling this matter as

7  well?

8           MS. CHAVEZ:  No.  I'll be turning over the virtual

9  podium to Mr. Kanowitz and Ms. Furness with Haynes and Boone to

10 address that matter.

11          Thank you.

12          THE COURT:  All right.  Thank you.

13          Good morning, Mr. Kanowitz.

14          MR. KANOWITZ:  Good morning, Your Honor.  May it

15 please the Court.  Richard Kanowitz of Haynes and Boone on

16 behalf of the debtors and debtors in possession.

17          Your Honor, you've laid out the posture of this

18 matter on the record already, so I won't belabor it.  We're

19 here today pursuant to your order.  We could not get to an

20 agreed temporary restraining order pending the hearing on the

21 preliminary injunction motion that we filed, which is set for

22 hearing on April 19th, so we needed to file papers, and Your

23 Honor, thankfully, granted our hearing for today.

24          I'm going to turn the podium over to my partner,

25 Aimee Furness.  She will be arguing the TRO motion.  So I'll do

1 so now, unless you have any questions for me.

2          THE COURT:  No.  That's fine.  Thank you,

3 Mr. Kanowitz.

4          Ms. Furness, good morning.

5          MS. FURNESS:  Good morning, Your Honor.  Aimee

6 Furness with Haynes and Boone, here on behalf of the debtors.

7          And we are here today to request that the Court enter

8 the order to show cause with temporary restraints.  At issue

9 here are two lawsuits.  Both lawsuits are punitive class action

10 lawsuits brought against the debtors' officers, directors, and

11 former employees.  The first one is entitled <u>Greene vs. Prince</u>,

12 which is BlockFi CEO and board member, Flori Marquez, which is

13 BlockFi COO and board member.

14          They name a gentleman called Tony Laura.  At least

15 within BlockFi, there's no such person with that name.  We

16 presume they mean BlockFi's independent board member, Tony

17 Lauro, Jennifer Hill, which is another independent board

18 member, and then Gemini Trading which they allege is some sort

19 of partner of BlockFi.  That lawsuit was filed in New Jersey on

20 February 28, 2023.

21          Different than our papers, I looked again on the

22 docket this morning, and apparently Gemini Trading has been

23 served.  But we are without information that any of the others

24 have been served yet in that lawsuit.

25          The second lawsuit is Antonie Elas versus, again,

1  Mr. Prince, Ms. Marquez.  That one also includes Amit Cheela,

2  who is BlockFi's CFO, David Olsson, which is a former senior

3  vice president, and Samia Bayou, who's also a former senior

4  vice president.  That one is filed in Massachusetts.  Both of

5  those complaints, Your Honor, can be found in the Court's

6  record at Docket 4-1.

7          The Greene complaint is Exhibit A to the

8  certification of Mark Renzi, and it's located in the PDF at

9  Pages 2 through 71.  And the Elas complaint is also an exhibit

10 to the Renzi certification, which is Exhibit B.  Again,

11 Docket 4-1 and Pages 73 through 117.  Your Honor, we're here

12 today requesting emergency relief because Mr. Prince and

13 Mr. Cheela have both been served with the Elas complaint.  They

14 were served on March 9th making their deadline to assert 12(b)

15 defenses or answer March 30th, which is next week.

16         The summons served on each of those individuals is

17 attached, again, to the Renzi certification, which is

18 Docket 4-1.  Those are Exhibit M, as in Mary, and N, as in

19 Nancy, beginning on Pages 208 and 266.

20         By way of this adversary proceeding, the debtors

21 ultimately seek one of two things.  One, a declaration that the

22 automatic stay actually applies to these lawsuits or that the

23 stay can be and should be, and the Court finds, is extended to

24 the prosecution of these two lawsuits.

25         And the second thing the debtors seek in the

1   alternative is the issuance of a preliminary injunction under

2   Section 105, staying the prosecution of these two cases.

3   That's the ultimate relief that we seek.  And briefly, Your

4   Honor, the facts prior to the bankruptcy case, a lawsuit was

5   filed by the same counsel that represents Greene in the matter

6   that we're discussing today, alleging basically the same claims

7   against BlockFi.

8         There are allegations of violations related to

9   securities law, both federal as well as various states.  In

10  that matter, it was called Mangano, and for the Court's

11  purposes, the amended complaint in that matter is attached as

12  Exhibit O to the Renzi certification, and that starts on

13  Page 324.

14        In the Mangano matter, the issues had been fully

15  briefed.  The motion to dismiss had been completely briefed,

16  and it was awaiting a decision before the case was

17  administratively closed due to the bankruptcy.  So then what

18  happens, a very short time later, counsel in these two matters

19  filed these lawsuits.  Both lawsuits admit and proudly state

20  none of the defendants here are subject to the automatic stay.

21  None of them are in bankruptcy.  They're not subject to the

22  stay, but they're going to go forward.

23        Both lawsuits are against the current officers,

24  current directors, and former employees.  So, Your Honor,

25  again, we are here asking today for a temporary restraining

1  order and there are four factors that the Court needs to look

2  at to determine whether an injunction is appropriate in this

3  case.

4           Your Honor, unfortunately, you're probably going to

5  hear almost the same argument again on April 19th because the

6  standard is the same, whether we are requesting a temporary

7  restraining order or a preliminary injunction.  The first

8  factor is whether there's a reasonable probability of success

9  on the merits.  And, Your Honor, we're well aware that you are

10 well aware of these elements and the standards applied because

11 this case is remarkably similar to the LTL matter in which you

12 heard a similar request to stay securities class actions as a

13 result of the bankruptcy.

14          So for our purposes in the bankruptcy context,

15 success on the merits really means a successful reorganization.

16 Under the case law, in a case that's in the early stages,

17 courts say that there should be a rebuttable presumption that

18 the company is making a good faith effort to reorganize.  So in

19 this matter, Your Honor, several examples demonstrate that

20 BlockFi and the debtors are attempting a good faith

21 reorganization.

22          For example, the Court has granted several first day

23 orders.  Those are located at Dockets 298, 300, 303 through

24 306, and 308.  As we just heard, Your Honor, there's been an

25 auction process for various assets and the plan is on file and

1  that's Docket 22.

2         Factor two that the Court should review in

3  determining whether or not a TRO is appropriate is whether the

4  continuation of these two lawsuits will irreparably harm the

5  debtors.  And of course, Your Honor, we believe they absolutely

6  will, and none of the harms in this case are remote or

7  speculative.   They are demonstrative and they are imminent.

