UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

**DECLARATION OF MARK A. RENZI IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) EXTENDING
THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND
SOLICIT ACCEPTANCE THEREOF PURSUANT TO SECTION 1121 OF
THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF**

I, Mark A. Renzi, hereby declare under penalty of perjury:

1. I am the Chief Restructuring Officer (the "CRO") to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 Cases.

2. I submit this declaration (this "Declaration") in support of the relief requested in the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and (II) Solicit Acceptance Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 659] (the "Motion") and the *Debtors' Reply in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and (II) Solicit Acceptance Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 740] (the "Reply").[2] Unless otherwise indicated, the statements set forth in this Declaration are based upon (a) my personal

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or Reply, as applicable.

knowledge, belief, and opinion; (b) information learned from my review of relevant documents, books, and records; (c) information I have received from the Debtors' employees or advisors and/or employees of Berkeley Research Group, LLC ("BRG") working directly with me or under my supervision and direction; or (d) my experience as an industry professional.

3.      I am authorized to submit this Declaration on behalf of the Debtors, and, if I were called upon to testify, I could and would testify to the facts set forth herein.

## Background and Qualifications

4.      I am the Debtors' CRO. I am also a Managing Director and the Head of the Corporate Finance Financial Institutions Group for BRG. I have over twenty years of experience in the practice of turnarounds and restructurings. I have considerable experience in providing restructuring advisory and restructuring management services in reorganization proceedings and working with senior management teams in the areas of financial and operational restructuring, loan workouts, and business planning. I have advised and served in management positions involving many turnaround engagements.

5.      In the current cryptocurrency space in particular, in addition to serving as CRO of the Debtors, I lead the engagement for BRG as financial advisor to the Debtors in *In re Voyager Digital Holdings, Inc.* No. 22-10943 (MEW) (Bankr. S.D.N.Y.) and co-lead the engagement for BRG as financial advisor to the Official Committee of Unsecured Creditors in *In re Genesis General HoldCo LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y.).

## An Extension of The Exclusivity Periods is Prudent

6.      The Debtors' accomplishments thus far have been achieved in large part thanks to the breathing room provided by chapter 11. But much work remains. In the approximately five months since the Petition Date, the Debtors have worked towards negotiating the terms of a sale or standalone transaction that will maximize value for all creditors and have taken steps to test the

market for each of their assets, while engaging with the Official Committee of Unsecured Creditors (the "Committee") and other stakeholders in an effort to build consensus for a path forward.

7. Maintaining the Debtors' exclusive right to file and solicit votes on a proposed plan is critical to their ability to complete a value-maximizing process and achieve their remaining restructuring goals as efficiently and expeditiously as possible. If the Exclusivity Periods expire, substantial additional costs and disruption will most certainly follow. Competing plans would disrupt the restructuring process, increase professional fees, and shift all stakeholders' focus to evaluating competing proposals, immediate litigation, or both, rather than focusing all parties' efforts on negotiating and confirming a plan that will maximize value for the entirety of the Debtors' client base.

8. Ample cause exists to grant the Debtors such relief, including: (i) the Debtors' cases are large and complex; (ii) the Debtors have demonstrated good faith progress towards emerging from chapter 11; (iii) an extension of the Exclusivity Periods will not prejudice creditors, (iv) the Debtors are making and will continue to make required payments as they become due; (v) the Debtors have demonstrated reasonable prospects for filing a viable plan; (vi) the Debtors are not seeking to use exclusivity to pressure creditors into accepting a plan; and (vii) important contingencies must still be resolved.

### The Debtors' Chapter 11 Cases Are Large and Complex

9. The Debtors' chapter 11 cases are unquestionably large and complex, requiring the Debtors to navigate a host of issues across multiple jurisdictions. The Debtors have over 300,000 clients and other creditors, and these chapter 11 cases involve nine Debtor entities who operate an international platform that includes multiple products related to digital assets in a highly complex and evolving cryptocurrency industry.

10. Since the Petition Date, the Debtors have, among other things, marketed multiple

3

asset packages, evaluated the viability and likelihood of a customer platform migration, participated in the FTX and Core Scientific complex chapter 11 bankruptcy proceedings in an effort to maximize client recoveries, initiated an adversary proceeding against Emergent Fidelity Technologies Ltd, and preserved estate assets, even in the face of three separate bank failures that were directly related to the volatility of the industry in which the Debtors operate. These cases have been nothing if not complex and show no signs of slowing down.

