UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          .       Case No. 22-19361-MBK
                                .       (Jointly Administered)
BLOCKFI INC., et al.,           .
                                .
         Debtors.               .
                                .       April 19, 2023
. . . . . . . . . . . . .        .       10:02 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Debtors:                    Kirkland & Ellis LLP
                                BY:  JOSHUA A. SUSSBERG, ESQ.
                                     CHRISTINE A. OKIKE, ESQ.
                                     MICHAEL SLADE, ESQ.
                                601 Lexington Avenue
                                New York, NY 10022

                                Haynes and Boone
                                By:  RICHARD KANOWITZ, ESQ.
                                30 Rockefeller Plaza, 26th Floor
                                New York, NY 10112

                                Haynes and Boone
                                By:  JORDAN CHAVEZ, ESQ.
                                2323 Victory Avenue, Suite 700
                                Dallas, TX 75219

For the Official                Brown Rudnick, LLP
Committee of Unsecured          By:  KENNETH AULET, ESQ.
Creditors:                           ROBERT J. STARK, ESQ.
                                7 Times Square
                                New York, NY 10036

Audio Operator                  Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**
**(609) 586-2311    Fax No. (609) 587-3599**

2

ADDITIONAL APPEARANCES:

For the United States          Office of the U.S. Trustee
Trustee:                       By:  JEFFREY SPONDER, ESQ.
                               One Newark Center
                               Newark, NJ 07102


For the Ad Hoc                 Troutman Pepper
Committee of Wallet            By: DEBORAH KOVSKY APAP, ESQ.
Account Holders:               4000 Town Center, Suite 1800
                               Southfield, MI 48075


_ _ _ _ _

1          THE COURT:  Okay, good morning everyone.  This is

2    Judge Kaplan.  Hope everyone is doing well.  This is the

3    Blockfi, Inc. matters.  And I appreciate everybody's

4    participation through Zoom, remotely.

5          For those who wish to be heard at any point in time,

6    if I haven't called on you please use the raise hand function

7    and either or my law clerks will make sure we spot you and give

8    you the opportunity to speak.

9          I've received correspondence from, on behalf of the

10   Committee regarding the exclusivity motion.  I expect that

11   we'll be talking about the process.  I see both Mr. Sussberg

12   and Mr. Stark have raised their hands, anxious to get involved.

13   Let's have it so to speak.  Good morning gentlemen.  Let me

14   start with Mr. Sussberg.

15        MR. SUSSBERG:  Yes, thank you Your Honor, Joshua

16   Sussberg from Kirkland & Ellis on behalf of the debtors.  I

17   think the agenda today is relatively straightforward, save for

18   what I think is straightforward, our exclusivity extension.

19        This is our first exclusivity extension, all right.

20   And it's a modest one at that Your Honor.  As you've seen in

21   our reply we ask for an extension of the filing deadline by 48

22   days and the solicitation deadline by 73 days.  So that would

23   be extensions to May 15th and August 11th, respectively.

24        And we laid out in our reply, it's on page 4, the

25   schedule that we're seeking to adhere to which includes the

1  filing of a plan no later than May 15th.  And then working our

2  way through all the statutory deadlines and the like to get to

3  the deadline we propose in August which we admit is aggressive,

4  but it's one that we want to move forward with.

5          And we have been doing a tremendous amount of work to

6  be in a position to resolve many complex issues notwithstanding

7  the commentary from the Committee.

8          And we laid this out for the Committee on April 10th.

9  And we noted in our papers, there was an 88 page DEC.  Mr.

10 Renzi walked through it.  We had a conversation about the

11 schedule and we had a back and forth.

12         And you know, Your Honor I've been doing this 20

13 years.  I know there's people on this phone that have been

14 doing it a lot longer, the way it works with exclusivity you

15 have up to 18 and 20 months for filing a plan and for

16 soliciting.  The Debtor proposes six months or nine months.

17 The Committee comes back, we reach agreement on the dates.  We

18 were within 11 days of each other.  Mr. Stark wanted the end of

19 July, we wanted the middle of August like we suggested.

20         And then we got the pleading seeking to terminate

21 exclusivity on our first request.  This is not something that

22 I've ever seen.

23         And the reality is Your Honor that there's more to

24 this than meets the eye.  And, you know, notwithstanding all

25 the back and forth in the objection that Mr. Stark filed, comes

1  down to one sentence in his pleading.  It's paragraph 28 where

2  he makes a comment about the Debtors can file a plan that seeks

3  to confirm over the objection of creditors with releases in the

4  plan and we want to file our own plan.  And the reality is

5  that's what this is all about.  This is all about Mr. Stark

6  preadjudicating before we even file a plan, what our plan is

7  going to include and what it's going to say.

8           And what I would tell Your Honor we are continuing

9  the investigation.  Kirkland & Ellis is handling an

10 investigation at the direction of our independent directors,

11 Jennifer Hill and Scott Vogel.  As you know the Committee is

12 conducting an investigation.  And as we sit here today that

13 investigation is ongoing.  There are more depositions.  We have

14 more document requests from the Committee.  And we are going to

15 make determinations and decisions when it is complete.

16          But there is no world in which we should be

17 terminating exclusivity at the first request.  I think we have

18 demonstrated cause more than sufficiently in the 32 bullets

19 that we laid out on pages 3 through 5 in our pleading.

20          And I know Your Honor mentioned Mr. Stark's letter

21 from yesterday.  I will admit that we did take the bait a bit

22 from the Committee when they asked us what our evidentiary

23 record would be when we submitted declarations from Mr. Renzi

24 and Ms. Pullo.  And obviously we'll take guidance from Your

25 Honor.

1          I think those declarations are unnecessary.  I think

2  Your Honor can decide this on the papers.  Again it's a first

3  exclusivity extension.  We were talking about 11 days.  This is

4  about Mr. Stark and the Committee trying to make a point that

5  I'm not sure is ringing hollow.  It is ringing hollow.

6          And I think we are going to work over the next couple

7  of months to pursue and ultimately confirm a plan that's in the

8  best interests of our stakeholders and we're not going to

9  preadjuciate anything, especially because investigations and

10  the like are not complete.

11          So we would submit Your Honor unless you want to

12  handle it differently, I'm hopeful that we can move forward on

13  the pleadings here today and get our exclusivity extension and

14  really start building the consensus that we need which we

15  through had started admittedly on April 10th.

16          I know it will continue.  And I'm hopeful we can put

17  some of this aside and really move this forward for the benefit

18  of the customers of this estate.

19          THE COURT:  All right, thank you Mr. Sussberg.  Mr.

20  Stark let me hear from you.

21          MR. STARK:  Thank you Your Honor.  Can Your Honor

22  hear me okay?

