**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' OMNIBUS
## REPLY IN SUPPORT OF
## DEBTORS' MOTION FOR ENTRY
## OF AN ORDER (I) AUTHORIZING THE
## DEBTORS TO (A) HONOR WITHDRAWALS FROM
## WALLET ACCOUNTS, (B) UPDATE THE USER INTERFACE
## TO PROPERLY REFLECT TRANSACTIONS AND ASSETS AS
## OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE
## RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
submit this reply (this "Reply")[2] in support of the *Debtors' Motion for Entry of an Order
(I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User
Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct
Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 121]
(the "Wallet Withdrawal Motion") in response to the objections to the Wallet Withdrawal Motion
filed on the chapter 11 docket (the "Objections" filed by the "Objecting Parties").[3]  In support of
the Wallet Withdrawal Motion and this Reply, the Debtors submit the Declaration of Amit Cheela,
Chief Financial Officer of BlockFi, Inc. and state the following:

**Preliminary Statement**

1.    The Debtors implemented the Platform Pause on November 10 at 8:15 p.m.
(prevailing Eastern Time).[4]  At that moment, the Debtors drew a line in the sand to protect and
ensure equal treatment of similarly situated clients.  In accordance with the Platform Pause, the
Debtors took the requisite steps via their True-Up Process and Batching Process (each as defined
herein) to honor all transfer, withdrawal, and trade requests that had been initiated on the User
Interface ***prior*** to the Platform Pause Time Stamp.  If a client requested a transfer on the User
Interface by clicking the "transfer" button any time ***after*** the Platform Pause Time Stamp, that

---

[2]    Capitalized terms used but not otherwise defined in this Reply shall have the meanings ascribed to them in the
*Declaration in Amit Cheela, Chief Financial Officer of BlockFi, Inc., in Support of the Debtors' Motion for Entry
of an Order(I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User
Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course
Reconciliation of Accounts, and (II) Granting Related Relief,* filed contemporaneously herewith (the "Cheela
Declaration"), and the Wallet Withdrawal Motion, as applicable.

[3]    A summary of all of the Objections filed in response to the Wallet Withdrawal Motion and the responses thereto
are provided in the objection chart attached hereto as **Exhibit A** (the "Objection Chart").  The Debtors reiterate
their reservation of rights from the Wallet Withdrawal Motion.  The omission of a specific response to an
Objection should not be taken as a waiver of the Debtors' arguments.  The Debtors reserve all rights with respect
to such arguments, including the right to supplement the Reply with arguments live at the hearing.

[4]    November 10, 2022, at 8:15 p.m. (prevailing Eastern Time) is referred to as the "Platform Pause Time Stamp".

request was never effectuated because the Platform had been paused at the time of such requests, and the Debtors took no action to effectuate or complete such attempted transactions, regardless of what is reflected on the User Interface.[5]  This was an effort to treat all clients fairly and equally.

2.        The Court could grant the requested relief in the Wallet Withdrawal Motion upon a reading of the plain language of the BlockFi Terms of Service alone, which permitted the Debtors to limit platform activity at any time, without any notice to affected clients, in their discretion. Throughout the course of these chapter 11 cases, the Debtors have repeatedly maintained that the assets held in Wallet Accounts as of the Platform Pause Time Stamp are not property of the estates, and that they should be returned to clients expeditiously.  In fact, the Debtors have been trying since the first-day hearing to return the assets held in the Wallet Accounts to clients and will continue doing so, but the Objections must be overruled for the Debtors to be able to return *any* assets in the Client Wallet Accounts to customers at any time in the foreseeable future.

3.        The Ad Hoc Committee of Wallet Holders (the "Ad Hoc Committee") argues that their clients had the ability to effectuate a bona fide transfer of digital assets on BlockFi's platform with the press of a button, even after platform activity had been paused.  Not so.

4.        The User Interface and the Company-Facing Interface are totally distinct and separate from the Debtors' True-Up Process and Batching Process (as described herein and in the Cheela Declaration).  Requesting a withdrawal on the User Interface does not automatically transfer digital assets to or from the Debtors' Rehypothecateable Wallets or Custodial Omnibus Wallets.  Cheela Decl. ¶ 36.  In other words, a client has no ability to effectuate an actual transfer,

---

[5]    The only transfer requests that were initiated *after* the Platform Pause Time Stamp and processed by the Debtors are described in the Cheela Declaration and were not initiated by clients clicking buttons on the User Interface. Cheela Decl. ¶¶ 53–54.

trade, or withdrawal of digital assets without the intervention of BlockFi's employees.  Cheela Decl. ¶ 36.  Instead, the Debtors cannot effectuate transactions, including requested BIA to Wallet transfers, unless at least one of two processes occurs with respect to a given transfer request—the True-Up Process and/or the Batching Process.  Cheela Decl. ¶ 36.  Because the platform was paused as of November 10, 2022, at 8:15 p.m. (prevailing Eastern Time), the Debtors did not undertake the True-Up or Batching Processes that are required to effectuate client transfer requests for requests initiated by clients on the User Interface after the Platform Pause Time Stamp.

5.      Since the Debtors filed the Wallet Withdrawal Motion,[6] the Debtors cooperated with the Ad Hoc Committee and the official committee of unsecured creditors (the "UCC") and provided these parties with all diligence requested, including having meetings, preparing written responses to *numerous* questions, and providing data.  In addition, the Debtors explained the Wallet system several times to anyone who asked, sometimes in excruciating detail, in an effort to demonstrate to these parties that the Attempted BIA to Wallet Transfers were never effectuated.

6.      Among other things, prior to filing this Reply, the Debtors provided the Ad Hoc Committee and the UCC with a fulsome suite of data, diligence materials, and narrative explanations of the Debtors' systems and operations, including, among other things, (a) detailed responses to over 100 informal discovery requests, (b) copies of the Debtors' internal and external communications with their clients regarding the Platform Pause, (c) detailed descriptions of the True-Up and Batching Processes, (d) data for tens of thousands of transaction requests and hashes, and voluminous data for Custodial Omnibus Wallet coin balances at various points in time, (e) the

---

[6]     With respect to withdrawal requests of the clients of BlockFi International, the Debtors requested in the Wallet Withdrawal Motion the authority to honor withdrawal requests from the International Vault Wallets subject to entry of an order authorizing such withdrawals in the parallel joint provisional liquidation proceedings (the "Bermuda JPL Proceedings") currently pending in the Supreme Court of Bermuda, together with related relief of the same or substantially similar nature as sought in the Wallet Withdrawal Motion.

data for all transfer requests collected by the Company-Facing Interface after the Platform Pause Time Stamp, and (f) data for all True-Ups conducted before, during, and after the Platform Pause Time Stamp, which included withdrawal and transfer requests that were initiated prior to the Platform Pause Time Stamp and the DOJ Seizure.

7.      The diligence already provided unequivocally demonstrates that, as of the Platform Pause Time Stamp, the Debtors discontinued their True-Up Process and Batching Process after the Platform Pause Time Stamp.  The Debtors seek to update their client-facing User Interface with proper balances that reflect the digital assets actually contained in the Custodial Omnibus Wallets (the "User Interface Reconciliation Relief").  As set forth in the Wallet Withdrawal Motion, the User Interface Reconciliation Relief is a necessary first step for the Debtors to be able to honor withdrawals of digital assets in the Client Wallet Accounts as of the Platform Pause Time Stamp.

8.      Yet even after months of re-emphasizing and arguing over facts, a dispute somehow still remains.  The Ad Hoc Committee continues to burden the estates with additional demands, has thus far declined to stipulate to the facts not subject to reasonable dispute and articulated herein and in the Cheela Declaration, and objects to the Debtors' requested relief.

9.      Through this litigation exercise, the Ad Hoc Committee and the other Objecting Parties effectively ask the Court to impermissibly ***favor them*** ahead of those clients whose assets were actually contained in Client Wallet Accounts at the Platform Pause Time Stamp, merely because they pressed a button several times after the Platform Pause Time Stamp.  The Ad Hoc Committee has attempted, through its burdensome litigation and public filings, to muddle and obscure facts, but what they ultimately have is a simple goal: to have their clients' general unsecured claims paid out using non-estate, client property.

10.     The Ad Hoc Committee's goal is not achievable through this method.  If successful, the Ad Hoc Committee's efforts would result in a mass transfer of estate property to a custodial, non-estate account.  Then, if the Debtors were required to honor all requests after the Platform Pause Time Stamp, that would ***materially dilute recoveries for all clients who actually have holdings in their Client Wallet Account and had such holdings prior to the Platform Pause Time Stamp.***  What the Ad Hoc Committee asserts is a radical position that completely undermines not only the purpose of the Platform Pause, but also one of the fundamental goals of chapter 11:  to ensure that all similarly situated clients are treated equally and fairly.

