| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-1(b) ||
|---|---|
| BROWN RUDNICK LLP<br>Robert J. Stark, Esq.<br>Kenneth J. Aulet, Esq.<br>Bennett S. Silverberg, Esq.<br>Seven Times Square<br>New York, NY 10036<br>Telephone: (212) 209-4800<br>Fax: (212) 209-4801<br>Email: rstark@brownrudnick.com<br>   kaulet@brownrudnick.com<br>   bsilverberg@brownrudnick.com<br>*Counsel for the Official Committee of Unsecured Creditors*<br>  -and-<br>GENOVA BURNS LLC.<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Gregory S. Kinoian, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>Telephone: (973) 230-2095<br>Fax: (973) 533-1112<br>Email: DStolz@genovaburns.com<br>   DClarke@genovaburns.com<br>   GKinoian@genovaburns.com<br>*Local Counsel for the Official Committee of Unsecured Creditors* | BROWN RUDNICK LLP<br>Stephen D. Palley, Esq.<br>601 Thirteenth Street, NW<br>Washington, DC 20005<br>Telephone: (202) 536-1700<br>Fax: (202) 536-1701<br>Email: spalley@brownrudnick.com<br><br>BROWN RUDNICK LLP<br>One Financial Center<br>Boston, MA 02111<br>Tristan Axelrod, Esq. (*pro hac vice* pending)<br>Telephone: (617) 856-8300<br>Fax: (617) 856-8201<br>Email: taxelrod@brownrudnick.com |
| In re:<br><br>BLOCKFI INC., *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>Jointly Administered |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC. (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

65021080 v3

**REPLY OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR
WITHDRAWALS FROM WALLET ACCOUNTS, (B) UPDATE THE USER
INTERFACE TO PROPERLY REFLECT TRANSACTIONS AND ASSETS
AS OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE
RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 cases of BlockFi, Inc. and its affiliated debtors (collectively, the "**Debtors**," the "**Company**," or "**BlockFi**") respectfully submits this Reply to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief*, dated December 19, 2022 [Docket No. 121] (the "**Wallet Motion**")[2]. In support of this Reply, the Committee respectfully states as follows:

**REPLY**

1. Each and every customer of BlockFi is owed their full account balance. However, by the time of the "Platform Pause" and the collapse of FTX and Alameda Research, BlockFi had realized it no longer had the funds to do so: it was indisputably insolvent. These bankruptcy cases followed.

2. BlockFi cannot satisfy its debts in full. All assets of BlockFi are being marshalled and will be directed to the satisfaction of claims against it, and the owners are entitled to nothing on account of their equity interests. Issues such as the validity of "post-pause" wallet transactions are, thus, not really questions of what will *BlockFi* pay the customers that initiated such

---

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Wallet Motion.

2

transactions (the "Post-Pause Transferring Customers"), but what will *other customers* pay: every dollar a customer receives means one less dollar for every other customer.

3. As set forth below, "post-pause" transfers cannot be considered "Wallet" claims. The assets segregated are sufficient for pre-pause wallet transfers, but are woefully insufficent if the Attempted Post-Pause Transfers are included as valid wallet claims. Accordingly, considering such transfers to have established a valid Wallet claim (and entitlement to the Wallet assets segregated for the benefit of pre-pause Wallet holders) would transfer value from the pre-pause Wallet holders to the post-pause transferring customers. There is no basis in law or equity to do so: those assets were owned by the pre-pause customers, and BlockFi and the post-pause transferring creditors have no legal basis to assert an entitlement to those assets.

4. Post-Pause Transferring Customers raise several contractual arguments asserting an entitlement to have the Attempted Platform Pause Transfers recognized; and the Debtors raise several contractual arguments in response. The Debtors have the better of the argument, but the point is academic: even under the objecting parties' interpretation of what BlockFi's contractual obligations were, *it did not comply with them* (as it likewise failed to comply with many other contractual obligations to other customers, including every customer still owed money from BlockFi).

5. Wallet customers are entitled to be treated, not as unsecured creditors, but parties reclaiming their property that is not part of the estate because the terms of such wallet accounts were clear that they (and not BlockFi) held title to their funds. Accordingly, to exit the "unsecured creditor" pool, Post-Pause Transferring Customers must show that they actually obtained title to property and are seeking to reclaim that property. Under applicable law, they cannot do so.

6. BlockFi engaged in certain back-end processes before confirming and effectuating any transfer of its own assets to a Wallet Account holder. These included reviewing the transfers, updating certain ledgers, and then the "true up" – which was, in essence, the actual transfer of funds owned and controlled by BlockFi to custodial accounts beneficially owned by customers. Absent a "true-up" no funds were actually segregated for the benefit of a customer seeking to transfer funds into Wallet.

