**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Deborah Kovsky-Apap (NJ Bar No. 030942003)
875 Third Avenue
New York, NY 10022
(212) 808-2726
deborah.kovsky@troutman.com

*Counsel for the Ad Hoc Committee of
Wallet Account Holders*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*[1]<br><br>      Debtors. | Chapter 11 Case No. 22-19361 (MBK)<br><br>(Jointly Administered)<br><br>**RE: DOCKET NOS. 121 AND 805**<br><br>**HEARING DATE AND TIME:** May 8, 2023, at 10:00 a.m. (EDT) |

**AD HOC COMMITTEE OF WALLET ACCOUNT HOLDERS' RESPONSE TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS FROM WALLET ACCOUNTS, (B) UPDATE THE USER INTERFACE TO PROPERLY REFLECT TRANSACTIONS AND ASSETS AS OF THE PLATFORM PAUSE, AND (C) CONDUCT ORDINARY COURSE RECONCILIATION OF ACCOUNTS, AND (II) GRANTING RELATED RELIEF**

    The Ad Hoc Committee of Wallet Account Holders (the "**Ad Hoc Committee**"),[2] through its undersigned counsel, submits this response to the Debtors' motion for authority to reverse valid transfers out of BlockFi's yield-bearing interest accounts [Docket No. 121] (the "**Motion**"), and respectfully states as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Ad Hoc Committee's Preliminary Objection, Docket No. 184, or the Debtors' omnibus reply brief, Docket No. 805.

1

#154559075 v1

# PRELIMINARY STATEMENT

1. In their reply brief, the Debtors willfully mischaracterize the Ad Hoc Committee's position. The Debtors claim that the Ad Hoc Committee's objection "argu[es] that once a client initiates a transfer request by clicking a button on the User Interface, digital assets are instantly transferred from the Rehypothecated Wallets to the Custodial Omnibus Wallets without any intervention by the Debtors and their employees." Reply Brief ¶ 28. Not so.

2. In fact, the Ad Hoc Committee has argued just the opposite: that clicking the "Transfer" button *never* caused the immediate or automatic movement of digital assets from one wallet to another, because the transfer out of the BIA program and into the Wallet product was, by design, decoupled from the actual transfer of coins to true up the Custodial Omnibus Wallets. *See, e.g.* Preliminary Objection [Docket No. 184], ¶¶ 16, 42.

3. The Debtors would like the question of whether and when a transfer out of BIA took place to turn on whether and when digital assets moved from the Rehypothecated Wallets to the Custodial Omnibus Wallets. But the Debtors miss the point. The real question is whether, contractually and practically, customers exited BIA and acquired rights to the assets in the Custodial Omnibus Wallets *before* any digital assets moved at all. The facts and the Terms of Service show that they did.

# ARGUMENT

**A. Transfer from BIA to Wallet were immediate and did not depend on the True-Up Process.**

4. The following facts are undisputed:[3]

---

[3] In their omnibus reply brief, the Debtors make a number of inaccurate statements regarding discovery, factual stipulations and the Ad Hoc Committee's conduct. The Ad Hoc Committee is not interested in engaging in a tit-for-tat with the Debtors; suffice it to say that the Ad Hoc Committee, among other things, made numerous good faith attempts to enter into a stipulation of facts with the Debtors, all of which were rebuffed.

a. BlockFi's Interest Account Terms provide:

> We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the specified principal in the account on each day. . . .[4]
>
> You may make a request for complete or partial withdrawal of principal from your Crypto Interest Account at any time. Any withdrawal of principal will be transferred instantly to your BlockFi Wallet and any withdrawal from your BlockFi Wallet will be subject to BlockFi Wallet Terms. Any interest that has accrued but not been credited to your account on a month-end basis is not eligible for withdrawal until the fifth business day of the following month.[5]

b. BlockFi chose to design its platform so that the accrual of interest described in the Interest Account Terms was based on the balance of digital assets shown as being in BIA on the User Interface.[6]

c. BlockFi chose to design its platform so that as soon as a customer clicked the "Transfer" button in BIA, the balance instantly transferred from BIA to Wallet within the User Interface and immediately stopped accruing interest.[7]

d. BlockFi did *not* choose to design its platform to show transfers from BIA to Wallet as "pending" for any period of time after a Transfer click.

e. BlockFi chose to design its platform so that as soon as a customer clicked Transfer in BIA, an automated email was sent to the customer confirming the completion of the transfer to Wallet.[8]

---

[4] BlockFi Interest Account Terms, § A.2.

