**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al*., | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**STIPULATED FACTS**

**I.      Terms of Service; Other Documents Admitted By Stipulation.**

1.      A true and correct copy of the BlockFi General Terms of Service applicable at all relevant times was attached to the Cheela Declaration, Dkt. 822, as **Exhibit A**.[2]

2.      A true and correct copy of the BlockFi US Interest Account Terms of Service applicable at all relevant times was attached to the Cheela Declaration, Dkt. 822, as **Exhibit C**.[3]

3.      A true and correct copy of the BlockFi Non-US Interest Account Terms applicable at all relevant times was attached to the Cheela Declaration, Dkt. 822, as **Exhibit D**.[4]

4.      A true and correct copy of the BlockFi Wallet Terms of Service applicable at all relevant times was attached to the Cheela Declaration, Dkt. 822 as **Exhibit B**.[5]

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[2]   BlockFi General Terms of Service, https://www.blockfi.com/terms. The Amended Declaration of Amit Cheela appears on the Docket as Docket No. 822 (the "Amended Cheela Declaration").  The parties agree that the Amended Cheela Declaration is admitted into evidence along with these Stipulated Facts and the Exhibits attached both to the Amended Cheela Declaration and these Stipulated Facts.

[3]   BlockFi BIA US Terms of Service, https://www.blockfi.com/interest-account-terms-existing-us.

[4]   BlockFi BIA Non-US Terms of Service, https://www.blockfi.com/interest-account-terms.

[5]   BlockFi Wallet Terms of Service, https://blockfi.com/wallet-terms.

1

5.      A true and correct copy of the BlockFi Trading Terms of Service applicable at all relevant times was attached to the Cheela Declaration, Dkt. 822, as **Exhibit E.**[6]

6.      A true and correct copy of the BlockFi Private Client Terms of Services applicable at all relevant times was attached to the Cheela Declaration, Dkt. 822, as **Exhibit F**.[7]

7.      A true and correct copy of the BlockFi ACH Terms of Service applicable at all relevant times was attached to the Cheela Declaration, Dkt. 822, as **Exhibit G**.

8.      The BlockFi Terms of Service do not require BlockFi customers to follow BlockFi on Twitter, Reddit, both, or neither.

9.      A true and correct copy of the Crypto Interest Rates applicable in November 2022 is attached hereto as **Exhibit H**.

10.      A true and correct copy of the settlement between BlockFi and the Securities and Exchange Commission ("SEC") is attached hereto as **Exhibit I** (the "SEC Settlement").

11.      On November 8, 2022, at 12:15 p.m. (prevailing Eastern Time) a Tweet was issued from the Twitter account with the handle "@FounderFlori."  A true and correct copy of that Tweet is attached as **Exhibit J**.

12.      On November 10, 2022, at 9:00 a.m. (prevailing Eastern Time), BlockFi published a statement in a Tweet from the handle @BlockFi.  A true and correct copy of the statement is attached hereto as **Exhibit K**.

13.      On November 10, 2022, at 9:30 a.m. (prevailing Eastern Time), the Board of Directors of BlockFi Inc. met for a special meeting.  A true and correct copy of the minutes of the board meeting is attached hereto as **Exhibit L**.

---

[6]      BlockFi Trading Terms of Service, https://blockfi.com/trading-terms.

[7]      BlockFi Private Client Terms of Service, https://blockfi.com/private-client-terms.

14.     On November 10, 2022, at 3:45 p.m. (prevailing Eastern Time), the Board of Directors of BlockFi Inc. met for a special meeting.  A true and correct copy of the minutes of the board meeting is attached hereto as **Exhibit M**.

15.     On November 10, 2022, at 8:09 p.m. (prevailing Eastern Time), Flori Marquez, BlockFi's chief operating officer, made an internal statement to BlockFi's employees via Slack. A true and correct copy of the Slack message is attached hereto as **Exhibit N**.

16.     On November 10, 2022 at 8:11 p.m. (prevailing Eastern Time), Ms. Marquez transmitted a company-wide email to BlockFi's employees (as defined below).  A true and correct copy of the email is attached hereto as **Exhibit O**.

17.     November 10, 2022, at 8:16 p.m. (prevailing Eastern Time), BlockFi made statements via Twitter and Reddit.  A true and correct copy of the Tweet is attached hereto as **Exhibit P** and a true and correct copy of the Reddit announcement is attached hereto as **Exhibit Q**.

18.     On November 10, 2022, at 8:16 p.m. (prevailing Eastern Time), the Twitter accounts with the handles "@BlockFiZac" and "@FounderFlori" retweeted the Debtors' statement made via Twitter on November 10, 2022 at 8:16 p.m. (prevailing Eastern Time), a true and correct copy of which is attached hereto as **Exhibit R**.

19.     On November 11, 2022, at 12:14 p.m. (prevailing Eastern Time), the Debtors posted an in-app, "dismissible," pop-up message viewable by all of their customers on iOS and Android, a true and correct copy of which is attached hereto as **Exhibit S**.

20.     On November 11, 2022, at 12:17 p.m. (prevailing Eastern Time), the Debtors published an official update on their website, a true and correct copy of which is attached hereto as **Exhibit T**.

21.     On November 11, 2022, at 12:17 p.m. (prevailing Eastern Time), the Debtors transmitted an email to all customers, a true and correct copy of which is attached hereto as **Exhibit U**.

22.     On November 14, 2022, at 12:44 p.m. (prevailing Eastern Time), BlockFi made a statement via Twitter using the handle @BlockFi, a true and correct copy of which is attached hereto as **Exhibit V**.

23.      On November 23, 2022, BlockFi posted a statement on its website frequently asked questions page, a true and correct copy of which is attached hereto as **Exhibit W**.

**II.     BlockFi Interest.**

24.     The BlockFi Interest Account ("BIA") product, referred to in the BlockFi Interest Account Terms of Service as the "Crypto Interest Account" is a crypto repository account that allows customers to earn interest in the form of digital assets on the eligible, supported digital assets deposited or transferred into BIA.

25.     The BIA product is administered by BlockFi Inc. for BlockFi's U.S. customers or BlockFi International Ltd. for BlockFi's non-U.S. customers.

26.     BlockFi published interest rates on its website at https://blockfi.com/rates.

27.     BlockFi used the daily balance method to calculate interest on customers' BIA accounts, applying a daily periodic rate to the specified principal in the accounts each day.

28.     As set forth in the BlockFi BIA US Terms of Service and the BlockFi BIA Non-US Terms of Service, BlockFi has the contractual right to redeploy digital assets transferred to a BIA account for its revenue-generating activities.

29.     On February 14, 2022, BlockFi Lending LLC entered into the SEC Settlement.

30.    Pursuant to the SEC Settlement, BlockFi undertook to cease offering BIAs to new customers in the U.S. and cease accepting further investments or digital assets in BIAs by current U.S. customers.

31.    On February 14, 2022, BlockFi stated on its website that "existing U.S. BlockFi Interest Account (BIA) customers will maintain their accounts and receive interest as they always have, but cannot add new assets to their accounts as of today, February 14, 2022.  Further, U.S. persons will not be able to open new BIAs. . . . BIAs of BlockFi clients outside of the U.S. are not subject to today's resolution."[8]

32.    In February 2022, BIAs for non-U.S. customers were moved from BlockFi Lending LLC to BlockFi International Ltd., and, in April 2022, BIAs of U.S. customers were moved from BlockFi Lending LLC to BlockFi Inc.

### III.    BlockFi Private Client.

33.    In addition to BIAs, which generally have standardized terms applicable to all holders, BlockFi provides an individually negotiated interest-bearing borrowing product to eligible customers as part of its BlockFi Private Client suite of products ("BPC").  BPC loan agreements are with (and administered by) either BlockFi Lending LLC (U.S. customers) or BlockFi International (non-U.S. customers).

34.    The BPC product suite permits customers to lend digital assets to BlockFi on individually negotiated terms, in addition to individually negotiated terms for other products and services.  BPC loan interest is paid in the form of digital assets at a negotiated rate.

---

[8]    BlockFi Enters Landmark Resolution with Federal and State Regulators Providing Clarity on Pathway for Crypto Interest Securities, BlockFi Update (Feb. 14, 2022), https://blockfi.com/resolution-announcement.

35.     A BPC loan may be structured as an "open" term (i.e., the BPC customer may request that BlockFi repay the loan at any time) or a "fixed" term (i.e., the loan has a negotiated maturity date).

36.     BlockFi has the right to redeploy digital assets borrowed under a BPC loan for its revenue-generating activities.

37.     Deferred 1031 LLC is a U.S. customer and has a BPC account with BlockFi Lending LLC.

## IV.     BlockFi Wallet.

38.     BlockFi Trading LLC provides wallet accounts for their U.S. customers and BlockFi International Ltd. provides wallet accounts for non-U.S. Customers (the "Customer Wallet Accounts").  The Customer Wallet Accounts are non-interest bearing.

39.     BlockFi Wallet LLC has a wallet account with Fireblocks (the "WLLC FBO Customers of Trading Account").  BlockFi Wallet LLC hosts and maintains pooled wallets for U.S. customers through the WLLC FBO Customers of Trading Account "for the benefit of" the customers of BlockFi Trading LLC (the "Wallet LLC Wallets").

40.     BlockFi Trading LLC has a wallet account with BitGo (the "BitGo Account").  BlockFi Trading LLC hosts and maintains pooled wallets for the benefit of U.S. customers of BlockFi Trading LLC through the BitGo Account (the "BitGo Custodial Wallets").  Non-U.S. customers also use BitGo as the sole cryptocurrency onramp and offramp to and from BlockFi; however, the digital assets in BitGo are all considered to be part of the U.S. customer Custodial Omnibus Wallet assets in the True-Up Process, and non-U.S. customer liabilities are reconciled through the True-Up Process.  Therefore, coins for non-U.S. clients are handled at the omnibus-level reconciliation.

