IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                     .    Case No. 22-19361-MBK
                           .    (Jointly Administered)
BLOCKFI INC., *et al.*,     .
                           .
          Debtors.         .
                           .    May 8, 2023
. . . . . . . . . . . . .   .    10:11 a.m.


TRANSCRIPT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I)
AUTHORIZING THE DEBTORS TO (A) HONOR WITHDRAWALS FROM WALLET
ACCOUNTS, (B) UPDATE THE USER INTERFACE TO PROPERLY REFLECT
TRANSACTIONS AND ASSETS AS OF THE PLATFORM PAUSE, AND (C)
CONDUCT ORDINARY COURSE RECONCILIATION OF ACCOUNTS, AND (II)
GRANTING RELATED RELIEF [DOCKET NO. 121]

**BEFORE THE HONORABLE MICHAEL B. KAPLAN**
**UNITED STATES BANKRUPTCY COURT JUDGE**


APPEARANCES ON NEXT PAGE.


Audio Operator:            Kiya Martin


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES:

For Debtors:                          Kirkland & Ellis LLP
                                      BY:  MICHAEL B. SLADE, ESQ.
                                      300 North LaSalle
                                      Chicago, IL 60654

                                      Haynes and Boone, LLP
                                      BY:  RICHARD KANOWITZ, ESQ.
                                      30 Rockefeller Plaza
                                      26th Floor
                                      New York, NY 10112

For the Official                      Brown Rudnick, LLP
Committee of Unsecured                By:  KENNETH AULET, ESQ.
Creditors:                            7 Times Square
                                      New York, NY 10036

For the Ad Hoc Committee              Troutman Pepper Hamilton Sanders
of Wallet Holders:                      LLP
                                      BY:  DEBORAH KOVSKY-APAP, ESQ.
                                      875 Third Avenue
                                      New York, NY 10022

For the Ad Hoc Committee              Reed Smith LLP
of Actual Wallet Holders:             BY:  KURT F. GWYNNE, ESQ.
                                      1201 Market Street, Suite 1500
                                      Wilmington, DE 19801

1          THE COURT:  Good morning, everyone.  This is Judge

2  Kaplan.  and I'll start this morning's hearing on Blockfi,

3  Inc., *et al.*  We have a limited number of attorneys in the

4  courtroom as well as counsel and parties appearing remotely.

5  To the extent the parties who are appearing remotely wish to be

6  heard, they're to use the "raise hand" function.

7          Let me turn to debtors' counsel.  Good morning.

8          MR. SLADE:  Good morning, Your Honor.

9          Mike Slade from Kirkland & Ellis for the debtors.

10          THE COURT:  All right.

11          MR. SLADE:  I think we are ready to proceed this

12  morning on the Wallet withdrawal motion.

13          THE COURT:  We're finally there.

14          MR. SLADE:  Yes.

15          I have some slides that I intend to use to guide the

16  presentation.  May I approach, Your Honor?

17          THE COURT:  Absolutely.  it wouldn't be oral argument

18  these days without a PowerPoint.

19                         (Pause)

20          MR. SLADE:  Okay.  They're also available on the

21  Kroll BlockFi website for folks that are participating in the

22  hearing over Zoom and would like to follow along.

23          THE COURT:  For the benefit of all, my intention is

24  to hear from the debtor first, let them prosecute their motion,

25  hear from those who are supporting the debtor, and then to the

4

1  objectors and then, of course, I'm sure there's always a reply.

2          MR. SLADE:  Yes.  Thank you, Your Honor.

3          And Ms. Kovsky, my opposing counsel, I just want to

4  thank her.  We were able to work out a set of agreed stipulated

5  facts that are on the docket at Docket Number 842.  Those facts

6  along with the declaration of -- the amended declaration of

7  Amit Cheela, which is on the docket at 822 plus the exhibits,

8  those constitute the factual record for this particular hearing

9  by agreement.  And we have agreed there won't be any witness

10 cross-examination at this hearing.  We're ready to proceed to

11 argument.

12         THE COURT:  Makes sense.  Thank you.

13         MR. SLADE:  So thank you, Your Honor.

14         And as you noted, we are here at long last for the

15 Wallet withdrawal motion.  And the particular issue being

16 addressed today is whether post-platform pause actions were

17 effective to give those clients rights against assets in the

18 custodial omnibus Wallets.

19         We believe that they are not, and the relief that the

20 debtors are requesting today is supported by the Official

21 Committee of Unsecured Creditors and also what we believe to be

22 the aptly named Ad Hoc Committee of Actual Wallet Holders,

23 which is represented by the Reed Smith firm.  And during our

24 argument today, I'll refer to them as the Reed Smith Ad Hoc

25 Group.

1          And, Your Honor, the motion follows a familiar

2  pattern in the BlockFi case.  I'm trying to advance the slides.

3          UNIDENTIFIED SPEAKER:  I can flip through it.

4          MR. SLADE:  Okay.  Next slide.

5          THE COURT:  There we go.

6          MR. SLADE:  The relief that we're seeking is pretty

7  simple.  BlockFi wants to give people their assets back, and we

8  want to give them back their assets as quickly as possible.

9  But the process for effectuating this pretty simple goal has

10  become very complicated and challenging.  And today, we are

11  going to debate the consequences of very small details about

12  BlockFi's infrastructure, the terms of service and how they

13  work together.

14          Next slide.

15          BlockFi filed this motion because there are specific

16  tokens that are worth about $297 million that are sitting in

17  the custodial omnibus Wallets at BITCO and Fireblocks.  And

18  those tokens were deposited or moved to the custodial omnibus

19  Wallets at the direction of specific clients for requests

20  before the platform pause timestamp on November 10th at 8:15

21  p.m. Eastern Time.

22          Under BlockFi's terms of service, BlockFi did not

23  have the right to use or re-hypothecate those assets because

24  they were in those particular custodial omnibus Wallets, and

25  BlockFi did not do so.  The tokens in those particular omnibus

6

1  Wallets are the property of the clients that directed them into

2  those particular Wallets before the platform pause.  And we

3  want those assets to go back to those clients because they are

4  not property of the estate.

5          It is undisputed that the actual tokens that are in

6  those custodial omnibus Wallets were all deposited or moved

7  there by BlockFi clients as a result of transactions before the

8  platform pause timestamp.  My opposing counsel, which I'm going

9  to call the Troutman Ad Hoc Group, it is their position that

10 they have an equal right to the coins that were moved to those

11 custodial omnibus Wallets at the direction of other clients

12 before the platform pause.  Their clients sought to remove

13 assets from BlockFi's estates after the platform pause.

14          If you could flip to Slide 4.

15          Between the platform pause timestamp, Your Honor, on

16 November 10th at 8:15 p.m. and the petition date, about 48,000

17 clients clicked buttons on the BlockFi user interface -- 48,000

18 clients -- in an effort to transfer about $375 million of

19 crytocurrency from their BlockFi Interest Accounts, which I'll

20 call the BIA accounts, into the custodial omnibus Wallets.  And

21 the members of the Troutman Ad Hoc Group are among the 48,000

22 clients that did that.

23          It is not disputed that no cryptocurrency ever moved

24 as a result of the buttons pushed after November 10th at 8:15

25 Eastern Time, period.  Nothing moved.  And even though the only

1  tokens that are in the custodial omnibus Wallets reflect other

2  clients' activities, the Troutman Ad Hoc Group thinks that they

3  have rights to those assets, too.  And we respectfully disagree

4  with their position.  And to articulate why, I want to step

5  back, way back and talk specifically about the two products at

6  issue.

7           And, Rob, if you can turn to Slide 5.

8           So BlockFi offered several different products, but

9  the two that are at issue here, Your Honor, are the BlockFi

10  Wallet product and the BlockFi Interest Account.

11  Cryptocurrency assets that are on the BlockFi platform have to

12  be in one or the other.  They cannot be in both.  And just by

13  the nature of the way the products work, it is not possible for

14  assets to be moved from one of the accounts to the other at

15  just the push of a button.

16           Slide 6.

17           BlockFi maintains the omnibus Wallet accounts at

18  BITCO and Fireblocks for the Wallet product.  And, Your Honor,

19  I think you can think of the BITCO and Fireblocks accounts,

20  they're like safes that are held by BlockFi.  BlockFi has the

21  private keys and BlockFi has the ability to access these

22  particular coins through the BITCO or the Fireblocks software

23  and their Omnibus Accounts by coin.

24           So the bitcoin that's placed in the BlockFi Wallet

25  product by customers, okay, is put into the omnibus Wallet

1  account, and the same with Theorem put into the BlockFi

2  custodial Wallet product by customers.  Cryptocurrency that's

3  housed in the BlockFi Wallet product, it does not move outside

4  the custodial omnibus Wallets until and unless directed by the

5  customer.

6           And the terms of service are very explicit about

7  this.  The terms of service say that the title to the

8  cryptocurrency in the BlockFi Wallet shall at all times remain

9  with you, shall not transfer to BlockFi, and that BlockFi shall

10 not sell, transfer, loan, hypotheticate, or otherwise alienate

11 cryptocurrency held in the BlockFi Wallet unless specifically

12 instructed.

13          THE COURT:  But let me just clarify, all

14 cryptocurrency held by BlockFi that was deposited by customers

15 went through BITCO?

16          MR. SLADE:  Initially, yes.

17          THE COURT:  Initially.

18          MR. SLADE:  Initially.

19          THE COURT:  And then placed in the various omnibus

20 Wallets?

21          MR. SLADE:  So it went into BITCO.  And then if a

22 customer said I want this to be in the interest-bearing

23 accounts --

24          THE COURT:  Right.

25          MR. SLADE:  -- then it was moved to the

1  rehypothicatable Wallets.  If they do not, it stayed in the

2  custodial Wallets.

3           THE COURT:  Custodial, okay.

4           MR. SLADE:  Now there are two sets of those, Your

5  Honor.  One is at BITCO and one is at Fireblocks.  But those

6  are custodial Wallets that the coins have to sit in those

7  accounts.  They do not go to the BIA account, they do not earn

8  interest, and they cannot be used for BlockFi's revenue-

9  generating activities.

10          THE COURT:  Okay.

11          MR. SLADE:  And that's actually the opposite of the

12 coins that go into the BIA or BlockFi Interest Accounts.  And

13 that's on Slide 7.  They are the opposite of the custodial

14 accounts.

15          The point of the BIA interest product is that by

16 directing the deposit of cryptocurrency into the BIA accounts,

17 you are giving title and control over the tokens to BlockFi for

18 use in BlockFi's revenue-generating activities.  And

19 cryptocurrency that's placed into the BIA accounts earns

20 interest so, of course, BlockFi has to do something with those

21 coins.  Otherwise, it would have no way to generate the money

22 to pay the interest.

23          And the terms of service, again, are very explicit

24 about this.  They say that BlockFi has the right to direct your

25 coins into the BIA product without further notice to you to

1  pledge, repledge, hypothecate, rehypothecate, sell, lend,

2  otherwise transfer with all attendant rights of ownership for

3  any period of time and without BlockFi retaining possession and

4  control a like amount of cryptocurrency.

5       Those are very clear in the BlockFi BIA terms of

6  service.  And my colleagues on the other side admit this in

7  their reply brief that when you direct assets in to the BIA

8  product, you are giving title to those assets away from

9  yourself and to BlockFi.  And you acknowledge in the BIA terms

10 that with respect to assets used by BlockFi pursuant to the BIA

11 terms, you will not be able to exercise rights of ownership.

12      So, Your Honor, as BlockFi told everyone it was going

13 to do, BlockFi did in fact rehypothecate and lend currency

14 placed by customers into the BIA accounts over to third parties

15 to earn yield.  Now BlockFi did keep a buffer on hand at any

16 one time to try to have liquidity available to meet customer

17 withdrawals.  But the whole business model was to lend

18 cryptocurrency that was deposited into the BIA accounts to

19 third parties to earn yield.

20      BlockFi was a crypto lending business, and it did

21 exactly what it told customers it was going to do.  Now those

22 loans in large part were freely callable, and they were

23 callable far in advance of BlockFi's obligations to its

24 clients.  And the system that BlockFi had in place worked for

25 years because BlockFi could call back loans to customers

1 quicker than it would need to in order to satisfy withdrawal

2 requests.  And that's why BlockFi was in fact able to satisfy

3 customer requests prior to November 9th of 2022 at all times.

4 It was able to satisfy those faster than it was required to in

5 its terms of service.

