| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| BROWN RUDNICK LLP<br>Robert J. Stark, Esq.<br>Kenneth J. Aulet, Esq.<br>Bennett S. Silverberg, Esq.<br>Seven Times Square<br>New York, NY  10036<br>Telephone: (212) 209-4800<br>Fax: (212) 209-4801<br>Email: rstark@brownrudnick.com<br>          kaulet@brownrudnick.com<br>          bsilverberg@brownrudnick.com<br>*Counsel for the Official Committee of Unsecured Creditors*<br>  -and-<br>GENOVA BURNS LLC.<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Gregory S. Kinoian, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>Telephone: (973) 230-2095<br>Fax: (973) 533-1112<br>Email: DStolz@genovaburns.com<br>          DClarke@genovaburns.com<br>          GKinoian@genovaburns.com<br>*Local Counsel for the Official Committee of Unsecured Creditors* | BROWN RUDNICK LLP<br>Stephen D. Palley, Esq.<br>601 Thirteenth Street, NW<br>Washington, DC  20005<br>Telephone: (202) 536-1700<br>Fax: (202) 536-1701<br>Email:  spalley@brownrudnick.com<br><br>BROWN RUDNICK LLP<br>One Financial Center<br>Boston, MA  02111<br>Tristan Axelrod, Esq.<br>Telephone: (617) 856-8200<br>Fax:  (617) 856-8201<br>Email: taxelrod@brownrudnick.com |
| In re:<br><br>BLOCKFI INC., *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>Jointly Administered |

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC. (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ  07302.

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS RESPECTING THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the Chapter 11 cases of BlockFi, Inc. and its affiliated debtors (collectively, the "Debtors" or "BlockFi") hereby submits this Statement respecting the *First Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") [Docket No. 875]. The Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. At the April 19, 2023, hearing on the Debtors' exclusivity motion, the Committee gently/obliquely signposted plan-related disagreements between the Debtors and the Committee, referring to them as "misalignments" of interest. The Committee was not more explicit, hoping to better the out-of-court negotiating dynamic.[2] At the hearing's conclusion, the Court granted the Debtor's motion, overruled the Committee's objection, and urged the parties to "start the negotiation process yesterday." The Court also gave the Committee license to respectfully say "I told you so," depending on what happened next.

2. On Friday evening, the Debtors filed a new proposed Plan and Disclosure Statement, and commenced a broad and illegal solicitation campaign.[3] The filings were a surprise, given that the Committee had just received the Plan (hours earlier), had been pursuing good faith

---

[2] Tr. of Hr'g April 19, 2023, at 14:23-15:11 ("I wanted in this presentation … to not … talk about the issue, the big issue in dispute. I wanted to measure my words because it may be Pollyann-ish. I thought if … Your Honor found my proposal acceptable, put the hearing out for the end of the month and let's see if we can't … find some common ground…. [W]e have a very active community and one that is watching everything we say…. I didn't necessarily think feeding the fire was a good idea. I'm happy to talk about it further because I think Mr. Sussberg kind of alluded to it. But I think I'm going to hold my tongue at this moment.")

[3] This is described in the *Emergency Motion of the Official Creditors Committee requesting an Order Remedying the Debtors' Improper Plan Solicitation in Violation of Bankruptcy Code Section 1125(b)* (the "Emergency Motion"), filed contemporaneously herewith. The Emergency Motion is incorporated by reference, as if set forth in full, and capitalized terms not otherwise defined in this Statement shall have the meanings ascribed thereto in the Emergency Motion.

2

negotiations, and had even proposed a slight extension of exclusivity to continue the discussions. Then came the weekend's "Twitter Storm," leaving the Committee in a state of utter shock, especially given: (i) the disclosure of FRE 408 settlement discussions that the parties agreed would be kept private; and (ii) the falsehoods and gross misstatements targeting the Committee.

3. Regrettably, the Committee now finds itself compelled to explain more fully the "misalignments" that prompted such a breathtaking violation of Section 1125 and surrounding law. There are three.

4. **First Issue: Continued Oversight Of The Estates**. The Debtors and the Committee seem to agree that, under a plan, all estate assets should be placed in some liquidation vehicle. The Debtors want to retain control over that vehicle—forever, with no creditor input whatsoever—following the plan's effective date. This is a nonstarter for the Committee. It is, after all, the creditors' value and, so, it is only fitting that representatives selected by the creditors take control. This should not be controversial: As the Court is well aware, this kind of "hand-off" is a normal and customary feature of Chapter 11 plans.

