**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

| | |
|---|---|
| BROWN RUDNICK LLP<br>Robert J. Stark, Esq.<br>Kenneth J. Aulet, Esq.<br>Bennett S. Silverberg, Esq.<br>Seven Times Square<br>New York, NY 10036<br>Telephone: (212) 209-4800<br>Fax: (212) 209-4801<br>Email: rstark@brownrudnick.com<br>　　　kaulet@brownrudnick.com<br>　　　bsilverberg@brownrudnick.com<br>*Counsel for the Official Committee of Unsecured Creditors*<br>　-and-<br>GENOVA BURNS LLC.<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>Gregory S. Kinoian, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>Telephone: (973) 230-2095<br>Fax: (973) 533-1112<br>Email: DStolz@genovaburns.com<br>　　　DClarke@genovaburns.com<br>　　　GKinoian@genovaburns.com<br>*Local Counsel for the Official Committee of Unsecured Creditors* | BROWN RUDNICK LLP<br>Stephen D. Palley, Esq.<br>601 Thirteenth Street, NW<br>Washington, DC 20005<br>Telephone: (202) 536-1700<br>Fax: (202) 536-1701<br>Email: spalley@brownrudnick.com |
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>　　　　　　　　Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>Jointly Administered |

---

[1]　　　The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC. (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

**OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO DEBTORS'
SECOND MOTION TO EXTEND EXCLUSIVITY**

**-AND-**

**CROSS-MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR AN ORDER (A) APPOINTING A CHAPTER 11 TRUSTEE, (B) TERMINATING
THEDEBTORS' EXCLUSIVITY PERIODS OR, ALTERNATIVELY,
(C) CONVERTING THESE CASES TO CHAPTER 7 PROCEEDINGS, AND (D) FOR
OTHER RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Official Committee") duly appointed in these Chapter 11 cases, respectfully submits this: (i) Objection to the *Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 886] (the "Debtors' Exclusivity Motion"); and (ii) Cross-Motion seeking entry of an Order: (a) appointing a Chapter 11 trustee pursuant to Bankruptcy Code Section 1104(a); (b) terminating the Debtors' exclusivity periods pursuant to Section 1121(d); or (c) converting these cases to Chapter 7 proceedings pursuant to Section 1112(b)(2), and (d) for other related relief.  In support of its Objection and Motion, the Official Committee respectfully states as follows:[2]

---

[2]  The Official Committee incorporates by reference: (i) *Preliminary Report Addressing Question Posed By the Official Committee of Unsecured Creditors: Why Did BlockFi Fail?* [Docket No. 928] (the "Investigative Report"); (ii) *Statement of the Official Committee of Unsecured Creditors Respecting the Debtors' Amended Joint Chapter 11 Plan* [Docket No. 899] (the "Committee Plan Statement"); and (iii) *Emergency Motion of the Official Creditors Committee Requesting an Order Remedying the Debtors' Improper Plan Solicitation in Violation of Bankruptcy Code Section 1125(b)* [Docket No. 895] (the "1125 Motion").  Capitalized terms not defined herein shall have meanings ascribed thereto in the Committee Plan Statement and/or 1125 Motion.

## PRELIMINARY STATEMENT

1.     This "reorganization" case is over.  The business has ceased all operations and is now completely defunct.  Extended efforts to sell the platform (in an operating or non-operating condition) generated zero actionable offers.  Today, the estate is a proverbial "bundle of sticks" -- cash, cryptocurrency, a modest portfolio of loans, claims and causes of action.  This has been BlockFi's reality for quite some time.

2.     There is no balance sheet complexity.  Here, unlike nearly all other Chapter 11 cases, there is no: DIP loan; secured debt; unsecured bond debt; utilities, vendor or supplier claims; PBGC, pension, or other employee-benefits obligations.  Besides an incidental amount of trade debt, rejection damages, and employee bonus claims, there are customers.[3]  The Court has already given all the guidance necessary to allocate value among the creditors,[4] so this case should be a snap to wrap up and at very little cost.

3.     But, that is not happening.  The administrative burn is a staggering $16 million per month (on average).  The Debtors continue paying, among other things, the salaries to more than 100 individuals – many of whom, to the best of our knowledge, have had little to do but work on their golf game.  The Official Committee has repeatedly asked the Debtors to cut the waste.  All such requests have been denied, like other forms of cooperative interaction.  Mediation has now failed and negotiations are over.  Instead of an efficient conclusion, there will be litigation.

4.     How do we find ourselves here?  Why do the Debtors, knowing that there is nothing left to do, refuse to "give up the ghost," refuse to cut the waste, and threaten to magnify and

---

[3]   That is 600,000+ "mom and pop" individuals who entrusted their savings with BlockFi.

