**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING OF**
**REVISED DISCLOSURE STATEMENT**
**RELATING TO THE SECOND AMENDED JOINT**
**CHAPTER 11 PLAN OF BLOCKFI INC. AND ITS DEBTOR**
**AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on May 12, 2023, the above-captioned debtors and

debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement Relating to the*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

*First Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 874] (the "Initial Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A** (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that a comparison between the Disclosure Statement and the Initial Disclosure Statement is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that a hearing at which the Bankruptcy Court will consider approval of the Disclosure Statement will commence on **July 13, 2023 at 10:00 a.m. (prevailing Eastern Time)** or soon thereafter as counsel may be heard before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Disclosure Statement shall:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the

Supplemental Commentary, so as to be received on or before **July 5, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

     **PLEASE TAKE FURTHER NOTICE** that copies of the Disclosure Statement and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Kroll at https://restructuring.ra.kroll.com/blockfi/.  You may also obtain copies of the Disclosure Statement and other pleadings filed in these chapter 11 cases by visiting the Bankruptcy Court's website at https://www.njb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated:  June 28, 2023

_/s/ Michael D. Sirota_

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted _pro hac vice_)
Christine A. Okike, P.C. (admitted _pro hac vice_)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted _pro hac vice_)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

_Attorneys for Debtors and_
_Debtors in Possession_

# Exhibit A

**Disclosure Statement**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

## DISCLOSURE STATEMENT RELATING TO THE
## SECOND AMENDED JOINT CHAPTER 11 PLAN OF BLOCKFI INC. AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.

THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JULY 13, 2023 OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE SECOND AMENDED JOINT PLAN OF BLOCKFI INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN.  IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY

SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE WIND DOWN CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE XI, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS, OR ANY STATE SECURITIES LAWS AS TO WHETHER DIGITAL ASSETS OR TRANSACTIONS INVOLVING DIGITAL ASSETS ARE SECURITIES, AND THE RIGHT OF THE SEC TO CHALLENGE ANY TRANSACTION INVOLVING DIGITAL ASSETS ON ANY BASIS ARE EXPRESSLY RESERVED.  THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN DIGITAL ASSETS AND CERTAIN TRANSACTIONS INVOLVING DIGITAL ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER U.S. FEDERAL SECURITIES LAWS.  THE LEGAL TEST FOR DETERMINING WHETHER ANY GIVEN DIGITAL ASSET OR TRANSACTION INVOLVING DIGITAL ASSETS IS A SECURITY IS A HIGHLY COMPLEX, FACT-DRIVEN ANALYSIS THAT EVOLVES OVER TIME, AND THE DETERMINATION AS TO WHETHER A DIGITAL ASSET OR A TRANSACTION INVOLVING DIGITAL ASSETS MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE DEBTORS' BUSINESS AND FINANCIAL STRATEGIES, BUDGETS, AND PROJECTIONS;

- THE OVERALL HEALTH OF THE DIGITAL ASSET INDUSTRY;

- THE REGULATORY LICENSES HELD BY THE DEBTORS OR THE WIND-DOWN DEBTORS;

- THE EVOLVING REGULATORY LANDSCAPE AND POTENTIAL ADOPTION AND IMPACT OF NEW GOVERNMENTAL REGULATIONS;

- TAXATION APPLICABLE TO THE DEBTORS AND ANY CHANGES THERETO;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, AND PERFORMANCE OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY BOTH SHORT AND LONG-TERM LIQUIDITY NEEDS;**

- **THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **BANK VOLATILITY;**

- **THE INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.   THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR DIGITAL ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS OR FINANCIAL LOSSES IN EXCESS OF FDIC INSURED COVERED AMOUNTS CAUSED BY THE FAILURE OF CRITICAL BANKING RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **CLIENT RESPONSES TO THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

4

- **THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR IF AN ALTERNATIVE PLAN WOULD PROVIDE MORE VALUE TO STAKEHOLDERS THAN THE PLAN;**

- **THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THESE CHAPTER 11 CASES;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND WIND-DOWN EXPENSES;**

- **LIMITED ACCESS TO CAPITAL RESOURCES;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS;**

- **CHANGES IN LABOR RELATIONS;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS;**

- **ADVERSE TAX CHANGES;**

- **POSSIBLE RESTRICTIONS ON THE ABILITY TO OPERATE; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, DIGITAL ASSET VALUES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| I. | **INTRODUCTION** | **10** |
| II. | **PRELIMINARY STATEMENT** | **10** |
| | A. Background | 10 |
| | B. The Postpetition Sale Process | 13 |
| | C. Anticipated Proceedings to Maximize Value for Creditors | 14 |
| III. | **OVERVIEW OF THE PLAN** | **15** |
| | A. The Plan | 15 |
| | B. Holders of Claims May Be Released by the Debtors | 23 |
| | C. Employee Transition Plan | 24 |
| IV. | **WHY HOLDERS OF CLAIMS SHOULD VOTE IN FAVOR OF THE PLAN** | **26** |
| V. | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** | **27** |
| | A. What is chapter 11? | 27 |
| | B. Why are the Debtors sending me this Disclosure Statement? | 27 |
| | C. Am I entitled to vote on the Plan? | 28 |
| | D. What will I receive from the Debtors if the Plan is consummated? | 29 |
| | E. What will I receive from the Debtors if I hold an Allowed Administrative Claim? | 42 |
| | F. What happens to my recovery if the Plan is not confirmed or does not go effective? | 43 |
| | G. If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? | 43 |
| | H. What are the sources of consideration and other consideration used to make Distributions under the Plan? | 44 |
| | I. Is there potential litigation related to the Plan? | 44 |
| | J. Does the Plan provide for the subordination of any Claims? | 44 |
| | K. Will there be releases and exculpation granted to parties in interest as part of the Plan? | 47 |
| | L. What are the consequences of opting out of the releases provided by the Plan? | 52 |
| | M. What are the consequences of not opting out of the releases provided by the Plan? | 52 |
| | N. Are any regulatory approvals required to consummate the Plan? | 52 |
| | O. What is the deadline to vote on the Plan? | 53 |
| | P. What are the overall projected recoveries under the Plan? | 53 |
| | Q. How do I vote for or against the Plan? | 53 |
| | R. Why is the Bankruptcy Court holding a Confirmation Hearing? | 53 |
| | S. When is the Confirmation Hearing set to occur? | 53 |
| | T. What is the purpose of the Confirmation Hearing? | 54 |
| | U. What is the effect of the Plan on the Debtors' ongoing business? | 54 |
| | V. Will any party have significant influence over the corporate governance and operations of the Wind-Down Debtors? | 54 |
| | W. What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? | 54 |
| | X. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 54 |
| VI. | **SOLICITATION AND VOTING PROCEDURES** | **55** |
| | A. Classes Entitled to Vote on the Plan. | 55 |
| | B. Votes Required for Acceptance by a Class. | 55 |
| | C. Certain Factors to Be Considered Prior to Voting. | 56 |
| | D. Classes Not Entitled to Vote on the Plan. | 56 |
| | E. Solicitation Procedures. | 57 |

F.     Voting Procedures...........................................................................................58
G.    Voting Tabulation. .........................................................................................59
H.    Ballots Not Counted. .....................................................................................59

**VII.    CONFIRMATION OF THE PLAN.............................................................................59**

A.    Requirements of Section 1129(a) of the Bankruptcy Code........................59
B.    Best Interests of Creditors—Liquidation Analysis. ...................................60
C.    Feasibility. ....................................................................................................61
D.    Acceptance by Impaired Classes..................................................................61
E.    Confirmation without Acceptance by All Impaired Classes. ......................62

**VIII.   THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE.............................63**

A.    The Debtors' Corporate Structure and History. ..........................................63
B.    The Debtors' Assets and Operations............................................................64
C.    The Debtors' Capital Structure. ...................................................................67

**IX.    EVENTS LEADING TO THESE CHAPTER 11 CASES ..................................................69**

A.    Market and Industry-Specific Challenges. ..................................................69
B.    Governance Initiatives. ................................................................................75

**X.     EVENTS OF THE CHAPTER 11 CASES ...................................................................75**

A.    First and Second Day Relief and Other Case Matters..................................75
B.    Appointment of Unsecured Creditors' Committee. .....................................77
C.    Schedules and Statements. ...........................................................................77
D.    Bar Date Motion. ..........................................................................................78
E.    The Wallet Withdrawal Motion. ..................................................................79
F.    The Redaction Motion. .................................................................................80
G.    The Exclusivity Motions. .............................................................................81
H.    The Institutional Loan Motion and Settlements. .........................................81
I.     Returning Post-Pause Payments on Retail Client Loans. ............................82
J.     Litigation Matters. ........................................................................................82
K.    The Key Non-Insider Employee Retention Plan. ........................................83
L.    The Post-Petition Sale Process.....................................................................83
M.   Bermuda Proceedings. ..................................................................................83
N.    The Release of Funds in the Silvergate Bank Reserve Account and Failure of Silvergate Bank. ............................................................................................................84
O.    The Failure of Silicon Valley Bank and Signature Bank and the U.S. Trustee's Motion to Compel............................................................................................................84
P.    Government Seizures ....................................................................................86
Q.    The D&O Settlement ....................................................................................87
R.    The Special Committee's Investigation and Recommendation....................90

**XI.    RISK FACTORS ...................................................................................................93**

A.    Risks Related to the Wind-Down..................................................................93
B.    Risks Related to Recoveries under the Plan. ................................................98
C.    Risks Related to the Debtors' Businesses. ...................................................99
D.    Miscellaneous Risk Factors and Disclaimers. ..........................................102

**XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.................................................................................................................103**

A.    Introduction.................................................................................................103
B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ...........................105
C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote......................................................................................106
D.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Digital Assets Received Under the Plan. ..............................111

E.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
        Allowed Claims. ....................................................................................................111

F.      Information Reporting and Back-Up Withholding. ...................................................112

**XIII.    RECOMMENDATION OF THE DEBTORS ..........................................................114**

**EXHIBITS**

EXHIBIT A        Chapter 11 Plan

EXHIBIT B        Liquidation Analysis

# I.    INTRODUCTION

BlockFi Inc. and its debtor Affiliates (each, a "<u>Debtor</u>," and collectively, the "<u>Debtors</u>," and together with BlockFi Inc.'s non-Debtor Affiliates, "<u>BlockFi</u>" or the "<u>Company</u>") submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Debtors' *Second Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (as supplemented or amended from time to time, the "<u>Plan</u>").[2]   A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and is incorporated herein by reference. The Plan constitutes a separate chapter 11 plan for each of the Debtors.[3]

**THE DEBTORS BELIEVE THE PLAN IS THE BEST WAY TO COMPLETE THESE CHAPTER 11 CASES AS QUICKLY AS POSSIBLE AND RETURN DIGITAL ASSETS IN KIND TO CLIENTS.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN AND, IF RELEVANT, SEPARATELY VOTE TO APPROVE ANY IMPLEMENTATION MECHANISMS REQUIRED TO IMPLEMENT THE PLAN OUTSIDE OF THE UNITED STATES OF AMERICA.**

# II.    PRELIMINARY STATEMENT

## A.    Background

BlockFi operated a financial services platform that allowed retail and institutional Account Holders to earn, borrow, trade, and store certain Digital Assets. Using the Company's online platform, BlockFi's Clients could earn interest on the Digital Assets transferred to the Company's platform, trade over forty unique Digital Assets at competitive prices, store them all in one convenient place, and earn credit card spending rewards.  Additionally, BlockFi provided loans secured by Digital Assets (and was the first in many U.S. states to seek and receive lending licenses to do so). BlockFi's mission since its inception has been to provide credit services to markets with limited access to financial products. BlockFi's culture embodies four core values: "Pragmatic Pioneering," "Clients not Customers," "Individual Effort, Collective Success," and "Transparency Builds Trust." These values have been key drivers of BlockFi's strategy and decision-making, which has consistently prioritized Client protection, stability, and prudent stewardship. This model helped BlockFi experience rapid growth—between 2019 and 2021, total annual trading volume grew from $2 million to more than $23 billion, while Deployable Assets[4] grew from $345 million to $14.8 billion as of December 31, 2019 and December 31, 2021, respectively. Cumulative gross loan originations expanded from $687 million in 2019 to more than $47 billion through 2021.

During 2022, events in the world economy roiled traditional markets and the Digital Asset markets alike. Digital Asset prices deteriorated in response to macroeconomic conditions, an unfavorable interest rate environment, decelerating growth, and high inflation.  All major Digital Assets and cryptocurrency-focused companies experienced significant declines; as of July 2022, the cryptocurrency market had lost $2 trillion in aggregate market value. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("<u>Luna</u>")

---

[2]   This Disclosure Statement and the Plan remain subject to the ongoing review and approval of the Bermuda Provisional Liquidators of BlockFi International Ltd., acting in accordance with their fiduciary responsibilities, and to such further amendment as may be required to ensure compliance with Bermuda law, regulations, and the duties of the Bermuda Provisional Liquidators.

[3]   Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I.B of the Plan. **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

[4]   "Deployable Assets" represent the fair value of Digital Assets (including Stablecoins) transferred to BlockFi through BIAs (as defined below), BPCs (as defined below), and other types of individually negotiated borrowing arrangements or as collateral in connection with loans BlockFi made to Clients. Deployable Assets do not include Digital Assets held in the Wallet Program (as defined below).

(as discussed in Article IX.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk. Singapore-based cryptocurrency hedge fund Three Arrows Capital, Ltd. ("3AC") collapsed, followed by the bankruptcies of Digital Asset exchange platforms Celsius Network ("Celsius") and Voyager Digital ("Voyager"). Although BlockFi fared better than other Digital Asset financial service platforms due to, among other things, its relative insulation from the Luna collapse and its requirement that many institutional loans be materially overcollateralized, the bankruptcies of BlockFi's peer firms shook the confidence of cryptocurrency investors and caused market flight, with substantial numbers of investors seeking to pull their funds from any and all cryptocurrency investments.

The collapse of two of BlockFi's major competitors put BlockFi's business at risk of contagion, similar to the banking crises seen in 2023. This risk, combined with the decline in Client activity and assets on its platform, led BlockFi to seek a liquidity injection in an effort to protect its Clients. West Realm Shires, Inc. (dba FTX US, "FTX US," and together with its subsidiaries and Affiliates, "FTX") offered to supply that liquidity through a transaction, that included providing FTX an option to purchase BlockFi's equity. BlockFi accepted this offer because it was the best option for stakeholders, including BlockFi Clients, at the time; it provided liquidity to backstop client funds and best positioned BlockFi to avoid a run on the platform. As part of the transaction, on June 30, 2022, BlockFi Inc., entered into an agreement with FTX US (the "FTX Facility"), which provided BlockFi with access to up to $400 million in capital, $300 million of which was available for general corporate purposes, including obligations to Clients (the "Client Payment Obligations"), and $100 million solely to fund the Client Payment Obligations. The FTX Facility was, and remains, contractually subordinated to Account Holder Claims.

The transaction initially led to the two outcomes BlockFi had hoped for; it softened the risk of contagion from the "crypto-winter" and the collapse of Voyager and Celsius, and provided immediate liquidity to the BlockFi Platform (as defined below) from the FTX Facility, as provided in greater detail below. From July through October 2022, BlockFi successfully drew $275 million from the FTX Facility through five separate transactions, dated on or about July 8, 2022, July 13, 2022, August 12, 2022, September 12, 2022, and October 13, 2022. Throughout this period, BlockFi also successfully processed over $3 billion in Client withdrawals. The transaction was viewed positively by the markets. This and other transactions led to Sam Bankman-Fried ("SBF"), the chief executive officer of FTX and the ultimate owner of Alameda Research Ltd. ("Alameda"), being heralded as the J.P. Morgan and Warren Buffet[5] of this generation.

At the time BlockFi entered into this transaction, the audited 2021 financial statements of FTX Trading Ltd. ("FTX Trading") and FTX US had been provided to BlockFi.[6] These audited financial statements indicated FTX Trading was a profitable enterprise with 2021 net income of approximately $387 million and over $1.6 billion in shareholders' equity.[7] Furthermore, the details of FTX's January 2022 Series C raise of approximately $437.6 million were included in the notes to the audited financials and provided even further comfort to BlockFi regarding FTX's capital position. Moreover, outside of the data provided by FTX to BlockFi, it was widely reported that FTX had raised over $1.8 billion in cumulative equity funding from some of the largest venture capital firms in the world.[8] SBF publicly presented FTX as having "top-notch, sophisticated automated risk measures in place to protect customer assets, that those assets were safe and secure, and that Alameda was just another platform customer with no special privileges."[9] Given the information conveyed and widely held public perception of FTX, there were no indications at the time that FTX US would be unable to honor its financial commitments to BlockFi under the

---

[5]    https://fortune.com/2022/08/01/ftx-crypto-sam-bankman-fried-interview/.

[6]    All descriptions of events related to FTX, Alameda, and 3AC in this Disclosure Statement are based on publicly-available information, news, and market data. All characterizations of the events related to FTX, Alameda, and 3AC in this Disclosure Statement are based on the Debtors' current understanding and are in no way intended to, or in fact, offer legal conclusions regarding such events.

[7]    FTX Trading Ltd., Consolidated Financial Statements as of December 31, 2021 and 2020 and For the Years ended December 31, 2021 and 2020, as audited by Prager Metis CPAs, LLC April 2, 2022.

[8]    https://www.crunchbase.com/organization/ftx-exchange.

[9]    Securities and Exchange Commission vs Sam Bankman-Fried, SEC Civil Action No. 22-cv-10501.

FTX Facility or that FTX Trading would be unable to honor its commitments to BlockFi and its other customers that had transferred assets on to FTX.com (the platform FTX operated). Given the perceived strength of FTX's business, in connection with FTX US's option to acquire all of the equity of BlockFi, certain of BlockFi's preferred shareholders specifically requested to receive consideration in the preferred shares of FTX Trading, rather than cash. Nor were there any indications that Alameda was having or projected to have financial difficulties at the time. To the contrary, among other things, Alameda: (1) had repaid approximately $1 billion to BlockFi essentially on demand when it was requested to do so in June 2022; (2) had won an auction for certain collateral that BlockFi had foreclosed upon from another third party, paying cash; (3) had made an investment to Voyager, one of BlockFi's competitors; (4) had provided BlockFi with information regarding certain Digital Asset wallets from which BlockFi had been able to verify billions of dollars in assets; and (5) had worked cooperatively with BlockFi regarding certain contractual terms that BlockFi had requested to be modified to provide BlockFi with additional downside protection.

Approximately five months later, in November 2022, Changpeng Zhao ("CZ"), the founder and chief executive officer of Binance Holdings Ltd., one of FTX's primary competitors, announced his intention to liquidate BAM Trading Services, Inc.'s (d/b/a Binance.US) (together with Binance Holdings Ltd., "Binance") substantial holdings of the native Digital Asset token of the FTX platform ("FTT").[10] This announcement created significant sell pressure on FTT and introduced uncertainty into the broader cryptocurrency markets. Less than an hour later, in response to CZ's tweet, Caroline Ellison, the chief executive officer of Alameda, tweeted an open offer to purchase the outstanding FTT for $22 per token.[11] On November 7, 2022, SBF tweeted, "FTX is fine. Assets are fine".[12] On November 8, 2022, SBF tweeted "we have come to an agreement on a strategic transaction with Binance for http://FTX.com (pending DD etc.)."[13] Then, on November 9, 2022, Binance announced there would be no transaction.[14] Rumors swirled as to the cause of and need for FTX to enter into a transaction and the reasons Binance backed out. In the span of seven days, FTX broadcast conflicting and ever-changing information to the world.

BlockFi learned of these events surrounding the Binance transaction at the same time and in the same manner as the general market—through Twitter and news reports. While watching and digesting these events as they unfolded over social media, BlockFi immediately acted to address its exposure to each of Alameda and FTX. On November 7, 2022, BlockFi reacted to market volatility by modifying existing lending arrangements with Alameda thereby increasing the overall required overcollateralization levels from generally 160% to 200%, which were satisfied at that point in time. On November 8, 2022, BlockFi requested to withdraw approximately $181 million in Digital Assets from its accounts at FTX.com, which was not honored. Separately, on November 8, 2022, BlockFi requested an additional $125 million in capital pursuant to the terms of the FTX Facility, which FTX US failed to fund.

On November 9, 2022, BlockFi Inc., BlockFi Lending LLC ("BlockFi Lending"), and BlockFi International Ltd. ("BlockFi International") entered into separate pledge agreements with Alameda (the "Alameda Pledge Agreement") and Emergent Fidelity Technologies Ltd. ("Emergent" and the pledge agreement, the "Emergent Pledge Agreement," and together with the Alameda Pledge Agreement, the "Pledge Agreements"). Pursuant to the terms of the Emergent Pledge Agreement, Emergent granted BlockFi a first-priority security interest in all of Emergent's rights, titles, and interests in, among other things, all of Emergent's shares of Class A Common Stock of Robinhood Markets, Inc. (the "Robinhood Shares") to secure all obligations of Emergent, Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International, or any Affiliate thereof under the secured financing

---

[10]    @CZ_Binance, Twitter (Nov. 6, 2022) ("Due to recent revelations that have came to light, we have decided to liquidate any remaining FTT on our books.")

[11]    @carolinecapital, Twitter (Nov. 6, 2022) ("@cz_binance if you're looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!").

[12]    @SBF_FTX, Twitter (Nov. 7, 2022).

[13]    @SBF_FTX, Twitter (Nov. 8, 2022).

[14]    @Binance, Twitter (Nov. 9, 2022).

agreements or any other agreement or arrangement.  Similarly, the Alameda Pledge Agreement granted BlockFi a first-priority security interest in all of Alameda's rights, titles, and interests in, among other things, Alameda's shares of Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum Trust (ETHE), and shares of the Bitwise 10 Crypto Index Fund (BITW) (the "Trust Shares") to secure all obligations of Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International, or any Affiliate thereof under the secured financing agreements or any other agreement or arrangement.

On November 10, 2022, Alameda breached the terms of a forbearance agreement it entered into with BlockFi contemporaneously with the Alameda Pledge Agreement.  BlockFi took actions to gain control of the additional collateral pledged to BlockFi, but the third-party custodian refused to honor the Alameda Pledge Agreement.  On November 11, 2022, certain of the various FTX entities filed voluntary chapter 11 petitions in the United States District Court for the District of Delaware; others followed.  As of May 5, 2023, the additional collateral pledged has a potential recovery value of $880.6 million based on market prices.

As noted above, BlockFi had exposure on account of the loans that BlockFi made to Alameda, and BlockFi had Digital Assets trapped on the FTX.com platform due to suspended withdrawals.  These exposures, and FTX's failure to fully fund the FTX Facility, left BlockFi in a liquidity crunch.  Accordingly, on November 10, 2022 at 8:15 p.m. (prevailing Eastern Time) (the "Platform Pause"), BlockFi paused the BlockFi Platform (as defined below) activities, including account withdrawals.  Soon thereafter, BlockFi retained Kirkland & Ellis LLP and Kirkland & Ellis International LLP (together, "Kirkland"), longtime corporate counsel Haynes and Boone, LLP ("Haynes and Boone"), Cole Schotz P.C. ("Cole Schotz"), as New Jersey local counsel, Berkeley Research Group ("BRG"), as financial advisor, and Moelis & Company LLC ("Moelis"), as investment banker, to assist BlockFi in navigating its uncertain position, contingency planning and liquidity management, among other things.  Ultimately, the Debtors determined that an in-court process would be necessary to develop the most value-maximizing alternative available to BlockFi and protect its Clients.  On November 28, 2022 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases.

## B.    The Postpetition Sale Process

Intent on moving expeditiously through chapter 11, the Debtors filed the *Joint Plan of Reorganization of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 22] (the "Initial Plan") on the first day of these Chapter 11 Cases.  The Initial Plan contemplated either a sale of substantially all of BlockFi's assets to a third-party or a self-liquidation transaction wherein BlockFi would return Digital Assets and cash to creditors (the "Self-Liquidation Transaction") followed, in each case, by a Wind Down of the Debtors' Estates.  The Self-Liquidation Transaction served as a floor for a third-party sale transaction.

Moelis prepared a comprehensive marketing strategy designed to identify bidders for packages of the Debtors' assets, including the BlockFi Platform (as defined below), Debtors' physical self-mining assets (the "Equipment"), loans secured by mining assets (the "Mining Loans"), and claims against certain third-parties. With a marketing strategy in place, on or about December 12, 2022, the Debtors, with the assistance of Moelis, began soliciting interest in the purchase of certain of the Debtors' Equipment and Mining Loans (together, the "Mining Portfolio"), as well as an interest in a self-mining facility in Spartanburg, South Carolina hosted by the Debtors' joint venture, BV Power Alpha LLC (the "Hosting Joint Venture").  The Debtors marketed the Mining Portfolio to potential bidders as a package, but also allowed parties to make bids on portions of the Mining Portfolio.

These efforts were successful and generated market interest in the Mining Portfolio—more than seventy prospective bidders executed nondisclosure agreements with the Debtors and engaged in further diligence toward potentially submitting a bid for the Mining Portfolio.  Through this marketing process, the Debtors, in consultation with Moelis and the Debtors' other advisors, concluded that it would be value-maximizing to sell the Equipment separately from the Debtors' interest in the Hosting Joint Venture and Mining Loans.  To that end, the Debtors and Moelis reoriented their Mining Portfolio sale efforts to focus, in the near-term, on the marketing and sale of the Equipment while holding, renegotiating, or otherwise pursuing collection on the Mining Loans and continuing to manage the Hosting Joint Venture.

In furtherance of the sale process, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection*

*Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 226] (the "Bidding Procedures Motion"). The Bidding Procedures Motion sought authority to establish certain formal bidding procedures for a potential sale of any or all of the Debtors' assets. On January 30, 2023, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 441] (the "Bidding Procedures Order").

On February 28, 2023, in accordance with the Bidding Procedures Order, the Debtors held an auction to sell the Equipment (the "Equipment Auction"). The Equipment Auction was competitive and involved hard-fought, arms-length negotiations with each participating bidder. At the conclusion of the Equipment Auction, the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "Committee"), concluded that U.S. Farms & Mining Opportunity Fund LLC's ("U.S. Farms") bid for the totality of the auctioned Equipment represented the most value-maximizing offer available to the Debtors.

On March 2, 2023, the Debtors sought Court approval to execute an asset purchase agreement with U.S. Farms and sell the Equipment for approximately \$4.675 million by filing the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of all Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief* [Docket No. 571]. After a hearing on March 23, 2023 to consider the Debtors' proposed sale of the Equipment to U.S. Farms, on March 24, 2023, the Bankruptcy Court entered the *Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief* [Docket No. 669] authorizing the sale.

In parallel with the marketing and sale of their Mining Portfolio, on January 9, 2023, the Debtors and Moelis began soliciting interest for the purchase of the BlockFi Platform (as defined below). This asset package consists of (i) an end-to-end Digital Asset platform that offers a wide array of product offerings to both retail and institutional users across the U.S. and internationally (the "Digital Asset Platform"), (ii) approximately 440,000 funded U.S. Client accounts (the "U.S. Client Accounts"), and (iii) approximately 220,000 funded international Client accounts (the "International Client Accounts," and together with the Digital Asset Platform and U.S. Client Accounts, the "BlockFi Platform" and each a "Component"). The Debtors marketed the BlockFi Platform to potential bidders as a package while allowing parties to make separate bids on each Component.

The Debtors and their advisors actively facilitated diligence and engaged with potential bidders throughout this process, and although the Debtors received a number of indications of interests for some or all of the Components of the BlockFi Platform, the Debtors concluded that, given recent regulatory developments, among other things, there may be a lack of meaningful value to be generated from a sale. Therefore, finalizing and consummating a transaction for the BlockFi Platform would not result in an expedient and value-maximizing transaction for the benefit of the Debtors' creditors. Accordingly, the Debtors are proceeding with proposing the Self-Liquidation Transaction whereby, if the Plan is confirmed, the Debtors will distribute their assets to creditors in accordance with the terms of the Plan, followed by a Wind Down of their affairs. The Debtors, however, continue to evaluate their options, and to the extent the Debtors determine that an alternative transaction providing for the sale of all, or substantially all, of the Debtors' assets (an "Alternative Transaction") would provide more value to stakeholders than the Plan, the Debtors will pursue the Alternative Transaction, and will provide Holders of Claims and Interests with additional information and revised documents, as applicable.

### C.    Anticipated Proceedings to Maximize Value for Creditors

The ultimate recovery to Clients and other creditors will depend heavily on the Debtors' success or failure in prosecuting and defending against pending and future disputes with BlockFi's commercial counterparties, including Alameda, FTX, Emergent, ED&F Man Capital Markets, Inc. (now known as Marex Capital Markets Inc., herein, "Marex"), 3AC, and Core Scientific, Inc. ("Core Scientific"). Collectively, the success or failure of this litigation (the "Litigation") will make a difference of in excess of \$1 billion to Clients. The Debtors thus believe that any action that may impair the Debtors' ability to prosecute and defend against these claims would be

irresponsible, could be catastrophic for the Estates and Clients, and is not advisable.  Accordingly, to maximize recoveries to Clients, it is critical that BlockFi put itself in a position to:

(i)     recover on the Emergent Pledge Agreement, which will likely require active litigation in a forfeiture proceeding in the United States District Court for the Southern District of New York and the Bankruptcy Court, and potentially foreign proceeding(s).  The amounts at issue in litigation over the Emergent Pledge Agreement, based on prevailing trading prices for certain of the assets at issue, exceed $525 million;

(ii)    recover on the Alameda Pledge Agreement (and on other claims likely to be advanced against Alameda and FTX), which will likely require active litigation in both the Bankruptcy Court and the United States Bankruptcy Court for the District of Delaware.  The amounts at issue in litigation over the Alameda Pledge Agreement, based on allegations made in the Debtors' Chapter 11 Cases, exceed $500 million;

(iii)   recharacterize or subordinate (contractually, equitably, or otherwise) FTX's claim for $275 million based on the FTX Facility, which FTX contends to be *pari passu* with Clients and ahead in the priority line of other General Unsecured Creditors.  If FTX's claims succeed, they would reduce recoveries to Clients;

(iv)    defeat Alameda's preference claims, in which it alleges that BlockFi should return to Alameda's bankruptcy estate approximately $150 million based on loan repayments made to BlockFi within the 90 days preceding Alameda's bankruptcy filings, approximately $1 billion in additional collateral posted in the 90 days preceding Alameda's bankruptcy to secure Alameda's borrowings from BlockFi, and approximately $4 billion based on trading activity on the FTX.com platform in the 90 days preceding Alameda's bankruptcy filing;

(v)     defeat 3AC's claim that BlockFi's foreclosure on nearly $1 billion of collateral posted to secure BlockFi's loans to 3AC was improper, preferential, or both, a dispute that will be litigated in the Bankruptcy Court and potentially the United States Bankruptcy Court for the Southern District of New York and foreign proceedings;

(vi)    recover on BlockFi's affirmative claims for approximately $132 million against the 3AC estate, which will take place in a combination of foreign proceedings in the British Virgin Islands and the United States Bankruptcy Court for the Southern District of New York; and

(vii)   recover on BlockFi's secured claims against Core Scientific for approximately $55 million.

As described above, success or failure in these matters will make a positive or negative difference to Client recoveries of over $1 billion, orders of magnitude larger than any other issue facing BlockFi and its Clients. BlockFi has been actively preparing to prosecute and defend these actions, and key witnesses will include, among others, CEO Zac Prince, COO Flori Marquez, former CFO Tony Lauro, CFO Amit Cheela, CRO Yuri Mushkin, and General Counsel Jonathan Mayers.

## III.    OVERVIEW OF THE PLAN

### A.    The Plan

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will substitute the obligations set forth in the Plan for pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

A summary of the treatment is as follows, with a more detailed description provided in Article V.D of this Disclosure Statement.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3-a | BlockFi Lending LLC Private Client Account Claims | Impaired | Entitled to Vote |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Impaired | Entitled to Vote |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired | Entitled to Vote |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | Impaired | Entitled to Vote |
| 3-e | BlockFi Inc. Interest Account Claims | Impaired | Entitled to Vote |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired | Entitled to Vote |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Impaired | Entitled to Vote |
| 4-c | BlockFi Inc. General Unsecured Claims | Impaired | Entitled to Vote |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-e | BlockFi Trading LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | FTX Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | FTX Avoidable Transfer Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Alameda Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | 3AC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Government Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 13 | Existing Preferred Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 14 | Existing Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 15 | SEC Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### 1.    *Overview - Satisfaction of Claims and Interests*

Each of the Debtors is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code. The Plan thus provides the Debtors with the necessary latitude to negotiate the precise terms of their ultimate emergence from chapter 11.  Recoveries for certain Classes of Claims could be as high as 100%.  Please refer to the Article V.D of this Disclosure Statement for more detail on the projected recoveries for your specific Claim(s). Generally, the Plan contemplates the following treatment of Claims and Interests:

- Holders of Secured Tax Claims and Other Priority Claims will be rendered Unimpaired.

- Holders of Account Holder Claims will receive their Pro Rata share of (i) Digital Assets for any Distributions made during the six (6) month period following the Effective Date and (ii) Cash for any Distributions made following the expiration of such six (6) month period.

- Holders of General Unsecured Claims will receive their Pro Rata share of Cash allocated to the respective Debtor entities.

- FTX Facility Claims will be recharacterized as equity contributions, or, in the alternative, are contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims, and, in either case, will not be entitled to a Distribution under the Plan.

- FTX Avoidable Transfer Claims will be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims and will not be entitled to a Distribution under the Plan.

- Alameda Claims will be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims and will not be entitled to a Distribution under the Plan.

- 3AC Claims will be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims and will not be entitled to a Distribution under the Plan.

- Government Penalty Claims are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code, pursuant to which they are subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.  For the avoidance of doubt, the SEC Penalty Claims are not Government Penalty Claims under the Plan.

- Intercompany Claims will be, at the option of the Debtors, either (a) reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum.  However, Intercompany Claims (x) between BlockFi International Ltd. and BlockFi Lending LLC, (y) between BlockFi International Ltd. and BlockFi Inc., and (z) between BlockFi Lending LLC and BlockFi Inc., will, in each case, be netted, resulting in three separate Intercompany Claims (one for each pair of Debtors in clauses (x), (y), and (z)), and such remaining Intercompany Claims after such netting will be treated *pari passu* with Account Holder Claims and General Unsecured Claims at the applicable Debtor entity; *provided*, *further*, that, for the avoidance of doubt, in no case shall the treatment of Intercompany Claims set forth in the Restructuring Transactions Memorandum modify or alter the allocation of value among Debtor entities as set forth herein.

- *De Minimis* Claims will be cancelled and will not be entitled to a Distribution.[15]

- Existing Preferred Equity Interests in BlockFi Inc. will be cancelled and will not be entitled to a Distribution.

- Existing Common Equity Interests in BlockFi Inc. will be cancelled and will not be entitled to a Distribution.

- Pursuant to the *Stipulation and Agreed Order Between U.S. Securities and Exchange Commission and Debtors to Forego Receiving Distribution from Debtors' Bankruptcy Estates*, the SEC and the Debtors stipulated that the SEC will not receive a Distribution on account of the SEC Penalty Claims unless and until all allowed Secured Tax Claims, Other Priority Claims, Account Holder Claims, General Unsecured Claims, and Intercompany Claims are paid in full.

- Clients with Digital Assets held by the Debtors in Client accounts associated with the Wallet Program ("Client Wallet Accounts") are unclassified and will receive Digital Assets held in the Client Wallet Accounts less (i) any negative Account balances including for any ACH chargeback transactions and (ii) any applicable withdrawal fees (the "Wallet Deductions"). Any remaining Claim after the Wallet Deductions will be treated as a BlockFi Wallet LLC General Unsecured Claim for domestic Clients and a BlockFi International Ltd. General Unsecured Claims for international Clients.

- The Wind-Down Debtors will prosecute claims against third parties, including claims against 3AC, FTX, Alameda, Emergent, Marex, and Core Scientific, and Wind Down the Debtors' Estates.

- Except to the extent otherwise provided by the Plan, no debts may be proved by any creditors or Holders of Interests whose Claims are affected by the Plan in the Bermuda Insolvency Proceedings.

### 2. *Treatment of Claims*

#### (a) **Treatment of Wallet Claims**

BlockFi provided BlockFi Wallet, a non-interest-bearing account product for Clients to store supported Digital Assets (the "Wallet Program"). Certain of the supported Digital Assets were "trade only" Digital Assets (the "Trade-Only Assets"), meaning that Clients could use Digital Assets acquired through the BlockFi Platform to trade and earn interest (if transferred to an interest account), but could not transfer these Digital Assets into or out of the BlockFi Platform.

The Terms of Service related to the Wallet Program provides, in relevant part "[t]he title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi. . . . BlockFi shall not sell, transfer, loan, hypothecate, or otherwise alienate cryptocurrency held in your BlockFi Wallet unless specifically instructed by you."[16] Accordingly, the Debtors believe that the Digital Assets held by the Debtors in the Client Wallet Accounts belong to the Clients and are not part of the Debtors' Estates. Although title to Digital Assets held in Client Wallet Accounts does not pass to the Debtors, the Terms of Service do grant the Debtors the right to (i) charge transaction fees for withdrawals from Client Wallet Accounts, (ii) setoff any obligations that the Client owes to BlockFi Trading LLC or BlockFi International, as applicable, on account of a Client Wallet Account or to any of their Affiliates on account of other services and products the Debtors offered, and (iii) setoff any liabilities incurred by BlockFi Wallet LLC from Digital Assets held on account of Client Wallet Accounts.[17] Under the Terms of Service, Clients grant BlockFi Trading LLC or BlockFi International, as applicable, a security interest in the Digital Assets in the Client Wallet Accounts to secure any obligations a Client

---

[15] "*De Minimis Claim*" means any Claim equal to or less than the *De Minimis* Claim Threshold and "*De Minimis Claim Threshold*" means $10, after accounting for Standard Withdrawal Fees, determined on a CID-by-CID basis.

[16] Wallet Terms of Service § F.

[17] Wallet Terms of Service §§ D, H and M.

may owe the Debtors in connection with BlockFi Wallet or other BlockFi services and products. Specifically, the BlockFi Wallet Terms of Service provide "[y]ou grant us a security interest in any and all of your BlockFi account(s) with us for obligations owing to us or any of our affiliates by any owner of any of your accounts. . . . We may take or set off assets in your BlockFi Wallet, or transfer assets between any or all of your BlockFi Wallet, with us or any of our affiliates for direct, indirect and acquired obligations that you owe us or our affiliates, including any balances as a result of not having sufficient assets available or as a result of an erroneous transfer of assets to an address under your control, or a return or other negative balance, regardless of the source of assets in an account." [18]

Shortly after the commencement of these Chapter 11 Cases, on December 19, 2022, BlockFi filed the Wallet Withdrawal Motion (as defined below), seeking to return Digital Assets held in Client Wallet Accounts. Consistent with such relief requested, the Plan provides for the return of those non-Estate Digital Assets held in Client Wallet Accounts in connection with the Wallet Program in full, subject to set off for (i) any negative Account balances including for any ACH chargeback transactions and (ii) any applicable withdrawal fees.

Trade-Only Assets in the Wallet Program will be converted into USDC or another Stablecoin at the Debtors' election prior to being available for withdrawal by Clients from the Wallet Program. All other Digital Assets in the Wallet Program will be available for withdrawal in kind. Holders of Wallet Account Claims will have sixty (60) days following the Effective Date to withdraw their Digital Assets in the Wallet Program from the BlockFi Platform. Any Digital Assets in the Wallet Program not withdrawn during that period will be converted to Cash and any subsequent Distributions of assets in the Wallet Program will be made in Cash.

The Committee has advised the Debtors that it is supportive of returning some Digital Assets held in Client Wallet Accounts, but only if such Clients are not subject to potential preference claims under Chapter 5 of the Bankruptcy Code. More specifically, the Committee alleges that certain transfers from BlockFi Interest Accounts ("BIAs") and/or BlockFi Private Client Accounts ("BPCs") into Client Wallet Accounts may give rise to preference claims if transferred during the applicable preference periods. *See e.g.*, *Limited Objection and Response of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 380]. The Committee demanded that the order granting the Debtors' Wallet Withdrawal Motion include a paragraph preventing the distribution of any wallet assets to clients who are subject to potential preference claims pending further order of court, and the paragraph provided by the Committee was included in the Order entered by the Bankruptcy Court [Docket No. 923].

The Debtors do not believe that transfers from BIAs/BPCs into Client Wallet Accounts are subject to preference claims under the Bankruptcy Code or Bermuda Law, as applicable.[19] The Debtors believe that any platform transfers would be subject to defenses including the contemporaneous exchange of new value defense, the ordinary course of business or financial affairs defense, and the new value defense under section 547(c) of the Bankruptcy Code. Additionally, preference claims against defendants for less than $25,000 must be filed in the court in which the defendant resides. The pursuit of preference claims would require significant expenditures for legal and financial professionals as the Debtors would be forced to litigate expensive lawsuits in multiple jurisdictions. With respect to preferences under Bermuda law, the application of section 237 of the Companies Act 1981 (the "Companies Act") requires that it be established that the transaction was undertaken with the intention to fraudulently prefer one or more of the company's creditors, at a time when the company was unable to pay its debts as they fell due. This is a high bar which the Debtors believe means that any transfers from BIAs/BPCs into Client Wallet Accounts would not be subject to preference claims under Bermuda law. Accordingly, pursuing preference claims would not inure to the Debtors' benefit and would result in lower creditor recoveries because of professional fees incurred during the pursuit of such claims.

---

[18]    Wallet Terms of Service § M.

[19]    The Terms of Service provide that BIAs and BPCs held by Clients of BlockFi International Ltd. are governed by Bermuda law.

(b)        **Treatment of Retail and Institutional Loan Collateral Claims**

One of BlockFi's service offerings was its retail loan program whereby BlockFi Lending made prepetition retail advances to Retail Borrowers (as defined below), which in some cases were subsequently assigned to BlockFi International (the "Retail Loan Program").  Under the Retail Loan Program, BlockFi's Clients could borrow U.S. Dollars or Stablecoin (*e.g.*, USDC, GUSD, or PAX) from BlockFi Lending or BlockFi International, as applicable, secured by collateral in the form of Digital Assets (the "Loan Collateral") (*e.g.*, BTC, ETH, LTC, or PAXG).

At the initial funding, loans extended under the Retail Loan Program were generally collateralized on a two-to-one basis, meaning the value of the Loan Collateral was twice the value of the assets loaned to the applicable Client.  Account Holders (the "Retail Borrowers") entered into loan agreements with BlockFi Lending, pursuant to which the applicable Retail Borrower granted the applicable Debtor a security interest in the Loan Collateral. Generally, Retail Borrowers were required to maintain a loan-to-value ratio below 70 percent, meaning the value of the loaned assets (*i.e.*, the principal amount of the loan) could not exceed 70 percent of the value of the Loan Collateral.  If this ratio was breached, the Retail Borrower had the option to pay down their loan and/or add additional Loan Collateral.  To the extent that a Retail Borrower repaid their loan in full, the Retail Borrower's Loan Collateral would be returned to their Client Wallet Account.

Similarly, under BlockFi's institutional loan program (the "Institutional Loan Program"), BlockFi Lending and BlockFi International made prepetition advances to institutional borrowers (the "Institutional Borrowers" and, together with the Retail Borrowers, the "Borrowers").  Under the Institutional Loan Program, Institutional Borrowers could borrow fiat currency or Digital Assets from BlockFi Lending or BlockFi International, as applicable.  The loans could generally be secured by collateral in the form of fiat currency or other Digital Assets, depending on BlockFi's assessment of a particular Client's creditworthiness, and, to the extent collateralized, were generally (but not always) subject to collateral maintenance requirements whereby BlockFi would require the pay down of loans or additional collateral in the event the applicable loan-to-value ratios were breached.

Collateral pledged by Institutional Borrowers in connection with the institutional loan agreements (the "Institutional Loan Agreements") and Retail Borrowers in connection with the retail loan agreements (the "Retail Loan Agreements") are property of the Debtors' Estates.  Both the Institutional Loan Agreements and Retail Loan Agreements generally allowed BlockFi Lending and BlockFi International, as applicable, with broad rehypothecation rights.  For example, the Retail Loan Agreements provide "Borrower agrees that Lender may, for its own account, pledge, repledge, rehypothecate, sell, lend or otherwise transfer or use any amount of such Collateral, separately or together with other property, with all attendant rights of ownership from time to time, without notice to the Borrower, either separately or in common with other such cryptocurrency, any or all of the Collateral and that Lender may do so without retaining in its possession or control for delivery, a like amount of similar Collateral."[20]

Under the Plan, each Allowed BlockFi Lending LLC Loan Collateral Claim and each Allowed BlockFi International Ltd. Loan Collateral Claim will be reduced by the applicable Loan Account Obligation (as defined below) outstanding as of the Petition Date.  Any remaining BlockFi Lending LLC Loan Collateral Claim or BlockFi International Ltd. Loan Collateral Claim (*i.e.*, to the extent that such Claim *exceeds* any claim of the Debtors against the Borrower with respect to advances made by the Debtors in connection with the loans (the "Loan Account Obligations"))[21] after application of the Set Off Treatment (as defined in footnote 33) shall be classified as an Account Holder Claim at the applicable Debtor and treated as described in Article V.D of this Disclosure Statement.

---

[20]    Retail Loan Agreement § 4(d).  Similarly, the Institutional Loan Agreements provide: "Lender shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral, unless otherwise specified on the applicable Loan Term Sheet."  Institutional Loan Agreement § V(a).

[21]    The Debtors have not yet begun the process of evaluating their portfolios of retail and institutional loans to determine which, if any, would result in Borrowers owing Digital Assets or Stablecoins to the Debtors after application of the Set Off Treatment.  The Debtors reserve all rights with respect to all of their retail and institutional loans.

For the avoidance of doubt, the Debtors propose to apply the Set Off Treatment in lieu of alternative options, including reinstating loan agreements and payments due thereunder.  The Debtors believe that the Set Off Treatment maximizes recoveries for Holders of Allowed Loan Collateral Claims while minimizing administrative burdens on the Debtors' Estates.

### (c)    Treatment of Intercompany Claims

The operations of the Debtor entities are interrelated, regularly requiring transfers and transactions of Cash and Digital Assets between the different Debtor entities (together, the "Intercompany Transactions").  Accordingly, the Debtors are each party to several different types of transactions and intercompany agreements, such as agreements related to the execution of trades in various Digital Assets, intercompany loans, intercompany service agreements, and capital contribution agreements.

In the ordinary course of business, the Debtors make Intercompany Transactions to: (a) reimburse certain Debtors for various expenditures including employee compensation expenses, sales and marketing expenses, and technology expenses; (b) fund certain Debtors' accounts in anticipation of such expenditures, as needed; and/or (c) facilitate trading, lending, and other revenue generating activity.  The primary Debtor entities involved in the Intercompany Transactions are BlockFi Inc., BlockFi International, and BlockFi Lending.[22]

Specifically, prior to the Petition Date, BlockFi International, BlockFi Lending, and BlockFi Inc. regularly conducted Intercompany Transactions, to among other things, re-balance Digital Assets held by such Debtor Entities to honor Client withdrawals in the ordinary course and simultaneously adhere to certain regulatory requirements. Notably, the rapid growth of the Institutional Loan Program caused BlockFi International and BlockFi Lending to engage in frequent Intercompany Transactions across various Digital Assets with BlockFi Inc. and amongst themselves to ensure they had sufficient Digital Assets to address Client demands.  Additionally, BlockFi Inc., BlockFi Lending, and BlockFi International regularly facilitated Intercompany Transactions amongst each other to allocate attributable costs between the Entities, including costs related to vendor, contractor, and employee compensation expenses, professional fees, technology, sales and marketing, and other expenses associated with maintaining and operating the BlockFi Platform, based on a percentage of revenue.  The Debtors actively tracked Intercompany Transactions and reviewed all expenses to determine allocation to the applicable Debtor Entity.

The Debtors' books and records as of the Petition Date reflect approximately $1.668 billion in Intercompany Claims between the Debtor Entities.  A simplified graphic of the Debtors' Intercompany Claims as of the Petition Date is as follows:[23]

---

[22]    Non-Debtor BlockFi Asia PTE Ltd. is also a party to an intercompany agreement with BlockFi Services, Inc. whereby BlockFi Services, Inc. transfers certain payroll amounts to BlockFi Asia PTE Ltd. for its employees (BlockFi Asia PTE Ltd. previously employed two persons, which has been reduced to one employee after the Petition Date).

[23]    A Debtor entity could simultaneously be a borrower and lender given the differing Digital Assets transacted.



Under the Plan, Intercompany Claims (a) between BlockFi International and BlockFi Lending, (b) between BlockFi International and BlockFi Inc., and (c) between BlockFi Lending and BlockFi Inc., will, in each case, be netted, resulting in three separate Intercompany Claims (one for each pair of Debtors in clauses (a), (b), and (c)), and such remaining Intercompany Claims after such netting will be treated *pari passu* with Account Holder Claims and General Unsecured Claims at the applicable Debtor entity.  Accordingly, the intercompany balances after netting will be reduced to approximately $872.2 million.  A simplified graphic of the Debtors' intercompany balances after netting under the Plan is as follows:



(d)        **Treatment of SEC Penalty Claims**

On February 14, 2022, the SEC released an "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order" (the "Consent Order") after reaching an agreement with BlockFi Lending to settle certain alleged charges against BlockFi Lending for violations of various securities laws and regulations.  Pursuant to the Consent Order, BlockFi Lending agreed to "pay a *civil money penalty* of $50 million to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury," in five installments of $10 million each.[24]  The Consent Order further provided that "[a]mounts ordered to be paid as *civil money penalties* pursuant to this [Consent Order] shall be treated as *penalties* paid to the government for all purposes."[25]   As of the Petition Date, BlockFi Lending has made two of the five installment payments, and $30 million remains outstanding.

On [●], 2023, the Debtors and the SEC entered into the *Stipulation and Agreed Order Between U.S. Securities and Exchange Commission and Debtors to Forego Receiving Distribution from Debtors' Bankruptcy Estates* (the "SEC Penalty Stipulation").   Pursuant to the SEC Penalty Stipulation, the SEC and the Debtors stipulated that the SEC will not receive a Distribution on account of the SEC Penalty Claims unless and until all allowed Secured Tax Claims, Other Priority Claims, Account Holder Claims, General Unsecured Claims, and Intercompany Claims are paid in full.

(e)        **Dollarization of Account Holder Claims**

As required by section 502(b) of the Bankruptcy Code, each Account Holder Claim is determined by the fair market value of the Digital Assets (based in U.S. Dollars) held by the Account Holder at the Debtors as of the Petition Date at 11:59 p.m. UTC.  This process is generally referred to as a "dollarization."  Dollarization allows the Debtors to put all Account Holder Claims on equal footing to calculate recoveries in accordance with the requirements of the Bankruptcy Code and does not affect the ability to satisfy such Claims in kind.

3.        *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and as consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan (to the extent such controversies have not already been compromised and settled in accordance with the terms and conditions of the 9019 Motion (as defined herein)).  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.        **Holders of Claims May Be Released by the Debtors**

In order to effectuate an expedient process and limit future legal costs, the Plan also contemplates that Holders of Claims may be released by the Debtors specifically, (i) Holders of Claims voting to accept the Plan, (ii) Holders of Claims deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan, (iii) Holders of Claims who abstain from voting on the Plan and do not affirmatively opt out of the releases provided by the Plan, and (iv) Holders of Claims who vote to reject the Plan and do not affirmatively opt out of the releases provided by the Plan shall be deemed "Releasing Parties" and will receive a release from the Debtors.  This release includes any avoidance actions the Debtors could bring against such Holder.  The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to emerge swiftly from

---

[24]    Emphasis added.

[25]    Emphasis added.

chapter 11 while giving finality to all stakeholders.  Importantly, the Committee has indicated that it would like to terminate exclusivity to move these cases along more swiftly.  But the plan the Committee would file could preserve all these preference actions and significantly delay—and ultimately dilute—creditor recoveries.

### C.      Employee Transition Plan

The Debtors will require the services of certain crucial employees to consummate the Plan.  Among other things, in addition to having key personnel available to help the Debtors prosecute and defend against the Litigation, the Debtors will require certain employees to assist the Wind-Down Debtors with:  (i) securely maintaining and protecting Client data, including "Know Your Client" data; (ii) updating BlockFi's user interface to reflect proper accounting of Digital Assets as of the Platform Pause; (iii) reconciling Client Claims and Accounts; (iv) rebalancing the Debtors' Digital Assets portfolio; (v) reopening the BlockFi Platform for a limited period of time to permit Clients to withdraw Digital Assets safely and securely; (vi) conducting ordinary course maintenance of the BlockFi Platform; and (vii) interacting and responding to state, federal and international regulators.  To complete these tasks, the Debtors will need certain employees in legal, finance, compliance, operations, data, product, engineering, people, and security.  Separate and apart from entering into cooperation agreements with key witnesses in the Litigation, which the Debtors intend to do, the Debtors have created a transition plan (the "Employee Transition Plan") for employees necessary to fulfill these obligations.  The Employee Transition Plan contemplates two participation milestones whereby approximately 60 employees will be necessary to fulfill these obligations.  Following the completion of the first and second milestones, the Debtors expect to reduce their employee headcount to approximately 60 employees and 8 employees, respectively.  The Debtors do not believe that the Plan is feasible without these key employees.

Additionally, the Plan contemplates at least one, and possibly multiple, Distributions of assets in kind (that is, in Digital Assets) through the BlockFi Platform to Clients.  These Distributions will present challenges without the continued focus and efforts of crucial BlockFi employees.

The BlockFi Platform was developed in-house, is written in a unique and esoteric programming language, and has capabilities that newcomers to the situation would need time to digest and understand (if they could do so at all).  Hiring outside professionals or new temporary employees to attempt to facilitate Distributions without current staff who were responsible for processing withdrawals pre-petition would come with substantial cost and risk.  As a practical matter, the only realistic way to process in-kind Distributions is through the BlockFi Platform—otherwise processing hundreds of thousands of transactions manually to external wallets is not realistic.  Alternative third-party Distribution agents similarly present additional costs for set up, "Know Your Customer" review, and implementing security protocols that BlockFi already has in place.

Digital Asset Distributions are particularly sensitive, and injecting new procedures to distribute Digital Assets to Clients with new people is risky.  Digital Assets are like bearer bonds and transmission of those assets is inherently high risk; small errors in Distributions can lead to permanent losses—among other things, if even a single character in a lengthy Distribution address is entered incorrectly, the Digital Assets can be gone forever, unable to be retrieved.  These errors and losses have happened before, which BlockFi has learned from and, in turn, established the expert knowledge base within the existing team to make Distributions, reduce the risks of errors, and increase the chances for a successful and safe in-kind Distribution of Digital Assets to Clients.  Other Digital Asset platforms have been subject to data security breaches and the existing team is best equipped to make sure that the BlockFi Platform is protected.

In order to process Distributions, the Debtors are in the process of building a new ledger system that will, for the first time, allow the Debtors to upload new balance information for the Debtors' more than 650,000 Clients, in order to update Client balances to match the recovery level approved by the Court.  This is a new system that will require the upload of hundreds of thousands of rows of Client data.  The Debtors need to build this in order to allow Clients to withdraw the Digital Assets from the BlockFi Platform, but limit their withdrawal amounts to the recovery level and Court approved amount rather than the amount of Digital Assets "deposited."  Those managing both the maintenance and enhancement of the BlockFi Platform will, as a practical matter, need to be existing employees familiar with creation of the BlockFi Platform and the development of the BlockFi Platform over time.

In addition to experience working with Digital Assets and blockchain transactions, in order to complete the work required, the leader(s) of the project(s) needs to have knowledge of:

- The Debtors' Chapter 11 Cases;

- The Debtors' ledger and accounting system, including knowledge of prior changes to the system that could affect new products (ACH reversals, automated freezes to Client accounts when loans are in margin calls, credits made to Client accounts and the system use to apply those credits) as one off-changes can cause issues when integrating a new system;

- The Debtors' withdrawal system, which was originally built by BlockFi's engineering team three years ago.  The system, Kingpin, has specific nuances built in to accommodate issues with Bitgo's API;

- Knowledge of historical gas fees, as the time and volume of when withdrawals are processed have a huge impact on the average cost of the withdrawal.  In 2022, BlockFi's gas fee optimization project saved approximately $2.5 million per year in fees, and leveraging this knowledge will save the Estate valuable resources; and

- Bespoke risks in building the product, including risks relating to: (a) historical impact of "ghost code" on BlockFi's system; (b) historical Client escalations based on user experience concerns; and (c) safety and security of Client withdrawals.

The Debtors have also created a Distribution plan assuming that they will be making the Distributions from the BlockFi Platform using their own employees.  The Debtors will need to retain capabilities to complete at least the following tasks:

- **Pre emergence** – Finalize full Distribution plan;

- **Day 1-90** – Complete build of, beta test, and finalize new withdrawals engine.  Distribute BlockFi Wallet and recoveries on account of BIAs, BPCs, and Loan Collateral Claims;

- **Day 90-180** – Transfer knowledge to skeleton team, shut down custodians, sunset platform;

- **Day 181+** – Long tail on Estate management - claims and litigation.

The key workstreams and key teams for these tasks are listed below for the first 90 days:

1. *Rebalancing*

   - Key Teams – Finance, Institutional, Operations

2. *Effectuating Distributions*

   - Key teams – Operations, Finance, Product, Engineering

3. *Claims Reconciliation*

   - Key teams – Operations, Finance

4. *Employment and Offboarding*

   - Key teams – People, Security, Legal

5. *Regulatory / Litigation*

   - Key teams – Legal, Compliance, Finance

Key workstreams and key teams for projected days 90–180 are listed below:

     **1.**       *Shutting Down Custodians & Key Accounts, Knowledge Transfer to Skeleton Team*

- Key teams – Operations, Finance

     **2.**       *Long Tail on Claims and Litigation*

- Key teams – Operations, Finance, Legal

     **3.**       *Sunsetting Platform*

- Key teams – Engineering, Product, Security, Operations

     **4.**       *Offboarding All But Skeleton Team*

- Key teams – People, Security, Legal

The Debtors believe that these workstreams and teams are critical to their ability to make in-kind Distributions to Clients in a safe, secure, and efficient manner. Losing the capabilities of individuals on the key teams above could eliminate the Estate's ability to make in-kind Distributions at all, would require the Estate to spend substantially more money and take substantially more time to finalize the capabilities to make these Distributions, and would create risk in the process. Securing the cooperation of those referenced here for the Distribution process would be extremely valuable to the Estate.

## IV.     WHY HOLDERS OF CLAIMS SHOULD VOTE IN FAVOR OF THE PLAN

**Voting in favor of the Plan is the fastest way for Holders of Claims to receive the highest recovery.**

Through the Plan, the Debtors are one step closer to returning Digital Assets and Cash to Clients. The Plan maximizes recovery for Clients and provides for the quickest possible Distributions to Clients, while allowing the Debtors to Wind Down in an orderly fashion. The Plan also preserves and puts the Debtors in the best place to successfully prosecute (and defend) viable litigation claims against Emergent, Marex, Alameda, FTX, 3AC, and Core Scientific which, if successful, could lead to meaningfully higher recoveries for Clients. While preserving these viable Causes of Action, the Plan avoids years spent in litigation—and Client money—pursuing other potential causes of action that would make success on the meaningful litigation described above less likely and are unlikely to be successful in their own right while resulting in substantially increased professional fees and decreased recoveries for Clients.

The Debtors have remained steadfast throughout these Chapter 11 Cases in their goal to return Digital Assets to Clients as quickly as possible. It remains unclear if the Committee shares this goal. The Committee objected to two early, extremely straightforward motions intended to ensure that the Debtor would retain and engage the people necessary to return Digital Assets to Clients as quickly as possible. The Committee then objected to the Wallet Withdrawal Motion, indicating that it would like to preserve potential clawback claims against Clients that transferred assets from BIAs or BPCs to Wallet and/or off of the BlockFi Platform in the 90 days prior to the Petition Date. The Committee then objected to the Debtors' motion to extend exclusivity, suggesting that it wanted to file its own plan that would have required years of litigation before any assets could be returned to Clients and could not have resulted in safe and secure in-kind Distributions to Clients. Pursuit of preference claims against 4,152 (or any material number of) Clients, which the Committee has expressed a desire to do, would result in a substantial holdback of Client assets, which would be used to pay legal professionals to pursue clawback of funds that are currently in Clients' possession into BIAs and BPCs with uncertain probability of returns.

**If you vote in favor of the Debtors' Plan, you will receive a release from the Debtors. This release includes a release of any clawback claims the Debtors could bring against you for transfers from BIAs or BPCs to Wallet and/or off the BlockFi Platform prior to the Platform Pause. The releases to be implemented pursuant to the Plan preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to all stakeholders.**

If you do not vote in favor of the Plan, the Committee will likely seek to propose their own competing plan that will preserve clawback claims against Clients, resulting in significantly reduced recoveries to Clients and materially extending the timeline for Clients to receive Distributions.  The Committee's chapter 11 plan would likely seek to authorize the Wind-Down Debtors to claw back certain amounts that Clients properly transferred from BIAs or BPCs to Wallet and/or withdrew from Client Wallet Accounts before the Platform Pause.  Under the Committee's chapter 11 plan, if you are the target of a preference claim, you will have to come out of pocket for personal legal counsel to defend any clawback claims brought against you.  There will likely be no Distributions to Clients until these clawback claims are litigated and resolved which could take years.  The Committee's strategy will not only result in significant professional fees but it is also unlikely to be successful given the valid defenses that Clients have to potential preference claims.  In the end, only professionals will benefit from such litigation.

The Committee may also seek to pursue potential claims that it believes exist against insiders of the Debtors.  This litigation strategy would be extremely expensive to pursue (draining Estate assets that should go to Clients), would take a material amount of time, and is unlikely to be successful based on the results of the Special Committee Investigation (as further discussed below).  It would also alienate the remaining employees, effectively foreclosing the possibility of any in-kind Distributions to Clients, jeopardizing the safety of the Debtors' Digital Assets, and reducing the likelihood of success in the Litigation.  The Debtors do not believe that any employee would voluntarily cooperate with the estate, in the Litigation, the return of assets in kind to Clients, or both, if they were being targeted with specious litigation claims.

A vote in favor of the Plan will help usher these Chapter 11 Cases to conclusion.  Your affirmative vote will preserve remaining value, the Debtors will release all claims and causes of action they may have against you, including any potential clawback claims, and you will receive Digital Assets and Cash on the fastest timeline.  The Wind-Down Debtors will then focus all of their efforts on pursuing real claims and causes of action in the Litigation against Emergent, Marex, Alameda, FTX, 3AC, and Core Scientific to maximize recoveries for their Clients, and defending against claims asserted by Alameda, FTX, and 3AC (which threaten to massively dilute Clients).  Only success on *those* causes of action—claims against Alameda, FTX, Emergent, Marex, 3AC, and Core Scientific, and claims against the Debtors by Alameda, FTX, and 3AC—will have a material impact on Client recoveries, and it makes no sense for the Debtors to take action that would compromise the estates' ability to succeed on those claims.

## V.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment of creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your Distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3-a | BlockFi Lending LLC Private Client Account Claims | Impaired | Entitled to Vote |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Impaired | Entitled to Vote |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired | Entitled to Vote |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | Impaired | Entitled to Vote |
| 3-e | BlockFi Inc. Interest Account Claims | Impaired | Entitled to Vote |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired | Entitled to Vote |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Impaired | Entitled to Vote |
| 4-c | BlockFi Inc. General Unsecured Claims | Impaired | Entitled to Vote |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-e | BlockFi Trading LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | FTX Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | FTX Avoidable Transfer Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Alameda Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | 3AC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Government Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 10 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 13 | Existing Preferred Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 14 | Existing Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 15 | SEC Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive Distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Any Claims referenced as being *pari passu* will receive equal treatment between the classes of Claims.

For example, if you are the Holder of a Class 3-a BlockFi Lending LLC Private Client Account Claim, you may recover as much as 100% of the amount of your Claim through Distributions under the Plan.  If the Debtors are unsuccessful in recovering any amounts from 3AC, Alameda, FTX, among others, through the Litigation (*i.e.*, in a worst-case scenario), you may recover approximately 83.5% of your Claim.  Holders of Class 3-a BlockFi Lending LLC Private Client Account Claims may recover these amounts in either Cash or Digital Assets depending on the timing of the Distributions.  For additional information on your potential recovery under the Plan, please refer to the table below.

The projected recoveries set forth in the table below are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis (as defined below) attached hereto as **Exhibit B**.  Accordingly, recoveries actually received by Holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, THE ULTIMATE TREATMENT OF SUBORDINATED CLAIMS, INCLUDING THE FTX FACILITY CLAIMS, THE FTX AVOIDABLE TRANSFER CLAIMS, THE ALAMEDA CLAIMS, THE 3AC CLAIMS, AND THE GOVERNMENT PENALTY CLAIMS, THE RESOLUTION OF LITIGATION INCLUDING WITH RESPECT TO THE ROBINHOOD SHARES, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[26]**

---

[26]    The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility and the ultimate treatment of the FTX Facility Claims, FTX Avoidable Transfer Claims, Alameda Claims, 3AC Claims, Government Penalty Claims and Intercompany Claims which could reduce the recoveries projected above.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| 1 | Secured Tax Claims[30] | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | n/a | | 100.0% | | 100.0% | |
| 2 | Other Priority Claims[31] | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | n/a | | 100.0% | | 100.0% | |
| 3-a | BlockFi Lending LLC Private Client Account Claims[32] | Each Holder of an Allowed BlockFi Lending LLC Private Client Account Claim will receive, in full and final satisfaction of such Allowed BlockFi Lending LLC Private Client Account Claim: | $187.9 million | $211.4 million | 86.0% | 100.0% | 76.8% | 100.0% |

27    The Claims presented are based on scheduled Claims and do not reflect adjustments for filed Proofs of Claim other than those Claims filed by FTX and Arch Insurance Company.  There are over 30,000 other Proofs of Claim which have been filed by potential creditors and which will need to be reconciled.  These filed Claims, if valid, would change the allowed Claims in the Account Holder Claims and General Unsecured Claims classes including the associated creditor recoveries in a material way.

28    Claims are estimated based on the Debtors total customer Claim balances and have not been reduced for potential *De Minimis* Claims which would not be entitled to Distributions under the Plan.

29    The Claim values presented herein are based on scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket Nos. 856–858].

30    The claims presented herein are based on scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket Nos. 856–858].  In the event that Secured Tax Claims are found to be valid and thus included as Claims, they will receive a full recovery.

31    The Claims presented herein reflect scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket No. 856–858].  Although no Other Priority Claims have been contemplated, in the event that filed Other Priority Claims are deemed valid and subsequently included in the Claims population, they will receive a full recovery.

32    BIA & BPC interest accrued through the Petition Date has been included in the Claim amounts.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | (i)      its Pro Rata share of:<br><br>A.  the Cash Allocation for Holders of Claims at BlockFi Lending LLC; or<br><br>B.  the Digital Assets Allocation for Holders of Claims at BlockFi Lending LLC; and<br><br>(ii)     its Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC Private Client Account Claims;<br><br>*provided* that Holders of BlockFi Lending LLC Private Client Account Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date; *provided further* that any Distribution made to Holders of Allowed BlockFi Lending LLC Private Client Account Claims shall be *pari passu* with Holders of Claims in Class 3-b (BlockFi Lending LLC Loan Collateral Claims) and Class 4-a (BlockFi Lending LLC General Unsecured Claims). For the avoidance of doubt, Holders of Claims in Class 3-b shall only be treated *pari passu* with Holders of Allowed BlockFi Lending LLC Private Client Account Claims in this Class 3-a to the extent any remaining amount of such | | | | | | |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | Holder's Allowed Claims in Class 3-b, after the Set Off Treatment[33] is accounted for, is still owed to such Holder on account of its Class 3-b Claim. | | | | | | |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Each Holder of an Allowed BlockFi Lending LLC Loan Collateral Claim will receive, in full and final satisfaction of such Allowed BlockFi Lending LLC Loan Collateral Claim, the Set Off Treatment; *provided* that, for the avoidance of doubt, any Distribution made to Holders of Allowed BlockFi Lending LLC Loan Collateral Claims shall be *pari passu* with Holders of Claims in Class 3-a (BlockFi Lending LLC Private Client Account Claims) and Class 4-a (BlockFi Lending LLC General Unsecured Claims). | $100.6 million | | 86.0% | 100.0% | 76.8% | 100.0% |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims[34] | Each Holder of an Allowed BlockFi International Ltd. Private Client and Interest Account Claim will receive, in full and final satisfaction of such Allowed BlockFi International Ltd. Private Client and Interest Account Claim:<br>(i)  its Pro Rata share of:<br>A.  the Cash Allocation for Holders of Claims at | $365.2 million | | 52.7% | 100.0% | 48.1% | 89.9% |

---

[33]  "*Set Off Treatment*" means, with respect to any Allowed BlockFi Lending LLC Loan Collateral Claims or Allowed BlockFi International Ltd. Loan Collateral Claims, such Claims will be set off or recouped against the applicable Loan Account Obligations outstanding on the Petition Date.  Under the Set Off Treatment, Holders of Allowed BlockFi Lending LLC Loan Collateral Claims or Allowed BlockFi International Ltd. Loan Collateral Claims, as applicable, will receive on account of any remaining Claims after set off of the Loan Account Obligations (i) a Pro Rata share of either (a) the Digital Assets Allocation or (b) the Cash Allocation for Holders of Claims at BlockFi International Ltd. or BlockFi Lending LLC, as applicable, in any event, in an amount (calculated in United States dollars as of the Petition Date pursuant to the Digital Assets Conversion Table) not to exceed (x) such Holder's Loan Collateral outstanding as of the Petition Date (calculated in United States dollars pursuant to the Digital Assets Conversion Table) less (y) such Holder's Loan Account Obligations, and (ii) a Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of such Claims until payment in full of such Allowed Claims; *provided* that the Holders of such Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date.  The remaining amount of such Holder's Allowed BlockFi Lending LLC Loan Collateral Claims or Allowed BlockFi International Ltd. Loan Collateral Claims (each calculated in United States dollars as of the Petition Date pursuant to the Digital Assets Conversion Table), after such set off or recoupment is accounted for (if any) and any further Distribution made to Holders of such Claims, shall be *pari passu* with Account Holder Claims and General Unsecured Claims at BlockFi Lending LLC or BlockFi International Ltd., as applicable.

[34]  BIA & BPC interest accrued through the Petition Date has been included in the Claim amounts.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | BlockFi International Ltd.; or<br><br>B.  the Digital Assets Allocation for Holders of Claims at BlockFi International Ltd.; and<br><br>(ii)  its Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. Private Client and Interest Account Claim;<br><br>*provided* that Holders of BlockFi International Ltd. Private Client and Interest Account Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date; *provided further* that any Distribution made to Holders of Allowed BlockFi International Ltd. Private Client and Interest Account Claims shall be *pari passu* with Holders of Claims in Class 3-d (BlockFi International Ltd. Loan Collateral Claims) and Class 4-b (BlockFi International Ltd. General Unsecured Claims). For the avoidance of doubt, Holders of Claims in Class 3-d shall only be treated *pari passu* with Holders of Allowed BlockFi International Ltd. Private Client and Interest Account Claims in this Class 3-c to the extent any remaining amount of such Holder's Allowed Claims in Class 3-d, after the Set Off Treatment is accounted for, is still owed to such Holder on account of its Class 3-d Claim. | | | | | | |
| 3-d | BlockFi International Ltd. Loan | Each Holder of an Allowed BlockFi International Ltd. Loan Collateral Claim will receive, in full and final satisfaction of | $39.0 million | | 52.7% | 100.0% | 48.1% | 89.9% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | Collateral Claims | such Allowed BlockFi International Ltd. Loan Collateral Claim, the Set Off Treatment; *provided* that, for the avoidance of doubt, any Distribution made to Holders of Allowed BlockFi International Ltd. Loan Collateral Claims shall be *pari passu* with Holders of Claims in Class 3-c (BlockFi International Ltd. Private Client and Interest Account Claims) and Class 4-b (BlockFi International Ltd. General Unsecured Claims). | | | | | | |
| 3-e | BlockFi Inc. Interest Account Claims[35] | Each Holder of an Allowed BlockFi Inc. Interest Account Claim will receive, in full and final satisfaction of such Allowed BlockFi Inc. Interest Account Claim:<br><br>(i)      its Pro Rata share of:<br><br>A. the Cash Allocation for Holders of Claims at BlockFi Inc.; or<br><br>B. the Digital Assets Allocation for Holders of Claims at BlockFi Inc.; and<br><br>(ii)     its Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. Interest Account Claim;<br><br>*provided* that Holders of BlockFi Inc. Interest Account Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date; *provided further* that any Distribution made to Holders of Allowed BlockFi Inc. Interest Account Claims shall be *pari passu* | $984.9 million | $1,050 million | 39.7% | 100.0% | 36.7% | 59.2% |

---

[35]    BIA & BPC interest accrued through the Petition Date has been included in the Claim amounts.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | with Holders of Claims in Class 4-c (BlockFi Inc. General Unsecured Claims). | | | | | | |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Each Holder of an Allowed BlockFi Lending LLC General Unsecured Claim will receive, in full and final satisfaction of such Allowed BlockFi Lending LLC General Unsecured Claim, its Pro Rata share of (i) the Cash Allocation for Holders of Claims at BlockFi Lending LLC and (ii) any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC General Unsecured Claim; *provided* that any Distribution made to Holders of Allowed BlockFi Lending LLC General Unsecured Claims shall be *pari passu* with Holders of Claims in Class 3-a (BlockFi Lending LLC Private Client Account Claims) and Class 3-b (BlockFi Lending LLC Loan Collateral Claims).  For the avoidance of doubt, Holders of Claims in Class 3-b shall only be treated *pari passu* with Holders of Allowed BlockFi Lending LLC General Unsecured Claims in this Class 4-a to the extent any remaining amount of such Holder's Allowed Claims in Class 3-b, after the Set Off Treatment is accounted for, is still owed to such Holder on account of its Class 3-b Claim. | $1.3 million | | 86.0% | 100.0% | 76.8% | 100.0% |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Each Holder of an Allowed BlockFi International Ltd. General Unsecured Claim will receive, in full and final satisfaction of such Allowed BlockFi International Ltd. General Unsecured Claim, its Pro Rata share of (i) the Cash Allocation for Holders of Claims at BlockFi International Ltd. and (ii) any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. General Unsecured Claim; *provided* that any Distribution made to Holders of Allowed BlockFi International Ltd. General Unsecured Claims shall be *pari passu* with Holders of Claims in Class 3-c | $0.1 million | | 52.7% | 100.0% | 48.1% | 89.9% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | (BlockFi International Ltd. Private Client and Interest Account Claims) and Class 3-d (BlockFi International Ltd. Loan Collateral Claims). For the avoidance of doubt, Holders of Claims in Class 3-d shall only be treated *pari passu* with Holders of Allowed BlockFi International Ltd. General Unsecured Claims in this Class 4-b to the extent any remaining amount of such Holder's Allowed Claims in Class 3-d, after the Set Off Treatment is accounted for, is still owed to such Holder on account of its Class 3-d Claim. | | | | | | | |
| 4-c | BlockFi Inc. General Unsecured Claims | Each Holder of an Allowed BlockFi Inc. General Unsecured Claim will receive, in full and final satisfaction of such Allowed BlockFi Inc. General Unsecured Claim, its Pro Rata share of (i) the Cash Allocation for Holders of Claims at BlockFi Inc. and (ii) any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. General Unsecured Claim; *provided* that any Distribution made to Holders of Allowed BlockFi Inc. General Unsecured Claims shall be *pari passu* with Holders of Claims in Class 3-e (BlockFi Inc. Interest Account Claims). | $36.2 million | | 39.7% | 100.0% | 36.7% | 59.2% |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | On the Effective Date, all BlockFi Services, Inc. General Unsecured Claims shall be canceled, released and extinguished, and will be of no further force or effect, and Holders of BlockFi Services, Inc. General Unsecured Claims will not receive any Distribution on account of such BlockFi Services, Inc. General Unsecured Claims. | n/a | | n/a | | n/a | |
| 4-e | BlockFi Trading LLC General Unsecured Claims | On the Effective Date, all BlockFi Trading LLC General Unsecured Claims shall be canceled, released and extinguished, and will be of no further force or effect, and Holders of BlockFi Trading LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Trading LLC General Unsecured Claims. | n/a | | n/a | | n/a | |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | Each Holder of an Allowed BlockFi Wallet LLC General Unsecured Claim will receive, in full and final satisfaction of such Allowed BlockFi Wallet LLC General Unsecured Claim, (i) the Cash Allocation for Holders of Claims at BlockFi Wallet LLC or (ii) such other treatment rendering such Holder's Allowed BlockFi Wallet LLC General Unsecured Claim Unimpaired. | $0.9 million | | 100.0% | | 100.0% | |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | On the Effective Date, all BlockFi Ventures LLC General Unsecured Claims shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of BlockFi Ventures LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Ventures LLC General Unsecured Claims. | n/a | | n/a | | n/a | |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | On the Effective Date, all BlockFi Investment Products LLC General Unsecured Claims will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of BlockFi Investment Products LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Investment Products LLC General Unsecured Claims. | n/a | | n/a | | n/a | |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | On the Effective Date, all BlockFi Lending II LLC General Unsecured Claims will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of BlockFi Lending II LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Lending II LLC General Unsecured Claims. | n/a | | n/a | | n/a | |
| 5 | FTX Facility Claims[36,37] | The FTX Facility Claims shall be recharacterized as equity contributions and | $279.7 million | | 0.0% | 1.5% | 0.0% | 0.0% |

---

[36]   Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties. Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of FTX Facility Claims will not receive any Distribution on account of such FTX Facility Claims; *provided*, *however*, if the Bankruptcy Court determines that the FTX Facility Claims should not be recharacterized as equity contributions, then the FTX Facility Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims at the applicable Debtor entity pursuant to section 510(c) of the Bankruptcy Code; *provided further*, *however*, if the Bankruptcy Court determines that the FTX Facility Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, such Claims shall be *pari passu* with General Unsecured Claims and Intercompany Claims at the applicable Debtor entity. | | | | | | |
| 6 | FTX Avoidable Transfer Claims[38,39] | The FTX Avoidable Transfer Claims shall be, pursuant to section 510(c) of the Bankruptcy Code, equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity; *provided*, *however*, if the Bankruptcy Court | n/a | | n/a | | n/a | |

---

[37]  Certain Claims from Alameda and FTX related to collateral pledges of approximately $0.7B are assumed to be invalid as the Debtors are not in possession of such collateral and in the scenarios where the Debtors do receive a recovery of such perfected secured collateral and take possession of the collateral, it is assumed that the Debtors will have successfully prevailed in the Litigation, thus invalidating the Alameda/FTX Claims.

[38]  Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties. Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

[39]  Certain Claims from Alameda and FTX related to collateral pledges of approximately $0.7B are assumed to be invalid as the Debtors are not in possession of such collateral and in the scenarios where the Debtors do receive a recovery of such perfected secured collateral and take possession of the collateral, it is assumed that the Debtors will have successfully prevailed in the Litigation, thus invalidating the Alameda/FTX Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | determines that the FTX Avoidable Transfer Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, then the FTX Avoidable Transfer Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | | | | | | |
| 7 | Alameda Claims[40,41] | The Alameda Claims shall be, pursuant to section 510(c) of the Bankruptcy Code, equitably subordinated to Account Holders Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity; *provided*, *however*, if the Bankruptcy Court determines that the Alameda Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, such Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | n/a | | n/a | | n/a | |
| 8 | 3AC Claims[42] | The 3AC Claims shall be, pursuant to section 510(c) of the Bankruptcy Code, equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity; *provided*, *however*, if the Bankruptcy Court determines that the 3AC | n/a | | n/a | | n/a | |

---

[40] Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties.  Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

[41] Certain Claims from Alameda and FTX related to collateral pledges of approximately $0.7B are assumed to be invalid as the Debtors are not in possession of such collateral and in the scenarios where the Debtors do receive a recovery of such perfected secured collateral and take possession of the collateral, it is assumed that the Debtors will have successfully prevailed in the Litigation, thus invalidating the Alameda/FTX Claims.

[42] Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties.  Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, then the 3AC Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | | | | | | |
| 9 | Government Penalty Claims[43] | The Government Penalty Claims shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity, and the Government Entity will not receive any Distribution on account of such Government Penalty Claims until all Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity are paid in full; *provided, however,* if the Bankruptcy Court determines that the Government Penalty Claims should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then the Government Penalty Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | $29.4 million | | 0.0% | 100.0% | 0% | 100.0% |
| 10 | *De Minimis* Claims | On the Effective Date, all *De Minimis* Claims shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of *De Minimis* Claims will not receive any Distribution on account of such *De Minimis* Claims. | n/a | | n/a | | n/a | |
| 11 | Intercompany Claims | On the Effective Date, all Intercompany Claims will be, at the option of the Debtors, either (a) reinstated or (b) converted to equity, otherwise set off, | $872.2 million | | 48.6% | 100.0% | 44.5% | 80.1% |

---

[43]   Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties.   Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | settled, distributed, contributed, cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum; *provided* that the Intercompany Claims (x) between BlockFi International Ltd. and BlockFi Lending LLC, (y) between BlockFi International Ltd. and BlockFi Inc., and (z) between BlockFi Lending LLC and BlockFi Inc., will, in each case, be netted, resulting in three separate Intercompany Claims (one for each pair of Debtors in clauses (x), (y), and (z)), and such remaining Intercompany Claims after such netting will be treated *pari passu* with Account Holder Claims and General Unsecured Claims at the applicable Debtor entity; *provided*, *further*, that, for the avoidance of doubt, in no case shall the treatment of Intercompany Claims set forth in the Restructuring Transactions Memorandum modify or alter the allocation of value among Debtor entities as set forth herein. | | | | | | |
| 12 | Intercompany Interests[44] | On the Effective Date, all Intercompany Interests will be, at the option of the Debtors, either (a) reinstated or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $987.4 million | | 0.5% | 55.4% | 0.5% | 7.2% |
| 13 | Existing Preferred Equity Interests | On the Effective Date, all Existing Preferred Equity Interests will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Existing Preferred Equity Interests will not receive any Distribution on account of such Existing Preferred Equity Interests. | $935.8 million | | 0.0% | 1.5% | 0.0% | 0.0% |
| 14 | Existing Common Equity | On the Effective Date, all Existing Common Equity Interests will be cancelled, released, and extinguished, and | n/a | | 0% | | 0% | |

---

[44]   In certain Entities where subordinated Claims receive a full recovery, any remaining assets left to distribute flow up to the respective parent entity.  The recovery calculation contemplates these excess funds relative to the equity contribution made by BlockFi Inc.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | Interests | will be of no further force or effect, and Holders of Existing Common Equity Interests will not receive any Distribution on account of such Existing Common Equity Interests. | | | | | | |
| 15 | SEC Penalty Claims | Pursuant to the SEC Stipulation, Holders of Allowed SEC Penalty Claims shall not be entitled to receive a Distribution on account of such Allowed SEC Penalty Claims unless all Holders of Allowed Claims in Class 1 (Secured Tax Claims), Class 2 (Other Priority Claims), Class 3 (Account Holder Claims), Class 4 (General Unsecured Claims), and Class 11 (Intercompany Claims) are paid in full. | $30.0 million | | 0.0% | 100.0% | 0.0% | 0.0% |

**E. What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Wallet Account Claims, and Post-Petition Digital Asset and Cash Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan. The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |

| Claim | Description of Claim | Plan Section |
|-------|---------------------|--------------|
| Wallet Account Claims | Any Claims against BlockFi Wallet LLC, BlockFi Trading LLC, or BlockFi International Ltd. on account of Wallet Account Claims are entitled to, in full and final satisfaction of such Claims, Distribution in full of the non-Estate assets contained in such Holders' Account in connection with the Wallet Program, subject to set off for (i) any negative Account balances including for any ACH chargeback transactions and (ii) any applicable withdrawal fees.

Trade-Only Assets in the Wallet Program will be converted into USDC or another Stablecoin at the Debtors' election prior to being available for withdrawal by Clients from the Wallet Program.  All other assets in the Wallet Program will be available for withdrawal in kind.  Account Holders will have sixty (60) days' notice to withdraw their assets in the Wallet Program from the Debtors' platform.  Any assets in the Wallet Program not withdrawn in that period will be converted to Cash and any subsequent Distributions of assets in the Wallet Program will be made in Cash. | Article II, Section D |
| Post-Petition Digital Asset and Cash Claims | Any Claim against any of the Debtors on account of Digital Assets or Cash transferred to the Debtors after the Petition Date are entitled to, in full and final satisfaction of such Claims, return in full of the Digital Assets or Cash transferred to the Debtors after the Petition Date. | Article II, Section E |
| Post-Effective Date Deposits | Any Client that deposits Cash or Digital Assets on the BlockFi Platform on or after the Effective Date shall be deemed to have forfeited such Cash or Digital Assets, as applicable, and such Cash or Digital Assets will not be returned to the Client. | Article II, Section F |

**F.**     **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Holders of Claims will receive the potential recoveries reflected herein.  It is possible that any alternative plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article VII.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**G.**     **If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the Distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial Distributions[45] to Holders of Allowed Claims will be made as soon as reasonably practicable after the Plan becomes effective—the "Effective Date", as specified in the Plan.  *See* Article IX of the Plan for a description of the conditions precedent to Consummation of the Plan.

---

[45]    The decision to make an initial Distribution will be at the discretion of the Wind-Down Trustee subject to ongoing disputes, litigation, and/or Claims reconciliation.

**H.      What are the sources of consideration and other consideration used to make Distributions under the Plan?**

The Wind-Down Debtors shall fund Distributions under the Plan with:  (a) Cash and (b) Digital Assets.

**I.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article XI.C.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

**J.      Does the Plan provide for the subordination of any Claims?**

The Plan contemplates that the Class 5 (FTX Facility Claims), Class 6 (FTX Avoidable Transfer Claims), Class 7 (Alameda Claims), Class 8 (3AC Claims), and Class 9 (Government Penalty Claims) are subordinated Claims.

**1.      *FTX Facility Claims***

The Debtors believe that the FTX Facility Claims were clearly intended as, and as a practical matter were, equity contributions.  The Debtors intend to seek recharacterization of the claims arising out of the FTX Facility to the extent those Claims are not disallowed in light of FTX's massive fraud and other misconduct which has substantially harmed BlockFi and all creditors.

However, if the Bankruptcy Court finds that the FTX Facility Claims are not equity contributions, the Plan also provides for contractual subordination and equitable subordination of the FTX Facility Claims to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.  Contractually, the Claims arising out of the FTX Facility rank junior to "Client Liabilities" which are defined as "obligations to Clients incurred by [BlockFi Inc. and the Guarantors] or any of [their] Subsidiaries in connection with (x) the BlockFi Interest Account, BlockFi Yield, BlockFi Personalized Yield/BPC or BlockFi Wallet products, (y) custody arrangements and collateral arrangements relating to loans made to Clients and (z) any other similar products or services provided to Clients by [BlockFi Inc., the Guarantors] or any of [their] Subsidiaries."[46]  The consideration for this contractual subordination agreed to by FTX was, in part, FTX's option to purchase BlockFi.  Accordingly, as a matter of contract, a Holder of the FTX Facility Claims is not entitled to a Distribution under the Plan until all Account Holders are paid in full.

Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(l).  Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met:  (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime.  *See Citicorp Venture Cap., Ltd. v. Comm. of Creds. Holding Unsecured Claims*, 160 F.3d 982, 986–87 (3d Cir. 1998) (citing *U.S. v. Noland*, 517 U.S. 535, 116 S. Ct. 1524, 134 L.Ed.2d 748 (1996)).

The Debtors believe that if the FTX Facility Claims are not found to be equity contributions by the Bankruptcy Court, such Claims should be equitably subordinated, due to FTX's inequitable and harmful conduct that precipitated the Debtors' chapter 11 filing.  FTX carried out a series of deceptions which caused irreparable harm to the Debtors and their creditors.  Since FTX's bankruptcy filing, SBF and other FTX executives have been charged with (and some have pleaded guilty to) various crimes including wire fraud, conspiracy to commit bank fraud, and securities and derivatives fraud.

---

[46]    The Debtors' "BlockFi Personalized Yield" product was renamed "BlockFi Private Client" after the execution of the FTX Loan Agreement.  BPC Terms, https://blockfi.com/private-client-terms.

Given the fallout following the discovery of the historic fraud committed by FTX, the Debtors believe that FTX had no intention of fulfilling its obligations under the FTX Facility. The Debtors believe that such misconduct warrants the equitable subordination of the FTX Facility Claims. The Debtors will further demonstrate the legal and factual bases for subordinating the FTX Facility Claims prior to or at Confirmation.

Although the Debtors will seek to recharacterize the FTX Facility Claims as equity contributions, to the extent that the Bankruptcy Court finds otherwise, the FTX Facility Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims at the applicable Debtor entity. Further, if the Bankruptcy Court determines that the FTX Facility Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, such Claims shall be *pari passu* with General Unsecured Claims and Intercompany Claims at the applicable Debtor entity.

### 2. *FTX Avoidable Transfer Claims*

The Debtors believe that the FTX Avoidable Transfer Claims (even if allowable, which the Debtors believe they are not) should be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims in the same manner and for the same reasons as stated above with regard to the FTX Facility Claims.

Although the Debtors have classified the FTX Avoidable Transfer Claims as subordinated Claims, the Bankruptcy Court may rule that equitable subordination of the FTX Avoidable Transfer Claims is improper. If the Bankruptcy Court denies equitable subordination of the FTX Avoidable Transfer Claims, then such FTX Avoidable Transfer Claims (if allowed which, again, the Debtors believe they should not be) shall be *pari passu* with Account holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

### 3. *Alameda Claims*

In the ordinary course of business, BlockFi entered into a series of lending arrangements with Alameda, and as a result of the FTX fallout, BlockFi both modified its existing lending arrangements with Alameda and also entered into the Alameda Pledge Agreement. Although the Debtors will assert claims against Alameda in its bankruptcy proceedings, Alameda, along with FTX and their Affiliates, filed proofs of claims against the Debtors in these Chapter 11 Cases. Specifically, Alameda has asserted claims against the Debtors for the avoidance of certain payments made in the 90-day period prior to the commencement of FTX's and Alameda's bankruptcy proceedings. Alameda asserts that payments it made to BlockFi Lending in the amount of $124,423,552 and to BlockFi International in the amount of $7,825,017 constitute preferential transfers under Section 547 of the Bankruptcy Code and are subject to avoidance under Section 550(a) of the Bankruptcy Code.

The Plan provides for the equitable subordination of the Alameda Claims, to the extent any such claims are ever Allowed, to Account Holder Claims, General Unsecured Claims, and Intercompany Claims. Section 510(c) of the Bankruptcy Code provides that the Bankruptcy Court may subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. *See* 11 U.S.C. § 510(c)(l). The Debtors believe that the Alameda Claims, to the extent Allowed, should be equitably subordinated due to Alameda's role in FTX's historic fraud discussed above.

Although the Debtors have classified the Alameda Claims as subordinated claims, the Bankruptcy Court may rule that equitable subordination of the Alameda Claims is improper. If the Bankruptcy Court denies equitable subordination of the Alameda Claims and if the Debtors' defenses against such claims do not succeed (leading to the allowance of such claims), then Allowed Alameda Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

### 4. *3AC Claims*

On May 2, 2019, BlockFi Lending and 3AC entered into that certain secured loan agreement (as amended by that certain Amended and Restated Master Loan Agreement dated April 23, 2020, that certain First Amendment to Amended and Restated Master Loan Agreement dated February 24, 2021, that certain Letter Agreement in connection with Amended and Restated Master Loan Agreement, dated September 1, 2021, as further amended, restated, supplemented or modified from time to time, the "3AC Master Loan Agreements") providing loans secured

by certain Loan Collateral.  The loans to 3AC were secured by, among other things, Digital Assets, certain equity interests in Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum Trust (ETHE), Grayscale Ethereum Classic Trust (ETCG), Grayscale Digital Large Cap Fund (GLCF), Grayscale Zcash Trust, cash, general intangibles, investment property, and financial assets.

In June 2022, BlockFi accelerated approximately $1.1 billion of overcollateralized loans that had been made to 3AC, BlockFi's largest borrower Client at the time, because of a default caused by 3AC's failure to meet a margin call.  As of the Petition Date, approximately $117 million was outstanding in 3AC loans.  BlockFi has calculated that, based on the amount remaining outstanding on the loan after applying the proceeds from liquidation and, considering default interest, it has a claim to assert in 3AC's bankruptcy proceedings of approximately $132 million.[47]

On June 27, 2022, 3AC was ordered to commence liquidation proceedings before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division).  On July 1, 2022 3AC's foreign representatives commenced a chapter 15 case in the United States Bankruptcy Court for the Southern District of New York (No. 22-10920), and on July 28, 2022, the United States Bankruptcy Court for the Southern District of New York granted recognition of 3AC's foreign main proceeding.

Although the Debtors will assert claims against 3AC in 3AC's bankruptcy proceedings, the foreign representatives of 3AC filed proofs of claims against the Debtors in these Chapter 11 Cases.  Specifically, 3AC has asserted "known" and "unknown" claims, with known claims based on alleged preferences including cash payments to the Debtors of approximately $71,000,000, Stablecoin transfers to the Debtors of 6,070,123 USDC, transfers of ETH, and transfers of various trust shares.  The Debtors believe they have valid defenses to 3AC's claims.

The Plan provides for the equitable subordination of the 3AC Claims, to the extent any such claims are ever allowed, to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.  Section 510(c) of the Bankruptcy Code provides that the Bankruptcy Court may subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.  *See* 11 U.S.C. § 510(c)(l).  The Debtors believe that the 3AC Claims, to the extent Allowed, should be equitably subordinated due to 3AC and its founders' conduct both before and during its liquidation and chapter 15 proceedings.  Among other things, 3AC is alleged to have been a fraud from inception, and 3AC's founders Kyle Livingstone Davis and Su Zhu have fled the jurisdiction, failed to cooperate with 3AC's foreign representatives, and have taken steps to undermine asset recovery efforts by the foreign representatives in favor of creditors, such as BlockFi, including by failing to provide information necessary for the foreign representatives to take control of certain of 3AC's assets and accounts.[48]

Although the Debtors have classified the 3AC Claims as subordinated claims, the Bankruptcy Court may rule that equitable subordination of the 3AC Claims is improper.  If the Bankruptcy Court denies equitable subordination of the 3AC Claims and if the Debtors' defenses against such claims do not succeed (leading to the allowance of such claims), then Allowed 3AC Claims (if any) shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

**5.**      ***Government Penalty Claims***

On February 14, 2022, BlockFi Lending agreed with various state securities regulators, represented by a North American Securities Administrators Association ("NASAA") working group, to settle certain alleged charges against BlockFi Lending for alleged violations of various state securities laws and regulations.  As part of this settlement, BlockFi Lending agreed to, among other things, pay up to $50 million to state regulators.  As of the Petition Date, approximately $29.4 million of these settlement payments remains outstanding.

---

[47]    This claim amount also does not consider the amount that BlockFi made from 3AC in interest revenue over the life of the loan, which exceeded $80 million.

[48]    Foreign Representatives of Three Arrows Capital, Ltd.'s Motion for an Order Compelling Compliance with Subpoena, *In re Three Arrows Capital, Ltd.*, No. 22-10920 (MG) [Docket No. 81].

#### (a)        Basis for Subordination

The Debtors believe that the Government Penalty Claims are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code, pursuant to which they are subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at BlockFi Lending.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 181 (Bankr. D.N.J. 2010). If any of the states disputes these points, the Debtors will further demonstrate the legal and factual bases for subordinating the Government Penalty Claims prior to or at Confirmation.

Although the Debtors have classified the Government Penalty Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Government Penalty Claims is improper.  If the Bankruptcy Court denies subordination of the Government Penalty Claims, then such Government Penalty Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at BlockFi Lending.

#### (b)        Governmental Bar Date

The Bar Date for Governmental Units (the "Governmental Bar Date") is May 30, 2023 and the deadline for the United States to determine the dischargeability of any debts arising from any civil actions is July 21, 2023.[49]  To the extent that any Governmental Unit files a Claim that constitutes penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, and to the extent any such claims are ultimately allowed, such Claims will be subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

### 6.      *Certain Insider Claims*

In connection with the proposed settlement of estate claims against them, certain insiders have agreed to either subordinate or waive certain claims that they have against the estates.  Some of those claims reflect assets on the BlockFi platform purchased by the insiders, and others include claims to compensation that was promised by the Debtors but not made to such insiders.  More detail on the proposed subordination and waiver of claims is provided below in Article X.R.

### K.      Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes, Article VIII of the Plan proposes to provide releases to the Released Parties and to exculpate the Exculpated Parties.

As discussed in greater detail in Article X.Q and X.R of this Disclosure Statement, on or around the Petition Date, the board of directors of BlockFi Inc. (the "Board") voted to appoint Scott Vogel, an independent director, to the board of BlockFi Inc. and to establish a special committee (the "Special Committee") comprised of Jennifer Hill, a member of the Board since 2021, and Mr. Vogel, a new board member appointed just prior to the Petition Date.  The Special Committee was established to investigate historical transactions, including all potential claims against insiders of the Debtors (the "Investigation"), and to assess whether the Debtors should pursue, settle, release, or retain such claims.

The Special Committee directed an exhaustive examination of all such potential claims, and counsel prepared a report and recommendations (the "Special Committee Report").  The investigation was comprehensive and, while many collateral issues were also investigated, in general, the investigation focused on:

- BlockFi's business in general;

---

[49]    On May 11, 2023, the Debtors filed the *Application in Lieu of Motion for Consent Order Extending the Governmental Bar Date to June 13, 2023 for the United States of America* [Docket No. 866], seeking to extend the Governmental Bar Date to June 13, 2023.

- BlockFi's risk and investment policies;

- BlockFi's investments in (and acceptance of collateral related to) the Grayscale Bitcoin Trust ("GBTC");

- BlockFi's dealings with Three Arrows Capital;

- BlockFi's dealings with FTX and Alameda Research generally, including the time periods before and after BlockFi's transaction with FTX US announced July 1, 2022;

- BlockFi's compensation of employees generally, and including (but not limited to) certain payments made in connection with or following the FTX Transaction;

- Transactions related to SECFI, Inc., and Serengeti Asset Management (collectively "SecFi");

- BlockFi's procurement of additional director and officer liability insurance in November 2022; and

- BlockFi's decision to sell cryptocurrency for cash in November 2022.

The results of the Investigation indicate that the claims the Estates may have against the Debtors' insiders are weak. Although some could potentially survive a motion to dismiss, the Special Committee does not believe such claims are more likely than not to succeed or recover material value. Moreover, the Special Committee concluded that claims against the Debtors' insiders would be expensive to prosecute and would take considerable time to do so. Finally, the Special Committee concluded that pursuing litigation against insiders who could conceivably serve as witnesses in litigation would be inconsistent with what the Special Committee recommended the Estates' large-scale goals should be, namely: (1) ensuring the Estates are in the best position possible to prosecute and defend litigation against the bankruptcy estates of, among others, FTX, Alameda, Emergent, and 3AC; and (2) ensuring that the Estates are in a position to distribute cryptocurrency through the BlockFi Platform to customers. As such, the Debtors determined that negotiating a settlement, pursuant to which certain of the Debtors' insiders will be included as Released Parties in exchange for the consideration described therein, is the best path forward to resolving these Chapter 11 Cases. The terms of that settlement are described in detail below in Article X.R, and they include releases of the Debtors' claims against insiders described here.

The Debtor Release is a release *of the Debtors' claims* against third parties. By contrast, the Third-Party Release is a release of direct claims a Holder of a Claim or Interest has against third parties unless a Holder of such Claim or Interest affirmatively elects to opt out of the Third-Party Release.

The Debtors believe that the settlement, releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.[50]

"Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Releasing Parties; (d) the Bermuda Provisional Liquidators, and (e) each Related Party of each Entity in clauses (a) through (d); *provided* that any of (i) FTX, (ii) 3AC, (iii) Alameda, (iv) Emergent,

---

[50]    This provision remains subject to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

(v) Marex, and (vi) any Holder of a Claim against or Interest in the Debtors that is not a Releasing Party shall not be a "Released Party."[51]

"Releasing Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtors; (c) all Holders of Claims that vote to accept the Plan; (d) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clauses (a) through (f).[52]

"Exculpated Parties" means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors and the Wind-Down Debtors; (b) the Committee and each of its respective members; and (c) each Related Party of each Entity in clauses (a) through (b).

**ALL HOLDERS OF CLAIMS AND INTERESTS THAT (I) VOTE TO ACCEPT THE PLAN, (II) ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (III) ABSTAIN FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN; OR (IV) VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS AND THE WIND-DOWN DEBTORS.**

      1.     *Releases by the Debtors.*

**Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Platform Pause, the FTX Loan Agreement, the 3AC Master Loan Agreements, the Alameda Loan Agreements, the Emergent Pledge, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the administration and implementation of the Wind Down, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

---

[51]    This definition and any related provisions in the Plan remain subject to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

[52]    This definition and any related provisions in the Plan remain subject to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in **Article VIII.A** of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in **Article VIII.A** of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.[53]

2.      *Releases by Holders of Claims and Interests.*

Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Platform Pause, the business or contractual arrangements between any Debtor and any Released Party, the FTX Loan Agreement, the 3AC Master Loan Agreements, the Alameda Loan Agreements, the Emergent Pledge, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the administration and implementation of the Wind Down, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in **Article VIII.B** of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in **Article VIII.B** of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Debtors or the Wind-Down Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Without limiting the foregoing, from and after the Effective Date, any Entity that either votes in favor of the Plan or is given the opportunity to opt out of the releases contained in **Article VIII.B** of the Plan and does not exercise such opt out may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors.  From and after the Effective Date, any Entity (i) that did not vote in favor of the Plan and that opted out of the releases contained in **Article VIII.B** of the Plan or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of

---

[53]    This provision remains subject to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

Action is not subject to the releases contained in <u>Article VIII.A</u> of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in <u>Article VIII.A</u> of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in <u>Article XI</u> of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.[54]

### 3.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the Distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

### 4.    *Injunction.*

The assets of the Debtors and the Wind-Down Debtors shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose.  All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtors, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and Distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.A, Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from

---

[54]    This provision remains subject to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or Distributions that are contemplated by the Plan.

>     5.     *Bermuda Release*

On the Effective Date, except to the extent otherwise provided in the Plan, any Implementation Mechanism, and/or any Bermuda Order entered by the Bermuda Court, all Claims against and Interests in BlockFi International Ltd. that were affected by the Plan shall be deemed to be satisfied in full, cancelled, discharged, and of no force and effect.  By accepting a Distribution pursuant to the Plan, each Holder of a Claim against and/or Interest in BlockFi International Ltd. will be deemed to have specifically consented to the injunctions contained in Article VIII.J of the Plan. The release described therein shall, on the Effective Date, have the effect of res judicata (a matter adjudged) to the fullest extent permissible under the applicable laws of Bermuda.

>     L.     **What are the consequences of opting out of the releases provided by the Plan?**

As described above, each Holder of a Claim that votes to reject the Plan, abstains from voting on the Plan, or is deemed to accept the Plan, may opt out of providing the releases under the Plan. Making an opt out election will preserve any direct Causes of Action that the Holder may have against the Released Parties and those Causes of Action the Estates hold against a Holder, including avoidance (or "clawback") actions.

Upon the Effective Date, the Wind-Down Trustee will be vested with authority to commence, litigate, and settle any and all Vested Causes of Action. The Wind-Down Trustee will have a fiduciary duty to, among other things, maximize the value of the Wind-Down Debtors' Assets, including pursuing any of the Vested Causes of Action. Accordingly, because the proposed releases are bilateral in nature, opting out of the releases may result in a voting party being sued in their personal capacity by the Wind-Down Trustee on account of any Causes of Action the Debtors may hold against the voting party.

>     M.     **What are the consequences of not opting out of the releases provided by the Plan?**

Each Holder of a Claim that votes to accept the Plan and each Holder of a Claim entitled to opt out of the releases that elects not to exercise such opt out, will become a Released Party under the Plan. Accordingly, any direct Causes of Action that such Holder may have against the Released Parties will be unconditionally released upon the Effective Date, and correspondingly, each such Holder will receive a release from the Debtors for any Causes of Action the Debtors may hold against them, including avoidance (or "clawback") actions.

This means that no Released Party may be sued in their personal capacity by the Wind-Down Trustee on account of any Causes of Action the Debtors may hold against such party, regardless of the nature of any such Causes of Action.

>     N.     **Are any regulatory approvals required to consummate the Plan?**

Prior to the Petition Date, BlockFi maintained state money transmission licenses or their equivalents (each, a "Money Transmission License") in thirty-three (33) states and has received a separate Class F Digital Business Assets License issued by the Bermuda Monetary Authority.[55]   BlockFi has surrendered most of its Money Transmission Licenses and currently maintains Money Transmission Licenses in seven (7) states.  The Debtors will continue to take steps to surrender those Money Transmission Licenses in connection with the Wind Down (the "Licensing Wind-Down Process").  Such Licensing Wind-Down Process requires notice to, and in some cases approval by, those state banking departments in states where the Debtors are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.  The Debtors do not believe that active Money Transmission Licenses are required to distribute Digital Assets or Cash to Holders of Claims under the Plan.

---

[55]    BlockFi also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal anti-money laundering laws.

BlockFi also maintains state lending licenses or their equivalents (each, a "<u>Lending License</u>") in 16 states. The Debtors will continue to take steps to surrender those Lending Licenses in connection with the Wind Down (the "<u>Lending License Wind-Down Process</u>").  Such Lending License Wind-Down Process requires notice to, and in some cases approval by, those state banking departments in states where the Debtors are licensed pursuant to the requirements set forth in each state lending statute and as otherwise required by the relevant state banking departments.

**O.      What is the deadline to vote on the Plan?**

The Voting Deadline is [August 21], 2023, at 4:00 p.m. (prevailing Eastern Time).

**P.      What are the overall projected recoveries under the Plan?**

The projected recoveries are provided in Article V.D of this Disclosure Statement.

**Q.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **<u>actually received</u>** before the Voting Deadline by the Claims, Noticing, and Solicitation Agent.  *See* Article VI of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**R.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**S.      When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for August 17, 2023.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by [August 21], 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition), *Royal Gazette*, and *CoinDesk* to provide notification to those persons who may not receive notice by electronic mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**T.      What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**U.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are distributing assets and winding down under Chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on or as soon as reasonably practicable after the Effective Date.  On or after the Effective Date, the Wind-Down Trustee will commence the Wind Down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**V.      Will any party have significant influence over the corporate governance and operations of the Wind-Down Debtors?**

As of the Effective Date, the current members of the Boards, as applicable, of the Debtors shall be dissolved and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, or the officers, directors, or managers, as applicable of the Debtors.  From and after the Effective Date, the Wind-Down Trustee shall be the sole representative of, and shall act for, the Wind-Down Debtors.  Subject in all respect to the terms of the Plan, the Wind-Down Trustee shall have the power and authority to take any action necessary to Wind Down and dissolve any of the Wind-Down Debtors.  The Wind-Down Trustee shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers.  The foregoing shall not limit the authority of the Wind-Down Debtors or the Wind-Down Trustee, as applicable, to continue the employment of any former manager or officer to assist in the Wind Down, as needed. [56]

**W.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article IX of this Disclosure Statement, as well as in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions*  [Docket No. 17] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**X.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

**By telephone at**:
(888) 773-0375 (Toll-Free)
(646) 440-4371 (International)

**By electronic mail at:**
blockfiinfo@ra.kroll.com with a reference to "In re BlockFi – Solicitation Inquiry" in the subject line.

---

[56]      Provided that with respect to BlockFi International, depending on the Implementation Mechanism, the Bermuda Provisional Liquidators and/or any trustee appointed pursuant to the establishment of a Bermuda Liquidation Trust shall have the power, authority, and responsibilities described in this Article V.V in accordance with applicable law.

**By mail at:**

BlockFi Inquiries, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at https://restructuring.ra.kroll.com/blockfi (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

## VI.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

### A.    Classes Entitled to Vote on the Plan.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3-a | BlockFi Lending LLC Private Client Account Claims | Impaired |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Impaired |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | Impaired |
| 3-e | BlockFi Inc. Interest Account Claims | Impaired |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Impaired |
| 4-c | BlockFi Inc. General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

### B.    Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number and two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

C.      **Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect Distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article XI of this Disclosure Statement.

D.      **Classes Not Entitled to Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired |
| 4-e | BlockFi Trading LLC General Unsecured Claims | Impaired |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | Unimpaired |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | Impaired |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | Impaired |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired |
| 5 | FTX Facility Claims | Impaired |
| 6 | FTX Avoidable Transfer Claims | Impaired |
| 7 | Alameda Claims | Impaired |
| 8 | 3AC Claims | Impaired |

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 9 | Government Penalty Claims | Impaired |
| 10 | *De Minimis* Claims | Impaired |
| 11 | Intercompany Claims | Unimpaired / Impaired |
| 12 | Intercompany Interests | Unimpaired / Impaired |
| 13 | Existing Preferred Equity Interests | Impaired |
| 14 | Existing Common Equity Interests | Impaired |
| 15 | SEC Penalty Claims | Impaired |

### E. Solicitation Procedures.

#### 1. *Claims, Noticing, and Solicitation Agent.*

The Debtors have retained Kroll Restructuring Administration LLC to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

#### 2. *Solicitation Package.*

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the applicable form of electronic Ballot with a unique E-Ballot ID, detailed voting instructions, and instructions on how to submit the Ballot;

- the cover letter, which urges Holders of Claims in each of the Voting Classes to vote to accept the Plan (the "Cover Letter");

- a copy of procedures for (i) soliciting, receiving, and tabulating votes to accept or reject the Plan, (ii) voting to accept or reject the Plan, and (iii) filing objections to Confirmation of the Plan (the "Solicitation and Voting Procedures");

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the order (without exhibits) (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving this Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the Solicitation Packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan (the "Disclosure Statement Order");

- the notice of the Confirmation Hearing (the "Confirmation Hearing Notice"); and

- any additional documents that the Bankruptcy Court has ordered to be made available.

#### 3. *Distribution of the Solicitation Package and Plan Supplement.*

The Debtors are causing the Claims, Noticing, and Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on July 14, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at (888) 773-0375 (Toll-Free) or (646) 440-4371 (International), (b) emailing the Claims, Noticing, and Solicitation Agent at blockfiinfo@ra.kroll.com and referencing "In re BlockFi – Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at BlockFi Inquiries, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website,

https://restructuring.ra.kroll.com/blockfi, or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).  The online balloting portal is the sole manner in which Ballots will be accepted.  **Hard copy Ballots will not be accepted, and electronic Ballots will not be accepted by facsimile or any other electronic means (other than the online portal)**.

No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by:  (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/blockfi and the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee), (c) emailing the Claims, Noticing, and Solicitation Agent at blockfiinfo@ra.kroll.com, or (d) writing to the Claims, Noticing, and Solicitation Agent at BlockFi Inquiries, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232.

      **F.**      **Voting Procedures.**

[June 30], 2023, (the "Voting Record Date") is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder must cast an electronic Ballot through the Debtors' case website https://restructuring.ra.kroll.com/blockfi/EBallot-Home, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent **on or before [August 21], 2023, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline")**.  The online balloting portal is the sole manner in which Ballots will be accepted.  **Hard copy Ballots will not be accepted, and electronic Ballots will not be accepted by facsimile or any other electronic means (other than the online portal)**.

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING

INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

G.     **Voting Tabulation.**

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report") as soon as practicable after the Voting Deadline.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

H.     **Ballots Not Counted.**

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT'S NUMBER AT (888) 773-0375 (TOLL-FREE) OR (646) 440-4371 (INTERNATIONAL).**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

---

**VII.     CONFIRMATION OF THE PLAN**

A.     **Requirements of Section 1129(a) of the Bankruptcy Code.**

Among the requirements for confirmation are the following:  (i) the Plan is accepted by all Impaired Classes or, if the Plan is rejected by an Impaired Class, at least one Impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Interest Account Claims and Loan Collateral Claims, Holders of Class 4 General Unsecured Claims, Holders of Class 5 FTX Facility Claims, Holders of Class 6

FTX Avoidable Transfer Claims, Holders of Class 7 Alameda Claims, Holders of Class 8 3AC Claims, Holders of Class 9 Government Penalty Claims, Holders of Class 10 *De Minimis* Claims, Holders of Class 11 Intercompany Claims, Holders of Class 12 Intercompany Interests, Holders of Class 13 Existing Preferred Equity Interests, Holders of Class 14 Existing Common Equity Interests, and Holders of Class 15 SEC Penalty Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of Chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of Section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.  Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.**     **Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the Distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As set forth in greater detail in Article VII.B of this Disclosure Statement, Holders of Account Holder Claims and General Unsecured Claims would likely receive significantly reduced recoveries in a hypothetical liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make Distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Plan. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Digital Assets. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any Chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the number and amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed Distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that Distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

### C.    Feasibility.

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the liquidation and Distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of

such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the Consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their Ballots in favor of acceptance.  For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance.

### E.      Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.      *No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.      *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

(a)      **Unsecured Claims.**

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)      **Interests.**

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## VIII.    THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    The Debtors' Corporate Structure and History.

BlockFi was founded in 2017 by Zac Prince and Flori Marquez to provide credit services to markets with limited access to financial products.  BlockFi worked to become an industry leader in compliance by adopting corporate governance and risk management processes and reaching a settlement with the SEC.  Unlike certain competitors, BlockFi never launched its own token to raise funds but instead relied on traditional venture capital.  Also, in contrast to many firms in the cryptocurrency industry, BlockFi has a history of actively working with regulators, BlockFi was also the first in many states to seek and receive lending licenses to make Digital Asset-backed loans.

BlockFi experienced rapid growth; between 2019 and 2021, total annual trading volume grew from $2 million to more than $23 billion, while Deployable Assets grew from $345 million to $14.8 billion as of December 31, 2019 and December 31, 2021, respectively.  Cumulative gross loan originations expanded from $687 million in 2019 to more than $47 billion through 2021.  As BlockFi's business and operations grew, it expanded its management team and employee base, with a focus on hiring experts from other segments of the financial industry to better mature the nascent cryptocurrency business.

BlockFi Inc. has twelve wholly-owned subsidiary entities that are organized under the laws of Delaware, Bermuda, England and Wales, the Cayman Islands, and Singapore.  BlockFi Inc. currently directly or indirectly owns 100% of the equity in each of the other Debtors.  BlockFi Inc. also owns 100% of the equity in non-Debtors BlockFi Holding UK Limited (directly) and BlockFi Cayman LLC, BlockFi UK Limited, and BlockFi Asia PTE Ltd. (indirectly), and 50% of non-Debtor BV Power Alpha LLC.  A simplified version of the Debtors' current corporate structure is as follows:





### B.      The Debtors' Assets and Operations.[57]

BlockFi's primary operations consisted of, among other things (i) a trading platform, (ii) a platform through which Clients earned interest on Digital Assets, and (iii) lending programs for their two primary types of Clients: retail and institutional.  BlockFi served retail Clients through web and mobile applications, and its products enabled individuals and small businesses to store and/or earn interest on, buy and sell, borrow U.S. dollars secured by, and earn (via a credit card rewards program) Digital Assets.  On the institutional front, BlockFi provided hedge funds, market makers, proprietary trading firms, trading desks, cryptocurrency miners, exchanges, and corporations with bespoke financing, trading, and treasury solutions relating to Digital Assets.

#### 1.      Retail Clients.

BlockFi's founders understood that retail investors deserved a high-quality experience that maximized their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.  Understanding the difficulty many individuals face in entering the investment world, BlockFi created web and mobile applications that enabled its retail Clients to easily access, trade, borrow, and store select Digital Assets.

#### (a)      BlockFi Wallet.

The Debtors provided wallet accounts for the Debtors' domestic and international Clients (the "Client Wallet Accounts").  The Debtors' U.S. Clients had the ability to store Digital Assets by opening accounts provided by Debtor BlockFi Trading LLC ("BlockFi Trading"), which are hosted and maintained on BlockFi Trading's behalf by Debtor BlockFi Wallet LLC ("BlockFi Wallet") "for the benefit of" the Clients of BlockFi Trading (the "WLLC FBO Wallet").  The Debtors' non-U.S. Clients had the ability to store Digital Assets by opening accounts provided by Debtor BlockFi International.  BlockFi International hosted and maintained an omnibus custodial wallet account "for the benefit of" Clients of BlockFi International (each, an "International Vault Wallet,"[58] and together with the WLLC FBO Wallet, the "Custodial Omnibus Wallets").

---

[57]    The Debtors own a fifty percent interest in BV Power Alpha LLC (Delaware), which operates a certain digital currency mining hosting facility.

[58]    Until recently, BlockFi Wallet maintained wallet accounts on behalf of BlockFi International "for the benefit of" the Clients of BlockFi International (the "International FBO Wallet") per the Terms of Service.  In connection with offering international Clients the ability to store Trade-Only Assets in their Wallet Accounts, prior to the Petition Date, the Digital Assets in the International FBO Wallet were transferred from the International FBO Wallet to a separate, non-interest bearing, segregated vault account labeled the "No Sweep BFI (NIA)," which is maintained by BlockFi International for the benefit of the Clients of BlockFi International.

A Client Wallet Account could be funded either by (a) transferring supported Digital Assets from an external personal wallet to a wallet address provided by BlockFi Trading, which would then record the Digital Assets to a Client Wallet Account and be displayed on the User Interface or (b) transferring U.S. dollar fiat currency to BlockFi Trading's accounts at Silvergate Bank, which could be used to purchase supported Digital Assets that are recorded in the Client's Client Wallet Account.[59]

Client Wallet Accounts were non-interest bearing, and the Digital Assets held in the Custodial Omnibus Wallets were not rehypothecated for the Debtors' lending activities.  Instead, all Digital Assets deposited into Custodial Omnibus Wallets were held by BlockFi Wallet or BlockFi Trading "for the benefit of" the Clients of BlockFi Trading for U.S. Clients, or by BlockFi International "for the benefit of" the Clients of BlockFi International for non-U.S. Clients.

A Client Wallet Account could be used by retail Clients in connection with BlockFi's other products and services.  For example, after opening a Client Wallet Account, Clients could (a) (for non-U.S. Clients and all BlockFi Private Clients) direct the transfer of Digital Assets recorded in their Client Wallet Account to an interest earning account, (b) buy and sell Digital Assets on the BlockFi's Platform, (c) direct transfers of Digital Assets or fiat cash to the Client's personal account, and (d) receive Digital Asset rewards through the Rewards Card and other bonuses.

### (b)        BlockFi Interest Accounts.

BlockFi Clients could also earn interest in the form of Digital Assets through a BIA.  BIAs were interest-bearing accounts that allowed Clients to earn interest on supported Digital Assets.  Interest earned on account of Digital Assets transferred to a BIA was paid in the form of Digital Assets at variable rates determined at BlockFi's sole discretion.  Before the Platform Pause, a Client could request a complete or partial withdrawal of principal at any time for Digital Assets in a BIA, subject to the Terms of Service.

Pursuant to the Terms of Service, BlockFi had the contractual right to redeploy Digital Assets transferred to a BIA account for its revenue-generating activities.  More specifically, BlockFi had the right, without further notice to a Client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any amount of Digital Assets transferred to a BIA, separately or together with other property, with all attendant rights of ownership, for any period of time and without retaining in BlockFi's possession and/or control a like amount of Digital Assets.[60]

Under the Terms of Service, BIAs are provided and administered by BlockFi Inc. (U.S. Clients) or BlockFi International (non-U.S. Clients).  In February 2022, BIAs of non-U.S. Clients were moved from BlockFi Lending to BlockFi International, and in April 2022, BIAs of U.S. Clients were moved from BlockFi Lending to BlockFi Inc.

### (c)        BlockFi Private Client Program.

In addition to BIAs, which generally have standardized terms applicable to all holders, BlockFi provided an individually negotiated interest-bearing borrowing product to eligible Clients as part of its BlockFi Private Client suite of products.  The BPC product suite permitted Clients to lend Digital Assets to BlockFi on individually negotiated terms, which led to individually negotiated terms for other products and services.  BPC loan interest is paid in the form of Digital Assets at a negotiated rate.  A BPC loan was structured as an "open" term (*i.e.*, the Client could request that BlockFi repay the loan at any time) or a "fixed" term (*i.e.*, the loan has a negotiated maturity date).

---

[59]   The exception to this is residents of New York who have a crypto-backed loan but who do not have a Client Wallet Account.

[60]   BlockFi Interest Account Terms (Existing U.S. only), https://blockfi.com/interest-account-terms-existing-us; BlockFi Interest Account Terms (Non-U.S.), https://blockfi.com/interest-account-terms.

BlockFi had the right to redeploy Digital Assets borrowed under a BPC loan for its revenue-generating activities. More specifically, BlockFi had the right, without further notice to a Client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any amount of Digital Assets borrowed under a BPC loan, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of Digital Assets.[61] BPC loan agreements were with (and administered by) either BlockFi Lending (U.S. Clients) or BlockFi International (non-U.S. Clients).

(d)      **BlockFi Retail Client Loans.**

BlockFi's retail Clients were able to borrow U.S. Dollars or Stablecoins (*e.g.*, USDC, GUSD, or PAX) from BlockFi Lending and BlockFi International secured by certain types of Digital Asset collateral (BTC, ETH, LTC, or PAXG). U.S.-based loans were serviced by an outside provider, Scratch, while international-based loans were serviced by BlockFi. BlockFi's retail loans were collateralized at origination as Clients could borrow funds with a value of, generally, up to at least 50% of their collateral at origination. Interest rates for retail loans are based on the level and type of Digital Asset collateral.

BlockFi's retail loans were subject to margin calls and/or liquidation based on specified loan-to-collateral value ratios. If a Client with a BIA elected to use as collateral Digital Assets that had been transferred to BlockFi through the BIA, the Digital Assets would cease to earn interest. Once a Client had repaid a retail loan in full, he or she could elect to have the loan collateral returned to their BlockFi Wallet. For U.S. retail Clients following the Consent Order, once collateral was released, it could not be sent to their BIA from the BlockFi Wallet to earn interest. For non-U.S. retail Clients, however, once collateral was released, it could be transferred to the BIA from the BlockFi Wallet to earn interest.

BlockFi has the right to redeploy retail Client loan collateral for its revenue-generating activities. More specifically, BlockFi has the right, without further notice to a retail loan Client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any retail Client loan collateral, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of assets.

Since March 2022, all non-U.S. Client retail loan agreements have first been entered into with BlockFi Lending, and then assigned to BlockFi International (non-U.S. Client retail loan agreements entered into before March 2022 were also assigned by BlockFi Lending to BlockFi International).

(e)      **BlockFi Retail Client Trading.**

BlockFi's retail Clients could buy, sell, and exchange Digital Assets supported by BlockFi. BlockFi acted as a principal in trading transactions with retail Clients and could earn a spread from the prevailing market price in these transactions. Retail trading agreements are with (and administered by) either BlockFi Trading (U.S. Clients) or BlockFi International (non-U.S. Clients). BlockFi Trading typically executed trades for all supported Digital Assets in the U.S. BlockFi International could also execute trades for supported Digital Assets in the U.S., and BlockFi International executed all trades for supported Digital Assets for non-U.S. Clients.

(f)      **BlockFi Rewards Card Program.**

The BlockFi Credit Card Rewards Program (the "Rewards Program") allowed certain eligible U.S. Clients to earn reward points ("Points"), which were redeemed for cryptocurrency rewards. To participate in the Rewards Program, eligible Clients must: (a) have had a BlockFi Wallet; (b) applied for and have been issued a BlockFi Rewards Visa® Signature Card (the "Rewards Card"); (c) held their Rewards Card in good standing; and (d) not be past due by more than two monthly payments on their Rewards Card at the time of earning Points or redeeming such Points. Clients earned Points, which were redeemed monthly for cryptocurrency at the then-current market price(s) (subject to applicable spreads, charges, or fees), by using the Rewards Card on certain qualifying purchases.

---

[61]      BPC Terms, https://blockfi.com/private-client-terms.

BlockFi's Crypto Rewards Account ("Rewards Account") was a non-interest-bearing account that allowed Clients to hold cryptocurrency earned from the Rewards Program.  All Rewards were automatically transferred from the Rewards Account to the BlockFi Wallet, monthly.  On November 16, 2022, Visa sent BlockFi a letter purporting to terminate the parties' relationship.  The Debtors have reserved all rights, but the BlockFi Rewards Visa is no longer active.

### 2.      *Institutional Clients.*

#### (a)      **Institutional Finance**

Like retail Clients, BlockFi institutional Clients could also open a BlockFi Wallet to store Digital Assets or earn interest through interest earning accounts.  But given the more bespoke needs of its institutional Clients, BlockFi also offered a custom suite of services as well.

BlockFi required institutional Clients to complete a rigorous onboarding process, including anti-money laundering and sanctions screenings, before borrowing.  Each Client also underwent credit due diligence managed by BlockFi's credit risk underwriting team, and BlockFi set credit limits based on company credit guidelines, policies and procedures.  Based on the results of BlockFi's diligence process, at times, BlockFi required borrowers to provide collateral for lending activity ranging from zero to more than 100% of the loan principal (as appropriate).

BlockFi's financing desk enabled qualifying institutional Clients like hedge funds, market makers, proprietary trading firms, over-the-counter trading desks, and other corporations to obtain Digital Asset or U.S. dollar financing.  Interest on those loans was typically fixed and payable in kind, monthly in arrears, and durations on those loans were often under a year.

BlockFi also offered institutional Clients custom trading services with advanced trading features such as real-time quotes, a variety of order types, and trading algorithms through either voice, a web interface, or application programming interface.  BlockFi either acted as a principal or agent in trading transactions with its institutional Clients and could earn a spread from the prevailing market price in connection with these transactions.  As it would with retail Client trading, BlockFi would either enter a hedging transaction or internalize the trade itself.

Generally, to offer these services, institutional Clients would enter into Master Digital Currency Loan Agreements (the "MDCLA").  Loans governed by the MDCLA were subject to margin calls and/or liquidation based on specified loan-to-collateral value ratios.  Collateral pledged under the MDCLA was typically redeployed in BlockFi's lending business.  Specifically, BlockFi was "free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral, unless otherwise specified on the applicable loan term sheet."[62]

#### (b)      **Mining Finance**

Certain institutional Clients—Clients that mine Digital Assets—were offered financing secured by mining equipment.  These loans were extended by BlockFi Lending, and mining equipment was taken as security for repayment.  The mining Clients entered into Facility and Security Agreements with BlockFi Lending that provided the repayment terms and amortization schedule, along with the interest rate and, in some cases, loan-to-value tests based on the value of the machines pledged.

### C.      **The Debtors' Capital Structure.**

### 1.      *The FTX Facility.*

On June 30, 2022, BlockFi Inc. entered into the FTX Facility, which provided for capital to be made available to BlockFi Inc. in an amount of up to $400 million outstanding at any time, of which: (a) $300 million was available for general corporate purposes, including Client Payment Obligations; and (b) $100 million was available solely to fund Client Payment Obligations.  BlockFi Inc.'s obligations under the FTX Facility were guaranteed by BlockFi Trading and BlockFi Lending (together, the "Guarantors").  Any capital made available to BlockFi through

---

[62]     Institutional Loan Agreement § V(a).

the FTX Facility would contractually be junior to the Client Liabilities.  Client Liabilities are "obligations to Clients incurred by [BlockFi Inc. and the Guarantors] or any of [their] Subsidiaries in connection with (x) the BlockFi Interest Account, BlockFi Yield, BlockFi Personalized Yield/BPC or BlockFi Wallet products, (y) custody arrangements and collateral arrangements relating to loans made to Clients and (z) any other similar products or services provided to Clients by [BlockFi Inc., the Guarantors] or any of [their] Subsidiaries."  As part of the consideration for the FTX Facility, BlockFi Inc. entered into an option agreement with FTX US and with respect to certain matters, FTX Trading (the "FTX Option Agreement").  The FTX Option Agreement provided FTX US the unconditional, irrevocable, and exclusive option to acquire BlockFi Inc. by requiring BlockFi Inc. to redeem and cancel all equity securities of BlockFi Inc., other than equity securities issued to FTX US.

On November 8, 2022, the Debtors requested an additional $125 million pursuant to the terms of the FTX Facility, which FTX did not provide.

On November 11, 2022, the various FTX entities began to commence voluntary cases under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  As of the Petition Date, the Debtors had drawn $275 million under the FTX Facility.  The Debtors believe the FTX Facility Claims should be recharacterized as equity contributions; however, if the Bankruptcy Court finds otherwise, the FTX Facility Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims under the Plan.

### 2.    *The Equity Interests in the Debtors.*

As of the Petition Date, BlockFi Inc. has 6,508,898 shares of Common Stock (the "Common Stock") outstanding, 1 share of Special Voting Stock ("Special Voting Stock") outstanding, and ten series totaling 45,312,958 shares of Preferred Stock (collectively, the "Preferred Stock") outstanding.

### (a)    Common Stock in BlockFi Inc.

BlockFi Inc. has two types of common equity: (a) Common Stock and (b) Special Voting Stock.  As of the Petition Date, BlockFi Inc. had 6,508,898 shares of Common Stock outstanding and 1 share of Special Voting Stock outstanding.  The Special Voting Stock was issued to FTX US under the FTX Option Agreement.

### (b)    Preferred Stock in BlockFi Inc.

As of the Petition Date, there were 45,312,958 outstanding shares of Preferred Stock outstanding, which are held by a variety of institutional investors, as follows:

| Type | Total Shares Outstanding |
| --- | --- |
| Series Seed Preferred Stock | 2,833,977 |
| Series Seed-2 Preferred Stock | 1,167,941 |
| Series A-1 Preferred Stock | 3,109,745 |
| Series A-2 Preferred Stock | 127,210 |
| Series A-3 Preferred Stock | 7,753,114 |
| Series B Preferred Stock | 9,837,208 |
| Series C Preferred Stock | 7,642,144 |
| Series D Preferred Stock | 9,739,310 |
| Series E Preferred Stock | 2,442,193 |
| Series E-1 Preferred Stock | 660,116 |

Between 2019 to 2021, BlockFi Inc. completed five preferred stock financing transactions to raise capital, as follows:

***Series A Preferred Stock***. From July to August 2019, BlockFi Inc. sold an aggregate of 13,259,229 shares of its Series A-1 preferred stock, Series A-2 preferred stock, and Series A-3 preferred stock. BlockFi Inc. issued an aggregate of 3,902,716 shares of Series A-1 preferred stock at a price of $1.0641 per share, 190,815 shares of Series A-2 preferred stock at a price of $1.5722 per share, and 9,165,698 shares of Series A-3 preferred stock at a purchase price of $1.7476 per share for an aggregate purchase price of $20.5 million, of which $16.0 million was paid in cash and $4.5 million was paid through the conversion and cancellation of convertible promissory notes and agreements for future equity issued by BlockFi Inc.

***Series B Preferred Stock***. From January to February 2020, BlockFi Inc. sold an aggregate of 9,907,010 shares of its Series B preferred stock, at a cash purchase price of $3.78952 per share, for an aggregate purchase price of $37.5 million.

***Series C Preferred Stock***. From August to September 2020, BlockFi Inc. sold an aggregate of 7,081,821 shares of Series C preferred stock, at a cash purchase price of $9.5138 per share, for an aggregate purchase price of $67.4 million.

***Series D Preferred Stock***. From March to May 2021, BlockFi Inc. sold an aggregate of 9,415,382 shares of Series D preferred stock, at a cash purchase price of $58.737 per share, for an aggregate purchase price of $553.0 million.

***Series E Preferred Stock***. From July to August 2021, BlockFi sold an aggregate of 2,442,193 shares of Series E preferred stock and 660,116 shares of Series E-1 preferred stock, in each case at a cash purchase price of $75.7442 per share, which included 1,551,147 warrants, each of which grants the holder the right to purchase either a share of Series E preferred stock or a share of Series E-1 preferred stock, at the holder's option, in each case at a strike price of $75.7442 per share, for an aggregate purchase price of $235.0 million.

In connection with certain of the foregoing preferred stock financing transactions, BlockFi Inc. repurchased certain classes of Preferred Stock and Common Stock in varying amounts for cash consideration.

## IX.   EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.   Market and Industry-Specific Challenges.

#### 1.   *2020 and 2021 Market Conditions.*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of BTC fell over 50 percent over the same time period, and most other Digital Assets experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether (the "COVID Crash"). BlockFi, however, continued to operate its platform through the entirety of 2020.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of BTC rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021. In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency

sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses from all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal. But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022 was marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well. Between January 1, 2022 and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy NASDAQ declined by nearly 30 percent over the same period. Rising inflation and commodity prices contributed to investor pessimism and further sell-offs. In June 2022, market analysts officially labeled 2022 as a bear market.

## 2. *Cryptocurrency Industry-Wide Sell-off.*

Many cryptocurrencies experienced significant decline since early 2022. A chart showing the decline in BTC prices over the course of 2022 is copied below:[63]



As investor pessimism grew—exacerbated by the collapse of 3AC, the Voyager and Celsius bankruptcy filings, and ultimately FTX's implosion—the cryptocurrency industry experienced significant declines. Declining investor confidence in the industry more broadly led significant numbers of BlockFi's Clients to withdraw from its product offerings:

---

[63]   https://coinmarketcap.com/currencies/bitcoin/ (Jan. 5, 2023).



As shown in the above graph, BlockFi's Deployable Assets declined from $12 billion at the beginning of 2022 to below $2 billion in November of 2022. The value of Deployable Assets declined in part because of price declines but in larger part because of Client withdrawals.

**(a)    Overall Industry Pullback.**

Crypto's 2022 pullback began with the collapse of Luna, a cryptocurrency issued by Terra, an open-source blockchain protocol. Terra issued the cryptocurrency Luna to execute transactions on the Terra blockchain. In early May 2022, Luna was trading at $86 per token and had a market capitalization of approximately $14 billion. Along with Luna, Terra issued TerraUSD ("UST"), an algorithmic Stablecoin that was pegged at $1.

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. This dropped UST's price to $0.91. UST holders saw the "de-peg" and rushed to unstake and sell their coins.

Traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in its price. Simultaneously, other traders attempted to repeg Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna and further exacerbated its price decline. In one week, Luna's price fell from $82.55 to $0.000001 per token, eliminating $18 billion of value in the cryptocurrency sector.

Many cryptocurrency-focused hedge funds, and other cryptocurrency companies, owned Luna. Some were unable to sell their Luna under staking agreements and were forced to incur up to a 99% loss on their investment.

On June 15, 2022, 3AC confirmed that it had suffered at least some loss from the Luna collapse and that it had hired legal and financial advisors to explore potential liquidity solutions. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

In addition to 3AC, several prominent cryptocurrency lenders faced challenges in June and July 2022. On June 12, 2022, Celsius announced that it was pausing Client withdrawals, sparking market volatility and widespread speculation about contagion among cryptocurrency lenders. On July 1, 2022, Voyager, a cryptocurrency brokerage and lender publicly listed on the Toronto Stock Exchange, announced it was pausing Client trading, deposits, and withdrawals. On July 5, 2022, Voyager filed for chapter 11. On July 13, 2022, Celsius also filed for chapter 11.

BlockFi had no direct exposure to Celsius, Luna, Terra, or Voyager, outside of offering Clients facing BlockFi International the ability to trade Luna on its retail trading platform. During this period of market disruption, BlockFi took swift action to de-risk itself of exposure to 3AC but could not completely evade the harm. While 3AC was one of BlockFi's largest borrower Clients, BlockFi limited its losses in connection with the 3AC collapse to a fraction of the original exposure (and a similar sum to that BlockFi had made in interest during the life of its

relationship with 3AC).  The collapse of UST, along with the halting of withdrawals and bankruptcies of Celsius, Voyager and 3AC, led to significant Client withdrawals from BlockFi.

While BlockFi was able to withstand the loss from 3AC and other borrowers and process all Clients' withdrawals within the normal periods set forth in its Client agreements, it prudently sought additional liquidity to protect its Client accounts into the indefinite future.

BlockFi first attempted to obtain equity financing from third-party investors in a new financing round. BlockFi then considered several other potential transactions.  This rapid financing process led to an offer from FTX to essentially backstop Client withdrawals:  FTX US committed up to $400 million in USDC (or other fiat or Digital Asset as mutually agreed) to BlockFi on a junior basis to BlockFi's obligations to its Clients, while FTX US received an option to acquire BlockFi, exercisable as early as July 2023.  The FTX transaction was overwhelmingly supported by BlockFi's shareholders, with nearly 90% in favor of the transaction.

The offer imposed steep costs on BlockFi personnel and shareholders.  To secure liquidity for its Clients, BlockFi's executives and employees were required to (and did) sacrifice hundreds of millions of dollars of their own equity value.  BlockFi accepted the offer because—for BlockFi's leadership and employees—Client protection was paramount.  The offer from FTX was determined to be the best and most viable by BlockFi's management team and Board of Directors, and it received nearly 90% approval from BlockFi's shareholder vote.  This approval included the majority of each share class and sub-share class.  In addition, BlockFi significantly reorganized its workforce, reducing headcount by over 20% in a further effort to protect Client value and chart a return to profitability.

Support from FTX, with its highly visible brand, bolstered Client confidence in the strength and safety of the BlockFi Platform.  And indeed, throughout the summer of 2022, BlockFi maintained its operations while several other cryptocurrency trading and lending platforms and exchanges were forced to declare bankruptcy.

### (b)        Collapse of FTX and the Debtors' Response.

Before the transaction with FTX, BlockFi acted as a lender to Alameda, an FTX Affiliate, and traded on the FTX platform (starting in 2021).  The amounts of BlockFi's loans to Alameda have varied over time and typically consisted of Digital Assets (primarily BTC and ETH) and USD-denominated Stablecoins.

As part of BlockFi's credit evaluation process of Alameda, BlockFi, among other things, received unaudited quarterly financial statements and certain verifiable financial information, such as cryptocurrency wallet addresses, and had regular dialogue with Alameda staff, who made ongoing representations regarding its financial standing, significant equity capital, and unencumbered assets on Alameda's balance sheet.  In 2022, BlockFi also received and relied on audited financials for FTX Trading and FTX US.

On November 6, 2022, Binance, FTX's largest rival, soon stated that it would liquidate its entire position in FTT, FTX's native exchange token.[64]  Binance's founder compared FTT to Luna, stating: "Liquidating our FTT is just post-exit risk management, learning from LUNA.  We gave support before, but we won't pretend to make love after divorce."[65]  Binance held a large position in FTT.  After Binance's announcement, many investors followed suit and sold the token.  In 2 days, the price of FTT fell from trading at $22.06 to $3.38:

---

[64]    @CZ_Binance, Twitter (Nov. 6, 2022) ("Due to recent revelations that have came to light, we have decided to liquidate any remaining FTT on our books.").

[65]    @CZ_Binance, Twitter (Nov. 6, 2022).



These and other comments from Binance and others led to material withdrawals from the FTX platform.

On November 8, 2022, SBF stated publicly that, among other things, FTX was experiencing a "liquidity crunch" due to user withdrawals.[66]  Hoping to stall the collapse, FTX sought to be acquired by Binance.  While Binance reportedly signed a non-binding letter of intent, it later demurred, stating publicly that "[a]s a result of corporate due diligence, as well as the latest news reports regarding mishandled client funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com."[67]  On November 11, 2022, FTX began filing for bankruptcy.[68]

Customer withdrawals from FTX and FTT token price declines by themselves should not have taken FTX or Alameda down if they were being run legitimately and in line with the representations they made to the market and BlockFi.  If FTX and Alameda had had proper corporate governance and FTX had been backing client funds 1:1 as FTX represented it had done, all FTX clients would have been able to withdraw from the FTX platform, regardless of the price of FTT.  Ultimately, FTX's demise was driven by fraudulent actions and misrepresentations

---

[66]    @SBF_FTX, Twitter (Nov. 8, 2022).

[67]    @Binance, Twitter (Nov. 9, 2022).

[68]    @SBF_FTX, Twitter (Nov 11, 2022).

including but not limited to (i) representing what in reality were liabilities to FTX customers as assets on Alameda's balance sheet, and (ii) allowing Alameda to carry a negative balance on the FTX's platform.[69]

BlockFi, like other market participants, was shocked when FTX's and Alameda's fraud came to light. Multiple FTX and Alameda executives including Caroline Ellison, chief executive officer of Alameda, Zixiao "Gary" Wang, co-founder of FTX, and Nishad Singh, head of engineering of FTX, have already plead guilty to crimes that, for some, included intent to defraud lenders. On June 13, 2023, the U.S. District Court handling criminal proceedings against Sam Bankman-Fried split the case into two separate trials, the first of which is currently scheduled to begin in October 2023.

As in the previous episode of market stress, BlockFi took several proactive measures to attempt to limit its exposure to each of Alameda and FTX.com (the platform operated by FTX Trading). On November 7, 2022, BlockFi modified existing lending arrangements with Alameda, increasing the overall required collateralization levels to 200%. Alameda thereafter defaulted on approximately $680 million of collateralized loan obligations to BlockFi, the recovery on which is unknown. In response to Alameda's default, on November 9, 2022, BlockFi Lending and BlockFi International entered into a forbearance agreement with Alameda. As a condition to the effectiveness of the forbearance agreement, BlockFi Inc., BlockFi Lending, and BlockFi International entered into the Pledge Agreements. The Pledge Agreements aimed to protect BlockFi in the event of a default on outstanding loans to Alameda. Under the Alameda Pledge Agreement, Alameda granted BlockFi a first-priority security interest in certain of Alameda's Trust Shares to secure all obligations of Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International or any Affiliate thereof under the secured financing agreements or any other agreement or arrangement. Under the Emergent Pledge Agreement, Emergent granted BlockFi a first-priority security interest in all of Emergent's rights, title, and interests in, among other things, all of Emergent's Robinhood Shares to secure all obligations of Emergent, Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International or any Affiliate thereof under the secured financing agreements or any other agreement or arrangement.

Separately, on November 8, 2022, BlockFi requested an additional $125 million pursuant to the terms of the FTX facility, which FTX failed to fund. Simultaneously, BlockFi requested to withdraw approximately $181 million in Digital Assets from its accounts with FTX.com, which FTX failed to honor.

In response to failures of the FTX companies and Emergent to meet their obligations to BlockFi, BlockFi faced a liquidity shortage. So, to avoid a disorderly series of withdrawals that would harm many Clients, on November 10, 2022, BlockFi decided to limit platform activity, including pausing Client withdrawals, as allowed under BlockFi's terms.[70]

---

[69]   *Securities and Exchange Commission vs Sam Bankman-Fried*, SEC Civil Action No. 22-cv-10501. As current FTX CEO John Ray most recently stated, "The FTX Group portrayed itself as the vanguard of customer protection efforts in the crypto industry. Its co-founder and CEO, Sam Bankman-Fried, claimed to support federal legislation to safeguard consumers' digital assets, and touted the FTX exchanges' purported procedures to protect fiat currency and crypto deposits, including in testimony he provided to the U.S. Senate. In 2021, the FTX Group released, and urged Congress to read, its "key principles" for regulation of the crypto industry, which included the primary goals of "ensuring customer and investor protection, promoting market integrity, preventing financial crimes, and ensuring overall system safety and soundness." In an accompanying press release, Bankman-Fried declared "the protection of investors and the public as a top priority" for the FTX exchanges. The image that the FTX Group sought to portray as the customer-focused leader of the digital age was a mirage. . . . The FTX Senior Executives did not commingle and misuse customer deposits by accident. Commingling and misuse occurred at their direction, and by their design. Bankman-Fried, with the assistance of a senior FTX Group attorney ("Attorney-1") and others, lied to banks and auditors, executed false documents, and moved the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to the Bahamas, in a continual effort to enable and avoid detection of their wrongdoing. In doing so, they showed little of the concern for customers that they publicly professed. . . . Through its website, social media, and in statements and submissions to Congress, regulators and third parties, the FTX Group represented that it maintained a strict separation of customer and corporate funds . . . . At all times, with the exception of isolated jurisdictions, the FTX Group's representations in this regard were false." *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.Com*, Case No. 22-11068-JTD (Bankr. D. Del. June 26, 2023) [Docket No. 1704-1].

[70]   November 11, 2022 BlockFi Update (Nov. 11, 2022), https://blockfi.com/november-11-2022-blockfi-update.

The FTX companies began commencing chapter 11 cases in the United States Bankruptcy Court for the District of Delaware early in the morning on November 11, 2022.[71] Recognizing that BlockFi could not, due to these and other circumstances, restore its liquidity alone, BlockFi's Board and management sought the support of veteran restructuring advisors to navigate its uncertain position, proceeding to engage BRG, Kirkland, longtime corporate counsel Haynes and Boone, Cole Schotz as New Jersey local counsel, and Moelis as investment banker to assist with contingency planning and liquidity management, among other tasks.  Ultimately, BlockFi, with the aid of its advisors, determined the commencement of these Chapter 11 Cases was necessary to protect its Clients and maximize value for all stakeholders.

In preparation for these Chapter 11 Cases, BlockFi took steps to liquidate certain of its owned Digital Assets to limit its exposure to market forces impacting Digital Assets and bolster available cash to fund its business and administrative costs.  Through this process, BlockFi was able to raise $238.6 million of additional cash, for a total unencumbered cash position as of the Petition Date of $256.5 million.  BlockFi currently expects that this cash position will be sufficient to fund the costs of these Chapter 11 Cases.

B.       **Governance Initiatives.**

On or about November 25, 2022, the Debtors took several steps to strengthen the independence and experience of their Boards:  (i) appointing Scott Vogel as an independent director of BlockFi Inc.; (ii) appointing Alan Carr as an independent director of BlockFi Trading; (iii) appointing Jill Frizzley as an independent director of BlockFi International; (iv) appointing Harvey Tepner as independent director of BlockFi Lending; (v) appointing Pam Corrie as independent director of BlockFi Wallet LLC; and (vi) the Board voted to establish the Special Committee comprised of Jennifer Hill[72] and Scott Vogel (collectively, the "Independent Directors") and tasked the Special Committee with addressing potential intercompany conflicts and evaluating historical transactions.

X.       **EVENTS OF THE CHAPTER 11 CASES**

A.       **First and Second Day Relief and Other Case Matters.**

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  At a hearing on November 29, 2022, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions, and at a hearing on January 17, 2023, the Bankruptcy Court granted certain of the First Day Motions on a final basis as follows:[73]

(i)       **Automatic Stay Motion.**  Debtors' Motion Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (II) Granting Related Relief [Docket No. 12].  On November 30, 2022, the Bankruptcy Court entered an Order approving the Automatic Stay Motion [Docket No. 56];

(ii)      **The Case Management Motion.**  Debtors' Motion to Establish Certain Notice, Case Management and Administrative Procedures [Docket No. 3].  On November 30, 2022, the Bankruptcy Court entered an Order approving the Case Management Motion [Docket No. 54];

(iii)     **Cash Management Motion.**  Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Existing Business Forms and Records,

---

[71]   *In re FTX Trading, Ltd.*, No. 22-1068 (JTD) (Bankr. D. Del. Nov. 11, 2022).  Filings of various other entities related to FTX continued for several days.  The first day hearing in the FTX bankruptcy cases occurred on November 22, 2022.

[72]   Jennifer Hill has been a member of the Board since 2021.  Given her prior connection with BlockFi, however, Ms. Hill has recused herself from the Special Committee's investigation.

[73]   The First Day Motions, the First Day Declaration, and all orders for relief granted in these Chapter 11 Cases can be viewed free of charge at https://restructuring.ra.kroll.com/blockfi/.

(B) Maintain Existing Corporate Bank Accounts and Cash Management System, (C) Pay Prepetition Bank Fees Associated with the Cash Management System, and (D) Continue Performance of Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Waiving Certain U.S. Trustee Requirements [Docket No. 7]. On November 29, 2022, the Bankruptcy Court entered an Order approving the Cash Management Motion on an interim basis [Docket No. 44], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Cash Management Motion on a final basis [Docket No. 306];

(iv)     **The Creditor Matrix Motion.**  Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders and (V) Granting Related Relief [Docket No 4]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Creditor Matrix Motion on an interim basis [Docket No. 53];

(v)      **Critical Vendors Motion.**  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Claimants and (II) Granting Related Relief [Docket No. 13]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 52], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 308];

(vi)     **Insurance Motion.**  Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtors to (I) Continue, Renew, or Supplement Insurance Policies, (II) Pay Insurance Premiums Thereon, (III) Continue, Renew, or Supplement the Surety Bond Program, and (IV) Granting Related Relief [Docket No. 11]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Insurance Motion on an interim basis [Docket No. 49], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Insurance Motion on a final basis [Docket No. 298];

(vii)    **The Joint Administration Motion.**  Debtors' Motion for Joint Administration [Docket No. 2]. On November 29, 2022, the Bankruptcy Court entered an Order approving the Joint Administration Motion [Docket No. 42];

(viii)   **NOL Motion.**  Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief [Docket No. 14]. On January 17, 2023, the Bankruptcy Court entered an Order approving the NOL Motion on a final basis [Docket No. 300];

(ix)     **Claims and Noticing Agent Application.**  Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date [Docket No. 15]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Claims and Noticing Agent Application [Docket No. 48];

(x)      **Schedules/SOFAs Extension Motion.**  Debtors' Motion for Entry of an Order Extending the Time to File Schedules and Statements [Docket No. 5]. On November 29, 2022, the Bankruptcy Court entered an Order approving the Schedules/SOFAs Extension Motion [Docket No. 47];

(xi)     **Tax Motion.**  Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Bankruptcy Code §§ 105(a), 363(b), 507(a)(8), and 541(d) [Docket No. 9]. On November 30, 2022, the Bankruptcy Court entered an Order

76

approving the Tax Motion on an interim basis [Docket No. 55], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Tax Motion on a final basis [Docket No. 303];

(xii) **Utilities Motion.** Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366(I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment [Docket No. 10]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Utilities Motion on an interim basis [Docket No. 51], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Utilities Motion on a final basis [Docket No. 304]; and

(xiii) **Wages Motion.** Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief [Docket No. 16]. On November 29, 2022, the Bankruptcy Court entered an Order approving the Wages Motion on an interim basis [Docket No. 43], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Wages Motion on a final basis [Docket No. 305]. The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens, including certain retention applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland, Haynes and Boone, and Cole Schotz as co-legal counsel to the Debtors, Moelis as investment banker to the Debtors, and authorizing BRG to provide Mr. Renzi as Chief Restructuring Officer and additional personnel, among others.

**B.    Appointment of Unsecured Creditors' Committee.**

On December 21, 2022, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 130] appointing the Committee. The nine-member Committee is currently composed of exclusively individual Clients (including non-U.S. Clients of BlockFi International), and includes the following members:

(i)     Nicholas Owen Gunden;

(ii)    Corey L. Grossman;

(iii)   John A. Javes;

(iv)    Robert Moleda;

(v)     Curt Tudor;

(vi)    Elisabeth Carabas;

(vii)   Michael Ilg;

(viii)  Greg Dingel; and

(ix)    Brendon Ishikawa.

**C.    Schedules and Statements.**

On November 29, 2022, the Bankruptcy Court entered the *Order Extending the Time to File Schedules and Statements* [Docket No. 45] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional 30 days for a total of 44 days after the Petition Date.

The Debtors filed their Schedules and Statements at Docket Nos. 242, 243, 247-262, and filed amended Schedules and Statements at Docket Nos. 460, 461, and 462.  Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://restructuring.ra.kroll.com/blockfi.

D.    **Bar Date Motion.**

On January 9, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 225] (the "Bar Date Motion").  On January 30, 2023, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 440] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was March 31, 2023, at 5:00 p.m. prevailing Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is May 30, 2023, at 5:00 p.m. prevailing Eastern Time.  The Bar Date Notice was published in *The New York Times* (national edition) on February 2, 2023 [Docket No. 471], the *Royal Gazette* on February 3, 2023 [Docket No. 472], and CoinDesk's Valid Points email newsletter on:  (i) February 15, 2023; (ii) February 22, 2023; and (iii) March 1, 2023 [Docket No. 568], and was served on February 8, 2023 [Docket No. 591].

Approximately 30,800 proofs of Claims have been filed against the Debtors.  The Debtors have already commenced the Claims reconciliation process including filing objections to a number of claims.  *See e.g.*, *Order Granting Debtors' First Omnibus Objection to Claims 1363, 1649, and 3217* [Docket No. 777].  The Debtors anticipate the Claims reconciliation process to continue through the Effective Date.

E.      **The Wallet Withdrawal Motion.**

From the very first day of these Chapter 11 Cases, the Debtors have taken the position that the Digital Assets held by the Debtors for their Clients in the Client Wallet Accounts belong to the Clients and are not part of the Debtors' Estates. Accordingly, the Debtors wished to return those Digital Assets to their Clients as soon as permissible.

On December 19, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals From Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 121] (the "Wallet Withdrawal Motion"). The Wallet Withdrawal Motion sought to permit Clients to access Digital Assets that are held in their Wallet Accounts following a reconciliation of the Debtors' Product UI/UX System[74] and User Interface[75] to reflect the proper accounting of Digital Assets in the Wallet Accounts as of the Platform Pause to ensure that all Clients are treated fairly.

On January 20, 2023, the Debtors filed the *Debtors' Statement with Respect to the Wallet Withdrawal Motion* [Docket No. 339] (the "Debtors' Wallet Statement"), through which the Debtors sought to withdraw the Wallet Withdrawal Motion from consideration by the Bankruptcy Court due to opposition by the Committee and the ad hoc group of wallet holders (the "Ad Hoc Committee of Wallet Holders") with respect to the relief requested by the Wallet Withdrawal Motion. The Debtors' Wallet Statement reiterated the requested relief in the Wallet Withdrawal Motion to return the Digital Assets held by the Debtors for the benefit of their Clients in Client Wallet Accounts but, instead of through the Wallet Withdrawal Motion, through a chapter 11 plan. In response, on January 23, 2023, the Ad Hoc Committee of Wallet Holders filed the *Statement of the Ad Hoc Committee of Wallet Account Holders in Response to the Debtors' Statement Regarding their Wallet Withdrawal Motion [Docket No. 339]* [Docket No. 360], and, on January 24, 2023, the Committee filed the *Limited Objection and Response of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 380], which, in part, addressed the Debtors' Wallet Statement. On February 21, 2023, the Bankruptcy Court decided to move the Wallet Withdrawal Motion to a suspense docket to be able to further address discovery, potential settlement, or ancillary relief.

On February 28, 2023, counsel to the Ad Hoc Committee of Wallet Holders and Deferred 1031 LLC ("Deferred 1031," a BIA and Wallet Account Holder) sent a letter to the U.S. Trustee seeking the appointment of an official committee of Wallet Account Holders. On March 13, 2023, the Debtors sent a letter to the U.S. Trustee objecting to the request.

On March 8, 2023, the Debtors filed a letter with the Bankruptcy Court that was in collaboration with and cosigned by the Committee and the Ad Hoc Committee of Wallet Holders to inform all of the Debtors' stakeholders of the status of the Wallet Withdrawal Motion. The Debtors, the Committee, and the Ad Hoc Committee of Wallet Holders subsequently agreed on a briefing schedule for the limited issue of whether attempted transfers from BIAs to Client Wallet Accounts after the Platform Pause actually occurred. On April 30, 2023, the Debtors filed the *Declaration of Amit Cheela, Chief Financial Officer of BlockFi Inc., in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 804], as amended by [Docket No. 822], and the *Debtors' Omnibus Reply in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the*

---

[74]   The Debtors use a "user interface" / "user experience" system for its product offerings, which the Debtors call "Storm" (the "Product UI/UX System"), to collect and record transfer requests that Clients initiate when they interface and interact with the User Interface.

[75]   The Product UI/UX System and the User Interface are two sides of the same coin. While the User Interface is the Debtors' **Client-facing**, user-experience program that Clients interact with, the Product UI/UX System is the **company-facing** aspect of the User Interface that the Debtors' employees see, experience, and interact with to collect and review, and subsequently manually action, transfer request data.

*Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 805].  On May 3, 2023, the Committee filed the *Reply of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 824].  On May 5, 2023, the Ad Hoc Committee of Wallet Holders filed the *Ad Hoc Committee of Wallet Account Holders' Response to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 834].  A hearing on the Wallet Withdrawal Motion was May 8, 2023.

On May 11, 2023, the Bankruptcy Court issued a bench ruling, overruling the objections of the Ad Hoc Committee of Wallet Holders and others, holding that the Digital Assets held in the Omnibus Custodial Wallets and represented in the Client Wallet Accounts as of the Platform Pause are not Estate property and authorizing the Debtors to update the User Interface to properly reflect balances held in the Client Wallet Accounts as of the Platform Pause.  As the Bankruptcy Court reasoned, the BlockFi terms of service were clear, and "BIA account holders deposited their assets into these accounts with the full knowledge that they were undertaking certain risk in exchange for the chance at greater returns."[76]  On June 9, 2023, as provided for in the Wallet Withdrawal Motion, the Bermuda Court entered an order authorizing BlockFi International to honor such withdrawals in the Bermuda Insolvency Proceedings.

**F.        The Redaction Motion.**

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File A Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders, and (V) Granting Related Relief* [Docket No. 4] (the "Redaction Motion").  The Redaction Motion seeks authority to, among other things, redact certain confidential and personally identifiable information, such as names and home addresses, of creditors.

On November 30, 2022, the Bankruptcy Court entered an order [Docket No. 53] authorizing the Debtors to, on an interim basis, redact certain personally identifiable information from any document filed with the Court.  On January 10, 2023, the U.S. Trustee filed an objection [Docket No. 232] to final approval of the Redaction Motion, objecting to the sealing of the names of Clients and creditors and the sealing of names, addresses and other contact information for Clients or creditors who are not individuals.  Also on January 10, 2023, the Committee filed a joinder [Docket No. 234] in support of final approval of the Redaction Motion.

On January 13, 2023, the Committee filed a reply in opposition to the U.S. Trustee's objection [Docket No. 278], and the Debtors filed a response [Docket No. 275, amended by Docket No. 337] to the U.S. Trustee's objection.  It is the Debtors' position that the relief requested in the Redaction Motion is critical to maintaining the physical and financial security of BlockFi's Clients and mitigating the ability of bad actors to target them.  Of the cryptocurrency bankruptcy cases, only the Celsius court has required disclosure of client names.  *See In re Celsius Network, LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 28, 2022) [Docket No. 910].  The consequences of the required disclosures of individual names and institutional names and addresses were severe.  Some creditors became the victim of phishing scams—scammers posed as debtors' counsel using fake email accounts and requested that the creditors reply with their account information.  Client and creditor protection remains paramount to the Debtors.  A final hearing on the Redaction Motion will be held on [July 6], 2023.

---

[76]    May 11, 2023 Tr., *In re BlockFi Inc.*, 22-19361-MBK (Bankr. D.N.J. 2023) (transcript of Judge Kaplan's ruling on Wallet Withdrawal Motion).

G.     **The Exclusivity Motions.**

On March 21, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 659] (the "Exclusivity Motion") seeking to extend their exclusive periods to file and solicit votes on a chapter 11 plan by 90 days through June 26, 2023 and August 28, 2023, respectively.  On March 22, 2023, the Bankruptcy Court entered that *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 661] extending the Debtors' exclusivity periods on an interim basis until the Exclusivity Motion is heard on April 19, 2023.  On April 12, 2023, the Committee filed an objection [Docket No. 733] to approval of the Exclusivity Motion, arguing, among other things, that termination of exclusivity would move these Chapter 11 Cases forward.  On April 14, 2023, the Debtors filed the *Debtors Reply in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 740].  In the spirit of compromise, the Debtors proposed a revised Confirmation schedule whereby their exclusive period to file and solicit votes on a chapter 11 plan would terminate on May 15, 2023 and August 11, 2023, respectively.

On April 19, 2023, the Bankruptcy Court overruled the Committee's Objection and entered the *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 755], extending the Debtors' exclusive periods to file and solicit a chapter 11 plan to May 15, 2023 and August 11, 2023, respectively.  On May 15, 2023, the Debtors filed the *Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 886] (the "Second Exclusivity Motion") seeking to further extend the exclusive periods to file a chapter 11 plan by 100 days through August 23, 2023 and to solicit votes on a chapter 11 plan by 50 days through August 28, 2023.

On May 15, 2023, the Bankruptcy Court entered the *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121* of the Bankruptcy Code [Docket No. 889] extending the Debtors' exclusivity periods through and including the date by which the Court enters a final order with respect to the Second Exclusivity Motion.  On June 12, 2023, after amending the Confirmation schedule and with the consent of the Committee, the Bankruptcy Court entered the *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 1052] extending the Debtors' exclusivity periods on an interim basis through the original hearing date of July 6, 2023.  On June 16, 2023, to correspond with a further amended Confirmation schedule, the Bankruptcy Court entered the *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 1086] further extending the period through July 13, 2023.

H.     **The Institutional Loan Motion and Settlements.**

On December 19, 2022, the Debtors filed the *Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to Continue Servicing and Administration Activities in the Ordinary Course of Business With Respect to the Debtors' Institutional Loan Portfolio and Granting Related Relief and (II) Authorizing and Establishing Procedures Regarding the Restructuring, Settlement, or Other Modifications of Institutional Loans and Loan Obligations* [Docket No. 125], which the Bankruptcy Court approved on January 17, 2023 [Docket No. 299].  Accordingly, the Debtors were granted authority to continue normal servicing activities, including entering into any workouts or settlements with the borrowers under the Debtors' institutional loan portfolio.

Since the Debtors obtained the Bankruptcy Court's approval, the Debtors have sought [Docket Nos. 313, 424, 522, 533] and have obtained approval [Docket Nos. 439, 488, 566, 567] to enter into a number of institutional loan settlement agreements.

On March 29, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Sale and Assignment of Certain of the Debtors' Institutional Loans Free and Clear of all Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter into the Assignment Agreements, and (III) Granting*

*Related Relief* [Docket No. 701], seeking entry of an order approving the sale and assignment of certain loans made by BlockFi Lending to each of TYMIF Coin Ventures LLC and VCV Power Beta LLC (together, the "VCV Loans") to Faithful High LTD, a limited liability partnership organized under the laws of the British Virgin Islands free and clear of all claims, liens, rights, interests, and encumbrances.

## I.    Returning Post-Pause Payments on Retail Client Loans.

On February 24, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Direct Scratch to Return Post-Pause Payments on Retail Client Loans and (B) Granting Related Relief*, [Docket No. 559], which the Bankruptcy Court approved on April 19, 2023 [Docket No. 754]. Accordingly, the Debtors were authorized to direct Scratch Services, LLC ("Scratch"), the Debtors' U.S.-based loan subservice provider to immediately return $596,670.77 in payments received from Retail Loan Program Clients on account of such loans after the Platform Pause.

## J.    Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, consumer protection, regulatory, and disputes with other companies. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

On November 28, 2022, the Debtors commenced an adversary proceeding against Emergent and Marex seeking to enforce the terms of a pledge agreement and to recover collateral that the Debtors believe is property of the estate. (Adv. Proc. 22-01382) [Docket Nos. 1–2]. On February 3, 2023, Emergent filed a voluntary petition for chapter 11 in the Bankruptcy Court for the District of Delaware and a corresponding Antiguan insolvency proceeding. On February 16, 2023, the Debtors filed a *Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case* in *In re Emergent Fidelity Technologies, Ltd.*, (Case No. 23-10149) [Docket No. 32]. On March 14, 2023, the Debtors withdrew their motion to dismiss Emergent's bankruptcy case without prejudice. Minute Entry (Case No. 23-10149) [Docket No. 80]. On April 11, 2023, the Debtors and the Emergent debtors submitted a stipulation in the FTX debtors bankruptcy cases that stayed further litigation and discovery concerning the Robinhood Shares while still permitting a reasonable exchange of information regarding the Robinhood Shares, pending the outcome of the criminal proceedings against SBF. On April 21, 2023, the Court entered an *Order Approving the Stipulation Staying Litigation and Related Discovery entered between BlockFi and Emergent, Concerning the Robinhood Assets* [Docket No. 760]. On April 25, 2023, the Debtors submitted the *Application in Lieu of Motion in Support of an Entry of an Order Approving Stipulation Staying Litigation and Related Discovery*, also concerning the Robinhood Shares, relating to the Debtors' claims against Marex [Adv. Proc. Doc. No. 65]. The Debtors anticipate that the stipulation with Marex will also be approved. Together, the two stipulations, along with corresponding stipulations in the FTX debtors' cases (which have already been approved) will stay all proceedings related to the Robinhood Shares. Additional information with respect to the government seizure of the Robinhood Shares is described below in subsection P below.

On March 22, 2023, BlockFi International commenced an adversary proceeding (the "Druk Adversary") against Druk Holding and Investments Limited ("Druk") seeking to enforce the terms of, and BlockFi International's rights under and pursuant to, a Master Digital Currency Loan Agreement between BlockFi International and Druk. (Adv. No. 23-01078) [Docket No. 1]. BlockFi International alleges that Druk has defaulted under the loan agreement despite BlockFi International's delivery of written notice of default and demand for payment. Subsequently, the Debtors reached a settlement with Druk to resolve the Druk Adversary, and on April 19, 2023, the Druk Adversary was dismissed.

On March 23, 2023, the Debtors commenced an adversary proceeding against Trey Greene ("Greene") and Antonie Elas ("Elas") seeking to extend the automatic stay or, in the alternative, seeking an injunction enjoining prosecution of two putative class-action lawsuits—one filed in New Jersey and the other in Massachusetts—against certain of the Debtors' officers, directors, and former employees related to BIAs. (Adv. No. 23-01071) [Docket No. 1] (the "PI Complaint"). On March 23, 2023, the Bankruptcy Court held a hearing on the PI Complaint and, on the same day, entered its *Order to Show Cause With Temporary Restraints* (the "TRO") temporarily restraining Greene and Elas from prosecuting their putative class-action lawsuits pending a further hearing on the PI Complaint scheduled for April 19, 2023. (Adv. No. 23-01071) [Docket No. 10]. The Bankruptcy Court ordered, in the interim, that counsel for the Debtors, Elas, and Greene meet and confer regarding an expedited discovery schedule addressing the needs of the parties. Following entry of the TRO, the Debtors, Greene, and Elas entered into a stipulation agreeing to enjoin the putative two class-action lawsuits until 30 days after the Effective Date of the Plan, with the exception of initial lead plaintiff filings. The Bankruptcy Court subsequently entered the parties' stipulation as an order of the Bankruptcy Court [Docket No. 16].

On May 1, 2023, BlockFi Lending commenced an adversary proceeding (the "PrimeBlock Adversary") against PrimeBlock Operations LLC ("PrimeBlock") seeking to enforce the terms of, and BlockFi Lending's rights under and pursuant to, a Master Digital Currency Loan Agreement between BlockFi Lending and PrimeBlock. (Adversary No. 23-01116) [Docket No. 1]. The PrimeBlock Adversary is pending before the Bankruptcy Court. In addition to the Druk Adversary and the PrimeBlock Adversary, the Debtors may commence and prosecute additional adversary proceedings to enforce the Debtors' rights with respect to, including, without limitation, collection of amounts owed by borrower counterparties under the Debtors' institutional loan portfolio.

### K.      The Key Non-Insider Employee Retention Plan.

On November 28, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief* [Docket No. 21] (the "Retention Programs Motion"), seeking approval of the Debtors' key non-insider employee retention program (the "KERP") and non-insider targeted retention plan (the "TRP," and together with the KERP, the "Retention Programs").

On November 17, 2022, the Debtors' engaged Willis Towers Watson US LLC ("WTW") to assist in evaluating which of the Debtors' employees were the most critical to retain and most at risk of flight absent any retention plan. The Debtors designated 90 of its 374 prepetition employees and independent contractors as key employees to participate in the KERP and 31 key employees to participate in the TRP, all of whom perform essential tasks for the Debtors, including accounting, cash and Digital Asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "Participant"). The Participants were selected based on their deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both. Some Participants maintain critical relationships with counterparties that are essential to the Debtors' businesses. Accordingly, approximately 66% of the Debtors' entire employee population were deemed not critical to retain going forward and the Debtors' made the difficult decision to give notice of termination to such employees just prior to the Petition Date.

While the Debtors received objections from the U.S. Trustee [Docket No. 231] and the Committee [Docket No. 280] to the Retention Programs Motion, following litigation and depositions, the Debtors were able to reach a settlement with the Committee. On January 27, 2023 the Bankruptcy Court entered an Order approving the Debtors' Retention Programs [Docket No. 423].

### L.      The Post-Petition Sale Process.

The details of the Debtors' post-petition sales process are described in Article II.B of this Disclosure Statement.

### M.      Bermuda Proceedings.

BlockFi International is an Entity incorporated as an exempt company under the laws of Bermuda. In parallel with its Chapter 11 Case filed on November 28, 2022, BlockFi International filed a winding-up petition in the Supreme Court of Bermuda pursuant to section 161(e) of the Companies Act on the grounds that BlockFi International was unable to pay its debts and was therefore insolvent within the meaning of section 162(c) of the

Companies Act.  Upon the application of BlockFi International, the Bermuda Court appointed the Bermuda Provisional Liquidators by an order entered on November 29, 2022 (the "Appointment Order") for BlockFi International and granted the Bermuda Provisional Liquidators' "light touch" powers to, *inter alia*, oversee and monitor the restructuring of BlockFi International's business under the continued control of its Board and under the supervision of the Bankruptcy Court.  The Bermuda Provisional Liquidators act as independent officers of the Bermuda Court and are required under the Appointment Order to regularly report on a confidential basis on the progress of the Bermuda Debtor's Chapter 11 Case and the provisional liquidation.  Upon the appointment of the Bermuda Provisional Liquidators, a statutory stay of proceedings in Bermuda against BlockFi International and its assets automatically arose.  The Bermuda Insolvency Proceedings were initially adjourned to January 13, 2023, and subsequently further adjourned to October 6, 2023.

The Bermuda Provisional Liquidators, with the support of the Debtors, have filed a number of applications in the Bermuda Insolvency Proceedings designed to assist and facilitate the administration of the Chapter 11 Cases and to progress the provisional liquidation.

In parallel with the Chapter 11 Cases, and to facilitate the administration of the Plan, the Bermuda Provisional Liquidators may pursue one or more Implementation Mechanisms, and may seek one or more Bermuda Orders in connection with any such Implementation Mechanisms.  Further, it is intended that the Bermuda Provisional Liquidators will seek the approval of such other Bermuda Orders, in the appropriate form, as may be required in connection with the Bermuda Proceedings.  After the occurrence of the Effective Date of the Plan, the Bermuda Court will be requested to make a winding up order in respect of BlockFi International, and make an order that the Bermuda Provisional Liquidators be appointed on a "full powers" basis to continue as liquidators, which will result in the displacement of the directors and officers of BlockFi International.

### N.    The Release of Funds in the Silvergate Bank Reserve Account and Failure of Silvergate Bank.

Shortly after the Petition Date, pursuant to the Debtors' fiduciary duty to their stakeholders to maximize the value of their estates, the Debtors entered into negotiations with Silvergate Bank ("Silvergate") in an attempt to reach an agreement with regard to the release of $10 million in cash held in a reserve account (the "Reserve Account") on account of potential ACH chargebacks by Clients.  On March 3, 2023, the Debtors filed an *Application in Lieu of Motion for Entry of Stipulation and Order Between the Debtors and Silvergate Bank Regarding Silvergate Bank's Release of Funds from the Reserve Account* [Docket No. 576] seeking Court approval and entry of the agreement the Debtors reached with Silvergate for the immediate release of $9.85 million in cash to the Debtors that was deposited into the Reserve Account to secure the Debtors' obligations under the parties' ACH Origination Agreement (the "ACH Security Agreement").  On the same day, the Bankruptcy Court granted the relief requested and entered the *Stipulation and Order Between the Debtors and Silvergate Bank Regarding Silvergate Bank's Release of Funds from the Reserve Account* [Docket No. 577].  The requisite funds were subsequently withdrawn from the Reserve Account.  Under the stipulation with Silvergate, the remaining $150,000 held in the Reserve Account were to be released upon the later of (x) termination of the ACH Security Agreement and (y) November 17, 2024

On March 8, 2023, Silvergate announced that it was closing in light of recent industry and regulatory developments.[77]  Silvergate largely catered to crypto companies and the venture capital industry, known for its proprietary Silvergate Exchange Network, which allowed institutional investors to move dollars in and out of crypto-trading platforms in real time.  Silvergate has announced that while it will wind down operations, all deposits will be repaid.  Silvergate returned the funds in the Reserve Account to the Debtors on May 30, 2023.

### O.    The Failure of Silicon Valley Bank and Signature Bank and the U.S. Trustee's Motion to Compel

On March 10, 2023, the Federal Deposit Insurance Corporation (the "FDIC") took control of Silicon Valley Bank ("SVB") in the second largest bank failure in the history of the United States; second only to the collapse of

---

[77]    Rachel Louise Ensign, *Crypto Bank Silvergate to Shut Down, Repay Deposits*, Wall St. J. (March 8, 2023), https://www.wsj.com/articles/crypto-bank-silvergate-to-shut-down-repay-deposits-4bc2a469.

Washington Mutual during the 2008 financial crisis.[78]  SVB collapsed in approximately twenty-four hours[79] and just two weeks after SVB's external auditor, KPMG LLC, gave it a clean bill of health.  In the days leading up to SVB's failure, the Debtors were actively engaged in efforts to mitigate their cash management system's exposure to SVB as well as Signature Bank, which the FDIC seized shortly after SVB's downfall.  The Debtors were in communications with the U.S. Trustee, but like the rest of the industry, were faced with significant uncertainty in light of the collapse of banks so integral to not only the crypto industry but the U.S. banking system.

On March 13, 2023, "all deposits—both insured and uninsured—and substantially all assets of the former Silicon Valley Bank" were transferred "to a newly created, full-service FDIC-operated 'bridge bank'" called Silicon Valley Bridge Bank, N.A. (the "SVB Bridge").[80]  "All depositors of [SVB] will be made whole."[81]  The Debtors' cash and other assets now held at the SVB Bridge are thus backed by the full faith and credit of the Treasury, Federal Reserve, and FDIC.

On March 19, 2023, New York Community Bank announced that it planned to acquire a significant portion of the assets of Signature Bank.  One week later, on March 26, 2023, First Citizens BancShares ("First Citizens") announced that it planned to acquire approximately $72 billion in loans issued by SVB Bridge and all of SVB Bridge's deposits.

Following SVB's collapse, the United States Trustee for the District of New Jersey (the "U.S. Trustee") filed the *Motion of the United States Trustee to Compel the Debtors to Comply with: (i) Section 345(b) of the Bankruptcy Code; and (ii) the Final Cash Management Order* [Docket No. 173] (the "Motion to Compel").  After discussions with the U.S. Trustee, the Debtors converted approximately $230 million in money market mutual fund shares held by SVB Bridge, as the Debtors' agent, to cash.

In an effort to comply with Section 345(b) of the Bankruptcy Code, the Debtors requested a surety bond from all depositories with which they hold funds, but such efforts have met with little success—the surety bond market has dried up and the Debtors' banks expressed no desire to collateralize the full amount of the Debtors' funds with securities.  Accordingly, the Debtors determined that the safest places for their funds was in (a) an insured cash sweep program with Webster Bank or another authorized depository in an amount up to $125 million and (b) one or more money market funds that only invest in the U.S. government obligations and/or U.S. government obligations themselves in an amount up to $275 million with Webster Bank or another authorized depository.

On April 21, 2023, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Granting A Limited Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 770] (the "Limited 345 Waiver Motion"), seeking a waiver of Section 345(b) of the Bankruptcy Code so the Debtors may safeguard these funds through the cash sweep program and/or money market funds.  On April 27, 2023, the U.S. Trustee filed the *United States Trustee's Objection to Debtors' Emergency Motion for Entry of an Order (I) Granting A Limited Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 793].  On May 1, 2023, the Bankruptcy Court entered the *Order (I) Granting in Part and Denying in Part a Limited Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 810] (the "Limited 345 Waiver Order").  Pursuant to the Limited 345 Waiver Order, a limited waiver of section 345(b) was denied to the extent the Debtors received confirmation from First Citizens and/or the U.S. Trustee that First Citizens had collateralized the

---

[78]    Rachel Louise Ensign, *et al.*, *Silicon Valley Bank Closed by Regulators, FDIC Takes Control*, Wall St. J. (March 10, 2023), https://www.wsj.com/articles/svb-financial-pulls-capital-raise-explores-alternatives-including-possible-sale-sources-say-11de7522?mod=article_inline; David French, *et al.*, *SVB is largest bank failure since 2008 financial crisis*, Reuter's (Mar. 11, 2023), https://www.reuters.com/business/finance/global-markets-banks-wrapup-1-2023-03-10/.

[79]    Ensign, *supra* note 1 (noting that depositors attempted to withdraw approximately 25 percent of SVB's total deposits on Thursday, March 9, 2023).

[80]    Press Release, Federal Deposit Insurance Corp., FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California (Mar. 13, 2023) (on file with author).

[81]    *Id.*

Debtors' funds in an amount equal to 115% of such funds (the "345 Confirmation") as required under the Uniform Depository Agreement between First Citizens and the U.S. Trustee by 5:00 pm prevailing Eastern time on May 1, 2023 (the "345 Deadline"). The U.S. Trustee provided the Debtors with the 345 Confirmation prior to the 345 Deadline. Accordingly, the Debtors' funds at First Citizens are fully collateralized. The Limited 345 Waiver Order also provided that with respect to the $24 million of BlockFi International funds currently held at Bank of America and BofA Securities, the Debtors are authorized to transfer such funds to First Citizens if First Citizens confirms prior to the 345 Deadline that they will open a bank account for BlockFi International (the "Account Confirmation"). To the extent First Citizens failed to provide the Account Confirmation directly to the Debtors by the 345 Deadline, or any agreed upon extension thereof, the Debtors were granted a limited waiver of the section 345 requirements to allow such funds of BlockFi International to be deposited into one or more money market funds that only invest in U.S. government obligations or to purchase U.S. government obligations directly. First Citizens did not provide the Account Confirmation to the Debtors prior to the 345 Deadline. The BlockFi International funds have been moved to Webster Bank and are fully collateralized.

### P.    Government Seizures

On December 9, 2022, a grand jury in the Southern District of New York returned an eight-count Indictment charging SBF with conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and commit campaign finance violations. In connection with the prosecution of SBF, the U.S. Department of Justice (the "DOJ"), informed BlockFi that on January 4, 2023, the DOJ had seized the Robinhood Shares from Marex. On January 6, 2023, the DOJ filed the *United States' Notice of Asset Seizures* on the docket in these Chapter 11 Cases [Docket No. 203]. The seizure of the Robinhood Shares is the reason the Debtors' adversary proceeding against Emergent is stayed. On April 11, 2023, the Debtors and the Emergent debtors submitted a stipulation in the FTX debtors' bankruptcy cases that stayed further litigation and discovery concerning the Robinhood Shares while still permitting a reasonable exchange of information regarding the Robinhood Shares, pending the outcome of the criminal proceedings against SBF. On April 21, 2023, the Court entered an *Order Approving the Stipulation Staying Litigation and Related Discovery* entered between BlockFi and Emergent, concerning the Robinhood Shares [Docket No. 760]. On April 25, 2023, the Debtors submitted the *Application in Lieu of Motion in Support of an Entry of an Order Approving Stipulation Staying Litigation and Related Discovery*, also concerning the Robinhood Shares, relating to the Debtors' claims against Marex [Adv. Proc. Doc. No. 65]. The stipulation with Marex was approved by the Court on May 11, 2023 [Adv. Proc. Doc. No. 67]. Together, the two stipulations, along with corresponding stipulations in the FTX debtors' cases which have already been approved, will stay all proceedings related to the Robinhood Shares. The parties anticipate that the ownership issues with respect to the Robinhood Shares may be adjudicated by the U.S. District Court for the Southern District of New York. To the extent the District Court does not adjudicate the intercreditor disputes regarding the ownership of the Robinhood Shares, the Debtors position is that those issues should be decided by Judge Kaplan in the U.S. Bankruptcy Court, District of New Jersey.

In addition to the seizure of the Robinhood Shares, prior to the Petition Date in these Chapter 11 Cases, two Clients were indicted for conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. In connection with these criminal proceedings, the United States served BlockFi with four *Warrants to Seize Property Subject to Forfeiture* to recover the Digital Assets held by the charged Clients (the "Seizure Warrants"). On January 6, 2023, the DOJ sent the Debtors a letter demanding compliance with the Seizure Warrants in the form of BlockFi turning over the Digital Assets in the charged Clients' subject accounts and transferring them to wallets controlled by the United States. The Debtors called the Seizure Warrants to the Bankruptcy Court's attention at a hearing on January 9, 2023, explaining there was no need for an order from the Bankruptcy Court to permit compliance with the Seizure Warrants with respect to Digital Assets in the respective Clients' BlockFi Wallet Accounts.[82]

With respect to the BIA and Retail Client Loan Accounts, the Debtors were in the process of negotiating a stipulation with the United States when the Committee filed an adversary proceeding in the Bankruptcy Court against the Debtors and the United States (the "UCC Proceeding") seeking injunctive relief to prevent the signing of

---

[82]    Hr'g Tr. at p. 91 (Jan. 9, 2023).

the stipulation and the transfer of any additional funds to the United States in satisfaction of the Seizure Warrants. The Bankruptcy Court entered an *Order to Show Cause and For Temporary and Related Relief* (the "*Ex Parte TRO*") [Adv. Proc. Doc. No. 4] temporarily restraining the Debtors from entering into the stipulation and making any transfers to the United States.  Shortly thereafter, the United States filed a motion to compel BlockFi to comply with the Seizure Warrants in the U.S. District Court for the Western District of Washington (the "Washington District Court").  The Committee then filed a supplemental application in support of its request for injunctive relief requesting, in addition to the previous relief sought, that the United States be restrained from prosecuting the motion to compel and either withdraw the motion or adjourn all deadlines [Adv. Proc. Doc. No. 8].  The Bankruptcy Court entered an *Amended Order to Show Cause and for Temporary and Preliminary Injunctive Relief* (the "*Ex Parte Amended TRO*") [Adv. Proc. Doc No. 10] granting the relief sought by the Committee.  The United States then filed a Motion to Withdraw the Reference (the "Withdrawal Motion") seeking to have the UCC Proceeding heard by the U.S. District Court for the District of New Jersey (the "New Jersey District Court").  Briefing on the Withdrawal Motion is complete, and the parties are awaiting a decision by the New Jersey District Court. The Washington District Court has agreed to hold the motion to compel in abeyance pending the outcome of litigation or resolution of the Withdrawal Motion and UCC Proceeding.  After further negotiations, the United States, the Committee, and the Debtors entered into an *Amended Stipulation and Consent Order* [Adv. Proc. Doc. No. 21] which replaces the TRO and Amended TRO and provides, *inter alia*, that no party shall take further action on the assets or interests subject to the Seizure Warrants until the Bankruptcy Court (or New Jersey District Court, should the Withdrawal Motion be granted) rules on the UCC Proceeding.  As of the date of this Disclosure Statement, the Committee plans to file an Amended Complaint in the UCC Proceeding and the United States has indicated that they will move to dismiss and/or stay the UCC Proceeding until such time as the Withdrawal Motion is decided by the New Jersey District Court.

The Debtors also received a Seizure Warrant issued by the United States District Court for the Southern District of Texas in connection with assets held by a certain Client in BlockFi Wallet, BIA, and Retail Client Loan Accounts (the "Texas Seizure Warrant").  Unlike the Seizure Warrants from Washington, the Texas Seizure Warrant was issued postpetition.  The Debtors are continuing to discussions with the FBI regarding the appropriate measures that need to be taken to ensure the Debtors are able to comply with the Texas Seizure Warrant and federal bankruptcy law.

Q.      **The D&O Settlement**

As described above and below, the Special Committee concluded that it was the best interests of the estates to seek to negotiate settlements with certain BlockFi insiders in order to resolve potential litigation, conserve costs, and ensure that the estate could maximize distributions to creditors.  The Special Committee, through Mr. Vogel and counsel, negotiated those settlements, which will be proposed as part of a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Global Insider Settlement").  The formal agreement reflecting the Global Insider Settlement is currently being negotiated and will be filed with the Bankruptcy Court prior to the hearing on this Disclosure Statement scheduled for July 13, 2023.  The general principal terms of the Global Insider Settlement are reflected in the below chart.  The Settlement enables the parties to it (the "Settlement Parties") to participate and assist with any ongoing litigation, including prosecuting claims against 3AC, FTX, and Alameda, and defending against claims asserted by Alameda, FTX, and 3AC, the outcome of which will have a material impact on Client recoveries, as well as ongoing regulatory matters.

The Settlement also ensures that the Settlement Parties to it will aid in the distribution of Digital Assets to the Debtors' Clients.   As all parties agree, receiving Distributions in-kind rather than in cash is preferred.  Accordingly, the Debtors must maintain the capability of reopening the BlockFi Platform and making Distributions safely and securely, including the capability of building on and adjusting the BlockFi Platform, if that is needed to make Distributions.   The Settlement Parties will be intimately involved in overseeing the engineering team maintaining the BlockFi Platform and ensuring that all necessary updates are made to facilitate in-kind Distributions to Clients as quickly and safely as possible.

Furthermore, the Settlement Parties have agreed to waive or subordinate material prepetition claims against the Estates, together totaling approximately $7 million, and to make cash payment to the Estates totaling $2.25 million.  The primary terms of the proposed settlement are listed below:

| Individual | Claims Waived or Subordinated[83] | Cash Contribution | Cooperation Amount[84] |
|---|---|---|---|
| Zac Prince | $1.3 million on platform waived.<br><br>$1.8 million in other unsecured claims against estate subordinated.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $1.5 million | 200 hours |
| Flori Marquez | $109,000 on platform waived.<br><br>Actual and potential unsecured claims of ~$750,000 waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $500,000 | 200 hours |
| Amit Cheela | $200,000 on platform waived (remaining ~$92,000 retained).<br><br>Unsecured claims for unpaid wages (currently $281,000) subordinated.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 100 hours (but not more than 10 hours per week) |
| Jonathan Mayers | Unsecured claims against estate (currently $281,000) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 200 hours (but not more than 2 hours on any day, 10 hours in any week, or 20 in any month) |

---

[83]  With respect to the waiver or subordination of claims based on assets on the BlockFi Platform, this chart reflects pricing of cryptocurrency assets consistent with the disclosures in the *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 242 at 14–16], which used cryptocurrency pricing as of November 11, 2021.  Cryptocurrency prices did change in the one-week period between November 21, 2022, and the Petition Date so these numbers as far as the amounts on the platform that are waived or subordinated as part of the Global Insider Settlement are not exact.

[84]  This column reflects the agreed amounts of time the insiders have agreed to give to the estate without any further compensation beyond the terms of the Global Insider Settlement to help prosecute and defend against litigation, to assist with regulatory inquiries, and to assist in making in-kind distributions to clients, *after* the individuals are no longer employed with BlockFi and presumably have other jobs.

| Rob Loban | $43,000 on platform subordinated.[85]<br><br>All unsecured claims against estate (currently $1,060,000) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 100 hours |
|---|---|---|---|
| Tony Lauro | $125,000 on platform subordinated.<br><br>All unsecured claims against estate (currently $26,398) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $100,000 | 200 hours |
| Yuri Mushkin | All unsecured claims against estate (currently $275,000) waived.<br><br>Any indemnity claims (currently ~$100,000) subordinated except to the extent needed to access insurance policies. | N/A | 200 hours |
| Andrew Tam | $13,000 on platform waived.<br><br>All unsecured claims against estate waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $100,000 | 100 hours |
| David Spack | Waiver of all unsecured claims against estate (currently $171,875).<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $50,000 | Unlimited through date of first BIA distribution, 150 hours thereafter |

The Debtors are confident that if the Global Insider Settlement is approved and the proposed Plan confirmed, the Settlement Parties will honor their obligations to the Debtors, including their obligations to cooperate in the ongoing litigation, regulatory processes, and distribution, following confirmation of the Plan. But to ensure that they do, the settlement makes clear that releases are conditioned upon cooperation. If the Wind-Down Trustee believes that the Settlement Parties are not honoring their cooperation obligation, the Wind-Down Trustee shall provide them with written notice and an opportunity to cure the deficiency, with the possibility of seeking to void the Debtor Release if the deficiency is not cured.

---

[85]    Subordination as reflected in this chart is subordination to Account Holder Claims and General Unsecured Claims (Classes 3–4).

The Special Committee spent hundreds of hours interviewing approximately 25 witnesses, reviewing tens of thousands of documents, and performing legal analysis related to all potential claims against insiders. The Special Committee analyzed all potential claims that the Debtors might have against the Settlement Parties, whether they be in the nature of avoidance actions seeking to recover payments received by the Settlement Parties, or claims based on their duties to BlockFi. The Special Committee found no claims in the nature of theft from BlockFi or fraud against BlockFi by the Settlement Parties. And the Special Committee does not believe the pursuit of claims against the Settlement Parties would maximize the value of the estate or distributions to creditors, given the nature of the potential claims, the direct and indirect costs of pursuing such claims, and the nature of the potential recoveries even if potential claims were pursued successfully. No party has provided any analysis to the Debtors or the Special Committee suggesting that pursuit of any claims would have a material net-positive impact on the estate or on creditor recoveries, and the Debtors and Special Committee are skeptical that any such analysis would be credible.

Instead the Debtors believe the Settlement will maximize the value of the Estates where, as here, pursuing potential claims and causes of action against the Settlement Parties would be value destructive in its own right, and would clearly distract from pursuing value-maximizing claims against FTX, Alameda, and Emergent (among others), would increase costs associated with regulatory inquiries and make it far more challenging for the Debtors to respond to such inquiries, and would likely make in-kind Distributions under the Plan impossible. For these and other reasons, the Special Committee has determined in its business judgment that is in the best interests of the Estates to enter into the Global Insider Settlement.

The Debtors anticipate filing a motion seeking approval of the Settlement pursuant to Rule 9019 of the Bankruptcy Rules (the "9019 Motion") incorporating these terms prior to the hearing on this Disclosure Statement. The Debtors anticipate commencing a hearing on the 9019 Motion simultaneous with the Confirmation Hearing.

**R.      The Special Committee's Investigation and Recommendation**

**1.      *The Special Committee Investigation, Conclusions, and Proposed Settlements***

To assess whether the Estates should litigate, settle, release, or simply retain potential Causes of Action against insiders, the Debtors' Board approved the formation of the Special Committee to conduct and oversee the Investigation. The Special Committee is comprised of the Debtors' two Independent Directors, Scott Vogel and Jennifer Hill. Ms. Hill recused herself from the Investigation with regard to all pre-bankruptcy actions she was involved in while serving on the Board. Because most of the matters ultimately investigated were during her tenure on the Board, Ms. Hill recused herself from any decision-making with respect to potential insider Claims or Causes of Action. Mr. Vogel did not serve as a director of, or have any involvement with, the Debtors prior to his appointment to the Board and the Special Committee in November 2022.[86]

Mr. Vogel instructed Kirkland to interview witnesses, review documents, and provide legal analysis related to all potential Claims and/or Causes of Action against insiders. During the course of the Investigation, Kirkland regularly updated Mr. Vogel on the work it was doing, and received additional direction regarding paths to investigate. Kirkland collected and reviewed a massive amount of information from the Debtors. Kirkland also retained consulting experts to independently evaluate certain financial information and inform its legal advice to Mr. Vogel. The Investigation was comprehensive. Many issues were investigated including:

- the Debtors' business in general;

- the Debtors' risk and investment policies;

---

[86]   Mr. Vogel is the managing member of Vogel Partners LLC, and previously was a managing director at Davidson Kempner Capital Management LLC. During his 14-year tenure at Davidson Kempner, Mr. Vogel invested in a diverse set of industries. Before then, Mr. Vogel worked at MFP Investors investing in special situations and turnaround opportunities for the private investment firm of Michael F. Price and at Chase Securities. Mr. Vogel has served on many boards during his career, including Merrill Corporation, Mod Space, Key Energy, Alpha Resources, Arch Coal, PetSmart, Seadrill, Bonanza Creek Energy, Inc., Neiman Marcus Group, CBL Properties, rue21, Voyager Digital Holdings, Inc., and Avaya.

- the Debtors' investments in (and acceptance of collateral related to) the GBTC;

- the Debtors' dealings with 3AC;

- withdrawals from the BlockFi Platform (to the extent there were any) by the Debtors' insiders;

- the Debtors' dealings with FTX and Alameda generally, including the time periods before and after the FTX Transaction;

- the Debtors' compensation of employees generally, and including (but not limited to) certain payments made following execution of the FTX Transaction;[87]

- transactions with a confidential counterparty previously disclosed in detail as part of the Global Notes[88] and during a hearing before the Bankruptcy Court;[89]

- the Debtors' procurement of additional director and officer liability insurance in November 2022; and

- the Debtors' decision to sell Digital Assets in November 2022.

Kirkland reviewed approximately 60,000 documents comprising approximately 750,000 pages and conducted interviews of approximately 25 witnesses, focused on these topics but also covering a slew of other subsidiary issues (collectively, the "Investigated Issues"). Kirkland ultimately provided Mr. Vogel with a comprehensive and privileged report (the "Investigation Report"), consisting of approximately 170 pages, evaluating the merits of all potential Claims and/or Causes of Action, including related to potential breaches of fiduciary duty, fraudulent transfers, and preferences (among others), that the Debtors may have against insiders, and assessing whether the Debtors should assert, reserve, settle, or release those Claims and/or Causes of Action. The standard applied, generally speaking, was whether the potential Claims and/or Causes of Action were colorable and whether pursuit thereof would provide an overall benefit to the Estates, as opposed to reserving, resolving, or releasing such Claims or Causes of Action. *See, e.g.*, *In re G-I Holdings. Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004); *In re Crivaro*, 2017 WL 3314232, at *5 (Bankr. D.N.J. 2017). The Investigation Report also made recommendations to Mr. Vogel concerning how the Debtors should address such potential Claims and/or Causes of Action in the proposed Plan. In addition, Mr. Vogel directed Kirkland to meet with counsel for the Committee to allow counsel for the Committee to present its views of the merits and potential value of Claims and/or Causes of Action held by the Estates based on the UCC's investigation. Kirkland did so and reported that information, as well as written information provided in the form of a short PowerPoint presentation and a report the Committee claimed to address the question of "Why did BlockFi fail?," which was reviewed and considered by the Special Committee and counsel in the course of its investigation and analysis.

Based on information to date, the Special Committee's general conclusions are as follows:

1.    As an Estate fiduciary, the Special Committee should be focused on maximizing value for creditors and should make decisions that are most likely to maximize value for creditors. The Special Committee needs to analyze the reasons for releasing, prosecuting, settling, or reserving Claims and/or Causes of Action, in light of the available alternatives. The key question is what is in the best interests of the Estates *going forward*.

2.    The most important thing for the Debtors to do going forward is ensure they do everything possible to prosecute and defend Claims and Causes of Action by and against the Alameda, FTX, and Emergent

---

[87]    The Special Committee also reviewed the insiders' participation in secondary stock transactions related to BlockFi.

[88]    *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* at 23–24, *In re BlockFi Inc.*, Case No. 22-19361 [Docket No. 242].

[89]    *See* 1/9/2023 Hr'g Slides in *In re BlockFi Inc.*, Case No. 22-19361 (accessible on Kroll website), pp. 24–26.

estates (and the Core Scientific and 3AC estates) successfully,[90] and defend Claims that have been and/or will likely be filed by, among others, Alameda, 3AC, Emergent, and FTX.[91]  The success or failure of *those various pieces of Litigation*—which will likely play out over several years—is what will make a real difference to creditor recoveries.

3.    The Special Committee should not do anything that would compromise the BlockFi Estates' abilities to put their best foot forward in this Litigation.  Relative to the success or failure of that go-forward litigation, every other issue facing the Debtors—including all of the Debtors' potential affirmative Claims and Causes of Action against insiders and others—is far less significant.

4.    The second most important thing for the Debtors to do is to maintain and execute on the ability to distribute cryptocurrency to creditors.  The Committee has made clear customers' preferences to receive Distributions in kind rather than Distributions in cash, and have explained the economic rationale for that preference.  Therefore, the Debtors *must* maintain the capability internally of reopening the BlockFi Platform and making Distributions safely and securely, including the capability of building on and improving the BlockFi Platform if that is needed to make Distributions.  Any course of action that would eliminate that capability, or increase the challenges in effectuating it (by, for example, suing or threatening to sue people that are needed to effectuate in-kind cryptocurrency Distributions), is not advisable.  Suing (or maintaining the ability to sue) the Debtors' officers and employees anticipated to be involved in making in-kind Distributions to Clients as quickly as possible would likely delay Distributions to Clients and may make in-kind Distributions impossible (or too risky to justify).

5.    The potential Claims and Causes of Action *the Estates* have against the Debtors' insiders all face substantial challenges.  In considering these Claims and Causes of Action, the Special Committee analyzed: (1) the Debtors' solvency during the relevant time period; (2) the potential recovery on the Claims and Causes of Action identified (which included all potential Claims and Causes of Action identified by the Committee); (3) the risk, time, and cost of the litigation to recover on such Claims and Causes of Action; and (4) potential value destruction to the Estates that could be caused by bringing Claims and/or Causes of Action against individuals who are needed to prosecute and defend against the Litigation described above.  Through this analysis, the Special Committee identified certain Claims and Causes of Action that may be able to survive a motion to dismiss, but would face substantive hurdles in reaching a favorable judgment.  These hurdles include:  (1) establishing the Debtors' insolvency when, based on the Special Committee's analysis to date, there are substantial arguments that the Debtors were solvent during the relevant period; (2) establishing that the Debtors did not receive reasonably equivalent value where the Debtors undoubtedly received at least *some* value that is difficult to quantify with precision; and (3) establishing the withdrawals from the Debtors' platform were not done in the ordinary course of business.  Moreover, BlockFi understands from Bermuda counsel that, to the extent the plaintiff in the claim is BlockFi International, BlockFi International would either be barred by its charter from pursuing the claim at all, would be required to advance millions of dollars in attorneys' fees to the putative defendant(s) before the court would permit the case to proceed, or both.  Proceeding in the face of these legal rules would present additional challenges.

6.    The potential Claims and Causes of Action *the Estates* have against the Debtors' insiders would also be expensive to pursue, particularly in relation to the value of the potential recoveries.  Most of the potential Claims and Causes of Action would likely require a full solvency analysis and expert testimony on solvency and other issues.  Based on the Special Committee's analysis, the solvency analysis would be complex.  The pursuit of

---

[90]    By way of example, on November 28, 2022, BlockFi, Inc., BlockFi Lending, LLC, and BlockFi International, LLC initiated Adv. Pro. No. 22-01382 (MBK) against Emergent and Marex, in the Bankruptcy Court.  The goal of this case is to secure the Debtors' interests in approximately 55,273,469 Robinhood Shares currently worth approximately $550 million and approximately $20.7 million in cash.  Whether this dispute continues in a forfeiture proceeding or in a bankruptcy court, the Debtors will need to present evidence describing their lending relationship with Alameda, Alameda's obligation to provide more and more collateral in late October/early November 2022 as security for its loan obligations, its default on its loan obligations, and the facts and circumstances supporting the entry into the forbearance agreement, the Alameda Pledge Agreement, and the securing of additional collateral including the Robinhood Shares.  Emergent and various FTX-affiliated entities, among others, have indicated they will challenge the validity of the Emergent Pledge Agreement.  In addition, there is a related matter pending in Antigua and Barbuda in which an FTX customer asserted rights in the Robinhood Shares.

[91]    The Debtors anticipate material preference litigation against the FTX, Alameda, and 3AC estates, likely in the hundreds of millions, if not the billions, of dollars.

such Claims and/or Causes of Action would require the expenditure of millions of dollars—which would be spent on professionals rather than Distributions to Clients—and any net-benefit from that pursuit (if any) would not be achieved for years.  Although some of the insiders received proceeds from secondary transactions involving the Debtors' equity investors in 2021 or earlier and may have some assets to satisfy a judgment, given the risk that any litigation could result in zero recovery for the Estates (or a materially negative recovery given the costs of litigation) and the relatively limited upside to creditors even if the claims were pursued successfully, it is challenging to justify prosecution on a cost/benefit basis.

7.      Pursuing litigation against the insiders who could conceivably serve as key witnesses in future litigation would be largely inconsistent with what should be the Debtors' primary goals:  (a) ensuring that the Estates are in the best position possible to prosecute and defend Litigation against the other bankruptcy estates (FTX, Alameda, Emergent, 3AC, Core Scientific); and (b) making sure that the Estates are in a position to make Distributions of cryptocurrency to Clients through the BlockFi Platform.  The Estates will materially benefit by securing insider cooperation on both fronts going forward.  Even if some of the potential insider Claims and/or Causes of Action may be able to survive a motion to dismiss and have some value, the harm to the Debtors' overall goals likely to result from prosecuting the Claims and/or Causes of Action would still render such pursuit inadvisable.

The Special Committee's ultimate responsibility in this matter is to pursue an outcome most likely to maximize value for the Estates and, most directly, for Clients.  The Special Committee believes that settlements that resolve these Claims and Causes of Action on the terms described above will do so.  The Special Committee believes that the alternative—preservation and/or prosecution of these Claims and/or Causes of Action, which come with irrevocably alienating the very individuals that are needed to maximize value for the Estates and creditors—is value destructive and inadvisable.

The proposed Rule 9019 settlements will be presented to the Bankruptcy Court for approval at the same time as the Debtors seek Confirmation of the proposed Plan.

## XI.    RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    Risks Related to the Wind-Down.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

> **1.      *The Debtors Will Consider All Available Restructuring Alternatives if the Plan Is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.***

The Debtors will consider all restructuring alternatives available, which may include the filing of an alternative chapter 11 plan or any other transaction that would maximize the value of the Debtors' Estates.  Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, any Implementation Mechanism or any  approvals of the Bermuda Court in the Bermuda Insolvency Proceedings, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.  For example, it would also adversely affect:

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' assets.

Further, in-kind Distributions would not be advisable or possible without the retention of key employees pursuant to the Plan.  If such employees are not retained, the Plan and the Distribution process contemplated thereunder would not be feasible.

## 2. *Certain Bankruptcy Law Considerations.*

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### (a) Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (b) The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent and, if required, these may include the completion of any Implementation Mechanism(s) in Bermuda or in jurisdictions outside the United States.  If such conditions precedent are not met or not waived, the Effective Date will not take place.

### (c) Failure to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### (d) The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that:  (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is

contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to restructure and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a Distribution of property with a lesser value than currently provided in the Plan or no Distribution whatsoever under the Plan.

(e)    **Nonconsensual Confirmation.**

In the event that any impaired class does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

(f)    **Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses, further industry deterioration or other changes in economic conditions, and changes in Digital Asset regulations and laws.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

(g)    **Filing of a Competing Plan.**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan through May 15, 2023.  Because the Debtors have filed the Plan contemporaneously with this Disclosure Statement, the Debtors have avoided the risks associated with competing plans being filed by third parties and now have the exclusive right to solicit votes on the Plan through August 11, 2023.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan because creditors and others may propose a competing plan.

(h)    **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under Chapter 7 of the

Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would generally result in smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.  In addition, a Chapter 7 case would also likely lead to distributions to Clients being made in cash, except those made pursuant to the Wallet Program.

(i)       **One or More of the Chapter 11 Cases May be Dismissed.**

If the Bankruptcy Court finds that a debtor has incurred substantial or continuing loss or diminution to its estate and lacks a reasonable likelihood of rehabilitation or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of these Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor, which may ultimately result in significantly lower recoveries for creditors than those provided for in the Plan.

(j)       **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

(k)       **Risk that an Implementation Mechanism May be Required and May Not Be Approved.**

To implement the Restructuring Transactions the Bermuda Provisional Liquidators may determine that one or more Implementation Mechanisms is required or would be beneficial to the implementation of the Restructuring Transactions.  While the Debtors and the Bermuda Provisional Liquidators are confident that, if it is determined that any such Implementation Mechanism should be pursued, they will determine and pursue the best available path with respect to any such Implementation Mechanism (if required), there is a risk associated with implementation which may impact the Restructuring Transactions.  Such risks include, without limitation, if a Bermuda Scheme of Arrangement is proposed by the Bermuda Debtor, the Bermuda Court may not sanction such Bermuda Scheme of Arrangement

(l)       **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

(m)       **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and/or recharacterized as equity contributions.  The occurrence of any and all such contingencies could affect Distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or

more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(n)  **Litigation Over Plan Treatment of FTX Facility Claims, FTX Avoidable Transfer Claims, Alameda Claims, Government Penalty Claims, and 3AC Claims.**

As described in Article V.J of this Disclosure Statement, the Debtors believe that the FTX Facility Claims should be recharacterized as equity contributions; however, if the Bankruptcy Court finds otherwise, the FTX Facility Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims pursuant to section 510(c) of the Bankruptcy Code. The Debtors believe that the FTX Avoidable Transfer Claims, the Alameda Claims, and the 3AC Claims should be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims pursuant to section 510(c) of the Bankruptcy Code and the Government Penalty Claims should be subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code. Litigation related to the Debtors' proposed treatment of the FTX Facility Claims, the FTX Avoidable Transfer Claims, the Government Penalty Claims, and the 3AC Claims could cause the Debtors to incur significant professional fees, which will reduce recoveries to Holders of Allowed Claims under the Plan.

(o)  **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

(p)  **Risk that the Bermuda Court Will Not Grant Recognition of One or More Bermuda Orders.**

BlockFi International intends to seek one or more Bermuda Orders, in the appropriate form in Bermuda. There is a risk that the Bermuda Court will not grant such approval(s), which may affect BlockFi International's ability to effectuate certain relief granted pursuant to the Confirmation Order.

(q)  **Risk that the Bermuda Monetary Authority Will Not Provide Any Necessary Approvals or Non-Objections to the Plan**

The Bermuda Monetary Authority is the regulator of BlockFi International pursuant to the Digital Assets Business License, and in that capacity, has issued a series of directions letters culminating in the current version dated December 15, 2022 (the "BMA Directions Letter"). Pursuant to the Digital Assets Business Act 2018 and the BMA Directions Letter, the consent and/or non-objection of the Bermuda Monetary Authority to the consummation of the "Restructuring Transactions" and the "Licensing Wind Down Process" (as defined in the BMA Directions Letter) may be required. There is a risk that the Bermuda Monetary Authority may not provide such approvals or non-objections, or may impose conditions in respect of any such approvals or non-objections, which may affect the ability of BlockFi International to participate in the consummation of the Restructuring Transactions and the Licensing Wind Down Process.

(r)  **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest where such Claim or

Interest is subject to an objection cannot rely on the estimates in this Disclosure Statement. As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

> **3.      *Even if the Restructuring Transactions Are Implemented, the Debtors Will Continue to Face Risks.***

Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, bank instability, changes in the Debtors' industry, changes in Digital Asset prices, changes in the Digital Asset regulatory environment, and changes in the Debtors' Client base. As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

> **4.      *Governmental Approvals May Not Be Granted.***

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units. Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

**B.      Risks Related to Recoveries under the Plan.**

> **1.      *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries***

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual Distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

> **2.      *The Debtors Are Subject to the Volatility of Digital Assets.***

The volatility of Digital Assets may adversely affect the fair market value of the Debtors' Digital Assets, which could result in lower recoveries for creditors than the Debtors' current estimates based on the fair market value as of the Petition Date.

> **3.      *The Tax Implications of the Debtors' Bankruptcy Are Highly Complex.***

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

> **4.      *The Orderly Wind Down May Take Longer and Cost More Than Estimated, Which
> May              Decrease Recoveries.***

The Wind Down presents risks for all stakeholders. The Wind Down is estimated to take approximately two years to be completed. However, this is merely an estimate and it is possible that it could take longer. In the event the Wind Down takes longer to be completed, the associated costs, such as professional fees, will also be higher than estimated. Accordingly, estimated recoveries pursuant to the Wind Down could also be lower than estimated.

> **5.      *The Value of Litigation Proceeds that the Wind-Down Trustee May Secure Is
> Uncertain,        Which May Impact the Value that Can Be Distributed to Holders of Claims Entitled to
> Receive Litigation Proceeds.***

The Plan provides that the Wind-Down Debtors may prosecute and settle any Vested Causes of Action. There can be no guarantee as to the success of the prosecution of any of the Vested Causes of Action or the value of any litigation proceeds that may be distributed to Holders of Claims.

6. *The Debtors' Substantial Ongoing Liquidity Needs May Impact Recoveries.*

Although the Debtors' core operations have been paused as of the Platform Pause, the Debtors have nonetheless had to maintain significant business operations to comply with the demands of these Chapter 11 Cases. Accordingly, depending on how long the Chapter 11 Cases go, the recoveries that Holders of Claims are estimated to receive will be impacted by the Debtors' ongoing liquidity requirements.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the Cash necessary to fund the ongoing operations necessary to comply with the demands of these Chapter 11 Cases, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of these Chapter 11 Cases. The Debtors cannot guarantee that Cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate Cash on hand; (b) their ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of these Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

C. **Risks Related to the Debtors' Businesses.**[92]

1. *The Debtors Are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and Regulations Could Adversely Affect Their Brand, Reputation, Business, Assets, and Financial Condition.*

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another.

Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and

---

[92]    For the avoidance of doubt, as used in this section, the term Debtors shall refer to both the Debtors prior to the Effective Date and the Wind-Down Debtors after the Effective Date.

regulators may disagree with their conclusions.  To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses, limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, and financial condition.  Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities.  The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, BlockFi currently maintains Money Transmission Licenses in seven (7) states and BlockFi International maintains a Digital Assets License in Bermuda.  The Debtors have engaged with the state banking departments and BlockFi International has engaged with the Bermuda Monetary Authority throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Plan provides for compliance by BlockFi with state money transmission and Bermuda laws.  The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' or the Bermuda Monetary Authority's determinations.  There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to Confirmation of the Plan.

Following Confirmation of the Plan, BlockFi will continue to take steps pursuant to the Licensing Wind-Down Process.  Such Licensing Wind-Down Process will require notice to, and in some cases approval by, the Bermuda Monetary Authority, in the case of BlockFi International and by those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments or applicable laws.

### 2. *The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations.*

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors.  For example, on the Petition Date, the Debtors filed an adversary proceeding against Emergent Fidelity Technologies Ltd., the investment company of FTX's former founder and chief executive officer SBF, over the Robinhood Shares.  In the future, the Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to BlockFi's historical compliance with State money transmission and lending laws, which could result in significant fines.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial health.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Debtors' businesses and financial stability, however, could be material.

On February 14, 2022, BlockFi entered into resolutions with the SEC and various State regulators in which it agreed to pay an aggregate amount up to $100 million to settle charges that BIAs constituted unregistered securities as well as violating the registration provisions of the Investment Company Act of 1940.  Since that resolution, BlockFi has periodically responded to requests for information from the SEC and State regulators on various matters related to the resolution.  As before, BlockFi continues to cooperate with the SEC and State regulators' requests.

On November 18, 2022, BlockFi received a subpoena from the Commodity Futures Trading Commission (the "CFTC") seeking information and documents from BlockFi regarding, among other things, its transactions with FTX and its communications with certain FTX officers and employees.  BlockFi is cooperating with the CFTC and working to provide information that is responsive to its requests.

On November 29, 2022, BlockFi received a Cease and Desist Order from the North Carolina Office of the Commissioner of Banks in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in North Carolina.  BlockFi has complied with the requirements of the order and has not engaged in money transmission activity within the state of North Carolina.

On November 21, 2022, BlockFi received a voluntary request from the United States Attorney's Office for the Southern District of New York ("SDNY") seeking information and documents from BlockFi regarding, among other things, its transactions with FTX and its communications with certain FTX officers and employees.  BlockFi is cooperating with the SDNY and working to provide information that is responsive to its requests.

On November 22, 2022, BlockFi entered into a Consent Order with the Texas Department of Banking in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Texas.  BlockFi has complied with the Consent Order, including by surrendering its Money Transmission License in Texas.

On November 25, 2022, Alaska's Department of Commerce, Community, and Economic Development, Division of Banking and Securities issued a Cease and Desist Suspension Order to BlockFi.  The order was issued in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Alaska.  BlockFi has complied with the requirements of the order and has not engaged in money transmission activity within the state of Alaska.

On December 6, 2022, Georgia's Department of Banking and Finance issued an Order to Cease and Desist to BlockFi in connection with the cancellation of its surety bond.  BlockFi is complying with the requirements of the order.

On December 14, 2022, BlockFi received a subpoena from the SEC seeking information and documents from BlockFi regarding, among other things, its transactions with FTX and its communications with certain FTX officers and employees.  BlockFi is cooperating with the SEC and working to provide information that is responsive to its requests.

On December 16, 2022, the State of Washington Department of Financial Institutions issued final Orders to Cease and Desist against BlockFi in connection with the Platform Pause, cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Washington, and BlockFi's lending programs.  BlockFi is complying with the requirements of the orders.

On January 10, 2023, BlockFi received a subpoena from the CFTC seeking information and documents from BlockFi relating, among other things, to BlockFi's lending programs and the disposition and accounting of customer assets.  BlockFi is cooperating with the CFTC and working to provide information that is responsive to its requests.

On February 13, 2023 and February 17, 2023, BlockFi received subpoenas from the Alabama Securities Commission and the California Department of Financial Protection and Innovation, respectively.  These subpoenas seek information and documents from BlockFi regarding, among other things, BlockFi's lending programs and the disposition and accounting of customer assets.  BlockFi is cooperating with the relevant agencies and working to provide information that is responsive to their requests.

On February 14, 2023, BlockFi received a Notice of Automatic Suspension, Intent to Revoke Money Transmission License, Intent to Issue Order to Cease and Desist, Intent to Impose Civil Penalty, and Right to Hearing from the Connecticut Department of Banking ("CDB") in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Connecticut.  BlockFi is cooperating with the CDB and seeking to resolve the allegations and claims in the Notice.

On March 21, 2023, the Florida Office of Financial Regulation ("FLOFR") issued an Emergency Suspension Order and Administrative Complaint in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Florida.  BlockFi has not objected to revocation of its money transmitter license in Florida.

On March 27, 2023, BlockFi entered into a Stipulated Interim Suspension, Final Order to Discontinue Unsafe or Injurious Practices, and Final Desist and Refrain Order with the California Department of Financial Protection and Innovation in connection with BlockFi's lending programs.  BlockFi is complying with the requirements of the stipulated suspension and order.

   **3.      *The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Plan and Effectuate Distributions.***

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Plan and provide Distributions to the creditors.

   **4.      *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition.***

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances.  Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Debtors and may have an adverse effect on the Debtors' financial condition.

   **D.      Miscellaneous Risk Factors and Disclaimers.**

   **1.      *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.***

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

   **2.      *No Legal or Tax Advice Is Provided By This Disclosure Statement.***

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

   **3.      *No Admissions Made.***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

   **4.      *Failure to Identify Litigation Claims or Projected Objections.***

No reliance should be placed on the fact that a particular litigation claim, or projected objection to a particular Claim, is or is not identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5.      *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6.      *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.      *No Representations Outside This Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF NEW JERSEY.**

**XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

A.      **Introduction.**

The following discussion is an overview of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan. This overview is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan and to Digital Assets in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is or will be binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors, Wind-Down Debtors, or Holders take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS**

**DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). Furthermore, this overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders entitled to vote to accept or reject the Plan described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in. This overview does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of Digital Assets that persons transferred to the Debtors in connection with the BIA, the Retail Loan Program, and the Institutional Loan Program when persons transferred Digital Assets to the Debtors in connection therewith. The Debtors believe this position is correct based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in such deposited Digital Assets. If the Debtors were determined to not have taken tax ownership of such

Digital Assets at such time, the consequences of the Plan to Holders entitled to vote to accept or reject the Plan and the Debtors generally would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING OVERVIEW OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

**B.        Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The Plan is being structured as a Wind Down of the Debtors' operations and a series of Distributions by the Debtors (and Wind-Down Debtors, as applicable) to Holders in respect of their Claims.

In connection with the Plan, the Debtors (or Wind-Down Debtors, as applicable) may, among other things, (x) distribute Digital Assets (including newly purchased Digital Assets) "in kind" to certain Account Holders, (y) sell certain assets to third parties or otherwise monetize assets, and (z) distribute Cash and otherwise distribute Digital Assets (in a non-"in-kind" fashion, i.e., by distributing Digital Assets to a Holder other than Digital Assets that such Holder had in its Account on the Petition Date). As a result of any sale of assets, the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. The Distributions referenced above will, from the Debtors' perspective, result in the recognition of income equal to the difference between the value of what Holders receive in exchange for their Claims (including any in-kind Distribution) and the amount of their Claims (determined without regard to "dollarization" of such Claims). Income will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation.

Thus, the U.S. federal income tax consequences of the Plan to the Debtors will in large part be a function of (a) the Debtors' tax basis in their assets that the Debtors transfer, (b) the difference between the value of what the Holders receive in exchange for their Claims and the amount of their Claims, and (c) the Debtors' ability to demonstrate the existence of tax losses, including losses that may be generated as a result of the implementation of the Restructuring Transactions and historically incurred losses. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of Digital Assets to a business like that of the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such Digital Assets) or the transferee's utilization of the transferred Digital Assets (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of the Plan to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Plan, potentially in a way that has a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Because the Plan is being structured as a liquidation, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, are not discussed further.

The Debtors continue to evaluate how "dollarization" of certain Claims as of the Petition Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.

The Debtors continue to analyze whether there will be any material administrative income tax liabilities that must be satisfied under the Plan.

C.      **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[93] of Allowed Claims Entitled to Vote.[94]**

Before discussing the consequences to any particular Class of Claims entitled to vote, we discuss certain U.S. federal income tax considerations that are relevant to any U.S. Holder of such a Claim which U.S. Holder will or may receive an in-kind Distribution of Digital Assets pursuant to the Plan (either up-front or as a delayed Distribution) which Digital Assets (x) the Debtors took U.S. federal income tax ownership of upon such U.S. Holder's transfer of such Digital Assets to the Debtors, and (y) is the same as the type of Digital Assets in such U.S. Holder's Account as of the Petition Date.

The tax treatment of such U.S. Holders under the Plan depends significantly on the tax treatment of their transfer of Digital Assets to the Debtors in the first instance. There is uncertainty with respect to whether deposits in which tax ownership of the Digital Assets transferred to the Debtors were taxable when they occurred, but the Debtors generally expect that most customers have taken the position that the act of depositing Digital Assets with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of Digital Assets for a contractual right to the return of such Digital Assets is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on case law that predates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058 of the IRC. On the other hand, with respect to customers, there is also support for the position that the initial deposit of Digital Assets is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited Digital Assets (in particular, provisions related to the Debtors' ability to not support "airdropped" Digital Assets or Digital Assets issued pursuant to a "hard fork").

To the extent an initial deposit of Digital Assets was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of the same kind of Digital Asset to customers, because the exchange of the contractual right to the return of such Digital Asset for the underlying Digital Asset is itself not an exchange of property "differing materially either in kind or in extent." The Debtors emphasize that, like other aspects of Digital Asset taxation, this position is subject to significant uncertainty, including because of the existence of proposed Treasury Regulation section 1.1058-1(e)(2), which causes a securities lending transaction to become taxable where a borrower fails to return to the lender securities identical to the securities transferred, or otherwise defaults under the agreement. While this proposed Treasury Regulation is inapplicable by its terms to Digital Assets, it would very likely cause such a transaction to be taxable to a customer (or other person that transferred Digital Assets to the Debtors in a transaction (such as a "loan" (for commercial purposes but not tax purposes) of Digital Assets) intended to be treated as non-taxable in the first instance) if it applied to Digital Assets. Furthermore, with respect to a U.S. Holder that receives Digital Assets and non-Digital Assets in satisfaction of its Claim, if the foregoing argument would apply in the first place to a recovery that comprised solely Digital Assets, such argument would need to be supplemented by a general "bifurcation" approach that permitted U.S. Holders to take the position that such U.S. Holders retained their Digital Asset positions in a tax-free manner, even if the receipt of other consideration constituted a taxable exchange. The Debtors emphasize that these positions are unclear.

The ability to take the position that an in-kind Distribution of Digital Assets is not taxable to U.S. Holders is subject to increased risk as a result of the "dollarization" of Claims. It may be the case that "dollarization" resulted, or will result, in a taxable event to U.S. Holders, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular Digital Assets was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the argument described above that supports tax-free treatment of an in-kind Distribution could still

---

[93]   The Debtors will discuss certain U.S. federal income tax consequences of the Consummation of the Plan to Non-U.S. Holders in a supplement hereto to the extent the Debtors determine such a supplement is necessary or appropriate based on the Debtors' understanding of the residence of Holders.

[94]   No Class of Interests is entitled to vote.

apply.  Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying Digital Assets.  However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to underlying entitlements to cause tax events, either because of dollarization in the first instance or to the extent of an in-kind Distribution.

The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of Digital Assets from the Debtors, "dollarization," and the Consummation of the Plan is subject to extreme uncertainty.  Although there are instructive analogous authorities, there is effectively no "controlling" authority on any of these issues.  Accordingly, there is a material risk that the positions described throughout this discussion may not be sustained.  The concept of a non-taxable in-kind Distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in kind to a U.S. Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the U.S. Holder deposited property with the Debtors.  Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a U.S. Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the U.S. Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the U.S. Holder deposited property with the Debtors (and thus tax-free in-kind treatment would likely be unavailable).

1.    *BlockFi Lending LLC Private Client Account Claims (Class 3-a).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Lending LLC Private Client Account Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of (A) the Digital Assets Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made within six (6) months after the Effective Date), or (B) the Cash Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made later than six (6) months after the Effective Date), and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC Private Client Account Claim.

To the extent any Digital Asset distributed to a U.S. Holder of an Allowed BlockFi Lending LLC Private Client Account Claim is the same as the type of Digital Asset in such U.S. Holder's Account as of the Petition Date, then such return may be treated as a tax-free in-kind Distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the discussion set forth above.

In the case where such tax-free treatment did not apply with respect to such Digital Asset Distribution, and for any consideration that a U.S. Holder of an Allowed BlockFi Lending LLC Private Client Account Claim receives in satisfaction of its Claim that is not the same as the type of Digital Asset in such U.S. Holder's Account as of the Petition Date, the exchange will be taxable to the U.S. Holder.  In such case, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of such consideration received under the Plan and such U.S. Holder's adjusted tax basis in the Claim (this assumes that all of the consideration is received in a taxable fashion; see immediately below for a discussion of a bifurcated approach).  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such U.S. Holder's tax basis in such consideration should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

Where a U.S. Holder receives some consideration tax-free and other consideration that is taxable (*e.g.*, some but not all of the consideration that a U.S. Holder of an Allowed BlockFi Lending LLC Private Client Account Claim receives in satisfaction of its Claim is the same as the type of Digital Asset in such U.S. Holder's Account as of the Petition Date), such U.S. Holder would recognize gain or loss in an amount equal to the difference between (x) the fair market value of such consideration received under the Plan in a taxable fashion, and (y) while subject to uncertainty, a proportionate portion of the tax basis in such Claim (possibly based on relative fair market values of

the consideration received in a tax-free fashion and the consideration received in a taxable fashion, although other potential ways of calculating gain or loss may exist). The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such U.S. Holder's tax basis in any consideration received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in any such consideration should begin on the day after the Effective Date.

For a very simplified numerical example of the abovementioned methodology (which, for the avoidance of doubt, may be one among others) for determining gain or loss where a U.S. Holder receives some consideration tax-free and other consideration that is taxable, assume the following: (a) such U.S. Holder has an adjusted tax basis in its Claim of $1,000; (b) such Claim corresponds entirely to BTC that such U.S. Holder previously deposited with the Debtors; and (c) such Holder receives, in satisfaction of its Claim, BTC worth $3,000 and ETH worth $2,000. Pursuant to the above methodology, the U.S. Holder would have gain equal to the difference between (x) $2,000 (the fair market value of the ETH), and (y) $2,000 / ($3,000 + $2,000) x $1,000, i.e., $1,600 of gain.

It is generally expected that a Class 3-a Holder should not be taxed on Distributions received after the Effective Date until such Distributions are received (if at all).

**2.**     ***BlockFi Lending LLC Loan Collateral Claims (Class 3-b).***

Pursuant to the Plan, each Holder of an Allowed BlockFi Lending LLC Loan Collateral Claim shall, in full and final satisfaction of such Claim, receive the Set Off Treatment, under which (i) such Claim will first be set off or recouped against such Holder's Loan Account Obligations outstanding on the Petition Date, and (ii) such Holder will receive, on account of any amount of such Claim remaining after such set off, (A) its Pro Rata share of (x) the Digital Assets Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made within six (6) months of the Effective Date) or (y) the Cash Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made later than six (6) months after the Effective Date), as further specified in the Plan.

The set off of a U.S. Holder's Allowed BlockFi Lending LLC Loan Collateral Claim against such U.S. Holder's Loan Account Obligations should be a taxable transaction to the U.S. Holder.

One possible treatment of such set off is as a disposition of the applicable portion of the Loan Collateral by the Debtors on behalf of the U.S. Holder and the application of the resultant proceeds to such U.S. Holder's Loan Account Obligations. Under such treatment, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the applicable portion of its Loan Account Obligations and its adjusted tax basis in the applicable portion of the Loan Collateral. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Loan Collateral constituted a capital asset in the hands of the U.S. Holder, and, potentially, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Under this treatment, there is some amount of uncertainty with respect to how a U.S. Holder with differing amounts of tax basis in its Loan Collateral would calculate taxable income or loss, because it is unclear what portion of the U.S. Holder's Loan Collateral would be treated as having been sold by the Debtors on the U.S. Holder's behalf. One possibility is that a "blended" approach would be applied. Another is that a U.S. Holder could specifically identify lots of its Loan Collateral that are treated as having been sold.

Another possible tax treatment is that the set off be treated as a taxable disposition of the applicable portion of such U.S. Holder's Allowed BlockFi Lending LLC Loan Collateral Claim in satisfaction of the U.S. Holder's Loan Account Obligations. If such treatment applied, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the applicable portion of its Loan Account Obligations and its adjusted tax basis in the applicable portion of its Allowed BlockFi Lending LLC Loan Collateral Claim. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the

tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

The treatment of each U.S. Holder's remaining amount of an Allowed BlockFi Lending LLC Loan Collateral Claim after set off of such U.S. Holder's Loan Account Obligations will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Private Client Account Claims.

### 3.      *BlockFi International Ltd. Private Client and Interest Account Claims (Class 3-c).*

Pursuant to the Plan, each Holder of an Allowed BlockFi International Ltd. Private Client and Interest Account Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of (A) the Digital Assets Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made within six (6) months after the Effective Date), or (B) the Cash Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made later than six (6) months after the Effective Date), and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. Private Client and Interest Account Claim.

The treatment to each U.S. Holder of an Allowed BlockFi International Ltd. Private Client and Interest Account Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Private Client Account Claims.[95]

### 4.      *BlockFi International Ltd. Loan Collateral Claims (Class 3-d).*

Pursuant to the Plan, each Holder of an Allowed BlockFi International Ltd. Loan Collateral Claim shall, in full and final satisfaction of such Claim, receive the Set Off Treatment, under which (i) such Claim will first be set off or recouped against such Holder's Loan Account Obligations outstanding on the Petition Date, and (ii) such Holder will receive, on account of any amount of such Claim remaining after such set off, (A) its Pro Rata share of (x) the Digital Assets Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made within six (6) months of the Effective Date) or (y) the Cash Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made later than six (6) months after the Effective Date), as further specified in the Plan.

The treatment to each U.S. Holder of an Allowed BlockFi International Ltd. Loan Collateral Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Loan Collateral Claims.

### 5.      *BlockFi Inc. Interest Account Claims (Class 3-e).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Inc. Interest Account Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of (A) the Digital Assets Allocation for Holders of Claims at BlockFi Inc. (for any Distributions made within six (6) months after the Effective Date), or (B) the Cash Allocation for Holders of Claims at BlockFi Inc. (for any Distributions made later than six (6) months after the Effective Date), and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. Interest Account Claim.

The treatment to each U.S. Holder of an Allowed BlockFi Inc. Interest Account Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Private Client Account Claim.

### 6.      *BlockFi Lending LLC General Unsecured Claims (Class 4-a).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Lending LLC General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims

---

[95] BlockFi International Ltd. is treated as a disregarded entity of BlockFi Inc. for U.S. federal income tax purposes.

at BlockFi Lending LLC, and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC General Unsecured Claim.

The exchange will be taxable to the U.S. Holder.  The U.S. Holder will recognize gain or loss in an amount equal to the difference between the amount of such cash received under the Plan and such U.S. Holder's adjusted tax basis in the Claim.  The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

### 7.     *BlockFi International Ltd. General Unsecured Claims (Class 4-b).*

Pursuant to the Plan, each Holder of an Allowed BlockFi International Ltd. General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims at BlockFi International Ltd., and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. General Unsecured Claim.

The treatment to each U.S. Holder of an Allowed BlockFi International Ltd. General Unsecured Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC General Unsecured Claims.

### 8.     *BlockFi Inc. General Unsecured Claims (Class 4-c).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Inc. General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims at BlockFi Inc., and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. General Unsecured Claim.

The treatment to each U.S. Holder of an Allowed BlockFi Inc. General Unsecured Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC General Unsecured Claims.

### 9.     *BlockFi Services, Inc. General Unsecured Claims (Class 4-d).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Services, Inc. General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims at BlockFi Services, Inc., and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Services, Inc. until payment in full of such Allowed BlockFi Services, Inc. General Unsecured Claim.

The treatment to each U.S. Holder of an Allowed BlockFi Services, Inc. General Unsecured Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC General Unsecured Claims.

### 10.     *Net Investment Income Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 11.     *Limitations on Losses.*

U.S. Holders who recognize capital losses as a result of the Distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for

married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

D.     **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Digital Assets Received Under the Plan.**

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Digital Assets received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets.  U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

E.     **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the Consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder.

1.     *Gain Recognition.*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).  If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Net Investment Income Tax would generally not apply).   In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  ***The taxation of Digital Assets is extremely uncertain, and each Non-U.S. Holder should consult its own tax advisor regarding the possibility of being deemed to be engaged in a trade or business in the United States as a result of its Digital Asset-related activities (including activities on exchanges such as the Debtors').***

2.     *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Digital Assets Received Under the Plan.*

The U.S. federal income tax consequences to a Non-U.S. Holder of owning and disposing of Digital Assets received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets.  Non-U.S.

Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

### 3.    *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### F.    **Information Reporting and Back-Up Withholding.**

The Debtors, the Wind-Down Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with Distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to Distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to Distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).

Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

---

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND UNCERTAIN. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN**

**APPLICABLE TAX LAWS. THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

* * * * *

## XIII.   RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger Distribution to Holders of Allowed Claims than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller Distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims vote to accept the Plan.

BlockFi Inc. on behalf of itself and each
of the other Debtors

By:    */s/ Mark A. Renzi*

Name:    Mark A. Renzi
Title:    Chief Restructuring Officer

Prepared By:

Dated:  June 28, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Chapter 11 Plan**

[Filed separately]

**Exhibit B**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR BLOCKFI INC., *et al.*[1]

## I.   INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either:  (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their financial advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' Estates.  As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation. Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  This Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS.  THE ACTUAL LIQUIDATION VALUE

---

[1]   Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the disclosure statement to which this exhibit is attached (the "Disclosure Statement") or the *Second Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as supplemented or amended from time to time, the "Plan"), as applicable.

OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS.  WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE.  THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.  NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about September 30, 2023 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of May 31, 2023, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date.  Certain balances, including Cash, Digital Assets, and expenses have been projected forward or estimated as of the Conversion Date.  As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements.  In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in these Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any Distributions to be made on account of Allowed Claims and Interests under the Plan.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' Estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.  There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

**Deconsolidated Liquidations**

This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition.  The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1.  Unaudited Financial Statements.  This Liquidation Analysis contains numerous estimates.  Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2.  Chapter 7 Liquidation Costs.  The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 27 months, in order to pursue sales of substantially all remaining assets, collect receivables, pursue claims against other companies in bankruptcy including 3AC, FTX, Alameda, Emergent and Core Scientific, pursue the return of preference payments, make Distributions, and otherwise administer and close the Estates.  In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries.  Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3.  Distribution of Net Proceeds.  Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any Distribution to chapter 11 Administrative Claims or Other Priority Claims.  The estimate used in this Liquidation Analysis for these expenses included estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee.  Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority:  (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

    Under the absolute priority rule, no junior creditor at a given entity would receive any Distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any Distribution until all creditors at such entity are paid in full.  The assumed Distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4.  Certain Exclusions and Assumptions.  This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis.  Such tax consequences may be material.

II.    **CONCLUSIONS**

> THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

**SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS**

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan (Low) | Estimated Percentage Recovery Under the Plan (High) | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| Unclassified | Administrative and Priority Tax Claims | Unimpaired | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims[2] | Unimpaired | 100.0% | 100.0% | 100.0% | 100.0% |
| 2 | Other Priority Claims[3] | Unimpaired | 100.0% | 100.0% | 100.0% | 100.0% |
| 3-a | BlockFi Lending LLC Private Client Account Claims | Impaired | 86.0% | 100.0% | 76.8% | 100.0% |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Impaired | 86.0% | 100.0% | 76.8% | 100.0% |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired | 52.7% | 100.0% | 48.1% | 89.9% |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | Impaired | 52.7% | 100.0% | 48.1% | 89.9% |
| 3-e | BlockFi Inc. Interest Account Claims | Impaired | 39.7% | 100.0% | 36.7% | 59.2% |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired | 86.0% | 100.0% | 76.8% | 100.0% |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Impaired | 52.7% | 100.0% | 48.1% | 89.9% |
| 4-c | BlockFi Inc. General Unsecured Claims | Impaired | 39.7% | 100.0% | 36.7% | 59.2% |

[2]    The Claims presented herein reflect scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket No. 856–858].  Although no Secured Tax Claims have been contemplated, in the event that filed Secured Tax Claims are deemed valid and subsequently included in the Claims population, they will receive a full recovery.

[3]    The Claims presented herein reflect scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket No. 856–858].  Although no Other Priority Claims have been contemplated, in the event that filed Other Priority Claims are deemed valid and subsequently included in the Claims population, they will receive a full recovery.

| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
|---|---|---|---|---|---|---|
| 4-e | BlockFi Trading LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | Unimpaired | 100.0% | 100.0% | 100.0% | 100.0% |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | Impaired | 0.0% | 1.5% | 0.0% | 0.0% |
| 6 | FTX Avoidable Transfer Claims | Impaired | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | Impaired | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | Impaired | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | Impaired | 0.0% | 100.0% | 0% | 100.0% |
| 10 | *De Minimis* Claims | Impaired | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | Unimpaired/ Impaired | 48.6% | 100.0% | 44.5% | 80.1% |
| 12 | Intercompany Interests | Unimpaired / Impaired | 0.5% | 55.4% | 0.5% | 7.2% |
| 13 | Existing Preferred Equity Interests | Impaired | 0.0% | 1.5% | 0.0% | 0.0% |
| 14 | Existing Common Equity Interests | Impaired | 0.0% | 0.0% | 0.0% | 0.0% |
| 15 | SEC Penalty Claims | Impaired | 0.0% | 100.0% | 0.0% | 0.0% |

## III.   NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### A.   *Gross Liquidation Proceeds*

1. <u>Cash</u>:  This Liquidation Analysis projects the level of cash balances on hand as of May 31, 2023 and represents the Debtors' best estimate of balances on hand at the Conversion Date.  Balances are assumed to be recoverable at 100%.

2. <u>Restricted Cash</u>:  This Liquidation Analysis projects the level of restricted cash balances on hand as of May 31,

2023 and represents the Debtors' best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%.

3. <u>Stablecoin Held</u>:[4] Estimated Stablecoin values at the Conversion Date are based on pricing as of May 31, 2023 and assume a 1:1 peg to U.S. Dollar. This Liquidation Analysis projects the level of Stablecoin balances on hand as of May 31, 2023 and represents the Debtors' best estimate of balances on hand at the Conversion Date. Balances are assumed to be recoverable at 100%.

4. <u>Digital Assets Held</u>:[4] Estimated Digital Asset values at the Conversion Date are based on pricing as of May 31, 2023 and are discounted using historical average intra-day trading prices and the respective Digital Asset's implied volatility as calculated in other comparable company analyses. Certain illiquid Digital Assets are liquidated at a discount to account for market depth and trading dynamics.

5. <u>Digital Assets Staked</u>: The Debtors have certain Digital Assets which are staked. These Digital Assets are comprised primarily of staked ETH, but also include other Digital Assets, none of which are presently liquid. Estimated Digital Asset values at the Conversion Date are based on pricing as of May 31, 2023 and are discounted using historical average intra-day trading prices and the respective Digital Asset's implied volatility as calculated in other comparable company analyses.

6. <u>Collateral Receivable</u>: The Debtors' assets include Digital Assets held with a counterparty as part of an institutional borrowing agreement. It is anticipated that outstanding loan balances will be fully setoff. Collateral balances are assumed to be recoverable at 0% - 100% post-setoff.

7. <u>Emergent & Alameda Collateral</u>:[5,6,7,8,9] The Debtors believe they have perfected liens for collateral which was pledged pursuant to the Alameda Pledge Agreement and the Emergent Pledge Agreement. The Emergent Pledge Agreement is secured by Emergent's Robinhood Shares and USD. The Alameda Pledge Agreement is secured by Alameda's rights, titles, and interests in, among other things, Alameda's shares of Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum Trust (ETHE) and shares of the Bitwise 10 Crypto Index Fund (BITW). Pursuing this collateral will be difficult and will require significant institutional knowledge and expertise. In a liquidation, the Debtors do not believe that a trustee would be successful in recovering this collateral and balances have been assumed to be recoverable at 0%.

---

[4]   The Digital Asset and Stablecoin balances have been reduced from the 5/31 values to adjust for the potential seizure of certain Digital Assets by the U.S. Department of Justice.

[5]   BlockFi's asserted claim of $1,192.1 million against FTX/Alameda is subject to increase should FTX/Alameda be successful in any of their Claims against the Debtors regarding preference payments, collateral pledges, and/or withdrawals of certain FTX collateral.

[6]   The value of the Robinhood Shares and all other perfected secured collateral which would offset asserted claims if recovered, is based on the trading price as of 11/11/22.

[7]   FTX/Alameda recoveries are likely to be lower in a chapter 7 liquidation as cooperation from critical resources would be more difficult resulting in diminished institutional knowledge, subject to local regulatory guidelines on witness cooperation.

[8]   The Debtors' recovery on secured collateral is assumed to be cross collateralized due to indemnification provisions within the Alameda Loan Agreements and is limited to the amount of the Debtors' claims against FTX and Alameda.

[9]   BlockFi is indemnify by FTX/Alameda in accordance with the Amended and Restated Master Loan Agreement between BlockFi International Ltd (the "<u>Lender</u>") and Alameda Research Limited (the "<u>Borrower</u>"). As such, BlockFi asserts the right to cross-collateralize the related loans with the secured collateral.

8. <u>Alameda Loan & FTX Claims</u>:[5,7,10,11]  The Debtors have various Claims against both FTX and Alameda for institutional loans, Digital Assets held on FTX.com (the platform operated by FTX Trading), trading funds, cross-collateralization of Alameda collateral, and other deficiencies.  The Debtors will file Proof of Claim forms in the FTX/Alameda bankruptcy proceedings on or prior to the June 30, 2023 bar date.  In a liquidation, the Debtors would be classified as general unsecured creditors in the FTX/Alameda bankruptcy proceedings and would expect to recover between 25% and 66% on account of their Claims.

9. <u>Claims Against Other Debtors in Bankruptcy</u>:[10]  The Debtors will assert Claims in other bankruptcy cases, including 3AC, amongst others, and have asserted Claims against Core Scientific on or prior to the applicable bar dates.  In a liquidation, the Debtors would be classified as secured creditors in the Core Scientific bankruptcy proceedings and general unsecured creditors in the 3AC bankruptcy proceedings and would expect to recover between 0% and 90% on their Claims, depending on recoveries in each respective bankruptcy case.

10. <u>Mining Portfolio</u>: The Debtors are party to various Mining Loans with third-party mining companies which are scheduled to come due over the next two years.  Many of these Mining Loans are in default and recoveries are not guaranteed.  The Mining Loans are generally secured by Equipment.  Balances are assumed to be recoverable at 2% – 100%.

11. <u>Other Assets</u>:  The Debtors have other assets including, but not limited to, loan and other receivables, equity investments in various private and public companies, and other internally developed assets.  This Liquidation Analysis reflects recovery rates on these assets between 0% and 100%.

12. <u>Litigation Claims</u>:  Preferences in a chapter 7 are assumed to be pursued to the fullest extent possible by a chapter 7 trustee.  Any Client who either removed funds from the BlockFi Platform in an amount greater than $7,575 during the 90 days before the Petition Date or moved funds from BIA to a Client Wallet Account in excess of $7,575 during the 90 days before the Petition Date, would be pursued by the chapter 7 trustee in a preference action.  It is assumed that the chapter 7 trustee would take 24 months to pursue preference actions and would successfully recover approximately 25% of off-platform preferences and 100% of on-platform preferences.  During this time, professional fees are expected to be approximately $2.4 million per month and a 33% contingency fee on successful preference recoveries is also assumed.  Any Clients who have a preference payment recovered by the chapter 7 trustee are assumed to receive a general unsecured claim for the amount of preference recovered.

   **B.    *Liquidation Costs***

13. <u>Chapter 7 Professional Fees</u>:[12]  Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to range from $6.3 million per month during the initial phase of the liquidation, reducing to $2.3 million per month once Distribution on account of Wallet Account Claims have been completed.  These estimates contemplate additional contingent

---

[10]   BlockFi's potential Claims against bankrupt Entities including Alameda, FTX, 3AC, Core Scientific Inc., Digistar Norway AS, PrimeBlock Operations LLC, and BK Offshore Fund Ltd. are assumed to be dollarized as of the Petition Date in each respective bankruptcy case.

[11]   BlockFi's asserted claim of $1,192.1 million against Alameda Research Ltd. is subject to setoff of any recoveries on perfected secured collateral including the Robin Hood Shares, USD, trust shares of GBTC, ETHE, and BITW, and/or FTT, SOL, and SRM tokens.

[12]   Under a chapter 7 liquidation scenario, it is assumed that a chapter 7 trustee will engage new restructuring advisors.  It is assumed that these new restructuring advisors will require additional time to acclimate themselves to the case, resulting in higher professional fees and delays in Distributions relative to the current advisors who are attuned to the complex case dynamics.  Additionally, it is likely that a chapter 7 liquidation will result in increased employee attrition at the Debtors, which will either need to be back-filled by professionals or newly hired employees.

professional fees that would be incurred for the successful pursuit of preference payments. This Liquidation Analysis assumes a 33% contingency fee on any successful preference clawbacks.

14. <u>Chapter 7 Trustee Fees</u>:  In a chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the chapter 7 trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest.  Chapter 7 trustee fees were estimated at 3% of proceeds from liquidation, excluding recoveries related to cash and cash equivalents.

15. <u>Chapter 7 Estate Wind-Down Headcount</u>:  In a chapter 7 liquidation, the chapter 7 trustee will incur certain costs necessary to wind-down the Estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs, and ongoing support from the Debtors' management through a transition services agreement throughout the liquidation.  Once Distributions on account of Wallet Account Claims have been made and the BlockFi Platform has been closed, the headcount is expected to be reduced to 8 people at a cost of approximately $0.2 million per month for the remaining 19 months of the wind down.  It is assumed that the chapter 7 trustee would take 8 months to facilitate any initial distributions.

16. <u>Chapter 7 Estate Wind-Down Other Fees</u>:  In a chapter 7 liquidation, the chapter 7 trustee will incur certain vendor, technology, and miscellaneous costs necessary to wind-down the Estates including ordinary course professionals for legal, tax and accounting support, temporary labor costs, insurance, document management costs and banking fees, among others.  Such expenses include the necessary costs to maintain the BlockFi Platform through the disbursement date of assets held in the Wallet Program as well as costs to maintain limited operations while long dated, illiquid assets are being pursued.  During the 8-month initial phase of the wind down, the Debtors anticipate that the costs of a chapter 7 trustee will be approximately $365,000 per month for technology, approximately $345,000 per month for ordinary course professionals to support legal, tax, and accounting, and approximately $550,000 per month for other general and administrative costs.  Following distributions of assets held in the Wallet Program and the shutdown of the BlockFi Platform, expenses are assumed to reduce to approximately $10,000 per month for technology, approximately $305,000 per month for ordinary course professionals, and approximately $200,000 per month for other general and administrative costs.

   *C.     Claims*

17. <u>Secured Tax Claims</u>:  The Debtors are continuing to evaluate claims filed prior to the Governmental bar date of May 30, 2023. No Secured Tax Claims have been contemplated in this analysis.  To the extent that Secured Tax Claims are later identified, a recovery of 100% is expected.

18. <u>Administrative, Priority Tax Claims and Other Priority Claims</u>:

   - <u>Administrative Claims</u>:  Administrative Claims include unpaid postpetition accounts payable, accrued operating expenses, unpaid postpetition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $60 million on the Conversion Date.

   - <u>Priority Tax Claims</u>: The Debtors are continuing to evaluate claims filed prior to the Governmental bar date of May 30, 2023.  No Priority Tax Claims have been contemplated in this analysis.  To the extent that Priority Tax Claims are determined, a recovery of 100% is expected.

   - <u>Other Priority Claims</u>:  Total Other Priority Claims are estimated to be $0.00.

19. <u>BlockFi Lending LLC Private Client Account Claims</u>:  BlockFi Lending LLC Private Client Account Claims are estimated to be approximately $211.4 million as of the Conversion Date based on Clients' Digital Assets as of the Petition Date.

20. <u>BlockFi Lending LLC Loan Collateral Claims</u>:  BlockFi Lending LLC Loan Collateral Claims are estimated to be approximately $100.6 million as of the Conversion Date based on Clients' Digital Assets as of the Petition Date.

21. <u>BlockFi International Ltd. Private Client and Interest Account Claims</u>:  BlockFi International Ltd. Private Client and Interest Account Claims are estimated to be approximately $365.2 million as of the Conversion Date based on Clients' Digital Assets as of the Petition Date.

22. <u>BlockFi International Ltd. Loan Collateral Claims</u>:    BlockFi International Ltd. Loan Collateral Claims are estimated to be approximately $39.0 million as of the Conversion Date.  These Claims are for Loan Collateral issued pursuant to the Loan Program.  The BlockFi International Ltd. Loan Collateral Claims are net of Loan Account Obligations.

23. <u>BlockFi Inc. Interest Account Claims</u>:  BlockFi Inc. Interest Account Claims are estimated to be approximately $1.050 billion as of the Conversion Date based on the Clients' Digital Assets as of the Petition Date.

24. General Unsecured Claims are estimated to total approximately $38.5 million on the Conversion Date (excluding Intercompany Claims between Debtor entities).

- <u>BlockFi Lending LLC General Unsecured Claims</u>:  BlockFi Lending LLC General Unsecured Claims are estimated to be approximately $1.3 million as of the Conversion Date.

- <u>BlockFi International Ltd. General Unsecured Claims</u>:  BlockFi International Ltd. General Unsecured Claims are estimated to be approximately $0.1 million as of the Conversion Date.

- <u>BlockFi Inc. General Unsecured Claims</u>:  BlockFi Inc. General Unsecured Claims are estimated to be approximately $36.2 million as of the Conversion Date.  These General Unsecured Claims include $29 million in surety bond claims,[13] $2.7 million in contract rejection damage claims, $435,000 in lease rejection claims, and $4.1 million in other liabilities.

- <u>BlockFi Services, Inc. General Unsecured Claims</u>:  BlockFi Services, Inc. General Unsecured Claims are estimated to be approximately $0.00 as of the Conversion Date.

- <u>BlockFi Trading LLC General Unsecured Claims</u>:  BlockFi Trading LLC General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

- <u>BlockFi Wallet LLC General Unsecured Claims</u>:  BlockFi Wallet LLC General Unsecured Claims are estimated to be approximately $0.9 million as of the Conversion Date.

- <u>BlockFi Ventures LLC General Unsecured Claims</u>:  BlockFi Ventures LLC General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

- <u>BlockFi Investment Products LLC General Unsecured Claims</u>:  BlockFi Investment Products LLC General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

- <u>BlockFi Lending II General Unsecured Claims</u>:  BlockFi Lending II General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

25. <u>Recharacterized Claims (FTX Facility Claims)</u>:  $279.7 million of Claims related to principal and interest on the FTX Facility Claims are assumed to be recharacterized as equity contributions at the applicable Debtor Entity. Any portion of the FTX Facility Claims that are not recharacterized as described above are assumed to be contractually subordinated to Account Holder Claims pursuant to the terms of the FTX Loan Agreement and

---

[13]    The Debtors have filed an objection [Docket No. 1068] to the proofs of claim of $29 million in surety bond claims.  These claims have been considered in this analysis out of an abundance of caution, but may be removed if the Court enters an order sustaining the Debtors' objections or the claims are otherwise deemed invalid.

equitably subordinated to General Unsecured Claims and Intercompany Claims under section 510(c) of the Bankruptcy Code.

26. <u>Subordinated Claims (FTX Avoidance Action Claims, Alameda Claims, 3AC Claims, and Government Penalty Claims)</u>:  FTX Avoidable Transfer Claims, Alameda Claims, and 3AC Claims are assumed to be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims under section 510(c) of the Bankruptcy Code.  The Debtors believe that the Government Penalty Claims,[14] comprised of $29.4 million in claims related to BlockFi Lending's $50 million settlement with various state securities regulators, represented by the North American Securities Administrators Association ("NASAA") working group, are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code, pursuant to which they are subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor Entity.

27. <u>Invalid Claims</u>:  FTX and Alameda have filed Proof of Claim forms in the amount of $4.571 billion.  These Claims are assumed to be invalid for a number of reasons including, but not limited to, the fact that FTX and Alameda committed fraud and/or made material misrepresentations regarding their financial capacity and that preference claims do not account for inflows above the value received from withdrawals.  3AC has filed Proof of Claim forms in the amount of $214.5 million.  3AC Claims are assumed to be invalid for a number of reasons including, but are not limited to, the fact that British Virgin Island law states that preference liability has an intent element.  Thus, any conveyances received by the Debtors must be proven to have been received with the intent, which the Debtors do not believe is factually accurate.

28. <u>SEC Penalty Claims</u>:  The SEC Penalty Claims in the amount of $30.0 million arose from the Securities and Exchange Commission ("SEC") settling the "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order" that the SEC issued on February 14, 2022.  The Debtors and the SEC entered into a stipulation with regard to the SEC Penalty Claims pursuant to which the Debtors and the SEC stipulated that the SEC will not receive a distribution on account of the SEC Penalty Claims unless and until all allowed Secured Tax Claims (Class 1), Other Priority Claims (Class 2), Account Holder Claims (Class 3), General Unsecured Claims (Class 4), and Intercompany Claims (Class 11) are paid in full.

29. <u>Net Intercompany Claims</u>:  Term sheets and promissory notes exist between Debtor entities to reflect prepetition intercompany transactions incurred during the Debtors' normal course of business.  As part of a chapter 7 liquidation, each Intercompany Claim will be netted between the respective Debtor entities and the remaining Intercompany Claims after such netting will be *pari passu* with Account Holder Claims and General Unsecured Claims at the applicable Debtor entity.  The total Intercompany Claims amount to $872.2 million on a net basis.

- Net Intercompany Claims from BlockFi International Ltd. to BlockFi Lending LLC are estimated to be $36.0 million.

- Net Intercompany Claims from BlockFi International Ltd. to BlockFi Inc. are estimated to be $555.5 million.

- Net Intercompany Claims from BlockFi Inc. to BlockFi Lending LLC are estimated to be $273.0 million.

30. <u>Preference Clawback Account Holder Claims</u>:[15,16]  In a chapter 7 liquidation, it is assumed that a chapter 7 trustee would pursue all available preference Claims against the Debtors' U.S. Clients.  Under Bermudian law, preference Claims against international Clients are assumed to be zero and therefore, in a liquidation, it is assumed that the chapter 7 trustee would not bring preference claims against international Clients.  Any preference actions would

---

[14]    For the avoidance of doubt, the SEC Penalty Claims are not Government Penalty Claims under the Plan.

[15]    Assumes off-platform preferences are recovered in Cash.

[16]    On-platform preferences are assumed to be successfully transferred from Client Wallet Accounts to BIAs/BPCs.

be against U.S. Clients who removed more than $7,575 off the BlockFi Platform within the 90 days preceding the Petition Date.  These amounts total $187.5 million.  Preferences would also be pursued against U.S. Clients who moved more than $7,575 from BIA to a Client Wallet Account within the 90 days preceding the Petition Date and which funds remained on the BlockFi Platform.  These amounts total $42.0 million.  The Debtors estimate that it will cost approximately $37 million in professional fees, in addition to a 33% contingency fee on all funds successfully recovered, to pursue preferences under a chapter 7 liquidation over a roughly two-year period.  It is also assumed, based on industry collection success rates and the expected clawback success rate in other Digital Asset bankruptcy cases, that 25% of targeted off-BlockFi Platform preference funds would be successfully clawed back and 100% of preference funds that remain on the BlockFi Platform in Client Wallet Accounts could be successfully transferred back into BIA/BPC accounts.  Successful clawbacks would result in additional Account Holder Claims in the amount of $88.9 million.

31.  <u>Preferred and Common Equity</u>: In a chapter 7 liquidation, it is assumed that both preferred and common equity receive no recovery.

*[Remainder of page intentionally left blank.]*

## IV.    LIQUIDATION ANALYSIS RESULTS

The following pages present the results for the hypothetical liquidation of the Debtors.    This Liquidation Analysis is presented by creditor class on an unconsolidated basis for all Debtors and is compared against recoveries under the Plan.

| Class | Claim or Interest | BlockFi Inc Ch. 11 Low | High | Ch. 7 Low | High | BlockFi International Ch. 11 Low | High | Ch. 7 Low | High |
|---|---|---|---|---|---|---|---|---|---|
| Unclassified | Administrative & Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | 52.7% | 100.0% | 48.1% | 89.9% |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | 52.7% | 100.0% | 48.1% | 89.9% |
| 3-e | BlockFi Inc. Interest Account Claims | 39.7% | 100.0% | 36.7% | 59.2% | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | 52.7% | 100.0% | 48.1% | 89.9% |
| 4-c | BlockFi Inc. General Unsecured Claims | 39.7% | 100.0% | 36.7% | 59.2% | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | 0.0% | 0.0% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | 39.7% | 100.0% | 36.7% | 59.2% | 52.7% | 100.0% | 48.1% | 89.9% |
| 12 | Intercompany Interests | 0.5% | 55.4% | 0.5% | 7.2% | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | 0.0% | 1.5% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | 0.0% | 0.0% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Class | Claim or Interest | BlockFi Lending Ch. 11 Low | High | Ch. 7 Low | High | BlockFi Wallet Ch. 11 Low | High | Ch. 7 Low | High |
|---|---|---|---|---|---|---|---|---|---|
| Unclassified | Administrative & Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | 86.0% | 100.0% | 76.8% | 100.0% | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | 86.0% | 100.0% | 76.8% | 100.0% | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | 86.0% | 100.0% | 76.8% | 100.0% | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | 100.0% | 100.0% | 100.0% | 100.0% |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | 0.0% | 100.0% | 0.0% | 100.0% | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 12 | Intercompany Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | 0.0% | 100.0% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |

| Class | Claim or Interest | BlockFi Trading | | | | BlockFi Ventures | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ch. 11 | | Ch. 7 | | Ch. 11 | | Ch. 7 | |
| | | Low | High | Low | High | Low | High | Low | High |
| Unclassified | Administrative & Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | 100.0% | 100.0% | 100.0% | 100.0% | 34.4% | 100.0% | 31.8% | 74.1% |
| 12 | Intercompany Interests | | | | | | | | |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Class | Claim or Interest | BlockFi Lending II | | | | BlockFi Services | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ch. 11 | | Ch. 7 | | Ch. 11 | | Ch. 7 | |
| | | Low | High | Low | High | Low | High | Low | High |
| Unclassified | Administrative & Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | n/a | n/a | n/a | n/a | 0.0% | 100.0% | 0.0% | 1.2% |
| 12 | Intercompany Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Class | Claim or Interest | BlockFi Investment Products | | | |
| | | Ch. 11 | | Ch. 7 | |
| | | Low | High | Low | High |
|---|---|---|---|---|---|
| Unclassified | Administrative & Priority Claims | n/a | n/a | n/a | n/a |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | 0.0% | 100.0% | 0.0% | 1.2% |
| 12 | Intercompany Interests | | | | |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | n/a | n/a | n/a | n/a |

14

**<u>Exhibit B</u>**

**Redline**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT RELATING TO THE**
~~**FIRST**~~**SECOND AMENDED JOINT CHAPTER 11 PLAN OF BLOCKFI INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**THE DEBTORS ARE NOT CURRENTLY SOLICITING VOTES ON A CHAPTER 11 PLAN. THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

**THE DEBTORS WILL SEEK APPROVAL OF THE DISCLOSURE STATEMENT AT A HEARING ON JU~~NE~~LY ~~20~~13, 2023 OR SUCH OTHER DATE AS DETERMINED BY THE BANKRUPTCY COURT.**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE ~~FIRST~~SECOND AMENDED JOINT PLAN OF BLOCKFI INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN.    IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.    WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS OR OPERATIONS.    THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.    THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY

UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, THOSE HOLDERS OF CLAIMS WHO VOTE TO REJECT THE PLAN, OR THOSE HOLDERS OF CLAIMS AND INTERESTS WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE WIND DOWN CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE XI, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

2

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, NOTHING IN THIS DISCLOSURE STATEMENT CONSTITUTES A FINDING UNDER U.S. FEDERAL SECURITIES LAWS, FOREIGN SECURITIES LAWS, OR ANY STATE SECURITIES LAWS AS TO WHETHER DIGITAL ASSETS OR TRANSACTIONS INVOLVING DIGITAL ASSETS ARE SECURITIES, AND THE RIGHT OF THE SEC TO CHALLENGE ANY TRANSACTION INVOLVING DIGITAL ASSETS ON ANY BASIS ARE EXPRESSLY RESERVED.  THE SEC AND ITS STAFF HAVE TAKEN THE POSITION THAT CERTAIN DIGITAL ASSETS AND CERTAIN TRANSACTIONS INVOLVING DIGITAL ASSETS FALL WITHIN THE DEFINITION OF A "SECURITY" UNDER U.S. FEDERAL SECURITIES LAWS.  THE LEGAL TEST FOR DETERMINING WHETHER ANY GIVEN DIGITAL ASSET OR TRANSACTION INVOLVING DIGITAL ASSETS IS A SECURITY IS A HIGHLY COMPLEX, FACT-DRIVEN ANALYSIS THAT EVOLVES OVER TIME, AND THE DETERMINATION AS TO WHETHER A DIGITAL ASSET OR A TRANSACTION INVOLVING DIGITAL ASSETS MAY CONSTITUTE A "SECURITY" UNDER APPLICABLE LAWS IS A DETERMINATION FOR THE SEC, APPLICABLE STATE AND FOREIGN REGULATORY AUTHORITIES, AND COURTS WITH PROPER JURISDICTION.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE DEBTORS' BUSINESS AND FINANCIAL STRATEGIES, BUDGETS, AND PROJECTIONS;

- THE OVERALL HEALTH OF THE DIGITAL ASSET INDUSTRY;

- THE REGULATORY LICENSES HELD BY THE DEBTORS OR THE WIND-DOWN DEBTORS;

- THE EVOLVING REGULATORY LANDSCAPE AND POTENTIAL ADOPTION AND IMPACT OF NEW GOVERNMENTAL REGULATIONS;

- TAXATION APPLICABLE TO THE DEBTORS AND ANY CHANGES THERETO;

- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;

- THE RELIABILITY, STABILITY, AND PERFORMANCE OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;

- **THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;**

- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY BOTH SHORT AND LONG-TERM LIQUIDITY NEEDS;**

- **THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **BANK VOLATILITY;**

- **THE INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;**

- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.   THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:

- **THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;**

- **CHANGES TO A PARTICULAR DIGITAL ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;**

- **LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS OR FINANCIAL LOSSES IN EXCESS OF FDIC INSURED COVERED AMOUNTS CAUSED BY THE FAILURE OF CRITICAL BANKING RELATIONSHIPS;**

- **THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

4

- **CLIENT RESPONSES TO THE CHAPTER 11 CASES;**

- **THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;**

- **THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR IF AN ALTERNATIVE PLAN WOULD PROVIDE MORE VALUE TO STAKEHOLDERS THAN THE PLAN;**

- **THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THESE CHAPTER 11 CASES;**

- **THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;**

- **THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND WIND-DOWN EXPENSES;**

- **LIMITED ACCESS TO CAPITAL RESOURCES;**

- **RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**

- **INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;**

- **RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS;**

- **CHANGES IN LABOR RELATIONS;**

- **FLUCTUATIONS IN OPERATING COSTS;**

- **LEGISLATIVE OR REGULATORY REQUIREMENTS;**

- **ADVERSE TAX CHANGES;**

- **POSSIBLE RESTRICTIONS ON THE ABILITY TO OPERATE; AND**

- **FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, DIGITAL ASSET VALUES, AND CURRENCY VALUES.**

**YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE**

5

**AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

TABLE OF CONTENTS

Page

| | | | |
|---|---|---|---|
| I. | **INTRODUCTION** | | **10** |
| II. | **PRELIMINARY STATEMENT** | | **10** |
| | A. | Background | 10 |
| | B. | The Postpetition Sale Process ~~and the Self-Liquidation~~ | 13 |
| | C. | Anticipated Proceedings to Maximize Value for Creditors | 14 |
| III. | **OVERVIEW OF THE PLAN** | | **15** |
| | A. | The Plan | 15 |
| | B. | Holders of Claims May Be Released by the Debtors | 22~~3~~ |
| | C. | Employee Transition Plan | 23~~4~~ |
| IV. | **WHY HOLDERS OF CLAIMS SHOULD VOTE IN FAVOR OF THE PLAN** | | **25~~6~~** |
| V. | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** | | **26~~7~~** |
| | A. | What is chapter 11? | 26~~7~~ |
| | B. | Why are the Debtors sending me this Disclosure Statement? | 26~~7~~ |
| | C. | Am I entitled to vote on the Plan? | 27~~8~~ |
| | D. | What will I receive from the Debtors if the Plan is consummated? | 28~~9~~ |
| | E. | What will I receive from the Debtors if I hold an Allowed Administrative Claim? | 41~~2~~ |
| | F. | What happens to my recovery if the Plan is not confirmed or does not go effective? | 42~~3~~ |
| | G. | If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? | 42~~3~~ |
| | H. | What are the sources of consideration and other consideration used to make Distributions under the Plan? | 42~~4~~ |
| | I. | Is there potential litigation related to the Plan? | 42~~4~~ |
| | J. | Does the Plan provide for the subordination of any Claims? | 42~~4~~ |
| | K. | Will there be releases and exculpation granted to parties in interest as part of the Plan? | 46~~7~~ |
| | L. | What are the consequences of opting out of the releases provided by the Plan? | 52 |
| | M. | What are the consequences of not opting out of the releases provided by the Plan? | 52 |
| | ~~L~~N. | Are any regulatory approvals required to consummate the Plan? | 50~~2~~ |
| | ~~M~~O. | What is the deadline to vote on the Plan? | 50~~3~~ |
| | ~~N~~P. | What are the overall projected recoveries under the Plan? | 50~~3~~ |
| | ~~O~~Q. | How do I vote for or against the Plan? | 50~~3~~ |
| | ~~P~~R. | Why is the Bankruptcy Court holding a Confirmation Hearing? | 50~~3~~ |
| | ~~Q~~S. | When is the Confirmation Hearing set to occur? | 50~~3~~ |
| | ~~R~~T. | What is the purpose of the Confirmation Hearing? | 51~~4~~ |
| | ~~S~~U. | What is the effect of the Plan on the Debtors' ongoing business? | 51~~4~~ |
| | ~~T~~V. | Will any party have significant influence over the corporate governance and operations of the Wind-Down Debtors? | 51~~4~~ |
| | ~~U~~W. | What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? | 51~~4~~ |
| | ~~V~~X. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 52~~4~~ |
| VI. | **SOLICITATION AND VOTING PROCEDURES** | | **52~~5~~** |
| | A. | Classes Entitled to Vote on the Plan. | 52~~5~~ |
| | B. | Votes Required for Acceptance by a Class. | 53~~5~~ |

C.      Certain Factors to Be Considered Prior to Voting. .................................................. 536

D.      Classes Not Entitled to Vote on the Plan. ................................................................ 536

E.      Solicitation Procedures. ........................................................................................... 547

F.      Voting Procedures. ................................................................................................... 558

G.      Voting Tabulation. .................................................................................................... 569

H.      Ballots Not Counted. ................................................................................................ 569

**VII.    CONFIRMATION OF THE PLAN** ................................................................................. **579**

A.      Requirements of Section 1129(a) of the Bankruptcy Code. ..................................... 579

B.      Best Interests of Creditors—Liquidation Analysis. ................................................ 5860

C.      Feasibility. ................................................................................................................ 5861

D.      Acceptance by Impaired Classes. ............................................................................ 5961

E.      Confirmation without Acceptance by All Impaired Classes. .................................. 5962

**VIII.   THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE** ............. **603**

A.      The Debtors' Corporate Structure and History. ...................................................... 603

B.      The Debtors' Assets and Operations. ....................................................................... 614

C.      The Debtors' Capital Structure. ............................................................................... 647

**IX.     EVENTS LEADING TO ~~THESE~~THESE CHAPTER 11 CASES** ...................................... **669**

A.      Market and Industry-Specific Challenges. .............................................................. 669

B.      Governance Initiatives. ............................................................................................. 715

**X.      EVENTS OF THE CHAPTER 11 CASES** .................................................................. **715**

A.      First and Second Day Relief and Other Case Matters. ............................................ 715

B.      Appointment of Unsecured Creditors' Committee. .................................................. 737

C.      Schedules and Statements. ....................................................................................... 747

D.      Bar Date Motion. ...................................................................................................... 748

E.      The Wallet Withdrawal Motion. .............................................................................. 749

F.      The Redaction Motion. ............................................................................................. 7680

G.      The Exclusivity Motions. ......................................................................................... 7681

H.      The Institutional Loan Motion and Settlements. ..................................................... 7781

I.      Returning Post-Pause Payments on Retail Client Loans. ....................................... 7782

J.      Litigation Matters. .................................................................................................... 7782

K.      The Key Non-Insider Employee Retention Plan. .................................................... 783

L.      The Post-Petition Sale Process. ................................................................................ 7983

M.      Bermuda Proceedings. .............................................................................................. 7983

N.      The Release of Funds in the Silvergate Bank Reserve Account and Failure of Silvergate Bank. ....................................................................................................... 7984

O.      The Failure of Silicon Valley Bank and Signature Bank and the U.S. Trustee's Motion to Compel ..................................................................................................... 804

P.      Government Seizures ................................................................................................ 816

Q.      The D&O Settlement ................................................................................................ 87

~~Q~~R.      The Special Committee's Investigation and Recommendation ................................ 8290

**XI.     RISK FACTORS** ............................................................................................................ **8593**

A.      Risks Related to the Wind-Down. ............................................................................ 8593

B.      Risks Related to Recoveries under the Plan. ............................................................ 908

C.      Risks Related to the Debtors' Businesses. ............................................................... 919

D.      Miscellaneous Risk Factors and Disclaimers. ......................................................... 94102

**XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .......................................................................................................................... **95103**

A.      Introduction. ............................................................................................................. 95103

B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ......... 96105

7

C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
       Claims Entitled to Vote. ................................................................... 97106

D.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and
       Disposing of Digital Assets Received Under the Plan. ................................ 102111

E.    Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
       Allowed Claims. .............................................................................. 102111

F.    Information Reporting and Back-Up Withholding. ..................................... 103112

XIII.    RECOMMENDATION OF THE DEBTORS ........................................... 105114

**EXHIBITS**

EXHIBIT A      Chapter 11 Plan

EXHIBIT B      Liquidation Analysis

## I.    INTRODUCTION

BlockFi Inc. and its debtor Affiliates (each, a "Debtor," and collectively, the "Debtors," and together with BlockFi Inc.'s non-Debtor Affiliates, "BlockFi" or the "Company") submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Debtors' ~~First~~Second *Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith (as supplemented or amended from time to time, the "Plan").[2]  A copy of the Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.[3]

**THE DEBTORS BELIEVE THE PLAN IS THE BEST WAY TO COMPLETE THESE CHAPTER 11 CASES AS QUICKLY AS POSSIBLE AND RETURN DIGITAL ASSETS IN KIND TO CLIENTS.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN AND, IF RELEVANT, SEPARATELY VOTE TO APPROVE ANY IMPLEMENTATION MECHANISMS REQUIRED TO IMPLEMENT THE PLAN OUTSIDE OF THE UNITED STATES OF AMERICA.**

## II.    PRELIMINARY STATEMENT

### A.    Background

BlockFi operated a financial services platform that allowed retail and institutional Account Holders to earn, borrow, trade, and store certain Digital Assets.  Using the Company's online platform, BlockFi's Clients could earn interest on the Digital Assets transferred to the Company's platform, trade over forty unique Digital Assets at competitive prices, store them all in one convenient place, and earn credit card spending rewards.  Additionally, BlockFi provided loans secured by Digital Assets (and was the first in many U.S. states to seek and receive lending licenses to do so).  BlockFi's mission since its inception has been to provide credit services to markets with limited access to financial products.  BlockFi's culture embodies four core values: "Pragmatic Pioneering," "Clients not Customers," "Individual Effort, Collective Success," and "Transparency Builds Trust."  These values have been key drivers of BlockFi's strategy and decision-making, which has consistently prioritized Client protection, stability, and prudent stewardship.  This model helped BlockFi experience rapid growth—between 2019 and 2021, total annual trading volume grew from $2 million to more than $23 billion, while Deployable Assets[4] grew from $345 million to $14.8 billion as of December 31, 2019 and December 31, 2021, respectively.  Cumulative gross loan originations expanded from $687 million in 2019 to more than $47 billion through 2021.

During 2022, events in the world economy roiled traditional markets and the Digital Asset markets alike.  Digital Asset prices deteriorated in response to macroeconomic conditions, an unfavorable interest rate environment, decelerating growth, and high inflation.  All major Digital Assets and cryptocurrency-focused companies experienced significant declines; as of July 2022, the cryptocurrency market had lost $2 trillion in aggregate market value.  Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna")

---

[2]  This Disclosure Statement and the Plan remain subject to the ongoing review and approval of the Bermuda Provisional Liquidators of BlockFi International Ltd., acting in accordance with their fiduciary responsibilities, and to such further amendment as may be required to ensure compliance with Bermuda law, regulations, and the duties of the Bermuda Provisional Liquidators.

[3]  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I.B of the Plan.  **The summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to the Plan and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

[4]  "Deployable Assets" represent the fair value of Digital Assets (including Stablecoins) transferred to BlockFi through BIAs (as defined below), BPCs (as defined below), and other types of individually negotiated borrowing arrangements or as collateral in connection with loans BlockFi made to Clients.  Deployable Assets do not include Digital Assets held in the Wallet Program (as defined below).

(as discussed in Article IX.A.2 of this Disclosure Statement), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk.  Singapore-based cryptocurrency hedge fund Three Arrows Capital, Ltd. ("3AC") collapsed, followed by the bankruptcies of Digital Asset exchange platforms Celsius Network ("Celsius") and Voyager Digital ("Voyager").  Although BlockFi fared better than other Digital Asset financial service platforms due to, among other things, its relative insulation from the Luna collapse and its requirement that many institutional loans be materially overcollateralized, the bankruptcies of BlockFi's peer firms shook the confidence of cryptocurrency investors and caused market flight, with substantial numbers of investors seeking to pull their funds from any and all cryptocurrency investments.

The collapse of two of BlockFi's major competitors put BlockFi's business at risk of contagion, similar to the banking crises seen in 2023.  This risk, combined with the decline in Client activity and assets on its platform, led BlockFi to seek a liquidity injection in an effort to protect its Clients.  West Realm Shires, Inc. (dba FTX US, "FTX US," and together with its subsidiaries and Affiliates, "FTX") offered to supply that liquidity through a transaction, that included providing FTX an option to purchase BlockFi's equity.  BlockFi accepted this offer ~~to stave off a liquidity crisis and avoid harm to its Clients~~because it was the best option for stakeholders, including BlockFi Clients, at the time; it provided liquidity to backstop client funds and best positioned BlockFi to avoid a run on the platform.  As part of the transaction, on June 30, 2022, BlockFi Inc., entered into an agreement with FTX US (the "FTX Facility"), which provided BlockFi with access to up to $400 million in capital, $300 million of which was available for general corporate purposes, including obligations to Clients (the "Client Payment Obligations"), and $100 million solely to fund the Client Payment Obligations.  The FTX Facility was, and remains, contractually subordinated to Account Holder Claims.

The transaction initially led to the two outcomes BlockFi had hoped for; it softened the risk of contagion from the "crypto-winter" and the collapse of Voyager and Celsius, and provided immediate liquidity to the BlockFi Platform (as defined below) from the FTX Facility, as provided in greater detail below.  From July through October 2022, BlockFi successfully drew $275 million from the FTX Facility through five separate transactions, dated on or about July 8, 2022, July 13, 2022, August 12, 2022, September 12, 2022, and October 13, 2022.  Throughout this period, BlockFi also successfully processed over $3 billion in Client withdrawals.  The transaction was viewed positively by the markets.  This and other transactions led to Sam Bankman-Fried ("SBF"), the chief executive officer of FTX and the ultimate owner of Alameda Research Ltd. ("Alameda"), being heralded as the J.P. Morgan and Warren Buffet[5] of this generation.

At the time BlockFi entered into this transaction, the audited 2021 financial statements of FTX Trading Ltd. ("FTX Trading") and FTX US had been provided to BlockFi.[6]  These audited financial statements indicated FTX Trading was a profitable enterprise with 2021 net income of approximately $387 million and over $1.6 billion in shareholders' equity.[7]  Furthermore, the details of FTX's January 2022 Series C raise of approximately $437.6 million were included in the notes to the audited financials and provided even further comfort to BlockFi regarding FTX's capital position.  Moreover, outside of the data provided by FTX to BlockFi, it was widely reported that FTX had raised over $1.8 billion in cumulative equity funding from some of the largest venture capital firms in the world.[8]  SBF publicly presented FTX as having "top-notch, sophisticated automated risk measures in place to protect customer assets, that those assets were safe and secure, and that Alameda was just another platform customer with no

---

[5]    https://fortune.com/2022/08/01/ftx-crypto-sam-bankman-fried-interview/.

[6]    All descriptions of events related to FTX, Alameda, and 3AC in this Disclosure Statement are based on publicly-available information, news, and market data.  All characterizations of the events related to FTX, Alameda, and 3AC in this Disclosure Statement are based on the Debtors' ~~beliefs~~current understanding and are in no way intended to, or in fact, offer legal conclusions regarding such events.

[7]    FTX Trading Ltd., Consolidated Financial Statements as of December 31, 2021 and 2020 and For the Years ended December 31, 2021 and 2020, as audited by Prager Metis CPAs, LLC April 2, 2022.

[8]    https://www.crunchbase.com/organization/ftx-exchange.

special privileges."[9]  Given the information conveyed and widely held public perception of FTX, there were no indications at the time that FTX US would be unable to honor its financial commitments to BlockFi under the FTX Facility or that FTX Trading would be unable to honor its commitments to BlockFi and its other customers that had transferred assets on to FTX.com (the platform FTX operated).  Given the perceived strength of FTX's business, in connection with FTX US's option to acquire all of the equity of BlockFi, certain of BlockFi's preferred shareholders specifically requested to receive consideration in the preferred shares of FTX Trading, rather than cash.  Nor were there any indications that Alameda was having or projected to have financial difficulties at the time.  To the contrary, among other things, Alameda:  (1) had repaid approximately $1 billion to BlockFi essentially on demand when it was requested to do so in June 2022; (2) had won an auction for certain collateral that BlockFi had foreclosed upon from another third party, paying cash; (3) had made an investment to Voyager, one of BlockFi's competitors; (4) had provided BlockFi with information regarding certain Digital Asset wallets from which BlockFi had been able to verify billions of dollars in assets; and (5) had worked cooperatively with BlockFi regarding certain contractual terms that BlockFi had requested to be modified to provide BlockFi with additional downside protection.

Approximately five months later, in November 2022, Changpeng Zhao ("CZ"), the founder and chief executive officer of Binance Holdings Ltd., one of FTX's primary competitors, announced his intention to liquidate BAM Trading Services, Inc.'s (d/b/a Binance.US) (together with Binance Holdings Ltd., "Binance") substantial holdings of the native Digital Asset token of the FTX platform ("FTT").[10]  This announcement created significant sell pressure on FTT and introduced uncertainty into the broader cryptocurrency markets.  Less than an hour later, in response to CZ's tweet, Caroline Ellison, the chief executive officer of Alameda, tweeted an open offer to purchase the outstanding FTT for $22 per token.[11]  On November 7, 2022, SBF tweeted, "FTX is fine.  Assets are fine".[12]  On November 8, 2022, SBF tweeted "we have come to an agreement on a strategic transaction with Binance for http://FTX.com (pending DD etc.)."[13]  Then, on November 9, 2022, Binance announced there would be no transaction.[14]  Rumors swirled as to the cause of and need for FTX to enter into a transaction and the reasons Binance backed out.  In the span of seven days, FTX broadcast conflicting and ever-changing information to the world.

BlockFi learned of these events surrounding the Binance transaction at the same time and in the same manner as the general market—through Twitter and news reports.  While watching and digesting these events as they unfolded over social media, BlockFi immediately acted to address its exposure to each of Alameda and FTX.com.  On November 7, 2022, BlockFi reacted to market volatility by modifying existing lending arrangements with Alameda thereby increasing the overall required overcollateralization levels from generally 160% to 200%, which were satisfied at that point in time.  On November 8, 2022, BlockFi requested to withdraw approximately $181 million in Digital Assets from its accounts at FTX.com, which was not honored.  Separately, on November 8, 2022, BlockFi requested an additional $125 million in capital pursuant to the terms of the FTX Facility, which FTX US failed to fund.

On November 9, 2022, BlockFi Inc., BlockFi Lending LLC ("BlockFi Lending"), and BlockFi International Ltd. ("BlockFi International") entered into separate pledge agreements with Alameda (the "Alameda Pledge Agreement") and Emergent Fidelity Technologies Ltd. ("Emergent" and the pledge agreement, the "Emergent

---

[9]    Securities and Exchange Commission vs Sam Bankman-Fried, SEC Civil Action No. 22-cv-10501.

[10]   @CZ_Binance, Twitter (Nov. 6, 2022) ("Due to recent revelations that have came to light, we have decided to liquidate any remaining FTT on our books.")

[11]   @carolinecapital, Twitter (Nov. 6, 2022) ("@cz_binance if you're looking to minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!").

[12]   @SBF_FTX, Twitter (Nov. 7, 2022).

[13]   @SBF_FTX, Twitter (Nov. 8, 2022).

[14]   @Binance, Twitter (Nov. 9, 2022).

Pledge Agreement," and together with the Alameda Pledge Agreement, the "Pledge Agreements"). Pursuant to the terms of the Emergent Pledge Agreement, Emergent granted BlockFi a first-priority security interest in all of Emergent's rights, titles, and interests in, among other things, all of Emergent's shares of Class A Common Stock of Robinhood Markets, Inc. (the "Robinhood Shares") to secure all obligations of Emergent, Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International, or any Affiliate thereof under the secured financing agreements or any other agreement or arrangement. Similarly, the Alameda Pledge Agreement granted BlockFi a first-priority security interest in all of Alameda's rights, titles, and interests in, among other things, Alameda's shares of Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum Trust (ETHE), and shares of the Bitwise 10 Crypto Index Fund (BITW) (the "Trust Shares") to secure all obligations of Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International, or any Affiliate thereof under the secured financing agreements or any other agreement or arrangement.

On November 10, 2022, Alameda breached the terms of a forbearance agreement it entered into with BlockFi contemporaneously with the Alameda Pledge Agreement. BlockFi took actions to gain control of the additional collateral pledged to BlockFi, but the third-party custodian refused to honor the Alameda Pledge Agreement. On November 11, 2022, certain of the various FTX entities filed voluntary chapter 11 petitions in the United States District Court for the District of Delaware; others followed. As of May 5, 2023, the additional collateral pledged has a potential recovery value of $880.6 million based on market prices.

As noted above, BlockFi had exposure on account of the loans that BlockFi made to Alameda, and BlockFi had Digital Assets trapped on the FTX.com platform due to suspended withdrawals. These exposures, and FTX's failure to fully fund the FTX Facility, left BlockFi in a liquidity crunch. Accordingly, on November 10, 2022 at 8:15 p.m. (prevailing Eastern Time) (the "Platform Pause"), BlockFi paused the BlockFi Platform (as defined below) activities, including account withdrawals. Soon thereafter, BlockFi retained Kirkland & Ellis LLP and Kirkland & Ellis International LLP (together, "Kirkland"), longtime corporate counsel Haynes and Boone, LLP ("Haynes and Boone"), Cole Schotz P.C. ("Cole Schotz"), as New Jersey local counsel, Berkeley Research Group ("BRG"), as financial advisor, and Moelis & Company LLC ("Moelis"), as investment banker, to assist BlockFi in navigating its uncertain position, contingency planning and liquidity management, among other things. Ultimately, the Debtors determined that an in-court process would be necessary to develop the most value-maximizing alternative available to BlockFi and protect its Clients. On November 28, 2022 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases.

### B.    The Postpetition Sale Process and the Self-Liquidation

Intent on moving expeditiously through chapter 11, the Debtors filed the *Joint Plan of Reorganization of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 22] (the "Initial Plan") on the first day of these Chapter 11 Cases. The Initial Plan contemplated either a sale of substantially all of BlockFi's assets to a third-party or a self-liquidation transaction wherein BlockFi would return Digital Assets and cash to creditors (the "Self-Liquidation Transaction") followed, in each case, by a Wind Down of the Debtors' Estates. The Self-Liquidation Transaction served as a floor for a third-party sale transaction.

Moelis prepared a comprehensive marketing strategy designed to identify bidders for packages of the Debtors' assets, including the BlockFi Platform (as defined below), Debtors' physical self-mining assets (the "Equipment"), loans secured by mining assets (the "Mining Loans"), and claims against certain third-parties. With a marketing strategy in place, on or about December 12, 2022, the Debtors, with the assistance of Moelis, began soliciting interest in the purchase of certain of the Debtors' Equipment and Mining Loans (together, the "Mining Portfolio"), as well as an interest in a self-mining facility in Spartanburg, South Carolina hosted by the Debtors' joint venture, BV Power Alpha LLC (the "Hosting Joint Venture"). The Debtors marketed the Mining Portfolio to potential bidders as a package, but also allowed parties to make bids on portions of the Mining Portfolio.

These efforts were successful and generated market interest in the Mining Portfolio—more than seventy prospective bidders executed nondisclosure agreements with the Debtors and engaged in further diligence toward potentially submitting a bid for the Mining Portfolio. Through this marketing process, the Debtors, in consultation with Moelis and the Debtors' other advisors, concluded that it would be value-maximizing to sell the Equipment separately from the Debtors' interest in the Hosting Joint Venture and Mining Loans. To that end, the Debtors and

13

Moelis reoriented their Mining Portfolio sale efforts to focus, in the near-term, on the marketing and sale of the Equipment while holding, renegotiating, or otherwise pursuing collection on the Mining Loans and continuing to manage the Hosting Joint Venture.

In furtherance of the sale process, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 226] (the "Bidding Procedures Motion").  The Bidding Procedures Motion sought authority to establish certain formal bidding procedures for a potential sale of any or all of the Debtors' assets.  On January 30, 2023, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures and Related Dates and Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, Disclosure Statement, and Plan Confirmation, and (III) Granting Related Relief* [Docket No. 441] (the "Bidding Procedures Order").

On February 28, 2023, in accordance with the Bidding Procedures Order, the Debtors held an auction to sell the Equipment (the "Equipment Auction").  The Equipment Auction was competitive and involved hard-fought, arms-length negotiations with each participating bidder.  At the conclusion of the Equipment Auction, the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "Committee"), concluded that U.S. Farms & Mining Opportunity Fund LLC's ("U.S. Farms") bid for the totality of the auctioned Equipment represented the most value-maximizing offer available to the Debtors.

On March 2, 2023, the Debtors sought Court approval to execute an asset purchase agreement with U.S. Farms and sell the Equipment for approximately $4.675 million by filing the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of all Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief* [Docket No. 571].  After a hearing on March 23, 2023 to consider the Debtors' proposed sale of the Equipment to U.S. Farms, on March 24, 2023, the Bankruptcy Court entered the *Order (I) Approving the Sale of Certain of the Debtors' Self-Mining Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, and (III) Granting Related Relief* [Docket No. 669] authorizing the sale.

In parallel with the marketing and sale of their Mining Portfolio, on January 9, 2023, the Debtors and Moelis began soliciting interest for the purchase of the BlockFi Platform (as defined below).  This asset package consists of (i) an end-to-end Digital Asset platform that offers a wide array of product offerings to both retail and institutional users across the U.S. and internationally (the "Digital Asset Platform"), (ii) approximately 440,000 funded U.S. Client accounts (the "U.S. Client Accounts"), and (iii) approximately 220,000 funded international Client accounts (the "International Client Accounts," and together with the Digital Asset Platform and U.S. Client Accounts, the "BlockFi Platform" and each a "Component").  The Debtors marketed the BlockFi Platform to potential bidders as a package while allowing parties to make separate bids on each Component.

The Debtors and their advisors actively facilitated diligence and engaged with potential bidders throughout this process, and although the Debtors received a number of indications of interests for some or all of the Components of the BlockFi Platform, the Debtors concluded that, given recent regulatory developments, among other things, there may be a lack of meaningful value to be generated from a sale.  Therefore, finalizing and consummating a transaction for the BlockFi Platform would not result in an expedient and value-maximizing transaction for the benefit of the Debtors' creditors.  Accordingly, the Debtors are proceeding with proposing the Self-Liquidation Transaction whereby, if the Plan is confirmed, the Debtors will distribute their assets to creditors in accordance with the terms of the Plan, followed by a Wind Down of their affairs.  The Debtors, however, continue to evaluate their options, and to the extent the Debtors determine that an alternative transaction providing for the sale of all, or substantially all, of the Debtors' assets (an "Alternative Transaction") would provide more value to stakeholders than the Plan, the Debtors will pursue the Alternative Transaction, and will provide Holders of Claims and Interests with additional information and revised documents, as applicable.

14

C.    **Anticipated Proceedings to Maximize Value for Creditors**

The ultimate recovery to Clients and other creditors will depend heavily on the Debtors' success or failure in prosecuting and defending against pending and future disputes with BlockFi's commercial counterparties, including Alameda, FTX, Emergent, ED&F Man Capital Markets, Inc. (now known as Marex Capital Markets Inc., herein, "Marex"), 3AC, and Core Scientific, Inc. ("Core Scientific"). Collectively, the success or failure of this litigation (the "Litigation") will make a difference of in excess of $1 billion to Clients. ~~Any~~The Debtors thus believe that any action that may impair the Debtors' ability to prosecute and defend against these claims would be irresponsible, could be catastrophic for the Estates and Clients, and is not advisable. Accordingly, to maximize recoveries to Clients, it is critical that BlockFi put itself in a position to:

(i)     recover on the Emergent Pledge Agreement, which will likely require active litigation in a forfeiture proceeding in the United States District Court for the Southern District of New York and the Bankruptcy Court, and potentially foreign proceeding(s). The amounts at issue in litigation over the Emergent Pledge Agreement, based on prevailing trading prices for certain of the assets at issue, exceed $525 million;

(ii)    recover on the Alameda Pledge Agreement (and on other claims likely to be advanced against Alameda and FTX), which will likely require active litigation in both the Bankruptcy Court and the United States Bankruptcy Court for the District of Delaware. The amounts at issue in litigation over the Alameda Pledge Agreement, based on allegations made in the Debtors' Chapter 11 Cases, exceed $500 million;

(iii)   recharacterize or subordinate (contractually, equitably, or otherwise) FTX's claim for $275 million based on the FTX Facility, which FTX contends to be *pari passu* with Clients and ahead in the priority line of other General Unsecured Creditors. If FTX's claims succeed, they would reduce recoveries to Clients;

(iv)    defeat Alameda's preference claims, in which it alleges that BlockFi should return to Alameda's bankruptcy estate approximately $150 million based on loan repayments made to BlockFi within the 90 days preceding Alameda's bankruptcy filings, approximately $1 billion in additional collateral posted in the 90 days preceding Alameda's bankruptcy to secure Alameda's borrowings from BlockFi, and approximately $4 billion based on trading activity on the FTX.com platform in the 90 days preceding Alameda's bankruptcy filing;

(v)     defeat 3AC's claim that BlockFi's foreclosure on nearly $1 billion of collateral posted to secure BlockFi's loans to 3AC was improper, preferential, or both, a dispute that will be litigated in the Bankruptcy Court and potentially the United States Bankruptcy Court for the Southern District of New York and foreign proceedings;

(vi)    recover on BlockFi's affirmative claims for approximately $132 million against the 3AC estate, which will take place in a combination of foreign proceedings in the British Virgin Islands and the United States Bankruptcy Court for the Southern District of New York; and

(vii)   recover on BlockFi's secured claims against Core Scientific for approximately $55 million.

As described above, ~~S~~success or failure in these matters will make a positive or negative difference to Client recoveries of over $1 billion, orders of magnitude larger than any other issue facing BlockFi and its Clients. BlockFi has been actively preparing to prosecute and defend these actions, and key witnesses will include, among others, CEO Zac Prince, COO Flori Marquez, former CFO Tony Lauro, CFO Amit Cheela, CRO Yuri Mushkin, and General Counsel Jonathan Mayers.

## III.    OVERVIEW OF THE PLAN

### A.    The Plan

A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will substitute the obligations set forth in the Plan for pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

A summary of the treatment is as follows, with a more detailed description provided in Article V.D of this Disclosure Statement.

| | | | |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 a | BlockFi Lending LLC Private Client Account Claims | Impaired | Entitled to Vote |
| 3 b | BlockFi Lending LLC Loan Collateral Claims | Impaired | Entitled to Vote |
| 3 c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired | Entitled to Vote |
| 3 d | BlockFi International Ltd. Loan Collateral Claims | Impaired | Entitled to Vote |
| 3 e | BlockFi Inc. Interest Account Claims | Impaired | Entitled to Vote |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired | Entitled to Vote |
| 4 b | BlockFi International Ltd. General Unsecured Claims | Impaired | Entitled to Vote |
| 4 c | BlockFi Inc. General Unsecured Claims | Impaired | Entitled to Vote |
| 4 d | BlockFi Services, Inc. General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4 e | BlockFi Trading LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4 f | BlockFi Wallet LLC General Unsecured Claims | ~~I~~Unimpaired | Not Entitled to Vote (~~Deemed~~Presumed to ~~Reject~~Accept) |
| 4 g | BlockFi Ventures LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4 h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | FTX Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | FTX Avoidable Transfer Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Alameda Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | 3AC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Government Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

16

| | | | |
|---|---|---|---|
| 10 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 13 | Existing Preferred Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 14 | Existing Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 15 | SEC Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### 1.    *Overview - Satisfaction of Claims and Interests*

Each of the Debtors is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code. The Plan thus provides the Debtors with the necessary latitude to negotiate the precise terms of their ultimate emergence from chapter 11. Recoveries for certain Classes of Claims could be as high as 100%. Please refer to the Article V.D of this Disclosure Statement for more detail on the projected recoveries for your specific Claim(s). Generally, the Plan contemplates the following treatment of Claims and Interests:

- Holders of Secured Tax Claims and Other Priority Claims will be rendered Unimpaired.

- Holders of Account Holder Claims will receive their Pro Rata share of (i) Digital Assets for any Distributions made during the six (6) month period following the Effective Date and (ii) Cash for any Distributions made following the expiration of such six (6) month period.

- Holders of General Unsecured Claims will receive their Pro Rata share of Cash allocated to the respective Debtor entities.

- FTX Facility Claims will be recharacterized as equity contributions, or, in the alternative, are contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims, and, in either case, will not be entitled to a Distribution under the Plan.

- FTX Avoidable Transfer Claims will be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims and will not be entitled to a Distribution under the Plan.

- Alameda Claims will be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims and will not be entitled to a Distribution under the Plan.

- 3AC Claims will be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims and will not be entitled to a Distribution under the Plan.

- Government Penalty Claims are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code, pursuant to which they are subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.  For the avoidance of doubt, the SEC Penalty Claims are not Government Penalty Claims under the Plan.

- Intercompany Claims will be, at the option of the Debtors, either (a) reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum.  However, Intercompany Claims (x) between BlockFi International Ltd. and BlockFi Lending LLC, (y) between BlockFi International Ltd. and BlockFi Inc., and (z) between BlockFi Lending LLC and BlockFi Inc., will, in each case, be

17

netted, resulting in three separate Intercompany Claims (one for each pair of Debtors in clauses (x), (y), and (z)), and such remaining Intercompany Claims after such netting will be treated *pari passu* with Account Holder Claims and General Unsecured Claims at the applicable Debtor entity*; provided, further,* that, for the avoidance of doubt, in no case shall the treatment of Intercompany Claims set forth in the Restructuring Transactions Memorandum modify or alter the allocation of value among Debtor entities as set forth herein.

- *De Minimis* Claims will be cancelled and will not be entitled to a Distribution.[15]

- Existing Preferred Equity Interests in BlockFi Inc. will be cancelled and will not be entitled to a Distribution.

- Existing Common Equity Interests in BlockFi Inc. will be cancelled and will not be entitled to a Distribution.

- Pursuant to the *Stipulation and Agreed Order Between U.S. Securities and Exchange Commission and Debtors to Forego Receiving Distribution from Debtors' Bankruptcy Estates*, the SEC and the Debtors stipulated that the SEC will not receive a Distribution on account of the SEC Penalty Claims unless and until all allowed Secured Tax Claims, Other Priority Claims, Account Holder Claims, General Unsecured Claims, and Intercompany Claims are paid in full.

- Clients with Digital Assets held by the Debtors in Client accounts associated with the Wallet Program ("Client Wallet Accounts") are unclassified and will receive Digital Assets held in the Client Wallet Accounts less (i) any negative Account balances including for any ACH chargeback transactions; and (ii) any applicable withdrawal fees; and (iii) any administrative costs and expenses incurred in connection with, or arising out, of the Wallet Program (the "Wallet Deductions"). Any remaining Claim after the Wallet Deductions will be treated as a BlockFi Wallet LLC General Unsecured Claim for domestic Clients and a BlockFi International Ltd. General Unsecured Claims for international Clients.

- The Wind-Down Debtors will prosecute claims against third parties, including claims against 3AC, FTX, Alameda, Emergent, Marex, and Core Scientific, and Wind Down the Debtors' Estates.

- Except to the extent otherwise provided by the Plan, no debts may be proved by any creditors or Holders of Interests whose Claims are affected by the Plan in the Bermuda Insolvency Proceedings.

    **2.**    *Treatment of Claims*

    **(a)**    **Treatment of Wallet Claims**

BlockFi provided BlockFi Wallet, a non-interest-bearing account product for Clients to store supported Digital Assets (the "Wallet Program"). Certain of the supported Digital Assets were "trade only" Digital Assets (the "Trade-Only Assets"), meaning that Clients could use Digital Assets acquired through the BlockFi Platform to trade and earn interest (if transferred to an interest account), but could not transfer these Digital Assets into or out of the BlockFi Platform.

The Terms of Service related to the Wallet Program provides, in relevant part "[t]he title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi. . . . BlockFi shall not sell, transfer, loan, hypothecate, or otherwise alienate cryptocurrency held in your BlockFi Wallet unless specifically instructed by you." [16] Accordingly, the Debtors believe that the Digital Assets held by the

---

[15] "*De Minimis Claim*" means any Claim equal to or less than the *De Minimis* Claim Threshold and "*De Minimis Claim Threshold*" means $10, after accounting for Standard Withdrawal Fees, determined on a CID-by-CID basis.

[16] Wallet Terms of Service § F.

Debtors in the Client Wallet Accounts belong to the Clients and are not part of the Debtors' Estates. Although title to Digital Assets held in Client Wallet Accounts does not pass to the Debtors, the Terms of Service do grant the Debtors the right to (i) charge transaction fees for withdrawals from Client Wallet Accounts, (ii) setoff any obligations that the Client owes to BlockFi Trading LLC or BlockFi International, as applicable, on account of a Client Wallet Account or to any of their Affiliates on account of other services and products the Debtors offered, and (iii) setoff any liabilities incurred by BlockFi Wallet LLC from Digital Assets held on account of Client Wallet Accounts.[17] Under the Terms of Service, Clients grant BlockFi Trading LLC or BlockFi International, as applicable, a security interest in the Digital Assets in the Client Wallet Accounts to secure any obligations a Client may owe the Debtors in connection with BlockFi Wallet or other BlockFi services and products. Specifically, the BlockFi Wallet Terms of Service provide "[y]ou grant us a security interest in any and all of your BlockFi account(s) with us for obligations owing to us or any of our affiliates by any owner of any of your accounts. . . . We may take or set off assets in your BlockFi Wallet, or transfer assets between any or all of your BlockFi Wallet, with us or any of our affiliates for direct, indirect and acquired obligations that you owe us or our affiliates, including any balances as a result of not having sufficient assets available or as a result of an erroneous transfer of assets to an address under your control, or a return or other negative balance, regardless of the source of assets in an account." [18]

Shortly after the commencement of these Chapter 11 Cases, on December 19, 2022, BlockFi filed the Wallet Withdrawal Motion (as defined below), seeking to return Digital Assets held in Client Wallet Accounts. Consistent with such relief requested, the Plan provides for the return of those non-Estate Digital Assets held in Client Wallet Accounts in connection with the Wallet Program in full, subject to set off for (i) any negative Account balances including for any ACH chargeback transactions, and (ii) any applicable withdrawal fees, and (iii) any administrative costs and expenses incurred in connection with, or arising out, of the Wallet Program.

Trade Only Assets in the Wallet Program will be converted into USDC or another Stablecoin at the Debtors' election prior to being available for withdrawal by Clients from the Wallet Program. All other Digital Assets in the Wallet Program will be available for withdrawal in kind. Holders of Wallet Account Claims will have sixty (60) days following the Effective Date to withdraw their Digital Assets in the Wallet Program from the BlockFi Platform. Any Digital Assets in the Wallet Program not withdrawn during that period will be converted to Cash and any subsequent Distributions of assets in the Wallet Program will be made in Cash.

The Committee has advised the Debtors that it is supportive of returning some Digital Assets held in Client Wallet Accounts, but only if such Clients are not subject to potential preference claims under Chapter 5 of the Bankruptcy Code. More specifically, the Committee alleges that certain transfers from BlockFi Interest Accounts ("BIAs") and/or BlockFi Private Client Accounts ("BPCs") into Client Wallet Accounts may give rise to preference claims if transferred during the applicable preference periods. *See e.g., Limited Objection and Response of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 380]. The Committee demanded that the order granting the Debtors' Wallet Withdrawal Motion include a paragraph preventing the distribution of any wallet assets to clients who are subject to potential preference claims pending further order of court, and the paragraph provided by the Committee was included in the Order entered by the Bankruptcy Court [Docket No. 923].

The Debtors do not believe that transfers from BIAs/BPCs into Client Wallet Accounts are subject to preference claims under the Bankruptcy Code or Bermuda Law, as applicable.[19] The Debtors believe that any platform transfers would be subject to defenses including the contemporaneous exchange of new value defense, the ordinary course of business or financial affairs defense, and the new value defense under section 547(c) of the Bankruptcy Code. Additionally, preference claims against defendants for less than $25,000 must be filed in the

---

[17]    Wallet Terms of Service §§ D, H and M.

[18]    Wallet Terms of Service § M.

[19]    The Terms of Service provide that BIAs and BPCs held by Clients of BlockFi International Ltd. are governed by Bermuda law.

court in which the defendant resides. The pursuit of preference claims would require significant expenditures for legal and financial professionals as the Debtors would be forced to litigate expensive lawsuits in multiple jurisdictions. With respect to preferences under Bermuda law, the application of section 237 of the Companies Act 1981 (the "Companies Act") requires that it be established that the transaction was undertaken with the intention to fraudulently prefer one or more of the company's creditors, at a time when the company was unable to pay its debts as they fell due. This is a high bar which the Debtors believe means that any transfers from BIAs/BPCs into Client Wallet Accounts would not be subject to preference claims under Bermuda law. Accordingly, pursuing preference claims would not inure to the Debtors' benefit and would result in lower creditor recoveries because of professional fees incurred during the pursuit of such claims.

**(b)      Treatment of Retail and Institutional Loan Collateral Claims**

One of BlockFi's service offerings was its retail loan program whereby BlockFi Lending made prepetition retail advances to Retail Borrowers (as defined below), which in some cases were subsequently assigned to BlockFi International (the "Retail Loan Program"). Under the Retail Loan Program, BlockFi's Clients could borrow U.S. Dollars or Stablecoin (e.g., USDC, GUSD, or PAX) from BlockFi Lending or BlockFi International, as applicable, secured by collateral in the form of Digital Assets (the "Loan Collateral") (e.g., BTC, ETH, LTC, or PAXG).

At the initial funding, loans extended under the Retail Loan Program were generally collateralized on a two-to-one basis, meaning the value of the Loan Collateral was twice the value of the assets loaned to the applicable Client. Account Holders (the "Retail Borrowers") entered into loan agreements with BlockFi Lending, pursuant to which the applicable Retail Borrower granted the applicable Debtor a security interest in the Loan Collateral. Generally, Retail Borrowers were required to maintain a loan-to-value ratio below 70 percent, meaning the value of the loaned assets (i.e., the principal amount of the loan) could not exceed 70 percent of the value of the Loan Collateral. If this ratio was breached, the Retail Borrower had the option to pay down their loan and/or add additional Loan Collateral. To the extent that a Retail Borrower repaid their loan in full, the Retail Borrower's Loan Collateral would be returned to their Client Wallet Account.

Similarly, under BlockFi's institutional loan program (the "Institutional Loan Program"), BlockFi Lending and BlockFi International made prepetition advances to institutional borrowers (the "Institutional Borrowers" and, together with the Retail Borrowers, the "Borrowers"). Under the Institutional Loan Program, Institutional Borrowers could borrow fiat currency or Digital Assets from BlockFi Lending or BlockFi International, as applicable. The loans could generally be secured by collateral in the form of fiat currency or other Digital Assets, depending on BlockFi's assessment of a particular Client's creditworthiness, and, to the extent collateralized, were generally (but not always) subject to collateral maintenance requirements whereby BlockFi would require the pay down of loans or additional collateral in the event the applicable loan-to-value ratios were breached.

Collateral pledged by Institutional Borrowers in connection with the institutional loan agreements (the "Institutional Loan Agreements") and Retail Borrowers in connection with the retail loan agreements (the "Retail Loan Agreements") are property of the Debtors' Estates. Both the Institutional Loan Agreements and Retail Loan Agreements generally allowed BlockFi Lending and BlockFi International, as applicable, with broad rehypothecation rights. For example, the Retail Loan Agreements provide "Borrower agrees that Lender may, for its own account, pledge, repledge, rehypothecate, sell, lend or otherwise transfer or use any amount of such Collateral, separately or together with other property, with all attendant rights of ownership from time to time, without notice to the Borrower, either separately or in common with other such cryptocurrency, any or all of the Collateral and that Lender may do so without retaining in its possession or control for delivery, a like amount of similar Collateral."[20]

Under the Plan, each Allowed BlockFi Lending LLC Loan Collateral Claim and each Allowed BlockFi International Ltd. Loan Collateral Claim will be reduced by the applicable Loan Account Obligation (as defined

---

[20]   Retail Loan Agreement § 4(d). Similarly, the Institutional Loan Agreements provide: "Lender shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral, unless otherwise specified on the applicable Loan Term Sheet." Institutional Loan Agreement § V(a).

20

below) outstanding as of the Petition Date. Any remaining BlockFi Lending LLC Loan Collateral Claim or BlockFi International Ltd. Loan Collateral Claim (*i.e.*, to the extent that such Claim *exceeds* any claim of the Debtors against the Borrower with respect to advances made by the Debtors in connection with the loans (the "Loan Account Obligations"))[21] after application of the Set Off Treatment (as defined in footnote 31̶33) shall be classified as an Account Holder Claim at the applicable Debtor and treated as described in Article V.D of this Disclosure Statement.

For the avoidance of doubt, the Debtors propose to apply the Set Off Treatment in lieu of alternative options, including reinstating loan agreements and payments due thereunder. The Debtors believe that the Set Off Treatment maximizes recoveries for Holders of Allowed Loan Collateral Claims while minimizing administrative burdens on the Debtors' Estates.

### (c)        Treatment of Intercompany Claims

The operations of the Debtor entities are interrelated, regularly requiring transfers and transactions of Cash and Digital Assets between the different Debtor entities (together, the "Intercompany Transactions"). Accordingly, the Debtors are each party to several different types of transactions and intercompany agreements, such as agreements related to the execution of trades in various Digital Assets, intercompany loans, intercompany service agreements, and capital contribution agreements.

In the ordinary course of business, the Debtors make Intercompany Transactions to: (a) reimburse certain Debtors for various expenditures including employee compensation expenses, sales and marketing expenses, and technology expenses; (b) fund certain Debtors' accounts in anticipation of such expenditures, as needed; and/or (c) facilitate trading, lending, and other revenue generating activity. The primary Debtor entities involved in the Intercompany Transactions are BlockFi Inc., BlockFi International, and BlockFi Lending.[22]

Specifically, prior to the Petition Date, BlockFi International, BlockFi Lending, and BlockFi Inc. regularly conducted Intercompany Transactions to, among other things, re-balance Digital Assets held by such Debtor Entities to honor Client withdrawals in the ordinary course and simultaneously adhere to certain regulatory requirements. Notably, the rapid growth of the Institutional Loan Program caused BlockFi International and BlockFi Lending to engage in frequent Intercompany Transactions across various Digital Assets with BlockFi Inc. and amongst themselves to ensure they had sufficient Digital Assets to address Client demands. Additionally, BlockFi Inc., BlockFi Lending, and BlockFi International regularly facilitated Intercompany Transactions amongst each other to allocate attributable costs between the Entities, including costs related to vendor, contractor, and employee compensation expenses, professional fees, technology, sales and marketing, and other expenses associated with maintaining and operating the BlockFi Platform, based on a percentage of revenue. The Debtors actively tracked Intercompany Transactions and reviewed all expenses to determine allocation to the applicable Debtor Entity.

The Debtors' books and records as of the Petition Date reflect approximately $1.6̶7̶0̶3̶68 billion in Intercompany Claims between the Debtor Entities. A simplified graphic of the Debtors' Intercompany Claims as of the Petition Date is as follows:[23]

---

[21]    The Debtors have not yet begun the process of evaluating their portfolios of retail and institutional loans to determine which, if any, would result in Borrowers owing Digital Assets or Stablecoins to the Debtors after application of the Set Off Treatment. The Debtors reserve all rights with respect to all of their retail and institutional loans.

[22]    Non-Debtor BlockFi Asia PTE Ltd. is also a party to an intercompany agreement with BlockFi Services, Inc. whereby BlockFi Services, Inc. transfers certain payroll amounts to BlockFi Asia PTE Ltd. for its employees (BlockFi Asia PTE Ltd. previously employed two persons, which has been reduced to one employee after the Petition Date).

[23]    A Debtor entity could simultaneously be a borrower and lender given the differing Digital Assets transacted.



Under the Plan, Intercompany Claims (a) between BlockFi International and BlockFi Lending, (b) between BlockFi International and BlockFi Inc., and (c) between BlockFi Lending and BlockFi Inc., will, in each case, be netted, resulting in three separate Intercompany Claims (one for each pair of Debtors in clauses (a), (b), and (c)), and such remaining Intercompany Claims after such netting will be treated *pari passu* with Account Holder Claims and General Unsecured Claims at the applicable Debtor entity.  Accordingly, the intercompany balances after netting will be reduced to approximately $874~~2.3~~2 million.  A simplified graphic of the Debtors' intercompany balances after netting under the Plan is as follows:



### (d)    Treatment of SEC Penalty Claims

On February 14, 2022, the SEC released an "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order" (the "Consent Order") after reaching an agreement with BlockFi Lending to settle certain alleged charges against BlockFi Lending for violations of various securities laws and regulations.  Pursuant to the Consent Order, BlockFi Lending agreed to "pay a *civil money penalty* of $50 million to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury," in five installments of $10 million each.[24]  The Consent Order further provided that "[a]mounts ordered to be paid as *civil money penalties* pursuant to this [Consent Order] shall be treated as *penalties* paid to the government for all purposes."[25]  As of the Petition Date, BlockFi Lending has made two of the five installment payments, and $30 million remains outstanding.

On [ ], 2023, the Debtors and the SEC entered into the *Stipulation and Agreed Order Between U.S. Securities and Exchange Commission and Debtors to Forego Receiving Distribution from Debtors' Bankruptcy Estates* (the "SEC Penalty Stipulation").  Pursuant to the SEC Penalty Stipulation, the SEC and the Debtors stipulated that the SEC will not receive a Distribution on account of the SEC Penalty Claims unless and until all allowed Secured Tax Claims, Other Priority Claims, Account Holder Claims, General Unsecured Claims, and Intercompany Claims are paid in full.

### (e)    ~~(d)~~ Dollarization of Account Holder Claims

As required by section 502(b) of the Bankruptcy Code, each Account Holder Claim is determined by the fair market value of the Digital Assets (based in U.S. Dollars) held by the Account Holder at the Debtors as of the Petition Date at 11:59 p.m. UTC.  This process is generally referred to as a "dollarization."  Dollarization allows the Debtors to put all Account Holder Claims on equal footing to calculate recoveries in accordance with the requirements of the Bankruptcy Code and does not affect the ability to satisfy such Claims in kind.

**3.    *General Settlement of Claims and Interests***

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and as consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan (to the extent such controversies have not already been compromised and settled in accordance with the terms and conditions of the 9019 Motion (as defined herein)).  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**B.    Holders of Claims May Be Released by the Debtors**

In order to effectuate an expedient process and limit future legal costs, the Plan also contemplates that Holders of Claims may be released by the Debtors: specifically, (i) Holders of Claims ~~that vote~~voting to accept the Plan, ~~and all other~~(ii) Holders of Claims ~~and Interests~~deemed to accept the Plan who do not affirmatively opt out of the releases provided by the Plan ~~by checking the box on the applicable form indicating that they opt not to provide~~, (iii) Holders of Claims who abstain from voting on the Plan and do not affirmatively opt out of the releases provided by the Plan ~~(whether or not such~~, and (iv) Holders of Claims who votes ~~on~~to reject the Plan~~),  and do not~~

---

[24]   Emphasis added.

[25]   Emphasis added.

affirmatively opt out of the releases provided by the Plan shall be deemed "Releasing Parties" and will receive a release from the Debtors.  This release includes any avoidance actions the Debtors could bring against such Holder.  The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to all stakeholders.  Importantly, the Committee has indicated that it would like to terminate exclusivity to move these cases along more swiftly.  But the plan the Committee would file could preserve all these preference actions and significantly delay—and ultimately dilute—creditor recoveries.

## C.      Employee Transition Plan

The Debtors will require the services of certain crucial employees to consummate the Plan.  Among other things, in addition to having key personnel available to help the Debtors prosecute and defend against the Litigation, the Debtors will require certain employees to assist the Wind-Down Debtors with:  (i) securely maintaining and protecting Client data, including "Know Your Client" data; (ii) updating BlockFi's user interface to reflect proper accounting of Digital Assets as of the Platform Pause; (iii) reconciling Client Claims and Accounts; (iv) rebalancing the Debtors' Digital Assets portfolio; (v) reopening the BlockFi Platform for a limited period of time to permit Clients to withdraw Digital Assets safely and securely; (vi) conducting ordinary course maintenance of the BlockFi Platform; and (vii) interacting and responding to state, federal and international regulators.  To complete these tasks, the Debtors will need certain employees in legal, finance, compliance, operations, data, product, engineering, people, and security.  Separate and apart from entering into cooperation agreements with key witnesses in the Litigation, which the Debtors intend to do, the Debtors have created a transition plan (the "Employee Transition Plan") for employees necessary to fulfill these obligations.  The Employee Transition Plan contemplates two participation milestones whereby approximately 60 employees will be necessary to fulfill these obligations.  Following the completion of the first and second milestones, the Debtors expect to reduce their employee headcount to approximately 60 employees and 8 employees, respectively.  The Debtors do not believe that the Plan is feasible without these key employees.

Additionally, the Plan contemplates at least one, and possibly multiple, Distributions of assets in kind (that is, in Digital Assets) through the BlockFi Platform to Clients.  These Distributions will present challenges without the continued focus and efforts of crucial BlockFi employees.

The BlockFi Platform was developed in-house, is written in a unique and esoteric programming language, and has capabilities that newcomers to the situation would need time to digest and understand (if they could do so at all).  Hiring outside professionals or new temporary employees to attempt to facilitate Distributions without current staff who were responsible for processing withdrawals pre-petition would come with substantial cost and risk.  As a practical matter, the only realistic way to process in-kind Distributions is through the BlockFi Platform—otherwise processing hundreds of thousands of transactions manually to external wallets is not realistic.  Alternative third-party Distribution agents similarly present additional costs for set up, "Know Your Customer" review, and implementing security protocols that BlockFi already has in place.

Digital Asset Distributions are particularly sensitive, and injecting new procedures to distribute Digital Assets to Clients with new people is risky.  Digital Assets are like bearer bonds and transmission of those assets is inherently high risk; small errors in Distributions can lead to permanent losses—among other things, if even a single character in a lengthy Distribution address is entered incorrectly, the Digital Assets can be gone forever, unable to be retrieved.  These errors and losses have happened before, which BlockFi has learned from and, in turn, established the expert knowledge base within the existing team to make Distributions, reduce the risks of errors, and increase the chances for a successful and safe in-kind Distribution of Digital Assets to Clients.  Other Digital Asset platforms have been subject to data security breaches and the existing team is best equipped to make sure that the BlockFi Platform is protected.

In order to process Distributions, the Debtors are in the process of building a new ledger system that will, for the first time, allow the Debtors to upload new balance information for the Debtors' more than 650,000 Clients, in order to update Client balances to match the recovery level approved by the Court.  This is a new system that will require the upload of hundreds of thousands of rows of Client data.  The Debtors need to build this in order to allow Clients to withdraw the Digital Assets from the BlockFi Platform, but limit their withdrawal amounts to the recovery level and Court approved amount rather than the amount of Digital Assets "deposited."  Those managing both the

maintenance and enhancement of the BlockFi Platform will, as a practical matter, need to be existing employees familiar with creation of the BlockFi Platform and the development of the BlockFi Platform over time.

In addition to experience working with Digital Assets and blockchain transactions, in order to complete the work required, the leader(s) of the project(s) needs to have knowledge of:

- The Debtors' Chapter 11 Cases;

- The Debtors' ledger and accounting system, including knowledge of prior changes to the system that could affect new products (ACH reversals, automated freezes to Client accounts when loans are in margin calls, credits made to Client accounts and the system use to apply those credits) as one off-changes can cause issues when integrating a new system;

- The Debtors' withdrawal system, which was originally built by BlockFi's engineering team three years ago.  The system, Kingpin, has specific nuances built in to accommodate issues with Bitgo's API;

- Knowledge of historical gas fees, as the time and volume of when withdrawals are processed have a huge impact on the average cost of the withdrawal.  In 2022, BlockFi's gas fee optimization project saved approximately $2.5 million per year in fees, and leveraging this knowledge will save the Estate valuable resources; and

- Bespoke risks in building the product, including risks relating to: (a) historical impact of "ghost code" on BlockFi's system; (b) historical Client escalations based on user experience concerns; and (c) safety and security of Client withdrawals.

The Debtors have also created a Distribution plan assuming that they will be making the Distributions from the BlockFi Platform using their own employees.  The Debtors will need to retain capabilities to complete at least the following tasks:

- **Pre emergence** – Finalize full Distribution plan;

- **Day 1-90** – Complete build of, beta test, and finalize new withdrawals engine.  Distribute BlockFi Wallet and recoveries on account of BIAs, BPCs, and Loan Collateral Claims;

- **Day 90-180** – Transfer knowledge to skeleton team, shut down custodians, sunset platform; ~~and~~

- **Day 181+** – Long tail on Estate management - claims and litigation.

The key workstreams and key teams for these tasks are listed below for the first 90 days:

1. *Rebalancing*

   - Key Teams – Finance, Institutional, Operations

2. *Effectuating Distributions*

   - Key teams – Operations, Finance, Product, Engineering

3. *Claims Reconciliation*

   - Key teams – Operations, Finance

4. *Employment and Offboarding*

- Key teams – People, Security, Legal

  5.  *Regulatory / Litigation*

  - Key teams – Legal, Compliance, Finance

Key workstreams and key teams for projected days 90–180 are listed below:

  1.  *Shutting Down Custodians & Key Accounts, Knowledge Transfer to Skeleton Team*

  - Key teams – Operations, Finance

  2.  *Long Tail on Claims and Litigation*

  - Key teams – Operations, Finance, Legal

  3.  *Sunsetting Platform*

  - Key teams – Engineering, Product, Security, Operations

  4.  *Offboarding All But Skeleton Team*

  - Key teams – People, Security, Legal

The Debtors believe that these workstreams and teams are critical to their ability to make in-kind Distributions to Clients in a safe, secure, and efficient manner.  Losing the capabilities of individuals on the key teams above could eliminate the Estate's ability to make in-kind Distributions at all, would require the Estate to spend substantially more money and take substantially more time to finalize the capabilities to make these Distributions, and would create risk in the process.  Securing the cooperation of those referenced here for the Distribution process would be extremely valuable to the Estate.

## IV.    WHY HOLDERS OF CLAIMS SHOULD VOTE IN FAVOR OF THE PLAN

**Voting in favor of the Plan is the fastest way for Holders of Claims to receive the highest recovery.**

Through the Plan, the Debtors are one step closer to returning Digital Assets and Cash to Clients.  The Plan maximizes recovery for Clients and provides for the quickest possible Distributions to Clients, while allowing the Debtors to Wind Down in an orderly fashion.  The Plan also preserves and puts the Debtors in the best place to successfully prosecute (and defend) viable litigation claims against Emergent, Marex, Alameda, FTX, 3AC, and Core Scientific which, if successful, could lead to meaningfully higher recoveries for Clients.  While preserving these viable Causes of Action, the Plan avoids years spent in litigation—and Client money—pursuing other potential causes of action that would make success on the meaningful litigation described above less likely and are unlikely to be successful in their own right while resulting in substantially increased professional fees and decreased recoveries for Clients.

The Debtors have remained steadfast throughout these Chapter 11 Cases in their goal to return Digital Assets to Clients as quickly as possible.  It remains unclear if the Committee shares this goal.  The Committee objected to two early, extremely straightforward motions intended to ensure that the Debtor would retain and engage the people necessary to return Digital Assets to Clients as quickly as possible.  The Committee then objected to the Wallet Withdrawal Motion, indicating that it would like to preserve potential clawback claims against Clients that transferred assets from BIAs or BPCs to Wallet and/or off of the BlockFi Platform in the 90 days prior to the Petition Date.  The Committee then objected to the Debtors' motion to extend exclusivity, suggesting that it wanted to file its own plan that would have required years of litigation before any assets could be returned to Clients and could not have resulted in safe and secure in-kind Distributions to Clients.  Pursuit of preference claims against 4,152 (or any material number of) Clients, which the Committee has expressed a desire to do, would result in a

26

substantial holdback of Client assets, which would be used to pay legal professionals to pursue clawback of funds that are currently in Clients' possession into BIAs and BPCs with uncertain probability of returns.

**If you vote in favor of the Debtors' Plan, you will receive a release from the Debtors. This release includes a release of any clawback claims the Debtors could bring against you for transfers from BIAs or BPCs to Wallet and/or off the BlockFi Platform prior to the Platform Pause. The releases to be implemented pursuant to the Plan preserve value by enabling the Debtors to emerge swiftly from chapter 11 while giving finality to all stakeholders.**

If you do not vote in favor of the Plan, the Committee will likely seek to propose their own competing plan that will preserve clawback claims against Clients, resulting in significantly reduced recoveries to Clients and materially extending the timeline for Clients to receive Distributions. The Committee's chapter 11 plan would likely seek to authorize the Wind-Down Debtors to claw back certain amounts that Clients properly transferred from BIAs or BPCs to Wallet and/or withdrew from Client Wallet Accounts before the Platform Pause. Under the Committee's chapter 11 plan, if you are the target of a preference claim, you will have to come out of pocket for personal legal counsel to defend any clawback claims brought against you. There will likely be no Distributions to Clients until these clawback claims are litigated and resolved which could take years. The Committee's strategy will not only result in significant professional fees but it is also unlikely to be successful given the valid defenses that Clients have to potential preference claims. In the end, only professionals will benefit from such litigation.

The Committee may also seek to pursue potential claims that it believes exist against insiders of the Debtors. This litigation strategy would be extremely expensive to pursue (draining Estate assets that should go to Clients), would take a material amount of time, and is unlikely to be successful based on the results of the Special Committee Investigation (as further discussed below). It would also alienate the remaining employees, effectively foreclosing the possibility of any in-kind Distributions to Clients, jeopardizing the safety of the Debtors' Digital Assets, and reducing the likelihood of success in the Litigation. The Debtors do not believe that any employee would voluntarily cooperate with the estate, in the Litigation, the return of assets in kind to Clients, or both, if they were being targeted with specious litigation claims.

A vote in favor of the Plan will help usher these Chapter 11 Cases to conclusion. Your affirmative vote will preserve remaining value, the Debtors will release all claims and causes of action they may have against you, including any potential clawback claims, and you will receive Digital Assets and Cash on the fastest timeline. The Wind-Down Debtors will then focus all of their efforts on pursuing real claims and causes of action in the Litigation against Emergent, Marex, Alameda, FTX, 3AC, and Core Scientific to maximize recoveries for their Clients, and defending against claims asserted by Alameda, FTX, and 3AC (which threaten to massively dilute Clients). Only success on *those* causes of action—claims against Alameda, FTX, Emergent, Marex, 3AC, and Core Scientific, and claims against the Debtors by Alameda, FTX, and 3AC—will have a material impact on Client recoveries, and it makes no sense for the Debtors to take action that would compromise the estates' ability to succeed on those claims.

## V.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a

27

bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your Distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

|  |  |  |  |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 a | BlockFi Lending LLC Private Client Account Claims | Impaired | Entitled to Vote |
| 3 b | BlockFi Lending LLC Loan Collateral Claims | Impaired | Entitled to Vote |
| 3 c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired | Entitled to Vote |
| 3 d | BlockFi International Ltd. Loan Collateral Claims | Impaired | Entitled to Vote |
| 3 e | BlockFi Inc. Interest Account Claims | Impaired | Entitled to Vote |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired | Entitled to Vote |
| 4 b | BlockFi International Ltd. General Unsecured Claims | Impaired | Entitled to Vote |
| 4 c | BlockFi Inc. General Unsecured Claims | Impaired | Entitled to Vote |
| 4 d | BlockFi Services, Inc. General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4 e | BlockFi Trading LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4 f | BlockFi Wallet LLC General Unsecured Claims | IUnimpaired | Not Entitled to Vote (Deemed Presumed to Reject Accept) |
| 4 g | BlockFi Ventures LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4 h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
|---|---|---|---|
| 5 | FTX Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | FTX Avoidable Transfer Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Alameda Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | 3AC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Government Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 13 | Existing Preferred Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 14 | Existing Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 15 | SEC Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.     What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive Distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  Any Claims referenced as being *pari passu* will receive equal treatment between the classes of Claims.

For example, if you are the Holder of a Class 3-a BlockFi Lending LLC Private Client Account Claim, you may recover as much as 100% of the amount of your Claim through Distributions under the Plan.  If the Debtors are unsuccessful in recovering any amounts from 3AC, Alameda, FTX, among others, through the Litigation (*i.e.*, in a worst-case scenario), you may recover approximately 83.5% of your Claim.  Holders of Class 3-a BlockFi Lending LLC Private Client Account Claims may recover these amounts in either Cash or Digital Assets depending on the timing of the Distributions.  For additional information on your potential recovery under the Plan, please refer to the table below.

The projected recoveries set forth in the table below are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis (as defined below) attached hereto as **Exhibit B**.  Accordingly, recoveries actually received by Holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, THE ULTIMATE TREATMENT OF SUBORDINATED CLAIMS, INCLUDING THE FTX FACILITY CLAIMS, THE FTX AVOIDABLE TRANSFER CLAIMS, THE ALAMEDA CLAIMS, THE 3AC CLAIMS, AND THE GOVERNMENT PENALTY CLAIMS, THE RESOLUTION OF LITIGATION INCLUDING WITH RESPECT TO THE ROBINHOOD SHARES, ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND THE RESOLUTION OF DISPUTED CLAIMS.    FOR  A  COMPLETE  DESCRIPTION  OF  THE  DEBTORS'  CLASSIFICATION  AND**

**TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**[2426]

---

[2426] The recoveries included in this Disclosure Statement are for illustrative purposes only and subject to material change particularly due to, among other things, market volatility and the ultimate treatment of the FTX Facility Claims, FTX Avoidable Transfer Claims, Alameda Claims, 3AC Claims, Government Penalty Claims and Intercompany Claims which could reduce the recoveries projected above.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims 25,26,27,28,29 (in $mm) | Projected Plan Recovery | Liquidation Recovery |
|---|---|---|---|---|---|
| | | | | | |

---

25  The Claims presented are based on scheduled Claims and do not reflect adjustments for filed Proofs of Claim other than those Claims filed by FTX and Arch Insurance Company.  There are nearly 30,000 other Proofs of Claim which have been filed by potential creditors and which will need to be reconciled.  These 30,000 filed Claims, if valid, would change the allowed Claims in the Account Holder Claims and General Unsecured Claims classes including the associated creditor recoveries in a material way.

26  Claims are estimated based on the Debtors total customer Claim balances and have not been reduced for potential *De Minimis* Claims which would not be entitled to Distributions under the Plan.

27  The Claims values presented herein are based on scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket Nos. 856–858]and do not reflect adjustments for filed Proofs of Claim other than those Claims filed by FTX and Arch Insurance Company.  There are over 30,000 other Proofs of Claim which have been filed by potential creditors and which will need to be reconciled.  These filed Claims, if valid, would change the allowed Claims in the Account Holder Claims and General Unsecured Claims classes including the associated creditor recoveries in a material way.

28  Claims are estimated based on the Debtors total customer Claim balances and have not been reduced for potential *De Minimis* Claims which would not be entitled to Distributions under the Plan.

29  The Claim values presented herein are based on scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket Nos. 856–858].

31

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| 1 | Secured Tax Claims[28,30] | Each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Allowed Secured Tax Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Secured Tax Claim or such other treatment rendering such Holder's Allowed Secured Tax Claim Unimpaired. | n/a | | 100.0% | | 100.0% | |
| 2 | Other Priority Claims[29,31] | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, at the option of the applicable Debtor, payment in full in Cash of such Holder's Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | n/a | | 100.0% | | 100.0% | |
| 3-a | BlockFi Lending LLC Private Client Account Claims[30,32] | Each Holder of an Allowed BlockFi Lending LLC Private Client Account Claim will receive, in full and final satisfaction of such Allowed BlockFi Lending LLC | $192.87.9 million | $2161.04 million | 836.50% | 100.0% | 746.08% | 100.0% |

---

[28] Filed Secured Tax Claims have not been contemplated herein as the Bar Date for Governmental Claims is May 30, 2023 [30] The claims presented herein are based on scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket Nos. 856–858].  In the event that Secured Tax Claims are found to be valid and thus included as Claims, they will receive a full recovery.

[29,31] The Claims presented herein reflect scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket Nos. 856–858].  Although no Other Priority Claims have been contemplated, in the event that filed Other Priority Claims are deemed valid and subsequently included in the Claims population, they will receive a full recovery.

[30,32] BIA & BPC interest accrued through the Petition Date has been included in the Claim amounts.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | Private Client Account Claim:<br><br>(i)  its Pro Rata share of:<br><br>    A. the Cash Allocation for Holders of Claims at BlockFi Lending LLC; or<br><br>    B. the Digital Assets Allocation for Holders of Claims at BlockFi Lending LLC; and<br><br>(ii)  its Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC Private Client Account Claims;<br><br>*provided* that Holders of BlockFi Lending LLC Private Client Account Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date; *provided further* that any Distribution made to Holders of Allowed BlockFi Lending LLC Private Client Account Claims shall be *pari passu* with Holders of Claims in Class 3-b (BlockFi Lending LLC Loan Collateral Claims) and Class 4 a (BlockFi Lending LLC General Unsecured Claims). For the avoidance of doubt, Holders of Claims in Class 3 b shall only be treated *pari passu* with Holders of Allowed BlockFi Lending LLC Private Client Account Claims in this Class 3 a to the extent any remaining amount of such Holder's Allowed Claims in Class 3 b, after the Set Off Treatment[34,33] is accounted | | | | | | | |

[34,33] "*Set Off Treatment*" means, with respect to any Allowed BlockFi Lending LLC Loan Collateral Claims or Allowed BlockFi International Ltd. Loan Collateral Claims, such Claims will be set off or recouped against the applicable Loan Account Obligations outstanding on the Petition Date.  Under the Set Off Treatment, Holders of Allowed BlockFi Lending LLC

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | for, is still owed to such Holder on account of its Class 3 b Claim. | | | | | | |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Each Holder of an Allowed BlockFi Lending LLC Loan Collateral Claim will receive, in full and final satisfaction of such Allowed BlockFi Lending LLC Loan Collateral Claim, the Set Off Treatment; *provided* that, for the avoidance of doubt, any Distribution made to Holders of Allowed BlockFi Lending LLC Loan Collateral Claims shall be *pari passu* with Holders of Claims in Class 3 a (BlockFi | $99.7 100.6 million | | 83 6.50 % | 100.0% | 74 6.08 % | 100.0% |

Loan Collateral Claims or Allowed BlockFi International Ltd. Loan Collateral Claims, as applicable, will receive on account of any remaining Claims after set off of the Loan Account Obligations (i) a Pro Rata share of either (a) the Digital Assets Allocation or (b) the Cash Allocation for Holders of Claims at BlockFi International Ltd. or BlockFi Lending LLC, as applicable, in any event, in an amount (calculated in United States dollars as of the Petition Date pursuant to the Digital Assets Conversion Table) not to exceed (x) such Holder's Loan Collateral outstanding as of the Petition Date (calculated in United States dollars pursuant to the Digital Assets Conversion Table) less (y) such Holder's Loan Account Obligations, and (ii) a Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of such Claims until payment in full of such Allowed Claims; *provided* that the Holders of such Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date.  The remaining amount of such Holder's Allowed BlockFi Lending LLC Loan Collateral Claims or Allowed BlockFi International Ltd. Loan Collateral Claims (each calculated in United States dollars as of the Petition Date pursuant to the Digital Assets Conversion Table), after such set off or recoupment is accounted for (if any) and any further Distribution made to Holders of such Claims, shall be *pari passu* with Account Holder Claims and General Unsecured Claims at BlockFi Lending LLC or BlockFi International Ltd., as applicable.

34

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | Lending LLC Private Client Account Claims) and Class 4 a (BlockFi Lending LLC General Unsecured Claims). | | | | | | |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims[3234] | Each Holder of an Allowed BlockFi International Ltd. Private Client and Interest Account Claim will receive, in full and final satisfaction of such Allowed BlockFi International Ltd. Private Client and Interest Account Claim:<br><br>(i)  its Pro Rata share of:<br><br>A. the Cash Allocation for Holders of Claims at BlockFi International Ltd.; or<br><br>B. the Digital Assets Allocation for Holders of Claims at BlockFi International Ltd.; and<br><br>(ii) its Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. Private Client and Interest Account Claim;<br><br>*provided* that Holders of BlockFi International Ltd. Private Client and Interest Account Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date; *provided further* that any Distribution made | $37~~71~~65.02~~ million | | 47~~52.7~~% | 100.0% | 4~~38.41~~% | 8~~39.39~~% |

---

| | 3234 BIA & BPC interest accrued through the Petition Date has been included in the Claim amounts.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | to Holders of Allowed BlockFi International Ltd. Private Client and Interest Account Claims shall be *pari passu* with Holders of Claims in Class 3-d (BlockFi International Ltd. Loan Collateral Claims) and Class 4-b (BlockFi International Ltd. General Unsecured Claims). For the avoidance of doubt, Holders of Claims in Class 3-d shall only be treated *pari passu* with Holders of Allowed BlockFi International Ltd. Private Client and Interest Account Claims in this Class 3-c to the extent any remaining amount of such Holder's Allowed Claims in Class 3-d, after the Set Off Treatment is accounted for, is still owed to such Holder on account of its Class 3-d Claim. | | | | | | |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | Each Holder of an Allowed BlockFi International Ltd. Loan Collateral Claim will receive, in full and final satisfaction of such Allowed BlockFi International Ltd. Loan Collateral Claim, the Set Off Treatment; *provided* that, for the avoidance of doubt, any Distribution made to Holders of Allowed BlockFi International Ltd. Loan Collateral Claims shall be *pari passu* with Holders of Claims in Class 3-c (BlockFi International Ltd. Private Client and Interest Account Claims) and Class 4-b (BlockFi International Ltd. General Unsecured Claims). | $3~~89~~.~~50~~ million | | ~~47~~52.7 % | 100.0% | 4~~3~~8.4~~1~~ % | 8~~3~~9.~~3~~9 % |
| 3-e | BlockFi Inc. Interest Account Claims[33,35] | Each Holder of an Allowed BlockFi Inc. Interest Account Claim will receive, in full and final satisfaction of such Allowed BlockFi Inc. Interest Account Claim:<br><br>(i)    its Pro Rata share of:<br><br>    A.  the Cash Allocation for Holders of Claims at | $9~~97~~84 .~~59~~ million | $1,06~~1~~ ~~50~~ million | 3~~6~~9.~~2~~7 % | ~~94.4~~100 .~~0~~% | 3~~3~~6.4~~7~~ % | 59.2~~.5~~% |

[33,35] BIA & BPC interest accrued through the Petition Date has been included in the Claim amounts.

36

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | BlockFi Inc.; or<br><br>B.  the Digital Assets Allocation for Holders of Claims at BlockFi Inc.; and<br><br>(ii)  its Pro Rata share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. Interest Account Claim;<br><br>*provided* that Holders of BlockFi Inc. Interest Account Claims shall receive the Digital Assets Allocation for any Distributions made during the six (6) month period after the Effective Date and the Cash Allocation for any Distributions made following the expiration of the six (6) month period after the Effective Date; *provided further* that any Distribution made to Holders of Allowed BlockFi Inc. Interest Account Claims shall be *pari passu* with Holders of Claims in Class 4 c (BlockFi Inc. General Unsecured Claims). | | | | | | |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Each Holder of an Allowed BlockFi Lending LLC General Unsecured Claim will receive, in full and final satisfaction of such Allowed BlockFi Lending LLC General Unsecured Claim, its Pro Rata share of (i) the Cash Allocation for Holders of Claims at BlockFi Lending LLC and (ii) any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC General Unsecured Claim; *provided* that any Distribution made to Holders of Allowed BlockFi Lending LLC General Unsecured Claims shall be *pari passu* with Holders of Claims in Class 3 a (BlockFi Lending LLC Private Client Account Claims) and Class 3-b (BlockFi Lending LLC Loan Collateral Claims).  For the avoidance of doubt, Holders of Claims in Class 3 b shall | $1.13 million | | 836.50% | 100.0% | 746.08% | 100.0% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | **Plan** | **Liq.** | **Low** | **High** | **Low** | **High** |
| | | only be treated *pari passu* with Holders of Allowed BlockFi Lending LLC General Unsecured Claims in this Class 4 a to the extent any remaining amount of such Holder's Allowed Claims in Class 3 b, after the Set Off Treatment is accounted for, is still owed to such Holder on account of its Class 3 b Claim. | | | | | | |
| 4-b | BlockFi International Ltd. General Unsecured Claims[34] | Each Holder of an Allowed BlockFi International Ltd. General Unsecured Claim will receive, in full and final satisfaction of such Allowed BlockFi International Ltd. General Unsecured Claim, its Pro Rata share of (i) the Cash Allocation for Holders of Claims at BlockFi International Ltd. and (ii) any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. General Unsecured Claim; *provided* that any Distribution made to Holders of Allowed BlockFi International Ltd. General Unsecured Claims shall be *pari passu* with Holders of Claims in Class 3-c (BlockFi International Ltd. Private Client and Interest Account Claims) and Class 3-d (BlockFi International Ltd. Loan Collateral Claims). For the avoidance of doubt, Holders of Claims in Class 3-d shall only be treated *pari passu* with Holders of Allowed BlockFi International Ltd. General Unsecured Claims in this Class 4 b to the extent any remaining amount of such | $~~1.1~~0.1 million ~~$1.2 million~~ | | ~~47~~52.7% | 100.0% | ~~43~~38.41% | ~~8~~39.39% |

---

[34]   ~~As a result of certain post-petition expense allocation methodologies, allowed Claims may differ under the Plan and a chapter 7 liquidation as expenses allocated to Holders of Client Wallet Accounts in BlockFi Wallet LLC and BlockFi International will reduce recoveries below 100%, resulting in General Unsecured Claims for Holders of Client Wallet Accounts.~~

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims25,26,27,28,29 (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | **Plan** | **Liq.** | **Low** | **High** | **Low** | **High** |
| | | Holder's Allowed Claims in Class 3 d, after the Set Off Treatment is accounted for, is still owed to such Holder on account of its Class 3 d Claim. | | | | | | |
| 4-c | BlockFi Inc. General Unsecured Claims | Each Holder of an Allowed BlockFi Inc. General Unsecured Claim will receive, in full and final satisfaction of such Allowed BlockFi Inc. General Unsecured Claim, its Pro Rata share of (i) the Cash Allocation for Holders of Claims at BlockFi Inc. and (ii) any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. General Unsecured Claim; *provided* that any Distribution made to Holders of Allowed BlockFi Inc. General Unsecured Claims shall be *pari passu* with Holders of Claims in Class 3 e (BlockFi Inc. Interest Account Claims). | $346.02 million | | 369.27% | 94.4100.0% | 336.47% | 59.2.5% |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | ~~Each Holder of an Allowed~~ On the Effective Date, all BlockFi Services, Inc. General Unsecured Claims ~~will receive in full and final satisfaction of such Allowed~~ shall be canceled, released and extinguished, and will be of no further force or effect, and Holders of BlockFi Services, Inc. General Unsecured ~~Claim, its Pro Rata share of (i) the Cash Allocation for Holders of Claims at BlockFi Services, Inc. and (ii) any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Services, Inc. until payment in full of such Allowed~~ Claims will not receive any Distribution on account of such BlockFi Services, Inc. General Unsecured Claims. | ~~$0.2 million~~n/a | | ~~1.0%~~n/a | | ~~1.0%~~n/a | |
| 4-e | BlockFi Trading LLC General Unsecured Claims | On the Effective Date, all BlockFi Trading LLC General Unsecured Claims shall be canceled, released and extinguished, and will be of no further force or effect, and Holders of BlockFi Trading LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Trading LLC General Unsecured Claims. | n/a | | n/a | | n/a | |
| 4-f | BlockFi Wallet LLC General | ~~On the Effective Date, all~~ Each Holder of an Allowed BlockFi Wallet LLC General | ~~$2.1 million~~$2.2 | | 0100.0% | | 0100.0% | |

39

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | **Plan** | **Liq.** | **Low** | **High** | **Low** | **High** |
| | Unsecured Claims[35] | Unsecured Claim~~s shall be canceled, released and extinguished, and will be of no further force or effect, and Holders of~~ will receive, in full and final satisfaction of such Allowed BlockFi Wallet LLC General Unsecured ~~Claims will not receive any Distribution on account of such~~ Claim, (i) the Cash Allocation for Holders of Claims at BlockFi Wallet LLC or (ii) such other treatment rendering such Holder's Allowed BlockFi Wallet LLC General Unsecured Claim~~s~~ Unimpaired. | 0.9 million | | | | | |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | On the Effective Date, all BlockFi Ventures LLC General Unsecured Claims shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of BlockFi Ventures LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Ventures LLC General Unsecured Claims. | n/a | | n/a | | n/a | |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | On the Effective Date, all BlockFi Investment Products LLC General Unsecured Claims will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of BlockFi Investment Products LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Investment Products LLC General Unsecured Claims. | n/a | | n/a | | n/a | |
| 4-i | BlockFi Lending II | On the Effective Date, all BlockFi Lending II LLC General Unsecured Claims will be | n/a | | n/a | | n/a | |

---

[35] ~~As a result of certain post-petition expense allocation methodologies, allowed Claims may differ under the Plan and a chapter 7 liquidation as expenses allocated to Holders of Client Wallet Accounts in BlockFi Wallet LLC and BlockFi International will reduce recoveries below 100%, resulting in General Unsecured Claims for Holders of Client Wallet Accounts.~~

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | LLC General Unsecured Claims | cancelled, released, and extinguished, and will be of no further force or effect, and Holders of BlockFi Lending II LLC General Unsecured Claims will not receive any Distribution on account of such BlockFi Lending II LLC General Unsecured Claims. | | | | | | |
| 5 | FTX Facility Claims[36,37] | The FTX Facility Claims shall be recharacterized as equity contributions and shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of FTX Facility Claims will not receive any Distribution on account of such FTX Facility Claims; *provided, however,* if the Bankruptcy Court determines that the FTX Facility Claims should not be recharacterized as equity contributions, then the FTX Facility Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims at the applicable | $279.67 million | | 60.0% | 1.5% | 90.0% | 0.0% |

---

[36]    Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties.  Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

[37]    Certain Claims from Alameda and FTX related to collateral pledges of approximately $0.7B are assumed to be invalid as the Debtors are not in possession of such collateral and in the scenarios where the Debtors do receive a recovery of such perfected secured collateral and take possession of the collateral, it is assumed that the Debtors will have successfully prevailed in the Litigation, thus invalidating the Alameda/FTX Claims.

41

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | Debtor entity pursuant to section 510(c) of the Bankruptcy Code; *provided further, however*, if the Bankruptcy Court determines that the FTX Facility Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, such Claims shall be *pari passu* with General Unsecured Claims and Intercompany Claims at the applicable Debtor entity. | | | | | | |
| 6 | FTX Avoidable Transfer Claims[38,39] | The FTX Avoidable Transfer Claims shall be, pursuant to section 510(c) of the Bankruptcy Code, equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity; | n/a | | n/a | | n/a | |

---

[38]   Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties.  Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

[39]   Certain Claims from Alameda and FTX related to collateral pledges of approximately $0.7B are assumed to be invalid as the Debtors are not in possession of such collateral and in the scenarios where the Debtors do receive a recovery of such perfected secured collateral and take possession of the collateral, it is assumed that the Debtors will have successfully prevailed in the Litigation, thus invalidating the Alameda/FTX Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | *provided, however,* if the Bankruptcy Court determines that the FTX Avoidable Transfer Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, then the FTX Avoidable Transfer Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | | | | | | | |
| 7 | Alameda Claims[40,41] | The Alameda Claims shall be, pursuant to section 510(c) of the Bankruptcy Code, equitably subordinated to Account Holders Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity; *provided, however,* if the Bankruptcy Court determines that the Alameda Claims should not be equitably | n/a | | n/a | | n/a | |

---

[40]    Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties. Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

[41]    Certain Claims from Alameda and FTX related to collateral pledges of approximately $0.7B are assumed to be invalid as the Debtors are not in possession of such collateral and in the scenarios where the Debtors do receive a recovery of such perfected secured collateral and take possession of the collateral, it is assumed that the Debtors will have successfully prevailed in the Litigation, thus invalidating the Alameda/FTX Claims.

43

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26][27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | subordinated pursuant to section 510(c) of the Bankruptcy Code, such Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | | | | | | |
| 8 | 3AC Claims[42] | The 3AC Claims shall be, pursuant to section 510(c) of the Bankruptcy Code, equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity; *provided*, *however*, if the Bankruptcy Court determines that the 3AC Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, then the 3AC Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | n/a | | n/a | | n/a | |
| 9 | Government Penalty Claims[43] | The Government Penalty Claims shall be, | $529.4 million | | 0.0% | 100.0% | 0% | 100.0% |

---

[42]    Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties.  Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

[43]    Alameda, FTX, 3AC, and certain regulatory agencies have asserted Claims of approximately $5.1B against the Debtors for, among other things, (i) amounts due under the loan agreement including accrued and unpaid interest, (ii) preference payments, (iii) collateral pledges, (iv) withdrawals of certain collateral, and (v) fines and penalties.  Certain Claims are assumed to be invalid, while others are assumed to be subordinated (contractually, equitably, or otherwise) to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity, and the Government Entity will not receive any Distribution on account of such Government Penalty Claims until all Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity are paid in full; *provided, however*, if the Bankruptcy Court determines that the Government Penalty Claims should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then the Government Penalty Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity. | | | | | | | |
| 10 | *De Minimis* Claims | On the Effective Date, all *De Minimis* Claims shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of *De Minimis* Claims will not receive any Distribution on account of such *De Minimis* Claims. | n/a | | n/a | | n/a | |
| 11 | Intercompany Claims | On the Effective Date, all Intercompany Claims will be, at the option of the Debtors, either (a) reinstated or (b) converted to equity, otherwise set off, settled, distributed, contributed, cancelled, or released, in each case in accordance with the Restructuring Transactions Memorandum; *provided* that the Intercompany Claims (x) between BlockFi International Ltd. and BlockFi Lending LLC, (y) between BlockFi International Ltd. and BlockFi Inc., and (z) between BlockFi Lending LLC and BlockFi Inc., will, in each case, be netted, resulting in three separate Intercompany Claims (one for each pair of Debtors in clauses (x), (y), and (z)), and such remaining Intercompany Claims after such netting will be treated *pari passu* with Account Holder Claims | $874 2.32 million | | 44 8.36% | 98 100.0% | 40 4.5% | 73.6 80.1% |

| Class | Claim or Interest | Treatment | Projected Amount of Allowed Claims[25,26,27,28,29] (in $mm) | | Projected Plan Recovery | | Liquidation Recovery | |
|---|---|---|---|---|---|---|---|---|
| | | | Plan | Liq. | Low | High | Low | High |
| | | and General Unsecured Claims at the applicable Debtor entity; *provided, further, that, for the avoidance of doubt, in no case shall the treatment of Intercompany Claims set forth in the Restructuring Transactions Memorandum modify or alter the allocation of value among Debtor entities as set forth herein*. | | | | | | |
| 12 | Intercompany Interests[44] | On the Effective Date, all Intercompany Interests will be, at the option of the Debtors, either (a) reinstated or (b) set off, settled, addressed, distributed, contributed, merged, or cancelled, in each case in accordance with the Restructuring Transactions Memorandum. | $987.4 million | | 0.~~0~~25% | ~~48.0~~55.4% | 0.~~0~~25% | ~~17~~.92% |
| 13 | Existing Preferred Equity Interests | On the Effective Date, all Existing Preferred Equity Interests will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Existing Preferred Equity Interests will not receive any Distribution on account of such Existing Preferred Equity Interests. | $93~~65.0~~8 million | | ~~0~~0.0% | 1.5% | ~~0~~0.0% | 0.0% |
| 14 | Existing Common Equity Interests | On the Effective Date, all Existing Common Equity Interests will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Existing Common Equity Interests will not receive any Distribution on account of such Existing Common Equity Interests. | n/a | | 0% | | 0% | |
| 15 | SEC Penalty Claims | Pursuant to the SEC Stipulation, Holders of Allowed SEC Penalty Claims shall not be entitled to receive a Distribution on account of such Allowed SEC Penalty Claims unless all Holders of Allowed Claims in Class 1 (Secured Tax Claims), Class 2 (Other Priority Claims), Class 3 (Account Holder Claims), Class 4 (General Unsecured Claims), and Class 11 (Intercompany Claims) are paid in full. | $30.0 million | | 0.0% | 100.0% | 0.0% | 0.0% |

---

[44]    In certain Entities where subordinated Claims receive a full recovery, any remaining assets left to distribute flow up to the respective parent entity.  The recovery calculation contemplates these excess funds relative to the equity contribution made by BlockFi Inc.

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Wallet Account Claims, and Post-Petition Digital Asset and Cash Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  The chart below summarizes the various unclassified claims and provides the relevant section of the Plan that addresses their treatment:

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Administrative Claims | A Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date and prior to the Effective Date pursuant to section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' business and (b) Allowed Professional Fee Claims. | Article II, Section A |
| Professional Fee Claims | Any Administrative Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. | Article II, Section B |
| Priority Tax Claims | Any Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code. | Article II, Section C |
| Wallet Account Claims | Any Claims against BlockFi Wallet LLC, BlockFi Trading LLC, or BlockFi International Ltd. on account of Wallet Account Claims are entitled to, in full and final satisfaction of such Claims, Distribution in full of the ~~non-Estate~~non Estate assets contained in such Holders' Account in connection with the Wallet Program, subject to set off for (i) any negative Account balances including for any ACH chargeback transactions~~;~~ and (ii) any applicable withdrawal fees~~; and (iii) any administrative costs and expenses incurred in connection with, or arising out of, the Wallet Program.~~[45]~~.~~<br><br>Trade-Only Assets in the Wallet Program will be converted into USDC or another Stablecoin at the Debtors' election prior to being available for withdrawal by Clients from the Wallet Program.  All other ~~Digital A~~assets in the Wallet Program will be available for withdrawal in kind.  Account Holders will have sixty (60) days ~~following the Effective Date~~' notice to withdraw their ~~Digital A~~assets in the Wallet Program from the ~~BlockFi~~Debtors' ~~p~~platform.  Any assets in the Wallet Program not withdrawn in that period will be converted to Cash and any subsequent Distributions of assets in the Wallet Program will be made in Cash. | Article II, Section D |

~~[45]   Assets held in the Wallet Program have been allocated expenses that are directly attributable to the administration and Distribution of such funds.  These expenses are to be paid first by any excess amount in the Client Wallet Accounts before being deducted from Client Wallet Accounts.~~

| Claim | Description of Claim | Plan Section |
|---|---|---|
| Post-Petition Digital Asset and Cash Claims | Any Claim against any of the Debtors on account of Digital Assets or Cash transferred to the Debtors after the Petition Date are entitled to, in full and final satisfaction of such Claims, return in full of the Digital Assets or Cash transferred to the Debtors after the Petition Date. | Article II, Section E |
| Post-Effective Date Deposits | Any Client that deposits Cash or Digital Assets on the BlockFi Platform on or after the Effective Date shall be deemed to have forfeited such Cash or Digital Assets, as applicable, and such Cash or Digital Assets will not be returned to the Client. | Article II, Section F |

**F.** **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Holders of Claims will receive the potential recoveries reflected herein.  It is possible that any alternative plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article VII.B of this Disclosure Statement, titled "Best Interests of Creditors—Liquidation Analysis" and the Liquidation Analysis attached hereto as **Exhibit B**.

**G.** **If the Plan provides that I get a Distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the Distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial Distributions[4645] to Holders of Allowed Claims will be made as soon as reasonably practicable after the Plan becomes effective—the "Effective Date", as specified in the Plan.  *See* Article IX of the Plan for a description of the conditions precedent to Consummation of the Plan.

**H.** **What are the sources of consideration and other consideration used to make Distributions under the Plan?**

The Wind-Down Debtors shall fund Distributions under the Plan with:  (a) Cash and (b) Digital Assets.

**I.** **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article XI.C.2 of this Disclosure Statement titled "The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

**J.** **Does the Plan provide for the subordination of any Claims?**

The Plan contemplates that the Class 5 (FTX Facility Claims), Class 6 (FTX Avoidable Transfer Claims), Class 7 (Alameda Claims), Class 8 (3AC Claims), and Class 9 (Government Penalty Claims) are subordinated Claims.

---

[4645]  The decision to make an initial Distribution will be at the discretion of the Wind-Down Trustee subject to ongoing disputes, litigation, and/or Claims reconciliation.

1.     *FTX Facility Claims*

The Debtors believe that the FTX Facility Claims were clearly intended as, and as a practical matter were, equity contributions. The Debtors intend to seek recharacterization of the claims arising out of the FTX Facility to the extent those Claims are not disallowed in light of FTX's massive fraud and other misconduct which has substantially harmed BlockFi and all creditors.

However, if the Bankruptcy Court finds that the FTX Facility Claims are not equity contributions, the Plan also provides for contractual subordination and equitable subordination of the FTX Facility Claims to Account Holder Claims, General Unsecured Claims, and Intercompany Claims. Contractually, the Claims arising out of the FTX Facility rank junior to "Client Liabilities" which are defined as "obligations to Clients incurred by [BlockFi Inc. and the Guarantors] or any of [their] Subsidiaries in connection with (x) the BlockFi Interest Account, BlockFi Yield, BlockFi Personalized Yield/BPC or BlockFi Wallet products, (y) custody arrangements and collateral arrangements relating to loans made to Clients and (z) any other similar products or services provided to Clients by [BlockFi Inc., the Guarantors] or any of [their] Subsidiaries."[4746] The consideration for this contractual subordination agreed to by FTX was, in part, FTX's option to purchase BlockFi. Accordingly, as a matter of contract, a Holder of the FTX Facility Claims is not entitled to a Distribution under the Plan until all Account Holders are paid in full.

Section 510(c) of the Bankruptcy Code provides, in relevant part, that the Bankruptcy Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(l). Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the federal bankruptcy regime. *See Citicorp Venture Cap., Ltd. v. Comm. of Creds. Holding Unsecured Claims*, 160 F.3d 982, 986–87 (3d Cir. 1998) (citing *U.S. v. Noland*, 517 U.S. 535, 116 S. Ct. 1524, 134 L.Ed.2d 748 (1996)).

The Debtors believe that if the FTX Facility Claims are not found to be equity contributions by the Bankruptcy Court, such Claims should be equitably subordinated, due to FTX's inequitable and harmful conduct that precipitated the Debtors' chapter 11 filing. FTX carried out a series of deceptions which caused irreparable harm to the Debtors and their creditors. Since FTX's bankruptcy filing, SBF and other FTX executives have been charged with (and some have pleaded guilty to) various crimes including wire fraud, conspiracy to commit bank fraud, and securities and derivatives fraud.

Given the fallout following the discovery of the historic fraud committed by FTX, the Debtors believe that FTX had no intention of fulfilling its obligations under the FTX Facility. The Debtors believe that such misconduct warrants the equitable subordination of the FTX Facility Claims. The Debtors will further demonstrate the legal and factual bases for subordinating the FTX Facility Claims prior to or at Confirmation.

Although the Debtors will seek to recharacterize the FTX Facility Claims as equity contributions, to the extent that the Bankruptcy Court finds otherwise, the FTX Facility Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims at the applicable Debtor entity. Further, if the Bankruptcy Court determines that the FTX Facility Claims should not be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, such Claims shall be *pari passu* with General Unsecured Claims and Intercompany Claims at the applicable Debtor entity.

2.     *FTX Avoidable Transfer Claims*

The Debtors believe that the FTX Avoidable Transfer Claims (even if allowable, which the Debtors believe they are not) should be equitably subordinated to Account Holder Claims, General Unsecured Claims, and

---

[4746] The Debtors' "BlockFi Personalized Yield" product was renamed "BlockFi Private Client" after the execution of the FTX Loan Agreement. BPC Terms, https://blockfi.com/private-client-terms.

Intercompany Claims in the same manner and for the same reasons as stated above with regard to the FTX Facility Claims.

Although the Debtors have classified the FTX Avoidable Transfer Claims as subordinated Claims, the Bankruptcy Court may rule that equitable subordination of the FTX Avoidable Transfer Claims is improper.  If the Bankruptcy Court denies equitable subordination of the FTX Avoidable Transfer Claims, then such FTX Avoidable Transfer Claims (if allowed which, again, the Debtors believe they should not be) shall be *pari passu* with Account holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

### 3. *Alameda Claims*

In the ordinary course of business, BlockFi entered into a series of lending arrangements with Alameda, and as a result of the FTX fallout, BlockFi both modified its existing lending arrangements with Alameda and also entered into the Alameda Pledge Agreement.  Although the Debtors will assert claims against Alameda in its bankruptcy proceedings, Alameda, along with FTX and their Affiliates, filed proofs of claims against the Debtors in these Chapter 11 Cases.  Specifically, Alameda has asserted claims against the Debtors for the avoidance of certain payments made in the 90-day period prior to the commencement of FTX's and Alameda's bankruptcy proceedings. Alameda asserts that payments it made to BlockFi Lending in the amount of $124,423,552 and to BlockFi International in the amount of $7,825,017 constitute preferential transfers under Section 547 of the Bankruptcy Code and are subject to avoidance under Section 550(a) of the Bankruptcy Code.

The Plan provides for the equitable subordination of the Alameda Claims, to the extent any such claims are ever Allowed, to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.  Section 510(c) of the Bankruptcy Code provides that the Bankruptcy Court may subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.  *See* 11 U.S.C. § 510(c)(l).  The Debtors believe that the Alameda Claims, to the extent Allowed, should be equitably subordinated due to Alameda's role in FTX's historic fraud discussed above.

Although the Debtors have classified the Alameda Claims as subordinated claims, the Bankruptcy Court may rule that equitable subordination of the Alameda Claims is improper.  If the Bankruptcy Court denies equitable subordination of the Alameda Claims and if the Debtors' defenses against such claims do not succeed (leading to the allowance of such claims), then Allowed Alameda Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

### 4. *3AC Claims*

On May 2, 2019, BlockFi Lending and 3AC entered into that certain secured loan agreement (as amended by that certain Amended and Restated Master Loan Agreement dated April 23, 2020, that certain First Amendment to Amended and Restated Master Loan Agreement dated February 24, 2021, that certain Letter Agreement in connection with Amended and Restated Master Loan Agreement, dated September 1, 2021, as further amended, restated, supplemented or modified from time to time, the "3AC Master Loan Agreements") providing loans secured by certain Loan Collateral.  The loans to 3AC were secured by, among other things, Digital Assets, certain equity interests in Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum Trust (ETHE), Grayscale Ethereum Classic Trust (ETCG), Grayscale Digital Large Cap Fund (GLCF), Grayscale Zcash Trust, cash, general intangibles, investment property, and financial assets.

In June 2022, BlockFi accelerated approximately $1.1 billion of overcollateralized loans that had been made to 3AC, BlockFi's largest borrower Client at the time, because of a default caused by 3AC's failure to meet a margin call.  As of the Petition Date, approximately $117 million was outstanding in 3AC loans.  BlockFi has calculated that, based on the amount remaining outstanding on the loan after applying the proceeds from liquidation

and, considering default interest, it has a claim to assert in 3AC's bankruptcy proceedings of approximately $132 million.[4847]

On June 27, 2022, 3AC was ordered to commence liquidation proceedings before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division).  On July 1, 2022 3AC's foreign representatives commenced a chapter 15 case in the United States Bankruptcy Court for the Southern District of New York (No. 22-10920), and on July 28, 2022, the United States Bankruptcy Court for the Southern District of New York granted recognition of 3AC's foreign main proceeding.

Although the Debtors will assert claims against 3AC in 3AC's bankruptcy proceedings, the foreign representatives of 3AC filed proofs of claims against the Debtors in these Chapter 11 Cases.  Specifically, 3AC has asserted "known" and "unknown" claims, with known claims based on alleged preferences including cash payments to the Debtors of approximately $71,000,000, Stablecoin transfers to the Debtors of 6,070,123 USDC, transfers of ETH, and transfers of various trust shares.  The Debtors believe they have valid defenses to 3AC's claims.

The Plan provides for the equitable subordination of the 3AC Claims, to the extent any such claims are ever allowed, to Account Holder Claims, General Unsecured Claims, and Intercompany Claims.  Section 510(c) of the Bankruptcy Code provides that the Bankruptcy Court may subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.  *See* 11 U.S.C. § 510(c)(l).  The Debtors believe that the 3AC Claims, to the extent Allowed, should be equitably subordinated due to 3AC and its founders' conduct both before and during its liquidation and chapter 15 proceedings.  Among other things, 3AC is alleged to have been a fraud from inception, and 3AC's founders Kyle Livingstone Davis and Su Zhu have fled the jurisdiction, failed to cooperate with 3AC's foreign representatives, and have taken steps to undermine asset recovery efforts by the foreign representatives in favor of creditors, such as BlockFi, including by failing to provide information necessary for the foreign representatives to take control of certain of 3AC's assets and accounts.[4948]

Although the Debtors have classified the 3AC Claims as subordinated claims, the Bankruptcy Court may rule that equitable subordination of the 3AC Claims is improper.  If the Bankruptcy Court denies equitable subordination of the 3AC Claims and if the Debtors' defenses against such claims do not succeed (leading to the allowance of such claims), then Allowed 3AC Claims (if any) shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

5.  *Government Penalty Claims*

(a) SEC Penalty Claims

On February 14, 2022, the SEC released an "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order" (the "Consent Order") after reaching an agreement with BlockFi Lending to settle certain alleged charges against BlockFi Lending for violations of various securities laws and regulations.  Pursuant to the Consent Order, BlockFi Lending agreed to "pay a *civil money penalty* of $50 million to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury," in five installments of $10 million each.[50]The Consent Order further provided that "[a]mounts ordered to be paid as *civil money penalties* pursuant to this [Consent Order] shall be treated as *penalties* paid to the government for all

---

[4847]  This claim amount also does not consider the amount that BlockFi made from 3AC in interest revenue over the life of the loan, which exceeded $80 million.

[4948]   Foreign Representatives of Three Arrows Capital, Ltd.'s Motion for an Order Compelling Compliance with Subpoena, *In re Three Arrows Capital, Ltd.*, No. 22-10920 (MG) [Docket No. 81].

[50]   Emphasis added.

purposes."[51] ~~As of the Petition Date, BlockFi Lending has made two of the five installment payments, and $30 million remains outstanding.~~

**(b) Other Government Penalty Claims**

~~In addition, on~~On February 14, 2022, BlockFi Lending agreed with various state securities regulators, represented by a North American Securities Administrators Association ("NASAA") working group, to settle certain alleged charges against BlockFi Lending for alleged violations of various state securities laws and regulations.  As part of this settlement, BlockFi Lending agreed to, among other things, pay up to $50 million to state regulators.  As of the Petition Date, approximately $29.4 million of these settlement payments remains outstanding.

**(a)    ~~(c)~~ Basis for Subordination**

The Debtors believe that the Government Penalty Claims are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code, pursuant to which they are subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at BlockFi Lending.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 181 (Bankr. D.N.J. 2010).  If any of the ~~SEC or the~~ states disputes these points, the Debtors will further demonstrate the legal and factual bases for subordinating the Government Penalty Claims prior to or at Confirmation.

Although the Debtors have classified the Government Penalty Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Government Penalty Claims is improper.  If the Bankruptcy Court denies subordination of the Government Penalty Claims, then such Government Penalty Claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at BlockFi Lending.

**(b)    ~~(d)~~ Governmental Bar Date**

The Bar Date for Governmental Units (the "Governmental Bar Date") is May 30, 2023 and the deadline for the United States to determine the dischargeability of any debts arising from any civil actions is July 21, 2023.[52][49]  To the extent that any Governmental Unit files a Claim that constitutes penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, and to the extent any such claims are ultimately allowed, such Claims will be subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.

**6.    *Certain Insider Claims***

In connection with the proposed settlement of estate claims against them, certain insiders have agreed to either subordinate or waive certain claims that they have against the estates.  Some of those claims reflect assets on the BlockFi platform purchased by the insiders, and others include claims to compensation that was promised by the Debtors but not made to such insiders.  More detail on the proposed subordination and waiver of claims is provided below in Article X.R.

**K.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to provide releases to the Released Parties and to exculpate the Exculpated Parties.

---

[51]  ~~Emphasis added.~~

[52][49]  On May 11, 2023, the Debtors filed the *Application in Lieu of Motion for Consent Order Extending the Governmental Bar Date to June 13, 2023 for the United States of America* [Docket No. 866], seeking to extend the Governmental Bar Date to June 13, 2023.

As discussed in greater detail in Article X.Q and X.R of this Disclosure Statement, on or around the Petition Date, the board of directors of BlockFi Inc. (the "Board") voted to appoint Scott Vogel, an independent director, to the board of BlockFi Inc. and to establish a special committee (the "Special Committee") comprised of Jennifer Hill, a member of the Board since 2021, and Scott Mr. Vogel, a new board member appointed just prior to the Petition Date.  The Special Committee was established to investigate historical transactions, including all potential claims against insiders of the Debtors (the "Investigation").  As of the date hereof, the Investigation has been completed, but the Special Committee has not completed its recommendations.  To the extent the Special Committee concludes there are viable Claims and/or Causes of Action against certain parties, such Claims and/or Causes of Action against such parties will either be settled, or such parties will be expressly carved out of the Released Parties, and (if so) such Claims and/or Causes of Action will be retained by the Wind-Down Debtors., and to assess whether the Debtors should pursue, settle, release, or retain such claims.

The Special Committee directed an exhaustive examination of all such potential claims, and counsel prepared a report and recommendations (the "Special Committee Report").  The investigation was comprehensive and, while many collateral issues were also investigated, in general, the investigation focused on:

- BlockFi's business in general;

- BlockFi's risk and investment policies;

- BlockFi's investments in (and acceptance of collateral related to) the Grayscale Bitcoin Trust ("GBTC");

- BlockFi's dealings with Three Arrows Capital;

- BlockFi's dealings with FTX and Alameda Research generally, including the time periods before and after BlockFi's transaction with FTX US announced July 1, 2022;

- BlockFi's compensation of employees generally, and including (but not limited to) certain payments made in connection with or following the FTX Transaction;

- Transactions related to SECFI, Inc., and Serengeti Asset Management (collectively "SecFi");

- BlockFi's procurement of additional director and officer liability insurance in November 2022; and

- BlockFi's decision to sell cryptocurrency for cash in November 2022.

The results of the Investigation indicate that the claims the Estates may have against the Debtors' insiders are weak.  Although some could potentially survive a motion to dismiss, the Special Committee does not believe such claims are more likely than not to succeed or recover material value.  Moreover, the Special Committee concluded that claims against the Debtors' insiders would be expensive to prosecute and would take considerable time to do so.  Finally, the Special Committee concluded that pursuing litigation against insiders who could conceivably serve as witnesses in litigation would be inconsistent with what the Special Committee recommended the Estates' large-scale goals should be, namely:  (1) ensuring the Estates are in the best position possible to prosecute and defend litigation against the bankruptcy estates of, among others, FTX, Alameda, Emergent, and 3AC; and (2) ensuring that the Estates are in a position to distribute cryptocurrency through the BlockFi Platform to customers.  As such, the Debtors determined that negotiating a settlement, pursuant to which certain of the Debtors' insiders will be included as Released Parties in exchange for the consideration described therein, is the best path

forward to resolving these Chapter 11 Cases.  The terms of that settlement are described in detail below in Article X.R, and they include releases of the Debtors' claims against insiders described here.

The Debtor Release is a release *of the Debtors' claims* against third parties.  ~~The~~By contrast, the Third-Party Release is a release of direct claims a Holder of a Claim or Interest has against third parties unless a Holder of such Claim or Interest affirmatively elects to opt out of the Third-Party Release.

~~THE RELEASES AND EXCULPATIONS IN THE PLAN ARE EXPRESSLY SUBJECT TO THE OUTCOME OF THE SPECIAL COMMITTEE'S INVESTIGATION AND ALL PARTIES' RIGHTS TO OBJECT TO SUCH PROVISIONS OR SEEK TO LIMIT THE SCOPE OF SUCH PROVISIONS ARE RESERVED.~~

[The Debtors believe that the settlement, releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.]⁵³⁵⁰

["Released Parties" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the ~~Wind-Down~~Wind-Down Debtors; (c) the Releasing Parties; (d) the Bermuda Provisional Liquidation~~s~~rs; and (e) each Related Party of each Entity in clauses (a) through (d); *provided* that any of (i) FTX, (ii) 3AC, (iii) Alameda, (iv) Emergent, (v) Marex, and (vi) any Holder of a Claim against or Interest in the Debtors that is not a Releasing Party shall not be a "Released Party."]⁵⁴⁵¹

["Releasing Parties" means, collectively, in each case in its capacity as such:  (a) the Debtors; (b) the ~~Wind-Down~~Wind-Down Debtors; (c) all Holders of Claims that vote to accept the Plan; (d) all Holders of Claims that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (e) all Holders of Claims ~~or Interests that are deemed to reject the Plan and who~~ ~~do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims~~ who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (~~f~~g) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (~~h~~g) each Related Party of each Entity in clauses (a) through (~~g~~f).]⁵⁵⁵²

"Exculpated Parties" means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors and the Wind Down Debtors; (b) the Committee and each of its respective members~~;~~, and (c) each Related Party of each Entity in clauses (a) through (b).

**ALL HOLDERS OF CLAIMS AND INTERESTS THAT (I) VOTE TO ACCEPT THE PLAN, (II) ARE DEEMED TO ACCEPT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; (III) ~~VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN; OR (IV)~~ ABSTAIN FROM VOTING ON THE PLAN AND DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN; OR (IV) VOTE TO REJECT THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS**

---

⁵³⁵⁰ This provision remains subject ~~to the recommendation of the Special Committee and~~ to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

⁵⁴⁵¹ This definition and any related provision~~s~~ in ~~this Disclosure Statement~~the Plan remain subject ~~to the recommendation of the Special Committee and~~ to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

⁵⁵⁵² This definition and any related provision~~s~~ in ~~this Disclosure Statement~~the Plan remain subject ~~to the recommendation of the Special Committee and~~ to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

**AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS AND THE WIND-DOWN DEBTORS.**

      1.     ***Releases by the Debtors.***

[Notwithstanding anything contained in the Plan to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Platform Pause, the FTX Loan Agreement, the 3AC Master Loan Agreements, the Alameda Loan Agreements, the Emergent Pledge, the Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the administration and implementation of the Wind Down, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases described in Article VIII.A of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.A of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.]⁵⁶⁵³**

      2.     ***Releases by Holders of Claims and Interests.***

**Except as expressly set forth in the Plan, effective on the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in,**

---

⁵⁶⁵³ This provision ~~in this Disclosure Statement~~ remains subject ~~to the recommendation of the Special Committee and~~ to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the **Platform Pause, the** business or contractual arrangements between any Debtor and any Released Party, the FTX Loan Agreement, the 3AC Master Loan Agreements, the Alameda Loan Agreements, the **Emergent Pledge, the** Debtors' out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Definitive Documents, **or any** contract, instrument, release, or other agreement or document created or entered into in connection with the Definitive Documents, the pursuit of Consummation of the Plan, the administration and implementation of the Wind Down, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in **Article VIII.B** of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in **Article VIII.B** of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Causes of Action; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) a sound exercise of the Debtors' business judgment; and (7) a bar to any of the Releasing Parties or the Debtors or the ~~Wind-Down~~**Wind-Down** Debtors or their respective Estates asserting any Cause of Action related thereto, of any kind, against any of the Released Parties or their property.

Without limiting the foregoing, from and after the Effective Date, ~~no~~**any** Entity that either votes in favor of the Plan or ~~does not~~**is given the opportunity to** opt out of the releases contained in **Article VIII.B** of the Plan **and does not exercise such opt out** may ~~not~~ assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors. From and after the Effective Date, any Entity **(i)** that did not vote in favor of the Plan and **that** opted out of the releases contained in **Article VIII.B** of the Plan **or (ii) was deemed to reject the Plan** may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in **Article VIII.A** of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in **Article VIII.A** of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in **Article XI** of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.[54]

3.    *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any act or omission **arising on or after the Petition Date and prior to the Effective Date** in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or **C**consummation of the Plan, any Definitive Documents, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the Distribution of property under the Plan or any other related

---

[54] This provision remains subject to the ongoing review and approval of the Bermuda Provisional Liquidators with respect to BlockFi International Ltd.

56

agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

**4.**    *Injunction.*

The assets of the Debtors and ~~of~~ the Wind-Down Debtors shall be used for the satisfaction of expense obligations and the payment of Claims and Interests only in the manner set forth in the Plan and shall not be available for any other purpose. All Persons and Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtors, or the Debtors' Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and Distribution of the Debtors' assets in the manner contemplated by the Plan.

In addition, as of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons and Entities who have held, hold, or may hold Claims or Interests that are fully satisfied pursuant to the Plan or any Claim or Interest that is subject to the releases and exculpations set forth in Article VIII.A, Article VIII.B and Article VIII.C of the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claims or Interests, except for the receipt of the payments or Distributions that are contemplated by the Plan.

**5.**    *Bermuda Release*

On the Effective Date, except to the extent otherwise provided in the Plan, any Implementation Mechanism, and/or ~~the Recognition~~any Bermuda Order entered by the Bermuda Court, all Claims against and Interests in BlockFi International Ltd. that were affected by the Plan shall be deemed to be satisfied in full, cancelled, discharged, and of no force and effect. By accepting a Distribution pursuant to the Plan, each Holder of a Claim against and/or Interest in BlockFi International Ltd. will be deemed to have specifically consented to the injunctions contained in Article VIII.J of the Plan. The release described therein shall, on the Effective Date, have the effect of res judicata (a matter adjudged) to the fullest extent permissible under the applicable laws of Bermuda. ~~For the avoidance of doubt, Holders of Claims against and Interests in BlockFi International Ltd. are not entitled to receive any further Distributions from BlockFi International Ltd. in the Bermuda Insolvency Proceedings.~~

**L.**    **What are the consequences of opting out of the releases provided by the Plan?**

As described above, each Holder of a Claim that votes to reject the Plan, abstains from voting on the Plan, or is deemed to accept the Plan, may opt out of providing the releases under the Plan. Making an opt out election will preserve any direct Causes of Action that the Holder may have against the Released Parties and those Causes of Action the Estates hold against a Holder, including avoidance (or "clawback") actions.

Upon the Effective Date, the Wind-Down Trustee will be vested with authority to commence, litigate, and settle any and all Vested Causes of Action. The Wind-Down Trustee will have a fiduciary duty to, among other things, maximize the value of the Wind-Down Debtors' Assets, including pursuing any of the Vested Causes of

Action. Accordingly, because the proposed releases are bilateral in nature, opting out of the releases may result in a voting party being sued in their personal capacity by the Wind-Down Trustee on account of any Causes of Action the Debtors may hold against the voting party.

**M.    What are the consequences of not opting out of the releases provided by the Plan?**

Each Holder of a Claim that votes to accept the Plan and each Holder of a Claim entitled to opt out of the releases that elects not to exercise such opt out, will become a Released Party under the Plan. Accordingly, any direct Causes of Action that such Holder may have against the Released Parties will be unconditionally released upon the Effective Date, and correspondingly, each such Holder will receive a release from the Debtors for any Causes of Action the Debtors may hold against them, including avoidance (or "clawback") actions.

This means that no Released Party may be sued in their personal capacity by the Wind-Down Trustee on account of any Causes of Action the Debtors may hold against such party, regardless of the nature of any such Causes of Action.

**N.    ~~L.~~ Are any regulatory approvals required to consummate the Plan?**

Prior to the Petition Date, BlockFi maintained state money transmission licenses or their equivalents (each, a "Money Transmission License") in thirty-three (33) states and has received a separate Class F Digital Business Assets License issued by the Bermuda Monetary Authority.[~~5~~55]  BlockFi has surrendered most of its Money Transmission Licenses and currently maintains Money Transmission Licenses in seven (7) states.  The Debtors will continue to take steps to surrender those Money Transmission Licenses in connection with the Wind Down (the "Licensing Wind-Down Process").  Such Licensing Wind-Down Process requires notice to, and in some cases approval by, those state banking departments in states where the Debtors are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments.  The Debtors do not believe that active Money Transmission Licenses are required to distribute Digital Assets or Cash to Holders of Claims under the Plan.

BlockFi also maintains state lending licenses or their equivalents (each, a "Lending License") in 16 states. The Debtors will continue to take steps to surrender those Lending Licenses in connection with the Wind Down (the "Lending License Wind-Down Process").  Such Lending License Wind-Down Process requires notice to, and in some cases approval by, those state banking departments in states where the Debtors are licensed pursuant to the requirements set forth in each state lending statute and as otherwise required by the relevant state banking departments.

**O.    ~~M.~~ What is the deadline to vote on the Plan?**

The Voting Deadline is ~~July~~[August 2~~8~~1], 2023, at 4:00 p.m. (prevailing Eastern Time).

**P.    ~~N.~~ What are the overall projected recoveries under the Plan?**

The projected recoveries are provided in Article V.D of this Disclosure Statement.

**Q.    ~~O.~~ How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered in accordance with the instructions provided such that a vote cast is **actually received** before the Voting Deadline by the Claims, Noticing, and Solicitation Agent.  *See* Article VI of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

---

[~~5~~55]  BlockFi also maintains a registration as a "money services business" with the Financial Crimes Enforcement Network ("FinCEN") pursuant to federal anti-money laundering laws.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

---

**R.** ~~P.~~ **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**S.** ~~Q.~~ **When is the Confirmation Hearing set to occur?**

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for August 17, 2023.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by ~~July~~[August 2~~8~~1], 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* (national edition), *Royal Gazette*, and *CoinDesk* to provide notification to those persons who may not receive notice by electronic mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**T.** ~~R.~~ **What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a chapter 11 plan, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.

**U.** ~~S.~~ **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are distributing assets and winding down under Chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on or as soon as reasonably practicable after the Effective Date.  On or after the Effective Date, the Wind-Down Trustee will commence the Wind Down of the Wind-Down Debtors in accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**V.** ~~T.~~ **Will any party have significant influence over the corporate governance and operations of the Wind-Down Debtors?**

As of the Effective Date, the current members of the Boards, as applicable, of the Debtors shall be dissolved and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, or the officers, directors, or managers, as applicable of the Debtors.  From and after the Effective Date, the Wind-Down Trustee shall be the sole representative of, and shall act for, the Wind-Down Debtors.  Subject in all respect to the terms of the Plan, the Wind-Down Trustee shall have the power and authority to take any action necessary to Wind Down and dissolve any of the Wind-Down Debtors.  The Wind-Down Trustee shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers.  The foregoing shall not limit the authority of the Wind-Down Debtors or the Wind-Down Trustee, as applicable, to continue the employment of any former manager or officer to assist in the Wind Down, as needed. [56]

~~~~ Provided that with respect to BlockFi International, depending on the Implementation Mechanism, the Bermuda Provisional Liquidators and/or any trustee appointed pursuant to the establishment of a Bermuda Liquidation Trust shall have the

59

**W.** ~~U.~~ **What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in Article IX of this Disclosure Statement, as well as in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 17] (the "First Day Declaration"), prior to the Petition Date, the Debtors evaluated numerous potential alternatives, including options relating to mergers, sales, capital raising, and consensual recapitalizations, to provide stability and requisite capitalization to their business enterprise in light of significant market volatility.

**X.** ~~V.~~ **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Claims, Noticing, and Solicitation Agent:

**By telephone at**:
(888) 773-0375 (Toll-Free)
(646) 440-4371 (International)

**By electronic mail at:**
blockfiinfo@ra.kroll.com with a reference to "In re BlockFi – Solicitation Inquiry" in the subject line.

**By mail at:**
BlockFi Inquiries, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232.

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims, Noticing, and Solicitation Agent at https://restructuring.ra.kroll.com/blockfi (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

**VI.    SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the Solicitation Package.

---

THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS
DISCLOSURE STATEMENT IS ONLY A SUMMARY.

PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE
COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

**A.    Classes Entitled to Vote on the Plan.**

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes"):

---

Liquidators and/or any trustee appointed pursuant to the establishment of a Bermuda Liquidation Trust shall have the power, authority, and responsibilities described in this Article V.U in accordance with applicable law.

| | | |
|---|---|---|
| 3 a | BlockFi Lending LLC Private Client Account Claims | Impaired |
| 3 b | BlockFi Lending LLC Loan Collateral Claims | Impaired |
| 3 c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired |
| 3 d | BlockFi International Ltd. Loan Collateral Claims | Impaired |
| 3 e | BlockFi Inc. Interest Account Claims | Impaired |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Impaired |
| 4-c | BlockFi Inc. General Unsecured Claims | Impaired |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below).  If you are a Holder of a Claim in one or more of the Voting Classes, you should read your Ballot(s) and carefully follow the instructions included in the Ballot(s).  Please use only the Ballot(s) that accompanies this Disclosure Statement or the Ballot(s) that the Debtors, or the Claims, Noticing, and Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If you are a Holder of a Claim in more than one of the Voting Classes, you will receive a Ballot for each such Claim.

**B.      Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted.  Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number and two-thirds in dollar amount of the total allowed claims that have voted.  Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

**C.      Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect Distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

61

For a further discussion of risk factors, please refer to "Risk Factors" described in Article XI of this Disclosure Statement.

**D.    Classes Not Entitled to Vote on the Plan.**

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| | | |
|---|---|---|
| 1 | Secured Tax Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired |
| 4 e | BlockFi Trading LLC General Unsecured Claims | Impaired |
| 4 f | BlockFi Wallet LLC General Unsecured Claims | ~~I~~Unimpaired |
| 4 g | BlockFi Ventures LLC General Unsecured Claims | Impaired |
| 4 h | BlockFi Investment Products LLC General Unsecured Claims | Impaired |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired |
| 5 | FTX Facility Claims | Impaired |
| 6 | FTX Avoidable Transfer Claims | Impaired |
| 7 | Alameda Claims | Impaired |
| 8 | 3AC Claims | Impaired |
| 9 | Government Penalty Claims | Impaired |
| 10 | *De Minimis* Claims | Impaired |
| 11 | Intercompany Claims | Unimpaired / Impaired |
| 12 | Intercompany Interests | Unimpaired / Impaired |
| 13 | Existing Preferred Equity Interests | Impaired |
| 14 | Existing Common Equity Interests | Impaired |
| 15 | SEC Penalty Claims | Impaired |

**E.    Solicitation Procedures.**

**1.    *Claims, Noticing, and Solicitation Agent.***

The Debtors have retained Kroll Restructuring Administration LLC to act, among other things, as Claims, Noticing, and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**2.    *Solicitation Package.***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the applicable form of electronic Ballot with a unique E-Ballot ID, detailed voting instructions, and instructions on how to submit the Ballot;

- the cover letter, which ~~describes the contents of the Solicitation Package and~~ urges Holders of Claims in each of the Voting Classes to vote to accept the Plan (the "Cover Letter");

- a copy of procedures for (i) soliciting, receiving, and tabulating votes to accept or reject the Plan, (ii) voting to accept or reject the Plan, and (iii) filing objections to Confirmation of the Plan (the "Solicitation and Voting Procedures");

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the order (without exhibits) (a) authorizing the Debtors to solicit acceptances for the Plan; (b) approving this Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the Solicitation Packages; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan (the "Disclosure Statement Order");

- the notice of the Confirmation Hearing (the "Confirmation Hearing Notice"); and

- any additional documents that the Bankruptcy Court has ordered to be made available.

### 3. *Distribution of the Solicitation Package and Plan Supplement.*

The Debtors are causing the Claims, Noticing, and Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on [  ]July 14, 2023 (the "Solicitation Launch").

The Solicitation Package (without Ballots, unless you are an eligible voting party) may also be obtained from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at (888) 773-0375 (Toll-Free) or (646) 440-4371 (International), (b) emailing the Claims, Noticing, and Solicitation Agent at blockfiinfo@ra.kroll.com and referencing "In re BlockFi – Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at BlockFi Inquiries, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232. You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/blockfi, or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee). The online balloting portal is the sole manner in which Ballots will be accepted. **Hard copy Ballots will not be accepted, and electronic Ballots will not be accepted by facsimile or any other electronic means (other than the online portal)**.

No later than seven days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, the Debtors intend to file the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims, Noticing, and Solicitation Agent by: (a) calling the Claims, Noticing, and Solicitation Agent at the telephone number set forth above; (b) visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/blockfi or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee), (c) emailing the Claims, Noticing, and Solicitation Agent at blockfiinfo@ra.kroll.com, or (d) writing to the Claims, Noticing, and Solicitation Agent at BlockFi Inquiries, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232.

### F. **Voting Procedures.**

[June 12̶30], 2023, (the "Voting Record Date") is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Classes to have its Ballot counted as a vote to accept or reject the Plan, such Holder must cast an electronic Ballot through the Solicitation Agent through the Debtors' case website https://restructuring.ra.kroll.com/blockfi/EBallot-Home, so that such Holder's Ballot is actually received by the Claims, Noticing, and Solicitation Agent **on or before J̶u̶l̶y̶[August 2̶81], 2023, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline")**. The online balloting portal is the sole manner in which Ballots will be accepted. **Hard copy Ballots will not be accepted, and electronic Ballots will not be accepted by facsimile or any other electronic means (other than the online portal)**.

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed

to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Claims, Noticing, and Solicitation Agent.

If you hold Claims in more than one Voting Class under the Plan, you should receive a separate Ballot for each Class of Claims, coded by Class number, and a set of solicitation materials.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.  NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

### G.    Voting Tabulation.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. A Ballot will be deemed delivered only when the Claims, Noticing, and Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Claims, Noticing, and Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court the voting report prepared by the Claims, Noticing, and Solicitation Agent (the "Voting Report") as soon as practicable after the Voting Deadline.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

### H.    Ballots Not Counted.

No Ballot will be counted toward Confirmation if, among other things:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile,

email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), or the Debtors' financial or legal advisors instead of the Claims, Noticing, and Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT'S NUMBER AT (888) 773-0375 (TOLL-FREE) OR (646) 440-4371 (INTERNATIONAL).**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

## VII. CONFIRMATION OF THE PLAN

### A. Requirements of Section 1129(a) of the Bankruptcy Code.

Among the requirements for confirmation are the following: (i) the Plan is accepted by all Impaired Classes or, if the Plan is rejected by an Impaired Class, at least one Impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Impaired Claims or Interests (*i.e.*, Holders of Class 3 Interest Account Claims and Loan Collateral Claims, Holders of Class 4 General Unsecured Claims, Holders of Class 5 FTX Facility Claims, Holders of Class 6 FTX Avoidable Transfer Claims, Holders of Class 7 Alameda Claims, Holders of Class 8 3AC Claims, Holders of Class 9 Government Penalty Claims, Holders of Class 10 *De Minimis* Claims, Holders of Class 11 Intercompany Claims, Holders of Class 12 Intercompany Interests, Holders of Class 13 Existing Preferred Equity Interests, ~~and~~ Holders of Class 14 Existing Common Equity Interests~~)~~, and Holders of Class 15 SEC Penalty Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of Chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of Section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation will be reasonable or (ii) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full

or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims will be paid in full on the Effective Date or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

**B.      Best Interests of Creditors—Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit B**, showing that the value of the Distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. As set forth in greater detail in Article VII.B of this Disclosure Statement, Holders of Account Holder Claims and General Unsecured Claims would likely receive significantly reduced recoveries in a hypothetical liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make Distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Plan. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the expenses that would be incurred in a chapter 7 liquidation, including the potential added time (thereby reducing the present value of any recovery for Holders) and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases and the Debtors' Digital Assets. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any Chapter 7 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the number and amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed Distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that Distributions under the Plan would provide Holders of Claims and Interests with the same or greater recovery than under a hypothetical chapter 7 liquidation.

### C.    Feasibility.

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the liquidation and Distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the Consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their Ballots in favor of acceptance. For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan. Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance.

### E.    Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to

render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### 1.    *No Unfair Discrimination.*

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### (a)    Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

### (b)    Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## VIII.   THE DEBTORS' BUSINESS OPERATIONS AND CAPITAL STRUCTURE

### A.    The Debtors' Corporate Structure and History.

BlockFi was founded in 2017 by Zac Prince and Flori Marquez to provide credit services to markets with limited access to financial products. BlockFi worked to become an industry leader in compliance by adopting corporate governance and risk management processes and reaching a settlement with the SEC. Unlike certain competitors, BlockFi never launched its own token to raise funds but instead relied on traditional venture capital. Also, in contrast to many firms in the cryptocurrency industry, BlockFi has a history of actively working with regulators, BlockFi was also the first in many states to seek and receive lending licenses to make Digital Asset-backed loans.

BlockFi experienced rapid growth; between 2019 and 2021, total annual trading volume grew from $2 million to more than $23 billion, while Deployable Assets grew from $345 million to $14.8 billion as of December 31, 2019 and December 31, 2021, respectively.  Cumulative gross loan originations expanded from $687 million in 2019 to more than $47 billion through 2021.  As BlockFi's business and operations grew, it expanded its management team and employee base, with a focus on hiring experts from other segments of the financial industry to better mature the nascent cryptocurrency business.

BlockFi Inc. has twelve wholly-owned subsidiary entities that are organized under the laws of Delaware, Bermuda, England and Wales, the Cayman Islands, and Singapore.  BlockFi Inc. currently directly or indirectly owns 100% of the equity in each of the other Debtors.  BlockFi Inc. also owns 100% of the equity in non-Debtors BlockFi Holding UK Limited (directly) and BlockFi Cayman LLC, BlockFi UK Limited, and BlockFi Asia PTE Ltd. (indirectly), and 50% of non-Debtor BV Power Alpha LLC.  A simplified version of the Debtors' current corporate structure is as follows:





B.      **The Debtors' Assets and Operations.**[5857]

BlockFi's primary operations consisted of, among other things (i) a trading platform, (ii) a platform through which Clients earned interest on Digital Assets, and (iii) lending programs for their two primary types of Clients: retail and institutional.  BlockFi served retail Clients through web and mobile applications, and its products enabled individuals and small businesses to store and/or earn interest on, buy and sell, borrow U.S. dollars secured by, and earn (via a credit card rewards program) Digital Assets.  On the institutional front, BlockFi provided hedge funds, market makers, proprietary trading firms, trading desks, cryptocurrency miners, exchanges, and corporations with bespoke financing, trading, and treasury solutions relating to Digital Assets.

1.      *Retail Clients.*

BlockFi's founders understood that retail investors deserved a high-quality experience that maximized their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.  Understanding the difficulty many individuals face in entering the investment world, BlockFi created web and mobile applications that enabled its retail Clients to easily access, trade, borrow, and store select Digital Assets.

(a)      **BlockFi Wallet.**

The Debtors provided wallet accounts for the Debtors' domestic and international Clients (the "Client Wallet Accounts").  The Debtors' U.S. Clients had the ability to store Digital Assets by opening accounts provided by Debtor BlockFi Trading LLC ("BlockFi Trading"), which are hosted and maintained on BlockFi Trading's behalf by Debtor BlockFi Wallet LLC ("BlockFi Wallet") "for the benefit of" the Clients of BlockFi Trading (the "WLLC FBO Wallet").  The Debtors' non-U.S. Clients had the ability to store Digital Assets by opening accounts provided by Debtor BlockFi International.  BlockFi International hosted and maintained an omnibus custodial wallet account "for the benefit of" Clients of BlockFi International (each, an "International Vault Wallet,"[5958] and together with the WLLC FBO Wallet, the "Custodial Omnibus Wallets").

A Client Wallet Account could be funded either by (a) transferring supported Digital Assets from an external personal wallet to a wallet address provided by BlockFi Trading, which would then record the Digital Assets to a Client Wallet Account and be displayed on the User Interface or (b) transferring U.S. dollar fiat currency to BlockFi Trading's accounts at Silvergate Bank, which could be used to purchase supported Digital Assets that are recorded in the Client's Client Wallet Account.[6059]

Client Wallet Accounts were non-interest bearing, and the Digital Assets held in the Custodial Omnibus Wallets were not rehypothecated for the Debtors' lending activities.  Instead, all Digital Assets deposited into Custodial Omnibus Wallets were held by BlockFi Wallet or BlockFi Trading "for the benefit of" the Clients of BlockFi Trading for U.S. Clients, or by BlockFi International "for the benefit of" the Clients of BlockFi International for non-U.S. Clients.

A Client Wallet Account could be used by retail Clients in connection with BlockFi's other products and services.  For example, after opening a Client Wallet Account, Clients could (a) (for non-U.S. Clients and all BlockFi Private Clients) direct the transfer of Digital Assets recorded in their Client Wallet Account to an interest earning account, (b) buy and sell Digital Assets on the BlockFi's Platform, (c) direct transfers of Digital Assets or

---

[5857] The Debtors own a fifty percent interest in BV Power Alpha LLC (Delaware), which operates a certain digital currency mining hosting facility.

[5958] Until recently, BlockFi Wallet maintained wallet accounts on behalf of BlockFi International "for the benefit of" the Clients of BlockFi International (the "International FBO Wallet") per the Terms of Service.  In connection with offering international Clients the ability to store Trade-Only Assets in their Wallet Accounts, prior to the Petition Date, the Digital Assets in the International FBO Wallet were transferred from the International FBO Wallet to a separate, non-interest bearing, segregated vault account labeled the "No Sweep BFI (NIA)," which is maintained by BlockFi International for the benefit of the Clients of BlockFi International.

[6059] The exception to this is residents of New York who have a crypto-backed loan but who do not have a Client Wallet Account.

fiat cash to the Client's personal account, and (d) receive Digital Asset rewards through the Rewards Card and other bonuses.

**(b)        BlockFi Interest Accounts.**

BlockFi Clients could also earn interest in the form of Digital Assets through a BIA. BIAs were interest-bearing accounts that allowed Clients to earn interest on supported Digital Assets. Interest earned on account of Digital Assets transferred to a BIA was paid in the form of Digital Assets at variable rates determined at BlockFi's sole discretion. Before the Platform Pause, a Client could request a complete or partial withdrawal of principal at any time for Digital Assets in a BIA, subject to the Terms of Service.

Pursuant to the Terms of Service, BlockFi had the contractual right to redeploy Digital Assets transferred to a BIA account for its revenue-generating activities. More specifically, BlockFi had the right, without further notice to a Client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any amount of Digital Assets transferred to a BIA, separately or together with other property, with all attendant rights of ownership, for any period of time and without retaining in BlockFi's possession and/or control a like amount of Digital Assets.[61][60]

Under the Terms of Service, BIAs are provided and administered by BlockFi Inc. (U.S. Clients) or BlockFi International (non-U.S. Clients). In February 2022, BIAs of non-U.S. Clients were moved from BlockFi Lending to BlockFi International, and in April 2022, BIAs of U.S. Clients were moved from BlockFi Lending to BlockFi Inc.

**(c)        BlockFi Private Client Program.**

In addition to BIAs, which generally have standardized terms applicable to all holders, BlockFi provided an individually negotiated interest-bearing borrowing product to eligible Clients as part of its BlockFi Private Client suite of products. The BPC product suite permitted Clients to lend Digital Assets to BlockFi on individually negotiated terms, which led to individually negotiated terms for other products and services. BPC loan interest is paid in the form of Digital Assets at a negotiated rate. A BPC loan was structured as an "open" term (*i.e.*, the Client could request that BlockFi repay the loan at any time) or a "fixed" term (*i.e.*, the loan has a negotiated maturity date).

BlockFi had the right to redeploy Digital Assets borrowed under a BPC loan for its revenue-generating activities. More specifically, BlockFi had the right, without further notice to a Client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any amount of Digital Assets borrowed under a BPC loan, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of Digital Assets.[62][61] BPC loan agreements were with (and administered by) either BlockFi Lending (U.S. Clients) or BlockFi International (non-U.S. Clients).

**(d)        BlockFi Retail Client Loans.**

BlockFi's retail Clients were able to borrow U.S. Dollars or Stablecoins (*e.g.*, USDC, GUSD, or PAX) from BlockFi Lending and BlockFi International secured by certain types of Digital Asset collateral (BTC, ETH, LTC, or PAXG). U.S.-based loans were serviced by an outside provider, Scratch, while international-based loans were serviced by BlockFi. BlockFi's retail loans were collateralized at origination as Clients could borrow funds with a value of, generally, up to at least 50% of their collateral at origination. Interest rates for retail loans are based on the level and type of Digital Asset collateral.

---

[61][60]  BlockFi Interest Account Terms (Existing U.S. only),  https://blockfi.com/interest-account-terms-existing-us; BlockFi Interest Account Terms (Non-U.S.), https://blockfi.com/interest-account-terms.

[62][61]  BPC Terms, https://blockfi.com/private-client-terms.

BlockFi's retail loans were subject to margin calls and/or liquidation based on specified loan-to-collateral value ratios. If a Client with a BIA elected to use as collateral Digital Assets that had been transferred to BlockFi through the BIA, the Digital Assets would cease to earn interest. Once a Client had repaid a retail loan in full, he or she could elect to have the loan collateral returned to their BlockFi Wallet. For U.S. retail Clients following the Consent Order, once collateral was released, it could not be sent to their BIA from the BlockFi Wallet to earn interest. For non-U.S. retail Clients, however, once collateral was released, it could be transferred to the BIA from the BlockFi Wallet to earn interest.

BlockFi has the right to redeploy retail Client loan collateral for its revenue-generating activities. More specifically, BlockFi has the right, without further notice to a retail loan Client, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest, or use any retail Client loan collateral, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of assets.

Since March 2022, all non-U.S. Client retail loan agreements have first been entered into with BlockFi Lending, and then assigned to BlockFi International (non-U.S. Client retail loan agreements entered into before March 2022 were also assigned by BlockFi Lending to BlockFi International).

### (e)       BlockFi Retail Client Trading.

BlockFi's retail Clients could buy, sell, and exchange Digital Assets supported by BlockFi. BlockFi acted as a principal in trading transactions with retail Clients and could earn a spread from the prevailing market price in these transactions. Retail trading agreements are with (and administered by) either BlockFi Trading (U.S. Clients) or BlockFi International (non-U.S. Clients). BlockFi Trading typically executed trades for all supported Digital Assets in the U.S. BlockFi International could also execute trades for supported Digital Assets in the U.S., and BlockFi International executed all trades for supported Digital Assets for non-U.S. Clients.

### (f)       BlockFi Rewards Card Program.

The BlockFi Credit Card Rewards Program (the "Rewards Program") allowed certain eligible U.S. Clients to earn reward points ("Points"), which were redeemed for cryptocurrency rewards. To participate in the Rewards Program, eligible Clients must: (a) have had a BlockFi Wallet; (b) applied for and have been issued a BlockFi Rewards Visa® Signature Card (the "Rewards Card"); (c) held their Rewards Card in good standing; and (d) not be past due by more than two monthly payments on their Rewards Card at the time of earning Points or redeeming such Points. Clients earned Points, which were redeemed monthly for cryptocurrency at the then-current market price(s) (subject to applicable spreads, charges, or fees), by using the Rewards Card on certain qualifying purchases.

BlockFi's Crypto Rewards Account ("Rewards Account") was a non-interest-bearing account that allowed Clients to hold cryptocurrency earned from the Rewards Program. All Rewards were automatically transferred from the Rewards Account to the BlockFi Wallet, monthly. On November 16, 2022, Visa sent BlockFi a letter purporting to terminate the parties' relationship. The Debtors have reserved all rights, but the BlockFi Rewards Visa is no longer active.

### 2.       *Institutional Clients.*

### (a)       Institutional Finance

Like retail Clients, BlockFi institutional Clients could also open a BlockFi Wallet to store Digital Assets or earn interest through interest earning accounts. But given the more bespoke needs of its institutional Clients, BlockFi also offered a custom suite of services as well.

BlockFi required institutional Clients to complete a rigorous onboarding process, including anti-money laundering and sanctions screenings, before borrowing. Each Client also underwent credit due diligence managed by BlockFi's credit risk underwriting team, and BlockFi set credit limits based on company credit guidelines, policies and procedures. Based on the results of BlockFi's diligence process, at times, BlockFi required borrowers to provide collateral for lending activity ranging from zero to more than 100% of the loan principal (as appropriate).

BlockFi's financing desk enabled qualifying institutional Clients like hedge funds, market makers, proprietary trading firms, over-the-counter trading desks, and other corporations to obtain Digital Asset or U.S. dollar financing. Interest on those loans was typically fixed and payable in kind, monthly in arrears, and durations on those loans were often under a year.

BlockFi also offered institutional Clients custom trading services with advanced trading features such as real-time quotes, a variety of order types, and trading algorithms through either voice, a web interface, or application programming interface. BlockFi either acted as a principal or agent in trading transactions with its institutional Clients and could earn a spread from the prevailing market price in connection with these transactions. As it would with retail Client trading, BlockFi would either enter a hedging transaction or internalize the trade itself.

Generally, to offer these services, institutional Clients would enter into Master Digital Currency Loan Agreements (the "MDCLA"). Loans governed by the MDCLA were subject to margin calls and/or liquidation based on specified loan-to-collateral value ratios. Collateral pledged under the MDCLA was typically redeployed in BlockFi's lending business. Specifically, BlockFi was "free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral, unless otherwise specified on the applicable loan term sheet."[6362]

### (b)      Mining Finance

Certain institutional Clients—Clients that mine Digital Assets—were offered financing secured by mining equipment. These loans were extended by BlockFi Lending, and mining equipment was taken as security for repayment. The mining Clients entered into Facility and Security Agreements with BlockFi Lending that provided the repayment terms and amortization schedule, along with the interest rate and, in some cases, loan-to-value tests based on the value of the machines pledged.

### C.      The Debtors' Capital Structure.

#### 1.      *The FTX Facility.*

On June 30, 2022, BlockFi Inc. entered into the FTX Facility, which provided for capital to be made available to BlockFi Inc. in an amount of up to $400 million outstanding at any time, of which: (a) $300 million was available for general corporate purposes, including Client Payment Obligations; and (b) $100 million was available solely to fund Client Payment Obligations. BlockFi Inc.'s obligations under the FTX Facility were guaranteed by BlockFi Trading and BlockFi Lending (together, the "Guarantors"). Any capital made available to BlockFi through the FTX Facility would contractually be junior to the Client Liabilities. Client Liabilities are "obligations to Clients incurred by [BlockFi Inc. and the Guarantors] or any of [their] Subsidiaries in connection with (x) the BlockFi Interest Account, BlockFi Yield, BlockFi Personalized Yield/BPC or BlockFi Wallet products, (y) custody arrangements and collateral arrangements relating to loans made to Clients and (z) any other similar products or services provided to Clients by [BlockFi Inc., the Guarantors] or any of [their] Subsidiaries." As part of the consideration for the FTX Facility, BlockFi Inc. entered into an option agreement with FTX US and with respect to certain matters, FTX Trading (the "FTX Option Agreement"). The FTX Option Agreement provided FTX US the unconditional, irrevocable, and exclusive option to acquire BlockFi Inc. by requiring BlockFi Inc. to redeem and cancel all equity securities of BlockFi Inc., other than equity securities issued to FTX US.

On November 8, 2022, the Debtors requested an additional $125 million pursuant to the terms of the FTX Facility, which FTX did not provide.

On November 11, 2022, the various FTX entities began to commence voluntary cases under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. As of the Petition Date, the Debtors had drawn $275 million under the FTX Facility. The Debtors believe the FTX Facility Claims should be recharacterized as equity contributions; however, if the Bankruptcy Court finds otherwise, the FTX Facility

---

[6362] Institutional Loan Agreement § V(a).

Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims under the Plan.

### 2.    *The Equity Interests in the Debtors.*

As of the Petition Date, BlockFi Inc. has 6,508,898 shares of Common Stock (the "Common Stock") outstanding, 1 share of Special Voting Stock ("Special Voting Stock") outstanding, and ten series totaling 45,312,958 shares of Preferred Stock (collectively, the "Preferred Stock") outstanding.

### (a)    **Common Stock in BlockFi Inc.**

BlockFi Inc. has two types of common equity: (a) Common Stock and (b) Special Voting Stock.  As of the Petition Date, BlockFi Inc. had 6,508,898 shares of Common Stock outstanding and 1 share of Special Voting Stock outstanding.  The Special Voting Stock was issued to FTX US under the FTX Option Agreement.

### (b)    **Preferred Stock in BlockFi Inc.**

As of the Petition Date, there were 45,312,958 outstanding shares of Preferred Stock outstanding, which are held by a variety of institutional investors, as follows:

| Type | Total Shares Outstanding |
| --- | --- |
| Series Seed Preferred Stock | 2,833,977 |
| Series Seed-2 Preferred Stock | 1,167,941 |
| Series A-1 Preferred Stock | 3,109,745 |
| Series A-2 Preferred Stock | 127,210 |
| Series A-3 Preferred Stock | 7,753,114 |
| Series B Preferred Stock | 9,837,208 |
| Series C Preferred Stock | 7,642,144 |
| Series D Preferred Stock | 9,739,310 |
| Series E Preferred Stock | 2,442,193 |
| Series E-1 Preferred Stock | 660,116 |

Between 2019 to 2021, BlockFi Inc. completed five preferred stock financing transactions to raise capital, as follows:

*Series A Preferred Stock*.  From July to August 2019, BlockFi Inc. sold an aggregate of 13,259,229 shares of its Series A-1 preferred stock, Series A-2 preferred stock, and Series A-3 preferred stock. BlockFi Inc. issued an aggregate of 3,902,716 shares of Series A-1 preferred stock at a price of $1.0641 per share, 190,815 shares of Series A-2 preferred stock at a price of $1.5722 per share, and 9,165,698 shares of Series A-3 preferred stock at a purchase price of $1.7476 per share for an aggregate purchase price of $20.5 million, of which $16.0 million was paid in cash and $4.5 million was paid through the conversion and cancellation of convertible promissory notes and agreements for future equity issued by BlockFi Inc.

*Series B Preferred Stock*.  From January to February 2020, BlockFi Inc. sold an aggregate of 9,907,010 shares of its Series B preferred stock, at a cash purchase price of $3.78952 per share, for an aggregate purchase price of $37.5 million.

*Series C Preferred Stock*.  From August to September 2020, BlockFi Inc. sold an aggregate of 7,081,821 shares of Series C preferred stock, at a cash purchase price of $9.5138 per share, for an aggregate purchase price of $67.4 million.

*Series D Preferred Stock*.  From March to May 2021, BlockFi Inc. sold an aggregate of 9,415,382 shares of Series D preferred stock, at a cash purchase price of $58.737 per share, for an aggregate purchase price of $553.0 million.

*Series E Preferred Stock*.  From July to August 2021, BlockFi sold an aggregate of 2,442,193 shares of Series E preferred stock and 660,116 shares of Series E-1 preferred stock, in each case at a cash purchase price of $75.7442 per share, which included 1,551,147 warrants, each of which grants the holder the right to purchase either a share of Series E preferred stock or a share of Series E-1 preferred stock, at the holder's option, in each case at a strike price of $75.7442 per share, for an aggregate purchase price of $235.0 million.

In connection with certain of the foregoing preferred stock financing transactions, BlockFi Inc. repurchased certain classes of Preferred Stock and Common Stock in varying amounts for cash consideration.

## IX.    EVENTS LEADING TO ~~THE~~ THESE CHAPTER 11 CASES

### A.    Market and Industry-Specific Challenges.

#### 1.    *2020 and 2021 Market Conditions.*

The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike.  Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value.  The price of BTC fell over 50 percent over the same time period, and most other Digital Assets experienced similar declines.

Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether (the "COVID Crash").  BlockFi, however, continued to operate its platform through the entirety of 2020.

After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth.  Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic.  Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed.  Between its lowest point in 2020 and its highest point in 2021, the price of BTC rose by over 1,000 percent.  The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove a series of sell-offs as equity markets moved sideways through the end of 2021.  In the cryptocurrency space, strong sell-offs in "risk-on" assets, like technology and early-stage equities, led to sell-offs in the cryptocurrency sector as investors trimmed exposure.  Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses from all-time highs.

Ultimately, traditional markets closed 2021 with double-digit growth.  On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that the lingering effects of the pandemic would be minimal.  But discussions around a potential recession in 2022 began to materialize as inflation rose along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

The year 2022 was marked by historic levels of volatility in the traditional markets and cryptocurrency markets.  On February 24, 2022, Russia invaded Ukraine in a major escalation of the conflict between the two countries (the "Ukrainian War").  The Ukrainian War had a swift and profound impact on the world economy.  In an effort to weaken Russia's ability to pursue the war, Western countries imposed a series of financial, trade, and travel

75

sanctions against Russia, all of which measures contributed to a rampant increase in global commodity prices. Equity markets were roiled as well.  Between January 1, 2022 and the Petition Date, the S&P 500 shed 20 percent of its value while the tech-heavy NASDAQ declined by nearly 30 percent over the same period.  Rising inflation and commodity prices contributed to investor pessimism and further sell-offs.  In June 2022, market analysts officially labeled 2022 as a bear market.

**2.** *Cryptocurrency Industry-Wide Sell-off.*

Many cryptocurrencies experienced significant decline since early 2022.  A chart showing the decline in BTC prices over the course of 2022 is copied below:[6463]



As investor pessimism grew—exacerbated by the collapse of 3AC, the Voyager and Celsius bankruptcy filings, and ultimately FTX's implosion—the cryptocurrency industry experienced significant declines.  Declining investor confidence in the industry more broadly led significant numbers of BlockFi's Clients to withdraw from its product offerings:

---

[6463] https://coinmarketcap.com/currencies/bitcoin/ (Jan. 5, 2023).



As shown in the above graph, BlockFi's Deployable Assets declined from $12 billion at the beginning of 2022 to below $2 billion in November of 2022. The value of Deployable Assets declined in part because of price declines but in larger part because of Client withdrawals.

### (a)    Overall Industry Pullback.

Crypto's 2022 pullback began with the collapse of Luna, a cryptocurrency issued by Terra, an open-source blockchain protocol. Terra issued the cryptocurrency Luna to execute transactions on the Terra blockchain. In early May 2022, Luna was trading at $86 per token and had a market capitalization of approximately $14 billion. Along with Luna, Terra issued TerraUSD ("UST"), an algorithmic Stablecoin that was pegged at $1.

On May 7, 2022, $2 billion of UST was unstaked and immediately sold. This dropped UST's price to $0.91. UST holders saw the "de-peg" and rushed to unstake and sell their coins.

Traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in its price. Simultaneously, other traders attempted to repeg Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna and further exacerbated its price decline. In one week, Luna's price fell from $82.55 to $0.000001 per token, eliminating $18 billion of value in the cryptocurrency sector.

Many cryptocurrency-focused hedge funds, and other cryptocurrency companies, owned Luna. Some were unable to sell their Luna under staking agreements and were forced to incur up to a 99% loss on their investment. ~~And approximately a month later, reportedly due in part to the collapse of Luna, a major player in the space, 3AC collapsed.~~

On June 15, 2022, 3AC confirmed that it had suffered at least some loss from the Luna collapse and that it had hired legal and financial advisors to explore potential liquidity solutions. ~~Shortly thereafter, on~~On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

In addition to 3AC, several prominent cryptocurrency lenders faced challenges in June and July 2022. On June 12, 2022, Celsius announced that it was pausing Client withdrawals, sparking market volatility and widespread speculation about contagion among cryptocurrency lenders. On July 1, 2022, Voyager, a cryptocurrency brokerage and lender publicly listed on the Toronto Stock Exchange, announced it was pausing Client trading, deposits, and withdrawals. On July 5, 2022, Voyager filed for chapter 11. On July 13, 2022, Celsius also filed for chapter 11.

BlockFi had no direct exposure to Celsius, Luna, Terra, or Voyager, outside of offering Clients facing BlockFi International the ability to trade Luna on its retail trading platform. During this period of market disruption,

BlockFi took swift action to de-risk itself of exposure to 3AC but could not completely evade the harm. While 3AC was one of BlockFi's largest borrower Clients, BlockFi limited its losses in connection with the 3AC collapse to a fraction of the original exposure (and a similar sum to that BlockFi had made in interest during the life of its relationship with 3AC). The collapse of UST, along with the halting of withdrawals and bankruptcies of Celsius, Voyager and 3AC, led to significant Client withdrawals from BlockFi.

While BlockFi was able to withstand the loss from 3AC and other borrowers and process all Clients' withdrawals within the normal periods set forth in its Client agreements, it prudently sought additional liquidity to protect its Client accounts into the indefinite future.

BlockFi first attempted to obtain equity financing from third-party investors in a new financing round. BlockFi then considered several other potential transactions. This rapid financing process led to an offer from FTX to essentially backstop Client withdrawals: FTX US committed up to $400 million in USDC (or other fiat or Digital Asset as mutually agreed) to BlockFi on a junior basis to BlockFi's obligations to its Clients, while FTX US received an option to acquire BlockFi, exercisable as early as July 2023. The FTX transaction was overwhelmingly supported by BlockFi's shareholders, with nearly 90% in favor of the transaction.

The offer imposed steep costs on BlockFi personnel and shareholders. To secure liquidity for its Clients, BlockFi's executives and employees were required to (and did) sacrifice hundreds of millions of dollars of their own equity value. BlockFi accepted the offer because—for BlockFi's leadership and employees—Client protection was paramount. The offer from FTX was determined to be the best and most viable by BlockFi's management team and Board of Directors, and it received nearly 90% approval from BlockFi's shareholder vote. This approval included the majority of each share class and sub-share class. In addition, BlockFi significantly reorganized its workforce, reducing headcount by over 20% in a further effort to protect Client value and chart a return to profitability.

Support from FTX, with its highly visible brand, bolstered Client confidence in the strength and safety of the BlockFi Platform. And indeed, throughout the summer of 2022, BlockFi maintained its operations while several other cryptocurrency trading and lending platforms and exchanges were forced to declare bankruptcy.

**(b)      Collapse of FTX and the Debtors' Response.**

Before the transaction with FTX, BlockFi acted as a lender to Alameda, an FTX Affiliate, and traded on the FTX platform (starting in 2021). The amounts of BlockFi's loans to Alameda have varied over time and typically consisted of Digital Assets (primarily BTC and ETH) and USD-denominated Stablecoins.

As part of BlockFi's credit evaluation process of Alameda, BlockFi, among other things, received unaudited quarterly financial statements and certain verifiable financial information, such as cryptocurrency wallet addresses, and had regular dialogue with Alameda staff, who made ongoing representations regarding its financial standing, significant equity capital, and unencumbered assets on Alameda's balance sheet. In 2022, BlockFi also received and relied on audited financials for FTX Trading and FTX US.

On November 6, 2022, Binance, FTX's largest rival, soon stated that it would liquidate its entire position in FTT, FTX's native exchange token.[6564] Binance's founder compared FTT to Luna, stating: "Liquidating our FTT is just post-exit risk management, learning from LUNA. We gave support before, but we won't pretend to make love after divorce."[6665] Binance held a large position in FTT. After Binance's announcement, many investors followed suit and sold the token. In 2 days, the price of FTT fell from trading at $22.06 to $3.38:

---

[6564]  @CZ_Binance, Twitter (Nov. 6, 2022) ("Due to recent revelations that have came to light, we have decided to liquidate any remaining FTT on our books.").

[6665]  @CZ_Binance, Twitter (Nov. 6, 2022).



These and other comments from Binance and others led to material withdrawals from the FTX platform.

On November 8, 2022, SBF stated publicly that, among other things, FTX was experiencing a "liquidity crunch" due to user withdrawals.[6766] Hoping to stall the collapse, FTX sought to be acquired by Binance. While Binance reportedly signed a non-binding letter of intent, it later demurred, stating publicly that "[a]s a result of corporate due diligence, as well as the latest news reports regarding mishandled client funds and alleged US agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com."[6867] On November 11, 2022, FTX began filing for bankruptcy.[6968]

Customer withdrawals from FTX and FTT token price declines by themselves should not have taken FTX or Alameda down if they were being run legitimately and in line with the representations they made to the market and BlockFi. If FTX and Alameda had had proper corporate governance and FTX had been backing client funds 1:1 as FTX represented it had done, all FTX clients would have been able to withdraw from the FTX platform, regardless of the price of FTT. Ultimately, FTX's demise was driven by fraudulent actions and misrepresentations including but not limited to (i) representing what in reality were liabilities to FTX customers as assets on Alameda's balance sheet, and (ii) allowing Alameda to carry a negative balance on the FTX's platform.[7069]

---

[6766] @SBF_FTX, Twitter (Nov. 8, 2022).

[6867] @Binance, Twitter (Nov. 9, 2022).

[6968] @SBF_FTX, Twitter (Nov 11, 2022).

[7069] *Securities and Exchange Commission vs Sam Bankman-Fried*, SEC Civil Action No. 22-cv-10501. As current FTX CEO John Ray most recently stated, "The FTX Group portrayed itself as the vanguard of customer protection efforts in the crypto industry. Its co-founder and CEO, Sam Bankman-Fried, claimed to support federal legislation to safeguard consumers' digital assets, and touted the FTX exchanges' purported procedures to protect fiat currency and crypto deposits, including in testimony he provided to the U.S. Senate. In 2021, the FTX Group released, and urged Congress to read, its "key principles" for regulation of the crypto industry, which included the primary goals of "ensuring customer and investor protection, promoting market integrity, preventing financial crimes, and ensuring overall system safety and soundness." In an accompanying press release, Bankman-Fried declared "the protection of investors and the public as a top priority" for the FTX exchanges. The image that the FTX Group sought to portray as the customer-focused leader of the digital age was a mirage. . . . The FTX Senior Executives did not commingle and misuse customer deposits by accident. Commingling and misuse occurred at their direction, and by their design. Bankman-Fried, with the assistance of a senior FTX Group attorney ("Attorney-1") and others, lied to banks and auditors, executed false documents, and moved the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to the Bahamas, in a continual effort to enable and avoid detection of their wrongdoing. In doing so, they showed little of the concern for customers that they

BlockFi, like other market participants, was shocked when FTX's and Alameda's fraud came to light. Multiple FTX and Alameda executives including Caroline Ellison, chief executive officer of Alameda, Zixiao "Gary" Wang, co-founder of FTX, and Nishad Singh, head of engineering of FTX, have already plead guilty to crimes that, for some, including intent to defraud lenders. On June 13, 2023, the U.S. District Court handling criminal proceedings against Sam Bankman-Fried split the case into two separate trials, the first of which is currently scheduled to begin in October 2023.

As in the previous episode of market stress, BlockFi took several proactive measures to attempt to limit its exposure to each of Alameda and FTX.com (the platform operated by FTX Trading). On November 7, 2022, BlockFi modified existing lending arrangements with Alameda, increasing the overall required collateralization levels to 200%. Alameda thereafter defaulted on approximately $680 million of collateralized loan obligations to BlockFi, the recovery on which is unknown. In response to Alameda's default, on November 9, 2022, BlockFi Lending and BlockFi International entered into a forbearance agreement with Alameda. As a condition to the effectiveness of the forbearance agreement, BlockFi Inc., BlockFi Lending, and BlockFi International entered into the Pledge Agreements. The Pledge Agreements aimed to protect Blockfi in the event of a default on outstanding loans to Alameda. Under the Alameda Pledge Agreement, Alameda granted BlockFi a first-priority security interest in certain of Alameda's Trust Shares to secure all obligations of Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International or any Affiliate thereof under the secured financing agreements or any other agreement or arrangement. Under the Emergent Pledge Agreement, Emergent granted BlockFi a first-priority security interest in all of Emergent's rights, title, and interests in, among other things, all of Emergent's Robinhood Shares to secure all obligations of Emergent, Alameda or any Affiliate thereof to BlockFi Lending, BlockFi International or any Affiliate thereof under the secured financing agreements or any other agreement or arrangement.

Separately, on November 8, 2022, BlockFi requested an additional $125 million pursuant to the terms of the FTX facility, which FTX failed to fund. Simultaneously, BlockFi requested to withdraw approximately $181 million in Digital Assets from its accounts with FTX.com, which FTX failed to honor.

In response to failures of the FTX companies and Emergent to meet their obligations to BlockFi, BlockFi faced a liquidity shortage. So, to avoid a disorderly series of withdrawals that would harm many Clients, on November 10, 2022, BlockFi decided to limit platform activity, including pausing Client withdrawals, as allowed under BlockFi's terms.[270]

The FTX companies began commencing chapter 11 cases in the United States Bankruptcy Court for the District of Delaware early in the morning on November 11, 2022.[271] Recognizing that BlockFi could not, due to these and other circumstances, restore its liquidity alone, BlockFi's Board and management sought the support of veteran restructuring advisors to navigate its uncertain position, proceeding to engage BRG, Kirkland, longtime corporate counsel Haynes and Boone, Cole Schotz as New Jersey local counsel, and Moelis as investment banker to assist with contingency planning and liquidity management, among other tasks. Ultimately, BlockFi, with the aid of its advisors, determined the commencement of these Chapter 11 Cases was necessary to protect its Clients and maximize value for all stakeholders.

In preparation for these Chapter 11 Cases, BlockFi took steps to liquidate certain of its owned Digital Assets to limit its exposure to market forces impacting Digital Assets and bolster available cash to fund its business

---

publicly professed. . . . Through its website, social media, and in statements and submissions to Congress, regulators and third parties, the FTX Group represented that it maintained a strict separation of customer and corporate funds . . . . At all times, with the exception of isolated jurisdictions, the FTX Group's representations in this regard were false." *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.Com*, Case No. 22-11068-JTD (Bankr. D. Del. June 26, 2023) [Docket No. 1704-1].

---

[270] November 11, 2022 BlockFi Update (Nov. 11, 2022), https://blockfi.com/november-11-2022-blockfi-update.

[271] *In re FTX Trading, Ltd.*, No. 22-1068 (JTD) (Bankr. D. Del. Nov. 11, 2022). Filings of various other entities related to FTX continued for several days. The first day hearing in the FTX bankruptcy cases occurred on November 22, 2022.

and administrative costs.  Through this process, BlockFi was able to raise $238.6 million of additional cash, for a total unencumbered cash position as of the Petition Date of $256.5 million.  BlockFi currently expects that this cash position will be sufficient to fund the costs of these Chapter 11 Cases.

      **B.**      **Governance Initiatives.**

On or about November 25, 2022, the Debtors took several steps to strengthen the independence and experience of their Boards:  (i) appointing Scott Vogel as an independent director of BlockFi Inc.; (ii) appointing Alan Carr as an independent director of BlockFi Trading; (iii) appointing Jill Frizzley as an independent director of BlockFi International; (iv) appointing Harvey Tepner as independent director of BlockFi Lending; (v) appointing Pam Corrie as independent director of BlockFi Wallet LLC; and (vi) the Board voted to establish the Special Committee comprised of Jennifer Hill[7372] and Scott Vogel (collectively, the "<u>Independent Directors</u>") and tasked the Special Committee with addressing potential intercompany conflicts and evaluating historical transactions.

**X.**      **EVENTS OF THE CHAPTER 11 CASES**

      **A.**      **First and Second Day Relief and Other Case Matters.**

On the Petition Date, the Debtors filed several motions (the "<u>First Day Motions</u>") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  At a hearing on November 29, 2022, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions, and at a hearing on January 17, 2023, the Bankruptcy Court granted certain of the First Day Motions on a final basis as follows:[7473]

    (i)      **Automatic Stay Motion.**  Debtors' Motion Seeking Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (II) Granting Related Relief [Docket No. 12].  On November 30, 2022, the Bankruptcy Court entered an Order approving the Automatic Stay Motion [Docket No. 56];

    (ii)      **The Case Management Motion.**  Debtors' Motion to Establish Certain Notice, Case Management and Administrative Procedures [Docket No. 3].  On November 30, 2022, the Bankruptcy Court entered an Order approving the Case Management Motion [Docket No. 54];

    (iii)      **Cash Management Motion.**  Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Existing Business Forms and Records, (B) Maintain Existing Corporate Bank Accounts and Cash Management System, (C) Pay Prepetition Bank Fees Associated with the Cash Management System, and (D) Continue Performance of Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Waiving Certain U.S. Trustee Requirements [Docket No. 7].  On November 29, 2022, the Bankruptcy Court entered an Order approving the Cash Management Motion on an interim basis [Docket No. 44], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Cash Management Motion on a final basis [Docket No. 306];

    (iv)      **The Creditor Matrix Motion.**  Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of

---

[7372]  Jennifer Hill has been a member of the Board since 2021.  Given her prior connection with BlockFi, however, Ms. Hill ~~will~~has recuse~~d~~ herself from ~~any investigation~~ the Special Committee~~'s~~ ~~performs related to the June 2022 transactions between BlockFi and FTX and any other work that presents an actual or potential conflict~~investigation.

[7473]  The First Day Motions, the First Day Declaration, and all orders for relief granted in these Chapter 11 Cases can be viewed free of charge at https://restructuring.ra.kroll.com/blockfi/.

Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders and (V) Granting Related Relief [Docket No 4]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Creditor Matrix Motion on an interim basis [Docket No. 53];

(v)    **Critical Vendors Motion.**    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Claimants and (II) Granting Related Relief [Docket No. 13]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on an interim basis [Docket No. 52], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Critical Vendors Motion on a final basis [Docket No. 308];

(vi)    **Insurance Motion.**    Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtors to (I) Continue, Renew, or Supplement Insurance Policies, (II) Pay Insurance Premiums Thereon, (III) Continue, Renew, or Supplement the Surety Bond Program, and (IV) Granting Related Relief [Docket No. 11]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Insurance Motion on an interim basis [Docket No. 49], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Insurance Motion on a final basis [Docket No. 298];

(vii)    **The Joint Administration Motion.**    Debtors' Motion for Joint Administration [Docket No. 2]. On November 29, 2022, the Bankruptcy Court entered an Order approving the Joint Administration Motion [Docket No. 42];

(viii)    **NOL Motion.**    Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief [Docket No. 14]. On January 17, 2023, the Bankruptcy Court entered an Order approving the NOL Motion on a final basis [Docket No. 300];

(ix)    **Claims and Noticing Agent Application.**    Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date [Docket No. 15]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Claims and Noticing Agent Application [Docket No. 48];

(x)    **Schedules/SOFAs Extension Motion.**    Debtors' Motion for Entry of an Order Extending the Time to File Schedules and Statements [Docket No. 5]. On November 29, 2022, the Bankruptcy Court entered an Order approving the Schedules/SOFAs Extension Motion [Docket No. 47];

(xi)    **Tax Motion.**    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Bankruptcy Code §§ 105(a), 363(b), 507(a)(8), and 541(d) [Docket No. 9]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Tax Motion on an interim basis [Docket No. 55], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Tax Motion on a final basis [Docket No. 303];

(xii)    **Utilities Motion.**    Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366(I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment [Docket No. 10]. On November 30, 2022, the Bankruptcy Court entered an Order approving the Utilities Motion on an interim basis [Docket No. 51], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Utilities Motion on a final basis [Docket No. 304]; and

(xiii)    **Wages Motion.**  Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief [Docket No. 16]. On November 29, 2022, the Bankruptcy Court entered an Order approving the Wages Motion on an interim basis [Docket No. 43], and on January 17, 2023, the Bankruptcy Court entered an Order approving the Wages Motion on a final basis [Docket No. 305].  The Debtors also filed several other motions subsequent to the Petition Date to facilitate the Debtors' restructuring efforts and ease administrative burdens, including certain retention applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland, Haynes and Boone, and Cole Schotz as co-legal counsel to the Debtors, Moelis as investment banker to the Debtors, and authorizing BRG to provide Mr. Renzi as Chief Restructuring Officer and additional personnel, among others.

**B.    Appointment of Unsecured Creditors' Committee.**

On December 21, 2022, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 130] appointing the Committee.  The nine-member Committee is currently composed of exclusively individual Clients (including non-U.S. Clients of BlockFi International), and includes the following members:

(i)    Nicholas Owen Gunden;

(ii)    Corey L. Grossman;

(iii)    John A. Javes;

(iv)    Robert Moleda;

(v)    Curt Tudor;

(vi)    Elisabeth Carabas;

(vii)    Michael Ilg;

(viii)    Greg Dingel; and

(ix)    Brendon Ishikawa.

**C.    Schedules and Statements.**

On November 29, 2022, the Bankruptcy Court entered the *Order Extending the Time to File Schedules and Statements* [Docket No. 45] extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional 30 days for a total of 44 days after the Petition Date.

The Debtors filed their Schedules and Statements at Docket Nos. 242, 243, 247-262, and filed amended Schedules and Statements at Docket Nos. 460, 461, and 462.  Interested parties may review the Schedules and Statements and any amendments thereto free of charge at https://restructuring.ra.kroll.com/blockfi.

**D.    Bar Date Motion.**

On January 9, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof* [Docket No. 225] (the "Bar Date Motion").  On January 30, 2023, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 440] (the "Bar Date Order"), which established procedures and set deadlines for filing Proofs of Claim against the Debtors and approved the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Order and the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases was March 31, 2023, at 5:00 p.m.

prevailing Eastern Time (the "General Claims Bar Date") and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is May 30, 2023, at 5:00 p.m. prevailing Eastern Time.  The Bar Date Notice was published in *The New York Times* (national edition) on February 2, 2023 [Docket No. 471], the *Royal Gazette* on February 3, 2023 [Docket No. 472], and CoinDesk's Valid Points email newsletter on:  (i) February 15, 2023; (ii) February 22, 2023; and (iii) March 1, 2023 [Docket No. 568], and was served on February 8, 2023 [Docket No. 591].

Approximately 30,800 proofs of Claims have been filed against the Debtors.  The Debtors have already commenced the Claims reconciliation process including filing objections to a number of claims.  *See e.g.*, *Order Granting Debtors' First Omnibus Objection to Claims 1363, 1649, and 3217* [Docket No. 777].  The Debtors anticipate the Claims reconciliation process to continue through the Effective Date.

84

E.    **The Wallet Withdrawal Motion.**

From the very first day of these Chapter 11 Cases, the Debtors have taken the position that the Digital Assets held by the Debtors for their Clients in the Client Wallet Accounts belong to the Clients and are not part of the Debtors' Estates.  Accordingly, the Debtors wished to return those Digital Assets to their Clients as soon as permissible.

On December 19, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals From Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 121] (the "Wallet Withdrawal Motion").  The Wallet Withdrawal Motion sought to permit Clients to access Digital Assets that are held in their Wallet Accounts following a reconciliation of the Debtors' Product UI/UX System[7574]and User Interface[7675] to reflect the proper accounting of Digital Assets in the Wallet Accounts as of the Platform Pause to ensure that all Clients are treated fairly.

On January 20, 2023, the Debtors filed the *Debtors' Statement with Respect to the Wallet Withdrawal Motion* [Docket No. 339] (the "Debtors' Wallet Statement"), through which the Debtors sought to withdraw the Wallet Withdrawal Motion from consideration by the Bankruptcy Court due to opposition by the Committee and the ad hoc group of wallet holders (the "Ad Hoc Committee of Wallet Holders") with respect to the relief requested by the Wallet Withdrawal Motion.  The Debtors' Wallet Statement reiterated the requested relief in the Wallet Withdrawal Motion to return the Digital Assets held by the Debtors for the benefit of their Clients in Client Wallet Accounts but, instead of through the Wallet Withdrawal Motion, through a chapter 11 plan.  In response, on January 23, 2023, the Ad Hoc Committee of Wallet Holders filed the *Statement of the Ad Hoc Committee of Wallet Account Holders in Response to the Debtors' Statement Regarding their Wallet Withdrawal Motion [Docket No. 339]* [Docket No. 360], and, on January 24, 2023, the Committee filed the *Limited Objection and Response of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 380], which, in part, addressed the Debtors' Wallet Statement.  On February 21, 2023, the Bankruptcy Court decided to move the Wallet Withdrawal Motion to a suspense docket to be able to further address discovery, potential settlement, or ancillary relief.

On February 28, 2023, counsel to the Ad Hoc Committee of Wallet Holders and Deferred 1031 LLC ("Deferred 1031," a BIA and Wallet Account Holder) sent a letter to the U.S. Trustee seeking the appointment of an official committee of Wallet Account Holders.  On March 13, 2023, the Debtors sent a letter to the U.S. Trustee objecting to the request.

On March 8, 2023, the Debtors filed a letter with the Bankruptcy Court that was in collaboration with and cosigned by the Committee and the Ad Hoc Committee of Wallet Holders to inform all of the Debtors' stakeholders of the status of the Wallet Withdrawal Motion.  The Debtors, the Committee, and the Ad Hoc Committee of Wallet Holders subsequently agreed on a briefing schedule for the limited issue of whether attempted transfers from BIAs to Client Wallet Accounts after the Platform Pause actually occurred.  On April 30, 2023, the Debtors filed the *Declaration of Amit Cheela, Chief Financial Officer of BlockFi Inc., in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 804], as amended by [Docket No. 822],

---

[7574]  The Debtors use a "user interface" / "user experience" system for its product offerings, which the Debtors call "Storm" (the "Product UI/UX System"), to collect and record transfer requests that Clients initiate when they interface and interact with the User Interface.

[7675]  The Product UI/UX System and the User Interface are two sides of the same coin.  While the User Interface is the Debtors' ***Client-facing***, user-experience program that Clients interact with, the Product UI/UX System is the ***company-facing*** aspect of the User Interface that the Debtors' employees see, experience, and interact with to collect and review, and subsequently manually action, transfer request data.

85

and the *Debtors' Omnibus Reply in Support of the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 805].  On May 3, 2023, the Committee filed the *Reply of the Official Committee of Unsecured Creditors to the Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 824].  On May 5, 2023, the Ad Hoc Committee of Wallet Holders filed the *Ad Hoc Committee of Wallet Account Holders' Response to Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief* [Docket No. 834].  A hearing on the Wallet Withdrawal Motion was May 8, 2023.

On May 11, 2023, the Bankruptcy Court issued a bench ruling, overruling the objections of the Ad Hoc Committee of Wallet Holders and others, holding that the Digital Assets held in the Omnibus Custodial Wallets and represented in the Client Wallet Accounts as of the Platform Pause are not Estate property and authorizing the Debtors to update the User Interface to properly reflect balances held in the Client Wallet Accounts as of the Platform Pause.[77]  As the Bankruptcy Court reasoned, the BlockFi terms of service were clear, and "BIA account holders deposited their assets into these accounts with the full knowledge that they were undertaking certain risk in exchange for the chance at greater returns."[76]  On June 9, 2023, as provided for in the Wallet Withdrawal Motion, the Bermuda Court entered an order authorizing BlockFi International to honor such withdrawals in the Bermuda Insolvency Proceedings.

### F.    The Redaction Motion.

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File A Consolidated List of Top 50 Unsecured Creditors and Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individual Creditors, Clients, Equity Holders, and Current and Former Employees, (III) Authorizing Client Name Redaction, (IV) Waiving the Requirement to File an Equity List and Provide Notices Directly to Equity Security Holders, and (V) Granting Related Relief* [Docket No. 4] (the "Redaction Motion").  The Redaction Motion seeks authority to, among other things, redact certain confidential and personally identifiable information, such as names and home addresses, of creditors.

On November 30, 2022, the Bankruptcy Court entered an order [Docket No. 53] authorizing the Debtors to, on an interim basis, redact certain personally identifiable information from any document filed with the Court.  On January 10, 2023, the U.S. Trustee filed an objection [Docket No. 232] to final approval of the Redaction Motion, objecting to the sealing of the names of Clients and creditors and the sealing of names, addresses and other contact information for Clients or creditors who are not individuals.  Also on January 10, 2023, the Committee filed a joinder [Docket No. 234] in support of final approval of the Redaction Motion.

On January 13, 2023, the Committee filed a reply in opposition to the U.S. Trustee's objection [Docket No. 278], and the Debtors filed a response [Docket No. 275, amended by Docket No. 337] to the U.S. Trustee's objection.  It is the Debtors' position that the relief requested in the Redaction Motion is critical to maintaining the physical and financial security of BlockFi's Clients and mitigating the ability of bad actors to target them.  Of the cryptocurrency bankruptcy cases, only the Celsius court has required disclosure of client names.  *See In re Celsius Network, LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sept. 28, 2022) [Docket No. 910].  The consequences of the required disclosures of individual names and institutional names and addresses were severe.  Some creditors became the victim of phishing scams—scammers posed as debtors' counsel using fake email accounts and requested that the

---

[77]  As provided in the Wallet Withdrawal Motion, the Debtors' ability to honor withdrawal requests from Client Wallet Accounts held by BlockFi International Ltd. is subject to entry of an order authorizing such withdrawals in the Bermuda Insolvency Proceeding currently pending in the Supreme Court of Bermuda.

[76]  May 11, 2023 Tr., *In re BlockFi Inc.*, 22-19361-MBK (Bankr. D.N.J. 2023) (transcript of Judge Kaplan's ruling on Wallet Withdrawal Motion).

creditors reply with their account information. Client and creditor protection remains paramount to the Debtors. A final hearing on the Redaction Motion will be held on ~~June 5~~[July 6], 2023.

### G.    The Exclusivity Motions.

On March 21, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 659] (the "Exclusivity Motion") seeking to extend their exclusive periods to file and solicit votes on a chapter 11 plan by 90 days through June 26, 2023 and August 28, 2023, respectively.  On March 22, 2023, the Bankruptcy Court entered that *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 661] extending the Debtors' exclusivity periods on an interim basis until the Exclusivity Motion is heard on April 19, 2023.  On April 12, 2023, the Committee filed an objection [Docket No. 733] to approval of the Exclusivity Motion, arguing, among other things, that termination of exclusivity would move these Chapter 11 Cases forward.  On April 14, 2023, the Debtors filed the *Debtors Reply in Support of Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 740].  In the spirit of compromise, the Debtors proposed a revised Confirmation schedule whereby their exclusive period to file and solicit votes on a chapter 11 plan would terminate on May 15, 2023 and August 11, 2023, respectively.

On April 19, 2023, the Bankruptcy Court overruled the Committee's Objection and entered the *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 755], extending the Debtors' exclusive periods to file and solicit a chapter 11 plan to May 15, 2023 and August 11, 2023, respectively.  On May 15, 2023, the Debtors filed the *Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 886] (the "Second Exclusivity Motion") seeking to further extend the exclusive periods to file a chapter 11 plan by 100 days through August 23, 2023 and to solicit votes on a chapter 11 plan by 50 days through August 28, 2023.

On May 15, 2023, the Bankruptcy Court entered the *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 889] extending the Debtors' exclusivity periods through and including the date by which the Court enters a final order with respect to the Second Exclusivity Motion.  On June 12, 2023, after amending the Confirmation schedule and with the consent of the Committee, the Bankruptcy Court entered the *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 1052] extending the Debtors' exclusivity periods on an interim basis through the original hearing date of July 6, 2023.  On June 16, 2023, to correspond with a further amended Confirmation schedule, the Bankruptcy Court entered the *Bridge Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 1086] further extending the period through July 13, 2023.

### H.    The Institutional Loan Motion and Settlements.

On December 19, 2022, the Debtors filed the *Debtors' Motion for Entry of An Order (I) Authorizing the Debtors to Continue Servicing and Administration Activities in the Ordinary Course of Business With Respect to the Debtors' Institutional Loan Portfolio and Granting Related Relief and (II) Authorizing and Establishing Procedures Regarding the Restructuring, Settlement, or Other Modifications of Institutional Loans and Loan Obligations* [Docket No. 125], which the Bankruptcy Court approved on January 17, 2023 [Docket No. 299].  Accordingly, the Debtors were granted authority to continue normal servicing activities, including entering into any workouts or settlements with the borrowers under the Debtors' institutional loan portfolio.

Since the Debtors obtained the Bankruptcy Court's approval, the Debtors have sought [Docket Nos. 313, 424, 522, 533] and have obtained approval [Docket Nos. 439, 488, 566, 567] to enter into a number of institutional loan settlement agreements.

On March 29, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Sale and Assignment of Certain of the Debtors' Institutional Loans Free and Clear of all Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the Debtors to Enter into the Assignment Agreements, and (III) Granting Related Relief* [Docket No. 701], seeking entry of an order approving the sale and assignment of certain loans made by BlockFi Lending to each of TYMIF Coin Ventures LLC and VCV Power Beta LLC (together, the "VCV Loans") to Faithful High LTD, a limited liability partnership organized under the laws of the British Virgin Islands free and clear of all claims, liens, rights, interests, and encumbrances.

### I.      Returning Post-Pause Payments on Retail Client Loans.

On February 24, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Direct Scratch to Return Post-Pause Payments on Retail Client Loans and (B) Granting Related Relief*, [Docket No. 559], which the Bankruptcy Court approved on April 19, 2023 [Docket No. 754]. Accordingly, the Debtors were authorized to direct Scratch Services, LLC ("Scratch"), the Debtors' U.S.-based loan subservice provider to immediately return $596,670.77 in payments received from Retail Loan Program Clients on account of such loans after the Platform Pause.

### J.      Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.

Further, the Debtors are party to various other legal proceedings (including individual, class and putative class actions as well as federal and state governmental investigations) covering a wide range of matters and types of claims including, but not limited to, securities laws, consumer protection, regulatory, and disputes with other companies. Such matters are subject to uncertainty and the outcome of individual matters is not predictable.

On November 28, 2022, the Debtors commenced an adversary proceeding against Emergent and Marex seeking to enforce the terms of a pledge agreement and to recover collateral that the Debtors believe is property of the estate. (Adv. Proc. 22-01382) [Docket Nos. 1–2]. On February 3, 2023, Emergent filed a voluntary petition for chapter 11 in the Bankruptcy Court for the District of Delaware and a corresponding Antiguan insolvency proceeding. On February 16, 2023, the Debtors filed a *Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case* in *In re Emergent Fidelity Technologies, Ltd.*, (Case No. 23-10149) [Docket No. 32]. On March 14, 2023, the Debtors withdrew their motion to dismiss Emergent's bankruptcy case without prejudice. Minute Entry (Case No. 23-10149) [Docket No. 80]. On April 11, 2023, the Debtors and the Emergent debtors submitted a stipulation in the FTX debtors bankruptcy cases that stayed further litigation and discovery concerning the Robinhood Shares while still permitting a reasonable exchange of information regarding the Robinhood Shares, pending the outcome of the criminal proceedings against SBF. On April 21, 2023, the Court entered an *Order Approving the Stipulation Staying Litigation and Related Discovery entered between BlockFi and Emergent, Concerning the Robinhood Assets* [Docket No. 760]. On April 25, 2023, the Debtors submitted the *Application in Lieu of Motion in Support of an Entry of an Order Approving Stipulation Staying Litigation and Related Discovery*, also concerning the Robinhood Shares, relating to the Debtors' claims against Marex [Adv. Proc. Doc. No. 65]. The Debtors anticipate that the stipulation with Marex will also be approved. Together, the two stipulations, along with corresponding stipulations in the FTX debtors' cases (which have already been approved) will stay all proceedings related to the Robinhood Shares. Additional information with respect to the government seizure of the Robinhood Shares is described below in subsection P below.

On March 22, 2023, BlockFi International commenced an adversary proceeding (the "Druk Adversary") against Druk Holding and Investments Limited ("Druk") seeking to enforce the terms of, and BlockFi International's rights under and pursuant to, a Master Digital Currency Loan Agreement between BlockFi International and Druk. (Adv. No. 23-01078) [Docket No. 1].  BlockFi International alleges that Druk has defaulted under the loan agreement despite BlockFi International's delivery of written notice of default and demand for payment. Subsequently, the Debtors reached a settlement with Druk to resolve the Druk Adversary, and on April 19, 2023, the Druk Adversary was dismissed.

On March 23, 2023, the Debtors commenced an adversary proceeding against Trey Greene ("Greene") and Antonie Elas ("Elas") seeking to extend the automatic stay or, in the alternative, seeking an injunction enjoining prosecution of two putative class-action lawsuits—one filed in New Jersey and the other in Massachusetts—against certain of the Debtors' officers, directors, and former employees related to BIAs.  (Adv. No. 23-01071) [Docket No. 1] (the "PI Complaint").  On March 23, 2023, the Bankruptcy Court held a hearing on the PI Complaint and, on the same day, entered its *Order to Show Cause With Temporary Restraints* (the "TRO") temporarily restraining Greene and Elas from prosecuting their putative class-action lawsuits pending a further hearing on the PI Complaint scheduled for April 19, 2023.  (Adv. No. 23-01071) [Docket No. 10].  The Bankruptcy Court ordered, in the interim, that counsel for the Debtors, Elas, and Greene meet and confer regarding an expedited discovery schedule addressing the needs of the parties.  Following entry of the TRO, the Debtors, Greene, and Elas entered into a stipulation agreeing to enjoin the putative two class-action lawsuits until 30 days after the Effective Date of the Plan, with the exception of initial lead plaintiff filings.  The Bankruptcy Court subsequently entered the parties' stipulation as an order of the Bankruptcy Court [Docket No. 16].

On May 1, 2023, BlockFi Lending commenced an adversary proceeding (the "PrimeBlock Adversary") against PrimeBlock Operations LLC ("PrimeBlock") seeking to enforce the terms of, and BlockFi Lending's rights under and pursuant to, a Master Digital Currency Loan Agreement between BlockFi Lending and PrimeBlock. (Adversary No. 23-01116) [Docket No. 1].  The PrimeBlock Adversary is pending before the Bankruptcy Court.  In addition to the Druk Adversary and the PrimeBlock Adversary, the Debtors may commence and prosecute additional adversary proceedings to enforce the Debtors' rights with respect to, including, without limitation, collection of amounts owed by borrower counterparties under the Debtors' institutional loan portfolio.

**K.     The Key Non-Insider Employee Retention Plan.**

On November 28, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief* [Docket No. 21] (the "Retention Programs Motion"), seeking approval of the Debtors' key non-insider employee retention program (the "KERP") and non-insider targeted retention plan (the "TRP," and together with the KERP, the "Retention Programs").

On November 17, 2022, the Debtors' engaged Willis Towers Watson US LLC ("WTW") to assist in evaluating which of the Debtors' employees were the most critical to retain and most at risk of flight absent any retention plan.  The Debtors designated 90 of its 374 prepetition employees and independent contractors as key employees to participate in the KERP and 31 key employees to participate in the TRP, all of whom perform essential tasks for the Debtors, including accounting, cash and Digital Asset management, IT infrastructure, legal, human resources, and other critical functions (each, a "Participant").  The Participants were selected based on their deep institutional knowledge of the Debtors' operations, the cryptocurrency industry generally, or both.  Some Participants maintain critical relationships with counterparties that are essential to the Debtors' businesses. Accordingly, approximately 66% of the Debtors' entire employee population were deemed not critical to retain going forward and the Debtors' made the difficult decision to give notice of termination to such employees just prior to the Petition Date.

While the Debtors received objections from the U.S. Trustee [Docket No. 231] and the Committee [Docket No. 280] to the Retention Programs Motion, following litigation and depositions, the Debtors were able to reach a settlement with the Committee.  On January 27, 2023 the Bankruptcy Court entered an Order approving the Debtors' Retention Programs [Docket No. 423].

### L.    The Post-Petition Sale Process.

The details of the Debtors' post-petition sales process are described in Article II.B of this Disclosure Statement.

### M.    Bermuda Proceedings.

BlockFi International is an Entity incorporated as an exempt company under the laws of Bermuda.  In parallel with its Chapter 11 Case filed on November 28, 2022, BlockFi International filed a winding-up petition in the Supreme Court of Bermuda pursuant to section 161(e) of the Companies Act on the grounds that BlockFi International was unable to pay its debts and was therefore insolvent within the meaning of section 162(c) of the Companies Act.  Upon the application of BlockFi International, the Bermuda Court appointed the Bermuda Provisional Liquidators by an order entered on November 29, 2022 (the "Appointment Order") for BlockFi International and granted the Bermuda Provisional Liquidators' "light touch" powers to, *inter alia*, oversee and monitor the restructuring of BlockFi International's business under the continued control of its Board and under the supervision of the Bankruptcy Court.  The Bermuda Provisional Liquidators act as independent officers of the Bermuda Court and are required under the Appointment Order to regularly report on a confidential basis on the progress of the Bermuda Debtor's Chapter 11 Case and the provisional liquidation.  Upon the appointment of the Bermuda Provisional Liquidators, a statutory stay of proceedings in Bermuda against BlockFi International and its assets automatically arose.  The Bermuda Insolvency Proceedings were initially adjourned to January 13, 2023, and ~~on that date were~~subsequently further adjourned to ~~February 24, 2023, and on that date were further adjourned to June 9~~October 6, 2023.

The Bermuda Provisional Liquidators, with the support of the Debtors, have filed a number of applications in the Bermuda Insolvency Proceedings designed to assist and facilitate the administration of the Chapter 11 Cases and to progress the provisional liquidation.

In parallel with the Chapter 11 Cases, and to facilitate the administration of the Plan, the Bermuda Provisional Liquidators may pursue one or more Implementation Mechanisms, and may seek one or more Bermuda Orders in connection with any such Implementation Mechanisms.  Further, it is intended that the Bermuda Provisional Liquidators will seek ~~recognition of the Plan and a permanent stay of Claims from the Bermuda Court, following the entry of a Confirmation Order.  Any party wishing to contest recognition of the Confirmation Order by the Bermuda Court is required to appear at the appropriate time in the Bermuda Insolvency Proceedings to contest such recognition.  As soon as practicable after~~the approval of such other Bermuda Orders, in the appropriate form, as may be required in connection with the Bermuda Proceedings.  After the occurrence of the Effective Date of the Plan, the Bermuda ~~Provisional Liquidators will put BlockFi International into liquidation.  At the hearing on the Bermuda winding-up petition, the Supreme~~ Court ~~of Bermuda~~ will be requested to make a winding-~~up~~ up order in respect of BlockFi International, and make an order that the Bermuda Provisional Liquidators be appointed on a "full powers" basis to continue as liquidators, which will result in the displacement of the directors and officers of BlockFi International. ~~At the same time, the Bermuda Provisional Liquidators and BlockFi International will seek orders providing for a "short form" or "accelerated" winding up of BlockFi International, which will dispense with the usual post-winding-up statutory requirements, *inter alia,* for convening the first meeting of creditors and shareholders.~~

### N.    The Release of Funds in the Silvergate Bank Reserve Account and Failure of Silvergate Bank.

Shortly after the Petition Date, pursuant to the Debtors' fiduciary duty to their stakeholders to maximize the value of their estates, the Debtors entered into negotiations with Silvergate Bank ("Silvergate") in an attempt to reach an agreement with regard to the release of $10 million in cash held in a reserve account (the "Reserve Account") on account of potential ACH chargebacks by Clients.  On March 3, 2023, the Debtors filed an *Application in Lieu of Motion for Entry of Stipulation and Order Between the Debtors and Silvergate Bank Regarding Silvergate Bank's Release of Funds from the Reserve Account* [Docket No. 576] seeking Court approval and entry of the agreement the Debtors reached with Silvergate for the immediate release of $9.85 million in cash to the Debtors that was deposited into the Reserve Account to secure the Debtors' obligations under the parties' ACH Origination Agreement (the "ACH Security Agreement").  On the same day, the Bankruptcy Court granted the relief

requested and entered the *Stipulation and Order Between the Debtors and Silvergate Bank Regarding Silvergate Bank's Release of Funds from the Reserve Account* [Docket No. 577].  The requisite funds were subsequently withdrawn from the Reserve Account.  ~~The~~Under the stipulation with Silvergate, the remaining $150,000 held in the Reserve Account ~~will~~were to be released upon the later of (x) termination of the ACH Security Agreement and (y) November 17, 2024~~.~~

On March 8, 2023, Silvergate announced that it was closing in light of recent industry and regulatory developments.[78][77]  Silvergate largely catered to crypto companies and the venture capital industry, known for its proprietary Silvergate Exchange Network, which allowed institutional investors to move dollars in and out of crypto-trading platforms in real time.  Silvergate has announced that while it will wind down operations, all deposits will be repaid.  Silvergate returned the funds in the Reserve Account to the Debtors on May 30, 2023.

**O.      The Failure of Silicon Valley Bank and Signature Bank and the U.S. Trustee's Motion to Compel**

On March 10, 2023, the Federal Deposit Insurance Corporation (the "FDIC") took control of Silicon Valley Bank ("SVB") in the second largest bank failure in the history of the United States; second only to the collapse of Washington Mutual during the 2008 financial crisis.[79][78]  SVB collapsed in approximately twenty-four hours[80][79] and just two weeks after SVB's external auditor, KPMG LLC, gave it a clean bill of health.  In the days leading up to SVB's failure, the Debtors were actively engaged in efforts to mitigate their cash management system's exposure to SVB as well as Signature Bank, which the FDIC seized shortly after SVB's downfall.  The Debtors were in communications with the U.S. Trustee, but like the rest of the industry, were faced with significant uncertainty in light of the collapse of banks so integral to not only the crypto industry but the U.S. banking system.

On March 13, 2023, "all deposits—both insured and uninsured—and substantially all assets of the former Silicon Valley Bank" were transferred "to a newly created, full-service FDIC-operated 'bridge bank'" called Silicon Valley Bridge Bank, N.A. (the "SVB Bridge").[81][80]  "All depositors of [SVB] will be made whole."[82][81]  The Debtors' cash and other assets now held at the SVB Bridge are thus backed by the full faith and credit of the Treasury, Federal Reserve, and FDIC.

On March 19, 2023, New York Community Bank announced that it planned to acquire a significant portion of the assets of Signature Bank.  One week later, on March 26, 2023, First Citizens BancShares ("First Citizens") announced that it planned to acquire approximately $72 billion in loans issued by SVB Bridge and all of SVB Bridge's deposits.

Following SVB's collapse, the United States Trustee for the District of New Jersey (the "U.S. Trustee") filed the *Motion of the United States Trustee to Compel the Debtors to Comply with: (i) Section 345(b) of the Bankruptcy Code; and (ii) the Final Cash Management Order* [Docket No. 173] (the "Motion to Compel").  After

---

[78][77]  Rachel Louise Ensign, *Crypto Bank Silvergate to Shut Down, Repay Deposits*, Wall St. J. (March 8, 2023), https://www.wsj.com/articles/crypto-bank-silvergate-to-shut-down-repay-deposits-4bc2a469.

[79][78]  Rachel Louise Ensign, *et al.*, *Silicon Valley Bank Closed by Regulators, FDIC Takes Control*, Wall St. J. (March 10, 2023), https://www.wsj.com/articles/svb-financial-pulls-capital-raise-explores-alternatives-including-possible-sale-sources-say-11de7522?mod=article_inline; David French, *et al.*, *SVB is largest bank failure since 2008 financial crisis*, Reuter's (Mar. 11, 2023), https://www.reuters.com/business/finance/global-markets-banks-wrapup-1-2023-03-10/.

[80][79]  Ensign, *supra* note 1 (noting that depositors attempted to withdraw approximately 25 percent of SVB's total deposits on Thursday, March 9, 2023).

[81][80]  Press Release, Federal Deposit Insurance Corp., FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California (Mar. 13, 2023) (on file with author).

[82][81]  *Id.*

discussions with the U.S. Trustee, the Debtors converted approximately $230 million in money market mutual fund shares held by SVB Bridge, as the Debtors' agent, to cash.

In an effort to comply with Section 345(b) of the Bankruptcy Code, the Debtors requested a surety bond from all depositories with which they hold funds, but such efforts have met with little success—the surety bond market has dried up and the Debtors' banks expressed no desire to collateralize the full amount of the Debtors' funds with securities. Accordingly, the Debtors determined that the safest places for their funds was in (a) an insured cash sweep program with Webster Bank or another authorized depository in an amount up to $125 million and (b) one or more money market funds that only invest in the U.S. government obligations and/or U.S. government obligations themselves in an amount up to $275 million with Webster Bank or another authorized depository.

On April 21, 2023, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Granting A Limited Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 770] (the "Limited 345 Waiver Motion"), seeking a waiver of Section 345(b) of the Bankruptcy Code so the Debtors may safeguard these funds through the cash sweep program and/or money market funds. On April 27, 2023, the U.S. Trustee filed the *United States Trustee's Objection to Debtors' Emergency Motion for Entry of an Order (I) Granting A Limited Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 793]. On May 1, 2023, the Bankruptcy Court entered the *Order (I) Granting in Part and Denying in Part a Limited Waiver of the Deposit Requirements of Section 345(b) of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 810] (the "Limited 345 Waiver Order"). Pursuant to the Limited 345 Waiver Order, a limited waiver of section 345(b) was denied to the extent the Debtors received confirmation from First Citizens and/or the U.S. Trustee that First Citizens had collateralized the Debtors' funds in an amount equal to 115% of such funds (the "345 Confirmation") as required under the Uniform Depository Agreement between First Citizens and the U.S. Trustee by 5:00 pm prevailing Eastern time on May 1, 2023 (the "345 Deadline"). The U.S. Trustee provided the Debtors with the 345 Confirmation prior to the 345 Deadline. Accordingly, the Debtors' funds at First Citizens are fully collateralized. The Limited 345 Waiver Order also provided that with respect to the $24 million of BlockFi International funds currently held at Bank of America and BofA Securities, the Debtors are authorized to transfer such funds to First Citizens if First Citizens confirms prior to the 345 Deadline that they will open a bank account for BlockFi International (the "Account Confirmation"). To the extent First Citizens failed to provide the Account Confirmation directly to the Debtors by the 345 Deadline, or any agreed upon extension thereof, the Debtors were granted a limited waiver of the section 345 requirements to allow such funds of BlockFi International to be deposited into one or more money market funds that only invest in U.S. government obligations or to purchase U.S. government obligations directly. First Citizens did not provide the Account Confirmation to the Debtors prior to the 345 Deadline. The BlockFi International funds have been moved to Webster Bank and are fully collateralized.

**P.      Government Seizures**

On December 9, 2022, a grand jury in the Southern District of New York returned an eight-count Indictment charging SBF with conspiracy to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and commit campaign finance violations. In connection with the prosecution of SBF, the U.S. Department of Justice (the "DOJ"), informed BlockFi that on January 4, 2023, the DOJ had seized the Robinhood Shares from Marex. On January 6, 2023, the DOJ filed the *United States' Notice of Asset Seizures* on the docket in these Chapter 11 Cases [Docket No. 203]. The seizure of the Robinhood Shares is the reason the Debtors' adversary proceeding against Emergent is stayed. On April 11, 2023, the Debtors and the Emergent debtors submitted a stipulation in the FTX debtors' bankruptcy cases that stayed further litigation and discovery concerning the Robinhood Shares while still permitting a reasonable exchange of information regarding the Robinhood Shares, pending the outcome of the criminal proceedings against SBF. On April 21, 2023, the Court entered an *Order Approving the Stipulation Staying Litigation and Related Discovery* entered between BlockFi and Emergent, concerning the Robinhood Shares [Docket No. 760]. On April 25, 2023, the Debtors submitted the *Application in Lieu of Motion in Support of an Entry of an Order Approving Stipulation Staying Litigation and Related Discovery*, also concerning the Robinhood Shares, relating to the Debtors' claims against Marex [Adv. Proc. Doc. No. 65]. The ~~Debtors anticipate that the~~ stipulation with Marex ~~will also be~~was approved by the Court on May 11, 2023 [Adv. Proc. Doc. No. 67]. Together, the two stipulations, along with corresponding stipulations in the FTX debtors' cases which have already been approved, will stay all proceedings related to the Robinhood Shares. The parties anticipate that the ownership

issues with respect to the Robinhood Shares may be adjudicated by the U.S. District Court for the Southern District of New York. To the extent the District Court does not adjudicate the intercreditor disputes regarding the ownership of the Robinhood Shares, the Debtors position is that those issues should be decided by Judge Kaplan in the U.S. Bankruptcy Court, District of New Jersey.

In addition to the seizure of the Robinhood Shares, prior to the Petition Date in these Chapter 11 Cases, two Clients were indicted for conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. In connection with these criminal proceedings, the United States served BlockFi with four *Warrants to Seize Property Subject to Forfeiture* to recover the Digital Assets held by the charged Clients (the "Seizure Warrants"). On January 6, 2023, the DOJ sent the Debtors a letter demanding compliance with the Seizure Warrants in the form of BlockFi turning over the Digital Assets in the charged Clients' subject accounts and transferring them to wallets controlled by the United States. The Debtors called the Seizure Warrants to the Bankruptcy Court's attention at a hearing on January 9, 2023, explaining there was no need for an order from the Bankruptcy Court to permit compliance with the Seizure Warrants with respect to Digital Assets in the respective Clients' BlockFi Wallet Accounts.[83]~~With respect to the BIA and Retail Client Loan Accounts, the Debtors have continued discussions with the DOJ regarding the appropriate measures that need to be taken to ensure the Debtors are able to comply with both the Seizure Warrants and federal bankruptcy law. The Debtors expect that a stipulation to this effect between the Debtors and the DOJ will be entered into shortly.[82]~~

With respect to the BIA and Retail Client Loan Accounts, the Debtors were in the process of negotiating a stipulation with the United States when the Committee filed an adversary proceeding in the Bankruptcy Court against the Debtors and the United States (the "UCC Proceeding") seeking injunctive relief to prevent the signing of the stipulation and the transfer of any additional funds to the United States in satisfaction of the Seizure Warrants. The Bankruptcy Court entered an *Order to Show Cause and For Temporary and Related Relief* (the "*Ex Parte TRO*") [Adv. Proc. Doc. No. 4] temporarily restraining the Debtors from entering into the stipulation and making any transfers to the United States. Shortly thereafter, the United States filed a motion to compel BlockFi to comply with the Seizure Warrants in the U.S. District Court for the Western District of Washington (the "Washington District Court"). The Committee then filed a supplemental application in support of its request for injunctive relief requesting, in addition to the previous relief sought, that the United States be restrained from prosecuting the motion to compel and either withdraw the motion or adjourn all deadlines [Adv. Proc. Doc. No. 8]. The Bankruptcy Court entered an *Amended Order to Show Cause and for Temporary and Preliminary Injunctive Relief* (the "*Ex Parte Amended TRO*") [Adv. Proc. Doc No. 10] granting the relief sought by the Committee. The United States then filed a Motion to Withdraw the Reference (the "Withdrawal Motion") seeking to have the UCC Proceeding heard by the U.S. District Court for the District of New Jersey (the "New Jersey District Court"). Briefing on the Withdrawal Motion is complete, and the parties are awaiting a decision by the New Jersey District Court. The Washington District Court has agreed to hold the motion to compel in abeyance pending the outcome of litigation or resolution of the Withdrawal Motion and UCC Proceeding. After further negotiations, the United States, the Committee, and the Debtors entered into an *Amended Stipulation and Consent Order* [Adv. Proc. Doc. No. 21] which replaces the TRO and Amended TRO and provides, *inter alia*, that no party shall take further action on the assets or interests subject to the Seizure Warrants until the Bankruptcy Court (or New Jersey District Court, should the Withdrawal Motion be granted) rules on the UCC Proceeding. As of the date of this Disclosure Statement, the Committee plans to file an Amended Complaint in the UCC Proceeding and the United States has indicated that they will move to dismiss and/or stay the UCC Proceeding until such time as the Withdrawal Motion is decided by the New Jersey District Court.

The Debtors also received a Seizure Warrant issued by the United States District Court for the Southern District of Texas in connection with assets held by a certain Client in BlockFi Wallet, BIA, and Retail Client Loan Accounts (the "Texas Seizure Warrant"). Unlike the Seizure Warrants from Washington, the Texas Seizure Warrant was issued postpetition. The Debtors are continuing to discussions with the FBI regarding the appropriate measures

---

[83] ~~Hr'g Tr. at p. 91 (Jan. 9, 2023).~~

[82] Hr'g Tr. at p. 91 (Jan. 9, 2023).

that need to be taken to ensure the Debtors are able to comply with the Texas Seizure Warrant and federal bankruptcy law.

### Q.    The D&O Settlement

As described above below, the Special Committee concluded that it was the best interests of the estates to seek to negotiate settlements with certain BlockFi insiders in order to resolve potential litigation, conserve costs, and ensure that the estate could maximize distributions to creditors.  The Special Committee, through Mr. Vogel and counsel, negotiated those settlements, which will be proposed as part of a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Global Insider Settlement").  The formal agreement reflecting the Global Insider Settlement is currently being negotiated and will be filed with the Bankruptcy Court prior to the hearing on this Disclosure Statement scheduled for July 13, 2023.  The general principal terms of the Global Insider Settlement are reflected in the below chart. The Settlement enables the parties to it (the "Settlement Parties") to participate and assist with any ongoing litigation, including prosecuting claims against 3AC, FTX, and Alameda, and defending against claims asserted by Alameda, FTX, and 3AC, the outcome of which will have a material impact on Client recoveries, as well as ongoing regulatory matters.

The Settlement also ensures that the Settlement Parties to it will aid in the distribution of Digital Assets to the Debtors' Clients.  As all parties agree, receiving Distributions in-kind rather than in cash is preferred.  Accordingly, the Debtors must maintain the capability of reopening the BlockFi Platform and making Distributions safely and securely, including the capability of building on and adjusting the BlockFi Platform, if that is needed to make Distributions.  The Settlement Parties will be intimately involved in overseeing the engineering team maintaining the BlockFi Platform and ensuring that all necessary updates are made to facilitate in-kind Distributions to Clients as quickly and safely as possible.

Furthermore, the Settlement Parties have agreed to waive or subordinate material prepetition claims against the Estates, together totaling approximately $7 million, and to make cash payment to the Estates totaling $2.25 million.  The primary terms of the proposed settlement are listed below:

| Individual | Claims Waived or Subordinated[83] | Cash Contribution | Cooperation Amount[84] |
| --- | --- | --- | --- |

---

[83]  With respect to the waiver or subordination of claims based on assets on the BlockFi Platform, this chart reflects pricing of cryptocurrency assets consistent with the disclosures in the *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 242 at 14–16], which used cryptocurrency pricing as of November 11, 2021.  Cryptocurrency prices did change in the one-week period between November 21, 2022, and the Petition Date so these numbers as far as the amounts on the platform that are waived or subordinated as part of the Global Insider Settlement are not exact.

[84]  This column reflects the agreed amounts of time the insiders have agreed to give to the estate without any further compensation beyond the terms of the Global Insider Settlement to help prosecute and defend against litigation, to assist with regulatory inquiries, and to assist in making in-kind distributions to clients, *after* the individuals are no longer employed with BlockFi and presumably have other jobs.

| Zac Prince | $1.3 million on platform waived.<br><br>$1.8 million in other unsecured claims against estate subordinated.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $1.5 million | 200 hours |
|---|---|---|---|
| Flori Marquez | $109,000 on platform waived.<br><br>Actual and potential unsecured claims of ~$750,000 waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $500,000 | 200 hours |
| Amit Cheela | $200,000 on platform waived (remaining ~$92,000 retained).<br><br>Unsecured claims for unpaid wages (currently $281,000) subordinated.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 100 hours (but not more than 10 hours per week) |
| Jonathan Mayers | Unsecured claims against estate (currently $281,000) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 200 hours (but not more than 2 hours on any day, 10 hours in any week, or 20 in any month) |
| Rob Loban | $43,000 on platform subordinated.[85]<br><br>All unsecured claims against estate (currently $1,060,000) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 100 hours |

---

[85]   Subordination as reflected in this chart is subordination to Account Holder Claims and General Unsecured Claims (Classes 3–4).

| Tony Lauro | $125,000 on platform subordinated.  All unsecured claims against estate (currently $26,398) waived.  Any indemnity claims subordinated except to the extent needed to access insurance policies. | $100,000 | 200 hours |
|---|---|---|---|
| Yuri Mushkin | All unsecured claims against estate (currently $275,000) waived.  Any indemnity claims (currently ~$100,000) subordinated to the extent needed to access insurance policies. | N/A | 200 hours |
| Andrew Tam | $13,000 on platform waived.  All unsecured claims against estate waived.  Any indemnity claims subordinated except to the extent needed to access insurance policies. | $100,000 | 100 hours |
| David Spack | Waiver of all unsecured claims against estate (currently $171,875).   Any indemnity claims subordinated except to the extent needed to access insurance policies. | $50,000 | Unlimited through date of first BIA distribution, 150 hours thereafter |

The Debtors are confident that if the Global Insider Settlement is approved and the proposed Plan confirmed, the Settlement Parties will honor their obligations to the Debtors, including their obligations to cooperate in the ongoing litigation, regulatory processes, and distribution, following confirmation of the Plan.  But to ensure that they do, the settlement makes clear that releases are conditioned upon cooperation.  If the Wind-Down Trustee believes that the Settlement Parties are not honoring their cooperation obligation, the Wind-Down Trustee shall provide them with written notice and an opportunity to cure the deficiency, with the possibility of seeking to void the Debtor Release if the deficiency is not cured.

The Special Committee spent hundreds of hours interviewing approximately 25 witnesses, reviewing tens of thousands of documents, and performing legal analysis related to all potential claims against insiders.  The Special Committee analyzed all potential claims that the Debtors might have against the Settlement Parties, whether they be in the nature of avoidance actions seeking to recover payments received by the Settlement Parties, or claims based on their duties to BlockFi.  The Special Committee found no claims in the nature of theft from BlockFi or fraud against BlockFi by the Settlement Parties.  And the Special Committee does not believe the pursuit of claims against the Settlement Parties would maximize the value of the estate, or distributions to creditors, given the nature of the potential claims, the direct and indirect costs of pursuing such claims, and the nature of the potential recoveries even if potential claims were pursued successfully.  No party has provided any analysis to the Debtors or the Special Committee suggesting that pursuit of any claims would have a material net-positive impact on the estate or on creditor recoveries, and the Debtors and Special Committee are skeptical that any such analysis would be credible.

Instead the Debtors believe the Settlement will maximize the value of the Estates where, as here, pursuing potential claims and causes of action against the Settlement Parties would be value destructive in its own right, and

96

would clearly distract from pursuing value maximizing claims against FTX, Alameda, and Emergent (among others), would increase costs associated with regulatory inquiries and make it far more challenging for the Debtors to respond to such inquiries, and would likely make in-kind Distributions under the Plan impossible.  For these and other reasons, the Special Committee has determined in its business judgment that is in the best interests of the Estates to enter into the Global Insider Settlement.

The Debtors anticipate filing a motion seeking approval of the Settlement pursuant to Rule 9019 of the Bankruptcy Rules (the "9019 Motion") incorporating these terms prior to the hearing on this Disclosure Statement. The Debtors anticipate commencing a hearing on the 9019 Motion simultaneous with the Confirmation Hearing.

### R. ~~Q.~~ The Special Committee's Investigation and Recommendation

#### 1.    *The Special Committee Investigation, Conclusions, and Proposed Settlements*

To assess whether the Estates should litigate, settle, release, or simply retain potential Causes of Action against insiders, the Debtors' Board approved the formation of the Special Committee to conduct and oversee the Investigation.  The Special Committee is comprised of the Debtors' two Independent Directors, Scott Vogel and Jennifer Hill.  Ms. Hill recused herself from the Investigation with regard to all pre-bankruptcy actions she was involved in while serving on the Board.  Because most of the matters ultimately investigated were during her tenure on the Board, Ms. Hill recused herself from any decision-making with respect to potential insider Claims or Causes of Action.  Mr. Vogel did not serve as a director of, or have any involvement with, the Debtors prior to his appointment to the Board and the Special Committee in November 2022.[~~84~~86]

Mr. Vogel instructed~~,~~ Kirkland~~,~~ to interview witnesses, review documents, and provide legal analysis related to all potential Claims and/or Causes of Action against insiders.  During the course of the Investigation, Kirkland regularly updated Mr. Vogel on the work it was doing, and received additional direction regarding paths to investigate.  Kirkland collected and reviewed a massive amount of information from the Debtors.  Kirkland also retained consulting experts to independently evaluate certain financial information and inform its legal advice to Mr. Vogel.  The Investigation was comprehensive.  Many issues were investigated including:

- the Debtors' business in general;

- the Debtors' risk and investment policies;

- the Debtors' investments in (and acceptance of collateral related to) the ~~Grayscale Bitcoin Trust ("~~GBTC~~");~~

- the Debtors' dealings with 3AC;

- withdrawals from the BlockFi Platform (to the extent there were any) by the Debtors' insiders;

- the Debtors' dealings with FTX and Alameda generally, including the time periods before and after the ~~Debtors' transaction with FTX that was announced July 1, 2022 (the "~~FTX Transaction~~");~~

---

[~~84~~86] Mr. Vogel is the managing member of Vogel Partners LLC, and previously was a managing director at Davidson Kempner Capital Management LLC.  During his 14-year tenure at Davidson Kempner, Mr. Vogel invested in a diverse set of industries.  Before then, Mr. Vogel worked at MFP Investors investing in special situations and turnaround opportunities for the private investment firm of Michael F. Price and at Chase Securities.  Mr. Vogel has served on many boards during his career, including Merrill Corporation, Mod Space, Key Energy, Alpha Resources, Arch Coal, PetSmart, Seadrill, Bonanza Creek Energy, Inc., Neiman Marcus Group, CBL Properties, rue21, Voyager Digital Holdings, Inc., and Avaya.

- the Debtors' compensation of employees generally, and including (but not limited to) certain payments made following execution of the FTX Transaction;[87]

- transactions with a confidential counterparty previously disclosed in detail as part of the Global Notes[8588] and during a hearing before the Bankruptcy Court;[8689]

- the Debtors' procurement of additional director and officer liability insurance in November 2022; and

- the Debtors' decision to sell Digital Assets in November 2022.

Kirkland reviewed approximately 60,000 documents comprising approximately 750,000 pages and conducted interviews of approximately 25 witnesses, focused on these topics but also covering a slew of other subsidiary issues (collectively, the "Investigated Issues"). Kirkland ultimately provided Mr. Vogel with a ~~draft of a~~ comprehensive and privileged report (the "Investigation Report"), consisting of approximately 170 pages ~~to date~~, evaluating the merits of all potential Claims and/or Causes of Action, including related to potential breaches of fiduciary duty, fraudulent transfers, and preferences (among others), that the Debtors may have against insiders, and assessing whether the Debtors should assert, reserve, settle, or release those Claims and/or Causes of Action. The standard applied, generally speaking, was whether the potential Claims and/or Causes of Action were colorable and whether pursuit thereof would provide an overall benefit to the Estates, as opposed to reserving, resolving, or releasing such Claims or Causes of Action. *See, e.g.*, *In re G-I Holdings. Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004); *In re Crivaro*, 2017 WL 3314232, at *5 (Bankr. D.N.J. 2017). The Investigation Report also made recommendations to Mr. Vogel concerning how the Debtors should address such potential Claims and/or Causes of Action in the proposed Plan. In addition, Mr. Vogel directed Kirkland to meet with counsel for the Committee to allow counsel for the Committee to present its views of the merits and potential value of Claims and/or Causes of Action held by the Estates based on the UCC's investigation. Kirkland did so and reported that information, as well as written information provided in the form of a short PowerPoint presentation and a report the Committee claimed to address the question of "Why did BlockFi fail?," which was reviewed and considered by the Special Committee and counsel in the course of its investigation and analysis.

Based on information to date, the Special Committee's general conclusions are as follows:

1.      As an Estate fiduciary, the Special Committee should be focused on maximizing value for creditors and should make decisions that are most likely to maximize value for creditors. The Special Committee needs to analyze the reasons for releasing, prosecuting, settling, or reserving Claims and/or Causes of Action, in light of the available alternatives. The key question is what is in the best interests of the Estates *going forward*.

2.      The most important thing for the Debtors to do going forward is ensure they do everything possible to prosecute and defend Claims and Causes of Action by and against the Alameda, FTX, and Emergent estates (and the Core Scientific and 3AC estates) successfully,[8790] and defend Claims that have been and/or will

---

[87]      The Special Committee also reviewed the insiders' participation in secondary stock transactions related to BlockFi.

[8588]      *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* at 23–24, *In re BlockFi Inc.*, Case No. 22-19361 [Docket No. 242].

[8689]      *See* 1/9/2023 Hr'g Slides in *In re BlockFi Inc.*, Case No. 22-19361 (accessible on Kroll website), pp. 24–26.

[8790]      By way of example, on November 28, 2022, BlockFi, Inc., BlockFi Lending, LLC, and BlockFi International, LLC initiated Adv. Pro. No. 22-01382 (MBK) against Emergent and Marex, in the Bankruptcy Court. The goal of this case is to secure the Debtors' interests in approximately 55,273,469 Robinhood Shares currently worth approximately $550 million and approximately $20.7 million in cash. Whether this dispute continues in a forfeiture proceeding or in a bankruptcy court, the Debtors will need to present evidence describing their lending relationship with Alameda, Alameda's obligation to provide more and more collateral in late October/early November 2022 as security for its loan obligations, its default on its loan obligations, and the facts and circumstances supporting the entry into the forbearance agreement, the Alameda Pledge

likely be filed by, among others, Alameda, 3AC, Emergent, and FTX.[8891]  The success or failure of *those various pieces of Litigation*—which will likely play out over several years—is what will make a real difference to creditor recoveries.

3.      The Special Committee should not do anything that would compromise the BlockFi Estates' abilities to put their best foot forward in this Litigation.  Relative to the success or failure of that go-forward litigation, every other issue facing the Debtors—including all of the Debtors' potential affirmative Claims and Causes of Action against insiders and others—is far less significant.

4.      The second most important thing for the Debtors to do is to maintain and execute on the ability to distribute cryptocurrency to creditors.  The Committee has made clear customers' preferences to receive Distributions in kind rather than Distributions in cash, and have explained the economic rationale for that preference.  Therefore, the Debtors *must* maintain the capability internally of reopening the BlockFi Platform and making Distributions safely and securely, including the capability of building on and improving the BlockFi Platform if that is needed to make Distributions.  Any course of action that would eliminate that capability, or increase the challenges in effectuating it (by, for example, suing or threatening to sue people that are needed to effectuate in-kind cryptocurrency Distributions), is not advisable.  Suing (or maintaining the ability to sue) the Debtors' officers and employees anticipated to be involved in making in-kind Distributions to Clients as quickly as possible would likely delay Distributions to Clients and may make in-kind Distributions impossible (or too risky to justify).

5.      The potential Claims and Causes of Action *the Estates* have against the Debtors' insiders all face substantial challenges.  In considering these Claims and Causes of Action, the Special Committee analyzed: (1) the Debtors' solvency during the relevant time period; (2) the potential recovery on the Claims and Causes of Action identified (which included all potential Claims and Causes of Action identified by the Committee); (3) the risk, time, and cost of the litigation to recover on such Claims and Causes of Action; and (4) potential value destruction to the Estates that could be caused by bringing Claims and/or Causes of Action against individuals who are needed to prosecute and defend against the Litigation described above.  Through this analysis, the Special Committee identified certain Claims and Causes of Action that may be able to survive a motion to dismiss, but would face substantive hurdles in reaching a favorable judgment.  These hurdles include:  (1) establishing the Debtors' insolvency when, based on the Special Committee's analysis to date, there are substantial arguments that the Debtors were solvent during the relevant period; (2) establishing that the Debtors did not receive reasonably equivalent value where the Debtors undoubtedly received at least *some* value that is difficult to quantity with precision; and (3) establishing the withdrawals from the Debtors' platform were not done in the ordinary course of business.  Moreover, BlockFi understands from Bermuda counsel that, to the extent the plaintiff in the claim is BlockFi International, BlockFi International would either be barred by its charter from pursuing the claim at all, would be required to advance millions of dollars in attorneys' fees to the putative defendant(s) before the court would permit the case to proceed, or both.  Proceeding in the face of these legal rules would present additional challenges.

6.      The potential Claims and Causes of Action *the Estates* have against the Debtors' insiders would also be expensive to pursue, particularly in relation to the value of the potential recoveries.  Most of the potential Claims and Causes of Action would likely require a full solvency analysis and expert testimony on solvency and other issues.  Based on the Special Committee's analysis, the solvency analysis would be complex.  The pursuit of such Claims and/or Causes of Action would require the expenditure of millions of dollars—which would be spent on professionals rather than Distributions to Clients—and any net-benefit from that pursuit (if any) would not be achieved for years.  Although some of the insiders received proceeds from secondary transactions involving the Debtors' equity investors in 2021 or earlier and may have some assets to satisfy a judgment, given the risk that any litigation could result in zero recovery for the Estates (or a materially negative recovery given the costs of litigation)

---

Agreement, and the securing of additional collateral including the Robinhood Shares.  Emergent and various FTX-affiliated entities, among others, have indicated they will challenge the validity of the Emergent Pledge Agreement.  In addition, there is a related matter pending in Antigua and Barbuda in which an FTX customer asserted rights in the Robinhood Shares.

[8891]  The Debtors anticipate material preference litigation against the FTX, Alameda, and 3AC estates, likely in the hundreds of millions, if not the billions, of dollars.

and the relatively limited upside to creditors even if the claims were pursued successfully, it is challenging to justify prosecution on a cost/benefit basis.

7.      Pursuing litigation against the insiders who could conceivably serve as key witnesses in future litigation would be largely inconsistent with what should be the Debtors' primary goals: (a) ensuring that the Estates are in the best position possible to prosecute and defend Litigation against the other bankruptcy estates (FTX, Alameda, Emergent, 3AC, Core Scientific); and (b) making sure that the Estates are in a position to make Distributions of cryptocurrency to Clients through the BlockFi Platform.  The Estates will materially benefit by securing insider cooperation on both fronts going forward.  Even if some of the potential insider Claims and/or Causes of Action may be able to survive a motion to dismiss and have some value, the harm to the Debtors' overall goals likely to result from prosecuting the Claims and/or Causes of Action would still render such pursuit inadvisable.

Given these findings, the Special Committee has decided to seek settlements to resolve Claims and Causes of Action related to the Investigated Issues with relevant officers, directors, and employees of the Debtors.  Such settlements, if completed, would be presented to the Bankruptcy Court through Bankruptcy Rule 9019 and litigated at the Confirmation Hearing.

The Special Committee's ultimate responsibility in this matter is to pursue an outcome most likely to maximize value for the Estates and, most directly, for Clients.  The Special Committee believes that settlements that resolve these Claims and Causes of Action, if they can be completed with satisfactory terms to the Estates, on the terms described above will do so.  The Special Committee believes that the alternative—preservation and/or prosecution of these Claims and/or Causes of Action, which come with irrevocably alienating the very individuals that are needed to maximize value for the Estates and creditors—is value destructive and inadvisable.  At the request of the Committee, however, the Special Committee has not yet made specific settlement demands pursuant to its findings, to allow for continued discussions with the Committee.

The Special Committee intends to continue negotiating in good faith and hopes to announceproposed Rule 9019 settlements prior to the Bankruptcy Court's hearing on approval of this Disclosure Statement, which (if reached) will be presented to the Bankruptcy Court for approval at the same time as the Debtors seek Confirmation of the proposed Plan.

## XI.   RISK FACTORS

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES.  THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN.  EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE WIND-DOWN DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

### A.    Risks Related to the Wind-Down.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

**1.**      ***The Debtors Will Consider All Available Restructuring Alternatives if the Plan Is Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of    Claims    Against    the Debtors.***

The Debtors will consider all restructuring alternatives available, which may include the filing of an alternative chapter 11 plan or any other transaction that would maximize the value of the Debtors' Estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, ~~or the recognition of the Plan~~any Implementation Mechanism or any  approvals of the Bermuda Court in the Bermuda Insolvency Proceedings, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' assets.

Further, in-kind Distributions would not be advisable or possible without the retention of key employees pursuant to the Plan. If such employees are not retained, the Plan and the Distribution process contemplated thereunder would not be feasible.

**2.**      ***Certain Bankruptcy Law Considerations.***

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

**(a)**      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**(b)**      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article X of the Plan, the Effective Date is subject to a number of conditions precedent and, if required, these may include the completion of any Implementation Mechanism(s) in Bermuda or in jurisdictions outside the United States. If such conditions precedent are not met or not waived, the Effective Date will not take place.

**(c)**      **Failure to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that

sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

> **(d)**      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to restructure and what, if anything, Holders of Allowed Claims against them would ultimately receive with respect to their Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a Distribution of property with a lesser value than currently provided in the Plan or no Distribution whatsoever under the Plan.

> **(e)**      **Nonconsensual Confirmation.**

In the event that any impaired class does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements, and the Debtors will request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to Professional Fee Claims.

> **(f)**      **Continued Risk After Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as increasing expenses, further industry deterioration or other changes in economic conditions, and changes in Digital Asset regulations and laws. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

> **(g)**      **Filing of a Competing Plan.**

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors have retained the exclusive right to propose the Plan through May 15, 2023. Because the Debtors have filed the Plan contemporaneously with

this Disclosure Statement, the Debtors have avoided the risks associated with competing plans being filed by third parties and now have the exclusive right to solicit votes on the Plan through August 11, 2023.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan because creditors and others may propose a competing plan.

**(h)      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under Chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would generally result in smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.  In addition, a Chapter 7 case would also likely lead to distributions to Clients being made in cash, except those made pursuant to the Wallet Program.

**(i)      One or More of the Chapter 11 Cases May be Dismissed.**

If the Bankruptcy Court finds that a debtor has incurred substantial or continuing loss or diminution to its estate and lacks a reasonable likelihood of rehabilitation or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of these Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor, which may ultimately result in significantly lower recoveries for creditors than those provided for in the Plan.

**(j)      The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

**(k)      Risk that an Implementation Mechanism May be Required and May Not Be Approved.**

To implement the Restructuring Transactions the Bermuda Provisional Liquidators may determine that one or more Implementation Mechanisms is required or would be beneficial to the implementation of the Restructuring Transactions.  While the Debtors and the Bermuda Provisional Liquidators are confident that, if it is determined that any such Implementation Mechanism should be pursued, they will determine and pursue the best available path with respect to any such Implementation Mechanism (if required), there is a risk associated with implementation which may impact the Restructuring Transactions.  Such risks include, without limitation, if a Bermuda Scheme of Arrangement is proposed by the Bermuda Debtor, the Bermuda Court may not sanction such Bermuda Scheme of Arrangement

**(l)      ~~(k)~~ Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will in fact occur.

**(m)** ~~(l)~~ **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and/or recharacterized as equity contributions.  The occurrence of any and all such contingencies could affect Distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**(n)** ~~(m)~~ **Litigation Over Plan Treatment of FTX Facility Claims, FTX Avoidable Transfer Claims, Alameda Claims, Government Penalty Claims, and 3AC Claims.**

As described in Article V.J of this Disclosure Statement, the Debtors believe that the FTX Facility Claims should be recharacterized as equity contributions; however, if the Bankruptcy Court finds otherwise, the FTX Facility Claims shall be contractually subordinated to Account Holder Claims and equitably subordinated to General Unsecured Claims and Intercompany Claims pursuant to section 510(c) of the Bankruptcy Code.  The Debtors believe that the FTX Avoidable Transfer Claims, the Alameda Claims, and the 3AC Claims should be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims pursuant to section 510(c) of the Bankruptcy Code and the Government Penalty Claims should be subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code.  Litigation related to the Debtors' proposed treatment of the FTX Facility Claims, the FTX Avoidable Transfer Claims, the Government Penalty Claims, and the 3AC Claims could cause the Debtors to incur significant professional fees, which will reduce recoveries to Holders of Allowed Claims under the Plan.

**(o)** ~~(n)~~ **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

**(p)** ~~(o)~~ **Risk that the Bermuda Court Will Not Grant Recognition of** ~~the Confirmation~~**One or More Bermuda** **Orders**~~.~~**.**

~~Following the Effective Date,~~ BlockFi International intends to seek ~~recognition of the Confirmation Order~~one or more Bermuda Orders, in the appropriate form in Bermuda.  There is a risk that the Bermuda Court will not grant such ~~recognition~~approval(s), which may affect BlockFi International's ability to effectuate certain relief granted pursuant to the Confirmation Order.

**(q)** ~~(p)~~ **Risk that the Bermuda Monetary Authority Will Not Provide Any Necessary Approvals or Non-Objections to the Plan**

The Bermuda Monetary Authority is the regulator of BlockFi International pursuant to the Digital Assets Business License, and in that capacity, has issued a series of directions letters culminating in the current version dated December 15, 2022 (the "BMA Directions Letter"). Pursuant to the Digital Assets Business Act 2018 and the BMA Directions Letter, the consent and/or non-objection of the Bermuda Monetary Authority to the consummation of the "Restructuring Transactions" and the "Licensing Wind Down Process" (as defined in the BMA Directions Letter) may be required. There is a risk that the Bermuda Monetary Authority may not provide such approvals or non-objections, or may impose conditions in respect of any such approvals or non-objections, which may affect the ability of BlockFi International to participate in the consummation of the Restructuring Transactions and the Licensing Wind Down Process.

**(r)** ~~(q)~~ **The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest where such Claim or Interest is subject to an objection cannot rely on the estimates in this Disclosure Statement. As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

**3.** *Even if the Restructuring Transactions Are Implemented, the Debtors Will Continue to Face Risks.*

Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, bank instability, changes in the Debtors' industry, changes in Digital Asset prices, changes in the Digital Asset regulatory environment, and changes in the Debtors' Client base. As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

**4.** *Governmental Approvals May Not Be Granted.*

Consummation of the Restructuring Transactions may depend on obtaining approvals of certain Governmental Units. Failure by any Governmental Unit to grant an approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

**B.** **Risks Related to Recoveries under the Plan.**

**1.** *The Debtors Cannot Guarantee Recoveries or the Timing of Such Recoveries*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. In addition, the timing of actual Distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

**2.** *The Debtors Are Subject to the Volatility of Digital Assets.*

The volatility of Digital Assets may adversely affect the fair market value of the Debtors' Digital Assets, which could result in lower recoveries for creditors than the Debtors' current estimates based on the fair market value as of the Petition Date.

3.       *The Tax Implications of the Debtors' Bankruptcy Are Highly Complex.*

Holders of Allowed Claims and Allowed Interests should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

4.       *The Orderly Wind Down May Take Longer and Cost More Than Estimated, Which May*      *Decrease Recoveries.*

The Wind Down presents risks for all stakeholders.  The Wind Down is estimated to take approximately two years to be completed.  However, this is merely an estimate and it is possible that it could take longer.  In the event the Wind Down takes longer to be completed, the associated costs, such as professional fees, will also be higher than estimated.  Accordingly, estimated recoveries pursuant to the Wind Down could also be lower than estimated.

5.       *The Value of Litigation Proceeds that the Wind-Down Trustee May Secure Is Uncertain,*      *Which May Impact the Value that Can Be Distributed to Holders of Claims Entitled to Receive Litigation Proceeds*.

The Plan provides that the Wind-Down Debtors may prosecute and settle any Vested Causes of Action. There can be no guarantee as to the success of the prosecution of any of the Vested Causes of Action or the value of any litigation proceeds that may be distributed to Holders of Claims.

6.       *The Debtors' Substantial Ongoing Liquidity Needs May Impact Recoveries.*

Although the Debtors' core operations have been paused as of the Platform Pause, the Debtors have nonetheless had to maintain significant business operations to comply with the demands of these Chapter 11 Cases. Accordingly, depending on how long the Chapter 11 Cases go, the recoveries that Holders of Claims are estimated to receive will be impacted by the Debtors' ongoing liquidity requirements.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the Cash necessary to fund the ongoing operations necessary to comply with the demands of these Chapter 11 Cases, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of these Chapter 11 Cases.  The Debtors cannot guarantee that Cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to maintain adequate Cash on hand; (b) their ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of these Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that Cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

C.       **Risks Related to the Debtors' Businesses.**[8992]

---

[8992]  For the avoidance of doubt, as used in this section, the term Debtors shall refer to both the Debtors prior to the Effective Date and the Wind-Down Debtors after the Effective Date.

**1.**    ***The Debtors Are Subject to an Extensive and Highly Evolving Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, any Laws and  Regulations    Could    Adversely Affect Their Brand, Reputation, Business, Assets, and          Financial Condition.***

The Debtors' business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another.

Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses, limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, and financial condition. Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

In order to operate its business, BlockFi currently maintains Money Transmission Licenses in seven (7) states and BlockFi International maintains a Digital Assets License in Bermuda. The Debtors have engaged with the state banking departments and BlockFi International has engaged with the Bermuda Monetary Authority throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that the Plan provides for compliance by BlockFi with state money transmission and Bermuda laws. The state banking departments may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of the state banking departments' or the Bermuda Monetary Authority's determinations. There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of the state banking departments to require certain approvals with respect to Confirmation of the Plan.

Following Confirmation of the Plan, BlockFi will continue to take steps pursuant to the Licensing Wind-Down Process. Such Licensing Wind-Down Process will require notice to, and in some cases approval by, the Bermuda Monetary Authority, in the case of BlockFi International and by those state banking departments in states where the Debtors have applications pending or are licensed pursuant to the requirements set forth in each state money transmission statute and as otherwise required by the relevant state banking departments or applicable laws.

2.      *The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations.*

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors.  For example, on the Petition Date, the Debtors filed an adversary proceeding against Emergent Fidelity Technologies Ltd., the investment company of FTX's former founder and chief executive officer SBF, over the Robinhood Shares.  In the future, the Debtors may become parties to additional litigation, including enforcement actions brought by state banking departments with respect to BlockFi's historical compliance with State money transmission and lending laws, which could result in significant fines.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Debtors' financial health.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Debtors' businesses and financial stability, however, could be material.

On February 14, 2022, BlockFi entered into resolutions with the SEC and various State regulators in which it agreed to pay an aggregate amount up to $100 million to settle charges that BIAs constituted unregistered securities as well as violating the registration provisions of the Investment Company Act of 1940.  Since that resolution, BlockFi has periodically responded to requests for information from the SEC and State regulators on various matters related to the resolution.  As before, BlockFi continues to cooperate with the SEC and State regulators' requests.

On November 18, 2022, BlockFi received a subpoena from the Commodity Futures Trading Commission (the "CFTC") seeking information and documents from BlockFi regarding, among other things, its transactions with FTX and its communications with certain FTX officers and employees.  BlockFi is cooperating with the CFTC and working to provide information that is responsive to its requests.

On November 29, 2022, BlockFi received a Cease and Desist Order from the North Carolina Office of the Commissioner of Banks in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in North Carolina.  BlockFi has complied with the requirements of the order and has not engaged in money transmission activity within the state of North Carolina.

On November 21, 2022, BlockFi received a voluntary request from the United States Attorney's Office for the Southern District of New York ("SDNY") seeking information and documents from BlockFi regarding, among other things, its transactions with FTX and its communications with certain FTX officers and employees.  BlockFi is cooperating with the SDNY and working to provide information that is responsive to its requests.

On November 22, 2022, BlockFi entered into a Consent Order with the Texas Department of Banking in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Texas.  BlockFi has complied with the Consent Order, including by surrendering its Money Transmission License in Texas.

On November 25, 2022, Alaska's Department of Commerce, Community, and Economic Development, Division of Banking and Securities issued a Cease and Desist Suspension Order to BlockFi.  The order was issued in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Alaska.  BlockFi has complied with the requirements of the order and has not engaged in money transmission activity within the state of Alaska.

On December 6, 2022, Georgia's Department of Banking and Finance issued an Order to Cease and Desist to BlockFi in connection with the cancellation of its surety bond.  BlockFi is complying with the requirements of the order.

On December 14, 2022, BlockFi received a subpoena from the SEC seeking information and documents from BlockFi regarding, among other things, its transactions with FTX and its communications with certain FTX

officers and employees.  BlockFi is cooperating with the SEC and working to provide information that is responsive to its requests.

On December 16, 2022, the State of Washington Department of Financial Institutions issued final Orders to Cease and Desist against BlockFi in connection with the Platform Pause, cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Washington, and BlockFi's lending programs.  BlockFi is complying with the requirements of the orders.

On January 10, 2023, BlockFi received a subpoena from the CFTC seeking information and documents from BlockFi relating, among other things, to BlockFi's lending programs and the disposition and accounting of customer assets.  BlockFi is cooperating with the CFTC and working to provide information that is responsive to its requests.

On February 13, 2023 and February 17, 2023, BlockFi received subpoenas from the Alabama Securities Commission and the California Department of Financial Protection and Innovation, respectively.  These subpoenas seek information and documents from BlockFi regarding, among other things, BlockFi's lending programs and the disposition and accounting of customer assets.  BlockFi is cooperating with the relevant agencies and working to provide information that is responsive to their requests.

On February 14, 2023, BlockFi received a Notice of Automatic Suspension, Intent to Revoke Money Transmission License, Intent to Issue Order to Cease and Desist, Intent to Impose Civil Penalty, and Right to Hearing from the Connecticut Department of Banking ("CDB") in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Connecticut. BlockFi is cooperating with the CDB and seeking to resolve the allegations and claims in the Notice.

On March 21, 2023, the Florida Office of Financial Regulation ("FLOFR") issued an Emergency Suspension Order and Administrative Complaint in connection with the Platform Pause and cancellation of the surety bond required as a condition of BlockFi's Money Transmission License in Florida.  BlockFi has not objected to revocation of its money transmitter license in Florida.

On March 27, 2023, BlockFi entered into a Stipulated Interim Suspension, Final Order to Discontinue Unsafe or Injurious Practices, and Final Desist and Refrain Order with the California Department of Financial Protection and Innovation in connection with BlockFi's lending programs.  BlockFi is complying with the requirements of the stipulated suspension and order.

**3.**     ***The Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Plan and Effectuate Distributions.***

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the cryptocurrency and financial industries can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Plan and provide Distributions to the creditors.

**4.**     ***Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition.***

Section 1141(d)(3) of the Bankruptcy Code limits a debtor's ability to discharge Claims in certain circumstances.  Any Claims not ultimately discharged through a Plan could be asserted against the Wind-Down Debtors and may have an adverse effect on the Debtors' financial condition.

### D.        Miscellaneous Risk Factors and Disclaimers.

#### 1.        *The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

#### 2.        *No Legal or Tax Advice Is Provided By This Disclosure Statement.*

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

#### 3.        *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Wind-Down Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

#### 4.        *Failure to Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that a particular litigation claim, or projected objection to a particular Claim, is or is not identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

#### 5.        *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

#### 6.        *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7.    *No Representations Outside This Disclosure Statement Are Authorized.*

NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION.   VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF NEW JERSEY.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Wind-Down Debtors, and to Holders entitled to vote to accept or reject the Plan.   This overview is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan and to Digital Assets in general, is subject to an unusually high level of uncertainty.   No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan.   No portion of this discussion is or will be binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors, Wind-Down Debtors, or Holders take.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.   THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances.   This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).   Furthermore, this overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).   This overview also assumes that the various debt and other arrangements to which the Debtors and Wind-Down Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for

111

purposes of section 897 of the IRC. This overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors, and Holders entitled to vote to accept or reject the Plan described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Wind-Down Debtors engage in. This overview does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of Digital Assets that persons transferred to the Debtors in connection with the BIA, the Retail Loan Program, and the Institutional Loan Program when persons transferred Digital Assets to the Debtors in connection therewith. The Debtors believe this position is correct based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in such deposited Digital Assets. If the Debtors were determined to not have taken tax ownership of such Digital Assets at such time, the consequences of the Plan to Holders entitled to vote to accept or reject the Plan and the Debtors generally would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING OVERVIEW OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The Plan is being structured as a Wind Down of the Debtors' operations and a series of Distributions by the Debtors (and Wind-Down Debtors, as applicable) to Holders in respect of their Claims.

In connection with the Plan, the Debtors (or Wind-Down Debtors, as applicable) may, among other things, (x) distribute Digital Assets (including newly purchased Digital Assets) "in kind" to certain Account Holders, (y) sell certain assets to third parties or otherwise monetize assets, and (z) distribute Cash and otherwise distribute Digital Assets (in a non-"in-kind" fashion, i.e., by distributing Digital Assets to a Holder other than Digital Assets that such Holder had in its Account on the Petition Date). As a result of any sale of assets, the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. The Distributions referenced above will, from the Debtors' perspective, result in the recognition of income equal to the difference between the value of what Holders receive in exchange for their Claims (including any in-kind Distribution) and the

amount of their Claims (determined without regard to "dollarization" of such Claims). Income will be reduced by the amount of tax attributes available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation.

Thus, the U.S. federal income tax consequences of the Plan to the Debtors will in large part be a function of (a) the Debtors' tax basis in their assets that the Debtors transfer, (b) the difference between the value of what the Holders receive in exchange for their Claims and the amount of their Claims, and (c) the Debtors' ability to demonstrate the existence of tax losses, including losses that may be generated as a result of the implementation of the Restructuring Transactions and historically incurred losses. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of Digital Assets to a business like that of the Debtors' (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such Digital Assets) or the transferee's utilization of the transferred Digital Assets (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of the Plan to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Plan, potentially in a way that has a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Because the Plan is being structured as a liquidation, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, are not discussed further.

The Debtors continue to evaluate how "dollarization" of certain Claims as of the Petition Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.

The Debtors continue to analyze whether there will be any material administrative income tax liabilities that must be satisfied under the Plan.

### C.        Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders[9093] of Allowed Claims Entitled to Vote.[9194]

Before discussing the consequences to any particular Class of Claims entitled to vote, we discuss certain U.S. federal income tax considerations that are relevant to any U.S. Holder of a Claim which U.S. Holder will or may receive an in-kind Distribution of Digital Assets pursuant to the Plan (either up-front or as a delayed Distribution) which Digital Assets (x) the Debtors took U.S. federal income tax ownership of upon such U.S. Holder's transfer of such Digital Assets to the Debtors, and (y) is the same as the type of Digital Assets in such U.S. Holder's Account as of the Petition Date.

The tax treatment of such U.S. Holders under the Plan depends significantly on the tax treatment of their transfer of Digital Assets to the Debtors in the first instance. There is uncertainty with respect to whether deposits in which tax ownership of the Digital Assets transferred to the Debtors were taxable when they occurred, but the Debtors generally expect that most customers have taken the position that the act of depositing Digital Assets with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of Digital Assets for a contractual right to the

---

[9093] The Debtors will discuss certain U.S. federal income tax consequences of the Consummation of the Plan to Non-U.S. Holders in a supplement hereto to the extent the Debtors determine such a supplement is necessary or appropriate based on the Debtors' understanding of the residence of Holders.

[9194] No Class of Interests is entitled to vote.

return of such Digital Assets is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent."  Such position relies, among other things, on case law that predates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058 of the IRC.  On the other hand, with respect to customers, there is also support for the position that the initial deposit of Digital Assets is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited Digital Assets (in particular, provisions related to the Debtors' ability to not support "airdropped" Digital Assets or Digital Assets issued pursuant to a "hard fork").

To the extent an initial deposit of Digital Assets was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of the same kind of Digital Asset to customers, because the exchange of the contractual right to the return of such Digital Asset for the underlying Digital Asset is itself not an exchange of property "differing materially either in kind or in extent."  The Debtors emphasize that, like other aspects of Digital Asset taxation, this position is subject to significant uncertainty, including because of the existence of proposed Treasury Regulation section 1.1058-1(e)(2), which causes a securities lending transaction to become taxable where a borrower fails to return to the lender securities identical to the securities transferred, or otherwise defaults under the agreement.  While this proposed Treasury Regulation is inapplicable by its terms to Digital Assets, it would very likely cause such a transaction to be taxable to a customer (or other person that transferred Digital Assets to the Debtors in a transaction (such as a "loan" (for commercial purposes but not tax purposes) of Digital Assets) intended to be treated as non-taxable in the first instance) if it applied to Digital Assets.  Furthermore, with respect to a U.S. Holder that receives Digital Assets and non-Digital Assets in satisfaction of its Claim, if the foregoing argument would apply in the first place to a recovery that comprised solely Digital Assets, such argument would need to be supplemented by a general "bifurcation" approach that permitted U.S. Holders to take the position that such U.S. Holders retained their Digital Asset positions in a tax-free manner, even if the receipt of other consideration constituted a taxable exchange.  The Debtors emphasize that these positions are unclear.

The ability to take the position that an in-kind Distribution of Digital Assets is not taxable to U.S. Holders is subject to increased risk as a result of the "dollarization" of Claims.  It may be the case that "dollarization" resulted, or will result, in a taxable event to U.S. Holders, either as of the Petition Date or as of the Confirmation Date.  If such a taxable event were determined to have occurred, it would be because the contract to receive particular Digital Assets was modified, as a result of dollarization, to have an economic "cap."  In light of this, it is unclear whether the argument described above that supports tax-free treatment of an in-kind Distribution could still apply.  Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying Digital Assets.  However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to underlying entitlements to cause tax events, either because of dollarization in the first instance or to the extent of an in-kind Distribution.

The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of Digital Assets from the Debtors, "dollarization," and the Consummation of the Plan is subject to extreme uncertainty.  Although there are instructive analogous authorities, there is effectively no "controlling" authority on any of these issues.  Accordingly, there is a material risk that the positions described throughout this discussion may not be sustained.  The concept of a non-taxable in-kind Distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in kind to a U.S. Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the U.S. Holder deposited property with the Debtors.  Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a U.S. Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the U.S. Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the U.S. Holder deposited property with the Debtors (and thus tax-free in-kind treatment would likely be unavailable).

114

1.       *BlockFi Lending LLC Private Client Account Claims (Class 3-a).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Lending LLC Private Client Account Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of (A) the Digital Assets Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made within six (6) months after the Effective Date), or (B) the Cash Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made later than six (6) months after the Effective Date), and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC Private Client Account Claim.

To the extent any Digital Asset distributed to a U.S. Holder of an Allowed BlockFi Lending LLC Private Client Account Claim is the same as the type of Digital Asset in such U.S. Holder's Account as of the Petition Date, then such return may be treated as a tax-free in-kind Distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the discussion set forth above.

In the case where such tax-free treatment did not apply with respect to such Digital Asset Distribution, and for any consideration that a U.S. Holder of an Allowed BlockFi Lending LLC Private Client Account Claim receives in satisfaction of its Claim that is not the same as the type of Digital Asset in such U.S. Holder's Account as of the Petition Date, the exchange will be taxable to the U.S. Holder.  In such case, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of such consideration received under the Plan and such U.S. Holder's adjusted tax basis in the Claim (this assumes that all of the consideration is received in a taxable fashion; see immediately below for a discussion of a bifurcated approach).  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such U.S. Holder's tax basis in such consideration should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

Where a U.S. Holder receives some consideration tax-free and other consideration that is taxable (*e.g.*, some but not all of the consideration that a U.S. Holder of an Allowed BlockFi Lending LLC Private Client Account Claim receives in satisfaction of its Claim is the same as the type of Digital Asset in such U.S. Holder's Account as of the Petition Date), such U.S. Holder would recognize gain or loss in an amount equal to the difference between (x) the fair market value of such consideration received under the Plan in a taxable fashion, and (y) while subject to uncertainty, a proportionate portion of the tax basis in such Claim (possibly based on relative fair market values of the consideration received in a tax-free fashion and the consideration received in a taxable fashion, although other potential ways of calculating gain or loss may exist).  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such U.S. Holder's tax basis in any consideration received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in any such consideration should begin on the day after the Effective Date.

For a very simplified numerical example of the abovementioned methodology (which, for the avoidance of doubt, may be one among others) for determining gain or loss where a U.S. Holder receives some consideration tax-free and other consideration that is taxable, assume the following: (a) such U.S. Holder has an adjusted tax basis in its Claim of $1,000; (b) such Claim corresponds entirely to BTC that such U.S. Holder previously deposited with the Debtors; and (c) such Holder receives, in satisfaction of its Claim, BTC worth $3,000 and ETH worth $2,000. Pursuant to the above methodology, the U.S. Holder would have gain equal to the difference between (x) $2,000 (the fair market value of the ETH), and (y) $2,000 / ($3,000 + $2,000) x $1,000, i.e., $1,600 of gain.

115

It is generally expected that a Class 3-a Holder should not be taxed on Distributions received after the Effective Date until such Distributions are received (if at all).

**2.      BlockFi Lending LLC Loan Collateral Claims (Class 3-b).**

Pursuant to the Plan, each Holder of an Allowed BlockFi Lending LLC Loan Collateral Claim shall, in full and final satisfaction of such Claim, receive the Set Off Treatment, under which (i) such Claim will first be set off or recouped against such Holder's Loan Account Obligations outstanding on the Petition Date, and (ii) such Holder will receive, on account of any amount of such Claim remaining after such set off, (A) its Pro Rata share of (x) the Digital Assets Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made within six (6) months of the Effective Date) or (y) the Cash Allocation for Holders of Claims at BlockFi Lending LLC (for any Distributions made later than six (6) months after the Effective Date), as further specified in the Plan.

The set off of a U.S. Holder's Allowed BlockFi Lending LLC Loan Collateral Claim against such U.S. Holder's Loan Account Obligations should be a taxable transaction to the U.S. Holder.

One possible treatment of such set off is as a disposition of the applicable portion of the Loan Collateral by the Debtors on behalf of the U.S. Holder and the application of the resultant proceeds to such U.S. Holder's Loan Account Obligations. Under such treatment, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the applicable portion of its Loan Account Obligations and its adjusted tax basis in the applicable portion of the Loan Collateral. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Loan Collateral constituted a capital asset in the hands of the U.S. Holder, and, potentially, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Under this treatment, there is some amount of uncertainty with respect to how a U.S. Holder with differing amounts of tax basis in its Loan Collateral would calculate taxable income or loss, because it is unclear what portion of the U.S. Holder's Loan Collateral would be treated as having been sold by the Debtors on the U.S. Holder's behalf. One possibility is that a "blended" approach would be applied. Another is that a U.S. Holder could specifically identify lots of its Loan Collateral that are treated as having been sold.

Another possible tax treatment is that the set off be treated as a taxable disposition of the applicable portion of such U.S. Holder's Allowed BlockFi Lending LLC Loan Collateral Claim in satisfaction of the U.S. Holder's Loan Account Obligations. If such treatment applied, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the applicable portion of its Loan Account Obligations and its adjusted tax basis in the applicable portion of its Allowed BlockFi Lending LLC Loan Collateral Claim. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

The treatment of each U.S. Holder's remaining amount of an Allowed BlockFi Lending LLC Loan Collateral Claim after set off of such U.S. Holder's Loan Account Obligations will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Private Client Account Claims.

**3.      BlockFi International Ltd. Private Client and Interest Account Claims (Class 3-c).**

Pursuant to the Plan, each Holder of an Allowed BlockFi International Ltd. Private Client and Interest Account Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of (A) the Digital Assets Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made within six (6) months after the Effective Date), or (B) the Cash Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made later than six (6) months after the Effective Date), and (ii) its Pro Rata Share of any

116

Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. Private Client and Interest Account Claim.

The treatment to each U.S. Holder of an Allowed BlockFi International Ltd. Private Client and Interest Account Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Private Client Account Claims.[9295]

### 4.    *BlockFi International Ltd. Loan Collateral Claims (Class 3-d).*

Pursuant to the Plan, each Holder of an Allowed BlockFi International Ltd. Loan Collateral Claim shall, in full and final satisfaction of such Claim, receive the Set Off Treatment, under which (i) such Claim will first be set off or recouped against such Holder's Loan Account Obligations outstanding on the Petition Date, and (ii) such Holder will receive, on account of any amount of such Claim remaining after such set off, (A) its Pro Rata share of (x) the Digital Assets Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made within six (6) months of the Effective Date) or (y) the Cash Allocation for Holders of Claims at BlockFi International Ltd. (for any Distributions made later than six (6) months after the Effective Date), as further specified in the Plan.

The treatment to each U.S. Holder of an Allowed BlockFi International Ltd. Loan Collateral Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Loan Collateral Claims.

### 5.    *BlockFi Inc. Interest Account Claims (Class 3-e).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Inc. Interest Account Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of (A) the Digital Assets Allocation for Holders of Claims at BlockFi Inc. (for any Distributions made within six (6) months after the Effective Date), or (B) the Cash Allocation for Holders of Claims at BlockFi Inc. (for any Distributions made later than six (6) months after the Effective Date), and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. Interest Account Claim.

The treatment to each U.S. Holder of an Allowed BlockFi Inc. Interest Account Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC Private Client Account Claim.

### 6.    ~~1.~~ *BlockFi Lending LLC General Unsecured Claims (Class 4-a).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Lending LLC General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims at BlockFi Lending LLC, and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Lending LLC until payment in full of such Allowed BlockFi Lending LLC General Unsecured Claim.

The exchange will be taxable to the U.S. Holder.  The U.S. Holder will recognize gain or loss in an amount equal to the difference between the amount of such cash received under the Plan and such U.S. Holder's adjusted tax basis in the Claim.  The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

---

[9295] BlockFi International Ltd. is treated as a disregarded entity of BlockFi Inc. for U.S. federal income tax purposes.

### 7.   ~~1.~~ *BlockFi International Ltd. General Unsecured Claims (Class 4-b).*

Pursuant to the Plan, each Holder of an Allowed BlockFi International Ltd. General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims at BlockFi International Ltd., and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi International Ltd. until payment in full of such Allowed BlockFi International Ltd. General Unsecured Claim.

The treatment to each U.S. Holder of an Allowed BlockFi International Ltd. General Unsecured Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC General Unsecured Claims.

### 8.   ~~2.~~ *BlockFi Inc. General Unsecured Claims (Class 4-c).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Inc. General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims at BlockFi Inc., and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Inc. until payment in full of such Allowed BlockFi Inc. General Unsecured Claim.

The treatment to each U.S. Holder of an Allowed BlockFi Inc. General Unsecured Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC General Unsecured Claims.

### 9.   ~~3.~~ *BlockFi Services, Inc. General Unsecured Claims (Class 4-d).*

Pursuant to the Plan, each Holder of an Allowed BlockFi Services, Inc. General Unsecured Claim shall, in full and final satisfaction of such Claim, receive (i) its Pro Rata share of the Cash Allocation for Holders of Claims at BlockFi Services, Inc., and (ii) its Pro Rata Share of any Additional Bankruptcy Distributions in Cash for Holders of Claims at BlockFi Services, Inc. until payment in full of such Allowed BlockFi Services, Inc. General Unsecured Claim.

The treatment to each U.S. Holder of an Allowed BlockFi Services, Inc. General Unsecured Claim will be as described above for U.S. Holders of Allowed BlockFi Lending LLC General Unsecured Claims.

### 10.   ~~4.~~ *Net Investment Income Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 11.   ~~5.~~ *Limitations on Losses.*

U.S. Holders who recognize capital losses as a result of the Distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**D.**     **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Digital Assets Received Under the Plan.**

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Digital Assets received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets.  U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

**E.**     **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the Consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder.

**1.**     *Gain Recognition.*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).  If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Net Investment Income Tax would generally not apply).  In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  *The taxation of Digital Assets is extremely uncertain, and each Non-U.S. Holder should consult its own tax advisor regarding the possibility of being deemed to be engaged in a trade or business in the United States as a result of its Digital Asset-related activities (including activities on exchanges such as the Debtors').*

**2.**     *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing*  *of Digital Assets Received Under the Plan.*

The U.S. federal income tax consequences to a Non-U.S. Holder of owning and disposing of Digital Assets received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets.  Non-U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

**3.**     *FATCA.*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable,

119

annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### F.    Information Reporting and Back-Up Withholding.

The Debtors, the Wind-Down Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with Distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to Distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to Distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).

Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND UNCERTAIN. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS. THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

* * * * *

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger Distribution to Holders of Allowed Claims than would otherwise result in a liquidation under Chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller Distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims vote to accept the Plan.

BlockFi Inc. on behalf of itself and each of the other Debtors

By:    _/s/ Mark A. Renzi_

Name:    Mark A. Renzi

Title:    Chief Restructuring Officer

121

Prepared By:

Dated: ~~May~~June ~~1~~28, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Chapter 11 Plan**

[Filed separately]

**<u>Exhibit B</u>**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS FOR BLOCKFI INC.,** *et al.*[1]

## I.    INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either: (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their financial advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' Estates. As illustrated by this Liquidation Analysis, Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive less than a full recovery in a hypothetical liquidation. Additionally, Holders of Claims or Interests in Impaired Classes would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

**Statement of Limitations**

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. This Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS. THE ACTUAL LIQUIDATION

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the disclosure statement to which this exhibit is attached (the "Disclosure Statement") or the ~~First~~ Second *Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as supplemented or amended from time to time, the "Plan"), as applicable.

VALUE OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS.  WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER(S) OF SUCH BUSINESS(ES).

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE.  THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.  NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

## Basis of Presentation

This Liquidation Analysis has been prepared assuming that the Debtors convert their current Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about September 30, 2023 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors as of February 28May 31, 2023, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date.  Certain balances, including Cash, Digital Assets, and expenses have been projected forward or estimated as of the Conversion Date.  As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements.  In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in these Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, tax liabilities, and professional fees attributable to the liquidation and wind-down.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any Distributions to be made on account of Allowed Claims and Interests under the Plan.

## Conversion Date and Appointment of a Chapter 7 Trustee

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' Estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.  There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect

2

and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest.

**Deconsolidated Liquidations**

      This Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered, but not substantively consolidated proceeding, and takes into account the administrative priority status of intercompany claims arising post-petition.  The results of this analysis have been consolidated for convenience.

**Additional Global Notes and Assumptions**

      This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1.  <u>Unaudited Financial Statements</u>.  This Liquidation Analysis contains numerous estimates.  Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2.  <u>Chapter 7 Liquidation Costs</u>.  The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately 27 months, in order to pursue sales of substantially all remaining assets, collect receivables, pursue claims against other companies in bankruptcy including 3AC, FTX, Alameda, Emergent and Core Scientific, pursue the return of preference payments, make Distributions, and otherwise administer and close the Estates.  In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries.  Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3.  <u>Distribution of Net Proceeds</u>.  Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any Distribution to chapter 11 Administrative Claims or Other Priority Claims.  The estimate used in this Liquidation Analysis for these expenses includes estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee.  Any remaining net Cash would then be distributed to creditors in accordance with applicable law in the following priority:  (a) first to pay the Allowed Secured Tax Claims, (b) second to pay any Allowed Administrative Claims, Priority Tax Claims, and Other Priority Claims; and (c) third to creditors holding Account Holder Claims and General Unsecured Claims.

      Under the absolute priority rule, no junior creditor at a given entity would receive any Distribution until all senior creditors are paid in full at such entity, and no equity holder at such entity would receive any Distribution until all creditors at such entity are paid in full.  The assumed Distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4.  <u>Certain Exclusions and Assumptions</u>.  This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis.  Such tax consequences may be material.

3

II.    **CONCLUSIONS**

> **THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

### SUMMARY OF ESTIMATED RECOVERIES FOR CLAIMS AND INTERESTS

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan (Low) | Estimated Percentage Recovery Under the Plan (High) | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| Unclassified | Administrative and Priority Tax Claims | Unimpaired | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims[2] | Unimpaired | 100.0% | 100.0% | 100.0% | 100.0% |
| 2 | Other Priority Claims[3] | Unimpaired | 100.0% | 100.0% | 100.0% | 100.0% |
| 3-a | BlockFi Lending LLC Private Client Account Claims | Impaired | ~~83~~6.50% | 100.0% | ~~74~~6.08% | 100.0% |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Impaired | ~~83~~6.50% | 100.0% | ~~74~~6.08% | 100.0% |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired | ~~47~~52.7% | 100.0% | ~~43~~8.41% | ~~83~~9.39% |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | Impaired | ~~47~~52.7% | 100.0% | ~~43~~8.41% | ~~83~~9.39% |
| 3-e | BlockFi Inc. Interest Account Claims | Impaired | ~~369.2~~7% | ~~94.4~~100.0% | ~~336.4~~7% | ~~59.2~~.5% |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired | ~~83~~6.50% | 100.0% | ~~74~~6.08% | 100.0% |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Impaired | ~~47~~52.7% | 100.0% | ~~43~~8.41% | ~~83~~9.39% |

---

[2]    ~~Filed~~The Claims presented herein reflect scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket No. 856–858].  Although no Secured Tax Claims have ~~not~~ been contemplated ~~herein as the Bar Date for Governmental Claims is May 30, 2023.  In~~, in the event that filed Secured Tax Claims are ~~found to be~~deemed valid and ~~thus~~subsequently included ~~as~~in the Claims population, they will receive a full recovery.

[3]    The Claims presented herein reflect scheduled Claims including those as amended on Schedule F filed on May 10, 2023 [Docket No. 856–858].  Although no Other Priority Claims have been contemplated, in the event that filed Other Priority Claims are deemed valid and subsequently included in the Claims population, they will receive a full recovery.

| # | Claim | Impairment | | | | |
|---|---|---|---|---|---|---|
| 4-c | BlockFi Inc. General Unsecured Claims | Impaired | 3~~6~~9.2~~5~~7% | ~~94.4~~100.0% | 3~~3~~6.4~~~~7% | 59.~~5~~2~~~~% |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired | ~~1.0%~~n/a | ~~1.0%~~n/a | ~~1.0%~~n/a | ~~1.0%~~n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | ~~I~~Unimpaired | ~~0~~100.0% | ~~0~~100.0% | ~~0~~100.0% | ~~0~~100.0% |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | Impaired | 0.0% | ~~0~~1.5% | 0.0% | 0.0% |
| 6 | FTX Avoidable Transfer Claims | Impaired | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | Impaired | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | Impaired | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | Impaired | 0.0% | 100.0% | 0% | 100.0% |
| 10 | *De Minimis* Claims | Impaired | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | Unimpaired/ Impaired | ~~44~~8.3~~6~~% | ~~98~~100.0% | ~~40~~4.5% | ~~73.6~~80.1% |
| 12 | Intercompany Interests | Unimpaired / Impaired | 0.~~2~~5% | ~~48.0~~55.4% | 0.~~2~~5% | ~~17.9~~2% |
| 13 | Existing Preferred Equity Interests | Impaired | 0.0% | ~~0~~1.5% | 0.0% | 0.0% |
| 14 | Existing Common Equity Interests | Impaired | 0.0% | 0.0% | 0.0% | 0.0% |
| 15 | SEC Penalty Claims | Impaired | 0.0% | 100.0% | 0.0% | 0.0% |

## III.   NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

### A.   *Gross Liquidation Proceeds*

1. <u>Cash</u>:  This Liquidation Analysis projects the level of cash balances on hand as of ~~February 28~~May 31, 2023 and represents the Debtors' best estimate of balances on hand at the Conversion Date.  Balances are assumed to

be recoverable at 100%.

2.  <u>Restricted Cash</u>:  This Liquidation Analysis projects the level of restricted cash balances on hand as of ~~February 28~~May 31, 2023 and represents the Debtors' best estimate of balances on hand at the Conversion Date.  Balances are assumed to be recoverable at 100%.

3.  <u>Stablecoin Held</u>:[4]  Estimated Stablecoin values at the Conversion Date are based on pricing as of ~~February 28~~May 31, 2023 and assume a 1:1 peg to U.S. Dollar.  This Liquidation Analysis projects the level of Stablecoin balances on hand as of ~~February 28~~May 31, 2023 and represents the Debtors' best estimate of balances on hand at the Conversion Date.  Balances are assumed to be recoverable at 100%.

4.  <u>Digital Assets Held</u>:[4]  Estimated Digital Asset values at the Conversion Date are based on pricing as of ~~February 28~~May 31, 2023 and are discounted using ~~a 60-day~~ historical average ~~of~~ intra-day trading prices and the respective Digital Asset's implied volatility as calculated in other comparable company analyses.  Certain illiquid Digital Assets are liquidated at a discount to account for market depth and trading dynamics.

5.  <u>Digital Assets Staked</u>:  The Debtors have certain Digital Assets which are staked.  These Digital Assets are comprised ~~P~~primarily of staked ETH, but also include other Digital Assets, none of which are ~~not~~ presently liquid.  Estimated Digital Asset values at the Conversion Date are based on pricing as of ~~February 28~~May 31, 2023 and are discounted using ~~a 60-day~~ historical average ~~of~~ intra-day trading prices and the respective Digital Asset's implied volatility as calculated in other comparable company analyses.

6.  <u>Collateral Receivable</u>:  The Debtors ~~have U.S. Dollars and~~' assets include Digital Assets held ~~at two~~with a counterpart~~ies~~y as part of ~~an~~ institutional borrowing ~~and trading~~ agreement~~s.  Certain counterparties are asserting various set off rights against the Debtors' collateral~~.  It is anticipated that outstanding loan balances will be fully ~~set off.~~ setoff.  Collateral ~~B~~balances are assumed to be recoverable at 0% - 100% post-setoff.

7.  <u>Emergent & Alameda Collateral</u>:[5,6,7,8,9]  The Debtors believe they have perfected liens for collateral which ~~were~~was pledged pursuant to the Alameda Pledge Agreement and the Emergent Pledge Agreement.  The Emergent Pledge Agreement is secured by Emergent's Robinhood Shares and USD.  The Alameda Pledge Agreement is secured by Alameda's rights, titles, and interests in, among other things, Alameda's shares of Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum Trust (ETHE) and shares of the Bitwise 10 Crypto Index Fund (BITW).  Pursuing this collateral will be difficult and will require significant institutional knowledge and

---

[4]  The Digital Asset and Stablecoin balances have been reduced from the ~~2~~5/~~28~~31 values to adjust for the potential seizure of certain Digital Assets ~~during the first week of May 2023~~ by the U.S. Department of Justice.

[5]  BlockFi's asserted claim of $1,1~~78~~92.~~8~~1 million against FTX/Alameda is subject to increase should FTX/Alameda be successful in any of ~~its~~their Claims against the Debtors regarding preference payments, collateral pledges, and/or withdrawals of certain FTX collateral.

[6]  The value of the Robinhood Shares and all other perfected secured collateral which would offset asserted claims if recovered, is based on the trading price as of 11/11/22.

[7]  FTX/Alameda recoveries are likely to be lower in a chapter 7 liquidation as cooperation from critical resources would be more difficult resulting in diminished institutional knowledge, subject to local regulatory guidelines on witness cooperation.

[8]  The Debtors' recovery on secured collateral is assumed to be cross collateralized due to indemnification provisions within the Alameda Loan Agreements and is limited to the amount of the Debtors' claims against FTX and Alameda.

[9]  BlockFi is indemnified by FTX/Alameda in accordance with the Amended and Restated Master Loan Agreement between BlockFi International Ltd (the "Lender") and Alameda Research Limited (the "Borrower").  As such, BlockFi asserts the right to cross-collateralize the related loans with the secured collateral.

expertise.  In a liquidation, the Debtors do not believe that a trustee would be successful in recovering this collateral and balances have been assumed to be recoverable at 0%.

8. Alameda ~~Claims~~Loan & FTX ~~Facility~~ Claims:[5,7,10,11]~~:~~   The Debtors have various Claims against both FTX and Alameda for institutional loans, Digital Assets held on FTX.com (the platform operated by FTX Trading), trading funds, cross-~~cross-~~collateralization of Alameda collateral, and other deficiencies.  The Debtors will file ~~p~~Proof~~s~~ of ~~e~~Claim forms in the FTX/Alameda bankruptcy proceedings on or prior to the June 30, 2023 bar date.  In a liquidation, the Debtors would be classified as general unsecured creditors in the FTX/Alameda bankruptcy proceedings and would expect to recover between 25% and 66% on account of their Claims.

9. Claims Against Other Debtors in Bankruptcy:[10]~~:~~   The Debtors will assert Claims in other bankruptcy cases, including 3AC, amongst others, and have asserted Claims against Core Scientific on or prior to the applicable bar dates.  In a liquidation, the Debtors would be classified as secured creditors in the Core Scientific bankruptcy proceedings and general unsecured creditors in the 3AC bankruptcy proceedings and would expect to recover between 0% and 90% on their Claims, depending on recoveries in each respective bankruptcy case.

10. Mining Portfolio: The Debtors are party to various Mining Loans with third-party mining companies which are scheduled to come due over the next two years.  Many of these Mining Loans are in default and recoveries are not guaranteed.  The Mining Loans are generally secured by Equipment.  Balances are assumed to be recoverable at 2% ~~-~~ 100%.

11. Other Assets:  The Debtors have other assets including, but not limited to, loan and other receivables, equity investments in various private and public companies, ~~as well as~~and other internally developed assets.  This Liquidation Analysis reflects recovery rates on these assets between 0% and ~~75~~100%.

12. Litigation Claims:  Preferences in a chapter 7 are assumed to be pursued to the fullest extent possible by a chapter 7 trustee.  Any Client who either removed funds from the BlockFi Platform in an amount greater than $7,575 during the 90 days before the Petition Date or moved funds from BIA to a Client Wallet Account in excess of $7,575 during the 90 days before the Petition Date, would be pursued by the chapter 7 trustee in a preference action.  It is assumed that the chapter 7 trustee would take 24 months to pursue preference actions and would successfully recover approximately 25% of off-platform preferences and 100% of on-platform preferences.  During this time, professional fees are expected to be approximately $2.~~2~~4 million per month and a 33% contingency fee on successful preference recoveries is also assumed.  Any Clients who have a preference payment recovered by the chapter 7 trustee are assumed to receive a general unsecured claim for the amount of preference recovered.

   **B.     Liquidation Costs**

13. Chapter 7 Professional Fees:[12]~~:~~   Professional fees include costs for financial advisors, attorneys, accountants, and other professionals retained by the chapter 7 trustee.  Professional fees were estimated to range from $~~7~~6.3 million per month during the initial phase of the liquidation, reducing to $2.3 million per month once

---

[10]   BlockFi's potential Claims against bankrupt Entities including Alameda, FTX, 3AC, Core Scientific Inc., Digistar Norway AS, PrimeBlock Operations LLC, and BK Offshore Fund Ltd.~~, and Druk Holding & Investments Limited~~ are assumed to be dollarized as of the Petition Date in each respective bankruptcy case.

[11]   BlockFi's asserted claim of $1,1~~78~~92.~~8~~1 million against Alameda Research Ltd. is subject to ~~set off~~setoff of any recoveries on perfected secured collateral including the Robin Hood Shares, USD, trust shares of GBTC, ETHE, and BITW, and/or FTT, SOL, and SRM tokens.

[12]   Under a chapter 7 liquidation scenario, it is assumed that a chapter 7 trustee will engage new restructuring advisors.  It is assumed that these new restructuring advisors will require additional time to acclimate themselves to the case, resulting in higher professional fees and delays in Distributions relative to the current advisors who are attuned to the complex case dynamics.  Additionally, it is likely that a chapter 7 liquidation will result in increased employee attrition at the Debtors, which will either need to be back-filled by professionals or newly hired employees.

Distribution on account of Wallet Account Claims have been completed.  These estimates contemplate additional contingent professional fees that would be incurred for the successful pursuit of preference payments. This Liquidation Analysis assumes a 33% contingency fee on any successful preference clawbacks.

14. <u>Chapter 7 Trustee Fees</u>:  In a chapter 7 liquidation, the Bankruptcy Court may allow reasonable compensation for the <u>chapter 7</u> trustee's services not to exceed a certain percentage of such proceeds greater than a set amount upon all proceeds disbursed or turned over in the case by the trustee to parties in interest. ~~c~~Chapter 7 trustee fees were estimated at 3% of proceeds from liquidation, excluding recoveries related to cash and cash equivalents.

15. <u>Chapter 7 Estate Wind-Down Headcount</u>:  In a chapter 7 liquidation, the chapter 7 trustee will incur certain costs necessary to wind-down the Estates.  Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs, and ongoing support from the Debtors' management through a transition services agreement throughout the liquidation.  Once ~~Wallet~~ Distributions <u>on account of Wallet Account Claims</u> have been made~~,~~ and the BlockFi Platform has been closed, the headcount is expected to be reduced to 8 people at a cost of approximately $0.2 million per month for the remaining 19 months of the wind down.  It is assumed that the chapter 7 trustee would take 8 months to facilitate any initial distributions.

16. <u>Chapter 7 Estate Wind-Down Other Fees</u>:  In a chapter 7 liquidation, the chapter 7 trustee will incur certain vendor, technology, and miscellaneous costs necessary to wind-down the ~~e~~Estates including ordinary course professionals for legal, tax and accounting support, temporary labor costs, insurance, document management costs and banking fees, among others.  Such expenses include the necessary costs to maintain the BlockFi Platform through the disbursement date of ~~Wallet~~ assets <u>held in the Wallet Program</u> as well as costs to maintain limited operations while long dated, illiquid assets are being pursued.  During the 8-month initial phase of the wind down, the Debtors anticipate that the costs of a chapter 7 trustee will be <u>approximately</u> $36~~0~~5,000 per month for technology, <u>approximately</u> $345,000 per month for ordinary course professionals to support legal, tax, and accounting, and <u>approximately</u> $550,000 per month for other general and administrative costs. Following distributions of ~~Wallet~~ assets <u>held in the Wallet Program</u> and the shutdown of the BlockFi Platform, expenses are assumed to reduce to <u>approximately</u> $10,000 per month for technology, <u>approximately</u> $30~~0~~5,000 per month for ordinary course professionals, and <u>approximately</u> $200,000 per month for other general and administrative costs.

   *C.*     *Claims*

17. <u>Secured Tax Claims</u>:  ~~Based on the~~<u>The</u> Debtors~~' claims register as of March~~ <u>are continuing to evaluate claims filed prior to the Governmental bar date of May</u> 3~~1~~0, 2023~~, no.~~ <u>No</u> Secured Tax Claims have been ~~identified and scheduled~~<u>contemplated in this analysis</u>.  To the extent that Secured Tax Claims are later identified, a recovery of 100% is expected.

18. <u>Administrative, Priority Tax Claims and Other Priority Claims</u>:

   - <u>Administrative Claims</u>:  Administrative Claims include unpaid postpetition accounts payable, accrued operating expenses, unpaid postpetition taxes, and Professional Fee Claims among others.  This Liquidation Analysis estimates Administrative Claims to be approximately $6~~3~~0 million on the Conversion Date.

   - <u>Priority Tax Claims</u>:  ~~Based on the~~<u>The</u> Debtors~~' claims register as of March~~ <u>are continuing to evaluate claims filed prior to the Governmental bar date of May</u> 3~~1~~0, 2023~~, federal and state.~~ <u>No Priority t</u>Tax Claims have been ~~scheduled but not quantified~~<u>contemplated in this analysis</u>.  To the extent that Priority Tax Claims are determined, a recovery of 100% is expected.

   - <u>Other Priority Claims</u>:  Total Other Priority Claims are estimated to be $0.00.

8

19. <u>BlockFi Lending LLC Private Client Account Claims</u>:  BlockFi Lending LLC Private Client Account Claims are estimated to be approximately $21~~61~~.~~0~~4 million as of the Conversion Date based on Clients' Digital Assets as of the Petition Date.

20. <u>BlockFi Lending LLC Loan Collateral Claims</u>:  BlockFi Lending LLC Loan Collateral Claims are estimated to be approximately $~~99.7~~100.6 million as of the Conversion Date based on Clients' Digital Assets as of the Petition Date.

21. <u>BlockFi International Ltd. Private Client and Interest Account Claims</u>:  BlockFi International Ltd. Private Client and Interest Account Claims are estimated to be approximately $37~~1~~65.~~0~~2 million as of the Conversion Date based on Clients' Digital Assets as of the Petition Date.

22. <u>BlockFi International Ltd. Loan Collateral Claims</u>:  BlockFi International Ltd. Loan Collateral Claims are estimated to be approximately $3~~8~~9.~~5~~0 million as of the Conversion Date.  These Claims are for Loan Collateral issued pursuant to the Loan Program.  The BlockFi International Ltd. Loan Collateral Claims are net of Loan Account Obligations.

23. <u>BlockFi Inc. Interest Account Claims</u>:  BlockFi Inc. Interest Account Claims are estimated to be approximately $1.0~~6~~11~~50~~ billion as of the Conversion Date based on the Clients' Digital Assets as of the Petition Date.

24. General Unsecured Claims are estimated to total approximately $38.~~6~~5 million on the Conversion Date (excluding Intercompany Claims between Debtor entities).

- <u>BlockFi Lending LLC General Unsecured Claims</u>:  BlockFi Lending LLC General Unsecured Claims are estimated to be approximately $1.~~1~~3 million as of the Conversion Date.

- <u>BlockFi International Ltd. General Unsecured Claims</u>:  BlockFi International Ltd. General Unsecured Claims are estimated to be approximately $~~1~~0.~~2~~1 million as of the Conversion Date.

- <u>BlockFi Inc. General Unsecured Claims</u>:  BlockFi Inc. General Unsecured Claims are estimated to be approximately $34~~6~~.~~0~~2 million as of the Conversion Date.  These General Unsecured Claims include $29 million in surety bond claims,[13] $2.7 million in contract rejection damage claims, $435,000 in lease rejection claims, and $4.~~5~~1 million in other liabilities.

- <u>BlockFi Services, Inc. General Unsecured Claims</u>:  BlockFi Services, Inc. General Unsecured Claims are estimated to be approximately $~~200,000~~0.00 as of the Conversion Date.

- <u>BlockFi Trading LLC General Unsecured Claims</u>:  BlockFi Trading LLC General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

- <u>BlockFi Wallet LLC General Unsecured Claims</u>:  BlockFi Wallet LLC General Unsecured Claims are estimated to be approximately $~~2~~0.~~1~~9 million as of the Conversion Date.

- <u>BlockFi Ventures LLC General Unsecured Claims</u>:  BlockFi Ventures LLC General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

- <u>BlockFi Investment Products LLC General Unsecured Claims</u>:  BlockFi Investment Products LLC General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

---

[13] The Debtors have filed an objection [Docket No. 1068] to the proofs of claim of $29 million in surety bond claims.  These claims have been considered in this analysis out of an abundance of caution, but may be removed if the Court enters an order sustaining the Debtors' objections or the claims are otherwise deemed invalid.

- BlockFi Lending II General Unsecured Claims:  BlockFi Lending II General Unsecured Claims are estimated to be approximately $0.00 million as of the Conversion Date.

25. Recharacterized Claims (FTX Facility Claims):  $279.~~6~~7 million of Claims related to principal and interest on the FTX Facility Claims are assumed to be recharacterized as equity contributions at the applicable Debtor Entity.  Any portion of the FTX Facility Claims that are not recharacterized as described above are assumed to be contractually subordinated to Account Holder Claims pursuant to the terms of the FTX Loan Agreement and equitably subordinated to General Unsecured Claims and Intercompany Claims under section 510(c) of the Bankruptcy Code.

26. Subordinated Claims (FTX Avoidance Action Claims, Alameda Claims, 3AC Claims, and Government Penalty Claims):  FTX Avoidable Transfer Claims, Alameda Claims, and 3AC Claims are assumed to be equitably subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims under section 510(c) of the Bankruptcy Code.  The Debtors believe that the Government Penalty Claims, ~~including, a~~ [14] comprised of $~~5~~29.4 million ~~in~~ claims ~~from the Securities and Exchange Commission ("SEC") to settle the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order that the SEC issued on February 14, 2022 and~~ related to BlockFi Lending's $50 million settlement with various state securities regulators, represented by the North American Securities Administrators Association ("NASAA") working group, are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code, pursuant to which they are subordinated to Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor Entity.

27. Invalid Claims:  FTX and Alameda have filed Proof of Claim forms in the amount of $4.571 billion.  These Claims are assumed to be invalid for a number of reasons including, but not limited to, the fact that FTX and Alameda committed fraud and/or made material misrepresentations regarding their financial capacity and that preference claims do not account for inflows above the value received from withdrawals.  3AC has filed Proof of Claim forms in the amount of $214.5 million.  3AC Claims are assumed to be invalid for a number of reasons including, but are not limited to, the fact that British Virgin Island law states that preference liability has an intent element.  Thus, any conveyances received by the Debtors must be proven to have been received with the intent, which the Debtors do not believe is factually accurate.

28. SEC Penalty Claims:  The SEC Penalty Claims in the amount of $30.0 million arose from the Securities and Exchange Commission ("SEC") settling the "Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order" that the SEC issued on February 14, 2022.  The Debtors and the SEC entered into a stipulation with regard to the SEC Penalty Claims pursuant to which the Debtors and the SEC stipulated that the SEC will not receive a distribution on account of the SEC Penalty Claims unless and until all allowed Secured Tax Claims (Class 1), Other Priority Claims (Class 2), Account Holder Claims (Class 3), General Unsecured Claims (Class 4), and Intercompany Claims (Class 11) are paid in full.

29. ~~28.~~ Net Intercompany Claims:  Term sheets and promissory notes exist between Debtor entities to reflect prepetition intercompany transactions incurred during the Debtors' normal course of business.  As part of a chapter 7 liquidation, each Intercompany Claim will be netted between the respective Debtor entities and the remaining Intercompany Claims after such netting will be *pari passu* with Account Holder Claims and General Unsecured Claims at the applicable Debtor entity.  The total Intercompany Claims amount to $87~~4~~2.~~3~~2 million on a net basis.

- Net Intercompany Claims from BlockFi International Ltd. to BlockFi Lending LLC are estimated to be $36.0 million.

---

[14]  For the avoidance of doubt, the SEC Penalty Claims are not Government Penalty Claims under the Plan.

- Net Intercompany Claims from BlockFi International Ltd. to BlockFi Inc. are estimated to be $555.5 million.

- Net Intercompany Claims from BlockFi Inc. to BlockFi Lending LLC are estimated to be $273.0 million.

30. 29.  Preference Clawback Account Holder Claims[13,14][15,16]   In a chapter 7 liquidation, it is assumed that a chapter 7 trustee would pursue all available preference Claims against the Debtors' U.S. Clients.   Under Bermudian law, preference Claims against international Clients are assumed to be zero and therefore, in a liquidation, it is assumed that the chapter 7 trustee would not bring preference claims against international Clients.  Any preference actions would be against U.S. Clients who removed more than $7,575 off the BlockFi Platform within the 90 days preceding the Petition Date.  These amounts total $190 87.25 million.  Preferences would also be pursued against U.S. Clients who moved more than $7,575 from BIA to a Client Wallet Account within the 90 days preceding the Petition Date and which funds remained on the BlockFi Platform.  These amounts total $39.3 42.0 million.  The Debtors estimate that it will cost approximately $52 37 million in professional fees, in addition to a 33% contingency fee on all funds successfully recovered, to pursue preferences under a chapter 7 liquidation over a roughly two-year period.  It is also assumed, based on industry collection success rates and the expected clawback success rate in other Digital Asset bankruptcy cases, that 25% of targeted off-BlockFi Platform preference funds would be successfully clawed back and 100% of preference funds that remain on the BlockFi Platform in Client Wallet Accounts could be successfully transferred back into BIA/BPC accounts.  Successful clawbacks would result in additional Account Holder Claims in the amount of $86 8.9 million.

31. Preferred and Common Equity: In a chapter 7 liquidation, it is assumed that both preferred and common equity receive no recovery.

*[Remainder of page intentionally left blank.]*

---

13.  Assumes off-platform preferences are recovered in Cash.

14.  On-platform preferences are assumed to be successfully transferred from Client Wallet Accounts to BIAs/BPCs.

15  Assumes off-platform preferences are recovered in Cash.

16  On-platform preferences are assumed to be successfully transferred from Client Wallet Accounts to BIAs/BPCs.

11

# IV.  **LIQUIDATION ANALYSIS RESULTS**

The following pages present the results for the hypothetical liquidation of the Debtors.  This Liquidation Analysis is presented by creditor class on an unconsolidated basis for all Debtors and is compared against recoveries under the Plan.

| Class | Claim or Interest | BlockFi Inc | | | | BlockFi International | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ch. 11 | | Ch. 7 | | Ch. 11 | | Ch. 7 | |
| | | Low | High | Low | High | Low | High | Low | High |
| Unclassified | Administrative & Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | 52.7% | 100.0% | 48.1% | 89.9% |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | 52.7% | 100.0% | 48.1% | 89.9% |
| 3-e | BlockFi Inc. Interest Account Claims | 39.7% | 100.0% | 36.7% | 59.2% | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | 52.7% | 100.0% | 48.1% | 89.9% |
| 4-c | BlockFi Inc. General Unsecured Claims | 39.7% | 100.0% | 36.7% | 59.2% | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | 0.0% | 0.0% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | 39.7% | 100.0% | 36.7% | 59.2% | 52.7% | 100.0% | 48.1% | 89.9% |
| 12 | Intercompany Interests | 0.5% | 55.4% | 0.0% | 7.2% | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | 0.0% | 1.5% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | 0.0% | 0.0% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Class | Claim or Interest | BlockFi Lending | | | | BlockFi Wallet | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ch. 11 | | Ch. 7 | | Ch. 11 | | Ch. 7 | |
| | | Low | High | Low | High | Low | High | Low | High |
| Unclassified | Administrative & Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | 86.0% | 100.0% | 76.8% | 100.0% | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | 86.0% | 100.0% | 76.8% | 100.0% | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | 86.0% | 100.0% | 76.8% | 100.0% | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | 100.0% | 100.0% | 100.0% | 100.0% |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | 0.0% | 100.0% | 0.0% | 100.0% | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 12 | Intercompany Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | 0.0% | 100.0% | 0.0% | 0.0% | n/a | n/a | n/a | n/a |

| Class | Claim or Interest | BlockFi Trading | | | | BlockFi Ventures | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ch. 11 | | Ch. 7 | | Ch. 11 | | Ch. 7 | |
| | | Low | High | Low | High | Low | High | Low | High |
| Unclassified | Administrative & Priority Claims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | 100.0% | 100.0% | 100.0% | 100.0% | 34.4% | 100.0% | 31.8% | 74.1% |
| 12 | Intercompany Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

| Class | Claim or Interest | BlockFi Lending II | | | | BlockFi Services | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Ch. 11 | | Ch. 7 | | Ch. 11 | | Ch. 7 | |
| | | Low | High | Low | High | Low | High | Low | High |
| Unclassified | Administrative & Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 1 | Secured Tax Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account  Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-b | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | De Minimis Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Intercompany Claims | n/a | n/a | n/a | n/a | 0.0% | 100.0% | 0.0% | 1.2% |
| 12 | Intercompany Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 15 | SEC Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

# (Modified)

| Class | Claim or Interest | BlockFi Investment Products | | | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Unclassified | Administrative & Priority Claims | n/a | n/a | n/a | n/a |
| Unclassified | Secured Tax Claims | n/a | n/a | n/a | n/a |
| 1 | Secured Claims | n/a | n/a | n/a | n/a |
| 2 | Other Priority Claims | n/a | n/a | n/a | n/a |
| 3-a | BlockFi Lending LLC Private Client Account Claims | n/a | n/a | n/a | n/a |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | n/a | n/a | n/a | n/a |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims | n/a | n/a | n/a | n/a |
| 3-d | BlockFi International Ltd. Loan Collateral Claims | n/a | n/a | n/a | n/a |
| 3-e | BlockFi Inc. Interest Account Claims | n/a | n/a | n/a | n/a |
| 3-f | BlockFi Lending LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 3-g | BlockFi International Ltd. General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-a | BlockFi Inc. General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-b | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-c | BlockFi Trading LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-d | BlockFi Wallet LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Services Inc. General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-f | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Investment Products LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Ventures LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-j | PRHP Investments Ltd. LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 4-k | BlockFi Lending II LLC General Unsecured Claims | n/a | n/a | n/a | n/a |
| 5 | SAC Claims | n/a | n/a | n/a | n/a |
| 6 | FTX Facility Claims | n/a | n/a | n/a | n/a |
| 7 | Government Penalty Claims | n/a | n/a | n/a | n/a |
| 8 | De Minimis Transfer Claims | n/a | n/a | n/a | n/a |
| 9 | Alameda Claims | n/a | n/a | n/a | n/a |
| 10 | Intercompany Claims | 0.0% | 100.0% | n/a | n/a |
| 11 | Intercompany Interests | n/a | n/a | n/a | n/a |
| 12 | Government Penalty Claims | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a |
| 15 | Intercompany Interests | 0.0% | 0.0% | 0.0% | 0.0% |
| 12 | Intercompany Interests | n/a | n/a | n/a | n/a |
| 13 | Existing Preferred Equity Interests | n/a | n/a | n/a | n/a |
| 14 | Existing Common Equity Interests | n/a | n/a | n/a | n/a |