**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
(201) 489-1536 Facsimile
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Matthew T. Ferris, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
matt.ferris@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

|  |  |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>                                Debtors.[1]<br><br>---<br><br>BLOCKFI INTERNATIONAL LTD.,<br><br>                                Plaintiff,<br><br>                  -against-<br><br>VRAI NOM INVESTMENT LIMITED,<br><br>                                Defendant. | **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>Adv. Pro. No. 23-_____ (MBK) |

## COMPLAINT AGAINST VRAI NOM INVESTMENT LIMITED

BlockFi International Ltd. ("<u>BlockFi International</u>"), as a debtor and debtor in possession

in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") and as Plaintiff in the above-

---

[1] The Debtors in these chapter 11 cases (the "<u>Debtors</u>"), along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

captioned adversary proceeding (the "Adversary Proceeding"), brings this Complaint against Vrai

Nom Investment Limited ("Vrai Nom"). In support, BlockFi International alleges as follows:

## NATURE OF THE CASE

1.      Through this Adversary Proceeding, BlockFi International seeks, among other

relief: (a) turnover of certain estate property that BlockFi International pledged as collateral

pursuant to the June 7, 2022 Master Digital Currency Loan Agreement between BlockFi

International, as borrower, and Vrai Nom, as lender (the "Loan Agreement"),[2] or, in the alternative,

an award of damages to BlockFi International on account of Vrai Nom's post-petition exercise of

remedies against estate property in violation of the automatic stay; and (b) entry of an order

disallowing Vrai Nom's claim (the "Vrai Nom Claim") as set forth in proof of claim #14777 (the

"Proof of Claim"), which Vrai Nom filed on March 31, 2023.

2.      As set forth in Vrai Nom's Proof of Claim, Vrai Nom liquidated or otherwise

transferred estate property BlockFi International pledged as collateral under the Loan Agreement

and related Loan Documents (as defined below)—specifically, 12,254.6305 Ethereum tokens (the

"Transferred Collateral")—on November 30, 2022, two days after the Petition Date. Vrai Nom

liquidated the Transferred Collateral without first seeking relief from the automatic stay or

otherwise obtaining relief from this Court. Consequently, by its own admission, Vrai Nom

exercised remedies against property of BlockFi International's estate in violation of the automatic

stay. By doing so, Vrai Nom deprived BlockFi International's estate of its right of redemption with

respect to the Transferred Collateral as well as the equity value of the Transferred Collateral that

would have accrued to the benefit of BlockFi International's estate, and which amounts to nearly

$6 million as of May 30, 2023.

---

[2] A true and correct copy of the Loan Agreement is attached hereto as **Exhibit A**.

## JURISDICTION AND VENUE

3.       BlockFi International brings this Adversary Proceeding pursuant to sections 105(a),

502, 541, 542(a), 543, 549 and 550(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–

1532 (the "Bankruptcy Code"), Rules 3007(b), 7001 and 7054 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 3007-1 and 7003-1 of the Local Rules of the

United States Bankruptcy Court for the District of New Jersey (the "Local Rules"). BlockFi

International brings this Adversary Proceeding because, *inter alia*, this matter is a proceeding to

(a) recover money or property belonging to BlockFi International's bankruptcy estate from Vrai

Nom and (b) obtain a declaratory judgment relating to the foregoing. *See* Fed. R. Bankr. P.

3007(b); 7001(1), (9).

4.       This Court has jurisdiction over this Adversary Proceeding under 28 U.S.C. § 1334

and *In the matter of: Standing Order of Reference to Bankruptcy Court under Title 11,* Standing

Order of Reference 12-1, dated September 18, 2012.

5.       BlockFi International brings this Adversary Proceeding in connection with the

Chapter 11 Cases, which are pending in the United States Bankruptcy Court for the District of

New Jersey, Trenton Division (this "Court").

6.       This is a statutory core proceeding involving claims arising under and arising in the

Chapter 11 Cases within the meaning of 28 U.S.C. § 157(b). The claims BlockFi International

asserts in this Complaint concern disallowance of claims against BlockFi International's

bankruptcy estate, BlockFi International's counterclaims against persons filing claims against the

estates, turnover of property of the estate, the administration of BlockFi International's estate, and

other matters affecting the liquidation of BlockFi International's assets. *See*, *e.g.*, 28 U.S.C.

§ 157(b)(2)(A)–(C), (E), (O).

7.      BlockFi International consents to this Court's entry of final orders or judgment in connection with this Adversary Proceeding if the Court determines that, absent consent of the parties, the Court cannot enter final orders or judgments on certain of the matters in this Adversary Proceeding consistent with Article III of the United States Constitution. By filing the Proof of Claim, Vrai Nom has submitted to the equitable jurisdiction of this Court and consented to this Court's adjudication of its claims. *See Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) (per curiam); *In re Tarragon Corp.*, 2009 WL 2244598, at *6 (Bankr. D.N.J. July 27, 2009) ("[T]he filing of a proof of claim brings a creditor within the equitable jurisdiction of the Bankruptcy Court removing the creditor's right to a jury trial.") (citing *Shubert v. Lucent Techs., Inc.* (*In re Winstar Communications, Inc.*), 554 F.3d 382, 406–07 (3d Cir. 2009) (citing *Langenkamp*, 498 U.S. at 44– 45) (other citations omitted)); *Shared Network Users Group, Inc. v. WorldCom Techs., Inc.*, 309 B.R. 446, 451 (E.D. Pa. 2004).

8.      Venue is proper before this Court pursuant to 28 U.S.C. § 1409.

9.      This Court has personal jurisdiction over the non-resident Vrai Nom because Vrai Nom submitted to the jurisdiction of this Court by filing the Proof of Claim. *Supra* ¶ 7. In addition, this Court has personal jurisdiction over Vrai Nom because Vrai Nom asserted claims against BlockFi International in this Court, thereby establishing the minimum contacts with the United States necessary for the Bankruptcy Court to exercise personal jurisdiction over Vrai Nom. This Court also has personal jurisdiction over Vrai Nom pursuant to New Jersey's long-arm statute and/or Federal Rule of Civil Procedure 4(k)(2).

## **THE PARTIES**

10.      BlockFi International is a company organized under the laws of Bermuda and is a Debtor in the Chapter 11 Cases. Joint provisional liquidators, for restructuring purposes only (the "JPLs"), were appointed to BlockFi International on November 29, 2022, by the Supreme Court

of Bermuda in a statutory process ancillary to, and in support of, the Chapter 11 Cases. The JPLs have been informed of this matter and are supportive of the action being taken by BlockFi International.

11.     Vrai Nom is a company organized under the laws of Hong Kong. Vrai Nom may be served by serving any of its officers or employees at its principal office or anywhere else they may be found. In addition, Vrai Nom may be served by serving either (a) Vrai Nom at: Vrai Nom Investment Limited, RM4, 16/F, Ho King Comm Ctr, 2-16 Fayuen St, Mongkok, Kowloon, Hong Kong, Attn: Michael Zhang (matrixvrainom@gmail.com); and/or (b) counsel for Vrai Nom: Gosai Law, Level 2, 194 Varsity Parade, Varsity Lakes, QLD 4227, Australia, Attn: Krish Gosai (krish@gosailaw.com.au), by the methods identified in Bankruptcy Rule of Procedure 7004 and Federal Rules of Civil Procedure 4(f) and 4(h)(2). *See* FED. R. CIV. P. 4(f) and (h); FED. R. BANKR. P. 7004(a)(1), (b)(3).

## FACTUAL BACKGROUND

12.     In the ordinary course of BlockFi International's business, BlockFi International enters into loan agreements with certain institutional clients pursuant to which BlockFi International borrows digital currency, fiat currency, and related funds.

13.     On or about June 7, 2022, BlockFi International and Vrai Nom entered into the Loan Agreement. The Loan Agreement is governed by the laws of the State of Delaware. From time to time this Complaint refers to the Loan Agreement, together with all loan and security documents entered by BlockFi International and Vrai Nom in connection with the Loan Agreement, collectively as the "Loan Documents."

14.     Pursuant to the terms of the Loan Agreement, Vrai Nom loaned BlockFi International 21,670,000 USDC[3] (the "Loan"). To secure its obligations under the Loan Agreement, BlockFi International pledged to Vrai Nom a total of 15,920.63 Ethereum ("ETH") tokens and 5,631 Ethereum Proof of Work ("ETHW") tokens as collateral for the Loan (collectively, the "Collateral").

15.     As of May 30, 2023, the value of the Collateral, inclusive of the proceeds of the Huobi Transaction, was approximately $27,740,818.61.[4] The outstanding balance of the Loan (principal and interest included) was $21,752,035.75 on May 30, 2023.[5] Accordingly, the value of the Collateral exceeded the outstanding balance of the Loan by approximately $5,988,782.86 as of May 30, 2023.

16.     Section V(f) of the Loan Agreement requires Vrai Nom to return any Collateral after all "Obligations" have been satisfied:

> (f) Return of Collateral. After all the Obligations (other than contingent indemnification obligations for which no claim has been asserted or accrued) have been paid and satisfied in full, Lender shall return the Collateral to Borrower (i) in the case of Dollars or Alternative Currency, by bank wire to the account specified by Borrower and (ii) in the case of Stablecoins or Digital Currency, by Transfer to the Digital Currency Address specified by Borrower.

---

[3] Unless otherwise specified herein: (a) amounts represented with the "$" sign reflect amounts in U.S. Dollars; (b) "USDC" represents the digital currency USD Coin, which has the equivalent value of U.S. Dollars; and (c) "USDT" represents the digital currency Tether, which has the equivalent value of U.S. Dollars.

[4] The Collateral values are subject to change as digital asset prices continue to fluctuate. For purposes of this Complaint, BlockFi International uses May 30, 2023, as an appropriate valuation date because BlockFi International used the same valuation date in its Demand Letter to Vrai Nom, which put Vrai Nom on notice of its obligation to turn over the Collateral.

[5] Vrai Nom asserts a total outstanding Loan balance of $21,871,666.02. Proof of Claim at 6. But Vrai Nom's calculation fails to account for a $119,630.27 payment BlockFi International made on November 1, 2022. Thus, the actual outstanding balance as of May 30, 2023 was $21,752,035.75.

