**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING AND APPROVING THE SETTLEMENT AND RELEASE**
**OF CLAIMS AND CAUSES OF ACTION BY AND AMONG THE DEBTORS AND**
**CERTAIN OF THE DEBTORS' INSIDERS AND (II) GRANTING RELATED RELIEF**

       **PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order*

*(I) Authorizing and Approving the Settlement and Release of Claims and Causes of Action By and*

*Among the Debtors and Certain of the Debtors' Insiders and (II) Granting Related Relief*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

(the "9019 Motion") will be held on **August 16, 2023 at 10:00 a.m. (prevailing Eastern Time)** or as soon thereafter as counsel may be heard (the "Hearing") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE** that the 9019 Motion and its attachments set forth the relevant factual bases upon which the relief requested should be granted.  A proposed order granting the relief requested in the 9019 Motion is also submitted herewith.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief requested in the 9019 Motion shall:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received on or before **August 2, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the 9019 Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that unless objections are timely filed and served, the 9019 Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d) and the relief requested may be granted without further notice or hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Kroll Restructuring Administration, LLC at https://restructuring.ra.kroll.com/blockfi.  You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

Dated: July 10, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br>BLOCKFI INC., *et al.*,<br><br>　　　　　　　　　　　Debtors.[2] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

## DEBTORS' MOTION
## FOR ENTRY OF AN ORDER (I) AUTHORIZING
## AND APPROVING THE SETTLEMENT AND RELEASE OF
## CLAIMS AND CAUSES OF ACTION BY AND AMONG THE DEBTORS AND
## CERTAIN OF THE DEBTORS' INSIDERS, AND (II) GRANTING RELATED RELIEF

TO: THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES

BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

---

[2]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state

the following in support of this motion (the "<u>Motion</u>"):[3]

<u>**Preliminary Statement**</u>

1.      The Debtors file this Motion to memorialize and finalize the settlement of the

estates' claims (the "<u>Global Insider Settlement</u>") with certain current and former members of the

Debtors' management team (collectively, the "<u>Released Parties</u>," and together with the Debtors,

the "<u>Settlement Parties</u>").[4]   The key terms of the Global Insider Settlement are reflected in the

settlement and severance agreements attached as **<u>Exhibit A</u>** hereto (the "<u>Settlement Agreements</u>")

and follow a multi-day mediation process that concluded on Friday, June 23, 2023.

2.      For the last seven months, the special committee of the board of directors of Debtor

BlockFi Inc. (the "<u>Special Committee</u>") has been engaged in an investigation into potential claims

or causes of action the Debtors may possess against insiders of the Debtors (the "<u>Investigation</u>").

The Investigation included the review of tens of thousands of documents and dozens of formal and

informal interviews; the Investigation also benefited from the input of the Official Committee of

Unsecured Creditors (the "<u>Committee</u>"), through a review of the Committee's diligence requests,

the transcripts of depositions taken by Committee counsel, and the report submitted by the

Committee concerning its findings.   The Special Committee's core findings are summarized in a

report attached as **<u>Exhibit B</u>** hereto (the "<u>Report</u>").

---

[3]   Capitalized terms used but not defined herein shall have the meanings ascribed in the *Revised Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1133] (the "<u>Disclosure Statement</u>") and the *Second Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1132] (the "<u>Plan</u>").

[4]   The Released Parties included Zac Prince and Flori Marquez (together, the "<u>Founders</u>") along with Amit Cheela, Jonathan Mayers, Rob Loban, Tony Lauro, Yuri Mushkin, Andrew Tam, and David Spack.

3.      With respect to the claims against the Released Parties, the Investigation and subsequent Report established several key points.  Most importantly, beyond being a company in the crypto industry that has sought bankruptcy protection, BlockFi's business operations bore no resemblance to other crypto companies (like FTX, Three Arrows Capital ("3AC"), or Celsius) that found themselves in dire straights as a result of theft or intentional misconduct by insiders.  None of the Released Parties made any meaningful withdrawal of assets from the Debtors' platform as their performance deteriorated.  None of the Released Parties misused client funds for their own purposes.  None of the Released Parties directed the Debtors to engage in transactions without performing reasonable diligence or understanding the risks and rewards of those transactions.  Ultimately, BlockFi failed because FTX and Alameda were and are fraudulent enterprises, and the Special Committee has not uncovered any evidence that the Released Parties knew, should have known, or reasonably could have known, about FTX's and Alameda's true nature.

4.      In any event, the only potential claims the Special Committee uncovered that would potentially survive a motion to dismiss, even if they could be litigated successfully to a judgment, do not justify prosecution from a cost/benefit perspective.  There is zero reason to believe that, if the estates were to throw good money after bad by spending millions of dollars of additional funds pursuing claims against insiders, they would be able to recover sufficient net consideration to make a substantive difference to BlockFi creditors' recoveries.  The estates are far better off focusing their time, attention, and funds pursuing recoveries from the entities that defrauded BlockFi.  Specifically, focusing the estates' resources on pursuing affirmative relief against FTX, Alameda, and 3AC (and defending against those entities' claims against BlockFi) is **clearly** the approach that will maximize the value of the BlockFi estates and distribution to creditors.

5.      The consideration that the Released Parties are providing in the Settlement Agreements is highly valuable to the estates for a variety of reasons.  The Released Parties are agreeing, without any further compensation, to assist the Debtors in their litigation with the Alameda, FTX, Emergent, Core Scientific, and 3AC estates.  Each Released Party will provide more than 75 hours of such cooperation even after their employment with BlockFi ends, without further compensation.  This cooperation will be essential in allowing the Debtors to successfully pursue and defend claims against these counterparties, maximizing the value of the estates.  And, in the end, the outcome of the litigations by and against Alameda, FTX, Emergent, Core Scientific, and 3AC estates will determine the amount available to distribute to BlockFi's creditors. Distributions to creditors are overwhelmingly dependent on the estates' success (or failure) in these litigations.

6.      In addition to prosecuting and defending claims against Alameda, FTX, Emergent, Core Scientific, and 3AC, the Debtors must also ensure they maintain the capability to make in-kind distributions of crypto to their creditors.  All parties agree that making distributions in-kind rather than in cash is greatly preferred, as it allows for favorable tax treatment for clients.  As with the litigations discussed above, the Released Parties are the key individuals who understand the BlockFi systems and will ensure the Debtors maintain the ability to make those in-kind distributions.

7.      The Global Insider Settlement is the _only_ path forward that reasonably addresses these two primary concerns.  It will guarantee hundreds of hours of cooperation from the Released Parties to maximize the value of the estates, as the parties will participate and assist with ongoing litigation, including prosecuting their many claims against 3AC, FTX, and Alameda, and defending against those claims asserted by those parties, the outcome of which will have a material

4

impact on Client recoveries in a quantum of over $1 billion.  And the Global Insider Settlement also ensures that the Released Parties will aid in the distribution of digital assets to the Debtors' clients.  Accordingly, the Released Parties, and particularly Ms. Marquez, will be key to maintaining the capability and integrity of the BlockFi Platform and making coin and cash distributions safely and securely.  The Released Parties will be intimately involved in guiding the team maintaining the BlockFi Platform and ensuring that all necessary adjustments are made to facilitate in-kind distributions to clients as quickly and safely as possible.

8.     Aside from this valuable cooperation, the Global Insider Settlement will provide a direct financial benefit to the Debtors.  Each of the Released Parties have agreed to waive or subordinate all or a substantial portion of their prepetition claims against the Debtors' estates, including insiders who placed assets on the BlockFi Platform, leaving them there for the benefit of other creditors.  The total face amount of the claims asserted that are being waived or subordinated in the Settlement Agreements is approximately $7 million (not including unliquidated claims for indemnification), which will increase the recoveries of other creditors.  In addition, certain of the Released Parties have also agreed to make direct cash contributions to the Debtors: Zac Prince agrees to make a cash payment in the amount of $1.5 million, Flori Marquez agrees to make a cash payment of $500,000, Tony Lauro and Andrew Tam each agree to make a cash payment of $100,000, and David Spack agrees to make a cash payment of $50,000.  These cash payments, along with the waived or subordinated claims, provide millions of dollars in direct consideration to the estates, while also saving the estates from incurring millions (or tens of millions) of dollars that would be spent litigating with the Released Parties.  Put simply, even putting aside the substantial value of the cooperation being provided by the Released Parties, the other consideration being provided through the settlement—through the waiver/subordination of

claims and cash contributions—exceeds the value of the claims being released. Even without that cooperation, based on the Special Committee Investigation, the Debtors believe the Settlement Agreements would still be in the best interests of the estate.

9.      To ensure compliance, the releases approved by the Court will make clear that a release granted to the Released Parties are contingent on their continued and agreed cooperation. Described in more detail in the Settlement Agreements, if any Released Party violates their obligations, the Debtor release will be null and void as to such party.

10.     While the Special Committee took the views of the Committee into account, it does not appear that the Committee is interested in maximizing the value of these chapter 11 estates. Instead, it appears the Committee has opted to try and extract a "pound of flesh" from certain BlockFi insiders (particularly Mr. Prince and Ms. Marquez), notwithstanding the negative impact such an approach would have on the Debtors and the weakness of the claims the Committee (apparently) prefers to bring against certain insiders rather than support a settlement. There is no reason to believe that Committee approach would have any material benefit for creditors, and as estate fiduciaries, the Debtors' choice is clear. The Global Insider Settlement (1) brings material value into the estates immediately, (2) avoids the material costs that would be incurred prosecuting weak claims against the Released Parties that are unlikely (even if successful) to make a material difference to creditors, and (3) most importantly, ensures the Released Parties will be required to provide the necessary assistance in the litigations and in-kind distributions that will actually help the estates and BlockFi's creditors. Accordingly, the Debtors request that the Court enter the proposed Order attached and grant the relief requested in this Motion.

**Requested Relief**

11.    The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"), (a) approving the Global Insider Settlement by and among the Settlement Parties as set forth in the Settlement Agreement, and (b) granting related relief.

**Jurisdiction and Venue**

12.    The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

13.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.    The bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002(a)(3), 6004, 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002, 9019-3, and rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

**Background**

**I.    The Chapter 11 Cases**

15.    On November 28, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth in greater detail in the First Day Declaration and incorporated by reference herein.

16.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On November 29, 2022, the Court entered an order [Docket No. 42] authorizing procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  On December 21, 2022, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 130].

## II.     The Appointment of the Special Committee and the Investigation that Followed

### A.     The Special Committee

17.     On or about the Petition Date, as part of installing independent directors or managers at several Debtor entities (each an "Independent Director" and collectively, the "Independent Directors"), the Debtors appointed Scott Vogel as an independent director at BlockFi Inc.  Around the same time, the board of directors of Debtor BlockFi Inc. (the "Board") voted to establish the Special Committee comprised of Jennifer Hill, a member of the Board since 2021, and Scott Vogel.  The Special Committee was established to conduct the Investigation, which included, among other things, an investigation into the Debtors' historical transactions, including all potential claims and causes of action against the Debtors' insiders.  Because Ms. Hill had been a member of the Board since 2021, and the Investigation ultimately investigated numerous transactions that had occurred during her tenure, she recused herself from the Investigation, leaving the Investigation to Mr. Vogel in his capacity as an Independent Director of the Special Committee. Notably, prior to Mr. Vogel's appointment to the Board and Special Committee, he did not have any affiliation with the Debtors.[5]

---

[5]    Mr. Vogel is the managing member of Vogel Partners LLC, and previously was a managing director at Davidson Kempner Capital Management LLC.  During his 14-year tenure at Davidson Kempner, Mr. Vogel invested in a diverse set of industries.  Before then, Mr. Vogel worked at MFP Investors investing in special situations and turnaround opportunities for the private investment firm of Michael F. Price and at Chase Securities.  Mr. Vogel

B.      **The Investigation**

18.      Beginning in early December 2022, shortly after the Petition Date, Mr. Vogel

directed counsel at Kirkland & Ellis LLP ("Kirkland") to begin an investigation into potential

claims and causes of actions the Debtors may have against insiders, including the Released Parties.

The Investigation was highly iterative, as it expanded to consider additional topics the Special

Committee became aware of as it reviewed documents and interviewed witnesses.  The topics the

Investigation ultimately covered included, but were not limited to:

- the Debtors' business in general;

- the Debtors' risk and investment policies and, specifically, how those
  policies were applied to the transactions listed below;

- the Debtors' investments in (and acceptance of collateral related to) the
  Grayscale Bitcoin Trust ("GBTC");

- the Debtors' dealings with 3AC and its affiliates;

- withdrawals from the Debtors' platform (to the extent there were any)
  by the Debtors' insiders;

- the Debtors' dealings with Alameda Research Ltd. and FTX generally,
  including the time periods before and after the Debtors' transaction with
  FTX Trading Ltd. and its affiliates (collectively, "FTX") that was
  announced July 1, 2022 (the "FTX Transaction");

- the Debtors' compensation of employees generally, and including (but
  not limited to) certain payments made following execution of the FTX
  Transaction;

---

has served on many boards during his career, including Merrill Corporation, Mod Space, Key Energy, Alpha
Resources, Arch Coal, PetSmart, Seadrill, Bonanza Creek Energy, Inc., Neiman Marcus Group, CBL Properties,
rue21, Voyager Digital Holdings, Inc., and Avaya.

- transactions with a confidential counterparty previously disclosed in detail as part of the Global Notes[6] and during a hearing before the Bankruptcy Court;[7]

- the Debtors' procurement of additional director and officer liability insurance in November 2022; and

- the Debtors' decision to sell digital assets in November 2022.

19.    As part of the Investigation, Kirkland reviewed approximately 60,000 documents comprising approximately 750,000 pages and conducted formal and informal interviews of approximately 25 witnesses (several of whom Kirkland spoke with on several occasions).  The Investigation focused on the foregoing topics but also covered a slew of other subsidiary issues (collectively, the "Investigated Issues").

20.    Early on in its process, Kirkland and the Special Committee determined that one of the gating issues to several categories of potential claims would be whether (and when) BlockFi became insolvent.  And the solvency question was complicated by several factors such as the large swings in the crypto markets (and the accompanying withdrawal requests experienced by BlockFi) in June 2022 following the LUNA collapse and Celsius platform freeze, and the nature of the Debtors' capital infusion from FTX announced at the end of June.  Accordingly, Kirkland retained a consulting expert (the "Consulting Expert") to assist the Special Committee in anticipation of potential litigation.  Kirkland tasked the Consulting Expert with weighing the relative strengths and weakness of arguments concerning the potential insolvency of BlockFi at various points in time.

---

[6]    *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* at 23–24, *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. 2022) [Docket No. 242].

[7]    *See* 1/9/2023 Hrg. Slides in *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. 2022), pp. 24-26.

21.     Kirkland's affirmative investigation and the work of the Consulting Expert allowed Kirkland to provide a view to the Special Committee concerning the existence and value of potential claims against insiders.  But the Committee was also running its own investigation that covered some of the same topics.  So in addition to the specific materials requested and reviewed by Kirkland, the Special Committee also considered issues raised by the Committee.  Specifically, the Special Committee and Kirkland had access to and reviewed the diligence materials provided to the Committee's advisors and reviewed the transcripts of the depositions taken by the Committee in connection with its investigation.  And, finally, the Special Committee had the ability to review and consider the *Preliminary Report Addressing Question Posed by the Official Committee of Unsecured Creditors: Why Did BlockFi Fail?*, [Dkt. No. 928 (the "Committee Report")].[8]

22.     Kirkland ultimately provided the Special Committee with a comprehensive and privileged report (the "Investigation Report"), consisting of approximately 170 pages, evaluating the merits of all potential claims and/or causes of action Kirkland and the Special Committee had identified through the Investigation.  The claims considered in the Investigation Report included claims from potential breaches of fiduciary duty, fraudulent transfers, and preferences (among others), that the Debtors may have against insiders, and the Investigation Report then analyzed the respective strengths and weaknesses of such claims to recommend whether the Debtors should assert, reserve, settle, or release those claims and/or causes of action.  Non-privileged findings from that Investigation Report are contained in the document attached as **Exhibit B.**

---

[8]     Prior to the filing of the Committee Report, the Committee informally described to the Debtors' counsel some of the allegations made in the Committee Report.

23.     In general, the standard applied was whether the potential claims and/or causes of action were colorable and whether pursuit thereof would provide an overall benefit to the Debtors' estates, as opposed to reserving, resolving, or releasing such claims or causes of action. *See, e.g.*, *In re G-I Holdings. Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004); *In re Crivaro*, 2017 WL 3314232, at *5 (Bankr. D.N.J. Apr. 24, 2017).

24.     As discussed at length below,[9] the Special Committee ultimately determined that potential claims for breach of fiduciary duty, which had the highest potential damage awards, bordered on frivolous. And the few claims the Special Committee identified as potentially being able to survive a motion to dismiss had relatively low potential damages associated with them. Moreover, in analyzing the costs and benefits to the Debtors' estates from the potential claims, the Investigation also had to consider the impact to the estates from bringing these claims against various insiders. It has become apparent in these cases that *the* key factor in determining the amount of recovery available for clients of BlockFi will be the outcome of litigation between BlockFi and various other crypto firms currently in bankruptcy, including 3AC, FTX, and Alameda. The Debtors have claims against Alameda for hundreds of millions of dollars Alameda borrowed from the Debtors and has not repaid (and which the Debtors could not recoup through the liquidation of collateral). The Debtors believe they have secured claims against Alameda and Emergent for nearly $1 billion. The Debtors have a claim against 3AC for over $100 million. And the FTX debtors have asserted claims against BlockFi for approximately $4 ***billion***.[10] Thus, a key consideration for the Special Committee was to ensure that any resolution of the potential claims would leave the Debtors in the best position possible to prosecute and defend claims and causes

---

9     *See* Argument Section I.A.

10     *See* Claim No. 26962

of actions by and against the Alameda, FTX, and Emergent estates (and the Core Scientific and 3AC estates) successfully.[11]  The success or failure of those various pieces of litigation is what will make a real difference to creditor recoveries.

25.    The Investigation established that the Released Parties are going to be key witnesses for the Debtors in affirmatively litigating claims against 3AC, Alameda, FTX, and others, and in defending against claims asserted by the FTX debtors and 3AC.

26.    The Special Committee also considered the extent to which the Released Parties would assist in the Debtors' ability to distribute Digital Assets to creditors.  The Debtors are seeking to maintain the capability internally of reopening the BlockFi Platform and making Distributions safely and securely, including the capability of building on and improving the BlockFi Platform to make Distributions.  Making sure key personnel are available to assist with this process over time is critical, given the likely relationship between the timing of distributions to creditors and the resolution of certain of the litigation referenced above.  The Special Committee thus took steps to understand which Debtor employees may be necessary to effectuate the in-kind Distributions and considered the value of resolving claims against those individuals, given the challenges in securing services from people that may otherwise be defendants in litigation.

C.    **The Special Committee's Conclusions.**

---

[11]    By way of example, on November 28, 2022, BlockFi, Inc., BlockFi Lending, LLC, and BlockFi International, LLC initiated Adv. Pro. No. 22-01382 (MBK) against Emergent and Marex.  The goal of this case is to secure the Debtors' interests in approximately 55,273,469 Robinhood Shares currently worth approximately $620 million and approximately $20.7 million in cash.  Whether this dispute continues in a forfeiture proceeding or in a bankruptcy court, the Debtors will need to present evidence describing their lending relationship with Alameda, Alameda's obligation to provide more and more collateral in late October/early November 2022 as security for its loan obligations, its default on its loan obligations, and the facts and circumstances supporting the entry into the forbearance agreement, the Alameda Pledge Agreement, and the securing of additional collateral including the Robinhood Shares.  In addition, there is a related matter pending in Antigua and Barbuda in which an FTX customer asserted rights in the Robinhood Shares.

27.     Based on the work described above, the Special Committee reached a number of conclusions related to the Investigation.  ***First***, the potential claims and causes of action the Debtors' estates have against the Debtors' insiders would be extremely expensive to pursue, particularly in relation to the value of the potential recoveries.  Most of the potential claims and causes of action would likely require a full solvency analysis and expert testimony on solvency and other crypto industry-specific issues.  Based on the analysis in the Investigation, the solvency analysis would be complex and its outcome uncertain for most of the relevant time periods.  The pursuit of such claims and/or causes of action would require the expenditure of many millions of dollars—which would be spent on professionals rather than Distributions to Clients—and any net-benefit from that pursuit of claims against insiders (if any) would not be achieved for years.  Although some of the insiders received proceeds from secondary transactions involving the Debtors' equity investors in 2021 or earlier and may have assets to satisfy a judgment, given the risk that any litigation could result in zero recovery for the Debtors' estates, it is challenging to justify prosecution on a cost/benefit analysis.  Moreover, even ***if*** potential claims against insiders had merit, it is extremely unlikely that such claims could be pursued successfully ***and*** collected upon in an amount material enough to make a difference to BlockFi creditors.

28.     ***Second***, putting aside the cost of pursuing the litigation, the merits of the potential claims and causes of action are highly speculative.  The highest value claims considered by the Special Committee—claims for breach of fiduciary duty from the running of BlockFi and its demise—would face substantial hurdles on the merits and are highly unlikely to succeed.  In short, the Special Committee's Investigation did not uncover any evidence that would support a claim that the Debtors' insiders breached their fiduciary duties in operating the business.  In reaching this conclusion, the Special Committee also considered the Committee Report.  But the Special

Committee determined that the Committee Report hung the entirety of its conclusion (1) on a small number of communications largely taken out of context, which were overwhelmed by a mountain of evidence (ignored by the Committee Report) reflecting that BlockFi's insiders operated the business diligently, and (2) on arguments infused with hindsight based on the current understanding of FTX/Alameda.

29.    Other claims that the Special Committee considered were of lower potential value to the estates as they arose primarily from payments received by certain BlockFi insiders or from transactions entered into with third parties.    As discussed in Section I.A below, the Special Committee determined that, although certain of these claims may be able to survive a motion to dismiss, the likelihood of obtaining a favorable judgment on any such claims was highly uncertain, and the damages from such a successful suit would be limited.[12]

30.    **_Third_**, and finally, in light of these considerations about the merits and value of the potential claims and causes of action, the Special Committee determined that the most valuable item that it could acquire from the Released Parties through a potential settlement was not any monetary payment, but rather an agreement to provide cooperation both with respect to litigation against FTX, Alameda, 3AC and others and the in-kind distribution of cryptocurrency.

### III.    The Global Insider Settlement

31.    Following the conclusion of the Special Committee Investigation, in an effort to resolve certain disputes and issues outstanding in these Chapter 11 Cases regarding the potential claims and causes of action against insiders, the Debtors, the Committee, the Founders, Mr. Vogel, and respective advisors engaged in a mediation process overseen by the Hon. Christopher Sontchi

---

[12]    The Special Committee's view of the lack of relative value from these other potential claims seems to be supported by the lack of attention provided these claims by the Committee in its investigation and the Committee Report.

(ret.).  The parties engaged in good faith, arms'-length negotiations, including the exchange of several proposals, which ultimately resulted in the Global Insider Settlement.  Through the Global Insider Settlement, the Debtors will maximize value by settling all potential claims and causes of action against the Released Parties in exchange for:

| Individual | Claims Waived or Subordinated[13] | Cash Contribution | Cooperation Amount[14] |
|---|---|---|---|
| Zac Prince | $1.3 million on platform waived.<br><br>$1.8 million in other unsecured claims against estate subordinated.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $1.5 million | 200 hours |
| Flori Marquez | $109,000 on platform waived.<br><br>Actual and potential unsecured claims of ~$750,000 waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $500,000 | 200 hours |
| Amit Cheela | $200,000 on platform waived (remaining ~$92,000 retained).<br><br>Unsecured claims for unpaid wages (currently $281,000) subordinated.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 100 hours (but not more than 10 hours per week) |

---

[13]  With respect to the waiver or subordination of claims based on assets on the BlockFi Platform, this chart reflects pricing of cryptocurrency assets consistent with the disclosures in the *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 242 at 14–16], which used cryptocurrency pricing as of November 11, 2021.  Cryptocurrency prices did change in the one-week period between November 21, 2022, and the Petition Date so these numbers as far as the amounts on the platform that are waived or subordinated as part of the Global Insider Settlement are not exact.

[14]  This column reflects the agreed amounts of time the insiders have agreed to give to the estates without any further compensation beyond the terms of the Global Insider Settlement to help prosecute and defend against litigation, to assist with regulatory inquiries, and to assist in making in-kind distributions to clients, *after* the individuals are no longer employed with BlockFi and presumably have other jobs.

| | | | |
|---|---|---|---|
| Jonathan Mayers | Unsecured claims against estate (currently $281,000) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 200 hours (but not more than 2 hours on any day, 10 hours in any week, or 20 hours in any month) |
| Rob Loban | $43,000 on platform subordinated.[15]<br><br>All unsecured claims against estate (currently $1,060,000) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | N/A | 100 hours |
| Tony Lauro | $125,000 on platform subordinated.<br><br>All unsecured claims against estate (currently $26,398) waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $100,000 | 200 hours |
| Yuri Mushkin | All unsecured claims against estate (currently $275,000) waived.<br><br>Any indemnity claims (currently ~$100,000) subordinated except to the extent needed to access insurance policies. | N/A | 75 hours (but not more than 5 hours in any week, or 15 hours in any one month) |
| Andrew Tam | $13,000 on platform waived. All unsecured claims against estate waived.<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $100,000 | 100 hours |
| David Spack | Waiver of all unsecured claims against estate (currently $171,875).<br><br>Any indemnity claims subordinated except to the extent needed to access insurance policies. | $50,000 | Unlimited through date of first BIA distribution, 150 hours thereafter |

---

[15]   Subordination as reflected in this chart is subordination to Account Holder Claims and General Unsecured Claims (Classes 3–4).

## Basis for Relief

I.   **The Global Insider Settlement Satisfies the Standards of Bankruptcy Rule 9019 and Should Be Approved.**

32.   Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Bankruptcy Rule 9019(a).  Moreover, section 105(a) of the Bankruptcy Code provides that a bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

33.   Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quoting *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)); *see also Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (Settlements are considered "a normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated and costly.") (citations omitted) (decided under the Bankruptcy Act).  Furthermore, it is well established that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (internal quotations omitted) (citing 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that "[s]ettlements are favored [in bankruptcy]"); *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 348 (Bankr. D. Del. 2007) (same).  Accordingly, when required, "courts are able to craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the

18

[Bankruptcy] Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

34.    Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Louise's Inc.*, 211 B.R. 798, 801 (D. Del. 1997) ("The decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate."); *see also In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'") (citations omitted); *In re Northwestern Corp.*, 2008 WL 2704341, at \*6 (Bankr. D. Del. July 10, 2008) ("[T]he bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (citations omitted); *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr D. Del. 2005) ("[T]he bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable."). "Ultimately, the decision whether or not to approve a settlement agreement lies within the sound discretion of the Court." *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014).

35.    In *Martin*, the United States Court of Appeals for the Third Circuit set forth a four-factor balancing test under which bankruptcy courts are to analyze proposed settlements. The factors the Court must consider are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393; *see also In re Nutraquest*, 434 F.3d at 644–45 (applying *Martin's* four-factor test to affirm district court's order approving settlement); *Nebo Ventures, LLC v.*

*Stanziale (In re Novapro Holdings, LLC)*, No. 18-766-RGA, 2019 U.S. Dist. LEXIS 49047
(D. Del., Mar. 5, 2019) (applying *Martin's* four-factor test to affirm order approving settlement);
*Key3Media*, 336 B.R. at 93 (holding that, when determining whether a compromise is in the best
interests of the estate, courts must "assess and balance the value of the claim that is being
compromised against the value to the estate of the acceptance of the compromise proposal").

36.     A settlement should be approved if it falls "within the reasonable range of litigation
possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional
Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008); s*ee also In re W.R. Grace & Co.*, 475
B.R. 34, 77–78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement
under the *Martin* factors, courts should not have a 'mini-trial' on the merits, but rather should
canvass the issues and see whether the settlement falls below the lowest point in the range of
reasonableness."); *Nortel*, 522 B.R. at 510 (same).

37.     Here, the Global Insider Settlement is fair and reasonable, and is clearly in the best
interests of the Debtors' estates; it should therefore be approved pursuant to Bankruptcy Rule 9019.
There is no reason to believe that litigating the settled claims to judgment would produce an
outcome that is materially better for creditors, and the highly likely outcome would be worse—
with many millions of dollars of estate funds wasted in the interim.  The Global Insider Settlement
represents an attractive outcome for the Debtors' estates and easily falls well above the lowest
point in the range of reasonableness when analyzed under the *Martin* factors.

##### A.     Successful Litigation Against the Founders is Unlikely.

38.     The Special Committee's Investigation determined that the outcome of any
litigation of breach of fiduciary duty and/or avoidance action claims would be far from certain.
The Investigation generally considered (1) potential breach of fiduciary duty claims; (2) potential
fraudulent conveyance actions; and (3) potential preference actions.

39.     As discussed immediately below, each of these claims has substantial weaknesses

on the merits and would be expensive to pursue.  Based on its analysis of the claims as supported

by the Investigation, the Special Committee determined that the amounts that will be  directly

contributed to the Debtors' estate (*i.e.*, the cash contributions and the waiver/subordination of

claims) under the Settlement Agreement exceed the risk-adjusted value of the potential claims

identified in the Investigation.

40.     *Breach of Fiduciary Duty*.  As discussed above, the Special Committee identified

substantial weaknesses in potential breach of fiduciary duty claims against the Debtors' insiders.

To prevail on such a claim, the Debtors would have to demonstrate that the insiders failed to

exercise due care.  It is ***not*** enough that such transactions were "risky" or even that they ultimately

resulted in the Debtors' failure; if the Debtors engaged in an informed decision-making process,

considered the risks and potential benefits of a transaction, and then decided on a course of action

in their business judgment, such transaction does not give rise to an estate claim.  *See, e.g., In re

Walt Disney Co. Derivative Litig.*, 907 A.2d 27, 52 (Del. 2006) (holding that, because the board

entered a transaction based on an informed reporting system and considered the pertinent

information, the business judgment rule applied).

41.     To overcome the business judgment rule and assert a successful estate claim, a

plaintiff must demonstrate that the process used to make a decision was "irrational."  *See In re

Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (holding that to "overcome the presumption that

directors and officers acted on an informed basis" a plaintiff must show "that a decision was the

production of an irrational process" or that the directors failed to establish "an information and

reporting system reasonably designed" to provide information to board member); *In re Trinsum

Group, Inc.*, 466 B.R. 596, 609-610 (Bankr. S.D.N.Y. 2012) ("In reviewing a director's

compliance with his duty of care, the court does not consider the content of the decision where the process employed was rational and used in a good faith attempt to promote corporate interests."). A plaintiff must show that directors or officers acted with "a reckless indifference or a deliberate disregard of" the interests of the company or took "actions which are without the bounds of reason." *In re Lear Corp. S'holder Litig*., 967 A.2d 640, 652 (Del. Ch. 2008); *Trinsum Group*, 466 B.R. at 609.

42.     Here, the Special Committee did not find either through its own Investigation or through materials cited by the Committee that BlockFi's insiders did anything that could possibly rise to the level of "gross negligence" in the operation of the business that would give rise to claims. In addition to a robust contemporaneous record of considering the risks of these transactions, such claims would likely be subject to strong defenses that they are based on impermissible "hindsight" about how these transactions ultimately turned out.

43.     Such claims made with respect to BlockFi Inc.'s losses would also have to overcome the exculpation provision in BlockFi Inc.'s certificate of incorporation that broadly insulates officers and directors.  Moreover, such claims with respect to BlockFi International's losses (which include the vast majority of claims related to the Alameda loans) would have to overcome that entity's charter and Bermuda law—which bars such claims generally and, moreover, would require BlockFi International to front the potential legal fees and expenses (which would exceed $10 million) of the putative insider defendants before such claims could even be pursued at all.

44.     The Special Committee also considered claims arising from the Debtors' decision pre-petition to liquidate certain cryptocurrency into U.S. dollars and also to purchase additional insurance for its directors and officers ("D&O Insurance").  The Special Committee determined

that any breach of duty claims arising from those transactions would be highly unlikely to succeed. In both instances, the Investigation revealed that the BlockFi Inc. Board consulted with legal and financial advisors about the considerations around undertaking those transactions. The Board weighed the potential risks and benefits associated with the liquidation of crypto, as well as the benefits and costs associated with the procurement of additional D&O Insurance, and both transactions were considered over the course of several meetings of the Board. With respect to the liquidation of cryptocurrency, the Board ultimately determined that liquidating the cryptocurrency would remove crypto price risk for the Debtors and creditors (as client claims would be based on their dollar value as of the Petition Date) and would provide liquidity the company needed to avoid costly DIP borrowing. The Board likewise determine the additional D&O Insurance was in the Debtors' best interests as it was needed to ensure the Debtors retained their existing directors and officers and to attract new independent directors with experience in the bankruptcy space.[16] In both cases, the Investigation determined that the Debtors underwent a thorough and rational process prior to entering into such transactions, and the Investigation did not uncover any facts suggesting that there may be breach of duty claims arising from these transactions.

45.    In arguing that substantial valuable breach of duty claims exist, the Committee Report focuses on the Debtors' interactions with Alameda. The potential losses at issue relate to loans made to Alameda in August and September of 2022.[17] But BlockFi's information at the time supported the transactions. *First*, as BlockFi faced a wave of withdrawals and the crypto industry generally experienced substantial volatility in June 2022, BlockFi recalled outstanding loans from

---

[16]    Ex. C, J. Hill Dep. Tr. at 106:17-107:4.

[17]    Committee Report at 54–82.

a number of counterparties, including Alameda.  Despite the volatility, Alameda had returned approximately $1 billion of outstanding loans to BlockFi promptly and without complaint, at substantial profit to BlockFi.[18]  ***Second***, during the same period, BlockFi had foreclosed on certain collateral posted by 3AC when 3AC was unable to meet a margin call.  BlockFi auctioned the collateral foreclosed upon, and Alameda won, paying the Debtors over $100 million.  ***Third***, during the August and September 2022 period—again, a time after the most disruptive period in the history of crypto and after several major crypto-related businesses had filed for bankruptcy— both Alameda and FTX reported to maintain enormous balance sheets and were believed by the market to be the best, most stable businesses in the sector.[19]  And ***fourth***, during the August and September 2022 period, Alameda and FTX were intimately (and publicly) involved in the Voyager bankruptcy proceeding.  During the same time period that BlockFi was making the loans to Alameda (oversecured by 160% of FTT) that are challenged by the Committee, after substantial diligence from a variety of estate and creditor professionals, FTX was selected as the winning bidder for Voyager's business, and Alameda returned hundreds of millions in loans to Voyager, voluntarily, at substantial profit.[20]  Diligence conducted by professionals in the Voyager case during the same time period BlockFi was lending to Alameda in the Fall of 2022 did not suggest reason to doubt FTX or Alameda's capitalization, viability, or trustworthiness.[21]

---

[18]  Ex. D, 4/12/23 Y. Mushkin Dep. Tr. at 99:19–100:4.

[19]  *Id.* at 199:7–23.

[20]  *See, e.g.*, *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 476, Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Asset Purchase Agreement, and (II) Granting Related Relief at p. 10 (Bankr. S.D.N.Y. Sept. 29, 2022); *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 929, Debtors' Objection to Proofs of Claim Nos. 11206, 11209 & 11213 of Alameda Ventures Ltd., at p. 14 (Bankr. S.D.N.Y. Jan. 30, 2023).

[21]  More generally, Voyager made large loans to Alameda that were only partially secured (with FTT as collateral). Yet no one—not the special committee that was appointed in that case to investigate claims against insiders, not the extremely aggressive creditors' committee in that case, not the U.S. trustee, not the Bankruptcy Court, and not any other state or federal regulator, has suggested that the Voyager estate has a viable duty of care claim

46.     In addition to these indications, between the Fall of 2021 and the Fall of 2022, Alameda had also worked with BlockFi on a variety of other matters to provide greater comfort about its viability.  Alameda had agreed to provide the Debtors with indemnification for any losses for crypto placed by Debtors on the FTX exchange due to hacking.[22]  Alameda also provided wallet information so the Debtors could conduct additional diligence.[23]  And Alameda and the Debtors had worked together on a tri-party agreement with Coinbase Ireland to allow BlockFi to take Solana as collateral for the loan and hold such collateral with Coinbase Ireland.[24]  Further, in connection with FTX's transaction to ultimately acquire BlockFi, the Debtors had also received audited financial statements with an unqualified opinion from FTX,[25] which only bolstered confidence in FTT as a source of collateral.

47.     In short, the Special Committee's Investigation identified a number of contemporaneous factors supporting the Debtors' view that Alameda was a solid counterparty to do business with in the Fall of 2022, even after the summer 2022 downturn in the crypto industry. In the judgment of the Special Committee, the existence of these positive indicators related to Alameda would provide an extremely strong defense to any breach of fiduciary duty claim based on the loans that BlockFi made to Alameda in the fall of 2022.

48.     The Committee's contrary theory as reflected in the Committee Report is based

---

against insiders that approved the Alameda loans.  Given this, it borders on the absurd to suggest that BlockFi, which had a materially more positive history with, and more positive information about, Alameda, would have a strong claim against insiders who made loans to Alameda while requiring *more* collateral and *more* protection.

[22]    Ex. D, 4/12/23 Y. Mushkin Dep. Tr. at 199:7–23.

[23]    *E.g.*, Ex. E–G, BF_BK_00070643 (requiring wallet verification); BF_BK_00006178 (Alameda offering wallets); BF_BK_00006780 (Alameda providing wallet IDs).

[24]    Ex. D, 4/12/23 Y. Mushkin Dep. Tr. at 206:12–19.

[25]    Ex. D, 4/12/23 Y. Mushkin Dep. Tr. at 69:6–15.

almost entirely on credit memos written in 2021, long prior to the transactions in 2022 about which the Committee complains.[26]  As an initial matter, the creation of these credit memos, as well as the risks flagged within those memos, actually demonstrates that the Debtors had in place a robust process to diligence potential counterparties.  The Committee Report argues that breach of duty claims exist against certain directors and officers because, despite risks flagged in the credit memos from 2021, the Debtors nonetheless made substantial loans to Alameda in the fall of 2022.[27]  This argument ignores that, as noted above, there were a number of events between 2021 and fall 2022 that further solidified Alameda's financial standing in the eye of the Debtors.  And even putting to the side that additional information, the credit memos that the Committee itself cites reflects that the Debtors had a meaningful process for identifying potential risks with their counterparties.[28]  The Committee agrees that BlockFi's risk management process identified the specific risks associated with lending to Alameda.[29]  It is noteworthy that the Committee Investigation brushes over meetings and documents reflected to BlockFi's Board Audit and Risk Committee ("BARC").  In addition to the internal risk team and executive team at BlockFi, risk and lending decision frameworks were also thoughtfully reviewed and governed at the Board level by this committee.  This structure demonstrates BlockFi's clear intent of considering all relevant risks associated with transactions at multiple levels of the company and making reasoned decisions at the time.[30]

49.    The Committee nonetheless appears to believe that claims exist against the Debtors'

---

[26]    *See*, *e.g.*, Committee Report at 59–74.

[27]    *Id.* at 77.

[28]    *Id.* at 69–73 (summarizing credit memos).

[29]    *Id.* at 77.

[30]    Beyond the good process found during the Investigation, it is also notable that loans made by BlockFi to Alameda during 2021 (*i.e.*, when the credit memos the Committee focuses on were drafted) were nearly all paid back **with interest** prior to the FTX Transaction.  In short, those transactions were profitable for the Debtors.

directors and officers based on their theory that they overrode the recommendations of the risk management team and went forward with the loans to Alameda.[31]  Even if this version of facts were correct—and the findings of the Special Committee's Investigation found no evidence that Mr. Prince or any other director or officer overrode or ignored issues raised by the risk management team—it still would not give rise to valuable claims.  The Committee admits that BlockFi established a set of risk management processes and procedures and used that process to analyze the risks and benefits of potential loans to Alameda.  And the Committee cannot contest that all lending decisions will involve some measure of risk.  So even if the Debtors nonetheless opted to proceed with the loans notwithstanding the risks identified, that decision still receives protection under the business judgment rule, even if that decision ultimately proved to be unwise. *See, e.g., In re Lear Corp. S'holder Litig.*, 967 A.2d at 651; *In re Trinsum Group*, 466 B.R. at 609.

50.    In total, based on the Special Committee's Investigation, and a review of the findings of the Committee Investigation, the Special Committee does not believe there to be valuable breach of duty claims against the BlockFi directors and officers.  The Committee's contrary conclusions are based on the type of hindsight that Delaware law does not allow in pursuing such claims.[32]

51.    In any event, *even if* the potential fiduciary duty claims at issue here had merit, that would *still* not justify their pursuit in the face of other realities of this case.  Given the expense of pursuing such claims and the reality of the potential net collections at issue, there is no reason to believe that the estates could pursue such claims, expend many millions of dollars in the process,

---

[31]  *Id.*

[32]  It is not apparent from the Committee Report that the Committee even considered BlockFi International's by-laws or has analyzed the application of Bermuda law to the facts and circumstances here.

and then actually collect enough net proceeds (particularly after considering the massive spend required to pursue the claims in the first place) to make a difference to BlockFi creditors. The estates are far better off resolving such claims and focusing on the bigger picture.

52.     _Fraudulent Conveyance Claims_.  Any fraudulent conveyance claims would also face a number of substantial hurdles.  The Special Committee considered potential fraudulent conveyance actions arising out of certain transactions such as payments made to insiders around the time of the FTX Transaction, and certain secondary transactions by BlockFi insiders.  Such claims would run into a variety of strong defenses.  The claims would be extremely expensive to prosecute, and the net benefits of pursuing such claims are speculative at best.

53.     An overriding question is at what points the Debtors were solvent.  The Special Committee's Investigation concluded there is virtually no argument that the Debtors were insolvent at any point prior to June 1, 2022.  But even after that point, in light of the unique nature and terms of the FTX Transaction, which included an option to purchase the equity of BlockFi while granting FTX substantial control over certain major corporate decisions of BlockFi, and after which the Debtors still paid all their debts as they came due (including honoring billions of dollars in customer withdrawals), arguments to prove insolvency would be challenging.  For purposes of analyzing the claims, the Special Committee viewed the claims based on the assumption that the Debtors could be proven to be insolvent as of June 1, 2022 but, in determining the reasonableness of any potential settlement, also considered the cost of proving insolvency and the real possibility of a court finding the Debtors were not insolvent at any point prior to November 2022.

54.     Moreover, even assuming insolvency, the transactions at issue were not situations where the Debtors received **no** value, but rather would require a finder of fact to weigh the relative value of what the Debtors paid and received.  For instance, as part of the settlement associated

with the confidential counterparty identified in the Debtors' Global Notes, BlockFi received a release of all claims from it; even if those claims against BlockFi would have been weak on the merits, the release would still have value to BlockFi in avoiding litigation costs and bad publicity. The only aspect of the settlement that the Debtors arguably did not receive value for—gross-up amounts paid to the BlockFi insiders to cover their taxes from the transaction—are both relatively small (approximately $7.5 million) and still subject to substantial defenses (including that they should be considered part of one integrated transaction, through which BlockFi received the releases). Similarly, with respect to the bonuses paid to various employees in July 2022, the Debtors received value in the form of the service of those employees. In both situations, the Debtors received value in return for the payments. Attempting to prosecute claims based on those transactions would require showing that the value received for these payments was not "reasonably" equivalent—a substantial factual hurdle.

55.    Finally, even putting aside these weaknesses in the claims or the cost of pursuing such claims, the potential fraudulent transfer claims identified by the Special Committee would be substantially less than the value to the estates from the consideration being provided by the Released Parties. The value to the estates from the Released Parties' cooperation alone (putting aside the cash payments and waiver or subordination of claims) fully justify the decision to settle, separate and apart from the reality that the net recoverable amounts for these claims would likely not be worth the investment to pursue given the factual and legal weaknesses noted above.

56.    _Preference Claims_. As with the fraudulent conveyance claims, potential preference claims would require litigation over the uncertain issue of the Debtors' insolvency. And for preferences based on withdrawals from the Debtors' platform, such claims would also likely face an "ordinary course of business" defense under 11 U.S.C. § 547(c)(2). Moreover, aside from

withdrawals from the platform, none of the other payments identified in the Special Committee's Investigation were "on account of an antecedent debt," and thus would not be subject to recovery under § 547(b)(2) in any event.

57.     Accordingly, the uncertainty of a successful prosecution with respect to the potential claims and causes of action against the Released Parties weighs in favor of compromise. *See In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) (finding uncertainty weighs in favor of settlement); *see also Moreno v. Ray & Bergman, et al.*, 2007 WL 953115 (9th Cir. Jan. 29, 2007) ("Given the tremendous uncertainty of success at trial, this factor weighs heavily in favor of approval of the compromise").  Furthermore, any judgment obtained would be subject to appeal, with no guarantee as to the ultimate outcome.  Here, the Global Insider Settlement allows the Settlement Parties to reach a just, reasonable, and consensual outcome, and avoids the uncertainty of protracted and expensive litigation that could possibly take years.

58.     Given the issues with respect to potential claims and causes of action, the ability to successfully prosecute such claims is uncertain and therefore weighs in favor of the Court approving the Global Insider Settlement.

**B.      Any Litigation Involving Potential Claims Would be Complex, Expensive, Inconvenient, and Would Delay or Altogether Inhibit the Debtors' Efforts to Maximize Value for Their Clients.**

59.     In the absence of the Global Insider Settlement, recovery on account of the potential claims and causes of action would require the Debtors to engage in lengthy and costly litigation, which would take years and millions of dollars, and may never ultimately be successful.

60.     Pursuit of claims against the Released Parties would cause those Released Parties to turn their attention to defending themselves in those proceedings rather than focusing their time and energy on matters that will ensure the greatest possible recovery for creditors of the BlockFi estates.  The success or failure of the litigation being pursued against FTX, Alameda, 3AC, and

others is what will make a real difference to creditor recoveries.  Relative to the success or failure

of that go-forward litigation, every other issue facing the Debtors—including all of the Debtors'

potential affirmative claims against others, including the Released Parties—is far less significant.

61.    And the cooperation embodied in the Settlement Agreements is key to this success

or failure.  The Released Parties could, in some circumstances, be subpoenaed to testify in some

of the litigations with FTX, Alameda, 3AC and others.  But being limited to that compelled

testimony, which will itself be limited to seven hours of deposition time and (*if* the party is subject

to the subpoena power of the Court at issue) then time spent testifying at trial, would rob the estate

of the value of the knowledge the Released Parties have of the underlying transactions.  Having

access to those individuals to be able to talk through those issues with them over a longer period

of time and outside of an adversarial setting will substantially improve the Debtors' chance of

success in future litigation and serve to maximize recoveries for the Debtors' creditors.

62.    Pursuing litigation against the very individuals who will serve as key witnesses and

sources of information in future litigation that will *itself* determine the ultimate recovery to BlockFi

creditors would be antithetical to the Debtors obligation to maximize the value of the estate and

would be counterproductive.  The Debtors' estates will materially benefit by securing these

insiders' cooperation going forward.  Moreover, if the Debtors chose to directly pursue potential

claims and causes of action against the Released Parties or allow them to be pursued through

another litigation vehicle, any allegations asserted in such uncertain, and speculative, litigation,

would harm the Debtors in the ongoing litigation against other parties who actually did defraud

the Debtors and owe BlockFi hundreds of millions, if not billions, of dollars.  The bottom line is

that an estate fiduciary engaged in that pursuit would be cutting off their nose to spite their face,

harming BlockFi creditors.[33]

C.    **The Paramount Interests of Creditors Weighs Heavily in Favor of Approving the Global Insider Settlement.**

63.    The Global Insider Settlement inures to the benefit of, and is in the paramount

interests of, the Debtors' clients.  The Global Insider Settlement is a critical piece of the Debtors'

efforts to maximize the value of their estates and will assist the estates to (a) help facilitate the

ultimate distributions of Cash and Digital Assets to Clients upon emergence from chapter 11 and

(b) allow for the Released Parties to serve as key witnesses in the ongoing litigation against FTX,

Alameda, Emergent, 3AC, and others.

64.    As discussed above, the Released Parties will collectively contribute approximately

$2.2 million in cash consideration to the Debtors' estates in addition to waiver or subordination of

approximately $7 million in their own claims, while also agreeing to collectively contribute

hundreds of hours of their time to assisting the Debtors.  Moreover, settling these claims obviates

the need for protracted litigation and the associated fees and expenses, which could take years, and

allows for more amounts to be distributed to Clients.  The Global Insider Settlement will also

enable the Debtors to move forward with the completion of the administration of these Chapter 11

Cases and make distributions to creditors as fast as possible.

65.    Accordingly, approval of the Global Insider Settlement is in the paramount interests

of the Debtors' estates and all key stakeholders in these Chapter 11 Cases.

---

[33]    Indeed, the Committee Report exemplifies this concern; in its misguided effort to pursue claims against Mr. Prince and other officers, the Committee has made several unsupported assertions that will certainly be used against the Debtors in future litigation.  It is in the best interests of the estates (and creditors) for those to stop.

**II.    Consummating the Global Insider Settlement is a Sound Exercise of the Debtors'
Business Judgment Under Section 363(b)(1) of the Bankruptcy Code.**

66.    Section 363(b)(1) of the Bankruptcy Code provides that "after notice and a hearing

[a debtor] may use, sell, or lease, other than in the ordinary course of business, property of the

estate."   11 U.S.C. § 363(b)(1).   A settlement of claims and causes of action by a debtor in

possession constitutes a use of property of the estate.   *See Northview Motors, Inc. v. Chrysler

Motors Corp.*, 186 F.3d 346, 350–51 (3d Cir. 1999) ("[t]he scope of [11 U.S.C. § 541] is broad.  It

includes all kinds of property, including tangible or intangible property, causes of action . . . and

all other forms of property currently specified in section 70a of the Bankruptcy Act . . . ." (quoting

H.R.Rep. No. 95–595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6323).  If a settlement

is outside of the ordinary course of business of the debtor, it requires approval of the bankruptcy

court pursuant to section 363(b) of the Bankruptcy Code.   *See id.*; *see also Martin*, 91 F.3d at 395

n.2 ("Section 363 of the Code is the substantive provision requiring a hearing and court approval;

Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise

a controversy.").

67.    Courts in the Third Circuit have made clear that a debtor may use property of the

estate outside of the ordinary course of business under this provision if there is a good business

reason for doing so.   *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section

363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business

justification' . . . ."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999);

*In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Trans World

Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

68.    As a general rule, a debtor's decision to use property of the estate out of the ordinary

course of business shields a debtor's decisions from judicial second-guessing and enjoys a strong

presumption "that in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted)); *Montgomery Ward*, 242 B.R. at 153 ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions").

69.    Here, the Special Committee conducted a thorough investigation of the Investigated Issues, comprised of an in-depth review of 60,000 documents totaling approximately 750,000 pages and interviews of approximately 25 witnesses.  Kirkland ultimately produced an approximately 170-page draft Investigation Report detailing the merits of each potential claim and cause of action against the insiders and ultimately concluded that the Debtors would be better served focusing their efforts on obtaining recoveries from FTX, Alameda, Emergent and 3AC among others.  Litigating against the Released Parties for claims and causes of action where the only certainty is the cost and expense of such litigation is precisely a decision that should be reserved for a debtor when exercising its business judgment.  After this thorough Investigation, the Debtors do not see utility in pursuing the potential claims and causes of action against the Released Parties, and neither should any other party, including the Committee.

### Conclusion

70.    For the reasons set forth herein, authorizing the Debtors to proceed with the Global

Insider Settlement is in the best interest of the Debtors, their estates, creditors and all parties in

interest in these Chapter 11 Cases.  Furthermore, the Debtors have more than demonstrated that

the Global Insider Settlement falls well above the lowest point in the range of reasonableness as

required before the Court.  Accordingly, the Debtors request that the Court approve the Motion

and the Global Insider Settlement.

### Request of Waiver of Stay

71.    To the extent that the relief sought in the Motion constitutes a use of property under

section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the fourteen-day stay under

Bankruptcy Rule 6004(h).  As explained herein, the relief requested in this Motion is immediately

necessary for the Debtors to be able to continue to operate their businesses and preserve the value

of their estates.

### Waiver of Memorandum of Law

72.    The Debtors respectfully request that the Court waive the requirement to file a

separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon

which the Debtors rely is set forth herein and in the attachments hereto, and the Motion does not

raise any novel issues of law.

### Reservation of Rights

73.    Nothing contained in this Motion or any actions taken pursuant to any order

granting the relief requested by this Motion is intended or should be construed as (a) an admission

as to the validity of any particular claim, (b) a waiver of the Debtors' rights to dispute any particular

claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication

or admission that any particular claim is of a type specified or defined in this Motion or any order

granting the relief requested by this Motion, (e) a request or authorization to assume any

agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver or

limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law.  If the

Court grants the relief sought herein, any payment made pursuant to the Court's order is not

intended and should not be construed as an admission as to the validity of any particular claim or

a waiver of the Debtors' rights to subsequently dispute such claim.

**No Prior Request**

74.      No prior request for the relief sought in this Motion has been made.

**Notice**

75.      The Debtors will provide notice of this Motion to the following parties and/or their

respective counsel, as applicable:  (a) the office of the U.S. Trustee for the District of New Jersey;

(b) the Committee; (c) the United States Attorney's Office for the District of New Jersey; (d) the

Internal Revenue Service; (e)  the U.S. Securities and Exchange Commission; (f) the attorneys

general in the states where the Debtors conduct their business operations; (g) the Released Parties;

and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit

that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors request that the Court enter an order, in substantially the forms submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: July 10, 2023

/s/ Michael D. Sirota
_____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

| | |
|---|---|
| In re:<br>BLOCKFI INC., *et al.*,<br>            Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

**ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT AND RELEASE OF CLAIMS AND CAUSES OF ACTION BY AND AMONG THE DEBTORS AND**

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**CERTAIN OF THE DEBTORS' INSIDERS AND (II) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered three (3) through four (4), is

**ORDERED**.

(Page | 4)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al*. |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT AND RELEASE OF CLAIMS AND CAUSES OF ACTION BY AND AMONG THE DEBTORS AND CERTAIN OF THE DEBTORS' INSIDERS AND (II) GRANTING RELATED RELIEF |

Upon the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement and Release of Claims and Causes of Action By and Among the Debtors and Certain of the Debtors' Insiders and (II) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) approving the Global Insider Settlement by and among the Settlement Parties as set forth in the Settlement Agreement, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** on the basis as set forth herein.

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(Page | 5)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al*. |
| Case No. | 22-19361 (MBK) |
| Caption of Order: | ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT AND RELEASE OF CLAIMS AND CAUSES OF ACTION BY AND AMONG THE DEBTORS AND CERTAIN OF THE DEBTORS' INSIDERS AND (II) GRANTING RELATED RELIEF |

2.    The Settlement Agreements by and among the Settlement Parties attached hereto as <u>Exhibit A</u> are hereby approved.  The Debtors are authorized and directed to take all actions necessary to immediately continue and fully implement the Global Insider Settlement in accordance with the terms, conditions, and agreements in the forms attached hereto.

3.    This Order shall be binding on the Debtors, their estates, all creditors and parties-in-interest, and any trustee appointed in these cases.

4.    Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

5.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

6.    The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

7.    Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the hearing, nothing in the Motion, this Order, or announced at the hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

8.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# Exhibit A

DocuSign Envelope ID: 7C84D58A-CDFE-447F-8199-7B8548E89C8I

## GLOBAL SETTLEMENT AGREEMENT AND RELEASE

This Global Settlement Agreement and Release ("Settlement Agreement") is entered into as of July 10, 2023, by and among (i) Zachary Prince, Florencia Marquez, Amit Cheela, Jonathan Mayers, Robert Loban, and Tony Lauro (each a "BlockFi Individual" and, collectively, the "BlockFi Individuals") and (ii) BlockFi Inc. and its affiliated Debtors (collectively, the "Debtors," and, with the BlockFi Individuals, the "Parties").

## RECITALS

WHEREAS, on November 28, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petition Date") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), Case No. 22-19261-MBK;

WHEREAS, Prince, Marquez, Cheela, Mayers, and Loban are expected to remain employees of the Debtors through the effective date of chapter 11 a plan confirmed by the Bankruptcy Court (the "Plan"), if not longer, and Lauro is expected to remain on the Board of Directors of BlockFi Inc. through the effective date of a Plan;

WHEREAS, prior to the Petition Date, the Debtors appointed a special committee of the Board of Directors of BlockFi Inc. (the "Special Committee") and tasked it with performing an investigation into potential claims or causes of action the Debtors may hold against certain parties, including the BlockFi Individuals, and determining whether such claims or causes of action should be pursued, released, settled, or retained (the "Special Committee Investigation");

WHEREAS, the Special Committee Investigation included a review of many matters in the history of BlockFi prior to the Petition Date, including BlockFi's business in general; BlockFi's risk and investment policies; BlockFi's investments in (and acceptance of collateral related to) the Grayscale Bitcoin Trust ("GBTC"); BlockFi's dealings with Three Arrows Capital ("3AC"); BlockFi's dealings with Alameda Research ("Alameda") and FTX US ("FTX") generally, including the time periods before and after BlockFi's transaction with FTX announced July 1, 2022 (the "FTX Transaction"); the participation of the BlockFi Individuals in secondary stock transactions; BlockFi's compensation of employees generally, and including (but not limited to) certain payments made in connection with or following the FTX Transaction; transactions related to SECFI, Inc., and Serengeti Asset Management (collectively "SecFi"); BlockFi's procurement of additional director and officer liability insurance in November 2022; and BlockFi's decision to sell cryptocurrency in November 2022 (collectively, the "Specifically Investigated Matters");

WHEREAS, the Special Committee Investigation resulted in the creation of, among other pieces of work product, a privileged written report that analyzed the strengths and weaknesses of potential claims or causes of action the Debtors may possess against insiders of the Debtors, including the BlockFi Individuals;

WHEREAS, the BlockFi Individuals deny liability for any of the potential claims the Debtors' may possess against them, including any of the Specifically Investigated Matters; and

1

DocuSign Envelope ID: 7C84D58A-CDFE-447F-8199-7B8543E89C9A

WHEREAS, the Parties now seek to reach a consensual resolution of the potential claims and causes of actions the Debtors may hold in order to avoid costly and time-consuming litigation and to attempt to maximize the value of the Debtors' estates;

NOW, THEREFORE, in consideration of the mutual promises and releases contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.    **Approval Process.**  Within fourteen (14) days of the execution of this Settlement Agreement, the Debtors shall file a motion seeking the Bankruptcy Court's approval of this Settlement Agreement (the "9019 Motion").

2.    **Need to Secure Bankruptcy Court Approval.**    The Parties agree and acknowledge that this Settlement Agreement is contingent upon and shall be binding on the Parties only after the issuance of an order by the Bankruptcy Court approving this Settlement Agreement (the "9019 Approval Order").

3.    **Cooperation with the Estate.**  The BlockFi Individuals agree to cooperate and assist the Debtors[1] before and following the effective date of the Plan with (a) any litigation, including but not limited to litigation between and among the Debtors and FTX, Alameda, 3AC, Core Scientific, and any other counterparties (including the United States); (b) any regulatory inquiries promulgated by federal, state, or international authorities; and (c) distributions to clients from the BlockFi platform, including specifically in-kind distributions (the "Cooperation Requirement"), as set forth herein.  Specifically, following their departures from the Debtors' employ, the BlockFi Individuals agree to provide up to the number of hours reflected in Chart 1 in cooperating with the Debtors' estate without any further compensation beyond the terms described in this Settlement Agreement.  Any time spent actually testifying (at deposition or trial) or formally preparing for such testimony shall not count toward the number of hours of cooperation reflected in Chart 1.

(a)    Each BlockFi Individual shall provide to the Debtors (or an individual the Debtors identify) a log of hours such BlockFi Individual has spent towards the Cooperation Requirement on at least a monthly basis.  Such information may be provided in any written format, including an informal email.  If there is a dispute concerning the hours reported by any BlockFi Individual, including a claim by the Debtors that a BlockFi Individual has not provided the required reporting, the Debtors and that BlockFi Individual shall confer in good faith to attempt to resolve such dispute.  To the extent they are unable to resolve such dispute, the issue may be raised with the Bankruptcy Court for resolution.

(b)    If any BlockFi Individual completes the number of hours of cooperation reflected in Chart 1, the Debtors and that BlockFi Individual may agree for that BlockFi Individual to provide further cooperation on terms mutually agreed to.  If the Debtors and

---

[1]    For the avoidance of doubt, any references to the "Debtors" in this Settlement Agreement also applies to any successor to the Debtors' interests, such as the Wind-Down Debtors (as defined in the Plan) or similar entity.

the BlockFi Individual cannot come to agreement on such terms, the issue may be raised with the Bankruptcy Court for the Court to determine fair compensation and terms for such cooperation, taking into account, among other things, any other employment or obligations of such BlockFi Individual.

(c)     For the avoidance of doubt, the Cooperation Requirement shall not preclude the BlockFi Individuals from taking alternative full-time employment following their departure of the employ of the Debtors and during the time the Cooperation Requirement is effective.

(d)     The Debtors and the BlockFi Individuals will coordinate to ensure that the Debtors receive the cooperation they need consistent with the schedules of the BlockFi Individuals, which may require cooperation to occur at night and on weekends.  The Debtors will take reasonable steps to accommodate schedules of the BlockFi Individuals and, to the extent reasonably practical, schedule the time required under the Cooperation Requirement around the schedules of the BlockFi Individuals.

(e)     To the extent any BlockFi Individual incurs reasonable and documented out-of-pocket expenses in the course of his or her cooperation after their employment with the Debtors ends, such costs will be reimbursed by the Debtors.

The Debtors agree that the Wind-Down Estate will indemnify the BlockFi Individuals and procure reasonable and customary insurance coverage with respect to services performed by the BlockFi Individuals after the effective date of any plan of reorganization and provided as part of the Cooperation Requirement.

4.     **Waiver and Subordination of Claims Against Estate**.  Each of the BlockFi Individuals waive and/or subordinate claims the BlockFi Individuals have asserted or may assert against the Debtors.  Such claims to be waived or subordinated are reflected in Chart 2.

(a)     Certain BlockFi Individuals are agreeing to subordinate their claims against the Debtors, including for amounts those BlockFi Individuals held on the Debtors' platform and indemnity claims against the Debtors (except as is necessary to preserve their claims to coverage under any available insurance policy).  For purposes of this Settlement Agreement, subordinating those claims shall mean that the BlockFi Individual shall not receive any recovery on account of the subordinated claim unless and until Classes 1-V creditors under the proposed Plan receive 100% recovery on their allowed claims.

(b)     For the avoidance of doubt, nothing in this Settlement Agreement shall impact any BlockFi Individual's ability to sell or transfer any claims they hold against the Debtors' estate (if any) that are not waived or subordinated by this Settlement Agreement. If a BlockFi Individual sells or transfers any claims, the treatment of such claims will remain subject to the terms of this Settlement Agreement.  Also for the avoidance of doubt, nothing in his Settlement Agreement shall impact any BlockFi Individual's ability to access any insurance proceeds on any policy for which he or she is a beneficiary or preclude any BlockFi Individual from making a request for indemnification from the Debtors to the extent necessary for that BlockFi Individual to maintain access to such insurance.

5.    **Cash Payment**.  Certain BlockFi Individuals have agreed to make cash payments to the Debtors (the "Cash Payments").  The amount of the Cash Payments, as applicable, are reflected in Chart 3.

(a)    Each of the Cash Payments shall be made in three installments.  One third of the total amount of the Cash Payments due from any BlockFi Individual must be paid within two business days of the date upon which the Court's Confirmation Order becomes final (either through the running of any applicable period for appeals of the Confirmation Order without an appeal being taken by any party or through the affirmation on appeal of the Confirmation Order) (the "First Payment Date").  One third of the total amount of the Cash Payments due from any BlockFi Individual must be paid by the day 120 days after the First Payment Date (the "Second Payment Date").  One third of the total amount of Cash Payments due from the BlockFi Individual must be paid on the later of: (i) the day at least two (2) weeks before the date the Debtors are scheduled to make a non-wallet distribution to creditors; or (ii) the day five (5) days after the Debtors give the Individual written notice that the Debtors intend to commence non-wallet distributions on a date certain (the "Third Payment Date", and, together with the First Payment Date and Second Payment Date, the "Payment Dates").

(b)    If any of the Payment Dates fall on a weekend or holiday, the payment due on that Payment Date will instead be due on the next business day that is not a holiday.

(c)    Notwithstanding anything to the contrary in this Paragraph 5, the entire amount of the Cash Payments due from any BlockFi Individual shall be made no later than the Third Payment Date.  For the avoidance of doubt, if the Third Payment Date occurs prior to the occurrence of the Second Payment Date, the entirety of Cash Payments not already paid by the BlockFi Individual will be due upon the Third Payment Date.

(d)    Nothing in this Settlement Agreement shall prevent any BlockFi Individual from making the required Cash Payments on dates prior to the Second Payment Date or the Third Payment Date.

(e)    Cash Payments shall be made by check or wire transfer of U.S Dollars pursuant to appropriate instructions provided by the Debtors to the BlockFi Individuals.

(f)    The Debtors will not dispute the BlockFi Individuals characterizing the Cash Payments as repayments under claim of right under Internal Revenue Code § 1341.

6.    **Estate Releases**.  In return for the agreements set forth in this Settlement Agreement, the Debtors shall include each of the BlockFi Individuals as a "Released Party" for purposes of the Debtors' Plan (the "Release") in which all claims and causes of action by the Debtors against the Released Parties shall be released.  The Second Amended Joint Chapter 11 Plan and Disclosure Statement related thereto were filed on June 28, 2023, at Docket Nos. 1132-33 in the Bankruptcy Court (the "Proposed Plan").  The Debtors agree that they will not voluntarily modify the estate Releases in the Proposed Plan in a way that is adverse to the BlockFi Individuals without securing their consent, and that if the Debtors do so, this Agreement is null and void as to such BlockFi Individual.

7.      **Loss of Release**.   The Release described in Paragraph 6 shall be effective immediately as of the entry of the 9019 Approval Order, but shall be subject to both the Cash Payments and waiver/subordination of claims provided in this Agreement and specifically subject to the Cooperation Requirement and related obligations reflected herein.

(a)      To the extent the Debtors believe any BlockFi Individual is not complying with the Cooperation Requirement, the Debtors shall provide written notice to the BlockFi Individual outlining the specific basis for believing that BlockFi Individual is not complying with the Cooperation Requirement (the "Cooperation Notice").   The BlockFi Individual shall have ten (10) days from receipt of the Cooperation Notice to cure the claimed lack of cooperation.   If the Parties cannot resolve the dispute over the claimed lack of cooperation in the Cooperation Notice, the Debtors or the affected BlockFi Individual may bring the dispute to the Bankruptcy Court for resolution.

(b)      Upon receiving notice of a dispute concerning the Cooperation Requirement as reflected in Paragraph 7(a), the Bankruptcy Court shall give all parties an opportunity to be heard and shall then determine whether any BlockFi Individual is complying with the Cooperation Requirement.   Upon a final determination by the Bankruptcy Court that a BlockFi Individual is not complying with the Cooperation Requirement, the Release shall be null and void and of no further force and effect as to that BlockFi Individual.   For the avoidance of doubt, upon a determination by the Bankruptcy Court that a BlockFi Individual is not complying with the Cooperation Agreement, this Settlement Agreement shall be unwound as to that individual, and all consideration provided by that individual in exchange for the Release shall (within seven (7) days of the unwinding of such Release) be returned to such BlockFi Individual.

(c)      No individual or entity (including, but not limited to the Debtors) may take any action to pursue a claim or cause of action against any BlockFi Individual covered by the Release until after (i) the Bankruptcy Court makes a final determination that a BlockFi Individual is not complying with the Cooperation Requirement, (ii) the Settlement Agreement has been unwound and all consideration provided by that BlockFi Individual has been returned, and (iii) the Release is finally declared null and void.

8.      **Termination**.   Any of the Parties may serve written notice of the termination of this Settlement Agreement upon the occurrence of any of the following events:

(a)      The entry of an order by the Bankruptcy Court denying approval of the 9019 Motion without leave to re-file or modify the Motion; or

(b)      The entry of an order by the Bankruptcy Court purporting to modify the terms of settlement or ordering modifications to the Debtors' Plan that alter the releases contemplated by the Settlement Agreement or otherwise materially impact the terms of this Settlement Agreement adversely to the BlockFi Individuals.

9.      **Access to Documents**.   The Debtors will provide the BlockFi Individuals (through their counsel) with reasonable access to BlockFi documents, consistent with their confidentiality

DocuSign Envelope ID: 7C84D58A-CDF5-447F-8199-7B8548E89C8L

obligations to BlockFi, in connection with the defense of any third-party claims, including but not limited to the pending securities litigation.

10.    **Retained Jurisdiction.**  The Parties agree that the Bankruptcy Court shall retain jurisdiction to interpret and enforce the terms of this Settlement Agreement.

11.    **Conflict with Orders**.  To the extent there is any conflict between the terms of this Settlement Agreement and the terms of the 9019 Approval Order, the terms of the 9019 Approval Order shall control.

12.    **No Admission of Liability.**  This Settlement Agreement constitutes a compromise of disputed claims.  This Settlement Agreement is not an indication that the Special Committee found, or that the Bankruptcy Court found, any misconduct of any kind having been committed by any of the BlockFi Individuals.  Nothing herein shall be construed or used as evidence of any admission of liability or responsibility by any of the Parties hereto or any waiver of any privilege or defense.  Each of the Parties also acknowledges, understands, and agrees that liability for any claim, demand, or cause of action is specifically denied.

13.    **Warranties and Representations.**  Each of the Parties represents and warrants to the other Parties that: (a) it has not heretofore or otherwise transferred to any persons any claim or potential claim which it may have against the other Parties, (b) it has full power, right, and authority to execute this Settlement Agreement and to take all steps necessary to implement its terms and conditions and take the actions contemplated hereby, (c) this Settlement Agreement has been duly and validly executed and delivered by it and constitutes the legal, valid, and binding obligation of such Parties enforceable against such Parties in accordance with its terms, and (d) other than from the Bankruptcy Court, no consent of any person or entity not a party to this Settlement Agreement is necessary for this Settlement Agreement to be fully and completely binding upon each of the Parties.

14.    **Costs, Fees, and Expenses.**  The Parties agree that they will not seek repayment or reimbursement of the Cash Payments or reimbursement for the Waiver and Subordination of Claims from any source, including the Debtors or any insurance carriers.  In addition, subject to a Party's right to seek insurance coverage for legal fees incurred consistent with the terms of this Settlement Agreement, each of the Parties shall bear its own attorneys' fees, costs, and expenses incurred in connection with this Settlement Agreement.

15.    **Governing Law and Forum Selection.**  This Settlement Agreement is made under and shall be governed, construed, and enforced in accordance with the laws of the State of New Jersey without giving effect to its conflicts of law principles that would require or permit a court to consider the laws of any other state.  The Parties agree that any litigation arising out of or relating to this Settlement Agreement shall be brought solely and exclusively in the Bankruptcy Court, and, for purposes of any such litigation, the Parties consent to the jurisdiction and venue of said court.

16.    **Entire Agreement.**  This Settlement Agreement constitutes and contains the entire agreement and understanding between the Parties with respect to the above referenced disputes and supersedes and replaces all prior negotiations, representations, agreements, judgments, or orders, proposed or otherwise, whether written or oral, concerning the matters covered in the

DocuSign Envelope ID: 7C84D58A-GDF5-447F-8199-7B8E48E89C8L

Settlement Agreement.  No representations have been made to induce any of the Parties to enter into this Settlement Agreement except for the representations expressly stated herein.  No covenant or condition not expressed in this Settlement Agreement shall affect or be effective to interpret, change, or restrict this Settlement Agreement.

17.    **No Oral Modification or Waiver.**  No modification of any provision of this Settlement Agreement shall be binding unless in writing signed by the Parties.  No provision of this Settlement Agreement may be waived except by a writing signed by the Party that expressly refers to this Paragraph of this Settlement Agreement and makes such waiver, and such waiver shall be limited to the terms of such writing.  Waiver of any one breach shall not be deemed to be a waiver of any other breach of the same or of any other provision hereof, nor shall any such waiver by any Party be deemed to be a continuing waiver.  No delay or omission by any Party in exercising any right hereunder, at law, in equity, or otherwise, shall impair any such right or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any right preclude other or further exercise of such right or the exercise of any other right.

18.    **Successors and Assigns.**  Every covenant, term, and provision of this Settlement Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, assigns, heirs, legal representatives, and transferees, including the Wind-Down Debtors.

19.    **Counterparts.**  This Settlement Agreement may be executed by the Parties hereto in several counterparts, each of which shall be deemed to be an original but all of which shall constitute together one and the same agreement.  This Settlement Agreement may be executed by facsimile or .pdf signature, and a facsimile or .pdf signature shall constitute an original for all purposes.

**[INTENTIONALLY LEFT BLANK; SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the Parties hereunto have executed this Settlement Agreement

DocuSigned by:

*Zac Prince*

FFA30A9A87CD4EC...

_____

Zachary Prince

DocuSigned by:

*Florencia Marquez*

CAC052FED8E54EF...

_____

Florencia Marquez

_____

Jonathan Mayers

_____

Tony Lauro

_____

Amit Cheela

_____

Rob Loban

_____

BlockFi Inc., by
Scott Vogel, in his capacity as an Independent Director
of BlockFi, Inc.

IN WITNESS WHEREOF, the Parties hereunto have executed this Settlement Agreement

_____

Zachary Prince


_____

Florencia Marquez


DocuSigned by:

_Jonathan Mayers_____

Jonathan Mayers


_____

Tony Lauro


_____

Amit Cheela


_____

Rob Loban


_____

BlockFi Inc., by
Scott Vogel, in his capacity as an Independent Director
of BlockFi, Inc.

IN WITNESS WHEREOF, the Parties hereunto have executed this Settlement Agreement

_____

Zachary Prince

_____

Florencia Marquez

_____

Jonathan Mayers

_____

Tony Lauro

_____

Amit Cheela

_____

Rob Loban

_____

BlockFi Inc., by
Scott Vogel, in his capacity as an Independent Director
of BlockFi, Inc.

IN WITNESS WHEREOF, the Parties hereunto have executed this Settlement Agreement

_____

Zachary Prince

_____

Florencia Marquez

_____

Jonathan Mayers

_____

Tony Lauro

_____

Amit Cheela

_____

Rob Loban

_____

BlockFi Inc., by
Scott Vogel, in his capacity as an Independent Director
of BlockFi, Inc.

IN WITNESS WHEREOF, the Parties hereunto have executed this Settlement Agreement

_____
Zachary Prince


_____
Florencia Marquez


_____
Jonathan Mayers


_____
Tony Lauro


_____
Amit Cheela

DocuSigned by:

*Robert Loban*

C0DBBD97C47E4FE
_____
Rob Loban


_____
BlockFi Inc., by
Scott Vogel, in his capacity as an Independent Director
of BlockFi, Inc.

IN WITNESS WHEREOF, the Parties hereunto have executed this Settlement Agreement

_____

Zachary Prince


_____

Florencia Marquez


_____

Jonathan Mayers


_____

Tony Lauro


_____

Amit Cheela


_____

Rob Loban


_____

BlockFi Inc., by
Scott Vogel, in his capacity as an Independent Director
of BlockFi, Inc.

DocuSign Envelope ID: 7C84D58A-CDFE-447F-8199-7B8548E89C8L

**Chart 1**

| Individual | Hours of Cooperation[2] |
|---|---|
| Zachary Prince | 200 |
| Florencia Marquez | 200[3] |
| Amit Cheela | 100[4] |
| Jonathan Mayers | 200[5] |
| Rob Loban | 100 |
| Tony Lauro | 200 |

---

[2]    For the avoidance of doubt, the Cooperation Requirements reflected here are the time commitments each BlockFi Individual has agreed to make to the Debtors *after* the end of their employment with BlockFi.  Until each BlockFi individual either terminates affirmatively their employment with the Debtors or is let go by the Debtors (including by the Wind-Down estate), such individual shall remain a full-time employee and/or a board member of BlockFi.  Mr. Lauro is anticipated to complete his service on the BlockFi board upon the effective date of a Plan. Messrs. Prince, Mayers, Loban, and Cheela agree that they will remain full time employees until, at least, the earlier of (a) the date the Wind-Down Debtors advise the respective individual that it does not need their full time service; or (b) December 31, 2023, subject to further good faith negotiations between the individuals and the Wind-Down Debtors if further full-time service is needed.

[3]    Ms. Marquez will remain a full time paid BlockFi employee until the Wind-Down Estate's completion of a successful launch of a system needed for distribution from the BlockFi interest account.  Her Cooperation Requirement reflects her obligations following the end of her paid employment at BlockFi.

[4]    Mr. Cheela's Cooperation Requirement shall not require him to work more than ten (10) hours in any individual week.

[5]    Mr. Mayers's Cooperation Requirement shall not require him to work more than 2 (two) hours on any day, more than ten (10) hours in any single calendar week, or more than twenty (20) hours in any calendar month.

**Chart 2**

| Individual | Amount of Claims Waived and/or Subordinated |
|---|---|
| Zachary Prince | Entire amount held on the Debtors' platform waived.[6] <br><br> Subordination of all other unsecured claims asserted against the Debtors' estate except as stated below. <br><br> Subordination of any indemnity claims except to the extent needed to access insurance policies. |
| Florencia Marquez | Entire amount held on the Debtors' platform waived. <br><br> Waiver of all other unsecured claims asserted against Debtors' estate, except indemnity claims. <br><br> Subordination of any indemnity claims except to the extent needed to access insurance policies. |
| Amit Cheela | Waiver of $200,000 of assets held on Debtors' platform.[7] <br><br> Subordination of all other unsecured claims against the Debtors' estates except as stated below. <br><br> Subordination of any indemnity claims except to the extent needed to access insurance policies. |
| Jonathan Mayers | Waiver of all unsecured claims against estate except as stated below. <br><br> Subordination of any indemnity claims except to the extent needed to access insurance policies. |
| Rob Loban | Subordination of entire amount on Debtors' platform. <br><br> Waiver of all other unsecured claims against estate except as stated below. <br><br> Subordination of any indemnity claims except to the extent needed to access insurance policies. |
| Tony Lauro | Subordination of entire amount on Debtors' platform. <br><br> Waiver of all other unsecured claims against estate except as stated below. <br><br> Subordination of any indemnity claims except to the extent needed to access insurance policies. |

---

[6]    For the avoidance of doubt, amounts that are "waived" means that the respective individual will not receive any recovery in exchange for the waived claims, regardless of the outcome of the Debtors' chapter 11 cases.

[7]    For the avoidance of doubt, amounts held on the Debtors' platform by Mr. Cheela in excess of $200,000 shall be neither waived nor subordinated.

**Chart 3**

| **Individual** | **Cash Payment Amount** |
|---|---|
| Zachary Prince | $1,500,000 |
| Florencia Marquez | $500,000 |
| Amit Cheela | N/A |
| Jonathan Mayers | N/A |
| Rob Loban | N/A |
| Tony Lauro | $100,000 |

SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release (the "Agreement") is entered into by and between BlockFi Inc., together with its debtor subsidiaries (collectively, the "Company" or "Debtors") and Andrew Tam ("Employee", and, together with the Company, the "Parties").

1.    End of Employment.  The Parties acknowledge and mutually agree that on August 31, 2023 (the "Resignation Date"), Employee's employment with the Company will terminate.  Employee will be paid his regular salary through the Resignation Date.

2.    COBRA.  The benefits received by Employee (and Employee's eligible dependents, if any) under the Company's medical and dental plan(s) shall cease as of the Resignation Date.  Thereafter, pursuant to governing law and independent of this Agreement, Employee will be entitled to elect benefit continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), for Employee and any eligible dependents if Employee timely applies for such coverage. Such COBRA coverage will be at Employee's sole expense.  Information regarding Employee's eligibility for COBRA coverage and the terms and conditions of such coverage will be provided to Employee in a separate mailing.

3.    Release.  In exchange for the consideration provided to Employee pursuant to this Agreement, Employee, on behalf of Employee and all of Employee's spouse, heirs, executors, administrators, successors, and assigns (collectively, "Releasors"), hereby releases and forever waives and discharges any and all claims, demands, contracts, promises, obligations, causes of action, suits, controversies, actions, crossclaims, counterclaims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, any other damages, claims for costs and attorneys' fees, losses or liabilities of any nature whatsoever in law and in equity and any other liabilities, known or unknown, suspected or unsuspected of any nature whatsoever (collectively, "Claims") that Employee or any of the other Releasors ever had, now have, or might have against the Company, and/or its or their respective current, former, and future affiliates, subsidiaries, parents, related companies, controlling shareholders, owners, divisions, directors, members, trustees, officers, general partners, limited partners, employees, agents, attorneys, successors, assigns, representatives, insurers, and investment funds (and the other investment vehicles any of the foregoing manage and/or for which they perform services) (collectively, with the Company, the "Company Group" and each a "Company Group Member"); and each Company Group Member's respective current, former, and future directors, members, trustees, controlling shareholders, subsidiaries, general partners, limited partners, affiliates, related companies, divisions, officers, employees, agents, insurers, representatives, and attorneys (collectively, with the Company Group, the "Releasees" and each a "Releasee"), arising at any time prior to and including the date Employee executes this Agreement, whether such Claims are known to Employee or unknown to Employee, whether such Claims are accrued or contingent, including, but not limited to, any and all (a) Claims arising out of, or that might be considered to arise out of or to be connected in any way with, Employee's employment or other relationship with any of the Releasees, or the Resignation of such employment or other relationship; (b) Claims under any contract, agreement, or understanding that Employee may have with any of the Releasees, whether written or oral, whether express or implied, at any time prior to the date Employee executes this Agreement (including, but not limited to, under any employment agreement, offer letter, or any carried interest documents or agreements); (c) arising from or in any way related to awards, policies, plans, programs or practices of any of the Releasees that may apply to Employee or in which Employee may participate; (d) any Claims for any bonus, incentive payment, severance or other Compensation; (e) any Claims for any carried interest distributions or other carry rights; (f) Claims arising under any federal, state, foreign, or local law, rule, ordinance, or public policy,

including, without limitation, (i) Claims arising under the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Civil Rights Act of 1991, the Americans With Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act of 1974, the Vietnam Era Veterans Readjustment Act of 1974, the Immigration Reform and Control Act of 1986, the Equal Pay Act, the Labor Management Relations Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, the Genetic Information Nondiscrimination Act of 2008, the Rehabilitation Act of 1973, the Uniformed Services Employment and Reemployment Rights Act, the Worker Adjustment and Retraining Notification Act, the Sarbanes-Oxley Act of 2002, the Dodd-Frank Act, and the Internal Revenue Code of 1986, as all such laws have been amended from time to time, or any other federal, state, foreign, or local labor law, wage and hour law, worker safety law, employee relations or fair employment practices law, or public policy, (ii) Claims arising in tort, including, but not limited to, Claims for misrepresentation, defamation, libel, slander, invasion of privacy, conversion, replevin, false light, tortious interference with contract or economic advantage, negligence, fraud, fraudulent inducement, quantum meruit, promissory estoppel, prima facie tort, restitution, or the like, and (iii) Claims for Compensation, attorneys' or experts' fees or costs, forum fees or costs, or any tangible or intangible property of Employee's that remains with any of the Releasees; and (g) Claims arising under any other applicable law, regulation, rule, policy, practice, promise, understanding, or legal or equitable theory whatsoever; provided, however, that Employee does not release (A) any Claims that arise after the date Employee executes this Agreement; (B) any Claims for breach of this Agreement or to enforce the terms of this Agreement; (C) any Claims that cannot be waived or released as a matter of law; (D) any claims Employee may have to workers' compensation or unemployment benefits; or (E) any right to the Vested 401(k) Benefits.  Employee specifically intends the release of Claims in this Paragraph 3 to be the broadest possible release permitted by law.  This release includes the release of any proof of claim that Employee has filed or could file against the Company (including the waiver of the entire amount held by Employee on Debtors' platform), including any indemnity claim, except to the extent seeking indemnity is necessary to preserve Employee's claim to coverage under any applicable insurance policy.[1]

4.      Cash Payment.  Employee agrees to make a cash payment of $100,000 (the "Cash Payment") to the Company in three installments, subject to the conditions set forth below in Paragraph 13.  One third of the total amount of the Cash Payment must be paid within two business days of the date upon which the Bankruptcy Court's Confirmation Order becomes final (either through the running of any applicable period for appeals of the Confirmation Order without an appeal being taken by any party or through the affirmation on appeal of the Confirmation Order) (the "First Payment Date").  One third of the total amount of the Cash Payment must be paid by the day 120 days after the First Payment Date (the "Second Payment Date").  One third of the total amount of Cash Payment must be paid on the later of: (i) the day at least two (2) weeks before the date the Debtors are scheduled to make a non-wallet distribution to creditors; or (ii) the day five (5) days after the Debtors give Employee written notice that the Debtors intend to commence non-wallet distributions on a date certain (the "Third Payment Date", and, together with the First Payment Date and Second Payment Date, the "Payment Dates").  Notwithstanding anything to the contrary in this Paragraph 4, the entire amount of the Cash Payments shall be made no later than the Third Payment Date.  For the avoidance of doubt, if the Third Payment Date occurs before the Second

---

[1]   For the avoidance of doubt, Employee shall not seek reimbursement for the Cash Payment or for his waiver or subordination of general unsecured claims against the Company's estates from anyone, including the Company or any insurer.  Nothing in his Settlement Agreement shall otherwise impact Employee's ability to access any insurance proceeds on any policy for which he is a beneficiary or preclude Employee from making a request for indemnification from the Debtors to the extent necessary for Employee to maintain access to such insurance.

Payment Date, the entirety of Cash Payments not already paid will be due upon the Third Payment Date. The Company will not dispute the Employee characterizing the Cash Payment as a claim of right refund.

5.     <u>Release by Company</u>. In exchange for the consideration provided by Employee pursuant to this Agreement, the Company shall include Employee as a "Released Party" for purposes of its Plan of Reorganization to be filed in the United States Bankruptcy Court for the District of New Jersey (such court, the "<u>Bankruptcy Court</u>", and such release, the "<u>Company Release</u>"). The Second Amended Joint Chapter 11 Plan and Disclosure Statement related thereto were filed on June 28, 2023, at Docket Nos. 1132-33 in the Bankruptcy Court (the "Proposed Plan"). The Debtors agree that they will not modify the estate Releases in the Proposed Plan in a way that is adverse to Employee without securing his consent, and that if the Debtors do so, this Agreement is null and void as to Employee. For the avoidance of doubt, nothing in this Agreement should be read to suggest that the Company (or the Special Committee of the Board of BlockFi Inc. (the "<u>Special Committee</u>")) accused Employee of any misconduct or found any such misconduct. To the contrary, the Special Committee, in connection with activities in the Bankruptcy Court, did a comprehensive investigation and did not identify any such misconduct, although the Special Committee identified potential avoidance claims against Employee, and such potential avoidance claims are being resolved in this Agreement.

6.     <u>No Further Payments</u>. Employee acknowledges and agrees that the Release provided in Paragraph 3 above: (a) is in full discharge of any and all liabilities and obligations the Releasees have to Employee following the Resignation Date, monetarily or otherwise, with respect to Employee's employment or otherwise, other than any continuing or vested rights Employee may have, if any, under the Company's 401(k) Plan, as set forth in the books and records of such 401(k) Plan (the "<u>Vested 401(k) Benefits</u>"); and (b) exceeds any payment, benefit, or other thing of value to which Employee might otherwise be entitled. Except with respect to the Vested 401(k) Benefits, Employee specifically acknowledges and agrees that the Company and the Releasees have paid to Employee all of the wages, commissions, overtime, premiums, vacation, notice pay, severance pay, separation pay, sick pay, holiday pay, equity, phantom equity, carried interest, distributions, allocations, royalties, bonuses, deferred compensation, and other forms of compensation, benefits, perquisites, or payments of any kind or nature whatsoever to which Employee was or may have been entitled (collectively, "<u>Compensation</u>"), and that the Company and the Releasees do not owe Employee any other Compensation, other than as explicitly provided in this Agreement.

7.     <u>No Further Claims</u>. Employee represents and warrants that other than the Proof of Claim that was filed in the Bankruptcy Court (and is being released as set forth herein), Employee has never commenced or filed, or caused to be commenced or filed, any lawsuit or arbitration against any of the Releasees. Except as otherwise provided in this Agreement, Employee further agrees not to commence, file, or in any way pursue, or cause or assist any person or entity to commence, file, or pursue, any lawsuit or arbitration against any of the Releasees in the future. For avoidance of doubt, nothing in this Agreement, any other agreement between Employee and the Company, or any Company policy shall prevent Employee from (a) filing a charge with the Equal Employment Opportunity Commission or other governmental agency or commission (collectively, the "<u>EEOC</u>") or participating in any EEOC investigation; provided that Employee may not receive any relief (including, but not limited to, Compensation, reinstatement, back pay, front pay, damages, attorneys' or experts' fees, costs, and/or disbursements) as a consequence of any charge filed with the EEOC and/or any litigation arising out of an EEOC charge to the fullest extent permitted by law; (b) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding relating to this Agreement, or as required by law or legal process, including with respect to possible violations of law; or (c) accepting any U.S. Securities and Exchange Commission awards.

8.   <u>Acknowledgements and Representations</u>.  Employee acknowledges and represents that: (a) Employee has no known workplace injuries or occupational diseases; (b) Employee is unaware of the existence of any Claim(s) that have not been asserted in writing against any Releasee (whether by Employee or any other individual or entity); (c)      to the best of Employee's knowledge, neither Employee nor any other employee or other party has violated any policy or procedure applicable to the Releasees during the course of Employee's employment; and (d) to the best of Employee's knowledge, neither Employee nor any other employee or other party has violated any law or regulation applicable to the Releasees during the course of Employee's employment.

9.   <u>Cooperation with the Estate.</u>  Employee agrees to cooperate and assist the Company[2] following the effective date of the Plan with (a) any litigation, including but not limited to litigation between and among the Company and FTX, Alameda, 3AC, Core Scientific, and any other counterparties (including the United States); (b) any regulatory inquiries promulgated by federal, state, or international authorities; and (c) distributions to clients from the BlockFi platform, including specifically in-kind distributions (the "<u>Cooperation Requirement</u>"), as set forth herein.  Specifically, following the Resignation Date, Employee agrees to provide up to 100 hours in cooperation with the Company's estate without any further compensation beyond the terms described in this Agreement.[3]  Any time spent actually testifying (at deposition or trial) or formally preparing for such testimony shall not count toward the 100 hours.

(a)   Employee shall provide to the Company (or an individual the Company identifies) a log of hours he has spent towards the Cooperation Requirement on at least a monthly basis.  Such information may be provided in any written format, including an informal email.  If there is a dispute concerning the hours reported by Employee, the Company and Employee shall confer in good faith to attempt to resolve such dispute.  To the extent they are unable to resolve such dispute, the issue may be raised with the Bankruptcy Court for resolution.

(b)   If Employee completes 100 hours of cooperation, the Company and Employee may agree for Employee to provide further cooperation on terms mutually agreed to.

(c)   For the avoidance of doubt, the Cooperation Requirement shall not preclude Employee from taking alternative employment during the time the Cooperation Requirement is effective.

(d)   The Company and Employee will coordinate to ensure that the Company receives the cooperation it needs consistent with Employee's schedule, which may require cooperation to occur at night and on weekends.

(e)   To the extent Employee incurs reasonable and documented out-of-pocket expenses in the course of his cooperation after the Resignation Date, such costs will be reimbursed.

(f)   The Company agrees to indemnify Employee and procure reasonable and customary insurance coverage with respect to services performed by Employee after the effective date of any plan of reorganization and provided as part of the Cooperation Requirement.

---

[2]   For the avoidance of doubt, any references to the "Company" in this Agreement also applies to any successor to the Company's interests, such as the Wind-Down Debtors (as defined in the Plan) or similar entity.

[3]   Employee's Cooperation Requirement shall not require him to work more than 4 (four) hours on any day, more than ten (10) hours in any single calendar week, or more than twenty (20) hours in any calendar month.

10.    Construction.  This Agreement shall be interpreted strictly in accordance with its terms, to the maximum extent permissible under governing law, and shall not be construed against or in favor of any party, regardless of which party drafted this Agreement or any provision hereof.  If any provision of this Agreement is determined to be unenforceable as a matter of governing law, an arbitrator or reviewing court of appropriate jurisdiction shall have the authority to modify such provision so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible.  Each provision of this Agreement is severable from the other provisions hereof, and if one or more provisions hereof are declared invalid, the remaining provisions shall nevertheless remain in full force and effect.  For purposes of this Agreement, the connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a sentence or clause all subject matter that might otherwise be construed to be outside of its scope.

11.    Interpretation.    This Agreement sets forth the entire agreement between the Parties hereto, fully supersedes any and all prior agreements or understandings between the Parties, and can be modified only in a written agreement signed by Employee, on the one hand, and an officer of the Company, on the other hand.  Employee specifically acknowledges and agrees that notwithstanding any discussions or negotiations Employee may have had with any of the Releasees prior to the execution of this Agreement, Employee is not relying on any promises or assurances other than those explicitly contained in this Agreement.  This Agreement shall be deemed to have been made in New York, and shall be interpreted, construed, and enforced pursuant to the laws of New York, without giving effect to New York's conflict or choice of law principles.  Each of the Releasees shall be a third party beneficiary to this Agreement and entitled to enforce it in accordance with its terms.  PDF or other electronic copies of this Agreement shall have the same force and effect as the original.  This Agreement may be executed in counterparts and each shall be considered to be an original and all of which taken together will constitute one and the same agreement.

12.    No Admission.  This Agreement shall not in any way be construed as an admission by any of the Releasees of any liability, or of any wrongful acts whatsoever against Employee or any other person.  Nor shall this Agreement in any way be construed as an admission by Employee of any liability, or of any wrongful acts whatsoever against the Company.

13.    Effectiveness and Termination.  Employee understands that this Agreement includes a release covering all legal rights or claims arising or accruing prior to the date this Agreement is executed, whether those rights or claims are presently known to Employee or hereafter discovered. The Company and Employee agree that this Agreement      shall not become      effective until the Bankruptcy Court enters an order    approving    this Agreement    (the "Approval Order").  This Agreement shall become effective immediately upon entry of the Approval Order (the "Effective Date").[4]  Any of the Parties may serve written notice of the termination of this Settlement Agreement upon the occurrence of any of the following events: (1) The entry of an order by the Bankruptcy Court denying approval of the Agreement without leave to re-file or modify the Motion; or (2) the entry of an order by the Bankruptcy Court purporting to modify the terms of settlement or ordering modifications to the Debtors' Plan that alter the releases contemplated by the Agreement or otherwise materially impact the terms of this Agreement adversely to Employee.

---

[4] Within fourteen (14) days of the execution of this Agreement, the Debtors shall file a motion seeking the Bankruptcy Court's approval of this Agreement.

14.     <u>Loss of Release</u>.  The Company Release described in Paragraph 5 shall be effective immediately as of the entry of the Approval Order, but shall be subject to the Cooperation Requirement and related obligations reflected herein.

(a)     To the extent the Company believes Employee is not complying with the Cooperation Requirement, the Company shall provide written notice to Employee outlining the specific basis for believing he is not complying with the Cooperation Requirement (the "<u>Cooperation Notice</u>").  Employee shall have ten (10) days from receipt of the Cooperation Notice to cure the claimed lack of cooperation.  If the Parties cannot resolve the dispute over the claimed lack of cooperation in the Cooperation Notice, the Company may bring the dispute to the Bankruptcy Court for resolution.

(b)     Upon receiving notice of a dispute concerning the Cooperation Requirement as reflected in Paragraph 14(a), the Bankruptcy Court shall give all parties an opportunity to be heard, and shall then determine whether Employee is complying with the Cooperation Requirement. Upon a final determination by the Bankruptcy Court that Employee is not complying with the Cooperation Requirement, the Release shall be null and void and of no further force and effect. For the avoidance of doubt, upon any determination by the Bankruptcy Court that Employee is not complying with the Cooperation Agreement, this Settlement Agreement shall be unwound as to Employee, and all consideration provided by Employee in exchange for the Release shall (within seven (7) days of the unwinding of such Release) be returned to such Employee.

(c)     No individual or entity (including, but not limited to the Company) may take any action to pursue a claim or cause of action against Employee until after (i) the Bankruptcy Court makes a final determination that Employee is not complying with the Cooperation Requirement; (ii) the Agreement has been unwound and all consideration provided by Employee has been returned; and (iii) and the Release is declared null and void.

15.     EMPLOYEE EXPRESSLY ACKNOWLEDGES, REPRESENTS, AND WARRANTS THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT; THAT EMPLOYEE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE OF THIS AGREEMENT; THAT EMPLOYEE HAS HAD AMPLE TIME TO CONSIDER THIS AGREEMENT; THAT THE COMPANY HAS ADVISED AND URGED EMPLOYEE TO CONSULT WITH AN ATTORNEY CONCERNING THIS AGREEMENT; THAT EMPLOYEE HAS EXECUTED THIS AGREEMENT VOLUNTARILY, KNOWINGLY, AND WITH AN INTENT TO BE BOUND BY THIS AGREEMENT; AND THAT EMPLOYEE HAS FULL POWER AND AUTHORITY TO RELEASE EMPLOYEE'S CLAIMS AS SET FORTH HEREIN AND HAS NOT ASSIGNED ANY SUCH CLAIMS TO ANY OTHER INDIVIDUAL OR ENTITY.

BlockFi Inc.

By:_____          _____7-10-23_____
        Name:                                                    Date
        Title:

_____          __July 10, 2023_____
Andrew Tam                                                 Date

SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release (the "Agreement") is entered into by and between BlockFi Inc., together with its debtor subsidiaries (collectively, the "Company") and David Spack ("Employee", and, together with the Company, the "Parties").

    1.    End of Employment.  The Parties acknowledge and mutually agree that on August 4, 2023 (the "Resignation Date"), Employee's employment with the Company will terminate.  Employee will be paid his regular salary through the Resignation Date.

    2.    COBRA.  The benefits received by Employee (and Employee's eligible dependents, if any) under the Company's medical and dental plan(s) shall cease as of the Resignation Date.  Thereafter, pursuant to governing law and independent of this Agreement, Employee will be entitled to elect benefit continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), for Employee and any eligible dependents if Employee timely applies for such coverage.  Such COBRA coverage will be at Employee's sole expense.  Information regarding Employee's eligibility for COBRA coverage and the terms and conditions of such coverage will be provided to Employee in a separate mailing.

    3.    Release.  In exchange for the consideration provided to Employee pursuant to this Agreement, Employee, on behalf of Employee and all of Employee's spouse, heirs, executors, administrators, successors, and assigns (collectively, "Releasors"), hereby releases and forever waives and discharges any and all claims, demands, contracts, promises, obligations, causes of action, suits, controversies, actions, crossclaims, counterclaims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, any other damages, claims for costs and attorneys' fees, losses or liabilities of any nature whatsoever in law and in equity and any other liabilities, known or unknown, suspected or unsuspected of any nature whatsoever (collectively, "Claims") that Employee or any of the other Releasors ever had, now have, or might have against the Company, and/or its or their respective current, former, and future affiliates, subsidiaries, parents, related companies, controlling shareholders, owners, divisions, directors, members, trustees, officers, general partners, limited partners, employees, agents, attorneys, successors, assigns, representatives, insurers, and investment funds (and the other investment vehicles any of the foregoing manage and/or for which they perform services) (collectively, with the Company, the "Company Group" and each a "Company Group Member"); and each Company Group Member's respective current, former, and future directors, members, trustees, controlling shareholders, subsidiaries, general partners, limited partners, affiliates, related companies, divisions, officers, employees, agents, insurers, representatives, and attorneys (collectively, with the Company Group, the "Releasees" and each a "Releasee"), arising at any time prior to and including the date Employee executes this Agreement, whether such Claims are known to Employee or unknown to Employee, whether such Claims are accrued or contingent, including, but not limited to, any and all (a) Claims arising out of, or that might be considered to arise out of or to be connected in any way with, Employee's employment or other relationship with any of the Releasees, or the Resignation of such employment or other relationship; (b) Claims under any contract, agreement, or understanding that Employee may have with any of the Releasees, whether written or oral, whether express or implied, at any time prior to the date Employee executes this Agreement (including, but not limited to, under any employment agreement, offer letter, or any carried interest documents or agreements); (c) arising from or in any way related to awards, policies, plans, programs or practices of any of the Releasees that may apply to Employee or in which Employee may participate; (d) any Claims for any bonus, incentive payment, severance or other Compensation; (e) any Claims for any carried interest distributions or other carry rights; (f) Claims arising under any federal, state, foreign, or local law, rule, ordinance, or public

policy, including, without limitation, (i) Claims arising under the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Civil Rights Act of 1991, the Americans With Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act of 1974, the Vietnam Era Veterans Readjustment Act of 1974, the Immigration Reform and Control Act of 1986, the Equal Pay Act, the Labor Management Relations Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, the Genetic Information Nondiscrimination Act of 2008, the Rehabilitation Act of 1973, the Uniformed Services Employment and Reemployment Rights Act, the Worker Adjustment and Retraining Notification Act, the Sarbanes-Oxley Act of 2002, the Dodd-Frank Act, and the Internal Revenue Code of 1986, as all such laws have been amended from time to time, or any other federal, state, foreign, or local labor law, wage and hour law, worker safety law, employee relations or fair employment practices law, or public policy, (ii) Claims arising in tort, including, but not limited to, Claims for misrepresentation, defamation, libel, slander, invasion of privacy, conversion, replevin, false light, tortious interference with contract or economic advantage, negligence, fraud, fraudulent inducement, quantum meruit, promissory estoppel, prima facie tort, restitution, or the like, and (iii) Claims for Compensation, attorneys' or experts' fees or costs, forum fees or costs, or any tangible or intangible property of Employee's that remains with any of the Releasees; and (g) Claims arising under any other applicable law, regulation, rule, policy, practice, promise, understanding, or legal or equitable theory whatsoever; provided, however, that Employee does not release (A) any Claims that arise after the date Employee executes this Agreement; (B) any Claims for breach of this Agreement or to enforce the terms of this Agreement; (C) any Claims that cannot be waived or released as a matter of law; (D) any claims Employee may have to workers' compensation or unemployment benefits; or (E) any right to the Vested 401(k) Benefits. Employee specifically intends the release of Claims in this Paragraph 3 to be the broadest possible release permitted by law. This release includes the release of any proof of claim that Employee has filed or could file against the Company, including any indemnity claim, except to the extent seeking indemnity is necessary to preserve Employee's claim to coverage under any applicable insurance policy.[1]

4.      Cash Payment.    Employee agrees to make a cash payment of $50,000 (the "Cash Payment") to the Company in three installments. One third of the total amount of the Cash Payment must be paid within two business days of the date upon which the Bankruptcy Court's Confirmation Order becomes final (either through the running of any applicable period for appeals of the Confirmation Order without an appeal being taken by any party or through the affirmation on appeal of the Confirmation Order) (the "First Payment Date"). One third of the total amount of the Cash Payment must be paid by the day 120 days after the First Payment Date (the "Second Payment Date"). One third of the total amount of Cash Payment must be paid on the later of: (i) the day at least two (2) weeks before the date the Debtors are scheduled to make a non-wallet distribution to creditors; or (ii) the day five (5) days after the Debtors give Employee written notice that the Debtors intend to commence non-wallet distributions on a date certain (the "Third Payment Date", and, together with the First Payment Date and Second Payment Date, the "Payment Dates"). Notwithstanding anything to the contrary in this Paragraph 4, the entire amount of the Cash Payments shall be made no later than the Third Payment Date. For the avoidance of doubt, if the Third Payment Date occurs before the Second Payment Date,

---

[1]    For the avoidance of doubt, Employee shall not seek reimbursement for the Cash Payment or for his waiver or subordination of general unsecured claims against the Company's estates from anyone, including the Company or any insurer. Employee does, however, retain the rights to seek indemnity to the extent doing so is necessary to preserve his rights to coverage under an applicable insurance policy.

the entirety of Cash Payments not already paid will be due upon the Third Payment Date. The Company will not object to the Cash Payment being categorized as a claim of right refund.

5.  <u>Release by Company</u>.  In exchange for the consideration provided by Employee pursuant to this Agreement, the Company shall include Employee as a "Released Party" for purposes of its Plan of Reorganization to be filed in the United States Bankruptcy Court for the District of New Jersey (such court, the "<u>Bankruptcy Court</u>", and such release, the "<u>Company Release</u>").  For the avoidance of doubt, nothing in this Agreement should be read to suggest that the Company (or the Special Committee of the Board of BlockFi Inc. (the "<u>Special Committee</u>")) accused Employee of any misconduct or found any such misconduct.  To the contrary, the Special Committee, in connection with activities in the Bankruptcy Court, did a comprehensive investigation and did not identify any misconduct by Employee, although the Special Committee identified potential avoidance claims against Employee arising out of a transaction with a third party, and such potential avoidance claims are being resolved in this Agreement.

6.  <u>No Further Payments</u>.  Employee acknowledges and agrees that the Release provided in Paragraph 3 above: (a) is in full discharge of any and all liabilities and obligations the Releasees have to Employee following the Resignation Date, monetarily or otherwise, with respect to Employee's employment or otherwise, other than any continuing or vested rights Employee may have, if any, under the Company's 401(k) Plan, as set forth in the books and records of such 401(k) Plan (the "<u>Vested 401(k) Benefits</u>"); and (b) exceeds any payment, benefit, or other thing of value to which Employee might otherwise be entitled.  Except with respect to the Vested 401(k) Benefits, Employee specifically acknowledges and agrees that the Company and the Releasees have paid to Employee all of the wages, commissions, overtime, premiums, vacation, notice pay, severance pay, separation pay, sick pay, holiday pay, equity, phantom equity, carried interest, distributions, allocations, royalties, bonuses, deferred compensation, and other forms of compensation, benefits, perquisites, or payments of any kind or nature whatsoever to which Employee was or may have been entitled (collectively, "<u>Compensation</u>"), and that the Company and the Releasees do not owe Employee any other Compensation, other than as explicitly provided in this Agreement.

7.  <u>No Further Claims</u>.  Employee represents and warrants that other than the Proof of Claim that was filed in the Bankruptcy Court (and is being released herein), Employee has never commenced or filed, or caused to be commenced or filed, any lawsuit or arbitration against any of the Releasees. Except as otherwise provided in this Agreement, Employee further agrees not to commence, file, or in any way pursue, or cause or assist any person or entity to commence, file, or pursue, any lawsuit or arbitration against any of the Releasees in the future.  For avoidance of doubt, nothing in this Agreement, any other agreement between Employee and the Company, or any Company policy shall prevent Employee from (a) filing a charge with the Equal Employment Opportunity Commission or other governmental agency or commission (collectively, the "<u>EEOC</u>") or participating in any EEOC investigation; provided that Employee may not receive any relief (including, but not limited to, Compensation, reinstatement, back pay, front pay, damages, attorneys' or experts' fees, costs, and/or disbursements) as a consequence of any charge filed with the EEOC and/or any litigation arising out of an EEOC charge to the fullest extent permitted by law; (b) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding relating to this Agreement, or as required by law or legal process, including with respect to possible violations of law; or (c) accepting any U.S. Securities and Exchange Commission awards.

8.  <u>Acknowledgements and Representations</u>.  Employee acknowledges and represents that: (a) Employee has no known workplace injuries or occupational diseases; (b) Employee is unaware of the existence of any Claim(s) that have not been asserted in writing against any Releasee (whether by Employee or any other individual or entity); (c)    to the best of Employee's knowledge, neither

Employee nor any other employee or other party has violated any policy or procedure applicable to the Releasees during the course of Employee's employment; and (d) to the best of Employee's knowledge, neither Employee nor any other employee or other party has violated any law or regulation applicable to the Releasees during the course of Employee's employment.

9.      Cooperation with the Estate.   Employee agrees to cooperate and assist the Company[2] following the effective date of the Plan with (a) any litigation, including but not limited to litigation between and among the Company and FTX, Alameda, 3AC, Core Scientific, and any other counterparties (including the United States); (b) any regulatory inquiries promulgated by federal, state, or international authorities; and (c) distributions to clients from the BlockFi platform, including specifically in-kind distributions (the "Cooperation Requirement").   Specifically, following the Resignation Date, Employee agrees to provide up to 150 hours in cooperation with the Company's estate without any further compensation beyond the terms described in this Agreement.   Any time spent actually testifying (at deposition or trial) or formally preparing for such testimony shall not count toward the 150 hours.

(a)      Employee shall provide to the Company (or an individual the Company identifies) a log of hours he has spent towards the Cooperation Requirement on at least a monthly basis. Such information may be provided in any written format, including an informal email. If there is a dispute concerning the hours reported by Employee, the Company and Employee shall confer in good faith to attempt to resolve such dispute.   To the extent they are unable to resolve such dispute, the issue may be raised with the Bankruptcy Court for resolution.

(b)      If Employee completes 150 hours of cooperation, the Company and Employee may agree for Employee to provide further cooperation on terms mutually agreed to.

(c)      For the avoidance of doubt, the Cooperation Requirement shall not preclude Employee from taking alternative employment during the time the Cooperation Requirement is effective.

(d)      The Company and Employee will coordinate to ensure that the Companay receives the cooperation it needs consistent with Employee's schedule, which may require cooperation to occur at night and on weekends.

(e)      To the extent Employee incurs reasonable and documented out-of-pocket expenses in the course of his cooperation after the Resignation Date, such costs will be reimbursed.

10.    Construction.   This Agreement shall be interpreted strictly in accordance with its terms, to the maximum extent permissible under governing law, and shall not be construed against or in favor of any party, regardless of which party drafted this Agreement or any provision hereof. If any provision of this Agreement is determined to be unenforceable as a matter of governing law, an arbitrator or reviewing court of appropriate jurisdiction shall have the authority to modify such provision so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible. Each provision of this Agreement is severable from the other provisions hereof, and if one or more provisions hereof are declared invalid, the remaining provisions shall nevertheless remain in full force

_____

[2]    For the avoidance of doubt, any references to the "Company" in this Agreement also applies to any successor to the Company's interests, such as the Wind-Down Debtors (as defined in the Plan) or similar entity.

and effect.  For purposes of this Agreement, the connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a sentence or clause all subject matter that might otherwise be construed to be outside of its scope.

11.    <u>Interpretation</u>.    This Agreement sets forth the entire agreement between the Parties hereto, fully supersedes any and all prior agreements or understandings between the Parties, and can be modified only in a written agreement signed by Employee, on the one hand, and an officer of the Company, on the other hand.  Employee specifically acknowledges and agrees that notwithstanding any discussions or negotiations Employee may have had with any of the Releasees prior to the execution of this Agreement, Employee is not relying on any promises or assurances other than those explicitly contained in this Agreement.  This Agreement shall be deemed to have been made in New York, and shall be interpreted, construed, and enforced pursuant to the laws of New York, without giving effect to New York's conflict or choice of law principles.  Each of the Releasees shall be a third party beneficiary to this Agreement and entitled to enforce it in accordance with its terms.  PDF or other electronic copies of this Agreement shall have the same force and effect as the original.  This Agreement may be executed in counterparts and each shall be considered to be an original and all of which taken together will constitute one and the same agreement.

12.    <u>No Admission</u>.  This Agreement shall not in any way be construed as an admission by any of the Releasees of any liability, or of any wrongful acts whatsoever against Employee or any other person.  Nor shall this Agreement in any way be construed as an admission by Employee of any liability, or of any wrongful acts whatsoever against the Company.

13.    <u>Effectiveness</u>.  Employee understands that this Agreement includes a release covering all legal rights or claims arising or accruing prior to the date this Agreement is executed, whether those rights or claims are presently known to Employee or hereafter discovered.  The Company and Employee agree that this Agreement shall not become effective until the Bankruptcy Court enters an order approving this Agreement (the "<u>Approval Order</u>").  This Agreement shall become effective immediately upon entry of the Approval Order (the "<u>Effective Date</u>").

14.    <u>Loss of Release</u>.  The Company Release described in Paragraph 5 shall be effective immediately as of the entry of the Approval Order, but shall be subject to the Cooperation Requirement and related obligations reflected herein.

(a)    To the extent the Company believes Employee is not complying with the Cooperation Requirement, the Company shall provide written notice to Employee outlining the basis for believing he is not complying with the Cooperation Requirement (the "<u>Cooperation Notice</u>").  Employee shall have ten (10) days from receipt of the Cooperation Notice to cure the claimed lack of cooperation.  If the Parties cannot resolve the dispute over the claimed lack of cooperation in the Cooperation Notice, the Company may bring the dispute to the Bankruptcy Court for resolution.

(b)    Upon receiving notice of a dispute concerning the Cooperation Requirement as reflected in Paragraph 14(a), the Bankruptcy Court shall give all parties an opportunity to be heard, and shall then determine whether Employee is complying with the Cooperation Requirement.  Upon a final determination by the Bankruptcy Court that Employee is not complying with the Cooperation Requirement, the Release shall be null and void and of no further force and effect.

(c)      No individual or entity (including, but not limited to the Company) may take any action to pursue a claim or cause of action against Employee until after: (i) the Bankruptcy Court makes a final determination that Employee is not complying with the Cooperation Requirement; (ii) agreement has been unwound and all consideration provided by Employee has been returned; and (iii) the Release is declared null and void.

15.      EMPLOYEE EXPRESSLY ACKNOWLEDGES, REPRESENTS, AND WARRANTS THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT; THAT EMPLOYEE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE OF THIS AGREEMENT; THAT EMPLOYEE HAS HAD AMPLE TIME TO CONSIDER THIS AGREEMENT; THAT THE COMPANY HAS ADVISED AND URGED EMPLOYEE TO CONSULT WITH AN ATTORNEY CONCERNING THIS AGREEMENT; THAT EMPLOYEE HAS EXECUTED THIS AGREEMENT VOLUNTARILY, KNOWINGLY, AND WITH AN INTENT TO BE BOUND BY THIS AGREEMENT; AND THAT EMPLOYEE HAS FULL POWER AND AUTHORITY TO RELEASE EMPLOYEE'S CLAIMS AS SET FORTH HEREIN AND HAS NOT ASSIGNED ANY SUCH CLAIMS TO ANY OTHER INDIVIDUAL OR ENTITY.

BlockFi Inc.

By:_____          _____7-10-23_____
    Name:                                                        Date
    Title:

_____          ____7/10/23_____
David Spack                                                  Date

SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release (the "Agreement") is entered into by and between BlockFi Inc., together with its debtor subsidiaries (collectively, the "Company") and Yuri Mushkin ("Employee", and, together with the Company, the "Parties").

1.    End of Employment.  The Parties acknowledge and mutually agree that Employee's employment with the Company ended effective June 16, 2023 (the "Resignation Date").

2.    COBRA.    The benefits received by Employee (and Employee's eligible dependents, if any) under the Company's medical and dental plan(s) shall cease as of the Resignation Date.  Thereafter, pursuant to governing law and independent of this Agreement, Employee will be entitled to elect benefit continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), for Employee and any eligible dependents if Employee timely applies for such coverage.  Such COBRA coverage will be at Employee's sole expense.  Information regarding Employee's eligibility for COBRA coverage and the terms and conditions of such coverage will be provided to Employee in a separate mailing.

3.    Release by Company.  In exchange for the consideration provided by Employee pursuant to this Agreement, the Company shall include Employee as a "Released Party" for purposes of its Plan of Reorganization to be filed in the United States Bankruptcy Court for the District of New Jersey (such court, the "Bankruptcy Court", and such release, the "Company Release").  For the avoidance of doubt, nothing in this Agreement should be read to suggest that the Company (or the Special Committee of the Board of BlockFi Inc. (the "Special Committee")) accused Employee of any misconduct or found any such misconduct.  To the contrary, in the course of its investigation, the Special Committee, through its advisors, reviewed tens of thousands of documents, conducted interviews of approximately 25 witnesses, and attended depositions of several key witnesses, and did not identify any misconduct by Employee.

4.    Release by Employee.  Subject to the approval of the Bankruptcy Court of the Company Release which includes Employee as a releasee, in exchange for the consideration provided to Employee pursuant to this Agreement, Employee, on behalf of Employee and all of Employee's spouse, heirs, executors, administrators, successors, and assigns (collectively, "Releasors"), hereby releases and forever waives and discharges any and all claims, demands, contracts, promises, obligations, causes of action, suits, controversies, actions, crossclaims, counterclaims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, any other damages, claims for costs and attorneys' fees, losses or liabilities of any nature whatsoever in law and in equity and any other liabilities, known or unknown, suspected or unsuspected of any nature whatsoever (collectively, "Claims") that Employee or any of the other Releasors ever had, now have, or might have against the Company, and/or its or their respective current, former, and future affiliates, subsidiaries, parents, related companies, controlling shareholders, owners, divisions, directors, members, trustees, officers, general partners, limited partners, employees, agents, attorneys, successors, assigns, representatives, and investment funds (and the other investment vehicles any of the foregoing manage and/or for which they perform services) (collectively, with the Company, the "Company Group" and each a "Company Group Member"); and each Company Group Member's respective current, former, and future directors, members, trustees, controlling shareholders, subsidiaries, general partners, limited partners, affiliates, related companies, divisions, officers, employees, agents, representatives, and

attorneys (collectively, with the Company Group, the "Releasees" and each a "Releasee"), arising at any time prior to and including the date Employee executes this Agreement, whether such Claims are known to Employee or unknown to Employee, whether such Claims are accrued or contingent, including, but not limited to, any and all (a) Claims arising out of, or that might be considered to arise out of or to be connected in any way with, Employee's employment or other relationship with any of the Releasees, or the Resignation of such employment or other relationship; (b) Claims under any contract, agreement, or understanding that Employee may have with any of the Releasees, whether written or oral, whether express or implied, at any time prior to the date Employee executes this Agreement (including, but not limited to, under any employment agreement, offer letter, or any carried interest documents or agreements); (c) arising from or in any way related to awards, policies, plans, programs or practices of any of the Releasees that may apply to Employee or in which Employee may participate; (d) any Claims for any bonus, incentive payment, severance or other Compensation; (e) any Claims for any carried interest distributions or other carry rights; (f) Claims arising under any federal, state, foreign, or local law, rule, ordinance, or public policy, including, without limitation, (i) Claims arising under the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Civil Rights Act of 1991, the Americans With Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act of 1974, the Vietnam Era Veterans Readjustment Act of 1974, the Immigration Reform and Control Act of 1986, the Equal Pay Act, the Labor Management Relations Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, the Genetic Information Nondiscrimination Act of 2008, the Rehabilitation Act of 1973, the Uniformed Services Employment and Reemployment Rights Act, the Worker Adjustment and Retraining Notification Act, the Sarbanes-Oxley Act of 2002, the Dodd-Frank Act, and the Internal Revenue Code of 1986, as all such laws have been amended from time to time, or any other federal, state, foreign, or local labor law, wage and hour law, worker safety law, employee relations or fair employment practices law, or public policy, (ii) Claims arising in tort, including, but not limited to, Claims for misrepresentation, defamation, libel, slander, invasion of privacy, conversion, replevin, false light, tortious interference with contract or economic advantage, negligence, fraud, fraudulent inducement, quantum meruit, promissory estoppel, prima facie tort, restitution, or the like, and (iii) Claims for Compensation, attorneys' or experts' fees or costs, forum fees or costs, or any tangible or intangible property of Employee's that remains with any of the Releasees; and (g) Claims arising under any other applicable law, regulation, rule, policy, practice, promise, understanding, or legal or equitable theory whatsoever; provided, however, that Employee does not release (A) any Claims that arise after the date Employee executes this Agreement; (B) any Claims for breach of this Agreement or to enforce the terms of this Agreement; (C) any Claims that cannot be waived or released as a matter of law; (D) any claims Employee may have to workers' compensation or unemployment benefits; or (E) any right to the Vested 401(k) Benefits.  For avoidance of doubt, nothing herein shall serve to release any claim that Employee may have which may be covered by or which otherwise relates to any policy of insurance pursuant to which Employee is a covered party or beneficiary. Subject to the foregoing, Employee specifically intends the release of Claims in this Paragraph 3 to be the broadest possible release permitted by law.

    5.    No Further Payments.  Employee acknowledges and agrees that the Release provided in Paragraph 3 above: (a) is in full discharge of any and all liabilities and obligations the Releasees have to Employee, monetarily or otherwise, with respect to Employee's employment or otherwise, other than any continuing or vested rights Employee may have, if any, under the

Company's 401(k) Plan, as set forth in the books and records of such 401(k) Plan (the "<u>Vested 401(k) Benefits</u>"); and (b) exceeds any payment, benefit, or other thing of value to which Employee might otherwise be entitled.  Except with respect to the Vested 401(k) Benefits, Employee specifically acknowledges and agrees that the Company and the Releasees have paid to Employee all of the wages, commissions, overtime, premiums, vacation, notice pay, severance pay, separation pay, sick pay, holiday pay, equity, phantom equity, carried interest, distributions, allocations, royalties, bonuses, deferred compensation, and other forms of compensation, benefits, perquisites, or payments of any kind or nature whatsoever to which Employee was or may have been entitled (collectively, "<u>Compensation</u>"), and that the Company and the Releasees do not owe Employee any other Compensation, other than as explicitly provided in this Agreement.

6.    <u>No Further Claims</u>.  Employee represents and warrants that other than the Proof of Claim that was filed in the Bankruptcy Court (which, subject to the approval of the Bankruptcy Court of the Company Release which includes Employee as a releasee, is being released herein), Employee has never commenced or filed, or caused to be commenced or filed, any lawsuit or arbitration against any of the Releasees.  Except as otherwise provided in Paragraph 5 of this Agreement, subject to the approval of the Bankruptcy Court of the Company Release which includes Employee as a releasee, Employee further agrees not to commence, file, or in any way pursue, or cause or assist any person or entity to commence, file, or pursue, any lawsuit or arbitration against any of the Releasees in the future.  For avoidance of doubt, nothing in this Agreement, any other agreement between Employee and the Company, or any Company policy shall prevent Employee from (a) filing a charge with the Equal Employment Opportunity Commission or other governmental agency or commission (collectively, the "<u>EEOC</u>") or participating in any EEOC investigation; provided that Employee may not receive any relief (including, but not limited to, Compensation, reinstatement, back pay, front pay, damages, attorneys' or experts' fees, costs, and/or disbursements) as a consequence of any charge filed with the EEOC and/or any litigation arising out of an EEOC charge to the fullest extent permitted by law; (b) making any disclosure of relevant and necessary information or documents in any action, investigation, or proceeding relating to this Agreement, or as required by law or legal process, including with respect to possible violations of law; or (c) accepting any U.S. Securities and Exchange Commission awards.

7.    <u>Acknowledgements and Representations</u>.  Employee acknowledges and represents that: (a) Employee has no known workplace injuries or occupational diseases; (b) Employee is unaware of the existence of any Claim(s) that have not been asserted in writing against any Releasee (whether by Employee or any other individual or entity); (c) to the best of Employee's knowledge, neither Employee nor any other employee or other party has violated any policy or procedure applicable to the Releasees during the course of Employee's employment; and (d) to the best of Employee's knowledge, neither Employee nor any other employee or other party has violated any law or regulation applicable to the Releasees during the course of Employee's employment.

8.    <u>Cooperation with the Estate.</u>  Subject to the approval of the Bankruptcy Court of a final, non-appealable order approving the Company Release which includes Employee as a releasee, Employee agrees to cooperate and assist the Company[1] following the effective date of

---

[1]    For the avoidance of doubt, any references to the "Company" in this Agreement also applies to any successor to the Company's interests, such as the Wind-Down Debtors (as defined in the Plan) or similar entity.

the Plan with (a) any litigation, including but not limited to litigation between and among the Company and FTX, Alameda, 3AC, Core Scientific, and any other counterparties (including the United States); (b) any regulatory inquiries promulgated by federal, state, or international authorities; and (c) distributions to clients from the BlockFi platform, including specifically in-kind distributions (the "Cooperation Requirement"). Specifically, following the approval of the Bankruptcy Court of the Company Releasee which includes Employee, Employee agrees to provide up to 75 hours in cooperation with the Company's estate without any further compensation beyond the terms expressly described in this Agreement. Employee will not seek any further monetary compensation for his time cooperating with estate, with the provisos below:

(a)     For the avoidance of doubt, the Cooperation Requirement shall not preclude Employee from taking alternative employment during the time the Cooperation Requirement is effective. Employee commits to cooperate with the Company in litigation against and by FTX, Alameda, 3AC, Core Scientific, and other counterparties (including the United States), with the precise times to be reasonably consistent with Employee's schedule and the needs of the Company.

(b)     The Company and Employee will coordinate to ensure that the Company receives the cooperation it needs consistent with Employee's schedule, which may require cooperation to occur at night and on weekends, but in no event, absent consent by Employee, shall such cooperation require Employee to provide more than 5 hours per week or 15 hours per month, except that time spent actually testifying (at deposition or at trial) or preparing for such testimony shall not count against such weekly or hourly caps. For the avoidance of doubt, time spent actually testifying (at deposition or at trial) or preparing for such testimony shall count against the 75 hours in total cooperation the Employee is agreeing to provide.

(c)     To the extent Employee incurs reasonable and documented out-of-pocket expenses in the course of his cooperation after the Resignation Date, such costs will be reimbursed within thirty (30) days of Employee providing a written request, including an informal email, for such reimbursement (a "Reimbursement"). Employee's Cooperation Requirement shall be stayed for any period in which a Reimbursement is delinquent, and Employee's Cooperation Requirement shall be reduced to zero hours in the event such delinquency continues for more that forty-five (45) days after delivery of a written notice as set forth in paragraph 14, below.

9.     Construction. This Agreement shall be interpreted strictly in accordance with its terms, to the maximum extent permissible under governing law, and shall not be construed against or in favor of any party, regardless of which party drafted this Agreement or any provision hereof. If any provision of this Agreement is determined to be unenforceable as a matter of governing law, an arbitrator or reviewing court of appropriate jurisdiction shall have the authority to modify such provision so as to render it enforceable while maintaining the parties' original intent to the maximum extent possible. Each provision of this Agreement is severable from the other provisions hereof, and if one or more provisions hereof are declared invalid, the remaining provisions shall nevertheless remain in full force and effect. For purposes of this Agreement, the connectives "and," "or," and "and/or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a sentence or clause all subject matter that might otherwise be construed to be outside of its scope.

10.    <u>Interpretation</u>.  This Agreement sets forth the entire agreement between the Parties hereto, fully supersedes any and all prior agreements or understandings between the Parties, and can be modified only in a written agreement signed by Employee, on the one hand, and an officer of the Company, on the other hand.  Employee specifically acknowledges and agrees that notwithstanding any discussions or negotiations Employee may have had with any of the Releasees prior to the execution of this Agreement, Employee is not relying on any promises or assurances other than those explicitly contained in this Agreement.  This Agreement shall be deemed to have been made in New York, and shall be interpreted, construed, and enforced pursuant to the laws of New York, without giving effect to New York's conflict or choice of law principles.  Each of the Releasees shall be a third party beneficiary to this Agreement and entitled to enforce it in accordance with its terms.  PDF or other electronic copies of this Agreement shall have the same force and effect as the original.  This Agreement may be executed in counterparts and each shall be considered to be an original and all of which taken together will constitute one and the same agreement.

11.    <u>No Admission</u>.  This Agreement shall not in any way be construed as an admission by any of the Releasees of any liability, or of any wrongful acts whatsoever against Employee or any other person.  Nor shall this Agreement in any way be construed as an admission by Employee of any liability, or of any wrongful acts whatsoever against the Company.

12.    <u>Effectiveness</u>.  Employee understands that this Agreement includes a release covering all legal rights or claims arising or accruing prior to the date this Agreement is executed, whether those rights or claims are presently known to Employee or hereafter discovered.  The Company and Employee agree that this Agreement shall not become effective until the Bankruptcy Court enters an order approving this Agreement (the "<u>Approval Order</u>").  This Agreement shall become effective immediately upon entry of the Approval Order (the "<u>Effective Date</u>"), and for the avoidance of doubt, shall become void in the event the Bankruptcy Court does not enter a final, non-appealable order approving a Company Release which includes Employee as a releasee.

13.    <u>Loss of Release</u>.  The Company Release described in Paragraph 3 shall be effective immediately as of the entry of the Approval Order, but shall be subject to the Cooperation Requirement and related obligations reflected herein.

(a)    To the extent the Company believes Employee is not complying with the Cooperation Requirement, the Company shall provide written notice to Employee outlining the basis for believing he is not complying with the Cooperation Requirement (the "<u>Cooperation Notice</u>").  Employee shall have ten (10) business days from actual receipt of the Cooperation Notice to cure the claimed lack of cooperation by providing confirmation of a willingness to comply.  If the Parties cannot resolve the dispute over the claimed lack of cooperation in the Cooperation Notice, the Company may bring the dispute to the Bankruptcy Court for resolution.

(b)    Upon receiving notice of a dispute concerning the Cooperation Requirement as reflected in Paragraph 13(a), the Bankruptcy Court shall give all parties an opportunity to be heard, and shall then determine whether Employee is complying with the Cooperation Requirement.  Upon a final determination by the Bankruptcy Court that Employee is not complying with the Cooperation Requirement, the Release shall be null and void and of no further force and effect.

(c)     No individual or entity (including, but not limited to the Company) may take any action to pursue a claim or cause of action against Employee until after the Bankruptcy Court makes a final determination that Employee is not complying with the Cooperation Requirement, the Settlement Agreement should be unwound and the Release is declared null and void.

14.     Notices.  Any notice to be given under this Agreement must be in writing and shall be deemed to have been given when delivered by email to the party to whom the notice is given at the address designated below or, if any party subsequently designates a different address for this purpose, at such subsequently designated address.  Notices shall be addressed and delivered as follows:

To Employee:

Mr. Yuri Mushkin
yurimushkin@me.com

With a copy to:

Michael T. Conway, Esq.
Lazare Potter Giacovas & Moyle LLP
747 Third Avenue, 16th Floor
New York, New York 10017
(917) 242-1597
mconway@lpgmlaw.com

To BlockFi Inc.:

[Address to be Provided Upon Effective Date of a Plan, but until then
Employee shall send any notice hereunder to michael.slade@kirkland.com]

15.     EMPLOYEE   EXPRESSLY   ACKNOWLEDGES,   REPRESENTS,   AND WARRANTS THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT; THAT EMPLOYEE FULLY UNDERSTANDS THE TERMS, CONDITIONS, AND SIGNIFICANCE OF THIS AGREEMENT; THAT EMPLOYEE HAS HAD AMPLE TIME TO CONSIDER THIS AGREEMENT; THAT THE COMPANY HAS ADVISED AND URGED EMPLOYEE TO CONSULT WITH AN ATTORNEY CONCERNING THIS AGREEMENT; THAT EMPLOYEE HAS EXECUTED THIS AGREEMENT VOLUNTARILY, KNOWINGLY, AND WITH AN INTENT TO BE BOUND BY THIS AGREEMENT; AND THAT EMPLOYEE HAS FULL POWER AND AUTHORITY TO RELEASE EMPLOYEE'S CLAIMS AS SET FORTH HEREIN AND HAS NOT ASSIGNED ANY SUCH CLAIMS TO ANY OTHER INDIVIDUAL OR ENTITY.

BLOCKFI INC.

By:_____          _____
    Name:                                      Date
    Title:


_____          _____
Yuri Mushkin                               Date

# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., et al.,<br><br>                Debtors. | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

## SHOULD POTENTIAL ESTATE CAUSES OF ACTION AGAINST INSIDERS SHOULD BE LITIGATED, RELEASED, SETTLED, OR RETAINED?

**KIRKLAND & ELLIS LLP**
July 10, 2023

Michael B. Slade
Richard U.S. Howell
Casey McGushin
Alexandra Schrader
Katie Welch
Cade Boland
**Kirkland & Ellis LLP**
300 N. LaSalle
Chicago, IL  60654

Counsel for the Special Committee
of the Board of BlockFi Inc.

and

Co-counsel for the Debtors

# TABLE OF CONTENTS

**Page**

INTRODUCTION TO THE INVESTIGATION........................................................ 1

EXECUTIVE SUMMARY ............................................................................... 3

FACTUAL BACKGROUND ............................................................................ 9

I.      **Company History** ........................................................................ 9

     A.    BlockFi Corporate Background ................................................ 13

     B.    BlockFi Products and Related Agreements ................................ 15

II.     **Funding Rounds** ........................................................................ 22

     A.    Series A Funding Round ........................................................ 22

     B.    Series B Funding Round ........................................................ 22

     C.    Series C Funding Round ........................................................ 22

     D.    Series D Funding Round ........................................................ 22

     E.    Series E Funding Round ........................................................ 23

     F.    Series F Funding Round ........................................................ 23

III.    **Operations and Risk Management with Respect to Specific Counterparties and Transactions.** .................................................................. 27

     A.    General Risk Management Policies and Procedures. ..................... 28

     B.    GBTC ................................................................................ 36

     C.    3AC ................................................................................. 40

     D.    FTX/Alameda ..................................................................... 45

     E.    Post-July 1, 2022 Relationship With FTX and Alameda.................. 58

IV.    **SEC Inquiry and Settlement** ....................................................... 66

V.    **Individual Payments To Or Related To Insiders** ............................... 71

     A.    █████ Transactions ............................................................ 71

B.    Main Round of ███ Financing Transactions ..................................... 72

C.    Dispute With █████████ ........................................................... 73

D.    Zac Prince's April 2022 Withdrawal .................................................. 79

E.    Retention Payments to Insiders Following FTX Transaction .............................. 80

VI.    **November Contingency Planning** ........................................................... **82**

A.    D&O Insurance ......................................................................... 83

B.    Liquidation of Cryptocurrency ......................................................... 86

**WHY DID BLOCKFI REALLY FAIL?** ................................................................. **88**

**ANALYSIS OF POTENTIAL LEGAL CLAIMS** ..................................................... **90**

I.    **Breach of Fiduciary Duty** .................................................................... **90**

A.    Legal Overview ........................................................................ 90

B.    Potential Breach of Fiduciary Duty Claims Against Directors .......................... 100

C.    Potential Breach of Fiduciary Duty Claims Against Officers. ......................... 121

II.    **Fraudulent Transfer** ......................................................................... **122**

A.    Legal Overview ....................................................................... 122

B.    Potential Fraudulent Transfer Claim Regarding the Payments to █████ ...... 128

C.    Potential Fraudulent Transfer Claim Regarding the Gross-Up Payments to
       BlockFi Executives. ................................................................. 130

D.    Potential  Fraudulent  Transfer  Claims  Arising  from  Management's
       Secondary Transactions ............................................................. 133

E.    Potential Fraudulent Transfer Claim Regarding Other Transactions ................ 134

III.    **Preference** ............................................................................... **136**

A.    Legal Overview ....................................................................... 136

B.    Potential Preference Claim Regarding the Payments to █████ .................... 136

C.    Potential  Preference  Claims  Regarding  the  Gross-Up  and  Retention
       Payments to Employees ............................................................. 138

D.      Potential Preferences Arising from Withdrawal of Funds from Platform. ......... 138

**IV.     Claims Based On Representations To Customers.** .................................................... **140**

**ANALYSIS OF NEED FOR INSIDER SERVICES GOING FORWARD**......................... **142**

**I.      Litigation**................................................................................................................. **142**

**II.     Anticipated Plan Distributions** ............................................................................. **147**

**CONCLUSION** ...................................................................................................................... **152**

## INTRODUCTION TO THE INVESTIGATION

To assess whether the estates should litigate, settle, release, or simply retain potential causes of action against insiders, the BlockFi Inc. board of directors approved the formation of a special committee ("Special Committee") to conduct and oversee a comprehensive investigation. The Special Committee is comprised of two independent directors, Scott Vogel and Jennifer Hill. Ms. Hill has recused herself from the investigation of any actions that she was involved in while serving on the Board of Directors of BlockFi Inc. prior to the bankruptcy filing.  Mr. Vogel has never served as a director of, or had any other prior involvement with, the Company, prior to his appointment to the Board and the Special Committee in November 2022.

Mr. Vogel instructed counsel, Kirkland & Ellis LLP ("Kirkland"), to interview witnesses, review documents, and provide legal analysis related to all potential claims against insiders. During the course of the investigation Kirkland updated Mr. Vogel on the work it was doing, and received additional direction regarding paths to investigate.  Kirkland collected a massive sum of information from the Debtors and reviewed it.  Kirkland also retained consulting experts to help it independently evaluate certain financial information and inform its legal advice to Mr. Vogel.

The investigation was comprehensive and, while many collateral issues were also investigated, in general, the investigation focused on the following issues:

- the Debtors' business in general;

- the Debtors' risk and investment policies and, specifically, how those policies were applied to the transactions listed below;

- the Debtors' investments in (and acceptance of collateral related to) the Grayscale Bitcoin Trust ("GBTC");

- the Debtors' dealings with Three Arrows Capital ("3AC") and its affiliates;

- withdrawals from the Debtors' platform (if any) by the Debtors' insiders;

- the Debtors' dealings with Alameda Research Ltd. and FTX generally, including the time periods before and after the Debtors' transaction with FTX Trading Ltd. and its affiliates (collectively, "FTX") that was announced July 1, 2022 (the "FTX Transaction");

- the Debtors' compensation of employees generally, and including (but not limited to) certain payments made following execution of the FTX Transaction;

- transactions with a confidential counterparty previously disclosed in detail as part of the Global Notes[1] and during a hearing before the Bankruptcy Court;[2]

- the Debtors' procurement of additional director and officer liability insurance in November 2022; and

- the Debtors' decision to sell digital assets in November 2022.

Kirkland reviewed approximately 60,000 documents comprising 750,000 pages and conducted approximately 25 formal and informal witness interviews.  Several of the witnesses interviewed by Kirkland also participated voluntarily in informal interviews, and/or depositions, with counsel for the Official Committee of Unsecured Creditors ("UCC").  The Special Committee also evaluated the merits of all potential legal claims, including potential breach of fiduciary duty, fraudulent transfer, and preference claims that BlockFi may have against insiders, and assessed whether the Debtors should assert those claims, reserve those claims, settle those claims, or release those claims.  The standard applied, generally speaking, was whether the potential claim is both colorable and whether pursuit of the claim would provide an overall benefit to the estate if successful, as opposed to reserving, resolving, or releasing such claim(s).  *See, e.g.*, *In re G-I Holdings. Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004); *In re Crivaro*, 2017 WL 3314232, at *5 (Bankr. D.N.J. 2017).

---

[1]    *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* at 23–24, *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. 2022) [Docket No. 242].

[2]    *See* 1/9/2023 Hrg. Slides in *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. 2022), pp. 24-26.

For a variety of reasons, it is in the best interests of the estates to settle the potential insider claims on the terms described here.  The proposed settlements bring valuable consideration to the estate that exceed the risk-adjusted value of such claims.  Moreover, as a practical matter, pursuing the claims against insiders is unlikely to deliver material value to creditors, given (among other things) the challenges in achieving success, the costs of pursuing the claims, the time it would take to do so, and the relatively limited upside even if successful.

This report also addresses the UCC's position, expressed most recently in a May 18, 2023 Report (the "UCC Report") where UCC counsel offered its opinion on "Why did BlockFi fail?"[3] The UCC Report fails (and, to date, the UCC has refused) to address the big picture—what is in the estates' (and creditors') best interests *going forward*.  The UCC also fundamentally misunderstands what claims *the estate* could assert in any event.  And the UCC "Report" cherry-picks statements out of context, errs on other matters, and does not deliver the objective analysis promised.  The UCC's proposed "war on insiders" would harm rather than help BlockFi creditors.

## EXECUTIVE SUMMARY

Our conclusions are as follows:

1.      The Special Committee should be focused on maximizing value for creditors, and all decisions should be those most likely to maximize value for creditors.  The key question is what is in the best interests of the estate *going forward*.

2.      There is no doubt that the most important thing for the BlockFi estate to do going forward is prosecute claims against the Alameda, FTX, and Emergent bankruptcy estates (and to a lesser extent the Core Scientific and 3AC estates) successfully,[4] and defend claims that have

---

[3]      The UCC emailed its Report to counsel for the Special Committee and filed it under seal in the middle of the night on May 18, 2023 (Dkt. 928).

[4]      By way of example, on November 28, 2022, BlockFi Inc., BlockFi Lending LLC, and BlockFi International Ltd. initiated Adv. Pro. No. 22-01382 (MBK), against Emergent Fidelity Technologies, Inc. and and Marex Capital

been and/or will be filed from, among others, 3AC, Emergent, Alameda, and FTX.[5]  The success

or failure of *those various pieces of litigation* (and in related forfeiture proceedings involving the

United States) will make a real difference to creditor recoveries, with potential value swings

exceeding $1 billion.  The Special Committee should not do anything that would compromise the

BlockFi estate's abilities to put its best foot forward in those matters.  Relative to the success or

failure of those go-forward litigations, every other issue facing BlockFi—including all of

BlockFi's potential affirmative claims against others—is far less significant.[6]

---

Markets Inc., formerly known as ED&F Man Capital Markets Inc. ("Marex").  The goal of this case was to secure BlockFi's interests in approximately 55,273,469 shares of common stock of Robinhood Markets Inc. (NASDAQ ticker symbol: HOOD) currently worth approximately $550 million and approximately $20.7 million in cash (the "Robinhood Assets").  The Robinhood Assets were pledged to BlockFi by Emergent Fidelity Technologies, Inc. ("Emergent") (an entity 90% owned by Sam Bankman-Fried ("SBF")) to guaranty and provide additional collateral in connection with BlockFi's agreement to forbear from exercising its rights under outstanding loan agreements with Alameda Research Limited ("Alameda") (a FTX affiliate also controlled by SBF).  The forbearance and pledge were granted on November 9, 2022.  The Emergent pledge agreement granted BlockFi an irrevocable power of attorney to take any action with respect to the Robinhood assets, including to have them sold.  BlockFi made written demand on Marex on November 14 to surrender the Robinhood assets to it.  Marex refused.  In January 2023, the US Government seized the Robinhood Assets and is holding them pending the outcome of the SBF criminal proceedings.  All actions involving the Robinhood Assets have been stayed pending the outcome of the SBF criminal trial and potential forfeiture actions brought by the US Government.  Whether this dispute continues in a forfeiture proceeding or in a bankruptcy court (if SBF is not convicted), to establish the validity of its security interest in the Robinhood Assets, BlockFi will need to present evidence describing its lending relationship with Alameda, Alameda's obligation to provide more and more collateral in late October/early November 2022 as security for its loan obligations, its decision to call a default on Alameda's loan obligations, and the facts and circumstances supporting the entry into the forbearance agreement, the Emergent pledge agreement, and the securing of additional collateral including the Robinhood Assets, inclusive of BlockFi's knowledge and conduct throughout the parties' relationship.  Emergent and various FTX affiliated entities among others have indicated they will challenge the validity of the Emergent pledge.  In addition, there is a related matter pending in Antigua and Barbuda in which an FTX customer asserted rights in the Robinhood Assets.  This has ultimately led to a liquidation proceeding in the courts in Antigua and Barbuda.  The following witnesses are needed to present BlockFi's case: Zac Prince (among other things, knowledge of the historical lending relationship with Alameda and the events in early November 2022 that led to the forbearance agreement and the Emergent pledge agreement), Flori Marquez (among other things, personally interacted with Caroline Ellison and others at Alameda in connection with the November 2022 transactions regarding the additional collateral that was offered to secure Alameda's debt), Yuri Mushkin (personally involved in evaluating collateral coverage for the Alameda loans and the needs for additional collateral to secure repayment and evaluating the collateral that was offered to secure the Alameda loans and the Robinhood Assets), and Jonathan Mayers (was involved in the negotiation and preparation of the transaction documents and made the written demand on Marex to surrender the collateral to BlockFi pursuant to its irrevocable power of attorney).

[5]        BlockFi also faces material preference litigation brought by the FTX, Alameda, and 3AC bankruptcy estates seeking recovery in the billions of dollars.

[6]        Both FTX/Alameda and 3AC have filed objections to the disclosure statement making clear that the Debtors will need the assistance of and evidence from key employees to defeat those entities' claims in the BlockFi bankruptcy. *See* Dkt. 1153-54.  The FTX/Alameda/3AC claims, if allowed, would dilute BlockFi creditor claims by ~50-65%.

3.      The second most important thing for the BlockFi estate to do is to maintain and execute on the ability to distribute cryptocurrency to creditors through a Plan.  The UCC has made clear customers' preferences to receive distributions in kind rather than distributions in cash. Therefore, even if BlockFi secures assistance from an existing exchange in making distributions, given the ongoing regulatory uncertainty,[7] BlockFi *must* maintain the capability internally of reopening the BlockFi platform and facilitating distributions through it.  Any course of action that would eliminate that capability, or increase the challenges in effectuating it (by, for example, suing or threatening to sue people needed to facilitate in-kind distributions), is not advisable.

4.      The settlements achieved bring valuable consideration into the estate that exceeds the risk-adjusted value of the potential claims.  From the estate's perspective, while some claims could potentially survive a motion to dismiss, the claims are not likely to recover material value on a net basis, and pursuing the claims would require the estates to incur substantial additional costs for an at-best-speculative return.  As described in more detail below:

- Any **breach of fiduciary duty claims based on the duty of care** are weak.  BlockFi had sector-leading risk management practices and its lending diligence and protections (including overcollateralizing every relevant transaction) far exceeded its peer firms. Because of those practices, risks from lending to Alameda were in fact identified on the front end and discussed extensively by the company in various forums, including at the Board Audit and Risk Committee ("BARC").  But any suggestion that BlockFi's managers were grossly negligent when entering into those transactions in the first place reflects hindsight bias that ignores the reality of BlockFi's business and the facts on the ground at the time.  Perhaps someone lacking context or understanding of the cryptocurrency market or BlockFi's business (or looking to sue out of anger) would challenge the decisions made.  But no objective person lacking hindsight bias would believe *the company* has a good faith claim against *its management team* for doing so. BlockFi was operating a crypto lending business, and claims by the company against management and/or the Board for specific lending decisions are unlikely to succeed. Further, the vast majority of the Alameda loans were made by BlockFi International (a

---

[7]      Based on the most recent communications, it appears the SEC may object to or otherwise attempt to interfere with any efforts to distribute cryptocurrency through transactions with third parties.  Because the SEC may ultimately attempt to prohibit in-kind distributions to creditors through any path other than through the BlockFi platform, keeping the platform alive and ensuring retention of personnel capable of facilitating distributions through it appears the only way to ensure the ability to make in-kind distributions.

Bermuda entity); not only are suits against directors based on the BlockFi International loans barred by that entity's charter (and Bermuda law, which poses even a higher standard than the near-impossible standard imposed by Delaware law), but BlockFi would not be able to plead those claims against any member of the management team without advancing the putative defendants' potential costs and attorneys' fees (which would likely exceed $10 million).  For these reasons and others, pursuit of these claims by the estate would not be wise.

- Any **breach of fiduciary duty claims based on the duty of loyalty** are also weak. Unlike in other cryptocurrency cases, no insiders stole money from BlockFi or defrauded the company.  The insiders' stock sales came in secondary transactions (or tender offers) with outside investors *after* the company secured the capital it needed at the time, or transactions with a third party that was itself taking the risk of BlockFi's success going forward.  The only potential claim here would be based on BlockFi's acquisition of additional directors' and officers' liability insurance in November 2022. The reality, though, is that: (1) the executives at the company did not ask for the additional coverage or play a material role in procuring it; (2) the rationale given by all relevant witnesses, i.e., the need to retain existing independent directors and procure five additional independent directors, by securing market-based insurance, is understandable; and (3) the board relied on advice from counsel in making the decision. To our knowledge no claim like this has been prosecuted successfully, and this one would not be likely to succeed, either.

- The evidence suggests any **preference** claims would face major challenges too.[8]  The two material platform withdrawals in the year prior to bankruptcy were by Mr. Prince.[9] The first (and much larger) transaction occurred in April 2022, a point at which we do not believe there is a reasonable argument that BlockFi was insolvent.  Although the second (approximately a $600,000 platform withdrawal) occurred when BlockFi was arguably insolvent, Mr. Prince would have a substantial ordinary course defense.  Thus, although a preference claim based on Mr. Prince's second withdrawal may survive a motion to dismiss, we do not believe it is more likely than not to ultimately succeed. And with respect to the ███ transactions, those were clearly not *preferences* because none of the payments were made on account of antecedent debts, nor were the retention-based payments to certain employees in July and August 2022.

- Finally, the pursuit of **fraudulent transfer claims** would present similar challenges. To pursue fraudulent transfer claims based on the ███ settlement payments, the estate would have to prove that it was insolvent at the time and did not receive reasonably

---

[8]    *Compare Celsius Executives Cashed Out $18 Million in Crypto Before Bankruptcy*, https://www.wsj.com/articles/former-celsius-ceo-cashed-out-10-million-in-crypto-before-bankruptcy-11665090875 (last accessed April 22, 2023).

[9]    The most material of these was a withdrawal from the platform of approximately $9 million by Mr. Prince in April 2022 to pay taxes that were created as a result of secondary transactions that he engaged in in 2021.  The case that BlockFi was insolvent at the time—where it had recently negotiated equity infusions at a multi-billion valuation, had received a valuation in the multi-billions by an investment bank, and was not experiencing material withdrawals—would not be credible.

6

equivalent value for the transfers.  There are reasonable arguments for solvency *and* insolvency at the time of the payments, but demonstrating insolvency would be expensive.  Moreover, BlockFi did benefit from the transactions; among other things, a lawsuit against BlockFi accusing it of misrepresenting its financial situation or the circumstances of its Series F fundraising would have harmed market confidence and perception of BlockFi at the worst possible time, just as it was stabilizing the situation, and defending the suit would have been very expensive.  Quantifying the value of this benefit would be difficult and fact specific—but BlockFi did receive value.  We also analyzed potential fraudulent transfer claims based on retention payments made to certain individuals shortly after the FTX Transaction.  Because the Company did not enter written agreements in connection with those payments, the estate could argue that the payments were gratuitous.  But the individuals were in fact retained by the payments such that BlockFi did receive substantial value, and any associated claims would face substantial difficulties (as there are indications that these payments merely brought the individuals' pay closer to market levels).

5.     Any potential claims against insiders, moreover, would be expensive to prosecute and would take considerable time.  Experts would need to be retained and paid for any such case.  All in, pursuing these claims would cost many millions of dollars.  And even though some of the insiders received material proceeds from secondary transactions in 2021 or earlier and would have some assets to satisfy a judgment, given the risk that litigation would result in zero (or net zero) recovery for the estate and the near certainty that litigation would not result in net collections that would make a material difference for creditors, it is hard to justify prosecution of these claims on a cost/benefit basis.

6.     Pursuing litigation against the insiders who could conceivably serve as witnesses in these cases, moreover, would be largely inconsistent with what should be the estate's large-scale goals described above:  (1) ensuring that the estate is in the best position possible to prosecute and defend litigation against the other bankruptcy estates (FTX, Alameda, Emergent, 3AC) and work with the United States in connection with a potential forfeiture suit; and (2) making sure the estate is in a position to distribute cryptocurrency *itself*, through the BlockFi platform, to BlockFi clients.  The most important benefit the estate could secure from any of the insiders would be cooperation on both fronts going forward.  In addition, while some of these claims may have modest settlement

value, any such value would be outweighed by the costs of prosecution and the harm to the estate's overall goals likely to result from prosecution.

7.     The Special Committee thus attempted to, and did, reach settlements with the key principals.  The company will maximize value by settling potential claims in exchange for:

- **Guaranteed cooperation for the life of the estate to assist in litigation.** Guaranteeing commitments of the witnesses' time after the depart the employ of BlockFi to assist counsel for the life of litigation, plus voluntarily preparing for and participating in depositions and testimony (if necessary) without retaining separate counsel that would eat into applicable insurance coverage, has tremendous value to the BlockFi estate.

- **Guaranteed performance of services to the estate until at least the first distribution of cryptocurrency is made to customers**.  Based on our understanding of the cryptocurrency market and BlockFi's platform, it is not wise to attempt in-kind distributions to creditors through the BlockFi platform unless the key internal resources are available to facilitate those transfers safely.  The primary people needed to do that include the key principals described above.  It is critical that their services are retained, both through the initial distribution and likely on a consulting basis for any subsequent in-kind distribution.

- **Waiver of claims**.  Many of the identified executives have filed proofs of claim, reflecting BlockFi's failure to pay a retention bonus they earned, and for indemnity, for example, due to BlockFi's inability to cover the costs of counsel engaged to represent them.  Securing waivers (or agreements to subordinate) the filed or threatened claims (which on their face assert seek approximately $7 million) directly benefits creditors by reducing dilution and/or ensuring that the estates do not need to incur legal fees to litigate such claims.

- **Platform Assets**.  Many of the identified executives continue to maintain a balance of cryptocurrency on the platform.  The Global Notes to the Schedules and Statements filed in the Chapter 11 cases provides as below for the approximate value of these individuals' assets on the BlockFi platform near the time of filing:

| | |
|---|---|
| A. Cheela | $292,000 |
| T. Lauro | $125,000 |
| R. Loban | $43,000 |
| F. Marquez | $109,000 |
| Z. Prince | $1,392,000 |
| A. Tam | $13,000 |

8

Securing agreement to waive or subordinate these claims directly benefits creditors. In effect, the insiders are leaving nearly $2 million on the BlockFi platform for distributions to BlockFi clients.

- **Cash Contributions**. The Special Committee also asked for, and secured, cash contributions to the estate totaling $2.2 million.

## FACTUAL BACKGROUND

## I.    COMPANY HISTORY

BlockFi is a digital asset (cryptocurrency) lender founded in 2017 by Zac Prince and Flori Marquez.[10]  The company's stated mission was to provide credit services to markets with limited access to simple cryptocurrency-related financial products.

BlockFi was the first in many states to seek and receive licenses to make cryptocurrency-backed loans.[11]  It was issued 47 licenses for lending, money transmission, operations, and the like by 32 states and D.C., and received a Class F Digital Business Assets License from Bermuda.[12] BlockFi only engaged in lending or money transmission in states in which it was licensed.[13]

Unlike certain competitors, BlockFi never launched its own token to raise funds.  BlockFi relied on traditional venture capital to raise money, completing six separate capital raises at valuations of up to $3.8 billion.[14]  BlockFi's equity investors included a variety of well-known private equity and hedge funds including Susquehanna, Jump Capital, Kenetic, Morgan Creek, Bain Capital, Valar Ventures, Tiger, Winklevoss Capital, and Coinbase Ventures.

---

[10]    *Declaration of Mark A. Renzi in Support of First-Day Motions* ¶ 22 ("First Day Declaration") (ECF No. 17).

[11]    *Id.* ¶ 23.

[12]    *See* https://blockfi.com/licenses (last visited 1/23/23).

[13]    *See* Mar. 17, 2023 D. Spack Tr. at 42:15-43:10 (describing BlockFi efforts to expand its footprint by getting new licenses in states that required such licenses).  BlockFi also registered with FinCen.

[14]    First Day Declaration., Exhibit C.

BlockFi has two primary types of clients: retail and institutional.[15]  BlockFi serves retail clients through web and mobile applications, and its products enable individuals and small businesses to store and/or earn interest on, buy, sell, and borrow U.S. dollars secured by, and earn (via a credit card rewards program) digital assets.  On the institutional front, BlockFi provides hedge funds, market makers, proprietary trading firms, trading desks, miners, exchanges, and corporations with bespoke financing, trading, and treasury solutions for digital assets.

BlockFi was clear with its clients that funds deposited in interest-bearing accounts on the BlockFi platform would be lent to third parties to generate yield.[16]  As the Bankruptcy Court has already found, the BlockFi terms of service were clear, and "BIA account holders deposited their assets into these accounts with the full knowledge that they were undertaking certain risk in exchange for the chance at greater returns."[17]  The terms of service for interest bearing accounts expressly granted BlockFi the right to use the amounts deposited in lending activities, including by rehypothecating any and all such deposits.  BlockFi repeatedly advised clients that to pay yield promised to customers, it would, among other things, lend cryptocurrency deposited on its platform to third parties that were engaged in proprietary trading.  That was not a secret, and it was common sense that doing so exposed BlockFi and BIA clients to counterparty risk.[18]

---

[15]     First Day Declaration ¶ 30.

[16]     *Id.* ¶ 26; *see* Section I.B.

[17]     May 11, 2023 Tr., *In re BlockFi Inc.*, 22-19361-MBK (Bankr. D. N.J.) (transcript of Judge Kaplan's ruling on Wallet Withdrawal Motion).

[18]     *E.g.,* "*Lending Your Crypto Could Generate Attractive Yields.  But How Safe Is It?*", available at https://www.barrons.com/articles/crypto-lending-yields-51639123201 ("How safe is crypto lending?  The companies say they use rigorous risk controls and impose steep collateral requirements . . . [s]till, investors shouldn't count on government protections against losses.  FDIC bank insurance or SIPC brokerage insurance isn't available in crypto. The industry isn't regulated as closely as banks or brokerages.  And while lenders may be conservative with loan-to-value ratios and capital reserves, they may take liberties.").  Indeed, BlockFi's settlement with the SEC in February 2022 publicly asserted that BlockFi left one statement on its website for too long that unintentionally understated clients' risk profile.  *See infra* Section IV.  Clients had nine months following this public SEC statement to withdraw cryptocurrency from BlockFi's platform before its bankruptcy and many did so.

BlockFi also advised clients that it was investing in GBTC shares to earn yield for clients.[19] On October 15, 2020, BlockFi publicly filed a Section 13(g) form with the SEC, confirming it had crossed the 5% ownership threshold for GBTC shares.[20]  Shortly thereafter, BlockFi issued a press release, advising clients and other interested observers that it had taken a material position in GBTC and noting BlockFi's view of the direct correlation between its ownership of shares in the GBTC trust and clients' Bitcoin exposure.[21]  BlockFi's GBTC positions were widely reported in the industry press in October 2020 and thereafter; they were not by any means a secret either.[22]

BlockFi experienced rapid growth.  Between 2019 and March 2022, total trading volume grew from $2 million to more than $23 billion (on an LTM basis), while deployable assets grew from $345 million to $14.8 billion and gross loan originations expanded from $687 million to more than $47 billion.[23]  As BlockFi's business and operations grew, it expanded its management team and employee base, with a focus on hiring experts from other segments of the financial sector.[24] By January 2022, BlockFi and its affiliates had grown to 814 employees.[25]

---

[19]    *See* https://twitter.com/BlockFiZac/status/1546609720051499016

[20]    https://fintel.io/doc/sec/1726072/000149315220019975/sc13g.htm

[21]    https://blockfi.com/blockfi-position-in-gbtc-reaches-disclosure-threshold ("GBTC allows investors to gain exposure to BTC in the form of a security without the challenges of buying, storing and safekeeping Bitcoin directly. GBTC is one of the most liquid ways for equity investors to take advantage of BTC's price movement.")

[22]    https://www.coindesk.com/markets/2020/10/27/blockfi-takes-5-stake-in-grayscales-48b-bitcoin-trust/ (10/27/2020) ("CEO Zac Prince said in a press statement BlockFi's "significant" GBTC position will "add value" to the "marketplace for liquid and illiquid" shares. "There are lending markets related to GBTC," he told CoinDesk in an email."); https://www.yahoo.com/lifestyle/blockfi-takes-5-stake-grayscale-194531542.html (same).

[23]    First Day Decl. ¶ 27.  Total loan originations prior to BlockFi's bankruptcy exceeded $60 billion.

[24]    For example, BlockFi hired Yuri Mushkin as Chief Risk Officer in August 2021.  Prior to joining BlockFi, Mushkin had worked at Goldman Sachs for 14 years and McKinsey for 3. (Apr. 12, 2023 Y. Mushkin Dep. Tr. at 10:4-6, 42:23-43:2.)  Prior to joining as BlockFi's General Manager of Institutions in 2022, Brian Oliver held various roles at CME Group, J.P. Morgan, Citadel Securities, IHS Markit, and other institutions.  Chief Accounting Officer Rob Loban, prior to joining BlockFi, had worked at PriceWaterhouseCoopers for 15 years.  (Mar. 21, 2023 R. Loban Dep. Tr. at 9:8-10:8.)

[25]    *Declaration of Chief People Officer, Megan Crowell, in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Retention Programs and (II) Granting Related Relief* at ¶¶ 20, 27 (ECF No. 350).

11

Between August and November 10, 2022, the Board of Directors of BlockFi Inc. was comprised of BlockFi's co-founders Zac Prince and Flori Marquez, Tony Lauro (who had served as BlockFi's CFO), and Jennifer Hill.[26]  Ms. Hill was an independent director who had been added in 2021 shortly after the hiring of CRO Yuri Mushkin; she added expertise and experience in risk management and chaired the Board of Directors' Audit and Risk Committee ("BARC").[27]  The cryptocurrency market experienced increasing volatility and significant decline throughout 2022, culminating in several cryptocurrency platforms pausing activity and declaring bankruptcy.  A detailed accounting of the market's deterioration in the second half of 2022 is provided in BlockFi's First Day Declaration and, as relevant here, is detailed more fully below.

Ultimately, following FTX and Alameda's respective bankruptcy filings and BlockFi's inability to access certain assets and collateral being held at FTX and at a third-party custodian, BlockFi determined that it may need to seek chapter 11 protection to secure client funds and ensure equitable treatment for clients.  To ensure that BlockFi would be in a position to manage a restructuring appropriately, BlockFi installed new independent directors or managers, as applicable (collectively, the "Independent Directors"), as follows:

| Entity | New Independent Director |
|---|---|
| BlockFi Inc. | Scott Vogel |
| BlockFi Lending | Harvey Tepner |
| BlockFi Wallet | Pamela Corrie |
| BlockFi Trading | Alan Carr |
| BlockFi International | Jill Frizzley |

---

[26]    *Id.* ¶ 60.

[27]    Prior to joining BlockFi's board, Ms. Hill had served on a variety of boards of directors in the financial industry, including serving as a director at Santander Asset Management, ExcelFin Acquisition Corp., Cantor Fitzgerald Europe, and Melqart Asset Management.  Prior to taking these director roles, Hill had also worked at Goldman Sachs for ten years, at RBS for three years, and at Merrill Lynch & Co. (serving as CFO) for approximately three years.  Apr. 26, 2023 J. Hill Dep. Tr. at 6:14-8:18, 9:11-20.

A.      **BlockFi Corporate Background**

BlockFi, Inc., is the parent of the other Debtors, and an organizational chart depicting the

Debtors' corporate structure[28] is copied below:



BlockFi Inc.'s Articles of Incorporation authorized the company to provide

indemnification to "directors, officers, and agents . . . through Bylaw provisions, agreements with

such agents or other persons, vote of stockholders or disinterested directors or otherwise."[29]  The

Articles also waived "[t]o the fullest extent permitted by law" any personal liability "to the

Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."[30]

And consistent with these Articles, BlockFi Inc. provided indemnity to its directors and officers.

Specifically, under the Amended and Restated Bylaws of BlockFi Inc., directors are indemnified

for any claims "made, or threatened to be made, a party to an action or proceeding, whether

criminal, civil, administrative or investigative, by reason of being a director of the corporation."[31]

These indemnification rights include the right to the advancement of fees.[32]

---

[28]      *See First Day Declaration*, Ex. A.

[29]      Aug. 9, 2021 Eighth Am. and Restated Certificate of Corporation for BlockFi Inc. at 26; 7/8/22 Ninth Am.
and Restated Certificate of Incorporation for BlockFi Inc. at 28.

[30]      *Id*. at 26.

[31]      BlockFi Inc.'s Amended and Restated Bylaws at § 7.6.

[32]      *Id*.

In addition, most of BlockFi's material unpaid loans at the time of its bankruptcy were issued by BlockFi International, a subsidiary of BlockFi Inc. and a Bermuda Limited Company.[33] Consistent with Bermuda law, BlockFi International's "Bye-Laws" expressly waive fiduciary duty claims that could be brought against directors, and also require BlockFi International to indemnify and advance the costs and attorneys' fees of any officer, director, or employee if any claim was threatened or brought against them arising out of their service to the company:[34]

### INDEMNIFICATION AND EXCULPATION OF DIRECTORS AND OFFICERS

108.   To the fullest extent permitted by the Companies Act, a Director of the Company shall not be liable to the Company or its Shareholders for breach of fiduciary duty as a Director.

109.   Without limitation of any right conferred by Bye-law 108, each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "**proceeding**"), by reason of the fact that such person is or was a Director, Officer or Resident Representative of the Company, or is or was serving at the request of the Company as a Director, Officer, Resident Representative, employee or agent of another company or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "**indemnitee**"), whether the basis of such proceeding is alleged action in an official capacity while serving as a Director, Officer, Resident Representative, employee or agent or in any other capacity while serving as a Director, Officer, Resident Representative, employee or agent, shall be indemnified and held harmless by the Company to the fullest extent authorized by the Companies Act (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than permitted prior thereto), against all expense, liability and loss (including attorneys' fees, judgments, fines, excise taxes or amounts paid in settlement) reasonably incurred or suffered by such indemnitee in connection therewith and such indemnification shall continue as to an indemnitee who has ceased to be a Director, Officer or Resident Representative and shall inure to the benefit of the indemnitee's heirs, testators, intestates, executors and administrators; provided, however, except as provided in Bye-law 110 with respect to proceedings to enforce rights to indemnification, the Company shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) initiated by such indemnitee was authorized by the Board.  The right to indemnification conferred in this Bye-law 109 shall be a contract right and shall include the right to be paid by the Company, the expenses incurred in defending any such proceeding in advance of its final disposition (hereinafter an "**advancement of expenses**"); provided, however, that, if the Companies Act requires, an advancement of expenses incurred by an indemnitee in his capacity as a Director, Officer or Resident Representative shall be made only upon delivery to the Company of an undertaking (hereinafter an "**undertaking**"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "**final adjudication**") that such indemnitee is not entitled to be indemnified for such expenses under this Bye-law or otherwise.

---

[33]     Of the $933 million in loans outstanding as of January 31, 2023, approximately $800 million were made by BlockFi International and $133 million were made by BlockFi Lending LLC.

[34]     *See* Jan. 21, 2022 Bye-Laws of BlockFi International Ltd., at pp. 18-19.  Under the applicable Bermuda law, provisions like this are enforceable and extremely difficult to overcome.

### B.    BlockFi Products and Related Agreements

BlockFi offered a variety of products, ranging from BlockFi Wallet, which served merely as a spot for clients to store crypto without earning interest, to BlockFi Interest Accounts ("BIA"). Pursuant to the terms of service for the Wallet accounts, title to cryptocurrency assets deposited by clients remained the property of the client and did not pass to BlockFi.[35]  The terms of service for Wallet accounts also included limitations on the amount and timing of withdrawals from those accounts.  Specifically, BlockFi disclosed that withdrawal requests could take "up to seven (7) days after you submit your withdrawal request to process the withdrawal."[36]  BlockFi also disclosed that it could limit the frequency and amount of withdrawals at any time in its discretion.[37] Finally, BlockFi disclosed that it or third-party partners "may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of transfers and withdrawals of cryptocurrency either temporarily or permanently."[38]

In contrast to Wallet accounts, for the BIA accounts, the terms of service made clear that BlockFi had the right to use such assets for any purpose:[39]

---

[35]    *See* Feb. 1, 2022 Wallet Terms of Service at § F ("The title to the cryptocurrency held in your BlockFi Wallet shall at all times remain with you and shall not transfer to BlockFi. . . .  Except as required by a valid court order or applicable law, BlockFi shall not sell, transfer, loan, hypothecate or otherwise alienate cryptocurrency held in your BlockFi Wallet unless specifically instructed by you.").  *See also Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (II) Granting Related Relief*, Dkt. No. 121 (the "Wallet Motion") at ¶¶ 15–17.

[36]    *Id*. at § D.1.

[37]    *Id*. at § D.2.  As the Bankruptcy Court described in ruling on the Debtors' Wallet Withdrawal Motion, the terms of service include the provisions that "Pursuant to the BlockFi general terms of service clients must, among other things, acknowledge and agree that BlockFi in its sole discretion may suspend or discontinue your and refuse any and all current future access to or use of your BlockFi accounts at any time without notice to you." and that "Clients agree that BlockFi and our third party partners may experience cyber attacks, extreme market conditions or other operational or technical difficulties which could result in the immediate halt of transfers and withdrawals of crypto currency either temporarily or permanently."  May 8, 2023 Hrg. Tr. at 8.

[38]    Feb. 1, 2022 Wallet Terms of Service at § D.5.

[39]    *See* Apr. 14, 2022 Interest Account Terms (Existing US Only) at § E.  The terms for non-U.S. interest account holders contained substantially similar provisions.  *See* Feb. 14, 2022 Interest Account Terms (Non-US) at § G.

## E. Utilization of Assets

**1. Except where prohibited or limited by applicable law, BlockFi has the right, without further notice to you, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.**

**2. You acknowledge that, with respect to assets used by BlockFi pursuant to this paragraph: (i) you will not be able to exercise rights of ownership, (ii) BlockFi and its affiliates may receive compensation in connection with lending or otherwise using or investing cryptocurrency in its business to which you will have no entitlement, and (iii) cryptocurrency that is subject to such lending transactions, investment or otherwise being used in these transactions will not be held by BlockFi's third party custodians.**

In general, this arrangement reflected in the terms of service formed the basis for BlockFi's business model. With assets in the BIA product and collateral posted for loans, BlockFi would, among other things, make loans to third parties, charging the third parties interest on such loans.[40] With a portion of the income for these loans, BlockFi would pay interest to the client. In addition to interest revenue, BlockFi also received a spread of fees for trading by clients on the platform. BlockFi would also seek to make money on its own trades in some circumstances.

BlockFi had policies to manage duration-mismatch, and avoided currency mismatches. Moreover, as discussed above, BlockFi's terms of service gave it seven days to honor withdrawal requests, and the ability to pause or limit withdrawals at any time. And BlockFi's loans to third parties were largely freely callable, meaning that BlockFi could demand return of the assets lent at any point (and liquidate collateral if the borrower did not comply with the call).

---

[40] In some circumstances, BlockFi would seek to earn additional revenue from collateral held or cryptocurrency in BIA accounts by "staking" certain coins. This too was disclosed to customers in the Terms of Service and elsewhere. As the Bankruptcy Court held in connection with the Wallet Withdrawal motion, "[a]s a matter of both New Jersey and Bermuda contract law … [and] the plain, ordinary and unambiguous language of the reference[d] terms of service" advised all clients that "BIA account holders deposited their assets into these accounts with the full knowledge that they were undertaking certain risk in exchange for the chance at greater revenue." May 8, 2023 Hrg. Tr. at 7.

The UCC's Report is critical of BlockFi's business model in general.  The UCC suggests that BlockFi's business model was "fundamentally flawed" because its ability to make money depended in part on being able to secure higher interest rates from third party borrowers than those BlockFi paid to clients.[41]  The UCC contends this was difficult between April 2021 and August 2022 as BlockFi had promised "between 2% and 6% for BTC and ETH deposits" to clients, BlockFi needed to lend more out "as its marketing strategy flourished," and BlockFi was "not successful at this" because it "never generated positive operating income."[42]

These general sorts of economic arguments are those that could be levied against any lending business, and they are irrelevant to any potential *estate* claims—a company cannot sue its board or management team for executing on a flawed business model.  But in any event, the UCC's factual claims about BlockFi's ability to generate profit are belied by financial records and testimony.  For instance, for the year 2020, based on the fair value accounting that BlockFi used to present an accurate view of its business and that was used for calculating BlockFi's income taxes, BlockFi reported a net profit of more than $200 million.[43]  This was confirmed for the UCC by Chief Accounting Officer Rob Loban, who confirmed that BlockFi "showed on a profit . . . in 2020" both "on a tax return" and "on our management reporting return."[44]  Accordingly, the public statement Mr. Prince made in March of 2021 that BlockFi had been "operating profitably for several months," was consistent with BlockFi's performance.[45]

---

[41]    UCC Report at 5.  The UCC Report is inconsistent in sometimes recognizing and sometimes forgetting that BlockFi's business model also included generating revenue through the spread on client trades.

[42]    UCC Report at 6.

[43]    *See* Dec. 31, 2020 BlockFi Inc. Consolidated Financial Statements (Unaudited).

[44]    Mar. 21, 2023 R. Loban Dep. Tr. at 125:23–126:10

[45]    UCC Report at 21.

To the extent the UCC is trying to parse operating profits as **not** including fair value accounting with respect to trading positions—which would not make much sense given the UCC recognizes trading was an element of BlockFi being able to earn a return—it also ignores that BlockFi also regularly had a positive net interest margin position. That is, BlockFi regularly earned more from interest than it paid out and would regularly monitor and adjust the interest rates it paid to customers in order to maintain a positive net interest margin.[46]

More generally, the UCC's claim that BlockFi's business was fundamentally flawed from the outset is contradicted by contemporaneous market evidence and appears to be based on nothing more than hindsight. It is unclear *who* among the UCC's advisors believes BlockFi's business model was "fatally flawed" from inception and what witness (if any) would testify to that premise. As the UCC recognizes, BlockFi raised hundreds of millions of dollars in equity.[47] The Series E financing round valued BlockFi at more than $3 billion and occurred in the summer of 2021— after BlockFi's Grayscale positions were disclosed to potential investors. And the equity investments in BlockFi at multi-billion dollar valuations were made by sophisticated investors. Nor was BlockFi an outlier in this regard.[48] Even if today, *after* a year of crypto-winter, it appears that cryptocurrency businesses face long-term challenges, the market defeats any claim that BlockFi's business model was fatally flawed from the outset.

---

[46]     *E.g.*, Aug. 31, 2022 Monthly Consolidated Statement of Operations (reflecting $200 million of Interest and Fee Revenue as against $160 million of Interest and Fee Expense); Sep. 30, 2022 Monthly Consolidated Statement of Operations (reflecting $219 million of Interest and Fee Revenue as against $192 million of Interest and Fee Expense).

[47]     UCC Report at 20–21.

[48]     *See, e.g.,* https://www.fool.com/investing/2022/02/15/voyager-digital-surging-growth-at-a-compelling-val/ (identifying Voyager as a public company with a significant and growing market cap at the time). More generally, the business model the UCC advisors criticize as "fatally flawed" is similar conceptually to *many* types of lending businesses.

The UCC also suggests that BlockFi misled customers by presenting itself as a "local community banker."[49]    Nothing is cited to substantiate the UCC's assertion that BlockFi analogized itself to a local bank.  The evidence shows the opposite.  Among other things:

- The footer on BlockFi's website is clear, among other things, both that "Digital currency is not legal tender, is not backed by the government, and **crypto accounts held with BlockFi are not subject to FDIC or SIPC protections**." . . . and "**BlockFi is not a Bank**.  [Credit and Debit] Cards are issued by Evolve Bank & Trust, Member FDIC, pursuant to a license from Visa® USA Inc."[50]

- BlockFi's Wallet Terms of Service provide that "**Your BlockFi Wallet is not a checking or savings account**, and it is not covered by insurance against losses" and "Accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections"[51]

- BlockFi's Interest Account Terms provide that "**Your Crypto Interest Account is not a checking or savings account, and it is not covered by insurance against losses.**  We will pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use funds and cryptocurrency assets to counterparties, and such cryptocurrency assets **will be exposed to various risks as a result of such transactions**."[52]

- BlockFi's Private Client Terms provide that "**The Private Client program is not a checking or savings account, and it is not covered by insurance against losses.**  We will pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use funds and cryptocurrency assets to counterparties, and such cryptocurrency assets will be exposed to various risks as a result of such transactions. In certain jurisdictions, cryptocurrency is not legal tender, and is not backed by the government.  The Private Client Open and Fixed Term Loans and loan balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections."[53]

- BlockFi's Trading Terms similarly provide that "Accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections."[54]

---

[49]    UCC Report at 2; UCC Powerpoint at 3.

[50]    https://blockfi.com/ (emphasis added)

[51]    https://blockfi.com/wallet-terms (emphasis added)

[52]    https://blockfi.com/interest-account-terms (emphasis added)

[53]    https://blockfi.com/private-client-terms (emphasis added).

[54]    https://blockfi.com/trading-terms

- BlockFi's Transparency Report for the Second Quarter of 2022, which the UCC somehow cites for the proposition that BlockFi's marketing analogized the firm to a local bank,[55] says the opposite. It confirmed for clients that "Digital currency is not legal tender, is not backed by any government, and **the Wallet, BlockFi Interest Account and BlockFi Private Client are not bank accounts nor brokerage accounts, and are not subject to FDIC, SIPC, or other similar protections. . . . These are not risk-free products and loss of principal is possible**."[56]

- Some of BlockFi's other blog posts reinforced these warnings. Among other things, in a "Message from Our CEO" published March 17, 2020, BlockFi again confirmed that "Digital currency is not legal tender, is not backed by the government, and BIA accounts are not subject to FDIC or SIPC protections.[57]

Moreover, while statements by BlockFi insiders to the public are not relevant to potential estate claims *by BlockFi* against insiders, the public statements made by BlockFi insiders do not support the UCC's assertion that BlockFi "presented itself as a hometown community bank." To the contrary, when questions were posed to BlockFi insiders in public forums, they distinguished BlockFi from a bank.[58] As an example, in August 2022, BlockFi CEO Zac Prince appeared on a

---

[55]    *See* UCC Report at 2 n.6.

[56]    *See* Q2 2022 Transparency Report (*available at* https://blockfi.com/blockfi-transparency-report-Q2-2022, emphasis added). More generally, the UCC criticizes BlockFi's efforts to be transparent with its customers, including its issuance of a "transparency report" that allegedly created an "ethos" of trust. (*See* UCC Report at 2.) But the UCC does not identify a single allegedly false statement of fact in the report (the only one the UCC cites). Indeed, in the report criticized, BlockFi made no explicit promises, and instead tried to educate customers, in a very high-level sense, on procedures used to monitor, and hopefully minimize, risk. *See id.* ("BlockFi's core value is Transparency Builds Trust—which is paramount to maintaining and expanding our clients' trust. As such, we view risk management as key to our success. **We seek to** monitor and control our risk exposure through an enterprise risk management framework…."); ("**We seek to** maintain the liquidity necessary to meet all our obligations under our core business activities, which includes institutional and retail borrowing and trading activities. **We seek to** maintain sufficient levels of short-term assets to meet client redemption and payback obligations, as well as to support trading activity, by keeping sufficient balances in inventory."); ("We have established an internal credit lending policy that **generally** limits exposure to any one borrower, principal or guarantor **based on net exposures**, which represents our aggregate exposure to economically related borrowers for approval purposes. Based on our internal credit process, our loan approvals follow a transaction authority and credit limit matrix, which are based on a counterparty's financial information and size, business model related to traditional or digital assets markets, country of domicile, leverage, and other credit measures."); ("Whether we require institutional borrowers to post collateral and, if so, the type and level of collateral we require, **depends on the borrower's credit profile** and the size and composition of the loan portfolio.") (all emphasis added) It is unfair and improper advocacy to equate statements about what BlockFi advised clients it would "seek" to do with statements that BlockFi *promised* it would do.

[57]    A Message from Our CEO: An Update on BlockFi Operations (March 17, 2020, *available at* https://blockfi.com/an-update-on-blockfi-operations)

[58]    Zac Prince, CNBC, Feb. 12, 2020 ("There is more risk here versus a savings account with FDIC insurance or a traditional brokerage account with SIPC insurance, but you're compensated for it with the high yields.") (available

Podcast called "The Scoop" to share lessons learned following liquidating collateral posted by

3AC, and he stated the following:

> Look, if you're saving money for a house for your family for a down
> payment, I don't know if the BlockFi Interest Account is the right place
> for you.  If you're saving money for a down payment on a boat, sure!  I
> think there's a distinction there, like these aren't municipal bonds, this
> isn't a savings account with FDIC insurance or a brokerage account with
> SIPC insurance.  There is a different amount of risk here.[59]

Consistent with other statements, Prince advised that "Folks have to be cautious with this stuff."[60]

Given the explicit disclaimers throughout BlockFi's Terms of Service, Judge Kaplan's findings

that the Terms are clear and disclose the risks to BlockFi clients, many public statements explicitly

*distinguishing* BlockFi from a bank,[61] and the disconnect as a matter of law between any such

alleged statements and an *estate* cause of action,[62] any legal theory suggesting BlockFi can sue its

management team because it promised to operate like a bank would not survive serious scrutiny.

---

at https://www.cnbc.com/video/2020/02/13/ blocfi-co-founder-and-ceo-zac-prince-on-wealth-management-for-crypto-investors.html, approx. 1:38); *All the Hacks with Chris Hutchins*, June 3, 2021 (Zac Prince, at approx. 7:11: "Yeah. There's a very important disclaimer which is this is not a bank account.  And as a result, it does not come with FDIC insurance.  It's also not a security account with [SIPC] insurance.") (available at https://podcasts.google.com/feed/aHR0cHM6Ly9mZWVkcy5tZWdhcGhvbmUuZm0vQVRITExDNDQ3NDk1MTM2NQ/episode/OGYxYmU4MjItMTllMS00NDJhLWIwNTQtZDVlMThjZmJiOTBi?sa=X&ved=0CAIQuIEEahgKEwjo796Kk4f_AhUAAAAAHQAAAAAQjQ4); Inc. Founders Project with Alexa von Tobel - How to Create a Sticky Product with Flori Marquez of BlockFi, April 28, 2021, at approx. 11:17 ("Our products are not FDIC insured. It's not like a bank account.  You are earning interest in a similar way, but it's fundamentally a very different risk profile.") (available at https://podcasts.google.com/feed/aHR0cHM6Ly9mZWVkcy5tZWdhcGhvbmUuZm0vTUFOVjkyMTE2NjE0OTk/episode/ZWMyNDI5OTItYTc5OS0xMWVjLWFjNWUtMTM1MjBkMjA3MTRm?sa=X&ved=0CAIQuIEEahcKEwjA4qP5qof_AhUAAAAAHQAAAAAQRA).

[59]    https://open.spotify.com/episode/59ZmkGkjAnZYFfyG9h8GAg?si=wqFFNEyETD-FAZmwDfIPpg&context=spotify%3Acollection%3Apodcasts%3Aepisodes&nd=1

[60]    *Id.*

[61]    The UCC Report identifies one statement in which, in response to a question during a podcast in April 2019 (one month after BlockFi began offering BIA accounts), Ms. Marquez agreed the account operated like a "high yield savings account for crypto."  UCC Report at 3 n.9, 82 n. 285.  That statement was accurate, but the UCC's leap from that statement to the mantra that "Zac and Flori assured clients that their funds were safe just as one might expect when depositing with one's local community bank" (UCC Report at 3-4) is a stretch.  These assertions (even if true) are not relevant to any *estate* claim that *BlockFi* could pursue against its management team.  But in any event, no reasonable person could have believed putting crypto on BlockFi's platform was as safe as making an FDIC-insured deposit at Chase.

[62]    *See infra*, Analysis Section IV.

## II.    FUNDING ROUNDS

After its founding, BlockFi completed a number of funding rounds that reflected active

equity investments at a steadily increasing valuation through the market downturn in mid-2022.

### A.    Series A Funding Round

Between July and August 2019, BlockFi Inc. sold 13,259,229 shares of Series A preferred

stock.  Different tranches of the Series A preferred stock sold at different prices, ranging from

$1.06 per share to $1.75 per share.  The aggregate purchase price of the shares was $20.5 million;

$16 million in cash, and $4.5 million through the conversion and cancellation of convertible notes.

### B.    Series B Funding Round

In January and February 2020, BlockFi sold a total of 9,907,010 shares of its Series B

preferred stock at a price of $3.79 per share.  The aggregate purchase price was $37.5 million.

### C.    Series C Funding Round

From August to September 2020, BlockFi Inc. sold an aggregate of 7,081,821 shares of

Series C Preferred stock at a price of $9.51 per share.  The aggregate purchase price was $67.4

million and the valuation of the company at the time was $450 million.

### D.    Series D Funding Round

From March to May 2021, BlockFi sold an aggregate of 9,415,382 shares of Series D

preferred stock based on a $3 billion valuation, at a cash purchase price of $58.737 per share, for

an aggregate purchase price of $553 million.[63]  Among other investors, Prince participated in this

round, buying 51,075 Series D Preferred Shares through his entity A210Z Capital LLC at the same

price other investors paid (and paying approximately $3 million in the aggregate).[64]

---

[63]    *Id.*; *see also* https://www.forbes.com/sites/ninabambysheva/2021/03/11/blockfi-gets-a-3-billion-valuation-with-new-350-million-series-d-funding/?sh=b8613458a570 ("BlockFi Gets A $3 Billion Valuation With New $350 Million Series D Funding.")

[64]    These shares remain owned by A210Z and have no value.

Because Series D was significantly oversubscribed, BlockFi allowed shareholders, including certain qualified employees, to participate in a tender offer and receive the same price received by the company for those shares.  Specifically, any employee with shares could sell up to 15% of their holdings if they had been with the company for at least one year.  BlockFi served as a middleman, receiving funds from the investors and transmitting those funds to employees.

Through that tender offer, both Zac Prince and Flori Marquez sold portions of their existing holdings of common equity.  Prince sold approximately 595,000 shares, recognizing proceeds of approximately $35 million, and Marquez sold approximately 195,000 shares recognizing proceeds of approximately $11.5 million.[65]  Other employees also sold shares, as did existing shareholders Galaxy Digital Ventures, Three Arrows Capital, and CMT Digital Ventures Fund.[66]

### E.    Series E Funding Round

From July to August 2021, BlockFi sold an aggregate of 2,442,193 shares of Series E preferred stock and 660,116 shares of Series E-1 preferred stock at a $3.8 billion valuation, in each case at a cash purchase price of $75.7442 per share, which included 1,551,147 warrants, each of which grants the holder the right to purchase either a share of Series E or E-1 preferred stock.  The aggregate purchase price for the shares sold at a $3.8 billion valuation was $235.0 million.[67]

### F.    Series F Funding Round

BlockFi began 2022 on a high-growth path and began work on another round of funding. In January of 2022, Jefferies prepared a presentation for BlockFi regarding a proposed Series F

---

[65]     BF_BK_00118002.

[66]     Total gross proceeds from management stock sales in secondary transactions (before taxes) were approximately $41 million for Prince, $14 million from Marquez, $3.5 million from Spack, $1.9 million from Healy, and $406,000 from Cheela.  (BF_BK_00128339).

[67]     First Day Declaration ¶ 75.  Due to the quantum of capital BlockFi was trying to raise, and because BlockFi had recently included tender offers in the Series D round, Series E did not include a tender offer.

capital raise.[68]  That presentation summarized the rapid growth that BlockFi experienced in 2020

and 2021 on all relevant metrics including revenue, gross profits, funded accounts, and AUM.





Jefferies  also  prepared  an  indicative  valuation  of  BlockFi  based  on  public  company

comparables.  That comparable analysis indicated a valuation midpoint for BlockFi of $7 billion.

---

[68]      January 2022, Jefferies Presentation.  In May of 2022, JP Morgan also put together certain illustrative values
for BlockFi based on comparable companies.  These multiples generally valued BlockFi in ranges from approximately
$2 billion on the low side to in excess of $6 billion on the high side.



Based on that valuation, Jefferies recommended launching the Series F round of funding to seek at least $500 million and potentially up to more than $700 million depending on demand. The proceeds from this capital raise were to be used primarily to fund the company's ongoing operations and growth in 2022.  Jefferies' proposal called for the funding raise to close sometime in the middle of Q2 in 2022.[69]  Around this time, BlockFi was also planning for an initial public offering, and Jefferies expressed its view that completing a capital raise "shortly before an IPO Process" was a standard approach in Fintech.[70]

---

[69]        *Id*. at slide 13.

[70]        *Id*. at slide 14.

Following the Jefferies presentation in January of 2022, BlockFi moved forward with the Series F fundraising (led by J.P. Morgan), but a number of issues specific to BlockFi and applicable to the crypto sector generally impacted BlockFi's ability to complete the raise as contemplated.

In February 2022, BlockFi entered into a settlement (the first of its kind) with the U.S. Securities and Exchange Commission ("SEC") to resolve the SEC's claims, primarily that BlockFi had offered unregistered securities.[71]  As described in more detail below, the SEC and several state regulatory agencies alleged that BlockFi Interest Accounts ("BIA") were securities that BlockFi was marketing and providing to clients without proper registration.  The SEC also, after reviewing every one of BlockFi's public statements over a period of several years, alleged that one of them was a misrepresentation, true at the time it was made but misleading over time.

As part of the settlement, BlockFi agreed to pay a total fine of $100 million to the SEC and other state agencies and stop offering the BIA product in the United States until BlockFi completed a registration.  As noted in the initial Jefferies presentation related to the potential Series F financing, clarity on these regulatory issues was one of the gating issues BlockFi sought to resolve prior to launching its financing efforts.  BlockFi believed that parts of the settlement—in particular the provisions that provided a pathway for BlockFi to create and register the first SEC-approved crypto yield account (BlockFi Yield®) would create a material net benefit for the firm and lead to long-term profits multiple times the size of the agreed penalty.

After the SEC settlement, as the company worked to progress its Series F financing and register its BlockFi Yield® product, it ran headlong into the market headwinds in the crypto space described at length in BlockFi's First Day Declaration.  By May 2022, Prince was still expressing optimism that the company would complete the funding round, although at that point it was

---

[71]    *See* https://www.sec.gov/news/press-release/2022-26 (last visited on 1/22/23).

expected to be led by existing investors at a valuation of $2 billion.[72]    Although the company

continued to believe it would be able to finalize a capital raise through June of 2022,[73] the overall

market contagion created substantial headwinds for that effort.

### III.    OPERATIONS AND RISK MANAGEMENT WITH RESPECT TO SPECIFIC COUNTERPARTIES AND TRANSACTIONS.

This section of the Report discusses potential claims arising out of the general operation of

BlockFi's business, and specifically BlockFi's risk management and dealings with respect to

specific counterparties and transactions.[74]

While BlockFi did an overwhelming volume of institutional and retail lending without

default,[75] this section focuses on a small subset of those transactions, specifically BlockFi's

transactions involving Grayscale Bitcoin Trust ("GBTC"), Three Arrows Capital ("3AC"),

Alameda Research ("Alameda"), and FTX.    The potential claims arising from the GBTC, 3AC,

Alameda, and FTX transactions all touch on BlockFi's risk management policies and practices.

To that end, this section begins with a general discussion of those policies and practices, before

delving into the specific transactions at issue.

---

[72]    May 11, 2022 Z. Prince Email to ▮▮▮▮▮ (PRINCE_ZAC-00070148).

[73]    Jun. 9, 2022 Z. Prince Email to ▮▮▮▮▮ (PRINCE_ZAC-00070148).

[74]    This Section deals virtually exclusively with institutional clients and how BlockFi approached the risk associated with those accounts.  With respect to retail accounts, BlockFi's risk management process was much more straightforward.  Beyond doing the necessary know-your-customer ("KYC") and anti-money laundering ("AML") checks, BlockFi generally did not separately engage in credit checks or analysis for retail customers.  Instead, with respect to loans to retail customers, BlockFi simply required customers to post collateral generally worth at least twice the sum borrowed, and would actively monitor the client's position for changes that would require margin calls or liquidation of collateral.  (Mar. 17, 2023 D. Spack Dep. Tr. at 60:2–6; 62:4–63:19.)  Margin calls and liquidations were initiated at the times that the loan-to-value ratios on retail loans were well below 100%, and BlockFi actively managed the retail loan book (both automatically and manually); there were and are no material losses associated therewith.

[75]    Total loans originated by BlockFi prior to its bankruptcy exceeded $60 billion.  Loans were made and recalled frequently as this was a very dynamic business, reflected by the fact that total originations exceeded $60 billion even though BlockFi never loaned out more than 80% of rehypothecatable assets at any one time and its assets on platform peaked at approximately $15 billion.

A.      **General Risk Management Policies and Procedures.**

Any lending operations involve risk.  Indeed, the yield that clients earned on BlockFi's platform would not have been possible without taking some degree of risk.  BlockFi put into place comprehensive policies and procedures, which were improved upon over time, to ensure BlockFi understood and managed its risk profile.

Historically, the risk function at BlockFi had served both retail and institutional businesses and was housed within and reported to the institutions business unit.  In July 2021, as part of and in anticipation of a potential IPO, BlockFi hired Yuri Mushkin to serve as its Chief Risk Officer. Mushkin's hire was part of BlockFi's initiative to separate risk assessment from sales, with risk now reporting through the finance department.  The risk group reported through the CFO at the time to the CEO, as well as to the BARC.

While BlockFi had risk management processes in place previously,[76] upon Mushkin's hiring, the risk team also started to build more structured, traditional governance based on industry best practices, including but not limited to creating the BARC and building out risk policies and risk identification and reporting capabilities.[77]  For example, in the credit function specifically, BlockFi established a credit-specific risk policy, and instituted quarterly reporting to BARC. BlockFi shared its risk management policies with its clients, including through sharing a number of blog posts and slide decks providing general information about the process.[78]

Mushkin described his role of Chief Risk Officer as one "to clarify the risks, report the risks, ensure the risks are understood and ensure the right people are there and that the right forums

---

[76]      Apr. 12, 2023 Y. Mushkin Dep. Tr. at 52:9-11.

[77]      *E.g.*, Jul. 6, 2021 Risk Governance and Operational Resiliency - Industry Report.

[78]      *E.g.*, An In-Depth Look at BlockFi's Risk Management ("Risk Management Blog"); Responsible Lending Supports Growth ("Responsible Lending Blog"); Recap: Reddit AMA with Chief Risk Officer Yuri Mushkin.

exist in the company[.]"[79]  Hill corroborated this testimony, described the risk-sharing process at

BlockFi as being an open one where ideas were exchanged, and described how she and other

members of the BARC had an open dialogue with Mushkin about potential risks.

### Enterprise Credit Risk Management Policy

BlockFi employs a "comprehensive risk management framework" to assess four key risk

areas: credit risk, liquidity risk, market risk, and enterprise risk.[80]   Credit risk management,

specifically, "involves a thorough analysis of [BlockFi's] counterparties to understand their

financial standing and ongoing ability to repay loans."[81]   To that end, BlockFi created a

comprehensive Enterprise Credit Risk Management Policy.[82]   The Credit Risk Policy "define[s]

and provide[s] the Credit Risk framework" for BlockFi's institutional and retail clients.

#### _Risk Appetite_

As an initial matter, BlockFi's risk team assesses credit risk against the company's risk

appetite based on various metrics:[83]   BlockFi's risk appetite focuses on five things:

- Targeting "long term portfolio return that exceeds our risk-adjusted cost of capital";

- Having "flexibility to define the level of concentration in areas where BlockFi has expertise in managing risk";

- "Evaluat[ing] the potential for losses of overall portfolio value over short-term and prolonged periods";

- Taking actions to "minimize reputational risks"; and

- "Manag[ing] our equity capital ratios including leverage and liquidity."[84]

---

[79]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 81:10–82:3.

[80]    _See_ Risk Management Blog.

[81]    _Id._

[82]    _Enterprise Credit Risk Policy (last updated October 26, 2022)_ ("Credit Risk Policy").

[83]    Credit Risk Policy at 9.

[84]    Risk Governance Presentation at 3.

***Counterparty Review and Approval***

BlockFi went through a defined risk management process with respect to each counterparty.  This process was followed every time and improved upon over time.[85]

First, BlockFi underwriters recommended a tier for each potential counterparty based on guidelines for "counterparty selection and credit extension."[86]  As Yuri Mushkin testified, however, these were "guidelines" rather than strict rules, and the primary purpose of the "Tiering" process was to assess whether to extend *unsecured* credit to counterparties—making it less relevant when BlockFi decided to lend to a counterparty only on an overcollateralized basis.[87]

| Category | Criteria | Tier 1 | Tier 1C-X | Tier 1C-Other | Tier 2 | Tier 2C | Tier 3 |
|---|---|---|---|---|---|---|---|
| Balance Sheet | Entity and Group NAV/ Equity | Entity equity >100mm OR AUM>1bn (for fund manager) /group equity > 300mm (for prop) | Entity equity >100mm OR AUM>1bn (for fund manager) /group equity > 300mm (for prop) | Entity equity >100mm OR AUM>1bn (for fund manager) /group equity > 300mm (for prop) | Entity equity >100mm OR AUM>300mm (for fund manager) /group equity > 100mm (for prop) | Entity equity >15mm OR AUM>300mm (for fund manager) /group equity > 100mm (for prop) | >$5mm for Crypto and >$10mm for non-Crypto |
| Transparenc y & Organizatio n | Transparency | Verifiable Financials (Audited/Fund Admin) | Verifiable Financials (Audited/Fund Admin) | Verifiable Financials (Audited/Fund Admin) or unaudited financials + other sources to verify acceptable to Credit | Verifiable Financials (Audited/Fund Admin) or unaudited financials + other sources to verify acceptable to Credit | Verifiable Financials (Audited/Fund Admin) or unaudited financials + other sources to verify acceptable to Credit | Some Financial Disclosure at least unaudited financials |
| | Crypto Assets | <50% | >50% | >50% | <50% | >50% | N/A |
| | Years in Business and Size | > 5yrs and firm-wide employees >10 | > 3yrs and firm-wide employees >10 | > 3yrs and firm-wide employees >10 | > 3yrs and firm-wide employees >10 | >2yrs and firm-wide employees >5 | >2yrs and firm-wide employees >5 |
| | Key Person Years of Experience | >15yrs | >15yrs | >15yrs | >10yrs | >10yrs | >7yrs |
| | Country of Risk | Tier 1 COR | Tier 1 COR | Tier 1 COR | >=Tier 2 COR | >=Tier 2 COR | Other |

---

[85]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 124:7–125:25.

[86]    Credit Risk Policy at 10-11.

[87]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 119:15–123:20.  BlockFi only lent to 3AC and Alameda on an overcollateralized basis because, among other things, neither provided audited financial statements.  *See e.g.,* Y. Mushkin Dep. R. Tr. 127:7-12; 168:16-169:16, 204:24-205:21; *see also* Presentation for UCC re 3AC & GBTC, at slide 11.  That is, with immaterial exceptions, BlockFi did not lend to either of 3AC or Alameda without them posting collateral worth materially more than 100% of the loan amount at inception; BlockFi then actively monitored the loans, and required both to "top up" collateral when there was a risk of less than 100% coverage.  *See e.g.,* BF_BK_00065356 (describing additional collateral pledge from 3AC due to collateral level falling to 92%).  This was a materially more conservative approach than BlockFi's peer firms, who often lent uncollateralized and/or materially undercollateralized. *See e.g., In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 863, Second Amended Disclosure Statement at ECF p. 60 (Bankr. S.D.N.Y. Jan. 13, 2023) ("Voyager Disclosure Statement").

Under BlockFi's risk policies, counterparties were then reviewed, approved (or denied) for a loan at inception, and were always (for approved loans) subjected to continued monitoring.[88] Credit memos identifying risks of any particular loan and counterparty were circulated to authorized approvers with context. Further deliberation within BlockFi and/or negotiation with the counterparty were then held as needed, until the loan was accepted or rejected based on a weighing of the risks against the potential rewards. Moreover, the vast majority of the loans extended by BlockFi were callable-on demand, and BlockFi's 20 largest exposures (both net and gross) and the risks associated with counterparties were also reviewed periodically, in detail, by the BARC.[89]

---

[88]    Credit Risk Policy at 12-14. While the UCC report criticizes BlockFi for modifying tiering classifications over time, UCC Report at 35 & n.20, it is unsurprising that credit assessments of counterparties changed over time as (a) the tiering criteria itself was modified; and (b) BlockFi received additional information about counterparties. That is how lending works.

[89]    Apr. 26, 2023 J. Hill. Dep. Tr. at 18:13-15. The UCC Report includes a bald assertion that "problematic loan packages that were elevated to top BlockFi officials appear to have been approved without any meaningful discussion." *See* UCC Report at 77. No citation is made to support that statement, and the witnesses interviewed did not share the UCC's view. The UCC's assertion is also undermined by detailed BARC materials that were provided to UCC counsel, and which the BARC Chair described in detail. *See, e.g.,* Oct. 1, 2021 BARC Update on Counterparty Risk; Nov. 1, 2021 BARC Slides at 9 ███████████████████████████████████████ 12 (describing in detail the Alameda loans at the time and the FTT collateral and seeking input on the potential reward "[d]epending on BARC risk appetite"); May 2022 BARC Slides, "Risk Exec Summary" ("The market risk model for collateralized lending is enhanced for additional coins, and haircuts have been recalibrated to enable BlockFi to participate in additional client trade flows." and one of the "BARC risk-related decisions" for the day was to "Agree collateralization level for coin financings,: specifically identifying the overcollateralization requirements for Tier 3 coins like FTT and the "Risk vs Reward" calculation for "FTT concentration over-collateralized with ~160% margin call vs. Alameda recourse trade"); August 2022 BARC Slides (specifically asking for approval of Alameda as a counterparty with gross loan amounts ███████ notional, and overcollateralization of coins including FTT as a Tier III coin at 150%, while specifically pointing out the methodology for assessing downside risk and stating that "given FTT is illiquid, we have assumed 8 required days of market risk (3 admin, 5 days of no liquidity) then selling 500m OTC at 20% discount"). Notably, the UCC deposed the Chair of the BARC and the CRO for a total of approximately 12 hours and did not ask either of them a single question about *any* of the BARC written materials. Even unprompted by documents, BARC Chair Jennifer Hill described at deposition how the risks and rewards of lending to Alameda secured by FTT were explained to BARC and approved by BARC. *See* Apr. 26, 2023 J. Hill Dep. Tr. at 29:14-31:10, 71:12-76:3, 78:25-79:1, 80:22-81:21.

BlockFi's BARC meetings always included a detailed review of its loan book at the time.

Each BARC presentation included data on the "Top 20" net and gross exposures, for example:[90]

## 1. Current BlockFi Top 20 Counterparty Net Exposures

Portfolio as of Dec 31st 2021 / Equity as of Nov 30 2021

Share of Equity, %: > 100, 25-100, 10-25, < 10 — Concentrated Exposures

| Top 20 clients based on net exposure | Client Type | Gross Exposure $M | Gross Exposure Share of equity, % | Net Exposure (incl Trust Shares) $M | Net Exposure (incl Trust Shares) Share of equity, % | Net Revenue* Annualized Net Revenue, $M | Net Revenue* Net $ Revenue per unit of $ Net Exposure, % |
|---|---|---|---|---|---|---|---|
| | Market Access | 217 | 99% | 217 | 99% | 15.2 | 7.0% |
| | Lender to BlockFi | 0 | 0% | 167 | 76% | -7.5 | -4.5% |
| | Prop Capital | 160 | 73% | 160 | 73% | 5.0 | 3.1% |
| | Prop Capital | 122 | 56% | 122 | 56% | 4.0 | 3.3% |
| | Prop Capital | 106 | 49% | 106 | 49% | 6.8 | 6.4% |
| | Exchange | 92 | 42% | 92 | 42% | 1.2 | 1.3% |
| | Crypto Native | 90 | 41% | 90 | 41% | 8.6 | 9.6% |
| | Prop Capital | 72 | 33% | 72 | 33% | 3.2 | 4.5% |
| | Crypto Native | 75 | 34% | 48 | 22% | 4.7 | 9.9% |
| | Hedge Fund | 96 | 44% | 47 | 22% | 9.0 | 19.1% |
| | Crypto Native | 45 | 21% | 45 | 21% | 4.2 | 9.4% |
| | Prop Capital | 136 | 62% | 45 | 21% | 4.6 | 10.2% |
| | Exchange | 40 | 18% | 40 | 18% | 3.4 | 8.5% |
| | Prop Capital | 37 | 17% | 37 | 17% | 1.1 | 2.9% |
| | Crypto Native | 34 | 16% | 34 | 16% | 1.9 | 5.5% |
| | Prop Capital | 30 | 14% | 30 | 14% | 3.2 | 10.5% |
| | Crypto Native | 29 | 13% | 29 | 13% | 0.8 | 2.6% |
| | Crypto Native | 28 | 13% | 28 | 13% | 0.4 | 1.6% |
| | Crypto Native | 92 | 42% | 21 | 10% | 2.1 | 10.0% |
| | Crypto Native | 201 | 92% | 18 | 8% | 6.4 | 35.6% |
| Top 20 Total | | 1,702 | 781% | 1,448 | 664% | 78 | |
| Total BlockFi Portfolio | | 4,408 | 2,022% | 1,760 | 807% | | |

* Net Revenue = Lending Revenue - Borrowing Cost

## 1. Current BlockFi Top 20 Counterparty Gross Exposures

Portfolio as of Dec 31st 2021 / Equity as of Nov 30 2021

Share of Equity, %: > 100, 25-100, 10-25, < 10 — Concentrated Exposures

| Top 20 clients based on gross exposure | Client Type | Gross Exposure $M | Gross Exposure Share of equity, % | Net Exposure (incl Trust Shares) $M | Net Exposure (incl Trust Shares) Share of equity, % | Net Revenue* Annualized Net Revenue, $M | Net Revenue* Net $ Revenue per unit of $ Net Exposure, % |
|---|---|---|---|---|---|---|---|
| | Crypto Native | 1,197 | 549% | 0 | 0% | 46.0 | |
| | Crypto Native | 602 | 276% | 0 | 0% | 60.2 | |
| | Market Access | 217 | 99% | 217 | 99% | 15.2 | 7.0% |
| | Crypto Native | 201 | 92% | 18 | 8% | 6.4 | 35.6% |
| | Prop Capital | 160 | 73% | 160 | 73% | 5.0 | 3.1% |
| | Prop Capital | 136 | 62% | 45 | 21% | 4.6 | 10.2% |
| | Prop Capital | 122 | 56% | 122 | 56% | 4.0 | 3.3% |
| | Prop Capital | 106 | 49% | 106 | 49% | 6.8 | 6.4% |
| | Hedge Fund | 96 | 44% | 47 | 22% | 9.0 | 19.1% |
| | Exchange | 92 | 42% | 92 | 42% | 1.2 | 1.3% |
| | Crypto Native | 92 | 42% | 21 | 10% | 2.1 | 10.0% |
| | Crypto Native | 90 | 41% | 90 | 41% | 8.6 | 9.6% |
| | Crypto Native | 80 | 37% | 8 | 4% | 1.6 | 20.6% |
| | Crypto Native | 75 | 34% | 48 | 22% | 4.7 | 9.9% |
| | Prop Capital | 72 | 33% | 72 | 33% | 3.2 | 4.5% |
| | Hedge Fund | 63 | 29% | 3 | 1% | 1.6 | 50.9% |
| | Miner | 60 | 28% | 0 | 0% | 7.5 | |
| | Crypto Native | 45 | 21% | 45 | 21% | 4.2 | 9.4% |
| | Prop Capital | 43 | 20% | 0 | 0% | 3.9 | |
| | Crypto Native | 40 | 18% | 2 | 1% | 2.8 | 133.9% |
| Top 20 Total | | 3,589 | 1,647% | 1,096 | 503% | 199 | |
| Total BlockFi Portfolio | | 4,408 | 2,022% | 1,760 | 807% | | |

* Net Revenue = Lending Revenue - Borrowing Cost

---

[90]    These are illustrative examples from the January 2021 BARC materials.  The BARC materials undermine many of the bald assertions in the UCC's report (*see* UCC Report 31-32), such as "[t]he lending book was never 'diversified'" (it was) and the loan book did not involve "financial institutions" (it did).  While some borrowers were "crypto-centric firms" (UCC Report 32), that is hardly surprising, as BlockFi **was a cryptocurrency lender**.

BARC meetings also included discussions on potential alternative revenue sources, some of which were approved, and some of which were not.[91]

### Other Limits and Guidelines

BlockFi Credit Risk Policy also had guidelines that seek to control "[c]redit exposure to a single obligor" by establishing counterparty **net** exposure limits (i.e., *unsecured* limits) based on tier.[92] "Limits are set, reviewed and approved by the Credit & Investment Review Committee."[93]

| Counterparty Type | Counterparty Maximum Net Exposure Limit (Net USD) |
|---|---|
| Tier 1: Traditional HF/Prop >50% Traditional Assets and Crypto Native Public Exchanges | 75mm |
| Tier 1C-X: Crypto Native Non-public Exchanges and Crypto OTC (>50% Crypto, No Prop/HF) | 60mm |
| Tier 1C-Other: Crypto Native Other (HF/Prop/Foundation) | 40mm |
| Tier 2 (>50% Traditional Assets) | 20mm |
| Tier 2C (Crypto Native) | 0mm |
| Tier 3 | 0 |

As discussed above, BlockFi's risk policies were and are meant to be guidelines with the understanding that not every counterparty and loan scenario would fit neatly into each framework. As such, it was part of the policies for requests to be elevated or flagged to appropriate levels for further review and decision.[94]  Prince by himself did not have sole "exception authority," and there were checks on his decision-making authority.[95]  In addition, most of BlockFi's institutional loans were freely callable at any time (and could have been called at any time if there were concern), and the BARC periodically reviewed each material gross and net exposure in detail.

---

[91]    The UCC's assertion that BlockFi never had any other potential forms of revenue coming (UCC Report 32) again ignores the BARC materials.  *See, e.g.,* Jan. 2022 BARC Materials (identifying new business opportunities for discussion including Cefi/Defi market access, single coin financing, self-mining, and staking), June 2022 BARC Materials (same, and including new staking and hedging opportunities).

[92]    Credit Risk Policy at 5.  Again, this addresses *net* exposure (i.e., exposure not covered by collateral) and thus did not apply to collateralized (or overcollateralized) loans.  BlockFi was very comfortable with collateralized lending as reflected in its Risk Appetite statement.

[93]    *Id.* at 5, 10-11.

[94]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 83:23–85:10.

[95]    *Id.* at 85:14–87:21.

### *Collateralized Lending*

As an illustration of BlockFi's risk management processes in the context of collateralized lending, we reviewed the approval of FTT as collateral for loans to Alameda.  First, under BlockFi's Financial Risk Policy, a cross-functional team vetted the type of digital asset collateral at issue (*e.g.,* FTT) by analyzing whether it is a legitimate asset, whether there are legal and compliance concerns, and other similar factors.[96]  Within this analysis, the cross-functional team considered the size of the market for the collateral, as well as any specific risks related to that collateral.  With respect to the approval of FTT, this memo noted the potential for "wrong way risk"[97] in accepting FTT as collateral for loans to Alameda.[98]  The cross-functional team noted this risk, but ultimately approved FTT to be accepted as collateral given the market for it.

Once a particular form of collateral is deemed generally acceptable, then BlockFi examined how much of that token (*e.g*., FTT) would be acceptable for a specific counterparty and how it should be valued.  This process included examining trading volumes, volatility, size of the loan, trading risks, and other similar factors.  The credit underwriters produced memos outlining various stress scenarios and the risks of approving the particular loan request.[99]  BlockFi utilized stress testing in the context of collateralized lending by analyzing the impact on value of collateral, and as a result BlockFi's net exposure, under various potential distress scenarios.[100]  The credit memos and analysis are and were updated as needed based on changes at the company or in the market or

---

[96]    *See* Dec. 4, 2020 Structured Finance Review Group Memo re Nonstandard transaction approval Alameda Including New Coin as Collateral: FTT.

[97]    "Wrong-way risk" is the risk that occurs when the value of collateral is tied in some way (either generally or specifically) to the creditworthiness of the borrower.  (Apr. 26, 2023 Y. Mushkin Dep. Tr. at 62:24–64:8.)

[98]    *See* Dec. 4, 2020 Structured Finance Review Group Memo re Nonstandard transaction approval Alameda Including New Coin as Collateral: FTT

[99]    *See* Aug. 23, 2021 Alameda Research Credit Memo.

[100]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 150:11–24.

of a particular loan request. The risk team would then review and deliberate to determine whether the risks identified for that collateral and whether those risks (as well as other considerations with the loan) required escalation of the request.

Finally, applying the approval authority guidelines above depending on the size of the loan and tier of the counterparty, the particular loan and collateral combination was approved (or denied) and tracked internally.[101]   For instance, with respect to the August 23, 2021 transaction referenced in the Alameda Research Credit Memo above, based on the notes in the credit memo, the transaction was ultimately "approved with comments," which required higher levels of collateral both for that trade and an increase in collateral for prior trades with Alameda.[102]

As time went on, BlockFi formalized a "Tiering" system for collateral and required collateral levels consistent with its assessment of the "tier" applicable to a particular cryptocurrency.  Prior to August 2022, BlockFi generally required institutional loans to be backed by collateral reflected as below:

| | Confidence % | 95% | | |
|---|---|---|---|---|
| | Loan Amount | 10 | | |

**Overcollateralization Matrix – Minimum Margin Call**

| | | Collateral | | | |
|---|---|---|---|---|---|
| | | USD/Stablecoins | Tier 1 | Tier 2 | Tier 3 |
| Loan | USD/Stablecoins | n/a | 115.0% | 125.0% | 130.0% |
| | Tier 1 | 115.0% | 110.0% | 120.0% | 125.0% |
| | Tier 2 | 120.0% | 120.0% | 125.0% | 130.0% |
| | Tier 3 | 125.0% | 125.0% | 130.0% | 135.0% |

---

[101]     *See* Institution Lending Transaction Log (BF_BK_00144568).

[102]     *Id*.

That is, if the collateral posted to secure a U.S. dollar (or stablecoin) loan was "Tier 1" collateral (like BTC), generally at least 115% needed to be posted; if the collateral was "Tier 3" collateral (like FTT or a less liquid coin) at least 130% needed to be posted.[103]

In August 2022, BlockFi's BARC revised this tiering system to require higher levels of collateral in most circumstances:[104]

### Minimum overcollateralization [OC] levels by coin tier, subject to adjustment for trade size / liquidity

| | Confidence % | 99% | Note: For loans >10m haircuts maybe more conservative to allow liquidation with minimal market impact |
| | Loan Amount | 10 | |

#### Overcollateralization Matrix -- Minimum Margin Call

| Loan | | Collateral USD/Stablecoins | Tier 1 | Tier 2 | Tier 3 |
|---|---|---|---|---|---|
| | USD/Stablecoins | n/a | 125.0% | 135.0% | 140.0% |
| | Tier 1 | 120.0% | 115.0% | 125.0% | 130.0% |
| | Tier 2 | 135.0% | 130.0% | 140.0% | 145.0% |
| | Tier 3 | 140.0% | 135.0% | 145.0% | 150.0% |

That is, after August 2022, where "Tier 1" collateral like BTC was posted to secure loans of U.S. Dollars (or stablecoins), 125% was required; and if "Tier 3" collateral (like FTT) was posted to secure loans of U.S. Dollars (or stablecoins), generally 140% was required to be posted.

**B.    GBTC**

GBTC is a publicly-traded investment trust that invests in BTC.  Parties may contribute BTC to the GBTC in return for GBTC shares, subject to a six-month lock-up period during which the shares could not be traded on public markets.  Importantly, because of the GBTC's legal structure, BTC could only be contributed; it could not be redeemed.  Thus, the only way to transact GBTC shares would be to trade the shares—they could not be returned to GBTC in return for BTC.

---

[103]    August 2022 BARC materials, PDF page 16.

[104]    *Id.*

For years, GBTC was viewed as one of the most straightforward ways for the general public to get exposure to BTC (avoiding the need to have a wallet and hold crypto directly).[105]  And because GBTC shares were and are publicly traded, it was one of the only ways for individuals to diversify into crypto in 401(k) or other investment funds.[106]  For this basic supply and demand reason (i.e., many investors could invest in GBTC shares but not directly in Bitcoin), GBTC shares historically traded at a premium to the net asset value ("NAV") of the sum of BTC in the trust.[107]

This presented an opportunity that several crypto trading firms and hedge funds participated in, contributing BTC in return for the GBTC shares in order to capture the premium. Then, after the six-month "lock-up" period expired for such GBTC shares, they would sell the GBTC shares and collect the premium relative to the BTC.[108]

In January 2020, BlockFi began to engage in GBTC trades.  Because BlockFi held BTC in BIA accounts and as collateral for loans, and clients agreed BlockFi could use or rehypothecate that BTC for any purpose, BlockFi had ready access to a large sum of BTC.  To access the premium, rather than simply holding the BTC it received as collateral, BlockFi would contribute it to the GBTC and receive shares in the trust in return.  So long as the GBTC continued to trade at a premium to NAV, after the six-month lock-up period, BlockFi could sell the GBTC shares, use the proceeds to re-purchase BTC, and utilize the premium realized for its business.[109]  In addition to directly investing this collateral into GBTC (and related trusts) BlockFi also made non-

---

[105]     Apr. 4, 2023 Z. Prince Dep. Tr. at 104:19-105:22.

[106]     *See e.g., $32bn Grayscale Bitcoin Trust Feels the Heat from Cheaper ETFs*, November 28, 2021, https://www.ft.com/content/9fc7b034-7659-439f-a991-169662815883 (last visited April 23, 2023).

[107]     Apr. 26, 2023 R. Van Kesteren Dep. Tr. at 78:11-17.

[108]     *See* Amber Group, Grayscale GBTC and ETHE Arbitrage Risks, Medium (June 11, 2020), https://medium.com/amber-group/grayscale-gbtc-and-ethe-arbitrage-risks-f14f745641ce (last accessed April 24, 2023).

[109]     *E.g.*, Feb. 24, 2021 Z. Prince Email to P. Johnson (BF_BK_00065482).

recourse loans to borrowers to permit them to make GBTC trades. BlockFi would loan BTC to these counterparties, who would then contribute those to GBTC in return for GBTC shares, and the GBTC shares would serve as collateral for the loan.

As described above, BlockFi's GBTC investments were not a secret withheld from clients, and were publicly disclosed via SEC filings, a press release by BlockFi, and many press articles.[110] As of December 31, 2020, BlockFi's direct investments in GBTC[111] were worth approximately $1.5 billion, and at year-end 2020, BlockFi had an unrecognized gain of approximately $350 million (some amounts could not be recognized at that time as a result of lock-up periods).[112] Although BlockFi recognized that the GBTC premium was not guaranteed, BlockFi believed it would likely remain until some ETF was approved for BTC—and that, even if the first ETF for BTC was something other than GBTC, that would likely indicate that the SEC was going to approve GBTC as an ETF in the near future (and even if the premium disappeared, it could merely return to NAV, or could return to a premium).[113] This view was widely held[114] and rational.[115]

---

[110]    *See infra Why Did BlockFi Really Fail?*; https://fintel.io/doc/sec/1726072/000149315220019975/sc13g.htm; https://blockfi.com/blockfi-position-in-gbtc-reaches-disclosure-threshold; https://www.coindesk.com/markets/2020/10/27/blockfi-takes-5-stake-in-grayscales-48b-bitcoin-trust/

[111]    Grayscale maintained trusts for ETH and LTCN as well as for BTC. For ease of reference here, GBTC refers to all of these trusts.

[112]    *See* Feb 2023 BlockFi Update to UCC/Advisors re 3AC & GBTC ("Presentation for UCC re 3AC & GBTC") at slide 7.

[113]    BF_BK_00065434.

[114]    *E.g.*, Shaurya Malwa, *How Grayscale is Sucking Up All the Bitcoin*, Decrypt (Dec. 17, 2020), https://decrypt.co/51771/how-grayscale-is-sucking-up-all-the-bitcoin; António Madeira, Interest in Grayscale Crypto Products Not Easing UP, Not Just BTC Now, Cointelegraph (Aug. 13, 2020), https://cointelegraph.com/news/interest-in-grayscale-crypto-products-not-easing-up-not-just-btc-now.

[115]    It is unclear who prepared the UCC's analysis or came to the conclusions that BlockFi's fully disclosed GBTC investments were "highly risky" and "it was a bet that a premium with no inherent reason to exist would continue to exist in six months" (UCC Report 44). Nothing is cited by the UCC, and all of the witnesses interviewed who were knowledgeable on the subject believed the contrary.

In March 2021, the GBTC premium unexpectedly flipped to a discount.  That market movement led BlockFi to face approximately $200 million in unrealized losses.[116]  BlockFi's team immediately began to investigate ways to minimize these losses, such as creating an SPV to offload its GBTC holdings, or closing GBTC positions into BTC.[117]

Rather than unloading the entirety of its GBTC position at one point in time in a fire sale, BlockFi sought to strategically time transactions to limit its losses.  By June 2021, BlockFi had sold 27% of its March 31st position, realizing $5.9 million in losses (as opposed to a loss of $7.4 million had it sold immediately on March 31).[118]  By July 2021, BlockFi has sold 63% of its March 31 position, realizing $121 million in losses (as opposed to $146 million had it sold on March 31).[119]  By October 2021, BlockFi had fully exited its position, realizing approximately $215 million in actual losses; given the $60 million in realized profits, on an overall basis, BlockFi lost approximately $155 million in its direct investment activity on GBTC.[120]

Separate from direct investment in GBTC, BlockFi had two other areas of exposure to it. *First*, while GBTC was trading at a premium, BlockFi would engage in non-recourse lending against GBTC shares.  In these transactions, BlockFi would loan funds to a counterparty, which would use those funds to purchase GBTC shares and post the GBTC shares as collateral, with the loans otherwise being non-recourse.[121]  BlockFi required a higher level of collateralization where GBTC was posted as collateral rather than BTC or ETH.[122]

---

[116]    *See* Presentation for UCC re 3AC & GBTC, at Slide 6.

[117]    *E.g.*, BF_BK_00065481; BF_BK_00065415.

[118]    BF_BK_00065322.

[119]    BF_BK_00065282.

[120]    *See* Presentation for UCC re 3AC & GBTC, at slide 7.

[121]    *Id*. at slide 9; Apr. 4, 2023 Z. Prince Dep. Tr. at 107:9-15.

[122]    BF_BK_00065364.

**Second**, BlockFi also invested directly in a hedge fund known as Hunting Hill, which was in the business of financing GBTC trading.  Through these two activities, BlockFi suffered losses of approximately $72 million.

Overall, there was a rational basis for the GBTC trades and they were a tool BlockFi used in an effort to generate returns.  They were disclosed to clients and to the public.  Others outside of BlockFi believed the trade to be potentially lucrative and it did lead to profits for some time.  It led to losses at the end of the day, but all financial transactions carry the risk of loss.

## C.    3AC

3AC was a crypto-focused hedge fund founded by Kyle Davis and Su Zhu.  Public sources described 3AC's meteoric rise in growth and profitability beginning in 2015; soon after, it was believed to be a "behemoth" in the crypto space, making it an attractive client for lenders.[123]

In May 2021, Bloomberg and other outlets profiled Davies and Zhu as "among the world's largest crypto holders."[124]  As of year-end 2021, the Messari Report reported that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right."[125]  During this time, Su Zhu hosted a popular public podcast[126] and

---

[123]    *See generally, e.g.,* The Block, "Three Arrows reports more than $1.2 billion position in Grayscale's GBTC," January 4, 2021; Bloomberg, "Ex-High School Classmates Are Among the World's Largest Crypto Holders," May 25, 2021 (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Sydney Morning Herald, "School Friends Started Their Own Firm, Now They Are Among The World's Largest Crypto Holders," May 27, 2021 (describing "the extent of the firm's influence, when Three Arrows reported it owned a 5.6 per cent stake in the Grayscale Bitcoin Trust, a $US22 billion fund"); Messari Report, "Messari Crypto Thesis For 2022," December 26, 2021 (describing Three Arrows Capital founder Su Zhu as one of "the big guys" and noting that "Three Arrows Capital has amassed one of the largest funds in Asia, and boasts one of the top performing portfolios in their own right"); Bloomberg, "Fund Manager Who Called End of Last Crypto Winter Remains Bullish," April 7, 2022 (noting that Three Arrows Capital's "blockchain holdings alone are worth close to $10 billion"); FTX, Crypto Bahamas 2022 Su Zhu Speaker Profile, April 26, 2022 (describing Three Arrows Capital as "a leading investor in the cryptocurrency space").

[124]    https://www.bloomberg.com/news/articles/2021-05-25/ex-credit-suisse-traders-amass-billions-of-dollars-of-crypto#xj4y7vzkg/

[125]    https://messari.io/pdf/messari-report-crypto-theses-for-2022.pdf

[126]    https://uncommoncore.co/podcast/

was a featured speaker at the FTX Crypto Bahamas, alongside former President Bill Clinton and former British Prime Minister Tony Blair, among others.[127]

3AC was largely viewed as one of the most successful crypto funds in the industry. Consistent with this view, BlockFi's peer firms made substantial loans to 3AC. Several of BlockFi's peers lent large sums of assts to 3AC with limited (or no) collateral. For instance, an affiliate of Genesis Global Holdco ("Genesis") began lending to 3AC in 2020 and, by June 2022, the amount of its loan outstanding to 3AC was $2.4 billion. Genesis's loan to 3AC was only 50% collateralized, and Genesis reportedly suffered losses of $1.2 billion when 3AC collapsed.[128]

Voyager Digital, LLC ("Voyager"), another major player in the crypto industry, also conducted extensive business with 3AC. In February 2022, Voyager received a Net Asset Value ("NAV") statement reflecting $3.729 billion and had follow-up calls with 3AC representatives.[129] On March 4, 2022, Voyager entered into a loan agreement with 3AC, under which Voyager made unsecured loans approaching $1 billion without requiring any collateral.[130]

In mid-June 2022,[131] Voyager sought to recall its loans to 3AC.[132] 3AC did not return the loans, and Voyager had no collateral against which to foreclose. Consequently, on June 27, 2022, Voyager issued a notice of default to 3AC.[133] The same day, a British Virgin Islands court ordered 3AC to commence liquidation proceedings.

---

[127]    https://www.cryptobahamas.com/speakers

[128]    *See Declaration of A. Derar Islim in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2, In re Genesis Global Holdco, LLC, et al.*, Dkt. No. 17 ("Genesis FDD") at ¶¶ 31–32.

[129]    Voyager Disclosure Statement, at  p. 59.

[130]    *Id.*. at 60

[131]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 15, Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions ¶ 5 (Bankr. S.D.N.Y. July 6, 2022) (the "Ehrlich First Day Declaration").

[132]    Voyager Disclosure Statement at 61.

[133]    Ehrlich First Day Declaration ¶ 56.

Soon after, Voyager faced a "run on the bank" given the downturn in the crypto industry and 3AC's default.[134]  On July 5, 2022, Voyager filed for chapter 11 in New York.[135]  Voyager continues to seek recovery in 3AC's liquidation proceedings but has recovered nothing to date.[136]

3AC's list of creditors includes a series of other well-known players in the cryptocurrency business in addition to Genesis and Voyager, many of whom made uncollateralized or materially undercollateralized loans to 3AC.[137]  Those creditors include Celsius, Deribit, CoinList, FalconX, SBI Crypto, and Tower Square Capital.[138]

3AC was historically one of BlockFi's largest institutional borrowing clients.[139]  BlockFi lent 3AC funds mostly in the form of USD, requiring 3AC to post collateral in the form of GBTC, BTC, and ETH.[140]  BlockFi, however, would not lend to 3AC without substantial collateral; due to BlockFi's lending policies, because (among other things) 3AC did not provide audited financial statements, it could not receive uncollateralized or even undercollateralized loans from BlockFi. BlockFi typically required 125% collateralization from 3AC, with BlockFi also having recourse against the 3AC master fund in addition to having recourse to the posted collateral.[141]

---

[134]    *Id*. ¶ 1.

[135]    *Id*. ¶ 10.

[136]    Voyager Disclosure Statement at p. 70.

[137]    Three Arrows Capital Singapore Liquidation Proceeding, *Affidavit of Russell Crumpler*, at 393–97; https://goblincrypto.com/full-list-27-creditors-asking-three-arrows-capital-for-3-5-billion/.

[138]    *Id*.

[139]    *See* Presentation for UCC re 3AC & GBTC, at slide 11 (chart reflecting amount of loans outstanding to 3AC); November 2021 BARC Materials at slide 14 (listing largest counterparty exposures and identifying 3AC as largest at $2.2 billion of gross exposure, but identifying zero net exposure in light of collateral).

[140]    Presentation for UCC re 3AC & GBTC, at slide 11.

[141]    June 2022 Board Audit and Risk Committee Risk Update Materials at slide 6.  The UCC claims in its report that 3AC was an "undercollateralized borrower."  UCC Report at 31.  That statement is strange and untrue.  BlockFi required 3AC to post more than 100% in collateral for its loans and as described below, when collateral values dipped, immediately required it to post additional collateral to cover the loan by more than 125%.

In 2020, when 3AC suggested posting as collateral shares in a private company (Deribit) that did not have an active trading market, BlockFi declined to accept it and advised 3AC that it needed to post collateral that had a publicly posted price.[142]  And when in 2021 crypto prices went down such that BlockFi's loans to 3AC were slightly less than 100% collateralized, BlockFi demanded and received additional collateral, such that the collateral for BlockFi's loans to 3AC was topped up above 125%, where it remained until BlockFi's margin call in June 2022.[143]

In June 2022, BlockFi had outstanding loans to 3AC totaling approximately $1.1 billion.[144] As crypto prices fell, BlockFi made margin calls for 3AC's loans, demanding additional collateral; rather than posting liquid collateral, 3AC again sought to post illiquid shares as collateral (*i.e.*, shares in private companies Deribit and Starkware).[145]  BlockFi again declined 3AC's proposal, and when 3AC did not meet margin calls, BlockFi began liquidating collateral per BlockFi's rights under its lending agreements.   Within approximately the first 48 hours, BlockFi liquidated approximately $375 million worth of collateral; at that point, the outstanding loan was approximately $649 million against approximately $643 million remaining in collateral value. BlockFi took action *before* 3AC's travails were publicly known or disclosed, and did so as a direct result of its lending and risk diligence policies.

---

[142]     *See* Jun. 24, 2020 Email from Z. Prince to K. Davies (3AC) (BF_BK_00054706).

[143]     *See* Sep. 3, 2021 Email from Y. Mushkin (BF_BK_00065356); Apr. 4, 2023 Zz Prince Dep. Tr. at 149:16-18.  The UCC's report criticizes BlockFi making massively oversecured loans to 3AC in May 2022, claiming that BlockFi (unlike the rest of the world) "knew or should have known that UST and LUNA were substantial components of 3AC's investment portfolio and that 3AC was perilously close to collapse."  UCC Report at 52.  The UCC appears to demand clairvoyance, and fundamentally misunderstands BlockFi's business and the actual loans made in May 2022.  No one knew how large an impact UST/LUNA had on 3AC until mid-June.  In the interim, BlockFi made loans massively oversecured by BTC at 125%, and BlockFi *held* that BTC as collateral.  That and other statements about the 3AC relationship in the UCC's report, such as the allegation that the 3AC loans were "backed largely by GBTC and an increasingly perilous arbitrage play" (*id.*), are inaccurate.

[144]     June 2022 BARC Materials at slide 14.

[145]     *Id.* at slide 6.

Over the ensuing weeks, BlockFi proceeded to liquidate the remaining collateral, including auctioning off a large block of GBTC shares it held as collateral (an auction won by Alameda).[146] BlockFi ultimately realized approximately $900 million in proceeds from liquidating 3AC's posted collateral. In addition to successfully invoking its lending policies and collateral rights in the face of a borrower's collapse (apparently due to 3AC's fraud), BlockFi learned from this experience that through these over-the-counter (OTC) trades, it could sell large blocks of illiquid collateral for approximately 20% off the posted price.[147]

BlockFi has calculated that, based on the amount outstanding on the loan after the proceeds from liquidation and taking into account default interest, it still has a claim to assert in 3AC's bankruptcy proceedings for approximately $132 million, and BlockFi intends to assert this claim.[148] This potential claim does not account for BlockFi's interest revenue over the life of the loan, which exceeded $80 million.[149] Net-net, because of the interest profit that BlockFi earned during the course of its business with 3AC and its work to foreclose on collateral upon 3AC's default, BlockFi to date has a small loss, even though it loaned up to $1 billion to 3AC.[150] Whether BlockFi ultimately can turn that into a profit overall will depend on the end result of the 3AC bankruptcy and liquidation proceedings—as well as BlockFi's ability to defeat 3AC's claims in BlockFi's bankruptcy proceedings.

---

[146]     Presentation for UCC re 3AC & GBTC, at slides 12-14.

[147]     *Id.* at slide 7.

[148]     *Id*. at slide 15.

[149]     Presentation for UCC re 3AC & GBTC, at slide 11.

[150]     *See* Apr. 4, 2023 Z. Prince Dep. Tr. at 169:13–170:19 (testifying that over the life of its relationship with 3AC, BlockFi made about $85 million in interest and fees, but then lost ~$85 million as part of the liquidation); Apr. 11, 2023 F. Marquez Dep. Tr. at 85:20–87:1 (testifying that taking into account the money earned by BlockFi during its relationship with 3AC, the liquidation of collateral resulted in a "net loss to BlockFi [that] was under 10 million").

BlockFi disclosed this information to clients.  Among other things, on July 1, 2022, Prince Tweeted that "[w]hile we were one of the first to fully accelerate our overcollateralized loan to 3AC, as well as liquidate and hedge all collateral, we did experience ~$80M in losses, which is a fraction of losses reported by others.  This represents the full extent of the impact to BlockFi from 3AC.  We have no further exposure and the limited losses we did experience will be absorbed by BlockFi with no impact to client funds."[151]  Although these statements were accurate, the UCC Report characterizes the Tweet as "misleading," claiming the only reason client funds were not impacted was the previously-discussed (and *simultaneously disclosed*) FTX transaction.[152] Respectfully, the UCC's assertion makes no sense—and in any event it is irrelevant to any potential estate claim against Mr. Prince or any other insider.

### D.    FTX/Alameda

BlockFi and FTX/Alameda had several touchpoints during the course of a multi-year, dynamic, relationship.

- First, prior to July 2022, Alameda was a full recourse borrower from BlockFi.[153]

- Second, during the June-July 2022 time period, FTX and Alameda were potential investors in/purchasers of BlockFi.

- Third, following the July 2022 FTX-BlockFi Transaction (defined below), BlockFi was a lender to Alameda, and a borrower from FTX, while FTX was viewed as the ultimate future beneficial owner of BlockFi as a result of its purchase option (which was widely believed would be executed upon).

- Fourth, BlockFi executed cryptocurrency trades on the FTX exchange and custodied certain assets on FTX.

Each touchpoint is addressed below.

---

[151]    https://twitter.com/BlockFiZac/status/1542934049970348033

[152]    UCC Report at 54.

[153]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 96:13–97:11 (noting that loans to Alameda were full recourse).

### 1.     Pre-July 2022 Lending to Alameda.

Prior to July 2022, Alameda interacted with BlockFi as a borrower.  As represented to BlockFi, Alameda and FTX were independent entities with common ownership.[154]

Alameda and BlockFi International entered into a Master Loan Agreement in August of 2020.[155] █████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████     But in 2020, BlockFi first began accepting FTT as collateral.  Prior to that acceptance, as described above, BlockFi went through its standard credit risk process to determine whether FTT should be accepted as collateral and agreed to accept it in principle.[156]  *How much of FTT to require to secure individual future loans was assessed later.*

The lending relationship between BlockFi and Alameda expanded considerably and, ████

████████████████████████████████████████████████████████████[157]

These loans were consistently over-collateralized, with ████████████████████████

This trend continued into the first half of 2022, with ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

---

[154]     *Id.* at 140:16–141:3; Aug. 16, 2021 Email from R. Ramchandani to Z. Prince, et al. (BF_BK_00070759) ("I just confirmed that Alameda is completely separate from FTX from an equity capital pov. SBF recently removed himself as CEO of Alameda and they promoted two existing employees to be Co-CEOs. Our team has the board resolution for this.")

[155]     BF_BK_00009888.

[156]     Apr. 12, 2023 Y. Mushkin Dep. Tr. at 65:15-23; Apr. 4, 2023 Z. Prince Dep. Tr. At 185:20:187:4; BF_BK_00011629, at 31.

[157]     *See* Feb 2023 BlockFi Update to UCC/Advisors re FTX/Alameda ("Presentation for UCC re FTX/Alameda"), at slide 14.

Most of the collateral posted by Alameda was in the form of FTT (a token issued by FTX). BlockFi understood that accepting FTT as collateral for loans to Alameda presented a form of wrong-way risk, as there was a relationship between Alameda and FTX.[158] Mushkin characterized this as "general" rather than "specific" wrong-way risk[159] as Alameda and FTX's link was a common shareholder (SBF), creating a potential correlation between a hypothetical failure of Alameda to perform on its loan and the value of FTT.[160] BlockFi also knew that because FTT was less liquid than certain other tokens, it could take longer to sell in a downside scenario than tokens like BTC or ETH that traded in a larger number of places.[161]

BlockFi thus demanded escalating forms of mitigation in its loans to Alameda in 2021 and early 2022 in an effort to limit the risk of default. ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[158]    *E.g.,* Aug. 13, 2021 Draft Credit Memo; Aug. 23, 2021 Draft Credit Memo; Aug. 31, 2021 Draft Credit Memo; Sep. 7, 2021 Draft Credit Memo ("█████████████████████████████████████████████ FTT can be regarded as the equity issued by the FTX exchange (similar to the relationship between BNB and Binance) and therefore lending to Alameda with FTT collateral is fully correlated wrong-way risk."); Oct. 5, 2021 Draft Credit Memo ("This exposure is very correlated to our loans to Alameda . . . IF something goes wrong at FTX (for example a hack or a fraud) then FTX tokens will get dumped on the market. We can probably assume Alameda has posted several billions of [FTT] as collateral to other lenders so it will be difficult to liquidate our FTT collateral and our $700m loan to Alameda will be at risk."). BF_BK_00011388 (email string from August 2021 identifying Alameda balance sheet ████████████, noting wrong-way risk associated with lending to Alameda collateralized by FTT, with Mushkin noting that one "c[ould] also consider as quasi-investment if we are bullish on FTX/FTT" and lend at a low LTV, and Prince responding "I'm fine w all that. Would love a short term solution to grow with FTX. There is sooo much room [given the balance sheet] to grow regardless of how we slice the data").

[159]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 63:12-64:18.

[160]    *Id.* at 66:2-68:20. The reality is that had Alameda and FTX operated as they had promised, a default by Alameda would not have meant catastrophe for FTX. Alameda was a crypto hedge fund that engaged in proprietary trading on FTX and other venues. FTX was an exchange that promised clients that it held a reserve of 1-to-1 for all customer funds. Had these entities operated as represented, Alameda certainly could have failed to repay its debts while FTX continued operating. But both entities were frauds, which was the problem.

[161]    *E.g.,* *Id.* at 223:2-224:7.



Mushkin countered Alameda that it would need to overcollateralize at 200%, and ultimately the parties reached agreement where Alameda posted additional collateral for all three outstanding loans (up to 200%), with Lauro responding "Great work Yuri and Team."[164]  When in September a similar trade was proposed, something similar occurred, where BlockFi demanded and secured more collateral before additional funds were loaned.[165]

In addition, Mushkin and Van Kesteren had the idea of "verifying" Alameda's finances by checking wallets on the blockchain, which would both validate some of the assets on Alameda's balance sheet and confirm that those assets had not been posted to another party as collateral.[166] This effort was successful; Alameda began providing wallet addresses, which BlockFi checked beginning at the end of 2021 and confirmed, just from the wallet addresses provided,

---

[162]     Aug. 23, 2021 Credit Memo.

[163]     BF_BK_00070711-14.

[164]     *Id.* at BF_BK_00070711; *see also* BF_BK_00071268 (Lauro reporting "some great work by Yuri on Alameda" to Prince in increasing the collateral up to 200%).

[165]     *See* BF_BK_00067325 (Slack string where Y. Mushkin confirmed that "[d]uring the discussion with Joe I indicated the only way we can get comfortable adding against FTT is 220% restrike on entire portfolio and 1805 margin trigger - we agreed that [we] can test this with 50M as that's under current torch gross limit").

[166]     *See* BF_BK_00067370 (Slack string between Y. Mushkin to A. Healy, where Mushkin remarks "we have some cases where a client doesn't have audited financials (I am thinking alameda) but claim to have lots of tokens on B/S [balance sheet] . . . would help if we can check their wallets" and noting that while it may be pointless because "we can look and the next second they can move the funds," it would be useful to "cross-check the unaudited financials they shared"); BF_BK_00070731-33 (Mushkin reporting that "at least it allows BlockFi credit team to do a verification of the assets listed in the unaudited financials, and potentially we can monitor their equity in "real time").

"███████████████████████████."[167]    More generally, BlockFi engaged repeatedly with Alameda and found it "very transparent" and cooperative.[168]

Late 2021 and early 2022 loans made to Alameda secured by FTT were also conditioned on the receipt of updated financial information that included references to FTX's well-publicized capital raises and Alameda working with BlockFi on additional mitigation efforts. ███████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████."[169]    Both of those things happened, with: (a) the legal review of the FTX terms of service confirming that FTX had represented it did not loan or trade or rehypothecate customer cryptocurrency for any purpose;[170] and (b) BlockFi reacting to the review of those terms of service by adding an indemnity into the Master Loan Agreement where Alameda indemnified BlockFi for any damages to BlockFi arising from an issue (for example, a hack) in collateral being held on the FTX exchange.[171]

---

[167]    Nov. 7, 2022 Credit Memo; *see also* BF_BK_00067301 (Sep. 1, 2021 Slack string between T. Lauro and Y. Mushkin, where T. Lauro says "I think we should do the full alameda deal if they are willing to put up commensurate collateral. Also, given the size of their balance sheet (and how much it's probably grown since the last time we looked) they seem very able to top up collateral if needed", Mushkin agrees and comments that "I think a way to get there . . . is to verify assets in their public wallets . . . if we have wallets we can see what's not encumbered and monitor in real time"); *see also* BF_BK_00070643 (requiring wallet verification); BF_BK_00006178 (Alameda offering wallets); BF_BK_00006780 (Alameda providing wallet IDs); BF_BK_00011394 (Mushkin pushing for more wallets from Alameda in May 2022); Nov. 7, 2022 Alameda Credit Memo, at 3 (noting Alameda provided wallet addresses for $█b of assets by end of 2021). The UCC's Report contains a lengthy and confusing section (UCC Report 57-59) which appears to challenge the reliability of this wallet analysis and suggests it was hard to complete, but does nothing to undermine the fact that BlockFi did substantial work and verified substantial assets.

[168]    *E.g.,* BF_BK-00070643

[169]    Oct. 5, 2021 Credit Memo; Nov. 9, 2021 Credit Memo.

[170]    *See generally* BF_BK_00009019 (FTX Terms of Service).

[171]    Jan. 26, 2022 Amended and Restated Master Loan Agreement, at 28 (BF_BK_00009913).

In summer 2022, as crypto-winter began and BlockFi faced a rash of withdrawals, BlockFi recalled all of Alameda's outstanding callable loans (as it did with most of its other borrowers).[172] Alameda made a series of repayments on the loans promptly following such demand.  In total, between June 2 and June 17, 2022, the total amount of Alameda's outstanding loan decreased from more than $1.3 billion to approximately $165 million—all as a result of repayments on-demand by Alameda without any dispute or delay.

The speed and efficiency with which Alameda returned the loans after they were recalled, and Alameda's cooperation in the loan recall process, combined with extensive other market activity, gave BlockFi further confidence in the reliability of Alameda as a counterparty.[173]  At essentially the same time, BlockFi held an auction to sell the collateral it had foreclosed on from 3AC, and Alameda won that auction, paying cash.[174]  And FTX's CEO Sam Bankman-Fried (who also owned Alameda) made numerous public statements concerning his commitment to the crypto sector, FTX's large balance sheet, and his intent to backstop the cryptocurrency space.[175]  Those

---

[172]    *See* Apr. 11, 2023 F. Marquez Dep. Tr. at 181:4–13; Apr. 12, 2023 Y. Mushkin Dep. Tr. at 97:18–98:9; 100:14–101:8; Apr. 4, 2023 Z. Prince Dep. Tr. at 221:13–222:10.

[173]    Those asked questions on this topic confirmed as much at deposition, noting that BlockFi's actual experience with Alameda as a counterparty was very positive prior to August 2022, increasing BlockFi's appetite to lend to it. Apr. 12, 2023 Y. Mushkin Dep. Tr. at 98:6-9; Apr. 26, 2023 J. Hill Dep. Tr. at 84:1-8.  Notably, the UCC's criticisms in hindsight of BlockFi's decisions to lend to Alameda are entirely based on internal correspondence from 2021, completely ignoring the eight months of uniformly positive history (including *many* loans that were made and returned on demand) that fundamentally informed BlockFi's decisions in August, September, and October 2022—all of which were discussed in detail with the BARC.  *See, e.g.,* J. Hill Dep. Tr. 71:20-76:10, 78:25-79:19, 80:19-84:8.

[174]    Apr. 12, 2023 Y. Mushkin Dep. Tr. at 98:19–100:13; Apr. 4, 2023 Z. Prince Dep. Tr. at 222:10–14; *see also* Presentation for UCC re 3AC & GBTC, at slides 12-14.

[175]    *E.g.*, *Crypto Exchange FTX has "A Few Billion" to Support Industry - Bankman-Fried*, July 6, 2022, https://www.reuters.com/technology/crypto-exchange-ftx-has-few-billion-support-industry-bankman-fried-2022-07-06/ (last accessed 4/22/23) (quoting Bankman-Fried as saying that FTX had a "few billion" dollars to use to backstop crypto firms because "[h]aving trust with consumers that things will work as advertised is incredibly important and if broken is incredibly hard to get back"); *Bankman-Fried Warns: Some Crypto Exchanges Already "Secretly Insolvent"*, June 28, 2022, https://www.forbes.com/sites/stevenehrlich/2022/06/28/bankman-fried-some-crypto-exchanges-already-secretly-insolvent/?sh=150adf7247f7 (last visited April 23, 2023) (regarding infusion into BlockFi and Voyager following 3AC collapse, Bankman-Fried stated "we're willing to do a somewhat bad deal here, if that's what it take to sort of stabilize things and protect customers"); Stuti Mansata, *SBF Comments on Voyager Rejecting FTX's Buyout Offer*, Crypto Times (July 25, 2022), https://www.cryptotimes.io/sbf-comments-on-voyager-rejecting-ftxs-buyout-offer/; *Crypto billionaire says Fed is driving current downturn*, NPR (June 19, 2022),

statements aligned with Alameda's unaudited financial statements, *and* with wallet information shared by Alameda where BlockFi had been able to verify billions of dollars of cryptocurrency in wallets from public sources.[176]  Numerous analysts reaffirmed Alameda's perceived strength in the period of the sector's greatest weakness.[177]  The UCC Report suggests that BlockFi should have known Alameda was unreliable, but every piece of *evidence* at the time (other than speculation) suggested the opposite conclusion.

### 2.    June 2022 and Transaction with FTX.

In June of 2022, as crypto-winter exacerbated, the Series F financing had not closed, and BlockFi began investigating other possible avenues for an injection of liquidity.  The need for liquidity to calm the market, reduce withdrawals, and to ensure withdrawals could be met on a timely basis, crystallized quickly.  Celsius paused withdrawals from its platform on June 12 and certain issues attributed to 3AC were reported shortly thereafter.[178]  Largely as a result of these events, BlockFi faced unprecedented withdrawal requests from its platform.

---

https://www.npr.org/2022/06/19/1105853170/crypto-billionaire-says-fed-is-driving-current-downturn;  *Billionaire Bankman-Fried's FTX Launches $2 Billion Crypto Fund Amid Venture's Massive Deal Boom*, Forbes (January 17, 2022)  https://www.forbes.com/sites/jonathanponciano/2022/01/14/billionaire-bankman-frieds-ftx-launches-2-billion-crypto-fund-amid-ventures-massive-deal-boom/?sh=1c4fdc75e017 (describing FTX's promises to "to plow billions of dollars into burgeoning startups in the nascent crypto space.")  Indeed, Bankman-Fried also publicly touted his personal wealth and spending.  *See e.g., Crypto billionaire says he could spend a record $1 billion in 2024 election*, NBC News (May 24, 2022), https://www.nbcnews.com/politics/2022-election/crypto-billionaire-says-spend-record-breaking-1-billion-2024-election-rcna30351 (describing Bankman-Fried's $20 million contribution to elections in 2022, and commitment to contribute more in 2024).

[176]    *See e.g.,* BF_BK_00070643 (requiring wallet verification); BF_BK_00006178 (Alameda offering wallets); BF_BK_00006780 (Alameda providing wallet IDs).

[177]    *E.g.*, Hannah Miller & Olga Kharif, *Sam Bankman-Fried Turns #2 Trillion Crypto Rout Into Buying Opportunity*, Bloomberg (July 19, 2022), https://www.bloomberg.com/news/articles/2022-07-19/sam-bankman-fried-expands-ftx-alameda-empire-by-bailing-out-failing-crypto-firm#xj4y7vzk; John Mccrakn & Megan Davies, *Crypto exchange FTX has "a few billion" to support industry – Bankman-Fried*, Reuters (July 6, 2022), https://www.reuters.com/technology/crypto-exchange-ftx-has-few-billion-support-industry-bankman-fried-2022-07-06/; *Sam Bankman-Fried Out to Win Whole Crypto Market, Early FTX Backer Says*, Blockworks (June 30, 2022), https://blockworks.co/news/sam-bankman-fried-out-to-win-whole-crypto-market-early-ftx-backer-says

[178]    *Crypto Lender Celsius Pauses Withdrawals Due to 'Extreme Market Conditions'*, June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html# .

As reflected in the chart and timeline below, during the calendar year of 2022, BlockFi only experienced six days where it faced withdrawals of more than $200 million in that single day; all six of those days occurred between June 12 and June 20.



BlockFi processed all withdrawal requests within the time frame provided in its Terms of Service (or earlier).  But the requests, combined with the worsening overall industry picture, led BlockFi's Board and management to undertake substantial efforts to identify potential sources of liquidity.  BlockFi received term sheets from several potential investors for rounds of convertible notes, which generally would convert to equity when the company issued another round of preferred shares.[179]  BlockFi also received an indicative term sheet from Alameda.[180]

Over the course of several days in June, the BlockFi board met to discuss various operational issues as well as the ongoing efforts to raise liquidity.  In addition to numerous informal discussions among members of management and members of the board, the Board formally met twice on June 19, twice on June 20, on June 22, June 23, June 27, June 28, June 29, and twice on

---

[179]     *See* BlockFi Inc. Convertible Note Term Sheet from Morgan Creek Digital, et al., & BlockFi Inc. Convertible Note Term Sheet from Ledn Inc., et al. (BF_BK_00144560).

[180]     Ex. A to Jun. 20, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (the "Alameda Term Sheet") (BF_BK_00009100).

June 30 (ultimately approving the form of definitive documentation for the FTX transaction at the second meeting on June 30).   These meetings reflect robust discussion amongst the Board, management, and their legal advisors.

BlockFi received the Term Sheet on June 20.[181]   During the first meeting of the Board on that day, Mr. Prince disclosed to the Board that Alameda had made an offer, and the Board directed Prince to continue to engage with Alameda to attempt to negotiate the best possible terms, while also continuing to "discuss [] alternatives with other interested parties."[182]

The Board reconvened the evening of June 20 for an update; Prince provided an update on his discussions with various potential counterparties (including Alameda and its affiliate FTX, Binance, Morgan Creek, Galaxy Digital, and others).[183]   The Board discussed the various options, ultimately concluding that the proposed structure from Alameda was in the best interest of the company and its stockholders given, among other things, "the uncertainty of whether such [other] transactions could be consummated and on what timeline, the lack of proposed deal terms, and the urgent execution timeline imposed by current market conditions and Company financials."[184]

BlockFi viewed it as important that the company announce a liquidity support transaction before the market opened on June 21, 2022.[185]   There had been 3 days since the last market open, and it was unclear what BlockFi would face in customer withdrawals if the market reopened with no announcement.[186]   The Board noted that the Alameda proposal provided "certainty" in respect

---

[181]      *See* Jun. 20, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 2:30PM EST (BF_BK_00011823)

[182]      *Id*.

[183]      Jun. 20, 2022 Meeting Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. 9:30PM EST (BF_BK_00011827).

[184]      *Id.*

[185]      *Id.*  June 20, 2022 was a Monday.  But markets were closed that day in observance of Juneteenth.

[186]      *E.g.,* Apr. 26, 2023 J. Hill. Dep. Tr. at 54:17-20, 65:11-23.

of being able to make an announcement prior to market open, while also providing flexibility as it was "non-binding except in respect of confidentiality and did not contain any exclusivity provisions."[187]   The Board thus approved the Term Sheet and authorized management to move towards definitive documentation.[188]

The initial non-binding Term Sheet called for a multi-pronged transaction.  BlockFi would get access to $250 million of capital, with $100 million drawable in the first 15 days, and BlockFi would be able to draw up to an additional $25 million per rolling 30-day period.[189]   Any capital drawn was expressly subordinate to any customer deposits in any account type.

The Term Sheet also called for an option to acquire BlockFi, first exercisable in July 2023, and, if not exercised then, extendable for a $10 million to receive a replacement option exercisable in July of 2024.  The same process would occur in each of 2025, 2026, and 2027.

The Term Sheet also stated that BlockFi would work to file its S-1 within 60 days, that the parties would "work in good faith to deepen the commercial relationship under mutually agreed and commercially reasonable terms" and, if the option were exercised, "significant management incentives will be provided."[190]

The Board's approval of the Term Sheet did not end its consideration of other options.  At the next meeting of the Board on June 22, the Board continued discussion of other potential transactions.[191]   Ultimately the Board approved management to continue meeting with potential

---

[187]     *Id*.

[188]     *See BlockFi Signs a Landmark Term Sheet with FTX to Provide a $250 Million Credit Facility*, June 21, 2022,  https://www.prnewswire.com/news-releases/blockfi-signs-a-landmark-term-sheet-with-ftx-to-provide-a-250-million-credit-facility-301572011.html (last visited April 10, 2023).  The counterparty in the term sheet was changed to FTX shortly before the term sheet was executed.

[189]     Alameda Term Sheet, BF_BK_00009100.

[190]     *Id*.

[191]     Jun. 22, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi, Inc. (BF_BK_00011837).

transaction partners.[192]  This process—the Board, management, and advisors discussing both the progress of the potential FTX transaction and other alternative transactions—continued over the next several days.[193]

As BlockFi sought to formally execute a transaction prior to the end of the month, the Board considered three potential transactions.  ***First***, there was the Term Sheet.[194]  ***Second***, there was the proposal led by certain of BlockFi's existing investors, primarily Morgan Creek, referred to as the "MC Convertible Note Transaction."  On June 28th, the Board discussed that offer and its continued lack of a lead investor.  The "last potential lead investor" for that deal was a family office in Hong Kong, and that investor noted that it would take time to evaluate the Company's legal and regulatory position, which, "given the urgency of the Company's situation," the Board determined that was "not a feasible alternative."[195]  ***Third***, on June 30th, BlockFi received a term sheet for a convertible note transaction led by Ledn Inc. (the "Ledn Term Sheet").[196]  The Board determined the Ledn Term Sheet was not an immediately actionable proposal for several reasons, including timing and the fact that it called for Ledn to provide an infusion of its own equity rather

---

[192]    *Id*.  This dual-tracking of discussions led to certain complications.  As Morgan Creek continued to try and find a lead investor for its proposal, a call that Morgan Creek had with its own investors leaked to the press.  During this leaked conversation, Morgan Creek expressed that it was still negotiating with BlockFi in an effort to avoid a scenario where FTX exercised its option and effectively wiped out existing shareholders (including Morgan Creek).  *Morgan Creek is Trying to Counter FTX's BlockFi Bailout, Leaked Call Shows*, June 25, 2022, https://www.coindesk.com/business/2022/06/25/morgan-creek-is-trying-to-counter-ftxs-blockfi-bailout-leaked-call-shows/ (last visited April 10, 2023).  Ms. Marquez noted in a subsequent board meeting that the leak "led to a spike in withdrawal volumes" and gave her concerns about "putting the FTX transaction in jeopardy."  Jun. 27, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011847).

[193]    *See, e.g.*, Jun. 23, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011841); Jun. 27, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011847); Jun. 28, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011944).

[194]    Jun. 30, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 1PM EST (BF_BK_00011850).

[195]    Jun. 28, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011944).

[196]    Jun. 30, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 5PM EST (BF_BK_00011853).

than cash.[197]  None of these transactions would have met BlockFi's goals of sending a strong signal to the market and assuring the market that funds on BlockFi's platform had a backstop.

The Board ultimately determined that the FTX transaction presented the best path forward for the Company and all stakeholders, and directed management to execute the definitive documents, subject to shareholder approval as needed.[198]  The final terms of the transaction provided that FTX would be the counterparty (the "FTX Transaction").  The structure had some similarities to what was initially proposed, but had key differences.  FTX agreed to make available up to $400 million in capital.[199]  After an initial $100 million draw, BlockFi could draw up to $25 million in additional funds during each rolling 30 day period, unless the funds were being withdrawn to satisfy customer withdrawal requests (for which the cap would not apply).[200]  The available capital on its face called for an interest rate of 5% per year, but no interest payments at all would be due or paid during the life of the loan.  The Maturity Date (upon which any principal and interest were due) was five years from closing.[201]

The FTX Transaction also included a purchase option for FTX (the "Purchase Option").[202]  Under the Purchase Option, FTX would have the right to purchase the outstanding equity of BlockFi every January or July for five years, beginning in July 2023.  The additional amount FTX would pay (in FTX stock) was based on a formula of (1) $15 million plus (2) 25% of BlockFi's Cumulative Operating Income (but capped at $100 million) plus (3) an additional $25 million if

---

[197]    *Id*.

[198]    *Id*.

[199]    Loan Agreement (BF_BK_00009101).  The $400 million was comprised of a $300 million revolver that could be used for general corporate purposes and an additional $100 million that could be used for covering customer withdrawals.  *Id*. at Schedule A.

[200]    *Id*. at § 2.2.

[201]    *Id*. at Schedule A.

[202]    Option Agreement (BF_BK_00009270).

BlockFi's S-1 had been declared effective on or prior to January 1, 2023, plus (4) an additional

$100 million if prior to the option exercise, BlockFi's assets under management were greater than

$8 billion.[203]  Thus, all in, the maximum additional amount FTX would pay (in addition to capital

provided before exercise) would be $240 million.  For any July in which FTX opted not to exercise

the Purchase Option, it could pay $10 million to extend the Purchase Option an additional year.[204]

If FTX allowed the Purchase Option to lapse, it would **not** cause any capital provided in the interim

to be due, but if the Purchase Option expired, BlockFi would not be permitted to draw any

additional sums.  The FTX transaction as executed did not include any provisions at all that would

provide for post-transaction consideration to any BlockFi management team members.[205]

As part of the deal, FTX also received certain rights under BlockFi's Articles of

Incorporation.  Specifically, FTX was given approval rights over any disposition of material

assets.[206]  In addition, after the FTX Transaction, BlockFi could not receive any additional equity

funding absent FTX's approval.

Following the closing of the FTX Transaction, BlockFi drew down $200 million.[207]

BlockFi subsequently made three additional draws of $25 million each.[208]  BlockFi attempted to

draw the remaining $125 million available in November 2022, but FTX did not fund.[209]

---

[203]     *Id*. at § 2.6

[204]     *Id*. at definition of "Option Termination Date."

[205]     Reflecting the shareholders' belief in FTX as a counterparty at the time, the preferred shareholders asked for the right to receive their payouts in FTX stock, FTX agreed to that, and the preferred shareholders voted overwhelmingly in favor.

[206]     *See* Exhibit A to Option Agreement, Ninth Amended and Restated Certificate of Incorporation of BlockFi Inc. at § C (BF_BK_00009270)

[207]     Jul. 8, 2022 Notice of Borrowing (BF_BK_00009258); Jul. 13, 2022 Notice of Borrowing (BF_BK_00009260).

[208]     Aug. 12, 2022 Notice of Borrowing (BF_BK_00009262); Sep. 12, 2022 Notice of Borrowing (BF_BK_00009264); Oct. 13, 2022 Notice of Borrowing (BF_BK_00009266).

[209]     Nov. 8, 2022 Notice of Borrowing (BF_BK_00009268).

Although formally structured as a line of credit with an option to purchase, BlockFi viewed the FTX Transaction as an equity investment and bridge to FTX purchasing BlockFi consistent with the terms of the Option Agreement.  It was widely anticipated that FTX would exercise its Purchase Option at the earliest opportunity in July 2023.  Despite FTX's apparent intent to acquire BlockFi, the FTX Transaction was structured as it was due to other considerations.  Specifically, given the need to execute quickly in light of the state of the market, the parties had concerns about the regulatory impact of a formal sale as the change in control could impact BlockFi's ability to operate under its various state licenses and impact its ability to promptly complete and file the S-1 for its BlockFi Yield product.  In structuring the transaction the way they did, the parties believed they would have time before the Purchase Option was exercised to address those issues.

Assuming the Purchase Option was exercised, BlockFi would be part of FTX.  But as a practical matter, based on the structure of the transaction, it is hard to see *ex ante* how any capital accessed by BlockFi would be repaid to FTX in any realistic scenario.  In almost all circumstances FTX exercises the option and acquires BlockFi, with the capital drawn in the interim becoming an intercompany book entry that is cancelled in inter-company reporting.  In the downside scenario, BlockFi files for bankruptcy at some unknown time in the future, and the loan is not repaid because it is junior to clients who would not be recovering in full.[210]

### E.      Post-July 1, 2022 Relationship With FTX and Alameda

Following the execution of the definitive documents for the FTX transaction, the markets calmed some and BlockFi began lending to counterparties again (which, of course, was BlockFi's

---

[210]      The UCC Report does not take a position on whether BlockFi should have accepted or rejected the FTX proposal at the time it was offered.  Given the circumstances, entering into the transaction was *clearly* in the best interests of BlockFi clients (given the availability of $400 million in new capital junior to clients); the only stakeholders who may have felt otherwise were common shareholders like employees (whose equity was wiped out) or preferred shareholders (who were massively diluted, but voted overwhelmingly in favor of the transaction and asked that any consideration they ultimately received be paid in FTX stock).

business).  This section discusses how that relationship grew between June 30, 2022 and November 11, 2022 (when Alameda and certain affiliates filed for bankruptcy).

### 1.    Market View of FTX/Alameda in Summer and Fall of 2022

In order to understand the context in which BlockFi entered into the June 30 FTX transaction and then continued to grow its lending relationship with Alameda and its acceptance of FTT as collateral, it is relevant to recognize the overall market sentiment towards FTX, Alameda, and Sam Bankman-Fried during this time period.

As described in some detail above, in the summer of 2022, the market generally viewed FTX as one of the most well-capitalized and successful crypto trading platforms in the world.  FTX had received widely publicized equity investments from sophisticated investment funds, including Thoma Bravo, Third Point, Sequoia, and Tiger Global.[211]  During the summer of 2022, when much of the sector faced contagion as a result of the collapse of Celsius, Voyager, and 3AC Bankman-Fried and FTX were viewed as the healthy goliath in a position to take advantage of distressed asset (and business) prices.  Public reporting compared Bankman-Fried to "John Pierpont Morgan" and "Warren Buffett," and described his transaction with BlockFi and his June 2022 loan to Voyager as "a dealmaking spree unlike any other in the brief history of the [crypto] industry."[212]

---

[211]    *E.g.*, *Investors Who Put $2 Billion Into FTX Face Scrutiny, Too*, November 11, 2022, https://www.nytimes.com/2022/11/11/technology/ftx-investors-venture-capital.html (last visited April 11, 2023). Although this article was written after FTX's crash, these investors were known prior to the collapse. *E.g.*, *Crypto Firm FTX Trading's Valuation Rises to $18 Bln after $900 Mln Investment*, July 20, 2021, https://www.reuters.com/technology/crypto-firm-ftx-trading-raises-900-mln-18-bln-valuation-2021-07-20/ (last visited April 11, 2023) (disclosing investments by Sequoia Capital, Thoma Bravo, and Third Point among others); *VC Firm Sequoia Latest To Be Hit With FTX Suit*, Law360 (February 15, 2023), https://www.law360.com/articles/1576546/vc-firm-sequoia-latest-to-be-hit-with-ftx-suit (describing Sequoia's since-deleted article weeks before FTX's collapse "describ[ing] Bankman-Fried as 'obviously a genius,' 'a future trillionaire,' and someone who was seeking to maximize 'the total value of the universe,' according to the suit.").

[212]    *See, e.g., Sam Bankman-Fried Turns $2 Trillion Crypto Rout into Buying Opportunity*, July 19, 2022, https://www.bloomberg.com/news/articles/2022-07-19/sam-bankman-fried-expands-ftx-alameda-empire-by-bailing-out-failing-crypto-firm (last visited April 11, 2023); *see also Robinhood shares pop more than 20% after Sam Bankman-Fried buys 7.6% stake*, CNBC (May 12, 2022) https://www.cnbc.com/2022/05/12/robinhood-shares-pop-more-than-20percent-after-sam-bankman-fried-buys-7point6percent-stake.html.

This view of FTX, Alameda, and Bankman-Fried as successful crypto titans was widely shared at the time.  As an example, Voyager had extensive dealings with Alameda before, during, and after Voyager commenced its chapter 11 proceedings in July 2022.  On September 2, 2021, Voyager had entered into a loan agreement with Alameda, under which Voyager loaned Alameda BTC, ETH, and other cryptocurrencies with notional values of up to over $1 billion.[213]  Voyager's loans to Alameda were only partially collateralized by FTT and Serum.[214]  As of August 2022—a month after Voyager commenced chapter 11 proceedings—approximately $440 million of the loan proceeds remained outstanding, with Voyager holding approximately $166 million in FTT and Serum as collateral (~37%).[215]  Voyager had called back other open term loans, but *not* Alameda's undercollateralized loans, on which it continued to earn interest for the first two months of its bankruptcy.

Voyager continued to work with Alameda, FTX and other affiliates, during Voyager's chapter 11 proceedings.  On July 14, 2022, Voyager's investment banker Moelis & Company LLC ("Moelis") distributed a letter to prospective buyers of Voyager.[216]  After negotiating with and receiving input from many prospective buyers and stakeholders, Voyager commenced a two-week auction on September 13, 2022.[217]  Voyager, in conjunction with its advisors, including Kirkland & Ellis LLP, Paul Hastings LLP (regulatory counsel), Moelis (investment bankers), and BRG (financial advisors), as well as other stakeholders including the Unsecured Creditors Committee

---

[213]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 929, Debtors' Objection to Proofs of Claim Nos. 11206, 11209 & 11213 of Alameda Ventures Ltd. at p. 14 (Bankr. S.D.N.Y. Jan. 30, 2023) [hereinafter, the "Voyager Motion for Equitable Subordination"].

[214]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 402, Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief at p. 10 (Bankr. S.D.N.Y. Sept. 12, 2022) [hereinafter, the "Voyager Motion to Return Collateral"].

[215]    *Id*. at p. 9.

[216]    Voyager Motion for Equitable Subordination at p. 16.

[217]    *Id*. at p. 19.

(the "UCC") represented by McDermott Will & Emery and their financial advisor FTI Consulting, Inc., and the Special Committee of independent directors of Voyager Digital LLC, scrutinized each bid and ultimately determined that FTX made the best bid.[218]   Further, based in part on representations from Alameda and FTX and their joint advisors (including Sullivan & Cromwell LLP), all relevant parties concluded that Alameda/FTX could and would close the transaction.[219] Consequently, on September 27, 2022, Voyager entered into an asset purchase agreement with FTX US for the sale of Voyager's customer accounts.[220]

On October 20, 2022, after a public hearing, the U.S. Bankruptcy Court for the Southern District of New York approved the sale of 1 million Voyager customer accounts to FTX.[221]   But three weeks later, the Alameda/FTX fraud was uncovered and both Alameda and FTX collapsed.[222]   On November 10, 2022, FTX voluntarily released Voyager from the asset purchase agreement, and Voyager restarted the marketing and sales process, ultimately entering into an asset purchase agreement on December 18, 2022 with Binance.US.[223]   Voyager's revised plan with Binance.US as the buyer was confirmed by the Bankruptcy Court, although the transaction ultimately did not close and Voyager began a self-liquidation managed by its own management team.[224]

---

[218]    *Id.*

[219]    *Id.*; Voyager Disclosure Statement at pp. 74–75; *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 476, Declaration of Brian Tichenor in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry into the Asset Purchase Agreement, and (II) Granting Related Relief at p. 10 (Bankr. S.D.N.Y. Sept. 29, 2022) [hereinafter, the "Tichenor Declaration"].

[220]    Voyager Motion for Equitable Subordination at p. 20; Voyager Disclosure Statement at pp. 74–75.

[221]    Voyager Motion for Equitable Subordination at p. 20.

[222]    *Id.* at p. 11.

[223]    *Id.* at p. 21.

[224]    *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 1166, Corrected and Amended Order (I) Approving the Second Amended Disclosure Statement and (II) Confirming the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Bankr. S.D.N.Y. July 6, 2022) (the "Voyager Confirmation Order").

As is relevant here, between July and November 2020, the largest exposure of Voyager's bankruptcy estate was a loan to Alameda partially (less than half) collateralized by FTT. Yet Voyager only recalled the Alameda loans after several months—and even then, it advised it was doing so not because of any concern about credit, but merely to provide a level playing field during Voyager's auction.[225]   And despite the subsequent collapse of Alameda and FTX, no one— including the Voyager UCC, the Special Committee of the Voyager Digital, LLC Board, any of their legal or financial advisors, the United States Trustee, or the Bankruptcy Court—has ever suggested that Voyager's entry into materially undercollateralized loans to Alameda in 2021 and 2022 or a sale to FTX in the Fall of 2022 resulted in viable claims for breach of the duty of care.

## 2.    Collapse of FTX and BlockFi Response

BlockFi's loans outstanding to Alameda reached their nadir at less than $100 million in mid-July of 2022 after Alameda returned on demand over $1 billion to BlockFi in June 2022. Over the next several months, BlockFi's lending to Alameda steadily increased, eventually approaching the prior pre-paydown balance by late October and early November of 2022.[226]

BlockFi's confidence in Alameda as a counterparty grew materially between 2021 and the "re-start" of their lending relationship in July 2022. Among other things, between late 2021 and the "restart," (1) Alameda had returned $1 billion to BlockFi on demand following the worst period of contagion in crypto history;[227] (2) shortly thereafter Alameda won the auction for GBTC shares

---

[225]     *Declaration of Stephen Ehrlich, Chief Executive Officer of the Debtors*, In re: Voyager Digital Holdings, Inc. at 21-23, No. 22-10943, Dkt. No. 15 (Bankr. S.D.N.Y. July 6, 2022); *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief*, In re: Voyager Digital Holdings, Inc., No. 22-10953, Dkt. No. 402 (Bankr. S.D.N.Y. Sept. 12, 2022) (the "Ehrlich Declaration").

[226]     Presentation for UCC re FTX/Alameda, at slides 15-16.

[227]     *See e.g.,* Apr. 12, 2023 Y. Mushkin Dep. Tr. at 97:21–98:9; Apr. 26, 2023 J. Hill Dep. Tr. 84:1-8.  More generally, for more than a year prior to November 2022, Alameda and BlockFi had a productive lending relationship in which, over time, many loans were made and returned with interest.

that BlockFi had foreclosed upon from 3AC, paying cash;[228] (3) BlockFi had hired new employees who gave additional feedback on Alameda as a counterparty and FTT as collateral;[229] (4) Alameda had provided wallet information that evidenced billions of dollars in assets;[230] (5) FTX had provided BlockFi with audited financial statements, furthering the case for FTT as collateral;[231] (6) Alameda agreed to indemnify BlockFi for any damage to FTT collateral held on FTX's platform;[232] (7) Alameda was affirmatively working with BlockFi to secure partial guarantees from a third party;[233] (8) FTX's trading volumes had increased, giving BlockFi more confidence FTT would have value in a down cycle;[234] and (9) Alameda had worked with BlockFi to develop a three-party agreement with Coinbase Ireland for further protection.[235] This, plus the uniformly positive market feedback about Alameda and FTX, gave BlockFi little reason to doubt either.[236]

---

[228]   *See e.g.,* Apr. 12, 2023 Y. Mushkin Dep. Tr. at 98:19–100:13; *see also* Presentation for UCC re 3AC & GBTC, at slides 12-14.

[229]   *See e.g.,* Apr. 12, 2023 Y. Mushkin Dep. Tr. at 143:14–145:19.

[230]   *Id.* at 178:17–179:2; Oct. 12, 2021 Email from R. Chang (Alameda) to J. Hoorweg (BlockFi), et al. (BF_BK_00006238). In May 2022 BlockFi's risk team reviewed Alameda's financials and concluded based on a series of assumptions that Alameda had net shareholder equity of ████. BF_BF_00070813.

[231]   Apr. 12, 2023 Y. Mushkin Dep. Tr. at 100:5–13.

[232]   Apr. 12, 2023 Y. Mushkin Dep. Tr. at 97:21–98:9; Jan. 26, 2022 Master Loan Agreement (BF_BK_00009913).

[233]   Apr. 12, 2023 Y. Mushkin Dep. Tr. at 184:20–185:11.

[234]   Apr. 4, 2023 Z. Prince Dep. Tr. at 227:22–228:14; *see also FTX US Says Daily Trading Volume Jumped 500% Last Quarter*, November 11, 2021, https://www.bloomberg.com/news/articles/2021-11-11/ftx-us-says-daily-trading-volume-jumped-500-last-quarter#xj4y7vzkg (last visited April 23, 2023).

[235]   Apr. 12, 2023 Y. Mushkin Dep. Tr. at 206:12–19; Jan. 26, 2022 Amended and Restated Master Loan Agreement (BF_BK_00009913); Jan. 26, 2022 Security Agreement over a Custody Account (BF_BK_00009948).

[236]   The independent board and BARC members who supported additional lending to Alameda in August 2022 and beyond both saw Alameda's track record as the single most reliable counterparty (emphasized by its return of hundreds of millions in loans on demand during the worst crypto downcycle then known) as the most important factor in approving additional lending. They described the discussion at the August 2 BARC meeting, including a discussion about the possibility of wrong-way risk created by loans to Alameda secured by FTT. They rejected any characterization of the discussion as one where Prince "overruled" a risk assessment, and described the discussion as one where everyone understood the nature of the transactions and felt it was a business transaction worth doing for the reasons described above, knowing that "as of Aug 2nd, 2022 Alameda gross loan exposure increased to $511m, collateralized by 809m FTT (mostly), SOL and SRM." *See* August 2022 BARC materials. ████████

As of November 5, the total outstanding loan to Alameda was approximately $975 million; the collateral (mostly FTT tokens) had a market value of approximately $1.5 billion.[237]

A number of news reports and market events in November 2022 ultimately led to FTX and Alameda's bankruptcy filings.  But the UCC's assertion that FTX and Alameda "immediately collapsed"[238] following the public disclosure of information about Alameda's balance sheet on November 2, 2022 (which showed material sums of FTT, among other assets) is inaccurate.

On November 2, 2022, CoinDesk published an article citing "a private financial document" and stating the FTT token issued by FTX appeared to represent the majority of Alameda's net equity.  But the bulk of the withdrawals from FTX and the material decline in value of the FTT token followed *additional* market information and speculation, *not* merely this disclosure (which itself stated that "Alameda is big")[239]

Specifically, on November 6, 2002, the founder of Binance, Changpeng Zhao ("CZ"), Tweeted that Binance would be liquidating all FTT tokens in its possession.[240]  It was public information that Binance held a massive position in FTT.  The public statement that a large FTT holder intended to immediately liquidate its entire position moved the market, and the price dropped from $22 on November 6, 2022 to just over $2 on November 9, 2022—following another

---

▮▮▮▮▮▮▮▮▮▮▮  The UCC ignores that the BARC had approved lending against FTT at 150%, despite knowing that from a strict model perspective, BlockFi's modeling suggested 180%.  *See* August 2022 BARC Materials, slides 16–17; BF_BK_00011934. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  The UCC's complaint about this email is thus a red herring.

[237]    Presentation for UCC re FTX/Alameda, at slide 6.

[238]    UCC Report at 11.

[239]    https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/

[240]    https://twitter.com/cz_binance/status/1589283421704290306 (last visited on April 11, 2023).

even-more negative CZ Tweet.[241]  As has been publicly reported by Bloomberg based on work by
the Federal Reserve Bank of Chicago, the run on FTX's platform immediately followed CZ's
negative tweets about FTX,[242] *not* the November 2 article about the Alameda balance sheet.[243]

During this time period, BlockFi took a number of steps to protect its position vis-à-vis its
loan to Alameda and FTT collateral.  These actions included the following:

Regardless, had FTX been a real company (and not a fraud) and complied with its promises
to BlockFi and its customers not to loan or use or rehypothecate cryptocurrency, and instead held
all customer deposits one-to-one, the run on FTX would have been a short-term blip.  But FTX
had defrauded everyone and it ultimately collapsed.

- **November 7**:  BlockFi increased the margin requirement on the Alameda loan to 200%,
  and Alameda posted an additional 19.5 million FTT tokens as collateral.

- **November 8**:  When the margin threshold was breached, Alameda posted more
  collateral and negotiated a paydown plan, paying back $125 million.

- **November 9**:  Alameda posted additional collateral, including ETHE, GBTC, and
  BITW shares.  BlockFi filed a UCC-1 to perfect its security interest.

- **November 9**:  BlockFi received a guarantee of Alameda's obligations from Emergent,
  and Emergent posted additional collateral, including HOOD shares to secure the
  guarantee.  BlockFi filed a UCC-1 to perfect its security interest.

- **November 10**:  BlockFi declared an event of default and accelerated the Alameda loan.
  BlockFi also froze platform activity due to the uncertainty around FTX and Alameda.

---

[241]      *See* https://coinmarketcap.com/currencies/ftx-token/ (last visited on April 11, 2023).  The UCC's suggestion
that November 2 was the beginning of an "immediate" collapse is also undermined by the fact that the price of FTT
moved only modestly until November 9, *after* Binance had announced its intent to sell all of its FTT *and* that it was
backing out of any acquisition of FTX following additional diligence. *See* https://finance.yahoo.com/quote/FTT-
USD/history?p=FTT-USD&nn=1 (listing historical prices for FTT including opening prices on Nov 2 ($25.87), Nov
3 ($25.03), Nov 4 ($24.36), Nov 5 ($25.47), Nov 6 ($24.06), Nov 7 ($22.25), Nov 8 ($22.13), and Nov 9 ($5.52)).

[242]      @Binance, Twitter (Nov. 9, 2022) ("As a result of corporate due diligence, as well as the latest news reports
regarding mishandled client funds and alleged US agency investigations, we have decided that we will not pursue the
potential acquisition of FTX.com.").

[243]      https://www.bloomberg.com/news/articles/2023-05-15/large-investors-led-2022-crypto-withdrawal-crisis-
on-celsius-ftx-chicago-fed?srnd=cryptocurrencies-v2 (citing *A Retrospective on the Crypto Runs of 2022*, Federal
Reserve Bank of Chicago, Chicago Fed. Letter 779 (May 2023).



As a result of these actions in the days leading up to November 11, 2022, at the time that FTX and Alameda filed for bankruptcy, BlockFi still maintained an overcollateralized position on the Alameda loan (inclusive of the HOOD shares posted as collateral).

## IV.    SEC INQUIRY AND SETTLEMENT

When BlockFi Interest Accounts were developed and rolled out, BlockFi believed that they were not "securities" requiring registration and were most akin to subjects that had not previously been regulated as securities.  BlockFi also believed that it as a company clearly fit within an exception to the definition of "investment company" in Section 3(c)(2) of the Securities & Exchange Act, a view supported by advice it received from well-credentialed outside counsel.

In June 2021, BlockFi received an inbound request for information from the SEC.  While BlockFi was preparing the information requested, on July 19, 2021, it learned from a *Forbes* reporter, citing the leak of a *draft* press release, that the State of New Jersey was preparing a cease and desist order with respect to BIA accounts—which came as a complete surprise to BlockFi.[244]

---

[244]    https://www.forbes.com/sites/stevenehrlich/2021/07/19/new-jersey-attorney-general-prepares-cease-and-desist-order-against-multi-billion-dollar-bitcoin-financial-services-platform/?sh=7ddc96c121a5 .  *See also* J. Mayers Interview; Z. Prince Interview.  In fact, in the *Forbes* interview published that day, the reporter states that "When

CEO Zac Prince publicly disclosed New Jersey's action the day he learned of it[245] and BlockFi added banners noting the issue to its Website shortly thereafter.  Thereafter, the deadlines in New Jersey's (and other states') proceedings were periodically extended as BlockFi worked with regulators to understand their concerns, provide information, and attempt to resolve the matter.

What followed was 6 months of exhaustive inquiries of BlockFi's businesses, where the SEC examined every part of BlockFi's business and every statement BlockFi had made about it. BlockFi produced 3,972 documents and 16,701 pages to the SEC and engaged *extensively* with it.

In February 2022, BlockFi consented to the entry of an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing a Cease-and-Desist Order (the "SEC Order").  In the SEC Order, the SEC took the position that BIA products were unregistered securities and that BlockFi was acting as an unregistered investment company because it was "engaged in the business of investing, reinvesting, owning, holding, or trading in securities and owning investment securities . . . having a value exceeding 40% of its total assets[.]"[246]

The UCC opines that the SEC settlement raises general questions about "BlockFi's approach to regulatory compliance" and that the "decision to continue offering the BIA product for over a year after notice from state regulators was neither reasonable nor rational."[247]  The UCC

---

reached for comment, BlockFi CEO Zac Prince told Forbes, "The company has no knowledge of any impending actions with the New Jersey Attorney General's office. We maintain great relationships with the New Jersey regulators and other state and federal regulators." *Id.*

[245]  https://twitter.com/BlockFiZac/status/1417316834244796416.   Prince followed this tweet with another, accurate, disclosure: "BlockFi is engaged in an ongoing dialogue with regulators to help them understand our products, which we believe are lawful and appropriate for crypto market participants. BIA is not a security, and we therefore disagree   with   the   action   by   the   New   Jersey   Bureau   of   Securities." https://twitter.com/BlockFiZac/status/1417316836157296643

[246]  SEC Order. ¶¶ 2–4.

[247]  UCC Report at 41; *see id.* at 7 (claiming that continuing to offer BIAs while working with regulators was "shocking").  The UCC opines that had BlockFi ceased offering BIA when the SEC first sought information, the settlement "likely" would have been smaller.  *Id.*  No evidence (again) is cited in support of that statement, which is

cites nothing for either proposition and does not say whose opinion these statements reflect.

BlockFi's SEC proceeding and settlement was covered *extensively* in the legal community as ***the***

***first of its kind***, and the SEC Order provided the first pathway for BlockFi to seek registration

(which BlockFi did).  No objective observer shares the UCC's views which, respectfully, reflect a

deep misunderstanding of how regulatory inquiries work and hindsight bias run amok.

 The SEC also concluded that BlockFi "made a materially false and misleading statement

on its website from March 4, 2019 to August 31, 2021, concerning its collateral practices and,

therefore, the risks associated with its lending activity."[248]  Specifically, after reviewing everything

BlockFi had ever said, the SEC identified as problematic one statement on BlockFi's website

(posted in 2019) that institutional loans were "typically over-collateralized" and found that while

it was BlockFi's intent to require overcollateralization on most institutional loans when the

statement was made, less than a majority were actually *over*collateralized during this time frame,

and the statement on the website had not been corrected as a result of an "operational oversight."[249]

The Commission (after thorough review) did not identify any other alleged misstatements.

---

speculative at best.  More generally, it is absurd to conclude from a *settlement* that BlockFi did not care about compliance.  The opposite conclusion—that BlockFi was doing all it could to comply with unclear regulations—is far more compelling, and consistent with the reality that BlockFi applied for and secured nearly 50 licenses and had a compliance department leveraging more than 100 employees across legal, compliance and finance at its peak.

[248] *Id*. ¶ 3.  The UCC exaggerates the SEC Order by using the term "statements" (UCC Report at 7, 39, 40).  The SEC reviewed every statement BlockFi ever made and took issue with one.

[249] The SEC's precise statement was "When BlockFi began offering the BIA investment, it intended to require over-collateralization on a majority of its loans to institutional investors, but it quickly became apparent that large institutional investors were frequently not willing to post large amounts of collateral to secure their loans. Approximately 24% of institutional crypto asset loans made in 2019 were overcollateralized; in 2020 approximately 16% were over-collateralized; and in 2021 (through June 30, 2021) approximately 17% were over-collateralized.  As a result, BlockFi's statement materially overstated the degree to which it secured protection from defaults by institutional borrowers through collateral.  Through operational oversight, BlockFi's personnel failed to take steps to update the website statement to accurately reflect the fact that most institutional loans were not over-collateralized." SEC Order ¶ 22.  The SEC went out of its way to clarify that this was a finding of negligence, not scienter.  *Id.* ¶ 35.

The UCC claims the SEC finding "undisclosed risk in connection with BlockFi's collateralization practices for institutional counterparties appears quite apt" today,[250] but its statement is again incorrect.  For one thing, the SEC's findings have been public since February 2022, rendering it logically impossible for any such risk to be "undisclosed" to clients who had an opportunity to withdraw from BlockFi for nine months before its November bankruptcy filing. For another, it is undisputed that most of BlockFi's institutional loans between July and November 2022 were overcollateralized at inception (by a considerable margin), so any concerns reflected in the SEC findings are not "apt" today at all.

In addition, BlockFi's Transparency Report provided clients with detail about the way the firm assessed its (and clients') exposure as a result of its Institutional Loans.  As of July 21, 2022, BlockFi disclosed that it had approximately $600 million of "net exposure" to institutional loans, conservatively calculated as the sum of net exposures of counterparties for whom there was a net exposure.[251]  BlockFi continued by describing the process that the firm generally followed, which was informational and accurate:

> We enable institutional clients such as hedge funds, market makers, proprietary trading firms, over-the-counter trading desks, and corporations such as exchanges and digital assets miners to obtain financing from us in the form of digital assets or U.S. dollar fiat currency. Interest on these loans is typically fixed and payable in kind. The average term of all loans within our loan portfolio is less than one year.
>
> As of June 30, 2022, the fair value of our outstanding loans to institutional borrowers was approximately $1.5 billion. Each institutional client that borrows from us undergoes a credit due diligence process to allow our credit risk underwriting team to establish appropriate credit limits. We have established an internal credit lending policy that ***generally*** limits exposure to any one borrower, principal or guarantor based on ***net exposures***, which represents our aggregate exposure to economically related borrowers for approval purposes. Based on our internal credit process, our loan approvals follow a transaction authority and credit limit matrix, which are based on a counterparty's financial information and size,

---

[250]    UCC Report at 40-41.

[251]    https://blockfi.com/blockfi-transparency-report-Q2-2022

business model related to traditional or digital assets markets, country of domicile, leverage, and other credit measures.

We require ***many, but not all, institutional borrowers to post collateral in the form of digital assets, cash or other assets. Whether we require institutional borrowers to post collateral and, if so, the type and level of collateral we require, depends on the borrower's credit profile and the size and composition of the loan portfolio***. The collateral provided by our institutional borrower clients may also be subject to margin calls if the loan to collateral value ratio breaches certain thresholds set forth in their loan agreements.[252]

These disclosures are consistent with BlockFi's actual practices; they defy the UCC's theories.

As part of the SEC Order, BlockFi agreed to, within 60 days of the of the institution of the Order, come into compliance with section 7(a) of the Investment Company Act by either registering, or completing steps such that it fit one of the exceptions to registrations.[253] BlockFi was required to provide evidence to the SEC that it fit such an exception. BlockFi ultimately complied with this requirement, submitting a certification stating that it qualifies as a market intermediary under the 1940 Act.[254] BlockFi continued to work with the SEC in an effort to register its S-1 statement through early November 2022.

Finally, the UCC claims that BlockFi attempted to "skirt" regulatory oversight after the SEC settlement, causing it to take risky positions and causing of BlockFi's ultimate downfall.[255] These statements are inconsistent with the facts and, respectively, make no sense; we highly doubt the UCC will offer any witness (expert or otherwise) to substantiate them. First, BlockFi worked with the SEC to come into compliance by attempting to register BlockFi Yield® as a security. Second, BlockFi was also required by the SEC Order to register or fit within an exception to the

---

[252]    *Id.* (emphasis added).

[253]    SEC Order ¶ 43.

[254]    May 13, 2022 Certification Submitted by BlockFi (BLOCKFI-00000488).

[255]    UCC Report at 4, 6, 39-41, 82-83.

definition of investment company, and BlockFi recognized that it needed to have a certain proportion of its assets in individualized agreements.  On the deposit side, BlockFi, through its private client service, had substantial deposits through individualized transactions.  And BlockFi's institutional lending business was *already engaged* in individualized transactions.  These forms of arrangement were required to comply with the terms of the SEC settlement, and were hardly efforts to "skirt" regulatory oversight (in reality, they were the opposite).

## V.    INDIVIDUAL PAYMENTS TO OR RELATED TO INSIDERS

This section of the Report now turns to specific transactions involving company insiders.

### A.    ██████ Transactions

#### 1.    Initial Approaches By ████

In 2021, two lenders (████████████████████) approached shareholders of BlockFi, including BlockFi executives, offering to enter into transactions whereby ██████ would give the shareholder a loan to finance the shareholder's pre-IPO exercise of their options.  The transactions would allow the shareholder to obtain near-term liquidity for their otherwise illiquid holdings in BlockFi, in exchange for various fees and the transfer of shares into a trust held as collateral.

The Board initially decided to allow only Jonathan Mayers (BlockFi's General Counsel) to participate in this type of transaction, as he had narrowly missed qualifying for participation in the Series D tender offer due to his vesting schedule.  (Mayers ultimately decided not to do so.) Following that decision, Adam Healy (BlockFi's Chief Security Officer), who had similarly missed the tender offer cutoff, requested authorization to participate in this type of financing. Healy reported that ████████████████ had "said they [were] willing to sign releases absolving the company and directors of" risk associated with the transactions, and that "[t]heir

own marketing refer[red] to these loans as 'no recourse.'"[256]  The Board subsequently approved

Healy's participation[257] and Healy executed his ████████████████████████████ on

December 29, 2021, transferring 84,375 BlockFi common shares into a trust maintained by a ████

affiliate.[258]

### B.    Main Round of ████ Financing Transactions

After those initial transactions, other BlockFi executives began working with ████.  The

transactions that eventually closed during this time involved David Spack, Dylan Stigliano, Flori

Marquez, Robert Loban, Tony Lauro, and Zac Prince.  ████ represented to these individuals that

the transactions were "risk-free," would not have any adverse tax consequence and were entirely

non-recourse.  ████ also wanted to move fast with minimal diligence to complete the deals.

Nonetheless, and although BlockFi was not a party to the ████ transactions, the Company

did provide some information to ████, including by providing ████ with certain documents in a

dataroom that was prepared for potential investors in the Series F.  In general, the documents ████

downloaded included an investor presentation that contained information about BlockFi's

financial performance, and other financial models supporting BlockFi's projections.[259]

By March 2022, BlockFi's Board had approved ████ to begin working with a larger

number of BlockFi employees and to loan up to $3 million per individual; to the extent that ████

had capacity remaining after working with any of those employees that wished to transact, the

Board approved ████ to begin working with former employees.[260]

---

[256]    Nov. 9, 2021 A. Healy Email to Z. Prince (BF_BK_00134264).

[257]    Jan. 5, 2023 Z. Prince Interview.

[258]    *See* Dec. 29, 2021 Healy Private Securities Contract; Healy Stock Transfer Agreement (BF_BK_00106903);
Healy Stock Transfer Agreement (BF_BK_00106906).

[259]    April 2022 BlockFi Investor Presentation.

[260]    ████████████████████████████████████████████████

████ deals with Spack, Stigliano, Loban, and Lauro closed in late March 2022.  Prince and Marquez's transactions closed in late April 2022.  The agreements were non-recourse as to the individuals except for very limited exceptions (such as the individual not actually owning shares free and clear).  And as discussed above, these transactions were being negotiated and closed in the same time period that BlockFi's valuation with respect to the Series F fundraising was decreasing.  Eventually, as a result of those reductions as well as the overall state of the crypto market, ████ representatives informed BlockFi that, although they would follow through with the transactions that had been signed, they were pausing transactions with any other BlockFi employees.[261]  Although ████ worked with the BlockFi executives to close these transactions, ████ itself did not put up the money to pay the BlockFi executives, that was done by ████ ████ was ultimately the counterparty to the private securities contracts executed by the BlockFi executives.[262]  ████ received certain fees for originating the transactions.[263]

### C.    Dispute With ████

### 1.    ████ Make Initial Threats

In the first week of June 2022, as crypto markets entered a period of turmoil, details regarding BlockFi's challenges with its Series F funding round made national news.[264]  In response

---

[261]    May 11, 2022 ████████████████████████████████████
████████ ████

[262]    *See*, *e.g.*, Z. Prince Private Securities Contract.

[263]    *Id*. at Schedule B.

[264]    *See*,  *e.g.*,  https://www.bloomberg.com/news/articles/2022-06-07/blockfi-looks-to-raise-new-cash-at-reduced-1-billion-valuation (last visited 1/23/23)

to these reports, ███████████ began to contact members of BlockFi's management asking questions about BlockFi's fundraising.

███████████████ requested an update call with Tony Lauro (BlockFi's Chief Financial Officer) on or around June 10, 2022. When Lauro joined the call, he was surprised to find that Harman was joined by ████████████████████, who Mr. Lauro had not interacted with previously. After Lauro provided an update on the funding round, ████ began accusing *BlockFi* of misleading ███████████ in connection with the transactions they had entered into with BlockFi's executives. ████ threatened to sue BlockFi if there was no resolution. Lauro explained that ███████████ had not been misled, and that BlockFi had provided them with accurate information—the same information internally available to BlockFi at the time. Lauro also explained that BlockFi's funding difficulties were a result of the broader crypto market pullback. But ████ was unrelenting. After approximately 20 minutes, Lauro ended the call and informed other members of the executive team about ██████ threats.

Following that call, representatives of ████ reached out to Prince and Marquez. When they connected, ████ raised some of these same issues around the transactions that had closed and discussed the structure of a potential resolution. Coming out of that call, ████ sent a proposal to resolve the dispute that would require certain of the BlockFi employees to contribute additional shares and cash to bring those transactions more into compliance with what ████████████ said were their expectations.[265] BlockFi did not respond to that initial proposal for several weeks, as the BlockFi team (described in detail above) was focused on finding a transaction partner to help calm the market through a liquidity support transaction.

---

[265]    Jun. 22, 2022 ████████ Email to F. Marquez, T. Lauro, and Z. Prince (BF_BK_00134792) (attaching initial proposal).

2.    **July 2022: FTX Deal Executed; Board Approval of ▮▮▮▮▮▮▮▮ Settlement Negotiation and Execution**

As ▮▮▮▮▮▮▮▮ were making their initial threats, BlockFi's senior executives were working to try and identify a transaction partner in light of ongoing market conditions.  Ultimately, after intensive negotiations in the second half of June, the company closed the FTX Transaction.  But the FTX Transaction and the Purchase Option included in it had a devastating impact on the company's common equity holders.  As the FTX Transaction gave FTX the ability to purchase the equity of the BlockFi for an amount capped at $240 million (which would be paid only to preferred shareholders), and the transaction was widely expected to close with FTX acquiring BlockFi, the equity held by BlockFi's common shareholders was rendered effectively worthless.  This caused massive losses for BlockFi executives.  But it also rendered effectively worthless the shares being held for the benefit of ▮▮▮▮ as a result of the ▮▮▮▮ transactions.

After the FTX deal was closed and approved by BlockFi's shareholders, BlockFi turned its attention back to threats and claims being asserted by ▮▮▮▮.  All parties, including the Board of Directors, quickly determined that they wished to resolve the claims asserted by ▮▮▮▮.  FTX was ultimately supportive of resolving the dispute to avoid the cost of the potential litigation and negative attention.

The decision to settle with ▮▮▮▮▮▮▮▮ appears to have been made largely independent of the *legal* strength of the potential claims against BlockFi.  But in addition to avoiding the cost of litigation, BlockFi's Board saw benefit from the settlement in avoiding the negative press that they believed would be associated with such a suit at that time.  Given that the FTX deal was, in large part, designed to allow BlockFi to cement customer trust in turbulent market times, the value from that deal could be imperiled by a simultaneous lawsuit claiming that BlockFi had defrauded ▮▮▮▮—even though the allegations had no merit.

Accordingly, management recommended that the Board provide approval to settle the ███████████ dispute for an amount up to $30 million, with the understanding that management would attempt to negotiate that number down.[266]  The Board unanimously approved that potential settlement on July 13, 2022.[267]  Accordingly, on July 13, 2022, the Board executed written consent with respect to a number of issues, including approval of the ██████ settlements up to $30,000,000.  FTX's Board Observer Ramnik Arora ultimately had the same perspective and approved the expenditure.

On July 12, 2022, Prince had reached out to ████████████ asking for a time to discuss the issues.[268]  During that call, Prince, ██████████████████████ discussed potential resolution structures; when ██████ initially reached out in June, they proposed a revised structure that would have the individuals provide some additional shares and return some amount of cash to right-size the loans.  Given the FTX Transaction had rendered those additional shares largely worthless, that proposed settlement structure was no longer feasible.  Following that call, Harman provided a proposed revised settlement structure via email; in essence, this structure would have six of the individuals that transacted with ██████ (not Adam Healy) return to ███████ an amount equal to the liquidity received from the transactions (netting out fees and taxes).[269]  This resulted in a proposed payment to ██████ of approximately $7.4 million, as calculated below.

---

[266]    Jul. 10, 2022 Board Materials (BF_BK_00133416; BF_BK_00133418; BF_BK_00133419); J. Hill Interview.

[267]    Jul. 13, 2022 Board Consents (BF_BK_00134801).

[268]    Jul. 12, 2022 Z. Prince Email to ██████ (BF_BK_00132142).

[269]    Jul. 15, 2022 ██████ Email to Z. Prince (BF_BK_00074416).

| Client | Advance Amount | Origination Fee | Exercise Amount | Total Tax Amount | Liquidity to Individual |
|---|---|---|---|---|---|
| Zac Prince | $3,000,000 | $94,500 | - | - | $2,905,500 |
| Flori Marquez | $3,176,000 | $163,300 | $74,843 | $1,000,780 | $1,937,078 |
| Tony Lauro | $3,000,000 | $154,500 | $476,800 | $1,147,907 | $1,220,793 |
| David Spack | $2,384,000 | $123,700 | $186,919 | $1,072,786 | $1,000,595 |
| Robert Loban | $431,000 | $26,050 | $134,931 | $51,309 | $218,710 |
| Dylan Stigliano | $261,000 | $17,550 | $98,627 | $1,871 | $142,952 |
| **Total** | **$12,252,000** | **$579,600** | **$972,119** | **$3,274,653** | **$7,425,628** |

BlockFi did not respond to ███████ settlement offer until August 3, 2022; BlockFi proposed reducing the payment to ███████ from $7.4 million to $4 million.[270] ███████ swiftly rejected the counter and clearly indicated it would not be negotiating down from the $7.4 million. Following that call, the business deal between ███████ and BlockFi was largely agreed to, and it did not end up changing from ███████'s initial $7.4 million proposal.

The parties did spend several weeks negotiating the language that would be included in the settlement agreement, including the scope of the release that would be included. Ultimately, the parties executed a settlement agreement (the "Release Agreement") on August 23, 2022. That agreement laid out the payments that would be made to ███████ by each individual (matching the amounts provided in ███████ proposal).[271] The Release Agreement also contained releases. Each of the Individuals, ███████ were "Releasing Parties" under the Agreement, which provided that each Releasing Party was releasing all claims against all "Released Parties." BlockFi was not a Releasing Party, but was a Released Party.[272] That is, BlockFi received a release from all other parties to the Release Agreement but did not provide a release.

---

[270]    Aug. 3, 2022 Z. Prince Email to ███████ (BF_BK_00074400).

[271]    Release Agreement at Schedule 1.

[272]    Release Agreement at Section I.A & I.B.

3.    **August 2022:** ███ **Payments**

After signing the Release Agreement, BlockFi funded payments to the affected individuals

so that they could make the payments to ███.  In addition to providing the amounts to be

paid to ███, BlockFi also paid additional amounts to the individuals to "gross up" for taxes;

these additional amounts were not actually transmitted to the individuals but were withheld as

taxes.  The payments were made to the individuals on August 25, 2022,[273] and routed to ███

The "gross ups" were paid to the government.   The concept of the transactions was that the

individuals would not keep any of the funds paid to them in August 2022 as those funds would

either go to ███ or the government.  That appears to be what happened.[274]

The precise amounts paid to each individual are listed below:

| Individual | Gross Payment | Net Payment (after Taxes) |
|---|---|---|
| Tony Lauro | $2,191,335.49 | $1,463,051.30 |
| Rob Loban | $462,545.47 | $276,139.65 |
| Flori Marquez | $4,096,688.10 | $2,136,860.16 |
| Zac Prince | $6,144,784.71 | $3,003,300.46 |
| David Spack | $2,116,138.65 | $1,042,888.77 |
| Dylan Stigliano | $302.326.37 | $121,837.52 |
| *Total* | $15,011,492.42 | $8,044,077.86[275] |

---

[273]    *See* Payroll Register.

[274]    We understand from individual counsel to the management team and BlockFi finance that the tax calculations done at the time were imprecise and that the affected individuals have *additional* tax exposure which they are working through with their individual tax advisors, and that instead of breaking even on the August 2022 transaction, they may have to come out of pocket.  This might create claims by the individuals against BlockFi, but any such claims are waived and/or subordinated in the proposed settlement.

[275]    The net amounts paid to individuals were slightly higher than the amounts to be paid to ███.  This occurred because of the process used to determine the amount that may be due in taxes.  In the ordinary course, BlockFi would determine the total gross or net amount it wished to pay to an individual, and its payroll processor would withhold the amount of taxes determined based on prior payments to the individual.  Here, Lauro (then CFO) separately calculated the amount of potential taxes due on the payments to the individuals if the highest marginal tax rate applied; he then used that amount (*i.e.*, the payment to ███ plus the highest possible tax due) to establish the total gross amount that would be paid.  That gross amount was communicated to BlockFi's payroll processor, who then ran that number through its normal process, which resulted in lower tax withholdings than calculated by Lauro given Lauro's assumptions.  That lower tax withholding resulted in slightly higher net amounts paid to the individuals than was due ███.  Ultimately, even with this increased amount of gross up for withholding purposes, it appears that several individuals who made the settlement payments faced an increased tax liability over and above the withheld amounts.

Our understanding is that the payments were made through the individuals based on an accounting and tax rationale.  Since ██████ would be "booking" these payments as offsetting loans received (to avoid the payments being recorded as income), the IRS would link them to the loans and expect BlockFi to have withheld taxes.  Accordingly, if BlockFi had not treated the transactions in this manner, it may have faced IRS fines and penalties.  Even if the payments were made directly from BlockFi to ██████ and the Release Agreement only referenced claims against BlockFi, the tie to the individual transactions may still cause the IRS to ultimately view the payments as requiring withholding.  And particularly given the timing following the FTX transaction and while BlockFi was pursuing its S-1, BlockFi was sensitive to taking any steps that could draw conflict with the IRS.

The payments (net of taxes) were ultimately made to the individuals' personal accounts, and they then wired the proper amount of funds to ██████  The tax treatments for the individuals arising from this transaction remains, to some extent, still uncertain.  Those issues have not yet come to a head, as they will have to be dealt with in each individual's 2022 tax returns (due in April or October of 2023, depending on whether those individuals have filed extensions).  Thus, it is possible that, depending on an individual's other tax circumstances, the gross-up payments made to the individuals as part of the payment for the settlements could exceed (or be less than) the amount of taxes actually due on the payments.  We understand that the IRS prescribes the amount of tax withholding required (which is how the settlement payments to the individuals were treated), so there was not much the company could do other than provide the gross up in the amount prescribed by those IRS rules.

**D.**     **Zac Prince's April 2022 Withdrawal**

In April 2022, Zac Prince withdrew approximately $9.7 million from his holdings on the BlockFi platform.[276]  Prince withdrew these funds to pay U.S. federal and state taxes, including taxes associated with his participation in the Series D tender offer from the previous tax year.[277]

Separately, Prince also withdrew approximately $600,000 from the platform in August of 2022.[278]  No withdrawals followed.  As of the bankruptcy filing, he had in excess of $1 million in cryptocurrency on the BlockFi platform.[279]

### E.    Retention Payments to Insiders Following FTX Transaction

After the FTX deal closed, the Board and management discussed the need to focus on employee retention.  As discussed above, the FTX Transaction effectively wiped out the equity value of BlockFi.  Prior to that time, the executives and employees at BlockFi had received substantial compensation in the form of equity options; the FTX Transaction effectively wiped out that upside as a form of compensation for those individuals.  The BlockFi managers and Board thus turned their attention to how to modify their compensation approach in order to ensure they retained the executives and employees needed to manage the business.

BlockFi's directors understood the need to retain employees.  Using examples from their past where, for example, management teams they had worked with had lost their equity due to market contagion and promptly quit for other opportunities, they emphasized the need to make real payments to retain key people.  There was no other reason for the employees to stay given the wipe-out of their own equity, opportunities elsewhere, and the massive amount of work that they had done in June and July and anticipated doing to close the FTX acquisition.

---

[276]    SOFA, part 2, question 4.

[277]    Global Notes, Docket No. 242, at 20 & n.9.

[278]    SOFA, part 2, question 4.

[279]    Global Notes, Docket No. 242, at 20.

Following approval of the FTX Transaction, the Board also considered, in addition to the ███ settlement, (1) dealing with other share financing reimbursement costs, (2) addressing the general employee population, and (3) addressing executive and board compensation changes.[280]

With respect to the share financing reimbursement, certain employees had spent cash to pay the strike price on the options they exercised.  As of July 1, 2022, that amount (excluding certain executives who were handled separately) was approximately $299,085.  Management recommended, and the Board approved, a proposal to make payments to employees equal to the amount they spent to exercise their options, plus a gross up for taxes.[281]  Two executives, Andrew Tam and Jonathan Mayers, were dealt with separately.  Tam received a payment of $2.2 million reflecting, among other things, the option exercise cost, AMT liability, and retention.[282]  Finally, Mayers had engaged in a bespoke and complex transaction, among other reasons, to permit BlockFi to comply with Sarbanes-Oxley regulations in connection with a potential IPO.[283]  Mayers received a payment of $4 million, in part, to allow him to unwind that transaction.[284]

The next issue addressed was the general employee population.  The company split those employees into three sets: "Gen Pop," "Rockstars," and others.  For Gen Pop, the individuals were eligible for a 10% increase in base salary, plus a 30% bonus payable on January 31, 2023 (a portion would be paid if the employee remain employed, and the remainder would be paid if certain performance metrics were satisfied).[285]  Rockstars were eligible for a 25% increase in base salary,

---

[280]    Jul. 8, 2022 Board Presentation (BF_BK_00133419).

[281]    *Id*. at slide 4.

[282]    *Id*.

[283]    Mayers had received a loan to acquire certain shares from the company, but when the company considered an IPO, Mayers had to pay back the loan to comply with SOX so that BlockFi could consider going public (and the shares had become worthless).

[284]    Jul. 8, 2022 Board Presentation  at Slide 4 (BF_BK_00133419).

[285]    *Id*. at slide 8.

and a 20% bonus payable on January 31, 2023 (a portion would be paid if the employee remain employed, and the remainder would be paid if certain performance metrics were satisfied). The employees in the "other" category were eligible for a voluntary separation plan. Under that plan, employees who agreed to leave the company would receive 3 months' pay.[286] Employees in the Gen Pop and Rockstar groups were not eligible to participate in the voluntary separation plan.

With respect to Executives (a group that included 13 individuals at the time of the presentation), the plan proposed a 20% increase in base salary, with a possibility for 50% bonus every six months subject to performance metrics.[287] The presentation also recognized that "bespoke" negotiations with individual executives may be required. In addition to those general changes to executive compensation, management also recommended to the Board that retention payments be made to three others–Amit Cheela, Alice Liou, and Laura Cooper. Cheela and Cooper received $2 million each, and Liou received $1 million.[288] Although the Board described these as being for retention purposes, they did not include any formal contractual requirements that the individuals remain at BlockFi for any specific amount of time. Liou and Cheela remain employed by BlockFi; Cooper was asked to leave BlockFi (and did so) in October 2022.

The Board unanimously approved all of these payments. From Hill's perspective, retention of employees was a key issue at this point for the company (to drive the value of the company in advance of a potential purchase by FTX), and all of these payments were deemed reasonable.

## VI.    NOVEMBER CONTINGENCY PLANNING

As described above, on November 8, 2022, FTX froze its platform, and the price of FTT declined drastically. This had an immediate and severe impact on BlockFi's business given that

---

[286]    *Id*. at slide 11.

[287]    *Id*. at slide 8.

[288]    Jul. 13, 2022 Board Consents (BF_BK_00134801).

FTX was its source of capital, it served as a lender to Alameda (with a lot of FTT serving as collateral for its loans), and BlockFi had significant assets on FTX's platform.  Given the uncertainty regarding FTX, BlockFi thus began a process of contingency planning.  This process included engaging restructuring advisors and later (1) increasing the amount of D&O Insurance coverage carried, and (2) liquidating a portion of the crypto it held for dollars.

## A.    D&O Insurance

On November 10, 2022, BlockFi's Board of Directors held a special meeting to discuss pausing BlockFi's product capabilities on its platform, and related matters.[289]  During that meeting, the Board also discussed insurance coverage for BlockFi's directors and officers.  The independent members of BlockFi's Board of Directors (Jennifer Hill and Tony Lauro) expressed a view that the company needed to evaluate their current D&O Insurance and consider obtaining additional coverage, and that need was also discussed by BlockFi's legal and other advisors.[290]  The Board and its advisors believed that this additional coverage was necessary both to ensure the continued service of the existing board members, and also to ensure the Board was able to retain additional independent directors that would likely be necessary in the the case of a restructuring transaction.  Ms. Hill specifically advised that she would not be willing to stay unless the level of D&O Insurance was materially increased.[291]

Following that meeting, David Spack (BlockFi's Chief Compliance Officer) reached out to BlockFi's insurance broker James Knox (Aon Risk Solutions) to obtain a tail to BlockFi's existing D&O policy worth $2 million.[292]  Spack was told that the cost for procuring the tail would

---

[289]    Nov. 10, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011959; BF_BK_00011962)

[290]    Apr. 4, 2023 Z. Prince Dep. Tr. at 250:11–20.

[291]    Apr. 26, 2023 J. Hill Dep. Tr. at 106:17-107:16.

[292]    SPACK_DAVID-00000456

would be 400% of BlockFi's extension premium of $350,000—$1.4 million in total for a six-year runoff.[293]  Knox advised Spack that the runoff would not cover "any new wrongful acts that occur after you incept the runoff cover."[294]

On the morning of November 11, 2022, the Board held a special meeting to discuss various issues, including D&O insurance.[295]  During the meeting, the Board directed BlockFi management "to discuss with, and receive bids from, insurance brokers on additional D&O insurance coverage, including tail insurance."[296]  Following that meeting, Spack reached out to Knox asking him to inquire whether RELM had an appetite to provide additional D&O coverage on top of the existing $2 million.[297]  Ahmed Nagib (Aon Risk Solutions) responded to Spack indicating that RELM was open to the idea of providing additional coverage but wanted to have a conversation about it.

On the evening of November 11, 2022, the Board held another meeting, again discussing the D&O insurance and other issues.[298]  During that meeting, Spack provided an update on the status of ongoing discussions regarding additional D&O insurance and anticipated that he would be able to provide a pricing update early the next week.

On November 13, 2022, Joseph Ziolkowski (CEO, RELM) emailed Knox regarding coverage for BlockFi.[299]  Ziolkowski advised Knox that RELM's underwriting committee "pushed back immediately on the proposed approach citing concerns about the negative perceptions (at

---

[293]    SPACK_DAVID-000001523

[294]    *Id.*

[295]    Nov. 11, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 9:30 AM EST (BF_BK_00011965).

[296]    *Id.*

[297]    SPACK_DAVID-00001515

[298]    Nov. 11, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 5:30 PM EST (BF_BK_00011968).

[299]    MAYERS_JONATHAN-00002169

best) of working with Blockfi to transfer company assets in advance of a likely insolvency."

Ziolkowski stated that he was not sure there was a path forward unless BlockFi had legal support

for the move.[300]  On November 14, 2022, in light of RELM's pushback and after an additional

discussion with RELM, Spack emailed Knox telling him to ask RELM to put together a formal

proposal for a fully funded $10 million in additional coverage.[301]  Spack agreed that it was his

initial impression that RELM was only willing to consider a proposal for fully funded coverage.

Knox responded stating he would push RELM but, "[m]y sense is with the 'Burning building'

analogy, that is all they will do."[302]

On November 15, 2022, Knox shared with Ziolkowski (RELM) an analysis from Haynes

and Boone regarding BlockFi obtaining D&O insurance immediately prior to filing for

bankruptcy.[303] Knox advised Spack that RELM was speaking with their board about the self-

funded D&O policy and would get back to them.[304]  Later that day, RELM informed Knox that it

would not agree to the self-funded D&O policy.

On November 15 and 16, 2022, Spack had calls with Proof Insurance,[305] Axa XL,[306]

Sompo,[307] and others regarding potential D&O insurance coverage. As a result of these calls,

BlockFi received a number of proposals for additional insurance coverage, including additional

coverage of up to $30 million in additional coverage.[308]

---

[300]    *Id*.

[301]    SPACK_DAVID-00000234

[302]    *Id*.

[303]    MAYERS_JONATHAN-00001861

[304]    SPACK_DAVID-00000025

[305]    CHEELA_AMIT-00013087

[306]    CHEELA_AMIT-00013060

[307]    LOBAN_ROB-00090999

[308]    Mar. 17, 2023 D. Spack Dep. Tr. at 122:1–9.

On November 17, 2022, the Board of Directors held a special meeting to discuss various issues, including D&O insurance.[309]  Spack provided an update on the efforts to obtain additional D&O coverage.  Per the minutes, "the Board then weighed the benefits of an additional D&O insurance policy, including that it would be difficult to find independent directors to join the Board or the boards of the Company's subsidiaries without such coverage in place, against the impact of the premium payment to the Company's liquidity."[310]  After additional discussion, the Board approved the additional D&O insurance in the amount of $30 million.[311]

On November 18, 2022, James Knox emailed Thorne, Cheela, Spack, and others from Aon Risk Management, a copy of the excess D&O insurance coverage obtained.[312]  The total premium offered for that coverage was $22.5 million.[313]

## B.  Liquidation of Cryptocurrency

As of mid-November, BlockFi held approximately $180 million worth of cryptocurrency that was not part of any Wallet accounts.[314]  One of the options the Board considered was liquidating that crypto currency into USD.  The Board saw several potential benefits in this path. **First**, the Board believed (based on consultations with their advisors) that in a bankruptcy case, the claims of clients would likely be dollarized as of the Petition Date.  That is, if a client had two BTC in a BIA account, the amount of that client's claim would be equal to two times the market price of BTC as of the Petition Date, and even if the BTC price decreased during the course of the

---

[309]  Nov. 17, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 5:30 PM EST (BF_BK_00011988).

[310]  *Id.*

[311]  *Id*.

[312]  CHEELA_AMIT-01059042

[313]  Mar. 17, 2023 D. Spack Dep. Tr. at 122:10–18.

[314]  Nov. 16, 2022 Minutes of a Special Meeting of the Board of BlockFi Inc. at § 3 (BF_BK_00011984).

bankruptcy, the amount of claim would remain fixed at the dollar value as of the Petition Date.
The Board believed that liquidating the crypto it held would just ensure that its ability to pay its
clients' claims would not be impacted by fluctuations in crypto prices during the bankruptcy case.

**Second**, the Board believed that liquidating the crypto would allow BlockFi to fund a
bankruptcy proceeding with its own cash, rather than having to seek DIP financing. The Board
believed this would serve to maximize recoveries for its clients, as it would avoid layering senior
debt ahead of customers and avoid the substantial fees that any DIP loan would require.[315]

In addition, November 2022 was another moment of reflection for the crypto sector more
generally. Following the contagion caused by the collapse of Luna, Celsius's shutting its doors,
the 3AC collapse, and the Voyager and Celsius bankruptcy filings, there had been a several month
period of stability. That relative calm was then followed by the historic, sudden, and unforeseen
collapse of Alameda and FTX on charges of massive fraud. Many were concerned about the crypto
market more generally and believed liquidating crypto to cash was prudent to manage risk.[316]

Based on these considerations and others, the Board unanimously approved "the
liquidation of cryptocurrency held by the Company and BlockFi Lending LLC (excluding BlockFi
Wallet assets) on November 16."[317] The Board reaffirmed its decision the following day.[318]

Over the course of the next several days, the Board received updates on BlockFi's efforts
to liquidate that collateral without unduly impacting the price of the crypto being sold.[319] As a

---

[315] *Id.*

[316] *E.g.*, Apr. 11, 2023 F. Marquez Dep. Tr. at 207:13–210:4.

[317] *Id.*; *see also* Nov. 16, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 3 (BF_BK_00011984).

[318] Nov. 17, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 4 (BF_BK_00011988 BF_BK_00011991).

[319] Nov. 18, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 6 (BF_BK_00011991).

result of this liquidation, in combination with the repayment of loans by certain institutional

borrowers, BlockFi had sufficient cash on hand to forego any need for DIP Financing.[320]

## WHY DID BLOCKFI REALLY FAIL?

The UCC Report purports to answer the question "Why Did BlockFi Fail?"[321]  But in a

nearly 100-page advocacy piece, the UCC devotes nearly *zero* space to the ***actual*** events that

caused BlockFi to fail.  There can really be no dispute that the FTX/Alameda fraud was the direct

and proximate cause of BlockFi's failure.  Fraud is difficult to uncover,[322] and if FTX and Alameda

had been anything other than the colossal frauds they turned out to be, BlockFi would not have

failed.  If FTX were a real exchange that honored its own terms and conditions, BlockFi would not

have failed.   And if Alameda were a legitimate company that provided truthful disclosures,

BlockFi either not have lent to it in the first place, or would not suffer material losses from the

loans.  These propositions are clear; the UCC's decision to ignore them is puzzling.

Instead, the UCC focuses extensive amount of attention on transactions that had little if

anything to do with BlockFi's bankruptcy filing.  BlockFi's GBTC-related losses were incurred in

spring and summer 2021.  BlockFi's transactions with 3AC and 3AC-related losses were disclosed

publicly in June and July 2022.[323]  BlockFi's transaction with FTX, and likely future merger with

---

[320]    Nov. 20, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 5 (BF_BK_00011995) (noting that BlockFi forecasted to "have approximately $200 million in cash by the end of week 14 and therefore there would be no need for debtor-in-possession-financing in the event of a potential bankruptcy").

[321]    UCC Report at 1.

[322]    FTX and Alameda even defrauded their own lawyers (Sullivan & Cromwell) given Sullivan's representations in November 2022 that FTX had a bottomless sea of cryptocurrency and was in no distress whatsoever.  *See, e.g., Declaration of Joseph B. Evans in Support of the Objection of the Official Committee of Unsecured Creditors to Proofs of Claim Nos. 11206, 11209, and 11213* at Ex. 13, In re: Voyager Digital Holdings, Inc., No. 22-10953, Dkt No. 937 (February 1, 2023).   Several FTX and Alameda executives have since pled guilty to fraud, including defrauding lenders (like BlockFi).

[323]    *E.g., Crypto Hedge Fund Three Arrows Files for US Bankruptcy,* (July 2, 2022) https://www.ft.com/content/8e4538cc-e8c5-4cc2-9448-053074f72f67.

FTX, was fully disclosed by July 1, 2022.[324]  The parties' likely near-term combination was widely

covered in the press.[325]  And the UCC focuses an immense amount of its Report on potential loans

to Alameda evaluated in 2021 and January 2022.[326]  Many of those loans were either not made or

made only after material improvements to their terms but, in any event, all such loans that were

actually made were paid back in full, with interest, to BlockFi prior to August 2022.

At any point through early November 2022, any BlockFi client could have withdrawn from

the platform.  And many did, with BlockFi processing withdrawals of cryptocurrency worth

billions consistent with (usually ahead of) the requirements of BlockFi's terms of service.

Accordingly, although the UCC spends a lot of time discussing the 3AC and GBTC transactions,

they categorically did not cause (or have any material relationship to) BlockFi's bankruptcy.  Nor

did any of the loans made to Alameda prior to July 2022.  BlockFi filed for chapter 11 protection

because Alameda absconded with funds lent to it after July 2022, and BlockFi was unable to

immediately access the collateral that was posted in the ED&F Man/Marex account; at the same

time, FTX, an exchange custodying many BlockFi assets, ceased processing client withdrawals

and simultaneously declined to grant access to capital it was contractually obligated to provide.

That is why BlockFi is in bankruptcy.  As described above, BlockFi intends to pursue relief against

Alameda, FTX, and related parties to maximize creditor recoveries because, if Alameda and FTX

were not frauds, BlockFi would not be in bankruptcy and would be in a position to repay all of its

creditors.

---

[324]    *FTX Signs Deal with Option to Buy BlockFi for Up to $240 mln*, (July 1, 2022),
https://www.reuters.com/markets/us/ftx-signs-deal-with-option-buy-blockfi-up-240-mln-2022-07-01/

[325]    *E.g.*, *id.*; *FTX Reaches Deal to Acquire BlockFi for up to $240M*, (July 1, 2022)
https://blockworks.co/news/ftx-reaches-deal-to-acquire-blockfi-for-up-to-240m.

[326]    UCC Report 8-10, 54-73, 77-80.

<u>**ANALYSIS OF POTENTIAL LEGAL CLAIMS**</u>

**I.    BREACH OF FIDUCIARY DUTY**

This section provides an overview of (1) the law that courts will apply in assessing fiduciary breach claims, (2) the elements of a fiduciary breach claim, and (3) application of the business judgment rule.

**A.    Legal Overview**

**1.    Choice of Law**

In evaluating claims that the officers or directors of a company breached their fiduciary duties, courts apply the law of the company's state of incorporation or registration. *See e.g.*, *In re Magnesium Corp. of Am.*, 399 B.R. 722, 742 (Bankr. S.D.N.Y. 2009). BlockFi Inc. is a Delaware corporation, BlockFi Trading LLC is a Delaware limited liability company, and BlockFi Lending LLC is a Delaware limited liability company. Accordingly, Delaware law controls claims by those entities. But the *vast* majority of the loans made to Alameda were made by BlockFi International, a Bermuda Limited Company. Bermuda law likely controls claims against BlockFi insiders challenging the loans made by BlockFi International to Alameda (which, as described above, are the primary current delta between customers recovering 96% or less than that sum).

**2.    Elements of a Fiduciary Breach Claim**

Delaware imposes two primary fiduciary duties on corporate directors: a duty of care and a duty of loyalty. *See*, *e.g.*, *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 745 (Del. Ch. 2005) *aff'd,* 906 A.2d 27 (Del. 2006). Delaware law requires that fiduciaries perform their duties in good faith. *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006).

Directors and officers of a company ordinarily owe fiduciary obligations to the company's shareholders. *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 400

(S.D.N.Y. 2013).   "Insolvency, however, changes the scope of a director's duties, and upon

insolvency directors owe fiduciary duties to creditors or, stated differently, to the corporation and

to all of its interested constituencies, including creditors and shareholders." *RSL Commc'ns PLC

ex rel. Jervis v. Bildirici*, No. 04-CV-5217 (KMK), 2006 WL 2689869, at *8 (S.D.N.Y. Sept. 14,

2006) (applying Delaware law) (citation omitted).   Thus, in an insolvent company, "a board of

directors is not merely the agent of the residual risk bearers, but owes its duty to the corporate

enterprise."   *Credit Lyonnais Bank Nederland, NV v. Pathe Comms. Corp.*, No. Civ. A. 12150,

1991 WL 277613, at *34 (Del. Ch. Dec. 30, 1991).   But upon insolvency, fiduciary obligations are

not owed specifically or exclusively to creditor groups.   Rather, the duties are owed to the

corporation, to maximize value for all claimants:

> It remains true that insolvency "marks a shift in Delaware law," but that
> shift does not refer to an actual shift of duties to creditors (duties do not
> shift to creditors).   Instead, the shift refers primarily to standing: upon a
> corporation's insolvency, its creditors gain standing to bring derivative
> actions for breach of fiduciary duty, something they may not do if the
> corporation is solvent, even if it is in the zone of insolvency. . . .   The
> fiduciary duties that creditors gain derivative standing to enforce are not
> special duties to creditors, but rather the fiduciary duties that directors owe
> to the corporation to ***maximize its value for the benefit of all residual
> claimants.***

*Quadrant Structured Prods. Co. Ltd. v. Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (emphasis

added), *reconsideration denied sub nom.* No. CIV.A. 6990-VCL, 2014 WL 5465535 (Del. Ch.

Oct. 28, 2014).   Moreover, there is no fiduciary duty for a director of an insolvent company to "do

what [is] best for a particular *class* of ... creditors."   *Shandler v. DLJ Merch. Banking, Inc.*, No.

Civ. A. 4797-VCS, 2010 WL 2929654, at *14 (Del. Ch. July 26, 2010).   Rather, directors and

officers should focus always on what they believe "would maximize [the company's] value," *id.*

and "best serves th[e] entire corporate enterprise rather than any single group interested in the

corporation[.]"   *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992).

### 3.    The Business Judgment Rule

Delaware courts apply the "business judgment rule," which generally protects from court scrutiny decisions that corporate directors and officers make as fiduciaries.  Under the business judgment rule there exists a presumption that "in making a business decision" corporate decision-makers "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367–68 n.36 (Del. 1993), *decision modified on other grounds*, 636 A.2d 956 (Del. 1994); *see also In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 at 52.  In other words, the rule establishes a presumption that the directors and officers complied with their fiduciary duties.  *Cede & Co.*, 634 A.2d. at 361; *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Orman v. Cullman*, 794 A.2d 5, 19-20 (Del. Ch. 2002).

The rule exists so that "courts will not second-guess these business judgments."  *Cede & Co.*, 634 A.2d at 361.  Courts have explained the rationale behind the presumption as follows:

> [T]he business judgment doctrine, at least in part, is grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments.... [B]y definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility. Thus, absent evidence of bad faith or fraud, ... the courts must and properly should respect their determinations.

*Auerbach v. Bennett*, 47 N.Y.2d 619, 630-31 (N.Y. 1979).  Unless the business judgment rule is found inapplicable, corporate officers and directors cannot be held liable for decisions that led to bad results, regardless of how bad the results actually were.  *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 958 (Del. 1985).

The business judgment rule applies with equal force where a company is insolvent.  As the Delaware Chancery Court has explained:

> The incantation of the word insolvency, or even more amorphously, the

> words zone of insolvency should not declare open season on corporate
> fiduciaries. Directors are expected to seek profit for stockholders even at
> risk of failure. With the prospect of profit often comes the potential for
> defeat.... Even when the firm is insolvent, directors are free to pursue value
> maximizing strategies, while recognizing that the firm's creditors have
> become its residual claimants and the advancement of their best interests
> has become the firm's principal objective.

*Trenwick Am. Litig. Tr. v. Ernst & Young, LLP*, 906 A.2d 168, 174-75 (Del. Ch. 2006), *aff'd sub.*

*nom. Trenwick Am. Litig. Tr. v. Billett*, 93 l A.2d 438 (Del. 2007).

In Delaware, the plaintiff bears the burden of rebutting the business judgment rule by

pleading and proving by a preponderance of the evidence that the decision-makers failed to

exercise due care or were materially conflicted in making the challenged decision.  *See, e.g.,*

*Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009).  That burden is extremely high, and cases

successfully demonstrating violations of the duty of care are rare, even when the transactions at

issue turn out badly or can be questioned in hindsight.  That is particularly so where, as here, the

management team and board did not personally benefit from the transactions challenged under the

duty of care.

Further, in Bermuda, the burden of proving a breach of care claim—particularly where, as

here, the company's "Bye-Laws" provide exculpation and indemnity—is even higher.  The

Bermuda courts have consistently stricken claims falling within the scope of a company's Bye-

Law indemnification provisions, and as we understand it, the only reported case to make it to trial:

(a) did so because the defendant did not raise a pretrial dismissal motion; and (b) ended with

judgment in favor of the director.  Per Bermuda counsel, a company cannot sue for damages on a

claim it is bound to indemnify the defendant against.[327]

---

[327] Applied here, this would render near impossible any claims by the company against officers, directors, or
employees based on the approximately $800 million (nearly 90%) of loans made to Alameda secured by FTT, as the
BlockFi International Bye Laws exculpate and provide indemnity for such claims.  *See* BlockFi International Bye
Laws 108-110.  It would also require BlockFi International to reimburse any of the defendants contemporaneously for

### 4.        Fiduciary Duties of Directors and Officers

This section provides an overview of the two primary fiduciary duties that Delaware imposes on corporate directors and officers — (1) the duty of care; and (2) the duty of loyalty.

### a.        The Duty of Care

The duty of due care obligates fiduciaries to "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available" in making business decisions. *In re Walt Disney*, 907 A.2d at 749. The business judgment rule "presume[es] that 'in making a business decision the directors of a corporation acted on an informed basis, [in good faith] and in the honest belief that the action taken was in the best interests of the company.'" *Id*. at 752 (citation omitted).

A "plaintiff may overcome the presumption that directors and officers acted on an informed basis by establishing that a decision was the product of an irrational process" or by showing that directors failed to establish an "information and reporting system reasonably designed" to provide the board with information material to their decision-making process. *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (applying Delaware law). But "[i]n reviewing a director's compliance with his duty of care, the court does not consider the content of the decision where the process employed was rational and used in a good faith attempt to promote corporate interests." *In re Trinsum Group, Inc.*, 466 B.R. 596, 609-610 (Bankr. S.D.N.Y. 2012).

Specifically, to overcome the business judgment rule on a duty of care claim, a plaintiff must show that the decision-makers "acted with gross negligence." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 651 (Del. Ch. 2008). Notably, "[t]he definition of gross negligence used in our corporate law jurisprudence is extremely stringent" for purposes of assessing such claims. *Id*.

---

their fees (i.e., to advance fees) during the course of any such proceedings, subject only to back-end rights to recoup such fees if the allegations are finally proven in a "final" judicial decision.

Thus, to show a duty of care violation, a plaintiff must plead and prove "a reckless indifference to or a deliberate disregard of" the interest of the corporations' constituents "or actions which are without the bounds of reason." *In re Trinsum Group*, 466 B.R. at 609 (internal quotation marks and citation omitted).  Illustrating the stringent standard for showing gross negligence, the Delaware Chancery Court has explained that, "[t]o state a claim for gross negligence, a complaint might allege, by way of example, that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation." *Trenwick Am. Litig. Tr.*, 906 A.2d at 194.

In evaluating a board's decision-making process, courts consider such factors as: the type and quality of the advice available to the directors in making the challenged decision, *see Sealy Mattress Co. v. Sealy, Inc.*, 532 A.2d 1324, 1337 (Del. Ch. 1987); and the extent of the directors' preparation for and participation in meetings evaluating the issue at hand, *see, e.g., Cede & Co.*, 634 A.2d at 371; *In re BHC Commc'ns, Inc. S'holder Litig.*, 789 A.2d 1, 11 (Del. Ch. 2001) (dismissing care claim where the facts demonstrated that the fiduciaries "hired expert financial and legal advisers" to assist in decision-making); *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304,318 (Del. Ch. 2009) *aff'd,* 981 A.2d 1173 (Del. 2009) (fiduciaries did not breach duty of care where, among other things, they "sought advice from [company] management"); *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1356 (Del. 1986) (directors satisfied duty of care where they received synopses of proposed plan before meeting, and evaluated proposal with sophisticated financial and legal advisors); *Einsenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1056 (Del. Ch. 1987) (no breach of duty of care where directors received 1.5 hour presentation by financial advisor without any written documentation).

In Delaware, a fiduciary must also exercise his duties in good faith in order to satisfy the duty of care. *See In re BH S & B Holdings LLC*, 420 B.R. 112, 147 (Bankr. S.D.N.Y. 2009) *aff'd as modified,* 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (applying Delaware law). Bad faith, however, is "not simply bad judgment or negligence, but rather it implies ***the conscious doing of a wrong because of dishonest purpose or moral obliquity***; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *Id*. at 147 (emphasis added).

As described above, BlockFi's Certificate of Incorporation includes a provision exculpating its directors from any monetary liability to the corporation or its stockholders arising out of a breach of fiduciary duty.[328]  Delaware enforces such exculpatory provisions that shield directors from liability for claims alleging breaches of the duty of care. *See United Food & Commer. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1050 (Del. 2021). These clauses do not eliminate or limit the liability of a director or officer, however, for (i) any breach of the duty of loyalty, (ii) any act or omission not in good faith or that involve intentional misconduct or a knowing violation of law, or (iii) "for any transaction from which the director or officer derived an improper personal benefit." *See* Del. Code. 8 § 102(b)(7). Delaware courts have stated in dicta that the purpose behind the inclusion of such exculpatory provisions in corporate charters is to "free[] up directors to take business risks without worrying about negligence lawsuits." *Malpiede v. Townson,* 780 A.2d 1075, 1095 (Del. 2001); *see also In re Cornerstone Therapeutics, Inc.*, 115 A.3d 1173, 1185 (Del. 2015).

Bankruptcy courts in the Third Circuit also enforce such exculpatory provisions. *See In re Midway Games Inc.*, 428 B.R. 303, 317 (Bankr. D. Del. 2010) (holding that even if the Committee

---

[328]      BF_BK_00009346.  BlockFi International's provisions, as described above, are even more protective.

had sufficient facts to form a plausible claim for breach of the duty of care, the directors were shielded from liability by an exculpation clause); *see also In re HH Liquidation, LLC*, 590 B.R. 211, 274 (Bankr. D. Del. 2018) (holding that an exculpatory clause immunized the managers for any claim for breach of the duty of care).  Indeed, the Delaware Bankruptcy Court has noted that litigation concerning alleged breaches of the duty of care is rare considering the widespread incorporation of exculpatory provisions in corporate charters.  *See In re Fedders N. Am., Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009).  The exculpation and related provisions would present substantial challenges for anyone attempting to seek relief from any insiders for BlockFi Inc.'s losses, and even greater challenges in seeking relief for BlockFi International's losses.

### b.        The Duty of Loyalty

Directors and officers also owe undivided and unqualified loyalty to the corporation. *Pepper v. Litton*, 308 U.S. 295 (1939).  They cannot personally profit at the expense of the corporation.  *BelCom, Inc. v. Robb*, No. Civ. A. 14663, 1998 WL 229527, at *3 (Del. Ch. Apr. 28, 1998), *aff'd,* 725 A.2d 443 (Del. 1999).  Thus, most duty of loyalty claims assert that the director or officer had a conflict of interest or acted out of self-interest in causing the company to enter into a transaction that benefited the fiduciary, rather than the company.  *See, e.g.*, *Cede & Co.*, 634 A.2d 345.  Courts have also recognized breach of duty of loyalty claims in narrow circumstances in which the director or officer failed to act in good faith.  *See, e.g.*, *Stone*, 911 A.2d at 370.  Each concept is addressed in turn below.

### i.        Conflict of Interest Standard

The baseline question for a duty-of-loyalty analysis is whether the director possessed a personal interest in the transaction.  Such an interest exists where the director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).  The plaintiff must demonstrate that the fiduciary was

on both sides of a transaction or that the fiduciary materially benefited from the transaction when the company did not. *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 563-64 (Bankr. D. Del. 2008); *see Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004). In order for a conflict to be sufficient to overcome the business judgment rule, the plaintiff must show the fiduciary had an "actual" conflict that created the basis for the fiduciary to act disloyally. *Cooke v. Oolie*, No. Civ. A. 11134, 2000 WL 710199, at *12 (Del. Ch. May 24, 2000). It is not enough to show that there was the potential for a conflict of interest, but rather the plaintiff must show that a particular action "in fact offered superior terms for [the director] and inferior terms for the plaintiff shareholders compared to the other proposals available." *Id*.

Further, it is not enough for a single director or even a subset of directors to be conflicted. Rather, a plaintiff must demonstrate "that a ***majority*** of a board that approved the transaction in dispute was interested and/or lacked independence" to defeat the business judgment rule. *Continuing Creditors' Comm. of Star Telecomms.*, 385 F. Supp. 2d at 460 (emphasis in original) (quoting *Orman,* 794 A.2d at 23); *Pallot v. Peltz*, 734 N.Y.S.2d 62, 62-63 (N.Y. App. Div. 2001) ("A determination of whether a board is properly disinterested at the time a transaction is voted on turns on whether the majority, not the minority, of the board participating in the vote was disinterested and independent.") (applying Delaware law).

A plaintiff, however, may avoid the business judgment rule by showing that an interested fiduciary "controls or dominates the board as a whole." *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 363 (Del. Ch. 2008) (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995)). This requirement is demanding: a plaintiff must present facts demonstrating that the self-interested directors have coercive powers over the other directors. *See Merchs. Nat'l Props., Inc. v. Meyerson*, No. CIV.A.13139, 2000 WL 1041229, at *5-6 (Del. Ch. July 24, 2000)

(plaintiff failed to present sufficient evidence that a self-interested director dominated or controlled independent directors even though he had a close personal friendship with several directors and had been responsible for one director becoming CEO).

A "controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (citing *Orman*, 794 A.2d at 25 n. 50).  A director is "controlled" if she is:

> beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.

*Id*. (denying summary judgment to directors on fiduciary breach claim based on evidence that interested director "was in a position to affect the[] livelihood" of independent directors).

### ii.    Failure to Act in Good Faith Standard

Under Delaware law, the fiduciary duty of loyalty "also encompasses cases where the fiduciary fails to act in good faith." *In re Bridgeport Holdings*, 388 B.R. at 564.  "Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith." *Stone*, 911 A.2d at 370; *Nagy v. Bistricer*, 770 A.2d 43, 48 (Del. Ch. 2000).

To hold a disinterested director or officer liable for breach of the duty of loyalty based on failure to act in good faith, a plaintiff must make a strong showing of misconduct. *In re Lear Corp. S'holder Litig.*, 967 A. 2d at 653.  Overcoming the business judgment rule on such a theory requires the plaintiff to demonstrate that a fiduciary consciously and intentionally disregarded her duties. *See KDW Restructuring & Liquidation Serv. LLC v. Greenfield*, 874 F. Supp. 2d 213, 222 (S.D.N.Y 2012).  A plaintiff must "show that the directors acted with scienter, *i.e.*, there was an

intentional dereliction of duty or a conscious disregard for their responsibilities, amounting to bad faith." *In re Trinsum Grp., Inc.*, 466 B.R. at 611 (citation omitted).

A showing of bad faith must be predicated on actions that are "qualitatively more culpable than gross negligence." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 66-67.  The Delaware Supreme Court has defined "bad faith" as "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993).  In other words, a plaintiff must show that a fiduciary's decision is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999).  Moreover, "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations." *Stone*, 911 A.2d at 370.  Thus, this standard is rarely satisfied, except under the most extreme circumstances.  *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) ("In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."); *cf. In re Tower Air*, 416 F.3d at 241 (denying a motion to dismiss duty of loyalty claim where defendants established and maintained "an unprofitable airline route for years solely to keep [the CEO's] daughter happy"); *Lyondell Chem.*, 970 A.2d at 244 (noting bad faith question was whether "directors utterly failed to attempt to obtain the best sale price," rather than whether the efforts they used to arrive at price were reasonable).

B.      **Potential Breach of Fiduciary Duty Claims Against Directors**

The evidence does not support a colorable claim that the directors violated their fiduciary duties with respect to the investigated transactions and that BlockFi and/or BlockFi International

suffered damages as a result of the breach.  Instead, the decisions regarding the investigated transactions are protected from court scrutiny by the business judgment rule.  *Cede & Co.*, 634 A.2d at 360; *Trenwick Am. Litig. Tr.*, 906 A.2d at 174-75.  There is no evidence that the directors failed to exercise due care, and the decision-makers were not materially conflicted in any of the transactions.  *See Gantler*, 965 A.2d at 706.

1.    **No Colorable Breach of Care Claim Exists Against the BlockFi Directors or Officers Arising Out BlockFi's GBTC, 3AC, or Alameda/FTX Transactions.**

There are no plausible, non-frivolous claims that could be brought against the BlockFi Board of Directors in their management of GBTC transactions, loans to 3AC, or dealings with Alameda/FTX.  For each of these transaction categories, BlockFi's Directors and Officers openly discussed them and analyzed the risks and rewards.  Because of these risk management practices, the limited losses suffered relative to BlockFi's peer firms cannot be labeled the consequence of "gross negligence" the business judgment rule requires.  *In re Lear*, 967 A.2d at 651.

a.    **GBTC**

The critical inquiry is whether the process adopted and utilized to enter the GBTC transactions was rational.  *In re Tower Air, Inc.*, 416 F.3d at 238; *In re Trinsum Group, Inc.*, 466 B.R. at 609-610.  It was.  Like other firms, BlockFi took advantage of the GBTC premium by contributing BTC holdings to GBTC and receiving shares of GBTC in return.  Once the six-month lock-up period was exhausted, BlockFi would sell the GBTC shares and use those proceeds to re-purchase the BTC, gaining the premium that GBTC had over BTC.

This investment strategy was monitored by BlockFi's directors and officers.  GBTC performance was reported to BlockFi leadership regularly—and decisions to invest were based on

reports of the institutional services team, risk team, and executives.[329] Because the decision to invest in GBTC was based on an informed decision-making process, and not an irrational or bad faith action of a director or officer, there is no viable claim that BlockFi leadership breached its duty of care. *See, e.g., In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 52 (finding that, because the board entered a transaction based on an informed reporting system and considered the pertinent information, the business judgment rule applied).

BlockFi leadership also acted with the requisite care in managing these transactions. Despite the UCC's use of quotation marks, BlockFi never believed the GBTC transactions were "risk-free"[330]; ***no financial transactions*** (even simultaneous arbitrage strategies) ***are risk free***. Indeed, BlockFi managed its investments with an awareness that the premium could flip, and generally used GBTC to diversify custodian risk against BTC itself.[331] Specifically, to limit BlockFi's exposure, and unlike more risk exposed hedge funds and trading firms, BlockFi did not increase leverage to engage in the GBTC trade; instead it made use of the BTC clients deposited into BIA—enabling BlockFi to break even at just a 2% premium.[332] BlockFi leadership also limited investments to no more than 5-20% of BlockFi's BTC holdings at a given time.[333] Moreover, to the extent BlockFi was exposed to GBTC risk through indirect investments (such as

---

[329] Apr. 4, 2023 Z. Prince Dep. Tr. at 108:1-13; 128:14-129:14.

[330] UCC Report at 44 (itself coining and then rebutting its own term "risk free"). The UCC suggests that BlockFi "sought indirect exposure to the GBTC strategy through its institutional clients." *Id.* at 45. But the UCC gets the timeline wrong. BlockFi was introduced to the GBTC strategy by certain sophisticated institutional clients (such as Susquehanna and Akuna) that were employing it with success; BlockFi then diligenced the strategy and took a position in it. The UCC presents its own hindsight analysis of the strategy (citing zero contemporaneous critics, *see* UCC Report 42-48), which is interesting as a hindsight analysis but irrelevant to whether BlockFi had a reasonable basis to make the investment in the first place. It did.

[331] BF_BK_00065394; BF_BK_00065434; Apr. 4, 2023 Z. Prince Dep. Tr. at 111:4-16.

[332] BF_BK_00065485; Apr. 4, 2023 Z. Prince Dep at 133-134.

[333] Apr. 4, 2023 Z. Prince Dep. Tr. at 112:8-19.

non-recourse loans), BlockFi would hedge against that risk by directly investing in BTC.[334]  There

is no precedent for a successful breach of care claim under these circumstances.

The GBTC premium unexpectedly flipped to a discount in late February 2021.  This

exposed BlockFi to approximately $200 million in unrealized losses based on its GBTC holdings

at that time.  But BlockFi's team took immediate strategic measures to try and unwind these

transactions in a way to minimize those losses.  Rather than attempting to unwind the entirety of

the GBTC position immediately, BlockFi considered a variety of potential avenues for exiting the

transactions (such as creating an SPV to offload GBTC holdings).[335]  BlockFi's Board was

presented analyses of exit strategies and provided feedback.[336]  Ultimately, BlockFi determined

that it would unwind its GBTC position over time.

None of this reflects an irritational decision-making process or insufficient reporting

system; BlockFi's analysis and monitoring of the GBTC position falls far shy of the requirement

that an officer demonstrate "a reckless indifference or deliberate disregard of the interests of the

corporations' constituents."  *In re Trinsum Group*, 466 B.R. at 609 (citation omitted).

### b.  3AC

BlockFi's management of 3AC is a far cry from gross negligence, and if anything reflects

the success of its risk management program.  Due to 3AC's then-stellar reputation on the global

stage, several crypto firms made substantial loans to 3AC backed by little, if any, collateral.[337]

---

[334] Presentation for UCC re 3AC & GBTC, at slide 9.

[335] BF_BK_00065481; BF_BK_00065415; BF_BK_00065322; BF_BK_00065282

[336] Apr. 4, 2023 Z. Prince Dep. Tr. at 147:9-148:14.

[337] *Declaration of A. Derar Islim in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2, In re Genesis Global Holdco, LLC, et al.*, Dkt. No. 17 ("Genesis FDD") at ¶¶ 31–32; *In re Voyager Digital Holdings, Inc., et al.*, No. 22-10943, Dkt. 863, Second Amended Disclosure Statement Relating to the Third Amended Joint Plan at p. 59 (Bankr. S.D.N.Y. Jan. 13, 2023) ("Voyager Disclosure Statement").

BlockFi, however, was far more conservative than its peer firms;[338] its loans to 3AC were overcollateralized at inception at approximately 125%.[339]  Moreover, BlockFi required that 3AC post collateral that had a publicly posted price—refusing 3AC's offer to post shares in a private company.[340]  Such transactions were consistent with BlockFi's disclosed business model.  There is no precedent for successful challenges to reasoned decisions like these, where limited risk was weighed against the possibility of a material reward.[341]

When 3AC collapsed, these precautions protected BlockFi while other firms suffered. When 3AC announced its struggles, many other crypto firms sought to recall their loans, but 3AC returned nothing to those parties.  BlockFi's story is different.  When crypto prices fell in early June, BlockFi issued margin calls to 3AC per their lending agreement.  When 3AC was unable to provide additional collateral acceptable to BlockFi, BlockFi began liquidating 3AC's collateral.[342] Through this liquidation process, BlockFi recovered $900 million in proceeds.  This, factored in with its outstanding claim against 3AC of $132 million and the $80 million in interest BlockFi gained during the course of loans may well result in an ultimate profit to BlockFi from the 3AC relationship.[343]  Indeed, it is not even clear at this time that BlockFi will incur *any* loss from 3AC, and there is no plausible claim that BlockFi leadership acted without due care in lending on an oversecured basis (with much of the collateral being BTC and ETH) to 3AC.

---

[338] Apr. 4, 2023 Z. Prince Dep. Tr. at 149:3-24; 153:13-25.

[339] June 2022 BARC Materials at slide 6; Apr. 4, 2023 Z. Prince Dep. Tr. at 167:2-13.

[340] BF_BK_00054706.

[341] The UCC's Report tries to attribute improper motive to BlockFi by suggesting it lent crypto to 3AC in order to facilitate a "venture investing" relationship (i.e., BlockFi lent money to 3AC to reward it for investing equity capital in BlockFi).  *See* UCC Report at 51.  There is no evidence to suggest as much, and again, the UCC gets the timeline wrong. 3AC had been an early equity investor in BlockFi, but had sold all of its equity to third parties as part of BlockFi's tender offer in March 2021.  *See supra* Section III.C; BF_BK_00118002.  Not only is there no evidence of any "quid-pro-quo," but one would not make sense given the timeline.

[342] June 2022 BARC Materials at slide 6, 14.

[343] Presentation for UCC re 3AC & GBTC, at slides 11-15; Apr. 4, 2023 Z. Prince Dep. Tr. at 170:2-19.

### c.    FTX/Alameda Transactions

Nor is there a viable derivative claim against BlockFi's Directors and Officers based on their interactions with FTX and Alameda.

As with many of BlockFi's other borrowers, BlockFi leadership required that Alameda provide collateral well in excess of the fair value of the loan. These lending decisions were driven by a collaborative risk management analysis by BlockFi's institutional team, compliance team, and senior leadership.[344]  At the end of the 2021 and through April 2022, BlockFi's loans to Alameda had an LTV of approximately 56%, meaning that they were always materially overcollateralized.[345]  In summer 2022, BlockFi called most of Alameda's outstanding loans in light of customer withdrawals, and Alameda swiftly made all requested repayments, paying back $1 billion on demand during the worst downturn the sector had then experienced.[346]

These loans were lucrative for BlockFi, and the investigation revealed no evidence of BlockFi entering these transactions in bad faith or without considering and evaluating the risks and rewards. *In re Trinsum Grp., Inc.*, 466 B.R. at 611. To the contrary, prior to November 2022, Alameda had been one of BlockFi's most reliable counterparties.

A different question is the June 2022 transaction with FTX. As discussed, relevant to a board's decision-making process is the information they considered, whether they consulted outside advisors and the quality of those advisors, and the extent of preparation and participation in meetings evaluating the business decision. *See Sealy Mattress Co.*, 532 A.2d at 1337; *Cede & Co.*, 634 A.2d at 371; *In re BHC Commc'ns, Inc. S'holder Litig.*, 789 A.2d at 11.

---

[344] Apr. 4, 2023 Z. Prince Dep. Tr. at 174:9-19; 176; 186:3-20; 193:17-194:15; 211:15-212:13.

[345] Presentation for UCC re FTX/Alameda, at slide 14.

[346] Apr. 4, 2023 Z. Prince Dep. Tr. at 222:7-224:11. Indeed, BlockFi and Alameda had a long-term healthy relationship in which many loans were repaid in full and with interest, on demand, prior to November 10, 2022.

Here, the investigation revealed no possible violation of the duty of care.  In the second half of June 2022, BlockFi faced an uncertain market and the prospect of material customer withdrawals—largely driven by a lack of crypto investor confidence in light of LUNA's collapse and the Celsius trade pause.[347]  As a result, BlockFi's leadership began to explore ways to inject liquidity to ensure it could meet withdrawal requests, and secured term sheets from several groups of potential investors for convertible notes.[348]  The Board reviewed and scrutinized the terms offered and investor groups themselves over the course of 10 formal board meetings and numerous informal discussions between June 19 and June 30.  The Board, in consultation with management and advisors, determined that FTX's term sheet was the most favorable option for the company.

BlockFi's scrutiny of the proposed terms began as soon as the term sheet was provided. Once Mr. Prince informed the Board of the offer, the Board directed him to seek more favorable terms while simultaneously exploring alternatives from other investors.[349]  Ultimately, the Board believed the proposed deal was the only transaction that could be consummated on a timeline that guaranteed a short-term liquidity backstop for BlockFi's customers—thus, it authorized management to execute a non-binding term sheet.[350] Despite approving the term sheet, BlockFi's Board continued to explore other routes to liquidity—including exploring transactions with Bain, Morgan Creek, Ledn, and others.  Ultimately, after thorough consideration, the Board determined that the FTX transaction was the best path forward for the company.  Critically, the principal alternative lacked a lead investor and introduced regulatory concerns, and the other potential term

---

[347] *Crypto Lender Celsius Pauses Withdrawals Due to 'Extreme Market Conditions'*, June 13, 2022, https://www.cnbc.com/2022/06/13/crypto-lender-celsius-pauses-withdrawals-bitcoin-slides.html#

[348] Ex. A to Jun. 20, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011827).

[349] Jun. 20, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011823; BF_BK_00011827)

[350] Jun. 20, 2022 Meeting Minutes of a Special Meeting of the Board of Directors of BlockFi Inc.

sheet (offered by Ledn), did not provide liquidity on an adequate timeframe and did not offer a cash infusion. [351] The Board accepted the FTX deal for many sound reasons.

The Board's repeated meetings and consultation with management and outside advisors over the course of two weeks far exceeds the requirements of the business judgment rule.  Indeed, BlockFi did far more than typical diligence before deciding on this transaction—it met more than 10 times, compared terms, and solicited offers even after accepting a term sheet.  *See In re BHC Commc'ns, Inc. S'holder Litig.*, 789 A.2d at 11 (no breach of duty of care where board approved proposed merger following same-day recommendation); *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d at 1139 (reliance on 1.5 hour meeting sufficient to approve tender offer).

BlockFi's Board received materials in advance of meetings and evaluated each proposal with the advice of financial and legal experts—including Gunderson Dettmer and Davis Polk.[352] *See Moran v. Household Int'l, Inc.*, 500 A.2d at 1356.  Nor did the investigation reveal any failure of the Board to inform itself of information available—to the contrary, the Board fully considered the options but determined the FTX transaction was the best course forward.  *In re Walt Disney*, 907 A.2d at 756-57.  Indeed, in the absence of hindsight bias, this was obviously the correct decision at the time.[353]  Accordingly, there is no viable breach of care claim.[354]

---

[351] Jun. 30, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011850; Jun. 28, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011944).

[352] *E.g.*, Jun. 19, 2022 Meeting Minutes of a Special Meeting of the Board of BlockFi Inc. (BF_BK_00011816); Jun. 23, 2022 Meeting Minutes of a Special Meeting of the Board of BlockFi Inc. (BF_BK_00011841).

[353] Had BlockFi rejected the FTX proposal and then ultimately failed, unsecured creditors *surely* would be alleging that the Board breached a fiduciary duty by rejecting junior capital available to clients to preserve shareholder value.  Indeed, the FTX transaction was widely understood as a win for BlockFi.  The UCC's suggestion to the contrary, stating that the FTX transaction "caused an increase in client withdrawals" (UCC Report 80) is based on another misunderstanding of the timeline and the facts.  The cited source (BARC minutes from July 1, 2022) says that withdrawals increased following "leaks in the media regarding the FTX transaction." (BF_BK_00011918.)  But the "leaks" were statements by another potential investor trying to *undermine* the FTX transaction.  Withdrawals increased due to threats the FTX deal might not happen, because the market was bullish on the FTX transaction.

[354] The UCC has suggested insiders would hypothetically benefit in the future from the FTX deal based on the vague statement in the original term sheet that, if the merger occurred, "significant management incentives will be provided." This argument has no merit.  The Board unanimously (the majority of which would never have shared in any such

After the FTX transaction, BlockFi made new loans to Alameda that gradually approached where Alameda's loan balance had been in 2021 and early 2022 (before Alameda paid them back). But contrary to the UCC's theory, BlockFi did not forego diligence. BlockFi continued to gather information about Alameda and FTX, it required Alameda to overcollateralize, and it continued to investigate and analyze the viability and risks of loans to Alameda as a counterparty and FTT as collateral.[355] BlockFi's risk team did so, taking learnings from its GBTC sell-down in the wake of the 3AC collapse and concluding that it would need approximately 5 days of market risk in a down cycle and BlockFi could reasonably expect approximately 20-25% off-market sales for approximately a $500 million chunk of FTT.[356] BlockFi's risk team reported its work to the BARC on August 2, 2022, describing that "given FTT is illiquid, we have assumed 8 required days of market risk (3 admin, 5 days of no liquidity) then selling 500m OTC at 20% discount."[357]

At a meeting on August 2, 2022, BlockFi presented Alameda as a counterparty and FTT as collateral again to the BARC and Board of Directors, which agreed to exceed the limit of $500 million in gross loans to Alameda, secured by FTT. In addition, the BARC provided guidelines that, as a Class 3 Token, FTT-backed loans needed to have at least 150% security at origination to be within BlockFi's risk framework.[358] The risks were discussed and evaluated and how BARC and Board members asked questions and got answers from CRO Yuri Mushkin, among others.[359]

---

"incentives" if they ever existed) approved the FTX transaction for a straightforward reason—it was the best transaction for clients— and there is no serious argument to the contrary.

[355] *E.g,* Apr. 4, 2023 Z. Prince Dep. Tr. at 226:6-21; 240: 7-241:10; 247:4-250:4.

[356] *See* BF_BK_00067355, at 56-57 ("btw we came up w/potential approach for incorporating OTC selling into our haircuts. even e.g., for illiquid collateral like FTT, which given our quantum would take ~86days to sell in market..the learning from GBTC is market markets may bid ~20-25% off market for a ~500m chunk…we just have to allow ~5 days of market because if there is a raging sell-off we can expect market markets to step back entirely..like in GBTC we got quotes after the 1 week sell off was finished").

[357] *See, e.g.,* August 2022 BARC Materials; J. Hill Dep. Tr. 80:22-81:13 (recalling this part of the presentation).

[358] *See, e.g.,* August 2022 BARC Materials; J. Hill Dep. Tr. at 80:22-81:13.

[359] *E.g.,* J. Hill Dep. Tr. at 96:13-16.

Many reasons were given to support these transactions; among other things, Alameda had just returned over $1 billion in loans on demand during an extreme down cycle; Alameda's wallet information had revealed billions of dollars in assets giving BlockFi that Alameda had sufficient assets to support the loans and that there was substance to its unaudited balance sheets; Alameda had just won the auction and quickly paid cash for GBTC shares seized from 3AC; BlockFi had received, reviewed, and analyzed FTX's audited financial statements, giving additional credence to the FTT collateral posted; FTT's liquidity had improved; and Alameda had begun working with BlockFi on additional mitigation efforts.[360]

Given BlockFi entered into these loan transactions after a deliberate weighing of risk and reward, there is no viable breach of care claim related to the post-July 2022 loans from BlockFi to Alameda.  *Cf. In re Walt Disney*, 907 A.2d at 756; *Eisenberg*, 537 A.3d at 1139; *Trenwick Am. Litig.*, 906 A.2d at 193.  Indeed, again, BlockFi **may recover on those loans in full**, depending on future proceedings against FTX, Alameda, Emergent, and others (proceedings the UCC's desire to pursue claims against BlockFi insiders would surely undermine), and depending on certain claims that have been filed in BlockFi's bankruptcy case.  But efforts by *the company* trying to sue its management team to challenge the front-end decisions to make these loans in the Fall of 2022 would fail.  *See, e.g., id.* ("[B]usiness failure is an ever-present risk. The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit."); *Gagliardi v. TriFoods Intern., Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996) ("The business outcome of an investment project that is unaffected by director self-interest or bad faith, cannot itself be an occasion for director liability. That is the hard core of the business judgment doctrine.").

---

[360] *See* Section III.D-E. for more detail.

The UCC's Report ignores *everything* about BlockFi's actual experience with Alameda and FTX from December 2021 to October 2022, focusing wholly on risk assessments performed early in the parties' relationship.[361]  Invoking out of context snippets from 2021 Slack messages and e-mails about loans that either did not happen or were paid in full (and without acknowledging as much), the UCC asserts that BlockFi senior management "refus[ed] to follow (*i.e.,* overrul[ed]) repeated warnings by the Company's risk department."[362] But that was not even true in 2021, let alone for the actual loans that remain outstanding.  The UCC's narrative is misleading, and appears intended to provoke anger rather than describe what happened:

- The UCC's Report claims that CEO Zac Prince "told his team to learn to 'get comfortable' with lending large sums to Alameda secured by FTT."[363]  But that is not what happened.  The e-mail string in question (from August 16, 2021)[364] concerns whether to make secured loans to Alameda considering that, among other things, Alameda's balance sheet at the time (which is displayed in the email) showed ███████████████████████████████████████████████████ ████████████████████ ██▆ ████████████ Mr. Prince looked at the balance sheet and says "I think we should get comfortable" with Alameda as a borrower, and there is "soooo much room to grow regardless of how you slice the data" "The data" **was the balance sheet**—which showed ████████████████.[366]  The e-mail is not at all what the UCC suggests (an edict from on high where Prince directed subordinates to disregard risks), but more generally, the UCC's assertion that there was something wrong with making oversecured loans to an entity that was providing security of 150% or more and had a massive balance sheet ████████████ ████████████████████████, is frivolous.

---

[361]    *See* UCC Report at 3, 8-10, 22, 34, 56.

[362]    UCC Report at 3.

[363]    *Id.*

[364]    BF_BK_00011388-93.

[365]    It could not have been a surprise to anyone that Alameda held FTT tokens.

[366]    Since then, multiple Alameda employees have pled guilty to crimes, including defrauding lenders with false balance sheets.  So this was fraud by Alameda.  But BlockFi was a cryptocurrency lender.  Making oversecured loans to an entity widely regarded as the most respected crypto firm in the world that reported a balance sheet more than 10x the size of any proposed loans is not something that should be challenged in hindsight and cannot plausibly be challenged by the estate given the business judgment rule.

- The UCC's Report cites a series of credit memos from 2021, where members of BlockFi's credit group described the risks of lending to Alameda while accepting FTT as security.[367]   The cited credit memos are all from 2021, none reflect any loans that led to a single dollar in losses for BlockFi, and all of them are evidence that BlockFi actually assessed counterparty risk, did considerable due diligence, and made sure that such risk was considered by decision-makers in their business judgment.  Indeed, as the UCC knows (but does not advise readers of its Report), most of the proposed loans listed in its chart were not made as proposed, and ***all*** of them were paid back in full at a profit to BlockFi.

- The UCC's Report suggests that in a Slack communication between Prince and Marquez from November 2021, Prince "acknowledg[ed] his understanding that FTT was "worthless" as collateral from Alameda."[368]   But that is not what the messages say or mean.  The Slack string is not about the value of FTT, but about the benefits and risks of taking FTT tokens pledged as collateral and staking them on the FTX platform to earn additional yield.  As Prince described at his deposition, BlockFi already had lent against FTT as collateral, and the value of the FTT token was correlated with market perception of FTX:  if FTX "went down, FTT was going down with it."  The question addressed in the Slack communication was whether it was worth the risk of custodying FTT on the FTX platform, which would earn substantial yield for BlockFi: ██████████████████."  Prince was simply expressing that the incremental risk of custodying the FTT it was holding at FTX was worth it for $████████████, since if FTX (and with it FTT) went down, it would not matter where the assets where custodied.

These  misleading  and  out-of-context  snippets  from  partial  internal  correspondence  aside,

everything the UCC complains about relates to proposed transactions from 2021 or January 2022

that either: (a) did not happen; or (b) did happen, and were repaid to BlockFi, in full, with interest,

in June 2022.[369]

---

[367]     UCC Report 59-74.

[368]     UCC Report 78.

[369]     The UCC contends that "BlockFi failed to complete basic due diligence on FTX and Alameda more than two years after signing its loan agreement with Alameda and even after BlockFi originated approximately $650 million of new loans to Alameda from August 18, 2020 to September 30, 2021."  UCC Report at 56.  The UCC does not explain precisely what it is referring to here, and this broad statement—which is incorrect—is also fundamentally inconsistent with the rest of the UCC's arguments.  Separately, the UCC cites a slew of internal memoranda from 2021 (more than 15 were produced for counsel's review), admits that substantial diligence was done, and claims (incorrectly) that the diligence was ignored.  Which one is it?

Stepping back for a moment, any duty of care claim challenging BlockFi's loans to Alameda between August and October 2022 would have to allege, at a minimum, that BlockFi was grossly negligent in making materially overcollateralized loans to Alameda, an entity that: (1) was the darling of crypto and believed to be one of the most reliable counterparties in the sector; (2) had honored *all* of BlockFi's many requests to return loans for a year and had just repaid over $1 billion on demand during the worst possible time; (3) had cooperated with BlockFi on numerous fronts, including providing financial information showing a massive balance sheet that, although unaudited, had been at least partially verified with real-world data; (4) had just engaged in other market transactions *with BlockFi* where Alameda beat the market to buy illiquid collateral and paid cash; and (5) was working actively with BlockFi on additional mitigation efforts, such as a guarantee of FTT from FTX,[370] based on concerns over FTT as collateral even though (6) BlockFi had received audited financial statements from FTX suggesting it was a very viable counterparty; (7) FTX, the issuer of FTT, had received hundreds of millions of dollars in equity investments from sophisticated investors; (8) one of BlockFi's peers was openly holding open-term loans from Alameda secured *partially* by FTT in a bankruptcy situation being actively monitored by numerous professionals and a U.S. Bankruptcy Court; and (9) FTX had been approved to acquire a large competitor by a federal court in a case actively monitored in the legal, financial, and regulatory community.  That sort of claim would reek of hindsight bias and is not credible or sustainable.[371]

---

[370]     BF_BK_00070262.

[371]     It is also particularly hard to understand why (other than out of anger) the UCC or any other estate fiduciary would ever argue that BlockFi was anything other than a victim of FTX's and Alameda's fraud.  Indeed, asserting that BlockFi did know or should have known about the true nature of FTX and Alameda's fraud (an allegation which is completely inaccurate) would undoubtedly and negatively impact the affirmative claims the estate possesses against FTX and Alameda and the claims both are making against the estate.  So in order to justify filing a lawsuit making such an argument on behalf of the estate, any responsible fiduciary would require a high degree of confidence that the facts would establish that knowledge within BlockFi.  For the reasons described above, the evidence points in the other direction, and filing (or even suggesting) a claim for breach of duty on this basis at this time would irresponsibly and needlessly harm the estate's affirmative claims while also being unlikely to succeed.

### 2.     No Colorable Breach of Care Claims Exist Arising out of BlockFi's Overall Business Strategy.

Aside from the specific business transactions discussed above, the UCC appears to put forward a theory that the entirety of BlockFi's business strategy was doomed to failure and caused BlockFi to take "enormous" business risks.  This argument does not rise to any actionable claim for breach of fiduciary duty (or any other claim).  BlockFi was transparent about its business model and how it intended to make money.  Armed with that information, thousands of clients decided to invest money with BlockFi and sophisticated investors made equity investments into BlockFi at large valuations.  Arguing that the business was at all times doomed to failure is the purest form of hindsight bias and is contradicted by all contemporaneous evidence.  The UCC's theory is also puzzling, given that it would challenging the underpinnings of nearly any lending business.

The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue strategies that have risks but promise rewards.  *See, e.g., Trenwick Am. Litig. Tr.*, 906 A.2d at 193.  Similarly, the Delaware Court of Chancery has rejected attempts to extend *Caremark* "duty of oversight" claims to accusations that directors improperly failed to monitor business risk. *See, e.g., Asbestos Workers Loc. 42 Pension Fund v. Bammann*, 2015 WL 2455469 (Del. Ch. May 22, 2015), *aff'd*, 132 A.3d 749 (Del. 2016); *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104 (Del. Ch. Oct. 12, 2011); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123-124 (Del. Ch. 2009).  "Oversight duties under Delaware law are not designed to subject directors, even expert directors, to *personal liability* for failure to predict the future and to properly evaluate business risk." *Id.* at 131 (emphasis original).  No such general "duty of care" claim would be viable here.

### 3.    No Colorable Breach of Care Claim Exists Arising Out of the ███ Transactions or Payments to Employees.

The Board approved the ███ settlement with the support of multiple independent directors and FTX (whose investment was funding the settlement) and upon the recommendation of management to settle the dispute for an amount up to $30 million, with the understanding that management would attempt to negotiate that number down.[372]    Following deliberations by the Board at the July 8, 2022 Board meeting, informed by the advice of management and legal counsel, the Board was unanimous in pursuing settlement.[373]    FTX later agreed and approved, too.

The Board was at least equally deliberative in approving the investigated insider retention payments.    The payments were discussed at length at the July 8, 2022 Board meeting, as documented by the minutes and Board materials.[374]    Ultimately, the Board approved the payments with unanimous consent. [375]    A review of email correspondence, Board materials, and interviews with certain of the directors and officers shows no evidence of "bad faith or fraud" in connection with either set of transactions.    *Auerbach*, 47 N.Y.2d at 630-31.

Even in the absence of the business judgment rule, there is no basis to find a breach of the duty of care with respect to the ███ transaction or the retention payments.    The Board's approval of the settlement payments, including key aspects of its structure such as gross-up payments to the executives that would transfer the settlement payment to ███████ showed all the hallmarks of an entirely fair transaction.    The Board arrived at the decision after weighing the cost of the settlement against the negative impact a lawsuit and the resulting publicity would have on BlockFi's ability to operate, maintain customer confidence, and weather the crypto downturn.    The

---

[372]    *E.g.,* Jul. 8, 2022 Board Materials at 4 (BF_BK_00133419).

[373]    Jul. 13, 2022 Board Consent (BF_BK_00114494).

[374]    Jul. 8, 2022 Board Materials (BF_BK_00133419).

[375]    Jul. 13, 2022 Board Consents (BF_BK_00114494) (approving retention payments).

Board instructed Prince to negotiate with ███ aided by other members of the management team, to secure the lowest possible settlement price (and with a $30 million cap) while still expeditiously resolving the dispute so that the company could focus on operations. *See, e.g.*, *San Antonio Fire & Police Pension Fund*, 983 A.2d at 318 (holding fiduciaries did not breach duty of care where, among other things, they "sought advice from [company] management").

The Board's approval of employee retention payments in July 2022 in an effort to retain key employees and management necessary to operate the business and steer it through the crypto downturn was also entirely fair to the company and its shareholders.[376]  Retention of employees was especially critical after the FTX Transaction wiped out the employees' equity.[377]  In considering the price of the retention payments, the Board evaluated the payments' impact on the business, on employees' total compensation, and on headcount goals, as well as the propriety of bonus criteria, among other considerations.[378]  Like the ███ settlement, the Board's deliberations regarding employee retention payments were also informed by the advice of senior management, which exhaustively analyzed various scenarios to evaluate their relative impacts.

As to each set of transactions, the Board appears to have conducted a deliberate process in deciding whether to pursue and approve the investigated transactions, and in doing so "consider[ed] all material information reasonably available." *Walt Disney Co. Derivative Litig.*,

---

[376]    Jul. 13, 2022 Board Consent (BF_BK_00134801) ("[T]he Board deems it to be in the best interest of the company and its stockholders to provide compensation packages to incentivize the retention of certain employees.").

[377]    *See* First Day Declaration ¶ 90 (discussing write-down of employee equity).

[378]    Jul. 8, 2022 Board Materials (BF_BK_00133419); *see supra* Section V.E.

907 A.2d at 749.   That process dispels any suggestion of gross negligence, *In re Lear Corp.*

*S'holder Litig.*, 967 A.2d at 651-52,[379] or bad faith.[380]

### 4.      No Colorable Breach of the Duty of Care Claims Exist Relating to the Actions Taken in Preparation for Bankruptcy.

As discussed above, BlockFi took two actions in the weeks leading up to the bankruptcy

filing that the Special Committee asked us to investigate.   ***First***, BlockFi converted nearly $200

million in crypto it had on hand into fiat currency.   ***Second***, BlockFi obtained $30 million in

additional D&O insurance for a premium of $22.5 million.   Neither action is likely to present a

colorable claim for breach for the duty of care by the Debtors' directors or officers.

As an initial matter, it is apparent that both these actions were the subject of analysis and

discussion between BlockFi's directors and its management.[381]   And BlockFi was advised by in-

house and external legal counsel as well as financial advisors on the proper path forward.[382]   The

retention of sophisticated advisors to assist in the decision-making for these transactions weighs

heavily against a finding of fiduciary breach.   *See, e.g.*, *In re BHC Commc'ns, Inc. S'holder Litig.*,

789 A.2d at 11 (dismissing breach of duty of care claim where the facts demonstrated that the

fiduciaries "hired expert financial and legal advisers" to assist in decision-making); *Moran*, 500

A.2d at 1356 (directors satisfied duty of care where they received synopses of proposed plan before

meeting and evaluated proposal with sophisticated financial and legal advisors).

---

[379]      "The definition of gross negligence used in our corporate law jurisprudence is extremely stringent."  *Id.*  "To state a claim for gross negligence, a complaint might allege, by way of example, that a board undertook a major acquisition without conducting due diligence, without retaining experienced advisors, and after holding a single meeting at which management made a cursory presentation."  *Trenwick Am. Litig. Tr.*, 906 A.2d at 194.

[380]      Bad faith is "not simply bad judgment or negligence" and "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will."  Black's Law Dictionary 139 (6th ed. 1990).

[381]      *E.g.,* No. 16, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 3 (BF_BK_00011984).

[382]      *Id.*

Moreover, the rationale provided for both transactions are reasonable and further support

that the Board and management were diligently considering their options.  With respect to the

conversion of the crypto currency, the minutes of the Board's meeting reflect a conscious weighing

of the costs and benefits of the transactions.  The Board recognized BlockFi had the legal right to

liquidate crypto under the relevant terms of service,[383] that liquidating the crypto would, among

other things, remove any risk to the company of a decrease in the value of crypto, and would avoid

the need for a (likely expensive) DIP financing.  This careful analysis, informed by experienced

outside legal and financial advisors, is nowhere near the "gross negligence" needed to establish a

breach of the duty of care.  Here, unlike in *Trenwick Am. Litig. Tr.*, 906 A.2d at 194, the Board (1)

conducted due diligence on the proposed conversion of crypto by considering the possible benefits

and drawbacks of the transaction, (2) had experienced advisors on hand to assist in the analysis,

(3) even though the matter was incredibly time-sensitive, discussed the issue over the course of

several board meetings.[384]  The Board then actively monitored the process of the liquidation.[385]

As it has turned out, the price of crypto has generally increased from mid-November 2022

(when the crypto was sold) through today.[386]  But the opposite could also easily have occurred.

And courts routinely recognize that the duty of care should not be measured by hindsight to second-

---

[383]     The UCC's Report incorrectly states that "[t]he Board unanimously approved the liquidation of customer
BTC deposits." UCC Report at 83.  As the UCC knows and the Bankruptcy Court found in connection with the Wallet
Withdrawal Motion, the cryptocurrency liquidated was property of the estate.  Consistent with that reality, the Board
minutes cited by the UCC actually say that the Board approved "the liquidation of cryptocurrency on hand," and
expressly clarify that this was "excluding BlockFi Wallet assets."  (BF_BK_00011984, at 85–86).

[384]     *Id.*; Nov. 17, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 4
(BF_BK_00011988).

[385]     Nov. 18, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 6
(BF_BK_00011991); Nov. 20, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. at § 5
(BF_BK_00011995).

[386]     As an example, in mid-November 2022, the price of BTC was around $16,500.  In the month of April 2023,
BTC prices have generally been about $27,000 and have occasionally exceeded $30,000.  *See*
https://www.coindesk.com/price/bitcoin/

guess the business judgment of directors or officers.  *E.g.*, *Unocal Corp.*, 493 A.2d at 958 (recognizing that officers and directors are not liable for decisions that lead to bad results).  But here, even with the benefit of hindsight, given the cases are still ongoing and the possibility for continued volatility in crypto prices, it is far from certain that the estate would have been better off holding the crypto (and likely needing DIP financing) than converting it.  Overall, these facts present an extremely weak case for a breach of the duty of care.

A similar analysis applies to the procurement of additional D&O Insurance.  Once again, this was an issue discussed amongst the Board over the course of several meetings, with substantial input from experienced legal and financial advisors.[387]  And again, the Board spent substantial time discussing the benefits that would be received from obtaining the additional D&O Insurance: the Board's existing lead independent director (Hill) stated that she would not be comfortable remaining on the Board absent additional D&O coverage, and BlockFi's advisors informed them that such additional coverage would be crucial to ensuring that additional independent directors could be hired to assist in the restructuring process.[388]  The Board minutes also reflect substantial work by BlockFi's advisors (at the Board's direction) to negotiate with potential insurance brokers and providers to get the best possible coverage under the circumstances.[389]  Ultimately, the Board approved the purchase of an additional $30 million in coverage for the $22.5 million premium.

---

[387]    Nov. 10, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc. (BF_BK_00011959; BF_BK_00011962); Nov. 11, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 9:30 AM EST (BF_BK_00011965); Nov. 11, 2022, Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 5:30 PM EST (BF_BK_00011968); Nov. 17, 2022, Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 5:30 PM EST (BF_BK_00011988).  *See also*, Apr. 4, 2023 Z. Prince Dep. Tr. at 250:5–251:10.

[388]    Nov. 17, 2022, Minutes of a Special Meeting of the Board of Directors of BlockFi Inc., 5:30 PM EST (BF_BK_00011988).

[389]    *Id*.

As with the conversion of the crypto currency, the available board materials demonstrate that the determination to purchase the additional D&O Insurance was the result of substantial and measured discussion between the Board and its advisors.  This was not a decision entered into rashly or without due consideration, and the Board's business judgment in determining to spend $22.5 million to obtain $30 million (along with the benefits to ensuring the continued service of the independent directors and the ability to hire additional independent directors) would be entitled to deference.  *In re Tower Air, Inc.*, 416 F.3d at 238 (recognizing that to overcome presumption that directors and officers acted with due care, plaintiff would have to show that the directors failed to provide information needed for the decision-making process).

### 5.    No Colorable Breach of Loyalty Claim Exists Against the BlockFi Directors Related to the ▮▮▮▮▮▮▮▮

While Prince and Marquez had an interest in the decision to approve the ▮▮▮ settlement payments—*i.e.*, the receipt of a full release from ▮▮▮▮▮—those personal interests did not rise to the level of disqualifying conflict of interest or breach of the duty of loyalty.  Moreover, the other three members of the Board (Jennifer Hill, Stefan Cohen, and Ellen-Blair Chube) had no personal interest in, and did not personally profit in any way from, the investigated transactions; they all approved the transactions, rendering Prince and Marquez's votes irrelevant.[390]

A conflict of interest exists only where a director materially benefits from the transaction and the company does not.  *Bridgeport Holdings,* 388 B.R. at 563-64.  Here, BlockFi benefited from the ▮▮▮ settlement at least as much as Prince and Marquez (if not more), as ▮▮▮▮▮ allegations were against BlockFi—not the individual executives—and BlockFi received a full release.  Moreover, to rebut the business judgment rule, the director's self-interest must be

---

[390]    *See* BF_BK_00134801 (written consent approving payments).

"material" to their independence.  *Cede & Co.,* 634 A.2d at 362-64.  This is "a fact-dominated question."  *Id.* at 364.  Here, the value of the individual releases received by Prince and Marquez were minimal for the same reason: ▮▮▮▮▮▮ repeatedly stated to Prince and Lauro that their claims were not directed at the executives that had transacted with ▮▮▮ (including Prince and Marquez).  And in fact the underlying agreements between ▮▮▮ and the individuals plainly state that they were non-recourse, making clear that ▮▮▮ would not have been able to successfully advance claims against any of the executives personally.

Moreover, a review of documents and numerous interviews established that Prince and Marquez operated diligently and in BlockFi's best interest with respect to the ▮▮▮ settlement. The Board instructed Prince to diligently negotiate the ▮▮▮ settlement, which he did over the course of several weeks from mid-July to late August 2022.  And Marquez worked with counsel at Haynes & Boone and BlockFi CPO Laura Cooper to structure the settlement, which ultimately included a full release for BlockFi (but not a release *by* BlockFi).[391]

In any event, even if Prince and Marquez were conflicted, this did not result in a breach of loyalty by the Board.  It is not enough for a subset of the Board to be conflicted; a plaintiff asserting a claim for fiduciary breach must demonstrate "that a ***majority*** of a board that approved the transaction in dispute was interested and/or lacked independence" to defeat the business judgment rule.  *Continuing Creditors' Comm. of Star Telecomms.*, 385 F. Supp. 2d at 460 (emphasis in original) (quoting *Orman,* 794 A.2d at 23).  Here, of the five directors that approved the ▮▮▮ settlement, the majority (three) had no personal interest in the transaction (Stefan Cohen, Jennifer Hill, and Ellen-Blair Chube).[392]  Moreover, the interests held by Prince and Marquez in the

---

[391]    *See* Release Agreement.

[392]    *See* Jul. 13, 2022 Board Consent (BF_BK_00114494).

settlement were fully disclosed to the Board's disinterested members prior to Board approval of the transaction, and the disinterested members determined that the settlement was nonetheless in the best interests of the Company and its shareholders for the reasons articulated above.[393]

## C.    Potential Breach of Fiduciary Duty Claims Against Officers.

Like the directors, BlockFi's officers owed fiduciary duties to the corporation and shareholders prior to insolvency, and additionally owed those duties to creditors following insolvency.[394]   However, because the BlockFi officers, other than Prince and Marquez, did not have the power or authority to decide whether BlockFi would enter into the investigated transactions, there is no colorable claim against these individuals for breach of fiduciary duty, even though several of these officers stood to receive material benefits by virtue of the transactions.

Several of the BlockFi officers received financial gain from the investigated transactions. Cheela (CFO), Tam (CMO), Spack (CCO), Crowell (CPO), and Loban (CAO) all received payments that included reimbursements for monies they previously paid to exercise their options and payments for retention, including a $2.2 million payment to Tam, a $2 million payment to Cheela and Cooper, and a $4 million payment to Mayers.[395]   Finally, as to the ▆▆▆ settlement, BlockFi's settlement payments resulted in full releases for Spack, Marquez (COO), Loban, Lauro (former CFO), and Prince (CEO), in addition to tax gross-up amounts necessary to avoid some of the negative tax consequences from the pass-through structure of the settlement payments.[396]

These facts do not support a fiduciary-breach claim.   Corporate officers cannot be liable for a breach of fiduciary duty based on a decision that was within the "exclusive province of the

---

[393]    *See id.*; 8 Del. C. § 144.

[394]    *See, e.g.*, *In re the Walt Disney Co.*, 2004 WL 2050138, at *3 (Del. Ch. Sept. 10, 2004).

[395]    SOFA part 2, question 4.  A portion of this amount was for retention, while a portion was reimbursement for unwinding a previously financing transaction.

[396]    *Id.*; Release Agreement.

board." *Official Committee of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 474 (Bankr. S.D.N.Y. 2006) (interpreting Delaware law); *In re Greater Southeast Community Hospital Corp.*, 333 B.R. 506, 526 (Bankr. D.D.C. 2005) (while officers owe fiduciary duties, "the scope of those duties is restricted necessarily to those activities within each officer's control.")*.*

Only BlockFi's Board had the authority to approve or reject the ▮▮▮▮ settlement and insider retention payments.  Thus, there is no basis for a fiduciary-breach claim against the non-director officers.  And, as discussed above, there is no basis for a fiduciary-breach claim against Prince and Marquez, who, while both directors and officers of BlockFi, nonetheless satisfied their duties of care and loyalty and were protected by the business judgment rule.  Moreover, although this Report does not exhaustively examine the market rates of compensation for individuals in these roles, there are indications in publicly-available information that, absent these payments, these individuals would have been underpaid relative to their peers.[397]

## II.      FRAUDULENT TRANSFER

### A.      Legal Overview

#### 1.      Choice of Law

As an initial matter, there is a potential question as to which state's law would apply to any claims for fraudulent transfer or fraudulent conveyance.  BlockFi Inc. is a Delaware corporation, BlockFi Trading LLC is a Delaware limited liability company, and BlockFi Lending LLC is a Delaware limited liability company.  However, each of these entities have their principal place of business in Jersey City, New Jersey.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is registered in Delaware

---

[397]      *E.g.*, Brian Baxter, *Block, Robinhood, Coinbase Lawyers Among Fintech's Top Paid*, (May 1, 2023), https://news.bloomberglaw.com/business-and-practice/block-robinhood-coinbase-law-leaders-among-industrys-top-paid/ (last accessed May 3, 2023) (noting Robinhood chief legal officer was paid $15.1 million, Coinbase's chief legal officer was paid $7.5 million, and Block's chief legal officer was paid $8.3 million).

and ███████████████ is organized under Delaware law.  However, both entities

primarily operate in New York.  ████████ is incorporated in Delaware.

The Court would apply New Jersey choice-of-law rules in order to determine what law

applies.  *See In re Filene's Basement*, No. 11-13511 (KJC), 2013 WL 620288 at *6 n.7 (Bankr. D.

Del. Feb. 19, 2013) ("A bankruptcy court should apply the choice of law rules of the state in which

it resides." (citing *In re PHP Healthcare Corp.*, 128 F.App'x 839, 843 (3d Cir. 2005)).  "New

Jersey applies a 'governmental interest' test to determine the appropriate state law to be applied,

under which test 'the determinative law is that of the state with the greatest interest in governing

the particular issue.'" *In re B.S. Livingston Co., Inc.*, 186 B.R. 841, 863 (D.N.J. 1995) (citing

*Veazey v. Doremus*, 103 N.J. 244, 248 (1986)).  *Veazey* provides the procedure to be followed

under this analysis:

> The first step in the analysis is to determine whether a conflict exists between the law of
> the interested states. Any such conflict is to be determined on an issue-by-issue basis.
>
> . . . If an actual conflict exists, the next step is to identify the governmental policies
> underlying the law of each state and how those policies are affected by each state's contacts
> to the litigation and to the parties . . . If a state's contacts are not related to the policies
> underlying its law, then that state does not possess an interest in having its law apply . . .
> Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately
> determines whether its law should apply.

103 N.J. at 248 (citations omitted).

This Report's inquiry can end at the first step.  If there were a conflict among the laws of

the jurisdictions implicated, a court would most likely apply Delaware, New York, or New Jersey

law to any state law fraudulent transfer claim.  But given the relative uniformity of fraudulent

transfer law across jurisdictions, there is unlikely to be an actual conflict between the laws of those

states.  Accordingly, due to the relevant business entities' incorporation and registration in

Delaware, this Report applies Delaware law in its fraudulent transfer analysis.

### 2.   Intentional Fraudulent Transfer

Under the Bankruptcy Code, debtors may challenge intentional fraudulent transfers under § 548(a)(1)(A) or § 544(b)(1).  Section 548(a)(1)(A) provides a cause of action to avoid transfers made or obligations incurred "with *actual intent to hinder, delay, or defraud* any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."  11 U.S.C. § 548(a)(1)(A) (emphasis added).  Additionally, section 544(b)(1) allows the debtor to avoid transfers or obligations that are "voidable under applicable law," including state law, by a creditor holding an unsecured claim.

Section 550(a) of the Bankruptcy Code permits a creditor or trustee to recover damages for a fraudulent transfer from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).  Section 550(b) of the Bankruptcy Code, however, does not permit a creditor or trustee to avoid transfers to immediate or mediate transferees who take for value in good faith without knowledge of the voidability of the transfer.  11 U.S.C. § 550(b).

Delaware has adopted the 1984 Uniform Fraudulent Transfer Act (UFTA).  Under that statute, a plaintiff seeking to avoid an alleged fraudulent transfer must show the debtor made a transfer or incurred the obligation:  (1) With *actual intent* to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a ***reasonably equivalent value in exchange for the transfer*** or obligation, and the debtor's remaining assets were "***unreasonably small in relation to the business*** or transaction" or the debtor knew or "reasonably should have believed" that the debtor would incur debts beyond the debtor's ability to pay as they became due.  *See* 6 DE Code § 1304(a) (emphasis added); *see Quadrant Structured Prods. v. Vertin*, 102 A.3d at 198.

A plaintiff can allege direct evidence of a debtor's intent—for instance, contemporaneous documents or testimony expressing a desire to avoid creditors—but a conveyance may be

fraudulent even in the absence of such direct evidence.  More frequently, Delaware courts assess

whether a plaintiff can establish "badges of fraud," relying on the inferences drawn from the facts

and circumstances surrounding the transaction.  At the pleading stage, the plaintiff must allege

particular badges of fraud because actual fraudulent transfer claims "must meet the heightened

pleading standard" of Rule 9(b).  *CIBC Bank USA v. JH Portfolio Debt Equit., LLC*, 2021 WL

2230976, at *9 (Del. Sup. Ct. June 2, 2021).

A plaintiff can establish a debtor's actual intent to defraud creditors using any of the

following considerations:  (1)  the transfer or obligation was to an insider; (2)  the debtor retained

possession or control of the property transferred after the transfer; (3)  the transfer or obligation

was disclosed or concealed; (4)  before the transfer was made or obligation was incurred, the

debtor had been sued or threatened with suit; (5)  the transfer was of substantially all the debtor's

assets; (6)  the debtor absconded; (7)  the debtor removed or concealed assets; (8)  the value of the

consideration received by the debtor was reasonably equivalent to the value of the asset transferred

or the amount of the obligation incurred; (9)  the debtor was insolvent or became insolvent shortly

after the transfer was made or the obligation was incurred; (10)  the transfer occurred shortly before

or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets

of the business to someone who transferred the assets to an insider.  6 DE Code § 1304(b).

"Capitalization and solvency" of the debtor are not necessarily "critical factors in assessing

actual fraudulent transfers."  *Burkhart v. Genworth Financial, Inc.*, 250 A.3d 842, 860 n.128 (Del.

Ch. Ct. 2020).  Yet in most cases, the "badges of fraud" analysis still examines whether the debtor

was insolvent and the fairness of the consideration, and these factors are often determinative.[398]

---

[398]    We have not identified any transaction that we believe would give rise to a viable claim for an actual
fraudulent transfer.

### 3.    Constructive Fraudulent Transfer

Absent actual fraudulent intent, a transfer may nonetheless be avoided if it is made for less than reasonably equivalent value at a time when the transferor is or becomes insolvent.  6 Del. C. § 1304(a).  Delaware recognizes constructive fraud as a separate cause of action from intentional fraud, and the heightened pleading requirements of Rule 9(b) to not apply to constructive fraudulent transfer claims.  *E.g.*, *CIBC Bank USA*, 2021 WL 2230976, at *11 ("Unlike claims for actual fraud, a claim for constructive fraud is "governed by Civil Procedure Rule 8(a).") (citations and quotations omitted).  *Quadrant Structured Prods.*, 102 A.3d at 198-200 (analyzing fraudulent transfer claims separately based on allegations of the debtor's actual versus constructive intent).

To prevail on a constructive fraudulent transfer claim, a plaintiff will need to demonstrate insolvency: "the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."  6 DE Code § 1302(a).  Delaware's "balance sheet" test analyzes whether an entity "has liabilities in excess of a reasonable market value of assets held."  *Trenwick Am. Litig. Trust*, 906 A.2d at 195 n.74.  Courts have held that a plaintiff alleging fraudulent transfer may rely on the balance sheet test, cash flow test, and/or adequate capital test.  *See, e.g.*, *Peltz v. Hatten*, 279 B.R. 710, 742 (D. Del. 2002) (plaintiff must show debtor was insolvent or rendered insolvent under one of three tests).

Delaware courts assessing "reasonably equivalent value" typically analyze (1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between fair market value of the asset transferred and the price paid.   *In re Plassein Intern. Corp.*, 428 B.R. 64, 67 (2010).

Reasonably equivalent value is not defined in the Bankruptcy Code, but it is commonly assessed by comparing the value of the property transferred to the value of property (or other benefits) received by the debtor in the transaction. *See, e.g.*, *VFB LLC v. Campbell Soup Co.*,

482 F.3d 624, 631 (3d Cir. 2007) ("[A] party receives reasonably equivalent value for what it gives

up if it gets roughly the value it gave") (citations and quotations omitted).   A debtor need not

receive a dollar-for-dollar equivalence; instead, a court will consider whether what the debtor

received was "in the range of a reasonable measure of the value of what the debtor transferred."

*See, e.g.*, *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 172 (S.D. Tex. 2009) (describing

"reasonably equivalent value" as "a continuum starting at market value and stopping just short of

an amount or price sufficiently below market value to be less than reasonably equivalent value").

The Bankruptcy Code does define value and transfer, however:

- For purposes of section 548 of the Bankruptcy Code, value includes "property, or satisfaction or securing of a present or antecedent debt of the debtor, but . . . not . . . an unperformed promise to furnish support to the debtor or to a relative of the debtor. 11 U.S.C. § 548(d)(2)(A).

- The Bankruptcy Code defines transfer broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54)(D).

Determining whether a transfer is of reasonably equivalent value is often straightforward

when the debtor receives cash payments or property.   Indirect benefits received by the debtor,

however, can also constitute a transfer of value. *See, e.g.*, *Mellon Bank, N.A. v. Metro Commc'ns,*

*Inc.,* 945 F.2d 635, 648 (3d Cir. 1991), *as amended* (Oct. 28, 1991) (reasoning that the ability to

obtain credit and the synergistic strength expected from a merger both have value that can be

considered in a reasonably equivalent value analysis); *PSN Liquidating Trust v. Intelsat Corp. (In*

*re PSN USA, Inc.)*, 615 F. App'x 925, 933 (11th Cir. 2015) (holding that a debtor—the operator

of cable television sports channel—received reasonably equivalent value for payments that it made

on its corporate parent's contract because the debtor indirectly benefitted from the services

provided under the contract).

**B.    Potential Fraudulent Transfer Claim Regarding the Payments to** ████████

In analyzing a potential fraudulent transfer claim as against ████████, three issues arise: (1) can the Debtors recover the funds from ████████ even though BlockFi made the payments to the individuals and not directly to ████████; (2) assuming that the analysis could consider the payments as going from BlockFi to ████████, did BlockFi receive reasonably equivalent value; and (3) was BlockFi insolvent at the time of the payment or insolvent by the payment.

**1.    Clawback of Funds**

The first potential fraudulent transfer analyzed is the settlement payments that ultimately went to ████████ after passing through the individual BlockFi executives.  The fact that the payments were made first the individual BlockFi executives before being passed on to ████████ would not be fatal to this claim.  Under 11 U.S.C. § 550(a), if a claim is avoidable as a fraudulent transfer, the payments may be recovered from "(1) the initial transferee or the entity for whose benefit such transfer was made."  Given the overall structure of the settlement, where the payments were made by BlockFi to the individual executives expressly for them to then be passed on to ████████, it appears highly likely that, if there was a fraudulent transfer, it could be recovered from ████████ notwithstanding it was did not receive the funds directly from BlockFi.

In addition, it is possible that, for purposes of a fraudulent transfer analysis, ████████ *would* be deemed to be the "initial transferee" under § 550(a).  Although the funds were paid through the executive, courts recognize that the analysis identifying the initial transferee should disregard any "mere conduits."  "To be a 'mere conduit' a [party] must 'establish that it lacked dominion and control over the transfer because the payment simply passed through it hands and it had no power to redirect the funds to its own use.'"  *In re CVEO Corp.*, 327 B.R. 210, 217-18 (D. Del. 2005).  Here, the executives are likely to be considered "mere conduits" as they received funds into their accounts with the express direction from their employer to simply route those

payments directly to ████. Thus, *if* a fraudulent transfer occurred, it appears likely that the funds could be recovered from ████.

### 2.    Reasonably Equivalent Value

In determining whether the payments to ████ were made for reasonably equivalent value, the analysis considers the amount paid out by BlockFi and the value of the benefit BlockFi received as part of the agreement (*i.e.*, the release), as well as the indirect benefits of the transaction (*i.e.*, the avoidance of bad publicity from the payments).   *In re Akanmu*, 502 B.R. 124, 130 (Bankr. E.D.N.Y. 2013) ("In reaching its determination, a 'court should consider both direct and indirect benefits flowing to the debtor as a result of the exchange.'").  As an initial matter, there can be no dispute that BlockFi received ***some*** value in return for the payments.  But unlike a situation where a payment is made to acquire property that can be readily valued, both of these items represent intangible benefits with more subjective values.  *E.g.*, *U.S. v. McCombs*, 30 F.3d. 310, 326 (2d Cir. 1994) ("[T]he concept [of fair consideration] can be an elusive one that defies any one precise formula.").

Considering the release first, the direct benefit of the release will depend on the merits of ████ potential claim against BlockFi, as well as the projected costs of litigating the claim. As discussed above, based on analysis performed at the time by Haynes and Boone as well as an independent analysis of those claims in connection with this Report, those claims seem very weak. But even if the claims were ultimately unlikely to succeed, the costs of litigating such claims could be material, and the avoidance of those costs provided a material benefit to BlockFi.

Moving to the indirect costs and the avoidance of negative publicity, those benefits prove even more difficult to quantify.  BlockFi, its independent directors, and ultimately FTX, at the time, believed that the benefit to BlockFi of avoiding the negative publicity at a fraught time for the sector far outweighed the cost of settling (even approving the potential settlement up to an

amount of $30 million).[399]  Although difficult to value, these surrounding facts certainly suggest a substantial perceived benefit to BlockFi from the payment, as FTX (as the entity providing the funds) viewed BlockFi's value as a going concern as being greater after the settlement was paid than if ███████ filed its threatened suit against BlockFi.  And where (as here) the payor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before  the  transaction, reasonably  equivalent  value  has  been  received.  *Mellon Bank, N.A.*, 945 F.2d at 647.

In light of these considerations, and that the legal standard does not require a dollar-for-dollar equivalency in the value for it to be reasonably equivalent, *ASARCO LLC*, 404 B.R. at 172, a court is likely to determine that the payments were for reasonably equivalent value.

### C.    Potential Fraudulent Transfer Claim Regarding the Gross-Up Payments to BlockFi Executives.

A court may look separately at the additional payments made to the individuals for taxes.[400] We believe a court is likewise unlikely to find a fraudulent transfer with respect to the gross-up payments to the BlockFi executives that were made to cover the taxes for those individuals associated with the pass-through nature of the settlement payments to ███████ .  Although the estate could argue that BlockFi received no value in return for the gross-up payments, those payments were part and parcel of the payments made to ███████ in return for the BlockFi release. As noted above, the reason that BlockFi structured the payments in this way (with the payments made to the individuals as compensation with a gross-up for taxes) was driven by BlockFi's

---

[399]    While precise quantification would be challenging, BlockFi had just witnessed the potential impact of even indirect bad publicity when it saw the impact on customer withdrawals caused by Celsius closing its doors and 3AC announcing challenges.  BlockFi and its Board thus had direct insight and recent history suggesting that avoiding publicity that could cause a run on the platform could be very valuable to the company.

[400]    Although these payments were not actually made into the individual's accounts, but rather were withheld for taxes, the analysis would be unchanged given amounts are withheld for the individuals' benefit and offset their tax liability.

understanding that if they did not treat the payments as coming from the individuals, BlockFi could have faced fines or penalties from the IRS.  And certain of the individuals involved noted that given the weakness of the claims against them in light of the clearly non-recourse nature of the loan, they would not have been willing to facilitate the payments to ▮▮▮▮ if they were going to incur an unreimbursed tax liability.[401]   It is thus possible that BlockFi *could not* have done the transaction (and received the benefit of the release) other than in this manner.   In such circumstances, bankruptcy courts regularly "collapse" transactions to look at the entirety of the transaction rather than its distinct steps.  *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 379 (Bankr. S.D.N.Y. 2013) ("Collapsing transactions is compatible with fraudulent conveyance principles as both emphasize substance over form.") (determining that two distinct sales transactions should be considered as a single integrated transaction for purposes of fraudulent transfer analysis); *In re OODC, LLC*, 321 B.R. 128, 137 (Bankr. D. Del. 2005) ("In appropriate circumstances courts may view a series of transactions (such as those involved in a leveraged buyout) as one integrated transaction.").

Looking at the transaction as a whole, the question is whether BlockFi received reasonably equivalent value for the approximately $15 million it paid out in total.  A plaintiff could argue that the BlockFi did not receive reasonably equivalent value because the main value was from the avoidance of litigation with ▮▮▮▮  But the analysis is more complicated given the focus is on the value *received by the Debtor*, not the value as viewed from the perspective of a third party (here, ▮▮▮▮ ).  *In re FBI Wind Down, Inc.*, 581 B.R. 116, 148 (Bankr. D. Del. 2018) ("The purpose of the [fraudulent conveyance] laws is estate preservation; thus, the question whether the

---

[401]     *E.g.*, Mar. 17, 2023 D. Spack Dep. Tr. at 115:1–12 ("And my view was, I don't owe them anything, it's a nonrecourse loan, I'm not paying back a cent, the money is mine.").

debtor received reasonable value must be determined from the standpoint of the [Debtor's] creditors."). From the perspective of BlockFi's estate, there are indications that the value received on account of the transaction exceeded $15 million. Primarily, the Board initially authorized management to settle the claims for up to $30 million.[402]  And at that point in time, the Board was made up of a majority of individuals who: (1) had not engaged in transactions with ██████ or ██████ and had no personal interest in the transactions at all; and (2) had just personally witnessed the damage that could be done to the company from even *indirect* negative media attention. That analysis from the Board of the value that BlockFi would receive from the settlement would be entitled to weight, particularly given the subjective and difficult-to-value nature of the benefit to BlockFi of avoiding litigation and negative publicity at that point in time.

Separately, the payments to the executives could be viewed as compensation to avoid the executives from having to personally incur the tax liability associated with the settlement payments (because the payments were routed through the individuals). As described further below, these types of compensation decisions, and whether the Company received reasonably equivalent value for those compensation payments, is a fact-specific analysis. The Company's Board made a reasoned decision (ultimately supported by FTX, which was funding the transaction) that these payments would help ensure retention of key employees, and that the retention of those employees was essential to preserving the value of the enterprise.

Based on all of these considerations, any claim for fraudulent transfer related to the ██████ settlement payments is likely to face significant hurdles to success. Attempting to show that BlockFi did not receive reasonably equivalent value would require expert testimony around

---

[402]    Jul. 13, 2022 Action by Unanimous Written Consent of the Board of Directors of BlockFi Inc. (BF_BK_00134801).

the value of avoiding negative publicity.  Making the case to recoup such payments, even assuming

insolvency (a challenge in its own right) would be both expensive and highly uncertain to succeed.

### D.    Potential Fraudulent Transfer Claims Arising from Management's Secondary Transactions

As described above, in certain funding rounds through the Series D round, given the rounds

were over-subscribed, existing shareholders were given the opportunity to tender their shares to

be sold to new investors.  This opportunity was provided to employees as well as non-employee

shareholders.  The UCC has suggested that these transactions may give rise to claims.  We do not

believe that such claims have any potential merit.

As an initial matter, the UCC's questioning of certain witnesses seems to suggest a

misunderstanding of the structure and purpose of these transactions.  Mechanically, an existing

shareholder would tender its shares back to BlockFi and receive cash for its shares.  BlockFi would

sell shares in the current funding round to the investors who wished to purchase preferred equity

shares in that round, and BlockFi would receive cash in the equivalent amount of value per

share.[403]  So although BlockFi would make direct payments to existing holders that tendered

shares, part and parcel of that transaction, BlockFi received an equivalent amount from a new

investor.[404]  The reason that BlockFi engaged in these tender offers rather than merely expanding

the size of their preferred equity raises was to limit the dilution of existing shareholders while also

giving existing equity holders a mechanism to receive liquidity on a portion of their investment.

---

[403]    *See* BF_BK_00128339 (identifying the purchaser as "BlockFi Inc." for certain tendering of shares by employees).

[404]    This mechanism was used to ensure that the new investors received the same series preferred share as the primary offering.  For instance, if as part of the tender offer for Series D an existing equity holder who held Series B preferred shares directly sold its shares to a new investor, that new investor would be received Series B preferred shares (rather than the Series D).  By having BlockFi Inc. "buy back" the equity from the existing investor, it ensured that investors buying Series D through the tender offer received the same terms as investors buying Series D preferred shares through the primary offering.

In order to assert a fraudulent transfer claim based on these transactions, a court would have to find insolvency at a time where the market believed BlockFi was worth billions of dollars (which is highly unlikely), and completely ignore one half of these transactions.  Put simply, BlockFi Inc. was ***not*** buying back shares from existing equity holders as a one-off transaction.  It was part of an integrated transaction through which BlockFi would also receive equivalent value from the purchaser of the new preferred equity.  As discussed above, in analyzing a fraudulent transfer claim, courts focus on the substance of the transaction rather than its form and often "collapse" multiple steps of a transaction that are in actuality part of a single integrated transaction. Looking at the integrated transaction, BlockFi Inc. was merely a conduit, and undoubtedly received reasonably equivalent value.  BlockFi did nothing more than effectively act as a middleman, both receiving and disbursing an equivalent amount per share.  Had the existing equity holders ***not*** tendered their shares back to BlockFi, BlockFi would not have been in a position to recognize the benefit on the other side of the transaction (*i.e.*, the sale of shares to the new preferred shareholders).  In that situation, there is no colorable fraudulent transfer claim.

## E.     Potential Fraudulent Transfer Claim Regarding Other Transactions

Our investigation also considered other payments to insiders—specifically, the options exercise (and related) reimbursement to Cheela, Tam, Spack, Crowell, and Loban, and the retention payments to Cheela, Mayers, Liou, and Cooper.

There is no direct evidence that any of these insider payments were made with an "actual intent to hinder, delay or defraud any creditor of the debtor."  6 Del. C. § 1304(a); 11 U.S.C. § 548(a)(1).  Those transactions are also largely devoid of the traditional "badges of fraud."  *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006); *see* 6 DE Code § 1304(b) (listing factors under DUFTA).  While the transfers were to insiders and BlockFi likely became insolvent within a few months of the transfers being made, *id.* § 1304(b)(1), (9), those factors alone are not dispositive.

*See In re Fedders North America, Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) ("The presence or absence of any single badge of fraud is not conclusive").  And the other factors considered under Delaware law are not present at all: BlockFi did not retain possession or control of the transferred property after the transfer, the transfer was not concealed, the transfers were not made pursuant to a threat against BlockFi by the insiders, the transfer was not of substantially all of BlockFi's assets, BlockFi has not absconded, BlockFi did not remove or conceal assets, the transfer did not occur shortly before or after a substantial debt was incurred, and BlockFi did not transfer the essential assets of its business.  *See* 6 DE Code § 1304(b)(2)-(7), (10)-(11).

Absent direct or indirect evidence of actual fraudulent intent, the focus of the inquiry turns to whether there is a colorable claim for constructive fraudulent transfer.  Even assuming insolvency, which would present another hurdle, whether these transactions constitute constructive fraudulent transfers largely depends on whether BlockFi received less than reasonably equivalent value for the transactions.  11 U.S.C. § 548(a)(1)(B); 6 DE Code § 1304(a); *CIBC Bank USA*, 2021 WL 2230976, at *11 (acknowledging constructive fraudulent transfer as separate claim from intentional fraudulent transfer).

Although we believe it is more likely than not that a court would determine BlockFi did receive reasonably equivalent value for these payments, there are reasonable contrary arguments. The payments were made primarily to retain key employees during the crypto downturn, especially in the face of lost equity value due to the FTX Transaction.  The benefit of employee retention is difficult, if not impossible, to quantify. *Cf. McCombs*, 30 F.3d. at 326 ("[T]he concept [of fair consideration] can be an elusive one that defies any one precise formula.").  Here, however, although these payments were described by many at the company as retentive in nature, and an effort to incent key employees to remain at BlockFi even after their equity had been rendered

largely valueless, there were no formal conditions or clawbacks attached to these retention payments.  As a purely legal matter, any of the individuals who received such a payment could have argued that they were free to immediately leave BlockFi without being required to return any of the payments received.  But it is unlikely they would (or could) have done so, and many individuals (including those who received the payments) stated that there was an understanding that individuals would not leave after receiving the payments.  Because this understanding was never formalized, the payments could theoretically be characterized as gratuitous with the Debtors not receiving reasonably equivalent value for them, but such claims would have to overcome the reality that the payments had their intended effect of retaining the employees *and* that retention has provided a substantial, material benefit to BlockFi.

## III.    PREFERENCE

### A.    Legal Overview

The elements of a preference claim are set out in § 547(b) of the Bankruptcy Code.

> Section 547(b) authorizes a Trustee or debtor-in-possession to avoid a transfer of an interest of the debtor in property: (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before the transfer was made; (3) made while the debtor was insolvent; (4) on or within 90 days before the date of the filing of the bankruptcy petition; (5) that enables such creditor to receive more than such creditor would have received if the debtor liquidated under Chapter 7 of the Bankruptcy Code.

*Zeta Consumer Products Corp. v. Equistar Chemical, LP (In re Zeta Consumer Products Corp.)*, 291 B.R. 336, 346 (Bankr. D.N.J. 2003) (citing 11 U.S.C. § 547(b)).

### B.    Potential Preference Claim Regarding the Payments to █████

Even assuming BlockFi was insolvent at the time the payments were made to ██████, a potential preference claim against ██████ is unlikely to be viable.  The payments were not made on account of an antecedent debt.  The Third Circuit has held that a payment in settlement of

136

litigation does not constitute an antecedent debt.  In *Lewis v. Diethorn*, 893 F.2d 648 (3d Cir. 1990), that court considered a $15,500 payment that was made "in exchange for [a] undertaking to terminate" a lawsuit.  *Id.* at 650.  The court found that this payment was not "for or on account of an antecedent debt owed by the debtor" because "[w]hat Eaton received was not the freedom from liability on an antecedent debt, but the freedom from the risk of litigation."  *Id.*  As the Third Circuit has held that a payment to settle actual litigation is not a payment on account of an antecedent debt, a payment to settle threatened litigation would likewise *a fortiori* not be on account of an antecedent debt.

In addition, the payments to ██████ (even assuming that a court would consider the payments directly to ██████ and ignore that the payments first went to the individual executives and employees), the payments may also fall outside the ninety-day preference period.  The Debtors filed for bankruptcy on November 28, 2022.  The ninety-day period would thus capture any payments made on or after August 30, 2022.  Here, the majority of the payments were received by ██████ prior to August 30, 2022.  For a small amount from Dylan Stigliano, it appears that ██████ did not receive the funds until after the ninety-day period expired.[405]  There is some authority supporting the proposition that, the preference period should be measured from the date the creditor receives the funds.  *In re Allegheny,* 86 B.R. 466 (W.D. Pa. 1988).  But, in any event, separate and apart from the fact that they were not made on account of an antecedent debt, the majority of the payments to ██████ were received by ██████ prior to August 30.[406] Accordingly, most of the payments to ██████ fall outside the ninety-day preference period.

---

[405]     *See* Sep. 1, 2022 D. Sigliano Email to F. Marquez (BF_BK_00114368).

[406]     *E.g.*, Aug. 30, 2022 T. Mauro Email to ███████████████████████████████████
████████████████████████████ mail to Z. Prince (BF_BK_00134135) (reflecting receipt of payment on 8/26/22).

### C.    Potential Preference Claims Regarding the Gross-Up and Retention Payments to Employees

Preference claims for the gross-up and retention payments to employees are similarly unlikely to be viable.  Even assuming BlockFi was insolvent when the payments were made in July and August 2022, the payments were not made "for or on account of an antecedent debt *owed by the debtor* before such transfer was made."  11 U.S.C. § 547(b).  The payments are not associated with any debt *owed by BlockFi* to the *insiders*.  And as to the tax amounts associated with the gross-up payments—which debts belonged to the insiders and not BlockFi—those debts had not yet been incurred when the gross-up payments were made in August 2022, and so do not qualify as *antecedent* debts necessary for a preference claim.  *See* 11 U.S.C. § 547(a)(4) ("a debt for a tax is incurred on the day when such tax is last payable without penalty, including any extension"); *see also In re USDigital, Inc.*, 443 B.R. 22, 36 (Bankr. D. Del. 2011) (antecedent debt must be incurred prior to alleged preferential transfer).

### D.    Potential Preferences Arising from Withdrawal of Funds from Platform.

The UCC has also identified the withdrawal of funds from the platform as giving rise to potential preference claims generally, and has specifically suggested a desire to pursue users of the BlockFi platform for preferences.  With specific reference to insider withdrawals, our analysis of those claims suggests that, for the most part, the claims are not colorable, and for the one withdrawal that may arguably support a preference claim, the amount at issue (approximately $600,000) would be dwarfed by the costs of litigation.  The two withdrawals at issue were both made by Prince.  The first was in April 2022 of approximately $10 million (which was withdrawn to cover income tax liability that Prince incurred as a result of a sale of shares through a tender offer); the second was in early August 2022 of approximately $600,000.

Because Prince is an insider, the lookback period for preferences is one year.  11 U.S.C. § 547(b)(4)(B).  Both the withdrawals referenced above occurred in the year prior to the Petition Date.  But despite being within the statutory lookback period for insiders, the presumption of insolvency would not apply because, even for insider transactions, the presumption only applies for a period of 90 days prior to the Petition Date.  11 U.S.C. § 547(f).  Neither of Prince's withdrawals fell within that window.[407]  Thus, in order to recover on those claims, the estate would have to establish that the company was insolvent when Prince made the withdrawal.  But arguing insolvency in April would not be credible, and arguing insolvency in August would be a highly uncertain endeavor.  In addition, Prince (like other BlockFi clients who withdrew at the time), would have a further defense that the underlying debt and the repayment were "in the ordinary course of business or financial affairs of the debtor and the transferee[.]"  11 U.S.C. § 547(c)(2).[408]

Here, BlockFi's business was accepting client deposits and then permitting withdrawal of such deposits pursuant to BlockFi's terms of service, and Prince (like other clients) had a history of making deposits and withdrawals like other BlockFi clients.  Accordingly, there can be little doubt that the debt owed to Prince was incurred in the ordinary course.  *See Fid. Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1177 (10th Cir. 1989) (holding that redemption of certificate of deposit was excepted from a preference claim based on ordinary course of business defense because "Fidelity was in the business of making small, high interest consumer loans, and it was only able to do this by regularly borrowing money from small investors and then lending it out at

---

[407]     The August 2022 withdrawal occurred before August 17.  *See* Global Notes to SOFAs and Schedules at 20.

[408]     Once determined that the underlying debt was incurred in the ordinary course of the debtor's business, the ordinary course defense can be established either by satisfying the "subjective" test of 547(c)(2)(A), which requires that the transfer was also made in the ordinary course of the debtor's and the transferee's business, or the "objective" test of 547(c)(2)(B), which require that the transfer was "made according to ordinary business terms."  *In re Newpage Corp.*, 555 B.R. 444, 452 (Bankr. D. Del. 2016)  ("A defendant can protect a transfer from avoidance by meeting the 'subjective' test of section 547(c)(2)(A) or the 'objective' test of section 547(c)(2)(B).")

higher interest rates. The incurrence of such debt was a regular part of its daily business, much like

a bank or savings and loan institution"). And it is highly likely that a court would determine that

Prince's withdrawal would satisfy both the subjective and the objective tests of 547(c)(2).

Subjectively, a standard withdrawal of funds from the platform, in an amount reflecting 25%-30%

of Prince's holdings at the time, was not out of the ordinary for BlockFi's business with its clients.

And objectively, there is no indication that Prince's withdrawal, done at a time any client had the

ability to withdraw from the platform, was on terms any different than the terms available to any

of BlockFi's thousands of customers. *Id.* (determining that the transfer satisfied the objective test

because the certificates were redeemed "in a regular manner, pursuant to the terms of the

certificates, and without any indication that the corporation was having financial difficulties").

Accordingly, we believe that a preference claim based on Prince's withdrawals is unlikely

to succeed in light of the difficulties in establishing that BlockFi was insolvent at the time of the

transfers and that the transfers were outside the ordinary course of business.

## IV.    CLAIMS BASED ON REPRESENTATIONS TO CUSTOMERS.

In its report and in subsequent pleadings, the UCC alleges that BlockFi (through company

marketing or public statements by members of the management team) made misrepresentations to

customers, including (1) creating an "impression" that BlockFi operated and was regulated like a

bank; (2) that cyrpto deposits were insured by the FDIC; (3) that BlockFi provided secure storage

for crypto currency, and; (4) that BlockFi was taking on less risk in lending to counterparties than

it actually was.[409]    These theories, even if they were accurate, do not create actionable estate

---

[409] UCC Report at 27-36; *see also Statement of the Official Committee of Unsecured Creditors Respecting the Debtors'
Amended Joint Chapter 11 Plan,* Dkt. 899, ¶ 6 (claiming that "prior to bankruptcy, management did things in
contravention of the promises made to BlockFi customers"); Objection of the Official Committee of Unsecured
Creditors to Debtors' Second Motion to Extend Exclusivity, Dkt. 1131-1, at ¶ 36 (claiming that BlockFi in general
and Mr. Prince in particular "perpetrated a fraud on customers")

claims. To the contrary, the UCC's repeated charge of "fraud on customers"[410] reflects a misunderstanding of the nature of an estate claim.

The prospective claims asserted by the Committee, based on alleged misrepresentations to customers, would be held by customers individually (and not the estate). In determining whether a claim belongs to the estate, courts decide "whether the claim is 'general' to the estate or 'personal' to a specific creditor." *Artesanias Hacienda Real S.A. De C.V. v. North Mill Capital, LLC*, 968 F.3d 273, 282 (3d Cir. 2020). "To distinguish general from personal claims, we focus not on the nature of the injury, but on the 'theory of liability.'" *Id.* An estate claim exists where **debtor assets** were wrongfully depleted, creating "a secondary harm to all creditors regardless of the nature of the underlying claim[s] against het debtor." *Id.* at 283. By contrast, a personal claim exists where a creditor "suffers a direct, particularized injury that can be 'directly traced' to the defendant's conduct." *Id.* As a matter of law, such direct claims are "not property of the estate." *Id.* Such claims cannot be pursued by the estate, and efforts to do so would fail as a matter of law.

The UCC does not and cannot allege that purported misrepresentations made to customers "wrongfully deplete[d] the debtor's assets." *Id.* at 282 (quoting *Tronox Inc. v. KerrMcGee Corp.*, 855 F.3d 84, 103 (2d Cir. 2017)). To the contrary, the UCC Report alleges that the challenged statements drew more customers *to* the BlockFi platform; thus, if the UCC's theory was accurate, BlockFi would have *benefitted* from that conduct, and any harm (if any) would be to individual customers that were purportedly misled. Any assertion to the contrary is not coherent under the applicable law, and there is no legal basis to suggest that these sorts of allegations (even if accurate) could give rise to a claim by *BlockFi* against its management team.

---

[410]    Objection to Debtors' Second Motion to Extend Exclusivity, Dkt. 1131-1, ¶ 36

### ANALYSIS OF NEED FOR INSIDER SERVICES GOING FORWARD

I. **LITIGATION**

BlockFi has filed a plan of reorganization and anticipates confirming that plan in August

2022.  Given the regulatory concerns that have deterred potential buyers, the premise of the draft

plan is a self-liquidation where BlockFi would reopen its platform and distribute recoveries in kind

to creditors (in cryptocurrency), which is the express preference of the creditors.  If BlockFi has

the technical capabilities of doing so and the personnel needed to do so safely and securely, initial

wallet distributions would hopefully occur shortly after a plan became effective.  Future

distributions would then be made as the resolution of litigation occurs going forward, either

through the platform in kind, or in cash (if not possible).

At the same time, extensive litigation will occur post-confirmation—**and that litigation

(rather than anything else) will be the primary driver of client recoveries**.  While BlockFi

anticipates a "base" recovery to non-wallet clients, non-wallet clients' ultimate recoveries could

be as low as ~10% or as high as 80-100% dependent on the estate's success (or failure) in pending

and anticipated litigation against FTX, Alameda, Emergent, 3AC, and Core Scientific.[411]  No estate

fiduciary should compromise success or failure in that litigation to pursue any other goal.

The litigation BlockFi will face post-confirmation will include, but is not limited to, (1)

litigation over the more than $600 million in collateral posted by Alameda and Emergent in

November 2022, which will likely occur in some combination of a forfeiture proceeding in the

U.S. District Court in the Southern District of New York, the BlockFi bankruptcy case in the

---

[411]    Includes related parties.  Each of these entities is involved in at least one U.S. bankruptcy proceeding.  *See,
e.g., BlockFi, Inc., et al. v. Emergent Fidelity Technologies,, et al.*,; Adv. Pro. No. 22-01382 (MBK) (Bankr. D. N.J.);
*In re FTX Trading Ltd., et al.*, No. 22-11068 (Bankr. D. Del.) ; *In re Three Arrows Capital Ltd.*, No. 22-10920 (Bankr.
S.D.N.Y.);. *In re Emergent Fidelity Technologies, Inc., et al.*, No. 23-10149 (Bankr. D. Del); *In re Core Scientific*,
No. 22-90341 (Bankr. S.D. Tex.).  FTX, 3AC, and Emergent also have their own foreign insolvency proceedings
ongoing at the same time.

District of New Jersey, and the U.S. Bankruptcy Court for the District of Delaware; (2) preference, fraudulent transfer, and other litigation in the U.S. Bankruptcy Court for the District of Delaware involving Alameda, FTX, Emergent, and perhaps others, over the repayment of $100 million in loans by Alameda to BlockFi in November 2022, the posting of collateral, and other issues; (3) preference, fraudulent transfer, and other litigation in some combination of the U.S. Bankruptcy Court for the District of New Jersey and the Southern District of New York covering BlockFi's execution on various pledges by 3AC and foreclosures on in excess of $1 billion of collateral; and, to a lesser extent (4) preference, fraudulent transfer, and other litigation in the Core Scientific Bankruptcy in Texas.

It is generally not a good idea to sue your key witnesses when facing or affirmatively prosecuting litigation, and the estate should not expect cooperation from witnesses that it intends to sue (or retains the right to sue).  Given threats that have been raised by the UCC, moreover, it seems unlikely that any of the targets of that litigation would voluntarily agree to cooperate in the prosecution or defense of claims by or against BlockFi while such threats are out there.  The estate's choice is essentially between resolving any potential claims in a way that would facilitate witnesses *assisting* the estate prosecute (and defend) litigation, or leaving those claims hanging (or actively pursuing them), in which case the estate should expect no assistance from targets other than what they can be subpoenaed to provide, which would effectively be a single deposition in which witness would be represented by his or her own counsel and testify truthfully under oath.

No experienced trial lawyer would challenge the statement that having real-live witnesses who lived a situation actively helping to develop case strategies and trial themes is massively more helpful than having those witnesses living in fear of litigation and only willing to answer questions a single time under oath.  For that reason, unless there is a real reason to alienate the key witnesses

that BlockFi will need to prosecute and/or defend against significant going forward litigation, the

estate's top priority should be to ensure its fitness to create the best outcome forward in litigation

against FTX, Alameda, Emergent, 3AC, and Core Scientific (among others).

Accordingly, the below chart describes which witnesses the estate will need to retain and

to secure cooperation from in order to act in creditors' best interests going forward:

| Dispute | Stakes | Nature of the Case | Key Insider Witnesses |
|---------|--------|--------------------|-----------------------|
| Suits (Various Likely Locations) against Emergent/ED&F Man/AlamedaFTX | ~$600 million[412] | Declaratory judgment re HOOD shares and other collateral posted in November 2022 to secure Alameda loans to BlockFi[413] | Zac Prince[414] Flori Marquez[415] Yuri Mushkin[416] Jonathan Mayers[417] |
| Anticipated Alameda Preference Litigation | ~$150 million[418] | Alameda will assert preference claims. BlockFi will assert counterclaims for fraud, breach of contract, and and other theories, and will argue that forbearance was an equal value contemporaneous exchange. | Zac Prince Flori Marquez Yuri Mushkin |

---

[412] This case seeks to secure BlockFi's interests in 55,273,469 shares of common stock of Robinhood Markets Inc. (NASDAQ ticker symbol: HOOD) (which has typically traded at approximately $10/share, creating easy math), and approximately $20.7 million in cash (together, the "Robinhood Assets").

[413] The Robinhood Assets were pledged to BlockFi by Emergent Fidelity Technologies, Inc. (an entity in which Sam Bankman-Fried held a 90% interest) to guaranty and provide collateral in connection with BlockFi's agreement to forbear from exercising its rights under an outstanding loan agreement with Alameda. The Emergent pledge agreement granted BlockFi an irrevocable power of attorney to take any action with to the Robinhood assets, including to have them sold. BlockFi made written demand on ED&F Man on November 14 to surrender the Robinhood assets to it. ED&F Man refused. In January 2023, the US Government seized the Robinhood Assets and is holding them pending the outcome of Bankman-Fried's criminal proceedings. All actions involving the Robinhood Assets have been stayed pending the outcome of the criminal trial and potential forfeiture actions brought by the US Government.

[414] Personal knowledge of the historical lending relationship with Alameda and the events in early November 2022 that led to the forbearance agreement and the Emergent pledge agreement.

[415] Personally interacted with Caroline Ellison and others at Alameda in connection with the November 2022 transactions concerning the collateral that was offered to secure Alameda's debt.

[416] Personally involved in evaluating collateral coverage for the Alameda loans. Was also involved in evaluating the collateral that was offered to secure the Alameda loans and the Robinhood Assets.

[417] Personally involved in the negotiation and preparation of the transaction documents. Also made the written demand on Marex to surrender the collateral to BlockFi pursuant to its irrevocable power of attorney.

[418] The Debtors received $124,423,552 from Alameda to BFI Lending and $7,825,017 from Alameda to BFI International in the 90 days prior to Alameda's bankruptcy filing.

| Anticipated FTX Transaction-Related Litigation | Unclear; FTX will assert $275m claim | BlockFi will be objecting to FTX's claims on multiple grounds including fraud, material misrepresentations regarding its financial capacity to fund, etc., and FTX will likely argue breach of contract, and unjust enrichment.  BlockFi would also be arguing for recharacterization of the loan as an equity infusion based on the option agreement and applicable case law. | Zac Prince Flori Marquez Amit Cheela Rob Loban |
| --- | --- | --- | --- |
| Anticipated FTX Exchange-Related Claim | Unclear; FTX will assert $3+ billion claim | FTX may assert preference and fraudulent transfer claims based on all transactions consummated on FTX exchange.  Based on our understanding of the facts to date, BFI Lending withdrew assets of $25 million and BFI International withdrew assets of $3.6 billion.

Our understanding is that accounting for all deposits during preference period, BlockFi International is currently owed $400M which is frozen on FTX's platform (i.e. Exchange Withdrawal Claim is zeroed out and International has a counterclaim for $400M). | Zac Prince Amit Cheela Rob Loban |
| Three Arrows Capital Affirmative Claims Against BlockFi | ~$1 billion | BlockFi made a series of secured loans to 3AC in the principal amount of approx. $1.085 billion (USD equivalent) secured by various trust shares, digital currencies, and accounts containing additional trust shares. In June 2022, 3AC defaulted. | Zac Prince[419] Tony Lauro[420] Yuri Muskhin[421] |

[419] Heavily involved in margin calls to 3AC as well as in communications with 3AC post-default.

[420] BlockFi Lending signatory of the First Amendment to the Amended and Restated Master Loan Agreement with Three Arrows

[421] Heavily involved in foreclosure process and in the decision to foreclose.

| | | | |
|---|---|---|---|
| | | BlockFi declared an EOD and foreclosed on the Collateral. BlockFi recovered approximately $900 million. Now that BlockFi is in Chapter 11, 3AC's JPLs filed claims against all of the BlockFi debtors.<br><br>3AC has stated an intent to pursue a variety of theories against BlockFi, including preference and BVI preference liability, which has an intent element. BlockFi will also defend by proving up that it was a secured creditor vis a vis 3AC and that if 3AC had a claim, it should be equitably subordinated. | |
| BlockFi Affirmative Claims Against Three Arrows Capital | ~$120 million | BlockFi's efforts to collect all amounts owed from 3AC came up approximately $120 million short. As described earlier in this report, net-net BlockFi's business with 3AC was approximately break-even considering the interest collected from 3AC over time, but BlockFi also still has this affirmative claim to pursue against 3AC's estate. | Same |
| BlockFi Affirmative Claim Against Core Scientific | $55 million | Core Scientific defaulted on two secured loans. BlockFi Lending has a claim of approximately $55 million, secured by ASIC Miners. | Zac Prince[422]<br>Yuri Mushkin[423] |

Given the stakes, voluntarily alienating the estate's key witnesses in what will be the

estate's most likely path to maximizing value for creditors—i.e., these various litigation efforts

against Alameda/FTX, Emergent, 3AC, and Core Scientific, a/k/a "Counterparty Litigation"—in

---

[422] Signatory on certain key documents

[423] Key witness for describing decision to accelerate loan and efforts to mitigate damages

order to pursue vendettas against those witnesses, would be a breach of fiduciary duty to the estate.

Accordingly, we do not think it would be a good idea to sue those individuals unless the claims

against them were slam-dunk efforts (assuming ultimate collectability) to recover hundreds of

millions of dollars (we have no reason to believe they are) *and* one could pursue that litigation

without simultaneously compromising the estate's efforts in the Counterparty Litigation (which

we do not believe one could).  Attempting to resolve claims against your witnesses while securing

their help in prosecuting and defending these key claims going forward is by far the most

responsible path forward.

## II.    ANTICIPATED PLAN DISTRIBUTIONS

BlockFi's proposed chapter 11 plan contemplates at least one, and possibly multiple,

distributions of assets in-kind (that is, in cryptocurrency) through the BlockFi platform to BlockFi

creditors.[424]  UCC counsel has advised that creditors' strong preference is for an-kind distributions,

among other reasons, to mitigate potential tax exposure.[425]  The estate is working to facilitate this

customer preference, but it will present challenges.

As a practical matter, the only realistic way to process in-kind distributions would be

through BlockFi's platform—otherwise processing hundreds of thousands of transactions

manually to external wallets, according to several we spoke to during the investigation, is not

realistic.  But distributing the assets through the BlockFi platform presents its own challenges. The

BlockFi platform was developed in-house, is written in a unique and esoteric programming

language and has capabilities that newcomers to the situation would need time to digest and

understand (if they could do so at all).  Hiring outside professionals or new temporary employees

---

[424] We understand that given the current regulatory environment a "platform sale" where fiat and/or cryptocurrency is sent to another platform for distribution to creditors by it (e.g., Binance, eToro, etc.) is unlikely.

[425] *E.g.,* Apr. 14, 2023 Email from K. Aulet to M. Slade.

to come in and attempt to facilitate distributions without current staff who was responsible for processing withdrawals pre-petition would come with substantial cost and risk. Moreover, BlockFi's platform will likely require both maintenance and the development of new functionality to facilitate partial withdrawals and implement the proposed plan, and those managing both the maintenance and enhancement of the platform will, as a practical matter, need to be existing employees familiar with the development of the platform over time.[426] Although the Company has already begun working to create this capability, it will require continued work to execute.

Cryptocurrency distributions are particularly sensitive and injecting new procedures to distribute cryptocurrency to clients with new people is risky. Cryptocurrency is like a bearer bond and transmission of it is inherently high risk; small errors in distributions can lead to permanent losses—if even a single character in a lengthy distribution address is entered incorrectly, the cryptocurrency can be gone forever, unable to be retrieved. Errors and losses have actually happened before, making clear the wisdom of keeping together the existing team to make distributions, reduce the risks of errors, and increase the chances for a successful and safe distribution.

In addition, as described above, to reduce risk and cost to the estates, much of the cryptocurrency available for rehypothecation pursuant to BlockFi's Terms of Service was sold pre-petition for cash.[427] Accordingly, to make distributions through the BlockFi platform, not only will BlockFi need the staffing and in-house capabilities to distribute cryptocurrency (in omnibus wallet accounts) through the BlockFi platform (which will have to be enhanced to some degree),

---

[426]     At the time BlockFi declared bankruptcy, BlockFi was in the process of doing a backend rebuild of its infrastructure, which is typical in scaling startups as the system originally built for the platform was outpaced by growth. This rebuild was not completed at the time of the bankruptcy filing, leaving the infrastructure in a fragile state.

[427]     *See supra* Section VI.B.

but BlockFi will need to retain the capability of "rebalancing" the company's asset portfolio in the rehypothecatable wallets in order to ensure that the estate has the correct amount of each cryptocurrency to complete the distributions.

In order to process distributions, BlockFi is in the process of building a new ledger system that will, for the first time, allow the BlockFi team to upload new balance information for the company's more than 650,000 clients, in order to update client balances to match the recovery level approved by the UCC and the court.  This is a new system that will be partially manual, requiring the operations team, led by Ms. Marquez[428] and the finance team (led by Mr. Cheela) to upload hundreds of thousands of rows of client data.  BlockFi needs to build this in order to allow clients to withdraw crypto from the platform, but limit their withdrawal amounts to the recovery level and court approved amount rather than the amount of cryptocurrency "deposited."

In addition to experience working with crypto and blockchain transactions, in order to complete the work required, the leader(s) of the project(s) needs to have knowledge of:

- **BlockFi's bankruptcy case;**

- **BlockFi's ledger and accounting system**, including knowledge of prior changes to the system that could affect new products (ACH reversals, automated freezes to client accounts when loans are in margin calls, credits made to client accounts and the system use to apply those credits) as one off-changes can cause issues when integrating a new system;

- **BlockFi's withdrawal system**, which was originally built by an engineering team led by Ms. Marquez 3 years ago. The system, Kingpin, has specific nuances built in to accommodate issues with Bitgo's API;

- **Knowledge of historical gas fees**, as the time and volume of when withdrawals are processed have a huge impact on the average cost of the withdrawal.  In 2022 BlockFi's

---

[428]     BlockFi's remaining team is thin.  Since filing for bankruptcy BlockFi's Chief Product Officer and the only two VPs BlockFi had on product have left the company, despite retention efforts.  BlockFi promoted the most senior product person remaining to VP, who unfortunately chose to leave in May 2023 for another opportunity. The remaining team led by Ms. Marquez appears to be the only realistic option for completing this work efficiently and safely.

gas fee optimization project saved ~$2.5MM per year in fees, and leveraging this knowledge will save the estate valuable resources; and

- **Bespoke Risks in Building the Product**, including risks relating to: (a) historical impact of "ghost code" on BlockFi's system; (b) historical client escalations based on user experience concerns; and (c) safety and security of client withdrawals.

Voyager recently confirmed a plan with a "toggle" structure[429] that was triggered following Binance's announcement that it is backing out of the Voyager/Binance transaction.[430]  Voyager's chapter 11 plan and disclosure statement (which received 97% support from voting creditors)[431] announced an "Employee Transition Plan" that, as described, included "at least 38 employees" necessary for the self-liquidation process where cryptocurrency was distributed in kind through the Voyager platform.[432]  Voyager is executing on that plan, and BlockFi's CRO and investment banking team are directly involved in making sure that process is completed successfully through their separate engagements by Voyager, making them able to speak directly to the challenges presented.  Both confirmed the importance of preserving in-house capability to perform these tasks in Voyager and in the BlockFi case.

BlockFi has also created a distribution plan assuming that it will be making the distributions from its own platform using its own employees.  BlockFi will need to retain capabilities to complete at least the following tasks:

- **Pre-emergence** - Finalize full distribution plan; and build, beta test, and complete new withdrawals engine;

- **Day 1-90** - Initial distributions;

---

[429] *See In re Voyager Digital Holdings, Inc.*, No. 22-10943-mew (Bankr S.D.N.Y.), Dkt. No. 1166 (Confirmation Order) and Exhibit A (Plan of Reorganization).

[430] *See, e.g., https://cointelegraph.com/news/binance-us-backs-out-of-1b-voyager-asset-purchase-blames-regulatory-environment; https://www.reuters.com/markets/deals/binanceus-calls-off-13-bln-deal-voyagers-assets-2023-04-25/*

[431] *See In re Voyager Digital Holdings, Inc.*, No. 22-10943-mew (Bankr S.D.N.Y.), Dkt. No. 1127 (Voting Report).

[432] *See In re Voyager Digital Holdings, Inc.*, No. 22-10943-mew (Bankr S.D.N.Y.), Dkt. No. 863 (Disclosure Statement) at 31-32; Dkt. No. 1006 (Second Plan Supplement) at pp. 42-45 (Employee Transition Plan).

- **Day 90-180** - Transfer knowledge to skeleton team, shut down custodians; and

- **Day 181+** - Long tail on estate management - claims and litigation.

The key workstreams and key individuals for these tasks are listed below for the first 90

days (tasks specific to distributions are **bolded**):

1. **Rebalancing**
   a. **Key Teams - Finance, Institutional, Operations**
   b. **Key Leads - Rob Loban, Amit Cheela, Flori Marquez, Dylan Stigliano**
2. **Effectuating Distributions**
   a. **Key teams - Ops, Finance, Product, Engineering**
   b. **Key leads - Flori Marquez, Dylan Stigliano, Amit Cheela, Rob Loban**
3. **Claims reconciliation**
   a. **Key teams - Ops, Finance**
   b. **Key leads - Flori Marquez, Michelle Henry, Amit Cheela**
4. Laying off and offboarding remaining workforce
   a. Key teams - People, Security, Legal
   b. Key leads - Meg Crowell, Adam Healy, Jonathan Mayers
5. Regulatory / Litigation
   a. Key teams - Legal, Compliance, Finance
   b. Key leads - Jonathan Mayers, Ross Kirschner, Alice Liou, Usec Rho, David Spack, Amit Cheela, Rob Loban, Zac Prince, Michelle Henry

Key workstreams for projected days 90-180[433] are listed below, again with tasks specific to client

distributions in **bold**:

1. **Shutting down custodians & key accounts, knowledge transfer to skeleton team**
   a. **Key teams - Operations, Finance**
   b. **Key leads - Flori Marquez, Dylan Stigliano, Amit Cheela**
2. **Long tail on claims + litigation**
   a. **Key teams - Operations, Finance, Legal**
   b. **Key leads - Flori Marquez, Amit Cheela, Michelle Henry, Jonathan Mayers, Ross Kirschner**
3. Sunsetting Platform
   a. Key teams - Engineering, Product, Security, Operations
   b. Key leads - Greg Hoffman, Dylan Stigliano, Adam Healy, Flori Marquez

---

[433]    The current intent is for the team to be reduced to a skeleton crew at day 180 subject to those the estate asks and needs to provide cooperation executing cooperation agreements.

4. Offboarding all but skeleton team
    a. Key teams - People, Security, Legal
    b. Key leads - Meg Crowell, Adam Healy, Jonathan Mayers

We understand the individuals listed here to be critical to the estate's ability to make in-kind distributions in a safe, secure, efficient way.  Losing the capabilities of these individuals could eliminate the estate's ability to make in-kind distributions at all, would require the estate to spend substantially more money and take substantially more time to finalize the capabilities to make these distributions, and would create risk in the process.  Securing the cooperation of those referenced here for the distribution process would be extremely valuable to the estate.

## CONCLUSION

The Special Committee's ultimate responsibility in this matter is to pursue an outcome most likely to maximize value for the Debtors' estate and, most directly, for BlockFi's creditors.  With respect to potential litigation claims against BlockFi directors and officers, in determining the correct path to maximize value, the Special Committee needs to weigh the potential recovery on these claims not only against the cost of that litigation itself, but also against the potential harm to the estate from being denied the willing participation of these individuals in the Counterparty Litigation.  As a practical matter, if the Debtors opt not to support a release for these individuals and instead directly pursue these claims or allow them to be pursued through a litigation trust, those individuals will have no incentive to cooperate.  Although they may be compelled to testify in certain circumstances through subpoenas, that compelled testimony is far outweighed by the ongoing, affirmative support they would provide under a settlement.

But even putting aside this need for ongoing cooperation, pursuing the claims described above would present minimal (if any) upside for the estates.  Although there are certain claims that may be able to get past a motion to dismiss (such as the ▬▬▬ settlement tax gross-up payments),

each of the claims described above would face substantial and costly hurdles before reaching a successful judgment (even assuming collectability). There is virtually no argument that BlockFi was insolvent at any point prior to June 1, 2022; and even after that point, in light of the unique nature and terms of the FTX Transaction, any argument that BlockFi was insolvent between June and November 2022 is challenging. The claims identified and discussed above also face substantial hurdles and defenses even apart from solvency.

BlockFi had processes in place to measure risk and to analyze potential transactions. Although several of these transactions ultimately resulted in BlockFi losing money, this process will make any claim based on a breach of the duty of care unlikely to succeed. And unlike several other crypto cases, there is no evidence of BlockFi directors or officers taking steps to pull money off the BlockFi platform at an improper time or directly or indirectly stealing from the company. Any such litigation would thus require costly discovery and expert testimony (pertaining at least to matters of solvency, the crypto industry generally, and, corporate governance/risk management). We believe the cost of such litigation is likely to swamp any material, collectible recovery on account of these claims. Thus, even in the absence of the additional considerations around the Counterparty Litigation, it is challenging to justify pursuing the claims against insiders on a cost/benefit basis.

As the UCC is a fiduciary for BlockFi's creditors, the Special Committee must consider the views of the UCC with respect to these categories of claims. But in our view, the potential "claims" the UCC has focused on only confirms the weakness of the overall basket of claims against directors and officers. After months of reviewing documents and responses to diligences and engaging in more than a dozen depositions and interviews, the UCC is apparently focused on a set of claims challenging the business strategy and operations of BlockFi.

At bottom, the UCC appears to believe that BlockFi's business was doomed to fail at the outset and that the actions BlockFi took in an effort to succeed caused BlockFi to incur undue risk. But asserting such a claim would run into substantial legal and factual hurdles; principally, a plaintiff asserting such claims would have to explain why sophisticated investors put hundreds of millions of dollars into a "doomed" business model at a valuation of several billion dollars. And the plaintiff would then have to overcome black letter Delaware law that the business judgment rule expressly insulates allegedly "risky" business strategies that provide the possibility of high returns from challenges based purely on hindsight. Prior to engaging directly with the UCC, we viewed these types of claims that challenge BlockFi's business model and decisions as extremely weak. Analyzing the UCC's views on these claims has not changed our view. And moreover, we have no reason to believe that, even if such claims were to be pursued successfully, the estate could collect enough value to make a material difference to creditors.

The UCC has stated that it does not support a Plan of Reorganization that includes releases for BlockFi's officers or directors. This is irrational, but something the Special Committee has considered in plotting the value-maximizing path forward. The Special Committee cannot abdicate its role to identify and pursue the path that it views as value maximizing for the Debtors' estates and for clients. And the value maximizing path for the estates here is clearly a settlement of potential estate claims that includes:

- cooperation for the BlockFi estate in ongoing litigation, including the Counterparty Litigation, with the exact parameters of that cooperation to be fleshed out on an individual-by-individual basis;

- cooperation for the BlockFi estate in connection with the distribution of crypto to customers if the Debtors determine to make an in-kind distribution to creditors;

- the waiver or subordination of any claims against the Debtors held by these individuals (such as for unpaid compensation or indemnification amounts);

- the agreement to waive or subordinate any claim for assets on the BlockFi platform behind those claims of other clients; and

- for some, cash payments in an amount that the Special Committee has negotiated.

# Exhibit C

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

----------------------------------------x

In re:

                     Chapter 11

BLOCKFI INC., et al.

                     Case No. 11-19361(MBK)


                     Debtors.

----------------------------------------x

        EXAMINATION BEFORE TRIAL of the Debtors,
BlockFi Inc. by JENNIFER HILL, taken by the Creditors'
Committee, pursuant to Agreement, held at the law
offices of Kirkland & Ellis 601 Lexington Avenue 51st
Floor New York New York 10022, on April 26, 2023, at
9:06 a.m., before a Notary Public of the State of New
York.


    *********************************************


    ****CONFIDENTIAL



```
 1   A P P E A R A N C E S:
 2     BROWN RUDNICK
               Attorneys for Creditors' Committee
 3             7 Times Square
               New York, New York 10036
 4
       BY:     KEN AULET, ESQ.
 5             kaulet@brownrudnick.com
               PATRICK GILMAN, ESQ.
 6             Pgilman@brownrudnick.com
               JASON ROTSTEIN, ESQ.
 7             WILLIAM FRANZESE, ESQ.
               wfranzese@brownrudnick.com
 8
 9     KIRKLAND & ELLIS LLP
               Attorneys for Debtors'
10             601 Lexington Avenue
               New York, New York 10022
11
       BY:     MICHAEL B. SLADE, ESQ.
12             michael.slade@kirkland.com
               RUSH HOWELL, ESQ.
13
14
       HAYNES AND BOONE, LLP
15             Attorneys for Debtors
               30 Rockefeller Plaza, 26th Floor
16             New York, New York 10112
17     BY:     RICK ANIGIAN, ESQ.
               rick.anigan@haynesboone.com
18
19
20
     ALSO PRESENT:
21
       Jonathan Mayers-Inhouse Counsel
22                   BlockFi
23
24
25
```



Page 106

1    A.      It's a reporting period.  June 30th, it's

2    always going to be -- you're going to stop your balance

3    sheet.  You are going to be audited on June 30th.  So

4    having an enhanced liquidity position, capital position

5    is always going to be beneficial at June 30th.

6    Q.      Are you aware that shortly before the

7    bankruptcy filing, the company purchased a new directors

8    and officers insurance policy?

9    A.      Yes.

10   Q.      Are you aware that the company paid about 22

11   and a half million for $30 million of coverage under

12   that policy?

13   A.      Yes.

14   Q.      Are you aware that half of that policy covers

15   only pre-petitioned acts?

16   A.      Correct.

17   Q.      Did you ever express a view that you would

18   resign as a director if that D&O policy was not

19   purchased?

20   A.      Yes.

21   Q.      And who did you express that view to?

22   A.      To -- I don't remember exactly who was on the

23   call, but to members of management as well as legal

24   counsel.

25   Q.      And specifically you would resign if the



HILL-CONFIDENTIAL

Page 107

1      pre-petitioned portion was not purchased; is that

2      correct?

3      A.      It was not divided out in the discussion.  It

4      was -- additional insurance was required.

5      Q.      Would you have resigned if no additional

6      prepetition coverage had been bound but additional post

7      petition coverage had been bound?

8      A.      I don't know that wasn't on the table.  We were

9      presented with bids for insurance and it included pre

10     and post.

11     Q.      But you did not clarify your statement that you

12     would resign if you do not obtain additional D&O

13     insurance to specify which portion of the D&O insurance

14     you required?

15     A.      I did not break it down.  I was on pre and

16     post.

17     Q.      Did any of the company's officers express that

18     they would resign if the D&O coverage was not obtained?

19                     MR. SLADE:  Objection.  Lack of

20             foundation.

21                     You can answer.

22     Q.      In your hearing?

23     A.      No, not in my hearing.

24     Q.      Were any of the companies officers asked if

25     they would resign if D&O coverage was not obtained?



# Exhibit D

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

----------------------------------------x

In re:

                      Chapter 11

BLOCKFI INC., ET AL.,


                      Debtors.

----------------------------------------x

        CONFIDENTIAL DEPOSITION of YURI

MUSHKIN, taken by the Creditors' Committee,

pursuant to Notice, held at the offices of

Kirkland & Ellis, LLP, 601 Lexington Avenue,

50th Floor, New York, New York 10021, on

April 12, 2023, at 9:00 a.m., before Daniel A.

Joseph, Shorthand Reporter and Notary Public in

and for the State of New York.

*************************************************

Magna Legal Services

(866) 624-6221

www.MagnaLS.com



Page 2

```
 1
 2    A P P E A R A N C E S:
 3    BROWN RUDNICK
              Attorneys for Creditors' Committee
 4            7 Times Square
              New York, New York 10036
 5
      BY:     STEPHEN PALLEY, ESQ.
 6            PATRICK GILMAN, ESQ.
              KENNETH AULET, ESQ.
 7
 8
      KIRKLAND & ELLIS, LLP
 9            Attorneys for Debtors
              601 Lexington Avenue
10            New York, New York 10022
11    BY:     MICHAEL SLADE, ESQ.
12
      HAYNES AND BOONE, LLP
13            Attorneys for Debtors
              30 Rockefeller Plaza, 26th Floor
14            New York, New York 10112
15    BY:     JONATHAN MAYERS, ESQ.
16
17    ALSO PRESENT:
18    Matthew Manning - M3 Partners
19    John K. Crossman, Esq. - Zukerman, Gore,
      Brandeis & Crossman, LLP
20
21
22
23
24
25
```



Page 69

1              *CONFIDENTIAL*  Y. MUSHKIN

2   me ask you the question BlockFi.  You were

3   talking about the challenges in the industry of

4   getting audits, but BlockFi did have some audited

5   financials, right?

6   A.     Yeah, BlockFi, for example, received

7   audited financials from FTX at some -- at some

8   point, so -- and also a number of borrowers on

9   the BlockFi platform were able to produce audited

10  financials usually.  I believe it's hard for me

11  to generalize, but I believe usually the ones

12  that were able to produce it or subsidiaries of

13  larger financial institutions that engaged in not

14  only crypto but other traditional financial

15  assets.

16  Q.     And BlockFi itself was able to have its

17  own financial statements audited until, I

18  believe, the last year?

19  A.     Right.

20  Q.     So, it wasn't impossible, just hard?

21  A.     I would agree with that characterization,

22  yeah.  I mean, I'm not fully astute to all the,

23  you know -- the different parameters and all

24  that.

25  Q.     Understood.  So from a risk management



1            *CONFIDENTIAL*   Y. MUSHKIN

2    loans and open term loans and then repaying

3    customers that withdrawed from the platform.

4            And then BlockFi recalibrated basically

5    the situation through a course of discussion.

6    And as I recall, in the credit investment

7    committee, the board audit and risk committee and

8    adjusted its risk limits, I believe, and kind of

9    took stock of what's in -- who's left in the

10   market as -- as -- as kind of feasible borrowers,

11   what do we know about these borrowers in general.

12           As I recall, the board audit and risk

13   committee had you know more preference for

14   collateralized lending versus unsecured lending.

15   And I believe at the time; also BlockFi decided

16   not to lend anything to tier 3 type

17   counterparties at all and maybe

18   overcollateralized tier 2 as well.

19           So, I think there was some deliberate

20   approach to focus kind of on the bigger

21   counterparties left in the market and those that

22   were able to post collateral and, you know, I --

23   I suppose Alameda fit that criteria, and also

24   they just exhibited, you know, that they were

25   able to fully repay, you know, the -- you know,



MAGNA
LEGAL SERVICES

1              *CONFIDENTIAL*  Y. MUSHKIN

2    over a billion of loans so that they -- they were

3    the winner in the auction for the Three Arrows

4    collateral.

5              So, back to our discussion earlier, like

6    predicting creditworthiness based on historical

7    patterns at that point, BlockFi knew a lot more

8    about Alameda.  I believe at that point BlockFi

9    also actually received audited FTX financials

10   which gave more comfort, among other things.  And

11   you know, I think that all that was part of the

12   calculus of how BlockFi were to resume lending,

13   including Alameda, from what I recall.

14   Q.   So, at some point during the summer crisis

15   in 2022, BlockFi decided to risk off Alameda and

16   recall its loans, correct?

17   A.   At some point, BlockFi decided to risk off

18   in general, and in particular, it affected

19   Alameda as well, as they were a large borrower at

20   the time, and certainly they had a lot of

21   BlockFi's liquidity out, and so, yeah, they were

22   affected, you know, to a great extent by

23   BlockFi's risk-off decision and like I recalled

24   all those loans, so maybe with the exception of

25   there might have been some we talked about open



1                *CONFIDENTIAL*   Y. MUSHKIN

2    at FTX rather than security at Alameda, who is

3    the borrower here.  But yeah, I think security is

4    important, and there are different considerations

5    that -- and risks that would be associated with

6    such a circumstance.

7    Q.    Why, if he's talking about a loan to

8    Alameda, would there be a concern for security at

9    FTX?

10   A.    I'm not 100 percent sure based on this

11   alone, but I suspect potentially it's because of

12   the desire to on -- on BlockFi's part to take

13   advantage of the FTT rewards by placing FTT on

14   FTX, for which then security of FTX becomes an

15   important consideration.  I believe that there

16   was a negotiation with Alameda on that point.

17   And the fact that -- and this is, in fact, as you

18   mentioned, a risk, I recall raising myself in

19   that circumstance.  And I think in this -- this

20   particular concern was maybe resolved in some

21   ways by Alameda, providing indemnification to

22   BlockFi later on for any FTT that would have been

23   on FTX.

24               WITNESS:  Do you mind if we take a

25          two-minute break?



Page 206

1              *CONFIDENTIAL*  Y. MUSHKIN

2    recourse and/or where we could take larger cap

3    coins as collateral?

4    A.    There were a number of risk mitigation

5    initiatives, of which this is one that were

6    pursued during the lending relationship.  I

7    believe BlockFi did eventually receive FTX

8    audited in terms of exploring recourse to another

9    entity, whether it's FTX or a third party, and

10   that would be the mitigation, I think, we talked

11   about earlier that BlockFi was pursuing.

12          I don't think BlockFi consummated that

13   guarantee, but I know that with respect to other

14   coins, getting other coins as collateral, there

15   was a mitigation that was being worked on to

16   establish a tri-party agreement, I believe, with

17   Coinbase Ireland so that BlockFi could take as

18   collateral Solana, which is another point, and I

19   think that was achieved some extent.

20   Q.    Are you aware that -- do you know the

21   extent to which Sam Bankman-Fried had a stake in

22   the Solana ecosystem?

23   A.    I don't know.  I don't know, but I know

24   just from super high-level public mentions about

25   his interest in the Solana ecosystem.  Yeah.



# Exhibit E

# Exhibit F



HIGHLY CONFIDENTIAL



# Exhibit G