**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors. | (Jointly Administered) |

**REPLY MEMORANDUM IN SUPPORT OF
THE DEBTORS' SECOND MOTION TO EXTEND EXCLUSIVITY PERIODS**

The Court previously held that exclusivity should be extended to permit the Debtors to prosecute a proposed Plan through a confirmation hearing without additional cost and distraction. The Committee completely ignores the Court's prior decision. And everything that has occurred since confirms the Court's rationale. The Court should grant the extension and permit the Debtors to move forward with soliciting and prosecuting the proposed Plan and the Disclosure Statement.[1]

---

[1] *See Second Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1132] (the "Plan"); *Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1133] (the "Disclosure Statement").

1

Clients want cryptocurrency back, and not one client objected to the Disclosure Statement. Ironically, the only roadblock to maximizing value and making distributions is the Committee.

**Introduction**

1. Since the Official Committee of Unsecured Creditors (the "Committee") was appointed and retained advisors, the Debtors have attempted to work with the Committee to maximize the value of the estates and distributions to BlockFi clients. But the Committee always had a different agenda, namely, destruction of the Debtors' management team, creditor recoveries be damned. Committee objectivity is non-existent, as it seeks to pursue an irrational and massively expensive path that has zero chance of maximizing distributions to BlockFi clients and, worse, destroys value and creates material further delays.

2. The Court has seen some of this first-hand, but actions behind-the-scenes make it clear. Before the Committee reviewed a single document or asked a single question of a single witness, it proclaimed that Committee members and the Debtors' management team were adversaries. The Committee has since wasted millions with objections to nearly every substantive motion—including one that simply sought to return assets outside the estate to BlockFi clients; the Committee demanded a massive amount of unnecessary diligence (through three sets of advisors) and then insisted on *preserving its right to sue BlockFi clients* to secure its support. The Committee has since made clear in word and deed that it will try to extract pain from, and ruin the lives of, the Debtors' management team, regardless of the waste the Committee creates or the damage and delay the Committee inflicts on creditor recoveries.

3. While simultaneously driving up fees by engaging in extensive motion practice and even more extensive discovery, the Committee feigns concern over the costs of this case. The Committee uses rising case costs as an excuse to suggest the company is mismanaged, even though

the Committee's practices and strategy caused most of this burn. Just by way of example, the Committee retained a blockchain forensics firm and directed it to investigate every cryptocurrency transaction in the history of BlockFi, to "find" the fraud its forensics team found in another case where (unlike here) there actually was theft from the company.[2] The Committee spent millions.[3] It found none. The Debtors also publicly disclosed all insider-related transactions in the year before bankruptcy in writing and during a public court hearing at the outset of this case.[4] Yet after the Debtors went through that effort and voluntarily made their management team available for interviews, the Committee served more than 100 document requests and insisted on 11 depositions exceeding 55 hours of on-the-record examination, and during which its agenda was apparent. The proof is in the pudding: even *after* filing its June 27 pleading complaining about cost, the Committee served three new subpoenas, 70 new document requests, and 60 new interrogatories so far. The Committee's behavior is inconsistent with any desire to conserve expense or maximize value and, most certainly, does not justify terminating the Debtors' exclusivity periods.

---

[2] *Application for Retention of Professional* [Docket No. 401] (seeking retention of Elementus as "blockchain intelligence and forensics expert"); *see Report of Robert J. Stark*, *In re Cred Inc.*, No. 20-12836-JTD (Bankr. D. Del. Mar. 8, 2021) [Docket No. 605] (detailing the "dereliction in corporate responsibility" of Cred Inc. and its officers contributing to the theft of fiat currency and cryptocurrency by Cred's chief capital officer).

