## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*,[1] | Case No. 22-19361 (MBK) |
| Debtors. | (Jointly Administered) |

### PRELIMINARY REPORT ADDRESSING QUESTION POSED BY THE
### OFFICIAL COMMITTEE OF UNSECURED CREDITORS: *WHY DID BLOCKFI FAIL?*

**BROWN RUDNICK LLP**
Robert J. Stark
Kenneth J. Aulet
Bennett S. Silverberg
7 Times Square
New York, NY 10036
(212) 209-4950
rstark@brownrudnick.com
kaulet@brownrudnick.com
bsilverberg@brownrudnick.com

Stephen D. Palley
E. Patrick Gilman
601 Thirteenth Street NW
Washington, DC 20005
(202) 536-1730
spalley@brownrudnick.com
pgilman@brownrudnick.com

Hailey E. Lennon
2211 Michelson Drive 7th Floor

**MCCARTER & ENGLISH, LLP**
David J. Adler
Lisa Bonsall
Four Gateway Center
100 Mulberry St
Newark, NJ 07102
(973) 622-4444
dadler@McCarter.com
lbonsall@mccarter.com

Joseph R. Scholz
825 Eighth Avenue
31st Floor
New York, NY 10019
(973) 639-6999
jscholz@mccarter.com

**GENOVA BURNS LLC**
Daniel M. Stolz
Donald W. Clarke

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

Irvine, CA 92612
(949) 440-0235
hlennon@brownrudnick.com

110 Allen Road
Ste 304
Basking Ridge, NJ 07920
(973) 467-2700
dstolz@genovaburns.com
dclarke@genovaburns.com

Gregory S. Kinoian
494 Broad Street
Newark, NJ 07102
(973) 646-3284
gkinoian@genovaburns.com

**Dated: May 17, 2023**

# TABLE OF CONTENTS

I.     EXECUTIVE SUMMARY ...................................................................................1

    A.    Investigative Approach. ........................................................................ 3

    B.    Summary Conclusions. ......................................................................... 4

        1.    BlockFi's Business Model Was Fundamentally Flawed, Prompting Unreasonable Risk-Taking...................................................................... 5

        2.    BlockFi's Efforts To Skirt Regulatory Compliance Necessitated Even More Unreasonable Risk-Taking...................................................................... 6

        3.    Warnings Issued By BlockFi's Risk Management Team Went Unheeded. 8

        4.    BlockFi's Reliance on Alameda/FTX Led to Foreseeable (Actually Foreseen) Losses of a Staggering Quantum......................................................... 10

II.    KEY ENTITIES AND INDIVIDUALS. ..........................................................11

    A.    Debtor Entities. .................................................................................. 11

    B.    Involved Entities. ............................................................................... 12

    C.    Relevant Individuals. ......................................................................... 14

III.   UNDERSTANDING "RISK FACTORS" INHERENT IN BLOCKFI'S BUSINESS.....15

IV.   GENERAL TIMELINE OF EVENTS.............................................................17

V.    CUSTOMER PROMISES; CORPORATE GUIDELINES AND OVERSIGHT FUNCTIONS; REGULATORY; AND INVESTMENT FAILURES IN EXECUTION…………………………………………………………………....27

A.    Customer Promises. ......................................................................... 27

    1.    Protecting/Custodying Customer Assets.................................. 27

    2.    Product Risk........................................................................... 28

    3.    Risk Management Functions.................................................... 29

B.    Corporate Guidelines And Oversight Functions.................................... 36

    1.    Enterprise Financial Risk Management Policy......................... 36

    2.    BlockFi Board Audit and Risk Committee ("BARC").............. 37

C.    Regulatory........................................................................................ 38

D.    Investment Failures in Execution......................................................... 41

    1.    Grayscale............................................................................... 42

    2.    Three Arrows Capital.............................................................. 49

    3.    FTX and Alameda.................................................................. 54

VI.    QUESTIONABLE TRANSACTIONS JUST PRIOR TO THE BANKRUPTCY
FILINGS…………………………………………………………………………82

A.    Liquidation of Cryptocurrency. ........................................................... 82

B.    D&O Insurance. ................................................................................ 84

C.    Personal Transactions. ....................................................................... 86

D.    D&O Litigation: ███████████. ...................................................... 86

I.    **EXECUTIVE SUMMARY**

When this bankruptcy case started, BlockFi immediately distanced itself from other cryptocurrency debtors accused of fraudulent, manipulative, and/or otherwise wrongful pre-petition behavior.  According to Debtors' financial advisor, Mark Renzi, "the Debtors do not face the myriad issues apparently facing FTX.  Quite the opposite."[2]  BlockFi was, according to its initial case filings, "best-in-class" in terms of its business practices, customer service, transparency, and regulatory compliance.[3]  BlockFi thus presented itself as an island of integrity in a sea of malfeasance and an innocent victim of market conditions and FTX's collapse.[4]

Promptly upon appointment, the Official Committee of Unsecured Creditors (the "Committee") tasked its professionals to conduct an investigation (the "Investigation")) testing the accuracy of the Company's case narrative, posing the question in a simple and unbiased manner: *Why did BlockFi fail?*  While the Investigation remains on-going, sufficient evidence has been produced to confidently draw certain factual conclusions.  Those conclusions do not square with BlockFi's contentions to the Court or to its stakeholders.

BlockFi was a financial services company that allowed users to: (1) store cryptocurrencies; (2) trade cryptocurrencies; (3) invest cryptocurrencies in interest-bearing accounts; (4) borrow dollars against cryptocurrencies; and (5) borrow dollars against cryptocurrency mining equipment.  Reduced to its essentials, BlockFi's business looked somewhat like "savings and loan" or "thrift"

---

[2] Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions at ¶ 2, Case No. 22-19361 (Nov. 28, 2022),  Dkt. No. 17.
[3] *Id.*
[4] Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions at ¶ 1, Case No. 22-19361 (Nov. 28, 2022), Dkt. No. 17 (stating that "the Debtors are faced with a severe liquidity crunch due to the unprecedented, expedited collapse of FTX Trading Ltd., West Realm Shires, Inc (dba FTX US), Alameda Research, Ltd. and their affiliates (together, 'FTX')…").

retail lending.  Although BlockFi was not a regulated lending institution and none of its accounts

were FDIC insured, it presented itself as almost akin to a regulated, insured hometown community

bank.

      BlockFi's marketing strategy was personified by "Zac and Flori,"[5] and supplemented by

executives and employees with impressive credentials, all of whom presented well to the public.

Collectively, they exuded a "trust your local community banker" ethos and messaged

"Transparency Builds Trust."[6]  BlockFi created and promoted the hashtag #TBT and indicated that

it was transparent "in all aspects: across teams, with our clients, with our investors."[7]  Using

BlockFi's platform was supposed to be safe and boring.  Although BlockFi Interest Accounts

("BIA") and loan agreements gave BlockFi broad power to invest BIA and loan collateral deposits

as management saw fit,[8] Zac and Flori assured clients that their funds were safe – just as one might

---

[5] Deposition testimony of Marquez revealed that her twitter handle was operated and controlled by BlockFi's marketing team and not her personally.  See Ex. 1, Marquez Dep. 36:12 – 37:19.

[6] BlockFi, *Q2 2022 Transparency Report: Platform Assets and Management of Liquidity and Credit Risks*, BLOCKFI, (July 21, 2022), https://blockfi.com/blockfi-transparency-report-Q2-2022 (last accessed 5/17/2023).

[7] BlockFi, *BlockFi Mission,* BLOCKFI, (May 5, 2023), https://blockfi.com/mission/.

[8] Ex. 2, BF_BK_00015213 (BlockFi Consumer Loan and Security Agreement (§4(d)), stating "Borrower agrees that Lender may, for its own account, pledge, repledge, hypothecate, rehypothecate, sell, lend or otherwise transfer or use any amount of such Collateral , separately or together with other property, with all attendant rights of ownership from time to time. . ."); Ex. 3, BlockFi BIA Terms of Service (§ E) ("BlockFi has the right, without further notice to you, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk. . .").

expect when depositing with one's local community bank.[9]  The depositing community warmly

embraced the message, and BlockFi generated enormous volumes of customer deposits.

Behind the marketing veneer, however, was a flawed business model, with operational and

regulatory obstacles that grew commensurately with the deposit levels.  This led BlockFi to take

on unreasonable business risks that, in turn, led to cataclysmic loss.  It may be true that

Alameda/FTX's downfall triggered BlockFi's downfall, but BlockFi's demise was rooted in

business practices and decisions well preceding Alameda/FTX's bankruptcy filing. That included

senior management's staunch refusal to follow (*i.e.*, over-ruling) repeated warnings by the

Company's credit risk department not to loan enormous sums to Alameda, collateralized by FTT.

Indeed, senior management was repeatedly told that such loans were tantamount to very high-risk

gambles.  Mr. Prince, in response, told his team to learn to "get comfortable" with much of the

Company's cash being deployed this way.  The Company's business practices and decisions were

materially inconsistent with what was promised to customers.

A.    **Investigative Approach.**

The Committee charged its professionals to conduct the Investigation in an objective and

unbiased (*i.e.*, not "results oriented") manner, following the same methods, approach, and using

largely the same team that completed the Examiner's charge in In re Cred Inc.[10]  This Preliminary

Report is not intended to be an advocacy piece.  It is, rather, the memorialization of an Investigative

effort to discern the truth undergirding the Chapter 11 cases, per the Committee's directive.

---

[9] Thinking Crypto Podcast, *Interview: BlockFi Cofounder Flori Marquez*, YOUTUBE, Apr. 17, 2019, https://www.youtube.com/watch?v=dsGKw4RwqJI (Ms. Marquez stated about the BIA that, "it's essentially a high yield savings account for crypto").
[10] *See Examiner's Report,* Case No. 20-12836 (Mar. 8, 2021) (Bankr. D. Del.), Dkt. No. 605.

3

As part of the Investigation, Counsel obtained documents from the Debtors, Committee members, and certain customers or vendors of the Debtors.  To date, approximately 30,000 documents have been delivered and reviewed.  Counsel interviewed six individuals.[11]  None of the interviews were conducted under oath or with personal counsel present.  In general, Counsel found the Debtors, Committee members, executives, and other interviewees responsive, willing to provide information, and answered questions largely without interruption by BlockFi counsel. Counsel thereafter deposed nine individuals, between March 2023 and April 2023.[12]  In contrast to the more candid answers provided during initial interviews, the deponents (represented by both BlockFi and personal counsel) were generally guarded and evasive during the questioning. Executive deponents routinely professed a lack of expertise or knowledge of BlockFi practices, even when presented with documents demonstrating their awareness of such practices.  This was particularly true of COO Flori Marquez, whose evasiveness and professed lack of knowledge added materially to the aura of suspicion.

B.    <u>**Summary Conclusions**</u>.

The evidence produced lead the Investigative team to draw four categorical conclusions:

(1) BlockFi's business model was fundamentally flawed, prompting unreasonable risk-taking; (2)

BlockFi's efforts to skirt regulatory compliance necessitated even more unreasonable risk-taking;

---

[11] Interviews included Zachary ("Zac") Prince (founder, CEO), Amit Cheela (CFO), Rob Loban (CAO), Yuri Mushkin (CRO), Jonathan Mayers (GC), and Michelle Henry (Head of Private Client).
[12] Depositions included Zac Prince (CEO), Florencia ("Flori") Marquez (COO), Rob Loban (CAO), Amit Cheela (CFO), Yuri Mushkin (CRO), Rene van Kesteren (former CRO), David Spack (CCO), Michelle Henry (Head of Private Client), Jennifer M. Hill (non-Executive Board Member).

(3) warnings issued by BlockFi's risk management team went unheeded; and (4) BlockFi's reliance on Alameda/FTX led to foreseeable (actually foreseen) losses of a staggering quantum.

### 1.  BlockFi's Business Model Was Fundamentally Flawed, Prompting Unreasonable Risk-Taking.

BlockFi's business was built on interest-bearing accounts, often referred to as "BIAs." The idea was this. BlockFi would take in deposits of cryptocurrency (redeemable at any time), promising depositors a certain rate of interest. BlockFi would, in turn, reinvest that same cryptocurrency with third parties promising an even greater investment yield. BlockFi would pocket the difference.

In its marketing materials, BlockFi promised customers that it would not convert deposited cryptocurrency into fiat currency as part of its investment activities. It would, in other words, only place cryptocurrency with third parties that would allow in-kind reinvestment. On the surface, the strategy made sense: Risks of loss associated with cryptocurrency trading prices were thereby passed on to BlockFi's reinvesting counterparties, thus (i) insulating the Company from trading price fluctuations and (ii) avoiding the (likely expensive) need for trading hedges.

The problem was that this dramatically narrowed the places where BlockFi could reinvest large quantities of cryptocurrency. BlockFi first had to find investment counterparties willing to (and sufficiently stable to ultimately) deliver yields greater than what BlockFi had promised its customers. Between April 2021 and August 2022, BlockFi promised to pay customers between 2% and 6% for BTC and ETH deposits,[13] meaning that third-party counterparties had to promise several yield points higher for BlockFi to reinvest profitably. This "narrowing of the field" became

---

[13] *See, e.g.,* BlockFi, *Updated Rates for BTC, ETH, LINK, LTC, and PAXG Effective May 1, 2021*, BLOCKFI, (Apr. 26, 2021) https://blockfi.com/updated-rates-for-btc-eth-link-ltc-and-paxg-effective-may-1-2021 (last accessed 5/17/2023).

increasingly more difficult for BlockFi as its marketing strategy flourished and it thereby needed

reliable investment counterparties that could receive – and, thus, assume all associated price

volatility risks (akin to shorting the currency) – hundreds of millions of dollars in cryptocurrency.

BlockFi was not successful at this.  In its four-year existence, except for one month (May

2022), BlockFi never generated positive operating income.[14]  To satisfy customer yield obligations

and seek profit, BlockFi had to accept riskier and riskier investment opportunities.  Although

customers were promised that BlockFi would not "concentrate"[15] investments, "to help ensure we

don't take on too much risk to any one single borrower,"[16] that is precisely what it did.  BlockFi

entrusted billions of dollars in assets with three separate counterparties and suffered devastating

losses each time: Grayscale (loss of $215 million), Three Arrows Capital (loss of $85 million), and

FTX/Alameda (default of at least $680 million in collateralized loan obligations).[17]

> ### 2. BlockFi's Efforts To Skirt Regulatory Compliance Necessitated Even More Unreasonable Risk-Taking.

From inception, BlockFi's BIA products always involved regulatory risk.  The Company

long took the position that its activities fit within narrow regulatory exemptions from federal and

state securities laws.  This may have been cutting it too close.  On June 10, 2021 the SEC informed

BlockFi that it had opened an informal inquiry to determine whether violations of the federal

---

[14]  Ex. 4, BlockFi Monthly File (*Source: 3.2.2.1 Historical Financials Management View_2022_09*) ("Monthly operating income as provided by BlockFi and excludes provision for credit losses, which are estimates of potential future loan losses but not actual losses when recorded").

[15]  BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BLOCKFI (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).

[16]  *Id.*

[17]  *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions* at ¶ 96, Case No. 22-19361 (Nov. 28, 2022), Dkt. No. 17.

securities laws had occurred.[18]  Shockingly, BlockFi did not then discontinue offering BIA's to the public; it continued doing so.

The SEC ultimately charged BlockFi Lending LLC ("Lending,") with failures to register BIAs as securities, making false and misleading statements (from March 4, 2019 through August 31, 2021), and with violating the registration provisions of the Investment Company Act of 1940 (the "1940 Act").[19]  At the time, Lending was the only BlockFi entity offering the BIA product. A settlement ultimately was achieved, requiring BlockFi to pay a heavy penalty and reorient its entire business structure.  BlockFi: (i) paid a $50 million penalty to the SEC; (ii) paid an additional $50 million to thirty-two states; (iii) agreed to cease offering and selling unregistered BIA products; and (iii) agreed to henceforth be 1940 Act compliant.[20]  This is the largest SEC penalty ever levied against any issuer of crypto asset securities.[21]

Thereafter, BlockFi sought to avoid further 1940 Act scrutiny by fitting within the "market intermediaries" exemption (Section 3(c)(2)).  Operations were dramatically reformatted: (i) BIAs now became the province of BlockFi International; and (ii) BlockFi started actively managing its deposits/investments to ensure that, at each corporate entity, the quantum of "good assets" (*i.e.*, bespoke depositing/investing) overwhelmed "bad assets" (*i.e.*, standardized depositing/investing). Stated differently, BlockFi risked losing access to the "market intermediary" exemption if it did not, among other things, reinvest with counterparties willing to "play ball" from a regulatory standpoint, by negotiating large scale transfers of cryptocurrency on non-standard terms.

---

[18] Ex. 5, SEC Letter to Jonathan Mayer (General Counsel, BlockFi, Inc.) regarding In the Matter of BlockFi, Inc., MNY-10450 (June 10, 2021).
[19] Ex. 6, Order Instituting Cease and Desist Proceedings, BlockFi Lending LLC, Release No. 11029 (Feb. 14, 2022) (hereinafter "SEC Order").
[20] *Id.*
[21] *Id.*

This further restricted possible places where BlockFi could deploy large volumes of customer deposits.  It appears that, by this point, it had left only one place it could go to place such large volumes: Alameda/FTX.

### 3.      Warnings Issued By BlockFi's Risk Management Team Went Unheeded.

In June 2021, BlockFi hired Yuri Mushkin as its Chief Risk Officer[22] and it built out a dedicated team devoted to risk analysis.  The team delivered detailed reports ("Credit Memos"), evaluating prospective reinvestment counterparties and providing recommendations as to whether BlockFi should or should not place cryptocurrency with such counterparties.  Documents produced to the Committee, including Credit Memos prepared by BlockFi's risk team, demonstrate that the team was quite skilled at identifying and evaluating risks associated with proposed lending opportunities.

The evidence shows, however, that such evaluations and recommendations were routinely dismissed by senior management, especially when it came to Alameda.  By August 2021, BlockFi had already lent $217 million to Alameda, secured by FTT.  The risk management team had, by this point, already began flagging risks associated with lending to Alameda.  They recommended against issuing any new loans secured by FTT, warning of high risks should the collateral need to be liquidated.[23]  The recommendations were disregarded.[24]

---

[22] BlockFi, *Recap: Reddit AMA with Chief Risk Officer Yuri Mushkin*, BLOCKFI, Sept. 29, 2022, https://blockfi.com/recap-reddit-ama-with-chief-risk-officer-yuri-mushkin (last accessed 5/16/2023).

[23] Ex. 7, *Credit Memo for Alameda Research* (Aug. 23, 2021).

[24] *See* Ex. 8, BF_BK_00071268 (August 2021 email chain in which BlockFi's Robert Levine notes that the risk team recommends "not approving this trade" with Alameda because of stressed net exposure, wrong way risk, and the inability to liquidate collateral relatively quickly).

On August 31, 2021, Rob Levine (BlockFi's former Head of Credit and Underwriting) wrote that extending Alameda any further credit would be difficult to approve "because of the sheer size of FTT exposure it would entail as well as the long timeframe (over 90 days) to liquidate it if need be."[25]  Mr. Prince dismissed the concern as "too conservative."  He instead proposed "FTT/SRM collateral higher than 110%,"[26] which did nothing to obviate Mr. Levine's assessment that the loan was already too reliant on FTT collateral and that it could not be quickly liquidated to cover losses.

