IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                      .    Case No. 22-19361-MBK
                            .    (Jointly Administered)
BLOCKFI INC., *et al.,*     .
                            .
        Debtors.            .
                            .
. . . . . . . . . . . . .   .
                            .
BLOCKFI INC., *et al.,*     .    Adversary No. 23-01071-MBK
                            .
        Plaintiffs,         .
                            .
        v.                  .
                            .
TREY GREENE AND             .
ANTONIE ELAS,               .
                            .
        Defendants.         .    Thursday, August 17, 2023
. . . . . . . . . . . .      .   11:05 a.m.

TRANSCRIPT OF MOTIONS HEARING IN LEAD CASE
AND STATUS CONFERENCE IN ADVERSARY CASE
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES VIA ZOOM VIDEOCONFERENCE:

For the Debtors          Haynes and Boone, LLP
and Respondents:         BY:  RICHARD KANOWITZ, ESQ.
                         30 Rockefeller Plaza, 26th Floor
                         New York, NY 10112

                         Haynes and Boone, LLP
                         BY:  JORDAN CHAVEZ, ESQ.
                         2323 Victory Avenue, Suite 700
                         Dallas, TX 75219

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

2

APPEARANCES VIA ZOOM VIDEOCONFERENCE(Cont'd):

For Cameron Wyatt:        Lowenstein Sandler, LLP
                          BY:  MICHAEL S. ETKIN, ESQ.
                               MICHAEL PAPANDREA, ESQ.
                          One Lowenstein Drive
                          Roseland, New Jersey 07068

For Gerro Movants:        Law Offices of Gerro & Gerro,
                          BY:  GEORGE J. GERRO, ESQ.
                          530 South Glenoaks Blvd, Suite 200
                          Burbank, CA 91502

3

**INDEX**

| | ID | EVD |
|---|---|---|

**EXHIBITS IN LEAD CASE**

<u>FOR THE DEBTORS/RESPONDENTS</u>:

| | ID | EVD |
|---|---|---|
| A - Renzi Certification | 12 | 13 |
| A through E - Loan Agreement, Emails, Washburn Declaration, Owen declaration, and Gerro-3 Notice of Ruling | 12 | 13 |

<u>FOR THE MOVANTS</u>:

| | ID | EVD |
|---|---|---|
| 1 through 31 | 13 | 13 |

1          THE COURT:  Okay.  Good morning everyone.  This is

2   Judge Kaplan.  Thank you all for appearing remotely.  As

3   already some of you have started, if you want to be heard,

4   please raise your hand and I'm happy to hear from you all.  And

5   we have two matters to review.

6          Bear with me just one moment.  Here we go.

7          Two matters on with respect to BlockFi.  The

8   scheduling conference on the motion brought on behalf of the

9   potential or putative plaintiff Cameron Wyatt, lead counsel, as

10  well as the objection to the claim of Mr. Gerro or it's Gerro.

11  I'm going to ask how I pronounce it properly when we get there.

12          Mr. Kanowitz, did you want to be heard on the order

13  to address these matters?

14          MR. KANOWITZ:  Yes, Your Honor.  That's exactly why I

15  raised my hand.  Thank you, and thank you for accommodating us

16  by Zoom today.

17          I suggest we do the scheduling conference first.  It

18  should take very few time commitments from anybody here, and

19  those who don't need to participate in the Gerro claim

20  objection could leave if they so desire.  If Your Honor is

21  permitting us to do that, that would be great.

22          THE COURT:  All right.  I tend to agree.  That was

23  where I was inclined.  It will allow us to have more fuller

24  opportunity for the arguments that I anticipate in the other

25  matter.

1          So I see Mr. Etkin.  Let me have appearances with

2     respect to the Cameron Wyatt matter.

3          MR. KANOWITZ:  Appearing for the debtor, Richard

4     Kanowitz.

5          MR. ETKIN:  Good morning, Your Honor.  Michael Etkin,

6     Lowenstein Sandler for Mr. Wyatt.

7          THE COURT:  Wyatt, yeah.

8          MR. ETKIN:  On the phone as well is my colleague

9     Mr. Papandrea, as well as Brian Collandra, a partner at the

10    Pomerantz law firm who is representing Mr. Wyatt in connection

11    with the lead plaintiff motion that's pending in the district

12    courts.

13         THE COURT:  All right.

14         MR. GOLD:  Dan Gold from Sherman and Sterling.  We

15    represent the individual defendants in the securities

16    litigation.

17         THE COURT:  All right.  Good morning, still,

18    Mr. Gold.

19         Anyone else?

20              (No audible response)

21         THE COURT:  Let me turn to plaintiffs' counsel,

22    Mr. Etkin or your co-counsel who wishes to address the matter.

23         MR. ETKIN:  Well, Your Honor, assuming that this is

24    just for scheduling purposes, obviously, we were looking

25    through our motion to shorten time to get this before the Court

1  as soon as possible given the timing involved.  And that

2  remains our position.  So we would ask the Court to schedule

3  this as soon as reasonably possible.

4        We're getting into a time of the year where

5  scheduling and people's availability becomes a little

6  difficult, and we have our eye on that September 11th objection

7  deadline with respect to confirmation and the confirmation

8  hearing on September 26th.

9        One thing that is clearly true that was pointed out

10 in the debtors' opposition to the motion to shorten time is we

11 really don't know how quickly the district courts are going to

12 act if given the opportunity to act on the pending motions for

13 appointment of lead plaintiff and lead counsel.  But what we do

14 know is that without the relief we're requesting, they're not

15 going to act at all.

16       So we're looking at these deadlines staring at us

17 that are within the next few weeks.  So from a scheduling

18 perspective, we would ask that the Court put this on as soon as

19 possible.

20       THE COURT:  All right.  I understand the intent was

21 to have the matter heard on shortened time.  It was just in the

22 Court's view too quick to allow reasonable opportunity to

23 respond.  It's not my intent to go forward with a discussion on

24 the merits, although it's always difficult when you're talking

25 about scheduling and the need to have something heard.

7

1          Let me first hear from -- let me next hear from

2   Mr. Kanowitz.

3          MR. KANOWITZ:  Yes, Your Honor.

4          And we're pleased to try to accommodate the movant.

5   Clearly, if they had just filed a regular motion, we could have

6   it heard on September 6th.  That is the court hearing date for

7   us, I believe.  If Your Honor wanted to moved it up further, we

8   do have an August 30th date.

9          We need at least a week for debtor to respond

10  fulsomely.  We're going to demonstrate why the motion and the

11  movant have no merit, but we'll leave that for another day.

12         I would point out in scheduling, you know, Your

13  Honor's order and stipulation that we had with the class action

14  plaintiffs who appeared as defendants was done in May -- sorry,

15  in April.  And all the class action motions that were permitted

16  to be filed were filed on May 1st.  So we had three and a half

17  months or three months waiting anticipating relying on things

18  and while we're committed to moving fast or as Your Honor

19  directs, if it's too fast, we are not going to be able to brief

20  everything.  That's very important for this Court to understand

21  before you rule on the motion.

