**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered)<br><br>**Hearing Date: September 20, 2023 @ 10:00 a.m. ET**<br>**Response Deadline: September 13, 2023 @ 4:00 p.m. ET**<br>**Oral Argument Waived Unless Response Timely Filed** |

### NOTICE OF BLOCKFI'S NINTH OMNIBUS
### OBJECTION TO THE FTX CLAIMS
**(books and records, unliquidated, duplicates, incorrect/improper**
**classification, insufficient documentation, not liable)**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

YOU SHOULD LOCATE YOUR REFERENCE NUMBER OR CLAIM NUMBER AND YOUR CLAIM(S) ON THE SCHEDULES ATTACHED HERETO. PLEASE TAKE NOTICE THAT YOUR CLAIM(S) MAY BE DISALLOWED, EXPUNGED, RECLASSIFIED, REDUCED, OR OTHERWISE AFFECTED AS A RESULT OF THE OBJECTION. THEREFORE, PLEASE READ THIS NOTICE AND THE ACCOMPANYING OBJECTION VERY CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

IF YOU HAVE QUESTIONS OR WISH TO RESPOND TO THIS NOTICE, PLEASE CONTACT DEBTORS' COUNSEL:

| JORDAN E. CHAVEZ, ESQ. | LAUREN M. SISSON ESQ. |
|---|---|
| (214) 651-5453 | (212) 835-4877 |
| JORDAN.CHAVEZ@HAYNESBOONE.COM | LAUREN.SISSON@HAYNESBOONE.COM |

**PLEASE TAKE NOTICE** that on **September 20, 2023 @ 10:00 a.m. (ET)**, or as soon thereafter as counsel may be heard, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, shall move for disallowance, expungement and/or reduction or adjustment of certain claims described herein (the "Objection") before the Honorable Michael B. Kaplan, Chief United States Bankruptcy Judge, in Courtroom #8 of the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), 402 East State Street, Trenton, New Jersey 08608, or such other physical or virtual location as may be determined by the Court, for entry of an order, substantially in the form submitted herewith.

**PLEASE TAKE FURTHER NOTICE** the Objection sets forth the relevant factual bases upon which the relief requested should be granted. The Debtors shall rely upon the accompanying *Certification of Zachary Prince* attached to the Objection as Exhibit A. A Proposed Order granting the relief requested in the Objection is also submitted herewith as Exhibit B.

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the relief requested in the Objection shall: (i) be in writing, (ii) state with particularity the basis of the objection; (iii) conform with the Bankruptcy Court's *Order Granting Debtors' Motion to Establish Certain Notice, Case Management, and Administrative Procedures* [Docket No. 54] (the "Case

Management Order"); (iv) conform with the Bankruptcy Court's *Order Granting Debtors' Motion for Entry of an Order (A) Approving the (I) Omnibus Claims Objection Procedures and Form of Notice, (II) Omnibus Substantive Claims Objections, and (III) Satisfaction Procedures and Form of Notice, (B) Waiving Bankruptcy Rule 3007(e), and (C) Granting Related Relief* [Docket No. 609] (the "Claims Procedures Order," attached to the Objection as Exhibit C); and (v) be filed with the Clerk of the United States Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received no later than 4:00 pm (ET) seven (7) days before the hearing date set forth above.

**PLEASE TAKE FURTHER NOTICE** that unless responses are timely filed and served, the Objection shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d), and the relief requested may be granted without further notice or hearing.

*[Remainder of page intentionally left blank]*

Dated: August 21, 2023

/s/ *Michael D. Sirota*
_____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice* g)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

## BLOCKFI'S NINTH OMNIBUS
## OBJECTION TO THE FTX CLAIMS
### (books and records, unliquidated, duplicates, incorrect/improper
### classification, insufficient documentation, not liable)

TO: THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES
BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

# Contents

Preliminary Statement ........................................................................................................... 4

Jurisdiction and Venue .......................................................................................................... 5

Background ............................................................................................................................. 6

    A.   The Prepetition Relationship Between BlockFi and FTX ............................................... 6

        i.   The FTX Contracts ................................................................................................ 6

        ii.   BlockFi's Transactions on the FTX Exchanges .................................................... 8

        iii.   BlockFi's Lending Relationship with Alameda ................................................... 10

        iv.   FTX's Investment in BlockFi ............................................................................... 12

        v.   FTX's Prepetition Pledges Leading up to FTX's Bankruptcy .............................. 14

    B.   FTX's Bankruptcy Filing and the Aftermath ............................................................... 18

        i.   FTX Revealed the Extent of its Fraud .................................................................. 18

        ii.   BlockFi Foreclosed on the Robinhood Shares, Marex Refused to Comply, and the DOJ Seized the Collateral ....................................................................................... 21

        iii.   FTX Filed a Plan of Reorganization That Aims to Prejudice BlockFi ................... 22

    C.   BlockFi's Chapter 11 Cases and Plan of Reorganization .............................................. 23

    D.   The Claims Process and FTX's Claims ........................................................................ 24

Relief Requested and Legal Basis ......................................................................................... 26

BlockFi's Objections to the FTX Claims .............................................................................. 27

    A.   Gating Issues with the FTX Claims .............................................................................. 27

        i.   FTX has Alleged Insufficient Facts to Support its Claims .................................... 27

        ii.   The Avoidable Transfer Claims are Procedurally Defective .................................. 30

        iii.   FTX Lacks Standing to Bring the Emergent Pledge Claim .................................... 31

    B.   BlockFi's Objections to the FTX Claims on the Merits ................................................ 32

        i.   FTX's $3.5 Billion Exchange Withdrawal Claims Fail as a Matter of Law ............ 32

        ii.   Alameda Cannot Carry its Burden on the Repayment Avoidance Claim, the MLA Collateral Pledge Avoidance Claim, or the Alameda Pledge ................................... 33

            1.   The Repayment Avoidance Claim ............................................................ 33

            2.   The MLA Collateral Pledge Avoidance Claim ......................................... 33

            3.   The Alameda Pledge ............................................................................... 34

        iii.   FTX Cannot Prove Essential Elements of a Preference or Fraudulent Transfer with Respect to the Emergent Pledge ........................................................................... 34

        iv.   FTX Agreed to Subordinate the Loan Claim, and the Loan Claim and Option Agreement Claim Stem From an Equity Transaction .......................................... 35

        v.   Alameda's Liability to BlockFi Sets Off the Entirety of Alameda's Claims .......... 37

C. BlockFi's Defenses to the FTX Claims .........................................................................38

    i. Unclean Hands ...........................................................................................................38

    ii. *In Pari Delicto* ..........................................................................................................39

D. In the Alternative, this Court should Equitably Subordinate the FTX Claims ..............40

Reservation of Rights...........................................................................................................42

Separate Contested Matters..................................................................................................42

Waiver of Memorandum of Law ..........................................................................................43

No Prior Request...................................................................................................................43

Notice....................................................................................................................................43

BlockFi Inc. and its debtor affiliates (collectively, "BlockFi" or the "Debtors"), as debtors and debtors-in-possession in the above-referenced Chapter 11 cases (the "Chapter 11 Cases"), file *Debtors' Ninth Omnibus Objection to the FTX Debtors' Claims* (the "Objection") for entry of an Order disallowing the FTX Claims pursuant to sections 105(a) and 502 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 3007-1, 3007-2, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules"). In support of the Objection, BlockFi respectfully represents as follows:

## **Preliminary Statement**

1.    While perpetrating a now-notorious fraud against the global cryptocurrency industry, FTX[2] misrepresented the health of its finances, falsified its financial statements, and concealed its theft of customer property. The scheme included fraudulently inducing BlockFi to loan over $1 billion worth of digital assets deposited on the BlockFi platform to Alameda Research Ltd. ("Alameda"). Several of FTX's principals have been indicted for their roles in the FTX fraud and charged with similar violations by the SEC and CFTC. Three principals confessed to defrauding lenders like BlockFi to make loans to Alameda and then using Alameda like a personal "piggy bank" to fund pet projects, donate to politicians, and lavishly investing in real estate and other property for their personal benefit. FTX stole customer assets on the FTX Exchanges to cover losses incurred by Alameda, while at the same time publicly promoting FTX as financially secure and the savior of the crypto industry. In early November 2022, FTX's fraudulent scheme began to unravel, sinking the crypto industry just a few months after the market crash of June 2022. Shortly thereafter, FTX filed bankruptcy, BlockFi did too, and the DOJ seized hundreds of millions of

---

[2] As used herein, FTX collectively refers to FTX Trading, Ltd. and/or one or more of its 101 debtor affiliates.

dollars' worth of BlockFi's collateral as alleged proceeds of FTX's criminal scheme. The dominoes continued to fall as the sheer magnitude of FTX's fraud became clear to federal authorities and the rest of the world.

2.      FTX's fraud caused BlockFi to lose over a billion dollars' worth of property, which could take years of litigation to recover. FTX's fraud was also a primary cause of BlockFi's bankruptcy. Despite its admitted fraud, lack of accurate books and records, paucity of controls, serial breaches of fiduciary duty, and outright theft of creditor assets—despite all these wrongful acts—FTX filed defective claims against the BlockFi estates, each of which is meritless, for over $5 billion. FTX's claims fail for many reasons, but at the end of the day, FTX simply cannot be allowed to unjustly enrich its estates at the expense of BlockFi's innocent creditors in light of the irreparable harm FTX has already caused. For the reasons that follow, this Court should disallow FTX's claims in their entirety.

### Jurisdiction and Venue

3.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered September 18, 2012 (Simandle, C.J.). BlockFi confirms its consent to the Court entering a final order in connection with this Objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. By filing proofs of claim, FTX Trading, Ltd. and its 101 debtor-affiliates (collectively, "FTX") have submitted to the equitable jurisdiction of this Court and consented to this Court's adjudication of its claims. *See Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) (per curiam); *In re Tarragon Corp.*, 2009 WL 2244598, at *6 (Bankr. D.N.J. July 27, 2009) ("[T]he filing of a proof of claim brings a creditor within the equitable jurisdiction of the Bankruptcy Court

removing the creditor's right to a jury trial.") (citing *Shubert v. Lucent Techs., Inc.* (*In re Winstar Communications, Inc.*), 554 F.3d 382, 406–07 (3d Cir. 2009) (citing *Langenkamp*, 498 U.S. at 44–45) (other citations omitted)); *Shared Network Users Group, Inc. v. WorldCom Techs., Inc.*, 309 B.R. 446, 451 (E.D. Pa. 2004).

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a) and 502(a) of Bankruptcy Code, Bankruptcy Rule 3007 and Local Rules 3007-1, 3007-2 and 9013-1.

## **Background**

### A.      **The Prepetition Relationship Between BlockFi and FTX**

6.      FTX and BlockFi engaged in prepetition transactions that give rise to BlockFi's affirmative claims against FTX and defenses to FTX's claims against BlockFi. Several of the transactions and related contracts are discussed below.

#### i.      **The FTX Contracts**

7.      The FTX Debtors, BlockFi, and Emergent, as applicable, are parties to certain contracts, including those listed in the table below (collectively with the financing statements listed below and all addenda and attachments as may be referenced therein, the "<u>FTX Contracts</u>"),[3] under which BlockFi, the FTX Debtors, and Emergent engaged in transactions that form, in part, the basis of their prepetition relationship:

| #   | Contract Title | Type of Contract | Contract Counterparties |
| --- | --- | --- | --- |
| 1.  | Master Digital Currency Loan Agreement dated July 15, 2019 (the "<u>U.S. Loan Agreement</u>") | Loan Agreement | Alameda Research Ltd. BlockFi Lending LLC |
| 2.  | Master Loan Agreement dated | Loan Agreement | Alameda Research Ltd. |

---

[3] The listed FTX Contracts are noted for summary purposes only and may not include other contracts between BlockFi on the one hand and the FTX Debtors or Emergent on the other hand. If there is any discrepancy between the summary presented herein and any of the FTX Contracts, the language and terms of the FTX Contracts shall control. True and correct copies of the FTX Contracts are available upon request to BlockFi's counsel, subject to prior execution of a non-disclosure agreement satisfactory to BlockFi in its sole discretion, as applicable.

| # | Contract Title | Type of Contract | Contract Counterparties |
|---|---|---|---|
| | August 14, 2020 | | BlockFi International Ltd. |
| 3. | Amended and Restated Master Loan Agreement dated January 26, 2022 (the "International Loan Agreement," together with the documents listed at numbers 1, 2, 4, 9–11 and 13–19 the "Alameda Loan Documents") | Loan Agreement | Alameda Research Ltd.<br>BlockFi International Ltd. |
| 4. | Security Agreement over a Custody Account dated January 26, 2022 | Security Agreement | Alameda Research Ltd.<br>BlockFi International Ltd.<br>Coinbase Custody International Limited |
| 5. | FTX Terms of Service dated May 13, 2022 (the "FTX Terms of Service") | Terms of Service | FTX Trading Ltd.<br>BlockFi International Ltd. |
| 6. | FTX.US User Agreement (last updated September 16, 2022) (the "FTX.US Terms of Service") | Terms of Service | West Realm Shires Inc.<br>BlockFi Lending LLC |
| 7. | Loan Agreement dated June 30, 2022 (the "FTX Agreement") | Agreement to Provide Capital in Connection with Contract 8 below | BlockFi Inc.<br>BlockFi Lending LLC<br>BlockFi Trading LLC<br>West Realm Shires Inc. |
| 8. | Option Agreement dated June 30, 2022 (the "Option Agreement") | Option Agreement | BlockFi Inc. and the Significant Equityholders (defined therein)<br>West Realm Shires Inc.<br>FTX Trading Ltd. |
| 9. | Novation Agreement dated August 31, 2022 | Novation Agreement | Alameda Research Ltd.<br>BlockFi International Ltd.<br>BlockFi Lending LLC |
| 10. | Amendment & Forbearance Agreement dated November 9, 2022 (the "Forbearance Agreement") | Forbearance Agreement | Alameda Research Ltd.<br>BlockFi Inc.<br>BlockFi International Ltd.<br>BlockFi Lending LLC |
| 11. | Pledge Agreement dated November 9, 2022 (the "Alameda Pledge Agreement") | Pledge Agreement | Alameda Research Ltd.<br>BlockFi Inc.<br>BlockFi International Ltd.<br>BlockFi Lending LLC |
| 12. | Emergent Pledge Agreement dated November 9, 2022 (the "Emergent Pledge Agreement") | Pledge Agreement | Emergent Fidelity Technologies Ltd.<br>BlockFi Inc.<br>BlockFi International Ltd.<br>BlockFi Lending LLC |
| 13. | UCC Financing Statement dated November 10, 2022, Doc. #2022112094 | UCC Financing Statement | Alameda Research Ltd.<br>BlockFi Inc.<br>BlockFi International Ltd.<br>BlockFi Lending LLC |
| 14. | UCC Financing Statement dated | UCC Financing Statement | Alameda Research Ltd. |

| # | Contract Title | Type of Contract | Contract Counterparties |
|---|---|---|---|
| | November 10, 2022<br>Doc. #2022111977 | | BlockFi International Ltd. |
| 15. | UCC Financing Statement dated November 10, 2022<br>Doc. #2022112160 | UCC Financing Statement | Alameda Research Ltd.<br>BlockFi Lending LLC |
| 16. | UCC Financing Statement dated November 10, 2022<br>Doc. #2022112093 | UCC Financing Statement | Emergent Fidelity Technologies Ltd.<br>BlockFi Inc.<br>BlockFi International Ltd.<br>BlockFi Lending LLC |
| 17. | UCC Financing Statement dated November 14, 2022<br>Doc. #2022112383 | UCC Financing Statement | Alameda Research Ltd.<br>BlockFi Inc.<br>BlockFi International Ltd.<br>BlockFi Lending LLC |
| 18. | UCC Financing Statement dated November 14, 2022<br>Doc. #2022112380 | UCC Financing Statement | Alameda Research Ltd.<br>BlockFi International Ltd. |
| 19. | UCC Financing Statement dated November 14, 2022<br>Doc. #2022112381 | UCC Financing Statement | Alameda Research Ltd.<br>BlockFi Lending LLC |

### ii.       BlockFi's Transactions on the FTX Exchanges

8.       BlockFi International Ltd. ("BlockFi International")[4] and BlockFi Lending LLC ("BlockFi Lending") have accounts (the "BlockFi Accounts") on the FTX and FTX.US exchanges, respectively, (together, the "FTX Exchanges"). Digital assets that BlockFi International and BlockFi Lending deposited into the BlockFi Accounts always remained property of BlockFi pursuant to the terms of service governing each exchange. The FTX Terms of Service provide as follows:

> Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading . . . None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading. . . . You control the Digital Assets held in your Account. At any time . . . you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

---

[4] The Supreme Court of Bermuda appointed joint provisional liquidators, for restructuring purposes only, to BlockFi International on November 29, 2022, in a statutory process ancillary to, and in support of, the Chapter 11 Cases.

Ex. D, FTX Terms of Service § 8.2.6; *see also* Ex. E, FTX.US Terms of Service § 6 ("Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.").

9.      On November 8, 2022, BlockFi attempted to withdraw a substantial quantity of digital assets from the BlockFi Accounts. FTX failed to honor this withdrawal due to a pause they imposed that day on all FTX Exchanges. As a result of the pause and the automatic stay arising several days later in connection with the FTX Chapter 11 Cases, BlockFi has been unable to withdraw its assets from the FTX Exchanges. Using values as of November 11, 2022 (the "FTX Petition Date"),[5] BlockFi had assets trapped on the FTX Exchanges with a market value exceeding $180 million.

10.     Contrary to the Terms of Service for the FTX Exchanges and unbeknownst to BlockFi, Sam Bankman-Fried ("Bankman-Fried") and other FTX principals routinely transferred customer assets from the FTX Exchanges. *See FTX Trading Ltd., et al. v. Samuel Bankman-Fried, et al.*, Case No. 23-11068-JTD, Docket. No. 1886 at 4 ¶ 5 (Bankr. D. Del. July 20, 2023) (hereafter, the "FTX Complaint") (alleging numerous breaches of fiduciary duties and violations of laws). FTX readily acknowledges these facts. "[The FTX Executive Team] funded much of this spending through Alameda [and] unlawfully diverted billions of dollars in assets belongings to FTX.com . . . to [the FTX Executive Team's] pet projects. In doing so, the [FTX Executive Team] defrauded FTX.com's customers, creditors and shareholders, and violated their fiduciary duties and numerous laws." *Id.* at 8 ¶ 27; *see also Alameda Research Ltd., et al. v. Rocket Internet Capital Partners II SCS, et al.*, Case No. 22-11068-JTD, Docket No. 1502, at 7 ¶ 27 ("By causing Alameda

---

[5] November 11, 2022 is the petition date for all the FTX Debtors except West Realm Shires, Inc., which filed a voluntary Petition for Relief on November 14, 2022. Emergent, of course, filed its petition much later on February 3, 2023.

to take money belonging to FTX.com and spend it on the FTX Insiders' pet projects, the FTX Insiders defrauded FTX.com's creditors, including customers and investors."). The SEC has asserted similar allegations. *See S.E.C. v. Samuel Bankman-Fried*, Civ. No. 22-cv-10501, Docket No. 1, at 10 ¶ 33 (S.D.N.Y. Dec. 13, 2022) (hereafter, the "SEC Complaint").

11.    Billions in customer and lender property vanished because of FTX's standard practice of raiding and misappropriating assets on the FTX Exchanges.

12.    Crucially, during the 90–day period (the "FTX Preference Period") before November 11, 2022 (the "FTX Petition Date"), BlockFi deposited more value onto the FTX Exchanges than it withdrew using a daily end-of-day pricing model:

| Transaction | BlockFi Lending | BlockFi International |
|---|---|---|
| Total Deposits | $25,000,366.95 | $4,347,945,646.83 |
| (Total Withdrawals) | ($25,000,366.58) | ($3,605,712,812.48) |
| Net Balance | $0.37 | $742,232,834.35 |

### iii.    BlockFi's Lending Relationship with Alameda

13.    BlockFi began lending to Alameda in August of 2020. FTT was the predominant form of collateral Alameda provided to secure its obligations to BlockFi; Alameda pledged lesser amounts of SOL, SRM, and Stablecoins such as USDC and USDT (collectively, the "Token Collateral"). Before accepting FTT as collateral, BlockFi performed extensive due diligence, conducted stress-testing, and performed a liquidation analysis. For example, during its relationship with Alameda, BlockFi—

    a.    reviewed Alameda's business model as a quantitative trading firm transacting in approximately $1–10 billion per day;

    b.    analyzed Alameda's financial position for liquidity, leverage, and ability to repay loans;

    c.    reviewed publicly available information concerning FTX's business; and

    d.     reviewed FTT documentation available on the FTX.com website, including repurchases of FTT.

BlockFi also continued to monitor the risks associated with FTT collateral, by—

    a.     conducting FTT market-risk analysis using average traded volume and historical stressed conditions to determine required collateralization ratios under different risk appetite profiles;

    b.     conducting stress-tests on Alameda's balance sheet to ensure there were sufficient non-FTT assets to permit Alameda to meet its payment obligations in the event the market value of FTT declined materially;

    c.     conducting potential liquidation analysis based on BlockFi's prior experience with over-the-counter market makers offering liquidity for large transactions at discount to market prices during stressed market conditions, such as those experienced in June 2022; and

    d.     surveying the market to ensure that other institutional lenders had accepted FTT as collateral for loans to Alameda.

14.    Alameda led BlockFi to believe Alameda was financially sound by, among other things, misrepresenting its financial condition, assets, and liabilities. Alameda's borrowings were typically (i) denominated in USD, BTC, and ETH and (ii) overcollateralized, as BlockFi required Alameda to provide collateral valued at 140%–200% of the outstanding balances of the Alameda Loans, subject to increase in BlockFi's sole discretion and, should the collateral's value decrease, respond to margin calls to maintain the overcollateralization. Before November 2022, Alameda met all of BlockFi's additional margin calls to keep its borrowings sufficiently overcollateralized. Further, in June and July of 2022, Alameda repaid over $1 billion of open-term loans recalled by BlockFi. In June of 2022, Alameda also purchased over $350 million of collateral BlockFi was selling following a default by one of its borrowers.

15.    BlockFi International and BlockFi Lending LLC ("BlockFi Lending") each loaned digital assets to Alameda. As of the FTX Petition Date, Alameda had failed to return (or repay BlockFi for) the following borrowed digital assets:

| Lender | Coin/Token | Quantity |
|---|---|---|
| BlockFi International | BTC | 23,666 |
| BlockFi International | ETH | 133,960 |
| BlockFi Lending | BTC | 1,800 |
| BlockFi Lending | USDC | 90,000,000 |

As of the FTX Petition Date, the aggregate value of the digital assets lent to Alameda (collectively, the "Alameda Loan") was approximately $695.4 million.[6] As of August 15, 2023, the value of the Bitcoin and Ethereum that Alameda borrowed from BlockFi has increased to approximately $1 billion.

16.    In addition, pursuant to section 28 of the International Loan Agreement, Alameda agreed to indemnify BlockFi International for losses caused due to BlockFi International's inability to withdraw collateral from the FTX Exchanges. During the parties' relationship, and on the FTX Petition Date, BlockFi held substantial quantities of digital assets on the FTX Exchanges, including collateral that was pledged by Alameda.

**iv.        FTX's Investment in BlockFi**

17.    In May and June 2022, the global cryptocurrency market crashed after the token Luna fell from $82.55 per token to $0.25 per token in less than a week, evaporating approximately $18 billion of value.[7] Celsius Network LLC and its affiliates paused trading on June 12, 2022. Soon thereafter, Three Arrows Capital, Ltd. ("3AC"), one of BlockFi's biggest clients, also collapsed. Though BlockFi was able to withstand the 3AC collapse and continued processing

---

[6] This amount includes approximately $574.8 million worth of assets from BlockFi International and $120.6 million worth of assets from BlockFi Lending as of the FTX Petition Date. BlockFi includes the Alameda Loan balances as of the FTX Petition Date for informational purposes only and without prejudice to BlockFi's claim for a return of digital assets in kind.

[7] *See, e.g.*, Shaurya Malwa, *Terra's LUNA Has Dropped 99.7% in Under a Week. That's Good for UST*, COINDESK (May 12, 2022 at 4:39 a.m. CDT), available at https://www.coindesk.com/markets/2022/05/12/terras-luna-has-dropped-997-in-under-a-week-thats-good-for-ust/

customer withdrawals, the need for liquidity to calm the market, reduce withdrawals, and ensure withdrawals could be met on a timely basis crystallized later in June 2022. In response, BlockFi prudently sought additional liquidity to protect its client accounts, receiving term sheets from several potential investors. Enter FTX, who held itself out as the industry's savior. *See Commodity Futures Trading Commission v. Samuel Bankman-Fried, et al.*, Civ. No. 1:22-10503, Docket No. 1 ¶ 74 (S.D.N.Y. Dec. 13, 2022) ("Publicly during this time, [the FTX companies] portrayed that they remained highly profitable . . . . Following the market crash of May 2022, . . . Alameda and other entities[] bailed out several digital asset companies with loans or acquisitions. Bankman-Fried portrayed these activities as being benevolent and for the benefit of the digital asset industry.").

18.     At the end of June 2022, BlockFi entered into a transaction with an FTX entity in which FTX agreed to make up to $400 million in junior capital available to BlockFi, and FTX acquired an option to purchase BlockFi. Specifically, BlockFi agreed to sell its equity to FTX pursuant to (i) that certain Loan Agreement dated June 30, 2022, by and between West Realm Shires, Inc. ("West Realm") and BlockFi Inc. (the "FTX Agreement"), and (ii) that certain Option Agreement dated June 30, 2022, by and between West Realm, FTX Trading Ltd. ("FTX Trading"), BlockFi Inc., and the parties listed on Annex I attached thereto (the "Option Agreement").[8] The FTX Agreement entitled BlockFi to obtain up to $400 million of capital, with the first $100 million drawable in the first fifteen days and additional $25 million draws available on rolling 30–day periods thereafter. Under the Option Agreement, FTX could exercise its option to purchase BlockFi in July 2023 and, if not exercised at that time, pay $10 million to receive a replacement

---

[8] The FTX Agreement and Option Agreement can be provided to FTX or the Court upon request.

option exercisable in July 2024. The same extension terms were available to FTX each following year through July 2027.

19.　　The FTX Agreement expressly subordinated BlockFi's obligation to repay advanced funds to BlockFi's obligations to its customers. Specifically, the FTX Agreement states that "[a]ll Loans made hereunder shall . . . be junior to the repayment in full of all Customer Liabilities." FTX Agreement § 2.5. Pursuant to Schedule B of the FTX Agreement, "Customer Liabilities" include BlockFi's obligations to clients in connection with (x) the BlockFi Interest Account, BlockFi Yield, BlockFi Personalized Yield, or BlockFi Wallet products, (y) custody arrangements and collateral arrangements relating to loans made to clients, and (z) any other similar products or services provided to clients by BlockFi.

20.　　BlockFi treated all funds advanced pursuant to the FTX Agreement as an equity contribution, as all parties expected FTX to exercise its option to acquire BlockFi as early as 2023. Between July and October of 2022, BlockFi Inc. received draws on the facility totaling $275 million. On November 8, 2022, BlockFi Inc. requested the remaining $125 million, but FTX never responded and instead filed Chapter 11 six days later.

**v.　　FTX's Prepetition Pledges Leading up to FTX's Bankruptcy**

21.　　In November 2022, news media began questioning FTX and Alameda's financial health. On November 6, 2022, Binance, FTX's largest rival, stated that it would liquidate its entire $530 million position in FTT, FTX's native exchange token.[9] Binance's founder compared FTT to Luna, stating: "Liquidating our FTT is just post-exit risk management, learning from LUNA. We gave support before, but we won't pretend to make love after divorce."[10] After Binance's

---

[9] @CZ_Binance, Twitter (Nov. 6. 2022) (available at https://twitter.com/cz_binance/status/1589283421704290306).

[10] @CZ_Binance, Twitter (Nov. 6. 2022) (available at https://twitter.com/cz_binance/status/1589374530413215744).

announcement, many investors followed suit. In two days, from November 7 to November 9, FTT

fell from trading at $22.06 to $3.38 per token:



22.    Meanwhile, FTX's CEO Bankman-Fried continued assuring the public that the

FTX Debtors were "fine"[11]



---

[11] The now-deleted tweets are accessible on the Internet on various websites. *See, e.g.*, Helen Pratz, *FTX founder Sam Bankman-Fried removes 'assets are fine' flood from Twitter*, COINTELEGRAPH (Nov. 9, 2022), https://cointelegraph.com/news/ftx-founder-sam-bankman-fried-removes-assets-are-fine-flood-from-twitter (last accessed August 16, 2023).



23.     Nonetheless, the rapid devaluation of FTT, which may have been caused, at least in part, by FTX manipulating the price of FTT,[12] posed a significant credit risk to BlockFi given that FTT was the majority of the collateral pledged by Alameda to secure its loans. Thus, consistent with the terms of the Alameda Loan Agreement and their prepetition relationship, BlockFi issued margin calls to Alameda. Alameda complied with the margin calls by pledging additional collateral in the ordinary course of business from November 7–9, 2022:

a.     On November 7, BlockFi increased the margin requirement to 200% and Alameda pledged 19.5 million additional FTT.

b.     On November 8, FTT value continued to plummet, leading to another margin call. Accordingly, Alameda pledged an additional 21.1 million FTT and the parties

---

[12] For example, counsel to FTX stated on the record in the Genesis Global bankruptcy cases that—

The price of FTT is not simple to calculate because there have been allegations the price was subject to manipulation by Sam Bankman-Fried and the other founders of FTX. So the spot price may not be indicative of value. Expert evidence will be required. This question of the value of FTT is generally applicable to all holders of the FTT token and all other stakeholders of FTX that might not hold the token but object to the valuation.

Ex. F, June 15, 2023, Tr. of Genesis Global Proceedings, at 16:14–22.

negotiated a seven-day paydown plan pursuant to which Alameda paid approximately $126 million over the next 24 hours.

c.   On November 9, 2022, Alameda, BlockFi International, and BlockFi Lending negotiated the Forbearance Agreement and the Alameda Pledge Agreement. BlockFi agreed to extend Alameda's repayment obligations in exchange for Alameda's agreement to pledge additional collateral to further secure the Alameda Loan (the "Alameda Pledge"). The Alameda Pledge included all of Alameda's interests in shares of (a) the Grayscale Bitcoin Trust ("GBTC"), (b) the Grayscale Ethereum Trust ("ETHE"), (c) shares of the Bitwise 10 Crypto Index Fund ("BITW") and (d) Account No. ***-**270COMBINED held at Marex Capital Markets Inc. ("Marex"),[13] together with all assets held therein (the "Alameda Account").

d.   On November 9, 2022, as further consideration for the Forbearance Agreement, Bankman-Fried directed Caroline Ellison to cause Emergent Fidelity Technologies, Ltd. ("Emergent") to guarantee the Alameda Loan and all other obligations of the FTX Debtors to BlockFi. To secure its guarantee, Emergent pledged certain assets as collateral (the "Emergent Pledge"). The Emergent Pledge included all of Emergent's interest in (a) approximately 56 million shares of Robinhood Markets, Inc.'s Class A common stock (the "Robinhood Shares,") and (b) Account No. ***-**500COMBINED held at Marex, together with all assets held therein (the "Emergent Account", and together with the Alameda Account, GBTC, ETHE, BITW, and Token Collateral, collectively, the "Pledged Collateral").

24.     On the morning of November 10, 2022, BlockFi filed several of the UCC-1 Financing Statements, perfecting its interest in the Pledged Collateral. The same day, Alameda breached the terms of the Alameda Loan Documents, so BlockFi issued notices of default and acceleration to Alameda and Emergent. Also on November 10, BlockFi International sent a Notice of Sole Control to Coinbase Custody International Limited ("Coinbase Custody") with instructions to block access to the Custody Account (defined therein) for anyone other than BlockFi International. The same day, Coinbase Custody sent a response letter acknowledging receipt of the Notice of Sole Control and implementation of the blocking instructions.

---

[13] Marex Capital Markets Inc. was formerly known as ED&F Man Capital Markets, Inc.

25.     On the FTX Petition Date, the outstanding balance of the Alameda Loan was approximately $695.4 million, whereas the value of the Pledged Collateral was approximately $1.15 billion. Thus, BlockFi was oversecured as of the FTX Petition Date. Nonetheless, the pause of the FTX Exchanges on November 8, 2022 prevented BlockFi from withdrawing any of its digital assets, including Token Collateral, most notably 103,113,570 FTT.

**B.      FTX's Bankruptcy Filing and the Aftermath**

26.     On November 11, 2022, each of the FTX Debtors filed voluntary Petitions for Relief under Chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), except for West Realm, which filed on November 14, 2022, commencing Chapter 11 cases (the "FTX Chapter 11 Cases").

**i.      FTX Revealed the Extent of its Fraud**

27.     FTX's precipitous fall from grace was preceded by a period during which FTX was viewed as one of the premier global enterprises in the cryptocurrency industry and a reliable trading partner. Yet the commencement of the FTX Chapter 11 Cases revealed the extent of FTX's fraud against the world. Since the outset of its bankruptcy filings, FTX has publicly denounced the integrity of its own internal controls and recordkeeping and the accuracy of its books and records. For example, the FTX Debtors' CEO, John J. Ray III, testified before Congress that he does not "trust a single piece of paper in this organization"—

> BARR: In your declaration, you stated that you did not believe that [the FTX Debtors'] audited financial statements were reliable. Can you elaborate on why you believe that to be the case?
>
> RAY: Well, *we've lost $8 billion of customer money*, so, by definition, *I don't trust a single piece of paper in this organization*.

*Investigating the Collapse of FTX, Part I: Hearing Before the U.S. House Fin. Svcs. Comm.*, 117th

Cong. (Dec. 13, 2022), BLOOMBERG GOV'T., Tr. at. 30 (emphasis added).[14]

28.     In her criminal case, Caroline Ellison's confession revealed that Alameda, in

particular, was at the crux of FTX's scheme to defraud lenders like BlockFi, and that FTX

commingled and rehypothetcated accountholder assets in violation of the FTX and FTX.US Terms

of Service:

> [ELLISON]: From 2019 through 2022, I was aware that Alameda was provided
> access to a borrowing facility on FTX.com, the cryptocurrency exchange run by Mr.
> Bankman-Fried. I understood that FTX executives had implemented special settings
> on Alameda's FTX.com account that permitted Alameda to maintain negative
> balances in various fiat currencies and crypto currencies. In practical terms, this
> arrangement permitted Alameda access to an unlimited line of credit without being
> required to post collateral, without having to pay interest on negative balances and
> without being subject to margin calls or FTX.com's liquidation protocols. I
> understood that if Alameda's FTX accounts had significant negative balances in any
> particular currency, it meant that Alameda was borrowing funds that FTX's
> customers had deposited onto the exchange.
>
> While I was co-CEO and then CEO, I understood that Alameda had made numerous
> large illiquid venture investments and had lent money to Mr. Bankman-Fried and
> other FTX executives. I also understood that Alameda had financed these
> investments with short-term and open-term loans worth several billion dollars from
> external lenders in the cryptocurrency industry. When many of those loans were
> recalled by Alameda's lenders in and around June 2022, I agreed with others to
> borrow several billion dollars from FTX to repay those loans. I understood that FTX
> would need to use customer funds to finance its loans to Alameda. I also understood
> that many FTX customers invested in crypto derivatives and that most FTX
> customers did not expect that FTX would lend out their digital asset holdings and
> fiat currency deposits to Alameda in this fashion.
>
> From in and around July 2022 through at least October 2022, I agreed with Mr.
> Bankman-Fried and others to provide materially misleading financial statements to
> Alameda's lenders. In furtherance of this agreement, for example, we prepared
> certain quarterly balance sheets that concealed the extent of Alameda's borrowing
> and the billions of dollars in loans that Alameda had made to FTX executives and to
> related parties. I also understood that FTX had not disclosed to FTX's equity
> investors that Alameda could borrow a potentially unlimited amount from FTX,

---

[14]   Available  at  https://www.congress.gov/117/meeting/house/115246/witnesses/HHRG-117-BA00-Wstate-RayJ-
20221213.pdf.

thereby putting customer assets at risk. I agreed with Mr. Bankman-Fried and others not to publicly disclose the true nature of the relationship between Alameda and FTX, including Alameda's credit arrangement.

I also understood that Mr. Bankman-Fried and others funded certain investments in amounts more than $10,000 with customer funds that FTX had lent to Alameda. The investments were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds. [. . .]

THE COURT: You mentioned that you knew that what you were doing was wrong. Did you also know that it was illegal?

[ELLISON]: Yes.

*United States v. Caroline Ellison*, Case No. 22 Cr. 673, Dec. 19, 2022 Plea Tr. at 27:5–29:12.[15]

As discussed above, BlockFi performed diligence before loaning hundreds of millions of dollars' worth of digital assets to Alameda that were oversecured by FTT at inception. Nonetheless, BlockFi fell victim to FTX's fraudulent representations regarding, among other things, its Exchanges, the financial health of FTX and Alameda, and security measures to protect investors' property.

29.    Since commencing the FTX Chapter 11 Cases, FTX has publicly admitted, and continues to admit, the extent of its prepetition fraud and the unreliability of its internal controls, books and records. To illustrate:

- "[The FTX Executive Team] abused their control over the FTX Group to commit one of the largest financial frauds in history." FTX Complaint, at 2 ¶ 1.

- "[T]he FTX Group's collapse appears to stem from the absolute concentration of control in the hands of a very small group of grossly inexperienced and unsophisticated individuals who failed to implement virtually any of the systems or controls that are necessary for a company that is entrusted with other people's money or assets."[16]

---

[15]    Available    at    https://www.johnreedstark.com/wp-content/uploads/sites/180/2022/12/Ellison-Hearing-Transcript.pdf.

[16] *Investigating the Collapse of FTX, Part I: Hearing Before the U.S. House Fin. Svcs. Comm.*, 117th Cong. (Dec. 13, 2022), BLOOMBERG GOV'T., Tr. at 6. Link provided in footnote 13.

- "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented."[17]

- "[N]one of these financial statements have been audited. . . . I do not have confidence in them."[18]

- "The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets. Mr. Bankman-Fried and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group. . . . Unacceptable management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda and the Dotcom Silo."[19]

- "[B]lurring of ownership interests appears to be par for the course for Mr. Bankman-Fried's companies, based on evidence developed to date suggesting that Mr. Bankman-Fried, who controlled both Alameda and Emergent, treated assets of his different companies interchangeably. For example, in a public interview, Mr. Bankman-Fried appeared to admit that he may have allowed FTX Trading and Alameda funds to be commingled. . . ."[20]

- "[The FTX Executive Team] funded much of this spending through Alameda . . . unlawfully diverted billions of dollars in assets belongings to FTX.com . . . to [the FTX Executive Team's] pet projects. The "[FTX Executive Team] defrauded FTX.com's customers, creditors and shareholders, and violated their fiduciary duties and numerous laws." FTX Complaint at 8 ¶ 27.

### ii.    BlockFi Foreclosed on the Robinhood Shares, Marex Refused to Comply, and the DOJ Seized the Collateral

30.    As a result of Alameda's default under the Pledge Agreement, on November 14, 2022, BlockFi served a formal demand on Marex to transfer the Robinhood Shares to BlockFi

---

[17] *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [FTX Docket No. 24], ¶ 5.

[18] *Id.*, ¶ 28.

[19] *Id.*, ¶ 65.

[20] *Debtors' Motion to Enforce the Automatic Stay or, in the Alternative, Extend the Automatic Stay* [FTX Docket No. 291], ¶ 51.

pursuant to the absolute and irrevocable power of attorney granted to BlockFi in the Emergent

Pledge Agreement. Marex responded the same day, rejecting BlockFi's demand.

31.     On November 28, 2022, BlockFi commenced an adversary proceeding styled

*BlockFi Inc., BlockFi Lending LLC and BlockFi International LLC, Plaintiffs v. Emergent Fidelity*

*Technologies Ltd. and ED&F Man Capital Markets, Inc., Defendants*, Adversary Proceeding No.

22-01382 (the "Adversary Proceeding") against Emergent and Marex in the United States

Bankruptcy Court for the District of New Jersey, Trenton Division, seeking to enforce the terms

of the Emergent Pledge Agreement and to recover collateral that is property of the BlockFi estates.

32.     On December 9, 2022, a grand jury in the Southern District of New York returned

an eight-count Indictment charging Bankman-Fried with conspiracy to commit wire fraud, wire

fraud, conspiracy to commit commodities fraud, conspiracy to commit money laundering, and

conspiracy to defraud the United States and commit campaign finance violations. In connection

with the prosecution of Bankman-Fried, the U.S. Department of Justice (the "DOJ") informed

BlockFi that on January 4, 2023, the DOJ had seized the assets Emergent pledged to BlockFi,

including the Robinhood Shares. *See United States' Notice of Asset Seizures* [Docket No. 203].

The Adversary Proceeding was stayed after the DOJ's seizure of the Robinhood Shares. *See*

*Stipulation Staying Litigation and Related Discovery* [Docket No. 760] (the "Stipulation"), at p. 7

¶ 3.

### iii.     FTX Filed a Plan of Reorganization That Aims to Prejudice BlockFi

33.     On July 31, 2023, FTX filed its *Joint Chapter 11 Plan of Reorganization of FTX*

*Trading LTD. and its Debtor Affiliates* [FTX Docket No. 2100] (the "FTX Plan"). Ex. G. The FTX

Plan provides for, among other things: (i) the extinguishment of claims based on FTT, the primary

form of collateral that FTX pledged to secure BlockFi with respect to BlockFi's loan to Alameda;[21]

and (ii) valuation of all claims in U.S. dollars, which would significantly reduce the value of

BlockFi's claims for return of the digital assets that BlockFi loaned to Alameda. *See* Ex. G, FTX

Plan Art. 4 §§ 4.3.14; 4.4 n. 13.

**C.      BlockFi's Chapter 11 Cases and Plan of Reorganization**

34.      On November 28, 2022 (the "Petition Date"), each BlockFi Debtor filed a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code. A detailed description of the BlockFi

Debtors, their businesses, and the facts and circumstances supporting BlockFi's Chapter 11 Cases

is set forth in greater detail in the *Declaration of Mark Renzi in Support of the Debtors' Chapter*

*11 Petitions and First Day Motions* [Docket No. 17], which BlockFi filed on the Petition Date and

is incorporated herein by reference.

35.      On December 21, 2022, the United States Trustee for the District of New Jersey

(the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section

1102 of the Bankruptcy Code (the "Committee") [Docket No. 130].

36.      On May 12, 2023, BlockFi filed its *First Amended Joint Chapter 11 Plan* [Docket

No. 875], as amended on June 28, 2023 [Docket No. 1132] and July 31, 2023 [Docket No. 1300]

(collectively, and as may be further amended from time to time, the "Plan") and the accompanying

Disclosure Statement [Docket No. 874], as amended on June 28, 2023 [Docket No. 1133] and July

31, 2023 [Docket No. 1301] (collectively, and as may be further amended from time to time, the

"Disclosure Statement"). Article III.C of the Plan sets forth the proposed treatment of claims

against BlockFi, including the FTX Claims, which BlockFi assigned to Classes 5 through 7.

---

[21] Specifically, FTX pledged 103,113,570.45 FTT tokens worth $267,064,147.47 as of the FTX Petition Date. Thus, FTX's proposal under the FTX Plan to extinguish all FTT claims would eliminate $267,064,147.47 of BlockFi's security at the expense of BlockFi's bankruptcy estates.

**D.      The Claims Process and FTX's Claims**

37.      On January 30, 2023, the Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [Docket No. 440] (the "Bar Date Order") establishing certain dates and deadlines for filing proofs of Claims (collectively, the "Proofs of Claim") in these Chapter 11 cases. The Bar Date Order established March 31, 2023 at 5:00 p.m. (prevailing Eastern Time) as the last date and time for non-governmental creditors to file Proofs of Claim against any BlockFi Debtor (the "Claims Bar Date").

38.      On January 12, 2023, pursuant to Bankruptcy Rule 1007, BlockFi filed a Schedules of Assets and Liabilities for the following debtors: BlockFi Inc. (Case No. 22-19361) [Docket No. 242] (as amended by Docket Nos. 460 and 856), BlockFi International Ltd. (Case No. 22-19368) [Docket No. 247] (as amended by Docket Nos. 462 and 858); BlockFi Investment Products LLC (Case No. 22-19370) [Docket No. 249], BlockFi Lending LLC (Case No. 22-19365) [Docket No. 251] (as amended by Docket Nos. 461 and 857), BlockFi Lending II LLC (Case No. 22-19374) [Docket No. 253], BlockFi Services Inc. (Case No. 22-19371) [Docket No. 255], BlockFi Trading LLC (Case No. 22-19363) [Docket No. 257], BlockFi Ventures LLC (Case No. 22-19367) [Docket No. 259], and BlockFi Wallet LLC (Case No. 22-19366) [Docket No. 261] (collectively and as may be amended from time to time, the "Schedules"). On February 2, 2023 and February 3, 2023, BlockFi caused a bar-date notice to be published in The New York Times and The Royal Gazette as set forth in the affidavits filed at Docket Nos. 471 and 472, respectfully. With the assistance of Kroll Restructuring Administration LLC (the "Claims and Noticing Agent"), BlockFi also served the Bar Date Order and a Proof of Claim Form by email and/or first-class mail in accordance with the procedures set forth in the *Order Granting Debtors' Motion to Establish Certain Notice, Case Management and Administrative Procedures* [Docket No. 54] (the "Case Management Order").

24

The Bar Date Notice and Proof of Claim Forms were also published on BlockFi's case website maintained by the Claims and Noticing Agent at https://restructuring.ra.kroll.com/blockfi.

39.     On March 13, 2023, the Court entered its *Order Granting Debtors' Motion for Entry of an Order (A) Approving the (I) Omnibus Claims Objection Procedures and Form of Notice, (II) Omnibus Substantive Claims Objections, and (III) Satisfaction Procedures and Form of Notice, (B) Waiving Bankruptcy Rule 3007(e), and (C) Granting Related Relief* [Docket No. 609] (the "Claims Procedures Order"). Ex. C.

40.     As of the date hereof, over 32,000 Proofs of Claim have been filed against BlockFi. BlockFi, together with their advisors, have commenced the Claims reconciliation process, reviewed the claims listed on Schedule 1 to the Proposed Order, and concluded that each should be disallowed as detailed in this Objection and on Schedule 1.

41.     On March 31, 2023, four FTX debtor entities, including Alameda, FTX Trading, West Realm, and West Realm Shires Services Inc. ("WRSS"), filed thirty-six (36) duplicate proofs of claim (the "FTX Proofs of Claim") on behalf of all 102 FTX debtors (collectively, "FTX") against all nine BlockFi debtors.[22] Counsel for FTX, Brian D. Glueckstein, signed each FTX Proof of Claim. FTX attached to each FTX Proof of Claim an identical, unsubstantiated, five-page addendum (the "FTX Addendum") purporting to describe its claims (collectively, the "FTX Claims"). An exemplar of the FTX Proofs of Claim, including the FTX Addendum, is attached hereto as Exhibit H.

42.     The FTX Addendum groups the FTX Claims into six categories labeled A–F:

---

[22] As discussed herein, FTX also asserts claims belonging to Emergent, which it has no standing to bring, but Emergent did not file a proof of claim against BlockFi by the Bar Date.

A.   **The "Loan Claim"** – This claim alleges $279.6 million of liability against BlockFi Inc., as borrower, BlockFi Trading LLC, as guarantor, and BlockFi Lending, as guarantor, in connection with the FTX Agreement.

B.   **The "Repayment Avoidance Claim"** – FTX asserts $124,423,552 of preference liability against BlockFi Lending and $7,825,017 of preference liability against BlockFi International under section 547 and 550(a) of the Bankruptcy Code in connection with alleged repayments during the FTX Preference Period.

C.   **The "MLA Collateral Pledge Avoidance Claim"** – FTX asserts $147,755,170 of preference liability against BlockFi Lending, $24,687,432 of preference liability against BlockFi International, and $141,625,004 of preference liability against "Debtors whose identities remain unconfirmed" under section 547 and 550(a) of the Bankruptcy Code in connection with alleged collateral pledges during the FTX Preference Period.

D.   **The "Alameda and Emergent Pledge Claims"** – FTX asserts that the Alameda Pledge and Emergent Pledge are both avoidable and recoverable as preferences and fraudulent transfers under sections 547, 548 and 550(a) of the Bankruptcy Code. FTX asserts that the Alameda and Emergent Pledge Claims exceed $1 billion at the time of the transfers.

E.   **The "Exchange Withdrawal Claims"** – FTX asserts $25,000,362 of preference liability against BlockFi Lending and $3,585,787,270 of preference liability against BlockFi International under section 547 and 550(a) of the Bankruptcy Code in connection with withdrawals during the FTX Preference Period.

F.   **The "Option Agreement Claim"** – FTX asserts an unliquidated claim for damages against BlockFi Inc. and certain equity holders of BlockFi Inc. based on alleged misrepresentations and improper disclosures.

### <u>Relief Requested and Legal Basis</u>

43.    BlockFi objects to each of the FTX Claims in its entirety for the reasons set forth herein. BlockFi respectfully requests that the Court enter an order (the "<u>Proposed Order</u>") disallowing each of the FTX Claims in their entirety and expunging them from the claims register.

44.    Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party

in interest . . . objects." 11 U.S.C. § 502(a). Section 502(b) of the Bankruptcy Code provides

further, in pertinent part, that:

> if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> > (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . .

*Id.* § 502(b).

45.    When a claimant holds property of the estate, section 502(d) of the Bankruptcy

Code requires the Court to temporarily disallow any claims until after the claimant has returned

the estate's property, which is subject to turnover under section 542:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section 542 . . . of this title . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 542 . . . of this title.

*Id.* § 502(d).

46.    Under the Local Rules, "[a]n omnibus objection to claims may be filed to reduce

the amount of a claim or to modify a claim's priority status." Local Rule 3007-2.

### **BlockFi's Objections to the FTX Claims**

47.    FTX's Claims should be disallowed on one or more of the following grounds.

### A.    **Gating Issues with the FTX Claims**

48.    The FTX Claims are subject to evidentiary, procedural, and standing objections that

must be resolved before the Court can address the merits of each claim.

### i.    **FTX has Alleged Insufficient Facts to Support its Claims**

49.    The burden of proof for claims brought in the bankruptcy court under section 502(a)

of the Bankruptcy Code rests on different parties at different times. *In re Biolitec, Inc.*, Case No.

CIV. 13-5864 FSH, 2013 WL 6795400, at *3 (D.N.J. Dec. 16, 2013) (citing *In re Allegheny Int'l Inc.*, 954 F.2d 167, 173 (3d Cir. 1992)). First, the claimant must allege facts sufficient to support its claim. *Id.* If the allegations in the filed claim meet this standard, "it is '*prima facie*' valid." *Id.* "In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation." *Id.* A properly filed proof of claim is generally considered "*prima facie* evidence of the validity and the amount of the claim" but does not establish conclusive validity. *See* FED. R. BANKR. P. 3001(f).

50.    The burden then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. *Allegheny*, 954 F.2d at 173. In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the legal sufficiency of the claim. *Id.* at 173–74. If the objector meets this burden, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence; the burden of persuasion is always on the claimant. *Id.* Section 502(b)(1) "is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007).

51.    A claimant's failure to allege facts and to provide sufficient support for a claim deprives the claim of *prima facie* validity in the first place. *See, e.g.*, *In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims). "[I]n certain circumstances claims can be disallowed for failure to support the claim with sufficient evidence, even if this is not a specifically enumerated reason for disallowance under 11 U.S.C. § 502(b) . . . ." *In re Mallinckrodt Plc*, Case No. 20-12522-JTD, 2022 WL 3545583, at *4 (D. Del. Aug. 18, 2022); *see also In re O'Brien*, 440 B.R. 654, 667

(Bankr. E.D. Pa. 2010) (finding that lack of *prima facie* evidence pursuant to Bankruptcy Rule 3001(f) and failure of claimant to provide additional evidence warranted disallowance of claim).

52.     "The debtor . . . 'has no evidentiary burden to overcome' in objecting to a claim that is not *prima facie* valid." *In re Gilbreath*, 395 B.R. 356, 364 (Bankr. S.D. Tex. 2008) (citations omitted) (holding that debtors' objections alone are sufficient to shift the burden back to claimant when proof of claim had insufficient documentation).

53.     FTX submitted the FTX Addendum, and nothing more, in support of over $5 billion of claims. As a preliminary matter, the Court has no transaction data to determine whether any of the alleged payments or avoidable transfers actually occurred, whether the alleged transfers occurred during the FTX Preference Period, or the amounts of such alleged payments and transfers. Without transaction data, it is impossible to determine whether FTX can provide prima facie evidence to support a preference or fraudulent transfer with respect to any transfer, or the extent of BlockFi's purported liability (if any) with respect to such payment or transfer. FTX also asserted avoidable transfer liability in the aggregate without detailing the amounts of the underlying individual transfers, exacerbating the difficulty in evaluating the FTX Claims. Even if the complete lack of evidentiary support and paucity of information in the FTX Addendum were sufficient to carry FTX's evidentiary burden, which they are not, FTX's allegations warrant particularly harsh scrutiny and skepticism given the well-documented (and admitted) unreliability of its books and records upon which the FTX Claims are based.[23] Likewise, the Option Agreement Claim fails to cite a single purported improper disclosure or misrepresentation upon which it is based and is, therefore, completely baseless. *See, e.g.*, *Rana v. Islam*, 305 F.R.D. 53, 58 (S.D.N.Y. 2015) ("The allegations of fraud must (1) specify the statements that the plaintiff contends were fraudulent,

---

[23] *See supra* ¶ 28.

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (quotations omitted). The FTX Claims are insufficient on their face and should be disallowed in their entirety.

54.    Further, despite filing only thirty-six proofs of claim, FTX purports to assert claims on behalf of all of its 102 affiliated debtors against all nine BlockFi debtors by simply embedding language such as "any other relevant FTX Debtors," "any other Debtor," or "Debtors whose identities remain unconfirmed" within the claim summaries in the FTX Addendum. *See* FTX Addendum at 2–4. These unsupported, generic statements are insufficient to establish *prima facie* validity. FTX failed to identify claims against any BlockFi entities other than BlockFi Inc., BlockFi International, BlockFi Lending, or BlockFi Trading. FTX also only filed claims on behalf of FTX Trading, Alameda, West Realm and WRSS, and these are the only FTX debtors mentioned as having a relationship with any BlockFi Debtor in the FTX Addendum. Therefore, the Court should disallow all of FTX's claims against BlockFi Investment Products LLC, BlockFi Lending II LLC, BlockFi Services Inc., BlockFi Ventures LLC and BlockFi Wallet LLC for failure to allege any facts to support a claim against these entities. The Court should also disallow any claims purportedly asserted by any FTX Debtor other than FTX Trading, Alameda, West Realm and WRSS for failing to allege any facts to support that these other FTX debtors have a claim against any BlockFi Debtor.

### ii.    The Avoidable Transfer Claims are Procedurally Defective

55.    To establish an allowed claim based on preference or fraudulent transfer liability, FTX must obtain relief from the automatic stay in these Chapter 11 Cases and file an adversary proceeding against BlockFi to recover preferential or fraudulent transfers. *See* 11 U.S.C. § 362(a)(1); FED R. BANKR. P. 4001, 7001(1). Four of the six total FTX Claims—(i) the Repayment Avoidance Claim, (ii) the MLA Collateral Pledge Avoidance Claims, (iii) the Alameda and

Emergent Pledge Claims, and (iv) the Exchange Withdrawal Claims (collectively, the "FTX Avoidable Transfer Claims")—constitute avoidance actions which must be brought in an adversary proceeding under the Bankruptcy Rules. Yet, apart from describing the FTX Avoidable Transfer Claims in the FTX Addendum, FTX has not taken any steps to bring or prosecute these claims in accordance with the Bankruptcy Code and Bankruptcy Rules. These procedural defects are fatal and warrant disallowance of the FTX Avoidable Transfer Claims.

### iii.    FTX Lacks Standing to Bring the Emergent Pledge Claim

56.    BlockFi exercised its irrevocable power of attorney within the Emergent Pledge Agreement before the Emergent Petition Date. BlockFi is therefore the sole owner of the Robinhood Shares. As a result, FTX lacks standing to bring preference and fraudulent transfer claims related to the Robinhood Shares. *See* 11 U.S.C. §§ 547(b) (limiting preference actions to "any transfer of an interest *of the debtor* in property . . . ."); 548(a)(1) ("The trustee may avoid any transfer . . . *of an interest of the debtor in property*, or any obligation . . . *incurred by the debtor* . . . ."). Upon information and belief, BlockFi is the only secured creditor of Emergent. Emergent's chapter 11 case is being jointly administered with the FTX Chapter 11 Cases, but its estate has not been substantively consolidated with the FTX estates. *In re FTX Trading, Ltd., et al.*, Case No. 22-11068-JTD, Docket No. 1246 (Bankr. D. Del. Apr. 10, 2023).

57.    Moreover, FTX's claims to the Robinhood Shares are contingent upon multiple factors, including the outcomes of both the SBF Criminal Proceeding and the BlockFi Adversary Proceeding. Should Bankman-Fried be convicted in the SBF Criminal Proceeding, BlockFi's ownership of the Robinhood Shares can only be challenged in a subsequent government forfeiture proceeding. *See* Stipulation at 4. If Bankman-Fried is not convicted, then ownership of the Robinhood Shares must be litigated in this Court alone because the BlockFi Adversary Proceeding, which remains pending, was the first and only lawsuit commenced before the DOJ's seizure of the

Robinhood Shares and the parties' entry into the Stipulation. Thus, any claimed ownership of the Robinhood Shares by FTX is a remote contingency that bears no weight on FTX's standing to bring claims related to the Emergent Pledge at this juncture. *See, e.g.*, *In re SunEdison, Inc.*, Case No. 16-10992 (SMB), 2019 WL 2572250, at *5 (Bankr. S.D.N.Y. June 21, 2019) (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)) ("Prudential standing refers to the requirement that even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (internal quotations and citations omitted).

**B.      BlockFi's Objections to the FTX Claims on the Merits**

58.      Even if FTX somehow satisfied the gating issues for asserting claims against BlockFi at all, the FTX Claims all fail on the merits and should be disallowed.

**i.      FTX's $3.5 Billion Exchange Withdrawal Claims Fail as a Matter of Law**

59.      $3.5 billion (*i.e.*, 70%) of the $5 billion in aggregate FTX Claims are premised on the Exchange Withdrawal Claims alone. The Exchange Withdrawal Claims fail as a matter of law: FTX cannot avoid transfers of BlockFi's own property off the FTX Exchanges, regardless of whether such transfers occurred during the FTX Preference Period. *See* 11 U.S.C. § 547(b) (limiting preference actions to "any transfer of an interest *of the debtor* in property . . . ."). The FTX Terms of Service clearly state that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading . . . ." Ex. D, FTX Terms of Service § 8.2.6; *see also* Ex. E, FTX.US Terms of Service § 6. In any event, during the FTX Preference Period, BlockFi deposited almost $750 million more in assets *onto* the FTX Exchange than it withdrew.[24] At all

---

[24] *See supra*, ¶ 12 (detailing deposits).

times, these assets belonged to BlockFi, and there is no plausible preference claim for them; the

Exchange Withdrawal Claims are frivolous on their face and fail as a matter of law.

> ii.   **Alameda Cannot Carry its Burden on the Repayment Avoidance Claim, the MLA Collateral Pledge Avoidance Claim, or the Alameda Pledge**

> 1.    *The Repayment Avoidance Claim*

60.    Alameda cannot carry its burden to prove a preference with respect to the

Repayment Avoidance Claim because Alameda cannot prove that BlockFi improved its position

as a result of the repayments. *See* 11 U.S.C. § 547(b)(5). As of the FTX Petition Date, BlockFi

was oversecured by a first-priority lien in collateral that exceeded the value of any repayments.

*See, e.g.*, *In re GGI Properties, LLC*, 568 B.R. 231, 255 (Bankr. D.N.J. 2017) ("Section 547(b)(5)'s

requirement that the creditor not receive more by a prepetition transfer than it would under chapter

7 simply carries out the common sense notion that a creditor need not return a sum received from

the debtor prior to bankruptcy if the creditor is no better off vis-à-vis the other creditors of the

bankruptcy estate than he or she would have been had the creditor waited for liquidation and

distribution of the assets of the estate.") (internal quotations and citations omitted); *see also* 5

COLLIER ON BANKRUPTCY P 547.03 (16th Ed. 2023) ("Generally, payments to a fully secured

creditor will not be considered preferential because the creditor would not receive more in a

chapter 7 liquidation.").

> 2.    *The MLA Collateral Pledge Avoidance Claim*

61.    With respect to the MLA Collateral Pledge Avoidance Claim, during the FTX

Preference Period and in response to margin calls under the U.S. and International Loan

Agreement, the only collateral Alameda transferred was FTT. According to market valuations on

the FTX Petition Date, the value of BlockFi's FTT collateral alone exceeded $267 million. The

FTX Plan proposes to extinguish all FTT-based claims on the theory that FTT is equity-like and

presumably worthless now that FTX has filed chapter 11 proceedings. Ex. G at 2. In effect, FTX

seeks to impose a double standard: on one hand asserting that Alameda has a $147.7 million claim

against the BlockFi estates based on pledges of FTT, but on the other claiming that FTT is equity-

like and cannot form the basis of any claims against the FTX estates. Given that Alameda pledged

103,113,570.45 FTT—including 40,309,408.50 FTT before the FTX Preference Period—

extinguishment of FTT-based claims for anyone but FTX would have a significant adverse effect

on the pool of assets available for distribution to BlockFi's creditors.

### 3.    *The Alameda Pledge*

62.    The Alameda Pledge did not improve BlockFi's position with respect to

distributions under a hypothetical Chapter 7 liquidation of the Alameda estate. Although Alameda

pledged assets to BlockFi under the Alameda Pledge, the pledged assets were never transferred to

BlockFi.[25] *See* § 547(b)(5). The Alameda Pledge also did not constitute a fraudulent transfer.

Alameda cannot prove that it received less than reasonably equivalent value for the Alameda

Pledge because to date BlockFi has received *zero* value from any of the pledged assets. *See id.* at

§ 548(a)(1)(B)(i).

### iii.    **FTX Cannot Prove Essential Elements of a Preference or Fraudulent Transfer with Respect to the Emergent Pledge**

63.    Like the Alameda Pledge, FTX cannot prove an essential element of a preference

with respect to the Emergent Pledge because neither pledge put BlockFi in a better position than

it would have been under a Chapter 7 liquidation of the Emergent estate. *See* 11 U.S.C. § 547(b)(5).

To the extent FTX asserts that the Emergent Pledge constituted a fraudulent transfer, it cannot be

---

[25] *See, e.g.*, Disclosure Statement at 6 ("The Alameda Pledge Agreement is secured by Alameda's rights, titles, and interests in, among other things, Alameda's shares of Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum Trust (ETHE) and shares of the Bitwise 10 Crypto Index Fund (BITW). Pursuing this collateral will be difficult and will require significant institutional knowledge and expertise. In a liquidation, [BlockFi] do[es] not believe that a trustee would be successful in recovering this collateral and balances have been assumed to be recoverable at 0%.").

established that Emergent received less than reasonably equivalent value because, to date, BlockFi

has received *zero* value due to the DOJ seizure. *See id.* at § 548(a)(1)(B)(i). Further, as discussed,

preference and fraudulent transfer liability extend only to property of the debtor's estate, but FTX

does not own the Robinhood Shares.[26] For these reasons, the Emergent Pledge claims fail and

should be disallowed.

### iv.    FTX Agreed to Subordinate the Loan Claim, and the Loan Claim and Option Agreement Claim Stem From an Equity Transaction

64.     FTX's Loan Claim should be rejected. Under no circumstances can FTX recover

on such a claim until BlockFi customers recover in full, and even then, FTX still cannot recover

on such a claim.

65.     First, FTX agreed to contractually subordinate all claims under the FTX Agreement

to those of BlockFi's clients. FTX Agreement § 2.5. FTX agreed to contractually subordinate such

claims for a straightforward reason: FTX was making an equity investment in BlockFi as a going

concern and equity always follows after debt.

66.     Second, the Loan Claim and Option Agreement Claim stem from an equity

transaction that does not entitle FTX to a refund. Under Third Circuit precedent, the intent of the

parties regarding the nature of a transaction as debt or equity may be inferred from (i) what the

parties say in their contracts, (ii) what the parties do through their actions, and (iii) the economic

reality of the surrounding circumstances. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 456 (3d

Cir. 2006). The FTX Agreement and Option Agreement reflect an equity, not a debt, transaction,

and FTX has not (and will not) be able to proffer any admissible evidence suggesting the contrary.

---

[26] According to SEC Schedule 13D Emergent filed on or about May 12, 2022, the owner of the approximate 56 million shares of common stock of Robinhood Markets, Inc. was Emergent. Ex. I. The Schedule also lists Ryne Miller, the general counsel of several of the FTX Debtors, as the person authorized to receive notices and communications.

67. FTX entered into the FTX Agreement contemporaneously with the Option Agreement. The FTX Agreement was not structured like a typical $400 million loan. It was unsecured, had a 5–year term, had a well-below-market-interest rate, and provided that no interest or principal payments were due until maturity. Given its need to shore up potential liquidity demands and the state of the cryptocurrency industry in general as of June 30, 2022, both of which were known to FTX, BlockFi was unable to secure similar terms from any other party. The parties viewed this as an equity-purchase transaction, rather than an unsecured loan. FTX funded $275 million of its $400 million purchase price but failed to fund the remainder before it filed bankruptcy. The $275 million represents a partial purchase price or capital contribution, which is non-refundable and BlockFi is not liable to repay.

68. FTX's actions and the economic reality of the surrounding circumstances demonstrate that the true nature of the FTX Agreement. FTX's unsecured, interest-deferred, subordinated "loan" to BlockFi was, in reality, a gamble that the up to $400 million cash infusion would sustain BlockFi until the crypto markets stabilized, at which time FTX would exercise its right to purchase BlockFi's equity under the Option Agreement and, presumably, see a return on its investment. At the time of the FTX Agreement, two options were reasonably foreseeable: (1) FTX would exercise its option and acquire BlockFi, in which case capital made available to BlockFi would become an intercompany book entry; or (2) BlockFi would not ultimately survive, in which case customers would not recover 100% and the capital made available in the interim would not be repaid. The outcome that was *not* reasonably foreseeable at the time of the FTX Agreement was the "loan" remaining, accruing interests for a five-year period, and then being repaid—because this was an equity investment. Just because FTX's fraudulent actions caused

FTX's bet to fail does not mean BlockFi's creditors are now somehow liable to refund the purchase price.

     v.        **Alameda's Liability to BlockFi Sets Off the Entirety of Alameda's Claims**

    69.    Moreover, the FTX estates owe the BlockFi estates far more than the aggregate value of the FTX Claims. The bulk of the FTX Claims, even if valid, comprise Exchange Withdrawals valued at approximately $3.5 billion, which are completely offset by BlockFi's contemporaneous deposits made during the Preference Period, valued at over $4.3 billion. The FTX Claims also include a $560 million avoidance action regarding the Emergent Pledge, which, as noted, FTX has no standing to assert given that it does not own the Robinhood Shares. Accordingly, after appropriately discounting the FTX Claims by $4.2 billion in connection with the Exchange Withdrawals and the Robinhood Shares, FTX has asserted claims against the BlockFi estates for roughly $1 billion.

    70.    On the other hand, BlockFi's claims against FTX easily exceed $1.1 billion. BlockFi has legitimate claims for (i) turnover of its digital assets frozen on the FTX Exchanges and (ii) return of the digital assets borrowed under the Alameda Loan.[27] Using current pricing, the value of the Alameda Loan Assets alone exceeds $1.1 billion. Thus, any Allowed claim that the FTX estates could potentially have against BlockFi is subject to setoff pursuant to applicable law and the terms of the agreements between the parties. *See* 11 U.S.C. § 558. The Bankruptcy Code also requires the Court to disallow such claims temporarily until FTX returns any and all digital assets that constitute property of BlockFi's estates. *See id.* at § 502(d) (stating that "the court ***shall*** disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title . . . unless such entity . . . has paid the amount, or turned over any such property,

---

[27] *See supra* ¶ 14.

for which such entity . . . is liable . . . .") (emphasis added). As stated, neither FTX nor Alameda

has returned any of BlockFi's property and, until they do, their claims should be disallowed as a

matter of law.

## C.      BlockFi's Defenses to the FTX Claims

71.      The FTX Claims as pled lack sufficient detail and evidentiary support to warrant

allowance by this Court. However, even if FTX was able to provide additional documentation and

information to give the FTX Claims *prima facie* validity, BlockFi has multiple substantive

defenses under the Bankruptcy Code to successfully defend against the FTX Claims. These

defenses[28] include but are not limited to: the right to setoff under Section 558, preference defenses

under Section 547, fraudulent-transfer defenses under Section 548, and the safe-harbor defense

under Section 546(e).

72.      BlockFi may also utilize state law defenses against the FTX Claims. State law

defenses inure to the benefit of the estate under section 558 of the Bankruptcy Code. *See id.* at

§ 558. This Court has grounds to disallow the FTX Claims, including the preference and

fraudulent-transfer actions, under the doctrine of unclean hands and *in pari delicto*. *See In re Philip

Services (Delaware), Inc.*, 267 B.R. 62, 70–71 (Bankr. D. Del. 2001) (observing that section 547(c)

does not provide the exclusive defenses to a preference action).

### i.      Unclean Hands

73.      The unclean hands doctrine is "derived from the unwillingness of a court, originally

and still nominally one of conscience, to give its peculiar relief to a suitor who in the very

controversy has so conducted himself as to shock the moral sensibilities of the judge." *Gaudiosi*

---

[28] The list of defenses provided is non-exhaustive and BlockFi reserves all rights to assert additional defenses against
the FTX Claims as appropriate.

*v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959). Under Third Circuit law, a party seeking to invoke

the doctrine of unclean hands must show that (1) the party seeking equitable relief committed an

unconscionable act, and (2) the act is related to the claim upon which equitable relief is sought.

*Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 Fed. Appx. 147, 150 (3d Cir. 2019). For the

unclean hands doctrine to apply, "there must be a relationship between the inequitable conduct and

the claims brought before the court." *Id.* at 151.

74.     By filing the FTX Proofs of Claim, FTX submitted to the equitable jurisdiction of

this Court and consented to this Court's adjudication of its claims. *See Langenkamp*, 498 U.S. at

45; *In re Tarragon Corp.*, 2009 WL 2244598, at *6. FTX's openly admitted fraud and other

inequitable conduct forced FTX and BlockFi into bankruptcy and (to date) robbed BlockFi of over

a billion of dollars' worth property due to, among other things, the DOJ seizure, FTX's

commingling of customer assets, and outright theft by FTX. Now FTX seeks to recover on over

$5 billion of claims filed against the BlockFi estates at the direct expense of the ultimate victims

of FTX's fraud: BlockFi's clients and other legitimate creditors. To prevent further injustice to the

creditors of BlockFi's estates, the Court should disallow the FTX Claims under the doctrine of

unclean hands.

**ii.      *In Pari Delicto***

75.     Similar to unclean hands, the doctrine of *in pari delicto* refers to "[t]he principle

that a plaintiff who has participated in wrongdoing may not recover damages resulting from the

wrongdoing." *In re Oakwood Homes Corp.*, 356 Fed. Appx. 622, 626 (3d Cir. 2009) (citing Black's

Law Dictionary (8th ed. 2004)); *see also Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S.

299, 306–18 (1985) ("In a case of equal or mutual fault . . . the position of the [defending] party . . .

is the better one."). The defense premised on the reality ***that denying judicial relief to an admitted***

***wrongdoer is an effective means of deterring illegality****. Id.* at 306 (footnotes omitted) (emphasis

added).

76.     Courts have relied on *in pari delicto* to disallow the claims of claimants who

misused customer funds, just as FTX did here. *See, e.g.*, *In re MF Glob. Holdings Ltd. Inv. Litig.*

*(DeAngelis v. Corzine)*, 611 Fed. Appx. 34, 37 (2d Cir. 2015) (affirming denial of claims on

grounds that "misuse of customer funds" was "sufficiently linked" to auditing failures: "but for

MFGI's wrongful conduct, there would have been no violations of Section 4d or Regulation 30.7

for PwC to prevent."). But for FTX's illegal, fraudulent scheme, BlockFi (and many other crypto

companies) would not be in bankruptcy or at least would have more assets to distribute for the

benefit of its clients. FTX's claims should also be disallowed under the doctrine of *in pari delicto*.

**D.      In the Alternative, this Court should Equitably Subordinate the FTX Claims**

77.     In the event the Court finds that FTX has alleged sufficient facts to pursue one or

more if its claims, and in additional to the applicable contractual subordination for certain FTX

claims, any allowed claim(s) should be equitably subordinated pursuant to section 510(c) of the

Bankruptcy Code. The doctrine of equitable subordination is an "equitable power that a bankruptcy

court may employ to rearrange the priorities of creditors' interests and to place all or part of a

wrongdoer's claim in an inferior status, in order to achieve a just result." *LightSquared LP v. SP*

*Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014).

Pursuant to section 510(c) of the Bankruptcy Code, the Court may:

> (1) under principles of equitable subordination, subordinate for purposes of
> distribution all or part of an allowed claim to all or part of another allowed claim or
> all or part of an allowed interest to all or part of another allowed interest; or (2) order
> that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). Thus, Bankruptcy Code section 510(c) permits a bankruptcy court to

subordinate the claim of a wrongdoer to those of other creditors where it would be unjust or unfair

to permit the wrongdoer to share pro rata with other creditors of equal status. *In re LightSquared Inc.*, 511 B.R. 253 (Bankr. S.D.N.Y. 2014). Under Third Circuit precedent, courts may subordinate a claim if three conditions are met: (i) the claimant engaged in inequitable conduct, (ii) the misconduct resulted in injury to other creditors, and (iii) equitable subordination is not inconsistent with the Bankruptcy Code. *See Citicorp Venture Capital v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986–87 (3d Cir. 1998).[29]

78.    FTX's nefarious fraud far exceeded inequity, reaching heights of admitted criminality by three of its executives (so far) and myriad pending criminal charges against its disgraced former CEO Bankman-Fried. FTX's pervasive fraud ultimately caused its own bankruptcy filing, the DOJ seizure of Robinhood Shares and other assets, and significant contagion in the cryptocurrency markets that injured BlockFi and potentially millions of others. But for FTX's fraud, BlockFi would be oversecured with respect to the Alameda Loan because it had at least a 140% margin requirement at all relevant times. To the extent BlockFi is unsecured with respect to the Alameda Loan (and thus subject to FTX's preference and fraudulent-transfer actions), BlockFi is unsecured solely as a result of FTX's fraud, which constitutes sufficient grounds for equitably subordinating the FTX Claims to those of BlockFi's clients. *See* 11 U.S.C. § 510(c); *In re NJ Affordable Homes Corp.*, Case No. 05-60442 (DHS), 2013 WL 6048836, at *45 (Bankr. D.N.J. Nov. 8, 2013) (defining inequitable conduct to include fraud, illegality, and breach of fiduciary duties, among other things).

---

[29] The Third Circuit observed that the third condition is merely a "reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable." *Id.* at 990. Such circumstances are inapplicable here.

**Reservation of Rights**

79.     The Debtors reserve their rights to object to any claim by FTX on any ground.

Nothing contained in this Objection or any actions taken pursuant to any order granting the relief

requested by this Objection is intended or should be construed as: (a) an admission as to the validity

of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any

particular claim on any grounds, including the Surviving Claim, (c) a promise or requirement to

pay any particular claim, (d) an implication or admission that any particular claim is of a type

specified or defined in this Objection or any order granting the relief requested by this Objection,

(e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365

of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy

Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual,

common law, statutory, or otherwise) satisfied pursuant to the Objection are valid, and the Debtors

expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all

such liens. If the Court grants the relief sought herein, any transfer made pursuant to the Court's

order is not intended and should not be construed as an admission as to the validity of any particular

claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Separate Contested Matters**

80.     Each of the Disputed Claims constitutes a separate contested matter pursuant to

Bankruptcy Rule 9014. The Debtors respectfully request that any order entered by the Court with

respect to an objection asserted in this Objection be deemed a separate order with respect to each

of the Disputed Claims.

## Waiver of Memorandum of Law

81.    The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Objection does not raise any novel issues of law.

## No Prior Request

82.    No prior request for the relief sought in this Objection has been made to this Court or any other court.

## Notice

83.    The Debtors will provide notice of this Objection to the following parties and/or their respective counsel, as applicable: (a) the office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102; (b) the United States Attorney's Office for the District of New Jersey; (c) the Internal Revenue Service; (d) the attorneys general in the states where the Debtors conduct their business operations; (e) counsel for the Committee; (f) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (g) the claimant(s) listed on Schedule 1 attached to the Proposed Order (collectively, the "Notice Parties"). The Debtors submit that, in view of the facts and circumstances, such notice is sufficient, and no other or further notice need be provided.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, the Debtors respectfully request entry of the Proposed Order granting the

relief requested herein and such other and further relief as the Court may deem just and appropriate.

Respectfully Submitted,

Dated: August 21, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

**Exhibit A**

**Certification of Zachary L. Prince**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

---

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

## CERTIFICATION OF ZACHARY L. PRINCE IN SUPPORT
## OF DEBTORS' NINTH OMNIBUS OBJECTION TO THE FTX CLAIMS
**(books and records, amendments, duplicates, incorrect/improper classification,
insufficient documentation, not liable, late filed)**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

I, Zachary L. Prince, pursuant to 28 U.S.C. § 1746, declare:

1.      My name is Zachary L. Prince. I am over the age of 21. I am the Chief Executive Officer for the debtors and debtors in possession (collectively, "BlockFi" or the "Debtors") in the above-captioned Chapter 11 Cases. Accordingly, I am in all respects competent to make this certification (the "Certification").

2.      I submit this Certification in support of the *Debtors' Ninth Omnibus Objection to the FTX Claims* (the "Objection") filed contemporaneously herewith.

3.      Except as otherwise indicated herein, the facts set forth in this Certification are based upon my personal knowledge, my review of relevant documents, information provided to me by the professionals in this case and/or employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations. I am authorized to submit this Certification on the Debtors' behalf. If called upon to testify, I would testify competently to the facts set forth in this Certification.

84.      I have read and reviewed the Objection, including the information regarding the Disputed Claims[2] set forth on Schedule 1 to the Proposed Order attached thereto, and I am familiar with the information contained in those documents. In consultation with the Debtors' advisors, I have concluded that the Disputed Claims are claims that are (a) asserted in amounts that do not match the Debtor's books and records, (b) unliquidated, (c) duplicative, (d) incorrectly or improperly classified (asserted against the wrong debtor entity), (e) asserted on an unclear basis, and/or (f) seeking amounts for which the Debtors are not liable.

---

[2] Capitalized terms used but not defined in this Certification shall have the meanings set forth in the Objection.

4.      Accordingly, to prevent improper recovery against the estates, I believe that the
Proposed Order should be granted and that each such Disputed Claims should be disallowed, as
detailed on <u>Schedule 1</u>.


I hereby declare under the penalty of perjury that the foregoing is true and correct.


Executed on <u>August 21, 2023</u>          By:    <u>/s/ *Zachary L. Prince*</u>

3

**<u>Exhibit B</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

In re:

BLOCKFI INC., *et al.*,

    Debtors.[1]

Chapter 11
Case No. 22-19361 (MBK)
(Jointly Administered)
**Hearing Date and Time:**
**September 20, 2023 at 10:00 AM (ET)**

## ORDER GRANTING DEBTORS'
## NINTH OMNIBUS OBJECTION TO THE FTX CLAIMS
### (books and records, unliquidated, duplicates, incorrect/improper
### classification, insufficient documentation, not liable)

The relief set forth on the following pages numbered two (2) through five (5) and on

Schedule 1 is **ORDERED**.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

(Page 2)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' NINTH OMNIBUS OBJECTION TO THE FTX CLAIMS (books and records, unliquidated, duplicates, incorrect/improper classification, insufficient documentation, not liable) |

Upon consideration of the *Debtors' Ninth Objection to Certain Claims* (the "Objection")[1]; and the Court having jurisdiction to consider the Objection and the relief requested therein pursuant to 28 U.S.C. § 157 and Standing Order 12-1 (Simandle, C.J.), *Standing Order of Reference to the Bankruptcy Court Under Title 11*, dated September 18, 2012; and consideration of the Objection and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Objection having been provided; and it appearing that no other or further notice need be provided; and it appearing that no other or further notice of the Objection need be provided; and all responses, if any, to the Objection having been withdrawn, resolved, or overruled; and the Court having found and determined that the relief sought in the Objection is in the best interests of the Debtors, their respective estates and creditors, and all parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Objection establish just cause for the relief granted herein; and upon the Certification of Zachary L. Prince attached to the Objection, the record herein, and all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Objection is SUSTAINED as set forth herein.

2.      The Disputed Claims listed on Schedule 1 attached hereto are hereby deemed disallowed.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

2

(Page 3)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' NINTH OMNIBUS OBJECTION TO THE FTX CLAIMS (books and records, unliquidated, duplicates, incorrect/improper classification, insufficient documentation, not liable) |

3.     Kroll Restructuring Administration LLC (the "Claims and Noticing Agent") is hereby authorized and directed to disallow each Disputed Claim on Schedule 1.

4.     To the extent a Disputed Claim on Schedule 1 improperly asserted priority or secured status, the Claims and Noticing Agent is hereby authorized and directed to correct the registry to reflect the correct status of such Disputed Claims as general unsecured claims.

5.     To the extent a Disputed Claim on Schedule 1 was asserted against the incorrect Debtor entity, the Claims and Noticing Agent is hereby authorized and directed to correct the registry to reflect the correct Debtor entity.

6.     The Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

7.     The terms, conditions, and provisions of this Order shall be immediately effective and enforceable upon its entry.

8.     Notwithstanding anything to the contrary in the Objection, this Order, or any findings announced at the hearing, nothing in the Objection, this Order, or announced at the hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

9.     Nothing contained in this Objection or any actions taken pursuant to any order granting the relief requested by this Objection is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any

(Page 4)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' NINTH OMNIBUS OBJECTION TO THE FTX CLAIMS (books and records, unliquidated, duplicates, incorrect/improper classification, insufficient documentation, not liable) |

particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Objection are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any transfer made pursuant to the Court's Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

10.     The objection to each Disputed Claim addressed in the Objection and as set forth on <u>Schedule 1</u> attached hereto constitutes a separate contested matter as contemplated by Bankruptcy Rule 9014. This Order shall be deemed a separate order with respect to each claim that is the subject of the Objection and this Order. Any stay of this Order pending appeal by any claimants whose claims are subject to this Order shall only apply to the contested matter that involves such claimant and shall not stay the applicability and/or finality of this Order with respect to any other contested matters addressed in the Objection and this Order.

11.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Objection or is otherwise waived.

(Page 5)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' NINTH OMNIBUS OBJECTION TO THE FTX CLAIMS (books and records, unliquidated, duplicates, incorrect/improper classification, insufficient documentation, not liable) |

12.     This Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation, interpretation, or enforcement of this Order.

**<u>Schedule 1</u>**

**Disputed Claims**

**Debtor: BlockFi Inc *et al.*

Ninth Omnibus Objection**

**Legend: Basis for Objection**

| | | | |
|---|---|---|---|
| BR-NI | Claimant is not identifiable as a customer or counterparty of BlockFi | TOU | Claim includes amounts in violation of Terms of Use, including fraud or disabled account |
| BR - A | Inconsistent with Books and Records - Incorrect Crypto Amount, Correct Dollar Amount | IC | Claims are classified incorrectly or improperly |
| BR - B | Inconsistent with Books and Records - Incorrect Dollar Amount, Correct Crypto Amount | ID | Claims fail to specify the basis for claim or provide sufficient documentation |
| BR - C | Inconsistent with Books and Records - Incorrect Dollar and Crypto Amount | NL | Seeks recovery for amounts for which the Debtors are not liable |
| UL | Claims fail to specify the asserted claim amount or list 'unliquidated' | NDF | Non-debtor has satisfied the claim in full |
| AMD | Claim amended by subsequently filed proof of claim | L | Late filed claim after bar date |
| DUP | Duplicative claim | O | Other; see Notes for more information |

| Filed Claim | | | | | | Surviving Claim | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Proof of Claim No. | Claimant Name | Date Filed | Filed Debtor Entity | Asserted Claim Amount | Basis for Objection | Surviving Claim No. | Estate - Debtor Entity | Estate - Surviving Claim Amount | Wallet - Debtor Entity | Wallet Coins - Surviving Claim Amount [1] | Notes | Action [2] |
| 26377 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15205 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Wallet LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15580 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Investment Products LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26429 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Trading LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15204 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Ventures LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26386 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Services Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15612 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15184 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi International Ltd. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26360 | Alameda Research Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending II LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26962 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26006 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Wallet LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26067 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Investment Products LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |

[1] Claims that did not assert Wallet as part of their proof of claim may still have Wallet balances but may be listed as "N/A" to this particular claim.

[2] Claims that the Debtors are seeking to modify are subject to future objection.

**Legend: Basis for Objection**

| | | | |
|---|---|---|---|
| BR-NI | Claimant is not identifiable as a customer or counterparty of BlockFi | TOU | Claim includes amounts in violation of Terms of Use, including fraud or disabled account |
| BR - A | Inconsistent with Books and Records - Incorrect Crypto Amount, Correct Dollar Amount | IC | Claims are classified incorrectly or improperly |
| BR - B | Inconsistent with Books and Records - Incorrect Dollar Amount, Correct Crypto Amount | ID | Claims fail to specify the basis for claim or provide sufficient documentation |
| BR - C | Inconsistent with Books and Records - Incorrect Dollar and Crypto Amount | NL | Seeks recovery for amounts for which the Debtors are not liable |
| UL | Claims fail to specify the asserted claim amount or list 'unliquidated' | NDF | Non-debtor has satisfied the claim in full |
| AMD | Claim amended by subsequently filed proof of claim | L | Late filed claim after bar date |
| DUP | Duplicative claim | O | Other; see Notes for more information |

| Filed Claim | | | | | Basis for Objection | Surviving Claim | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Proof of Claim No. | Claimant Name | Date Filed | Filed Debtor Entity | Asserted Claim Amount | | Surviving Claim No. | Estate - Debtor Entity | Estate - Surviving Claim Amount | Wallet - Debtor Entity | Wallet Coins - Surviving Claim Amount [1] | Notes | Action [2] |
| 26003 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Trading LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26059 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Ventures LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26070 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Services Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26005 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26063 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi International Ltd. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 14971 | FTX Trading Ltd. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending II LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 25986 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26060 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Wallet LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26068 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Investment Products LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26004 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Trading LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26064 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Ventures LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 14607 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Services Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15818 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26066 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi International Ltd. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |

[1] Claims that did not assert Wallet as part of their proof of claim may still have Wallet balances but may be listed as "N/A" to this particular claim.

[2] Claims that the Debtors are seeking to modify are subject to future objection.

**Legend: Basis for Objection**

| | | | |
|---|---|---|---|
| BR-NI | Claimant is not identifiable as a customer or counterparty of BlockFi | TOU | Claim includes amounts in violation of Terms of Use, including fraud or disabled account |
| BR - A | Inconsistent with Books and Records - Incorrect Crypto Amount, Correct Dollar Amount | IC | Claims are classified incorrectly or improperly |
| BR - B | Inconsistent with Books and Records - Incorrect Dollar Amount, Correct Crypto Amount | ID | Claims fail to specify the basis for claim or provide sufficient documentation |
| BR - C | Inconsistent with Books and Records - Incorrect Dollar and Crypto Amount | NL | Seeks recovery for amounts for which the Debtors are not liable |
| UL | Claims fail to specify the asserted claim amount or list 'unliquidated' | NDF | Non-debtor has satisfied the claim in full |
| AMD | Claim amended by subsequently filed proof of claim | L | Late filed claim after bar date |
| DUP | Duplicative claim | O | Other; see Notes for more information |

| Filed Claim | | | | | Basis for Objection | Surviving Claim | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Proof of Claim No. | Claimant Name | Date Filed | Filed Debtor Entity | Asserted Claim Amount | | Surviving Claim No. | Estate - Debtor Entity | Estate - Surviving Claim Amount | Wallet - Debtor Entity | Wallet Coins - Surviving Claim Amount [1] | Notes | Action [2] |
| 15191 | West Realm Shires Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending II LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26342 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15206 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Wallet LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26325 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Investment Products LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 14810 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Trading LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26280 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Ventures LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26313 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Services Inc. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26268 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 26319 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi International Ltd. | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |
| 15595 | West Realm Shires Services Inc. on behalf of all FTX Debtors | 3/31/2023 | BlockFi Lending II LLC | Unliquidated/contingent | BR-C, UL, DUP, IC, ID, NL | N/A | N/A | N/A | | | | Expunge |

[1] Claims that did not assert Wallet as part of their proof of claim may still have Wallet balances but may be listed as "N/A" to this particular claim.

[2] Claims that the Debtors are seeking to modify are subject to future objection.

**<u>Exhibit C</u>**

**Claims Procedures Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)
COLE SCHOTZ P.C.
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

HAYNES AND BOONE, LLP
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*



**Order Filed on March 13, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

In re:

BLOCKFI INC., *et al*.,

    Debtors.[1]

Chapter 11
Case No. 22-19361 (MBK)
(Jointly Administered)
**Hearing Date and Time:
March 13, 2023 at 10:00 a.m. (ET)**

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF
AN ORDER (A) APPROVING THE (I) OMNIBUS CLAIMS OBJECTION
PROCEDURES AND FORM OF NOTICE, (II) OMNIBUS SUBSTANTIVE
CLAIMS OBJECTIONS, AND (III) SATISFACTION PROCEDURES AND
FORM OF NOTICE, (B) WAIVING BANKRUPTCY RULE 3007(e), AND
(C) GRANTING RELATED RELIEF**

**DATED: March 13, 2023**

Honorable Michael B. Kaplan
United States Bankruptcy Judge

(Page 2)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE (I) OMNIBUS CLAIMS OBJECTION PROCEDURES AND FORM OF NOTICE, (II) OMNIBUS SUBSTANTIVE CLAIMS OBJECTION, AND (III) SATISFACTION PROCEDURES AND FORM OF NOTICE, (B) WAIVING BANKRUPTCY RULE 3007(e), AND (C) GRANTING RELATED RELIEF |

The relief set forth on the following pages, numbered three (3) through seven (7) is

**ORDERED**.

(Page 3)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE (I) OMNIBUS CLAIMS OBJECTION PROCEDURES AND FORM OF NOTICE, (II) OMNIBUS SUBSTANTIVE CLAIMS OBJECTION, AND (III) SATISFACTION PROCEDURES AND FORM OF NOTICE, (B) WAIVING BANKRUPTCY RULE 3007(e), AND (C) GRANTING RELATED RELIEF |

Upon consideration of the *Debtors' Motion for Entry of an Order (A) Approving (I) Omnibus Claims Objection Procedures and Form of Notice, (II) Omnibus Substantive Claims Objections, and (III) Satisfaction Procedures and Form of Notice, (B) Waiving Bankruptcy Rule 3007(e), and (C) Granting Related Relief* (the "Motion")[1]; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 157 and Standing Order 12-1 (Simandle, C.J.), *Standing Order of Reference to the Bankruptcy Court Under Title 11*, dated September 18, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and it appearing that no other or further notice of the Motion need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and all objections, if any, to the Motion having been withdrawn, resolved, or overruled; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their respective estates and creditors, and all parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the First Day Declaration, the record of the Hearing, and all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(Page 4)

Debtors:                    BLOCKFI INC., *et al.*

Case No.:                   22-19361 (MBK)

Caption of Order:           ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN
                            ORDER (A) APPROVING THE (I) OMNIBUS CLAIMS OBJECTION
                            PROCEDURES AND FORM OF NOTICE, (II) OMNIBUS
                            SUBSTANTIVE CLAIMS OBJECTION, AND (III) SATISFACTION
                            PROCEDURES AND FORM OF NOTICE, (B) WAIVING
                            BANKRUPTCY RULE 3007(e), AND (C) GRANTING RELATED
                            RELIEF

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, and pursuant to Bankruptcy Rule 3007(c), the Debtors may file Omnibus Objections that include objections to Claims (including requests for payment of Administrative Claims) on any basis provided for in Bankruptcy Rule 3007(d) and/or the Additional Grounds.

3.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the Debtors may object to more than 100 Claims in a single Omnibus Objection on any of the bases set forth in Bankruptcy Rule 3007(d) and/or the Additional Grounds.

4.      The Debtors may file and prosecute any Omnibus Objections in accordance with the Objection Procedures attached hereto as **Exhibit 1**, which are approved, and the other procedural safeguards set forth in Bankruptcy Rule 3007(e) except as stated in the preceding paragraph. The Debtors may include scheduled Claims in Omnibus Objections.

5.      The form of Objection Notice attached hereto as **Exhibit 2** is approved. The Debtors are authorized to send Objection Notices via first-class mail or electronic mail, as applicable, in accordance with the Objection Procedures.

6.      The Satisfaction Procedures attached hereto as **Exhibit 3** are approved.

7.      The form of Notice of Satisfaction attached hereto as **Exhibit 4** is approved. The Debtors are authorized to mail or email Notices of Satisfaction via first-class mail or electronic

(Page 5)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE (I) OMNIBUS CLAIMS OBJECTION PROCEDURES AND FORM OF NOTICE, (II) OMNIBUS SUBSTANTIVE CLAIMS OBJECTION, AND (III) SATISFACTION PROCEDURES AND FORM OF NOTICE, (B) WAIVING BANKRUPTCY RULE 3007(e), AND (C) GRANTING RELATED RELIEF |

mail in accordance with the Satisfaction Procedures that notify certain claimants of the Debtors' belief that those Claims have been satisfied in full and will be expunged from the Claims Register absent a timely response from the Claim holder. If no response is received timely from the recipient of the Notice of Satisfaction, the Debtors or the Claims and Noticing Agent acting on the Debtors' behalf are authorized to expunge such Claim from the Claims Register and such recipient shall not be treated as a creditor with respect to the Claim for purposes of distribution.

8. The Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

9. The terms, conditions, and provisions of this Order shall be immediately effective and enforceable upon its entry.

10. Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the hearing, nothing in the Motion, this Order, or announced at the hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

11. Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular

(Page 6)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE (I) OMNIBUS CLAIMS OBJECTION PROCEDURES AND FORM OF NOTICE, (II) OMNIBUS SUBSTANTIVE CLAIMS OBJECTION, AND (III) SATISFACTION PROCEDURES AND FORM OF NOTICE, (B) WAIVING BANKRUPTCY RULE 3007(e), AND (C) GRANTING RELATED RELIEF |

claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any transfer made pursuant to the Court's Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

12.     For the avoidance of doubt, in the event that BlockFi International Ltd. enters into a full liquidation proceeding in Bermuda such that a separate adjudication process becomes necessary, notwithstanding anything contained herein, holders of Claims against BlockFi International Ltd. shall not be barred from asserting such Claims against BlockFi International Ltd. in such liquidation proceedings without further order of the Supreme Court of Bermuda.

13.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or is otherwise waived.

14.     This Court shall retain jurisdiction with respect to all matters arising from or related

(Page 7)

| | |
|---|---|
| Debtors: | BLOCKFI INC., *et al.* |
| Case No.: | 22-19361 (MBK) |
| Caption of Order: | ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE (I) OMNIBUS CLAIMS OBJECTION PROCEDURES AND FORM OF NOTICE, (II) OMNIBUS SUBSTANTIVE CLAIMS OBJECTION, AND (III) SATISFACTION PROCEDURES AND FORM OF NOTICE, (B) WAIVING BANKRUPTCY RULE 3007(e), AND (C) GRANTING RELATED RELIEF |

to the implementation, interpretation, or enforcement of this Order.

# Exhibit 1

## Objection Procedures

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

## PROCEDURES FOR FILING AND SERVING OMNIBUS CLAIMS OBJECTIONS

On [__], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered its *Order Granting Debtors' Motion for Entry of an Order (A) Approving (I) Omnibus Claims Objection Procedures and Form of Notice, (II) Omnibus Substantive Claims Objections, and (III) Satisfaction Procedures and Form of Notice, (B) Waiving Bankruptcy Rule 3007(e), and (C) Granting Related Relief* [Docket No. [__]] (the "Order")[2] in the Chapter 11 Cases of the above-captioned debtors (collectively, the "Debtors"). Among other things, the Order approved these omnibus objection procedures.

### Omnibus Objections

1.    <u>Grounds for Omnibus Objections</u>. In addition to those grounds expressly set forth in Bankruptcy Rule 3007(d), the Debtors may file omnibus objections (each, an "Omnibus Objection") to Claims on the grounds that such Claims, in part or in whole:

    a.    are inconsistent with the Debtors' books and records;

    b.    fail to specify the asserted Claim amount (or only list the claim amount as "unliquidated");

    c.    fail to sufficiently specify the basis for the Claim or provide sufficient supporting documentation in support of such Claim; *provided, however* that the Debtors shall be required to submit at least one request for additional information to the claimant prior to objecting on this ground;

    d.    seek recovery of amounts for which the Debtors are not liable;

    e.    are classified incorrectly or improperly;

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[2] Capitalized terms used but not defined herein have the meanings given to them in the Order.

      f.      are disallowed pursuant to section 502 of the Bankruptcy Code;

      g.      has been satisfied in full by a party that is not a Debtor;

      h.      are subject to satisfaction by one or more of the Debtors' insurers with a legal obligation to satisfy such Claims as determined by an order of this Court or other court of competent jurisdiction;

      i.      has been withdrawn formally by the claimant pursuant to either a pleading or an order of the Court; and

      j.      the Claims include amounts requested in violation of the Terms of Use.

2.    <u>Form of Omnibus Objection</u>. Each Omnibus Objection will be numbered consecutively regardless of basis.

3.    <u>Supporting Documentation</u>. To the extent appropriate, an affidavit or declaration may be provided in connection with an Omnibus Objection from a party with knowledge of the Debtors' books and records and the manner in which they are maintained that states that such party has reviewed the Claims included therein and applicable supporting information and documentation provided therewith, made reasonable efforts to research the Claim on the Debtors' books and records, and determined that the books and records do not reflect the debt or the amount of debt that is alleged in the Claim.

4.    <u>Claims Exhibits</u>. An exhibit or exhibits listing the Claims that are subject to the particular Omnibus Objection will be attached thereto. Each exhibit will include only the Claims for which there is a common basis for the objection. Claims that have more than one basis for objection may appear on only one exhibit with reference to all of the bases for objecting to the Claims. The Debtors' right to object to a Claim on an additional basis or bases will not be waived if such Claim has been included on an exhibit to either a previous or the same Omnibus Objection. The exhibits will include the following information and will be alphabetized based claimant:

      a.      the Claims that are the subject of the Omnibus Objection and, if applicable, the Proof of Claim number(s) or schedule number(s) related thereto from the Claims Register without disclosing personally identifiable information;

      b.      the asserted amount of the Claim, if applicable;

      c.      the grounds for the Omnibus Objection;

      d.      a cross-reference to the section in the Omnibus Objection discussing such Claim; and

      e.      other information, as applicable, including (i) the proposed classification of Claims the Debtors seek to reclassify, (ii) the reduced Claim amount(s) of Claims the Debtors seek to reduce, or (iii) the surviving Claims, if any, of groups of Claims the Debtors seek to expunge.

5.    Objection Notice. An objection notice, substantially in the form attached to the Order as Exhibit 2 (the "Objection Notice") and containing all information included in the standard form pursuant to Local Rule 3007-2, will accompany each Omnibus Objection to address a particular creditor, Claim, or objection and will include the following:

      a.      a description of the basic nature of the Omnibus Objection;

      b.      information to claimants that their rights may be affected by the Omnibus Objection and that failure to file a response may result in the Omnibus Objection being granted as to the claimant's Claim;

      c.      procedures for filing a written response (each, a "Response") to the objection, including all relevant dates and deadlines related thereto;

      d.      the hearing date, if applicable, and related information; and

      e.      a description of how copies of Proofs of Claim, the Omnibus Objection, and other pleadings filed in the Chapter 11 cases may be obtained.

6.    Notice and Service. Each Omnibus Objection will be filed with the Court and served upon (a) the affected claimant party set forth on the Proof of Claim or their respective attorney of record, (b) the U.S. Trustee, (c) the Committee, (d) parties that have filed a request for service of papers under Bankruptcy Rule 2002, and (e) with respect to Omnibus Objections filed pursuant to paragraph 1.h. of these procedures, the Debtors' applicable insurer for such claims.

7.    Omnibus Hearings. Each Omnibus Objection shall be set for hearing no less than thirty (30) days after service of the Omnibus Objection (the "Hearing"). The Debtors may request at the Hearing that the Court enter an order granting the Omnibus Objection with respect to each Claim subject to the Omnibus Objection when either (a) no Response has been filed in accordance with the proposed response procedures with respect to the Claim(s) or (b) a Response has been filed in accordance with the proposed response procedures with respect to the Claim(s), but such Response has been resolved prior to the Hearing. If a Response to an objection to a Claim cannot be resolved and a hearing is determined to be necessary, the Debtors shall file with the Court and serve on the affected claimant(s) a notice of the hearing to the extent the Debtors did not file a notice of hearing previously. The Debtors may adjourn Hearings regarding Omnibus Objections to subsequent hearing dates without further order of the Court in the Debtors' sole discretion so long as notice is provided to the affected claimant(s).

8.    Contested Matter. Each Claim subject to an Omnibus Objection along with any Responses thereto shall constitute a separate contested matter as contemplated in Bankruptcy Rule 9014, and any order that the Court may enter with respect to an Omnibus Objection will be deemed a separate order with respect to such Claim. The Debtors may, in their discretion and in accordance with other orders of this Court or the provisions of the Bankruptcy Code and the Bankruptcy Rules, settle the priority, amount, and validity of such contested Claims without any further notice to or action, order, or approval of the Court.

## Responses to Omnibus Objections

9.      Resolving Objections. Certain of the Debtors' advisors will be available to work with you to discuss and resolve consensually the Objection to your Claim(s) without the need for filing a formal response or attending a hearing. Please contact Jordan Chavez and Tom Zavala at Haynes and Boone, LLP, the Debtors' counsel, via (a) e-mail at Jordan.Chavez@haynesboone.com and Tom.Zavala@haynesboone.com, respectively, or (b) telephone at (214) 651-5453 or (214) 651-5046, respectively, within ten (10) calendar days after the date of this notice or such other date as the Debtors may agree in writing. Please have your Proof(s) of Claim and any related material available for any such discussions.

10.     Parties Required to File a Response. Any party who disagrees with an Omnibus Objection is required to file a Response in accordance with the procedures set forth herein. If a claimant whose Claim is subject to an Omnibus Objection does not file and serve a Response in compliance with the procedures below, the Court may grant the Omnibus Objection with respect to such Claim without further notice to the claimants.

11.     Response Contents. Each Response must contain the following (at a minimum):

a.      a caption stating the name of the Court, the name of the Debtors, the case number, the title of the Omnibus Objection to which the Response is directed, and, if applicable, the Proof of Claim number(s) related thereto from the Claims Register;

b.      a concise statement setting forth the reasons why the Court should not grant the Omnibus Objection with respect to such Claim, including the factual and legal bases upon which the claimant will rely in opposing the Omnibus Objection;

c.      a copy of any other documentation or other evidence of the Claim, to the extent not already included with the Proof of Claim (if applicable), upon which the claimant will rely in opposing the Omnibus Objection; *provided, however*, that the claimant need not disclose confidential, proprietary, or otherwise protected information in the Response; *provided further, however*, that the claimant shall disclose to the Debtors all information and provide copies of all documents that the claimant believes to be confidential, proprietary, or otherwise protected and upon which the claimant intends to rely in support of its Claim, subject to appropriate confidentiality constraints; and

d.      the following contact information for the responding party:

i.      the name, address, telephone number, and email address of the responding claimant or the claimant's attorney or designated representative to whom the attorneys for the Debtors should serve a reply to the Response, if any; or

ii.     the name, address, telephone number, and email address of the party

with authority to reconcile, settle, or otherwise resolve the Omnibus Objection on the claimant's behalf.

12. <u>Filing and Serving the Response</u>. A Response will be deemed timely only if it is filed with the Court and served on all of the following parties (the "<u>Notice Parties</u>") so as to be actually received **by or before 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days before the Hearing on the Objection(s) and Response(s)** (the "<u>Response Deadline</u>"), unless the Debtors consent to an extension in writing:

    a.    <u>Debtors' Counsel</u>. (1) Haynes and Boone, LLP, 30 Rockefeller Plaza, 26th Floor New York, New York 10112, Attn: Richard S. Kanowitz, Esq. (richard.kanowitz@haynesboone.com); Jordan E. Chavez (Jordan.chavez@haynesboone.com); and Tom Zavala (tom.zavala@haynesboone.com); and (2) Cole Schotz, P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq. (msirota@coleschotz.com) and Felice Yudkin, Esq. (fyudkin@coleschotz.com);

    b.    <u>Committee Counsel</u>. (1) Brown Rudnick LLP, Seven Times Square, New York, NY 10036, Attn: Robert J. Stark, Esq. (rstark@brownrudnick.com) and Kenneth Aulet, Esq. (kaulet@brownrudnick.com); and (2) Genova Burns LLC, 110 Allen Rd., Suite 304, Basking Ridge, NJ 07920, Attn: Daniel M. Stolz (DStolz@genovaburns.com), Esq. and Donald W. Clarke, Esq. (DClarke@genovaburns.com); and

    c.    <u>U.S. Trustee</u>. Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102, Attn: Jeffrey Sponder, Esq. (Jeffrey.M.Sponder@usdoj.gov) and Lauren Bielskie, Esq. (Lauren.Bielskie@usdoj.gov).

13. <u>Discovery</u>. If the Debtors determine that discovery is necessary in advance of a hearing on an Omnibus Objection, the Debtors will serve notice on the affected claimant and its counsel of record that the scheduled hearing will be treated as a status conference during which the parties will request that the Court issue a scheduling order to facilitate dismissal or resolution of the litigation. Such notice may be incorporated into the initial agenda letter for the hearing or may be provided in a separate notice.

14. <u>Failure to Respond</u>. A Response that is not filed with the Court and served on the Notice Parties or before the Response Deadline or such other date as agreed with the Debtors, in accordance with the procedures set forth herein, may not be considered at the Hearing before the Court. **Absent reaching an agreement with the Debtors resolving the Omnibus Objection to a Claim, failure to both file and serve a Response timely as set forth herein may result in the Court granting the Omnibus Objection without further notice or hearing.** Affected creditors will be served with such order once it has been entered.

15. <u>Reply to a Response</u>. The Debtors shall be permitted to file a reply or omnibus reply to any Response or multiple responses, as applicable, no later than two (2) business days before

the hearing with respect to the relevant Omnibus Objection.

**Miscellaneous**

16.    <u>Additional Information</u>. Copies of these procedures, the Order, the Motion, or any other pleadings filed in the Debtors' Chapter 11 Cases are available for free online at https://restructuring.ra.kroll.com/blockfi. Copies of these documents may also be obtained upon written request to Kroll, the Debtors' Claims and Noticing Agent by mail at Kroll Restructuring Administration LLC, Attn: BlockFi Inquiries, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232, or by email at blockfiinfo@ra.kroll.com. You may also obtain copies of any of the documents filed in the Debtors' Chapter 11 cases for a fee via PACER at http://www.njb.uscourts.gov.

17.    <u>Reservation of Rights</u>. NOTHING IN ANY NOTICE SHALL BE DEEMED TO CONSTITUTE A WAIVER OF ANY RIGHTS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST TO DISPUTE ANY CLAIMS, ASSERT COUNTERCLAIMS, RIGHTS OF OFFSET OR RECOUPMENT, DEFENSES, OBJECT TO ANY CLAIMS ON ANY GROUNDS NOT PREVIOUSLY RAISED IN AN OBJECTION (UNLESS THE COURT HAS ALLOWED THE CLAIM OR ORDERED OTHERWISE), OR SEEK TO ESTIMATE ANY CLAIM AT A LATER DATE. AFFECTED PARTIES WILL BE PROVIDED APPROPRIATE NOTICE THEREOF AT SUCH TIME.

*[Remainder of page intentionally left blank]*

## Exhibit 2

## Objection Notice

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq. (NJ Bar No. 014321986)<br>Warren A. Usatine, Esq. (NJ Bar No. 025881995)<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>(201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br><br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (admitted *pro hac vice*)<br>Christine A. Okike, P.C. (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>(212) 446-4800<br>jsussberg@kirkland.com<br>christine.okike@kirkland.com<br><br>**HAYNES AND BOONE, LLP**<br>Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)<br>Kenric D. Kattner, Esq. (admitted *pro hac vice*)<br>30 Rockefeller Plaza, 26th Floor<br>New York, New York 10112<br>(212) 659-7300<br>richard.kanowitz@haynesboone.com<br>kenric.kattner@haynesboone.com<br><br>*Attorneys for Debtors and Debtors in Possession* | |
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>     Debtors.[1] | Case No. 22-19361 (MBK)<br>Chapter 11 (Jointly Administered)<br>**Hearing Date and Time:**<br>_____, 2023 at __:00 _.m. (ET)<br>Chief Judge Michael B. Kaplan |

## NOTICE OF OBJECTION TO YOUR CLAIM

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

1

**PLEASE TAKE NOTICE** that BlockFi Inc. and its affiliates (collectively, the "Debtors") are objecting to your Claim(s)[2] pursuant to the attached objection (the "Objection").

---

**YOU SHOULD LOCATE YOUR REFERENCE NUMBER OR CLAIM NUMBER AND YOUR CLAIM(S) ON THE SCHEDULES ATTACHED HERETO. PLEASE TAKE NOTICE THAT YOUR CLAIM(S) MAY BE DISALLOWED, EXPUNGED, RECLASSIFIED, REDUCED, OR OTHERWISE AFFECTED AS A RESULT OF THE OBJECTION. THEREFORE, PLEASE READ THIS NOTICE AND THE ACCOMPANYING OBJECTION VERY CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

**IF YOU HAVE QUESTIONS OR WISH TO RESPOND TO THIS NOTICE, PLEASE CONTACT DEBTORS' COUNSEL:**

| | |
|---|---|
| **JORDAN E CHAVEZ, ESQ.** | **TOM J. ZAVALA, ESQ.** |
| **(214) 651-5453** | **(214) 651-5046** |
| **JORDAN.CHAVEZ@HAYNESBOONE.COM** | **TOM.ZAVALA@HAYNESBOONE.COM** |

---

## Important Information Regarding the Objection

Grounds for the Objection. Pursuant to the Objection, the Debtors are seeking to [disallow/expunge/reclassify/reduce] your Claim(s) listed in the table at the end of this notice on the grounds that your Claim(s) [is/are] [_____]. The Claim(s) subject to the Objection may also be found on the schedules attached to the Objection, a copy of which has been provided with this notice.

Objection Procedures. On March [__], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. ____] (the "Order") approving procedures for filing and resolving objections to Claims asserted against the Debtors in the Chapter 11 Cases (the "Objection Procedures"), which are attached to the Order at Exhibit 1. *Please review the Objection Procedures carefully to ensure your response to the Objection, if any, is filed and served timely and correctly. You may obtain a copy of the Order as set forth in the Additional Information section below.*

## Resolving the Objection(s) to Your Claim(s)

1.    Resolving Objections. Certain of the Debtors' advisors will be available to discuss and resolve consensually the Objection to your Claim(s) without the need for filing a formal response or attending a hearing. Please contact Jordan Chavez and Tom Zavala at Haynes and Boone, LLP, the Debtors' counsel, via (a) e-mail at Jordan.Chavez@haynesboone.com and Tom.Zavala@haynesboone.com, respectively, or (b) telephone at (214) 651-5453 or (214) 651-5046, respectively, within ten (10) calendar days after the date of this notice or such other date as

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection Procedures.

the Debtors may agree in writing. Please have your Proof(s) of Claim and any related material available for any such discussions.

2.    <u>Parties Required to File a Response</u>. If you are not able to resolve the Objection filed with respect to your Claim(s) as set forth above consensually, you must file a response (each, a "<u>Response</u>") with the Court in accordance with the following procedures:

3.    <u>Response Contents</u>. Each Response must contain the following (at a minimum):

a.    a caption stating the name of the Court, the name of the Debtors, the case number, the title of the Omnibus Objection to which the Response is directed, and, if applicable, the Proof of Claim number(s) related thereto from the Claims Register;

b.    a concise statement setting forth the reasons why the Court should not grant the Omnibus Objection with respect to such Claim, including the factual and legal bases upon which the claimant will rely in opposing the Omnibus Objection;

c.    a copy of any other documentation or other evidence of the Claim, to the extent not already included with the Proof of Claim (if applicable), upon which the claimant will rely in opposing the Omnibus Objection; *provided, however*, that the claimant need not disclose confidential, proprietary, or otherwise protected information in the Response; *provided further, however*, that the claimant shall disclose to the Debtors all information and provide copies of all documents that the claimant believes to be confidential, proprietary, or otherwise protected and upon which the claimant intends to rely in support of its Claim, subject to appropriate confidentiality constraints; and

d.    the following contact information for the responding party:

i.    the name, address, telephone number, and email address of the responding claimant or the claimant's attorney or designated representative to whom the attorneys for the Debtors should serve a reply to the Response, if any; or

ii.    the name, address, telephone number, and email address of the party with authority to reconcile, settle, or otherwise resolve the Omnibus Objection on the claimant's behalf.

4.    <u>Filing and Serving the Response</u>. A Response will be deemed timely only if it is filed with the Court and served on all of the following parties (the "<u>Notice Parties</u>") so as to be actually received **by or before 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days before the Hearing (defined below) on the Objection(s) and Response(s)** (the "<u>Response Deadline</u>"), unless the Debtors consent to an extension in writing:

a.    <u>Debtors' Counsel</u>. (1) Haynes and Boone, LLP, 30 Rockefeller Plaza, 26th

3

Floor New York, New York 10112, Attn: Richard S. Kanowitz, Esq. (richard.kanowitz@haynesboone.com), Jordan E. Chavez (jordan.chavez@haynesboone.com) and Tom Zavala (tom.zavala@haynesboone.com); and (2) Cole Schotz, P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq. (msirota@coleschotz.com) and Felice Yudkin, Esq. (fyudkin@coleschotz.com);

b.    <u>Committee Counsel</u>. (1) Brown Rudnick LLP, Seven Times Square, New York, NY 10036, Attn: Robert J. Stark, Esq. (rstark@brownrudnick.com) and Kenneth Aulet, Esq. (kaulet@brownrudnick.com); and (2) Genova Burns LLC, 110 Allen Rd., Suite 304, Basking Ridge, NJ 07920, Attn: Daniel M. Stolz (DStolz@genovaburns.com), Esq. and Donald W. Clarke, Esq. (DClarke@genovaburns.com); and

c.    <u>U.S. Trustee</u>. Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102, Attn: Jeffrey Sponder, Esq. (Jeffrey.M.Sponder@usdoj.gov) and Lauren Bielskie, Esq. (Lauren.Bielskie@usdoj.gov).

5.    <u>Failure to Respond</u>. A Response that is not filed and served on or before the Response Deadline or such other date as agreed with the Debtors, in accordance with the procedures set forth herein, may not be considered at the Hearing before the Court. **Absent reaching an agreement with the Debtors resolving the Omnibus Objection to a Claim, failure to both file and serve a Response timely as set forth herein may result in the Court granting the Omnibus Objection without further notice or hearing.** Affected creditors will be served with such order once it has been entered.

## Hearing on the Objection

6.    <u>Date, Time and Location</u>. A hearing (the "<u>Hearing</u>") on the Objection will be held on [____], 2023, at [____], prevailing Eastern Time, before the Honorable Michael B. Kaplan, United States Bankruptcy Judge for the District of New Jersey. The Hearing will be conducted virtually using Zoom for Government. To the extent parties wish to present their argument at the hearing, a request for "Presenter Status" must be submitted to the Court at least one (1) business day prior to the hearing by emailing Chambers (chambers_of_mbk@njb.uscourts.gov) and providing the following information: (a) name of Presenter, (b) email address of Presenter, (c) Presenter's affiliation with the case and/or (d) what party or interest the Presenter represents. If the request is approved, the Presenter will receive appropriate Zoom credentials and further instructions via email. The hearing may be adjourned to a subsequent date in these cases in the Court's or Debtors' discretion. You must attend the Hearing if you disagree with the Objection and have filed a Response that remains unresolved prior to the Hearing. If such Claims cannot be resolved and a hearing is determined to be necessary, the Debtors shall file with the Court and serve on the affected claimants a notice of the hearing to the extent the Debtors did not file a notice of hearing previously.

7.    <u>Discovery</u>. If the Debtors determine that discovery is necessary in advance of a

hearing on an Omnibus Objection, the Debtors will serve notice on the affected claimant and its counsel of record that the scheduled hearing will be treated as a status conference during which the parties will request that the Court issue a scheduling order to facilitate dismissal or resolution of the litigation. Such notice may be incorporated into the initial agenda letter for the hearing or may be provided in a separate notice.

### Additional Information

8.    Copies of these procedures, the Order, the Motion, or any other pleadings filed in the Debtors' Chapter 11 cases are available for free online at https://restructuring.ra.kroll.com/blockfi. Copies of these documents may also be obtained upon written request to the Debtors' Claims and Noticing Agent by mail at Kroll Restructuring Administration LLC, Attn: BlockFi Inquiries, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232, or by email at blockfiinfo@ra.kroll.com. You may also obtain copies of any of the documents filed in the Debtors' Chapter 11 cases for a fee via PACER at http://www.njb.uscourts.gov.

### Reservation of Rights

9.    NOTHING IN ANY NOTICE SHALL BE DEEMED TO CONSTITUTE A WAIVER OF ANY RIGHTS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST TO DISPUTE ANY CLAIMS, ASSERT COUNTERCLAIMS, RIGHTS OF OFFSET OR RECOUPMENT, DEFENSES, OBJECT TO ANY CLAIMS ON ANY GROUNDS NOT PREVIOUSLY RAISED IN AN OBJECTION (UNLESS THE COURT HAS ALLOWED THE CLAIM OR ORDERED OTHERWISE), OR SEEK TO ESTIMATE ANY CLAIM AT A LATER DATE. AFFECTED PARTIES WILL BE PROVIDED APPROPRIATE NOTICE THEREOF AT SUCH TIME.

*[Remainder of page intentionally left blank]*

Dated: [_____], 2023

/s/ _____

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

| Claimant Name or Identifier | Debtor | Claim Number | Date Filed | Asserted Claim Amount[1] | Basis for Objection | Surviving Claim No. |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

---

[1] Asserted Claim amounts listed as $0.00 or 0.00 cryptocurrency reflect that the Claim amount asserted on the Proof of Claim is "unliquidated."

## Exhibit 3

## Satisfaction Procedures

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In re:

BLOCKFI INC., *et al.*,

Debtors.[1]

Chapter 11

Case No. 22-19361 (MBK)

(Jointly Administered)

## PROCEDURES FOR FILING AND SERVING
## NOTICES OF SATISFACTION OF CLAIMS

On [___], 2023, the above-captioned debtors (collectively, the "Debtors") in the Chapter 11 cases filed the *Debtors' Motion for Entry of an Order (A) Approving (I) Omnibus Claims Objection Procedures and Form of Notice, (II) Omnibus Substantive Claims Objections, and (III) Satisfaction Procedures and Form of Notice, (B) Waiving Bankruptcy Rule 3007(e), and (C) Granting Related Relief* [Docket No. [___]] (the "Motion")[2] with the United States Bankruptcy Court for the District of New Jersey (the "Court"). On [___], 2023, the Court entered an order [Docket No. [___]] (the "Order") approving these procedures for serving notices of satisfaction of Claims (the "Satisfaction Procedures").

## Satisfaction Procedures

1.      Grounds for Satisfaction Procedures. The Debtors may file and serve notices of satisfaction in the form attached hereto (each, a "Notice of Satisfaction") with respect to Claims subject to Proofs of Claims or on the Schedules. A Notice of Satisfaction may be sent on the grounds that such Claims have been satisfied in full according to the Debtors books and records, including pursuant to any confirmed Chapter 11 plan or an order of the Court.

## Responses to Notices of Satisfaction

2.      Parties Required to File a Response. Any party who disagrees with a Notice of Satisfaction is required to file a response (each, a "Response") in accordance with the procedures set forth herein; *provided, however*, that such party may not object to any amount that the Court has approved pursuant to an order. **If a claimant whose Claim is subject to a Notice of Satisfaction does not file and serve a Response in compliance with the procedures below, the Debtors are authorized to instruct the Claims and Noticing Agent to expunge such Claim from the Claims Register without further notice to the claimant.**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion

3.     Response Contents. Each Response to a Notice of Satisfaction must contain the following (at a minimum):

    a.     a caption stating the name of the Court, the name of the Debtors, the case number, the Notice of Satisfaction to which the Response is directed, and, if applicable, the Proof of Claim number(s) related thereto from the Claims Register;

    b.     a concise statement setting forth the reasons why the Court should not enter the order with respect to the Notice of Satisfaction regarding such Claim, including the specific factual and legal bases upon which the claimant will rely in opposing the Notice of Satisfaction;

    c.     a copy of any other documentation or other evidence of the Claim, to the extent not already included with the Proof of Claim (if applicable), upon which the claimant will rely in opposing the Notice of Satisfaction; *provided, however*, that the claimant need not disclose confidential, proprietary, or otherwise protected information in the Response; *provided further, however*, that the claimant shall disclose to the Debtors all information and provide copies of all documents that the claimant believes to be confidential, proprietary, or otherwise protected and upon which the claimant intends to rely in support of its Claim, subject to appropriate confidentiality constraints; and

    d.     the following contact information for the responding party:

        i.     the name, address, telephone number, and email address of the responding claimant or the claimant's attorney or designated representative to whom the attorneys for the Debtors should serve a reply to the Response, if any; or

        ii.     the name, address, telephone number, and email address of the party with authority to reconcile, settle, or otherwise resolve the Notice of Satisfaction on the claimant's behalf.

4.     Filing and Serving the Response. A Response will be deemed timely only if it is filed with the Court and served on all of the following parties (the "Notice Parties") so as to be actually received **by or before 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days before the Hearing on the Notice of Satisfaction** (the "Response Deadline"), unless the Debtors consent to an extension in writing:

    a.     Debtors' Counsel. (1) Haynes and Boone, LLP, 30 Rockefeller Plaza, 26th Floor New York, New York 10112, Attn: Richard S. Kanowitz, Esq. (richard.kanowitz@haynesboone.com); Jordan Chavez (Jordan.chavez@haynesboone.com) and Tom Zavala (tom.zavala@haynesboone.com); and (2) Cole Schotz, P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D.

Sirota, Esq. (msirota@coleschotz.com) and Felice Yudkin, Esq. (fyudkin@coleschotz.com);

b.   <u>Committee Counsel</u>. (1) Brown Rudnick LLP, Seven Times Square, New York, NY 10036, Attn: Robert J. Stark, Esq. (rstark@brownrudnick.com) and Kenneth Aulet, Esq. (kaulet@brownrudnick.com); and (2) Genova Burns LLC, 110 Allen Rd., Suite 304, Basking Ridge, NJ 07920, Attn: Daniel M. Stolz (DStolz@genovaburns.com), Esq. and Donald W. Clarke, Esq. (DClarke@genovaburns.com); and

c.   <u>U.S. Trustee</u>. Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102, Attn: Jeffrey Sponder, Esq. (Jeffrey.M.Sponder@usdoj.gov) and Lauren Bielskie, Esq. (Lauren.Bielskie@usdoj.gov).

5.   <u>Failure to Respond</u>. A Response that is not filed and served in accordance with the procedures set forth herein may not be considered at the Hearing before the Court. **Absent reaching an agreement with the Debtors resolving the Response to the Notice of Satisfaction, failure to file and serve a Response timely as set forth herein may result in the Debtors causing its Claims and Noticing Agent to expunge such Claims from the Claims Register without further notice or hearing, and such claimant shall not be treated as a creditor with respect to the Claim for purposes of distribution.**

## Hearing on the Response

6.   <u>Date, Time and Location</u>. A hearing (the "<u>Hearing</u>") on the Objection will be held on [___], 2023, at [___], prevailing Eastern Time, before the Honorable Michael B. Kaplan, United States Bankruptcy Judge for the District of New Jersey. The Hearing will be conducted virtually using Zoom for Government. To the extent parties wish to present their argument at the hearing, a request for "Presenter Status" must be submitted to the Court at least one (1) business day prior to the hearing by emailing Chambers (chambers_of_mbk@njb.uscourts.gov) and providing the following information: (a) name of Presenter, (b) email address of Presenter, (c) Presenter's affiliation with the case and/or (d) what party or interest the Presenter represents. If the request is approved, the Presenter will receive appropriate Zoom credentials and further instructions via email. The hearing may be adjourned to a subsequent date in these cases in the Court's or Debtors' discretion. You must attend the Hearing if you disagree with the Objection and have filed a Response that remains unresolved prior to the Hearing. If such Claims cannot be resolved and a hearing is determined to be necessary, the Debtors shall file with the Court and serve on the affected claimants a notice of the hearing to the extent the Debtors did not file a notice of hearing previously.

7.   <u>Reply to a Response</u>. The Debtors shall be permitted to file a reply to any Response no later than one (1) business day before the Hearing with respect to the relevant Notice of Satisfaction.

## Miscellaneous

8.   <u>Additional Information</u>. Copies of these procedures, the Order, the Motion, or any

3

other pleadings filed in the Debtors' Chapter 11 cases are available for free online at
https://restructuring.ra.kroll.com/blockfi. Copies of these documents may also be obtained upon
written request to the Debtors' Claims and Noticing Agent by mail at Kroll Restructuring
Administration LLC, Attn: BlockFi Inquiries, 850 3rd Avenue, Suite 412, Brooklyn, New York
11232, or by email at blockfiinfo@ra.kroll.com. You may also obtain copies of any of the
documents filed in the Debtors' Chapter 11 cases for a fee via PACER at
http://www.njb.uscourts.gov.

       9.    <u>Reservation of Rights</u>. NOTHING IN ANY NOTICE SHALL BE DEEMED TO
CONSTITUTE A WAIVER OF ANY RIGHTS OF THE DEBTORS OR ANY OTHER PARTY
IN INTEREST TO DISPUTE ANY CLAIMS, ASSERT COUNTERCLAIMS, RIGHTS OF
OFFSET OR RECOUPMENT, DEFENSES, OBJECT TO ANY CLAIMS ON ANY GROUNDS
NOT PREVIOUSLY RAISED IN AN OBJECTION (UNLESS THE COURT HAS ALLOWED
THE CLAIM OR ORDERED OTHERWISE), OR SEEK TO ESTIMATE ANY CLAIM AT A
LATER DATE. AFFECTED PARTIES WILL BE PROVIDED APPROPRIATE NOTICE
THEREOF AT SUCH TIME.

*[Remainder of page intentionally left blank]*

**Exhibit 4**

**Notice of Satisfaction of Claims**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**COLE SCHOTZ P.C.**<br>Michael D. Sirota, Esq. (NJ Bar No. 014321986)<br>Warren A. Usatine, Esq. (NJ Bar No. 025881995)<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>(201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com | |
| **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C. (admitted *pro hac vice*)<br>Christine A. Okike, P.C. (admitted *pro hac vice*)<br>601 Lexington Avenue<br>New York, New York 10022<br>(212) 446-4800<br>jsussberg@kirkland.com<br>christine.okike@kirkland.com | |
| **HAYNES AND BOONE, LLP**<br>Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)<br>Kenric D. Kattner, Esq. (admitted *pro hac vice*)<br>30 Rockefeller Plaza, 26th Floor<br>New York, New York 10112<br>(212) 659-7300<br>richard.kanowitz@haynesboone.com<br>kenric.kattner@haynesboone.com | |
| *Attorneys for Debtors and Debtors in Possession* | |
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>    Debtors.[1] | Case No. 22-19361 (MBK)<br>Chapter 11 (Jointly Administered)<br>**Hearing Date and Time:**<br>**_____, 2023 at __:00 _.m. (ET)**<br>Chief Judge Michael B. Kaplan |

## NOTICE OF SATISFACTION OF CLAIMS

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

**PLEASE TAKE NOTICE** that BlockFi Inc. and its affiliates (collectively, the "Debtors") have identified you as holding certain Claim(s)[2] against Debtors listed in the table at the end of this notice, which have been satisfied in full according to the Debtors' books and records.

> **YOU SHOULD LOCATE YOUR REFERENCE NUMBER OR CLAIM NUMBER AND YOUR CLAIM(S) ON THE SCHEDULE ATTACHED HERETO. PLEASE TAKE NOTICE THAT YOUR CLAIM(S) MAY BE EXPUNGED FROM THE CLAIMS REGISTER AND YOU SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO THE CLAIM FOR PURPOSES OF DISTRIBUTION AS A RESULT OF THE NOTICE OF SATISFACTION. THEREFORE, PLEASE READ THIS NOTICE VERY CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**
>
> **IF YOU HAVE QUESTIONS OR WISH TO RESPOND TO THIS NOTICE, PLEASE CONTACT DEBTORS' COUNSEL:**
>
> | | |
> |---|---|
> | **JORDAN E. CHAVEZ, ESQ.** | **TOM J. ZAVALA, ESQ.** |
> | **(214) 651-5453** | **(214) 651-5046** |
> | **JORDAN.CHAVEZ@HAYNESBOONE.COM** | **TOM.ZAVALA@HAYNESBOONE.COM** |

### Important Information Regarding the Notice of Satisfaction

Grounds for the Notice of Satisfaction. The Debtors are seeking to expunge your Claim(s) listed in the table at the end of this notice on the grounds that such Claim(s), have been satisfied in full according to the Debtors' books and records.

Satisfaction Procedures. On March [___], 2023, the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an order [Docket No. ____] (the "Order") approving procedures for serving Notices of Satisfaction of Claims asserted against the Debtors in the Chapter 11 cases (the "Satisfaction Procedures"), which are attached to the Order at Exhibit 3. *Please review the Satisfaction Procedures carefully to ensure your response, if any, is filed and served timely and correctly. You may obtain a copy of the Order as set forth in the Additional Information section below.*

### Resolving the Notice of Satisfaction Regarding Your Claim(s)

1.  Resolving Objections. Certain of the Debtors' advisors will be available to discuss and resolve consensually the Objection to your Claim(s) without the need for filing a formal response or attending a hearing. Please contact Jordan Chavez and Tom Zavala at Haynes and Boone, LLP, the Debtors' counsel, via (a) e-mail at Jordan.Chavez@haynesboone.com and Tom.Zavala@haynesboone.com, respectively, or (b) telephone at (214) 651-5453 or (214) 651-5046, respectively, within ten (10) calendar days after the date of this notice or such other date as the Debtors may agree in writing. Please have your Proof(s) of Claim and any related material

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection Procedures.

available for any such discussions.

2.  <u>Response Contents</u>. Each Response to a Notice of Satisfaction must contain the following (at a minimum):

a.  a caption stating the name of the Court, the name of the Debtors, the case number, the Notice of Satisfaction to which the Response is directed, and, if applicable, the Proof of Claim number(s) related thereto from the Claims Register;

b.  a concise statement setting forth the reasons why the Court should not enter the order with respect to the Notice of Satisfaction regarding such Claim, including the specific factual and legal bases upon which the claimant will rely in opposing the Notice of Satisfaction;

c.  a copy of any other documentation or other evidence of the Claim, to the extent not already included with the Proof of Claim (if applicable), upon which the claimant will rely in opposing the Notice of Satisfaction; *provided, however*, that the claimant need not disclose confidential, proprietary, or otherwise protected information in the Response; *provided further, however*, that the claimant shall disclose to the Debtors all information and provide copies of all documents that the claimant believes to be confidential, proprietary, or otherwise protected and upon which the claimant intends to rely in support of its Claim, subject to appropriate confidentiality constraints; and

d.  the following contact information for the responding party:

i.  the name, address, telephone number, and email address of the responding claimant or the claimant's attorney or designated representative to whom the attorneys for the Debtors should serve a reply to the Response, if any; or

ii.  the name, address, telephone number, and email address of the party with authority to reconcile, settle, or otherwise resolve the Notice of Satisfaction on the claimant's behalf.

3.  <u>Filing and Serving the Response</u>. A Response will be deemed timely only if it is filed with the Court and served on all of the following parties (the "<u>Notice Parties</u>") so as to be actually received **by or before 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days before the Hearing (defined below) on the Notice of Satisfaction** (the "<u>Response Deadline</u>"), unless the Debtors consent to an extension in writing:

a.  <u>Debtors' Counsel</u>. (1) Haynes and Boone, LLP, 30 Rockefeller Plaza, 26th Floor New York, New York 10112, Attn: Richard S. Kanowitz, Esq. (richard.kanowitz@haynesboone.com); Jordan Chavez (jordan.chavez@haynesboone.com); and Tom Zavala

(tom.zavala@haynesboone.com); and (2) Cole Schotz, P.C., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq. (msirota@coleschotz.com) and Felice Yudkin, Esq. (fyudkin@coleschotz.com);

b.    <u>Committee Counsel</u>. (1) Brown Rudnick LLP, Seven Times Square, New York, NY 10036, Attn: Robert J. Stark, Esq. (rstark@brownrudnick.com) and Kenneth Aulet, Esq. (kaulet@brownrudnick.com); (2) Genova Burns LLC, 110 Allen Rd., Suite 304, Basking Ridge, NJ 07920, Attn: Daniel M. Stolz (DStolz@genovaburns.com), Esq. and Donald W. Clarke, Esq. (DClarke@genovaburns.com); and

c.    <u>U.S. Trustee</u>. Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102, Attn: Jeffrey Sponder, Esq. (Jeffrey.M.Sponder@usdoj.gov) and Lauren Bielskie, Esq. (Lauren.Bielskie@usdoj.gov).

4.    <u>Failure to Respond</u>. A Response that is not filed and served in accordance with the procedures set forth herein may not be considered at the Hearing before the Court. **Absent reaching an agreement with the Debtors resolving the Response to the Notice of Satisfaction, failure to file and serve a Response timely as set forth herein may result in the Debtors causing its Claims and Noticing Agent to expunge such Claims from the Claims Register without further notice or hearing, and such claimant shall not be treated as a creditor with respect to the Claim for purposes of distribution.**

**Hearing on the Response**

5.    <u>Date, Time and Location</u>. A hearing (the "<u>Hearing</u>") on the Objection will be held on [____], 2023, at [____], prevailing Eastern Time, before the Honorable Michael B. Kaplan, United States Bankruptcy Judge for the District of New Jersey. The Hearing will be conducted virtually using Zoom for Government. To the extent parties wish to present their argument at the hearing, a request for "Presenter Status" must be submitted to the Court at least one (1) business day prior to the hearing by emailing Chambers (chambers_of_mbk@njb.uscourts.gov) and providing the following information: (a) name of Presenter, (b) email address of Presenter, (c) Presenter's affiliation with the case and/or (d) what party or interest the Presenter represents. If the request is approved, the Presenter will receive appropriate Zoom credentials and further instructions via email. The hearing may be adjourned to a subsequent date in these cases in the Court's or Debtors' discretion. You must attend the Hearing if you disagree with the Objection and have filed a Response that remains unresolved prior to the Hearing. If such Claims cannot be resolved and a hearing is determined to be necessary, the Debtors shall file with the Court and serve on the affected claimants a notice of the hearing to the extent the Debtors did not file a notice of hearing previously.

6.    <u>Reply to a Response</u>. The Debtors shall be permitted to file a reply to any Response no later than one (1) business day before the Hearing with respect to the relevant Notice of Satisfaction.

4

## Additional Information

7.     Copies of these procedures, the Order, the Motion, or any other pleadings filed in the Debtors' Chapter 11 cases are available for free online at https://restructuring.ra.kroll.com/blockfi. Copies of these documents may also be obtained upon written request to the Debtors' Claims and Noticing Agent by mail at Kroll Restructuring Administration LLC, Attn: BlockFi Inquiries, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232, or by email at blockfiinfo@ra.kroll.com. You may also obtain copies of any of the documents filed in the Debtors' Chapter 11 cases for a fee via PACER at http://www.njb.uscourts.gov.

## Reservation of Rights

8.     NOTHING IN ANY NOTICE SHALL BE DEEMED TO CONSTITUTE A WAIVER OF ANY RIGHTS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST TO DISPUTE ANY CLAIMS, ASSERT COUNTERCLAIMS, RIGHTS OF OFFSET OR RECOUPMENT, DEFENSES, OBJECT TO ANY CLAIMS ON ANY GROUNDS NOT PREVIOUSLY RAISED IN AN OBJECTION (UNLESS THE COURT HAS ALLOWED THE CLAIM OR ORDERED OTHERWISE), OR SEEK TO ESTIMATE ANY CLAIM AT A LATER DATE. AFFECTED PARTIES WILL BE PROVIDED APPROPRIATE NOTICE THEREOF AT SUCH TIME.

*[Remainder of page intentionally left blank]*

Dated: [_____], 2023                    /s/ _____

                                                                  **COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and Debtors in Possession*

| Claimant Name or Identifier | Claim / Schedule No. | Total Claim Value |
|---|---|---|
| | | |

# Exhibit D

**FTX TERMS OF SERVICE**

Date: May 13, 2022

The following terms and conditions of service, together with any other documents expressly incorporated herein, (collectively, the **"Terms"**) constitute an agreement between you (**"you"**, **"your"** or **"User"**) and FTX Trading Ltd, a company incorporated and registered in Antigua and Barbuda (company number 17180) (**"FTX Trading"**, **"we"**, **"our"** or **"us"**), or a Service Provider in respect of a Specified Service, and apply to your use of:

(A)     the Exchange and any Specified Service that may be offered to you by a Service Provider (collectively, the **"Platform"**), as a User to buy, sell, exchange, hold, stake, lend, borrow, send, receive or otherwise transact in (together, **"transact in"**) or list Digital Assets;

(B)     the FTX Application Programming Interface (**"API"**); and

(C)     any other services offered through the FTX website (ftx.com) (the **"Site"**) or any Mobile Application,

         (together, the **"Services"**).

By registering for a Platform account (**"Account"**) or using the Services, you agree that you have read, understand and accept the Terms, including our Privacy Policy, Security Policy and Fee Schedule, and you acknowledge and agree that you will be bound by and comply with the Terms. Do not proceed with registering for an Account, or using the Services, if you do not understand and accept the Terms in their entirety.

Section 21 (*Right to change, suspend or discontinue Services*) and Section 22 (*Updates to Terms*) set out the terms on which we may, from time to time, change, suspend, or discontinue any aspect of the Services and amend any part of the Terms.

Our Services are not offered to Restricted Persons (as defined in Section 3.3.1(A) below) or persons who have their registered office or place of residence in the United States of America or any Restricted Territory (as defined in Section 3.3.1(A) below).

FTX Trading's relationship with you under the Terms is as a trading platform provider only. FTX Trading does not act as principal or counterparty with respect to trades entered into on the Platform. Notwithstanding the foregoing:

(A)     FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades; and

(B)     Affiliates of FTX Trading may execute trades on the Platform provided, however, that such Affiliates shall not be afforded any priority in trade execution.

Save in certain limited circumstances set out in Section 38.13 (*Exception to arbitration*), Section 38.12 (*Arbitration*) requires all Disputes to be resolved by way of legally binding arbitration on an individual basis only and not as a claimant or class member in a purported class or representative action. There is no judge or jury in arbitration and court review of an arbitration award is limited.

The laws of some jurisdictions may limit or not permit certain provisions of the Terms, such as arbitration, indemnification, the exclusion of certain warranties or the limitation of certain liabilities. In such a case, such provisions will apply only to the maximum extent permitted by the laws of such jurisdictions.

In the Terms, unless the context otherwise requires, the definitions and rules of interpretation set out in Schedule 1 shall apply.

1.      **STRUCTURE OF TERMS**

1.1     The Terms comprise:

        1.1.1     the general terms and conditions set out above, in Sections 1 (*Structure of Terms*) to 38 (*General*), and in Schedule 1 (*Definitions and Interpretation*), which

apply generally to you, your registration and use of an Account, and your use of the Services (**"General Terms"**);

1.1.2   the policies, schedules and other documents of FTX Trading and its Affiliates incorporated by reference into the Terms, including our Privacy Policy, Security Policy and Fee Schedule (**"FTX Policies"**); and

1.1.3   the terms and conditions set out in each Service Schedule, which shall also apply to the Specified Service referred to therein.

1.2   To the extent there is any conflict or inconsistency between the modules of the Terms, such conflict or inconsistency shall be resolved in the following order of precedence, unless a term or condition set out in a document of lower precedence is expressly identified as taking precedence over a document of higher precedence: General Terms, Service Schedules, Fee Schedule, Privacy Policy, Security Policy and other FTX Policies.

1.3   **IMPORTANT:** You acknowledge and agree that any Specified Service referred to in a Service Schedule shall be provided to you by the Service Provider specified in that Service Schedule. In such case, the Specified Service shall be provided to you on and subject to the Terms, with references in these General Terms to "FTX Trading" (or "we", "our" or "us") being read as references to the Service Provider specified in the Service Schedule, unless the context provides otherwise, and under no circumstances shall any other person, including any Affiliate of the Service Provider, be liable to you for the performance of any of the Service Provider's obligations under the Terms.

2.   **RISK DISCLOSURES**

Before beginning to use the Services, you should ensure you have read and understand (and you represent and warrant that you have read and understand) the following risk disclosures and the risk disclosures set out in the Service Schedules. You should note that this is not an exhaustive list of all of the risks associated with Digital Assets and the Services.

2.1   **No advice and no reliance**

2.1.1   FTX Trading does not advise on the merits of any particular transaction, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, taxation or legal advice in connection with the Services. To the extent that we or our representatives provide market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision by you to use the Services and transact in Digital Assets is your own independent decision. You represent that you are not relying on any communication (written or oral) by us as investment advice or as a recommendation to use the Services and transact in Digital Assets. FTX Trading will not be liable for any loss suffered by you or any third party.

2.1.2   You accept the risk of trading Digital Assets. In entering into any transaction on the Platform, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of such transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction entered into on the Platform or any underlying Digital Asset.

2.1.3   FTX Trading is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services.

2.2   **Digital Asset transfers and volatility**

2.2.1   Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value.

Factors beyond FTX Trading's control, such as regulatory activity or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks (as defined in Section 17 below), or other unforeseeable reasons. As a general matter, you should not engage in active trading on the Platform if you have limited trading experience or low risk tolerance. Speculating on the value of Digital Assets is high risk and you should never trade more than you can afford to lose.

2.2.2    Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on the Platform does not indicate FTX Trading's approval or disapproval of the underlying technology of any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Assets traded under the Terms and assume no fiduciary duty to you in connection with such use of the Services.

2.2.3    You accept all consequences of sending Digital Assets to an address off the Platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to a person that will not return your Digital Assets or may return your Digital Assets but first require action on your part, such as verification of your identity or compensation.

2.3    **Supply and value of Digital Assets**

2.3.1    The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for fiat currency and other Digital Assets, which may result in the permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

2.3.2    You acknowledge and agree that Digital Assets and/or Services (in whole or in part) available in one jurisdiction may not be available for trading, use or access, as applicable, in another.

2.4    **Margin trading**

2.4.1    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Digital Assets, fiat currency and E-Money (as defined in Section 8.3.2 below (collectively, **"Assets"**) in your Account, or owe Assets beyond what you have deposited in your Account. When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt.

2.5    **Complex products**

2.5.1    Trading of complex products, including but not limited to Futures Contracts, Options Contracts, and MOVE Volatility Contracts (each as defined in the Service Schedules) (collectively, **"Complex Products"**), may not be suitable for all Users. Complex Product trading is designed to be utilised only by sophisticated Users, such as active traders employing dynamic strategies. You should use extreme caution when trading Complex Products and only trade them if you understand how they work, including but not limited to the risks associated with margin trading, the use of leverage, the risk of shorting, and the effect of compounding and market volatility risks on leveraged products.

2.5.2    Complex Product trading entails significant risk, and you may feel the effects of losses immediately. Complex Product trading requires initial posting of collateral to meet initial margin requirements. If movements in the markets for a Complex

Product or the underlying Digital Asset decrease the value of your position in such Complex Product, you may be required to have or make additional collateral available as margin to ensure that maintenance margin requirements are met. If your Account is under the minimum margin requirements, your position may be liquidated at a loss, and you may lose all of your Assets in your Account. If there are any additional deficits in your Account, you will also be liable for all such deficits.

2.5.3    USERS WHO DO NOT UNDERSTAND LEVERAGE OR MARGIN TRADING, OR DO NOT INTEND TO ACTIVELY MANAGE THEIR PORTFOLIO, SHOULD NOT ENGAGE IN COMPLEX PRODUCT TRADING.

2.5.4    FTX TRADING AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY COMPLEX PRODUCT TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH COMPLEX PRODUCT TRADING.

2.6    **Blacklisted addresses and forfeited Assets**

2.6.1    FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Assets (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates the Terms (**"Blacklisted Addresses"**). In the event that you send Assets to a Blacklisted Address or receive Assets from a Blacklisted Address, FTX Trading may freeze such Assets and take steps to terminate your Account.

2.6.2    In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and other Regulatory Authorities, and you may forfeit any rights associated with your Assets, including the ability to redeem or exchange your Digital Assets for other Digital Assets or fiat currency. FTX Trading may also freeze Assets held in your Account in the event that we receive a related order or request from a legal or Regulatory Authority.

2.7    **Software protocols and operational challenges**

2.7.1    The software protocols that underlie Digital Assets are typically open source projects or are otherwise operated by third parties, which means that: (i) the operations, functionalities, development and control of such Digital Assets and their underlying networks are outside of FTX Trading's control; and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

2.7.2    You are aware of and accept the risk of operational challenges that may impact the Services. The Platform may experience sophisticated cyber-attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading liable for any related losses.

2.7.3    You understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your Digital Assets stored on the Platform. You are fully responsible for monitoring such technological changes and understanding their consequences for your Digital Assets.

2.7.4    Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with Digital Assets use generally or your use of our Services.

2.7.5    Digital Assets depend on the availability and reliability of power, connectivity, and hardware.  Interruption or failure of any of these things may disrupt the networks on which the Digital Assets rely or your ability to access or transact in Digital Assets.

2.8    **Compliance**

You are responsible for complying with all Applicable Laws. You agree that FTX Trading is not responsible for determining whether or which laws and regulations may apply to your transactions, including but not limited to tax laws and regulations. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

2.9    **Legislative and regulatory changes**

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, ability to transact in, and value of Digital Assets, or your access to, and our ability to provide, the Services. You acknowledge and accept the risks that such changes may bring and that FTX Trading is not liable for any adverse impact that that you may suffer as a result.

2.10    **No deposit protection**

Neither Digital Assets nor any fiat currency or E-Money held in your Account is eligible for any public or private deposit insurance protection.

2.11    **Digital Asset Distributions not supported**

Certain Digital Assets are built on protocols that support Digital Asset Distributions (as defined in Section 17.4 below), including, but not limited to, Forks (as defined in Section 17.1 below), Staking Rewards (as defined in Section 17.4 below) and Airdrops (as defined in Section 17.4 below). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX Trading. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX Trading is not liable for losses you may incur related to staking.

2.12    **Reliance on third parties**

Your use of the Services and the value of certain Digital Assets may rely on the acts of third parties or the fulfilment of related obligations by third parties. FTX Trading is not responsible for the acts or omissions of such third parties.

3.    **APPLICABLE LAWS AND REGULATIONS**

3.1    **Compliance with Applicable Laws**

3.1.1    You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with all Applicable Laws. Failure to do so may result in the suspension of your ability to use the Services or the closure of your Account.

3.1.2    Without limitation to the above, your access to and use of your Account and the Services, and the receipt of any fee discounts and rebates, is subject to your continued compliance with all Applicable Laws, including the rules and directions of any applicable Regulatory Authority and, without limitation, all applicable tax, anti-money laundering (**"AML"**) and counter-terrorist financing (**"CTF"**) laws and regulations.

5

3.2    **AML and CTF procedures**

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the Platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take the necessary steps that we believe appropriate to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and terrorist financing, any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

3.3    **Export controls**

3.3.1    The Services are subject to all applicable export control restrictions and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if:

(A)    you are in a prohibited jurisdiction as set forth at Location Restrictions (**"Restricted Territories"**);

(B)    you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government, the European Union, the Singapore government, or The Bahamas government (**"Restricted Persons"**);

(C)    you intend to transact with any Restricted Territories or Restricted Persons;

(D)    you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or

(E)    the publication or availability of the Services in the jurisdiction in which you are based is prohibited or contrary to local law or regulation or could subject FTX Trading to any local registration or licensing requirements.

3.3.2    We may, in our sole discretion, implement controls to restrict access to and use of the Services in any of the Restricted Territories or in any of the circumstances referred to in Section 3.3.1 above. If we determine that you are accessing or using the Services from any Restricted Territory, or any of the circumstances referred to in Section 3.3.1 above apply, we may suspend your ability to use the Services or close your Account at our discretion.

4.    **ELIGIBILITY**

4.1    In order to be eligible to open an Account or use the Services (and to enter into the Terms), you must meet (and you represent and warrant that you do meet), the following eligibility criteria:

4.1.1    If you are an individual, you must be at least 18 years of age, have the capacity to accept the Terms, and not have been previously suspended or removed from access to the Services or any other service or product offered by FTX Trading or any of its Affiliates, and are otherwise eligible to use the Services under Applicable Law.

4.1.2    If you are registering to use the Services on behalf of a legal entity, then:

(A)    you must be duly authorised by such legal entity to act on its behalf for the purpose of entering into the Terms;

(B)    the legal entity must be duly organised and validly existing under the laws of the jurisdiction of its organisation; and

(C)    the legal entity must not have been (and each of its Affiliates must not have been) previously suspended or removed from access to the

Services or any other service or product offered by FTX Trading or any of its Affiliates and must be otherwise eligible to use the Services under Applicable Law.

4.1.3   You have not: violated; been fined, debarred, sanctioned, the subject of economic sanctions-related restrictions, or otherwise penalised under; received any oral or written notice from any government concerning actual or possible violation by you under; or received any other report that you are the subject or target of sanctions, restrictions, penalties, or enforcement action or investigation under, any Applicable Law (including but not limited to AML, CTF, anti-corruption, or economic sanctions laws).

4.1.4   You do not have your registered office or place of residence in the United States of America or any Restricted Territory.

4.1.5   You are not a Restricted Person nor are you a resident of a Restricted Territory; and

4.1.6   You will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed in Section 13 below.

4.2   If we determine that you do not fulfil any of the above criteria, then we may suspend your ability to use the Services or close your Account at our discretion.

5.   **REGISTRATION PROCESS; IDENTITY VERIFICATION**

5.1   When registering your Account, you must provide complete, accurate, up-to-date and not misleading information for all required elements on the registration page, including your full legal name. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorise us to make any enquiries, directly or through third parties that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take any action we reasonably deem necessary based on the results of such inquiries. When we carry out these enquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

5.2   In certain circumstances, we may require you to submit additional information about yourself, your business, your source of wealth, or your transactions, provide records, and complete other verification steps (such process, **"Enhanced Due Diligence"**).

5.3   You represent and warrant that any and all information provided to us in connection with registering your Account, using the Services, pursuant to the Terms or otherwise is complete, accurate, up-to-date and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible and provide such updates to us.

5.4   Your access to the Services and the limits that apply to your use of the Services may be altered as a result of information collected about you on an ongoing basis.

5.5   If any (or we suspect that any) of the information that you have provided to us is not complete, accurate, up-to-date or misleading in any respect, or you fail to provide updates to any information that you have provided to us to ensure that it is complete, accurate, up-to-date and not misleading in any respect on a timely basis, we may suspend your ability to use the Services or close your Account at our discretion.

5.6   We reserve the right to maintain your Account registration information after you close your Account for business and regulatory compliance purposes, subject to Applicable Laws.

6.    **YOUR ACCOUNT; SECURITY OF USER INFORMATION**

6.1    You may access your Account (and the Services) directly via the Site, via a Mobile Application or by such other mode of access (including but not limited to through the APIs) as FTX Trading may prescribe from time to time, using the account names, User IDs, passwords, and other security features (**"User Credentials and Security Passwords"**) made available to you by FTX Trading for the purposes of enabling you to access your Account (and the Services). You are responsible for maintaining the confidentiality and security of any and all User Credentials and Security Passwords, which includes the enabling of all relevant security features. You are responsible for keeping your email address up to date in your Account profile.

6.2    You are only permitted to access your Account using your own User Credentials and Security Passwords. You must ensure that your Account is not used by any other third party and you must not share your User Credentials and Security Passwords with any third party. You are solely responsible for all activity on your Account.

6.3    You agree to notify FTX Trading immediately if you become aware of any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords, or unauthorised use of the Services via your Account, or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information. It is important that you regularly check your Account balance and your transaction history to ensure any unauthorised transactions or incorrect transactions are identified and notified to us at the earliest possible opportunity.

6.4    FTX Trading reserves the right to suspend your ability to use the Services or close your Account if we suspect that the person logged into your Account is not you or we become aware of or suspect that there has been any breach of security, loss, theft or unauthorised use of your User Credentials and Security Passwords.

6.5    In order to access your Account (and the Services) you must have the necessary equipment (such as a computer or smartphone) and access to the Internet. You are solely responsible for your own hardware used to access the Services and are solely liable for the integrity and proper storage of any data associated with the Services that is stored on your own hardware. You are responsible for taking appropriate action to protect your hardware and data from viruses and malicious software, and any inappropriate material. Except as provided by Applicable Law, you are solely responsible for backing up and maintaining duplicate copies of any information you store or transfer through our Services. Neither FTX Trading nor any other Indemnified Party shall be liable to you: (i) in the event that your hardware fails, is damaged or destroyed or any records or data stored on your hardware are corrupted or lost for any reason; (ii) for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack; or (iii) for your use of the Internet to connect to the Services or any technical problems, system failures, malfunctions, communication line failures, high internet traffic or demand, related issues, security breaches or any similar technical problems or defects experienced.

7.    **ORDER BOOK AND CONVERT**

7.1    FTX Trading operates Order Books on which Orders may be placed by Users to be matched with the Orders of other Users. The Order types that FTX Trading may offer from time to time in its sole discretion include but are not limited to "market" ,"limit", "stop-loss limit", "stop-loss market", "trailing stop" and "take profit limit" orders. FTX Trading may issue trading rules from time to time that apply to Orders placed on the Order Book, in addition to these General Terms.

7.2    The Convert function on the Platform also allows you to submit instructions ("**Convert Instructions**") to exchange (buy or sell) one spot Asset for another. Each Convert transaction is subject to the applicable Exchange Rate quoted for the given transaction and the applicable time limts for such quote. The **"Exchange Rate"** means the price of a given Digital Asset as quoted on your "Wallet" page on the Site or any Mobile Application. The

Exchange Rate is stated either as a "Buy Price" or as a "Sell Price", which is the price at which you may buy or sell the Asset, respectively.

7.3    The Exchange Rate quoted will depend on market conditions, and you are under no obligation to execute a Convert transaction at any Exchange Rate quoted to you. You acknowledge that the Buy Price Exchange Rate may not be the same as the Sell Price Exchange Rate at any given time, and that there may be a 'spread' to the quoted Exchange Rate. You agree to accept the Exchange Rate when you authorise a Convert transaction.

7.4    We do not guarantee the availability of any Exchange Rate and we do not guarantee that you will be able to buy and/or sell your Assets using Convert or on the Order Book at any particular price or time.

7.5    You are solely responsible for accurately entering any Order or Convert Instruction, including but not limited to all the necessary information in order to enable us to carry out any Order or Convert Instruction. FTX Trading is not obliged to verify the accuracy or completeness of any such information, Order or Convert Instruction.

7.6    You agree that any Order or Convert Instruction received or undertaken through your Account shall be deemed to be final and conclusive, and that FTX Trading may act upon such Order or Convert Instruction. We shall not be under any obligation to verify the identity or authority of any person giving any Order or Convert Instruction or the authenticity of such Order or Convert Instruction.

7.7    Your Orders and Convert Instructions shall be irrevocable and unconditional and shall be binding on you, and such Orders and Convert Instructions may be acted or relied upon by us irrespective of any other circumstances. As such, once you give any Order or Convert Instruction, you have no right to rescind or withdraw such Order or Convert Instruction without our written consent.

7.8    Each of your Orders and Convert Instructions shall not be considered to be received by FTX Trading unless and until it has been received by FTX Trading's server. FTX Trading's records of all Orders and Convert Instruction shall be conclusive and binding on you for all purposes.

7.9    Under no circumstances shall any of the Indemnified Parties be responsible or liable to you for any Losses suffered or incurred by you or any other person arising from any of the Indemnified Parties relying or acting upon any Order or Convert Instruction which is given or purported to be given by you, regardless of the circumstances prevailing at the time of such Order or Convert Instruction.

7.10   You hereby authorise FTX Trading to credit or debit (or provide settlement information to third parties for the purposes of the third party crediting or debiting) your Assets from your Account in accordance with your Orders and Convert Instructions. We reserve the right not to effect any transaction if you have insufficient Assets in your Account.

8.    **ACCOUNT FUNDING**

8.1    **Funding - General**

8.1.1    In order to fund your Account and begin transacting in Digital Assets using the Platform, you must first procure Digital Assets (or deposit Digital Assets that you already own into your Account) and/or load fiat currency into your Account.

8.1.2    You should be aware that FTX Trading: (i) may not support the loading into and/or storing of fiat currency in your Account in all jurisdictions; and (ii) does not support the use of all fiat currencies. A partial list of fiat currencies supported by FTX Trading can be found here. This list may be amended from time to time by FTX Trading at its sole discretion.

8.1.3    Any available Assets held in your Account is available to be locked and used as collateral for margin trading, or to fund trades, in relation to any Services or part thereof offered through the Platform by FTX Trading or its Affiliates.

8.2 **Digital Assets**

8.2.1 The Platform supports deposits and withdrawals of certain Digital Assets, including certain U.S. Dollar-pegged stablecoins (each a **"USD Stablecoin"**). You may deposit Digital Assets that you already own into your Account by generating an address within your Account and sending your Digital Assets to such address, after which they should appear in your Account balance (USD Stablecoins will appear in your "USD Stablecoins (USD)" balance).

8.2.2 You may purchase Digital Assets in exchange for certain supported fiat currencies (depending on your location) by linking a valid payment method to your Account. In such circumstances, you authorise us to debit the relevant amount of fiat currency using your selected payment method(s) to complete your purchase.

8.2.3 The Platform enables you to exchange one Digital Asset for another Digital Asset, send Digital Assets to and receive Digital Assets from other Users of the Services, or third parties outside of the Platform (where permitted by FTX Trading in its sole discretion).

8.2.4 You may sell Digital Assets in exchange for certain supported fiat currencies (depending on your location). In such circumstances, you authorise us to debit your Account and to send instructions to credit your selected payment method(s) in settlement of sell transactions.

8.2.5 FTX Trading makes no representations or warranties regarding the amount of time, transaction fees or other requirements that may be required to complete the transfer of your Digital Assets to or from a third party wallet or other source and for said Digital Assets to become available in your Account.

8.2.6 All Digital Assets are held in your Account on the following basis:

(A) Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading. As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

(B) None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party.

8.2.7 FTX Trading is under no obligation to issue any replacement Digital Asset in the event that any Digital Asset, password or private key is lost, stolen, malfunctioning, destroyed or otherwise inaccessible.

8.2.8 It is your responsibility to ensure that you send all Digital Assets, to the correct address provided for that particular Digital Asset, including with respect to any Digital Assets that you send to the Platform. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your Account or the specific Digital Asset sent), such Digital Asset may be lost forever. By sending any Digital Assets to the Platform, you attest that you will only send a supported Digital Asset to the Platform wallet address provided to you. For example, if you select an Ethereum Platform wallet address to receive funds, you attest that you are initiating an inbound transfer of Ethereum alone, and not any other forms of Digital Assets. You agree that FTX Trading incurs no obligation whatsoever with regards to sending unsupported Digital Assets to an address provided to you on the Platform. Similarly, if you

send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

8.2.9  You assume all liability for any Losses incurred as a result of sending Digital Assets to an incorrect address (such as typos, errors, copy-paste attacks, or an address not associated with your Account, or an address not associated with the specific Digital Asset). You are solely liable for verifying the accuracy of any external wallet address, and the identity of the recipient. All outbound transfers of Digital Assets cannot be reversed once they are broadcast to the underlying blockchain network. FTX Trading does not control any blockchain network and cannot guarantee that any transfer will be confirmed or transferred successfully by the network. FTX Trading is not responsible for any losses or for taking any actions to attempt to recover any lost, stolen, misdirected or irrecoverable Digital Assets. If the Digital Assets are recoverable, we may in our sole discretion attempt to recover them, but such recovery efforts are in no way guaranteed. Please be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your ETH may not be automatically credited, and may take time to recover, and may not be recovered at all.

8.2.10  When you elect to transfer Digital Assets from your Account to a third party wallet address or other location, it is always possible that the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting the Platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected or failed transfer.

8.2.11  You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services (including any Digital Assets used to fund your Account) are either owned by you or that you are validly authorised to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person.

8.2.12  It is your responsibility entirely to provide us with correct details of any withdrawal address. We accept no liability resulting in you or any third party not receiving Digital Assets withdrawn by you due to you providing incorrect, erroneous, incompatible or out-of-date details.

8.3  **Fiat currency**

8.3.1  Where specified on the Site or in a Service Schedule, and depending on your location, the Platform may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods.

8.3.2  Once we receive fiat currency that you load into your Account, we may issue you with an equivalent amount of electronic money (**"E-Money"**), denominated in the relevant fiat currency, which represents the fiat currency that you have loaded. This amount will be displayed in your Account.

8.3.3  E-MONEY IS NOT LEGAL TENDER. FTX TRADING IS NOT A DEPOSITORY INSTITUTION AND YOUR E-MONEY IS NOT A DEPOSIT OR INVESTMENT ACCOUNT. YOUR E-MONEY ACCOUNT IS NOT INSURED BY ANY PUBLIC OR PRIVATE DEPOSIT INSURANCE AGENCY.

8.3.4  E-Money held in your Account will not earn any interest. Your Account may hold E-Money denominated in different currencies and we will show the E-Money balance for each currency that you hold.

8.3.5  You may purchase Digital Assets by using E-Money credited to your Account (depending on your location). To carry out a Digital Asset purchase using E-Money, you must follow the relevant instructions on the Site. You authorise us to debit E-Money from your Account to complete your purchase. Although we will attempt to deliver Digital Assets to you as promptly as possible, E-Money may be debited from your Account before Digital Assets are delivered to your Account.

8.3.6    You may sell Digital Assets in exchange for certain fiat currencies (depending on your location). To carry out a Digital Asset sale, you must follow the relevant instructions on the Site. You authorise us to debit Digital Assets from your Account and send instructions to credit your Account with the relevant amount of fiat currency. Once we receive the fiat currency, we will issue you with an equivalent amount of E-Money denominated in the relevant fiat currency.

8.3.7    You may redeem all or part of any E-Money held in your Account at any time subject to outages, downtime, and other applicable policies (including the Terms), by selecting the relevant option in the Site and following the instructions. Unless agreed otherwise, funds will be transferred to the bank account you have registered with us. You hereby represent and warrant that this bank account is your own, and that you have full control over it. It is your responsibility entirely to provide us with correct details of your withdrawal account. We accept no liability resulting in you not receiving any amounts withdrawn by you due to you providing incorrect or out-of-date details.

8.3.8    If the Terms are terminated, we may redeem any E-Money remaining in your Account and attempt to transfer the equivalent amount of fiat currency to the bank account you have registered with us. Prior to redeeming E-Money from your Account, we may conduct checks for the purposes of preventing fraud, money laundering, terrorist financing and other financial crimes, and as required by Applicable Law. This may mean you are prevented or delayed from withdrawing E-Money until those checks are completed to our reasonable satisfaction in order to comply with our regulatory requirements.

## 9.    UNCLAIMED OR ABANDONED PROPERTY

9.1    If FTX Trading is holding Assets in your Account (**"Unclaimed or Abandoned Property"**), and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, Applicable Laws may require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you using the details shown in our records in relation to your Account, but if FTX Trading is unable to locate you, we may be required to deliver any such Unclaimed or Abandoned Property to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such Unclaimed or Abandoned Property, as permitted by Applicable Laws.

9.2    If FTX Trading is holding Unclaimed or Abandoned Property, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time or your Account has been closed, and Applicable Laws do not require us to report such Unclaimed or Abandoned Property as unclaimed property to the applicable jurisdiction, then you acknowledge and agree that your Account may be transferred to FTX Trading, or an Affiliate of FTX Trading, as Trustee of the Unclaimed or Abandoned Property. FTX Trading or the Affiliate of FTX Trading (as applicable), as Trustee, will hold the Unclaimed or Abandoned Property on your behalf and shall, on demand, repay to you the Unclaimed or Abandoned Property subject to your payment of any dormancy fee or other administrative charges that the Trustee may deduct from the Unclaimed or Abandoned Property. If no such demand is made by you, the Trustee may pay the Unclaimed or Abandoned Property into court in the applicable jurisdiction in accordance with Applicable Laws.

9.3    If we receive legal documentation confirming your death or other information leading us to believe you have died, we will freeze your Account and during this time, no transactions may be completed until: your designated fiduciary has opened a new Account, as further described below, and the entirety of your Account has been transferred to such new account, or (ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you may have died but we do not have proof of your death in a form satisfactory to us, you authorise us to make enquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

valid will or similar testamentary document will be required to open a new Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a will, a living trust or other similar documentation, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your Account. Pursuant to the above, the opening of a new Account by a designated fiduciary is mandatory following the death of an Account owner, and you hereby agree that your fiduciary will be required to open a new Account in order to gain access to the contents of your Account.

10.    **DEBIT ACCOUNT BALANCE**

10.1    If at any time your Account has a debit balance, you agree to pay us: (i) the applicable fees set out in the <u>Fee Schedule</u>; (ii) the total debit balance; and (iii) such other amounts specified in the Terms.

10.2    If you fail to pay such amounts, we may suspend your ability to use the Services or close your Account. We also reserve the right to debit your Account accordingly and/or to withhold amounts from fiat currency and Digital Assets that you may transfer to your Account.

10.3    If, after a demand is made by FTX Trading, you have not made payment of the outstanding debit balance by the time stated in the demand, then:

10.3.1    you authorise us to sell any Digital Assets or redeem any fiat currency or E-Money in your Account to recover the outstanding debit balance;

10.3.2    you agree to indemnify us and each other Indemnified Party against all Losses that we suffer or incur as a result of your not paying the outstanding debit balance; and

10.3.3    you will be liable for all costs which we incur in relation to instructing a collection agency, law firm or other third party to assist with and advise on the collection of such outstanding debit balance (where applicable).

11.    **THIRD PARTY PERMISSIONS TO CONNECT TO OR ACCESS YOUR ACCOUNT**

If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Platform, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under the Terms. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

12.    **ACCOUNT SUSPENSION AND CLOSURE; SERVICE SUSPENSION AND TERMINATION**

12.1    FTX Trading may, in its sole and absolute discretion and at any time, without liability to you or any third party:

12.1.1    refuse to let you open an Account, suspend your Account, or terminate your Account;

12.1.2    decline to process any instruction or Order submitted by you; and/or

12.1.3    limit, suspend or terminate your use of one or more, or part of, the Services.

12.2    Such actions will not relieve you from your obligations pursuant to the Terms.

12.3    Such actions may be taken as a result of a number of factors, including without limitation:

12.3.1   as a result of account inactivity, your failure to respond to customer support requests, our failure or inability to positively identify you;

12.3.2   as a result of a court order or your violation of Applicable Laws or the Terms; or

12.3.3   where we believe that a transaction is suspicious or may involve fraud, money laundering, terrorist financing or other misconduct.

12.4   If you do not agree with any actions taken by us under Section 12.1, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any actions taken by us under Section 12.1.

12.5   Without limitation to the foregoing, we may temporarily suspend access to your Account in the event that a technical problem causes a system outage or Account errors until the problem is resolved.

12.6   Where required by Applicable Laws, we will notify you promptly if we have suspended processing your Orders or Convert Instructions and, if possible, provide our reasons for doing so and anything you can do to correct or remedy the matters giving rise to such suspension.

12.7   You may close your Account or terminate your access to and use of the Services at any time upon request to FTX Trading, in accordance with the Terms. In order to close your Account or terminate your access to and use of the Services, you should contact us for assistance. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading or its Affiliates.

12.8   We encourage you to withdraw any remaining balance of Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if:

12.8.1   your Account has otherwise been suspended or closed by us in accordance with the Terms;

12.8.2   to do so would be prohibited by Applicable Laws or court order, or we have determined that the Assets in your Account were obtained fraudulently; or

12.8.3   you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account.

12.9   Upon closure or suspension of your Account, you authorise FTX Trading to cancel or suspend pending transactions.

12.10   Notwithstanding that you or FTX Trading closes or deactivates your Account or terminates or suspends your access to and use of any Services, or the termination or expiry of the Terms, you shall remain liable for all activity conducted with or in connection with your Account while it was open, and for all amounts due in connection with such activity.

13.   **RESTRICTED ACTIVITIES**

In connection with your use of the Services, you agree that you will not:

13.1.1   violate or assist any party in violating any Applicable Laws or any rule of any self-regulatory or similar organisation of which you are or are required to be a member through your use of the Services;

13.1.2   provide false, inaccurate, incomplete, out-of-date or misleading information;

13.1.3   infringe upon FTX Trading's or any third party's copyrights, patents, trademarks, or other intellectual property rights;

13.1.4   engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;

14

13.1.5   distribute unsolicited or unauthorised advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;

13.1.6   use a web crawler or similar technique to access our Services or to extract data;

13.1.7   reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;

13.1.8   perform any unauthorised vulnerability, penetration or similar testing on the API or Services;

13.1.9   take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;

13.1.10   transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

13.1.11   otherwise attempt to gain unauthorised access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;

13.1.12   transfer any rights granted to you under the Terms;

13.1.13   engage in any activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct;

13.1.14   engage in any behaviour which is unlawful, violates the Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion; or

13.1.15   assist, facilitate or encourage any third party in undertaking any activity otherwise prohibited by the Terms.

## 14.   ELECTRONIC TRADING TERMS

14.1   FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset at any time, including without limitation where there are changes in the characteristics of such Digital Asset.

14.2   A transaction on the Platform may fail for several reasons including, without limitation, as a result of a change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. Under no circumstances are we liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures via your Account. You have full responsibility for determining and inquiring into the failure of any transaction which you initiate.

14.3   In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to the Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

14.4   We may refuse to execute a trade or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, and the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on the Platform, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in the Terms. FTX Trading reserves the

right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorisation to make a transaction, except with respect to partially filled Orders.

14.5    FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an Order or Convert Instruction or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

14.6    Orders placed on the Order Book may be partially filled or may be filled by one or more Orders placed on the Order Book by other Users, depending on the trading activity on the Order Book at the time an Order is placed.

14.7    The Digital Assets available for purchase through the Platform may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide Exchange Rate information to you through the Platform, the Exchange Rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated Exchange Rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in any actual versus indicated Exchange Rates.

## 15.    **STAKING**

15.1    When you hold Digital Assets on the Platform you may be given the option to "stake" these assets via staking services provided by FTX Trading or its Affiliates. You are not required to stake any Digital Assets and you can opt out of any staking services (subject to applicable early withdrawal limits or penalties as specified on the staking page for such Digital Asset). If you stake your Digital Assets, FTX Trading or its Affiliate will facilitate the staking of such Digital Assets on your behalf. You agree and acknowledge that you have no right to any staking rewards whatsoever. FTX TRADING DOES NOT GUARANTEE THAT YOU WILL RECEIVE ANY STAKING REWARDS OVER TIME, INCLUDING THE DISPLAYED STAKING REWARDS RATES.

15.2    The tax treatment of staking Digital Assets is uncertain, and it is your responsibility to determine what taxes, if any, arise from the transactions. You are solely responsible for reporting and paying any applicable taxes arising from staking services and all related transactions, and acknowledge that FTX Trading does not provide investment, legal, or tax advice to you in connection with such election to participate. You should conduct your own due diligence and consult your advisors before making any investment decision including whether to participate in staking and related transactions.

## 16.    **MARGIN TRADING**

16.1    This Section 16 applies only to the extent you are permitted to engage in margin trading on the Platform. Margin trading is prohibited in certain jurisdictions, and you may not be able to engage in margin trading on the Platform. We reserve the right to amend and/or remove margin trading functionality at any time.

16.2    Margin trading is HIGH RISK. As a borrower, you may sustain a total loss of Assets or owe Assets beyond what you have deposited to your Account. The high volatility and substantial risk of illiquidity in markets means that you may not always be able to liquidate your position. You agree to maintain a sufficient amount of Assets at all times to meet our margin requirements, as such requirements may be modified from time to time. If the value of the Assets in your Account falls below the margin maintenance requirement or we determine, in our sole discretion, that your Account appears to be in danger of defaulting on a loan, we may seize and/or liquidate any or all of your positions and Assets on any balance in your Account in order to reduce your leverage or settle your debt to other Users, in which case, you may sustain a total loss of all Assets in your Account. Our liquidation mechanism is described at https://help.ftx.com/hc/en-us/articles/360027668712-Liquidations. If, after your positions and Assets are liquidated, your Account still contains

insufficient Assets to settle your debts to other Users, you will be responsible for any additional Assets owed. Intentionally defaulting on a loan may result in our reporting your activities to authorities and/or in legal prosecution.

16.3    When you lend Assets to other Users, you risk the loss of an unpaid principal if the borrower defaults on a loan and liquidation of the borrower's Account fails to raise sufficient Assets to cover the borrower's debt. Although we take precautions to prevent borrowing Users from defaulting on loans, the high volatility and substantial risk of illiquidity in markets means that we cannot make any guarantees to any Users using the Services against default.

16.4    Under certain market conditions, it may become difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on the Platform. Placing contingent Orders, such as "stop-loss" or "stop-limit" Orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such Orders. In such an event, our backstop liquidity provider program may come into play, but there is no assurance or guarantee that any such program activities will be sufficient or effective in liquidating your position. As a result, you may lose all of your Assets or incur a negative balance in your Account. In addition, even if you have not suffered any liquidations or losses, your Account balance may be subject to clawback due to losses suffered by other Users.

16.5    The use of leverage can work against you as well as for you and can lead to large losses as well as gains. Users conduct all trading, margin trading, lending, and/or borrowing on their own account and we do not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks associated with margin trading on the Platform.

17.    **FORKS AND DISTRIBUTIONS**

17.1    As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes (**"Forks"**) can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a **"Dominant Digital Asset"**) and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a **"Non-Dominant Digital Asset"**).

17.2    FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on the Platform. When trading or holding Digital Assets using your Account, you should operate under the assumption that the Platform will never support any Fork of such Digital Asset.

17.3    If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non-Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

17.4    The Platform does not generally offer support for the distribution of Digital Assets based on a triggering fact or event, such as the possession of another Digital Asset (each an **"Airdrop"**), the provision of rewards or other similar payment for participation in a Digital Asset's protocol (**"Staking Rewards"**), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the Platform (collectively, **"Digital Asset Distributions"**). FTX Trading may, in

its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

17.5    In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on the Platform for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored (**"Downtime"**). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

## 18.    ATTACKS ON BLOCKCHAIN NETWORKS

18.1    FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take (or to not take) actions, including, but not limited to, immediately halting trading, deposits and withdrawals for a Digital Asset if we believe that the Digital Asset's network is compromised or under attack. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

18.2    Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of the Services and you assume all liability for any lost value or stolen property.

## 19.    SITE; THIRD PARTY CONTENT

19.1    FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. You should always carry out your own independent appraisal and investigations in relation to such information and not rely on it in any way.

19.2    The Site may also contain links to third party websites, applications, events or other materials (**"Third Party Content"**). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading makes no representation as to the quality, suitability, functionality or legality of Third Party Content, or to any goods and services available from third party websites, and FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

19.3    We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from a third party (including other Users of the Platform). We are not responsible for ensuring that a third party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party purchased using Digital Assets in connection with the Services, you must resolve the dispute directly with that third party.

## 20.    AVAILABILITY

20.1    We do not represent that you will be able to access your Account or the Services 100% of the time. Your Account and the Services are made available to you without warranty of any kind, either express or implied. There are no guarantees that access will not be interrupted, or that there will be no delays, failures, errors, omissions or loss of transmitted information. This could result in the inability to trade on the Platform for a period of time and may also lead to time delays. We may, from time to time, suspend access to your Account and the Services, for both scheduled and emergency maintenance.

20.2    You acknowledge and agree that neither FTX Trading nor any other Indemnified Party shall have any liability to you or any third party for the correctness, quality, accuracy, security, completeness, reliability, performance, timeliness, pricing or continued availability of the Services or for delays or omissions of the Services, or for the failure of any connection or communication service to provide or maintain your access to the Services, or for any interruption in or disruption of your access or any erroneous communications between FTX Trading (or any other Indemnified Party) and you, regardless of cause.

20.3    FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements. In addition, FTX Trading may determine not to make the Services, in whole or in part, available to you, depending on your location. If you travel to a Restricted Territory, our Services may not be available and your access to our Services may be blocked. You acknowledge that this may impact your ability to trade on the Platform and/or monitor any existing Orders or open positions or otherwise use the Services. You must not attempt in any way to circumvent any such restriction, including by use of any virtual private network to modify your internet protocol address.

21.    **RIGHT TO CHANGE, SUSPEND OR DISCONTINUE SERVICES**

21.1    We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may advise you of any such changes, suspensions or discontinuations via your Account or the other contact details that you have provided to us but shall have no obligation to do so.

21.2    If you do not agree with any change, suspension, or discontinuance of any aspect of the Services, then your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any such changes, suspensions, discontinuations or decisions.

22.    **UPDATES TO THE TERMS**

22.1    We reserve the right to amend any part of the Terms, at any time, by posting the revised version of the Terms on the Site, with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised Terms and shall apply on a going-forward basis with respect to transactions initiated after the posting date. You acknowledge that it is your responsibility to check the Terms periodically for changes.

22.2    If you do not agree with any amendments to the Terms, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that neither we nor any other Indemnified Party shall be liable to you or any third party for any Losses suffered as a result of any amendment of the Terms.

23.    **FEES**

23.1    In consideration for the use of the Services, you agree to pay to FTX Trading the appropriate fees, as set forth in our Fee Schedule displayed on the Site (**"Fee Schedule"**), which FTX Trading may revise or update in its sole discretion from time to time. If you do not agree with any amendments to the Fee Schedule, your sole and exclusive remedy is to terminate your use of the Services and close your Account.

23.2    On request, FTX Trading may make available an alternative fee schedule (**"Alternative Fee Schedule"**) to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX Trading in its sole discretion from time to time.

23.3    You authorise FTX Trading to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

24.     **TAXES**

24.1    You will be able to see a record of your transactions via your Account which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Platform, and to collect, report, and remit the correct tax to the appropriate tax authority.

24.2    FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

25.     **RIGHT TO USE SERVICES; API USE; THIRD PARTY APPLICATIONS**

25.1    **License**

25.1.1    FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to the Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services, and you agree that the Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

25.1.2    Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of the Terms, your permission to access and use the Services may be terminated pursuant to the Terms.

25.1.3    "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written consent. All right, title, and interest in and to the Site and any Mobile Application, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

25.2    **API use**

25.2.1    Subject to your compliance with the Terms and any other agreement which may be in place between you and FTX Trading relating to your use of the API, FTX Trading grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on the Platform. You agree to not use the API or data provided through the API for any other purpose. You agree your access and use of the API shall be entirely at your own risk, and that FTX Trading will not be responsible for any liabilities that you incur as a result of the use of the API or actions you take based on the API.

25.2.2    FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion.

25.2.3    FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of the Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

25.3    **Third Party Applications**

25.3.1    We offer our Services to users both directly and via third party websites, platforms, applications and other access portals (collectively, "**Third Party Portals**"). If you are accessing these Terms via a Third Party Portal, you agree (a) to comply with all applicable terms of service of such Third Party Portal, (b) that you are solely responsible for payment of any and all costs and fees

associated with such Third Party Portals, and (c) we do not owe you any duty of care with respect to such Third Party Portals, nor do we accept any responsibility for them.

25.3.2  If you grant express permission to a third party to connect to your Account, either through the third party's product or through the Services, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under these Terms.

25.3.3  You acknowledge and agree that you will not hold us responsible for, and will indemnify us from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant. You expressly agree that your use of any Third Party Portal is at your own risk and we will not be liable to you for any inaccuracies, errors, omissions, delays, damages, claims, liabilities or losses, arising out of or in connection with your use of Third Party Portals.

25.3.4  In the event that access to the Services via any Third Party Portal is suspended, terminated or cancelled for any reason, you agree that you shall remain bound by these Terms and our Privacy Policy as a user of the Services.

26.  **PRIVACY POLICY**

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

27.  **CONFIDENTIALITY**

27.1  You shall treat as strictly confidential and not use or disclose any information or documents which you receive (or have received) from us, whether before, during or after the term of the Terms, and whether communicated orally, in writing, in electronic form or otherwise, relating to our business, financial situation, products and services (including the Services), expectations, processes and methods, customers or employees, in each case which is designated as being "confidential" or which by its very nature should obviously be treated as secret and confidential (together **"Confidential Information"**).

27.2  You may use the Confidential Information solely to the extent necessary to receive the benefit of the Services in accordance with the Terms.

27.3  The obligation to maintain confidentiality under this Section 27 shall not apply to any Confidential Information to the extent that such information is:

27.3.1  in the public domain through no breach of the Terms;

27.3.2  known to you at the time of disclosure without restrictions on use, or independently developed by you, and in each case, there is appropriate documentation to demonstrate either condition; or

27.3.3  required to be disclosed to a Regulatory Authority or by Applicable Laws.

27.4  If you are required under Applicable Laws or by any Regulatory Authority to disclose Confidential Information in the circumstances set out in Section 27.3.3 you shall give us such notice as is practical in the circumstances of such disclosure and shall provide all cooperation reasonably requested by us in relation to mitigating the effects of, or avoiding the requirements for, any such disclosure.

27.5  Any Confidential Information shall remain the property of FTX Trading and may be copied or reproduced only with our prior written consent.

27.6  Upon request, you shall return or destroy all materials containing our Confidential Information and, where such materials have been destroyed, confirm such destruction in writing. You shall be under no obligation to return or destroy such materials if and to the extent you are required to retain such materials under Applicable Laws, provided that you

shall notify us in writing of such requirement, giving details of the materials which have not been destroyed or returned, and this Section 27 shall continue to apply to such materials.

27.7    The parties agree and acknowledge that a breach of this Section 27 constitutes a matter of urgency for the purposes of section 12A(4) of Singapore's International Arbitration Act (Chapter 143A) both before, and after, the formation of the arbitral tribunal.

27.8    The availability of relief from an emergency arbitrator or the expedited formation of an arbitral tribunal under SIAC Rules (as defined in Section 38.12.1 below) shall not prejudice any party's right to apply to a state court or other judicial authority for any interim or conservatory measures before the formation of the arbitral tribunal and it shall not be treated as an alternative to or substitute for the exercise of such right. Where a party applies for relief from a state court or other judicial authority, the parties agree that failure to make an application for expedited appointment of the arbitral tribunal and/or for the appointment of an emergency arbitrator under the SIAC Rules shall not indicate, or be deemed to indicate, a lack of urgency. The parties also agree that any refusal by the President of the Court of Arbitration of SIAC to appoint an emergency arbitrator or allow the expedited formation of the arbitral tribunal shall not be determinative of the question of urgency.

27.9    The parties agree that an application to a state court or other judicial authority for interim or conservatory measures after the formation of the arbitral tribunal in respect of this Section 27 shall be considered "exceptional circumstances" under Rule 30.3 of the SIAC Rules. The parties also agree that an application may be made for interim relief on a non-urgent basis under section 12A(5) of Singapore's International Arbitration Act and agree that this Section 27.9 constitutes agreement in writing for the purposes of section 12A(5) of Singapore's International Arbitration Act.

28.    **COOKIES**

By accessing the Site, you agree to use cookies in agreement with FTX Trading's Privacy Policy. The Site uses cookies to enable us to retrieve User details for each visit, and to enable the functionality of certain areas of the Site to make it easier for Users visiting the Site to access and use the Services.

29.    **INDEMNIFICATION; RELEASE**

29.1    You shall and agree to defend, indemnify and hold harmless FTX Trading, its Affiliates and service providers and, in each case, their Personnel (collectively, **"Indemnified Parties"** and each an **"indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"Losses"** or **"Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (i) your use of your Account and/or the Services; (ii) your breach or anticipatory breach of the Terms; or (iii) your violation or anticipatory violation of any Applicable Laws.

29.2    You will cooperate as fully required by the Indemnified Parties in the defence of any such claims and Losses. The Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and Losses. You will not settle any claims and Losses without FTX Trading's prior written consent.

29.3    You hereby agree to release each of the Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the Indemnified Parties in relation to any Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the Services (including any Digital Asset transactions) or the subject matter of the Terms.

30.    **LIMITATION OF LIABILITY; NO WARRANTY**

30.1    NOTHING IN THE TERMS SHALL LIMIT OR EXCLUDE A PARTY'S LIABILITY:

30.1.1 FOR DEATH OR PERSONAL INJURY CAUSED BY ITS NEGLIGENCE;

30.1.2 FOR FRAUD OR FRAUDULENT MISREPRESENTATION; OR

30.1.3 TO THE EXTENT SUCH LIABILITY CANNOT BE EXCLUDED BY APPLICABLE LAWS.

30.2 SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES SHALL BE LIABLE TO YOU IN CONTRACT, TORT (INCLUDING NEGLIGENCE), EQUITY, STATUTE OR ANY OTHER CAUSE ARISING OUT OF OR IN CONNECTION WITH THE TERMS (OR ARISING OUT OF OR IN CONNECTION WITH: YOUR USE OR INABILITY TO USE THE SERVICES; THE COST OF PROCURING SUBSTITUTE GOODS AND SERVICES IN CIRCUMSTANCES WHERE YOU DO NOT OR ARE UNABLE TO USE THE SERVICES; ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; UNAUTHORISED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR ANY OTHER MATTER RELATING TO THE SERVICES) FOR:

30.2.1 INCIDENTAL, PUNITIVE, EXEMPLARY OR OTHER SPECIAL LOSS OR DAMAGE; OR LOSS OF PROFIT, LOSS OF REVENUE, LOSS OF GOODWILL, LOSS OF USE, LOSS OF BUSINESS OR CONTRACT, LOST OPPORTUNITIES, INCREASED COSTS OR EXPENSES (OR WASTED EXPENDITURE INCLUDING PRE-CONTRACT EXPENDITURE), LOSS OF SAVINGS, ANY LIABILITY VOLUNTARILY ASSUMED BY YOU, OR LOSS OF OR DAMAGE TO DATA, IN EACH CASE REGARDLESS OF WHETHER SUCH LOSS OR DAMAGE WAS DIRECT OR INDIRECT, FORESEEABLE OR UNFORESEEABLE, OR WHETHER FTX TRADING OR ANY OF THE OTHER INDEMNIFIED PARTIES HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE; OR

30.2.2 INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE.

30.3 YOU ACKNOWLEDGE AND AGREE THAT FTX TRADING AND ITS AFFILIATES MAY RELY ON ONE OR MORE THIRD PARTY INTERMEDIARIES FOR THE PURPOSES OF PROVIDING THE SERVICES. THE THIRD PARTY INTERMEDIARIES ARE INDEPENDENT THIRD PARTIES AND ARE NOT FTX TRADING'S AGENTS OR SUBCONTRACTORS. SUBJECT TO SECTION 30.1, FTX TRADING SHALL NOT BE LIABLE FOR THE ACTS OR OMISSIONS OF ANY THIRD PARTY INTERMEDIARY, OR ANY LOSSES ARISING FROM THE FAULT OF ANY THIRD PARTY INTERMEDIARY, SUCH AS A FAILURE BY A THIRD PARTY INTERMEDIARY TO COMPLY WITH APPLICABLE LAWS OR ANY REASONABLE INSTRUCTIONS PROVIDED BY FTX TRADING.

30.4 YOU ACKNOWLEDGE AND AGREE THAT THE SERVICES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT ANY WARRANTY OR REPRESENTATION OF ANY KIND AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF FTX TRADING AND THE OTHER INDEMNIFIED PARTIES EXPRESSLY DISCLAIM ANY WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SERVICES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. NEITHER FTX TRADING NOR ANY OTHER INDEMNIFIED PARTY MAKES ANY WARRANTY THAT:

30.4.1 THE SERVICES WILL MEET YOUR REQUIREMENTS;

30.4.2 THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE; OR

30.4.3 THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

30.5    SUBJECT TO SECTION 30.1, NEITHER FTX TRADING NOR ANY OF THE OTHER INDEMNIFIED PARTIES WILL BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; SERVER FAILURE OR DATA LOSS; CRYPTOCURRENCY WALLETS OR CORRUPT FILES; UNAUTHORISED ACCESS TO SERVICES; OR ANY THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST YOUR COMPUTER OR ANY BLOCKCHAIN NETWORK UNDERLYING THE SERVICES.

31.    **COUNTRY-SPECIFIC ADDENDA**

If you are a resident of Australia, Japan, or South Africa, additional terms and conditions will apply to your use of the Services as set forth in the Schedules attached hereto.

32.    **COMMUNICATIONS IN ENGLISH**

The Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

33.    **FEEDBACK**

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide to us or one of our social media accounts, regarding the Services (collectively, **"Feedback"**) that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, in and to such Feedback, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

34.    **QUESTIONS AND CONTACT INFORMATION**

34.1    We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise You to check those channels before contacting support.

Telegram: https://t.me/FTX_Official

Twitter: https://twitter.com/FTX_Official

WeChat: ftexchange

Blog: https://blog.ftx.com/

34.2    To contact us, please visit one of the links or channels above. For support with your Account, you may submit a support ticket at https://ftx.com/support. For legal and media inquiries, please contact legal@ftx.com and media@ftx.com, respectively. Please provide all relevant information, including your Account username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will endeavour to get back to you as soon as possible.

35.    **PROMOTIONS**

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to the Platform.

36.    **FORCE MAJEURE AND RELIEF EVENTS**

36.1   FTX Trading shall not be responsible (and shall have no liability) for any failure, interruption or delay in relation to the performance of the Services or its obligations under the Terms that results from any abnormal or unforeseeable circumstances outside our reasonable control, including without limitation:

36.1.1   any Force Majeure Event; or

36.1.2   any failure by you to comply with your obligations under the Terms or Applicable Laws (**"Relief Event"**).

37.    **ASSIGNMENT AND SUBCONTRACTING**

37.1   You may not assign, novate, or otherwise transfer, any of your rights or obligations under the Terms, or sub-contract the performance of any of your obligations under the Terms, without the prior written consent of FTX Trading. Any attempted assignment, novation, transfer or sub-contracting without our consent shall be void.

37.2   FTX Trading may assign, novate, or otherwise transfer any of its rights or obligations under the Terms to any other person, or sub-contract the performance of any of its obligations under the Terms (including the performance of the Services), at any time and without your consent, and you hereby consent to such assignment, novation, transfer or subcontracting, and agree to take all actions (including by way of executing documents) and other assistance required by FTX Trading to ensure that any such assignment, novation, transfer or subcontracting is effective and enforceable. If you object to such assignment, novation, transfer or sub-contracting you may stop using our Services and terminate the Terms by contacting us and requesting us to close your Account.

38.    **GENERAL**

38.1   **Entire agreement**

38.1.1   You agree that the Terms constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

38.1.2   You agree that in agreeing to and entering into the Terms you have not been induced to do so by, and have not relied on, any statement, representation, warranty, assurance, covenant, indemnity, undertaking or commitment (**"Representation"**) which is not expressly set out in the Terms.

38.1.3   You agree that your only right of action in relation to any innocent or negligent Representation set out in the Terms or given in connection with the Terms shall be for breach of contract. All other rights and remedies in relation to any such Representation (including those in tort or arising under statute) are excluded.

38.2   **Survival**

Upon the later of the closure of your Account and the termination of your access to and use of the Services the Terms shall terminate. All rights and obligations of the parties that by their nature are continuing will survive the termination of the Terms.

38.3   **Severability**

If any provision or part of the Terms is void or unenforceable due to any Applicable Laws, it shall be deemed to be deleted and the remaining provisions of the Terms shall continue in full force and effect. If any invalid, unenforceable or illegal provision of the Terms would be valid, enforceable and legal if some part of it were deleted, the provision shall apply with the minimum deletion necessary to make it valid, legal and enforceable.

38.4   **Successors and assigns**

The Terms shall be binding on, and enure to the benefit of, the parties to the Terms and their respective personal representatives, successors and permitted assigns, and references to any party shall include that party's personal representatives, successors and permitted

assigns.

**38.5 Variation and waiver**

38.5.1 Subject to Section 22, no variation of the Terms shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, each of the parties. The expression "variation" includes any variation, supplement, deletion or replacement however effected.

38.5.2 No waiver by FTX Trading of any right or remedy provided by the Terms or by law shall be effective unless it is in writing (which for this purpose, does not include email) and signed by, or on behalf of, FTX Trading. The failure by FTX Trading to exercise, or delay in exercising, any right or remedy provided by the Terms or by law does not: (i) constitute a waiver of that right or remedy; (ii) restrict any further exercise of that right or remedy; or (iii) affect any other rights or remedies. A single or partial exercise by FTX Trading of any right or remedy does not prevent any further or other exercise of that right or remedy or the exercise of any other right or remedy.

**38.6 No partnership or agency**

Nothing in the Terms or in any matter or any arrangement contemplated by it is intended to constitute a partnership, association, joint venture, fiduciary relationship or other co-operative entity between the parties for any purpose whatsoever. Except as expressly provided in the Terms, neither party has any power or authority to bind the other party or impose any obligations on it and neither party shall purport to do so or hold itself out as capable of doing so. Each party confirms it is acting on its own behalf and not for the benefit of any other person.

**38.7 Set off**

38.7.1 Notwithstanding that any amount is from time to time payable by FTX Trading to you under or by virtue of the Terms or otherwise, you shall not set off such amount against any amount payable by you to FTX Trading under the Terms.

38.7.2 FTX Trading may set off any amounts which from time to time are payable by FTX Trading to you under or by virtue of the Terms or otherwise against any amounts payable by you to FTX Trading under the Terms.

**38.8 Equitable remedies**

Without prejudice to any other rights or remedies that FTX Trading may have, you acknowledge and agree that damages alone may not be an adequate remedy for your breach of the Terms. The remedies of injunction and specific performance as well as any other equitable relief for any threatened or actual breach of such provisions of the Terms may be more appropriate remedies.

**38.9 Third party rights**

Save as otherwise expressly provided in the Terms (such as in Sections 29, 30 and 38.12.8):

38.9.1 the Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and its Affiliates, which each shall be a third party beneficiary of the Terms; and

38.9.2 no other person shall assert any rights as a third party beneficiary hereunder (notwithstanding any legislation to the contrary anywhere in the world).

**38.10 Electronic signature**

The Terms may be entered into by electronic means.

26

38.11   **Governing law**

The Terms and any Dispute shall be governed by, and construed in accordance with, English law.

38.12   **Arbitration**

38.12.1   Subject to Section 38.13 below, any Dispute shall be referred to and finally determined by arbitration administered by the Singapore International Arbitration Centre (**"SIAC"**) in accordance with the Arbitration Rules of the SIAC (**"SIAC Rules"**) for the time being in force.

38.12.2   This arbitration agreement shall be governed by English law.

38.12.3   The seat of the arbitration shall be Singapore.

38.12.4   The language of the arbitration shall be English.

38.12.5   The number of arbitrators shall be one.

38.12.6   Each party agrees that:

(A)   any Dispute shall be referred to arbitration in accordance with this Clause 38.12 on an individual basis only and not as a claimant or class member in a purported class or representative action;

(B)   combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties.

38.12.7   This agreement to arbitrate shall:

(A)   be binding upon the parties, their successors and assigns;

(B)   survive the termination of these Terms.

38.12.8   Where a User alleges or claims that a Dispute has arisen between it and any of the Indemnified Parties who is not otherwise a party to these Terms, that Indemnified Party may require that the Dispute be finally settled by arbitration in accordance with this Section 38.12 (without prejudice to that Indemnified Party's right to make a jurisdictional challenge), provided that such Indemnified Party exercises its right to arbitration under this Section 38.12 by notice in writing to all parties to the Terms within 7 days of being notified in writing of the Dispute. For the avoidance of doubt, the User provides express consent to the joinder of such Indemnified Party to an arbitration commenced pursuant to this Section 38.12.

38.13   **Exception to arbitration**

If you are a resident of a jurisdiction where the law prohibits arbitration of Disputes, Section 38.12 above will not apply to you. Instead, each party irrevocably agrees that the Courts of England and Wales located in London, England shall have exclusive jurisdiction in relation to any Dispute and each party irrevocably waives any right that it may have to object to an action being brought in those Courts, to claim that the action has been brought in an inconvenient forum, or to claim that those Courts do not have jurisdiction.

27

**SCHEDULE 1**

**DEFINITIONS AND INTERPRETATION**

1.    **DEFINITIONS**

1.1    As used throughout the Terms unless the context requires otherwise:

**"Affiliate"** means, in relation to a party, any person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party. A person shall be deemed to control another person if such person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other person, whether through the ownership of voting securities, by contract or otherwise.

**"Applicable Laws"** means all laws, including rules of common law, principles of equity, statutes, regulations, directives, proclamations, ordinances, by-laws, rules, regulatory principles and requirements, mandatory codes of conduct, writs, orders, injunctions, judgments and any awards of other industrial instruments, which are applicable to the provision, receipt or use of the Services or any products or other deliverables provided, used or received in connection with the Services.

**"Assets"** means the Digital Assets, fiat currency and E-Money held in your Account.

**"BTC"** means the cryptocurrency Bitcoin.

**"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to transact in using the Platform.

**"Dispute"** means any dispute, claim, controversy or difference arising out of or in connection with the Terms, including any question regarding its existence, validity, subject matter, interpretation, negotiation, termination or enforceability, and any dispute, claim, controversy or difference regarding any non-contractual obligations arising out of or in connection with the Services.

**"ETH"** means the cryptocurrency Ethereum.

**"Exchange"** means the trading platform operated by FTX Trading or its Affiliates through which the Services may be offered to Users to transact in Digital Assets with other Users.

**"fiat currency"** means any government issued national currency.

**"Force Majeure Event"** means any circumstance not within a party's reasonable control including:

(i)    acts of God, flood, drought, earthquake or other natural disaster;

(ii)    epidemic or pandemic;

(iii)    terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(iv)    nuclear, chemical or biological contamination or sonic boom;

(v)    any law or any action taken by a Regulatory Authority, including the imposition of an export or import restriction, quota or prohibition;

(vi)    collapse of buildings, fire, explosion or accident; and

(vii)    any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party (or its Affiliates) seeking to rely on this clause).

**"FTT"** is the exchange token of the Exchange ecosystem and is not offered in the United States or to U.S. persons.

28

**"Mobile Application"** means any mobile application developed or provided by FTX Trading and/or any of its Affiliates through which Users can access the Platform.

**"Order"** means each instruction placed by you on the Order Book to purchase or sell a specified quantity of a Digital Asset at a specified price in the Digital Asset in which trading is denominated on the Order Book; the second Digital Asset in a trading pair (e.g. USD in the BTC/USD trading pair).

**"Order Book"** means the central limit order book operated by FTX Trading on the Platform.

**"parties"** means the parties to the Terms, being you and FTX Trading (or, where applicable, the Service Provider responsible for providing a Specified Service to you as specified in a Service Schedule, insofar as that Specified Service is concerned), and **"party"** shall mean any one of the foregoing (as the context requires).

**"Personnel"** means the directors, officers, employees, agents, joint venturers, and contractors or subcontractors of a person.

**"Regulatory Authority"** means any foreign, domestic, state, federal, cantonal, municipal or local governmental, executive, legislative, judicial, administrative, supervisory or regulatory authority, agency, quasi-governmental authority, court, commission, government organisation, self-regulatory organisation having regulatory authority, tribunal, arbitration tribunal or panel or supra-national organisation, or any division or instrumentality thereof, including any tax authority.

**"Service Provider"** means the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule.

**"Service Schedule"** means the Service Schedules set out in the Schedules (other than this Schedule 1) to the General Terms.

**"Specified Service"** means any service specified in a Service Schedule.

**"transaction"** or **"trade"** means each transaction or trade carried out (or to be carried out) via the Platform relating to buying, selling, exchanging, holding, staking, lending, borrowing, sending, receiving or otherwise transacting in a Digital Asset.

**"User"** means a user of the Services, including you.

2.   **INTERPRETATION**

2.1   **References to the Terms and other agreements**

In the Terms, except where the context otherwise requires:

2.1.1   a reference to the Terms includes a reference to the Service Schedules and any other Schedules to it, each of which forms part of the Terms;

2.1.2   a reference to a Section or Schedule (other than to a schedule to a statutory provision) is a reference to a Section or Schedule (as the case may be) of, or to, the Terms and reference to a paragraph is to a paragraph of the relevant Schedule;

2.1.3   the headings are for convenience only and shall not affect the interpretation of the Terms;

2.1.4   a reference to the Terms includes the Terms as amended or supplemented in accordance with its terms; and

2.1.5   a reference to any agreement or other instrument (other than an enactment or statutory provision) is to that agreement or instrument as from time to time amended, varied, supplemented, substituted, novated or assigned otherwise than in breach of the Terms.

2.2   **Singular, plural and gender**

Words in the singular include the plural and vice versa and a reference to one gender includes other genders.

2.3    **References to persons and companies**

In the Terms, except where the context otherwise requires:

2.3.1    a reference to a person includes a reference to any individual, firm, company, government, state or agency of a state, local or municipal authority or government body or any joint venture, association or partnership (whether or not having separate legal personality);

2.3.2    a reference to a company includes any company, corporation or other body corporate wherever and however incorporated or established; and

2.3.3    a reference to an individual includes that individual's estate and personal representatives.

2.4    **References to time periods**

In the Terms, except where the context otherwise requires, any reference to a date or time is a reference to that date or time in the principal financial centre of the country in which the registered office of FTX Trading (or the relevant Affiliate of FTX Trading) is located, unless otherwise agreed in writing. A reference to a day means a period of 24 hours ending at midnight. Any period of time shall be calculated exclusive of the day from which the time period is expressed to run or the day upon which the event occurs which causes the period to start running.

2.5    **References to legislation and legal terms**

In the Terms, except where the context otherwise requires, a reference to an enactment or statutory provision shall include a reference to any subordinate legislation made under the relevant enactment or statutory provision, and is a reference to that enactment, statutory provision or subordinate legislation as from time to time amended, modified, incorporated or reproduced and to any enactment, statutory provision or subordinate legislation that from time to time (with or without modifications) re-enacts, replaces, consolidates, incorporates or reproduces it.

2.6    **Includes and including**

In the Terms, except where the context otherwise requires:

2.6.1    the words and phrases "includes", "including", "in particular" (or any terms of similar effect) shall not be construed as implying any limitation; and

2.6.2    general words shall not be given a restrictive meaning because they are preceded or followed by particular examples.

2.7    **To the extent that**

In the Terms, except where the context otherwise requires, the phrase "to the extent that" is used to indicate an element of degree and shall mean "to the extent that" and not solely "if", and similar expressions shall be construed in the same way.

2.8    **Writing**

A reference to writing includes any modes of reproducing words in any legible form and, except where expressly stated otherwise, shall include email).

**SCHEDULE 2**

**SERVICE SCHEDULE**

| Specified Service | Spot Market |
|---|---|
| **Specified Service description** | The Spot Market is a trading platform through which you can spot trade certain Digital Assets with other Users in exchange for fiat currency (depending on your location) or Digital Assets. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Digital Assets that are available for spot trading on the Spot Market are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 3**

**SERVICE SCHEDULE**

| Specified Service | Spot Margin Trading |
| --- | --- |
| **Specified Service description** | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | **IMPORTANT**: Section 16 of the General Terms applies to this service.<br><br>You may be asked to sign other documents in some cases in relation to Spot Margin Trading, including but not limited to the FTX Institutional Customer Margin and Line of Credit Agreement.<br><br>The Service Provider and its Affiliates may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, or to other Users. Such measures include attempts by the Platform's risk engine to liquidate any Users before they could get a negative net Account balance. Using spot margin trading therefore opens you up to liquidation risk.<br><br>The Service Provider may impose margin position limits or decreasing collateral on large positions of illiquid coins.<br><br>The Digital Assets that are available for borrowing/lending are listed on the Site. This list may be amended from time to time by the Service Provider at its sole discretion.<br><br>Digital Assets that are lent to other Users are effectively locked, and cannot be withdrawn/sold/used as collateral/staked/etc. However, they can be used as maintenance margin to prevent liquidations.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |

| | |
|---|---|
| **Risk disclosures** | Margin trading may not be suitable for all Users and should only be used by those who understand the risks. Also see Section 2.4 of the General Terms.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR USE OF ANY MARGIN TRADING SERVICES OFFERED ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MARGIN TRADING. |

**SCHEDULE 4**

**SERVICE SCHEDULE**

| Specified Service | OTC / Off-exchange Portal (OEP Portal) |
|---|---|
| **Specified Service description** | The OEP Portal enables you to connect with other Users to request quotes for spot Digital Assets. In response to a request for a quote, other Users will return prices offered by them in respect of the Digital Assets and you may decide whether or not you wish to trade at the price offered by the other User. Affiliates of FTX Trading may participate on the OEP Portal as Users and execute trades (as principal) with other Users, on terms no more favourable to such Affiliate than terms offered to other similarly situated Users. If you agree, the trade is confirmed, and you will trade directly with the other User. The Service Provider will carry out post-trade clearing and settlement of the trade between you and the other User. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | The Service Provider shall have no liability in relation to your use of the OEP Portal or for any trades that you enter into with other Users that you connect with through the OEP Portal. The Service Provider reserves the right to final interpretation of this Specified Service. |

**SCHEDULE 5**

**SERVICE SCHEDULE**

| Specified Service | Futures Market |
|---|---|
| **Specified Service description** | The Futures Market is a trading platform on which you can trade Quarterly Futures Contracts and Perpetual Futures Contracts (collectively, **Futures Contracts**) on certain Digital Assets and Digital Asset indexes with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Quarterly Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, on a specified future date. Quarterly Futures Contracts expire to a time-weighted average price (**"TWAP"**) of their associated index on the last Friday of every quarter between 2am and 3am UTC. If you hold an expiring position, you will be credited with USD profit and loss equal to the expiration price shortly after. |
| | Perpetual Futures Contracts represent obligations to buy or sell a Digital Asset at a specific price, at any time while the contract remains open. Perpetual Futures Contracts do not have an expiry date but instead, continuously roll over, i.e. every hour, each perpetual futures contract has a funding payment where longs pay shorts equal to 1 hour TWAP of Premium / 24. |
| | You can trade Futures Contracts on the Futures Market by posting collateral in the form of fiat currency (depending on your jurisdiction) and Digital Assets to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset, your profit or loss is settled in stablecoins. |
| | **IMPORTANT:** Section 16 of the General Terms applies to this service. |
| | Futures Contracts are Complex Products and the trading of Futures Contracts is high risk. The market price of any Futures Contract may not reflect the price of spot markets in the applicable underlying Digital Assets and may fluctuate significantly in response to the value of the underlying Digital Asset's(s') price, supply and demand, and other market factors. |
| | In order to trade Futures Contracts on the Futures Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Futures Contract trading can be highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. For instance, a small price decrease on a 20x leveraged Futures Contact's underlying Digital Asset could result in 20x loss in your leveraged position in the Futures Contract. Further, short positions will lose money when the price of the underlying |

| | |
|---|---|
| | Digital Asset rises, a result that is opposite from holding the underlying Digital Asset. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE SERVICE PROVIDER AND ITS AFFILIATES. |
| | By trading in Futures Contracts on the Futures Market on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Futures Contract trading. You further agree to independently assume all the risks arising from conducting Futures Contract trading on your own account. If you are uncomfortable with this level of risk, you should not trade Futures Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING FUTURES CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH FUTURES CONTRACT TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 6**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (Options Contacts) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Call Options or Put Options (collectively, **Options Contracts**) on certain Digital Assets with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Options Contracts give you the option (i.e. the right, but not the obligation), to either buy (Call Option) or sell (Put Option) Digital Assets for a specific price (the strike or exercise price) on a specified expiry date. |
| | If, at the expiration of a Call Option, the market price of the underlying Digital Asset is higher than the strike price, the Service Provider will automatically exercise the option and credit your Account with the difference between the market price and the strike price. If the market price is lower, the option expires to USD 0.00. In the case of Put Options, the reverse applies. |
| | You can trade Options Contracts on the Volatility Market by posting collateral in fiat currency (depending on your location) and Digital Assets, to cover initial and maintenance margin. |
| | Instead of delivery of the underlying Digital Asset on the specified expiry date, your profit or loss is settled in stablecoins. |
| | **IMPORTANT**: Section 16 of the General Terms applies to this service. |
| | The Options Contracts on the Volatility Market are European style. This means that you will not be able to exercise the option before the specified expiry date. |
| | The Options Contracts auto-expire, which means that the Service Provider will automatically exercise all options "in the money" and no options "out of the money". |
| | The Options Contracts expire on their specified expiry date at 3:00:00AM UTC. The expiration price of the underlying Digital Asset is based on a 1-hour TWAP of the underlying index the hour before expiration. |
| | Options Contracts are Complex Products and the trading of Options Contracts is high risk. In order to trade Options Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because Options Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |
| | If you are uncomfortable with this level of risk, you should not trade Options Contracts. |

37

|  | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING OPTIONS CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH OPTIONS CONTRACTS TRADING.<br><br>The Service Provider reserves the right to final interpretation of this Specified Service. |
|---|---|
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 7**

**SERVICE SCHEDULE**

| **Specified Service** | **Volatility Market (MOVE Volatility Contracts)** |
| --- | --- |
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, **MOVE Volatility Contracts**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Digital Markets Ltd**, an International Business Company incorporated in The Bahamas (company registration number 207269 B), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | MOVE Volatility Contracts represent the absolute value of the amount a Digital Asset moves in a period of time, i.e. a day, week or quarter. MOVE Volatility Contracts expire to the absolute value of the difference between the TWAP price of the underlying Digital Asset over the first hour and the TWAP price of the underlying Digital Asset over the last hour of their expiration time, measured in UTC. 1. Daily MOVE Volatility Contracts expire to the movement of BTC over a single day's period. Their ticker is [underlying]-MOVE-[expiration date]; e.g. BTC-MOVE-1116 is the BTC-MOVE Volatility Contract expiring at the end of 16 November UTC. 2. Weekly MOVE Volatility Contracts expire to the movement of BTC over a 7 day period. Their ticker is [underlying]-MOVE-WK-[expiration date]; e.g. BTC-MOVE-WK-1122 expires to the amount that BTC moves between the start of 16 November and the end of 22 November. 3. Quarterly MOVE Volatility Contracts expire to the move of BTC over a roughly 3 month period. Their ticker is [underlying]-MOVE-[expiration year]Q[quarter number]; e.g. BTC-MOVE-2020Q2 expires to the amount that BTC moves during Q2 2020, from 27 March 2020 to 25 June 2020. You can trade Move Volatility Contracts on the Volatility Market by posting collateral in the form of fiat currency (depending on your location) and Digital Assets to cover initial and maintenance margin. **IMPORTANT**: Section 16 of the General Terms applies to this service. MOVE Volatility Contracts are Complex Products and the trading of MOVE Volatility Contracts is high risk. In order to trade MOVE Volatility Contracts on the Volatility Market, you must post collateral. Depending on market movements, your positions may be liquidated, and you may sustain a total loss of the Assets in your Account. This is because MOVE Volatility Contract trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset having a much greater value. |

| | If you are uncomfortable with this level of risk, you should not trade MOVE Volatility Contracts. |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING MOVE VOLATILITY CONTRACTS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH MOVE VOLATILITY CONTRACTS TRADING. |
| | The Service Provider reserves the right to final interpretation of this Specific Service. |
| **Risk disclosures** | See Section 2 of the General Terms. |

**SCHEDULE 8**

**SERVICE SCHEDULE**

| Specified Service | Leveraged Tokens Spot Market |
|---|---|
| **Specified Service description** | The Leveraged Tokens Market is a trading platform on which you can spot trade Leveraged Tokens on certain Digital Assets with other Users. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | Leveraged Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index (collectively **"Underlying"**) and can be created or redeemed for its share of the Digital Assets of that account. |
| | Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period. |
| | A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns. |
| | Leverage Tokens are Complex Products, and the trading of Leveraged Tokens is high risk. The market price of any Leveraged Token may not reflect the price of spot markets in the applicable Underlying and may fluctuate significantly in response to the value of the Underlying's price, supply and demand, and other market factors. |
| | Leveraged Tokens reduce the risk of liquidation (as compared to Futures Contracts for example) but it is still possible that liquidation may occur; if markets instantaneously gap down 50%, there is nothing that can stop a +3x leveraged position from getting liquidated. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, |

41

ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

By trading in Leveraged Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from Leveraged Tokens trading. You further agree to independently assume all the risks arising from conducting Leveraged Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade Leveraged Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING LEVERAGED TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specific Service.

| | |
|---|---|
| Risk disclosures | Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading Leveraged Tokens, including but not limited to: <br><br> • **Market price variance risk:** Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the Underlying. The market price for a Leveraged Token will fluctuate in response to changes in the value of the Leveraged Token's holdings, supply and demand for the Leveraged Token and other market factors. <br><br> • **Inverse correlation risk:** Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Underlying rises, a result that is opposite from holding the Underlying. <br><br> • **Portfolio turnover risk:** Leveraged Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token. <br><br> • **Interest rates:** Leveraged Tokens take positions in Perpetual Futures Contracts to achieve their desired leverage. These Perpetual Futures Contracts might trade at a premium or discount to spot markets in the applicable Underlying as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Underlying's spot market returns due to a divergence between the two markets. |

**SCHEDULE 9**

**SERVICE SCHEDULE**

| Specified Service | Volatility Market (BVOL/iBVOL Tokens) |
|---|---|
| **Specified Service description** | The Volatility Market is a trading platform on which you can trade BVOL Tokens and iBVOL Tokens (collectively, **BVOL/iBVOL Tokens**) with other Users, with or without leverage. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms)** | BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by LT Baskets Ltd, an Affiliate of FTX Trading. Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC (collectively, **"Underlying"**), in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. |
| | In order to get their volatility exposure, BVOL Tokens trade MOVE Volatility Contracts and Perpetual Futures on BTC. In particular, they aim to hold 1/6th each of each MOVE Volatility Contract that has not yet had its strike price determined as of each rebalance. That means 1/6th each of: |
| | • Tomorrow's MOVE Volatility contract<br>• Next weeks' MOVE contract, and the two weeks after that<br>• Next Quarter's MOVE contract, and the quarter after that and<br><br>• -1x BTC-PERP (Short) |
| | IBVOL, conversely, aims to hold -1/6th each of those MOVE Volatility contracts and 1x Perpetual Futures Contract on BTC (Long). |
| | BVOL targets +1x leverage, and IBVOL targets -1x leverage. As such, BVOL should not need to significantly alter its leverage at rebalance time (00:02:00 UTC every day): there may be small amounts of slippage but by and large its leverage should always be 1. IBVOL, however, will need to. If volatility is down, iBVOL will have gains and will reinvest them by selling more MOVE contracts; if volatility is up, iBVOL will have losses and will buy back MOVE contracts to reduce risk and attempt to avoid liquidation. Because of this BVOL almost completely avoids liquidation risk, but IBVOL is at risk if volatility doubles in a day. To mitigate this, iBVOL also has daily rebalances. If market moves cause iBVOL's leverage to reach -4/3, it will do an intraday rebalance to reduce risk. |
| | YOU AGREE AND HEREBY AUTHORISE THE SERVICE PROVIDER AND ITS AFFILIATES TO TAKE ANY MEASURES IN THEIR SOLE DISCRETION, INCLUDING BUT NOT LIMITED TO, FORCED POSITION |

REDUCTION AND LIQUIDATION UNDER MARKET VOLATILITY, ILLIQUIDITY AND OTHER CIRCUMSTANCES, FOR THE PURPOSES OF MITIGATING POTENTIAL LOSSES TO YOU, OTHER USERS, AND THE PLATFORM.

BVOL/iBVOL Tokens are Complex Products and the trading of BVOL/iBVOL Tokens is high risk. The market price of any BVOL/iBVOL Token may not reflect the price of spot markets in BTC and may fluctuate significantly in response to the value of BTC's price, supply and demand, and other market factors.

By trading in BVOL/iBVOL Tokens on the Platform, you acknowledge and agree that you have sufficient investment knowledge, financial expertise, and experience and the capacity to take on the increased risks arising from BVOL/iBVOL Tokens trading. You further agree to independently assume all the risks arising from conducting BVOL/iBVOL Tokens trading on your own account.

If you are uncomfortable with this level of risk, you should not trade BVOL/iBVOL Tokens.

THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH BVOL/iBVOL TOKEN TRADING.

The Service Provider reserves the right to final interpretation of this Specified Service.

| | |
|---|---|
| **Risk disclosures** | BVOL/iBVOL Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading BVOL/iBVOL Tokens, including but not limited to:<br><br>• **Market price variance risk:** Holders buy and sell BVOL/iBVOL Tokens in the secondary market at market prices, which may be different from the value of BTC. The market price for a BVOL/iBVOL Tokens will fluctuate in response to changes in the value of the BVOL/iBVOL Tokens holdings, supply and demand for the BVOL/iBVOL Tokens and other market factors.<br><br>• **Portfolio turnover risk:** BVOL/iBVOL Tokens may incur high portfolio turnover to manage the exposure to the Underlying. Additionally, active market trading of a BVOL/iBVOL Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a BVOL/iBVOL Tokens.<br><br>• **Interest rates:** BVOL/iBVOL Tokens take positions in MOVE Volatility Contracts and Perpetual Futures Contracts to achieve their desired implied volatility of BTC. These MOVE Volatility Contracts and Perpetual Futures Contracts might trade at a premium or discount to spot markets in BTC as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a BVOL/iBVOL Token could |

| | outperform or underperform BTC's spot market returns due to a divergence between the two markets. |
|---|---|

**SCHEDULE 10**

**SERVICE SCHEDULE**

| Specified Service | Issuing and redeeming Leveraged Tokens and BVOL/iBVOL Tokens |
|---|---|
| **Specified Service description** | The issuance and redemption of Leveraged Tokens and BVOL/iBVOL Tokens. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **LT Baskets Ltd**, a company incorporated in Antigua and Barbuda (company number 17336), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | Leveraged Tokens and BVOL/iBVOL Tokens are "ERC-20" digital tokens issued by the Service Provider. |
| | Each Leveraged Token has an associated account on the Platform that takes leveraged positions on Perpetual Futures Contracts on an underlying Digital Asset or Digital Asset index. |
| | Each BVOL/iBVOL Token has an associated account on the Platform that holds MOVE Volatility Contracts and Perpetual Futures Contracts on BTC, in an attempt to track the implied percent-based volatility of BTC. In particular, BVOL Tokens attempt to track the daily returns of being 1x long the implied volatility of BTC and iBVOL Tokens attempt to track the daily returns of being 1x short the implied volatility of BTC. |
| | You may place orders with the Service Provider to issue new Leveraged Tokens or BVOL/iBVOL Tokens by depositing stablecoins. |
| | You can redeem an existing Leveraged Token for its share of the Digital Assets of the Leveraged Token's associated account on the Platform. |
| | You can redeem existing BVOL/iBVOL Contracts for an equivalent amount of stablecoins. |
| | Creating or redeeming Leveraged Tokens and BVOL/iBVOL Tokens will have market impact and you won't know what price you ultimately get until after you have created or redeemed the Leveraged Token or BVOL/iBVOL Token (as applicable). |
| | THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR ORDERING OR REDEEMING LEVERAGED TOKENS OR BVOL/iBVOL TOKENS ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH LEVERAGED TOKENS AND BVOL/iBVOL TOKENS. |
| | The Service Provider reserves the right to final interpretation of this Specified Service. |

46

**SCHEDULE 11**

**SERVICE SCHEDULE**

| Specified Service | NFT Market |
|---|---|
| **Specified Service description** | The NFT Market is a trading platform on which you can trade non-fungible tokens (**"NFT"**) with other Users for fiat currency or Digital Assets and offer to sell them by auction. |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | NFTs are controllable electronic records recorded on the Ethereum and/or Solana blockchains, or any other blockchain(s) as determined by us in our sole discretion.<br><br>Unlike most cryptocurrencies, there may be very few or only one of an NFT, and they might be indivisible, meaning it may not be fungible with any other tokens.<br><br>NFTs can take a number of forms. Sometimes, they can be redeemed for a physical object. Sometimes the owner is entitled to an experience, like a movie or a phone call. Sometimes they are associated with a digital image. Sometimes they are associated with nothing at all.<br><br>NFTs do not necessarily have any intrinsic value. They might also be illiquid. If you buy an NFT, you are not necessarily going to be able to sell it for much later or gain any specific utility from it.<br><br>While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT through the NFT Market, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users of the NFT Market, as determined by the Service Provider in its sole discretion.<br><br>You are welcome to buy NFTs if it would make you happy to own them. But there is no implied economic return associated with doing so.<br><br>There are no refunds for NFTs, and the Service Provider and its Affiliates will not field customer complaints. You should only buy NFTs if you understand that doing so does not necessarily give any direct economic value.<br><br>NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE |

| | PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.<br><br>THE SERVICE PROVIDER AND ITS AFFILIATES DO NOT TAKE ANY RESPONSIBILITY WHATSOEVER FOR ANY LOSSES OR DAMAGE INCURRED AS A RESULT OF YOUR TRADING NFT ON THE PLATFORM OR YOUR FAILURE TO UNDERSTAND THE RISKS ASSOCIATED WITH NFT TRADING. |
|---|---|

**SCHEDULE 12**

**SERVICE SCHEDULE**

| Specified Service | NFT Listing |
|---|---|
| **Specified Service description** | Creating an NFT on the portal located at https://ftx.com/nfts/list (the **"NFT Site"**) that, as of its genesis issuance, is linked to the artwork, digital content or other collectible that is provided by you to the Service Provider (**"Artwork"**). |
| **Service Provider** | This Specified Service forms part of the Services and is provided by **FTX Trading Ltd**, a company incorporated and registered in Antigua and Barbuda (company number 17180), to all eligible Users other than persons who have their registered office or place of residence in the United States of America or any Restricted Territory. |
| **Specified Service specific terms (in addition to the General Terms) and risk disclosures** | By submitting a request and creating an NFT on the NFT Site, you acknowledge that you have carefully read and agree to the Terms. |
| | If there is a conflict between the General Terms and this Service Schedule with respect to your use of the NFT Site or your NFTs, this Service Schedule shall prevail. |
| | Your access to and use of the NFT Site is also governed by the terms in the General Terms that apply to the Site and references in the General Terms to "Site" should be read as including the NFT Site, unless the context provides otherwise. |
| | **Intellectual property** |
| | You represent and warrant that you own and control all rights in and to your Artwork and have the right to grant licenses to the Service Provider and its Affiliates and respective licensees and successors. In submitting any Artwork, you must not include any third party intellectual property (such as copyrighted materials) unless you have explicit permission from that party or are otherwise legally entitled to do so. You are legally responsible for all Artwork submitted by you. The Service Provider reserves the right to review and analyse your Artwork to help detect infringement and abuse, such as spam, malware and illegal content. |
| | By submitting any Artwork, you grant the Service Provider a worldwide, non-exclusive, royalty-free, perpetual, sublicensable and transferable license to use the Artwork for any purpose, including for the minting of the NFT linked to your Artwork and hosting such Artwork for you and future transferees of the NFT, as well as for the promotion of the Services provided by the Service Provider and its Affiliates. |
| | You also grant all other Users and future holders of your NFT a worldwide, non-exclusive, perpetual, and royalty-free license to view and access your Artwork. |
| | **Prohibited activities** |
| | You will not: |

49

- submit any Artwork that (a) violates or encourages any conduct that would violate any Applicable Law or regulation or would give rise to civil or criminal liabilities; (b) is fraudulent, false, misleading or deceptive; (c) is defamatory, obscene, vulgar, pornography or offensive; (d) promotes discrimination, bigotry, racism, hatred, harassment or harm against any individual or group; (e) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (f) promotes illegal or harmful activities or substantives;

- attack, hack, DDOS, interfere with, or otherwise tamper with the NFT or its underlying smart contract;

- access, tamper with or attempt to access the Service Provider and its Affiliates' computer systems or networks;

- attempt to probe, scan or test the vulnerability of the Service Provider and its Affiliates' system or network or breach any security or authentication measures;

- avoid, bypass, remove, deactivate, impair or otherwise circumvent any technological measures;

- interfere with, or attempt to interfere with, any other User or network, including without limitation sending a virus, overloading, flooding, spamming or mail-bombing;

- impersonate or misrepresent your identity or affiliation;

- use the NFT, the NFT Site or the Services, to conceal or transfer any proceeds relating to illegal or criminal activity;

- violate the Terms or any Applicable Law or regulation; or

- encourage or enable any third party to do any of the foregoing.

**No obligations**

The Service Provider and its Affiliates are not responsible for repairing, supporting, replacing or maintaining any website or network hosting your Artwork, nor do they have the obligation to maintain any connection or link between your NFT and the underlying Artwork. The Service Provider reserves the right to terminate, delete, take down or otherwise remove the Artwork and disconnect the link between the applicable NFT and the underlying Artwork at any time for any reason, including but not limited to if (a) you or any other NFT holder engage in any illegal or unlawful activity, (b) you or any other NFT holder are deemed to be in violation of the intellectual property rights of third parties, in each case as determined by the Service Provider in its sole discretion.

While the Service Provider may facilitate the ability to sell, re-sale, buy, transfer, withdraw, or otherwise engage in transactions involving the purchase, sale, or other transfer of a NFT, this functionality is provided without any guarantees of uptime, functionality, or serviceability. The Service Provider reserves the right to remove or otherwise limit any and all functionality, or to require additional conditions of access, for all Users or any User or group of Users, as determined by the Service Provider in its sole discretion.

**Disclaimers and risk disclosures**

NFTS ARE INTANGIBLE DIGITAL ASSETS. THEY EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE

APPLICABLE BLOCKCHAIN NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALISED LEDGER WITHIN SUCH BLOCKCHAIN NETWORK, WHICH WE DO NOT CONTROL. THE SERVICE PROVIDER DOES NOT GUARANTEE THAT IT CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY NFT.

ANY NFTS MINTED FOR YOU ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, THE SERVICE PROVIDER EXPLICITLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. THE SERVICE PROVIDER MAKES NO WARRANTY THAT THE NFTS WILL MEET YOUR REQUIREMENTS OR BE AVAILABLE ON AN UNINTERRUPTED, SECURE, OR ERROR-FREE BASIS. THE SERVICE PROVIDER MAKES NO WARRANTY REGARDING THE QUALITY, ACCURACY, TIMELINESS, TRUTHFULNESS, COMPLETENESS OR RELIABILITY OF ANY INFORMATION OR CONTENT ON THE NFT OR ITS UNDERLYING SMART CONTRACT OR BLOCKCHAIN NETWORK. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES IN CONTRACTS WITH CONSUMERS, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU.

THE SERVICE PROVIDER AND ITS AFFILIATES WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF THE NFTS, INCLUDING BUT NOT LIMITED TO ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM: (I) USER ERROR SUCH AS FORGOTTEN PASSWORDS, INCORRECTLY CONSTRUCTED TRANSACTIONS, OR MISTYPED WALLET ADDRESSES; (II) SERVER FAILURE OR DATA LOSS; (III) CORRUPTED CRYPTOCURRENCY WALLET FILES; (IV) UNAUTHORISED ACCESS; OR (V) ANY UNAUTHORISED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING, BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST BLOCKCHAIN NETWORK UNDERLYING THE NFTS.

THE SERVICE PROVIDER AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY KIND OF FAILURE, ABNORMAL BEHAVIOR OF SOFTWARE (E.G., WALLET, SMART CONTRACT), BLOCKCHAINS OR ANY OTHER FEATURES OF THE NFTS.

**Indemnification; release**

You shall and agree to defend, indemnify and hold harmless the Service Provider, its Affiliates and service providers and, in each case, their Personnel (collectively, **"NFT Indemnified Parties"** and each an **"NFT Indemnified Party"**) from and against any and all claims and liabilities, costs, expenses, damages and losses (including any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal and other reasonable professional costs and expenses) (**"NFT Losses"** or **"NFT Loss"**) which any Indemnified Party may suffer or incur, arising directly or indirectly out of or in connection with: (a) your use of the NFT Site, including the minting and creation of your NFT, (b) your violation or anticipatory violation of any Applicable Laws in connection with your use of the NFT Site or the NFTs, (c) any actual or alleged infringement of the intellectual property rights of others

by you, and (d) any act of gross negligence, willful or intentional conduct by you.

You will cooperate as fully required by the NFT Indemnified Parties in the defence of any such claims and NFT Losses. The NFT Indemnified Parties retain the exclusive right to assume the exclusive defence and control of any claims and NFT Losses. You will not settle any claims and NFT Losses without the Service Provider's prior written consent.

You hereby agree to release each of the NFT Indemnified Parties from any and all claims and demands (and waive any rights you may have against any of the NFT Indemnified Parties in relation to any NFT Losses you may suffer or incur), arising directly or indirectly out of or in connection with any dispute that you have with any other User or other third party in connection with the NFT Site or the NFTs.

**Limitation of liability**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER THE SERVICE PROVIDER NOR ITS AFFILIATES OR SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE NFTS WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE PRODUCTS OR SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE OR FROM THE USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE SERVICE PROVIDER, ITS AFFILIATES, OR ITS SERVICE PROVIDERS HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE APPLICABLE JURISDICTION, IN NO EVENT WILL THE SERVICE PROVIDER AND ITS AFFILIATES' TOTAL LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS SERVICE SCHEDULE, YOUR USE OF THE NFT SITE, OR YOUR USE OF OR INABILITY TO USE OR INTERACT WITH THE NFTS OR ACCESS THE ARTWORK EXCEED TEN U.S. DOLLARS (USD $10.00).

THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE SERVICE PROVIDER AND YOU.

**SCHEDULE 13**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO AUSTRALIAN USERS ONLY**

**(Updated September 18, 2022)**

Appendix A will form part of the Terms and apply to you if you are using the Exchange to buy, sell, exchange hold or otherwise transact in Digital Assets that are being provided by FTX Australia.

1.       **FIAT CURRENCY TO DIGITAL ASSET (AND VICE VERSA) CONVERSION SERVICES**

If you are depositing fiat currency, or instructing the conversion of Digital Assets to fiat currency, the conversion of:

a)     your deposit of fiat currency to Digital Assets; and

b)     your withdrawal of Digital Assets to fiat currency,

will be processed by a third-party DCE provider. The name of the DCE provider is provided on the FTX Website at the time you enter into any transaction.

You agree that you only place orders to convert fiat currency to Digital Assets (and vice versa) with the DCE provider. You do not place orders with FTX Trading or FTX Australia for the conversion of fiat currency to Digital Assets or vice-versa.

If you send fiat currency to the DCE provider, the DCE provider shall convert your fiat currency to stablecoins automatically by default. FTX Trading does not hold client money or E-Money for clients of FTX Australia. Any account balances shown in fiat currency are provided for convenience only. All such balances are held by FTX Trading in stablecoins.

You also agree to accept any additional terms and conditions of the DCE provider relevant to the conversion services it is providing and disclosed to you at the time any

2.       **FINANCIAL SERVICES OR FINANCIAL PRODUCTS PROVIDED BY FTX AUSTRALIA**

Only FTX Australia will, or may, provide you with financial services or financial products under its Australian Financial Services Licence.

Neither FTX Trading or the DCE provider will, or may, provide you with financial services or  financial products.

53

3.      **STANDING AUTHORISATION PROVIDED TO FTX AUSTRALIA**

As a pre-condition to you acquiring any service or product from FTX Australia, you acknowledge that you will provide FTX Australia with a 'Standing Authorisation' as set out in the FTX Australia Terms and Conditions ("**FTX Australia Terms**") to issue sell order(s) on your behalf to the DCE, which orders will impact the Digital Assets held in your FTX Digital Wallet.

4.      **YOUR DIGITAL ASSETS ARE ONLY HELD BY FTX TRADING**

Please note that you never provide Digital Assets to FTX Australia, and **FTX Australia does not hold any client property as defined in Part 7.8, Division 3 of the *Corporations Act 2001* (Cth).**

For the avoidance of doubt, you only provide Digital Assets to FTX Trading and it is only FTX Trading that will ever hold your Digital Assets.

FTX Australia only maintains a Standing Authorisation in relation your Digital Assets (as set out in the FTX Australia Terms).

5.      **DATA SHARING**

Both FTX Trading and FTX Australia will share your personal data with each other and with the DCE for the purposes of providing you with 'Services' set out in the FTX Terms, and DCE Terms and the FTX Australia Terms.

For the avoidance of doubt, FTX Trading will only collect, maintain, use and disclose personal information provided to us strictly in accordance with the Australian Privacy Principles in the *Privacy Act 1988* (Cth) and our Privacy Policy. You should carefully read the FTX Australia Privacy Policy, which provides details on how your personal information is collected, stored, protected and used by FTX Australia and any corresponding Privacy Policy provided by the DCE.

**SCHEDULE 14**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO SOUTH AFRICAN USERS ONLY**

You acknowledge that any marketing, promotional, sales or similar activities contemplated in these Terms (**South African activities**) which take place in the Republic of South Africa are pursuant to FTX Trading being appointed as the juristic representative of Ovex FSP (Pty) Ltd (authorized FSP 50776) (**Ovex**) in terms of section 13(1)(b)(i)(aa) of the Financial Advisory and Intermediary Services Act, 2002 (**FAIS**) and that any such South African activities will not be performed by FTX Trading as principal.

Where you are domiciled in South Africa, you confirm that you have voluntarily elected, pursuant to any South African activities performed by FTX Trading as the juristic representative of and in the name of Ovex, to open an Account with, use the Services and trade on the Exchange of FTX Trading pursuant to these Terms. You acknowledge that any client support in relation to your Account, the Services and the Exchange which occur within South Africa will be effected by FTX Trading as the juristic representative of and in the name of Ovex.

You undertake to comply with any applicable exchange control regulations or any other applicable laws or regulations which may, from time to time, become applicable pursuant to you opening an Account, using the Services and the Exchange.

**SCHEDULE 15**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO JAPAN USERS ONLY**

**(Updated September 19, 2022)**

The following terms will form part of the Terms and will apply to you if you are a resident of Japan who is using FTX Earn or has enabled Peer-to-Peer Crypto Borrowing and Lending ("**P2P Crypto Loans**") provided by FTX Trading.

FTX Trading provides and operates a peer-to-peer crypto asset borrowing and lending platform for matching Borrowers and Lenders of P2P Crypto Loans to users of FTX Japan Corporation (Cryptocurrency Exchange Business Kanto Finance Bureau Director No. 00002 and Type 1 Financial Instruments Business registrant) ("**FTX Japan**"). P2P Crypto Loans are available both via the Site as well as via the FTX Earn program on the Mobile Application.

By enabling and agreeing to borrow or lend P2P Crypto Loans (either via the Site or the FTX Earn program), you hereby acknowledge and agree that:

- you are an authorized and verified user of FTX Japan;

- P2P Crypto Loans are not provided by FTX Japan and all P2P Crypto Loan services are provided solely by FTX Trading;

- you have read and understood, and agree to the Terms of Service and FTX's Privacy Policy, each as amended from time to time;

- you authorize FTX Japan to share any information collected from you with FTX Trading as may be required under anti-money laundering laws or otherwise in compliance with applicable financial regulatory and other laws;

- if you're participating in the FTX Earn program, you are lending your crypto assets to third party borrowers in return for rewards which are variable for each crypto asset and changes hourly;

- you hereby authorize FTX Trading to instruct FTX Japan to borrow from and lend assets to Lenders and Borrowers, respectively, and to take all such actions as may be required to complete such P2P Crypto Loans on your behalf;

- you will only participate in P2P Crypto Loans for your own account and not for the account of others;

- you will not use P2P Crypto Loans for any illegal activities, unlawful conduct or other restricted purposes as set forth in the Terms;

- FTX Trading does not act as borrower or lender of any P2P Crypto Loans; and

Only FTX Japan users are eligible to participate in P2P Crypto Loans, either as a borrower or as a lender.

**Lending**

To become a P2P Crypto Loan lender ("**Lender**"), you must have first deposited assets with FTX Japan into your FTX Japan account ("**Account**"). As a Lender, you can select "LEND" on the P2P Crypto Loans website or participate in the FTX Earn program on the Mobile Application, and specify the amount, minimum rate and type of crypto asset that you wish to lend out in order to become eligible to lend out your crypto assets. Your lending offer will then be submitted to FTX Trading's P2P Crypto Loan order book and automatically matched with borrowers, if any.

The amount of funds borrowed, funding rates and estimated funding rates are based solely on historical data, are not guaranteed and are subject to frequent change on an hourly basis. There is no assurance that you will be able to lend out your crypto assets, that there will be any borrowers available to you, that there will be any demand for crypto borrowing, or that any of the displayed lending rates are accurate. FTX Trading reserves the right, in its sole discretion, to determine the ordering and matching of Lenders and Borrowers. You further agree to pay any platform charges or fees that FTX Trading may provide from time to time.

You are not required to lend out any assets at any time. To stop lending out your assets, (a) go to the P2P Crypto Loans website and click on "STOP LENDING" at any time, or (b) if you are participating in the FTX Earn program on the Mobile Application, click on "Disable" in "Profile" → "Earn rewards on assets".

All loans of crypto assets via the P2P Crypto Loans website are non-recourse loans. You agree that your sole recourse in the event of default of a Borrower's P2P Crypto Loan is the seizure and/or liquidation of assets held in the Borrower's Account. You agree, and shall cause all of your agents, representatives and affiliates to agree, not to seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account at any time.

LENDING CRYPTO ASSETS VIA P2P CRYPTO LOANS IS VERY HIGH RISK AND ARE NOT INSURED IN ANY WAY BY FTX TRADING, ANY GOVERNMENTAL AGENCY, OR ANY THIRD PARTY. AS A LENDER, YOU MAY SUSTAIN A TOTAL LOSS OF YOUR LENT CRYPTO ASSETS IF THE BORROWER DEFAULTS ON A P2P CRYPTO LOAN AND SEIZURE AND/OR LIQUIDATION OF THE BORROWER'S ACCOUNT FAIL TO REPAY SUFFICIENT CRYPTO ASSETS TO COVER THE BORROWER'S DEBT TO YOU OR OTHER LENDERS.

**Borrowing**

To become a P2P Crypto Loan borrower ("**Borrower**"), you must have first deposited crypto assets with FTX Japan into your Account as collateral. As a borrower, you can select "Enable Peer to Peer borrowing" on the P2P Crypto Loans website to enable borrowing of crypto assets from other FTX Japan users. The amount of crypto assets that you are entitled to borrow from time to time is determined based on a number of factors, including the amount of crypto assets made available by lenders for borrowing, the amount of crypto assets available in your Account as collateral, crypto asset market liquidity and volatility conditions, national, regional and global economic conditions, legal and regulatory requirements, as well as other factors that FTX Trading may consider from time to time.

All borrowed crypto assets using the P2P Crypto Loans website are ***non-recourse*** with respect to any assets held by the Borrower in the Borrower's Account. In other words, in the event of default, neither FTX Trading, any Lenders, nor any of their affiliates, agents or representatives may seek recourse or recompense against any funds, assets or properties owned by a Borrower outside of the Borrower's Account. In the event of default of a Borrower's P2P Crypto Loan, the sole recourse of any Lender is the seizure and/or liquidation of assets held in the Borrower's Account.

You agree to pay (a) any interest charges that may accrue on your P2P Crypto Loan, which you may view on the P2P Crypto Loans website, and (b) any platform charges or fees that FTX Trading may provide from time to time, which will be viewable on the P2P Crypto Loans website as well.

You are not required to borrow any crypto assets at any time. By enabling P2P Crypto Loan borrowing, you agree to do so at your own risk. You acknowledge and agree that any crypto assets borrowed from a Lender via a P2P Crypto Loan may be used for any purposes on the FTX Japan trading platform, including for trading, collateral and withdrawals, provided however, that you agree that FTX Trading may instruct FTX Japan to limit withdrawals of crypto assets borrowed under P2P Crypto Loans in the event that there is insufficient assets in your Account.

BORROWING P2P CRYPTO LOANS ON FTX TRADING IS VERY HIGH RISK. AS A BORROWER, YOU MAY SUSTAIN A TOTAL LOSS OF CRYPTO ASSETS IN YOUR ACCOUNT. THE HIGH VOLATILITY AND SUBSTANTIAL RISK OF ILLIQUIDITY IN THE MARKETS MEANS THAT YOU MAY NOT BE ABLE TO LIQUIDATE YOUR ACCOUNT ASSETS IN TIME, OR AT ALL. IF THE VALUE OF THE ASSETS HELD IN YOUR ACCOUNT FALLS BELOW THE MINIMUM BALANCE REQUIREMENT OR FTX TRADING DETERMINES IN ITS SOLE DISCRETION THAT YOUR ACCOUNT APPEARS TO BE IN DANGER OF DEFAULTING ON A P2P CRYPTO LOAN, FTX TRADING OR THE APPLICABLE LENDER(S) MAY, DIRECTLY OR INDIRECTLY, SEIZE AND LIQUIDATE ANY OR ALL OF YOUR POSITIONS AND ASSETS IN YOUR ACCOUNT TO REPAY YOUR BORROWED CRYPTO ASSETS.

別紙 **15**

サービスに関する別紙

日本のユーザーにのみ適用される規約

以下の規約は、本約款等の一部を構成し、FTX Earn を利用しているか又は FTX トレーディングが提供する P2P 貸借暗号資産取引（以下「**P2P 貸借暗号資産取引**」といいます。）をご利用可能な日本国に居住するお客様に適用されます。

FTX トレーディングは、P2P 貸借暗号資産の貸人及び借受人のマッチングのための P2P 貸借暗号資産取引プラットフォームを FTX Japan 株式会社（暗号資産交換事業者（登録番号関東財務局長第 00002 号）、第一種金融商品取引業登録業者）（以下「**当社**」といいます。）のユーザー向けに提供し、運営します。P2P 貸借暗号資産取引は当社ウェブサイトを通じて、また、モバイルアプリの FTX Earn プログラムを通じて利用可能です。

（当社ウェブサイト又は FTX Earn プログラムのいずれかを通じて）P2P 貸借暗号資産取引における借受け又は貸出しを可能とし及び合意することで、お客様は以下の事項を了承し、同意します。

- お客様は当社により認定・認証されたユーザーです。

- P2P 貸借暗号資産取引は当社が提供するのではなく、P2P 貸借暗号資産取引に係るサービスは全て FTX トレーディングが単独で提供しています。

- お客様は、ご利用規約及び FTX のプライバシーポリシー（それぞれ随時なされる修正を含みます。）を精読及び理解し、並びにこれらに同意しました。

- お客様は、当社がアンチマネーロンダリング法上必要な場合に又は適用ある金融規制その他の法律に従ってお客様から収集する情報を FTX トレーディングに共有することを認めます。

- FTX Earn プログラムに参加されているお客様の場合、お客様の暗号資産は、各暗号資産に応じて変更する可能性があり、1 時間単位で変動する報酬と引き換えに第三者借受人に貸し出されます。

- お客様は、FTX トレーディングが当社に対して本貸出人及び本借受人それぞれとの間で資産の借受け及び貸出しを行い、お客様に代わり P2P 貸借暗号資産取引を完了するために必要な全ての措置を講じるよう指図することを認めます。

- お客様は、ご本人の勘定でのみ P2P 貸借暗号資産取引に参加し、他人の勘定で参加しません。

- お客様は、P2P 貸借暗号資産を違法行為、不法行為、その他本約款等に定める制限された目的のために利用しません。

- FTX トレーディングが P2P 貸借暗号資産の借受人又は貸出人となることはありません。

当社のユーザーのみが、借受人又は貸出人のいずれかとして P2P 貸借暗号資産取引に参加する資格を有します。

**貸出し**

お客様が P2P 貸借暗号資産取引の貸人（以下「**本貸出人**」といいます。）となるには、まず資産をお客様が当社に開設した口座（以下「**お客様口座**」といいます。）に預託する必要があります。お客様は本貸出人として、P2P 貸借暗号資産取引ウェブサイトで「貸出し」を選択するか又はモバイルアプリの FTX Earn プログラムに参加し、貸出しを希望する暗号資産の数量、最低貸借料率及び暗号資産の種類を指定することで、お客様の暗号資産を貸し出す資格を得ます。お客様の貸出しオファーは FTX トレーディングの P2P 貸借暗号資産取引注文板に提出され、自動的に借受人（もしいれば）とのマッチングが行われます。

借受け額、資金調達率及び予想資金調達率は実績データのみに基づいており、保証されておらず、1 時間ごとに頻繁に変更されます。お客様の暗号資産を貸し出すことができるか、お客様が貸し出すことのできる借受人がいるか、暗号資産の借受けの需要があるか、又は表示された貸借料率が正確であるかは、保証されません。FTX トレーディングは、単独の裁量において本貸出人及び本借受人の注文及びマッチングを決定する権利を留保します。お客様はさらに FTX トレーディングが随時定めるプラットフォーム手数料を支払うことに同意します。

お客様はいかなる時も資産を貸し出す必要はありません。お客様の資産の貸出しをストップするには、(a) 何時でも P2P 貸借暗号資産取引ウェブサイトにアクセスして「STOP LENDING」をクリックするか、又は(b) モバイルアプリ上で FTX Earn プログラムに参加しているお客様の場合、「プロフィール」の「無効にする」をクリックし、「資産で利益を得られます」をクリックします。

P2P 貸借暗号資産取引ウェブサイトを利用した貸し付けた暗号資産は全て***責任財産限定型***消費貸借です。お客様は、本借受人の P2P 貸借暗号資産取引で債務不履行となった場合にお客様が遡及できるのは本借受人の口座において保有されている資産の差押え及び／又は決済のみであることに同意します。お客様は何時でも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めないことに同意し、お客様の全ての代理人、代表者及び関連会社に同意させます。

*P2P 貸借暗号資産取引を通じた暗号資産の貸出しは、極めて高いリスクを伴い、FTX トレーディング、政府機関又は第三者によって何ら保証されていません。本借受人が P2P 貸借暗号資産取引で債務不履行となり、かつ本借受人の口座の差押え及び／又は決済ではお客様又は他の本貸出人に対する本借受人の負債の補填に十分な暗号資産の返済ができない場合、お客様は本貸出人として貸し出した暗号資産を全て失う可能性があります。*

**借受け**

P2P 貸借暗号資産の借受人（以下「**本借受人**」といいます。）になるには、まず暗号資産を担保としてお客様口座において当社に預託する必要があります。お客様は借受人として P2P 貸借暗号資産取引ウェブサイトで「P2P 借受けを有効とする」を選択することで当社の他のユーザーから暗号資産を借り受けることができます。お客様が借り受けることのできる暗号資産の数量は、貸出人が借受けに提供する暗号資産の数量、お客様口座で担保として利用可能な暗号資産の数量、暗号資産市場の流動性及びボラティリティの状況、国、地域及び世界の経済状況、法律上及び規制上の要件並びに FTX トレーディングが随時検討するその他の要因を含む多くの要因に基づいて決定されます。

60

P2P 貸借暗号資産取引ウェブサイトを利用して借り受けられた暗号資産全てについて、**責任財産は**本借受人の口座において本借受人が保有する資産**に限定されます**。言い換えると、債務不履行の場合、FTX トレーディング、本貸出人又はその関連会社、代理人若しくは代表者のいずれも本借受人の口座外に本借受人が所有する資金、資産若しくは財産からの償還又はこれらによる補償を求めることはできません。本借受人が P2P 貸借暗号資産取引で債務不履行となった場合、本貸出人が遡及できるのは本借受人の口座において保有される資産の差押及び／又は決済のみです。

お客様は、(a) P2P 貸借暗号資産に付される利息（P2P 貸借暗号資産取引ウェブサイトで閲覧できます。）、及び (b) FTX トレーディングが随時定めるプラットフォーム手数料（これも P2P 貸借暗号資産取引ウェブサイトで閲覧可能です。）を支払うことに同意します。

お客様はいかなる時も暗号資産を借り受ける必要はありません。P2P 貸借暗号資産の借受けを可能とすることで、お客様はご自身がリスクを負担して借受けを行うことに同意します。お客様は、P2P 貸借暗号資産取引を通じて本貸出人から借り受けた暗号資産が当社の取引プラットフォーム上で取引、担保及び引出しを含むあらゆる目的で利用される可能性があることを了承し、同意します。但し、お客様は、お客様口座に十分な資産がない場合は FTX トレーディングが P2P 貸借暗号資産取引に基づき借り受けられた暗号資産の引出を制限するよう当社に指図する可能性があることに同意します。

*FTX トレーディングでの P2P 貸借暗号資産の借受けは極めて高いリスクを伴います。お客様は借受人として、お客様口座内の全ての暗号資産を失う可能性があります。マーケットにおける高いボラティリティ及び重大な非流動性リスクの存在は、お客様がお客様口座内の資産を期限内に決済できないか又は決済が全くできなくなる可能性があることを意味します。お客様口座において保有される資産の価額が最低必要残高を下回るか又は FTX トレーディングが単独の裁量でお客様口座の P2P 貸借暗号資産について債務不履行となるおそれがあると判断する場合、FTX トレーディング又は関連する本貸出人は、お客様が借り受けた暗号資産の返済のためにお客様口座内のポジション及び資産の全部又は一部を直接又は間接的に差し押え、決済する可能性があります。*

**SCHEDULE 16**

**SERVICE SCHEDULE**

**TERMS APPLICABLE TO UK USERS ONLY**

**(Updated September 29, 2022)**

---

Products and services related to a specified investment for the purposes of the UK Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 may not be promoted or offered to residents of the United Kingdom, unless they fall within the certain exemptions from the UK financial promotions regime under article 12 (Overseas Recipients), article 19 (Investment Professionals), article 48 (High Net Worth Individuals), article 49 (High Net Worth Companies, Unincorporated Associations), article 50 (Sophisticated Investors) and article 50A (Self-certified Sophisticated Investors) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or they have otherwise be lawfully communicated in accordance with the Financial Services and Markets Act 2000 and the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005.

---

# Exhibit E

FTX.US USER AGREEMENT

*Last updated* September 16, 2022

Welcome to FTX.US! This is the User Agreement between you and West Realm Shires Services Inc. dba FTX US, a Delaware company (hereinafter referred to as "FTX.US" or "us". Please read this FTX.US User Agreement (the "Terms") and our Privacy Policy ("Privacy Policy") carefully because they govern your use of the website located at FTX.US and other domain names offering or linking to the website (the "Site") and cryptocurrency services accessible via the Site and any corresponding mobile application ("App") offered by FTX.US. To make these Terms easier to read, the Site, our services and App are collectively called the "Services."

**IMPORTANT NOTICE REGARDING ARBITRATION: WHEN YOU AGREE TO THESE TERMS YOU ARE AGREEING (WITH LIMITED EXCEPTION) TO RESOLVE ANY DISPUTE BETWEEN YOU AND FTX.US THROUGH BINDING, INDIVIDUAL ARBITRATION RATHER THAN IN COURT. PLEASE REVIEW CAREFULLY SECTION 30 "DISPUTE RESOLUTION" BELOW FOR DETAILS REGARDING ARBITRATION.**

**As with any asset, the value of cryptocurrencies of all types (including those called "stable coins") can go up or down and there can be a substantial risk that you lose money buying, selling, holding, or investing in cryptocurrency. You should carefully consider whether trading or holding cryptocurrency is suitable for you in light of your financial condition. FTX.US is not registered with the U.S. Securities and Exchange Commission and does not offer securities services in the United States or to U.S. persons.**

1. Agreement to Terms/Privacy Policy. By using our Services, you agree to be bound by these Terms. If you don't agree to be bound by these Terms, do not use the Services. If you are accessing and using the Services on behalf of a company (such as your employer) or other legal entity, you represent and warrant that you have the authority to bind that entity to these Terms. In that case, "you" and "your" will refer to that entity. Please review our Privacy Policy, which also governs your use of the Services, for information on how we collect, use and share your information.

2. Changes to these Terms or the Services. We may amend or update the Terms from time to time in our sole discretion. If we do, we'll let you know by posting the updated Terms on the Site, to the App and/or may also send other communications. It's important that you review the Terms whenever we update them or you use the Services. If you continue to use the Services after we have posted updated Terms it means that you accept and agree to the changes. If you don't agree to be bound by the changes, you may not use the Services anymore. The only exception is for changes to the "Dispute Resolution" section, for which you have followed the process in Section 30(g). Because our Services are evolving over time we may change or discontinue all or any part of the Services, at any time and without notice, at our sole discretion.

3. Who May Use the Services. You may use the Services only if you are 18 years or older (or other age of majority in your jurisdiction) and capable of forming a binding contract with FTX.US, and not otherwise barred from using the Services under applicable law. You may not use the Services if you conduct a Prohibited Business or are in a Prohibited Jurisdiction as specified in the appendices thereto. Our Services are offered to persons in our sole discretion as we may choose to not offer the Services or discontinue access to the Services to you or any person or entity for any reason in our sole discretion. We do not accept individuals or entities that we decide not to permit from time to time in our discretion.

4. Feedback. We appreciate feedback, comments, ideas, proposals and suggestions for improvements to the Services ("Feedback"). If you choose to submit Feedback, you agree that we are free to use it without any restriction or compensation to you.

5.   <u>Account Access/Delays in Service.</u> You must register for a FTX.US account to use the FTX.US Services (a "**FTX.US Account**"). By using a FTX.US Account you agree and represent that you will use the Services only for yourself, and not on behalf of any third party, unless you have obtained prior approval from FTX.US. You are fully responsible for all activity that occurs under your FTX.US Account. We may, in our sole discretion, refuse to open a FTX.US Account, or limit the number of accounts that you may hold or suspend or terminate any FTX.US Account or the trading of specific cryptocurrency in your account.

During registration for your FTX.US Account or thereafter upon our request, you agree to provide us with the information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crimes and permit us to keep a record of such information. You will need to complete certain verification procedures before you are permitted to use the FTX.US Services. Your access to one or more FTX.US Services and the limits that apply to your use of the FTX.US Services, may be altered as a result of information collected about you on an ongoing basis. The information we request may include certain personal information, including, but not limited to, your name, address, telephone number, e-mail address, date of birth, taxpayer identification number, a government identification, and information regarding your bank account (such as the name of the bank, the account type, routing number, and account number), your source of funds and financial information, and in some cases (where permitted by law), special categories of personal data, such as your biometric information. In providing us with this or any other information that may be required, you confirm that the information is accurate and authentic. You agree to keep us updated if any of the information you provide changes. **You authorize us to make inquiries, whether directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries. When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full. This is an identity check only and should have no adverse effect on your credit rating.** Further, you authorize your wireless operator (AT&T, Sprint, T Mobile, US Cellular, Verizon, or any other branded wireless operator) to use your mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber status details, if available, solely to allow verification of your identity and to compare information you have provided to FTX.US with your wireless operator account profile information for the duration of the business relationship. See our Privacy Policy for how we treat your data.

To access the Services, you must have the necessary equipment (such as a smartphone or laptop) and the associated telecommunication service subscriptions to access the Internet. Access to the Services may become degraded or unavailable during times of significant volatility or volume. This could result in the inability to buy or sell for periods of time and may also lead to support response time delays. WE DO NOT REPRESENT THAT THE SITE OR THE SERVICES WILL BE AVAILABLE WITHOUT INTERRUPTION AND WE DO NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED, OR REMAIN OPEN. FTX.US shall not be liable for any losses resulting from or arising out of transaction delays.

6.   <u>Account Services.</u> As part of your FTX.US Account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency. All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit. You can load funds into your account from a valid bank account via ACH transfer or wire transfer, or other accepted payment methods such as credit or debit cards. Your balance is in a pending state and will not be credited to your FTX.US Account until after the bank transfer has cleared, usually with 5 business days. We may debit your linked bank account as soon as you initiate payment. Other payment methods may take a longer period to clear, and withdrawals may be limited for a period after a receipt of payments. FTX.US may impose withdrawal limits on your FTX.US Account from time to time in its discretion. Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US. Your balances in your FTX.US Account are not segregated and

cryptocurrency or cash are held in shared addresses or accounts, as applicable. A valid purchase of cryptocurrency that is accepted by FTX.US generally will initiate on the business day we receive your instructions. Purchased cryptocurrency or transferred payments will be credited to your FTX.US Account as soon as funds have settled to FTX.US, which in the case of a bank account or credit or debit card may take up to five business days. If FTX.US cannot complete your transaction for any reason (such as price movement, or an order exceeding the maximum order size), FTX.US will reject the order and notify you of such rejection. You will not be charged for a rejected transaction. When you give us instructions to purchase (buy) cryptocurrency, you cannot withdraw your consent to that purchase unless the purchase is not scheduled to occur until a future date, provided that you may withdraw your consent up until the end of the business day before the date is scheduled to take place. FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US.

Your FTX.US Account allows you to hold and transfer US dollars which are held by FTX.US for your benefit at U.S. banks. FTX.US is not insured by The Federal Deposit Insurance Corporation ("FDIC") and no cryptocurrency balances (including stablecoins) benefit from FDIC insurance. To the extent you hold USD fiat balances (and such balances are not held in stablecoins or other investments), those fiat balances are held in customer omnibus accounts at FDIC-insured banks (Silvergate Bank and Signature Bank for customers of the FTX.US, and Evolve Bank & Trust for users of our virtual accounts, as of August 2022). These customer omnibus accounts have been established in a manner that is intended to make pass-through FDIC insurance available up to the per-depositor coverage limit then in place (currently up to at least $250,000 per depositor, per ownership category). Availability of pass-through FDIC insurance is subject to the bank's records expressly disclosing that the deposits are being held for your benefit, maintaining accurate records that identify you as the actual owner of the funds in the omnibus account and your respective ownership interest in the omnibus account, and a favorable determination by the FDIC as receiver (in a bank insolvency case) at the time of receivership of the bank holding a customer omnibus account. Again, if determined to be available by the FDIC as receiver following a bank insolvency, FDIC insurance only covers fiat balances held in these banks up to the per-depositor coverage limit then in place, and does not extend to any cryptocurrency, stablecoin, or other non-fiat balances. As a reminder, FDIC insurance is only relevant in the case of the failure or insolvency of they bank, and is not relevant in the case of the failure or insolvency of FTX.US. Similarly, FDIC insurance does not apply to funds lost through changes in market prices, losses due to a hack or other similar breach or other misuse of either FTX US generally or your account specifically

The use of the Services is subject to a limit on the amount of volume, you may transact or transfer in a given period (e.g., daily). Your transaction limits may vary depending on your payment method, verification steps you have completed, and other factors. FTX.US reserves the right to change applicable limits as we deem necessary in our sole discretion. To increase transaction limits or upon our request in our discretion, we may require you to submit additional information about yourself or your business, provide records, and arrange for meetings with FTX.US staff (such process, "Enhanced Due Diligence"). FTX.US reserves the right to charge you costs and fees associated with Enhanced Due Diligence, provided that we notify you in advance of any such charges accruing. In our sole discretion, we may refuse to raise your limits or we may lower your limits at a subsequent time even if you have completed Enhanced Due Diligence.

7.  <u>Supported Cryptocurrencies</u>. You may only use the Services in connection with those particular cryptocurrencies shown available for sale and purchase on FTX.US website. Services and supported assets may vary by jurisdiction. As a result of our security protocols, it may be necessary for us to retrieve private keys or related information from offline storage in order to facilitate a cryptocurrency transfer in accordance with your instructions, and you acknowledge that this may delay the initiation or crediting of such cryptocurrency in your FTX.US Account. Under no circumstances should you attempt to use your FTX.US Account to store, send, request, or receive cryptocurrency we do not support. FTX.US assumes no responsibility in connection with any attempt to use your FTX.US Account with any cryptocurrency that we do not support. Unless listed for availability on the FTX.US website, we do not support protocols and/or functionality which supplement or interact with cryptocurrency that you may hold in your FTX.US Account, or with forked or metacoins, colored coins, side chains, or other derivative, enhanced, or forked protocols, tokens, or coins or other functionality, such as staking, protocol governance, and/or any smart contract functionality, which may supplement or interact with a cryptocurrency we support. Do not use your FTX.US Account to attempt to receive, request, send, store, or engage in any other type of transaction or functionality involving any such protocol as FTX.US is not configured to detect, secure, or process these transactions and functionality. Any attempted transactions in

such items will result in loss of the item.

We do not own or control the underlying software protocols which govern the operation of cryptocurrency supported on our platform. Generally, the underlying protocols are open source, and anyone can use, copy, modify, and distribute them. We assume no responsibility for the operation of the underlying protocols and we are not able to guarantee the functionality or security of network operations. In particular, the underlying protocols may be subject to sudden changes that materially affect the availability, value, functionality, and/or the name of the cryptocurrency you store in your FTX.US Account. It is your responsibility to make yourself aware of upcoming operating changes and you must carefully consider publicly available information in determining whether to continue to use a FTX.US Account for the affected cryptocurrency. In the event of any such operational change, FTX.US reserves the right to takes such steps as may be necessary to protect the security and safety of assets held on the FTX.US platform, including temporarily suspending operations for the involved digital currency(ies), and other necessary steps without notice. FTX.US's response to any material operating changes is subject to its sole discretion and includes deciding not to support any new digital currency, fork, or other actions.

8.  Fees. In general, FTX.US makes money when you purchase or sell digital currency on our Site. A full list of FTX.US fees for your FTX.US Account can be found through our Website. By using FTX.US Services you agree to pay all applicable fees. FTX.US reserves the right to adjust its pricing and fees and any applicable waivers at any time. We may charge network fees (miner fees) to process a cryptocurrency transaction on your behalf. We will calculate the network fee in our discretion. Bank fees charged to FTX.US are netted out of transfers to or from FTX.US. You are responsible for paying any additional fees charged by your financial service provider. We will not process a transfer if associated bank fees exceed the value of the transfer. You may be required to deposit additional funds to cover bank fees if you desire to complete such a transfer.

9.  Cryptocurrency Transactions. Once a cryptocurrency transfer is submitted to a cryptocurrency network, the transaction will be unconfirmed and remain in a pending state for a period of time sufficient to confirmation of the transaction by the cryptocurrency network. A cryptocurrency transfer is not complete while it is in a pending state. Pending cryptocurrency transfers that are initiated from a FTX.US Account may reflect a pending transaction status and may not be available to you for use on the FTX.US platform or otherwise while the transaction is pending.

When you or a third party sends cryptocurrency to a FTX.US Account from an external wallet or account not hosted on FTX.US, the person initiating the transaction is solely responsible for executing the transaction properly, which may include, among other things, payment of sufficient network or miner's fees in order for the transaction to be successful. Insufficient network fees may cause a transfer to remain in a pending state outside of FTX.US's control and we are not responsible for delays or losses incurred as a result of an error in the initiation of the transaction and have no obligation to assist in the remediation of such transactions. By initiating an transfer to FTX.US, you attest that you are transacting in a cryptocurrency that is identified as part of the FTX.US Website which conforms to the particular FTX.US wallet into which funds are directed. FTX.US incurs no obligation whatsoever with regard to unsupported digital currency sent to a FTX.US Account or supported cryptocurrency sent to an incompatible cryptocurrency wallet address. Erroneously transmitted funds will be lost. We recommend customers send a small amount of cryptocurrency as a test prior to initiating a send of a significant amount of supported cryptocurrency.

When you send cryptocurrency from your FTX.US Account to an external address, such transfers are executed at your instruction by FTX.US. You should verify all transaction information prior to submitting instructions to us. FTX.US shall bear no liability or responsibility in the event you enter an incorrect blockchain destination

address. We do not guarantee the identity or value received by a recipient of a transfer initiated by you. Cryptocurrency transfers cannot be reversed once they have been broadcast to the relevant cryptocurrency network, although they may be in a pending state, and designated accordingly, while the transaction is processed by network operators. FTX.US does not control the cryptocurrency network and makes no guarantees that a cryptocurrency transfer will be confirmed by the network.

We may refuse to process or cancel any pending transfers as required by law or any court or other authority to which FTX.US is subject in any jurisdiction. Additionally, we may require you to wait some amount of time after completion of a transaction before permitting you to use further FTX.US Services and/or before permitting you to engage in transactions beyond certain volume limits.

We may allow you to initiate a cryptocurrency transfer to a FTX.US customer by designating that customer's email address. If you initiate a cryptocurrency transfer to an email address, and the recipient does not have an existing FTX.US Account, we will invite the recipient to open a FTX.US Account. If the recipient does not open a FTX.US Account within 60 days, we will return the relevant cryptocurrency to your FTX Account.

If FTX.US elects to offer recurring transaction availability, and you initiate recurring transactions, you authorize us to initiate recurring electronic payments in accordance with your selected cryptocurrency or payments, such as recurring automated clearing house (ACH) debit or credit entries from or to your linked bank account. Your recurring transactions will occur in identical, periodic installments based on your period selection (e.g., daily, weekly, monthly), until either you or FTX.US cancels the recurring order. If you select a bank account as your payment method for a recurring transaction, and such transaction falls on a weekend or holiday (or any bank business hours, the ACH credit or debit will be executed on the next business day, although the cryptocurrency fees at the time of the regularly scheduled transaction will apply. If your bank is unable to process any electronic ACH debit entry, we will notify you of cancellation of the transaction and may avail itself of remedies set forth in these Terms to recover any amount owed to FTX.US. You agree to notify FTX.US in writing of any changes in your linked bank account information prior to a recurring transaction. FTX.US may, at any time, terminate recurring transactions by providing notice to you.

10. <u>Password Security; Contact Information.</u> You are responsible for creating a strong password and maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys or any other codes that you use to access the Services. Any loss or compromise of the foregoing information and/or your personal information may result in unauthorized access to your FTX.US Account(s) by third parties and the loss or theft of any cryptocurrency and/or funds held in your FTX.US Account(s) and any associated accounts, including your linked bank account(s) and credit card(s). You are responsible for keeping your information up to date in your FTX Account in order to receive any notices or alerts that we may send you. You should never allow remote access or share your computer screen with someone else when you are logged on to your FTX.US Account. FTX.US will never under any circumstances ask you for your IDs, passwords, or 2- factor authentication codes. We assume no responsibility for any loss that you may sustain due to compromise of account login credentials. In the event you believe your FTX.US Account(s) information has been compromised, contact us immediately at support@ftx.us

11. <u>Unauthorized and Incorrect Transactions</u>. When a transaction occurs using your credentials, we will assume that you authorized such transaction, unless you notify us otherwise. If you believe you did not authorize a particular transaction or that a transaction was incorrectly carried out, you must contact us as soon as possible by email at support@ftx.us. Check your transaction history regularly to ensure you notify us as soon as possible of any unauthorized or incorrect transactions to. In any event and without limitation, we are not responsible and you release us from damages and agree to not commence any Disputes (as such term is defined below) for any claim for unauthorized or incorrect transactions unless you have notified us within one (1) year from the first date such transaction posted to your account.

12. <u>Reversals & Cancellations</u>. You cannot cancel, reverse, or change any transaction marked as complete or pending. If your payment is not successful, if your payment method has insufficient funds, or if you reverse a payment made from funds in your bank account, you authorize FTX.US, in its sole discretion, either to cancel the transaction or to debit your other payment methods, including your dollar or cryptocurrency balance in your FTX.US Account or other linked accounts, in any amount necessary to complete the transaction. You are responsible for maintaining an adequate balance and/or sufficient credit limits in order to avoid overdraft, non sufficient funds (NSF), or similar fees charged by your payment provider. We reserve the right to refuse to process, or to cancel or reverse, any transaction or transfer in our sole discretion, even after funds have been debited from your account(s), if we suspect the transaction involves (or has a high risk of involvement in) money laundering, terrorist financing, fraud, or any other type of financial crime; in response to a subpoena, court order, or other government order; if we reasonably suspect that the transaction is erroneous; or if FTX.US suspects the transaction violates our policies and procedures or creates risk to FTX.US, FTX.US will reverse the transaction and we are under no obligation to allow you to reinstate a purchase or sale order at the same price or on the same terms as the cancelled transaction.

13. <u>Debts</u>. In the event that there are outstanding amounts owed to us hereunder, including your FTX.US Account, FTX.US reserves the right to debit your FTX.US Account accordingly and/or to withhold amounts from funds you may transfer to your FTX.US Account.

14. <u>Your Content</u>. Our Services may allow you to store or share content such as text (in posts or communications with others), files, documents, graphics, images, music, software, audio and video. Anything (other than Feedback) that you post or otherwise make available through the Services is referred to as "User Content". FTX.US does not claim any ownership rights in any User Content and nothing in these Terms will be deemed to restrict any rights that you may have to your User Content. By making any User Content available through the Services you hereby grant to FTX.US a non-exclusive, transferable, worldwide, royalty-free license, with the right to sublicense, to use, copy, modify, create derivative works based upon, distribute, publicly display, and publicly perform your User Content in connection with operating and providing the Services. You are solely responsible for all your User Content. You represent and warrant that you have (and will have) all rights that are necessary to grant us the license rights in your User Content under these Terms. You represent and warrant that neither your User Content, nor your use and provision of your User Content to be made available through the Services, nor any use of your User Content by FTX.US on or through the Services will infringe, misappropriate or violate a third party's intellectual property rights, or rights of publicity or privacy, or result in the violation of any applicable law or regulation. You can remove your User Content by specifically deleting it. You should know that in certain instances, some of your User Content (such as posts or comments you make) may not be completely removed and copies of your User Content may continue to exist on the Services. To the maximum extent permitted by law, we are not responsible or liable for the removal or deletion of (or the failure to remove or delete) any of your User Content. We may make available through the Services content that is subject to intellectual property rights. We retain all rights to that content.

15. <u>Limited License for Website and Apps.</u> We grant you a limited, nonexclusive, nontransferable license, subject to these Terms, to access and use the FTX.US Services, FTX.US Site, and related content, materials, information (collectively, the "Content") solely for purposes approved by FTX.US from time to time. Any other use of the FTX.US Site or Content is expressly prohibited and all other right, title, and interest in the FTX.US Services, FTX.US Site or Content is exclusively the property of FTX.US and its licensors. You agree you will not copy, transmit, distribute, sell, license, reverse engineer, modify, publish, or participate in the transfer or sale of, create derivative works from, or in any other way exploit any of the Content, in whole or in part without the prior written consent of FTX.US. "FTXUS.com", "FTX.US", "and all logos related to the FTX.US Services or displayed on the FTX.US Site are either trademarks or registered marks of FTX.US or its licensors. You may not copy, imitate or use them without FTX.US's prior written consent.

If you comply with these Terms, FTX.US grants to you a limited, exclusive, non-transferable license, with no right to sublicense, to download and install the App on your personal computers, mobile handsets, tablets, wearable devices, and/or other devices and to run the App solely for your own personal, non-commercial purposes. Except as expressly permitted in these Terms, you may not: (i) copy, modify or create derivative works based on the App; (ii) distribute, transfer, sublicense, lease, lend or rent the App to any third party; (iii) reverse engineer, decompile or disassemble the App (unless applicable law permits, despite this limitation); or (iv) make the functionality of the App available to multiple users through any means.

With respect to any App that you acquire from the Apple App Store or use on an iOS device, Apple has no obligation to furnish any maintenance and support services with respect to the App. In the event of any failure of the App to conform to any applicable warranty, you may notify Apple, and Apple will refund the App purchase price to you (if applicable) and, to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the App. Apple is responsible for addressing any claims by you or any third party relating to the App or your possession and use of it, including, but not limited to: (i) product liability claims; (ii) any claim that the App fails to conform to any applicable legal or regulatory requirement; and (iii) claims arising under consumer protection or similar legislation. Apple is not responsible for the investigation, defense, settlement and discharge of any third party claim that your possession and use of the App infringes that third party's intellectual property rights. Apple and its subsidiaries, are third party beneficiaries of these Terms, and upon your acceptance of the Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce these Terms against you as a third party beneficiary thereof. You represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a terrorist supporting country; and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You must also comply with any applicable third-party terms of service when using the App.

16. <u>General Prohibitions.</u> You agree not to do any of the following:

(a)      Post, upload, publish, submit or transmit any User Content that: (i) infringes, misappropriates or violates a third party's patent, copyright, trademark, trade secret, moral rights or other intellectual property rights, or rights of publicity or privacy; (ii) violates, or encourages any conduct that would violate, any applicable law or regulation or would give rise to civil liability; (iii) is fraudulent, false, misleading or deceptive; (iv) is defamatory, obscene, pornographic, vulgar or offensive; (v) promotes discrimination,

bigotry, racism, hatred, harassment or harm against any individual or group; (vi) is violent or threatening or promotes violence or actions that are threatening to any person or entity; or (vii) promotes illegal or harmful activities or substances;

(b)      Use, display, mirror or frame the Services or any individual element within the Services, FTX.US's name, any FTX.US trademark, logo or other proprietary information, or the layout and design of any page or form contained on a page, without FTX.US's express written consent;

(c)      Access, tamper with, or use non-public areas of the Services, FTX.US's computer systems, or the technical delivery systems of FTX.US's providers;

(d)      Attempt to probe, scan or test the vulnerability of any FTX.US system or network or breach any security or authentication measures;

(e)      Avoid, bypass, remove, deactivate, impair, descramble or otherwise circumvent any technological measure implemented by FTX.US or any of FTX.US's providers or any other third party (including another user) to protect the Services;

(f)      Attempt to access or search the Services or download content from the Services using any engine, software, tool, agent, device or mechanism (including spiders, robots, crawlers, data mining tools or the like) other than the software and/or search agents provided by FTX.US or other generally available third party web browsers;

(g)      Send any unsolicited or unauthorized advertising, promotional materials, email, junk mail, spam, chain letters or other form of solicitation;

(h)      Use any meta tags or other hidden text or metadata utilizing a FTX.US trademark, logo URL or product name without FTX.US's express written consent;

(i)      Use the Services, or any portion thereof, for any commercial purpose or for the benefit of any third party or in any manner not permitted by these Terms;

(j)      Forge any TCP/IP packet header or any part of the header information in any email or newsgroup posting, or in any way use the Services to send altered, deceptive or false source-identifying information;

(k)      Attempt to decipher, decompile, disassemble or reverse engineer any of the software used to provide the Services;

(l)      Interfere with, or attempt to interfere with, the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, or mail-bombing the Services;

(m)      Collect or store any personally identifiable information from the Services from other users of the Services without their express permission;

(n)      Impersonate or misrepresent your affiliation with any person or entity;

(o)      Violate any applicable law or regulation; or

(p)      Encourage or enable any other individual to do any of the foregoing.

FTX.US is not obligated to monitor access to or use of the Services or to review or edit any content. However, we have the right to do so for the purpose of operating the Services, to ensure compliance with these Terms and to comply with applicable law or other legal requirements. We reserve the right, but are not obligated, to remove or disable access to any content, including User Content, at any time and without notice, including, but not limited to, if

we, at our sole discretion, consider it objectionable or in violation of these Terms. We have the right to investigate violations of these Terms or conduct that affects the Services. We may also consult and cooperate with law enforcement authorities to prosecute users who violate the law.

17.  Links to Third Party Websites or Resources. The Services (including the App) may allow you to access third party websites or other resources. We provide access only as a convenience and are not responsible for the content, products or services on or available from those resources or links displayed on such websites. You acknowledge sole responsibility for and assume all risk arising from, your use of any third party resources.

18.  No Assurance of Accuracy. Although we intend to provide accurate and timely information on the FTX.US Site, the content provided through the Services may not always be entirely accurate, complete or current and may also include technical inaccuracies or typographical errors. In an effort to continue to provide you with as complete and accurate information as possible, information may be changed or updated from time to time without notice, including without limitation information regarding our policies, products and services. Accordingly, you should verify all information before relying on it, and all decisions based on information contained on the FTX.US Site or through the App are your sole responsibility and we shall have no liability for such decisions. Information provided by third parties, including historical price and supply data for cryptocurrency, is for informational purposes only and FTX.US makes no representations or warranties to its accuracy.

19.  Promotions. From time to time, FTX.US may make available special offers or conduct promotions for qualifying customers. Subject to applicable laws, FTX.US or the issuer of a cryptocurrency subject to an offer or promotion may establish qualifying criteria to participate in any special promotion its sole discretion. FTX.US may revoke any special offer at any time without notice. Once cryptocurrency has been deposited to a depositor's cryptocurrency FTX Account, that cryptocurrency becomes the property of the FTX.US user with all applicable property rights, including those noted in these Terms. FTX.US shall have no obligation to make special offers available to all customers. FTX.US makes no recommendation and does not provide any advice about the value or utility of any cryptocurrency subject to a promotion.

20.  Taxes. It is your sole responsibility to determine whether, and to what extent, any taxes apply to any transactions you conduct through the Services, and to withhold, collect, report and remit the correct amounts of taxes to the appropriate tax authorities. Your transaction history is available through your FTX.US Account(s).

21.  No Investment Advice or Brokerage. For the avoidance of doubt, FTX.US does not provide investment, tax, or legal advice, nor does FTX.US broker trades on your behalf. All FTX.US trades are executed automatically, based on the parameters of your order instructions and in accordance with posted trade execution procedures, and you are solely responsible for determining whether any investment, investment strategy or related transaction is appropriate for you based on your personal investment objectives, financial circumstances and risk tolerance. You should consult your legal or tax professional regarding your specific situation. FTX.US may provide educational information about cryptocurrency. Information may include, but is not limited to, blog posts, articles, links to to third party content, news feeds, tutorials, and videos. The information provided does not constitute investment advice, financial advice, trading advice, or any other sort of advice, and you should not treat any of the content as such. FTX.US does not recommend that any cryptocurrency should be bought, earned, sold, or held by you. Before making the decision to buy, sell or hold any cryptocurrency, you should conduct your own due diligence and consult your financial advisors before making any investment decision. FTX.US will not be held responsible for the decisions you make to buy, sell, or hold cryptocurrency based on the information provided by FTX.US or others.

22.  Computer Viruses. We shall not bear any liability, whatsoever, for any damage or interruptions caused by any computer viruses or other malicious code that may affect your computer or other equipment, or any phishing,

spoofing or other attack. We advise the regular use of a reputable and readily available virus screening and prevention software. You should also be aware that SMS and email services are vulnerable to spoofing and phishing attacks and should use care in reviewing messages purporting to originate from FTX.US. Always log into your FTX.US Account(s) through the FTX.US Site to review any transactions or required actions if you have any uncertainty regarding the authenticity of any communication or notice.

23. Termination. We may suspend or terminate your access to and use of the Services, including suspending access to or terminating your account, at our sole discretion, at any time and without notice to you. You may cancel your account at any time by withdrawing your balances and sending us an email at ftx@ftx.us Upon any termination, discontinuation or cancellation of the Services or your account, the following Sections will survive: 5, 6, 9, 12, 13, 14, 15, 17, 18, 19, 21, 22, this 23, 24, 25, 26, 27, 28, 29, 30, 31, and 32.

If FTX.US suspends or closes your account, or terminates your use of FTX.US Services for any reason, we will provide you with notice of our actions unless a court order or other legal process prohibits FTX.US from providing you with such notice. You acknowledge that FTX.US's decision to take certain actions, including limiting access to, suspending, or closing your account, may be based on confidential criteria that are essential to FTX.US's risk management and security protocols. You agree that FTX.US is under no obligation to disclose the details of its risk management and security procedures to you.

You will be permitted to transfer cryptocurrency or funds associated with your FTX.US Account ninety (90) days after account deactivation or cancellation unless such transfer is otherwise prohibited (i) by the law, including but not limited to applicable sanctions programs, or (ii) by a facially valid subpoena or court order.

24. Warranty Disclaimers. THE SERVICES ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND. WITHOUT LIMITING THE FOREGOING, WE EXPLICITLY DISCLAIM ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUIET ENJOYMENT AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING OUT OF COURSE OF DEALING OR USAGE OF TRADE. We make no warranty that the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. We make no warranty regarding the quality, accuracy, timeliness, truthfulness, completeness or reliability of any information or content on the Services.

25. Indemnity. You will indemnify and hold FTX.US and its officers, directors, employees and agents, harmless from and against any claims, disputes, demands, liabilities, damages, losses, and costs and expenses, including, without limitation, reasonable legal and accounting fees arising out of or in any way connected with (a) your access to or use of the Services, (b) your User Content, or (c) your violation of these Terms.

26. Limitation of Liability. TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER FTX.US NOR ITS SERVICE PROVIDERS INVOLVED IN CREATING, PRODUCING, OR DELIVERING THE SERVICES WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, EXPECTED GAINS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE SERVICES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THESE TERMS OR FROM THE USE OF OR INABILITY TO USE THE SERVICES, WHETHER   BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT FTX.US OR ITS SERVICE PROVIDERS HAS

BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET
FORTH HEREIN IS FOU ND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

IN NO EVENT SHALL FTX.US, ITS AFFILIATES AND SERVICE PROVIDERS, OR ANY OF THEIR
RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES OR
REPRESENTATIVES, BE LIABLE (A) FOR ANY AMOUNT GREATER THAN TH E VALUE OF THE
SUPPORTED DIGITAL CURRENCY ON DEPOSIT IN YOUR FTX.US ACCOUNT(S) OR (B) FOR ANY LOST
PROFITS, DIMINUTION IN VALUE OR BUSINESS OPPORTUNITY, ANY LOSS, DAMAGE, CORRUPTION
OR BREACH OF DATA OR ANY OTHER INTANGIBLE PROPERTY OR ANY SPECIAL, INCIDEN TAL,
INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, TORT,
NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH
AUTHORIZED OR UNAUTHORIZED USE OF THE FTX.US SITE OR THE FTX.US SERVICES, OR THESE
TERMS, EVEN IF AN AUTHORIZED REPRESENTATIVE OF FTX.US HAS BEEN ADVISED OF OR KNEW
OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE
FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE, EXCEPT TO THE
EXTENT OF A FINAL JUD ICIAL DETERMINATION THAT SUCH DAMAGES WERE A RESULT OF FTX.US'S
GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF LAW.. SOME
JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR
CONSEQUENTIAL DAMAGES, SO THE ABOVE L IMITATION MAY NOT APPLY TO YOU.

THE FTX.US SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY
REPRESENTATION OR WARRANTY, WHETHER EXPRESS, IMPLIED OR STATUTORY. TO THE
MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FTX.US SPECIFICALLY DISCLAIMS ANY
IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE
AND/OR NON INFRINGEMENT. FTX.US DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES
THAT ACCESS TO THE SITE, ANY PART OF THE FTX.US SERVICES, OR ANY OF T HE MATERIALS
CONTAINED THEREIN, WILL BE CONTINUOUS, UNINTERRUPTED, TIMELY, OR ERROR -FREE. FTX.US
DOES NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED OR
REMAIN OPEN. EXCEPT FOR THE EXPRESS STATEMENTS SET FORTH IN THESE TERMS, YOU
HEREBY A CKNOWLEDGE AND AGREE THAT YOU HAVE NOT RELIED UPON ANY OTHER STATEMENT
OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, WITH RESPECT TO YOUR USE AND ACCESS
OF THE FTX.US SERVICES AND FTX.US SITE. WITHOUT LIMITING THE FOREGOING, YOU HEREBY
UNDERSTAND AND AGREE TH AT FTX.US WILL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES
ARISING OUT OF OR RELATING TO: (A) ANY INACCURACY, DEFECT OR OMISSION OF DIGITAL
CURRENCY PRICE DATA, (B) ANY ERROR OR DELAY IN THE TRANSMISSION OF SUCH DATA, OR (C)
INTERRUPTION IN ANY SUCH DATA.

FTX .US makes no representations about the accuracy, order, timeliness or completeness of historical
cryptocurrency price data available on the FTX.US Site. FTX.US will make reasonable efforts to ensure that
requests for electronic debits and credits involving bank accounts, credit cards, and check issuances are
processed in a timely manner but FTX.US makes no representations or warranties regarding the amount of time
needed to complete processing which is dependent upon many factors outside of our control.

IF YOU ARE A NEW JERSEY RESIDENT, the provisions of this Section 26 are intended to apply only to
the extent permitted under New Jersey law.

27.  <u>Death of Account Holder</u> For security reasons, if we receive legal documentation confirming your death or
other information leading us to believe you have died, we will freeze your FTX.US Account and during this time,
no transactions may be completed until:(i) your designated fiduciary has opened a new FTX.US account, as
further described below, and the entirety of your FTX.US Account has been transferred to such new account, or
(ii) we have received proof in a form satisfactory to us that you have not died. If we have reason to believe you
may have died but we do not have proof of your death in a form satisfactory to us, you authorize us to make
inquiries, whether directly or through third parties, that we consider necessary to ascertain whether you have
died. Upon receipt by us of proof satisfactory to us that you have died, the fiduciary you have designated in a

valid Will or similar testamentary document will be required to open a new FTX.US Account. If you have not designated a fiduciary, then we reserve the right to treat as your fiduciary any person entitled to inherit your FTX.US Account, as determined by us upon receipt and review of the documentation we, in our sole and absolute discretion, deem necessary or appropriate, including (but not limited to) a living Will, Trust or a Small Estate Affidavit, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over your estate. In the event we determine, in our sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, we reserve the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to your FTX.US Account. Pursuant to the above, the opening of a new FTX.US Account by a designated fiduciary is mandatory following the death of a FTX.US Account owner, and you hereby agree that your fiduciary will be required to open a new FTX.US Account and provide the information required under these Terms in order to gain access to contents of your FTX.US Account.

28. Unclaimed Property. If FTX.US is holding funds (whether fiat currency or cryptocurrency) in your account, and FTX.US is unable to contact you and has no record of your use of the Services for several years, applicable law may require FTX.US to report these funds (including fiat currency and cryptocurrency) as unclaimed property to the applicable jurisdiction. If this occurs, FTX.US will try to locate you at the address shown in our records, but if FTX.US is unable to locate you, it may be required to deliver any such funds to the applicable state or jurisdiction as unclaimed property.

29. Governing Law and Forum Choice. These Terms and any action related thereto will be governed by the Federal Arbitration Act, federal arbitration law, and the laws of the State of California without regard to its conflict of laws provisions. Except as otherwise expressly set forth in Section 30, "Dispute Resolution," the exclusive jurisdiction for all Disputes (defined below) that you and FTX.US are not required to arbitrate will be the state and federal courts located in Alameda County in California, and you and FTX.US each waive any objection to jurisdiction and venue in such courts.

30. Dispute Resolution.

(a)      Mandatory Arbitration of Disputes. We each agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services (collectively, "Disputes") will be resolved solely by binding, individual arbitration and not in a class, representative or consolidated action or proceeding. You and FTX.US agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of these Terms, and that you and FTX.US are each waiving the right to a trial by jury or to participate in a class action. This arbitration provision shall survive termination of these Terms.

(b)      Exceptions. As limited exceptions to Section 30(a) above: (i) we both may seek to resolve a Dispute in small claims court if it qualifies; and (ii) we each retain the right to seek injunctive or other equitable relief from a court to prevent (or enjoin) the infringement or misappropriation of our intellectual property rights.

(c)      Conducting Arbitration and Arbitration Rules. The arbitration will be conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules (the "AAA Rules") then in effect, except as modified by these Terms. The AAA Rules are available at www.adr.org or by calling 1-800-778-7879. A party who wishes to start arbitration must submit a written Demand for Arbitration to AAA and give notice to the other party as specified in the AAA Rules. The AAA provides a form Demand for Arbitration at www.adr.org. Any arbitration hearings will take place in the county, city (or parish) where you live, unless we both agree to a different location. The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement. To the extent the location of the arbitration hearing is more than 100 miles from a

location of FTX.US offices, FTX.US reserves the right to appear by video conference to the fullest extent permitted by law.

(d)    <u>Arbitration Costs</u>. Payment of all filing, administration and arbitrator fees will be governed by the AAA Rules, and we won't seek to recover the administration and arbitrator fees we are responsible for paying, unless the arbitrator finds your Dispute frivolous. If we prevail in arbitration we'll pay all of our attorneys' fees and costs and won't seek to recover them from you. If you prevail in arbitration you will be entitled to an award of attorneys' fees and expenses to the extent provided under applicable law.

(e)    <u>Injunctive and Declaratory Relief</u>. Except as provided in Section 30(b) above, the arbitrator shall determine all issues of liability on the merits of any claim asserted by either party and may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. To the extent that you or we prevail on a claim and seek public injunctive relief (that is, injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the public), the entitlement to and extent of such relief must be litigated in a civil court of competent jurisdiction and not in arbitration. The parties agree that litigation of any issues of public injunctive relief shall be stayed pending the outcome of the merits of any individual claims in arbitration.

(f)    <u>Class Action Waiver</u>. **YOU AND FTX.US AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.** Further, if the parties' dispute is resolved through arbitration, the arbitrator may not consolidate another person's claims with your claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this Dispute Resolution section shall be null and void.

(g)    <u>Effect of Changes on Arbitration</u>. Notwithstanding the provisions of Section 26 "Changes to Terms or Services" above, if FTX.US changes any of the terms of this Section 30 "Dispute Resolution" after the date you most recently accepted these Terms, you may reject any such change by sending us written notice (including by email to legal@ftx.us) within 30 days of the date such change became effective, as indicated in the "Last Updated" date above or in the date of FTX.US's email to you notifying you of such change. By rejecting any change, you are agreeing that you will arbitrate any Dispute between you and FTX.US in accordance with the terms of this Section 30 "Dispute Resolution" as of the date you most recently accepted these Terms.

(h)    <u>Severability</u>. With the exception of any of the provisions in Section 30(f) of these Terms ("**Class Action Waiver**"), if an arbitrator or court of competent jurisdiction decides that any part of these Terms is invalid or unenforceable, the other parts of these Terms will still apply.

**31.**    <u>General Terms</u>.

(i)    <u>Reservation of Rights</u>. FTX.US and its licensors exclusively own all right, title and interest in and to the Services, including all associated intellectual property rights. You acknowledge that the Services are protected by copyright, trademark, and other laws of the United States and foreign countries. You agree not to remove, alter or obscure any copyright, trademark, service mark or other proprietary rights notices incorporated in or accompanying the Services.

(j)    <u>Entire Agreement</u>. These Terms constitute the entire and exclusive understanding and agreement between FTX.US and you regarding the Services, and these Terms supersede and replace all prior oral or written understandings or agreements between FTX.US and you regarding the Services. If any provision of these Terms is held invalid or unenforceable by an arbitrator or a court of competent jurisdiction, that provision will be enforced to the maximum extent permissible and the other provisions of these Terms will remain in full force and effect. You may not assign or transfer these Terms, by operation of law or otherwise,

without FTX.US's prior written consent. Any attempt by you to assign or transfer these Terms, without such consent, will be null. FTX.US may freely assign or transfer these Terms without restriction. Subject to the foregoing, these Terms will bind and inure to the benefit of the parties, their successors and permitted assigns. In the event that FTX.US is acquired by or merged with a third party entity, we reserve the right, in any of these circumstances, to transfer or assign the information we have collected from you as part of such merger, acquisition, sale, or other change of control.

(k)      Notices. Any notices or other communications provided by FTX.US under these Terms will be given: (i) via email; or (ii) by posting to the Services. For notices made by email, the date of receipt will be deemed the date on which such notice is transmitted.

(l)      Waiver of Rights. FTX.US's failure to enforce any right or provision of these Terms will not be considered a waiver of such right or provision. The waiver of any such right or provision will be effective only if in writing and signed by a duly authorized representative of FTX.US. Except as expressly set forth in these Terms, the exercise by either party of any of its remedies under these Terms will be without prejudice to its other remedies under these Terms or otherwise. These Terms shall not be construed to waive rights that cannot be waived under applicable state law in this state where you are located.

(m)      Relationship of the Parties. FTX.US is an independent contractor for all purposes. Nothing in these Terms shall be deemed or is intended to be deemed, nor shall it cause, you and FTX.US to be treated as partners, joint ventures, or otherwise as joint associates for profit, or either you or FTX.US to be treated as the agent of the other.

(n)      Force Majeure. We shall not be liable for delays, failures to execute trades, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond our reasonable control, including but not limited to, significant market volatility, denial of service attacks, hacking, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is substantially beyond our control or not directly caused by us and shall not affect the validity and enforceability of any remaining provisions.

32.   Payment processing services for customers on the FTX.US Platform are provided by Stripe and are subject to the Stripe Connected Account Agreement, which includes the Stripe Terms of Service (collectively, the "Stripe Services Agreement"). By agreeing to these Terms or continuing to use the Services, you agree to be bound by the Stripe Services Agreement, as the same may be modified by Stripe from time to time. As a condition of FTX.US enabling payment processing services through Stripe, you agree to provide FTX.US with accurate and complete information about you and/or your business, and you authorize FTX.US to share it and transaction information related to your use of the payment processing services provided by Stripe.

33.   Contact Information. If you have any questions about or wish to modify these Terms or the Services, please contact FTX.US at legal@ftx.us or by registered or certified mail to the following address:

West Realm Shires Services Inc.

167 N. Green St, Suite 1102

Chicago, IL 60607

APPENDIX 1: Prohibited Businesses and Prohibited Jurisdictions

By opening a FTX.US Account, you confirm that you will not use FTX.US Services in connection with any of following businesses, activities, practices, or items:

We. prohibit businesses who use or intend to use its services in connection with any of following businesses, activities, practices, or items:

o Investment and Credit Services: Securities brokers; mortgage consulting or debt reduction services; credit counseling or repair; real estate opportunities; investment schemes

o Restricted Financial Services: Check cashing, bail bonds; collections agencies.

o Intellectual Property or Proprietary Rights Infringement: Sales, distribution, or access to counterfeit music, movies, software, or other licensed materials without the appropriate authorization from the rights holder

o Counterfeit or Unauthorized Goods: Unauthorized sale or resale of brand name or designer products or services; sale of goods or services that are illegally imported or exported or which are stolen

o Regulated Products and Services: Marijuana dispensaries and related businesses; sale of tobacco, cigarettes, and e-liquid; online prescription or pharmaceutical services; age restricted goods or services; weapons and munitions; gunpowder and other explosives; fireworks and related goods; toxic, flammable, and radioactive materials; products and services with varying legal status on a state-by-state basis

o Drugs and Drug Paraphernalia: Sale of narcotics, controlled substances, and any equipment designed for making or using drugs, such as bongs, vaporizers, and hookahs

o Pseudo-Pharmaceuticals: Pharmaceuticals and other products that make health claims that have not been approved or verified by the applicable local and/or national regulatory body

o Substances designed to mimic illegal drugs: Sale of a legal substance that provides the same effect as an illegal drug (e.g., salvia, kratom)

o Adult Content and Services: Pornography and other obscene materials (including literature, imagery and other media); sites offering any sexually related services such as prostitution, escorts, pay-per view, adult live chat features

o Multi-level Marketing: Pyramid schemes, network marketing, and referral marketing programs

o Unfair, predatory or deceptive practices: Investment opportunities or other services that promise high rewards; Sale or resale of a service without added benefit to the buyer; resale of government offerings without authorization or added value; sites that we determine in sole discretion to be unfair, deceptive, or predatory towards consumers

o High risk businesses: any businesses that we believe poses elevated financial risk, legal liability, or violates card network or bank policies

We prohibit access to our Services in the following jurisdictions:

•Any jurisdiction that is subject to the sanctions programs administered by the U.S. Treasury and other governing bodies.

•New York

•Any jurisdiction that we may determine poses elevated financial risk, legal, or violates card network or bank policies.

APPENDIX 2: E-Sign Disclosure and Consent

This policy describes how FTX.US delivers communications to you electronically. We may amend this policy at any time by providing a revised version on our website. The revised version will be effective at the time we post it. We will provide you with prior notice of any material changes via our website.

## Electronic Delivery of Communications

You agree and consent to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that we provide in connection with your FTX.US Account(s) and your use of FTX.US Services. Communications include:

- Terms of use and policies you agree to (e.g., the FTX.US User Agreement and Privacy Policy), including updates to these agreements or policies;

- Account details, history, transaction receipts, confirmations, and any other Account or transaction information;

- Legal, regulatory, and tax disclosures or statements we may be required to make available to you; and

- Responses to claims or customer support inquiries filed in connection with your Account.

We will provide these Communications to you by posting them on the FTX.US website, emailing them to you at the primary email address listed in your FTX.US profile, communicating to you via chat, and/or through other electronic communication such as text message or mobile push notification.

## Hardware and Software Requirements

In order to access and retain electronic Communications, you will need the following computer hardware and software:

- A device with an Internet connection;

- A current web browser that includes 128-bit encryption (e.g. Internet Explorer version 9.0 and above, Firefox version 3.6 and above, Chrome version 31.0 and above, or Safari 7.0 and above) with cookies enabled;

- A valid email address (your primary email address on file with FTX.US); and

- Sufficient storage space to save past Communications or an installed printer to print them.

## How to Withdraw Your Consent

You may withdraw your consent to receive Communications electronically by contacting us at support@ftx.us. If you fail to provide or if you withdraw your consent to receive Communications electronically, FTX.US reserves the right to immediately close your Account or charge you additional fees for paper copies.

**Updating your Information**

It is your responsibility to provide us with a true, accurate and complete email address and your contact information, and to keep such information up to date. You understand and agree that if FTX.US sends you an electronic Communication but you do not receive it because your primary email address on file is incorrect, out of date, blocked by your service provider, or you are otherwise unable to receive electronic Communications, FTX.US will be deemed to have provided the Communication to you.

You may update your information by logging into your account and visiting settings or by contacting our support team.

# Exhibit F

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC,

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   June 15, 2023

17                   12:26 PM

18

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: ALIANNA PERSAUD

1    HEARING re Doc. #432 Notice of Agenda

2

3    HEARING re Doc. #289 Motion for Relief from the Automatic

4    Stay Re:  FTX Trading

5

6    HEARING re Doc. #373 Motion to Authorize / Motion to

7    Establish Procedures and a Schedule for Estimating the

8    Amount of the FTX Debtors Claims Against the Debtors under

9    Bankruptcy Code Sections 105(a) and 502(c) and Bankruptcy

10   Rule 3018

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    power that's intended to create parity among creditors and

2    intended to create parity among creditors in the FTX cases.

3    So whichever Court decides the merits of this preference

4    action is going to have to decide a number of questions that

5    are central to FTX.  For example, the value of FTT.  This,

6    the fact here, are that this loan was either fully or

7    partially collateralized with FTT, which is the native token

8    to FTX.

9              Resolution of the preference requires the

10   valuation of FTT which at one point had a market

11   capitalization of about $4 billion and at our petition time

12   at hundreds of thousands of holders.  There's going to be

13   two relevant valuations, valuation at the FTX petition date

14   and at the distribution date.  The price of FTT is not

15   simple to calculate because there have been allegations the

16   price was subject to manipulation by Sam Bankman-Fried and

17   the other founders of FTX.

18             So the spot price may not be indicative of value.

19   Expert evidence will be required.  This question of the

20   value of FTT is generally applicable to all holders of the

21   FTT token and all other stakeholders of FTX that might not

22   hold the token but object to the valuation.

23             Next, it's not just the value of FTT that's

24   interesting, when FTT is held as collateral, but it's the

25   ranking of FTT because there's allegations in our case that

# Exhibit G

**FTX**
**Draft Plan of Reorganization – Term Sheet**

This summary term sheet (the "Term Sheet") describes certain material terms of the Debtors' draft joint plan of reorganization (as it may be amended in the future, the "Plan") of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"). The Term Sheet is provided for convenience and is qualified in its entirety by the draft Plan attached hereto, which stakeholders are encouraged to review.[1]

| I. Background | |
|---|---|
| **Purpose of the Draft Plan** | The FTX cases raise unresolved factual questions and novel legal issues that affect many stakeholders. The Debtors have decided to file the draft Plan publicly at a relatively early stage – before the expiration of customer bar dates, the completion of pending investigations, the resolution of important negotiations with Consulting Parties (as defined below) and the preparation of a disclosure statement – in order to facilitate creditor feedback and the consensual resolution of certain issues. The Debtors expect to amend the Plan in light of the feedback received from Consulting Parties (as defined below) and other stakeholders and file an amended Plan of reorganization and accompanying disclosure statement in the Fourth Quarter of 2023. |
| **Importance of Waiting to Review a Disclosure Statement** | The Bankruptcy Code requires the Debtors to prepare and circulate a disclosure statement prior to soliciting stakeholder approval of a plan of reorganization. Neither the draft Plan, this Term Sheet nor any other materials the Debtors may circulate should be regarded as a solicitation of acceptances of a chapter 11 plan for purposes of the Bankruptcy Code. Stakeholders are asked to reserve judgment on all the matters raised by the Plan until the amended Plan is available and a disclosure statement is prepared and approved by the Bankruptcy Court. |
| **The Plan as a Complex Settlement** | The draft Plan provides an initial construct for a global settlement and good-faith compromise of an exceptionally large and complicated collection of claims, causes of |

---

[1] This Term Sheet and the draft Plan filed contemporaneously herewith have not been approved by the Bankruptcy Court. The Debtors have filed the Term Sheet and the draft Plan for purposes of aiding discussion and negotiation with their stakeholders. Nothing contained herein or in the draft Plan shall constitute an offer, acceptance, commitment, or legally binding obligation of the Debtors or any other party in interest.

| | actions and disputes involving the Debtors, including both claims against the Debtors and intercompany claims by various Debtors against other Debtors.  Generally speaking, the global settlement involves:<br><br>1. the valuation of claims in U.S. dollars as of the Petition Date based on a valuation methodology that will be separately prepared by the Debtors and approved by the Bankruptcy Court;<br>2. disputes regarding the ownership of the assets held on the FTX.com and FTX US exchanges based on the applicable terms of service and trust doctrines;<br>3. the identification of three primary recovery pools, corresponding to segregated assets attributable to FTX.com customers, segregated assets attributable to FTX US customers, and other assets that the Debtors contend are not clearly attributable to the exchanges;<br>4. the recognition of special "shortfall" claims by the FTX.com and FTX US exchanges for the benefit of their customers against the pool of general assets, to compensate the exchanges for the unauthorized borrowing and/or misappropriation of assets held on the exchanges;<br>5. the cancellation of intercompany claims (other than as represented under the Plan as the Dotcom Intercompany Shortfall Claim and U.S. Intercompany Shortfall Claim) and the substantive consolidation of the estates of substantially all of the Debtors, other than certain excluded non-U.S. entities who are solvent and whose corporate separateness was historically respected;<br>6. the subordination of certain claims to the pecuniary losses of customers and creditors;<br>7. the extinguishment of FTT claims in recognition of the equity-like characteristics of FTT, as well as the extinguishment of all other equity interests; and<br>8. the liquidation of the estates of the Debtors and the payment of distributions to customers and creditors in cash, subject to certain voluntary elections that may be available to customers in connection with a restart of an offshore exchange or otherwise. |
| **Key Open Items** | The draft Plan does not purport to resolve certain open questions under discussion among the Debtors, Consulting Parties and other of the Debtors' stakeholders.  Important |

| | questions to be resolved before filing the amended Plan include the following. |
|---|---|
| | 1. What is the expected size of the various classes of claims, recovery pools and estimates of creditor recoveries? |
| | 2. What is the fair and appropriate amount of priority that should be given to the exchange shortfall claims against the general pool of assets? |
| | 3. The decision and manner in which the FTX.com exchange is sold or reorganized and what is the relationship between any future exchange and the other elements of the Plan? |
| | 4. How should claims be traded or transferred once a Plan becomes effective?  Whether claims should be evidenced by a recovery rights token or other digital asset and the ramifications of such structure? |
| | 5. The corporate governance and future stewardship of the Offshore Exchange Company, the Venture Trust and the other post-confirmation entities described in the Plan and the extent to which the various creditor groups should be involved in such governance determinations. |
| | 6. As the nature and extent of claims become more clear, are there amendments to the Plan required to confirm that it is in the best interests of all creditors? |
| **Stakeholder Involvement** | Over the past several weeks, the Debtors have discussed the elements of their Plan with representatives of the Creditors' Committee, the Ad Hoc Committee of Non-US Customers of FTX.com, the customer adversary plaintiffs prosecuting *Onusz, et al. v. West Realm Shires Inc., et al.,* Case No. 22-50513 (JTD) (Bankr. D. Del.) and certain individual stakeholders (collectively, the "Consulting Parties").  The draft Plan reflects input from these representatives on many issues, although there are issues that the Consulting Parties have raised opposition to that will be negotiated with the Debtors and open issues yet to be discussed.  All parties' rights are accordingly reserved as discussions continue.  The Debtors may change the draft Plan at any time, including in response to stakeholder input. |

| II. | Debtor Entities |
|---|---|
| **Modified Substantive Consolidation** | Under the Plan, the estates of all Debtors other than the Separate Subsidiaries (as defined below) will be substantively consolidated as of the effective date of the Plan for the purposes of voting, confirmation and distributions under the classification system proposed by the Plan.  Substantive consolidation and the classification proposed by the Plan are parts of an integrated settlement and compromise of claims among and against the Debtors. The Plan will not result in the merger or affect the separate legal existence of any Debtor for any other purpose. |
| **Separate Subsidiaries** | The Debtors may identify certain subsidiaries that are solvent and historically separate ("Separate Subsidiaries"). The Separate Subsidiaries will be excluded from substantive consolidation for purposes of the Plan, and claims against the Separate Subsidiaries will be separately classified and paid in full in cash or otherwise left unimpaired. |
| **Dismissed Subsidiaries** | The Debtors may identify certain subsidiaries whose Chapter 11 cases may be dismissed prior to confirmation of the Plan.  These Debtor subsidiaries will be liquidated and wound down pursuant to local proceedings and will be excluded from the Plan. |
| III. | Classification and Treatment |
| **General** | Claims and interests will be classified in classes (each, a "Class") as set forth in the Exhibit I hereto.

Administrative claims and certain other special priority claims will not be classified and will be paid in full in cash in accordance with the Bankruptcy Code. |
| **Priority Claims (Class 1)** | Allowed priority claims will be paid in full in cash or receive such treatment as may be permitted under the Bankruptcy Code. |
| **Secured Claims (Class 2)** | Allowed secured claims will be paid in full in cash or receive such treatment as may be permitted under the Bankruptcy Code. |
| **Separate Subsidiaries (Class 3)** | Allowed claims against Separate Subsidiaries will be paid in full in cash, unless another distribution is agreed with the holder of a claim.  After all claims against a Separate Subsidiary are paid or resolved, the Separate Subsidiary |

| | |
|---|---|
| | will be liquidated or sold and the remaining value made available to other Debtors. |
| **Dotcom Customer Entitlements (Class 4A)** | All customers of FTX.com (other than holders of NFTs) will constitute a single class, regardless of the type of token or product held and will have a claim in an amount equal to the USD value of their customer entitlements on FTX.com at the petition time (a "Dotcom Customer Entitlement"), to the extent allowed.<br><br>Each holder of an allowed Dotcom Customer Entitlement will receive a *pro rata* share of the Dotcom Customer Pool (defined below). |
| **U.S. Customer Entitlements (Class 4B)** | All customers of FTX US (other than holders of NFTs) will constitute a single class, regardless of the type of token or product held, and will have a claim in an amount equal to the USD value of their customer entitlements on FTX US at the petition time (a "U.S. Customer Entitlement"), to the extent allowed.<br><br>Each holder of an allowed U.S. Customer Entitlement will receive a *pro rata* share of the U.S. Customer Pool (defined below). |
| **NFT Entitlements (Class 4C)** | Holders of non-fungible tokens ("NFTs") as of the petition date will be classified separately. NFTs will be returned in kind to the applicable customer unless the NFT is missing or was destroyed, in which case the applicable customer will have a Class 4A claim (if the applicable customer is an FTX.com customer) or a Class 4B claim (if the applicable customer is a U.S. Customer) for the petition time value of the NFT. |
| **General Unsecured Claims (Class 5)** | Claims of customers or creditors not otherwise classified will be Class 5 claims ("General Unsecured Claims").<br><br>Class 5 is expected to include:<br>(a) trade and vendor claims;<br>(b) contract rejection claims against all Debtors;<br>(c) claims by lenders and trading partners of Alameda Research LLC or its direct and indirect subsidiaries (collectively, "Alameda");<br>(d) where preference actions (other than with respect to customer entitlements) are successful, "replacement" claims by the creditors who had to repay the preference; |

| | |
|---|---|
| | (e)  claims by customers or creditors of non-debtors (or by their insolvency estates) alleging that one or more Debtors are liable for claims against such non-debtors;<br>(f)  any foreign tax or other tax claims that are not priority claims; and<br>(g)  other general unsecured claims.<br><br>Each holder of an allowed General Unsecured Claim will receive a *pro rata* share of General Pool distributions available to Class 5 claims in accordance with the waterfall priorities set forth under "*General Pool Waterfall*" below. |
| **Convenience Classes (Classes 6A-C)** | Holders of claims in a Convenience Class will receive a one-time distribution in cash at a fixed amount to be determined in the Plan.  Such amount will be different for each convenience class based on the net present value of projected recoveries for the analogous classes 4A, 4B and 5 at the time of the Plan. |
| **Intercompany Claims/Interests (Classes 7 and 8)** | Intercompany claims and interests (other than as set forth in the Plan) will be compromised and eliminated in the Plan.  Claims and interests in Classes 7 and 8 do not include—and the Plan will preserve—the Debtors' investments in non-Debtor subsidiaries and all related claims. |
| **Subordinated Claims (Class 9)** | Class 9 consists of claims for regulatory fines and penalties, U.S. federal and state income taxes, similar foreign taxes and any other claim that has been subordinated on the basis of structural subordination, equitable subordination, laws or policies subordinating recoveries to claims by victims of crime or fraud, or any other grounds available under applicable law. |
| **FTT and Equity Classes (Classes 10-13)** | Classes 10, 11, 12 and 13 consist of claims by holders of FTT (whether or not held on any FTX exchange), preferred stock and equity investors in the Debtors and related claims.  All these claims and interests will be canceled and extinguished as of the Effective Date and holders will not receive any distribution. |
| **Valuation** | Where a customer entitlement or other claim reflects an underlying digital asset (other than an NFT), the claim will be liquidated in USD based on the fair market value at the petition time.  The fair market value will be determined |

|  | based on a matrix (the "<u>Valuation Matrix</u>") attached to an Omnibus Estimation Motion filed by the Debtors in advance of Plan solicitation and prepared with input from independent experts engaged by the Debtors for that purpose. |
|---|---|
| **Customer Preferences** | The Debtors anticipate that the Plan will include settlement procedures with respect to customer preferences below thresholds to be determined, facilitating the resolution of preference liabilities as part of an integrated claims resolution process for customers. |
| **IV.    Recovery Pools** ||
| **Dotcom Customer Pool** | Each holder of a Dotcom Customer Entitlement will receive a *pro rata* share (based on relative USD claim value) of the proceeds from a pool of assets associated with the FTX.com exchange (the "<u>Dotcom Customer Pool</u>"), net of distributions to the Dotcom Customer Convenience Class and allocable expenses. |
|  | The Dotcom Customer Pool will include: |
|  | (a) all fiat in segregated FBO accounts associated with FTX.com on the Petition Date; |
|  | (b) all digital assets in the AWS wallets associated with FTX.com on the Petition Date; |
|  | (c) any hack recoveries relating to digital assets in those wallets (pre- or post-petition); |
|  | (d) all recoveries of preferences paid to customers off the FTX.com platform; |
|  | (e) all net recoveries from the Bahamian subsidiaries, FTX Digital Markets Ltd. ("<u>FTX DM</u>") or FTX Property Holdings Ltd ("<u>FTX Bahamas Propco</u>"), of any sort, whether from the Debtors' equity interest in those subsidiaries or from claims against them; |
|  | (f) all net proceeds from the sale or recapitalization of the Offshore Exchange Company (as defined below), including any cash or other consideration as well as any the capital stock of the Offshore Exchange Company (as defined below) retained by the Debtors for distribution to stakeholders in the Plan; and |
|  | (g) a historical shortfall claim against the General Pool (defined below) (the "<u>Dotcom Exchange Shortfall Claim</u>") in an amount equal to the estimated difference between FTX.com aggregate customer |

| | entitlements and aggregate exchange assets at the petition time, as determined by the Debtors. |
| | No other prepetition creditor will have claims against the Dotcom Customer Pool. |
| **U.S. Customer Pool** | Each holder of a U.S. Customer Entitlement will receive a *pro rata* share (based on relative USD claim value) of the proceeds from a pool of assets associated with the FTX US exchange (the "U.S. Customer Pool"), net of distributions to the U.S. Customer Convenience Class and allocable expenses; *provided that* the *pro rata* shares of U.S. Customer Entitlement holders against the U.S. Customer Pool will be calculated in a manner that respects the status of Alameda as a customer of FTX US. The distributions to Alameda will be deposited into the General Pool (defined below) for reallocation among all other creditors (including the Dotcom Shortfall Claim). |
| | The "U.S. Customer Pool" will include: |
| | (a) all fiat in segregated FBO accounts associated with FTX US on the Petition Date; |
| | (b) digital assets in the AWS wallets associated with FTX US on the Petition Date; |
| | (c) any hack recoveries relating to digital assets in those wallets (pre- or post-petition); |
| | (d) all recoveries of preferences paid to customers off the FTX US platform; |
| | (e) all proceeds from the sale of FTX US or any associated property; and |
| | (f) an historical shortfall claim against the General Pool (defined below) (the "U.S. Exchange Shortfall Claim") in an amount equal to the estimated difference between aggregate customer entitlements and aggregate FTX US exchange assets at the petition time, as determined by the Debtors. |
| | No other creditor will have claims against the U.S. Customer Pool. |
| **General Pool** | The general pool (the "General Pool") will include all property of the estate that is not in the Dotcom Customer Pool, the U.S. Customer Pool or property of a Separate Subsidiary. |
| | The General Pool will include at least the following and all related proceeds: |

|  | (a) all fiat and digital assets not allocated to the Dotcom Customer Pool, the U.S. Customer Pool or a Separate Subsidiary; |
|  | (b) all recoveries from non-Debtor subsidiaries (other than FTX DM); |
|  | (c) all distributable value at the Separate Subsidiaries after payment of Class 3 claims; |
|  | (d) all preference actions not associated with either FTX.com or FTX US; |
|  | (e) all other avoidance actions and litigation claims , regardless of the particular Debtor(s) who may bring such actions under applicable law; |
|  | (f) all net proceeds from the unwinding of the venture book and other investments; |
|  | (g) the portion of the U.S. Customer Pool corresponding to Alameda's positions on the FTX US platform; |
|  | (h) the residual interests in the Dotcom Customer Pool and the U.S. Customer Pool (available only when Dotcom Customer Entitlements or U.S. Customer Entitlements, as applicable, are paid in full); and |
|  | (i) the proceeds from the sale or monetization of all other property of the estate. |
|  | Proceeds in the General Pool will be allocated as discussed under "*General Pool Waterfall*" below. |
| **General Pool Waterfall** | Proceeds in the General Pool will be allocated in the following manner: |
|  | • *first*, to pay administrative expenses and secured and priority claims allocable to the General Pool; |
|  | • *second*, to pay General Convenience Claims as set forth in the Plan; |
|  | • *third*, with respect to [•] percent of the amount next available for distribution from the General Pool, to pay the Dotcom Exchange Shortfall Claim and the U.S. Exchange Shortfall Claim on a Pro Rata basis; |
|  | • *fourth,* with respect to the remaining amount available for distribution from the General Pool, to pay General Unsecured Claims, the Dotcom Exchange Shortfall Claim and the U.S. Exchange Shortfall Claim on a Pro Rata basis; and |
|  | • *fifth*, to pay Subordinated Claims |

| | The General Pool waterfall works to establish a modified priority for the U.S. Exchange Shortfall Claim and the Dotcom Exchange Shortfall Claim against assets in the General Pool at the expense of General Unsecured Creditors, providing a mechanism to implement a settlement of potential misappropriation, constructive trust, equitable tracing and other claims by the exchanges against other Debtors for the benefit of exchange customers.  The Debtors will determine the percentage of the General Pool available on a priority basis following negotiations with Consulting Parties and other stakeholders. |
|---|---|
| **Expense Allocation** | Case expenses and professional fees and expenses as a general matter will be allocated as between the General Pool and the customer pools based on the Debtors' estimate of relative distributable value in each pool as of the date of confirmation of the Plan; *provided that* the Debtors will first allocate to the Dotcom Customer Pool any expenses related to FTX DM or FTX Bahamas Propco or the sale, 'reboot' or reorganization of FTX.com. |
| V.       Implementation | |
| **Offshore Exchange Company** | The property of the Debtors associated with the ownership and operation of FTX.com will be gathered and marketed in a competitive process for the benefit of the Dotcom Customer Pool.  As part of this competitive process, the Debtors may decide to establish in collaboration with third party investors a new company in a jurisdiction outside of the United States to operate a "rebooted" offshore platform not available to U.S. investors (an "Offshore Exchange Company") or enter into a merger or similar transaction.<br><br>Rather than all cash, the Debtors may determine that the Offshore Exchange Company remit non-cash consideration to the Dotcom Customer Pool in the form of equity securities, tokens or other interests in the Offshore Exchange Company, or rights to invest in such equity securities, tokens or other interests ("Take-Back Interests").  Any Take-Back Interests will be made available to holders of Dotcom Customer Entitlements on a *pro rata* basis, subject to applicable securities and other laws.<br><br>The Debtors reserve the right not to proceed with an Offshore Exchange Company if the Debtors determine that |

| | doing so may delay effectiveness of the remaining components of the Plan, create regulatory concerns or fail to yield material incremental value to holders of Dotcom Customer Entitlements. |
|---|---|
| **Venture Trust** | The Debtors also may establish a new limited liability trust company (the "FTX Ventures Trust") to hold the Debtors' illiquid venture capital, private company and token investments that are not being sold at the time of effectiveness and are not anticipated to be sold by the plan administrator promptly after effectiveness as part of the Wind-Down Estate (defined below).  The purpose of the FTX Ventures Trust will be to make cash distributions on a time horizon to be determined based on the nature of its investments.  The Debtors have made no determination whether the FTX Ventures Trust will be owned by the Wind-Down Estate or separately traded. |
| **Wind-Down Estate** | The other property of the estates will be maintained as a wind-down estate (the "Wind-Down Estate") administered by the Debtors and the plan administrator.  The plan administrator will be the CRO and will report to the incumbent Board of Directors of the Debtors. <br><br> The Wind-Down Estate will manage the business of closing the chapter 11 cases, reconciling claims, implementing AML and KYC compliance requirements, monetizing remaining assets and liquidating the Debtors and their non-Debtor subsidiaries. |
| **Distributions** | Distributions other than Take-Back Interests in the Offshore Exchange Company and NFTs will be made in cash in USD.  The Debtors will convert any remaining digital assets to USD in an orderly manner after the effectiveness of the Plan.  The Debtors will determine the investment principles for the management of cash prior to distribution, subject to parameters established in the Plan. <br><br> Distributions will not be made on claims held by the recipient of a preference or other avoidable transfer until any related avoidance claim has been settled or resolved by the court.  The Debtors reserve the right to enforce preference and avoidance claims against subsequent transferees to the full extent permitted by law. |

| | The Debtors are exploring alternatives related to claims trading after the effective date of the Plan, subject to appropriate securities law, AML and KYC arrangements. |
|---|---|
| **Anti-Double Dip** | The Plan is premised on a centralized distribution process in which each holder receives that same recovery as another similarly-situated holder.  The plan administrator may require any holder of a claim to submit satisfactory evidence that such holder has not requested or received compensation for the same losses underlying such claim in connection with any other judicial or administrative proceeding (including without limitation any proceedings with respect to FTX Australia, FTX DM, FTX Turkey or FTX EU), and may refrain from making distributions on such claim until such time as satisfactory evidence is obtained or appropriate arrangements are in place ensuring that no holder receives more than any other holder under the Plan after taking into account such other potential recoveries.<br><br>As a condition to receiving any distribution in the Plan, the plan administrator may require holders of claims in Classes 4A-C or Class 5 to assign to the plan administrator all right, title and interest in any claim for the same losses that have been or may be made in any other judicial or administrative proceeding relating to the FTX group (including without limitation any claim in any proceeding with respect to FTX Australia, FTX DM, FTX Turkey or FTX EU). |

**Exhibit I**

**Classification – Summary Chart[1]**

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4A | Dotcom Customer Entitlements | Impaired | Entitled to Vote |
| 4B | U.S. Customer Entitlements | Impaired | Entitled to Vote |
| 4C | NFT Entitlements | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6A | Dotcom Convenience Class | Impaired | Entitled to Vote |
| 6B | US Convenience Class | Impaired | Entitled to Vote |
| 6C | General Convenience Class | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | FTT Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 11 | Preferred Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 13 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |

---

[1]    The Debtors' investigation into claims is ongoing and classification is subject to change.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

—————————————————————x
In re                                          :        Chapter 11
                                               :
FTX TRADING LTD., *et al.*,[1]                 :        Case No. 22-11068 (JTD)
                                               :
                              Debtors.         :        (Jointly Administered)
                                               :
—————————————————————x

## JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## FTX TRADING LTD. AND ITS DEBTOR AFFILIATES

---

**THIS IS A DRAFT PLAN THAT HAS NOT BEEN APPROVED BY THE
BANKRUPTCY COURT. THE DEBTORS HAVE FILED THIS DRAFT PLAN FOR
PURPOSES OF AIDING THEIR DISCUSSIONS AND NEGOTIATIONS WITH THEIR
STAKEHOLDERS AND NOT FOR SOLICITATION OF AN ACCEPTANCE OR
REJECTION OF THE PLAN. NOTHING CONTAINED IN THE DRAFT PLAN SHALL
CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY
BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST.
THIS DRAFT PLAN IS SUBJECT TO CONTINUING NEGOTIATIONS AND
MATERIAL CHANGE.**

**THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.
YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN,
OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE
CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT.**

---

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and
        4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the
        Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete
        list of such information may be obtained on the website of the Debtors' claims and noticing agent at
        https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd
        is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.



Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*

Dated:  [•], 2023

Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

*Counsel for the Debtors and Debtors-in-Possession*

# TABLE OF CONTENTS

**Page**

1. INTRODUCTION ...........................................................................................................1
   1.1. Introduction............................................................................................ 1
   1.2. Dismissed Chapter 11 Cases ................................................................ 1

2. DEFINITIONS AND RULES OF INTERPRETATION ............................................2
   2.1. Defined Terms ...................................................................................... 2
   2.2. Rules of Interpretation ....................................................................... 17
   2.3. Governing Law .................................................................................. 18
   2.4. Computation of Time ......................................................................... 18

3. ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.................................19
   3.1. Administrative Claim Bar Date .......................................................... 19
   3.2. General Administrative Claims............................................................ 19
   3.3. 503(b)(9) Claims ............................................................................... 20
   3.4. Professional Claims ........................................................................... 20
   3.5. Statutory Fees Payable Pursuant to 28 U.S.C. § 1930 ........................ 21
   3.6. Priority Tax Claims ........................................................................... 21
   3.7. Expense Allocation ............................................................................ 21

4. CLASSIFICATION, TREATMENT AND VOTING OF CLAIMS AND
   INTERESTS ..............................................................................................................22
   4.1. Classification of Claims and Interests................................................. 22
   4.2. General Pool Waterfall ....................................................................... 23
   4.3. Treatment of Claims and Interests ...................................................... 23
   4.4. Valuation of Claims ........................................................................... 30
   4.5. Special Provision Governing Unimpaired Claims ............................... 30
   4.6. Acceptance by Impaired Classes ........................................................ 30
   4.7. Elimination of Vacant Classes ........................................................... 30
   4.8. Voting Classes; Presumed Acceptance by Non-Voting Classes........... 30
   4.9. Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy
        Code ................................................................................................... 30

5. IMPLEMENTATION OF THE PLAN .....................................................................31
   5.1. Operations Between the Confirmation Date and Effective Date .......... 31
   5.2. Global Settlement of Claims and Interests........................................... 31
   5.3. Substantive Consolidation .................................................................. 32
   5.4. Wind Down Estates............................................................................ 33
   5.5. Plan Funding Mechanism ................................................................... 33
   5.6. Plan Administrator ............................................................................. 33
   5.7. Vesting of Assets ............................................................................... 33
   5.8. D&O Policies..................................................................................... 34

5.9. Cancelation of Existing Interests ............................................................ 34
5.10. Section 1146 Exemption from Certain Transfer Taxes and Recording Fees........ 34
5.11. Preservation of Causes of Action .......................................................... 35
5.12. Effectuating Documents and Further Transactions................................. 35

6. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........36

6.1. Rejection of Executory Contracts and Unexpired Leases...................................... 36
6.2. Claims Against the Debtors upon Rejection................................................ 36
6.3. Modification, Amendments, Supplements, Restatements or Other
Agreements ............................................................................................. 36
6.4. Reservation of Rights................................................................................ 37

7. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................................38

7.1. Distributions Timing.................................................................................. 38
7.2. Distributions to Holders of Customer Entitlement Claims..................... 38
7.3. Record Date and Delivery of Distributions ............................................ 39
7.4. Distribution Agent.................................................................................... 40
7.5. Fractional and *De Minimis* Distributions............................................... 40
7.6. Undeliverable Distributions .................................................................... 40
7.7. Reversion .................................................................................................. 41
7.8. Surrender of Canceled Instruments or Securities.................................. 41
7.9. Setoffs ....................................................................................................... 41
7.10. No Interest on Claims .............................................................................. 41
7.11. No Payment over the Full Amount .......................................................... 42
7.12. Compliance with Tax Requirements........................................................ 43
7.13. Tax Identification, KYC and OFAC Certifications ................................ 43

8. CLAIMS ADMINISTRATION PROCEDURES...........................................................44

8.1. Objections to Claims................................................................................ 44
8.2. Estimation of Claims................................................................................ 44
8.3. Expungement and Disallowance of Claims ............................................ 44
8.4. Amendments to Proofs of Claim.............................................................. 45
8.5. No Distributions Pending Allowance ...................................................... 45
8.6. Distributions After Allowance ................................................................. 45
8.7. Administration Responsibilities............................................................... 45
8.8. Claims Paid or Payable by Third Parties ............................................... 46

9. CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ..........................47

9.1. Conditions Precedent to the Effective Date ........................................... 47
9.2. Waiver of Conditions................................................................................ 48
9.3. Simultaneous Transactions ...................................................................... 48
9.4. Effect of Non-Occurrence of the Effective Date .................................... 48
9.5. Notice of Effective Date ........................................................................... 48

10. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ..............49

10.1. Subordinated Claims ...................................................................................... 49
10.2. Non-Discharge of Debtors; Resolution of Claims and Termination of
Interests .......................................................................................................... 49
10.3. Release of Liens ............................................................................................. 49
10.4. Debtors' Release ............................................................................................. 50
10.5. Voluntary Release by Holders of Claims and Interests ................................. 51
10.6. Scope of Releases ........................................................................................... 51
10.7. Exculpation .................................................................................................... 52
10.8. Injunction ....................................................................................................... 52
10.9. Limitations on Exculpations and Releases .................................................... 53

11. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ...................53

11.1. Modification of Plan ...................................................................................... 53
11.2. Effect of Confirmation on Modification ....................................................... 53
11.3. Revocation of Plan ......................................................................................... 53

12. RETENTION OF JURISDICTION ..............................................................................55

12.1. Retention of Jurisdiction ............................................................................... 55

13. MISCELLANEOUS PROVISIONS ..............................................................................57

13.1. Immediate Binding Effect ............................................................................. 57
13.2. Additional Documents; Further Assurances .................................................. 57
13.3. Reservation of Rights ..................................................................................... 57
13.4. Successors and Assigns .................................................................................. 57
13.5. Term of Injunction or Stays .......................................................................... 57
13.6. Entire Agreement ........................................................................................... 58
13.7. Exhibits .......................................................................................................... 58
13.8. Nonseverability of Plan Provisions upon Confirmation ............................... 58
13.9. Dissolution of Committee .............................................................................. 58
13.10. Termination of Fee Examiner's Appointment ............................................... 59
13.11. Debtors' Directors and Officers .................................................................... 59
13.12. Post-Confirmation Operating Reports ........................................................... 59
13.13. Closing of Chapter 11 Cases ......................................................................... 59
13.14. Conflicts ......................................................................................................... 59
13.15. No Stay of Confirmation Order ..................................................................... 59
13.16. Waiver or Estoppel ........................................................................................ 60
13.17. Post-Effective Date Service ........................................................................... 60
13.18. Notices ........................................................................................................... 60

# 1. INTRODUCTION

## 1.1. Introduction

FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"), propose the following joint plan of reorganization (including the Plan Supplement and all other exhibits and schedules thereto, the "Plan") pursuant to section 1121(a) of the Bankruptcy Code.  These Chapter 11 Cases are being jointly administered pursuant to an order entered by the Court on November 22, 2022 [D.I. 128].  Each Debtor is a proponent of the Plan for purposes of section 1129 of the Bankruptcy Code.

## 1.2. Dismissed Chapter 11 Cases

The following entities were Debtors as of the Petition Date but are no longer Debtors and are not included in the Plan:

(a)    the chapter 11 case of FTX Turkey Teknoloji ve Ticaret Anonim Şirketi ("FTX Turkey") was dismissed on February 13, 2023 [D.I. 711];

(b)    the chapter 11 case of SNG Investments Yatırım ve Danışmanlık Anonim Şirketi ("SNG Investments") was dismissed on February 13, 2023 [D.I. 711]; and

(c)    the chapter 11 case of [•] was dismissed on [•] [D.I. [•]].[2]

---

[2]    Note to Draft:  The Debtors may identify certain Debtor subsidiaries whose Chapter 11 cases may be dismissed prior to confirmation of the Plan.  Such subsidiaries will be liquidated and wound down pursuant to local proceedings and will be excluded from the Plan.

## 2. DEFINITIONS AND RULES OF INTERPRETATION

### 2.1. Defined Terms

Except as otherwise provided herein, each capitalized term used in this Plan shall have the meaning set forth below.

2.1.1 "503(b)(9) Claim" means a Claim arising under section 503(b)(9) of the Bankruptcy Code for which a Proof of Claim was filed on or before the General Non-Customer Bar Date.

2.1.2 "Administrative Claim" means any Claim for costs and expenses of administration of the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code arising on or prior to the Effective Date and entitled to priority pursuant to sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code; *provided* that Administrative Claims shall not include 503(b)(9) Claims.

2.1.3 "Administrative Claim Bar Date" means: (a) 4:00 p.m. (Eastern Time) on the 30th day after the Effective Date or (b) such other date established by order of the Bankruptcy Court by which Proofs of Claim in respect of Administrative Claims must be filed (other than Professional Claims).

2.1.4 "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

2.1.5 "Allowed" means, with respect to any Claim or Interest, that the amount, priority and/or classification of such Claim or Interest has been (a) allowed by this Plan or the Confirmation Order, or by Final Order of the Bankruptcy Court; (b) allowed or stipulated in writing (i) prior to the Effective Date, by the Debtors in accordance with authority granted by an order of the Bankruptcy Court or (ii) on or after the Effective Date, by the Plan Administrator; (c) listed in the Schedules as not disputed, not contingent, not unliquidated with respect to amount, secured status or priority and (i) no Proof of Claim in an amount greater than the amount set forth in the Schedules has been filed, (ii) no objection to allowance, priority or classification, request for estimation, motion to deem the Schedules amended or other challenge has been filed prior to the applicable deadlines set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules or as determined by the Bankruptcy Court, (iii) such Claim is not otherwise subject to disallowance under section 502(d) or bifurcation under section 506(a) of the Bankruptcy Code, and (iv) solely with respect to a Customer Entitlement Claim, such Claim is not listed as unverified because of incomplete or inadequate know-your-customer information; (d) evidenced by a valid and timely filed Proof of Claim and (i) no objection to allowance, priority or classification, request for estimation or other challenge has been filed prior to the applicable deadlines set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules or as determined by the Bankruptcy Court and (ii) such Claim is not otherwise subject to disallowance under section 502(d) or bifurcation under section 506(a) of the Bankruptcy Code; (e) in the case of an Other Administrative Claim, subject to a request for payment timely filed and served in accordance with Section 3.1 and no objection to such

Claim has been timely filed and served pursuant to <u>Article 3</u>; or (f) in the case of any Professional Claim, allowed by an order of the Bankruptcy Court.

2.1.6    "<u>Available NFT</u>" means an NFT that is in the custody of a Debtor on the Effective Date.

2.1.7    "<u>Avoidance Actions</u>" means any and all Causes of Action to subordinate, avoid or recover a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including, but not limited to, sections 105(a), 502(d), 510, 542, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, or under any similar or related local, state, federal or foreign statutes or common law.

2.1.8    "<u>AWS Wallets</u>" means Digital Asset wallets stored by the Debtors at Amazon Web Services.

2.1.9    "<u>Bahamian Subsidiaries</u>" means FTX DM and FTX Bahamas PropCo.

2.1.10    "<u>Ballots</u>" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the Solicitation Procedures Order, and which must be actually received on or before the Voting Deadline.

2.1.11    "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*.

2.1.12    "<u>Bankruptcy Court</u>" or "<u>Court</u>" means the United States Bankruptcy Court for the District of Delaware.

2.1.13    "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to these Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

2.1.14    "<u>Business Day</u>" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

2.1.15    "<u>Case Expenses</u>" has the meaning set forth in <u>Section 3.7</u>.

2.1.16    "<u>Cash</u>" means the legal tender of the United States of America or the equivalents thereof, including bank deposits, checks and other similar items.

2.1.17    "<u>Cause of Action</u>" means any action, claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, remedy, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition

Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Causes of Action also include:  (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any Avoidance Action; (e) any claim or defense, including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any state law fraudulent transfer claim; and (g) any claim against persons or Entities that are not released under the Plan, including the Preserved Potential Claims, and such Entity's directors, officers, employees, agents, Affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities.

2.1.18    "Certificate" means any instrument evidencing a Claim or an Equity Interest.

2.1.19    "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for such Debtor and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court and, for avoidance of doubt, does not include any individual case that has been closed pursuant to Section 1.2, Section 13.13 or otherwise and does not include Debtor Emergent Fidelity Technologies Ltd.

2.1.20    "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

2.1.21    "Claims Bar Date" means, as applicable, (a) the Non-Customer Bar Date; (b) the Customer Bar Date; (c) the Governmental Bar Date; or (d) such other date established by order of the Bankruptcy Court by which Proofs of Claim must have been filed.

2.1.22    "Claims Objection Deadline" means: (a) the date that is the later of (i) one year after the Effective Date or (ii) as to Proofs of Claim filed after the applicable Claims Bar Date, the 60th day after a Final Order is entered by the Bankruptcy Court deeming the late-filed Proof of Claim to be treated as timely filed or (b) such later date as may be established by order of the Bankruptcy Court upon a motion by the Plan Administrator, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

2.1.23    "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent.

2.1.24    "Class" means a class of Claims or Interests as set forth in Article 4 pursuant to section 1122(a) of the Bankruptcy Code.

2.1.25    "Committee" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases on December 15, 2022 pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time [D.I. 231].

2.1.26    "Confirmation" means the entry of the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.27      "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of these Chapter 11 Cases.

2.1.28      "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.29      "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

2.1.30      "Consolidated Debtors" means all Debtors other than the Separate Subsidiaries.

2.1.31      "Consummation" means the occurrence of the Effective Date.

2.1.32      "Customer Bar Date" means 4:00 p.m. (Eastern Time) on September 29, 2023.

2.1.33      "Customer Entitlement Claim" means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Person or Entity against any of the Debtors, in each case arising out of or related to any Cash, Digital Assets or other assets held by such person or entity in an account on any FTX Exchange as of the Petition Date.

2.1.34      "D&O Policy" means any insurance policy and all agreements, documents or instruments relating thereto, issued to any of the Debtors covering defensive costs and other liabilities arising out of claims against current or former directors, members, trustees and officers of the Debtors, other than commercial general liability policies and cyber liability policies.

2.1.35      "Debtors" has the meaning set forth in Section 1.1 and, for avoidance of doubt, does not include any entity whose case has been closed pursuant to Section 1.2, Section 13.13 or otherwise and does not include Debtor Emergent Fidelity Technologies Ltd.

2.1.36      "Digital Asset" means a DLT Digital Asset or a Pre-Launch Cryptocurrency.

2.1.37      "Digital Assets Conversion Table" means the conversion table attached as Exhibit [•] to the Digital Assets Estimation Order.

2.1.38      "Digital Assets Estimation Order" means the [•] [D.I. [•]].

2.1.39      "Disclosure Statement" means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to the Solicitation Procedures Order, including all exhibits and schedules thereto and references therein that relate to the Plan.

2.1.40      "Disputed Claim" means any Claim that has not been Allowed.

2.1.41    "<u>Distribution</u>" means a distribution of property pursuant to the Plan, to take place as provided for herein, and "<u>Distribute</u>" shall have a correlative meaning.

2.1.42    "<u>Distribution Agent</u>" means an Entity chosen by the Plan Administrator, which may include the Notice and Claims Agent, to make any Distributions at the direction of the Plan Administrator.

2.1.43    "<u>Distribution Date</u>" means the Initial Distribution Date and each Subsequent Distribution Date.

2.1.44    "<u>Distribution Record Date</u>" means a date determined by the Plan Administrator, from time to time, in his or her reasonable discretion and in accordance with the Plan Administration Agreement, to make any Distributions under the Plan.

2.1.45    "<u>DLT Digital Asset</u>" means any digital representation of value or units that is issued or transferable using distributed ledger or blockchain technology, including Stablecoins, cryptocurrency and NFTs.

2.1.46    "<u>Dotcom Convenience Claim</u>" means (a) any Dotcom Customer Entitlement Claim Allowed in an amount equal to or less than $[•] or (b) any Dotcom Customer Entitlement Claim Allowed in an amount greater than $[•] but that is reduced to an amount equal to or less than $[•] by an irrevocable written election of the Holder of such Dotcom Customer Entitlement Claim made on a properly executed and delivered Ballot; *provided* that where any portion of a Dotcom Customer Entitlement Claim has been transferred or subdivided, any transferred or subdivided portion shall continue to be treated together with the entire initial Dotcom Customer Entitlement Claim for purposes of determining whether any portion of such Dotcom Customer Entitlement Claim qualifies as a Dotcom Convenience Claim.

2.1.47    "<u>Dotcom Customer Entitlement Claim</u>" means any Customer Entitlement Claim against the FTX.com Exchange that is not a FTT Customer Entitlement Claim or a NFT Customer Entitlement Claim.

2.1.48    "<u>Dotcom Customer Pool</u>" means (a) collectively, (i) all fiat currency in segregated accounts designated by the Debtors as accounts for the benefit of customers associated with the FTX.com Exchange held by the Debtors on the Petition Date; (ii) all Digital Assets (other than Available NFTs) held by the Debtors and identified by the Debtors as held for customers in FTX.com AWS Wallets on the Petition Date; (iii) all proceeds relating to the Hacking Incident recovered by the Debtors to the extent that such proceeds are in respect of Digital Assets held in FTX.com AWS Wallets before, on or after the Petition Date; (iv) all proceeds from any Claim or Cause of Action against any customer of the FTX.com Exchange and Dotcom Customer Preference Actions; (v) all proceeds from recoveries from the Bahamian Subsidiaries, of any sort, whether from the Debtors' equity interest in, or from claims against, such Bahamian Subsidiaries; (vi) all proceeds from the sale, disposition or other monetization of property of the Debtors associated with the

FTX.com Exchange;[3] and (vii) the Dotcom Intercompany Shortfall Claim, *less* (b) (i) amount necessary to satisfy the Dotcom Convenience Claim and (ii) the Case Expenses allocated to the Dotcom Customer Pool pursuant to <u>Section 3.7</u>.

2.1.49 "<u>Dotcom Customer Preference Actions</u>" means any and all Causes of Action to avoid any preferential payments or transfers of property from the FTX.com Exchange pursuant to section 547 of the Bankruptcy Code and any recovery action related thereto under section 550 of the Bankruptcy Code, or under any similar or related local, state, federal or foreign statutes or common law.

2.1.50 "<u>Dotcom Exchange Shortfall Amount</u>" means $[•].[4]

2.1.51 "<u>Dotcom Intercompany Shortfall Claim</u>" means a Claim against the General Pool subject to the waterfall priorities set forth in <u>Section 4.2</u> in an amount equal to the Dotcom Exchange Shortfall Amount.

2.1.52 "<u>Effective Date</u>" means, following the Confirmation Date, 12:01 a.m. prevailing Eastern Time on a Business Day selected by the Debtors, on which all conditions to the occurrence of the Effective Date set forth in <u>Sections 9.1</u> and <u>9.2</u> are satisfied or waived in accordance with this Plan.

2.1.53 "<u>Election Form</u>" means the election form regarding the Voluntary Release by Holders of Claims and Interests provided to Holders of Claims or Interests who are not entitled to vote on the Plan and which must be actually received on or before the Voting Deadline.

2.1.54 "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

2.1.55 "<u>Equity Interest</u>" means any Equity Security, including any issued, unissued, authorized or outstanding share of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, and any

---

[3] <u>Note to Draft</u>: The Debtors intend to seek to market the Debtors' property associated with the ownership and operation of the FTX.com Exchange. Depending on the sales and marketing process, the Debtors may establish in collaboration with third party investors a new company in a jurisdiction outside of the United States to operate a "rebooted" offshore platform not available to U.S. investors (an "<u>Offshore Exchange Company</u>") or enter into a merger or similar transaction. If the Debtors elect to establish an Offshore Exchange Company, the Debtors and the new investors will determine the legal structure and corporate governance arrangements for the Offshore Exchange Company in consultation with customer and creditor representatives prior to confirmation of the Plan.

The Debtors reserve the right not to proceed with an Offshore Exchange Company if the Debtors determine that doing so may, among other things, delay effectiveness of the remaining components of the Plan, create regulatory concerns or fail to yield material incremental value to Holders of Dotcom Customer Entitlement Claims.

[4] <u>Note to Draft</u>: This value will represent the historical shortfall in the accounts associated with the FTX.com Exchange at the time of commencement of the Chapter 11 Cases, and will be set as the Debtors' estimate of the difference as of the Petition Date between (a) the aggregate amount of Dotcom Customer Entitlement Claims and (b) the aggregate fair market value of (i) fiat currency in segregated accounts, (ii) Digital Assets in AWS Wallets (other than NFTs and FTT) and (iii) Digital Assets subject to the Hacking Incident.

option, warrant or right, contractual or otherwise, to acquire any such interest in a Debtor that existed immediately prior to the Effective Date; *provided* that Equity Interest does not include any Intercompany Interest.

2.1.56     "Equity Security" means an equity security as defined in section 101(16) of the Bankruptcy Code.

2.1.57     "Estate" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and/or as established by order of the Bankruptcy Court.

2.1.58     "Exchange Rate" means the closing exchange rate on the Petition Date, as published by *The Wall Street Journal*.

2.1.59     "Excluded Parties" means (a) Samuel Bankman-Fried, (b) Zixiao "Gary" Wang, (c) Nishad Singh, (d) Caroline Ellison, (e) any former director, officer or employee of any Debtor not incumbent as of the Confirmation Date, or (f) any other Entity associated with the Debtors that is identified by the Debtors in the Plan or the Plan Supplement as an Excluded Party.

2.1.60     "Exculpated Parties" means (a) the Debtors; (b) the Committee and its current members, in their capacities as such; (c) the Fee Examiner; and (d) with respect to each Entity named in (a) through (c), such Entity's current directors, officers, employees, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives solely when acting in any such capacities, in each case, current as of the Confirmation Date.  Notwithstanding anything to the contrary in the Plan or the Plan Supplement, no Excluded Party shall be an Exculpated Party.

2.1.61     "Executory Contract" means a contract to which one or more of the Debtors is a party and that such Debtor may assume or reject under section 365 or 1123 of the Bankruptcy Code.

2.1.62     "Federal Judgment Rate" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

2.1.63     "Fee Examiner" means Katherine Stadler, as Fee Examiner appointed under the *Order (I) Appointing Fee Examiner and (II) Establishing Procedures for Consideration of Requested Fee Compensation and Reimbursement of Expenses* [D.I. 834].

2.1.64     "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, vacated or amended, and as to which the time to appeal, seek *certiorari* or move for a new trial, stay, re-argument or rehearing has expired and no appeal, petition for *certiorari* or motion for a new trial, stay, re-argument or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for *certiorari*, or motion for a new trial, stay, re-argument or rehearing that has been or may be filed shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, stay, re-argument or

rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 9024, may be filed relating to an order shall not by itself cause such order to not be a Final Order.

2.1.65    "FTT" means the token native to the FTX.com Exchange.

2.1.66    "FTT Claim" means any FTT Customer Entitlement Claim or any Claim of any kind or nature (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Person or Entity in the capacity as a holder of FTT that is not a Section 510(b) FTT Claim.

2.1.67    "FTT Customer Entitlement Claim" means a Customer Entitlement Claim in respect of an FTT.

2.1.68    "FTX Bahamas PropCo" means FTX Property Holdings Ltd.

2.1.69    "FTX DM" means FTX Digital Markets Ltd.

2.1.70    "FTX Exchanges" means any exchange or trading platform operated by a Debtor as of the Petition Date.

2.1.71    "FTX Trading" has the meaning set forth in the Article 1.

2.1.72    "FTX Turkey" has the meaning set forth in the Section 1.2(a).

2.1.73    "FTX.com AWS Wallets" means the AWS Wallets associated with FTX.com Exchange.

2.1.74    "FTX.com Exchange" means the FTX.com trading platform.

2.1.75    "FTX.US AWS Wallets" means the AWS Wallets associated with the FTX.US Exchange.

2.1.76    "FTX.US Exchange" means the FTX.US trading platform.

2.1.77    "General Administrative Claim" means an Administrative Claim other than a Professional Claim.

2.1.78    "General Convenience Claim" means (a) any General Unsecured Claim Allowed in an amount equal to or less than $[•] or (b) any General Unsecured Claim Allowed in an amount greater than $[•] but that is reduced to an amount equal to or less than $[•] by an irrevocable written election of the Holder of such General Unsecured Claim made on a properly executed and delivered Ballot; *provided* that where any portion of a General Unsecured Claim has been transferred or subdivided, any transferred or subdivided portion shall continue to be treated together with the entire initial General Unsecured Claim for purposes of determining whether any portion of such General Unsecured Claim qualifies as a General Convenience Claim.

2.1.79    "General Pool" means (a) collectively, (i) all fiat and Digital Assets held by the Debtors not allocated to the Dotcom Customer Pool, the U.S. Customer Pool or a Separate Subsidiary; (ii) all excess distributable value of any non-Debtor Subsidiary (other than FTX DM) after satisfaction of all claims against such non-Debtor Subsidiary; (iii) all excess distributable value of the Separate Subsidiaries after satisfaction of all Allowed Separate Subsidiary Claims; (iv) all proceeds from all Avoidance Actions and litigation Claims of any Debtor other than the Dotcom Customer Preference Actions and the U.S. Customer Preference Actions; (v) all proceeds from the sale, disposition or other monetization of other property of the Debtors (including the venture investments held by the Debtors) other than FTX DM, the FTX.com Exchange and the FTX.US Exchange; (vi) a ratable [•] percent interest in the U.S. Customer Pool;[5] (vii) 100 percent of the residual interest in the Dotcom Customer Pool after all Dotcom Customer Entitlement Claims are satisfied in full; (viii) 100 percent of the residual interest in the U.S. Customer Pool after all U.S. Customer Entitlement Claims are satisfied in full; (ix) all other property of the Debtors or the Wind Down Estates, *less* (b) the Case Expenses allocated to the U.S. Customer Pool pursuant to Section 3.7; *provided* that the General Pool does not include any asset in the Dotcom Customer Pool or the U.S. Customer Pool.

2.1.80    "General Unsecured Claim" means any Claim that is not an (a) Administrative Claim, (b) 503(b)(9) Claim, (c) Priority Tax Claim, (d) Other Priority Claim, (e) Secured Claim, (f) Separate Subsidiary Claim, (g) Dotcom Customer Entitlement Claim, (h) U.S. Customer Entitlement Claim, (i) NFT Customer Entitlement Claim, (j) Dotcom Convenience Claim, (k) U.S. Convenience Claim, (l) General Convenience Claim, (m) Intercompany Claim, (n) Subordinated Claim, (o) FTT Claim, (p) Section 510(b) Claim, (q) Dotcom Intercompany Shortfall Claim or (r) U.S. Intercompany Shortfall Claim.

2.1.81    "Global Settlement" has the meaning set forth in Section 5.2.

2.1.82    "Governmental Bar Date" means 4:00 p.m. (Eastern Time) on September 29, 2023.

2.1.83    "Governmental Unit" means governmental unit as defined in section 101(27) of the Bankruptcy Code.

2.1.84    "Hacking Incident" means the November 2022 electronic attack against the Debtors and the FTX Exchanges.

2.1.85    "Holder" means an Entity holding a Claim against or an Interest in any of the Debtors.

2.1.86    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

---

[5]    Note to Draft:  Percentage to be determined based on size of Alameda's positions on the FTX.US Exchange.

2.1.87     "Initial Distribution Date" means the date determined by the Plan Administrator, in his or her reasonable discretion and in accordance with the Plan Administration Agreement, to commence Distributions under the Plan.

2.1.88     "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code, includes any non-statutory insiders of the Debtors and Affiliates of the Debtors, including, among others, Samuel Bankman-Fried, Zixiao "Gary" Wang, Nishad Singh and Caroline Ellison.

2.1.89     "Intercompany Claim" means any Claim of whatever nature and arising at whatever time held by a Debtor against another Debtor, other than the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim.

2.1.90     "Intercompany Interest" means any Equity Security, including any issued or unissued share of common stock, preferred stock or other instrument, evidencing an ownership interest in a Debtor or a subsidiary held by another Debtor.

2.1.91     "Interest" means any Equity Interest or Intercompany Interest.

2.1.92     "IRS" means the Internal Revenue Service.

2.1.93     "Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

2.1.94     "NFT Customer Entitlement Claim" means a Customer Entitlement Claim for the return of an Available NFT.

2.1.95     "NFTs" means non-fungible tokens.

2.1.96     "Non-Customer Bar Date" means 4:00 p.m. (Eastern Time) on June 30, 2023.

2.1.97     "Notice and Claims Agent" means Kroll Restructuring Administration LLC, located at 55 East 52nd Street, 17th Floor, New York, NY 10055, retained and approved by the Bankruptcy Court as the Debtors' notice and claims agent.

2.1.98     "Other Administrative Claim" means any Administrative Claim that is not a Professional Claim or Claim for U.S. Trustee Fees.

2.1.99     "Other Equity Interest" means any Equity Interest that is not a Preferred Equity Interest.

2.1.100     "Other Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

2.1.101     "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

2.1.102     "Petition Date" means (a) November 11, 2023, with respect to each Debtor other than West Realm Shires Inc. and (b) November 14, 2023, with respect to West Realm Shires Inc.

2.1.103     "Plan" has the meaning set forth in Section 1.1.

2.1.104     "Plan Administration Agreement" means the agreement between the Debtors and the Plan Administrator governing the Plan Administrator's rights and obligations in connection with the Plan and Wind Down Estates, dated as of the Effective Date, which shall be filed as part of the Plan Supplement.

2.1.105     "Plan Administrator" means the Debtors' Chief Restructuring Officer, and any successor to such Person, who shall administer the Debtors' Estates after the Effective Date in accordance with the Plan Administration Agreement.

2.1.106     "Plan Assets" means all property of each Estate and any property retained by any Debtor under the Plan.

2.1.107     "Plan Supplement" means the initial compilation of documents and forms of documents, schedules and exhibits to the Plan, to be filed and available on the Notice and Claims Agent's website at https://restructuring.ra.kroll.com/FTX/ no later than seven days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

2.1.108     "Pre-Distribution Requirements" has the meaning set forth in Section 7.13.

2.1.109     "Pre-Launch Cryptocurrency" means an asset that would have been a DLT Digital Asset but for the fact that such asset has not been issued and is not transferable using distributed ledger or blockchain technology as of the Petition Date, including PYTH and HOLE.

2.1.110     "Preferred Equity Interest" means with respect to a Debtor, Equity Interests in such Debtor that is entitled to preference or priority over any other Equity Interest in such Debtor with respect to the payment of dividends or distribution of assets upon liquidation or both, including (a) series A preferred stock issued by West Realm Shires Inc., (b) series B preferred stock issued by FTX Trading, (c) series B-1 preferred stock issued by FTX Trading, and (d) series C preferred stock issued by FTX Trading.

2.1.111     "Prepetition" means, with respect to each Debtor, prior to the Petition Date for such Debtor.

2.1.112     "Preserved Potential Claim" means the Causes of Action set out in the Exhibit [•] hereto.

2.1.113     "Priority Tax Claim" means a Claim of a Governmental Unit against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

2.1.114    "Pro Rata" means, with respect to an Allowed Claim, the percentage represented by a fraction (a) the numerator of which shall be an amount equal to such Claim and (b) the denominator of which shall be an amount equal to the aggregate amount of Allowed and estimated Claims in the same Class as such Claim, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that such Holder's Claim in a particular Class bears to the aggregate amount of all Allowed Claims and estimated in such multiple Classes.

2.1.115    "Professional" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to section 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

2.1.116    "Professional Claim" means an Administrative Claim for the compensation of a Professional and the reimbursement of expenses incurred by such Professional from the Petition Date through and including the Confirmation Date.

2.1.117    "Professional Fee Escrow Account" means an account to be funded by the Debtors upon the Effective Date in an amount equal to the Professional Fee Reserve Amount.

2.1.118    "Professional Fee Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals entered by the Bankruptcy Court* on January 9, 2023 [D.I. 435].

2.1.119    "Professional Fee Reserve Amount" means the aggregate amount of unpaid Professional Claims for all Professionals employed by the Debtors and the Committee through and including the Confirmation Date as estimated by the Debtors in accordance with Section 3.4.3.

2.1.120    "Proof of Claim" means a proof of Claim filed against any of the Debtors in these Chapter 11 Cases.

2.1.121    "Rejected Contract Claims Bar Date" means, with respect to any Executory Contract or Unexpired Lease that is rejected pursuant to this Plan, 4:00 p.m. (Eastern Time) on the earlier of (a) the 30th day after entry by the Bankruptcy Court of an order providing for the rejection of such Executory Contract or Unexpired Lease and (b) the 30th day after the Effective Date; *provided* that the deadline for filing any rejection damages claim in connection with any Executory Contract or Unexpired Lease rejected pursuant to a prior order of the Bankruptcy Court shall be the date set forth in the respective order authorizing such rejection.

2.1.122    "Released Parties" means the Exculpated Parties.  Notwithstanding anything to the contrary in the Plan or Plan Supplement, no Excluded Party shall be a Released Party.

2.1.123 "Releasing Parties" means (a) the Debtors; (b) the Committee and its current members, in their capacities as such; (c) the Holders of all Claims who vote to accept the Plan; (d) the Holders of all Claims that are Unimpaired under the Plan; (e) the Holders of all Claims whose vote to accept or reject the Plan is solicited but who (i) abstain from voting on the Plan and (ii) do not opt out of granting the releases set forth therein; (f) the Holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein; (g) all other Holders of Claims or Interests to the maximum extent permitted by law. Holders who were not provided a Ballot or an Election Form and are not listed in clauses (a) through (g) above are not Releasing Parties.

2.1.124 "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors in these Chapter 11 Cases, each as may be amended, supplemented or modified from time to time.

2.1.125 "Section 510(b) Claim" means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, including Section 510(b) FTT Claims.

2.1.126 "Section 510(b) FTT Claim" means any Claim (a) arising from the rescission of a purchase or sale of FTT, (b) for damages arising from the purchase or sale of FTT, or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

2.1.127 "Secured Claim" means a Claim (a) secured by a Lien on property in which an Estate has an interest, to the extent such Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code and to the extent of the value of its Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed as such pursuant to the Plan.

2.1.128 "Securities Act" means the United States Securities Act of 1933, as amended.

2.1.129 "Security" means a security as defined in section 2(a)(1) of the Securities Act.

2.1.130 "Separate Subsidiaries" means the Debtors listed in the Exhibit [•] hereto, as may be updated, supplemented and amended from time to time in accordance with the terms of the Plan Supplement.[6]

2.1.131 "Separate Subsidiary Claim" means any Claim against a Debtor that is a Separate Subsidiary.

---

[6] Note to Draft: The Debtors may identify in this exhibit certain subsidiaries that are solvent and historically separate.

2.1.132    "SNG Investments" has the meaning set forth in Section 1.2(b).

2.1.133    "Specially Designated Nationals and Blocked Persons" means individuals and companies owned or controlled by, or acting for or on behalf of, sanctioned countries as well as individuals, groups and entities, such as terrorists and narcotics traffickers designated under various sanctions programs as determined by the United States Treasury's Office of Foreign Assets Control.

2.1.134    "Solicitation Procedures Order" means the order (a) approving the Disclosure Statement; (b) establishing a voting record date for the Plan; (c) approving solicitation packages and procedures for the distribution thereof; (d) approving the forms of Ballots; (e) establishing procedures for voting on the Plan and (f) establishing notice and objection procedures for the confirmation of the Plan, entered by the Bankruptcy Court on [•] [D.I. [•]], together with any supplemental order(s) that may be entered by the Bankruptcy Court in connection therewith.

2.1.135    "Stablecoin" means any Digital Asset designed to maintain a stable value relative to a reserve asset, such as a fiat currency or exchange-traded commodity.

2.1.136    "Subordinated Claim" means a Claim for regulatory fines and penalties, U.S. federal and state income or employment taxes, similar foreign taxes and any other Claim that has been subordinated on the basis of structural subordination, equitable subordination, laws or policies subordinating recoveries to claims by victims of crime or fraud, or any other grounds available under applicable law.

2.1.137    "Subsequent Distribution Date" means a date after the Initial Distribution Date selected by the Plan Administrator for Distributions in accordance with Section 7.1.2.

2.1.138    "Terms of Service" means any contract between an FTX Exchange and its customers that governs the terms of use of such FTX Exchange by those customers.

2.1.139    "U.S. Convenience Claim" means (a) any U.S. Customer Entitlement Claim Allowed in an amount equal to or less than $[•], or (b) any U.S. Customer Entitlement Claim Allowed in an amount greater than $[•] but that is reduced to an amount equal to or less than $[•] by an irrevocable written election of the Holder of such U.S. Customer Entitlement Claim made on a properly executed and delivered Ballot; *provided* that where any portion of a U.S. Customer Entitlement Claim has been transferred or subdivided, any transferred or subdivided portion shall continue to be treated together with the entire initial U.S. Customer Entitlement Claim for purposes of determining whether any portion of such U.S. Customer Entitlement Claim qualifies as a U.S. Convenience Claim.

2.1.140    "U.S. Customer Entitlement Claim" means any Customer Entitlement Claim against the FTX.US Exchange that is not a FTT Customer Entitlement Claim or a NFT Customer Entitlement Claim.

2.1.141    "U.S. Customer Pool" means (a) collectively, (i) all fiat currency in segregated accounts designated by the Debtors as accounts for the benefit of customers associated with the FTX.US Exchange held by the Debtors on the Petition Date; (ii) all Digital

Assets (other than Available NFTs) held by the Debtors and identified by the Debtors as held for customers in FTX.US AWS Wallets on the Petition Date; (iii) all proceeds relating to the Hacking Incident recovered by the Debtors to the extent that such proceeds are in respect of Digital Assets held in FTX.US AWS Wallets before, on or after the Petition Date; (iv) all proceeds from any Claim or Cause of Action against any customer of the FTX.US Exchange and U.S. Customer Preference Actions; (v) all proceeds from the sale, disposition or other monetization of property of the Debtors associated with the FTX.US Exchange; (vi) the U.S. Intercompany Shortfall Claim, *less* (b) (i) the amount necessary to satisfy the U.S. Convenience Claim and (ii) the Case Expenses allocated to the U.S. Customer Pool pursuant to Section 3.7.

2.1.142    "U.S. Customer Preference Actions" means any and all Causes of Action to avoid any preferential payments or transfers of property from the FTX.US Exchange pursuant to section 547 of the Bankruptcy Code, and any recovery action related thereto under section 550 of the Bankruptcy Code, or under any similar or related local, state, federal or foreign statutes or common law.

2.1.143    "U.S. Exchange Shortfall Amount" means $[•].[7]

2.1.144    "U.S. Intercompany Shortfall Claim" means a Claim against the General Pool subject to the waterfall priorities set forth in Section 4.2 in an amount equal to the U.S. Exchange Shortfall Amount.

2.1.145    "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

2.1.146    "U.S. Trustee Fees" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

2.1.147    "Unclaimed Distribution" means any Distribution under the Plan on account of an Allowed Claim to a Holder that has not:  (a) accepted a particular Distribution or, in the case of a Distribution made by check, negotiated such check; (b) given written notice to the Distribution Agent of an intent to accept a particular Distribution; (c) responded in writing to the request of the Distribution Agent for information necessary to facilitate a particular Distribution or (d) taken any other action necessary to facilitate such Distribution.

2.1.148    "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

2.1.149    "Unimpaired" means any Claim or Interest that is not Impaired.

---

[7]    Note to Draft:  This value will represent the historical shortfall in the accounts associated with the FTX.US Exchange at the time of commencement of the Chapter 11 Cases, and will be set as the Debtors' estimate of the difference as of the Petition Date between (a) the aggregate amount of U.S. Customer Entitlement Claims and (b) the aggregate fair market value of (i) fiat currency in segregated accounts, (ii) Digital Assets in AWS Wallets (other than NFTs and FTT) and (iii) Digital Assets subject to the Hacking Incident.

2.1.150 "<u>Voluntary Release by Holders of Claims and Interests</u>" means the release by Holders of Claims and Interests as set forth in <u>Section 10.5</u>.

2.1.151 "<u>Voting</u>" means the process by which a Holder of a Claim may vote to accept or reject the Plan, pursuant to the conditions in <u>Article 4</u>.

2.1.152 "<u>Voting Deadline</u>" means [•] (Eastern Time) on [•], by which time all Ballots must be actually received by the Notice and Claims Agent.

2.1.153 "<u>Wind Down Budget</u>" means the budget to fund the Wind Down Estate, which shall be included in the Plan Supplement, as may be updated, supplemented and amended from time to time in accordance with the terms of the Plan Supplement.

2.1.154 "<u>Wind Down Cash Proceeds</u>" means all Cash proceeds from the sale, disposition or other monetization of Plan Assets available for Distribution by the Plan Administrator, other than Cash reserved or applied by the Plan Administrator (a) to make Distributions under the Plan to Holders of Allowed Administrative Claims, Allowed Other Priority Claims or Allowed Secured Claims or (b) to pay expenses and costs of administering the Wind Down Estates.

2.1.155 "<u>Wind Down Estate</u>" means the Estate of each Debtor after the Effective Date of the Plan.

2.2. <u>Rules of Interpretation</u>

For the purposes of this Plan: (a) any reference herein to the word "including" or word of similar import shall be read to mean "including without limitation"; (b) unless otherwise specified, all references herein to "Articles" are references to Articles herein, hereof or hereto; (c) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan; (d) captions and headings to Articles are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (e) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (f) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (g) all references to docket numbers of documents filed in these Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (h) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to these Chapter 11 Cases, unless otherwise stated; (i) any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions; (j) any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof; (k) any immaterial effectuating provisions may be interpreted by the Debtors and the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order; (l) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and permitted assigns; (m) except as otherwise

expressly provided in this Plan, where this Plan contemplates that any Debtor or the Plan Administrator shall take any action, incur any obligation, issue any security or adopt, assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and effective against and binding upon such Debtor and/or the Plan Administrator, as applicable, on and after the Effective Date without further notice to, order of or other approval by the Bankruptcy Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of the board of directors of any Debtor or any other Entity and (n) except as otherwise provided in the Plan, anything required to be done by the Debtors or the Plan Administrator, as applicable, on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

2.3.  Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflicts of laws, shall govern the construction and implementation of the Plan and any agreement, document or instrument executed or entered into in connection with the Plan.

2.4.  Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, and all dates and times shall be determined based on prevailing time in Wilmington, Delaware.

## 3.   <u>ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS</u>

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Professional Claims and Priority Tax Claims, payment of which is provided for below.

### 3.1.   Administrative Claim Bar Date

Any request for payment of an Administrative Claim must be filed and served on the Plan Administrator pursuant to the procedures specified in the notice of entry of the Confirmation Order and the Confirmation Order on or prior to the Administrative Claim Bar Date; *provided* that no request for payment is required to be filed and served pursuant to this <u>Section 3.1</u> with respect to any:

    (a)    Administrative Claim that is Allowed as of the Administrative Claim Bar Date;

    (b)    503(b)(9) Claim;

    (c)    Professional Claim; or

    (d)    Claim for U.S. Trustee Fees.

Any Holder of an Administrative Claim who is required to, but does not, file and serve a request for payment of such Administrative Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claim against any Wind Down Estate and such Administrative Claim shall be deemed satisfied as of the Effective Date without the need for any objection from the Plan Administrator or any notice to or action, order or approval of the Bankruptcy Court.

Any objection to a request for payment of an Administrative Claim that is required to be filed and served pursuant to this <u>Section 3.1</u> must be filed and served on the Plan Administrator and the requesting party creditor (a) no later than 90 days after the Administrative Claim Bar Date or (b) by such later date as may be established by order of the Bankruptcy Court upon a motion by the Plan Administrator, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

### 3.2.   General Administrative Claims

Except to the extent that a Holder of an Allowed General Administrative Claim agrees to less favorable treatment, the Holder of each Allowed General Administrative Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed General Administrative Claim on or as reasonably practicable after the later of (a) the Effective Date or (b) the date on which such Claim is Allowed.

3.3.    503(b)(9) Claims

Except to the extent that a Holder of an Allowed 503(b)(9) Claim agrees to less favorable treatment, the Holder of each Allowed 503(b)(9) Claim shall receive Cash in an amount equal to the full unpaid amount of such Allowed 503(b)(9) Claim on or as reasonably practicable after the later of (a) the Effective Date or (b) the date on which such Claim is Allowed.

3.4.    Professional Claims

3.4.1    Final Fee Applications.  All final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Effective Date, in accordance with the procedures established under the Professional Fee Order and the Confirmation Order.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders.

3.4.2    Professional Fee Escrow Account.  The Debtors shall establish and fund the Professional Fee Escrow Account on or prior to the Effective Date.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Except as provided in the last sentence of this paragraph, such funds shall not be considered property of the Wind Down Estates.  The Plan Administrator shall pay Professional Claims in Cash no later than five Business Days after such Claims are Allowed by Final Order of the Bankruptcy Court.  Any funds remaining in the Professional Fee Escrow Account following the approval of all Professionals' final fee applications provided for in Section 3.4.1 and payment of all Professionals' Allowed Professional Claims shall be allocated between the Dotcom Customer Pool, the U.S. Customer Pool and the General Pool pursuant to the terms of the Plan Supplement and shall be distributed by the Plan Administrator pursuant to the Plan.

3.4.3    Professional Fee Reserve Amount.  Professionals shall provide good-faith estimates of their Professional Claims for purposes of the Professional Fee Escrow Account and shall deliver such estimates to the Debtors no later than seven days prior to the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals.  If a Professional does not provide such an estimate, the Debtors may estimate, in their reasonable discretion, the Professional Claims of such Professional.

3.4.4    Post-Effective Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Plan Administrator, as the case may be, shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, the Plan Administrator or the Committee, as the case may be, in each case

in accordance with the Wind Down Budget.  Except as otherwise specifically provided in the Plan, upon the Confirmation Date, any requirement that Professionals comply with section 327, 328, 329, 330, 331 or 1103 of the Bankruptcy Code or the Professional Fee Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Plan Administrator or, solely with respect to the matters set forth in <u>Section 13.9</u>, the Committee, may employ and pay any Professional in the ordinary course of business, in each case subject to the Wind Down Budget.

3.5.    <u>Statutory Fees Payable Pursuant to 28 U.S.C. § 1930</u>

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date, including any applicable interest payable under section 3717 of Title 31 of the United States Code, shall be paid by the Debtors.  On and after the Effective Date, to the extent applicable, the Plan Administrator shall pay any and all such fees and interest when due and payable (including any fraction thereof) until the earliest of the Chapter 11 Cases being closed, dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

3.6.    <u>Priority Tax Claims</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, or as ordered by the Bankruptcy Court, the Holder of an Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

3.7.    <u>Expense Allocation</u>

Unless otherwise specified herein, the Plan Administrator shall allocate Administrative Claims, professional or other fees and expenses related to the implementation and Consummation of the Plan and expenses and costs of administering the Wind Down Estates (collectively, "<u>Case Expenses</u>") as follows:  (a) all Case Expenses related to the Bahamian Subsidiaries or the sale, disposition or other monetization of property of the Debtors associated with the FTX.com Exchange shall be allocated solely to the Dotcom Customer Pool; (b) all Case Expenses related to the sale, disposition or other monetization of property of the Debtors associated with the FTX.US Exchange shall be allocated solely to the U.S. Customer Pool; and (c) all other Case Expenses shall be allocated between the Dotcom Customer Pool, the U.S. Customer Pool and the General Pool pursuant to the terms of the Plan Supplement.[8]

---

[8]    <u>Note to Draft</u>:  The Debtors will allocate such other Case Expenses *pro rata* based on their estimate of relative distributable value in each pool as of the date of confirmation of the Plan.

**4.** **C**LASSIFICATION, **T**REATMENT AND **V**OTING OF **C**LAIMS AND **I**NTERESTS

    4.1.   Classification of Claims and Interests.

        All Claims and Interests except for Administrative Claims, 503(b)(9) Claims and Priority Tax Claims are classified in the Classes set forth in this Article 4. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is Allowed as a Claim or Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

    4.1.1   Summary of Classification and Treatment. The classification of Claims and Interests pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4A | Dotcom Customer Entitlement Claims | Impaired | Entitled to Vote |
| 4B | U.S. Customer Entitlement Claims | Impaired | Entitled to Vote |
| 4C | NFT Customer Entitlement Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6A | Dotcom Convenience Claims | Impaired | Entitled to Vote |
| 6B | U.S. Convenience Claims | Impaired | Entitled to Vote |
| 6C | General Convenience Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | FTT Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 11 | Preferred Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 13 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |

4.2.    <u>General Pool Waterfall</u>

Proceeds in the General Pool shall be applied in the following manner:

(a)    *first*, to pay (i) Allowed Claims subject to the treatment set forth in <u>Article 3</u> (other than Case Expenses that are not allocated to the General Pool pursuant to <u>Section 3.7</u>) and (ii) Allowed Other Priority Claims;

(b)    *second*, to pay the Allowed General Convenience Claims;

(c)    *third*, with respect to [•] percent of the amount next available for Distribution from the General Pool, to pay the Allowed Dotcom Intercompany Shortfall Claim and the Allowed U.S. Intercompany Shortfall Claim on a Pro Rata basis;

(d)    *fourth*, with respect to the remaining amount available for Distribution from the General Pool, to pay Allowed General Unsecured Claims, the Allowed Dotcom Intercompany Shortfall Claim and the Allowed U.S. Intercompany Shortfall Claim on a Pro Rata basis; and

(e)    *fifth*, to pay Allowed Subordinated Claims.

4.3.    <u>Treatment of Claims and Interests</u>

4.3.1    <u>Class 1 – Other Priority Claims</u>

(a)    *Classification*:  Class 1 consists of all Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)    *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

4.3.2    <u>Class 2 –Secured Claims</u>

(a)    *Classification*:  Class 2 consists of Secured Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Claim, each Holder of an Allowed Secured Claim shall receive one of the following treatments, in the sole discretion of the Plan Administrator:  (i) payment in full in Cash; (ii) delivery of the collateral securing such Allowed Secured Claim; or (iii) treatment of such Allowed Secured Claim in any other manner that renders the Claim Unimpaired.

(c)     *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Secured Claim is entitled to vote to accept or reject the Plan.

4.3.3     Class 3 – Separate Subsidiary Claims

(a)     *Classification*:  Class 3 consists of all Separate Subsidiary Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Separate Subsidiary Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Separate Subsidiary Claim, each Holder of an Allowed Separate Subsidiary Claim shall receive payment in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Allowed Separate Subsidiary Claim becomes Allowed; and (iii) such other date as may be ordered by the Bankruptcy Court.

(c)     *Voting*:  Claims in Class 3 are Unimpaired.  Each Holder of a Separate Subsidiary Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Separate Subsidiary Claim is entitled to vote to accept or reject the Plan.

4.3.4     Class 4A – Dotcom Customer Entitlement Claims

(a)     *Classification*:  Class 4A consists of all Dotcom Customer Entitlement Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Dotcom Customer Entitlement Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Dotcom Customer Entitlement Claims, each Holder of an Allowed Dotcom Customer Entitlement Claim shall receive payment in Cash in an amount

equal to such Holder's Pro Rata share of the Dotcom Customer
Pool.[9]

(c)    *Voting*:  Claims in Class 4A are Impaired.  Each Holder of a
Dotcom Customer Entitlement Claims is entitled to vote to accept
or reject the Plan.

4.3.5    Class 4B – U.S. Customer Entitlement Claims

(a)    *Classification*:  Class 4B consists of all U.S. Customer Entitlement
Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed U.S.
Customer Entitlement Claim agrees to less favorable treatment,
and in full and final satisfaction, settlement, release and discharge
of and in exchange for its Allowed U.S. Customer Entitlement
Claims, each Holder of an Allowed U.S. Customer Entitlement
Claim shall receive payment in Cash in an amount equal to such
Holder's Pro Rata share of the U.S. Customer Pool.

(c)    *Voting*:  Claims in Class 4B are Impaired.  Each Holder of a U.S.
Customer Entitlement Claim is entitled to vote to accept or reject
the Plan.

4.3.6    Class 4C – NFT Customer Entitlement Claims

(a)    *Classification*:  Class 4C consists of all NFT Customer Entitlement
Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed NFT
Customer Entitlement Claim agrees to less favorable treatment,
and in full and final satisfaction, settlement, release and discharge
of and in exchange for its Allowed NFT Customer Entitlement
Claim, each Holder of an Allowed NFT Customer Entitlement
Claim shall receive the Available NFT associated with such
Allowed NFT Customer Entitlement Claim.

(c)    *Voting*:  Claims in Class 4C are Impaired.  Each Holder of an NFT
Customer Entitlement Claim is entitled to vote to accept or reject
the Plan.

---

[9]    Note to Draft:  If the Debtors decide to establish the Offshore Exchange Company, the Debtors may determine
that, rather than Cash, the Offshore Exchange Company will remit non-cash consideration to the Dotcom
Customer Pool in the form of equity securities, tokens or other interests in the Offshore Exchange Company, or
rights to invest in such equity securities, tokens or other interests ("Take-Back Interests").  Any Take-Back
Interests will be made available to Holders of Dotcom Customer Entitlement Claims on a pro rata basis, subject
to applicable securities and other laws.

4.3.7    Class 5 – General Unsecured Claims

(a)    *Classification*:  Class 5 consists of all General Unsecured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in Cash in an amount equal to such Holder's Pro Rata share of General Pool Distributions in accordance with the waterfall priority set forth in Section 4.2.

(c)    *Voting*:  Claims in Class 5 are Impaired.  Each Holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

4.3.8    Class 6A – Dotcom Convenience Claims

(a)    *Classification*:  Class 6A consists of all Dotcom Convenience Claims.

(b)    *Treatment*:  On the later of the Initial Distribution Date or as soon as reasonably practicable after a Dotcom Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Dotcom Convenience Claim, each Holder of an Allowed Dotcom Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such Allowed Dotcom Convenience Claim;[10] *provided* that the aggregate amount of Cash received by Holders of Dotcom Convenience Claims on account of their Dotcom Convenience Claim shall not exceed $[•].

(c)    *Voting*:  Claims in Class 6A are Impaired.  Each Holder of a Dotcom Convenience Claim is entitled to vote to accept or reject the Plan.

4.3.9    Class 6B – U.S. Convenience Claims

(a)    *Classification*:  Class 6B consists of all U.S. Convenience Claims.

(b)    *Treatment*:  On the later of the Initial Distribution Date or as soon as reasonably practicable after a U.S. Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed U.S. Convenience Claim, each Holder of an Allowed U.S. Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such

---

[10]    Note to Draft:  Threshold to be determined based on net present value of projected recoveries for Class 4A.

Allowed U.S. Convenience Claim;[11] *provided* that the aggregate amount of Cash received by Holders of U.S. Convenience Claims on account of their Dotcom Convenience Claim shall not exceed $[•].

(c)     *Voting*: Claims in Class 6B are Impaired. Each Holder of a U.S. Convenience Claim is entitled to vote to accept or reject the Plan.

### 4.3.10   Class 6C – General Convenience Claims

(a)     *Classification*: Class 6C consists of all General Convenience Claims.

(b)     *Treatment*: On the later of the Initial Distribution Date or as soon as reasonably practicable after a General Convenience Claim becomes Allowed, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed General Convenience Claim, each Holder of an Allowed General Convenience Claim shall receive payment in Cash in an amount equal to [•] percent of such Allowed General Convenience Claim;[12] *provided* that the aggregate amount of Cash received by Holders of General Convenience Claims on account of their Dotcom Convenience Claim shall not exceed $[•].

(c)     *Voting*: Claims in Class 6C are Impaired. Each Holder of a General Convenience Claim is entitled to vote to accept or reject the Plan.

### 4.3.11   Class 7 – Intercompany Claims

(a)     *Classification*: Class 7 consists of all Intercompany Claims.

(b)     *Treatment*: All Intercompany Claims shall be canceled, released or otherwise settled in full, and the Holders of Intercompany Claims shall not be entitled to, and shall not receive or retain, any Distributions, property or interest in property on account of such Claims under the Plan.

(c)     *Voting*: Claims in Class 7 are Impaired. Each Holder of an Intercompany Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of an Intercompany Claim is entitled to vote to accept or reject the Plan.

---

[11]    Note to Draft: Threshold to be determined based on net present value of projected recoveries for Class 4B.

[12]    Note to Draft: Threshold to be determined based on net present value of projected recoveries for Class 5.

4.3.12  <u>Class 8 – Intercompany Interests</u>

     (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

     (b)    *Treatment*:  No Holder of an Intercompany Interest shall receive any Distributions on account of its Intercompany Interest.  On and after the Effective Date, all Intercompany Interests shall be canceled and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

     (c)    *Voting*:  Claims in Class 8 are Impaired.  Each Holder of an Intercompany Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Interest is entitled to vote to accept or reject the Plan.

4.3.13  <u>Class 9 – Subordinated Claims</u>

     (a)    *Classification*:  Class 9 consists of all Subordinated Claims.

     (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Subordinated Claim agrees to less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Subordinated Claim, each Holder of an Allowed Subordinated Claim shall receive its Pro Rata share equal to such Holder's Pro Rata share of General Pool Distributions in accordance with the waterfall priority set forth in <u>Section 4.2</u>.

     (c)    *Voting*:  Claims in Class 9 are Impaired.  Each Holder of a General Convenience Claim is entitled to vote to accept or reject the Plan.

4.3.14  <u>Class 10 – FTT Claims</u>

     (a)    *Classification*:  Class 10 consists of all FTT Claims.

     (b)    *Treatment*:  No Holder of a FTT Claim shall receive any Distributions on account of its FTT Claim.  On and after the Effective Date, all FTT Claims shall be canceled, released and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

     (c)    *Voting*:  Claims in Class 10 are Impaired.  Each Holder of a FTT Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of a FTT Claim is entitled to vote to accept or reject the Plan.

### 4.3.15 Class 11 – Preferred Equity Interests

(a) *Classification*: Class 11 consists of all Preferred Equity Interests.

(b) *Treatment*: No Holder of a Preferred Equity Interest shall receive any Distributions on account of its Preferred Equity Interest. On and after the Effective Date, all Preferred Equity Interests shall be canceled, released and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c) *Voting*: Claims in Class 11 are Impaired. Each Holder of a Preferred Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of a Preferred Equity Interest is entitled to vote to accept or reject the Plan.

### 4.3.1 Class 12 – Section 510(b) Claims

(a) *Classification*: Class 12 consists of all Section 510(b) Claims.

(b) *Treatment*: No Holder of a Section 510(b) Claim shall receive any Distributions on account of its Section 510(b) Claim. On and after the Effective Date, all Section 510(b) Claims shall be canceled, released and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c) *Voting*: Claims in Class 12 are Impaired. Each Holder of a Section 510(b) Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of a Section 510(b) Claim is entitled to vote to accept or reject the Plan.

### 4.3.1 Class 13 – Other Equity Interests

(a) *Classification*: Class 13 consists of all Other Equity Interests.

(b) *Treatment*: No Holder of an Other Equity Interest shall receive any Distributions on account of its Other Equity Interest. On and after the Effective Date, all Other Equity Interests shall be canceled, released and extinguished and shall be of no further force and effect, whether surrendered for cancelation or otherwise.

(c) *Voting*: Claims in Class 13 are Impaired. Each Holder of an Other Equity Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of an Other Equity Interest is entitled to vote to accept or reject the Plan.

4.4.    Valuation of Claims

Unless otherwise expressly provided herein, the value of a Claim in respect of a Digital Asset shall be calculated by converting the value of such Digital Asset into Cash as of the Petition Date utilizing the conversion rates set forth in the Digital Assets Conversion Table.[13]

4.5.    Special Provision Governing Unimpaired Claims

Except as otherwise provided herein, the Plan shall not affect the Plan Administrator's rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

4.6.    Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if:  (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims entitled to vote actually voting in such Class have voted to accept the Plan; and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims entitled to vote actually voting in such Class have voted to accept the Plan.

4.7.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or an Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purpose of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

4.8.    Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

4.9.    Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code

For purposes of Confirmation, section 1129(a)(10) of the Bankruptcy Code shall be satisfied if any one of Class 4A, 4B, 4C, 5, 6A, 6B, 6C or 9 accepts the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class or Classes of Claims and Interests.  Classes 7, 8, 10, 11, 12 and 13 are deemed to reject the Plan.

---

[13]    Note to Draft:  Where a Claim reflects an underlying Digital Asset (other than an NFT), such Claim will be liquidated in U.S. Dollars based on the fair market value at the Petition Date.  The fair market value will be determined based on a conversion table attached to the Digital Assets Estimation Order, approving the omnibus digital assets estimation motion filed by the Debtors in advance of Plan solicitation.

## 5. IMPLEMENTATION OF THE PLAN[14]

### 5.1. Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate as debtors-in-possession, subject to all applicable orders of the Bankruptcy Court.

### 5.2. Global Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided under the Plan, and pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, treatment, Distributions, releases and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise, settlement and resolution (the "Global Settlement") of various Claims, Interests, Causes of Action, controversies and disputes arising from or related to, among other things: (a) the purported fraud, unjust enrichment, misappropriation, conversion and misconduct of former Insiders; (b) the contractual, structural and legal subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim, Interest or any Distribution to be made on account of such Allowed Claim or Interest; (c) the purported commingling and misuse of customer deposits and corporate funds; (d) the tracing of assets of individual Debtors to particular sources of funding; (e) the allocation of corporate and administrative expenses across each of the Debtors; (f) the effects and consequences of the Debtors' Terms of Service and whether the assets held by the FTX.com Exchange and the FTX.US Exchange are property of the Debtors' Estates; (g) the purported absence of adequate corporate governance, cash management, accounting and cybersecurity controls by the Debtors and their Affiliates prior to the commencement of the Chapter 11 Cases; and (h) the costs and risks to the Debtors' Estates and creditor recoveries otherwise associated with prolonged litigation of each of the foregoing.

Pursuant to, and as part of, the Global Settlement: (i) the value of Claims in respect of Digital Assets shall be calculated pursuant to Section 4.4; (ii) the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim shall be recognized for the benefit of Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims; (iii) Claims shall be classified and treated as set forth in Article 4, which entitles Holders of Allowed Dotcom Customer Entitlement Claims and Allowed U.S. Customer Entitlement Claims to recover against the (x) Dotcom Customer Pool and the U.S.

---

[14] Note to Draft: In addition to the implementation mechanisms described herein, the Debtors also may establish a new limited liability trust company (the "FTX Ventures Trust") to hold the Debtors' illiquid venture capital, private company and token investments that will not be sold at the time of effectiveness and are not anticipated to be sold by the Plan Administrator promptly after effectiveness as part of the Wind Down Estate. The purpose of the FTX Ventures Trust will be to make cash distributions on a time horizon to be determined based on the nature of its investments.

The Debtors will determine the management structure and corporate governance arrangements for the FTX Ventures Trust in consultation with customer and creditor representatives prior to confirmation of the Plan. The Debtors have made no determination whether the FTX Ventures Trust will be owned by the Wind Down Estate or separately traded.

Customer Pool, respectively, and (y) General Pool, in accordance with the waterfall priority set forth in <u>Section 4.2</u>; (iv) the Consolidated Debtors shall be substantively consolidated as set forth in <u>Section 5.3</u>; (v) Intercompany Claims shall be canceled; (vi) the Subordinated Claims shall be subordinated to Claims of other Holders; (vii) FTT Claims and Equity Interests shall be canceled; and (viii) Distributions to customers and creditors shall be made in Cash (other than in Available NFTs) as set forth in <u>Articles 4</u> and <u>7</u>.

The Plan shall be deemed a motion to approve the Global Settlement pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as findings by the Bankruptcy Court that the Global Settlement is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests.

Any settlement agreement entered into among any of the Debtors and Holders of Claims or Interests that is contained in the Plan Supplement is incorporated into the Plan and shall become effective in accordance with its terms.

5.3. <u>Substantive Consolidation</u>

As discussed in detail in the Disclosure Statement and as otherwise provided pursuant to the Plan, and pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Global Settlement, the classification, treatment, Distributions, releases and other benefits provided under the Plan, the Plan shall be deemed a motion by the Debtors seeking the approval, effective as of the Effective Date, of the substantive consolidation of the Estates of the Consolidated Debtors into a single Estate for the limited purposes of the Plan, including Voting, Confirmation and Distribution subject in all respects to (a) the classification and treatment of Claims and Interests set forth in <u>Article 4</u> and (b) this <u>Section 5.3</u>. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such substantive consolidation, as well as findings by the Bankruptcy Court that such substantive consolidation is fair, equitable, reasonable and in the best interests of the Debtors, their Estates and Holders of Claims and Interests.

Except as otherwise provided herein and subject in all respects to the classification and treatment of Claims and Interests set forth in <u>Article 4</u>, as a result of the substantive consolidation set forth in this <u>Section 5.3</u>:  (a) all assets (other than the Dotcom Customer Pool and the U.S. Customer Pool) and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (b) all guarantees of any Consolidated Debtor of the payment, performance or collection of obligations of another Consolidated Debtor shall be eliminated and canceled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (d) all Claims between any Consolidated Debtors (other than the Dotcom Intercompany Shortfall Claim and the U.S. Intercompany Shortfall Claim) shall be deemed canceled; and (e) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.  Except as otherwise provided herein, the substantive consolidation set forth in this <u>Section 5.3</u> shall not

-32-

affect (other than for purposes of the Plan as set forth in this section): (i) the legal and organizational structure of the Consolidated Debtors; (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; *provided* that any Claim or Interest that is Allowed against any Consolidated Debtor shall be deemed Allowed against the Estate of all Consolidated Debtors; or (iii) distributions out of any insurance contracts or any Entity's or Person's rights, if any, to proceeds of such insurance contracts. The Plan shall not otherwise result in the merger or affect the separate legal existence of each Debtor for any other purpose.

5.4.  Wind Down Estates

The purpose of the Wind Down Estates is to monetize and distribute the Plan Assets, with no objective to continue or engage in the conduct of a trade or business. The Wind Down Estates shall administer, and close as necessary, the Chapter 11 Cases; administer, reconcile and settle claims; monetize remaining assets; and liquidate the Debtors and their non-Debtor subsidiaries pursuant to the terms of the Plan Supplement. The Plan Administrator shall be vested with all powers and authority set forth in this Plan and the Plan Administration Agreement, shall be deemed to have been appointed as the Debtors' Estates' representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections 704(a)(1), 704(a)(2) and 704(a)(5) of the Bankruptcy Code.

5.5.  Plan Funding Mechanism

Distributions under the Plan shall be funded from (a) Cash on hand, (b) Available NFTs, (c) Wind Down Cash Proceeds, and (d) any other Plan Assets, except as expressly set forth herein.[15]

5.6.  Plan Administrator

The Plan Administrator shall be the Debtors' Chief Restructuring Officer, and appointment of the Plan Administrator shall be approved in the Confirmation Order. The powers and duties of the Plan Administrator shall be set forth in this Plan and the Plan Administration Agreement. The Plan Administrator shall report to the incumbent Board of Directors of the Debtors pursuant to the terms of this Plan and the Plan Administration Agreement. The Plan Administrator shall be a fiduciary of the Wind Down Estates and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administration Agreement.

5.7.  Vesting of Assets

Except as otherwise expressly provided in this Plan or the Confirmation Order, as of the Effective Date, all Plan Assets shall vest in the Wind Down Estates free and clear of all Liens, Claims, charges or other encumbrances or interests to the extent permitted by section 1141 of the Bankruptcy Code. All property held for Distribution pursuant to the Plan shall be held by

---

[15]  Note to Draft: If the Debtors decide to establish the Offshore Exchange Company, the Debtors may determine that, rather than Cash, the Offshore Exchange Company will remit non-cash consideration to the Dotcom Customer Pool in the form of Take-Back Interests. *See* footnote 9.

the Plan Administrator in trust for the Holders of Allowed Claims and Interests and to pay the expenses of the administration of the Wind Down Estates, and shall not be deemed property of the Debtors or Wind Down Estates.

5.8.    <u>D&O Policies</u>

As of the Effective Date, the Debtors shall be deemed to have assumed all of the Debtors' D&O Policies pursuant to sections 105 and 365(a) of the Bankruptcy Code.  The Debtors' D&O Policies purchased on or after the Petition Date shall continue in force following the Effective Date subject to the terms and conditions of such D&O Policies.  Coverage for defense and indemnity under any assumed or continued D&O Policies shall remain available within the definition of "Insured" in any of the D&O Policies subject to the terms and conditions of such D&O Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption or continuation, as applicable, of each D&O Policy.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an order of the Bankruptcy Court, Confirmation of the Plan shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption or continuation of the D&O Policies, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.  For the avoidance of doubt, the D&O Policies (i) are prefunded and will not require any additional premiums on or after the Effective Date, (ii) provide coverage for those insureds currently covered by such policies for the remaining term of such policies and (iii) in the case of the D&O Policies purchased on or after the Petition Date, provide runoff or tail coverage after the Effective Date to the fullest extent permitted by such policies.

5.9.    <u>Cancelation of Existing Interests</u>

On the Effective Date, except as otherwise specifically provided for in the Plan or any agreement, instrument or other document incorporated into the Plan, the obligations of the Debtors under any Certificate, Interest, share, note, purchase right, option, warrant, intercreditor agreement, guaranty, indemnity or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be canceled solely as to the Debtors, and the Debtors shall not have any continuing obligations thereunder and shall be released therefrom.

5.10.    <u>Section 1146 Exemption from Certain Transfer Taxes and Recording Fees</u>

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Wind Down Estates or to any other Person pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the Distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (b) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing

or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment. The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

 5.11. Preservation of Causes of Action

   Except as otherwise provided in Article 10 or the other provisions of the Plan, each Cause of Action of a Debtor shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the Wind Down Estates as of the Effective Date. Any Claim or Cause of Action against any customer of an FTX Exchange arising out of or relating to any transaction on an FTX Exchange shall be a Claim or Cause of Action of the Debtors and shall vest exclusively in the Wind Down Estates as of the Effective Date. Any such Claim or Cause of Action against any customer of the FTX.com Exchange shall vest exclusively in the Wind Down Estates for the benefit of the Dotcom Customer Pool, and any such Claim or Cause of Action against any customer of the FTX.US Exchange shall vest exclusively in the Wind Down Estates for the benefit of the US Customer Pool. Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Plan Administrator expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of Confirmation, the Plan, the vesting of such Cause of Action in the Wind Down Estates, any order of the Bankruptcy Court or these Chapter 11 Cases. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Plan Administrator, as applicable, will not pursue such Cause of Action.

 5.12. Effectuating Documents and Further Transactions

   The Debtors or the Plan Administrator, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The secretary, any assistant secretary or any other appropriate officer of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

   Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

6. **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

6.1. Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases will be rejected by the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) Executory Contracts or Unexpired Leases that are the subject of a pending motion to assume or (c) as is specifically described in the Plan to be assumed in connection with the Plan or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of such Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code.

6.2. Claims Against the Debtors upon Rejection

No Executory Contract or Unexpired Lease rejected by the Debtors on or prior to the Effective Date shall create any obligation or liability of the Debtors that is not a Claim. Any Proof of Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Notice and Claims Agent before the Rejected Contract Claims Bar Date. **Any Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease that is not filed with the Notice and Claims Agent by the Rejected Contract Claims Bar Date will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Wind Down Estates, the Plan Administrator or any of their property**. Any Allowed Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as a General Unsecured Claim and shall be treated in accordance with Section 4.3.7.

6.3. Modification, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is rejected shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the Prepetition nature of such Executory Contracts or Unexpired Leases or the validity, priority or amount of any Claims that may arise in connection therewith.

6.4.    <u>Reservation of Rights</u>

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Debtor has any liability thereunder.



7. **PROVISIONS GOVERNING DISTRIBUTIONS**

   7.1. Distributions Timing

   7.1.1    Initial Distribution Date.  On the Initial Distribution Date, the Distribution Agent shall commence Distributions under the Plan on account of each Claim that is Allowed on or prior to the Effective Date.[16]

   7.1.2    Subsequent Distribution Dates.  The Plan Administrator shall identify, in his or her reasonable discretion and in accordance with the Plan Administration Agreement, periodic dates after the Initial Distribution Date to be Subsequent Distribution Dates for purposes of making additional Distributions under the Plan.  Each Subsequent Distribution Date shall be a Business Day.

   7.1.3    Distributions to Holders of Claims Allowed After the Effective Date.  The Distribution Agent shall make Distributions to Holders of Claims Allowed after the Effective Date in accordance with the applicable provision of Article 4 on the first Subsequent Distribution Date after such Claim is Allowed.  Unless the Plan Administrator otherwise agrees, no partial Distribution shall be made with respect to such Claim until all disputes in connection with such Claim have been resolved by Final Order of the Bankruptcy Court.

   7.2. Distributions to Holders of Customer Entitlement Claims

   7.2.1    Distributions of Dotcom Customer Entitlement Claims, U.S. Customer Entitlement Claim and Allocations of Wind Down Cash Proceeds.  On any Distribution Date, the Plan Administrator may direct the Distribution Agent to Distribute to the Holders of Allowed Dotcom Customer Entitlement Claims or U.S. Customer Entitlement Claims the Wind Down Cash Proceeds that the Plan Administrator, in his or her reasonable discretion and in accordance with this Plan and the Plan Administration Agreement, determines are Wind Down Cash Proceeds that belong to the Dotcom Customer Pool or U.S. Customer Pool, respectively, in each case, in accordance with Sections 4.3.4 and 4.3.5.

   7.2.2    Final Distribution at Closing of the Chapter 11 Cases.  On or prior to the closing of the Chapter 11 Cases, the Plan Administrator shall Distribute all remaining Wind Down Cash Proceeds to the Holders of Allowed Dotcom Customer Entitlement Claims, Allowed U.S. Customer Entitlement Claims and Allowed General Unsecured Claims, respectively, in each case, in accordance with Sections 4.3.4, 4.3.5 and 4.3.7.

---

[16]    Note to Draft:  Distributions dates shall be determined by the Plan Administrator in his or her reasonable discretion.  To determine the "Initial Distribution Date," the Plan Administrator shall consider, among many factors, the costs associated with making Distributions, the assets and liabilities of the Wind Down Estate, liquidity, projected revenues and cash flows, status likelihood of successful resolution of current and future litigation and tax considerations.  The Initial Distribution Date may not be the Effective Date.

### 7.3.   Record Date and Delivery of Distributions

#### 7.3.1   Record Date for Distributions

In advance of each Distribution Date, the Plan Administrator shall establish a Distribution Record Date for purposes of determining the Holders of Allowed Claims entitled to receive a Distribution on such Distribution Date, which Distribution Record Date shall be no less than [•] and no more than [•] days prior to the corresponding Distribution Date.  On each Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on such Distribution Record Date.  If a Claim is transferred 20 or fewer days before the applicable Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

#### 7.3.2   Delivery of Distributions in General

Except as otherwise provided herein, the Distribution Agent, at the direction of the Plan Administrator, shall make all Distributions required under the Plan to Holders of Allowed Claims.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, Distributions to Holders of Allowed Claims shall be made to Holders of record as of the applicable Distribution Record Date by the Distribution Agent, as appropriate: (a) to the signatory set forth on any of the Proofs of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtors, the Plan Administrator or the Distribution Agent have been notified in writing of a change of address); (b) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent; or (c) at the address reflected in the Schedules if no Proof of Claim has been filed and the Notice and Claims Agent has not received a written notice of a change of address.  The Debtors, the Plan Administrator, the Distribution Agent and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any Distributions under the Plan.

In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  Except as specifically provided in the Plan, Holders of Allowed Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for in the Plan, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

#### 7.3.3   Foreign Currency Exchange Rate

Except as otherwise provided herein, an order of the Bankruptcy Court or as agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollars at the Exchange Rate.

7.4. <u>Distribution Agent</u>

The Plan Administrator shall have the authority, in its sole discretion, to enter into an agreement with a Distribution Agent to facilitate the Distributions required under the Plan. To the extent the Plan Administrator determines to utilize a Distribution Agent to facilitate the Distributions, such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or Distributions required under the Plan; and (c) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the Distributions required under the Plan to be distributed by such Distribution Agent.

The Plan Administrator shall pay to the Distribution Agent all of its reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise. The Distribution Agent shall submit detailed invoices to the Plan Administrator for all fees and expenses for which the Distribution Agent seeks reimbursement, and the Plan Administrator shall pay those amounts that it, in its sole discretion, deems reasonable, and shall object to those fees and expenses, if any, that the Plan Administrator deems to be unreasonable. In the event that the Plan Administrator objects to all or any portion of the amounts requested to be reimbursed in the Distribution Agent's invoice, the Plan Administrator and the Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Plan Administrator and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

7.5. <u>Fractional and *De Minimis* Distributions</u>

Notwithstanding anything herein to the contrary, the Plan Administrator and the Distribution Agent shall not be required to make Cash Distributions or payments of less than $[•]. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $[•] shall be forever barred from asserting such Claim against the Debtors, the Estates, the Plan Administrator, the Wind Down Estates or any of their property.

7.6. <u>Undeliverable Distributions</u>

In the event that any Distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' records, no further Distribution to such Holder shall be made unless and until the Plan Administrator or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such Distribution shall be made to such Holder not less than 30 days thereafter. Undeliverable Distributions shall remain in the possession of the Plan Administrator or the Distribution Agent until such time as such Distribution becomes deliverable or such Distribution reverts to the Wind Down Estates or is canceled pursuant to <u>Section 7.7</u> and shall not be supplemented with any interest, dividends or other accruals of any kind. Nothing contained herein shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim whose Distribution is declared an undeliverable or Unclaimed Distribution.

7.7.   Reversion

Any Distribution under the Plan, including Distributions made by the Plan Administrator or the Distribution Agent in accordance with Section 7.4, that is an Unclaimed Distribution for a period of six months thereafter, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Wind Down Estates as Plan Assets with respect to Unclaimed Distributions on account of Claims.  Upon such revesting, the Claim of any Holder or its successors and assigns with respect to such property shall be canceled and forever barred, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

7.8.   Surrender of Canceled Instruments or Securities

Except as otherwise provided in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, each holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent.  Subject to the foregoing sentence, regardless of any actual surrender of a Certificate, the deemed surrender shall have the same effect as if its Holder had actually surrendered such Certificate, and such Holder shall be deemed to have relinquished all rights, Claims and Interests with respect to such Certificate.  Notwithstanding the foregoing paragraph, this Section 7.8 shall not apply to any Claims reinstated pursuant to the terms of the Plan.

7.9.   Setoffs

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, pursuant to the Bankruptcy Code (including section 553), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Debtors or the Plan Administrator, as applicable, may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or the Plan Administrator of any such Claims, rights and Causes of Action that such Debtor or the Plan Administrator may possess against such Holder.  In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of a Debtor or the Plan Administrator, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases by the applicable Claims Bar Date preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

7.10.   No Interest on Claims

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors,

and no Holder of any Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

7.11.   No Payment over the Full Amount

In no event shall a Holder of an Allowed Claim receive more than the full payment of such Allowed Claim. To the extent any Holder has received payment in full with respect to an Allowed Claim, such Allowed Claim shall be deemed satisfied and expunged from the claims registry without an objection to such Claim having been filed and without any further notice to or action, order or approval of the Bankruptcy Court. To the extent that a Holder of an Allowed Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, the Plan Administrator or the Distribution Agent on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Plan Administrator or the Distribution Agent, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Plan Administrator annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

The Plan Administrator may require any Holder of any Claim to submit satisfactory evidence that such Holder has not requested or received compensation for the same losses underlying such Claim in connection with any other judicial or administrative proceeding, including, without limitation, any proceedings with respect to: [(a) FTX DM, (b) FTX Turkey, (c) SNG Investments or (d) FTX Europe AG].[17] The Plan Administrator may, and may direct the Distribution Agent to, withhold any Distributions on such Claim until such time as satisfactory evidence is obtained or appropriate arrangements are in place that ensure no Holder receives more than any other Holder under the Plan, taking into account potential recoveries of all Holders.

As a condition to receiving any Distribution under the Plan, the Plan Administrator may require Holders of Allowed Dotcom Customer Entitlement Claims, U.S. Customer Entitlement Claims, NFT Customer Entitlement Claim, General Unsecured Claims, Dotcom Convenience Claims, U.S. Convenience Claims or General Convenience Claims to irrevocably and unconditionally assign and transfer to the Plan Administrator all right, title and interest in any claim or Cause of Action for the same losses that has been or may be made or asserted in any other judicial or administrative proceeding relating to any Debtor or any Affiliate of the Debtors, including, without limitation, [FTX DM, FTX Turkey, SNG Investments or FTX Europe or FTX Europe AG].

---

[17]   Note to Draft: List of entities subject to review and update by the Debtors.

7.12. <u>Compliance with Tax Requirements</u>

In connection with the Plan, to the extent applicable, the Debtors, the Plan Administrator and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any tax law, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Plan Administrator and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the Distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms that are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable Holder. The Plan Administrator reserves the right to allocate all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

7.13. <u>Tax Identification, KYC and OFAC Certifications</u>

Any Holder entitled to receive any Distribution under the Plan shall, upon request, deliver to the Distribution Agent or such other Entity designated by the Plan Administrator: (a) a completed IRS Form W-9 or appropriate IRS Form W-8, as applicable; (b) a certification that the Holder is not a person or entity with whom it is illegal for a U.S. person to do business under Office of Foreign Assets Control sanctions regulations and/or the list of Specially Designated Nationals and Blocked Persons and (c) know-your-customer information of the Holder of such Claim, which (i) for individuals, may include, among other things, full name including any alias, date of birth, address and proof of address, identification and identification-related documents, nationality, phone number, email address, occupation, bank account information or wallet address, social security number (for U.S. citizens) and facial liveness and (ii) for institutional Holders, may include, among other things, company name, registration information, tax identification number, principal business address and phone number, business email address, information on the nature of the business and principal business activity, entity size, source of wealth/source of funds, annual revenue/profit, authorized signer, identity of ultimate beneficial owners, identity of directors and/or members of management, bank account information or wallet address and, for any ultimate beneficial owners, directors or members of management, similar identification information and records as are collected for individual Holders who are natural persons (collectively, the "<u>Pre-Distribution Requirements</u>"). If a request for Pre-Distribution Requirements has not been satisfied within 30 days thereafter, a second request shall be sent. If the Holder fails to comply with the Pre-Distribution Requirements before the date that is 60 days after a second request is made, such Holder shall be deemed to have forfeited its right to receive Distributions, and shall be forever barred and enjoined from asserting any right to Distributions made prior to the Plan Administrator receiving its executed Pre-Distribution Requirements. Any Distributions that are forfeited pursuant to this provision shall revest in the Wind Down Estates as Plan Assets.

## 8. CLAIMS ADMINISTRATION PROCEDURES

### 8.1. Objections to Claims

Any objections to Claims (other than Administrative Claims) shall be filed on or before the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Plan Administrator, by filing a motion to extend on or before the Claims Objection Deadline. The Plan Administrator shall have standing to object to Claims. Except as otherwise set forth in the Plan, after the Effective Date, the Plan Administrator and Wind Down Estate shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.

### 8.2. Estimation of Claims

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may, within their reasonable discretion, at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not yet been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including, but not limited to, for purposes of Distributions).

Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court or under the Plan. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation of such Claim unless the Holder of such Claim has filed a motion with the Bankruptcy Court requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

### 8.3. Expungement and Disallowance of Claims

#### 8.3.1 Paid, Satisfied, Amended, Duplicated or Superseded Claims

Any Claim or Interest that has been paid, satisfied, amended, duplicated (by virtue of the substantive consolidation provided for under this Plan or otherwise), superseded or otherwise dealt with or treated in the Plan, may be adjusted or expunged on the Claims Register at the direction of the Plan Administrator without the Plan Administrator having to file an objection, application, motion, complaint or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order or approval of the Bankruptcy Court.

8.3.2    Claims by Persons from Whom Property Is Recoverable

Unless otherwise agreed to by the Debtors, the Plan Administrator or ordered by the Bankruptcy Court, any Claims held by any Person or Entity from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and any Holder of such Claim may not receive any Distributions on account of such Claim until such time as such Cause of Action against that Person or Entity has been resolved.

8.4.    Amendments to Proofs of Claim

On or after the Effective Date, a Proof of Claim may not be amended (other than solely to update or correct the name or address of the Holder of such Claim) without the prior authorization of the Bankruptcy Court or the Plan Administrator, and any such amended Proof of Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

8.5.    No Distributions Pending Allowance

If an objection to the amount, validity, priority or classification of a Claim or a portion thereof is filed or is intended to be filed as set forth in this Article 8 or a Claim otherwise remains a Disputed Claim, except as otherwise provided in a Final Order of the Bankruptcy Court, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim or is otherwise settled or resolved.

8.6.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the applicable provisions of the Plan.

8.7.    Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date the Plan Administrator shall have the sole authority (subject to the terms of the Plan Administration Agreement) to (a) file, withdraw or litigate to judgment objections to Claims, (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court, (c) administer and adjust, or cause to be administered and adjusted, the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court and (d) determine, without the need for notice to or action, order or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is filed is Allowed.  Nothing in this Section 8.7 shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim prior to the Claims Objection Deadline unless otherwise ordered by the Bankruptcy Court.

8.8.    <u>Claims Paid or Payable by Third Parties</u>

        The Debtors or the Plan Administrator, as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or the Plan Administrator.  To the extent a Holder of a Claim receives a Distribution on account of such Claim and also receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the Distribution to the applicable Debtor, the applicable Wind Down Estate, or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Allowed Claim as of the applicable Distribution Date.

## 9. CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

9.1. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of this Article 9.

(a)  Confirmation Order.  The Confirmation Order shall have been entered in a form and substance reasonably acceptable to the Debtors and there shall not be a stay or injunction in effect with respect thereto.

(b)  Professional Fee Escrow Account.  The Debtors shall have established and funded the Professional Fee Escrow Account in accordance with Section 3.4.2.

(c)  Professional Fee Payments.  All professional fees and expenses of the Debtors, the Committee and [•] as of the Effective Date that were due and payable under an order of the Bankruptcy Court shall have been paid in full, other than any Professional Claims subject to approval by the Bankruptcy Court.

(d)  Plan Documents.  The Plan, Plan Supplement, Confirmation Order and all documents related thereto shall be in form and substance reasonably acceptable to the Debtors and any conditions precedent thereto shall have been satisfied, waived or satisfied contemporaneously with the occurrence of the Effective Date.

(e)  Necessary Documents.  All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered, as applicable.

(f)  Necessary Authorizations.  All authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved.

(g)  Governmental Action.  No governmental entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan or any of the other transactions contemplated hereby and no governmental entity shall have instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan.

9.2.    Waiver of Conditions

The Debtors may waive conditions to the occurrence of the Effective Date set forth in this Article 9 at any time.

9.3.    Simultaneous Transactions

Except as otherwise expressly set forth in the Plan, the Confirmation Order or a written agreement by the Debtors, each action to be taken on the Effective Date shall be deemed to occur simultaneously as part of a single transaction.

9.4.    Effect of Non-Occurrence of the Effective Date

If the Effective Date does not occur by [•] or such later date as the Debtors determine, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall constitute a waiver or release of any claims by or Claims against or Interests in the Debtors, prejudice in any manner the rights of the Debtors or any other Person, or constitute an admission, acknowledgment, offer or undertaking by the Debtors or any Person.

9.5.    Notice of Effective Date

As soon as practicable after the Effective Date has occurred, the Plan Administrator shall file with the Bankruptcy Court a notice specifying the Effective Date.

## 10.  SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 10.1.  Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account, conform to and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto; however, the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest.

### 10.2.  Non-Discharge of Debtors; Resolution of Claims and Termination of Interests

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge the Debtors.  However, no Holder of a Claim may receive any payment from, or seek recourse against, the Plan Administrator, the Wind Down Estate or any Plan Assets that are to be distributed under the Plan other than Plan Assets required to be distributed to that Holder pursuant to the Plan.  Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Interests under the Plan shall be in full and final satisfaction, settlement, release and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Interests in, the Debtors, any property of the Estates, the Plan Administrator or any property of the Wind Down Estates, including all Claims of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim or Interest based upon such Claim, debt, right, liability, obligation or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, liability, obligation or Interest is Allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of such a Claim, liability, obligation or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

### 10.3.  Release of Liens

**Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and canceled, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Wind Down Estates and their successors and assigns.  Any Holder of such mortgage, deed of trust, Lien, pledge or other security interest (and the applicable agents for such holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence such release, including the execution, delivery and filing or recording of such releases.  The**

presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

10.4. <u>Debtors' Release</u>

Except as otherwise specifically provided in the Plan with respect to the Preserved Potential Claims, for good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases and the implementation of the orderly liquidation contemplated by the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Released Parties are hereby conclusively, absolutely, unconditionally, irrevocably and forever released, waived and discharged by the Debtors, the Plan Administrator and the Estates, including any successor to, or assignee of the Debtors or any Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, breach of contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the release of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act; *provided* that the release under this <u>Section 10.4</u> shall not apply to any Excluded Party, nor to any Preserved Potential Claims to the extent such Preserved Potential Claims are brought by and for the benefit of the Wind Down Estates with the approval of the Plan Administrator, unless otherwise specifically provided in the Plan or the Plan Supplement. Nothing in the Plan or Confirmation shall affect any releases previously granted or approved by the Court.

10.5. Voluntary Release by Holders of Claims and Interests

**For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases, the implementation of the Plan, and the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, breach of contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Plan Administrator or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the Plan Supplement or the Disclosure Statement, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted gross negligence, willful misconduct, fraud, or a criminal act. Nothing in this <u>Section 10.5</u> shall cause the release of any Excluded Party nor any Preserved Potential Claims that are otherwise transferred to, and may be prosecuted by, the Wind Down Estate pursuant to the terms of this Plan.**

10.6. Scope of Releases

**Each Person providing releases under the Plan, including the Debtors, the Plan Administrator, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.**

10.7. <u>Exculpation</u>

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

As of the Effective Date, to the fullest extent permitted by applicable law, and without affecting or limiting the releases set forth in <u>Section 10.4</u> or <u>Section 10.5</u> of this Plan, the Exculpated Parties shall neither have nor incur any liability to any Entity for any act or omission in connection with, related to, or arising out of these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) the administration and adjudication of Claims and Interests during these Chapter 11 Cases; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the Plan, the Disclosure Statement, the Plan Supplement or any related contract, instrument, release or other agreement or document created or entered into in connection with the Chapter 11 Cases (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan, the trading or sale of Cryptocurrencies and tokens in connection with the Chapter 11 Cases, the offer and issuance of any securities under or in connection with the Plan and the distribution of property, Digital Assets, or tokens under the Plan); or (d) any other transaction, agreement, event, or other occurrence related to these Chapter 11 Cases taking place on or before the Effective Date, other than liability resulting from any act or omission that is determined by Final Order to have constituted gross negligence, willful misconduct, fraud or a criminal act. Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party. Nothing in the Plan or Confirmation shall affect any exculpation orders previously granted or approved by the Court.

10.8. <u>Injunction</u>

Except as otherwise expressly provided in the Plan or Confirmation Order with respect to Preserved Potential Claims, the satisfaction and release pursuant to this <u>Article 10</u> shall also act as a permanent injunction against any Person who has held, holds or may hold Claims, Interests or Causes of Action from (a) commencing or continuing any action to collect, enforce, offset, recoup or recover with respect to any Claim, liability, obligation, debt, right, Interest or Cause of Action released, settled or exculpated under the Plan or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including to the extent provided for or authorized by sections 524 or 1141 thereof, (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims or Interests; and (d) asserting any right of setoff, subrogation or recoupment of any kind on account of

or in connection with or with respect to any such Claim or Interest, notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to applicable law or otherwise, against any Plan Asset, the Wind Down Estates, any Holder of a Claim or Interest or any initial or subsequent transferee. Notwithstanding anything to the contrary in the Plan, all Holders of Claims, Interests or Causes of Action are enjoined from interfering with the Distributions contemplated by the Plan and from asserting any Claim or Cause of Action expressly preserved and vested exclusively in the Wind Down Estates as of the Effective Date.

.

10.9. Limitations on Exculpations and Releases

Notwithstanding anything to the contrary herein, none of the releases or exculpations set forth herein shall operate to waive or release any obligation or Causes of Action of any Person or Entity: (a) arising under any contract, instrument, agreement, release or document delivered pursuant to the Plan or documents, agreements or instruments executed in connection therewith, including all post-Effective Date obligations or (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, including the Preserved Potential Claims.

11. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

11.1. Modification of Plan

Subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications with respect to the treatment of Classes 4A, 4B, 4C, 5, 6A, 6B, 6C and 9 to satisfy section 1129(b) of the Bankruptcy Code and (b) after the entry of the Confirmation Order, the Debtors or the Plan Administrator, as applicable, may, upon order of the Bankruptcy Court, (i) amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or (ii) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

11.2. Effect of Confirmation on Modification

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

11.3. Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date and to file subsequent plans of reorganization or liquidation. If the Debtors revoke or withdraw the Plan, if the Confirmation Order is not entered or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise

embodied in the Plan, assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or Claims against, or any Interests in, any Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.



**12.** **RETENTION OF JURISDICTION**

12.1. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain its existing exclusive jurisdiction over all matters arising in or out of, or related to, these Chapter 11 Cases or the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims or Interests;

(b)     Decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)     Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including any disputes regarding cure obligations; and (ii) any dispute regarding whether a contract or lease is, or was, executory or expired;

(d)     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the Plan and adjudicate any and all disputes from, or relating to Distributions under the Plan;

(e)     Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and Causes of Action, including the Preserved Potential Claims, and grant or deny any applications, involving a Debtor that may be pending before the Bankruptcy Court on the Effective Date;

(f)     Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(g)     Enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, Plan Supplement or the Disclosure Statement;

(h)     Enter, adjudicate and enforce any order for the sale of property pursuant to section 363, 1123 or 1146(a) of the Bankruptcy Code

(i)     Adjudicate, decide or resolve any and all disputes as to the ownership of any Claim or Interest;

(j)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with enforcement of the Plan;

(k)     Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the existence, nature and scope of the releases, injunctions and other provisions contained in the Plan, and enter such orders as may be necessary or appropriate to implement and enforce such releases, injunctions and other provisions;

(l)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     Determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Plan Administration Agreement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

(n)     Enter an order or final decree concluding or closing these Chapter 11 Cases;

(o)     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(p)     Hear and determine disputes, cases, controversies or Causes of Action arising in connection with the interpretation, implementation or enforcement of the Plan, including the releases or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(q)     Hear and determine all disputes relating to any liability arising out of the termination of employment or the termination of any employee or retirement benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(r)     Enforce and adjudicate all orders previously entered by the Bankruptcy Court; and

(s)     Hear any other matter not inconsistent with the Bankruptcy Code.

-56-

## 13. MISCELLANEOUS PROVISIONS

### 13.1. Immediate Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Plan Administrator and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 13.2. Additional Documents; Further Assurances

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Plan Administrator and all Holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 13.3. Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Debtor with respect to the Holders of Claims or Interests or any other Entity or (b) any Holder of a Claim or an Interest or any other Entity prior to the Effective Date.

### 13.4. Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 13.5. Term of Injunction or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in these Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

13.6.    Entire Agreement

On the Effective Date, the Plan and the Plan Supplement shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations with respect to the subject matter hereof and thereof, all of which have become merged and integrated into the Plan.

13.7.    Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents may be obtained upon written request to the Debtors' counsel at the address below or by downloading such exhibits and documents from the website of the Debtors' Notice and Claims Agent, at https://restructuring.ra.kroll.com/FTX/ or the Bankruptcy Court's electronic docket for the Debtors' Chapter 11 Cases at https://.ecf.deb.uscourts.gov/ (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.uscourts.gov).  In addition, copies of such exhibits and documents may be requested from the Notice and Claims Agent at (888) 482-0049 (U.S./Canada) or (646) 440-4176 (International).

13.8.    Nonseverability of Plan Provisions upon Confirmation

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (c) nonseverable and mutually dependent.

13.9.    Dissolution of Committee

On the Effective Date, the Committee shall dissolve and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided* that the Committee will stay in existence solely for the limited purpose of (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and (b) motions or litigation, including pending appeals, seeking enforcement of the provisions of the Plan or under the Confirmation Order; *provided, further*, that, with respect to pending appeals and related proceedings, the Committee shall continue to comply with sections 327, 328, 329, 330, 331 and 1103 of the Bankruptcy Code and the Professional Fee Order in seeking compensation for services rendered.

13.10. Termination of Fee Examiner's Appointment

Upon the resolution of all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code by professionals subject to review by the Fee Examiner, the Fee Examiner's appointment shall terminate, and the Fee Examiner shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

13.11. Debtors' Directors and Officers

On the Effective Date, each of the Debtors' directors and officers shall be released and discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

13.12. Post-Confirmation Operating Reports

The Plan Administrator, on behalf of the Debtors and the Wind Down Estates, shall file and serve on the U.S. Trustee quarterly reports of the disbursements made pursuant to the Plan, until each of the Chapter 11 Cases are converted, dismissed or closed by entry of a final decree. Any such reports shall be prepared consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee's guidelines for such matters.

13.13. Closing of Chapter 11 Cases

The Plan Administrator shall, promptly after the full administration of these Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close these Chapter 11 Cases. The Plan Administrator may also, in its reasonable discretion, file the necessary documents to close any individual Debtor's case at any appropriate time.

13.14. Conflicts

Except as set forth in the Plan, to the extent that any provisions of the Disclosure Statement, the Plan Supplement or any order of the Bankruptcy Court (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control. To the extent any provision of the Disclosure Statement, the Plan Supplement or any other document referenced in the Plan (or any exhibits, appendices, supplements or amendments to any of the foregoing) conflicts with or is in any way inconsistent with the Confirmation Order, the Confirmation Order shall govern and control.

13.15. No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

13.16. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

13.17. Post-Effective Date Service

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed renewed requests for service after the Effective Date.

13.18. Notices

All notices, requests, pleadings and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> (a)  If to the Debtors, to:
>
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004
> Attn:  Andrew G. Dietderich
>         James L. Bromley
>         Brian D. Glueckstein
>         Alexa J. Kranzley
>
> and
>
> Landis Rath & Cobb LLP
> 919 Market Street, Suite 1800
> Wilmington, Delaware 19801
> Attn:  Adam Landis
>         Kimberly A. Brown
>         Matthew R. Pierce
>
> (b)  If to the Committee, to:
>
> Paul Hastings LLP
> 200 Park Avenue
> New York, NY 10166
> Attn: Kristopher M. Hansen

Kenneth Pasquale
Erez E. Gilad
Gabriel E. Sasson

and

Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801
Attn:  Matthew B. Lunn
        Robert F. Poppiti, Jr.


(c)      If to the U.S. Trustee, to:

United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Attn: Juliet Sarkessian
        Benjamin A. Hackman

Dated: [•], 2023
Wilmington, Delaware



FTX Trading Ltd., on behalf of itself and all other Debtors

By: *DRAFT*

Name:  John J. Ray III

Title:  Chief Executive Officer and Chief Restructuring Officer

# Exhibit H

United States Bankruptcy Court, District of New Jersey (Trenton)

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|

| ☐ | BlockFi Inc. (Case No. 22-19361) | ☐ | BlockFi Wallet LLC (Case No. 22-19366) | ☐ | BlockFi Investment Products LLC (Case No. 22-19370) |
| ☐ | BlockFi Trading LLC (Case No. 22-19363) | ☐ | BlockFi Ventures LLC (Case No. 22-19367) | ☐ | BlockFi Services Inc. (Case No. 22-19371) |
| ☐ | BlockFi Lending LLC (Case No. 22-19365) | ☒ | BlockFi International Ltd. (Case No. 22-19368) | ☐ | BlockFi Lending II LLC (Case No. 22-19374) |

Modified Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | Alameda Research Ltd. on behalf of all FTX Debtors (as defined in the Addendum) |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☑ No |
|---|---|---|
| | | ☐ Yes. From whom? _____ |

| 3. | Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | | Where should payments to the creditor be sent? (if different) |
|---|---|---|---|---|
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Address1: Brian Glueckstein | | Address1: |
| | | Address2: C/O Sullivan & Cromwell LLP | | Address2: |
| | | Address3: | | Address3: |
| | | Address4: | | Address4: |
| | | City: New York | | City: |
| | | State: NY | | State: |
| | | Postal Code: 10004 | | Postal Code: |
| | | Country: | | Country: |
| | | Contact phone 2125584000 | | Contact phone |
| | | Contact email gluecksteinb@sullcrom.com | | Contact email |

| 4. | Does this claim amend one already filed? | ☑ No |
|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| **7.  How much is the claim?** | $ <u>See attached Addendum.</u>  **Does this amount include interest or other charges?**<br>☐ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>See attached Addendum. |

| | |
|---|---|
| **9. Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**                          $_____<br><br>**Amount of the claim that is secured:**        $_____<br><br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**   $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| **10. Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____ |

| | |
|---|---|
| **11. Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| | |
|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check one:*   **Amount entitled to priority**<br><br>☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $_____<br><br>☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $_____<br><br>☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $_____<br><br>☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $_____<br><br>☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $_____<br><br>☐ Other. Specify subsection of 11 U.S.C. § 507(a)(____) that applies.   $_____<br><br>* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. |
| **13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**   $_____ |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

BG /AT          03/31/2023

_____          _____
Electronic Signature          Date

**Name of the person who is completing and signing this claim**

| | | | |
|---|---|---|---|
| Name | Brian | D. | Glueckstein |
| | First name | Middle name | Last name |
| Title | Partner | | |
| Company | Sullivan & Cromwell LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 125 Broad Street | | |
| | Number          Street | | |
| | New York | NY | 10004 |
| | City | State          ZIP Code | Country |
| Contact phone | 2125884000 | Email | gluecksteinb@sullcrom.com |

**Proof of Claim**          page 3

**Additional Noticing Addresses (if provided):**

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:

City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

---

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
 Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Supporting Documentation Provided**

☑ Yes

☐ No

-----------------------------------------------------------------------------------------------------------

Attachment Filename:

BlockFi POC Addendum (FILING VERSION) (4856-5426-1594.2).pdf

**KROLL**

**<u>Addendum</u>**

**ADDENDUM TO PROOF OF CLAIM OF FTX TRADING LTD., ALAMEDA
RESEARCH LTD., WEST REALM SHIRES INC., WEST REALM SHIRES SERVICES
INC. AND THEIR AFFILIATED DEBTORS-IN-POSSESSION AGAINST BLOCKFI,
INC., BLOCKFI TRADING LLC, BLOCKFI LENDING LLC, BLOCKFI WALLET
LLC, BLOCKFI VENTURES LLC, BLOCKFI INTERNATIONAL LTD., BLOCKFI
INVESTMENT PRODUCTS LLC, BLOCKFI SERVICES, INC. AND BLOCKFI
LENDING II LLC**

FTX Trading Ltd., Alameda Research Ltd. ("Alameda"), West Realm Shires Inc.
("WRS"), West Realm Shires Services Inc. ("WRSS") and their affiliated debtors-in-possession
as set forth in Exhibit A (collectively, the "FTX Debtors") hereby submit this proof of claim (this
"Proof of Claim") against Debtors BlockFi, Inc., BlockFi Trading LLC, BlockFi Lending LLC,
BlockFi Wallet LLC, BlockFi Ventures LLC, BlockFi International Ltd., BlockFi Investment
Products LLC, BlockFi Services, Inc. and BlockFi Lending II LLC (collectively, the "Debtors")
in the jointly administered chapter 11 case captioned *In re BlockFi Inc., et al.*, Case No. 22-
19361 (MBK) pending in the United States Bankruptcy Court for the District of New Jersey (the
"Bankruptcy Court") in accordance with the *Order (I) Setting Bar Dates for Submitting Proofs of
Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III) Approving Notice
Thereof, and (IV) Granting Related Relief* [Dkt. No. 440].

On November 9 and November 11, 2022, as applicable, each of the FTX Debtors
filed voluntary petitions for relief under title 11 of the United States Bankruptcy Code (the
"Bankruptcy Code").[1]  Those chapter 11 cases are being jointly administered in the case of *In re
FTX Trading Ltd.*, Case No. 22-11068 (JTD) pending in the United States Bankruptcy Court for
the District of Delaware (the "FTX Chapter 11 Cases").  No trustee has been appointed for the
FTX Debtors in the FTX Chapter 11 Cases, and the FTX Debtors continue to operate their
businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a)
and 1108 of the Bankruptcy Code.  The FTX Debtors' claims (the "Claims") against the Debtors,
as applicable and as set forth below, arise out of the following facts and circumstances.[2]

I.      **CLAIMS**

A.  **Claim for Outstanding Amounts Due Under Loan Agreement**

On June 30, 2022, Debtor BlockFi Inc., as borrower, entered into that certain
Loan Agreement (the "Loan Agreement"), with WRS, as lender, pursuant to which WRS agreed
to provide Debtor BlockFi Inc. with a revolving credit facility of up to $400 million (the
"Loans").  BlockFi Inc.'s obligations under the Loan Agreement were guaranteed by Debtor
BlockFi Trading LLC and Debtor BlockFi Lending LLC (the "BlockFi Guarantors").

As of November 28, 2022, which is the date on which the Debtors filed their
petitions for relief under the Bankruptcy Code, WRS was owed $275 million outstanding under
the Loan Agreement, plus amounts presently unliquidated consisting of, among other amounts,

---

[1]   November 9 is the petition date for each of the FTX Debtors, except for West Realm Shires, Inc.

[2]   For the avoidance of doubt, this Proof of Claim and each of the Claims herein are asserted against the specified
      Debtors on behalf of each of the FTX Debtors, and each of the FTX Debtors expressly reserves all rights with
      respect to all claims, defenses, setoff and other causes of action against the Debtors.

accrued and unpaid interest of not less than $4.6 million under the Loan Agreement[3] and all other amounts due or to become due to WRS under the terms of the Loan Agreement (collectively, the "Loan Claim"). Accordingly, WRS and any other relevant FTX Debtors assert the presently unliquidated Loan Claim against each of Debtor BlockFi Inc., as borrower, Debtor BlockFi Trading LLC, as guarantor, and Debtor BlockFi Lending LLC, as guarantor.

### B. Claims for Avoidance of Payments Under Loan Agreements

On June 15, 2019, Alameda and Debtor BlockFi Lending LLC entered into that certain Master Digital Currency Loan Agreement ("MDLA") pursuant to which Debtor BlockFi Lending LLC agreed to lend Alameda certain digital currency. On August 14, 2020, Alameda and Debtor BlockFi International LLC entered into that certain Master Loan Agreement ("BlockFi Intl. MLA") pursuant to which Debtor BlockFi International LLC agreed to lend Alameda certain digital currency, US dollars or other currencies. On January 26, 2022, Alameda and Debtor BlockFi International Ltd. entered into that certain Amended and Restated Master Loan Agreement (the "Amended MLA", together with the MDLA and the BlockFi Intl. MLA, the "Alameda MLAs"), pursuant to which Debtor BlockFi International Ltd agreed to lend Alameda certain digital currency, US dollars or other currencies.

During the 90-day period prior to the commencement of the FTX Chapter 11 Cases, Alameda made certain payments under the Alameda MLAs to Debtor BlockFi Lending in the aggregate amount of $124,423,552 and to Debtor BlockFi International LLC in the aggregate amount of $7,825,017 (the "Alameda Repayments"). The Alameda Repayments constitute preferential transfers under Section 547 of the Bankruptcy Code and are subject to avoidance by Alameda under Section 550(a) of the Bankruptcy Code (the "Repayment Avoidance Claim").

Alameda and any other relevant FTX Debtors accordingly assert the Repayment Avoidance Claim against each of Debtor BlockFi Lending LLC and Debtor BlockFi International Ltd, and any other Debtor that is an immediate or mediate transferee of the Alameda Repayments.

### C. Claims for Avoidance Relating to Pledges of Certain Collateral under the Alameda MLAs

During the 90-day period prior to the commencement of the FTX Chapter 11 Cases, Alameda made certain pledges of collateral under the Alameda MLAs to Debtor BlockFi Lending in the aggregate amount of $147,755,170; to Debtor BlockFi International LLC in the aggregate amount of $24,687,432 and to Debtors whose identities remain unconfirmed in the aggregate amount of $141,625,004 (the "MLA Collateral Pledges"). The Alameda Collateral Pledges constitute preferential transfers under Section 547 of the Bankruptcy Code and are

---

[3]    Under the terms of the Loan Agreement, the outstanding principal balance under the Loan Agreement accrues interest at a rate equal to five percent (5.0%) per annum, payable at maturity.

subject to avoidance by Alameda under Section 550(a) of the Bankruptcy Code (the "MLA Collateral Pledge Avoidance Claim").[4]

Alameda and any other relevant FTX Debtors accordingly assert the MLA Collateral Pledge Avoidance Claim against each of Debtor BlockFi Lending LLC and Debtor BlockFi International Ltd, and any other Debtor that is an immediate or mediate transferee of the MLA Collateral Pledges.

### D. Claims Relating to Pledges of Certain Collateral Pursuant to Pledge Agreements

On November 9, 2022, Emergent Fidelity Technologies Ltd. ("Emergent"), an affiliate of the FTX Debtors, Debtor BlockFi Lending LLC and Debtor BlockFi International purportedly entered into a Pledge Agreement pursuant to which Emergent purported to pledge approximately 56 million shares of Robinhood Markets, Inc. Class A common stock and proceeds related thereto (the "Emergent Pledge"), contained in an brokerage account at ED&F Man Capital Markets, Inc. (n/k/a Marex Capital Markets Inc.) ("EDFM"). The Emergent Pledge was made to secure loans owed by FTX Debtor Alameda, and consists of assets either owned by Alameda or purchased with funds belonging to Alameda. The Emergent Pledge is avoidable pursuant to sections 547 and 548 of the Bankruptcy Code, and subject to recovery by the FTX Debtors pursuant to section 550 of the Bankruptcy Code.

Also on November 9, 2022, Alameda purported to enter into a Pledge Agreement pursuant to which Alameda purported to pledge securities and other assets in an Alameda account held in an account at EDFM (the "Alameda Pledge"). The facts and circumstances concerning the Alameda Pledge, made at the direction of Samuel Bankman-Fried, establish that the Alameda Pledge is avoidable pursuant to section 547 and 548 of the Bankruptcy Code, and subject to recovery by the FTX Debtors pursuant to section 550 of the Bankruptcy Code.

The total amount of avoidable pledges combined between the Emergent Pledge and the Alameda Pledge exceeds $1 billion as of the time of the transfers.

Alameda and any other relevant FTX Debtors assert all presently unliquidated claims relating to the Emergent Pledge and the Alameda Pledge.

### E. Claims Relating to Withdrawals of FTX.com Exchange Assets

Prior to the commencement of the FTX Chapter 11 Cases, Debtors BlockFi Lending LLC and BlockFi International Ltd. held certain assets on the digital exchanges operated by the FTX Debtors (the "Exchange Assets"). During the 90-day period prior to the commencement of the FTX Chapter 11 Cases, Debtor BlockFi Lending LLC withdrew Exchange Assets in the aggregate amount of $25,000,362 and Debtor BlockFi International Ltd. withdrew Exchange Assets in the aggregate amount of $3,585,787,270 (the "Exchange Withdrawals"). The Exchange Withdrawals constitute preferential transfers under Section 547 of the Bankruptcy Code and are subject to avoidance by the FTX Debtors under 550(a) of the Bankruptcy Code (the "Exchange Withdrawal Claim").

---

[4]    In addition to the MLA Collateral Pledges, all collateral held by the Debtors under the Alameda MLAs as of the commencement of the FTX Chapter 11 Cases is set forth in Exhibit B.

FTX Trading Limited and WRSS, along with any other relevant FTX Debtors, accordingly assert the Exchange Withdrawal Claim against each of Debtor BlockFi Lending LLC and Debtor BlockFi International Ltd, and any other Debtor that is an immediate or mediate transferee of the Exchange Withdrawals.

### F.  Claim for Damages Relating to Option Agreement

On June 30, 2022, WRS, FTX Trading Ltd., Debtor BlockFi Inc. and certain equity holders of Debtor BlockFi Inc. entered into that certain Option Agreement (the "Option Agreement"), pursuant to which WRS acquired an exclusive option to acquire equity securities of Debtor BlockFi Inc.  The FTX Debtors, including, for the avoidance of doubt, WRS and FTX Trading Ltd., assert presently unliquidated claims against each of the Debtors including, without limitation, for damages arising from any Debtors' misrepresentations and improper disclosures in connection with, and inducing WRS and FTX Trading Ltd. to enter into, the Loan Agreement and the Option Agreement.

## II.      ADMINISTRATIVE EXPENSE CLAIMS

This Proof of Claim is without prejudice to claims, if any, that the FTX Debtors have or may have for payment of any administrative expenses allowable under section 503(b) of the Bankruptcy Code or otherwise, whether or not such amounts are included in this Proof of Claim, and the FTX Debtors' rights to file such claims or any similar claims at an appropriate time are expressly reserved.

## III.     ADDITIONAL OR SUPPLEMENTAL PROOFS OF CLAIM

This Proof of Claim is filed without prejudice to the filing by, or on behalf of, the FTX Debtors or its affiliates, of additional or supplemental claims or proofs of claim with respect to these claims or any other liability or indebtedness of the Debtors as more information becomes available.

## IV.      NO WAIVER

The filing of this Proof of Claim is not and should not be construed to be: (a) a waiver or release any of the FTX Debtors' rights against any of the Debtors or any other entity or person liable for all or part of any of the claims described herein, including, but not limited to, those owned by or affiliated with any of the Debtors; (b) a submission of jurisdiction to the Bankruptcy Court for adjudication of any of the claims set forth herein; (c) a waiver of the right to seek to have the reference withdrawn with respect to (i) the subject matter of this Proof of Claim, (ii) any objection or other proceedings commenced with respect thereto, or (iii) any other proceedings commenced in these bankruptcy cases against or otherwise involving any of the FTX Debtors; (d) a waiver of any right to the subordination, in favor of the FTX Debtors, of indebtedness or liens held by creditors of any of the Debtors; (e) a waiver or release of rights to setoff or recoupment; or (f) to elect remedies or choice of law.  The FTX Debtors expressly reserve all rights and remedies to satisfy the Claims.

4895-8609-2120 v.5

## V.        RESERVATION OF RIGHTS

This Proof of Claim is filed with full reservation of rights, including the right to assert a claim for additional amounts, the right to file additional or other pleadings to assert any of the amounts set forth in the Claims, the right to pursue the Claims based upon additional or alternative legal theories, and the right to assert additional, supplementary, and/or amended proofs of claim and requests for administrative expense reimbursements based on events, information, and/or documents obtained from the Debtors or others through discovery or otherwise. Without in any way limiting the foregoing, the FTX Debtors' rights to assert any claims that it may have against the Debtors, or against any other party or property other than the Debtors and their estates, are expressly reserved. To the extent that any of the Debtors or any other party takes any action that would give rise to a counterclaim or other rights or claims that the FTX Debtors may have against any of the Debtors, the FTX Debtors reserve all of their rights. By filing this Proof of Claim, the FTX Debtors do not waive, and specifically reserve, their respective procedural and substantive defenses to any claim that may be asserted against the FTX Debtors by any of the Debtors, by any trustee of their estates, by any official committee, or by any other party. This Proof of Claim is not intended, nor should it be construed, as the FTX Debtors' consent to jurisdiction in the Bankruptcy Court for any purpose other than with respect to this Proof of Claim, or as a waiver of the FTX Debtors' right to a trial by jury in any action or proceeding.

The FTX Debtors reserve the right to attach, produce and/or rely upon additional documentation that supports the Claims and any additional documents that may become available after further investigation or discovery, or upon request of any of the Debtors. Nothing contained in this Proof of Claim shall limit the rights of the FTX Debtors to file papers or pleadings, or commence any proceedings, or take any actions concerning the Claims.

## VI.        NOTICE

All matters concerning this Proof of Claim, including any request for information concerning this Proof of Claim, should be addressed as follows:

FTX Trading Ltd. and its affiliated Debtors
c/o Sullivan & Cromwell LLP
Attn:    Andrew G. Dietderich
         Brian D. Glueckstein
         Benjamin S. Beller
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Fax: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        gluecksteinb@sullcrom.com
        bellerb@sullcrom.com

4895-8609-2120 v.5

**Exhibit A**

**FTX Debtors**

1.    Alameda Aus Pty Ltd, a company organized under the laws of Australia.

2.    Alameda Global Services Ltd., a company organized under the laws of the British Virgin Islands.

3.    Alameda Research (Bahamas) Ltd, a company organized under the laws of the Bahamas.

4.    Alameda Research Holdings Inc., a corporation organized under the laws of the state of Delaware.

5.    Alameda Research KK, a company organized under the laws of Japan.

6.    Alameda Research LLC, a limited liability company organized under the laws of the state of Delaware.

7.    Alameda Research Ltd, a company organized under the laws of the British Virgin Islands.

8.    Alameda Research Pte Ltd, a company organized under the laws of Singapore.

9.    Alameda Research Yankari Ltd, a company organized under the laws of Nigeria.

10.    Alameda TR Ltd, a company organized under the laws of Antigua and Barbuda.

11.    Alameda TR Systems S. de R. L., a company organized under the laws of Panama.

12.    Allston Way Ltd, a company organized under the laws of Antigua and Barbuda.

13.   Analisya Pte Ltd, a company organized under the laws of Singapore.

14.   Atlantis Technology Ltd., a company organized under the laws of Antigua and Barbuda.

15.   Bancroft Way Ltd, a company organized under the laws of Antigua and Barbuda.

16.   Blockfolio, Inc., a corporation organized under the laws of the state of Delaware.

17.   Blue Ridge Ltd, a company organized under the laws of Antigua and Barbuda.

18.   Cardinal Ventures Ltd, a company organized under the laws of Antigua and Barbuda.

19.   Cedar Bay Ltd, a company organized under the laws of Antigua and Barbuda.

20.   Cedar Grove Technology Services, Ltd, a company organized under the laws of Antigua and Barbuda.

21.   Clifton Bay Investments LLC, a limited liability company organized under the laws of the state of Delaware.

22.   Clifton Bay Investments Ltd, a company organized under the laws of the British Virgin Islands.

23.   Cottonwood Grove Ltd, a company organized under the laws of Hong Kong.

24.   Cottonwood Technologies Ltd., a company organized under the laws of Antigua and Barbuda.

25.   Crypto Bahamas LLC, a limited liability company organized under the laws of the state of Delaware.

26.     DAAG Trading, DMCC, a company organized under the laws of UAE.

27.     Deck Technologies Holdings LLC, a limited liability company organized under the laws
        of the state of Delaware.

28.     Deck Technologies Inc., a corporation organized under the laws of the state of Delaware.

29.     Deep Creek Ltd, a company organized under the laws of Antigua and Barbuda.

30.     Digital Custody Inc., a corporation organized under the laws of the state of Delaware.

31.     Euclid Way Ltd, a company organized under the laws of Antigua and Barbuda.

32.     FTX (Gibraltar) Ltd, a company organized under the laws of Gibraltar.

33.     FTX Canada Inc, a company organized under the laws of Canada.

34.     FTX Certificates GmbH, a company organized under the laws of Switzerland.

35.     FTX Crypto Services Ltd., a company organized under the laws of Cyprus.

36.     FTX Digital Assets LLC, a limited liability company organized under the laws of the
        state of Delaware.

37.     FTX Digital Holdings (Singapore) Pte Ltd, a company organized under the laws of
        Singapore.

38.     FTX EMEA Ltd., a company organized under the laws of Cyprus.

39.     FTX Equity Record Holdings Ltd, a company organized under the laws of Seychelles.

40.     FTX EU Ltd., a company organized under the laws of Cyprus.

41.     FTX Europe AG, a company organized under the laws of Switzerland.

42.     FTX Exchange FZE, a company organized under the laws of UAE.

43.     FTX Hong Kong Ltd, a company organized under the laws of Hong Kong.

44.     FTX Japan Holdings K.K., a company organized under the laws of Japan.

45.     FTX Japan K.K., a company organized under the laws of Japan.

46.     FTX Japan Services KK, a company organized under the laws of Japan.

47.     FTX Lend Inc., a corporation organized under the laws of the state of Delaware.

48.     FTX Marketplace, Inc., a corporation organized under the laws of the state of Delaware.

49.     FTX Products (Singapore) Pte Ltd, a company organized under the laws of Singapore.

50.     FTX Property Holdings Ltd, a company organized under the laws of the Bahamas.

51.     FTX Services Solutions Ltd., a company organized under the laws of the British Virgin

        Islands.

52.     FTX Structured Products AG, a company organized under the laws of Liechtenstein.

53.     FTX Switzerland GmbH, a company organized under the laws of Switzerland.

54.     FTX Trading GmbH, a company organized under the laws of Germany.

55.     FTX Trading Ltd, a company organized under the laws of Antigua and Barbuda.

-4-

56.    FTX US Services, Inc., a corporation organized under the laws of the state of Delaware.

57.    FTX US Trading, Inc., a corporation organized under the laws of the state of Delaware.

58.    FTX Ventures Ltd, a company organized under the laws of the British Virgin Islands.

59.    FTX Zuma Ltd, a company organized under the laws of Nigeria.

60.    GG Trading Terminal Ltd, a company organized under the laws of Ireland.

61.    Global Compass Dynamics Ltd., a company organized under the laws of Antigua and Barbuda.

62.    Good Luck Games, LLC, a limited liability company organized under the laws of the state of Washington.

63.    Goodman Investments Ltd., a company organized under the laws of the British Virgin Islands.

64.    Hannam Group Inc, a company organized under the laws of Korea.

65.    Hawaii Digital Assets Inc., a corporation organized under the laws of the state of Delaware.

66.    Hilltop Technology Services LLC, a limited liability company organized under the laws of the state of Delaware.

67.    Hive Empire Trading Pty Ltd, a company organized under the laws of Australia.

68.    Innovatia Ltd, a company organized under the laws of Cyprus.

4895-8609-2120 v.5

69.     Island Bay Ventures Inc, a corporation organized under the laws of the state of Delaware.

70.     Killarney Lake Investments Ltd, a company organized under the laws of the British Virgin Islands.

71.     Ledger Holdings Inc., a corporation organized under the laws of the state of Delaware.

72.     LedgerPrime Bitcoin Yield Enhancement Fund, LLC, a limited liability company organized under the laws of the state of Delaware.

73.     LedgerPrime Bitcoin Yield Enhancement Master Fund LP, a company organized under the laws of the Cayman Islands.

74.     LedgerPrime Digital Asset Opportunities Fund, LLC, a limited liability company organized under the laws of the state of Delaware.

75.     LedgerPrime Ventures, LP, a company organized under the laws of the Cayman Islands.

76.     Ledger Prime LLC, a limited liability company organized under the laws of the state of Delaware.

77.     LedgerPrime Digital Asset Opportunities Master Fund LP, a company organized under the laws of the Cayman Islands.

78.     Liquid Financial USA Inc, a company organized under the laws of the state of Delaware.

79.     LiquidEX LLC, a limited liability company organized under the laws of the state of New York.

80.     Liquid Securities Singapore Pte Ltd, a company organized under the laws of Singapore.

81.    LT Baskets Ltd., a company organized under the laws of Antigua and Barbuda.

82.    Maclaurin Investments Ltd., a company organized under the laws of Seychelles.

83.    Mangrove Cay Ltd, a company organized under the laws of Antigua and Barbuda.

84.    North Dimension Inc, a corporation organized under the laws of the state of Delaware.

85.    North Dimension Ltd, a company organized under the laws of the British Virgin Islands.

86.    North Wireless Dimension Inc, a corporation organized under the laws of the state of Delaware.

87.    Paper Bird Inc, a corporation organized under the laws of the state of Delaware.

88.    Pioneer Street Inc., a corporation organized under the laws of the state of Delaware.

89.    Quoine India Pte Ltd, a company organized under the laws of India.

90.    Quoine Pte Ltd, a company organized under the laws of Singapore.

91.    Quoine Vietnam Co. Ltd, a company organized under the laws of Vietnam.

92.    Strategy Ark Collective Ltd., a company organized under the laws of Antigua and Barbuda.

93.    Technology Services Bahamas Limited, a company organized under the laws of the Bahamas.

94.    Verdant Canyon Capital LLC, a limited liability company organized under the laws of the state of Delaware.

-7-

95.     West Innovative Barista Ltd., a company organized under the laws of Antigua and
        Barbuda.

96.     West Realm Shires Financial Services Inc., a corporation organized under the laws of the
        state of Delaware.

97.     West Realm Shires Inc., a corporation organized under the laws of the state of Delaware.

98.     West Realm Shires Services Inc., a corporation organized under the laws of the state of
        Delaware.

99.     Western Concord Enterprises Ltd., a company organized under the laws of Antigua and
        Barbuda.

100.    Zubr Exchange Ltd, a company organized under the laws of Gibraltar.

4895-8609-2120 v.5

### Exhibit B

**Alameda MLAs Collateral**

| Collateral | BlockFi International | BlockFi Lending |
|---|---|---|
| FTT | 74,212,285.170 | 29,216,912.283 |
| SOL | 1,000,000 | |
| SRM | 38,910,505 | |

Electronic Proof of Claim Confirmation:  **3275-1-LHNMU-947033362**

Claim Electronically Submitted on (UTC) :  **2023-03-31T19:54:59.767Z**

Submitted by:  **Alameda Research Ltd. on behalf of all FTX Debtors**
**gluecksteinb@sullcrom.com**

# Exhibit I



# UNITED STATES OF AMERICA

SECURITIES AND EXCHANGE COMMISSION

# ATTESTATION

IT IS HEREBY ATTESTED THAT:

The attached SC 13D was received in this Commission on 2022-05-12, under the name of
Robinhood Markets, Inc., File No. 005-92819, pursuant to the relevant Act(s) of the Commission.

This certified document (ID e90568a2-5f12-4bf7-90bc-f921e7647091) was produced from the
files of this Commission on

For the Commission

| |
|---|
| Tue Dec 13 2022 |
| *Date* |

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission,
Washington, DC, which Commission was created by the Securities Exchange Act of 1934 (15
U.S.C. 78a et seq.) is official custodian of the records and files of said Commission and was such
official custodian at the time of executing the above attestation.

Secretary

SEC 334 (3-19)

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C.  20549

# SCHEDULE 13D

Under the Securities Exchange Act of 1934

# Robinhood Markets, Inc.

(Name of Issuer)

Class A Common Stock, par value $0.0001 per share
(Title of Class of Securities)

770700102
(CUSIP Number)

Ryne Miller
60 Broad Street, Suite 2501
New York, NY 10004
(405) 517-7570

(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)

May 2, 2022
(Date of Event Which Requires Filing of This Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☐

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

SCHEDULE 13D

| 1 | **NAMES OF REPORTING PERSONS**<br><br>Emergent Fidelity Technologies Ltd. | |
|---|---|---|
| 2 | **CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP** | (a) ☐<br>(b) ☒ |
| 3 | **SEC USE ONLY** | |
| 4 | **SOURCE OF FUNDS (SEE INSTRUCTIONS)**<br><br>WC | |
| 5 | **CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(D) OR 2(E)** | ☐ |
| 6 | **CITIZENSHIP OR PLACE OF ORGANIZATION**<br><br>Antigua and Barbuda | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7 | **SOLE VOTING POWER**<br><br>0 |
|---|---|---|
| | 8 | **SHARED VOTING POWER**<br><br>56,273,469 |
| | 9 | **SOLE DISPOSITIVE POWER**<br><br>0 |
| | 10 | **SHARED DISPOSITIVE POWER**<br><br>56,273,469 |

| 11 | **AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON**<br><br>56,273,469 | |
|---|---|---|
| 12 | **CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS)** | ☐ |
| 13 | **PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)**<br><br>7.6% | |
| 14 | **TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)**<br><br>FI | |

CUSIP No.: 770700102  SCHEDULE 13D  Page 3 of 7 pages

| 1 | **NAMES OF REPORTING PERSONS**<br><br>Samuel Benjamin Bankman-Fried | |
|---|---|---|
| 2 | **CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP** | (a) ☐<br>(b) ☒ |
| 3 | **SEC USE ONLY** | |
| 4 | **SOURCE OF FUNDS (SEE INSTRUCTIONS)**<br><br>AF | |
| 5 | **CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(D) OR 2(E)** | ☐ |
| 6 | **CITIZENSHIP OR PLACE OF ORGANIZATION**<br><br>United States | |

| **NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH** | 7 | **SOLE VOTING POWER**<br><br>0 |
|---|---|---|
| | 8 | **SHARED VOTING POWER**<br><br>56,273,469 |
| | 9 | **SOLE DISPOSITIVE POWER**<br><br>0 |
| | 10 | **SHARED DISPOSITIVE POWER**<br><br>56,273,469 |

| 11 | **AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON**<br><br>56,273,469 | |
|---|---|---|
| 12 | **CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES (SEE INSTRUCTIONS)** | ☐ |
| 13 | **PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)**<br><br>7.6% | |
| 14 | **TYPE OF REPORTING PERSON (SEE INSTRUCTIONS)**<br><br>IN | |

## Item 1. Security and Issuer

This statement on Schedule 13D (this "Statement") relates to the Class A Common Stock, $0.00001 par value per share (the "Shares"), of Robinhood Markets, Inc., a Delaware corporation (the "Issuer"). The address of the principal executive offices of the Issuer is 85 Willow Road, Menlo Park, California 94025, U.S.A.

## Item 2. Identity and Background

This Statement is filed on behalf of each of the following persons (collectively, the "Reporting Persons"): Emergent Fidelity Technologies Ltd. a company incorporated under the laws of Antigua and Barbuda ("Emergent"), and Samuel Benjamin Bankman-Fried, a United States citizen. This Statement relates to the Shares held by Emergent.

The principal business address of Emergent is Unit 3B Bryson's Commercial Complex, Friars Hill Road, St. Johns, Antigua. The principal business of Emergent is the making of investments in securities and other assets. Mr. Bankman-Fried is the sole director and majority owner of Emergent. The principal business addresses of Mr. Bankman-Fried are 27 Veridian Corporate Center, Western Road, New Providence, Nassau, Bahamas and 167 N Green St, Floor 11 Suite 2, Chicago IL 60607. Mr. Bankman-Fried is the co-founder and Chief Executive Officer of each of FTX Trading Ltd. and West Realm Shires Services Inc. d/b/a FTX US. The agreement between the Reporting Persons to file this Statement jointly in accordance with Rule 13d-1(k) under the Exchange Act is attached as Exhibit 1 hereto.

During the last five years, none of the Reporting Persons has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or has been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

## Item 3. Source and Amount of Funds or Other Consideration

The responses to Items 4, 5 and 6 of this Statement are incorporated herein by reference.

The Shares reported herein were purchased by Emergent using working capital. The total purchase price for the Shares reported herein was $648,293,886.33. All or part of the Shares owned by the Reporting Persons may from time to time be pledged with one or more banking institutions or brokerage firms as collateral for loans made by such bank(s) or brokerage firm(s) to the Reporting Persons. Such indebtedness may be refinanced with other banks or broker dealers.

## Item 4. Purpose of Transaction

The responses to Items 3, 5 and 6 of this Statement are incorporated herein by reference.

The Reporting Persons acquired the Shares in the belief that the Shares represent an attractive investment. The Reporting Persons intend to hold the Shares as an investment, and do not currently have any intention of taking any action toward changing or influencing the control of the Issuer, participating in any transaction having that purpose or effect or taking any action listed in Item 4 of Schedule 13D. The Reporting Persons review their investments on an ongoing basis, including their investment in the Issuer. As a result of that review, and depending on many factors, the Reporting Persons may from time to time engage in discussions as a stockholder with representatives of the Issuer, other stockholders of the Issuer or third parties regarding the performance of the Issuer and its business and investment returns. Additionally, although the Reporting Persons currently have no  intention to do so, in the future, and based on circumstances as they may develop, the Reporting Persons might determine to take other actions with respect to their investment in the Issuer as they deem appropriate, including, without limitation: reviewing options for enhancing stockholder value through, among other things, various strategic alternatives or operational or management initiatives; acquiring additional Shares and/or other securities of the Issuer or securities that are based upon or relate to the value of the Shares or otherwise relate to the Issuer (collectively, "Securities"), or disposing of, hedging or otherwise transacting in Securities; and proposing or considering, or changing their intention with respect to, one or more of the actions described in Item 4 of Schedule 13D.

-4-

**Item 5. Interest in Securities of the Issuer**

(a) – (b) Each of Emergent and Mr. Bankman-Fried may be deemed the beneficial owner of all of the Shares reported herein, which represent approximately 7.6% of the Issuer's outstanding Shares. The percentage in the immediately preceding sentence is calculated based on a total of 743,881,607 Shares issued and outstanding as of April 29, 2022, as reported in the Issuer's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on May 6, 2022.

(c) Except as set forth on Exhibit 2 attached hereto, there have been no transactions with respect to the Shares during the sixty days prior to the date hereof by any of the Reporting Persons.

(d) In addition to the Reporting Persons, members of Emergent may have the right to participate in the receipt of dividends from, or proceeds from the sale of, the Shares reported herein in accordance with their respective membership percentages.

(e) Not applicable.

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

Not applicable.

**Item 7. Materials to be Filed as Exhibits**

| Exhibit Number | Description |
|---|---|
| 1 | Joint Filing Agreement between Emergent Fidelity Technologies Ltd. and Samuel Benjamin Bankman-Fried. |
| 2 | Transactions in the Shares effected in the past 60 days. |

**SIGNATURES**

After reasonable inquiry and to the best of the undersigned's knowledge and belief, each of the undersigned certifies that the information set forth in this statement is true, complete and correct.

Dated: May 12, 2022

**Emergent Fidelity Technologies Ltd.**

By: /s/Samuel Benjamin Bankman-Fried
     Name: Samuel Benjamin Bankman-Fried
     Title:  Director

**Samuel Benjamin Bankman-Fried**

By: /s/Samuel Benjamin Bankman-Fried

-6-

**EXHIBIT INDEX**

| Exhibit Number | Description |
| --- | --- |
| 1 | Joint Filing Agreement between Emergent Fidelity Technologies Ltd. and Samuel Benjamin Bankman-Fried. |
| 2 | Transactions in the Shares effected in the past 60 days. |

Exhibit 1

**AGREEMENT**
**JOINT FILING OF SCHEDULE 13D**

The undersigned hereby agree to jointly prepare and file with regulatory authorities this Schedule 13D and any future amendments thereto reporting each of the undersigned's ownership of securities of Robinhood Markets, Inc., and hereby affirm that such Schedule 13D is being filed on behalf of each of the undersigned pursuant to and in accordance with the provisions of Rule 13d-1(k) under the Securities Exchange Act of 1934. The undersigned acknowledge that each shall be responsible for the timely filing of such amendments, and for the completeness and accuracy of the information concerning him or it contained therein, but shall not be responsible for the completeness and accuracy of the information concerning the other, except to the extent that he or it knows or has reason to believe that such information is inaccurate.

Date: May 12, 2022                    **Emergent Fidelity Technologies Ltd.**

                                      By:   /s/ Samuel Benjamin Bankman-Fried
                                            Name: Samuel Benjamin Bankman-Fried
                                            Title:  Director

Date: May 12, 2022                    **Samuel Benjamin Bankman-Fried**

                                      By:   /s/ Samuel Benjamin Bankman-Fried

**Exhibit 2**

## TRANSACTIONS

The following table sets forth all transactions with respect to Shares effected in the last 60 days by or on behalf of the Reporting Persons, inclusive of any transactions effected through 4:00 p.m., New York City time, on May 12, 2022. All such transactions were open-market purchases of Shares made through an affiliate of the Reporting Persons that transferred such Shares to Emergent Fidelity Technologies Ltd. at those Shares' respective purchase prices. The Reporting Persons undertake to provide, upon request of the staff of the Securities and Exchange Commission, full information regarding the number of Shares purchased at each separate price within the price ranges set forth on the table below.

| Transaction Date | Buy/Sell | Quantity | Weighted Avg. Price | Price Range |
|---|---|---|---|---|
| 03/14/2022 | Buy | 800,000 | 10.7092 | 10.4450 – 11.1300 |
| 03/15/2022 | Buy | 800,000 | 10.8915 | 10.5050 – 11.1100 |
| 03/16/2022 | Buy | 800,000 | 12.5464 | 11.9300 – 12.8400 |
| 03/17/2022 | Buy | 800,000 | 13.4212 | 12.7200 – 13.7000 |
| 03/22/2022 | Buy | 400,000 | 13.5252 | 13.2950 – 13.8500 |
| 03/23/2022 | Buy | 800,000 | 13.1211 | 12.8200 – 13.3350 |
| 03/24/2022 | Buy | 600,000 | 12.9467 | 12.8250 – 13.0400 |
| 03/25/2022 | Buy | 400,000 | 12.4069 | 12.2700 – 12.5200 |
| 03/28/2022 | Buy | 400,000 | 12.5177 | 12.2750 – 12.8000 |
| 04/11/2022 | Buy | 400,000 | 11.2423 | 11.0100 – 11.4650 |
| 04/12/2022 | Buy | 400,000 | 11.5911 | 11.3550 – 11.8300 |
| 04/13/2022 | Buy | 400,000 | 11.7531 | 11.4200 – 11.9300 |
| 04/14/2022 | Buy | 400,000 | 11.5851 | 11.3050 – 11.8800 |
| 04/18/2022 | Buy | 400,000 | 11.0111 | 10.9050 – 11.2700 |
| 04/19/2022 | Buy | 400,000 | 11.3910 | 11.2350 – 11.6300 |
| 04/20/2022 | Buy | 400,000 | 10.8683 | 10.6950 – 11.1050 |
| 04/27/2022 | Buy | 900,000 | 9.5583 | 9.3950 – 9.7600 |
| 04/28/2022 | Buy | 900,000 | 9.7489 | 9.2700 – 10.1900 |
| 05/02/2022 | Buy | 2,400,000 | 10.1458 | 9.5400 – 10.4800 |
| 05/03/2022 | Buy | 2,800,000 | 10.0107 | 9.6450 – 10.4900 |
| 05/04/2022 | Buy | 1,515,910 | 10.2058 | 9.8950 – 10.4950 |
| 05/04/2022 | Buy | 522,559 | 10.6816 | 10.5000 – 10.9050 |
| 05/05/2022 | Buy | 2,400,000 | 10.6365 | 10.3650 – 10.9500 |
| 05/06/2022 | Buy | 1,450,000 | 10.2339 | 9.9200 – 10.6500 |
| 05/09/2022 | Buy | 2,400,000 | 9.7423 | 9.4250 – 10.2300 |
| 05/10/2022 | Buy | 2,800,000 | 9.3580 | 8.9200 – 9.8800 |
| 05/11/2022 | Buy | 1,590,165 | 8.2786 | 8.0100 – 8.4950 |
| 05/11/2022 | Buy | 1,609,835 | 8.9340 | 8.5000 – 9.3500 |