**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

### NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on August 2, 2023, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No. 1306] (the "Disclosure Statement Order") (a) authorizing BlockFi Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1309] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1310] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154).  The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors hereby file this Plan Supplement.  The Plan Supplement contains the following documents each as defined in the Plan:  (a) the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) the Schedule of Retained Causes of Action; (c) the Restructuring Transactions Memorandum; (d) the Digital Assets Conversion Table; (e) the identification of the Plan Administrator; (f) the Plan Administrator Agreement; (g) the Wind-Down Budget; (h) the identification of the member(s) of the Wind-Down Debtors' Oversight Committee; (i) the Employee Transition Plan; (j) the Cross Border Insolvency Protocol; and (k) any additional documents necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider final approval of the Disclosure Statement and confirmation of the Plan will commence on **September 26, 2023 at 1:00 p.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Combined Hearing") before the Honorable Chief Judge Michael B. Kaplan, Clarkson S. Fisher United States Courthouse, 402 East State Street, Second Floor, Courtroom 8, Trenton, NJ 08608.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 11, 2023 at 4:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline").  Any objection to the Plan must:  (a) be in writing; (b) state with particularity the basis of the objection; and (c) be filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| Debtors |
|---|
| **BlockFi, Inc.**<br>201 Montgomery Street, Suite 263<br>Jersey City, NJ 07302 |

| *Counsel for the Debtors* | *Counsel for the Debtors* |
|---|---|
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg; Christine A. Okike; Francis Petrie | **Haynes and Boone, LLP**<br>Rockefeller Plaza, 26th Floor<br>New York, NY 10112<br>Attention:  Richard S. Kanowitz; Jordan Chavez |

| *Counsel for the Committee* |
|---|
| **Brown Rudnick LLP**<br>7 Times Square<br>New York, NY 10036<br>Attention:  Robert J. Stark; Kenneth J. Aulet; Bennett S. Silverberg |

| *United States Trustee* |
|---|
| **Office of the United States Trustee**<br>**United States Trustee, Regions 3 & 9**<br>One Newark Center, Suite 2100<br>Newark, NJ 07102<br>Attention:  Jeffrey M. Sponder; Lauren Bielskie |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Disclosure Statement Order, the Plan, the Plan Supplement, or related documents, you should contact Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors in these Chapter 11 Cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Claims, Noticing, and Solicitation Agent at (888) 773-0375 (Toll Free) or (646) 440-4371 (International), (b) emailing the Claims, Noticing, and Solicitation Agent at blockfiinfo@ra.kroll.com with a reference to "In re: BlockFi - Solicitation Inquiry" in the subject line, or (c) writing to the Claims, Noticing, and Solicitation Agent at BlockFi Inquiries, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, New York 11232.  You may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/blockfi, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.B CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT.**

Dated:  September 4, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**PLAN SUPPLEMENT FOR THE DEBTORS'**
**FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

**TABLE OF CONTENTS[2]**

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

| **Exhibit** | **Description** |
|---|---|
| A | Schedule of Assumed Executory Contracts and Unexpired Leases |
| B | Schedule of Retained Causes of Action |
| C | Restructuring Transactions Memorandum |
| D | Digital Assets Conversion Table |
| E | Plan Administrator Agreement and Members of the Wind-Down Debtor Oversight Committee |
| F | Wind-Down Budget |
| G | Employee Transition Plan |
| H | Cross Border Insolvency Protocol |

## EXHIBIT A

### Schedule of Assumed Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Debtors, including any employee benefit plans, severance plans, or other Executory Contracts under which employee obligations arise, shall be deemed rejected by the Debtors or Wind-Down Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract and Unexpired Lease:  (a) was previously assumed, assumed and assigned, or rejected by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume, assume and assign, or reject Filed on or before the Confirmation Date that is pending on the Effective Date; or (d) is designated specifically, or by category, as an Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, if any.

Pursuant to sections 365(a) and 1123 of the Bankruptcy Code, entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection, assumption, or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, effective as of the Effective Date unless otherwise specified.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Wind-Down Debtor according to its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law.  Any motions to assume any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases identified in this Plan Supplement at any time through and including forty-five days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

## <u>EXHIBIT B</u>

### Schedule of Retained Causes of Action

<u>Article IV.L</u> of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtors shall succeed to all rights to commence and pursue any and all Vested Causes of Action, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred under the Plan or pursuant to a Final Order. Such rights shall be preserved by the Debtors and Wind-Down Debtors and shall vest in the Wind-Down Debtors, with the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to a Final Order, pursuant to the releases and exculpations contained in the Plan, including in <u>Article VIII</u> of the Plan, or pursuant to the settlements contained in the Plan, including <u>Article IV</u> of the Plan, which shall be deemed released, waived, and settled by the Debtors and Wind-Down Debtors as of the Effective Date.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtors and in accordance with the Wind-Down Administrator Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Debtors, on behalf of the Debtors and the Wind-Down Debtors, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including <u>Article VIII</u> and <u>Article IV</u> of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtors, on behalf of the Debtors and Wind-Down Debtors and in accordance with the Plan Administrator Agreement, expressly reserve all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

The Wind-Down Debtors, on behalf of the Debtors, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Cause of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise provided in the Plan, including <u>Article VIII</u> and <u>Article IV</u> of the Plan. The Wind-Down Debtors, through their authorized agents or representatives, shall retain and

may exclusively enforce any and all such Causes of Action.  The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan.

Notwithstanding and without limiting the generality of Article IV.L of the Plan, the Debtors and the Wind-Down Debtors, as applicable, expressly reserve all Causes of Action that are not expressly released or settled under the Plan (including pursuant to Article VIII and Article IV thereof), including all Causes of Action against the Entities identified in **Schedule B(i)** attached hereto.

Certain documents, or portions thereof, contained and/or referred to in this **Exhibit B** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained or referred to herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.  Each of the documents contained or referred to in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan.

## Schedule B(i)

**Retained Causes of Action**

| Party | Address[1] | Nature |
|---|---|---|
| ALAMEDA RESEARCH LTD. | Alameda Research, Ltd. Tortola Pier Park Building 1, 2nd Floor Wickhams Cay 1 Roadtown, Tortola VG1110 British Virgin Island  Cc: SULLIVAN & CROMWELL LLP Attn: Andrew G. Dietderich, James L. Bromley, Brian D. Glueckstein, and Alexa J. Kranzley 125 Broad Street New York, NY 10004 | All Claims[2] and Causes of Action (in law or equity) including but not limited to those arising from or related to BlockFi's prepetition dealings with Alameda Research Ltd. and its affiliates as set forth in detail in Electronic Proof of Claim Nos. 3265-69-BEICU-822005607, 3265-69-YYJRH-613333911, 3265-69-LTOVO-542560921, filed by the BlockFi Debtors in the West Realm Shires Inc. chapter 11 bankruptcy case jointly administered with the other FTX Debtors. |
| CORE SCIENTIFIC, INC. | Core Scientific, Inc. 210 Barton Springs Road, Suite 300, Austin, Texas 78704  Cc: WEIL, GOTSHAL & MANGES LLP Attn: Alfredo R. Pérez and Clifford W. Carlson 700 Louisiana Street, Suite 1700 Houston, Texas 77002 -and- WEIL, GOTSHAL & MANGES LLP Attn: Ronit J. Berkovich 767 Fifth Avenue New York, New York 10153 | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to BlockFi's prepetition dealings with Core Scientific Inc. and its affiliates as set forth in detail in Electronic Proof of Claim No. 426 filed by the BlockFi Debtors in the Core Scientific, Inc. chapter 11 bankruptcy case. |
| CORE SCIENTIFIC OPERATING COMPANY | Core Scientific Operating Company 210 Barton Springs Road, Suite 300, Austin, Texas 78704  Cc: WEIL, GOTSHAL & MANGES LLP Attn: Alfredo R. Pérez and Clifford W. Carlson 700 Louisiana Street, Suite 1700 Houston, Texas 77002 -and- WEIL, GOTSHAL & MANGES LLP Attn: Ronit J. Berkovich 767 Fifth Avenue New York, New York 10153 | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to BlockFi's prepetition dealings with Core Scientific Operating Company and its affiliates as set forth in detail in Electronic Proof of Claim No. 447 filed by the BlockFi Debtors in the Core Scientific, Inc. chapter 11 bankruptcy case. |

---

[1] The Debtors relied upon the addresses provided in the sworn petitions for the Core Scientific, FTX, and Three Arrows Capital, Ltd. Debtors.

[2] Capitalized terms used but not otherwise defined shall have the meaning provided in the Third Amended Plan.

| | | |
|---|---|---|
| DIGISTAR NORWAY AS | Digistar Norway AS c/o Simonsen Vogt Wigg, Filipstad Brygge Attn: Christine Tan Lauten 1, 0252 Oslo Norway | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to the BlockFi Debtors' prepetition dealings with Digistar Norway AS and its affiliates including but not limited to that certain litigation styled *BlockFi Lending LLC v. Digistar Norway AS, Gaon, & Manganiello* bearing Adv. No. 23-01116 (MBK). |
| EMERGENT FID. TECHS. LTD. ("EMERGENT") | Emergent Fid. Techs. Ltd. Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to the BlockFi Debtors' prepetition dealings with Emergent and its affiliates including but not limited to that certain litigation styled *BlockFi Inc., BlockFi Lending LLC & BlockFi Int'l Ltd. v. Emergent Fid. Techs. Ltd. & Marex Cap. Markets (f/k/a ED&F Man Cap. Markets, Inc.)* bearing Adv. No. 22-01382 (MBK). |
| [REDACTED] | [Redacted] | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to that certain litigation styled *BlockFi Lending LLC v. Digistar Norway AS, [Redacted], & [Redacted]* bearing Adv. No. 23-01116 (MBK). |
| FTX TRADING LTD. | FTX Trading Ltd. 10-11 Mandolin Place, Friars Hill Road St. John's AG-04 Antigua and Barbuda Cc: SULLIVAN & CROMWELL LLP Attn: Andrew G. Dietderich, James L. Bromley, Brian D. Glueckstein, and Alexa J. Kranzley 125 Broad Street New York, NY 10004 | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to the BlockFi Debtors' prepetition dealings with FTX Trading Ltd. and its affiliates including but not limited to the claims set forth in detail in Proof of Claim Nos. 3265-69-FJEXK-896284146, 3265-69-FJXYA-542088514, and 3265-70-GIQUG-filed by the BlockFi Debtors in the FTX Trading Ltd. chapter 11 bankruptcy case jointly administered with the other FTX Debtors. |
| MAREX CAPITAL MARKETS, INC. (F/K/A ED&F MAN CAPITAL MARKETS) | Marex Capital Markets, Inc. 600 Mamaroneck Avenue Suite 400 Harrison, NY 10528 | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to the BlockFi Debtors prepetition dealings with Marex Capital Markets, Inc. and its |

| | | |
|---|---|---|
| | Cc: MINTZ, LEVIN, COHN, FERRIS GLOVSKY, & POPEO, P.C. Attn: Kaitlin R. Walsh, Therese M. Doherty, and Douglas P. Baumstein 919 Third Avenue New York, NewYork 10022 | affiliates including but not limited to that certain litigation styled *BlockFi Inc., BlockFi Lending LLC & BlockFi Int'l Ltd. v. Emergent Fid. Techs. Ltd. & Marex Cap. Markets (f/k/a ED&F Man Cap. Markets, Inc.)* bearing Adv. No. 22-01382 (MBK). |
| PRIMEBLOCK OPERATIONS LLC | PrimeBlock Operations LLC, Attn: Gavin Qu 589 Howard Street Suite 100, San Francisco, CA 94105  registered agent for service of process: Corporation Service Company 251 Little Falls Drive, Wilmington, DE 19808 | All Claims and Causes of Action (in law or equity) including but not limited to those arising or related to the BlockFi Debtors prepetition dealings with PrimeBlock Operations LLC and its affiliates including but not limited to that certain litigation styled *BlockFi Lending LLC v. PrimeBlock Operations LLC Limited* bearing Adv. No. 23-01116 (MBK). |
| RETAINED PREFERENCE CLAIMS | N/A | All Claims arising under section 547 and 550 of the Bankruptcy Code held by the Debtors against any Person (other than a Committee Settlement Party or other officer or director of the Debtors) that, in total, aggregate over $250,000, arising out of withdrawals from BlockFi Interest Accounts or BlockFi Private Client Accounts (other than release of loan collateral upon repayment of loans) on or after November 2, 2022 held by any Debtor other than BlockFi International. |
| [REDACTED] | [Redacted] | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to that certain litigation styled *BlockFi Lending LLC v. Digistar Norway AS, [Redacted], & [Redacted]* bearing Adv. No. 23-01116 (MBK). |
| THREE ARROWS CAPITAL, LTD. | Three Arrows Capital, Ltd. c/o Teneo Attn: Russell Crumpler and Christopher Farmer Banco Popular Building, 3rd Floor VG-1110 Road Town, Tortola British Virgin Islands  Cc: LATHAM & WATKINS LLP Attn: Adam J. Goldberg, Brett Neve, and Nacif Taousse | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to the BlockFi Debtors prepetition dealings with Three Arrows Capital Ltd. and its affiliates including but not limited to that certain (i) Amended and Restated Master Loan Agreement, dated as of April 23, 2020 (as amended by the First Amendment to Amended and Restated Master Loan Agreement, dated as of February 24, 2021, and |

| | | |
|---|---|---|
| | 1271 Avenue of the Americas<br>New York, NY 10020 | that certain Letter Agreement, dated as of September 1, 2021, as further amended, restated, amended and restated, supplemented or otherwise modified from time to time) and (ii) the Pledge Agreement, dated as of April 23, 2020 (as amended by those certain Amendments to Pledge Agreement, as further amended, restated, amended and restated, supplemented, including all Pledge Supplements, or otherwise modified from time to time) between BlockFi Lending LLC as Lender and Three Arrows Capital, Ltd. as Borrower. |
| VRAI NOM INVESTMENT LIMITED | Vrai Nom Investment Limited<br>RM4, 16/F<br>Ho King Comm Ctr<br>2-16 Fayuen St,<br>Mongkok, Kowloon, Hong Kong<br><br>Cc: Gosai Law<br>Attn: Krish<br>Level 2, 194 Varsity Parade<br>Varsity Lakes<br>Queensland, Australia 4227<br><br>Cc: CSG Law<br>Attn: Sam Della Fera, Jr.<br>105 Eisenhower Parkway<br>Roseland, NJ 07068 | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to that certain litigation styled *BlockFi Int'l Ltd. v. Vrai Nom Investment Limited* bearing Adv. No. 23-01175 (MBK). |
| WEST REALM SHIRES INC. | West Realm Shires Inc.<br>167 N. Green Street<br>Chicago, IL 60607<br><br>Cc: SULLIVAN & CROMWELL LLP Attn: Andrew G. Dietderich, James L. Bromley, Brian D. Glueckstein, and Alexa J. Kranzley<br>125 Broad Street<br>New York, NY 10004 | All Claims and Causes of Action (in law or equity) including but not limited to those arising from or related to BlockFi's prepetition dealings with West Realm Shires Inc. and its affiliates as set forth in detail in Electronic Proof of Claim Nos. 3265-69-QCDVO-922139597, 3265-69-SSGAC-994708543, and 3265-69-LJRGP-030432330 filed by the BlockFi Debtors in the West Realm Shires Inc. chapter 11 bankruptcy case jointly administered with the other FTX Debtors. |

<u>**EXHIBIT C**</u>

**Restructuring Transactions Memorandum**

In accordance with the Plan, the steps set forth in this Restructuring Transactions Memorandum[1] remain subject to modification until the Effective Date.

Unless otherwise set forth below, the following steps shall occur in the order set forth below.

1. Intercompany Claims shall be addressed in all events consistent with the terms of any settlement among the Debtors, as applicable, on account of the Intercompany Claims and otherwise as set forth in the books and records of the Debtors and the Plan.

