# <u>EXHIBIT A</u>

Ankura - 000100

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM T-3

### FOR APPLICATIONS FOR QUALIFICATION OF INDENTURES
### UNDER THE TRUST INDENTURE ACT OF 1939

# BlockFi Inc.
#### (Name of Applicant)

**201 Montgomery Street, Suite 263**
**Jersey City, New Jersey 07302**
**(Address of Principal Executive Offices)**

**SECURITIES TO BE ISSUED UNDER THE**
**INDENTURE TO BE QUALIFIED**

| Title of Class | Amount |
|---|---|
| BlockFi Interest Accounts | Unlimited |

**Approximate date of proposed public offering:**
**As soon as practicable after the date of this Application for Qualification.**

**Jonathan Mayers**
**201 Montgomery Street, Suite 263**
**Jersey City, New Jersey 07302**
**(646) 779-9688**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*With copies to:*

**Robert E. Buckholz**
**C. Andrew Gerlach**
**Sullivan & Cromwell LLP**
**125 Broad Street**
**New York, New York 10004**
**(212) 558-4000**

The obligor hereby amends this application for qualification on such date or dates as may be necessary to delay its effectiveness until (i) the 20th day after the filing of an amendment which specifically states that it shall supersede this application, or (ii) such date as the Commission, acting pursuant to Section 307(c) of the Trust Indenture Act of 1939, as amended, may determine upon the written request of the obligor.

Ankura - 000101

**GENERAL**

**1.  General Information**

(a)    BlockFi Inc. (the "Company") is a corporation.

(b)    The Company was incorporated under the laws of the State of Delaware.

**2.  Securities Act Exemption Available**

The Company will provide an interest-bearing account called the BlockFi Interest Account ("Account"), which allows holders to earn interest on supported digital assets. The Accounts will be governed by the Indenture (as defined below) to be qualified under this Application for Qualification on Form T-3.

BlockFi Lending LLC ("BlockFi Lending"), a wholly-owned subsidiary of the Company, currently provides an interest-bearing account ("BlockFi Lending Account") that is identical to the Accounts in all material respects. In accordance with the terms of the BlockFi Lending Accounts, the Company will fully and unconditionally assume BlockFi Lending's obligations thereunder and, subsequent to the qualification of the Indenture under this Application for Qualification on Form T-3, such BlockFi Lending Accounts will be exchanged for a like amount of Accounts, in accordance with their terms.

To the extent the exchange described above or any future change in interest rates with respect to the Accounts is deemed to constitute an offer to exchange securities under the Securities Act of 1933, as amended (the "Securities Act"), the transaction is exempt from registration pursuant to Section 3(a)(9) of the Securities Act. No sales of securities of the same class as the Accounts will be made by the Company or by or through an underwriter at or about the same time as the transaction for which the exemption is claimed. No consideration has been, or is to be, given, directly or indirectly, to any person in connection with the transaction for which the exemption is claimed, except for customary fees and expenses paid to the Trustee under the Indenture to be qualified. No holder of the Accounts has made or will be requested to make any cash payment to the Company in connection with the transaction for which the exemption is claimed. Pursuant to the Indenture, the Company will not offer Accounts to new customers in the United States or accept further investments or funds in the Accounts by current holders in the United States.

Ankura - 000102

**AFFILIATIONS**

**3.    Affiliates**

Certain directors and executive officers of the Company may also be deemed to be "affiliates" of the Company by virtue of their positions with the Company. See Item 4, "Directors and Executive Officers." The following is a list of all other affiliates of the Company as of April 4, 2022, each of which are wholly owned by the identified parent entity, except where otherwise noted:

| Name of Affiliate | Jurisdiction of Organization | Parent Entity |
| --- | --- | --- |
| BlockFi Asia PTE. Ltd. | Singapore | BlockFi Holding UK Limited |
| BlockFi Cayman LLC | Cayman Islands | BlockFi Lending LLC |
| BlockFi Holding UK Limited | England and Wales | BlockFi Inc. |
| BlockFi International Ltd. | Bermuda | BlockFi Inc. |
| BlockFi Lending LLC | Delaware | BlockFi Inc. |
| BlockFi Lending II LLC | Delaware | BlockFi Lending LLC |
| BlockFi Investment Products LLC | Delaware | BlockFi Inc. |
| BlockFi Services, Inc. | Delaware | BlockFi Inc. |
| BlockFi Trading LLC | Delaware | BlockFi Inc. |
| BlockFi UK Limited | England and Wales | BlockFi Holding UK Limited |
| BlockFi Ventures LLC | Delaware | BlockFi Inc. |
| BlockFi Wallet LLC | Delaware | BlockFi Inc. |
| BV Power Alpha LLC | Delaware | BlockFi Inc.(1) |

(1)    BlockFi Inc. owns 50% of the voting securities of BV Power Alpha LLC.

**MANAGEMENT AND CONTROL**

**4.    Directors and Executive Officers**

The following table lists the names of all directors and executive officers of the Company as of April 4, 2022. The mailing address for each executive officer and director listed below is 201 Montgomery Street, Suite 263, Jersey City, New Jersey 07302.

| Name | Office |
| --- | --- |
| *Executive Officers* | |
| Zachary L. Prince | Director, Chief Executive Officer and President |
| Florencia M. Marquez | Director and Senior Vice President of Operations |
| Tony Lauro II | Chief Financial Officer and Treasurer |
| Jonathan M. Mayers | General Counsel and Secretary |
| | |
| *Non-Employee Directors* | |
| Stefan Cohen | Director |
| Ellen-Blair Chube | Director |
| James Fitzgerald | Director |
| Jennifer M. Hill | Director |

2

**5.     Principal Owners of Voting Securities**

The following table provides information as to each person who owns more than 10% of the Company's outstanding voting securities as of March 28, 2022. The amounts and percentages of common stock beneficially owned are reported on the basis of the regulations of the SEC governing the determination of beneficial ownership of securities. Under these rules, a person is deemed to be a beneficial owner of a security if that person has or shares voting power, which includes the power to vote or to direct the voting of such security, or investment power, which includes the power to dispose of or to direct the disposition of such security.

| | Common Stock | | Preferred Stock(3) | | % of Total Voting Power |
|---|---|---|---|---|---|
| | Shares | % of Common Stock | Shares | % of Preferred Stock | |
| Entities affiliated with Valar Ventures (1) | — | — | 19,268,652 | 42.5% | 37.6% |
| Entities affiliated with Morgan Creek (2) | — | — | 5,294,782 | 11.7% | 10.3% |

(1)     Consists of (i) 5,539,024 shares of Series A-3 Preferred Stock held of record by Valar Fund V LP, (ii) 755,322 shares of Series A-3 Preferred Stock held of record by Valar Principals Fund V LP, (iii) 4,330,891 shares of Series B Preferred Stock held of record by Valar Fund V LP, (iv) 590,577 shares of Series B Preferred Stock held of record by Valar Principals Fund V LP, (v) 3,852,921 shares of Series C Preferred Stock held of record by Valar Velocity Fund 2 LP, (vi) 1,276,878 shares of Series D Preferred Stock held of record by Valar Fund VII LP, (vii) 1,338,168 shares of Series D Preferred Stock held of record by Valar Co-Invest 10 LP, (viii) 332,302 shares of Series E Preferred Stock held of record by Valar Co-Invest 11 LP, (ix) 64,163 shares of Series E Preferred Stock held of record by Valar Co-Invest 12 LP, (x) 660,116 shares of Series E-1 Preferred Stock held of record by Valar Fund VII LP, (xi) 166,151 shares of Series E Preferred Stock issuable upon exercise of warrants exercisable at $75.7442 per share held of record by Valar Co-Invest 11 LP, (xii) 32,081 shares of Series E Preferred Stock issuable upon exercise of warrants exercisable at $75.7442 per share held of record by Valar Co-Invest 12 LP and (xiii) 330,058 shares of Series E-1 Preferred Stock issuable upon exercise of warrants exercisable at $75.7442 per share held of record by Valar Fund VII LP. Valar Co-Invest 10 GP LLC is the general partner of Valar Co-Invest 10 LP and may be deemed to have voting and dispositive power over the shares held by such fund. Valar Co-Invest 11 GP LLC is the general partner of Valar Co-Invest 11 LP and may be deemed to have voting and dispositive power over the shares held by such fund. Valar Co-Invest 12 GP LLC is the general partner of Valar Co-Invest 12 LP and may be deemed to have voting and dispositive power over the shares held by such fund. Valar GP V LLC is the general partner of Valar Fund V LP and may be deemed to have voting and dispositive power over the shares held by such fund. Valar GP VII LLC is the general partner of Valar Fund VII LP and may be deemed to have voting and dispositive power over the shares held by such fund. Valar Velocity GP 2 LLC (together with Valar Co-Invest 10 GP LLC, Valar Co-Invest 11 GP LLC, Valar Co-Invest 12 GP LLC, Valar GP V LLC, and Valar GP VII LLC, the "Valar GPs") is the general partner of Valar Velocity Fund 2 LP (together with Valar Co-Invest 10 LP, Valar Co-Invest 11 LP, Valar Co-Invest 12 LP, Valar Fund V LP, Valar Fund VII LP, and Valar Principals Fund V LP, the "Valar Funds") and may be deemed to have voting and dispositive power over the shares held by such fund. James Fitzgerald and Andrew McCormack are the sole Managing Members of the Valar GPs and share voting and dispositive power with regard to the shares held by the Valar Funds. The address of the entities affiliated with Valar Ventures is 915 Broadway, New York, NY 10010.

3

(2)    Consists of (i) 244,479 shares of Series A-1 Preferred Stock held of record by Morgan Creek Blockchain Opportunities Fund, LP, (ii) 143,054 shares of Series A-3 Preferred Stock held of record by Morgan Creek Blockchain Opportunities Fund, LP, (iii) 923,600 shares of Series B Preferred Stock held of record by Morgan Creek Blockchain Opportunities Fund, LP, (iv) 1,715,257 shares of Series B Preferred Stock held of record by Morgan Creek Blockchain Opportunities Fund II, LP, (v) 1,324,391 shares of Series C Preferred Stock held of record by Morgan Creek Blockchain Opportunities Fund II, LP, (vi) 340,483 shares of Series D Preferred Stock held of record by Morgan Creek Private Opportunities Fund, LLC Series H—BlockFi, (vii) 289,425 shares of Series D Preferred Stock held of record by Morgan Creek Blockchain Opportunities Fund II, LP, (viii) 17,042 shares of Series D Preferred Stock held of record by Morgan Creek Consumer Opportunities Fund, LP, (ix) 125,422 shares of Series E Preferred Stock held of record by Morgan Creek Digital Fund III, LP, (x) 72,612 shares of Series E Preferred Stock held of record by Morgan Creek Private Opportunities, LLC Series K—BlockFi, (xi) 62,711 shares of Series E Preferred Stock issuable upon exercise of warrants exercisable at $75.7442 per share held of record by Morgan Creek Digital Fund III, LP and (xii) 36,306 shares of Series E Preferred Stock issuable upon exercise of warrants exercisable at $75.7442 per share held of record by Morgan Creek Private Opportunities, LLC Series K—BlockFi. Morgan Creek Digital Assets, LLC is the General Partner of Morgan Creek Blockchain Opportunities Fund, LP and Morgan Creek Blockchain Opportunities Fund II, LP. Morgan Creek Capital Partners, LLC is the Managing Member of Morgan Creek Private Opportunities Fund, LLC Series H—BlockFi and Morgan Creek Private Opportunities, LLC Series K—BlockFi and Morgan Creek Capital Partners, LLC is the General Partner of Morgan Creek Consumer Opportunities Fund, LP. Morgan Creek Digital, LLC is the General Partner of Morgan Creek Digital Fund III, LP. Mark W. Yusko is the Managing Member of Morgan Creek Digital Assets, LLC, Morgan Creek Capital Partners, LLC and Morgan Creek Digital, LLC and may be deemed to have voting and dispositive power with respect to such shares held by entities affiliated with Morgan Creek. The address of the entities affiliated with Morgan Creek is 301 W. Barbee Chapel Road, Suite 200, Chapel Hill, NC 27517.

(3)    Each share of Preferred Stock is convertible, at the option of the holder, at any time and from time to time, and without the payment of additional consideration by the holder, into a number of shares of Common Stock determined in accordance with our amended and restated certificate of incorporation.

## UNDERWRITERS

**6.   Underwriters**

(a)    The Company has not sold any securities through an underwriter in the preceding three years.

(b)    There are no underwriters for the Accounts proposed to be offered.

## CAPITAL SECURITIES

**7.   Capitalization**

(a)    The authorized and outstanding securities of the Company, including the Accounts to the extent the Accounts are deemed to constitute securities under the Securities Act, as of March 28, 2022 were as follows:

*(in 000s)*

| Title of Class | Amount Authorized | Amount Outstanding(1) |
|---|---|---|
| Common Stock | 69,284 | 5,893 |
| Series Seed Preferred Stock | 2,860 | 2,834 |
| Series Seed-2 Preferred Stock | 1,168 | 1,168 |
| Series A-1 Preferred Stock | 3,110 | 3,110 |
| Series A-2 Preferred Stock | 127 | 127 |
| Series A-3 Preferred Stock | 7,753 | 7,753 |
| Series B Preferred Stock | 9,837 | 9,837 |
| Series C Preferred Stock | 7,642 | 7,642 |
| Series D Preferred Stock | 9,739 | 9,739 |
| Series E Preferred Stock | 9,902 | 2,442 |
| Series E-1 Preferred Stock | 990 | 660 |

(1)    Amount outstanding figures are not inclusive of warrants to purchase shares of Preferred Stock and other convertible instruments the Company has issued. The Company has issued convertible instruments under the following terms: (i) warrants that, in the aggregate, are exercisable into 1,221,089 shares of Series E Preferred Stock at $75.7442 per share and (ii) a warrant exercisable into 330,058 shares of Series E-1 Preferred Stock at $75.7442 per share.

As described in Section 2 above, the Company will fully and unconditionally assume BlockFi Lending's obligations under the BlockFi Lending Accounts in accordance with the terms thereof and, subsequent to the qualification of the Indenture under this Application for Qualification on Form T-3, such BlockFi Lending Accounts will be exchanged for a like amount of Accounts, in accordance with their terms. As of March 28, 2022, $6,035,252,430 of BlockFi Lending Accounts were outstanding.

(b)    The holders of shares of common stock are entitled to one vote for each share of common stock held at all meetings of stockholders (and written actions in lieu of meetings). On any matter presented to the stockholders of the Company for their action or consideration at any meeting of stockholders of the Company (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of preferred stock is entitled to cast the number of votes equal to the number of whole shares of common stock into which the shares of preferred stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Except as provided by law or by the other provisions of the Company's Eighth Amended and Restated Certificate of Incorporation, holders of shares of preferred stock vote together with the holders of shares of common stock as a single class and on an as-converted to common stock basis. The holders of Series E-1 Preferred Stock have no voting rights with respect to the election of the members of the Board of Directors of the Company, and the shares of Series E-1 Preferred Stock shall not be included in determining the number of shares voting or entitled to vote on such matter. The Accounts do not represent a voting interest in the Company.

4

Ankura - 000105

**INDENTURE SECURITIES**

**8.    Analysis of Indenture Provisions**

The Accounts will be issued under an Indenture (the "Indenture") between the Company and Ankura Trust Company, LLC, as trustee (the "Trustee"). The following analysis is not a complete description of the provisions of the Indenture and is qualified in its entirety by reference to terms of the Indenture, which is attached as Exhibit T3C hereto. All capitalized and otherwise undefined terms shall have the meanings ascribed to them in the Indenture.

(a) Events of Default; Withholding of Notice

The following events are defined as "events of default" with respect to Accounts: (a) failure to (i) pay interest, if any, when due, or (ii) redeem all or a portion of an Account upon request (but subject to the satisfaction of certain information requests, redemption limits and delivery periods), and in either case, such failure occurs with respect to holders of more than 5% in principal amount of all Accounts then outstanding. and continues for a period of five business days beginning after the payment is due or (b) bankruptcy or insolvency events relating to the Company.

Upon the occurrence of an event of default that is continuing with respect to certain bankruptcy or insolvency events relating to the Company, the principal of and accrued and unpaid interest on all Accounts will become immediately due and payable. In the case of any other event of default that is continuing, the Trustee may in its discretion, and will, subject to its rights and protections in the Indenture, upon receipt of a written request of holders of not less than 25% in principal amount of all Accounts then outstanding, declare the principal of and accrued and unpaid interest on all Accounts immediately due and payable, by notice to the Company.

The Trustee is under no obligation to exercise any of the rights or powers vested under the Indenture at the request or direction of any Account holders, unless, among other things, such holders offer to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

Following the occurrence of a default under the Indenture, the Trustee will provide to holders notice of all uncured defaults known to it as and to the extent provided by the Trust Indenture Act of 1939.

Each year the Company will give the Trustee a statement by certain of the Company's officers announcing that, to the best of their knowledge, the Company is not in default or, if default has occurred, describing the default.

(b) Authentication and Delivery of New Accounts; Use of Proceeds

The Accounts will be evidenced on the books and records of the Company. Physical certificates representing the Accounts will not be issued.

The Company will not receive any proceeds from the issuance of Accounts which is the result of a change in the interest rates payable on the Accounts, because the Accounts deemed issued as a result of such change in interest rate are deemed issued in exchange for existing Accounts.

(c) Release and Substitution of Property Subject to the Lien of the Indenture

The Accounts are unsecured obligations of the Company. As such, the Accounts are not secured by any lien on any property.

(d) Satisfaction and Discharge of the Indenture

The Company may discharge is obligations under the Indenture if: (i) the Company has paid and discharged all amounts then owing in respect of all Accounts then outstanding; (ii) the Company has paid or caused to be paid all other sums payable under the Indenture by the Company; and (iii) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent for discharge of the Indenture have been complied with.

(e) Evidence Required to be Furnished by the Company to the Trustee as to Compliance with the Conditions and Covenants Provided for in the Indenture

5

Ankura - 000106

The Company is required to deliver to the Trustee, within 120 days after the end of each fiscal year of the Company, a certificate signed by the Chairman of the Board, a Vice Chairman of the Board, the President or a Vice President, and by the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Company, stating whether or not to the best knowledge of the signers the Company is in default in the performance and observance of any of the terms, provisions and conditions of the Indenture (without regard to any period of grace or requirement of notice provided hereunder) and, if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge.

**9.    Other Obligors**

Other than the Company, no other person is an obligor with respect to the Accounts.

## CONTENTS OF APPLICATION FOR QUALIFICATION

This application for qualification comprises:

(a)    Pages numbered 1 to 6, consecutively.
(b)    The statement of eligibility and qualification of the Trustee on Form T-1 (included as Exhibit T3G hereto).
(c)    The following Exhibits in addition to those filed as part of the statement of eligibility and qualification of the trustee:

| Exhibit No. | Description |
| --- | --- |
| Exhibit T3A | Eighth Amended and Restated Certificate of Incorporation of BlockFi Inc. |
| Exhibit T3B-1 | Amended and Restated Bylaws of BlockFi Inc. |
| Exhibit T3B-2 | Amendment No. 1 to Amended and Restated Bylaws of BlockFi Inc. |
| Exhibit T3C | Form of Indenture between BlockFi Inc. and Ankura Trust Company, LLC, as Trustee |
| Exhibit T3D | Not applicable |
| Exhibit T3E-1 | Form of Notice of Exchange |
| Exhibit T3E-2 | Form of Rate Change Announcements |
| Exhibit T3F | Cross-reference sheet showing the location in the Indenture of the provisions inserted therein pursuant to Sections 310 through 318(a), inclusive, of the Trust Indenture Act of 1939 (included as part of Exhibit T3C herewith) |
| Exhibit T3G | Statement of eligibility and qualification of the Trustee on Form T-1 |

6

Ankura - 000107

**SIGNATURE**

Pursuant to the requirements of the Trust Indenture Act of 1939, the applicant, BlockFi Inc., a corporation organized and existing under the laws of the State of Delaware, has duly caused this application to be signed on its behalf by the undersigned, thereunto duly authorized, and its seal to be hereunto affixed and attested, all in the city of Jersey City, New Jersey, on the 4th day of April, 2022.

(Seal)                                                                   BlockFi Inc.

Attest:   /s/ Jonathan M. Mayers                                    By:   /s/ Tony Lauro II
             Name: Jonathan M. Mayers                                         Name: Tony Lauro II
             Title: General Counsel and Secretary                             Title: Chief Financial Officer and Treasurer

EIGHTH AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
BLOCKFI INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

BlockFi Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY:**

**1.** That the name of this corporation is BlockFi Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on August 1, 2017 under the name BlockFi Inc.

**2.** That the Board of Directors duly adopted resolutions proposing to amend and restate the Sixth Amended and Restated Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Sixth Amended and Restated Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is BlockFi Inc. (the "**Corporation**").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law, as the same exists or as may hereafter be amended from time to time.

**FOURTH:** The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 69,284,496 shares of Common Stock, $0.00001 par value per share ("**Common Stock**") and (ii) 53,128,943 shares of Preferred Stock, $0.00001 par value per share ("**Preferred Stock**"), of which 2,860,381 shares of Preferred Stock are hereby designated "**Series Seed Preferred Stock**", 1,167,941 shares of Preferred Stock are hereby designated "**Series Seed-2 Preferred Stock**", 3,109,745 shares of Preferred Stock are hereby designated "**Series A-1 Preferred Stock**", 127,210 shares of Preferred Stock are hereby designated "**Series A-2 Preferred Stock**", 7,753,114 shares of Preferred Stock are hereby designated "**Series A-3 Preferred Stock**", 9,837,208 shares of Preferred Stock are hereby designated "**Series B Preferred Stock**", 7,642,144 shares of Preferred Stock are hereby designated "**Series C Preferred Stock**", 9,739,310 shares of Preferred Stock are hereby designated "**Series D Preferred Stock**", 9,901,716 shares of Preferred Stock are hereby designated "**Series E

**Preferred Stock**" and 990,174 shares of Preferred Stock are hereby designated "**Series E-1 Preferred Stock**" and together with the Series E Preferred Stock, the "**Series E and E-1 Preferred Stock**"). The Series Seed Preferred Stock, Series Seed-2 Preferred Stock, Series A-1 Preferred Stock, Series A-2 Preferred Stock, Series A-3 Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock and Series E Preferred Stock, excluding the Nonvoting Preferred Stock (as defined below) shall collectively be referred to as the "**Voting Preferred Stock**", and together with the Common Stock, the "**Voting Stock**". The Series E-1 Preferred Stock shall be referred to as the "**Nonvoting Preferred Stock**". The Nonvoting Preferred Stock of a given class or series of stock shall be identical in every respect to the Voting Preferred Stock of the same class or series of stock, except with respect to voting rights for directors or for the size of the Board of Directors.

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A. COMMON STOCK

1. <u>General</u>. The voting, dividend and liquidation rights of the holders of shares of Common Stock are subject to and qualified by the rights, powers and preferences of the holders of shares of Preferred Stock set forth herein.

2. <u>Voting</u>. The holders of shares of Common Stock are entitled to one vote for each share of Common Stock held at all meetings of stockholders (and written actions in lieu of meetings). There shall be no cumulative voting. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of Preferred Stock that may be required by the terms of this Seventh Amended and Restated Certificate of Incorporation (this "**Restated Certificate**")) the affirmative vote of a majority of the votes represented by all outstanding shares of capital stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

B. PREFERRED STOCK

Preferred Stock of the Corporation shall have the following rights, preferences, powers, privileges and restrictions, qualifications and limitations. Unless otherwise indicated, references to "sections" or "subsections" in this Part B of this Article Fourth refer to sections and subsections of Part B of this Article Fourth.

1. <u>Dividends</u>. The Corporation shall not declare, pay or set aside any dividends on shares of any other class or series of capital stock of the Corporation (other than dividends on shares of Common Stock payable in shares of Common Stock) unless (in addition to the obtaining of any consents required elsewhere in this Restated Certificate) the holders of the Preferred Stock then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding share of Preferred Stock in an amount at least equal to (i) in the case of a dividend on Common Stock or any class or series that is convertible into Common Stock, that dividend per share of Preferred Stock as would equal the product of (A) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Common Stock and (B) the number of shares of Common Stock issuable upon

Ankura - 000110

conversion of a share of Preferred Stock, in each case calculated on the record date for determination of holders entitled to receive such dividend or (ii) in the case of a dividend on any class or series that is not convertible into Common Stock, at a rate per share of Preferred Stock determined by (A) dividing the amount of the dividend payable on each share of such class or series of capital stock by the original issuance price of such class or series of capital stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to such class or series) and (B) multiplying such fraction by an amount equal to the Applicable Original Issue Price (as defined below); provided that, if the Corporation declares, pays or sets aside, on the same date, a dividend on shares of more than one class or series of capital stock of the Corporation, the dividend payable to the holders of Preferred Stock pursuant to this Section 1 shall be calculated based upon the dividend on the class or series of capital stock that would result in the highest Preferred Stock dividend. The "**Series Seed Original Issue Price**" shall mean $0.4743 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series Seed Preferred Stock. The "**Series Seed-2 Original Issue Price**" shall mean $0.5215 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series Seed-2 Preferred Stock. The "**Series A-1 Original Issue Price**" shall mean $1.0641 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A-1 Preferred Stock. The "**Series A-2 Original Issue Price**" shall mean $1.5722 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A-2 Preferred Stock. The "**Series A-3 Original Issue Price**" shall mean $1.7476 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A-3 Preferred Stock. The "**Series B Original Issue Price**" shall mean $3.78952 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series B Preferred Stock. The "**Series C Original Issue Price**" shall mean $9.5138 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series C Preferred Stock. The "**Series D Original Issue Price**" shall mean $58.7370 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series D Preferred Stock. The "**Series E Original Issue Price**" shall mean $75.7442 per share of Series E and Series E-1 Preferred Stock, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series E and Series E-1 Preferred Stock. "**Applicable Original Issue Price**" refers to the Series Seed Original Issue Price with respect to the Series Seed Preferred Stock, the Series Seed-2 Original Issue Price with respect to the Series Seed-2 Preferred Stock, the Series A-1 Original Issue Price with respect to the Series A-1 Preferred Stock, the Series A-2 Original Issue Price with respect to the Series A-2 Preferred Stock, the Series A-3 Original Issue Price with respect to the Series A-3 Preferred Stock, the Series B Original Issue Price with respect to the Series B Preferred Stock, the Series C Original Issue Price with respect to the Series C Preferred Stock, the Series D Original Issue Price with respect to the Series D Preferred Stock and the Series E Original Issue Price with respect to the Series E and Series E-1 Preferred Stock.

