Adam S. Ravin

Adam J. Goldberg (admitted *pro hac vice*)

Christopher Harris (admitted *pro hac vice*)

Brett M. Neve (admitted *pro hac vice*)

Nacif Taousse (admitted *pro hac vice*)

**LATHAM & WATKINS LLP**

1271 Avenue of the Americas

New York, NY 10020

Telephone: (212) 906-1200

Facsimile: (212) 751-4864

Email:  adam.ravin@lw.com

adam.goldberg@lw.com

christopher.harris@lw.com

brett.neve@lw.com

nacif.taousse@lw.com

Nima H. Mohebbi (admitted *pro hac vice*)

Tiffany M. Ikeda (*pro hac vice* pending*)

**LATHAM & WATKINS LLP**

355 South Grand Avenue, Suite 100

Los Angeles, CA 90071

Telephone: (213) 485-1234

Facsimile: (213) 891-8763

Email:  nima.mohebbi@lw.com

tiffany.ikeda@lw.com

*Counsel to the Joint Liquidators of*
*Three Arrows Capital, Ltd. (in liquidation)*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

---------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BLOCKFI INC., *et al.*,[1] | : | Case No. 22-19361 (MBK) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- x   **Re: ECF Nos. 1346 & 1375**

**THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD. (IN LIQUIDATION)'S (A) OBJECTION TO DEBTORS' MOTION TO ESTIMATE THE AMOUNT OF THE 3AC CLAIMS AGAINST THE DEBTORS PURSUANT TO SECTIONS 105(a) AND 502(c) OF THE BANKRUPTCY CODE (ECF NO. 1346), AND (B) OPPOSITION TO DEBTORS' EIGHTH OMNIBUS OBJECTION TO CLAIMS OF THREE ARROWS CAPITAL, LTD. (ECF NO. 1375)**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 201 Montgomery Street, Suite 263, Jersey City, NJ 07302.

Russell Crumpler and Christopher Farmer, in their capacities as the joint liquidators (collectively, the "**Joint Liquidators**") appointed in the British Virgin Islands ("**BVI**") liquidation of Three Arrows Capital, Ltd. (in liquidation) ("**3AC**") and foreign representatives of 3AC, as recognized pursuant to chapter 15 of the Bankruptcy Code, by and through the undersigned counsel, hereby respectfully file this (a) objection to the *Debtors' Motion to Estimate the Amount of the 3AC Claims Against the Debtors Pursuant to Sections 105(a) and 502(c) of the Bankruptcy Code* (ECF No. 1346) (the "**Estimation Motion**") (cited as "**Est. Mot. at __**") and (b) opposition to the *Debtors' Eighth Omnibus Objection to Claims of Three Arrows Capital, Ltd.* (ECF No. 1375) (the "**Claim Objection**") (cited as "**Claim Obj. at __**") (together, the "**Objection**").  In support of this Objection, the Joint Liquidators rely upon the *Declaration of Brett Neve In Support of the Joint Liquidators of Three Arrows Capital, Ltd.'s (In Liquidation) (A) Objection to Debtors' Motion to Estimate the Amount of the 3AC Claims Against the Debtors Pursuant to Sections 105(a) and 502(c) of the Bankruptcy Code (ECF No. 1346), and (B) Opposition to Debtors' Eighth Omnibus Objection to Claims of Three Arrows Capital, Ltd. (ECF No. 1375)* (the "**Neve Declaration**") filed contemporaneously herewith.  The Joint Liquidators respectfully submit as follows:

## PRELIMINARY STATEMENT

1.      By the Estimation Motion and Claim Objection, the Debtors seek to summarily invalidate claims in excess of $280 million without affording the Joint Liquidators a meaningful opportunity to defend their claims consistent with foundational notions of due process.  Although the Joint Liquidators began serving discovery two months ago, a great amount of discovery required to articulate and prove 3AC's claims remains to be provided.  As the Debtors are well aware, the failure of 3AC's founders to cooperate with the Joint Liquidators has caused significant

informational asymmetries that the Joint Liquidators are currently facing in their litigation with counterparties such as the Debtors. Indeed, until the Debtors recently made an initial document production on August 14, 2023—three days after the Estimation Motion was filed—the Joint Liquidators did not have access to many of the key transaction documents needed to fully articulate their claims. With the benefit of initial discovery from the Debtors, the Joint Liquidators have now amended their proofs of claim to set forth their claims with greater specificity and address the procedural deficiencies about which the Debtors complain. While the Joint Liquidators have made significant progress in developing their claims against the Debtor, further discovery, including expert discovery into 3AC's solvency, is necessary before the parties are prepared to litigate the merits of 3AC's claims.

2.      The Debtors are aware of this dynamic and seize upon it to argue that purported delay in the prosecution of the claims warrants invalidating the Joint Liquidators' claims, regardless of their merits. Est. Mot. ¶¶ 11, 28-29; Claim Obj. ¶¶ 19, 28. The Joint Liquidators respectfully submit that the Court should not sanction this effort to short circuit due process and eliminate their claims. Instead, the Joint Liquidators request the Court, at minimum, adjourn both motions and order a reasonable litigation schedule affording a fair opportunity to conduct discovery and present evidence.

3.      As to the Estimation Motion, the Debtors have failed to carry their burden under section 502(c) of the Bankruptcy Code to show that estimation is necessary to avoid undue delay in the administration of these chapter 11 cases. The Debtors do not (and could not) contend that estimation is necessary to confirm the Plan; rather, the Debtors assert, without any evidentiary support, that estimation is need because liquidation of 3AC's claims "*could* materially delay distributions to creditors." Est. Mot. ¶ 26 (emphasis added). But the Debtors provide no evidence

3

of this whatsoever, including evidence of the expected timeline for making distributions or how that timeline compares with a timeline for determination of 3AC's claims.  And even were distributions imminent, the Debtors have presented no evidence that they are unable to establish a reserve for the 3AC claims—the customary, well-established method of addressing disputed claims—that would allow the Debtors to begin making meaningful distributions to creditors.  For these reasons, the Estimation Motion should be denied.

4.    To the extent the Court determines estimation is warranted, it should be narrowly tailored and proceed solely for purposes of establishing a reserve.  3AC has asserted similar preference claims against other counterparties who are also debtors in their own chapter 11 proceedings, including Genesis, FTX, and Celsius.  A critical issue in each of these claims is *when* 3AC became insolvent.  The Joint Liquidators have a compelling interest in having its preference claims against each of these counterparties decided in a centralized forum to avoid undertaking litigation on multiple fronts on common issues of fact and law, thereby introducing a risk of inconsistent outcomes and judicial decisions on issues that are foundational to the 3AC liquidation. The Joint Liquidators respectfully submit that they should be permitted to litigate the merits of their preference claims in the BVI Proceeding (defined below) or, in the alternative, in their Chapter 15 Case (defined below) and will file a motion seeking relief from stay to that effect contemporaneously with this Objection.  If estimation occurs, it should be limited to the question of an appropriate reserve, without preclusive effect on other proceedings in order to balance the goals of section 510(c) with the goal of having a single forum to make any final merits determination in these many analogous claims against various other debtor and non-debtor entities.

5.    Likewise, the Claim Objection should be denied because the Joint Liquidators were (and remain) entitled to amend their proofs of claim, and the recently-amended proofs of claim

moot the Debtors' objections.  The Debtors seek to invalidate the Joint Liquidators' claims on the grounds that the prior proofs of claim did not "allege facts" and "provide sufficient support" to establish *prima facie* validity.  Claim Obj. ¶ 24.  Aside from conclusory statements that the 3AC Claims are meritless, *id.* ¶ 32, the Claim Objection is devoid of any argument or briefing on the merits of the Joint Liquidators' claims.  And regardless, even if criticisms of the wording of a prior proof of claim were (a) relevant now and (b) accurate, that would only prevent an evidentiary presumption at an eventual merits hearing, rather than being a basis for disallowance of a claim.

