**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

# DECLARATION OF BRETT WITHERELL, MANAGING DIRECTOR OF BERKELEY RESEARCH GROUP, LLC, IN SUPPORT OF FINAL APPROVAL OF THE DISCLOSURE STATEMENT FOR, AND CONFIRMATION OF, THE DEBTORS' CHAPTER 11 PLAN

I, Brett Witherell, hereby declare under penalty of perjury as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

**Background and Qualifications**

1. I am a Managing Director in the Corporate Finance Financial Institutions Group for Berkeley Research Group, LLC ("BRG"), and serve as a financial advisor to BlockFi Inc., a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2. I have more than twenty years of financial advisory experience, including cash management and liquidity analysis, valuing assets, business plan diligence and development, operational analysis, and solvency assessment. Since joining BRG, I have provided restructuring advice to companies both in chapter 11 and on an out-of-court basis, in the crypto, financial services, automotive, retail, real estate, and technology industries. As an advisor, I have conducted numerous financial, valuation, and/or liquidation analyses for various companies. Prior to my employment at BRG I served in a similar role at FTI Consulting. Before beginning my career in consulting, I served as a Vice President at Anglo Irish Bank where I was heavily involved in the operation to wind down the bank's entire $9 billion U.S. loan portfolio. Additionally, for seven years I served in various treasury and finance roles at EMC Corporation.

3. BRG's corporate finance practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance typically in distressed business settings. BRG has a wealth of experience in providing financial advisory services for in-court and out-of-court restructuring, sale, and wind down scenarios, and enjoys an excellent reputation for its services rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States. BRG professionals have significant restructuring and industry experience assisting distressed companies with financial and operational challenges and working with management teams and boards of directors of large companies facing financial challenges similar to those of the Debtors.

4. BRG has acted as financial advisor, crisis manager, and corporate officer in middle market to large multinational companies in crisis or those in need of performance improvement in specific financial and operational areas across a wide array of industries. Moreover, the professionals at BRG have assisted and advised debtors, creditors, creditors' committees, bondholders, investors, and others in numerous bankruptcy cases, including the bankruptcy cases of *Voyager Digital Holdings, Inc.; Intelsat S.A.; Liberty Power Holdings, LLC; The Collected Group, LLC; CBL & Associates Properties, Inc.; Hospital Acquisition LLC (d/b/a LifeCare); rue21, Inc.; Sports Authority Holdings, Inc.; Specialty Retail Shops Holding Corp. (a.k.a. Shopko); Brookstone Holding Corp.; American Apparel LLC; Rentpath Holdings, Inc.; MF Global Holdings, Ltd.; Le Tote, Inc.; Chrysler (a.k.a. Old Carco LLC); Southern Foods Group; Speedcast International Limited; The Hertz Corporation, LLC; Borden Dairy Company; Nine West Holdings, Inc.; Verity Health System of California, Inc.; Real Industry, Inc.; M & G USA Corporation; Peabody Energy Corporation; Sabine Oil & Gas Corporation; Molycorp Inc.; Refco, Inc.; Spiegel Inc.; W.R. Grace; Penson Worldwide; Dynegy Holdings, LLC; Calpine Generating Company; and Nortel Networks Inc.*

5. I submit this declaration (this "Declaration") in support of approval of the *Disclosure Statement Related to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1310] (as modified, amended, or supplemented from time to time in accordance with its terms, the "Disclosure Statement") and confirmation of the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)*

3

[Docket No. 1564] (as modified, amended, or supplemented from time to time in accordance with its terms, the "Plan").[2]

6. Since November 2022, BRG has been one of the principal advisors to the Debtors.[3] BRG has been involved in the matters leading up to the Debtors' chapter 11 filings, the day-to-day operations of these Chapter 11 Cases, and preparing the Disclosure Statement and Liquidation Analysis. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

7. The statements in this Declaration are, except where specifically noted or otherwise stated herein, based on my personal knowledge or opinion, information that I have received from the Debtors' employees or advisors, or employees of BRG working directly with me or under my supervision or direction, or from the Debtors' books and records. If called to testify, I would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

8. Neither BRG nor I am being specifically compensated for this testimony other than pursuant to BRG's engagement letter with the Debtors.

