**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and
Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered) |

**DECLARATION OF SCOTT D. VOGEL,
INDEPENDENT DIRECTOR AND MEMBER OF THE
SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS
OF BLOCKFI INC., IN SUPPORT OF (I) FINAL APPROVAL
OF THE DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE
THIRD AMENDED JOINT CHAPTER 11 PLAN OF BLOCKFI INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

Pursuant to 28 U.S.C. § 1746, I, Scott D. Vogel, hereby declare under penalty of perjury to the best of my knowledge, information, and belief as follows:

### Background and Qualifications

1. I am an independent director and member of the special committee (the "Special Committee") of the board of directors of debtor BlockFi Inc. (the "Board"). I submit this declaration (this "Declaration") in support of (i) final approval of the *Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1310] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") and (ii) confirmation of the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Technical Modifications)* [Docket No. 1564] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

2. In addition to my role as independent director of the Board and member of the Special Committee, I am currently a managing member of Vogel Partners LLC and have occupied that position since 2016. Prior to 2016, I was a managing director at Davidson Kempner Capital Management, LLC for fourteen years. Before joining Davidson Kempner, I was an analyst at MFP Investors LLC and Chase Securities, Inc, focusing on investing in special situations and turnaround opportunities. I have also served on many boards during my career, including, Merrill Corporation, ModSpace, Key Energy, Alpha Metallurgical Resources, Arch Coal, PetSmart, Seadrill, Bonanza Creek Energy, Inc., Neiman Marcus Group, CBL Properties, rue21, Voyager

---

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan or the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) an Order Confirming the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Brief"), filed contemporaneously herewith, as applicable.

Digital Holdings, Inc., Cyxtera, and Avaya. I hold a Bachelor of Science in business administration from Washington University and a Master's in Business Administration from The Wharton School of the University of Pennsylvania.

3. I have no connection with any potential party that was within the Special Committee's mandate to investigate, and prior to my appointment to the Board and the Special Committee, I had no affiliation with the Debtors. Except as otherwise noted, I have personal knowledge of the matters set forth herein. I am over the age of 18 and if I were called upon to testify, I could and would testify competently to the facts set forth herein.

### Appointment to Special Committee

4. On November 25, 2022, as part of installing independent directors or managers at several Debtor entities (each an "Independent Director" and collectively, the "Independent Directors"), the Debtors appointed me as an Independent Director at BlockFi Inc. Concurrently therewith, the Board voted to establish the Special Committee comprised of me and Jennifer Hill, who has been a member of the Board since 2021. The Special Committee was established to conduct an independent investigation with respect to, among other things, the Debtors' historical transactions, including all potential estate claims and causes of action against the Debtors' insiders (the "Investigation"). I understand that Ms. Hill recused herself from the Investigation because the Investigation ultimately covered numerous transactions that had occurred during her tenure on the Board. Thus, I directed the Investigation in my capacity as an Independent Director of the Special Committee.

### The Investigation

5. Beginning in early December 2022, shortly after the Petition Date, I directed the Debtors' co-counsel at Kirkland & Ellis LLP ("Kirkland") to begin the Investigation to examine

potential claims and causes of actions the Debtors may have against insiders (if any). The Investigation was highly iterative, as it expanded to consider additional topics the Special Committee became aware of as it reviewed documents and interviewed witnesses. The topics the Investigation ultimately covered included, but were not limited to:

- the Debtors' business in general;

- the Debtors' risk and investment policies and, specifically, how those policies were applied to the transactions listed below;

- the Debtors' investments in (and acceptance of collateral related to) the Grayscale Bitcoin Trust ("GBTC");

- the Debtors' dealings with 3AC and its affiliates;

- withdrawals from the Debtors' platform (to the extent there were any) by the Debtors' insiders;

- the Debtors' dealings with Alameda Research Ltd. and FTX generally, including the time periods before and after the Debtors' transaction with FTX Trading Ltd. and its affiliates (collectively, "FTX") that was announced July 1, 2022 (the "FTX Transaction");

- the Debtors' compensation of employees generally, and including (but not limited to) certain payments made following execution of the FTX Transaction;

- transactions with a confidential counterparty previously disclosed in detail as part of the Global Notes[3] and during a hearing before the Bankruptcy Court;[4]

- the Debtors' procurement of additional director and officer liability insurance in November 2022; and

- the Debtors' decision to sell digital assets in November 2022.

