**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

*Attorneys for Debtors and*
*Debtors in Possession*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT
OF (I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT
RELATING TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN
OF BLOCKFI INC. AND ITS DEBTOR AFFILIATES PURSUANT TO
CHAPTER 11 OF THE BANKRUPTCY CODE AND (II) AN ORDER CONFIRMING
THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF BLOCKFI INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965); and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

# <u>TABLE OF CONTENTS</u>

Preliminary Statement.................................................................................................1

Argument ....................................................................................................................3

I.     Case Background and Objections. .........................................................................4

     A.     Procedural History. .......................................................................4

     B.     The Plan Solicitation and Notification Process. ........................7

     C.     Plan Modifications..................................................................10

II.    The Disclosure Statement Contains "Adequate Information" as Required by
     Section 1125 of the Bankruptcy Code, and the Debtors Complied with the
     Applicable Notice Requirements. ......................................................................12

     A.     The Disclosure Statement Contains Adequate Information.....................12

     A.     The Debtors Complied with the Applicable Notice and Solicitation
          Requirements. ...............................................................15

     B.     Solicitation of the Plan Complied with the Bankruptcy Code and Was in
          Good Faith. .................................................................16

III.   The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code...............16

     A.     The Plan Complies with the Applicable Provisions of the Bankruptcy
          Code (§ 1129(a)(1)). ...........................................................17

          1.     The Plan Satisfies the Classification Requirements of Section 1122
              of the Bankruptcy Code. ...............................................17

          2.     The Plan Satisfies the Mandatory Plan Requirements of
              Section 1123(a) of the Bankruptcy Code......................21

          3.     The Plan Complies with the Discretionary Provisions of
              Section 1123(b) of the Bankruptcy Code......................24

               (i)     The Debtor Release Is Appropriate....................28

              (ii)    The Third-Party Release is Wholly Consensual and
                     Is Appropriate. ...................................................33

              (iii)   The Exculpation Provision Is Appropriate. ......................36

              (iv)   The Injunction and Bermuda Implementation
                    Provision Are Appropriate.................................39

i

4.       The Plan Complies with Section 1123(d) of the Bankruptcy Code...........40

B.     The Debtors Complied with the Applicable Provisions of the
Bankruptcy Code (§ 1129(a)(2))............................................................................40

       1.       The Debtors Complied with Section 1125 of the Bankruptcy Code. ........41

       2.       The Debtors Complied with Section 1126 of the Bankruptcy Code. ........42

C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)). ..........................................44

D.     The Plan Provides that the Debtors' Payment of Professional Fees and
Expenses Are Subject to Court Approval (§ 1129(a)(4)). .....................................45

E.     The Plan Does Not Require Additional Disclosures Regarding Directors,
Officers, and Insiders (§ 1129(a)(5)). ....................................................................46

F.     The Plan Does Not Require Governmental Regulatory Approval
(§ 1129(a)(6)).........................................................................................................46

G.     The Plan Is in the Best Interests of All the Debtors' Creditors
(§ 1129(a)(7)).........................................................................................................47

H.     The Plan Satisfies the Bankruptcy Code's Voting Requirements of
Section 1129(a)(8) of the Bankruptcy Code. ..........................................................48

I.     The Plan Provides for Payment in Full of All Allowed Priority Claims
(§ 1129(a)(9)).........................................................................................................49

J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan
(§ 1129(a)(10)).......................................................................................................50

K.     The Plan Is Feasible (§ 1129(a)(11)). ...................................................................51

L.     All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...........................52

M.    Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do
Not Apply to the Plan. ...........................................................................................53

N.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of
the Bankruptcy Code..............................................................................................54

       1.       The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii))................................54

       2.       The Plan Does Not Unfairly Discriminate with Respect to the
Impaired Classes that Have Not Voted to Accept the Plan
(§ 1129(b)(1)).........................................................................................55

O.   The Debtors Complied with Sections 1129(c) and 1129(d) of the
     Bankruptcy Code. ..................................................................................56

P.   Modifications to the Plan. ....................................................................57

Q.   Good Cause Exists to Waive the Stay of the Confirmation Order. ......................59

IV.   The Objections Should be Overruled...............................................................60

A.   The Third-Party Release Should Be Approved ...................................................61

     1.   The Third-Party Release Is Consensual and Appropriate..........................61

     2.   Even if the Third-Party Release Is Non-Consensual, It Is
          Permissible..............................................................................66

B.   The Gatekeeping Provision Is Integral to the Plan and Should Be
     Approved.........................................................................................67

C.   The Wyatt Objection Should Be Overruled........................................................72

D.   The 3AC Objection Should be Overruled...........................................................75

E.   The Lymn Objection Should be Overruled..........................................................76

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 500 Fifth Ave. Assocs.*,
148 B.R. 1010 (Bankr. S.D.N.Y. 1993) .................................................................17, 32

*In re 710 Long Ridge Rd. Operating Co., II, LLC*,
No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D.N.J. Mar. 5, 2014) ...........................29, 31

*In re A.H. Robins Co.*,
88 B.R. 742 (Bankr. E.D. Va. 1988) ....................................................................11

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (3d Cir. 1986)..............................................................................44

*In re Aceto Corporation*,
Case No.-15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017) .......................................62

*In re Aceto Corporation*,
Case No. 19-13448 (VFP) (Bankr D. N.J. Sept. 18, 2019)................................61, 76

*In re Aegean Marine Petroleum Network, Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019)..................................................................37

*Aleman Food Services, Inc. v. United States*,
994 F.2d 819 (Fed. Cir. 1993).............................................................................57

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010)....................51, 55

*In re Am. Family Enters.*,
256 B.R. 377 (D.N.J. 2000) ...............................................................................34

*In re Armstrong World Indus.*,
348 B.R. 111 (Bankr. D. Del. 2006) .....................................................................55

*In re Avaya Inc.*,
Case No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) .................................67

*Ball State Univ. v. United States*,
488 F.2d 1014 (Ct. Cl. 1973) .............................................................................57

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)....................................................................................46, 54

iv

*Baron v. Sherman (In re Ondova Ltd. Co.,*),
  2017 Bankr. LEXIS 325 (Bankr. N.D. Tex. Feb. 1, 2017) ....................................................68

*Barton v. Barbour,*
  104 U.S. 126 (1881) ................................................................................................................67

*In re Bed Bath and Beyond Inc.,*
  No. 23-13359 (VFP) ...................................................................................62, 67, 71, 76

*In re Blackhawk Mining LLC,*
  No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) ............................................................33

*Blake Constr. Co. Inc. v. United States,*
  987 F.2d 743 (Fed. Cir. 1993) ...............................................................................................57

*In re BlockFi, Inc.,*
  No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 22, 2023) ...........................................................44

*Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr.
  Inc.),*
  410 F.3d 100 (1st Cir. 2005) ..................................................................................................69

*In re Burns & Roe Enters., Inc.,*
  No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) .............................................56

*Carter v. Rodgers,*
  220 F.3d 1249 (11th Cir. 2000) ..............................................................................................68

*In re Century Glove, Inc.,*
  Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993) ........................44

*Century Glove, Inc. v. First Am. Bank of N.Y.,*
  860 F.2d 94 (3d Cir. 1988) ............................................................................................. *passim*

*In re Chapel Gate Apartments, Ltd.,*
  64 B.R. 569 (Bankr. N.D. Tex. 1986) .....................................................................................45

*In re Chassix Holdings, Inc.,*
  533 B.R. 64 (Bankr. S.D.N.Y. 2015) ......................................................................................35

*In re Checkout Holding Corp.,*
  No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) ..............................................................33

*In re Cinram Group, Inc.,*
  No. 17-15258-VFP (Bankr. D.N.J. Nov. 27, 2018) [Docket No. 568]....................................64

*In re Cobalt Int'l Energy, Inc.,*
  No. 17-36709 (MI) .................................................................................................................66

*In re Congoleum Corp.*,
    326 B.R. 167 (KCF) (Bankr. D.N.J. Jan. 26, 2007)................................................36

*In re Congoleum Corporation*,
    Case No. 20-18488 (MBK) (Bankr. D. N.J. Jan. 25, 2021)................................61, 76

*In re Coram Healthcare Corp., Inc.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ....................................................................35

*In re Crivaro*,
    2017 WL 3314232 (Bankr. D.N.J. 2017)..............................................................27

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) .................................................................46

*In re: Diocese of Camden, New Jersey*,
    No. 20-21257 (JNP), 2023 WL 5605156 (Bankr. D.N.J. Aug. 29, 2023) ..............43

*In re Dow Corning Corp.*,
    237 B.R. 374 (Bankr. E.D. Mich. 1999) ...............................................................10

*In re Drexel Burnham Lambert Grp.*,
    960 F.2d 285 (2d Cir. 1992)................................................................................ 38

*In re Drexel Burnham Lambert Grp. Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992)...................................................................17

*In re EOGH Liquidation, Inc., f/k/a/ East Orange Gen. Hosp.*, No. 15-31232-VFP
    (Bankr. D.N.J. June 28, 2016) ............................................................................64

*In re FAH Liquidating Corp.*,
    No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) .............................................36

*Firestone Tire & Rubber Co. v. United States*,
    444 F.2d 547 (Ct. Cl. 1971) ...............................................................................57

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993)..................................................................................17

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988)...................................................................45

*In re G–1 Holdings Inc.*,
    420 B.R. 216 (D.N.J. 2009) ................................................................................50

*In re G-I Holdings. Inc.*,
    313 B.R. 612 (Bankr. D.N.J. 2004) .....................................................................27

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................65

*Gillman v. Continental Airlines (In re Continental Airlines)*,
    203 F.3d 203 (3d Cir. 2000)..............................................................................65

*In re Glob. Safety Textiles Holdings LLC*,
    No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009).............56

*In re Global Indus. Tech., Inc.*,
    645 F.3d 201 (3rd Cir. 2011) .............................................................................74

*In re Great Bay Hotel & Casino, Inc.*,
    251 B.R. 213 (Bankr. D.N.J. 2000) ....................................................................18

*Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*,
    167 B.R. 389 (Bankr. D. Md. 1994) ...................................................................68

*In re Harstad*,
    155 B.R. 500 (Bankr. D. Minn. 1993) .................................................................35

*Helmer v. Pogue*,
    212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton
    Doctrine to debtor in possession)......................................................................68

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)................................................................17

*In re Highland Capital Management, L.P.*,
    Case No.19-34054-SGJ (Bankr. N.D. Tex. Nov. 24, 2020) ...........................67, 70

*Hol-Gar Mfg. Corp. v. United States*,
    351 F.2d 972 (Ct. Cl. 1965) ...............................................................................57

*In re Hollister Construction Services, LLC*,
    No. 19-27439 (MBK) (Bankr. D.N.J. Apr. 16, 2021).............................................58

*In re Horsehead Holding Corp.*,
    No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) .............................................33

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ...............................................................29, 34

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)..............................................................................17

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)...........................................................................17, 53

*Kenneth Reed Constr. Corp. v. United States*,
    475 F.2d 583 (Ct. Cl. 1973) ................................................................57

*Kirk v. Texaco, Inc.*,
    82 B.R. 678, 682 (S.D.N.Y. 1988) ......................................................12

*Krys v. Official Comm. of Unsecured Creditors (In re Refco, Inc.)*,
    505 F.3d 109 (2d Cir. 2007) ................................................................74

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003) ................................................................12

*In re L'OCCTAINE, Inc.*,
    No. 21-10632 (MBK) (Bankr. D.N.J. Aug. 25, 2021) ..........................58

*In re Laboratory Partners, Inc.*,
    No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ..........................36

*In re Lannett Company, Inc.*,
    Case No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) ......................69

*In re Lannett Company, Inc.*,
    No. 23-10559 (JKS) ....................................................................62, 76

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (Bankr. D.N.J. 2005) ..............................................12, 44

*Lowenbraun v. Canary (In re Lowenbraun)*,
    453 F.3d 314 (6th Cir. 2006) ..............................................................68

*In re Martin*,
    91 F.3d 389 (3d Cir.1996) ..................................................................29

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ..........................................29, 30

*In re Metrocraft Publ'g Servs., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ..................................................13

*In re Modell's Sporting Goods, Inc.*,
    Case No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020) ..............61, 76

*In re Modell's Sporting Goods, Inc.*,
    No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020) ..........................69

*In re Monnier Bros.*,
    755 F.2d 1336 (8th Cir. 1985) ............................................................12

*In re Motors Liquidation Co.*,
   541 B.R. 104 (Bankr. S.D.N.Y. 2015) .................................................................68

*In re Mountain Creek Resort, Inc.*,
   No. 17-19899-SLM (Bankr. D.N.J. Fed. 26, 2020) [Docket No. 1219] ................................64

*In re National Realty Investment Advisors, LLC*,
   Case No. 22-14539 (JKS) (Bankr. D. N.J. Aug. 10, 2023) .....................................67

*In re Nautical Solutions, L.L.C.*,
   No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) ........................................67

*NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt, L.P.)*,
   48 F.4th 419 (5th Cir. 2022) .................................................................70

*In re Nickels Midway Pier, LLC*,
   No. 03-49462 (GMB), 2010 WL 2034542 (Bankr. D.N.J. May 21, 2010) ............................18

*In re NII Holdings, Inc.*,
   288 B.R. 356 (Bankr. D. Del. 2002) ..........................................................44

*In re Nutraquest, Inc.*,
   434 F.3d 639 (3d Cir.2006)...................................................................29

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) .........................................................17

*In re Ocean View Motel, LLC*,
   No. 20-21165-ABA, 2022 WL 243213 (Bankr. D.N.J. Jan. 25, 2022) ...............................55

*In re One Aviation Corp.*,
   No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) ...........................................33

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
   848 F.2d 414 (3d Cir. 1988)..................................................................12

*In re Phoenix Petrol., Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ....................................................12, 13

*In re Premier Int'l Holdings, Inc.*,
   2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) .......................................16, 37

*In re Princeton Alternative Income Fund, LP*,
   Case No. 18-14603 (MBK) (Bankr. D. N.J. Feb. 19, 2020)......................................67

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)..........................................................................29

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ...................................................................50

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)................................................................37, 40, 43, 44

*In re RCS Cap. Corp.*,
No. 16-10223 (MFW) .........................................................................................35

*In re Revel AC, Inc.*,
No. 14-22654 (MBK) (Bankr. D.N.J. June 30, 2014) ...........................................25

*In re River Village Assoc.*,
181 B.R. 795 (E.D. Pa. 1995) .............................................................................12

*In re Riverbed Techs., Inc.*,
No. 21-11503 (Bankr. D. Del. Dec. 4, 2021) [Docket No. 169]............................64

*Matter of Rochem, Ltd.*,
58 B.R. 641 (Bankr. D.N.J. 1985) .......................................................................17

*In re S B Bldg. Assocs. Ltd. P'ship*,
621 B.R. 330 (Bankr. D.N.J. 2020) ..........................................................29, 53, 54

*In re S&W Enter.*,
37 B.R. 153 (Bankr. N.D. Ill. 1984) ....................................................................17

*In re Saint Michael's Medical Center, Inc.*,
Case No. 15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017) ..............................61, 76

*In re Samson Resources Corp.*,
No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) ...........................................33

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988)..................................................................13

*In re Sea Garden Motel & Apartments*,
195 B.R. 294 (D.N.J. 1996) ................................................................................50

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
546 B.R. 284 (Bankr. S.D.N.Y. 2016)..................................................................68

*In re Sentinel Mgmt. Grp., Inc.*,
398 B.R. 281 (Bankr. N.D. Ill. 2008) ..................................................................10

*In re SLT Holdco, Inc.*,
Case No 20-18368 (MBK) (Bankr. D. N.J. Oct. 21, 2020) ........................61, 62, 76

x

*In re SLT HoldCo, Inc., et al.*
No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020) .......................................................58, 62

*In re Spansion,*
2010 WL 2905001 (Bankr. D. Del. April 16, 2010).............................................................37

*In re Spansion, Inc.,*
426 B.R. 114 (Bankr. D. Del. 2010) .................................................................................29, 34

*In re Specialty Equip. Companies, Inc.,*
3 F. 3d 1043 (7th Cir. 1993) ...............................................................................................35

*Matter of T-H New Orleans Ltd. P'ship,*
116 F.3d 790 (5th Cir. 1997) ..............................................................................................44

*In re TCI 2 Holdings, LLC,*
428 B.R. 117 (Bankr. D.N.J. 2010) ............................................................................. *passim*

*In re Tex. Extrusion Corp.,*
844 F.2d 1142 (5th Cir. 1988) ............................................................................................12

*Tilley Constructors v. United States,*
15 Cl. Ct. 559 (1988) ..........................................................................................................57

*In re TK Holdings Inc.,*
No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ..........................................................33

*In re Tribune Co.,*
464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464
B.R. 208 (Bankr. D. Del. 2011) ..........................................................................................50

*In re U.S. Brass Corp.,*
194 B.R. 20 (Bankr. E.D. Tex. 1996) .................................................................................13

*In re Unichem Corp.,*
72 B.R. 95 (Bankr. N.D. Ill. 1987) .....................................................................................12

*Matter of Union Cnty. Wholesale Tobacco & Candy Co., Inc.,*
8 B.R. 442 (Bankr. D.N.J. 1981) ........................................................................................41

*In re Vantage Drilling Int'l,*
603 B.R. 538 (D. Del. 2019)...............................................................................................74

*In re W.R. Grace & Co.,*
475 B.R. 34 (D. Del. 2012)..................................................................................................44

*In re Walker,*
165 B.R. 994 (E.D. Va. 1994).............................................................................................50

*In re Wash. Mut., Inc.,*
   442 B.R. 314 (Bankr. D. Del. 2011) ..................................................29, 30, 37

*In re WebSci Technologies, Inc.,*
   234 Fed. Appx. 26 (3d Cir.2007) .............................................................29

*Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.,*
   157 B.R. 100 (S.D. Tex. 1993) ................................................................13

*In re Wiersma,*
   227 F. App'x 603 (9th Cir. 2007) ...........................................................16

*In re Zenith Elecs. Corp.,*
   241 B.R. 92 (Bankr. D. Del. 1999) ..............................................29, 30, 33, 35

