```
                   IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF NEW JERSEY

IN RE:                      .      Case No. 22-19361-MBK
                            .      (Jointly Administered)
BLOCKFI INC., et al.,       .
                            .
         Debtors.           .
. . . . . . . . . . . . ..
OFFICIAL COMMITTEE OF       .      Adv. Case No. 23-01144-MBK
UNSECURED CREDITORS,        .
                            .
         Plaintiff,         .      Clarkson S. Fisher U.S.
                            .         Courthouse
             v.             .      402 East State Street
                            .      Trenton, NJ 08608
BLOCKFI INC., et al.,       .
                            .
         Defendants.        .      September 21, 2023
. . . . . . . . . . . . ..         11:31 a.m.

        TRANSCRIPT OF MOTION TO LIFT THE AUTOMATIC STAY,
          MOTION TO FILE UNDER SEAL THE D&O POLICY, AND
            MOTION TO DISMISS THE ADVERSARY PROCEEDING
             BEFORE THE HONORABLE MICHAEL B. KAPLAN
          UNITED STATES BANKRUPTCY COURT CHIEF JUDGE
```

APPEARANCES:

For the United States       U.S. Department of Justice, Civil Div.
of America:                 By:  SETH BRANDON SHAPIRO, ESQ.
                           1100 L Street, N.W. 8142
                           Washington, DC 20530


For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  JEFFREY M. SPONDER, ESQ.
                           One Newark Center, Suite 2100
                           Newark, NJ 07102


Audio Operator:            Kiya Martin

 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
_____

                   **J&J COURT TRANSCRIBERS, INC.**
                        **268 Evergreen Avenue**
                     **Hamilton, New Jersey 08619**
                    **E-mail:  jjcourt@jjcourt.com**

              **(609) 586-2311     Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

| | |
|---|---|
| For the Official Committee of Unsecured Creditors: | Brown Rudnick, LLP<br>By:  SHARI I. DWOSKIN, ESQ.<br>One Financial Center<br>Boston, MA 02111 |
| | Brown Rudnick, LLP<br>By:  KENNETH AULET, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| | Genova Burns LLC<br>By:  DONALD W. CLARKE, ESQ.<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the U.S. Trustee: | Office of the U.S. Trustee<br>By:  LAUREN BIELSKIE, ESQ.<br>One Newark Center, Suite 2100<br>Newark, NJ 07102 |
| For Bermuda Joint Provisional Liquidators: | Faegre Drinker Biddle & Reath LLP<br>By:  RICHARD BERNARD, ESQ.<br>1177 Avenue of the Americas<br>41st Floor<br>New York, NY 10036 |
| For Flori Marquez and Zachary Prince: | Porzio, Bromberg & Newman, P.C.<br>By:  DEAN M. OSWALD, ESQ.<br>1675 Broadway, Suite 1810<br>New York, NY 10019 |
| | Zukerman Gore Brandeis & Crossman<br>By:  KAREN S. PARK, ESQ.<br>Eleven Times Square, 15th Floor<br>New York, NY 10036 |
| | Shearman & Sterling<br>By:  DONALD GOLD, ESQ.<br>599 Lexington Avenue<br>New York, NY 10022 |
| For Yuri Mushkin: | Lazare Potter Giacovas & Moyle<br>By:   ANNA PIA FELIX, ESQ.<br>747 Third Avenue<br>New York, NY 10017 |

- - -

1          THE COURT:  All right.  Good morning, everyone.  This

2  is Judge Kaplan, and this morning we'll be hearing a couple of

3  matters in the BlockFi, Inc. case.

4          I have counsel, certain counsel who are present in

5  court, and I have counsel who are appearing remotely.  Let me

6  start with those in court and ask for appearances.

7          MR. SHAPIRO:  Good morning, Your Honor.  Seth Shapiro

8  on behalf of the United States America.

9          THE COURT:  Thank you.  It's always nice to see you

10  in Trenton.

11          MR. SHAPIRO:  Thank you.  It's nice to be here.

12          MS. DWOSKIN:  Good morning, Your Honor.  Shari

13  Dwoskin from Brown Rudnick on behalf of the Committee.

14          THE COURT:  Thank you.

15          MS. DWOSKIN:  This is my partner Ken Aulet, who you

16  know well.

17          THE COURT:  I've seen him a couple of times.

18          MR. CLARKE:  Good morning, Judge.  Don Clarke, Genova

19  Burns, local counsel for the Committee.

20          THE COURT:  Thank you, Mr. Clarke.

21          MR. SPONDER:  Good morning, Your Honor.  Jeff Sponder

22  from the Office of the United States Trustee.  I believe Lauren

23  Bielskie is also participating, but she is virtual.  Thank you.

24          THE COURT:  All right.  Let me have appearances from

25  those who are appearing remotely.

1        MR. BERNARD:  Thank you, Your Honor.  Richard Bernard

2    of Faegre Drinker on behalf of the Bermuda Joint Provisional

3    Liquidators.

4        THE COURT:  All right.  Thank you.  Anyone else?

5        MS. OSWALD:  Good morning, Your Honor.  This is Dean

6    Oswald from Porzio Bromberg & Newman serving as local counsel

7    to Flori Marquez and Zac Prince.  I'm joined virtually by my

8    co-counsel Karen Park of Zukerman Gore Brandeis & Crossman and

9    Dan Gold of Shearman & Sterling.

10        THE COURT:  All right.  Thank you, all.

11        MR. GOLD:  Good morning.

12        THE COURT:  Good morning.

13        MS. PARK:  Good morning, Your Honor.

14        THE COURT:  Anyone else?

15        MS. FELIX:  Yes, good morning, Your Honor.  This is

16    Anna Pia Felix from the Law Firm of Lazare Potter Giacovas &

17    Moyle.  Our firm represents Yuri Mushkin, and we had filed a

18    joinder with Zachary Prince.

19        THE COURT:  All right.  Thank you.  Good morning.

20    And I think that's it.  For those who are appearing remotely,

21    as always, please use the raise hand function if you need to be

22    called upon, unless I've already called on you.

23        Let's start with the motion of Zachary Prince and

24    Flori Marquez for lifting the automatic stay to access certain

25    funds or reimbursement under an existing insurance policy.  I

1 think it has been mentioned, I received a joinder on behalf of

2 Yuri Mushkin.  I've not received any opposition.  Does anybody

3 wish to address the matter of either in favor of or in

4 opposition to the requested relief?

5         MR. GOLD:  Your Honor, Dan Gold from Shearman &

6 Sterling, counsel for Zac Prince.  As you note, our motion for

7 an order lifting the automatic stay to the extent applicable,

8 as well our motion to file under seal the D&O policy, there

9 have been no objections, so I don't need to be heard on that

10 unless Your Honor has questions.

11         THE COURT:  No, I think it's pretty straightforward.

12 I don't have any questions.  I have no basis to object.  I've

13 read through the request.  It seems acceptable.  So, absent any

14 further objection from anyone, I will grant the motion and

15 enter the dual -- the order later today or tomorrow.

16         MR. GOLD:  Thank you, Your Honor.

17         THE COURT:  Thank you.  Those who are appearing on

18 that matter may be excused or may stay around for the

19 entertainment value in the second matter to be addressed.

