```
              IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE DISTRICT OF NEW JERSEY

IN RE:                    .    Case No. 22-19361-MBK
                          .    (Jointly Administered)
BLOCKFI INC., et al.,     .
                          .
          Debtors.        .
                          .    September 26, 2023
. . . . . . . . . . . . . .    1:02 p.m.
```

```
            TRANSCRIPT OF HEARING ON PLAN CONFIRMATION AND
      FINAL DISCLOSURE STATEMENT APPROVAL AND MOTIONS HEARING
              BEFORE THE HONORABLE MICHAEL B. KAPLAN
              UNITED STATES BANKRUPTCY COURT CHIEF JUDGE
```

APPEARANCES:

APPEARANCES:

```
For the Debtors and        Haynes and Boone, LLP
Debtors-in-Possession:     By:  RICHARD KANOWITZ, ESQ.
                           30 Rockefeller Plaza, 26th Floor
                           New York, NY 10112

                           Kirkland & Ellis LLP
                           By:  FRANCIS PETRIE, ESQ.
                           601 Lexington Avenue
                           New York, NY 10022

                           Kirkland & Ellis LLP
                           By:  MICHAEL B. SLADE, ESQ.
                           300 North LaSalle
                           Chicago, IL 60654
```

```
Audio Operator:            Kiya Martin
```

```
Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
```

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:   JEFFREY M. SPONDER, ESQ.
                                     LAUREN BIELSKIE, ESQ.
                               One Newark Center, Suite 2100
                               Newark, NJ 07102

For the Official               Brown Rudnick, LLP
Committee of Unsecured         By:   KENNETH AULET, ESQ.
Creditors:                           ROBERT STARK, ESQ.
                               7 Times Square
                               New York, NY 10036

For Creditor                   Lowenstein Sandler LLP
Cameron Wyatt:                 By:  MICHAEL ETKIN, ESQ.
                               One Lowenstein Drive
                               Roseland, New Jersey 07068

For the Securities             Securities and Exchange Commission
and Exchange                   By:  ALAN STUART MAZA, ESQ.
Commission:                    100 Pearl Street, Suite 20-100
                               New York, NY 10004

For the Foreign                Latham & Watkins LLP
Representatives of             By:  BRETT M. NEVE, ESQ.
Three Arrows Capital:          1271 Avenue of the Americas
                               New York, NY 10020

For Creditor                   Akerman LLP
John Lymn:                         By: JOANNE GELFAND, ESQ.
                               Three Brickell City Centre
                               98 Southeast Seventh Street
                               Suite 1100
                               Miami, FL 33131


                               - - -

## INDEX

### WITNESSES

                                                                      **PAGE**

FOR THE DEBTORS:

JAMES DALOIA
  Cross-Examination by Mr. Etkin                                 15

SCOTT VOGEL
  Cross-Examination by Mr. Etkin                                 18
  Redirect Examination by Mr. Slade                              29
  Recross-Examination by Mr. Etkin                               30

MARK RENZI
  Cross-Examination by Mr. Etkin                                 31


### EXHIBITS

                                                                **ID**   **EVD**

FOR THE DEBTORS:

D-1   Declaration of Scott Vogel                               11     12

D-2   Declaration of Mark Renzi                                11     12

D-3   Declaration of Brett Witherell                           12     12

D-4   Declaration of James Daloia                              12     12

4

1          (Proceedings commenced at 1:03 p.m.)

2          THE COURT:  Good afternoon, everyone.  This is Judge

3   Kaplan, and we will be addressing the BlockFi matters on for

4   today including confirmation.  We have a somewhat full court.

5   Nice to see.  And we have parties at least watching remotely.

6          For the benefit of those who are watching remotely,

7   to the extent counsel wants to be heard, they should raise the

8   "raise hand" function.  Otherwise, I'll be focusing on those in

9   court.  And I won't go through the process of having

10  appearances since we have a full room.  But as you begin to

11  speak, enter your appearance for your respective clients.

12         Let me turn -- I have an agenda.  Let me turn to

13  debtors' counsel. just have an appearance on behalf of the

14  debtor.  Good afternoon.

15         MR. PETRIE:  Good afternoon, Your Honor.

16         Francis Petrie of Kirkland on behalf of the debtors.

17         THE COURT:  All right.

18         MR. PETRIE:  So at the outset, we'd just like to

19  thank the whole -- on behalf of the whole debtor advisory team

20  and company, we'd like to thank Your Honor and your chambers

21  staff for being so accommodating, especially during what was a

22  holiday weekend.

23         We were filing documents late into the night last

24  night and even filed some this morning.

25         THE COURT:  Oh yes.

1        MR. PETRIE:  I'm sure you noticed.  And, as usual,

2   you have been extremely accommodating both today and throughout

3   the course of these cases.

4        I'd also like to highlight the efforts of the BlockFi

5   management team and all the employees of the company who have

6   helped advance these cases and worked through some extremely

7   novel issues at every turn to accomplish the resolution that we

8   have before the Court today.  With their support, we've

9   committed to a path that will maximize recoveries for our

10  clients and return crypto to those individuals through the

11  BlockFi platform.

12       We also recognize the important role that the JPLs

13  played in representing the international constituency in these

14  cases in Bermuda that I've seen in the courtroom with us today,

15  and express deep appreciation to the Committee for working with

16  us to reach a global resolution.  I'm sure Committee counsel

17  will be speaking at today's hearing and, like them, we

18  recognize that crypto bankruptcies are not easy cases.

19       With the Committee's assistance, we managed to

20  achieve a lot.  We're at the finish line now and closer than

21  ever to ending these cases and getting the company out of

22  bankruptcy which will have people receiving distributions

23  sooner rather than later.  So we are happy to be before Your

24  Honor today.  At today's hearing, we're seeking approval of the

25  disclosure statement on a final basis.  And we also are here

6

1 with a confirmable plan that solicitation has proven has

2 obtained widespread support by all creditors.

3       All nine voting classes submitted acceptances in

4 favor of the plan with each class accepting by over 90 percent

5 tin number and around the same amount in amount.  We believe

6 these results speak for themselves.

7       As noted, we filed many documents over the past 72

8 hours, so I'll highlight the governing ones.  We filed our

9 brief in support of confirmation at Docket Number 1608.  The

10 most current plan that we seek approval of is at Docket Number

11 1609 and is called the third amended plan with additional

12 technical modifications.  And the revised proposed confirmation

13 order is at Docket Number 1610.

14       We won't be seeking entry of that docketed

15 confirmation order.  We have made some changes to that since

16 the hearing, prior to the hearing.  So we'll submit one to

17 chambers if and when we receive confirmation today.

18       And as you noted, we did file an agenda at Docket

19 Number 1611 that shows the status of matters going forward.  As

20 you can see on that agenda, we've resolved a number of the

21 formal objections through language in the plan and the

22 confirmation order and some by stipulation.  Of note are some

23 recent developments, particularly that we filed a stipulation

24 with FTX that resolves their objection.  That stipulation

25 appears at Docket Number 1605, though we're not seeking

1  approval of that stipulation today.  We will ask Your Honor to

2  enter it before this plan can go effective.

3       The stipulation does a couple of things, but most

4  importantly it ensures that the FTX debtors' claim is

5  contractually subordinated to all BlockFi accountholders in

6  these cases and their affirmative defenses are waived.  So

7  importantly for today, that stipulation resolves FTX's

8  objection to confirmation of the plan.

9       We also worked out agreeable language with Three

10 Arrows Capital in the confirmation order, clarifies their

11 treatment and builds in a construct surrounding the disputed

12 claims reserve and required notice.  The one in the filed

13 confirmation order has since had some tweaks, but we are

14 resolved with Three Arrows Capital.

15      And also of note --

16      UNIDENTIFIED SPEAKER: For some reason, this is not

17 working.  Let me try this again.

18      MR. PETRIE:  Alan, I think you're not on mute.

19      THE CLERK:  I muted him.

20      MR. PETRIE:  Okay, thank you.

21      THE COURT:  He is now.

22                      (Laughter)

23      MR. PETRIE:  So also of note, Your Honor, the Ankura

24 objection which was focused on last week was resolved.  We

25 added language regarding their entitlement to be a distribution

1    agent to the confirmation order and their entitlement to fees

2    issue has been resolved through mutually agreeable language

3    between us, Ankura, and the Committee.

4         So the resolution of these threshold issues removes

5    yet another barrier that existed in these cases to eliminate

6    very large claims that are against the estate and they have

7    taken priority over client distributions.  It adds certainty

8    that distributions can be made to clients more quickly, as

9    well.

10        It's undisputed that we meet the 1129 factors, so

11   that leaves us with four objecting parties.  The U.S. Trustee

12   and the Securities and Exchange Commission both take issue with

13   the scope of the releases contained within the plan and the

14   gatekeeper provision.  The securities lead action plaintiff who

15   has appeared in this Court before raises a couple of points

16   that we plan to address later of an individual creditor that

17   seeks to prevent the debtors and others parties in interest

18   from reconciling outstanding proofs of claim also have formal

19   objections pending.

20        We'll address each of these in turn, but first I'd

21   like to provide the Court with an overview of what the plan

22   does.

23        So after significant negotiation, we worked out a

24   plan structure over the course of several months that functions

25   to facilitate maximum distributions to clients.  It includes

1  distributions that can be made in the form of digital assets,

2  including ones that are acceptable to the Securities and

3  Exchange Commission, and then a wind-down of the remaining

4  estate overseen by a Committee-selected plan administrator who

5  reports to an oversight board.

6        Perhaps most importantly is that the plan embodies

7  the terms of a settlement with the Committee.  And Your Honor's

8  role in assisting us with achieving this result through

9  mediation sessions cannot be understated, and we thank you for

10 helping us get there.

11       The settlement did not come easy and virtually every

12 term was fought over and negotiated before it was agreed upon.

13 The final form of settlement does several things, but at the

14 heart of it in exchange for a release of claims, key members of

15 the company management team will provide the estates with not

16 only millions of dollars but also required minimal hours of

17 go-forward cooperation.

18       This cooperation preserves the option to make in-kind

19 distributions to clients which would likely not be possible in

20 the event these individuals were not cooperating with the

21 estate, and it provides for the retention of certain key

22 litigation causes of action that will move forward, including

23 against FTX and Three Arrows Capital.  And if proceeds are

24 realized out of such litigation, it will significantly help

25 maximize recovery to creditors.

1          As is typical, we made certain modifications to the

2    plan leading up to the hearing.  In certain classes, we

3    provided for a new option in treatment.  If it's feasible, they

4    can elect as to whether or not they'd like to make a loan

5    repayment rather than be subject to setoff.  And in the

6    convenience class which once contemplated distributions only in

7    cash, such claimants can elect to collect on their claim in

8    acceptable crypto instead.

9          These revisions are reflective of the ongoing work

10   and cooperation with the Committee and the wind-down trustee

11   and provides creditors with more optionality than they had at

12   the solicitation stage.  So in short, the transactions

13   contemplated by the plan make it clear that confirmation is the

14   best solution for creditors.  We've explored almost all

15   available options and constructs and are confident that the one

16   before the Court today is value-maximizing and the fastest way

17   to get money back to creditors.

18         So we've analyzed the remaining objections which I

19   just outlined and, in our assessment, these are almost entirely

20   legal in nature.  No objection seems to raise disputes about

21   the facts at hand.  But that said, we did file four

22   declarations in support of confirmation.

23         At Docket Number 1584 is the declaration of Scott

24   Vogel who is an independent director and a member of the

25   special committee of the board.  His declaration describes the

11

1  terms of the settlement and the investigation that led to

2  assessing the claims that were at issue.

3          At Docket Number 1582, we filed a declaration of Mark

4  Renzi, the debtors' chief restructuring officer, which

5  describes the formulation of the plan and how we meet the 1129

6  factors.

7          At Docket Number 1583 is the declaration of Brett

8  Witherell of BRG.  His declaration describes the formulation of

9  the liquidation analysis and how we passed the best-interests

10 test as part of the disclosure statement.

11         At Docket Number 1607 is the declaration of James

12 Daloia from Kroll which sets up the solicitation process and

13 the tabulation results of the votes.

14         All of these individuals are here in the courtroom

15 and are available to be cross-examined if needed.  But we would

16 like to admit all four declarations into evidence to ensure

17 that we meet our evidentiary burden.

18         THE COURT:  All right.  Let me open it up to those

19 counsel present.  Any objections to the Court admitting into

20 evidence the declarations of Mr. Witherell, Mr. Vogel, Mr.

21 Renzi, and Mr. Daloia in lieu of direct testimony?

22                     (No audible response)

23         THE COURT:  All right.  Then for the record, Mr.

24 Vogel's declaration will be admitted as D-1.  Mr. Renzi's

25 declaration CRO will be admitted as D-2.  Me. Witherell's

12

1  declaration on behalf of BRG is D-3.  And Mr. Daloia's from

2  Kroll, his declaration will be admitted as D-4.  Thank you.

3     (Debtors' Exhibits D-1 through D-4 admitted into evidence)

4            MR. PETRIE:  Thank you, Your Honor.

5            So with that, I think we can turn to addressing each

6  of the objections that are still outstanding.

7            For the record, by our count, we have four --

8            MR. ETKIN:  Your Honor?

9            THE COURT:  Yes.

10           MR. ETKIN:  Sorry to interrupt.

11           I do have a few questions for a couple of the

12  declarants.  And I think in terms of -- I'm sorry, Your Honor.

13  Michael Etkin, Lowenstein Sandler --

14           THE COURT:  Thank you.

15           MR. ETKIN:  -- on behalf of Cameron Wyatt, the

16  proposed lead plaintiff in the securities litigation.

17           I think in terms of appropriate order, but that's up

18  to Your Honor, if there's any cross, that should probably take

19  place before merits arguments --

20           THE COURT:  Before argument.

21           MR. ETKIN:  -- on the objection.  So, again, I'll

22  leave that to Your Honor.  But I'd just raise that.

23           THE COURT:  And specifically, Mr. Etkin, you wish to

24  cross-examine which witnesses?

25           MR. ETKIN:  It's not lengthy cross-examination, Your

13

1   Honor.  Mr. Renzi, the declarant from Kroll, and --

2           MR. PETRIE:  We had four declarations.

3           MR. ETKIN:  Not Mr. Witherell.

4           MR. PETRIE:  Scott Vogel?

5           MR. ETKIN:  Mr. Vogel, yes.

6           THE COURT:  Mr. Vogel, the independent director?

7           MR. ETKIN:  Yes.

8           THE COURT:  All right.  So Mr. Vogel and Mr. Renzi?

9           MR. ETKIN:  And the declarant Mr. --

10          THE COURT:  Daloia?

11          MR. ETKIN:  -- Daloia.

12          THE COURT:  Any objections?

13          MR. SLADE:  I'm not sure what the questions will be,

14  but there likely will be objection to the questions.  But I

15  have no objection to the concept of cross-examination.

16          THE COURT:  All right.  I think it's better that we

17  get the testimony aspects and the factual predicate done first

18  before argument.  D-3.

19          So do you have a preference?

20          MR. ETKIN:  No particular preference, Your Honor.

21          THE COURT:  Then let's start with Mr. Daloia,

22  representative of Kroll Restructuring.

23          Yeah, you'll be going there for --

24          MR. ETKIN:  Okay.

25          THE COURT:  We're just setting up the monitor.

14

1    MR. SLADE:  (Indiscernible) questions, but it does

2  not seem like this witness is going to have anything relevant

3  to say about Mr. Etkin's objection.

4    MR. ETKIN:  We'll wait and see.

5    THE COURT:  Again, we'll wait.  We won't speculate.

6    MR. DALOIA:  Thank you, Your Honor.  I'm just

7  filling out the appearance sheet.

8    THE COURT:  It will be about two minutes.

9    (Pause)

10    THE COURT:  And, Mr. Daloia, am I pronouncing it

11  correctly?

12    MR. DALOIA:  Daloia.  Yes, correct, Your Honor.

13    THE COURT:  Okay.  Would you please raise your right

14  hand?

15    JAMES DALOIA, DEBTORS' WITNESS, SWORN

16    THE COURT:  All right.

17    THE CLERK:  You can adjust it if you need it.

18    THE COURT:  Thank you, Ms. Earl.

19    All right.  Would you state your name and business

20  address for the record?

21    THE WITNESS:  James Daloia.  The business address is

22  55 East 52nd Street, New York, New York.

23    THE COURT:  And the Court has accepted into the

24  record your declaration as Debtor's Exhibit D-4.

25    Mr. Etkin.

Daloia - Cross/Etkin                               15

1          MR. ETKIN:  Thank you, Your Honor.

2                        CROSS-EXAMINATION

3  BY MR. ETKIN:

4  Q    This will be extremely brief, Mr. Daloia.

5  A    Great.

6  Q    Thank you.

7       Mr. Daloia, do you know how many claimants were sent

8  ballots in connection with Class 3, all the classes in Class 3?

9  A    Off the top of my head, I am not -- I wouldn't have the

10 exact figure on me.  I would have to go back to the affidavit

11 of service.

12 Q    Would it be in excess of 100,000, do you believe?

13 A    To be honest, I would not know off the top of my head.

14 Q    Okay.  Your declaration has as an exhibit a lengthy list

15 of excluded ballots?

16 A    Yes.

17 Q    Do you know how many excluded ballots there were?

18 A    The exact amount, no.  That's why it's -- you know, what's

19 ever on the declaration is accurate.

20 Q    With respect to the excluded ballots, did you note at all

21 how many or if any contained checkmarks on the opt-out box with

22 respect to the ballot?

23 A    We do keep note of which ones do have checkmarks on the

24 opt-out, and that is included in the opt-out figures.

25 Q    So that would be a manifestation of those particular

Daloia - Cross/Etkin                                16

1   claimants that they were looking to opt out of the third-party

2   releases.  Is that correct?

3   A    That's correct.

4   Q    And with respect to those excluded ballots, how are those

5   -- I understand what the votes, that the votes were not

6   counted.  How were those opt-out elections dealt with?

7   A    Again, as noted in my declaration, we don't talk to the

8   validity.  We just count how many actually elect the opt outs.

9   Q    So if the ballots were excluded, ultimately were the

10  opt-outs set forth in the ballots also excluded?

11            MR. SLADE:  Your Honor, I would object.  That seems

12  to call for a legal conclusion.  Excluded for what?

13            THE COURT:  You can ask him whether he knows.

14            Can you answer that question?

15            THE WITNESS:  No, I cannot.  Again, yeah, we don't

16  talk to the validity of -- of the opt-outs themselves.  We just

17  note that they're made.

18  BY MR. ETKIN:

19  Q    Right.  My question is not the validity of the opt-out.

20  My question is whether they were counted or not counted if the

21  opt-out was contained in an excluded ballot.

22            THE COURT:  Are you asking whether they were included

23  in the number of creditors who opted out?

24            MR. ETKIN:  That's correct, Your Honor.

25            THE WITNESS:  Yeah, they are included.

Vogel - Cross/Etkin                                    17

1 BY MR. ETKIN:

2 Q    So of the 10,000-plus that's been reflected in the

3 debtors' brief, that includes opt-outs from excluded ballots?