8         The first is, frankly, Your Honor, the debtors are

9  between a rock and a hard place as it relates to this.  If

10 these lawsuits continue, the basis of these lawsuits is the

11 allegation by the plaintiff that the BIAs, the BlockFi interest

12 accounts are securities.  That's their allegation.  If that's

13 determined in these lawsuits with these officers and directors,

14 BlockFi is left out of that argument.

15        It is a critical question and it's the exact same

16 question that was present in the Mangano case that was filed

17 pre-bankruptcy and was stayed as a result of the bankruptcy.

18 The other issue that the plaintiffs in these two matters are

19 challenging are actions that they allege violated securities

20 law.  BlockFi can only act through individuals.  As a company,

21 it can't act on its own.  And here, they're alleging, instead

22 of saying BlockFi in their pleadings, BlockFi sold, BlockFi

23 offered and sold, they are now saying these individuals caused

24 BlockFi to offer and sell.

25        They're basically the same allegations, and as Your

1    Honor has noted in other opinions, that puts the debtors in a

2    very precarious position because the debtors' actions are what

3    is actually going to be judged in these two lawsuits.  There is

4    an identity of interest between these officers and directors

5    and the debtors.

6         A judgment against these officers and directors is

7    more or less a judgment or finding against the debtors, and

8    that is an irreparable harm for which there is nothing that can

9    be done once those things happen.  These lawsuits, Your Honor,

10   are clearly an effort only to avoid the automatic stay.

11        As I mentioned, Your Honor, they made very small

12   changes.  So instead of saying BlockFi offered and sold, that

13   becomes in the new pleading, the BFI defendants, which are the

14   individuals, caused BlockFi to offer and sell.  And just as an

15   example, Your Honor, to compare those two, these are attached

16   again to the Renzi certification at 4-2 is the Docket Number.

17   The first one I mentioned was Exhibit O, and you can find that

18   on Page 327.  The second one I mentioned is Exhibit A and

19   that's on Page 4.

20        In addition, Your Honor, just to go to show that

21   these are simply an effort to avoid the automatic stay, in the

22   Greene matter, they only mention, as far as any statements,

23   allegations, or anything, Prince and Marquez.  There are

24   absolutely no allegations at all other than identifying as

25   parties, Mr. Lauro or Ms. Hill.  And the other one, Elas, is

1  the same.  The only mention of the actual individual officers

2  and directors is one statement that Olsson and Bayou, those are

3  two of the former employees, resigned.  That matter has

4  Mr. Cheela, which is the current CFO, as a party.  There's

5  absolutely no allegation about him at all other than

6  identification as a party.  These two are simply efforts to

7  avoid the automatic stay.

8       The debtors are really in a bad spot because they

9  have to participate to protect their interests.  Again, on

10 whether these BIAs are securities and whether the actions of

11 the officers and directors somehow violated security claims

12 because that necessarily means that BlockFi also violated some

13 security claims.  So they can either participate and have their

14 rights and obligations outlined, or they can enjoy the stay.

15 That is a choice that BlockFi has to make and courts frequently

16 say that's an irreparable harm.

17      In the <u>In re Calpine</u> case, which is out of the

18 Southern District of New York, the court says having to be put

19 in this Hobson's choice between these two options is an

20 irreparable harm.  As the Court knows, actions like this can

21 subject the debtors to something called record taint, meaning a

22 decision, and that one can be used against the debtors.

23      Collateral estoppel is possible.  *Res judicata* is

24 also possible.  The claims, the allegations, the assertions,

25 and the decisions in these lawsuits against the officers and

1  directors are going to be the same ones as against the debtors.

2  And where we sit now, the debtors are going to be unable to

3  protect their interests.

4         Another irreparable harm here is the depletion of

5  estate assets and we think this absolutely goes to the

6  extension of the automatic stay, which isn't exactly what we're

7  talking about today.  But it is also an irreparable harm.  This

8  Court has found in the <u>In re LTL</u> case that insurance is the

9  property of the estate.

10        In this matter, there is a policy that covers both

11 the company as well as officers and directors.  And I would

12 like to point you, Your Honor, to Docket Number 11 in the main

13 case.  That is a motion for entry of orders regarding insurance

14 policies, and in there in Schedule C on page 30 of that

15 document, it outlines the policy held by the debtors, one of

16 which is a D&O policy for $2 million.  That policy covers both

17 the debtors and the officers and directors.

18        If these two lawsuits continue to go forward, that

19 asset of the estate, the insurance coverage, will be depleted.

20 To the extent it's reduced at all, it is any irreparable

21 injury.  Debtors cannot go and get it back.  They can't reclaim

22 the insurance policy once it is depleted.

23        Your Honor, the Fourth Circuit in <u>A.H. Robins vs.</u>

24 <u>Piccinin, P-I-C-C-I-N-I-N</u>, 788 F.2d 1008.  The Court there

25 found that the insurance is property of the estate and

depleting that insurance is irreparable harm for which an

injunction can issue.

Mr. Renzi's certification gives further detail about

the insurance policies.  And, again, that's on Docket

Number 4-1 on Pages 4 and 5, in Paragraphs 21 and 22.  And he

says there that the claims made against the officers and

directors will be subject to those insurance policies.  He

outlines what the policy provides coverage for.  And he

outlines that the debtors and their officers are entitled to

use the proceeds for, among other things, defending actions and

settlements and things like that.

So, again, while we do believe that's probably a

352(a)(3), meaning these cases will actually deplete estate

assets and should be stayed, it's also an irreparable harm that

the Court can and should consider in whether to issue the show

cause here.

Another irreparable harm that the debtors are facing

is that these lawsuits are going to interfere with

reorganization.  The In re Calpine case I mentioned also found

that to be irreparable harm.  In this case, it's going to

divert the time and energy that our officers and directors have

for restructuring.  And we're seeing it already, Your Honor,

frankly.  Mr. Olsson, for example, has contacted debtors to

say, I keep getting names.  In securities litigation context,

plaintiff's counsel issue press releases it seems like daily.

1          And every time that comes up, the individual

2    defendants, including those that are not mentioned other than

3    as parties, are getting pinged as far as these are press

4    releases to which they end up contacting the debtors, asking

5    for updates and indemnification issues.  It is already

6    diverting time and energy.  The Renzi certification, again,

7    Docket 4-1, Page 5, Paragraph 23, he outlines this and he says

8    that if the focus and energy of our officers and directors is

9    diverted, the reorganization of the company will be impacted.