**The Debtors Have Made Good Faith Progress Towards Exiting Chapter 11**

11. Over the course of these cases, the Debtors have made substantial progress towards achieving a value-maximizing transaction for their clients. The Debtors accomplished the below, including other achievements:

- stabilized operations and ensured a smooth transition into chapter 11 through the approval of thirteen first-day motions, including gaining the authority to pay certain taxes, continue important insurance programs, honor wages and certain employee benefit programs for the Debtors' remaining employees in the ordinary course of business, maintain their cash management system, and pay certain critical vendors necessary to continue certain operations during the Debtors' chapter 11 cases;

- contemporaneously commenced parallel liquidation proceedings in Bermuda, and coordinated with the joint provisional liquidators appointed in those proceedings to ensure efficient administration of BlockFi International Ltd.'s chapter 11 and Bermuda cases;

- successfully implemented a reduction in force of approximately 2/3 of all employees, saving substantial expenses for the estates;

- filed a *Joint Plan of Reorganization of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 22] (as may be supplemented or amended from time to time, the "Plan") on the first day of these chapter 11 cases, to have a baseline option against which other potential options would be evaluated;

- obtained Court approval of the Debtors' employee retention programs (the "Retention Programs") after litigating and resolving objections from the Committee and U.S. Trustee, authorizing the Debtors to make retention payments to certain non-insider employees to preserve the value of the Debtors' estates and maintain the viability of the customer platform for distributions and a potential sale transaction;

- negotiated the consensual resolution of, and obtained Court authority for, bidding

4

- procedures and a timeline for interested parties to submit bids for an acquisition of the Debtors' assets;

- initiated a marketing process for each of Debtors' major asset packages, including their self-mining assets and customer platform, with the sale of the self-mining assets resulting in $4.675 million in value to the Debtors' clients;

- performed regular analysis of dozens of cryptocurrency coin values and price movements in connection with evaluating available transaction options and value-maximizing alternatives, and analysis surrounding the development of a corresponding platform infrastructure for efficient distribution to clients;

- filed a motion to allow for the assets held in the Wallet platform to be returned to clients, provided substantial diligence regarding that motion to the Committee, the Ad Hoc Committee of Wallet Holders, and others, and negotiated extensively with the Committee and other objecting parties surrounding the process for resolving that motion (which the Debtors will ask the Court to hear and resolve on May 8, 2023);

- advocated for the Debtors' interests in the FTX chapter 11 cases,[3] including negotiating for the entry of a standstill stipulation with the FTX/Emergent debtors regarding competing claims over ownership interest in shares of Robinhood, Inc. and related collateral and the governmental seizure of those shares and collateral, which the Debtors have pressed aggressively in this Court since the Petition Date;

- filed motions and appeared in the Core Scientific, Inc., chapter 11 cases[4] on the Debtors' behalf, including making motions to preserve the Debtors' liens and security interests;

- negotiated with multiple governmental agencies, including the Department of Justice and state authorities, on the Debtors' regulatory requirements, including certain government seizure warrants relating to clients, and begun working with the various relevant regulators;

- obtained Court approval to establish procedures and deadlines for filing Proofs of Claim [Docket No. 440] (the "Bar Date Order") and corresponded with numerous creditors and creditor constituencies regarding the proof of claim process;

- commenced an adversary proceeding to stay two putative class action litigations that were filed against certain of the Debtors' directors, officers, and former employees [Docket No. 608];

- expeditiously worked to find solutions in the face of a series of unforeseen bank failures, including those of Silicon Valley Bank, Silvergate Bank, and Signature Bank;

---

[3] *In re FTX Trading Ltd., et al.*, Case No. 22-11068 (JTD) (Bankr. D. Del 2022).

[4] *In re Core Scientific, Inc., et al.*, Case No. 22-90341(DRJ) (Bankr. S.D. Tex. 2022).

5

- engaged meaningfully with the Committee and its advisors on a regular basis, including providing extensive diligence, holding numerous telephonic and in-person meetings, facilitating direct access by the Committee's advisors to certain systems operated by the Debtors for purposes of data analysis and review, producing hundreds of thousands of pages of data, information, and documents[5] and making witnesses available, first for informal interviews and then separately for formal depositions, all voluntarily;[6] and

- most recently, conducting a five hour meeting at Kirkland's offices on April 10, 2023 to explain, among other things, current understandings regarding potential recovery ranges, the extreme complexity presented by intercompany claims, and a series of other issues, using a 77-page slide deck to facilitate an iterative dialogue on these issues. During that meeting, the Debtors described their proposed timetable for proposing an Amended Plan, working with the Committee on such a plan, and prosecuting that plan, and the Committee advisors agreed that the Debtors' proposed timetable was appropriate and necessary.