23          THE COURT:  Yes, I can.

24          MR. STARK:  Thank you.  I do have a presentation.  I

25  think it's a little longer than Mr. Sussberg, but I do

1   appreciate the things that he says as I think Mr. Sussberg said

2   in open Court, we have a relationship that goes over many cases

3   and I respect the man and I think he is an honest and good

4   lawyer.  So what I'm about to say is not a reflection of

5   anything other than the fact that I accept him at his word and

6   I always have and we will continue to work in good faith.

7           But we have an issue.  And there has been pleadings

8   that have been filed that admittedly may be from us and I think

9   probably they'd admit as well, raises the rhetorical level

10  considerably high.  And so I think Your Honor it's worth

11  spending a couple of minutes to talk about that.

12          The reply says hey, wait a second, we had, we've

13  moved a lot from our original request.  And there was a meeting

14  and the schedule was presented.  And it gets a little personal

15  towards me, but I said maybe we can talk about this, I want to

16  think about it.  We didn't agree to anything is what they said.

17          And it really kind of presents this as the Committee

18  picking a fight and I don't think that's fair.  And I want to

19  unpack that.  And I will at the end of my presentation because

20  I do believe this is a status conference and I do believe that

21  we are, and I will make a proposal procedurally about how to

22  advance.  But we're not, as I understand it, going to be taking

23  evidence today.

24          THE COURT:  Right.

25          MR. STARK:  And we of course would reserve that

1 right.  So let me just unpack it a little bit and then

2 hopefully move, seek to, okay, where do we go from here which I

3 know that's always Your Honor's request of all counsel.  So I'd

4 like to make a proposal on that.

5 　　　　　Before we filed the objection there was a meeting and

6 there were conversations.  And I did call Debtor's counsel, not

7 Mr. Sussberg, I spoke with Mr. Kanowitz beforehand and I said,

8 I don't want to file this objection.  I want to talk.  And we

9 spent some time talking to our respective clients and the

10 decision was no, go ahead and file your objection.  Okay, so we

11 filed the objection.

12 　　　　　I assumed we would continue to talk thereafter.  It

13 went, you know, it zig-zagged to what I now read as a fairly

14 heavily-handed rhetorical position.  We have sort of two points

15 that are going on underneath this.  The first is the need for

16 speed and I want to spend a minute or two because it's not only

17 us talking, the three of us talking right now, it's also a lot

18 of people listening to what we're talking about right now.  So

19 I'd like to say a few things on speed.

20 　　　　　And then let's talk about that underlying substantive

21 issue because it's enormous.  And the pleading kind of masks

22 the substance with very heavy headed rhetoric and I think we

23 need to talk substance at this moment.

24 　　　　　On the need for speed I want to embody who's reading

25 the Debtor's motion and reply papers, there's sort of this

1 imperialistic kind of tone and it comes right off the shelf

2 from every other Chapter 11 case; hey, we got exclusivity

3 because that's de rigueur.  We get it because we ask for it.

4 Cases are big.  We get it and move it forward.  There's no

5 real, there's iteratives, but it doesn't really say any

6 substantively about progress.  But I understand that's what we

7 do in most cases but this is not most cases.

8         In this case we don't have banks, hedge funds,

9 abitrageurs, landlords, trade vendors, companies.  In this case

10 the creditors are people, individuals, moms and pops, many of

11 whom have lost their life savings.  And Your Honor I know has

12 received a number of communications from some of these people.

13 At the last hearing I got up and said please don't call

14 chambers anymore, call me.  So Your Honor can only imagine how

15 many you're receiving because I'm receiving more.

16         But the stories are frightfully terrible and I take

17 that very, very seriously as does the Committee.  We will not

18 allow these people to get processed in the usual course.  We

19 don't believe that's appropriate given the circumstances of

20 this particular case.

21         I can't explain four months from now why we can't get

22 something done.  I've been saying for quite a while now we want

23 a plan on file that we can agree to before there are leaves on

24 the trees.  And there are already leaves on the trees.  And I

25 can't explain the delay.

1    It is the Debtor's job in a case as personal as this

2  one to say in open Court in a much better way than the pro

3  forma ipse dixit that's been filed already, why it takes four

4  more months, why the separation from money is so important.

5  Not for me to do.

6    Second, this case is burning money.  It's clear it's

7  burning money.  And yes, this little contested matter is

8  burning money.  But there's a rule Your Honor and I learned it

9  when I was in college.  It's called Parkinson's Law and maybe

10  Your Honor knows this.  Work will always expand to fill the

11  time allotted.  And in bankruptcy, Parkinson's Law is visited

12  in the millions and the tens of millions, monthly, two months,

13  because most of us are on an hourly time basis and these are

14  not small law firms involved here.

15    But we don't normally have to talk about Parkinson's

16  Law in bankruptcy cases because we have a DIP loan.  And DIP

17  loans have budgets, they have milestones, case controls and

18  maturities.

19    And so debtors have to move quickly because the

20  secured lenders demand it and those are the rules of engagement

21  in every case.

22    But not so here.  Because what the company did the

23  minutes before bankruptcy is they sold all the crypto that was

24  domestic.  And they've been sitting on 250 plus million dollars

25  in U.S. currency sitting in a bank account.  And no one is

1  tethering the expenditures to that money.  So that makes it my

2  job and in turn Your Honor's oversight job to make sure that

3  the hauling knife of cost is accounted for every single day,

4  week and month of burn because that's what these moms and pops

5  deserve, okay.

6          And I don't agree with the 38 iteratives about how

7  hard this case is.  That there's oh so much work to do.  I do

8  not agree that that is a accurate narrative of what's going on

9  in this case.  This is no business.  There is no enterprise to

10 rehabilitate.  There is no business that will be organized.

11 There is nothing viable or feasible here to come out.  There's

12 an MNA process for the platform.  That is a bundle of sticks to

13 be sold, okay.  And that process is concluded.

14         Then we have the cash, some crypto currency assets.

15 We have some loans and J.B. interests in mining companies.  We

16 have the FTX, --  by causes of action.  Those are the things

17 you shove into a liquidation trust and give the creditors

18 control of their own fate because we have no secured debt.  We

19 just have unsecured creditors here.  They can choose for

20 themselves what and how they want to handle all those things

21 and how they want to resolve claims and causes of action as

22 they see fit.

23         If Your Honor, these issues have been presented after

24 coordinating with the JPMs (phonetic).  We have my

25 investigation which is pretty much wrapping up.  We have

12

1 intercompany issues.  We have the Wallet issues.  Those are all

2 manufactured complexity.  It's resolved and it's a slow walk.

3       And I'll tell Your Honor, I'll prove the point this

4 way.  If Your Honor were to lift exclusivity today, I could

5 have a plan on file in 10 days, maybe even sooner.  And I feel

6 very, very confident that that plan would be widely accepted by

7 all creditor classes and would settle out the remaining issues

8 that are out there like Wallets and stuff like that and would

9 be confirmable in June.