11.     In addition to the objection of the Ad Hoc Committee, the Debtors received 42 objections to the requested User Interface Reconciliation Relief, the vast majority of which were submitted on *pro se* basis (the "Other Objecting Parties" and together with the Ad Hoc Committee, the "Objecting Parties").  Similar to the Ad Hoc Committee, each of the objections to the User Interface Reconciliation Relief were from a specific type of client:  someone who attempted to transfer digital assets held in their BIAs (*i.e.*, rehypothecateable digital assets, and estate property) to their Client Wallet Accounts ***after*** the Platform Pause Time Stamp.  While the Objecting Parties take issue with the proposed User Interface Reconciliation, no party objects to the assertion that the digital assets contained in the Custodial Omnibus Wallets are client property and not property of the Debtors' estates.  Only the UCC reserves its rights with respect to potential preference claims.[7]

---

[7]     The Debtors and UCC are working to resolve any potential preference issue and will bring it to the Court at the appropriate time, as necessary.  *See Limited Objection and Response of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to(A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 380] (the "UCC Objection") ¶¶ 31–33.

12.     The Other Objecting Parties make a number of arguments surrounding the proposed User Interface Reconciliation, but the only issue that the Court must resolve is whether the Attempted BIA to Wallet Transfers were effectuated.  ***They were not.***  They were requests that were never fulfilled.

13.     The Objecting Parties also assert, among other things, that the BlockFi Wallet Terms of Service[8] contain language that suggests withdrawal requests are immediately effectuated and completed (they do not),[9] that the Debtors' website, emails, and other notices and alerts beget a later Platform Pause Time Stamp (they do not),[10] and that the Debtors were not authorized to pause their platform without prior notice to their clients (not so).[11]  No Objecting Party argues that the BlockFi Terms of Service were not binding upon them—in fact, nearly all of the Objecting Parties pick excerpts from the BlockFi Terms of Service in an attempt to support their arguments. But, as described herein and in the Cheela Declaration, the BlockFi Terms of Service are clear, and the Debtors were permitted to limit all platform activity ***without prior notice to their clients***.[12]

14.     Even in the face of the challenges created by the Objecting Parties and others, the Debtors are determined to do right by their clients.  For the reasons described above and herein, the Debtors submit that the relief requested in the Wallet Withdrawal Motion is necessary to not

---

[8]     BlockFi Wallet Terms of Service §C.1.

[9]     *See, e.g.*, *Objection to Entry of Debtors' Motion to Update the User Interface and Reconcile BlockFi Accounts as of the Platform Pause Time Stamp* [Docket Nos. 137, 144, 145, 146, 147, 148, 149, 188] (collectively, the "Pro Se Form Objection") ¶¶ 2, 3; *Objection to Entry of Debtors' Motion to Update the User Interface and Reconcile BlockFi Accounts as of the Platform Pause Time Stamp* filed by Momin Siddique [Docket No. 143] (the "Siddique Objection") ¶¶ 1, 6; Ad Hoc Committee Objection ¶ 36.

[10]    *See, e.g.*, Pro Se Objection ¶ 3.

[11]    *See* Cheela Decl. ¶ 6; BlockFi General Terms of Service; BlockFi Wallet Terms of Service; BlockFi BIA Terms of Service; BlockFi BPC Terms of Service; BlockFi ACH Terms of Service; and BlockFi Debit Card Terms of Service.

[12]    ". . . BlockFi, in its sole discretion, may suspend or discontinue your, and refuse any and all current and future, access to or use of you[r] BlockFi Account at any time without notice to you."  BlockFi General Terms of Service.

only return the digital assets currently maintained in the Custodial Omnibus Wallets to clients, but also vital to moving these chapter 11 cases forward towards a value-maximizing resolution for all clients.  As a matter of law, the Objections fail and should be overruled.

**Reply**

## I.    The Attempted Platform Pause Transactions Were Not Effectuated After the Platform Pause Time Stamp.

15.    Nearly all of the Objecting Parties allege that the Attempted Platform Pause Transactions were effectuated after the Platform Pause Time Stamp.  However, as described in detail in the Cheela Declaration, the manual, back-end True-Up and Batching processes by which transfer requests that are initiated on the User Interface are processed demonstrate how this is not—and cannot be—the case.  In addition, the BlockFi Terms of Service are unambiguous that client activity on the User Interface (*i.e.*, clicking "transfer," "trade," or "withdraw" buttons on the User Interface) are simply requests, which the Debtors must then reconcile after the fact through the True-Up Process and/or Batching Process.

16.    By choosing to use the Debtors' products and services, a client agrees to the BlockFi General Terms of Service and any other applicable terms of service, including the noticing provision contained therein.[13]  For U.S. clients, the BlockFi Terms of Service are governed by and construed in accordance with the laws of the State of New Jersey.[14]  For non-U.S. clients, the

---

[13]    *See* Cheela Decl. ¶ 6; *see* BlockFi General Terms of Service; BlockFi Wallet Terms of Service; BlockFi BIA Terms of Service; BlockFi BPC Terms of Service; BlockFi ACH Terms of Service; and BlockFi Debit Card Terms of Service.

[14]    "The Terms and all disputes, claims or controversies (whether in tort, contract or otherwise) arising out of or relating in any way to the Terms, the Online Platform or the Content, the negotiation, interpretation, validity or performance of the Terms, the rights and obligations of you and us hereunder or any transaction contemplated by the Online Platform shall be governed by and construed in accordance with the laws of the State of New Jersey without regard to the rules or principles of conflict of laws of such State or any other jurisdiction that would permit or require the application of the laws of any other jurisdiction."  BlockFi General Terms of Service (discussing choice of law for U.S. Clients).  "It is . . . the general rule that the validity, interpretation and legal effect of a contract is governed by the law of the State in which it is made."  *Mullaly v. Carlisle Chem. Works, Inc.*, 177 F. Supp. 588, 592 (D.N.J. 1959).

BlockFi Terms of Service are governed by and construed in accordance with the laws of Bermuda.[15]   Under New Jersey law, a court interprets a contract according to its plain language. *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3rd Cir. 2011) ("[w]e interpret a contract according to its plain language by reading the document as a whole in a fair and common sense manner so as to match the reasonable expectations of the parties"); *see Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F. Supp. 275, 282–83 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993) ("Whether a term is clear or ambiguous is . . . a question of law," and "the terms of the contract must be given their 'plain and ordinary meaning.'").   Similarly, Bermuda courts also interpret a contract according to its plain meaning.  *Grand View Private Trust Co. Ltd. V. Wong and Another Intervening* [2021] CA (Bda) 5A (20 Apr. 2020) ("When interpreting a contract, the court is concerned to find the intention of the party or parties, and it does this by identifying the meaning of the relevant words, (a) in the light of (i) the natural and ordinary meaning of those words . . ."); *The Corporation of Hamilton v. Bermuda Electric Light Co. Ltd.* [2018] SC (Bda) 75 Civ. (16 Nov. 2018) (citing *Aircare Ltd. v Wyatt Sellyeh* [2015] CA (Bda) 6 Civ (20 March 2015)) (same).

---

[15]   "The Terms and all disputes, claims or controversies (whether in tort, contract or otherwise) arising out of or relating in any way to the Terms, the Online Platform or the Content, the negotiation, interpretation, validity or performance of the Terms, the rights and obligations of you and us hereunder or any transaction contemplated by the Online Platform shall be governed by and construed in accordance with the laws of Bermuda without regard to the rules or principles of conflict of laws of any other jurisdiction that would permit or require the application of the laws of any other jurisdiction."   BlockFi General Terms of Service (discussing choice of law for non-U.S. Clients).

17.     As set forth above, the BlockFi Terms of Service are replete with language that support the position that client button-pushing activity on the User Interface constitutes only a "request."  For example, the BlockFi Wallet Terms of Service provide that:

> You may make a ***request*** for a complete or partial withdrawal of cryptocurrency from your BlockFi Wallet at any time with appropriate time notice as stated above.[16]

18.     The BlockFi Wallet Terms of Service further provide that:

> Upon a withdrawal ***request***, your cryptocurrency will first be transferred to BlockFi Trading LLC, and then will be transferred to your designated account.[17]

19.     The BlockFi BIA US Terms of Service and BlockFi BIA Non-US Terms of Service provide that:

> You may make a ***request*** for complete or partial withdrawal of principal from your Crypto Interest Account at any time.

20.     The BlockFi Trading Terms of Service provide that:

> ***We may settle any trading activity through book-entry. At any given time, there is no assurance that all purchased digital assets will be immediately transferred into your BlockFi Wallet. Therefore, you may be subject to our credit risk.*** Your right to receive purchased digital assets will not be secured by any property nor insured by any insurance. Your right to receive purchased digital assets may be subordinated to any of our secured debt and rank equally with any of our other debt obligations. This means that, in a bankruptcy or liquidation proceeding against us, your right to receive digital assets in your BlockFi Wallet may rank equally in right of payment with all our other unsecured and unsubordinated debt. In such an event, you may lose the entire value of your BlockFi Wallet.[18]

---

[16]   BlockFi Wallet Terms of Service § C.1 (emphasis added).

[17]   BlockFi Wallet Terms of Service § D.2 (emphasis added).

[18]   BlockFi Trading Terms of Service § E.4 (emphasis added).