7. As set forth below, under standard legal principles even if BlockFi had a *contractual duty* to immediately segregate funds for a wallet holder and even if it had not effectively informed the world it would breach that duty, a transfer of a property interest is not perfected until such time as BlockFi actually moved funds into segregation for the benefit of such customers. In fact, holding otherwise would likely mean that a customer who owned the crypto in their Wallet account prior to the pause – and who had sufficient crypto actually segregated – would be deprived of that property interest through *BlockFi's* failure to meet its contractual obligations to Post-Pause Transferring Customers through the creation of a shortfall in those accounts.

8. Even if such transfers were effective – and they are not - it is similarly obvious from undisputed facts that withdrawals from BIA to Wallet Accounts are presumptively preferential and inequitable in this instance, and were they to be recognized they would be avoidable. Recognizing them, until they were avoided by operation of the bankruptcy code – would merely impose an additional delay on pre-pause wallet holders.

9. For those reasons, the Court should not recognize the Attempted Platform Pause Transfers.[3]

---

[3] By agreement, the parties are not seeking to distribute funds in Wallet subject to potential avoidance (i.e. funds transferred from BIA accounts within 90 days of the petition date) at this time. The avoidability of such transfers does not depend on whether the funds in Wallet are owned by the wallet holders (they are), as

4

### A. The Attempted Platform Pause Transfers Were Not Perfected Because The Debtors Did Not Consummate The Back End Transaction.

10. The Attempted Platform Pause Transfers were not perfected because BlockFi at all times held the funds requested to be withdrawn and did not perform the back end functions required for it to approve the requests and transfer the funds beyond its control.

11. BlockFi functioned as a form of crypto bank, taking in deposits to subsequently deploy, profiting from the resulting spread. Under ordinary circumstances and under section 547 of the Bankruptcy Code, the determination of perfection of a purported bank transfer – the debtor or creditor, bank or customer – is a question of which party has greater control over the funds or transfer instrument.[4]

12. For instance, transfer of a personal check is not perfected at the time the check is delivered, but rather, at the point when the transferor directs the drawee bank to honor the check <u>and</u> the drawee bank in fact honors the check.[5] At any time prior, the transferor has the unilateral ability to stop payment and thus maintained some control over the funds.

---

funds withdrawn from the platform entirely are similarly subject to potential avoidance actions. These issues will be resolved at a later date (in a plan or otherwise).

[4] *See, e.g., Barnhill v. Johnson*, 503 U.S. 393 (1992) (holding that for purposes of a transfer by ordinary check, the transfer occurred at the point when both the transferor directed the drawee bank to honor the check and the drawee bank in fact honored the check); *see also In re Citibank August 11, 2020 Wire Transfers*, Case No. 20-CV-6539 (JMF) (S.D.N.Y. Feb. 16, 2021), at p. 54, *vacated and remanded on other grounds sub nom Citibank, N.A. v. Brigade Capital Management, LP*, Case No. 21-487 (2d Cir. Sep. 8, 2022) (reasoning that a creditor receiving a mistaken payment was not required to "credit" the books of the debtor to invoke the discharge-for-value defense, as such an approach would lead to excessive litigation and inconsistent outcomes). Whether a party can acquire a judicial lien under the particular facts of a transfer at issue is generally a question of state law that may be assessed by the Bankruptcy Court. *See In re Ramco Am. Intern., Inc.*, 754 F.2d 130, 132 (3d Cir. 1985) (quoting 11 U.S.C. § 547(e)(1)(B)).

[5] *Barnhill*, 503 U.S. at 393 (emphasis added). *cf. In re Wilkinson*, 196 B.R. 311, 322 (Bankr. E.D. Va. 1996) ("the primary underpinning for the Supreme Court's holding in [*Barnhill*] was that under applicable commercial law, the delivery of a check does not operate as an assignment of the funds in the drawer's bank account and gives the payee no property rights in those funds."); *see also* UCC § 9-314 (perfection of security interest in deposit account requires control).

13. Conversely, cashier's checks follow a different rule: the transfer thereof may be consummated at the time of delivery, and <u>not</u> the date the check is honored.[6] This is because a cashier's check is guaranteed by the bank, leaving the transferor no ability to stop payment following delivery of the physical instrument. Similar reasoning is employed with wire transfers, as "wire payments are the equivalent of honored funds and are deemed transferred when the recipient receives the electronic transmission."[7]

14. In other words, the transfer may be perfected where the transfer determination is no longer in the hands of the transferor.

15. Here, the Debtors' disclosures to the Committee and objectors indicate that, similar to the personal check example, a number of processes had to occur before the Debtors transferred their property (BIA deposits) to a Wallet Account in satisfaction of obligations to a BIA account holder. These included a transaction review process, updates to certain ledgers, and a "true-up" of funds from BlockFi's proprietary accounts to the custodial accounts safeguarding Wallet assets to which Wallet Account holders held title.