[5] *Id.*, § C.1.

[6] Declaration of Amit Cheela ("**Cheela Dec.**") [Docket No. 804], ¶ 34.

[7] *Id.*

[8] *Id.* ¶ 49.

3

     f. BlockFi did *not* choose to design its platform to send automated emails to customers following a Transfer click to advise them that the transfer from BIA to Wallet was "pending" or "in process."

     g. With a minor exception not relevant here, BlockFi does not maintain an individual, dedicated digital wallet for each customer in its Wallet program. Rather, BlockFi maintains omnibus wallets that hold digital assets in fungible bulk. No customer owns any particular coin in these Custodial Omnibus Wallets.

     h. BlockFi did not transfer a coin on the blockchain into the Custodial Omnibus Wallets for each coin transferred in the User Interface from BIA to Wallet. Instead, it performed periodic true-ups of the Custodial Omnibus Wallets on a net, omnibus basis.[9]

     i. BlockFi performed the True-Up Process on business days, and each True-Up Process reconciled Customer Omnibus Wallet balances with transfer data from the *prior* business day.[10] In other words, when a customer clicked Transfer in BIA, that act would not result in the performance of the True-Up Process until the next business day.

     j. The goal of the True-Up Process was to try to ensure that the Custodial Omnibus Wallets held enough digital assets to cover balances reflected as being in Wallet in the User Interface as of the prior business day, plus a 1-5% buffer. Sometimes the True-Up Process required BlockFi to add coins to the Custodial Omnibus Wallets. Sometimes the True-Up Process showed that there was an excess in the Custodial Omnibus Wallets, and digital assets were released to Rehypothetcated Wallets.[11]

---

[9] *Id.* ¶¶ 40-41.

[10] *Id.* ¶ 41.

[11] *Id.*

      k.      On many occasions—including five times just in the three months leading up to November 10—BlockFi performed the True-Up Process but still left a shortfall in the Custodial Omnibus Wallets. Sometimes the deficiencies were in the multiple millions of dollars' worth of digital assets.[12]

      l.      BlockFi did <u>not</u> require customers to wait for the True-Up Process to be completed before allowing them to buy, sell or trade digital assets reflected in their Wallet Accounts.[13]

      m.      Following the launch of BlockFi's Wallet product, customers could no longer withdraw eligible digital assets directly from BIA to an external wallet. Instead, customers first had to request a transfer of digital assets from BIA to their Wallet Account.[14] The customer made the request by clicking Transfer, an act that (as described above) had certain immediate effects.

---

[12] It should come as no surprise that BlockFi, a multi-billion dollar company that used a *manually-updated Google spreadsheet* as its financial ledger, wasn't very good at keeping track of customers' assets. As the inimitable Matt Levine put it:

> Meanwhile crypto built its own financial industry, with its own quasi-bank-like institutions, and what is striking about a lot of that industry is that:
>
> It uses the same basic processes — keeping centralized secret records of account balances on computers, with a certain amount of sloppy manual reconciliation — as traditional banks; and
>
> It is … worse … at it than the banks?
>
> To exaggerate slightly, many of crypto's "centralized finance" companies learned no lessons from the blockchain, but they also learned no lessons from traditional finance. They were like "hey you know what's a good way to keep track of customer transactions, we'll write them down on some scraps of paper, then we'll shuffle those scraps together and spill coffee on them, that should be great."

Matt Levine, "Keeping Track of Crypto Is Hard," *Bloomberg* (Nov. 21, 2022), *available at* https://www.bloomberg.com/opinion/articles/2022-11-21/keeping-track-of-crypto-is-hard#xj4y7vzkg

[13] Cheel Dec., ¶ 35.