41.     BlockFi International Ltd. has an account with Fireblocks (the "International Fireblocks Account").  BlockFi International Ltd. has a wallet subaccount of the International Fireblocks Account (the "International Vault Account").  BlockFi International Ltd. hosts and maintains pooled wallets for the benefit of non-U.S. customers of BlockFi International Ltd. through the International Vault Account (the "International Vault Wallets" and together with Wallet LLC Custodial Wallets and the BitGo Custodial Wallets, the "Custodial Omnibus Wallets").  The digital assets held in the Custodial Omnibus Wallets are not rehypothecated for BlockFi's lending activities.[9]

42.     The BlockFi Wallet Terms of Service, for both U.S. and non-U.S. customers, provide that, among other things, "title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi."[10]

43.     No specific digital asset in the Custodial Omnibus Wallets belongs to any particular customer, but the digital assets that are present in the Custodial Omnibus Wallets are digital assets placed there by BlockFi following initial deposits or True-Ups pursuant to transactions requested prior to November 10, 2022, at 8:15 (Eastern Time).

44.     BlockFi Inc., BlockFi Lending LLC, and BlockFi International Ltd. each separately host and maintain omnibus non-custodial wallets through Fireblocks or other exchanges and custodians for BlockFi's other product offerings, BPC (open and fixed loans) and BIA (the "Rehypothecateable Wallets").  The digital assets in the Rehypothecateable Wallets are free to be pledged, repledged, hypothecated, rehypothecated, sold, lent, or otherwise transferred,

---

[9]     BlockFi Wallet Terms of Service § F.

[10]    BlockFi Wallet Terms of Service § F.

invested, or used.[11]  There is no commingling of digital assets held in the Custodial Omnibus Wallets with the Rehypothecateable Wallets.

45.    Every customer has a unique BitGo Custodial Wallet address to facilitate BlockFi's receipt of digital assets if such customer transmitted digital assets via blockchain.  Other than the foregoing, BlockFi does not maintain a dedicated wallet with a distinct wallet address for each customer.  Instead, all customers' digital assets are commingled in omnibus wallets for each type of coin maintained by BlockFi Trading LLC, BlockFi Wallet LLC FBO BlockFi Trading LLC, or BlockFi International Ltd., as applicable for the BlockFi Wallet product.  For example, all U.S. customers' BTC in the BlockFi Wallet product are held in a commingled omnibus wallet for BTC with BlockFi Wallet LLC or BlockFi Trading LLC, and all non-U.S. customers' BTC is the BlockFi Wallet product are held in a commingled omnibus wallet for BTC with BlockFi International Ltd.

46.    The digital assets in the Custodial Omnibus Wallets today reflect effectuated transactions that were initiated by clients prior to November 10, 2022 at 8:15 P.M. (Eastern Time). Such assets belong to the customers and do not belong to and are not assets of BlockFi.

**V.    Deposits into Wallet.**

47.    When a customer deposits digital assets into their Customer Wallet Account from an external source (e.g., an external wallet), such digital assets are received by the BitGo Custodial Wallets maintained by BlockFi Trading LLC.

---

[11]    BlockFi Private Client Terms of Service § G.1; BlockFi BIA Non-US Terms of Service § G.1; BlockFi BIA US Terms of Service § E.1.

48.     When a customer successfully sends a deposit of digital assets onto BlockFi's platform from an external source (e.g., an external wallet), such deposit is first cleared,[12] and when cleared, is instantaneously recorded in the Company-Facing Interface (as defined below) as a deposit received and is also immediately displayed on the User Interface (as defined below) as being held in the applicable Customer Wallet Account.

49.     From the perspective of the blockchain, the digital assets move from the customers' external wallet to the BitGo Custodial Wallets, where such digital assets can remain indefinitely or be swept to the Wallet LLC Wallets.

**VI.     Transfers and Withdrawals.**

50.     Following the launch of BlockFi's Wallet product, customers could no longer withdraw eligible digital assets directly from BIA to an external wallet.  Instead, as set forth in the BlockFi US BIA Terms of Service and BlockFi Non-US BIA Terms of Service, digital assets had to first be transferred from BIAs to Customer Wallet Accounts.

51.     In order for a customer to initiate a withdrawal of digital assets from BIA to an external destination (including external wallets), a customer must first click the button labeled "Transfer" in their BIA account on the User Interface and, if the customer is a US customer, subsequently click buttons labeled "Continue with Transfer" and "Confirm Transfer."[13]  The completion of these steps by the customer creates book entries in BlockFi's STORM system that a customer's BIA balance is reduced and Wallet balance is increased, but no assets are actually

---

[12]   https://help.blockfi.com/hc/en-us/articles/4416034844180-How-long-do-transactions-to-and-from-BlockFi-take-to-clear-

[13]   Certain BPC customers may have received white glove service from time to time whereby BlockFi employees effectuated moves from such BPC customers' BPC accounts to the applicable Customer Wallet Account and thereafter facilitated a subsequent withdrawal without such BPC customers first needing to click the requisite buttons on the User Interface, but the BlockFi employees took all of the same steps as they would have if the BPC customer had clicked the requisite buttons on the User Interface.

moved from one location to another unless and until BlockFi completes the "Batching" or "True-Up" Processes described in the Cheela Declaration.

52.    As set forth in the BlockFi BIA US Terms of Service and BlockFi BIA Non-US Terms of service, limits on transfers of eligible digital assets from BIA to Customer Wallet Accounts based on frequency and amount may apply from time-to-time and are described in on the User Interface and on the Debtors' website at https://blockfi.com/fees.[14]

53.    If a customer was a U.S. customer, then in order to initiate a transfer of digital assets out of their BIA, the customer first had to: (i) click the button labeled "Transfer," (ii) view a pop-up warning advising, "Are You Sure? Once you transfer assets from your Interest Account, you won't be able to transfer them back in," and click "Continue With Transfer"; and (iii) on a second page, check a box acknowledging that, "I understand this transfer cannot be reversed and I will lose the possibility to earn interest on these assets" and click "Confirm Transfer."  The completion of these steps by the customer would create a book entry in BlockFi's STORM system that a customer's BIA balance is reduced and Wallet balance is increased, but no assets were actually moved from one location to another unless and until BlockFi completed the "Batching" or "True-Up" Processes described in the Cheela Declaration.

54.    When a customer performed the steps reflected in Paragraph 51, interest stopped accruing immediately in STORM as the interest accrual calculation was connected to the balances displayed on the User Interface.[15]

---

[14]    BlockFi BIA US Terms of Service § C.2; BlockFi BIA Non-US Terms of Service § E.2.

[15]    When a user reviews his or her interest balance on the User Interface, the following always appears as an automatic pop-up:  "Accrued interest shown is an estimate based on month to date activity.  Actual payments may vary based on Flex preferences, activity in the account, interest rates, and compliance with BlockFi's Terms and Conditions.  Interest accrued may reset prior to actual payment on the first business day of the month.  USD value is for information purposes only.  Interest payments are made in cryptocurrency, not USD."

55.    When a customer performed the steps reflected in Paragraph 51, digital assets would immediately be reflected in the customer's Customer Wallet Account on the User Interface. The customer could immediately request a trade of those digital assets, and book entries reflecting such trades would be recorded on BlockFi's Company Interface and the User Interface, with BlockFi assuming the hedging risk as was standard for all trading on BlockFi.  No digital assets moved, however, until BlockFi completed the True-Up Process or the Batching Process, whichever came first.

56.    When a customer performed the steps reflected in Paragraph 51, the customer could immediately request a withdrawal from their Customer Wallet Account in the form of digital assets, wire or ACH transfer.[16]  Such withdrawals were processed and effectuated following the Batching Process or True-Up Processes described in the Cheela Declaration.

57.    As set forth in the BlockFi Wallet Terms of Service, the off-platform withdrawal process can take up to seven days for the Debtors to process after a customer submits their withdrawal request.  BlockFi usually processed off-platform withdrawal requests in fewer than seven days.  For example, the Ad Hoc Committee has identified a customer who performed the steps reflected in Paragraph 51 and, because BlockFi performed the Batching Process in the interim, said customer was able to request and receive a cash withdrawal via wire transfer from Wallet to an external account on the same day.

58.    The off-platform withdrawal process is a partially manual process undertaken by members of the Debtors' Financial Operations team, summarized as follows:

    1.    The Debtors' Financial Operations team would "batch" request data on the Company-Facing Interface and then send such "batches" of withdrawal

---

[16]    Customers can request to transfer the notional value of stablecoin reflected in their Customer Wallet Account, which can be traded for U.S. Dollar for purposes of withdrawal, subject to the ordinary withdrawal fees under the BlockFi Wallet Terms of Service.

request data to the Debtors' Fraud and Security team.  The Debtors' Fraud and Security team would run automated fraud checks.  The automated fraud check system would identify and flag certain off-platform withdrawal requests, which the Debtors' Fraud and Security team would manually review.  The process described in this paragraph can take several days to complete;

2.     Each business day, the Debtors' Financial Operations team would review the withdrawal request data that had been reviewed by the Debtors' Fraud and Security team and had cleared fraud checks and hold time;

3.     The Debtors' Financial Operations team would again "batch" such withdrawal requests (i.e., organize the requests for processing) according to the time of request and whether such withdrawal request was for digital currency, ACH, or wire;

4.     Two times each business day, the Debtors' Financial Operations team would upload and submit the valid withdrawal request data to BitGo (in the instance of on-chain digital currency withdrawal requests), and Silvergate (in the instance of ACH or wire fiat withdrawal requests);

5.     Provided there is sufficient digital assets and fiat to fulfill the withdrawal requests, BitGo would then effectuate the withdrawal requests by facilitating the movement of digital assets from the BitGo Custodial Wallet to the applicable customers and Silvergate would facilitate fiat wires and ACH requests.