6           But in our view, based on the nature of the BlockFi

7 Interest Account, it does not make sense to assert that if

8 customer A pushed a button seeking to transfer assets in the

9 Interest Account to the Wallet Account to assert that it

10 happened immediately and, therefore, there are coins in the

11 omnibus custodial accounts reflecting customer A's direction.

12 That's not how the system worked.

13           By definition, the movement of assets could not

14 happen immediately because the asset transfer were manual.

15 They were manual for a number of reasons.  One is that the

16 company deliberately divorced the user interface from the

17 external actual asset in order to reduce opportunities for

18 security breaches.  But more practically, there might not have

19 been assets available for immediate movement from BIA to Wallet

20 precisely because of the nature of the product.

21           Customers had allowed the assets in BIA to be lent to

22 third parties, rehypothecated, and large portions of them were.

23 So BlockFi might not even have possession of the assets to be

24 able to move them from BIA to Wallet.

25           So if you move to Slide 8, the reality is that the

12

1  assets held for the BIA -- the BlockFi Wallet product were in

2  segregated Wallets at BITCO and Fireblocks that BlockFi did not

3  use to generate revenue.  The assets in the Interest Accounts

4  were in fact rehypothecated for revenue-generated activities.

5  They were not commingled.  And for one to be moved from one to

6  the other, you actually have to move them from one to the

7  other.

8         So now I want to move to the November situation and

9  talk about exactly what happened.

10        And let's turn to Slide 9, Rob.

11        So as I talked about previously, throughout BlockFi's

12  history, it had been able to process customer withdrawal

13  requests in the ordinary course.  Just an example, in June when

14  Celsius shut its doors, BlockFi was able to process all

15  customer withdrawal requests.  And Voyager, when it shut down

16  its doors in July of 2022, BlockFi kept right on trucking as

17  prices reduced and the crypto market struggled a little bit

18  between June and November of 2022, some clients decided that

19  crypto was too risky, they wanted to pull their assets out of

20  BlockFi.  It had processed billions of dollars in customer

21  withdrawals.

22        But that said, as the markets have shown in the

23  summer, the cryptocurrency market is very sensitive to market

24  feedback.  A single news article can have a huge impact on

25  customer behavior.  Tweets can kill or spike value at any

1  moment.

2           You can go to the next slide, Rob.

3           Crypto Twitter, Your Honor, is nonstop as I know you

4  have experience.  I'm sure people who are listening right now

5  at what I'm saying, for some reason I probably can't figure

6  out, is probably moving the price of some cryptocurrency.  But

7  what happened in November of 2022 is pretty straightforward.

8  Negative news caused a run on the bank at FTX.  That's what

9  happened.

10          Now if the FTX's disclosures to the world had been

11  accurate, if it had been a real company and maintained assets

12  one to one, that wouldn't have mattered because customers would

13  have been able to withdraw their cryptocurrency as FTX had

14  represented they would have been able to.  Unfortunately, it

15  was a massive fraud and it failed.  And BlockFi was collateral

16  damage.  And all of this played out over a week in November of

17  2022.

18          Next slide.

19          On November 6th, the CEO of Binance, which is one of

20  the largest players, tweeted that he was going to sell all of

21  his position in FTX.  When a major player with a large position

22  in a cryptocurrency says it's going to liquidate its entire

23  position, obviously the price moves materially.  And Binance

24  continued to tweet about FTX.

25          And you can go to the next slide.

1          Customers continued to react, and there were huge

2    customer withdrawals; $6 billion in just a couple of days.  And

3    on November 8th, FTX ceased customer withdrawals.  But the

4    situation was still unclear, okay.  BlockFi didn't exactly know

5    what was going to happen because Binance announced the next day

6    that it was going to acquire FTX and stop the slide.  Nobody

7    knew it was going to happen, but the situation calmed down for

8    at least a short amount of time.  Then the situation flipped

9    again.

10          Next slide.

11          The next day, on November 9th, the CEO of Binance

12   changed his mind and he tweeted out, "As a result of corporate

13   due diligence, as the result of agent latest news reports

14   regarding mishandled customer funds and alleged U.S. agency

15   investigations, we have decided that we will not pursue the

16   potential acquisition of FTX.com."

17          Now that calls a massive run on the bank at FTX, and

18   they had to shut down their platform.  BlockFi had to figure

19   out what to do.  It tried to get capital elsewhere.  FTX had an

20   obligation to provide capital.  It refused to do so.  FTX's

21   Alameda had posted additional collateral, as Your Honor knows

22   from the adversary that was pending in front of the Court.

23   BlockFi tried to access that but was unable to immediately do

24   so.

25          And BlockFi began experiencing its own high levels of

1  customer withdrawals.  And then it had to decide what to do

2  under its own terms of service.  And so the board fought hard

3  about this and BlockFi held out as long as it could.

4          If you go to the next slide.

5          It had two meetings of the board on November 10th of

6  2022 at 9:30 in the morning.  They thought about whether or not

7  they should stop customer withdrawals and freeze the platform.

8  They decided to wait and see until what happened later in the

9  day.

10          Next slide.

11          At 3:45 p.m., they had a second board meeting and

12  held that they really didn't have any alternative.  Because of

13  the level of customer withdrawals and the liquidity issues that

14  they were facing, it was in the company's best interest to

15  pause platform activity.

16          So at 8:15 p.m. -- next slide -- BlockFi implemented

17  the platform pause.  BlockFi drew a line in the sand November

18  10th at 8:15 p.m. to protect and ensure equal treatment of

19  similarly-situated clients.  BlockFi took the steps via the

20  true-up and batching processes to honor all trading and

21  withdrawal requests that had been initiated before that

22  timestamp, 8:15 p.m. on November 10th, including requests for

23  transfer, requests for withdrawal, and requests for trades.  If

24  you requested it before April -- 8:15 on November 10th, BlockFi

25  fulfilled that request.

1            But BlockFi stopped all other processing of

2    transaction requests.  And so if you push a button on the user

3    interface to request a withdrawal from the platform, a transfer

4    to the Wallet Account, or a trade after that time period, it

5    was not fulfilled.

6            If a client tried to make a loan payment after the

7    platform pause timestamp, that request was never recognized.

8    And Your Honor authorized us via your scratch order, which is

9    at Docket 754, to send that money and any future loan payments

10   that the clients want to make back to the clients immediately

11   because those transactions were never processed and

12   effectuated, no transactions initiated after the platform pause

13   timestamp were completed.

14           And BlockFi had the right to do this.  In fact, this

15   possibility was expressly contemplated by the terms of service

16   as it had to be.  BlockFi had to have put in place processes to

17   protect clients in a downside scenario, and that's what it did.

18   So let's move to some of those.

19           Slide 19 shows the general acknowledgments by all

20   users of the platform that they have to agree -- read, agreed,

21   and understood the BlockFi terms of service which were written

22   to protect the company and clients.

23           The next slide.  This is a key term of service, Your

24   Honor.  And, in fact, it's written in not just the general

25   terms of service, it's part of each product, the Wallet

17

1  product, the BIA product, the BIA product for International

2  client, the private client terms of service.  Every client

3  agrees --

4          THE COURT:  So they're a sense two sets of terms of

5  service is the general and then account specific?

6          MR. SLADE:  There are several sets of terms of

7  service, and basically they apply depending on what you're

8  doing.  The general terms apply at all times.  The Wallet terms

9  apply when you're -- to Wallet-related transactions.  The BIA

10 term applies to BIA term-related transactions.  And multiple

11 sets of terms might apply depending on what specifically you

12 are doing.

13         It is more often the case that multiple sets of terms

14 would apply.  And in fact, this specific term was listed

15 multiple places because it had to be applicable in many

16 different circumstances.  And people had to agree that BlockFi

17 might experience among other things extreme market conditions

18 or other operational and technical difficulties which could

19 result in the immediate halt of transfers and withdrawals of

20 cryptocurrency either temporarily or permanently.

21         And this is a warning, and it appears in the terms of

22 service for all products.  And the reason it's there is because

23 BlockFi must take action in some circumstances to protect

24 customers.  I mean BlockFi was not in a position to satisfy all

25 demands for withdrawal off the platform.  It was not in a

1  position to satisfy the demands for people to put names in the

2  client -- property in the client's name in the Wallet Accounts

3  because it didn't have control of specific certain enough

4  assets to do so.

5          So the next slide shows one of the other key terms of

6  service which is in the Wallet, the BIA, the International BIA,

7  and others.  BlockFi had the right to limit access which can

8  include temporarily or permanently removing your online access,

9  restricting your accounts, and/or closing your accounts without

10  prior notice to you unless prior notice is required by law.

11          And there's also a set of terms of service, the next

12  slide, in the general terms of service which generally give

13  BlockFi the right in its sole discretion to suspend use at any

14  time and without notice to you and to cancel orders or

15  transactions in its discretion.  That's in the general terms of

16  service applicable to every client and every transaction.

17          And so BlockFi's platform pause was announced to

18  clients via Twitter and via Reddit, which are the sources that

19  are most likely to be used by BlockFi clients.  And it

20  definitely was not a secret.  In fact, it was publicly reported

21  shortly thereafter.

22          The next slide shows just some of the public reports.

23  The Bloomberg reported it 15 minutes after it happened.  Wall

24  Street Journal reported it an hour or two later.  Even the

25  leading reporting in Singapore, the leading paper in Singapore

reported it before anybody woke up the next morning in

Singapore.

And it's not disputed what BlockFi actually did as a

result of the platform pause, and that's shown in the next

slide, Slide 24.  BlockFi shut down all substantive

transactions as of the platform pause.  Users could go on to

the platform, they could view balances, and they could click

buttons but no transactions were actually consummated.  No

substantive action requested after the platform pause was

processed.

Now, Your Honor, FTX's demise and BlockFi's platform

pause all happened very fast.  And BlockFi could not

immediately turn off a number of the internal and external

functions that were part of its system.  And that is what

caused some of the communications that some of the objectors to

our motion have cited to the Court.  The user interface was not

able to be turned off immediately.  It was extremely

complicated to get that process complete.

The user interface remained on and clients could push

buttons to request a transfer.  The user interface would change

to request reflected transactions even though they never

happened.  And users continued to receive automated emails as

they had pre-pause.

And all of this happened because of the technical

issues involved in changing the user interface and the related

1  internal functionality which took a significant amount of time.

2           Next slide.

3           So BlockFi right after November 10th at 8:15 started

4  working on disabling the functionality of the platform and

5  nobody knew right at the beginning how hard it would be or how

6  long it would take.  Along the way, BlockFi did take actions to

7  try to tell people that platform activity was paused.  And so

8  let's go to the next slide, and let's start with this timeline.

9           So November 10th at 8:15 p.m. is when BlockFi

10  implemented the platform pause and communicated that to the

11  world on the places most likely going to be seen by BlockFi

12  clients.

13           Next slide.

14           The BlockFi engineers immediately started working on

15  the problem.  In years of operations no one had tried to

16  disable functionality.  The system had worked well for years.

17  And at first, they didn't know what would be required or how

18  long it would take.  Within about ten hours, they knew it was

19  going to be more complicated than they feared, so -- next

20  slide, Rob.

21           The engineering team, what they did was they posted

22  what's called an in-app message.  Your Honor might have seen

23  these sort of messages on your phone, right.  You open up an

24  app and it's the first thing that pops up.  And these are

25  warnings.  Starting at 12:14 on November 11th, any user who

1  accessed BlockFi had to click on this pop-up message before

2  they clicked on anything else on the platform.  This is the

3  first thing that popped up.  And I want to focus on this

4  message a bit.

5             Next slide.

6             It's a dismissible message.  So it was reasonably

7  straightforward to add it to the app, and it's the first thing

8  that anybody saw.  And it explicitly said that given the FTX

9  situation, BlockFi was not able to operate business as usual

10 and was limiting platform activity immediately as permitted by

11 its terms.  BlockFi did not know how long the pause would last.

12            And after this time -- next slide -- to access your

13 BlockFi accounts at any time after this was posted, you had to

14 click a button that said "got it."  Okay, got it, affirmatively

15 dismissing the message that platform activity was suspended.

16 And even after this was posted, as I just mentioned earlier,

17 tens of thousands of BlockFi clients still clicked "got it" and

18 then went and hit "transfer" and tried to do transactions on

19 their phone.

20            THE COURT:  Let me just stop you there, if I may.

21 The notice, and this is referenced in the pleadings, references

22 we are limiting platform activity including pausing client

23 withdrawals.  It doesn't reference transfers.  Those are

24 separate activities that require, and you may be going into it,

25 separate functions on the customer interface?