5. But, there is another—darker—reason behind the Committee's viewpoint. The Debtors did not manage their affairs *pre-petition* in a way that gives the Committee any confidence in their leadership (quite the opposite, in fact), and the Debtors have not managed their affairs *post-petition* in a way that gives them any confidence going forward (quite the opposite, in fact).

6. As discussed below, prior to bankruptcy, management did things in contravention of the promises made to BlockFi customers, disregarded the faith (and fiduciary responsibilities) entrusted to them, and ran their business in a way that caused foreseeable, catastrophic loss. As it segued to bankruptcy, BlockFi sold much of its domestic digital currency, locking in massive trading losses and potentially exposing customers to undesired tax consequences. After filing for

3

bankruptcy, the leadership team recklessly ignored the Court's cash management order and kept $250+ million in uninsured, unbonded accounts (realizing the omission only after Silicon Valley Bank collapsed).[4] Given what has transpired, one would have thought the Debtors would want a clean (quiet) handoff to creditors. But, handing off control undermines the Debtors' foremost concern, which is the second point of case "misalignment."

7. **Second (Primary) Issue: Plan Releases**. The Debtors are bent on full plan releases, period. The Committee does not agree with that position.

8. There are, as the Court knows, two kinds of plan releases. The first kind is a plan term that forever bars the estates (*i.e.*, the liquidation vehicle mentioned in paragraph 4 above) from suing BlockFi management—even if, when no one was watching, management did some very wrongful things, grossly mismanaged the money customers entrusted with them, and/or took for themselves money that the law says must now be given back (*e.g.*, CEO Zach Prince took out $10 million in the preference period). It is, essentially, a gift to BlockFi's managers. That gift may not be justifiable. And, it may be worth enormous sums of money.

9. The second kind of plan release forever bars customers/creditors from suing BlockFi management—even if management perpetrated a grand fraud on them. A plan cannot automatically release individual customer/creditor fraud claims without their consent, but the Debtors may try to coax a "voluntary" release by offering something small (*e.g.*, a release of "preference" claims that no one thinks are worth pursuing) in exchange for something big (*e.g.*, a release of valuable individual fraud claims against those that may have done them wrong). This

---

[4] Fortunately for those in charge, the U.S. government backstopped all deposit accounts at Silicon Valley Bank. But, it is no understatement to say that, after that experience (as well as the underlying case facts discussed herein), the Committee is very skeptical of those presently at the helm of BlockFi.

"exchange" mechanic is precisely what the Debtors are proposing in their Plan. Per Section 1125, the creditors are due full and fair disclosure.

10. The Committee has undertaken an extensive investigation of underlying case facts. In conducting this investigation, the Committee charged its professionals to be objective (*i.e.*, not "results oriented"), following the same methods, approach, and using largely the same team that completed the Examiner's charge in *In re Cred Inc.*[5] Despite the Debtors' repeated case narrative (to wit, BlockFi's D&Os bear no responsibility for their customers' catastrophic losses), the Committee has reached a very different conclusion. Most significantly (and as discussed further herein), the Committee believes that BlockFi management bears legal culpability for substantial loans made to FTX affiliate, Alameda Research ("Alameda").

11. The Debtors are very much aware of this. Hence why, this past weekend, the Debtors undertook such a brazen solicitation (and smear) campaign. The facts now must come to light.

12. **Third Issue: Value Allocation**. The BlockFi bankruptcy is, as the Court knows, comprised of several affiliated companies. There are, in other words, multiple Chapter 11 estates comprising this bankruptcy case. BlockFi customers have different value entitlements based on where their claims reside: Customers at "Inc." are entitled to a different recovery than customers at "International" or at "Lending," simply because there are different assets at each of those entities. That said, the affiliated companies did business with one another, and their dealings impact how value should be allocated among customers. All of this needs to be studied carefully to arrive at a plan that fairly allocates value among the various classes of BlockFi customers.

---

[5] *See* Docket No. 605 in Case No. 20-12836 (Bankr. D. Del.)