[4]   See *Order (I) Authorizing the Debtors to (A) Honor Withdrawals From Wallet Accounts, (B) Update The User Interface To Properly Reflect Transactions And Assets As Of The Platform Pause, And (C) Conduct Ordinary Course Reconciliation Of Accounts, And (II) Granting Related Relief*, dated May 17, 2023 [Docket No. 923].

compound waste via their exclusivity motion?  What is it they want so badly?  The answer is crystal clear: They want plan releases for the insiders.

5.      As the Court knows, the Official Committee conducted an internal investigation, and memorialized its factual conclusion in the Investigative Report.  As the Official Committee noted in the Committee Plan Statement (at ¶ 10), "the Committee believes that BlockFi management bears legal culpability for loans made to FTX affiliate, Alameda Research."  The customer base knows little more than this because the Investigative Report, as well as Paragraphs 25 and 26 of the Committee Plan Statement, are filed under seal or in redacted form.  The Official Committee does not think it has discretion to accede to the releases and bury what it – but not the creditors – knows.  The Official Committee is, after all, an estate fiduciary.  See Meinhard v. Salmon, 249 N.Y. 458, 464 (N.Y. 1928)(Cardozo, C.J.)("A trustee is held to something stricter than the morals of the marketplace.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.").

6.      It is time to end all of this.  It is time for the Debtors' unsecured creditors to finally come to know what BlockFi truly was, who Zac Prince truly is, how much he personally profited from the company, and what he and certain of his colleagues were doing (in juxtaposition to what they promised customers) when no one was watching.  It is time for the Court to order an end to the burn and, thereby, end the extortion tactics.

7.      Assuredly, the Debtors will retort that continued exclusivity and prosecution of their plan is the surest/quickest way to ending the case.  That has surface appeal only.  First, the Debtors haven't earned yet another shot.  This case has been extant for seven months, costing creditors approximately $94 million (through just the end of May).  The Debtors have explored every conceivable option and already proposed enough dead-on-arrival plans.  Second, it costs the

Debtors many millions to disseminate and solicit acceptances on a plan, and that is before considering the costs of a hotly contested confirmation trial. Third, it is impossible to see how customers – once they are made aware of what lies beneath the surface of this case (per Section 1125) – will support a plan that delivers insider releases, especially over the Official Committee's opposition. The Debtors know this. That is why the Debtors resorted to their illegal and utterly cockamamie solicitation (smear) campaign a month ago. See *Order Enforcing Section 1125 of the Bankruptcy Code*, dated May 18, 2023 [Docket No. 933].

8.      For these reasons, as explained more fully herein, the Official Committee respectfully requests that the Court deny the relief requested in the Debtors' Exclusivity Motion, and also bring this case to a swift, efficient, and orderly conclusion. This can be done in one of several ways: (i) ordering the appointment of a Chapter 11 trustee who can quickly bring about consensual case resolution; (ii) opening up exclusivity so that this bankruptcy can be wrapped up with a plan that does not include undue releases; or (iii) converting this Chapter 11 proceeding to a Chapter 7.

## FACTUAL BACKGROUND

**I.    What Remains Of This Bankruptcy.**

    **A.    The Residual (Limited) Asset Base.**

9.    The Debtors are primarily comprised of three corporate units: (1) BlockFi, Inc. (the "Domestic Debtor"); (2) BlockFi International, Ltd (the "International Debtor"); and (3) BlockFi Lending, LLC (the "Lending Debtor").   Each debtor has an easily discernable asset-base.

10.    The Domestic Debtor had, on the Petition Date, $261 million in US fiat cash.  This money came from the Debtors' decision (truly disastrous in hindsight) to liquidate all BIA crypto deposits the days before bankruptcy.  As of May 31, 2023, the Domestic Debtor had only around $206 million left.  The delta is the administrative burn of these cases.

11.    The International Debtor has approximately $432 million in cash and non-wallet crypto, as well as claims against FTX/Alameda's bankruptcy estates.

12.    The Lending Debtor currently has approximately $88 million in liquid assets, including cash and crypto.

13.    Notice that these paragraphs do not include descriptions of business assets.  That is because the businesses ended a long time ago.  The Debtors' investment bankers (Moelis) ran an extensive M&A process (at significant professional expense), which did not generate a single actionable bid.

14.    The three primary Debtors have debt obligations to each other, and that impacts value-allocation and, in turn, value distributable to each Debtor's creditors.  In many large Chapter 11 cases, especially multinational bankruptcies, complex inter-company debt schemes (often created for tax purposes) necessitate considerable analysis.  Not here.  There are only three primary debtors and, so, the value-allocation "mapping" exercise is fairly straightforward.  The Official

Committee finished that work months ago.

      **B.**        **The Enormous (Ongoing) Administrative Burn.**

15.      Attached hereto as **Exhibit B** is a chart that lays out the monthly costs of this Chapter 11 case.  That is, on average, more than $16 million per month.  It makes clear what the Debtors have spent, $94 million estimated through May.