Loan Agreement at 15 § V(f). The Loan Agreement defines "Obligations" as "all debts, liabilities, obligations, covenants, indemnifications, interest and fees, including the Total Accrued Loaned Amount, created hereunder or under the other Loan Documents, whether arising before or after the commencement of any bankruptcy or insolvency proceeding." *Id.* at 5.

17.     On November 12, 2022, Vrai Nom exercised its right to recall the Loan balance pursuant to Section II(c)(i) of the Loan Agreement. BlockFi International did not repay the outstanding balance of the Loan within the time period prescribed by the Loan Agreement.

18.     On November 24, 2022, Vrai Nom exercised remedies against a portion of the Collateral by liquidating 3,665.9995 of pledged Ethereum with a trade partner called Huobi in exchange for 4,381,743.109 USDT (the "Huobi Transaction"). *See* Proof of Claim, Schedule at 1– 2.

19.     On November 28, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for chapter 11 relief in this Court, thereby commencing these Chapter 11 Cases. On the same day, Kroll Restructuring Administration ("Kroll") served the Letter Regarding First Day Hearing (the "First Day Hearing Letter"), a copy of which is attached as Exhibit B to the *Affidavit of Service* [Docket No. 36] (the "Affidavit of Service") filed on November 29, 2022, to all parties-in-interest listed on the service list attached as Exhibit A to the Affidavit of Service. The affidavit of service reflects that Vrai Nom received service of the First Day Hearing Letter. BlockFi also widely publicized its Chapter 11 filings on social media and news outlets alike on the Petition Date and on November 29, 2022.[6] BlockFi also launched a claims agent website through Kroll Restructuring

---

[6] *See, e.g.*, BLOCKFI, *Important Client Update – November 28, 2022* (Nov. 28, 2022), https://blockfi.com/November28-ClientUpdate; BLOCKFI, *Chapter 11 FAQ* (Nov. 28, 2022), https://blockfi.com/November28-ClientFAQ; C Street Advisory Group, *BlockFi Commences Restructuring Proceeding to Stabilize Business and Maximize Value for all Clients and Stakeholders*, BUSINESSWIRE (Nov. 28, 2022, 10:17 AM), https://www.businesswire.com/news/home/20221128005451/en/BlockFi-Commences-Restructuring-Proceeding-to-Stabilize-Business-and-Maximize-Value-for-all-Clients-and-Stakeholders; @BlockFi, TWITTER (Nov 28, 2022, 9:37 AM), https://twitter.com/BlockFi/status/1597253469374910466 ("Today, BlockFi filed voluntary

LLC (the "Kroll Website"), which has, since its launch on the Petition Date, provided free access to notices, other documents and deadlines.[7] The First Day Hearing Letter included links to the Kroll Website and the Court's website to attend the first-day hearing by Zoom. *See* Docket No. 36 at Ex. B. Such notice of the commencement of these Chapter 11 Cases provided Vrai Nom due and sufficient notice of the imposition of the automatic stay in these Chapter 11 Cases.

20.     On November 30, 2022, two days after the Petition Date, the Court entered its *Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (II) Granting Related Relief* [Docket No. 56] (the "Worldwide Stay Order"), restating and enforcing the worldwide automatic stay. That same day, without first obtaining modification of the worldwide stay, Vrai Nom liquidated additional Collateral consisting of 12,254.6305 ETH (i.e., the Transferred Collateral) with a trade partner called Blockchain Trading International Limited in exchange for 15,519,044.391 USDC.

21.     On March 31, 2023, Vrai Nom filed the Proof of Claim and attached a trade confirmation email dated November 30, 2022 (the "Trade Confirmation") from Blockchain Trading International Limited as one of several exhibits to the Proof of Claim. The Trade Confirmation confirms the date, amount, and other details of Vrai Nom's post-petition liquidation of the Transferred Collateral. Vrai Nom also attached an addendum labeled Schedule of Support of Proof of Claim in which Vrai Nom represented that it continues to hold Collateral consisting of 5,631 ETHW tokens (the "ETHW Collateral").

---

cases under Chapter 11 of the U.S. Bankruptcy Code."); BLOCKFI, *Client Update – First Day Hearing* (Nov. 29, 2022), https://blockfi.com/client-update-first-day-hearing; @BlockFi, TWITTER (Nov. 29, 2022, 4:59 PM), https://twitter.com/BlockFi/status/1597726965251072000 ("Earlier today, BlockFi's First Day Chapter 11 Hearing was held. We reiterated our singular focus: maximizing value for all clients and other stakeholders.").

[7] https://restructuring.ra.kroll.com/blockfi/.

22.    On May 31, 2023, BlockFi International sent a letter (the "Demand Letter") to Vrai

Nom demanding turnover of the Transferred Collateral and the ETHW Collateral or, alternatively,

payment of damages for Vrai Nom's exercise of remedies against and control over the Transferred

Collateral in violation of the automatic stay. To date, Vrai Nom has not responded to, much less

complied with, the terms of the Demand Letter.

## CAUSES OF ACTION

### COUNT ONE
### Request for Entry of Declaratory Judgment

23.    BlockFi International restates and realleges all foregoing and subsequent factual

allegations as if fully set forth herein and incorporates them herein by reference.

24.    Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within

its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be sought."

28 U.S.C. § 2201(a). Bankruptcy Courts, as units of the district court, have the authority to issue

declaratory judgments.

25.    Courts possess jurisdiction to issue declaratory relief when "the facts alleged, under

all the circumstances, show that there is a substantial controversy, between parties having adverse

legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007).

26.    BlockFi International has demanded that Vrai Nom comply with its obligations

under the Loan Documents and the Bankruptcy Code, including, without limitation, Vrai Nom's

obligation to return the Transferred Collateral and the ETHW Collateral and to preserve the *status*

*quo* as of the Petition Date with respect to property of BlockFi International's estate.

27.    Vrai Nom has breached its obligations under the Loan Documents by, *inter alia*,

failing to turn over the Transferred Collateral and the ETHW Collateral despite BlockFi International's demand.

28.    Vrai Nom's obligation to turn over property of the estate is a current obligation that Vrai Nom owes to BlockFi International.

29.    BlockFi International seeks an order declaring that: (a) pursuant to section 541 of the Bankruptcy Code, the Transferred Collateral and the ETHW Collateral are property of BlockFi International's bankruptcy estate; (b) by exercising remedies against the Transferred Collateral on November 30, 2022, Vrai Nom caused a transfer of property of BlockFi International's estate on a post-petition basis in violation of the automatic stay and such transfer was, therefore, void *ab initio* under section 549 of the Bankruptcy Code; (c) sections 542, 543 and 550(a) of the Bankruptcy Code, as applicable, require Vrai Nom to turn over the Transferred Collateral for the benefit of BlockFi International's estate or, in the alternative, Vrai Nom must compensate BlockFi International for damages caused by its improper exercise of remedies against the Transferred Collateral; and (d) sections 542 and 543 of the Bankruptcy Code, as applicable, require Vrai Nom to turn over the ETHW Collateral for the benefit of BlockFi International's estate.

30.    BlockFi International also seeks a finding of contempt and an award of damages, costs, and attorneys' fees resulting from Vrai Nom's willful violation of the automatic stay and the Worldwide Stay Order.

**COUNT TWO**
**Turnover of Property of the Estate Pursuant to 11 U.S.C. §§ 542(a) and 543;**
**Return of Surplus Collateral Pursuant to Del. Code Ann. tit. 6, § 9-615(d)(1)**

31.    BlockFi International restates and realleges all foregoing and subsequent factual allegations as if fully set forth herein and incorporates them herein by reference.

32.    Section 542(a) of the Bankruptcy Code provides, in relevant part:

[A]n entity, other than a custodian, in possession, custody, or

control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property. . . .

11 U.S.C. § 542(a).

33.     Section V(f) of the Loan Agreement and the Delaware Uniform Commercial Code require Vrai Nom to return to BlockFi International any Collateral in excess of the Obligations. *See* Loan Agreement at 15 § V(f); *see also* Del. Code Ann. tit. 6, § 9-615(d)(1) (West 2023) ("If the security interest under which a disposition is made secures payment or performance of an obligation, after making the payments and applications required by subsection (a) and permitted by subsection (c): (1) . . . the secured party shall account to and pay a debtor for any surplus.").

34.     As stated, the value of the Collateral as of May 30, 2023, inclusive of the proceeds of the Huobi Transaction, exceeded the outstanding balance of the Loan by approximately $5,988,782.86. The Transferred Collateral and the ETHW Collateral also constitute property of BlockFi International's estate. Thus, the Loan Agreement, the Delaware Uniform Commercial Code and the Bankruptcy Code all require Vrai Nom to turn over any Collateral exceeding the Obligations and the ETHW Collateral to BlockFi International.

35.     BlockFi International also seeks an award of pre- and post-judgment interest thereon from the date of demand to the date of turnover and the costs of this action. *See In re Pilate*, 488 B.R. 500, 502 (Bankr. D.D.C. 2013) ("It stands to reason that the trustee ought to be entitled to recover prejudgment interest from the date of the filing of the motion to compel turnover."); *In re Roti*, 271 B.R. 281, 292 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Nelmark v. Helms*, Case No. 02 C 0925, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003) ("It is within the Court's discretion whether to grant prejudgment interest [in a turnover action]."); *Monte Carlo Cruise Concessions, Inc. v. Lassman*, Case No. CIV.A.04-12215 DPW, 2005 WL 352858, at *5 (D. Mass.

Feb. 8, 2005) (same); *In re Patton*, 200 B.R. 172, 177 (Bankr. N.D. Ohio 1996) (same).

36.    If the Court determines that Vrai Nom is a custodian for purposes of the turnover

claims asserted herein, section 543 of the Bankruptcy Code entitles BlockFi International to

turnover of the Transferred Collateral and the ETHW Collateral, together with an award of pre-

and post-judgment interest thereon from the date of demand to the date of turnover and the costs

of this action. *See* 11 U.S.C. § 543(b)(1) (requiring a custodian to "deliver to the trustee any

property of the debtor held by or transferred to such custodian, or proceeds, product, offspring,

rents, or profits of such property, that is in such custodian's possession, custody, or control on the

date that such custodian acquires knowledge of the commencement of the case.").