[3] The Committee's professionals have incurred more than $14.94 million in fees and expenses through April 30, 2023. *See First Interim Application for Allowance of Fees and Reimbursement of Expenses to Genova Burns LLC* [Docket No. 1073] (seeking allowance of $523,017.43 in fees and expenses); *First Interim Application for Allowance of Fees and Reimbursement of Expenses of Brown Rudnick LLP, as Counsel to the Official Committee of Unsecured Creditors for Services Rendered and Reimbursement of Expenses Incurred for the Period of December 29, 2022 Through and Including April 30, 2023* [Docket No. 1074] (seeking allowance of $6,844,965.02 in fees and expenses); *First Interim Application for Allowance of Fees and Reimbursement of Expenses of Elementus, Inc.* [Docket No. 1075] (seeking allowance of $1,167,163.06 in fees and expenses); *First Interim Application for Allowance of Fees and Reimbursement of Expenses to Elementus, Inc.* [Docket No. 1076] (seeking allowance of $3,519,908.91 in fees and expenses); *First Interim Application for Allowance of Fees and Reimbursement of Expenses of McCarter & English, LLP, as Efficiency Counsel to the Official Committee of Unsecured Creditors for Services Rendered and Reimbursement of Expenses Incurred for the Period of December 29, 2022 Through and Including March 31, 2023* [Docket No. 1077] (seeking allowance of $1,355,202.63 in fees and expenses). Committee demands are the direct cause of not only these expenses, but also of a material portion of the expenses incurred by Debtor professionals.

[4] *See Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* [Docket No. 243]; *Tr. of Jan. 9, 2023 Status Conference* at 16:15–19:16 [Docket No. 230].

4. The truth is that the Committee's focus has been misdirected by anger and its advisors are incentivized to continue a crusade against BlockFi management regardless of the consequences to clients. And the *coup de grace* of these efforts (so far) is the Committee's second exclusivity objection, coupled with a "cross-motion" asking the Court to terminate exclusivity and permit the solicitation and prosecution of dueling plans, appoint a trustee, or convert the case to chapter 7.[5] The Committee's exclusivity arguments are rehashes of theories that the Court already rejected. And its "cross-motion," which the Debtors will address before the August 16 hearing, is frivolous. None of the relief the Committee requests would benefit BlockFi clients. Instead, the Committee's path would further reduce recoveries and ensure that no distributions are made until far into the future. The Committee barely suggests otherwise; it cannot credibly do so.

5. The Debtors, on the other hand, are focused on maximizing recoveries to BlockFi creditors—and nothing else. There is no serious doubt that the proposed Plan does exactly that, for straightforward reasons:

- As disclosed in the Disclosure Statement and Liquidation Analysis,[6] the amounts distributed to BlockFi creditors will overwhelmingly depend on the Debtors' efforts to recover against the actual fraudsters in the crypto sector—Alameda,[7] FTX,[8] and

---

[5] *Cross-Motion of the Official Committee of Unsecured Creditors for an Order (A) Appointing a Chapter 11 Trustee. (B) Terminating the Debtors' Exclusivity Periods or, Alternatively, (C) Converting these Cases to Chapter 7 Proceedings, and (D) for Other Related Relief* [Docket No. 1131] (the "Committee Obj.").

[6] Amended Disclosure Statement at Art. II.C; *Exhibit B – Liquidation Analysis* at 6–7 [Docket No. 1133].

[7] *See e.g., SEC Charges Caroline Ellison and Gary Wang with Defrauding Investors in Crypto Asset Trading Platform FTX*, U.S. Securities and Exchange Commission (December 21, 2022), https://www.sec.gov/news/press-release/2022-234 ("The complaint alleges that, by manipulating the price of FTT, Bankman-Fried and Ellison caused the valuation of Alameda's FTT holdings to be inflated, which in turn caused the value of collateral on Alameda's balance sheet to be overstated, and misled investors about FTX's risk exposure."); *United States Attorney Announces Extradition Of FTX Founder Samuel Bankman-Fried To The United States And Guilty Pleas Of Former CEO Of Alameda Research And Former Chief Technology Officer Of FTX*, United States Attorney's Office Southern District of New York (December 22, 2022), https://www.justice.gov/usao-sdny/pr/united-states-attorney-announces-extradition-ftx-founder-samuel-bankman-fried-united ("With the pleas announced today, Ms. Ellison and Mr. Wang admitted they were willing participants in schemes to defraud FTX.com's customers and backers out of their money.").