As early as August 2021, BlockFi's risk management team was advised that Alameda's balance sheet was largely comprised of "~7bb unlocked FTT, and 11bb total including locked tokens based on unaudited financials."[27]  This set off alarms at BlockFi.  Mr. Prince dismissed the concerns, urging the risk team to learn to "get comfortable [with Alameda] being a three arrows size borrower, just with FTT and other collateral types instead of GBTC shares.  It's the largest / clearest growth opportunity we have."[28]

In January 2022, BlockFi's Institutional Clients team raised concerns related to the collateralization of a $1 billion loan requested by Alameda.[29]  Again, Mr. Prince dismissed the concern, stating that BlockFi's "risk parameters for collateral treatment are still in flight – and they

---

[25] Ex. 9, BF_BK_00070693 (Sept. 3, 2021 email thread concerning a request from Alameda to borrow 10k BTC in which Mushkin notes that "we have no more appetite for FTT.").
[26] *Id.*
[27] Ex. 10, BF_BK_00011388 at BF_BK_00011389 (Aug. 15, 2021 email thread concerning a request from Alameda to "get to a point where we can borrow $1b from you?").
[28] *Id.*
[29] Ex. 11, BF_BK_00011350 (Jan. 7, 2022 email thread titled "Alameda – Urgent" concerning a "potential client issue with terms for Alameda" regarding the appropriate collateralization level).

generally assume that we have **just** the collateral for the loan and that the counterparty won't post margin," and insisted that BlockFi "offer terms [] the client could say yes to."[30]

After January 2022, the risk management team stopped writing Credit Memos regarding loans made to Alameda, while continuing to draft these documents for other potential counterparties.[31] Discussions concerning Alameda-related risks moved to offline meetings and Slack, where Mr. Prince occasionally acknowledged the Company's significant exposure to Alameda/FTX.[32]

### 4.    BlockFi's Reliance on Alameda/FTX Led to Foreseeable (Actually Foreseen) Losses of a Staggering Quantum.

In June 2022, the cryptocurrency market was in turmoil, following the devaluation of LUNA and UST, and the collapse of Three Arrows Capital. At this time, BlockFi recalled its loans from Alameda, and Alameda repaid its outstanding balance to almost zero. BlockFi then could have walked away from the relationship. Instead, it re-lent Alameda nearly $900 million (between July and September 2022), almost exclusively collateralized by FTT.[33]

---

[30] *Id.* (emphasis in original).

[31] *See, e.g.,* Ex. 12, Credit Memo for FTX Trading Ltd (Jan. 28, 2022) (second to last credit memo regarding either Alameda or FTX); Ex. 13, BF_BK_00011615 (Nov. 7, 2022 credit memo: the last credit memo regarding either Alameda or FTX); Ex. 14, Credit Memo for Galaxy Digital (Mar. 25, 2022) (Credit memo with Galaxy Digital: one of many credit memos with other counterparties in the gap of time between January 2022 and November 2022).

[32] *See* Ex. 15, BF_BK_00066622 (Slack conversation between Prince and Marquez in which Prince writes "my pov is that we already had the risk to FTX *even when we weren't getting the SRM" "so if FTX went down, FTT was going down with it" "and we would be sitting on a pile of worthless FTT in our fireblocks wallet" "now it would just be a pile of worthless FTT in our FTX account."). During depositions, BlockFi executives uniformly insisted that Slack was an informal means of communication that did not convey official BlockFi policy. This assertion appears questionable. *See, e.g.*, Ex. 16, BF_BK_00066252 at BF_BK_00066254 (Prince writing in the "credit-underwriting" Slack channel that a loan to Alameda is "approved" because "[i]t's overcollateralized, w margin call at best level in book, highly profitable and our biggest client" "Ship it.")

[33] Ex. 13, BF_BK_00011615 (Nov. 7, 2022 Credit Memo regarding Alameda).

On November 2, 2022, CoinDesk published its now infamous report revealing that, of Alameda's $14.6 billion in reported assets (Q2 2022), $5.8 billion was comprised of FTT.[34]  As Mr. Renzi stated in his "First Day" Declaration, this disclosure pushed Alameda/FTX into a "death spiral."[35]  Public confidence in both companies, and in FTT, immediately collapsed.  Within nine days, Alameda and FTX were in bankruptcy, prompting widespread allegations of fraud.

Here, it bears repeating that BlockFi had Alameda's balance sheet (showing overreliance on FTT) as early as August 2021.[36]  It also bears repeating that, in June 2022, BlockFi could have severed the relationship, and would have then preserved nearly all customer deposits had it done so.  Further, it bears observing that BlockFi had the exact same balance sheet published by CoinDesk (the one prompting the public's spectacular run from Alameda/FTX) *before* it placed any of the cryptocurrency placed on the FTX/Alameda platform in the second half of 2022 – money that now may be irretrievable.[37]

## II.   KEY ENTITIES AND INDIVIDUALS.

### A.   Debtor Entities.[38]

- **BlockFi Inc.:** The parent company of the organization.  BlockFi Inc. is a corporation organized under Delaware law.  It is a registered Money Services Business (MSB) with FinCEN.

- **BlockFi Trading LLC:** A Delaware Limited Liability Company, formed on May 28, 2019 with its principal place of business in Jersey City, New Jersey.

---

[34] *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions* at ¶ 93, Case No. 22-19361 (Nov. 28, 2022), Dkt. No. 17.
[35] *Id.* at ¶ 93.
[36] Ex. 10, BF_BK_00011388 (Aug. 15, 2021 email thread with subject line "Call Report: Alameda Research").
[37] A comparison of the Q 2022 Alameda balance sheet produced by BlockFi and the figures disclosed in the CoinDesk report (which did not publish the balance sheet itself) show that the balance sheet possessed by BlockFi was the same as that relied upon by CoinDesk.
[38] Unless otherwise specified, the Debtors are collectively referred to herein as "BlockFi," the "Company," or the "Debtors."

BlockFi Trading offered BlockFi's clients a platform to obtain digital currency in exchange for other digital currency or in exchange for U.S. dollars. BlockFi Trading LLC is a registered Money Services Business (MSB) with FinCEN and holds money transmitter licenses in various states and in Puerto Rico.

- **BlockFi Lending LLC:** A Delaware Limited Liability Company formed on January 11, 2018 with its principal place of business in Jersey City, New Jersey. BlockFi Lending lent virtual currency or U.S. dollars to retail and institutional borrowers and originally provided the interest-bearing account called the BlockFi Interest Account or "BIA"). This entity holds multiple state-level lending licenses.

- **BlockFi Wallet LLC:** BlockFi Wallet LLC was responsible for opening and maintaining non-interest-bearing customer crypto wallets on behalf of either BlockFi Lending LLC for U.S. customers or on behalf of BlockFi International Ltd. for non-U.S. clients.

- **BlockFi Ventures LLC:** A Delaware registered entity responsible for facilitating privately held investment opportunities by BlockFi in potential third parties.

- **BlockFi International Ltd.:** A Bermuda Limited Liability Company, formed to conduct digital asset business activities. The entity was originally formed under the name BlockFi International LLC on May 10, 2019 as a specific-use trading vehicle for certain institutional clients.

- **BlockFi Investment Products LLC (Formerly BlockFi NB LLC)**: A Delaware entity organized to sponsor various over-the-counter investment trusts (*e.g.*, BlockFi Bitcoin Trust, BlockFi Ether Trust, BlockFi Litecoin Trust, and BlockFi Digital Asset Trust (dormant)) and trusts for proposed exchange-traded products (*e.g.*, BlockFi Bitcoin ETF).

- **BlockFi Services, Inc.:** A Delaware registered entity that housed international consultants who provided services to BlockFi Inc. as well as vendor management services.

- **BlockFi Lending II LLC:** A Delaware registered subsidiary of BlockFi Lending LLC.

**B.    Involved Entities.**

- **Three Arrows Capital**: Three Arrows Capital ("Three Arrows" or "3AC"), formerly a cryptocurrency hedge fund focused on trading cryptocurrency and other digital assets, collapsed in June 2022 following the devaluation of the LUNA and UST tokens. On June 27, 2022, after failing to meet a series of

12

margin calls, 3AC was ordered to liquidate by a court in the British Virgin Islands.  At the time of its collapse, 3AC was a significant BlockFi client.

- **Grayscale Investments**: Grayscale Investments ("Grayscale") was founded in 2013 and launched a BTC trust the same year – the Grayscale Bitcoin Trust ("GBTC").  GBTC pools money from institutional investors, purchases BTC, and then holds the BTC.  Investors may trade their BTC for trust shares (in-kind subscriptions) but cannot immediately sell those shares to take advantage of short-term price fluctuations because the GBTC shares are subject to a six-month lock-up period. The GBTC price has traded above and below the exchange (market) value of  underlying BTC; this price is referred to as the GBTC premium or discount.

  BlockFi utilized a significant amount of BTC collateral and BIA account deposit BTC to finance in-kind subscriptions of GBTC. While this activity was initially profitable, GBTC began trading at a discount in and around the end of February 2021 and has consistently done so since. In order to mitigate resulting financial exposure and to ensure that the company would have sufficient BTC to meet potential customer withdrawals and collateral return, BlockFi ultimately had to liquidate its GBTC holdings and lost approximately $215 million.

- **FTX Trading Ltd., West Realm Shires, Inc.**: FTX Trading Ltd., West Realm Shires, Inc. (dba FTX US), (together, "FTX") was established by Sam Bankman-Fried, Gary Wang, and Nishad Singh.  FTX began international operations on May 8, 2019 and launched a U.S. exchange in May 2020.

- **Alameda Research Ltd.**: Alameda Research Ltd. ("Alameda") was co-founded by Sam Bankman-Fried and Tara MacAulay in September 2017. Alameda played a significant role in the growth of its sister entity, FTX, and collapsed alongside FTX in November 2022.  BlockFi issued a significant amount of loans to Alameda throughout the companies' relationship.

- **Gemini Trust Company, LLC.**: Gemini Trust Company, LLC ("Gemini") is the company that BlockFi purported to use as the custodian for client funds. Our Investigation has found that BlockFi did not use Gemini as a custodian but kept client funds on its exchange as a way to cut costs.

- **Grant Thornton LLP**: Grant Thornton LLP ("Grant Thornton") was BlockFi's auditor in  2020 and 2021.  Grant Thornton's Audit and Accounting Services group reviewed BlockFi's financial statements and may have expressed reservations about BlockFi's accounting interpretations.

13

- **Deloitte Touche Tohmatsu Limited**: Deloitte Touche Tohmatsu Limited's ("Deloitte") Tax and Financial Services group prepared BlockFi's 2020 and 2021 federal and state income tax returns and provided related advice.

- **Berkeley Research Group, LLC**: Berkeley Research Group, LLC ("BRG") is the financial advisor to BlockFi.  Mark Renzi, the Managing Director and the Head of the Corporate Finance Financial Institutions Group for BRG submitted a declaration in support of the chapter 11 petitions and First Day Motions filed by the Debtors.

C.      **Relevant Individuals.**

- **Zachary ("Zac") Prince**: Zac Prince is the Co-Founder and Chief Executive Officer ("CEO") of BlockFi.  Mr. Prince has a history of working within the financial services sector, including within the digital advertising and sales.  Mr. Prince met co-founder Flori Marquez in June of 2017, and the two founded BlockFi, marketing the Company as a lender who could provide credit services within the cryptocurrency market.

- **Florencia ("Flori") Marquez**: Flori Marquez is the Co-Founder and Chief Operating Officer ("COO") of BlockFi.  Ms. Marquez has history within the financial services sector as an analyst for Oak Hill Advisors and as an investment banking analyst for Sword, Rowe & Company LLC.  She joined Bond Street Servicing where she was an owner and managed financial portfolios before co-founding BlockFi.

- **Amit Cheela**: Amit Cheela is the current Chief Finance Officer ("CFO") of BlockFi.  Prior to becoming CFO in October of 2022, Mr. Cheela was  Senior Vice President of Finance since joining the Company in June 2018.  Mr. Cheela studied economics at New York University before earning a Master's in Accounting from the University of Southern California.  Following graduation, Mr. Cheela worked for two years at PricewaterhouseCoopers ("PwC") in its financial advisory and audit practice.  He then joined Hedge Fund ESL Investments in a finance and operations role before joining BlockFi in 2018.

- **Yuri Mushkin**: Yuri Mushkin is the current Chief Risk Officer ("CRO") of BlockFi and has served in this position since July 2021.  Mr. Mushkin is also a Certified Financial Analyst.  Prior to becoming CRO, Mr. Mushkin served as the CRO for Beneficient Group LLP.  Before Beneficient Group LLP, Mr. Mushkin was the co-head of the McKinsey & Company Traded Risk service line. Mr. Mushkin spent the first fourteen years of his career in Goldman Sachs' Securities Risk Management Division, during which he received a master's degree from the London School of Economics.

14

- **David Spack**: David Spack is the Chief Compliance Officer ("CCO") of BlockFi. Prior to joining BlockFi, Mr. Spack worked as a paralegal at different law firms and as an analyst at Windmill Software. Mr. Spack attended Columbia University's Social Work School. Mr. Spack then worked as a paralegal at the Boston Stock Exchange before joining the equities compliance program at MF Global. After MF Global went out of business, Mr. Spack transferred to work at UBS's compliance group as an associate director in the regulatory inquiries group. Mr. Spack then worked as the CCO for a group of equity and option execution firms in San Francisco. Mr. Spack then ran and built out the compliance program at Bond Street. After leaving Bond Street, Mr. Spack worked for a startup named Pinch. Mr. Spack was originally an advisor to Bond Street because of his work experience with Ms. Marquez at Bond Street.

- **Robert Loban**: Robert Loban is the Chief Accounting Officer ("CAO") for BlockFi. Mr. Loban worked in a variety of accounting roles, including almost 15-years at PwC at PwC Japan, PwC India, PwC Hong Kon, and PwC China. After leaving PwC, Mr. Loban worked for CommonBond, a green lending company. Loban joined BlockFi in August 2020 as the Director of Accounting. He became CAO in October 2022.

- **Michelle Henry**: Michelle Henry is the former head of BlockFi Private Client. She originally joined BlockFi in April 2021 as Director of Retail Strategy. She was promoted to Vice President in January 2022, and she became Global Head of Private Client in July 2022. Prior to joining BlockFi, Ms. Henry worked at McKinsey, Barclays, and Anheuser-Busch.

- **Jonathan Mayers**: Jonathan Mayers is the General Counsel of BlockFi. Prior to joining BlockFi, Mr. Mayers worked with Renaissance Technologies, Deutsche Bank, Barclays, and Davis Polk & Wardwell LLP.

- **Jennifer Hill**: Jennifer Hill has been a member of the BlockFi Board of Directors since October 2021. Ms. Hill served as the Chairperson of the Board Audit and Risk Committee. Hill has extensive work experience in financial services firms in New York City and London, including as CFO of Bank of America Merrill Lynch's Global Banking and Markets Division.

## III. UNDERSTANDING "RISK FACTORS" INHERENT IN BLOCKFI'S BUSINESS.

BlockFi's business model depended on the extension of credit – either in stablecoins, BTC,

ETH, or other assets - to counterparties, generally (but not always) on a secured basis. Inherent in

15

this business are key risk factors that are described below that are referenced in various risk and

credit memoranda.  The collateral BlockFi accepted was generally (a) digital assets; or (b) mining

equipment.  Importantly, the value of this collateral can (and does) fluctuate in value.

- **Counterparty Risk:**  Where BlockFi lent on an unsecured or undersecured basis, the risk was simple: if its counterparty became insolvent (or unwilling to pay), BlockFi would lose its investment.  Where BlockFi lent on an oversecured basis, counterparty risk was reduced (but not eliminated) because it could look to its collateral.  However, counterparty risk was not eliminated due to the below risks inherent in secured lending.[39]

- **Wrong-Way Risk:**  Collateral has "wrong-way risk" when it is likely to decline in value at the same time that the risk of non-payment from the counterparty rises.  One example is if Lehman Brothers secured a loan it took with its own stock (prior to its bankruptcy).  Lehman stock carries wrong-way risk for a loan to Lehman Brothers because if Lehman Brothers cannot pay its secured debt, its equity is likely impaired or worthless.  As a result, collateral that carries wrong-way risk may have value when the loan is made, but be unlikely to have value when the loan is in default and BlockFi is looking to sell collateral to cover the loan.[40]

- **Collateral Liquidity**:  The purpose of collateral, to the lender, is to sell the collateral to repay the loan if it is in default.  However, if the collateral is illiquid – large amounts cannot be sold in a short timeframe without depressing the price (or, cannot be sold at any price), then even if the collateral nominally covers the loan on a "mark to market" basis (i.e. value the entire collateral based on the last trade of that collateral), BlockFi could not reasonably realize that value.[41]

- **Jump-To-Default Risk**:  Because the value of collateral accepted by BlockFi could change, BlockFi would issue a margin call (a demand for additional collateral) when the value of the collateral dropped below a certain threshold.  This enabled BlockFi to sell collateral that was dropping in value when it still held sufficient value to cover the loan.  However, certain assets have a "Jump-to-default" risk where there is a risk that, rather than a slow slide in value, they can immediately

---

[39]   Office of the Comptroller of the Currency, *Counterparty Risk*, Occ.Treas.Gov, https://www.occ.treas.gov/topics/supervision-and-examination/capital-markets/financial-markets/counterparty-risk/index-counterparty-risk.html (last visited, May 17, 2023). ("Counterparty risk is the probability that the other party in an investment, credit, or trading transaction may not fulfill its part of the deal and may default on the contractual obligations.").

[40]  Ex. 17, Mushkin Dep. 62:20-64:8 (defining general and specific wrong-way risk, and specifically referencing an entity using its own stock as collateral as an example of specific wrong-way risk).

[41] Ex. 17, Mushkin Dep. 91:2-24.

lose a large portion (such as 80%) of their value abruptly, leaving a position severely undercollateralized before a margin call could be issued.[42]

## IV.    <u>GENERAL TIMELINE OF EVENTS.</u>

Zac Prince and Flori Marquez formed BlockFi Inc., the direct or indirect parent company of the Debtor Entities, on August 1, 2017.  BlockFi first operated solely out of its offices in Jersey City, New Jersey.  Before founding BlockFi, Mr. Prince had served as Senior Vice President of Business Development and Sales for Katapult, a consumer lending business that integrates with retailers at the point of sale to offer financing options for larger customer purchase.  Ms. Marquez worked as an analyst for Oak Hill Advisors and as an investment banking analyst for Sword, Row & Company LLC before becoming a portfolio manager at Bond Street.  Throughout BlockFi's corporate history Ms. Marquez also worked as the Owner and Head of Portfolio Management of Bond Street Servicing LLC.[43]

BlockFi launched its first product in January 2018, allowing customers to borrow dollars with BTC or ETH as collateral.  BlockFi would generate revenue and profits from the interest charged on these crypto-backed loans.  In the event of default, BlockFi maintained a long position on at least some of the digital assets that would come into its possession, holding onto certain collateral that had been posted in lieu of liquidation.

---

[42] *Id.* at 180:19-181:6.

[43] *See Flori Marquez*, LINKEDIN, https://www.linkedin.com/in/flori-marquez-5020a021 (last accessed 5/17/2023).

BlockFi raised a $1.55 million seed round in February 2018 led by ConsenSys Ventures,[44] a $52.5 million funding round in July 2018 led by Mike Novogratz's Galaxy Digital,[45] and $4 million in December 2018 with Akuna Capital as lead.[46]

In March 2019, BlockFi launched its BlockFi Interest Account (again, the "BIA") program, through which customers could invest their cryptocurrencies with BlockFi and receive a variable rate of return, initially pegged at a 6% annual interest rate.[47]   At the outset, the BIA program allowed for BTC or ETH deposits.  BlockFi asserted that it was capable of providing its proposed returns due to its practice of charging "more to the institutions borrowing the crypto from BlockFi then [sic] we pay to depositors."[48]  Market interest in the BIA accounts was high, and customers deposited $53 million in crypto by April, 2019.[49]

In August 2019, BlockFi raised additional funds through a Series A funding round led by Valar Ventures, a company founded in part by PayPal co-founder Peter Thiel.  Through this funding round, BlockFi raised $18.3 million.[50]

---

[44] Anna Baydakova, *BlockFi Raises $52.5 Million in Round Lead by Novogratz's Galaxy Digital*, COINDESK (July 24, 2018), https://www.coindesk.com/markets/2018/07/24/blockfi-raises-525-million-in-round-lead-by-novogratzs-galaxy-digital/.

[45] *Id.*

[46] Yogita Khatri, *Novogratz's Galaxy Digital Backs $4 million Raise for Crypto-Lender BlockFi*, COINDESK (Dec. 12, 2018), https://www.coindesk.com/markets/2018/12/12/novogratzs-galaxy-digital-backs-4-million-raise-for-crypto-lender-blockfi/.

[47] Yogita Khatri, *BlockFi Now Offers a Crypto Deposit Account with Compound Interest*, COINDESK (Mar. 5, 2019), https://www.coindesk.com/markets/2019/03/05/blockfi-now-offers-a-crypto-deposit-account-with-compound-interest/.