22         So I could do it August 30th.  I would ask that if we

23  do it August 30th that we do it by Zoom.  It is just oral

24  argument on a motion.  There might be other matters on for that

25  day I believe that could also be handled by Zoom and, if not,

1 September 6th could appear in person.

2          THE COURT:  All right.  I'm inclined to schedule it

3 on the 30th.  Does anybody else want to be heard?

4          MR. ETKIN:  Your Honor, if I might?

5          THE COURT:  Yes.

6          MR. ETKIN:  Clearly, we would like it to be even a

7 little sooner than that because we're running into Labor Day

8 weekend from the 30th.  And if the Court were inclined to grant

9 the motion, we would then have to reach out to the district

10 court and where we're really cutting it close.  But obviously,

11 it's Your Honor's call.

12          I would also point out that the landscape of this

13 case was a little different back on May 1 than it is today.

14 There was no consensual plan.  I think as I'm trying to play

15 some catch-up football with respect to this case, I think the

16 Committee and the debtor were at serious odds with one another

17 way back when.  So things have changed; the landscape has

18 changed somewhat since the lead plaintiff motions were filed.

19          But, again, if the Court is looking at August 30th,

20 we'll accommodate.  The sooner the better as far as we're

21 concerned.

22          THE COURT:  All right.

23          MR. ETKIN:  It's not a complicated motion, Your

24 Honor.

25          THE COURT:  No, it's not.

1          And I'm glad to address the merits of it.  I mean

2   certainly just looking at the pleadings that will be filed, Mr.

3   Wyatt seems to have at least four counsel who signed off on the

4   pleading.  So going forward, even though it's a short time

5   frame before the confirmation hearing and the objections, I'm

6   not that concerned that

7   Mr. Wyatt will be prejudiced, but I certainly want to hear from

8   counsel.

9          I think the 30th is a fair -- it accommodates the

10  Court's schedule significantly and also it gives the

11  opportunity to get in rather quickly.  So with opposition due,

12  Mr. Kanowitz, let's take a look at the calendar.

13          MR. KANOWITZ:  We could do it a week before, Your

14  Honor, and provide a reply, if any, if you permit, get done so

15  that we could see what they're going to say in response.

16          THE COURT:  That's fine.  So 30th, opposition due the

17  close of business on the 23rd with replies due close of

18  business on the 28th, that Monday.

19          MR. KANOWITZ:  Thank you, Your Honor.

20          THE COURT:  All right.  Thank you, Counsel.

21          MR. ETKIN:  Thank you, Your Honor.

22          THE COURT:  I appreciate your accommodation.

23          MR. KANOWITZ:  Your Honor, the next matter, the Gerro

24  matter, I would cede the virtual podium to my colleague Jordan

25  Chavez who will be handling the primary oral argument of this

 1  case.

 2          THE COURT:  All right.  Thank you, Mr. Kanowitz.

 3          MR. ETKIN:  Your Honor, I'm sorry to interrupt.

 4          THE COURT:  Yeah.

 5          MR. ETKIN:  But may we be excused?

 6          THE COURT:  You are by all means excused.  Have a

 7  good weekend.

 8          MR. ETKIN:  As much as I'd love to stay.

 9          THE COURT:  All right.

10          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11          MR. ETKIN:  Thank you, Your Honor.

12          THE COURT:  You're welcome.

13   (Status Conference in adversary case concluded at 11:15 a.m.)

14          THE COURT:  All right.  Let me have appearances in

15  the -- Mr. Gerro, you're going to have to -- is it Gerro?

16          MR. GERRO:  Your Honor, I'd say that it's Gerro as in

17  "thorough."

18          THE COURT:  All right.  Mr. Gerro, good morning.

19          And let me have other appearances.

20          MS. CHAVEZ:  Good morning, Your Honor.

21          Jordan Chavez with Haynes and Boone on behalf of the

22  debtors.

23          THE COURT:  All right.

24          Anyone else entering an appearance?

25          MR. RENZI:  Good morning, Your Honor.

1          Mark Renzi, CRO for the debtors.

2          THE COURT:  Good morning, Mr. Renzi.

3          Okay.  So we've had briefing, extensive briefing

4   which I've read through.  I welcome oral argument to supplement

5   the briefing.  The burden here is a shifting burden.  We all

6   know that once the proof of claim is allowed, it's prima facie

7   valid until there's been opposition raised.  Then ultimately,

8   Mr. Gerro, the burden rests with you.

9          Let me hear from the debtors.  It's the debtors'

10  objection initially, so we'll start with the debtor and then

11  I'll give, Mr. Gerro, you a full opportunity.

12         MS. CHAVEZ:  Thank you, Your Honor.

13         Again, Jordan Chavez on behalf of the debtors.

14         I'm addressing the debtors' fourth omnibus objection

15  filed to the claims filed by Mr. Gerro at Docket Number 1069

16  which were followed by his response and cross-motion at Docket

17  Number 1192 and the debtors' reply at Docket 1341.

18         As Your Honor has noted, the debtors view it as

19  appropriate to take up the objection first as the first filed

20  pleading and because it obviates the need to address the

21  cross-motion.  I know Your Honor has read all of the papers and

22  is fully aware of the litigious history between BlockFi and

23  Mr. Gerro.  His claims are rather convoluted, but as we've

24  outlined in our papers, the path to disallowance for these

25  claims is straightforward.

1          There's no triable issues of fact here.  The only

2  dispute is whether, despite the clear terms of the loan

3  agreement, Mr. Gerro is entitled to a claim for 426 Bitcoin

4  against BlockFi.  And the answer to that question is a

5  resounding no as a matter of law.

6          These matters can be decided on the papers, and I'd

7  like to move for admission of the debtors' exhibits and then

8  just take a few moments to summarize why these claims should be

9  disallowed.

10          Your Honor, I'd like to move for admission of the

11  Debtors' Exhibit A which was attached to the claim objection

12  and is the Renzi certification, as well as Debtors' Exhibits A

13  through E that were attached to the reply which is the loan

14  agreement, the email communications between the parties, the

15  Washburn declaration, the Owen declaration, and the Gerro-3

16  notice of ruling.

17          THE COURT:  All right.  Mr. Gerro, I haven't seen any

18  issues taken with exhibits on either side that have been

19  presented, so I'm inclined to admit them all.  Any objection on

20  your end?

21          MR. GERRO:  Your Honor, I think as long as it's

22  mutual, I will not make any evidentiary objections, if that's

23  okay with the other side, as well.  Yeah.

24          THE COURT:  All right.  Well, I don't see why it

25  shouldn't be mutual, the exhibits.  The Court's had the

1  opportunity to review it as a practical matter, and they inform

2  the Court on the issues.  So we'll admit the exhibits --

3          MS. CHAVEZ:  Thank you, Your Honor.  For the record

4  --

5          THE COURT:  Both the movant and the respondent.

6          (Respondents' Exhibit A admitted into evidence)

7      (Respondents' Exhibits A through E admitted into evidence)

8      (Movants' Exhibits 1 through 31 admitted into evidence)

9          THE COURT:  Was there someone else who wanted to be

10  heard?  I'm sorry, I interrupted.