2. Pursuant to the Plan, the Existing Preferred Equity Interests and Existing Common Equity Interests shall be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Existing Preferred Equity Interests or Existing Common Equity Interests will not receive any Distribution on account of such Existing Preferred Equity Interests or Existing Common Equity Interests, as applicable.

3. On and after the Effective Date, each Holder of an Allowed Account Holder Claim shall, in accordance with the Plan, receive its Pro Rata share of the Cash Allocation or the Digital Assets Allocation for Holders of Claims at the applicable Debtor. With respect to a Holder of an Allowed Account Holder Claim who, in accordance with the Plan, receives its Pro Rata share of the Digital Assets Allocation for Holders of Claims at the applicable Debtor, the Wind-Down Debtors shall be deemed to make an in-kind Distribution to such Holder of such Digital Assets in proportionate satisfaction of such Person's Allowed Account Holder Claim.

4. The Debtors or the Wind-Down Debtors, as applicable, shall make other distributions on and after the Effective Date pursuant to the Plan.

5. The Debtors or the Wind-Down Debtors, as applicable, shall perform any necessary Wind Down activities (with the assistance of the Wind-Down Administrator and subject to the oversight of the Wind-Down Debtors' Oversight Committee) and, following the completion of the Wind Down, shall be liquidated pursuant to applicable law.

The foregoing list of steps is not necessarily comprehensive and may be subject to further refinement or change.

*[Remainder of page intentionally left blank.]*

---

[1] Capitalized terms that are not defined herein shall have the meaning ascribed to them in the Plan or Disclosure Statement, as the case may be.

## EXHIBIT D

### Digital Assets Conversion Table

| Coin | Ticker | USD Price as of 11/28/2022 at 11:59 p.m. UTC |
|---|---|---|
| Bitcoin (BTC) | BTC | $16,206.3000 |
| Ethereum (ETH) | ETH | $1,167.2400 |
| Gemini Dollar (GUSD) | GUSD | $1.0000 |
| USD Coin (USDC) | USDC | $1.0000 |
| 1inch Network1 (INCH) | INCH | $0.5170 |
| Aave (AAVE) | AAVE | $60.1500 |
| Algorand (ALGO) | ALGO | $0.2359 |
| Avalanche (AVAX) | AVAX | $12.4500 |
| Axie Infinity (AXS) | AXS | $6.5600 |
| Basic Attention Token (BAT) | BAT | $0.22322 |
| Binance Coin (BNB) | BNB | $292.7865 |
| Bitcoin Cash (BCH) | BCH | $109.9100 |
| Binance USD (BUSD) | BUSD | $1.0000 |
| Cardano (ADA) | ADA | $0.3064 |
| Chainlink (LINK) | LINK | $7.1940 |
| Celo (CELO) | CELO | $0.6170 |
| Chiliz (CHZ) | CHZ | $0.1642 |
| Compound (COMP) | COMP | $37.1600 |
| Cosmos (ATOM) | ATOM | $9.8590 |
| Curve DAO Token (CRV) | CRV | $0.6450 |
| Decentraland (MANA) | MANA | $0.3862 |
| DogeCoin (DOGE) | DOGE | $0.09506 |
| dYdX (DYDX) | DYDX | $1.6660 |
| Elrond (EGLD) | EGLD | $42.1390 |
| Enjin Coin (ENJ) | ENJ | $0.2960 |
| EOS (EOS) | EOS | $0.9034 |
| Fantom (FTM) | FTM | $0.2049 |
| Filecoin (FIL) | FIL | $4.2530 |
| FTX Token (FTT) | FTT | $1.2923535 |
| Gala (GALA) | GALA | $0.02478 |
| Hedera Hashgraph (HBAR) | HBAR | $0.0486 |
| Kusama (KSM) | KSM | $25.5900 |
| Litecoin (LTC) | LTC | $73.8500 |

| Loopring (LRC) | LRC | $0.2368 |
|---|---|---|
| Maker (MKR) | MKR | $645.4100 |
| Multi Collateral Dai (DAI) | DAI | $0.9997 |
| Near (NEAR) | NEAR | $1.5900 |
| OMG Network (OMG) | OMG | $1.1605 |
| One Coin (ONE) | ONE | $0.0137 |
| PAX Gold (PAXG) | PAXG | $1,740.6400 |
| Paxos Standard Token (PAX) | PAX | $1.0000 |
| Polkadot (DOT) | DOT | $5.1340 |
| Polygon (MATIC) | MATIC | $0.8209 |
| Quant (QNT) | QNT | $112.4100 |
| Render Token (RNDR) | RNDR | $0.4672 |
| Serum (SRM) | SRM | $0.2330 |
| Solana (SOL) | SOL | $13.3200 |
| Stellar (XLM) | XLM | $0.087183 |
| SushiSwap (SUSHI) | SUSHI | $1.3348 |
| Synthetix (SNX) | SNX | $1.6620 |
| Terra 2.0 (LUNA) | LUNA | $0.0001552 |
| Tether (USDT) | USDT | $0.9995 |
| Tezos (XTZ) | XTZ | $0.9750 |
| The Graph (GRT) | GRT | $0.0622 |
| The Sandbox (SAND) | SAND | $0.5531 |
| THORchain (RUNE) | RUNE | $1.1670 |
| Tron (TRX) | TRX | $0.052973 |
| TrueUSD (TUSD) | TUSD | $0.9997 |
| Uniswap (UNI) | UNI | $5.2830 |
| Waves (WAVES) | WAVES | $2.3300 |
| Yearn.Finance (YFI) | YFI | $6,266.5000 |
| US Dollar Fiat (USD) | USD | $1.0000 |

13

## EXHIBIT E

### Plan Administrator Agreement and Members of the Wind-Down Debtor Oversight Committee

Certain documents, or portions thereof, contained and/or referred to in this **Exhibit E** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained or referred to herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.  Each of the documents contained or referred to in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan.

## PLAN ADMINISTRATOR AGREEMENT

This Plan Administrator Agreement (as it may be amended, modified, supplemented, or restated from time to time, this "Agreement" or the "Plan Administrator Agreement") dated as of [•], is made and entered into by and among the entities listed as "Debtors" on the signature pages hereto (each, a "Debtor"), and Mohsin Meghji, solely in his capacity as Plan Administrator for purposes of this Agreement (the "Plan Administrator"), and is executed in connection with and pursuant to the terms of the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* dated July 31, 2023 [Docket No. 1300] (as it may be amended, modified, supplemented, or restated from time to time, the "Plan").[8]

## RECITALS

WHEREAS, on November 28, 2022, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, (the "Bankruptcy Court"), and their chapter 11 cases are being jointly administered as *In re BlockFi Inc., et al.,* Case No. 22-19361 (MBK);

WHEREAS, on November 28, 2022, the Bermuda Debtor also filed a winding up petition (No. 363 of 2022) in the Bermuda Court and sought the appointment of the Bermuda Provisional Liquidators, and on November 29, 2022 the Bermuda Provisional Liquidators were appointed by the Bermuda Court to monitor and assist the Bermuda Debtor in the Chapter 11 Cases;

WHEREAS, on December 21, 2022, the United States Trustee for Region 3 (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee");[9]

WHEREAS, the Plan contemplates that a plan administrator will be appointed to perform its duties in accordance with the Plan and this Agreement;

WHEREAS, the Plan provides that the Plan Administrator will, among other things, retain, preserve, and distribute certain assets of the Wind-Down Debtors for the benefit of Holders of Allowed Claims or Allowed Interests that are entitled to receive distributions pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date;

WHEREAS on [•], 2023, the Bankruptcy Court entered an order ("Confirmation Order")[10] confirming the Plan, which became effective on [•] ("Effective Date");

WHEREAS, this Agreement is entered into in accordance with, and to facilitate the implementation and execution of, the Plan;

---

[8]   All capitalized terms used in this Agreement and not otherwise defined herein have the meanings ascribed to such defined terms in the Plan.

[9]   Docket No. 106.

[10]   Docket No 1159.

WHEREAS, on the Effective Date of the Plan, the Plan Administrator shall be appointed in accordance with the Plan, and, in respect of the Bermuda Debtor, be bound by the Cross-Border Insolvency Protocol Agreement agreed between the Bermuda Debtor and the Bermuda Provisional Liquidators (which sets out the administrative and other steps required to implement the Plan in Bermuda), and the Plan Administrator is willing to serve in such capacity, in each case upon the terms set forth in this Agreement and, with respect to the Bermuda Debtor, the Cross-Border Insolvency Protocol Agreement, and pursuant to the Plan;

WHEREAS, the Plan provides that the Plan Administrator shall act for the Debtors and Wind-Down Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions of the Plan, this Agreement and, in respect of the Bermuda Debtor, the Cross-Border Insolvency Protocol Agreement; and

WHEREAS, the Plan provides that, in carrying out its responsibilities, and in exercising its powers set-out herein, in respect of the Bermuda Debtor, the Plan Administrator shall comply with the terms of the Cross-Border Insolvency Protocol Agreement (and any amendments thereto) and specifically obtain all necessary consents and approvals as required thereto.

NOW, THEREFORE, in accordance with the Plan and the Confirmation Order, and in consideration of the promises, and the mutual covenants and agreements of the Parties contained in the Plan and herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties agree and declare as follows:

## RECITALS, INTERPRETATION, AND CONSTRUCTION

1.1     <u>Recitals</u>. The Recitals are incorporated into and made terms of this Agreement.

1.2     <u>Interpretation; Headings</u>. All references herein to specific provisions of the Plan or Confirmation Order are without exclusion or limitation of other applicable provisions of the Plan or Confirmation Order. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Agreement.

1.3     <u>Construction of Agreement</u>. This Agreement shall not be construed to impair or limit in any way the rights of any Person under the Plan.

1.4     <u>Conflict Among Plan Documents</u>. Subject to Section 1.5 of this Agreement, in the event of any inconsistency between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall govern and control. In the event of any inconsistency between this Agreement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control and take precedence.  In the event of any inconsistency between the authority given to the Oversight Committee pursuant to Article VI of this Agreement and any authority given to any other party pursuant to this Agreement, Article VI shall control and take precedence.

1.5    Conflict with the Cross-Border Insolvency Protocol Agreement. Notwithstanding any provision to the contrary in this Agreement, in the event of any conflict between the terms of this Agreement and the Cross-Border Insolvency Protocol Agreement with respect to the Bermuda Debtor, the terms of the Cross-Border Insolvency Protocol Agreement shall prevail.

## ARTICLE II
## ACCEPTANCE OF POSITION; OBLIGATION TO PAY CLAIMS; FIDUCIARY STATUS; CROSS-BORDER INSOLVENCY PROTOCOL AGREEMENT

2.1    Acceptance. (a) Mohsin Meghji hereby accepts appointment as the Plan Administrator; and (b) Mohsin Meghji agrees to observe and perform all duties and obligations imposed upon the Plan Administrator under the Plan, this Agreement, or other orders of the Bankruptcy Court and, in respect of the Bermuda Debtor, under the Cross-Border Insolvency Protocol Agreement or orders of the Bermuda Court, and applicable law.

2.2    Fiduciary. The Plan Administrator shall perform its obligations consistent with the Plan, this Agreement, and applicable orders of the Bankruptcy Court. Subject to sections 1.4, 1.5, 2.3 and 3.3 hereof, the Plan Administrator shall be the sole officer and director of the Wind-Down Debtors, except in the case of the Bermuda Debtor, where the Plan Administrator is authorized by a power of attorney (the "Power of Attorney") executed by the directors of the Bermuda Debtor immediately prior to, and effective on, the Effective Date, to take actions with respect to the Bermuda Debtor consistent with the role of a sole officer and director of the Bermuda Debtor and with the Cross-Border Insolvency Protocol Agreement.  The Plan Administrator shall hold the equity of BlockFi Inc., to the extent that any new equity is issued, in an agency capacity, for the benefit of and to facilitate the rights of Holders of Claims provided under the Plan. The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents, other than those relating to the Bermuda Debtor, are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Debtors shall be deemed to have resigned, solely in their capacities as such (and in the case of the Bermuda Debtor shall be deemed to have had their powers as directors suspended), and the Plan Administrator or a representative of the Plan Administrator shall be appointed as a director and the sole officer of the Debtors and the Wind-Down Debtors and shall succeed to the powers of the Debtors' directors and officers who resign on the Effective Date other than, in respect of the Bermuda Debtor, in respect of which the Plan Administrator shall succeed to the powers of the Bermuda Debtor pursuant to the Power of Attorney and subject to the Cross-Border Insolvency Protocol Agreement. Subject to sections 1.4, 1.5, 2.3 and 3.3 hereof, from and after the Effective Date, the Plan Administrator shall be the sole representative (other than in respect of the Bermuda Debtor) of, and shall act for, the Debtors and the Wind-Down Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, to continue the employment of any former director, officer, or employee.

2.3     Cross-Border Insolvency Protocol Agreement. The terms of this Agreement, in so far as they relate to the Bermuda Debtor, including without limitation the appointment, powers, duties, rights and obligations of the Plan Administrator and/or anyone acting as Plan Administrator with respect to the Bermuda Debtor pursuant to Section 3.2 or otherwise (howsoever arising) shall in all respects be subject to the terms of the Cross-Border Insolvency Protocol Agreement.

# ARTICLE III
## GENERAL POWERS, RIGHTS AND OBLIGATIONS OF THE PLAN ADMINISTRATOR

3.1     Rights, Powers, and Privileges of Plan Administrator Generally. Effective as of the Effective Date, the Plan Administrator is appointed under the Plan for purposes of implementing the terms and conditions of the Plan with respect to (i) effectuating the transactions beneficial and necessary to wind down the Debtors and the Wind-Down Debtors, including as set forth in the Restructuring Transactions Memorandum, (ii) administration of, and distributions with respect to, the claims asserted against the Debtors, (iii) pursuing Vested Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant the Plan and subject to the limitations set forth in the Plan, and (iv) such other matters agreed to by the Debtors and Plan Administrator in accordance with the terms of the Plan (collectively, the "Plan Administrator Responsibilities"), in each case, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order. The Plan Administrator is hereby appointed to make all disbursements and distributions under the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, and the Confirmation Order.  The Debtors and the Wind-Down Debtors shall be managed, administered, and wound down by the Plan Administrator in accordance with the terms of the Plan, in consultation with and subject to the rights and powers of the Oversight Committee established pursuant to this Agreement (the "Oversight Committee") as set forth in this Agreement, and the Plan Administrator shall have full authority to administer the provisions of the Plan, and subject to the terms and conditions of this Agreement, the Plan, and the Confirmation Order.  Without prejudice, in the case of the Bermuda Debtor, to the Bermuda Provisional Liquidators' powers, duties and responsibilities under Bermuda Law, and consistent with and subject to the terms of the Cross-Border Insolvency Protocol Agreement, the Plan Administrator shall be deemed to be a judicial substitute and estate representative for the Debtors as the party-in-interest in the Chapter 11 Cases, under the Plan, or in any judicial proceeding or appeal to which any of the Debtors or Wind-Down Debtors is a party. The Plan Administrator shall be deemed a "representative" of the estate as contemplated by Bankruptcy Code section 1123(b)(3)(B), and performance of certain services in connection with this Agreement shall be authorized by the execution of this Agreement to the extent not already authorized by the Plan or the Confirmation Order.

3.1.1     Power to Contract. In furtherance of the purpose of the Debtors and the Wind-Down Debtors, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Plan Administrator may cause the Debtors or the Wind-Down Debtors to enter into any covenants or agreements binding the Debtors or the Wind-Down Debtors, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by

the Plan Administrator to be consistent with and advisable in furthering the purpose of the Plan or this Agreement.

3.1.2   Ultimate Right to Act Based on Advice of Counsel or Other Professionals. Nothing in this Agreement shall be deemed to prevent the Plan Administrator from taking or refraining to take any action on behalf of the Debtors or the Wind-Down Debtors that, based upon the advice of counsel or other professionals, the Plan Administrator determines he is obligated to take or to refrain from taking in the performance of any duty under the Plan, Confirmation Order, or this Agreement.