Ankura - 000111

2. <u>Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales</u>.

2.1 <u>Preferential Payments to Holders of Shares of Preferred Stock</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation (each, a "**Liquidation Event**") or Deemed Liquidation Event, the holders of shares of Preferred Stock then outstanding shall be entitled to be paid, on a *pari passu* basis, out of the assets of the Corporation available for distribution to its stockholders before any payment shall be made to the holders of shares of Common Stock by reason of their ownership thereof, an amount per share equal to the Applicable Original Issue Price, plus any dividends declared but unpaid thereon (the amount payable to a series of Preferred Stock pursuant to this sentence, subject to <u>Section 2.4</u>, is hereinafter referred to as the "**Applicable Liquidation Amount**" of such series). If upon any such liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, the assets of the Corporation available for distribution to its stockholders shall be insufficient to pay the holders of shares of Preferred Stock the full amount to which they shall be entitled under this <u>Subsection 2.1</u>, the holders of shares of Preferred Stock shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

2.2 <u>Payments to Holders of Shares of Common Stock</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of shares of Preferred Stock pursuant to <u>Subsection 2.1</u>, the remaining assets of the Corporation available for distribution to its stockholders shall be distributed among the holders of shares of Common Stock, pro rata based on the number of shares held by each such holder.

2.3 <u>Deemed Liquidation Events</u>.

2.3.1 <u>Definition</u>. Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of (i) a majority of the outstanding shares of Preferred Stock (voting as a single class on an as-converted basis) (the "**Requisite Holders**"), (ii) solely with respect to the Series D Preferred Stock, (A) the holders of at least 75% of the outstanding shares of Series D Preferred Stock and (B) if there are then Specified Stockholders (as defined in that certain Series D Preferred Stock Purchase Agreement by and among the Corporation and the other parties thereto dated on or around February 25, 2021, as may be amended, modified and/or restated from time to time), at least one Specified Stockholder ((A) and (B), together, the "**Requisite Series D Holders**"), and (iii) solely with respect to the Series E and Series E-1 Preferred Stock, the holders of a majority of the outstanding shares of Series E and Series E-1 Preferred Stock (voting as a single class on an as-converted basis) (the "**Requisite Series E Holders**"), elect otherwise by written notice sent to the Corporation at least 10 days prior to the effective date of any such event:

    (a) a merger or consolidation in which
        (i)      the Corporation is a constituent party or
        (ii)     a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation,

Ankura - 000112

except (1) any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (A) the surviving or resulting corporation; or (B) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or (2) a merger effected exclusively to change the domicile of the Corporation;

(b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation; or

(c) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of this corporation's securities), of the Corporation's securities if, after such closing, such person or group of affiliated persons would hold fifty percent (50%) or more of the then outstanding voting stock of this corporation (or the surviving or acquiring entity). Notwithstanding the prior sentence, the sale by this corporation of its equity securities in a bona fide financing transaction conducted in accordance with Section 3.3 of Part B of this Article Fourth shall not be deemed a "Deemed Liquidation Event."

2.3.2 Effecting a Deemed Liquidation Event.

(a) The Corporation shall not have the power to effect a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(i) unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the stockholders of the Corporation shall be allocated among the holders of capital stock of the Corporation in accordance with Subsections 2.1 and 2.2.

(b) In the event of a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(ii) or 2.3.1(b), if the Corporation does not effect a dissolution of the Corporation under the General Corporation Law within 90 days after such Deemed Liquidation Event, then (i) the Corporation shall send a written notice (the "**Redemption Notice**") to each holder of Preferred Stock no later than the 90th day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to require the redemption of such shares of Preferred Stock, and (iii) if the Requisite Holders so request in a written instrument delivered to the Corporation not later than 120 days after such Deemed Liquidation Event, the Corporation shall use the consideration received by the Corporation for such Deemed Liquidation Event (net of any retained

Ankura - 000113

liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors (including Preferred Director Approval (as defined below)), together with any other assets of the Corporation available for distribution to its stockholders, all to the extent permitted by Delaware law governing distributions to stockholders (the "**Available Proceeds**"), on the 150th day after such Deemed Liquidation Event, to redeem all outstanding shares of Preferred Stock at a price per share equal to the Applicable Liquidation Amount. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Available Proceeds are not sufficient to redeem all outstanding shares of Preferred Stock, the Corporation shall ratably redeem each holder's shares of Preferred Stock to the fullest extent of such Available Proceeds, and shall redeem the remaining shares as soon as it may lawfully do so under Delaware law governing distributions to stockholders. Prior to the distribution or redemption provided for in this Subsection 2.3.2(b), the Corporation shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event or in the ordinary course of business.

(i)     Each Redemption Notice shall state: (1) the number of shares of Preferred Stock held by the holder that the Corporation shall redeem; (2) the date of redemption (the "**Redemption Date**") and the amount to be paid to such holder; and (3) for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Preferred Stock to be redeemed.

(ii)    On or before the Redemption Date, each holder of shares of Preferred Stock to be redeemed shall surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Available Proceeds for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.

2.3.3 Amount Deemed Paid or Distributed. The amount deemed paid or distributed to the holders of capital stock of the Corporation upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or redemption shall be the cash or the value of the property, rights or securities paid or distributed to such holders by the Corporation or the acquiring person, firm or other entity. The value of such property, rights or securities shall be determined in good faith by the Board of Directors (including Preferred Director Approval). "**Preferred Director Approval**" shall mean (i) at any time when there are three Preferred Directors serving, the approval of at least two of the Preferred Directors, (ii) at any time when there are one or two Preferred Directors serving, the approval of at least one Preferred Director, and (iii) at any time when there are no Preferred Directors serving, any reference to this defined term shall have no effect.

2.3.4 Allocation of Escrow and Contingent Consideration. In the event of a Deemed Liquidation Event pursuant to Subsection 2.3.1(a)(i), if any portion of the consideration payable to the stockholders of the Corporation is payable only upon satisfaction of contingencies (the "**Additional Consideration**"), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial**

Ankura - 000114

Consideration") shall be allocated among the holders of capital stock of the Corporation in accordance with Subsections 2.1 and 2.2 as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the stockholders of the Corporation upon satisfaction of such contingencies shall be allocated among the holders of capital stock of the Corporation in accordance with Subsections 2.1 and 2.2 after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this Subsection 2.3.4, consideration placed into escrow or retained as holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

2.4 Automatic Rational Conversion. Notwithstanding any other provision of this Section 2, for purposes of determining the amount each holder of shares of Preferred Stock is entitled to receive with respect to a Liquidation Event or Deemed Liquidation Event, each such holder of shares of a series of Preferred Stock shall be deemed to have converted (regardless of whether such holder actually converted) such holder's shares of such series into shares of Common Stock immediately prior to the Liquidation Event or Deemed Liquidation Event if, as a result of an actual conversion of such holder's shares and the shares of all other series of Preferred Stock deemed converted pursuant to this paragraph, such holder would receive, in the aggregate, an amount greater than the amount that would be distributed to such holder if such holder did not convert such series of Preferred Stock into shares of Common Stock. If any such holder shall be deemed to have converted shares of Preferred Stock into Common Stock pursuant to this paragraph, then such holder shall not be entitled to receive any distribution that would otherwise be made to holders of Preferred Stock that have not converted (or have not been deemed to have converted) into shares of Common Stock.

3. Voting.

3.1 General. On any matter presented to the stockholders of the Corporation for their action or consideration at any meeting of stockholders of the Corporation (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Except as provided by law or by the other provisions of this Restated Certificate, holders of shares of Preferred Stock shall vote together with the holders of shares of Common Stock as a single class and on an as-converted to Common Stock basis.

3.2 Election of Directors.

3.2.1 The holders of the Nonvoting Preferred Stock shall have no voting rights with respect to the election of the members of the Board of Directors of the Corporation, and the shares of Nonvoting Preferred Stock shall not be included in determining the number of shares voting or entitled to vote on such matter (the "**Nonvoting Restriction**"); provided, however, that the Nonvoting Restriction shall cease to apply upon the earlier to occur of (i) the closing of a Qualified IPO (as defined below) or (ii) a Deemed Liquidation Event, except, in each case to the extent that any governmental filings would be triggered by such cessation, such cessation would not take effect until the required parties have submitted any required filings (to be made at the discretion of each holder of Nonvoting Preferred Stock) and observed any required

Ankura - 000115

waiting periods. The (A) holders of record of the Voting Preferred Stock other than Series E Preferred Stock, exclusively and as a separate class, shall be entitled to elect two directors of the Corporation, (B) holders of record of the shares of Series E Preferred Stock, exclusively and as a separate class, shall be entitled to elect two directors of the Corporation (the directors elected pursuant to subclauses (A) and (B), the "**Preferred Directors**") and (C) holders of record of the shares of Common Stock, exclusively and as a separate class, shall be entitled to elect two directors of the Corporation. Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of capital stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders. If the holders of shares of Preferred Stock or Common Stock, as the case may be, fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this Subsection 3.2.1, then any directorship not so filled shall remain vacant until such time as the holders of shares of Preferred Stock or Common Stock, as the case may be, elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by stockholders of the Corporation other than by the stockholders of the Corporation that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class. The holders of record of the shares of Common Stock and of Voting Preferred Stock other than Series E Preferred Stock, exclusively and voting together as a single class on an as-converted basis, shall be entitled to elect the balance of the total number of directors of the Corporation. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of at least a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this Subsection 3.2.1, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this Subsection 3.2.1. The rights of the holders of shares of Preferred Stock under the first sentence of this Subsection 3.2.1 shall terminate on the first date following the Original Issue Date (as defined below) on which there are no issued and outstanding shares of Preferred Stock.

3.2.2 Each director shall have one vote with respect to all matters to be acted upon by the Board of Directors (whether by meeting or written consent); provided that, if at the time the Board of Directors acts upon any such matter:

(a) if the First Condition (as defined in the Voting Agreement) is satisfied, the CEO Director (as defined in the Voting Agreement) shall be entitled to cast two votes. For purposes of this Article Fourth, the "**Voting Agreement**" means that certain Sixth Amended and Restated Voting Agreement, dated on or around the Original Issue Date, by and between the Corporation and certain of its stockholders, as may be amended, modified and/or restated from time to time;

(b) if the Conditions (as defined in the Voting Agreement) are satisfied, the CEO Director shall be entitled to cast three votes (inclusive of the votes described in Subsection 3.2.2(a)); and

(c) if the First Condition is not satisfied, the Founder Director (as defined in the Voting Agreement) shall be entitled to cast two votes.

Ankura - 000116

3.2.3 Every reference in this Restated Certificate or the Bylaws of this corporation to a majority or other proportion of the directors, including with respect to establishing a quorum for meetings of the Board of Directors or the requisite vote for approval by directors or the Board of Directors, shall refer to a majority or other proportion, as applicable, of the votes entitled to be cast by such directors.

3.3 <u>Preferred Stock Protective Provisions</u>. At any time when at least 12,787,152 shares of Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Preferred Stock) are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or this Restated Certificate) the written consent or affirmative vote of the Requisite Holders, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect; *provided, however* that a consent or resolution of the Board approving any of the following items that is contingent upon receipt of the stockholder consent required pursuant to this <u>Section 3.3</u> shall not, solely by reason thereof, be deemed to be an action or transaction entered into in violation hereof.

3.3.1 liquidate, dissolve or wind-up the business and affairs of the Corporation, effect any merger or consolidation or any other Deemed Liquidation Event, or consent to any of the foregoing;

3.3.2 amend, alter or repeal any provision of this Restated Certificate or Bylaws of the Corporation;

3.3.3 create, or authorize the creation of, or issue or obligate itself to issue shares of, any additional class or series of capital stock unless the same ranks junior to the Preferred Stock with respect to the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends and rights of redemption, if any, or increase the authorized number of shares of Common Stock or Preferred Stock or any series thereof;

3.3.4 (i) reclassify, alter or amend any existing security of the Corporation that is *pari passu* with the Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to the Preferred Stock in respect of any such right, preference, or privilege or (ii) reclassify, alter or amend any existing security of the Corporation that is junior to the Preferred Stock in respect of the distribution of assets on the liquidation, dissolution or winding up of the Corporation, the payment of dividends or rights of redemption, if such reclassification, alteration or amendment would render such other security senior to or *pari passu* with the Preferred Stock in respect of any such right, preference or privilege;

3.3.5 purchase or redeem (or permit any subsidiary to purchase or redeem) or pay or declare any dividend or make any distribution on, any shares of capital stock of the Corporation other than (i) redemptions of or dividends or distributions on the Preferred Stock as expressly authorized herein, (ii) dividends or other distributions payable on the Common Stock solely in the form of additional shares of Common Stock or (iii) repurchases of stock from former employees, officers, directors, consultants or other persons who performed services for the Corporation or any subsidiary in connection with the cessation of such employment or service at the lower of the original purchase price or the then-current fair market value thereof;

Ankura - 000117

3.3.6 create, or hold capital stock in, any subsidiary that is not wholly owned (either directly or through one or more other subsidiaries) by the Corporation, or sell, transfer or otherwise dispose of any capital stock of any direct or indirect subsidiary of the Corporation, or permit any direct or indirect subsidiary to sell, lease, transfer, exclusively license or otherwise dispose (in a single transaction or series of related transactions) of all or substantially all of the assets of such subsidiary;

3.3.7 increase or decrease the authorized number of directors constituting the Board of Directors;

3.3.8 enter into any material transaction with (i) an officer, director or employee (other than (a) employment agreements entered into in the ordinary course and the payment of any amounts set forth therein, (b) the grant or issuance of Options, Restricted Stock Units, or Common Stock to employees pursuant to a Stock Plan and (c) standard employee benefits generally made available to all employees) of the Corporation (a "**Related Party**") or a member of such Related Party's immediate family, or (ii) any corporation, partnership or other entity (other than a wholly-owned subsidiary of the Corporation) in which such Related Party is an officer, director or partner, or in which such Related Party has significant ownership interests or otherwise controls (any such material transaction, a "**Related Party Transaction**"), unless (x) approved by the Board of Directors (including a majority of disinterested directors), (y) specifically disclosed and approved in the Corporation's budget or (z) entered into in the ordinary course of business on arms-length terms;

3.3.9 create or authorize the creation of (by reclassification or otherwise) or issue, directly itself or indirectly through an affiliate or nominee, any cryptographic tokens, coins or convertible virtual currencies, virtual mediums of exchange or similar instruments issued or issuable by the Corporation, whether or not currently authorized, as well as rights, options, or warrants to purchase such tokens, coins or convertible virtual currencies, virtual mediums of exchange or similar instruments of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for (directly or indirectly) such tokens, coins, convertible virtual currencies, virtual mediums of exchange or similar instruments;

3.3.10 increase or decrease the number of authorized shares of Common Stock or Preferred Stock;

3.3.11 make any adverse change to the rights, preferences, and privileges of the Preferred Stock; or

3.3.12 undertake any action with respect to any subsidiary that, if taken by the Corporation, would require approval pursuant to this Section 3.3.

3.4 Series D Preferred Stock Protective Provisions. At any time when at least 2,100,000 shares of Series D Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series D Preferred Stock) are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in

Ankura - 000118

addition to any other vote required by law or this Restated Certificate) the written consent or affirmative vote of the Requisite Series D Holders, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect; *provided, however* that a consent or resolution of the Board approving any of the following items that is contingent upon receipt of the stockholder consent required pursuant to this Section 3.4 shall not, solely by reason thereof, be deemed to be an action or transaction entered into in violation hereof.

3.4.1 amend, alter, waive or repeal any provision of this Restated Certificate or Bylaws of the Corporation to alter, waive or change the rights, preferences, privileges and restrictions of the shares of Series D Preferred Stock so as to affect them adversely in a manner different than the other series of Preferred Stock which shall include any amendment, alteration, waiver or repeal of any of the specific rights of the Requisite Series D Holders (for the avoidance of doubt, a difference in the absolute impact of any such amendment, alteration, waiver or repeal on the Series D Preferred Stock shall not require such written consent or affirmative vote, so long as such amendment, alteration, waiver or repeal is applied in a consistent manner to all series of Preferred Stock);

3.4.2 increase or decrease the number of authorized shares of Series D Preferred Stock; or

3.4.3 amend, alter, waive or repeal this Section 3.4.

3.5 Series E Preferred Stock Protective Provisions. At any time when at least 2,227,888 shares of Series E and E-1 Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series E and E-1 Preferred Stock) are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or this Restated Certificate) the written consent or affirmative vote of the Requisite Series E Holders, and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect; *provided, however* that a consent or resolution of the Board approving any of the following items that is contingent upon receipt of the stockholder consent required pursuant to this Section 3.5 shall not, solely by reason thereof, be deemed to be an action or transaction entered into in violation hereof.

3.5.1 amend, alter, waive or repeal any provision of this Restated Certificate or Bylaws of the Corporation to alter, waive or change the rights, preferences, privileges and restrictions of the shares of Series E and E-1 Preferred Stock so as to affect them adversely in a manner different than the other series of Preferred Stock which shall include any amendment, alteration, waiver or repeal of any of the specific rights of the Requisite Series E Holders (for the avoidance of doubt, a difference in the absolute impact of any such amendment, alteration, waiver or repeal on the Series E and E-1 Preferred Stock shall not require such written consent or affirmative vote, so long as such amendment, alteration, waiver or repeal is applied in a consistent manner to all series of Preferred Stock);

3.5.2 increase or decrease the number of authorized shares of Series E Preferred Stock or Series E-1 Preferred Stock;

Ankura - 000119

3.5.3 prior to the three-year anniversary of the Original Issue Date, effect any Series E Non-Qualified Transaction (as defined below);

3.5.4 prior to the three-year anniversary of the Original Issue Date, effect any Deemed Liquidation Event which would result in proceeds per share in respect of Series E and E-1 Preferred Stock less than two times (2x) the Series E Original Issue Price (as adjusted for any stock splits, stock dividends, combinations, subdivisions, recapitalizations or the like); or

3.5.5 amend, alter, waive or repeal this Section 3.5, Section 2.1 (but only if such amendment, alteration, waiver or repeal would result in a downward adjustment to the Applicable Liquidation Amount payable with respect to the Series E and Series E-1 Preferred Stock), Section 2.3.1 (but only if as a result of such amendment, alteration, waiver or repeal, treatment of a given transactions as a Deemed Liquidation Event could be waived with respect to the Series E and E-1 Preferred Stock without the consent of the Requisite Series E Holders), Section 4.4.2 (but only if as a result of such amendment, alteration, waiver or repeal any downward adjustment to the Applicable Conversion Price of the Series E and E-1 Preferred Stock could be waived without the written consent of the Requisite Series E Holders) or Section 5.1 (but only if as a result of such amendment, alteration, waiver or repeal the outstanding shares of Series E and E-1 Preferred Stock would be required to convert into Common Stock without the consent of the Requisite Series E Holders in connection with any transaction that is a Series E Non-Qualified Transaction).

4. Optional Conversion.

The holders of shares of Preferred Stock shall have conversion rights as follows (the "**Conversion Rights**"):

4.1 Right to Convert.

4.1.1 Voting Preferred Stock into Nonvoting Preferred Stock. Each share of Series E Preferred Stock shall be convertible at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into one share of Series E-1 Preferred Stock

4.1.2 Nonvoting Preferred Stock into Voting Preferred Stock. Each share of Series E-1 Preferred Stock shall be convertible at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into one share of Series E Preferred Stock.

4.1.3 Conversion Ratio. Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable shares of Common Stock as is determined by dividing the Applicable Original Issue Price by the Applicable Conversion Price (as defined below) in effect at the time of conversion. The "**Series Seed Conversion Price**" shall initially be equal to the Series Seed Original Issue Price in the case of the Series Seed Preferred Stock. The "**Series Seed-2 Conversion Price**" shall initially be equal to the Series Seed-2 Original Issue Price. The "**Series A-1 Conversion Price**" shall initially be equal to the Series A-1 Original Issue Price. The "**Series A-2 Conversion Price**" shall initially be equal to the Series A-2 Original Issue Price. The "**Series A-3 Conversion Price**"

Ankura - 000120

shall initially be equal to the Series A-3 Original Issue Price. The "**Series B Conversion Price**" shall initially be equal to the Series B Original Issue Price. The "**Series C Conversion Price**" shall initially be equal to the Series C Original Issue Price. The "**Series D Conversion Price**" shall initially be equal to the Series D Original Issue Price. The "**Series E Conversion Price**" shall initially be equal to the Series E Original Issue Price. "**Applicable Conversion Price**" shall refer to the Series Seed Conversion Price with respect to the Series Seed Preferred Stock, the Series Seed-2 Conversion Price with respect to the Series Seed-2 Preferred Stock, the Series A-1 Conversion Price with respect to the Series A-1 Preferred Stock, the Series A-2 Conversion Price with respect to the Series A-2 Preferred Stock, the Series A-3 Conversion Price with respect to the Series A-3 Preferred Stock, the Series B Conversion Price with respect to the Series B Preferred Stock, the Series C Conversion Price with respect to the Series C Preferred Stock, the Series D Conversion Price with respect to the Series D Preferred Stock and the Series E Conversion Price with respect to the Series E and E-1 Preferred Stock. Such initial Applicable Conversion Price, and the rate at which shares of each series of Preferred Stock may be converted into shares of Common Stock, shall be subject to adjustment as provided below.

4.1.4 <u>Termination of Conversion Rights</u>. In the event of a liquidation, dissolution or winding up of the Corporation or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of shares of Preferred Stock.

4.2 <u>Fractional Shares</u>. No fractional shares of Common Stock shall be issued upon conversion of the Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the fair market value of a share of Common Stock as determined in good faith by the Board of Directors. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of shares of Preferred Stock the holder is at the time converting into Common Stock and the aggregate number of shares of Common Stock issuable upon such conversion.

4.3 <u>Mechanics of Conversion</u>.

4.3.1 <u>Notice of Conversion</u>. In order for a holder of shares of Preferred Stock to voluntarily convert shares of Preferred Stock into shares of Common Stock, such holder shall (a) provide written notice to the Corporation's transfer agent at the office of the transfer agent for the Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent) that such holder elects to convert all or any number of such holder's shares of Preferred Stock and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such shares of Preferred Stock (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate), at the office of the transfer agent for the Preferred Stock (or at the principal office of the Corporation if the Corporation serves as its own transfer agent). Such notice shall state such holder's name or the names of the nominees in which such holder wishes the shares of Common Stock to be issued. If required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the

Corporation, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Corporation if the Corporation serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion Time**"), and the shares of Common Stock issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date. The Corporation shall, as soon as practicable after the Conversion Time (i) issue and deliver to such holder of Preferred Stock, or to his, her or its nominees, a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the shares of Preferred Stock represented by the surrendered certificate that were not converted into Common Stock, (ii) pay in cash such amount as provided in Subsection 4.2 in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the shares of Preferred Stock converted. Notwithstanding anything to the contrary in this Subsection 4.3.1, if any conversion would require a holder or its ultimate parent entity (as that term is defined in the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "**HSR Act**")) to make any filings under the HSR Act, then such conversion will not become effective until all applicable waiting periods have expired with respect to such filings.

    4.3.2 <u>Reservation of Shares</u>. The Corporation shall at all times when the Preferred Stock shall be outstanding, reserve and keep available out of its authorized but unissued capital stock, for the purpose of effecting the conversion of the Preferred Stock, such number of its duly authorized shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Corporation shall take such corporate action as may be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite stockholder approval of any necessary amendment to this Restated Certificate. Before taking any action which would cause an adjustment reducing the Applicable Conversion Price below the then par value of the shares of Common Stock issuable upon conversion of the Preferred Stock, the Corporation will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Corporation may validly and legally issue fully paid and non-assessable shares of Common Stock at such adjusted Applicable Conversion Price.

    4.3.3 <u>Effect of Conversion</u>. All shares of Preferred Stock which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive shares of Common Stock in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in Subsection 4.2 and to receive payment of any dividends declared but unpaid thereon. Any shares of Preferred Stock so converted shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Preferred Stock accordingly.

Ankura - 000122

4.3.4 <u>No Further Adjustment</u>. Upon any such conversion, no adjustment to the Applicable Conversion Price shall be made for any declared but unpaid dividends on the Preferred Stock surrendered for conversion or on the Common Stock delivered upon conversion.

4.3.5 <u>Taxes</u>. The Corporation shall pay any and all issue and other similar taxes that may be payable in respect of any issuance or delivery of shares of Common Stock upon conversion of shares of Preferred Stock pursuant to this <u>Section 4</u>. The Corporation shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of shares of Common Stock in a name other than that in which the shares of Preferred Stock so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

4.4 <u>Adjustments to Applicable Conversion Price for Diluting Issues</u>.

4.4.1 <u>Special Definitions</u>. For purposes of this Article Fourth, the following definitions shall apply:

(a) "**Option**" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(b) "**Original Issue Date**" shall mean the date on which the first share of either Series E Preferred Stock or E-1 Preferred Stock was issued.

(c) "**Convertible Securities**" shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Stock, but excluding Options.

(d) "**Additional Shares of Common Stock**" shall mean all shares of Common Stock issued (or, pursuant to <u>Subsection 4.4.3</u> below, deemed to be issued) by the Corporation after the Original Issue Date, other than (1) the following shares of Common Stock and (2) shares of Common Stock deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, "**Exempted Securities**"):

    (i)    shares of Common Stock, Options or Convertible Securities issued as a dividend or distribution on Preferred Stock;

    (ii)    shares of Common Stock, Options or Convertible Securities issued by reason of a dividend, stock split, split-up or other distribution on shares of Common Stock for which an adjustment to the Applicable Conversion Price of the Preferred Stock is made pursuant to <u>Subsection 4.5</u>, <u>4.6</u>, <u>4.7</u> or <u>4.8</u>;

Ankura - 000123

(iii) shares of Common Stock or Options issued to employees or directors of, or consultants or advisors to, the Corporation or any of its subsidiaries pursuant to a plan, agreement or arrangement approved by the Board of Directors (including Preferred Director Approval);

(iv) shares of Common Stock or Convertible Securities actually issued upon the exercise of Options or shares of Common Stock actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v) shares of Common Stock, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction approved by the Board of Directors (including Preferred Director Approval) and are primarily for non-equity financing purposes;

(vi) shares of Common Stock, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services pursuant to transactions approved by the Board of Directors (including Preferred Director Approval) and are primarily for non-equity financing purposes;

(vii) shares of Common Stock, Options or Convertible Securities issued pursuant to the acquisition of another corporation by the Corporation by merger, purchase of substantially all of the assets or other reorganization or to a joint venture agreement approved by the Board of Directors (including Preferred Director Approval); or

(viii) Shares of Common Stock issued or issuable or Convertible Securities issued pursuant to that certain Amended and Restated Series E Preferred Stock and Warrant Purchase Agreement, by and among the Corporation and the other parties thereto dated on or around August 9, 2021, as may be amended, modified and/or restated from time to time.