6.      In their initial proofs of claim, the Joint Liquidators explained that the proofs of claim were filed in order to preserve potential claims against the Debtors, the Joint Liquidators did not have fundamental information that is necessary to fully articulate their claims, and expressly reserved their rights to amend as further facts are uncovered through discovery.  Since filing the initial proofs of claim, the Joint Liquidators sought discovery from the Debtors and received an initial production of over 4,000 documents on August 14, 2023—seven days before the Claim Objection was filed.  With the benefit of the initial production, the Joint Liquidators have been able to amend their proofs of claim.  The Debtors' Claim Objection, which relies entirely on procedural deficiencies and challenges to the form of the proofs of claim, has been mooted by the amended proofs of claim and, consequently, the Claim Objection should be denied or, at minimum, adjourned.  Now, if the Debtors wish to proceed with an objection to the claims, the Joint Liquidators respectfully submit that the Debtors should be required to renew their objection stating the basis for their objection on the merits and a reasonable litigation schedule should be ordered.

## **BACKGROUND**

**I.    3AC's Liquidation, Appointment of the Joint Liquidators, and the BVI Proceeding**

7.      On June 27, 2022, 3AC commenced a liquidation proceeding (the "**BVI Proceeding**") before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin

Case 22-19361-MBK    Doc 1484    Filed 09/13/23    Entered 09/13/23 15:37:31    Desc Main
Document    Page 6 of 35

Islands (Commercial Division) (the "**BVI Court**"), and that court issued an order, appointing Russell Crumpler and Christopher Farmer as joint liquidators of 3AC. 3AC's BVI Proceeding is governed by the BVI's Insolvency Act of 2003 (the "**BVI Insolvency Act**"). Under BVI law, the Joint Liquidators are court appointed fiduciaries of the 3AC estate, with an obligation to conduct an orderly, fair liquidation of 3AC and to maximize the value of its assets for 3AC's creditors. As liquidators, the Joint Liquidators are "office holders" as defined in section 244 of the BVI Insolvency Act, who are authorized to seek relief from a court setting aside voidable transactions.

8.    On July 1, 2022, the Joint Liquidators commenced a chapter 15 case (the "**Chapter 15 Case**"), and on July 28, 2022, the U.S. Bankruptcy Court for the Southern District of New York granted recognition of the foreign main proceeding pending in the BVI. *See Order Granting Recognition Of Foreign Main Proceeding And Related Relief*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. 2022), ECF No. 47 (the "**Recognition Order**").

## II.    3AC's Relationship With The Debtors

9.    3AC was an investment firm incorporated in the BVI with a focus on trading cryptocurrency and other digital assets. Kyle Davies and Su Zhu (together, the "**Founders**") established 3AC in 2013. 3AC initially focused on foreign-exchange arbitrage before shifting to cryptocurrency trading in 2018. 3AC's investment strategy involved making large, leveraged cryptocurrency trades using funding from the Debtors and other investors.

10.    The Debtors were one of the largest lenders to 3AC. Between 2019 and 2022, the Debtors extended 3AC billions in loans denominated in cryptocurrency and USD (collectively, the "**Loans**") pursuant to that certain Master Loan Agreement by and among 3AC and BlockFi Lending, LLC ("**BlockFi Lending**"), dated as of May 2, 2019 (as amended and restated on April

23, 2020 and amended on February 24, 2021, the "**MLA**").[2]  The Debtors assert that the Loans

were secured by Bitcoin (BTC), interests in Grayscale Bitcoin Trust (GBTC), Grayscale Ethereum

Trust (ETHE), Grayscale Ethereum Classic Trust (ETCG), Grayscale Digital Large Cap Fund

(GLCF), Grayscale Zcash Trust, cash, general intangibles, investment property, and financial

assets.  Est. Mot. ¶ 8; Claim Obj. ¶ 15.

## III.   3AC's Collapse and the Debtors' Seizure of 3AC's Assets

11.   Between 2018 and 2021, as the cryptocurrency market grew, 3AC's strategy was

successful.  However, by May 2022, the cryptocurrency market crashed, and 3AC failed.

12.   3AC began focusing on cryptocurrency in 2018, when the global cryptocurrency

market's value was estimated at just over $100 billion.   Between 2018 and 2021, the

cryptocurrency market grew exponentially, reaching its peak in November 2021 at over $3 trillion

in value.  Between November 2021 and May 2022, however, the global cryptocurrency market

experienced a historic and momentous decline.  By May 3, 2022, it had fallen over $1 trillion, to

$1.9 trillion, and by May 11, 2022, it had fallen to $1.3 trillion.

13.   As the size of the cryptocurrency market shrank, so did 3AC's net asset value

("**NAV**").[3]  For example, the Founders exposed 3AC heavily to the Luna token.[4]  On May 5, 2022,

the price of Luna began to collapse and, on May 7, 2022, UST began to crash and lose its U.S.

dollar "peg," falling to less than $1.  Given the fundamental relationship between the two tokens,

the "de peg" of UST resulted in Luna tokens falling to $0 by May 13, 2022.

---

[2]   The MLA and the First Amendment to Amended and Restated Master Loan Agreement are attached to the Neve Declaration as **Exhibit 1** and **Exhibit 2**, respectively.

[3]   3AC's NAV is calculated by subtracting its assets from its liabilities.

[4]   Luna was the reserve currency for the associated token TerraUSD (UST), which was a "stablecoin" designed to maintain a value of one U.S. dollar.

14. The Luna crash furthered the "meltdown" in cryptocurrency markets, resulting in a crash in the price of Bitcoin and the loss of $300 billion in value in cryptocurrency markets between May 9 and May 12, 2022. This further devastated 3AC. By early May 2022, 3AC's balance sheet had collapsed. 3AC's NAV decreased dramatically between May 4 and May 11, 2022. Ultimately, when taking into account Luna, BTC, GBTC, and its other assets, 3AC lost around $2.7 billion in value between February 28 and May 12, 2022.

15. On information and belief, the Debtors were aware of the decline in Luna and cryptocurrency markets generally from 2021 through 3AC's collapse in 2022, and of 3AC's exposure to the Luna. Despite this, the Debtors loaned more than $938 million to 3AC from May 15 to May 27, 2022, *after the Luna collapse.* The Debtors did not extend any further Loans to 3AC after May 27, 2022. *See Preliminary Report Addressing Question Posed by the Official Committee of Unsecured Creditors:* Why Did BlockFi Fail?, ECF No. 1202 at 52 ("BlockFi knew or should have known that UST and LUNA were substantial components of 3AC's investment portfolio and that 3AC was perilously close to collapse" when BlockFi loaned $938 million to 3AC between May 15 and May 27, 2022).

16. On June 14, 2022, BlockFi Lending purported to accelerate the Loans and foreclose on the 3AC assets under its control.[5] The Debtors have represented that as of June 15, 2022, Loans in the amount of approximately $1.085 billion remained outstanding and that they held purported collateral valued at approximately $1.036 billion. On information and belief, between June 15 and 23, 2022, the Debtors purported to foreclose on the remaining 3AC assets under their control. Although to date the Debtors have only submitted a claim in the BVI Proceeding for $1, the Debtors have asserted in these chapter 11 cases that following the purported foreclosures

---

[5] The notice of acceleration, dated as of June 14, 2022, is attached to the Neve Declaration as **Exhibit 3**.

approximately $117.2 million remained outstanding on the Loans.  ECF No. 1310 at 52.

## IV.    The Debtors' Chapter 11 Cases and 3AC's Claims

17.    On November 28, 2022 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in United States Bankruptcy Court for the District of New Jersey (the "**Court**").