**The Plan Satisfies the Best Interests Test**

9. Relying on information from the Debtors' advisors and my own personal knowledge, I have reviewed the classification of Claims and Interests under the Plan and the

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed contemporaneously herewith, the Plan, or the Disclosure Statement, as applicable.

[3] Pursuant to the terms of that certain engagement letter between the Debtors and BRG dated November 12, 2022, and that certain engagement letter between the Debtors and BRG dated December 27, 2022, respectively. On February 9, 2023, the Bankruptcy Court entered an order authorizing the retention of BRG as the Debtors' financial advisor and authorizing the appointment of Mark Renzi as the Debtors' Chief Restructuring Officer.

proposed distributions to each Class of Claims. My testimony below that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code is informed by this knowledge.

10. It is my understanding that section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim or interest either accept the proposed plan or receive or retain under the plan property of a value that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This is commonly known as the "best interests" test. I understand that the projected recoveries for the Impaired Claims and Interests under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.

11. To determine whether the Plan satisfies the best interests test, the Debtors, with the assistance of their advisors, prepared a liquidation analysis, which is attached to the Disclosure Statement as Exhibit B (the "Liquidation Analysis"). I oversaw the preparation of the Liquidation Analysis and worked closely with a team of BRG professionals in its development.

12. The Liquidation Analysis estimates the projected recoveries that would result from the liquidation of the Debtors in a hypothetical conversion to chapter 7 of the Bankruptcy Code on or about November 30, 2023 (the "Liquidation Date"), which is then compared with the estimated recoveries to Holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis was completed following due diligence performed by the BRG team, including a review of the Debtors' unaudited financial statements and balance sheets, and was based on a variety of assumptions that I believe are reasonable. The Liquidation Analysis is based on the estimated value of the Debtors' assets and liabilities as of the Liquidation Date in a forced wind-down by a chapter 7 trustee, and incorporates various estimates and assumptions that are customarily used in chapter 11 cases similar to this one, including the projected costs associated with the administration

of the estate and the support required to wind down the Debtors' operations in a hypothetical conversion to a chapter 7 liquidation.[4]

I. **Gross Liquidation Proceeds.**

13. I calculated the gross proceeds available upon a hypothetical chapter 7 liquidation (the "Gross Liquidation Proceeds") based on the value of the Debtors' assets at each entity as of June 30, 2023, the date of the Debtors' most recent unaudited balance sheets available at the time of preparing the Liquidation Analysis. Specifically, I estimated the amount of Cash on hand as of the Conversion Date by projecting from the Cash balances on hand as of June 30, 2023. Estimated Stablecoin as of the Conversion Date was based on pricing as of June 30, 2023, and assumes a 1:1 peg to U.S. Dollars. Estimated Digital Asset values as of the Conversion Date are based on pricing as of June 30, 2023, and are discounted using historical average intra-day trading prices and each respective Digital Asset's implied volatility, as calculated in other comparable company analyses.[5] Certain illiquid Digital Assets are liquidated at a discount to account for market depth and trading dynamics. Furthermore, the Debtors have certain Digital Assets that are staked, primarily consisting of ETH, none of which were liquid at the time that the Liquidation Analysis was prepared. The Debtors' estimated Gross Liquidation Proceeds were also contingent upon the recovery of collateral from certain counterparties.

14. *Emergent and Alameda Collateral.* The Debtors believe they have perfected liens for collateral which was pledged pursuant to the Alameda Pledge Agreement and the Emergent Pledge Agreement (each as defined in the Liquidation Analysis). Pursuing this collateral would

---

[4] The assumptions contained within the Liquidation Analysis are subject to potentially material changes.

[5] The Digital Asset and Stablecoin balances were reduced from the June 30, 2023 values to adjust for the potential seizure of certain Digital Assets by the U.S. Department of Justice.

be difficult and requires significant institutional knowledge and expertise. In a hypothetical chapter 7 liquidation, I do not believe that a chapter 7 trustee would be successful in recovering this collateral and balances have been assumed to be recoverable at 0%.