---

[3] *Global Notes, Methodology, and Specific Disclosures Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* at 23–24, *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. 2022) [Docket No. 242].

[4] *See* 1/9/2023 Hrg. Slides in *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. 2022), pp. 24-26.

4

6. As part of the Investigation, I understand that, consistent with the Special Committee's mandate, Kirkland reviewed approximately 60,000 documents comprising approximately 750,000 pages and conducted formal and informal interviews of approximately 25 witnesses (several of whom Kirkland spoke with on several occasions). The Investigation focused on the foregoing topics but also covered a slew of other subsidiary issues (collectively, the "Investigated Issues"). Kirkland prepared a report summarizing the findings of the Special Committee, which was filed in redacted form on the docket as Docket No. 1173, pages 83–241 (the "Report"), and is attached as **Exhibit A** hereto and incorporated by reference.

7. While Kirkland was investigating at my direction and providing me updates on its work, the Official Committee of Unsecured Creditors (the "Committee") was also conducting its own investigation that covered some of the same topics as the Investigation. Thus, in addition to the specific materials requested and reviewed by Kirkland, I also considered issues raised by the Committee both formally and informally in discussions with Kirkland.

8. In addition to the strength or weakness of the potential estate claims against BlockFi insiders (which, as described in the Report, largely drove my assessment of potential settlements thereof), I also considered two other issues as part of fulfilling my mandate to act in the best interests of the estates.

9. First, I considered the extent to which the Committee Settlement Parties would assist in the Debtors' ability to distribute Digital Assets to creditors. I understand that the Debtors' proposed plan seeks to maintain the capability of reopening the BlockFi Platform and making Distributions of Digital Assets safely and securely, including the capability of building on and improving the BlockFi Platform to make such Distributions. Therefore, I believe that making sure key personnel are available to assist with this process over time is critical, given the likely

relationship between the timing of Distributions to creditors and the resolution of certain of the litigation referenced above. The Special Committee thus took steps to understand which Debtor employees may be necessary to effectuate the in-kind Distributions and considered the value of resolving claims against those individuals, given the challenges in securing services from people that may otherwise be defendants in litigation.

10. Second, it is clear that the ultimate recovery to Clients and other creditors will depend heavily on the Debtors' success or failure in prosecuting and defending against pending and future disputes with BlockFi's commercial counterparties, including Alameda, FTX, Emergent, ED&F Man Capital Markets, Inc., 3AC, and Core Scientific, Inc. Any action that would impair the Debtors' ability to prosecute and defend against these claims would not be value-maximizing for the Debtors Estates and Clients. The Special Committee thus considered which Debtor employees would be essential to the Debtors' efforts to prevail in this litigation and took steps to ensure that such efforts would continue to cooperate with the Debtors, even after the confirmation of a Plan of Reorganization.

11. Throughout the course of the Investigation, Kirkland provided me with regular updates regarding the status of the Investigation, including facts learned, impressions obtained, and relevant legal theories and conclusions, both through formal meetings and email correspondence. During these meetings, I was engaged and asked questions based on my experience regarding the facts being developed and potentially applicable legal theories. These meetings were in addition to my participation in several Board meetings concerning the Debtors' general business and case trajectory.

**Investigation Report and Special Committee's Conclusions**

12. Following the conclusion of the Investigation, Kirkland provided me with a comprehensive and privileged report (the "Investigation Report"). The claims considered in the Investigation Report included potential breaches of fiduciary duty, fraudulent transfers, and preferences (among others), that the Debtors may have against insiders. The Investigation Report analyzed the respective strengths and weaknesses of such claims and provided recommendations on whether the Debtors should assert, reserve, settle, or release those claims and/or causes of action. Non-privileged findings from that Investigation Report are contained in the document attached as Exhibit A, which was previously attached to the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement and Release of Claims and Causes of Action By and Among the Debtors and Certain of the Debtors' Insiders, and (II) Granting Related Relief* [Docket No. 1173].