**Statutes**

11 U.S.C. §§ 101–1532 ................................................................................1

11 U.S.C. § 365 ..............................................................................25, 39, 58

11 U.S.C. § 502(a) ...................................................................................76

11 U.S.C. § 503 .......................................................................................48

11 U.S.C. § 507 ..............................................................................48, 49, 51

11 U.S.C. § 510(b) ...................................................................................42

11 U.S.C. § 1102 ......................................................................................1

11 U.S.C. § 1107 ......................................................................................1

11 U.S.C. § 1108 ......................................................................................1

11 U.S.C. § 1109(b) .................................................................................74

11 U.S.C. § 1122 ...............................................................................*passim*

11 U.S.C. § 1123 ...............................................................................*passim*

11 U.S.C. § 1123(a)(1)–(3) ........................................................................21

11 U.S.C. § 1125 ...............................................................................*passim*

11 U.S.C. § 1126 .........................................................................8, 40, 42, 43

11 U.S.C. § 1127 ...............................................................................56, 58

11 U.S.C. § 1128 ...................................................................................................52

11 U.S.C. § 1129 ........................................................................................... *passim*

11 U.S.C. § 1129(a)(2) ...........................................................................................40

11 U.S.C. § 1129(a)(9)(A) ......................................................................................49

28 U.S.C. § 1930 ............................................................................................51, 52

31 U.S.C. § 3717 ....................................................................................................52

**Rules**

Fed. R. Bankr. P. 1015(b) ........................................................................................1

Fed. R. Bankr. P. 3017 ...........................................................................................40

Fed. R. Bankr. P. 3018 ...........................................................................................40

Fed. R. Bankr. P. 3019 ............................................................................10, 56, 58

Fed. R. Bankr. P. 3020 ...........................................................................................58

Fed. R. Bankr. P. 6004 ...........................................................................................58

Fed. R. Bankr. P. 6004(h), 6006(d) ........................................................................58

Fed. R. Bankr. P. 6006 ...........................................................................................58

Fed. R. Bankr. P. 9019 ...........................................................................................29

Fed. R. Civ. P. 23(c)(2) ..........................................................................................75

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) .............................12, 17, 40

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978)........................................12, 17

The above-captioned debtors (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of (a) final approval of the *Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1310] (the "Disclosure Statement")[2] and (b) confirmation of the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications)* filed contemporaneously herewith (as modified, amended, or supplemented from time to time, the "Plan"),[3] pursuant to section 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). In support of confirmation of the Plan, final approval of the Disclosure Statement, and in response to the objections thereto (the "Objections"), the Debtors respectfully state as follows:

## Preliminary Statement

1.     The Debtors, the Committee, and the Committee Settlement Parties together have achieved a result that, for most of these chapter 11 cases, seemed impossible. After several months of compromise and hard-fought negotiations, including multiple mediation sessions, on July 21, 2023, the Debtors, the Committee, and the Committee Settlement Parties reached an

---

[2]   The Disclosure Statement was conditionally approved by the United States Bankruptcy Court for the District of New Jersey (the "Court") on August 1, 2023 [Docket No. 1306], subject to final approval at the Combined Hearing.

[3]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Confirmation Order (as defined herein), as applicable.

A detailed description of the Debtors and their businesses and the facts and circumstances surrounding the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 17] (the "First Day Declaration"). On November 28, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No 42]. On December 21, 2022, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 130].

agreement on the terms of the Committee Settlement, which forms the cornerstone of the Plan that is before the Court for approval.  After incorporating the Committee Settlement into the Plan, the results of the solicitation process were decisive.  The voting results show that the Plan has the overwhelming support of **all** Voting Classes.

2.      The Plan is clearly the best path forward for creditors.  The compromises achieved in the Plan will allow clients to receive distributions in kind, put the Debtors in the best position to prevail in litigation against 3AC, FTX, Alameda, Core Scientific, and others (collectively, the "Litigation") to meaningfully increase client recoveries, and wind down the Debtors' businesses efficiently and effectively.  The largely consensual Plan is in the best interests of the Debtors' estates and should be confirmed.

3.      The Plan satisfies all of the requirements for confirmation under the Bankruptcy Code.  And the Plan faces limited opposition.  The Debtors have over 600,000 clients and only two of them filed objections to the Plan, one of which has since been withdrawn.  Of the eight formal objections filed to Confirmation of the Plan and/or final approval of the Disclosure Statement, only a handful remain unresolved including Objections from 3AC, the United States Securities and Exchange Commission (the "SEC"), the United States Trustee (the "U.S. Trustee"), Cameron Wyatt, and John Lymn.  None of these Objections pose an obstacle to final approval of the Disclosure Statement and Confirmation of the Plan.  The Debtors will continue to engage with the objectors leading up to the Combined Hearing in hopes of a fully consensual resolution, but as explained in detail below, to the extent not resolved prior to the Combined Hearing, the Court should overrule these Objections, approve the Disclosure Statement on a final basis, confirm the Plan, and set in motion the final steps needed to bring the Debtors' chapter 11 cases to conclusion and deliver value back to the Debtors' stakeholders.

## Argument

4.      This Memorandum is divided into four parts.  Part I provides the procedural history of the Plan and Disclosure Statement, the Debtors' solicitation efforts and the voting results.  Part II requests that the Court approve the Disclosure Statement on a final basis. Part III establishes the Plan's compliance with each applicable requirement for Confirmation, including that certain of the discretionary contents of the Plan, including the Releases, are appropriate.  Part IV establishes that the Objections to the Plan should be overruled.  In further support of Confirmation of the Plan, the Debtors have filed:

- the *Declaration of James Daloia of Kroll Restructuring Administration LLC Regarding the Solicitation and Tabulation of Votes on the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* contemporaneously herewith (the "Voting Report");

- the *Declaration of Mark A. Renzi, Chief Restructuring Officer of BlockFi Inc., in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1582] (the "Renzi Declaration");

- the *Declaration of Brett Witherell, Managing Director of Berkeley Research Group, LLC, in Support of the Debtors' Disclosure Statement for, and Confirmation of, the Debtors' Chapter 11 Plan* [Docket No. 1583] (the "Witherell Declaration"); and

- the *Declaration of Scott D. Vogel, Independent Director and Member of the Special Committee of the Board of Directors of BlockFi Inc., in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Third Amended Joint Chapter 11 Plan of BlockFi Inc and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1584] (the "Vogel Declaration" and, together with the Voting Report, the Renzi Declaration, and the Witherell Declaration, the "Declarations").

5.      For the reasons stated herein, the Debtors respectfully request that the Court find that the Debtors have satisfied all relevant burdens, approve the Disclosure Statement on a final basis, and approve the Plan.

3

I.      **Case Background and Objections.**

A.      **Procedural History.**

6.      On November 28, 2023, the Debtors filed with the Court, among other pleadings,
the *Joint Plan of Reorganization of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11
of the Bankruptcy Code* [Docket No. 22] (the "Initial Plan").

7.      On January 30, 2023, the Court entered the *Order (I) Setting Bar Dates for
Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III)
Approving Notice Thereof, and (IV) Granting Related Relief* [Docket No. 440] (the "Bar Date
Order"), which established March 31, 2023, as the General Claims Bar Date, and May 30, 2023,
as the Governmental Bar Date, and provided that any Holder of a Claim that fails to timely
submit a Proof of Claim by the applicable bar date shall not be treated as a creditor with respect
to such claim for the purposes of either (a) voting on any plan of reorganization filed in these
chapter 11 cases or (b) participating in any distribution in the Debtors' chapter 11 cases on
account of such Claim.

8.      On May 12, 2023, the Debtors filed (a) the *First Amended Joint Chapter 11 Plan
of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*
[Docket No. 875] (the "First Amended Plan"), (b) the *Disclosure Statement Relating to the First
Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11
of the Bankruptcy Code* [Docket No. 874] (the "Initial Disclosure Statement"), and (c) the
*Debtors' Motion for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement,
(II) the Solicitation and Notice Procedures, (III) the Forms of Ballots and Notices in Connection
Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 876]
(the "Disclosure Statement Motion").

4

9. On June 28, 2023, the Debtors filed the *Second Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1132] and the *Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1133].

10. On July 30, 2023, the Debtors filed the *Debtors' Supplemental Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Replying to Objections to the Disclosure Statement* [Docket No. 1294] (the "Supplemental Disclosure Statement Motion" and together with the Disclosure Statement Motion the "Disclosure Statement Motions"). On July 31, 2023, the Debtors filed revised versions of the solicitation materials in the *Notice of Filing of Revised Exhibits of Debtors' Proposed Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms, Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates with Respect Thereto* [Docket No. 1302].

11. On August 2, 2023, the Court entered the *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, and (IV) Scheduling Certain Dates with Respect Thereto* [Docket No. 1306] (the "Conditional Disclosure Statement Order").

12.     Pursuant to the Conditional Disclosure Statement Order, the Debtors were required to distribute Solicitation Packages to Holders of Claims entitled to vote to accept or reject the Plan "within ten (10) days following entry of the Order (or as soon as reasonably practicable thereafter)."[4]  Thus, as described in more detail in the Voting Report, the Debtors worked to ensure that Solicitation Packages were distributed as soon as reasonably practicable and took the following steps:[5]

- the Debtors caused the Combined Hearing Notice to be published in *The New York Times* (National Edition), the *Royal Gazette*, and the *Financial Times* (International Edition) on August 7, 2023, August 9, 2023, and August 9, 2023, respectively, as evidenced by each *Affidavit of Service of Publication*.[6]  The Claims, Noticing and Solicitation Agent also distributed the Combined Hearing Notice to Holders of Claims and Interests through hard copy and email service on August 8, 2023 and August 11, 2023, respectively;

- on August 18, 2023, the Claims, Noticing and Solicitation Agent distributed, through email and hard copy service, as applicable, ballots with unique IDs to parties entitled to vote on the Plan;

- additionally, on August 18, 2023, Kroll caused to be served certain notices of non-voting status together with copies of the Disclosure Statement, the Conditional Disclosure Statement Order, and the Plan in lieu of a Solicitation Package on Classes not entitled to vote under the Plan (the "Non-Voting Classes"); and

- on August 23, 2023, Kroll opened the online portal in which Holders of Claims could submit their votes on the Plan (the "E-Balloting Portal").  As described in further detail in the Voting Report, in addition to allowing for Holders of Claims in the Voting Classes to submit their votes on the Plan, the E-Balloting Portal provided Holders of Claims the opportunity to submit their completed Opt Out Form if they elected to opt out of the Plan's Third-Party Release.[7]

---

[4]     *See* Conditional Disclosure Statement Order ¶ 4.

[5]     *See Affidavit of Service* [Docket No. 1573] (the "Affidavit of Solicitation").

[6]     Docket Nos. 1333, 1334, and 1335.

[7]     *See* Voting Report;  *see also* Affidavit of Solicitation.

13.     On September 4, 2023, the Debtors filed the Plan Supplement,[8] which included (a) the Schedule of Retained Causes of Action, (b) the Restructuring Transactions Memorandum, (c) the Digital Assets Conversion Table, (d) the Plan Administrator Agreement, including the identities of the Plan Administrator and members of the Wind-Down Oversight Committee, (e) the Wind-Down Budget, and (f) the Cross-Border Insolvency Protocol.

14.     On September 8, 2023, the Debtors filed the Amended Plan Supplement[9] which included (a) the Schedule of Assumed Executory Contracts and Unexpired Leases, and served notices of assumption, including cure amounts, on each of the counterparties to such Executory Contracts and Unexpired Leases, (b) a revised Schedule of Retained Causes of Action and (c) the Employee Transition Plan.

15.     On September 22, 2023, the Debtors filed the Second Amended Plan Supplement[10] which included (a) a revised Schedule of Assumed Executory Contracts and Unexpired Leases, (b) a revised Schedule of Retained Causes of Action, (c) a revised Plan Administrator Agreement and (d) a revised Cross-Border Insolvency Protocol.

16.     The deadline: (a) to file objections to the Plan and final approval of the Disclosure Statement and (b) for all Holders of Claims entitled to vote on the Plan to cast their ballots was September 11, 2023, at 4:00 p.m., prevailing Eastern Time.

**B.      The Plan Solicitation and Notification Process.**

17.     In compliance with the Bankruptcy Code, only Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims were entitled to vote on the

---

[8]     Docket No. 1443.

[9]     Docket No. 1467.

[10]    Docket No. 1585.

Plan.[11]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired (in which case they were conclusively deemed to accept the Plan) or if they are not receiving or retaining any property under the Plan (in which case they were conclusively deemed to reject the Plan).  The following Classes of Claims and Interests were **not** entitled to vote on the Plan, and the Debtors did not solicit votes from the Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4-d | BlockFi Services, Inc. General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-e | BlockFi Trading LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-f | BlockFi Wallet LLC General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4-g | BlockFi Ventures LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-h | BlockFi Investment Products LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 4-i | BlockFi Lending II LLC General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 5 | FTX Facility Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | FTX Avoidable Transfer Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Alameda Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | 3AC Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Government Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) |
| 13 | Existing Preferred Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 14 | Existing Common Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 15 | SEC Penalty Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[11]  *See* 11 U.S.C. § 1126.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 17 | State Governmental Regulatory Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

18.    The Debtors solicited votes on the Plan from Holders of Claims in Class 3-a (BlockFi Lending LLC Private Client Account Claims), Class 3-b (BlockFi Lending LLC Loan Collateral Claims), Class 3-c (BlockFi International Ltd. Private Client and Interest Account Claims), Class 3-d (BlockFi International Ltd. Loan Collateral Claims), Class 3-e (BlockFi Inc. Interest Account Claims), Class 4-a (BlockFi Lending LLC General Unsecured Claims), Class 4-b (BlockFi International Ltd. General Unsecured Claims), Class 4-c (BlockFi Inc. General Unsecured Claims), and Class 16 (Convenience Claims), which were entitled to vote to accept or reject the Plan (each a "Voting Class" and collectively, the "Voting Classes").  Each of the Voting Classes, as reflected in the Voting Report and as shown below, voted to accept the Plan by an overwhelming amount.  Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of its stakeholders. The voting results, as reflected in the Voting Report, are summarized as follows:

| Total Ballots Received | | | |
|---|---|---|---|
| Accept | | Reject | |
| Number (% of Number) | Amount (% of Amount) | Number (% of Number) | Amount (% of Amount) |
| Class 3-a:  BlockFi Lending LLC Private Client Account Claims | | | |
| 296 (94.87%) | $173,206,406.10 (89.55%) | 16 (5.13%) | $20,217,083.85 (10.45%) |
| Class 3-b:  BlockFi Lending LLC Loan Collateral Claims | | | |
| 465 (91.54%) | $78,495,808.29 (89.70%) | 43 (8.46%) | $9,016,492.50 (10.30%) |
| Class 3-c:  BlockFi International Ltd. Private Client and Interest Account Claims | | | |
| 4,239 (95.93%) | $217,665,344.01 (98.57%) | 180 (4.07%) | $3,152,537.62 (1.43%) |
| Class 3-d:  BlockFi International Ltd. Loan Collateral Claims | | | |
| 107 (92.24%) | $25,535,223.96 (97.98%) | 9 (7.76%) | $526,659.93 (2.02%) |
| Class 3-e:  BlockFi Inc. Interest Account Claims | | | |
| 11,246 (94.01%) | $469,946,292.52 (96.41%) | 717 (5.99%) | $17,486,299.61 (3.59%) |
| Class 4-a:  BlockFi Lending LLC General Unsecured Claims | | | |
| 2 (100%) | $1,690,618.58 (100%) | 0 (0%) | $0 (0%) |
| Class 4-b:  BlockFi International Ltd. General Unsecured Claims | | | |
| 1 (100%) | $1,417,236.08 (100%) | 0 (0%) | $0 (0%) |
| Class 4-c:  BlockFi Inc. General Unsecured Claims | | | |
| 17 (100%) | $17,518,411.47 (100%) | 0 (0%) | 0 (0%) |
| Class 16:  Convenience Claims | | | |
| 16,723 (92.08%) | $15,261,958.13 (93.04%) | 1438 (7.92%) | $1,139,105.85 (6.96%) |

## C.    Plan Modifications.

19.    A plan proponent may modify its plan at any time before confirmation if the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[12] Once filed, "the plan as modified becomes the plan."[13]   Pursuant to Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be

---

[12]   11 U.S.C. § 1127(a).

[13]   *Id.*

deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[14]

20.       Accordingly, only those modifications that are "material" require resolicitation. A plan modification is not material unless it so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.[15]   Here, to clarify certain provisions, resolve certain formal and informal objections and provide flexibility with respect to the treatment of certain Claims, the Debtors made certain modifications to the Plan.   The modifications to the Plan allow certain creditors to *elect* to receive different treatment than the treatment provided under the solicited Plan.   If creditors do not elect to do so, they will receive the treatment under the solicited Plan.   As a result, these modifications will have no impact on creditors in the affected classes—*i.e.*, no holder is "likely" to reconsider its acceptance—unless the holder voluntarily elects to receive the alternate treatment.   The Debtors also made technical modifications to the Plan to clarify that notwithstanding the Debtor Release, the Debtors and the Wind-Down Debtors maintain the right to object to Claims and Interests.   This is not a material modification to the Plan as Article VII.B of the solicited Plan expressly provided that after the Effective Date the Wind-Down Debtors would have the sole authority to file, withdraw or litigate to judgment any objections to Claims

---

[14]   *See In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class' distribution was not sufficiently material to require re-solicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan. The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.").

[15]   *See In re A.H. Robins Co., Inc.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan. The Court concludes that the modifications do not require resolicitation of acceptances or rejections….").

or settle or compromise any Disputed Claims, and the solicited Plan as a whole cannot reasonably be read to eliminate the Wind-Down Debtors right to object to Claims asserted against the estates.  Accordingly, the Plan modifications are not adverse and do not require resolicitation of the Plan.

## II.    The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with the Applicable Notice Requirements.

### A.    The Disclosure Statement Contains Adequate Information.

21.    The purpose of a disclosure statement is to provide "adequate information" that allows parties entitled to vote on a proposed plan to make an informed decision as to whether to vote to accept or reject the plan.[16]  "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[17]  Courts within the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[18]

---

[16]  *See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321–22 (3d Cir. 2003) (providing that a disclosure statement must contain "adequate information to enable a creditor to make an informed judgment about the Plan" (internal quotations omitted)); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phoenix Petrol., Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan.").