20         MS. FELIX:  Thank you, Your Honor.

21         MS. PARK:  Thank you, Your Honor.

22         THE COURT:  You're welcome.  All right.  Then we'll

23 turn to I'll call it, tongue and cheek, the main event, the

24 United States motion to dismiss Adversary Number 23-1144.  This

25 is the adversary proceeding brought by -- on behalf of the

1  Committee with respect to certain funds that have been the

2  subject of a criminal warrant relative to a criminal forfeiture

3  proceeding relative to a criminal prosecution that is ongoing

4  out in the State of Washington.

5         Let's get right to it.  This is not a new matter for

6  any of us here.  If I may, I'm going to take a little liberty

7  in that I've had the benefit in the pleadings, in the written

8  submissions rather to read certain very colorful analogies.

9  There was flip flops to Air Jordans.  There's red Mercedes and

10  blue Jeeps I think was argued.  I'd like to offer a very

11  simplified fact pattern to form the basis of our argument and

12  discussions today.  I draw the fact pattern from the

13  allegations in the motions to dismiss, the -- in the underlying

14  pleadings, which because this is a motion to dismiss I can

15  infer as true.

16         So, let's say -- I don't even think -- this fact

17  pattern doesn't even work because we don't have enough people

18  in the courtroom, but let's say we had eight people in this

19  courtroom or on -- or appearing remotely who -- one of which is

20  my law clerk, Becca Earl, who has invested or deposited with

21  BlockFi a hundred dollars through their accounts, and then our

22  two criminal defendants also invested a hundred dollars each

23  with BlockFi through their accounts for a total of a thousand

24  dollars.

25         Now, BlockFi or BlockFi International maybe more

1   accurately takes this thousand dollars from these respective

2   accounts and puts it in another BlockFi account owned and

3   controlled by BlockFi from which it lends, spends, invests all

4   of the thousand dollars.  The account is thereafter

5   subsequently replenished by BlockFi with other borrowed money,

6   other loan repayments, other -- new investments and deposits.

7             Now, there comes a point in time where BlockFi has

8   lost the money and only has $500 in this BlockFi account, and

9   BlockFi files for bankruptcy.  At this point in time all of our

10  ten investors, the eight in the courtroom, including Becca, and

11  the two criminal defendants each have claims for a share of

12  that $500 that's there, 500 being lost, 50 percent.

13            Now comes the United States Department of Justice and

14  lay claims and demands a return of the criminals' full share,

15  their $200 that they had put in, a hundred dollars each out of

16  that $500, leaving only $300 to be shared by the remaining

17  eight.  That's the fact pattern it seems pretty

18  straightforward.

19            So, I would ask the United States to start to explain

20  why in light of 28 U.S.C. 1334(e) and 28 U.S.C. 157, BlockFi

21  being in bankruptcy, the money in BlockFi's account, a new

22  account, a different account than the deposit holders, why I

23  don't have jurisdiction and authority to determine whether the

24  original -- the $500 is property of the bankruptcy estate under

25  Section 541 and protected under the automatic stay provisions

1  under Section 362.  That's one area.

2        Number 2, why I don't have jurisdiction under Section

3  105 to issue an injunction if necessary, if appropriate.

4        And for me most importantly why is it of sound public

5  policy to have the remaining eight investors and depositors in

6  the courtroom put up, including poor old Becca here, put up and

7  chip in $12.50 out of the remaining $50 share that each of them

8  would have to pay the forfeiture obligations of the criminal

9  defendants.

10        So, we'll start with that, and I'm here to listen.

11 Counsel?

12        MR. SHAPIRO:  Thank you, Your Honor.  For the record,

13 Seth Shapiro for the United States of America.

14        As to your first question with respect to why this

15 Court would have no jurisdiction to decide that matter, it's

16 because of 21 U.S.C. Section 853(k) and (n).  The United States

17 believes that that Criminal Code Statute takes precedence over

18 28 U.S.C. 1334(e).  We believe that 28 U.S.C. 1334(e) assumes

19 that an action is filed before the grant of jurisdiction to the

20 District Court and the referral to the Bankruptcy Court under

21 157.

22        The Criminal Code, which is more specific than the

23 general jurisdictional grant in 1334(e) is very specific, that

24 no action shall be filed, period, challenging assets subject to

25 a criminal forfeiture regardless of whether that action is

1   filed in the Bankruptcy Court or any other court in a post-

2   indictment situation until after the criminal conviction and

3   the forfeiture proceedings are in progress where parties can

4   come to the criminal court and actually make a presentation as

5   to why they should be entitled to the money or why the -- if

6   they believe tracing is relevant, why the tracing is not

7   sufficient for the Government to take that money, which it

8   doesn't keep of course, the Government is acting pursuant to

9   police and regulatory powers under 362(b)(4), but the

10  Government takes that money and simply would distribute it to

11  the victims of the crime.

12          And the Government believes that Congress in its

13  infinite wisdom decided that in this kind of a situation the

14  victims of the crime should take precedence over the creditors

15  of the bankruptcy estate.

16          And there's a case that we cite in our briefs that

17  kind of discusses that issue.  It's the GuildMaster case, and

18  if I could quote from that.  It's in our brief.  It says, all

19  of these issues relating to the relative rights of the parties

20  in the lamps, which in that case had been seized, namely

21  whether the lamps are property of the bankruptcy estate in

22  light of the criminal statutes purporting to vest retroactive

23  title to Government, whether any of the lamps were or were not

24  property seized are all issues which necessarily involve the

25  interpretation and application of a -- of criminal statutes, a

1 task that's outside the scope of this court's jurisdiction

2 while the criminal action remains pending, and then dismissing

3 the suit, noting that bankruptcy is not an alternative forum

4 for deciding criminal actions.

5         So, we take the view that the same is true here, that

6 questions concerning what assets are subject to these criminal

7 seizure warrants have to be adjudicated in the Western District

8 of Washington in the criminal case, and that until the criminal

9 defendants are extradited from abroad, wherever they might be,

10 there's a conviction and then there's a forfeiture, no court

11 can really take jurisdiction over those accounts and that

12 crypto.

13         THE COURT:  Does that hold true in the -- were the

14 criminals in that case the debtor?

15         MR. SHAPIRO:  I believe they were, Your Honor.

16         THE COURT:  Does that hold true if -- the criminal

17 action is not directed against this debtor here, BlockFi, it's

18 not --

19         MR. SHAPIRO:  That's correct.

20         THE COURT:  -- nor are these funds -- unless you

21 could tell me you can trace them, and we've said in my

22 hypothetical they all went into a new account, and I think

23 that's pretty much how it worked at BlockFi.  There weren't

24 individual accounts.  They were ledger accounting issues, but

25 apart from wallets, which are not at issue here, there's no

1  separate accounts, the assets don't belong to the debtor

2  defendant in your -- as in your situation.  These assets were a

3  third party, the debtor here, BlockFi, and tangentially the

4  customers and depositors who will have a share in it like the

5  criminal defendants.  How is it the same situation?