4 A    I believe so, yes.  I'd have to double check, but some of

5 them are duplicative.  If they are duplicative, we would not

6 double count opt-outs.

7         MR. ETKIN:  Okay.  I have no further questions, Your

8 Honor.

9         THE COURT:  All right.  Thank you.

10        Any redirect?

11        MR. SLADE:  No, Your Honor.  Thank you.

12        THE COURT:  Mr. Daloia, thank you for your time.

13        THE WITNESS:  Thank you.

14                    (Witness excused)

15        THE COURT:  And why don't we hear from Mr. Vogel.

16        Good afternoon, Mr. -- it's afternoon.  Let's hope we

17 don't reach the next morning.

18        Please raise your right hand.

19          SCOTT VOGEL, DEBTORS' WITNESS, SWORN

20        THE COURT:  Thank you.  Please have a seat, and give

21 us your name and business address.

22        THE WITNESS:  Scott Vogel.  885 Park Avenue, New

23 York, New York.

24        THE COURT:  All right.  Mr. Vogel, your declaration

25 has been admitted into evidence as D-1.

1        Mr. Etkin, cross-examine?

2             MR. ETKIN:  Thank you, Your Honor.

3                      CROSS-EXAMINATION

4   BY MR. ETKIN:

5   Q    Thank you, Mr. Vogel.

6        And my questions are going to essentially relate to the

7   declaration that was admitted into evidence.

8        Do you have the declaration in front of you?

9   A    I do not.

10            MR. SLADE:  Mickey (phonetic), we have some copies.

11            MR. ETKIN:  I think we might, as well.

12            MR. SLADE:  May I approach?

13            THE COURT:  Absolutely.

14            All right.  You may continue.

15            MR. ETKIN:  Thank you, Your Honor.

16  BY MR ETKIN:

17  Q    Mr. Vogel, with respect to Paragraph 4 of your

18  declaration, you talk about the independent investigation with

19  respect to potential estate claims and causes of action against

20  the debtors' insiders.  Do you see that?

21  A    I do.

22  Q    In the context of that investigation, did you look at any

23  claims with respect to violations of the federal securities

24  laws against any of these insiders?

25  A    We looked at claims that the debtor would have against

Vogel - Cross/Etkin                                    19

1  these various parties.

2  Q    So you didn't look at any of the claims asserted by anyone

3  else against these individuals.  Is that right?

4          MR. SLADE:  I would object.  To the extent it's not

5  in the materials, that would be privileged information.

6          THE COURT:  Overruled.

7          THE WITNESS:  We looked at debtor claims.  We didn't

8  look at individual -- what claims another individual would have

9  against the various parties.

10 BY MR. ETKIN:

11 Q    I see.  So you didn't look at the complaints in the

12 pending securities class actions at the time?

13 A    We were aware of those filings, but we focused on what the

14 debtor would have -- what claims the debtor would have.

15 Q    So the settlement that was ultimately reached that you

16 discuss in your declaration did not include any settlement of

17 non-debtor claims?

18          MR. SLADE:  Yeah, I object, Your Honor,  That calls

19 for a legal conclusion.

20          THE COURT:  Sustained.

21          MR. ETKIN:  Well, the witness already testified that

22 they only looked at debtor claims, Your Honor.  I'm asking

23 whether the ultimate settlement was intended to include or

24 address any non-debtor claims.

25          THE COURT:  Well, phrase it that way, then.

Vogel - Cross/Etkin                                    20

1          THE WITNESS:  Can you repeat the question?

2    BY MR. ETKIN:

3    Q    Sure.  You just testified that you looked at claims that

4    the debtor would have in the context of your investigation.

5    And ultimately, a settlement was reached, the Committee

6    settlement which you discuss in your declaration.  Is that

7    right?

8    A    That's correct.

9    Q    And with respect to that settlement, is that settlement

10   intended to address any non-debtor claims or claims that exist

11   other than the debtors against these same insiders?

12   A    Well --

13          MR. SLADE:  Your Honor, I would object.  Asking him

14   the intent of the settlement is asking him to identify the

15   intent of many other people separate and apart from himself.

16   And also, it requires him to interpret the settlement agreement

17   which would be a legal conclusion.

18          MR. ETKIN:  He spends a lot of time interpreting the

19   settlement agreement in his declaration, Your Honor.  I'm not

20   asking for an interpretation.  I'm asking whether certain

21   claims were included or not included.

22          THE COURT:  Well, you can testify as to your

23   understanding, limited to your understanding.

24          THE WITNESS:  So my understanding is that it was a

25   global settlement.  Various parties would be providing

Vogel - Cross/Etkin                          21

1  releases.  Some of the release parties would provide releases

2  to the company, and the company would provide releases to them,

3  as well as to other parties that chose -- that participated in

4  the global release.

5  BY MR. ETKIN:

6  Q    So in terms of that settlement, only the debtor is

7  providing releases.  Is that correct?

8          MR. SLADE:  Your Honor, I object.  This again calls

9  for a legal conclusion.

10         THE COURT:  I'll overrule.  The question asks you of

11 your understanding of the settlement and whether or not there

12 are releases being offered by other parties other than the

13 debtor.  Correct?

14         THE WITNESS:  Yes.

15         MR. SLADE:  Well, it's also vague as to which

16 settlement he's talking about.

17         THE COURT:  Well, I assume we're talking about the

18 settlement referenced in his declaration.

19         MR. SLADE:  But, Your Honor, his declaration

20 references two settlements.  There are settlements that were

21 reached between the Special Committee and the individuals, and

22 then there's a global settlement that's embodied in the plan

23 that was also with the Creditors' Committee, so.

24         THE COURT:  Well, then I'll ask you to refine --

25 thank you, Counsel.  I'll ask you to refine your question.

Vogel - Cross/Etkin                    22

1  BY MR. ETKIN:

2  Q    It's the Committee settlement that's embodied in the plan

3  that I'm referring to, Mr. Vogel.

4  A    So we were focused, we the debtor, were focused on

5  releases that the debtor was providing to various release

6  parties.  As part of the global settlement, there was an

7  understanding that others -- that maybe others would be

8  participating in that as part of this global settlement.

9  Q    When you talk about the global settlement, are you

10  referring to something other than the Committee settlement

11  that's described in your declaration?

12  A    I'm talking about -- I would be talking about the plan.

13  Q    Let me try it again.  Is the global settlement something

14  different than the Committee settlement that's referenced and

15  discussed in your declaration?

16  A    I'm talking about -- there are -- as Counsel just

17  suggested, there are two plans.  There are two settlements, the

18  settlement that the debtors have with the various release

19  parties and then other people could choose to participate in a

20  global release of the debtors, as well.

21  Q    What other people?

22  A    The creditors.

23  Q    But in terms of the Committee settlement, that involves

24  solely releases by the debtors to the other settlement parties,

25  the insiders that are referenced in the plan and the Committee

Vogel - Cross/Etkin                                    23

1  settlement.  Is that right?

2           MR. SLADE:  Your Honor I object.  That calls for a

3  legal conclusion about what the global settlement and the plan

4  provides for.  And he --

5           MR. ETKIN:  Your Honor, this --

6           MR. SLADE:  He knows the answer to these questions.

7  He's just trying to trick the witness.

8           MR. ETKIN:  This declaration --

9           THE COURT:  Then let's just --

10          MR. ETKIN:  That's all he talks about.

11          THE COURT:  Let him get to the heart of it.

12 Overruled.

13          To the extent you're able to answer the question.

14          Do you want to repeat it for him?

15          MR. ETKIN:  I'll try.

16 BY MR. ETKIN:

17 Q   With respect to the Committee settlement that you

18 referenced in your declaration --

19 A   Yes.

20 Q   -- involving certain named insiders of the debtor, the

21 debtor was the only party providing a release in connection

22 with that settlement.  Is that right?

23 A   I believe that's correct.

24          MR. ETKIN:  Sorry it took so long to get there, Your

25 Honor.

Vogel - Cross/Etkin                                    24

1              THE COURT:  That's fine.

2   BY MR. ETKIN:

3   Q    In Paragraph 5 of your declaration in the bullets, the

4   next to the last bullet discusses an investigation or a topic

5   of the investigation being the debtor's procurement of

6   additional director and officer liability insurance in November

7   of 2022.  Do you see that?

8   A    I do.

9   Q    Could you provide me with some additional context as to

10  what that investigation is all about with respect to the

11  procurement of the NO insurance?

12             MR. SLADE:  Your, Honor I would object.  That calls

13  for privileged information.

14             THE COURT:  Sustained.

15  BY MR. ETKIN:

16  Q    With respect to Paragraph 10 of your declaration, it talks

17  about needing the cooperation from several debtor employees

18  with respect to certain estate litigation.  Do you see that?

19  A    I do.

20  Q    And it includes certain Committee settlement parties that

21  have agreed to devote a certain number of hours in the context

22  of that cooperation.  Is that right?

23  A    Yes.

24  Q    How long do you think that cooperation is going to last

25  post-confirmation based upon what's in store for the debtor or

Vogel - Cross/Etkin                                25

1  the liquidating debtor post-confirmation?  Last a year, two

2  years, three years, with respect to all this litigation?

3  A    It's hard to speculate.

4  Q    Do you anticipate it lasting more than a year?

5  A    Again, it's hard to speculate.  It's going to be dependent

6  on how the plan administrator uses these various consultant

7  advisors and -- and what they're needed for.

8  Q    Is the cooperation that you discussed in that paragraph

9  conditioned on their getting a full release from creditors?

10  A    Yes, as part of that global release.

11  Q    Would that include those creditors who chose to opt out of

12  the release?

13         MR. SLADE:  Your Honor, I would object.  Again, it's

14  asking the witness to interpret legally how the settlement

15  agreement works.

16         THE COURT:  I agree.  Sustained.  Rephrase it.

17         MR. ETKIN:  I'll try, Your Honor.

18  BY MR. ETKIN:

19  Q    To the extent that there are creditors who opt out of the

20  release and the indication in the papers is that that's in

21  excess of 10,000, the fact that those creditors are not

22  releasing the Committee settlement parties, does that give the

23  Committee settlement parties the opportunity to back out of the

24  deal that they struck?

25  A    No.

                                Vogel - Cross/Etkin                    26

1  Q    So even if there were 100,000 opt outs and they faced

2  claims from 100,000 creditors, they would still be obligated to

3  fulfill their cooperation obligations under the terms of the

4  Committee settlement?

5  A    Well, I believe --

6  Q    Is that right?

7  A    Maybe, it depends on what those numbers look like in the

8  scheme of the voting classes.  But I think only 10,000 or so,

9  as you noted, chose to opt out.

10 Q    But it basically doesn't matter how many did or didn't opt

11 out.  They would still be bound by the terms of the settlement.

12 Is that right?

13        MR. SLADE:  I mean, Your Honor, again, you're asking

14 the witness a legal conclusion.

15        THE COURT:  Sustained.  Legal conclusion.

16 BY MR. ETKIN:

17 Q    Mr. Vogel, with respect to Paragraph 20 of your

18 declaration, it mentions the gatekeeper, what's been called the

19 gatekeeper provision that's part of the settlement and the

20 subject of some objections that are pending.  Is the Court's

21 approval of the gatekeeper provision a condition to

22 confirmation of the plan?

23 A    Yes.  It's part of this overall settlement package.

24 Q    So in other words, if the Court doesn't approve that

25 gatekeeper provision, then the plan would blow up and it would

Vogel - Cross/Etkin                                    27

1  be starting from scratch?  Would that be the result?

2          MR. SLADE:  Your Honor, I would object.  Lack of

3  foundation.  I don't know how he could know that.

4          THE COURT:  Sustained.

5  BY MR. ETKIN:

6  Q    In the context of the Committee settlement that you

7  discuss in your declaration, is it your understanding that the

8  individual Committee settlement parties were providing

9  cooperation under the Committee settlement preserve all their

10 rights to any existing directors and officers liability

11 insurance?

12 A    That's correct.

13 Q    Do you know how much directors and officers liability

14 insurance coverage exists?

15 A    Not offhand.

16 Q    Again, with respect to the gatekeeper provision,

17 Mr. Vogel, is it your understanding that that provision would

18 apply even if a creditor opted out of the third-party release?

19         MR. SLADE:  Your Honor, I object.  This again calls

20 for legal conclusions interpreting the plan.

21         THE COURT:  I'll overrule that.

22         THE WITNESS:  Can you repeat the question?

23 BY MR. ETKIN:

24 Q    I'm sorry.  Would you like me to repeat the question?

25 A    Yes.

Vogel - Redirect/Slade                                        28

1              THE COURT:  Yeah.  He asked you to repeat it.

2              MR. ETKIN:  Sure.

3    BY MR. ETKIN:

4    Q     With respect to the gatekeeper provision, is it your

5    understanding of the Committee settlement and the plan that

6    even if a creditor opted out of the third-party release, they

7    would still be subject to the gatekeeper provision --

8    A     Yes.

9    Q     -- under the plan?

10          So, in other words, it's not enough to just opt out?

11   There are other hurdles a creditor would have to overcome in

12   the context of the plan and the gatekeeper provision in order

13   to assert their claims against the individual?

14   A     That's how it's drafted.

15   Q     Mr. Vogel, with respect to Paragraph 25 of your

16   declaration, is it your understanding that the gatekeeper

17   provision is not severable for purposes of the plan?

18   A     Correct.

19   Q     And do you know whether the plan provides for the

20   potential for severing a provision that the Court ultimately

21   believes or determines is inappropriate?

22   A     I am not sure I recall what the -- whether or not there's

23   a broader provision but certainly not in the context of this

24   gatekeeper provision.

25              MR. ETKIN:  I have no further questions, Your Honor.

1           THE COURT:  All right.  Thank you.

2           Redirect?

3           MR. SLADE:  Just briefly.

4           For the record, Michael Slade for the debtors.

5                      REDIRECT EXAMINATION

6  BY MR. SLADE:

7  Q    Mr. Vogel, just a few clarifying questions.

8       You testified in response to Mr. Etkin's question that the

9  gatekeeper provision and the opt-outs are parts of the global

10 settlement, right?

11 A    Correct.

12 Q    And the third-party releases are parts of the same

13 settlement, right?

14 A    Correct.

15 Q    Is that part of what everybody negotiated for and got

16 implemented in the plan?

17 A    That's correct.

18           MR. SLADE:  That's all.  Thank you, Your Honor.

19           THE COURT:  All right.

20           No further cross, Mr. Etkin?

21           MR. ETKIN:  Just some further clarification, Your

22 Honor.  One question

23                     RECROSS-EXAMINATION

24 BY MR. ETKIN:

25 Q    When Mr. Slade refers to the global settlement, is he

Renzi - Cross/Etkin                                         30

1  referring to a different settlement than the Committee

2  settlement that's set forth in your declaration?

3          MR. SLADE:  Yeah, I object.  I'm not sure how he

4  could know the answer to that question.

5          THE COURT:  Well, overruled.  He can give your

6  understanding.

7          THE WITNESS:  There is a Committee settlement.  And

8  as part of the plan of reorganization, there is a global

9  settlement.

10          MR. ETKIN:  I think that answers the question, Your

11  Honor.  Thank you.

12          THE COURT:  Thank you.

13          Thank you for your time.  You may step down.

14                      (Witness excused)

15          THE COURT:  That brings us to Mr. Renzi.

16          Good afternoon, Mr. Renzi.

17          MR. RENZI:  Good afternoon, Your Honor.

18          THE COURT:  If you would be so kind, please raise

19  your right hand.

20          MARK RENZI, DEBTORS' WITNESS, SWORN

21          THE COURT:  Please have a seat.  Provide us with your

22  name and business address.

23          THE WITNESS:  Mark Renzi.  99 High Street, Bost,

24  Mass.

25          THE COURT:  And for the record, we have Mr. Renzi's

Renzi - Cross/Etkin                          31

 1  declaration marked as Debtors' Exhibit D-2.

 2                           CROSS-EXAMINATION

 3  BY MR. ETKIN:

 4  Q    Good afternoon, Mr. Renzi.

 5  A    Good afternoon.

 6  Q    I just have a few questions, again, focusing on your

 7  declaration.

 8  A    Should I have a copy?

 9  Q    Yeah, that's probably a good idea.

10  A    Thank you.

11          MR. SLADE:  Your Honor, may I approach?

12          THE COURT:  Yes, please.

13          THE WITNESS:  Thank you.

14          THE COURT:  Getting his good side.

15          Go ahead.

16          MR. ETKIN:  I'm sorry, Your Honor.  I'm fighting a

17  little bit of a cold.

18          THE COURT:  That's quite all right.

19  BY MR. ETKIN:

20  Q    Mr. Renzi, in the context of the disclosures set forth in

21  the disclosure statement, were you involved in the process of

22  providing information or input?

23  A    Yes.

24  Q    And in that context, was there ever any discussion of

25  providing specific information about the pending class action

1  litigation and what the claims were and what was asserted and

2  who the potential defendants were?

3          MR. SLADE:  Objection, lack of foundation.

4          THE COURT:  Sustained.

5          MR. ETKIN:  Let me see if I can fix that.

6  BY MR. ETKIN:

7  Q    Mr. Renzi, the debtor was aware of the pendency of the

8  securities class actions early on in the case?

9  A    Yes.

10 Q    In fact, early on in the case, an adversary proceeding was

11 commenced to enjoin the continued prosecution of the securities

12 litigation against the non-debtor defendants in that case.  Is

13 that right?

14 A    Yes.

15 Q    So in that context, you became aware of the pendency of

16 those class action complaints in Massachusetts and New Jersey?

17 A    Yes.

18 Q    And getting back to my question, was there ever any

19 discussion about including a description of that litigation,

20 who the defendants were, what the claims were in the context of

21 the disclosure statement?

22          MR. SLADE:  Objection, lack of foundation.  How could

23 he know whether there was any discussion about that topic?

24

25          MR. ETKIN:  Well, he would know if he was involved in

Renzi - Cross/Etkin                                          33

1  any discussion.

2           THE COURT:  Well, ask that question.

3  BY MR. ETKIN:

4  Q    Were you involved in any discussion regarding inclusion of

5  information with respect to the pending class action

6  litigation?

7  A    I'd defer to counsel.

8  Q    I'm not asking you if your counsel was involved.  I'm

9  asking you if you were involved.

10 A    It wasn't under my purview to discuss the -- the class

11 action lawsuits in terms of how they were presented in the

12 disclosure statement.  The purview was to make sure the

13 financial information was done appropriately, and that was our

14 main focus.

15 Q    With respect to Paragraph 35 of your declaration?

16 A    I'm there.

17 Q    Again, with respect to the individuals that are parties to

18 the Committee settlement and are getting releases from the

19 debtors, and again aside from the cooperation and what value

20 that might be, in the aggregate, they're contributing I believe

21 it's a shade over $2 million.  Is that right?

22 A    Yes.

23 Q    And --

24 A    Just to clarify, that's the financial aspect of it.  There

25 are other things that they're providing.

1  Q    The cooperation, for example?

2  A    Yes.

3  Q    Anything other than the cooperation and the financial

4  aspect of it?