10   I'm not sure there can be much argument about that.

11         The next irreparable harm is the company's

12   indemnification obligations and they are extensive.  In the

13   Calpine matter, Your Honor, the Southern District of New York

14   found that indemnification can also be an irreparable harm.

15   Again, we certainly believe that that relates to extension of

16   the stay, but today is focusing only on irreparable harm and

17   that's what we have here.

18         I'm not going to walk through every one, Your Honor,

19   but I just request a tiny bit of patience to walk through a few

20   of the indemnification obligations that the company has.  The

21   first source is the amended and restated bylaws off BlockFi.

22   This is again attached to the Renzi certification, and it is

23   found on Page 119.  That's the beginning of the by-laws.  And

24   I'm actually going to turn to Page 133.  Most of the

25   indemnification obligation are very similar, so again, I'm not

1 going to walk through every single one.  But the bylaws --

2          THE COURT:  Counsel, I'll short-circuit it just a bit

3 because I have read the papers, including the requisite

4 exhibits and the language in the agreements, especially since

5 we're doing this remotely.  Let me let you finish.

6          I see Mr. Squitieri with a hand raised.  Did you want

7 to speak now, or is this more for when you want to respond,

8 Mr. Squitieri?

9          MR. SQUITIERI:  (No audible response)

10          THE COURT:  You need to put your mic on.

11          There you go.

12          MR. SQUITIERI:  Your Honor, I thought you were

13 bringing the debtors' counsel presentation to a conclusion and

14 then I just wanted to queue up.  But I can wait.

15          THE COURT:  All right.  That's fine.  Thank you.

16          Ms. Furness, please continue.

17          MS. FURNESS:  Thank you, Your Honor.

18          And, as I mentioned, the debtors have indemnification

19 obligations in bylaws and specific indemnification agreements.

20 In addition to that, the debtors have actually received

21 indemnification demands.  They are also attached to the Renzi

22 certification.  I'm sure Your Honor has looked at them.  That,

23 again, is an irreparable harm.

24          The fourth factor that the Court should review in

25 determining whether or not to issue an injunction in this

1  matter is the public interest.  And here, the public interest

2  is for the reorganization of companies, for the debtors to be

3  able to reorganize.  And most of the cases say that one of the

4  most important public interests is that the debtor is allowed

5  to march down this path and come out on the other side.

6          What we're requesting here, Your Honor, is the

7  suspension of the status quo.  The status quo currently is that

8  these individual officers and directors are not required to

9  answer or get otherwise involved, engage counsel, start the

10 bills running, reducing the insurance, beginning (audio

11 interference).  That's what we're asking for, Your Honor.

12 We're asking for that for a total 28 days.

13         As Mr. Kanowitz mentioned, we have set the motion for

14 preliminary injunction for April 20th, or sorry, April 19th.

15 If Your Honor were to issue a TRO today as we requested, 28

16 days will be through April 20th.  We do believe good cause

17 exists to extend it for 28 days because the Court (audio

18 interference) for us on April 19th, which would also allow the

19 adversary defendants here time to ramp up and get up to speed.

20         So, Your Honor, the debtors meet all four factors and

21 we request that the Court do so.  The Court is also not

22 required to request a bond of the debtors.  I'm sure Your Honor

23 knows that under Federal Rule of Bankruptcy Procedure 76 (audio

24 interference).

25         THE COURT:  I think you're off.  Your mic is off.

26

1          MS. FURNESS:  We tried to get a agreement with the

2   adversary defendant's counsel over the course of the last many

3   days.  We served them with the complaint that was filed within

4   18 minutes of it being filed.  We sent a proposed TRO.  We had

5   a call yesterday.  We got responses on the proposed TRO, and

6   unfortunately, the provisions that adversary defendant's

7   counsel brought to us denied, for example, that this Court had

8   exclusive jurisdiction over such an order.

9          And they also requested things related to the plan

10  that debtors could not agree to, some ultimate decisions on the

11  plan.  So we have attempted that.  Again, we're only asking for

12  28 days.  There's a *de minimus* if any amount of harm on the

13  adversary defendants at this point.  Mr. Squitieri will likely

14  tell you about the extension under the PSLRA, and therefore,

15  we'll ask that you enter the TRO that we've requested.

16         THE COURT:  All right.  Thank you, Counsel.

17         I saw Mr. Fishbein and Mr. Squitieri.  Let me turn to

18  Mr. Squitieri first.

19         MR. SQUITIERI:  Thank you, Your Honor.  Good morning,

20  Lee Squitieri, Squitieri and Fearon, on behalf of plaintiff,

21  Trey Green.

22         Trey Greene is about a $1.5 million loser in the

23  BlockFi failure.  And so he brings a substantial claim before

24  this Court.  And I think the Court wisely said, let's shortcut

25  this, and I will.

1          There was a call yesterday at 2:30 which I could not

2    attend.  I asked for it to be at 3:30 but debtors' counsel was

3    busy and I understand that.  This morning, I contacted them.  I

4    asked them -- I told them that I would agree to the TRO.  Of

5    course, that's without admitting or denying or conceding any of

6    the basis for it, and I would agree to it in advance of the PI

7    on April 19th.

8          I asked him if they'd be willing to get an agreement

9    for expedited discovery because this is a little more complex

10   than just shutting down this lawsuit for the benefit of the

11   debtor.  Why is it more complex?  For reasons that haven't been

12   brought to the Court's attention.

13         One is that the insurance policy whose assets we're

14   supposed to be preserving is only for $2 million.  Conceitedly,

15   that is a asset of the estate because it provides debtor

16   coverage.  But there appears to be a $30 million Side A

17   coverage policy only covering the offices and directors.

18   Side A only coverage is typically held not to be an asset of

19   the estate.  Why is that so very relevant to us?

20         It is relevant because there are news reports that

21   claims have been made against that policy and payments have

22   been made under that policy.  That policy is very likely the

23   only source of a lot of claimants' payments.  And so we want

24   that fleshed out in advance of the preliminary injunction

25   hearing.

1    We want discovery on that.  We want discovery on the

2   exact role of Prince, Marquez, and the three independent

3   directors that we've named.  We have no desire to disrupt the

4   orderly proceeding of this Bankruptcy Court.  We have no desire

5   to interfere in the reorganization except to the extent that

6   the debtor has some third party releases up their sleeve for

7   the principles who are actually responsible for all this.