12. The foregoing demonstrates that there can be no doubt that the Debtors have acted diligently and in good faith to make progress during the initial months of these chapter 11 cases and that an extension of the Exclusivity Period is appropriate.

## **An Extension of the Exclusivity Periods Will Not Prejudice Creditors**

13. The Debtors' request for an extension of the Exclusivity Periods is the Debtors' first such request and comes approximately five months after the Petition Date. In my experience, in a case of this size and complexity, it is routine for the first request for an exclusivity extension to be granted, and it is rare for a Committee to oppose such an extension.

14. The requested extension here is clearly reasonable given the Debtors' progress to date and is critical given the juncture that the Debtors find themselves in. Namely, the Debtors'

---

[5] BRG has assisted in facilitating the diligence process along with multiple BlockFi employees and the Debtors' counsel at Kirkland & Ellis LLP and Haynes Boone LLP. To date, over 28,000 documents consisting of over 420,000 pages have been produced through some combination of direct document production by Kirkland and uploads to an Intralinks site created for Committee diligence. For the avoidance of doubt, this diligence process has been *in addition* to the work done by the Debtors and their advisors to facilitate the Committee's advisors having direct access to certain of the Debtors' internal databases.

[6] To date, the Committee's advisors have taken seven depositions of BlockFi employees in connection with their investigation, and the depositions already taken also included an opportunity for the Committee's advisors to ask questions on sixteen different topics pursuant to Fed. R. Civ. P. 30(b)(6). The most recent deposition, of the Debtors' Chief Risk Officer, began at 9:00 AM, and ended at approximately 5:30 PM, on Wednesday, April 12, 2023. The Committee has also scheduled additional depositions for April 24, 2023, and April 26, 2023.

marketing and sale process remains ongoing, and the Debtors are in the midst of making a decision as to whether a sale to a third party will provide more value to the Debtors' clients than a self-liquidating plan. The Debtors are also evaluating how a plan will align with their intercompany structure, given the need to evaluate claims by and against nine different entities and coordinate with Joint Provisional Liquidators and a foreign proceeding in Bermuda. The Debtors will also need to ensure that they can actually make distributions, hopefully in kind, to clients—whether through their platform, a third-party transaction partner, or a combination of both—which will likely require commitments from certain BlockFi employees and others and coordination with applicable regulators (who have asked for additional time to evaluate any proposal that BlockFi might make).

15. The Debtors are not using exclusivity as a tactic to harm clients or other creditors. To the contrary, the Debtors are requesting a targeted extension of the Exclusivity Periods to focus on evaluating all potential options and choosing a path in the near term. Continued exclusivity will avoid competing plans that could derail the Debtors' restructuring and add substantial expense and burden the process.

16. Moreover, throughout these chapter 11 cases, the Debtors have had ongoing and transparent communications with the Committee. Those communications began promptly after the Committee's appointment and have continued since. Among other things, the Debtors have produced hundreds of thousands of pages of documents in response to its Bankruptcy Rule 2004 investigation and have made seven witnesses so far available for deposition (while preparing them to address sixteen separate topics identified by the Committee through a draft Rule 30(b)(6) notice). The Debtors have been extremely accommodating and responsive to the Committee's

requests (which are ongoing). Ultimately, extending the Exclusivity Periods will benefit the Debtors' estates, their creditors, and all other key parties in interest.

### The Debtors Are Paying Their Bills as They Come Due

17. Since the Petition Date, the Debtors have paid their vendors in the ordinary course of business or as otherwise provided by orders of the Court. Importantly, the Debtors maintain their ability to continue to pay their bills throughout these chapter 11 cases using cash on hand (rather than borrowing money at high interest rates). In addition, though their trading platform is paused, the Debtors have remained well-equipped to run their business and preserve the safety of customer assets as a path is being decided, and the Debtors have continued to actively monitor their open loan book. As such, the requested extension of the Exclusivity Periods should be granted because the Debtors' ability to run the portions of their business that are ongoing, in the ordinary course, remains strong.

### The Debtors Have Demonstrated Reasonable Prospects for Filing a Viable Plan

18. The Debtors have already taken significant steps toward reorganization, including preparing and filing their schedules of assets and liabilities and statements of financial affairs, preparing for and facilitating a lengthy Rule 341 conference (at which I testified), and engaging in ongoing dialogue and communication with the Committee and its advisors regarding a potential plan, disclosure statement, and related potential recoveries. The Debtors are continuing to evaluate bids for the customer platform, as a sale would be contemplated in the context of a plan.