10      And that gets us to what's lying beneath the surface.

11 What is this dispute about.  Your Honor is probably not used to

12 seeing the kind of pleadings now at least the reply and how

13 personal it got.  So quick it got so personal.  Maybe I

14 promoted it by my own rhetoric, I don't know.

15      But it went from slow to really fast really quick.

16 So there's got to be something going on beneath the surface.

17 And in fact it's not the calendar, except in this respect.

18 It's not May 15th, right.  If Your Honor were to set the

19 deadline tomorrow for filing a plan, they'd have a plan on

20 file.  They already have a plan on file.  They filed it in the

21 first days of the case.

22      It's the solicitation deadline that's the hard one.

23 Okay, you usually get two months, they want three.  And they

24 put in an affidavit about well in this case for some reason

25 unlike any other case that any of us were involved in, they

1    need an extra month here.

2            But let's just talk about mid August for a second

3    from a different vantage point, okay.  I didn't fall off the

4    turnip truck yesterday.  I know what plan they're going to

5    file, okay.  And we've had lots of conversations among counsel.

6    Again I talked to counsel before I filed my objection.  We've

7    had conversations since, okay.

8            There's misalignment on a very significant issue in

9    this case and we'll talk about that in a second, okay.  The

10    plan that I believe they intend to file will be vigorously

11    opposed by the Committee.  We don't see how that plan confirms.

12    It won't (indiscernible) class.  We don't think it will be good

13    faith.  We don't think it will be fair and equitable.  We've

14    got a whole bunch of other things that we're thinking about

15    here and we're setting up for a very ugly case.  Which means

16    that we don't get to pick up according to the schedule, until

17    mid August assuming that we're successful in blowing up that

18    plan.  And then we don't get out until Halloween.

19            Meanwhile we've incurred tens of millions of dollars

20    in additional incremental cost.  And that's terrible, that's

21    terrible.

22            So I reached out to opposing counsel and made several

23    different proposals to try to obviate this matter right now,

24    this dispute right now.  But I made this proposal which I

25    thought was fair and in the middle, okay.  I said Your Honor's

1  bridge order on exclusivity didn't have a date certain.  It

2  says we will have, exclusivity will automatically bridge until

3  Your Honor can schedule a hearing.  And at that hearing will be

4  a final order on the motion and you automatically bridge to

5  that date.

6          I said let's all agree just to hold off that hearing

7  for a little bit of time.  Let's talk.  Let's put some oxygen

8  into our respective positions and talk it through and see if we

9  can find common ground as opposed to going immediately to the

10 fight.

11         I got a voice mail message back midday yesterday,

12 nope, we're not talking.  Let's get on with the fight.  That's

13 why we're having this dispute Your Honor.  That's what's going

14 on.

15         I want to talk.  I want to share perspective.  They

16 want exclusivity in their positioning, not unlike another case

17 that Your Honor may have been dealing with yesterday on

18 injunctions and controls and rights.  And we want the ability

19 to talk as opposed to being held in the gulag and have to make,

20 essentially be extorted by tying in cost runs to giving in on

21 something we feel very strongly about.  And that's a bad

22 dynamic.

23         I wanted in this presentation Your Honor to not want

24 to talk about the issue, the big issue in dispute.  I wanted to

25 measure my words because it may be Pollyann-ish.  I thought if

1 we actually had, if Your Honor found my proposal acceptable,

2 put the hearing out for the end of the month and let's see if

3 we can't talk it through, is try to find some common ground

4 before we went (indiscernible 10:21:00) with each other.

5       But I didn't want to put it out in the public now, we

6 have a very active community and one that is watching

7 everything we say and talk amongst themselves about.  I didn't

8 necessarily think feeding the fire was a good idea.

9       I'm happy to talk about it further because I think

10 Mr. Sussberg kind of alluded to it.  But I think I'm going to

11 hold my tongue at this moment.  Perhaps on rebuttal if Your

12 Honor asks and Mr. Sussberg prompts me, we can talk about it

13 further.

14       My proposal stands Your Honor.  I think the right

15 answer for this case before we go ahead and go hammer and tong,

16 go into tens of millions of dollars of expense on mom and pop

17 money over something that seems awfully parochial and not

18 necessarily what the creditors want, we should talk.  But if we

19 can't make a resolution on talking, then I'd rather have the

20 trial now on exclusivity and put it all on the table for

21 everyone to see and the creditors to realize so that Your Honor

22 can make a decision before we incur all that expense and take

23 this case all the way out to Halloween.  I think that's the

24 proper staging of how we end the Blockfi case.  And make it

25 unlike Voyager (phonetic), and Celsius (phonetic) and Lord

1    knows FTX.  Your Honor have any questions for me at this point?

2         THE COURT:  No, thank you Mr. Stark.  Let me go back

3    to Mr. Sussberg and hear from his, any response.

4         MR. SUSSBERG:  Yeah, I have a few Your Honor, thank

5    you.  Joshua Sussberg, Kirkland & Ellis.  You know as I've told

6    Mr. Stark before, none of this is personal.  We're all trying

7    to get to the right answer.

8         But the one thing he said that demonstrates that

9    exclusivity and an extension is critical here is he said and he

10   hasn't even seen a plan from the Debtors.  He said there is no

11   plan that the Debtors will propose that he will recommend his

12   constituents agree to.

13        And that is the posture that he's taken.  And the

14   commentary that has come back as far as trying to bridge the

15   gap here in a conversation is, give the Committee a consent and

16   veto right over the filing of a plan, which is effectively the

17   same as terminating exclusivity.

18        And I'm reminded of the Dow Corning case because it's

19   cited in Mr. Stark's pleading.  And the one thing that stuck

20   out to me was the chaos factor that the Courts allude to in Dow

21   Corning.  This is our first exclusivity request extension.  We

22   are asking on April 19th, today, to have a deadline of May 15th

23   to file a plan.  We intend to share that plan with the

24   Committee in the next week or so and then get it on file.  And

25   then we'll move forward with that plan.

1         And just like all Chapter 11 plans this is no

2    different, notwithstanding the constituencies, there are

3    differences in the case, I admit.  But just like in Voyager

4    where we built consensus, not only with individuals but with

5    the Committee.  And just like we're doing in Celsius, this is

6    exactly the same.

7         This is about a leverage play by Mr. Stark to try to

8    thwart the cases and increase and enhance an agenda that he

9    has, that he doesn't even know what our document says.  And

10   it's all the more reason Your Honor that I believe on the

11   pleadings and on this record and on the factors, because Your

12   Honor has sat here for four months and I know you know the

13   complications of this case.  It is not a simple case.  It is

14   global.  It involves international.  It involves U.S.  There

15   are Wallet issues.  Not to mention the fact that we're in the

16   middle of a sale process and we may end up going with a sponsor

17   deal.  And there could end up being an auction, all of which

18   needs to play out in the context of filing a Chapter 11 plan.