21.     Finally, the BlockFi Trading Terms of Service provide that BlockFi "may accept or refuse any order, or delay placing any order, if [BlockFi] determine[s] that it is necessary or appropriate to do so.  Additionally, you may suffer market losses during periods of volatility in the price and volume of eligible crypto, particularly when system issues result in the inability to buy or sell eligible crypto. You agree that you will not hold BlockFi responsible for any losses caused by such refusal or delay or such inability to transact."[19]

22.     Each of the foregoing clauses are clear that a client's action on the User Interface is a "request."  The Debtors submit that nether (a) an actual transfer of digital assets amongst the Debtors Rehypothecateable Wallets and Custodial Omnibus Wallets nor (b) an actual transfer of digital assets from BIA to a Client Wallet Account and then subsequently off-platform for a withdrawal can happen unless and until the Debtors' employees effectuate the True-Up Process, the Batching Process, or both, as applicable.  Cheela Decl. ¶ 36.

**A.     Transaction Requests that are Initiated on the User Interface are Not Immediately Effectuated by the Debtors.**

23.     As described more fully in the Cheela Declaration, the process to effectuate requested transfers is, in part, ***manual***.  *See* Cheela Decl. ¶ 36.  In the ordinary course of business, the Debtors use two distinct and independent systems to ***first***, collect transfer request data (*i.e.*, via the Company-Facing Interface) and, ***second***, effectuate transfer requests (*i.e.*, the True-Up Process and the Batching Process).   Cheela Decl. ¶ 44.  The Debtors use a "user interface" / "user experience" client-facing system for its product offerings, which is enabled by what the Debtors call "Storm" (the "Company-Facing Interface"), to collect and record transfer requests that clients initiate when they interface and interact with the User Interface.  Cheela Decl. ¶ 44.  The User

---

[19]    BlockFi Trading Terms of Service, § A.5 (emphasis added).

Interface, as described in the Wallet Withdrawal Motion, is the client-facing, web-based, in-app display that a client sees, experiences, and interacts with when logging into their BlockFi account from a computer or mobile device. Cheela Decl. ¶¶ 44–45. The User Interface allows clients to, among other things, view their account balances (*e.g.*, the balance in their Client Wallet Account) and use various product offerings. Cheela Decl. ¶ 44.

24.     While the User Interface is the Debtors' ***client-facing***, user-experience program that clients interact with, the Company-Facing Interface is the ***company-facing*** aspect of the User Interface that the Debtors' employees see, experience, and interact with to collect and review, and subsequently manually act upon, transfer request data. Cheela Decl. ¶ 48. When a client initiates a transfer request on the User Interface (*i.e.*, clicks the requisite digital buttons on their in-app display), that transfer request data is automatically collected and recorded as a book entry in a queue in the Company-Facing Interface. Cheela Decl. ¶ 49. In connection with the automatic collection of the initiated transfer request data on the Company-Facing Interface, the User Interface automatically sends a fully automated email communication to the requesting client once such client clicks the "transfer" button on the User Interface to initiate a transfer request. Cheela Decl. ¶ 49. Although the client receives an email immediately upon initiating the transfer request on the User Interface, there is a delay on the back end because the Debtors must manually process transfer and withdrawal requests initiated on the User Interface and collected on the Company-Facing Interface via the True-Up Process and/or Batching Process. Cheela Decl. ¶ 49.

25.     The Debtors' Treasury team and Financial Operations team effectuate the transfer requests through a partially manual reconciliation, or True-Up Process, as more fully described in the Cheela Declaration. Cheela Decl. ¶¶ 40–42. The Debtors facilitate off-platform withdrawals from the Omnibus Custodial Wallets via the Batching-Process, as more fully described in the

Cheela Declaration.  Cheela Decl. ¶¶ 37–39.  A client cannot effectuate a transfer of digital assets

from their BIA to their Client Wallet Account, and no such transfer request is effectuated unless

and until the Debtors' employees complete(a) the Batching Process or (b) the True-Up Process.

Cheela Decl. ¶ 38.  This is because, when a client clicks the "transfer" button on the User Interface,

the Debtors review such queued data in the Company-Facing Interface one business day following

such a request and undertake the True-Up Process in connection therewith.  *See* Cheela Decl. ¶ 40.

Digital assets can alternatively be transferred from BIA to a Client Wallet Account via the

Batching Process.  Depending on the time of day of a transfer and withdrawal request initiated on

the User Interface, it is possible that, rather than there being a one business day delay as with the

True-Up Process, such request data might be "batched" by the Debtors' Financial Operations team,

run through the automated check system, and thereafter be uploaded to BitGo, which would

facilitate the external withdrawal from BitGo Custodial Wallets (which is a part of the BlockFi

Wallet product), all in one day.  But this is not automatic.

26.    A client can only withdraw from BIA to Wallet and then off-platform via the

Batching Process and True-Up Process.  This can be (and in the ordinary course of business prior

to the Platform Pause often was) completed by the Debtors on the same day, depending on the

time of day the transfer and withdrawal requests were received.  But the actual completion of such

transactions was effectuated only after such a transfer is manually effectuated via the Batching

Process and True-Up Process.  *See* Cheela Decl. ¶ 37.  While the BlockFi Terms of Service

permitted the company to take up to seven days to process withdrawal requests, the Debtors usually

were able to process off-platform withdrawals via in fewer than seven days.  Cheela Decl. ¶ 38.

27.    As set forth in the Wallet Withdrawal Motion and the Cheela Declaration, the

Debtors' clients were unable to, and did not, effectuate any bona fide transactions on the BlockFi

platform beginning the moment of the Platform Pause Time Stamp.  Cheela Decl. ¶ 81.  As of the

Platform Pause Time Stamp, (a) the Debtors immediately ceased to process trades, transfers, or

withdrawals that were requested after the Platform Pause Time Stamp,[20] and (b) the Debtors'

Treasury team discontinued the True-Up Process and the Batching Process with respect to transfer

requests initiated after the Platform Pause Time Stamp.  Today, the actual digital assets held in the

Omnibus Custodial Wallets correspond with the data recorded in the Company-Facing Interface

as of 8:15 p.m. (prevailing Eastern Time) on November 10, 2022, taking into account client

deposits after the Platform Pause Time Stamp and the DOJ Seizure, with a modest surplus as was

customary.  Cheela Decl. ¶ 79. Because the Platform was paused, the Debtors' clients could not,

and did not, effectuate any transactions on the BlockFi platform that were requested on the User

Interface after the Platform Pause Time Stamp.  Cheela Decl. ¶ 79.  And, today, there are simply

not sufficient digital assets in the Rehypothecateable Wallets to fully effectuate the True-Up

Process.  Cheela Decl. ¶ 79.  Therefore, it is not possible for the Debtors to undertake the True-Up

Process and Batching Process, which are necessary to effectuate a transfer from BIAs to the Client

Wallet Accounts and subsequently to effectuate the off-platform withdrawals to external wallets

from the Custodial Wallet Accounts.  Cheela Decl. ¶ 79.

     28.    Nevertheless, the Ad Hoc Committee specifically argues that a "click" on the User

Interface equals a "transfer." The Ad Hoc Committee contends that the Attempted Platform Pause

Transactions must have been completed because, pursuant to the BlockFi BIA Terms of Service,

"a customer's decision to exit BIA and terminate his loan of crypto assets to BlockFi is effectuated

***instantaneously upon request***."  Ad Hoc Committee Objection ¶ 14 (emphasis added).  However,

---

[20]   Certain valid withdrawal requests that were submitted ***prior*** to the Platform Pause Time Stamp were fulfilled
after the Platform Pause Time Stamp in the ordinary course of business after such withdrawal requests cleared
the Debtors requisite and customary fraud and security checks.

the Ad Hoc Committee cherry-picks the words from the BlockFi BIA Terms of Service that best suit its members' argument, arguing that once a client initiates a transfer request by clicking a button on the User Interface, digital assets are instantly transferred from the Rehypothecated Wallets to the Custodial Omnibus Wallets without any intervention by the Debtors and their employees. As set forth in the Cheela Declaration, this is far from the case.

29.     Indeed, the Ad Hoc Committee cherry-picks the sentence of the BlockFi BIA US Terms of Service and BIA Non-US Terms of Service that best suits its argument. However, the sentence quoted by the Ad Hoc Committee must be read together with the preceding sentence, which provides that a client "may make a ***request*** for complete or partial withdrawal of principal from your Crypto Interest Account at any time."[21]  A client may request a withdrawal of their digital assets from BIA to their Client Wallet Account, but it is only when the request is recognized by BlockFi through the earlier of the Batching Process or True-Up Process that a transfer and/or withdrawal request is effectuated. Cheela Decl. ¶ 38. These two sentences in the BlockFi BIA US Terms of Service and BlockFi BIA Non-US Terms of Service, when read together, are clear that in the ordinary course of business, a client "may make a request for complete or partial withdrawal of principal . . . at any time," but the actual "withdrawal" or "transfer" of digital assets from BIA to the Custodial Omnibus Wallets happens instantly once the Debtors undertake the True-Up Process and/or Batching Process. Cheela Decl. ¶ 39.