16. These processes, most notably including the "true up," simply did not occur. The funds stayed with the Debtors, within their unilateral control, and are now property of the estate. The fact that certain communications to BlockFi's customers regarding attempted transfers were mistaken, or misleading, or not timely received is extremely unfortunate but does not speak to perfection of a transfer of funds. The funds did not move and the Debtors did not transfer control; *that* fact is dispositive.

---

[6] *In re Lee*, 179 B.R. 149, 161-62 (9th Cir. B.A.P. 1995).

[7] *In re Pioneer Comm. Funding Corp.*, 140 B.R. 951, 957 (Bankr. S.D.N.Y. 1992).

17. The Post-Pause Transferring Creditors assert a number of contractual arguments, that boil down to (a) BlockFi was obligated to immediately honor the Attempted Platform Pause Transfers based on the underlying account agreement language; and (b) that BlockFi's attempts to notify the world it would exercise its contractual rights not to do so were ineffective. As the Debtors set forth in their papers, neither argument is correct. But more importantly, neither argument matters: as set forth above, even if the Debtors had such a contractual duty to immediately segregate such assets, they did not do so. No such transfers were perfected. Customers are entitled to the full range of *unsecured claims* they may have based on such failure,[8] but they are not entitled to greater property rights as a result of such failure.

### B. The Attempted Platform Pause Transfers Should Not Be Recognized Because They Are Inherently Preferential and Inequitable

18. Setting aside title transfer, any Attempted Platform Pause Transfer would be presumptively preferential and would diminish the value of the estates. This is the type of transfer the Bankruptcy Code expressly discourages and permits to be voided.

19. As previously noted, BIA and similar account deposits represent antecedent debts: obligations of the Debtors to repay deposited funds at interest on demand. It should be beyond reasonable argument that a demand for such repayment following the Platform Pause was (1) for the benefit of the creditor-account holder, (2) in satisfaction of such antecedent debt, (3) made while BlockFi was insolvent, (4) made during the 90 days prior to the Petition Date in these cases, and (5) would, if recognized, improve the position of the transferor over the outcome anticipated for BIA account holders in these cases. Indeed, if the transfers were legally recognized, there

---

[8] The Committee does not believe any such claims against BlockFi would provide an incrementally greater claim than the contractual claim to the return of account value.

would be insufficient funds to honor them, and holders of BIA claims would be at risk to receive greatly diminished distributions (if anything) from these proceedings.[9]

20.    The objectors appear to raise arguments for equitable remedies in light of the misleading nature of communications from the Debtors.  But the Bankruptcy Code recognizes no such argument in equity: to the contrary, section 547 expressly permits a trustee or debtor-in-possession to avoid transfers of this nature because they are inequitable, by virtue of diminishing the value of the estate distributable to all creditors in the interest of "preferring" those who, for instance here, press the button fastest to pull out their money.  Such an outcome is not equitable in the bankruptcy context.

21.    Ultimately, on the date of the Platform Pause, BlockFi had admitted it was insolvent.  It had obligations to its customers it simply could not meet as they came due.  The Committee does not fault any customer for doing their best to obtain what BlockFi owed them – they were owed their money back, and BlockFi had not yet filed for Chapter 11 and customers were entitled to do their best to get paid.  But BlockFi could not pay those customers in full, and it cannot today.  Accordingly, to obtain payment in full the Post-Pause Transferring Customers must demonstrate a *greater* entitlement to payment than any other creditor, because to obtain payment in full such customers must take value that would otherwise flow to all creditors equally; or to assert a property interest in non-estate property that belongs to other customers.  They cannot do so.

---

[9] *See* 11 U.S.C. § 547(b)(1)-(5) (standard for avoidance of preferential transfers).

## **CONCLUSION**

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court deem the Attempted Platform Pause Transfers to have not occurred and grant such other and further relief as it deems proper.

New York, New York
Dated: May 3, 2023

By: */s/ Kenneth J. Aulet*

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Kenneth J. Aulet, Esq.
Bennett S. Silverberg, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Fax:        (212) 209-4801
Email:    rstark@brownrudnick.com

Stephen D. Palley, Esq.
601 Thirteenth Street, NW
Washington, DC  20005
Telephone:  (202) 536-1700
Fax:        (202) 536-1701
Email: spalley@brownrudnick.com

Tristan G. Axelrod, Esq. (*pro hac vice pending*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Fax:        (617) 856-8201
Email: taxelrod@brownrudnick.com

*Counsel for the Official
Committee of Unsecured Creditors*

By: */s/ Daniel M. Stolz*
**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 230-2095
Fax:       (973) 533-1112
Email:    DStolz@genovaburns.com
          DClarke@genovaburns.com
          GKinoian@genovaburns.com
*Local Counsel for the Official
Committee of Unsecured Creditors*