[14] *Id.*, ¶ 30.

     n.  However, once a customer clicked Transfer, BlockFi did <u>not</u> require the customer to wait for the True-Up Process to be completed, and for digital assets to move from Rehypothecated Wallets to the Custodial Omnibus Wallets, before allowing them to transfer digital assets reflected in their Wallet Account off of the BlockFi platform. *See* Reply Brief ¶ 25. In other words, a customer could click Transfer in BIA, request a withdrawal out of Wallet, and receive digital assets or fiat currency in an external account *all on the same day*, without any intervening True-Up Process.

    5.  The Debtors claim in their omnibus reply brief that "[a] client can only withdraw from BIA to Wallet and then off-platform via the Batching Process and True-Up Process. This can be (and in the ordinary course of business prior to the Platform Pause often was) completed by the Debtors on the same day, depending on the time of day the transfer and withdrawal requests were received. But the actual completion of such transactions was effectuated only after such a transfer is manually effectuated via the Batching Process[15] and True-Up Process." Reply Brief ¶ 26. Not only is this factually inaccurate, as demonstrated by the testimony of the Debtors' chief financial officer, it doesn't even make any logical sense. If a customer transfers from BIA to Wallet and thence off-platform all in the same day, how can the "actual completion of such transaction" be effectuated via the True-Up Process that, by

---

[15] The Batching Process, as described by the Debtors' chief financial officer, Amit Cheela, relates to the off-platform withdrawal process and not inter-account transfers. It involves (i) batching data regarding requests for external withdrawals, running automated fraud checks and identifying red flags for further review, (ii) organizing external withdrawal requests for processing according to the time of the request and whether the request was for digital currency, ACH or wire, (iii) uploading valid withdrawal request data to BitGo and Silvergate, and (iv) the effectuation of the movement of digital currency by BitGo, or wires and ACH transfers by Silvergate, to customers' external accounts. Cheela Dec., ¶ 37. The Batching Process described in Mr. Cheela's declaration has nothing to do with inter-account transfers from BIA to Wallet and does not involved, as one of the steps, the movement of digital assets from Rehypothecated Wallets to Custodial Omnibus Wallets.

definition, happens the *next* business day? By then, the funds are already safely in the customer's bank account or external wallet.

6. Rather, the facts show that the Debtors always intended – as they state in their Terms of Service – that transfers out of BIA would happen "instantly." The Debtors deliberately designed their platform so that the movement of assets on the User Interface from one account to another, the generation of a confirmation email, and the cessation of the accrual of interest all happened instantly when the customer clicked Transfer.

7. Those design choices reflect legal reality, as customers' BIA Accounts and Wallet Accounts (that is, the information displayed in the User Interface) can best be understood as showing the legal relationship between the customer and BlockFi with respect to the account balances. Balances shown in BIA reflect assets to which the customer has granted title to BlockFi. Balances shown in Wallet reflect assets to which the customer has not granted such title (or has revoked the grant), as to which assets the customer has the right to look to the Custodial Omnibus Wallets for withdrawal and recovery.

8. The act that changes the legal relationship isn't the True-Up Process—it is the customer's act of clicking Transfer. As soon as that happens, the customer's participation in BIA terminates (permanently, for US customers). BlockFi recognized that and designed its system so that interest would stop accruing on digital assets the moment they left BIA on the User Interface. As the court in *Celsius Network* noted, the consideration supporting the contractual grant of right, title and interest to the debtor in customers' digital assets was the debtor's payment of interest (or "rewards") on those assets. *In re Celsius Network LLC*, 647 B.R. 631, 653 (Bankr. S.D.N.Y. 2023), *leave to appeal denied*, 2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023). Here, similarly, the accrual of interest is the consideration supporting customers'

7

contractual grant of right and title in their digital assets to BlockFi. Once the grant of right and title is revoked, the consideration supporting it likewise terminates.