## VII.   The User Interface and the Company-Facing Interface.

59.     The "User Interface" is the customer-facing, web-based or in-app display that a customer sees, experiences, and interacts with when logging into their BlockFi account from a computer or mobile device.

60.     The User Interface allows customers to, among other things, view their account balances (e.g., the balance in their Customer Wallet Account) and use the Debtors' various product offerings.

61.     The "Company-Facing Interface" (sometimes referred to as "Storm" or the "Product UI/UX System") is the company-facing aspect of the User Interface that BlockFi's

employees see, experience, and interact with to collect and review, and subsequently manually action, data.

62.     When a customer performs the steps reflected in Paragraph 51, book entries are created in the Debtors' Company-Facing Interface, but no assets are moved until a combination of employees in the Debtors' Treasury team (approx. 4 individuals) and the Debtors' Financial Operations team (approx. 5 individuals) complete the Batching and/or True-Up Process described in the Cheela Declaration.

63.     When a customer performs the steps reflected in Paragraph 51, the User Interface automatically sends a fully automated email communication to the customer.  The email states, in part, "Your assets have been successfully transferred from your BlockFi Interest Account into your BlockFi Wallet. Please see the transaction details below."

64.     The Batching and True-Up Processes are necessary to ensure that there are adequate digital assets available in BlockFi's omnibus accounts to effectuate withdrawals.

**VIII.   The True-Up Process.**

65.     The True-Up process occurred once each business day, generally between 9:00 a.m. and 11:00 a.m. (prevailing Eastern time).

66.     The following are summary descriptions of the steps of the "True-Up Process":

1.      The customer performs the steps reflected in Paragraph 51.

2.      Data regarding the steps taken by the customer reflected in Paragraph 51 is automatically collected in the Company-Facing Interface.

3.      The data in the Company-Facing Interface is reviewed by BlockFi's Treasury team on the next business day.  The Treasury team also reviews current Custodial Omnibus Wallet balances to calculate the digital assets that are needed to reconcile the Custodial Omnibus Wallets so that the balances match the data reflected in the Company-Facing Interface (*i.e.*, the required net inflow or outflow of digital assets from the Custodial Omnibus Wallets and Rehypothecateable Wallets so that the omnibus balances match the Company-Facing Interface from the prior business day), and then take

requisite steps to "true-up" the Custodial Omnibus Wallets so that the two systems match one another.

4. Once each business day, by reference to the prior day's closing balances in Custodial Omnibus Wallets, members of BlockFi's Treasury team reconciled customers' actions from the prior business day as described in Paragraph 51 with the Custodial Omnibus Wallets.

   a. The first step to reconciling the Company-Facing Interface data with BlockFi's financial ledger (the term BlockFi uses to refer to the Omnibus Custodial Wallet balance information maintained on Google Sheets and that is ultimately imported to and reflected on BlockFi's books and records at month's end) was to calculate the quantum of digital assets that needed to be transferred to or from the Custodial Omnibus Wallets and the Rehypothecateable Wallets. To do this, the Treasury team inputted a download of data from the Company-Facing Interface into a spreadsheet calculator to determine the amount of digital assets (the "True-Up Amounts") that had to be transferred in or out of the Custodial Omnibus Wallets to match the data collected in the Company-Facing Interface the prior business day.

   b. Following the Treasury team's review and calculation of the True-Up Amounts, BlockFi's Financial Operations team "trued up" the Custodial Omnibus Wallets by manually transferring digital assets into or out of the Custodial Omnibus Wallets from the Rehypothecateable Wallets.

5. BlockFi typically aimed to transfer additional digital assets from Rehypothecateable Wallets via internal omnibus account transfers to applicable Custodial Omnibus Wallets to provide for a 1–5% buffer in the Custodial Omnibus Wallets in an effort to ensure that the Custodial Omnibus Wallets were always fully reserved. This buffer created an intercompany loan payable from BlockFi Wallet LLC to the relevant corresponding legal entity from which the digital assets were borrowed.

6. If the True-Up Process showed that there were excess digital assets in the Custodial Omnibus Wallets of greater than $10,000 USD (on a coin-by-coin basis), the excess assets may be released to the Rehypothecateable Wallets.

67. On five occasions during the 90 days prior to November 10, 2022 at 8:15 p.m. (prevailing Eastern Time), the Custodial Omnibus Wallets held fewer digital assets than the total amount reflected in the Customer Wallet Accounts on an omnibus basis following the completion of that day's True-Up Process:

     a. On Friday, September 9, 2022, the Custodial Omnibus Wallets for U.S. customers had a shortfall with a total USD value of approximately $1.8 million. Because the True-Up Process did not occur on weekends, the shortfall continued through Saturday, September 10, and Sunday, September 11, 2022.

     b. On Monday, September 12, 2022, the Custodial Omnibus Wallets for U.S. customers had a shortfall with a total USD value of approximately $3.6 million.

     c. On Monday, November 7, 2022, the Custodial Omnibus Wallets for non-U.S. customers had a shortfall with a total USD value of approximately $1.5 million.

     d. On Tuesday, November 8, 2022, the Custodial Omnibus Wallets for non-U.S. customers had a shortfall with a total USD value of approximately $822,000.

     e. On Wednesday, November 9, 2022, the Custodial Omnibus Wallets for non-U.S. customers had a shortfall with a total USD value of approximately $1.9 million.

## IX.    Events.

68. BlockFi engaged in loans related to digital assets.

69. One of BlockFi's borrowers was Alameda Research Ltd.

70. As of November 8, 2022, BlockFi had outstanding loans to Alameda Research totaling over $600 million (the "Alameda Loans"). The Alameda Loans were overcollateralized at inception, but some of the collateral was custodied on the FTX platform.

71. Separately, as of July 1, 2022, BlockFi had entered into a transaction with West Realm Shires, Inc. (d/b/a FTX US) under which, among other things, BlockFi had access to up to $400 million in capital.

72. On November 8, 2022, BlockFi requested $125 million of the $400 million in liquidity, which should have been available under its transaction with FTX.US, which FTX.US did not provide. That same day, FTX.COM suspended withdrawals for its international accounts, beginning a period of uncertainty in the cryptocurrency markets.

73. On November 8, 2022, BlockFi also demanded that Alameda Research post additional collateral for its loans, and it did so.

74.     On November 10, 2022, BlockFi tried and failed to access its collateral from ED&F Man, Emergent's broker and the custodial entity of BlockFi's collateral.  Shortly thereafter, Alameda missed a payment on its repayment plan with BlockFi.

75.     According to the minutes of BlockFi's Special Meeting of the Board of Directors began at 3:45 pm (prevailing Eastern Time) on November 10, 2022, as reflected in the minutes attached as **Exhibit M**.

76.     Beginning at 8:15 p.m. (prevailing Eastern Time) on November 10, 2022 (a) BlockFi immediately ceased processing any transactions resulting from any activity described in Paragraph 51 herein that began after 8:15 p.m. (prevailing Eastern Time) on November 10, 2022; and (b) the Debtors' Treasury team discontinued the Batching and daily True-Up Process with respect to any activity on the BlockFi platform that occurred after 8:15 p.m. (prevailing Eastern Time) on or after November 10, 2022.

77.     Beginning at 8:15 p.m. (prevailing Eastern Time) on November 10, 2022, BlockFi stopped moving digital assets from the Rehypothecateable Accounts into Custodial Omnibus Wallets with respect to any activity on the BlockFi platform that was initiated after November 10, 2022 at 8:15 p.m. (prevailing Eastern Time), including the types of actions described in Paragraph 51.

78.     For the avoidance of doubt, BlockFi did complete a True-Up Process with respect to all actions reflected in Paragraph 51 that were completed before 8:15 p.m. (prevailing Eastern time) on November 10, 2022.

79.     No True-Up Process or Batching Process was performed by the Debtors after November 10, 2022 except in connection with (i) withdrawals or trades that were requested, but not processed, prior to November 10, 2022 at 8:15 p.m. (prevailing Eastern Time); (ii) the

Department of Justice (the "DOJ") seizure (the "DOJ Seizure"), [17] and (iii) the Debtors' movement of digital assets from Gemini's platform to protect customers' digital assets in response to reports that Gemini would be imminently filing for bankruptcy (the "Gemini Transition").

80.      The withdrawals described in Paragraph 79(i) were processed manually.

81.      On November 11, 2022, the Debtors: (a) at 12:14 p.m. (prevailing Eastern Time), posted a pop-up message viewable by all of their customers on iOS and Android, a true and correct copy of which is attached hereto as **Exhibit S** (b) at 12:17 p.m. (prevailing Eastern Time), published an official update on their website, a true and correct copy of which is attached hereto as **Exhibit T**; and at 12:17 p.m. (prevailing Eastern Time), the Debtors transmitted an email to all customers, a true and correct copy of which is attached hereto as **Exhibit U**.

82.      On November 15, 2022, at approximately 6:00 p.m. (prevailing Eastern Time), the Debtors introduced a pop-up alert message on the iOS mobile version of the User Interface (the "iOS Transfer Pause Notification") stating: "Transfers are currently paused." The iOS Transfer Pause Notification was rolled out over a period of twenty-four hours and was completed on November 16, 2022.