22

1          MR. SPADE:  So if you're moving from the Interest

2   Account to the custodial account, okay, the funds have to be

3   withdrawn from the Interest Account and then transferred to the

4   custodial accounts.  So a withdrawal could include a transfer,

5   a transfer could include a withdrawal.  It depends specifically

6   on what you are trying to do.

7          So a number of the clients, actually the overwhelming

8   majority of the people that are at issue here, they didn't just

9   say I want to withdraw from the BIA Accounts and move it to the

10  custodial account.  They said I wanted to withdraw all

11  together.  And to do that, it requires the activities to go

12  from the BIA Accounts through the Wallet to the client's

13  external Wallet.  So both of those --

14          THE COURT:  So BlockFi's position is you cannot

15  initiate a transfer without actually including a withdrawal?

16          MR. SPADE:  That's right.  That's what happens.  It

17  physically moves from the BIA Account to somewhere.  And you

18  can either transfer it to -- just transfer it to the Interest

19  Account or you can withdraw all together from the platform.

20  The vast majority of people, I think we have the numbers

21  somewhere, were trying to get off the platform entirely which

22  required going through the custodial interest accounts.

23          So where are we?  Okay.  Next slide.

24          A few minutes later after this, BlockFi posted a

25  message on its website and it finalized the ability to send an

23

email to the 650,000-plus clients that were potentially
affected, and it sent the same message out to email to every
client whether their clients have assets in Wallet, clients
that have assets in the BIA Account, or both.

Now disabling the user functionality was a challenge,
and BlockFi was still seeing clients click through the
dismissible message and click more buttons trying to withdraw
assets off the platform.  And the disabling the functionality
was taken longer than expected.

So then on November 15th, BlockFi added another
message to iPhones and iOS phones notifying people the transfer
was paused.  This went up again after you click through the
dismissible message.  And then on November 17th, it still did
the same thing for the Android messages because it was taking
longer than BlockFi expected it to takes.

On November 18th, BlockFi was finally able to disable
the user functionality and users were no longer able to click
on the transfer button.  But, again, in the interim, between
the platform pause timestamp and November 18th, 48,000 clients
had clicked buttons saying transfer.

Next slide.

And they had received automated emails saying
transfers valued at $375 million had been completed where they
had not been.  And that's why we're here.  The people that made
those transfers after the platform pause are saying that they

1  should be treated the same as the clients who physically had

2  cryptocurrency in the custodial accounts as of the platform

3  pause.

4      And so now I want to go into a little more detail

5  about the way the business worked before and after the pause

6  because that shows why these transactions did not happen and

7  then try to walk the Court and people watching this hearing

8  through this in a few slides.  The back-end of BlockFi's system

9  is very complex.

10      So go to Slide 36.

11      So the direct transactions between BlockFi and

12  clients come through the Wallet custodial omnibus Wallets,

13  okay.  Those are the ones on the left-hand side of the slide.

14  Deposits come in to those.  When clients choose to move assets

15  into the rehypothecatable Wallets to earn interest,

16  cryptocurrency is in fact moved from the custodial Wallet to

17  the rehypothecatable Wallets.

18      And BlockFi then sends that cryptocurrency to

19  borrowers as indicated at the right-hand side of this slide.

20  And, again, this is the core of the business.  We were a

21  cryptocurrency lender, and we told the world and all of our

22  clients that the business was to earn yield on loans to third

23  parties.  That was the business.

24      Next slide.

25      So when customers clicked "transfer" on their user

interface before the platform pause, because they wanted to
move assets out of the BIA rehypothecatable Wallets, either to
withdraw from BlockFi all together or to trade them or to just
move the coins to the custodial Wallets, nothing immediately
happened to any actual assets.  Nothing.

And, actually, it was impossible for anything to
happen physically until and unless BlockFi employees actually
moved assets.  And, actually, it's not technically feasible to
do that anyway given the constraints and capacity of the block
chain itself.  It can't be that you push a button and the
assets immediately move.  That's not how it works.

Next slide.

What happened automatically when clients hit the
buttons was that the user interface changed.  If you had five
bitcoin in your BIA Account and you hit "transfer" two of them
to the external Wallet, the user interface would immediately
reflect three bitcoin in the BIA Account and two bitcoin into
an external Wallet.  And you as the clients would get an
automated email saying that the transaction had been completed,
but it had not been.

It was not until after the BlockFi batching and/or
true-up processes were complete that the client transfer
requests are or actually could be actually effectuated.  And in
the interim, in between these two things, BlockFi always had
the rights under its terms of service to pause withdrawals or

1  transfers and/or to cancel transactions.  Those are clear parts

2  of the BlockFi terms of service.  So let's walk through this

3  with an illustrative pre-pause transaction.

4        Next slide.

5        So assume that as shown here, client A hits the

6  button on the BlockFi platform to move ten bitcoin from the BIA

7  Account to the Wallet, hits "transfer" and "confirm."

8        Go ahead, Rob.  Next slide.

9        Client A's user interface immediately displays ten

10  less bitcoin in their BIA Account and ten more bitcoin in their

11  custodial Wallets.  And -- next slide -- client A would

12  immediately receive a fully automated email saying the

13  transaction had been completed.

14        Next slide.

15        But nothing actually happened until later steps on

16  the back-end.  And those steps began when the company's

17  interface collected the transaction and began consolidating

18  them for review by BlockFi's operations and finance teams.

19        Next slide.

20        So BlockFi had two processes that its employees in

21  finance and operations performed, one called batching and one

22  called true-up.  And no physical transactions occur, no

23  cryptocurrency is moved until one or both of these processes on

24  the back end occur.

25        What BlockFi does on the back end depends on the

1   nature of all clients' collective requests on the front end

2   within a specific time period.  If all the client is doing is

3   trying to move assets out of the BIA Account and into the

4   custodial Wallets without trading them or moving them off the

5   platform, then that action did not occur until the next day

6   following the true-up.

7        But if a client is trying to do something further

8   than that, if a client is trying to move the assets from their

9   BIA Accounts ultimately off the platform entirely to an

10  external Wallet, that could happen sooner but only if the

11  assets went through what BlockFi calls the batching process in

12  the interim.  So I'm going to walk through those two processes

13  separately.

14       Go to Slide 44 in the true-up process.

15       The true-up process is critical because BlockFi had

16  an obligation to match what was physically in the custodial

17  Wallets with what was owed to clients who had directed their

18  assets to the custodial Wallets.  BlockFi had promised people

19  it was not going to rehypothecate these particular assets.

20  These assets are in the account, and they are yours, not ours.

21       So each day after clients -- and one business day

22  after the transfer request, the treasury team looked at the

23  assets in the accounts and compared those accounts to where

24  clients wanted their assets to be.  And if there was an

25  insufficient amount in the custodial Wallets, coins were

28

physically moved from the BIA to Wallet.  And if there were not

sufficient assets in the BIA and you needed to go further to

clients to call back those assets, BlockFi did that.  That is

the true-up process.

THE COURT:  So is it fair to say that the true-up

process involved a look at the transaction as an aggregate for

the day, not customer-specific but collectively to see if

there's enough money in one to transfer what was transferred

individually into the other?

MR. SPADE:  Right.  It's both.  You look at

individuals and the group as a whole.  But a true-up was

necessary only if the group as a whole required additional

movement of assets from the BIA accounts to the Wallet

Accounts, right.  And, obviously, if there's a significant

amount of assets that are moving on any given day, by

definition, it's going to be required because the purpose of

the process is for the assets in the custodial accounts to

match one to one at all times.

THE COURT:  Okay.

MR. SPADE:  So Slide 45, assuming that clients have

asked to move assets in the hypothetical that I mentioned

earlier from BIA to the Wallet, BlockFi actually has to get the

assets from somewhere.  So it's treasury team takes physical

assets from the rehypothecatable Wallets and move them to the

custodial Wallets so you can match your obligations to clients.

1          Now depending on the day, as I said, BlockFi may or

2     may not physically possess the coins to be able to do that in

3     the rehypothecatable Wallets.  It might have lent those assets

4     to a third party.  That was its business.  It lent many many

5     assets to third parties consistent with what it told clients.

6     And BlockFi may be able to move existing assets from those

7     Wallets over to the custodial Wallets or it might have to get

8     those from the borrowers.

9          In any event, the process of physically moving assets

10    from BIA to the rehypothecatable Wallets, it's not automatic.

11    It's definitely not immediate.  That's not how it works.  And

12    the BIA terms of service, Your Honor, are completely consistent

13    with this process, but you have to read the terms of service

14    all together.

15         Let's go to the next slide, Slide 46.

16         So this is the terms of service, Your Honor.  And

17    these are under the BIA terms of service, it's the same under

18    the BIA U.S. and non-U.S. terms, okay.  This is under the

19    category of withdrawals, like one, two, and three.

20         Number one, you may make a request for a complete

21    withdrawal of principal from your crypto Interest Account,

22    that's the BIA Account, at any time.  Any withdrawal of

23    principal will be transferred instantly to your BlockFi Wallet,

24    and any withdrawal from the Wallet is subject to the Wallet

25    terms.

1            And then BlockFi, number three, right below it,

2   BlockFi and our third-party partners as I described before, may

3   experience extreme market conditions that could result in

4   immediate halt of transfers and withdrawals of cryptocurrency

5   temporarily or permanently.

6            So my colleagues on the other side are trying to make

7   a meal out of these two words, these two words "transfer

8   instantly."  But you have to read those words in the context of

9   the full sentence, definitely in the context of the full

10  paragraph and in the context of all the terms of service.

11           The first sentence says that you can make a request

12  for a complete or partial withdrawal of principal from your BIA

13  Accounts at any time.  And the second says that the actual

14  withdrawal of principal, once that withdrawal happens, will be

15  transferred to your Wallet immediately.  And then further

16  Wallet transfers out of the system are subjected to the Wallet

17  terms.

18           But the actual withdrawal of principal from BIA does

19  not occur immediately and it could not, and that's because of

20  what I described before about how BlockFi's business actually

21  works.  BlockFi has to go physically to get principal assets

22  from the BIA and move them to Wallet, and that's not happened

23  instantly ever.  And so the argument that's being advanced on

24  the other side takes these two words "transfer instantly" out

25  of context and it ignores the rest of the sentence.  And it

1  definitely ignores number three, BIA term (c)(3) which couldn't

2  be any clearer in identifying the situation that BlockFi found

3  itself in on November 10th at 8:15 p.m.

4        There were extreme market conditions.  That's

5  indisputable.  And BlockFi decided to immediately halt all

6  withdrawals and all transfers of cryptocurrency.  And so our

7  view is that my friends' argument on the other side is

8  inconsistent not only with the way BlockFi's business worked

9  but also with the terms of service.

10        Now the argument gets even more complicated, Your

11  Honor, because there's a conflation between requests to move

12  assets from BIA to Wallet with requests to move assets from BIA

13  to an external Wallet through the custodial Wallets.  That

14  makes things even more complicated, and that's what brings into

15  play the so-called batching process, okay.

16        And so let's go to the next slide, 47.  The batching

17  process reflects what I mentioned earlier, Your Honor.  BlockFi

18  set up its system to try to be responsive to clients' requests.

19  When a client wanted to withdraw assets, BlockFi wanted to be

20  responsive and wanted to be in a position to do that as quickly

21  as possible.  But, certainly, it was not instant.  So let's

22  walk through that process.

23        So when a client wants to take assets off the BlockFi

24  platform entirely, the process looks a lot like the true-up

25  process that I mentioned earlier with respect to just

1  withdrawals from BIA and deposits into the custodial accounts.

2  Clients initiate transfer requests in the user interface.

3  Those are collected by the company and the financial operations

4  group.  And the user interface immediately reflects the book

5  entries that assets in the BIA are reduced in the amount

6  requested.  But it takes time to process the transactions.

7        Next slide.

8        Now here, Your Honor, because assets are leaving the

9  platform entirely, the fraud and security team takes the first

10  cracks at these particular requests.  And they're done in

11  groups, and that's why they call it batching.  Batches of

12  proposed transactions are sent to the fraud and security team

13  and they look at them and that's the first line of defense.

14  And, oftentimes, security issues are flagged and those issues

15  actually may require interaction with the clients, but it

16  actually might need additional information from the clients

17  before you're able to process the particular request.

18        And so it definitely cannot be the case that when you

19  ask for a withdrawal from your BIA accounts that it happen

20  instantly because it has to go through the fraud and security

21  checks and may require further interaction with the clients.

22  But depending on the nature of the individual batch, what is

23  requested specifically and what is overall requested, the

24  process can go slow but it can go fast.  Twice a day the

25  finance team would review the batches and it would try to

1   process the fraud checks, which depended both on who was trying

2   to withdraw and what they were trying to get.