13. The Committee dedicated considerable time and analysis to this issue, and was hopeful that a consensual solution would not be too difficult to reach with the Debtors. But, discussions were abruptly cut off (over plan releases) and the Debtors' Plan essentially pockets (*i.e.*, doesn't tell anyone) how value will be allocated among creditors at the different estates. It, instead, tells everyone that allocation mechanics will be set forth in a "plan supplement" to be filed *after* the Disclosure Statement is approved.

14. This, of course, does not work for approval of a Disclosure Statement under Section 1125. A disclosure statement describing a plan that hasn't yet figured out creditor entitlements is, essentially, a jumble of meaningless pages.

15. But, at least the underlying *strategy* is clear enough. As a matter of law, the Court cannot approve the Plan unless it has been accepted by at least one class of impaired creditors. *See* 11 U.S.C. § 1129(a)(10). The Debtors know that some very unflattering information about "Zac and Flori" and others at BlockFi is about to come out, and this information may turn the entire customer base against them. By reserving the opportunity to "play" with value allocations, the Debtors reserve the opportunity to try to "buy" plan support of at least one customer class (by taking another class's rightful value). This is almost definitionally "bad faith" under Section 1129(a)(3). *See, e.g., In re Quigley Co., Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010).[6]

16. When the Committee started its work (around the first of the year), it observed that the other cryptocurrency bankruptcies (*e.g.*, *Voyager*, *Celsius*, *FTX*) were not going well: They are

---

[6] The Committee has yet another reason to distrust the Debtors' "wait and see" approach to value allocation. At case inception, the Debtors filed their Wallet Motion, proposing to release all wallet money without any analysis of avoidance issues. The Debtors knew this was not consistent with law, given that (i) Debtors' counsel is also debtor's counsel in *In re Celsius Networks LLC*, Case No. 22-10964-MG and (ii) only a few weeks earlier, Judge Glenn ruled [Docket No. 1044] that the debtor cannot release wallet funds without analyzing avoidance issues. The Debtors wrote up the Wallet Motion essentially ignoring Judge Glenn's ruling, thus putting the Committee in "the bad guy" role for correcting the obvious legal error.

each overly expensive; they have persisted or likely will persist for long periods without an answer in sight; and, they have resulted in an extended separation of customers from (and a substantial administrative tax levied against) their money. It also observed that, in this industry and despite how debtors artfully construct their case narratives, the underlying facts tend to be uglier than what is reported to the Court and all stakeholders.[7]

17. The Committee sincerely wanted, and has worked very hard to try to achieve, a very different kind of case outcome—a conclusion that all customers could feel was fair, appropriate, and efficient. The Committee hoped to achieve consensus, but the Debtors want litigation. The Committee is certain that, after the dust has settled, customers will not be supportive of the Debtor's Plan.

**STATEMENT**

**I.    Why The Committee Cannot Support The Plan.**

18. As noted above, the Committee has had very little time to read and analyze the Plan. But, it was able to identify points of objection and to provide suggestions to the Debtors as to how such objections could be resolved. Out of an abundance of caution, the Committee here

---

[7] *Compare Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* (Case No. 22-10964, Bankr. S.D.N.Y. Dkt. No. 23) (setting forth narrative of Celsius as a well-run company toppled in by "a series of negative media and social media comments about Celsius, a number of which were unsupported and misleading" that caused a run on the bank) *with Final Report of Shoba Pillay, Examiner* (Case No. 22-10964, Bankr. S.D.N.Y. Dkt. No. 1956) (reporting that "Celsius conducted its business in a starkly different manner than how it marketed itself to its customers in every key respect" and setting forth numerous wrongful acts that were actual causes of Celsius' collapse).

identifies only the issues (*i.e.*, not proposed resolutions so as not to trigger any argument under Section 1121):