16.      Some tidbits worth mentioning here.  $4.3 million per month for operating disbursements including employee salaries, including Zac Prince and a dozen other executives with six figure salaries who now do little except scheme for plan releases.  A run rate of almost $2 million per month for BRG (inclusive of the CRO's monthly retainer), which is utterly confounding to the Official Committee.  A continued $200,000 monthly retainer for Moelis, which finished its work quite a while ago.  And, about $2 million per month for the Debtors' notice and solicitation agent (Kroll) for papers and processes, much of which seems driven to create bargaining leverage for plan releases.

17.      The chart makes clear that, if we continue along this path, there will be winnowing value left for creditors.  And, that is the Debtors' point entirely, to wit:  If the Official Committee does not relent on the plan releases – despite what the Investigative Report says – the Debtors are going to intentionally erode much of the remaining distributable value.  That is extortion, and it is wrongful under the law.

**II.    Some Further Context for Evaluating
The Debtors' Demand For Insider Releases.**

18.    As the Court (and anyone who reads a newspaper) is aware, BlockFi is not the only

large crypto company to file for bankruptcy in the last twelve months.  Other sizable filers include

Celsius Networks (another crypto bank),[5] Core Scientific (crypto mining company),[6] FTX Trading

and Alameda (crypto trading platform and hedge fund),[7] Genesis Global Capital (another crypto

bank),[8] Three Arrows Capital (crypto hedge fund),[9] and Voyager Digital (crypto trading

platform).[10]  These firms had relatively short lives before the pandemic.  But, they had meteoric

growth following – perhaps in reaction to – lifestyle changes necessitated by the global

lockdown.[11]

19.    In those years, becoming "unbanked" (a Celsius term) through crypto was seen as

new and modern kind of financial freedom -- just like working from home instead of in an office

building.[12]  Charismatic corporate leaders, like Sam Bankman-Fried (FTX) and Alex Mashinsky

(Celsius), had Svengali-like abilities to attract public attention and, in turn, mass followings.[13]

---

[5]    Chapter 11 Case Number 22-10964 (MG) (Bankr. S.D.N.Y.), filed on July 13, 2022.

[6]    Chapter 11 Case Number 22-90341 (DRJ) (Bankr. S.D. Tex.), filed on December 21, 2022.

[7]    Chapter 11 Case Number 22-11068 (JTD) (Bankr. D. Del.), filed on November 11, 2022.

[8]    Chapter 11 Case Number 23-10063 (SHL) (Bankr. S.D.N.Y.), filed on January 1, 2023.

[9]    Chapter 15 Case Number 22-10924 (MG) (Bankr. S.D.N.Y.), filed on July 1, 2022.

[10]    Chapter 11 Case Number 22-10943 (MEW) (Bankr. S.D.N.Y.), filed on July 5, 2022.

[11]    See *Final Report of Shoba Pillay, Examiner*, dated January 30, 2023, at 59 [Docket No. 1956], In re Celsius
Networks LLC, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.) [hereinafter, the "Celsius Examiner's Report"].

[12]    Id. at 3.

[13]    See, e.g., Mihir A. Desai, *The Crypto Collapse and the End of the Magical Thinking that Infected Capitalism*,
N.Y. Times (Jan. 16, 2023).

Vast sums of money flew into the crypto "ecosphere"[14] – well before government regulators, operating under 1930's New Deal statutory regimes,[15] could catch up.  Deposits generally were not FDIC insured or SIPC protected.[16]  Not to worry, crypto banks said, they would oversee customer deposits conservatively, prudently, and with transparency.[17]

20.    When companies like Celsius and Voyager failed, customer anger segued to bankruptcy investigations.  In Celsius, the examiner issued a massive report detailing how the company (led by Mr. Mashinsky) gambled with customer deposits, despite promises of conservative, prudent, transparent investing.[18] In Voyager, the Board's Special Committee also issued a report revealing how the company (led by Mr. Ehrlich) gave more than $650 million to Three Arrows Capital without conducting *any* meaningful diligence.[19]  And in FTX, John J. Ray III (as successor to Sam Bankman-Fried) issued his now infamous statement: in his "40 years of legal and restructuring experience," he had never seen "such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here."[20]

---

[14] Ryan Browne, *Cryptocurrency Exchange FTX Hits $32 Billion Valuation Despite Bear Market Fears,* CNBC (January 31, 2022).

[15] See *Sample Letter to Companies Regarding Recent Developments in Crypto Asset Markets,* S.E.C. (Dec. 8, 2022) [https://www.sec.gov/corpfin/sample-letter-companies-regarding-crypto-asset-markets].

[16] See, *e.g.*, BlockFi Website, *What is TaxBit and how does it help BlockFi clients?* (Sept. 14, 2002)[https://help.blockfi.com/hc/en-us/articles/4404797816596-What-is-TaxBit-and-how-does-it-help-BlockFi-clients].