**COUNT THREE**
**Avoidance of Post-Petition Transfers Pursuant to 11 U.S.C. § 549**

37.    BlockFi International restates and realleges all foregoing and subsequent factual

allegations as if fully set forth herein and incorporates them herein by reference.

38.    Vrai Nom sold or otherwise transferred the Transferred Collateral on a post-petition

basis on account of Obligations that arose before the Petition Date and without an order of this

Court modifying the automatic stay to permit such transfer or otherwise authorizing such transfer.

Neither the Bankruptcy Code nor order of this Court authorized Vrai Nom's post-petition transfer

of the Transferred Collateral. *See* 11 U.S.C. § 549(a) ("[T]he trustee may avoid a transfer of

property of the estate—(1) that occurs after the commencement of the case; and (2) . . . (B) that is

not authorized under this title or by the court.").

39.    BlockFi International requests entry of an order avoiding Vrai Nom's post-petition

transfer of the Transferred Collateral and recovering the Transferred Collateral or the value thereof

for the benefit of BlockFi International's bankruptcy estate.

**COUNT FOUR**
**Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)**

40.      BlockFi International restates and realleges all foregoing and subsequent factual

allegations as if fully set forth herein and incorporates them herein by reference.

41.      As further set forth herein, section 549 of the Bankruptcy Code allows BlockFi

International to avoid Vrai Nom's transfer of the Transferred Collateral.

42.      Vrai Nom is the initial transferee of such transfer, or the person for whose benefit

the transfers were made.

43.      Section 550(a) of the Bankruptcy Code permits BlockFi International to recover

from Vrai Nom or any subsequent transferees of the initial transferee the Transferred Collateral

itself or the value of the Transferred Collateral at the time of recovery. *See id.* § 550(a) ("[T]o the

extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for

the benefit of the estate, the property transferred, or, if the court so orders, the value of such

property, from—(1) the initial transferee of such transfer or the entity for whose benefit such

transfer was made; or (2) any immediate or mediate transferee of such initial transferee."); *see also*

*In re Am. Way Serv. Corp.*, 229 B.R. 496, 531 (Bankr. S.D. Fla. 1999) ("[W]hen the property has

appreciated, the trustee is entitled to recover the property itself, or the value of the property ***at the***

***time of judgment*. . . .**") (emphasis supplied); *accord In re Zohar III, Corp.*, 631 B.R. 133, 185

(Bankr. D. Del. 2021) (citing *In re Am. Way Serv. Corp.*, 229 B.R. at 531–32).

44.      In addition to recovery of the Transferred Collateral or its value at the time of

judgment, BlockFi International requests an award of interest thereon to the date of recovery or

payment, plus all costs and expenses incurred in connection with this action. *See, e.g.*, *In re Mall*

*at Galaxy, Inc.*, Case No. 10-12435 (VFP), 2022 WL 1299088, at *25 (Bankr. D.N.J. Apr. 29,

2022), *aff'd sub nom. In re Mall at the Galaxy*, Case No. CV 22-2859, 2023 WL 2966785 (D.N.J.

Apr. 17, 2023) (observing "[c]ourts cite 11 U.S.C. § 550(a), which requires the return to the estate of 'the value of such property' transferred and subsequently recovered in the avoidance action, as statutory authority for awarding prejudgment interest" in awarding prejudgment and post-judgment interest at the rate set forth in 28 U.S.C. § 1961).

**COUNT FIVE**
**Disallowance of Claims Pursuant to 11 U.S.C. § 502(b) and (d)**

45.    BlockFi International restates and realleges all foregoing and subsequent factual allegations as if fully set forth herein and incorporates them herein by reference.

46.    For the reasons set forth herein, pursuant to section 502(b) of the Bankruptcy Code, the Court should permanently disallow Vrai Nom's claims based on the Loan or the Loan Agreement, including without limitation the Vrai Nom Claim. In the alternative, pursuant to section 502(d) of the Bankruptcy Code, the Court should temporarily disallow any claims based on the Loan or the Loan Agreement, including without limitation the Vrai Nom Claim, unless and until such time as the claimant turns over the Transferred Collateral and the ETHW Collateral to BlockFi International as required by the Bankruptcy Code. *See* 11 U.S.C. § 502(d) ("[T]he court **shall** disallow any claim of any entity from which property is recoverable under section 542, 543 [or] 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 549 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property. . . .") (emphasis supplied); *see also In re KB Toys Inc.*, 736 F.3d 247, 251–52 (3d Cir. 2013) (holding that any claim of an entity that received an avoidable transfer "is disallowable until the avoidable transfer is returned. Because the statute focuses on claims—and not claimants—claims that are disallowable under § 502(d) must be disallowed no matter who holds them.").

**COUNT SIX**
**Damages and Sanctions**

47.     BlockFi International restates and realleges all foregoing and subsequent factual

allegations as if fully set forth herein and incorporates them herein by reference.

48.     As set forth in the preceding allegations, Vrai Nom's violation of the automatic stay

and the ensuing harm to BlockFi International's estate was knowing, willful, and intentional.

49.     Section 362(k) of the Bankruptcy Code entitles BlockFi International to all of its

actual damages in an amount to be proven in an evidentiary proceeding before this Court, as well

as any punitive damages and sanctions as BlockFi International proves to be appropriate.

**COUNT SEVEN**
**Attorneys' Fees and Costs**

50.     BlockFi International restates and realleges all foregoing and subsequent factual

allegations as if fully set forth herein and incorporates them herein by reference.

51.     Vrai Nom's actions and omissions, including Vrai Nom's exercise of remedies

against and post-petition transfer of property of the BlockFi International estate, have forced

BlockFi International to retain the undersigned legal counsel to prosecute this action.

52.     Section XIII of the Loan Agreement entitles BlockFi International to recover its

reasonable attorneys' fees, expenses and costs incurred in connection with the filing and

prosecution of the claims outlined in this Complaint:

> Costs. The defaulting party shall promptly pay to the non-defaulting
> party, upon demand, all costs, expenses, commissions or other fees,
> including without limitation, attorneys' fees and court costs,
> incurred by the non-defaulting party in connection with the
> enforcement of its rights hereunder and the other Loan Documents
> after an Event of Default.

Loan Agreement § XIII. Under Delaware contract law, courts defer to contractual fee- and cost-

shifting provisions. *See, e.g.*, *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, Case

No. CIV.A. 2742-VCN, 2009 WL 458779, at *8 (Del. Ch. Feb. 23, 2009) ("[W]here the parties have determined the allocation of fees by private ordering . . . deference to their agreement [is] warranted."); *AHS N.M. Holdings, Inc. v. Healthsource, Inc.*, 2007 WL 431051, at *9 (Del. Ch. Feb. 2, 2007) ("Delaware courts routinely enforce contract provisions allocating costs of legal actions . . . .").

53.     The foregoing facts entitle BlockFi International to a judgment in the amount of its reasonable attorneys' fees, expenses and costs with such amounts to be determined at trial.

## RESERVATION OF RIGHTS

54.     BlockFi International reserves all rights and remedies available with respect to its interests and rights under the Loan Agreement and under applicable law. BlockFi International further reserves the right to amend this Complaint to add or remove parties and causes of action to the extent necessary and in light of the information that becomes available, in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court, or other applicable law. The filing of this Complaint does not constitute a waiver of any rights or claims available to BlockFi International.

## PRAYER FOR RELIEF

**WHEREFORE** BlockFi International respectfully prays that this Court award it the following relief in its favor against Vrai Nom:

A.     Entry of an order and judgment pursuant to Bankruptcy Rules 7001(1) and (9) and 28 U.S.C. §§ 2201–2202, the Declaratory Judgment Act, making the declarations identified and requested in this Complaint;

B.     Entry of an order sustaining BlockFi International's objection to Vrai Nom's claims and permanently or temporarily disallowing, as appropriate, all such claims belonging to Vrai

Nom, including those set forth in the Proof of Claim;

C.    Entry of an order mandating immediate turnover of the Transferred Collateral and the ETHW Collateral to BlockFi International or, in the alternative, immediate payment of compensatory damages, including without limitation actual damages of not less than $5,988,782.86;

D.    Prejudgment and post-judgment interest at the highest rate allowed by contract or as is otherwise appropriate under applicable law;

E.    All reasonable and necessary attorneys' fees, expenses, and costs, including court costs and attorneys' fees for all post-verdict proceedings and appeals; and

F.    All such other relief to which BlockFi International may be entitled.

*[Remainder of page intentionally left blank.]*

Dated: July 10, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
(201) 489-1536 Facsimile
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Matthew T. Ferris, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
matt.ferris@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

# **<u>EXHIBIT A</u>**

Loan Agreement

*Strictly Private & Confidential*
*Execution Version*

## <u>MASTER DIGITAL CURRENCY LOAN AGREEMENT</u>

Dated as of <u>7th of June</u>, 2022, between **BlockFi International Ltd.**, an exempted company organized and existing under Bermuda law ("<u>Borrower</u>") and **Vrai Nom Investment Limited**, a company organized and existing under Hong Kong law ("<u>Lender</u>", and Borrower and Lender, each a "<u>party</u>" and together, the "<u>parties</u>").

## R E C I T A L S:

**WHEREAS**, subject to the terms and conditions of this Master Digital Currency Loan Agreement (this "<u>Agreement</u>"), Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend certain Digital Currency, Dollars or Alternative Currency (each as defined herein) to Borrower and Borrower will return such Digital Currency or repay such Dollars or Alternative Currency to Lender upon the termination of the Loan pursuant to the terms and conditions in this Agreement or as otherwise set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and Lender hereby agree as follows:

**I.**    **<u>Definitions</u>.**  For purposes of this Agreement, the following terms shall have the respective meanings set forth in this <u>Section I</u>.  References to any agreements or documents herein shall mean such agreements or documents as amended, restated, amended and restated, modified and/or otherwise supplemented from time to time in accordance with the terms hereof.