[8] *See e.g., United States Attorney Announces Charges Against FTX Founder Samuel Bankman-Fried*, United States Attorney's Office Southern District of New York (December 13, 2022), https://www.justice.gov/usao-

- Three Arrows Capital[9]—as well as Emergent and Marex. These claims are BlockFi's largest assets by far, by orders of magnitude.

- Success or failure on these affirmative claims, and in defending the over $4 billion in claims asserted by Alameda, FTX and 3AC against BlockFi, **will swing recoveries by over $1 billion in aggregate and up to 75 cents on the dollar for every BlockFi creditor**.[10] No other claims make a material difference to creditors.

- It is irrational for any estate fiduciary to alienate key witnesses in prosecuting and defending against these claims—particularly to pursue vindictive theories that lack merit *and would make no difference to creditor recoveries even if they had merit*. The Committee cannot explain how its proposal, which actively assists BlockFi's adversaries, maximizes value. It does not.

6.  In other words, taking action to impair BlockFi's most significant assets makes no sense. Yet that is what the Committee is doing. Every chapter 11 estate is a so-called "bundle of sticks."[11] But the Committee's proposed path would burn BlockFi's bundle of sticks to kindling and dust. Committee counsel claims that creditors may reject a plan that settles estate claims against insiders to preserve the estate's full-throated ability to pursue $1+ billion from commercial counterparties. While time will tell, and the Committee's invective surely poisons the well, exactly the opposite should be true: **any rational creditor would vote "yes" on the proposed Plan**.

---

sdny/pr/united-states-attorney-announces-charges-against-ftx-founder-samuel-bankman-fried ("As today's charges make clear, this was not a case of mismanagement or poor oversight, but of intentional fraud, plain and simple."); *id.* ("The Justice Department has filed charges alleging that Samuel Bankman-Fried perpetrated a range of offenses in a global scheme to deceive and defraud customers and lenders of FTX and Alameda, the defendant's crypto hedge fund, as well as a conspiracy to defraud the United States government."); *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* at 2, *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. June 26, 2023) [Docket No. 1704-1] ("[F]rom the inception of the FTX.com exchange, the FTX Group commingled customer deposits and corporate funds, and misused them with abandon."); *id.* ("The FTX Senior Executives did not commingle and misuse customer deposits by accident. Commingling and misuse occurred at their direction, and by their design. Bankman-Fried … and others, lied to banks and auditors, executed false documents, and moved the FTX Group from jurisdiction to jurisdiction, taking flight from the United States to Hong Kong to the Bahamas, in a continual effort to enable and avoid detection of their wrongdoing.").

9  *See e.g.*, *Foreign Representatives' Notice of Filing of December 2, 2022 Hearing Presentation*, *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. December 2, 2022) [Docket No. 68] (detailing lack of cooperation by 3AC management with liquidation efforts and transfers of Three Arrows Capital funds to pay for superyacht).

10  *See* Disclosure Statement at Art. II.C, Art. V.C.

11  Committee Obj. ¶ 1.

5

7. The Committee's proposed strategy has zero upside for creditors. The only thing that denying an extension of exclusivity would do is permit the filing of dueling plans, materially increasing professional fees and further delaying initial distributions. The Court already explained why terminating exclusivity makes no sense—yet the Committee ignored the Court and spent yet another fortune drafting yet another set of unnecessary pleadings. And suggesting the appointment of a chapter 11 trustee, or converting the case to chapter 7, only wastes more money. Neither approach would lead to distributions occurring any faster. The Committee does not suggest that denying an exclusivity extension would reduce cost or maximize value, nor could it.

8. And what is the supposed "benefit" to clients of the Committee's proposed war on insiders as an alternative to the proposed Plan? The Committee has already spent millions on its "preliminary" investigation. Actual litigation would cost many millions more. The Committee does not say that pursuing claims against insiders would bring material net consideration to the estate for distribution to creditors. Nor could it credibly do so. The truth is that *even if* the estates made the massive investment required to pursue those claims, there is no realistic possibility of recovering material value that would make a substantive difference to creditors. None.