[48] *Id.*

[49] Anna Baydakova, *BlockFi is Now Paying Interest on $53 Million of Crypto Deposits*, COINDESK (Apr. 23, 2019), https://www.coindesk.com/markets/2019/04/23/blockfi-is-now-paying-interest-on-53-million-of-crypto-deposits/.

[50] William Foxley, *Bitcoin and Ether Lender BlockFi Raises $18.3 Million Series A*, COINDESK (Aug. 6, 2019), https://www.coindesk.com/markets/2019/08/06/bitcoin-and-ether-lender-blockfi-raises-183-million-series-a/.

In December 2019, BlockFi began offering crypto trading with zero fees on purchases and sales.[51]  BlockFi purportedly profited from this trading activity through sales of trading data to institutional crypto firms that would provide liquidity to BlockFi.[52]

In February 2020, BlockFi raised $30 million[53] in series B funding led by Peter Thiel's Valar Ventures, with additional contributions by Akuna Capital, Morgan Creek Digital, Winklevoss Capital, and HashKey Capital.

In March 2020, BlockFi partnered with Silvergate Capital to enable customers to use cash deposits to purchase Bitcoin on its platform.[54]  BlockFi also disclosed that it had $650 million of assets on its platform the prior month.[55]

In April 2020, BlockFi indicated that it would be extending credit to cryptocurrency miners.[56]

---

[51] Anna Baydakova, *Crypto Lender BlockFi Rolls Out Zero-Fee Trading for Bitcoin, Ether, GUSD*, COINDESK (Dec. 5, 2019), https://www.coindesk.com/business/2019/12/05/crypto-lender-blockfi-rolls-out-zero-fee-trading-for-bitcoin-ether-gusd/.
[52] Robert Stevens, *BlockFi's Rise and Fall: A Timeline* CoinDesk (Nov. 30, 2022), https://www.coindesk.com/learn/blockfis-rise-and-fall-a-timeline/ (last accessed 5/16/2023).
[53] Nate DiCamillo, *Bitcoin Lender BlockFi Raises $30M in Series B Led by Peter Thiel's Valar Ventures*, COINDESK (Feb. 13, 2020), https://www.coindesk.com/business/2020/02/13/bitcoin-lender-blockfi-raises-30m-in-series-b-led-by-peter-thiels-valar-ventures/.
[54] Bradley Keoun, *Previously Crypto-Only BlockFi Adds Cash On-Ramp Through Silvergate Partnership*, COINDESK (Mar. 10, 2020), https://www.coindesk.com/business/2020/03/10/previously-crypto-only-blockfi-adds-cash-on-ramp-through-silvergate-partnership/.
[55] *Id.*
[56] Anna Baydakova, *CEO Says BlockFi is Lending to Crypto Miners as Other Providers Pull Back*, COINDESK (Apr. 9, 2020), https://www.coindesk.com/business/2020/04/09/ceo-says-blockfi-is-lending-to-crypto-miners-as-other-providers-pull-back/.

In August 2020, BlockFi raised $50 million in a Series C funding round led by Morgan

Creek Digital.[57]  BlockFi indicated that it now had $1.5 billion in crypto assets on its lending

platform and that it was producing approximately $10 million a month in revenue.[58]

In October 2020, BlockFi invested heavily in Grayscale's $4.8 billion bitcoin trust

("GBTC").  According to SEC filings, BlockFi Inc., through its subsidiary BlockFi Lending LLC,

purchased approximately 5.07% of the GBTC common shares.[59]  BlockFi's ownership interest in

the GBTC was second only to Three Arrows, which had a 6% stake as of June 2020.[60]  By February

2021, BlockFi had expanded its stake in GBTC to 5.6% at a purported market value of $1.7

billion.[61]

 In January 2021, BlockFi expressed an interest in operating its own institutional bitcoin

trust when it filed a Form D statement with the SEC for the "BlockFi Bitcoin Trust."[62] The BlockFi

Bitcoin Trust was intended to custody fund assets with Fidelity Digital Asset Services, obtain index

and pricing data from Coin Metrics, and have Grant Thornton serve as the fund's auditor.[63]

---

[57] Nate DiCamillo, *BlockFi Raises $50M from Universities, NBA Star, Others as Crypto Lending Soars*, COINDESK (Aug. 20, 2020), https://www.coindesk.com/business/2020/08/20/blockfi-raises-50m-from-universities-nba-star-others-as-crypto-lending-soars/.

[58] *Id.*

[59] BlockFi Lending LLC *et al.*, Beneficial Ownership Disclosure Statement (Schedule 13G) (Oct. 15, 2020).

[60] *Id.*

[61] BlockFi Lending LLC *et al.*, Beneficial Ownership Disclosure Statement (Schedule 13G/A) (Dec. 31, 2020); Danny Nelson, *BlockFi Boosted Grayscale Bitcoin Trust Holdings by 11.9M Shares, Now Holds $1.7B GBTC*, COINDESK (Feb. 12, 2021), https://www.coindesk.com/markets/2021/02/12/blockfi-boosted-grayscale-bitcoin-trust-holdings-by-119m-shares-now-holds-17b-gbtc/.

[62] BlockFi Bitcoin trust, Notice of Exempt Offering of Securities (Form D) (Jan. 29, 2021), https://www.sec.gov/Archives/edgar/data/1842696/000095010321001273/xslFormDX01/primary_doc.xml.

[63] Nate DiCamillo, *BlockFi's Bitcoin Trust Takes Aim at GBTC*, COINDESK (Feb. 9, 2021), https://www.coindesk.com/markets/2021/02/09/blockfis-bitcoin-trust-takes-aim-at-gbtc/

In March 2021, BlockFi raised an additional $350 million through a Series D funding round led by Bain Capital Ventures.[64]  Around this time, BlockFi was valued at roughly $3 billion with a total of $10 billion in outstanding loans and $15 billion in total assets.[65]  In a March 2021 interview with CoinDesk, Mr. Prince represented that the Company had been "operating profitably for several months,  although records obtained from BlockFi reflect that BlockFi only generated a positive operating income for one month, in May 2022."[66]

In July 2021, BlockFi began receiving notices from state financial regulators that the BIA program could be considered the unregistered sale of a security to the public.[67]  The first state to issue such a notice was New Jersey, shortly followed thereafter by Alabama, Texas, Vermont, and Kentucky.[68]  These notices from state regulators coincided with BlockFi's attempt to raise approximately $500 million in a Series E funding round.[69]

By August 2021, BlockFi had lent Alameda approximately $114 million, secured by  FTT. Although the risk management function at BlockFi warned that accepting FTT Tokens as collateral presented a wrong-way risk that could spiral to a 50-75% collateral loss, Mr. Prince expressed a desire to "go through the exceptions process," emphasizing that "we should get comfortable w

---

[64] Nate DiCamillo, *Crypto Lender BlockFi Raises $350M at a $3B Valuation*, COINDESK (Mar. 11, 2021), https://www.coindesk.com/business/2021/03/11/crypto-lender-blockfi-raises-350m-at-a-3b-valuation/

[65] *Id.*

[66] *Id*.

[67] Danny Nelson*, NJ Regulators Give BlockFi 1 Week Before Blocking New Interest Accounts*, COINDESK (July 21, 2021), https://www.coindesk.com/business/2021/07/21/nj-regulators-give-blockfi-1-week-before-blocking-new-interest-accounts/.

[68] Nikhilesh De, *Kentucky Orders BlockFi to Stop Signing Up New Interest Accounts*, COINDESK (July 30, 2021), https://www.coindesk.com/markets/2021/07/30/kentucky-orders-blockfi-to-stop-signing-up-new-interest-accounts/.

[69] Zack Seward, *BlockFi is Pursuing Plans to Go Public -Even as Regulators Close In*, COINDESK (July 22, 2021), https://www.coindesk.com/business/2021/07/22/blockfi-is-pursuing-plans-to-go-public-even-as-regulators-close-in/.

[sic] them being a three arrows size borrower, just with FTT and other collateral types instead of GBTC shares."[70]

By January of 2022, BlockFi was contemplating lending nearly $1 billion worth of Bitcoin, Ether, and USD to Alameda.  The risk management function of BlockFi indicated that for a loan of this level the appropriate collateralization level would be between 180-200% of the loan value, with a preference for SOL over FTT.  Yet again, Mr. Prince pushed back on risk management's conclusions, stating that "we should offer terms that we think the client could say yes to."[71]

 On February 14, 2022, BlockFi settled claims brought by the SEC and state regulators concerning securities violations.  The settlement called for, among other things, a $100 million payment divided between the various regulators.[72] As part of the settlement with the SEC, BlockFi was forced to make certain changes to its business.  It was forced to transfer U.S. BIAs  from Lending to Inc.  It also chose to transfer international BIA and lending activity to International – which it redomiciled in Bermuda.  Further, BlockFi was required to comply with the 1940 Act requirement that, to qualify as a "market intermediary," it needed to "primarily" deal in individually negotiated contracts (which it interpreted as 55% or more, on an asset value basis) both in its deposits and its lending.  BlockFi understood that for Inc. to qualify for the exception it needed to comply at each subsidiary – *i.e.* even at International, despite being a non-U.S. entity.

---

[70] Ex. 10, BF_BK_00011388 (Aug. 15, 2021 with subject line "Call Report: Alameda Research").

[71] Ex. 11, BF_BK_00011350 (Jan. 8, 2022 email thread titled "Alameda – Urgent").

[72] Danny Nelson, Nikhilesh De, *BlockFi Will Pay $100M in Settlement With SEC, State Regulators Over High-Yield Accounts: Report*, COINDESK (Feb. 12, 2022), https://www.coindesk.com/policy/2022/02/12/blockfi-will-pay-100m-halt-high-yield-offering-in-settlement-with-sec-state-regulators-report/.

During the first half of 2022, the digital asset collateral that BlockFi was accepting as part of its loan packages suffered severe decreases in market value.  Between January 2022 and June 2022, FTT fell by 33%,[73] SOL fell by approximately 78%,[74] and GBTC fell by 33%.[75]

In early May 2022, the stablecoin TerraUSD (UST) and its associated reserve asset cryptocurrency Luna collapsed, wiping out roughly $45 billion in market capitalization within a week.[76]

By June 2022, the collapse of Terra/Luna had contributed to financial illiquidity and insolvency at Three Arrows.  Public reporting indicates that the liquidation of Three Arrows' assets and collateral further impacted cryptocurrency prices on a market-wide basis, depressing the price for Bitcoin.[77]

That same month, BlockFi announced it would be reducing its headcount by roughly 20%[78] and that it would be reducing its market spend, eliminating "non-critical vendors," reducing executive compensation, and slowing headcount growth.[79]

---

[73] *FTX Token to USD Chart*, COINMARKETCAP, https://coinmarketcap.com/currencies/ftx-token/ (from 40.19 on January 1, 2022 to 27.14 on June 2, 2022).

[74] *Solana Chart*, COINDESK, https://www.coindesk.com/price/solana/ (from $179.04 on January 1, 2022 to $40.10 by June 1, 2022).

[75] *Grayscale Bitcoin Trust (BTC) Chart*, CNBC, https://www.cnbc.com/quotes/GBTC (from $34.27 on January 4, 2022 to $19.47 on June 1, 2022).

[76] Hannah Miller, *Terra $45 Billion Face Plant Creates Crowd of Crypto Losers*, BLOOMBERG (May 13, 2022), https://www.bloomberg.com/news/articles/2022-05-14/terra-s-45-billion-face-plant-creates-a-crowd-of-crypto-losers.

[77] Jen Wieczner, The Crypto Geniuses Who Vaporized a Trillion Dollars Everyone trusted the two guys at Three Arrows Capital. They knew what they were doing — right?, NEW YORK MAGAZINE (Aug. 15, 2022), https://nymag.com/intelligencer/article/three-arrows-capital-kyle-davies-su-zhu-crash.html.

[78] Zac Prince (@BlockFiZac), TWITTER (June 13, 2022), https://twitter.com/BlockFiZac/status/1536372338379608065.

[79] Zac Prince (@BlockFiZac), TWITTER (June 13, 2022), ( https://twitter.com/BlockFiZac/status/1536372352921096194.

On June 12, 2022, cryptocurrency lending company Celsius Network LLC ("Celsius") froze withdrawals, swaps, and transfers. Celsius hired firm Alvarez & Marsal to explore the firm's options to mitigate the fallout of the cryptocurrency market financial collapse.[80]

On June 16, 2022, BlockFi confirmed publicly that, respecting "a large client that failed to meet its obligation on an overcollateralized margin loan," there would be full acceleration of the loan and liquidation of the associated collateral.[81]  BlockFi would later assert that "3AC is not currently on our cap table.  They were for a period of time and now they aren't.  Then [sic] coming off our cap table was completely unrelated to liquidation events of the last few weeks."[82]

On June 21, 2022, BlockFi announced that it had signed a term sheet with FTX to secure a $250 million revolving credit facility that would provide BlockFi with "access to capital that further bolsters our balance sheet and performance strength."[83]

On July 1, 2022, BlockFi announced that it was "broadening the scope of the initial deal for the benefit of all key @BlockFi stakeholders."[84]  Under the new agreement, there would be "1. A $400M revolving credit facility which is subordinate to all client funds and 2. An option to acquire BlockFi at a variable price of up to $240M based on performance triggers."[85]  This meant

---

[80] Elizabeth Napolitano, *The Fall of Celsius Network: A Timeline of the Crypto Lender's Descent Into Insolvency*, COINDESK (July 15, 2022), https://www.coindesk.com/markets/2022/07/15/the-fall-of-celsius-network-a-timeline-of-the-crypto-lenders-descent-into-insolvency/.

[81]    Zac    Prince    (@BlockFiZac),    TWITTER    (June    16,    2022), https://twitter.com/BlockFiZac/status/1537499455007645696.

[82]    Zac    Prince    (@BlockFiZac),    TWITTER    (June    25,    2022), https://twitter.com/BlockFiZac/status/1540742565305229313.

[83]    BlockFi    (@BlockFi)    Twitter,    (June    21,    2022), https://twitter.com/BlockFi/status/1539342963939151874.

[84]    Zac    Prince    (@BlockFiZac),    TWITTER    (July    1,    2022), https://twitter.com/BlockFiZac/status/1542934038469640192.

[85]    Zac    Prince    (@BlockFiZac),    TWITTER    (July    1,    2022), https://twitter.com/BlockFiZac/status/1542934040092856321.

that, "together with other potential consideration, [the deal] represents a total value of up to $680M."[86] Mr. Prince explained that "Crypto market volatility, particularly market events related to Celsius and 3AC, had a negative impact on BlockFi. The Celsius news on June 12th started an uptick in client withdrawals from BlockFi's platform despite us having no exposure to them."[87] Mr. Prince further explained that "[i]n the same week, 3AC news spread further fear in the market. While we were one of the first to fully accelerate our overcollateralized loan to 3AC, as well as liquidate and hedge all collateral, we did experience ~$80M in losses, which is a fraction of losses reported by others."[88] BlockFi asserted that it took the deal with FTX to "add capital to our balance sheet to bolster liquidity and protect client funds."[89]

On July 5, 2022, Voyager Digital, a New Jersey-based cryptocurrency brokerage company that was publicly traded on the Toronto Stock Exchange, filed for Chapter 11 bankruptcy. Eight days later on July 13, 2022, Celsius filed for Chapter 11 bankruptcy as well.

By August 2022, BlockFi was celebrating its temporary survival, writing that "crypto companies with disciplined risk management, financial transparency, and robust regulatory compliance will survive and help retail investors weather this crypto winter."[90]

---

[86]     Zac     Prince     (@BlockFiZac),     Twitter     (July     1,     2022), https://twitter.com/BlockFiZac/status/1542934041766273024.
[87]     Zac     Prince     (@BlockFiZac),     Twitter     (July     1,     2022), https://twitter.com/BlockFiZac/status/1542934048296914944.
[88]     Zac     Prince     (@BlockFiZac),     Twitter     (July     1,     2022), https://twitter.com/BlockFiZac/status/1542934049970348033.
[89]     Zac     Prince     (@BlockFiZac),     Twitter     (July     1,     2022), https://twitter.com/BlockFiZac/status/1542934060489707520.
[90]     Zac     Prince     (@BlockFiZac),     Twitter     (Aug.     26,     2022), https://twitter.com/BlockFiZac/status/1563177086331674624.

On October 27, 2022, Core Scientific, one of the largest publicly traded cryptocurrency mining companies in the U.S., filed for bankruptcy. Core Scientific had borrowed from BlockFi as part of BlockFi's equipment-backed loans.[91]

On November 2, 2022, CoinDesk reporter Ian Allison published the story revealing that roughly $5.8 billion out of the $14.6 billion on FTX balance sheet of assets were linked to FTX's exchange token, FTT.[92] According to that story, "the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-air token."[93] Public dissemination of the severe concentration of FTT on Alameda's balance sheets kicked off a rush of withdrawals from FTX, generating over $6 billion in withdrawals in 72 hours.[94]

On November 8, 2022, FTX froze withdrawals from its platform.[95] That same day, BlockFi issued loan recalls to Alameda totaling $215 million in USDC, a digital stablecoin pegged to the U.S. dollar, 21,110 in BTC, and 133,960 in ETH.[96]

On November 9, 2022, Alameda and BlockFi circulated agreements whereby BlockFi would forbear from exercising remedies under its loan agreements in exchange for additional

---

[91] Eliza Gkritsi, *Core Scientific Bankruptcy Approves $70M Financing Deal From B. Riley*, COINDESK (Mar. 1, 2023), https://www.coindesk.com/business/2023/03/02/core-scientific-bankruptcy-judge-set-to-approve-70m-financing-deal-from-b-riley/.

[92] Ian Allison*, Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet*, COINDESK (Nov. 2, 2022), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/.

[93] *Id.*

[94] Tom Wilson and Angus Berwick, *Crypto exchange FTX saw $6 bln in withdrawals in 72 hours*, REUTERS (Nov. 8, 2022), https://www.reuters.com/business/finance/crypto-exchange-ftx-saw-6-bln-withdrawals-72-hours-ceo-message-staff-2022-11-08/.

[95] Jamie Redman, *Report: FTX CEO Told Staff Crypto Exchange 'Effectively Paused' Withdrawals*, BITCOIN.COM (Nov. 8, 2022), https://news.bitcoin.com/report-ftx-ceo-told-staff-crypto-exchange-effectively-paused-withdrawals/.

[96] Ex. 18, BF_BK_00001222 (11/8/2022 email thread recalling loans made in USDC); Ex. 19, BF_BK_00001223 (11/8/2022 email thread recalling loans issued in both ETH and BTC).

pledges of HOOD, GBTC, ETHE, and BITW shares on top of a newly proposed repayment schedule. Alameda originally promised a $200 million payment to be issued on November 9, but email communications indicate that only $50 million was deposited with BlockFi on that day.[97]

On November 10, 2022, BlockFi began limiting customer withdrawals.[98]

On November 11, 2022, FTX filed for bankruptcy.[99] After FTX declared bankruptcy, BlockFi internally sought to determine the potential scale and scope of the financial losses that it would suffer.

On November 28, 2022, BlockFi filed for Chapter 11 bankruptcy, explicitly citing the collapse of the SBF Entities as the precipitating cause of the bankruptcy.[100]

## V.    CUSTOMER PROMISES; CORPORATE GUIDELINES AND OVERSIGHT FUNCTIONS; REGULATORY; AND INVESTMENT FAILURES IN EXECUTION.

### A.    Customer Promises.

#### 1.    Protecting/Custodying Customer Assets.

BlockFi was not licensed or registered as a Bank or an Investment Company, but it consistently used language that could reasonably create the impression that BlockFi was similar to regulated entities. BlockFi's mission statement, for example, represented that BlockFi's business purpose was to "redefine banking."[101]

---

[97] Ex. 20, BF_BK_00000806 (Nov. 9, 20222 Pledge Agreement); Ex. 21, BF_BK_00000791 (Amendment & Forbearance Agreement).

[98] Luke Huigsloot, *BlockFi limits platform activity, including a halt on client withdrawals*, COINDESK (Nov. 11, 2022), https://cointelegraph.com/news/blockfi-limits-platform-activity-including-a-halt-on-client-withdrawals.

[99] *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions*, Case No. 22-19361 (Nov. 28, 2022), Dkt. No. 17.

[100] *Id.*

[101] BlockFi, *Mission*, BLOCKFI.COM, https://blockfi.com/mission/.