11          MS. CHAVEZ:  Oh, no.  I interrupted.  Sorry, Your

12  Honor.  Thank you.

13          And for the record, we do not object to Mr. Gerro's

14  exhibits either.

15          So for the reasons that this claim should be

16  disallowed, first and foremost, Mr. Gerro, is not a creditor of

17  BlockFi.  Mr. Gerro is an attorney with a pre-petition loan

18  with BlockFi Lending in which he borrowed $2.27 million and

19  pledged approximately 440 Bitcoin as collateral.

20          The loan agreement contains a clean loan-to-value

21  ratio requirement of 70 percent.  That ratio rose above 70

22  percent, BlockFi issued a margin call as it's entitled to do

23  under the terms of the agreement, and Mr. Gerro failed to meet

24  that margin call.  Then the ratio rose above 80 percent, and

1  BlockFi immediately liquidated the collateral which the loan

2  agreement authorized it to do.  It liquidated 399 Bitcoin to

3  bring the loan back into compliance.

4       The emails between the two parties which Your Honor

5  just admitted really say it all.  They indicate that Gerro knew

6  about this requirement, he understood the terms of the

7  agreement, he thanks BlockFi for keeping him updated about the

8  liquidations, he inquired about some options to potentially

9  reverse the liquidation but nothing was ever agreed to between

10 the parties.

11      He instructs BlockFi to liquidate any additional

12 necessary collateral to pay off the remainder of his loan and

13 then return the excess to him which BlockFi promptly did in

14 March of 2020.  Gerro then withdrew the remainder of the

15 Bitcoin which was approximately 15 Bitcoin from the platform

16 which is why as of the petition date, he was not a creditor of

17 BlockFi.  Then 30 days later, once the market swung in his

18 favor, he attempted to try and bind BlockFi in the emails to

19 some agreement that it never made to reverse or reinstate the

20 loan.

21      BlockFi acted fully within its rights to liquidate

22 the collateral.  There was never a loan modification or other

23 writings signed by the parties which is what the loan agreement

24 requires to effectuate any type of modification, reversal, or

25 reinstatement.  This is why Mr. Gerro conjured up the various

1  arguments he did in his pre-petition state court litigation and

2  then reasserted those in his proofs of claim.

3        Your Honor, these are red herrings to attempt to

4  divert first the state court and now this Court from the

5  reality that Gerro has no claim against BlockFi.  And the

6  debtors would respectfully request that Your Honor disallow

7  these claims in their entirety.

8        THE COURT:  All right.  Is that it at this point on

9  your end?

10       MS. CHAVEZ:  Yes, Your Honor.  I'd cede the podium to

11 Mr. Gerro for his position.

12       THE COURT:  Thank you.

13       Mr. Gerro?

14       MR. GERRO:  Good morning, Your Honor.

15       THE COURT:  Good morning.

16       MR. GERRO:  George Gerro, self-represented creditor,

17 attorney practicing in the state of California.  And I practice

18 law with my father over here.  We have a little real estate

19 practice just him and I.

20       Your Honor, I have a presentation prepared, but I

21 want to prioritize your questions.  So please feel free at any

22 time to ask questions.  And I don't need to read any of the

23 prepared remarks.  If you just want to address your questions,

24 we could do that if you'd like.

1          THE COURT:  No.  I never hesitate in asking

2    questions.  I'd rather hear from you and be able to listen and

3    glean if there's any issues that I've missed.  So feel free and

4

5    the presentation is fine.

6          MR. GERRO:  Sure.  Absolutely, Your Honor.

7          Is it possible if I would share my screen to show the

8    documents?

9          THE COURT:  Let me ask those who know far better than

10   I how to do it.

11         THE CLERK:  Yes.  He should be able to.

12         THE COURT:  You should be able to do it now.

13         MR. GERRO:  Oh, great.  Thank you.

14                        (Pause)

15         MR. GERRO:  Okay.  I was informed by my Zoom software

16   that it would require relaunching the Zoom, so I will -- for

17   convenience of the Court and the parties, I will not relaunch

18   the Zoom.  Instead, I would rather proceed perhaps with an oral

19   -- I'll make primarily an oral presentation if that's fine.

20         THE COURT:  That's fine.

21         MR. GERRO:  Okay, very good.

22         When BlockFi was applying for its California finance

23   lender license, BlockFi was informed multiple times in writing

24   that it cannot under California Financial Code Section 22009

25   retain possession of Bitcoin securing its loans.

1      Does Your Honor have the exhibits available and in

2 front?

3      THE COURT:  Yes, I do.  You could just --

4      MR. GERRO:  Great.  Do you want --

5      THE COURT:  -- cite to the tab number.

6      MR. GERRO:  Sure, tab number.  Tab Number 14.

7      THE COURT:  All right.

8      MR. GERRO:  And for everyone's reference, this is the

9 certification of George J. Gerro which attaches the proof of

10 claim as Exhibit A, I believe, or Exhibit 1.  And this is

11 Attachment 14 to the proof of claim.  This is a copy of

12 BlockFi's finance lender license.

13      The license states in part that pursuant to the

14 California Financing Law, that BlockFi may engage in the

15 business of finance lender as defined in said law.  That is an

16 incorporation by reference of the next page in Tab 14, which is

17 Financial Code Section 22009.

18      This statute defines the business of a finance lender

19 and, in relevant part, it states, "A finance lender includes

20 any person engaged in the business of making consumer loans or

21 making commercial loans.  The business of making commercial

22 loans or commercial loans may include lending money and taking

23 in the name of the lender or in any other name in whole or in

24 part as security for a loan any contract or obligation

25 involving the forfeiture of rights in or to personal property,

1  the use and possession of which property is retained by other

2  than the mortgagee or lender," et cetera.

3       That language of exclusion, "use and possession of

4  which property is retained by other than the mortgagee or

5  lender," that language is not mere surplusage.  That language,

6  language of exclusion, conditions and limits the general grant

7  of authority which is made with the word "may" which is

8  permissive, but the phrase "other than" is not permissive.

9       The phrase "other than" construed in the statute as a

10 whole only can arrive at one reasonable construction which is

11 that a lender may either have a security interest in personal

12 property or use and possession -- use or possession, excuse me,

13 of personal property.  It cannot have both at the same time.

14 The finance lender cannot have a security interest and use or

15 possession of the property.

16       Of course, Bitcoin constitutes personal property.  I

17 don't think there's any dispute about that.  It's certainly not

18 real property, and it certainly is property.  Now BlockFi was

19 informed of this prohibition, and I will refer the Court to Tab

20 Number 6, please.  And for everyone's reference, each tab

21 refers to an attachment to the proof of claim, so this would be

22 Attachment Number 6.

23       On the third page of this tab, which has a Bates

24 number of 24, the second sentence that's typewritten in this

25 application, it says, "In accordance with California Financial

1   Code Section 2209," which is a typo, they meant to say 22009,

2   "BlockFi will take in the name of the lender in part as

3   security for the loan possession of each borrower's assets."

4           That is an incorrect interpretation of the law

5   because the lender is not allowed to take possession of the

6   borrower's assets.  The lender is allowed to take a security

7   interest in personal property, which the lender does not use or

8   possess.  Now this could have been an innocent

9   misunderstanding, but after two admonitions from the Department

10  of Business Oversight which is now known as the California

11  Department of Financial Protection and Innovation, the

12  admonitions are present in Tab 7, that's a letter dated March

13  28th.