3.2   Oversight Committee Member Designation. If a conflict arises that prevents the involvement of the Plan Administrator from performing his duties, the Oversight Committee shall designate a member of the Oversight Committee (with such member's consent) to act as the Plan Administrator solely with respect to such conflict. During such time as an Oversight Committee member is acting as Plan Administrator, such member shall not be entitled to vote on matters requiring Oversight Committee approval and the voting provisions set forth in Article VI hereof shall apply.

3.3   Powers of Plan Administrator. The Plan Administrator shall provide the post-Effective Date administration, wind down, dissolution, and liquidation services related to the Plan Administrator Responsibilities that are necessary, required, desirable, or advisable to effectuate the terms and conditions of the Plan and the wind down of the Debtors and the Wind-Down Debtors, in consultation and with the authority of the Oversight Committee as required by this Agreement and the Plan. Subject to the oversight and direction of the Oversight Committee set forth herein and in Article VI of this Agreement, the Plan Administrator shall have all duties, powers, and rights set forth herein, in the Plan, and in the Confirmation Order, including but not limited to, all powers and duties incidental to the following services related to the Debtors and the Wind-Down Debtors:

3.3.1   implementing the Wind-Down, and making distributions contemplated by the Plan;

3.3.2   marshalling, marketing for sale, and winding down any of the Debtors' assets constituting Wind-Down Debtors' Assets;

3.3.3   overseeing the accounts of the Debtors and the Wind-Down Debtors and the Wind Down and dissolution of the Debtors and the Wind-Down Debtors, including effectuating the transactions described in the Restructuring Transactions Memorandum;

3.3.4   receiving, maintaining, conserving, supervising, prosecuting, collecting, settling, managing, investing, protecting, and where appropriate, causing the Wind-Down Debtors to abandon the Wind-Down Debtors' Assets, including causing the Wind-Down Debtors to invest any monies held as Wind-Down Debtors' Assets;

3.3.5   opening and maintaining bank accounts on behalf of or in the name of the Debtors or the Wind-Down Debtors, including, in the Plan Administrator's discretion, separate bank accounts for each of the Debtors;

3.3.6    entering into any agreement or executing any document or instrument required by or consistent with the Plan, the Confirmation Order, or the Plan Administrator Agreement, and performing all obligations thereunder;

3.3.7    collecting and liquidating all Wind-Down Debtors' Assets, including the sale of any of the Wind-Down Debtors' Assets;

3.3.8    protecting and enforcing, as well as settling subject to section 3.5 hereof, the rights to the Wind-Down Debtors' Assets (including any Vested Causes of Action) vested in the Wind-Down Debtors and Plan Administrator, as applicable, by the Plan Administrator Agreement by any method deemed appropriate, including, without limitation, by judicial proceedings or otherwise;

3.3.9    investigating any of the Wind-Down Debtors' Assets and any Vested Causes of Action;

3.3.10  reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind;

3.3.11  seeking the examination of any Person or Entity pursuant to Bankruptcy Rule 2004;

3.3.12  retaining professionals, disbursing agents, and other agents, independent contractors, and third parties pursuant to the Plan Administrator Agreement and paying the reasonable compensation thereof;

3.3.13  paying all lawful expenses, debts, charges, taxes, and other liabilities, and making all other payments relating to the Wind-Down Debtors' Assets, solely out of Wind-Down Debtors' Assets;

3.3.14  reviewing,    reconciling,    pursuing,    commencing,    prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue all Vested Causes of Action;

3.3.15  acquiring litigation and other Claims related to the Debtors and prosecuting such Claims;

3.3.16  reviewing and compelling turnover of the Debtors or the Wind-Down Debtors' property;

3.3.17  calculating and making all Distributions to the Holders of Allowed Claims against each Debtor and, solely to the extent of payment in full of Allowed Claims, to Holders of Allowed Interests, as provided for in, or contemplated by, the Plan and the Plan Administrator Agreement; provided that because the Plan does not substantively consolidate the Debtors' Estates, the Plan Administrator shall make Distributions from the Wind-Down Debtors' Assets to the Holders of Claims and Interests (if applicable) against that specific Debtor;

3.3.18 establishing, administering, adjusting, and maintaining the Wind-Down Reserve and the Disputed Claims Reserve;

3.3.19 withholding from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Plan Administrator has determined, based upon the advice of his agents or professionals, may be required to be withheld from such Distribution under any income tax or other laws; *provided, however,* that notwithstanding the foregoing, the Plan Administrator shall endeavor to  minimize taxes or other charges applicable to Holders of Allowed Claims to the extent permitted under applicable laws and in connection therewith the Plan Administrator may seek such professional advice or guidance as he determines necessary or appropriate;

3.3.20 in reliance upon the Debtors' Schedules, the official Claims Register maintained in the Chapter 11 Cases and the Debtors' filed lists of equity security holders, reviewing, and where appropriate, allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtors;

3.3.21 making all tax withholdings, filing tax information returns, filing and prosecuting tax refunds claims, making tax elections by and on behalf of the Debtors or the Wind-Down Debtors, and filing tax returns for the Debtors or the Wind-Down Debtors pursuant to and in accordance with the Plan, and paying taxes, if any, payable for and on behalf of the Debtors or the Wind-Down Debtors, as applicable; *provided, however*, that notwithstanding any other provision of this Agreement, the Plan Administrator shall not have any responsibility or personal liability in any capacity whatsoever for the signing or accuracy of the Debtors' income tax returns that are due to be filed after the Effective Date or for any tax liability related thereto;

3.3.22  in accordance with the terms of Section 3.6 herein, abandoning or donating to a charitable organization qualifying under section 501(c)(3) of the IRC any of the Wind-Down Debtors' Assets that the Plan Administrator determines to be too impractical to distribute or of inconsequential value;

3.3.23  seeking a determination of tax liability or refund under Bankruptcy Code section 505;

3.3.24 establishing reserves for taxes, assessments, and other expenses of administration of the Debtors or the Wind-Down Debtors as may be necessary and appropriate for the proper operation of matters incident to the Debtors or the Wind-Down Debtors;

3.3.25 paying the Wind-Down Debtors' Expenses, and upon request of the Bermuda Provisional Liquidators, the Plan Administrator shall be obliged to provide, or cause the Bermuda Debtor to provide, additional funding payable to satisfy the Bermuda Professional Fee Claims in full and not to cause the Bermuda Debtor to make any payment or distribution without reserving sufficient funds to discharge of the Bermuda Professional Fee Claims in full;

3.3.26  if the Plan Administrator, in its sole discretion, deems it appropriate, to seek to establish a bar date for Filing Proofs of Interest in any Debtor or otherwise determine the Holders and extent of Allowed Interests in any Debtor;

3.3.27  purchasing and carrying all insurance policies that the Plan Administrator deems reasonably necessary or advisable and paying all associated insurance premiums and costs;

3.3.28  undertaking all administrative functions remaining in the Chapter 11 Cases to the extent necessary to carry out the Debtors', the Wind-Down Debtors', or the Plan Administrator's duties under the Plan, as applicable, including reporting and making required payments of fees to the U.S. Trustee and overseeing the closing of the Chapter 11 Cases;

3.3.29  retaining, terminating, appointing, hiring, or otherwise employees, personnel, management, and directors at any of the Debtors to the extent necessary to carry out the purposes of the Plan Administrator Agreement and the Plan, including, without limitation, to address any disputes between the Debtors;

3.3.30  exercising, implementing, enforcing, and discharging all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement;

3.3.31  seeking a determination of tax liability or refund under Bankruptcy Code section 505;

3.3.32  taking all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement that the Plan Administrator deems reasonably necessary or desirable to administer the Debtors and the Wind-Down Debtors;

3.3.33  complying with the Cross-Border Insolvency Protocol Agreement and negotiating any amendments to the Cross-Border Insolvency Protocol Agreement or further protocols with the Bermuda Provisional Liquidators (as may be necessary and appropriate) approved by the Bermuda Court and the Bankruptcy Court and taking all steps reasonably required to facilitate a Bermuda Implementation Mechanism and/or as required under Bermuda law and/or to comply with the terms of a Bermuda Order; and

3.3.34  making commercially reasonable efforts to allow electing unsecured creditors to receive Distributions of Digital Assets to the extent provided and permitted by the Plan.

3.4    <u>Exclusive Authority to Pursue Vested Causes of Action</u>. The Plan Administrator shall have the exclusive right, power, and interest to review, reconcile, enforce, collect, compromise, settle, or elect not to pursue the Vested Causes of Action on behalf of the Wind-Down Debtors. The Plan Administrator shall be the sole representative of the Estates under Bankruptcy Code section 1123(b)(3) with respect to the Vested Causes of Action. The Wind-Down Debtors shall be vested with and entitled to assert all setoffs and defenses of the Debtors or Wind-Down Debtors to any counterclaims that may be asserted by any defendant with respect to any Vested Cause of Action. The Wind-Down Debtors shall also be vested with and entitled to assert all of the Debtors' and the Estates' rights with respect to any such counterclaims, under

Bankruptcy Code section 558. All costs and expenses of pursuing the Vested Causes of Action shall be satisfied first from the Wind-Down Debtors' Assets, and all other expenses of the Wind-Down Debtors shall be paid or reserved for, before any proceeds of Vested Causes of Action are distributed, provided that the costs and expenses of pursuing the Vested Causes of Action and the proceeds of the Vested Causes of Action attributable to the Bermuda Debtor shall be agreed with the Bermuda Provisional Liquidators in accordance with the Cross-Border Insolvency Protocol Agreement. For the avoidance of doubt, all evidentiary privileges of the Debtors of any type or nature whatsoever, including the Debtors' attorney-client privilege, the work product privilege, and any other applicable evidentiary privileges of the Debtors, shall and shall be deemed to be assigned by the Debtors and shall vest in the Wind-Down Debtors as of the Effective Date.

3.5     Authority to Enter Into Settlement Agreements. The Plan Administrator shall have the exclusive right to enter into settlements regarding the Vested Causes of Action without requiring court approval, subject to obtaining approval from the Oversight Committee for any such action as set forth in Article VI hereof and subject to the approvals required pursuant to the terms of the Cross-Border Insolvency Protocol Agreement.

3.6     Abandonment. If, in the Plan Administrator's reasonable judgment and subject to obtaining approval from the Oversight Committee for any such action as set forth in Article VI hereof, and subject to compliance with the Cross-Border Insolvency Protocol Agreement, any non-cash Wind-Down Debtors' Assets cannot be sold in a commercially reasonable manner or the Plan Administrator believes in good faith that such property has inconsequential value, the Plan Administrator shall have the right to cause the Wind-Down Debtors to abandon or otherwise dispose of such property, including by donation of such property to a charitable organization.

3.7     Responsibility for Administration of Claims. From and after the Effective Date, the Wind-Down Debtors shall become responsible for administering and paying Distributions to the holders of Allowed Claims and (if applicable) Allowed Interests. The Wind-Down Debtors shall have the exclusive right on behalf of the Debtors to object to the allowance of any Claim or Interest on any ground, to file, withdraw, or litigate to judgment objections to Claims or Interests, to settle or compromise any Disputed Claims or Disputed Interests without any further notice to or action, order, or approval by the Bankruptcy Court, and to assert all defenses of the Debtors and their Estates. The Wind-Down Debtors shall also be entitled to assert all of the Debtors' and the Estates' rights under, without limitation, Bankruptcy Code section 558. The Wind-Down Debtors may also seek estimation of any Claims under and subject to Bankruptcy Code section 502(c). For the avoidance of doubt, any party may object to any Claims or Interests prior to the Claims Objection Bar Date.

3.8     Agents and Professionals. The Plan Administrator may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants, appraisers, and other professionals the Plan Administrator believes have qualifications necessary to assist in the administration of the Wind-Down Debtors, including professionals previously retained by the Debtors or the Committee. For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Plan Administrator from engaging counsel or other professionals, including the Plan Administrator himself, to do work for the Wind-Down Debtors. The Plan Administrator may pay the reasonable salaries, fees, and expenses of such Persons out of the Wind-Down Debtors' Assets in the ordinary course of business.

3.9     Maintenance and Disposition of Wind-Down Debtors' Records. The Plan Administrator shall maintain accurate records of the administration of the Wind-Down Debtors' Assets, including receipts and disbursements and other activity of the Wind-Down Debtors. The Wind-Down Debtors may, but have no obligation to, engage a claims agent (including, but not limited to, the Claims, Noticing, and Solicitation Agent) to continue to maintain and update the Claims Register maintained in the Chapter 11 Cases throughout the administration of the Wind-Down Debtors. To the extent of any Unsecured Claims reflected thereon, the Claims Register may serve as the Plan Administrator's register of beneficial interests held by creditors. The Plan Administrator shall be provided with originals or copies of or access to all documents and business records of the Debtors that are in the possession of the Debtors and reasonably necessary for the disposition of the Wind-Down Debtors' Assets and objections to Claims or (if applicable) Interests except, in each case, to the extent necessary to: (i) ensure compliance with any applicable law or an order of the Bankruptcy Court; (ii) preserve any applicable privilege (including the attorney-client privilege); or (iii) comply with any contractual confidentiality obligations. The Debtors and the Wind-Down Debtors shall use commercially reasonable efforts to cooperate with the Plan Administrator in connection with the Plan Administrator's investigation and prosecution of Vested Causes of Action and objections to Claims and Interests, including with respect to providing evidence and information as reasonably requested by the Plan Administrator. Nothing in the Plan or the Confirmation Order shall affect the obligations of the Debtors, the Wind-Down Debtors, or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

3.10     Reporting Requirements. The Plan Administrator shall maintain books and records relating to the administration of the Wind-Down Debtors' Assets and the Distributions by the Plan Administrator of the proceeds therefrom in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Plan Administrator shall also maintain books and records relating to the administration of the Wind-Down Debtors' Assets, the income and expenses of the Wind-Down Debtors, and the payment of expenses of and liabilities of, claims against or assumed by, the Wind-Down Debtors in such detail and for such period of time as may be necessary to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  Except as otherwise provided herein or in the Plan (including under the Cross-Border Insolvency Protocol Agreement), nothing in this Agreement requires the Plan Administrator to file any accounting or seek approval of any court with respect to the administration of the Wind-Down Debtors, or as a condition for making any payment or distribution out of the Wind-Down Debtor Assets.  The Plan Administrator shall provide the Oversight Committee and the Bermuda Provisional Liquidators with access to such books and records referenced herein upon request.

## ARTICLE IV
## DISTRIBUTIONS

4.1     Reserves; Pooling of Reserved Funds. Before any Distribution can be made to any holders of Allowed Claims and (if applicable) Allowed Interests, the Plan Administrator shall, in his reasonable discretion, establish reserves in an amount sufficient to meet any and all expenses and liabilities of the Wind-Down Debtors, including attorneys' fees and expenses, the fees and expenses of other professionals and the Bermuda Professionals, and fees owed to the U.S. Trustee.

The Wind-Down Debtors may also maintain as necessary a Disputed Claims Reserve with respect to Claims and (if applicable) Interests required to be administered by the Wind-Down Debtors. For the avoidance of doubt, the Plan Administrator may withhold any Distribution pending the Plan Administrator's determination of whether to object to any Claim or Interest. Any such withheld distribution shall become part of the Wind-Down Debtors' Disputed Claims Reserve and shall be distributed to the appropriate claimholder no later than the first Distribution Date after a decision is made not to object to the pertinent Claim or Interest, or the Claim or Interest becomes Allowed. The Plan Administrator need not maintain the Wind-Down Debtors' reserves in segregated bank accounts and may pool funds in the reserves with each other and other funds of the Wind-Down Debtors; *provided*, *however*, that the Wind-Down Debtors shall treat all such reserved funds as being held in a segregated manner in its books and records, by use of book entries, subledgers, or other means of recognizing the separateness of non-consolidated estates, such that the Wind-Down Debtors will be able to account for all distributions under the Plan separately for each Debtor, as expressly contemplated by the Plan.