Ankura - 000124

4.4.2 <u>No Adjustment of Applicable Conversion Price</u>. No adjustment in the Applicable Conversion Price of a series of Preferred Stock shall be made as the result of the issuance or deemed issuance of Additional Shares of Common Stock if the Corporation receives written notice from the Requisite Holders, agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Shares of Common Stock; *provided*, that any such waiver of the downward adjustment of the Applicable Conversion Price of the Series D Preferred Stock as the result of the issuance or deemed issuance of Additional Shares of Common Stock shall require that the Corporation receive written notice from the Requisite Series D Holders, agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Shares of Common Stock; *provided further*, that any such waiver of the downward adjustment of the Applicable Conversion Price of the Series E and E-l Preferred Stock as the result of the issuance or deemed issuance of Additional Shares of Common Stock shall require that the Corporation receive written notice from the Requisite Series E Holders, agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Shares of Common Stock.

4.4.3 <u>Deemed Issue of Additional Shares of Common Stock</u>.

(a) If the Corporation at any time or from time to time after the Original Issue Date shall issue any Options or Convertible Securities (excluding Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such record date shall have been fixed, as of the close of business on such record date.

(b) If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the Applicable Conversion Price pursuant to the terms of <u>Subsection 4.4.4</u>, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Corporation upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the Applicable Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such Applicable Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security.

Ankura - 000125

Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the Applicable Conversion Price to an amount which exceeds the lower of (i) the Applicable Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the Applicable Conversion Price that would have resulted from any issuances of Additional Shares of Common Stock (other than deemed issuances of Additional Shares of Common Stock as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c) If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the Applicable Conversion Price pursuant to the terms of <u>Subsection 4.4.4</u> (either because the consideration per share (determined pursuant to <u>Subsection 4.4.5</u>) of the Additional Shares of Common Stock subject thereto was equal to or greater than the Applicable Conversion Price then in effect, or because such Option or Convertible Security was issued before the Original Issue Date), are revised after the Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of shares of Common Stock issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Corporation upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Shares of Common Stock subject thereto (determined in the manner provided in <u>Subsection 4.4.3(a)</u>) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

(d) Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the Applicable Conversion Price pursuant to the terms of <u>Subsection 4.4.4</u>, the Applicable Conversion Price shall be readjusted to such Applicable Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e) If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the Applicable Conversion Price provided for in this <u>Subsection 4.4.3</u> shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this <u>Subsection 4.4.3</u>). If the number of shares of Common Stock issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Corporation upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the Applicable Conversion Price that would result under the terms of this <u>Subsection 4.4.3</u> at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the Applicable Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

Ankura - 000126

4.4.4 <u>Adjustment of Applicable Conversion Price Upon Issuance of Additional Shares of Common Stock</u>. In the event the Corporation shall at any time after the Original Issue Date issue Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to <u>Subsection 4.4.3</u>), without consideration or for a consideration per share less than the Applicable Conversion Price in effect immediately prior to such issue, then the Applicable Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a) "$CP_2$" shall mean the Applicable Conversion Price in effect immediately after such issue of Additional Shares of Common Stock

(b) "$CP_1$" shall mean the Applicable Conversion Price in effect immediately prior to such issue of Additional Shares of Common Stock;

(c) "A" shall mean the number of shares of Common Stock outstanding immediately prior to such issue of Additional Shares of Common Stock (treating for this purpose as outstanding all shares of Common Stock issuable upon exercise of Options outstanding immediately prior to such issue or upon conversion or exchange of Convertible Securities (including the Preferred Stock) outstanding (assuming exercise of any outstanding Options therefor) immediately prior to such issue);

(d) "B" shall mean the number of shares of Common Stock that would have been issued if such Additional Shares of Common Stock had been issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Corporation in respect of such issue by $CP_1$); and

(e) "C" shall mean the number of such Additional Shares of Common Stock issued in such transaction.

4.4.5 <u>Determination of Consideration</u>. For purposes of this <u>Subsection 4.4</u>, the consideration received by the Corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

(a) <u>Cash and Property</u>: Such consideration shall:

(i)    insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation, excluding amounts paid or payable for accrued interest;

(ii)    insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors (including Preferred Director Approval); and

(iii)    in the event Additional Shares of Common Stock are issued together with other shares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors (including Preferred Director Approval).

(b) <u>Options and Convertible Securities</u>. The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to <u>Subsection 4.4.3</u>, relating to Options and Convertible Securities, shall be determined by dividing:

(i)    The total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(ii)    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

Ankura - 000128

4.4.6 <u>Multiple Closing Dates</u>. In the event the Corporation shall issue on more than one date Additional Shares of Common Stock that are a part of one transaction or a series of related transactions and that would result in an adjustment to the Applicable Conversion Price pursuant to the terms of <u>Subsection 4.4.4</u>, and such issuance dates occur within a period of no more than 90 days from the first such issuance to the final such issuance, then, upon the final such issuance, the Applicable Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5 <u>Adjustment for Stock Splits and Combinations</u>. If the Corporation shall at any time or from time to time after the Original Issue Date effect a subdivision of the outstanding Common Stock, the Applicable Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of shares of Common Stock outstanding. If the Corporation shall at any time or from time to time after the Original Issue Date combine the outstanding shares of Common Stock, the Applicable Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of shares of Common Stock outstanding. Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6 <u>Adjustment for Certain Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Original Issue Date shall make or issue, or fix a record date for the determination of holders of shares of Common Stock entitled to receive, a dividend or other distribution payable on the Common Stock in additional shares of Common Stock, then and in each such event the Applicable Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the Applicable Conversion Price then in effect by a fraction:

(1) the numerator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(2) the denominator of which shall be the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of shares of Common Stock issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Applicable Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Applicable Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of shares of Preferred Stock simultaneously receive a dividend or other distribution of shares of Common Stock in a number equal to the number of shares of Common Stock as they would have received if all outstanding shares of Preferred Stock had been converted into Common Stock on the date of such event.

Ankura - 000129

4.7 <u>Adjustments for Other Dividends and Distributions</u>. In the event the Corporation at any time or from time to time after the Original Issue Date shall make or issue, or fix a record date for the determination of holders of shares of Common Stock entitled to receive, a dividend or other distribution payable in securities of the Corporation (other than a distribution of shares of Common Stock in respect of outstanding shares of Common Stock) or in other property and the provisions of <u>Section 1</u> do not apply to such dividend or distribution, then and in each such event the holders of shares of Preferred Stock shall receive, simultaneously with the distribution to the holders of shares of Common Stock, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding shares of Preferred Stock had been converted into Common Stock on the date of such event.

4.8 <u>Adjustment for Merger or Reorganization, etc</u>. Subject to the provisions of <u>Subsection 2.3</u>, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Corporation in which the Common Stock (but not the Preferred Stock) is converted into or exchanged for securities, cash or other property (other than a transaction covered by <u>Subsections 4.4</u>, <u>4.6</u> or <u>4.7</u>), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Preferred Stock shall thereafter be convertible in lieu of the Common Stock into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of shares of Common Stock issuable upon conversion of one share of Preferred Stock immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in such case, appropriate adjustment (as determined in good faith by the Board of Directors (including Preferred Director Approval)) shall be made in the application of the provisions in this <u>Section 4</u> with respect to the rights and interests thereafter of the holders of shares of Preferred Stock, to the end that the provisions set forth in this <u>Section 4</u> (including provisions with respect to changes in and other adjustments of the Applicable Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Stock.

4.9 <u>Certificate as to Adjustments</u>. Upon the occurrence of each adjustment or readjustment of the Applicable Conversion Price pursuant to this <u>Section 4</u>, the Corporation at its expense shall, as promptly as reasonably practicable but in any event not later than 30 days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Stock a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Preferred Stock is convertible) and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Stock (but in any event not later than 10 days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the Applicable Conversion Price then in effect, and (ii) the number of shares of Common Stock and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Preferred Stock.

Ankura - 000130

4.10 <u>Notice of Record Date</u>. In the event:

(a) the Corporation shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon conversion of the Preferred Stock) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

(b) of any capital reorganization of the Corporation, any reclassification of the Common Stock of the Corporation, or any Deemed Liquidation Event; or

(c) of the voluntary or involuntary dissolution, liquidation or winding-up of the Corporation,

then, and in each such case, the Corporation will send or cause to be sent to the holders of shares of Preferred Stock a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon the conversion of the Preferred Stock) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Preferred Stock and the Common Stock. Such notice shall be sent at least 10 days prior to the record date or effective date for the event specified in such notice.

5. <u>Mandatory Conversion</u>.

5.1 <u>Trigger Events</u>. Upon either (a) the closing of the sale of shares of Common Stock to the public in a firm-commitment underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933 (the "**Securities Act**"), as amended, the offering price of which is equal to at least the Series D Original Issue Price per share (as adjusted for any stock splits, stock dividends, combinations, subdivisions, recapitalizations or the like) and that results in at least $50,000,000 of gross proceeds to the Corporation (a "**Qualified IPO**"), (b) immediately prior to the consummation of a business combination pursuant to which the Corporation is merged into, or otherwise combines with, a special purpose acquisition company listed on a national securities exchange, or a subsidiary thereof, and the shares of capital stock of the Corporation outstanding immediately prior to such combination continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such combination, at least a majority, by voting power, of the capital stock of (i) the surviving or resulting corporation; or (ii) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such combination or consolidation, the parent corporation of such surviving or resulting corporation (a "**SPAC Transaction**"), in either case, with an implied per share valuation (derived from a price per share equal to the average trading price of the shares or other equity interests into which the shares of capital stock of the Corporation are to be converted or exchanged for the twenty trading days ending on the date preceding the closing of the SPAC Transaction) equal to at least the Series D Original Issue Price (as adjusted for any stock splits, stock dividends, combinations, subdivisions, recapitalizations or the like) (a "**Qualified SPAC Transaction**"), (c) the effectiveness of the registration statement filed under the Securities Act that registers shares of existing capital stock of the Corporation for resale not

Ankura - 000131

pursuant to an underwritten offering, the reference price of which is equal to at least the Series D Original Issue Price per share (as adjusted for any stock splits, stock dividends, combinations, subdivisions, recapitalizations or the like) (a "**Qualified Direct Listing**") or (d) the date and time, or the occurrence of an event, specified by vote or written consent of (i) the Requisite Holders, (ii) solely with respect to the Series D Preferred Stock, Requisite Series D Holders and (iii) solely with respect to the Series E and E-1 Preferred Stock, Requisite Series E Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the "**Mandatory Conversion Time**"), then (A) all outstanding shares of Preferred Stock shall automatically be converted into shares of Common Stock, at the then effective conversion rate as calculated pursuant to <u>Subsection 4.1.1</u> and (B) such shares may not be reissued by the Corporation; provided that any such conversion pursuant to <u>Subsection 5.1(a), 5.1(b) or 5.1(c)</u> shall not apply to the outstanding shares of Series E and E-1 Preferred Stock to the extent that the offering price, implied price per share or reference price for such Qualified IPO, Qualified SPAC Transaction or Qualified Direct Listing, respectively, does not equal or exceed two times (2x) the Series E Original Issue Price) per share (as adjusted for any stock splits, stock dividends, combinations, subdivisions, recapitalizations or the like) (a "**Series E Non-Qualified Transaction**").

5.2 <u>Procedural Requirements</u>. All holders of record of shares of Preferred Stock being converted pursuant to Subsection 5.1 shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such shares of Preferred Stock pursuant to this <u>Section 5</u>. Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time. Upon receipt of such notice, each such holder of shares of Preferred Stock in certificated form shall surrender his, her or its certificate or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation at the place designated in such notice. If so required by the Corporation, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Corporation, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Preferred Stock converted pursuant to <u>Subsection 5.1</u>, including the rights, if any, to receive notices and vote (other than as a holder of Common Stock), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this <u>Subsection 5.2</u>. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Preferred Stock, the Corporation shall (a) issue and deliver to such holder, or to his, her or its nominees, (i) a certificate or certificates for the number of full shares of Common Stock issuable on such conversion in accordance with the provisions hereof or (ii) a notice of issuance of uncertificated shares and may, upon written request, issue and deliver a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion in accordance with the provisions hereof and (b) pay cash as provided in <u>Subsection 4.2</u> in lieu of any fraction of a share of Common Stock otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the shares of Preferred Stock converted. Such converted Preferred Stock shall be retired and cancelled and may not be reissued as shares of such series, and the Corporation may thereafter take such appropriate action (without the need for stockholder action) as may be necessary to reduce the authorized number of shares of Preferred Stock accordingly.

Ankura - 000132

6. <u>Redemption</u>. Other than as set forth in <u>Section 2.3.2(b)</u>, the Preferred Stock is not redeemable.

7. <u>Redeemed or Otherwise Acquired Shares</u>. Any shares of Preferred Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred. Neither the Corporation nor any of its subsidiaries may exercise any voting or other rights granted to the holders of shares of Preferred Stock following a redemption or acquisition of such shares.

8. <u>Waiver</u>. Except where a different vote is required herein, any of the rights, powers, preferences and other terms of the Preferred Stock set forth herein may be waived on behalf of all holders of Preferred Stock by the affirmative written consent or vote of the Requisite Holders.

9. <u>Notices</u>. Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Preferred Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

**FIFTH:** Subject to any additional vote required by this Restated Certificate or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Restated Certificate, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Ankura - 000133

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification.

**ELEVENTH:** The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity. An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Preferred Stock or any partner, member, director, stockholder, employee or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation.

**TWELFTH:** Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within 10 days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

Ankura - 000134

**THIRTEENTH:** For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Restated Certificate from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any other consent required under this Restated Certificate), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code). Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero.

\* \* \*

**3.** That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

**4.** That this Restated Certificate, which restates and integrates and further amends the provisions of this Corporation's Sixth Amended and Restated Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

Ankura - 000135

**IN WITNESS WHEREOF**, this Seventh Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 9th day of August, 2021.

By:  /s/ Zachary Prince

Zachary Prince, Chief Executive Officer

*Signature Page to Seventh Amended and Restated Certificate of Incorporation*

Ankura - 000136

Exhibit T3C

**BLOCKFI INC.**

TO

**ANKURA TRUST COMPANY, LLC**

*Trustee*

**Indenture**

*Dated as of [ ], 2022*

**BlockFi Interest Accounts**

Ankura - 000137

**Certain Sections of this Indenture relating to Sections 310 through 318, inclusive,**

**of the Trust Indenture Act of 1939:**

| Trust Indenture Act Section | Indenture Section |
|---|---|
| § 310(a)(1) | 509 |
| (a)(2) | 509 |
| (a)(3) | Not Applicable |
| (a)(4) | Not Applicable |
| (b) | 508 |
| | 510 |
| § 311(a) | 513 |
| (b) | 513 |
| § 312(a) | 601 |
| | 602(a) |
| (b) | 602(b) |
| (c) | 602(c) |
| § 313(a) | 603(a) |
| (b) | 603(a) |
| (c) | 603(a) |
| (d) | 603(a) |
| § 314(a) | 604 |
| (a)(4) | 101 |
| | 904 |
| (b) | Not Applicable |
| (c)(1) | 102 |
| (c)(2) | 102 |
| (c)(3) | Not Applicable |
| (d) | Not Applicable |
| (e) | 102 |
| § 315(a) | 501 |
| (b) | 502 |
| (c) | 501 |
| (d) | 501 |
| (e) | 414 |
| § 316(a) | 101 |
| (a)(1)(A) | 402 |
| | 412 |
| (a)(1)(B) | 413 |
| (a)(2) | Not Applicable |
| (b) | 408 |
| (c) | 104 |
| § 317(a)(1) | 403 |
| (a)(2) | 404 |

Ankura - 000138

| Trust Indenture Act Section | Indenture Section |
|---|---|
| (b) | 903 |
| § 318(a) | 107 |

Note: This reconciliation and tie shall not, for any purpose, be deemed to be a part of the Indenture.

- ii -

Ankura - 000139

TABLE OF CONTENTS

PAGE

PARTIES                                                                        1

RECITALS OF THE COMPANY                                                        1

ARTICLE ONE

DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 101.    Definitions.                                                   1
                Accounts                                                       2
                Act                                                            2
                Affiliate; control                                            2
                Board of Directors                                            2
                Board Resolution                                              2
                books and records of the Company                              2
                Business Day                                                   3
                Commission                                                     3
                Company                                                        3
                Company Request; Company Order                                 3
                Corporate Trust Office                                         3
                corporation                                                    3
                Electronic Means                                              3
                Event of Default                                              3
                Exchange Act                                                   3
                Funding Amount                                                 3
                Holder                                                         4
                Indenture                                                      4
                Interest Account Terms                                         4
                Officers' Certificate                                         4
                Opinion of Counsel                                            4
                Outstanding                                                    4
                Person                                                         4
                Platform                                                       4
                principal                                                      4
                Responsible Officer                                           5
                Securities Act                                                5
                Trust Indenture Act                                           5
                Trustee                                                        5
                U.S. dollars                                                   5
                Vice President                                                 5
SECTION 102.    Compliance Certificates and Opinions.                         5
SECTION 103.    Form of Documents Delivered to Trustee.                       6
SECTION 104.    Acts of Holders.                                              7

-i-

Ankura - 000140

| SECTION 105. | Notices, Etc., to Trustee and Company. | 8 |
| SECTION 106. | Notice to Holders; Waiver. | 9 |
| SECTION 107. | Conflict with Trust Indenture Act. | 10 |
| SECTION 108. | Effect of Headings and Table of Contents. | 10 |
| SECTION 109. | Successors and Assigns. | 10 |
| SECTION 110. | Separability Clause. | 10 |
| SECTION 111. | Benefits of Indenture. | 10 |
| SECTION 112. | Governing Law. | 10 |

ARTICLE TWO

THE ACCOUNTS

| SECTION 201. | Title and Terms. | 10 |
| SECTION 202. | Notification of Changes. | 11 |

ARTICLE THREE

SATISFACTION AND DISCHARGE

| SECTION 301. | Satisfaction and Discharge of Indenture. | 12 |

ARTICLE FOUR

REMEDIES

| SECTION 401. | Events of Default. | 12 |
| SECTION 402. | Repayment of Accounts if Event of Default Occurs; Rescission and Annulment. | 13 |
| SECTION 403. | Suits for Enforcement by Trustee. | 15 |
| SECTION 404. | Trustee May File Proofs of Claim. | 15 |
| SECTION 405. | Trustee May Enforce Claims Without Possession or Control of Accounts. | 16 |
| SECTION 406. | Application of Money Collected. | 16 |
| SECTION 407. | Limitation on Suits. | 16 |
| SECTION 408. | Unconditional Right of Holders to Receive Principal and Interest | 17 |
| SECTION 409. | Restoration of Rights and Remedies. | 17 |
| SECTION 410. | Rights and Remedies Cumulative. | 18 |
| SECTION 411. | Delay or Omission Not Waiver. | 18 |
| SECTION 412. | Control by Holders. | 18 |
| SECTION 413. | Waiver of Past Defaults. | 18 |
| SECTION 414. | Undertaking for Costs. | 19 |
| SECTION 415. | Waiver of Stay or Extension Laws. | 19 |

Ankura - 000141

## ARTICLE FIVE

### THE TRUSTEE

| | | |
|---|---|---|
| SECTION 501. | Certain Duties and Responsibilities. | 19 |
| SECTION 502. | Notice of Defaults. | 20 |
| SECTION 503. | Certain Rights of Trustee. | 21 |
| SECTION 504. | Not Responsible for Recitals or Issuance of Accounts. | 22 |
| SECTION 505. | May Hold Accounts. | 22 |
| SECTION 506. | Money Held in Trust. | 22 |
| SECTION 507. | Compensation and Reimbursement. | 23 |
| SECTION 508. | Disqualification; Conflicting Interests. | 24 |
| SECTION 509. | Corporate Trustee Required; Eligibility. | 24 |
| SECTION 510. | Resignation and Removal; Appointment of Successor. | 24 |
| SECTION 511. | Acceptance of Appointment by Successor. | 26 |
| SECTION 512. | Merger, Conversion, Consolidation or Succession to Business. | 26 |
| SECTION 513. | Preferential Collection of Claims Against Company. | 26 |

## ARTICLE SIX

### HOLDERS' LISTS AND REPORTS BY TRUSTEE AND COMPANY

| | | |
|---|---|---|
| SECTION 601. | Company to Furnish Trustee Names and Addresses of Holders; Account Information. | 27 |
| SECTION 602. | Preservation of Information; Communications to Holders. | 27 |
| SECTION 603. | Reports by Trustee. | 28 |
| SECTION 604. | Reports by Company. | 28 |

## ARTICLE SEVEN

### CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

| | | |
|---|---|---|
| SECTION 701. | Company May Consolidate, Etc., Only on Certain Terms. | 28 |
| SECTION 702. | Successor Substituted. | 29 |

## ARTICLE EIGHT

### SUPPLEMENTAL INDENTURES

| | | |
|---|---|---|
| SECTION 801. | Supplemental Indentures. | 29 |
| SECTION 802. | Execution of Supplemental Indentures. | 30 |
| SECTION 803. | Effect of Supplemental Indentures. | 30 |
| SECTION 804. | Conformity with Trust Indenture Act. | 30 |

-iii-

Ankura - 000142

ARTICLE NINE

COVENANTS

SECTION 901.     Payment of Principal and Interest.                                          30
SECTION 902.     Maintenance of Office or Agency.                                            30
SECTION 903.     Money for Payments to Be Held in Trust.                                     31
SECTION 904.     Statement by Officers as to Default.                                        31
SECTION 905.     Existence.                                                                  31
SECTION 906.     No Further Transfers.                                                       31

ARTICLE TEN

MISCELLANEOUS PROVISIONS

SECTION 1001.    Consent to Jurisdiction.                                                    31
SECTION 1002.    Indenture and Accounts Solely Corporate Obligations.                        32
SECTION 1003.    Execution in Counterparts.                                                  33
SECTION 1004.    Waiver of Jury Trial.                                                       33
SECTION 1005.    Force Majeure.                                                              33
SECTION 1006.    Patriot Act.                                                                34

-iv-

Ankura - 000143

INDENTURE, dated as of [ ], 2022, between BlockFi Inc., a corporation duly organized and existing under the laws of the State of Delaware (herein called the "Company"), having its principal office at 201 Montgomery Street, Suite 263, Jersey City, New Jersey 07302, and ANKURA TRUST COMPANY, LLC, a New Hampshire chartered trust company, as Trustee (herein called the "Trustee").

RECITALS OF THE COMPANY

The Company has duly authorized the execution and delivery of this Indenture with respect to the operation of its BlockFi Interest Account product, which allows Holders to earn interest on supported digital assets (herein called the "Accounts", and each, an "Account").

All things necessary to make this Indenture a valid agreement of the Company, in accordance with its terms, have been done.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

For and in consideration of the premises and the entering into of the Accounts by the Holders thereof, it is mutually agreed, for the equal and proportionate benefit of all Holders of the Accounts, as follows:

ARTICLE ONE

DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 101. Definitions.

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(1) the terms defined in this Article have the meanings assigned to them in this Article and include the plural as well as the singular;

(2) all other terms used herein which are defined in the Trust Indenture Act, either directly or by reference therein, have the meanings assigned to them therein

(3) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles, and, except as otherwise herein expressly provided, the term "generally accepted accounting principles" with respect to any computation required or permitted hereunder shall mean such accounting principles as are generally accepted at the date of such computation;

Ankura - 000144

(4) unless the context otherwise requires, any reference to an "Article" or a "Section" refers to an Article or a Section, as the case may be, of this Indenture;

(5) the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(6) the word "or" is not exclusive; and

(7) whenever the term "including" (whether or not that term is followed by the phrase "but not limited to" or "without limitation" or words of similar effect) is used in this Indenture in connection with a listing of items within a particular classification, that listing shall be interpreted to be illustrative only and shall not be interpreted as a limitation on, or exclusive listing of, the items within that classification.

"Accounts" has the meaning stated in the first recital of this Indenture.

"Act" , when used with respect to any Holder, has the meaning specified in Section 104.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Board of Directors" means either the board of directors of the Company or any duly authorized committee of that board.

"Board Resolution" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"books and records of the Company" means electronic records maintained from time to time by or on behalf of the Company for purposes of the Accounts and this Indenture.

- 2 -

Ankura - 000145

"Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in the City of New York, New York, or Jersey City, New Jersey, are authorized or obligated by law or executive order to close.

"Commission" means the Securities and Exchange Commission, from time to time constituted, created under the Exchange Act, or, if at any time after the execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties at such time.

"Company" means the Person named as the "Company" in the first paragraph of this instrument until a successor Person shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Company" shall mean such successor Person.

"Company Request" or "Company Order" means a written request or order signed in the name of the Company by its Chairman of the Board, its Vice Chairman of the Board, its President or a Vice President, and by its Treasurer, an Assistant Treasurer, its Secretary or an Assistant Secretary, and delivered to the Trustee.

"Corporate Trust Office" means the principal corporate trust office of the Trustee at which at any particular time its corporate trust business shall be administered, which, as of the date of this Indenture is 140 Sherman Street, 4th Floor, Fairfield, CT 06824, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company.

"corporation" means a corporation, association, company, joint-stock company or business trust.

"Electronic Means" shall mean the following communications methods: email, secure electronic transmission containing applicable authorization codes, passwords or authentication keys issued by the relevant party, including web-based communication methods, or another method or system specified by that party as available for use in connection with communications hereunder. For the avoidance of doubt, communications by Electronic Means shall constitute "written" communications for the purposes of this Indenture.

"Event of Default" has the meaning specified in Section 401.

"Exchange Act" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case as amended from time to time.

"Funding Amount" has the meaning specified in Section 507(3).

- 3 -

Ankura - 000146

"Holder" means a Person reflected as the owner of such Account in the books and records of the Company. For the avoidance of doubt, the term "Holder", as used herein, refers solely to Persons residing in the United States.

"Indenture" means this instrument as originally executed or as it may from time to time be supplemented or amended by one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof, including, for all purposes of this instrument and any such supplemental indenture, the provisions of the Trust Indenture Act that are deemed to be a part of and govern this instrument and any such supplemental indenture, respectively.

"Interest Account Terms", with respect to any Account, has the meaning specified in Section 201.