### A.    Initial Proofs of Claim

18.    On the March 31, 2023, the Joint Liquidators timely filed a proof of claim against each of the Debtors (collectively, the "**Initial POCs**").[6]  In the Initial POCs, the Joint Liquidators identified certain Known Claims that the Joint Liquidators had been able to uncover to-date in their investigation, including:

> (a) preference claims under BVI and other applicable law arising from (i) the payment by Three Arrows to the Debtors on May 9, 2022 in the amount of $71,000,000, (ii) an interest payment by Three Arrows to the Debtors on June 3, 2022 in the amount of 6,070,123 USD Coin (USDC), and (iii) various transfers of cash and digital assets by Three Arrows to the Debtors, including the transfers of (v) 34,225 Ether tokens (ETH), (w) 1,905,529 Grayscale Bitcoin Trust shares (GBTC), (x) 6,150,854 Grayscale Ethereum Trust shares (ETHE), (y) 386,477 Grayscale Ethereum Classic Trust shares (ETCG), and (z) $1,691,744, and (b) obligations to repay loans made by Three Arrows to the Debtors in the amount of 2,307.75 Bitcoin.

Claim No. 15592, ¶ 6.

19.    The Joint Liquidators also expressly reserved their rights to *inter alia* amend, clarify, or supplement the Initial POCs.  *Id.* ¶ 8.  The Joint Liquidators explained that their investigation into potential claims remains limited by 3AC's meager record-keeping and the

---

[6]    The Initial Proofs of Claim were filed at Claims Nos. 15592, 25923, 25953, 25958, 25961, 25964, 25984, 25985, and 26292.  The Initial Proofs of Claim are each identical and, consequently, a citation to one Initial Proof of Claim shall constitute a citation to each Initial Proof of Claim.  Claim No. 15592 is attached to the Neve Declaration as **Exhibit 4** for ease of reference.

Founders' failure to cooperate with the Joint Liquidators' efforts in contravention of their duties under applicable law and several court orders, and reserved their rights to amend the Initial POCs and/or assert any new claims based on facts that are subsequently discovered. *Id.* ¶¶ 5, 7-8, 15. In particular, the Joint Liquidators noted that based on the facts available as of the claims bar date there may be other transactions between 3AC and the Debtors that "could constitute the basis for additional claims by Three Arrows and its estate against the Debtors," but that the Joint Liquidators did not possess facts and documentation necessary to assert those potential claims with specificity and instead noted that they "remain subject to the Joint Liquidators' ongoing evaluation and investigation." *Id.* ¶ 6.

### B.    Amended Proofs of Claim

20.      Contemporaneously with the filing of this Objection, the Joint Liquidators filed amendments to the Initial POCs (collectively, the "**Amended POCs**" and the claims asserted therein, the "**3AC Claims**").[7]  The Amended POCs set forth the Joint Liquidators' claims with greater particularity in light of additional facts learned during the course of the Joint Liquidators' investigation, including factual developments learned through review of the initial documents produced by the Debtors during the course of discovery.  By the Amended POCs, the Joint Liquidators assert claims (a) to avoid, pursuant to BVI law, preferential transfers to the Debtors by 3AC while it was insolvent  in the amount of approximately $273 million (using values as of the date of the respective transfers) and (b) for repayment of loans made by 3AC to the Debtors.

21.      From May 5 to June 13, 2022, the Debtors made several margin calls to 3AC.  In

---

[7]    The Amended POCs have been filed with the claims and noticing agent, Kroll Restructuring Administration LLC, and are available on the claims docket.  The Amended POC filed against Debtor BlockFi Inc. is attached to the Neve Declaration as **Exhibit 5** for ease of reference.  The Amended POCs filed against the other Debtors are identical to the Amended POC attached as Exhibit 5.

order to satisfy these margin calls, 3AC either made payments on the Loans in USD or transferred

assets to the Debtors to purportedly serve as additional security for the Loans.  Specifically, 3AC

made the following transfers to the Debtors in response to margin calls (collectively, the "**Margin**

**Call Transfers**"):

- On May 5, 2022, 3AC transferred $29 million to the Debtors, which was applied as payment against the balance of the Loans.

- On May 9, 2022, 3AC transferred $71 million to the Debtors, which was applied as a payment against the balance of the Loans.

- On May 12 and 18, 2022, 3AC transferred 21,205 and 13,200 Ether (ETH), respectively, to the Debtors (the "**ETH Transfers**").[8]  As of the date the transfers occurred, the ETH had a value of approximately $41.1 million and $25.2 million, respectively.

- 3AC, BlockFi Lending, and Canaccord executed that certain Securities Account Control Agreement, dated as of May 27, 2022, with respect to the securities account ending in 477B-1 (the "**Canaccord Account**").  As of May 30, 2022, the Canaccord Account held the following assets with an aggregate value of approximately $100.6 million, comprised of:  (a) 2,005,529 GBTC interests worth approximately $38.0 million, (b) 6,200,854 ETHE interests worth approximately $57.9 million, (c) 386,477 ETCG interests worth approximately $4.6 million, and (d) $137,964.

22.    The Amended POCs assert that each of the Margin Call Transfers is avoidable as a

preference under BVI law.  The Joint Liquidators also reserve the right to assert claims under

section 547 of the Bankruptcy Code in the event a plenary case is commenced with respect to 3AC.

23.    In addition, the Joint Liquidators assert claims for repayment of 2,307.5 BTC that

3AC lent to the Debtors.  The Debtors transferred 31,345 ETH to 3AC as collateral for the loan.

On information and belief, the Debtors did not repay the loan and 3AC dissipated the ETH

collateral.  The Joint Liquidators assert a claim for repayment of the BTC loan, net of the value of

---

[8]    The ETH transferred to the Debtors was subsequently converted to approximately 2,046 BTC between June 2 and 4, 2022.

the ETH collateral (each valued as of the date the BVI Proceeding was commenced), in the amount

of not less than $10.4 million (the "**BTC Loan Claim**").

24.      In aggregate, the Joint Liquidators assert claims against the Debtors of not less than

$283.4 million.

## **OBJECTION**

**I.    The Debtors' Have Not Carried Their Burden Under Section 502(c) of the Bankruptcy Code**

25.      The Estimation Motion should be denied because the Debtors have failed to carry

their burden under section 502(c) of the Bankruptcy Code to show that estimation is necessary to

avoid undue delay in the administration of the chapter 11 cases.   Section 502(c)(1) of the

Bankruptcy Code provides that "[t]here shall be estimated for purposes of allowance under this

section any contingent or unliquidated claim, the fixing or liquidation of which, as the case may

be, would unduly delay the administration of the case."   The Bankruptcy Code's "general rule is

to liquidate, not estimate."   *In re Dow Corning Corp.*, 211 B.R. 545, 560-61 (Bankr. E.D. Mich.

1997); *see In re North Am. Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016)

("[E]stimation is a second-best method").

26.      The Debtors incorrectly assert that the 3AC Claims are contingent because the Joint

Liquidators have not yet obtained relief from the automatic stay to pursue the 3AC Claims or

otherwise litigated those claims to judgment.  Est. Mot. ¶ 23.  But a claim is not contingent "if all

events giving rise to liability occurred prior to the filing of the bankruptcy petition."   *In re Nugent*,

254 B.R. 14, 37 (Bankr. D.N.J. 1998); *see, e.g., Matter of M. Frenville Co., Inc.*, 744 F.2d 332,

336 n. 7 (3d Cir. 1984) (stating that a contingent claim is one "which the debtor will be called upon

to pay only upon the occurrence or happening of an extrinsic event").   If all the events giving rise

to liability occurred prepetition, it is "immaterial" that the claim "is not adjudicated or liquidated,

or that the claim is disputed." *In re Nicholes*, 184 B.R. 82, 89 n. 7 (9th Cir. BAP 1995).  Indeed,

courts have consistently rejected arguments that claims are contingent because the claim has not

been reduced to a judgment where all of the facts that would give rise to liability occurred

prepetition.  *See Id.* 184 B.R. at 89 ("[T]he fact that a claim has not been reduced to judgment does

not render it contingent."); *Matter of Knight*, 55 F.3d 231, 236 (7th Cir. 1995) (rejecting argument

that claims for governmental fines would become "noncontingent only when a triggering event

(such as the entry of a final judgment) occurs to make the claim immediately due" because "all of

the allegations upon which the fact of liability is based related to events that have already

occurred").