15. *Alameda Loan and FTX Claims.* Additionally, the Debtors hold various claims against both FTX and Alameda regarding, among other things, certain institutional loans, Digital Assets that were previously held on FTX's trading platform, trading funds, and cross-collateralization of Alameda collateral. The Debtors have filed proof of claim forms in the FTX and Alameda bankruptcy proceedings.[6] In the FTX/Alameda bankruptcy proceedings the Debtors were classified as general unsecured creditors, and in a hypothetical liquidation I believe that the Debtors would recover between 25% and 66% of their claims.

16. *Claims Against Other Debtors in Bankruptcy.* The Debtors also hold claims against debtors in various insolvency proceedings, including the chapter 11 cases of Core Scientific[7] and the foreign liquidation proceedings of 3AC.[8] At the time my team and I prepared the Liquidation Analysis, the Debtors would likely be classified as secured creditors in the Core Scientific bankruptcy proceedings and general unsecured creditors in the 3AC bankruptcy proceedings. I believe that the Debtors would expect to recover between 0% and 90% on such claims, depending on recoveries in each respective bankruptcy case or proceeding.[9]

---

[6] *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Nov. 19, 2022).

[7] *In re Core Scientific Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex. Dec. 21, 2022).

[8] *In re Three Arrows Capital, Ltd.*, No. 22-10920 (MG) (Bankr. S.D.N.Y. July 1, 2022).

[9] The Debtors have potential claims against FTX, Alameda, Core Scientific, 3AC, Digistar Norway AS, PrimeBlock Operations LLC, and BK Offshore Fund Ltd. The Liquidation Analysis assumed each claim as dollarized as of the petition date in each respective proceeding.

17. *Mining Portfolio and Other Assets*. The Debtors are party to various loans with third-party cryptocurrency mining companies. Such loans are secured by certain mining equipment. Many of these loans are in default and the Debtors' recovery on these loans is not guaranteed. In preparing the Liquidation Analysis, my team and I assumed that recoveries on these mining loans would vary between 2% and 100%. Furthermore, the Debtors have a portfolio of assets including, but not limited to, certain loans and receivables, equity investments in various public and private companies, and other assets developed internally. In preparing the Liquidation Analysis, my team and I estimated that the Debtors would recover between 0% and 100% on these assets.

18. *Litigation Claims.* The Liquidation Analysis assumes that in a hypothetical chapter 7 liquidation preference Claims against the Debtors' U.S. Clients would be fully pursued by a chapter 7 trustee. Under Bermudian law, preference Claims against international Clients are assumed to be zero and therefore, in a liquidation, it is assumed that the chapter 7 trustee would not bring preference Claims against international Clients. However, any U.S. Client who during the 90-day period before the Petition Date either removed funds from the BlockFi Platform or transferred funds from their BlockFi Interest Account or BlockFi Private Client Account to their Wallet Account, in an amount greater than $7,575, would be subject to a preference action from the chapter 7 trustee. The Liquidation Analysis assumes that the chapter 7 trustee would take twenty-one (21) months to pursue said preference actions. The chapter 7 trustee's recoveries were estimated at 25% of the funds subject to the preference claims that were removed from the BlockFi Platform and 100% of the funds subject to preference Claims that remained in Client Wallet Accounts. Professional fees were estimated to be approximately $2.5 million per month and the chapter 7 trustee would receive a 33% contingency fee upon successful recoveries. Any Clients

8

who had a preference payment recovered by the chapter 7 trustee were assumed to receive a general unsecured claim in that amount recovered.

## II. **Liquidation Costs**.

19. In preparing the Liquidation Analysis, my team and I also made certain assumptions and estimations regarding the costs of a hypothetical chapter 7 liquidation. In making such estimations, I assumed that a hypothetical chapter 7 would last approximately twenty-five (25) months, as that was the time estimated for the chapter 7 trustee to complete the sales of substantially all remaining assets, collect receivables, pursue claims against other companies in their respective insolvency proceedings, pursue all preference claims, make distributions, and otherwise administer and close the Debtors' Estates. During this timeline, I assumed that the chapter 7 trustee would take eight (8) months to complete the Wallet Account Claim distributions and seventeen (17) months thereafter to wind-down the Debtors' Estates. In an actual chapter 7 liquidation, the length of the wind-down could vary significantly, which would impact recoveries. The estimated costs of the hypothetical chapter 7 liquidation contemplated under the Liquidation Analysis are as follows.