13. Based on the work described above, I reached several conclusions related to the Investigation. *First*, I believe that the potential claims and causes of action the Debtors' estates have against the Debtors' insiders would be extremely expensive to pursue, particularly in relation to the value of the potential recoveries. Most of the potential claims and causes of action would require a full solvency analysis and expert testimony on solvency and other crypto industry-specific issues. The solvency analysis would be complex and its outcome uncertain for many of the relevant time periods. The pursuit of such claims and/or causes of action would require the expenditure of many millions of dollars—which would be spent on professionals rather than Distributions to Clients—and any net-benefit from pursuing claims against insiders (if any) would not be achieved for years. Although some of the insiders received proceeds from secondary transactions involving the Debtors' equity investors in 2021 or earlier and may have assets to

7

satisfy a judgment, given the risk that any litigation could result in zero recovery for the Debtors' estates, it is challenging to justify prosecution from a cost/benefit perspective. Moreover, even *if* potential claims against insiders had merit, I believe that it is extremely unlikely that such claims could be pursued successfully *and* collected upon in an amount sufficient to make a material difference to BlockFi creditors.

14. **Second**, putting aside the cost of pursuing the litigation, I believe the merits of the potential claims and causes of action are highly speculative, if not frivolous. For the reasons described in the Report, the highest value claims that I considered—claims for breach of fiduciary duty—would face substantial hurdles on the merits and are highly unlikely to succeed. In short, the Investigation did not uncover evidence providing strong support for a claim that the Debtors' insiders breached their fiduciary duties in operating the business. In reaching this conclusion, I also considered the Committee Report. But I determined that the Committee Report hung the entirety of its conclusion (1) on a small number of communications largely taken out of context, which were overwhelmed by a mountain of evidence reflecting that BlockFi's insiders operated the business diligently, and (2) on arguments infused with hindsight bias based on the current understanding of the fraud that took place at FTX/Alameda.

15. Other claims I considered were of lower potential value to the estates as they arose primarily from payments received by certain BlockFi insiders or from transactions entered into with third parties. Thus, I ultimately determined that, although certain of these claims might survive a motion to dismiss, the likelihood of obtaining a favorable judgment on any such claims was highly uncertain, and the damages from such a successful suit would be limited.[5]

---

[5] The Special Committee's view of the lack of relative value from these other potential claims seems to be supported by the lack of attention provided these claims by the Committee in its investigation and the Committee Report.

8

16. *Third*, and finally, in light of these considerations about the merits and value of the potential claims and causes of action, I believe that the most valuable item that the Debtors could acquire from the Committee Settlement Parties through a potential settlement was not any monetary payment, but rather an agreement to provide cooperation both with respect to litigation against FTX, Alameda, 3AC and others and the in-kind distribution of cryptocurrency. It is apparent that *the* key factor in determining the amount of recovery available for clients of BlockFi will be the outcome of litigation between BlockFi and various other cryptocurrency firms currently in bankruptcy, including 3AC, FTX, and Alameda. I believe that the success or failure of those various pieces of litigation is what will make a real difference to creditor recoveries. Accordingly, the Investigation established that the Committee Settlement Parties will be key witnesses for the Debtors in affirmatively litigating claims against 3AC, Alameda, FTX, and others, and in defending against claims asserted by the FTX debtors and 3AC.

## The Settlement

17. The Special Committee agreed to terms of settlement with the Committee Settlement Parties following a multi-day mediation overseen by Hon. Christopher Sontchi, who had been appointed pursuant to a *Mediation Order* entered by this Court at Docket No. 1013. The Mediation Order has strict confidentiality rules, and I will not disclose any of the offers or demands made during that mediation, or any of the negotiations. That said, the terms agreed to were negotiated at arms' length between the Special Committee and its counsel and the Committee Settlement Parties.

18. When the initial mediation sessions before Judge Sontchi concluded, the Committee itself was not supportive of the insider settlements that the Special Committee had

9

reached. But the parties continued to discuss the matter, in another set of confidential mediation discussions.