[17]  11 U.S.C. § 1125(a)(1) ("'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907 ("the information required will necessarily be governed by the circumstances of the case").

[18]  *See, e.g., In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (Bankr. D.N.J. 2005) ("The information required will necessarily be governed by the circumstances of the case."); *Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) ("The legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a):  'Precisely what constitutes adequate information in any particular instance will develop on a

22.     Courts look for certain information when evaluating the adequacy of the

disclosures in a proposed disclosure statement, including:

a.      the events which led to the filing of a bankruptcy petition;

b.      the relationship of a debtor with its affiliates;

c.      a description of the available assets and their value;

d.      the anticipated future of the company;

e.      the source of information stated in the disclosure statement;

f.      the present condition of a debtor while in chapter 11;

g.      the claims asserted against a debtor;

h.      the estimated return to creditors under a chapter 7 liquidation;

i.      the future management of a debtor;

j.      the chapter 11 plan or a summary thereof;

k.      the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 plan;

l.      the information relevant to the risks posed to claimants under the plan;

m.      the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

n.      the litigation likely to arise in a nonbankruptcy context; and

o.      the tax attributes of a debtor.[19]

---

case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case.'" (*quoting* H.R. Rep. No. 595, at 408–09 (1977))); *see also In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (same).

[19]  *In re U.S. Brass Corp.*, 194 B.R. 20, 424–25 (Bankr. E.D. Tex. 1996) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *Westland Oil Dev. Corp. v.*

23.     The Disclosure Statement, which was previously approved on a conditional basis, contains adequate information.[20]  The Disclosure Statement contains descriptions and summaries of, among other things:  (a) the Debtors' business operations and capital structure;[21] (b) certain events preceding the commencement of these chapter 11 cases;[22] (c) key events in these chapter 11 cases;[23] (d) the Debtors' sale and reorganization efforts;[24] (e) an overview of the Plan;[25] (f) the classification, treatment and projected recoveries of Claims and Interests;[26] (g) a description of the Debtor Release, Third-Party Release and related opt-out, and exculpation provisions in the Plan;[27] (h) risk factors affecting the Plan;[28] (i) the investigation performed and conclusions reached by the Special Committee of the Board of Directors of BlockFi Inc. of potential claims against insiders and the settlement reached between the Debtors, the Committee, and the Committee Settlement Parties;[29] (j) the Liquidation Analysis, which sets forth the

---

*MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (same); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics "is not necessary in every case."  *In re U.S. Brass Corp.*, 194 B.R. at 425; *see also In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("[C]ertain categories of information which may be necessary in one case may be omitted in another . . . .").

[20]   *See* Conditional Disclosure Statement Order [Docket No. 1306].

[21]   *See* Disclosure Statement Art. VIII.

[22]   *See id.* Art. IX.

[23]   *See id.* Art. X.

[24]   *See id.*

[25]   *See* Disclosure Statement, Art. III.

[26]   *See id.* Art. V.D.

[27]   *See id.* Art. V.L.

[28]   *See id.* Art. XI.

[29]   *See id.* Art. X.R.

14

estimated return that holders of Claims and Interests would receive in a hypothetical chapter 7 liquidation;[30] and (k) federal tax law consequences of the Plan.[31]

24.     As discussed above, section 1125(a) requires only "adequate information" sufficient for parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.  The Disclosure Statement clearly contains adequate information within the meaning of section 1125(a) and should be approved.

**A.     The Debtors Complied with the Applicable Notice and Solicitation Requirements.**

25.     In addition to conditionally approving the adequacy of the Disclosure Statement, the Conditional Disclosure Statement Order granted final relief regarding solicitation and noticing procedures and materials including, among other things:  (a) approving the Solicitation and Voting Procedures; (b) approving the Non-Voting Status Notices; (c) approving the Ballots; (d) approving the Opt Out Form; (e) approving the manner and form of the Solicitation Packages and the materials contained therein; (f) approving the Cover Letter; (g) approving the UCC Letter; (h) approving the Instruction Letter; (i) approving the Combined Hearing Notice; (j) approving the Publication Notice; (k) approving the Plan Supplement Notice; (l) approving the Assumption Notice; and (m) scheduling the dates and deadlines related thereto.[32]   The Debtors have complied with the procedures and timeline approved by the Conditional Disclosure Statement Order.

---

[30]   *See id.* Exhibit B.

[31]   *See id.* Art. XII.

[32]   In accordance with the relief granted pursuant to the Conditional Disclosure Statement Order, the Debtors also issued communication materials via press release, in-app messages, email distribution, their official website (including Frequently Asked Questions), and on their regular social media feeds, including X (f/k/a Twitter) to facilitate a robust voting process on the Plan and address questions that were frequently asked of the Debtors counsel, Claims, Noticing and Solicitation Agent, and counsel to the Committee.

**B.**    **Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

26.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[33]

27.    As set forth in the Disclosure Statement and Disclosure Statement Motions, and as demonstrated by the Debtors' compliance with the Conditional Disclosure Statement Order, the Debtors at all times took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.  Therefore, the Debtors request that the Court grant the parties the protections provided under section 1125(e) of the Bankruptcy Code.

28.    For the forgoing reasons, the Court should enter an order approving the Disclosure Statement on a final basis.

**III.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.**

29.    To confirm the Plan, the Court must find that the Debtors have satisfied the requirements of section 1129 of the Bankruptcy Code.[34]  As described in detail below, the Plan complies with all relevant provisions of the Bankruptcy Code and all other applicable law.

---

[33]    11 U.S.C. § 1125(e).

[34]    *See In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success[] and is more than a visionary scheme") (citing *In re Wiersma*, 227 F. App'x 603, 606 (9th Cir. 2007) (internal quotation marks omitted)).

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

30.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[35]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses and incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[36]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 in all respects.

**1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

31.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[37]

32.    Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[38]  Moreover, the requirement of substantial similarity does not mean that claims

---

[35]    11 U.S.C. § 1129(a)(1).

[36]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[37]    11 U.S.C. § 1122(a).

[38]    *See, e.g.*, *Matter of Rochem, Ltd.*, 58 B.R. 641, 642 (Bankr. D.N.J. 1985) ("Although Section 1122(a) of the Code requires that claims be substantially similar within a particular class, there is no requirement within Section 1122 or elsewhere in the Code that all substantially similar claims be included within a particular class.").  Courts have identified grounds justifying separate classification, including:  (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993)

17

or interests within a particular class must be identical or that all similarly situated claims must receive the same treatment under a plan.[39]

33.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into seventeen separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[40]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

 a.  <u>Class 1</u>:  Secured Tax Claims;

 b.  <u>Class 2</u>:  Other Priority Claims;

 c.  <u>Class 3-a</u>:  BlockFi Lending LLC Private Client Account Claims;

 d.  <u>Class 3-b</u>:  BlockFi Lending LLC Loan Collateral Claims;

---

(holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) (explaining that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (holding that, although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case") (internal quotations omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .").

[39] *See, e.g.*, *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) ("[s]eparate classification of similar claims has been found to be permissible where the classification is offered in good faith, does not foster an abuse of the classification system, and promotes the rehabilitative goals of Chapter 11."); *In re Nickels Midway Pier, LLC*, No. 03-49462 (GMB), 2010 WL 2034542, at *7 (Bankr. D.N.J. May 21, 2010) (proffering just one rule regarding classification of separate classification of similar classes under section 1122, only that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan").

[40] *See* Plan Art. III.

e.      <u>Class 3-c</u>:  BlockFi International Ltd. Private Client and Interest Account Claims;

f.      <u>Class 3-d</u>:  BlockFi International Ltd. Loan Collateral Claims;

g.      <u>Class 3-e</u>:  BlockFi Inc. Interest Account Claims;

h.      <u>Class 4-a</u>:  BlockFi Lending LLC General Unsecured Claims;

i.      <u>Class 4-b</u>:  BlockFi International Ltd. General Unsecured Claims;

j.      <u>Class 4-c</u>:  BlockFi Inc. General Unsecured Claims;

k.      <u>Class 4-d</u>:  BlockFi Services, Inc. General Unsecured Claims;

l.      <u>Class 4-e</u>:  BlockFi Trading LLC General Unsecured Claims;

m.      <u>Class 4-f</u>:  BlockFi Wallet LLC General Unsecured Claims;

n.      <u>Class 4-g</u>:  BlockFi Ventures LLC General Unsecured Claims;

o.      <u>Class 4-h</u>:  BlockFi Investment Products LLC General Unsecured Claims;

p.      <u>Class 4-i</u>:  BlockFi Lending II LLC General Unsecured Claims;

q.      <u>Class 5</u>:  FTX Facility Claims;

r.      <u>Class 6</u>:  FTX Avoidable Transfer Claims;

s.      <u>Class 7</u>:  Alameda Claims;

t.      <u>Class 8</u>:  3AC Claims;

u.      <u>Class 9</u>:  Government Penalty Claims;

v.      <u>Class 10</u>:  De Minimis Claims;

w.      <u>Class 11</u>:  Intercompany Claims;

x.      <u>Class 12</u>:  Intercompany Interests;

y.      <u>Class 13</u>:  Existing Preferred Equity Interests;

z.      <u>Class 14</u>:  Existing Common Equity Interests;

aa.     <u>Class 15</u>:  SEC Penalty Claims;

bb.     <u>Class 16</u>:  Convenience Claims; and

cc.     <u>Class 17</u>: State Governmental Regulatory Claims.

34.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[41]   In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[42]   Dissimilar Claims and Interests are not classified together under the Plan.  For example, secured, priority and unsecured claims are classified separately as are preferred and common equity interests.  General Unsecured Claims are further broken into nine classes to account for the fact that Holders of such claims have legal recourse against only a specific Debtor.  Holders of Account Holder Claims are classified separately from Holders of General Unsecured Claims due to the unique nature and basis for the Account Holder Claims, which consist of claims held by clients on the BlockFi Platform.  Account Holder Claims are further sub-classified by legal entity and product type.  For example, Holders of BlockFi Interest Account Claims are classified separately from Holders of BlockFi Loan Collateral Claims.  Convenience Claims are classified separately because the holders of such Claims, either by amount or election, will be entitled to a one-time payment of no greater than 50% of their Claims to ease the administrative burdens on the Debtors.  FTX Facility Claims (Class 5), FTX Avoidable Transfer Claims (Class 6), Alameda Claims (Class 7), and 3AC Claims (Class 8) are properly classified separately as such claims are disputed by the Debtors and relate to alleged loans and/or preference and/or fraudulent transfer claims asserted by such litigation parties.  Governmental Penalty Claims are classified separately because the Debtors believe that such claims are subordinated pursuant to sections 726(a)(4) and 1129(a)(7) to

---

[41]   *See* Renzi Decl. ¶ 23.

[42]   *See id.*

Account Holder Claims, General Unsecured Claims and Intercompany Claims.  SEC Penalty Claims and State Governmental Regulatory Claims are classified separately due to stipulations entered into between the Debtors and such parties which consensually resolves the treatment of their respective Claims.

35.    Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions. The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has asserted otherwise.

**2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

36.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.[43]  The Plan satisfies each of these requirements.[44]

37.    ***Specification of Classes, Impairment, and Treatment***.  The first three requirements of section 1123(a) are that the plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise nature of their treatment under the Plan.  Article III of the Plan satisfies these three requirements by setting forth these specifications in detail, and no party has asserted otherwise.[45]

38.    ***Equal Treatment***.  Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or

---

[43]    11 U.S.C. § 1123(a)(1)–(7).

[44]    *See* 11 U.S.C. § 1123(a)(1)–(8).  Section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

[45]    11 U.S.C. § 1123(a)(1)–(3).

interest."[46]   The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such holders' respective Class.[47]   To the extent the Court determines that the FTX Facility Claims should not be disallowed, recharacterized as equity contributions or equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, such claims shall be *pari passu* with General Unsecured Claims and Intercompany Claims at the applicable Debtor entity,[48]and to the extent the Court determines that the FTX Avoidable Transfer Claims, Alameda Claims, and/or 3AC Claims should not be disallowed or equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, such claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims and Intercompany Claims at the applicable Debtor entity.[49] Additionally, to the extent the Court determines that the Government Penalty Claims should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, such claims shall be *pari passu* with Account Holder Claims, General Unsecured Claims, and Intercompany Claims at the applicable Debtor entity.[50]

39.   ***Means for Implementation***.   Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[51]   The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provide for the

---

[46]   11 U.S.C. § 1123(a)(4).

[47]   *See* Renzi Decl. ¶ 27.

[48]   Plan Art. III.C.17.  FTX Facility Claims are contractually subordinated to Account Holder Claims.

[49]   Plan Art. III.C.18–20.

[50]   Plan Art. III.C.21.

[51]   11 U.S.C. § 1123(a)(5).

means by which the Plan will be implemented.[52]   Among other things, Article IV of the Plan

provides for:

     a.     the general settlement of Claims and Interests;

     b.     the consummation of the Restructuring Transactions, including the buying and selling of Digital Assets as necessary to make the Digital Assets Allocation;

     c.     the implementation of the Committee Settlement;

     d.     the establishment of, and vesting of assets in, the Wind-Down Debtors;

     e.     the execution of the Plan Administrator Agreement and the appointment of the Plan Administrator and the Wind-Down Debtors' Oversight Committee;

     f.     the effectuation of the Employee Transition Plan;

     g.     the sources of consideration for the Restructuring Transactions;

     h.     the cancellation of certain notes, instruments, certificates, and other documents; and

     i.     the preservation of the Retained Causes of Action.

The Debtors submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

40.    ***Non-Voting Stock.***  Section 1123(a)(6) of the Bankruptcy Code requires that a

debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.

As the Debtors are winding down, there will not be any issuance of non-voting equity

securities.[53]   Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the

Bankruptcy Code, and no parties have asserted otherwise.

41.    ***Selection of Officers and Directors.***  Section 1123(a)(7) of the Bankruptcy Code

requires that plan provisions with respect to the manner of selection of any director, officer, or

---

52    *See* Renzi Decl. ¶ 28.

53    *See* Renzi Decl. ¶ 30.

trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." The Plan provides that, on the Effective Date, the existing board of directors of the Debtors will be dissolved[54] and all of the Debtors' managers and officers will be discharged from their duties. On the Effective Date, the Plan Administrator will be appointed as the sole officer, director, and manager, of the Wind-Down Debtors[55] in the same fiduciary capacity as applicable to a board of managers and officers, subject to the oversight of the Wind-Down Debtors' Oversight Committee.[56]

42.    The Debtors filed the Plan Administrator Agreement in the Plan Supplement, which identities the Plan Administrator, the Plan Administrator's responsibilities, and the members of the Wind-Down Debtors' Oversight Committee. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### 3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

43.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) modify, impair, or leave unimpaired any class of claims or interests; (b) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (c) provide for the assumption or rejection of executory contracts and unexpired leases; (d) provide for the sale of all or substantially all of the property

---

[54]    Plan Art. IV.D.5 (except in the case of the Bermuda Debtor, where the board of directors shall be dissolved upon the entry of a winding up order by the Bermuda Court).

[55]    Except in the case of the Bermuda Debtor where the Plan Administrator shall be authorized by a power of attorney executed by the Bermuda Debtor to take actions consistent with the Cross-Border Insolvency Protocol Agreement to the same extent as if the Plan Administrator were the Bermuda Debtor in the Chapter 11 Cases.

[56]    *See* Plan Art. IV.D; Renzi Decl. ¶ 31.

of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims

or interests; or (e) "include any other appropriate provision not inconsistent with the applicable

provisions of [the Bankruptcy Code]."[57]

44.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.[58]

Specifically, under Article III of the Plan, Classes 1, 2, and 4-f are Unimpaired because the Plan

leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such

Classes.[59]   On the other hand, Classes 3-a, 3-b, 3-c, 3-d, 3-e, 4-a, 4-b, 4-c, 4-d, 4-e, 4-g, 4-h, 4-i,

5, 6, 7, 8, 9, 10, 13, 14, 15, 16, and 17 are Impaired since the Plan modifies the rights of the

Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the

Bankruptcy Code.[60]   Classes 11 (Intercompany Claims) and 12 (Intercompany Interests) may be

Impaired or Unimpaired under the Plan.

45.    In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of

the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases,

including any employee benefit plans, severance plans, and other Executory Contracts under

which employee obligations arise, that, as of the Effective Date, were not previously rejected,

assumed, or assumed and assigned, shall be deemed automatically rejected pursuant to

sections 365 and 1123 of the Bankruptcy Code, except to the extent set forth in the Plan.[61]

46.    Finally, the Plan contains provisions implementing certain releases and

exculpations, compromising claims and interests, and enjoining certain causes of action.   These

---

[57]    *See* 11 U.S.C. § 1123(b)(1)–(6).

[58]    *See* Renzi Decl. ¶ 36.

[59]    *See* Plan Art. III.

[60]    *See* Plan Art. III.

[61]    *See* Plan Art. V.A.

provisions are consistent with those approved by the Court in precedent chapter 11 liquidation

plans.[62]  Each of these provisions is appropriate because, as applicable, they (a) are the product

of arm's-length negotiations, including those that occurred during multiple mediation sessions

(b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are

given for valuable consideration, (d) are fair and equitable and in the best interests of the

Debtors, their estates, and these chapter 11 cases, and (e) are consistent with the relevant

provisions of the Bankruptcy Code and Third Circuit law.[63]  Such provisions, including certain

releases of potential Debtor claims in connection with the Committee Settlement, are discussed

in turn below, but, in summary, satisfy the requirements of section 1123(b).

47.    ***Settlement of Claims and Controversies.***    The Plan provides for the general

settlement of all Claims, Interests, Causes of Action, and controversies released, settled,

compromised, or otherwise resolved pursuant to the Plan.    The Plan also provides for

implementation of the Committee Settlement.  As described in greater detail in Article IV.C of

the Plan and Article X.Q. of the Disclosure Statement, the Committee Settlement is the result of

the Special Committee Investigation into the facts and circumstances of the Debtors' prepetition

conduct.  Over the course of the Investigation, the Special Committee, with Kirkland & Ellis

LLP's assistance, among other things, collected and reviewed approximately 60,000 documents

and conducted interviews of approximately twenty-five (25) witnesses.