6          MR. SHAPIRO:  Well, we argue that the relation-back

7  doctrine that applies under federal criminal law is not

8  dependent upon whether or not the debtor is the criminal

9  defendant or not, that at the time of the crimes, which

10 occurred, you know, many, many years ago, between, you know,

11 five to ten years ago, that all of the crypto at issue and the

12 accounts, you know, were established in that timeline.  And

13 then that's where the Government's rights to seize because the

14 case law Payner, Fernandez and the other cases --

15         THE COURT:  Rights in what?

16         MR. SHAPIRO:  The rights in the accounts --

17         THE COURT:  And no --

18         MR. SHAPIRO:  -- to seize the accounts --

19         THE COURT:  The money in the accounts --

20         MR. SHAPIRO:  -- and the crypto.

21         THE COURT:  -- right?

22         MR. SHAPIRO:  No, it's -- well, the accounts and the

23 crypto.

24         THE COURT:  I mean, how do you seize an account?

25 You're trying to seize the funds.

1          MR. SHAPIRO:  You serve a -- you know, you have the

2  U.S. Marshals come in, and they serve a warrant or a court

3  order, as they did from the U.S. magistrate judge, and then --

4          THE COURT:  But aren't --

5          MR. SHAPIRO:  -- the accounts -- the contents of the

6  accounts, which at that time had been represented to us was the

7  full amount --

8          THE COURT:  But bank accounts are pretty much debts

9  under the UCC.  It's not really funds sitting in an account.

10 When we have a checking account, I'd love to think the bank is

11 holding my money in an account.  It's really -- when I deposit

12 a check, I loan the bank money, and they owe me.  It's a debt

13 from the bank.  How are you -- you're seizing --

14         MR. SHAPIRO:  Well --

15         THE COURT:  Aren't you seizing the debt owing?

16         MR. SHAPIRO:  That is not the Government's view in a

17 criminal case, Your Honor.  In a criminal case we see -- we

18 believe we are seizing the account itself and the contents of

19 that account, and that's why the Government takes the view that

20 we are not a creditor of the estate, and we are not a -- we are

21 not seizing some kind of debt obligation or right to payment as

22 defined in 1015.  We're simply seizing the actual --

23         THE COURT:  What account?

24         MR. SHAPIRO:  -- you know, contents of that account.

25         THE COURT:  Which account?  The criminal defendants'

1 account?

2        MR. SHAPIRO:  Well, we're seizing the account on file

3 with BlockFi or BlockFi International, whatever happened to be

4 the case.  We're not seizing the right of the criminal

5 defendant to the payment.  We're seizing the account and its

6 contents from the innocent stakeholder BlockFi.

7        THE COURT:  But doesn't every investor customer in

8 BlockFi have an account, but those accounts don't necessarily

9 have anything in them.  Once BlockFi exercised its contractual

10 right to hypothecate, pledge, and they take the money and put

11 it in a different account.  Isn't -- or is it -- can we find

12 out if that's -- this is a motion to dismiss.  Shouldn't we

13 discover how it operates?  I mean, I'm speaking from my

14 knowledge that I've gleaned from the case so far, but is there

15 anything in the account you just seized or you're looking to

16 seize?

17        MR. SHAPIRO:  We were told there was.  At the time

18 that the warrants were served, we were informed by counsel for

19 BlockFi that the money was there.

20        THE COURT:  Were you told the money was there or that

21 there was a debt owed?

22        MR. SHAPIRO:  No, the money was there and that they

23 would cooperate with a turnover, and that's what eventually led

24 to the negotiation of a stipulation.  And as a professional

25 courtesy, we agree to inform the Creditors' Committee, so they

1  would have an opportunity to come into Your Honor to let Your

2  Honor --

3         THE COURT:  -- and would hear it.

4         MR. SHAPIRO:  -- consider it if you --

5         THE COURT:  Yes.

6         MR. SHAPIRO:  -- wanted to, and that's how we ended

7  up where we were rather than --

8         THE COURT:  I've interrupted enough.

9         MR. SHAPIRO:  No, no, I mean, that -- I mean, we

10  weren't trying to -- I mean, this money is not going to go

11  anywhere for a long time, right, if we end up seizing it.

12  We're just trying to take possession.

13         THE COURT:  Isn't that the problem for the 600,000

14  creditors and customers out there?

15         MR. SHAPIRO:  Well --

16         THE COURT:  Not just the eight in my hypothetical

17  courtroom.  The actual 600,000 who are depending upon seeing a

18  return of --

19         MR. SHAPIRO:  Well --

20         THE COURT:  -- their investment from, you know, their

21  interest in the accounts.

22         MR. SHAPIRO:  But they should blame Congress, Your

23  Honor.  They should not blame the United States Justice

24  Department.  I mean, if you look at the Winpar case that we --

25         THE COURT:  Well, they're going to blame me, but go

1  ahead.

2                          (Laughter)

3          MR. SHAPIRO:  But if you look at the <u>Winpar</u> case,

4  Your Honor, that we cited in our brief, the Court acknowledged

5  that allowing a forfeiture proceeding to go forward might

6  benefit the crime victims at the expense of unsecured

7  creditors, and the Court noted that this outcome does not

8  significantly outweigh the well-recognized public benefits of

9  such action, namely the punishment of criminals and the

10 deterrence of others who might be like-minded.

11         So, because -- you know, we sought forfeiture of the

12 accounts at issue before BlockFi filed for bankruptcy in

13 connection with a criminal action.  There's no question that

14 the enforcement of these warrants is excepted from the stay

15 under 362(b)(4), and that the priority set forth by Congress

16 are to ensure that those criminal victims are afforded the

17 opportunity to assert claims to those -- the contents of those

18 accounts in the criminal forfeiture proceeding in the Western

19 District of Washington.

20         I think the District Court judge in Washington

21 deferred to Your Honor to see if he agreed, and we understand

22 where he was coming from, but as a practical matter, we think

23 that Your Honor should dismiss the action and let it go back to

24 Washington --

25         THE COURT:  Well --

1          MR. SHAPIRO:  -- because the --

2          THE COURT:  Or do we take that the District Court

3    judge recognized this Court's authority under 28 U.S.C.

4    1334(e)?  I could read it that way, couldn't I?

5          MR. SHAPIRO:  Well, he didn't state that on the

6    record, Your Honor.

7          THE COURT:  Oh.

8          MR. SHAPIRO:  What he did state is that he doesn't

9    know very much about bankruptcy, that he had gone out to lunch

10   with his local bankruptcy judge and explained that there could

11   be bankruptcy issues here, and since Your Honor is, you know,

12   the --

13         THE COURT:  We're good at lunch.

14         MR. SHAPIRO:  Yeah, right, well respected -- no,

15   you're a well-respected judge, and he wanted to give Your Honor

16   an opportunity to rule, but that doesn't mean he might not take

17   back jurisdiction if he thinks that something in it was going

18   to happen in the case that could -- that goes beyond what he

19   feels is legally permissible.

20         THE COURT:  Doesn't that go back on aside to the

21   question I asked I think during the stay motion.  And by the

22   way, I did make an error.  We have also the stay -- the motion

23   to stay the action pending withdrawal of the reference that I

24   carried to today as well.

25         MR. SHAPIRO:  That action might be partially mooted

1  by the fact that the District Court last night, Your Honor, you

2  may not be aware of this, denied our motion to withdraw the

3  reference without prejudice.