5  A    I think they were helping, you know, with any wind-down of

6  the estate that's necessary, so that's important.  And any

7  testimony required to maintain any value from litigation, you

8  know, for the estate, to help the estate with other legal

9  entities outside of the estate.

10  Q    But only up to the amount of hours that they're

11  specifically committing for that purpose?

12  A    It is written that way, yes, it is.  However, I'm -- I'm

13  certain to the extent that they are -- they are people that are

14  diligent and to the extent that something else is needed, I'm

15  sure they can negotiate that to make sure they're maximizing

16  value for the estate.  So they're good people.

17  Q    That's your speculation as to what would happen?

18  A    That is my speculation.

19  Q    You heard me ask Mr. Vogel how long he anticipates that

20  cooperation and the scope of the cooperation that you just

21  testified to, how long is that going to be required, and he was

22  unable to estimate.  Do you have an idea, would it be more than

23  a year?  Is it anticipated to be more than a year?

24  A    Sure.  I've -- I've read Mr. Vogel's declaration.  You

25  know, BRG as an institution is involved in a number of crypto

Renzi - Cross/Etkin                                        35

1  cases.  They are complex, as you know, sir.  I think it's more

2  than six months and hopefully it can be resolved within a year.

3  So if you want me to put, you know, parameters, that's my best

4  guess.  It could take longer, though.

5  Q    And going to Paragraph 37 of your declaration, you

6  specifically state, and Mr. Vogel and I had a little bit of a

7  discussion on it.  You specifically state that the Committee

8  settlement and the debtor release under the Committee

9  settlement has no impact on the claims of third parties.  Is

10 that right?

11 A    Yes, I'd defer to Mr. Vogel on this aspect, but that's

12 right.

13 Q    But this is what you essentially testified to in Paragraph

14 37.  Is that right?

15 A    Yes.

16     "And provides for releases of the debtors' potential

17 claims subject to the terms of the Committee settlement of

18 their directors, officers, and employees."  Yes, that's what it

19 says.

20     "The debtor releases are a vital component of the plan,

21 and it is a sound exercise of the debtors' business judgment

22 and should be approved."

23 Q    Thank you, Mr. Vogel.  I'm sorry, Mr. Renzi.

24     In Paragraph 44 of your declaration, you talk about the

25 fact that the potential claims at issue are no secret.  Do you

Renzi - Cross/Etkin                                          36

1  see that testimony?

2  A    It's a long paragraph.  Can you help me where that is?

3  Q    It's lengthy and --

4         THE COURT:  Begins with "This case and other cases."

5  BY MR. ETKIN:

6  Q    Right at the end of the second sentence.

7  A    "I have this case and other cases in the cryptocurrency

8  sector.  More generally, I've received tremendous publicity,

9  and the potential claims at issue are no secret."

10 Q    When you made that statement, were you in any way

11 referencing the claims set forth in the class action litigation

12 that's pending?

13 A    Yes.

14 Q    So it would be your position then that the creditors,

15 customers of BlockFi, were generally aware of the securities

16 litigation claims?

17 A    I think it's public record, so if they chose to read it.

18 Q    Moving on to Paragraph 49, in the first -- I'm sorry, in

19 the second sentence of Paragraph 49, you refer to the release

20 parties being exposed, and I'm quoting, "to numerous frivolous

21 litigation claims after the plan is confirmed."

22     What's the basis for that statement, Mr. Renzi?

23 A    I've discussed with counsel that that's -- that's a

24 potential.  That's the basis.

25 Q    So you aren't relying on any particular evidence in terms

Renzi - Cross/Etkin                               37

1  of making that statement?

2  A    I was relying on excellent counsel.

3  Q    But based upon your response just now, the idea of

4  numerous frivolous litigation claims is conjecture and

5  hypothetical.  Is that right?

6  A    Okay.  I'm not a lawyer, so -- but I -- I do rely on

7  counsel when we're doing analyses and when pulling together a

8  declaration.  So I -- I trust our counsel.

9  Q    So the basis for that position is, and that understanding,

10 is simply discussions with counsel.  Is that right?

11 A    Yes.

12         MR. ETKIN:  I have no further questions, Your Honor.

13         THE COURT:  Thank you, Mr. Etkin.

14         Redirect?

15         MR. SLADE:  No, Your Honor.  Thank you.

16         THE COURT:  All right.  Mr. Renzi, thank you for your

17 time.  You may step down.

18         THE WITNESS:  Thank you, Your Honor.

19                         (Witness excused)

20         THE COURT:  Thank you, Mr. Etkin.  I believe that

21 completes the witnesses.

22         MR. ETKIN:  Yes, Your Honor.

23         THE COURT:  Thank you.

24         MR. ETKIN:  At least from my perspective.

25

1          THE COURT:  Then we'll return to the next phase of

2     the hearing and argument.

3          MR. SLADE:  Maybe just to make sure that the record

4     is closed, can we just confirm that nobody else has any

5     witnesses to offer in support of or in opposition to

6     confirmation?

7          THE COURT:  Well, let's start with the debtor.  The

8     debtor has no further witnesses, correct?

9          MR. SLADE:  We do not, Your Honor.

10         THE COURT:  Committee is not offering any independent

11    witnesses, correct?

12         MR. AULET:  No, Your Honor

13         THE COURT:  All right.  U.S. Trustee?

14         MR. SPONDER:  No, Your Honor.

15         THE COURT:  Any of the objecting creditors?

16         MR. ETKIN:  No, Your Honor.

17         THE COURT:  Then the record is closed with the

18    declarations that have been admitted, and we'll turn to the

19    argument phase.

20         MR. PETRIE:  Thank you, Your Honor.

21         So for the record, it's Francis Petrie of Kirkland on

22    behalf of the debtors.

23         By our count, we have four remaining objections right

24    now.  So there's the U.S. Trustee and the SEC, Wyatt who is the

25    securities lead plaintiff who we just had do cross-examination,

1  and the individual creditor which I spoke about before.  So

2  we'll begin -- a lot of these arguments are intertwined, but

3  we'll begin by addressing the arguments raised by the two

4  governmental entities which are the U.S. Trustee and the SEC.

5         So I'll start first with good news which is that

6  we've largely narrowed the issues that were raised in both the

7  SEC's objection and the U.S. Trustee's objection, both formally

8  and informally.  There's changes to the amended plan that deal

9  with the definition of exculpated parties, for instance,

10  modifications to who is a releasing party under the plan

11  including excluding parties who are known not to receive notice

12  and holders who are deemed to reject.

13         All of those parties automatically are excluded from

14  the releases.  They don't need to take any additional steps to

15  opt out, and they are automatically out.  Nonetheless, one of

16  the issues raised by the U.S. Trustee that we weren't able to

17  resolve surrounds the scope of the debtor release which they

18  argue is overly broad.

19         First, the debtor release that is contained in the

20  plan is critical.  Both we and the Committee had very

21  hard-fought months' long negotiations that led to the term and

22  the scope of the debtor release and tailored appropriately,

23  including multiple mediation sessions.  In our view, it's

24  undeniable that the debtor release is in the best interest of

25  creditors.  Without its inclusion, we would not have the

40

1  support of the people we need to effect the plan.

2  **

3       MR. PETRIE:  Some of this might have not been clear

4  on cross, but there's a lot more to the Committee's settlement

5  than just the monetary contribution and cooperation.  There's a

6  waiver of claims on the platform.  There's subordination of

7  other claims.  There's many pieces of the settlement that are

8  outlined in detail in the plan that shouldn't be glossed over.

9  It's very complex, and a cornerstone of the plan itself.

10       Either way, we set this out in our papers.  But the

11  courts in this jurisdiction analyze debtor releases under the

12  Zenith factors which include an inquiry into five different

13  prongs, all of which are easily met in this case.

14       First, there's an examination as to the identity of

15  interest between the debtor and the non-debtor.  The debtors

16  have indemnity obligations to the vast majority of the release

17  parties.  So any asserted claims would effectively be circular.

18       Second, an inquiry into the contribution of the plan

19  by the non-debtor.  The release parties here are providing a

20  lot, as I just outlined, in the form of cooperation with the

21  estate.  The CEO, COO, and other insiders are also making

22  additional personal contributions.

23       But again, here, it's not just about the money being

24  contributed.  It's about preserving the ability to make in-kind

25  distributions and to assist in recovering amounts in key

1   ongoing litigation.  Without the debtor release and the other

2   provisions of the plan, those contributions, both monetary and

3   significant non-monetary, would not be possible.

4          Third prong looks at the necessity of the release to

5   the plan.  The debtor release is essential to the success of

6   the plan.  Absent this release, it's highly unlikely that the

7   release parties would have agreed to support, and highly

8   unlikely that would have been able to formulate a plan at all.

9          Fourth looks at the overwhelming acceptance of the

10  plan and release by creditors.  We have that here.  We have all

11  of these individuals who voted in favor across classes.  We had

12  over 90 percent of voting creditors vote in favor of the plan,

13  which includes the release.  And we should not second-guess

14  their judgment.

15         And fifth, there's an examination into the payment of

16  all or substantially all of the claims of creditors or interest

17  holders.  The plan provides the highest amount and in-kind

18  recovery for creditors.  And the cooperation by the management

19  team obtained as part of the release allows for the possibility

20  of real success on the litigation.

21         So for all classes, there will be truly significant

22  swings in recovery if they're able to prevail.  So the fifth

23  factor is also met here.

24         Nobody's really saying that these are claims that the

25  company should be pursuing because it's not getting enough

26  value in exchange for the release.  In fact, earlier this year,

42

1  each of the special committee of the BlockFi board and the

2  unsecured creditor's committee filed unredacted versions of

3  their investigation reports.  And we engaged in several

4  contested hearings at which we made our respective views known

5  about the merits of the claims held by the debtors.

6       There's truly a very robust and extreme public

7  disclosure about the merits of estate claims, more than --

8  significantly more than you'd see in any other Chapter 11 case.

9  And through that public information, the creditor body became

10 educated on the value of these claims.  And even armed with

11 that information, they submitted overwhelming votes in favor of

12 the plan.

13      The other piece of the Government objections deals

14 with the opt-out provision and the third-party release.  In

15 this case, the third-party release is reasonable and

16 appropriate and wholly consistent with the decisions of this

17 Court, and the circuit more broadly.

18      First, and I can't emphasize this enough, the release

19 is consensual.  The law is clear that parties that receive

20 sufficient notice of a plan's release provisions and had an

21 opportunity to object or to opt out of that release and failed

22 to or chose not to do so, including where such holder abstained

23 from voting all together, are agreeing to grant such a release.

24      In these cases, we engaged in a fulsome process

25 noticing surrounding the plan.  And the third-party release

43

1 language is clearly and conspicuously all over multiple

2 documents.  It's included in the combined hearing notice that

3 went to every one of the creditor matrix.  It's on the ballots,

4 it's on the opt-out forms.  And all of these were sent to

5 parties in connection with solicitation as well as the

6 disclosure statement and the plan.

7        The Committee also emphasized the option to opt out

8 for all creditors in the letter that it sent out as part of the

9 solicitation package which went to all of their constituency,

10 and through it's own tweets, emails, and other communications

11 which the debtors also engaged in highlighting the key parts of

12 these documents and the deadline to submitting voting and opt-

13 out results.

14        And even beyond that, the obligation to affirmatively

15 opt out is explicitly stated multiple times in the disclosure

16 statement.  No party is surprised by the fact that opting out

17 is a key part of this plan.  If it was known that a party did

18 not get proper notice, they either got a bounce back email or a

19 returned physical mailing, then those parties are not subject

20 to the release.  But that's not who we're talking about here.

21        The other piece of the obligation is a suggestion

22 that parties who have rejected the plan did not have ample

23 opportunity to opt out.  We also argue that that's untrue.

24 Parties who voted to reject the plan received the same ballot

25 as anyone else, and were given ample opportunity to evaluate

44

1 the opt-out form, though they still, like others, were required

2 to check a box or opt out if they did not want to be subject to

3 the release.

4        And many of these parties, over 10,000 of them, did

5 just that.  The sheer number of parties that opted out is a

6 clear demonstration that the process worked as intended and was

7 clear and understood by all parties who chose to retain these

8 actions, if they exist, and participate in opting out.

9        I would also point out that this method follows the

10 reasoning that was followed in <u>Aceto Corporation</u>.  And, Your

11 Honor, it's much like you saw in Sur La Table -- I know there's

12 argument about how to pronounce that -- when Your Honor

13 overruled similar objections at the SEC made here as they did

14 there.

15        So the overwhelming weight of authority in this

16 district suggests that the opt out mechanism such as the one

17 included in the plan constitute consensual releases.  Courts

18 throughout this circuit follow similar reasons.  Recent cases

19 including one in front of Your Honor two weeks ago upheld the

20 notion that a non-debtor release is consensual where holders

21 and claimants in interest are provided the opportunity to opt

22 out, even when the holders in such classes reject the plan.

23        The objecting parties also object to the third-party

24 release not including a carve out for fraud, intentional

25 misconduct, or gross negligence.  The third-party release,

45

1  without such carve out, is clearly warranted in this case where

2  releasing any and all potential claims of fraud, willful

3  misconduct, and gross negligence are crucial to properly

4  implement the plan.

5          The debtors have hundreds of thousands of clients who

6  have a unique outrage towards certain of the release parties,

7  specifically the debtors' current officers and directors.  We

8  needed to release such parties to implement the terms of the

9  settlement and the plan.  And any carve out for fraud, willful

10 misconduct, and gross negligence would circumvent the third-

11 party release.

12         The objecting parties do not cite any Third Circuit

13 authority that requires a carve out in non-debtor releases.

14 Courts in this district and in the Third Circuit have

15 repeatedly approved plans that did not include such a carve

16 out.

17         And again, this is a consensual release.  All

18 stakeholders needed to do to preserve such claims was to opt

19 out, meaning that under clear law in this circuit, the release

20 of claims given by stakeholders who do not opt out is

21 consensual, notwithstanding the inclusion or exclusion of this

22 carve out.

23         So, Your Honor, unless you have any questions, I'd

24 like to move on to the gatekeeper provision.

25         THE COURT:  Please.

46

1          MR. PETRIE:  Another piece of this objection is to

2    what's labeled as the gatekeeper provision.  And to clear up

3    any misconception about what we're asking for here, this is an

4    administrative safeguard.  To the extent any entity that has

5    opted out or otherwise not participated in the releases seeks

6    to assert a claim or cause of action against a released party,

7    that entity must first obtain an order from this Court

8    determining that they are authorized to bring such a claim.

9          And we'll be clear about something right now.  It's

10   not contemplated necessarily that the gatekeeping court is

11   ruling on the underlying merits of the action.  The Court is

12   making an inquiry into whether or not there's an ability to

13   bring the action or whether it has been addressed already as

14   part of the plan or confirmation order.

15         So what we're asking for here is for this Court to

16   make an initial threshold inquiry and engage in the

17   construction of the terms of the plan, and to interpret those

18   terms in conjunction with the confirmation order.  Clearly,

19   this Court is the best forum to accurately construe the

20   language of it's own plan and confirmation order, especially

21   here where there's a bargain for benefit and complex history.

22         Settling parties provided financial and other

23   contributions to obtain the releases that are contained in the

24   plan.  And this Court has jurisdiction to implement this

25   mechanism, notwithstanding what some of the objectors say.

47

1        Thu true that bankruptcy courts are of limited

2    authority, this is certainly within that authority.  All we're

3    asking for the Court to do, as I stated, was to figure out

4    whether a claim is barred or not by the terms of the plan,

5    which this Court is otherwise very familiar with.  This Court

6    can, unquestionably, decide that.

7        And if there is a real direct claim against the

8    released parties, then the claim will have to be later defended

9    on the merits.  But what we and the settling parties

10   anticipated was that there will be many frivolous claims that

11   parties will bring here.  As we stated, over 10,000 creditors

12   have opted out.

13       So in this case, there are a lot of lawsuits that

14   will likely have to be sorted through that may be asserted

15   against a wind-down debtor with limited resources.  That is a

16   huge concern.

17       So I'll note that this mechanism isn't in every plan.

18   That's true.  But it has been approved in various instances in

19   many courts in different circuits.  It stems from the Barton

20   Doctrine which we've also seen in the Madoff and General Motors

21   cases.  And the Fifth Circuit in Highland Capital engaged

22   heavily with the topic, and ultimately upheld confirmation of a

23   plan that found that this provision helped screen and prevent

24   bad faith litigation against parties, including directors and

25   officers.

48

1        One of the SEC's issues with this provision surrounds

2 burdens.  They argue that the burden falls inappropriately upon

3 creditors to bring this cause of action or come before this

4 Court.  Even if that's taken as true, those creditors accepted

5 that burden by overwhelmingly voting in favor of the plan which

6 contained a description of this mechanism.  And the

7 solicitation version of the plan of DS did not amend this

8 version.  That is what went out to creditors and what they

9 voted to accept.

10       But on this topic of burdens, odds are that if there

11 was an issue about the release of claims, those issues would

12 likely be in front of this Court anyway.  The plaintiffs would

13 likely be brought here by defendants who would then seek this

14 Court to interpret the terms of the order and enforce the plan

15 against them.

16       So I argue that what this mechanism does then is to

17 preserve wind-down debtor resources that otherwise would be

18 wasted defending frivolous actions that are going to be

19 improperly brought.

20       And likewise, the structure benefits everybody.

21 Individual claimants may have no idea whether their claims are

22 released or enjoined by the plan.  Clearing up this inquiry to

23 those individuals in front of this Court is beneficial.  This

24 Court is definitely, at least in my view, more acceptable and

25 accessible than the vast majority of other jurisdiction or

49

1  forums, and will let them know whether their claim can be

2  properly brought.

3        And it prevents courts from around the country from

4  inconsistently misconstruing the terms of the plan and a

5  confirmation order, which is especially at issue here when

6  certain parties are making a substantial contribution to the

7  estates with the expectation of certain protections in return.

8        So in sum, the gatekeeping mechanism is a feature

9  that offers protection, consistency, and fairness to these

10 parties.  It's inclusion and structure were negotiated heavily

11 with the Creditor's Committee, and was accepted by all voting

12 classes.  It's common in other circuits and in other cases, and

13 has been approved by this Court.  It's a key part of the

14 settlement that was negotiated with settling parties, and I'm

15 certain that the plan would probably not exist without its

16 inclusion.

17       To address -- so I think that addresses some of what

18 Mr. Wyatt's objection consisted of.  But at the outset, we'd

19 just like to note that Mr. Wyatt, we do not believe, has

20 standing to make an objection.  He has opted out of the third-

21 party release himself.  But he seeks to object on behalf of

22 other individuals in a class that has not yet been certified.

23       In short, he's objecting to consensual releases given

24 by people he does not represent.  And what underpins the

25 objection is that the third-party release is consensual and

50

1   appropriate.  There's no due process issue here, as we

2   outlined.  Individuals were provided notice and an opportunity

3   to opt out.  If they didn't submit a response, they were sent

4   an email.  There were tweets, there were posts on the debtors'

5   website.

6        The UCC had its own set of communications including a

7   letter that was sent to every creditor in this case.  More than

8   10,000 people exercised the ability to opt out if they chose

9   to.  The creditors understood that this feature existed, and

10  some of them exercised it.