8    And so those are our interests in having our lawsuit

9   advance.  And I might add that it appears from the public

10  reports that the $30 million was used to pay off claims of

11  private investors in BlockFi who complained that they had been

12  duped into purchasing the company's securities.  This is a

13  privately held company, Your Honor, private in that it's not a

14  exchange listed company, so it qualifies as closely held.

15   And when the debtor, pre-repetition of course, when

16  the debtor in its officers and directors willingly allow a

17  major source of coverage for their liability to be paid to what

18  appear to be friendly parties, we, the public account holders,

19  are very worried.  So there's a little more complexity to this

20  than just the TRO.  But it's 28 days.  The PI is the main

21  event.  And so we, or I, on behalf of Trey Green, without

22  conceding or admitting any of the underlying factors for the

23  TRO, will agree to the TRO.  We would like leave to make a

24  motion for expedited discovery.  It will be as limited as

25  possible.

1          And at this time,  Your Honor, we would like one

2 exception to the TRO, and that is to be allowed to meet the May

3 1st deadline we have with respect to the filing of lead counsel

4 motions in the District of New Jersey.  Why?  It is because the

5 Private Securities Litigation Reform Act has this threshold

6 mechanism for organizing all cases, putting them into one,

7 appointing a lead counsel and a lead plaintiff.

8          I dare say that when that was passed in 1995, it was

9 passed for the protection of defendants so that they wouldn't

10 have to run all over the country chasing different plaintiffs

11 and different lawsuits.  Courts have uniformly held that

12 defendants have no standing on a lead counsel motion.  It is

13 without prejudice to their rights in any further Rule 23

14 applications to claim that the lead plaintiff is not qualified,

15 without being able to at least file the papers on May 1st and

16 then someone can reach out to the judge in New Jersey and say

17 don't make any order yet.

18          But without allowing us to meet the May 1st deadline,

19 it throws the whole applicability of the Reform Act up in the

20 air.  The May 1st date cannot be extended because it is in a

21 sense jurisdictional in that it is barred.  Litigants have

22 tried to get it extended.  They've tried to make technical

23 grounds for why a late filing should be considered.  They've

24 made equitable tolling.  No court has listened to it.

25          (Audio interference) deadline, if the deadline is

 1  missed, it throws everything up at the air as to the

 2  applicability of the Reform Act's ability to bring about

 3  orderly litigation.  We are not the last lawsuit the BlockFi

 4  officers and directors are going to see.  That's just the way

 5  these things go.

 6          So allowing the May 1st date to be met to the extent

 7  of allowing only the filing of those motions will preserve for

 8  the world at large, Your Honor.  Not just the people who are

 9  before you now but for the world at large, anybody who wants to

10  sue the BlockFi officers and directors got to come forward by

11  May 1st and they've got to do it in Massachusetts and New

12  Jersey.

13          That, believe it or not, is a good thing for BlockFi

14  and the officers and directors because it corrals all the

15  litigation in one place under one plaintiff, under one law

16  firm, or multiple as the Court may decide.  But we are not even

17  asking that it be allowed to get to that stage.  Only that the

18  May 1st.

19          But, Your Honor, that may be too big a bite for this

20  hearing and, therefore, I just bring it up as one of the

21  reasons why the TRO application is not as simple as it sounds.

22  That is one of the issues we'll be bringing before the Court on

23  the April 19th PI hearing date.  One is that the TRO -- to

24  continue to TRO in its present form is overly broad and would

25  do damage to our rights, it would unfairly advantage other

1    claimants to the $30 million, and it would frustrate the

2    objectives, which as the plaintiff's lawyer, I say a pro-

3    defendant.  It upsets the pro-defendant objectives of the

4    PSLRA.

5          I'm raising that not to ask you to make a ruling

6    today.  I started by saying I agree to the TRO for the 28 days

7    until we get to April 19th.  And that's it.  My request to you

8    before I started this perhaps overly lengthy presentation, but

9    I'm sorry, is may I make a motion for expedited discovery, Your

10   Honor?

11         THE COURT:  All right.  Let me hear -- I'll address

12   that and the other issues.  Let me hear from Mr. Fishbein.

13         MR. FISHBEIN:  Thank you, Your Honor.

14         I don't want to duplicate what Mr. Squitieri said and

15   I think that our position is slightly different than his in

16   dealing with the PSLRA issues.  But let me make a few comments

17   here.

18         As you know, I represent Antonie Elas and the

19   putative class in the Massachusetts action that was captioned

20   Elas v. Zac Prince and Others.  My client, Antonie Elas, has

21   also been named as a defendant in Adversary Proceeding 23-1071.

22   Now my client has not been served yet with the complaint.

23   We've gotten email copies of everything, and we have as you

24   heard been in communication with debtors' counsel.

25         And yesterday, the Court directed that the TRO papers

1  be served on us by email.  But the complaint has not yet been

2  served on my client.  And just for the record, debtors' counsel

3  filed a certification of service this morning in the adversary

4  proceeding, that's Docket Number 9, that incorrectly identified

5  me as counsel for Trey Green.  I am not counsel for Trey Green.

6  Mr. Squitieri is.  I am counsel only for Antonie Elas.

7           Now as a little background on our Massachusetts case,

8  it asserts claims under Sections 5, 12, and 15 of the 1933

9  Securities Act and Sections 10(b) and 20 of the 1934 Securities

10 Exchange Act.  As such, the Private Securities Litigation

11 Reform Act applies to the case.  That statute, PSLRA is what we

12 refer to it as, is codified in 15 U.S.C. Section 78U-4.  Set

13 forth in that statute are provisions that dictate a process by

14 which the district court determines who will be appointed lead

15 plaintiff in a case that is brought under the Securities Act or

16 the Securities and Exchange Act.

17          The first requirement is that there be a publication

18 of a notice advising potential members about the filing of the

19 case and providing them an opportunity to appear and file a

20 motion to be appointed lead plaintiff.  We published our PSLRA

21 notice for the Massachusetts lawsuit on March 1st.  If people

22 are interested, as you heard, class members have 60 days or

23 until May 1st to file a motion to be appointed lead plaintiff.

24          Mow we don't know who is going to appear and file a

25 lead plaintiff motion in our case.  Our client certainly

1   intends to.   In most cases, there are multiple lead plaintiff

2   movants.   And in those cases, there can be multiple rounds of

3   briefing and usually a hearing is held and the court will make

4   a decision as to who should be the lead plaintiff.