19. As noted, the Debtors filed a Plan on the first day of these cases and propose to file an amended Plan charting the path forward at some point between May 1, 2023 and May 15, 2023. The Debtors intend to provide a copy of that proposed Plan to the Committee during the second half of the week of April 24, 2023 and to file the proposed Plan shortly thereafter, depending on

the status of negotiations with the Committee, as the Debtors would prefer to file a plan that is as consensual as possible.

20. The remaining parts of the Debtors' proposed confirmation schedule are driven by the statutory notice requirements, the advice of the Debtors' notice and service agent, or both. Among other things, the Debtors' notice and service agent needs at least fourteen days to complete solicitation, and then needs at least ten days (and, given the number of clients, likely more) to tabulate votes following the voting deadline. Even if none of these dates slipped, it is not realistic to plan for a confirmation hearing materially sooner than the Debtors' current proposal, which is to begin a hearing, subject to the Court's availability, on or shortly after August 7, 2023.

## An Extension Will Not Pressure Creditors

21. The Debtors are not seeking an extension of the Exclusivity Periods to pressure or prejudice any of their stakeholders. All creditor groups or their advisors have had an opportunity to actively participate in substantive discussions with the Debtors throughout these chapter 11 cases. The Debtors will continue to facilitate those discussions.

22. The Debtors are seeking an extension of the Exclusivity Periods to preserve and capitalize on the progress made to date in their restructuring negotiations and to allow them time to select a value maximizing path in light of the receipt of bids after the Bid Deadline, which recently passed.

## Certain Unresolved Contingencies Exist

23. As discussed, the Debtors continue to evaluate what the most value-maximizing transaction will be in these chapter 11 cases in light of several threshold issues. The Debtors continue to evaluate the results of a comprehensive marketing process and compare recoveries of such process to those of a self-liquidating plan, especially in light of ongoing regulatory uncertainty. The Committee continues to push on preference claims related to the Debtors'

9

custodial cryptocurrency assets and questions remain for this group about the Debtors' methodology for booking intercompany claims with respect to Debtor BlockFi International Ltd. In addition, the Debtors need to engage in conversations and negotiations with multiple regulatory bodies about the structure of a viable plan in light of their posture in similarly situated cases. In the face of these contingencies, more time is needed to adequately evaluate such options and determining the value available for distribution to clients.

### The Requested Extensions are Reasonable Under the Circumstances

24. The Debtors' Bid Deadline for the sale of their customer platform assets recently passed on April 4, 2023. Any transfer of a cryptocurrency platform is a complex endeavor, and the Debtors are in negotiations with the counterparties about the logistics and viability of such transfer of digital assets and customer migration, as well as the applicable regulatory risks associated with any such transfer. Such discussions are active and ongoing, and the results of which will need to be built into a Plan. The extended Exclusivity Filing Period is designed to allow for these discussions to play out in their entirety and get all parties comfortable that the documents relating to any potential transaction are accurately documented.

25. Further, the go-forward timeline provided in the Reply is the bare minimum that the Debtors believe they need to solicit votes on their Plan and to tabulate ballots in a case of this size and complexity. The timeline that the Debtors are working towards contemplates the statutory notice periods and the requisite time that the Debtors, in discussion and consultation with their claims and noticing agent, determined is practically needed to deliver, receive, organize, and tabulate the solicitation materials accurately. More accurately, the timeline provided is ambitious, as it requires the Debtors to engage in parallel negotiations to obtain requisite approval of governmental authorities in both the United States and Bermuda. Accordingly, based on my

experience, the timeline that the Debtors are operating under is reasonable and expedient, if not aggressive.

## Conclusion

Based on my experience and personal knowledge of the Debtors' commercial circumstances, prepetition negotiations, and postpetition progress, I believe that an extension of the Exclusivity Periods would be prudent, and ample cause exists to grant such relief. The extensions of the Exclusivity Periods as requested herein will not prejudice any party in interest, but will avert the additional costs and conflicts that come with premature competing plans. The termination of the Exclusivity Periods and the threat of multiple plans would likely lead to unnecessary adversarial situations and confrontations that will cause deterioration of the Debtors' assets.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

April 17, 2023

*/s/ Mark A. Renzi*
Mark A. Renzi
Chief Restructuring Officer