19   We've worked on the stand alone but it could be that the sale

20   process makes sense.

21        And then there's dealing with all the regulators and

22   making sure that they're onboard with the plan.  We have done

23   this before in similar circumstances.  We know what's involved.

24   And it absolutely merits and warrants a modest, again a very

25   modest exclusivity extension.  We did not come in here and ask

1  for the sun and the moon and the stars.  We asked to get a plan

2  on file by the middle of May and then to proceed down a path as

3  quickly as we can.

4          And if we can beat those dates and if solicitation

5  goes faster, by all means we're going to pursue that.  We are

6  not looking to draw this out for the sake of drawing it out.

7  That is unfair and I hope every single customer knows that I

8  mean what I said on the first day of this case, it is our job

9  to deliver people back their money and that's exactly what

10 we're going to do.  But we're going to do it in a thoughtful

11 manner and not a chaotic manner consistent with <u>Dow Corning</u>.

12         And I would submit Your Honor again that you can

13 decide this today on these pleadings.  But we obviously will do

14 whatever Your Honor recommends as far as moving this forward.

15         THE COURT:  Mr. Stark.

16         MR. STARK:  Your Honor I, I don't, this is where I do

17 part company with Mr. Sussberg on a personal level.  This is

18 not a leverage play.

19         And by the way it's not Mr. Stark's decision, this is

20 the Committee's decision.  I have an active Committee, I have

21 an active client.  And I'd prefer if my opposing counsel

22 actually referred to my client as opposed to making this all

23 personal about me.  Your Honor knows me.  This isn't my first

24 rodeo.  I've been doing this for like 30 years.  I have a

25 little more experience than Mr. Sussberg on not only committee

1  work, so I don't really appreciate that.

2      What's happening Your Honor it's not a leverage play.

3  Quite the opposite.  My proposal is let's talk to one another.

4  Let's not jam the litigation at this moment.

5      But I'm not an idiot.  I sat in the room.  I've seen

6  the plan they've filed and I've talked to these people.  I know

7  what plan they're going to file.  Mr. Sussberg even said he's

8  conducting his own investigation and he's going and talking to

9  independent directors that he installed in this company.  And

10 we've done the investigation ourselves and we have views about

11 what the plan should look like in contravention to what we've

12 been told, right.

13      It's not like I'm making this stuff.  I said let's

14 talk.  Let's go into a room and see if we can't figure this

15 out.  But no, you don't get to have exclusivity because

16 possession is nine tenths of the law.  And you don't get to use

17 the cost and the burden and the time delay on people who are

18 desperate, to extort what you want without a rational

19 conversation.  That is wrongful.

20      And if that's the position the Debtor wants to take,

21 then we reply upon the jurisprudence that says we want to have

22 a trial.  Say it in open court.  Let's have at it.

23      And that's where we are Your Honor.  But I don't

24 appreciate that this is anything personal or anything like

25 that.  We just don't agree with their positioning and we want

1  to talk about it instead of litigating it.

2          It wasn't the decision of mine to move this hearing

3  this way.

4          THE COURT:  All right, before I start addressing the

5  issues, is there anyone else who wishes to be heard on this?

6  All right, I don't see anybody with a raised hand.

7          Probably yesterday toward the end of a nine hour plus

8  hearing was not the right time to read a letter requesting

9  another evidentiary hearing.  It certainly, I'm not sure

10 whether I would be receptive yesterday.

11         I've had the time to consider the issue over the

12 evening and listening to the arguments.  I don't view any of

13 this as personal.  This is zealous advocacy on each side with

14 Mr. Stark trying to protect the Committee and the clients and

15 the customers and Mr. Sussberg in his venue, in his way of also

16 trying to protect the customers.

17         It's a difference as to what the best pathway.  I

18 will say that I believe the professionals in this case have

19 acted as such, professionals.  You've kept most of the issues

20 out of my Court to date which has been tremendous because it

21 does preserve.  I'm not saying there aren't dollars being spent

22 in this case, there are.  Every case of this magnitude and

23 complexity.  And it has complexities involved, generates

24 unfortunately litigation and time consuming discovery and

25 investigations.

1          I am pleased that the Committee through Mr. Stark's

2    efforts and his colleagues have pursued their investigation and

3    done so without running to the Court on every issue and working

4    with the Debtor's counsel and other counsel in trying to

5    resolve issues so that, I refer to this case almost as my

6    stealth crypto currency case.  Because I don't see a lot of

7    what I know is going on looking at all the records, looking at

8    what's on the docket.

9          I know the communications, I know the discussions by

10   and among the professionals.  I know the investigation that's

11   being taken.

12         And because of that and that effort to try by all the

13   professionals to reduce the administrative burdens, I am leery

14   of moving forward with an evidentiary hearing on a first time

15   exclusivity request extension when the result if the Committee

16   is successful will be completing plans which have their own

17   inherent administrative costs and burdens.

18         The estate does not benefit from necessarily from

19   competing plans.  There may come a point where there has to be

20   when negotiations simply are at an impasse.  Or where the plans

21   are just unacceptable.

22         But my concern is that we go down a path of spending

23   what I view as wasted dollars and efforts fighting over weeks.

24   I've seen in Celsius, I've seen in Voyager, you all have more

25   experience in these cases, the complexities and the stop and

1 gos of the processes.

2       We see confirmed plans that are suddenly on hold

3 because not all the ducks are in order, with stays in place.

4 And then appeals to District Courts and Circuits.

5       We see a very active regulatory scheme in which just

6 from reading the papers, we understand the SEC pursuing

7 regulatory actions against exchanges and platforms which adds

8 to the complexity in trying to find an exit strategy for this

9 Debtor, Blockfi, that's appropriate.

10       I agree wholeheartedly with Mr. Stark that speed is

11 important.  The interest of these customers are important and

12 this needs to move forward.

13       I guess where I differ respectfully Mr. Stark is the

14 idea that we just have the trial now.  Because I don't -- on

15 exclusivity.  Because I don't think we limit the trial there.

16 That's just the first trial.  And then we have a trial with

17 competing plans and competing disclosure statements.

18       And let alone two different proponents of plans

19 trying to come to terms with regulatory issues, international

20 issues, liquidation issues.

21       I have read the two declarations that were filed, Ms.

22 Pullo which speaks from Kroll as to a timing and Mr. Renzi's

23 declaration which frankly and it's no disrespect to Mr. Renzi.

24 He outlines everything that's going on.  I can look at the

25 docket and get 80 percent of the content of the declaration

23

1  just by looking at the docket because it shows the activity of

2  the Debtor and of, and the Committee in this case.  It's not,

3  these declarations aren't dispositive.

4        I want to turn to Mr. Stark and ask is there and my

5  preference in all candor is to decide this one papers rather

6  than evidentiary hearings which necessarily involve discovery,

7  argument, Court time.  Are there declarations or additional

8  affidavits you think would be dispositive that you would like

9  to submit for my consideration in response to the declarations?