30.     The Ad Hoc Committee's interpretation of this mid-Term sentence out of context manipulates what the provision as a whole says and means, but also nullifies the remainder of BlockFi's Terms of Service. The Ad Hoc Committee essentially argues that transactions between the Rehypothecateable Wallets and Custodial Omnibus Wallets are effectuated and completed by

---

[21]     BlockFi BIA Terms of Service § C.1.

clients at a push of a button, regardless of anything else that is happening with the BlockFi platform

or with BlockFi as a company.  But ***numerous*** other terms of service make clear that is not the

case:

- Pursuant to the BlockFi General Terms of Service, clients must, among other things, "acknowledge and agree that BlockFi, in its sole discretion, may suspend or discontinue your, and refuse any and all current and future, access to or use of you[r] BlockFi Account at any time <u>without notice</u> to you."[22]

- Pursuant to each of the BlockFi Wallet Terms of Service, the BlockFi BIA US Terms of Service, the BlockFi BIA Non-US Terms of Service, and the BlockFi Private Client Terms of Service, clients agree that "BlockFi and our third-party partners may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the <u>immediate halt</u> of transfers and withdrawals of cryptocurrency either temporarily or permanently."[23]

- Pursuant to each of the BlockFi Wallet Terms of Service, BlockFi BIA US Terms of Service, the BlockFi BIA Non-US Terms of Service, the BlockFi Trading Terms of Service, and the BlockFi Rewards Program Terms of Service, BlockFi reserves the right "to limit access to your accounts, which can include temporarily or permanently removing your online access, restricting your account and/or closing your accounts <u>without prior notice</u> to you unless prior notice is required by law."[24]

- The BlockFi General Terms of Service further provide that "BlockFi reserves the right to refuse service, terminate relationships, and cancel orders or transactions in its discretion."[25]

- The BlockFi Trading Terms of Service further provide that "***We may settle any trading activity through book-entry.  <u>At any given time, there is no assurance that all purchased digital assets will be immediately transferred into your BlockFi Wallet</u>.  Therefore, you may be subject to our credit risk.*** Your right to receive purchased digital assets will not be secured by any property nor insured by any insurance."[26]

---

[22] BlockFi General Terms of Service, Registration (emphasis added).

[23] BlockFi Wallet Terms of Service, § D.5 (emphasis added); BlockFi BIA Non-US Terms of Service, § E.3 (emphasis added); BlockFi BIA US Terms of Service, § C.3 (emphasis added); BPC Terms of Service, § F.9 (emphasis added).

[24] BlockFi Wallet Terms of Service, § G.12 (emphasis added); BlockFi BIA US Terms of Service, § G.11 (emphasis added); BlockFi BIA Non-US Terms of Service, § I.11 (emphasis added); BlockFi Rewards Program Terms of Service, § I.12 (emphasis added).

[25] BlockFi General Terms of Service, Acceptable Use of the Online Platform.

[26] BlockFi Trading Terms of Service § E.4 (emphasis added).  The BlockFi Trading Terms of Service provide that BlockFi "may accept or refuse any order, or delay placing any order, if [BlockFi] determine[s] that it is necessary

- The BlockFi Wallet Terms of Service further provide that: "You may make a ***request*** for a complete or partial withdrawal of cryptocurrency from your BlockFi Wallet at any time with appropriate time notice as stated above. ***Additionally, before a withdrawal is processed, you may be required to provide certain personally identifiable information so BlockFi can verify your identity. BlockFi initiates the withdrawal process instantly when possible, and we may require up to seven (7) days after you submit your withdrawal request to process the withdrawal.***"[27]

None of these provisions would make sense if, as the Ad Hoc Committee avers, clients can push a button on an app after BlockFi halts activities on its platform and by that action alone can secure claims to assets in the Custodial Omnibus Wallets.

### B.    The User Interface, Automated Emails, or the Debtors FAQ Blog Posts Do Not Demonstrate that the Attempted BIA to Wallet Transfers Were Effectuated.

31.    Many of the Objecting Parties assert that the Attempted BIA to Wallet Transfers were completed because they believe (or wish) that the Client Wallet Account balances displayed on the User Interface are correct (although they are not).[28]  In support of this argument, many Objecting Parties cite to the automated emails that they received from the User Interface in error during the Platform Pause Period and screengrabs from the User Interface itself displaying incorrect Client Wallet Account balances.  As more fully described in the Cheela Declaration, it took the Debtors a period of time to fully disable the client-facing transfer request functionality on the User Interface and the automated emails in connection therewith.  This does not mean that the Debtors undertook the True-Up Process or the Batching Process to effectuate attempted transfers that were requested on the User Interface after the Platform Pause Time Stop.

---

or appropriate to do so. Additionally, you may suffer market losses during periods of volatility in the price and volume of eligible crypto, particularly when system issues result in the inability to buy or sell eligible crypto. You agree that you will not hold BlockFi responsible for any losses caused by such refusal or delay or such inability to transact." *Id.* § A.5.

27    BlockFi Wallet Terms of Service § D.1 (emphasis added).

28    Ad Hoc Committee Objection ¶ 42.

32.     Citing no legal authority, the Pro Se Form Objecting Parties assert that the Debtors waived their right to limit BIA transfers to Custodial Omnibus Wallets because the User Interface continued to send automated email communications in error after the Platform Pause Time Stamp.[29]  That cannot be the case.  The transmission of an automated email, with no indication whatsoever that the Debtors were waiving any rights to limit transfers (and after they had in fact paused platform activities), cannot constitute a waiver.  *Boylan v. Jackson Nat. Life Ins. Co.*, No. CIV.A.06-4099GEB, 2008 WL 4490639, at *4 (D.N.J. Sept. 30, 2008), *aff'd*, 353 F. App'x 708 (3d Cir. 2009) ("A waiver must 'be clearly established[ ] and will not be inferred from doubtful or equivocal acts or language.'") (internal citations omitted).  Regardless, the automated emails have nothing to do with whether assets were actually moved from the Rehypothecateable Wallets to the Custodial Omnibus Wallets after the Platform Pause.  They were not.

33.     Certain of the Objecting Parties further argue that the Attempted BIA to Wallet transfers must have been completed because the Debtors published an FAQ response[30] on November 23, 2022, directing the Debtors' clients to their BlockFi app for "accurate information regarding account balances."[31]  The Debtors' November 23, 2022 FAQ blog post, however, does not indicate that the Attempted BIA to Wallet Transfers were effectuated, *see* Cheela Decl. Ex. U, and such Objecting Parties take the blog post out of context.  The intention of the blog post was to direct the Debtors' clients to the Debtors' app and website for reliable information regarding their account balances, as opposed to other, less-reliable, third-party sources that the Debtors understood were circulating among web channels and publications that their clients consume.

---

[29]   Pro Se Form Objection ¶ 4.

[30]   Responses to Frequently Asked Questions, BlockFi Update (Nov. 23, 2022), https://blockfi.com/responses-to-frequently-asked-questions.

[31]   Pro Se Form Objection ¶ 2; Siddique Objection ¶ 4; Mills Objection ¶ 5; Rosario Objection ¶¶ 3, 5; Barnett Objection ¶ 3.

Cheela Decl. ¶ 64.  Regardless, the Debtors November 23, 2022 FAQ blog post has no bearing on whether assets were actually moved from the Rehypothecateable Wallets to the Custodial Omnibus Wallets after the Platform Pause (they were not) or the fact that the Debtors were authorized to (and did) successfully implement the Platform Pause.

### C.   Requiring the Debtors to Use a Different Time Stamp Would Result in Inequitable and Unfair Treatment Amongst the Debtors' Clients.

34.   Certain of the Objecting Parties argue that the Platform Pause Time Stamp is "arbitrary," improper, and/or should be set to a different, later time.[32]  As described in the Cheela Declaration, the Debtors are unable to use a later time stamp for the Platform Pause.  Cheela Decl. ¶¶ 79–80.  The Debtors do not have the digital assets on hand in the Rehypothecated Wallets to true up the Custodial Omnibus Wallets to permit in-kind withdrawals if they were required to use a time stamp later than the Platform Pause Time Stamp.  Consequently, requiring the Debtors to use a different time stamp would only potentially marginally benefit those clients who initiated the Attempted BIA to Wallet Transfers after the Platform Pause, while materially harming all other clients who did not initiate Attempted BIA to Wallet Transfers—as such clients would not receive their digital assets back in full, in-kind.  Accordingly, the Platform Pause Time Stamp, which coincides with the Debtors' public announcement of the Platform Pause, is the only possible time stamp that could ensure that all similarly situated clients are treated fairly and equally.

---

[32]   *See, e.g.*, Siddique Objection ¶ 6; Pro Se Form Objection ¶ 2 ("[T]he displayed Wallet balances for the users must be regarded as true and effective as of November 23, 2022."); *Deferred 1031 LLC's Initial Objection to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 201] ("Deferred 1031 Objection") ¶ 7.

II.    **The Debtors Were Not Required to Provide Any Notice to Clients Regarding the Implementation of the Platform Pause.**

A.    **The BlockFi Terms of Service Permit the Debtors to Implement the Platform Pause Without Notice.**

35.    As set forth above, by choosing to use the Debtors' products and services, a client agrees to the BlockFi General Terms of Service and any other applicable terms of service, including the waiver of notice provision contained therein.[33]

36.    The BlockFi Terms of Service are replete with terms authorizing the Debtors to implement the Platform Pause without any notice to their clients, including the limitation of BIA to Client Wallet Account transfers.  Indeed, the BlockFi Terms of Service are thorough with regard to the Debtors' ability to limit its clients' access to its products and services, including BIAs and Client Wallet Accounts.[34]  As described above, each of the BlockFi Wallet Terms of Service, the BlockFi BIA US Terms of Service, the BlockFi BIA Non-US Terms of Service, and the BlockFi Private Client Terms of Service provide that "BlockFi and our third-party partners may experience cyber-attacks, ***extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of transfers and withdrawals of cryptocurrency either temporarily or permanently***."[35]  The Debtors were clearly facing "extreme market conditions"—and the tremendous uptick in withdrawal requests initiated on the User Interface during this time frame exemplifies that reality.  The Debtors' actions in the midst of these conditions are some of the precise circumstances contemplated by these Terms of Service.