9. At the same time the BIA relationship terminates, the customer acquires an undivided ownership interest in, and right to withdraw from, the existing digital assets already sitting in the Custodial Omnibus Wallets. This is demonstrated by the fact that BlockFi regularly processed external withdrawals from the BitGo Custodial Wallets *before* the True-Up Process was performed with respect to the predicate BIA-to-Wallet transfer.

10. The Debtors insist that this isn't so, and that a customer's assets in fact remain in BIA unless and until the True-Up Process is completed some unspecified time later. Reply Brief ¶ 15. If the Debtors' position were correct, it would lead to absurd results. All of the customers who transferred assets from BIA to Wallet to an external account without an intervening True-Up Process would be liable for having absconded with someone else's assets, since *their* assets remained in BIA. *They* had no right to withdraw assets from the BitGo Custodial Wallet. And if those customers' assets actually remained in BIA until the next True-Up Process (which could be as much as three days later, in the event of a holiday weekend), then they were still entitled to accrue interest during that period—meaning that BlockFi would have cheated every customer that clicked Transfer out of additional interest owed to them.

11. Plainly that is not the case. The entire architecture of the Debtors' platform is set up so that clicking Transfer "instantly" terminates a customer's BIA relationship and gives the customer rights in and access to the Custodial Omnibus Wallets.

B. **"Instantly" means right away, not days later.**

12. The Debtors urge the Court to adopt a tortured interpretation of the Terms of Service, arguing that "a client 'may make a request for complete or partial withdrawal of principal . . . at any time,' but the actual 'withdrawal' or 'transfer' of digital assets from BIA to

8

#154559075 v1

the Custodial Omnibus Wallets happens instantly once the Debtors undertake the True-Up Process and/or Batching Process."[16] Reply Brief ¶ 29. In the Debtors' reading, "instantly" means "after a delay of one to three days, which is never disclosed to customers and appears nowhere in the Terms of Service."

13. It is well settled that "[u]nder New Jersey law, words in a contract 'must be given their ordinary meaning.'" *Days Inns Worldwide, Inc. v. Miller*, 2014 WL 6485923, at *2 (D.N.J. Nov. 19, 2014) (quoting *Assisted Living Assoc.'s of Moorestown, L.L.P. v. Moorestown Twp.*, 31 F.Supp.2d 389, 398 (D.N.J.1998). "Instantly" is a common and well-understood English word. Merriam-Webster defines "instantly" as "without the least delay: IMMEDIATELY." Black's Law Dictionary, in turn, defines "immediate" as "occurring without delay; instant." *United States v. Patton*, 927 F.3d 1087, 1099 (10th Cir. 2019) (quoting Black's Law Dictionary 751 (7th ed. 1999). Clearly, "instantly" doesn't mean what the Debtors think it means.

14. Context does not change that outcome. While the Debtors focus on the word "request" in the prior (which appears to mean nothing more than clicking Transfer—an act that, as described in detail above, has immediate, real-world effects), the real context is the sentence that follows and that the Debtors do not quote: "Any interest that has accrued but not been credited to our account on a month-end basis is not eligible for withdrawal until the fifth business day of the following month."[17] In context, it is plain that what the Terms of Service mean is that principal (i.e., amounts that the customer deposited on the platform plus capitalized

---

[16] As noted above, the Batching Process relates to off-platform withdrawals, *not* inter-account transfers from BIA to Wallet.

[17] BlockFi Interest Account Terms, § C.1.

9

#154559075 v1

interest) is transferred to the Wallet program immediately, while accrued but unpaid interest is not.

15.   The Committee evidently agrees with this interpretation. It noted in its initial response to the Debtors' Motion that BlockFi "deployed what it described as 'best-in-class' client protections, such as . . . policies and protections empowering clients to transfer assets (including accrued interest as paid) from BIAs "immediately" and receive confirmation thereof." *See* Docket No. 380, ¶ 10.