83.      On November 15, 2022, at 6:12 p.m. (prevailing Eastern Time), the Debtors introduced a pop-up alert message on the web-based version of the User Interface (the "Web Transfer Pause Notification") stating: "Transfers are currently paused."

84.      On November 17, 2022, at 9:29 a.m. (prevailing Eastern Time), the Debtors introduced a pop-up alert message on the Android mobile version of the User Interface

---

[17]   The DOJ Seizure refers to the Debtors' compliance with multiple DOJ seizure warrants that were served on the Debtors on November 16, 2022, prior to the Petition Date.  To comply with the DOJ Seizure warrants, on February 10 and 13, 2023, after advising parties and the Bankruptcy Court in a public hearing, the Debtors transferred to the U.S. government the wallet balances connected to the customers that were implicated in the DOJ Seizure warrants.

(the "Android Transfer Pause Notification") stating: "Transfers are currently paused."   The Android Transfer Pause Notification was rolled out over a period of eight days and was completed on November 25, 2022.

85.     From the time of the Initial Notice until the rollout of the Web Transfer Pause Notification (the "Web Interim Period"), a customer could click on the buttons described in Paragraph 51 on the web-based version of the User Interface.

86.     From the time of the Initial Notice until the rollout of iOS Transfer Pause Notification to a particular customer using BlockFi's iOS mobile platform (the "iOS Interim Period"), a customer could click on the buttons described in Paragraph 51 on the iOS-based version of the User Interface.

87.     From the time of the Initial Notice until the rollout of the Android Transfer Pause Notification to a particular customer using BlockFi's Android mobile platform (the "Android Interim Period" and, together with the Web Active Transfer Period and iOS Active Transfer Period, the "Interim Period"), a customer could click on the buttons described in Paragraph 51 on the Android-based version of the User Interface.

88.     When a customer initiated the tasks described in Paragraph 51 during the Interim Period, (i) a book entry was created reducing the customer's BIA balance and increasing the customer's Wallet balance; (ii) the transaction history that the customer could download from the BlockFi platform as a .csv file reflected a transfer from BIA to Wallet, and (iii) the customer received a fully automated email from BlockFi stating, in part, "Your assets have been successfully transferred from your BlockFi Interest Account into your BlockFi Wallet. Please see the transaction details below."

89.    BIA assets continued to accrue prepetition interest between November 10, 2022 and November 28, 2022.

Dated: May 7, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
300 N. LaSalle Drive
Chicago, IL 60654
(312) 862-2000
mslade@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

/s/ Deborah Kovsky-Apap

**Troutman Pepper LLP**
Deborah Kovsky-Apap (NJ Bar No. 030942003)
875 Third Avenue
New York, New York 10022
(212) 704-6000
deborah.kovsky@troutman.com

*Counsel for the Ad Hoc Committee of*
*Wallet Account Holders*

**Exhibit H**

On November 28, 2022, BlockFi filed voluntary cases under Chapter 11 of the U.S. Bankruptcy Code. Additional information about our filing can be found on our blog here.

 

# Crypto Interest Rates

Check here to find the latest rates for interest-earning accounts and loans. Please note that crypto interest rates, withdrawal limits, and fees are subject to change.

## BlockFi Interest Account (BIA)

BlockFi Interest Account clients can earn interest in crypto. Paid out at the beginning of every month, the crypto interest earned by account holders compounds, increasing the Annual Percentage Yield (APY)* for our clients. BlockFi uses a tiered Interest Structure. Click here to learn how our tiers work. Rates are effective August 1, 2022.

**BlockFi Interest Accounts (BIAs) have not been registered under the Securities Act of 1933 and may not be offered or sold in the  United States, to U.S. persons, for the account or benefit of a U.S. person or in any jurisdiction in which such offer would be prohibited.**

| CURRENCY | AMOUNT | APY* |
|---|---|---|
| BTC (Tier 1) | 0 - 0.1 BTC | 3.50% |
| BTC (Tier 2) | 0.1 - 0.35 BTC | 2.00% |
| BTC (Tier 3) | >0.35 BTC | 2.00% |
| ETH (Tier 1) | 0 - 1.5 ETH | 3.50% |

| CURRENCY | AMOUNT | APY* |
|---|---|---|
| ETH (Tier 2) | 1.5 - 5 ETH | 2.00% |
| ETH (Tier 3) | >5 ETH | 2.00% |
| DOGE | No Limit | 2.00% |
| LTC (Tier 1) | 0 - 20 LTC | 2.00% |
| LTC (Tier 2) | 20 - 100 LTC | 1.00% |
| LTC (Tier 3) | >100 LTC | 0.10% |
| UNI (Tier 1) | 0 - 100 UNI | 1.00% |
| UNI (Tier 2) | 100 - 500 UNI | 0.20% |
| UNI (Tier 3) | >500 UNI | 0.10% |
| LINK (Tier 1) | 0 - 100 LINK | 1.00% |
| LINK (Tier 2) | 100 - 500 LINK | 0.20% |
| LINK (Tier 3) | >500 LINK | 0.10% |
| ALGO | No Limit | 2.50% |
| BCH | No Limit | 3.00% |
| BAT (Tier 1) | 0 - 4000 BAT | 1.00% |
| BAT (Tier 2) | 4000 - 20000 BAT | 0.20% |
| BAT (Tier 3) | >20000 BAT | 0.10% |
| PAXG (Tier 1) | 0 - 1.5 PAXG | 1.00% |
| PAXG (Tier 2) | 1.5 - 5 PAXG | 0.20% |

| CURRENCY | AMOUNT | APY* |
|---|---|---|
| | | |
| PAXG (Tier 3) | >5 PAXG | 0.10% |
| USDC (Tier 1) | 0 - 20000 USDC | 7.50% |
| USDC (Tier 2) | 20000 - 2000000 USDC | 6.00% |
| USDC (Tier 3) | >2000000 USDC | 6.00% |
| BUSD (Tier 1) | 0 - 20000 BUSD | 7.50% |
| BUSD (Tier 2) | 20000 - 2000000 BUSD | 6.00% |
| BUSD (Tier 3) | >2000000 BUSD | 6.00% |
| DAI (Tier 1) | 0 - 20000 DAI | 6.00% |
| DAI (Tier 2) | 20000 - 2000000 DAI | 4.00% |
| DAI (Tier 3) | >2000000 DAI | 3.50% |
| PAX (Tier 1) | 0 - 20000 PAX | 7.50% |
| PAX (Tier 2) | 20000 - 2000000 PAX | 6.00% |
| PAX (Tier 3) | >2000000 PAX | 6.00% |
| GUSD (Tier 1) | 0 - 20000 GUSD | 7.50% |
| GUSD (Tier 2) | 20000 - 2000000 GUSD | 6.00% |
| GUSD (Tier 3) | >2000000 GUSD | 6.00% |

* APYs reflect effective yield based on monthly compounding. Actual yield will vary based on account activity and compliance with BlockFi's terms and conditions. Rates are largely dictated by market conditions, which are a key factor in a company's ability to provide its clients yield on their crypto assets. For more information, please see our Terms of Service. Rates are subject to change. BlockFi will

communicate any rate changes prior to these changes taking effect. Digital currency is not legal tender, is not backed by the government, and the BlockFi Interest Account (BIA) is not a bank account nor a brokerage account, and is not subject to FDIC or SIPC protections.

As of February 14, 2022, BlockFi Interest Accounts (BIAs) are no longer available to new clients who are "U.S. persons" or persons located in the United States and existing U.S. clients will be unable to transfer new assets to their BIAs.

Terms Apply

## Products ⌄

## Institutions ⌄

## Resources ⌄

## Company ⌄

## Follow Us ⌄

 

Everything you need on-the-go

Download the BlockFi app



Log in

BlockFi Lending LLC NMLS ID#1737520 | NMLS Consumer Access
BlockFi Trading LLC NMLS ID#1873137 | NMLS Consumer Access

Privacy Policy | Legal | Licenses | Disclosures and Complaints | NMLS Consumer Access

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with BlockFi are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by BlockFi. Rates for BlockFi products are subject to change.

BlockFi Rewards Credit Card: For more information, please see BlockFi's Terms of Service. BlockFi is not a Bank. Cards are issued by Evolve Bank & Trust, Member FDIC, pursuant to a license from Visa® USA Inc. Rewards are not offered by Evolve Bank & Trust and are instead offered and managed by BlockFi.

BlockFi International Ltd. holds a Class F digital assets business license under the Digital Assets Business Act, 2018 (as amended) and is licensed by the Bermuda Monetary Authority to conduct the following digital assets business activities: (i) issuing, selling or redeeming virtual coins, tokens or any other form of digital assets (ii) operating as a digital asset exchange (iii) providing custodial wallet services (iv) operating as a digital asset derivative exchange provider and (v) operating as a digital assets services vendor.

See blockfi.com/terms for more information.

2022 © All Rights Reserved.

**Exhibit I**

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 11029 / February 14, 2022**

**INVESTMENT COMPANY ACT OF 1940**
**Release No. 34503 / February 14, 2022**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20758**

| | |
|---|---|
| In the Matter of<br><br>　　BLOCKFI LENDING LLC,<br><br>Respondent. | ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against BlockFi Lending LLC ("BlockFi" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-And-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      From March 4, 2019 to the present, BlockFi, a New Jersey-based financial services company and wholly owned subsidiary of BlockFi, Inc., has offered and sold BlockFi Interest Accounts ("BIAs") to investors, through which investors lend crypto assets to BlockFi in exchange for BlockFi's promise to provide a variable monthly interest payment.  BlockFi generated the interest paid out to BIA investors by deploying its assets in various ways, including loans of crypto assets made to institutional and corporate borrowers, lending U.S. dollars to retail investors, and by investing in equities and futures.  As of March 31, 2021, BlockFi and its affiliates held approximately $14.7 billion in BIA investor assets.  As of December 8, 2021, BlockFi and its affiliates held approximately $10.4 billion in BIA investor assets, and had approximately 572,160 BIA investors, including 391,105 investors in the United States.