3          It might be different if you were asking for a

4   withdrawal of cryptocurrency or if you were asking for a

5   withdrawal of cash through a wire or through an ACH.  The

6   debtors' systems had in place an 18-hour fraud check for any

7   crypto withdrawal.  It was actually quicker if you wanted to

8   get a cash withdrawal because of the back-end systems.

9          So what happened was that valid requests were sent to

10  the BITCO accounts.  That was the smaller account that directly

11  interacted with the clients.  Those were where the crypto asset

12  requests were sent once they were validated.  And the cash

13  requests were sent to Silvergate for wires or ACH.

14         If Silvergate had enough cash, the cash would go out

15  the door.  If it did not, it had to get the cash either by

16  liquidating the crypto or getting cash somewhere else.  If

17  BITCO had enough crypto in the form of the specific coin

18  requested to meet the withdrawal request, the whole batch, then

19  once the request passed the fraud check, it would batch out the

20  crypto to clients.

21         And, again, that was only if the BITCO account had

22  enough.  It didn't have to itself go to the other account at

23  Fireblocks to get crypto to send out the door.  So depending on

24  the day, cryptocurrency withdrawal requests could either be

25  consummated during the batching process if there was a limited

1  number of requests depending on what was in the BITCO account

2  to begin with or it would have to go through a separate mini

3  true-up process where cryptocurrency was physically moved to

4  effectuate the transaction.  It just depended on the day.

5       Like, for example, my colleagues on the other side

6  found one time that this had happened where there was a same-

7  day withdrawal request that actually was processed.  And it was

8  processed -- this was in July of 2022, I believe.  And it was

9  processed because there was an intra-day batching system that

10 BlockFi was able to effectuate.  The process was certainly not

11 instant, and the process was done exactly consistently with the

12 BlockFi terms.

13      So if you go to Slide 50, Rob.

14      The bottom line is that no withdrawal request,

15 whether it was a withdrawal from BIA to the custodial Wallet or

16 withdrawal from BIA to the external Wallet through the

17 custodial product, none of them were instant.  Every single one

18 of them had to go through BlockFi's back-end systems.  And that

19 was not -- that was true for every transaction before the

20 platform pause period.

21      Now let's talk about the attempted post-pause

22 transactions.  Let's go to Slide 51.

23      So my friends on the other side are arguing that

24 because they clicked "transfer" and "confirm" on the user

25 interface during the eight-day period between November 10th at

1  8:15 p.m. Eastern and November 18th when we shut down the

2  system, as did 48,000 people trying to move $375 million of

3  cryptocurrency, their argument is that they clicked the buttons

4  as they could have done pre-pause.

5          Next slide.

6          The user interface as it had done pre-pause displayed

7  the transaction had been completed.

8          Next slide.

9          And as had occurred pre-pause, they received an

10 automated email saying the transaction had been completed.  And

11 in fact, as had happened pre-pause -- next slide -- BlockFi's

12 system had internally collected the transfer requests for

13 review by the team.  But BlockFi did not and could not conduct

14 any of the back-end processes after the platform pause.

15         Doing so would not have treated clients fairly and

16 would certainly have not treated them equally given that other

17 clients had assets in the custodial omnibus accounts that were

18 attributable to them.  And actually moving more cryptocurrency

19 from BIA to the custodial Wallets would be unfair to the

20 remaining clients that were at BIA.

21         The argument being made by my opponents is that

22 clicking the button saying "transfer" creates an ownership

23 interest in assets that were already in the custodial omnibus

24 accounts because other clients had directed those assets to be

25 there.  But that can't be right, in our view.  The assets that

1   are in those custodial accounts, they belong to those other

2   clients.  And I want to end by kind of just level-setting on

3   the current state of affairs.

4           And you can go to Slide 58, Rob.

5           So sitting here today, we have about 297 million when

6   you round up of cryptocurrency that is sitting in the omnibus

7   custodial Wallet accounts at BITCO and Fireblocks.  And that

8   matches almost to the dollar the Wallet claims that are

9   attributable to those clients who had assets in the product as

10  of the platform pause.

11          And separately, we have about $1.2 billion in claims

12  for clients who as of the pause had directed clients to the BIA

13  product and permitted BlockFi through the terms that we went

14  through to rehypothecate and lend those assets out to a third

15  party in order to earn yield.  Those are assets that BlockFi

16  had title to, not the individual clients.

17          Now when we read the initial objection, we actually

18  weren't clear, and we thought that what they were asking was

19  for assets to actually be physically moved from the

20  rehypothecatable Wallets over to the custodial Wallets to

21  address the post-pause requests.  And the supplemental

22  objection in my view clarifies what they originally requested.

23          The way I read them to be saying now -- next slide --

24  is that because they clicked the "transfer" and "confirm"

25  buttons, between November 10 at 8:15 and November 18th, they

1   have an equal claim to the assets that are in the custodial

2   Wallet accounts even though no assets were actually moved to

3   the custodial Wallet accounts on account of their button

4   clicking.

5          We don't agree with their theory, but the effect

6   would be, of course, to just more than double amount of the

7   Wallet claims against the same pool of assets sitting in the

8   custodial Wallet accounts.

9          Next slide.

10         That result would materially reduce the recovery to

11  Wallet Holders, but more practically for purposes of the motion

12  that we filed, it would make it impossible for us to do what we

13  want to do which is to give Wallet customers whose assets

14  BlockFi held in trust without the right to rehypothecate those

15  assets.  We want to give those people their money back.

16         And so -- next slide -- what we're asking the Court

17  to do is overrule the objections and allow the debtors to do

18  what we've been trying to do since the motion was filed.  There

19  is a pool of cryptocurrency in the custodial Wallet accounts

20  that was directed there by specific customers and placed there

21  by BlockFi employees on the premise that those specific assets

22  belong to those specific customers.  BlockFi promised to give

23  those coins back to the clients, and that's what we want to do.

24         And as Your Honor knows, time is often the enemy of a

25  creditor in bankruptcy.  And we've been trying to get these

1  assets out the door to these people for some time.  Funds on

2  hand at the company, they're sitting in accounts.  Obviously,

3  they're targets for all sorts of potential creditors, so I

4  don't blame anybody for trying to get at those assets.  They

5  are sitting there, and we are taking the position that that is

6  not property of the estate.  We want those assets to go out the

7  door.

8          Largely, this is an inter-creditor fight about who

9  gets those particular assets, Your Honor.  Our position is that

10 it's pretty clear it's the people who put those assets there in

11 the first place on the premise that the debtors wouldn't have a

12 right to move them.  The Creditors' Committee is reserving

13 their right to pursue preferences depending on when those

14 assets were moved to the custodial accounts.  They're

15 suggesting there might be clawbacks from the Wallet.  And

16 there's a suggestion on the other side that the Wallet Account

17 isn't big enough.  Maybe there should be more assets in the

18 Wallet Account.

19         But what that highlights, Your Honor, is the

20 fundamental reality a line in the sand had to be drawn by the

21 debtors' pre-petition, and it has to be drawn here by the

22 Court.  And the publicly announced platform pause is clearly

23 the most logical and rational route to an expedient process

24 that enables client recoveries, and it is the only one that's

25 consistent with both the way BlockFi actually conducted its

1   business and BlockFi's terms of service.

2          So unless Your Honor has any questions, that's all I

3   have for now subject to rebuttal.

4          THE COURT:  No, not at this time.  Thank you.

5          MR. SPADE:  Thank you, Your Honor.

6          THE COURT:  Hear from the Committee?

7          MR. AULET:  Good morning, Your Honor.  Kenneth Aulet

8   of Brown Rudnick for the Official Committee.

9          We agree with the relief the debtors are seeking

10  here, but we come at it from a little bit of a different

11  perspective.  Every single one of BlockFi's customers was

12  promised their money back and is entitled to their money back.

13  The issue is it's just not there.  And that's why we're here

14  today because BlockFi does not have the money to meet all of

15  its promises to return money to its customers.

16         And so the role of this bankruptcy is to resolve

17  those competing entitlements to funds in the fairest and most

18  equitable way consistent with the Bankruptcy Code.

19         And so we view this less as a question of contractual

20  interpretation as what actually happened and what was BlockFi

21  actually able to do.  So it's undisputed that there are

22  sufficient funds segregated for the pre-pause Wallet Holders.

23  If no additional funds come in to the Wallet, those people can

24  be paid in full, they can recover their property, and they

25  don't have to further deal with this bankruptcy --

1          THE COURT:  Subject to potential clawback, correct?

2          MR. AULET:  Correct, Your Honor.

3          And as we know, it's not them being in the Wallet

4   that's the issue with potential clawbacks.  It's it coming out

5   of the BIA Accounts.

6          So from our perspective, like I said, the debtors

7   have talked about the contractual and notice issues.  But we

8   don't actually see that as relevant because I think the debtors

9   have the better of that argument.  But even if they don't, what

10  that means is the debtors breached their contracts.  And they

11  breached a lot of contracts, unfortunately.  Every BIA

12  accountholder was entitled to withdrawal of their funds in

13  full, and they're not going to be able to get that.  And that's

14  -- as a result, the question is do you have an unsecured claim

15  or do you have something else.

16         And we analogize this in our response to a bank

17  check.  Even if BlockFi sent a message saying we're going to

18  pay you, they sent a check.  But BlockFi didn't actually move

19  any money on the back-end, and that in our view is what's

20  determinative because even if BlockFi was obligated as the

21  paragraph on 46 of the debtors' slide deck said, even if

22  BlockFi was obligated to immediately transfer funds, it didn't.

23  That's a promise, and it breached its promise.  But that is

24  nothing more than an unsecured claim.

25         Companies headed into bankruptcy all the time write

1 checks trying to pay people that aren't honored.  And as we

2 note in our papers, when the funds actually transfer with the

3 check is when the check is honored.  And here, these transfer

4 requests were never honored.

5 　　　　　So BlockFi may have breached its contracts, but the

6 remedy is a breach of contract claim.  The funds that were

7 segregated pre-petition are not BlockFi's property.  Those were

8 owned by the pre-pause Wallet Holders.  And so it cannot be the

9 case that BlockFi's breach of its contractual obligations made

10 it so that pre-pause Wallet Holders lost their entitlement to

11 property that they had.

12 　　　　　BlockFi wasn't entitled to take that property at

13 pre-pause.  If BlockFi had taken property from the Wallets to

14 use as it saw fit, there might be much more significant claims

15 in this case.  But there's no indication that it did that.

16 　　　　　And we don't challenge anybody's -- for trying to get

17 their money back.  Like we said, everybody was owed their money

18 back.  At the time of the pause, the automatic stay had not

19 come into effect, and everybody was entitled to do their best

20 to try and get paid.  And we don't challenge anybody for doing

21 that.  You know, tens of thousands of people did.

22 　　　　　You know, Mr. Slade noted some aspects of what was

23 happening, but, you know, the story with FTX and Alameda

24 Research began even earlier on November 2nd when, as the

25 debtors noted in their first day declarations, certain balance

1  sheets leaked of Alameda Research, which was the debtor's

2  counterparty there.

3        Ultimately, today, we're here because BlockFi just

4  doesn't have the money that it needs to have to be able to pay

5  everybody in full.  It made a number of contractual promises.

6  And every day in a bankruptcy court, contractual promises are

7  not honored.  It's why you're in bankruptcy.  Just it's not

8  that anybody wasn't owed their money.  The money just isn't

9  there today.

10        And so as of the pause date, BlockFi did announce it

11  was, you know, halting withdrawals.  I think that it's a fair

12  reading of how the BIA accounts work that if you're taking

13  money out and putting it into Wallet or you're taking it off

14  the platform entirely, you're getting paid on an unsecured

15  claim.  That sounds like a withdrawal to me.

16        But in our view, you don't need to dance on the head

17  of the pin of all these contractual arguments.  You don't need

18  to look at what notice was actually provided, because at the

19  end of the day, even if BlockFi was not entitled to an actual

20  platform pause, it did.  BlockFi stopped honoring withdrawals,

21  stopped honoring transfers, stopped honoring everything,

22  because it knew that at that moment it didn't have the funds it

23  needed to satisfy debts in the ordinary course.

24        And so that's why we're here today, Your Honor.

25  That's why we've been here since November.  And, unfortunately,

1  that means that certain BIA account holders are not going to

2  get paid in full.  But, unfortunately, absent some fairly

3  substantial recoveries, none of them are going to get paid in

4  full.