| Item | Plan Provision | Summary |
|---|---|---|
| 1 | Allocation of Value Among Customer Classes | Allocation is subject to reconfiguration based on the treatment of intercompany claims, which will not be identified until after approval of the Disclosure Statement (in the "Plan Supplement"). |
| 2 | Customer Distributions | The Debtors will use its cash on hand to purchase two kinds cryptocurrency (Bitcoin or Ethereum) for distributions to customers that want it, but the commitment does not extend to other forms of cryptocurrency (regardless of the individual tax implications) and the commitment ends after 6 months.  So, if the estates ultimately recover a significant amount of cash from FTX, customers will receive the cash (regardless of the individual tax implications). |
| 3 | Releases of Estate Claims | Plan provides broad releases of estate claims and causes of action against insiders, for no or indeterminate consideration. |
| 4 | Releases of Individual Creditor Fraud Claims | The Plan will release preference claims against customers in exchange for customer releases of fraud claims they may have against insiders.  This will require enormous disclosure in the Disclosure Statement to be operable.  The releases are automatic (i.e., creditors must affirmatively "opt-out" of the release), which is inappropriate, especially given that customers are individuals (not corporate creditors). |
| 5 | Assumption of Indemnification Obligations | The Plan provides for the assumption of all prepetition indemnification obligations – even those owed to insiders that may bear significant liability to the estates. |
| 6 | Governance After Plan Confirmation | Plan provides that the Debtors will emerge from bankruptcy as a reorganized corporate entity, controlled by the individuals hand-picked by the Debtors (without any input from the Committee). |

| **Item** | **Plan Provision** | **Summary** |
|---|---|---|
| 7 | No Avoidance of Insurance Payments | Plan prohibits any avoidance action to recover $22.5 million of customer money used to purchase $30 million in D&O insurance just before the bankruptcy filing.  See paragraph 32 below. |
| 8 | Employee Transition Plan | The Plan provides for the continuation of all employee benefit programs and the assumption of employment agreements that the Debtors determine, in their sole discretion, are appropriate (despite that this is a liquidation). The Disclosure Statement does not sufficiently justify what will assuredly be an enormous tax on customer recoveries. |
| 9 | Exculpation | The Plan releases "Exculpated Parties" (insiders and Debtor professionals) for their work respecting the bankruptcy and all their *pre-petition* acts leading up to the bankruptcy (not typical). |
| 10 | Convenience Class | A "convenience" class is comprised of small customers willing to receive a small, one-time distribution and thereby relinquish any further distributions.  This mechanic can dramatically reduce administrative burden going forward. This is a customary plan concept that is absent here. |
| 11 | Government Penalty Claims | Government penalty claims are subordinated to customer claims, but they are not subordinated to intercompany claims (see point 1).  This creates added ambiguity for what customers ultimately will receive. |
| 12 | Professional Compensation | Plan provides for unsupervised compensation of estate professionals between confirmation and the Effective Date of the Plan. |
| 13 | Wallet Account Treatment | Wallet Account claims receive distributions free of any holdbacks for preference or other avoidance issue. This will reduce the amount available to creditors, as avoidable funds are distributed (unnecessarily) to Wallet Accounts holders. |

| Item | Plan Provision | Summary |
|---|---|---|
| 14 | Plan Acceptance | In attempt to "jerry-rig" an impaired accepting class, the Plan provides that non-voting impaired classes of claims are deemed to accept the Plan, rather than reject it. |
| 15 | Exchange Rates | It is not clear why FX claims are dollarized on Effective Date in contrast to Digital Assets that are dollarized as of the Petition Date.<br><br>The conversion rates for Digital Assets were not published in the Plan. |
| 16 | Conditions Precedent To Plan Effective Date | Debtors may waive conditions precedent to Effective Date without Committee consent. |

## II. Why The Committee Has Not Acceded To The Debtors' Demands.

### A. The Debtors Are Pressing A False Case Narrative.

19. In most large Chapter 11 cases, the debtor files an "informational" (also known as the "first day") declaration with its Chapter 11 petition. The declaration attempts to explain why (from the debtor's perspective) the company failed. This can be an ornate piece of rhetoric (even scapegoating) that ultimately proves to be untethered to the true case facts. Bankruptcy anticipates this: The debtor's case narrative is just one side of the story; it will be tested by the debtor's required disclosures, interim discovery (via, *e.g.*, Bankruptcy Rules 2004 and 7026), and potentially the appointment of an Examiner pursuant to Bankruptcy Code Section 1104. In many cases, the debtor's case narrative is disproved.