[17] See *AMA: I'm Yuri Mushkin, Chief Risk Officer (CRO) at BlockFi. Ask me anything!"* [https://www.reddit.com/r/blockfi/comments/x8bsgo/ama_im_yuri_mushkin_chief_risk_officer_cro_at/].

[18] See *Celsius Examiner's Report* at 22 ("In every key respect—from how Celsius described its contract with its customers to the risks it took with their crypto assets—how Celsius ran it business differed significantly from what Celsius told its customers.").

[19] See *Investigation Report of the Special Committee of the Board of Directors of Voyager Digital, LLC,* dated October 7, 2022, at 31-34 [Docket No. 1000], In re Voyager Digital Holdings, Inc., Case No. 22-1043 (MEW) (Bankr. S.D.N.Y.) [hereinafter, "Voyager Board Report"].

[20] *Declaration of John J. Ray III In Support of Chapter 11 Petitions and First Day Pleadings*, dated November 17, 2022, at ¶ 4 [Docket No. 24], In re FTX Trading Ltd., Case No. 22-11068 (JTD) (Bankr. D. Del.).

21.     The crypto debtors all collapsed within a few months of each other.  The catalytic
event was the collapse of the TERRA/LUNA cryptocurrency in May/June 2022, which caused a
chain reaction of defaults, bank-runs, and industry-wide calamity.[21]   But there was a more
fundamental reason for 2022's "Crypto Winter." Customers who deposited crypto were promised,
almost invariably, state-of-the-art risk management[22] and a relatively high yield.[23]   The crypto
banks and trading platforms that took in such deposits had to, in turn, find places to invest the
crypto deposits.  The investments had to be equally safe (deposits were redeemable by customers
at will) and they had to generate even higher yields than what was promised to customers.[24]

22.     The banks and trading platforms could have sold the crypto, converting it into fiat
currency, and invested the US dollars.  But that was way too risky (crypto prices fluctuate
dramatically) and expensive (hedges against currency price fluctuations are costly).[25]   So,
companies like BlockFi promised customers that they would not invest crypto deposits by first
converting them in fiat currency.[26]  They would, instead, find third parties that would borrow the

---

[21]   See *Celsius Examiner's Report* at 62-63.

[22]   See BlockFi Website, *How BlockFi Handles Risk and Security* (February 11, 2021)("At BlockFi, the responsibility to protect our clients, our staff, and our systems is built into our DNA.  People trust BlockFi because managing risk and security isn't just an afterthought – it's our default operating model and the keystone of our culture.") [https://blockfi.com/how-blockfi-handles-risk-and-security].

[23]   See *Order Instituting Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-And-Desist Order,* at ¶ 15, In re BlockFi Lending LLC, SEC Administrative Proceeding 3-20758 [https://www.sec.gov/litigation/admin/2022/33-11029.pdf].

[24]   Id. ("When clients send crypto to their BlockFi account or purchase additional crypto within the BlockFi Interest Account, that digital asset is replaced with an obligation to return the same amount of that crypto plus any interest earned.").

[25]   See *Report of Robert J. Stark, Examiner,* dated March 8, 2021, at 8 [Docket No 605], In re Cred, Inc., Case No. 20-12836 (JTD) (Bankr. D. Del.).

[26]   See BlockFi Website, *An In-depth Look at BlockFi's Risk Management* (July 19. 2022) ("Asset matching reduces digital asset conversion risk by seeking to deploy digital assets into loans or investments that will generally 'match' or generate returns in the same denomination of the corresponding liabilities.") [https://blockfi.com/in-depth-look-at-blockfis-risk-management].

crypto (i.e., fully assume the volatility risks and costs) while promising the originating institution the higher level of return.[27]

23.    Problem was this: There weren't any reliable third-parties.  A company like Celsius, for example, grew more and more successful at its marketing – luring in billions from "mom and pop" investors – but simply could not find places to reliably and profitably invest the deposits.[28] But, it still owed customers high interest; it sunk deeper in a hole each day it did not generate profits.  So, it started making riskier and risker investments with deposited capital to "chase yield."[29]  Companies in this predicament deployed vast amounts of capital without first conducting diligence[30] and/or they made very risky gambles with deposited funds, in spite of the promises they made to customers.[31]  Meanwhile, executives protected themselves[32] and/or took money out before it was too late.[33]

24.    Retracting the lens, this is an interesting moment for American bankruptcy. Bankruptcy Courts in Delaware, Houston, New Jersey, and New York are overseeing what is, essentially, a grand public inquest over how and why the industry grew so quick, collapsed so

---

[27]    See id. ("In simpler terms, bitcoin loans are made with bitcoin, not with other cryptoassets.").

[28]    See *Celsius Examiner's Report* at 162-16.

[29]    Id. at 167-180.

[30]    See *Voyager Board Report* at 31-34

[31]    See *Celsius Examiner's Report* at 174-177.