"***Account Control Agreement (Digital Currency)***" means any Account Control Agreement, dated on or after the date hereof, by and among Borrower, Lender and a custodian to be mutually agreed between Borrower and Lender (the "Custodian"), that provides for Lender to have control of the applicable Digital Currency.".

"***Accrued Borrowed Amount***" means, at any time, for a Loan, the Borrowed Amount, together with accrued and unpaid interest thereon and accrued and unpaid fees thereon, to such time.

"***Additional Collateral***" has the meaning set forth in <u>Section V(b)</u>.

"***Airdrop***" means a distribution of a new token or tokens resulting from the ownership of a preexisting token.

"***Alternative Currency***" means fiat currency other than Dollars.

"***Applicable Law***" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws (including common law), ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, decrees, injunctions, or judgments and (ii) ruling, declaration, regulation, requirement, or interpretation issued by any regulatory, judicial, administrative or governmental body or person that, in either case, are applicable to or binding on any person or

DocuSign Envelope ID: 450BEF89-162E-4A6D-BACB-0D9085390741

entity or any of its property or assets or to which such entity or person or any of its property or assets is subject.

"*Authorized Agent*" has the meaning set forth in <u>Exhibit A</u>.

"*Borrow Rate*" has the meaning set forth in the Loan Term Sheet.

"*Borrowed Amount*" has the meaning set forth in <u>Section II(b)</u>.

"*Borrower*" has the meaning set forth in the introductory paragraph of this Agreement.

"*Business Day*" means any day other than a Saturday or Sunday on which commercial banks are open for business in New York City, United States.

"*Calculation Agent*" means BlockFi International, Ltd., an exempted company organized and existing under Bermuda law.

"*Callable Option*" means the option of Lender to recall a portion or the entirety of the Borrowed Amounts during the term of the Loan, subject to the terms of this Agreement.

"*Change in Law*" means that, on or after the Effective Date (a) due to the adoption of or change in any Applicable Law or any regulation or (b) due to the promulgation or announcement of or any change in the interpretation by any Governmental Authority, Calculation Agent determines in good faith that (X) (i) it has become illegal to maintain or extend a Loan, receive repayment or delivery of Borrowed Amounts or hold and remain secured by Collateral or (ii) the ability to Transfer any Borrowed Amounts or Collateral has become materially impaired or (Y) there is an increased risk that it will become subject to regulations to which it is not already subject, whether due to Digital Currency being classified or interpreted as "securities" under the Securities Act or Exchange Act, or otherwise.

"*Code*" means the Internal Revenue Code of 1986 as amended.

"*Coinbase*" means the Coinbase Pro platform, or any successor platform thereto (acceptable to the parties), that acts as an exchange for professional trading of digital currencies operated by Coinbase Inc. (or an affiliate) or any successor thereto.

"*Collateral*" has the meaning set forth in <u>Section V(a)</u>.

"*Custodian*" has the meaning set forth in the definition of "Account Control Agreement".

"*Default Rate*" has the meaning set forth in <u>Section III(b)</u>.

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), any New Currency and any digital currency that the Borrower and Lender agree upon.

"***Digital Currency Address***" means an identifier of 26-34 alphanumeric characters (or such other market-standard identifier) that represents a possible destination for a Transfer of Digital Currency.

"***Digital Currency Collateral Account***" means the account subject to the Account Control Agreement (Digital Currency).

"***Dollars***" and "***$***" mean lawful currency of the United States of America.

"***Effective Date***" has the meaning set forth in <u>Section X</u>.

"***Eligible Compatibility***" means a New Currency that is transferable by the parties and supported by recognized custodians that regularly custody digital assets for customers within 30 days of the applicable Hard Fork, as determined by Calculation Agent.

"***Eligible Hash Power***" means the average hash power mining the New Currency equals or exceeds 5% of the hash power mining the relevant Digital Currency on the 30th day following the applicable Hard Fork, as determined by Calculation Agent.

"***Eligible Market Capitalization***" means a New Currency that has a market capitalization that equals or exceeds 5% of the market capitalization of the relevant Digital Currency on the 30th day following the applicable Hard Fork, as determined by Calculation Agent.

"***Eligible New Currency***" means a New Currency that (a) has (i) Eligible Hash Power, (ii) Eligible Market Capitalization, (iii) Eligible Volume and (iv) Eligible Compatibility or (b) that Lender and Borrower agree in writing is an Eligible New Currency.

"***Eligible Volume***" means a New Currency that has an average 24-hour volume that equals or exceeds 1% of the 24-hour volume of the relevant Digital Currency on the 30th day following the applicable Hard Fork, as determined by Calculation Agent.

"***Event of Default***" has the meaning set forth in <u>Section XI</u>.

"***Exchange Act***" means the United States Securities Exchange Act of 1934, as amended.

"***Excluded Taxes***" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower under this Agreement, any of the following Taxes imposed on or measured by or required to be withheld or deducted from a payment to the Lender or any other recipient (a) Taxes imposed on or measured by its overall net income, overall gross income or overall gross receipts (however denominated), branch profits Taxes, franchise taxes imposed on it (in lieu of net income taxes) or capital taxes, in each case, by the applicable jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which it is resident for tax purposes or in which its principal office is located or imposed as a result of a present or former connection between the Lender or such recipient and the jurisdiction imposing such Tax (other than connections arising from the Lender or such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document), (b) withholding Taxes imposed on amounts payable to or for the account of the Lender or any

other recipient with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which the Lender or such recipient acquires such interest in the Loan, (c) Taxes attributable to the Lender or such recipient's failure to comply with <u>Section IV(d)</u> and (d) any withholding Taxes imposed under FATCA.

"***FATCA***" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"***Gemini***" means the Gemini platform that acts as an exchange for trading digital currencies operated by Gemini Trust Company, LLC (or an affiliate) or any successor thereto.

"***Governmental Authority***" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"***Hard Fork***" means a permanent divergence in the relevant Digital Currency blockchain, that for example commonly occurs when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules or an Airdrop or any other event which results in the creation of a new token.

"***Indemnified Taxes***" means Taxes other than Excluded Taxes.

"***Information***" has the meaning set forth in <u>Section XXV</u>.

"***Initial Margin Level***" has the meaning set forth in <u>Section V(a)</u>.

"***Initial Margin Percentage***" has the meaning set forth in the Loan Term Sheet.

"***Invoice Due Date***" has the meaning set forth in <u>Section III(c)</u>.

"***Lender***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Lending Request***" has the meaning set forth in <u>Section II(b)</u>.

"***Liquidity Exchange***" means Coinbase, but if for any reason Coinbase is not readily available (whether due to technical maintenance or otherwise), "Liquidity Exchange" shall mean Gemini or any other exchange as may be mutually agreed in writing between Borrower and Lender.

"***Loan***" means a loan of Digital Currency, Dollars or an Alternative Currency made pursuant to and subject to this Agreement.

"***Loan Documents***" shall collectively mean this Agreement, all Loan Term Sheets, all exhibits and schedules hereto and thereto, the Account Control Agreement (Digital Currency), and any other document jointly identified by the Lender and Borrower as a "Loan Document."

"*Loan Term Sheet*" has the meaning set forth in <u>Section II(b)</u>.

"*Margin Call Threshold Amount*" means, with respect to any Loan as of any date, the amount obtained by multiplying the Margin Requirement Percentage by the Accrued Borrowed Amount for such Loan as of such date.

"*Margin Notification*" has the meaning set forth in <u>Section V(b)</u>.

"*Margin Release Threshold Amount*" means, with respect to any Loan as of any date the amount obtained by multiplying the Release Margin Percentage by the Accrued Borrowed Amount for such Loan as of such date.

"*Margin Requirement Percentage*" has the meaning set forth in the Loan Term Sheet.

"*Material Adverse Effect*" means a material adverse effect on (a) the business, assets, liabilities, prospects or financial condition of a party, (b) the ability of a party to perform any of its Obligations under the Loan Documents, (c) the Lender's liens on the Collateral or the priority of such liens (including the resignation or notice of resignation of any applicable securities intermediary), or (d) the rights of or benefits available to a party under the Loan Documents.

"*Maturity Date*" means, with respect to a Loan, the pre-determined specified maturity date in the relevant Loan Term Sheet, if any, upon which such Loan will terminate and the Loan becomes due in full (as may be extended as agreed to by the parties), unless such Loan is terminated prior to such maturity date pursuant to <u>Section II(d)</u>.

"*Minimum Transfer Amount*" means $100,000.

"*New Currency*" means, any incremental tokens generated as a result of any Hard Forks in the relevant Digital Currency protocol with respect to the Digital Currency; *provided* that, when applicable, the determination of whether a Hard Fork has occurred may be made by Calculation Agent by reference to the CME CF Cryptocurrency Indices Hard Fork Policy (Version 4) as published by the CME Group in May 2020, as amended from time to time.

"*Obligations*" means all debts, liabilities, obligations, covenants, indemnifications, interest and fees, including the Total Accrued Loaned Amount, created hereunder or under the other Loan Documents, whether arising before or after the commencement of any bankruptcy or insolvency proceeding.

"*party*" and "*parties*" have the meaning set forth in the introductory paragraph of this Agreement.

"*Prepayment Option*" means the option of Borrower to redeliver or repay to Lender prior to the applicable Maturity Date the Digital Currency, Dollars or Alternative Currency, as applicable, subject to the terms of this Agreement.

"*Proceeds*" has the meaning assigned to such term in the UCC.

"*Recall Delivery Time*" has the meaning set forth in <u>Section II(c)</u>.

"***Redelivery Day***" has the meaning set forth in <u>Section II(c)</u>.

"***Release Margin Percentage***" has the meaning set forth in the Loan Term Sheet.

"***Required Collateral Amount***" means, with respect to any Loan as of any date, the amount obtained by multiplying the Initial Margin Percentage by the Accrued Borrowed Amount for such Loan as of such date.

"***Returned Collateral***" has the meaning set forth in <u>Section V(d)</u>.

"***Sanctions***" has the meaning set forth in <u>Section VII(a)</u>.