9. Instead, the Committee offers *ad hominem* attacks on the Debtors' management team and bald, irresponsible claims of "fraud on customers." While none of that is true, none of it is relevant to *the estate's* claims—nor does Committee member anger justify throwing good money after bad. The Committee must realize that rational people seeking to maximize their recovery will reject the Committee's "burn the house down" agenda. That is why the Committee wants to deny creditors the ability to choose reason and vote in favor of the value-maximizing approach proposed in the Plan. But the Committee's scorched earth war on insiders only destroys value, and ending exclusivity benefits no creditor. The Court should grant the Debtors' request.

**Reply**

**I.     The Debtors Are Clearly Entitled to an Extension of Exclusivity.**

10.     The legal standard for extending exclusivity is neither complicated nor controversial and is one the Debtors clearly meet. As set forth in the Second Exclusivity Motion, courts typically examine multiple factors to assess whether there is "cause" for extension of the Exclusivity Period. *See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re Friedman's Inc.*, 336 B.R. 884, 888 (Bankr. D. Ga. 2005) (same).[12]

11.     Even if the Court were considering the Debtors' Second Exclusivity Motion in a vacuum, the Debtors meet the legal standard for the extension requested. The Debtors only seek an extension sufficient to permit the Debtors to solicit and prosecute a plan and disclosure statement filed after the Debtors tried in good faith to negotiate consensus with the Committee at mediation. The request was filed less than six months after the Petition Date. Hundreds of millions of dollars are at stake and hundreds of thousands of individuals are affected, in a case with a slew of complex issues, including a developing regulatory landscape that must be navigated to make distributions and litigation on behalf of the estate in multiple forums, in multiple countries, to maximize recoveries.[13] The Debtors are paying all of their debts as they come due and they did not delay the filing of the proposed Plan and Disclosure Statement. Moreover, not a single BlockFi client objected to the Disclosure Statement before expiration of the objection deadline.

---

[12] These nine factors are the following: (i) the size and complexity of the case; (ii) progress toward reorganization; (iii) the necessity of sufficient time to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan; (iv) whether the debtor is paying its debts as they become due; (v) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (vi) whether the debtor has made progress negotiating with creditors; (vii) the amount of time which has elapsed in the case; (viii) whether the debtor is seeking an extension to pressure creditors; and (ix) whether an unresolved contingency exists. *In re Cent. Jersey Airport Servs.*, 282 B.R. at 184.

[13] *See, e.g.*, Tr. of Hr'g Held Apr. 19, 2023, 26:20–27:7, *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Apr. 19, 2023) [Docket No. 756] (the "April 19 Hr'g Tr.").

12. The Court previously found that the Debtors had made meaningful progress in these chapter 11 cases by reference to the Court's docket.[14] That observation is even more clearly correct today, as the Debtors have continued to make progress and drive this case to conclusion. In addition to that laid out in the Second Exclusivity Motion, at this point the Debtors have now also:

- engaged in a monthlong mediation in an effort to resolve or otherwise narrow issues in connection with the Plan;[15]

- drafted and filed proofs of claim in the FTX Trading Ltd. jointly administered chapter 11 cases, the outcome of which will be a material source of BlockFi creditor recoveries;

- drafted and filed proofs of claim in the Core Scientific Inc. jointly administered chapter 11 cases;

- drafted, developed, and filed an amended Plan and Disclosure Statement on June 28, 2023 [Docket Nos. 1132–1133], which materially narrow the issues in dispute;

- filed an application in lieu of motion with respect to the withdrawal process for the digital assets in the Custodial Omnibus Wallets [Docket No. 1140];

- filed five omnibus objections to claims [Docket Nos. 1067, 1068, 1069, 1070 1091];

- rejected numerous executory contracts [Docket Nos. 1019, 1035, 1045, 1096, 1159];