27

Relatedly, BlockFi stated that "Gemini" functioned as BlockFi's "primary custodian," alluding to Gemini Trust Company, LLC.  For example, in an April 2019 program titled "Thinking Crypto Podcast," Ms. Flori Marquez spoke in a way that strongly implied that customer funds that company and, therefore, FDIC insured:

> *When you're depositing your crypto with BlockFi you're sending it directly to Gemini so when you click deposit it's actually generating a wallet address for you directly on Gemini which is our third-party custodian. They are a licensed custodian and they're regulated by the NY DFS. Gemini does have FDIC insurance on their cash deposits, and I think they're one of the only exchanges to have insurance protecting it ... so when you deposit you're sending it directly to Gemini like . . . you [can] look up your transaction [and] you can actually see it being swapped out to Gemini's cold storage which is great and that makes a lot of our customers feel safer.*[102]

BlockFi did not, however, placed customer deposits with Gemini Trust Company, LLC. Customer funds were instead placed on Gemini's exchange, which was not a bank and, thus, not FDIC insured.

### 2.  **Product Risk.**

In announcing the BIA product, BlockFi stated on its Twitter: "Users can securely store Bitcoin or Ether at BlockFi and receive 6% annual interest, paid monthly in cryptocurrency!"[103] But, BIAs were not places to "securely store" cryptocurrency.  There were not safe deposit boxes. They were legally constructed as customer loans to BlockFi, which could then reinvest deposits as they saw fit.[104]

---

[102] Thinking Crypto Podcast, *Interview: BlockFi Cofounder Flori Marquez*, YOUTUBE (Apr. 17, 2019), https://www.youtube.com/watch?v=dsGKw4RwqJI.

[103] BlockFi (@BlockFi), TWITTER (Mar. 5, 2019) https://twitter.com/BlockFi/status/1102927702510706688?lang=en;  https://blockfi.com/blockfi-interest-account-now-live.

[104] BlockFi, Interest Account Terms (Existing US only), BlockFi (Apr. 14, 2022) https://blockfi.com/interest-account-terms-existing-us ("Your Crypto Interest Account is not a

28

BlockFi promised to re-lend deposited cryptocurrency to "trusted institutional or corporate borrowers" on "overcollateralized terms" to "ensure loan performance;" or from trading "SEC-regulated equities and predominantly CFTC-regulated futures."[105]  That is not what happened. First, BlockFi loans were not typically "overcollateralized."   According to the SEC's Order, BlockFi had only "intended to require over-collateralization on a majority of its loans to institutional investors, but it quickly became apparent that large institutional investors were frequently not willing to post large amounts of collateral to secure their loans."[106]  Second, BlockFi loans were extended to risky counterparties, as discussed at length herein.

### 3. Risk Management Functions.

In a blog post titled "An In-Depth Look at BlockFi's Risk Management" (originally published July 19, 2022), BlockFi stated "Risk Management is core to our DNA and central to our mission: to accelerate global prosperity through crypto-powered financial services.  Since 2017, we've paid over $575 million of crypto interest to BlockFi clients worldwide while honoring 100% of client redemption and withdrawal requests, within our terms.  These results wouldn't have been

---

checking or savings account, and it is not covered by insurance against losses. We will pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use funds and cryptocurrency assets to counterparties, and such cryptocurrency assets will be exposed to various risks as a result of such transactions.")

[105] BlockFi, *BlockFi's Founder and CEO Explains the Bitcoin Lending Market*, BLOCKFI (Apr. 23, 2021), https://blockfi.com/blockfis-founder-and-ceo-explains-the-bitcoin-lending-market; BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BLOCKFI (July 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management.; BlockFi, *How is BlockFi able to pay interest on crypto held on the platform?*, BLOCKFI (Aug. 22, 2022), https://help.blockfi.com/hc/en-us/articles/360048863692-How-is-BlockFi-able-to-pay-interest-on-crypto-held-on-the-platform-.

[106] Ex. 6, SEC Order at *6.

possible without our risk management strategy led by a team of seasoned professionals with experience from the world's leading financial institutions."[107]

Further, BlockFi asserted that it was "taking the best of traditional financial risk management practices" and that "creating adaptations for crypto markets is what we do best. Risk management is one of BlockFi's key strategic advantages and differentiators, powering our track record of delivering market leading interest payments, access to client funds, and preservation of client capital through all market environments."[108]

As discussed herein, risk management was deployed for BlockFi's marketing initiatives, but the team's recommendations were routinely, regularly dismissed or ignored by senior management.

### a.    Credit Risk.

BlockFi described management of credit risk as follows (June 2022 blog post):

*Credit Risk Management involves a thorough analysis of our counterparties to understand their financial standing and ongoing ability to repay loans. A critical aspect of credit risk is managing concentration to help ensure we don't take on too much risk to any one single borrower.*

*As part of the credit analysis process, all institutional counterparties undergo a full due diligence and underwriting analysis which includes a review of their operation and financial statements, with focus on leverage and liquidity. Each client is assigned an internal credit rating (e.g., Tier 1, 2, or 3) along with a specific credit limit corresponding to the rating achieved. The credit evaluation is part of a detailed onboarding process, which also considers the business model, KYC/AML, organizational structure, industry dynamics, client reputation, track record, quality and frequency of financial disclosures, and their general transparency. For counterparties engaged in trading activities, we review the risk framework and associated controls. In conjunction with establishing credit appetite, we typically*

---

[107] BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BʟᴏᴄᴋFɪ (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).
[108] BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BʟᴏᴄᴋFɪ (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).

*negotiate a master loan agreement which may include a number of borrower covenants, and includes our contractual lender rights.*

*At BlockFi, unsecured lending appetite is limited to our largest and most established Tier 1 clients based on the potential of attractive risk-adjusted returns. Only those clients that have a significant capital base, verifiable financial position, and a willingness to be transparent and engaged with us may be afforded an unsecured credit limit. Our risk appetite to our Tier 2 and Tier 3 clients is limited, and as a result, this client segment is asked to collateralize their loans.*

*Our Credit Risk Management team regularly reviews the credit framework, client transactions, and changing market conditions. During the recent period of prolonged market volatility, a detailed plan was executed to manage distressed counterparty situations, drawing on years of experience and best practice in traditional finance. As a result, we were able to enforce contractual rights under our loan agreements and took swift action to mitigate potential losses.*[109]

Mr. Prince and Ms. Marquez repeatedly represented that BlockFi subjected its institutional clients to a rigorous underwriting process.[110]



BlockFi ✓ @BlockFi · Jul 19, 2022
All institutional counterparties undergo a full due diligence and underwriting evaluation based on a detailed review of their financial statements.

BlockFi did not conduct its business affairs in a manner consistent with these statements. The lending book was never "diversified." BlockFi's loan portfolio was always heavily concentrated, with undercollateralized borrowers (like 3AC) and/or with borrowers posting very weak collateral (like Alameda). The loan book did not heavily involve "financial institutions"

---

[109] BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BLOCKFI (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).
[110] BF_BK_00038269 (February 15, 2022 Reddit AMA); Zac Prince ("blockfizac"), REDDIT (Jan. 24, 2020), https://www.reddit.com/r/BATProject/comments/etem3t/im_zac_prince_founder_ceo_of_blockfi_ask_me/.

with "other forms of revenue coming" beyond "crypto trading strategies."[111]  Instead, BlockFi's portfolio was dominated by crypto-centric firms who, one-by-one, led BlockFi down a foreseeable (and foreseen) path to financial ruin.

### b.    Liquidity Risk.

In its article ,"An In-Depth Look at BlockFi's Risk Management," BlockFi claimed that it manages "liquidity risk with a dedicated framework and set of measurement and monitoring tools across three key dimensions: (1) Asset matching (2) Duration management (3) Liquidity buffers. Asset matching reduces digital asset conversion risk by seeking to deploy digital assets into loans or investments that will generally "match" or generate returns in the same denomination of the corresponding liabilities.  In simpler terms, bitcoin loans are made with bitcoin, not with other cryptoassets.  This is analogous to currency matching, a cornerstone of traditional finance."[112]

BlockFi's did not, however, fully deploy its investment assets in a manner reliant on asset matching.  For example, BlockFi's major investment in the GBTC "arbitrage" strategy involved: (1) receiving GBTC shares in exchange for BTC and then (2) selling those GBTC shares (after six-months) for USD which (3) was used to re-purchase BTC to fund returns.  Digital asset conversion risk was not only present in this trade strategy – it was the predominant underlying risk of the entire approach.

After BlockFi reorganized its risk function and ceased participating in the GBTC strategy, BlockFi's lending strategy to 3AC involved transferring significant amounts of USD collateralized by BTC and GBTC.  Although BlockFi would, in theory, earn interest on these loans in USD

---

[111] Thinking Crypto Podcast, *Interview: BlockFi Cofounder Flori Marquez*, YOUTUBE (Apr. 17, 2019), https://www.youtube.com/watch?v=dsGKw4RwqJI.
[112] BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BLOCKFI (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).

(consistent with asset matching), the default of 3AC meant that BlockFi instead took possession of a significant amount of digital assets and trust shares.  This meant that, rather than reducing digital asset conversion risk per BlockFi's risk management update, BlockFi's lending and collateralization practices ended up drastically increasing the risk of losses in connection with digital asset conversion.  This risk was especially acute at the point that BlockFi took possession of 3AC's cryptocurrency collateral, as there were significant declines in the market value of GBTC and BTC around that time.

Further, on August 29, 2022, Mr. Prince tweeted: "Withdrawals are and have always been fully available..if you're seeing an issue it's related to something specific to your account and @BlockFiSupport can help!"[113]  Withdrawals were not "always" and "fully available" for BlockFi customers.  For example, on July 1, 2022, Ms. Marquez informed the Board that an uptick in withdrawals had caused the company to implement "a $5 million withdrawal limitation in a seven-day period."[114]  Subsequently, on July 6, 2022, Mr. Prince himself informed the Board that "the Company was enforcing the provisions in the Company's terms of service for withdrawals over $1 million to manage large withdrawals, which would otherwise adversely affect the Company's liquidity position."[115]

---

[113]    Zac    Prince    (@BlockFiZac),    TWITTER    (Aug.    29    2022), https://twitter.com/BlockFiZac/status/1564259981905494020.

[114] Ex. 2, BF_BK_00011918 at BF_BK_00011919 (Minutes of a July 1, 2022 meeting of the Board Audit and Risk Committee).

[115] Ex. 23, BF_BK_00011921 at BF_BK_00011922 (Minutes of a July 6, 2022 meeting of the Board of Directors).

### c. **Market Risk and Quantitative Analysis**.

In its article, " An In-Depth Look at BlockFi's Risk Management," BlockFi asserted that it utilized haircuts on collateral in order to determine how much collateral would be necessary to minimize losses in its lending book:

> With respect to our collateralized loans, we subject even the most liquid collateral, such as BTC, ETH and stablecoins, to a market risk "haircut." This "haircut" is used to reduce the value which we ascribe to collateral in order to provide a margin of safety for us to liquidate the collateral in the event of potential counterparty default. The margin of safety for potential collateral liquidation is important to minimize any resulting losses in our USD or crypto denominated lending book. For example, a loan of $100 USD may be collateralized by an equivalent of $120 in BTC.[116]

Alameda was excepted from this "important" risk management metric.  For example, on August 2, 2022, Mr. Prince was informed that "due to the size of the collateral position and the updated collateral haircut calibration, we believe the overcollateralization needed for FTT with Alameda is 180% MM.[117]  Currently, our loans to Alameda are mostly done at 160/140% (IC/MM)."  In contrast to the BlockFi's assertion that the "margin for safety for potential collateral liquidation is important to minimize any resulting losses in our USD or crypto denominated lending book,"  Mr. Prince responded simply "[a]pproved to keep growing at 160% collateralization w/ Alameda."[118]

---

[116] BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BLOCKFI (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).
[117] Ex. 24, BF_BK_00011379 (Aug. 2, 2022, email thread with the subject line "Limit related escalation – Alameda / FTT").
[118] *Id.*

### d.    Risk Capital Modeling.

BlockFi said that it modeled the risk of joint borrower defaults through implementation of

a custom risk capital model for its digital asset portfolio.  Ostensibly, this model was based on the

Basel III Economic Capital Framework:

> To help ensure we have sufficient risk capital to withstand stressed market conditions and potential counterparty defaults in the loan portfolio, we've designed a custom risk capital model for our digital asset portfolio. The BlockFi model is based on the Basel III Economic Capital Framework, which applies to most major banking institutions worldwide.
>
> Our risk capital model seeks to capture potential joint defaults of BlockFi borrowers according to default probabilities, exposures, and estimates of losses given default of those borrowers. The default probabilities are based on our counterparty rating Tiers. The risk capital model considers correlations among possible defaults and the levels of exposure which may exist under those conditions.  The model also includes concentration penalties which seeks to ensure there is sufficient risk capital to withstand a default of one of our largest counterparties.[119]

This statement failed to disclose that internal "counterparty rating Tiers" were

inconsistently applied for certain counterparties (*e.g.*, Alameda), resulting in modeling/default

probabilities that do not resemble the system employed by most major banking institutions

worldwide.  As discussed in more below, BlockFi's Credit Risk Policy tiering system was only

loosely applied, and counterparties with significant risk profiles (*e.g.*, Alameda), were occasionally

provided Tiering in excess of their risk potential.  Additionally, counterparties could receive loans

vastly in excess of the limits even for the appropriate tier.[120]  The evidence does not corroborate

---

[119] BlockFi, *An In-Depth Look at BlockFi's Risk Management*, Bʟᴏᴄᴋ Fɪ (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).

[120] *Compare* Ex. 25, BF_BK_00011705 at BF_BK_00011708 (Credit Memo for Alameda dated November 5 with gross exposure $856 million that notes that Alameda is over the credit with "for crypto native funds 'Tier 1C'") *with* Ex. 26, Credit Memo for Alameda Research Ltd., (Nov. 16, 2021) (noting that Alameda is now considered a 2c counterparty while having an expanded gross exposure of $1.418 bn or nearly $600 million greater than the prior memo).

BlockFi's promise that its Risk Capital Modeling would "ensure there is sufficient risk capital to withstand a default of one of our largest counterparties." The close connectivity between this bankruptcy and the Alameda/FTX bankruptcy further proves the point.

B.    **Corporate Guidelines And Oversight Functions.**

1.    **Enterprise Financial Risk Management Policy.**

Beginning in early 2021, BlockFi made significant changes to its risk management framework in order to establish an Enterprise Financial Risk Management Policy ("Financial Risk Policy"). We were provided Version 2.0 of this policy, which was labeled "Draft." The effective date is listed as October 30, 2020 and the next review date is May 31, 2022.[121] The policy provides that it must be reviewed on an annual basis. The purpose of the Financial Risk Policy is to define the framework for "carrying out the measurement and management of credit, liquidity and market risk at BlockFi."[122] The Financial Risk Policy notes that, "most of the counterparties with whom BlockFi bears credit risk are traders, asset managers and investors whose principal business activities involve incurring market risk, or otherwise have business activities rooted in the market value of digital and other assets. Our due diligence process necessarily requires a coordinated analytical framework that considers these risk types together. Liquidity risk at BlockFi is managed by the market risk team within a single holistic framework."[123]

The Enterprise Risk Management framework is organized to develop discrete processes and procedures to manage and mitigate: (1) Credit Risks, (2) Market & Liquidity Risks, and (3)

---

[121] Ex. 27, BF_BK_00012714 (BlockFi Policy Document Enterprise Financial Risk Management).
[122] *Id.*
[123] *Id.*

Operational Risks.[124]   Importantly, BlockFi's risk management policies contained a built-in

exception process that allowed risk guidelines to be bypassed or overruled by executives.[125]

### 2.   BlockFi Board Audit and Risk Committee ("BARC").

Coincident with its liquidation of GBTC shares, BlockFi established a Board Audit & Risk

Committee ("BARC") to enable the Board of Directors to more closely monitor, review, and

provide oversight of the company's risk management policies and practices.[126]   Management was

expected to present regular updates and information to the BARC, including at any separate

sessions of the company's quarterly BOD meetings, to keep the Board apprised of the various risk

elements present at any given time.   In its early formulation, the BARC was also seemingly

responsible for setting the company's "Risk Appetite Framework" under the Financial Risk

policy.[127]

BARC purportedly had significant decision-making authority at BlockFi and was

ostensibly responsible for authorizing a significant number of the Alameda loans.[128]   BlockFi Chief

Risk Officer Yuri Mushkin expressed adamantly in his deposition that he felt a central function of

his position was to present the entire package of risks associated with any particular loan

opportunity to BARC, and that BARC was responsible for determining whether BlockFi should

accept those business risks.[129]

---

[124] See Ex. 28, Investment Trust Overview at *5.

[125] See Ex. 1, Marquez Dep. 108:4-6 ("[M]y understanding was that there was built into our risk process -- I believe there was an exception process.").

[126] Notably, when liquidation of the GBTC shares began on March 31, 2021, BlockFi had loaned 3AC $1,040.4 million and had only loaned Alameda $52.2 million.

[127] Ex. 29, BF_BK_00011785 (Jan. 14, 2022 Minutes of a Regular Meeting of the Board Audit and Risk Committee); see Ex. 30, BF_BK_00067301 (Sept. 1, 2021 Slack Messages among Yuri Mushkin and Tony Lauro).

[128] See Ex. 17, Mushkin Dep. 81:6-82:3.

[129] See Id. at 183:18-184:13.

BARC appears to have met nine or ten times between October 2021 and July 2022.[130]  The original members include James Fitzgerald (Chairman), Jennifer Hill, Ellen-Blair Chube, and Stefan Cohen.

### C.     **Regulatory.**

In 2020, state securities regulators, as members of the North American Securities Administrators Association ("NASAA"), formed a working group (the "Multistate Working Group"), and commenced an investigation into whether BIA and similar products involved the offer and sale of unregistered securities.  On January 7, 2021, members of the Multistate Working Group notified BlockFi of its non-compliance with relevant state securities laws.  In June 2021, the SEC notified BlockFi's General Counsel that it had commenced an informal investigation.[131]  On July 19, 2021, New Jersey Bureau of Securities' entered a Summary Cease and Desist Order ("NJ Order") against BlockFi Inc., BlockFi Lending LLC, and BlockFi Trading LLC.[132]

Mr. Prince asserted in his deposition that BlockFi had provided at least some sort of notice to clients prior to the settlement with the SEC stating,

> *...we made multiple communications about, you know, about the actions of New Jersey and other regulators in a variety of – in a variety of places. I mean, I'm – I'm sure we talked about it on Twitter. I also know that we, you know, we had like a big banner up on our website, like, on our home page. I think it was like throughout the entire website, there was a big banner, and I think even the color of it was, like, discussed with the regulator.*
>
> *And it was like, you know, some very bright color shade of yellow or orange maybe. So it was like, you know – it's almost like a – like a yellow stop light, or something like that, that was, you know, big, bold letters, at the top of every page of our website*

---

[130] Minutes for nine meetings were provided. Eight presentations that appear to have been designed for presentation at the BARC meetings were supplied. One such presentation, for November of 2022, does not appear to have any associated minutes provided.

[131] Letter from Gwen Licardo, Senior Investigations Counsel, SEC Enforcement Division, to Jonathan Mayer, General Counsel, BlockFi Inc. (June 10, 2021).

[132] Consent Order, *In re BlockFi Lending LLC* (July 19, 2021).

*if I remember correctly. If you clicked on that, it took you to a page, you know, which had disclosures about, you know – I don't know if it was all actions or investigations and actions, but, you know, there was a lot – there were a lot of, you know, a lot of different things disclosed.*[133]

Clients were not informed about any ongoing regulatory investigations until they were made public by New Jersey and other states in the media.  BlockFi did not notify clients of either investigation by regulators until formal orders had been issued.  BlockFi notified customers of New Jersey's enforcement action on July 19, 2021[134] and of the SEC's enforcement action on February 14, 2022.[135]

In February 2022, the SEC announced a settlement with BlockFi regarding three issues that it had identified during its own investigation: (1) BlockFi's failure to register the BIA product as a security in violation of Sections 5(a) and 5(c) of the Securities Act of 1933; (2) BlockFi's false and misleading statements on its website from March 4, 2019 through August 31, 2021 concerning BlockFi's collateral practices in violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933; and (3) BlockFi's operation as an unregistered investment company in violation of Section 7(a) of the Investment Company Act of 1940.