14          At the bottom, the last paragraph on the first page

15  of that tab, "The collateral must remain with the borrower,"

16  the response indicated here the Department quotes BlockFi.  And

17  the next page on the top of the page, it says, it's Bates stamp

18  27, "This is not allowed under the California Financing Law,"

19  CFL for short.  "The collateral must remain with the borrower.

20  Moreover, the applicant cannot hold the borrower's digital

21  assets as collateral.  Based upon the business plan and

22  explanation provided, the applicant is conducting or will be

23  conducting activities not authorized by the California

24  Financing Law."

25          That was the second admonition.

1            The third admonition was in Tab 8 which is a letter

2    dated April 6th, which once again contains a substantially

3    similar admonition at the bottom of the first page.  This

4    handwritten "no" on the left margin, that's the way I received

5    the documents directly from the Department of Business

6    Oversight.  Perhaps, the person at the Department indicated

7    that this requirement was not fulfilled.

8            Tab Number 9 if Your Honor is so inclined because I

9    know I'm moving a little quickly, but I want to get to the most

10   shocking exhibits.  This is a letter dated April 10th which

11   once again has a similar admonition that BlockFi cannot possess

12   collateral securing its loans.  And here in the last paragraph,

13   the Department sets forth California Section 22009 in its

14   entirety.

15           Then, on the next paragraph, the Department says,

16   "Your email," referring to BlockFi's email, "dated April 10th,

17   2018 indicates reference to a different law" -- which was the

18   Uniform Commercial Code as we will see in the next attachment

19   -- "and not the California Financial Code."

20           "I do understand your confusion.  However, we have

21   obtained legal counsel, and the laws of the California

22   Commercial Code do not apply or trump the laws under the

23   California Financial Code.  Therefore, the business plan and

24   method of operation are not allowed under the California

25   Financing Law.  The collateral must remain with the borrower.

1 Applicant cannot hold the borrower's digital assets as

2 collateral.  Based on the business plan provided, it's not

3 allowed."

4 　　　　Let's in fact see that email dated April 10th and

5 find out what was said.  And that is in Attachment 10.  Oh,

6 Attachment 10, yes.  Attachment 10.

7 　　　　Attachment 10 is actually an email chain.  So the

8 first email here -- well, let's actually go sequentially here.

9 Let's go to the third -- I'm sorry, the fourth page.  The

10 fourth page or the fifth page under Attachment 10.  I will

11 paraphrase.

12 　　　　Essentially, what has happened was that on April

13 10th, 2018, an attorney for BlockFi working on behalf of Manatt

14 Phelps, a law firm in California, perhaps they are also present

15 on the East Coast, was attempting to explain why he believes

16 that the language that we saw earlier -- which I posit is not

17 mere surplusage because we must give effect to every clause and

18 every word if possible -- that he claims that that language is

19 a vestige, that's a quote.

20 　　　　A vestige of the law, meaning that he's essentially

21 arguing that the legislature should have or intended to repeal

22 the language and that it should be ignored, essentially.  There

23 is a reference made to the Uniform Commercial Code's provisions

24 that allow a secured party to secure or to perfect their

22

1  security interest in collateral by taking possession of the

2  collateral.

3          However, that Code section, which is Uniform

4  Commercial Code Section 9-313, under Official Comment 7, that

5  Code section says that it does not create a right to take

6

7  possession.

8          Furthermore, the Uniform Commercial Code has an

9  express reverse preemption provision.  And why do I call it a

10 reverse preemption provision?  It expressly states that it does

11 not authorize or validate any provision that violates another

12 substantive law.  And here, the substantive law is a statutory

13 law.

14         Now if I could refer this Court to the first page of

15 Exhibit 10, Tab 10.  I'm sorry, Attachment 10 I meant to say.

16         After the letter that we saw from April 10th, BlockFi

17 sends an email on April 11th.  And in the introduction, it

18 says, "The phone call we had yesterday was extremely useful."

19 So after the letter or on the same day as the April 10th

20 letter, there was a phone call.

21         Then in the paragraph entitled "Updated Business

22 Plan" with an underscore underneath it, BlockFi says that now

23 it has revised its business plan and as part of their

24 underwriting, they will prescribe value -- this is the second

25 paragraph under "Updated Business Plan" on Bates stamp Page 35.

23

1          And under the "Updated Business Plan" subheading, the

2   second paragraph, it says, "BlockFi Lending will make one year

3   loans" -- I'm going to skip over some language here.  "As part

4   of our underwriting, we will prescribe value to commercial and

5   consumer applicants' holdings of cryptocurrencies which they

6   possess."  In other words, BlockFi has now updated its

7   application to say that the borrower will possess the digital

8   assets securing the loan.

9          They were admonished that they cannot retain use and

10   possession.  They sent an email, they had a phone call.  They

11   updated their business plan in writing.  This was the last

12   update of their business plan that I have seen.  And although I

13   did not receive these documents from BlockFi because BlockFi

14   would not provide me with these documents.  BlockFi has

15   admitted in other pleadings that these are genuine, they are

16   directly from the Department of Business Oversight.  And this

17   was the last written update to the application.

18          I will move now to Attachment 11, Tab 11.

19          This is a request for interpretative opinion.

20   (Indiscernible).  The Commissioner of the  (indiscernible) has

21   authority to issue specific rulings in writing, and there's a

22   regulatory section that defines that authority.  It's for this

23   Court's reference, you don't need to look into this, it's Title

24   10 of the California Code of Regulations Section 250.12(a).

1          And in part, this regulation states that a request

2    for an interpretative opinion shall be made in writing, it

3    shall fully set forth the questions presented and the

4    particular facts and circumstances upon which the opinion is

5    requested.  Each interpretative opinion, determination, or

6    specific ruling is applicable only to the transaction

7    identified in the request, therefore, and may not be relied

8    upon in connection with any other transaction.

9          Moving to the request for interpretative opinion, in

10   this request, Attorney Charles Washburn on behalf of Manatt,

11   Phelps & Phillips, LLP, sets forth the same argument that was

12   set forth in his email that we saw a few moments ago, which

13   essentially states this language does not prevent us from

14   taking possession of collateral.  He admits that BlockFi is

15   going to be possessing the collateral or in this interpretative

16   opinion, he says that his client would like to take possession

17   of the collateral.

18         And the part that I would like the Court to see is on

19   Page Bates stamp -- pardon me one moment.  I apologize because

20   I had highlighted the electronic version I was planning on

21   presenting it on the screen for all of us.

22         Okay, Bates stamp Page 44.  This is the second full

23   paragraph.  It starts where -- with the words "In a letter."

24   Okay, here the attorney for BlockFi is acknowledging actual

25   receipt of that letter dated April 10th which had the strongest

1  admonition in the series of letters.  And he goes on to

2  acknowledge other admonitions that we did not see in the

3  record.  For example, on the second full sentence starting with

4  "Other communications from Department representative to BlockFi

5  have similarly stated that a finance letter may "never hold the

6  assets of California borrowers it makes loan to under the

7  California Finance Lender License."

8         "Assets collateral may not be held by BlockFi or any

9  other third party."