4.2    Plan Distributions in General. Except as otherwise provided in the Plan, the Plan Administrator shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.  The Plan Administrator shall make any Distributions of Digital Assets to Holders of Allowed Account Holder Claims to the external wallet address designated by such Holder prior to the Distribution Date. The manner of such Distributions shall be determined at the discretion of the Plan Administrator, subject to compliance with the requirements of applicable regulatory authorities.

4.3    Record Date of Distributions. On the Distribution Record Date, the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims.  The Plan Administrator shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Plan Administrator shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

4.4    Tax Identification Numbers. The Plan Administrator may require any creditor to furnish its taxpayer identification number as assigned by the Internal Revenue Service, including without limitation by providing an executed current Form W-9, Form W-8 or similar tax form, as a prerequisite to receiving any distribution under the Plan or this Agreement. If a creditor does not timely provide the Plan Administrator with its taxpayer identification number in the manner and by the deadline established by the Plan Administrator and/or the Plan, the creditor shall be deemed to have forfeited its right to any current, reserved or future distributions provided for under the Plan and such creditor's Claim or Interest shall be disallowed and expunged without further order of the Bankruptcy Court. Any such forfeited distribution shall be deemed to have reverted back to the Wind-Down Debtors for all purposes, including for distributions to other holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the

forfeited distribution was made, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property law to the contrary.

4.5     Unclaimed and Undeliverable Distributions. If any distribution to a creditor is returned to the Plan Administrator as undeliverable and/or otherwise remains unclaimed, the Plan Administrator shall use reasonable efforts to contact such creditors, *provided* that no further Plan Distributions to such creditor shall be made unless and until the Plan Administrator has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *further*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the applicable Distribution Date.  A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind-Down Debtors of an intent to accept a particular distribution; (c) responded to the Wind-Down Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

After the passage of the deadlines set forth in Article VI.C(6) of the Plan, such distribution shall be deemed unclaimed property under Bankruptcy Code section 347(b) and all title to and beneficial interest in such undeliverable Distribution shall revert to or remain in the Wind-Down Debtors automatically and without any need for further order by the Bankruptcy Court, notwithstanding any federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary, and shall be distributed in accordance with this Article IV and the Plan.

4.6     No Responsibility to Attempt to Locate Creditors. The Plan Administrator may, in his sole discretion, attempt to determine a creditor's current address or otherwise locate a creditor, but nothing in this Agreement or the Plan shall require the Plan Administrator to do so.

4.7     Disallowance of Claims and Interests; Cancellation of Corresponding Beneficial Interests. All Claims in respect of undeliverable or unclaimed Distributions that have been deemed to have reverted back to the Plan Administrator for all purposes (including, but not limited to, for distribution to holders of other Allowed Claims or Allowed Interests, as applicable, against the particular Debtor in respect of which the unclaimed or undeliverable distribution was made) pursuant to Article VI of the Plan shall be deemed disallowed and expunged without further action by the Wind-Down Debtors or Plan Administrator and without further order of the Bankruptcy Court, and the corresponding interests of any creditor holding such disallowed Claims or Interests shall be deemed canceled. The creditor with respect to any such disallowed Claim or Interest shall no longer have any right, claim, or interest in or to any distributions in respect of such Claim or Interest, and further, such creditor is forever barred, estopped, and enjoined from receiving any distributions under the Plan or this Agreement and from asserting such disallowed Claim or Interest against the Wind-Down Debtors or Plan Administrator.

4.8     Inapplicability of Escheat, Abandoned, or Unclaimed Property Laws.  Unclaimed property held by the Wind-Down Debtors shall not be subject to the escheat, abandoned or unclaimed property laws of the United States, any state, any local or any foreign governmental unit.

4.9    Delivery of Distributions.  Subject to the terms of this Agreement, the Plan Administrator shall cause the Wind-Down Debtors to make Distributions to creditors in the manner provided in the Plan.

# ARTICLE V
# THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

5.1    Parties Dealing With the Plan Administrator. In the absence of actual knowledge to the contrary, any Person dealing with the Wind-Down Debtors or the Plan Administrator shall be entitled to rely on the authority of the Plan Administrator or any of the Plan Administrator's agents to act in connection with the Wind-Down Debtors' Assets. There is no obligation of any Person dealing with the Plan Administrator to inquire into the validity or expediency or propriety of any transaction by the Plan Administrator or any agent of the Plan Administrator.

5.2    Limitation of Liability. In exercising the rights granted herein, the Plan Administrator shall exercise the Plan Administrator's best judgment with respect to the affairs of the Wind-Down Debtors and the interests of creditors. However, notwithstanding anything herein to the contrary, neither (a) the Plan Administrator, (b) the Oversight Committee, (c) any Committee Settlement Parties that provide services to the Wind-Down Debtors after the Effective Date, (d) the Bermuda Provisional Liquidators, their respective members, employees, employers, designees or professionals, or (e) any of their duly designated agents or representatives (each, a "Wind-Down Debtors Party" and collectively, the "Wind-Down Debtors Parties"), shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtors or for the act or omission of any other Wind-Down Debtors Party, nor shall the Wind-Down Debtors Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the Plan Administrator Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtors Party's willful misconduct, gross negligence, or actual fraud.  Subject to this Agreement, the Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities, and privileges applicable to a chapter 7 trustee, and the Oversight Committee shall be entitled to enjoy all of the rights, powers, immunities, and privileges of the Committee.

5.3    [Reserved.]

5.4    No Liability for Acts of Predecessors. No successor Plan Administrator shall be in any way responsible for the acts or omissions of any Plan Administrator in office prior to the date on which such successor becomes the Plan Administrator, unless a successor Plan Administrator expressly assumes such responsibility.

5.5    No Liability for Good Faith Error of Judgment. The Plan Administrator shall not be liable for any error of judgment made in good faith, unless it shall be finally determined by a final judgment of a court of competent jurisdiction (not subject to further appeal or review) that the Plan Administrator was grossly negligent in ascertaining the pertinent facts.

5.6    Reliance on Documents and Advice of Counsel or Other Persons. The Plan Administrator or the Oversight Committee, as applicable, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants,

financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Plan Administrator nor the Oversight Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator, the Oversight Committee, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.

5.7    No Liability For Acts Approved by Bankruptcy Court. The Plan Administrator shall have the right at any time to seek instructions from the Bankruptcy Court concerning the administration or disposition of the Wind-Down Debtors. The Plan Administrator and the Oversight Committee shall not be liable for any act or omission that has been approved by the Bankruptcy Court, and all such actions or omissions shall conclusively be deemed not to constitute fraud, gross negligence, or willful misconduct.

5.8    No Personal Obligation for Wind-Down Debtors' Liabilities. Persons dealing or having any relationship with the Plan Administrator shall have recourse only to the Wind-Down Debtors' Assets and shall look only to the Wind-Down Debtors' Assets to satisfy any liability or other obligations incurred by the Wind-Down Debtors or the Oversight Committee to such Person in carrying out the terms of the Plan Administrator Agreement, and neither the Plan Administrator nor the Oversight Committee shall have any personal obligation to satisfy any such liability.

5.9    Indemnification. The Wind-Down Debtors (on an attribution and/or allocation basis) shall indemnify and hold harmless the Wind-Down Debtors Parties (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) that such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Wind-Down Debtors or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such Persons for actions or omissions as a result of willful misconduct, gross negligence, or actual fraud.  The foregoing indemnity in respect of any Wind-Down Debtors Party shall survive the termination of such Wind-Down Debtors Party from the capacity for which they are indemnified.    The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 5.9.

5.9.1    Expense of Wind-Down Debtors; Limitation on Source of Payment of Indemnification. All indemnification liabilities of the Wind-Down Debtors under this section 5.9 shall be expenses of the Wind-Down Debtors (on an attribution and/or allocation basis). The amounts necessary for such indemnification and reimbursement shall be paid by the Wind-Down Debtors out of the available Wind-Down Debtors' Assets after reserving for all other actual and anticipated expenses and liabilities of the Wind-Down Debtors. Neither the Plan Administrator, the Oversight Committee, the Oversight Committee's members, nor any other Wind-Down Debtors Party shall be personally liable for the payment of any Wind-Down Debtors' expense or claim or other liability of the Wind-Down Debtors, and no Person shall look to the Plan

Administrator the Oversight Committee, or other Wind-Down Debtors Party personally for the payment of any such expense or liability.

        5.9.2   <u>Procedure for Current Payment of Indemnified Expenses; Undertaking to Repay</u>. The Wind-Down Debtors (on an attribution and/or allocation basis) shall promptly pay expenses reasonably incurred by any Wind-Down Debtors Party in defending, participating in, or settling any action, proceeding, or investigation in which such Wind-Down Debtors Party is a party or is threatened to be made a party or otherwise is participating in connection with the Plan Administrator Agreement or the duties, acts or omissions of the Plan Administrator or otherwise in connection with the affairs of the Wind-Down Debtors, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Each Wind-Down Debtors Party hereby undertakes, and the Wind-Down Debtors hereby accepts his or her undertaking, to repay any and all such amounts so advanced if it shall ultimately be determined that such Wind-Down Debtors Party is not entitled to be indemnified therefor under the Plan Administrator Agreement.

        5.10   <u>No Implied Obligations</u>. The Plan Administrator and the Oversight Committee members shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administrator Agreement against any of them.

        5.11   <u>Confirmation of Survival of Provisions</u>. Without limitation in any way of any provision of this Agreement, the provisions of this Article V shall survive the death, dissolution, liquidation, incapacity, resignation, replacement, or removal, as may be applicable, of the Plan Administrator, or the termination of the Wind-Down Debtors or this Agreement, and shall inure to the benefit of the Plan Administrator's and the Wind-Down Debtors Parties' heirs and assigns.

**ARTICLE VI**
**OVERSIGHT COMMITTEE**

        6.1   <u>Appointment, Composition, and Governance of Oversight Committee</u>. As provided for in Article IV of the Plan, the Oversight Committee shall consist of those initial members identified on **<u>Exhibit A</u>** hereto. In the event that a member of the Oversight Committee resigns, a new member may be appointed pursuant to Section 6.2 hereof.

        6.2   <u>Resignation/Removal of Oversight Committee Members</u>. Any member of the Oversight Committee may resign upon reasonable notice to the Plan Administrator, counsel for the Plan Administrator, and other members of the Oversight Committee. Sixty (60) days' prior written notice shall constitute reasonable notice under this Section 6.2. Any member of the Oversight Committee may be removed by the Bankruptcy Court for cause or inactivity, provided that there shall always be a member of the Oversight Committee representing the interests of the Bermuda Provisional Liquidators (the "BPL Representative") unless the Bermuda Court otherwise directs the Bermuda Provisional Liquidators to remove the BPL Representative. The Oversight Committee may authorize its own dissolution by filing with the Bankruptcy Court an appropriate notice that its responsibilities under the Plan have concluded. With authorization of a majority of the Oversight Committee, the Plan Administrator may seek an order from the Bankruptcy Court removing or replacing any member of the Oversight Committee for cause, provided that there shall

always be a BPL Representative unless the Bermuda Court otherwise directs the Bermuda Provisional Liquidators to remove the BPL Representative.  Upon the resignation, removal or death of a member of the Oversight Committee, the Oversight Committee may appoint a replacement member by unanimous written resolution.  Absent such resolution within sixty (60) days of such resignation, removal or death, the Plan Administrator shall appoint a replacement member subject to the majority approval of the Oversight Committee.

6.3    <u>Fiduciary Duties</u>. Members of the Oversight Committee shall have fiduciary duties to creditors in the same manner that members of an official committee of creditors appointed pursuant to Bankruptcy Code section 1102 have fiduciary duties to the constituents represented by such a committee, and shall be entitled to indemnification from the Wind-Down Debtors in the same manner as the Plan Administrator for service as members of the Oversight Committee from and after the Effective Date of the Plan under or in connection with this Agreement; provided that nothing in this Agreement shall impose fiduciary duties on the Bermuda Provisional Liquidators (whether in their capacity as BPL Representative or otherwise) which are inconsistent with their powers, duties and obligations under Bermuda law, and/or the terms of the Cross-Border Insolvency Protocol Agreement.

6.4    <u>Limitations on Plan Administrator's Actions</u>. The Plan Administrator shall obtain the approval of the Oversight Committee by at least a majority vote prior to (i) taking any non-ministerial action or determining not to take any such action regarding the administration, reconciliation, objection to, compromise, resolution, settlement, prosecution or litigation of any (a) Claim against the Debtors or Wind-Down Debtors (as determined by the Plan Administrator in his sole discretion) where the face amount of the asserted Claim exceeds $5,000,000.00, or (b) Vested Cause of Action, contested matter, adversary proceeding, or other legal proceeding in which the Plan Administrator, Debtors, and/or Wind-Down Debtors are or may be parties; (ii) determining any Distribution Date, issuing any Distributions, or determining the amounts of any reserves required to be held to facilitate any Distributions; (iii) retaining, terminating, appointing, hiring or taking any other non-ministerial action with respect to the employment of professionals, disbursing agents, other agents, independent contractors, employees or other third parties or agreeing to compensation thereof; (iv) acquiring litigation and other Claims related to the Debtors and/or prosecuting such claims; (v) seeking any determination of tax liability or refund with respect to the Wind-Down Debtors or their Assets; (vi) establishing or modifying any bar date for filing proofs of claims or interests; (vii) abandonment of any assets; (viii) seeking to close any chapter 11 case of any Debtor or seeking any order of the Bankruptcy Court with respect to such closure; (ix) raising any dispute relating to the Cross-Border Insolvency Protocol; or (x) any other action or determination not to take any action that the Oversight Committee informs the Plan Administrator in writing shall be subject to approval of the Oversight Committee pursuant to this section 6.4; provided that, where a member of the Oversight Committee has a personal conflict or conflict of duties relating to a matter in respect of which approval is sought, that member of the Oversight Committee's vote shall not be counted for the purposes of calculating the relevant majority vote in respect of such matter.  The Oversight Committee may modify or waive its approval right, or grant pre-approval, as to any action or category of action provided herein by unanimous written consent describing with particularity such action or category of action for which such rights are waived, *provided that* such modification or waiver may thereafter be revoked and all rights herein reinstated by majority vote.

6.5    <u>Payment of Fees and Expenses</u>. The Plan Administrator shall pay from the Wind-Down Debtors' Assets the reasonable out-of-pocket expenses of the members of the Oversight Committee incurred solely in connection with their role as an Oversight Committee member, and not in their individual capacity.  The Plan Administrator, in consultation with and approval from the Oversight Committee, shall pay reasonable compensation to the members of the Oversight Committee, comprising a per annum or per month fee to each member paid quarterly, plus a fee per each meeting of the Oversight Committee and the Plan Administrator. The Bankruptcy Court shall hear and finally determine any dispute arising out of this section 6.5.

6.6    <u>Bermuda Provisional Liquidators</u>.  Unless otherwise ordered by the Bermuda Court, one BPL Representative shall have the right to direct the Plan Administrator with respect to any matters relating to compliance with Bermuda law in respect of the Bermuda Debtor, and with respect to the matters set out in the Cross-Border Insolvency Protocol Agreement, provided that (i) approval of the Plan Administrator and a majority of the Oversight Committee shall be required with respect to any amendment of the Cross-Border Insolvency Protocol Agreement itself after the Effective Date, and (ii) the Plan Administrator may request that the BPL Representative request the Bermuda Provisional Liquidators to seek a ruling from the Bermuda Court regarding the applicability of Bermuda law as to any matter in which the BPL Representative asserts such rights, or as to the propriety of any direction given.  The Plan Administrator shall consult the BPL Representative regarding any issue or action involving the Bermuda Debtor or compliance with Bermuda law and may, in its discretion, request that the Bermuda Provisional Liquidators seek approval of any related action by the Bermuda Court.