"Officers' Certificate" means a certificate signed by the Chairman of the Board, a Vice Chairman of the Board, the President or a Vice President, and by the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary, of the Company, and delivered to the Trustee. One of the officers signing an Officers' Certificate given pursuant to Section 904 shall be the principal executive, financial or accounting officer of the Company.

"Opinion of Counsel" means a written opinion of counsel, who may be counsel for the Company, and who shall be reasonably acceptable to the Trustee.

"Outstanding", when used with respect to the Accounts, means, as of the date of determination, all Accounts then reflected on the books and records of the Company as having been opened and then holding assets; *provided, however*, that in determining whether the Holders of the requisite principal amount of the Outstanding Accounts have given, made or taken any request, demand, authorization, direction, notice, consent, waiver or other action hereunder as of any date, Accounts owned by the Company or any other obligor upon the Accounts or any Affiliate of the Company or of such other obligor shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent, waiver or other action, only Accounts which the Trustee knows to be so owned shall be so disregarded.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Platform" has the meaning specified in Section 106(2).

"principal" , when used at any time with respect to an Account, means the aggregate amount of digital assets then held in such Account, on the books and records of the Company; provided that such amount, when used with respect to a majority or other

- 4 -

Ankura - 000147

percentage of principal of the Accounts, shall be expressed in U.S. dollars, based on the applicable conversion rates published on [ ] (or any successor page or, if a successor page is unavailable, a page of any comparable provider showing such conversion rates, as determined by the Company) as of the date of determination.

"Responsible Officer", when used with respect to the Trustee, means the chairman or any vice chairman of the board of directors, the chairman or any vice chairman of the executive committee of the board of directors, the chairman of the trust committee, the president, any director, any senior director, any managing director, any senior managing director, any vice president, the secretary, any assistant secretary, the treasurer, any assistant treasurer, the cashier, any assistant cashier, any trust officer or assistant trust officer, the controller or any assistant controller or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and who, in each case, shall have direct responsibility for the administration of this Indenture and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"Securities Act" means the Securities Act of 1933 and any statute successor thereto, in each case as amended from time to time.

"Trust Indenture Act" means the Trust Indenture Act of 1939 as in force at the date as of which this instrument was executed; *provided*, *however*, that in the event the Trust Indenture Act of 1939 is amended after such date, "Trust Indenture Act" means, to the extent required by any such amendment, the Trust Indenture Act of 1939 as so amended.

"Trustee" means the Person named as the "Trustee" in the first paragraph of this instrument until a successor Trustee shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean or include each Person who is then a Trustee hereunder, and if at any time there is more than one such Person, "Trustee" as used with respect to the Accounts shall mean the Trustee with respect to such Accounts.

"U.S. dollars" means the lawful currency of the United States.

"Vice President" , when used with respect to the Company, means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president".

SECTION 102. Compliance Certificates and Opinions.

Upon any application or request by the Company to the Trustee to take any action under any provision of this Indenture, the Company shall furnish to the

- 5 -

Ankura - 000148

Trustee such certificates and opinions as may be required under the Trust Indenture Act. Each such certificate or opinion shall be given in the form of an Officers' Certificate, if to be given by officers of the Company, or an Opinion of Counsel, if to be given by counsel, and shall comply with the requirements of the Trust Indenture Act and any other requirements set forth in this Indenture.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (except for certificates provided for in Section 904) shall include

(1) a statement that each individual signing such certificate or opinion has read such covenant or condition and the definitions herein relating thereto;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3) a statement that, in the opinion of each such individual, such individual has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4) a statement as to whether, in the opinion of each such individual, such condition or covenant has been complied with.

SECTION 103. Form of Documents Delivered to Trustee.

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate or opinion of counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

- 6 -

Ankura - 000149

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

SECTION 104. Acts of Holders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided or permitted by this Indenture to be given, made or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to and received by the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 501) conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof. Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient.

The Company may, in the circumstances permitted by the Trust Indenture Act, fix any day as the record date for the purpose of determining the Holders entitled to give or take any request, demand, authorization, direction, notice, consent, waiver or other action, authorized or permitted to be given or taken by Holders. If not set by the Company prior to the first solicitation of a Holder made by any Person in respect of any such action, or, in the case of any such vote, prior to such vote, the record date for any such action or vote shall be the 30th day (or, if later, the date of the most recent list of Holders required to be provided pursuant to Section 601) prior to such first solicitation or vote, as the case may be. With regard to any record date, only the Holders on such date (or their duly designated proxies) shall be entitled to give or take, or vote on, the relevant action.

- 7 -

Ankura - 000150

For the purposes of this Indenture, the ownership of Accounts shall be proved by the books and records of the Company.

SECTION 105. Notices, Etc., to Trustee and Company.

Any notice or demand that by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders on the Company shall be deemed to have been sufficiently given or made, for all purposes if given or served to the Company by email at: [ ], by any other Electronic Means, using such contact information as may have previously been provided to the Trustee or Holders, as the case may be, by the Company, or by mail addressed (until another address is filed by the Company with the Trustee) to [ ].

Any notice, direction, request or demand hereunder to or upon the Trustee shall be given to the Trustee by mail addressed to the Trustee at its Corporate Trust Office with copies to:

[ ]

The Trustee shall have the right to accept and act upon notices, directions, requests or demands given pursuant to this Indenture and delivered using Electronic Means. The Company shall provide to the Trustee an incumbency certificate listing officers with the authority to provide such notices, directions, requests or demands ("Authorized Persons") and containing specimen signatures of such Authorized Persons, which incumbency certificate shall be amended by the Company whenever a person is to be added or deleted from the listing. The Company shall be responsible for ensuring that only Authorized Persons transmit such notice, direction, request or demand to the Trustee and all Authorized Persons are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Company. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such notice, direction, request or demand notwithstanding such notices, directions, requests or demands conflict or are inconsistent with a subsequent written notice, direction, request or demand. The Company understands and agrees that the Trustee cannot, and is not required to, determine the identity of the actual sender of such notice, direction, request or demand and that the Trustee shall conclusively presume that notices, directions, requests or demands that purport to have been sent by an Authorized Person listed on the incumbency certificate provided to the Trustee have been sent by such Authorized Person. The Company agrees, other than, in each case, with respect to gross negligence or willful misconduct on the part of the Trustee arising out of or in connection with any such actions taken or omitted: (i) to assume all risks arising out of the submission of any notice, direction, request or demand to the Trustee, including without limitation the risk of the Trustee acting on any unauthorized notice, direction, request or demand, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting

- 8 -

Ankura - 000151

such notice, direction, request or demand to the Trustee and that there may be more secure methods of transmitting such notice, direction, request or demand than the method(s) selected by the Company; (iii) that the security procedures (if any) to be followed in connection with its transmission of any notice, direction, request or demand provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of any such security procedures.

SECTION 106. Notice to Holders; Waiver.

   Where this Indenture provides for notice or information to Holders of any event, such notice or information shall be sufficiently given if given either:

     (1) by Electronic Means or by mail using such contact information as may have previously been provided to the Company by the Holders as such information appears in the books and records of the Company not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice. In any case where notice to any Holder is given using such Holder's contact information provided by such Holder to the Company in connection with the entry into an Account (and not subsequently updated by such Holder by notice to the Company), neither the failure to give such notice, nor any defect in any notice so given to any particular Holder shall affect the sufficiency of such notice with respect to other Holders;

     (2) if delivered by the Trustee to the Holders, notwithstanding anything herein to the contrary, electronically by posting such information (and upon the posting of such information, each Holder shall be deemed to have received such information or notice) on DebtDomain, IntraLinks, Syndtrak or another similar electronic system that is maintained by or on behalf of the Trustee (the "Platform"). The Company covenants that it shall provide each Holder with sufficient information to access the Platform. The Platform is provided "as is" and "as available." The Trustee does not warrant the adequacy of the Platform and expressly disclaims liability for errors or omissions in the information and notices posted to the Platform. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by the Trustee in connection with the Platform or any information posted on the Platform. In no event shall the Trustee have any liability to the Company, any Holder or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Trustee's transmission of communications through the Platform or the information posted on the Platform.

   Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Holders shall be filed with the Trustee in writing, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

- 9 -

Ankura - 000152

Where this Indenture provides for notice of any event, condition or other matter by the Trustee to Holders, the Company shall, at the written request of the Trustee, promptly provide such notice on the Trustee's behalf.

SECTION 107. Conflict with Trust Indenture Act.

If any provision hereof limits, qualifies or conflicts with a provision of the Trust Indenture Act which is required under such Act to be a part of and govern this Indenture, the latter provision shall control. If any provision of this Indenture modifies or excludes any provision of the Trust Indenture Act which may be so modified or excluded, the latter provision shall be deemed to apply to this Indenture as so modified or to be excluded, as the case may be.

SECTION 108. Effect of Headings and Table of Contents.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 109. Successors and Assigns.

All covenants and agreements in this Indenture by the Company shall bind its successors and assigns, whether so expressed or not.

SECTION 110. Separability Clause.

In case any provision in this Indenture or in the Accounts shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 111. Benefits of Indenture.

Nothing in this Indenture, in the Accounts or in the Interest Account Terms, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder and the Holders, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 112. Governing Law.

This Indenture shall be governed by and construed in accordance with the law of the State of New York.

- 10 -

Ankura - 000153

ARTICLE TWO

THE ACCOUNTS

SECTION 201. <u>Title and Terms</u>.

The aggregate principal amount of the Accounts is unlimited.

Each Account shall bear interest at such rates as shall be posted from time to time by the Company on its website, and shall have such other terms and conditions posted by the Company on its website relating to such Account (such terms and conditions, the "Interest Account Terms") or as otherwise agreed with the relevant Holder; *provided* that the rates of interest payable on the Accounts for the period from, and including, April 1, 2022 to, but excluding, the next reset date, shall be as set forth on Schedule A hereto, which Schedule is incorporated into this Indenture; *provided*, *further*, that in connection with any future reset of rates of interest payable on the Accounts, the Company shall file with the books and records of the Company and transmit to the Trustee, in advance of such reset taking effect, a further Schedule to this Indenture, in substantially similar form and setting forth such new rates, whereupon such further Schedule shall be deemed to be incorporated in this Indenture, effective as of the date of such transmission. For the avoidance of doubt, to the extent a new rate is not set forth on such Schedule with respect to an Account, the rate of interest for that Account remains unchanged for the applicable reset period.

The Company will make on its own behalf all payments of principal and interest due in respect of all Accounts, and will serve as the registrar of the Accounts, maintaining books and records of the Company reflecting all of the Accounts, and the respective amounts of principal and interest owing in respect thereof. The Company will provide the Trustee with access to information about such payments and Account balances as provided in Section 601.

If an Event of Default occurs and is continuing, the Trustee may request that the Company promptly enter into an agency agreement with a registrar or paying agent other than the Company, such registrar or paying agent to be subject to the Trustee's prior written consent, which shall not be unreasonably withheld. Any such agreement shall implement the applicable terms of the Trust Indenture Act that are incorporated into this Indenture. Any such agent so appointed hereunder shall be entitled to the benefits of this Indenture as though a party hereto. The Company shall, when any such agent is appointed, promptly notify the Trustee of the name and address of such agent.

Subject to the provisions of the Trust Indenture Act, the Company may from time to time modify, change or amend the terms of any Account, in the Company's sole discretion.

SECTION 202. <u>Notification of Changes</u>.

Whenever the Company shall make a modification, change or amendment to the Interest Account Terms, or any other terms and conditions of the Accounts, the Company will promptly notify the Trustee of such action.

- 11 -

Ankura - 000154

ARTICLE THREE

SATISFACTION AND DISCHARGE

SECTION 301. Satisfaction and Discharge of Indenture.

This Indenture shall upon Company Request cease to be of further effect (except as to any surviving rights herein expressly provided for), and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when

(1) the Company has paid and discharged all amounts then owing in respect of all Accounts then Outstanding;

(2) the Company has paid or caused to be paid all other sums payable hereunder by the Company; and

(3) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under Section 507 shall survive.

ARTICLE FOUR

REMEDIES

SECTION 401. Events of Default.

"Event of Default", wherever used herein with respect to an Account, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body), except, in each case, as otherwise provided in the Interest Account Terms then applicable to such Account:

(1) default in the payment of any interest upon one or more Accounts when due and payable, which default relates to Accounts holding 5% or more of the aggregate principal amount of all of the Accounts then Outstanding, and continuance of such default for a period of five Business Days; or

- 12 -

Ankura - 000155

(2) default in the performance, or breach, of the Company's obligation to redeem all or a portion of the digital assets then held in one or more Accounts upon request (in each case subject to the satisfaction of any information requests, redemption limits, delivery periods and other requirements then applicable to such Account), which default or breach relates to Accounts holding 5% or more of the aggregate principal amount of all of the Accounts then Outstanding, and continuance of such default or breach for a period of five Business Days; or

(3) the entry by a court having jurisdiction in the premises of (A) a decree or order for relief in respect of the Company in an involuntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or (B) a decree or order adjudging the Company a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Company under any applicable Federal or State law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive days; or

(4) the commencement by the Company of a voluntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by it to the entry of a decree or order for relief in respect of the Company in an involuntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable Federal or State law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Company or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by the Company in furtherance of any such action.

SECTION 402. <u>Repayment of Accounts if Event of Default Occurs; Rescission and Annulment</u>.

If an Event of Default (other than an Event of Default specified in Section 401(3) or 401(4)) occurs and is continuing, then in every such case the Trustee or

- 13 -

Ankura - 000156

the Holders of not less than 25% in principal amount of the Outstanding Accounts may declare the principal amount of all the Accounts to be due and payable immediately, by a notice in writing to the Company (and, if given by Holders to the Company, the Company shall promptly notify the Trustee in writing of its receipt of such notice), and upon any such declaration, the principal amount of all the Accounts shall become immediately due and payable. If an Event of Default specified in Section 401(3) or 401(4) occurs, the principal amount of all the Accounts shall automatically, and without any declaration or other action on the part of the Trustee or any Holder, become immediately due and payable.

At any time after such a declaration of repayment has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter in this Article provided, the Holders of a majority in principal amount of the Outstanding Accounts, by written notice to the Company and the Trustee, may rescind and annul such declaration and its consequences if

(1) the Company has paid or deposited with or as directed by the Trustee a sum sufficient to pay

(A) all overdue interest on all Accounts,

(B) the principal of any Accounts which have become payable otherwise than by such declaration of repayment and interest thereon at the respective rates prescribed in respect of such Accounts,

(C) to the extent that payment of such interest is lawful, interest upon overdue interest at the respective rates then applicable in respect of all amounts of principal in such Accounts, and

(D) any sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel and any indemnification payments and other amounts payable to the Trustee by the Company;

and

(2) all Events of Default, other than the non-payment of the principal of Accounts which have become due solely by such declaration of repayment, have been cured or waived as provided in Section 413.

No such rescission shall affect any subsequent default or impair any right consequent thereon.

- 14 -

Ankura - 000157

SECTION 403. <u>Suits for Enforcement by Trustee</u>.

    If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders by such appropriate judicial proceedings as the Trustee shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

SECTION 404. <u>Trustee May File Proofs of Claim</u>.

    In case of any judicial proceeding relative to the Company (or any other obligor upon the Accounts), its property or its creditors, the Trustee shall be entitled and empowered, by intervention in such proceeding or otherwise, to take any and all actions authorized under this Indenture and the Trust Indenture Act in order to have claims of the Holders and the Trustee allowed in any such proceeding. In particular, the Trustee shall be authorized to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same, and in the event that the Trustee collects or receives any property other than U.S. dollars (including amounts of any digital assets), the Trustee:

    (1) may request that the Company or any agents and advisors as the Trustee may deem advisable, assist in connection with and make such distributions;

    (2) shall be authorized to sell or exchange such property for U.S. dollars and distribute the same, and in connection therewith, to retain such agents and advisors as it may deem advisable to assist in connection with such sale or exchange;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents, advisors and counsel, and any indemnification payments and other amounts due the Trustee under Section 507. The Trustee may conclusively rely on the records of the Company in determining the entitlement of each Holder to moneys or other property payable or deliverable on account of the claims of the Holders.

    No provision of this Indenture shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Accounts or the rights of any Holder thereof or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding; *provided*, *however*, that the Trustee may, on behalf of the Holders, vote for the election of a trustee in bankruptcy or similar official and be a member of a creditors' or other similar committee.

- 15 -

Ankura - 000158

SECTION 405. Trustee May Enforce Claims Without Possession or Control of Accounts.

All rights of action and claims under this Indenture or the Accounts may be prosecuted and enforced by the Trustee without the possession or control of any of the Accounts or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel and any indemnification payments and other amounts due the Trustee under Section 507, be for the ratable benefit of the Holders of the Accounts in respect of which such judgment has been recovered.

SECTION 406. Application of Money Collected.

Any money or other property collected by the Trustee pursuant to this Article shall be applied in the following order, at the date or dates fixed by the Trustee and, in case of the distribution of such money or other property on account of principal or interest, the books and records of the Company shall be adjusted to reflect such payment:

FIRST: To the payment of all amounts due the Trustee under Section 507;

SECOND: To the payment of the amounts then due and unpaid for principal of and interest on the Accounts in respect of which or for the benefit of which such money has been collected, ratably, without preference or priority of any kind, according to the amounts due and payable on such Accounts for principal and interest, respectively; and

THIRD: to the Company or to such party as a court of competent jurisdiction shall direct.

SECTION 407. Limitation on Suits.

No Holder of any Account shall have any right to institute any proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless

(1) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

- 16 -

Ankura - 000159

(2) the Holders of not less than 25% in principal amount of the Outstanding Accounts shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(3) such Holder or Holders have offered to the Trustee indemnity reasonably acceptable to the Trustee against the costs, expenses and liabilities to be incurred in compliance with such request;

(4) the Trustee for 90 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5) no direction inconsistent with such written request has been given to the Trustee during such 90-day period by the Holders of a majority in principal amount of the Outstanding Accounts;

it being understood and intended that no one or more of such Holders shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other of such Holders, or to obtain or to seek to obtain priority or preference over any other of such Holders or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all of such Holders.

SECTION 408. Unconditional Right of Holders to Receive Principal and Interest

Notwithstanding any other provision in this Indenture (other than Section 507), the Holder of any Account shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Account on the respective due dates applicable to such Account and, subject to Section 407, to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

SECTION 409. Restoration of Rights and Remedies.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Company, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

- 17 -

Ankura - 000160

SECTION 410. <u>Rights and Remedies Cumulative</u>.

        No right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 411. <u>Delay or Omission Not Waiver</u>.

        No delay or omission of the Trustee or of any Holder of any Account to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

SECTION 412. <u>Control by Holders</u>.

        The Holders of a majority in principal amount of the Outstanding Accounts shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee, *provided* that the Trustee may refuse to follow any direction that

        (1) conflicts with any rule of law or with this Indenture,

        (2) the Trustee determines may be unduly prejudicial to the rights of other Holders, or

        (3) may involve the Trustee in personal liability.

The Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction.

SECTION 413. <u>Waiver of Past Defaults</u>.

        The Holders of not less than a majority in principal amount of the Outstanding Accounts may on behalf of the Holders of all the Accounts waive any past default hereunder and its consequences, except a default

        (1) in the payment of the principal of or interest on any Account, or

- 18 -

Ankura - 000161

(2) in respect of a covenant or provision hereof which under the Trust Indenture Act cannot be modified or amended without the consent of the Holder of each Outstanding Account affected.

Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

SECTION 414. Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, suffered or omitted by it as Trustee, a court may require any party litigant in such suit to file an undertaking to pay the costs of such suit, and may assess costs against any such party litigant, in the manner and to the extent provided in the Trust Indenture Act; *provided*, that neither this Section nor the Trust Indenture Act shall be deemed to authorize any court to require such an undertaking or to make such an assessment in any suit instituted by the Company.

SECTION 415. Waiver of Stay or Extension Laws.

The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

ARTICLE FIVE

THE TRUSTEE

SECTION 501. Certain Duties and Responsibilities.

(a) The duties and responsibilities of the Trustee shall be as provided by the Trust Indenture Act.

(b) Except during the continuance of an Event of Default:

(i) the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

- 19 -

Ankura - 000162

(ii) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c) The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i) this paragraph does not limit the effect of paragraphs (b) or (d) of this Section 501;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in accordance with a direction received by it pursuant to Section 412 hereof.

(d) No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(e) Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section.

SECTION 502. <u>Notice of Defaults</u>.

If a default occurs hereunder and is known to the Trustee pursuant to Section 503(6), the Trustee shall give the Holders notice of any default hereunder as and to the extent provided by the Trust Indenture Act. For the purpose of this Section, the term "default" means any event which is, or after notice or lapse of time or both would become, an Event of Default.

- 20 -

Ankura - 000163

SECTION 503. Certain Rights of Trustee.

Subject to the provisions of Section 501:

(1) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(2) any request or direction of the Company mentioned herein shall be sufficiently evidenced by a Company Request or Company Order and any resolution of the Board of Directors may be sufficiently evidenced by a Board Resolution;

(3) whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officers' Certificate;

(4) the Trustee may consult with counsel and the written advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

(5) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction;

(6) the Trustee shall not be deemed to have notice of any default or Event of Default unless a Responsible Officer of the Trustee has received actual written notice of any default or Event of Default at the Corporate Trust Office, and such notice references the Accounts and this Indenture;

(7) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney;

- 21 -

Ankura - 000164

(8) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(9) The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture and/or the Trust Indenture Act or for any action it takes or omits to take without negligence or willful misconduct; and

(10) In no event shall the Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

SECTION 504. Not Responsible for Recitals or Issuance of Accounts.

The recitals contained herein shall be taken as the statements of the Company, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Accounts. The Trustee shall not be accountable for the use or application by the Company of Accounts or the proceeds thereof.

SECTION 505. May Hold Accounts.

The Trustee or any agent of the Company, in its individual or any other capacity, may become the owner or pledgee of Accounts and, subject to Sections 508 and 513, may otherwise deal with the Company and any Affiliate of the Company with the same rights it would have if it were not Trustee or such agent.

SECTION 506. Money Held in Trust.

Money held by the Trustee in trust hereunder need not be segregated from other funds held by the Trustee except to the extent required by law. The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed in writing with the Company.

- 22 -

Ankura - 000165

SECTION 507. <u>Compensation and Reimbursement</u>.

The Company agrees to and shall:

(1) pay to the Trustee such compensation as shall be agreed to in writing from time to time between the Company and the Trustee for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(2) promptly reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture (including the reasonable compensation and the expenses and disbursements of its agents and counsel), except any such expense, disbursement or advance as may be attributable to its negligence or willful misconduct; and

(3) indemnify the Trustee for, and to hold it harmless against, any loss, liability or expense incurred without negligence or willful misconduct on its part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

To secure the Company's payment and indemnification obligations under this Indenture, the Trustee shall have a lien prior to the Accounts on all, or any right to payment of, money, digital assets or other property held, collected or distributed by or on behalf of the Company, the Trustee, any paying agent, registrar, transfer agent, or any other Person acting in similar capacity. Such lien shall survive the satisfaction and discharge of this Indenture or the resignation or removal of the Trustee. To further secure the Company's payment and indemnification obligations under this Indenture, within thirty (30) days of the date of this Indenture (or, if such day is not a Business Day, the immediately succeeding Business Day), the Company shall establish and fund a standby letter of credit in an amount not less than $750,000 (the "<u>Funding Amount</u>"), in form and substance reasonably acceptable to the Trustee, which shall provide that upon a default by the Company to comply with any of its payment or indemnification obligations under this Indenture, the Trustee shall have a right to demand payment from the issuing institution with respect to the amount subject to such default; <u>provided</u> that, if, as a result of any such demand by the Trustee, the balance available under such standby letter of credit is less than the Funding Amount, the Company shall, within fifteen (15) days thereafter (or, if such day is not a Business Day, the immediately succeeding Business Day), replenish the balance available under such standby letter of credit to be no less than the Funding Amount.

- 23 -

Ankura - 000166

When the Trustee incurs expenses or renders services after an Event of Default specified in clause (3) or (4) of Section 401 hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any bankruptcy law.

The obligations of the Company under this Section 507 shall survive the resignation or removal of the Trustee, and the satisfaction and discharge of this Indenture, or rejection or termination under (a) Title 11 of the U.S. Code (as may be amended from time to time), (b) any other law of the United States (or any political subdivision thereof) or New York (or any political subdivision thereof)), or (c) the laws of any other relevant jurisdiction or any political subdivision thereof relating to bankruptcy, insolvency, receivership, winding up, liquidation, reorganization or relief of debtors.

SECTION 508. Disqualification; Conflicting Interests.

If the Trustee has or shall acquire a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act and this Indenture.

SECTION 509. Corporate Trustee Required; Eligibility.

There shall at all times be a Trustee hereunder which shall be a Person that is eligible pursuant to the Trust Indenture Act to act as such. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of said supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

SECTION 510. Resignation and Removal; Appointment of Successor.

No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article shall become effective until the acceptance of appointment by the successor Trustee in accordance with the applicable requirements of Section 511.

The Trustee may resign at any time by giving written notice thereof to the Company. If an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

- 24 -

Ankura - 000167

The Trustee may be removed at any time by Act of the Holders of a majority in principal amount of the Outstanding Accounts, delivered to the Trustee and to the Company.

If at any time:

(1) the Trustee shall fail to comply with Section 508 after written request therefor by the Company or by any Holder who has been a bona fide Holder of an Account for at least six months, or

(2) the Trustee shall cease to be eligible under Section 509 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(3) the Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, (A) the Company by a Board Resolution may remove the Trustee, or (B) subject to Section 414, any Holder who has been a bona fide Holder of an Account for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of Trustee for any cause, the Company, by a Board Resolution, shall promptly appoint a successor Trustee. If, within one year after such resignation, removal or incapability, or the occurrence of such vacancy, a successor Trustee shall be appointed by Act of the Holders of a majority in principal amount of the Outstanding Accounts delivered to the Company and the retiring Trustee, the successor Trustee so appointed shall, forthwith upon its acceptance of such appointment, become the successor Trustee and supersede the successor Trustee appointed by the Company. If no successor Trustee shall have been so appointed by the Company or the Holders and accepted appointment in the manner hereinafter provided, any Holder who has been a bona fide Holder of an Account for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

The Company shall give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee to all Holders in the manner provided in Section 106. Each notice shall include the name of the successor Trustee and the email address of its Corporate Trust Office.

- 25 -

Ankura - 000168

SECTION 511. Acceptance of Appointment by Successor.

Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Company and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on request of the Company or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder. Upon request of any such successor Trustee, the Company shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts. Notwithstanding the replacement of the Trustee pursuant to this Section 511, the Company's obligations under Section 507 hereof shall continue for the benefit of the retiring Trustee.