27.     Here, all the facts upon which liability is based—namely, the transfers of certain

3AC assets to BlockFi—occurred prepetition.  The fact that the Joint Liquidators have not litigated

the 3AC Claims to judgment, or been granted relief from the automatic stay to do so, does not

make the claims contingent.  The Debtors suggestion that because the Joint Liquidators have not

obtained relief from the stay to liquidate the 3AC Claims makes them contingent would lead to the

absurd result that as of the petition date every disputed or unliquidated claim that has not been

litigated to a final judgment prepetition is also a contingent claim.  In any event, the Joint

Liquidators will file a motion for relief from stay contemporaneously with this Objection to

liquidate the 3AC Claims in the BVI proceeding or, alternatively, in the chapter 15 Case.

28.     With respect to undue delay, section 502(c)(1) requires more than a showing that

estimation will be more expedient than liquidation.  "Liquidation of a claim, in fact, will almost

always be more time consuming than estimation."  *Dow Corning*, 211 B.R. at 563.  Rather, undue

delay requires that the delay in administration of the estate is "unjustifiable."  *Id.*; *see In re Teigen*,

228 B.R. 720, 722 (Bankr. D.S.D. 1998) ("Although liquidation of a claim may take longer, the

delay is only undue if it is unjustifiable."). In considering whether a delay is undue, courts consider "all the circumstances in the case," including "[t]he costs and benefits associated with both liquidation and estimation." *Teigen*, 228 B.R. at 722. The Debtors have the burden of demonstrating that liquidation of the 3AC Claims would result in undue delay. *See Dow Corning*, 211 B.R. at 573-74 ("[T]he party moving for estimation must show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process. . . . It is therefore incumbent on the movant(s) to establish particulars as to why the delay which would be engendered by a typical liquidation would be undue in a particular circumstance."); *In re Apex Oil Co.*, 107 B.R. 189, 192 (Bankr. E.D. Mo. 1989) ("[T]he duty to estimate is not mandatory until the court determines that liquidation of the claim outside of the bankruptcy court would unduly delay the bankruptcy proceeding.").

29.    Here, the Debtors do not explain the projected timeline for making distributions or how that timeline compares with the timeline for liquidation of 3AC's claims.[9] Notably, the Debtors do not (and could not) contend that estimation is a prerequisite to confirmation of the Plan. Instead, the Debtors assert in conclusory fashion that estimation is necessary because liquidation of the 3AC Claims "*could* materially delay distributions to creditors." Est. Mot. ¶ 26 (emphasis added). Yet, the Debtors have failed to provide any evidence that liquidating the 3AC Claims would delay distributions. While the Debtors' assert in their motion that liquidation *could* delay distributions, nowhere do they state that estimation of the 3AC Claims is necessary to begin

---

[9]    There is reason to believe based on recent experiences in similarly complex crypto chapter 11 cases that there could be significant delays in making distributions under the Plan. For example, in the Voyager chapter 11 cases, initial distributions under the Plan were significantly delayed due to an array of complications, ranging from regulatory scrutiny of crypto liquidations to fund distributions to logistical and operational challenges. *See* Tr. at 8:22-11:8, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. June 6, 2023) (relevant excerpts of which are attached to the Neve Declaration as **Exhibit 6**). Voyager's liquidating plan went effective on May 19, 2023 and the plan administrator did not make the first distributions were until June 23, 2023. *See In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. June 23, 2023), Dkt. No. 1480.

making distributions.

30.     Moreover, even if distributions were imminent, there is a well-established mechanism under bankruptcy law—the disputed claims reserve—to allow the Debtors to begin making distributions while disputes regarding the 3AC Claims are resolved.  It is highly unusual for all claims to be resolved pre-confirmation (or even pre-distribution); instead, for large, disputed claims it is normal to reserve for them.  Indeed, in the only cryptocurrency-related chapter 11 case counsel is aware of in which a plan has been confirmed, over 50% of the assets available for distribution were reserved, and 33% of the assets available, or $445 million, were reserved for preference claims by a single creditor.  *See In re Voyager Digital Holdings, Inc.*, Case No 22-10943, ECF No. 1374 (Bankr. S.D.N.Y. May 5, 2023), at 4.

31.     The Debtors' Plan, as with nearly all chapter 11 plans, in fact already contemplates the creation of a Disputed Claims Reserve, which is defined as "an appropriate reserve . . . for Distributions on account of Disputed Claims that are subsequently Allowed after the Effective Date."  Plan, art. I.A.105.  The Debtors have presented no evidence that they are unable to reserve for the 3AC Claims.

32.     The Debtors' further assert that the Joint Liquidators' purported delay in pursuing the 3AC Claims is a basis to estimate the 3AC Claims at $0, regardless of their merit, because liquidating the 3AC Claims "could take a significant amount of time to resolve."  Est Mot. ¶¶ 28-29.  The fact that it would take more time to liquidate the 3AC Claims than it would to summarily estimate them at $0 is a truism that cannot serve as a basis for estimation.  *See Dow Corning*, 211 B.R. at 563.  Notably, the Debtors provide no case that estimated a claim at $0 merely because it would take time to liquidate it.

33.     Moreover, the Debtors' suggestion that the Joint Liquidators have unjustifiably

delayed in pursuing the 3AC Claims is contradicted by the clear record here. The Joint Liquidators are officers of the BVI court that owe fiduciary duties to all 3AC creditors. Consistent with those obligations, and well-established practice in BVI liquidations, the Joint Liquidators have taken a thorough, judicious approach to their investigation; only pursuing claims where they are able to satisfy themselves that doing so is in the best interest of 3AC's creditors.

34.    The Joint Liquidators have complied with all deadlines. They timely filed the Initial POCs to identify certain known claims and preserve potential claims against the Debtors. The Joint Liquidators stated in the Initial POC that their investigation is ongoing and expressly reserved their rights to amend the Initial POC as they uncover more information through their investigation. Claim No. 15592, ¶¶ 5-8. As the Joint Liquidators have now explained across a number of filings, those efforts have been, and remain, inhibited by 3AC's incomplete books and records and the refusal of the Founders to cooperate with the Joint Liquidators' efforts. *Id.* ¶ 7; *see also In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Aug. 1, 2023), Dkt. No. 109; *Letter to Judge Lane*, *In re Genesis Global Holdco, LLC*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y. Aug. 1, 2023), Dkt. No. 563; *see also* Tr. at 20:10-12, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. Aug. 8, 2023) (MG) (Bankr. S.D.N.Y. June 6, 2023) (Judge Glenn commenting that Davies "thumbed his nose at this Court and every other court that has tried to get his cooperation") (relevant excerpts of which are attached to the Neve Declaration as **Exhibit 7**). The Joint Liquidators have exercised all formal means of discovery available in the BVI, the United States, and elsewhere to compel the Founders' cooperation and obtain access to 3AC's records. *See, e.g., In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. 2022), Dkt. No. 100, ¶ 5. The Joint Liquidators have also been able to supplement 3AC's records through informal and formal third-party discovery.