20. *Chapter 7 Professional Fees*. The estimated professional fees included costs for the chapter 7 trustee to retain financial advisors, attorneys, accountants, and other professionals. I assumed that a chapter 7 trustee would also engage new restructuring advisors and that these advisors would require additional time to acclimate themselves to such a complex case. Such delay would likely increase the professional fees incurred during a hypothetical chapter 7 liquidation. Additionally, I assumed that a chapter 7 liquidation would result in increased employee attrition, which would either require the Debtors' professionals to replace said employees or require the Debtors to hire new employees.

21. Pursuant to these assumptions, I estimated that professional fees for the initial eight (8) months of the liquidation would be incurred at a rate of approximately $6.1 million per month. Upon completing distribution of the Debtors' Wallet Account Claims, the chapter 7 professional fees in the final (17) months of the liquidation would decrease to approximately $2.5 million per month. These estimates also consider additional contingent professional fees incurred upon successful pursuit of preference claims, which as discussed above, were assumed at a 33% rate on a contingency fee basis.

22. *Chapter 7 Trustee Fees*. In a chapter 7 liquidation, the Court may allow reasonable compensation for the chapter 7 trustee's services, so long as such compensation does not to exceed a certain percentage of all proceeds disbursed or turned over in the case by the chapter 7 trustee to parties in interest. Here, the chapter 7 trustee fees were estimated at 3% of the proceeds from the liquidation and excluded recoveries related to Cash and Cash equivalents.

23. *Chapter 7 Estate Wind-Down Headcount*. In a hypothetical chapter 7 liquidation, the chapter 7 trustee will incur certain costs necessary to wind-down the Debtors' Estates. Such expenses include the cost of the Debtors' operating personnel to liquidate customer accounts, technology and platform operating costs, and ongoing support from the Debtors' management throughout the liquidation. After eight (8) months once all Distributions on account of Wallet Account Claims have been made and the BlockFi Platform has been closed, the headcount estimation was eight (8) employees at a cost of approximately $175,000 per month for the remaining seventeen (17) months of the wind-down.

24. *Chapter 7 Estate Wind-Down Other Fees*. To wind-down the Debtors' Estates, the chapter 7 trustee would incur certain vendor, technology, and miscellaneous costs including, among others, ordinary course professionals for legal, tax and accounting support, temporary labor

costs, insurance costs, document management costs, and banking fees. Such expenses include the necessary costs to maintain the BlockFi Platform through the disbursement date of assets held in the Wallet Program as well as costs to maintain limited operations while the chapter 7 trustee pursues long dated, illiquid assets. During the 8-month initial phase of the wind-down, I estimated that the chapter 7 trustee would incur approximately $320,000 per month for technology costs, approximately $345,000 per month for ordinary course professional expenses, and approximately $350,000 per month for other general and administrative costs. Following distributions of assets held in the Wallet Program and the shutdown of the BlockFi Platform, I assumed the chapter 7 trustee's costs would reduce to approximately $10,000 per month for technology costs, approximately $305,000 per month for ordinary course professional expenses, and approximately $200,000 per month for other general and administrative costs.

### III. Analysis of Impaired Classes.

25. Pursuant to the assumptions and estimations discussed above, my team and I calculated the potential high-end and low-end recoveries for each Class of Claims under the Plan and in a chapter 7 liquidation. An illustration of the estimated recoveries for the Impaired Classes under the Plan and in a chapter 7 liquidation, according to the Liquidation Analysis, is depicted below:

| Class | Name of Class Under Plan | Status Under the Plan | Estimated Percentage Recovery Under the Plan (Low) | Estimated Percentage Recovery Under the Plan (High) | Recovery Under Hypothetical Liquidation (Low) | Recovery Under Hypothetical Liquidation (High) |
|---|---|---|---|---|---|---|
| 3-a | BlockFi Lending LLC Private Client Account Claims | Impaired | 93.1% | 100.0% | 81.6% | 100.0% |
| 3-b | BlockFi Lending LLC Loan Collateral Claims | Impaired | 93.1% | 100.0% | 81.6% | 100.0% |
| 3-c | BlockFi International Ltd. Private Client and Interest Account Claims | Impaired | 54.6% | 100.0% | 49.7% | 94.5% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3-d | BlockFi International Ltd. Loan Collateral Claims | Impaired | 54.6% | 100.0% | 49.7% | 94.5% |
| 3-e | BlockFi Inc. Interest Account Claims | Impaired | 39.4% | 100.0% | 35.6% | 63.3% |
| 4-a | BlockFi Lending LLC General Unsecured Claims | Impaired | 93.1% | 100.0% | 81.6% | 100.0% |
| 4-b | BlockFi International Ltd. General Unsecured Claims | Impaired | 54.6% | 100.0% | 49.7% | 94.5% |
| 4-c | BlockFi Inc. General Unsecured Claims | Impaired | 39.4% | 100.0% | 35.6% | 63.3% |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-e | BlockFi Trading LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | n/a | n/a | n/a | n/a |
| 5 | FTX Facility Claims | Impaired | n/a | n/a | n/a | n/a |
| 6 | FTX Avoidable Transfer Claims | Impaired | n/a | n/a | n/a | n/a |
| 7 | Alameda Claims | Impaired | n/a | n/a | n/a | n/a |
| 8 | 3AC Claims | Impaired | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | Impaired | 0.0% | 100.0% | 0% | 100.0% |
| 10 | *De Minimis* Claims | Impaired | 0.0% | 0.0% | 0.0% | 0.0% |
| 11 | Intercompany Claims | Unimpaired/ Impaired | 49.9% | 100.0% | 45.3% | 84.6% |
| 12 | Intercompany Interests | Unimpaired / Impaired | 0.5% | 62.6% | 0.5% | 10.5% |
| 13 | Existing Preferred Equity Interests | Impaired | 0.0% | 13.6% | 0.0% | 0.0% |

| 14 | Existing Common Equity Interests | Impaired | 0.0% | 0.0% | 0.0% | 0.0% |
|---|---|---|---|---|---|---|
| 15 | SEC Penalty Claims | Impaired | 0.0% | 93.0% | 0.0% | 0.0% |
| 16 | Convenience Claims | Impaired | 50.0% | 50.0% | 50.0% | 50.0% |

26. Based on the Liquidation Analysis, both the high-end and low-end recoveries of Impaired Classes under the Plan are greater than or equal to the corresponding recoveries under a hypothetical chapter 7 liquidation. Accordingly, I believe the Plan satisfies the requirements of the "best interests test" under section 1129(a)(7) of the Bankruptcy Code.

**IV.  Intercompany Claims**

27. The operations of the Debtors were interrelated and regularly required transfers and transactions between the different Debtor entities (together, the "Intercompany Transactions"). Each of the Debtors is party to multiple types of transactions and intercompany agreements, including agreements related to the execution of trades in various cryptocurrencies, intercompany service agreements, and capital contribution agreements.

28. The Intercompany Transactions are comprised of transactions in the ordinary course of the Debtors' business to, among other things: (a) reimburse certain Debtor entities for expenditures including employee compensation expenses, sales and marketing expenses, and technology expenses, (b) fund certain Debtors' accounts in anticipation of those expenditures, as needed, and (c) facilitate trading and lending activity.

29. Although each of the Debtor entities is party to some Intercompany Transactions, the primary Debtor entities involved are BlockFi Inc., BlockFi International Ltd. ("BlockFi International"), and BlockFi Lending, LLC ("BlockFi Lending").

30. Before November 28, 2022 (the "Petition Date"), BlockFi Inc., BlockFi International, and BlockFi Lending regularly engaged in Intercompany Transactions to rebalance the digital assets held by those Debtor entities to honor client withdrawals in the ordinary course of the Debtors' business and to adhere to regulatory considerations. In particular, the rapid growth of BlockFi International and its institutional loan program caused BlockFi International to engage in frequent Intercompany Transactions to ensure it had sufficient digital assets to address client demand and to allocate attributable costs between BlockFi International and BlockFi Inc., including costs related to vendor, contractor, and employee compensation, professional fees, and technology, sales, marketing, and other expenses associated with maintaining and operating the BlockFi Platform, based on a percentage of revenue methodology.