19. Ultimately, following those mediation discussions, the Debtors, the Committee, and the Committee Settlement Parties agreed to the terms of the settlement to be implemented through the Plan and to be approved by the Court in connection with confirmation thereof (the "Committee Settlement"). The economic consideration being provided by the Committee Settlement Parties toward a global settlement is generally the same as that which the Special Committee had negotiated which, in my view, supports the reasonableness of the settlement itself. But the Committee Settlement was negotiated at arms' length between professionals operating in good faith, and the result is fair.

20. The principal terms of the Committee Settlement are detailed in Article IV.C of the Plan and Article X.Q of the Disclosure Statement, but generally consist of, among other things: (a) the Committee Settlement Parties' cooperation and participation in assisting the Plan Administrator with any ongoing litigation as described above; (b) the Committee Settlement Parties assisting the Debtors in making in-kind distributions to creditors; (c) the Committee Settlement Parties' inclusion as "Released Parties" under the Plan; (d) that the Court will serve as "gatekeeper" for determining whether claims asserted against a Released Party are released under the Plan, are direct or derivative, and whether any such claims are colorable; and (e) consideration in the form of cash and waiver and/or subordination of certain claims that the Committee Settlement Parties hold against the Debtors.

21. Specifically, as described in the Plan and Disclosure Statement, the Committee Settlement Parties have agreed to provide the following consideration:

10

| Individual | Claims Waived or Subordinated | Cash Contribution | Cooperation Amount[6] |
|---|---|---|---|
| Zac Prince[7] | All pre and/or postpetition claims other than salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies.<br><br>No reimbursement by the Debtors for amounts incurred pursuant to the Committee Settlement or for legal fees incurred | $1.5 million.<br><br>1/3 of such amount is due within two business days of the Confirmation Order becoming final ("First Payment Date").<br><br>1/3 of such amount is due 120 days after the First Payment Date (the "Second Payment Date").<br><br>1/3 of such amount is due: (i) the day at least two (2) weeks before the date the Debtors are scheduled to make a non-wallet distribution to creditors; or (ii) the day five (5) days after the Debtors give Prince written notice that the Debtors intend to commence non-wallet distributions on a date certain (the "Third Payment Date") | 200 hours |
| Flori Marquez[8] | All pre and/or postpetition claims other than salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies.<br><br>No reimbursement by the Debtors for amounts incurred pursuant to the Committee Settlement or for legal fees incurred. | $500,000<br><br>1/3 of such amount shall be due on the First Payment Date.<br><br>1/3 of such amount shall be due on the Second Payment Date.<br><br>1/3 of such amount shall be due on the Third Payment Date. | 200 hours |

---

[6] This column reflects the agreed amounts of time the insiders have agreed to give to the estate without any further compensation beyond the terms of the Committee Settlement to help prosecute and defend against litigation, to assist with regulatory inquiries, and to assist in making in-kind distributions to clients, *after* the individuals are no longer employed with BlockFi and presumably have other jobs.

[7] Zac Prince shall also provide, under penalty of perjury, certification that to the best of his belief, his estimated net worth on a confidential basis to be provided to the Debtors, the Bankruptcy Court, and Mohsin Meghji exclusively for in camera review that is consistent with the representations made to the Committee regarding his estimated net worth and relied upon in reaching the Committee Settlement. An estate professional, including but not limited to an attorney of the Debtors, shall hold the net worth statement under that firm's record-keeping policy for clients for a period of seven years.

[8] Flori Marquez shall also provide, under penalty of perjury, certification that to the best of her belief, her estimated net worth on a confidential basis to be provided to the Debtors, the Bankruptcy Court, and Mohsin Meghji exclusively for in camera review that is consistent with the representations made to the Committee regarding her estimated net worth and relied upon in reaching the Committee Settlement. An estate professional, including but not limited to an attorney of the Debtors, shall hold the net worth statement under that firm's record-keeping policy for clients for a period of seven years.