---

[62]   *See, e.g.*, *Order Confirming the Second Amended Joint Chapter 11 Plan for Revel AC, Inc. and Its Affiliated Debtors filed* in *In re Revel AC, Inc.*, No. 14-22654 (MBK) (Bankr. D.N.J. June 30, 2014) at docket number 1914 (confirming liquidating chapter plan with third party and debtor releases consistent with those in the Debtors' plan).

[63]   *See* Renzi Decl. ¶ 35.

48.      As set forth in the Special Committee Report,[64] the Special Committee found that the potential Claims and Causes of Action that Estates may have against the Debtors' insiders all face substantial challenges, and the value of the settlements achieved exceed the risk-adjusted value of any potential claim.  Specifically, the Special Committee found that although certain potential avoidance actions may be colorable, the relevant question was whether pursuit of those or other claims would provide an overall benefit to the Estates, as opposed to reserving, resolving, or releasing such Claims or Causes of Action.[65]  The Special Committee negotiated settlements, subject to approval of the Court as part of Plan confirmation, which is clearly the best outcome for these estates—a position with which the Committee agrees.  Each component of the Committee Settlement is integral to the parties' entry into the Committee Settlement.[66]

49.      The Special Committee made the decision to settle, subject to Court approval, based on both the challenges in litigating the potential Claims and Causes of Action against the Debtors' insiders and the need to ensure the Estates' abilities to put their best foot forward in the Litigation.  In addition, any course of action that would eliminate the capability of reopening the BlockFi Platform and making Distributions in kind safely and securely or increase the challenges in effectuating it would outweigh the potential gain from pursuing any Claim or Cause of Action.

50.      The rationale for the Special Committee's negotiation and recommendation for the settlements is based, among other things, on the relative strength or weakness of these claims, the challenges involved in litigating these claims, the costs of litigating these claims, the

---

[64]   *See Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Settlement and Release of Claims and Causes of Action by and Among the Debtors and Certain of the Debtors' Insiders and (II) Granting Related Relief* [Docket No. 1173], Ex. B; *Should Potential Estate Causes of Action Against Insiders Be Litigated, Released, Settled or Retained?*

[65]   *See, e.g.*, *In re G-I Holdings. Inc.*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004); *In re Crivaro*, 2017 WL 3314232, at *5 (Bankr. D.N.J. 2017).

[66]   *See* Vogel Decl. ¶¶ 22-25.

potential net recovery even if successful, the risk of not having key witnesses in future litigation to ensure that the Estates are in the best position to prosecute and defend Litigation against other bankruptcy estates, and the need to ensure that the Estates are in a position to make Distributions of Digital Assets to Clients through the BlockFi Platform.  The Special Committee therefore believes, and the Debtors agree, that the settlements embodied in the Plan are in the best interests of the estate.  And the Committee after conducting its own parallel investigation, agrees.

51.    The compromises set forth in the Plan, including the Committee Settlement, are critical to bringing closure to these and other matters addressed in the Plan and permitting the Debtors to avoid waste and maximize the value of the Estates for the benefit of all parties in interest.[67]

52.    ***The Release, Exculpation, Injunction, and Bermuda Implementation Mechanism***.  The Plan includes certain releases, an exculpation provision, an injunction and a Bermuda Implementation Mechanism.  These discretionary provisions are proper because, among other things, they are necessary to bringing these chapter 11 cases to conclusion, securing necessary support for the Plan from the Committee, the Committee Settlement Parties, and the Bermuda Provisional Liquidators, are overwhelmingly supported by the Debtors' creditors as demonstrated by the voting results, and are consistent with applicable precedent.[68]

(i)    The Debtor Release Is Appropriate.

53.    Article VIII.A of the Plan provides for releases by the Debtors, Wind-Down Debtors and their estates of Claims and Causes of Action against the Released Parties[69]

---

[67]    *See* Vogel Decl. ¶ 26.

[68]    *See* Renzi Decl. ¶¶ 35-36.

[69]    Pursuant to the Plan, "<u>Released Parties</u>" means, collectively, in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtors; (c) the Releasing Parties; (d) the Bermuda Provisional Liquidators; (e) the Committee Settlement Parties (subject to the terms of the Committee Settlement); (f) the

(the "Debtor Release").  The Debtor Release is a vital component of the Plan, a sound exercise of

the Debtors' business judgment, and it should be approved.

54.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan

may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or

to the estate."[70]  A debtor may release claims under section 1123(b)(3)(A) "if the release is a

valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of

the estate."[71]

---

Indenture Trustee; and (g) each Related Party of each Entity in clauses (a) through (f); *provided* that any of (i) FTX; (ii) 3AC; (iii) Alameda; (iv) Emergent; (v) Marex; (vi) Core Scientific; (vii) the D&O Insurance Providers; (viii) any Holder of a Claim against or Interest in the Debtors that is not a Releasing Party; (ix) any known Holder of a Claim against or Interest in the Debtors that did not receive notice of the opportunity to opt out of the releases contained in the Plan; (x) Kroll Restructuring Administration LLC;[1] and (xi) each Related Party of each Entity in clauses (i) through (x) shall not be a "Released Party;" *provided further* that additional Persons, other than the Committee Settlement Parties and their Related Parties, may be included in the Plan Supplement as non-Released Parties.  [1] Exclusively with regard to Claims and Causes of Action (in law or equity) against Kroll arising from or related to the data breach occurring in or around August 2023 or any other data breach at Kroll during these Chapter 11 cases that impacts BlockFi claimants. Plan Art. I.A. 188.

[70]    *See In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 380 (Bankr. D.N.J. 2020) (The standards for approving a settlement are the same under both Bankruptcy Rule 9019 and section 1123(b)(3).).  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010) (citation omitted); *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir.2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."). Additionally, the Third Circuit has held that, to approve a settlement pursuant to Rule 9019, the court must balance: "'(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.'"  *In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir.2007) (quoting *In re Martin*, 91 F.3d 389, 393 (3d Cir.1996)).  In addition, the court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate.  *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("Under the 'fair and equitable' standard, we look to the fairness of the settlement to other persons, *i.e.*, the parties who did not settle.").

[71]    *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

55.      Courts in this jurisdiction generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[72]  The analysis includes an inquiry into whether there is:  (1) identity of interest between the debtor and non-debtor; (2) contribution to the plan by the non-debtor; (3) the necessity of the release to the plan; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[73]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[74]  The Debtor Release easily meets the applicable standard and should be approved.

56.      ***First***, an identity of interest exists between the Debtors and the parties to be released.  The Debtors have indemnity obligations to the vast majority of such parties (if not all), so such claims would be circular in any event.  In addition, each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been highly unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan and the Committee Settlement (or to participate in the ultimate implementation of both) without the Debtor Release.  The Debtor Release was tailored to capture the need for finality to those critical to the wind-down

---

[72]   *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).  The Master Mortgage factors have been adopted by the Third Circuit, including application by the Bankruptcy Court of the District of New Jersey as "neither exclusive nor conjunctive requirements, but . . . guidance in the Court's determination of fairness."  *See, e.g.*, *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011)).

[73]   *See In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Zenith Elecs. Corp.*, 241 B.R. at 110 and *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937)

[74]   *In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *In re Master Mortg.*, 168 B.R. at 935).

efforts of the Debtors and to maximizing value for creditors.  The Debtor Release provides that

needed finality, underpins the settlement and compromise of issues achieved by the Plan, and

actually permits the estate to consummate the Plan; therefore the inclusion of the Debtor Release

inures to the benefit of all the Debtors' stakeholders.

57.     **Second**, the substantial contributions are clear.  As Courts in this jurisdiction have

recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's

reorganization.[75]  Without the Debtor Release, the Debtors would be unable to make in-kind

Distributions, which is of critical importance to their creditors, as the employees necessary to do

so would not be incentivized to assist with the distribution process while the estates

simultaneously pursued potential claims against them.  Without the Debtor Release, the Debtors

would also be disadvantaged in prosecuting claims against, and defending claims asserted by,

FTX, Alameda, Emergent and 3AC.  In addition, as described in section IV.C.5 of the Plan and

section X.Q of the Disclosure Statement, the CEO, COO, and other insiders are making

additional personal contributions to the Plan pursuant to the Committee Settlement.  Without the

Debtor Release and the other provisions of the Plan, those contributions (monetary and non-

monetary), and the Plan and transactions contemplated thereby would not be possible.

58.     **Third**, the Debtor Release is essential to the success of the Debtors' Plan.  Absent

the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the

Plan, and highly unlikely that the Plan would exist at all.  As described above, each of the

Released Parties contributed substantial value to these chapter 11 cases and did so with the

understanding that they would receive releases from the Debtors.  In the absence of Released

---

[75]   *See In re Long Ridge Road Operating Company, II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14
(Bankr. D.N.J. Mar. 5, 2014) (finding that the non-debtor party had substantially contributed by providing
financial support, without which, the plan would not be feasible).

Parties' support, the Debtors would not be in a position to confirm the Plan, emerge from chapter 11, implement the Plan, and maximize value for creditors. The Debtor Release, therefore, is essential to the Debtors' Restructuring Transaction.

59. **Fourth**, the Plan, including the Debtor Release, has been overwhelmingly accepted by the Voting Classes include all classes of customer claims.[76]

60. **Fifth**, the Plan provides for meaningful (and if the Debtors prevail in the Litigation in some cases full) recoveries for creditors in exchange for, among other things, the Debtors giving up potential claims that would range from weak to frivolous under the releases.[77] As demonstrated by the Liquidation Analysis, the ranges of recoveries for Holders of Claims and Interests are materially higher under the Plan than they would have been in a chapter 7 liquidation scenario. The Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

61. Furthermore, as described above, the Debtors, through the Special Committee, conducted a review of potential claims and causes of action held by the Debtors' estates against insiders of the Debtors. The Debtors worked closely with their advisors, in consultation with other parties in interest, to analyze whether to pursue, release, retain, or settle all potential estate claims.[78] The Committee also conducted its own parallel investigation of potential claims and causes of action held by the Debtors' estates and engaged in informal discovery with the Debtors.[79] The Special Committee found that the cost to the Debtors' Estates to pursue such claims or causes of action (including professional fees) would be substantial and the odds of

---

[76]  *See generally* Voting Report.

[77]  *See* Disclosure Statement Art. V.D.

[78]  *See* Vogel Decl. ¶¶ 5-6.

[79]  *See* Vogel Decl. ¶ 7.

recovering material net value were low.[80]   No objector presents any serious argument to the

contrary, and the fact that after making a massive expenditure on behalf of creditors in its own

parallel investigation, the Committee now supports the global settlement embodied in the Plan,

speaks volumes.

62.    For the reasons set forth above, and as supported by the Vogel Declaration, the

*Zenith* factors support approval of the Debtor Release.   Moreover, the breadth of the Debtor

Release is consistent with those regularly approved in this jurisdiction and others.[81]   The Debtors

have easily satisfied the business judgment standard in granting the Debtor Release under the

Plan.   The Debtor Release is fair, reasonable, overwhelmingly supported by creditors, and in the

best interests of the Debtors' Estates.   Thus, the Court should approve the Debtor Release.

63.    For the foregoing reasons, the Debtors' agreement to provide the Debtor Release

constitutes a sound exercise of the Debtors' business judgment and should be approved.

(ii)    The Third-Party Release is Wholly Consensual and Is
Appropriate.

64.    In addition to the Debtor Release, Article VIII.B of the Plan provides that each

Releasing Party[82] that has not opted out shall release any and all Causes of Action such parties

---

[80]    *See* Vogel Decl. ¶ 16.

[81]    *See, e.g.*, *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan
providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re
Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding
Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS)
(Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D. Del.
Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016)
(same).

[82]    Pursuant to the Plan, "Releasing Parties" means, collectively, in each case in its capacity as such:   (a) the
Debtors; (b) the Wind-Down Debtors; (c) all Holders of Claims that vote to accept the Plan and who do not
affirmatively opt out of the releases provided by the Plan; (d) all Holders of Claims that are deemed to accept
the Plan and who do not affirmatively opt out of the releases provided by the Plan; (e) all Holders of Claims
who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan;
(f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases
provided by the Plan; (g) the Committee Settlement Parties (subject to the terms of the Committee Settlement);
and (h) each Related Party of each Entity in clauses (a) through (g).   For the avoidance of doubt, no Holder of

could assert against the Released Parties (the "Third-Party Release," and together with the Debtor Release, the "Releases").  The Third-Party Release is consistent with established Third Circuit law, integral to the Plan, and therefore should be approved.

65.    Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[83]  In this district, a release is consensual where (as here) parties receive notice of a plan's release provisions and have an opportunity to opt out.  Here, the ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release and clearly informed such Holders of the steps to take if they wanted to opt out of the Third-Party Release.[84]  Notices sent to Holders in Unimpaired Classes not entitled to vote similarly informed Holders of their ability to opt out.  Moreover, the Committee explicitly referenced the "opt-out" choice stakeholders had to make in its letter to creditors, and both the Debtors and Committee advertised it on social media.[85]  Thus,

---

any Claim or Interest that is deemed to reject this Plan shall be a Releasing Party.  *See* Plan, Art. I.A.189.  For the avoidance of doubt, subject to the express limitations set forth in the Plan, parties who are covered by the D&O Liability Insurance Policy retain their rights to coverage and indemnity as set forth in those policies.  *See* Plan, Art. V.F.

[83]  *See, e.g.*, *In re Am. Family Enters.*, 256 B.R. 377, 390 (D.N.J. 2000) (although in the context of a settlement, the court held that a consensual third-party release "the essential vehicle by which the Debtors c[ould] obtain the funds needed to perform their monetary obligations under the Plan" and is thus "substantially similar to the plan context"); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (collecting cases); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (stating that "a third party release may be included in a plan if the release is consensual"); *see also infra* ¶¶ 122-131 & nn. 87-88 and 173-182.

[84]  *See* Renzi Decl. ¶ 44.

[85]  *See e.g.*, https://blockfiofficialcommittee.com/faq/plan/ ("The Plan allows individual creditors to pursue direct claims against third parties, if desired, by "opting out" of the third-party releases.").  The UCC's letter to creditors [Docket No. 1306, Exhibit 9 at 11] made the choice available to them exceptionally clear:

affected parties were clearly on notice of the Third-Party Release and of their ability to opt out.

In fact, more than 10,000 creditors did exercise the opt out, which illustrates that Holders were in

fact adequately put on notice of their ability to opt out and had every chance to do so.

66.    Moreover, the Plan is a contract between a Debtor and its stakeholders,

implemented with approval from the Court.[86]  As with any party considering a contract, parties

entitled to vote on a chapter 11 plan consider the options in front of them holistically prior to

voting to accept or reject such a plan, including the benefits they get in exchange for giving

releases.  Courts in the Third Circuit and others have recognized that voting in favor of a plan is

sufficient to demonstrate consent to any third-party release contained therein.[87]  This structure

---

The Plan also includes an **optional** release of the Released Parties by all creditors who do not affirmatively opt-out of providing this release on their ballot or otherwise (with respect to creditors that are not entitled to vote).  On this point, the Committee negotiated modifications to the Plan and ballot procedures to enable creditors that vote in favor of the Plan to opt-out of providing releases to certain "third-parties."  Note that you will receive the broad preference waiver described above **regardless** of your choice with respect to this release.  The Committee has identified no other potential estate causes of action against customers that would be assigned to the Wind-Down Trustee to pursue other than the retained preference actions described above.

*If you do not opt out, you will be deemed to have granted this third-party release.  The Committee cannot make a recommendation to any individual creditor with respect to granting this third-party release, and you may wish to consult your own attorney to determine the effects of granting such release and if you should do so.*

[86]    *See, e.g.*, *In re Coram Healthcare Corp., Inc.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("[A] Plan is a contract that may bind those who vote in favor of it."); *see also In re Harstad*, 155 B.R. 500, 510 (Bankr. D. Minn. 1993) (holding that "a chapter 11 plan is a contract between the debtor and its creditors" and applying contracts law principle to plan interpretation issues).

[87]    *See, e.g.*, *In re Coram Healthcare Corp., Inc.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("To the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the [creditors], they are bound by that."); *In re Zenith Elecs. Corp.*, 241 B.R. 92 111 (Bankr. D. Del. 1999) (finding that a third-party release binds those voting in favor of the plan); *see also In re Specialty Equip. Companies, Inc.*, 3 F. 3d 1043, 1047 (7th Cir. 1993) ("Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors.  It binds only those creditors voting in favor of the plan of reorganization."); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) (holding that releasing parties "should include creditors who voted in favor of the Plan" and that "case law in this District and elsewhere supports the conclusion that the creditors' vote for the Plan constitutes a consent to the releases.").

does not take away any party's right to opt-out of the Third-Party Release if they so chose. Eligible parties were able to opt out of the third-party release by completing the Opt Out Form.[88]

67.     The Third-Party Release is an integral and essential provision of the Plan and helps provide finality for the Released Parties, is in exchange for good and valuable consideration provided by the Released Parties, is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, is fair and equitable, and reasonable, and is given and made after due notice and opportunity to be heard.  For the foregoing reasons, the Third-Party Release is permissible.

(iii)     The Exculpation Provision Is Appropriate.

68.     Article VIII.C of the Plan provides that each Exculpated Party[89] shall be released and exculpated from any causes of action arising out of acts or omissions in connection with these chapter 11 cases and certain related transactions, except for acts or omissions that are found to have been the product of actual fraud, willful misconduct, or gross negligence (the "Exculpation").  The Exculpation is intended to prevent collateral attacks against estate fiduciaries that have acted in good faith to help facilitate the Debtors' restructuring.  The Exculpation is an integral part of the Plan and otherwise satisfies the governing standards in the Third Circuit.  This provision provides necessary and customary protections to estate fiduciaries whose efforts were and continue to be vital to implementing the Plan.