4  THE COURT:  Well, see, I got --

5  MR. SHAPIRO:  So --

6  THE COURT:  I got to keep up.

7  MR. SHAPIRO:  No.

8  THE COURT:  I didn't know they withdrew.  Okay.  Then

9  --

10  MR. SHAPIRO:  It happened late yesterday.  It's not

11  --

12  THE COURT:  Okay.

13  MR. SHAPIRO:  So, you might want to take some time to

14  read it.  It's a very short decision, but --

15  THE COURT:  All right.  So, then the -- so that stay

16  is mooted, the request to stay is mooted --

17  MR. SHAPIRO:  Well, to --

18  THE COURT:  -- at this point.  It would --

19  MR. SHAPIRO:  -- an extent.  There have been some

20  other factors that have come up, such as --

21  THE COURT:  Okay.

22  MR. SHAPIRO:  -- for example, the possible Government

23  shutdown in a week, and we've talked to opposing counsel about

24  possibly, you know, maybe waiting to see what happens with the

25  Government, so that, you know, we don't have to be trying cases

1  while people might not be able to, you know --

2            THE COURT:  Right.

3            MR. SHAPIRO:  -- be here in New Jersey to argue

4  before Your Honor.

5            THE COURT:  All right.  Fair enough.  Thank you.  No,

6  I'm glad -- I did not know that Judge Kirsch had ruled on the

7  motion.  Continue or -- I mean, again, I keep interjecting.

8            MR. SHAPIRO:  Oh, no, no, that's perfectly fine.  I

9  completely understand.  I think you were going to raise the

10 question about when you asked me at the earlier hearing about

11 whether or not it was our intention to move to transfer venue

12 --

13           THE COURT:  Right, that --

14           MR. SHAPIRO:  -- if -- right, but that was a slight

15 -- it was not our intention to move to transfer venue of

16 course, but we intended to of course continue with our motion

17 to dismiss.   And the practical reality is, if Your Honor were

18 to grant our motion to dismiss, then as a -- the matter would

19 simply, you know, go back to the District Court and the Western

20 District of Washington I think by operation of law.

21           THE COURT:  Understood.

22           MR. SHAPIRO:  So, it's not something intentional that

23 we would be trying to go there and take the matter away from

24 Your Honor, but it's obvious, if Your Honor dismisses it, then

25 some judge is going to have to rule on the enforceability of

1   those seizure warrants and the issue of whether or not those

2   assets are subject to seizure or not.

3          THE COURT:  All right.  Again, if you have anything

4   you wish to add to the papers --

5          MR. SHAPIRO:  Well, I --

6          THE COURT:  -- it's your opportunity.

7          MR. SHAPIRO:  Right.  The only other -- there are two

8   things I'd like to add, the first is the point that I think I

9   generically made, that we believe the more specific statute is

10  the Criminal Code Statute, 21 U.S.C. 1853(f) and (n) in

11  particular, and we believe Your Honor should rule that that

12  statute should govern over 28 U.S.C. 1334(e)(1) because 1334(e)

13  (1) presumes that an action can be filed to determine whether

14  or not the property is property of the estate or not.

15         And obviously if the Criminal Code Statute is the

16  governing statute, then no action could be filed arguing that

17  1334(e)(1) grants the Court jurisdiction, and that -- I'm not

18  so sure that came across very clearly in our briefs, but there

19  is a general proposition that's been adopted in the Third

20  Circuit, and we can provide Your Honor with the case law if

21  you'd like, that the more specific statute should govern over

22  the more general.

23         THE COURT:  All right.

24         MR. SHAPIRO:  And then I don't know if this is -- if

25  Your Honor feels this is relevant to the Court's determination

1  of the issues, but the issue of whether or not this matter

2  involves a core proceeding or not.  We've discussed this pretty

3  much in depth at the last hearing, but in light of the District

4  Court's ruling, which Your Honor will have an opportunity to

5  read at some point within the next week or so, the District

6  Court of course is doing exactly what Your Honor predicted, is

7  giving -- has ruled that the motion be denied as essentially

8  premature because Your Honor has not had an opportunity yet to

9  rule on the question of whether or not --

10          THE COURT:  -- it's core or non-core.

11          MR. SHAPIRO:  -- it's core or non-core, as Your Honor

12  predicted at the last hearing.

13          And so we would say that what's happened here in this

14  proceeding is that the debtor has taken what is essentially a

15  criminal forfeiture proceeding and put some bankruptcy labels

16  on it and terminology and has tried to argue that the automatic

17  stay is being violated in a way that turns what would

18  ordinarily be a non-core criminal forfeiture proceeding into a

19  core proceeding, accusing the Government of violating the

20  automatic stay by seizing or attempting to seize contents of an

21  account which belong to the estate.

22          I think at best in the case law that I've seen, the

23  asset is in limbo.  The debtor may have possession of it.  The

24  Government doesn't have possession, but until that forfeiture

25  proceeding is -- you know, until there is a conviction and the

1  forfeiture proceeding is concluded, we don't really know, Your

2  Honor, who's entitled to the contents of that account.

3       And if in the confirmed -- in this adversary

4  proceeding or in the case generally, I think we have a

5  stipulation on file that says no party will do anything with

6  the asset until 30 days after a judgment in this adversary

7  proceeding, but if at some point those contents are distributed

8  to the unsecured creditors in the case under the -- either on

9  judgment in this proceeding or in the plan generally, then Your

10 Honor would be authorizing the contents of those accounts to go

11 to, you know, creditors of the bankruptcy, which is not what

12 Congress envisioned.  Congress envisioned that if there is a

13 final forfeiture judgment, it should go to those crime victims.

14      And, yes, I do agree with Your Honor that there is

15 some prejudice to be suffered by those unsecured creditors

16 because they have to wait, but, again --

17      THE COURT:  Well, it's more than waiting.  It's

18 actually -- as in my hypothetical, it's the fact that if the

19 Government is successful in accomplishing what you're

20 attempting to accomplish, then the victims of the criminality

21 of those two defendants that has nothing to do with BlockFi or

22 its customers or its investors are being compensated by

23 BlockFi's customers and investors.  It's -- that money or a

24 portion of it or there -- their entitlement is being reduced.

25 There's no doubt about it.  Their funds are going to be

1  reduced.  Their recovery is going to be reduced.

2          MR. SHAPIRO:  We respectfully disagree with Your

3  Honor on that -- from that perspective because we do believe

4  that the relation-back doctrine gives us the right, even in a

5  case where the criminal defendants are not the debtor, we

6  believe it gives us the right to seize for the benefit of the

7  crime victims what the Government was entitled to between 1998

8  and two thousand -- I think it was August of 2022 when the

9  crimes were committed -- were being committed.

10         And as soon as those accounts were open -- well, even

11 actually not -- even before that, when the crimes were

12 committed and the criminal defendants had possession of that

13 crypto, we had the right to seize it all.  We had --

14         THE COURT:  You have the right because the criminals

15 had the right.

16         MR. SHAPIRO:  No, we had the right because of the

17 case law.  In the criminal jurisprudence that we've cited that

18 essentially gives us what I said at the last hearing was a time

19 machine.  It gives us something that unsecured creditors don't

20 -- and creditors generally in bankruptcy don't have.  It gives

21 us the right to go back in time and to see what the

22 Government's right was at the time the crimes were committed,

23 well before when the warrants were issued.