11       But for those who received notice and did not opt

12  out, Mr. Wyatt appears to be substituting his judgment for

13  theirs.  I can personally imagine many reasons why individuals

14  would choose not to opt out.  For instance, they may want the

15  settlement parties to focus on other things like litigation or

16  returning things in kind to creditors without being served with

17  discovery or being distracted by another lawsuit.

18       Or maybe the individuals just want nothing to do with

19  what's probably a frivolous lawsuit and to move on.  The

20  securities lead plaintiff, as I said, is attempting to

21  substitute its judgment for theirs.  But for those who decided

22  not to opt out, they consented to this mutual release.  It's

23  likely a lot of individuals do not even know that Mr. Wyatt

24  seeks to represent them or speak on their behalf, and

25  invalidate a release that they chose to be party to.

51

1  Currently, he does not represent them, and we do not know if he

2  ever will.

3          And from where we sit, no other party has really

4  expressed a desire similar to his.  And the lead plaintiff had

5  ample opportunity in these cases to certify a class at this

6  point.

7          To address any issues on disclosure, we did include

8  information in the disclosure statement about his complaint and

9  the adversary proceeding.  It's in Section 10-J and is cited in

10 our confirmation brief.  We believe that these factors, in

11 total, mean that his objection should be overruled.

12         I'll now address the one additional objector.  This

13 objector's issue was a potential ambiguity surrounding the

14 language of causes of action in the debtor release section

15 which we clarified through an additional edit at their request.

16         The edit is not a material modification to the plan.

17 It simply reinforces the rights that are otherwise provided for

18 under the plan.  This individual raised their misunderstanding

19 to the UCC and the debtor several weeks ago.

20         They were notified through Counsel prior to the

21 voting deadline of the intention of the section.  And if this

22 result was not what the individual wanted, we offered to change

23 the submitted vote.  The individual instead chose to accept the

24 plan, notwithstanding the explanation, and offered to change

25 the vote to another direction.

52

1            The standard is that any plan modification is not

2    material unless if a creditor knew of the modification, they'd

3    be likely to reconsider their acceptance.  And here telling me

4    this individual in fact did not change their vote when

5    presented with the option to do so.

6            The edit that we made was arguably not even

7    necessary.  But we made that technical modification anyway to

8    clarify this perceived inconsistency in the plan.  No other

9    creditors have joined in to argue they also believe that

10   claimed objections were going away.  So no reasonable person

11   could read the disclosure statement and the plan and say no

12   claim will ever be objected to.

13           The disclosure statement and the solicited plan were

14   clear that the debtors and the wind-down debtors were

15   instituting a claims objection process.  There are many

16   provisions providing descriptions of how we plan to object to

17   claims, including Page 2 of the DS, Article 11(a) under

18   multiple sections.  Article 11(3)(4), all of these are

19   described in our papers and cited in our confirmation brief.

20           Article 7(b) of the solicited plan expressly provides

21   that after the effective date, the wind-down debtors would have

22   the sole authority to file, withdraw, or litigate to judgment

23   any objections to claims.  The sections go on including the

24   second page of the DS which says in all capital letters that

25   the ability to object to claims after the confirmation or the

53

1  effective date of the plan, irrespective of whether the

2  disclosure statement identifies any such claims or objections

3  to claims.

4        There's no read of the plan or disclosure statement

5  that suggests a vote in favor of the plan ensures that a claim

6  will be wholly permitted in full at any point in time.  And

7  regardless under the bankruptcy code, Section 502(a) preserves

8  the ability for any party to object to a claim, even if the

9  debtor somehow did not have this right.

10        So in light of all that, Your Honor, even if we

11  confirm the plan, that does not hinder this ability's

12  individual -- it does not hinder this individual's ability to

13  dispute the debtors' objection to their claim.  They were

14  included in the 11 omnibus claims objection.  The response

15  deadline to that is October 3rd.  And the 11 omnibus claims

16  objection is currently scheduled to be heard by this Court on

17  October 10th.  If they have any defenses, they should be heard

18  at that time.

19        With that, I will turn the podium over to likely the

20  Committee --

21        THE COURT:  All right.

22        MR. PETRIE:  -- unless Your Honor has any questions.

23        THE COURT:  No, not at this juncture.  Thank you.

24        Let me hear from the Committee, please.

25        MR. AULET:  Good afternoon, Your Honor.  Kenneth

54

1  Aulet of Brown Rudnick for the official Committee.

2          Your Honor, I would join in the debtors' request that

3  the objections be overruled.  As Your Honor is well aware, the

4  Committee's settlement was extremely hard fought in this case.

5  And one of the things we're proud of in this case is that every

6  creditor got a huge amount of disclosure.

7          Now, if you look at some of the usual cases where

8  releases like this have been approved, it's not necessarily a

9  huge amount of information that's been given out.  But here,

10 the debtors' put out a hundred-plus page report.  The Committee

11 put out a hundred-plus page report.  And both reports were

12 expressly referenced in the disclosure statement.  And you

13 know, all parties were encouraged to read them.

14         We certainly don't like every aspect of the

15 settlement, and I'm sure that the debtors and the settlement

16 parties don't either.  But at the end of the day, this

17 settlement and getting this plan approved is the best path

18 forward at this time for the customers of BlockFi.

19         There's one, you know, statement that counsel for the

20 debtors made about, you know, some settlement parties

21 anticipating frivolous claims.  To be clear, the Committee has

22 no -- has not made -- reached any view that any potential

23 claims are frivolous.  You know, in our view, the third-party

24 releases and the gatekeeper function are a negotiated part of

25 the plan.

**WWW.JJCOURT.COM**

1   We are certainly not taking position, and I don't

2   think that anybody has offered an opinion on if any specific

3   claim is frivolous.  But what we have agreed to and what we

4   request be approved is the settlement that has been embodied in

5   the plan after very, very hard-fought negotiations.

6   I also want to address the final objection to the

7   modification of the plan.  At the end of the day, this

8   objection just asks that the Court order that the entire plan

9   be resolicited again.  This is not a case where we can simply

10  -- there's 9,000 that the leave claims, simply accept those

11  claims at face value not only because some claims are

12  overstated, but some claims are under stated.

13  You know, if you look at some of the omnibus

14  objections that have been filed, they're actually asking the

15  claim amount be increased because it was very important to the

16  Committee.  We have hundreds of thousands of individuals who

17  are not experienced in bankruptcy.  And we did not want the

18  claims process to be essentially a quiz on if the claimants

19  could properly identify what debtor was liable, properly fill

20  out the form to properly set forth the claim.

21  And so there are, and I expect there will be,

22  additional objections to make sure that people get more than

23  what they claimed because they made a mistake on the claim

24  form.  We need to get the claims population right.

25  And there is no way that asking all of the customers

56

1  of BlockFi to sit in bankruptcy for another two months after

2  they overwhelmingly accepted the plan, just so they can be

3  asked did you mean it because one of the objections that was

4  received was for Three Arrows Capital that wanted to make very

5  sure that they were deemed to have opted out.  They've asserted

6  hundreds of millions of dollars of claims.  If any reasonable

7  party thought that the plan released the ability to object to

8  claims, Three Arrows would have been beating down the doors of

9  the debtors demanding to be included in the opt out release,

10 not demanding be taken out of it.

11          So you know, with that, Your Honor, we'd urge that

12 the Court overrule the objections and confirm the plan.

13          THE COURT:  All right, thank you, Mr. Aulet.

14          Let me turn to the -- I want to hear all objections,

15 and then any responses.  Let me turn to the governmental

16 objectors.  Mr. Maza, I'll let you -- you want to catch your

17 breath?  Why don't we hear from -- we'll hear from the U.S.

18 Trustee first.

19          MR. SPONDER:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. SPONDER:  Thank you, Your Honor.  And good

22 afternoon.  Jeff Sponder on behalf of the United States

23 Trustee.

24          As you know, Your Honor, the U.S. Trustee filed an

25 objection to the third amended joint plan at Docket Number 1476

57

1   on the basis that the exculpation clause is impermissibly

2   broad, the debtor releases are over broad, the opt out clause

3   is insufficient, the non-debtor third-party releases are not

4   fair and necessary to the reorganization.  The injunction

5   provisions are impermissible.

6          The plan is not a settlement subject to approval

7   under 9019.  And the gatekeeping provision should be removed.

8   In addition, the U.S. Trustee objects to certain of the wind-

9   down provisions in the plan.

10          As Counsel mentioned, as a result of discussions

11   between the U.S. Trustee and the debtors, the debtors filed

12   last night a third amended joint plan with additional technical

13   modifications at Docket Number 1609.  The third amended joint

14   plan now includes modifications agreed upon between the debtors

15   and the United States Trustee that include modification to

16   Article 1 Section 121 as to the definition of exculpated

17   parties, that it includes only specific estate fiduciaries,

18   removing Article 4(d)(12) from the plan which provided an

19   indemnification and limitation of liability to the plan

20   administrator, modifies Article 2(g) and Article 12(c) which

21   concerns statutory fees and provides that the debtors and the

22   wind-down debtors are jointly and severally liable, and it

23   modifies Article 1, Section 191 which is the definition of

24   releasing parties to set forth that no holder of a claim or

25   interest that is deemed to reject the plan shall be a releasing

1   party.

2           Your Honor, I realize that we have had -- we filed

3   similar objections in various cases over the years which have

4   been overruled by Your Honor.  In fact, one such case was

5   decided just a few weeks ago.  With that knowledge and

6   understanding, the United States Trustee intends to rest on his

7   objection filed again at Docket 1476, but would still like to

8   address some of the remaining issues including certain of the

9   releases, the injunction and gatekeeping provisions, and the

10  plan as a settlement under Rule 9019.

11          But first, Your Honor, this plan provides for third-

12  party releases, as we all know, for the benefit of the release

13  parties.  The non-debtor third-party releases are referred to

14  as consensual, but the definition of releasing party includes

15  all holders of claims that vote to accept the plan, and who do

16  not affirmatively opt out of the releases provided by the plan.

17          All holders of claims that are deemed to accept the

18  plan and who do not affirmatively opt out of the releases

19  provided by the plan, all holders of claims who abstain from

20  voting on the plan, and who do not affirmatively opt out of the

21  releases provided by the plan, and all holders of claims who

22  vote to reject the plan and do not affirmatively opt out of the

23  releases provide by the plan.

24          It is unclear, Your Honor, if holders of claims or

25  interest whose ballots are returned to the debtors marked

59

1  undeliverable are releasing parties.  Creditors who are deemed

2  to reject the plan whose ballots are returned undeliverable

3  should not be deemed to have consented to the third-party

4  releases.  With that said, Your Honor, I believe Counsel argued

5  and agreed today that -- during argument today that those are

6  outside of the definition of the releasing parties.

7          Your Honor, likewise, U.S. Trustee submits that those

8  parties who vote to reject the plan and who do not

9  affirmatively opt out of the releases provided by the plan are

10 not agreeing to consensual third-party releases, and thus

11 including them in the definition of releasing party is contrary

12 to applicable case law, including the standards set forth in

13 Washington Mutual and other cases that we've cited in our

14 objection.

15         The U.S. Trustee submits that those creditors who

16 rejected the plan but did not affirmatively opt out of the

17 releases did not provide affirmative consent.  To the contrary,

18 Your Honor, those parties that rejected the plan in all

19 likelihood believed that with their rejection, they were in

20 fact rejecting the releases as well as with, you know, no need

21 to check the opt out box.

22         Marking the rejection box should establish a complete

23 rejection of the plan, including the releases.  Accordingly,

24 Your Honor, the U.S. Trustee submits that those holders of

25 claims how rejected the plan but who did not affirmatively opt

60

1    out of the releases should be deleted from the definition of

2    releasing parties.

3            Second, Your Honor, through the plan, the debtors

4    request an injunction precluding and permanently enjoining all

5    persons or entities from interfering with the use and

6    distribution of the debtors' assets in a manner contemplated by

7    the plan.  And those that have been fully satisfied under the

8    plan are permanently enjoined from any set off or relief except

9    for payments or distributions contemplated under the plan.

10           Section 1141(d)(3) does not grant a liquidating

11   debtor a discharge, which is the situation we have here.  In

12   addition, Your Honor, 1141(a) sets forth that the provisions of

13   a confirmed plan bind the debtor and any entity acquiring

14   property under the plan and any creditor except if the plan is

15   a liquidating plan under 1141(d)(3), which again is what we

16   have here.

17           Instead, Your Honor, where we should look at is

18   Section 362(c)(1).  And that section applies.  And that

19   provides that the stay of an act against property of the estate

20   under Subsection A of this section continues until such

21   property is no longer property of the estate.  And in addition,

22   Section 362(c)(2) provides that the stay of any other act under

23   Subsection A continues until the earlier of the time the case

24   is closed or dismissed.

25           Further, Your Honor, the debtors include a

61

1  gatekeeping provision with the U.S. Trustee submits represents

2  an inappropriate burden on the claim holders and should be

3  deleted.   As provided in the objection, there's no reason why a

4  court in which a relevant action has been filed between non-

5  debtors cannot make the determination as to whether the claim

6  was released under the plan.

7         Again, we ask the Court of follow Judge Owen's

8  decision in the In re Gulf Coast Healthcare LLC case and not

9  the Fifth Circuit decision.

10        Your Honor, the U.S. Trustee is amenable to a

11  limitation being placed on the injunction, which is exactly

12  what occurred in the <u>Bed Bath & Beyond</u> case a couple of weeks

13  ago.   There, the debtors agreed to the following limiting

14  language which seems to coincide with Section 362(c)(1).   And

15  that is that the injunction would remain through and until the

16  date upon which all remaining property of the debtors' estates

17  vested in the wind-down debtors has been liquidated and

18  distributed in accordance with the terms of the plan.

19        Such limiting language should be included in the

20  injunction provision, especially in light of the addition of

21  the gatekeeping provision in the plan which requires parties to

22  obtain a final order from Your Honor to pursue a claim against

23  the debtors.

24        Third, Your Honor, the debtors in Article 4(a)

25  suggest that the plan itself is a settlement agreement subject

62

1  to approval under Rule 9019.  However, sending a plan to

2  impaired creditors for a vote is not the same thing as parties

3  negotiating a settlement among themselves.

4         In addition, Your Honor, it appears that Article 4(a)

5  does not limit the settlement of claims to the debtor or the

6  estates, and does not appear to be permissible under Section

7  1123(b)(3)(A).  For a plan to incorporate a settlement of

8  claims or causes of action of other parties, those parties must

9  have expressly agreed to settle or compromise those claims,

10  Your Honor.

11         In Docket 1609 in Article 4(a), the debtors have

12  agreed to remove any reference to Rule 9019 and Section 1123.

13  However, the debtors replace such language with the phrase, and

14  I quote, "to the extent provided by the bankruptcy code," which

15  would seem to incorporate Rule 9019 and Section 1123.

16         In addition, Your Honor, the paragraph provides that

17  the plan is deemed a motion to approve the settlement of all

18  claims and controversies which, again, would seem to suggest

19  that it's a 9019 motion.

20         Similarly, Your Honor, Article 8(b) appears to

21  impermissibly seek to provide for the settlement of third-party

22  claims.  The releases described in Article 8(b) are not part of

23  the any agreement between the debtors and all parties affected

24  by the plan.  Also, Articles 3(c), 3(a) to (e) and 4(a) to (c)

25  purport to treat the distributive provisions of the plan as if

63

1  they were part of a settlement.  The debtors have not provided

2  any justification for such additional relief.

3          As a result, the United States Trustee requests that

4  Paragraph 4(a) be removed from the plan, as it is not necessary

5  or applicable, that the second paragraph of Article 8(b) be

6  modified to remove reference to Rule 9019 or any reference to

7  settlement, and as well as to remove the provision that the

8  releases are "a good faith settlement and compromise of such

9  causes of action" and that any references to settlement in the

10  distributive provisions of Articles 3(c)(3) and (4) be removed.

11          Lastly, Your Honor --

12          THE COURT:  Let me just clarify because obviously

13  plans can incorporate settlements.

14          MR. SPONDER:  Correct.

15          THE COURT:  So what's the distinction here that your

16  office finds troubling?

17          MR. SPONDER:  The entire plan is being included as a

18  settlement, that it's the entire plan.  And what we're saying

19  is that the entire plan cannot be a settlement under 9019.

20  There can be, just like the Committee settlement, you can have

21  those type of settlements incorporated through the plan.  Here,

22  it's the entire plan is now being set forth as a settlement.

23          THE COURT:  So if the Court were to confirm the plan

24  and in the confirmation order make it clear that the

25  confirmation is being approved based on satisfaction of 1129(a)

64

1 factors and not the standards for approving a 9019, does that

2 address the concerns?

3           MR. SPONDER:  Yes, Your Honor.

4           THE COURT:  Okay.

5           MR. SPONDER:  Lastly, Your Honor, the debtors through

6 Docket 1564 modified the treatment of Classes 3B and 3D to

7 allow a voluntary opt-in for a loan repayment treatment.

8 Docket 1564 also defined certain new terms such as loan

9 repayment amount, loan repayment election, loan repayment

10 treatment, and loan treatment deadline.

11           These modifications appear to change the treatment of

12 such claimants under the plan.  However, as it appears that

13 this is an added election post-confirmation, such modification

14 would appear to be appropriate subject, Your Honor, to the

15 debtors, or the wind down debtors, providing notice to those

16 claimants to make it to let them know that there is that post-

17 confirmation election.

18           Your Honor, in sum, the debtors and the U.S. Trustee

19 were able to partially resolve the U.S. Trustee's objection

20 concerning exculpation, statutory fees, and the limitation of

21 liability and indemnification of the plan administrator.  For

22 the reasons set forth in the U.S. Trustee objections, as well

23 as the argument that I've made today, the U.S. Trustee requests

24 that the remaining objections concerning the releases, the

25 injunction provision, the gatekeeping provision, and the plan

65

1  as a (indiscernible) settlement be sustained.  In addition,

2  Your Honor, to require the debtors and/or the wind down debtors

3  to provide notice of the loan repayment treatment to those

4  parties that will be affected.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Sponder.

7          Mr. Maza.

8          MR. MAZA:  Thank you, Judge.  Alan Maza on behalf of

9  the United States Securities and Exchange Commission.

10         I will start to indicate that the debtors and the

11 Committee worked with us with regard to certain aspects to seek

12 consensual resolution on issues as represented by counsel.

13 However, there are some remaining issues which we brought to

14 the Court's attention, some of which have been shared by other

15 stakeholders which we believe are concerning going from

16 confirmation or potential confirmation of the plan.

17         To begin with, I just want to, on behalf of the SEC

18 staff, state a reservation of rights regarding crypto

19 distributions which has been stated and incorporated in the

20 proposed confirmation order and was also stated in our

21 objection, and reservation of rights.  The plan contemplates

22 transactions involving crypto assets, including the

23 distribution of certain crypto assets to shareholders and the

24 liquidation of crypto assets.

25         As set forth in our limited objection and reservation

1   of rights, the SEC is not opining about whether these

2   transactions comply with the securities laws and reserves its

3   rights to challenge transactions involving crypto assets.