5           The PSLRA has guidelines and presumptions that govern

6   how a court selects a lead plaintiff.   What is important,

7   though, is that this process does not involve the defendants.

8   It is, in essence, a fight just between plaintiffs and any

9   competing movants.   Defendants do not have a say in the

10  selection of the lead plaintiff, and they do not get involved

11  in the briefing and arguing the motion.   So they don't have to

12  worry about it and expend resources.

13          By asking for the stay here to be applied to our

14  case, the proposed TRO here would stop that process, at least

15  with respect to my client.   But I don't believe that this Court

16  can do that.   The PSLRA was adopted in 1995.   There have been a

17  number of cases that have held that the 60-day rule is a strict

18  requirement.   Lead plaintiff motions have been rejected for

19  being filed even one day late.

20          We have done an exhaustive search and not found a

21  single case where the 60-day deadline has been tolled, stayed,

22  or extended.   It's just not anything that we have seen done

23  before and would be extreme in this case.   Our view is this.

24  We do not believe that a TRO is necessary here.   A TRO is meant

25  to preserve the status quo.   Nothing is going to happen in our

1  Massachusetts case before the PI hearing that is scheduled for

2  April 19th.  As I said, lead plaintiff motions are not due

3  until May 1st.  Presumably, a decision will be made at the

4  April 19th hearing on the PI motion before May 1st.

5         Until then, plaintiff will not be doing anything to

6  prosecute the case.  Now the debtors are concerned because two

7  of the individuals, Prince and Cheela, have been served in our

8  case and they have to answer or otherwise respond to the

9  complaint by March 30th.  That's their concern.  But it has

10 always been standard practice in PSLRA cases that the date for

11 defendants to respond is extended by stipulation and order of

12 the Court until after the lead plaintiff determination has been

13 made and usually after an amended complaint has been filed.

14        We have already offered and agreed to do that with

15 respect to the individual defendants here so they will not have

16 to do anything to respond to the complaint on March 20th.  They

17 do not have to do anything to respond to the PSLRA motions.

18        Now the discussions that we've had and the offer to

19 extend the response date, it's a little bit challenging here as

20 debtors' counsel have repeatedly told us they're not

21 representing any of the individual defendants and none of them

22 have any counsel that have appeared yet in Massachusetts.

23        Nonetheless, we're willing to agree that the March 30

24 response date for the two defendants that have been served as

25 well as the response date for any of the other individual

1  defendants will also be stayed until after the lead plaintiff

2  process has been played out.  That's the main reason why we

3  don't think there is a need for a TRO in this case.

4         Now, debtors' counsel presented us with a draft

5  stipulation regarding the injunctive relief.  We were generally

6  in agreement with the stipulation but there were a couple of

7  items that we wanted to add to it so that our client's interest

8  would be protected.  Fundamentally, we don't believe our

9  client's interest and the claims that they have asserted have

10 anything to do with this bankruptcy.

11        There were a number of items in particular that we

12 sought and we provided redline comments to debtors' counsel.  I

13 want to address them just briefly.  One, we wanted the debtors

14 to agree to preserve and maintain all sources of discovery in

15 our case.  We think that the PSLRA rules and other rules

16 already require that, but we wanted that protection.

17        Second, we wanted to be able to file any order that

18 the Court might enter with respect to this TRO.  We wanted to

19 be able to file that in Massachusetts and have it appear on the

20 docket.  That was rejected.

21        Three, we wanted the lead plaintiff process to

22 proceed.  Again, for the reasons that I indicated, there's

23 nothing -- it has nothing to do with the defendants.  Mr.

24 Squitieri's position is that he wants those filed.  Our

25 position would be that we want them filed and that process

1  played out.  And I'll address that a little more later.

2          Fourth in the proposed stipulation, we agreed that

3  the individual defendants in our case do not need to appear,

4  respond, or otherwise participate in the case until after the

5  lead plaintiff process is done.  I talked about that before.

6          And, finally, we wanted to seek assurances that the

7  debtors in this bankruptcy would not seek to extinguish or

8  discharge the claims that we had brought individually in our

9  action against non-debtors.  That's it.  Otherwise, we were

10 okay with the relief they sought.

11         We provided our suggested edits to them and offered

12 to meet to discuss them hoping to avoid the need for both this

13 TRO hearing and the injunction hearing.  We made that offer

14 several times.  They initially refused and finally agreed to

15 talk to us but after they filed the TRO papers.  And when we

16 did talk, they simply rejected our suggestions.

17         Now as Mr. Squitieri mentions, it's not necessary to

18 resolve the issues with respect to the lead plaintiff process

19 today.  The preliminary injunction hearing is set for April

20 19th.  Lead plaintiff motions are not due until May 1st.  That

21 presumably gives the parties enough time to get the Court's

22 guidance on whether the injunctive relief the debtors seek will

23 exclude the lead plaintiff motion process.

24         And, again, as we did with the proposed TRO, we are

25 willing to continue to discuss the parameters of an injunction

1   to avoid the need to have such a hearing.  We think the

2   defendants should not have to be involved in the Massachusetts

3   litigation during this bankruptcy.  We think that the lead

4   plaintiff process can be carved out and allowed to proceed.

5          One other thought with respect to the TRO, I think

6   it's clear what the TRO is really seeking here.  The debtors

7   are seeking to stay a case that has not asserted any claims

8   against the debtors.  They are seeking to extend a TRO to stay

9   cases that have only brought claims against non-debtors.  And

10  to support that, you heard the arguments they have made about

11  how their officers are having to spend time and there may be

12  resources that are spent.

13         We've just been brought into this, and I'm certainly

14  not a bankruptcy expert.  I've only done preliminary research

15  on this issue, and it is clear that there are cases that go

16  both ways on whether a bankruptcy stay can be extended to non-

17  debtors.

18         I do recognize the Court's recent decision in <u>LTL</u>

19  <u>Management</u>.  And while I think it's distinguishable, I

20  certainly have no confidence that I can persuade you of that.

21  in <u>LTL Management</u>, you lay out a three-part test to decide

22  whether or not stay can be extended to non-debtors.  I don't

23  think two of the three parts are satisfied.  I am not aware of

24  any authority that gives you jurisdiction to stay the deadlines

25  of the PSLRA, and I don't believe an injunction under 105(a) is

1    warranted.