10  I don't want necessarily to leave the declarations as the last

11  word, although I think you can address it in argument.  But

12  what would be your preference?

13        MR. STARK:  Well Your Honor I apologize if I ask, if

14  I can't directly answer the question or I can.  But I think I

15  want to get to the place where I think Your Honor is more

16  inclined to go.

17        Look, I have now made my argument.  I believe that

18  the Debtors if they want to go down a path that we perceive

19  will be war, I think that before we incur the expense and the

20  time delay we, they should come and answer to the community for

21  it.

22        But I understand Your Honor's views on that.  I

23  respect it.  And I suppose we have a legal right to press the

24  evidentiary point, but I understand Your Honor's ruling and I

25  respect it.  And so therefore if 80 percent of what Your Honor

1  feels confident in rendering the ruling on is from the docket

2  itself and is not going to be reliant on the declarations in

3  any way, shape and form, then it would not be a good advocate's

4  role I think to get in the way of where the Judge is inclined

5  to go and let's just move forward.

6          But as long as the record is clear when and if we

7  find ourselves back at, in the future back to a moment that

8  I've presaged at this moment and we may.  You won't hit me too

9  hard Your Honor if I said I told you so.

10          THE COURT:  I was just going to say you reserve the

11 right to have an I told you so moment.  I get it in other cases

12 occasionally.

13          MR. STARK:  But with respect.  With respect.

14          THE COURT:  Always with respect.  But and I

15 appreciate it.  Is there other argument that either side wishes

16 to make?  We'll start with you Mr. Sussberg.  Anything you wish

17 to add to what you've already laid out before the Court or in

18 the papers?

19          MR. SUSSBERG:  No, Your Honor.  We appreciate the

20 Court taking the time today.  And I just do want to mention

21 that, you know, Mr. Stark is preassuming an outcome.  It's our

22 job to work together to try to avoid that.  We will get them

23 drafts of documentation.  And Mr. Stark and I have already

24 talked about sitting down and seeing how we can reach middle

25 ground.  We've done it many, many times before.  I'm hopeful

1  that we will do it yet again, so thank you.

2          THE COURT:  All right, thank you Mr. Sussberg.  Mr.

3  Stark.

4          MR. STARK:  I'm looking forward to that phone call.

5  And we'll have a meal and hopefully we can find some common

6  ground.  But I respect Your Honor's decision today.

7          THE COURT:  And thank you.  And Mr. Stark I

8  definitely want to express my appreciation for the

9  professionalism.  Yes, when we have lawyers who are very

10 knowledgeable about both substance and procedure and know their

11 way around a courtroom, but that's one thing.  But to recognize

12 expediency for the benefit of their clients is more of a rarity

13 and I appreciate those efforts.

14         MR. STARK:  Thank you Your Honor.

15         THE COURT:  I've made my judgment and my ruling which

16 will be to grant the extensions primarily because of the

17 limited nature of the extension.  With a proviso that it would

18 have to be extraordinary, there would have to be an

19 extraordinary event to deviate from it going forward if

20 something were to go array.

21         I don't foreclose that, but certainly I take Mr.

22 Sussberg and the Debtor's position at face value, that this can

23 proceed along the time frame that's been laid out in the

24 documents.

25         I anticipate that there's going to be pushback from

1 the Committee and maybe other parties in interest.  There's an

2 ad hoc committee, there's other creditors involved.  That's

3 part and parcel of the process.

4        In gauging whether or not to extend exclusivity, the

5 Court recognizes that there are built into the Code by Congress

6 leverage points.  The Debtor's exclusivity is a tool.  The

7 requirements for voting and confirming a plan are a creditor's

8 tools.

9        Congress built in a pathway for extensions.  They've

10 limited since going back to 2005.  We're not going to approach

11 the caps on the extensions.  We're talking about a plan being

12 filed somewhere in early May and a process that will take us

13 into the summer.

14        The good news is I have relatively few travel plans

15 in July and August so I won't be holding you all up and I will

16 make the Court available.

17        It is important that the parties start the

18 negotiation process yesterday.  And we'll get into that when we

19 discuss the status of the Wallets and other matters.

20        I'm extending exclusivity because I do agree that the

21 case, even though Mr. Stark may question the level of

22 complexity, the usual nature of the crypto cases is evident

23 just from what we see going on in FTX and Celsius and Voyager.

24 What we see going on with issues as to property of the estate,

25 ownership, how to handle the regulatory issues, the

1  international aspects, those complexities.

2        A liquidation is not necessarily complex.  But the

3  best way to do so to maximize returns can be.  And I want this

4  process to go forward with all eyes wide open, especially in

5  light of the pending sale process that all the parties were

6  able to identify the best pathway forward to maximize the

7  returns to the creditors.

8        Because the requested extension is minimal compared

9  to what may be the norm in Chapter 11, I'm going to approve it

10  but hold the Debtor to, fire to their feet as the phrase goes.

11  I don't need to do so as much as I know Mr. Stark and other ad

12  hocs and everyone else will as well.

13        The Court is open to assist if in any way, at any

14  point a neutral assist in trying to reach an accord if there is

15  a gap.  Again we're assuming a lot.  Maybe good communication

16  by strong professionals we won't have such a huge gap.

17        So I will enter the order based on the pleadings

18  submitted.  Based primarily what the Court can take judicial

19  notice of with respect to the docket and we'll move forward.

20  And I appreciate the advocacy involved and the professionalism.

21        Do we want to turn to Mr. Sussberg.

22        MR. SUSSBERG:  Thank you Your Honor.

23        THE COURT:  Or how do we move on to other agenda

24  items?

25        MR. SUSSBERG:  Yeah, I think we should proceed with

1    the agenda.  We can move to agenda item two.  And then we have

2    some status conference items to be heard, so I'm going to leave

3    it to the rest of the team to pick that up.

4          THE COURT:  All right.  Who will be taking the

5    mantle?

6          MS. CHAVEZ:  Good morning Your Honor Jordan Chavez on

7    behalf of the Debtors. I'll be addressing the second item on

8    the agenda which is the Debtor's motion for an order

9    authorizing the Debtors to direct Scratch to return the post

10   pause payments made by retail clients which we filed at Docket

11   Number 559.

12          As set forth in the motion Your Honor, the U.S. based

13   retail client loans are serviced by Scratch Services, LLC

14   pursuant to a sub-servicing agreement that was executed between

15   the parties back in 2018.

16          When a U.S. retail client would make a loan payment,

17   Scratch would service the loan payment and coordinate with

18   Blockfi to allow Blockfi to then apply the payment to the

19   balance on the loan.

20          Now when the platform paused on November 10th

21   subsequently all the activities related to the platform were

22   paused including the retail loans and any payments made thereto

23   and they were placed into administrative forbearance.  So there

24   were no margin calls or liquidations that have taken place

25   since the platform pause.