---

[33]    *See* Cheela Decl. ¶ 8; *see* BlockFi General Terms of Service; BlockFi Wallet Terms of Service; BlockFi BIA Terms of Service; BlockFi BPC Terms of Service; BlockFi ACH Terms of Service; and BlockFi Debit Card Terms of Service.

[34]    Cheela Decl. ¶¶ 11–15.

[35]    BlockFi Wallet Terms of Service, § D.5 (emphasis added); BlockFi BIA Non-US Terms of Service, § E.3 (emphasis added); BlockFi BIA US Terms of Service, § C.3 (emphasis added); BPC Terms of Service, § F.9 (emphasis added).

37.     In addition, the BlockFi General Terms of Service provide that ". . . BlockFi, in its sole discretion, may suspend or discontinue your, and refuse any and all current and future, access to or use of you[r] BlockFi Account *at any time without notice to you*."[36]  And each of the BlockFi Wallet Terms of Service, BlockFI BIA US Terms of Service, the BlockFi BIA Non-US Terms of Service, the BlockFi Trading Terms of Service, and the BlockFi Rewards Program Terms of Service, provide that the Debtors reserve the right "to limit access to your accounts, which can include temporarily or permanently removing your online access, restricting your account and/or closing your accounts *without prior notice to you* unless prior notice is required by law."[37]

38.     More generally, the BlockFi General Terms of Service provide that:

> ***BlockFi may terminate your right to use the Online Platform, or block you from future use, at any time in its sole discretion, with or without cause, and without notice to you.*** Some circumstances in which BlockFi may exercise this right to terminate your right to use the Online Platform include, but are not limited to: (i) you have breached any provision of the Terms; (ii) you have engaged in conduct which BlockFi, in its sole discretion, considers to be unacceptable; (iii) BlockFi is required by law to do so; or (iv) BlockFi no longer provides the Online Platform. The above are only examples of circumstances in which BlockFi may terminate your right to use the Online Platform and BlockFi may terminate your right to use the Online Platform for any other reason in its sole discretion. We will not be liable to you due to or by reason of our termination of your right to use the Online Platform or the automatic termination of your right to use the Online Platform for non-compliance set forth above.[38]

---

[36]   BlockFi General Terms of Service (emphasis added).

[37]   BlockFi Wallet Terms of Service § G.12 (emphasis added); BlockFi BIA US Terms of Service § G.11 (emphasis added); BlockFi BIA Non-US Terms of Service § I.11 (emphasis added).

[38]   BlockFi General Terms of Service, Termination; Survival of Provisions (emphasis added).  With respect to trading activity on the Debtors' platform, the BlockFi Trading Terms of Service provide that BlockFi "may accept or refuse any order, or delay placing any order, if [BlockFi] determine[s] that it is necessary or appropriate to do so."  *See* Cheela Decl. ¶ 14; BlockFi Trading Terms of Service, § A.5 (emphasis added).

39.    All of the Objecting Parties affirmatively agreed to the BlockFi Terms of Service by virtue of using the Debtors' products and services.  Despite the unambiguous language of the BlockFi Terms of Service, many of the Objecting Parties argue that they were entitled to prior notice of the Platform Pause,[39] ostensibly so that they would have adequate time to pull their digital assets off the Debtors' platform.  Similarly, many of the Objecting Parties, including the Ad Hoc Committee, further argue that the Debtors' use of Twitter, rather than email, as an initial means of communicating the Platform Pause with their clients was inadequate, and, therefore (a) the Platform Pause should be considered ineffective such that the Attempted BIA to Wallet Transfers should be treated as "completed" or  (b) the Court should force the Debtors to use a difference time stamp for the Platform Pause.[40]  Further, several Objections, including the Ad Hoc Committee's Objection, allege that the content of the Debtors' notices did not sufficiently notify clients that ***all platform activity*** had been paused.[41]  As described in more detail below, each of these arguments would defeat the purpose of the Terms of Service, which exist (among other things) to allow BlockFi to protect clients in extreme market situations by freezing the platform and ensuring that similarly situated clients are treated fairly.

---

[39]    *See, e.g.*, Pro Se Form Objection ¶ 2; Siddique Objection ¶ 4; Mills Objection ¶ 5.

[40]    *See* Ad Hoc Committee Objection ¶¶ 27–28 ("BlockFi's Terms of Service do not identify Twitter as an official means for communicating with customers . . . BlockFi did not disable transfers from BIA to Wallet, either on its web-based or mobile platform, on November 10, 2022."); *see also* Pro Se Form Objection ¶ 3 ("The so-called 'Notice' by BlockFi of pausing user withdrawals through Twitter is grossly inadequate and insufficient," because "BlockFi, contrary to its own earlier representation on Twitter, sent out a formal notice of pause in user withdrawals only on November 11, 2022."); *see also* Siddique Objection ¶¶ 1, 6 (arguing that because there was "no communication from BlockFi in November 2022 regarding a pause on internal transfers from [BIAs] to Wallet[Accounts]," "there is absolutely no basis for BlockFi's claim . . . that the Platform Pause for internal transfers.").

[41]    *See, e.g.*, Ad Hoc Committee Objection ¶ 36 ("[n]one of the Debtors' official or unofficial notices to customers ever advised them that inter-account transfers between BIA and Wallet were being paused."); Pro Se Form Objection ¶ 2 ("Transfers, which means an internal transfer between BlockFi accounts, are not even referenced in that [Twitter] post.").

40.     As a matter of law, all of these "notice" arguments should be dismissed out of hand. *First*, the BlockFi Terms of Service are binding on the Objecting Parties and no Objecting Party has asserted otherwise.

41.     ***Second***, under the unambiguous language of the BlockFi Terms of Service, notice of any kind, at any time—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in-app messaging, or otherwise—***is not necessary, and is simply not a prerequisite to effectuating a pause on all platform activity***.[42]  Any argument furthered by the Objecting Parties contending that advance notice of the Platform Pause was required is nonsensical from a practical perspective.

42.     It is imperative for the Debtors, and companies similar to the Debtors, to have the ability to pause platform activity to avoid the disastrous effects of a bank run.  The ability for the Debtors to implement the Platform Pause without any notice to their clients (whether by email, Twitter, or otherwise) was designed to protect the Debtors' clients' digital assets in emergency circumstances by enabling the Debtors to act quickly to prevent a "run on the bank."  In light of unforeseen market conditions in the cryptocurrency industry, the Debtors implemented the Platform Pause as contemplated by the unambiguous language of the BlockFi Terms of Service to protect clients' digital assets and ensure that all clients would be treated equally and fairly by establishing a cutoff time for effectuating initiated transfer requests.  For all practical purposes, requiring the Debtors to provide clients with prior notice (or any notice) of the Platform Pause would have caused the very bank run that the Platform Pause was intended to prevent.[43]

---

[42]    *Hunter v. Sterling Bank*, 750 F. Supp. 2d 530, 540 (E.D. Pa. 2010) ("When reading a contract, the court must 'consider the entire instrument and attempt to reconcile all of its provisions in order to determine the meaning intended to be given to any portion of it.  Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.'") (citing *In re Stone & Webster, Inc.,* 558 F.3d 234, 246 (3d Cir. 2009)).

[43]    After reports on November 9, 2022 that Binance would walk away from its proposed acquisition of FTX.com FTX CEO and Alameda Research founder Sam Bankman-Fried issued a series of tweets commenting on FTX's liquidity crisis and the future of "FTX International" and Alameda Research, the latter of which he says is "one

43.     In sum, the BlockFi Terms of Service functioned as intended by allowing the Debtors to act swiftly to prevent the collapse of their own platform.

44.     With respect to those Objecting Parties who take issue with the staggered timing of the Debtors' noticing efforts,[44] which, as described in the Cheela Declaration, was due to logistical hurdles, the timing of the Debtors' noticing campaign is irrelevant because the Debtors were empowered to implement the Platform Pause at any time, without prior notice to their clients. Similarly, some Objecting Parties, including the Ad Hoc Committee, object to the content of the notices.[45]  The Debtors believe that the language of their notices was more than sufficient to alert their clients that the Platform Pause, which included BIA to Wallet Transfers,[46] had taken effect.

### B.     The Equitable Doctrine of Promissory Estoppel is Inapplicable to the BlockFi Terms of Service.

45.     The Pro Se Form Objection provides that the "equitable doctrine of promissory estoppel" applies because certain clients may have detrimentally relied on the Debtors' statements in tweets and blog posts that were published ***prior to*** the Platform Pause Time Stamp.[47]  This argument, respectfully, is without merit, and is simply not relevant to the relief requested in the motion in any event.