16.   Moreover, as noted in the Ad Hoc Committee's Preliminary Objection, clickwrap agreements such as the Terms of Service are contracts of adhesion. *See, e.g. Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 697 (E.D. Va. 2020); *see also* Docket No. 184, ¶ 47. Contracts of adhesion are subject to extra scrutiny and, in the event of any ambiguous terms, will be construed against the drafter. *Leonard & Butler, P.C. v. Harris*, 279 N.J. Super. 659, 670–71, 653 A.2d 1193, 1199 (App. Div. 1995). Accordingly, to the extent that there is any ambiguity about what the word "instantly" means, it must be construed against BlockFi.

C.   **A few words about notice.**

17.   The Debtors make much of provisions in the Terms of Service that allow them to take a variety of actions "without notice" to its customers. Reply Brief ¶¶ 36-38. Even if the Debtors had the right to pause platform activities without notice, the fact is that the Debtors *did* provide notice to its customers. It told them, repeatedly, that the activity they were "pausing" was withdrawals from the platform. By doing so, the Debtors waived their right to act without notice to customers. *See, e.g., Sateriale v. RJ Reynolds Tobacco Co.*, 2014 WL 7338881, at *7 (C.D. Cal. Dec. 19, 2014) (holding that defendant waived its contractual right to terminate without notice when it voluntarily chose to provide notice).

10

18.  Whether or not BlockFi waived its contractual right, the content of its internal and external communications is evidence of what was actually, clearly "paused." The infamous November 10, 2022, 8:16 p.m. (ET) tweet (the "**November 10 Tweet**") stated that "[u]ntil there is further clarity, we are limiting platform activity, including pausing client withdrawals as allowed under our Terms."[18] Identical language was used in the dismissible, in-app notice and email pushed out to customers on November 11, 2022.[19] There was no mention in the public announcement or direct customer communications that inter-account transfers were among the activities being "limited," much less "paused." This is consistent with internal communications at BlockFi via Slack and email sent by co-founder Flori Marquez on November 10, which indicated significant uncertainty about what products or activities, other than withdrawals, would be affected:

-How long are we pausing client withdrawals?
- o We are not sure how long client withdrawals will remain paused as we work through various alternatives

-Are other products affected by this change?
- o The executive team is working through further implications for the platform.[20]

In other words, just five minutes before the November 10 Tweet, BlockFi's executive team was still unsure what the implications of the "Pause" would be for anything other than external withdrawals.

19.  In the days and weeks following the November 10 Tweet, BlockFi *knew* that it had not disabled inter-account transfers. It *knew* that the Transfer button still worked and

---

[18] Cheela Dec., Ex. J.

[19] *Id.*, Exs. P, R.

[20] *Id.*, Exs. K, L.

11

that customers continued to click it, see their balances move, receive email confirmations and cease accruing interest. If BlockFi had truly intended that all inter-account transfers were to be halted, it could have pushed out an email or in-app notice to customers, saying plainly that *transfers* (and not just withdrawals) were paused. It failed to do so.

20. More important, though, is the fact that regardless of BlockFi's right (or not) pause inter-account transfers without notice and regardless of the content of any notices that it did choose to provide, BlockFi simply ***didn't freeze transfers*** until days after the November 10 Tweet. BlockFi may have wanted or intended to freeze them (though that is far from clear), but it didn't do so. BlockFi had drafted its Terms of Service and built its platform so that customers could unilaterally transfer out of the BIA program at any time, instantly, by clicking a button. BlockFi cannot rewrite history and pretend that those exits from BIA did not occur.

**D.    Fairness and equity.**

21. The Debtors accuse the members of the Ad Hoc Committee of "ask[ing] the Court to impermissibly ***favor them*** ahead of those clients whose assets were actually contained in Client Wallet Accounts at the Platform Pause Time Stamp, merely because they pressed a button several times after the Platform Pause Time Stamp." Reply Brief ¶ 9.