2.      Based on the facts and circumstances set forth below, the BIAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny*,* and also because BlockFi offered and sold the BIAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), and its progeny, including the cases discussed by the Commission in its *Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017).  BlockFi promised BIA investors a variable interest rate, determined by BlockFi on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that BlockFi return their loaned assets at any time.  BlockFi thus borrowed the crypto assets in exchange for a promise to repay with interest.  Investors in the BIAs had a reasonable expectation of obtaining a future profit from BlockFi's efforts in managing the BIAs based on BlockFi's statements about how it would generate the yield to pay BIA investors interest.  Investors also had a reasonable expectation that BlockFi would use the invested crypto assets in BlockFi's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from BlockFi's efforts.  BlockFi offered and sold the BIAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to BIA investors, and promoted the BIAs as an investment.  BlockFi offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from registration; as a result, BlockFi violated Sections 5(a) and 5(c) of the Securities Act.

3.      BlockFi also made a materially false and misleading statement on its website from March 4, 2019 to August 31, 2021, concerning its collateral practices and, therefore, the risks associated with its lending activity.  As a result, and as discussed in more detail below, BlockFi violated Sections 17(a)(2) and 17(a)(3) of the Securities Act.

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

4.      In addition, from at least December 31, 2019 to at least September 30, 2021, BlockFi operated as an unregistered investment company because it is an issuer of securities engaged in the business of investing, reinvesting, owning, holding, or trading in securities and owning investment securities, as defined by Section 3(a)(2) of the Investment Company Act, having a value exceeding 40% of its total assets (exclusive of Government securities and cash items).  BlockFi violated Section 7(a) of the Investment Company Act by engaging in interstate commerce while failing to register as an investment company with the Commission.

## Respondent

5.      **BlockFi** is a Delaware limited liability company formed in 2018 and a wholly owned subsidiary of BlockFi Inc., with its principal place of business in Jersey City, New Jersey. On March 4, 2019, BlockFi began publicly offering and selling BIAs.

## Other Relevant Entities

6.      **BlockFi Inc.** is a Delaware corporation formed in 2017 with the same principal place of business as BlockFi**.**

7.      **BlockFi Trading LLC ("BlockFi Trading")** is Delaware limited liability company formed in May 2019 and a wholly owned subsidiary of BlockFi Inc., with the same principal place of business as BlockFi.

## Facts

### BlockFi Offered and Sold BIAs
### as Investment Opportunities

8.      On March 4, 2019, BlockFi publicly announced the launch of the BIA, through which investors could lend crypto assets to BlockFi and in exchange, receive interest, "paid monthly in cryptocurrency."  Interest began accruing the day after assets were transmitted to BlockFi and compounded monthly, with interest payments made to accounts associated with each BIA investor, in crypto assets, on or about the first business day of each month.

9.      BlockFi offered and sold BIAs to obtain crypto assets for the general use of its business, namely to use the assets in its lending and investment activities, which generated income both for BlockFi and to pay interest to BIA investors.  BlockFi pooled the loaned assets, and exercised full discretion over how much to hold, lend, and invest.  BlockFi had complete legal ownership and control over the loaned crypto assets, and advertised that it managed the risks involved.

10.      Under BlockFi's terms for the BIA, investors:

3

grant BlockFi the right, without further notice to [the investor], to hold the cryptocurrency held in [the] account in BlockFi's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

11.     At all relevant times, BlockFi represented that it earned interest on the assets that it borrowed from BIA investors by lending those crypto assets to institutional borrowers. Beginning in September 2020, BlockFi disclosed on its website that it also purchased "SEC-regulated equities and predominantly CFTC-regulated futures" using BIA assets.

12.     To begin investing in a BIA, an investor could transfer crypto assets to the digital wallet address assigned by BlockFi to the investor, or purchase crypto assets with fiat currency from BlockFi Trading for the purpose of investing in a BIA. BlockFi Trading accepted the crypto asset or fiat from the investor, and then transferred the asset or fiat to BlockFi. BlockFi did not hold private keys for the investors' wallet addresses; rather, investors' crypto assets were sent to BlockFi's wallet addresses at third-party custodians.



13.     BIA investors were permitted to withdraw the equivalent to the crypto assets they loaned to BlockFi at any time, with some limitations, and could borrow money in U.S. dollars against the amount of crypto assets deposited in BIAs.

14.     BlockFi adjusted the interest rates payable on BIAs for particular crypto assets periodically, and typically at the start of each month.  BlockFi set the rates based, in part, on "the yield that [BlockFi] can generate from lending," to institutional borrowers, and thus it was correlated with the efforts that BlockFi put in to generate that yield.  BlockFi periodically adjusted its interest rates payable on the BIAs in part after analysis of current yield on its investment and lending activity.  BIA investors could demand that BlockFi repay the loaned crypto assets at any time.

15.     BlockFi regularly touted the profits investors may earn by investing in a BIA. When announcing the BIA, BlockFi promoted the interest earned, promising "an industry-leading 6.2% [annual percentage yield]," compounded monthly.  BlockFi described it as "an easy way for crypto investors to earn bitcoin as they HODL."[2]

16.     Within the first few weeks of launching the BIA, BlockFi again touted investors' potential for profit.  On March 20, 2019, BlockFi announced that BIAs experienced significant growth, including from large firms who participated in BIAs "as a way to bolster their returns." BlockFi asserted that it "provide[d] the average crypto investor with the tools to build their wealth," and that it "look[ed] forward to giving even more investors a chance to earn a yield on their crypto."

17.     On April 1, 2019, BlockFi began to "tier" the interest rates that investors received, initially announcing that "BIA balances of up to and including 25 [Bitcoin] or 500 [Ether] (equivalent to roughly $100,000 and $70,000 respectively) will earn the 6.2% APY interest rate. All balances over that limit will earn a tiered rate of 2% interest."  Even when changing the interest rates customers receive, BlockFi touted the yields to investors.  On August 27, 2021, BlockFi stated that the adjustments to interest rates are done "with the goal of maintaining great rates for the maximum number of clients."

18.     On January 1, 2021, BlockFi advertised that it had "distributed more than $50 million in monthly interest payments to [its] clients."

19.     As of November 1, 2021, the interest rates BlockFi paid investors ranged from 0.1% to 9.5%, depending on the type of crypto asset and the size of the investment.  For example, investors could receive 9.5% in interest for up to 40,000 Tether ("USDT") and 8.5% for anything over 40,000 USDT, as well as 4.5% interest for up to 0.1 Bitcoin ("BTC"), 1% for 0.1 to 0.35 BTC, and 0.1% for anything over 0.35 BTC.

20.     BlockFi offered and sold the BIA securities to investors, including retail investors, through advertising and general solicitations on its website, www.blockfi.com.  BlockFi also promoted distribution of the BIA offering through its social media accounts, including YouTube, Twitter, and Facebook.  In addition, through its "Partner" program, an affiliate marketing program

---

[2]     "HODL" is a purposeful misspelling of "hold" and an acronym for "hold on for dear life," denoting buy-and-hold strategies in the context of crypto assets.

in which participants could "earn passive income by introducing your audience to financial tools for crypto investors," BlockFi extended its distribution of the BIA securities to retail investors through certain offers and promotions.

21.     BlockFi did not have a Securities Act registration statement filed or in effect with the Commission for the offer and sale of the BIAs, nor did the offer and sale of BIAs qualify for an exemption from registration under the Securities Act.

## BlockFi Misrepresented the Level of
## Risk in the BIA Investment Opportunity

22.     BlockFi made a material misrepresentation to BIA investors concerning the level of risk in its loan portfolio.  Beginning at the time of the BIA launch on March 4, 2019 and continuing to August 31, 2021, BlockFi made a statement in multiple website posts that its institutional loans were "typically" over-collateralized, when in fact, most institutional loans were not.  When BlockFi began offering the BIA investment, it intended to require over-collateralization on a majority of its loans to institutional investors, but it quickly became apparent that large institutional investors were frequently not willing to post large amounts of collateral to secure their loans.  Approximately 24% of institutional crypto asset loans made in 2019 were over-collateralized; in 2020 approximately 16% were over-collateralized; and in 2021 (through June 30, 2021) approximately 17% were over-collateralized.  As a result, BlockFi's statement materially overstated the degree to which it secured protection from defaults by institutional borrowers through collateral.  Through operational oversight, BlockFi's personnel failed to take steps to update the website statement to accurately reflect the fact that most institutional loans were not over-collateralized.

23.     Although BlockFi made other disclosures on its website regarding its risk management practices, because of BlockFi's misrepresentation and omission about the level of risk in its loan portfolio, BIA investors did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by its institutional borrowers, BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand.

## BlockFi Operated as an Unregistered Investment Company

24.     As the issuer of the BIA, BlockFi is an "issuer" for purposes of the Investment Company Act.

25.     After the launch of the BIA, BlockFi pooled the crypto assets it borrowed, and commingled and rehypothecated these crypto assets received from investors in the BIAs with BlockFi's other assets, including collateral received from institutional borrowers.  As BlockFi took ownership of the loaned crypto assets from investors in the BIAs, BlockFi used the commingled

assets to, among other things, make loans to institutional and retail borrowers, stake crypto assets, and purchase crypto asset trust shares and interests in private funds.