5        And what we have to do here is to do what's fairest

6  and equitable for all BIA account holders, both those who

7  attempted to withdraw their funds after the platform pause date

8  and those who didn't.  And so, Your Honor, we'd request that

9  you find that the platform pause transfers did not give

10 customers a right to Wallet funds that had not been segregated

11 for their benefit.

12        THE COURT:  All right.  Thank you, counsel.

13        Anyone else on behalf of the debtor -- in support of

14 the debtor's motion?

15        Mr. Gwynne, I see your hand raised.  I think you need

16 to -- you're on mute.

17        MR. GWYNNE:  Can you hear me?

18        THE COURT:  Now we can.

19        MR. GWYNNE:  Thank you, Your Honor.  Good morning.

20 Kurt Gwynne from Reed Smith on behalf of the Ad Hoc Group of

21 Actual Wallet Holders who are identified by name in footnote

22 two of our response in support of the motion, which is Docket

23 Item Number 826.

24        Our clients had assets in the Wallet accounts prior

25 to the platform pause.  Neither the debtors nor the Troutman Ad

1  Hoc Group deny that our clients own their assets in the Wallet

2  account.  The Troutman Ad Hoc Group, however, seeks to share in

3  the assets of the actual Wallet holders.

4      As a matter of law, Your Honor, there's no basis for

5  the Troutman Ad Hoc Group to request or for the Court to grant

6  the Troutman Group an interest in assets that belong to someone

7  else, here the actual Wallet Holders.  The Troutman Group's

8  assertion of a right to someone else's property is itself based

9  on a fiction.

10     There's no factual dispute that the Troutman Group's

11 BIA assets remained in the BIA.  That is all the Court needs to

12 know to determine that the Troutman Group has no interest in

13 other clients' assets in the Wallet account.

14     What does not matter -- and I see this largely the

15 way Committee counsel does, Your Honor.  What does not matter

16 is the notice, whether any notice was given or what it, in

17 fact, said.  What also does not matter here are the terms of

18 conditions with respect to the Troutman Group or the terms of

19 service.

20     Why are those, the notice and the terms and

21 conditions of service, irrelevant as applicable to the Troutman

22 Group?  Because at bottom, at the end of the day, none of their

23 assets were transferred to the Wallet accounts.  So even

24 assuming that the Troutman Group is right about the notice or

25 the terms of service or both, and I'm not saying they are, but

45

1  even if they were right about both of those things, the bottom

2  line is their assets were never moved to the Wallet account.

3         So as Committee counsel said, at most the Troutman

4  Group has a breached contract claim against the debtor, because

5  their assets were not transferred to the Wallet account.  But

6  what the Troutman Group does not have is the right to share in

7  the assets of clients that were transferred to he Wallet

8  account and are indisputably property of clients like the Ad

9  Hoc Group of Actual Wallet Holders.

10        As the Supreme Court recognized in 1962 in the

11 Pearlman case: "The bankruptcy act does not authorize a trustee

12 to distribute other people's property among a bankrupt's

13 creditors."  The same is true under the Bankruptcy Code.

14        So for those reasons, Your Honor, the Ad Hoc Group of

15 Actual Wallet Holders respectfully request that the Court grant

16 the motion which was filed on December 19th of 2022 and permit

17 the debtors to do what the Bankruptcy Code already permits, to

18 return the actual Wallet Holders' property to those actual

19 Wallet Holders.  And that's all I have, Your Honor, unless you

20 have questions for me.

21        THE COURT:  No.  Thank you, Mr. Gwynne.

22        MR. GWYNNE:  Thank you, Your Honor.

23        THE COURT:  Is there anyone else in support of the

24 motion?

25        All right.  Then let me turn to Ms. Kovsky.  Good

1   morning, Ms. Kovsky.

2         MS. KOVSKY:  Good morning, Your Honor.  Sorry.  I've

3   got a lot of paper here.  Good morning, Your Honor.  Deb

4   Kovsky, Troutman Pepper, for the Ad Hoc Committee of Wallet

5   Account Holders.  I don't have a fancy PowerPoint presentation

6   like the debtors.  And unlike the estate, I don't have nine

7   lawyers present here.  My clients don't have a virtually

8   unlimited war chest.  They've just got me.

9         The members of the Ad Hoc Committee are just ordinary

10  customers of BlockFi.  They're not wealthy.  They're not

11  well-financed.  They're just trying to get fair treatment by

12  the debtors to whom they entrusted their digital assets.

13        As Mr. Slate alluded to, at bottom, this is really a

14  dispute over the allocation of non-estate assets.  The question

15  before the Court is at what point did a BlockFi customer who

16  clicked the button to transfer out of BIA who instantly stopped

17  accruing interest on those assets in the BlockFi system, who

18  received an automated email set up by BlockFi confirming that,

19  in fact, the transfer had occurred, at what point did they

20  legally leave BIA and acquire the right to look instead to

21  whatever digital assets are sitting in the commingled omnibus

22  custodial Wallet reserves?

23        And I think it's important to note here that the

24  debtors really have no skin in the game.  The Official

25  Committee definitely has no skin in the game.  This is about

1  assets that are not property of the estate.

2           If the debtor's motion is granted, no digital assets

3  return to the estate.  If the Ad Hoc Committee's objection is

4  sustained and the Ad Hoc members' valid transfers are

5  recognized, there's no increase in claims against the estate.

6           And let's walk through the math.  The debtors have

7  said there's about three -- and I'm going to use round numbers,

8  because I can do math in my head that way.  There's about $300

9  million worth of digital assets in the custodial Wallet

10  reserves.  There's about $300 million of -- about $300 million

11  reflected in the pre-November 10 8:15 p.m. Wallet accounts.

12  About $375 million reflected in the post-November 10 8:15 p.m.

13  Wallet accounts.

14           So if the debtor's motion is granted, there's about

15  $375 million in claims against the estate.  If the Ad Hoc

16  Committee's objection is sustained, there would be some kind of

17  allocation of Wallet assets, and then there would be a $375

18  million deficiency that could be asserted as claims against the

19  estate.  So from the perspective of the estates, this is a

20  complete wash.

21           It's really especially perplexing to the Ad Hoc

22  Committee that the Official Committee has spent so much time

23  and energy opposing the Ad Hoc Committee on this matter when it

24  has zero impact whatsoever on the Official Committee's actual

25  constituents.  The Official Committee doesn't have a roving

1    commission to do what it perceives as equity.  It has a mandate

2    to represent the interests of unsecured creditors.  And,

3    importantly, those interests are completely unaffected here.

4           It was also kind of surprising and disappointing that

5    the Committee chose to argue preference issues in its reply

6    brief since the parties had decided and agreed that those

7    issues, if they come up, would be deferred for another day and

8    that the only issue before the Court today is whether the

9    transfers out of BIA and into Wallet actually happened.  And

10   with respect to that issue, as Mr. Slade indicated, there's

11   really no dispute as to the key facts.

12          The transfer button remained live in the user

13   interface well after November 10th at 8:15 p.m.  The debtors

14   did not shut it down.  BlockFi did not pause those transfers in

15   the user interface, did not pause the cessation of interest,

16   did not pause all of the things that the customer could do and

17   all of the immediate impacts that those actions had.

18          All that BlockFi did was make the back-end decision

19   to stop truing up the Wallet reserves.  So when the customer

20   clicked transfer, their BIA account balance was immediately

21   debited, and their Wallet account balance was immediately

22   credited.  Interest immediately stopped accruing in the

23   debtor's storm system which is described in Mr. Cheela's

24   declaration.  An automated email confirming the transfer was

25   sent by the debtor's system.  And then the debtors failed to

1  add any digital assets to the Wallet reserves on account of

2  those actions.

3        But here's the important part.  When a customer

4  transferred out of the BIA program and into the Wallet program,

5  his right to tap the existing assets in the custodial Wallet

6  reserves wasn't dependent on the debtors first putting more

7  assets into the reserves on account of that transfer.  And that

8  is crystal clear from all of the facts that Mr. Slade just ran

9  us through.

10       And, first of all, the debtors chose to design their

11 system so that all that a customer had to do to exit BIA and

12 stop earning interest was click the transfer button.  They

13 didn't have to design it that way.  They could have built in a

14 delay.  They could have tied the cessation of interest, the

15 consideration for the grant of title to those digital assets to

16 some other event.  The debtors could have had the automated

17 email say transfer pending.

18       They didn't do those things.  They chose to make it

19 instantaneous.  BlockFi chose to agree with its customers in

20 terms of service that BlockFi drafted that the transfer of

21 principal out of BIA would happen instantly.

22       In fact, customers' ability to make those transfers

23 out of BIA instantly was part of what the Official Committee

24 described in one of its briefs as BlockFi's best in class

25 customer protections.

1        THE COURT:  But notwithstanding that the app reflects

2   instantaneous movement, the terms of service provided that it

3   would not necessarily be instantaneous.  Isn't that correct?

4        MS. KOVSKY:  No, that's not correct, Your Honor.  The

5   terms of service say that it -- well, let's take a look at --

6        THE COURT:  Well --

7        MS. KOVSKY:  It's --

8        THE COURT:  I mean, portions of it say that there can

9   be up to a seven-day delay in certain situations.

10        MS. KOVSKY:  Well, Your Honor, actually, let me

11   clarify that.  Because you asked Mr. Slade a question, and I

12   think his answer may have been a little bit confusing.  I think

13   you said can you have a transfer -- or I think you said you

14   can't initiate a transfer without a withdrawal; is that

15   correct?  And I believe my colleague on the other side said,

16   yes, that's correct.

17        But, actually, that's exactly wrong.  If you look at

18   paragraph 50 of the stipulated facts that were filed on the

19   docket, it says that "Following the launch of BlockFi's Wallet

20   product, customers could no longer withdraw eligible digital

21   assets directly from BIA to an external Wallet.  Instead, as

22   set forth in the BlockFi U.S. BIA terms of service and BlockFi

23   non-U.S. BIA terms of service, digital assets had to first be

24   transferred from BIAs to customer Wallet accounts."

25        Now, that first step, the transfer from BIA to a

1  customer Wallet account, that's instant.  That's put -- that's

2  discussed right there in the BIA terms of service.  Then if you

3  go to the Wallet terms of service, if you want to actually

4  withdraw off the platform altogether, there could be up to a

5  seven-day delay.

6      That's in a separate set of terms of service.  And

7  that's once you're already in Wallet, then you can request your

8  transfer off the platform.  And that can be, you know -- you

9  know, it depends on how quickly the debtors were able to

10 process it.  It could be same day.  It could be a couple of

11 days.  It could be up to seven days.

12     THE COURT:  So you're saying withdrawals are not

13 necessarily instantaneous?

14     MS. KOVSKY:  Correct.  Absolutely.  Yes.  A

15 withdrawal off of the platform by the terms of service -- and

16 everybody agrees that was not instantaneous.  Not even it was

17 not necessarily.  It was not instantaneous.

18     But the inter-account transfer from BIA to Wallet,

19 the terms of service are very clear.  It happened instantly.

20 And the debtors would like the Court to believe that instantly

21 in that context actually means, well, after we perform all of

22 our back-end true-up processes or batching processes, then

23 we'll instantly transfer you out of BIA and into Wallet.

24     That completely negates any possible sensible

25 understanding of the word "instantly."  That word, instantly,

1  doesn't belong there if, in fact, the transfer out of BIA and

2  into Wallet was something that could take a day, two days, even

3  three days if it was a holiday weekend, and the true-up process

4  wasn't run until the next Monday.

5        THE COURT:  Now, I didn't question too much your

6  adversary, because I did want -- I want to be fair to you.  But

7  I do have a question.

8        MS. KOVSKY:  Sure.

9        THE COURT:  And, overall, let me say I accept your

10  views of what instantaneous should mean and the impact -- and

11  the difference and the distinction between transfer and

12  withdrawal.  The BlockFi general terms, at least what's been

13  presented to me as part of the record, provides that BlockFi

14  reserves the right to refuse service, terminate relationships,

15  and cancel orders or transactions in its discretion.  If at the

16  end of the day it retained the ability to cancel what may have

17  been an instantaneous transaction, what difference does it

18  make?

19        MS. KOVSKY:  Well, Your Honor --

20        THE COURT:  Couldn't they, when they initiated the

21  pause, and even after the fact, go back and say we are

22  canceling in order to level the playing field.  It may give

23  rise to claims.  Maybe they're doing so improperly, which would

24  create a general unsecured claim.  It's a breach of contract if

25  they cancel without a basis.  But they reserve the right to

1   cancel.