20. With their bankruptcy petitions, BlockFi filed a Declaration signed by its Chief Restructuring Officer, Mr. Mark Renzi. Mr. Renzi's Declaration goes to painstaking lengths to portray the Debtors as innocent victims of unfortunate circumstances. It includes an entire section

10

devoted to BlockFi's purported "Approach to Risk Management," describing "well-developed, transparent risk management procedures and policies," establishment of "a dedicated Audit and Risk Committee to set risk appetite and manage financial and non-financial risks," and a "risk management function…independent from BlockFi's core business [which] reports to the CEO and to the Audit and Risk Committee [and which] uses a comprehensive framework to identify and manage liquidity risk, credit risk, market risk, and enterprise risk, which (again) is publicly disclosed."[8]  Mr. Renzi further stated that "[t]hose leading BlockFi's risk management function are veterans of the traditional financial industry with decades of experience in identifying and managing risk in credit and trading operations in accordance with the company's risk governance and risk appetite."[9]

21. When the Committee began its work, it tasked its professionals to answer this question: Why did BlockFi fail?  The investigation was to be run in an objective (not "results oriented") manner.  If the investigation corroborated the Debtors' narrative, Committee professionals were directed to so advise.  If the investigation reached a different conclusion, Committee professionals were directed to explain how and why.  The investigation was to be run following the same approaches, procedures, and using many of the same team members that assisted the Examiner in the *In re Cred Inc.* Chapter 11 case.

22. In conducting its investigation, Committee professionals: (i) reviewed approximately 30,000 documents produced in discovery; (ii) reviewed a multitude of pertinent information otherwise made available in this bankruptcy, other cryptocurrency bankruptcies, and/or in the public generally; and (iii) deposed 12 individuals, including CEO Zach Prince, COO

---

[8] *See* First Day Declaration ¶¶ 55-58.

[9] *Id.* at ¶ 58.

Flori Marquez, CFO Amit Cheela, former Head of Risk Rene van Kesteren, and present Head of Risk Yuri Mushkin. While the Committee's investigation remains on going, it has matured to a point where the Committee has visibility and has an answer to why BlockFi failed.

23. The answer does not comport with the Debtors' case narrative. In many respects, Mr. Renzi's "first day" declaration is materially incorrect. In the days ahead, all of the myriad mistakes will be presented. But, in the meantime, here are advance "coming attractions" to help put things into perspective.

24. As the Court may be aware, FTX's collapse was driven by a now infamous "Coindesk" article,[10] which relied on an Alameda balance sheet (specifically, the Q2 2022 balance sheet) to report that much of the balance sheet value of Alameda was driven by FTT. This balance sheet led the public to, in the Debtors' words, "question[] the health and liquidity of both FTX and Alameda Research" which (along with other public reporting) "began a death spiral for FTX." [11] In other words, when the public obtained Alameda's balance sheet, it ran screaming. Not just from Alameda, but from FTX as well.

25. But, here lies the major problem with the Debtors' case narrative: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[10] *See* https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/.

[11] *See* First Day Declaration ¶ 93.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████

26. And, yet, BlockFi entrusted a vast amount of customer funds with FTX/Alameda.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████ This includes many hundreds of millions of dollars placed with FTX/Alameda in the summer/fall months preceding bankruptcy, money that is now sunk in the FTX bankruptcy quagmire. All of this despite the company setting itself up to be, and repeatedly assuring customers that it was, a conservative, safe banking platform.[13]

27. What happened here was wrongful, and the estates hold substantial claims and causes of action against those at the helm of the company. The Committee is not in a fiduciary position to acquiesce to the Debtors' demands for broad plan releases. It is, to be frank, a wrongful demand by Debtor fiduciaries.

B. **The Debtors Should Relinquish Control.**

28. As discussed in paragraph 4 above, it is normal and customary for creditors to assume control of a liquidation trust (or comparable liquidation vehicle) under a confirmed Chapter 11 plan. That is especially true where the estate is not an organic and functioning business enterprise. It is, rather, a proverbial "bundle of sticks" that can be effectively governed by creditor representatives. It is their value, after all; it is proper that they control it.

---

[12] ███████████████████████████████████████████████████████████████

[13] A representation that BlockFi has continued to put forth post-petition. *See* First Day Dec. (describing its purported robust risk management policies and procedures).

29. Regardless, the Committee has learned certain ugly truths undergirding this bankruptcy. It is not prepared to further entrust those at BlockFi's helm, and that includes the professionals and "bankruptcy directors" hired by, reporting to, and/or interfacing with them. The Committee has been in communication with these people for some time. The Committee appreciates where their allegiances lie. It isn't with the customers/creditors, despite what they said in this weekend's "Tweet Storm."