[32]    See *BlockFi's Court Presentation* at 25 (January 9, 2023) [https://www.crowdfundinsider.com/wp-content/uploads/2023/01/BlockFi-Presentation-January-2023.pdf] (in August 2022, BlockFi paid five executives more than $15 million to settle certain litigation claims); See also Exhibit C to *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(A) And 363(C) Authorizing the Debtors to (I) Continue, Renew, or Supplement Insurance Policies, (II) Pay Insurance Premiums and Related Obligations Thereon, (III) Continue, Renew, or Supplement the Surety Bond Program, and (IV) Granting Related Relief* [Docket No. 11] (indicating $22.6 million premium paid for D&O insurance coverage beginning November 18, 2022).

[33]    See p. 19-20, fn. 9 of the *Statement of Financial Affairs for BlockFi Inc. (Case No. 22-19361)* [Docket No. 243] (reflecting $10 million withdrawn off BlockFi's platform in April 2022).

hard, and is now delivering such staggering losses to millions of individual "mom and pop" investors.  This is necessary to, among other things, ensure that stakeholders know that the bankruptcy system is faithfully working for their economic interests.  Today, Celsius and Voyager customers understand the story of their debtor.  FTX customers are coming to understand the story undergirding their case.  BlockFi customers do not yet know their story, and this is facilitating case mischief.

## ARGUMENT

I.    **The Relief Requested In The Motion
Should Be Denied Because It Is Not Likely To Lead
This Bankruptcy To A Principled Or Swift Conclusion.**

25.    It is blackletter law that the officers and directors of a Chapter 11 debtor-in-possession owe precisely the same fiduciary duties – to the creditors -- as does a Chapter 11 trustee. See 11 U.S.C. § 1107(a); see also Wolf v. Weinstein, 372 U.S. 633, (1963)("so long as the Debtor remains in possession, it is clear that the corporation bears essentially the same fiduciary obligation to the creditors as does the trustee for the Debtor out of possession.").  This is not an insignificant or whimsical legal obligation.  It is, rather, as Justice Cardozo phrased it, "the punctilio of an honor the most sensitive."  Meinhard, 249 N.Y. at 464.

26.    Thus, when the debtor-in-possession takes action to further the interests of insiders to the detriment of creditors, bankruptcy jurisprudence commands swift corrective action from the Court.  As the Supreme Court made clear, in Pepper v. Litton, 308 U.S. 295, 307-08 (1939):

> In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.  And its duty so to do is especially clear when the claim seeking allowance accrues to the benefit of an officer, director, or stockholder. That is clearly the power and duty of the bankruptcy courts.

27.    Even the "appearance of impropriety" demands judicial remediation because, as Judge Friendly famously put it, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right."  In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966).  Indeed, "Courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair[,] and whether fiduciary duties were properly taken into consideration."  In re Innkeepers USA Trust, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).  The debtor in possession must, in other words, always be

like Caesar's Wife: above suspicion.

28.    This is critical to system integrity.  After all, management oversaw the debtor's pre-petition financial collapse.  It is no small thing for stakeholders to trust those same managers to lead the corporation out of the very mess they made.  But, the idea behind "exclusivity" is that management is (begrudgingly) best situated to know the business, know how to turn it around, and thereby know how to maximize value.  See Official Comm. of Unsec. Creds. of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 577 (3d Cir. 2003); In re Washington-St. Tammany Electric Cooperative, Inc., 97 B.R. 852, 854-55 (E.D. La. 1989) (citing legislative history and importance of debtor diligence in demonstrating probable success of reorganization). This idea becomes completely unmoored when there is no longer a business to reorganize, and the Chapter 11 case is simply a liquidation.  See  In re Timbers of Inwood Forest Associates, Ltd., 808 F.2d 363, 373 (5th Cir. 1987) ("when there is no reasonable likelihood that the statutory objective of reorganization can be realized…statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors").

29.    Moreover, Congress foresaw the possibility that a debtor would weaponize exclusivity, cautioning that "[a]n extension should not be employed as a tactical device to put pressure on parties interest to yield to a plan they consider unsatisfactory."  See S. Rep. No. 989, 95th Cong., 2d Sess. 118 (1978); see also Timbers of Inwood Forest Associates, Ltd., 808 F.2d at 372 (cautioning that the legislative goal behind 1121 should be kept in mind to "avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI… [as] 1121was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.").  Cf. In re All Seasons Indus., 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (denying extension of exclusivity when "such an extension would

have the result of continuing to hold creditors hostage to the Chapter 11 process and pressuring

them to accept a plan they believe to be unsatisfactory").