"***Securities Act***" means the United States Securities Act of 1933, as amended.

"***Stablecoin***" means any cryptocurrency pegged to the US Dollar, including, but not limited to the Gemini Dollar (GUSD), USD Coin (USDC) and Paxos Standard (PAX).

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees, including stamp taxes, registration fees, documentation or other excise or property taxes, or similar taxes, or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"***Term***" has the meaning set forth in <u>Section XXIII</u>.

"***Total Accrued Loaned Amount***" means, at any time, the Total Loaned Amount, together with accrued and unpaid interest thereon and accrued and unpaid fees thereon, to such time.

"***Total Loaned Amount***" means, at any time, the aggregate outstanding Borrowed Amount for all Loans.

"***Transfer***" means the delivery of Digital Currency, Dollars or Alternative Currency by Lender to the Borrower or the redelivery of Digital Currency, Dollars or Alternative Currency by Borrower to Lender hereunder.  With respect to Digital Currency, a Transfer shall be deemed to occur once such Digital Currency is transferred to the applicable Digital Currency Address by (i) recording such transaction in a block and five (5) consecutive subsequent blocks referring back to such block (meaning, for the avoidance of doubt, six (6) blocks in total) and has been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties in writing.  With respect to Dollars or an Alternative Currency, it shall mean when such funds have been deposited in the applicable bank account.

"***UCC***" shall mean the Uniform Commercial Code as from time to time in effect in the State of Delaware.

"***U.S. Person***" means any Person that is a "***United States Person***" as defined in Section 7701(a)(30) of the Code.

"***Value***" means, with respect to (i) Dollars, the actual Dollar amount thereof and (ii) Digital Currency, Alternative Currency or Stablecoins, the value of such Digital Currency, Alternative

DocuSign Envelope ID: 450BFF8D-162B-4A6D-BACB-0D9985390741

Currency or Stablecoin, as applicable, as determined by Calculation Agent in good faith and in its sole discretion by reference to the Liquidity Exchange, if applicable, or to other generally recognized pricing sources for the Digital Currency, Alternative Currency or Stablecoin, as applicable.

## II.    General Operation.

(a)    Loans of Digital Currency, Dollars or Alternative Currency.  Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request Lender to Loan to Borrower a specified amount of Digital Currency, Dollars or Alternative Currency, and Lender may, in its sole and absolute discretion, extend, or decline to extend, such Loan in accordance with the terms of this Agreement.

(b)    Loan Procedure.  During the Term of this Agreement, on a Business Day an Authorized Agent of Borrower may request from Lender (by email directed to the email address indicated in Section XVI, or by any other means acceptable to Lender) a Loan of a specific amount of Digital Currency, Dollars or Alternative Currency in accordance with the terms of this Section II(b) (a "Lending Request").

Each Lending Request submitted by Borrower shall provide relevant information for the Loan request, which may include the following information:

(i)    The type of Loan (either Digital Currency, Dollars or an Alternative Currency) requested, and, if Digital Currency or an Alternative Currency, specifying the Digital Currency or Alternative Currency, as applicable;

(ii)    the amount of Digital Currency, Dollars or Alternative Currency requested;

(iii)    whether the Loan shall have a Callable Option and/or Prepayment Option;

(iv)    the proposed Borrow Rate for such Loan;

(v)    the Maturity Date;

(vi)    the type or types of Collateral and amounts thereof, as applicable, proposed to be pledged; and

(vii)    the proposed Initial Margin Percentage, Margin Requirement Percentage and Release Margin Percentage, as applicable.

If Lender agrees to make a Loan on the terms set forth in the Lending Request or as otherwise agreed in writing between Borrower and Lender, the Lender and Borrower shall execute a term sheet using the form of Loan Term Sheet attached hereto as Exhibit B (with respect to a particular Loan, such term sheet, the "Loan Term Sheet").  Following delivery of such Loan Term Sheet, if Borrower does not execute the applicable Loan Term Sheet by 5:00 p.m. New York City time on the day on which the relevant Loan Term Sheet was delivered, Borrower shall be deemed

to have rejected the terms in the Loan Term Sheet. Promptly after execution of the applicable Loan Term Sheet, the Lender shall commence transmission to the Borrower's Digital Currency Address or bank account, as applicable, the amount of Digital Currency, Dollars or Alternative Currency, as applicable, set forth in the Loan Term Sheet (such amount of Digital Currency, Dollars or Alternative Currency, the "Borrowed Amount") subject to the terms and conditions set forth herein.

Until the parties have agreed (or have been deemed to agree) to the terms in a Loan Term Sheet, neither party shall have any obligations to the other with respect to such particular Loan. In the event of a conflict of terms between this Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

If Borrower and Lender agree in writing, with respect to any Borrowed Amount in Dollars, Borrower may satisfy any repayment or redelivery obligations via delivery of the agreed type and quantity of Stablecoins in lieu of Dollars.

(c)    Callable Option/Prepayment Option.

(i)    Applicable solely to Loans with a Callable Option, Lender may at any time from 9:00 a.m. until 5:00 p.m. New York City time on a Business Day (the "Recall Request Time") exercise the Callable Option and recall all or any portion of the Borrowed Amount (the "Recall Amount"). Borrower will then deliver the Recall Amount (i) with respect to any Borrowed Amount that is a Digital Currency, within twenty-four (24) hours from the Recall Request Time and (ii) with respect to any Borrowed Amount that is Dollars or an Alternative Currency, within one (1) Business Day from the Recall Request Time (such time in (i) or (ii), the "Recall Delivery Time") .

(ii)    Applicable solely to Loans with a Prepayment Option, Borrower may at any time from 9:00 a.m. until 5:00 p.m. New York City time on a Business Day (the "Redelivery Day") exercise the Prepayment Option and deliver or prepay all or any portion of the Borrowed Amount (the "Prepaid Amount"). Upon receipt of such Prepaid Amount, Lender will promptly notify Borrower of any interest that has accrued on the Prepaid Amount through such Redelivery Day, and Borrower shall have up to five (5) Business Days to pay such accrued amounts after the Redelivery Day (which due date will be deemed to be an "Invoice Due Date" for purposes of Section III(c)).

(d)    Termination of a Loan. A Loan will terminate upon the earliest of:

(i)    The Maturity Date applicable to such Loan;

(ii)    With respect to a Loan with a Prepayment Option or Callable Option, upon redelivery or prepayment by Borrower of all Borrowed Amounts such that no such Borrowed Amount in respect thereof remains undelivered;

(iii)    At the end of the Term as set forth in Section XXIII; and

(iv)    Upon the exercise of remedies pursuant to Section XI.

(e)    <u>Redelivery of Borrowed Amounts</u>.  In connection with any termination of a Loan pursuant to the terms of this Agreement, Borrower shall effect redelivery or repayment of the relevant Borrowed Amount at or before 5:00 p.m. New York City time on the applicable Business Day when due (i.e., the Maturity Date, the Business Day on which the Recall Delivery Time falls, the Redelivery Day, or any other date of termination).

(f)    <u>Return of Collateral</u>.  In connection with any termination of a Loan pursuant to the terms of this Agreement, Lender shall either return the Collateral or request that the Custodian return the Collateral, as applicable, at or before 5:00 p.m. New York City time on the applicable Business Day when due (i.e. the Maturity Date, the Business Day on which the Recall Delivery Time falls, the Redelivery Day, or any other date of termination).

(g)    <u>Acts by Governmental Authorities and Changes in Applicable Laws</u>.  If a Change in Law occurs, (i) Lender may recall all or any portion of the Borrowed Amount and Borrower shall redeliver or repay such Borrowed Amount (including any accrued but unpaid interest and fees with respect to such amount) within ten (10) Business Days following notice of such recall by Lender, and (ii) Borrower may notify Lender and redeliver or repay the Borrowed Amount (including any accrued but unpaid interest and fees with respect to such amount) and Lender shall return the Collateral on the Business Day following notice of such repayment by Borrower; *provided that*, in each case, if it is not legally permissible and/or possible after such Change in Law to redeliver or repay the Borrowed Amount in the applicable Digital Currency or return the Collateral, the Borrower shall repay, or the Lender shall return, as the case may be, an equivalent amount in Dollars, as determined by Calculation Agent in good faith.

**III.    <u>Interest.</u>**

(a)    <u>Calculation</u>.  When a Loan is executed, the Borrowed Amount shall accrue interest at a rate per annum equal to the Borrow Rate, and such interest will be payable in accordance with subsection (c) below.  The total amount of interest due on the dates set forth in subsection (c) shall be computed by the Lender, calculated daily on the basis of actual days elapsed and a year of 365 days.  The Borrow Rate is subject to change only if agreed to in writing (email sufficient) by Borrower and Lender.

Interest shall be computed and payable in the Digital Currency, Dollars or Alternative Currency applicable to the Borrowed Amount for such Loan; *provided* that, Borrower and Lender may agree in writing (email sufficient) that interest may be paid in another Digital Currency, Dollars or Alternative Currency, or in lieu of Dollars, Stablecoin.

Lender shall promptly provide Borrower with the calculation of interest upon request.  Except as Borrower and Lender may otherwise agree, interest shall accrue from and include the date on which the relevant Digital Currency, Dollars or Alternative Currency is Transferred to Borrower to, but excluding, the date on which such Digital Currency, Dollars or Alternative Currency is redelivered or repaid and Transferred to Lender.

(b)    <u>Default Rate; Breakage Costs</u>.  If any amount is not paid or delivered by Borrower when due, whether at the Maturity Date, the Recall Delivery Time, or otherwise, such amount shall thereafter bear interest at the rate per annum equal to the Borrow Rate plus two

percent (2%) (the "Default Rate") from the date that such amount was due to but excluding the date that such amount is paid or delivered in full and be payable on demand (and in any event on the date such amount shall be paid or delivered in full); *provided, however* in no event shall the Default Rate be higher than the highest rate of interest permitted to be charged under Applicable Law.