- resolved a significant amount of the Debtors' institutional loan portfolio pursuant to this Court's *Order Granting Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue Servicing and Administration Activities in the Ordinary Course of Business with Respect to the Debtors' Institutional Loan Portfolio and Granting Related Relief and (II) Authorizing and Establishing Procedures Regarding the Restructuring, Settlement, or Other Modifications of Institutional Loans and Loan Obligations* [Docket No. 299] (*see, e.g.*, this Court's orders authorizing the Debtors to enter into loan settlement agreements at [Docket Nos. 439, 488, 566 and 567]);

- prepared, initiated, and ultimately settled an adversary proceeding against Druk Holding and Investment Limited seeking to enforce the terms of a master digital currency loan agreement. *See BlockFi International Ltd. v. Druk Holding and Investment Limited*, Adv. No. 23-01078 (Adv. Docket No. 1);

---

[14] April 19 Hr'g Tr. at 22:24–23 ("I can look at the docket and get 80 percent of the content of the declaration just by looking at the docket because it shows the activity of the Debtor and of, and the Committee in this case.").

[15] *Order Appointing a Mediator and Governing Mediation Procedures* [Docket No. 1013].

8

- initiated an adversary proceeding against PrimeBlock Operations LLC seeking to enforce the terms of a master digital currency loan agreement. *See BlockFi Lending LLC v. PrimeBlock Operations LLC*, Adv. No. 23-01116 [Adv. Docket No. 1];

- prepared and initiated an adversary proceeding against Digistar Norway AS and others to recover $37 million on an equipment mining loan. *See BlockFi Lending LLC v. Digistar Norway AS et al*, Adv. No. 23-01150 [Adv. Docket No. 1];

- drafted a proposed complaint against Vrai Nom Investment Limited for the return of crypto collateral and engaged in settlement negotiations with respect thereto;

- obtained entry of an order appointing a fee examiner [Docket No. 854] to ensure administrative expenses remain at the appropriate level;

- initiated an adversary proceeding against the Connecticut Department of Banking regarding the imposition of fines and penalties against the Debtors related to the Debtors' money transfer license. *See BlockFi Inc. v. Jorge L. Perez*, Adv. No. 23-01159 (Bankr. D.N.J. June 13, 2023) [Adv. Docket No. 1]; and

- consensually resolved by stipulation and agreed order the treatment of the SEC Penalty Claims pursuant to which the SEC has agreed to forego any distributions on such claims until payment in full of all creditors. *See Stipulation and Agreed Order Between U.S. Securities and Exchange Commission and Debtors To Forego Receiving Distributions From Debtors' Bankruptcy Estates* [Docket No. 1161].

13. Importantly, while the Committee has been an obstacle to progress at every turn, the Amended Plan reflects that the Debtors made multiple modifications to address Committee concerns. The Committee's "Statement" indicated disagreement with sixteen items in the original plan; the Amended Plan resolves eight of them.[16] The Debtors are hopeful that the Committee will begin thinking logically and negotiate the final disputed points in good faith, but if the Committee will not do so, the Debtors have no choice but to proceed with the proposed amended Plan.

---

[16] *See* Plan at Art. IV.D.4 (providing for the Committee's financial advisor to be Wind Down Trustee and a "Wind-Down Debtors Oversight Committee" that includes a Committee appointee), Art. III (resolving the value allocation issue), Art. IV.P (describing the employee transition plan), Art. VIII.C (resolving Committee concern over timing of exculpation), Art. III.C (addressing Committee concern over government penalty claims), Art. II.B.4 (addressing Committee concern about post-effective date professional fees), Art. III.C (addressing non-voting classes of claims), Art. VI.E (addressing foreign exchange concerns); *Order (I) Authorizing the Debtors to (A) Honor Withdrawals from Wallet Accounts, (B) Update the User Interface to Properly Reflect Transactions and Assets as of the Platform Pause, and (C) Conduct Ordinary Course Reconciliation of Accounts, and (III) Granting Related Relief* [Docket No. 923] (wallet order already addresses holdback for preferences).