According to the SEC's order, from March 4, 2019 through the date of the settlement, BlockFi's offer and sale of BIAs to the public amounted to an unregistered securities offering because the BIA product met all of the requisite criteria to be considered an "investment

---

[133] Ex. 31, Prince Dep. 101:17-102:16.

[134]      Zac      Prince      (@BlockFiZac),      TWITTER      (July      19,      2021), https://twitter.com/BlockFiZac/status/1417316834244796416.

[135] BlockFi, BlockFi Enters Landmark Resolution with Federal and State Regulators Providing Clarity on Pathway for Crypto Interest Securities, BLOCKFI (Feb. 14, 2022), https://blockfi.com/resolution-announcement.

contract."[136]   The SEC stated plainly why BlockFi should have known that the BIAs were securities:

> *BlockFi sold BIAs in exchange for the investment of money in the form of crypto assets. BlockFi pooled the BIA investors' crypto assets, and used those assets for lending and investment activity that would generate returns for both BlockFi and BIA investors. The returns earned by each BIA investor were a function of the pooling of the loaned crypto assets, and the ways in which BlockFi deployed those loaned assets. In this way, each investor's fortune was tied to the fortunes of the other investors. In addition, because BlockFi earned revenue for itself through its deployment of the loaned assets, the BIA investors' fortunes were also linked to those of the promoter, i.e., BlockFi. Through its public statements, BlockFi created a reasonable expectation that BIA investors would earn profits derived from BlockFi's efforts to manage the loaned crypto assets profitably enough to pay the stated interest rates to the investors. BlockFi had complete ownership and control over the borrowed crypto assets, and determined how much to hold, lend, and invest. BlockFi's lending activities were at its own discretion, and BlockFi advertised that it managed the risks involved. Similarly, its investment activities were at its own discretion, and BlockFi could decide whether and how to invest the BIA assets in equities or futures.*[137]

The portion of the settlement related to BlockFi's false and misleading statements concerned a representation on BlockFi's website that its institutional loans were "typically" overcollateralized.[138]   In fact, the SEC found that this statement was not true and that because of this statement "BIA investors did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by BlockFi's institutional borrowers, BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand."[139]   From the vantage point of today's bankruptcy proceedings, this statement by the SEC about BlockFi customers facing undisclosed risk in

---

[136] SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946).
[137] Ex. 6, *SEC Order* at *8-9.
[138] *Id.* at *2.
[139] *Id.* at *9.

connection with BlockFi's collateralization practices for institutional counterparties appears quite apt.

Lastly, the SEC's order of settlement found that BlockFi operated for more than eighteen months as an unregistered investment company because it issued securities and also held more than forty percent of its total assets, excluding cash, in investment securities, including loans of crypto assets to institutional borrowers.[140]

To resolve these allegations, BlockFi agreed to pay a $50 million penalty to the SEC, to cease its unregistered offers and sales of the BIA product, and to attempt to bring its business within the provisions of the 1940 Act within sixty days.  BlockFi's parent company also announced that it intended to register under the Securities Act of 1933 the offer and sale of a new lending product.  At the same time, BlockFi agreed to pay an additional $50 million in fines to thirty-two states to settle similar charges.

From the outset, BlockFi's approach to regulatory compliance and adherence is seriously put in question by this settlement.  BlockFi's decision to continue offering the BIA product for over a year after notice from state regulators was neither reasonable nor rational.  Had BlockFi acted promptly when it first received notice of the SEC or state regulators' investigations, BlockFi likely would have incurred a lower penalty amount than it ultimately faced.

### D.   Investment Failures in Execution.

From January 2019 through September 2022, BlockFi only had one month in which it produced a positive operating margin, excluding provisions for credit losses (May 2022).  Over this approximately four year year period, the Company incurred approximately $320 million of

---

[140] *Id.* at *3.

cumulative operating losses (excluding provisions for credit losses).  Incorporating provisions for

credit losses for the same period, the cumulative loss increases from approximately $320 million

to approximately $368 million.[141]

      **1.**      **Grayscale.**

        **a.**       **Description of Investment Vehicles and "Arbitrage" Strategy.**

Grayscale, owned by Digital Currency Group ("DGC"), manages a variety of

cryptocurrency investment vehicles, including the Grayscale Bitcoin Trust ("GBTC"), which

was the first publicly traded bitcoin trust in the U.S. and the largest bitcoin fund in the world.

GBTC functions as an over-the-counter securities trust, invested solely in BTC, traded on the

OTCQX, and registered with the SEC pursuant to Section 12(g) of the Securities Exchange Act

of 1934.

The Grayscale Investment Trust originally launched as a private placement opportunity

for accredited investors on September 25, 2013.[142]  At launch, the minimum investment amount

was $25,000.[143]  That minimum threshold increased to $50,000 by February 27, 2018.[144]  On

January 21, 2020, the GBTC became a reporting company, registering its shares with the SEC.[145]

GBTC was the first digital currency investment vehicle to attain reporting company status with

the SEC.  This regulatory shift allowed accredited investors who acquired shares in GBTC

---

[141] Ex. 4, BlockFi Monthly File (*Source: 3.2.2.1 Historical Financials Management View_2022_09*) ("Monthly operating income as provided by BlockFi and excludes provision for loan losses, which are estimates of potential future loan losses but not actual losses when recorded").

[142] Bitcoin Inv. Trust, Notice of Exempt Offering of Securities (Form D) (Oct. 4, 2013).

[143] *Id.*

[144] Bitcoin Inv. Trust, Notice of Exempt Offering of Securities (Form D) (Feb. 27, 2018).

[145] Grayscale Inv., LLC, Current Report (Form 8-K) (Jan. 21, 2020).

through private placements to have a six-month statutory holding period rather than the previous twelve-month holding period.

GBTC shares could be acquired through private placements in two ways: (1) cash subscriptions in which investors would wire funds to Grayscale to purchase digital assets that would ultimately be held by the trust; and (2) in-kind subscriptions by which investors already holding digital assets could send those assets directly to the related trust, *e.g.,* sending BTC to subscribe to the Grayscale Bitcoin Trust.

From mid-2015 through December 2020, the market price of GBTC shares traded at a premium to the market price of the digital assets that could be used to subscribe to the trust. Over this same five-year period, the premium of the share-to-underlying-asset value ranged between roughly 0% and 120%, averaging out to a rough 40% premium to NAV. This persistent premium to NAV was attributed to a variety of factors, including:

- Poor availability of digital asset investment vehicles for traditional investors;
- Large retail demand to gain exposure to digital assets alongside traditional investments;
- Bullish market sentiment with regards to digital asset markets; and
- High trading volumes and liquidity.

In essence, the GBTC "arbitrage" strategy was simple. A party contributed bitcoin to the GBTC trust and obtained shares. Six months later, it would sell those shares. As long as the GBTC premium existed, that party would pocket a profit measured on a BTC basis – even if the price of BTC had declined. It was called an "arbitrage" because, theoretically, it was profiting off of the spread of two items that were (in theory) identical: BTC and GBTC shares.

However, this strategy was flawed. Arbitrage is generally considered a risk-free strategy because a party buys and sells the same asset *at the same time*. However, here, there was a mandatory six month waiting period and, so, the bet was that the premium would still exist in

six months.  As a result, the strategy was not "risk-free" and indeed highly risky: it was a bet that a premium with no inherent reason to exist would continue to exist in six months.

Further, it was foreseeable that when the premium vanished, it would go negative. BlockFi knew that many parties were borrowing the bitcoin to invest in the GBTC trust (it lent it to them), and thus knew there were many investors that would need to sell out of their investment once the six-month lockup expired.  If there were more investors looking to exit than people wishing to buy shares, the premium would go negative.  Further, because the GBTC Trust charged an annual premium, each GBTC share had less inherent value than the nominal bitcoin it represented.



146

---

### b.    **BlockFi's Direct and Indirect Use of the GBTC Arbitrage.**

BlockFi sought to profit from the premium to NAV by subscribing to GBTC using BTC posted as collateral or deposited with BlockFi in BIA accounts.[147]  This investment strategy was internally referred to as the "Grayscale Arbitrage."[148]  The Grayscale Arbitrage investment thesis was that BlockFi could earn a theoretical profit on in-kind subscriptions so long as the premium continued to exceed the 2% management fee associated with the trust.[149]  BlockFi's then Chief Risk Officer, Rene van Kesteren, and Director of Institutional Services, Yev Feldman, agreed to this in-kind subscriptions arbitrage mechanism as early as January 22, 2020.[150]  BlockFi's total deployment of digital assets into the trust by December 31, 2020 was approximately $1.5 billion.[151]  Total investment reached $2.5 billion by the end of March 2021, primarily due to appreciation of the underlying digital assets.

BlockFi also sought indirect exposure to the GBTC investment strategy through its institutional clients.  BlockFi's pitch was as follows: The institutional counterparty would be introduced to and onboarded with both BlockFi and Grayscale, BlockFi would issue a BTC loan to the institutional counterparty collateralized by either USD or other digital assets, the BlockFi-issued BTC would be used to subscribe with Grayscale, the GBTC shares would be pledged to

---

[147] Ex. 32, BF_BK_00065482 (Feb. 24, 2021 email chain with the subject line "GBTC / ETHE Exposure & Risk Management" among Zac Prince, Peter Johnson, and Rene van Kesteren); Ex. 33, BF_BK_00143262 ("we don't tie up equity capital in these trades, strictly debt capital (BTC raised in the interest account or BTC posted to BlockFi as collateral.")).
[148] Ex. 34, BF_BK_00143828 (Grayscale Arbitrage Overview dated June 2020).
[149] Ex. 32, BF_BK_00065482 (Feb. 24, 2021 with subject line "GBTC/ETHE Exposure & Risk Management").
[150] See Ex. 35, Grayscale Investment Product In-Kind Information Form (Jan. 22, 2020); Ex. 36, Grayscale Investment Product In-Kind Information Form (Feb. 6, 2020).
[151] See Ex. 28, Investment Trust Overview.

45

BlockFi in event of default, and (once the six-month lock-up period was over) the GBTC shares could be sold in order to make a profit and repay the initial loan amount to BlockFi.[152]

For a brief period of time, BlockFi's investment thesis bore fruit.  In July 2020, BlockFi internally reported selling its first batch of vested GBTC shares, realizing a total profit of ~$3.8 million.[153]  BlockFi used the USD revenue associated with these sales to purchase additional BTC, approximating a roughly 6% return on the BTC it had invested.  Ultimately, BlockFi realized profits of approximately $60 million through GBTC arbitrage in late 2020 and early 2021.

By the end of February 2021, however, GBTC had begun trading at a discount to the market price of the BTC that could be used to subscribe to the trust.  This flip from premium to discount presented a serious financial risk to BlockFi, as BlockFi would now have to incur losses to re-purchase the BTC it had used to subscribe to the trust in order to fund BIA BTC withdrawals or to return BTC to counterparties that had posted the BTC as collateral.

Around this time, BlockFi executives received inquiries from potential investors about BlockFi's GBTC position and any response BlockFi might have to the discount to NAV.[154]  In response to one set of queries, BlockFi executives insisted that the Company had always understood that the premium could go to zero or negative at some point and that BlockFi was

---

[152] Ex. 37, BF_BK_00065350 (Aug. 1, 2020 email thread with subject line "GBTC Activity Recap"); Ex. 38, BF_BK_00056391 (Feb. 25, 2020 email thread with subject line "BlockFi / Share Pledge").

[153] Ex. 37, BF_BK_00065350 (Aug. 1, 2020 email thread with subject line "GBTC Activity Recap").

[154] *See* Ex. 32, BF_BK_00065482 (Feb. 24, 2021 email thread with subject line "GBTC / ETHE Exposure & Risk Management") and Ex. 39, BF_BK_00065382 (Feb. 28, 2021 email thread among Zac Prince, Lance Miller, and Flori Marquez with subject line "FW: Who suffers if the Grayscale arbitrage dries up?").

accordingly managing the size of its GBTC position.  At the same time, BlockFi executives with
other outside investors that it was unlikely that the GBTC products would continue to trade below
NAV for a long period of time, even with BlockFi and others deploying a significant amount of
capital into the trade.[155]

### c.    Liquidation of Direct GBTC Investments.

The trend from selling at a premium to discount deepened throughout March 2021.  By
March 31, 2021, BlockFi faced greater than $200 million in unrealized mark to market losses on
its directly held positions in GTBC.[156]  BlockFi began liquidating its position in GBTC.  In order
to minimize the impact that its liquidation would have on the price of GBTC shares, BlockFi tried
to sell roughly $20 million of GBTC/day.[157]



158

---

[155] Ex. 32, BF_BK_00065482 (Feb. 24, 2021 email thread with subject line "GBTC / ETHE Exposure & Risk Management").
[156] Ex. 28, Investment Trust Overview.
[157] Ex. 40, BF_BK_00126474 at BF_BK_00126552 (Apr. 2021 Board Meeting Presentation).
[158] Ex. 28, Investment Trust Overview.

47

Amit Cheela, who functioned as BlockFi's SVP of Finance at this time, would periodically provide updates to BlockFi board members, executives, and investors regarding the status of the GBTC liquidation efforts.[159]  In associated emails, BlockFi executives weighed the propriety of ceasing further liquidation efforts and adopting a more opportunistic approach going forward, but these discussions ultimately did not materially alter BlockFi's push to liquidate its GBTC position.[160]  By October of 2021, BlockFi had fully exited its direct ownership positions, realizing ~$215 million in actual losses.

BlockFi also incurred losses associated with institutional clients who had borrowed funds to participate in Grayscale related strategies.  These loan and hedge-fund investment write downs totaled an additional ~$72 million.[161]

### d.  Contemporaneous Reorganization of Risk Management Function.

At the same time that BlockFi began liquidating its GBTC shares, BlockFi restructured its risk management department.[162]  As part of this restructuring, the risk team was reorganized so that it would no longer report to the institutional business lead.  Instead, BlockFi's risk management team merged into the Finance function.[163]  As part of the Finance team, BlockFi's new Chief Risk Officer, Yuri Mushkin, reported to BlockFi's then CFO, Tony Lauro.[164]  These changes suggest that BlockFi's GBTC strategy was interpreted internally as a byproduct of inappropriate risk management.

---

[159] *See* Ex. 41, BF_BK_00065334 at BF_BK_00065336 (June 6, 2021 email thread with subject line "BlockFi GBTC Update 06.18.21").
[160] *See* Ex. 41, BF_BK_00065334 (June 6, 2021 email thread with subject line "BlockFi GBTC Update 06.18.21").
[161] Ex. 28, Investment Trust Overview.
[162] *Id.*
[163] *Id.*
[164] See Mushkin Dep. 58:13-15.

48

### e.    BlockFi's Continued Acceptance of GBTC as Collateral.

Even after GBTC, BlockFi had exposure to GBTC price fluctuations through its acceptance of GBTC as collateral for customer loans.  Moreover, BlockFi did not appear to recognize that some of its institutional counterparties, such as 3AC, might have incurred outsized losses associated with their own GBTC strategies and that these losses may have impaired their creditworthiness.  BlockFi incurred additional losses in 2022 related to its acceptance of GBTC collateral, including realized losses in June 2022 upon the collapse of 3AC (discussed below) and the subsequent liquidation of the associated collateral.

### 2.    Three Arrows Capital.

Three Arrows Capital was a Singapore-based cryptocurrency hedge fund founded in 2012 by Kyle Davies and Su Zhu.  3AC borrowed money from lenders (such as BlockFi) to invest in cryptocurrency, crypto-based financial instruments and blockchain startups.  Like BlockFi, 3AC was heavily invested in the GBTC arbitrage strategy.  Thus, when GBTC began trading at a discount to the market price of Bitcoin in February 2021, 3AC reportedly suffered tremendous financial losses.[165]

3AC made a series of risky investments in an effort to recover, such as participating alongside Jump Crypto in buying of $1 billion in LUNA and the TerraUSD (UST) algorithmic stablecoin in early 2021.[166]  Within months of 3AC's initial investment, both UST and LUNA

---

[165] Jen Wieczner, The Crypto Geniuses Who Vaporized a Trillion Dollars Everyone trusted the two guys at Three Arrows Capital. They knew what they were doing — right?, NEW YORK MAGAZINE (Aug. 15, 2022), https://nymag.com/intelligencer/article/three-arrows-capital-kyle-davies-su-zhu-crash.html.

[166] Brady Dale, *Jump and Three Arrows Lead $1B LUNA Buy to Secure UST Against Black Swans*, YAHOO! (Feb. 23, 2022), https://www.yahoo.com/video/jump-three-arrows-lead-1b-054508397.html (last accessed May 17, 2023).

collapsed in May 2022 when depositors rushed to withdraw their stablecoins from Anchor, a lending project based on the Terra blockchain that promised interest rates as high as 20% for UST deposits. Mass liquidation of UST automatically triggered hyperinflation of LUNA, causing the price of each to collapse in a matter of days, wiping out $45 billion in market capitalization. By June, 3AC's $600 million investment was worth less than $1,000.

BlockFi was one of many lenders who began issuing margin calls to 3AC in May 2022. As a result of these margin calls, 3AC was forced to sell large amounts of BTC to meet its impending obligations. Because 3AC's BTC position in the market was so large, however, the rapid sale of 3AC's assets depressed market prices for BTC.[167] By June 2022, 3AC failed to meet margin calls, defaulted on its loans, and was ultimately subject to court-ordered liquidation in the British Virgin Islands on June 27, 2022.

BlockFi's relationship with 3AC began in 2019.[168] Until Q3 2020, BlockFi's exposure to 3AC consisted of unsecured loans in the range of approximately $125 million. But by the end of Q4 2020 BlockFi had issued loans to 3AC backed by significant GBTC collateral. By August 2021, its exposure would grow to $1.3 billion, backed largely by GBTC and an increasingly perilous arbitrage play.

BlockFi credit memoranda detail BlockFi's knowledge that 3AC's business strategies included the "Grayscale premium arbitrage."[169] Specifically, BlockFi was well aware of the fact

---

[167] Jen Wieczner, The Crypto Geniuses Who Vaporized a Trillion Dollars Everyone trusted the two guys at Three Arrows Capital. They knew what they were doing — right?, NEW YORK MAGAZINE (Aug. 15, 2022), https://nymag.com/intelligencer/article/three-arrows-capital-kyle-davies-su-zhu-crash.html

[168] See Ex. 42, BF_BK_00057975 (May 2, 2019 email thread from Kyle Davies of Three Arrows with subject line "Three Arrows – BlockFi: Intro Call"); Ex. 43, BF_BK_00057986 (Master Digital Currency Loan Agreement with Three Arrows).

[169] Ex. 44, Credit Memo for Three Arrows Capital (Aug. 12, 2021).

that 3AC "[t]ogether with BlockFi [was] one of the largest GBTC holders."[170]  Given BlockFi's

own liquidation efforts and associated losses that resulted from the GBTC flip from a premium to

discount, BlockFi should have been cognizant of the fact that 3AC would have been incurring

similar or greater losses.  BlockFi, however, seems to have either been oblivious to this fact or was

otherwise willing to accept the risk that a significant counter party was suffering enormous

financial losses.

In fact,  BlockFi continued to issue large loans to 3AC throughout 2021, even as the GBTC

discount grew more severe.  BlockFi's loan portfolio with 3AC doubled from Q2 to Q4 2021,

reaching nearly $2.5 billion.  The reason for this explosive growth is not entirely clear, although

Credit Memos drafted during the 3rd quarter of 2021 reveal that the "business case" behind at least

some of these loans was "the importance of the client.  The more we lend them, the more they

trade with us."[171]  A potential secondary justification for these loans is also stated in these Credit

Memos: one of 3AC's business strategies included "[v]enture investing (including BlockFi,

Deribit, and Fireblocks.[)]."[172]

By the end of September 2021, BlockFi's credit team updated the "Business Case" for 3AC

from the "importance of the client" to the following description: "Three Arrows is still the pre-

eminent crypto native fund in Asia, and seem to be involved in all of the best performing assets /

projects in crypto.  We know from a recently departed partner there they made hundreds of millions

---

[170] *Id.*

[171] Ex. 45, Credit Memo for Three Arrows Capital (Sept. 1, 2021); Ex. 46, Credit Memo for Three
Arrows Capital (Sept. 13, 2021).