10        "The collateral" -- that word is illegible -- "has to

11 remain with the borrower, and the California Finance Lending

12 License does not permit you to take possession of the

13 collateral."

14        The reason why this is important is because the

15 attorney for BlockFi is acknowledging actual notice of this

16 prohibition, it's an implied prohibition but a prohibition

17 nonetheless, okay.  Now was the Department perfectly correct?

18 Well, the statute is our guidepost because what the Department

19 says is not necessarily what this Court must accept.  This

20 Court should independently construe the statute.

21        However, upon the independent construction of the

22 statute, if this Court finds that BlockFi's interpretation of

23 the statute is unreasonable, then under an authority cited in

24 the briefs, Safeco Insurance, that it does not matter what the

25 subjective intent of the party was.  And that's very common

1  under these willful provisions imposing civil liability that an

2  objectively unreasonable construction of a statute means that

3  there was a willful violation of that statute.

4         Here, of course, we have actual notice of the

5  prohibition.  And I think that it's pretty clear that this was

6  addressed by the executives.  Something I should have pointed

7  out in the emails was that the founders and chief executive,

8  Zac Prince and Flori Marquez, were copied on the email from

9  Washburn to the Department and that Flori copied -- Flori

10  Marquez sent the email to the Department updating the business

11  plan.  So this was something that the executives knew about.

12         Flori Marquez, which by the way, there is absolutely

13  nothing personal about this case.  If you asked my opinion, I

14  think that these were just -- they were just trying to do this

15  business uniformly throughout the states, and they wanted to --

16  they didn't want to make a whole change to their business

17  model, just for California.  But under California law, the

18  legislature in California has said that this business model was

19  not allowed.

20         Let's flip now to Attachment 13.

21         THE COURT:  Let me just stop you.

22         MR. GERRO:  Yes, please.  Go ahead.

23         THE COURT:  I certainly hope we're not intending to

24  go through all 31 of them.

25         MR. GERRO:  Absolutely not, Your Honor.  Yes.

1         THE COURT:  So that's my gentle nudge that you go to

2    the heart of the arguments because I have read your papers.  I

3    understand all of what you're submitting.

4         MR. GERRO:  Absolutely.  And I will -- in fact,

5    according to my notes, I only have two more attachments that

6    I'm going to discuss and then I'm going to focus on the reply.

7    I will try to make --

8         THE COURT:  That's fine.

9         MR. GERRO:  -- it very concise.  Thank you, Your

10   Honor.

11        THE COURT:  That's fine.  Thank you.

12        MR. GERRO:  Okay.  At the end of the request for

13   interpretative opinion that we were just looking at, Washburn

14   says that if the Department reaches a preliminary conclusion

15   that BlockFi cannot retain possession of collateral, that he'd

16   be permitted to withdraw the request for interpretative

17   opinion.

18        And Attachment 13 shows that according to the

19   Department of Business Oversight, that no interpretative

20   opinion was ever issued and that Washburn did withdraw the

21   request for interpretative opinion.

22        Now let's jump to the dispute here.  Washburn's

23   declaration says that he received a phone call from the

24   Department and they told him, they said we agree with you but

1  we're not going to issue anything in writing, we're just going

2  to issue your license.  Okay.

3         (Indiscernible) same law does provide a safeharbor

4  for a lender that relies upon a general rule, regulation, or

5  specific ruling of the Commissioner, and that's Financial Code

6  -- California Financial Code Section 22754.  22754.

7         And it states in relevant part that, "Any act done or

8  omitted in good faith in conformity with any written general

9  rule, regulation, or specific ruling of the Commissioner" shall

10  not subject to the finance lender to liability.  That has a

11  three-element test embedded in it.

12         Number one is that there must be a general rule,

13  regulation, or specific ruling of the Commissioner which is the

14  product of a quasi-legislative or quasi-judicial process.  In

15  this case, it's undisputed that there was no quasi-legislative

16  or quasi-judicial outcome and no final product of that process

17  and, furthermore, that there was no writing that authorized the

18  use and possession of collateral.

19         Number two, BlockFi must act in conformity with the

20  ruling.  And as we saw earlier, the license incorporates

21  Section 22009 meaning that BlockFi did not act in conformity

22  with its license.

23         And number three, the acts must be done in good

24  faith.  And I would posit that an act that is based upon an

1  unreasonable construction of the statute is not an act in good

2  faith but as a matter of law.

3       Let's discuss the declaration of Jan Lynn Owen who

4  impressively was actually the Commissioner at the time that

5  BlockFi applied for its license.  This declaration was made by

6  her in 2021 while she was working for the same law firm that

7  represented BlockFi in its application to the Department of

8  Business Oversight, Manatt, Phelps & Phillips, LLP.  She works

9  for the same law firm that Washburn works for.

10      And she did not make the declaration in any official

11  capacity.  She admitted that she had no personal knowledge of

12  the BlockFi application.  And she says as a matter of her

13  personal opinion, she says that this is common in commerce and

14  that Mr. Gerro is incorrect in his reading of the law.

15      Okay.  Now I will tell you that according to the

16  hornbook, which I've referenced and of course I always have

17  citations but I'm going to omit the citation here, the hornbook

18  says that actually commercial transactions where the lender

19  takes actual possession of the collateral is actually a small

20  minority of all commercial transactions.

21      Most of the time when we think about a margin loan,

22  it's when a bank financial institution or securities dealer is

23  using -- and, by the way, those are all independent

24  authorizations and BlockFi does not qualify as any of those

25  authorizations.  It's undisputed that my loan was made solely

1  pursuant to the California Financing Law.  And those

2  provisions, those are highly regulated transactions.  They are

3  done with less volatile instruments.  There are lots of

4  oversight measures, lots of regulators, lots of statutory

5  provisions that protect in that situation.  The California

6  Financing Law does not have any provisions dealing with a

7  lender's possession of collateral.

8       The pawnbroker law does.  And the pawnbroker law

9  states that under California law, this is actually California

10  Financial Code Section 21000, defines a pawnbroker as a lender

11  receiving goods to secure a loan.  And BlockFi argued in its

12  reply that the test for a good is whether something is

13  moveable, and I agree.  I just believe that Bitcoin is

14  moveable.

15       The reason why I brought up the pawnbroker law is

16  because the statutory structure is also important to keep in

17  mind when construing the independent statutes.  The California

18  pawnbroker law has provisions that protect the borrowers.  It

19  has a statutory right of redemption for the entire loan term.

20  The loan can, therefore, not be accelerated.  The collateral

21  cannot be sold before the expiration of the loan term.  The

22  California Financing Law has none of those safeguards.  It was

23  not intended to govern or protect a borrower in the situation

24  where they are giving their possession to the collateral.

25       Now does the Court have any questions or can I -- I

1  will -- at this time or I could breeze through the rest of the

2  presentation if you would like?