6.7    <u>Recusal</u>.  Each member of the Oversight Committee shall recuse themself from taking any action otherwise permitted by this Agreement to the extent pertaining directly and particularly to the administration, reconciliation, objection to, compromise, resolution, settlement, prosecution or litigation of, or Distribution upon, any Claim held by such member, or any affiliate, family member, majority-owned entity, agent, or other insider of such member.

6.8    <u>Other Decision-making</u>.  The Oversight Committee may act by majority vote or resolution unless otherwise expressly stated herein.  The Oversight Committee shall otherwise be empowered to enact its own bylaws provided that such bylaws do not contradict this Agreement, the Plan or the Confirmation Order.


**ARTICLE VII**
**REMOVAL, REPLACEMENT**

**AND COMPENSATION OF PLAN ADMINISTRATOR**

7.1    <u>Initial Plan Administrator</u>. The Initial Plan Administrator shall be Mohsin Meghji. The Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

7.2     Term of Service. The Plan Administrator shall serve until: (a) the completion of the administration of the Wind-Down Debtors' Assets and the Wind-Down Debtors, including the winding down of the Debtors and the Wind-Down Debtors, in accordance with this Agreement and the Plan; (b) the termination of the Wind-Down Debtors in accordance with the terms of this Agreement and the Plan; or (c) the Plan Administrator's resignation, death, dissolution, incapacity, liquidation, or removal. In the event that the Plan Administrator's appointment terminates by reason of resignation, death, dissolution, incapacity, liquidation, or removal, the Plan Administrator shall be immediately compensated for all reasonable fees and expenses accrued but unpaid through the effective date of termination, whether or not previously invoiced. The provisions of Articles V through VII of this Agreement shall survive the resignation or removal of any Plan Administrator.

7.3     Removal of Plan Administrator for Cause: The Oversight Committee may remove the Plan Administrator either (a) at any time upon written notice by unanimous resolution of the Oversight Committee, or (b) for cause by filing a motion (the "Removal Motion") with the Bankruptcy Court upon not less than thirty (30) days' prior written notice to the Plan Administrator. For purposes of this agreement, "cause" means

7.3.1     arrest or conviction (or plea of guilty or nolo contendere) of the Plan Administrator for any felony, or any other crime involving dishonesty or moral turpitude;

7.3.2     a finding by the Oversight Committee that the Plan Administrator engaged in willful misconduct, or was grossly negligent, in the performance of its duties;

7.3.3     a determination, in good faith, by the Oversight Committee that the Plan Administrator is not acting in the best interest of the creditors; or

7.3.4     a determination, in good faith, by the Oversight Committee that the Plan Administrator has a material and direct conflict of interest, not previously disclosed or specifically waived in advance by the Wind-Down Debtors.

7.4     Resignation of Plan Administrator. The Plan Administrator may resign at any time upon no less than sixty (60) days' prior written notice to the Oversight Committee. The resignation shall be effective on the later of (i) the date specified in the notice of resignation and (ii) the date that is sixty days (60) after the date such notice is delivered to the Oversight Committee members. In the event of a resignation, the resigning Plan Administrator shall render to the Oversight Committee a full and complete accounting of monies and assets received, disbursed, and held during the term of office of such Plan Administrator.

7.5     Appointment of Successor Plan Administrator. Upon the resignation, death, or removal of the Plan Administrator, the Oversight Committee shall appoint a successor. In the event the Oversight Committee does not seek the appointment of a successor Plan Administrator, the Bankruptcy Court may do so on its own motion. Any successor Plan Administrator so appointed (a) shall consent to and accept his, her, or its appointment as successor Plan Administrator, which may be done by e-mail or through acquiescence in not objecting to a motion for approval of his, her, or its appointment as successor Plan Administrator and (b) shall not have any liability or responsibility for the acts or omissions of any predecessor(s).

7.6     Powers and Duties of Successor Plan Administrator. A successor Plan Administrator shall have all the rights, privileges, powers, and duties of his, her, or its predecessor under this Agreement, the Plan, Confirmation Order and, with respect to the Bermuda Debtor, the Cross-Border Insolvency Protocol Agreement, and be bound by their terms.

7.7     Compensation of Plan Administrator and Costs of Administration. The Plan Administrator shall receive fair and reasonable compensation for his services in accordance with the terms and conditions of the Plan, which shall be a charge against and paid out of the Wind-Down Debtors' Assets. All costs, expenses, and obligations incurred by the Plan Administrator (or professionals who may be employed by the Plan Administrator in administering the Wind-Down Debtors, in carrying out their other responsibilities under this Agreement, or in any manner connected, incidental, or related thereto) shall be paid by the Wind-Down Debtors from the Wind-Down Debtors' Assets prior to any distribution to holders of Allowed Claims or Allowed Interests. The terms of the compensation of the Plan Administrator are set forth on **Exhibit B** hereto. The Oversight Committee may modify the Plan Administrator's compensation as agreed by a majority vote.

## ARTICLE VIII
## CLOSING OF THE CHAPTER 11 CASES

8.1     Termination. When each of the following have occurred or will have occurred by the hearing on a motion to close the Chapter 11 Cases, the Plan Administrator shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Cases for each of the Wind-Down Debtors in accordance with the Bankruptcy Code and the Bankruptcy Rules: (a) all Claims against the Wind-Down Debtors and their Estates entitled to payment under the Plan (i) have been satisfied in accordance with the Plan or (ii) have been disallowed by Final Order; (b) all assets have been liquidated (other than those assets abandoned by the Wind-Down Debtors in the Plan Administrator's discretion), and converted into distributable assets and/or Cash to the extent required by the Plan, and such distributable assets and Cash have been distributed in accordance with the Plan; and (c) all wind-down costs and expenses have been paid in full in Cash. Notwithstanding the foregoing, the Plan Administrator may seek authority from the Bankruptcy Court to close the Chapter 11 Cases of the Debtors individually, prior to the requirements above being met with respect to all of the Debtors' Chapter 11 Cases, and may seek to close the Chapter 11 Cases in the event the Debtors lack sufficient funding for further administration. Subject to further order of the Court, this Agreement shall terminate when the Bankruptcy Court enters a final decree contemplated by Bankruptcy Code section 350 and Bankruptcy Rule 3022 closing the Debtors' Chapter 11 Cases with respect to each Debtor.

8.2     Winding Up, Discharge, and Release of the Plan Administrator and Oversight Committee. For the purposes of winding up the affairs of the Debtors and/or the Wind-Down Debtors, as applicable, the Plan Administrator shall continue to act as Plan Administrator and the Oversight Committee shall continue their duties under this Agreement until such duties have been fully discharged or their role as Plan Administrator and Oversight Committee are otherwise terminated under this Agreement and the Plan and, with respect to the Bermuda Debtor, under the Cross-Border Insolvency Protocol Agreement and/or in accordance with Bermuda law. Upon a motion or notice by the Plan Administrator and/or the Oversight Committee, the Bankruptcy Court may enter an order relieving the Plan Administrator and Oversight Committee, its members,

agents, and employees of any further duties and discharging and releasing the Plan Administrator and the Oversight Committee, provided that under no circumstances shall the Oversight Committee, its members, agents or employees be deemed discharged or their roles terminated unless and until the Plan Administrator is likewise deemed discharged and his role terminated by like action.

# ARTICLE IX
## MISCELLANEOUS

9.1     Cumulative Rights and Remedies. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights and remedies under law or in equity.

9.2     Notices. All notices to be given to creditors may be given by electronic mail, first class mail, or may be delivered personally, at the addresses for such creditors appearing on the books kept by the Plan Administrator. Any notice or other communication that may be or is required to be given, served, or sent to the Plan Administrator shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

> If to the Plan Administrator:
> [                              ]
>
> with a copy to counsel:
> [                              ]

or to such other address as may from time to time be provided in written notice by the Plan Administrator.

9.3     Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware.

9.4     Successors and Assigns. This Agreement shall inure to the benefit of and shall be binding upon the Parties and their respective successors and assigns.

9.5     Particular Words. Reference in this Agreement to any Section or Article is, unless otherwise specified, to that such Section or Article under this Agreement. The words "hereof," "herein," and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

9.6     Execution. All funds in the Wind-Down Debtors shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a creditor, and no creditor or any other Person can execute upon, garnish or attach the Wind-Down Debtors' Assets or the Plan Administrator in any manner or compel payment from the Wind-Down Debtors except by Final Order of the Bankruptcy Court. Payments will be solely governed by the Plan and this Agreement.

9.7     Amendment. This Agreement may be amended by written agreement of the Plan Administrator and the Oversight Committee or by order of the Bankruptcy Court; *provided*, *however*, that such amendment may not be inconsistent with the Plan or the Confirmation Order.

9.8     No Waiver. No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver thereof.

9.9     No Relationship Created. Nothing contained herein shall be construed to constitute any relationship created by this Agreement as an association, partnership or joint venture of any kind.

9.10    Severability. If any term, provision, covenant, or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

9.11    Further Assurances. The Parties agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes and provide for the full implementation of this Agreement and the pertinent provisions of the Plan, and to consummate the transactions contemplated hereby.

9.12    Counterparts. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

9.13    Dispute Resolution.

9.13.1  Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 9.13 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Agreement, subject, with respect to the Bermuda Debtor, to the provisions relating to the resolution of disputes under the Cross-Border Insolvency Protocol Agreement.  For the avoidance of doubt, the following parties, and only the following parties, shall be entitled to seek enforcement of this Agreement, including by and through the dispute resolution procedures set forth herein: (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the Plan Administrator, (iv) the Oversight Committee, (v) members of the Oversight Committee in such capacity, and (vi) the Bermuda Provisional Liquidators.

9.13.2  Informal Dispute Resolution. Any dispute under this Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("Notice of Dispute"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

9.13.3  <u>Formal Dispute Resolution</u>. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("Statement of Position"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 9.13.4 below.

9.13.4  <u>Judicial Review</u>. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court and serving on the counterparty or counterparties and the Plan Administrator a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Wind-Down Debtors. Each counterparty shall respond to the motion within the time period allowed by the rules of the Bankruptcy Court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the Bankruptcy Court.

9.14  <u>Jurisdiction</u>. The Bankruptcy Court shall have jurisdiction regarding the Debtors, the Wind-Down Debtors, the Plan Administrator, the Oversight Committee, and the Wind-Down Debtors' Assets, including, without limitation, the determination of all disputes arising out of or related to administration of the Wind-Down Debtors. The Bankruptcy Court shall have continuing jurisdiction and venue to hear and finally determine all disputes and related matters among the Parties arising out of or related to this Agreement or the administration of the Wind-Down Debtors. The Parties expressly consent to the Bankruptcy Court hearing and exercising such judicial power as is necessary to finally determine all such disputes and matters. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Agreement, the provisions of this Agreement shall have no effect on and shall not control, limit or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter, and all applicable references in this Agreement to an order or decision of the Bankruptcy Court shall instead mean an order or decision of such other court of competent jurisdiction.

* * * * *

IN WITNESS WHEREOF, the Parties have or are deemed to have executed this Agreement as of the day and year written above.

[EACH OF THE DEBTORS]


Mohsin Meghji, as Plan Administrator


By: _____


Name_____


Title:_____

## <u>EXHIBIT A</u>

**Oversight Committee Members**

### Oversight Committee Members

1. Greg Dingle, representing the interests of BlockFi Inc.

2. Elisabeth Cabaras, representing the interests of BlockFi International

3. John Javes, representing all of the Wind-Down Debtors

4. Eleanor Fisher and Joel Edwards, jointly as one Member, appointed by and representing the interests of the Bermuda Provisional Liquidators

5. Brendon Ishikawa, representing the interests of BlockFi Lending

## **EXHIBIT B**

**Plan Administrator Compensation**

**Plan Administrator Compensation**

| Plan Administrator | Compensation |
|---|---|
| Mohsin Meghji | Mr. Meghji charges $1,350 per hour for professional services rendered, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses.  This hourly rate is subject to annual rate increases to reflect economic and other conditions.<br><br>The hourly rate is payable to M3 Partners.  Mr. Meghji intends for the Wind-Down Debtors to retain M3 Partners, subject to the approval of the Oversight Committee in all respects, for professional services in connection with administration of the Plan.  Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Oversight Committee and Plan Administrator. |

# EXHIBIT F

## Wind-Down Budget

Certain documents, or portions thereof, contained and/or referred to in this **Exhibit F** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained or referred to herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.

**Estimated BlockFi Wind Down Budget**
*August, 2023*

| ($MM) | Wind Down Budget[1][2] |
|---|---|
| **Operating Expenses** | |
| Employee & Staff Related Cost[3] | $15.2 |
| Other Operating Expenses[4] | 10.2 |
| Ordinary Course Professionals[5] | 4.4 |
| **Total Operating Expenses** | **$29.7** |
| | |
| **Wind Down Administration** | |
| Wind Down Trustee | $1.5 |
| Trust / Wind Down Debtor Advisors[6] | 16.0 |
| Claims/Noticing Agent | 1.7 |
| Other Advisors[7] | 3.6 |
| Document Retention & Processing Fees | 6.0 |
| Other Wind Down Costs[8] | 4.5 |
| **Wind Down Administration Costs** | **$33.3** |
| | |
| Regulatory Compliance[9] | $6.0 |
| Investigate & Prosecute Third Party Claims[10] | 60.0 |
| **Wind Down Legal and Regulatory Matters** | **$66.0** |
| | |
| **Total Wind Down Budget[11]** | **$129.0** |

**Notes:**

(1) *Budgeted amounts represents the Debtors' estimates of potential expenditures that will be incurred to effectuate the Plan and wind down the estate. These estimates are subject to material change and do not represent a commitment to spend. Any amounts not spent will be returned to creditors in a subsequent / final distribution. The Oversight Committee will work with the Trustee to minimize expenses and post-effective date spending and the budget does not assume any incentive based compensation*

(2) *For budgeting purposes, the analysis assumes a wind down period of 36 months. The actual time to wind down the estate could vary materially from estimates.*

(3) *Includes wages, benefits and other employee costs*

(4) *Includes expenses for Technology and Other G&A spend critical to the wind down process*

(5) *Ordinary course professionals will provide legal and accounting services to the Debtors throughout the Wind Down period; as the Debtors are planning to maintain only a minimal staff, outside support will be necessary to address legal issues, audit and prepare financials, and administer IT systems, among other tasks*

(6) *Includes estimated fees for Debtor counsel and FA including general administration and management of the Wind Down Debtors, claims reconciliation and objections, monetization of assets, managing cash and investments, servicing and monitoring loans, among other items as appropriate*

(7) *Includes advisors for Bermuda Joint Provisional Liquidators and Tax Professionals to prepare and file historical tax returns and perform ad hoc services as needed*

(8) *Includes estimates for legal entity wind downs, UST payments, D&O insurance, and reserve for contingency*

(9) *Estimated cost of legal support for continued regulatory compliance and inquiries and miscellaneous legal support*

(10) *The Wind-Down budget includes an estimate of $60 million to assure that the Wind-Down Entity has sufficient resources to pursue certain Claims against third parties including FTX and 3AC. The Committee believes this investment (to the extent ultimately made) will benefit Holders of Claims. All expenses will be reviewed and approved by the Plan Administrator and Oversight Committee to ensure that expenses are responsibly spent to the net benefit of Holders of Claims. Proceeds of litigation and any unspent funds reserved for litigation shall be distributed to Holders of Claims. No benefit from any litigation is assumed in this Wind-Down budget*

(11) *Total wind down costs include $57 million already contemplated in the calculation of illustrative customer recoveries included in the Disclosure Statement filed on August 3, 2023 and would not be dilutive to estimated recoveries*

## **EXHIBIT G**

### **Employee Transition Plan**

Certain documents, or portions thereof, contained and/or referred to in this **Exhibit G** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained or referred to herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.

[To come.]