No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be qualified and eligible under this Article, including Section 509.

SECTION 512. Merger, Conversion, Consolidation or Succession to Business.

Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any entity succeeding to all or substantially all the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such entity shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

SECTION 513. Preferential Collection of Claims Against Company.

If and when the Trustee shall be or become a creditor of the Company (or any other obligor upon the Accounts), the Trustee shall be subject to the provisions of the Trust Indenture Act regarding the collection of claims against the Company (or any such other obligor).

- 26 -

Ankura - 000169

ARTICLE SIX

HOLDERS' LISTS AND REPORTS BY TRUSTEE AND COMPANY

SECTION 601. <u>Company to Furnish Trustee Names and Addresses of Holders; Account Information</u>.

The Company will furnish or cause to be furnished to the Trustee

(1) semi-annually, no later than June 30 and December 31 of each year, a list, in such form as the Trustee may reasonably require, of the names and addresses of the Holders as of the preceding June 15 or December 15;

(2) at such other times as the Trustee may request in writing, within 30 days after the receipt by the Company of any such request, (i) a list of similar form and content or (ii) the information made available to the Trustee pursuant to clause (3) of this Section 601 and an Officers' Certificate stating that such information accurately represents the information reflected on the books and records of the Company, in each case as of a date not more than 15 days prior to the time such list is furnished; and

(3) for so long as Accounts remain Outstanding under this Indenture, electronic access, at any time and from time to time, to records maintained at the Company, containing the name, mailing address, email address and tax residency information of each Holder (exactly as such information appears in each Account's registration), the applicable interest payment dates and the dates and amounts of interest paid by the Company to such Account for the immediately preceding twelve months (by crypto currency), the principal amounts in respect of such Account then Outstanding (by crypto currency), the amount of accrued but unpaid interest (by crypto currency), the terms then applicable to such Account, including applicable interest rate.

SECTION 602. <u>Preservation of Information; Communications to Holders</u>.

The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of Holders contained in the most recent list furnished to the Trustee as provided in Section 601. The Trustee may destroy any list furnished to it as provided in Section 601 upon receipt of a new list so furnished.

The rights of Holders to communicate with other Holders with respect to their rights under this Indenture or under the Accounts, and the corresponding rights and duties of the Trustee, shall be as provided by the Trust Indenture Act.

- 27 -

Ankura - 000170

Every Holder of Accounts, by receiving and holding the same, agrees with the Company and the Trustee that neither the Company nor the Trustee nor any agent of either of them shall be held accountable by reason of any disclosure of information as to names and addresses of Holders made pursuant to the Trust Indenture Act.

SECTION 603. Reports by Trustee.

The Trustee shall transmit to Holders such reports concerning the Trustee and its actions under this Indenture as may be required pursuant to the Trust Indenture Act at the times and in the manner provided pursuant thereto.

SECTION 604. Reports by Company.

The Company shall file with the Trustee and the Commission, and transmit to Holders, such information, documents and other reports, and such summaries thereof, as may be required pursuant to the Trust Indenture Act at the times and in the manner provided pursuant to such Act; *provided* that any such information, documents or reports filed electronically with the Commission pursuant to Section 13 or 15(d) of the Exchange Act shall be deemed filed with, and delivered to, the Trustee at the same time as filed with the Commission.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and shall not constitute a representation or warranty as to the accuracy or completeness of the reports, information or documents. The Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely exclusively on Officer's Certificates).

ARTICLE SEVEN

CONSOLIDATION, MERGER, CONVEYANCE, TRANSFER OR LEASE

SECTION 701. Company May Consolidate, Etc., Only on Certain Terms.

The Company shall not consolidate with or merge into any other Person or convey, transfer or lease its properties and assets substantially as an entirety to any Person, and the Company shall not permit any Person to consolidate with or merge into the Company or convey, transfer or lease its properties and assets substantially as an entirety to the Company, unless:

(1) in case the Company shall consolidate with or merge into another Person or convey, transfer or lease its properties and assets substantially as an entirety to any Person, the Person formed by such consolidation or into which the

- 28 -

Ankura - 000171

Company is merged or the Person which acquires by conveyance or transfer, or which leases, the properties and assets of the Company substantially as an entirety shall be a corporation, partnership or trust, shall be organized and validly existing under the laws of the United States of America, any State thereof or the District of Columbia and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, in form satisfactory to the Trustee, the due and punctual payment of the principal of and interest on all the Accounts and the performance or observance of every covenant of this Indenture on the part of the Company to be performed or observed;

(2) immediately after giving effect to such transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have happened and be continuing; and

(3) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture comply with this Article and that all conditions precedent herein provided for relating to such transaction have been complied with.

SECTION 702. <u>Successor Substituted</u>.

Upon any consolidation of the Company with, or merger of the Company into, any other Person or any conveyance, transfer or lease of the properties and assets of the Company substantially as an entirety in accordance with Section 701, the successor Person formed by such consolidation or into which the Company is merged or to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein, and thereafter, except in the case of a lease, the predecessor Person shall be relieved of all obligations and covenants under this Indenture and the Accounts.

ARTICLE EIGHT

SUPPLEMENTAL INDENTURES

SECTION 801. <u>Supplemental Indentures</u>.

Without the consent of any Holders, the Company, when authorized by a Board Resolution, and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any purpose, subject to the provisions of the Trust Indenture Act.

- 29 -

Ankura - 000172

The Company shall promptly publish a notice of the entry into any such supplemental indenture on its website; *provided* that neither the failure to publish such notice, nor any defect in such notice, shall affect the validity of such supplemental indenture.

SECTION 802. Execution of Supplemental Indentures.

In executing, or accepting the additional trusts created by, any supplemental indenture permitted by the Trust Indenture Act or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Section 501) shall be fully protected in relying upon, an Opinion of Counsel and an Officers' Certificate stating, in addition to the matters set forth in Section 102, that the execution of such supplemental indenture is authorized or permitted by this Indenture. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise.

SECTION 803. Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Accounts theretofore or thereafter delivered hereunder shall be bound thereby.

SECTION 804. Conformity with Trust Indenture Act.

Every supplemental indenture executed pursuant to this Article shall conform to the requirements of the Trust Indenture Act.

ARTICLE NINE

COVENANTS

SECTION 901. Payment of Principal and Interest.

The Company will duly and punctually pay the principal of and interest on the Accounts in accordance with the terms thereof, as the same may be in effect from time to time.

SECTION 902. Maintenance of Office or Agency.

The Company will maintain in the United States an office or agency where notices and demands to or upon the Company in respect of the Accounts and this Indenture may be served. The Company will give prompt written notice to the Trustee of

- 30 -

Ankura - 000173

the location, and any change in the location, of such office or agency. As of the date of this Indenture, such location is the physical address set out in Section 105. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such notices and demands may be made or served at the Corporate Trust Office of the Trustee, and the Company hereby appoints the Trustee as its agent to receive all such notices and demands.

SECTION 903. Money for Payments to Be Held in Trust.

The Company shall, on or before each due date of the principal of or interest on any of the Accounts, segregate and hold in trust for the benefit of the Persons entitled thereto a sum sufficient to pay the principal or interest so becoming due until such sums shall be paid to such Persons or otherwise disposed of as herein provided and will promptly notify the Trustee of its action or failure so to act.

SECTION 904. Statement by Officers as to Default.

The Company will deliver to the Trustee, within 120 days after the end of each fiscal year of the Company ending after the date hereof, an Officers' Certificate, stating whether or not to the best knowledge of the signers thereof the Company is in default in the performance and observance of any of the terms, provisions and conditions of this Indenture (without regard to any period of grace or requirement of notice provided hereunder) and, if the Company shall be in default, specifying all such defaults and the nature and status thereof of which they may have knowledge.

SECTION 905. Existence.

Subject to Article Seven, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises; *provided*, *however*, that the Company shall not be required to preserve any such right or franchise if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Company and that the loss thereof is not disadvantageous in any material respect to the Holders.

SECTION 906. No Further Transfers.

Notwithstanding anything to the contrary herein, the Company shall not offer Accounts to new customers in the United States or accept further investments or funds in the Accounts by current Holders.

ARTICLE TEN

MISCELLANEOUS PROVISIONS

SECTION 1001. Consent to Jurisdiction.

The Company irrevocably consents and agrees, for the benefit of the Holders and the Trustee, that any legal action, suit or proceeding against it with respect to obligations, liabilities or any other matter arising out of or in connection with this Indenture may be brought in the courts of the State of New York or the courts of the

- 31 -

Ankura - 000174

United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Accounts have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court in personam, generally and unconditionally with respect to any action, suit or proceeding for itself in respect of its properties, assets and revenues.

The Company irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Nothing in this Section shall affect the right of the Trustee or any Holder to serve process in any manner permitted by law or limit the right of the Trustee to bring proceedings against the Company in the courts of any jurisdiction or jurisdictions.

SECTION 1002. Indenture and Accounts Solely Corporate Obligations.

No recourse under or upon any obligation, covenant or agreement of this Indenture, any supplemental indenture, or of any Account, or for any claim based thereon or otherwise in respect thereof, shall be had against any incorporator, shareholder, officer or director, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that this Indenture and the obligations under the Accounts are solely corporate obligations, and that no such personal liability whatever shall attach to, or is or shall be incurred by, the incorporators, shareholders, officers or directors, as such, of the Company or of any successor corporation, or any of them, because of the creation of the indebtedness hereby authorized, or under or by reason of the obligations, covenants or agreements contained in this Indenture or any of the Accounts or implied therefrom; and that any and all such personal liability, either at common law or in equity or by constitution or statute, of, and any and all such rights and claims against, every such incorporator, shareholder, officer or director, as such, because of the creation of the indebtedness hereby authorized, or under or by reason of the obligations, covenants or agreements contained in this Indenture or in any of the Accounts or implied therefrom, are hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and such Accounts.

- 32 -

Ankura - 000175

SECTION 1003. Execution in Counterparts.

This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument. The words "execution," "signed," "signature," "delivery," and words of like import in or relating to this Indenture or any document to be signed in connection with this Indenture shall be deemed to include electronic signatures, deliveries or the keeping of records in electronic form. Counterparts may be delivered via facsimile, electronic mail (including any electronic signature covered by the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act, the Electronic Signatures and Records Act or other applicable law, including, without limitation, DocuSign and Adobe Sign) or other transmission method or electronic format (including, without limitation, "pdf," "tif" or "jpg") and any counterpart so delivered shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code, and the parties hereto consent to conduct the transactions contemplated hereunder by electronic means.

SECTION 1004. Waiver of Jury Trial.

EACH OF THE COMPANY AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE OR THE TRANSACTION CONTEMPLATED HEREBY.

SECTION 1005. Force Majeure.

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

- 33 -

Ankura - 000176

SECTION 1006. Patriot Act.

The parties hereto acknowledge that in accordance with the Customer Identification Program (CIP) requirements under the USA PATRIOT Act and its implementing regulations, the Trustee in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties hereby agree that they shall provide the Trustee with such information as it may request including, but not limited to, each party's name, physical address, tax identification number and other information that will help the Trustee identify and verify each party's identity such as organizational documents, certificate of good standing, license to do business, or other pertinent identifying information.

- 34 -

Ankura - 000177

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed, all as of the day and year first above written.

BLOCKFI INC.

By: _____
    Name:
    Title:

ANKURA TRUST COMPANY, LLC, as Trustee

By: _____
    Name:
    Title:

[Signature Page to Indenture]

Schedule A

The rates of interest payable on the Accounts for the period from, and including, April 1, 2022 to, but excluding, the next reset date, shall be as follows:

**Stablecoin (including USDT) Updates**

| CURRENCY | NEW AMOUNT | NEW APY* | FORMER AMOUNT | FORMER APY* |
|---|---|---|---|---|
| Tier 1 | Up to 20,000 | 7.25% | N/A | 8.8% |
| Tier 2 | >20,000 - 5 Million | 6% | >20,000 - 10 Million | 7% |
| Tier 3 | >5 Million and above | 4.5% | >10 Million and above | 5.5% |

**Bitcoin Updates**

| CURRENCY | NEW AMOUNT | NEW APY* | FORMER AMOUNT | FORMER APY* |
|---|---|---|---|---|
| Tier 1 | 0 - 0.10 BTC | 4% | N/A | 4.5% |

**Ethereum USDT Updates**

| CURRENCY | NEW AMOUNT | NEW APY* | FORMER AMOUNT | FORMER APY* |
|---|---|---|---|---|
| Tier 1 | 0 - 1.5 ETH | 4% | N/A | 5% |

For the avoidance of doubt, to the extent a new rate is not set forth on this Schedule with respect to an Account, the rate of interest for that Account remains unchanged for the applicable reset period.

Ankura - 000179

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM T-1

**STATEMENT OF ELIGIBILITY**
**UNDER THE TRUST INDENTURE ACT OF 1939**
**OF A CORPORATION DESIGNATED TO ACT AS TRUSTEE**

☐ **CHECK IF AN APPLICATION TO DETERMINE ELIGIBILITY OF A TRUSTEE PURSUANT TO SECTION 305(b)(2)**

# ANKURA TRUST COMPANY, LLC

**(Exact name of trustee as specified in its charter)**

| New Hampshire | | 82-3832470 |
|---|---|---|
| **(Jurisdiction of incorporation if not a U.S. national bank)** | | **(I.R.S. employer identification no.)** |
| **140 Sherman Street, 4th Floor** | | |
| **Fairfield, CT** | | 06824 |
| **(Address of principal executive offices)** | | **(Zip code)** |

**Lynn Poss Veblen**
**Deputy General Counsel and Senior Managing Director**
**Ankura Trust Company, LLC**
**485 Lexington Avenue, 10th Floor**
**New York, NY 10017**
**(646) 291-8512**
**(Name, address and telephone number of agent for service)**

**BlockFi Inc.**
**(Exact name of obligor as specified in its charter)**

| Delaware | | 82-2390015 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | | **(I.R.S. employer identification no.)** |
| **201 Montgomery Street, Suite 263** | | |
| **Jersey City, NJ** | | 07302 |
| **(Address of principal executive offices)** | | **(Zip code)** |

**BlockFi Interest Accounts**
**(Title of the indenture securities)**

1.    **General information. Furnish the following information as to the Trustee:**

(a)    **Name and address of each examining or supervising authority to which it is subject.**

| Name | Address |
|---|---|
| New Hampshire Banking Department | 53 Regional Drive, Suite 200, Concord, N.H. 03301 |

(b)    **Whether it is authorized to exercise corporate trust powers.**

Yes.

2.    **Affiliations with Obligor.**

**If the obligor is an affiliate of the trustee, describe each such affiliation.**

None.

15.    **Foreign Trustee.**

Not applicable.

16.    **List of Exhibits.**

1.    A copy of the Certificate of Formation of Ankura Trust Company, LLC as now in effect.

2.    A copy of the State of New Hampshire — Office of the Bank Commissioner Certificate to Conduct Business for the Trustee, dated January 25, 2018.

3.    A copy of the State of New Hampshire Certificate to Exercise Corporate Trust Powers for the Trustee, dated January 23, 2018 (Certificate of Endorsement).

4.    A copy of the existing Limited Liability Company Agreement of the Trustee.

6.    The consent of the Trustee required by Section 321(b) of the Trust Indenture Act of 1939.

7.    A copy of the latest report of condition of the trustee published pursuant to law or the requirements of its supervising or examining authority (Call Report Schedule RC-T for quarter ending December 31, 2021).

Ankura - 000181

SIGNATURE

Pursuant to the requirements of the Trust Indenture Act of 1939, the trustee, Ankura Trust Company, LLC, a trust company organized and existing under the laws of the State of New Hampshire, has duly caused this statement of eligibility to be signed on its behalf by the undersigned, thereunto duly authorized, all in Fairfield, Connecticut, on the 4th day of April, 2022.

ANKURA TRUST COMPANY, LLC

By: /s/ James J. McGinley

James J. McGinley
Chief Executive Officer

Ankura - 000182

**Exhibit 1**

Ankura - 000183



**Exhibit 1**
**State of New Hampshire**
**Banking Department**
53 Regional Drive, Suite 200
Concord, New Hampshire 03301
Telephone: (603) 271-3561
FAX: (603) 271-1090 or (603) 271-0750

<u>Certificate of Endorsement</u>

Amended and Restated Certificate of Formation - Ankura Trust Company, LLC

By my signature below, I hereby confirm Ankura Trust Company, LLC applied for approval to amend its Certificate of Formation pursuant to RSA 383-A:3-316. On March 22, 2019, the New Hampshire Banking Department approved Ankura Trust Company, LLC's application. The attached Amended and Restated Certificate of Formation is a true and accurate copy of the certificate so approved.

/s/ Gerald H. Little

Date 3/22/19

Gerald H. Little
Bank Commissioner
State of New Hampshire
Banking Department

TDD Access: Relay NH 1-800-735-2964

**AMENDED AND RESTATED CERTIFICATE OF FORMATION**
**OF**
**ANKURA TRUST COMPANY, LLC**

Pursuant to the authority granted under RSA Chapter 383-C, Ankura Trust Parent, LLC, the sole member, hereby organizes a trust company as a limited liability company under RSA Chapter 304-C as follows:

**ARTICLE I**
**NAME**

The name of the trust company is Ankura Trust Company, LLC ("Trust Company").

**ARTICLE II**
**PURPOSES**

The Trust Company is organized as a limited liability company under RSA Chapter 383-C, as such law now exists or may be hereafter amended, and shall have and may exercise all the express, implied and incidental powers conferred upon trust companies under the act. The Trust Company shall not accept deposits or make loans.

**ARTICLE III**
**DURATION**

The duration of the Trust Company shall be perpetual.

**ARTICLE IV**
**MEMBERSHIP INTERESTS**

The amount of the authorized membership interests in the Trust Company shall be 1000, each having a nominal value of $1000.00. The sole member is Ankura Trust Parent, LLC ("Member").

**ARTICLE V**
**BOARD OF MANAGERS**

The Trust Company shall be managed by a Board of Managers appointed by the Member and shall consist of not less than five persons, as determined by the Member.

**ARTICLE VI**
**LIMITATION ON MANAGER LIABILITY**

No Manager of the Trust Company shall be personally liable to the Trust Company or its Member for monetary damages for breach ·of fiduciary duty as a Manager notwithstanding any provision of law imposing such liability, except liability:

(a) For any breach of the Manager's duty disloyalty to the Trust Company or its Member;

Ankura - 000185

(b) For acts of or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; or

(c) With respect to any transaction from which the Manager derived an improper personal benefit.

No amendment or repeal of this Article shall adversely affect the rights and protection afforded to a Manager of the Trust Company under this Article for acts or omissions occurring prior to such amendment or repeal. In construing the provisions of this Article, it is intended hereby to provide the Managers of the Trust Company with the full protection available to managers of a limited liability company under the New Hampshire Business Limited Liability Company Act (RSA Chapter 304-C).

### ARTICLE VII
### LIMITED LIABILITY COMPANY AGREEMENT

The Limited Liability Company Agreement of the Trust Company shall establish the procedures and standards of conduct for the regulation of the internal affairs of the Trust Company. The Limited Liability Company Agreement shall be adopted by the Member of the Trust Company and may be amended from time to time as provided therein.

### ARTICLE VIII
### AMENDMENTS

Subject to the approval of New Hampshire Bank Commissioner, this Amended and Restated Certificate of Formation may be amended by the Member.

### ARTICLE IX
### REGISTERED AGENT

The registered agent and address is National Registered Agents, Inc., 9 Capitol Street, Concord, New Hampshire 03301.

**IN WITNESS WHEREOF**, the Member has executed this Amended and Restated Certificate of Formation as of this 12th day of February, 2019.

-

2

Ankura - 000186

**Exhibit 2**

Ankura - 000187

**Exhibit 2**

## State of New Hampshire
## Office of the Bank Commissioner



*This is to certify that Ankura Trust Company, LLC
has complied with all requirements of RSA 383-A.*

*Now, therefore, under the authority vested in me as Bank Commissioner,
I hereby authorize Ankura Trust Company, LLC
to begin the transaction of business effective January 25, 2018.*

*Dated:*  _____1/25/2018_____       _____/s/ Gerald H. Little_____
                                                        *Gerald H. Little*
                                                        *Bank Commissioner*

Ankura - 000188

**Exhibit 3**

Ankura - 000189



**Exhibit 3**
**State of New Hampshire**
**Banking Department**
53 Regional Drive, Suite 200
Concord, New Hampshire 03301
Telephone: (603) 271-3561
FAX: (603) 271-1090 or (603) 271-0750

Certificate of Endorsement

By my signature below, I hereby confirm the New Hampshire Banking Department approved Ankura Trust Company, LLC to operate as a New Hampshire-chartered trust company.

Date 1/23/18

/s/ Emelia A.S. Galdieri
Emelia A.S. Galdieri
Deputy Bank Commissioner
State of New Hampshire
Banking Department

TDD Access: Relay NH 1-800-735-2964

Ankura - 000190

**Exhibit 4**

Ankura - 000191

**Exhibit 4**

**ANKURA TRUST COMPANY LLC**

A New Hampshire Limited Liability Company

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of 12/22/17

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

LIMITED LIABILITY COMPANY AGREEMENT

OF

ANKURA TRUST COMPANY LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of ANKURA TRUST COMPANY, LLC (the "Company") dated as of 12/22/17, is adopted, executed and agreed to by Ankura Trust Parent, LLC, a Delaware limited liability company, (the "Member") under the laws of the State of New Hampshire and in accordance with the provisions of the New Hampshire Limited Liability Company Act (RSA 304-C) and any successor statute, as amended from time to time, governing the affairs of the Company and the conduct of its business.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein made and other good and valuable consideration, the Member hereby agree as follows:

ARTICLE I
The Limited Liability Company

1.1 Formation. The Member has formed the Company as a limited liability company formed pursuant to the provisions of the RSA 304-C and RSA 383-C. A Certificate of Formation for the Company (the "Certificate of Formation") has been filed in the Office of the Secretary of State of the State of New Hampshire in conformity with the RSA 304-C and RSA 383-C.

1.2 Name. The name of the Company is "Ankura Trust Company, LLC" and its business shall be carried on in such name with such variations and changes as the Board (as hereinafter defined) shall determine or deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.

1.3 Business Purpose; Powers. The Company is formed for the purpose of engaging in a trust company business pursuant to RSA 383-C. The Company shall possess and may exercise all the powers and privileges granted by the RSA 383-C or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

1.4 Registered Office and Agent. The location of the registered office of the Company in the State of New Hampshire is 9 Capitol Street, Concord, New Hampshire 03301. The Company's Registered Agent at such address is National Registered Agents, Inc.

1.5 Term. Subject to the provisions of Article VI below, the Company shall have perpetual existence.

## ARTICLE II
### The Member

2.1 <u>The Member</u>. The name and address of the Member is as follows:

| <u>Name</u> | <u>Address</u> |
|---|---|
| Ankura Trust Parent, LLC | 750 Third Avenue, 28th Floor<br>New York, N.Y. 10017 |

2.2 <u>Actions by the Member; Meetings</u>. The Member shall have the right to vote on any Company matter as permitted under the Certificate of Formation or this Agreement or under any nonwaivable provision of RSA 304-C. The actions by the Member permitted hereunder may be taken at a meeting called by the Board or the Member or by written consent without a meeting. Meetings of the Member may be called at any time by the Member.

2.3 <u>Liability of the Member</u>. All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member.

2.4 <u>Lack of Authority</u>. The Member (in its capacity as such) shall have no the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures on behalf of the Company, unless such specific authority has been expressly granted to and not revoked from the Member by the Board, and the Member hereby consents to the exercise by the Board of the powers conferred on it by law and this Agreement.

2.5 <u>Admission of Members</u>. New members shall be admitted only upon the approval of the Member and the New Hampshire Bank Commissioner.


## ARTICLE III
### The Board

3.1 <u>Management by Board of Managers</u>.

(a) Subject to such matters which are expressly reserved under nonwaivable provisions of applicable law to the Member for decision and <u>Section 3.6</u>, (A) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a board of managers (the "<u>Board</u>"), and (B) the Board may make all decisions and take all actions for the Company not otherwise provided for in this Agreement.

(b) The Board may act (A) by resolutions adopted at a meeting and by written consents pursuant to <u>Section 3.4</u>, or (B) by delegating power and authority to any Officer pursuant to <u>Section 3.7</u>.

2

Ankura - 000194

3.2 <u>Composition and Election of Board of Managers</u>

(a) <u>Number and Designation</u>. The board shall consist of no fewer than five (5) individuals (each. a ''<u>Manager</u>''). The number of Managers on the Board shall be the number serving pursuant to clauses (i) through (iii) of this <u>Section 3.2(a)</u>. The Board shall at all times be comprised of the following persons:

(i) four (4) Managers designated by the Member (each a "<u>Company Manager</u>'' and, collectively, the "<u>Company Managers</u>"), who initially shall be Kevin Lavin, Roger Carlile, David Sawyer and James J. McGinley;

(ii) one ( 1) Managers or more designated by the Member, who is not an employee or equity investor of Member or its affiliates and is independent from management (each a "<u>Independent Manager</u>"), who initially shall be Carl Toriello; and

(iii) such additional Managers as may be appointed by the Member (each, an "<u>Additional Manager</u>")

3.3 <u>Term</u>. Members of the Board shall serve from their designation in accordance with the terms hereof until their resignation, death or removal in accordance with the terms hereof. Members of the Board need not be members and need not be residents of the State of New Hampshire. A person shall become a Manager and member of the Board effective upon receipt by the Company at its principal place of business of a written acceptance addressed to the Board (or at such later time or upon the happening of some other event specified in such acceptance) of such person's appointment pursuant to <u>Section 3.2(a)</u>. A member of the Board may resign as such by delivering his, her or its written resignation to the Company at the Company's principal office addressed to the Board. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

(a) <u>Removal</u>. The removal from the Board (with or without cause) of any Manager shall be upon (and only upon) the written demand of the Member; <u>provided</u> that, in the event any Company Manager or Additional Manager ceases to be an employee of the Company, Ankura Holdings, LP, or any of their respective subsidiaries (collectively the "<u>Company Group</u>") for any reason, such Company Manager or Additional Manager shall, at such time, be automatically removed from the Board.

(b) <u>Vacancies</u>. If any designee under <u>Section 3.2(a)</u> for any reason ceases to serve as a member of the Board, the resulting vacancy on the Board shall be filled by the Member.

(c) <u>Reimbursement</u>. The Company shall pay or cause to be paid all reimbursable out-of-pocket costs and expenses incurred by each Manager incurred in the course of his or her service hereunder, including in connection with attending regular and special meetings of the Board.