16

35.     Indeed, the Debtors' complaints about timing are particularly inappropriate given their role in any delay.  In furtherance of their investigation into potential claims against the Debtors, the Joint Liquidators sent a letter to the Debtors on February 21, 2023 requesting critical information and documents necessary to identify and articulate the 3AC Claims with greater particularity.  The Debtors did not provide any information or documents (aside from a generic high-level description of the relationship between the Debtors and 3AC) or otherwise cooperate with the Joint Liquidators' request for information.  The Joint Liquidators then served discovery on the Debtors on July 14, 2023 targeted at, among other topics, obtaining critical information regarding transactions among the Debtors and 3AC that go to the heart of the 3AC Claims—a fact that the Debtors notably omitted form their papers.  On August 14, 2023, three days after the Debtors filed the Estimation Motion, the Debtors produced more than 4,000 documents in response to the Joint Liquidators' requests.  While further discovery is needed to liquidate the 3AC Claims, whether through estimation or another process, the Joint Liquidators' review and assessment of the Debtors' initial production was a critical step to enabling the Joint Liquidators to prepare and file the Amended POCs.

36.     Thus, the Joint Liquidators have been diligently pursuing their investigation through all available means, including through formal discovery served on the Debtors, and any purported delay in prosecuting the 3AC Claims is a product of the extraordinary challenges presented by the 3AC liquidation.  Those challenges should not serve as a basis to prejudice 3AC's creditors by invalidating the 3AC Claims.

37.     For the foregoing reasons, the Debtors have failed to carry their burden to demonstrate an undue delay under section 502(c)(1) and, consequently, the Estimation Motion should be denied.

**II.    To the Extent Estimation is Warranted, It Should be Narrowly Tailored to Determining an Appropriate Reserve for 3AC's Claims and an Appropriate Schedule for Estimation Should Be Established**

38.    To the extent the Court determines that estimation is warranted here, estimation should be narrowly tailored to balance the goals of section 502(c)(1) with 3AC's due process interest in a full and fair adjudication of its claims.  While bankruptcy courts have discretion to order estimation procedures appropriate to the circumstances, courts have consistently cautioned: "Because estimation is a second-best method, [the scope of estimation] should be confined to the extent necessary to accomplish the overarching goal of avoiding undue delay . . . and not expanded beyond that point." *North Am. Health Care*, 544 B.R. at 689.  Here, the 3AC Claims should, at most, be estimated only for purposes of establishing an appropriate reserve—not for allowance. *See In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 423 (Bankr. S.D.N.Y. 2003) (holding that estimation is not appropriate for allowance and stating that "since the caselaw makes it clear that Bankruptcy Courts have a great flexibility in estimation procedures, it raises risks of denial of due process, and Bankruptcy Courts need to be sensitive to this concern").

39.    3AC has asserted similar claims against other counterparties who are also debtors in their own chapter 11 proceedings.  Namely, 3AC has filed proofs of claim asserting claims on similar legal theories with common issues of fact and law against Genesis Global Holdco, LLC and its debtor affiliates (collectively, "**Genesis**") (in whose Chapter 11 cases the Joint Liquidators have sought relief from the automatic stay for substantially the same reasons set forth here), against FTX Trading Ltd. and its debtor affiliates (collectively, "**FTX**"), and against Celsius Network LLC

and its debtor affiliates ("**Celsius**").[10]  A critical issue in each of these claims is *when* 3AC became

insolvent.

40.     The 3AC estate and all of its stakeholders have a compelling interest in having the

3AC Claims adjudicated, along with all other analogous claims 3AC has against other

counterparties involving common questions of fact and law, in a centralized forum to avoid

undertaking litigation on multiple fronts in multiple forums on the same issues and thereby risking

inconsistent outcomes and judicial decisions on issues that are central to the 3AC liquidation.  Not

only would multifront litigation require the 3AC estate to expend substantial resources litigating

the same issues in multiple courts in parallel, and in doing so risk inconsistent outcomes with

respect to similarly situated defendants, but any unfavorable outcome in any one court could be

used against 3AC in other courts (via the doctrine of equitable estoppel) notwithstanding active

litigation on the same issue.  Such an outcome would grant an undue litigation advantage to 3AC's

adversaries by providing them with a basis to cherry-pick the outcomes of multiple proceedings

and argue that 3AC should be tied to every unfavorable outcome in any one court.  In consideration

of these issues, the Joint Liquidators respectfully submit that they should be permitted to litigate

the merits of the 3AC Claims in the BVI Proceeding or, in the alternative, in the Chapter 15 Case

and will file a motion seeking relief from the automatic stay to that effect contemporaneously with

this Objection.

41.     To the extent the Court determines estimation in these Chapter 11 Cases is

appropriate, narrowly tailoring estimation for purposes of establishing a reserve, without

---

[10]    As stated in the Initial POCs, the information available to the Joint Liquidators regarding 3AC's assets, business,
affairs—including 3AC's relationships with the Debtors and other third parties—has been severely limited by the
lack of cooperation from the Founders and its incomplete books and records.   Accordingly, the Joint Liquidators
may uncover additional claims, including claims of a similar nature to the 3AC Claims, against additional parties.

preclusive effect on other proceedings in order to balance the goals of section 510(c) with the goal of having a single forum to make any final determination on the many analogous claims. Specifically, estimation solely for purposes of establishing a reserve would remove any potential impediments to making distributions (to be clear, none currently exist) while minimizing prejudice to 3AC by preserving the Joint Liquidators' rights to litigate the claims to a final adjudication on the merits in a centralized forum.

42.    In addition, if the Court decides to estimate the 3AC Claims, the Court should order an appropriate litigation schedule for estimation.  Any such schedule should afford 3AC a fair opportunity to conduct discovery and present evidence in support of its claims.

43.    The Debtors' estimation motion commenced a contested matter.  Fed. R. Bankr. Pro. 9014; *see In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 136 (Bankr. D. Del. 2005).  As in other contested matters, civil discovery rules apply.  Fed. R. Bankr. Pro. 9014(c) (applying Rules 7026 and 7028 to 7037 to contested matters).  As discussed above, the Joint Liquidators have sought discovery related to the 3AC Claims and require further discovery with respect to those claims, including in all likelihood expert discovery on the solvency issues (among other potential subjects for expert discovery).  Obtaining discovery is critical to the 3AC Claims because, despite their diligent efforts to obtain information related to transactions between 3AC and the Debtors, the Joint Liquidators' investigation has been limited by 3AC's incomplete books and records and the lack of cooperation from the Founders.  The Founders' failure to cooperate with the Joint Liquidators has caused severe information imbalances that the Joint Liquidators are currently facing in their litigation with counterparties such as the Debtors.  Ignoring these facts and circumstances, the Debtors have scheduled what purports to be a merits hearing on the Estimation Motion for September 20, 2023, where they will seek to summarily estimate the 3AC Claims at

$0 for all purposes.[11]    Having a hearing on estimation before the Joint Liquidators have an opportunity to complete discovery that will be necessary to litigate—even in an expedited estimation proceeding—the merits of the 3AC Claims would deny the Joint Liquidators the opportunity to conduct the discovery to which they are entitled under the Bankruptcy Rules.

44.    Further, the Debtors have not asserted their purported defenses to the merits of the 3AC Claims with sufficient specificity to afford the Joint Liquidators a fair opportunity to respond and prepare for a hearing on the merits.  Aside from conclusory statements about the existence of "substantive defenses" to the 3AC Claims, the Debtors arguments for estimation rely entirely on alleged deficiencies in the Initial POCs and the Joint Liquidators' delay in pursuing the claims. Est. Mot. ¶¶ 23-24, 28-29.  As discussed herein, any such deficiencies in the Initial POCs have been addressed by the filing of the Amended POCs.  Likewise, the Joint Liquidators have been diligently pursuing their investigation into 3AC's claims against the Debtors and, in any event, any delay has not prejudiced the Debtors and is not a valid basis to summarily estimate the 3AC Claims at $0.  While the Estimation Motion is silent as to substantive defenses, the Claim Objection includes a laundry list of potential defenses, none of which are explained or briefed.  Claim Obj. ¶ 30.  The Debtors appear poised to spring their potential defenses on the Joint Liquidators in reply briefing mere days before the September 20 hearing, which would deprive the Joint Liquidators of a reasonable opportunity to prepare their case in support of the 3AC Claims.