31. I understand that the Debtors' policy and practice with regard to tracking and documenting the Intercompany Transactions were implemented in 2021, well before the Petition Date, and have been maintained and enhanced since their inception. The Debtors' goal in designing Intercompany Transaction documentation procedure was to treat the Intercompany Transactions similarly to the Debtors' institutional lending transactions by drafting and executing master loan agreements and term sheets for each individual Intercompany Transaction among the applicable Debtor entities. This documentation procedure served to facilitate the Debtors actively tracking Intercompany Transactions and reviewing expenses to determine the correct allocations of expenses among Debtor entities. Moreover, the robust documentation of the Intercompany Transactions ensured compliance with the regulatory requirements imposed on the Debtors pursuant to the various licenses they held and the businesses they operated.

32. The Debtors maintained monthly general ledgers and books and records for each Debtor entity that, among other things, tracked each Intercompany Transaction to which each

Debtor entity was a party. At month end, the Debtors' practice was to net certain of the Intercompany Transactions according to setoff rights provided in the terms of certain master loan agreements and term sheets. This netting procedure was necessary for certain regulatory reporting purposes and was therefore designed to accurately capture net receivables and/or payables after its application. This netting procedure remained in place from 2021 through the Petition Date.

33. As of the Petition Date, the Debtors' books and records reflected approximately $1.67 billion in claims (together, the "Intercompany Claims") on account of more than ten thousand recorded and documented Intercompany Transactions.

34. The Intercompany Transactions and resulting Intercompany Claims are highly complex and interconnected. In formulating the Plan, the Debtors upscaled the existing netting procedure (the "Netting Procedure") and applied it to the total population of Intercompany Claims to simplify the settlement and reduce the gross amount of the Intercompany Claims to the maximum extent possible. Other members of the BRG team and I were closely involved with the upscaling and application of the Netting Procedure to the Intercompany Claims.

35. The Netting Procedure reduced the total Intercompany Claims to approximately $872.2 million broken down as follows:

- BlockFi Inc. holds Intercompany Claims against:
    - BlockFi International – $555.5 million;
    - BlockFi Trading LLC – $2.4 million;
    - BlockFi Services, Inc. – $1.6 million;
    - BlockFi Investment Products LLC – $0.1 million; and
    - BlockFi Ventures LLC – $2.3 million.

- BlockFi Lending holds Intercompany Claims against:
    - BlockFi Inc. – $273.0 million; and
    - BlockFi International – $36.0 million.

- BlockFi Lending II LLC holds an Intercompany Claim against:
    - BlockFi Inc. – $0.5 million.

- BlockFi Wallet LLC holds an Intercompany Claim against:
    - BlockFi Trading LLC – $0.9 million.

36. The Netting Procedure was designed and implemented to treat all Intercompany Claims equally, which treatment was subsequently reflected in the Intercompany Claims' priority and proposed treatment in the Plan. I believe the proposed treatment of the Intercompany Claims under the Plan is fair end equitable both as between the various Debtor entities holding Intercompany Claims and as to other, similarly-situated creditors.

37. The Netting Procedure was not intended to allocate, nor did it result in the allocation of, value to one Debtor entity to the detriment of another. The Netting Procedure was based solely on the Debtors' established policies and procedures, the Debtors' books and records, and my teams', along with the Debtors' employees', personal knowledge of the Intercompany Transactions and the Intercompany Claims. I believe the Netting Procedure was upscaled and implemented in the Debtors' business judgment appropriately to provide an efficient mechanism to allocate the Intercompany Transactions and minimize the number and amount of Intercompany Claims.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing Declaration are true and correct.

Dated: September 22, 2023                    /s/ *Brett Witherell*
                                             Brett Witherell
                                             Managing Director
                                             Berkeley Research Group, LLC