| | | | |
|---|---|---|---|
| Amit Cheela | All pre and/or postpetition claims (other than~$92,000 remaining on the BlockFi Platform, which shall be retained) <u>other than</u> salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies. | N/A | 100 hours (but not more than 10 hours per week) |
| Jonathan Mayers | All pre and/or postpetition claims <u>other than</u> salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies. | N/A | 200 hours (but not more than 2 hours on any day, 10 hours in any week, or 20 in any month) |
| Rob Loban | All pre and/or postpetition claims <u>other than</u> salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies. | N/A | 100 hours |
| Tony Lauro | All pre and/or postpetition claims <u>other than</u> salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies. | $100,000<br><br>1/3 of such amount shall be due on the First Payment Date.<br><br>1/3 of such amount shall be due on the Second Payment Date.<br><br>1/3 of such amount shall be due on the Third Payment Date. | 200 hours |
| Yuri Mushkin | All pre and/or postpetition claims <u>other than</u> salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies. | N/A | 75 hours (but not more than 5 hours in any week, or 15 hours in any one month) |
| Andrew Tam | All pre and/or postpetition claims <u>other than</u> salary and employee benefits against estate waived<br><br>Any indemnity claims waived except to the extent needed to access insurance policies. | $100,000<br><br>1/3 of such amount shall be due on the First Payment Date.<br><br>1/3 of such amount shall be due on the Second Payment Date.<br><br>1/3 of such amount shall be due on the Third Payment Date. | 100 hours |

| David Spack | All pre and/or postpetition claims <u>other than</u> salary and employee benefits against estate waived.<br><br>Any indemnity claims waived except to the extent needed to access insurance policies. | $50,000<br><br>1/3 of such amount shall be due on the First Payment Date.<br><br>1/3 of such amount shall be due on the Second Payment Date.<br><br>1/3 of such amount shall be due on the Third Payment Date. | Unlimited through date of first BlockFi Interest Account distribution, 150 hours thereafter |
|---|---|---|---|

22. After reviewing and analyzing the foregoing settlement terms and conditions, I concluded that the proposal was in the estates' best interest and gave my approval of the Committee Settlement. This conclusion was reached after careful consideration of the issues explained above, including the relative strength of the potential claims, the challenges involved in litigating loss causation, the costs of litigating the claims, the importance of the success in litigating claims against other crypto bankruptcy estates, and the financial wherewithal of the Committee Settlement Parties. Additionally, I considered the Committee's support for the Committee Settlement.

23. The Plan provides for the Debtors' release of their officers, directors, and employees who continued to hold such positions after the Petition Date. These individuals enabled the Debtors to wind down their businesses. Because the Investigation led me to conclude that the estates do not have any cognizable claims against any of these individuals (and no party has suggested that the Debtors might have cognizable claims against any of these individuals except for those who participated in transactions that have been fully disclosed to parties-in-interest), I believe, in my business judgment, that the releases contained in the Plan are appropriate.

24. The Plan also provides that the Court shall serve as the "gatekeeper" for any claims that may be asserted against the Released Parties after the Effective Date. In essence, a party may not bring any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in the Plan without first obtaining a final order from the Court (a) determining that such claim or Cause of

Action is not subject to the releases contained of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. The Court will then have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in the Plan, shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

25. The gatekeeper provision is a material term of the Committee Settlement and is not severable from the other component parts. I understand that, were it not for its inclusion in the Plan, the Committee Settlement Parties would not have agreed to participate in the Committee Settlement or provide the consideration that the estate is receiving. Thus, considering the highly negotiated nature of the Committee Settlement along with the importance of the gatekeeper provision, I believe that the gatekeeper provision is in the best interest of the estates, and removing it would threaten the entire Committee Settlement.

26. In sum, as described above, I believe that the Committee Settlement contained in the Plan was negotiated at arm's-length, in good faith by independent parties, represented by independent counsel, and is fair, reasonable, and in the best interests of the Debtors and their stakeholders. For these reasons, I believe that the Committee Settlement is appropriate and that the Court should confirm the Plan.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: September 22, 2023  
New York, New York

*/s/ Scott D. Vogel*  
Name: Scott D. Vogel  
Title: Independent Director and Member of the Board of Directors of Debtor BlockFi Inc.