---

[88]     *See In re RCS Cap. Corp.,* No. 16-10223 (MFW), Hr'g Tr. 59:21-60:2 (Bankr. D. Del. Mar. 21, 2016) ("[i]f a creditor doesn't want to grant a release, they can vote no and opt out . . . .").

[89]     Pursuant to the Plan, "Exculpated Parties" means, collectively, and in each case solely in its capacity as such and to the extent they are estate fiduciaries: (a) each of the Debtors and the Wind-Down Debtors; (b) the Committee and each of its respective members; and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former control persons, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, officers, directors, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such. *See* Plan, Art. I.A.120.

69.     In the Third Circuit, exculpation provisions like the one set forth in the Plan are regularly approved.[90]  Courts evaluate the appropriateness of exculpation provisions based on a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[91] Exculpation provisions that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[92]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se* but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[93]  Exculpation for parties participating in the Plan process is appropriate where Plan negotiations could not have occurred without protection from liability.[94]

70.     The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from

---

[90]  *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)).

[91]  *See, e.g.*, *In re Congoleum Corp.*, 326 B.R. 167, 189–90 (KCF) (Bankr. D.N.J. Jan. 26, 2007) (evaluating the appropriateness of the plan's exculpation provisions based on whether the parties played a significant role in the negotiations that led to the plan and whether the exculpation is necessary to the plan).

[92]  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011) (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[93]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[94]  *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) ("I believe that an appropriate exculpation provision should say that it bars claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.").

exposure to any lawsuits related to this chapter 11 process filed by unsatisfied parties.[95]

Moreover, the Exculpation provision and the liability standard it sets represent a conclusion of

law that flows logically from certain findings of fact that the Court must reach in confirming the

Plan as it relates to the Debtors.   As discussed above, this Court must find, under section

1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy

Code.   Additionally, this Court must find, under section 1129(a)(3), that the Plan has been

proposed in good faith and not by any means forbidden by law.   These findings apply to the

Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.

Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.

71.     Here, the Debtors and their officers, directors, and professionals actively

negotiated the Plan with the Committee and others.[96]   Such negotiations were extensive, and the

resulting Committee Settlement, embodied in the Plan, will maximize value for all stakeholders,

and enable the Debtors to emerge swiftly from chapter 11 while giving finality to all

stakeholders.   Furthermore, the Exculpation provision is limited to acts during these chapter 11

cases and does not extend beyond such time period.   Accordingly, the Court's findings of good

faith vis-à-vis the Debtors' chapter 11 cases should also extend to the Exculpated Parties.

72.     Under the circumstances, it is appropriate for the Court to approve the

Exculpation provision and to find that the Exculpated Parties have acted in good faith and in

compliance with the law.

---

[95]   *See* Vogel Decl. ¶ 19.

[96]   *See id.*

   (iv) The Injunction and Bermuda Implementation Provision Are
Appropriate.

73. The injunction provision set forth in Article VIII.D of the Plan (the "Injunction
Provision") is limited in scope to prevent any interference by third parties with the use and
distribution of the Debtors' assets in the manner contemplated by the Plan and to implement the
release and exculpation provisions of the Plan.  The Injunction Provision is a key provision of
the Plan because it enforces the terms that are critically important to the Plan.[97]  As such, the
Debtors respectfully submit that the Injunction Provision is appropriate.

74. The Bermuda Implementation Provision together with a Bermuda Order are
critical safeguards to ensure the proper implementation of the Plan with respect to BlockFi
International Ltd. in accordance with Bermuda Law.  The Debtors, in conjunction with the
Bermuda Provisional Liquidators, carefully evaluated the range of Bermuda law mechanisms and
orders which may be needed to consummate the Plan with regard to the Bermuda Debtor.  The
Plan contains the Bermuda Implementation Provision and Bermuda Order so that the Bermuda
Court may provide assistance to the Bankruptcy Court in giving effect to the Plan in accordance
with Bermuda law with respect to the Bermuda Debtor.  Accordingly, the Debtors respectfully
submit that the Bermuda Implementation Provision and Bermuda Order are necessary and
appropriate to ensure that the Plan as it relates to the Bermuda Debtor is given full force and
effect in Bermuda.

75. The Debtors submit that the discretionary provisions of the Plan are consistent
with and permissible under section 1123(b) of the Bankruptcy Code.  In light of the foregoing,
because the Plan fully complies with section 1122 and 1123 of the Bankruptcy Code, the Debtors

---

[97] *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992) (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

### 4.    The Plan Complies with Section 1123(d) of the Bankruptcy Code.

76.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[98]

77.    The Plan complies with section 1123(d) of the Bankruptcy Code.    The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount, if any, on the Effective Date, subject to the limitations described in Article V.D of the Plan or the Confirmation Order.[99] In accordance with Article V.D of the Plan and section 365 of the Bankruptcy Code, the Debtors provided notice of the amount and timing of payment of any cure payments to the parties to the applicable assumed Executory Contracts or Unexpired Leases as part of the Plan Supplement. The Plan also sets forth procedures for counterparties to assumed Executory Contracts or Unexpired Leases to follow in the event they submit a request for payment that differs from ordinary course amounts paid or proposed to be paid by the Debtors.    Accordingly, the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code, and no party has asserted otherwise.

### B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

78.    The principal purpose of section 1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code regarding solicitation of acceptances of

---

[98]    11 U.S.C. § 1123(d).

[99]    *See* Plan Art. V.D.

a plan.[100]   The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[101]   As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims, Noticing, and Solicitation Agent in accordance with the Conditional Disclosure Statement Order.[102]

### 1.    The Debtors Complied with Section 1125 of the Bankruptcy Code.

79.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[103] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[104]

---

[100]   *See, e.g.*, *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 170 (Bankr. D.N.J. 2010) ("Section 1129(a)(2) requires that '[t]he proponent of the plan compl[y] with the applicable provisions of this title.'") (citing 11 U.S.C. § 1129(a)(2)); *In re PWS Holding Corp.,* 228 F.3d 224, 248 (3d Cir.2000) ("§ 1129(a)(2) requires that the plan proponent comply with the adequate disclosure requirements of § 1125").

[101]   *See also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 170 (Bankr. D.N.J. 2010); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) (collectively, the legislative history refers to section 1125, regarding disclosure, as an example of one of those "applicable provisions").

[102]   *See* Renzi Decl. ¶ 4.

[103]   11 U.S.C. § 1125(b).

[104]   *See Matter of Union Cnty. Wholesale Tobacco & Candy Co., Inc.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) (the standards of section 1125 "essentially require information sufficient to enable a hypothetical reasonable investor to make an informed judgment re acceptance or rejection of the plan").

80.     Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Court conditionally approved the Disclosure Statement.[105]  The Court also approved the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[106]  As stated in the Voting Report, the Debtors, through the Claims, Noticing, and Solicitation Agent, complied with the content and delivery requirements of the Conditional Disclosure Statement Order, satisfying sections 1125(a) and (b) of the Bankruptcy Code.[107]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and all parties deemed to accept or reject the Plan.[108]

81.     Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Conditional Disclosure Statement Order, and no party has asserted otherwise.

### 2.     The Debtors Complied with Section 1126 of the Bankruptcy Code.

82.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[109]  As noted above, the Debtors did not solicit votes on the Plan from the following Classes:

---

[105]   *See* Conditional Disclosure Statement Order.

[106]   *See generally* Conditional Disclosure Statement Order.

[107]   *See* Voting Report; *see also* Affidavit of Solicitation.

[108]   *See* Voting Report; *see also generally* Affidavit of Solicitation.

[109]   *See* 11 U.S.C. § 1126.

- Class 1 (Secured Tax Claims), Class 2 (Other Priority Claims), and Class 4-f (BlockFi Wallet LLC General Unsecured Claims) which are Unimpaired under the Plan (collectively, the "Unimpaired Classes").[110]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Class 4-d (BlockFi Services, Inc. General Unsecured Claims), Class 4-e (BlockFi Trading LLC General Unsecured Claims), Class 4-g (BlockFi Ventures LLC General Unsecured Claims), Class 4-h (BlockFi Investment Products LLC General Unsecured Claims), Class 4-i (BlockFi Lending II LLC General Unsecured Claims), Class 5 (FTX Facility Claims), Class 6 (FTX Avoidable Transfer Claims), Class 7 (Alameda Claims), Class 8 (3AC Claims), Class 9 (Government Penalty Claims), Class 10 (*De Minimis* Claims), Class 13 (Existing Preferred Equity Interests), Class 14 (Existing Common Equity Interests), Class 15 (SEC Penalty Claims), and Class 17 (State Governmental Regulatory Claims) which are Impaired and receiving no recovery under the Plan (the "Deemed Rejecting Classes").[111]  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

- Class 11 (Intercompany Claims) and Class 12 (Intercompany Interests) may be Impaired or Unimpaired under the Plan.  Pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, as applicable, Holders of Claims in Classes 11 and 12 are conclusively presumed to have accepted the Plan or rejected the Plan, as applicable, and, therefore, were not entitled to vote on the Plan.

83.     Accordingly, the Debtors solicited votes only from Holders of Allowed Claims in the Voting Classes—Classes 3-a, 3-b, 3-c, 3-d, 3-e, 4-a, 4-b, 4-c, and 16—because each of these Classes is Impaired and entitled to receive a distribution under the Plan.[112]  With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed

---

[110]    *See* Plan, Art. III.B.

[111]    *See* Plan, Art. III.B.

[112]    Plan, Art. III.B*; see generally* Affidavit of Solicitation.

claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[113]

84.     The Voting Report, summarized above, demonstrates that the Plan has been accepted by all of the Voting Classes in accordance with section 1126 of the Bankruptcy Code.[114]  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

### C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

85.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[115]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[116]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[117]

86.     The Plan was proposed with integrity, good intentions, and with the goal of maximizing stakeholder recoveries.  Throughout these cases, the Debtors, the Debtors' board of directors, and their senior management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.  Importantly, the Plan is supported by the

---

[113]   11 U.S.C. § 1126(c).

[114]   *See generally* Voting Report, Ex. A.

[115]   11 U.S.C. § 1129(a)(3); *see also In re: Diocese of Camden, New Jersey*, No. 20-21257 (JNP), 2023 WL 5605156, at *25 (Bankr. D.N.J. Aug. 29, 2023) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000)); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 134 (Bankr. D.N.J. Apr. 12, 2010).

[116]   *E.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[117]   *E.g.*, *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993).

Committee[118] and all Voting Classes.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

### D.   The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).

87.   Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.[119]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[120]

88.   The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[121]  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these chapter 11 cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[122]  Article II.B.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than (forty-five) 45 days after the Effective Date for determination by the Court, after notice and a

---

[118]  *See* Hr'g Tr. 13:24–14:5 (Aug. 1, 2023) *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 22, 2023) (at the hearing on the Debtors' Conditional Disclosure Statement, Kenneth Aulet of Brown Rudnick, LLP, counsel to the Committee stated, "we are pleased that we have a plan and disclosure statement that the Committee can support").

[119]  11 U.S.C. § 1129(a)(4).

[120]  *In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (Bankr. D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[121]  *See* Renzi Decl. ¶ 56.

[122]  *See* Plan, Art. II.

hearing, in accordance with the procedures established by the Court.[123]    Accordingly, the Plan

fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party

has asserted otherwise.

> **E.    The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

89.    The Bankruptcy Code requires the plan proponent to disclose the affiliation of any

individual proposed to serve as a director or officer of the debtor or a successor to the debtor

under the plan.[124]    Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance

of such officers and directors be consistent with the interests of creditors and equity security

holders and with public policy.[125]

90.    The Plan satisfies section 1129(a)(5)(A)(i) of the Bankruptcy Code because the

Debtors have disclosed the identities of the Plan Administrator and the members of the

Wind-Down Debtors' Oversight Committee, and the responsibilities and compensation thereof.

Therefore, the requirements under section 1129(a)(5) of the Bankruptcy Code are satisfied, and

no party has asserted otherwise.

> **F.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

91.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any

regulatory commission that has or will have jurisdiction over a debtor after confirmation has

approved any rate change provided for in the plan.    The Plan does not provide for any rate

---

[123]    *See* Plan, Art. II.

[124]    11 U.S.C. § 1129(a)(5)(A)(i).

[125]    11 U.S.C. § 1129(a)(5)(A)(ii).

changes and the Debtors are not subject to any such regulation.[126]  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases, and no party has asserted otherwise.

### G.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).

92.    The "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[127]

93.    To demonstrate compliance with section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of Berkeley Research Group, the Debtors' restructuring advisors, prepared a liquidation analysis, which is attached to the Disclosure Statement as <u>Exhibit B</u> (the "<u>Liquidation Analysis</u>") and discussed at length in the Witherell Declaration.[128]  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[129]

---

[126]  *See* Renzi Decl. ¶ 58.

[127]  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

[128]  *See* Witherell Decl. ¶¶ 9-26.

[129]  *See* Witherell Decl. ¶ 25.

The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions regarding a hypothetical conversion to a chapter 7 liquidation as of a certain date.[130]

94.     Based on the Liquidation Analysis, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan.[131] Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**H.      The Plan Satisfies the Bankruptcy Code's Voting Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

95.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[132]   If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[133]

96.     All Voting Classes (Classes 3-a, 3-b, 3-c, 3-d, 3-e, 4-a, 4-b, 4-c and 16) voted to accept the Plan.  However, because certain Classes are deemed to reject the Plan, the Debtors do not satisfy section 1129(a)(8) of the Bankruptcy Code.  However, even though certain Classes are deemed to reject the Plan, the Debtors still satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code because, as discussed below, the Plan does not discriminate unfairly and is fair and equitable with respect to the deemed rejecting Classes.

---

[130]    *See* Witherell Decl. ¶ 12.

[131]    *See* Witherell Decl. ¶ 26.

[132]    11 U.S.C. § 1129(a)(8).

[133]    11 U.S.C. § 1129(b).

## I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).

97.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[134]    In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[135] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).    Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

98.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim allowed on or prior to the Effective Date will receive payment in full in Cash no later than thirty (30) days after the Effective Date or as soon as

---

[134]    11 U.S.C. § 1129(a)(9).

[135]    11 U.S.C. § 1129(a)(9)(A).

reasonably practicable thereafter.   *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course.[136]   *Third*, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

99.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[137]

100.    As set forth above, Holders of Claims in all Voting Classes—which are each an Impaired Class under the Plan—overwhelmingly voted to accept the Plan independent of any insiders' votes.[138]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

---

[136]   *See* 11 U.S.C. § 1129(a)(9)(A).

[137]   11 U.S.C. § 1129(a)(10).

[138]   *See* Voting Report, Ex. A.

### K. The Plan Is Feasible (§ 1129(a)(11)).

101.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine, in

relevant part, that confirmation is not likely to be followed by the liquidation or further financial

reorganization of the Debtors (or any successor thereto), unless such liquidation or

reorganization is proposed in the Plan.   The debtor bears the burden of demonstrating the

feasibility of the plan by a preponderance of the evidence.   There is a relatively low threshold of

proof necessary to satisfy the feasibility requirement.[139]   The Court need not require a guarantee

of success to find the Plan feasible.[140]   Instead, the Court must find that the "plan offers a

reasonable expectation of success…."[141]

102.    In determining standards of feasibility, courts have identified the following

probative factors:

- the adequacy of the capital structure;

- the earning power of the business;

- the economic conditions;

- the ability of management;

- the probability of the continuation of the same management; and

---

[139]   *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds,* 464 B.R. 208 (Bankr. D. Del. 2011).

[140]   *In re Walker*, 165 B.R. 994, 1004 (E.D. Va. 1994) (Noting that the "plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.").

[141]   *See, e.g.*, *In re G–1 Holdings Inc.,* 420 B.R. 216, 267 (D.N.J. 2009) (the "key element of feasibility is whether there is a reasonable probability the provisions of the Plan can be performed").

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[142]

103.    The Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code and should be confirmed.  The Plan provides for the orderly liquidation and wind down of the Debtors and distributions to Holders of Allowed Claims in accordance with the Bankruptcy Code and applicable law.  The Debtors have worked with their advisors to ensure that the Wind-Down Debtors maintain adequate liquidity and the necessary staffing in order to effectively wind down the Debtors' estates.  Rather than unnecessarily elongate these cases through a conversion to chapter 7, the Plan provides closure and assurance that the assets of the Debtors' Estates are being distributed to creditors in a value maximizing manner without the need for any further financial restructuring.  Thus, if confirmed as proposed, the Plan satisfies the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code.

### L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).

104.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

105.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.G of the Plan provides that all fees and applicable interest payable pursuant to section 1930 of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the

---

[142]    *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

Wind-Down Debtors for each quarter (including any fraction thereof) until the chapter 11 cases

are converted, dismissed, or a Final Decree is issued, whichever occurs first.  Accordingly, the

Debtors submit that the Plan fully complies with and satisfies the requirements of section

1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

### M.      Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.

106.    A number of the Bankruptcy Code's confirmation requirements are inapplicable

to the Plan.  Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue

all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).[143]  The Debtors have

no obligations to pay retiree benefits and, as such, section 1129(a)(13) of the Bankruptcy Code is

inapplicable to the Plan.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan

because the Debtors are not subject to any domestic support obligations.[144]  Section 1129(a)(15)

is inapplicable to the Plan because none of the Debtors are "individuals" as that term is defined

in the Bankruptcy Code.[145]  Section 1129(a)(16) of the Bankruptcy Code is also inapplicable

because the Plan does not provide for any property transfers by a corporation or trust that is not a

moneyed, business, or commercial corporation or trust.[146]

---

[143]   11 U.S.C. § 1129(a)(13). Section 1114(a) of the Bankruptcy Code defines "retiree benefits" as: "[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title."

[144]   *See id.* § 1129(a)(14).

[145]   *See id.* § 1129(a)(15).

[146]   *See id.* § 1129(a)(16).

### N.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.

107.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.   To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[147]

108.    As noted above, all Impaired Classes of Claims entitled to vote on the Plan voted in favor of the Plan.   However, the Deemed Rejecting Class have or are deemed to have rejected the Plan.   Nonetheless, as set forth below, the Plan satisfies the requirements under section 1129(b) of the Bankruptcy Code, and no party has asserted otherwise.