24         Once that forfeiture judgment is entered, if we can

25 show -- and we do have the ability to trace, and we have traced

1   up until the time when the seizure warrants were issued, and

2   this would come out if we have a trial, Your Honor, we will be

3   able to show that what the criminal defendants had at that

4   time, and we should be allowed to seize that.

5          Now, Ms. Dwoskin has very astutely noted that, well,

6   that might be the case even if the relation-back doctrine

7   applies, but -- which she contests, but she says, in any event,

8   BlockFi doesn't have those assets right now, they're gone, she

9   argues in her brief, that they might be in the hands of Alameda

10  or somebody else.

11         But what we're saying is that at the time that the

12  crimes were committed they did have it.  It was represented to

13  us by BlockFi when we served the seizure warrants that they had

14  it, and so we should be allowed to seize it.

15         THE COURT:  But they don't have it now.  Let's accept

16  the premise that they don't have it now.  So, you're saying

17  that you're entitled to it because they had it, but they don't

18  have it now.  So instead of getting other criminal assets,

19  other assets from the defendants, you're just going to latch

20  onto third party assets of the customers and the investors

21  because there's money there.  How is that sound policy?

22         MR. SHAPIRO:  Well --

23         THE COURT:  How does that teach a lesson to the

24  defendant, the criminals?  It's okay, we're going to -- your

25  obligation, we're going to have the rest of the -- we're going

24

1  to have poor Becca satisfy it with her $32.75.

2       MR. SHAPIRO:  Well, I understand your question, Your

3  Honor, but the point is that this is the judgment that Congress

4  made, that when Congress created this jurisdictional scheme

5  where they have two arguably inconsistent statutes that seem to

6  conflict with each other, the toughest part for Your Honor and

7  for all the courts here is to reconcile these two statutes and

8  figure it out.

9       Well, in this kind of a situation should the

10 Government be allowed to seize those -- that particular part of

11 the account or the crypto and distribute that to crime victims

12 down the road, a year or two post-conviction or forfeiture, or

13 should that money be distributed now in this case, and if --

14 that issue has never been decided in a published decision.  I

15 think I indicated I --

16      THE COURT:  Right.

17      MR. SHAPIRO:  -- had researched it myself over a

18 week.  The cases that we've cited are cases where the

19 Government has actually already seized the asset.

20      So, in those cases, GuildMaster was clearly

21 applicable, and we think it should also be applicable to a

22 situation where the Government has not yet seized the asset

23 because we're not trying to seize it for the public.  This,

24 we're trying to seize it for crime victims who were defrauded

25 based on, you know, wire fraud and money laundering and the

1   like.

2          And these particular unsecured creditors or creditors

3   generally in the case are the ones with respect to the

4   particular BIA accounts that we're talking about, those

5   creditors signed a contract essentially that they agreed,

6   including the criminal defendants, Your Honor, where they

7   agreed that once the money was deposited BlockFi could do what

8   it wanted with it.  The Government didn't sign that contract.

9   The crime victims in this HashFlare Ponzi scheme didn't sign

10  that contract.  So why should the crime victims suffer as a

11  result of some contract signed by investors who lost their

12  investment because they signed a contract that said, we're

13  giving you our money and you can do with it what you want?

14         And then they're saying, oh, now I'm suffering

15  because I'm not going to get paid in full.  Well, you know,

16  it's the Government's view that while we sympathize with those

17  creditors, we think the crime victims are the larger victims in

18  the general sense of the word here.

19         The unsecured creditors, at least to the best of my

20  knowledge, are not -- they might allege that they've been

21  victims of a crime, but there's not to my knowledge been any

22  crime yet asserted against BlockFi or against anyone else with

23  respect to their lost investment, and that's because they

24  signed that contract.

25         THE COURT:  All right.  I appreciate your argument.

1  Let me hear from the Committee that I'm certain is going to

2  tell you why they -- in their view what you're seeking doesn't

3  make sense, and also we have counsel for the JPL who are going

4  to say you're looking at the wrong law to begin with because

5  you should first start with Bermuda law.

6        MR. SHAPIRO:  Well, I did want to quickly address

7  that question because --

8        THE COURT:  Absolutely.

9        MR. SHAPIRO:  -- on the Bermuda law, that we believe

10 the crimes were committed here in the United States, Your

11 Honor, and therefore it should be U.S. federal criminal law

12 that should apply and not Bermuda law.

13       THE COURT:  All right.  Thank you.  Thank you,

14 counsel, Mr. Shapiro.

15       MR. SHAPIRO:  Thank you.

16       THE COURT:  Counsel.

17       MS. DWOSKIN:  Thank you, Your Honor.  Once again for

18 the record Shari Dwoskin from Brown Rudnick on behalf of the

19 Committee.

20       I want to address -- and thank you by the way for

21 laying out that fact pattern.  The analogies are -- I take full

22 responsibility for those, and, you know, this is a -- it's a

23 tricky case to trace these assets through and to think about it

24 in terms of assets that we're more used to dealing with.

25       But I want to address first and foremost because I

1   think this is really the thrust of the Government's point the

2   allegation that Sections 853(k) and (n) really do contradict

3   what 1334(e) says, and I think frankly, Your Honor, to use

4   another analogy, we're comparing apples and oranges.  We talked

5   a little bit about 853(k) the last time we were here.  That's

6   the statute that prevents -- and it's very specific about this,

7   it prevents third parties with a competing interest in property

8   subject to forfeiture from bringing actions concerning the

9   validity of that interest except as described in 853(k).

10          So, it explicitly only applies to property subject to

11  forfeiture, and 853(a) sets out what property subject to

12  forfeiture is, and forgive my shuffling of papers, but 853(a)

13  says that any person convicted of a violation of this

14  subchapter, there's a later chapter that deals with indictment,

15  punishable by imprisonment for more than one year shall forfeit

16  to the United States, so the person that's -- the criminal

17  defendant shall forfeit to the United States, irrespective of

18  any provision of state law, any property constituting or

19  derived from any proceeds the persons, the criminal defendant

20  obtained directly or indirectly as a result of the violation.

21          There's a couple of other provisions that I think

22  they're not applicable here, one is property used in the

23  commission of the crime, and the other is interests in a joint

24  criminal enterprise and a joint venture.

25          But, in essence, the only property in other words

1  that 853(k) applies to is property that was -- that constitutes

2  proceeds that the criminal defendant received or is derived

3  from that property.

4         So, here, argue is the only thing the seizure

5  warrants can possibly refer to, right, is either the actual

6  crypto that is in the accounts, and as Your Honor knows, you

7  know, the government already seized the contents of the wallet

8  account.  You know, BlockFi its standard practice was to

9  actually keep funds, segregate it in those accounts.  Those

10 funds we think fall into this first provision, right, that

11 they're property constituting proceeds that the criminal

12 defendant obtained as a result of the crime.  That's what the

13 seizure warrant says.  We turned it over.

14         Or what the, you know, funds from the account in the

15 seizure warrants means we think is the proceeds of what those

16 criminal defendants received from the commission of their

17 crime.  That is still at BlockFi, right, and we don't know what

18 the answer to that is yet, right.  We don't know what the

19 amount is that the criminal defendants would receive on account

20 of the funds, the balance that was in their accounts, the

21 balance of their accounts at the time the criminal seizure

22 warrants were served, but we'll find that out, right.  That's

23 the process of a normal bankruptcy case to figure out what

24 unsecured creditors are going to get.  That's the proceeds

25 that's described in 853(a).  That's what the seizure warrants

1   describe, and we're happy to turn that over, right.