4          Going beyond the reservation of rights, two issues

5   stand out.  One is, as mentioned by the Office of the U.S.

6   Trustee or as alluded to by the debtors, there is a failure to

7   include any exception for willful misconduct versus negligence,

8   a classic exception that we find in almost all plans that are

9   filed.  We find it actually disturbing that a bankruptcy court

10  would actually approve a release provision, even consensually,

11  that basically accepts fraud, willful misconduct, gross

12  negligence.

13         We've raised these issues with other judges in other

14  districts, and even judges that are favorable to opt outs and

15  other forms of consent do draw a line when it comes to this

16  exception and have directed debtors at disclosure statement

17  hearings or confirmation hearings when brought to their

18  attention to, at a minimum, include that provision.  One such

19  was in the Windstream Holdings in front of Judge Drain, who

20  certainly was in favor of the opt out.

21         While a specific case, per se, may be not easily

22  available, probably because it's an highly unusual issue or

23  it's resolved without the need for litigation, it does make

24  sense, as Judge Wiles said in the famous Aegean Marine case

25  that it just would be an anomaly that parties who have

67

1  peripheral interest in the Chapter 11 case would somehow walk

2  out of a case, a bankruptcy case with a better result than had

3  they filed their own personal bankruptcies, in which case fraud

4  would clearly be accepted under 523(a)(19) for an individual or

5  523(a)(2).

6           So the thought of going through a bankruptcy

7  proceeding as a third party and then having a bankruptcy court

8  say, no problem, you get out of the proceeding, somebody sues

9  you, don't worry about fraud, you're good.  It's not consistent

10  with even bankruptcy analysis.  So we rest on that objection

11  and we hope at a minimum, if these releases are approved, which

12  we're no fan of third-party releases, at a minimum the Court

13  could at least direct the debtor to put what is essentially a

14  classic template exception into those releases.

15          Now we get to the gatekeeper provision.  As expressed

16  by the U.S. Trustee we support this objection.  We believe this

17  is totally unnecessary.  There have been so many plans filed to

18  date.  Now all of the sudden this has become the flavor that

19  gets inserted into plans.  You have to wonder how bankruptcy

20  courts functioned for the last, I don't know, how many years

21  without it.

22          Given the clear exceptional weight in the plan for

23  those stakeholders who have been carved out of the release,

24  either in the form of opting out or otherwise if they were

25  deemed to reject the plan, we don't see this as a necessary

68

provision.  The unusual provision, which also includes the

bankruptcy court's adjudication of what is a "colorable claim,"

I put that in quotes, not only presents an unnecessary hurdle

and burden, which ultimately could discourage claimants from

bringing their actions which were already excepted from the

plan, but also unjustly expands the jurisdiction of the

bankruptcy court to go beyond the bankruptcy case and confirmed

plan to include reviewing and making dispositive findings with

respect to non-debtor claims, which are outside of the purview

of the bankruptcy arena.  And, again, which are specifically

carved out of the plan.

          Now, they will say that it's just a threshold

determination.  But, truthfully, there is cases that say that

colorable goes beyond mere interpretation.  And this would now

be going to application of a provision case in controversy.

And now we're asking the bankruptcy court now to start digging

into the possibility that this claim has some merit or not,

which now expands beyond interpretation of the bankruptcy plan.

          That's not to say that the defendants of such an

action do not have the opportunity and under which is depleted

as an affirmative defense and come back to Your Honor for Your

Honor to review and then work with that determination.  But to

set that up as the floor for how this operates is now bringing

this whole issue into a whole new uncharted territory, which

apparently was a non-issue for so many years and through so

69

1  many filed and confirmed plans throughout the last, you know, I

2  don't know, I don't want to say two generations, but it's

3  always, you know, could be 30 years.  Who knows?  As long as

4  I've seen plans, but I'm sure there's others here that may have

5  seen ones before that.

6          Further, to the extent that the debtors are relying

7  on the assertion that the settlement parties would not be

8  entering into this deal absent this provision, first of all,

9  it's questionable.  It's not clear that this was the whole

10 nexus or foundation for the plan.  However, it's been asserted

11 in declarations.  But even those declarations talk about

12 settlement parties, not the expansive gatekeeper provision that

13 would be sought to be imposed on all these non-debtors suing

14 related parties that have nothing to do with the settlement.

15         So, if Your Honor is inclined, and again, we don't

16 believe it's supportable, but if Your Honor's inclined to

17 approve this gatekeeper provision, okay, so let's narrowly

18 tailor it for the settlement parties who were so keen on only

19 entering into this plan process under those conditions.  Why

20 should somebody else who has nothing to do with this settlement

21 be forced to bear this prejudice, which is a prejudice, because

22 basically what we're saying is, even though you opted out, even

23 though you carved out, or you're carved out, you still have

24 this extra hurdle.

25         It is a burden.  Whether they want to admit it or not

70

1  or whether ultimately it gets back to the bankruptcy court

2  anyway.  But honestly, from the beginning, it's a hurdle and a

3  burden and a challenge for that particular non-debtor

4  stakeholder suing another non-debtor that they are now required

5  to stop before they file their complaint in state court or

6  whatever other non-bankruptcy jurisdiction.  And then they have

7  to come to Your Honor.  They have to go through all that.  They

8  have to probably hire an attorney.  They have to incur

9  additional costs.  They have to come in front of Your Honor,

10  and Your Honor says, yes, go do what you want to do originally,

11  which you bargained for on the plan.

12        We don't support that kind of position.  We don't

13  think the bankruptcy court should support that position.  They

14  mentioned the Highland case, which is a case that's being

15  brought as the flagship case for this kind of provision.

16        But even Highland, it was a limited bankruptcy case

17  and the court even said on remand that it was just for looking

18  to protect the administration of the plan.  In other words, a

19  certain subset of professionals would be protected.  That's not

20  what's going on here.  They have these extensive provisions

21  going to everybody.  You want it?  You want it?  You got a

22  release.  Yeah, you're excepted from release, you want to sue

23  Joe Schmo, nothing to do with the settlement and everything?

24  Huh-uh, got to go back to the bankruptcy court.

25        We don't see that as consistent with anything in

1  Highland.  And it's not consistent with the plain meaning of

2  the plan.  And it doesn't deprive the bankruptcy court at a

3  certain date if an affirmative defense is brought as

4  appropriate to coming back to the judge and saying, Judge

5  Kaplan, please, do I have permission?  If that's a defense that

6  one of these parties wants to avail itself as an affirmative

7  defense consistent with federal civil procedure.

8            So, going forward, we would like the bankruptcy court

9  here to address these two issues with the debtor and absent the

10 debtor's amending the plan to include the exception for fraud,

11 willful misconduct, gross negligence, as found in many plans,

12 and either deleting the gatekeeper provision or otherwise

13 tailoring it to the narrative that's been presented to the

14 Judge that the Court deny confirmation.

15           Thank you, Judge.

16           THE COURT:  Thank you, Mr. Maza.

17           All right.  Again, I see hands raised, but let me go

18 to other objectors.

19           Mr. Etkin, were you going to make argument?

20           MR. ETKIN:  Yes, Your Honor.

21           Your Honor, while our issues with the plan are

22 similar to those of the U.S. Trustee and the SEC, frankly, we

23 have a more narrow perspective.  We're not a government agency.

24 I have a client.  And we're focused on the claims in connection

25 with the securities litigation and the impact on those claims

72

1  with respect to what we believe are offensive provisions of the

2  plan.

3          I'm glad to see the debtor reached out and worked

4  with the U.S. Trustee and the SEC.  No such luck for us.  We've

5  had no contact with the debtor since the filing of the

6  objection.

7          Let me get to the standing issue first, Your Honor.

8  Kind of seems more like a heads-I-win, tails-you-lose argument.

9  From a standing perspective, as the presumptive lead plaintiff,

10  and we point this out in our papers, the presumptive lead

11  plaintiff himself has a pecuniary interest because the larger

12  the class, the larger the recovery, the more of an incentive

13  award he would get from the District Court.

14          If the class is narrowed, if the recovery is less

15  because of the impact of the releases, that incentive award may

16  not exist or it may be limited.  But that's really not the

17  major issue with respect to standing.

18          We've also objected, as the U.S. Trustee and the SEC

19  has, to this gatekeeping provision.  And Mr. Wyatt has an opt

20  out, even with respect to his individual claim, or as a class

21  representative, is impacted by this gatekeeping provision both

22  in terms of cost and in terms of unnecessary, we believe at

23  least, delay in litigating claims that for all purposes should

24  be resolved by the district court ultimately.

25          So standing, Your Honor the cases prefer to look at

73

1  party in interest from a broad perspective.  And you can't be

2  really a party in interest with respect to certain issues and

3  not a party in interest with respect to other issues.  Either

4  you're a party in interest, or you're not.  And we believe it's

5  clear that Mr. Wyatt is a party in interest as contemplated by

6  the Code and that his interests are impacted in several ways by

7  the provisions that we find objectionable.

8         So moving on, Your Honor, to certain problems that we

9  pointed out with the ballot itself.  You've heard an argument

10 thus far that there has been significant disclosure with

11 respect to the plan and a lot of patting on the back with

12 respect to that disclosure.  But specifically, here are the

13 problems as they relate to Mr. Wyatt and his constituency.

14        Number one, the ballot includes certain definitions

15 specifically laid out but doesn't include two definitions that

16 are critical for a punitive class member to have a sense of

17 what's going on.  One is the definition of the Committee

18 settlement parties, who are the beneficiaries of the release

19 specifically, and in fact, several of them are defendants in

20 the pending class action.  And the definition of related

21 parties, which succeeds in bringing everyone else potentially

22 in the universe under the umbrella of these releases.

23        Those two critical terms are not defined in the

24 ballot although other terms are.  And we believe that that

25 limits the ability of a class member to really determine

74

1  whether they should opt out or not.  Second of all, Your Honor,

2  the opt out clause itself, or the opt out checkbox itself, you

3  don't get to it until Page 7 of the ballot.  And this is all

4  the ballots under Class 3, 3A, B, C, D, E.  So a creditor is

5  making a decision on whether to accept the plan or not, and

6  then has to wade through several more pages before they get to

7  the opt-out checkbox.  We think that's a problem.

8          There's an informational statement in the ballot of

9  about a page and a half to give a creditor guidance with

10 respect to the vote and the ballot.  Nowhere in that

11 informational statement, which is something that maybe a

12 creditor would read, nowhere does it talk about the opt out

13 generally, or certainly nowhere does it talk about any specific

14 claims that a creditor may be releasing if they potentially

15 have claims as a putative class member under the federal

16 securities laws.

17         With that, Your Honor, we believe that although there

18 was a lot of disclosure, key aspects in key places in the

19 documents failed to really provide putative class members with

20 the information that they would need to realize that they're

21 potentially giving up a valuable claim.  Why not?  But the

22 documents don't provide them with that information.

23         There's no indication specifically as to the pendency

24 of these securities class actions.  And, Your Honor, the

25 debtors knew from the get go in this case, given that they

75

1   filed an adversary proceeding to enjoin those class actions

2   early on in the Chapter 11.  So, Your Honor, from that

3   standpoint, we believe that there are serious due process

4   issues with respect to the information that was provided to

5   these particular creditors who Mr. Wyatt is looking to

6   represent in the class action to make an informed choice

7   assuming that the opt out mechanism itself is appropriate.  We

8   have certain views with respect to that, but I'll get into that

9   in a moment.

10          Your Honor, let's talk for a moment about the concept

11  of consent.  Here, consent, which we believe is being

12  engineered by the debtor, creates silence and inaction where

13  there's no information about the securities litigation, as I've

14  just pointed out, concerning the claims that they're

15  potentially giving up.  We don't believe it's necessary, we

16  don't believe it's fair, and we don't believe it's equitable.

17          The Committee settlement is not conditioned on a

18  release of the settlement parties who are defendants in the

19  securities litigation.  It can't be, just by virtue of the opt

20  out mechanism itself as was pointed out in some of the cross-

21  examination that was conducted earlier.

22          Your Honor, the opt out mechanism in this case

23  improperly places the onus on class members to, A, know of the

24  existence of the securities fraud based claims.  And, Your

25  Honor, the securities cases are in their infancy, so there's

76

1  been no notice sent out to class members yet.  There wouldn't

2  be in circumstances like that.

3          And then, the litigation was enjoined by this Court

4  through a stipulation and order.  So there was nothing going on

5  in those cases other than, as the Court knows, the filing of

6  lead plaintiff motions, which was the only thing that was

7  allowed.

8          These securities fraud claims are not disclosed in

9  any plan related materials.  And then these individuals are

10 being asked to successfully navigate and interpret a maze of

11 dense ballot and plan provisions to understand the impact of

12 the third-party release.  Your Honor, this to us is not due

13 process, especially where the majority of the customers of the

14 debtor, and you've heard an argument and in some testimony that

15 they amount to hundreds of thousands of individuals.  They're

16 not, for the most part, institutional investors.  Most of them,

17 a lot of them, are individuals.

18         Your Honor, the debtors cite in their confirmation

19 brief, and I had a limited opportunity to take a look at it

20 given the fact that I was in synagogue to a certain point in

21 time last night.  And then --

22         THE COURT:  Now, you're making me feel guilty.

23         MR. ETKIN:  Breaking (Indiscernible) --

24         THE COURT:  Because I read it.

25         MR. ETKIN:  No.  Well, Your Honor --

**WWW.JJCOURT.COM**

77

1              THE COURT:  Let's not go there.

2              MR. ETKIN:  -- I'm impressed.  I'm impressed.

3              But the debtor cited the Aegean Marine case, which

4    you've heard mention of, Judge Wile's case, in New York.  We

5    happen to have been involved in that case.  And the debtors

6    cite it favorably for the proposition that the -- excuse me for

7    one second, Your Honor -- that the clause protecting estate

8    fiduciaries, the exculpation provision, is appropriate.

9              But let me quote what Judge Wiles said about third-

10   party releases in general in that case.  He said in the

11   transcript, which we could provide.  It's part of the record in

12   that case.  He said, and I'm quoting, "This is all about

13   consent and what consent means, right.  So you're basically

14   urging me to say that you need me to manufacture consent for

15   you because we know in every one of these cases, there are

16   people who are going to get this big package and they're not

17   going to open it, or even if they open it, they're not going to

18   understand it, and they're not going to respond.  We know that.

19   So all that this opt-out approach does is it seeks to

20   manufacture judicial deemed consent without an actual thought

21   process on behalf of the person whose consent is being sought."

22             Your Honor, debtors' counsel happened to be debtors'

23   counsel in that case as well.  And to the extent that they cite

24   Aegean Marine for their benefit in connection with the

25   exculpation clause, you've got to take the burdens with respect

78

1  to that decision as well and can't say that the Court should

2  ignore it if they're asking the Court to look at it and endorse

3  it from the standpoint of the exculpation provision.

4          And, Your Honor, as was pointed out by Mr. Maza,

5  these individual defendants who are defendants in the class

6  action and are parties to the Committee settlement, aren't even

7  entitled to a release in their own bankruptcy case.  There is

8  no provision of the Bankruptcy Code that authorizes a release

9  of third-party claims other than in the asbestos concept.  So

10  what the debtors need to hang their hat on is that it's a

11  matter of contract, that they've consented as a matter of

12  contract because the plan is in essence a contract.

13          But when you look at contract law with respect to the

14  issue of consent, they, for the most part take the position

15  that there must be an express manifestation of consent.  And at

16  Page 66 of their brief, they admit that it's really a matter of

17  contract, and that's what they're relying on with respect to

18  the propriety of the release and the so-called consensual

19  nature of the release.

20          Your Honor, that has not been demonstrated here on

21  the record.  Consent simply shouldn't be implied on the basis

22  of notice.  And the notice here does not even pass muster, as

23  we've pointed out, from a due process perspective, as it

24  relates to the securities claims.

25          Your Honor, I want to say a word about damages here.

1  Because regardless of what a Class 3 creditor recovers and it

2  varies from class to class, and frankly, most class members

3  fall into 3E under the plan.  But the damages that these

4  customers, these holders of BIAs, are entitled to, or the

5  recovery that they're entitled to under the plan is a matter of

6  contract.  So it's really the value of the crypto at the time

7  of the petition.  That's how it's determined.  And that is what

8  their claim would be.

9           The fact is that from the standpoint of the

10  securities laws, the damages are much more significant because

11  the securities laws can reach back to a point in time prior to

12  the filing, when the crypto was valued higher.  I think it was

13  maybe 20 to 25 percent higher at that point in time.  And the

14  allegations in the complaint are that by virtue of the

15  misrepresentations and fraud and other misconduct perpetrated

16  by the defendants, they invested and they lost that

17  differential by virtue of failures to disclose major issues

18  that ultimately resulted in the value dropping significantly

19  over a very short period of time.

20           So we're not talking about anything that these BIA

21  holders can recover in a bankruptcy context on their contract

22  claim.  The damages are potentially significantly higher in the

23  context of a securities court claim.

24           Your Honor, it's important to note that this is a

25  liquidation.  This is not a restructuring.  And the cooperation

1  from the former or current directors and officers that was

2  negotiated as part of the Committee settlement is not dependent

3  on the release of those individuals.  It is not a condition to

4  confirmation.  We can't find it in the plan.

5        Your Honor, much has been said about indemnification

6  obligations that the debtors may have to certain of these

7  parties.  And I want to talk about that solely in the context

8  of securities fraud claims.

9        Number one, securities fraud claims that form the

10  basis of indemnification requests, are statutorily subordinated

11  under the Bankruptcy Code, under 510(b).  Just as the

12  litigation claims of my constituency are subordinated under

13  510(b) and those claims are not entitled to any recovery under

14  the plan.  Contract claims, yes.  Securities claims, no.  So if

15  the debtors chose to assume those obligations for reasons I

16  can't possibly fathom rather than allow the Bankruptcy Code to

17  subordinate those claims, that, Your Honor, is, from our

18  perspective, that's on them.

19        Second of all, and equally important, is that most of

20  these individuals have already waived their indemnification

21  claims against the debtor as part of the Committee settlement.

22  So there is no risk with respect to those claims going forward.

23        The other thing that's important to point out is if

24  you look at the indemnification provision under the plan, and I

25  think it's Article VE at the top of Page 59 of the plan, the

81

1  plan specifically carves out any indemnification obligation to

2  any person for any cause of action arising out of or related to

3  any act or omission that is a criminal act or constitutes

4  actual fraud, gross negligence, bad faith, or willful

5  misconduct.

6          Now, there you have the clause that should be the

7  carve out with respect to the releases as well.  But the

8  debtors utilize that carve out to deny any indemnification

9  obligations to anyone who ultimately is subject to a finding of

10  liability on that basis.  And those are the claims in the

11  securities case.

12          So, there effectively couldn't be any indemnification

13  obligations running to these individuals if they're ultimately

14  found to be liable under the federal securities laws and with

15  respect to the claims raised in the securities litigation.

16          Your Honor, let me talk for a moment about the

17  gatekeeper provision and then, if you'll indulge me, I'd like

18  to go over some of the arguments the debtor made in the brief

19  that was filed yesterday that I think bear mention.