2           There is severe harm to my client.  That's where this

3    TRO fails.  If this TRO is extended, my client specifically

4    will not be able to satisfy the 60-day requirement, and that

5    will preclude us from ever being appointed lead plaintiff.  Now

6    you can rest assured that other movants, regardless of what you

7    do here today, are going to file lead plaintiff motions.  And

8    while those motions will likely be stayed because I have no

9    doubt the debtors will go in there immediately, there is no

10   assurance that when that stay is lifted, we would be able to

11   file our motions because the 60-day period will have expired.

12          So extending the stay would result in severe harm to

13   my client specifically because of the expiration of the 60-day

14   limit.  Given that likelihood and yet uncertainty and given

15   that we have agreed that the individuals do not need to respond

16   to the complaint at this time because there is nothing that

17   they will need to do in this case before the April 19 PI

18   hearing, we do not believe there is a need for a TRO in this

19   case.

20          Now what I would end with is that if the Court is

21   inclined, however, to grant the TRO, we would ask that we'd be

22   allowed to submit the revisions to the proposed order that

23   we've already given the debtors and that they be addressed in

24   any order that you might issue.  Thank you.

25          THE COURT:  All right.  Thank you, Counsel.

1        Is there anyone else who wishes to be heard on this?

2        Ms. Furness, do you wish to address -- Mr. Kanowitz,

3   do you wish address any of the issues raised as far as the

4   language of the order, pointedly their preservation of

5   discovery or the request to be able to file the order in

6   Massachusetts or New Jersey, would it apply?

7        MR. KANOWITZ:  Yes, Your Honor.  Happy to take a

8   couple of the issues.

9        I think there's a real misunderstanding from the

10  class action plaintiffs' part about who we represent and what

11  we're seeking and why we're seeking it.  So a couple of issues

12  raised by Mr. Squitieri.

13       First, on the issue of insurance, there is that Side

14  A policy.  It has not been tapped.  The allegations that he

15  raises are specious and in fact problematic and it's exactly

16  why we need a TRO to protect this estate.  In terms of

17  discovery, we're happy to consider any type of discovery that

18  the defendants in the adversary proceeding seek that they think

19  they need in connection with the preliminary injunction

20  hearing.

21       We are having Mr. Renzi as our witness.  He will be

22  available if necessary for an appropriate deposition in

23  connection with the types of issues to be raised at the

24  preliminary hearing.  But we welcome them to send us whatever

25  discovery demands.

1          We will respond in accordance with the Federal Rules,

2     and if we have any disagreements, I'm sure Your Honor will

3     listen to us and hear both sides out as to whether discovery

4     should be had or be limited.  But we're not there today, so I

5     don't know exactly what Mr. Squitieri wants to hear or wants to

6     get from us.  But we'll consider that in due course.

7          As to what the plaintiffs' bar is basically saying to

8     you is they know they violated the stay.  They know these

9     claims are really against the debtor, but they've named

10    individuals so let them just go run their process and don't

11    interfere.  It sort of turns everything on its head.

12         The reason why the debtor has done what it has done

13    in terms of starting this action is to protect the debtor and

14    its estate and all creditors from these type of actions.  So

15    letting a process run that continues to violate the stay and/or

16    continues to harm the debtor just doesn't work for us.

17         So I would suggest that those type of arguments, if

18    they're going to raise them, they should brief them for the

19    preliminary injunction hearing.  We could respond.  But for

20    purposes today, speculation, it's not appropriate for a TRO

21    hearing for them to tell you about how they want to continue to

22    violate the stay.  In fact, it serves our case well.

23         It's exactly why we need to shut everything down.

24    They continue to go out there and solicit for new plaintiffs.

25    They're jocking to position.  They're harming the estate.  As

1  Ms. Furness alluded to, we are getting inbound from other

2  people who are named defendants saying why is my name out

3  there, why am I being sued, this is clearly inappropriate, you

4  owe me indemnity, do I need to get my own lawyer involved.  And

5  the answer to that should be no.

6         And the real way to resolve this issue, Your Honor,

7  is for the class action plaintiffs to withdraw their

8  complaints.  They could restart the process at an appropriate

9  time when we're further down the road in this bankruptcy case

10 to see exactly how this case shapes up, what our plan is going

11 to be, how we're going to treat creditors, how we're going to

12 use our assets including insurance proceeds.  That is probably

13 the most logical and commercial thing for the plaintiffs to do,

14 but they won't do that.

15        So they're going to ask Your Honor to continue to

16 violate the stay, to continue to, as one of the counsel said,

17 to continue jockey for position to be lead counsel on something

18 that we believe shouldn't go forward, is really a claim against

19 the estate that will be dealt with the in the plan or

20 reorganization one way or another.  And so we're here today

21 simply to ask can you please enter a TRO stopping this, we'll

22 address it whatever we have to address in connection with the

23 preliminary hearing on an injunction request as well as in any

24 future hearings in this case in this adversary proceeding.

25        So unless you -- you know, as to document

1 preservation, of course, we've been preserving every single

2 record for this estate for the benefit of all creditors and

3 other regulatory interests.  So there's been no destruction or

4 concern about spoilation of any type of document in connection

5 with this bankruptcy case.

6 　　　　THE COURT:  All right.  Thank you, Mr. Kanowitz, Ms.

7 Furness and then I'll go back to you, Mr. Fishbein.

8 　　　　Ms. Furness?

9 　　　　MS. FURNESS:  Your Honor, thank you.  I just want to

10 address a few things that Mr. Fishbein mentioned about the

11 adversary defendants' draft TRO.

12 　　　　As I mentioned, they refused to recognize this

13 Court's exclusive jurisdiction over the order.  And we

14 obviously don't agree to that.  They put in demands about the

15 plan. and release or extinguishments of claims in about the

16 plan in their draft TRO.  Absolutely no, the debtors can't

17 agree to any future plan and what it may or may not contain.

18 　　　　In addition, their proposed TRO, I'm confident if

19 they file it as they presented it to us, Your Honor will

20 recognize this, but actually it relates to things in their

21 lawsuit which doesn't make any sense about when things should

22 be filed in the other lawsuits and when they don't.

23 　　　　But I do want to point this out, Your Honor, and I

24 want to be perfectly clear.  This is a problem of the adversary

25 defendants' own making.  They filed this lawsuit on February

43

1    28th and March 1.  Had that not happened, we wouldn't be

2    concerned about the PSLRA and, in fact, they could should they

3    feel like all of these horrible things were to happen, if Your

4    Honor decided to issue a TRO or said that the stay applied to

5    these two lawsuits, in order to prevent all of those allegedly

6    horrible things, they could non-suit their matters.