29

1          Nevertheless it was impossible for Blockfi or Scratch

2  to prevent parties from sending payments to Scratch, to try and

3  make payment on their retail loans.  The payments have largely

4  slowed down since more parties have become aware of the

5  administrative forbearance and these Chapter 11 cases.  However

6  at the moment Scratch is holding over half a million dollars in

7  post pause payments which necessitated this motion before Your

8  Honor today.

9          And at the time of the motion the specific amount

10 Scratch was holding was $585,100.03.  And again those payments

11 have largely slowed down since the case progressed.  But

12 Scratch is now, has received some additional payments and is

13 now holding $596,670.77.

14         So we filed a revised proposed order on the docket

15 yesterday at Docket Number 746 to reflect the new amount.  And

16 both the original and the revised proposed order provide that

17 if Scratch were to receive additional payments after the order

18 was to be entered if Your Honor grants the motion, then Scratch

19 would notify the Debtors of those payments and the Debtors can

20 then direct Scratch to also return any subsequent payments that

21 were made to Scratch.

22         There were no objections that were filed Your Honor

23 to the motion.  I did want to clarify for the record that there

24 were some crypto currency news outlets that had reported that

25 the payments were going to be returned to residents in one

30

1 particular state.  However Your Honor the motion and the relief

2 requested in it and the proposed order encompasses all payments

3 made by U.S. retail loan clients after the pause nationwide.

4 So the half a million dollar amount will be returned to all

5 residents regardless of which state they are located in.

6       Unless Your Honor has any questions I would ask that

7 Your Honor grant the motion.

8       THE COURT:  Okay, thank you Ms. Chavez.  I've read

9 the proposed order.  And needless to say there's been no

10 objection to the relief nor should there be.  It is surprising

11 that a lender has to work so hard to not take payments.  You

12 don't normally see this.

13      But I will enter the orders to allow the money to go

14 back as well as payments that are collected in the future.  I

15 think it makes absolute sense.  Thank you.

16      MS. CHAVEZ:  Thank you Your Honor.  I'll also be

17 addressing the next item on the agenda which is item number

18 three, the Debtor's first omnibus objection to claims which we

19 filed --

20      THE COURT:  Let me just, I'm sorry.  As far as the

21 proposed order that came with the notice of filing, it's Docket

22 746.  Is that the order that can be entered or are we going to

23 be getting a new one?

24      MS. CHAVEZ:  Yes, that order can be entered.  But

25 we're happy to submit a copy to chambers if Your Honor prefers.

1          THE COURT:  I think it's always cleaner.  Just send

2    it directly to chambers.

3          MS. CHAVEZ:  Sure, we'll do that following the

4    hearing.  Thank you Your Honor.

5          THE COURT:  Thank you.  Now as to the objections.

6          MS. CHAVEZ:  Yes, Your Honor we filed the objection

7    at Docket Number 573 which was accompanied by a certification

8    of CRO Mark Renzi that we attached as Exhibit A.  And I would

9    ask that Your Honor admit the exhibit into evidence.

10          THE COURT:  So admitted.

11          MS. CHAVEZ:  Thank you.  For the record as Your Honor

12    is properly aware, this hearing was adjourned from April 11th

13    to April 19th.  So I did want to state on the record that we

14    did the serve the claimant with a notice of the adjournment at

15    Docket Number 684.

16          The claim numbers that were filed that were included

17    in the objection are claim number 1363 which was filed for,

18    assets $100 million secured claim against all of the Debtors.

19    And then claim number 1649 and 3217 assert a secured $2.2

20    trillion claim against Blockfi, Inc.

21          So the basis for the objection is that the Debtors

22    have no record at all of this account holder with the name and

23    address that were provided in the claims.  And no documentation

24    supported a valid claim against the Debtors, let alone a

25    secured claim for such an exorbitant amount.

1          The Debtors did reach out to the claimant multiple

2     times as we set forth in the objection to try and get more

3     information and more documentation to try and support the

4     claim.  On one particular date, March 2nd, we did receive some

5     documentation from the claimant.  But it was largely non-

6     responsive and duplicative of what was already attached to the

7     claims.  We did explain the claim objection process as the

8     claimant is pro se' and, including that they could file a

9     formal response by the deadline and attend the hearing if they

10    desired to defend their objection.

11         No timely response was filed to the objection by the

12    deadline and the claimant has not amended or withdrawn the

13    claim.  With all of that Your Honor I would respectfully

14    request that the Court sustain the objection and enter the

15    proposed order that was attached to the objection and disallow

16    the claims in their entirety.

17         THE COURT:  Is there anyone who wishes to be heard on

18    this?  All right, Mr. Aulet.

19         MR. AULET:  Yes, good morning Your Honor.  The

20    Committee fully supports this objection as you might expect.

21    We just wanted to note that, you know, claims like this are

22    extremely serious.  It's a $2.2 trillion claim which had the

23    Debtors not timely addressed it would have prevented any sort

24    of distributions due to the massive reserves that would be

25    required.

33

1          And so we just urge the Court to enter the order.

2    And we'd urge claimants not to submit such claims in the

3    future.

4          THE COURT:  Actually you beat me to the punch, thank

5    you Mr. Aulet.  I was going to give an admonition.  Not only

6    does this cost the estate and all proper claimants time and

7    money in having to address.  I think claimants are well advised

8    to look at the references to Title 18 and bankruptcy fraud when

9    filing claims and realize there can be a consequence in

10   reaching for this pathway.  Thank you.  The motion is granted.

11         MS. CHAVEZ:  Thank you Your Honor.  That's all for me

12   today so I will turn it over to my co-counsel and the U.S.

13   Trustee to address the status conference.  Thank you.

14         THE COURT:  All right, thank you.

15         MS. OKIKE:  Good morning Your Honor, Christine Okike

16   of Kirkland & Ellis on behalf of the Debtors.  I think it makes

17   sense for me to provide just a brief update on the Debtors'

18   cash position which kind of relates to the U.S. Trustee's

19   motion to compel the Debtors to comply with Section 345 if

20   that's all right with Your Honor.

21         THE COURT:  Yes, please.

22         MS. OKIKE:  So Your Honor while the Debtors have

23   opened up several new bank accounts at authorized depositories,

24   those banks continue to struggle to obtain surety bonds.  My

25   understanding from conversations with the banks is that the

1  surety bond market has essentially dried up in the wake of the

2  collapse of Silicon Valley Bank and Signature Bank.  And I know

3  that other debtors are struggling also to obtain surety bonds.

4         So Your Honor may recall that we had a substantial

5  amount of cash invested in money market funds at Silicone

6  Valley Bank where the counter parties were Black Rock and

7  Morgan Stanley.  And those money market funds were invested in

8  government securities.