46.     ***First***, this argument should be dismissed out of hand because the doctrine of promissory estoppel is wholly inapplicable.  Promissory estoppel is a ***contract law*** defense that

---

way or another" "winding down trading."  The first of Sam Bankman Fried's tweets from his official Twitter account @SBF_FTX was on November 10, 20223 at 9:13 a.m. (prevailing Eastern Time).

[44]  *See, e.g.*, Pro Se Form Objection ¶ 1; Ad Hoc Committee Objection ¶ 29–31.

[45]  *See, e.g.*, Ad Hoc Committee Objection ¶ 26–33.

[46]  The word "including" serves to add a specific example and does not limit the "platform activity" or exclude transfers in any way.  Nothing in the Twitter and Reddit Post is "a material misrepresentation," and any inference that Attempted Platform Pause Transactions were effectuated based on the Twitter post is a flagrant misreading of the plain text.

[47]  *See, e.g.*, Pro Se Form Objection ¶ 1.

prevents a defendant from denying the existence of a contract for lack of consideration.[48]  Among other things, the Debtors' tweets and blog posts are not contracts, their tweets and blog posts did not contain material misrepresentations that induced the Objecting Parties to enter into any contract with the Debtors, and, moreover, the Objecting Parties have not provided any evidence whatsoever to demonstrate that they actually relief on these statements in connection with the Attempted BIA to Wallet Transfers.

47.      ***Second***, the Objecting Parties have taken the Debtors' statements out of the context at the time that they were published.[49]  As described in the Cheela Declaration, in response to the news that Silvergate, the Debtors' U.S.-based banking partner, would be closed on Veterans' Day and therefore unable facilitate off-platform ACH and wire transactions, at 9:00 a.m. (prevailing Eastern Time) on November 10, 2022, the Debtors tweeted and simultaneously published a message on their website blog that informed clients: (a) that, due to Silvergate's closure, there would be a multi-day delay in facilitating ACH and wire transactions and (b) that Silvergate's closure would not impact crypto withdrawals on November 11, 2022.  Cheela Decl. ¶ 70, Ex. T.

48.      The Debtors' tweet and blog post, which were posted hours before the decision was made to implement the Platform Pause, reflected the true state of affairs at the time at which they were published.  The Debtors did not decide to pause the platform until later in the afternoon on November 10, 2022—hours before the Platform Pause Time Stamp.

---

[48]   To prevail on a promissory estoppel claim, the plaintiff must plead and prove that: (a) the defendant made a clear and definite promise to the plaintiff; (b) the defendant made the promise expecting that the plaintiff would rely on it; (c) the plaintiff reasonably relied on the promise; and (d) the plaintiff incurred a definite and substantial detriment.  *See Segal v. Lynch*, 211 N.J. 230, 253 (2012).  The position is no different under Bermuda law where the elements of promissory estoppel are the same, as the Bermuda courts follow English law principles of equity.  *See Snell's Equity (34th Ed.)* at 12-018 for the elements of promissory estoppel.

[49]   Pro Se Form Objection ¶ 1 (referencing Exhibit C and Exhibit D, attached therein).

**III.    The Debtors Are Not Required under the Bankruptcy Rules to Commence an Adversary Proceeding for the Court to Grant the Requested Relief.**

49.    The Ad Hoc Committee, Deferred 1031, and Ford argue that the Wallet Withdrawal Motion is procedurally improper, and the relief requested therein is required to be adjudicated through an adversary proceeding pursuant to Bankruptcy Rule 7001(2) because, according to these Objection Parties, the Debtors are implicitly seeking a determination that the assets held in BIAs is property of the Debtors' estate.[50]

50.    Even if the Debtors were seeking a final determination that the digital assets held in BIA are property of the estate, a motion would nevertheless be the appropriate vehicle to do so. Indeed, Bankruptcy Courts both entertain and grant motions that seek an order determining whether a given asset—including a digital asset—is or is not property of the estate by motion. *See e.g.*, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Jan. 4, 2023) (granting the debtors' motion, holding that customer deposits in the debtors' Earn Program constituted property of the bankruptcy estate and not customer property, and noting that the Bankruptcy Rules do not require every declaratory action, including disputes over estate property ownership, to be brought as an adversary proceeding).

51.    If anything, the Wallet Withdrawal Motion seeks a determination that the digital assets held in the Custodial Omnibus Wallets belong to the Debtors' clients and are not property of the estate, which is a position that no Objecting Party disputes. Further, the Debtors submit that such a motion is appropriately brought by motion. *See e.g., In re Voyager Digital Holdings*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Oct. 5, 2022) (granting the debtors' motion and holding that

---

[50]    *See Objection of Gary Ford to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 182] (the "<u>Ford Objection</u>") ¶ 6; Deferred 1031 Objection ¶ 3; Ad Hoc Committee Objection ¶¶ 3, 5.

customers' assets in the FBO accounts were not the property of the debtors' estate and that customers should be permitted to withdraw those funds); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. Dec. 20, 2022) (authorizing withdrawals from the custody program) and (b) supported by Supreme Court jurisprudence. *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate).

52.     From a practical perspective, requiring the Debtors to initiate an adversary proceeding defies logic.  An adversary proceeding is a lawsuit initiated in Bankruptcy Court that requires a defendant.  Surely, the Ad Hoc Committee, Deferred 1031, and Ford are not suggesting that the Debtors ***sue each of their clients in Bankruptcy Court*** in order to return their digital assets in the Custodial Omnibus Wallets to them?  That request (if accepted) would create yet another massive waste of the very assets that should be returned to customers—which is exactly what the Debtors were trying to do when they filed the Wallet Withdrawal Motion and is exactly what the Debtors will continue trying to do, despite the obstructionist assertions by the Objecting Parties and others.  The Debtors could not imagine a more value-destructive request, and respectfully request that this argument be rejected.

## Conclusion

53.     For the foregoing reasons, as well as the reasons set forth in the Wallet Withdrawal Motion and the Cheela Declaration, the Debtors request that the Court (a) overrule the Objections, (b) enter the proposed Order, and (c) grant such other and further relief that the Court deems just and proper.

Dated: April 29, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

## Exhibit A

**Objection Chart**

**In re BlockFi Inc., et al., Case No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 28, 2022)**

## CHART OF OBJECTIONS AND RESPONSES[1] TO THE WALLET WITHDRAWAL MOTION

*The following chart summarizes the Objections filed in response to the Wallet Withdrawal Motion and provides high-level responses thereto.  The Debtors have done their best to accurately summarize the Objections and to provide responses to their key points where such responses are within the scope of findings sought.  The omission of a specific response to an Objection should not be taken as a waiver of the Debtors' arguments.  The Debtors reincorporate their reservation of rights with respect to such arguments, including the right to supplement the Reply with argument live at the hearing.*

| No. | Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|---|
| 1. | Ad Hoc Committee of Wallet Holders (the "<u>Ad Hoc Committee</u>") [Docket No. 184] (the "<u>Ad Hoc Committee Objection</u>") | 1. BlockFi's Wallet Withdrawal Motion is procedurally improper and is required to be adjudicated through an adversary proceeding. <br><br>2. BlockFi's terms of service provide that any withdrawal of principal will be transferred instantly to your BlockFi Wallet and any withdrawal from your BlockFi Wallet will be subject to BlockFi Wallet Terms. <br><br>3. The Terms of Service are unambiguous and BlockFi's attempt to reverse transfers from BIA to Wallet Accounts that actually took place contradicts their goal of "respecting the terms of service governing the relationship between the Debtors and their clients." <br><br>4. BlockFi's twitter announcement on November 10, 2022 was improper and BlockFi's Terms of Service do not identify Twitter as an official means of communication. <br><br>5. BlockFi did not disable transfers from BIA to Wallet Accounts on its web-based or mobile platform until at least November 18, 2022. <br><br>6. BlockFi breached its own Terms of Service because it deliberately stopped true-ups after November 10, which is a violation of the requirement to maintain strict controls over | 1. The Debtors address arguments related to an adversary proceeding in the Reply. Reply ¶¶ 49–52. Moreover, the Debtors submit that this argument is moot. <br><br>2. The Debtors address this argument in the Reply and Cheela Declaration.  Reply ¶¶ 28–29; Cheela Decl. ¶ 39. <br><br>3. As described in the Reply and Cheela Declaration, the Attempted Post Platform Pause Transactions were never effectuated by the Debtors.  As of the Platform Pause Time Stamp, the Debtors did not undertake the True-Up or Batching Process required to effectuate any transfer requests that were initiated by clients after the Platform Pause Time Stamp.  Cheela Decl. ¶ 55; Reply ¶ 15–30. <br><br>4. The Debtors address arguments regarding notice of the Platform Pause in the Reply.  Reply ¶¶ 35–44.  The Debtors were permitted to implement the Platform Pause without notice to their clients.  Cheela Decl. ¶¶ 5–11. <br><br>5. Not so.  During the UI Delay Period, clients only had the ability to initiate transfer *requests* by clicking buttons on the User Interface.  Cheela Decl. ¶¶ 72–75.  A client could not effectuate a bona fide transfer if such request was initiated after the Platform Pause Time Stamp.  Cheela Decl. ¶ 38. The Debtors did not conduct the True-Up Process or the Batching Process with respect to |

---

[1]    Capitalized terms used herein but not otherwise defined in this Objection Chart have the meanings ascribed to them in the Reply.