22. Not so. The members of the Ad Hoc Committee are asking that similarly-situated customers be treated the same. There is no difference—legally, equitably or morally—between the customer who clicked Transfer to leave BIA and stopped accruing interest at 8:14 p.m. on November 10 and the one who clicked Transfer two minutes later at 8:16 p.m. There was no intervening bankruptcy filing. There was no notice to customers that inter-account transfers were paused. There was no disabling of the transfer functionality on the User Interface. Even the

12

Debtors' executive team was unclear at that point in internal communications as to what was being paused, other than external withdrawals.[21]

23. The Debtors further argue that they are literally unable to recognize the Ad Hoc Committee's transfers as valid, because "[t]he Debtors do not have the digital assets on hand in the Rehypothecated Wallets to true up the Custodial Omnibus Wallets to permit in-kind withdrawals if they were required to use a time stamp later than the Platform Pause Time Stamp." Reply Brief ¶ 34. This is a bizarre statement. The Ad Hoc Committee has not requested that the Debtors true up the Custodial Omnibus Wallets. Indeed, the parties expressly agreed that the question of how the deficiency in the Custodial Omnibus Wallets should be treated is <u>not</u> before the Court at this time. The question before the Court is whether the Ad Hoc Committee have the right, alongside all other Wallet Account Holders, to recover from whatever assets are in the Custodial Omnibus Wallets at this time.

24. It should be pointed out that having assets "in Wallet" or "in the Wallet Program" does not mean that a customer is guaranteed to be made whole for the amounts reflected in his Wallet Account. It just means that the customer has an undivided ownership interest in the assets held in the Custodial Omnibus Wallets, which everyone agrees do not belong to BlockFi. But those assets may or may not be enough to satisfy all Wallet entitlements in full, and that was true throughout the life of the Wallet program.

25. As noted above, there were shortfalls in the Custodial Omnibus Wallets on numerous occasions even after performance of the True-Up Process, some of them significant. If customers had sought to withdraw all of the assets reflected in their Wallet Accounts on a day

---

[21] Ironically, the Debtors *didn't* actually freeze withdrawals on November 10, 2022. Instead, over the five days following the November 10 Tweet, the debtors chose to manually process a significant number of withdrawal requests that had been pending when the freeze was announced. *See* Debtors' Statement of Financial Affairs.

13

with a multi-million dollar shortfall, there would have been (by definition) insufficient assets in the Custodial Omnibus Wallets to satisfy all withdrawal requests in full. If that happened, perhaps some of the customers would have gotten lucky, getting out early and leaving the deficiency to fall on other customers. Perhaps the Debtors would have transferred in more assets from Rehypothecated Wallets, reasoning that the assets "really" belonged to the Wallet Account holders.

26. If BlockFi had filed for bankruptcy on one of those shortfall days, it is most likely that Wallet Account holders would have shared pro rata in the assets available in the Custodial Omnibus Wallets. That was precisely what happened in the Celsius Network case. When Celsius filed for bankruptcy, it had a shortfall in its Custody wallets (the equivalent of BlockFi's Custodial Omnibus Wallets) of about 6% on an omnibus, net basis—and significantly more than that, in some cases, on a coin-by-coin basis. Accordingly, when some Custody account holders were authorized to withdraw their digital assets from Custody, they could only withdraw 94% because there simply weren't enough assets available to make everyone whole.[22]

27. That was not unjust or inequitable. It was the reality of bankruptcy, and it treated all similarly-situated customers of Celsius the same.

## CONCLUSION

For the foregoing reasons, the Ad Hoc Committee respectfully requests that the Court deny the Debtors' Motion.

---

[22] *In re Celsius Network LLC*, Case No. 22-10964-mg (Bankr. S.D.N.Y. Jan. 31, 2023) [Docket No. 1958] (explaining that the debtors were only authorized to distribute 94% of each eligible user's Custody assets).

| | |
|---|---|
| Dated: May 4, 2023 | Respectfully submitted,<br><br>**TROUTMAN PEPPER LLP**<br><br>s/ Deborah Kovsky-Apap<br>Deborah Kovsky-Apap (NJ Bar No. 030942003)<br>875 Third Avenue<br>New York, New York 10022<br>(212) 704-6000<br>deborah.kovsky@troutman.com<br><br>*Counsel for the Ad Hoc Committee of*<br>*Wallet Account Holders* |

#154559075 v1