26.     From at least December 31, 2019 to at least September 30, 2021, BlockFi owned certain investment securities, as defined by Section 3(a)(2) of the Investment Company Act—such as loans of crypto assets and U.S. dollars to counter parties, investments in crypto asset trusts and funds, and intercompany receivables—exceeding 40% of the value of its total assets (exclusive of Government securities and cash items) on an unconsolidated basis.  For example, as of December 31, 2020, BlockFi held loans to counter parties valued at over $1.9 billion, investments in crypto asset trusts and funds valued at approximately $1.5 billion, and intercompany receivables valued at approximately $847 million, which together constituted well over 40% of its approximately $4.8 billion in total assets.

27.     Section 3(a)(1)(C) of the Investment Company Act defines "investment company" to mean any issuer that "is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."  Section 3(a)(2) of the Investment Company Act defines "investment securities" to include all securities except government securities, securities issued by employees' securities companies, and securities issued by majority-owned subsidiaries of the owner which are not investment companies and not relying on exceptions set forth in Sections 3(c)(1) or 3(c)(7) of the Investment Company Act.  Loans that BlockFi made to counter parties are considered investment securities under the Investment Company Act.  As an issuer holding over 40% of the value of its total assets in investment securities from at least December 31, 2019 to at least September 30, 2021, BlockFi met the definition of an investment company during this time period.

28.     Since at least December 31, 2019, BlockFi has engaged in interstate commerce by, among other things, making loans to institutional and retail investors, purchasing and selling other investment securities for its own account, and engaging in other business transactions in interstate commerce while an investment company within the meaning of Section 3(a)(1)(C) of the Investment Company Act.

29.     Although BlockFi met the definition of "investment company" from at least December 31, 2019 to at least September 30, 2021, it did not register with the Commission as an investment company, meet any statutory exemptions or exclusions from the definition of an investment company, or seek an order from the Commission declaring that it was primarily engaged in a business other than that of investing, reinvesting, owning, holding, or trading in securities, or exempting it from complying with any provisions of the Investment Company Act or the rules thereunder.  Although BlockFi has suggested that it was relying on the exclusion from the definition of "investment company" provided for "market intermediaries" by Section 3(c)(2) of the Investment Company Act during this period, it did not satisfy the terms of that exclusion.  Thus,

7

during the relevant period, BlockFi was required to have registered with the Commission as an investment company.

## Legal Analysis

### A.  Violation of Section 5(a) and 5(c) of the Securities Act

30.    The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market."  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).  They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors.  *Id.*  Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note."  *See* 15 U.S.C. §§ 77b & 78c.  A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test.  *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny.  Applying the *Reves* four-part analysis, the BIAs were notes and thus securities.  First, BlockFi offered and sold BIAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to BIA investors, and purchasers bought BIAs to receive interest ranging from 0.1% to 9.5% on the loaned crypto assets.  Second, BIAs were offered and sold to a broad segment of the general public.  Third, BlockFi promoted BIAs as an investment, specifically as a way to earn a consistent return on crypto assets and for investors to "build their wealth."  Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to BIAs.

31.    Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract."  *See* 15 U.S.C. §§ 77b, 78c.  Based on the facts and circumstances set forth above, the BIAs were also offered and sold as "investment contracts," as they meet the elements for an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), and its progeny, including the cases discussed by the Commission in its *Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017), citing *Forman*, 421 U.S. at 852-53 (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."); *see also SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125 1130-31 (9th Cir. 1991) (finding managed account product was an investment contract where investors provided funds in exchange for interest rate earned through the issuer's investment of the funds).  BlockFi sold BIAs in exchange for the investment of money in the form of crypto assets.  BlockFi pooled the BIA investors' crypto assets, and used those assets for lending and investment activity that would generate returns for both BlockFi and BIA investors.  The returns earned by each BIA investor were a function of the pooling of the loaned crypto assets, and the ways in which BlockFi deployed those loaned assets.  In this way, each investor's fortune was tied to the fortunes of the other investors.  In addition, because BlockFi earned revenue for itself through its

8

deployment of the loaned assets, the BIA investors' fortunes were also linked to those of the promoter, i.e., BlockFi.  Through its public statements, BlockFi created a reasonable expectation that BIA investors would earn profits derived from BlockFi's efforts to manage the loaned crypto assets profitably enough to pay the stated interest rates to the investors.  BlockFi had complete ownership and control over the borrowed crypto assets, and determined how much to hold, lend, and invest.  BlockFi's lending activities were at its own discretion, and BlockFi advertised that it managed the risks involved.  Similarly, its investment activities were at its own discretion, and BlockFi could decide whether and how to invest the BIA assets in equities or futures.

32.     BlockFi did not have a registration statement filed or in effect with the Commission for the offers and sales of BIAs, nor did it qualify for an exemption from registration under the Securities Act for those offers and sales.

33.     As a result of the conduct described above, BlockFi violated Section 5(a) of the Securities Act, which prohibits, unless a registration statement is in effect as to a security, any person, directly or indirectly, from making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

34.     As a result of the conduct described above, BlockFi also violated Section 5(c) of the Securities Act, which prohibits any person, directly or indirectly, from making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

### B.  Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

35.     As a result of the conduct described above, BlockFi violated Sections 17(a)(2) and 17(a)(3) of the Securities Act, which prohibit any person in the offer or sale of securities from obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make statements made not misleading, and from engaging in any practice or course of business which operates or would operate as a fraud or deceit upon the purchaser, respectively.  From March 2019 through August 2021, BlockFi misrepresented on its website that its institutional loans were "typically" over-collateralized, when in fact, most institutional loans were not.  Accordingly, although BlockFi made other disclosures on its website concerning its risk management practices, BIA investors did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by BlockFi's institutional borrowers, BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand.  This false and misleading statement was in the offer and sale of BIAs, and as such was in the offer and sale of

securities.  A violation of these provisions does not require scienter and may rest on a finding of negligence.  *See Aaron v. SEC*, 446 U.S. 685, 701-02 (1980).

### C.  Violation of Section 7(a) of the Investment Company Act

36.    As a result of the conduct described above, BlockFi violated Section 7(a) of the Investment Company Act, which makes it unlawful for an unregistered investment company to, among other things, directly or indirectly "[o]ffer for sale, sell, or deliver after sale, by the use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security" or "engage in any business in interstate commerce."

37.    From at least December 31, 2019 to at least September 30, 2021, BlockFi held assets meeting the definition of investment securities under Section 3(a)(2) of the Investment Company Act.  These investment securities, which include the loans that BlockFi made to counter parties, had a value exceeding 40% of its total assets as set forth in Section 3(a)(1)(C) of the Investment Company Act.  During these time periods, BlockFi was an issuer, was not registered as an investment company, and was not exempted or excluded from the Investment Company Act's definition of an investment company.

38.    Section 3(c)(2) of the Investment Company Act excludes from the definition of investment company any person that is "primarily engaged in the business of . . . acting as a market intermediary . . . whose gross income normally is derived principally from such business and related activities."  As defined in Section 3(c)(2)(B)(i), a "'market intermediary' is any person that regularly holds itself out as being willing contemporaneously to engage in, and that is regularly engaged in, the business of entering into transactions on both sides of the market for a financial contract or one or more such financial contracts," and whose "gross income normally is derived principally from such business and related activities."  Under Section 3(c)(2)(B)(ii), "'financial contract' means any arrangement that (I) takes the form of an individually negotiated contract, agreement, or option to buy, sell, lend, swap, or repurchase, or other similar individually negotiated transaction commonly entered into by participants in the financial markets; (II) is in respect of securities, commodities, currencies, interest or other rates, other measures of value, or any other financial or economic interest similar in purpose or function to any of the foregoing; and (III) is entered into in response to a request from a counter party for a quotation, or is otherwise entered into and structured to accommodate the objectives of the counter party to such arrangement."

39.    BlockFi did not satisfy the terms of the "market intermediary" exclusion under Section 3(c)(2) because it was not primarily engaged in the business of acting as a market intermediary; its principal source of gross income was not derived from intermediary business and related activities; and it did not regularly engage in the business of entering into transactions on both sides of the market for a financial contract.  The BIAs, for example, were not "individually negotiated" financial contracts that were entered into in "response to a request from a counter party for a quotation" or structured to accommodate "the objectives of the counter party."  Moreover, BlockFi only intermittently entered into individually negotiated transactions

10

to borrow crypto assets, and initiated and did not structure those transactions for the counter parties' objectives. Consequently, neither the BIA nor BlockFi's individually negotiated borrowings met the definition of financial contract in Section 3(c)(2), and so BlockFi was not regularly engaged in the business of entering into transactions on both sides of the market for a financial contract. BlockFi's primary business was investing in investment securities, including institutional loans. Moreover, BlockFi did not meet any other statutory exemptions or exclusions from the definition of an investment company, or seek an order from the Commission declaring that it was primarily engaged in a business other than that of investing, reinvesting, owning, holding, or trading in securities, or exempting it from complying with any provisions of the Investment Company Act or the rules thereunder. For these reasons, and for the reasons set forth in paragraph 37 above, BlockFi was an investment company engaged in business in interstate commerce.

### Subsequent Events, and Respondent's Cooperation and Remedial Efforts

40.    On February 14, 2022, BlockFi Inc., Respondent's parent company, publicly announced that it intends to register under the Securities Act the offer and sale of a new investment product, BlockFi Yield, which will include the filing of an indenture and Form T-1 under the Trust Indenture Act of 1939. BlockFi has represented that the general structure of the BlockFi Yield investment product will be as follows:



41.    In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by Respondent and cooperation afforded the Commission staff.