2          So how does that comport with what you're saying as

3   far as your entitlement?

4          MS. KOVSKY:  Well, Your Honor, first of all, they

5   didn't cancel the transfers.  That didn't happen.  All they did

6   was fail to put enough assets into the reserves to cover

7   everybody's transfers in full.

8          That's not a cancellation of the transfer.  That is a

9   breach of contract, but it's not a cancellation of the

10  transfer.  It just means that people are going to have to take

11  a haircut.

12         THE COURT:  Well, they're saying they're not honoring

13  any activity that took place post pause.  So if we accept that

14  the customers' initiation through the app was a transaction and

15  their refusal to honor it, you know, in light of their pause,

16  isn't -- that's not a cancel?  That's not a cancellation?

17         MS. KOVSKY:  Well, Your Honor, it's hard to see how

18  it is, because they didn't reverse -- I mean, they came to this

19  Court to ask to be able to cancel those transfers, to ask to be

20  able to reverse them.  Clearly, they haven't done it yet.  If

21  my clients go into their apps, and they pull up what assets do

22  I have, it shows right there in Wallet, in the Wallet account,

23  that they have their assets in the Wallet program.  And

24  being --

25         THE COURT:  So is my granting approval, authorization

54

1  the last step necessary for them to cancel consistent with the

2  terms of the -- general terms of agreement?

3      MS. KOVSKY:  I don't know that -- I don't actually

4  know whether it is or not.  But, clearly, the debtors felt that

5  they needed the Court's permission to do it since they asked

6  for it.

7      And, in addition, although this wasn't briefed or

8  argued, I would suggest that the debtors should not be able as

9  a contractual matter to exercise their discretion in an

10 entirely arbitrary and inequitable way, which would be the case

11 if they decided to choose winners and losers between similarly

12 situated customers.  That the person -- the customer who

13 transferred -- who all they did was click the button to say

14 transfer at 8:14 p.m., to make that customer the winner who

15 gets 100 percent recovery out of the Wallet reserves and the

16 person who transferred two minutes later at 8:16 p.m. gets

17 nothing --

18     THE COURT:  But there are going to be winners and

19 losers, unfortunately, when there's not enough funds.

20     MS. KOVSKY:  Your Honor, there are going to be

21 winners and losers because there are not enough funds, because

22 the debtors do not have enough assets to pay everyone in full.

23 But that doesn't mean treating similarly situated customers

24 differently.

25     The debtors did not halt the transfers from BIA to

1  Wallet until days after November 10th.  They did not -- they
2  didn't change anything about the system.  They deliberately set
3  up their system so that the architecture essentially pushed
4  people out of BIA the minute they clicked transfer.

5  The whole consideration -- and this was discussed a
6  lot in the <u>Celsius</u> case.  The consideration for customers'
7  grant of right and title to their digital assets to BlockFi,
8  the whole thing that gave BlockFi the right to rehypothecate
9  was the earning of rewards, the earning of interest.  And
10 BlockFi designed its system so you hit transfer, interest
11 ceases immediately.  You are now no longer in that
12 interest-earning relationship.

13 So I sort of think about it like sitting in a swivel
14 chair, right?  So if you're swivelled this way, and you're
15 looking at BIA, your account's pointing at BIA, you've got
16 risk.  You've granted title to BlockFi.  And in return, you're
17 getting interest.  You're getting rewards.

18 You click transfer.  Immediately, you swivel this
19 way.  You no longer get interest.  You no longer get those
20 benefits.  But instead, you have the right to tap the assets
21 over here that are in the reserve.

22 THE COURT:  But what if you swivel, and you're
23 transferring more than you have?  And the app is letting you do
24 so.  The user interface doesn't stop you.  You've transferred
25 more coins than what you have.

1         Or there's some error.  We know there are bank

2    errors.  We know there are lots of errors in using apps.  But

3    it allowed you to do so.

4         Your position on behalf of the Ad Hoc Committee is

5    that, wait, it's still a valid transfer, and we have --

6    actually, what I think you're saying is you have a title

7    interest in those coins, in what -- a legal interest in what's

8    in that account.  But it could be a mistake.  And doesn't the

9    general terms of agreement allow for an audit, essentially, a

10   look at that transaction before it becomes un-reversible?

11        MS. KOVSKY:  Not necessarily, Your Honor.  Well,

12   first, there's been no suggestion that there were any errors or

13   that even -- even that errors of that type could occur.  But

14   there really wasn't the necessity to check and make sure that

15   the amount that you had in BIA was the actual amount that you

16   transferred to Wallet.  That doesn't seem to have been part of

17   either the batching process or the true-up process.  There were

18   fraud checks.

19        THE COURT:  But it goes to whether the transaction

20   itself could ever be reversible, cancellable, or terminable by

21   BlockFi.  And you're saying they can't once the swivel took

22   place, once the customer used the user interface and completed

23   it on the app.

24        MS. KOVSKY:  I think that's right, Your Honor.  Once

25   the customer said I no longer want to be in this risky

1  relationship with BlockFi, I no longer want to be in this

2  unregistered security, I want to do what the terms of service

3  say I can do and push the button and be out instantly -- now,

4  that doesn't mean that I'm going to recover in full.  Because

5  you know what?  The debtors could screw up.  The debtors might

6  not have reserved enough in that customer Wallet reserve.

7         And, in fact, that happened multiple times even just

8  in the 90 days leading up to November 10th.  On at least five

9  different occasions, even after running their true-up process

10 where they were trying to have a one-to-one match plus a 1 to 5

11 percent buffer, the debtor still fell short, one day by almost

12 $4 million.

13        So, yeah, if -- I can swivel this way.  It doesn't

14 mean I'm necessarily going to get paid in full.  And if I

15 transfer out immediately off of the platform, that may leave

16 even greater of a deficiency.

17        But all that's necessary to transfer off the platform

18 is there have to be enough assets there for me to take, not

19 that there had to have been assets that were transferred in

20 specifically for me.  The true-up process, the process of

21 moving assets from BIA to the customer Wallet reserves, was

22 completely decoupled from the legal transfers from BIA to

23 Wallet and, in many cases, from Wallet to an external account.

24        And that's exactly what Mr. Slade was describing.

25 These were decoupled and independent processes.  And there was

1  a -- sure, there was a true-up process afterwards.  The debtors

2  tried to make sure that there was enough asset -- that there

3  were enough assets in the custody reserves.  Often, they

4  failed.

5        But what would have happened on a day that there was

6  a $4 million shortfall in the custody reserve Wallets and,

7  let's say, that was the day that BlockFi filed for bankruptcy,

8  and everything was frozen?  Everybody -- you know, let's say

9  that we showed $300 million of Wallet accounts that the debtors

10 agreed, yes, that's the right amount.  Those are the transfers

11 that we validated.  We ran true-up processes.  But, oops, this

12 was the day we had the $4 million shortfall.

13       What happens then?  I would submit that the right

14 answer is there's an allocation of the assets in the Wallet

15 reserves among all of the customers that said I want out of

16 BIA, just like the terms of service said I could.  All they had

17 to do was click that transfer button to say I'm out.  They

18 stopped accruing interest.

19       If the debtors had really intended for customers to

20 remain in BIA until there was an actual transfer of assets from

21 BIA into the Wallet reserve on account of their specific

22 request, then why didn't they continue to accrue interest until

23 that happened?  Sometimes that true-up process was as much as

24 three days later.  They only did the true-up on business days.

25 So if there was a holiday weekend, that's three days of

1  interest that BlockFi was shorting customers.

2         Now, I'm not assuming that BlockFi was cheating its

3  customers.  I'm assuming that BlockFi built its architecture to

4  reflect the legal reality, which is that once you click that

5  button, you're no longer in BIA.

6         It doesn't mean you're going to recover in full.  The

7  Wallet reserve may not be fully funded.  That happens.  It

8  happened multiple times before the pause.  It certainly

9  happened by the petition date.

10         But that doesn't mean that customers who exited BIA

11  don't have the right to swivel this way and look to that

12  undifferentiated mass of assets that, by the way, do not get

13  allocated to any particular customer.  And, in fact, some of

14  them didn't even end up there -- if you look at Mr. Cheela's

15  declaration, didn't even end up there as a result of customers

16  transferring from Wallet -- from BIA into Wallet.  Because the

17  BitGO custodial Wallets were also used as the on ramp for all

18  assets onto the platform.  Some of those were just deposits

19  that were coming in from outside.

20         So you have this large, undifferentiated mass of

21  unallocated assets in a reserve.  They're commingled, not with

22  the -- they're not commingled with the rehypothecatable lots.

23  I want to be clear.  But they're commingled with each other.

24  You can't point to any asset in there and say that belongs to a

25  particular customer.

1         All you can say is I've exited BIA.  I've swivelled

2    over here.  I'm looking at the Wallet reserve.  I have a right

3    and title to look there.

4         Sorry.  That was a very long answer to Your Honor's

5    question.

6         THE COURT:  No, that's fine.

7         MS. KOVSKY:  Okay.  So there were a few things that I

8    just wanted to make sure that I covered just to clarify a few

9    things that were discussed in Mr. Slade's presentation.  I

10   think we may have covered some of these.

11        THE COURT:  That's fine.

12        MS. KOVSKY:  Oh, I do want to point out also the

13   response to the Committee's argument that this is really like

14   BlockFi saying the check is in the mail.  I think that's really

15   inapposite to this type of platform and this type of

16   architecture, because this is really much more like going into

17   your banking app and then transferring money from a CD or a

18   money market account to your checking account.

19        And, yes, the bank may at some point have to move

20   things around on the back end.  But you don't have to wait to

21   be able to take cash out of the ATM.  You can do that

22   immediately.  And I think that's probably a closer analogy than

23   the check is in the mail.  This is digital finance.

24        Also want to point out that customers -- and we

25   covered this in our brief, but just to call it to the Court's

61

1  attention.  Customers who transferred out of BIA and into

2  Wallet could immediately trade the digital assets that they had

3  transferred even before any true-up process had occurred.  And,

4  in fact, if you look at the trading terms of service, it says

5  that those transfers -- or, I'm sorry, that those trades can be

6  settled by book entry.  So the debtors were expressly

7  recognizing that there could be trades in Wallet that were

8  finalized and settled by book entry without digital assets

9  actually moving.

10      Customers who transferred out of BIA and into Wallet

11  could immediately get a transfer out of the Wallet reserves and

12  into an external Wallet before any true-up process was

13  performed.  And, yes, there had to actually be enough assets in

14  the custodial Wallet to make that happen, because you can't

15  transfer what's not there.  That's obvious that everyone agrees

16  with that.  But it was often the case that there would be

17  assets there, because there were always assets in the custodial

18  reserves by definition.  And BlockFi would just true the

19  balances up later if necessary.

20      And Mr. Slade's presentation seemed to suggest that

21  the true-up always meant pulling assets from BIA and sending

22  them over to the Wallet reserves or maybe even having to go and

23  call loans and obtain assets elsewhere and send them over to

24  the Wallet reserves.  But if you look at Mr. Cheela's

25  declaration and the stipulated facts, in fact, sometimes the

1  reserves were overfunded, and so assets got released back to

2  the rehypothecatable Wallet.

3      So it kind of seems like the debtor's position is

4  almost that, well, if there happened to be enough assets in the

5  Wallet reserve to cover a customer, then, okay, fine, the

6  transfer out of BIA is valid.  But if there doesn't happen to

7  be enough there, then you have to wait until the next true-up

8  process runs, perhaps.  It's not entirely clear, but it

9  definitely doesn't make a lot of sense.

10      And it especially doesn't make a lot of sense,

11  because as I've mentioned, there were all of those occasions

12  where even after running the true-up process, there was still a

13  shortfall.  And having a shortfall doesn't mean, oh, some of

14  those customers didn't really exit BIA.  It doesn't mean that

15  some of them that exited BIA now somehow revert back to BIA.

16  It just means there's a deficiency.  It's kind of like being

17  temporarily undersecured.

18      And if everybody had tried to withdraw on the same

19  day, there would have had to be some kind of a solution,

20  probably an across-the-board haircut like the one that was

21  imposed in Celsius until the recent settlement.  And it was

22  discussed in our papers.

23      And, finally, a lot has been said about fairness and

24  equity in support of the debtors' position and I think we do

25  need to address that.