30. There is more.

31. **First,** on the eve of bankruptcy, BlockFi sold approximately $240 million worth of cryptocurrency assets, converting them into fiat US currency—at the nadir of trading levels (immediately following FTX's spectacular collapse). Mr. Renzi's "first day" declaration characterizes this as smart business move, creating a large store of liquidity.[14] But, no other cryptocurrency debtor did this, and for good reason. Liquidating nearly all domestic cryptocurrency in November 2022 was a very poor decision: (1) BlockFi locked in massive trading losses (by selling at the nadir), costing the Debtors' estates more than $100 million in lost "upswing" trading value in the months since; (2) distributing fiat cash (instead of like kind cryptocurrency) potentially exposes customers to unnecessary and undesired tax consequences; and (3) selling $240 million in cryptocurrency was never rationally related to bankruptcy funding needs, given that no reasonable estimate would peg the costs of this bankruptcy at $240 million.

32. One wonders if the decision was not economic at all, but was rather entirely strategic: Had the Debtors sold a more rational amount of cryptocurrency (say, $50 million) to fund these cases, that would be then become the case budget; if BlockFi needed more liquidity, it

---

[14] See First Day Declaration ¶ 99 ("In preparation for these chapter 11 cases, BlockFi took steps to liquidate certain of its owned cryptocurrency to bolster available cash to fund its business and administrative costs. Through this process, BlockFi was able to raise $238.6 million of additional cash, for a total unencumbered cash position as of the Petition Date of $256.5 million.").

14

would need Court authorization under Section 363 to sell more out of the ordinary course. By selling everything pre-petition, BlockFi gave itself a near limitless budget, essentially immune from bankruptcy's adversary process, to run its case as long and as contentious as it sees fit without the "typical milestones" in a DIP or cash collateral order, the Debtors are enabled to extort releases in exchange for relinquishing control (and stopping the fee burn).

33. **Second**, after selling off the digital assets but before filing for bankruptcy, the Debtors spent $22.5 million (customer money) to buy a $30 million insurance policy (for its D&O's). Please refer back to paragraph 24. Then, let it sink in that the D&Os spent $22.5 million of customer money to buy themselves a $30 million D&O insurance policy.

34. **Finally**, as the Court knows, the Debtors placed most of their cash (again, north of $250 million) with Silicon Valley Bank ("SVB"). SVB was not a depository institution of sufficient strength to meet the Bankruptcy Code's protective requirements, prompting the United States Trustee to object to estate money being deposited there. Eventually, an arrangement was reached whereby SVB would post sufficient collateral (in the form of a bond) should there be a bank failure. There was a bank failure. But, it seems, no one at BlockFi (including those in the "restructuring" and "finance" wings of the C-Suite) ensured that the bond was posted. It wasn't. Good thing the federal government stepped in to bail out all SVB depositors, including BlockFi.

35. For all of these reasons, the Committee has long pressed to end this case as soon as possible and, thereby, get the estate assets into the hands of new management. That is not, it seems, consistent with the Debtors' case agenda, as announced this weekend.

## CONCLUSION

36. The Committee takes no joy in sharing with the Court (and the world) some of the details that it has discovered over the past five months. However, it has a fiduciary duty to all creditors, and at this juncture, such duty requires more fulsome disclosure. The Committee's fiduciary duty likewise compels it to vigorously oppose the Plan which, for a litany of reasons, is not in creditors' best interests.

37. We remain hopeful that thoughtfulness, analysis, and fiduciary responsibility ultimately will prevail. The customers deserve far better than this.

Dated: May 15, 2023

By: */s/ Daniel M. Stolz*
**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 230-2095
Fax:           (973) 533-1112
Email:     DStolz@genovaburns.com
               DClarke@genovaburns.com
               GKinoian@genovaburns.com

*Local Counsel for the Official
Committee of Unsecured Creditors*


By: */s/ Robert J. Stark*
**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Kenneth J. Aulet, Esq.
Bennett S. Silverberg, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Fax:           (212) 209-4801
Email:     rstark@brownrudnick.com

Stephen D. Palley, Esq.
601 Thirteenth Street, NW
Washington, DC  20005
Telephone: (202) 536-1700
Fax:           (202) 536-1701
Email:     spalley@brownrudnick.com

Tristan G. Axelrod, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Fax:           (617) 856-8201
Email:     taxelrod@brownrudnick.com

*Counsel for the Official
Committee of Unsecured Creditors*