30.    The case In re GMG Capital Partners III, L.P., 503 B.R. 596 (Bankr. S.D.N.Y.

2014), is instructive.  There, the debtor (like BlockFi) was not in possession of an operational

business but, rather, managed a portfolio of stock in three companies.  The debtors believed that

the share price of one of the portfolio companies was likely to increase in the future, and sought

an extension of its exclusivity period to prohibit a competing plan which would seek to liquidate

the debtors' assets before such increase in value could be realized.  The debtors' largest creditor

objected.  In denying the debtors' (first) motion to extend exclusivity, the court characterized the

motion as a "tactical weapon in its ongoing war with [creditor]," and an attempt to retain control

over the disposition of the stock portfolio "designed to induce [creditor] to accept [the debtors']

view of the future, or at a minimum, prevent [creditor] from filing a plan that would jeopardize the

potential upside to [the debtors'] other stakeholders, including its members and limited partners

who are currently out of the money and have everything to gain and nothing to lose by waiting in

hope that the portfolio will increase in value." Id. at 602.

31.    The case In re New Valley Corp., described at 168 B.R. 73, 75 (Bankr. D.N.J. 1994)

is also instructive.  There, the debtor opposed any plan construct ousting pre-petition management

and refused to negotiate with creditors, who stood ready to file their own plan presenting a

meaningful alternative.  In that case, the Court terminated exclusivity despite the fact that "[a]ll

parties agree[d] that operationally [the debtor] has done extremely well during the debtor-in-

possession period and that its going concern value is increasing." Id.

32.    Here, there is no basis to continue exclusivity.  The true underlying purpose of the

Debtors' Exclusivity Motion is – not to reorganize the business, preserve value, and ensure a value-

maximizing exit from Chapter 11 – but to forcibly extract plan releases where none are due.  This

violates the "creditors-first" expectation of bankruptcy duties.  It flies in the face of foundational

bankruptcy jurisprudence, such as <u>Pepper</u> and <u>Ira Haupt</u>.  It defies the clear warning, contained in

the legislative history and in the case law, that debtors should not be allowed to "weaponize"

exclusivity.  And, all of this especially true given that BlockFi is a dead business and that this is a

Chapter 11 case in name (and expense) only.  The Debtors' Exclusivity Motion should be denied.

## II.    The Court Should, Instead, Relieve The Estates Of This Galling Administrative Burden By Sending It -- Via Alternative Order -- To A Swift Conclusion.

### A.    The Court Should, As A First Alternative, Appoint A Chapter 11 Trustee.

33.    Section 1104(a) provides that, upon request, the Court "shall" order the

appointment of a Chapter 11 trustee upon a showing (i) of "cause", including fraud, dishonesty,

incompetence, or gross mismanagement or (ii) that such appointment "is in the interests of

creditors". 11 U.S.C. § 1104(a).

34.    "Cause" has flexibility beyond a showing of fraud, dishonesty, incompetence, or

gross mismanagement.  Acrimony or conflicts of interest between the parties can be reason

enough, as "the appointment of a trustee may be the only effective way to pursue reorganization."

<u>In re Marvel Entm't Grp.</u>, 140 F.3d 463, 472 (3d Cir. 1998).

35.    In determining whether to appoint a Chapter 11 trustee under "in the interests of

creditors" test, courts consider: (a) the debtor's trustworthiness; (b) the debtor's past and present

performance and potential for reorganization; (c) whether creditors have confidence in present

management; and (d) the benefits of appointing a trustee balanced against the costs of appointment.

<u>See</u>, <u>e.g.</u>, <u>Mfrs. & Traders Tr. Co. v. Morningstar Marketplace, Ltd. (In re Morningstar</u>

<u>Marketplace, Ltd.)</u>, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016).

36.    Need for a Chapter 11 trustee is easily established by the facts of the case:

- The Investigative Report reveals, in great detail, that BlockFi (Mr. Prince in particular) perpetrated a fraud on customers. There is, in fact, substantial overlap in what is revealed in the Investigative Report, the Celsius Examiner's Report, and the Voyager Board Report. The facts give rise, not only to direct customer claims sounding in fraud, but also estate claims sounding in (among other theories) breach of fiduciary duty and aiding and abetting $900 million in intentional fraudulent transfers.

- Separately, the Debtors: (i) broke their own promises to customers by liquidating nearly $240 million in customers' crypto (and thereby subjecting customers to enormous tax risks); (ii) used tens of millions of it to purchase D&O insurance nearly dollar-for-dollar; (iii) unnecessarily burned tens of millions in administrative expense by "holding the case hostage" as leverage for insider releases; and then (iii) violated federal law by prematurely soliciting their plan, lying about their own conduct, and lying about the existence and content of an Official Committee plan (that did not exist) to scare customers into submission.

- This case is a liquidation. There is no revenue. There are only losses and, under the Debtors' stewardship, enormous and unnecessary monthly losses. Despite repeated requested by the Official Committee, the Debtors refuse to stave off the losses. The reason why is plain as day; that is their bargaining leverage.