(c)      Payment of Interest.  Interest shall be payable monthly in arrears.  An invoice for such interest shall be sent out on the first (1st) Business Day of each month prior to the Maturity Date and shall include the amount of interest incurred from the previous month. Borrower shall remit payment in full satisfaction of such invoice within five (5) Business Days after such invoice is sent to Borrower by Lender (such due date, the "Invoice Due Date").

(d)      Application of Payments.  Borrower shall, at the time of making each payment under this Agreement, specify to Lender the Loan to which such payment is to be applied. If an Event of Default has occurred and is continuing and the Borrower is the defaulting party, Lender may apply the payment in such manner as it may determine to be appropriate in its sole, reasonable discretion.

(e)      Non-Business Days.  If the due date of any payment or delivery or the Maturity Date of any Loan under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day, and the Borrow Rate shall accrue for the period of such extension.

IV.    **Taxes**.

(a)      Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower hereunder shall be made free and clear of and without reduction or withholding for any Taxes, except as required by Applicable Law; *provided* that if Borrower shall be required by Applicable Law to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions for Indemnified Taxes (including deductions for Indemnified Taxes applicable to additional sums payable under this Section) the Lender shall receive an amount equal to the sum it would have received had no such deductions for Indemnified Taxes been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)      Payment of Taxes by Borrower.  Without limiting the provisions of subsection (a) above, Borrower shall timely pay any stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution of or otherwise with respect to, any Loan Document, except any such Taxes that are imposed with respect to an assignment, if required and in accordance with Applicable Law.

(c)      Indemnification by Borrower.  Borrower shall indemnify the Lender for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section IV(c)) attributable to Borrower under this Agreement and paid by the Lender, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority against Lender. A certificate

delivered to Borrower by Lender as to the amount of such payment or liability actually paid by Lender to the relevant Governmental Authority shall be conclusive and binding absent manifest error.

(d)    <u>Indemnification by Lender</u>.    Lender shall indemnify Borrower, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender's failure to comply with the provisions of Section XIX relating to the maintenance of a Register and (ii) any Excluded Taxes attributable to Lender, in each case, that are payable or paid by Borrower in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(e)    <u>Status of Lender</u>.

(i)    If Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document, it shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrower as will enable Borrower to determine whether or not Lender is subject to backup withholding or information reporting requirements.

(ii)    Without limiting the generality of the foregoing,

(1)    if Lender is a U.S. Person, it shall deliver to Borrower on or about the Effective Date (or on the date of any assignment pursuant to which it becomes the Lender) (and from time to time thereafter upon the reasonable request of Borrower), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(2)    to the extent such Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate in form and substance acceptable to Borrower, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable;

(3)    if Lender is not a U.S. Person it shall, to the extent it is legally entitled to do so, deliver to Borrower on or about the Effective Date (or on the date of any assignment pursuant to which it becomes the Lender) (and from time to time thereafter upon the reasonable request of Borrower), executed copies of any form prescribed by Applicable Law (including, as applicable, an IRS Form W-8BEN, Form W-8ECI, Form W-8IMY, or in

the case of such Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code appropriate compliance certificates reasonably acceptable to Borrower) as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Borrower to determine the withholding or deduction required to be made; and

(4)     if a payment made to Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (4), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.

(f)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

DocuSign Envelope ID: 450BEF8D-162B-4A6D-BACB-0D9085390741

(g)    <u>Tax Reporting</u>.  Borrower and Lender shall file all returns and tax reports, if and/or as required under Applicable Law.

## V.    <u>Collateral; Margin</u>.

(a)    <u>Collateral</u>.

(i)    Borrower shall provide as collateral an amount of Digital Currency, Dollars or Alternative Currency to be determined (the "<u>Collateral</u>", which shall include any Additional Collateral and excluding any Returned Collateral as defined below) in accordance with the terms of this <u>Section V</u> and any other such terms as agreed upon by the Borrower and Lender and memorialized in a Loan Term Sheet.  Initially, the amount of Collateral required for each Loan will be greater than or equal to the product of (i) the Initial Margin Percentage as agreed upon in the Loan Term Sheet and (ii) the Borrowed Amount (such level, the "<u>Initial Margin Level</u>").  The Value of Collateral shall be calculated in Dollars by the Calculation Agent acting in good faith.

(ii)    The Collateral transferred by Borrower to Lender shall be security for all of Borrower's Obligations hereunder and under the other Loan Documents.  Borrower hereby pledges, collaterally assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, and right of setoff against, all of Borrower's right, title and interest in the Collateral and any Proceeds of any of the Collateral, whether now owned by or owing to, or hereafter acquired by or arising in favor of, Borrower, or in which Borrower has, or at any time in the future may acquire, any right, title, or interest, which shall attach upon the Transfer of the Borrowed Amount by Lender to Borrower.

(iii)    The pledge, assignment and security interest created by this paragraph shall constitute a continuing agreement and shall continue in effect until the Obligations (other than contingent indemnification obligations for which no claim has been asserted or accrued) have been paid and satisfied in full, at which time the Collateral shall automatically be released from the liens created hereunder and shall revert to the Borrower.  Upon any such payment and satisfaction, the Lender will, at its own expense and without any representations, warranties or recourse of any kind whatsoever, execute and deliver to Borrower such documents as Borrower shall reasonably request to evidence such release.

(iv)    In addition to the rights and remedies given to Lender hereunder and the other Loan Documents, Lender shall have all the rights and remedies of a secured party under Applicable Law (including the UCC).  Lender shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral, unless otherwise specified on the applicable Loan Term Sheet.

(b)    <u>Margin Calls</u>.

(i)    If, at any time, the Value of the Collateral subject to all Loans is less than the aggregate Margin Call Threshold Amount, Lender shall have the right, subject to the Minimum Transfer Amount, to require Borrower to (x) pledge and deliver Dollars or Stablecoins, or additional Digital Currencies ("<u>Additional Collateral</u>") or (y) at Borrower's option, repay a sufficient Borrowed Amount so that the Value of the Collateral subject to

13

all Loans (including the Additional Collateral) will thereupon equal or exceed the aggregate Required Collateral Amount. If Borrower is required to pledge and deliver Additional Collateral, Borrower shall provide Lender with calculations related thereto.

(ii)    If Lender requires Borrower to contribute Additional Collateral, it shall send notification (the "Margin Notification") to the Borrower in accordance with Section XVI that sets forth the amount of Additional Collateral required. Borrower shall deliver the Additional Collateral to Lender in accordance with subsection (c) below (i) with respect to Additional Collateral that is a Digital Currency, within twenty-four (24) hours of receipt of the Margin Notification or (ii) with respect to Additional Collateral that is in Dollars or an Alternative Currency, within one (1) Business Day of receipt of the Margin Notification, or as otherwise agreed by the parties. Notwithstanding the foregoing, Borrower shall have twelve (12) hours after the receipt of Margin Notification to provide its own calculations to Lender to support a determination that the Value of the Collateral subject to all Loans is not less than the aggregate Margin Call Threshold Amount. If (x) Lender agrees in writing with Borrower's calculations pursuant to the prior sentence, the relevant Margin Notification shall be deemed withdrawn and (y) if Lender disagrees in writing with Borrower's calculations pursuant to the prior sentence, such Margin Notification shall remain in effect.

(c)    Delivery of Additional Collateral. Delivery of Additional Collateral shall be made (i) in the case of Dollars or Alternative Currency, by bank wire to the account specified in the Loan Term Sheet and (ii) in the case of Stablecoins or Digital Currency, by Transfer to the Digital Currency Address associated with the Digital Currency Collateral Account, as specified in the Loan Term Sheet or as otherwise specified by Lender.

(d)    Return of Collateral.

(i)    If, at any time, the Value of the Collateral subject to all Loans exceeds the aggregate Margin Release Threshold Amount, Borrower shall have the right, subject to the Minimum Transfer Amount, to require that Lender return an amount of Collateral, so that the Value of the Collateral subject to all Loans (after deduction of any such Collateral so returned, such Collateral, the "Returned Collateral") will thereupon not exceed the aggregate Required Collateral Amount.

(ii)    If Borrower requires Lender to return any Returned Collateral, it shall send an email notification (the "Return Notification") to the Lender at the email address indicated in Section XVI that sets forth the amount of Returned Collateral. Lender shall return the Returned Collateral to Borrower in accordance with subsection (e) below (i) with respect to Returned Collateral that is a Digital Currency, within twenty-four hours of receipt of the Return Notification or (ii) with respect to Returned Collateral that is in Dollars or an Alternative Currency, within one (1) Business Day of receipt of the Return Notification, or as otherwise agreed by the parties.

(e)    Delivery of Returned Collateral. Delivery of the Returned Collateral shall be made (i) in the case of Dollars or Alternative Currency, by bank wire to the account specified

14

DocuSign Envelope ID: 450BEF8D-162E-4A6D-BACB-0D9985399741

in the Return Notification and (ii) in the case of Stablecoins or Digital Currency, by Transfer to the Digital Currency Address specified in the Return Notification.

(f)      Return of Collateral.   After all the Obligations (other than contingent indemnification obligations for which no claim has been asserted or accrued) have been paid and satisfied in full, Lender shall return the Collateral to Borrower (i) in the case of Dollars or Alternative Currency, by bank wire to the account specified by Borrower and (ii) in the case of Stablecoins or Digital Currency, by Transfer to the Digital Currency Address specified by Borrower.

## VI.   New Currency.

(a)      Notification.   Lender shall be required to provide notification to Borrower of an upcoming Hard Fork in the Digital Currency of any Borrowed Amounts.

(b)      No Immediate Termination of Loans Due to Hard Fork.   In the event of a Hard Fork, the terms set forth on a Loan Term Sheet for any outstanding Loans will not be affected and the Loans will not be immediately terminated as a result of the Hard Fork.

(c)      Obligation to Deliver Eligible New Currency.   On the Maturity Date or other date of termination of a Loan pursuant to the terms of this Agreement, notwithstanding anything to the contrary in the Agreement, (i) Borrower will deliver to Lender any Eligible New Currency in respect of any Borrowed Amounts during the term of such Loan, and (ii) Lender will deliver to Borrower any Eligible New Currency in respect of any Collateral (subject to the obligation to return Collateral set forth in Section V) not yet returned to Borrower during the term of such Loan.   The amount of such Eligible New Currency will be the amount of such Eligible New Currency to which a holder of the applicable Digital Currency would be entitled in connection with such Hard Fork based on the Borrowed Amount or Collateral not yet returned, as applicable, in connection with such Hard Fork, as determined by Calculation Agent in good faith.