14. Moreover, the Debtors' exclusivity request exists not in a vacuum, but in the context of the Court's prior rulings. The Court's guidance (which the Committee is unwilling to accept) is particularly on point now. As the Court recognized, exclusivity is "a tool" available to Debtors, while "voting and confirming a plan are a creditor's tools."[17] The Court's message was clear: an exclusivity extension is appropriate to give the Debtors a fair chance to put their Plan forward, commence solicitation, and allow creditors to speak through votes.[18] That is all the Debtors are asking to do. The Debtors tried to negotiate a comprehensive resolution during mediation, and when that did not succeed, amended the Plan and a Disclosure Statement (and the Committee knew *exactly* what was coming). The Committee wants to substitute its anger for the judgment of the Debtors (and the Court). But that is not how the Bankruptcy Code works.

15. The Committee's simplistic assertion that the case is a "snap to wrap up at very little cost" ignores reality—including the Committee's own, material, ongoing expenditures. And its Objection is plagued by inaccuracies about BlockFi's ongoing activities, including:

- BlockFi has not ceased all operations. BlockFi is servicing outstanding loans and engaging in staking activities and mining. BlockFi is attempting to maximize value from each of these activities, in the face of Committee inaction and obstruction. BlockFi needs employees and advisors to do so.

- BlockFi is actively working on wallet withdrawals, which have been delayed by a complex preference analysis completed at the Committee's request. To be clear, the Debtors do *not* support pursuing preferences and believe these assets should be returned to BlockFi clients, but the Debtors have waited for weeks *and continue to wait* to hear back from the Committee on the Debtors' proposal to expedite the process.

- BlockFi is actively working on expanding the capabilities of the BlockFi platform to permit in-kind BIA distributions securely following plan confirmation. Creating this capability will require complex technology development and maintenance long after the effective date of any plan. BlockFi has walked the Committee through the

---

[17] April 19 Hr'g Tr. at 26: 4-8.

[18] *See id.* at 21:15-20.

10

personnel that it needs, and is using, to create and maintain this capability. To date, the Committee has not offered any substantive feedback.[19]

- BlockFi has also actively planned for the wind-down of its workforce over time. As the Court knows, BlockFi terminated 2/3 of its entire workforce imminently prior to the chapter 11 filing, and (contrary to the Committee's suggestions) BlockFi headcount is down 24% since the bankruptcy filing. Indeed, BlockFi has shared weekly reports with Committee advisors since the petition date and, again, has never received any substantive feedback.

16. The case is expensive, no doubt, but by the Committee's own analysis, 75% of the expenses relate to work done by restructuring professionals—most of which was driven by Committee obstruction. Diverting from the current plan process would only accelerate the burn and delay distributions.[20]

## II. Terminating Exclusivity Is The Wrong Way To Address The Committee's Objection To Releases In The Proposed Settlement And Plan.

17. With the progress made by the Debtors in the face of Committee obstruction, the primary remaining issue in dispute is whether the estates should settle, prosecute, or retain causes of action against the Debtors' insiders. The Committee claims that the "true underlying purpose" of the Motion is "to forcibly extract plan releases where none are due."[21] But, again, the Committee's argument makes no sense. Extending exclusivity to permit a rational, efficient plan process does not "extract" anything. Creditors will get to vote on whether to accept the Debtors' value-maximizing plan. Ending exclusivity would only mean a default to the anarchy of Committee-created chaos where millions more is wasted on professional fees for no reason.

---

[19] Terminating people and bringing in additional professionals or new people in an effort to maintain this capability with people who are not familiar with BlockFi or the details of its business and platform would be more expensive and more risky—which presumably is why the Committee is not suggesting that the estates do that.

[20] For the avoidance of doubt, the Committee's run-rate analysis is materially incorrect. That said, the Debtors are working with the Committee's financial advisor in an attempt to align on the facts and come to agreement on making the process going forward as efficient as possible.

[21] Committee Obj. ¶ 32.