[172] Ex. 46, Credit Memo for Three Arrows Capital (Sept. 13, 2021).

in P&L in the latest market move up (the partner retired)."[173]  We have thus far not been able to ascertain whether BlockFi was able to independently confirm this P&L statement.

By the end of February 2022, it was public knowledge that 3AC had made a significant investment in the LUNA token.[174]  By May 9, 2022, Terra Form Labs and LUNA had imploded resulting in a two-day crash and LUNA fell 73% in value.[175]



Notwithstanding 3AC's exposure to GBTC and LUNA, according to internal BlockFi data, BlockFi loaned $938 million to 3AC between May 15 and May 27, 2022, *after the LUNA collapse*. BlockFi knew or should have known that UST and LUNA were substantial components of 3AC's investment portfolio and that 3AC was perilously close to collapse.

---

[173] Ex. 47, Credit Memo for Three Arrows Capital (Sept. 23, 2021).
[174] Jeff Benson, *Terra Says LUNA Token Sale Raises $1 Billion for Bitcoin Reserve,* DECRYPT.CO (Feb. 22, 2022), https://decrypt.co/93577/terra-says-luna-token-sale-raises-1-billion-bitcoin-reserve.
[175] *Terra LUNA to USD Chart*, COINBASE, https://www.coinbase.com/price/terra-luna (last accessed 5/17/2023).



Although BlockFi publicly stated that its risk capital modeling included "concentration penalties which seeks to ensure there is sufficient risk capital to withstand a default of one of our largest counterparties," the volume of lending to 3AC seriously challenges that contention.[176]  For much of 2021, BlockFi's gross loan exposure to 3AC was more than $1 billion, with gross exposure peaking at nearly $2.5 billion around November 2021.  In October 2021, gross exposure to 3AC represented nearly 35% of BlockFi's total institutional portfolio.  Based on internal BlockFi data, in June 2022, when 3AC collapsed, loans to 3AC represented approximately 20% of BlockFi's institutional loan book.

At the beginning of July 2022, as 3AC was filing for bankruptcy, Mr. Prince tweeted that BlockFi was "one of the first to fully accelerate our overcollateralized loan to 3AC, as well as

---

[176] BlockFi, *An In-Depth Look at BlockFi's Risk Management*, BLOCKFI (June 19, 2022), https://blockfi.com/in-depth-look-at-blockfis-risk-management (last accessed 5/9/2023).

liquidate and hedge all collateral, we did experience ~$80M in losses, which is a fraction of losses reported by others."[177]  Mr. Prince further stated that this "represents the full extent of the impact to BlockFi from 3AC.  We have no further exposure and the limited losses we did experience will be absorbed by BlockFi with no impact to client funds."[178]

This statement was misleading.  BlockFi had required a rescue from FTX and the only reason that client funds had not been impacted by this loss was that BlockFi's insolvency had been (for the time being) covered by the line of credit from FTX.

### 3.    FTX and Alameda.

Beginning in 2020, BlockFi's loans to Alameda were largely "collateralized" by FTX's native, illiquid token, FTT.  Mr. Prince pushed to increase exposure to (and revenue from) Alameda by allowing Alameda to use FTT as collateral, despite concerns from the risk management team regarding its illiquidity.  In August 2021, BlockFi's exposure to Alameda significantly increased, as BlockFi looked to strengthen its relationship with FTX.

On November 2, 2022, CoinDesk reported that FTX's financial reserves were primarily based on possession of FTT[179] and shortly thereafter, the market price of FTT collapsed from a

---

[177]    Zac    Prince    (@BlockFiZac),    TWITTER    (July    1,    2022), https://twitter.com/BlockFiZac/status/1542934049970348033.

[178]    Zac    Prince    (@BlockFiZac),    TWITTER    (July    1,    2022), https://twitter.com/BlockFiZac/status/1542934051471908864.

[179] *See*, Ian Allison*, Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's    Balance    Sheet*,    COINDESK    (Nov.    2,    2022), https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (showing that roughly $5.8 billion out of $14.6 billion of assets on the balance sheet of Alameda, based on then-current valuations, were linked to FTX's exchange token, FTT.).

trading price of around $25 to $2 within a week.  FTT served as collateral for most of BlockFi's

loans to Alameda.[180]

### a.    The Alameda Loan Agreements.

On July 15, 2019, BlockFi Lending executed the Master Digital Currency Loan Agreement

(the "Master Loan Agreement") with Alameda the borrower.[181]  The Master Loan Agreement

allowed Alameda, at its discretion, to request BlockFi Lending loan a specified amount of "Digital

Currency."[182]  BlockFi had discretion to extend, or decline to extend, the request.[183]

On August 14, 2020, BlockFi International LLC and Alameda executed another agreement,

allowing Alameda to request that BlockFi International loan a specified amount of "Digital

Currency, Dollars, or Alternative Currency."[184]  This agreement was amended on January 26, 2022

to include an "FTX Exchange Indemnity" clause, in which Alameda "shall indemnify and hold

harmless [BlockFi International] from and against any direct damages [BlockFi International]

incurs solely from [its] inability to withdraw Collateral from FTX exchange."[185]  The same day,

BlockFi International, Alameda, and Coinbase Custody International Limited ("Coinbase")

entered a tri-party Security Agreement over a Custody Account (the "Security Agreement") for

the benefit of the BlockFi International as lender.[186]

### b.  BlockFi's Due Diligence of FTX/Alameda's Business was Unconventional and Incomplete.

---

[180] Over $1.3 billion of the collateral recognized by BlockFi at the beginning of November 2022 was solely comprised of FTT.

[181] Ex. 48, BF_BK_00010100 (Master Digital Currency Loan Agreement with Alameda).

[182] *Id.* at BF_BK_00010103.

[183] *Id.*

[184] Ex. 49, BF_BK_00009913 (Amended and Restated Master Loan Agreement with Alameda).

[185] *Id.* at BF_BK_00009940.

[186] Ex. 50, BF_BK_00009948 (Security Agreement over a Custody Account among Alameda, BlockFi, and Coinbase).

Our Investigation revealed that BlockFi failed to complete basic due diligence on FTX and Alameda more than two years after signing its loan agreement with Alameda and even after BlockFi originated approximately $650 million of new loans to Alameda from August 18, 2020 to September 30, 2021.

On July 6, 2021, Mr. Prince reached out to Sam Bankman-Fried concerning FTX's failure to complete BlockFi's security questionnaire for counterparties: "We really want to do more with you guys and develop a big relationship – hopefully you understand that getting some basic security info is important to us.  I expect that we can be a very large lender and trade on your platform..just need to do some baseline diligence.  Kind of surprised y'all aren't better setup to help facilitate this!"[187]

On October 25, 2021, the questionnaire was still outstanding.  Paul Howard, BlockFi's Institutional Sales Director, sought to schedule a diligence call with FTX regarding "financials, organizational structure, strategy, platform and (perhaps separately cybersecurity/custody)" and explained to Zane Tackett, FTX Head of Institutional Sales, "[w]e want to extend further credit using FTT collat ($bn) [sic], as well as the breadth of coins (further quality/liquidity for FTX) and move the bulk to our trading volume to you as soon as possible."[188]  Tackett responded, "…based on your DDQ doc the cybersecurity questions you have would be a bit over my head…".[189]

---

[187] Ex. 51, BF_BK_00008395 (July 6, 2021 email thread with subject line "BlockFi <> FTX Onboarding").
[188] Ex. 52, BF_BK_00006169 at BF_BK_00006170 (October 27, 2021 email thread with subject line "Risk Follow Up").
[189] *Id.* at BF_BK_00006169.

Simultaneously, BlockFi employed unconventional due diligence practices in evaluating Alameda's business to mitigate "lack of third-party verification."[190]  On August 17, 2021, Mr. Prince approved an approach devised by the risk team to "'check' the contents of client wallets on the block-chain."[191]  On September 22, 2021, Chris Yeung, BlockFi's Asia Trading Manager, requested "3rd party verification such as wallets and/or exchange positions" and risk reports. Richard Chang, Alameda Head of Capital Markets, confirmed that "Alameda does not currently generate risk reports."[192]  The same day, Mr. Mushkin summarized a due diligence call with Mr. Yeung and Caroline Ellison, Alameda CEO:

> My main take-away is that their leverage is currently healthy based on their available equity – but **since lion share of equity is in FTT which fluctuates considerably, that remains our key area to monitor**.  The 'follow up' will definitely help as you mentioned, to i) verify their wallets (lacking audited financials), ii) get more financials/information on FTX given we're holding a lot of FTT, iii) keep track of their risk reporting, and iv) I think we may also ask to monitor their leverage also, and build that into our agreements along with ability to swap for SOL.[193]

On September 27, 2021, Jaap Hoorweg, BlockFi Director of Institutional Services Credit Risk, clarified that BlockFi wanted wallet information to "verify a large portion of [Alameda's] balance sheet…50% or more of [Alameda's] total assets."[194]  By October 4, Alameda provided

---

[190] Ex. 53, BF_BK_00070731 (August 17, 2021 email thread with subject line "Alameda loan request" among Rene van Kesteren, Yuri Mushkin, Rob Margolis, and AhYoung Kwak).

[191] *Id.*

[192] Ex. 54, BF_BK_00006363 (September 22, 2021 email thread with subject line "Risk Follow Up" among Richard Chang and Caroline Ellison of Alameda, Zane Tickett of FTX, and Chris Yeung, Rishi Ramchandani, Yuri Mushkin, Rob Levine, Joe Hickey, and Jon Heng of BlockFi).

[193] Ex. 55, BF_BK_00070643 (September 22, 2021 email thread with subject line "Call Report: Alameda" among Yuri Mushkin, Chris Yeung, Tony Lauro, Zac Prince, Joe Hickey, Jon Heng, Rene van Kesteren, David Olsson, and Yev Feldman).

[194] Ex. 56, BF_BK_00006238 at BF_BK_00006249 (October 12, 2021 email thread with subject line "Risk Follow Up" among Richard Chang of Alameda and Jaap Hoorweg of BlockFi, cc'ing other members of BlockFi's risk team as well as Caroline Ellison of Alameda).

BlockFi 100,000 wallet addresses holding approximately $7 billion in ETH and SOL.[195]   A few

days later, Mr. Hoorweg confirmed that the wallet addresses accounted for approximately 24% of

Alameda's total assets and reiterated that BlockFi wanted to verify at least 50%, or approximately

$15 billion, of Alameda's assets.[196]   On October 12, Mr. Chang provided additional wallets

containing SOL and noted "some of the assets are locked in pools on Raydium, Orca, Saber, Sunny,

Serum, and in lending protocols Larix, port.finance, as well as on marinade.finance so some work

could be necessary to figure out the total balances here" and told Mr. Hoorweg "I think this gets

us to 15bn."

        When BlockFi asked for proof of wallet ownership, Alameda suggested using "Nansen."[197]

Nansen is cryptocurrency intelligence software that is typically used for market insight, not proof

of wallet ownership.  This is an irregular industry practice and should have raised red flags: wallet

ownership can be proven at no cost by signing an arbitrary message with the private keys to a

given wallet.[198]  Regardless of the method BlockFi used to verify ownership, this approach to due

diligence was unfeasible: BlockFi would have had to manually verify over 100,000 wallet

---

[195] Ex. 57, BF_BK_00006780; Ex. 58, BF_BK_00006785 (Oct. 4, 2021 email thread with subject line "Risk Follow Up" among Richard Chang and Caroline Ellison of Alameda and Jaap Hoorweg and other members of BlockFi's risk function).

[196] Ex. 56, BF_BK_00006238 at BF_BK_00006245 (Oct. 12, 2021 email thread with subject line "Risk Follow Up").

[197] Use of Nansen software costs professional users upwards of $2,000 per month.

[198] Ex. 56, BF_BK_00006238 at BF_BK_00006246 (Email communication between BlockFi and Alameda underscores that Nansen is not an effective approach to verifying wallet ownership for due diligence purposes.  On October 5, 2021, Jaap Hoorweg asked Richard Chang whether BlockFi could share Alameda's list of wallet addresses with Nansen.  Chang said no and elaborated "I also don't think Nansen can give you a list of addresses that they have associated with us (I've asked them before).  So now that I think about it there's probably not much use for Nansen at this point." Regardless, Hoorweg moved forward with this approach, "[w]e understand Nansen has their own list of addresses which they somehow associated with Alameda.  So we are just trying to see if Nansen data gives us any more information on top of the addresses….").

addresses to verify only 25% of Alameda's assets – only half of the assets BlockFi's risk team determined necessary to verify.[199]

c.    **BlockFi Executives Overrode Risk Management Processes to Lend to Alameda.**

BlockFi executives began to disregard the advice of their credit risk team as early as August 2021, when the team drafted its first Credit Memo regarding Alameda. This Credit Memo detailed how a prospective loan package of "up to $1bn gross (overcollateralized by FTT/SOL/SRM)" would exceed the recently established credit limits for "Tier 1C" crypto native funds. Additionally, the memo flagged how Alameda presented wrong-way risk, had unaudited financials, relied on illiquid tokens, and was offering volatile collateral.[200]

Notably, under BlockFi's formal risk management policies, Alameda did not even meet the requisite criteria to be considered a so-called Tier 1C company. According to BlockFi's own Credit Risk Management policy, a Tier 1C-Other entity must have "Verifiable Financials (Audited/Fund Admin) or unaudited financials + other sources to verify acceptable to Credit," and must have a "Key Person" with ">15yrs" experience.[201] BlockFi was unable to identify a key person having 15 years or more of experience at Alameda, and Alameda did not provide audited financials or another source of certainty at the time BlockFi began lending hundreds of millions of dollars-worth of digital assets to Alameda. When asked about how Alameda could be considered a Tier 1C entity given its apparent failure to qualify as such under BlockFi's written policies, Mr. Mushkin was unable to say definitively and only opined that "I'm sure the rating that that would – would be something that would be escalated or proposed at something like the C&I forum and

---

[199] *Id.* at BF_BK_00006249.
[200] Ex. 59, BF_BK_00011629 (Credit Memo for Alameda Research dated Aug. 13, 2021).
[201] Ex. 60, BlockFi Credit Risk Management Policy.

discussed and the reasons deliberated, and basically agreed to, let's call it, you used the word earlier, but as some kind of exception process."[202]

Contemporaneous with the issuance of this August 2021 Credit Memo, Mr. Prince expressed interest in doing more business with Alameda, stating that BlockFi should "bring deals to table and flag anything that isn't approved relative to client ask to me."[203] Mr. Mushkin said that issuing loans would not be an issue if "Alameda can post major tokens as collateral" but that "the credit team doesn't see any other assets on their unaudited balance sheet other than mostly FTT, some SOL and SRM."[204]

Mr. Mushkin explained that the problem "with FTT as collateral here is that its [sic] wrong-way risk, therefore we have to assume between 50%-75% FTT collateral loss in scenario where Alameda gets into trouble."[205] With such an assumption in mind, BlockFi was already "at capacity with FTT as collateral" because "at the current levels of 114mm loan, an idiosyncratic 75% drop in FTT could result in over 50mm of losses on BlockFi's loan."[206]

FTT had wrong-way risk and "jump to default" risk due to its nature. FTT functioned, as the risk department understood and noted, like FTX equity.[207] Accordingly, because Alameda and FTX were tightly linked, in situations where Alameda was having difficulty repaying its loans, it was likely that FTT value would also be impaired. Further, because Alameda's balance sheet was so reliant on FTT, if Alameda's ability to repay loans was impaired it was reasonable that it would

---

[202] *See* Ex. 17, Mushkin Dep. 114:20-25, 115:2-22.
[203] Ex. 10, BF_BK_00011388 (Aug. 15, 2021 email thread with subject line "Call Report: Alameda Research" among Zac Prince, Rene van Kesteren, Rob Levine, Tony Lauro, and Yuri Mushkin).
[204] *Id.*
[205] *Id.*
[206] *Id.*
[207] Ex. 59, BF_BK_00011629 at BF_BK_00011629–00116230 (Credit Memo for Alameda dated August 13, 2021).

be *because* FTT was impaired.  Finally, because Alameda was borrowing from BlockFi secured by FTT, it was likely borrowing from other parties secured by FTT – and therefore, in a situation where BlockFi was seeking to sell FTT collateral, it would likely be competing with other institutions to do so.

At his deposition when asked about Mr. Mushkin's statement about being "at capacity with FTT as collateral," Mr. Prince explained, "Yeah, well, you know, at – at this point in time, August 13th, 2021, you know, he – you're right, he says therefore we are at capacity with FTT as collateral. You know, I'm sure – I'm sure we could find other things that, you know, explain how that – how that view changed over time because I know that there were points in time where we had more FTT as collateral than it sounds like we did here.  But, you know, there's – there's nothing in here. Yeah, I don't know if you're implying this or not, but there's nothing in here where somebody's saying, you know, we have to do it anyways."[208]  At this time, BlockFi held only $135 million of FTT as collateral, when Mr. Mushkin stated BlockFi was "at capacity."  BlockFi subsequently increased those holdings by an order of magnitude.  Mr. Prince responded that the Company should get comfortable with the risk: "is credits view right now that we can't lend more?  If so, how do we go through the exceptions process?  I think we should get comfortable w them being a three arrows size borrower, just with FTT and other collateral types instead of GBTC shares.  It's the largest / clearest growth opportunity we have."[209]

BlockFi's former Chief Risk Officer Rene van Kesteren was also uncomfortable with the risk profile presented by additional FTT as collateral.  He wrote in this same email chain, "100%

---

[208] Ex. 31, Prince Dep. 197:13-198:1.
[209] Ex. 10, BF_BK_00011388 (Aug. 15, 2021 email thread with subject line "Call Report: Alameda Research" among Zac Prince, Rene van Kesteren, Rob Levine, Tony Lauro, and Yuri Mushkin).

agree with Yuri.  For FTT, Filecoin etc. we have a real event-risk that doesn't exist with bitcoin or ether for example, whereby the token can gap 80% or more."[210]  Yet again, Mr. Prince disregarded the concerns, responding, "I'm fine w all of that. Would love a short term solution to grow with FTX.  There is sooo much room regardless of how we slice the data."

The team that was functionally responsible for analyzing risk data, however, had come to different conclusions.  In Slack messages circulated around this time, for which Mr. Mushkin is listed as a custodian, members of BlockFi's credit team were puzzled about accepting FTT as collateral.  One team member wrote that they were "surprised that we approved $135m worth of FTT as collateral???  I don't remember doing risk analysis for collateral of that size for FTT, is it just one loan?"[211]  The team member then asked, "who approved the additional collateral to be posted in FTT?"[212]  Head of Credit & Underwriting, Robert Levine, admonished the team member, asking "can we take this discussion offline please – I would like the focus here to be on the stress analysis.  Thanks."[213]

In spite of the risks articulated by members of the credit team that were memorialized in the August 13, 2021 Credit Memo and discussed in the August 15, 2021 email thread, Mr. Prince's request for an "exceptions process" appears to have been implemented by BlockFi.  Per this new exceptions process, on August 17, 2021, Mr. Mushkin circulated an internal email asking "Zac,

---

[210] *Id.*
[211] Ex. 61, BF_BK_00067834 at BF_BK_00067835 (Aug. 13, 2021 Slack message chain in the "market-risk" Slack Channel among Hendrik Hoorweg, Qianqian Yang, Robert Levine, and Sasikanth Nagalla).
[212] *Id.*
[213] *Id.*

Tony, cc Rene Following up to confirm Alameda exception approvals."[214]  Mr. Prince responded "Approved."[215]

In an August 23, 2021 Alameda Credit Memo, the credit risk team reviewed an additional request from Alameda for "100m USD loan with 110% collateral," noting that "we hold $203mm FTT collateral.  Although we should be holding approx. $34m of USD collateral (according to trade confirms), it seems that the trading desk has effectively swapped our USD collateral for FTT collateral."[216]  The credit team again raised its concerns about accepting FTT, writing that the "[c]redit team recommends not to approve this trade because it increases our exposure to FTT collateral which is already very significant."[217]  The team noted that to "upsize significantly we would need to explore the Alameda / FTX entity structure which requires full financial disclosures to see where we could establish recourse and / or where we could take larger-cap coins as collateral."[218]

Mr. Levine directly communicated these concerns to executive leadership, writing that "[w]e recommend not approving this trade which significantly raises stressed net exposure, wrong way risk, and the ability to liquidate collateral relatively quickly.  Please advise if we can decline this trade."[219]  Against the advice of the credit team, Mr. Prince pushed for the trade, writing to ask if "we even have 100M to lend?  What are the current positions in the book w/ them?  Could

---

[214] Ex. 53, BF_BK_00070731 (Aug. 17, 2021 email thread with subject line "Alameda loan request" among Rene van Kesteren, Yuri Mushkin, Rob Margolis, and AhYoung Kwak).
[215] *Id.*
[216] Ex. 7, Credit Memo for Alameda Research (Aug. 23, 2021).
[217] *Id.*
[218] *Id.*
[219] Ex. 8, BF_BK_00071268 (Aug. 25, 2021 with subject line "Alameda trade upsize" among Tony Lauro, Zac Prince, Yuri Mushkin, David Olsson, Amit Cheela, Max Edwards, Rene van Kesteren).

they give us another collateral type?"[220]  SVP of Finance Amit Cheela responded that "though we could technically scrape together the 100m … it would likely bottleneck client trading (retail needs usd on exchange too) and potentially necessitate calling loans from other counterparties to meet retail withdrawal/loan demand."[221]

Subsequent email communications reveal that BlockFi ultimately proposed a counter-offer whereby Alameda would "re-strike collateral for three USD denominated loans" and accept a higher collateralization level in exchange for the $100 million in loans.[222]  It is not clear from these email communications how accepting an even greater amount of FTT in return for the $100 million would alleviate the credit team's concerns regarding the wrong way risk, lack of full financial disclosures, reliance on smaller-cap tokens, and inability to liquidate the FTT collateral relatively quickly.