3           THE COURT:  Why don't you breeze through the rest.

4           MR. GERRO:  Yes.

5           THE COURT:  And then if I have questions, I will ask.

6           MR. GERRO:  Thank you.  Thank you so much, Your

7  Honor.

8           The declaration of Jan Lynn Owen does not qualify for

9  the safeharbor under the California Financing Law because it

10 was a writing that was not a general rule, regulation, or

11 specific ruling of the Commissioner, and it was issued after

12 the foreclosures and, therefore, BlockFi could not have

13 conformed in good faith to the writing, meaning that for there

14 to be a writing that is sufficient that BlockFi could confirm

15 with, that it would have to be prospective conformity, not

16 retrospective conformity.

17          I assume that there's no writing because BlockFi

18 would have produced it if they had a writing.  Notably, absent

19 from the record is that the Department of Business Oversight

20 had never issued a writing.  Well, I have not seen one.  I have

21 not seen any writings that would justify this deviation from

22 the statute.

23          I'd like to also point out that the reply does not

24 dispute that BlockFi took possession of the Bitcoin.  They do

25 not dispute that BlockFi charged an unlawful amount by

1  retaining the proceeds from the Bitcoin.  The proceeds from the

2  Bitcoin which would have been known to the common law as the

3  use of the Bitcoin, the use belongs to the borrower under the

4  Uniform Commercial Code Section 9-207(c).

5        THE COURT:  Well, let me stop you there.  Doesn't

6  9-207 have the exception provided that if you contract

7  otherwise and that section has the exception for consumer

8  goods.  So you would have to establish that it's a good and

9  that it's a consumer good.

10       I saw in your memorandum only one reference to a case

11 that referred to digital assets as a good.  You referenced

12 electricity cases which are all over the place for there's a

13 half probably a dozen on each side of the argument as to

14 whether an electricity is a good.  But certainly under the

15 Uniform Commercial Code, goods exclude investment property

16 which are securities, certificated or otherwise.

17       And there are more cases that have argued that

18 cryptocurrency are securities.  There are cases that have

19 argued and take the position that they are general intangibles

20 and including payment intangibles.  But other than the one case

21 you cited, are there any other cases that suggest that they are

22 a good let alone a consumer good?

23       MR. GERRO:  May I address those questions in order?

24       THE COURT:  Yes.

25       MR. GERRO:  First, Your Honor, you mentioned 9-207

1   can be contractually waived.  That is true.  Here there was no

2   contractual waiver.  The loan does not allow BlockFi to lease

3   the Bitcoin.  It does not allow BlockFi to retain the proceeds

4   from the Bitcoin.  It does not allow BlockFi to charge the

5   proceeds from the Bitcoin.  It does not disclose that there

6   will be a charge of the proceeds from the Bitcoin which should

7   be disclosed.  It must be disclosed under the Truth in Lending

8   Act.  And if it cannot be known with certainty, it must be

9   estimated.

10           Okay.  So I would like to make very clear that the

11  rule under Section 9-207 is the operative rule that we are

12  playing with.  And regarding Bitcoin's categorization under the

13  Uniform Commercial Code, that is an interesting question.  It's

14  potentially relevant to the pawnbroker issue.  It does not bear

15  at all under the financing law.  The financing law as we saw

16  makes reference to personal property, and we know that Bitcoin

17  is personal property.

18           Now whether or not Bitcoin is a good for purposes of

19  the pawnbroker law, that's an interesting question, and the

20  reason why is that we know Bitcoin is not a service, we know

21  it's not a security.  We know that it's something that could be

22  actually possessed.  It can be actually received.  And the

23  pawnbroker laws are -- if we say that Bitcoin is not a good,

24  then you see the way that a good is defined is it's defined

25  almost as a chosen possession.  It's something that could be

1  actually possessed.

2           THE COURT:  Well, again --

3           MR. GERRO:  Go ahead.

4           THE COURT:  -- let me stop you, because isn't it more

5  than just being a good.  Doesn't California's regulation or

6  statute -- and I'll refer to the Business and Professionals

7  Code, BPC 21627, doesn't it have to be a tangible good?

8  Tangible personal property.

9           Let me just back up.  And when I looked through this,

10 BPC 21626 defines and refers to secondhand dealers.  And it

11 refers to those whose business includes buying, selling,

12 trading, taking in pawn, and accepting for sale or consignment

13 tangible personal property.  So a secondhand dealer includes

14 all pawnbrokers, but pawnbrokers aren't all secondhand --

15 pawnbrokers are secondhand dealers but not all secondhand

16 dealers are pawnbrokers.

17          But for secondhand dealers, it has to be tangible

18 personal property.  How is digital currency tangible?

19          MR. GERRO:  I love that question because it shows how

20 learned that Your Honor is.  It's really a good question

21 because it's a secondhand dealer is very related to a

22 pawnbroker.  It's not -- a secondhand dealer is not necessarily

23 a pawnbroker.

24          And as pointed out in the memorandum of law --

25          THE COURT:  No, but a pawnbroker is necessarily a

1 secondhand dealer.

2       MR. GERRO:  I'm not sure sure about that, Your Honor.

3 The pawnbroker is statutorily defined and has a separate

4 statutory definition to a secondhand dealer.

5       THE COURT:  Well, and in fairness to you, I'm reading

6 this from the Secondhand Dealer Pawnbroker Licensing Unit

7 Frequently Asked Questions put out by the Office of the

8 Attorney General for the California Department of Justice.  And

9 a pawnbroker is also a secondhand dealer, but a secondhand

10 dealer is not a pawnbroker.  So --

11       MR. GERRO:  Okay.

12       THE COURT:  And if you read -- and according to the

13 definition, it includes pawnbrokers.  So we go back to is there

14 a need for it to be tangible as a pawnbroker.  We moved on

15 beyond the UCC.

16       MR. GERRO:  Sure.

17       THE COURT:  And we moved beyond the financing Law.

18       MR. GERRO:  Sure.

19       THE COURT:  Let's just focus now for the last bit on

20 the pawnbroker element.

21       MR. GERRO:  Yes.  And, also, if we can before we

22 conclude, I'd like to also discuss the contract just a little

23 -- the contractual redemption just a little bit.

24       Your Honor, California Financial Code Section 21000

25 *et sequitur*, that contains all of the provisions that have to

1   do with licensing a pawnbroker, defining a pawnbroker, and

2   regulating a pawnbroker.  The Business and Professionals Code

3   does regulate secondhand dealers, but it does not set forth the

4   licensing provisions.  And I don't believe it's incorporated by

5   reference.  I've done extensive research on the statutory

6   construction and legislative history.

7        Your Honor is correct that goods are sometimes

8   defined as intangible by the legislature, and a good example of

9   that is on the memorandum of law which unfortunately came after

10  all of the attachments, but Your Honor has obviously read it

11  because I think you referenced it earlier during this oral

12  argument, that in Footnote 7, there are citations to California

13  statutes that define a good as being tangible but there are

14  also sections that define goods without reference to

15  tangibility.

16       And the pawnbroker law defines good -- I'm sorry, it

17  does not define good.  It does not say tangible.  If the

18  legislature wanted to limit it to tangible, tangible personal

19  property, they could have.  As Your Honor just showed with the

20  Business and Professions Code, the legislature is more than

21  capable of defining a good with reference to tangibility.  And

22  the legislature does say tangible personal property in many

23  different statutory sections.