**<u>EXHIBIT H</u>**

**Cross Border Insolvency Protocol**

       Certain documents, or portions thereof, contained and/or referred to in this **<u>Exhibit H</u>** and the Plan Supplement remain subject to continuing negotiations among the Debtors and interested parties with respect thereto.  This **<u>Exhibit H</u>** and any amendments hereto are further subject to final approval by the Supreme Court of Bermuda.  The Debtors reserve all rights to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained or referred to herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.

## CROSS-BORDER INSOLVENCY PROTOCOL AGREEMENT
## REGARDING BLOCKFI INTERNATIONAL LTD.

This cross-border insolvency protocol (the **Protocol**) establishes a framework for the conduct of the Insolvency Proceedings (as is defined herein) concerning BlockFi International Ltd. (**BFI**) and the management of the estate of BFI pursuant to those proceedings. Capitalized terms that are not otherwise defined herein shall have the meanings given to them in the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates (the **Plan**) and/or the Disclosure Statement related thereto.

**Preliminary Statement**

This Protocol has been negotiated between BFI (acting by its directors) and Eleanor Fisher of EY (Cayman) Ltd and Joel Edwards of EY (Bermuda) Ltd as the Joint Provisional Liquidators (**Bermuda Provisional Liquidators**[1]) of BFI, with input from the Official Committee of Unsecured Creditors (the **Committee**) and [Mohsin Meghji], the Wind-Down Trustee appointed by the Committee pursuant to the Plan (collectively, the **Parties**). The Wind-Down Trustee Agreement, which is a Plan supplement, binds the Wind-Down Trustee to the terms of this Protocol.

This Protocol governs the conduct of the Parties, whether in interest in the Chapter 11 Case relating to BFI (**BFI Chapter 11 Case**) and/or the Bermuda Insolvency Proceedings (collectively, the **Insolvency Proceedings**).

**Background**

BFI was incorporated as a limited liability company under the laws of Cayman on 10 May 2019 and was originally known as "BlockFi International LLC".  BFI was continued in Bermuda on 21 January 2022 as an exempt company and with its name changed to "BlockFi International Ltd". BFI is a wholly owned direct subsidiary of BlockFi Inc. On the same date, BFI was granted a Class F digital assets business licence pursuant to the Digital Asset Business Act 2018. It is regulated for these purposes by the Bermuda Monetary Authority (**BMA**).

BFI's licensed activities, prior to the filing of the Insolvency Proceedings on 28 November 2022, included, *inter alia*, providing services to its non-US based clients such as custodial wallet services, selling or redeeming virtual coins and tokens and acting as a digital assets lender.

---

[1] This defined term includes the full meaning ascribed to these words in Article 1.A of the Plan. The term denotes the Bermuda Provisional Liquidators acting (where the context requires) either as joint provisional liquidators in a provisional liquidation of BFI or as liquidators of BFI following entry of orders in the Bermuda Insolvency Proceedings to (i) wind-up BFI and (ii) to appoint permanent liquidators.

**The Proceedings**

(1)  On 28 November 2022, BlockFi Inc, together with BFI and seven of BlockFi Inc's US subsidiaries (collectively the **Debtors**) commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey (the **Bankruptcy Court**).  The Debtors remained as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

(2)  On 28 November 2022, BFI also filed a Winding Up Petition (No.363 of 2022) in the Supreme Court of Bermuda  (the **Bermuda Court**, together with the Bankruptcy Court, the **Courts**) pursuant to section 161(e) of the Companies Act 1981 (**Companies Act**); the prayer for relief of which sought the appointment of the Bermuda Provisional Liquidators on a 'light touch' basis for restructuring purposes.

(3)  The Order appointing the Bermuda Provisional Liquidators dated 29 November 2022 (as subsequently varied) (the **Appointment Order**) set out the terms upon which the Bermuda Provisional Liquidators should oversee, monitor and assist in the exercise of the directors' powers of management of BFI and BFI's participation in the Chapter 11 Cases and directed *inter alia* that BFI and the Bermuda Provisional Liquidators should seek to agree a protocol setting out their respective rights and obligations. That protocol was executed on 5 December 2022 (the **Restructuring Protocol**), approved by order of the Bermuda Court on 8 December 2022 and subsequently supplemented by an agreed set of operating procedures executed between BFI and the Bermuda Provisional Liquidators (the **Standard Procedures and Controls**).

(4)  On 30 July 2023, the Debtors filed the Plan and Disclosure Statement in the Bankruptcy Court. This Plan set out in its terms the Committee Settlement  agreed with the Committee and to be implemented through the Plan, which included a provision that the Debtors and Bermuda Provisional Liquidators should seek to agree a further protocol to delineate the roles and responsibilities of the Wind-Down Trustee and Bermuda Provisional Liquidators (together, the **Official Representatives**) in order to ensure the just, efficient, orderly and expeditious administration of the parallel Insolvency Proceedings in the United States and Bermuda.  It was a pre-condition to the Plan becoming effective that this Protocol (or one or more other Bermuda Implementation Mechanisms) be approved and/or sanctioned by the Bermuda Court and by the Bankruptcy Court (through confirmation of the Plan).

(5)  On [     ] 2023, the Bermuda Court approved a draft form of this Protocol

(6)  On [26] September 2023, pursuant to section 1129 of the Bankruptcy Code, the Bankruptcy Court entered an order confirming the Plan, including the Plan Supplements containing this Protocol.

(7)  [On [6] October 2023, the Bermuda Court approved this Protocol.]

**NOW THEREFORE,** following the approval of the Bankruptcy Court (though confirmation of the Plan) and the Bermuda Court of the terms of this Protocol, and subject to the powers already afforded to the Bermuda Provisional Liquidators under the Appointment Order, the Bermuda Provisional Liquidators and BFI hereby state that the following matters hereinafter set out are agreed.

**The Need for a New Protocol**

1. The Bermuda Provisional Liquidators and BFI agreed to enter into this new protocol to implement the terms of the Plan. This Protocol supersedes and replaces the Restructuring Protocol and the Standard Procedures and Controls.

**Scope and Purpose of the Protocol**

2. While the Insolvency Proceedings are pending in the United States and in Bermuda, the implementation of basic administrative procedures is necessary to coordinate certain activities, to protect the rights of the parties in interest, ensure the maintenance of the respective independent jurisdictions of the Courts and give effect to the doctrine of comity. It is in the interests of all interested parties, including the Bermuda Provisional Liquidators, the Debtors and their creditors (acting through the Committee), the Wind-Down Trustee, and the Courts to cooperate to the greatest extent possible to ensure the efficient adjudication of BFI creditor claims and the subsequent distribution of the assets of BFI to its creditors pursuant to the terms of the Plan. This Protocol is therefore required, *inter alia*:

    a. **Coordination** – to promote international cooperation and harmonize the coordination of activities in the Insolvency Proceedings; and to provide for the orderly, effective, efficient, and timely administration of the Insolvency Proceedings, and to avoid duplication and conflict, in order to reduce costs and maximize recovery for creditors;

    b. **Communication** – to promote communication among the Official Representatives and, if and when appropriate, amongst the Bankruptcy Court and Bermuda Court;

    c. **Information and Data Sharing** – to provide for the sharing of information and data among the Official Representatives in order to promote effective, efficient and fair administration and to avoid duplication of effort and activities by the Official Representatives;

    d. **Asset Preservation** – to identify, preserve, and maximize the value of the Debtors' assets for the collective benefit of all creditors and interested parties;

    e. **Claims Reconciliation** – to avoid the risk of unfair treatment of creditors by coordinating the claims process, and in particular, to allow for an efficient process for the filing of Claims

against BFI in the Bermuda Insolvency Proceedings by a Bermuda Claimant (as defined herein) and to provide for a consistent and measured approach to the adjudication of Claims;

f.  **Efficient Distribution** – to cooperate in marshalling the assets of the Debtors in order to obtain an efficient distribution of funds, reduce costs and maximize the recovery for BFIs creditors; and

g.  **Comity** –to implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings in a manner consistent with the laws of the United States and of Bermuda, and which respects the independent jurisdiction, sovereignty and authority of the respective Courts.

3.  This Protocol is entered into for the purpose of setting forth the allocation of various duties and responsibilities to be undertaken with respect to the liquidation of BFI, and except as expressly provided herein, is not intended to modify, alter, or in any way affect the Official Representatives' ongoing rights, duties and responsibilities with respect to BFI pursuant to any of the Bankruptcy Code, BFI's regulatory obligations (including any directions issued by the BMA), the Companies Act and Bermuda law, as may be applicable.

**Comity and Independence of the Courts**

4.  The approval and implementation of this Protocol shall not divest nor diminish the Courts' respective independent jurisdiction over the subject matter of the applicable Insolvency Proceedings.

5.  The Bankruptcy Court has and shall continue to have sole and exclusive jurisdiction and power over the conduct of the BFI Chapter 11 Case, the approval of compensation of professionals rendering services in the BFI Chapter 11 Case and the hearing and determination of matters arising in the BFI Chapter 11 Case. Professionals rendering services in the BFI Chapter 11 Case will seek approval of their fees from the Bankruptcy Court for the period up to confirmation of the Plan and shall not be required to seek approval of such fees from the Bermuda Court.

6.  The Bermuda Court has and shall continue to have sole jurisdiction and power over the conduct of the Bermuda Insolvency Proceedings, the supervision of the Bermuda Provisional Liquidators (including their tenure in office and powers), and the hearing and determination of matters arising in the Bermuda Insolvency Proceedings in accordance with Bermuda law. The Bermuda Court has sole and exclusive jurisdiction to approve the fees, disbursements and expenses of the Bermuda Provisional Liquidators, their professional advisors and any other party appearing in the Bermuda

Insolvency Proceedings, and the aforesaid parties shall not be required to seek approval of such fees and expenses from the Bankruptcy Court.

7.    In accordance with the principles of comity and independence recognized herein, nothing contained in this Protocol shall be construed to:

   a.   increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Courts, including the ability of any such court to provide appropriate relief under applicable law on an *ex parte* basis;

   b.   require the Bankruptcy Court to take any action that is inconsistent with the laws of the United States;

   c.   require the Bermuda Court to take any action that is inconsistent with the laws of Bermuda;

   d.   require the Debtors, or any of the Official Representatives, to take any action or refrain from taking any action that would result in a breach of any duty imposed on any of them by any applicable law;

   e.   authorize any action that requires the specific approval of one or both Courts under the Bankruptcy Code or Companies Act after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); and/or

   f.   preclude the Debtors, the Bermuda Provisional Liquidators, the Wind-Down Trustee, the Office of the United States Trustee for the District of New Jersey (as applicable), the Committee, any creditor or any other interested party from asserting that party's substantive rights under the applicable laws of the United States, Bermuda, or any other relevant jurisdiction including, without limitation, the rights of interested parties or affected persons to appeal from the decisions taken by one or both Courts.

8.    The Debtors, Wind-Down Trustee, Bermuda Provisional Liquidators and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them by the Bankruptcy Code, Companies Act and other applicable laws and court orders.

**Powers of the Bermuda Provisional Liquidators**

9.    Unless and until such powers are varied by the Bermuda Court, the powers of the Bermuda Provisional Liquidators under the Appointment Order, as supplemented by an Order dated 16 February 2023, shall continue in force and effect and remain unaffected by this Protocol.

10. Following the Effective Date of the Plan, the Bermuda Court may require that the Winding Up Petition be brought forward and BFI be placed into liquidation. Upon entry of a winding up order in respect of BFI, the Bermuda Provisional Liquidators may apply for, and upon such grant, exercise without any further order of the Bermuda Court (unless required by the Companies Act), all the powers set out in section 175 of the Companies Act.

11. The aforesaid powers of the Bermuda Provisional Liquidators shall include but not be limited to:

   a. the power to adjudicate claims or proofs of debt filed in the Bermuda Insolvency Proceedings in compliance with Bermuda law and this Protocol;

   b. the power to create a Bermuda Liquidation Entity for the purpose of facilitating distributions to those of BFI's creditors outside of the United States;

   c. the power to promote a scheme of arrangement pursuant to section 99 of the Companies Act where necessary or beneficial to facilitate the implementation of the Plan or any part of it;

   d. the power to take any necessary steps to obtain the forms of relief included in the definition of Bermuda Order in Article A.1 of the Plan;

   e. the power to bring or defend any action or other legal proceeding in the name and on behalf of BFI; without prejudice to whatever rights the Wind-Down Trustee may have under the Wind-Down Trustee Agreement to bring or defend any action or other legal proceeding in the name and on behalf of BFI;

   f. the power to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against BFI or for which BFI may be rendered liable;

   g. the power to engage attorneys and other professionally qualified persons to assist the Bermuda Provisional Liquidators in the performance of their functions;

   h. the power to, as the Bermuda Provisional Liquidators deem necessary, apply for directions from the Bermuda Court pursuant to section 176(3) of the Companies Act in relation to any matter or question; and

   i. the power to do all things incidental to the exercise of the above powers and/or implement the Plan through the appropriate Bermuda Implementation Mechanism.

12. The powers of the Bermuda Provisional Liquidators will be exercised in a manner consistent with the implementation of the Plan (subject at all times to the Conflict Provisions, as defined herein).

13. The Bermuda Provisional Liquidators may communicate and/or consult with BFI's creditors, or any of them, as and when and in the manner they believe it is appropriate to do so; consulting where necessary and appropriate with the Wind-Down Trustee, and acting at all times in accordance with any applicable direction issued by the BMA.

**Representation of BFI with Respect to the Chapter 11 Cases[2]**

14. From the Effective Date of the Plan, it is anticipated that the Wind-Down Trustee will have the authority to act on behalf of BFI in the BFI Chapter 11 Case pursuant to a power of attorney executed by BFI (acting through its directors prior to the Effective Date) and subject to the supervision of the Oversight Committee and the provisions of this Protocol.  It is acknowledged that BFI is the largest liquidation estate of the Debtors in the Chapter 11 Cases, that BFI is continued and regulated in Bermuda, that BFI's creditors are strongly international in nature as a result of BFI's sole focus on non-US clients, that many of BFI's creditors may not have submitted and may not submit to the jurisdiction of the Bankruptcy Court and that certain contractual agreements with these creditors are governed by Bermuda law.

15. The Official Representatives shall work together in good faith to effectuate the desire and intent for the Wind-Down Trustee to act on behalf of BFI in the BFI Chapter 11 Case in furtherance of the Wind-Down Trustee's roles and responsibilities (as summarised in paragraph 18 hereof) consistent with the Bermuda Provisional Liquidators' duties and responsibilities under Bermuda or applicable law and subject to the Bermuda Provisional Liquidators reserving the right to seek relief from the Courts in the event the foregoing cannot be accomplished.

16. In this context, the respective roles of the Bermuda Provisional Liquidators and of the Wind-Down Trustee are – in broad terms – as follows below.

**Role of the Bermuda Provisional Liquidators[3]**

17. The primary role of the Bermuda Provisional Liquidators is to:

   a. conduct, under the supervision of the Bermuda Court, and in accordance with all responsibilities and duties applying to the Bermuda Provisional Liquidators (whether of a

---

[2] NTD: Section to be finalized once the form of the Protocol is broadly agreed.