3

Ankura - 000195

(d) <u>Compensation of Managers</u>. Except as approved in writing by the Member, Company Managers shall receive no compensation for serving in such capacity.

3.4 <u>Action by the Board</u>.

(a) <u>Quorum; Voting</u>. A quorum for the transaction of business shall consist of a majority of the Managers, except that at least two Company Managers must be present at any meeting of the Board (including for purposes of actions taken pursuant to <u>Section 3.4(c)</u>) in order to constitute a quorum. The act of the Managers that have a majority of the total votes present at a meeting of the Board at which a quorum is present shall be the act of the Board. Once a quorum is present to commence a meeting of the Board, such quorum shall be broken as soon as no Company Manager remains present at such meeting and no further business may be transacted at such meeting until such time as a quorum shall again be present. A Manager who is present at a meeting of the Board at which action on any matter is taken shall be presumed to have assented to the action unless his or her dissent shall be entered in the minutes of the meeting or unless he or she shall file his or her written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

(b) <u>Meetings</u>. Regular meetings of the Board may be held at such times and places as shall be determined from time to time by resolution of the Board. Notice of regular meetings shall not be required. Special meetings of the Board may be called by the Member on at least 24 hours' notice to each Managers. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for in this Agreement. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) <u>Action by Written Consent</u>. Any action permitted or required by the RSA 304-C, the Certificate of Formation or this Agreement to be taken at a meeting of the Board may be taken without a meeting, without notice and without a vote if a consent in writing, setting forth the action to be taken, is signed by at least one Company Manager and the Managers that have at least the number of votes required to take such action at a meeting of the Board if all Managers were present at such meeting. Decisions may be made through electronic mail. In the case of an electronic mail, a precise description of the proposed action to all Managers at their respective electronic mail addresses as maintained in the records of the Trust Company and as updated from time to time upon the request of a Manager. The Managers shall respond by electronic mail stating whether or not they are in favor of the proposed action, and the responses of the Managers collectively shall be deemed an action by written consent. Any such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of New Hampshire, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board.

4

(d) <u>Telephone Conference</u>. Subject to the requirements of RSA 304-C, the Certificate of Formation or this Agreement for notice of meetings, the Managers may participate in and hold a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(e) <u>Information</u>. Each Manager shall receive: (i) all notices and other materials as and when provided to any Manager in connection with meetings or actions of the Board; and (ii) copies of all minutes, resolutions and consents of the Board reasonably promptly after approval thereof; <u>provided</u> that, the Company may withhold any notices and/or materials from a Manager if the Board determines that such notice and/or material is related to the actions, employment, compensation or review of such Manager. For the avoidance of doubt, no action of the Board shall be deemed to be unauthorized or in breach of this Agreement as a result of non-compliance with this <u>Section 3.4(e)</u>.

3.5 <u>Power to Bind Company</u>. None of the Managers (acting in their capacity as such) shall have authority to bind the Company to any third party with respect to any matter unless the Board shall have approved such matter and authorized such Manager(s) to bind the Company with respect thereto.

3.6 <u>Certain Consent Rights</u>. Without the prior written consent of the Member, the Company shall not, and the Board and the Officers shall cause the Company not to:

(a) liquidate or file a voluntary petition for bankruptcy or take any action related to bankruptcy, insolvency, dissolution, or winding up;

(b) amend the Company's organizational documents (including recapitalizations and changes in equity interest or capital);

(c) alter the Company's principal lines of business;

(d) change of jurisdiction or legal form of the Company;

(e) create board committees, delegate powers to board committees or modify the powers of any board committees;

(f) enter into material contracts outside the ordinary course of business;

Ankura - 000197

(g) engage in affiliate transactions other than between members of the Company Group;

(h) redeem or repurchase any debt or equity securities;

(i) adopt or amend any employee benefit or incentive (whether cash or equity) plan or make any issuances under any such plan;

(j) incur any indebtedness for borrowed money or guarantee the indebtedness or obligations of any person;

(k) make any loans, advances or investments to or in other persons, other than members of the Company Group;

(l) initiate an initial public offering or grant any registration rights;

(m) undertake an acquisition, sale, merger, spin-off, joint-venture or other strategic transaction;

(n) change the Company's independent auditor;

(o) make significant tax elections or change significant tax, accounting, investment or risk management policies; ·

(p) approve the Company's annual budget and any material expenditures outside of the approved budget or intentionally deviate from the applicable annual budget;

(q) commence or settle any material litigation or dispute; or

(r) approve any material agreements with regulatory authorities or consent to any material regulatory orders.

3.7 Officers and Related Persons. The officers of the Company (the "Officers"), if any, shall be appointed by the Board in its sole discretion, and the Board may assign such officers titles including, but not limited to, "chief executive officer," "president," ''vice president," "treasurer," "secretary," "assistant secretary," "managing director," "chief financial officer," and such other officers and assistant officers as may be deemed necessary or desirable by the Board. Any Officers so appointed will have such authority and perform such duties as the Board may, from time to time, delegate to them. No Officer need be a Member or a member of the Board and any number of offices may be held by a single person. The salaries and other compensation, if any, of the Officers shall be fixed from time to time by the Board. Any Officer may resign, in writing, as such at any time and such resignation will be effective at the time specified in the written resignation, or if no time is specified, at the time the written resignation is received by the Company. Any Officer may be removed as such, either with or without cause, at any time by the Board or the Member. In the event that any Officer ceases to be an employee of any member of the Company Group for any reason, such Officer shall, at such time, be automatically removed from each applicable office.

6

Ankura - 000198

ARTICLE IV
Capital Structure and Contributions

4.1 Capital Structure. The capital structure of the Company shall consist of one class of common interests (the "Common Units"). All Common Units shall be identical with each other in every respect. The Member shall own all of the Common Units issued and outstanding, as set forth on Schedule I attached hereto.

4.2 Capital Contributions. From time to time, the Board may determine that the Company requires capital and may request the Member to make capital contribution(s) in an amount determined by the Board. A capital account shall be maintained for the Member, to which contributions and profits shall be credited and against which distributions and losses shall be charged.

ARTICLE V
Profits, Losses and Distributions

5.1 Profits and Losses. For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis in accordance with the manner determined by the Board. In each year, profits and losses shall be allocated entirely to the Member.

5.2 Distributions. The Board shall determine profits available for distribution and the amount, if any, to be distributed to the Member, and shall authorize and distribute on the Common Units, the determined amount when, as and if declared by the Board. The distributions of the Company shall be distributed entirely to the Member.

ARTICLE VI
Dissolution

Subject to the approval of the Bank Commissioner, the Company may be dissolved and its affairs wound up pursuant to RSA 383-C:10.

ARTICLE VII
Transfer of Common Units of the Company

Subject to the approval of the New Hampshire Bank Commissioner, the Member may sell, assign, transfer, convey, gift, exchange or otherwise dispose of any or all of its Common Units and, upon receipt by the Company of a written agreement executed by the person or entity to whom such Common Units are to be transferred agreeing to be bound by the terms of this Agreement as amended from time to time, such person shall be admitted as a member.

7

Ankura - 000199

ARTICLE VIII
Exculpation and Indemnification

8.1 Exculpation. Notwithstanding any other provisions of this Agreement, whether express or implied, or any obligation or duty at law or in equity, no Member, Manager or current or former manager, officers, employees, affiliates, representatives or agents of any of the foregoing, nor any officer, employee, representative or agent of the Company (individually, a "Covered Person" and, collectively, the "Covered Persons") shall be liable to the Company or any other person for any act or omission since the formation of the Company (in relation to the Company, its property or the conduct of its business or affairs, this Agreement, any related document or any transaction or investment contemplated hereby or thereby) taken or omitted by a Covered Person in the reasonable belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Covered Person by the Agreement, provided such act or omission does not constitute fraud, willful misconduct, bad faith or gross negligence.

8.2 Indemnification. To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative ("Claims"), in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs. A Covered Person shall not be entitled to indemnification under this Section 8.2 with respect to (i) any Claim with respect to which such Covered Person has engaged in fraud, willful misconduct, bad faith or gross negligence or (ii) any Claim initiated by such Covered Person unless such Claim (or part thereof) (A) was brought to enforce such Covered Person's rights to indemnification hereunder or (B) was authorized or consented to by the Board or Member. Expenses incurred by a Covered Person in defending any Claim shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be ultimately determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this Section 8.2.

8.3 No Right of Partition. No Member as a unitholder shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

8.4 Amendments. Any repeal or modification of this Article VIII by the Member shall not adversely affect any rights of such Covered Person pursuant to this Article VIII, including the right to indemnification and to the advancement of expenses of a Covered Person existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

8

Ankura - 000200

ARTICLE IX
Miscellaneous

9.1 <u>Tax Treatment</u>. Unless otherwise determined by the Member, the Company shall be a disregarded entity for U.S. federal income tax purposes (as well as for any analogous state or local tax purposes), and the Member and the Company shall timely make any and all necessary elections and filings for the Company treated as a disregarded entity for U.S. federal income tax purposes (as well as for any'analogous state or local tax purposes).

9.2 <u>Amendments</u>. Amendments to this Agreement shall be approved in writing by the Member. An amendment shall become effective as of the date specified in the approval of the Member or if none is specified as of the date of such approval or as otherwise provided in the RSA 304-C.

9.3 <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable for any reason, such provision shall be ineffective to the extent of such invalidity or unenforceability; provided, however, that the remaining provisions will continue in full force without being impaired or invalidated in any way unless such invalid or unenforceable provision or clause shall be so significant as to materially affect the expectations of the Member regarding this Agreement. Otherwise, any invalid or unenforceable provision shall be replaced by the Member with a valid provision which most closely approximates the intent and economic effect of the invalid or unenforceable provision.

9.4 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New Hampshire without regard to the principles of conflicts of laws thereof.

9.5 <u>Limited Liability Company</u>. The Member intends to form a limited liability company and does not intend to form a partnership under the laws of the State of New Hampshire or any other laws.

[Signature page follows]
9

Ankura - 000201

IN WITNESS WHEREOF, the undersigned have duly executed this Limited Liability Company Agreement as of the day first above written.

**ANKURA TRUST PARENT, LLC**

By:    Ankura Intermediate Holdings, LP
Its:    Member

By:    /s/ Roger Carlile
Name:    Roger Carlile
Its:    Chief Executive Officer

*Signature Page to Agreement of Limited Liability Company Agreement of [Ankura Trust Company], LLC*

Ankura - 000202

**SCHEDULE I**

| Name of Member | Number of Common Units |
|---|---|
| Ankura Trust Parent, LLC | 1,000 |

Ankura - 000203

**Exhibit 6**

Ankura - 000204

**Exhibit 6**

**Exhibit 6**

**CONSENT**

In accordance with Section 321(b) of the Trust Indenture Act of 1939, the undersigned, ANKURA TRUST COMPANY, LLC hereby consents that reports of examination of the undersigned by Federal, State, Territorial or District authorities may be furnished by such authorities to the Securities and Exchange Commission upon its request therefor.

Dated: April 4, 2022

By:  /s/ James J. McGinley
     James J. McGinley
     Chief Executive Officer & President

**Exhibit 7**

Ankura - 000206

**Exhibit 7**

Instructions:

This worksheet replaces the FFIEC 041 Report filing for Non-Depository Trust Companies

Please do not change the formatting, location of cells, or add calculations to the cells. The Department will be merging the information into a database and these changes will inhibit our ability to import the file.

The worksheets found in the excel file are based on the FFIEC 041 report. When filling out the forms please follow the instructions found at http://www.fdic.gov/regulations/resources/call/index.html. All New Hampshire non-depository trust companies must file quarterly. Disregard any instructions that state or imply quarterly filing is not necessary. When completing the call report, all dollar amounts should be rounded to thousands.

The "Attestation" worksheet needs to be printed off and signed as detailed on the worksheet. After the necessary signatures are gathered, the form needs to be mailed to the department. This needs to be received no later than 30 days after the quarter end.

The Department is requesting additional information to be reported quarterly on Call Report Schedule RC-T for those institutions or their subsidiaries offering fiduciary and related services. Please be aware that this particular Call Report schedule will differ from the FFIEC forms & instructions give the presence of two additional reporting items in the Memoranda section of Schedule RC-T. New reporting will include the following: 1) Accounts where the institution is named or serves as a fiduciary of an account to be funded at a later date ("dry trusts"), and 2) Accounts where the institution is named or serves as "Trust Protector".

Information:

| | |
|---|---|
| Name of Institution: | Ankura Trust Company LLC |
| Filing Period (Quarter ending): | 31-Dec-21 |
| Date Report was emailed: | 31-Dec-21 |

Information on person to contact with question on this call report filing

| | Primary Contact | Secondary Contact |
|---|---|---|
| Name: | Ryan M. Roy | James J. McGinley |
| Phone Number: | 646-528-4393 | 917-446-0136 |
| E-Mail Address: | Ryan.Roy@ankura.com | James.McGinley@ankura.com |

USA PATRIOT ACT Section 314(a) Anti-Money Laundering Contact Information:

To facilitate the 314(a) process, you will need to provide the following information for two (2) individuals who will serve as the Point of Contact (POC) for your institution. Any changes to the POCs will need to be reported in writing to the New Hampshire Banking Department.

| | Primary Contact | Secondary Contact |
|---|---|---|
| POC Name: | Krista Gulalo | Beth Micena |
| POC Title: | Managing Director | Senior Director |
| Mailing Address: | | |
| Street | 140 Shearman Street | 140 Shearman Street |
| PO Box | 4th Floor | 4th Floor |
| City, State, Zip | Fairfield, CT 06824 | Fairfield, CT 06824 |
| Email Address: | Krista.Gulalo@ankura.com | Beth.Micena@ankura.com |
| Phone Number: | 203-319-6900 | 203-319-6900 |
| FAX Number: | | |

**Attestation**

This report is required by RSA 383-A:5-510

**Name of Institution: <u>Ankura Trust Company LLC</u>**

**Date report was sent electronically to the New Hampshire Banking Department: <u>December 31, 2021</u>**

**Information in the report is for Quarter Ending: <u>December 31, 2021</u>**

NOTE: The report must be signed by an authorized officer and attested to by not less than two directors (trustees).

I, <u>Ryan M. Roy, Senior Managing Director</u>
Typed Name and Title of Officer Authorized to Sign Report
of the named bank do hereby declare that the report sent electronically to the New Hampshire Banking Department has been prepared in conformance
with the instructions issued by the FFIEC and are true to the best of my knowledge and belief.

| /s/ Ryan M. Roy | 1/28/2022 |
|---|---|
| Signature of Office Authorized to Sign Report | Date of Signature |

We, the undersigned directors (trustees), attest to the correctness of the report sent electronically to the New Hampshire Banking Department and declare
that it has been examined by us and to the best of our knowledge and belief has been prepared in conformance with the instruction issued by the FFIEC
and is true and correct.

|  | James J. McGinley |
|---|---|
| Signature of Director (Trustee) | Printed Name of Director (Trustee) |

|  | Philip J. Gund |
|---|---|
| Signature of Director (Trustee) | Printed Name of Director (Trustee) |

|  |  |
|---|---|
| Signature of Director (Trustee) | Printed Name of Director (Trustee) |

The signed "Attestation" needs to be received by the department no later than 30 days after the quarter end.

Ankura - 000208

**Attestation**

This report is required by RSA 383-A:5-510

**Name of Institution: <u>Ankura Trust Company LLC</u>**

**Date report was sent electronically to the New Hampshire Banking Department: <u>December 31, 2021</u>**

**Information in the report is for Quarter Ending: <u>December 31, 2021</u>**

NOTE: The report must be signed by an authorized officer and attested to by not less than two directors (trustees).

I, <u>Ryan M. Roy, Senior Managing Director</u>
Typed Name and Title of Officer Authorized to Sign Report
of the named bank do hereby declare that the report sent electronically to the New Hampshire Banking Department has been prepared in conformance with the instructions issued by the FFIEC and are true to the best of my knowledge and belief.

|  | 1/28/2022 |
|---|---|
| Signature of Office Authorized to Sign Report | Date of Signature |

We, the undersigned directors (trustees), attest to the correctness of the report sent electronically to the New Hampshire Banking Department and declare that it has been examined by us and to the best of our knowledge and belief has been prepared in conformance with the instruction issued by the FFIEC and is true and correct.

| /s/ James J. McGinley | James J. McGinley |
|---|---|
| Signature of Director (Trustee) | Printed Name of Director (Trustee) |
| /s/ Philip J. Gund | Philip J. Gund |
| Signature of Director (Trustee) | Printed Name of Director (Trustee) |
|  |  |
| Signature of Director (Trustee) | Printed Name of Director (Trustee) |

The signed "Attestation" needs to be received by the department no later than 30 days after the quarter end.

Ankura - 000209

### Schedule RI — Income Statement

**All Report of Income schedules are to be entered on a calendar year-to-date basis in thousands of dollars.**

| | | | |
|---|---|---|---|
| 1 | | Interest Income: | |
| 1. a. | | Interest and fee income on loans: | |
| | (1) | Loans secured by real estate | |
| | | (a) Loans secured by 1-4 family residential properties | |
| | | (b) All other loans secured by real estate | |
| | (2) | Commercial and industrial loans | |
| | (3) | Loans to individuals for household, family, and other personal expenditures: | |
| | | (a) Credit cards | |
| | | (b) Other (includes revolving credit plans other than credit cards, automobile loans, and other consumer loans) | |
| | (4) | Not Applicable | |
| | (5) | All other loans | |
| | (6) | Total interest and fee income on loans (sum of items 1.a.(1)(a) through 1.a.(5)) | |
| 1. b. | | Income from lease financing receivables | |
| 1. c. | | Interest income on balances due from depository institutions | |
| 1. d. | | Interest and dividend income on securities | |
| | (1) | U.S. Treasury securities and U.S. Government agency obligations (excluding mortgage-backed securities) | |
| | (2) | Mortgage-backed securities | |
| | (3) | All other securities (includes securities issued by states and pol. subdivisions in the U.S.) | |
| 1. e. | | Not Applicable | |
| 1. f. | | Interest income on federal funds sold and securities purchased under agreements to resell | |
| 1. g. | | Other interest income | |
| 1. h. | | Total interest income (sum of items 1.a.(6) through 1.g) | |
| **2.** | | Interest expense: | |
| 2. a. | | Interest on deposits: | |
| | (1) | Transaction accounts (interest-bearing demand deposits, NOW accounts, ATS accounts, and telephone and preauthorized transfer accounts) | |
| | (2) | Nontransaction accounts: | |
| | | (a) Savings deposits (includes MMDAs) | |
| | | (b) Time deposits of $250,000 or less | |
| | | (c) Time deposits of more than $250,000 | |
| 2. b. | | Expense of federal funds purchased and securities sold under agreements to repurchase | |
| 2. c. | | Interest on trading liabilities and other borrowed money | |
| 2. d. | | Interest on subordinated notes and debentures | |
| 2. e. | | Total interest expense (sum of items 2.a though 2.d) | |
| 3. | | Net interest income (item 1.h minus 2.e) | |
| 4. | | Provision for loan and lease losses | |
| 5. | | Noninterest income: | |
| 5. a. | | Income from fiduciary activities | 3,993 |
| 5. b. | | Service charges on deposit accounts | |
| 5. c. | | Trading revenue | |
| 5. d. (1) | | Fees and commissions from securities brokerage | |
| | (2) | Investment banking, advisory, and underwriting fees and commissions | |
| | (3) | Fees and commissions from annuity sales | |
| | (4) | Underwriting income from insurance and reinsurance activities | |
| | (5) | Income from other insurance activities | |
| 5. e. | | Venture capital revenue | |
| 5. f. | | Net servicing fees | |
| 5. g. | | Net securitization income | |
| 5. h. | | Not applicable | |
| 5. i. | | Net gains (losses) on sales of loans and leases | |
| 5. j. | | Net gains (losses) on sales of other real estate owned | |
| 5. k. | | Net gains (losses) on sales of other assets | |
| 5. l | | Other noninterest income* | |
| 5. m. | | Total noninterest income (sum of items 5.a though 5.l) | 3,993 |
| 6. a. | | Realized gains (losses) on held-to-maturity securities | |
| b. | | Realized gains (losses) on available-for-sale securities | |
| 7. | | Noninterest expense: | |
| 7. a. | | Salaries and employee benefits | 2,688 |
| 7. b. | | Expenses of premises and fixed assets (net of rental income) (excluding salaries and employee benefits and mortgage interest) | |
| 7. c. | | (1) Goodwill impairment losses | |
| | | (2) Amortization expense and impairment losses for other intangible assets | |
| 7. d. | | Other noninterest expense* | 1,451 |
| 7. e. | | Total noninterest expense (sum of items 7.a though 7.d) | 4,139 |
| 8. a. | | Income (loss) before unrealized holding gains (losses) on equity securities not held for trading, applicable income taxes, and discontinued operations (item 3 plus or minus items 4, 5.m, 6.a, 6.b and 7.e) | (146) |
| 8. b. | | Unrealized holding gains (losses) on equity securities not held for trading | |
| 8. c. | | Income (loss) before applicable income taxes and discontinued operations (sum of items 8.a and 8.b) | (146) |
| 9. | | Applicable income taxes (on item 8.c.) | |
| 10. | | Income (loss) before discontinued operations (item 8.c minus item 9) | (146) |
| 11. | | Discontinued operations, net of applicable income taxes | |
| 12. | | Net income (loss) attributable to bank and noncontrolling (minority) interests (sum of items 10 and 11) | (146) |

Ankura - 000210

13.  LESS: Net income (loss) attributable to noncontrolling (minority) interests (if net income, report as a positive value; if net loss, report as a negative value)

14.  Net income (loss) attributable to bank (item 12 minus item 13)                                        (146)

\* Describe on Schedule RI-E - Explanations

Ankura - 000211

**Schedule RI - Continued**

**All Report of Income schedules are to be entered on a calendar year-to-date basis in thousands of dollars.**
Memoranda

14.          Other-than-temporary impairment losses on held-to-maturity and available-for-sale debt securities recognized in earnings
             (included in Schedule RI, items 6.a and 6.b

\*  *Memoranda Items 1-13 and 15 Omitted*

**Schedule RI-A — Changes in Equity Capital**

| | | Dollar Amounts in Thousands |
|---|---|---:|
| | Indicate decreases and losses in parentheses. | |
| 1. | Total bank equity capital most recently reported for the December 31, 2021, Reports of Condition and Income (i.e., after adjustments from amended Reports of Income) | 2,978 |
| 2. | Cumulative effect of changes in accounting principles and corrections of material accounting errors* | (82) |
| 3. | Balance end of previous calendar year as restated (sum of items 1 and 2) | |
| 4. | Net income (loss) attributable to bank (must equal Schedule RI, item 14) | (146) |
| 5. | Sale, conversion, acquisition, or retirement of capital stock, net (excluding treasury stock transactions) | |
| 6. | Treasury stock transactions, net | |
| 7. | Changes incident to business combinations, net | |
| 8. | LESS: Cash dividends declared on preferred stock | |
| 9. | LESS: Cash dividends declared on common stock | |
| 10. | Other comprehensive income | |
| 11. | Other transactions with stockholders (including a parent holding company)* (not included items 5, 6, 8, or 9 above) | |
| 12. | Total bank equity capital end of current period (sum of items 3 through 11) (must equal Schedule RC, item 27.a) | 2,750 |
| * | | |

Ankura - 000213

**Schedule RI-E — Explanations**

**Schedule RI-E is to be completed each quarter on a calendar year-to-date basis.**

| | | Dollar Amounts in Thousands |
|---|---|---:|
| 1. | Other noninterest income (from Schedule RI, item 5.l) | |
| | Itemize and describe amounts greater than $100,000 that exceed 7% of Schedule RI, item 5.l: | |
| 1. a. | Income and fees from the printing and sale of checks | |
| 1. b. | Earnings on/increase in value of cash surrender value of life insurance | |
| 1. c. | Income and fees from automated teller machines (ATMs) | |
| 1. d. | Rent and other income from other real estate owned | |
| 1. e. | Safe deposit box rent | |
| 1. f. | Bank card and credit card interchange fees | |
| 1. g. | Income and fees from wire transfers not reportable as service charges on deposit accounts | |
| 1. h. | | |
| 1. i. | | |
| 1. j. | | |
| 2. | Other noninterest expense (from Schedule RI, item 7.d) | |
| | Itemize and describe amounts greater than $100,000 that exceed 7% of Schedule RI, item 7.d: | |
| 2. a. | Data processing expenses | 794 |
| 2. b. | Advertising and marketing expenses | |
| 2. c. | Directors' fees | 195 |
| 2. d. | Printing, stationery, and supplies | |
| 2. e. | Postage | |
| 2. f. | Legal fees and expenses | |
| 2. g. | FDIC deposit insurance assessments | |
| 2. h. | Accounting and auditing expenses | 180 |
| 2. i. | Consulting and advisory expenses | |
| 2. j. | Automated teller machine (ATM) and interchange expenses | |
| 2. k. | Telecommunications expenses | |
| 2. l. | Other real estate owned expenses | |
| 2. m. | Insurance expenses (not included in employee expenses, premises and fixed asset expenses, and other real estate owned expenses | |
| 2. n. | | |
| 2. 0. | | |
| 2. p. | | |
| 3. | Discontinued operations and applicable income tax effect (from Schedule RI, item 11) (itemize and describe each discontinued operation): | |
| 3. a. (1) | | |
| (2) | Applicable income tax effect | |
| 3. b. (1) | | |
| (2) | Applicable income tax effect | |
| 4. | Cumulative effect of changes in accounting principles and corrections of material accounting errors (from Schedule RI-A, item 2) (itemize and describe all such effects): | |
| 4. a. | Effect of adoption of current expected credit losses methodology - ASU 2016-13 | |
| 4. b. | Effect of adoption of lease accounting standard - ASC Topic 842 | |
| 4. c. | 2020 Bonus and related taxes expense true-up | (82) |
| 4. d. | | |
| 5. | Other transactions with stockholders (including parent holding company) (from Schedule RI-A, item 11) (itemize and describe all such transactions): | |
| 5. a. | | |
| 5. b. | | |
| 6. | Adjustments to allowance for credit losses (itemize and describe all adjustments) | |
| 6. a. | Initial allowances for credit losses recognized upon the acquisition of purchased credit-detriorated assets on or after the effective date of ASU 2016-13 | |
| 6. b. | Effect of adoption of current expected credit losses methodology on allowance for credit losses | |
| 6. c. | | |
| 6. d. | | |
| 7. | Other explanations (the space below is provided for the bank to briefly describe, at its option, any other significant items affecting the Report of Income): | |
| | Comments? (Yes or No) | |
| | Other explanations (please type or print clearly): | |