45.    For the reasons set forth herein, in the event that the Court determines estimation is

---

[11]    For comparison, the estimation process in similarly complex chapter 11 cases has often taken in excess of 100 days.  *See In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. Apr. 24, 2023) (scheduling estimation trial on fraudulent transfer claims for 101 days from the filing of estimation procedures motion); *In re MatlinPatterson Global Opportunities Partners II L.P.*, Case No. 21-11255 (DSJ) (Bankr S.D.N.Y. Feb. 10, 2023), Dkt. No. 778 (scheduling estimation trial on claims asserted by foreign representatives of Brazilian insolvency estate against chapter 11 debtor alleging alter ego and veil piercing theories for 115 days from filing of estimation procedures motion).

warranted, the Joint Liquidators respectfully request that the Court adjourn the Estimation Motion

and instead order a litigation schedule that would (a) afford the parties an opportunity complete

discovery into the 3AC Claims (which will be necessary regardless of the forum in which the

merits of the claims are ultimately litigated) and (b) permit the Joint Liquidators to further amend

their POCs after discovery is completed.  Then, the Joint Liquidators respectfully request that the

Court enter an appropriate scheduling order for estimation of the 3AC Claims on the merits

following completion of fact discovery.

**III.    The Debtors' Claim Objection Should Be Denied Because the Joint Liquidators Are Entitled to Amend the Initial POCs**

46.    The Debtors seek to invalidate 3AC's POCs, which are in excess of $283 million

and involve complex transactions between 3AC and the Debtors over three years, without

discovery or a hearing on the merits on the grounds that the Joint Liquidators fail to "allege facts"

and "provide sufficient support" for the 3AC Claims to establish *prima facie* validity.  Claim Obj.

¶ 24.  Aside from conclusory statements that the 3AC Claims are meritless, *id.* ¶ 32, the Claim

Objection is devoid of any argument or briefing on the merits of the Joint Liquidators' claims.

47.    The Joint Liquidators filed the Initial POCs to preserve potential claims against the

Debtors and, as noted herein, explained in detail that further information was necessary to more

fully articulate the claims and the Joint Liquidators intended to supplement and, as necessary,

amend the Initial POCs as their investigation progressed.  Claim No. 15592 ¶¶ 5-8.  Since filing

the initial proofs of claim, the parties have been engaged in discovery and the Joint Liquidators

received an initial production of over 4,000 documents on one week before the Claim Objection

was filed.  Those documents have enabled the Joint Liquidators to file the Amended POCs to state

their claims with greater particularity.    Accordingly, the Amended POCs moot the Claim

Objection, which relies exclusively on procedural deficiencies and complaints about the form of

the proofs of claim.  Now, if the Debtors wish to proceed with an objection to the claims, the Joint Liquidators respectfully submit that the Debtors should be required to renew their objection stating the basis for their objection on the merits and, to the extent the Joint Liquidators are not granted relief from stay to pursue the claims litigation in the BVI or the chapter 15 case, a reasonable litigation schedule should be ordered.

48.     Indeed, the Claim Objection should be denied because automatic disallowance is not the penalty for failure to comply with the procedural requirements for claims.  The requirements for a creditor's proof of claim are set out in Bankruptcy Rule 3001, which simply requires "a written statement setting forth a creditor's claim."  Fed. R. Bankr. Pro. 3001(a).  Every proof of claim must also "substantially conform" to the three-page Official Form.  Fed. R. Bankr. Pro. 3001(a), 9009(a); Official Form 410.  Bankruptcy Rule 3001 sets out specific requirements for additional "supporting information" required for certain claims.  Fed. R. Bankr. Pro. 3001(c)(1).  For example, when a claim is based on a writing, "a copy of the writing shall be filed with the proof of claim," unless it has been lost or destroyed.  Fed. R. Bankr. Pro. 3001(c)(1).

49.     The Bankruptcy Rules not only set out specific requirements for proofs of claim, but also set out the effects of following—or failing to follow—the textual requirements for proofs of claim.  When a creditor "execute[s] and file[s]" a proof of claim "in accordance with these rules [*i.e.,* Rule 3001]," the proof of claim "*shall* constitute prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. Pro. 3001(f) (emphasis added); *see also* 4 COLLIER ON BANKR. ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019) (stating that unless the objector "introduce[s] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer *no further proof* of the merits of the claim") (emphasis added).

50.     When a proof of claim fails to meet the explicit, textual requirements of Bankruptcy

23

Rule 3001, as where it "fail[s] to attach the required documentation," that failure "does not automatically render the claim invalid." *In re Minbatiwalla*, 424 B.R. 104, 112 (Bankr. S.D.N.Y. 2010); *see In re Hartman*, 2009 WL 4043096, at *3 (Bankr. D.N.J. Nov. 20, 2009) ("[F]ailure to attach documents required by Rule 3001 and Official Form 10 is not, by itself, a basis for disallowance of a claim."). Instead, the consequence for not meeting the requirements of Rule 3001 is simply an evidentiary one—the "loss of *prima facie* validity of the claim." *Minbatiwalla*, 424 B.R. at 112; *see Hartman*, 2009 WL 4043096, at *3 ("[I]n cases where the creditor has not meet the standards of Bankruptcy Rule 3001 and Official Form 10, the claim is not automatically disallowed; rather, it is deprived of the prima facie validity which it could have otherwise obtained."); *In re Foy*, 469 B.R. 209, 213 (Bankr. E.D. Pa. 2012) ("[N]oncompliance with F.R.B.P. 3001(c) is not in and of itself grounds for disallowance of a claim. Rather, whether or not a claimant attaches sufficient documentation to comply with F.R.B.P. 3001(c) is only determinative of whether a claimant is entitled to *prima facie* evidentiary status.") (internal citations omitted). Disallowance may result, if at all, only after the creditor has an opportunity to come forward with evidence supporting its claim, but fails to do so. *Minbatiwalla*, 424 B.R. at 112 (allowing creditor to file amended proof of claim within twenty-one days); *In re Linzenberg*, 2011 WL 7095423, at *2 (S.D.N.Y. Dec. 14, 2011) (allowing creditor to remedy defective proof of claim before hearing); *In re Shank*, 315 B.R. 799, 810 (Bankr. N.D. 2004) ("The consequence for [] a deficiency [under Bankruptcy Rule 3001], however, is not disallowance of the claim but denial of the Rule 3001(f) presumption of validity with, if appropriate, leave to the creditor to amend the claim."). That result is required because noncompliance with Bankruptcy Rule 3001 "is not one of the statutory grounds for disallowance," and bankruptcy courts cannot "enlarge or reduce" the "limited grounds for disallowance" provided by statute. *In re Heath*, 331 B.R. 424, 435 (B.A.P. 9th Cir. 2005)

24

(bankruptcy court properly allowed creditors' claims where debtors' objection "relied solely on the alleged lack of prima facie validity" of their proofs of claim); *see Hartman*, 2009 WL 4043096, at *3 (citing *Heath*).

51.    Rather than disallowing a creditor's claims, bankruptcy courts "liberally allow[]" creditors to amend their proof of claim to cure a defect or non-compliance with Bankruptcy Rule 3001. *See, e.g., In re Orion Refining Corp.*, 317 B.R. 660, 664 (Bankr. D. Del. 2004). Applying the standards for allowing amendments to pleadings under Rule 15 to amendments to proofs of claim, courts in this district have recognized that the strong policy in favor of amendments is necessary "to avoid the elevation of form over substance and 'to facilitate the amendment of pleadings except where prejudice to the opposing party would result.'" *In re Brown*, 159 B.R. 710, 714 (Bankr. D.N.J. 1993) (quoting *United States v. Hougham*, 364 U.S. 310, 316, 81 S.Ct. 13, 17, 5 L.Ed.2d 8 (1960)); *see United States v. Owens*, 84 B.R. 361, 363 (E.D.Pa. 1988) ("[A]mendments to proofs of claim should in the absence of contrary equitable considerations or prejudice to the opposing party be freely permitted.") (internal citations omitted). Amendments are routinely allowed to "cure obvious defects, describe the claim with greater particularity or plead a new theory of recovery on facts of the original proof of claim." *Brown*, 159 B.R. at 714; *In re Intern. Horizons, Inc.*, 751 F.2d 1213, 1217 (11th Cir. 1985).