#### 1.      The Plan Is Fair and Equitable (§ 1129(b)(2)(B)(ii)).

109.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[148]  This requires that an impaired rejecting class of claims or interests either be paid in full

---

[147]  *In re John Hancock Mut. Life Ins. Co.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (a plan must be "'fair and equitable' and may not unfair[ly] discriminat[e] under the requirements of section 1129(b)").

[148]  *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999) ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).   That latter condition is the core of what is known as the 'absolute priority rule.'").

or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[149]

110.    The Plan satisfies section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that the Deemed Rejecting Classes are deemed to have rejected the Plan, the Plan is confirmable.  There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

### 2.    The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (§ 1129(b)(1)).

111.    Unlike the concept of "fair and equitable," which is defined under the Bankruptcy Code, the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.  Courts typically examine the facts and circumstances of the particular case to make the determination.[150]  In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[151]  A threshold inquiry to assessing whether a proposed chapter 11

---

[149]   § 1129(b)(2)(B)(ii).

[150]   *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 158 (Bankr. D.N.J. 2010) (neglecting to apply a set standard or test to ascertain whether a plan unfairly discriminates, instead opting to consider "various standards" for a general analysis of unfair discrimination including whether the discrimination is "supported by a reasonable basis" and is "proposed in good faith"); *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 375 (Bankr. D.N.J. 2020) (considering the unique factual circumstances to determine whether the requirements of section 1129(b) are satisfied).

[151]   *See In re Ocean View Motel, LLC*, No. 20-21165-ABA, 2022 WL 243213, at *1 (Bankr. D.N.J. Jan. 25, 2022) (stating that "[u]nder 1129(b)(1), a plan unfairly discriminates when it treats similarly situated classes differently without a reasonable basis for the disparate treatment" (internal citations omitted)).

plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[152]

112.    Here, the Plan's treatment of the non-accepting Impaired Classes (*i.e.*, the Deemed Rejecting Classes) is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale.  Claims in the Deemed Rejecting Classes are not similarly situated to any other Classes given their distinctly different legal character from all other Claims and Interests.  The Plan's treatment of the Deemed Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.  Furthermore, where the Plan provides differing treatment for certain Classes of Claims or Interests, the Debtors have a rational basis for doing so.

113.    For the reasons set forth above, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

**O.    The Debtors Complied with Sections 1129(c) and 1129(d) of the Bankruptcy Code.**

114.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  ***First***, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan.[153]  ***Second***, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[154]  Moreover, no governmental unit or any other party has requested that the Court decline to

---

[152]   *See Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. 111, 121 (Bankr. D. Del. 2006)).

[153]   *See* Renzi Decl. ¶ 69.

[154]   *See* Renzi Decl. ¶ 70.

confirm the Plan on such grounds.[155]    Accordingly, the Plan satisfies the requirements of

section 1129(d) of the Bankruptcy Code.  *Lastly*, section 1129(e) of the Bankruptcy Code is

inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[156]

Accordingly, the Plan satisfies the requirements of section 1129(c), (d), and (e) of the

Bankruptcy Code, and no party has asserted otherwise.

### P.    Modifications to the Plan.

115.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may

modify its plan at any time before confirmation as long as such modified plan meets the

requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent

of a plan files the plan with modifications with the court, the plan as modified becomes the plan.

Bankruptcy Rule 3019 provides that modifications to a plan after such plan has been accepted

will be deemed accepted by all creditors and equity security holders who have previously

accepted the plan if the court finds that the proposed modifications do not adversely change the

treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting

Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a

previously accepted plan will be deemed accepted where the proposed modification is not

material or does not adversely affect the way creditors and stakeholders are treated.[157]

116.    Following solicitation, the Debtors made certain modifications to the Plan to

clarify certain provisions, to resolve formal and informal comments to the Plan by parties in

---

[155] *See id.*

[156] *See* Renzi Decl. ¶ 71.

[157] *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

interest, and to provide flexibility with respect to the treatment of certain claims (collectively, the "Modifications"). The Modifications allow certain creditors to **elect** to receive different treatment than the treatment provided under the solicited Plan. If creditors do not elect to do so, they will receive the treatment under the solicited Plan. As a result, these Modifications will have no impact on creditors in the affected Classes unless the Holder voluntarily elects to receive the alternate treatment. The Debtors also made Modifications to the Plan to clarify that notwithstanding the Debtor Release, the Debtors and the Wind-Down Debtors maintain the right to object to Claims or Interests. This is not a material Modification to the Plan as Article VII.B of the solicited Plan expressly provided that after the Effective Date the Wind-Down Debtors would have the sole authority to file, withdraw or litigate to judgment any objections to Claims or settle or compromise any Disputed Claims. In construing the terms of the entire Plan, no reasonable creditor could draw the conclusion that through the Debtor Release, the Debtors were agreeing to relinquish their right to object to Claims or Interests asserted against the Debtors as opposed to releasing the Debtors' affirmative claims and causes of action against the Released Parties.[158]

117. The Modifications are immaterial or otherwise do not affect the treatment of creditors absent their consent and thus comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Accordingly, the Debtors submit that no additional solicitation or

---

[158] A court should first employ a "plain meaning" analysis in any contract dispute. *Aleman Food Services, Inc. v. United States*, 994 F.2d 819, 822 (Fed. Cir. 1993). The intention of the parties to a contract controls its interpretation. *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (Ct. Cl. 1971). In construing the terms of a contract, however, the parties' intent must be gathered from the instrument as a whole in an attempt to glean the meaning of terms within the contract's intended context. *Kenneth Reed Constr. Corp. v. United States*, 475 F.2d 583, 586 (Ct. Cl. 1973); *Tilley Constructors v. United States*, 15 Cl. Ct. 559, 562 (1988). Contract interpretation requires examination first of the four corners of the written instrument to determine the intent of the parties. *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972 (Ct. Cl. 1965). An interpretation will be rejected if it leaves portions of the contract language useless, inexplicable, inoperative, meaningless, or superfluous. *Ball State Univ. v. United States*, 488 F.2d 1014 (Ct. Cl. 1973); *Blake Constr. Co. Inc. v. United States*, 987 F.2d 743, 746-47 (Fed. Cir. 1993).

disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

### Q.      Good Cause Exists to Waive the Stay of the Confirmation Order.

118.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of fourteen (14) days after the entry of the order, unless the Court orders otherwise."[159]    Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.[160]  Each rule also permits modification of the imposed stay upon court order.[161]

119.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[162]   As noted above, these chapter 11 cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.  The Debtors have undertaken great effort to exit chapter 11 as soon as possible.  Additionally, each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.[163]

120.    In light of the requisite support by the Voting Classes, no parties will be prejudiced by waiver of the stay to facilitate the Debtors' swift emergence from chapter 11.

---

[159]   Fed. R. Bankr. P. 3020(e).

[160]   Fed. R. Bankr. P. 6004(h), 6006(d).

[161]   Fed. R. Bankr. P. 6004(h), 6006(d).

[162]   *See, e.g., In re L'OCCTAINE, Inc.,* No. 21-10632 (MBK) (Bankr. D.N.J. Aug. 25, 2021); *In re Hollister Construction Services, LLC,* No. 19-27439 (MBK) (Bankr. D.N.J. Apr. 16, 2021) (same); *In re SLT HoldCo, Inc., et al.* No. 20-18368 (MBK) (Bankr. D.N.J. Oct. 22, 2020).

[163]   *See* Renzi Decl. ¶ 74.

Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

## IV. The Objections Should be Overruled.

121.    Certain parties filed formal Objections to the Plan: (i) Ankura Trust Company LLC;[164] (ii) the United States Trustee;[165] (iii) the Securities and Exchange Commission;[166] (iv) Foreign Representative, Three Arrows Capital;[167] (v) FTX Trading Ltd., and its affiliated debtors and debtors in possession;[168] (vi) Cameron Wyatt, Proposed Securities Class Action Lead Plaintiff;[169] (vii) John Javes;[170] (viii) the Chubb Companies;[171] and John Lymn[172] (collectively, the "Objection Parties").  To date, the Debtors have successfully resolved many of

---

[164]  *Limited Objection of Ankura Trust Company, LLC to Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1478] (the "Ankura Objection").

[165]  *Objection of the United States Trustee to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1476] (the "U.S. Trustee Objection").

[166]  *Limited Objection and Reservation of Rights of the U.S. Securities and Exchange Commission to Confirmation of Debtors' Joint Chapter 11 Plan* [Docket No. 1487] (the "SEC Objection").

[167]  *The Joint Liquidators' Limited Objection to Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1474] (the "3AC Objection").

[168]  *Objection of the FTX Debtors to (I) Confirmation of the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates and (II) Final Approval of the Debtors' Disclosure Statement* [Docket No. 1488] (the "FTX Objection").

[169]  *Objection of Cameron Wyatt, Proposed Securities Class Action Lead Plaintiff, to (I) Confirmation of the Debtors' Proposed Chapter 11 Plan and (II) Fina Approval of the Disclosure Statement in Connection Therewith* [Docket No. 1475] (the "Wyatt Objection").

[170]  *Verified Objection of Creditor John A. Javes to Confirmation of the Third Amended Joint Chapter 11 Plan* [Docket No. 1473] (the "Javes Objection").

[171]  *Limited Objection of the Chubb Companies to Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1519] (the "Chubb Objection").

[172]  *Objection to Debtors' Notice of Filing Technical Modifications to Third Amended Joint Chapter 11 Plan of Blockfi and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and to Confirmation of the Plan* [Docket No. 1600] (the "Lymn Objection").

these objections and expect to resolve additional objections before the commencement of the

Combined Hearing.[173]

### A.      The Third-Party Release Should Be Approved

122.     As discussed in section II.A.3.ii herein, the Third-Party Release in Article VIII.B

of the Plan is reasonable, appropriate, consistent with provisions regularly approved in the Third

Circuit, and critical to the Plan.  It should be approved.

### 1.      The Third-Party Release Is Consensual and Appropriate.

123.     The Third-Party Release is a consensual release.   All parties in interest—

including the Objecting Parties—had ample opportunity to evaluate and opt out of the Third-

Party Release by (a) returning an opt-out form to the Debtors and checking the opt-out box or

(b) objecting (formally or informally) to the Third-Party Release.  As such, under settled Third

Circuit law, the Third-Party Release is a consensual release given by all creditors and interest

holders who did not opt out or object to the Third-Party Release.

124.     The Objecting Parties' contention that the Third-Party Release is not consensual

is belied by the plain language of the Plan, robust service of Court-approved notices to Holders

of Claims and Interests alerting them to the Third-Party Release and the procedures for

exercising their right to opt out, and the fact that many parties in interest (more than 10,000)

availed themselves of the opt-out mechanism.  The law is clear that a release is consensual where

parties have received sufficient notice of a plan's release provisions and have had an opportunity

to object to or opt out of the release and failed to do so (including where such holder abstains

from voting altogether).   The Debtors clearly and conspicuously included the Third-Party

---

[173]   Of the remaining outstanding Objections, those that raise actual objections to confirmation of the Plan have
been addressed through additional language in the Plan or the Confirmation Order, as described herein and
summarized in the chart attached hereto as **Exhibit A** (the "Objection Response Chart").

Release language in the Opt-Out Forms and through the Combined Hearing Notice, Ballots, and

Notices of Nonvoting Status, explicitly alerted parties that unless they expressly opted out of the

Third-Party Release, they would be a Releasing Party under the Plan. The Committee also

emphasized this choice for creditors in its letter, which was sent to all parties-in-interest through

the Solicitation Packages.[174] Accordingly, there is no question that all applicable stakeholders

had proper notice of their rights and could have chosen to opt out of the Third-Party Release.

125.    The Objecting Parties assert that the Third-Party Release is non-consensual

because Holders that failed to vote or voted to reject the Plan missed the opportunity to opt out of

the Third-Party Release. However, the overwhelming weight of authority in this district suggests

otherwise, and most judges in this district have found that opt out mechanisms such as the one

included in the Plan constitute consensual releases.[175] Specifically, in *In re Saint Michael's

Medical Center*, this Court recognized that the releases provided through an opt-out mechanism

were "largely consensual," pointing to the numerous creditors who availed themselves of the

right to opt out.[176] Moreover, in *In re Aceto Corporation*, this Court approved third-party

releases from all parties who: (a) voted to accept the plan; (b) abstained from voting on the plan,

but failed to return an opt-out form; and (c) voted to reject the plan but did not elect on their

ballot to opt out of the third-party release.[177]

---

[174]    [Docket No. 1306, Exhibit 9] at 11.

[175]    *See, e.g., In re Congoleum Corporation*, Case No. 20-18488 (MBK) (Bankr. D. N.J. Jan. 25, 2021); *In re Modell's Sporting Goods, Inc.,* Case No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020); *In re SLT Holdco, Inc.*, Case No 20-18368 (MBK) (Bankr. D. N.J. Oct. 21, 2020); *In re Aceto Corporation*, Case No. 19-13448 (VFP) (Bankr D. N.J. Sept. 18, 2019); *In re Saint Michael's Medical Center, Inc.*, Case No. 15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017).

[176]    *In re Saint Michael's Medical Center*, Hr'g Tr. 3:13-15 (Jan. 12, 2017).

[177]    *In re Aceto Corporation*, Case No.-15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017).

126.    Indeed, the Court overruled precisely the same arguments raised by the Objecting

Parties in *In re SLT HoldCo*:

> As far as the third party releases I do not view them as non-consensual.  I view it as consensual.  I am –I find support in the fact that all creditors who are involved in this bankruptcy, all classes of claims received not only the opt-out provisions as part of a ballot, but if they were not given an opportunity to participate because they were not impaired or otherwise in a position to cast a ballot they were given and presented with the opt-out form.

> I disagree with Emerge Energy Services.  That language in which – and was cited by the U.S. Trustee both in argument and in their papers where the court held that the failure to return a notice can be due to carelessness and inattentiveness or mistake, and that's acceptable.  That's not acceptable.  I guess I'm frustrated with society today where we allow carelessness and inattentiveness and mistake to go without consequence.  There is consequence when you ignore your rights even if its through carelessness or inattentiveness.  And you forego the ability to pursue certain rights and remedies.  Due process requires proper notice, and I'm convinced that proper notice was granted in – was provided in this case.[178]

127.    Courts throughout this Circuit follow similar reasoning.  Recent cases, including a

decision two weeks ago from this Court, have upheld the notion that a non-debtor release is

consensual where (as here) holders of claims and interests are provided the opportunity to opt

out, even where the holders in such classes were deemed to reject the plan.[179]

128.    Here, again, the Third-Party Release releases Claims held by Holders in the

Voting Classes and the Unimpaired Classes only if such Holders did not opt out of the Third-

---

[178]    *In re SLT Holdco, Inc., et al.*, Case No. 20-18368 (MBK) (Oct. 21, 2020), Hr'g Tr. 27:18-28:13.

[179]    *In re Bed Bath and Beyond Inc.*, No. 23-13359 (VFP) Hr'g Tr. 39: 17-19 (Bankr. D.N.J. Sept. 14, 2023) ("The obligation to affirmatively opt out appears in the plan, in the disclosure statement, in the ballots.  It should come as no surprise."); *In re Lannett Company, Inc.*, No. 23-10559 (JKS) Hr'g Tr. 36: 2-8 (Bankr. D. Del. Jun. 8, 2023) ("As I and others on this Court have previously ruled, when a disclosure is prominent and conspicuous an opt-out mechanism is a valid means of obtaining consent.  It is incumbent on effected parties who have been properly served to protect their own rights.  Parties that fail to act in response to a judicial process are routinely bound by the results of the process.").

Party Release.  Holders of Claims in the Deemed Rejecting Classes are not subject to the Third-

Party Release.    The Debtors provided the Holders of Claims in the Voting Classes and

Unimpaired Classes with clear and conspicuous notice of the Third-Party Release via the Ballots

and the Opt Out Form.[180]  Further the Debtors posted information to the FAQs on their website

on why certain Holders received an Opt Out Form, instructions on how to submit such Opt Out

Form, and a link to the portal where Holders could properly submit their Opt Out Form.[181]

These FAQs were also linked to the Debtors' Twitter (n/k/a "X") account.[182]  The opportunity to

opt out was clear to all Releasing Parties under the Plan.

129.    The Objecting Parties also object to the Third-Party Release not including a

carve-out for fraud, intentional misconduct or gross negligence.    The Third-Party Release

without such carve out is clearly warranted under the circumstances.  Specifically, releasing any

and all potential claims of fraud, willful misconduct, and gross negligence is crucial to properly

implement the Plan.    The unique nature of these chapter 11 cases and the claims involved

provide that it is necessary for the Debtors to not carve out these types of claims from the Third-

Party Release.  The Debtors have hundreds of thousands of clients that have a unique outrage

towards certain of the Released Parties, specifically the Debtors' current officers and directors.

Unequivocally releasing such directors and officers was a necessary component to the

Committee Settlement and accordingly to reach the appropriate consensus to confirm the Plan.

Any carve out for fraud, willful misconduct, and gross negligence would allow such clients to

circumvent the Third-Party Release and expose the Released Parties to frivolous litigation, with

the majority of claims asserted against them being for or related to alleged fraud, gross

---

[180]    *See* Conditional Disclosure Statement Order.

[181]    *See BlockFi Voting FAQs* (Aug. 15, 2023), https://blockfi.com/voting-faq.

[182]    *See* @BlockFi, Twitter (n/k/a "X") (Aug. 15, 2023), twitter.com/BlockFi.

negligence, or willful misconduct.  Such litigation would be time consuming for the Released

Parties and ultimately hinder the Released Parties' ability to assist the Wind-Down Debtors and

Plan Administrator in making in-kind Distributions and pursuing litigation claims that would

increase creditor recoveries.  And, again, all stakeholders needed to do to preserve such claims

was to opt out, meaning that under clear law in this circuit, the release of such claims given by

stakeholders who do not opt out is consensual.