2          There's no dispute here about who has the right to

3   the accounts, right.  We don't dispute that the -- you know,

4   the debtors can turn over the criminal defendants' claim to the

5   United States.

6          So, I think that that gets around this, you know,

7   contrast of laws issue.  I frankly just don't see it being

8   there.

9          And I don't think the relation-back doctrine helps

10  them because once again the relation-back doctrine applies only

11  to the specific tainted property that's described in 853(a).

12  In other words, the property that is proceeds of the crime or

13  that's derived from that.

14         There's a second section.  It's 853(p) I believe that

15  talks about substitute property, which essentially says that if

16  the criminal defendant has transferred property to a third

17  party or it's been co-mingled or it's hard to get, the

18  Government can go after the criminal defendant's other

19  property, right, to make up the difference.

20         But the relation-back doctrine only applies to

21  tainted property, not substitute property, and, again,

22  substitute property can only be seized from the defendant, not

23  from a third party.

24         So, the _Winpar_ case and the _GuildMaster_ case that Mr.

25  Shapiro cited are both cases, both of them, all of them, in

1  fact, are cases where the criminal defendant was a debtor,

2  right, and there I think it's easy to see how the relation-back

3  doctrine does apply to set the rights of the United States

4  apart from the rights of individual unsecured creditors, right.

5       If, for example, the crime is committed before the

6  Chapter -- it's usually a Chapter 7 case, before a Chapter 7

7  estate came into existence, those funds never entered the

8  estate because you can only give what you have, right, and the

9  debtor at the time that they filed for bankruptcy did not have

10  the right.  They didn't -- they may possessed it.  They didn't

11  have a legal interest in the proceeds of this criminal

12  enterprise.

13       So, for that reason, right, all of these cases say,

14  well, you know, what the crime -- when the crime predates the

15  bankruptcy case, the proceeds of that crime never enter the

16  bankruptcy estate.  That's true, right, with respect to a

17  criminal defendant that is a debtor, but let's think about how

18  that works here.  Okay.

19       If it's true, and they've alleged that is and no

20  reason to believe it's not true, if it's true that the crimes

21  that were committed before the criminal defendants put their

22  money in BlockFi, and the DOJ had a right to those funds, the

23  DOJ still has a right to those funds, but, again, our

24  allegation is we just don't have them.

25       So, it gives the DOJ the right to I guess step ahead

1  of other competing interests to those funds, whether those

2  interests are at FTX, at Alameda, wherever they happen to be,

3  and if it's the case that the DOJ can trace the crypto to

4  BlockFi, that's a tainted asset, right, that's an 853 asset.

5  We just don't think it's fair.  We've alleged that it's not

6  fair.

7       If it turns out that, you know, we -- and through

8  discovery they find it, that's a tainted asset, and we think

9  that we need to turn that over, but that's not where we are,

10 and -- I'll just stop there.  That's not where we are, right.

11 Right now we're at a motion to dismiss.  We've alleged we don't

12 have the crytocurrency in its entirety or in principal part

13 that the criminal defendants deposited.

14      I wanted to mention one more case, Your Honor, and

15 it's another case where the debtor was the defendant because

16 they're all cases where the debtor was the defendant.  This is

17 the Erpenbeck case out of the Sixth Circuit, and that -- what's

18 kind of interesting, the FBI literally found a box of cash,

19 okay, buried in a Chapter 7 debtor's golf course.  Okay.  The

20 Chapter 7 debtor was the criminal defendant, and the bankruptcy

21 estate was still open, although the bankruptcy had concluded

22 long before, and the Trustee came and said, hey, this is

23 property of the estate, and the DOJ said, no, the relation-back

24 doctrine applies because this -- the crime predated the burying

25 of the cash I suppose on his golf course, which was true, but

1  the Sixth Circuit found that it was not -- the relation-back

2  doctrine did not apply because they couldn't trace that cash to

3  the crime.

4           In other words, the connection is what's really

5  important.  853(a) matters, right.  It matters that this

6  specific property is property that's derived from the crime.

7           So, even in the case of cash, right, which is

8  fungible, because they couldn't trace it, it didn't count as

9  853(a) property until it was property of the estate.

10           We've also alleged that BlockFi, as Your Honor noted

11  in the fact pattern, was insolvent at the time the seizure

12  warrants were served.  So, you know, unsecured claims would get

13  less than they would if -- they're going to get less than what

14  the United States is trying to seize, which is cryptocurrency

15  equal to the balances of the criminal defendants' accounts at

16  the time the seizure warrants were served.

17           So, you know, the fact that the relation-back

18  doctrine applies to tainted property doesn't mean that it

19  doesn't -- that it applies to anything that BlockFi has, right.

20  It can apply to what the criminal defendant rights are, and if

21  somebody else shows up and says, you know, that the criminal

22  defendants promised me something, you know, I have a claim

23  against them, they can go fight about that with the United

24  States in the Western District of Washington.

25           But we are not trying to seize any of those assets.

1  We are not trying to prevent the Government from seizing those

2  assets.  We're trying to prevent the Government from seizing

3  the assets that are not proceeds of the crime or derived from

4  proceeds of the crime, and those are the assets that are beyond

5  either what was actually deposited by the criminal defendants

6  or what the criminal defendants would receive on account of

7  their claim.

8          I've gone through this.  I -- so I think I've really

9  addressed all of those.  I do want to address very briefly the

10 United States sovereign immunity argument.  106(a) includes a

11 broad abrogation and waiver of sovereign immunity with respect

12 to both Sections 105 and 362 of the Code.  This summer the

13 Supreme Court expounded on what that means in the -- I'm going

14 to read this because it's -- I just don't want to get it wrong,

15 the Lac du Flambeau Band of Lake Superior Chippewa Indians

16 case, and that's 599 U.S. 382, and they're describing the

17 automatic stay and certain other provisions of the Code.

18          The Supreme Court held that courts can also enforce

19 these requirements against any kind of non-complying creditor,

20 whether or not the creditor is a governmental unit, by virtue

21 of 106(a)'s abrogation of sovereign immunity.

22          So, it's technically true I suppose that the DOJ is

23 not a creditor, but it's a distinction without a difference

24 because their only role in this case, the only thing they can

25 possibly do with respect to BlockFi is stand in the criminal

1    defendants' shoes and the criminal defendants were a creditor.

2    So, their position in this case is as a creditor seizing the

3    creditor's property that is their rights against BlockFi.

4            Let me pause and see if Your Honor has any questions

5    about jurisdiction because I want to turn to the 362(b)(4)

6    issue, but the jurisdictional issue here is relatively

7    complicated.

8            THE COURT:  No, go ahead.  Thank you.

9            MS. DWOSKIN:  So, that leads then, I think, to the

10   next point which is that -- the United States is making, which

11   is that the -- their subject to the Section 362(b)(4) exception

12   because criminal forfeiture proceedings are an exercise of

13   police power, and of course they are, right, but the adversary

14   proceeding doesn't seek to enjoin the criminal forfeiture

15   proceeding.  It just asks this Court to find that by

16   transferring the criminal defendants' claim to BlockFi --

17   against BlockFi to the United States, BlockFi has complied with

18   the seizure warrants, and the United States is not entitled to

19   anything else.