20          THE COURT:  I'm going to ask if you could, 10-15

21  minutes?

22          MR. ETKIN:  Yes.

23          THE COURT:  Okay.  Thank you.

24          MR. ETKIN:  Sorry.

25          THE COURT:  All right.

1            MR. ETKIN:  We really echo the comments of the SEC

2    and the U.S. Trustee on the gatekeeper provision.  All these

3    protections are already built in, especially in securities

4    litigation which is governed by the Private Securities

5    Litigation Reform Act.  So those claims can't even go forward.

6    There can't be any discovery, nothing, until a motion to

7    dismiss is decided by the district court.

8            So, the district court is going to determine whether

9    those claims are actionable, whether they're subject to a

10   motion to dismiss, or colorable.  That's fundamental to a

11   securities fraud litigation.  And, Your Honor, you have enough

12   to do than to sit and ruminate over violations of the

13   securities laws and whether they're colorable or not, in the

14   debtors' words.  That's a function of the district court.

15   These are non-core claims and there are serious jurisdictional

16   and constitutional authority questions that are baked into what

17   the debtor is requesting in connection with that gatekeeper

18   provision.

19           And now, Your Honor, with the remainder of my time,

20   I'd like to go over certain aspects of the debtors'

21   confirmation brief.

22           At Page 62 of their brief, in Footnote 175, they cite

23   several cases from this jurisdiction and others in favor of the

24   opt-out mechanism.  What they don't say and what these cases

25   say, each and every one of them, Congoleum, Modell's, SLT

83

1  Holdco, Aceto, a case I'm somewhat familiar with,

2  Saint Michael's Medical Center.  They all contained the fraud,

3  willful misconduct, and gross negligence carve out.  All of

4  them.

5          If that carve out were in this plan, Your Honor, you

6  wouldn't have to worry about me holding my tongue and limiting

7  myself to 15 minutes.  I wouldn't be here by virtue of the

8  standard carve out provision in these cases.  And the debtors

9  cite each and every one of them.

10          They obviously cite Bed Bath and Beyond, a case that

11  Your Honor decided a few weeks ago.  Similarly, Bed Bath and

12  Beyond, if you look at the plan, they have the same carve out

13  provision with respect to fraud, gross negligence, and willful

14  misconduct.  And then they cite the Lannett Company, Inc., case

15  at Page 63 of their brief in the footnote.  I happen to be

16  involved in that case too.  And what happened with respect to

17  the same constituency, putative class members in a securities

18  fraud class action, they were allowed to opt out on a class-

19  wide basis.  So, again, it was no issue for them in that case.

20  It was resolved.

21          Similarly, they cite the Court's decision in Cobalt,

22  which is a case that was before Judge Isgur in the Southern

23  District of Texas, a case I'm also somewhat familiar with, with

24  Kirkland and Ellis on the other side.  In that case, they cite

25  favorably but neglect to point out that putative class members

84

1  were allowed to opt out on a class-wide basis so they would not

2  be bound by the release.

3          So there are ways to resolve these issues, ways that

4  we've utilized in the past to resolve these issues.  But the

5  case law, even the string of cases that the debtors cite,

6  obviously favor the inclusion of that general fraud carve out.

7  And if you look at their brief, Your Honor, they give you the

8  reasons why that shouldn't be included in this case.  And the

9  reason, at least as far as I can tell reading it, is because

10 there's so much fraud here and there'll be so much litigation

11 that we've got to avoid all of that.  That's really what the

12 argument is, that this is a case littered with that kind of

13 misconduct.

14         That's not a reason to release those claims.  And,

15 Your Honor, just a couple of comments on the arguments that the

16 debtors' counsel made with respect to their presentation a

17 little earlier.  Everything that was referred to in that

18 argument is hypothetical, conjecture, without any factual

19 basis.  The floodgates argument, I've heard that a few times

20 over the years with no basis as to how that's going to happen

21 and no basis to determine that litigation would be frivolous.

22 They'd be just showered with frivolous lawsuits.

23         There are ways to deal with that, too, Your Honor, if

24 it were to come to pass.  But not by preventing someone, either

25 on a class-wide basis or individually, to assert those kinds of

1    claims, especially, especially in a case like this.

2            I also heard mention that we have the opportunity to

3    certify a class in the context of this case, and it's hard to

4    certify a class where a lead plaintiff hasn't been appointed

5    and the case has been enjoined so that just wasn't practical.

6    It wasn't an option with respect to this case given the timing.

7            Your Honor, we're not substituting our judgment for

8    the judgment of class members who likely don't have a clue as

9    to what they did or the impact of not opting out.  We're just

10   trying to give them the opportunity to assert claims that they

11   have or not.  That's what this is about.

12           It's about giving people the opportunity to assert

13   these claims and then the judicial system will do its part with

14   respect to determining whether these claims have merit or they

15   don't.  But to cut them off at the knees at this particular

16   juncture without the opportunity to have them see the light of

17   day is really inappropriate and not justified.

18           We're not looking to blow up this plan, Your Honor.

19   We have no objection to all of the substantive provisions of

20   the plan regarding distribution, classification, all of that.

21   We're just looking to preserve rights for people who really

22   weren't in a position to make that decision themselves.

23           So with that, Your Honor, unless the Court has any

24   questions, and hopefully I kept to my 15 minutes.

25           THE COURT:  You did a good job.

86

1          MR. ETKIN:  Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Etkin.  At this point, I

3   don't have any questions.

4          I see there's a Joanne Gelfand who has a hand raised.

5   Is there anyone else in the courtroom who wishes to make

6   argument?

7                    (No audible response)

8          THE COURT:  Ms. Gelfand, I'll get to you in a moment.

9          MR. NEVE:  Thank you, Your Honor.  Brett Neve of

10  Latham and Watkins on behalf of the joint liquidators of Three

11  Arrows Capital.

12         Your Honor, I can confirm Mr. Petrie's comments and

13  representations that we have agreed to order language in the

14  order that would resolve our objection today.  And that

15  language I understand will be included in a revised order that

16  will be submitted.  And we thank the debtors and the Committee

17  for working with us to resolve those issues.

18         There are still, of course, a number of issues

19  outstanding as it relates to Three Arrows and its claims,

20  specifically the debtors' pending estimation motion, claims

21  objection, and our motion for relief from stay.  We'll next be

22  before Your Honor on those issues on the 10th.  Those issues

23  aren't for today.  They don't affect confirmation today.

24         My comments are intended to briefly preview where we

25  see things going as it relates to Three Arrows.  And in

87

1  particular, as Your Honor may recall when we were before you on

2  a status conference last week, you remarked, perhaps in jest,

3  that it might be a good idea for the judges in these various

4  crypto currency cases that present these dueling debtor

5  dynamics to get together at NCBJ and maybe sort through how to

6  proceed.

7         Well, we thought that was a great idea given the need

8  for coordination and efficiency in adjudicating common issues

9  that the 3(a)(c) claims present across debtors in a number of

10  Chapter 11 cases.  And to that end, we'll shortly be filing a

11  motion in this case, as well as the other cases where we have

12  similar claims that present common issues pending and similar

13  motions for relief from stay pending, seeking a joint judicial

14  conference among the judges presiding over those cases to

15  discuss a path forward for litigation of the Three Arrows

16  claims.

17         THE COURT:  Do you have a nice location picked out?

18                        (Laughter)

19         MR. NEVE:  Well, I think probably virtually, but we

20  can discuss if Your Honor's open to it, perhaps in the BVI.

21         I understand that we've reached out to chambers

22  regarding scheduling and plan on seeking to shorten notice so

23  that that can be heard together with the other issues that

24  affect process moving forward on the 10th.  And given that

25  outreach, just wanted to preview for Your Honor that that would

1  be coming.

2             THE COURT:  All right.  Thank you, Counsel.

3             Thank you, Mr. Kanowitz for your restraint.

4             Anyone else in Court?

5                       (No audible response)

6             THE COURT:  Ms. Gelfand.  And then I know my court

7  reporter and others would like a break.

8             Ms. Gelfand, let me hear from you.  Thank you.

9             MS. GELFAND:  Thank you, Your Honor.  Joanne Gelfand,

10 Ackerman LLP, on behalf of creditor John Lymn.

11            Your Honor, I had hoped to be here in person.  I'm so

12 sorry I'm not.  Between the holiday and a little travel snafu,

13 I find myself on Zoom.  Initially, Your Honor, I want the Court

14 and everyone in the courtroom to understand, there is no desire

15 to derail the plan.  However, we had to bring this matter up to

16 the Court and that we've worked and tried to really settle this

17 with the debtor.  We've been in constant touch with them since

18 the modification was filed last Thursday.

19            And, in fact, we were the party that brought it to

20 the debtors' attention that their release actually looked more

21 like a general release, and it actually released the objections

22 to claims.  We didn't spring it on them and let them go through

23 confirmation with this problem in the plan.

24            The starting point, Your Honor, would certainly be

25 the release and the modification.  The release is of all causes

1  of action, and as you know, this release is available to

2  accepting creditors who do not opt out of the third-party

3  release.  The release language provides very broadly that all

4  causes of action are released, and they include in the release

5  language claims, cross claims, damages, controversies, demands,

6  obligations, liabilities, debts arising under law, and then the

7  debtors add this sentence to the definition of causes of action

8  being released.  "For the avoidance of doubt, causes of action

9  include any right to object or to otherwise contest claims or

10 interests that claims objections are being released."

11         In response to our pointing this out to the Committee

12 and the debtor, a modification was filed, I believe, last

13 Friday.  The modification creates an ambiguity in the plan.

14 The modification, which does not modify causes of action, it

15 modifies the article of the plan, Article 8, which is the

16 general release provision.  At the end of this general release,

17 releasing all causes of action, including, as I've stated,

18 claims objections, the modification states as follows, "For the

19 avoidance of doubt, nothing in this plan shall release waiver,

20 otherwise limit the debtors, or (indiscernible) now we have a

21 plan (indiscernible) for confirmation that's ambiguous on its

22 face."

23         I know the debtor is asserting that taken as a whole

24 and bringing the disclosure statement into the analysis, it's

25 clear that claims objections were not waived.  But that's just

90

1  not so.  First of all, the plan is entirely consistent with the

2  release of the claims objections.  First of all, of course, we

3  have the explicit language, and then we turn to Article 7,

4  which the debtor hangs their hat on.

5       Article 7 deals with claims objections and gives a

6  great deal of power to the wind down debtors to bring claims

7  objections, and we've been accused of trying to wipe out a

8  meaningful claims objection process.  Nothing could be farther

9  from the truth, and that's just not what will occur.

10      We heard from the debtor today that more than 10,000

11 creditors opted out of the third-party release.  That means

12 more than 10,000 creditors are not entitled to the release of

13 their claims objections.  Kroll filed their certification and

14 they attached 326 pages listing the opt-out creditors 20 or 25

15 a page.  So we will have a robust claims objection procedure as

16 to the opt-out creditors, Your Honor.

17      Your Honor, there are other things in the plan that

18 show it's consistent with the release.  Again, going back to

19 Article 7 claims objections.  The first sentence in Article 7

20 dealing with claims objections, is "Except as otherwise

21 provided herein."  So the released claims have clearly been

22 excepted.

23      Then we go to Article 4(c)(2) of the plan.

24 Article 4(c)(2) speaks to the release of all claims "other than

25 retained claims."  Then we go to the debtors' schedule of

91

1  retained causes of action.  In the middle here, after going on

2  and on about what they're retaining and getting to these

3  claims, it says, "Unless any cause of action is expressly

4  released," excepting again from the retained causes of action

5  these released objections to the claim.

6        The debtor has asked the Court to consider the

7  disclosure statement in determining whether or not the release

8  covered claims objections.  Clearly, it appears improper to

9  bring in this parole evidence.  We know the disclosure

10 statement has many warnings about reliance, and of course it

11 provides, as they do, that the plan would govern any

12 inconsistency.  Yet the disclosure statement is completely

13 consistent.

14        The debtor argues that Article 11(A)(2)(j) and (o)

15 dealing with treatment of claims and estimation show that the

16 objections to claims was never released.  Again, both of these

17 sections have a preface, which is "except as otherwise provided

18 in the plan."  So again, they're releasing these claims

19 objections.

20        We now have an ambiguous claim, excuse me, an

21 ambiguous plan as modified.  Offering Mr. Lymn the opportunity

22 to change his vote just wasn't a fix.  Mr. Lymn is one of many

23 creditors affected by this.  This affects all accepting non-

24 opt-out creditors.  The Committee had the timing a bit wrong.

25 I placed a call to the Committee on Friday, September 15th,

92

1  scratching my head about why the claims objections were

2  released.  I will note were also released in the

3  (indiscernible) case.  It's the exact same language, so it's

4  another common issue here.

5        Changing the vote was not in Mr. Lymn's interest.  He

6  voted to accept the plan as is and to release the claim

7  objection against his claim.  Your Honor, Rule 3019 is clear

8  that a modification may not adversely change the treatment of

9  any creditor.  And in fact, the Eleventh Circuit last year in

10 the In re America-CV Station Group case, reversed the

11 bankruptcy court, finding that a shareholder who either was not

12 entitled to or rejected the plan was entitled to resolicitation

13 and new disclosure because the modified plan eliminated the

14 shareholder's right to purchase certain equity.  The Eleventh

15 Circuit pointed to the language in 3019 saying the treatment of

16 any creditor, and determined that even the shareholder who may

17 not have been entitled to vote was covered by it and the court

18 knew it would be difficult to unwind things, but sent things

19 back, essentially saying, figure it out to the Southern

20 District of Florida, which is my hometown.

21        We would ask the Court to confirm the plan without

22 the modification.  Otherwise, this does not comply with

23 Section 1129(a).  It violates Section 1127 and 1120

24 (indiscernible) baffled by the (indiscernible) resolved

25 (indiscernible) one claim with the debtor.

93

1          Mr. Lymn is not the scoundrel here.  He

2   (indiscernible) through the modification to the release.

3          THE COURT:  Ms. Gelfand, unfortunately, we're having

4   transmission issues and a lot of your argument is not coming in

5   clear.

6          The Court has the benefit of the written objection.

7   The oral argument is proceeding along the same lines as the

8   written objection.  I can accept the written objection and rule

9   on it.  If you want to try to sum up, see if --

10         MS. GELFAND:  I would like to do a reservation of --

11  I would like to just conclude with a reservation of rights,

12  Your Honor.  Can you hear me?

13         THE COURT:  Yeah.  We have that on record.  The

14  reservation of rights.

15         MS. GELFAND:  Okay.  Of all rights, and we would be

16  happy to, even now, if the Court's taking a recess, to speak

17  with the debtor.

18         Thank you, Judge.

19         THE COURT:  Thank you, Ms. Gelfand.  I don't know on

20  whose end the transmission problem is but thank you for your

21  efforts.  You are free, obviously, to reach out for counsel.  I

22  am taking a 15-minute break.

23         It is 3:30.  We'll come back at 3:45 or so.  And

24  thank you all.

25         (Recess at 3:29 p.m./Reconvened at 3:47 p.m.)

94

1          THE COURT:  Before I turn to debtor's counsel, I

2     don't see anyone else remotely who wishes to be heard.  We've

3     outlasted them.

4          Let me hear a reply, debtor's counsel.

5          MR. PETRIE:  Yes, Your Honor.

6          For the record, this is Francis Petrie of Kirkland on

7     behalf of the debtors.

8          So not much has changed since my initial

9     presentation, in my view.  We've heard from each of the

10    objecting parties, and there's two main points that I believe

11    came out of that.

12         First, the third-party release is consensual.  And in

13    a consensual case, you and others have held that a lot of

14    things can be bargained for and anything can be released.

15    Though things like fraud at carve out cannot be discharged,

16    they can still be released in such a structure.

17         The opt-outs that we've seen in this case are higher

18    than you've ever seen.  And each of those parties who consented

19    to that release understood the scope of what they were either

20    releasing or what they were not releasing.

21         Every individual in this case had the option to opt

22    out.  And that structure was something we negotiated for in the

23    terms of the settlement.  Even accepting parties had the option

24    to opt out here.  But the release parties negotiated for that

25    limited structure and limited the universe of non-release

1    claims.

2          The massive amount of opt-outs I've received in this

3    case is evidence of their consent, if anything.  There was

4    notice of what these individuals agreed to, and all they had to

5    do was perform basic diligence to figure out what they were

6    going to be releasing and when.

7          So then to take on the other main argument that came

8    out here, which was about the scope of the gatekeeper

9    provision.

10          First, the gatekeeper provision only applies to the

11   extent that this court has jurisdiction.  It's not an attempt

12   to front run anything, and no party is better than this court

13   to make determination of determining the scope of the

14   confirmation order and the plan.

15          Those are the only things that we are asking this

16   court to do.  And I think beyond that is not something that we

17   are actually looking for.

18          I'll also address a few other arguments that were

19   made by the U.S. Trustee.  First is about the limitation to the

20   injunction.

21          The purpose of the injunction is designed to protect

22   what is being confirmed.  We're not seeking a discharge through

23   this plan, and a time limit can't be agreed to, because at the

24   point property is distributed is when an injunction would be

25   most important.

96

1            A lot of their other arguments are mooted by the fact

2    that the third-party release is consensual in settling claims,

3    but we did remove language that made specific reference to 9019

4    in certain sections to replace it to the extent provided for by

5    the Code.

6            And just to be clear, the undeliverable ballots issue

7    for those parties who do not receive actual notice, they are

8    not subject to the releases.  And we're happy to make the other

9    notice amendments that you requested about the parties who can

10   elect to make other post-confirmation elections under the terms

11   of the plan.

12           To address Mr. Wyatt's arguments, as I stated before,

13   in this circuit not opting out equals consent.  First, we do

14   still maintain that he does not have standing to bring these

15   claims.  He is not the lead plaintiff in a class action.  He is

16   a large claim holder in a class action and the class has not

17   yet been certified.

18           And further, he has opted out of the release, so he

19   personally will receive no injury, and he has no standing to

20   object on behalf of others.

21           10,000 parties did opt out of providing the release,

22   and he has provided no evidence to the contrary that these

23   parties didn't know exactly what they were doing when they

24   opted out, nor is there evidence of any sort of damage that

25   would be suffered by his client.

97

1          As a result, we do confirm that he has no standing to

2    object to these claims on behalf of others.  If they wanted to

3    preserve their claims, they could opt out, but they do not need

4    an individual passing their judgment for them.

5          It's also possible that there's a world where there's

6    claimants who actually are seeking to get the release from the

7    debtors, because they think BlockFi has a claim against them.

8    The possibilities are endless in this, and he has presented no

9    evidence to the contrary.  However, the balance of the evidence

10   does cut in our favor here.

11         And then, just to briefly address the last objection

12   about the plan modification, I don't think -- what I said

13   earlier still stands.  Nobody could read the plan to believe

14   that the claims objections are being released are terminated

15   resulting in an absurd result where a bunch of asserted claims

16   would be actually allowed against the estate.  And we've

17   provided a lot of evidence about how that was not the intention

18   of that portion of the plan.

19         Thank you, Your Honor.

20         THE COURT:  All right.  Thank you.

21         MR. PETRIE:  I do believe the Committee would like to

22   speak.