7         They put themselves in this position.  There is not,

8    as Mr. Fishbein said, some sort of horrible thing that's going

9    to happen.  If it were, they could have made that decision

10   before and they can make that decision now.  What this Court

11   should be concerned with, and I know you are, is the effect on

12   these debtors.  And the effect on these debtors will be

13   irreparable harm.

14        This is not some situation just about discovery or

15   just about taking focus from the restructuring and the

16   reorganization.  Your Honor, this is about fundamental

17   decisions, for example, whether BlockFi's products are

18   securities or not, whether certain statements are violations of

19   this securities law or that securities law, that will be made

20   without any input, argument, or anything from these debtors.

21   And that, again, is an irreparable harm and it goes beyond just

22   payments of insurance proceeds.

23        And, again, Your Honor, we just request that you

24   enter the TRO as submitted by the debtors.  Thank you.

25        THE COURT:  All right.  Thank you.

1          Mr. Fishbein, last comments?

2          MR. FISHBEIN:  Yeah, just a couple of comments.

3          First, while I appreciate the helpful advice from

4  debtors' counsel about how to practice law, we can't do what

5  they're suggesting.  There are statutes and limitations, there

6  are statutes of repose under the federal securities statutes.

7  These claims needed to be filed.  The PSLRA dictates what we

8  need to do after they have been filed.  That is what we are

9  doing.

10          I have heard no response to the suggestion that we

11  can aleve [sic] any burden on the defendants or implicate them

12  in any way by what I have suggested can be done, which is we

13  will agree to extend the response date for the defendants and

14  we think that the lead plaintiff process needs to continue.

15          Now, again, they did not respond to my argument that

16  in reading LTL, they don't get a TRO because of the severe harm

17  that will come to my plaintiff, my client, if this case is

18  stayed.  We will lose the ability to file a lead plaintiff

19  motion.  Others will file, and our ability will be gone.  The

20  severe harm here is to us.

21          THE COURT:  Well, Mr. Fishbein, let me clarify that

22  because my understanding was that that's really, and it's been

23  suggested by your co-counsel, Mr. Squitieri -- well, in the

24  other matter, counsel -- that that's a harm that may arise if I

25  were to continue the stay after the 19th or enter injunctive

1  relief that carried forward after the 19th, that there's not

2  necessarily any irreparable harm to your client now between

3  today and when we have the preliminary injunction.  You don't

4  lose any rights.

5       MR. FISHBEIN:  That is correct, and that's what I

6  said is that you don't necessarily have to decide today whether

7  those lead plaintiff proceedings are going to go forward with

8  respect to our two clients.  We wanted to tee that issue up

9  because it can be addressed in the TRO.  You can put language

10 in the TRO that I think we would be agreeable to which would be

11 that the stay does not apply, the TRO does not apply to the

12 lead plaintiff proceedings as they are going forward now.

13      I mean we don't have to do anything until May 1st.  I

14 do want to respond to this idea about we're issuing press

15 releases that name these people and they're getting phone calls

16 that they have to answer.  I want to point out that those press

17 releases are not coming from us.  They are coming from other

18 attorneys who are looking for people who are injured and may be

19 interested in moving for lead plaintiff.  We don't have

20 anything to do with that.  That's part of the process.

21      People in this 60-day period are looking to see if

22 there are other people who might be interested in moving for

23 lead plaintiff.  And the Court, it's a little ironic, but the

24 Court basically picks the biggest loser after the 60-day period

25 to be appointed lead plaintiff.  So that process is going to

1 continue.  You can tell us not to issue any press releases, and

2 we will follow that.  That's not going to stop that process.

3          I think the more sensible thing is to give the

4 individual defendants a stay so that they do not have to

5 respond to the complaint on March 30th and allow the lead

6 plaintiff motions to go forward.

7          And the last thing I want to say is I recognize that

8 there are some issues here that may implicate the interest of

9 BlockFi, but I also want to make it clear that the claims that

10 we have asserted in our case are claims for misrepresentations

11 and omissions made by the individual defendants.  That's why

12 they have liability under the federal securities laws.

13          There was a previous case against BlockFi that Mr.

14 Squitieri brought that was stayed by the bankruptcy case.

15 There's no dispute about that.  But the individual defendants

16 have responsibility.  Some of them that they complain are not

17 individually named, they are defendants because they are

18 control persons under the 34 Act.

19          So the idea that we tried to do an end-run around the

20 defendants and we violated the stay, that's just not true.  We

21 have asserted claims that we believe are outside the scope of

22 bankruptcy, but I recognize what will happen.  We just don't

23 think a TRO is necessary at this point, and we think that we

24 should be allowed to continue the lead plaintiff process.

25          THE COURT:  All right.  Thank you, Counsel.

1          Mr. Squitieri, very quickly.

2          MR. SQUITIERI:  Very briefly, Your Honor, and only to

3   address two matters that I think were way out of line by mr.

4   Kanowitz.

5          One, he's alluding to the -- or, rather, he's

6   implying that I made up and know it was specious that claims

7   have been paid under the $30-million policy.  If he's telling

8   me they were not paid, then we'll find that out in discovery.

9   But it was reported in the Financial Press, and that's why I

10  brought it up.

11         The other implication I resent is that I violated the

12  stay.  The stay was a 362 stay.  It applies to the debtor by

13  its terms.  When debtors' counsel had a chance to appear before

14  the Court with Docket Number 12, motion seeking entry of an

15  order restating and enforcing the worldwide stay, they

16  submitted an application to the Court for an order, that order

17  had provisions 2-A to 2-I and nowhere did they ever ask that

18  actions against officers and directors or any third parties be

19  stayed.

20         So I did not violate an order, and I want that stated

21  on the record.  Thank you.

22         THE COURT  All right.  Thank you, Counsel.

23         Thank all counsel.  Well argued.

24         As you could tell from my comments, I was trying to

25  distinguish the relief that's necessary today as far as the TRO

1   versus the relief that's sought as far as part of the

2   preliminary injunctive application.  There's a slight

3   difference.  The standard we all know are roughly the same.