9         Following discussions with the U.S. Trustee we

10 converted those money market funds into cash and that cash was

11 sitting at Silicone Valley Bridge Bank.  At the time that we

12 made the conversion all funds in the Bridge Bank were fully

13 insured when the government took over.

14        But now the deposits have been transferred from the

15 Bridge Bank to First Citizens.  FDIC protection has dropped

16 back down to 250K.

17        So given just the inability right now to obtain

18 surety bonds and also the desire to be responsive to the U.S.

19 Trustee's request, the Debtors intend to file a motion in the

20 near term seeking authority to invest in treasuries that are

21 backed by the U.S.  Or alternatively to invest in money market

22 funds that are invested in government securities.

23        The Debtors continue to believe that money market

24 funds are safe investments because the exposure is to the funds

25 themselves and not the bank which I think is probably a good

1  thing just given the uncertainty in the banking industry right

2  now.

3         So with that I'll turn it over to the U.S. Trustee.

4  I know we've been having several conversations to try to find a

5  way to move forward.  But unfortunately just given the banking

6  situation we have not been able to obtain surety bonds and we

7  obviously have cash above FDIC limits.

8         THE COURT:  All right, thank you.  It is an issue and

9  a difficulty.  Mr. Sponder did you want to speak?

10        MR. SPONDER:  Thank you Your Honor, Jeff Sponder from

11 the Office of the United States Trustee.  I appreciate the

12 position, the United States Trustee I should say appreciates

13 the position that the Debtors find themselves in.  However they

14 still are not complying with 345.  And I think it's even worse

15 now be it that SVB, Bridge Bank has gone to First Citizens and

16 has limited back down to the 250,000.

17        With that said I understand that a motion would be

18 forthcoming in the near term.  What my suggestion would be is

19 that the near term be today, tomorrow, this week, not something

20 that gets, that's waited on.  As well as seeking shortening

21 time to get this on the docket and a ruling from Your Honor.

22 Because I don't think we have the ability to move off of our

23 position that 345 needs to be complied with.  Thank you Your

24 Honor.

25        THE COURT:  Thank you.  I certainly will schedule it

1  on shortened time when the Debtor gets the motion to us.

2          MS. OKIKE:  Yes, Your Honor, we will endeavor to get

3  it on file.  It may not be today, but definitely this week.

4          THE COURT:  All right, thank you.  We have two other

5  matters.  I guess probably the quicker -- well I'll leave it to

6  you.  We have an update on the adversary proceeding with

7  respect to emergent and also the pending Wallet motion which is

8  of most interest I think to those who are watching.

9          MR. SLADE:  Your Honor, good morning, Mike Slade for

10  the Debtors.  Can you hear me?

11          THE COURT:  Yes, I can, thank you.

12          MR. SLADE:  Your Honor I'll give you an update on the

13  wallet motion.  We have been working with the counsel for the

14  ad hoc committee and for deferred 1031 and the UCC.  And we do

15  have a path forward.

16          The Debtors have provided a substantial amount of

17  diligence on this matter including answering about 100

18  questions in writing and providing some data that was

19  requested.

20          I am hopeful that we will be in a position to present

21  this to Your Honor in the form of a set of stipulated facts

22  that you will be able to hopefully rule on.  The parties are

23  going to work on that over the next approximately a week.

24          If we are not able to stipulate to certain facts, we

25  have agreed that we will make a witness available for the ad

1 hoc committee to ask questions of so that they can, you know,

2 put forth whatever evidence they have on the matters that can't

3 be stipulated to.

4        The parties have agreed that they will file any

5 supplemental briefs and that's the Debtors, the Creditors

6 Committee and the ad hoc committee or deferred 1031 on or

7 before May the 3rd.  And then we will present the matter for

8 Your Honor on May 8th at the next omnibus hearing.

9        Again the hope is that we're going to be able to

10 stipulate to the relevant facts or at least minimize to the

11 extent possible any actual evidence that has to be presented to

12 the Court.  And that's the plan.  And we have discussed this

13 and I believe all parties are in agreement that that's the path

14 forward.

15        We know that all of the creditors want to get this

16 resolved as quickly as possible and so do we.  And this is the

17 most streamlined way that we can present the issue to the

18 Court.  So happy to answer any questions that you have.  But

19 that is the plan.

20        THE COURT:  I do have a question but first let me

21 first turn to Ms. Kovsky.

22        MS. KOVSKY:  Thank you Your Honor.  Can you hear me

23 okay?

24        THE COURT:  Yes, I can.

25        MS. KOVSKY:  So the schedule that Mr. Slade described

1 is what we have discussed and what we've agreed to.  I think

2 it's important though given the widespread interest in this

3 issue and the number of, as Mr. Stark put it, the mom and pop

4 investors that this affects, there's been a lot of

5 misinformation online, a lot of questions about what's going

6 on.  Why is this taking so long.  What's everybody doing.  Why

7 have there been so many delays.  We should have had this

8 resolved already.

9         And I wanted to emphasize that the ad hoc committee

10 is committed to trying to get this resolved as quickly as

11 possible.  There have been a lot of activities taking place

12 behind the scenes.  We have managed to keep this largely out of

13 Your Honor's Court and that was very deliberate, trying to

14 resolve any issues we had ourselves.  We did not want to bring

15 you discovery disputes.  We did not want to spend money of the

16 estate that we didn't need to.

17         The ad hoc committee and I'll speak for deferred 1031

18 as I'm sure Mr. Besikoff (phonetic) won't mind, we jointly

19 agreed to forgo formal discovery in this matter even though

20 it's a contested matter, where we would have been entitled to

21 take full blow formal discovery.

22         Instead we simply asked a series of questions in

23 plain English and agreed to accept answers on an informal

24 basis.

25         It has unfortunately been an extremely slow process.

1   For example it took three written requests and almost two

2   months to get an answer to the simple question of, tell us what

3   assets are in Wallet.  What's actually there.

4          So while we have finally obtained the information

5   that, most of the information that we've been seeking from the

6   Debtors, I want to make it clear, we're not trying to slow walk

7   this in any way.  The ad hoc committee has always been willing

8   to move expeditiously.  But we're entitled to get the

9   information that we need in order to support our objection to

10  what the Debtors are seeking to do to their customers.

11         And so that's really the reason for the repeated

12  adjournments and extensions and why this matter hasn't been

13  heard yet.  It's really simply, we needed to obtain the

14  necessary information to understand how the Debtors' processes

15  work behind the scenes.  What exactly was happening.  What

16  assets are where.

17         And so I wanted to just make it clear to the Wallet

18  account holders who are not members of the ad hoc committee who

19  perhaps have not been able to hear on a, you know, on a

20  periodic basis and get updates about what's been going on, just

21  to let them know we have been working expeditiously to try to

22  get this resolved.

23         THE COURT:  Thank you, that was the direction of my

24  questions.  And I'm aware of some of the complexities inherent

25  in the potential differences from pause dates to potential

1 preferential transfers.