| | | | |
|---|---|---|---|
| | | the true-up of Wallet Reserve to be in compliance with the Terms of Service. | transfer requests that were initiated after the Platform Pause Time Stamp. Cheela Decl. ¶ 55; Reply ¶ 4.<br><br>6. Not so. The Platform Pause was implemented as of the Platform Pause Time Stamp. Cheela Decl. ¶ 53. After the Platform Pause Time Stamp, the Debtors only undertook the True-Up Process and Batching Process with respect to client transfer requests that were initiated on the User Interface **prior** to the Platform Pause Time Stamp. Cheela Decl. ¶ 59; Reply ¶ 27 |
| 2. | Deferred 1031 LLC<br><br>("Deferred 1031")<br><br>[Docket Nos. 179, 201]<br><br>(the "Deferred 1031 LLC Objection") | 1. The Objecting Party is entitled to a fair process, which would be achieved through an adversary proceeding.<br><br>2. The Objecting Party received confirmation that the transfer had been effectuated, which was reflected on the BlockFi User Interface.<br><br>3. Moreover, the Objecting Party's claim amount was listed on the Top 50 List of creditors for the amount based on the transfer having been effectuated. This proves that the transfer took place. | 1. The Debtors address arguments related to an adversary proceeding in the Reply. Reply ¶¶ 49-52. Moreover, the Debtors submit this argument is moot.<br><br>2. As set forth in the Reply and Cheela Declaration, until the Debtors could fully disable the client-facing transfer request functionality on the User Interface, the User Interface continued to improperly display account balances as if the transfer requests that had been initiated after the Platform Pause Time Stamp had been completed and the Company Facing Interface continued to collect and record transfer request data. Cheela Decl. ¶¶ 72–75; Reply ¶ 31. However, after the Platform Pause Time Stamp, the Debtors only undertook the True-Up Process and Batching Process with respect client transfer requests that were initiated on the User Interface **prior** to the Platform Pause Time Stamp. Cheela Decl. ¶ 59; Reply ¶ 27.<br><br>3. The Debtors Top 50 List is not evidence that a transfer took place. As set forth in the Cheela Declaration, the Debtors utilized balance data collected and recorded in the Company Facing Interface to prepare requisite bankruptcy filings because such data is the only data available to the Debtors on a client-level basis. Cheela Decl. ¶¶ 76–77. The Debtors inadvertently used balances that did not back out the Attempted BIA to Wallet Transfers of Deferred 1031 when drafting the Top 50 List. |

| | | | |
|---|---|---|---|
| 3. | Momin Siddique<br><br>("Siddique")<br><br>[Docket Nos. 143, 188]<br><br>(the "Siddique Objection") | 1. Objecting Party never received a communication from BlockFi in November 2022 regarding a pause on internal transfers from BIA to Wallet. The only email and/or communication received was with regards to a pause on withdrawals and deposits.<br><br>2. The terms withdrawal and transfer are not interchangeable. The help section on the website has separate sections dealing with transfers from BIAs to Wallets and a different section dealing with withdrawals.<br><br>3. Objecting Party received confirmation by email of transfers from BIA to Wallet account on November 14, 2022.<br><br>4. BlockFi publicized on their FAQs on November 23, 2022, that users can continue to check their accurate account balances through the BlockFi portal.<br><br>5. Objecting Party reserves right to hold the Debtors and their board of directors liable for deliberate misrepresentation.<br><br>6. There is no basis for the Debtors' claim that the platform pause took effect on November 10, 2022 at 8:15 PM because it was not communicated to nor operationalized for the users. | 1. The Debtors address arguments regarding their noticing efforts in the Reply and Cheela Declaration. Reply ¶¶35–44; Cheela Decl. ¶¶ 61–68.<br><br>2. The Debtors address arguments regarding the unambiguous BlockFi Terms of Service in the Reply and Cheela Declaration. Reply ¶¶ 39–44; Cheela Decl. ¶¶ 5–18.<br><br>3. As described in the Reply and Cheela Declaration, clients receive an email immediately upon initiating the transfer request on the User Interface, but the Debtors must still process the transfer and withdrawal requests that are initiated on the User Interface and collected on the Company-Facing Interface via the True-Up Process and/or Batching Process. Reply ¶ 24; Cheela Decl. ¶ 49.<br><br>4. The Debtors address arguments regarding the FAQ in the Reply and Cheela Declaration. Reply ¶¶ 31–33; Cheela Decl. ¶ 71.<br><br>5. As described in the Reply, among other things, the Debtors' tweets and blog posts are not contracts, their tweets and blog posts did not contain material misrepresentations that induced the Objecting Parties to enter into any contract with the Debtors. Reply ¶ 46.<br><br>6. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in app messaging, or otherwise—is simply not a prerequisite to effectuating a pause on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11. |
| 4. | Gary Ford<br>("Ford")<br>[Docket No. 182]<br><br>(the "Ford Objection") | 1. The Debtors' motion appears to be an effort to invalidate certain transactions which did, in fact, occur after the Platform Pause Time Stamp.<br><br>2. The User Interface indicates the Mr. Ford's attempted transfers from BIA to his Wallet Account were in fact completed. | 1. Not so. As set forth in the Reply and the Cheela Declaration, transaction requests that were initiated by BlockFi clients on the User Interface after the Platform Pause Time Stamp were not effectuated. Reply ¶¶ 15-30; Cheela Decl. ¶ 55.<br><br>2. Not so. As set forth in the Reply and the Cheela Declaration, the User Interface continued to improperly |

| | | | |
|---|---|---|---|
| | | | display account balances as if the transfer requests that had been initiated after the Platform Pause Time Stamp had been completed and the Company Facing Interface continued to collect and record transfer request data. Reply ¶¶ 31–33. Cheela Decl. ¶¶ 72–75. However, after the Platform Pause Time Stamp, the Debtors only undertook the True-Up Process and Batching Process with respect to client transfer requests that were initiated on the User Interface ***prior*** to the Platform Pause Time Stamp. Cheela Decl. ¶ 59; Reply ¶ 27. |
| 5. | Pro Se Form Objection[2] | 1. BlockFi made multiple clear public representations via the BlockFi Twitter account on November 10, 2022 that all BlockFi functions would be fully operational and that all transactions would continue including on November 11, 2022.<br><br>2. Any reasonable person would have relied on BlockFi's tweets on November 10, 2022 to their detriment and basing the Platform Pause on the 8:15 p.m. (prevailing Eastern Time) time stamp of one of their posts on Twitter would unconscionably prejudice any reasonable user who would have planned ahead to make a transfer on November 11, 2022 or later in the day on November 10, 2022.<br><br>3. BlockFi publicized on their FAQs on November 23, 2022, that users can continue to check their accurate account balances through the BlockFi portal.<br><br>4. There is no legal basis or need for reconciling the balances in the BIAs and Wallet Accounts as of the Platform Pause Time Stamp because the claim that balances were inaccurately reflected on the User Interface is meritless and unjustified. | 1. Not so. As described more fully in the Reply and the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in app messaging, or otherwise—is simply not a prerequisite to effectuating a pause on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11.<br><br>2. The Debtors address arguments regarding their noticing efforts in the Reply and the Cheela Declaration. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 61–68.<br><br>3. The Debtors address arguments regarding the FAQ in the Reply and Cheela Declaration. Reply ¶ 31–33; Cheela Decl. ¶ 71.<br><br>4. The Debtors describe the True-Up process in the Cheela Declaration. Cheela Decl. ¶¶ 40–42.<br><br>5. The Debtors address arguments regarding the Twitter (and Reddit) Notice in the Reply and the Cheela Declaration. Reply¶ 44; Cheela Decl. ¶¶ 63–64. The Debtors address arguments regarding their noticing efforts in the Reply and Cheela Declaration. Reply ¶¶ 35–44; Cheela Decl. ¶¶61–68.<br><br>6. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, |

---

[2] *Objection to Entry of Debtors' Motion to Update the User Interface and Reconcile BlockFi Accounts as of the Platform Pause Time Stamp* [Docket Nos. 137, 144, 145, 146, 147, 148, 149, 188] (collectively, the "<u>Pro Se Form Objection</u>")