## **Undertakings**

42.    BlockFi has undertaken to, on the day of the institution of the Order, cease offering BIAs to new investors in the United States and cease accepting further investments or funds in the BIAs by current U.S. investors.

43.    BlockFi has undertaken to, within 60 days of the institution of the Order, come into compliance with Section 7(a) of the Investment Company Act by either:

  a.  Filing a notification of registration pursuant to Section 8(a) of the Investment Company Act, and then within 90 days of filing such notification of registration, filing a registration statement with the Commission, on the appropriate form; or

  b.  Completing steps such that BlockFi is no longer required to be registered under Section 7(a) of the Investment Company Act and providing the Commission staff with sufficient credible evidence that it is no longer required to be registered under the Investment Company Act.

The Commission staff may grant a single 30-day extension for good cause shown.

44.    A Form S-1 registration statement filed by BlockFi Inc. for BlockFi Yield (or any similar product) will not be declared effective if, among other things, BlockFi Inc., or any subsidiary or affiliate involved in the BlockFi Yield investment product or in the borrowing or lending of crypto assets to external parties, is not in compliance with Section 7(a) of the Investment Company Act.  If a Form S-1 registration statement filed by BlockFi Inc. for BlockFi Yield is declared effective, BlockFi undertakes to, 180 days after the effectiveness date, provide the Commission staff with sufficient credible evidence to affirm that BlockFi, or any subsidiary or affiliate involved in the BlockFi Yield investment product or in the borrowing or lending of crypto assets to external parties, continues to be in compliance with Section 7(a) of the Investment Company Act.

45.    BlockFi undertakes to certify, in writing, compliance with each undertaking set forth above.  Each certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and BlockFi agrees to provide such evidence.  Each certification and supporting material shall be submitted to Kristina Littman, Chief, Cyber Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549, with a copy to the Office of Chief Counsel of the Division of Enforcement, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549, no later than 30 days from the date of the completion of each undertaking.

12

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED that**:**

A.       Pursuant to Section 8A of the Securities Act, Respondent cease and desist from committing or causing any violations and any future violations of Sections 5(a), 5(c), 17(a)(2) and 17(a)(3) of the Securities Act.

B.       Pursuant to Section 9(f) of the Investment Company Act, Respondent shall cease and desist from committing or causing any violations and any future violations of Section 7(a) of the Investment Company Act, subject to Section III, paragraphs 43 through 44.

C.       Respondent shall comply with the undertakings set forth in Section III, paragraphs 42 through 45 above.

D.       Respondent shall pay a civil money penalty in the amount of $50,000,000.00 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act 21F(g)(3).  Payment shall be made in the following installments:

1.       Due within 14 days of the entry of this Order: $10,000,000 (the "Initial Payment")
2.       Due 180 days of the entry of this Order: $10,000,000
3.       Due 365 days of the entry of this Order: $10,000,000
4.       Due 545 days of the entry of this Order: $10,000,000
5.       Due 730 days of the entry of this Order: $10,000,000

Payments shall be applied first to post-order interest, which accrues pursuant to 31 U.S.C. 3717.  Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due.  If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)       Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

13

(2)       Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)       Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying BlockFi Lending LLC as Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Kristina Littman, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

E.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary

14

**Exhibit J**



**Exhibit K**



## Exhibit L

# MINUTES OF A SPECIAL MEETING
# OF THE BOARD OF DIRECTORS
# OF
# BLOCKFI INC.

| | |
|---|---|
| **DATE:** | November 10, 2022 |
| **TIME:** | 9:30 am EST |
| **PLACE:** | Via teleconference |
| **DIRECTORS PRESENT:** | Zachary Prince |
| | Jennifer Hill |
| | Tony Lauro |
| | Florencia Marquez |
| **DIRECTORS ABSENT:** | None |
| **OTHERS PRESENT:** | Amit Cheela, BlockFi |
| | Ross Kirschner, BlockFi |
| | Alice Liou, BlockFi |
| | Rob Loban, BlockFi |
| | Jonathan Mayers, BlockFi |
| | Yuri Mushkin, BlockFi |
| | Usec Rho, BlockFi[1] |
| | Alexander Grishman, Haynes and Boone, LLP |
| | Richard Kanowitz, Haynes and Boone, LLP |
| | Kenric Kattner, Haynes and Boone, LLP |

1.   <u>Call to Order</u>.

Mr. Prince called the meeting of the Board of Directors (the "<u>Board</u>") of BlockFi Inc. (the "<u>Company</u>") to order.  After confirming that all participants could hear and be heard by all others via teleconference, Mr. Prince declared that all directors were present and that the meeting, having been duly convened, was ready to proceed with its business.  Each of the directors present waived

---

[1] Present for a portion of the meeting.

any notice with respect to the meeting.  Mr. Prince acted as chairman of the meeting.  Ms. Liou

acted as the secretary of the meeting.  Ms. Marquez reviewed the agenda for the meeting.

The Board next discussed the Company's ongoing operations and the various considerations for potentially pausing activities on the Company's platform, including the receipt of future funds, client withdrawal levels, the overall crypto market and any further developments or requests from the Company's regulators.  The Board then discussed the Company's current liquidity position and cash flow needs and potential further actions regarding contingency planning.  The Board then directed the Company's management to continue to focus on the Alameda recovery, obtaining liquidity, processing client withdrawals and to prepare a contingency plan over the course of the next few days.  The Board then determined to reconvene later in the day to assess the Company's liquidity position and any further developments.

5.    <u>Adjournment</u>.

There being no further business to come before the meeting, the meeting was adjourned.

DocuSigned by:

*Alice Liou*

FC02248D03F4465...

_____

Alice Liou
Secretary to the Meeting

**Exhibit M**

# MINUTES OF A SPECIAL MEETING
## OF THE BOARD OF DIRECTORS
## OF
## BLOCKFI INC.

| | |
|---|---|
| **DATE:** | November 10, 2022 |
| **TIME:** | 3:45 pm EST |
| **PLACE:** | Via teleconference |
| **DIRECTORS PRESENT:** | Zachary Prince |
| | Jennifer Hill |
| | Tony Lauro |
| | Florencia Marquez |
| **DIRECTORS ABSENT:** | None |
| **OTHERS PRESENT:** | Amit Cheela, BlockFi |
| | Ross Kirschner, BlockFi |
| | Alice Liou, BlockFi |
| | Rob Loban, BlockFi |
| | Jonathan Mayers, BlockFi |
| | Yuri Mushkin, BlockFi |
| | Usec Rho, BlockFi |
| | David Spack, BlockFi[1] |
| | Andrew Tam, BlockFi |
| | Matthew Frankle, Haynes and Boone, LLP |
| | Alexander Grishman, Haynes and Boone, LLP |
| | Richard Kanowitz, Haynes and Boone, LLP |
| | Kenric Kattner, Haynes and Boone, LLP |

1. <u>Call to Order</u>.

Mr. Prince called the meeting of the Board of Directors (the "<u>Board</u>") of BlockFi Inc. (the

"<u>Company</u>") to order.  After confirming that all participants could hear and be heard by all others

via teleconference, Mr. Prince declared that all directors were present and that the meeting, having

---

[1] Present for a portion of the meeting.

been duly convened, was ready to proceed with its business.  Each of the directors present waived any notice with respect to the meeting.  Mr. Prince acted as chairman of the meeting.  Ms. Liou acted as the secretary of the meeting.

2.      Alameda Update.

Mr. Prince provided an update on exposure to Alameda Research ("Alameda") and efforts being made to recover on collateral to limit such exposure.

3.      Withdrawals.

The Board next discussed and determined it was in the best interest of the Company and its clients and other creditors at this time to pause product capabilities on the Company's platform, including withdrawals, taking into consideration the Company's current liquidity position.  Mr. Kanowitz then provided legal advice to the Board at its request regarding actions to be taken in connection with a potential bankruptcy filing, including the hiring of financial advisors to assist in any restructuring or bankruptcy.  The Board then directed Company management to interview financial advisors.

_____

Mr. Spack joined the meeting.

_____

The Board next discussed insurance coverage for directors and officers.

The Board next reviewed and discussed the Company's public statement regarding pausing activities on the Company's platform and approved for dissemination the statement previewed during the meeting.

Mr. Mayers next noted that the board of directors for BlockFi International Ltd. was meeting at 5:30 p.m. EST that evening.

4.      <u>Adjournment</u>.

There being no further business to come before the meeting, the meeting was adjourned.

DocuSigned by:

*Alice Liou*

FC02248D03F4465...

Alice Liou
Secretary to the Meeting

**Exhibit N**



**Flori** 8:09 PM
Hi BlockFi Team,

As promised, we want to provide important updates to you about our business as transparently, empathetically, and quickly as possible.

We are in the heartbreaking position of sharing the following news with you, which will shortly be shared with outside stakeholders and on social media outlets:

1. We are shocked and dismayed by the news regarding FTX and Alameda. We, like the rest of the world, found out about this situation through Twitter. Given the lack of clarity on the status of FTX.com, FTX US and Alameda, we are not able to operate business as usual.
2. Our priority has been and will continue to be to protect our clients and their interests.
3. Until there is further clarity, we are limiting platform activity, including pausing client withdrawals as allowed under our Terms. We will share more specifics as soon as possible. We request that clients not deposit to BlockFi Wallet or Interest Accounts at this time.
4. We intend to communicate as frequently as possible going forward but anticipate that this will be less frequent than what our clients and other stakeholders are used to.