63

1          The Ad Hoc Committee respectfully submits that it is

2   not fair to the debtors' to be able to ignore the plain

3   language of the terms of service that say that exiting BIA

4   happens instantly.  It is not fair for the debtors now to try

5   to pick winners and losers among their similarly situated

6   customers, especially with respect to assets that everybody

7   agrees aren't even property of the estate.  It is not fair for

8   the customer who clicks transfer at 8:14 p.m. to recover 100

9   percent out of the Wallet reserve and the customer who clicked

10  transfer 8:16 p.m. to get nothing.  If the debtors' messed up

11  and didn't fully reserve for every customer who transferred out

12  of BIA, well, it's not the first time that it happened, but

13  it's also not the first -- it's really just one of a long list

14  of bad things that the debtors have done to their customers.

15  But the answer is not to give everything to one customer and

16  nothing to another.  That would be the opposite of fair and

17  equitable.  And if Your Honor has any further questions, I'm

18  happy to try to answer them.

19          THE COURT:   No, I appreciate your time.  Thank you,

20  counsel.  Counsel, do you wish to respond?

21          MR. SLADE:  Yes, Your Honor, just a few points.

22  First, I'd like to commend Ms. Kovsky, she's doing an excellent

23  job advocating for her clients and she does not need an army,

24  she's a one woman army and I think she did an excellent job

25  presenting her client's position.  And just so we're clear, at

64

1  the end of the day, the debtors' hope is that we can pay

2  everybody a hundred cents on the dollar.  We have to pursue all

3  this litigation against FTX and Alameda who defrauded the

4  debtors, in order to see whether there's going to be enough

5  assets to pay everybody in full but, you know, as we're sitting

6  here today there are not. It's definitely not a wash for the

7  estate.  There's a reason that we're taking a position on this,

8  it's pretty clear, but we need to know who has an interest in

9  these funds in order to propose and confirm a plan and like

10 without taking a position on that issue, I'm not really sure

11 that our plan would say.  And the fact that the Creditors'

12 Committee has joined in our position in a case where we agree

13 on nearly nothing, is fairly remarkable and actually shows why

14 this position is really pretty clear because if there were a

15 real argument for these pooled assets to be accessible to

16 unsecureds generally, one would believe that the Unsecured

17 Creditors' Committee would be making that very argument.

18         These are just not the debtors -- these are not the

19 estate's assets, these are specific customers' assets and the

20 assets are their because as Ms. Kovsky said people made initial

21 deposits into the Wallet product and just left them there

22 because they did not want them to go to BIA.  Those assets are

23 those customers' assets and some clients withdrew assets from

24 their BIA accounts and had been deposited into the Wallet

25 accounts.  The assets there today belong to those customers.

1  It wasn't a mess-up when BlockFi decided to pause the platform

2  entirely.  BlockFi had to do that, otherwise it would be a

3  severe disadvantage to all clients, it did it because,

4  precisely because the terms provided for it and the terms

5  provided for it and they required it.

6      I don't agree with the position that we're being

7  inconsistent with the terms and conditions for precisely the

8  reasons that I've described and there's two reasons.

9      If you look at the ones she relied on, first withdraw

10 BIA -- terms and conditions one, I would just return to the

11 argument that we had.  It is true that a withdraw of principle

12 from the BIA account gets immediately moved to the Wallet

13 account.  But the withdraw of principle from the BIA account

14 does not happen in the click of the button ever.  And even if

15 it did, as Your Honor pointed out, two terms down in the same

16 terms of service that she relies on it's very clear that RICA

17 (phonetic) immediately halts transfers and withdrawals of

18 Crypto currency temporarily or permanently which is exactly

19 what the client, what the company did.  That's exactly what

20 BlockFi did.  We implemented a pause of all transactions, BIA

21 transfers, withdrawals, trade, everything stopped at the

22 program pause.

23      A point on interest, just so we're clear, her clients

24 will get interest through the petition date because they were

25 in the BIA products.  As Mr. Cheela pointed out in his

1 amendment declaration, some of the schedules are correct for

2 that period of time, some of the schedules are incorrect for

3 that period of time and we're going to have to amend them but

4 that was always true.  Ms. Kovsky mentions that you could look

5 at your interest calculation when you open up the app but when

6 you did that, this is discussed in the agreed set of facts at

7 Paragraph 54, Footnote 15, there was always a pop-up in the app

8 that says, this is an estimate of your interest and the reason

9 is because of BlockFi interest was always calculated at the end

10 of the month and it was very complicated because the display

11 had your dollar calculation of interest but it really wasn't

12 calculated until the end of the month's Crypto price.  So, it

13 was always an estimate when you looked at interest.

14          THE COURT:  But isn't Ms. Kovsky arguing that the

15 fact that interest, whenever that calculation is done, would

16 cease on the dollars that were transferred as of the moment of

17 the transfer on the app?  Does that reflect that there was an

18 actual transfer of the funds or the coins in that account as of

19 that moment?  In other words, if BlockFi is not recognizing the

20 entitlement to interest outside of this extraordinary situation

21 that happened with the pause, why isn't that reflective of when

22 funds are actually transferred?

23          MR. SLADE:  It's not precise because the interest

24 calculation was always, it was automated and then it was redone

25 at the end of the month manually and it was often changed based

1   on some of the items that I had just discussed with the Court.

2          So, it is correct that just like all the other things

3   about the automated, people got an automated e-mail saying that

4   this transaction had happened and at the end of the day

5   sometimes it did not and BlockFi had the right, under the terms

6   of service, to calculate, to cancel transactions at any time.

7   And that kind of gets me to my more general point which is,

8   their argument is essentially that whatever the user of

9   interface says is the truth and is binding on BlockFi and all

10  customers at all times but that can't be right for a lot of

11  reasons, one of them Your Honor pointed out, what if there's a

12  hack in the system and there's some -- what if somebody hacks

13  into BlockFi's system and says, Mr. Aulet has a billion dollars

14  in Ethereum today, I mean, that could happen, that doesn't mean

15  it's correct.  Companies make adjustments to their books all

16  the time, to make sure that their books reflect reality.  In

17  fact, that's the whole concept of closing the books.  At the

18  end of the month or at the end of the quarter, you go back and

19  just try to determine whether or not your books reflect reality

20  and if they don't then you make adjustments.

21         Their argument, also, again, ignores terms of service

22  for precisely the reason that you're unfocused on.  BlockFi

23  always has the option, under its terms of service to cancel any

24  transaction.  BlockFi reserves the right to refuse service,

25  terminate relationships and cancel orders or transactions in

1    its discretion.  That's exactly what we did.  And we're asking

2    Your Honor for permission to match the user interface for what

3    actually BlockFi did in reality.  Unless you have any questions

4    that all I have.

5           THE COURT:  No, thank you.  Ms. Kovsky, did you have

6    anything else to add?

7                     (No audible response)

8           THE COURT:  Mr. Aulet, I'll let you respond.

9           MR. SLADE:  Actually, I do have one other point that

10   I was going to make, I apologize.  Their argument about title,

11   I wanted to directly, you know, Your Honor asked about that.

12   So, they agree that when clients directed the placement of

13   assets at BlockFi, title transferred to BlockFI.  BlockFi owns

14   those assets.  So, the client can ask to return the assets,

15   okay, that BlockFi has title to, but even if we refused, that

16   doesn't change title to the assets, it just gives people a

17   claim against BlockFi.  So, the customer cannot legally direct

18   the return of assets over which we have title just by

19   themselves, without BlockFi's cooperation.  That might give

20   them a claim, it doesn't say anything about who owns the

21   assets.  That's all.

22          THE COURT:  Well, wait, and actually, I'll go to Mr.

23   Aulet next so Ms. Kovsky can respond to any other issues.  But,

24   would you want to comment on the argument made that when

25   there's been a transfer of Crypto currency into the Wallet,

1  even before the batch or the true-up process, it could be

2  traded.

3          MR. SLADE:  Okay.  So, this is also addressed in Mr.

4  Cheela's declaration.  So, there are book entries reflecting

5  trades when those transactions happen but they don't happen

6  until after the true-up process and BlockFi retains the right

7  to cancel transactions for precisely that reason.  The user

8  interface will immediately reflect the trade, the trade may not

9  actually be possible.  BlockFi processes it on the back-end, if

10  it doesn't happen the trade is canceled.  So, I don't think

11  that helps Ms. Kovsky's arguments at all.  It isn't really

12  germane to specifically what happened here but I don't think it

13  advances her cause very well.

14          THE COURT:  What is, and this probably reflects my

15  meager understanding of Crypto currency and the process, but

16  from what you just said how does that relate to how changes are

17  reflected on the blockchain when there's been a transfer of

18  currency, if there were trading by a Wallet Holder?  Doesn't

19  that also have to get reflected on the blockchain at some point

20  and what's the gap in between?

21          MR. SLADE:  So, this would be my meager understanding

22  of Crypto currency as well, but I don't think there's anything

23  that's reflected on the blockchain until at least the

24  back-end happens.  Certainly, I don't believe there are changes

25  to the Block chain when --

1          THE COURT:  When the button is pushed.

2          MR. SLADE:  -- the button is pushed.  That doesn't

3    happen.  Thank you, Your Honor.

4          THE COURT:  Thank you.  Mr. Aulet.

5          MR. AULET:  For the record, Kenneth Aulet of Brown

6    Rudnick for the Official Committee.

7          I just wanted to respond to a few of the points Ms.

8    Kovsky made.  The first was the question of, what is the

9    Committee's skin in the game and Ms. Kovsky pointed to that,

10   you know, in certain interpretations this is essentially a

11   wash, it's an inner-creditor issue and that's precisely the

12   point, Your Honor.

13         This bankruptcy case, it's 650,000 individuals, a lot

14   of their life savings.  There's significant inner-creditors

15   issues here and this is not a case where there's a bottomless

16   well of money to pay lawyers, every dollar that we spend on

17   attorneys fees or anything else, comes out of these peoples'

18   life savings.  Every day that we delay, it's another day that

19   these people don't get what's left of their life savings back.

20   And the only way that a case like this can move forward and

21   reach an end is if everybody is treated fairly.  This is not a

22   case where we can afford sharp elbows of individual creditor

23   groups trying to advantage themselves over others because at

24   the end of the day the case will devolve and nobody wins.  And

25   so, that's why the Committee has a position here.

1        In the Committee's view and the Committee considered

2   this very carefully, the only way to get this case resolved as

3   quickly and efficiently as possible is for everybody to get

4   what they're legally entitled to.  And this is not a case where

5   there's an operating debtor to save where maybe it's worth

6   tolerating a few sharp elbows and some people getting more than

7   they're entitled to to save thousands of jobs or the like, this

8   is a case where we've got to return peoples' life savings in as

9   much as -- as intact as possible.  We share Mr. Slade's hope

10  that we can get 100 percent but that's not going to be today,

11  it's not going to be tomorrow and it's almost certainly not

12  going to be when a plan is confirmed and we've got to get as

13  close to what we've got as possible.  And that means that the

14  Committee needs things to go as they should.  Everybody has to

15  get what they're entitled to and that's why we can't support an

16  effort to invade property that's not the estate's property.

17  And, you know, it would generate deficiency claims and so, it's

18  a wash to the estate, but it's a loss because then we're going

19  to have to fight over it and many of those 650,000 people are

20  going to come in, delay the process and, quite frankly, feel

21  aggrieved and that's to the loss of everyone.

22        Next, Ms. Kovsky quoted a few lines from our initial

23  pleading where we referenced BlockFi's supposed best in class

24  practices.  Just to be clear, we're referencing what BlockFi

25  held itself out to be, that is not the Committee taking a

1  position.

2       And then two final key points.  The debtors'

3  practical ability to reverse one of these transactions,

4  regardless of what the contract says, the debtors' could go

5  back and if, as Mr. Slade said, suddenly there's a transaction

6  that says I am due a billion dollars at Ethereum, they have the

7  practical ability, even if title instantly transferred to me,

8  to go back into their system and say, wait a minute, that's not

9  right, undo that.  And that goes to what we said in Paragraph

10 11 of our reply in support of this, that where title transfers

11 depends on who has things like practical -- who has greater

12 control over the funds.  And the debtors' have the ability,

13 subject to now that they're in bankruptcy, Your Honor's

14 approval, to say these transactions didn't occur and that means

15 that title didn't transfer.

16      And, last, Ms. Kovsky pointed to that moving money at

17 a bank with wire transfers, and as we all unfortunately learned

18 in the recent turmoil with Silicon Valley Bank, the fact that

19 your bank has confirmed a transfer, the fact that you have, you

20 know, a federal reference ID for your wire transfer, the fact

21 that your bank is not yet in FDIC receivership, does not

22 necessarily mean that transfer is going to go through.

23      And, with that, Your Honor, I would just request that

24 Your Honor find that the post-pause transfers did not give

25 legal title to the transferred funds.