- The Debtors and the Official Committee are at a complete standstill. Mediation has failed. There are no negotiations. The Debtors shill for the insiders and the Official Committee believes that is a wrongful, illegal position. This befits a <u>Marvel Entertainment</u> solution.

37.    For all of the foregoing reasons, the Court should grant the Official Committee's

Cross-Motion, ordering the immediate appointment of a Chapter 11 trustee per Bankruptcy Code

Section 1104(a).

**B.    The Court Should, As A Second**
**Alternative, Open Up Plan Exclusivity.**

38.    Bankruptcy Code Section 1121(d)(1) provides that "the court may for cause reduce or increase" the debtor's exclusivity periods. This, again, "represents a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise." Timbers of Inwood., 808 F.2d 363, 372 (5th Cir. 1987), aff'd, 484 U.S. 365 (9188) (citing H.R. Rep. No. 95-595, at 174 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6191, 6192). It is intended to ensure that a debtor does not exploit exclusivity "as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 99-764; H.R. Conf. Rep. No. 99-958, reprinted in 1986 U.S. Code Cong. & Adm. News 5227. And, it was "designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." Timbers of Inwood Forest, 808 F.2d at 372.

39.    The Bankruptcy Code does not define "cause" for modifying exclusivity periods. But, courts have identified a variety of factors to consider, including, among others: (1) whether the debtor has had sufficient time to negotiate a plan of reorganization; (2) whether the debtor has made progress in negotiations with stakeholders; (3) whether the debtor is using exclusivity to pressure creditors; and (4) whether or not unresolved contingencies exist. See, e.g., In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); In re Dow Corning Corp., 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); In re Express One Int'l, 194 B.R. 98, 100 (Bankr .E.D. Tex. 1996). All of these factors militate in favor of terminating exclusivity.

40.    First, the debtor has had more than sufficient time to negotiation a plan. These cases, again, have lasted seven months. During that time, the Debtors have run an M&A process (utter failure) and filed two plans (both dead on arrival). This is now a Chapter 11 case in name

only.  Meanwhile, the Debtors are intentionally burning on average more than $16 million per month, merely to augment defensive positions for historical management. This is in breach of fiduciary responsibilities.  Time should have been called a long time ago.

41.    Second, the Debtors have not made progress in negotiations with stakeholders. Quite the opposite.  The mediation is over; negotiations are over.  One month ago, the Debtors undertook an illegal solicitation (smear) campaign, obviously intending to go-around the Official Committee, spreading lies directly to the customer base (600,000+ "mom and pop" investors). When an estate fiduciary did the exact same thing in the Boy Scouts case, that fiduciary was sanctioned, as detailed in the Committee's 1125 Motion.  This proves just how far the negotiating-dynamic has devolved.  But, to the extent there is any ambiguity, the Official Committee laid out why it will staunchly oppose plan confirmation in the Committee's Plan Statement.

42.    Third, the Debtors are assuredly using exclusivity to pressure creditors.  That is their entire point: If the Official Committee does not relent to insider releases, the Debtors are going to winnow estate value via continued administrative burn – all made possible by continued exclusivity. It is wrongful.

43.    Fourth, there are zero unresolved case contingencies.  The case is done.  There is simply nothing left to do but to litigate over, ostensibly, insider releases.  And, the Official Committee cannot see any principled reason why this is happening.

44.    In the final analysis, the "primary consideration" in determining whether to terminate exclusivity is whether terminating exclusivity will "facilitate moving the case forward." In re Dow Corning Corp., 208 B.R. at 670; In re Adelphia Commc'ns Corp., 352 B.R. at 590 ("[T]he test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case.").  The Official

Committee has a plan drafted and ready for filing; it is not difficult to conjure up what that plan

will provide for.  The Official Committee is exceedingly confident that creditors will vote in favor

of its plan and that it will be confirmed in short order.  The Debtors' plan, by contrast, faces a

difficult and expensive opposition.  The choice is obvious.  The Court should grant the Cross-

Motion and open up exclusivity.

      **C.**      **The Court Should, As A Third Alternative,**
                    **Convert The Cases To Chapter 7 Proceedings.**

      45.      Bankruptcy Code Section 1112(b)(1) provides that, on request of a party in interest,

and after notice and a hearing, the Court "shall" convert a case to a Chapter 7 proceeding "if the

movant establishes cause."   In this regard, a 2005 amendment to Section 1121(b) limited

bankruptcy court discretion (by changing "may" to "shall") meaning that, if there is a showing of

"cause," the Court must convert.  <u>See</u> <u>In re Gateway Access Solutions, Inc.</u>, 374 B.R. 556, 560

(Bankr. M.D. Pa. 2007) (noting the statutory language change "from permissive to mandatory"

and finding cause existed to convert the debtor's cases where the estate was diminishing rapidly at

the expense of creditors as extensive administrative costs from professional fees were

accumulating while the case lingered in Chapter 11).