## VII.   Representations and Warranties.

(a)      Each party represents and warrants on the date hereof (which representation and warranties will be deemed repeated on the date of execution of each Loan Term Sheet) that:

(i)      It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant to such laws, in good standing.

(ii)      It has the power to execute this Agreement, and to the extent required to be executed, each other Loan Document, to deliver this Agreement and each other Loan Document that is required to be delivered and to perform its Obligations hereunder and under each other Loan Document.

(iii)      The execution, delivery and performance of this Agreement and, if applicable, each other Loan Document does not contravene (1) its constituent documents,

(2) any Applicable Law, (3) any judgment, award, injunction or similar legal restriction binding on it or its property, or (4) any material agreement to which such party is a party.

(iv)    This Agreement and each other Loan Document have been duly and validly authorized, and, to the extent required to be executed, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of such party enforceable against the party in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(v)    No license, consent, authorization or approval or other action by, or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for the due execution, delivery and performance by such party of this Agreement and, if applicable, each other Loan Document.

(vi)    It has not relied on the other for any tax or accounting advice concerning this Agreement or any Loan Document and it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received or to be received hereunder.

(vii)    It is a sophisticated party and fully familiar with the inherent risks involved in the transactions contemplated in this Agreement and each Loan Document, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Borrowed Amount, and voluntarily takes full responsibility for any risk to that effect.

(viii)    Neither it, nor any of its subsidiaries or any director, officer, employee, agent, or affiliate of it or any of its subsidiaries is an individual or entity that is, or is owned or controlled by persons that are: (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including Crimea, Cuba, Iran, North Korea and Syria) (a "Sanctioned Country").

(ix)    It and its subsidiaries and their respective directors, officers and employees and, to its knowledge, its agents and their subsidiaries, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder and any other applicable anti-corruption law.

(x)    No Event of Default has occurred and is continuing.

(xi)    It is not insolvent and is not subject to any bankruptcy or insolvency laws.

16

(b)    Borrower represents and warrants on the date hereof (which representation and warranties will be deemed repeated on the date of execution of each Loan Term Sheet) that:

(i)    It has the right to transfer Digital Currency, Dollars or Alternative Currency, in accordance with the terms and conditions hereof, free and clear of all liens and encumbrances other than those arising under this Agreement.

(ii)    At the time of transfer of any Collateral, it has the right to grant a first priority security interest therein and the right to transfer such Collateral in accordance with the terms and conditions hereof, free and clear of all liens and encumbrances other than those arising under this Agreement or the other Loan Documents.

(iii)    There are no liens or encumbrances on the Collateral except in favor of Lender pursuant to the Loan Documents.

## VIII.    **Agreements**.

(a)    Each party agrees that, so long as it has any Obligations outstanding under this Agreement or any other Loan Document to which it is a party:

(i)    It will not knowingly fail to comply in any material respect with all Applicable Laws and orders binding on it.

(ii)    It shall pay and discharge all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which the penalties attach thereto, and all lawful claims in respect of any Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a lien or encumbrance upon any properties of such party, *provided* that such party shall not be required to pay any such tax, assessment, charge, levy or claim with respect to which the failure to pay would not reasonably be expected to have a Material Adverse Effect on its abilities to repay the Loans and perform all other Obligations hereunder and under the other Loan Documents, and such party has set aside on its books adequate reserves in accordance with generally accepted accounting principles (or other applicable accounting rules).

(iii)    It will maintain in full force and effect all consents and approvals of, and registrations and filings with, any Governmental Authority or otherwise that are required to be obtained by it with respect to this Agreement or any Loan Document or which are necessary to the operation of its business.

(b)    Lender shall furnish to Borrower, as promptly as reasonably practicable after the end of each month, a statement in form and substance reasonably satisfactory to Borrower that describes the type and balance of Collateral as of the end of each month then ended.

(c)    If requested and required by Lender, in connection with a pledge of (or maintenance of an existing pledge of) Collateral consisting of Digital Currency, Dollars or Alternative Currency, Borrower shall enter into an Account Control Agreement (Digital Currency).

(d)    Borrower authorizes Lender at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments thereto that contain any information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance.

**IX.    Negative Agreements**. So long as any Obligations remain outstanding under this Agreement or any other Loan Document:

(a)    Borrower shall not create, incur, assume or suffer to exist any lien upon the Collateral, except for the liens created hereunder or under the other Loan Documents.

(b)    Borrower shall not request any Loan, and Borrower shall not use the proceeds of any Loan (i) in violation of any anti-corruption laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any person subject to Sanctions, or in any Sanctioned Country or (iii) in violation of any applicable Sanctions.

**X.    Conditions Precedent**.  This Agreement and the Obligations set forth hereunder shall not become effective until the Business Day on which the following conditions are satisfied in a manner satisfactory to, or waived in writing by, the Lender (such date, the "Effective Date"):

(a)    The Lender's receipt of executed counterparts of this Agreement and each other applicable Loan Document, dated prior to, or as of the Effective Date or a date otherwise agreed by the parties;

(b)    The Lender's receipt of such documentation and other information reasonably requested by the Lender in connection with regulatory requirements under the applicable "know-your-customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act; and

(c)    The Lender shall have received all such other information with respect to the Borrower and its business as it shall have reasonably requested prior to the Effective Date.

**XI.    Default.**  If any of the following events shall occur (each such occurrence, an "Event of Default"):

(a)    the failure of the Borrower to (i) repay or return any Borrowed Amount when and as the same shall become due and payable, whether at the due date thereof, a date fixed for prepayment thereof, upon acceleration or otherwise or (ii) pay any interest, fee or any other payment required under the Loan Documents when and as the same shall become due and payable, and such failure shall continue unremedied for a period of five (5) Business Days;

(b)    the failure of the Lender to return any Collateral when and as the same shall become due to be returned under Section II(f), whether at the due date thereof, upon acceleration or otherwise;

(c)    the failure of the Borrower to (i) Transfer any required amount of Collateral or Additional Collateral by the time and/or in the manner required under Section V(b) or Section V(c), or (ii) make any payment or reimbursement specified in Section VI(c) in the event of a Hard

DocuSign Envelope ID: 450BEF8D-162E-4A6D-BACB-0D9985390741

Fork, in each such case when due and/or required to do so by the time required under this Agreement and such failure shall continue unremedied for the period of one (1) Business Day;

(d)　　　the failure of the Lender to return any required amount of Collateral by the time and/or in the manner required under Section V(d), and such failure shall continue unremedied for a period of one (1) Business Day;

(e)　　　any representation or warranty made by a party in any of the Loan Documents or in or pursuant to any certificate, document or other information provided pursuant to the terms hereof or thereof proves to be untrue in any material respect as of the date of making or deemed making (or repeating) thereof and such failure shall continue unremedied for the period of five (5) business days;

(f)　　　the failure of Borrower to perform or observe any term, condition, covenant, provision, or agreement (A) contained in Section VIII or IX herein or (B) under this Agreement or any of the Loan Documents (other than those described in Clause (A) or subsections (a), (b) and (c) above) and such default remains outstanding for five (5) Business Day following receipt of written notice thereof from the Lender;

(g)　　　any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against a party, and (solely in the case of proceedings instituted against such party) shall not be dismissed within forty-five (45) days or the applicable statutory time limit of their initiation;

(h)　　　a party notifies the other party of its inability to or its intention not to perform any of its Obligations hereunder or otherwise disaffirms, rejects or repudiates any of its Obligations hereunder;

(i)　　　if one or more judgments, orders, or awards for the payment of money, or the issuance of any requirement to pay by a Governmental Authority, which would reasonably be expected to have a Material Adverse Effect, is entered or filed against a party or with respect to any of its assets, and either (i) there is a period of forty-five (45) consecutive days at any time after the entry of any such judgment, order, or award during which (A) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (B) a stay of enforcement thereof is not in effect, or (ii) enforcement proceedings are commenced upon such judgment, order, or award;

then (1) if the defaulting party is the Borrower, the Lender may, at its option (a) declare the Total Accrued Loaned Amount to be immediately due and payable, whereupon such amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by Borrower; *provided*, that upon any Event of Default described in Section XI(f) above, the Total Accrued Loaned Amount shall automatically become and be immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by Borrower and (b) terminate this Agreement, the other Loan Documents and any other agreement or transaction between Borrower and Lender or any affiliate of Lender upon written notice to Borrower; or (2) if the defaulting party is the Lender, the Borrower may, at its option, terminate this Agreement, the other Loan Documents and

DocuSign Envelope ID: 450BEF89-162E-4A6D-BACB-0D9985390741

any other agreement or transaction between Borrower and Lender and set off the Value of any unreturned Collateral against any amounts owed by Borrower to Lender.

Upon the occurrence of an Event of Default of the type set forth in <u>Section XI(f)</u> or an Event of Default in respect of which the Total Accrued Loaned Amount has been declared to be forthwith due and payable, the non-defaulting party may exercise all rights and remedies available to such party hereunder or under any other Loan Document, under Applicable Law (including the UCC), or in equity; provided, however, .notwithstanding anything to the contrary in any Loan Document, upon the occurrence of an Event of Default, Lender's exercise of any rights or remedies with respect to the Collateral shall be subject to the following conditions: (i) Lender shall have delivered prior written notice to the Calculation Agent of its intention to foreclose on, liquidate or exercise any other rights or remedies with respect to the Collateral; (ii) the Calculation Agent shall have delivered written notice to the Lender and the Borrower setting forth (x) the Calculation Agent's determination of the amount of Obligations then owing to Lender and (y) the Calculation Agent's identification of the portion of the Collateral having a Value equal to such amount of Obligations then owing to Lender (as determined the Calculation Agent), such notice to be delivered to Lender and Borrower promptly, but in any event within one (1) Business Day following, the Calculation Agent's receipt of a notice from Lender pursuant to clause (i) above; and (iii) Lender shall exercise such rights or remedies with respect to the Collateral only by instructing the Custodian to transfer, liquidate or otherwise dispose of the portion of the Collateral identified by the Calculation Agent pursuant to clause (ii)(y) above.