11

18. For now, the Committee's argument is self-defeating. As the Court observed before, competing plans created by ending an exclusivity period while a proposed plan is already on file, are costly, burdensome, and value-destructive.[22] As stated above and as recognized by the Court, exclusivity is the Debtors' tool to drive a value-maximizing resolution to these cases.[23] The voting process that the Debtors are seeking to unleash—and the Committee is desperate to avoid—is the creditors' tool to ensure their voice is heard. And Congress intended debtors to have the first and exclusive chance to propose ***and confirm*** a Plan. *E.g.*, *In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 509 (E.D. Mich. 2012) ("Congressional intent ***obviously*** was that the Chapter 11 debtor should normally have the first and exclusive chance to propose and to ***confirm*** a plan.") (emphasis added). The Committee's effort to avoid this process is telling and baseless.

19. The Committee's references to other cryptocurrency cases only proves the Debtors' point. The Committee gets most of the facts wrong. But comparing this case to others illustrates the propriety of the proposed Plan and the absurdity of the Committee's scorched-earth path.

20. First, despite the Committee's attempt to sling mud, BlockFi is clearly not FTX/Alameda. Multiple senior FTX/Alameda officials have pled guilty to federal felonies[24] and their ringleader, Sam Bankman-Fried, awaits two separate federal trials. Among many other things, Alameda and FTX violated their own Terms of Service, defrauded lenders and contract counterparties, diverted money to affiliates illegally, and lied to the world about holding customer assets on the FTX platform one-to-one. No similar allegations are (or plausibly could be) lodged

---

[22] *See* April 19 Hr'g Tr. at 21:12-17.

[23] *Id.* at 26:4-8.

[24] *See, e.g.*, https://www.justice.gov/usao-sdny/pr/united-states-attorney-announces-extradition-ftx-founder-samuel-bankman-fried-united; https://www.nytimes.com/2022/12/21/technology/ftx-fraud-guilty-pleas.html; https://www.nytimes.com/2023/02/28/technology/ftx-guilty-plea-fraud.html

against BlockFi or any member of its management team—and in fact one of FTX's primary victims is BlockFi itself. Indeed, one part of the Committee's brief rings true: the truth about Alameda/FTX is still coming out, and BlockFi learns the troubling facts as they are revealed, along with the rest of the world. Quite frankly, the fact that the Committee would mention BlockFi in the same vein as Alameda/FTX is proof positive that the Committee's crusade is a witch hunt.

21. Nor does BlockFi bear any resemblance to Celsius Network LLC. Celsius's co-founder, Alexander Mashinsky, manipulated the price of a token he created (CEL), and then used customer funds to buy back tokens he fraudulently kept for himself—using customer funds to "cash out." Mr. Mashinsky also falsely represented that Celsius and its CEL token were registered with (and approved by) the SEC. Again, nothing similar has been or plausibly could be alleged against any member of the BlockFi management team by anyone.

22. Celsius was also criticized for entirely lacking a risk management function and even failing to track its assets and liabilities. But BlockFi's practices, again, were not comparable. As described in detail in the Report of the Special Committee of BlockFi Inc's Board of Directors,[25] BlockFi had industry-leading risk management practices and was far more conservative than peers. BlockFi demanded significant overcollateralization for loans extended to Alameda and 3AC during a time when they were among the most sought-after digital asset counterparties in the sector. The Committee suggests BlockFi should have declined to do business with Alameda and FTX while both were being actively monitored not only in the market, but also by parties to Voyager's active chapter 11 case (including a bankruptcy court), where loans to Alameda were viewed as a

---

[25] *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement and Release of Claims and Causes of Action By and Among the Debtors and Certain of the Debtors' Insiders and (II) Granting Related Relief* [Docket No. 1173] (the "9019 Motion").

source of profit and FTX as a rock-solid buyer. The Committee's hindsight and second-guessing are out of hand, and its blame-game would not help BlockFi creditors even if it were fair (it is not).

23. In any event, the Debtors have now filed both an amended Plan and Disclosure Statement, and the 9019 Motion articulating the proposed settlement along with a detailed explanation of the key reasons for it. Once exclusivity is extended and the Disclosure Statement approved, BlockFi creditors will have a chance to weigh in—and here is where Voyager serves as a useful parallel.

24. Voyager was also a cryptocurrency platform that lent crypto deposited by customers to various proprietary trading firms to earn yield. But Voyager took far more risk. Unlike BlockFi, many of Voyager's loans were uncollateralized (including a $1 billion loan to 3AC), and others were significantly undercollateralized. Most relevant here, Voyager made hundreds of millions of dollars in loans to Alameda, and only required it to post ***less than 40%*** in collateral.[26]

25. During its bankruptcy, Voyager (like BlockFi) appointed a Special Committee of its Board to evaluate claims against insiders, and its creditors' committee performed a parallel investigation. Voyager's Special Committee found that its CEO and CFO's diligence about 3AC, followed by making uncollateralized loans after reviewing a one-page net asset value statement,[27] potentially created claims, although "the standard for successfully prosecuting such claims would

---

[26] *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Collateral and (II) Granting Related Relief* ¶ 16-17, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Sept. 12, 2022) [Docket No. 402] (the "Unwinding Motion").

[27] *Investigation Report of the Special Committee of the Board of Directors of Voyager Digital, LLC* at 37-40, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Feb. 14, 2023) [Docket No. 1000] (the "Voyager SC Report").

be difficult to meet, with any judgment being even more difficult to collect."[28] But ***no one in that case***—not the Special Committee, not the creditors committee, not any professional monitoring the case, and not the Bankruptcy Court—ever suggested that the estate could or should pursue claims based on making loans to Alameda (even though Voyager's loans were materially under- or uncollateralized).

26.   This information—including the fact that no viable claims against any insiders related to its Alameda loans had been identified by anyone—was all disclosed to Voyager creditors at a time when Alameda and FTX had crumbled, leaving Voyager creditors completely in the lurch. And after receiving that information, **97% of Voyager customers voted in favor of the plan, settlements, and releases.**[29] There is no reason to expect that, if BlockFi clients think rationally and are not distracted by the Committee's tirade, the result will be different here.

27.   Time will tell, and the Debtors have not yet had the ability to solicit votes on their Plan. But there is no reason to end exclusivity before that happens. If the Committee were truly concerned about cost, it would withdraw its objection to exclusivity and work with the Debtors on an *agreed* disclosure statement to send to creditors. Instead, it has refused to do that, insisting on both a hearing on exclusivity and what will be an ***extremely expensive*** evidentiary hearing in August on its frivolous "cross-motion" and on what the Committee has insisted on being the first-ever evidentiary hearing on approval of a Disclosure Statement (at massive cost to creditors). Again, the Committee's actual conduct belies the concerns expressed in its papers.

---

[28] *Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* at 63, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2023) [Docket No. 863].

[29] *See Amended Declaration of Leticia Sanchez Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Mar. 1, 2023) [Docket No. 1127].

28. Through the voting process, creditors will be able to make their views known with respect to the releases proposed in the 9019 Motion and contained in the Plan. But a dispute about a confirmation issue is not adequate basis—as a matter of law—to end exclusivity and permit the Committee to submit a competing plan. Allowing such a result would defy the Bankruptcy Code and create an unwieldy process with massive unnecessary expense.

## Conclusion

29. The Debtors' confirmation timeline represents the fastest path out of chapter 11 and towards distributions, taking into account the required notice periods under the Bankruptcy Code and Rules and the practical realities of a widespread creditor base including hundreds of thousands of voting parties. A second Plan (with or without proposed settlements or releases) will not speed the process, nor would it reduce the administrative burn. It would do the opposite, extending the timeline, confusing creditors, and putting BlockFi client recoveries at risk. Maximizing value requires extending exclusivity, overruling the Committee's objection thereto, and permitting the proposed Plan process to move forward forthwith.

Respectfully submitted,

Dated: July 10, 2023      /s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*