On August 31, 2021, BlockFi's credit risk team drafted another Credit Memo analyzing a request from Alameda for a "10k BTC loan (worth ~470m) with 110% FTT/SRM collateral."[223]  Yet again, the credit team recommended against "approv[ing] this trade because it increases our exposure to FTT which is already very significant."[224]  The credit team provided a prescient addendum, writing that "[w]e do not recommend increasing our exposure to FTT collateral.  We think FTT tokens are in a way similar to equity in FTX exchange and BlockFi's exposure is already very large.  If something goes really wrong with FTX then the FTT tokens will drop sharply and

---

[220] *Id.*
[221] *Id.*
[222] *Id.*
[223] Ex. 62, Credit Memo for Alameda Research (Aug. 31, 2021).
[224] *Id.*

this will trigger a wave of liquidations from other lenders who apparently hold billions of dollars worth [sic] of FTT collateral."[225]

Yet again, Mr. Levine communicated these concerns to executive leadership, writing that "this is a difficult request for us to support because of the sheer size of FTT exposure it would entail as well as the long timeframe (over 90 days) to liquidate it if need be."[226]  Mr. Mushkin expressed partial agreement, writing that "[l]ending BTC is interesting but we have no more appetite for FTT."[227]  Mr. Prince, however, had different ideas.  He wrote, "I really think we are being too conservative not doing this and should make them a proposal w an FTT / SRM collateral level higher than 110%."[228]

On September 13, 2021, BlockFi's credit risk team reviewed another request for "50k ETH loan (worth ~162m) with 150% FTT collateral."[229]  In line with their previous statements, the team recommended "not to approve this trade because it significantly increases our exposure to FTT collateral which is already very significant (we hold $516m FTT collateral)."[230]  Executive-level email traffic specific to this transaction did not surface during the course of our investigation, but a subsequent Credit Memo dated September 15, 2021 indicates that the credit team's recommendation ignored and the trade was increased in size and scope.[231]  The September 15, 2021 Credit Memo notes that BlockFi's gross exposure had grown from $263 million on

---

[225] *Id.*

[226] Ex. 9, BF_BK_00070693 at BF_BK_00070696 (Sept. 3, 2021 email thread with subject line "Alameda Upsize" among David Olsson, Zac Prince, Yuri Mushkin, Rene van Kesteren, Rob Levine, and Tony Lauro).

[227] *Id* at BF_BK_00070695.

[228] *Id.*

[229] Ex. 63, Credit Memo for Alameda Research (Sept. 13, 2021).

[230] *Id.*

[231] *See* Ex. 64, BF_BK_00011654 (Credit Memo for Alameda Research dated Sept. 15, 2021).

September 13 to $866 million on September 15, with a corresponding growth in FTT collateral

held by BlockFi from $516 million to $1.69 billion.[232]  The credit risk team wrote to "highlight[]

the current exposure to FTT collateral which we think is too large and concentrated (we hold

$1.7bn FTT collateral) but this has already been approved at CEO/CFO level."[233]

On November 5, 2021, the credit risk team drafted another Credit Memo analyzing a

"request to borrow $600m worth of BTC with 180% FTT collateral (160% margin call)."[234]  Again,

the credit team warned against approving the trade "because it increases our exposure to FTT

collateral which is already very significant."[235]  The issue was elevated by Mr. Levine and

presented to senior executives by Mr. Mushkin who wrote "zac/tony/rene can you pls reply with

your [sic] ok.  Pls note we'll have ~1.5b loaned vs. 2.5bb of FTT.  If they push on 160% collateral

level – wld ask for right in future to swap into SOL to diversify away from FTT at our discretion,

Alameda has agreed to that before."[236]  Messrs. Lauro and Prince replied with one-word messages:

"approved."[237]

BlockFi Managing Director Angelo Chan clarified in a follow-up email to the executives

that, "while we have sent Alameda additional terms that would allow us to demand swapping FTT

for SOL at our discretion, they have not actually agreed to this in writing (i.e. there may be some

disconnect between their trading and legal functions).  If their position on this remains unchanged

---

[232] *Id.*

[233] *Id.*

[234] Ex. 25, BF_BK_00011705 (Credit Memo for Alameda Research dated Nov. 5, 2021).

[235] *Id.* at BF_BK_00011708.

[236] Ex. 65, BF_BK_00070536 at BF_BK_00070537 (Nov. 5, 2021 email thread with subject line "Alameda upsize request" among Joe Hickey, Zac Prince, Angelo Chan, David Olsson, Max Edwards, Rene van Kesteren, Rob Levine, Tony Lauro, and Yuri Mushkin).

[237] *Id.*

on this point, we will need to ask for 180% collateral based on the parameters you set."[238]  Mr.

Prince replied, "I'd be fine 160% FTT on this one, I think they are proving to be good

counterparties."[239]  BlockFi's Joe Hickey responded to Mr. Prince's message, "Thanks everyone.

We will get the BTC loan done ASAP.  Some fresh term FTT staking inventory for when we are

ready."[240]

Mr. Prince's overt optimism with regards to Alameda, and his willingness override the

advice of his risk management team in pursuit of growing BlockFi's relationship with Alameda,

was so plainly visible to members of BlockFi's institutional sales team that, on at least one

occasion, the team went directly to Mr. Prince.  On January 7, 2022, a member of the institutional

team wrote to Mr. Prince that "we have a potential client issue with terms for Alameda, and just

want to escalate quickly so we can get clarity sooner than later….  Risk has given us a collateral

level of 200% for SOL (as I understand it even vs. BTC and ETH)… after showing 140% in the

BS meeting grid, and mentioning 160% potentially verbally due to large size. We don't want to

show 200% to the client – it's not logical (isn't SOL more liquid / bigger market cap than FTT?),

and falls far short of their expectations."[241]

Mr. Prince responded to this message, in part, that "I agree that from a client pov SOL

should be the same or better collateralization terms vs. FTT.  I also agree strongly with the

importance of this client and as a result it's critical to be really smart w/ each step! Our risk

---

[238] Ex. 65, BF_BK_00070536 (Nov. 5, 2021 email thread with subject line "Alameda upsize request" among Joe Hickey, Zac Prince, Angelo Chan, David Olsson, Max Edwards, Rene van Kesteren, Rob Levine, Tony Lauro, and Yuri Mushkin).

[239] *Id.*

[240] *Id.*

[241] Ex. 11, BF_BK_00011350 at BF_BK_00011357 (Jan. 8, 2022 email thread with subject line "Alameda – Urgent" among Yuri Mushkin, David Olsson, Chris Perez, Joe Hickey, Rene van Kesteren, Rob Levine, Tony Lauro, Vitaly Fiks, Yev Feldman, and Zac Prince).

parameters for collateral treatment are still in flight – and they generally assume that we have just the collateral for the loan and that the counterparty won't post margin… Either way I think we should offer terms that we think the client could say yes to."[242]

Further down in the email thread, Mr. Mushkin explains that "the issue here is really loan sizes (1b to 2b, and upwards of 4bb of collateral) resulting in large concentration to either FTT and/or SOL. Thus we have developed an approach that guards sufficiently against the remote/low probability of the coin being impaired."[243]  Mr. Mushkin elaborated in a second email that "besides the margin methodology, since we are asked to increase A LOT of credit introducing 'wipe out' risks, also hope we can use the opportunity to negotiate."[244]

The January 5, 2022 Credit Memo detailing this transaction omits the typical "approval challenges/recommendations" subsection that had consistently recommended against approving trades collateralized by FTT.[245]  The Credit Memo, however, still notes that Alameda presents underwriting challenges because it has unaudited financials, is over the credit limit, presents wrong way risk, and has illiquid tokens.[246]

This January 5, 2022 Credit Memo is notable as being the *last* credit memo specific to Alameda that BlockFi's risk team authored before November 2022.  Although BlockFi continued to regularly transact with Alameda, no records of any BlockFi credit memoranda regarding Alameda have been provided between February 2022 and October 2022.  In fact, internal documents and communications indicate that executive authorization for some transactions with

---

[242] *Id*. at BF_BK_00011356.
[243] *Id*. at BF_BK_00011354.
[244] Ex. 11, BF_BK_00011350 (Jan. 8, 2022 email thread titled "Alameda – Urgent").
[245] Ex. 66, BF_BK_00011688 at BF_BK_00011692 (Credit Memo for Alameda Research dated Jan. 5, 2022).
[246] *Id*. at BF_BK_00011693.

Alameda shifted to informal channels, such as Slack, while email approval was still used for other transactions.

For example, on March 24, 2022, a BlockFi employee posted a request from Alameda into the "credit-underwriting" Slack channel for "50-200m of BTC/ETH/USD" on an "unsecured basis," writing that "we have some room to lend them additional if we have appetite. Want to get internal approval before reaching out."[247]  Mr. Prince responded to this message, "Def have appetite just a question of what size to go back to initial margin level (180 iirc)" "good on pricing at open term" "could go lower on eth and BTC" "Def try for higher for cash on term."[248]  After some back and forth among credit underwriting members, a team member writes, "Sounds good. So all approved?" to which BlockFi's Vitaly Fiks responds "yes, per Yuri above should be fine. actually updating loan amounts (forgot they had repaid some)."[249]

All credit memos related to Alameda that were produced to the Committee are summarized below:

| Date | Request | Collateral Notes | Risks Identified | Risk Conclusion |
|---|---|---|---|---|
| 8/13/2021 BF_BK_00011629 | Potentially up to $1bn gross. | Overcollateralized by FTT/SOL/SRM. | • Unaudited financials, over credit limit, wrong way risk, volatile collateral, illiquid tokens. | Not approved |

---

[247] Ex. 67, BF_BK_00066246 (Mar. 24, 2022 Slack Messages in the "Credit-Underwriting" Slack Channel).
[248] *Id.* at BF_BK_00066247.
[249] *Id.* at BF_BK_00066248.

| Date | Request | Collateral Notes | Risks Identified | Risk Conclusion |
|------|---------|------------------|------------------|-----------------|
| 8/23/2021 | $100m USD loan, open term. | 110% FTT collateral (100% margin call, no liquidation trigger). | • Unaudited financials, over credit limit, wrong way risk, volatile collateral, illiquid tokens.<br>• It increases our exposure to FTT collateral which is already significant. | Not approved |
| 8/31/2021 | 10k BTC loan (worth ~470m), open term. | 110% FTT/SRM collateral (100% margin call, no liquidation trigger). | • Unaudited financials, over credit limit, wrong way risk, volatile collateral, illiquid tokens.<br>• It increases our exposure to FTT collateral which is already very significant.<br>• SRM is not an approved form of collateral.<br>• Loan would reduce overall collateral level from 136% to 120%. | Not approved |

| Date | Request | Collateral Notes | Risks Identified | Risk Conclusion |
|---|---|---|---|---|
| 9/7/2021 BF_BK_00011714 | $100mm USDC loan, open term. | 220% SOL Collateral (150% margin call, no liquidation trigger). | • Unaudited financials, over credit limit, wrong way risk, volatile collateral, illiquid tokens.<br>• We think SOL is a better form of collateral than FTT. . . doesn't have the same level of wrong way risk as FTT, which is the FTX exchange token which is owned by the same owner as Alameda Research. | Not approved at current collateral level. Credit team recommends approving this trade at 220% initial SOL collateral and 150% margin call. |
| 9/13/2021 | 50k ETH loan (worth ~$162m), open term. | 150% FTT collateral (140% margin call, no liquidation trigger). | • Unaudited financials, over credit limit, wrong way risk, illiquid tokens.<br>• It increases our exposure to FTT collateral which is already very significant. | Not approved |

| Date | Request | Collateral Notes | Risks Identified | Risk Conclusion |
|------|---------|------------------|------------------|-----------------|
| 9/15/2021 BF_BK_00011654 | To refinance existing loans ($50m of ETH and $50m USD) for 1 months. The loans are currently open term. | 200% FTT collateral (margin call at 160%). | • Unaudited financials, over credit limit, wrong way risk, illiquid tokens. <br> • **"Credit team highlights the current exposure to FTT collateral which we think is too large and concentrated but this has already been approved at the CEO/CFO level"** | Approved |
| 9/15/2021 | $50m USD loan, open term. Alameda has also agreed to increase margin levels on the rest of their loans to 220%. | 220% FTT collateral (185% margin call, no liquidation trigger). | • Unaudited financials, over credit limit, wrong way risk, illiquid tokens. <br> • "Credit team highlights the current exposure to FTT which is already very significant." | Approved with 220% FTT collateral and subject to increasing FTT collateral on all loans to 220% (185% margin call). |
| 11/5/2021 BF_BK_00011705 | $600m worth of BTC. 1 month or 3-month term. | 180% FTT collateral (160% margin call). | • Unaudited financials, over credit limit, wrong way risk, illiquid tokens. | Trade not approved. Credit team recommends approving the maturity of these loans. |
| 11/7/2021 | Exposure Update. | N/A | N/A | N/A |

| Date | Request | Collateral Notes | Risks Identified | Risk Conclusion |
|---|---|---|---|---|
| 11/16/2021 | 100k to $300k ETH (worth $430m to $1.2bn). 1-month or 3-month term. | 160% FTT collateral (140% margin call). The FTT collateral is to be swapped for staked SOL collateral once we have Coinbase ACA in place. | • Unaudited financials, over credit limit, wrong way risk, illiquid tokens.<br>• Increases exposure to FTT | Not approved. "We could consider this trade with SOL. . ." |
| 1/5/2022 BF_BK_00011688 | To borrow $1bn (combination of ETH/BTC/USD). Open term. | SOL collateral. We have just completed the setup of a new Coinbase ACA which allows us to hold SOL collateral. | • Unaudited financials, over credit limit, wrong way risk, illiquid tokens. | Approved |
| 11/7/2022 BF_BK_00011615 | Exposure update. | Alameda posted additional 440m FTT, to bring up collateral levels to 200% (180% margin call). | N/A | N/A |

Mr. Prince's ability to authorize high value transactions through Slack messages appears to have been understood and accepted by BlockFi's CRO and CFO. On March 29, 2022, for example, Mr. Mushkin messaged Mr. Lauro, "just to let you know tony biz loaned another 10k BTC, or ~$480m of (sic) to Alameda, as our over-collateralization level on FTT grew to 220% ( yesterday we had 1.2 loaned and 2.7b of collateral available ) and alameda contractually could call back ~400m of FTT collateral back to 185%. There was a discussion in credit slack last night, and zac approved additional 10k BTC borrow, I pushed in tandem to get more SOL."[250] Mr. Lauro

---

[250] Ex. 68, BF_BK_00067309 at BF_BK_00067310 (Mar. 29, 2022 Slack messages among Yuri Mushkin and Tony Lauro).

responded to this and other messages from Mr. Mushkin regarding de-risking BlockFi's book, "ok thanks."

In addition to the communication becoming less formal, BlockFi's publicly touted first-rate risk management practices fail to appear in its email communications.  On an email chain beginning on April 8, 2022, for example, BlockFi's Director of Enterprise Credit Risk sought approval for a $300 million transaction with Alameda involving USDC, noting that "with the new trade, the portfolio will be in margin call, so additional collateral will need to be posted."[251]  Mr. Prince responded "Approved by me from a risk pov," although Mr. Prince cautioned that "there is a treasury component here" and that as a result "we can do it but at a higher price above our cost of capital."[252]

Mr. Mushkin chimed in to note that a new risk management issue had propped up with Alameda: "given the size of alameda loan, there is currently a huge absolute dollar difference between our Alameda IC and MC levels, right now with 180% IC and 150% MC, they are 433m below the IC margin requirement, and keep going in and out of call at 150% boundary…."[253] Attempting to properly manage this high level of potential exposure, Mr. Mushkin proposed a series of potential mitigants.  Mr. Prince responded "Why not just send them a margin call at 145 or whatever the predetermined level was?  That is our fundamental risk mitigation tool, no?"[254] Mr. Lauro agreed "with Zac on keeping it simple to get them back in compliance, and discuss new options later."[255]

---

[251] Ex. 69, BF_BK_00011394 at BF_BK_00011398 (May 10, 2022 email thread with the subject line "New Alameda Trade Approval").
[252] *Id*. at BF_BK_00011396−97.
[253] *Id*. at BF_BK_00011396.
[254] *Id*.
[255] *Id*. at BF_BK_00011396.

In the wake of FTX issuing a $400 million line of credit, BlockFi's internal communications reveal special treatment for FTT and Alameda – treatment that cast risk management principles entirely to the wind.  On a July 29, 2022 Slack thread between Messrs. Mushkin and Prince, for example, Mr. Mushkin wrote, in part, that "we came up w/potential approach for incorporating OTC selling into our haircuts. even e.g., for illiquid collateral like FTT, which given our quantum would take ~86days to sell in market.."[256]  Mr. Prince responded to this message, "yea but whats weird about FTT is we don't have to care bc it's alameda / FTX / our only source of capital ah."[257]  Mr. Mushkin agreed, writing, "yes alameda /ftx needs to be a special case now" "still thinking about how to treat it best to account for that "x-factor", the ideas include netting off loans to alameda vs. the drawn amount of FTX US LC.. although its different legal entity.. (alameda vs. FTX US) perhaps the most direct approach in the short term would be just to underwrite FTX financials for a big number."[258]  In a message on that same Slack chain, Mr. Prince summed up his theory on lending to FTX and Alameda succinctly: "FTX isn't gonna let us die because FTT or alameda died."[259]

Asked about the Slack messages regarding "alameda / FTX / our only source of capital," Mr. Prince responded that "it's kind of highlighting that similar to the, you know – to the raging dumpster fire comment[260] when contrasted with how I'm sure you've seen me talk in other forms

---

[256] Ex. 70, BF_BK_00067355 at BF_BK_00067357 (July 29, 2022 Slack message among Yuri Mushkin and Zac Prince).
[257] *Id.*
[258] *Id.*
[259] *Id.* at BF_BK_00067359.
[260] This is in reference to a prior message from Zac Prince referring to the GBTC discount as being a "raging dumpster fire."

like e-mail, this is, you know, this – this is not – this is not us like making risk policy decisions or something.  We're – we're just having a, you know, a conversation."[261]

Around the same time that he was sending these non-policy-setting Slack messages, Mr. Prince continued to throw away recommendations from his risk management department when it came to loans to Alameda.  On August 2, 2022, for example, BlockFi's Kit Spicer emailed "Zac, Tony, Yuri, Given the updated limits being proposed to BARC today for Gross Notional and Gross Collateral, we are escalating Alameda and FTT, respectively."[262]  Mr. Spicer provided two potential sets of approvals before noting that "due to the size of the collateral position and updated collateral haircut calibration, we believe the overcollateralization needed for FTT with Alameda is 180% MM.  Currently, our loans to Alameda are mostly done at 160/140% (IC/MM)."[263]  Mr. Prince responded simply, "Approved to keep growing at 160% collateralization w/ Alameda."[264]

Throughout these email communications, BlockFi demonstrated that it had a robust and well-developed risk management system.  Members of the various risk teams promptly, properly, and presciently assessed the risks associated with accepting certain types of collateral.  These concerns were, at least for a time, recorded and substantiated in Credit Memos.  The recommendations communicated in the Credit Memos were elevated to senior BlockFi officials, who directly communicated with individual team members who had performed the primary analyses.  BlockFi executives who had questions could be properly informed about how these conclusions were derived, and executives were provided ample opportunities to shift potential loan

---

[261] Ex. 31, Prince Dep. 221:14-21.
[262] Ex. 24, BF_BK_00011379 (August 2, 2022 email thread with subject line "Limit related escalation – Alameda / FTT").
[263] *Id.*
[264] *Id.*

packages in order to mitigate associated risks.  Finally, loan packages above certain risk thresholds were elevated to top BlockFi officials for discussion and approval.

But contemporaneous internal communications demonstrated how BlockFi failed to utilize its risk management framework.  Risk team recommendations were summarily dismissed without adequate justification.  Credit Memos for specific counterparties were no longer drafted for long periods of time, in spite of the volume of loans being issued.  BlockFi executives who saw concerns being raised would simply approve transactions anyway, without any apparent justification.  To the extent loan packages were changed at all, the associated changes did little or nothing to resolve the issues being elevated.  And, finally, problematic loan packages that were elevated to top BlockFi officials appear to have been approved without any meaningful discussion.

In short, BlockFi's risk management system accurately identified the risks and recommended rejecting efforts to lend huge sums to Alameda secured by FTT.  However, it was overridden at the direction of Mr. Prince and with the cooperation of the rest of the executive team.

### d.    BlockFi Was Aware of Key Risks in Lending to Alameda.

While Mr. Prince was comfortable with Alameda's risk profile, other executives expressed concerns.  Ms. Marquez, for example, was aware of the risk with regard to taking the FTT that had been posted as collateral by Alameda and staking it on FTX for SRM rewards.

On November 11, 2021, exactly one year prior to FTX's Bankruptcy filing, Ms. Marquez raised to Messrs. Cheela and Prince a series of concerns regarding the risk related to BlockFi's lending.  Ms. Marquez sent a Signal message to Mr. Cheela hoping to discuss the risk and what may occur if "something shitty happens to FTX."[265]  Mr. Cheela provided a high level overview

---

[265] Ex. 71, BF_BK_00065511 (Slack Messages between Flori Marquez and Amit Cheela).

of its lending arrangement with Alameda, explaining that "Alameda posted FTT tokens . . . as collateral," "FTT staked on FTX generates serum in staking rewards."[266]  Mr. Cheela continued that, "if FTX lost a bunch of it's [sic] own token, a few things could happen," including FTX could print more tokens, roll back the chain, or use equity to make BlockFi whole, or simply let BlockFi deal with the fallout of such event.[267]  Ms. Marquez described the arrangement as "a very strange set up" and asked Mr. Cheela how BlockFi knew this was not a "ponzi scheme."[268]  Mr. Cheela responded that this had been flagged for Mr. Mushkin.

Only a few hours later, Ms. Marquez raised her concerns with Mr. Prince.  He responded by acknowledging his understanding that FTT was "worthless" as collateral from Alameda:[269]

| 11/11/21 21:40:30 | Florencia Marquez <flori@blockfi.com> | im getting major ptsd of grayscale with this ftx stuff |
|---|---|---|
| 11/11/21 21:40:42 | Florencia Marquez <flori@blockfi.com> | i need you to walk me through it in our next 1x1 |
| 11/11/21 21:41:09 | Zac Prince <zac@blockfi.com> | sure |
| 11/11/21 21:41:16 | Zac Prince <zac@blockfi.com> | it's really simple |
| 11/11/21 21:41:45 | Zac Prince <zac@blockfi.com> | 1-2 months ago, we were already lending a ton to Alameda w/ FTT coin as collateral at like 180% collateralization |
| 11/11/21 21:42:03 | Zac Prince <zac@blockfi.com> | FTX has an incentive program where if you hold FTT at FTX, you get free rewards of SRM |
| 11/11/21 21:42:25 | Florencia Marquez <flori@blockfi.com> | i just dont think we're thinking about the collateral right if we're giving the collateral back to the issuing counterparty that has the same ownership as the borrower |

---

[266] *Id.* at BF_BK_00065512.
[267] *Id.* at BF_BK_00065512−13.
[268] *Id.*
[269] Ex. 15, BF_BK_00066622 (Slack Messages between Flori Marquez and Zac Prince).

| 11/11/21 21:42:25 | Zac Prince <zac@blockfi.com> | now we have about 50% of our FTT at FTX and we are making 4.5M / month in SRM rewards |
|---|---|---|
| 11/11/21 21:42:30 | Florencia Marquez <flori@blockfi.com> | just sounds sketchy |
| 11/11/21 21:42:57 | Zac Prince <zac@blockfi.com> | my pov is that we already had the risk to FTX *even when were weren't getting the SRM* |
| 11/11/21 21:42:58 | Florencia Marquez <flori@blockfi.com> | and i have questions of operational risk given how fast they scaled |
| 11/11/21 21:43:15 | Zac Prince <zac@blockfi.com> | bc the FTT that we were already taking as collateral, is the FTX exchange token |
| 11/11/21 21:43:19 | Florencia Marquez <flori@blockfi.com> | yes and is that risk appropriate – let's just talk about it next time we meet |
| 11/11/21 21:43:26 | Zac Prince <zac@blockfi.com> | so if FTX went down, FTT was going down with it |
| 11/11/21 21:43:33 | Florencia Marquez <flori@blockfi.com> | that's my concern |
| 11/11/21 21:43:38 | Zac Prince <zac@blockfi.com> | and we would be sitting on a pile of worthless FTT in our fireblocks wallet |
| 11/11/21 21:43:53 | Zac Prince <zac@blockfi.com> | now it would just be a pile of worthless FTT in our FTX account |

Simultaneously, Ms. Marquez messaged Mr. Cheela, asking whether "alameda is owned by the same people as ftx?"[270] Mr. Cheela responded, "almost… very close linkage… don't know exact…but widely perceived to be the same… sam is ceo of both…ftx and alameda…so control is

---

[270] Ex. 71, BF_BK_00065511 at BF_BK_0006515 (Nov. 11, 2021 Slack Messages between Amit Cheela and Flori Marquez).

def the same."[271]  A BlockFi Credit Memo written around this time indicates that BlockFi then had

$1.418 billion in gross exposure to Alameda, collateralized by $2.28 billion of FTT.[272]

### e.    <u>The FTX Loan Agreement to BlockFi.</u>

In late June 2022, in the midst of cryptocurrency market volatility and signals of industry

downturn, BlockFi disclosed that FTX had agreed provide BlockFi a $250 million revolving credit

facility.  The disclosure caused an increase in client withdrawals.[273]  To ease concerns of financial

trouble, Mr. Prince publicly stated that the line of credit was to "bolster [its] balance sheet" and

"reinforce [its] commitment to serving clients and ensuring all funds are safeguarded."[274]

Speaking about the revolver generally, on June 21, 2022, Mr. Prince stated that "the best time to

raise capital is when you don't need it."[275]  Regarding the cryptocurrency market generally, Mr.

Prince stated he was "highly confident" that we'll look back at this time and "we'll say, 'That was

a phenomenal time to buy.'  And the reason that's going to happen is because there's so much

long-term growth still ahead for this asset class."[276]  Only a few days later, 3AC collapsed, and

was ordered to liquidate by a court in the British Virgin Islands.

In truth, BlockFi was then facing liquidity issues and needed a lifeline.  On June 30, 2022,

BlockFi Inc. and FTX entered a Loan Agreement (the "FTX Loan Agreement") in which FTX

provided BlockFi an increased extension of credit "or other financial accommodations" to BlockFi

---

[271] *Id.* at BF_BK_0006515–16.
[272] Ex. 26, Credit Memo for Alameda Research (Nov. 16, 2021)
[273] Ex. 22, BF_BK_00011918 (July 1, 2022 Minutes of a Special meeting of the BARC).
[274]  Vildana Jajric, *BlockFi CEO Prince on Credit Pact with FTX, Crypto Plunge: Q&A*, BLOOMBERG,       https://www.bloomberg.com/news/articles/2022-06-21/blockfi-ceo-prince-on-credit-pact-with-ftx-crypto-plunge-q-a?leadSource=uverify%20wall (last visited, Apr. 18, 2023).
[275] *Id.*
[276] *Id.*

of up to $400 million.[277]   The FTX Loan Agreement included the option for FTX to acquire BlockFi.[278]

In an internal BlockFi "Q1 + G2 Adjusted Balance Sheet" included as part of BlockFi's August 2022 Board Audit and Risk Committee materials, BlockFi listed 4,726,666,328 (presumably USD) as its "Total Assets" as of "June 30, 2022" with an accompanying 4,345,417,189 in liabilities.[279]   This proposed balance sheet, however, includes the "FTX Line of Credit Available" as a $400 million asset with no accompanying liability.   In the absence of this $400 million infusion, BlockFi's internal balance sheet reflected a nearly $19 million deficit of assets versus liabilities.   Had BlockFi not included the "FTX Line of Credit Available" as an asset on its balance sheet, the Company would have been balance sheet insolvent.

Asked about BlockFi's treatment of the FTX Line of Credit (given his Master's in Accounting and background work in the accounting field), Mr. Cheela responded that this treatment was appropriate because "given the terms of that transaction, in my view, it was effectively an equity transaction."[280]   Asked about whether GAAP would have treated the transaction as such, Mr. Cheela responded, "I can't speak to the GAAP principles on it."[281]   Pressed on whether using GAAP accounting treatment for the line of credit would demonstrate liabilities in excess of assets, Mr. Cheela responded that "if you were to subtract $400 million from the top,

---

[277] Ex. 72, BF_BK_00009101 at BF_BK_00009116 (June 30, 2022 Loan Agreement between West Realm Shires and BlockFi).
[278] Ex. 73, BF_BK_00009270 (June 30, 2022 Option Agreement among BlockFi, West Realm Shires, and FTX Trading Ltd.).
[279] Ex. 74, BF_BK_00001490 (BlockFi August 2022 Board Audit and Risk Committee Risk Update Materials).
[280] Ex. 75, Cheela Dep. 186:7-8.
[281] *Id.* at 186:12-13.

then there would be fewer assets than liabilities."[282]  When questioned on whether that would mean

customers would have to take losses, Mr. Cheela dissimilated, arguing that "there may have been

other assets that aren't capitalized on the balance sheet."[283]  Asked what those assets were, Mr.

Cheela responded "[a] slew of intangible assets or other things that could be monetized.  And I

think there's also a fair amount of assumptions here on the loan book that were – see where it says

loans net, that's a reduced loan.  Recoveries could be higher.  Assets simply being less than

liabilities would not mean – would not necessarily mean that creditors were taking losses."[284]

## VI.   QUESTIONABLE TRANSACTIONS JUST PRIOR TO THE BANKRUPTCY FILINGS.

### A.   Liquidation of Cryptocurrency.

From the outset, BlockFi executives misled the public as to the risks associated with the

BIAs.  In an April 17, 2019 interview, Ms. Marquez stated that the BIA is "essentially a high yield

savings account for crypto."[285]  Mr. Prince assured BlockFi customers that their BTC would be

safe, explaining that a "liquidation scenario only applies if you take a USD loan secured by your

BTC.  BTC sitting in an interest account is not at risk of liquidation."[286]  Neither of these things

were true.  The BIA offered none of the safeguards of a retail bank – in fact, BlockFi's entire

corporate structure was redesigned in early 2022 to avoid regulation as an Investment Company

---

[282] *Id.* at 187:13-15.

[283] *Id.* at 187:20-21.

[284] *Id.* at 187:23-188:7.

[285] Thinking Crypto Podcast*, Interview: BlockFi Cofounder Flori Marquez*, YOUTUBE (Apr. 17, 2019), https://www.youtube.com/watch?v=dsGKw4RwqJI (Ms. Marquez stated, "It's essentially a high yield savings account for crypto").

[286] Zac Prince (@BlockFiZac), TWITTER (Mar. 12, 2020), https://twitter.com/BlockFiZac/status/1238187351299497984.

after BlockFi agreed to a $100 million fine from the SEC for skirting banking and investment regulations.

On November 16, 2022, days after the Company began preparing for a Chapter 11 filing, BRG provided the Board with a walkthrough of the Company's available assets, "noting that the liquidation of cryptocurrency on hand would result in approximately $180 million being added to the Company's liquidity."[287]  Minutes of the Board meeting reflect that the Board discussed the benefits and risks of liquidating the cryptocurrency on hand, noting in particular that doing so would give the Company "more liquidity through its bankruptcy process."[288]  The Board unanimously approved the liquidation of customer BTC deposits.[289]

Ultimately, BlockFi converted $239 million of its U.S. customers' cryptocurrency into fiat currency.[290]  The sale occurred at a moment of extreme market dislocation, given FTX's sudden and chaotic collapse.  Although BlockFi chose to liquidate customers' cryptocurrency on November 16, 2022, it is highly likely that most clients would not have done the same.  In fact, the market value of cryptocurrency has since increased significantly, resulting in a lost opportunity of about $100 million[291] for the estates.  Even from a bankruptcy process standpoint, the decision is questionable: Under no reasonable circumstances could the administrative costs of this bankruptcy even remotely approach $239 million.

---

[287] Ex. 76, BF_BK_00011984 (Nov. 16, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc.).
[288] *Id.*
[289] *Id.*
[290] Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions at ¶ 99, Case No. 22-19361 (Nov. 28, 2022), Dkt. No. 17
[291] Based on pricing as of April 2023.

In addition to being poorly considered as an exercise in economics, the liquidation of BlockFi's cryptocurrency was directly tied to self-interested attempts to protect senior executives and the Board from potential liability.  When the Board of Directors met on November 17, 2022, the Board approved the purchase of additional D&O insurance subject to the condition that the "final amount [of insurance] was subject to the Company's ability to liquidate the cryptocurrency assets on hand."[292]



**BTC and ETH Price Chart, November 28, 2022 through February 25, 2023**

Source: Project Sage – Coin Position Analysis 2 25 – 2.28 - DRAFT

**B.    D&O Insurance.**

On November 18, 2022, just two days after liquidating $239 million of its U.S. customers' cryptocurrency and ten days prior to filing for bankruptcy, BlockFi spent approximately $22.6

---

[292] Ex. 77, BF_BK_00011988 at BF_BK_00011989 (Nov. 17, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc.).

million to purchase a $30 million D&O insurance policy, including a six-month tail allowing additional time to assert claims under previous insurance coverage.[293] The topic of D&O insurance was presented to the Board during a Special Meeting of the Board of Directors on November 17, 2022.[294] Meeting minutes indicate that the Board weighed the benefits of an additional D&O insurance policy, citing the concern that "it would be difficult to find independent directors to join the Board" without such coverage in place.[295]

The Board also considered "the impact of the premium payment to the Company's liquidity," but observed that the Company's liquidity analysis would be updated to "take into account the Company's liquidation of cryptocurrency assets, which would help the Company's liquidity position."[296] Ultimately, the Board unanimously approved the additional D&O insurance in an amount of up to $30 million (broken down into $15 million in coverage for pre-petition acts and $15 million for post-petition acts).[297]

Two days later, on November 20, 2022, the Board was informed that the additional D&O insurance policy coverage was bound on November 18, 2022.[298] The insurance cost $22.5 million. While in depositions, parties professed not to know how the cost was broken down between pre-

---

[293] Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(c) Authorizing the Debtors to (I) Continue, Renew, or Supplement Insurance Policies, (II) Pay Insurance Premiums and Related Obligations Thereon, (III) Continue, Renew, or Supplement the Surety Bond Program, and (IV) Granting Related Relief [Dkt. No. 11] Ex. C.

[294] Ex. 77, BF_BK_00011988 (Nov. 17, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc.).

[295] *Id.*

[296] *Id.*

[297] *Id.*

[298] Ex. 78, BF_BK_00011995 (Nov. 20, 2022 Minutes of a Special Meeting of the Board of Directors of BlockFi Inc.).

and post-petition coverage, it seems likely under the circumstances that the price of the pre-petition

coverage was close to, if not exactly, $15 million.

### C. **Personal Transactions.**

Based on the Debtors' Statements of Financial Affairs, insiders withdrew significant

amounts from the platform during the year leading up to filing.[299]  The largest trade action was by

Mr. Prince, withdrawing ~$10 million from his BlockFi account in April 2022.  BlockFi Chief

Security Officer Adam Healy withdrew $411k (nearly his entire account) in June 2022 (when

BlockFi nearly collapsed).

On November 8, 2022 BlockFi Chief Marketing Officer Andrew Tam withdrew

approximately $225,400 from FTX.us to ndrwtm.eth.  There were then a series of transfers

between what appear to be cold wallet addresses before approximately before approximately

~$250k USDC was transferred to Coinbase on March 13, 2023.[300]

### D. **D&O Litigation:** ███████████

In August 2022, approximately $15 million was transferred to settle threatened legal

actions by ██████████████████████████████████████████

related to Private Securities Contracts ("PSCs") with certain current and former BlockFi

executives.[301]

---

[299] Statement of Financial Affairs for BlockFi, Inc. at *22-23, Case No. 22-19361 (Jan. 12, 2023),
Dkt. No. 243.
[300] The series of transfers looked as follows: FTX.US *to* ndrwtm.eth *to*
0x99d3cF5DA9a4A782a7ba8d265A4a7F7bfCee7f80 *to*
0x759f91681b5FBa36869370D66ec546aB61F14ab8.
[301] Statement of Financial Affairs for BlockFi, Inc. at *22-23, Case No. 22-19361 (Jan. 12, 2023),
Dkt. No. 243.

Between December 2021 and April 2022, ███████████ negotiated and entered into PSCs with various BlockFi executives, including Mr.Prince and Ms.Marquez, in which ███████████ provided immediate payments to the executives in exchange for some of their future rights to payment in the event of a BlockFi public offering or sale.[302]   The BlockFi executives entered the PSCs around the time BlockFi was seeking to raise additional capital following a major investment bank's estimate that BlockFi's equity value increased to approximately $6 billion dollars.[303]

On June 30, 2022, following a significant downturn of the cryptocurrency industry, BlockFi and FTX entered the FTX Loan Agreement in which FTX provided BlockFi an increased extension of credit to BlockFi of up to $400 million.[304]   The agreement also provided FTX the option to acquire BlockFi.[305]   The downturn of the cryptocurrency industry also had an impact on BlockFi's equity and ███████████ investment.[306]   ███████████ threated litigation to recoup the value of its investment but any of ███████████ potential claims were contractually limited to BlockFi shares.[307]

BlockFi assessed how to address the threats from ███████████ with the Board, which, at the time, included an observer appointed by FTX.[308]   The Board approved a confidential settlement agreement between the parties in which certain payments from BlockFi were routed

[302] *Id.*
[303] *Id.*
[304] Ex. 72, BF_BK_00009101 at BF_BK_00009116 (June 30, 2022 Loan Agreement among BlockFi Inc. and West Realm Shires, Inc.).
[305] Ex. 73, BF_BK_00009270 (June 30, 2022 Option Agreement among West Realm Shires Inc. BlockFi Inc. and FTX Trading Ltd).
[306] Statement of Financial Affairs for BlockFi, Inc. at *22-23, Case No. 22-19361 (Jan. 12, 2023), Dkt. No. 243.
[307] *Id.*
[308] *Id.*

through the executives and ultimately made to ██████████.[309]    The payments to

██████████ created tax liabilities for the executives and the executives were responsible for

making the appropriate tax payments.[310]   However, BlockFi made the executives whole for the

tax liabilities created by the settlement.[311]

---

[309] *Id.*

[310] Statement of Financial Affairs for BlockFi, Inc. at *23, Case No. 22-19361 (Jan. 12, 2023), Dkt. No. 243.

[311] *Id.*; *See also*, Ex. 79, BF_BK_00114818 (On August 23, 2023, Ms. Marquez received a bonus of $4,096,688.10 from BlockFi "which is tended to cover the settlement amount and taxes on the bonuses" so that Ms. Marquez can provide $1.9 million to ██████████ directly.).