24       I've checked five different dictionaries, and only

25  one of those five dictionaries had a reference to tangibility.

1  I believe even -- I don't have the definition in front of me,

2  but I even believe that -- the reason why I'm citing these old

3  cases is because the language, the word "goods," this is

4  actually a statutory language that's been carried on since

5  England.

6          This statute "goods" was imported from England, and

7  that's why I'm citing to laws under the -- I'm citing to the

8  common law which I think we may assume the common law

9  definition of a good is what the legislature intended without

10  further modification.

11          So I know Your Honor is -- the pawnbroker law is

12  maybe not the strongest argument in Your Honor's opinion, and I

13  respect that and I understand that.  But may I talk about the

14  contractual right of redemption?  Is that --

15          THE COURT:  Yes.

16          MR. GERRO:  Can we move on or -- okay.

17          THE COURT:  Let's move on to that.  Then I'd like to

18  hear from debtors' counsel.

19          MR. GERRO:  Absolutely, Your Honor.  Thank you.  I

20  appreciate that.

21          Soon after, very soon after the liquidations, BlockFi

22  and I are communicating and I say can I take out an unsecured

23  loan to buy back the Bitcoin, and BlockFi says, no, we can't do

24  that, we can only reverse the liquidations if you come up with

25  enough money.  This was within days of the liquidation.

1          Now I have to -- this is an important note.  The

2   standard of review, the burden of persuasion, as Your Honor

3   discussed earlier, the underlying burden of persuasion on

4   compliance with the Uniform Commercial Code Article 9 Chapter

5   6, that burden of persuasion is on BlockFi under California

6   law.  And BlockFi has not produced any evidence that the sales

7   actually occurred, has not produced any evidence that the

8   liquidations were commercially reasonable.

9          For all we know, they accepted the Bitcoin in partial

10  satisfaction of the loan which is void in a commercial

11  transaction -- I'm sorry, I'm sorry, not a commercial

12  transaction -- in a consumer transaction.

13          THE COURT:  Consumer transaction.

14          MR. GERRO:  Yes, that's right.

15          And why is this important?  It's important because I

16  don't have access to that information.  BlockFi should have

17  produced it in its objection.  It should have produced it in

18  its reply.  For all we know, there's no way of knowing that

19  these liquidations actually occurred.

20          So when I was approached afterwards asking to give

21  more money or Bitcoin to reverse the liquidations, we engaged

22  in negotiations.  And during the negotiations, I mentioned that

23  I was interested in reinstating the loan at a price of $7,500

24  per Bitcoin.  The ultimate price of Bitcoin at the time of the

25  acceptance of the offer was $7,700.

39

1          And during that time, I informed BlockFi that I was

2   engaged in the due-diligence phase with another lender.  And

3   within about a month thereafter, I accepted the offer and

4   obviously one month is a reasonable amount of time to engage in

5   a due-diligence phase with a lender.

6          BlockFi provided the formula for reinstating the

7   loan.  I accepted the offer in accordance with the formula.

8   Soon after that, BlockFi said that they were not going to honor

9   the contract to reinstate the loan.  And as a result, that's

10  when the litigation ensued.  The price of Bitcoin was not a

11  factor in this other than how it affected the formula for

12  reinstating the loan.

13         But more importantly, I think that there's something

14  not right about the offer to reverse the loan, and it wasn't a

15  modification of the loan contract.  It was a new contract.  It

16  was a written modification, and it was signed.  It had an email

17  signature which is sufficient in our day and age.  An email --

18  people do not have to transact business through facsimile

19  anymore.

20         And there was an offer and an acceptance to reinstate

21  the loan, although the amount of the proof of claim is prima

22  facially valid.  If this Court is inclined to specifically

23  enforce that contract to reinstate the loan, I think that

24  that's what everybody agreed to at that time.  And the Court

25  would be justified in overruling the objection to the proof of

1  claim.  We have not seen enough evidence to negate the prima

2  facie validity and amount of the proof of claim.

3         I think that it was very clear that there was actual

4  notice of the provisions of the law.  There's only one

5  reasonable construction of Financial Code Section 22009.  And

6  if there is another reasonable construction, I'd like to hear

7  it because the way that I read the law and I imagine that Your

8  Honor would read the law as well, it cannot be changed

9  unilaterally by any party to this litigation.  It was enacted

10  many years ago.

11         And that's what I'd request is that this Court

12  overrule the objection and enforce the California Financing Law

13  and the California -- this was not only a violation of the

14  statutory definition but a violation of the license which

15  incorporates the statutory definition by reference.

16         Any questions before I check my notes and I scramble

17  to see if I've missed anything?

18         THE COURT:  No, not at this -- well, let me ask this.

19  With respect to whether or not a modified loan offer was made

20  and accepted, there were no steps afterwards.  In other words,

21  did you put up collateral?  Did you follow through -- did

22  either side follow through on the obligations that would have

23  been required under reinstating or issuing a new loan?

24         MR. GERRO:  Yes, Your Honor.  I tendered the Bitcoin,

25  and a tender is what's required.  I did not have a Bitcoin

 1   address to send it to.  BlockFi would not provide a Bitcoin

 2   address to send it to.  That is the state of affairs.

 3        THE COURT:  By tender, you mean what specifically did

 4   you do?

 5        MR. GERRO:  Oh, great question.  Can I refer to that

 6   email for the Court's reference here?

 7        THE COURT:  Yes.

 8        MR. GERRO:  Okay.  Attachment 16.  Bates stamp Page

 9   89.  This page, the top email is the one that says, "I'm in the

10   due-diligence phase with the traditional source of capital."

11   That was May 1st, 2020.  The next email, BlockFi says, "That's

12   great news.  Here's the formula to reinstate your loan.  Here's

13   an example.  The payment would bring the principal balance" --

14   that's under his example.

15        In the next email -- by the way, that email with the

16   formula was from March 24th, 2020.  I apologize, I read the

17   date on the top on the header of the page, but that was the

18   date that this was printed.  That was not the date of the

19   email.  The date with the formula was from March 24th, 2020.

20        Then April 27th, 2020, I accepted the offer.  I

21   provided the formula.  I calculated the amount of paydown.  And

22   I said, "I will send the Bitcoin today.  Please confirm

23   BlockFi's Bitcoin address."  That's a tender of performance.

24        THE COURT:  So we're addressing the email of May

25   24th, and your response of April 27th?

42

1          MR. GERRO:  Correct, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Let me hear -- Ms. Chavez?

4          Thank you, Mr. Gerro.

5          MR. GERRO:  Thank you, Your Honor.

6          MS. CHAVEZ:  Thank you, Your Honor.

7          Mr. Gerro has indicated that his exhibits should be

8   considered shocking, but nothing about this case or the claims

9   or the exhibits should be shocking, Your Honor.  Mr. Gerro is

10  not shocked by the terms of the private written loan agreement

11  between the parties or BlockFi's exercise of its rights under

12  that agreement, nor did he appear shocked in the emails by the

13  liquidation notices from BlockFi.

14          And, again, I would emphasize that this was a private

15  agreement between sophisticated parties.  Gerro is not charged

16  with enforcing the laws of California or any other state.  And

17  as the evidence clearly indicates for the license itself,

18  everything Mr. Gerro is relying upon were pre-licensing

19  discussions, but the evidence in the Washburn declaration, the

20  Owen declaration, and Judge Strobel's ruling in Gerro-3 clarify

21  that the license was in fact issued to BlockFi on August 20th,

22  2018.

23          The Department advised that it agreed with BlockFi's

24  analysis of the California Lending Law, including Section

25  22009.  They made no request for BlockFi to change their

43

business plans, and they did decline to issue a formal

interpretative opinion because they already issued the license

and the license was their indication of approval of BlockFi to

act as a lender.

In the Gerro-3 ruling, Your Honor, Judge Strobel says

that Section 22009 does not explicitly prohibit a finance

lender from using or possessing collateral and that the

authority charged with issuing lending licenses like the

Department may be entitled to deference of their interpretation

of the statute.  And we think that interpretation is the

correct interpretation, Your Honor.

Nothing again shocked Mr. Gerro other than he was

just unhappy with the outcome here.  And we can understand

that, but he signed a written agreement with terms that allowed

BlockFi to liquidate the collateral when the loan-to-value

ratio was not in compliance.  It's clear what happened here

that there was no amendment or modification.

Section 22 of the loan agreement expressly states

that that was the entire agreement among the parties, and then

Section 29 provides that any changes would require a writing

signed by the parties.  And that was not indicated in the

emails.  And the debtors have carried their burden, and it's

Mr. Gerro's burden to establish that there was some new

contract or new loan originated.  And he has not done so.

1          The claim that Mr. Gerro is asserting is of a

2     substantial size which is why the debtors have been proactive

3     in objecting to it to eliminate the continued use of estate

4     resources to defend against a baseless claim.  We respectfully

5     request that Your Honor sustain our objection and disallow the

6     claims in their entirety.

7          If I can answer any questions Your Honor has, I'm

8     happy to do so, but we believe that Your Honor is fully capable

9     of making this decision based off the papers and the arguments

10    today.  Thank you.

11         THE COURT:  All right.  Thank you, Ms. Chavez.

12         Mr. Gerro, last comment?  You're on mute.

13         MR. GERRO:  Absolutely, Your Honor.  Thank you.

14         I wanted to just quickly address some of Ms. Chavez's

15    points here.  I want to say that deference requires two things.

16    It requires compliance with the Administrative Procedure Act,

17    and it requires something to defer to.  Here there is nothing

18    to defer to.  What this is referred to in California is an

19    underground regulation.  An underground regulation is something

20    that's done in secret, and it actually void.  It's not entitled

21    to any deference.

22         Regarding the size of the claim, this claim simply

23    just represents my Bitcoin.  The size of the claim is much more

24    massive for me than it is for BlockFi.  And I didn't ask for

25    any damages.  I'm asking for a return of the Bitcoin.  I'm

1    asking for a return of the Bitcoin on the same treatment that

2    any other debtor in my situation would be entitled to.

3          And, lastly, regarding Gerro-3, that tentative ruling

4    expressly states that it is not a final determination. The

5    tentative ruling is expressly tentative.  And although it was

6    adopted by the court, it is not preclusive.  I respectfully

7    submit that this Court should do its own independent statutory

8    construction of 22009 and Your Honor will hopefully arrive at

9    the same conclusion.  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         So just so we're all working under the same

12   assumption, if I were to allow the claim for roughly -- it has

13   a value roughly of 12 million I guess base, 400 Bitcoin, right?

14         MR. GERRO:  May I make a comment, Your Honor?

15         THE COURT:  Yes.

16         MR. GERRO:  The dollar value of the Bitcoin on the

17   day of the petition was about 6.9 million.  And the reason why

18   I'm asking for an in-kind amount is because just because I want

19   to qualify for an in-kind distribution just like everyone else.

20         THE COURT:  So on the day of the petition, Bitcoin

21   was trading at about $16,000.  And so you're seeking 400 coins,

22   roughly, at that amount?

23         MR. GERRO:  Yes, Your Honor.  And I will add that if

24   Your Honor is inclined to specifically perform the contract for

25   redemption, I will concede that this Court may subtract the

1  principal amount of the loan and the interest accrued thereon

2  which would be about $2-1/2 million.

3          THE COURT:  And let me turn to debtors' counsel.

4  Under the proposed plan, how are other BlockFi loan obligors

5  being treated?

6          MS. CHAVEZ:  Well, first and foremost, Your Honor, I

7  just would like to emphasize that Mr. Gerro instructed BlockFi

8  to liquidate the remaining collateral and pay off his loan.  So

9  to give him the new type of claim would be a double recovery

10  because he does not any longer owe a debt to BlockFi and he

11  withdrew his remaining Bitcoin from the platform.

12          But if he were to have an allowed claim, he would be

13  treated as a general unsecured creditor under BlockFi Lending,

14  which provides for a cash distribution, not an in-kind

15  distribution.

16          THE COURT:  Right.  and I believe according to the

17  disclosure statement, the anticipated return is in the range of

18  30 percent or so --

19          MS. CHAVEZ:  Yes --

20          THE COURT:  -- depending upon future litigation?

21          MS. CHAVEZ:  Certainly.

22          THE COURT:  All right.  Okay.  Thank you.

23          I will given the upcoming confirmation hearings in

24  September and the voting deadlines, I will issue a ruling, at

25  worse, a preliminary ruling at some point next week on both the

47

motion and the cross-motion.  I might supplement it with a more

extensive ruling.

I will, as I do with all parties, urge the parties to

take that time before I rule because when I rule, there will be

a winner and a loser, take the time to see if it makes sense,

especially in light of the questions I asked at the end whether

it makes sense to resolve this matter without the Court issuing

a ruling.

I'll leave that for you all to consider.  I thank you

all for your argument.  And, Mr. Gerro, did you have another

question?

MR. GERRO:  Yes, Your Honor.

Regarding the informal resolution, I would like to

say that I've asked BlockFi to mediate the issue.  They do not

want to mediate.  And, therefore, I would ask the Court to

order this to a mandatory settlement conference so we could

have meaningful settlement discussions.

THE COURT:  Well, every dollar that I direct BlockFi

to expend is coming out of everyone's pockets, all the other

creditors.  I am leery of doing that at this juncture.  You can

certainly start with phone calls on your own.  You don't need a

neutral.  You're all professionals, and I think you can by my

questions anticipate the direction or, if not, take into

account what the dollar are at stake and try to reach a

resolution.

48

1          If you need more time, you'll reach out for the Court

2 but I'm not going to direct a mediation at this point.

3          Thank you all.  Court is adjourned.

4          MR. GERRO:  Thank you very much, Your Honor.

5          THE COURT:  You're welcome.  Thank you.

6          (Proceedings adjourned at 12:16 p.m.)

7                    *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

        I, DIPTI PATEL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.


/s/ Dipti Patel

DIPTI PATEL, CET-997

J&J COURT TRANSCRIBERS, INC.      DATE:  August 18, 2023