[3] NTD: Section to be finalized once the form of the Protocol is broadly agreed.

fiduciary, statutory and/or regulatory nature and/or arising from Bermuda common law), the provisional liquidation and/or liquidation of BFI in Bermuda until the conclusion of the Bermuda Insolvency Proceedings (**Close of Bermuda Proceedings**)[4]. This conduct includes, *inter alia,* effectuating the Bermuda Claims Adjudication Process (as defined herein), carrying out distributions in accordance with the Plan (including via a Bermuda Liquidation Entity, as may be required), obtaining a Bermuda Order, implementing one or more Bermuda Implementation Mechanisms, seeking validation (where necessary) from time to time and/or prior to the Close of Bermuda Proceedings of the BFI Allocation (as defined herein) so as to avoid the consequences of section 166 of the Companies Act[5], producing a final return (unless dispensed with by order of the Bermuda Court), applying for the dissolution of BFI (see further below), and applying for the formal release of the Bermuda Provisional Liquidators;

b.   review, consider, and, if appropriate, provide consent on issues covered by the JPLs Consent Provisions (as defined herein);

c.   monitor, oversee and be consulted on, and regularly report to the Bermuda Court with respect to BFI in the Chapter 11 Cases, and, in particular, progress of the Vested Causes of Action and any issue of settlement, compromise or abandonment related thereto;

d.   bring or defend any necessary legal proceedings, including all legal proceedings before the Bermuda Court and such further proceedings as may be required to support the commencement or prosecution of the Vested Causes of Action or any other legal proceedings;

e.   ensure compliance by BFI with all directions from time to time imposed on BFI by the BMA; to liaise, meet with and update the BMA as may be required; and to prepare and provide a wind-down plan to the BMA;

f.   consider and agree with the Wind-Down Trustee the most tax efficient and administratively efficient way to make distributions to BFI's creditors;

g.   in their capacity as a member of the Oversight Committee, monitor, oversee and be consulted on, as required, in accordance with the terms governing such Oversight Committee, all matters relating to the administration of the Wind-Down Debtors;

---

[4] This term denotes (i) dissolution of BFI and (ii) formal release of the Bermuda Provisional Liquidators by order of the Bermuda Court.

[5] Section 166 avoids any disposition of property made by a company after the commencement of winding up proceedings unless the Bermuda Court orders otherwise.

h.   dissolve BFI at the earlier of (i) all of BFI's assets having been distributed pursuant to the Plan and this Protocol and/or any other Bermuda Implementation Mechanism; and (ii) the Bermuda Provisional Liquidators determining in their sole discretion, after consultation with the Wind-Down Trustee, that the administration of BFI's estate is unlikely to yield sufficient additional proceeds to justify further pursuit; provided, however, that in no event shall BFI be dissolved later than [three (3) years] from the Effective Date unless the Bermuda Court, upon application within the six (6) months prior to the third anniversary of the Effective Date (or at least six (6) months prior to the end of an extension period) determines that a fixed period extension (each extension not to exceed 18 months) is necessary to facilitate or complete the recovery and liquidation of BFI; and provided that, at the Bermuda Provisional Liquidators' sole discretion, the Bermuda Provisional Liquidators may take any reasonable actions to dissolve BFI if the Bermuda Provisional Liquidators reasonably believe that the continued existence of BFI is no longer necessary; and

i.   to act in good faith to resolve any disputes with the Wind-Down Trustee arising under or in connection with this Protocol.

**Role of the Wind-Down Trustee[6]**

18.   The details of the roles and responsibilities of the Wind-Down Trustee are *inter alia* set out in Article IV D.6 of the Plan and as may further be confirmed in the Wind-Down Trustee Agreement. The primary roles of the Wind-Drown Trustee include (*inter alia*) to:

a.   implement the Plan in the United States, under the supervision of the Oversight Committee and the Bankruptcy Court and in consultation with the Bermuda Provisional Liquidators;

b.   consider and agree with the Bermuda Provisional Liquidators the most tax efficient and administratively efficient way to make distributions to BFI's creditors;

c.   pursue the Vested Causes of Action in the United States in order to maximise recovery for the Debtors' creditors, including the creditors of BFI who have the most significant stake in these recoveries;

d.   consult and liaise with the Bermuda Provisional Liquidators regarding all matters and actions relating to the Vested Causes of Action, including without limitation to seek the

---

[6] NTD: Section to be finalized once the form of the Protocol is broadly agreed.

Bermuda Provisional Liquidators' approval of any proposed compromise, abandonment or other step likely to have a material impact on the recovery to BFI's creditors;

e.   seek the approval of the Bermuda Provisional Liquidators with regard to the matters covered by the JPLs Consent Provisions, and to act in good faith to try to resolve any areas of disagreement which may arise between the Parties; and

f.   to act in good faith to resolve any disputes with the Wind-Down Trustee arising under or in connection with this Protocol.

**Vested Causes of Action**

19.   The Wind-Down Trustee shall consult with the Bermuda Provisional Liquidators with respect to, and involve the Bermuda Provisional Liquidators in material matters concerning, the Vested Causes of Action, and the Official Representatives shall agree upon a desired litigation strategy to prosecute these claims (the **Agreed Litigation Strategy**).

20.   In order to carry out the Agreed Litigation Strategy, contemporaneous relief may need to be sought through the filing of applications and/or motions in both the Bermuda Court and/or the Bankruptcy Court or in a court of competent jurisdiction other than the Bankruptcy Court. In such cases, the Official Representatives shall expeditiously pursue such relief from the Bermuda Court or the Bankruptcy Court or other court, as applicable, to ensure that there are no delays or prejudice to the Official Representatives in effectuating the Agreed Litigation Strategy with respect to the Vested Causes of Action.

21.   In order to promote efficiencies and the timeliness of any desired application, to the extent possible the Official Representatives shall adhere to the following procedures and timeframes (which shall only apply to prosecution of the Vested Causes of Action and not those matters where specific consent is required by the JPLs Consent Provisions):

a.   The Wind-Down Trustee will notify the Bermuda Provisional Liquidators of the proposed litigation strategy as soon as practicable;

b.   In urgent cases where reasonable advance notice is not practicable, the Bermuda Provisional Liquidators will provide any initial commentary, observations, and/or concerns to the Wind-Down Trustee (either directly or through US and Bermuda counsel) within [one] business day (being a business day in Bermuda from 8am to 5pm (**Bermuda Business Day**) of being notified in writing of the proposed litigation strategy and/or provided with draft documents in relation to the same (the **Strategy Feedback**).  In the event that the Strategy Feedback is not timely provided, the Wind-Down Trustee may proceed to implement the

proposed litigation strategy if a delay in doing so will harm or otherwise prejudice the Wind-Down Trustee's ability to timely effectuate the said strategy;

c.    To the extent the Bermuda Provisional Liquidators consider it is needed, the Wind-Down Trustee will schedule a consultation call for the Official Representatives and their legal advisers as soon as practicable and within one Bermuda Business Day of any request being made by the Bermuda Provisional Liquidators;

d.    To the greatest extent possible, any draft filings (including motions, declarations, briefs, stipulations and any other legal filings) which are to be made in the Vested Causes of Action shall be provided to the Bermuda Provisional Liquidators for review, with all relevant supporting documentation and information, at least [three] Bermuda Business Days in advance of any filing requirement or deadline; and

e.    The Bermuda Provisional Liquidators will provide any commentary, observations and/or concerns to the Wind-Down Trustee (either directly or through US and/or Bermuda Counsel) within [two] (2) Bermuda Business Days of being provided with draft documentation relating to the Vested Causes of Action (the **Documentation Feedback**). In the event the Documentation Feedback is not timely provided, the Wind-Down Trustee may proceed to implement the desired strategy (including through the motions, declarations, briefs, stipulations and any other legal filings) if, in the reasonable opinion of the Wind-Down Trustee, a delay in doing so will harm or otherwise prejudice the Wind-Down Trustee's ability to timely effectuate the said strategy.

**Bermuda Provisional Liquidators' Consent**

22.  With respect to BFI, the Wind-Down Trustee shall obtain the consent of the Bermuda Provisional Liquidators prior to:

a.    exercising discretion under the Plan (insofar as the Plan grants the Wind-Down Trustee such discretion) to elect to make distributions to BFI's Holders of Allowed Claims by way of either digital assets or cash;

b.    implementing material changes to the anticipated distributions to BFI's Holders of Allowed Claims set-out in the Amended Disclosure Statement;

c.    the allocation to BFI of a share of the compensation incurred by the Debtors in relation to the fees of any of the professionals engaged by the Wind-Down Trustee or BFI in the Chapter 11 Cases, together with any disbursements (**BFI Allocation**);

d.   causing BFI in the Vested Causes of Action (or any one of them) and/or in the Chapter 11
Cases to compromise, settle, release, withdraw claims materially or directly affecting BFI;

e.   taking any steps on any matter which will materially or directly have an impact on BFI
and/or which would have or is likely to have a material impact on the interests of BFI or
BFI's creditors; or

f.   taking any further steps with regard to any specific matter which the Bermuda Provisional
Liquidators have reasonably requested the Wind-Down Trustee in writing not to take
without the prior consent of, or without first consulting with, the Bermuda Provisional
Liquidators.

(collectively, **JPLs Consent Provisions**)

23.   For the purpose of paragraph [22], the term "consent of the Bermuda Provisional Liquidators"
means that (a) the Bermuda Provisional Liquidators, or any one of them, or any agreed designee
on their behalf, have confirmed their consent to the Wind-Down Trustee in writing or (b) the Wind-
Down Trustee has given the Bermuda Provisional Liquidators not less than five (5) Bermuda
Business Days written notice of a contemplated action and the Bermuda Provisional Liquidators
have not indicated their objection in writing within such five (5) Bermuda Business Days period.

**Bermuda Claims Adjudication Process**

24.   There are both similarities and significant differences between the insolvency laws of the United
States and Bermuda with respect to the procedures for the filing and allowance of claims, debts
and interests so, in order to manage the claims adjudication process in compliance with Bermuda
law, it is necessary that there be a claims procedure in place (**Bermuda Claims Adjudication
Process**) for the filing of claims, debts, and interests by creditors of BFI who (i) have not filed a
claim in the BFI Chapter 11 Case[7] and (ii) wish to file a Claim in the Bermuda Insolvency
Proceedings (**"Bermuda Claimants"**) (provided that it is acknowledged that creditors whose
claims have been scheduled by BFI shall not be required to file a claim for the purpose of
participating in any distribution)[8].  Consequently, the Bermuda Provisional Liquidators and, to the
extent necessary, the Bermuda Court,  following entry of a winding-up order with respect to BFI,
subject to any scheme of arrangement and/or other Court approved compromise in respect of BFI
which sets out a claims procedure for the filing of claims, debts, and interests by Bermuda

---

[7] "Claim" in this context includes proofs of claim filed by a creditor and any objection taken to the amount of a scheduled claim.

[8] The notice for this process will make it clear that creditors whose claims have been scheduled in the Chapter 11 Cases, or whose disputes as to
quantum are being adjudicated in those proceedings, need not file a proof of debt in the Bermuda Insolvency Proceedings, in order to avoid a
duplication of administration time, costs and expenses.

Claimants shall be responsible for (i) implementing, in accordance with the laws of Bermuda, the process for filing, consideration and adjudication of such claims or proofs of debt against BFI and (ii) applying to the Bermuda Court to set a bar date for the filing of such proofs of debt in accordance with, and carrying the effects of, section 191 of the Companies Act (exclusion of creditors from distribution who do not prove in time). Except as otherwise provided herein, the decisions of the Bermuda Provisional Liquidators and/or the Bermuda Court in relation to the adjudication of proofs of debts filed by Bermuda Claimants shall be binding on the Wind-Down Trustee and BFI in the BFI Chapter 11 Case. Approval by the Bankruptcy Court of this Protocol shall constitute both an order approving the process set out above and an order that all claims of the Bermuda Claimants  be adjudicated, allowed, or disallowed by the Bermuda Provisional Liquidators, and to the extent necessary, the Bermuda Court, notwithstanding such creditors' rights to enforce their claims in the United States or elsewhere. To effectuate this procedure, and to ensure that the Official Representatives are aware of all possible claimants, both Official Representatives shall, on request, provide to the other copies of any proofs of claim, debt or interest filed in their respective Courts. With respect to the adjudication of proofs of claim or debt against, and proofs of interest in, BFI, the terms of this Protocol shall supersede, to the extent inconsistent herewith, the terms of the Bankruptcy Court's "Order (I) Setting Bar Dates For Submitting Proofs of Claim, (ii) Approving Procedures For Submitting Proofs of Claim, (iii) Approving Notice Thereof, and (iv) Granting Related Relief." [Dkt. No. 440; Case No. 22-19361; Bankr.D.N.J].

25. Contractual rights of set-off or netting of Claims between BFI and any Bermuda Claimant  (including without limitation any bilateral or multi-lateral set off or netting agreements) are enforceable against BFI for the purpose of quantifying Claims. Equally, where there are mutual credits, mutual debts or other mutual dealings between BFI and a Bermuda Claimant, an account shall be taken of what is due from each party to the other in respect of the mutual dealings pursuant to section 235 of the Companies Act, and the sums due from one party shall be set off against the sums due from the other; provided that amounts due from BFI to any Bermuda Claimant shall not be set-off if that creditor had actual notice of the winding up petition at the time the amounts became due.

26. The Bermuda Provisional Liquidators may admit, in whole or in part, any Claim of a Bermuda Claimant. The Bermuda Provisional Liquidators will notify each Bermuda Claimant  in writing whether its Claim has been admitted in full, admitted in part, or rejected. Where the Bermuda Provisional Liquidators have admitted a Claim in part, or rejected a Claim, the Bermuda Provisional Liquidators will provide the Bermuda Claimant with (a) an explanation as to the Bermuda Provisional Liquidators' reasons for rejecting the whole or part of the Claim and (b) confirmation of the Bermuda Claimant's right to appeal to the Bermuda Court to have the decision of the Bermuda Provisional Liquidators reversed or varied.

27. Any appeal to the Bermuda Court must be made within 21 days of the Bermuda Claimant receiving the Bermuda Provisional Liquidators' notice of decision in respect of their Claim. Notice of the appeal must be served on the counsel of record for the Bermuda Provisional Liquidators.

28. Unless otherwise provided pursuant to the terms of an enforceable contract between the Bermuda Claimant  and BFI, every Bermuda Claimant shall bear the cost of proving its own Claim against BFI, including the cost of responding to any request from the Bermuda Provisional Liquidators that it provide further details in respect of its Claim.

29. The Bermuda Provisional Liquidators' fees and costs of adjudicating the Claims shall be paid out of the assets of BFI as an expense of the liquidation.

30. Any Bermuda Claimant   may withdraw or vary its Claim at any time with the agreement of the Bermuda Provisional Liquidators.

31. Where it appears to the Bermuda Provisional Liquidators, on the basis of information not available at the time of their adjudication of a Claim, that a Claim ought not to have been admitted, or ought to have been admitted for a lesser amount, the Bermuda Provisional Liquidators may apply to the Bermuda Court to expunge a Claim which has been admitted or reduce the amount in respect of which it has been admitted.

32. An application to expunge a Claim must be made promptly and, in any event, not later than the date upon which a distribution is paid in respect of it. Notice of an application to expunge must be served by the Bermuda Provisional Liquidators on the Bermuda Claimant in respect of which it is sought to expunge the Claim.

**Limitation on a Creditor's Ability to Recover Twice for the Same Claim**

33. Pursuant to §1532 of the Bankruptcy Code, a "creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment for the same claim in a case under any other chapter of this title regarding the debtor, so long as the payment to other creditors of the same class is proportionally less than the payment the creditor has already received." Pursuant to Bermuda law, the same principle of *pari passu* distribution to creditors is achieved by the application of the hotchpot principle. The Official Representatives will consult and coordinate prior to the making of any distribution to creditors or shareholders of BFI with a view to, as closely as possible, complying in substance with the intent of §1532 and the substantial equivalent provisions under Bermuda law.

**Distributions in Bermuda to Creditors**

34.  At present, it is unclear whether distributions in the BFI Chapter 11 Case by the Wind-Down Trustee directly to creditors of BFI might result in adverse tax consequences or impose undue administrative or economic burden on the estate or on the individual creditors of BFI such that the interests of creditors might be adversely impacted and therefore would not be in the best interests of BFI's general body of unsecured creditors. If and to the extent the Wind-Down Trustee, after consultation with the Bermuda Provisional Liquidators, believes that distributions in the BFI Chapter 11 Case will not reduce recoveries to BFI creditors as a result of such adverse US tax consequences arising from distribution taking place in the United States, or cause undue administrative and economic burden on the estate or on the individual creditors of BFI such that the interests of creditors might be adversely impacted, the Wind-Down Trustee shall proceed to make distributions in accordance with the terms of the Plan.

35.  If upon consultation, the Official Representative jointly conclude that in order to maximize recoveries to creditors of BFI, and to reduce undue administrative burden on such creditors, the interests of creditors will be best served if the Bermuda Provisional Liquidators make distributions to the creditors of BFI through a Bermuda Liquidation Entity, the Bermuda Provisional Liquidators will proceed to make distributions in this manner and in accordance with the terms of the Plan, and the Wind-Down Trustee will facilitate the implementation of the same, including seeking such relief from the Bankruptcy Court as may be necessary.

**Funding related to the Bermuda Insolvency Proceedings**

36.  The Bermuda Liquidation Fund will be used to fund the liquidation and wind down of BFI under the supervision of the Bermuda Court and in accordance with the terms for payment of Bermuda fees and expenses set-out in the Plan[9].

37.  The Bermuda Professional Fee Claims shall be paid on account by the Bermuda Provisional Liquidators from the Bermuda Liquidation Fund as bills are rendered, provided that the amount of payment of the Bermuda Provisional Liquidators' fees shall not exceed 80% of the billed amount. The remaining 20% (or part thereof, as determined) will be accrued and paid on an approximately six monthly basis upon sanction by the Bermuda Court of 100% (or part thereof as determined) of accrued fees, expenses and disbursements. In the event that the amount of Bermuda Professional Fee Claims approved by the Bermuda Court is less than the amount paid on account, the Bermuda Provisional Liquidators shall forthwith pay the balance back to the Bermuda Liquidation Fund.

38.  The Bermuda Provisional Liquidators will notify the Wind-Down Trustee should the amount retained in the Bermuda Liquidation Fund fall, or be likely to fall, below $[600,000], at which time the

---

[9] Article B5 of the Plan.

Bermuda Provisional Liquidators may request, and the Wind-Down Trustee shall be obliged to provide, or cause BFI to provide, additional funding payable to satisfy the Bermuda Professional Fee Claims in full and will not cause BFI to make any payment or distribution without reserving sufficient funds to discharge of the Bermuda Professional Fee Claims in full.

**Sharing of Information and Common Interest**

39. The Wind-Down Trustee shall provide such information as is reasonably requested by the Bermuda Provisional Liquidators to ensure that they are able to act in accordance with their fiduciary and statutory responsibilities and in compliance with the terms of this Protocol and Bermuda law, including, without limitation, such reasonable requests for explanations as to:

   a. the actions or decisions taken or proposed to be taken by the Wind-Down Trustee with respect to BFI;

   b. the sale or disposal of any assets of BFI;

   c. the BFI Chapter 11 Case; any related litigation, including material discussions and communications by BFI with parties concerning the Vested Causes of Action and steps taken or proposed to be taken in connection with such Vested Causes of Action;

   d. materials in support of the wind-down plan and/or any other proposed amendment thereto, such as valuation reports, liquidation analyses and other schedules and reports;

   e. the terms of any budget to be filed in the BFI Chapter 11 Case;

   f. any information the Bermuda Provisional Liquidators consider necessary in order for the Bermuda Provisional Liquidators to seek validation of the BFI Allocation; and

   g. any proposed payment of distributions to BFI's creditors.

40. Each of the Official Representatives shall keep the other fully apprised of their activities and all relevant information and material developments arising in the Insolvency Proceedings.

41. To the extent permitted, non-public information available to the Wind-Down Trustee shall be shared with the Bermuda Provisional Liquidators, subject to appropriate confidentiality arrangements and maintenance of all privileges under the applicable rules of evidence. Any and all information shared which is considered to be of a confidential nature shall be treated as such. Furthermore, each of the Official Representatives will ensure by their reasonable endeavours that both their respective staff, legal counsel and independent advisors will maintain the confidentiality of such information.

In the furtherance of this objective, the Official Representatives shall not (and shall direct their respective agents and representatives not to) provide any non-public information received from the other party to any third party, unless the disclosure of such information is (i) agreed to by the other party, (ii) required by applicable law, or (iii) required by order of the Courts.

42. The entry of orders by the Courts approving this Protocol shall constitute recognition, to the extent permissible by applicable laws, by the Official Representatives that communications among the Official Representatives and their respective professionals, employees, agents, and representatives (collectively, the **Common Interest Parties**) serve common legal interests, and that such interests would best be served if the Common Interest Parties can confidentially exchange privileged information, and when doing so, such information or documents will be subject to, and not waive any, attorney-client privilege, work product, legal, professional, or other privileges or any confidentiality recognized under any applicable law.

**Official Representatives Meetings**

43. In order to facilitate efficient communication and information sharing between the Official Representatives, the Official Representatives will meet on a minimum weekly basis (unless otherwise agreed) and at such intervals as may be requested by the Bermuda Provisional Liquidators and/or the Wind-Down Trustee (the **Representatives Meeting**). The following procedures shall govern the conduct of the Representatives Meeting:

   a. The Bermuda Provisional Liquidators will be responsible for circulating an agenda ahead of each Representatives Meeting which will be circulated to the Wind-Down Trustee and its relevant advisors, as appropriate, not less than 4 hours in advance of any scheduled meetings;

   b. The Wind-Down Trustee will provide the Bermuda Provisional Liquidators with documentary information on or before the close of business on the day requested by the Bermuda Provisional Liquidators each week relating to the matters to be discussed at the Representatives Meeting, including, but not limited to: (i) budgeting; (ii) cash expenditures; (iii) matters relating to the Employee Transition Plan (as defined in the Plan) which are necessary for the implementation of the Plan; (iv) ordinary course transactions; (v) BFI's participation in the Vested Causes of Action; and (vi) BFI's participation in the BFI Chapter 11 Case and any related litigation; and

   c. Where the **Representatives Meeting** is at the request of the Wind-Down Trustee, the Wind-Down Trustee will be responsible for circulating an agenda ahead of each such

meeting which will be circulated to the Bermuda Provisional Liquidators and their relevant advisors, as appropriate, not less than 4 hours in advance of any scheduled meeting.

**Announcements and Public Statements**

44. With respect to BFI, the Wind-Down Trustee, with guidance from its legal and/or communications advisers and unless otherwise agreed with the Bermuda Provisional Liquidators, will be responsible for the initial drafting of any BFI related announcements, public statements, press releases, posts or the like (whether to be made solely on behalf of BFI or to be on behalf of the Debtors) (collectively **BFI Announcements**).

45. To the greatest extent possible, all BFI Announcements shall be provided to the Bermuda Provisional Liquidators for review, with all relevant supporting documentation and information, at least two (2) Bermuda Business Days in advance of their intended release.

46. The Bermuda Provisional Liquidators will provide any commentary, observations and/or concerns to the Wind-Down Trustee (either directly or through its US and/or Bermuda counsel) within [one (1)] Bermuda Business Day of being provided with any such draft BFI Announcements (the **Announcements Feedback**).

47. BFI Announcements shall only be made with the express authorization of each of the Official Representatives; provided that in the event the Announcements Feedback is not timely provided, the Wind-Down Trustee may make any BFI Announcement without the express authorization of the Bermuda Provisional Liquidators if a delay in doing so will harm or otherwise prejudice BFI or BFI's creditors.

48. The Official Representatives will ensure that all BFI Announcements shall comply with any notice requirements specified in the BFI Regulatory Obligations (as defined herein).

**Bermuda Monetary Authority**

49. The Official Representatives acknowledge the importance of adherence to any directions issued from time to time by the BMA, including the revised directions imposed on 15 December 2022 (or any variation or replacement thereof), and compliance with the Digital Assets Business Act 2018 (together, **BFI Regulatory Obligations**). While it is acknowledged that the Bermuda Provisional Liquidators will primarily be responsible for liaising with the BMA, it is understood by the Official Representatives that all BFI Regulatory Obligations apply to BFI directly.

50. To assist with BFI's adherence to the BFI Regulatory Obligations, and to help facilitate the Bermuda Provisional Liquidators' monitoring of the same:

    a.  To the extent allowable by the BMA, the Official Representatives shall ensure that all communications with the BMA (whether communications are addressed to or received from BFI or the Bermuda Provisional Liquidators) where the content is relevant to the BFI Regulatory Obligations are copied to the Wind-Down Trustee (if issued to or received from the Bermuda Provisional Liquidators) and the Bermuda Provisional Liquidators (if issued to or received from BFI); and

    b.  To the extent allowable by the BMA, the Bermuda Provisional Liquidators will update the Wind-Down Trustee following any meetings with the BMA in relation to the BFI Regulatory Obligations where material further restrictions or requirements are, or are likely to be, imposed on BFI by the BMA.

**Notice and Attendance at Hearings**

51. The Official Representatives shall provide each other with adequate notice of any motion, application or other pleading or papers filed in one or both of the Insolvency Proceedings, and shall provide each other notice of any related hearings or other proceedings, by appropriate means (generally by email but including, where circumstances warrant, by courier, telephone or other electronic means).

52. Notice of any meetings, court hearings or statutory deadlines shall be provided by the Official Representatives to each other by email as far in advance as possible.

53. The Bermuda Provisional Liquidators shall have the right to observe or appear and be heard by counsel in all proceedings in the Bankruptcy Court for and on behalf of BFI (without generally submitting to the jurisdiction of the Bankruptcy Court), and the Wind-Down Trustee shall not object to such appearances. Similarly, the Wind-Down Trustee shall have the right to observe or appear and be heard by counsel in all proceedings in the Bermuda Court for and on behalf of BFI (without generally submitting to the jurisdiction of the Bermuda Court), and the Bermuda Provisional Liquidators shall not object to such appearances.

54. Insofar as they may consider it necessary and appropriate, the Official Representatives are at liberty to apply to the Courts (or request the assistance of the other to do so) so that any specific document, or part of any document, on the court file be kept under seal and not made available to any particular person or class of person.

**Confidentiality / Adherence to Protective Orders**

55. The Official Representatives shall be bound by, and shall adhere to, any confidentiality requirement, protective order, or other similar mechanism entered by either of the Courts (subject to the Conflict Provisions).

**Cooperation and Mutual Opportunity for Input**

56. To assist in the efficient administration of the Insolvency Proceedings, the Official Representatives shall, to the extent allowed by applicable law, without prejudice to the terms of this Protocol:

    a. reasonably cooperate with each other in connection with actions taken in the Courts, respectively; and

    b. take all other steps reasonably required to coordinate the administration of the Insolvency Proceedings in the United States and Bermuda.

**Miscellaneous**

57. Each party represents and warrants to the other that the execution, delivery, and performance of this Protocol is within the power and authority of such party and has been duly authorized by such party.

58. This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by facsimile or other electronic means, which shall be deemed to constitute an original signature.

59. The Official Representatives are hereby authorized to take such actions and execute such documents as may be necessary and appropriate to implement and effectuate this Protocol.

60. All communications expressed to be made in writing in this Protocol between the Official Representatives under this Protocol may be made by letter or email.

**Binding Effect**

61. This Protocol is binding on and will inure to the benefit of the Parties hereto and their respective assigns, successors, representatives, managers, liquidators, and trustees (including any trustee under chapters 7 and 11 of the Bankruptcy Code) appointed under Bermuda Law or United States law, as the case may be. In the event of a subsequent order vacating, modifying or amending this Protocol, such order shall not rescind or nullify any action taken pursuant to the Protocol to the date

of such order unless an injunction has been timely issued and served upon the relevant parties prior to such action.

**Amendments and Waivers**

62. This Protocol may not be waived, amended or modified in any way or manner (in whole or part) except by written instrument signed by the party to be bound and after any approval or authorization by the Bankruptcy Court (so long as the BFI Chapter 11 Case remains open) and/or the Bermuda Court (as applicable) has been obtained. If any party proposes to waive, amend, or modify this Protocol (in whole or part) for so long as the BFI Chapter 11 Case remains open it shall notify the Bankruptcy Court [and the United States Trustee for the District of New Jersey], the Bermuda Court, and the Official Representatives and their respective counsel of record (collectively, the **Notice Parties**) of the proposed waiver, amendment or modification.

63. This Protocol may be supplemented from time to time by the parties hereto as circumstances may require with any supplementing stipulations as the Courts may approve.

**Conflict Provisions**

64. Nothing in this Protocol shall prejudice, or be construed to prejudice, the rights or duties of the Official Representatives to perform their respective responsibilities and obligations as required under the Insolvency Proceedings, pursuant to orders of the Courts, or otherwise under applicable law, or otherwise to circumvent, alter, or affect the rights, obligations, or laws of any jurisdiction. The provisions of this Protocol are to facilitate the performance of such responsibilities and obligations by each of the Official Representatives. If any party is directed by the Courts to act (or not to act) with respect to a particular issue whether on its own application or otherwise, that party's obligation to follow the court's direction should not be impaired or abridged by this Protocol.  To the extent any party's obligation to follow a court's order or direction conflicts with its obligations under this Protocol, such party shall be relieved from its obligations under this Protocol, but that party must promptly notify in writing all other parties, together with their counsel of record, of the conflict between that court's direction or order and this Protocol. In all other material respects, the affected party will remain bound by the terms of this Protocol.

65. The Official Representatives shall not seek from either the Bankruptcy Court or Bermuda Court any direction or order inconsistent with this Protocol, and to the extent any Official Representative reasonably anticipates the potential for the entry of such a direction or order, such Official Representative shall give the other Official Representative as much written notice of such potential application, and as much opportunity to object, as is reasonably practicable under the circumstances.

66.   Taken together, paragraphs [64] and [65] above are the **Conflict Provisions**.

**Exculpation**

67.   Notwithstanding any (i) notices, documents, pleading or information provided by the Official Representatives to the other; (ii) consultations between the Official Representatives (including their respective professionals, employees, agents and representatives); (iii) formulation and execution of this Protocol; and/or (iv) consents or non-objections by each Official Representative to the other's proposed actions, neither the Bermuda Provisional Liquidators nor the Wind-Down Trustee (including their respective professionals, employees, agents and representatives) shall have or incur any liability (whether personal or otherwise) in respect of or resulting from the other's actions.

**Jurisdiction over the Protocol**

68.   The Bankruptcy Court and the Bermuda Court shall retain jurisdiction over the Official Representatives appointed by each respective Court for the purpose of enforcing the terms and provisions of this Protocol or approving amendments or modifications thereto.

**Procedure for Resolving Disputes under the Protocol**

69.   If any dispute arises relating to the terms, intent or application of this Protocol, the dispute may be addressed to the Bankruptcy Court, the Bermuda Court, as applicable, or both Courts upon notice in accordance with paragraph [51] of this Protocol. In rendering a determination in any such dispute, the Court to which the issue is addressed, either: (i) may consult with the other Court; and (ii) may, in its sole and exclusive discretion, either (a) render a binding decision after such consultation; (b) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (c) may seek a joint hearing of both Courts. The Courts may communicate and conduct a joint hearing in accordance with the Judicial Insolvency Network Guidelines[10], unless the Official Representatives are directed by the Bankruptcy Court and/or Bermuda Court to agree and seek the Court's approval of a bespoke cross-border court-to-court communications protocol. Notwithstanding the foregoing, in making a determination under this paragraph, each of the Courts shall give due consideration to the independence, comity and inherent jurisdiction of the other court established under existing law.

70.   Alternatively, if the Official Representatives after good faith negotiations cannot resolve the dispute, then the Official Representatives may agree to refer the dispute (where appropriate to do so

---

[10] Attached hereto as Appendix A to this Protocol (and as approved by the Bermuda Court pursuant to Practice Direction Circular No. 6 of 2017 Guidelines For Communication And Cooperation Between Courts In Cross-Border Insolvency Matters).

considering the subject matter of the dispute) to mediation, with the mediator to be agreed between the Official Representatives or appointed by order of the Bankruptcy Court or of the Bermuda Court.

**IN WITNESS WHEREOF** the Parties hereto have caused this Protocol to be executed either individually or by their respective attorneys or representatives hereunto authorized.

[**Signature Blocks to come.**]