Ankura - 000214

**Schedule RC — Balance Sheet**

|  |  | Dollar Amounts in Thousands |
|---|---|---:|

### ASSETS

| | | |
|---|---|---:|
| 1. | Cash and balances due from depository institutions : | |
| 1. a. | Noninterest-bearing balances and currency and coin | 4,818 |
| 1. b. | Interest-bearing balances | |
| 2. | Securities: | |
| 2. a. | Held-to-maturity securities (from Schedule RC-B, column A) | |
| 2. b. | Available-for-sale securities (from Schedule RC-B, column D) | |
| 2. c. | Equity securities with readily determinable fair values not held for trading | |
| 3. | Federal funds sold and securities purchased under agreements to resell: | |
| 3. a. | Federal funds sold | |
| 3. b. | Securities purchased under agreements to resell | |
| 4. | Loans and lease financing receivables: | |
| 4. a. | Loans and leases held for sale | |
| 4. b. | Loans and leases held for investment | |
| 4. c. | LESS: Allowance for loan and lease losses | |
| 4. d. | Loans and leases, net of unearned income and allowance (item 4.b minus 4.c) | |
| 5. | Trading assets | |
| 6. | Premises and fixed assets (including capitalized leases) | |
| 7. | Other real estate owned | |
| 8. | Investments in unconsolidated subsidiaries and associated companies | |
| 9. | Direct and indirect investments in real estate ventures | |
| 10. | Intangible assets | |
| 11. | Other assets (from Schedule RC-F) | 265 |
| 12. | Total assets (sum of items 1 though 11) | 5,083 |

### LIABILITIES

| | | |
|---|---|---:|
| 13. | Deposits: | |
| 13. a. | In domestic offices: | |
| | (1) Noninterest-bearing | |
| | (2) Interest-bearing | |
| 13. b. | Not applicable | |
| 14. | Federal funds purchased and securities sold under agreements to repurchase: | |
| 14. a. | Federal funds purchased | |
| 14. b. | Securities sold under agreements to repurchase | |
| 15. | Trading liabilities | |
| 16. | Other borrowed money (includes mortgage indebtedness) | |
| 17/18 | Not applicable | |
| 19. | Subordinated notes and debentures | |
| 20. | Other liabilities (from Schedule RC-G) | 2,333 |
| 21. | Total liabilities (sum of items 13 through 20) | 2,333 |
| 22. | Not applicable | |

### EQUITY CAPITAL

| | | |
|---|---|---:|
| 23. | Perpetual preferred stock and related surplus | |
| 24. | Common Stock | |
| 25. | Surplus (exclude all surplus related to preferred stock) | |
| 26. a. | Retained earnings | (2,760) |
| 26. b. | Accumulated other comprehensive income | |
| 26. c. | Other equity capital components | 5,510 |
| 27. a. | Total bank equity capital (sum of items 23 through 26.c) | 2,750 |
| 27. b. | Noncontrolling (minority) interests in consolidated subsidiaries | |
| 28. | Total equity capital (sum of items 27.a and 27.b) | 2,750 |
| 29. | Total liabilities and equity capital (sum of items 21 and 28) | 5,083 |

**Memorandum**

Indicate in the box at the right the year of the last completed audit, that conforms to the standards listed in NH RSA 383-A:5-509, "Annual Audits". 2020

Ankura - 000215

### Schedule RC-B — Securities

|  |  | | Dollar Amounts in Thousands | | | |
|---|---|---|---|---|---|
|  |  | Held to maturity | | Available for sale | |
|  |  | (Column A) Amortized Cost | (Column B) Fair Value | (Column C) Amortized Cost | (Column D) Fair Value |
| 1. | U.S. Treasury securities |  |  |  |  |
| 2. | U.S. Government agency and sponsored agency obligations (exclude MBS): |  |  |  |  |
| 3. | Securities issued by states and political subdivisions in the U.S. |  |  |  |  |
| 4. | Mortgage-backed securities (MBS): |  |  |  |  |
| 4. a. | Residential mortgage pass-through securities: |  |  |  |  |
|  | (1) Guaranteed by GNMA |  |  |  |  |
|  | (2) Issued by FNMA and FHLMC |  |  |  |  |
|  | (3) Other pass-through securities |  |  |  |  |
| 4. b. | Other residential mortgage-backed securities (include CMOs, REMICs and stripped MBS): |  |  |  |  |
|  | (1) Issued or guaranteed by U.S. Government agencies or sponsored agencies |  |  |  |  |
|  | (2) Collateralized by MBS issued or guaranteed by U.S. Government agencies or sponsored agencies |  |  |  |  |
|  | (3) All other residential MBS |  |  |  |  |
| 4. c. | Commercial MBS: |  |  |  |  |
|  | (1) Commercial mortgage pass-through securities |  |  |  |  |
|  | (a) Issued or guaranteed by FNMA, FHLMC, or GNMA |  |  |  |  |
|  | (b) Other pass-through securities |  |  |  |  |
|  | (2) Other commercial MBS: |  |  |  |  |
|  | (a) Issued or guaranteed by U.S. Government agencies or sponsored agencies |  |  |  |  |
|  | (b) All other commercial MBS |  |  |  |  |
| 5. | Asset-backed securities and structured financial products: |  |  |  |  |
| a. | Asset-backed securities (ABS) |  |  |  |  |
| b. | Structured financial products: |  |  |  |  |
| 6. | Other debt securities: |  |  |  |  |
| 6. a. | Other domestic debt securities |  |  |  |  |
| 6. b. | Other foreign debt securities |  |  |  |  |
| 7. | Investments in mutual funds and other equity securities with readily determinable fair values |  |  |  |  |
| 8. | Total (sum of items 1 through 7) (total of column A must equal Schedule RC, item 2.a) (total of column D must equal Schedule RC, item 2.b) |  |  |  |  |

**Memoranda**

| | | Dollar Amounts in Thousands |
|---|---|---|
| 1. | Pledged securities 1 | |

1 Includes held-to-maturity securities at amortized cost and available-for-sale securities at fair value.

Ankura - 000216

**Schedule RC-F — Other Assets**

|  |  | Dollar Amounts in Thousands |
|---|---|---|
| 1. | Accrued interest receivable | |
| 2. | Net deferred tax assets | |
| 3. | Interest-only strips receivable (not in the form of a security) | |
| 4. | Equity securities without readily determinable fair values | |
| 5. | Life insurance assets: | |
| a. | General account life insurance assets | |
| b. | Separate account life insurance assets | |
| c. | Hybrid account life insurance assets | |
| 6. | All other assets (itemize and describe amounts greater than $100,000 that exceed 25% of this item) | |
| 6. a. | Prepaid expenses | 92 |
| 6. b. | Repossessed personal property (including vehicles) | |
| 6. c. | Derivatives with a positive fair value held for purposes other than trading | |
| 6. d. | FDIC loss-sharing indemnification assets | |
| 6. e. | Computer software | |
| 6. f. | Accounts receivable | 173 |
| 6. g. | Receivables from foreclosed government-guaranteed mortage loans | |
| 6. h. | | |
| 6. i. | | |
| 6. j. | | |
| 7. | Total (sum of items 1 through 6) (must equal Schedule RC, item 11) | 265 |

Ankura - 000217

**Schedule RC-G — Other Liabilities**

| | Dollar Amounts in Thousands |
|---|---|
| 1. a. Interest accrued and unpaid on deposits | |
| 1. b. Other expenses accrued and unpaid (includes accrued income taxes payable) | |
| 2.   Net deferred tax liabilities | |
| 3.   Allowance for credit losses on off-balance sheet credit exposures | |
| 4.   All other liabilities (itemize and describe amounts greater than $100,000 that exceed 25% of this item) | 2,333 |
| 4. a. Accounts payable | 1,077 |
| 4. b. Deferred compensation liabilities | |
| 4. c. Dividends declared but not yet payable | |
| 4. d. Derivatives with a negative fair value held for purposes other than trading | |
| 4. e. Operating lease liabilities | |
| 4. f.  Deferred Revenue | 1,256 |
| 4. g. | |
| 4. h. | |
| 5.   Total (sum of items 1 though 4) (must equal Schedule RC, item 20) | 2,333 |

Ankura - 000218

**(Continued)— Schedule RC-T — Fiduciary and Related Services**

| | | (Column A) Number of Issues | Dollar Amounts in Thousands |
|---|---|---|---|
| | | | (Column B) Principal Amount Outstanding |
| 2. | Corporate trust and agency accounts: | | |
| 2.a. | Corporate and municipal trusteeships | 15 | 6,523,286 |
| | (1) Issues reported in Memorandum item 2.a. that are in default | | |
| 2.b. | Transfer agent, registrar, paying agent, and other corporate agency | | |

| | | (Column A) Number of Funds | (Column B) Market Value of Fund Assets |
|---|---|---|---|
| 3. | Collective investment funds and common trust funds: | | |
| 3. a. | Domestic equity | | |
| 3. b. | International/Global equity | | |
| 3. c. | Stock/Bond blend | | |
| 3. d. | Taxable bond | | |
| 3. e. | Municipal bond | | |
| 3. f. | Short term investments/Money market | | |
| 3. g. | Specialty/Other | | |
| 3. h. | Total collective investment funds (sum of Memorandum items 3.a through 3.g) | | |

| | | (Column A) Gross Losses Managed Accounts | (Column B) Gross Losses Non-Managed Accounts | (Column C) Recoveries |
|---|---|---|---|---|
| 4. | Fiduciary settlements, surcharges, and other losses: | | | |
| 4. a. | Personal trust and agency accounts | | | |
| 4. b. | Employee benefit and retirement-related trust and agency accounts | | | |
| 4. c. | Investment management and investment advisory agency accounts | | | |
| 4. d. | Other fiduciary accounts and related services | | | |
| 4. e. | Total fiduciary settlements, surcharges, and other losses (sum of Memorandum items 4.a through 4.d) | | | |
| | (sum of columns A and B minus column C must equal Schedule RC-T, item 24) | | | |

| | | Number of Accounts |
|---|---|---|
| 5. | | |
| | Accounts where the institution is named or serves as a fiduciary of an account to be funded at a later date | |

| | | Number of Accounts |
|---|---|---|
| 6. | Accounts where the institution is named or serves as "Trust Protector" | |

Ankura - 000219

**Schedule RC-T — Fiduciary and Related Services**

| | (Column A) Managed Assets Amount | (Column B) Non-Managed Assets Amount | (Column C) Number of Managed Accounts | (Column D) Number of Non-Managed Accounts |
|---|---|---|---|---|
| **FIDUCIARY AND RELATED ASSETS (Dollar Amounts in Thousands)** | | | | |
| 4. Personal trust and agency accounts | | | | |
| 5. Employee benefit and retirement-related trust and agency accounts: | | | | |
| 5.a. Employee benefit — defined contribution | | | | |
| 5.b. Employee benefit — defined benefit | | | | |
| 5.c. Other employee benefit and retirement-related accounts | | | | |
| 6. Corporate trust and agency accounts | | 12,916,769 | | 84 |
| 7. Investment management and investment advisory agency accounts | | | | |
| 8. Foundation and endowment trust and agency accounts | | | | |
| 9. Other fiduciary accounts | | | | |
| 10. Total fiduciary accounts (sum of items 4 through 9) | | 12,916,769 | | 84 |
| 11. Custody and safekeeping accounts | | | | |
| 12. Not applicable | | | | |
| 13. Individual Retirement Accounts, Health Savings Accounts, and other similar accounts (included in items 5.c and 11) | | | | |
| **FIDUCIARY AND RELATED SERVICES INCOME (Dollar Amounts in Thousands)** | | | | |
| 14. Personal trust and agency accounts | | | | |
| 15. Employee benefit and retirement-related trust and agency accounts: | | | | |
| 15.a. Employee benefit — defined contribution | | | | |
| 15.b. Employee benefit — defined benefit | | | | |
| 15.c. Other employee benefit and retirement-related accounts | | | | |
| 16. Corporate trust and agency accounts | 3,993 | | | |
| 17. Investment management and investment advisory agency accounts | | | | |
| 18. Foundation and endowment trust and agency accounts | | | | |
| 19. Other fiduciary accounts | | | | |
| 20. Custody and safekeeping accounts | | | | |
| 21. Other fiduciary and related services income | | | | |
| 22. Total gross fiduciary and related services income (sum of items 14 through 21) (must equal Schedule RI, item 5.a) | | | | |
| 23. Less: Expenses | 4,139 | | | |
| 24. Less: Net losses from fiduciary and related services | | | | |
| 25. Plus: Intracompany income credits for fiduciary and related services | | | | |
| 26. Net fiduciary and related services income | (146) | | | |

| | (Column A) Personal Trust and Agency and Investment Management Agency Accounts | (Column B) Employee Benefit and Retirement Related Trust and Agency Accounts | (Column C) All Other Accounts |
|---|---|---|---|
| **Memoranda** | | | |
| 1. Managed assets held in fiduciary accounts: | | | |
| 1.a. Noninterest-bearing deposits | | | |
| 1.b. Interest-bearing deposits | | | |
| 1.c. U.S. Treasury and U.S. Government agency obligations | | | |
| 1.d. State, county and municipal obligations | | | |
| 1.e. Money market mutual funds | | | |
| 1.f. Equity mutual funds | | | |
| 1.g. Other mutual funds | | | |
| 1.h. Common trust funds and collective investment funds | | | |

Ankura - 000220

1.
i.      Other short-term obligations
1.
j.      Other notes and bonds
1.
k.      Investments in unregistered funds and private equity investments
1.
l.      Other common and preferred stocks
1.
m.     Real estate mortgages
1.
n.      Real estate
1.
o.      Miscellaneous assets
1.      Total managed assets held in fiduciary accounts (for each column, sum of
p.      Memorandum items 1.a through 1.o)

| | (Column A) Managed Assets | (Column B) Number of Managed Accounts |
|---|---|---|

1.
q.      Investments of managed fiduciary accounts in advised or sponsored mutual funds

Ankura - 000221

**EXHIBIT T3B-1**

AMENDED AND RESTATED BYLAWS OF

BLOCKFI INC.

(A DELAWARE CORPORATION)

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **ARTICLE I OFFICES** | | 1 |
| 1.1 | Registered Office | 1 |
| 1.2 | Offices | 1 |
| **ARTICLE II MEETINGS OF STOCKHOLDERS** | | 1 |
| 2.1 | Location | 1 |
| 2.2 | Timing | 1 |
| 2.3 | Notice of Meeting | 1 |
| 2.4 | Stockholders' Records | 1 |
| 2.5 | Special Meetings | 2 |
| 2.6 | Notice of Meeting | 2 |
| 2.7 | Business Transacted at Special Meeting | 2 |
| 2.8 | Quorum; Meeting Adjournment; Presence by Remote Means | 2 |
| 2.9 | Voting Thresholds | 3 |
| 2.10 | Number of Votes Per Share | 3 |
| 2.11 | Action by Written Consent of Stockholders; Electronic Consent; Notice of Action | 3 |
| **ARTICLE III DIRECTORS** | | 4 |
| 3.1 | Authorized Directors | 4 |
| 3.2 | Vacancies | 4 |
| 3.3 | Board Authority | 5 |
| 3.4 | Location of Meetings | 5 |
| 3.5 | First Meeting | 5 |
| 3.6 | Regular Meetings | 5 |
| 3.7 | Special Meetings | 5 |
| 3.8 | Quorum | 6 |
| 3.9 | Action Without a Meeting | 6 |
| 3.10 | Telephonic Meetings | 6 |
| 3.11 | Committees | 6 |
| 3.12 | Minutes of Meetings | 6 |
| 3.13 | Compensation of Directors | 7 |
| 3.14 | Removal of Directors | 7 |
| **ARTICLE IV NOTICES** | | 7 |
| 4.1 | Notice | 7 |
| 4.2 | Waiver of Notice | 7 |
| 4.3 | Electronic Notice | 7 |
| **ARTICLE V OFFICERS** | | 8 |
| 5.1 | Required and Permitted Officers | 8 |
| 5.2 | Appointment of Required Officers | 8 |
| 5.3 | Appointment of Permitted Officers | 8 |

i

| | | |
|---|---|---|
| 5.4 | Officer Compensation | 8 |
| 5.5 | Term of Office; Vacancies | 8 |
| 5.6 | Chairman Presides | 9 |
| 5.7 | Absence of Chairman | 9 |
| 5.8 | Powers of President | 9 |
| 5.9 | President's Signature Authority | 9 |
| 5.10 | Absence of President | 9 |
| 5.11 | Duties of Secretary | 9 |
| 5.12 | Duties of Assistant Secretary | 10 |
| 5.13 | Duties of Treasurer | 10 |
| 5.14 | Disbursements and Financial Reports | 10 |
| 5.15 | Treasurer's Bond | 10 |
| 5.16 | Duties of Assistant Treasurer | 10 |
| **ARTICLE VI CERTIFICATE OF STOCK** | | 10 |
| 6.1 | Stock Certificates | 10 |
| 6.2 | Facsimile Signatures | 11 |
| 6.3 | Lost Certificates | 11 |
| 6.4 | Transfer of Stock | 11 |
| 6.5 | Fixing a Record Date | 11 |
| 6.6 | Registered Stockholders | 12 |
| **ARTICLE VII GENERAL PROVISIONS** | | 12 |
| 7.1 | Dividends | 12 |
| 7.2 | Reserve for Dividends | 12 |
| 7.3 | Checks | 12 |
| 7.4 | Fiscal Year | 12 |
| 7.5 | Corporate Seal | 12 |
| 7.6 | Indemnification | 12 |
| 7.7 | Conflicts with Certificate of Incorporation | 14 |
| **ARTICLE VIII TRANSFER RESTRICTIONS** | | 14 |
| 8.1 | Restrictions on Transfer | 14 |
| 8.2 | Permitted Transfers | 14 |
| 8.3 | Void Transfers | 15 |
| 8.4 | Termination of Restriction of Transfer | 15 |
| 8.5 | Legends | 15 |
| **ARTICLE IX AMENDMENTS** | | 15 |
| **ARTICLE X LOANS TO OFFICERS** | | 15 |

ii

Ankura - 000223

**AMENDED AND RESTATED BYLAWS**
**OF**
**BLOCKFI INC.**

**ARTICLE I**
**OFFICES**

1.1 **Registered Office.** The registered office shall be in the City of Wilmington, County of New Castle, State of Delaware.

1.2 **Offices.** The corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

2.1 **Location.** All meetings of the stockholders for the election of directors shall be held in New York, New York, at such place as may be fixed from time to time by the Board of Directors, or at such other place either within or without the State of Delaware as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting; provided, however, that the Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication as authorized by Section 211 of the Delaware General Corporations Law ("DGCL"). Meetings of stockholders for any other purpose may be held at such time and place, if any, within or without the State of Delaware, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof, or a waiver by electronic transmission by the person entitled to notice.

2.2 **Timing.** Annual meetings of stockholders, commencing with the year 2017, shall be held at such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting, at which they shall elect by a plurality vote a Board of Directors, and transact such other business as may properly be brought before the meeting.

2.3 **Notice of Meeting.** Written notice of any stockholder meeting stating the place, if any, date and hour of the meeting, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, shall be given to each stockholder entitled to vote at such meeting not fewer than ten (10) nor more than sixty (60) days before the date of the meeting.

2.4 **Stockholders' Records.** The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address (but not the electronic address or other electronic contact information) of each stockholder and the number of shares registered in the name of each

1

Ankura - 000224

stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the corporation. In the event that the corporation determines to make the list available on an electronic network, the corporation may take reasonable steps to ensure that such information is available only to stockholders of the corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

2.5 **Special Meetings.** Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the certificate of incorporation, may be called by the president and shall be called by the president or secretary at the request in writing of a majority of the Board of Directors, or at the request in writing of stockholders owning at least fifty percent (50%) in amount of the entire capital stock of the corporation issued and outstanding and entitled to vote. Such request shall state the purpose or purposes of the proposed meeting.

2.6 **Notice of Meeting.** Written notice of a special meeting stating the place, date and hour of the meeting and the purpose or purposes for which the meeting is called, shall be given not fewer than ten (10) nor more than sixty (60) days before the date of the meeting, to each stockholder entitled to vote at such meeting. The means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting shall also be provided in the notice.

2.7 **Business Transacted at Special Meeting.** Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

2.8 **Quorum; Meeting Adjournment; Presence by Remote Means.**

(a) *Quorum; Meeting Adjournment.* The holders of a majority of the stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the certificate of incorporation. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally notified. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

2

(b) *Presence by Remote Means.* If authorized by the Board of Directors in its sole discretion, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(1) participate in a meeting of stockholders; and

(2) be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (i) the corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation.

2.9 **Voting Thresholds.** When a quorum is present at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall decide any question brought before such meeting, unless the question is one upon which by express provision of the statutes or of the certificate of incorporation, a different vote is required, in which case such express provision shall govern and control the decision of such question.

2.10 **Number of Votes Per Share.** Unless otherwise provided in the certificate of incorporation, each stockholder shall at every meeting of the stockholders be entitled to one vote by such stockholder or by proxy for each share of the capital stock having voting power held by such stockholder, but no proxy shall be voted on after three years from its date, unless the proxy provides for a longer period.

2.11 **Action by Written Consent of Stockholders; Electronic Consent; Notice of Action.**

(a) *Action by Written Consent of Stockholders.* Unless otherwise provided by the certificate of incorporation, any action required or permitted to be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing setting forth the action so taken, is signed in a manner permitted by law by the holders of outstanding stock having not less than the number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Written stockholder consents shall bear the date of signature of each stockholder who signs the consent in the manner permitted by law and shall be delivered to the corporation as provided in subsection (b) below. No written consent shall be effective to take the action set forth therein unless, within sixty (60) days of the earliest dated consent delivered to the corporation in the manner provided above, written consents signed by a sufficient number of stockholders to take the action set forth therein are delivered to the corporation in the manner provided above.

3

Ankura - 000226

(b) *Electronic Consent.* A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the corporation can determine (1) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (2) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission. The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the foregoing limitations on delivery, consents given by telegram, cablegram or other electronic transmission may be otherwise delivered to the principal place of business of the corporation or to an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded if, to the extent and in the manner provided by resolution of the Board of Directors of the corporation.

(c) *Notice of Action.* Prompt notice of any action taken pursuant to this Section 2.11 shall be provided to the stockholders in accordance with Section 228(e) of the DGCL.

## ARTICLE III
## DIRECTORS

3.1 **Authorized Directors.** The number of directors that shall constitute the whole Board of Directors shall be determined by resolution of the Board of Directors or by the stockholders at the annual meeting of the stockholders, except as provided in Section 3.2 of this Article, and each director elected shall hold office until his successor is elected and qualified. Directors need not be stockholders.

3.2 **Vacancies.** Unless otherwise provided in the corporation's certificate of incorporation, as it may be amended, vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced. If there are no directors in office, then an election of directors may be held in the manner provided by statute. If, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of

4

the whole Board of Directors (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least ten percent (10%) of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office.

3.3 **Board Authority.** The business of the corporation shall be managed by or under the direction of its Board of Directors, which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the certificate of incorporation or by these bylaws directed or required to be exercised or done by the stockholders.

3.4 **Location of Meetings.** The Board of Directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.

3.5 **First Meeting.** The first meeting of each newly elected Board of Directors shall be held at such time and place as shall be fixed by the vote of the stockholders at the annual meeting and no notice of such meeting shall be necessary to the newly elected directors in order to legally constitute the meeting, provided a quorum shall be present. In the event of the failure of the stockholders to fix the time or place of such first meeting of the newly elected Board of Directors, or in the event such meeting is not held at the time and place so fixed by the stockholders, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors, or as shall be specified in a written waiver signed by all of the directors.

3.6 **Regular Meetings.** Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board of Directors.

3.7 **Special Meetings.** Special meetings of the Board of Directors may be called by the president upon notice to each director; special meetings shall be called by the president or secretary in like manner and on like notice on the written request of two (2) directors unless the Board of Directors consists of only one director, in which case special meetings shall be called by the president or secretary in like manner and on like notice on the written request of the sole director. Notice of any special meeting shall be given to each director at his business or residence in writing, or by telegram, facsimile transmission, telephone communication or electronic transmission (provided, with respect to electronic transmission, that the director has consented to receive the form of transmission at the address to which it is directed). If mailed, such notice shall be deemed adequately delivered when deposited in the United States mails so addressed, with postage thereon prepaid, at least five (5) days before such meeting. If by telegram, such notice shall be deemed adequately delivered when the telegram is delivered to the telegraph company at least twenty-four (24) hours before such meeting. If by facsimile transmission or other electronic transmission, such notice shall be transmitted at least twenty-four (24) hours before such meeting. If by telephone, the notice shall be given at least twelve (12) hours prior to the time set for the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified in the notice of such meeting, except for amendments to these Bylaws as provided under Section 9.1 of Article IX hereof. A meeting may be held at any time without notice if all the directors are present (except as otherwise provided by law) or if those not present waive notice of the meeting in writing, either before or after such meeting.

5

Ankura - 000228

3.8 **Quorum.** At all meetings of the Board of Directors a majority of the directors shall constitute a quorum for the transaction of business and any act of a majority of the directors present at any meeting at which there is a quorum shall be an act of the Board of Directors, except as may be otherwise specifically provided by statute or by the certificate of incorporation. If a quorum is not present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

3.9 **Action Without a Meeting.** Unless otherwise restricted by the certificate of incorporation or these bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if all members of the Board of Directors or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing, writings, electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or committee.

3.10 **Telephonic Meetings.** Unless otherwise restricted by the certificate of incorporation or these bylaws, members of the Board of Directors or any committee designated by the Board of Directors may participate in a meeting of the Board of Directors or any committee, by means of conference telephone or other means of communication by which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at the meeting.

3.11 **Committees.** The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it, but no such committee shall have the power or authority in reference to the following matters: (i) approving or adopting, or recommending to the stockholders, any action or matter expressly required by the DGCL to be submitted to stockholders for approval or (ii) adopting, amending or repealing any provision of these bylaws.

3.12 **Minutes of Meetings.** Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

6

Ankura - 000229

3.13 **Compensation of Directors**. Unless otherwise restricted by the certificate of incorporation or these bylaws, the Board of Directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

3.14 **Removal of Directors**. Unless otherwise provided by the certificate of incorporation or these bylaws, any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of shares entitled to vote at an election of directors.

**ARTICLE IV**
**NOTICES**

4.1 **Notice**. Unless otherwise provided in these bylaws, whenever, under the provisions of the statutes or of the certificate of incorporation or of these bylaws, notice is required to be given to any director or stockholder, it shall not be construed to mean personal notice, but such notice may be given in writing, by mail, addressed to such director or stockholder, at his address as it appears on the records of the corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail. Notice to directors may also be given by telegram.

4.2 **Waiver of Notice**. Whenever any notice is required to be given under the provisions of the statutes or of the certificate of incorporation or of these bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

4.3 **Electronic Notice**.

(a) *Electronic Transmission*. Without limiting the manner by which notice otherwise may be given effectively to stockholders and directors, any notice to stockholders or directors given by the corporation under any provision of the DGCL, the certificate of incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder or director to whom the notice is given. Any such consent shall be revocable by the stockholder or director by written notice to the corporation. Any such consent shall be deemed revoked if (1) the corporation is unable to deliver by electronic transmission two consecutive notices given by the corporation in accordance with such consent and (2) such inability becomes known to the secretary or an assistant secretary of the corporation or to the transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

7

Ankura - 000230

(b) *Effective Date of Notice.* Notice given pursuant to subsection (a) of this section shall be deemed given: (1) if by facsimile telecommunication, when directed to a number at which the stockholder or director has consented to receive notice; (2) if by electronic mail, when directed to an electronic mail address at which the stockholder or director has consented to receive notice; (3) if by a posting on an electronic network together with separate notice to the stockholder or director of such specific posting, upon the later of (i) such posting and (ii) the giving of such separate notice; and (4) if by any other form of electronic transmission, when directed to the stockholder or director. An affidavit of the secretary or an assistant secretary or of the transfer agent or other agent of the corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

(c) *Form of Electronic Transmission.* For purposes of these bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

## ARTICLE V
## OFFICERS

5.1 **Required and Permitted Officers.** The officers of the corporation shall be chosen by the Board of Directors and shall be a president, treasurer and a secretary. The Board of Directors may elect from among its members a Chairman of the Board and a Vice-Chairman of the Board. The Board of Directors may also choose one or more vice-presidents, assistant secretaries and assistant treasurers. Any number of offices may be held by the same person, unless the certificate of incorporation or these bylaws otherwise provide.

5.2 **Appointment of Required Officers.** The Board of Directors at its first meeting after each annual meeting of stockholders shall choose a president, a treasurer, and a secretary and may choose vice-presidents.

5.3 **Appointment of Permitted Officers.** The Board of Directors may appoint such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

5.4 **Officer Compensation.** The salaries of all officers and agents of the corporation shall be fixed by the Board of Directors.

5.5 **Term of Office; Vacancies.** The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the corporation shall be filled by the Board of Directors.

Ankura - 000231

### THE CHAIRMAN OF THE BOARD

5.6 **Chairman Presides.** The Chairman of the Board, if any, shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present. He or she shall have and may exercise such powers as are, from time to time, assigned to him by the Board of Directors and as may be provided by law.

5.7 **Absence of Chairman.** In the absence of the Chairman of the Board, the Vice-Chairman of the Board, if any, shall preside at all meetings of the Board of Directors and of the stockholders at which he or she shall be present. He or she shall have and may exercise such powers as are, from time to time, assigned to him by the Board of Directors and as may be provided by law.

### THE PRESIDENT AND VICE-PRESIDENTS

5.8 **Powers of President.** The president shall be the chief executive officer of the corporation; in the absence of the Chairman and Vice-Chairman of the Board he or she shall preside at all meetings of the stockholders and the Board of Directors; he or she shall have general and active management of the business of the corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect.

5.9 **President's Signature Authority.** The president shall execute bonds, mortgages and other contracts requiring a seal, under the seal of the corporation, except where required or permitted by law to be otherwise signed and executed and except where the signing and execution thereof shall be expressly delegated by the Board of Directors to some other officer or agent of the corporation.

5.10 **Absence of President.** In the absence of the president or in the event of his inability or refusal to act, the vice-president, if any, (or in the event there be more than one vice-president, the vice-presidents in the order designated by the directors, or in the absence of any designation, then in the order of their election) shall perform the duties of the president, and when so acting, shall have all the powers of and be subject to all the restrictions upon the president. The vice-presidents shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

### THE SECRETARY AND ASSISTANT SECRETARY

5.11 **Duties of Secretary.** The secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings of the meetings of the corporation and of the Board of Directors in a book to be kept for that purpose and shall perform like duties for the standing committees when required. He or she shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or president, under whose supervision he or she shall be. He or she shall have custody of the corporate seal of the corporation and he or she, or an assistant secretary, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by his signature or by the signature of such assistant secretary. The Board of Directors may give general authority to any other officer to affix the seal of the corporation and to attest the affixing by his signature.

Ankura - 000232

5.12 **Duties of Assistant Secretary.** The assistant secretary, or if there be more than one, the assistant secretaries in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the secretary or in the event of his inability or refusal to act, perform the duties and exercise the powers of the secretary and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

### THE TREASURER AND ASSISTANT TREASURERS

5.13 **Duties of Treasurer.** The treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the Board of Directors.

5.14 **Disbursements and Financial Reports.** He or she shall disburse the funds of the corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the president and the Board of Directors, at its regular meetings or when the Board of Directors so requires, an account of all his transactions as treasurer and of the financial condition of the corporation.

5.15 **Treasurer's Bond.** If required by the Board of Directors, the treasurer shall give the corporation a bond (which shall be renewed every six years) in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his office and for the restoration to the corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the corporation.

5.16 **Duties of Assistant Treasurer.** The assistant treasurer, or if there shall be more than one, the assistant treasurers in the order determined by the Board of Directors (or if there be no such determination, then in the order of their election) shall, in the absence of the treasurer or in the event of the treasurer's inability or refusal to act, perform the duties and exercise the powers of the treasurer and shall perform such other duties and have such other powers as the Board of Directors may from time to time prescribe.

### ARTICLE VI
### CERTIFICATE OF STOCK

6.1 **Stock Certificates.** Every holder of stock in the corporation shall be entitled to have a certificate, signed by or in the name of the corporation by, the Chairman or Vice-Chairman of the Board of Directors, or the president or a vice-president and the treasurer or an assistant treasurer, or the secretary or an assistant secretary of the corporation, certifying the number of shares owned by him in the corporation.

Certificates may be issued for partly paid shares and in such case upon the face or back of the certificates issued to represent any such partly paid shares, the total amount of the consideration to be paid therefor, and the amount paid thereon shall be specified.

10

Ankura - 000233

If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualification, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, provided that, except as otherwise provided in Section 202 of the DGCL, in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate which the corporation shall issue to represent such class or series of stock, a statement that the corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

6.2 **Facsimile Signatures.** Any or all of the signatures on the certificate may be facsimile. In the event that any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, the certificate may be issued by the corporation with the same effect as if such officer, transfer agent or registrar were still acting as such at the date of issue.

6.3 **Lost Certificates.** The Board of Directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost, stolen or destroyed upon the making of an affidavit of that fact by the person claiming the certificate to be lost, stolen or destroyed. When authorizing such issuance of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance, require the owner of such lost, stolen or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or to give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

6.4 **Transfer of Stock.** Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer, it shall be the duty of the corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

6.5 **Fixing a Record Date.** In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

11

Ankura - 000234

6.6 **Registered Stockholders.** The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, to vote as such owner, to hold liable for calls and assessments a person registered on its books as the owner of shares and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII
### GENERAL PROVISIONS

7.1 **Dividends.** Dividends upon the capital stock of the corporation, if any, subject to the provisions of the certificate of incorporation, may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property or in shares of the capital stock, subject to the provisions of the certificate of incorporation.

7.2 **Reserve for Dividends.** Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their sole discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purposes as the directors think conducive to the interests of the corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

7.3 **Checks.** All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

7.4 **Fiscal Year.** The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

7.5 **Corporate Seal.** The Board of Directors may adopt a corporate seal having inscribed thereon the name of the corporation, the year of its organization and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or otherwise reproduced.

7.6 **Indemnification.** The corporation shall, to the fullest extent authorized under the laws of the State of Delaware, as those laws may be amended and supplemented from time to time, indemnify any director made, or threatened to be made, a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of being a director of the corporation or a predecessor corporation or a director or officer of another corporation, if such person served in such position at the request of the corporation; provided, however, that the corporation shall indemnify any such director or officer in connection with a proceeding initiated by such director or officer only if such proceeding was authorized by the Board of Directors of the corporation. The indemnification provided for in this Section 7.6 shall: (i) not be deemed

12

exclusive of any other rights to which those indemnified may be entitled under these bylaws, agreement or vote of stockholders or disinterested directors or otherwise, both as to action in their official capacities and as to action in another capacity while holding such office, (ii) continue as to a person who has ceased to be a director, and (iii) inure to the benefit of the heirs, executors and administrators of a person who has ceased to be a director. The corporation's obligation to provide indemnification under this Section 7.6 shall be offset to the extent of any other source of indemnification or any otherwise applicable insurance coverage under a policy maintained by the corporation or any other person.

Expenses incurred by a director of the corporation in defending a civil or criminal action, suit or proceeding by reason of the fact that he or she is or was a director of the corporation (or was serving at the corporation's request as a director or officer of another corporation) shall be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the corporation as authorized by relevant sections of the DGCL. Notwithstanding the foregoing, the corporation shall not be required to advance such expenses to an agent who is a party to an action, suit or proceeding brought by the corporation and approved by a majority of the Board of Directors of the corporation that alleges willful misappropriation of corporate assets by such agent, disclosure of confidential information in violation of such agent's fiduciary or contractual obligations to the corporation or any other willful and deliberate breach in bad faith of such agent's duty to the corporation or its stockholders.

The foregoing provisions of this Section 7.6 shall be deemed to be a contract between the corporation and each director who serves in such capacity at any time while this bylaw is in effect, and any repeal or modification thereof shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought based in whole or in part upon any such state of facts.

The Board of Directors in its sole discretion shall have power on behalf of the corporation to indemnify any person, other than a director, made a party to any action, suit or proceeding by reason of the fact that he or she, his testator or intestate, is or was an officer or employee of the corporation.

To assure indemnification under this Section 7.6 of all directors, officers and employees who are determined by the corporation or otherwise to be or to have been "fiduciaries" of any employee benefit plan of the corporation that may exist from time to time, Section 145 of the DGCL shall, for the purposes of this Section 7.6, be interpreted as follows: an "other enterprise" shall be deemed to include such an employee benefit plan, including without limitation, any plan of the corporation that is governed by the Act of Congress entitled "Employee Retirement Income Security Act of 1974," as amended from time to time; the corporation shall be deemed to have requested a person to serve the corporation for purposes of Section 145 of the DGCL, as administrator of an employee benefit plan where the performance by such person of his duties to the corporation also imposes duties on, or otherwise involves services by, such person to the plan or participants or beneficiaries of the plan; excise taxes assessed on a person with respect to an employee benefit plan pursuant to such Act of Congress shall be deemed "fines."

13

Ankura - 000236

**CERTIFICATE OF INCORPORATION GOVERNS**

7.7 **Conflicts with Certificate of Incorporation.** In the event of any conflict between the provisions of the corporation's certificate of incorporation and these bylaws, the provisions of the certificate of incorporation shall govern.

**ARTICLE VIII**
**TRANSFER RESTRICTIONS**

8.1 **Restrictions on Transfer.** No stockholder of the corporation may sell, assign, transfer, pledge, encumber or in any manner dispose of any share of Common Stock of the corporation (the "Common Stock"), including by way of any arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether voluntarily or by operation of law, or by gift or otherwise, other than by means of a Permitted Transfer (as defined below). If any provision(s) of any agreement(s) currently in effect by and between the corporation and any stockholder conflicts with this Article VIII, this Article VIII shall govern, and the remaining provision(s) of such agreement(s) that do not conflict with this Article VIII shall continue in full force and effect.

8.2 **Permitted Transfers.** For purposes of this Article VIII, a "Permitted Transfer" shall mean any of the following:

(a) any transfer by a stockholder of any or all of such stockholder's shares to the corporation;

(b) any transfer by a stockholder of any or all of such stockholder's shares to such stockholder's immediate family or a trust for the benefit of such stockholder or such stockholder's immediate family;

(c) any transfer by a stockholder of any or all of such stockholder's shares effected pursuant to such stockholder's will or the laws of intestate succession;

(d) if a stockholder is a partnership, limited liability company, or corporation, any transfer by such stockholder of any or all of such stockholder's shares to the partners, members, former partners, former members, stockholders, and/or affiliates of such stockholder;

(e) any transfer of Common Stock issued upon conversion of Preferred Stock of the corporation;

(f) any transfer of shares approved by the prior written consent of the Board of Directors, including Preferred Director Approval (as defined in the corporation's certificate of incorporation).

14

Ankura - 000237

Except with respect to the shares of Common Stock transferred under clauses (a) and (e) above, such transferred shares shall remain subject to the transfer restrictions of this Article VIII.

8.3 **Void Transfers.** Any transfer of shares shall be null and void unless the terms, conditions and provisions of this Article VIII are strictly observed and followed.

8.4 **Termination of Restriction of Transfer.** The foregoing restriction on transfer shall lapse immediately prior to the corporation's first firm commitment underwritten public offering of its securities pursuant to a registration statement under the Securities Act of 1933, as amended.

8.5 **Legends.** The certificates representing shares of stock of the corporation shall bear on their face the following legend so long as the foregoing right of first refusal remains in effect:

"THE SHARES REPRESENTED BY THIS CERTIFICATE MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR IN ANY MANNER DISPOSED OF, EXCEPT IN COMPLIANCE WITH THE BYLAWS OF THE CORPORATION. COPIES OF THE BYLAWS OF THE CORPORATION MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION."

**ARTICLE IX**
**AMENDMENTS**

9.1 These bylaws may be altered, amended or repealed, or new bylaws may be adopted by the stockholders or by the Board of Directors, when such power is conferred upon the Board of Directors by the certificate of incorporation at any regular meeting of the stockholders or of the Board of Directors or at any special meeting of the stockholders or of the Board of Directors if notice of such alteration, amendment, repeal or adoption of new bylaws be contained in the notice of such special meeting. If the power to adopt, amend or repeal bylaws is conferred upon the Board of Directors by the certificate of incorporation, it shall not divest or limit the power of the stockholders to adopt, amend or repeal bylaws.

**ARTICLE X**
**LOANS TO OFFICERS**

10.1 The corporation may lend money to, or guarantee any obligation of or otherwise assist any officer or other employee of the corporation or of its subsidiaries, including any officer or employee who is a director of the corporation or its subsidiaries, whenever, in the judgment of the Board of Directors, such loan, guarantee or assistance may reasonably be expected to benefit the corporation. The loan, guarantee or other assistance may be with or without interest and may be unsecured or secured in such manner as the Board of Directors shall approve, including, without limitation, a pledge of shares of stock of the corporation. Nothing in these bylaws shall be deemed to deny, limit or restrict the powers of guaranty or warranty of the corporation at common law or under any statute.

15

Ankura - 000238

**CERTIFICATE OF SECRETARY OF**

**BLOCKFI INC.**

The undersigned, Zachary Lee Prince, hereby certifies that he is the duly elected and acting Secretary of BlockFi Inc., a Delaware corporation (the "Corporation"), and that the Amended and Restated Bylaws attached hereto constitute the Bylaws of said Corporation as duly adopted by Action by Written Consent in Lieu of Organizational Meeting by the Board of Directors on July 23, 2019.

**IN WITNESS WHEREOF,** the undersigned has hereunto subscribed his name this 23rd day of July, 2019.

/s/ Zachary Lee Prince
Zachary Lee Prince, Secretary

Ankura - 000239

**Form of Notice of Exchange**

In connection with BlockFi's previously announced SEC settlement, we are changing the obligor of BlockFi Interest Accounts of U.S. clients from BlockFi Lending LLC to BlockFi Inc. This means that BlockFi Interest Accounts for U.S. clients will be obligations of the parent entity, BlockFi Inc., instead of BlockFi Lending LLC (a wholly owned subsidiary of BlockFi Inc.).

To implement the change, BlockFi Inc. will initially assume BlockFi Lending's obligations under the BlockFi Interest Accounts of our U.S. clients, effective [ ]. Subsequent to the assumption, we will exchange the BlockFi Interest Accounts of our U.S. clients at BlockFi Lending LLC for BlockFi Interest Accounts at BlockFi Inc. We expect the exchange to be completed on [ ].

The other terms and functions of the BlockFi Interest Account of our U.S. clients, including interest rates and payment terms will not be affected by the exchange. Clients are not required to take any action and all funds in their BIA accounts will continue to be accessible as usual.

*BlockFi Interest Accounts are not registered under the Securities Act of 1933 and may not be offered or sold in the U.S., to U.S. persons or for the account or benefit of U.S. Persons absent registration or the availability of an exemption from registration.*

EXHIBIT T3B-2

AMENDMENT NO. 1 TO THE

AMENDED AND RESTATED BYLAWS

OF

BLOCKFI INC.

**(adopted as of February 25, 2021)**

The undersigned certifies that he is the duly elected, qualified, and acting Secretary of BlockFi Inc., a Delaware corporation (the "<u>Company</u>") and that Article VIII of the Amended and Restated Bylaws of the Company (the "<u>Bylaws</u>") has been amended to read in its entirety as follows:

"ARTICLE VIII
TRANSFER RESTRICTIONS

8.1 <u>Restrictions on Transfer</u>. Any stockholder holding shares of the Company's capital stock ("<u>Restricted Shares</u>") other than Major Investors, as defined in that certain Fifth Amended and Restated Investors' Rights Agreement by and among the Company and the other parties listed therein dated on or around February 25, 2021 as may be amended from time to time, (any such stockholder, a "<u>Restricted Stockholder</u>") shall not directly or indirectly transfer, sell, assign, lend, grant any option or right of warrant to purchase, pledge, enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of, voting rights or other interests therein, or otherwise in any manner dispose of or encumber, whether voluntarily or by operation of law, or by gift or otherwise ("<u>transfer</u>"), Restricted Shares or any right or interest therein (including, but not limited to, any derivative security or contract based upon such stock) without the prior written consent of the Company, upon duly authorized action by the Board, and such holder otherwise complying with the requirements of this Article VIII. The restrictions on transfer and ownership of shares set forth in this Article VIII shall be in addition to, and not limited by the provisions of any agreements currently in effect by and between the Company and any stockholder

8.2 <u>Permitted Transfers</u>. The restriction contained in this Article VIII shall not apply to the following transactions (each, a "<u>Permitted Transfer</u>"):

(i) any transfer during the Restricted Stockholder's lifetime by gift or pursuant to domestic relations orders to the Restricted Stockholder's immediate family or a trust for the benefit of the Restricted Stockholder or the Restricted Stockholder's immediate family, where "<u>immediate family</u>" as used herein shall mean spouse, spousal equivalent, lineal descendant or antecedent, parent, sibling, stepchild, stepparent, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law (and for avoidance of doubt shall include adoptive relationships);

Ankura - 000241

(ii) any transfer or deemed transfer effected pursuant to the Restricted Stockholder's will or the laws of intestate succession;

(iii) any transfer by an entity Restricted Stockholder to an Affiliate (as defined below) of such Restricted Stockholder, where, for purposes of this Article VIII. An "<u>Affiliate</u>" of an entity Restricted Stockholder shall include any individual, firm, corporation, partnership, association, limited liability company, trust or other entity who, directly or indirectly, controls, is controlled by or is under common control with such entity Restricted Stockholder or such entity Restricted Stockholder's principal, including, without limitation, any general partner, managing member, managing partner, officer or director of such entity Restricted Stockholder, such entity Restricted Stockholder's principal or any venture capital fund now or hereafter existing that is controlled by one or more general partners or managing members of, or shares the same management company with, such entity Restricted Stockholder or such entity Restricted Stockholder's principal;

(iv) a corporate Restricted Stockholder's transfer of all of its Restricted Shares to a single transferee pursuant to and in accordance with the terms of any *bona fide* merger, consolidation, reclassification of shares or capital reorganization of the corporate Restricted Stockholder, or pursuant to a *bona fide* sale of all or substantially all of the stock or assets of a corporate Restricted Stockholder, provided in each case that such transfer is not essentially simply a transfer of the Restricted Shares without substantial additional assets other than cash or cash equivalents being transferred;

(v) any repurchase or redemption of Restricted Shares by the Company: (a) at or below cost, upon the occurrence of certain events, such as the termination of employment or services; or (b) at any price pursuant to the Company's exercise of a right of first refusal to repurchase such Restricted Shares (including the purchase of such Restricted Shares by the Company's assignee), upon duly authorized action by the Board (which shall include the Preferred Director Approval (as defined the Company's Certificate of Incorporation)); or

(vi) any transfer upon duly authorized action by the Board (which shall include the Preferred Director Approval).

*provided, however*, that each transferee, assignee, or other recipient of any interest in the Restricted Shares shall, as a condition to the transfer, agree to be bound by all of the restrictions set forth in these Bylaws. Notwithstanding the foregoing exception, a Restricted Stockholder may not transfer any Restricted Shares if prior to consulting with the Company to determine whether such transfer would result in the Company having a class of security held of record by 2,000 (or such other number as may be applicable under the Exchange Act) or more persons, as described in Section 12(g) of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>") and Rule 12g5-1 promulgated under the Exchange Act (or any successor provisions thereto), and no such transfer shall be effected if such transfer would result in the Company having a class of security held of record by 2,000 (or such other number as may be applicable under the Exchange Act) or more persons, as described in Section 12(g) of the Exchange Act and Rule 12g5-1 promulgated under the Exchange Act (or any successor provisions thereto).

Ankura - 000242

8.3 <u>Conditions to Transfers</u>. As a condition to any transfer, the Company may, in its sole discretion, (i) require in connection with such transfer of Restricted Shares delivery to the Company of a written opinion of legal counsel, in form and substance satisfactory to it or its legal counsel in their respective discretion, that such transfer is exempt from applicable federal, state or other securities laws and regulations, (ii) charge the transferor, transferee or both a transfer fee in such amount as may be reasonably determined by the Company's management in order to recoup the Company's internal and external costs of processing such transfer, due and payable to the Company prior to or upon effectiveness of such transfer, and/or (iii) require such transfer to be effected pursuant to a standard form of transfer agreement in such customary and reasonable form as may be determined by the Company's management from time to time in its discretion.

8.4 <u>Void Transfers</u>. Any sale or transfer, or purported sale or transfer, of securities of the Company shall be null and void ab initio, and the Company shall not be obligated to recognize any right, title or interest of any person or entity, in securities of the Company unless the terms, conditions, and provisions of this Article VII are strictly observed and followed.

8.5 <u>Termination of Restrictions</u>. The restrictions on transfer in Article VII shall terminate immediately prior to the closing of a firm commitment underwritten public offering of common stock pursuant to a registration statement filed with, and declared effective by, the United States Securities and Exchange Commission under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

8.6 <u>Legends</u>. The certificates representing shares of stock of the Company shall bear on their face the following legend so long as the foregoing restrictions on transfer remain in effect:

**"**THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER AS PROVIDED IN THE BYLAWS OF THE CORPORATION**."**

*[Remainder of page intentionally blank]*

Ankura - 000243

IN WITNESS WHEREOF, the undersigned has executed this Amendment No. 1 to the Amended and Restated Bylaws as of the date first written above.

/s/ Zachary Lee Prince

Zachary Lee Prince, Secretary

**Exhibit T3E-2**

**[Form of Rate Change Announcements†]**

**Update to BlockFi Interest Account (BIA) Rates**

We continually set rates based on market dynamics for lending and borrowing. Our goal is to practice sound risk management and maintain earning opportunities for you with our BlockFi Interest Account (BIA).

We're updating our rates and tiers starting on [DATE] for [TOKENS] in the BlockFi Interest Account (BIA). [TOKENS NOT CHANGING RATES] rates will remain the same.

All rates displayed on the BlockFi rates page [LINK] are current; We'll make the following adjustments starting [DATE]:

**[TOKEN(S) WITH RATE CHANGE]**

| CURRENCY | NEW AMOUNT | NEW APY* | FORMER AMOUNT | FORMER APY* |
|---|---|---|---|---|
| [TOKEN AND TIER (IF APPLICABLE)] | | | [FORMER | [FORMER |
| | [AMOUNT] | [APY]% | AMOUNT] | APY]% |
| [TOKEN AND TIER (IF APPLICABLE)] | | | [FORMER | [FORMER |
| | [AMOUNT] | [APY]% | AMOUNT] | APY]% |

**Background on Rate Updates**

We set rates for the BlockFi Interest Account (BIA) by balancing prudent risk management principles amid shifting market conditions. Rates on cryptoassets held in BIA are primarily driven by demand of institutional investors for borrowing these assets.

These adjustments are part of our ongoing mission to deliver high-quality, long-term service for you while expanding our innovative product offerings in a competitive and scalable way. Throughout our history, we have maintained rewarding crypto interest yields even as cryptoasset prices fluctuate dramatically. As our track record shows, rates may rise or fall, but BlockFi always remains committed to supporting your financial goals.

And if you have any additional questions about our rates, products, or services, please submit a support ticket here [LINK] and we'll be happy to help.

[*Insert additional description as applicable*]
* *APYs reflect effective yield based on monthly compounding. Actual yield will vary based on account activity and compliance with BlockFi's terms and conditions. Rates are largely dictated by market conditions, which are a key factor in BlockFi's ability to provide our clients yield on their crypto assets. For more information, please see BlockFi's Terms of Service [LINK].*

Ankura - 000245

*Disclaimer: Nothing contained in this announcement should be construed as a solicitation of an offer to buy or offer, or recommendation, to acquire or dispose of any security, commodity, investment or to engage in any other transaction. The information provided in this announcement is not intended for distribution to, or use by, any person or entity in any jurisdiction or country where such distribution or use would be contrary to law or regulation. This announcement is not directed to any person in any jurisdiction where the publication or availability of the announcement is prohibited, by reason of that person's nationality, residence or otherwise.*

*The BIAs have not been registered under the Securities Act of 1933 and, unless otherwise exempt from those registration requirements, may not be offered or sold in the United States, to U.S. persons, for the account or benefit of a U.S. person or in any jurisdiction in which such offer would be prohibited.*

*Neither BlockFi nor any of its affiliates or representatives provide legal, tax or accounting advice. You should consult your legal and/or tax advisors before making any financial decisions.*

*Digital currency is not legal tender, is not backed by the government, and crypto interest accounts are not subject to FDIC or SIPC protections.*

† All or portions may be used for rate change blog post, email and other communications to holders.

Ankura - 000246