52.    In furtherance of the Bankruptcy Code's preference for resolution on the merits, the informal proof of claim doctrine permits filing of a formal proof of claim that satisfies Bankruptcy Rule 3001 *after* the bar date so long as the creditor filed *some* document in the bankruptcy case setting out "the existence, nature and amount of the claim (if ascertainable)." *In re Am. Classic Voyages Co.*, 405 F.3d 127, 132 (3d Cir. 2005) (internal citations omitted); *see also In re Anderson-Walker Indus., Inc.*, 798 F.2d 1285, 1288 (9th Cir. 1986) ("The reason for [the] 'liberal'

25

rule is elemental.  Bankruptcy courts are courts of equity, and must assure that substance will not give way to form, [and] that technical considerations will not prevent substantial justice from being done.  The 'liberal' rule reflects our preference for resolution on the merits, as against strict adherence to formalities.") (internal citations omitted).

53.    Under both the Rule 15 standard and the informal proof of claim doctrine, bankruptcy courts freely permit amendments to timely filed proofs of claims provided that the initial proof of claim was sufficient to put the debtor on notice that the creditor asserted a claim against it. *See Trans World*, 145 F.3d at 141 (upholding decision allowing amendment to proof of claim to include an unsecured claim (in addition to an administrative claim) where initial timely filed proof of claim "had put [the debtor] on notice that an unsecured claim had been made against it and could be pursued"); *Brown*, 159 B.R. at 714-16 (stating that amendments should be freely given where "there was timely assertion of a similar claim or demand evidencing an intention to hold the estate liable").

54.    Even where the proposed amendment is more than "a correction of an error or involves something beyond the original claim," such that they are more properly considered new claims, courts in this district "apply an equitable test to determine whether to allow the amendment anyway." *Brown*, 150 B.R. at 715; *see In re G-I Holdings, Inc.*, 514 B.R. 720, 755 (Bankr. D.N.J. 2014) (same).  The equitable test "ultimately focus[es] on prejudice, delay and bad faith" with the greatest weight applied to "whether prejudice would result to other parties from allowing the amendments." *Id.* at 716.  In the context of a proof of claim amendment, prejudice does not mean "that if the error is corrected someone will lose, which is almost always true, but that the error itself imposed a cost, as by misleading someone." *Matter of Stoecker*, 5 F.3d 1022, 1028 (7th Cir. 1993).  As relevant here, courts have consistently found that increased administrative and litigation

costs and dilution to other creditors are *not* prejudice that warrant denying an opportunity for amendment.  *See Brown*, 159 B.R. at 717 ("[T]he fact that allowing this amendment may increase the litigation costs of the estate is not the type of prejudice that will overcome the liberal policy towards allowing amendments under Fed. R. Civ. P. 15."); *Stoecker*, 5 F.3d at 1028 (finding that the bankruptcy court abused its discretion in denying leave to amend a proof of claim on the basis that "harm to other creditors" would occur if the amendment were allowed because "the entitlements of the unsecured creditors will be cut down"); *In re McLean Indus., Inc.*, 121 B.R. 704, 710 (Bankr. S.D.N.Y. 1990) ("Increased administration and litigation costs, cited by the Trust as a potential prejudice, are not alone sufficient to overcome the policy favoring liberal amendments, particularly where the trial has not yet commenced.").  Instead, courts find prejudice only where parties have "change[d] their positions to their detriment" in reliance on the originally filed proof of claim.  *Brown*, 159 B.R. at 716.

55.     The party opposing the amendment carries the burden to overcome the policy in favor of amendment by demonstrating that its interest "would be seriously impaired were amendment allowed." *In re NorVergence, Inc.*, 424 B.R. 663, 701 (Bankr. D. N.J. 2010).

56.     Here, the Initial POCs were timely filed and identify certain transactions that the Joint Liquidators believe, based on the information available as of the bar date, are the basis for claims against the Debtors, including BVI law preference claims.   Specifically, the Joint Liquidators asserted that 3AC has (a) preference claims against the Debtors arising from (i) the payment by 3AC to the Debtors of $71 million on May 9, 2022, (ii) an interest payment by 3AC to the Debtors in the amount of 6,070,123 USD Coin (USDC) on June 3, 2022, and (iii) various other transfers of cash, trust shares, and digital assets, including 2,005,529 GBTC interests, 6,200,854 ETHE interests, 386,477 ETCG interests, and $137,964, and (b) claims for the

repayment of a loan extended by 3AC to BlockFi in the amount of 2,307.75 Bitcoin. *See* Claim
No. 15592, ¶ 6. The Joint Liquidators also stated that their investigation into potential claims
against BlockFi is ongoing and that efforts to identify claims have been frustrated by 3AC's limited
books and records and the refusal of the Founders to comply with their obligations to furnish
information. The Joint Liquidators acknowledged that, as of the bar date, they did "not yet have
access to documentation evidencing the Known Claims," and accordingly could not attach
supporting documentation to the Initial POCs. *Id.* ¶ 7. In consideration of the limited information
available to them as of the bar date, the Joint Liquidators expressly reserved rights to, *inter alia*,
"amend, clarify, or supplement" the Initial POCs, including based on further facts discovered
through the Joint Liquidators investigation. *See id.* ¶ 8.

57.     The Initial POCs are sufficient to put the Debtors on notice that 3AC seeks to assert
liability against the Debtors and of the existence and nature of the 3AC Claims. In particular, the
Initial POCs assert preference claims under BVI and other applicable law (*i.e.*, the Bankruptcy
Code) against the Debtors and identified certain specific transfers subject to those claims. The
Joint Liquidators also explained in detail that they "are aware of multiple other transactions
between and among Three Arrows and the Debtors . . . that could constitute the basis for additional
claims by Three Arrows and its estate against the Debtors" but that the Joint Liquidators were
missing critical documents and information necessary to assert the claims with specificity. *Id.* ¶¶
6-7. Now that the Joint Liquidators have obtained further information through discovery from the
Debtors, they have filed the Amended POCs to state the claims with greater particularity and attach
supporting documentation, each of which courts have consistently found are appropriate grounds
for a proof of claim amendment. *See, e.g., Brown*, 159 B.R. at 714.

58.     For these reasons, the Joint Liquidators submit that the Amended POCs are fairly

characterized as amendments to the Initial POCs in that they assert claims against the Debtors that are of the same nature and arising from the same transactions that were discussed in the Initial POCs.  Nevertheless, to the extent the Court determines that the Amended POCs assert any new claims, the balance of the equities weigh in favor of allowing the amendment.  The Debtors and other parties in interest would not be prejudiced by the amendments.

59.      The Plan has not yet been confirmed and the Debtors do not assert that resolution of the 3AC Claims is a gating issue for confirmation—nor could they given that the 3AC Claims are separately classified and deemed to reject the Plan.  The Joint Liquidators timely filed the Initial POCs and the Debtors only filed the Estimation Motion and Claim Objection initiating litigation of the 3AC Claims on August 11 and 21, 2023, respectively, approximately five months after the Initial POCs were filed.  Considering that the Joint Liquidators have amended the POCs at the outset of the claims litigation, neither the Debtors nor any other parties in interest could reasonably have relied on the Initial POCs to their detriment.

60.      Further, neither the Debtors nor other creditors can credibly contend that they are unfairly surprised by any claims asserted in the Amended POCs.  As discussed, there is a severe informational asymmetry in that the Debtors have all information needed to identify and analyze potentially preferential transfers and the Joint Liquidators have had to seek such information from the Debtors through discovery.  Indeed, the Debtors' disclosure statement informs creditors that "defeat[ing] 3AC's claim that BlockFi's foreclosure on nearly $1 billion of collateral posted to secure BlockFi's loans to 3AC was improper, preferential, or both" is "critical" to maximizing recoveries.  ECF No. 1310 at 15.  Based on these statements, the Debtors were aware of potential preference claims of nearly $1 billion arising from transactions with 3AC and disclosed such claims to their creditors in connection with soliciting votes on the Plan.  As a result, neither the

nature of the claims (*i.e.*, preference claims) nor the quantum (*i.e.*, approximately $273 million) is a surprise to the Debtors or other creditors, let alone a surprise that unfairly prejudices such parties, because in proposing, soliciting, and voting on the Plan, the Debtors warned their creditors of potential preference exposure to 3AC that far exceeds what is asserted in the Amended POCs.

61.    The only potential prejudice that has been cited by the Debtors is the expenditure of estate resources to defend against the 3AC Claims that in their view are "meritless."  Claim Obj. ¶ 32.  While the Joint Liquidators disagree with the Debtors' contention that the claims are meritless, the merits of the claims are irrelevant to a request to amend.  *See In re Roper & Twardowsky, LLC*, Case No. 15-32878 (SLM) (Bankr. D.N.J. July 5, 2017) ("The Amended Claim Objectors fail to recognize that the merits of Claim No. 5 are not the subject of the Motion to Amend.").  Likewise, increased administrative or litigation expense has been resoundingly rejected as a basis to deny an opportunity to amend.  *See Brown*, 159 B.R. at 717 (collecting cases); *Center for Professional Advancement v. Mazzie*, 347 F.Supp. 2d 150, 158 (D.N.J. 2004) ("Nor does the Court find that the increased costs of litigation that MetLife complins of are sufficient grounds for a finding of substantial prejudice . . . .").

62.    By contrast, the Joint Liquidators would suffer substantial prejudice if an opportunity to amend were denied.  Denying an opportunity to amend would have the dramatic consequence of invalidating hundreds of millions of dollars of claims against the Debtors to the detriment of 3AC's creditors.  *See Stoecker*, 5 F.3d at 1028 ("Nothing in the principles or practicalities of bankruptcy or in the language of any rule or statute justifies so disproportionate a sanction for a harmless error.  Forfeitures of valuable claims, and other heavy sanctions, should be reserved for consequential or easily concealed wrongs."); *In re WPRV-TV, Inc.*, 102 B.R. 234, 238 (Bankr. E.D. Okla. 1989) (holding that allowing amendment, even where creditor did not assert

amount of claim, was consistent with the intent of permissive amendment rules to "equitably prevent[] the potentially devastating effect of the failure of a creditor to formally comply with the requirements of the Code in the filing of a Proof of Claim, when, in fact, pleadings filed by the party asserting the claim during the claims filing period in a bankruptcy case puts all parties on sufficient notice that a claim is asserted by a particular creditor").  Such a result would be particularly inequitable considering that 3AC's creditors are the principal victims of the Founders' wanton failure to cooperate with the Joint Liquidators, which was the ultimate cause of any failure to comply with the technical requirements of Bankruptcy Rule 3001.

63.     Finally, there is no undue delay or bad faith here that would warrant denial of an opportunity to amend.  As previously discussed, and stated plainly in the Initial POCs, the Joint Liquidators lacked critical information to fully articulate their claims as of the bar date and also lacked key supporting documents.  The Joint Liquidators have pursued all available means, including pursuing discovery from the Debtors, in an effort to supplement 3AC's records and obtain information necessary to supplement the Initial POC.

64.     Under the circumstances here, the Joint Liquidators submit that the balance of the equities weighs heavily in favor of allowing the amendment even if the Court were to determine that the Amended POCs assert new claims.

65.     For the reasons set forth herein, the Joint Liquidators respectfully submit that the Court should overrule the current Claim Objection and grant the Joint Liquidators leave to amend.

## <u>RESERVATION OF RIGHTS</u>

66.     The Joint Liquidators reserve all rights, claims, defenses, and remedies, including without limitation, to supplement and amend this Objection, to raise further and other objections, to introduce evidence prior to or at any hearing regarding the Estimation Motion and Claim

Objection in the event the Joint Liquidators' objections are not resolved prior to such hearing, to seek to introduce documents or other relevant information in support of the positions set forth in this Objection.

## **CONCLUSION**

67.    For the reasons stated herein, the Court should deny the Estimation Motion and overrule the Claim Objection, grant leave to file the Amended POCs, and grant such other relief as may be just and proper.

*[Remainder of page intentionally left blank.]*

Dated:  September 13, 2023
        New York, New York

Respectfully submitted,

/s/ Adam S. Ravin

Adam S. Ravin
Adam J. Goldberg (admitted *pro hac vice*)
Christopher Harris (admitted *pro hac vice*)
Brett M. Neve (admitted *pro hac vice*)
Nacif Taousse (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  adam.ravin@lw.com
       adam.goldberg@lw.com
       christopher.harris@lw.com
       brett.neve@lw.com
       nacif.taousse@lw.com

– and –

Nima H. Mohebbi (admitted *pro hac vice*)
Tiffany M. Ikeda (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:  nima.mohebbi@lw.com
       tiffany.ikeda@lw.com

*Counsel to the Joint Liquidators of Three Arrows Capital, Ltd. (in liquidation)*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 13th day of September, 2023, a true and correct copy of the foregoing Objection was furnished to all ECF Participants via the CM/ECF system, and further, served by email upon the following:

**Debtors' Counsel**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
**COLE SCHOTZ P.C.**
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Tel: (201) 489-3000
Email: msirota@coleschotz.com
        wusatine@coleschotz.com

Joshua A. Sussberg, P.C.
Christine A. Okike, P.C.
**Kirkland & Ellis LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
Email: jsussberg@kirkland.com
        christine.okike@kirkland.com

Richard S. Kanowitz, Esq.
Kenric D. Kattner, Esq.
**HAYNES AND BOONE, LLP**
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Tel: (212) 659-7300
Email: richard.kanowitz@haynesboone.com
        kenric.kattner@haynesboone.com

**Counsel to the Official Committee of Unsecured Creditors**
GENOVA BURNS LLC
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
Gregory S. Kinoian, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
Tel: (973) 230-2095
Fax: (973) 533-1112

Email: DStolz@genovaburns.com
        DClarke@genovaburns.com
        GKinoian@genovaburns.com

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Kenneth J. Aulet, Esq.
Bennett S. Silverberg, Esq.
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Fax: (212) 209-4801
Email: rstark@brownrudnick.com
        kaulet@brownrudnick.com
        bsilverberg@brownrudnick.com

Stephen D. Palley, Esq.
601 Thirteenth Street, NW
Washington, DC 20005
Tel: (202) 536-1700
Fax: (202) 536-1701
Email: spalley@brownrudnick.com

Tristan G. Axelrod, Esq.
Sharon I. Dwoskin, Esq.
One Financial Center Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201
Email: taxelrod@brownrudnick.com
        sdwoskin@brownrudnick.com

**Office of the U.S. Trustee**
UNITED STATES DEPARTMENT OF JUSTICE OFFICE OF THE UNITED
STATES TRUSTEE ANDREW R. VARA UNITED STATES TRUSTEE,
REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
Lauren Bielskie, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993
Email: jeffrey.m.sponder@usdoj.gov
        lauren.bielskie@usdoj.gov

                                    /s/   Adam S. Ravin
                                        Adam S. Ravin