130.    The settlement embodied in the Plan also requires protecting the Released Parties

through the Gatekeeping Provision.  Carving out a release for fraud, willful misconduct, and

gross negligence would essentially defeat the purpose of the Gatekeeping Provision as it would

allow litigants to assert frivolous claims against the Released Parties if these claims were carved

out from the Third-Party Release, even if they did not opt out.  Doing so would deprive the Court

of its authority to determine whether such claims could be pursued in accordance with the Plan.

And, yet again, any creditor that desires to assert such claims may seek to do so if they opted out

of the Third-Party Release.

131.    The Objecting Parties fail to cite any Third Circuit authority that requires such a

carveout in non-debtor releases.  Courts in this district and within the Third Circuit have

repeatedly approved plans that did not include such a carveout.[183]

132.    The Third-Party Release is consensual, and the scope of the Third-Party Release

here is necessary for the consummation of the Plan, warranted under the circumstances, clearly

permitted by the applicable law, and should be approved without the carveout for fraud, willful

misconduct, or gross negligence.  Accordingly, the Objections should be overruled.

---

[183] *See, e.g.*, *In re Mountain Creek Resort, Inc.*, No. 17-19899-SLM (Bankr. D.N.J. Feb. 26, 2020) [Docket
No. 1219]; *In re Cinram Group, Inc.*, No. 17-15258-VFP (Bankr. D.N.J. Nov. 27, 2018) [Docket No. 568]; *In
re EOGH Liquidation, Inc., f/k/a/ East Orange Gen. Hosp.*, No. 15-31232-VFP (Bankr. D.N.J. June 28, 2016)
[Docket No. 690]; *In re Riverbed Techs., Inc.*, No. 21-11503 (Bankr. D. Del. Dec. 4, 2021) [Docket No. 169].

### 2.    Even if the Third-Party Release Is Non-Consensual, It Is Permissible.

133.    Even if the Court were to find that the Third-Party Release is non-consensual—which it should not—the Court should nevertheless approve the Third-Party Release under the circumstances of these Chapter 11 Cases.    Courts in the Third Circuit have held that a non-consensual release may be approved if such release is fair and necessary to the reorganization, and the court makes specific factual findings to support such conclusions.[184]   In addition, the Third Circuit has found that, for such releases to be permissible, fair consideration must be given in exchange for the release.[185]   "[N]ecessity requires a demonstration that the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability."[186]

134.    Here, the support of the Released Parties was critical in the strategic development of the Plan and in paving the way for emergence from these Chapter 11 Cases.    The Third-Party Releases are integral to the Plan and are fair and appropriate.    Without the efforts and contributions of the Released Parties, the Debtors would not be poised to confirm a plan, would not be able to make in-kind Distributions to clients and would not be in the best position to prevail in the Litigation with FTX, Alameda, and 3AC, further extending these Chapter 11 Cases and diminishing potential recoveries for all stakeholders.    The Third-Party Release was a

---

[184]   *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213-14 (3d Cir. 2000) (explaining that the "hallmarks" of permissible nonconsensual third-party releases are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions.")

[185]   *In re Cont'l Airlines*, 203 F. 3d 203, 214 (3d. Cir. 2000); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001) (considering whether: (a) the non-consensual release is necessary to the success of the reorganization; (b) the releasees have provided a critical financial contribution to the debtor's plan; (c) the releasees' financial contribution is necessary to make the plan feasible; and (d) the release is fair to the non-consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release).

[186]   *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001).

material inducement for support that the Released Parties have provided and will continue to provide in connection with the Plan.  Finally, the contributions made by the Released Parties are sufficient consideration to the parties bound by the Third-Party Release, as indicated by the broad support of the Plan among the Releasing Parties.

135.    Finally, holders of claims against the Debtors stand to benefit from the Third-Party Release given the mutuality of such releases.  The mutuality of the Third-Party Release—a "proverbial peppercorn-for-peppercorn"[187]—provides adequate consideration to parties under the Plan.  Accordingly, the Third-Party Release is necessary and reasonable under the circumstances, and the Objections should be overruled.

### B.    The Gatekeeping Provision Is Integral to the Plan and Should Be Approved.

136.    Certain of the Objecting Parties have objected to the "gatekeeping provision" in the Plan (the "Gatekeeping Provision"), which provides that:

> From and after the Effective Date, any Entity (i) that opted out of the releases contained in Article VIII.B of the Plan or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.    The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

---

[187]    *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) Hr'g Tr. 244:16-18 (Bankr. S.D. Tex. Apr. 4, 2018) [Docket No. 790] ("I simply find that this is, in effect, the proverbial peppercorn-for-peppercorn and that that is adequate consideration for the release, given its mutuality.").

137.    The Gatekeeping Provision is a legitimate exercise of this Court's power under sections 105, 1123(b)(6), and 1141(a), (b), and (c) of the Bankruptcy Code.  The purpose of the Gatekeeping Provision is to ensure that the Debtors and their successors-in-interest—namely, the Plan Administrator and the Wind-Down Debtors—as well as the Released Parties, do not become bogged down in vexatious, meritless litigation that never should have been brought in the first place.  And gatekeeping provisions are not a novel attempt to circumvent limitations on bankruptcy court jurisdiction; rather, they have been utilized by many courts to provide a threshold level of review following confirmation of a chapter 11 plan.  Under this construct, which has been approved in numerous jurisdictions[188] (including the District of New Jersey),[189] the Court serves as a "gatekeeper" and determines whether a litigant has a claim that remains assertable following confirmation of the Plan.

138.    In fact, the Gatekeeping Provision is an outgrowth of the long-standing "Barton Doctrine" established by the Supreme Court in *Barton v. Barbour*.[190]  The Barton Doctrine provides that, as a general rule, before a suit may be brough against a trustee, leave of the appointing court must be obtained.[191]  While the Barton Doctrine originated as a protection for federal receivers, courts have applied the concept to various participants in chapter 11 cases,

---

[188]    *In re Cineworld Group plc*, Case No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 26, 2023); *In re Avaya Inc.*, Case No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023); *In re Nautical Solutions, L.L.C.*, No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023); and *In re Highland Capital Management, L.P.*, Case No.19-34054-SGJ (Bankr. N.D. Tex. Nov. 24, 2020).

[189]    *See, In re Bed Bath and Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) (approving a similar gatekeeping provision because the Bankruptcy Court had jurisdiction and was in the best position to interpret the language of the plan and confirmation order); *In re National Realty Investment Advisors, LLC*, Case No. 22-14539 (JKS) (Bankr. D. N.J. Aug. 10, 2023) (providing that the Bankruptcy Court maintained exclusive jurisdiction to adjudicate matters related to the chapter 11 case on a post-effective date basis); *In re Princeton Alternative Income Fund, LP*, Case No. 18-14603 (MBK) (Bankr. D. N.J. Feb. 19, 2020) (explicitly applying the Barton Doctrine to post-confirmation suits).

[190]    *Barton v. Barbour*, 104 U.S. 126 (1881).

[191]    *Baron v. Sherman (In re Ondova Ltd. Co.,)*, 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. Feb. 1, 2017).

including debtors in possession,[192] officers and directors of a debtor,[193] and professionals retained by the debtors.[194]  By requiring claimants to seek leave of the Court before pursuing actions against the Released Parties, the Gatekeeping Provision is within the spirit of the protections afforded to fiduciaries and their agents under the Barton Doctrine.  The gatekeeping role is one played by Bankruptcy Courts in numerous contexts.  In the *Madoff* cases, the U.S. Bankruptcy Court for the Southern District of New York served as gatekeeper.[195]  In *In re Motors Liquidation Co.*, the U.S. Bankruptcy Court for the Southern District of New York serves as a gatekeeper to determine whether claims may properly be asserted against the pre- or post-reorganization General Motors entity.[196]  Under this construct, the Bankruptcy Court effectively serves the same role as it does when it determines whether a statutory committee should be granted standing to file litigation on behalf of a debtor; that is, the Court is asked to make a determination as to whether the claim at issue is colorable.

139.    Contrary to the Objecting Parties' assertions, the Gatekeeping Provision is not an attempt to impermissibly extend the Court's jurisdiction past its limits.  Courts in this circuit have confirmed plans on numerous occasions that provide permanent Bankruptcy Court jurisdiction over matters relating to the chapter 11 cases, recognizing that Bankruptcy Courts

---

[192]  *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession).

[193]  *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[194]  *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[195]  *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussing the Bankruptcy Court's gatekeeper role).

[196]  *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing Bankruptcy Court's gatekeeper role).

may continue to exclusively adjudicate such issues on a post-emergence basis.[197]   Furthermore,

courts have acknowledged that Bankruptcy Court jurisdiction over matters relating to chapter 11

cases may extend even further where the debtor is liquidating its assets, as is the case here.   In

*Boston Regional Med. Ctr. Inc. v. Reynolds (In re Boston Regional Med. Ctr. Inc.)*, the First

Circuit acknowledged that a "liquidating debtor exists for the singular purpose of executing an

order of the bankruptcy court," and "[a]ny litigation involving such a debtor thus relates much

more directly to a proceeding under title 11."[198]

140.    Furthermore, contrary to the assertions of the U.S. Trustee and the SEC,

the Gatekeeping Provision does not impose any greater burden on claimholders than the Plan

would impose without the Gatekeeping Provision.   Nearly all chapter 11 plans in complex cases,

including the Plan, contain an injunction permanently preventing parties from asserting released

claims against released parties.   If a claimant seeks to assert a claim following the effective date

of the Plan but is unsure whether that claim constitutes a direct or derivative (*i.e,* a released)

claim, the claimant will need a judicial determination that the claim was not released under the

Plan; otherwise, the claim could not be properly asserted and the claimant would be in contempt

of the Confirmation Order.   The Gatekeeping Provision ensures that the Court—the court most

familiar with the facts and circumstances of the Chapter 11 Cases, and the court best-positioned

to determine as to whether the claim may be asserted—is the court making that determination.

This inures to the benefit of all parties, including potential claimants.

---

[197]   *See, e.g., In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020) (providing that the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the chapter 11 cases and the plan); *In re Lannett Company, Inc.*, Case No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) (same).

[198]   *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr. Inc.)*, 410 F.3d 100 (1st Cir. 2005).

141.    The propriety of Gatekeeping Provisions was recently litigated in the Fifth Circuit in the *In re Highland Capital* matter.  There, the debtors sought approval of a provision nearly identical to the Gatekeeping Provision in the Plan.  In upholding confirmation of the plan, the Fifth Circuit recognized that the gatekeeping provision was necessary to ensure the effectiveness of the debtors' plan by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants."[199]  And indeed, following confirmation of the plan, the U.S. Bankruptcy Court for the Northern District of Texas exercised the gatekeeper provision by denying a suit by a non-debtor against the debtors' former chief executive officer.[200]

142.    The Court should approve the Gatekeeping Provision for the same reasons identified by the Northern District of Texas in *In re Highland Capital*.  Rather than seeking to shift the burden of proof to claimants or provide a further release of claims or causes of action under the Plan, the Gatekeeping Provision simply provides a threshold level of review necessary to ensure the effectiveness of the Plan.  In the absence of the Gatekeeping Provision, it is entirely possible that the parties who opt out of the Third-Party Release (and even those who did not) will seek to assert frivolous claims, or claims barred by the Plan's injunction provisions, thereby hindering the effectiveness of the Debtors' Plan.

143.    This Court approved the Gatekeeping Provision in another case two weeks ago.[201] And here, even more so than in that instance, the Gatekeeping Provision is a critical inducement for key constituencies, including the Committee Settlement Parties, to support the Plan.  Without

---

[199] *NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt, L.P.)*, 48 F.4th 419, 435 (5th Cir. 2022).

[200] *In re Highland Capital Management,* Case No.19-34054-SGJ (Bankr. N.D. Tex. Aug. 25, 2023).

[201] *In re Bed Bath and Beyond Inc.*, No. 23-13359 (VFP) Hr'g Tr. 41: 1-2 ("This Court holds similar views, that there is a purpose served by this gatekeeping function.").

the Gatekeeping Provision, which was highly negotiated among the Debtors, the Committee Settlement Parties and the Committee, the Committee Settlement which forms the cornerstone of the Plan would fall apart and the Debtors would be back to square one.   Accordingly, the Gatekeeping Provision represents a permissible exercise of the Court's jurisdiction, and will inure to the benefit of the Debtors, their successors-in-interest, and potential claimants. Accordingly, the Court should overrule the Objections and approve the Gatekeeping Provision.

       **C.**       **The Wyatt Objection Should Be Overruled**.

144.    The Wyatt Objection argues that (i) the Third-Party Release violated the due process rights of potential members of the putative (but not certified) securities fraud class action who got notice of the Third-Party Release and did not opt out, and (ii) the Disclosure Statement failed to provide adequate information regarding such securities fraud class action.   Both arguments are without merit and should be overruled.

145.    *First*, the Objecting Party lacks standing to object to a Third-Party Release that he has opted out of (as was his right) and thus does not affect him personally.   "To object to the confirmation of a reorganization plan in bankruptcy court, a party must, in the first instance, meet the requirements for standing that litigants in all federal cases face under Article III of the Constitution."[202]   Standing in bankruptcy cases is also governed by section 1109 of the Bankruptcy Code, which provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."[203]   To meet such standard, a party must demonstrate that confirming a plan would

---

[202]   *In re Global Indus. Tech., Inc.*, 645 F.3d 201, 210 (3rd Cir. 2011).

[203]   11 U.S.C. § 1109(b).

cause the party to personally suffer an "injury in fact" that is "concrete," "distinct and palpable,"
and "actual or imminent."[204]   Third Circuit authority clearly provides that "[p]arty in interest
standing under § 1109(b) does not arise if a party seeks to assert some right that is purely
derivative of another party's rights in the bankruptcy proceeding."[205]

146.    The Objecting Party has opted out of the Third-Party Release.  He thus plainly
lacks standing to object to a provision that does not affect him.

147.    Instead, what the Objecting Party is doing is objecting to the Third-Party Release
on behalf of *other people*—each of whom had the similar opportunity to opt out of the
Third-Party Release and chose not to.  He does not have standing on behalf of the members of
the purported class who did not opt out.  Each such person made an affirmative choice *not* to
participate in the proceeding that the Objecting Party (in reality, the Objecting Party's counsel)
seeks to prosecute on their behalf.  The Objecting Party and his counsel have no right to deprive
creditors who got actual notice of their options of the right to make that choice for themselves.

148.    ***Second***, even if the Objecting Party had standing to object to the Third-Party
Release on behalf of the class (which he does not), the Third-Party Release is consensual and
appropriate.  Again, parties bound by the Third-Party Release were given due and adequate
notice of the Third-Party Release and the opportunity to opt out.  The Debtors provided all
parties affected by the Third-Party Release, including each individual class member of the
Objecting Party, with robust notice of the Third-Party Release and the opportunity to opt out.
The Debtors noticed said Holders via the Opt Out Form, the Ballots, and the FAQs on the
Debtors' website, along with providing further information surrounding the Third-Party Release

---

[204]   *In re Vantage Drilling Int'l*, 603 B.R. 538, 545 (D. Del. 2019) (citing *Global*, 645 F.3d at 210).

[205]    *See Vantage Drilling*, 603 B.R. 538, 545-546 (quoting *Krys v. Official Comm. of Unsecured Creditors (In re Refco, Inc.)*, 505 F.3d 109, 117 & n.10 (2d Cir. 2007)).

in the Plan and Disclosure Statement.  The Committee emphasized this choice in its letter to creditors.  Moreover, this case has received massive amounts of publicity, and the individualized noticing scheme used in this chapter 11 case is far more robust than the notice procedures required in certifying a potential class claim.[206]  And more than 10,000 creditors *did* opt out.  To the extent the Objecting Party wants to "represent" other stakeholders, it had months to mobilize them, attempt to certify a class, seek to file a class proof of claim, or convince them to opt out, but failed to do so.  The Objecting Party cannot now seek to opt out of the Third-Party Release on behalf of a class that does not exist.

149.    What the Objecting Party is really doing is objecting to the concept of a Third-Party Release where a stakeholder gets notice of, but does not opt out of, that release.  But that argument has been rejected repeatedly in this district and by this Court, and there is no reason for a different result here[207]  All potential members of the Objecting Party's proposed class action were given notice and the opportunity to opt out of the Third-Party Release; as a matter of law, those who failed to opt out have consented to the release as part of their agreement with other stakeholders in these chapter 11 cases.  Failure to act on their rights during these Chapter 11 Cases should not invalidate the consensual nature of the Third-Party Release nor hinder confirmation of the Plan.

---

[206]    *See* Fed. R. Civ. P. 23(c)(2).

[207]    *See, e.g., In re Congoleum Corporation*, Case No. 20-18488 (MBK) (Bankr. D. N.J. Jan. 25, 2021); *In re Modell's Sporting Goods, Inc.,* Case No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020); *In re SLT Holdco, Inc.*, Case No 20-18368 (MBK) (Bankr. D. N.J. Oct. 21, 2020); *In re Aceto Corporation*, Case No. 19-13448 (VFP) (Bankr D. N.J. Sept. 18, 2019); *In re Saint Michael's Medical Center, Inc.*, Case No. 15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017); *In re Bed Bath and Beyond Inc.*, No. 23-13359 (VFP) Hr'g Tr. 39: 17-19 (Bankr. D.N.J. Sept. 14, 2023) ("The obligation to affirmatively opt out appears in the plan, in the disclosure statement, in the ballots.  It should come as no surprise."); *In re Lannett Company, Inc.*, No. 23-10559 (JKS) Hr'g Tr. 36: 2-8 (Bankr. D. Del. Jun. 8, 2023) (same).

150.    ***Third***, the Disclosure Statement provides adequate information surrounding the

Objecting Party's adversary proceeding.    Section X.J. of the Disclosure Statement clearly

provides that:

> On March 23, 2023, the Debtors commenced an adversary
> proceeding against Trey Greene ("Greene") and Antonie Elas
> ("Elas") seeking to extend the automatic stay or, in the alternative,
> seeking an injunction enjoining prosecution of two putative class-
> action lawsuits—one filed in New Jersey and the other in
> Massachusetts—against certain of the Debtors' officers, directors,
> and former employees related to BIAs.  (Adv. No. 23-01071)
> [Docket No. 1] (the "PI Complaint").  On March 23, 2023, the
> Bankruptcy Court held a hearing on the PI Complaint and, on the
> same day, entered its *Order to Show Cause With Temporary
> Restraints* (the "TRO") temporarily restraining Greene and Elas
> from prosecuting their putative class-action lawsuits pending a
> further hearing on the PI Complaint scheduled for April 19, 2023.
> (Adv. No. 23-01071) [Docket No. 10].  The Bankruptcy Court
> ordered, in the interim, that counsel for the Debtors, Elas, and
> Greene meet and confer regarding an expedited discovery schedule
> addressing the needs of the parties.  Following entry of the TRO,
> the Debtors, Greene, and Elas entered into a stipulation agreeing to
> enjoin the putative two class-action lawsuits until 30 days after the
> Effective Date of the Plan, with the exception of initial lead
> plaintiff filings.  The Bankruptcy Court subsequently entered the
> parties' stipulation as an order of the Bankruptcy Court [Docket
> No. 16].

Accordingly, the Wyatt Objection should be overruled.

**D.    The 3AC Objection Should be Overruled.**

151.    The 3AC Objection asserts that the Confirmation Order should include certain

language providing that the Classes deemed to reject the Plan are not subject to the Third-Party

Release.   Inserting this language in the Confirmation Order is simply unnecessary.   Classes

deemed to reject the Plan were excluded from the Plan's definition of "Releasing Parties"[208] and

---

[208]   Under the Plan, "*Releasing Parties*" means, collectively, in each case in its capacity as such:  (a) the Debtors;
(b) the Wind-Down Debtors; (c) all Holders of Claims that vote to accept the Plan and who do not
affirmatively opt out of the releases provided by the Plan; (d) all Holders of Claims that are deemed to accept
the Plan and who do not affirmatively opt out of the releases provided by the Plan; (e) all Holders of Claims

therefore are not subject to the Third-Party Release under the Plan.  Further, the Debtors have

included a provision in the Confirmation Order providing that for the avoidance of doubt 3AC

opts out of the Third-Party Release.

152.    Additionally, 3AC asserts that the Debtors should add language to the

Confirmation Order requiring the Debtors to notify 3AC as the amount of any Disputed Claims

Reserve prior to the Effective Date.  The Confirmation Order provides that prior to any

Distribution Date, the Debtors will file a notice on the docket of the proposed Disputed Claims

Reserve and all parties will have an opportunity to object at that time.  Accordingly, the 3AC

Objection should be overruled.

### E.    The Lymn Objection Should be Overruled.

153.    The Lymn Objection[209] asserts that a Modification to the Plan which clarifies that

the Debtors and the Wind-Down Debtors reserve the right to object to Claims and Interests was

an improper modification to the Plan.  This interpretation is inconsistent with the Plan,

Disclosure Statement, and section 502(a) of the Bankruptcy Code.[210]  As discussed above, the

solicited Plan explicitly preserved the Wind-Down Debtors' right to object to Claims and

Interests.  Specifically, Article VII.B of the solicited Plan provides that after the Effective Date

the Wind-Down Debtors would have the sole authority to file, withdraw or litigate to judgment

any objections to Claims or settle or compromise any Disputed Claims with any such objections

---

who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan;
(f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases
provided by the Plan; (g) the Committee Settlement Parties (subject to the terms of the Committee Settlement);
and (h) each Related Party of each Entity in clauses (a) through (g).  For the avoidance of doubt, no Holder of
any Claim or Interest that is deemed to reject this Plan shall be a Releasing Party.

[209]   *Objection to Debtors' Notice of Filing Technical Modifications to Third Amended Joint Chapter 11 Plan of
BlockFi and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and Confirmation to the Plan*
[Docket No. 1600].

[210]   11 U.S.C. § 502(a) ("A claim or interest…is deemed allowed…unless a party in interest…objects.").

to be filed before the Claims Objection Bar Date.  "Claims Objection Bar Date" is defined as the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtors, as applicable, or by an order of the Bankruptcy Court.  In addition, Article IV.D.6.j and Article IV.D.6.t of the solicited Plan, respectively, provide that the obligations of the Wind-Down Trustee include "reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind" and "allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtors."  When read as a whole, the Debtors submit that no Holder of Claims could reasonably interpret the Plan as releasing the Debtors and the Wind-Down Debtors right to object to Claims and Interests.

154.    The Disclosure Statement also put all creditors on notice that the Debtors and the Wind-Down Debtors reserve the right to object to Claims.  The introduction of the Disclosure Statement states in clear and conspicuous language that:

> ***THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.***[211]

Similarly, Article XI.A.2(j) and Article XI.A.2(o) of the Disclosure Statement provide "[t]he Debtors reserve the right to object to the amount or classification of any Claim under the Plan"

---

[211]    Disclosure Statement at 2.

and Article XI.E.4 of the Disclosure Statement provides that "[n]o reliance should be placed on the fact that a particular litigation claim, or projected objection to a particular Claim, is or is not identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims."  A proper interpretation of the Plan and Disclosure Statement leaves no doubt that the solicited Plan preserved the Debtors and the Wind-Down Debtors' right to object to claims.

155.    To be clear, confirmation of the Plan does not hinder the Objecting Party's right to dispute the Debtors' objection to its claims.  The Objecting Party's Claim is subject to the Debtors' Eleventh Omnibus Claims Objection.[212]   The response deadline to the Eleventh Omnibus Claims Objection is October 3, 2023 at 4:00 p.m. (prevailing Eastern Time) and the Eleventh Omnibus Claims Objection will be heard by the Court on October 10, 2023.  The Objecting Party's defenses to the Claims Objection should be heard at that time but should not be used as a litigation tactic to hold up confirmation of the Plan.

156.    Accordingly, the Modification was not a material modification to the Plan and the Lymn Objection should be overruled.

### Conclusion

157.    For all of the reasons set forth herein and in the Voting Report, the Witherell Declaration, the Renzi Declaration and the Vogel Declaration, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan as fully satisfying all of the applicable

---

[212]   *Debtors' Amended Eleventh Omnibus Objection to Certain Claims* [Docket No. 1450] (the "Eleventh Omnibus Claims Objection").

requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, overruling

any remaining Objections, and granting such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

Dated: September 25, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq. (NJ Bar No. 014321986)
Warren A. Usatine, Esq. (NJ Bar No. 025881995)
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christine A. Okike, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
(212) 446-4800
jsussberg@kirkland.com
christine.okike@kirkland.com

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Kenric D. Kattner, Esq. (admitted *pro hac vice*)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
kenric.kattner@haynesboone.com

*Attorneys for Debtors and*
*Debtors in Possession*

## Exhibit A

**Objection Response Chart**

**IN RE BLOCKFI INC.,** *ET AL.*, **CASE NO. 22-19361 (MBK)**

**CHART OF OBJECTIONS AND PROPOSED RESPONSES TO THE THIRD
AMENDED JOINT CHAPTER 11 PLAN OF BLOCKFI INC. AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE
(THE "PLAN")**[213]

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 1473, 1516 | John A. Javes | • The Third-Party Release is not "Integral" to the Debtors' Reorganization and the opt out structure of the Plan is inequitable.<br><br>• Creditors such as Javes have claims against certain insiders and such claims should not be released under the Plan.<br><br>• The Third-Party Contributions are not critical to the Plan because certain Insiders are only contributing $2,250,000. Accordingly, the Plan violates section 1129(a)(2) of the Bankruptcy Code. | • This objection was improperly filed by a member of the Committee in violation of the terms of the Committee Settlement. The objection has been withdrawn [Docket No. 1516]. |

---

[213]  Capitalized terms used but not defined herein have the meanings given to them in the Plan, the Memorandum, or the applicable Objection, as applicable.

\*  Denotes late-filed Objections.  The Debtors reserve all rights to contest the validity of any late-filed Objection.

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 1474 | 3AC | • Seeks clarification through language in the Confirmation Order that 3AC and other deemed to reject classes are not Releasing Parties under the Plan. <br><br> • Proposed language in the Confirmation Order to provide certainty surrounding the Debtors' or Wind-Down Debtors' obligation to create a "Disputed Claim Reserve." | • The Plan clearly states that Classes deemed to reject the Plan are not "Releasing Parties" under the Plan. For the avoidance of doubt, the Confirmation Order provides that 3AC opts out of the Third-Party Release. *See* Confirmation Order ¶ 125; Plan, Art. I.A.187. No additional language is necessary or appropriate. <br><br> • The Confirmation Order provides that prior to any Distribution Date the Debtors will file a notice on the docket of the amount of the proposed Disputed Claims Reserve. If a party objects to the proposed Disputed Claims Reserve, the Court will determine the amount of an appropriate Disputed Claims Reserve. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 1475 | Cameron Wyatt, Proposed Securities Class Action Lead Plaintiff | • The opt out mechanism violates the due process of the Class because it fails to give Class members actual notice of the impact of the Third-Party Release on their claims in their capacity as Class members or clear guidance for opting out of the Third-Party Release.<br><br>• The Third-Party Release is an impermissible, nonconsensual non-Debtor Release because the restructuring contemplated by the Plan is not a reorganization and the Plan does not provide any consideration to the Class members in exchange for the release.<br><br>• The Court lacks jurisdiction to approve the Post-Release Adjudication Procedures because the Class Claims do not relate to the chapter 11 cases once claimants opted out of the Third-Party Release.<br><br>• The Injunction is overly broad as it could be interpreted to prohibit the Class Claims to pursue claims against the Debtors solely to the extent of any insurance coverage.<br><br>• The Disclosure Statement does not adequately describe the Securities Class Action Proceedings and fails to provide any basis for the Third-Party Release and Injunction as they relate to the Securities Class Action Proceedings.<br><br>• The deemed release of the Class Claims under the Plan prejudices Class members therefore giving them standing to object to the Plan. | • Wyatt in fact opted out of the Third-Party Release and lacks standing to object to it on behalf of other people.<br><br>• The Third-Party Release is consensual and appropriate. All parties in interest were provided with adequate and sufficient notice and opportunity to opt out of the Third-Party Release. Indeed, the individualized notice the Debtors provided each member of the Class was more robust than the notice procedures generally used for class actions. *See* Confirmation Brief ¶¶ 148-150. More than 10,000 opt outs were received, making clear that parties received adequate and sufficient notice of their right to opt out.<br><br>• The Third-Party Release is wholly consensual. Any creditor that did not want to grant the Third-Party Release was provided the opportunity to opt out of the Third-Party Release. There is no conceivable due process issue under these circumstances, and numerous courts (including this Court on multiple occasions) have rejected Wyatt's argument to the contrary.<br><br>• The Third-Party Release is an integral part of the Plan. It is the product of extensive arms' length negotiations and numerous mediation sessions between the Debtors, the Committee and the Committee Settlement Parties. The Released Parties are providing substantial contributions under the Plan including, among other things, facilitating in-kind Distributions and assisting with litigation against FTX, Alameda, Emergent and 3AC, in addition to certain monetary contributions.<br><br>• The Gatekeeping Provision is an integral part of the Committee Settlement. The Gatekeeping |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | | Provision represents a permissible exercise of the Court's jurisdiction, and will inure to the benefit of the Debtors, their successors-in-interest, and potential claimants. The Injunction is a regularly approved provision and necessary to properly implement the Releases and Exculpation provisions of the Plan.<br><br>• The Injunction is a regularly approved provision and necessary to properly implement the Releases and Exculpation provisions of the Plan. *See* Confirmation Brief ¶ 73.<br><br>• The Disclosure Statement explicitly provides a description of the Securities Class Action Proceedings. *See* Disclosure Statement, Art. X.J.<br><br>• The Objecting Party does not have standing to object to the Third-Party Release on behalf of anyone but himself and the Objecting Party opted out the Third-Party Release so he is not bound by it. |
| 1476 | The U.S. Trustee | • The Exculpation Provision is too broad because it is not limited to estate fiduciaries.<br><br>• The Releases do not comply with applicable law:<br><br>  • The Debtor Releases are overly broad because the Debtor Releases fail to satisfy any of the *Zenith* factors.<br><br>  • The Third-Party Release is non-consensual because there is an opt-out mechanism. Furthermore, the Third-Party Release does not satisfy the necessity standard under *Continental* and should not be approved.<br><br>• The Gatekeeping Provision is improper because releases are | • The Exculpation Provision as amended is limited to estate fiduciaries. *See* Plan, Art. I.A.120, VIII.C.<br><br>• The Debtor Release is appropriate and complies with the *Zenith* factors: (1) an identity of interest exists between the Debtors and the Released Parties; (2) the Released Parties played a substantial role in the formation of the Plan and are providing substantial contributions under the Plan; (3) without the Debtor Release, the Debtors would not have the support of the Released Parties which is critical to implementing the Plan; (4) a majority of the Debtors' stakeholders support the Plan, including the Debtor Release, pursuant to the Voting Report; and (5) the Plan provides meaningful (and potentially full) recoveries for |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | affirmative defenses that cannot be adjudicated prior to the filing of an action and the provision would increase administrative costs.<br><br>• The Injunction is impermissible because pursuant to section 524(a)(3) of the Bankruptcy Code confirmation of a plan does not operate as an injunction, the automatic stay remains in effect until a discharge is granted or the cases are closed, and section 1141(a) of the Bankruptcy Code binds all parties to the terms of a plan upon confirmation.<br><br>• The Plan is impermissibly drafted as a Settlement under Bankruptcy Rule 9019.<br><br>• Article IV.D.12 of the Plan should be included in the Plan Administrator Agreement instead of the Plan because the Wind-Down Debtor Parties will not exist until after confirmation.<br><br>• Article II.G of the Plan should be revised to reflect that the Debtors and Wind-Down Debtors are joint and severally liable for the payment of the statutory fees, and any qualifying language in such provision should be removed. | creditors. *See* Confirmation Brief ¶¶ 53-63.<br><br>• The Third-Party Release is consensual and appropriate. Parties in interest were provided with adequate and sufficient notice and opportunity to opt out of the Third-Party Release. *See* Confirmation Brief ¶¶ 64-67.<br><br>• The Gatekeeping Provision is an integral part of the Committee Settlement. The Gatekeeping Provision represents a permissible exercise of the Court's jurisdiction, and will inure to the benefit of the Debtors, their successors-in-interest, and potential claimants. The Injunction is a regularly approved provision and necessary to properly implement the Releases and Exculpation provisions of the Plan.<br><br>• Plans routinely include compromises and settlements such as the Committee Settlement which are approved in connection with the confirmation process.<br><br>• The amended Plan clarifies that the Debtors and Wind-Down Debtors are jointly and severally liable for the payment of statutory fees. *See* Plan, Art. II.G |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 1478 | Ankura Trust Company, LLC | • The Indenture Trustee has the right to serve as or appoint a distribution agent for distributions to be made to BIA Holders under the Plan.<br><br>• Treating the BIA Indenture as void violates BlockFi's terms of service.<br><br>• The Debtors cannot prohibit the Indenture Trustee from asserting its priority lien because the Debtors' entry into the Indenture provided the Debtors the benefit of complying with regulatory requirements. Further, prohibiting the Indenture Trustee from asserting its lien would have negative market consequences and prevent other institutions from accepting indenture trustee positions. | • This Objection has been resolved through modifications to the Plan. *See* Plan, Art. VIII.H. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| 1487 | Securities and Exchange Commission | • The Third-Party Release is impermissible because it does not except claims arising out of fraud, gross negligence, or willful misconduct.<br><br>• The Plan's Gatekeeping provision is designed to limit the ability of creditors to seek redress for certain claims over which the Court would otherwise lack jurisdiction. Accordingly, this provision should be removed from the Plan to allow parties who opted out to pursue legitimate claims against third parties without the need for Court intervention. | • The SEC fails to provide any authority for the proposition that a third-party release must carve out claims arising out of fraud, gross negligence, or willful misconduct. The Third-Party Release and the scope thereof are consistent with third-party releases routinely approved in this district as consensual.<br><br>• The Gatekeeping Provision is integral to the Committee Settlement which is the cornerstone of the Plan. The Court has jurisdiction to determine whether an asserted claim is barred by the terms of the Plan. The Debtors have hundreds of thousands of clients and without the Gatekeeping Provision the Debtors, their directors and officers could be subject to numerous frivolous claims post-confirmation which will distract them from implementing the terms of the Plan. Further, absent the Gatekeeping Provision courts around the country run the risk of inconsistently interpreting the Plan. |
| 1488 | FTX | • The Committee Settlement is not fair and equitable.<br><br>• The Plan improperly manipulates the treatment of Intercompany Claims.<br><br>• The Plan unfairly discriminates against FTX's claims.<br><br>• The Debtors may not distribute alleged property of the FTX Debtors until the claims between BlockFi and FTX are resolved. | • This Objection has been resolved pursuant to the terms of the FTX Settlement filed contemporaneously herewith. |
| 1519 | Chubb Insurance Companies | • The Plan does not provide for a mechanism for how the Debtors or Wind-Down Debtors will continue meeting its obligations under Chubb's insurance policies with the Debtors.<br><br>• The Plan fails to clarify the administrative procedures regarding | • This Objection has been resolved through modifications to the Plan. *See* Plan, Art. V.A., V.F. |

| DOCKET # | OBJECTING PARTY | OBJECTION SUMMARY | DEBTORS' RESPONSE |
|---|---|---|---|
| | | insurance claims. <br><br> • The Plan fails to clarify that workers' compensation and direct action claims must continue to be administered in the ordinary course and that Chubb may continue to administer such claims pursuant to the insurance policies between the Debtors and Chubb and applicable nonbankruptcy law. | |
| 1600 | John Lymn | • Revising the Debtor Release to clarify that the Debtors and the Wind-Down Debtors retain the right to object to Claims and Interests after the Effective Date was a material Modification to the Plan. | • The solicited version of the Plan explicitly provided that the Wind-Down Debtors maintain the right to object to Claims after the Effective Date. In construing the terms of the entire Plan, no reasonable creditor could draw the conclusion that through the Debtor Release, the Debtors were agreeing to relinquish their right to object to Claims or Interests asserted against the Debtors as opposed to releasing the Debtors' affirmative claims and causes of action against the Released Parties. |