20           And, again, you know, the United States has other

21   avenues to obtain those assets, right.  It can obtain the

22   tainted assets wherever they are.  If they can trace them, they

23   can find out where they are, and it can go get them, or it can

24   obtain, as 853(p) allows it to do, substitute property from the

25   defendants, their house, their yacht, their car, whatever they

1 want.

2        So, seizing the criminal defendants' unsecured claim

3 against BlockFi is a proper exercise of the United States

4 police power and not subject to the stay.  That's why the

5 Committee had no objection to turning over the funds in the

6 wallet account.  But 362(b)(4) does not apply when the

7 Government is exercising a pecuniary interest in the debtor's

8 property.

9        So, in the <u>Nortel Networks</u> case the Third Circuit

10 held that liquidating a claim to property of the debtors is

11 primarily an adjudication of private rights rather than an

12 exercise of public policy.  In other words, 362(b)(4) allows

13 them to take the claim, but not get paid on it.  And we think

14 the legislative history of this section makes that very clear.

15 We cite it in our brief.  The exception permits entry of a

16 money judgment, but not enforcement of that judgment.

17        And the reasoning of Congress, which is quoted by the

18 Third Circuit in the <u>Penn Terra</u> case, is that enforcement of a

19 money judgment would give the Government preferential treatment

20 to the detriment of all other creditors.

21        It's also in line with Your Honor's ruling in the <u>LTL</u>

22 case on the State Consumer Protection actions findings that

23 those actions were excepted from the stay for the purpose of

24 fixing, but not collecting civil penalties.

25        So, here, by contrast, what the United States is

1  trying to do is not just seize the criminal defendants' claim,

2  again, to which we have no objection, but to collect on that

3  claim in full in kind now, which no other creditors are able to

4  do, and that's beyond what Section 362(b)(4) allows.

5        So, unless Your Honor has any other questions, I'll

6  cede the podium.

7        THE COURT:  No, I don't have any additional questions

8  for you.  Thank you, counsel.

9        MS. DWOSKIN:  Oh, I'm sorry, Your Honor.

10        THE COURT:  Mr. Aulet.

11        MS. DWOSKIN:  Backing up one minute.

12        THE COURT:  And then I'm going to go to Mr. Bernard

13  and then I'll -- Mr. Shapiro, I'll let you respond.

14        MS. DWOSKIN:  Yeah, Your Honor's --

15        MR. AULET:  Okay, (indiscernible) have the

16  conversation.

17        MS. DWOSKIN:  Oh, let me cede the podium.

18        MR. AULET:  I'm sorry.  So, I just wanted to --

19  there's a particular factual assertion that Mr. Shapiro made

20  that I wanted to respond to where he said that the debtor said

21  that the money was there.  Your Honor, we wouldn't be here if

22  we believed that the money had been properly traced.  I've

23  spoken to the debtors, and my understanding of what the debtors

24  conveyed is, to use your analogy, they have $200 in the bank

25  account.  They did not say that those $200 they are the same,

1   you know, serial number as the $200 that was deposited by

2   criminals.

3          Obviously, that's a factual matter, and of course the

4   Government would be entitled if this case is not dismissed to

5   try and trace, but I just wanted to clear up that particular

6   factual issue.

7          THE COURT:  I guess along those lines, the issue that

8   I raise, and the Court has come to a more fulsome

9   understanding, when -- even when a bank, and you can go to any

10  bank teller, you have $200 in the account.  It doesn't

11  necessarily -- and actually under the UCC and the -- it doesn't

12  mean you actually have physically $200 in an account.  You have

13  a debt owing.  It's a creditor-debtor relationship between the

14  bank and the account holder.

15         So, you're free to comment further on that.  The

16  Court is trying to take into account how that relationship

17  differs from the actual seizing of -- as if it were in a safety

18  deposit box, but before I return to you, Mr. Bernard.

19         MR. BERNARD:  Thank you, Your Honor.  We filed

20  papers.  Surprisingly or unsurprising, Bermuda law is

21  substantially similar to U.S. law with respect to the contents

22  of the account, and the account holders' rights, in that, you

23  know, when you look into the account, it's a ledger, it's an

24  IOU from BlockFi International that I owe you these assets.

25  The rights of the holders of those accounts are to share pro

1  rata in the assets available to satisfy those claims in a

2  liquidation.  The only variation in Bermuda is that under a

3  scheme that pro rata right could be modified.  A scheme is akin

4  to our Chapter 11, but does require super majority voting of

5  the creditors in each class.

6          So, in our situation in Bermuda, we are on track with

7  the Committee and its representation of what the content of the

8  account is and what the account holders' rights are with

9  respect to that account.

10          THE COURT:  All right.  Thank you, Mr. Bernard.  Mr.

11 Shapiro, anything in reply?

12          MR. SHAPIRO:  Yes, Your Honor.  So, the conflict of

13 law question is a relatively new question.  We certainly, you

14 know, will address that if the action is not dismissed.  I will

15 have an opportunity to speak with opposing counsel and also

16 probably in various motions.

17          But I did want to have an opportunity to kind of

18 respond to some of the comments made.  First is, in all

19 fairness for the record, BlockFi did indicate after -- later in

20 the case that the initial representations about the account and

21 the funds being there was not completely accurate, and we do,

22 if we end up going to trial, Your Honor, will see, you know,

23 correspondence reflecting that change of position.

24          But part of what drove this so aggressively at the

25 beginning was the belief of the Government that what we were

1  seizing was there based on what we were told, and then of

2  course BlockFi coalesced and was willing to sign a stipulation

3  turning it all over, and had it not been for the Committee, we

4  wouldn't be here today.

5       So, I just want to make sure the record is clear that

6  there is some dispute about, you know, factually about what

7  happened here, what money was there when the accounts were

8  seized on the day the warrants were served, what was there at

9  the time the crimes were committed, and of course, you know,

10  the tracing issue, we argue, that issue should be decided by

11  the District Court in the Western District of Washington under

12  21 U.S.C. 853 and not -- if tracing is relevant and not in this

13  court because of the jurisdictional framework.

14       So, we're not -- it is conceivably possible that

15  tracing will be required at some point, whether the matter is

16  tried in this court, the District Court here in New Jersey, or

17  in the criminal forfeiture proceeding in Washington, but we

18  argue that's where it should take place, in Washington, not in

19  this court because of 21 U.S.C. 853.

20       Then, I think I should address the sovereign immunity

21  question, which, you know, we had briefed, but essentially that

22  really boils down to the jurisdictional provision as well.  We

23  think that Congress in 21 U.S.C. 853 because it enacted that

24  section of the Criminal Code, it essentially carved out the

25  abrogation in Section 106(a) which does specifically state that

1  actions brought pursuant to Section 105 and 362 sovereign

2  immunity is waived.

3         So, it essentially kind of like comes full circle

4  back to the jurisdictional provision.  If this court doesn't

5  have jurisdiction and the only jurisdiction to determine the

6  scope and enforceability of a criminal seizure warrant is in

7  the criminal court, then sovereign immunity has not been

8  waived, and if that's not the case, if 28 U.S.C. 1334(e)(1), if

9  Your Honor decides that you do have jurisdiction pursuant to

10 that and the referral statute, then the -- you know, then the

11 legal conclusion will be that sovereign immunity has been

12 waived under 106.

13        And then there was some discussion that Ms. Dwoskin

14 had about LTL that is now being hotly contested in various

15 cases.  We think LTL is distinguishable, Your Honor, because in

16 that case this Court found authority to stay a civil collection

17 action to liquidate a claim to judgment.

18        The United States Government is not trying to

19 liquidate a claim to judgment.  We are simply trying to stop an

20 attempt under Section 105 and the Declaratory Judgment Act to

21 stop us from seizing an asset in a criminal case, and Section

22 105 does not have an independent grant of jurisdiction, and the

23 Federal Declaratory Judgments Act also does not have an

24 independent grant of jurisdiction.

25        So, we think in LTL, Your Honor we believe relied on

1 <u>Penn Terra</u> where the Third Circuit had addressed a state civil

2 environmental action explaining that there might be instances

3 where state regulatory powers impermissibly dilute federal

4 bankruptcy policy, but we don't think the <u>LTL</u> and <u>Penn Terra</u>

5 cases apply here because the plaintiff is essentially trying to

6 enjoin a federal criminal forfeiture proceeding where there's

7 no question that the seizure would benefit the public welfare

8 and that the crypto funds would not be kept by the Government.

9 We're not going to keep the money.  It's going to be

10 distributed to the crime victims where Congress wanted it to

11 go.

12         So, I think I've addressed all the questions raised

13 by my opposing counsel.  If Your Honor has any other questions,

14 please feel free to let me know.

15         THE COURT:  Well, in all candor, after three hearings

16 on this I'm not sure we haven't covered every aspect of it and

17 quite well.  Kudos to all counsel.  Thank you.

18         MR. SHAPIRO:  Thank you.  Thank you, Your Honor.

19         THE COURT:  What became clear and I think Mr. Shapiro

20 acknowledged there is no case law on this --

21         MR. SHAPIRO:  That is correct, Your Honor.

22         THE COURT:  -- on this fact pattern, you know, and I

23 think it was the last hearing Mr. Shapiro suggested that I

24 would be making law.  Well, so be it.  I'm reserving, Number 1.

25 I think you can glean from my questions at all three hearings

1  that I'm not sanguine with the Government's arguments, that I

2  am more inclined, especially at the motion to dismiss stage, to

3  deny the motion to see how it develops with as far as tracing

4  and other elements.

5       But I want to write on it, and in fairness, when you

6  write, you sometimes change outlooks.  I think it merits a

7  written opinion.  Since poor Becca is not getting all her

8  money, she'll need to keep working and work on it.  So, I want

9  to do it in the short term.  I believe everybody's interests

10 are better served by having a resolution at least of the motion

11 to dismiss at this stage.

12      As we were speaking, I see literally the Clerk's

13 Office forwarded an e-mail to me sending me, Judge --

14      UNIDENTIFIED ATTORNEY:  -- Kirsch.

15      UNIDENTIFIED ATTORNEY:  -- Kirsch.

16      THE COURT:  -- Kirsch's denial of the motion to

17 withdraw the reference.  I'll read through that, but I'm going

18 to give this all some additional thought, and I appreciate your

19 briefing and oral arguments.

20      MR. SHAPIRO:  Thank you, Your Honor.  May I just

21 address two quick issues?

22      THE COURT:  Yes.

23      MR. SHAPIRO:  One is, of course, about the Government

24 shutdown.  We'll of course talk to opposing counsel and try to

25 figure out something reasonable, but please feel free to reach

1  out to us, and we'll try to figure out something that is

2  mutually --

3         THE COURT:  Well --

4         MR. SHAPIRO:  -- acceptable if the Government does

5  shut down on --

6         THE COURT:  We don't know --

7         MR. SHAPIRO:  -- at midnight on September 30th.

8         THE COURT:  -- and I know the Court always has a

9  couple of extra weeks of hidden money to keep it going.  I

10 don't know if the Department of Justice has that.

11        But going forward with this, if I were to deny the

12 motion, then there has to be either another answer or another

13 motion to withdraw the reference.  Clearly, in -- I will

14 resolve whether it's core or non-core as part of my decision,

15 so that won't be hanging out there, so to speak, for the

16 District Court.

17        But at this point is there anything immediate as far

18 as what's going on in the State of Washington or elsewhere that

19 impacts timing?

20        MR. SHAPIRO:  No, Your Honor.  That was -- Your Honor

21 actually addressed my second point, which was that if Your

22 Honor decides to deny the motion to dismiss and let the

23 proceeding go forward, we of course would work with opposing

24 counsel to figure out a schedule, but we would ask that the

25 Court rule on the core versus non-core --

1            THE COURT:  I think it's appropriate.

2            MR. SHAPIRO:  -- issue so the District Court has an

3    opportunity to -- if we do refile a motion to withdraw the

4    reference, to actually have that before it.  So thank you.

5            THE COURT: Absolutely.  All right.  Thank you.

6    Counsel?

7            MS. DWOSKIN:  And the only other thing I would raise

8    is that the confirmation order that was negotiated together

9    with the DOJ and with the debtors has attempted we think we can

10   get -- well, Your Honor will decide whether it's acceptable, to

11   resolve issues that may arise from confirmation, right, if the

12   Committee goes out of existence.  So, we've --

13           THE COURT:  All of those issues, right.

14           MR. SHAPIRO:  Yes, in fact, I can confirm.

15           For the record, Your Honor, that the United States

16   has negotiated consensual language.  I don't know, I can't

17   speak for Mr. Sponder and the Office of the U.S. Trustee, but I

18   can speak for the DOJ Criminal Division, Civil Division, and

19   Commercial Education Branch, and also been in touch with the

20   Tax Division, and we have worked out language with both counsel

21   for the debtors and counsel for the Committee in connection

22   with what the confirmation order will look like.

23           THE COURT:  The impact --

24           MR. SHAPIRO:  (indiscernible) the plan on Tuesday.

25           THE COURT:  Mr. Sponder has other issues he's going

1  to be (indiscernible).

2           All right.  Then thank you, all.  If the Court has

3  any issues or concerns, it needs anything else from you as far

4  as submissions, we'll reach out for you all.  Thanks.

5           UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

6           THE COURT:  Have a safe trip back.

7           MS. DWOSKIN:  Thank you, Your Honor.

8           MR. SHAPIRO:  Thank you.

9           MS. DWOSKIN:  Thank you.

10          THE COURT:  And we are off.  Thank you, Mr. Bernard.

11                          *  *  *  *  *

12

13                  **C E R T I F I C A T I O N**

14          I, COLETTE MEHESKI, court approved transcriber,

15  certify that the foregoing is a correct transcript from the

16  official electronic sound recording of the proceedings in the

17  above-entitled matter and to the best of my ability.

18

19

20  /s/ Colette Meheski

21  COLETTE MEHESKI

22  J&J COURT TRANSCRIBERS, INC.      DATE:  September 27, 2023

23

24

25