23         THE COURT:  Mr. Aulet.

24         MR. AULET:  So I have a few responses, and then I

25   believe Mr. Stark will want to speak at closing or now,

98

1  whichever would be appropriate.

2          THE COURT:  That's fine.

3          MR. AULET:  Thank you.

4          So, basically two responses to points.

5          The SEC and a number of other parties pointed to a

6  lot of the sections in the gatekeeper provision, but I just

7  wanted to direct your court's attention to another provision

8  that was very heavily negotiated.

9          It says, in essence, that provided a party opted out,

10 nothing in this plan or confirmation order prevents releases or

11 obstructs a properly pled direct claim.

12         And I think that, combined with all the statements

13 that the debtors have made on the record, makes clear what this

14 gatekeeping function is and is not.  This is about making sure

15 a claim is a direct claim before letting it proceed.  It's not

16 about making Your Honor the judge for any and all claims

17 against the release parties on the merits.

18         As for the issues regarding the modification of the

19 plan to make it clear beyond dispute that the claims can still

20 be objected to, there is any number of provisions in the plan,

21 both before and after the modification, that could be pointed

22 to to show that it was always intended that parties have the

23 right to object.

24         To the extent that there's any ambiguity, counsel

25 pointed out, it's been clarified in the plan.  It's been

1   clarified on the record.  Everybody understands now what this

2   plan means.  This plan means that even if you did not opt out

3   of the release, your claim filed against BlockFi is still

4   subject to an objection to make sure that you receive the claim

5   that you are entitled to.

6          Anything else penalizes other creditors or

7   potentially the creditor themselves if they filed an amount

8   that's too low.

9          You could hold, simply based on all of the provisions

10  that make the wind-down debtor partially a successor to the

11  Committee as well, which has its own right to object to claims

12  as a party in interest.  And any other creditor would always

13  have the right to object to any claims.

14         So to the extent that Your Honor thinks there's any

15  ambiguity left in the plan, I don't think that anybody would

16  object to something clearly being stated on the record that

17  it's clear that anybody's claims are subject to objection to

18  make sure that everybody gets the claim that they are entitled

19  to.

20         Thank you, Your Honor.

21         THE COURT:  Thank you, Mr. Aulet.

22         Mr. Stark.

23         MR. STARK:  Thank you, Your Honor.  And thank you for

24  allowing us to switch counsel.  I know that's not normal.

25         THE COURT:  Not a problem.

1          MR. STARK:  For the record, Robert Stark from Brown

2  Rudnick, also appearing on behalf of the Official Committee.

3          Just a few words, if Your Honor will allow me, just

4  retracting the lens a little bit, okay, and a little bit of

5  case summation, because I'm a little bit fearful at this

6  moment, after the argument.

7          And they were very persuasively stated, but they're

8  on teeny, minute aspects of a plan, and I worry that for

9  focusing on the bark on the tree, we lose sight of the entire

10  topography.

11          So if Your Honor will allow me just for a few

12  minutes, and I won't take too much time.

13          The first sentence of our statement in support of the

14  plan states as follows:  These cases have been hard,

15  quote/unquote.  Five words.  And those five words were intended

16  to be poignant, not as a matter of advocacy, but as a matter of

17  fact.

18          The truth is, crypto bankruptcy cases, all of them,

19  are hard, and this case is hard.  In our milieu here, unlike

20  Bed Bath & Beyond and Biopharma, and all the other cases that

21  have been cited to in the briefs and talked about today before

22  Your Honor, we have issues that not only go to typical

23  bankruptcy blocking and tackling, who gets what, who owns what

24  between wallets and BIAs and lending -- how hard was that

25  issue?  And that's just normal blocking and tackling for any

1  bankruptcy case.

2        Then we delve into a thorny litany that begins and

3  then proceeds well beyond what I'm about to do now.  How did we

4  get here?  Who is responsible for the business failure?  How do

5  we maximize value if we're not going to rehabilitate a

6  business?  How do we wrap this up?  Who is going to be

7  responsible for the wrapping up?  And a million other tough

8  questions.

9        The litany is very long, as Your Honor knows so well.

10  And business failure always, automatically, seeks into blame.

11  And there's a lot of blame, and there's a lot of anger in this

12  case.  Let's be honest about that.  There's been a lot of anger

13  in this case.

14        And meanwhile, we've had massive monthly

15  deterioration about tracked where everybody's talked it known.

16  If this case does not end quickly, did not end quickly, massive

17  amounts of erosion every month.

18        And meanwhile -- and this is critically important --

19  we are separating people's life savings from their own bank

20  accounts.  Pause on that for a minute.  The customers, the six

21  hundred-odd thousand people who have deposited with BlockFi

22  cannot get their money for things that they need for their

23  daily lives.

24        That's a big responsibility that we in this room and

25  Your Honor have had to deal with for almost a year.  And that's

1  a terrible burden.

2          In crypto bankruptcies, the crucible of Chapter 11

3  burns hotter.  It just does.  And in this case, it burned very,

4  very hot.  This is not retail or Biopharma or any widget

5  company.  This is crypto, and we have to think about it in that

6  milieu, because it is different.  And we have to behave in this

7  case and think about things differently, and we've done that.

8          But even in this hot crucible, we have a job to do,

9  and we've done our job.  We have to get to a resolution, and a

10 resolution that creditors can support and they do come out and

11 support in mass volumes.  That, I think, is important.

12         But also of critical importance is that we have to be

13 able to walk away from this bankruptcy case, what happens

14 today, one way or the other, and be able to look back on today

15 in hindsight and ask ourselves was it a reasonably balanced

16 outcome?  Was a rough justice fair?  And do we have systemic

17 and process integrity?

18         Those are the three concepts that I'll throw out

19 today for Your Honor to think about, because we do think that

20 was done here.  Of course there are attributes of the deal that

21 we don't like and they don't like and everybody doesn't like.

22 Certainly it wasn't fast enough or it wasn't inexpensive enough

23 or what have you.

24         But think back on it.  It was quicker than every

25 other crypto bankruptcy case out there.  It was a whole lot

1  less expensive than any other crypto case out there.  It was

2  open.  Everyone knows what happened and everybody could see

3  everyone's side, and everyone could choose their own path.

4        They could choose to give the release or not give the

5  release, no strings attached one way or the other, move forward

6  and make a decision.  More disclosure than anyone has ever

7  seen.  Okay.  It is balanced.

8        Nobody really likes the outcome.  Everybody feels

9  aggrieved in one way or the other, which I gather -- I hate to

10  say it, because it's trite, but isn't that the definition of a

11  deal, a settlement that's quality, when no one is happy with

12  it?  Is it rough justice?  Your Honor will be the determiner of

13  that.  But the creditors have spoken.  They voted en masse in

14  favor it.

15        And does it evidence systemic and process integrity?

16  The adversary process in this case was hot, because we were in

17  the heated crucible of crypto bankruptcy, and it came out with

18  a deal that was hot, that has been accepted and accepted

19  broadly, and we now have time to heal.

20        I'd like to add two more points, just to make sure

21  our topography is right.  I don't want to lose sight of the

22  forest for the trees, to use another trite phrase.

23        And first is a comment about the Committee.  Now, I

24  get it.  At this moment, Creditor Committee lawyers love to get

25  up and talk about how great their committee and love their

1  committee, and it's rote.  And I really at this moment don't

2  want to do that.  Okay.

3       What I want to do is speak again is fact, and not

4  advocacy.  Although it will come out as advocacy, it is 100

5  percent from the heart.

6       For the Committee, this was not a quote/unquote hard

7  case.  For the Committee, this case was impossible.  It was all

8  consuming, time and energy.  It was gut wrenching in every

9  attribute of the word.  It was an emotional roller coaster.

10      And it was more than just the analytical, economic

11 analysis that we have to do.  It was emotional in many

12 respects.

13      To do this job, we analyzed, we re-analyzed, we

14 discussed, we analyzed again.  We fought amongst ourselves.

15 Not weekly.  Every single day.  We analyzed, we analyzed, met,

16 fought, discussed, we analyzed and did it again.  Okay.

17      This was -- I've been doing this for a while.  This

18 was one of the hardest, if not the hardest committee assignment

19 I've ever hard, and I will always remember it.  It was that

20 hard.

21      As Your Honor knows, committee members are not paid.

22 And this was a full-time job, and many of them had to move away

23 from their daily employment activities to be able to pay

24 attention to this case as they needed to do that.  That was

25 great sacrifice.

1        But here's an important part that I know Your Honor

2   is aware of as well.  We faced criticism and worse almost every

3   day in the chat rooms.  The pressures, the threats.  What we

4   were doing and trying to do for everyone was faced with a

5   constant barrage of what are we doing and why are we doing it

6   and we must be doing something wrong.

7        The easiest thing is to throw in the towel.  The

8   hardest thing to do is to be dogged about it through

9   litigation, first in mediation, then a second mediation, and

10  then a settlement.

11       And there's a truism, at least in terms of what I

12  find in life, is that it's very easy to threaten, it's very

13  easy to strife someone in an anonymous way, say in a chat room,

14  and almost anyone -- anyone can do that.  Almost anyone can and

15  is willing to levy an attack in a courtroom, because you can in

16  America with minimal repercussions.

17       Fewer will do the work.  And fewer still will have

18  the brainpower and, importantly, the stomach to settle.  That's

19  the continuing.  It's easy to attack and to threaten.  It's

20  hard to settle.  And that's what we had to do.

21       And I say all that in a way to laud the Committee for

22  all the did, but more importantly for purposes of now, at this

23  moment, looking at the topography, knowing as Your Honor, I

24  know, knows how hard it was to get here, let's not lose sight

25  of that data to inform how hard this was.

1          The second point is I'd like to go back to some

2    pretty tough days in July in this courtroom and in the hallway.

3    And there weren't many people with us.  Your Honor was with us.

4          I've had the privilege to appear before bankruptcy

5    courts all around this country in many different kinds of

6    cases, and I've been involved in many cases, mired in complex

7    issues, and I've been sent to mediation many times.  Many of

8    those times have failed.

9          And then what happens next is devolution of the case

10   into litigation, and hopefully a settlement on the courthouse

11   steps after a long administrative burn, and sometimes we go to

12   judgment.

13         Never before have I experienced a case where, when

14   mediation failed, rather than allowing the case to seque

15   automatically into that litigation devolution, the judge, Your

16   Honor, arrested the falling knife and said, "We're going to try

17   this one more time.  Get in that room and figure it out, and I

18   will guide you."

19         Never before has a judge changed personal scheduling

20   and court scheduling to focus personally and specifically on

21   the case at hand to avoid the disaster that we knew was going

22   to happen next for all of those people who are listening who

23   are separated from their life savings and then from November

24   when the case filed until it got to a deal, you folks will sit

25   in a room until you figure it out.  And figure it out we did.

1          That was a privilege to watch.  And that's something

2    that everybody should be aware of.  But what's critically

3    important as we listen to the objections today is to remember

4    -- because in bankruptcy we forget so quickly -- to remember

5    where we were on those hot afternoons here, when the air

6    conditioning wasn't working so well, and we figured it out.

7          And now we are, a couple of months later, with

8    overwhelming creditor support, we cannot lose sight of the

9    forest for the trees and go back to those days or spend more

10   months in bankruptcy over rather small issues.

11         It was an incredible privilege to work on this case.

12   It was an incredible privilege and an honor on my career to be

13   in this case before Your Honor, being guided by Your Honor, and

14   to working with this committee.  I'm very thankful in my career

15   for that opportunity.  It's time for this case to end.

16         Any questions from Your Honor?

17         THE COURT:  No, I don't.  Thank you, Mr. Stark.

18         MR. STARK:  Thank you.

19         THE COURT:  I appreciate your comments.

20         Is there anyone else who wishes to be heard?  No one

21   wants to follow that.  But I have to.

22         All right.  Thank you all.  Very well argued.

23         The record is closed.  The Court has listened to oral

24   argument.

25         I'll echo Mr. Stark's reference to the uniqueness of

108

1   cryptocurrency cases, and this case in particular.  Novel

2   issues, evolving precedent that changes day to day as our

3   sister courts in the Southern District decide issues and

4   Delaware decide issues for the first time anywhere in the

5   country and as this court decides issues for the first time.

6          It's been difficult, and it's been challenging.  And

7   what we have in this Third Amended Plan, as modified with

8   technical changes, is a compromise.  And to address Mr.

9   Sponder's concern, I agree, this is a settlement within a plan.

10         But we're confirming a plan.  And, yes, so there's no

11  surprise, I intend to confirm the plan today.  I find that the

12  plan satisfies the 1129(a) requirements.

13         But I need to address the issues and the objections

14  that have been raised.  The plan embodies a settlement which

15  was aggressively and painstakingly negotiated through failed

16  mediations, through multiple settlement sessions, and it was

17  only truly the dedication of the parties in not wanting to see

18  a failed effort, and counsel.

19         And when I speak to parties, the Committee members,

20  the debtors' management, the professionals involved.  All

21  really worked together to produce a settlement that satisfies

22  all and no one at the same time.

23         There are unique aspects of this settlement and this

24  plan that we do not see in other cases.  And as Mr. Maza points

25  out, we are seeing some more recently than we've seen in 30

1    years, in three decades worth of cases.  The law evolves, the

2    practice evolves, the needs of the parties change and sometimes

3    necessitate changes in how we practice.

4           Let me get to specifics.  With respect to the opt-out

5    provisions, it is no secret that this court has approved in the

6    past in <u>Sur La Table</u> -- let me get my French accent -- in <u>Bed</u>

7    <u>Bath & Beyond</u> recently and <u>Loxidah</u> (phonetic) and a host of

8    cases.  This court, I, as well as my colleagues within the

9    district, have approved opt-out releases, the lynchpin being

10   the proper notice.

11          And in here, there's no question, in this court's

12   view, that there is proper notice to the creditor body at

13   large, to the stakeholders, through a hearing notice, through a

14   disclosure statement, through a plan which has language

15   advising the parties of the ability to opt out and the need to

16   opt out to preserve their rights.

17          Beyond that, there are websites which -- with pages

18   addressing the issues that were put together by the debtor.

19   There were the plan and disclosure statement which had that

20   language.  There's the ballot that had the language.  There was

21   the solicitation letter drafted by the Committee explaining the

22   process to creditors.

23          There is no question that creditors were placed on

24   proper notice.

25          Now, Mr. Etkin quoted concerns raised by a colleague

1  and friend, Judge Wiles in the Southern District, with respect

2  to consensual releases.  And let's be clear, these are

3  consensual releases because those who don't want to

4  participate, who want to bring their claims, notwithstanding

5  how they vote, had the ability and option to opt out and not

6  doing so, made a conscious choice.

7         Now, going back to Judge Wiles, he and I have a

8  different view as to faith in individuals, faith in -- or maybe

9  not even faith, but expectations of individuals and their

10 ability to protect their own interests and engage in individual

11 responsibility.

12        I think 10,000 plus creditors who opted out confirms

13 -- gives me comfort in knowing that the opt-out provisions

14 work, that creditors can be expected to protect their interests

15 and take the minimal effort of a checkbox on a digital form or

16 a paper form to secure their rights.

17        I expect, and I think as a society -- and I said this

18 at the Bed Bath & Beyond hearing -- we have a number of

19 examples where expect action to preserve your rights.  You have

20 to answer a summons or complaint.  You have to respond to a

21 jury demand.  You have to unsubscribe.  You have to reject

22 cookies.

23        There are things you have to do, and we do it all the

24 time.  And simply checking a box to preserve your right is not

25 onerous, is not an obstacle, and is not a hindrance as long as

1  you're on notice of the need to do so.  So we go back to that

2  notice provision.

3          And in this case, these facts and the manner in which

4  the process was undertaken, it was clear that there was notice.

5          Now, did the plan and disclosure statement describe

6  all of the possible claims or the securities -- potential

7  securities fraud claims?  No.  It didn't go into specific

8  claims.  It referenced many, but there are a host of potential

9  claims that non-parties can bring against non-parties.

10          But what was clear was that there was going to be

11  release of all claims.  It didn't need to go into specifics.

12  The releases and the language and the notice, it was clear that

13  by failing to opt out, you were -- the creditors were releasing

14  their claims, whatever they may be.

15          The Court views these as proper consensual releases,

16  consistent with the law in the Third Circuit, consistent with

17  the law as set forth by colleagues in similar cases.

18          As to the gatekeeping function, likewise, I'm sure

19  counsel is aware I did approve that recently in Bed Bath &

20  Beyond.  It's a form of protection negotiated relief available

21  for those making a meaningful contribution to a Chapter 11

22  case, and it ensures the benefit of the bargain, so to speak.

23          It is not an assertion of jurisdiction over that

24  which I don't have.  It's limited to what the Code and the

25  Judicial Code allow me to decide.  But what it serves as is a

112

1  method of, frankly, preserving judicial economy and preserving

2  the centrality of the bankruptcy court as a forum to decide --

3  an appropriate forum to decide what the meaning of the plan is,

4  what the meaning of the confirmation order is and how does it

5  -- and how do potential claims fall within the plan and

6  confirmation order.

7           While the use of gatekeeping functions in plans may

8  be a newer phenomenon that we see a lot in the Fifth Circuit

9  and the bankruptcy courts and we have mixed views within our

10 circuit, the actual mechanism isn't new.

11          This court -- I've sat for 17 years.  I can point to

12 countless cases where I've been asked to interpret confirmation

13 order, interpret a plan, because this court is best equipped to

14 do so.

15          It makes no sense to urge parties to make

16 contributions to a Chapter 11 case and in return secure

17 releases or secure certain rights that will be undercut by then

18 having to defend their position all across the country in front

19 of separate courts in separate forums, with inconsistent

20 results.

21          The gatekeeping function ensures that a single court

22 with the closes hands-on and understanding of the plan and the

23 terms of the confirmation order make an initial threshold

24 determination as to whether a claim is direct or derivative and

25 whether it's been released.

113

1        It serves the interest of those who bargained for

2  certain rights in making contributions and it serves the

3  interest of even the plaintiffs in not spending time and money

4  on a claim that will have no traction.

5        It is not burdensome.  And as I said in other

6  hearings, we end up in the same place anywhere.  When these

7  actions are brought, somebody is bringing it back to the

8  bankruptcy court to determine whether or not it's a discharge

9  injunction, it's a plan injunction violation, it's a stay

10 violation -- well, it wouldn't be a stay violation any longer,

11 but an injunction, whether it's inconsistent with the plan or

12 the terms of the order.

13       It comes back to this court anyway.  So we're just

14 putting in place in language what is the practice.  I have no

15 issue with the scope or the provisions of the gatekeeping

16 function.

17       Going back to some of the more specific concerns, I

18 will ask that the confirmation order make it clear that the

19 Court is approving the plan which embodies a settlement and

20 that approval of the plan is based on satisfaction of 1129, as

21 opposed to the Rule 9019 standards.

22       I will ask that there be language in the confirmation

23 order that directs the wind-down -- the individual in charge of

24 the wind-down to give the proper notices with respect to the

25 loan repayments.  I would urge you to get the language asked

1  for by the U.S. Trustee.

2           I am not mandating any change to the release with

3  respect to willful misconduct or gross negligence or fraud

4  claims, because it goes back to the issue of the bargain that

5  was put in place in the settlement and the negotiated relief

6  and the fact that these claims, like all claims, you don't have

7  to break it down to certain claims.

8           Those who do not take advantage of the opt-out

9  knowingly waived rights to pursue claims of any sort, and so

10 there's no need to break it down further into subcategories.

11          I will lay out just for the record that the

12 discussions of opt-out, the benefits and burdens of opt-outs

13 weren't just limited to information available on websites and

14 in the documents.

15          All you had to do, as Mr. Stark suggested, is go on

16 any of the social media, go on Reddit.  Pages and pages of

17 themes discussing the opt-outs.  The public understood the

18 meaning of it.  And it was a conscious decision in exchange for

19 ensuring that the plan goes forward, in exchange for ensuring

20 that there would be personnel knowingly, with the capacity to

21 arrange for in-kind distributions, to make the process work, in

22 exchange for waivers of certain clawback claims that agreed to

23 accept a plan that didn't offer everything that they would want

24 but allowed the case to emerge -- allowed the debtor to emerge

25 and start the process of getting individuals the funds to which

1   they were entitled.

2          With respect to the objection -- I know I'm doing

3   this haphazard, but you all spoke for a long time, and I'm just

4   trying to go through my notes.

5          With respect to the Wyatt claim, let me be clear.  I

6   disagree that there is no standing.  Cameron Wyatt had standing

7   to raise the objection.  This is a combined disclosure

8   statement and confirmation hearing.  Mr. Wyatt is a creditor,

9   an individual creditor at a bare minimum, and thus could raise

10  issues as to disclosure, and I don't know how you carve out

11  standing from one aspect of a hearing to another.

12         So I'm not overruling Mr. Wyatt's objections based on

13  standing.  I am overruling them based on the merits.  I

14  disagree as to the concerns raised with respect to the scope of

15  the releases, the process, and I find that there was due

16  process in the manner in which it would have proceeded.

17         With respect to the objection raised on behalf of

18  John Lymn, if I accepted the analysis proffered by counsel, we

19  would have an absurd result where you would, simply by

20  accepting -- casting an accepting ballot you, in effect, could

21  load up a claim and there could be no objections.

22         FTX could have added hundreds of millions of dollars

23  to a claim and just accepted -- filed an accepting ballot and

24  there could be no objection.  The debtor can't negotiate away

25  another party -- their ability to object to a claim.  It just

1   -- it's not feasible.  It's not likely.

2         When you read the disclosure statement as a whole, I

3   think it makes it clear -- it's certainly acceptable for

4   approval that the claims process -- the claims resolution

5   process, the ability of the debtor and parties to object

6   continue, notwithstanding the releases, notwithstanding

7   affirmative votes.

8         But in any event, Mr. Lymn's claim is more properly

9   resolved through the claims resolution process.  There is a

10  pending objection to the claim.  Mr. Lymn is free to raise the

11  release in response to the debtors' objection, and I can

12  evaluate the issue further, but it's a valid part of the claims

13  allowance, not necessarily fatal to the plan confirmation

14  process.

15        The Court wants to note, of course, the overwhelming

16  acceptance of the plan by every class entitled to vote.  That

17  has a bearing.  And it should be the exception that a court

18  ignores the will of the parties that have the financial stake

19  in the matter.

20        There are times where it's appropriate.  Today is not

21  one of them.  None of these issues that have been raised

22  warrant upsetting the balance that's built into the settlement

23  that's part of the plan and that was negotiated.

24        I'm approving the disclosure statement as satisfying

25  requirements under 3016 and 3019.

1            Needless to say, I haven't had a chance to read

2     through -- I skimmed the revised proposed findings of fact and

3     conclusions of law.

4            Let me ask this of debtors' counsel.  Is there

5     another version coming, or is that the last one?

6            MR. PETRIE:  Your Honor, another version will be

7     coming.

8            THE COURT:  There's always another version.  I'll

9     await receipt of that and have a chance to take a look.  If

10    there are language issues in the proposed findings of fact and

11    conclusions of law as revised, all parties are free to advise

12    chambers of concerns.

13           I don't anticipate having extensive hearings on them.

14    I could always take a conference call, if need be.

15           I want to thank the debtors' principals, management,

16    and, of course, the professionals for the effort in trying to

17    do the right thing to the best they can in a very difficult

18    situation, in unforeseeable circumstances.  Likewise, the

19    Committee did extensive work.

20           And, again, also I want to note with respect to the

21    information available to the creditor body, to the stakeholders

22    that decided to opt out, let's not overlook that there were in-

23    depth investigations undertaken by both debtors' counsel and

24    independent directors and the Committee that these mammoth,

25    voluminous reports, in mostly unredacted version, were docketed

1 and made available through links.

2          There aren't many Chapter 11's where you would find

3 such transparency.  And for that, I do thank the Committee and

4 its counsel, its professionals that insisted that that element

5 be part of the process.  I think it was incredibly valuable to

6 assist the Court, but also the creditor body as a whole.  As

7 long as we all don't look at Reddit too closely, we'll continue

8 to do the same.

9          Again, I appreciate the concerns raised by the Office

10 of the U.S. Trustee and the SEC.  Very difficult choices.  But

11 again, if it's a difficult choice, I think the Court ought to

12 lean in favor of the interest as expressed by the stakeholders

13 who voted so overwhelmingly to go forward.

14          Any issues or concerns that anyone wants to bring to

15 the Court?  Mr. Sponder.

16          MR. SPONDER:  Thank you, Your Honor.  Jeff Sponder

17 from the Office of the U.S. Trustee.

18          Your Honor, you hit every objection of the U.S.

19 Trustee except for the injunction language, which we asked for

20 a limitation.  I don't think I heard anything about it, but I

21 just wanted to alert you to that for a decision on that, if you

22 may.

23          THE COURT:  I was going to overrule it.  I understand

24 the debtors' concern with the time restraints on modifying the

25 injunctive language.

119

1          I guess it's not every case where it's appropriate,

2   like in all cases.  But for purposes of the record, I am

3   overruling the objection.  I am overruling the other objections

4   raised, except to the extent they have been addressed by the

5   debtor and modified in the technical changes in the modified

6   plan.

7          Mr. Etkin.

8          MR. ETKIN:  Thank you, Your Honor.  Just a quick

9   question.

10         The colloquy with respect to the gatekeeper provision

11  seemed to indicate, as well as Your Honor's statements seemed

12  to indicate the purpose is to deal with the question of whether

13  a claim is derivative or direct and also to deal with whether

14  the claim was released.

15         There is language in the gatekeeper provision, which

16  I still don't understand, relating to whether the claim is

17  colorable or not.

18         I didn't hear the debtor talk about that, and I would

19  just want some clarity as to whether that's going to remain in

20  the gatekeeper provision.  And I believe it's going to, I

21  assume, create some of the same confusion, I feel, in terms of

22  wading into the merits of the claim.

23         THE COURT:  All right.  Let me have debtors'

24  response.

25         MR. PETRIE:  Your Honor, I think we were clear on the

120

1   record several times that we're asking for two things in the

2   gatekeeper provision:  First, a determination as to whether a

3   claim is direct or derivative; second, whether it's been

4   released by the plan.

5          And we would only ask for Your Honor to make those

6   rulings within the jurisdiction of this court.

7          THE COURT:  Well, then why don't we include that

8   wonderful language we see all over the plan, for purposes of --

9   to be clear, for purposes of clarity, it can be cored as a

10  gatekeeper is expected to undertake this two-prong analysis.

11         MR. PETRIE:  Yes, Your Honor.  We can include that.

12         THE COURT:  And, Mr. Etkin, it may not resolve the

13  issue as a whole, but it certainly should aid in clarity.

14         MR. ETKIN:  It's better, Your Honor.  Thank you.

15         THE COURT:  I try to make it better.

16         All right.  Mr. Kanowitz.

17         MR. KANOWITZ:  Yes, Your Honor.  We do have two other

18  matters to address, but happy to allow people to leave if

19  they're not going to be involved in this.

20         We hopefully will resolve or argue these things very

21  quickly, given the time of day.  In fact, the U.S. Trustee has

22  agreed that it's only going to be oral argument and our

23  declarations on the redaction motion to be submitted.  So I

24  think I can argue it in less than three minutes.

25         MS. BIELSKIE:  Not much longer than that, Your Honor.

1            THE COURT:  Okay.

2            MR. KANOWITZ:  So it's up to you.  Can we take a

3   five-minute break?

4            THE COURT:  Let's just knock it out.

5            MR. KANOWITZ:  Thank you, Your Honor.  So Mr. Sirota

6   is timing me, because we have a tee time at 6:00.

7            Your Honor, this is a motion that the debtor filed a

8   long, long time ago, docket number four, believe it or not.

9   Mr. Renzi's declaration is at 276, which is what we would like

10  you to submit and rule on.  And our reply is at 337, and our

11  other submissions were just recently made at 1594.

12           The bottom line is, Your Honor, we believe that under

13  107(b), but not with respect to the sale process, but with

14  respect to confidential information and with respect to 107(c),

15  with respect to the harm that individuals could happen if we

16  allow names of either corporations or individuals, email

17  addresses of corporations or individuals, or addresses of

18  individuals or corporations be out there in the public.

19           We just saw what happened in connection with the

20  Crowell security breach since the time we filed the motion.

21  We've given you a litany of -- a parade of horribles in other

22  cases, and even a name, a name of a company that goes out

23  there.

24           You could do a Google search.  You could find out,

25  oh, you're involved in crypto.  Oh, your officers and

122

1   directors, maybe they're individually involved in crypto.

2         So the bottom line is between the terms and

3   conditions, the applicable law, the Bankruptcy Code, and all

4   the other decisions on this, including probably Your Honor's

5   own thoughts about how to protect people from harm, I would ask

6   that Your Honor grant the motion.

7         There is no evidence in opposition to our motion.

8   It's just oral argument and speculation.  And the bottom line

9   is we have to stop the harm before it gets out.  And we have

10  been living under an interim order, and that interim order has

11  protected us to a certain extent, but when people have asked

12  for unredacted copies, we have given it to them, and that still

13  didn't even stop what happened with the Crowell security

14  breach.

15        So I would ask Your Honor to grant the motion.  It is

16  opposed, but it is purely argument.  There is no evidence to

17  support any of the Trustee's statements.

18        Thank you.

19        THE COURT:  Thank you, Mr. Kanowitz.

20        Mr. Aulet?

21        MR. AULET:  Your Honor, I will, likewise, be brief.

22        We would ask that you move our declaration at Docket

23  234 into evidence.

24        The U.S. Trustee's original objection included a

25  parade of horribles that have not come to pass.  The debtors'

1 motion and the Committee's joinder noted a parade of horribles

2 that, frankly, has come to pass.  Criminals did make an effort

3 to hack Crowell to get this exact information.

4        The Court in Celsius released this information, and

5 there have been nine notices of phishing attacks against

6 Celsius customers in that case.

7        For the reasons set forth in the Committee's papers,

8 we would urge that Your Honor find that this information, in

9 the context of a cryptocurrency bankruptcy, where transactions

10 are irreversible and once the money is gone, it's gone, to find

11 that cause exists under 107(c), as the undue risk of identity

12 theft or other unlawful injury, seal all of the customer

13 information.

14        Thank you, Your Honor.

15        THE COURT:  Thank you, Mr. Aulet.

16        Ms. Bielskie.

17        MS. BIELSKIE:  Thank you, Your Honor.

18        Lauren Bielskie with the Office of the United States

19 Trustee.

20        We are here at confirmation of a liquidating plan,

21 and the redaction motion is meant to exist not just during this

22 case, but in perpetuity, and not just for individuals, but for

23 non-individuals as well.

24        The asserted cause under Section 107(b)(1) simply

25 does not exist any longer.  The debtors' platform and customer

1    list is not being sold and the debtors are liquidating.

2          And we don't believe that the non-individuals would

3    fall under 107(c).  So at the very least, the information for

4    non-individual clients that was being protected as valuable

5    commercial information should now be disclosed on the

6    schedules.

7          So we should really just be talking about individuals

8    in Section 107(c)(1)(A), which requires a finding that

9    disclosure of information creates not just a risk, but an undue

10   risk of identity theft or other unlawful injury.

11         In the TCC's reply at Docket No. 278, they cite to a

12   New York Times article from February 18, 2018, which recounts

13   threats to physical safety, but it did note the spiking value

14   of Bitcoin at that time and identified victims that may have

15   been more unique to -- more unique than what's being portrayed

16   here.

17         One of the victims was the head of a Bitcoin exchange

18   in Ukraine.  Another was a New York City man that was held

19   captive by a friend.

20         Another article from 2021 regarding physical violence

21   involved an individual described as the cofounder of the

22   Spanish Facebook, which could suggest that he wasn't targeted

23   just as a crypto holder, but for other reasons connected to his

24   wealth as well.

25         Two of the online articles cited in the TCC's reply

1  contain reports that after the disclosures in Celsius, lists

2  were created of the biggest losers and those investors were

3  subject to harassment and mockery.  And while that's troubling,

4  Your Honor, it's not undue risk of identity theft or other

5  unlawful injury.

6        The debtor has informally provided our office with

7  additional articles and accounts suggesting physical threats,

8  but those threats were by creditors against principals of the

9  bankrupt crypto companies and their professionals.  Again,

10  troubling, but not relevant to this issue, Your Honor.

11        On Saturday, the debtors filed a supplement to their

12  prior response highlighting, again, phishing scams, identity

13  theft, and other scams.

14        So it would appear, Your Honor, that what we're

15  really talking about here is the financial threats.  And we

16  submit, Your Honor, that the creditors here are savvy in the

17  tech space.  They understand, own, and deal in cryptocurrency,

18  and this indicates a level of sophistication that creditors in

19  non-crypto cases may not possess.

20        And given the online presence of these creditors and

21  what the debtors and the Committee have offered as an abundance

22  of instances of hacking and phishing to target holders of

23  cryptocurrency, they are aware of these threats and they could

24  take measures to educate themselves and protect themselves, the

25  same as individuals who have to be wary of other financial

1  scams, like mortgage closing scams, debt settlement scams, and

2  ransom money scams.

3       Do we redact the names of proposed buyers in the sale

4  motion because of the risk that they could be targeted with a

5  wire transfer scam?  Do we redact the names and addresses of

6  creditors that are owed significant amounts of money by a

7  debtor because we think they may have a high net worth and

8  therefore be a target?

9       Your Honor recently said, and reiterated today in the

10 context of confirmation and what we should expect of

11 individuals of any level of sophistication, that when given a

12 ballot and opt-out forms and plans and disclosure statements

13 with pages and pages of legalese, that parties can't bury their

14 heads.  They have to take action.  They have to take steps to

15 protect their interests.

16      But should we expect less of holders of

17 cryptocurrency to protect their interests, especially knowing

18 for years now that there is an abundance of phishing and other

19 scams out there?

20      What I've learned during this case is that crypto

21 holdings are risky, and not just for their volatility.  The

22 scams and the phishing attempts are not new.  They are

23 prevalent and sophisticated and, in some instances, maybe a lot

24 of instances, effective.  But it hasn't deterred individuals

25 from holding these assets.  In the face of this known risk, it

1    is a choice.

2              What the Court has to consider in light of all of

3    that is whether disclosing names on these schedules is going to

4    create an undue risk.

5              As set forth in our papers, the Code and the

6    bankruptcy rules tell us the debtor shall disclose.  There is a

7    longstanding common law right of public access to court

8    records.

9              Public access is codified in the Bankruptcy Code in

10   Section 107(a).  Sections 107(b) and (c) offer limited

11   exceptions.  And the debtor has the burden of proof to apply

12   any exception to the general rule.

13             And as the Third Circuit said in <u>Cendant</u>, "a showing

14   that disclosure will work a clearly defined and serious

15   injury."

16             So we submit, Your Honor, that crypto holdings are

17   risky, but disclosing a name does not create an undue risk of

18   identity theft or other unlawful injury.  Instead of keeping

19   schedules sealed in perpetuity, it is time to unseal that

20   limited information, as well as full disclosure of any non-

21   individuals, because they are not protected by the exception in

22   107(c).

23             And, again, this doesn't appear as if the exception

24   in 107(b) is still being pursued, Your Honor.

25             Thank you.

128

1          THE COURT:  Ms. Bielskie, let me just ask a question.

2   With respect to individuals, what is sought by the Office of

3   the U.S. Trustee, disclosure of the names and address, or just

4   the names?

5          MS. BIELSKIE:  Just the names, Your Honor.

6          THE COURT:  Just the names.

7          All right.  Thank you.

8          I happen to be on a panel with Glenn on Monday at

9   Fordham University School of Law.  This will be one of the

10  topics we are debating.  I think I will decide this after the

11  debate.

12         I assume there is no need to decide in the next few

13  days?

14         MR. KANOWITZ:  No, Your Honor.  We could live on the

15  interim order as we have it.

16         THE COURT:  All right.  Thank you for the argument.

17  I'll think about it and see what Judge Glenn has to say.

18         Anything else?

19         MR. KANOWITZ:  Yes, Your Honor.  For calendar

20  purposes only, I believe, you carried the Wyatt motion to

21  modify the stipulation that was put into effect months ago on

22  the class action.

23         I think Your Honor -- your ruling would have denied

24  it, but you wanted to see where the plan was going to go.  We

25  know where the plan is going.  So hopefully we have an

1  effective date and we can move forward under that stipulation,

2  pursuant to its terms.

3           I don't believe --

4           THE COURT:  Mr. Etkin, your thoughts on the motion?

5  It was carried to today?

6           MR. ETKIN:  Yes, Your Honor.  I'm glad Mr. Kanowitz

7  brought it up, because I know you had a docket order on it.

8           At this stage, Your Honor, with the plan being

9  confirmed, I don't know what the timing is with respect to the

10 effective date.  I'd like to have some insight into that.

11          But leaving that issue aside, at this point, it

12 really makes no sense, because the injunction expires on the

13 effective date, so I don't know whether that's a couple of

14 weeks out or whatever, but if that's the case, then that's the

15 time frame.  It's really moot at this point.

16          THE COURT:  Is it better just to withdraw it as moot?

17          MR. ETKIN:  I'll withdraw it as moot, Your Honor.

18          THE COURT:  All right.  Thank you.

19          Thank you all.  Thank you.  Tough case, tough day.

20 Take care.

21          ALL:  Thank you.

22                    *  *  *  *  *

23

24

25

1       **C E R T I F I C A T I O N**

2               WE, DIPTI PATEL, KAREN WATSON and LORI KNOLLMEYER,

3       court approved transcribers, certify that the foregoing is a

4       correct transcript from the official electronic sound recording

5       of the proceedings in the above-entitled matter and to the best

6       of our ability.

7

8       /s/ Dipti Patel

9       DIPTI PATEL

10

11      /s/ Karen Watson

12      KAREN WATSON

13

14      /s/ Lori Knollmeyer

15      LORI KNOLLMEYER

16      J&J COURT TRANSCRIBERS, INC.    DATE:  September 28, 2023

17

18

19

20

21

22

23

24

25