4       While there may not be action taken between now and

5   when we have further hearings, it's not for the Court to guess

6   at that.  I'm going to enter a TRO today because what is of

7   import to the Court is the threat of harm that comes to the

8   debtor based on the potential for indemnification obligations

9   and the potential for depletion of insurance, the latter being

10  clearly in this Court's view an estate asset, a potentially

11  wasting asset.  And that potential harm is sufficient

12  irreparable harm, in this Court's view, today to get us to the

13  next hearing.

14      I respect the concerns raised as far as the issues

15  under the federal statute and would look forward to weighing in

16  on those when the time comes after the briefing.  I do not

17  intend to place the defendants in this case, the plaintiffs in

18  the ongoing litigation, at a disadvantage unnecessarily.  So I

19  will certainly consider what steps need to be taken to, in

20  essence, preserve the status quo, which is the goal of a TRO,

21  on both sides.

22      Now for the record, I am satisfied that the debtor

23  has met the standards for the entry of a TRO when taking into

24  account the balancing of the harms, the potential depletion of

25  estate assets, the potential pursuit of claims for which the

1 debtor would have indemnification obligations.

2          I would ask the parties, I don't -- in response to

3 Mr. Squitieri's concerns regarding discovery, I don't call or

4 ask for motions for discovery.  I prefer to address those

5 issues in conference calls if the parties after they meet and

6 confer can't come to an agreement.  I think everybody prefers

7 that.

8          And I would ask the parties to meet and confer to

9 discuss the discovery that is being sought.  April 19th is an

10 omnibus date for BlockFi.  We have other matters including

11 wallet motions, exclusivity motions.  I would ask counsel to

12 offline discuss whether a separate date would be worthwhile to

13 have a hearing on the preliminary injunction.  It could be the

14 20th.  it could be the 21st.  it could go into May depending

15 upon -- well, there is the May 1 deadline.  I recognize that.

16          We could, of course, also bifurcate the issues and

17 simply have that lead counsel motion issue be the topic on

18 April 19th because that is one of the immediacy -- that has

19 immediacy to it as opposed to the other issues that would go

20 forward where we have an evidentiary hearing on the preliminary

21 injunction.  It would seem to the Court that the thrust of the

22 concerns raised today by the defendants in this action revolve

23 around that process and the Court would consider addressing

24 that preliminarily on the 19th or another date.

25          I will -- Mr. Fishbein, if you want to send the Court

50

1  your proposed changes, I will take a look at them.  From what

2  I've heard, preservation of discovery is not going to be an

3  issue.  I'm not really sure what the pros and cons or the

4  prejudices to the debtor are with respect to where to file

5  orders.

6          I am certainly not going to require the debtor at

7  this juncture to limit themselves under any plan.  Those are

8  for fights that -- at another time.  But I certainly will look

9  at any concerns you had as far as language.

10         I will enter the TRO, at least a bench order today so

11 that it's in place.  I will refine it with an order as soon as

12 I take a look at any suggested language.  But we'll set the

13 hearing down for the 19th but, of course, the parties may want

14 to confer regarding a stand-alone day depending upon

15 expectations as far as witnesses and the like.

16         As far as discovery, have a meet and confer, discuss

17 what's needed for the limited issues that are there.  And if

18 there's an issue, reach out for chambers.  We'll have a

19 conference call and just resolve it.

20         Mr. Fishbein, I see your hand.

21         MR. FISHBEIN:  Yeah.  Given your guidance, I don't

22 think that there's a need for me to submit a stipulation with

23 our proposed changes.  One exception, which I think we can talk

24 about now on the record is the ability for us to file whatever

25 order you enter today on the docket in the Massachusetts and

1 the New Jersey cases.

2          We have been threatened with contempt of court

3 motions a number of times in this process for filing the

4 complaint.  And I would like assurances that that's not going

5 to happen if we take the action of filing the order that you

6 enter today on the docket in our two respective cases.

7          MR. KANOWITZ:  Your Honor?

8          THE COURT:  Let me hear from debtors' counsel.

9          MR. KANOWITZ:  Your Honor, that's not going to be a

10 problem.  It was the package of problems as opposed to that one

11 particular sentence in that revised order, as Your Honor is

12 well aware of the issues raised that you just identified.  So,

13 yes, whatever order Your Honor submits on the TRO, we welcome

14 it to be publicized in connection with the Grand Ellis

15 (phonetic) actions so that we don't have to come back here to

16 other and add other class action lawsuits.

17          THE COURT:  All right.  And we resolved that issue.

18          I'll take a -- do I have, Ms. Furness, do I have a

19 copy of what we'll call a final order to take a look at?

20          MS. FURNESS:  Your Honor, you have a copy of what our

21 proposed order is.  We filed it yesterday.  You don't have a

22 copy of Mr. Fishbein's, but I'm sure that they will get that to

23 you.  But our proposed order was filed on the docket, yes, Your

24 Honor.

25          THE COURT:  All right.  Well, I think I'm hearing

1  from Mr. Fishbein we basically resolved the open issue -- along

2  with my other comments.  So I'll take a look at the order and

3  see if it meets everybody's expectations.  And I'll let counsel

4  after the hearing maybe have a -- schedule a call among you all

5  to see how you want the 19th to play out time-wise.  And the

6  Court -- April is difficult, but the Court will do its best to

7  try to accommodate scheduling.

8       MR. KANOWITZ:  Yes, Your Honor.  Forthwith, we'll get

9  together and have those meet and confers and come back to Your

10 Honor.  We recognize what's on the 19th is a heavy lift for the

11 Court.  We don't need to add to that burden.

12      THE COURT:  All right.  Then I appreciate everybody's

13 time and effort as well as argument, and professionalism,

14 number one and foremost.

15      Does anyone need to be heard on any other matters for

16 today?

17            (No audible response)

18      THE COURT:  Then I thank you.  Take care.

19      MR. SQUITIERI:  Thank you, Your Honor.  Good day.

20      THE COURT:  You're welcome.

21      MR. FISHBEIN:  Thank you, Your Honor.

22      MS. FURNESS:  Thank you, Your Honor.

23      THE COURT:  You're welcome.

24           (Proceedings concluded at 12:53 p.m.)

25                 * * * * *

# C E R T I F I C A T I O N

We, KAREN K. WATSON, and DIPTI PATEL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the  above-entitled matter, and to the best of our ability.


/s/ Karen K. Watson

KAREN K. WATSON, CET-1039


/s/ Dipti Patel

DIPTI PATEL, CET-997

J&J COURT TRANSCRIBERS, INC.       DATE:  March 29, 2023