2        But let me ask what may be a naive question.  Are

3 there funds held currently now in Wallets that are not subject

4 to dispute that can be released to Wallet holders that are not

5 subject to any set off claims or defenses or any issues as to

6 pause dates et cetera?  And --

7        MR. SLADE:  Your Honor again, Mike Slade.

8        THE COURT:  And I apologize if it's not a simple

9 question to answer.

10       MR. SLADE:  Yeah, Mike Slade for the Debtors Your

11 Honor.  I think that depends on the outcome of this motion.  If

12 the Court agrees with the position of the Debtors and the

13 Creditors Committee that the attempts after the program pause

14 to move assets from the B accounts to the Wallet, if you agree

15 with us that those are not effective, then the answer to your

16 question is yes, we believe that there will be some funds that,

17 you know, in cooperation with the Creditors Committee we are

18 going to be in a position to be able to release.

19       If, that's a substantially more complicated question

20 if my colleague on the other side, Ms. Kovsky succeeds in her

21 motion.  Then to be honest I'm not quite sure what we're going

22 to do.  But I believe the answer is that there won't be the

23 ability to release any funds until certainly a plan is

24 confirmed.  That's at least my belief sitting here today.

25       THE COURT:  Well, thank you.  I think customers,

1  Wallet holders are entitled to at least, to understand and

2  appreciate the realities.  Ms. Kovsky is your hand still up or

3  is that from before?

4        MS. KOVSKY:  It is Your Honor.  I just wanted to

5  clarify a couple of points.  Mr. Slade referred to the ad hoc

6  committee's motion.  The ad hoc committee doesn't have a motion

7  on file.  The Debtors filed a motion and bear the burden of

8  proving their entitlement to reverse transfers that actually

9  took place.  And that's what they're seeking to do and the ad

10 hoc committee has objected to that.

11       I also wanted to clarify that the sole issue that

12 we're seeking to have the Court determine on May 8th is simply

13 were those transfers that were made, while the system was still

14 operational, were those transfers effective or not.  And it

15 sort of goes to the definition, what does transfer mean in this

16 context.  What constitutes a transfer.  We're not talking,

17 we're not asking the Court to determine well if the transfers

18 were effective, where did they get paid out of.  What assets

19 are available to satisfy them.  Are they subject to potential

20 preferential.  That's all for another day.

21       This is really the gating issue of, did transfers

22 happen.

23       THE COURT:  Understood, thank you Ms. Kovsky.  Mr.

24 Aulet.

25       MR. AULET:  Thank you Your Honor, Kenneth Aulet from

1  Brown Rudnick for the record.  Just to clarify one key issue.

2  It's the Committee's understanding that the Debtors can,

3  essentially cannot release portions of a Wallet account which

4  is why if the position of the ad hoc group is correct, there

5  are no funds that could be released.  Obviously there would be

6  funds that nobody disputes even if, you know, all of those

7  funds are moved into Wallet and there's a large shortfall.  The

8  issue is is that to our understanding the Debtors outside the

9  plan construct have the ability to potentially make 100 percent

10 distributions but not for example, you know, to pick a number,

11 50 percent distributions over anything aside from zero or 100

12 percent.

13      So there's a substantial amount of funds where there

14 is no dispute.  But that technical issue prevents those funds

15 from being sent out.  Because, you know, the dispute, the funds

16 that are not in dispute represent less than 100 percent of an

17 account.

18      THE COURT:  All right, thank you for that addition.

19 All right, that certainly helps.  It points to how important

20 May 8th will be and what I can expect to have in front of me.

21      And of course I will do my best to try to do the

22 quickest turn around that the Court can achieve.

23      Let's turn I think to the emergent matter.  Is there

24 an update Mr. Kanowitz?

25      MR. KANOWITZ:  Yes, Your Honor, thank you.  Richard

1  Kanowitz, Haynes and Boone, counsel, co-counsel to the Debtors

2  and Debtors in Possession.

3        Your Honor, real quick, at Docket 738 we submitted to

4  Your Honor for approval subject to the April 21st deadline for

5  objections, the stand still stipulation I'll call it between

6  emergent Debtor as well as the FTX Debtors and the Blockfi

7  Debtors.

8        Basically this was to carve out any and all disputes

9  concerning the liens, claims and encumbrances concerning the

10 Robinhood shares and only the Robinhood shares.

11       And we spent a lot of time between counsel for the

12 various estates coming to that stipulation and making sure that

13 we captured the right type of procedure as well as substantives

14 to put on hold pending the criminal prosecution of Sam Fried

15 as well as any forfeiture proceedings that arise from that

16 criminal prosecution.

17       So that was put before Judge Dorsey.  And he approved

18 it.  He did it under certification of counsel.  And that was

19 entered on April 17th.  So Your Honor has before the Court

20 subject again to the objection deadline passing on April 21st

21 and I don't anticipate anybody objecting since we've kept all

22 the parties in interest involved in the stipulation step by

23 step, comment by comment, issue by issue, that Your Honor will

24 hopefully approve it.  And that will again put on hold the

25 Robinhood issue.

1          As to defendant Marex we are likewise working with

2    them as to stand still stipulation because we do have a live

3    adversary proceeding against them.  And we would like that

4    adversary proceeding to remain on the docket.  We do not know

5    what's going to happen in connection with the, again,

6    prosecution and forfeiture proceedings.

7          We were first in time from our perspective and

8    everybody reserves rights as to what should happen if the

9    forfeiture proceedings don't go forward or if there's no

10   conviction.

11          So that's where we are with the emergent matter Your

12   Honor.  Happy to answer any questions if you have them.

13          THE COURT:  Can you give me the docket number again

14   for the stipulation?  I want to make sure my staff --

15          MR. KANOWITZ:  Yes, we did it by application.  It's

16   738 Your Honor.

17          THE COURT:  738, great.  I did speak with Judge

18   Dorsey coincidentally and I understood it was coming.  So we'll

19   keep an eye out for it and wait for the passage of time.  All

20   right, thank you Mr. Kanowitz.

21          MR. KANOWITZ:  Thank you Your Honor.

22          THE COURT:  Is there anyone else who wishes to be

23   heard?  All right, I'm not seeing anyone.  I thank everyone for

24   their time and effort.  And I guess the next date is the May

25   8th date unless there's something emergent in between.  So be

1  well, thank you.

2                      (Recording ended @ 11:07:37)

3                  C E R T I F I C A T I O N

4      I, TRACY GRIBBEN, court approved transcriber, certify that

5  the foregoing is a correct transcript from the official digital

6  audio recording of the proceedings in the above-entitled

7  matter.

8

9  /s/ Tracy Gribben

10 J&J COURT TRANSCRIBERS INC.      DATE:  April 20, 2023

11

12

13

14

15

16

17

18

19

20

21

22