| | | | |
|---|---|---|---|
| | | 5. The Twitter post used to set the Platform Pause Time Stamp addresses "withdrawals," but makes no mention of "transfers," which are two distinct transactions.<br><br>6. Email is the only means of electronic communication expressly mentioned in BlockFi's terms of service. Objecting Parties did not receive formal notice of pause of withdrawals only on November 11, 2022, because the Twitter post is grossly inadequate and insufficient. "Twitter" is not referenced anywhere on BlockFi's terms of service and is not a formal means of communicating with clients.<br><br>7. BlockFi's contractual right to limit withdrawals from BIAs was waived when BlockFi allowed withdrawals from BIAs to Wallet Accounts even after formally notifying users via email because they sent out confirmation emails for completion of such transactions.<br><br>8. BlockFi clients will be prejudiced and disadvantaged if the Platform Pause Time Stamp is November 10, 2022, 8:15 p.m. (prevailing Eastern Time) because they will be unfairly deprived of their personal property in their Wallet Accounts. | notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in app messaging, or otherwise—is simply not a prerequisite to effectuating a pause on all platform activity.  Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11.<br><br>7. The Debtors address this argument in the Reply.  Reply ¶ 31–33.<br><br>8. On the contrary, as set forth more fully in the Cheela Declaration and Reply, requiring the Debtors to use a different time stamp would result in inequitable and unfair treatment amongst the Debtors' clients.  Cheela Decl. ¶ 82; Reply ¶ 34. |
| 6. | Peter Elias II<br><br>("Elias")<br><br>[Docket No. 188]<br><br>(the "Elias Objection") | 1. Twitter is not a permitted form of notice under BlockFi's terms of service.  Even if it was permitted, BlockFi's Platform Pause tweet only stated that they were pausing client withdrawals, not transfers.<br><br>2. BlockFi seeks to reclassify the location of the Objecting Party's digital assets.  The terms of service state that the funds transferred into Wallet Accounts belong to clients at the time of transfer.  BlockFi is stripping ownership rights to funds by retroactively reclassifying funds.<br><br>3. BlockFi has communicated with their customers in a vague manner and has repeatedly gone against its word. | 1. This argument is addressed in the Reply.  As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in-app messaging, or otherwise—is not a prerequisite to effectuating a pause on all platform activity.  Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11.<br><br>2. As addressed more fully in the Reply and Cheela Declaration, a customer has no ability to effectuate a bona fide transfer, trade, or withdrawal request without the intervention of BlockFi's employees.  Reply ¶ 27; Cheela Decl. ¶ 38.<br><br>3. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in-app messaging, or otherwise—is not a prerequisite to effectuating a pause |

| | | | on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11. |
|---|---|---|---|
| 7. | Ryan Patrick Mills<br><br>("Mills")<br><br>[Docket No. 188]<br><br>(the "Mills Objection") | 1. BlockFi never publicly stated that Twitter is an official communication channel, and the use of Twitter as such is not in the Debtors' Terms of Service.<br><br>2. The Objecting Party received an email notice of the Platform Pause on November 11, 2022, but the Twitter announcement is not sufficient to be used to cut off clients' abilities to recover funds. BlockFi should adjust the Platform Pause Time Stamp to the daily true-up time on November 11, 2022.<br><br>3. BlockFi engaged in clear and willful misrepresentation. BlockFi told clients that the User Interface was accurate as of November 23, 2022 but contradicted this statement upon filing their motion on December 19, 2022. | 1. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in-app messaging, or otherwise—is not a prerequisite to effectuating a pause on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11.<br><br>2. See above.<br><br>3. The Debtors address arguments regarding the FAQ in the Reply and Cheela Declaration. Reply ¶¶ 31–33; Cheela Decl. ¶ 71. |
| 8. | Ashish Jain<br><br>("Jain")<br><br>[Docket No. 188]<br><br>(the "Jain Objection") | 1. BlockFi misrepresented or misstated the Platform Pause because BlockFi tweeted on November 10, 2022 that it would be fully operational on November 11, 2022 and all crypto transactions will continue as normal.<br><br>2. The Twitter notice is grossly inadequate. Twitter is not an official mode of communication for BlockFi and BlockFi clients are not required to have a Twitter account in order to be a BlockFi user.<br><br>3. BlockFi never properly put clients on notice of the Platform Pause, so BlockFi has not exercised any right to limit transfers from BIAs to Wallet Accounts.<br><br>4. The Objecting Party received email confirmation that their transfer from BIA to Wallet Account was complete after the Platform Pause Time Stamp. | 1. This argument takes the Debtors' statement out of context. As set forth in the Cheela Declaration, on November 10, 2022, at 9:00 a.m. (prevailing Eastern Time), a tweet was issued from the Twitter handle @BlockFi regarding news that Silvergate, BlockFi's U.S.-based banking partner for wire and ACH withdrawals, would be closed due to observance of the federal holiday, Veteran's Day, on November 11, 2022. The context of the tweet was to notify BlockFi clients that, while wire and ACH deposits and withdrawals may be delayed two extra business days due to Silvergate's closure on Veteran's Day, crypto withdrawals would be unaffected by Silvergate's closure on Veteran's Day.<br><br>2. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in-app messaging, or otherwise—is not a prerequisite to effectuating a pause on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11.<br><br>3. Same as above. |

| | | | | 4. As described in the Reply and Cheela Declaration, on the BlockFi platform, clients receive an email immediately upon initiating the transfer request on the User Interface, but the Debtors must still process the transfer and withdrawal requests that are initiated on the User Interface and collected on the Company-Facing Interface via the True-Up Process and/or Batching Process. Reply ¶ 24; Cheela Decl. ¶ 49. |
|---|---|---|---|---|
| 9. | Tram-Ahn Tran and Linda Tran<br><br>("Tran")<br><br>[Docket No. 188]<br><br>(the "Tran Objection") | 1. BlockFi has no legal right to use non-estate assets to further their reorganization. Under Section 541 of the Bankruptcy Code, property of the estate is determined as of the Petition Date.<br><br>2. BlockFi cannot change this well-settled law with a Twitter announcement. A company cannot receive the benefits of filing for bankruptcy by posting on social media that they are pausing withdrawals via Twitter because it has no legal effect under the Bankruptcy Code. | | 1. If anything, the Wallet Withdrawal Motion seeks a determination that the digital assets held in the Custodial Omnibus Wallets belong to the Debtors' clients and are not property of the estate, which is a position that no Objecting Party disputes. Reply ¶ 50.<br><br>2. The Debtors address arguments regarding notice of the Platform Pause in the Reply and Cheela Declaration. The Debtors were permitted under their BlockFi Terms of Service to implement the Platform Pause without notice to their clients. Cheela Decl. ¶¶ 5–11; Reply ¶ 35–44. |
| 10. | Second Pro Se Form Objection[3] | 1. Twitter is not an official form of communication and BlockFi routinely used email to communicate with clients.<br><br>2. The Objecting Party did not receive any notice of the Platform Pause until BlockFi emailed users an official notice on November 11, 2022. The email did not state or imply state, nor imply, that transfers would be paused.<br><br>3. BIA transfers were confirmed on the user interface and BlockFi stated as recently as November 23, 2022, when BlockFi posted FAQs that stated that the app reflects accurate account balances.<br><br>4. The Platform Pause Time Stamp is arbitrary. Under section 541 of the Bankruptcy Code, property of the estate is determined as of the Petition Date; here, November 28, | | 1. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in app messaging, or otherwise—is simply not a prerequisite to effectuating a pause on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶5–11.<br><br>2. The Debtors address arguments regarding their noticing efforts in the Reply and Cheela Declaration. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 61–68.<br><br>3. The Debtors address arguments regarding the FAQ in the Reply and Cheela Declaration. Reply ¶¶ 31–33; Cheela Decl. ¶ 71.<br><br>4. The Platform Pause was implemented pursuant to BlockFi's Terms of Service prior to these chapter 11 |

---

[3] *Pro See Objection to Entry of Debtors' Motion to Update the User Interface and Reconcile BlockFi Accounts as of the Platform Pause Time Stamp* [Docket No. 188] (Jose D. Rosario, Dana Barnett, and Rob Clerx) (collectively, the "Second Pro Se Form Objection").

| | | | |
|---|---|---|---|
| | | 2022. The Debtors are attempting to deprive users of their rightfully owned funds.<br><br>5. There is plenty of evidence proving that the Platform Pause was not effectuated at the time of the Twitter notice. | cases. The Petition Date and these chapter 11 cases are irrelevant to the effectiveness of the Platform Pause. Reply ¶ 35–44; Cheela Decl. ¶¶ 5–11, 53.<br><br>5. Not so. The Debtors address these arguments in the Cheela Declaration and Reply. Reply ¶¶ 15–30; Cheela Decl. ¶¶ 73–75. |
| 11. | Paul Clifford Escoll<br><br>("Escoll")<br><br>(the "Escoll Objection") | 1. BlockFi did not provide proper notice before pausing client withdrawals because the Website Notice was not posted under November 11, 2022.<br><br>2. The Platform Pause should be the same date and time of the Website Notice's timestamp. | 1. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in app messaging, or otherwise—is simply not a prerequisite to effectuating a pause on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11.<br><br>2. Same as above. |
| 12. | Todd J. Goeks<br><br>("Goeks")<br><br>[Docket No. 188]<br><br>(the "Goeks Objection") | 1. The Debtors' Terms of Service require communication from the Debtors to clients in email. There is nothing in the Debtors' Terms of Service that address the use of Twitter as official client notification.<br><br>2. The Platform Pause Time Stamp should be changed to a time no earlier than the Debtors' email to their clients on November 11, 2022 at 18:12 UTC indicating that BlockFi was limiting platform activity.<br><br>3. The email that the Debtors sent stated that they were limiting, but had not already limited platform activity, indicating that activity had not yet been paused as of the Platform Pause Time Stamp on November 10, 2022. | 1. As described more fully in the Reply and in the Cheela Declaration, under the BlockFi Terms of Service, notice—whether written or oral, whether by mail, email, phone, Twitter, Reddit, in-app messaging, or otherwise—is not a prerequisite to effectuating a pause on all platform activity. Reply ¶¶ 35–44; Cheela Decl. ¶¶ 5–11.<br><br>2. As described above, notice is not a prerequisite to effectuating a pause on platform activity.<br><br>3. Same as above. |