We know you will have numerous questions which we have tried to anticipate the start of below:

- Do I still have a job?
  - The short answer is yes and we have sufficient funds for payroll and company operations. We will have more formal operational plans to share as soon as we can.
- How long are we pausing client withdrawals?
  - We are not sure how long client withdrawals will remain paused as we work through various alternatives
- Are other products impacted by this change?
  - The executive team is working through further implications for the platform.
- What should I do if I'm contacted by the press or receive inquiries on social media?
  - As always, any press inquiries should be directed to ███████████ and forwarded to press@blockfi.com.

If you have further questions, please share them with ████████ and we will answer them as soon as we can. We plan to have an All Hands tomorrow to provide more context - stay tuned for details.

Through all of the crypto industry's ups and downs, Zac and I never expected to be in this position. We thank you all for your incredible work, grit, and ingenuity in supporting our clients, our partners, and most importantly each other as friends and colleagues.

Flori and Zac

**Exhibit O**

| | |
|---|---|
| **To:** | Team[team@blockfi.com] |
| **From:** | Flori Marquez███████████ |
| **Sent:** | Thur 11/10/2022 8:11:55 PM (UTC-05:00) |
| **Subject:** | November 10th Update |

Hi BlockFi Team,

As promised, we want to provide important updates to you about our business as transparently, empathetically, and quickly as possible.

We are in the heartbreaking position of sharing the following news with you, which will shortly be shared with outside stakeholders and on social media outlets:

1. We are shocked and dismayed by the news regarding FTX and Alameda. We, like the rest of the world, found out about this situation through Twitter. Given the lack of clarity on the status of FTX.com, FTX US and Alameda, we are not able to operate business as usual.
2. Our priority has been and will continue to be to protect our clients and their interests.
3. Until there is further clarity, we are limiting platform activity, including pausing client withdrawals as allowed under our Terms. We will share more specifics as soon as possible. We request that clients not deposit to BlockFi Wallet or Interest Accounts at this time.
4. We intend to communicate as frequently as possible going forward but anticipate that this will be less frequent than what our clients and other stakeholders are used to.

We know you will have numerous questions which we have tried to anticipate the start of below:

- Do I still have a job?
  - The short answer is yes and we have sufficient funds for payroll and company operations. We will have more formal operational plans to share as soon as we can.
- How long are we pausing client withdrawals?
  - We are not sure how long client withdrawals will remain paused as we work through various alternatives
- Are other products impacted by this change?
  - The executive team is working through further implications for the platform.
- What should I do if I'm contacted by the press or receive inquiries on social media?
  - As always, any press inquiries should be directed to ████████████████ and forwarded to press@blockfi.com.

If you have further questions, please share them with ████████████ and we will answer them as soon as we can. We plan to have an All Hands tomorrow to provide more context - stay tuned for details.

Through all of the crypto industry's ups and downs, Zac and I never expected to be in this position. We thank you all for your incredible work, grit, and ingenuity in supporting our clients, our partners, and most importantly each other as friends and colleagues.

Flori and Zac

**Flori Marquez**
Founder, COO

████████████

@founderflori

██████████████

**Exhibit P**



**Exhibit Q**



**Exhibit R**





**Exhibit S**

### Update to your account

We are shocked and dismayed by the news regarding FTX and Alameda. Given the lack of clarity on the status of FTX.com, FTX US and Alameda, we are not able to operate business as usual. Until there is further clarity, we are limiting platform activity, including pausing client withdrawals as allowed under our Terms.

We will share more specifics as soon as possible. **We request that clients not deposit to BlockFi Wallet or Interest Accounts at this time.** For further questions, please contact our Client Success team.

Got it

## Exhibit T



**Exhibit U**



**Exhibit V**



**Exhibit W**

On November 28, 2022, BlockFi filed voluntary cases under Chapter 11 of the U.S. Bankruptcy Code. Additional information about our filing can be found on our blog here.

 

← **Back to blog**



FEATURED

# Responses to Frequently Asked Questions

**Published, 23 November, 2022**

**Share article**

   

We know that our client community has a lot of questions. We are focused on doing the utmost to be transparent around decisions related to our pause, products, and platform activity. Please find below an FAQ with the latest information.

<u>General Questions</u>

- Why did BlockFi pause platform activities?
  - Following the events surrounding FTX, we determined that in the current environment we could no longer operate our business as usual. The most prudent decision for us, in the interest of all clients, was to initiate a pause of many of our platform activities.

- What's next?
  - There are a number of scenarios that may be available to us, and we are doing the work now to determine the best path forward. BlockFi has engaged expert outside advisors that are helping us navigate BlockFi's next steps. Across BlockFi, our team is working tirelessly towards our primary objective of maximizing value for all of our clients, and that will see us explore every strategic option available to us.

- Where can I find information about my account?
  - You can continue to check the BlockFi app for accurate information regarding your account balances. We will continue to share updates regarding changes to our products through our official communication channels, including Twitter and our blog.

- Who can I contact if I have questions?
  - Should you have questions, you are welcome to contact our client success team here. Please note, that due to the volume of client inquiries, response times may be delayed.

- Will the company contact me by email if there are any changes to my account?
  - Yes. You will continue to receive email updates if there are changes to your account. Please continue to check BlockFi's official communication channels for updates related to our pause, products, and platform activity.

- Does BlockFi hold 100% of client deposits on FTX?

  ○ The rumors that a majority of BlockFi assets are custodied at FTX are false. However, as shared, we do have significant exposure to FTX and associated corporate entities that encompasses obligations owed to us by Alameda, assets held at FTX.com, and undrawn amounts from our credit line with FTX.US

- What impact does FTX's Chapter 11 have on BlockFi?

  ○ We were shocked and dismayed by the news regarding FTX and Alameda. We, like the rest of the world, found out about this situation through Twitter. Given the lack of clarity on the status of FTX.com, FTX US, and Alameda, we are not able to operate business as usual.

  ○ While we will continue to work on recovering all obligations owed to BlockFi, we expect that the recovery of the obligations owed to us by FTX will be delayed as FTX works through the bankruptcy process. We intend to communicate as frequently as possible going forward but anticipate that this will be less frequent than you are used to. Our priority has been and will continue to be to protect our clients and their interests.

  ○ You can find additional information about FTX's chapter 11 cases here.

- How often will BlockFi provide updates?

  ○ We intend to communicate as frequently as possible going forward but anticipate that this will be less frequent than what our clients and other stakeholders are used to.

Retail Loan Questions

- What does this mean for my loans and loan collateral?

  ○ At this time, clients do not have the ability to post new funds to BlockFi. As a result, we are putting your loan into administrative forbearance.

  ○ Any amounts due, including interest and maturity payments, are placed on hold until further notice. The interest rate on your loan will be set to 0% from November 11, 2022 onwards and clients will not be charged additional interest if or when a loan enters delinquency after November 11, 2022. Your loan will not be reported as delinquent to any credit bureaus.

  ○ You are not expected to make a payment at maturity while your loan is on hold and there will be no late fees associated with any payments, including at maturity. Additionally, autopay has been turned off for your account, if it was enabled.

○ Should you have questions about this process, you are welcome to contact our client success team HERE.

- Why is my loan showing as delinquent?

  ○ For US-based customers, our loan servicing provider, Scratch, will show your loans as delinquent on their system, but given the 0% interest rate, your loan will not accrue any interest or late penalties. Your loan will not be reported as delinquent to any credit bureaus. Clients can disregard the automatically generated email from Scratch at the time of maturity notifying them of delinquency on Scratch's system.

- Is BlockFi liquidating retail loans if the loan reaches liquidation loan-to-value ("LTV") while platform activities are paused?

  ○ At this time, clients do not have the ability to post new funds to BlockFi. As a result, we are putting your loan into administrative forbearance. BlockFi has paused margin call requirements and auto liquidations at predefined loan-to-value levels.

*For further questions, you are welcome to contact our client success team here. As you can imagine, we are receiving an overwhelming number of inquiries and may need some time to get back to you. We will respond as soon as we are able.*

**Last updated on November 23rd, 2022**

BLOCKFI NEWS

**Share article**

   

Products   ⌄

Institutions   ⌄

Resources   ⌄

Company

Follow Us

 

Everything you need on-the go

**Download the BlockFi app**



Log in

BlockFi Lending LLC NMLS ID#1737520 | NMLS Consumer Access
BlockFi Trading LLC NMLS ID#1873137 | NMLS Consumer Access

Privacy Policy | Legal | Licenses | Disclosures and Complaints | NMLS Consumer Access

Digital currency is not legal tender, is not backed by the government, and crypto accounts held with BlockFi are not subject to FDIC or SIPC protections. Digital currency values are not static and fluctuate due to market changes. Not all products and services are available in all geographic areas and are subject to applicable terms and conditions. Eligibility for particular products and services is subject to final determination by BlockFi. Rates for BlockFi products are subject to change.

BlockFi Rewards Credit Card: For more information, please see BlockFi's Terms of Service. BlockFi is not a Bank. Cards are issued by Evolve Bank & Trust, Member FDIC, pursuant to a license from Visa® USA Inc. Rewards are not offered by Evolve Bank & Trust and are instead offered and managed by BlockFi.

BlockFi International Ltd. holds a Class F digital assets business license under the Digital Assets Business Act, 2018 (as amended) and is licensed by the Bermuda Monetary Authority to conduct the following digital assets business activities: (i) issuing, selling or redeeming virtual coins, tokens or any other form of digital assets (ii) operating as a digital asset exchange (iii) providing custodial wallet services (iv) operating as a digital asset derivative exchange provider and (v) operating as a digital assets services vendor.

See blockfi.com/terms for more information.

4/28/23, 9:24 PM
Responses to Frequently Asked Questions

2022 © All Rights Reserved.