1          THE COURT:  All right, thank you.  Mr. Gwynne, last

2    comment?

3          MR. GWYNNE:  ... group of actual Wallet Holders.

4    Just a few points.  One, we're not similarly situated.  Our

5    creditors' assets were moved into the Wallet account prior to

6    the pause cut.  So, we're not similarly situated.  It doesn't

7    matter whether the terms and conditions say something is going

8    to be transferred immediately or instantaneously, because at

9    the end of the day the assets were not transferred.  This is,

10   it's no different than if a debtor promised to make a refund

11   and to give someone back their property, said we're going to

12   give you back your purchase price, we'll give you a refund but

13   then they don't give that person the refund and they file

14   bankruptcy.  That doesn't give the person a right to go to

15   other people who actually got their money back, got their

16   property back and say, well, you know, we're entitled to share

17   in your refund.  I mean, there's no basis for saying the

18   creditors are similarly situated when you are in the Wallet

19   before the pause period versus if you're not.

20          Secondly, you can't decouple transferring a client to

21   the Wallet and then their assets going over later because the

22   property that is in the Wallet account belongs to those clients

23   whose assets were transferred to that account.  You can't just

24   move someone over to share in other peoples' property, the

25   debtor has no right to do that.  And the Perlman case, Your

1 Honor, again, is binding on that, that the bankruptcy code, the

2 Bankruptcy Act, does not give the debtor the right to use other

3 peoples' property to pay its creditors and that's exactly what

4 the Troutman Group is asking Your Honor to do.

5        So, once again, Your Honor, we would just request

6 that you grant the relief requested, it's been almost five

7 months since the debtor filed the motion and the clients who

8 are in the Wallet account have always been entitled to get

9 their property back and there's nothing in the code that

10 prohibits that but, Your Honor, we request you expressly

11 authorize the debtor to give the property back to the actual

12 Wallet Holders.  Thank you, Your Honor.

13        THE COURT:  Thank you, Mr Gwynne.  Now, Ms. Kovsky.

14        MS. KOVSKY-APAP:  Thank you, Your Honor, Deb Kovsky,

15 Troutman Pepper for the Ad Hoc Committee of Wallet Account

16 Holders.

17        I think one way to think about this, maybe cut

18 through some of the noise, is to think about pushing the

19 transfer button as being notice to the debtors.  That that was

20 the notice that customers provided that, hey, I don't want to

21 be in BIA any more.  I'm no longer giving you right and title

22 to my digital assets, I'm out of this program.  And that was

23 the act that terminated the grant of title.  Does that mean

24 that customers can physically get back their assets to which

25 they now have title?  No, of course not.  They needed BlockFi's

cooperation but that doesn't mean that the assets that BlockFi
was holding did not revert back to being under the ownership of
the customers who put them there in the first place, especially
when we're talking about assets that were all co-mingled and
fungible and dealt with on omnibus meant bases.

     With respect to my colleague on the other side who
spoke about the trading terms of service, which Your Honor had
questions about, I would just direct Your Honor to go back and
look at the terms of service themselves. They say really
clearly that trades are settled by book entry. It does not say
that settlement is dependent on some other act happening. Yes,
there could be a true-up later, yes, there was some risk
involved but the settlement itself happened by book entry.

     With respect to the Committee's argument, this is
actually not an inter-creditor issue at all. It's an
inter-noncreditor issue. These are not constituents of the
Committee and as, I think Mr. Aulet recognized, there's no
impact on the general unsecured creditors or the estate.
Whichever way the pot of assets that are there in the reserves
are divided up between non-creditors of the estate has no
impact on the amount of assets available to the estate or
available to general unsecured creditors and if lawyers fees
are really the issue, well, that was the Committee's decision
to jump into a fight that doesn't affect their constituents.

     And, respectfully, there have been no sharp elbows

1  here.  The Ad Hoc Committee members are the ordinary customers,

2  just like all of the rest of them who many have put their life

3  savings on the platform and all they want is to be treated

4  fairly and in accordance with the terms of service to which

5  they agreed.  All they want is what they're entitled to.  Mr.

6  Aulet says, we can't allow non-creditors to invade non-estate

7  property.  It is completely baffling that the Committee has any

8  position in this matter whatsoever, it simply doesn't affect

9  their constituents.

10         With respect to the Reed Smith Ad Hoc Committee's

11 argument, we are similarly situated to the customers that moved

12 out of BIA prior to the November 10th tweet.  November 10th, at

13 8:15 p.m., wasn't a bright line in terms of anything that the

14 debtors actually did with respect to those transfers.  The

15 inner-account transfers were not paused, there's no difference

16 between the customer who pushed the button at 8:14 p.m. versus

17 the customer who pushed the button at 8:16 p.m.  Both of them

18 told the debtors we want out of BIA, we're no longer giving you

19 right and title to our assets, title reverts back to us.  Now,

20 what do we recover from, we're looking around and the debtors,

21 sometime later, not at the moment that the 8:14 button was

22 pushed, that wasn't the moment that assets all of a sudden

23 magically transferred over to the Wallet reserve, sometime

24 later, maybe the next day, maybe even later than that, it's not

25 clear the debtors made the decision, yes, we're going to put

1 assets into the reserve for some customers but not others.

2 We're not going to true-up the reserves fully to cover all of

3 the notices that we got, that people were exiting BIA and

4 taking title back to their digital assets.

5       And, again, I go back to the question, what would

6 have happened if the debtors had filed on the day when they had

7 an almost $4 million shortfall?  Some customers recover in full

8 and some customers take a bigger deficiency?  Maybe some

9 customers wouldn't get anything at all out of the Wallet

10 reserve, there's no way to be able to point to an

11 undifferentiated mass of an omnibus Wallet and say, this

12 bitcoin belongs to that customer, that belongs to this

13 customer, that's not how it works.

14       And we're in basically, exactly the same situation.

15 You have a reserve that has insufficient assets to cover

16 everybody who exited BIA and some solution has to be found, but

17 it's not property of the estate, it doesn't impact claims

18 against the estate, it doesn't impact general unsecured

19 creditors.

20       And, further, I think Mr. Slade alluded to a problem

21 with actually being able to effectuate transfers out of Wallet.

22 My understanding is that if the Ad Hoc Committee's position

23 prevails and there has to be some kind of a pro rata or other

24 allocation of assets that are available in the Wallet reserves

25 right now, BlockFi has the ability to reset the amounts in

1  customers accounts and allow them to withdraw, I think in

2  fairly short order.  So, the Ad Hoc Committee is not standing

3  in the way of customers getting back what is rightfully theirs.

4  The Ad Hoc Committee is fighting for recognition that some of

5  that is rightfully theirs as well.  Thank you.

6        THE COURT:  All right, thank you, counsel.  Mr.

7  Sponder or Ms. Bielskie, is the U.S. Trustee taking any

8  position in this?  Got to get their legs moving.

9        MR. SPONDER:  Yes.  Thank you, Your Honor, good

10  afternoon.  Jeff Sponder from the Office of the United States

11  Trustee.  The United States Trustee is not taking a position on

12  this motion.  Thank you, Your Honor.

13        THE COURT:  All right, thank you.  All right.  I want

14  to thank all counsel.  Extremely well briefed, well argued and

15  I appreciate the civility, the professionalism in reaching an

16  accord on the stipulated facts, in lieu of dragging this out

17  with testimony which would just be repetitive of what you had

18  in there as well.

19        It is, the Court recognizes the impact on customers

20  who've waited months to have access to funds that they

21  desperately need.  And it's been too long coming to this,

22  although I think all parties recognize that there had to be due

23  diligence in trying to identify the issues and resolve certain

24  questions of fact.

25        In order to try to move this process along for the

1 benefit of customers, all customers, I am going to issue a

2 ruling.  I have a Third Circuit conference, I'm going to try to

3 carve out time this Thursday.  I'm going to ask you all to note

4 10:30.  That seems to be a break in the Third Circuit program.

5 I'll run up to my hotel room and try to read into the record a

6 decision.  It will be an abbreviated ruling.  Obviously, it can

7 be supplemented by proposed findings of fact and law or at that

8 point proposed findings of fact and conclusions of law as

9 needed to the extent the parties require so, but I will issue a

10 ruling to move this process along as quickly as possible.  This

11 Thursday at 10:30, we'll setup, my chambers will setup a

12 webcast.  There will be no argument, it'll simply be to allow

13 me to read a ruling into the record.  All right, thank you,

14 again.

15          MR. KANOWITZ:  Your Honor --

16          THE COURT:  Oh, counsel, yes.

17          MR. KANOWITZ:  -- may I address the Court on some

18 ancillary issues?

19          THE COURT:  Sure.

20          MR. KANOWITZ:  Thank you.  Thank you, Your Honor,

21 Richard Kanowitz, Haynes and Boone, counsel for the debtors.

22          Your Honor, harken back to, a while back when we

23 talked about some seizure orders that were delivered to the

24 debtor pre-bankruptcy out of the State of Washington.

25          In furtherance of what we advised Your Honor on

1  January 9th, I believe, we did transfer the Wallet assets to

2  the government in connection with that seizure order.  We still

3  are negotiating with the government, how to return what I would

4  say is a very material amount of posted collateral in BIA that

5  the government seeks to obtain.  Clearly, there's a large

6  amount that's owed to the debtor on the loan for the posted

7  collateral.  We're trying to work off those setoff numbers and

8  in the process of doing so the government's position is that

9  the stipulation and agreement between the debtor and the

10 government should be determined by the District Court in

11 Washington, which issued the seizure order.  We're speaking

12 with the Committee about the process to have that effectuated.

13 Whether we actually go there or whether something has to happen

14 in front of Your Honor to get that done.  We're not there yet,

15 we just received the proposed stipulation from the DOJ the

16 other day.  It was a long time coming as you can imagine

17 because I broached this issue with you in January.

18          THE COURT:  Sure.

19          MR. KANOWITZ:  Scroll forward to another seizure

20 warrant and order.  This one issued out of Texas.  A much

21 smaller amount.  Right now we're going to turnover from Wallet

22 about $47,000 not the 700,000 plus we previously turned over.

23 And the posted collateral setoff amounts we're talking about in

24 the $500,000 range, not the multi-million dollar range we're

25 talking about in the State of Washington.  Again, we're not

1    there with the DOJ on ths seizure order and warrant but the

2    mechanics will likely be the same and we're discussing with the

3    Committee, again, to try to appease the government and also

4    satisfy the estates' interest in this collateral and these

5    loans.

6            And, so, I just wanted to bring to your attention the

7    fact that we are going to comply with the seizure warrant and

8    the orders so that we're not held in contempt by transferring

9    the Wallet assets to the government involved.

10           THE COURT:  Now, these transfers are coming out of

11   the BIA account?

12           MR. KANOWITZ:  Well, no.  So, some -- and some of

13   these are sealed so I can't get into the details, but some of

14   these customers had Wallet.

15           THE COURT:  Okay.

16           MR. KANOWITZ:  Some of them had BIA and some of them

17   had posted collateral, which is money given to back their loans

18   which then BlockFi held in separate owned Wallet accounts,

19   unrelated to BIA, unrelated to Wallet.  So, all of that comes

20   into the mix but what we've only transferred and going to

21   transfer is the money that's associated with these client

22   identification numbers in Wallet because it's our view and the

23   government, obviously, has listened to our view, that whatever

24   is in Wallet is not property of the estate, so why aren't you

25   complying with the order?

82

1          THE COURT:  Okay.  That's what I wanted to clarify.

2          MR. KANOWITZ:  Yes.

3          THE COURT:   Okay.

4          MR. KANOWITZ:  Thank you, Your Honor.

5          THE COURT:  Mr. Aulet.

6          MR. AULET:  Yes, Your Honor, Kenneth Aulet of Brown

7    Rudnick for the Committee.  The Committee's view is that any --

8    we don't have an objection to Wallet funds being returned.  The

9    Committee's view is that any return of funds on a BIA account

10   or loan account has to come from order of this Court.  And to

11   the extent that that needs to be brought to Your Honor's

12   attention, we intend to do so quickly to ensure that this Court

13   gets a chance to review those issues.

14         THE COURT:  Fair enough.  Another battle down the

15   road.  All right.  Thank you all, again.  We're adjourned.

16         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

17                         *  *  *  *  *

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

WE, DIPTI PATEL, LIESL SPRINGER and ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Dipti Patel

DIPTI PATEL


/s/ Liesl Springer

LIESL SPRINGER


/s/ Elaine Howell

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.   DATE:  May 9, 2023