      46.      Stated differently, if the movant establishes "cause," the burden then shifts to the

debtor to prove it falls within the Section 1112(b)(2) "unusual circumstances" exception.  But that

requires "more than manifest unsubstantiated hopes for a successful reorganization."  <u>In re Brown</u>,

951 F.2d 564, 572 (3d Cir.1991) (citing <u>In re Canal Place Ltd. Partnership</u>, 921 F.2d 569, 577 (5th

Cir.1991)).

      47.      Although "cause" is not defined, Bankruptcy Code Section 1112(b)(4) provides a

non-exclusive list of sixteen "causes" for conversion.  Included as grounds for conversion at

section 1112(b)(4)(A) is a substantial or continuing loss to or diminution of the estate and the

absence of a reasonable likelihood of rehabilitation.  The inquiry under Bankruptcy Code Section

1112(b)(4)(A) is two-fold.  "First, the Court must look at the track record of the Debtor to

determine if it is suffering losses or making gains. Second, the Court must determine whether

rehabilitation is likely given the evidence presented at hearing." In re Gateway Access Sols., Inc.,

374 B.R. 556, 562 (Bankr. M.D. Pa. 2007).

48.    Cause for conversion is manifest:

- The estates are not generating any income and are rapidly burning cash. This is sufficient reason, unto itself, to convert the case. See Loop Corp. v. U.S. Trustee, 379 F.3d 511, 516 (8th Cir. 2004)( "[I]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash follow — including that resulting only from administrative expenses — effectively comes straight from the pockets of the creditors.  This is enough to satisfy the first element of [continuing loss to or diminution of the estate].").

- The Debtors are defunct; they have zero capacity to rehabilitate. This too is sufficient reason, unto itself, to convert the case. See In re AdBrite Corp., 290 B.R. 109, 215 (Bankr. S.D.N.Y. 2003); In re Johnston, 149 B.R. 158, 161 (B.A.P. 9th Cir. 1992) (granting motion to convert debtor's Chapter 11 case to Chapter 7 where the debtor lacked the ability to effectuate plan of reorganization because it had no income and further delay would prejudice creditors by eroding their position).

- The Debtors are proposing a disguised liquidation plan that creditors are not going to support. See In re Moore Construction, Inc., 206 B.R. 436, 438 (Bankr. N.D. Tex. 1997)(converting case because there is "no reason to allow…further harm the creditors while the Debtor continues its exercise in tire kicking.").

49.    For these reasons, the Court should grant the Official Committee's Cross-Motion,

Ordering the immediate conversion of these cases to Chapter 7 proceedings under Bankruptcy

Code Section 1112(b).

## WAIVER OF MEMORANDUM OF LAW

50.     The Committee respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to D.N.J. LBR 9013-1(a)(3) because the legal basis upon which the Committee relies is incorporated herein and the Motion does not raise any novel issues of law.

## NOTICE

51.     Notice of this Motion has been provided to: (a) the office of the U.S. Trustee for the District of New Jersey; (b) the Debtors; and (c) all parties that have filed a notice of appearance in these Chapter 11 cases pursuant to Federal Rule of Bankruptcy Procedure 2002.  In light of the nature of the relief requested herein, the Committee respectfully submits that no further notice is required.

## CONCLUSION

**WHEREFORE**, based on the foregoing, the Committee respectfully requests that this Court: (i) fully deny the relief requested in the Debtors' Exclusivity Motion; (ii) grant the Official Committee's Cross-Motion by Ordering (a) the immediate appointment of a Chapter 11 trustee, (b) immediate termination of the Debtors' exclusivity periods, or (c) convert these bankruptcy cases to proceedings under Chapter 7; and (ii) grant the Official Committee such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted,

Basking Ridge, New Jersey
Dated: June 27, 2023

By: */s/  Gregory S. Kinoian*
**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 230-2095
Fax:         (973) 533-1112
Email:      DStolz@genovaburns.com
               DClarke@genovaburns.com
               GKinoian@genovaburns.com


*Local Counsel for the Official*
*Committee of Unsecured Creditors*


By: */s/ Robert J. Stark, Esq.*
**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Kenneth J. Aulet, Esq.
Bennett S. Silverberg, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Fax:         (212) 209-4801
Email:      rstark@brownrudnick.com
               kaulet@brownrudnick.com
               bsilverberg@brownrudnick.com

Stephen D. Palley, Esq.
601 Thirteenth Street, NW
Washington, DC  20005
Telephone: (202) 536-1700
Fax:         (202) 536-1701
Email:      spalley@brownrudnick.com

Tristan G. Axelrod, Esq.
Sharon I. Dwoskin, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Fax:        (617) 856-8201
Email:       taxelrod@brownrudnick.com
             sdwoskin@brownrudnick.com

*Counsel for the Official*
*Committee of Unsecured Creditors*