**XII.    Rights and Remedies Cumulative.**  No delay or omission by Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder.  All rights of each party stated herein are cumulative and in addition to all other rights provided by law, in equity.

**XIII.    Costs.**  The defaulting party shall promptly pay to the non-defaulting party, upon demand, all costs, expenses, commissions or other fees, including without limitation, attorneys' fees and court costs, incurred by the non-defaulting party in connection with the enforcement of its rights hereunder and the other Loan Documents after an Event of Default.

**XIV.    Passwords and Security.**  Each party is responsible for maintaining adequate security and control of any and all passwords, private keys, and any other codes that it uses to Transfer or receive Digital Currencies hereunder.  Each party will be solely responsible for the private keys that it uses to make the Transfers and maintaining secure back-ups.  Each party will promptly notify the other party of any security breach of its accounts, systems or networks as soon as possible.  Each party will reasonably cooperate with the other party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a party's account credentials or private keys, and any security breach of a party's accounts, systems, or networks, and provide the other party with the results of any third-party forensic investigation that it may undertake.  Each party will be responsible for any unauthorized Transfers made utilizing its passwords, private keys, and any other codes it uses to make or receive Transfers, except to the extent caused by the other party's gross negligence or willful misconduct.

**XV.    Governing Law; Dispute Resolution.**  This Agreement is governed by, and shall be construed and enforced under, the laws of the State of Delaware applicable to contracts made

and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New Castle, State of Delaware by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

**XVI.** **Notices.** Except for Margin Notifications or as otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be sent by electronic mail (at such email addresses set forth below or as the parties may designate in accordance herewith), by Bloomberg or an internet chatroom, or otherwise posting to an Internet site (as the parties may designate in accordance herewith) or sent by express or certified mail (postage prepaid, return receipt requested), overnight courier or personally delivered to the respective address set forth below:

> Borrower:
> BlockFi International Ltd.
> Walkers Corporate (Bermuda) Limited
> Park Place, 3rd Floor
> 55 Par La Ville Road
> Hamilton HM 11
> Bermuda
> Attn: Zac Prince
> Email: institutions@blockfi.com

> Lender:
> Vrai Nom Investment Limited
> RM4, 16/F, HO KING COMM CTR, 2-16 FAYUEN ST, MONGKOK
> KOWLOON Hong Kong
> Attn: Michael Zhang
> Email: matrixvrainom@gmail.com
> Tel: +85267677055

Either party may change its address or other notice information by giving the other party written notice of its new address or other notice information as herein provided.

Margin Notifications may be provided by any of (i) telephone, (ii) written electronic communication, such as electronic mail (at such email addresses set forth above or as the parties may designate in accordance herewith), Bloomberg or an internet chatroom, or otherwise posting to an internet site (as the parties may designate in accordance herewith) or (iii) express or certified mail (postage prepaid, return receipt requested), overnight courier or personally delivered to the address set forth above. If a Margin Notification is provided via telephone, written confirmation will be provided pursuant to (ii) or (iii) above.

DocuSign Envelope ID: 450BEF8D-162C-4A6D-BACB-0D9985399741

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received. Notices and other communications sent to an e-mail address shall be deemed received when sent absent receipt of a failure to deliver notice within 30 minutes of such notice or communication being sent (it being understood that an "out of office" reply does not constitute a failure to deliver notice for this purpose). Notices or communications posted to Bloomberg, an internet chatroom or an internet site shall be deemed received upon the posting thereof.

**XVII.   Modifications.**  All modifications or amendments to this Agreement and the other Loan Documents shall be effective only when reduced to writing and signed by both parties hereto or thereto.

**XVIII.  Entire Agreement.**  This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

**XIX.    Successors and Assigns.**  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; *provided*, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party.  No person (other than the parties) shall have any right, benefit, priority or interest under, or because of the existence of this Agreement.  The Lender, acting solely for this purpose as an agent of the Borrower, shall maintain a copy of each assignment and assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

**XX.     Severability of Provisions.**  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**XXI.    Counterpart Execution.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission such as DocuSign shall be equally as effective as delivery of an original executed counterpart of this Agreement.

**XXII.   Relationship of Parties.**  Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

**XXIII. <u>Term and Termination</u>.**  The term of this Agreement shall commence on the Effective Date for a period of one year and shall automatically renew for successive one-year terms annually, unless either party provides written notice (email sufficient) of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period (the "<u>Term</u>").  The foregoing notwithstanding, this Agreement may be terminated (i) as set forth in <u>Section XI</u> or (ii) upon 30 days' written notice (email sufficient) by either party to the other.  Notwithstanding the foregoing, if there are any Loans outstanding at the time either party sends a notice of termination pursuant to this <u>Section XXIII</u> (other than a termination pursuant to <u>Section XI</u>), such termination of this Agreement will not be effective until all Loans are terminated on the relevant Maturity Date or pursuant to <u>Section II(d)</u>.

**XXIV. <u>Miscellaneous</u>.**

(a)    If an error is made hereunder in connection with a payment under any Loan Document, and such payment is an overpayment or a payment not anticipated thereunder, the party receiving the payment in error shall refund the mistaken amount to the paying party as promptly as is commercially practicable; *provided* that the paying party may, in its sole discretion and upon written notice of the amount and basis for such offset, elect to set-off such amounts against future payments hereunder.

(b)    Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The parties acknowledge and agree that this Agreement and the other Loan Documents are the result of negotiation between the parties which are represented by sophisticated counsel and shall be construed as though all parties participated equally in the drafting thereof.  Therefore, none of the provisions of this Agreement or any other Loan Document will be construed against the drafter hereof or thereof.

**XXV. <u>Remedy Sales</u>.**  At any time Lender sells Collateral as part of the exercise of remedies pursuant to <u>Section XI</u>, it shall simultaneously (or as promptly as practicable and in any event within 24 hours) provide Borrower with notice of any sales of Collateral in connection therewith, together with an appropriate trade confirmation or other evidence that shows in reasonable detail the prices at which such sales are conducted.

**XXVI. <u>Confidentiality</u>.**  Each party agrees to maintain the confidentiality of all information received from the other party relating to such other party or its business hereunder or pursuant hereto, including the existence and terms of this Agreement (the "<u>Information</u>"), except that Information may be disclosed (a) to its and its affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority having jurisdiction over such party (in which case the disclosing party agrees to inform the other party promptly of such disclosure, unless such notice is prohibited by Applicable Law and except in connection with any request as part of a regulatory examination), (c) to the extent required by the Applicable Law or regulations or by any subpoena or similar legal process (in which case the disclosing party agrees to inform the other party promptly of such

DocuSign Envelope ID: 450BFF8D-162B-4A6D-BACB-0D9085390741

disclosure to the extent permitted by law and except in connection with a regulatory examination of an audit or examination conducted by accountants), (d) in connection with the exercise of any remedies hereunder or any other Loan Documents, (e) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement, or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative or hedging transaction relating to Borrower and its obligations, (f) with the consent of the other party or (g) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section by such party or (ii) becomes available to such party on a non-confidential basis from a source other than the other party or its affiliates or (iii) is independently developed by such party without use of the Information.  Any person required to maintain the confidentiality of the existence of this Agreement and Information as provided in this Section shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord to its own confidential information.  The provisions of this Section are continuing obligations of the parties, their respective successors and assigns, and shall survive termination of this Agreement.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed and delivered as of the date first above written.

**BLOCKFI INTERNATIONAL LTD.**

By: _David Olsson_

Name: David Olsson

Title: Senior Vice President

**VRAI NOM INVESTMENT LIMITED**

By: _ZHENG ZHANG_

Name: ZHENG ZHANG

Title: Manager

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with <u>Section II</u> hereof:

Name: Zac Prince
Email: zac@blockfi.com

Name: Chris Yeung
Email: chris@blockfi.com

Name: Jason Wilkinson
Email: <u>jason@blockfi.com</u>

Name: Joe Hickey
Email: <u>joe.hickey@blockfi.com</u>

Name: Jon Heng
Email: <u>jon.heng@blockfi.com</u>

Name: Brian Oliver
Email: <u>brian.oliver@blockfi.com</u>

Borrower may change its Authorized Agents by notice given to Lender as provided in <u>Section XVI</u>.

## EXHIBIT B

## Loan Term Sheet

The following Loan Term Sheet dated [*insert date*] incorporates all of the terms of the Master Digital Currency Loan Agreement entered into by Vrai Nom Investment Limited and BlockFi International Ltd. on ‾7th‾of‾june‾ 2022 and the following specific terms:

| | |
|---|---|
| **Borrower:** | BLOCKFI INTERNATIONAL LTD. |
| **Lender** | VRAI NOM INVESTMENT LIMITED |
| **Digital Currency / Dollars / Alternative Currency** | [ ] |
| **Borrowed Amount** | $[ ] |
| **Borrow Rate** | [ ] |
| **Callable Option** | Yes/ No |
| **Prepayment Option** | Yes/ No |
| **Maturity Date** | [Insert date][None] |
| **Collateral** | [ ] |
| **Initial Margin Percentage** | [ ]% |
| **Margin Requirement Percentage** | [ ]% |
| **Release Margin Percentage** | [ ]% |
| **Allowable Stablecoin Collateral** | [GUSD][USDC][PAX][N/A] |
| **Digital Currency Payment to Borrower** | [insert Borrower's Digital Currency Address] |
| **Dollar Payment to Borrower** | [insert Borrower's Bank Details and stable coin blockchain address] |
| **Digital Currency Payment to Lender** | [insert Lender's Digital Currency Address] |
| **Dollar Payment to Lender** | [insert Lender's Bank Details and stable coin blockchain address] |

BLOCKFI INTERNATIONAL LTD.          VRAI NOM INVESTMENT LIMITED

By: _____          By: _____
Name:                            Name:
Title:                           Title: