```
                   IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF NEW JERSEY

IN RE:                       .      Case No. 22-19361-MBK
                             .      (Jointly Administered)
BLOCKFI INC., et al.,        .
                             .
          Debtors.           .
                             .      October 10, 2023
. . . . . . . . . . . . .     .      11:05 a.m.
```

```
                   TRANSCRIPT OF MOTIONS HEARING
               BEFORE THE HONORABLE MICHAEL B. KAPLAN
             UNITED STATES BANKRUPTCY COURT CHIEF JUDGE
```

APPEARANCES:

| | |
|---|---|
| For the Debtors and Debtors-in-Possession: | Haynes and Boone, LLP<br>By:  RICHARD KANOWITZ, ESQ.<br>         LAUREN SISSON, ESQ.<br>30 Rockefeller Plaza, 26th Floor<br>New York, NY 10112 |
| | Kirkland & Ellis LLP<br>By: DAN LATONA, ESQ.<br>300 North LaSalle<br>Chicago, IL 60654 |
| For the Official Committee of Unsecured Creditors: | Brown Rudnick, LLP<br>By:  KENNETH AULET, ESQ.<br>         MICHAEL WINOGRAD, ESQ.<br>Times Square<br>New York, NY 10036 |
| Audio Operator: | Kiya Martin |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Joint<br>Liquidators of<br>Three Arrows Capital: | Latham & Watkins LLP<br>By:   ADAM J. GOLDBERG, ESQ.<br>       BRETT M. NEVE, ESQ.<br>       MARISSA ALTER-NELSON, ESQ.<br>1271 Avenue of the Americas<br>New York, NY 10020 |
| | Pashman Stein Walder Hayden P.C.<br>By: JOHN WEISS, ESQ.<br>Court Plaza South, East Wing<br>21 Main Street, Suite 200<br>Hackensack, NJ 07601 |
| For Genesis Global<br>Holdco LLC, Genesis<br>GlobalCapital, LLC and<br>Genesis Asia Pacific<br>Pte. Ltd.: | Lite DePalma Greenberg & Afanador,LLC<br>By: ALLEN JOSEPH UNDERWOOD, II, ESQ.<br>570 Broad Street, Suite 1201<br>Newark, NJ 07102 |
| For Silvergate Bank: | Holland & Knight LLP<br>By: WARREN E. GLUCK, ESQ.<br>31 West 52nd Street<br>12th Floor<br>New York, NY 10019 |

APPEARANCES VIA ZOOM VIDEOCONFERENCE:

| | |
|---|---|
| For the Debtor and<br>Debtors-In-Possession: | Haynes and Boone, LLP<br>By: AIMEE FURNESS, ESQ.<br>       JORDAN CHAVEZ, ESQ.<br>       MATT FERRIS, ESQ.<br>2801 N. Harwood Street<br>Suite 2300<br>Dallas, TX 75201 |
| For Genesis Global<br>Holdco LLC, Genesis<br>GlobalCapital, LLC and<br>Genesis Asia Pacific<br>Pte. Ltd.: | Cleary Gottlieb Steen & Hamilton LLP<br>By: LUKE A. BAREFOOT, ESQ.<br>One Liberty Plaza<br>New York, NY 10006 |
| For Deserve, Inc: | Goodwin Procter LLP<br>By: MEGHAN SPILLANE, ESQ.<br>New York Times Building<br>620 8th Avenue<br>New York, NY 10018 |

APPEARANCES VIA ZOOM VIDEOCONFERENCE (CONT'D):

For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  JEFFREY M. SPONDER, ESQ.
                           One Newark Center, Suite 2100
                           Newark, NJ 07102

                      - - -

4

## INDEX

**WITNESSES**

**PAGE**

FOR THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD.:

GRANT CARROLL
  Cross-Examination by Ms. Furness                    31


**EXHIBITS**

| | ID | EVD |
|---|---|---|
| FOR THE DEBTORS: | | |
| Declaration of Mark Renzi | 19 | 19 |
| Declaration of Mr. Parker | 42 | 42 |
| FOR THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL, LTD.: | | |
| Declaration of Grant Carroll | 30 | 31 |

1                    (Proceedings commenced at 11:05 a.m.)

2              THE COURT:  Good morning again.  This is Judge

3    Kaplan.  We are here in an array of BlockFi matters this

4    morning.  We have counsel both in court and appearing remotely.

5    For the benefit of those who are appearing remotely, I'll

6    remind you to make use of the "raise hand" function and I'll be

7    sure to call on you.

8              For those who are here, let me first just have

9    appearances for those who are in court for the benefit of those

10   who are appearing remotely.

11             MR. KANOWITZ:  Yes.  Good morning, Your Honor.  May

12   it please the Court, Richard Kanowitz of Haynes and Boone on

13   behalf of the BlockFi debtors.

14             THE COURT:  All right.

15             MR. AULET:  Good morning, Your Honor.

16             Kenneth Aulet of Brown Rudnick for the Official

17   Committee.  I'm joined by my partner, Mike Winograd.

18             THE COURT:  Nice to see you again.

19             UNIDENTIFIED SPEAKER:  Nice to see you, Your Honor.

20             THE COURT:  Other appearances in court?

21             MR. GOLDBERG:  Good morning, Your Honor.

22             Adam Goldberg of Latham & Watkins on behalf of the

23   Joint Liquidators of Three Arrows Capital.  I'm joined in the

24   courtroom by my partner Marissa Alter Nelson, my colleague

25   Brett Neve, and our co-counsel, John Weiss of Pashman Stein.

1          THE COURT:  Nice to see you all.  Welcome.

2          MR. GOLDBERG:  Thank you.

3          THE COURT:  Anyone else entering an appearance?

4          Mr. Underwood.

5          MR. UNDERWOOD:  Good morning, Your Honor.  How are

6   you?

7          THE COURT:  Good, thank you.

8          MR. UNDERWOOD:  Thank you.

9          Allen Underwood of the firm of Lite DePalma Greenberg

10  & Afanador, local counsel to the Chapter -- New York Southern

11  District Chapter 11 debtor, Genesis Global Holdco LLC and its

12  affiliates.

13         I'd like to introduce to the Court Luke A. Barefoot

14  who is the debtor's counsel on the Genesis case.  He's

15  appearing remotely.  He has filed a -- or we have filed on his

16  behalf a pro hac vice application I believe this morning and if

17  it wasn't filed this morning, it will be filed today.  And I

18  would indicate for the record that this is a very limited

19  appearance with respect to the Chapter 11 debtor who is an

20  interested party.  And we reserve all rights with respect to

21  jurisdiction.

22         THE COURT:  Certainly.

23         MR. UNDERWOOD:  Thank you, Your Honor.

24         THE COURT:  Good afternoon, Mr. Barefoot.  Welcome to

25  Trenton at least remotely.

1          MR. BAREFOOT:  Thank you, Your Honor.

2          THE COURT:  All right.  Anyone else in court?

3          MS. SISSON:  I'm sorry, Your Honor.

4          Lauren Sisson, Haynes and Boone, for the debtors.

5          THE COURT:  Thank you.

6          For those who are also appearing remotely, you may of

7  course enter your appearance at the time you're called upon.

8  Thank you.

9          All right.  Counsel, Mr. Kanowitz?

10          MR. KANOWITZ:  Thank you, Your Honor.

11          Just so we could go directionally, I just want to map

12  out a couple of things, Your Honor, subject to of course your

13  approval and agreement.

14          The first couple of motions are really business-

15  oriented.  We are going to have a couple of the Haynes and

16  Boone team in court and out on Zoom present.  We'll go very

17  quickly and efficiently because all of them are unopposed.  But

18  if Your Honor does have questions, there are three 9019

19  settlements, I believe.

20          We next go to the Three Arrows matters.  From my

21  perspective, there are three main things to discuss, multiple

22  ancillary motions, but those are unopposed.  Three main issues

23  to discuss.  One is the motion to lift stay; two, the

24  coordination motion as it's entitled; and three, the proposed

25  scheduling order on the debtors' request to move forward with

1    the estimation motion as well as the claim objection motion.

2            We've agreed with counsel to Three Arrows that the

3    declarations of I would say BVI experts, for lack of a better

4    word, not necessarily qualifying them as experts but for lack

5    of verbiage or something else to call them, we have Mr. Parker

6    on our side who is on presenter status, as well as I believe

7    Grant Carroll on behalf of the Ogier firm for Three Arrows.

8            We agree that those should go in as direct testimony

9    subject to Your Honor's approval and then subject to cross-

10   examination.  My partner, Aimee Furness is on Zoom, and she

11   will be handling the evidentiary portion of those issues as

12   well as discovery, and I will be handling with Your Honor's

13   approval the argument in court on the motions to consolidate as

14   well as to lift stay.

15           What I suggest is, you know, there's sort of a whole

16   ball of wax on the Three Arrows matters.  A lot of issues that

17   go to both the consolidation motion as well as -- or

18   coordination motion as well as the lift stay.  I would ask that

19   Your Honor take them at one time so that we --

20           THE COURT:  Collectively.

21           MR. KANOWITZ:  -- don't have to stop, start, stop,

22   start.  That's what I would request unless Counsel thinks

23   otherwise.

24           THE COURT:  Are there any objection?  I anticipated

25   treating them collectively.  They touch on similar issues.

1              MR. GOLDBERG:  Thank you, Your Honor.

2              For the record, Adam Goldberg of Latham & Watkins on

3    behalf of Three Arrows.  We fully agree that the motion to lift

4    stay and what we call the coordination motion would be

5    naturally linked.  It could be heard together.  Those would be

6    our motions.  We're happy to present on those.

7              I think we also have the status conference on the

8    estimation motions and other issues which are somewhat separate

9    and flow from the first two.

10             THE COURT:  All right.  Then let's -- thank you,

11   Counsel.

12             MR. GOLDBERG:  Thank you.

13             THE COURT:  Let's continue.  Let's have -- let's

14   address the settlements and see if we can -- and other

15   essentially unopposed matters.

16             MS. SISSON:  Good morning, Your Honor.

17             Lauren Sisson, Haynes and Boone, for the debtors

18   again.

19             I'm just addressing the motion to quash Rule 2004

20   subpoena.  It's at Docket Number 1447.  The subpoena was issued

21   by a creditor in relation to our objection to their claims on

22   the seventh omnibus.  The counsel for the creditor had filed a

23   application and consent order seeking to withdraw which the

24   Court did enter this morning.  But because that was pending, we

25   agreed to adjourn the objection to his claims.  However, the

1   motion to quash, no response was filed and it's our

2   understanding that it's not opposed.  So we would just ask that

3   the Court enter the order quashing the subpoena.

4               THE COURT:  All right.  This is at 1447?

5               MS. SISSON:  Yes.

6               THE COURT:  All right.  And I'll do this for the

7   benefit of my court reporter.  Wendy, Number 4 on the calendar,

8   and the motion will be marked granted. Thank you.

9               MS. SISSON:   Thank you.

10              I'm just going to turn it over to Jordan Chavez who

11  will be presenting the Deserve settlement motion.

12              MS. CHAVEZ:  Good morning, Ms. Chavez.

13              THE COURT:  Good morning, Your Honor.

14              Jordan Chavez of Haynes and Boone on behalf of the

15  debtors.  I'll be addressing the second item on the agenda

16  which is the proposed Deserve settlement filed at Docket Number

17  1672.  We want to thank Your Honor for hearing this matter on

18  short notice.  And here with me today is Ms. Meghan Spillane of

19  Goodwin Procter who is counsel for Deserve.

20              All right.  Please continue.

21              MS. CHAVEZ:  The parties have been in negotiations

22  for some time now, and we're pleased to be before Your Honor

23  today with a mutually beneficial settlement.  As noted in the

24  pleadings, Deserve was BlockFi's business partner in connection

25  with the BlockFi Credit Card Program.  And the proposed

1   settlement really has three key parts, Your Honor.  The first

2   addresses the fees owed, the second addresses the collateral

3   account, and the third is Deserve's potential indemnity claim.

4   So I'd just like to briefly address each part for the record.

5          First is the fees.  The parties had a pre-petition

6   master service agreement related to the credit card, and the

7   parties owe each other fees related to that agreement which the

8   settlement agreement proposes to net resulting in a payment by

9   Deserve to BlockFi of $975,592.99.

10          THE COURT:  Let me just stop you for one second.

11          Wendy, just in case you need, this is Number 15.

12          I'm sorry.  Continue, Ms. Chavez.

13          MS. CHAVEZ:  No problem.  Thank you, Your Honor.

14          On the second part, this addresses the collateral.

15   The parties when they entered into their business relationship

16   executed a collateral account agreement through which BlockFi

17   established a collateral account in Deserve's name as security

18   for certain credit card accounts that were flagged as credit

19   risks for Deserve.  And that account currently has just over

20   $4.5 million in it.  But the current open balances on the

21   collateralized credit card accounts total approximately 1.37

22   million, leaving Deserve significantly overcollateralized.

23          So the proposed settlement agreement provides for

24   Deserve to retain in the accounts an amount that's deficient to

25   cover those current open balances, so the 1.37 million, and

1  make an initial return to BlockFi of the remaining excess

2  collateral of 3.13 million.  So if the settlement is approved,

3  it will result in an initial payment from Deserve to BlockFi of

4  just over $4.1 million.

5          The settlement also provides Deserve with the ability

6  to draw down on the collateral account for the current

7  outstanding billing receivables owed on the cards that they're

8  providing to BlockFi and will continue to do so if the

9  settlement agreement is approved until there's no longer an

10 open balance.  Deserve will provide monthly and quarterly

11 reporting to BlockFi and pay BlockFi any recoveries that may

12 result from payments made by the cardholders to Deserve.

13         The third and final part, Your Honor, is that Deserve

14 did file a proof of claim in this case regarding its right to

15 seek indemnification under the agreement.  Deserve has not yet

16 established an indemnifiable claim, but the settlement

17 agreement provides that it has 160 days post-effective date to

18 come forward and establish that it has an indemnifiable claim

19 and BlockFi will or the wind down trustee will then have the

20 right to review that claim and object and any allowed portion

21 of any indemnifiable claim will also be paid out of the

22 collateral account.

23         If there are insufficient funds at that time to cover

24 the allowed indemnity claim, then the remainder would be

25 treated as a general unsecured claim of BlockFi, Inc.  Any

1   excess in the account or to the extent there's not an allowed

2   indemnifiable claim but the collateralized partner card

3   accounts are paid off, that amount will then be turned back

4   over to the BlockFi estate, as well.

5           So aside from that potential indemnity claim

6   carveout, the settlement provides for a comprehensive release

7   by both parties of all other claims and causes of action.  The

8   debtors and Deserve had submitted that this is the product of a

9   good-faith negotiation between the parties.  Its supported by

10  the Committee, and it's in the best interest of the debtors,

11  the estates, and the BlockFi creditors.  So I would ask that

12  Your Honor approve the settlement motion and that the proposed

13  order submitted with the motion could be entered.

14          THE COURT:  All right.  I see a hand raised by Mr.

15  Sponder for the Office of the U.S. Trustee.

16          MR. SPONDER:  Thank you, Your Honor.  Good morning.

17          Your Honor, the U.S. Trustee objects to this order

18  shortening time as well as Number 4 on the amended agenda which

19  we'll get to shortly.  This 9019 with Deserve was filed on the

20  Friday of a holiday weekend, and the order required objections

21  to be filed at 4 p.m. on the holiday.  So it really didn't give

22  much time for anyone to look at and/or object to such a 9019

23  motion.

24          There are no reasons really articulated why it was

25  necessary to have a shortened hearing on this motion.  The plan

1  is not effective yet.  I don't believe any payments are

2  contemplated at this time, so I'm not sure why it was necessary

3  to have an order shortening time.  So that's our objection to

4  that, Your Honor.  Thank you.

5              THE COURT:  All right.  Thank you.

6              Ms. Chavez, do you want to address that?

7              MS. CHAVEZ:  Sure, Your Honor.  I'll briefly address

8  that.

9              First, the application shortening time addressed that

10 there was an immediate need to get this settlement approved.

11 Again, Your Honor, this has been a long time of negotiations

12 with Deserve, and it will bring immediate -- a significant

13 amount of funds back into the estates, at least accessible

14 funds.  It's BlockFi's position that this is estate property,

15 and so it will actually just give them access to that property.

16             The U.S. Trustee was welcome to reach out to the

17 debtors at any point after receiving notice of the application

18 and the motion, and we have not received any correspondence

19 from them or any -- I don't understand I guess the issue with

20 approving the settlement since it's such a great result for the

21 estate.

22             THE COURT:  All right.  Let me ask the Committee,

23 does the Committee support the debtors' motion at this point or

24 have any basis to agree with the U.S. Trustee to kick this for

25 a couple of weeks?

1        MR. AULET:  Your Honor, we support the debtors'

2  motion.  We don't see really any downside to anyone by

3  approving this settlement.  It gets money back into the estate

4  quickly.  It resolves an outstanding issue.  And people have

5  had a chance to look over it.  I'm not sure what basis anyone

6  could have to object to the settlement.  It's a great result

7  for the estates.

8        THE COURT:  All right.  Thank you.

9        Mr. Sponder, anything else you wish to add?

10        MR. SPONDER:  Thank you, Your Honor.

11        I'm not arguing at this point whether or not it's a

12  great result for the estate because, as I said, it was filed on

13  Friday over a federal holiday weekend with objections due at 4

14  p.m.  I take the Committee and the debtors at their word that

15  it's a good result, but the whole point is for parties to have

16  notice and to have the opportunity to object.

17        The settlement agreement's been signed.  I don't know

18  why it's necessary to have it on one business-day notice when

19  there's no reason otherwise because the agreement's been

20  signed.  Thank you, Your Honor.

21        THE COURT:  Thank you.

22        I appreciate the U.S. Trustee's concerns.  I'm going

23  to overrule the objection.  To the extent any party, creditor

24  or other party in interest, is in court with concrete concerns

25  and wishes to raise any issues or wishes additional time to

1  raise any of the issues, the Court certainly would have been

2  amenable.

3        From the way this case has been handled, the parties

4  that likely would have had information on the settlement to

5  raise the concerns would have been the Committee or other

6  parties during the course of the case.  No one has spoken up.

7  It's really been a two-party matter.  And absent a party

8  requesting additional time with concrete reasons to look or to

9  raise concerns, I'm going to overrule the objection.  I think

10 it's always better to get the money in.  It's a general rule of

11 thumb.

12       So I appreciate, Mr. Sponder, the concerns, but I

13 will overrule the objection.

14       MR. SPONDER:  Thank you, Your Honor.

15       THE COURT:  You're welcome.

16       All right.  So the Number 15 is granted.

17       There's also with it I believe, let me see -- no, I'm

18 sorry.  I was looking to see if there was a motion to seal that

19 went with it.

20       MS. CHAVEZ:  No problem, Your Honor.  That's the next

21 two matters actually, so with that, I will turn it over to

22 Mr. Ferris who has more good news of settlements to address

23 with Your Honor today.

24       THE COURT:  All right.  Good morning, Mr. Ferris.

25       MR. FERRIS:  Good morning, Your Honor.

1          Matt Ferris with Haynes and Boone on behalf of the

2    debtors.  I'll take the next two matters on the agenda.  Matter

3    3, Your Honor, is the debtors' motion to approve a settlement

4    agreement with US Farms.  That's filed at Docket Number 1479.

5          Briefly by way of background, as Your Honor may

6    recall, earlier in this case, the debtors were in a sale

7    process for a substantial portion of their self-mining

8    machines.  US Farms was the successful bidder for those

9    machines, and in March the Court approved the terms of the

10   debtors' sale of those machines to US Farms.

11         That sale closed in early April.  The APA provides

12   for a holdback of $675,000 from the purchase price under the

13   sale agreement.  That amount is still currently being held in

14   escrow.  The APA also contemplates a purchase price reduction

15   mechanism in connection with the (indiscernible) delivery of

16   the machines that were purchased.  And after the sale closed in

17   April, a dispute did arise regarding the type and condition of

18   the machines that were delivered by the debtors in connection

19   with the asset purchase agreement.

20         The debtors for their part point to a cap on the

21   purchase price reduction in the APA of $407,500.  US Farms, on

22   the other hand, asserts that their damages as a result of the

23   machines that were delivered are well in excess of that cap and

24   also assert that, under the circumstances, that cap shouldn't

25   apply to this dispute.

1          The parties have been negotiating for some time and

2    ultimately were able to reach a resolution of this dispute

3    under which the parties agree that the total purchase price

4    reduction will be $527,500, so in effect that is the deduction

5    cap, plus an additional $120,000.  And that will be in full and

6    final satisfaction of the damages claims that US Farms has

7    asserted under the APA.

8          Again, I think importantly for purposes of the

9    estate, those funds are currently being held in escrow, so

10   those funds would just come out of the funds that are in the

11   escrow account, and the balance of the funds in the escrow

12   account would then be able to be released back to the debtors'

13   estate.

14         As noted, there is a mutual release of claims

15   contemplated in the settlement agreement.  Your Honor, our

16   papers discuss the <u>Martin</u> factors for approval of settlement.

17   We believe that the settlement qualifies and should be

18   approved.  Settlement is the product of robust arms-length

19   negotiations between the parties.  The debtors in consultation

20   with the Unsecured Creditors Committee believe that the

21   settlement is in the best interest of the debtors' estates,

22   creditors, and stakeholders.

23         There were no formal or informal objections received

24   to the motion to approve the settlement.  And unless Your Honor

25   has any questions before I cede the podium, we would request

1    that the Court approve the settlement.

2           One housekeeping matter, Your Honor, there is a

3    declaration that was filed as an attachment, the declaration of

4    Mark Renzi in support of the settlement agreement.  Mr. Renzi

5    is in the courtroom virtually, has presenter status.  We would

6    ask that the initial Renzi certification be admitted for

7    purposes of the motion.

8           THE COURT:  All right.  Thank you.

9           I will accept into evidence his declaration.  I will

10   open up Mr. Renzi to any cross-examination of any party who

11   wishes to make inquiry.

12       (Declaration of Mark Renzi admitted into evidence)

13          THE COURT:   As with the prior motion and with all

14   the settlements, the Court has reviewed the underlying

15   documentation in order to assure itself that the In re Martin

16   standards have been met.  Certainly from the submissions made

17   in support of the proposed settlements, the Court has no basis

18   to object or to make a finding otherwise that the In re Martin

19   standards have been met.

20          Is there anyone who wishes to be heard -- this is on

21   Number 5, Wendy, on our calendar -- with respect to the

22   proposed settlement with US Farms and Mining?

23              (No audible response)

24       THE COURT:  All right.  The Court will grant the

25   motion and approve the settlement.  Thank you, Counsel.  That

1 takes us --

2          MR. FERRIS:  Thank you, Your Honor.

3          Moving on to Matter Number 4, this is the debtors'

4 motion to approve a settlement with Digistar Norway,

5 Nessim-Sarial Gaon, and Fiorenzo Manganiello.  This motion was

6 filed on October 2nd at Docket Number 1637.  It was set on

7 expedited notice for today's hearing.

8          In connection with this motion, we've also filed a

9 certification of Mark Renzi in support.  That was filed on

10 October 6th at Docket Number 1680.  And before I get into the

11 substance of the motion, would ask that that declaration be

12 admitted for purposes of this motion.

13          THE COURT:  All right.  Similar to the last matter,

14 the Court will accept the declaration in support of the

15 proposed settlement into evidence and provide anyone either in

16 court or remotely the opportunity to cross-examine Mr. Renzi

17 with respect to his declaration.

18      (Declaration of Mark Renzi admitted into evidence)

19          THE COURT:  All right.

20          MR. FERRIS:  Thank you, Your Honor.

21          THE COURT:  Please continue.

22          MR. FERRIS:  This settlement relates to one of the

23 institutional loans made by BlockFi Lending to Digistar Norway

24 which is an operator of digital mining machines.  And a related

25 parent guaranty or at least what we refer to as a parent

1  guaranty with two individual principals of Digistar Norway.

2          In addition to the disputes with respect to that

3  specific loan agreement, this settlement also resolves issues

4  related to a pre-bankruptcy filing assignment of the loan

5  agreement.  So prior to the bankruptcy filing, this loan had

6  gone into default.

7          In connection with working out the loan, BlockFi

8  Lending had initially entered into a loan assignment agreement

9  with a third party by the name of Brick Lane (phonetic).  That

10  assignment was only partially implemented, and there was a

11  dispute related to that as to whether the assignment was ever

12  effectuated.  So this, as I'll get into in just a moment, this

13  agreement resolves any issues related to that as well as to the

14  underlying loan agreement.

15          Your Honor, this was filed as a stand-alone motion.

16  Your Honor may recall, we do have institutional loan procedures

17  and institutional loan procedures order.  We have sought

18  approval of a number of these prior loan settlements under that

19  procedures order, but because the structure of this is a little

20  different in that we're actually assigning the loan as opposed

21  to just entering into a settlement agreement, we felt that it

22  was appropriate to do this as a stand-alone motion.

23          That being said, in our notice procedures under the

24  institutional loan procedures order that we attempted to comply

25  with, specifically providing advance notice to the U.S.

1  Trustee's Office and the SEC as well as to the Unsecured

2  Creditors Committee of unsealed terms of the settlement

3  agreement.

4          So that actually turns to the sealing issue.  Your

5  Honor, let me address that briefly.  As mentioned, unsealed

6  copies of the settlement or the assignment agreement, as more

7  properly called, have been provided to the Unsecured Creditors

8  Committee, the U.S. Trustee's Office, and the SEC consistent

9  with the loan settlement procedures.

10          Your Honor, we do have a number of continuing loan

11  collection actions that are pending and remain pending.  Each

12  of those loans is a stand-alone loan.  The circumstances are

13  different.  So notwithstanding that we are settling this one,

14  we think it's important that the terms of the settlement in

15  this particular instance remain confidential so as not to

16  affect our ongoing prosecution and negotiation of settlements

17  with respect to some of these other loans in the institutional

18  loan portfolio.

19          Your Honor, the settlement and the assignment is the

20  product of extensive arms-length negotiations that we believe

21  provide substantial value to the debtors' estates.  As I

22  mentioned, we do want to keep the specific terms of the

23  assignment payment amount confidential, but it does provide for

24  a meaningful cash settlement payment to the estate.  It also

25

1  resolves complex and multi-jurisdictional litigation.

2      Not only do we have the pending adversary proceeding

3  in the bankruptcy proceeding which was commenced back in

4  February, but there are also proceedings in Norway which were

5  commenced in March.  Based on the history to date, we have

6  every reason to believe that those would continue to be heavily

7  contested and would continue to result in substantial cost to

8  the estates to prosecute.

9      And then, lastly, Your Honor, there is a

10 comprehensive release of claims by the settling parties against

11 the estate that resolves potential claims against the estate,

12 not only in connection with the loan agreement but also, as I

13 mentioned, in connection with the pre-petition assignment to

14 Brick Lane.

15     Your Honor, again, our papers discuss the <u>Martin</u>

16 factors, and we believe that this satisfies the standards for

17 approval of the settlement agreement.  As set forth in Mr.

18 Renzi's declaration, the settlement is in the best interest of

19 the debtors' estates and creditors.

20     If I may just for a minute, Your Honor, to

21 specifically address the assignment because, again, although

22 this contemplates both relief under 9019, it's also a sale and

23 assignment of the loan and that's how we're effectuating this

24 settlement agreement.

25     Under the terms of the assignment, the assignee which

1   is an entity called G75 Capital which, as discussed in the

2   papers, is an affiliate of the defendants in this case, the

3   assignee will pay the assignment payment, which is a

4   substantial payment to the estate.  Subject to and conditional

5   upon BlockFi Lending's receipt of the assignment payment,

6   BlockFi Lending will then assign all of its interest in the

7   Digistar loan and the relating loan documents to the assignee.

8           Each of the borrower parties, as we define in our

9   papers, and BrickLane who is the pre-petition assignee will

10  provide comprehensive releases of all claims against BlockFi

11  Lending and BlockFi Lending estates.  And then, again, as

12  noted, promptly after the closing date of the settlement, the

13  various jurisdictional litigation will be promptly dismissed.

14          Your Honor, with respect to the specific assignment

15  and the relief that we've requested under 363, as set forth in

16  Mr. Renzi's declaration, the assignment is a sound exercise of

17  the debtors' business judgment.  We believe that the assignment

18  should be approved free and clear of all liens, claims, and

19  encumbrances.  Because of the nature of what's being assigned

20  here, which is a loan agreement, we don't actually believe that

21  there are any encumbrances, but to the extent that there are,

22  there are cash proceeds of this assignment that those

23  encumbrances can attach to and be adequately protected.

24          And then, lastly, Your Honor, as reflected in

25  Mr. Renzi's declaration, we believe that the parties have acted

1   in good faith.  The debtors are not aware of any collusion by

2   any parties.  And so for that reason, we believe that G75, the

3   assignee, is entitled to the protections under Section 363(f).

4          Your Honor, just lastly, let me briefly address the

5   expedited hearing and the issues raised by the U.S. Trustee.

6   Your Honor, first of all, the effectiveness of this assignment

7   agreement is conditioned on entry of an order approving the

8   assignment.  And also that's starts the clock ticking on the

9   assignee's obligation to pay the assignment payment.

10          There is -- you know, very importantly to the estate,

11  there is no financing contingency in this.  So as soon as or

12  very promptly after this order approving the assignment is

13  final, the assignee would be obligated to make that assignment

14  payment to the estate.  Working back from those timelines, we

15  expect that this would close before the end of this month so

16  resulting in a substantial recovery to the estate within the

17  next few weeks.

18          And also, Your Honor, again, because of the multiple

19  venues that we have litigation going on, one, we don't want to

20  dismiss anything until obviously the assignment is final and

21  the assignment payment has been funded.  But we also need to

22  make sure that that's put on pause while this has time to

23  close.  So we've asked the courts in Norway to pause those

24  proceedings.  We've adjourned the matters in the adversary

25  proceeding out until early November to allow this process to

1  close.

2         But obviously, there's multiple moving pieces here,

3  and the more times we have to go back and request additional

4  extensions or pauses, one, you know, (indiscernible) a way of

5  how that's handled and, two, there's of course there's a cost

6  to that.  So not only are we anxious to get the settlement

7  payment in as soon as possible (indiscernible) to stop pushing

8  off the litigation and just have this resolved hopefully by the

9  end of this month and then be able to promptly (indiscernible)

10 --

11        THE COURT:  I think we're having a little trouble.

12        MR. FERRIS:  -- and I will cede the podium here.  But

13 unless Your Honor has any additional questions from me, we

14 would ask that Your Honor approve the settlement and assignment

15 in substantially the form of the proposed order attached to the

16 motion.

17        THE COURT:  All right.  Thank you.

18        We had a little problem with internet connectivity

19 possibly on our end.  But I certainly got I think 99 percent of

20 what was being argued.

21        Wendy, for our records, these are Numbers 13 and 14

22 on the calendar, 14 being the motion to seal.

23        Let me turn to Mr. Sponder.  Good morning again.

24        MR. SPONDER:  Good morning again, Your Honor.

25        Jeff Sponder from the Office of the United States

1  Trustee.

2        Your Honor, the same objection that we raised with

3  respect to Deserve is that we don't think this should have been

4  on shortened time.  I'll leave it at that.  I have already

5  argued it.  Your Honor's already ruled on the Deserve motion,

6  and I'll leave it at that.  Thank you, Your Honor.

7        THE COURT:  Thank you, Mr. Sponder.

8        Let me ask, Mr. Ferris, is there also with the

9  application a waiver of a 6004(h) requirement?

10        MR. FERRIS:  There is, Your Honor.

11        THE COURT:  All right.  Given that this was done in

12  short notice and you're looking to close before month's end,

13  the 14 days would expire, if I enter an order tomorrow, on the

14  25th leaving time.  It's a means to balance the concern of the

15  Trustee if somebody wishes to come in, ask for reconsideration

16  or a stay or an appeal.

17        With respect to the U.S. Trustee's objection, I note

18  the same.  All it would have taken is one party in interest, a

19  creditor or otherwise, to come before the Court today to give

20  notice to express a concern that additional time was warranted

21  to investigate, to review the transaction.  The Court would

22  have accommodated to some extent even if it was for a week.

23  But since --

24        MR. FERRIS:  Yeah.  Your Honor, and Mr. Watson is on

25  for the defendants, and I'll let him speak for his clients.

1  But it's our understanding candidly, Your Honor, that the

2  defendants would not have closed until after the order has gone

3  final anyway.  So I think that that's -- I think where you're

4  going is certainly acceptable to the parties.  And that still

5  allows us to close -- assuming no issue with the order going

6  final, that would still allow us to be in position to close

7  before the end of the month.

8          THE COURT:  At least it offers an avenue for parties

9  to come back to the Court.  The doors are always open in case

10 there is an emergent issue or an opportunity to make inquiry

11 into the merits of the settlement.

12         The Court had reviewed the settlement and the

13 declaration supporting it and finds no basis certainly to

14 contest that it satisfies the In re Martin test and it

15 certainly represents meaningful dollars into the estate and the

16 avoidance of complex litigation in multiple fora and at a

17 substantial cost.  I assume the Committee's on board with the

18 sale -- with the settlement?

19         MR. AULET:  Yes, Your Honor, the Committee supports

20 it.

21         THE COURT:   Actually, it is a sale.  A sale and

22 assignment.  So the Court will approve it absent and will

23 strike the waiver of the Rule 6004(h) requirement.  Assuming we

24 have the order tomorrow, we'll enter the order as appropriate.

25         Mr. Sponder, was there an objection to the motion to

29

1  seal, as well?

2        MR. SPONDER:  With respect to this one, no, Your

3  Honor.  Thank you.

4        THE COURT:  All right.  Then the motion to seal will

5  be granted, as well.  That's Number -- at Docket Number 1680,

6  Number 14 on our calendar.  Nope, nope, wrong.  Docket Number

7  1638, Number 14 on the calendar.

8        All right.  I think that takes us to the 3AC matters.

9        MR. KANOWITZ:  Yes, it does, Your Honor.  And it is

10  3AC's motion and burden.  So to the extent that they're ready

11  to move forward, so are we.  I would just ask that the

12  witnesses and the declarations go first before there's any

13  argument.  This is not a jury trial, Your Honor.  You've read

14  the papers.  You see everything.  And before we launch into

15  argument, I think you should have the declarations in and the

16  cross-examination heard of both witnesses.

17        THE COURT:  All right.  Thank you.

18        I'll certainly defer to the parties.  I question the

19  need for cross-examination, as well.  But let me hear from

20  movants.

21        MR. GOLDBERG:  Thank you, Your Honor.

22        For the record, Adam Goldberg of Latham & Watkins for

23  Three Arrows.  We agree with Your Honor.  We'd move to have the

24  declarations admitted.  We're happy to have them admitted

25  without cross-examination.  We don't see a need for cross-

1  examination either, but if Mr. Kanowitz would like to, our

2  witness will be available via Zoom.

3          THE COURT:  All right.  Is there an agreement or --

4          MR. KANOWITZ:  No, Your Honor.  We believe that

5  Mr. Grant Carroll's declaration needs to be illuminated for

6  Your Honor.  There are some vague and missing pieces to that

7  that I believe is key to some of the arguments being made by

8  Three Arrows.  So I just think that Ms. Furness will handle

9  that and she'll do it expeditiously.

10         THE COURT:  All right.  Well, then what's good for

11  the goose, as they say, and the gander.  It's open for all

12  sides.

13         Why don't we then -- there's no objection to the

14  declaration coming in as direct testimony.  That leaves simply

15  the cross of Mr. Carroll, correct?

16         MR. KANOWITZ:  Correct.

17         THE COURT:  And do we have Mr. Carroll remotely?

18         There you are.

19         MR. CARROLL:  Good morning, Your Honor.

20         THE COURT:  Good morning.  There you go.  Welcome

21  again remotely to New Jersey.  Let me do the --

22         MR. CARROLL:  Thank you very much.

23         THE COURT:  -- perfunctory virtual swearing you in.

24  Please raise your right hand.

25     GRANT CARROLL, THREE ARROWS CAPITAL'S WITNESS, SWORN

Carroll - Cross/Furness                    31

1        THE COURT:  All right.  Thank you, Mr. Carroll.  Your

2  declaration has come in into evidence.

3        (Declaration of Grant Carroll admitted into evidence

4        THE COURT: Do you have your declaration in front of

5  you?

6        THE WITNESS:  Your Honor, I printed it off.

7        THE COURT:  Okay, great.  And we have, Ms. Furness,

8  you're going to undertake cross-examination?

9        MS. FURNESS:  Yes, thank you, Your Honor.

10       THE COURT:  All right.

11       MS. ALTER-NELSON:  And, Your Honor, Melissa

12  Alter-Nelson from Latham & Watkins.  I will be objecting to the

13  extent necessary.

14       THE COURT:  Absolutely, and redirect if appropriate

15  either, as well.

16       All right.  So, Ms. Furness, please proceed.

17       MS. FURNESS:  Thank you, Your Honor.

18                       CROSS-EXAMINATION

19  BY MS. FURNESS:

20  Q    And, Mr. Carroll, I'll keep this as short as possible.  I

21  have a couple of questions.

22       Your law firm, Ogier, am I saying that correctly?

23  A    Yeah, but it doesn't matter.  We all know who we're

24  talking about.

25  Q    Very good, Ogier.  And I just want to clarify, Ogier and

Carroll - Cross/Furness                                    32

1  you actually represent the Joint Liquidators in the BVI matter,

2  correct?

3  A    Yes.  The Joint Liquidators are clients of Ogier.

4  Q    So in fact you are actually their legal counsel, correct?

5  A    Correct, in the BVI.

6  Q    That's not mentioned anywhere in your declaration.  Is

7  there a reason you excluded that?

8  A    No reason.  I thought it was well known.

9  Q    I want to talk briefly about the claims that the Joint

10  Liquidators had alleged against BlockFi.  In Paragraph 9 of

11  your declaration, you talk about the recovery of assets subject

12  to purported foreclosure.  Do you see where I'm reading from?

13  A    So most of 3AC claims arises as a matter of BVI -- that

14  paragraph?

15  Q    Yes, sir.

16  A    Yeah.  Yes, I see that paragraph.

17  Q    And in this matter or in the BVI matter, do the Joint

18  Liquidators have claims against BlockFi to recover assets

19  subject to the purported foreclosure?

20  A    Well, no claims have been filed because of the automatic

21  stay.  So there's no live claims in the BVI.

22  Q    You understand though that there is a proof of claim that

23  has been filed in BlockFi's bankruptcy, correct?

24  A    Yes.  Yes, I understand that.

25  Q    And are you aware of whether or not that proof of claim

Carroll - Cross/Furness                                        33

1  includes any claims of the recovery of assets subject to

2  purported foreclosure?

3  A    I don't have the proof of claim in front of me, I'm

4  afraid.

5  Q    And you also talk in Paragraph 13 about Section 274(a) of

6  the BVI Insolvency Act.  Do you see that section?

7  A    Yes.

8  Q    And is that a claim that the Joint Liquidators allege as

9  against BlockFi?

10  A    That's a mechanism to recover assets that we -- that the

11  parties that belongs to it.  So that's the statutory mechanism

12  by which to recover.

13  Q    And are the Joint Liquidators using that statutory

14  mechanism to recover as against BlockFi?

15  A    Well, there's no claims filed.  If -- if we were to go

16  towards claims, then that is one of the statutory provisions

17  that could be relied upon to recover assets.  But there are no

18  counterclaims.

19  Q    So are those --

20  A    I'm sorry.  Other than the proof of claim filed in the

21  Chapter 11 proceeding.  What I mean is we've -- we've got no

22  claims on foot in the BVI against BlockFi.

23  Q    And are you aware that there is no Section 274(a) claim

24  against BlockFi in the proof of claim in the BlockFi

25  bankruptcy?

Carroll - Cross/Furness                           34

1  A    As I said, I don't have that document in front of me, I'm

2  afraid.

3  Q    Is that a claim that the Joint Liquidators plan to bring

4  but just haven't pled in the BlockFi bankruptcy here in the

5  United States?

6  A    Well --

7            MS. ALTER-NELSON:  Objection, Your Honor.

8            THE COURT:  Wait, don't answer.

9            MS. ALTER-NELSON:  I think that would be delving into

10  privilege and what claims are going to be brought prior to the

11  stay being lifted and those claims actually being brought.

12            THE COURT:  Sustained.

13            MS. FURNESS:  And, Your Honor, Mr. Carroll has

14  submitted a declaration that talks about Section 274(a).  It's

15  not in the proof of claim.  To the extent it was privileged,

16  then maybe their lawyer shouldn't have been the ones to draft

17  and submit this declaration.

18            He's submitting it as this is what the BVI law is,

19  these are the claims that the Joint Liquidators have, and this

20  is the reason that this Court should do two things, one is to

21  lift the stay and two is to consolidate this in the BVI court.

22            THE COURT:  That's fine.  And you can argue that.

23  What's in the proof of claim speaks for itself and the impact.

24  But I'm not going to have you delve into what their intentions

25  are at this point.  Thank you.

1  BY MS. FURNESS:

2  Q    Are you aware that the Section 274(a) claims are

3  specifically alleged as against Genesis in the proof of claim

4  filed in that bankruptcy?

5           MS. ALTER-NELSON:  Objection, Your Honor.  Outside

6  the scope of his declaration.

7           THE COURT:  I'll overrule it.

8           THE WITNESS:  Again, I don't have the Genesis

9  document in front of me.  I can't tell you.  If I see it, I can

10 confirm or otherwise.

11 BY MS. FURNESS:

12 Q    Also, in the motion to lift stay and the motion for

13 consolidation, the Joint Liquidators take the position that a

14 complete resolution of the claims against BlockFi can be had in

15 the BVI court.  Is that your position?

16 A    As a matter of BVI law, yes.

17 Q    Okay.  But you agree and it's in your declaration, but you

18 agree that the BVI court will not review USA cover defenses,

19 correct?

20 A    I think it's incredibly likely, yes, that the BVI court

21 would deal with a claim, a U.S. procedural claim.  I think --

22 Q    And you also agree that the BVI court will not review

23 equitable subordination?

24 A    That's not a concept that we would look at.

25 Q    And so instead, as I understand your position, that if the

Carroll - Cross/Furness                    36

1  BVI determines that there is a preference claim here, then the

2  claim itself actually has to be carried back to the United

3  States for complete resolution, right, to determine the safe

4  harbor defenses and equitable subordination, correct?

5          MS. ALTER-NELSON:  Objection.

6          THE WITNESS:  Well, the BVI --

7          THE COURT:  Before you answer --

8          MS. ALTER-NELSON:  Objection, Your Honor.  To the

9  extent she's asking him to testify about U.S. law procedures

10 that he's not familiar with, we would just object on that

11 basis.  To the extent he can answer, fine.  But if he can't

12 answer something he's not here to testify about U.S. law

13 procedures.

14         THE COURT:  all right.  Thank you.

15         Mr. Carroll --

16         MS. FURNESS:  And Your Honor if I -- may I respond --

17         THE COURT:  Yes.

18         MS. FURNESS:  -- just briefly, Your Honor, because

19 what Mr. Carroll swore to in his declaration and I'll quote

20 this, it's a very (indiscernible) sentence in the declaration,

21 "I understand from the Liquidators U.S. attorneys that such

22 defense may only potentially become relevant in the context of

23 this Court's determination following the entry of a judgment by

24 the BVI court on the 3AC claims as to whether such judgment may

25 serve as the basis of an allowed claim in the

Carroll - Cross/Furness                                37

1  debtors in their Chapter 11 cases."  He swore to that.

2           THE COURT:  I'm going to overrule the objection.

3           Mr. Carroll, you can answer the question to the best

4  of your ability.

5           THE WITNESS:  Please repeat the question.

6  BY MS. FURNESS:

7  Q    Absolutely.

8  A    Thank you.

9  Q    If the BVI court determines that there are preferences

10  here, that decision has to be carried back to the United States

11  for complete resolution of the safe harbor defenses and the

12  equitable subordination, correct?

13  A    Well, from BVI perspective, the end of the matter would be

14  the claim so there would be the unfair preference claim and if

15  the court makes a determination.  To the extent that there are

16  any U.S. law issues that the BVI court don't deal with them,

17  yes, I agree that they would have to be dealt with elsewhere.

18  Q    So in the BVI proceeding, BlockFi would lose its ability

19  there to argue safe harbor or equitable subordination?

20  A    Whether or not it loses -- I don't know if it loses its

21  ability to argue that before the U.S. court.  But in the BVI

22  court, I don't think that they would be relevant defenses for

23  the BVI judge to consider.

24  Q    Are you aware that BlockFi has claims also against the

25  Three Arrows estates?

1  A     Yes.

2  Q     Will the BVI court recognize a setoff of the amounts owed

3  to BlockFi by Three Arrows?

4  A     It can do --

5            MS. ALTER-NELSON:  Your Honor, objection.

6            THE COURT:  Objection.

7            MS. ALTER-NELSON:  Beyond the scope of his direct

8  testimony in his affidavit.

9            MS. FURNESS:  Your Honor, his direct testimony in the

10 declaration talks about matters of BVI law.  He sets himself

11 out as an expert on BVI law, that's what he's been presented to

12 this Court of, as well as what a BVI court will do with these

13 claims.  And I think it's only fair, especially considering the

14 issues that the Three Arrows Joint Liquidators are trying to

15 take away substantive rights from BlockFi to investigate that.

16           MS. ALTER-NELSON:  Your Honor?

17           THE COURT:  Yes.

18           MS. ALTER-NELSON:  We'd obviously disagree with the

19 characterization that Three Arrows is trying to take away any

20 substantive rights from BlockFi.  But, again, the issue of

21 setoff is not something that he is here to testify about.  If

22 we need to have BVI law experts on a very specific issue,

23 that's fine but it's just well outside of the scope of his

24 testimony.

25           THE COURT:  All right.  I'm going to overrule the

Carroll - Cross/Furness                          39

1  objection.

2            THE WITNESS:  Setoff fee is possible as a matter of

3  BVI law.  I'd have to look at the exact nature of the claims.

4  I can't remember the exact claim that BlockFi has into the BVI

5  estate at this time.

6  BY MS. FURNESS:

7  Q    The claim is for deficiency on a loan.

8  A    Okay.  Is this the one that's for one dollar?

9  Q    I'm sorry.

10 A    Is this the -- I believe there's a claim for one dollar

11 that's been submitted, if I'm recalling this one correct.  And

12 --

13 Q    That's correct.  There's a placeholder claim for one

14 dollar, but there is a claim for a deficiency on loans.

15 A    So it is -- there are mechanisms under BVI law and the

16 Insolvency Act to provide for setoff as between mutual dealings

17 between companies.  But I haven't -- again, I haven't got in

18 front of me an analysis of the BlockFi claims.  I'd struggle to

19 answer if it is appropriate in this exact circumstance.

20 Q    Thank you, Mr. Carroll.  Just a few more questions.

21      You talk in Paragraph 17 about what you call potential

22 statutory defenses.  Please let me know when you've made it to

23 that paragraph of your declaration.

24 A    Yes.  Yes, I'm there.

25 Q    And tell me under BVI insolvency law, whose burden is it

1  to prove insolvency?  Is it the person claiming the

2  preference?

3  A    Under -- the Act itself doesn't speak to burden at all.

4  And what the court would do is look at the expert evidence on

5  when insolvency occurred because it's a matter of fact.

6  Q    And how about the burden to prove that a transaction is

7  not in the ordinary course of business, whose burden is that?

8  A    Again, the Act is silent on who bears that burden in a

9  non-connected party.  And the procedure the court adopts is to

10 look at the entire course of dealing between the parties to

11 ascertain first what was the ordinary course of business and

12 then it's for the court to determine if that -- the particular

13 transaction falls inside or outside of that course of dealing.

14 Q    Just a few more questions, Mr. Carroll.  I want to talk

15 about efficiency.

16 A    Okay.

17 Q    The Joint Liquidators have asserted that this can be more

18 efficiently addressed in a court separate and apart from the

19 ones that you are in today.  How much approximately in legal

20 fees have the Joint Liquidators incurred so far?

21 A    In their totality on the way --

22        MS. ALTER-NELSON:  Your Honor, I'm sorry, I'm going

23 to object.  It's clearly not relevant and it's not something

24 that's covered in his declaration, as well.  It's outside the

25 scope.

Carroll - Cross/Furness                                      41

1            THE COURT:  Sustained.

2   BY MS. FURNESS:

3   Q    And are you aware, Mr. Carroll, of the estimated

4   distribution to unsecured creditors in the 3AC matter?

5            MS. ALTER-NELSON:  Again, same objection, Your Honor.

6            THE COURT:  Sustained.

7   BY MS. FURNESS:

8   Q    And just for clarification sake, Mr. Carroll, are you the

9   type of lawyer in the BVI system that actually argue in front

10  of the bar to the court?

11  A    Am I -- yes, my background is as a barrister in England.

12  I then moved to the BVI, so I appear before the commercial

13  court, court of appeal, and all courts in the BVI.

14  Q    So you are a barrister in BVI?

15  A    Yes.

16           MS. FURNESS:  Okay.  That's all we have.  Thank you,

17  Your Honor.

18           THE COURT:  Thank you, Ms. Furness.

19           Any redirect?

20           MS. ALTER-NELSON:  No redirect, Your Honor.  Thank

21  you.

22           THE COURT:  All right.  Well, we thank you, Mr.

23  Carroll, for your time.  I don't know whose accent I enjoyed

24  more, Ms. Furness's or Mr. Carroll's.

25           THE WITNESS:  Grateful, Your Honor.  Thank you.

1            THE COURT:  Thank you.

2            THE WITNESS:  Good-bye.

3            MR. KANOWITZ:  Your Honor, we also have Mr. Parker's

4  declaration to go into evidence, and we'd subject him to cross-

5  examination if Three Arrows wishes, or anybody else.

6            THE COURT:  All right.  Any objection to the

7  declaration?

8            MS. ALTER-NELSON:  No, Your Honor.  No objection to

9  the declaration.

10           THE COURT:  Do you wish to cross-examine?

11           MS. ALTER-NELSON:  We don't have any questions for

12  Mr. Parker.

13           THE COURT:  All right.  Thank you.

14        (Declaration of Mr. Parker admitted into evidence)

15           THE COURT:  Is the record closed then as far as

16  factual basis submissions?  Just the two declarations and the

17  cross-examination?

18           MR. KANOWITZ:  Yes, Your Honor.

19           THE COURT:  All right.  Thank you.

20           Then let's proceed to argument.  Let me hear from the

21  movant.

22           MR. GOLDBERG:  Thank you, Your Honor.

23           For the record, Adam Goldberg of Latham & Watkins on

24  behalf of Three Arrows Capital.

25           I'd like to break down the situation in light of the

1    objections that were raised by the parties here to explain more

2    simply what are the claims at issue before the Court, what is

3    it that we're asking of this Court, and why should the Court

4    grant it.

5            So what are the claims at issue?  Three Arrows has

6    asserted essentially two types of claims against BlockFi which

7    were described in detail in our amended proof of claim filed on

8    September 13th of this year about a month ago.  The first is

9    for unfair preference under Section 245 of the BVI Insolvency

10   Act, and the second is a contract and turnover claim in the

11   amount of approximately $10 million that is valued based on the

12   amount of a loan that was made on April 7th, 2022 which was

13   denominated in Bitcoin approximately 2300 Bitcoin, net of a

14   collateral position of approximately 31,000 Ether tokens.  And

15   so the net value of that depending upon the date evaluation we

16   put at approximately 10.4 million.

17           The preference claims are the lion's share of the

18   claims, and those are -- we've set forth a value in the amount

19   of roughly $270 million.  I think Mr. Carroll's declaration has

20   described the elements of an unfair preference claim under BVI

21   law in his declaration.  I'm happy to outline those for the

22   Court or move on for the sake of expedience.

23           THE COURT:  No, I read through it.  I understand

24   them.

25           MR. GOLDBERG:  Okay.  Thank you, Your Honor.

44

1           THE COURT:  Thank you.

2           MR. GOLDBERG:  There are a number of transfers that

3  are the basis for those preference claims.  Those spanned the

4  period from May 5th, 2022, which was a transfer of 29 million

5  U.S. dollars, and continued until June 3rd, which was a

6  transfer of approximately 6 million U.S. dollar coin tokens.

7  The total of those transfers at various points over that time

8  was -- we put at $272 million in our proof of claim.  And I'm

9  happy to go into more details, but I think that suffices for

10  now.  Thank you.

11          So we anticipate that BlockFi will seek to defend

12  against those claims on the basis of whether Three Arrows was

13  insolvent under BVI law at the time of any one of those

14  transfers; whether the transactions were in the ordinary course

15  of business, which is an affirmative defense under BVI law; and

16  whether the safe harbors under U.S. law apply to those

17  transfers, and potentially other issues of U.S. or BVI law that

18  may not have been crystallized yet.

19          I should note it's also very relevant as was

20  described in our papers that Three Arrows is asserting BVI

21  preference claims against Genesis which is a Chapter 11 debtor

22  in the Southern District of New York.  And I would highlight

23  that the earliest transfer at issue there was a transfer valued

24  in the amount of roughly $115 million on May 6th, 2022, and

25  that is the day after the first transfer at issue in this case,

1  the May 5th transfer of $29 million.

2          To be clear, Three Arrows has an array of other

3  claims against Genesis, as well, which I'm happy to outline for

4  Your Honor but, for the sake of expedience, I can move on

5  unless you'd like to hear that.

6          THE COURT:  No, it's fine.  Thank you.

7          MR. GOLDBERG:  Thank you.  So I think I would

8  highlight, though, that the common issues that arise between

9  the claims that we have in this case and the claims that exist

10 in Genesis are particularly when did Three Arrows become

11 insolvent under BVI law.

12          And as it relates to these debtors, May 5th is the

13 earliest relevant date.  As it relates to Genesis, May 6th.

14 Also other common issues that will arise are whether the

15 transactions occurred in the ordinary course of business and

16 whether the safe harbors of the U.S. Bankruptcy Code apply,

17 which are both issues that the Genesis debtors are also

18 raising.  But that is essentially a brief survey of the claims

19 that are currently relevant before Your Honor, today, for our

20 motion for relief from stay and the coordination motion.

21          So let me be more specific as well.  What are we

22 asking from Your Honor today?  I think this is an important

23 part of clarity for the purposes of this hearing.  First and

24 foremost, we are seeking relief from the automatic stay so that

25 we may prosecute claims against BlockFi in another form.  Our

1  preference, being debtors in a BVI liquidation proceeding, is

2  to bring that litigation in the BVI.  That is the home court

3  for our liquidation proceeding.  It's, in our view, the one

4  most naturally suited to decide the issues of insolvency under

5  BVI law, ordinary course under BVI law as well.  And indeed, it

6  will be deciding issues related to the date of insolvency of

7  Three Arrows as it relates to other parties that are not

8  debtors in their own Chapter 11 proceedings, and I believe we

9  put some of those facts before Your Honor under seal.

10         But that is not the only option.  It is not

11  necessary, in our view, that these issues be litigated in the

12  BVI.  We acknowledge that there are competing interests here of

13  what we view as co-equal bankruptcy estates between these

14  debtors, ourselves as a debtor, the Genesis debtors, and that

15  may lead this Court and other relevant courts to determine

16  that, on balance, the BVI court may not be the best place to

17  adjudicate these issues.  So, in alternative to the BVI court,

18  we would also seek relief from the automatic stay to have these

19  issues litigated in our Chapter 15 case, which is before Chief

20  Judge Martin Glenn of the Southern District of New York.

21         In that scenario, upon relief from the automatic

22  stay, we would commence an adversary proceeding that would be

23  the basis for a complete resolution of all of the issues that

24  are raised as it relates to claims against BlockFi and the

25  defenses they have asserted.  That procedure of an adversary

1   proceeding would also permit consolidation, in whole or in

2   part, of an adversary proceeding against Genesis if relief from

3   the stay is also granted in the Genesis Chapter 11 case.  So

4   that is our motion for relief from stay.

5          As to coordination, today we're only seeking

6   coordination and communication.  Ultimately, if successful, we

7   would seek consolidation, in whole or in part, of our claims

8   against BlockFi and Genesis together.  We are not seeking

9   coordination or consolidation as it relates to FTX or Celsius

10  at this time, which was initially described in our motion.

11         As to FTX, we have reached an agreement with them to

12  adjourn our motion for relief from stay and the motion for

13  coordination that we filed in the FTX bankruptcy cases.  The

14  parties have agreed on an information sharing period and a

15  standstill in litigation of our claims until at least

16  February 1st of next year.  There is a prospect that

17  information development will provide the basis for a settlement

18  or narrowing of the issues that may lead to the possibility

19  that insolvency may not need to be litigated with those

20  debtors.

21         As to Celsius, we are not seeking judicial

22  cooperation or consolidation at this time but for different

23  reasons.  We have co-counsel at Holland and Knight, who I

24  believe are on the Zoom, and can address the issues related to

25  Celsius now or at the appropriate time in Your Honor's view.

48

1          So that limits our request for coordination and

2   communication to two other debtors, BlockFi and Genesis.  And

3   to be absolutely clear, we are not asking this Court to order

4   any other court to do anything whatsoever.  We filed a revised

5   proposed order just before the hearing last night in an effort

6   to make that clear in preparation for the hearing, and that's

7   at Docket Number 1693.

8          What we're asking in terms of coordination and

9   communication is that Your Honor would confer with the other

10  courts prior to a ruling on our motion for relief from stay.

11  If Your Honor determines that coordination is appropriate and

12  we would think that that would only actually occur with that

13  coordination, if the other courts agree.  We can't make them

14  talk to Your Honor, of course.  So at this stage, all we're

15  asking to decide today is whether Your Honor would like to have

16  coordination or communication in any form with the other

17  relevant courts, which would be Judge Sean Lane in the SCNY

18  overseeing the Genesis Chapter 11 cases, Chief Judge Martin

19  Glenn in the SCNY overseeing our Chapter 15 case, and Justice

20  Ingrid Mangatal of the BVI Court.

21         We've been intentionally open ended about exactly how

22  that coordination or communication could occur because we

23  wanted to give Your Honor the opportunity and the other courts

24  the opportunity to exercise your discretion as to the

25  appropriate format for any communication.  The options that

1  would be available could be a joint hearing involving all of

2  the relevant courts where issues are decided on the questions

3  of relief from the automatic stay in particular.

4        There could be a joint status conference in which

5  issues of scheduling and options of procedures could be

6  discussed before coming back here for a decision by Your Honor.

7  Or potentially, there could be a judicial conference in camera

8  without the parties.  So those are our requests, Your Honor.

9  Why should they be granted?

10        Cause exists for relief from the automatic stay.

11  This is an extraordinary situation involving not just one

12  dueling debtor, but multiple dueling debtors.  And on that

13  basis, relief from the stay should be granted using either the

14  three part test or the Sonnax factors.  So let me first address

15  the three-part test and then we can get into the Sonnax factors

16  if Your Honor would like to hear details on those.

17        The three part test is prejudice, hardship, and

18  probability of success.  In our view, Your Honor, prejudice

19  weighs strongly in favor of Three Arrows in granting relief

20  from the stay.  The BlockFi plan has been confirmed and it is

21  actively seeking to litigate these claims.  There can be no

22  prejudice to BlockFi from litigating these claims, and that's

23  actually the issue that is facing most courts on a question of

24  relief from the automatic stay to litigate claims and causes of

25  action.

1        The only question before this Court is what should be

2   the forum for that litigation.  Three Arrows will face far

3   greater prejudice from continuing the stay than BlockFi would

4   face in granting relief.  Three Arrows is a debtor in its own

5   liquidation.  Its claims against BlockFi and very similar

6   claims against Genesis comprise some of its largest assets with

7   a face value over one billion U.S. dollars.  These are

8   preference claims.  They are intended to create parity among

9   Three Arrows creditors.  Whichever court adjudicates these

10  claims will have to decide a number of issues that are central

11  and core to the Three Arrows estate.

12       For example, the date of insolvency is one of, if not

13  the, most important legal question for the Three Arrows

14  liquidation because it will be dispositive, not only to the

15  claims in this case and in the Genesis case, but in other

16  cases, which Your Honor is partially aware of.  A risk of

17  inconsistent outcomes would indeed be deeply prejudicial to the

18  Three Arrows estate.  We have not identified any case, and

19  neither has BlockFi pointed to any either, where a bankruptcy

20  court has decided preference claims arising from another

21  bankruptcy estate, much less preference claims of a foreign

22  insolvency estate arising under foreign law.

23       The key element of prejudice that BlockFi articulates

24  is that it would lose defenses.  But if the issues are

25  litigated in our Chapter 15 case, the Bankruptcy Court would be

1 fully capable of adjudicating all of the issues, just as this

2 Court would.  And if the issues are litigated in the BVI, and

3 the BVI court decides not to adjudicate a particular issue, the

4 matter could return to this Court for those issues, such as

5 rulings on allowance under the U.S. safe harbors or

6 subordination under the supposed equitable subordination

7 arguments that Blockfi seeks to bring.

8 　　　　　Second, hardship, likewise weighs in favor of Three

9 Arrows.  BlockFi and Three Arrows will both incur the costs of

10 litigating this matter in any forum.  BlockFi has already

11 created a situation where they will be litigating preference

12 issues before another court through their settlement with FTX.

13 That settlement provides for FTX's preference claims against

14 BlockFi to be litigated in the FTX bankruptcy court.  BlockFi

15 should not now be entitled to claim that litigating preference

16 claims before another bankruptcy court is some undue hardship.

17 　　　　　Granting relief from the stay would allow Three

18 Arrows to avoid the very meaningful hardship of having multiple

19 courts hold trials on very similar issues on a very parallel

20 timetable, which both strains resources of the professionals

21 involved, we only have so much time, and also imposes

22 duplicative expenses.  And that hardship would far outweigh any

23 incremental hardship to BlockFi from appearing in another

24 bankruptcy case, particularly now that its plan has been

25 confirmed.

52

1          Third, as to the probability of success, Three Arrows

2     has demonstrated a probability of success through the *prima*

3     *fascia* case established in its proof of claim filed on an

4     amended basis on September 13th.  BlockFi has not provided any

5     substantive response to that proof of claim whatsoever.  And

6     the detail, in our view, of that proof of claim satisfies this

7     element in accordance with the cases of <u>Continental</u>, <u>15375</u>

8     <u>Memorial</u>, and the other cases cited in our reply.

9          I'm happy to go through the detail on the Sonnax

10    factors if the Court would like, or we can move along.

11         THE COURT:  You briefed it.  I have no issue.  I

12    don't need a repetition of it.

13         I appreciate it.  Thank you.

14         MR. GOLDBERG:  Thank you, Your Honor.

15         So I would simply kind of conclude a presentation on

16    the stay with a brief summation and then move on to the

17    coordination issues.

18         Essentially, this is a very challenging situation on

19    relief from the automatic stay.  There are multiple bankruptcy

20    cases involved, which in our view should be viewed as having

21    co-equal rights to decide the destiny of their own bankruptcy

22    cases.  In our view, however, the balance weighs decisively in

23    favor of Three Arrows.

24         If relief from the stay is denied, we will face at

25    least two trials on similar timetables, on similar issues, in

1  different courts.  All the while, yet another court, the BVI

2  court, will also have to adjudicate some of the same issues,

3  particularly the date of insolvency of Three Arrows against yet

4  more non-debtor parties.  This disjointed approach would

5  minimize judicial economy, maximize the cost for the Three

6  Arrows estates, and risk inconsistent outcomes on some of the

7  most critical and largest assets that remain for the Three

8  Arrows estate.

9        In contrast, if relief from the stay is granted,

10 BlockFi will still have the ability to be heard on all of the

11 issues that it seeks to present.  We cannot even be sure that

12 granting relief from the stay would be more expensive for

13 BlockFi.  A consolidated trial could potentially reduce

14 expenses for all parties depending upon the procedures that are

15 used.

16       I'd like to turn more briefly to the premise of

17 coordination and how we would see that unfolding.  Essentially,

18 the idea is that upon relief from the stay, we would prosecute

19 the actions either in the Chapter 15 court or in the BVI court.

20 And the authority for that process is very straightforward,

21 particularly, as it relates to an adversary proceeding before

22 the Chapter 15 court, which should be readily understandable by

23 the parties and Your Honor, just to walk through that.

24       Relief from the automatic stay is permitted by

25 Section 362 of the Bankruptcy Code.  This Court has authority

54

1  to coordinate and communicate with the other relevant courts

2  pursuant to Sections 105, 1517, and 1525 of the U.S. Bankruptcy

3  Code.  There is ample authority for cross-court communication

4  protocols in Chapter 11 cases, as well as Chapter 15 cases.

5  Those have been approved in our own Chapter 15 case before

6  Judge Glenn as it relates to other foreign courts abroad.

7  They've been approved in the LATAM Airlines Chapter 11 case and

8  a series of other cases that were cited in our motion.

9      We also cited a variety of other examples where

10 bankruptcy courts have employed bespoke procedures to address

11 various extraordinary and idiosyncratic situations.  One

12 particular example was a joint hearing that was held before two

13 different U.S. bankruptcy courts overseeing different

14 Chapter 11 cases but for the same debtor, where one case was

15 filed in 2016, that led to a plan, and later another Chapter 11

16 case was filed in 2020, that was Chaparral Energy.

17     So we don't think that the idea of judges having the

18 opportunity to communicate is an extraordinary matter as it

19 relates to the statutory authority.  We think the extraordinary

20 situation presented here justifies it.  In the context of an

21 adversary proceeding, should that be permitted to proceed as it

22 relates to our claims against both BlockFi and Genesis,

23 Bankruptcy Rule 7042 expressly permits the consolidation, and

24 that would be the basis for joint proceedings if relief from

25 the stay is granted.

1          To be clear, however, Your Honor, the decision on

2    consolidation is not necessary for you to decide today.  And if

3    relief from the stay is granted here and in the Genesis case,

4    whether and what extent to consolidate would be an issue for

5    the court presiding over that litigation.  In short, Your

6    Honor, this is the extraordinary situation in which relief from

7    the stay should be granted and which a practical solution

8    should be crafted to address a very complex situation.  We have

9    multiple dueling debtors litigating the same issues on the same

10   timeline in different courts.  With the prospect of

11   multiplication of costs for the one debtor that has the least

12   resources, that's Three Arrows, it creates a likelihood of

13   highly inefficient use of judicial resources and a risk of

14   inconsistent outcomes.

15         There is a statutory basis and a path under the rules

16   to permit consolidation of the BlockFi and Genesis litigation.

17   We filed the coordination motion as a way to tee up this Court

18   and the other relevant courts to have the opportunity to

19   communicate about what a process should look like and with an

20   opportunity for notice and all the parties to be heard on how

21   that communication should occur as well.  So we look forward to

22   Your Honor's direction.

23         THE COURT:  All right.  Thank you.  Let me have a

24   quick question.

25         MR. GOLDBERG:  Yes.

1          THE COURT:  It would seem that certainly insolvency

2     is the primary issue with respect to prosecuting a preference

3     action.  But even if there were a claim for a preference

4     recovery, whether or not that claim is subject to the safe

5     harbor defense or subordination, it still has to be resolved

6     either by this Court or by -- it has to be resolved outside of

7     the BVI, correct?

8          MR. GOLDBERG:  According to the testimony that we

9     have from our BVI law experts, yes.  The U.S. law issues of the

10    safe harbor defenses and the equitable subordination issues

11    would have to be addressed by a U.S. court.  That could be done

12    here or in the Chapter 15 court.  And we think, Your Honor,

13    there are advantages to having those issues determined by the

14    Chapter 15 court because the questions of the safe harbors, as

15    well as equitable subordination, will involve common issues of

16    law and fact.

17         As it relates to the safe harbors, I don't think

18    anyone's aware of a case in which the U.S. safe harbors have

19    been applied to cryptocurrency lending transactions and related

20    transfers.  Those are going to be complex and unprecedented

21    questions.  It likewise creates the prospect of inconsistent

22    outcomes to have two bankruptcy courts simultaneously

23    adjudicating those issues.

24         THE COURT:  Don't we have inconsistent rulings on

25    issues of law across every bankruptcy court on some of the most

1  significant issues as we stand?  That's a risk courts face and

2  parties face every day.

3          MR. GOLDBERG:  It is, Your Honor, but rarely, and it

4  shouldn't be, in the same bankruptcy case, which is the

5  bankruptcy case of Three Arrows.  The Three Arrows estate will

6  be facing inconsistent outcomes where it should be a debtor

7  entitled to have those issues that are common and central to

8  its own claims decided by one court and applied in a consistent

9  manner for its own estate.  And not only would it avoid

10  inconsistent outcomes, but having one judge decide those issues

11  would conserve judicial resources because only one judge would

12  have to take all of the briefing, consider those issues,

13  determine them, and adjudicate the common issues of fact and

14  law that       MR. NI: across those issues.

15          THE COURT:  Of course, another court could just find

16  persuasive the reasoning of one court and there won't be

17  inconsistency.

18          MR. GOLDBERG:  That's certainly possible, Your Honor.

19          THE COURT:  I mean, that happens as well.

20          All right.  I appreciate the argument.  Thank you.

21          MR. GOLDBERG:  Thank you, Your Honor.

22          THE COURT:  Mr. Kanowitz.

23          MR. KANOWITZ:  Yes, Your Honor.  Thank you.

24          I'm not going to regurgitate our briefs.  I know

25  you've read them.  I know you've looked at the issues and the

1    cases carefully, but I just want to put it in a framework of

2    discussion, really, because we're problem solvers, right.

3    We're fiduciaries.  We have to get going to get a distribution

4    to the Committee who has tirelessly fought for distributions to

5    be made sooner rather than later.

6          So, some big picture issues, right.  Coming out of

7    the September 20th hearing, I really thought we were going to

8    get on with it.  We adjourned the motion for estimation as well

9    as the motion for claim objection from a hearing that date to

10   this date so that we could coordinate on moving forward in this

11   Court.  And then what happened?  Well, we got a lift stay

12   motion and then we got a coordination motion.

13         And, look, I get that Three Arrows is trying to

14   protect their estate but they're doing it, from our

15   perspective, the wrong way.  And the reason they're doing it

16   the wrong way is because they first allege that you have

17   Celsius, then you have FTX, and then you have Genesis, and you

18   have BlockFi, and now most of those have gone away, right.  You

19   just heard it.

20         FTX issues that may be common aren't going to get

21   even teed up until February 24, and Mr. Parker made it clear

22   that if you go to the BVI, you're not getting a preference

23   determination until 2025.  So how do you move these things

24   forward?  Well, you move these things forward by filing a claim

25   here because you're seeking a distribution here.  But let's be

1  very clear.  FTX went away.  They reduced billions of dollars

2  of claims against us to zero, and they're going to use it

3  defensively.

4        Three Arrows could do the same here, Your Honor.

5  They just won't.  What they want is to prosecute claims against

6  us that should be heard in this Court, in another court.  That

7  is extraordinary.  That is unheard of.  Really what they want,

8  Your Honor, even though there's a lot of paper out there,

9  really what they want is something simple.  They want you to

10 not resolve their claims against this estate in this Court.

11       They want you to read out, strike out, or abstain,

12 however you think about it, the key language in Section 502 of

13 the Bankruptcy Code which says, "The court shall determine the

14 amount of such claim which is objected to and shall allow."

15 They want to read out under 502(c) the estimation.

16       Again, there shall be estimated for purposes of

17 allowance under Section 1, any contingent or unliquidated

18 claim.  They want to take that away, Your Honor.  They want to

19 take away your core *in rem* jurisdiction and basically have you

20 say, go fight somewhere else.  We'll see what happens years

21 from now, months from now, under whatever protocol some other

22 judge decides, and then come back here and then we'll have

23 further litigation.  That just doesn't work, Your Honor.

24       The bottom line is, and these fiduciaries, and they

25 are fiduciaries, remember, there's no company here.  Their

1  executives are in jail or may be in jail.  They've been chasing

2  them and they've spent upwards of $16.5 million already and

3  they can't answer under oath what expected distributions are

4  for unsecured creditors.  We have $140 million claim against

5  Three Arrows, Your Honor.  And if we have a $273 million

6  preference clawback, that means we're close to a half a billion

7  dollars.  How much legal fees are they going to go through to

8  get to that number?  How much are they going to pay us once we

9  have an allowed claim?  None of that is discussed here, Your

10 Honor.  But Mr. Parker's declaration goes into all of that, how

11 difficult it's going to be for us to get into the BVI court.

12 And so we do not think that going to BVI makes any sense,

13 putting aside the jurisdiction issues.

14        Now, does it make sense to go into Chapter 15 court?

15 I don't believe so either, Your Honor.  This is in your *in rem*

16 jurisdiction.  If they want a distribution from this Court,

17 they should proceed here under the federal rules as well as the

18 Bankruptcy Code.  They talk about insolvency, insolvency,

19 insolvency.  I thought Your Honor was going to go down a path,

20 and, again, I'm not suggesting this, but it's a way of thinking

21 about it.

22        Why do we have to talk about insolvency in a

23 preference?  In a Chapter 7, you get a presumption that can or

24 cannot be challenged.  And I'm not saying we're going to give

25 them that presumption.  But couldn't Your Honor determine on a

1  facts and circumstances basis what our defenses are first

2  without even talking about insolvency?  Has nothing to do with

3  Genesis.  We had specific loan agreements with margin calls.

4  Factually completely opposite of what Genesis is doing.  Okay.

5       We don't even know what Genesis was doing.  We don't

6  care what Genesis was doing.  We care about the facts and

7  circumstances of what BlockFi and Three Arrows was doing.

8  That's what Your Honor should focus on.  So, this insolvency

9  point is really a red herring and could be dealt with in a

10  timing situation.

11       Your Honor could find, through estimation, for

12  example, that their claim is rough X and we have a settle for Y

13  and cap that claim.  Estimation allows us to move forward with

14  distributions to unsecured creditors immediately.  The standard

15  for estimation is completely different than the standard for an

16  objection to claim, which is really a trial on the merits that

17  has legal and factual issues.

18       So what we want to do is we want to get to estimation

19  as soon as possible.  Three Arrows really doesn't want that.

20  They put up roadblocks.  What have they done?  They suggested

21  that we must prove under 502(c) there is going to be undue

22  delay.  So we said in our schedule, and Ms. Furness will get to

23  it, assuming Your Honor wants to go that route, why we

24  bifurcated the issues.

25       We bifurcated it for them so that they could have

1    their day in Court so that we could show through Mr. Meghji,

2    who is going to be the wind down plan administrator, or some

3    other witness, why a contingent or liquidated preference claim,

4    or now that I heard for the first time, a lien challenge to

5    everything that went on pre-bankruptcy, where we recovered $800

6    million of collateral and are still owed 140.  Okay.  Why we

7    need to resolve the Three Arrows claim.  Three Arrows right now

8    is the biggest unsecured claim in this estate now that FTX has

9    gone away and is the biggest impediment for making an interim

10   distribution or a final distribution to creditors quickly, not

11   later.

12          So if you go down the path of estimation, we are

13   going to have a capped number for a reserve and we could move

14   on.  We could then deal with the claim objection process that

15   deals with all of these other issues at another time.  Now,

16   Three Arrows doesn't like what we propose and they say, well,

17   we're ready to go forward in December.  Your Honor, they're not

18   ready to go forward in December.  We think they have two

19   document demands out to us that we've been writing love letters

20   back and forth about the types of discovery and what's

21   outstanding and what's needed.

22          They refuse to produce any documents on an expedited

23   basis, and in fact, are waiting until October 25th to produce

24   documents to us, and I'm sure we'll have some skirmishes along

25   the way about what gets produced and what doesn't get produced.

1   Then we need fact depositions, and then we need expert

2   witnesses and then reports.  So what we propose, Your Honor, is

3   that you tee up the estimation motion first in a legal fashion

4   to satisfy them, to show them that under 502(c), estimation is

5   appropriate.  And then we go to a trial.  Okay. And the trial

6   should be a merits trial on every issue that anybody wants to

7   have, and it should be in this Court.  And what we proposed was

8   first an estimation trial, and then later on in February, an

9   objection trial.  They oppose that.

10          They think that in the estimation trial, they're

11  going to throw in the kitchen sink.  Fine.  Why don't we just

12  do one merits trial where Your Honor determines findings of

13  fact and conclusions of law in January after all the discovery

14  is done and therefore, you use that determination, that ruling,

15  after hearing all of the evidence, as to estimation as well as

16  claim objection.  It gets us expeditiously to the place we need

17  to go.  They subjected themselves to this Court's jurisdiction.

18  They're asking you to wave a wand and act like there's no

19  bankruptcy case or there's no harm here.

20          So that's why there's no cause to lift the stay.

21  Because we're prejudiced at every turn.  We either have a more

22  expensive, time consuming, never ending quagmire of litigation

23  in some other court, whether it be BVI or Chapter 15, we're

24  joined with other defendants who have nothing to do with us.

25  We have no concern whatsoever what the relationship was between

1  Genesis or Three Arrows because it doesn't concern us.  They're

2  not tri-party agreements.  They're direct one on one.  So why

3  are we getting involved in the minutia of their problems?  We

4  have our own.

5        And so my view is there's no cause to lift the stay.

6  It's highly prejudicial.  It's costly.  They haven't cited one

7  case to say to Your Honor, give up your *in rem* jurisdiction on

8  the most fundamental thing.  The most fundamental thing of

9  bankruptcy is the compromise of claims so creditors could get

10  the residual value of this estate.  And what they want to do is

11  hijack it and tie it up.

12        As to coordination, Your Honor is free to go caucus

13  with other judges about what's the best way of handling these

14  complicated issues.  But there's not one case that they cite,

15  not one federal rule that they cite that authorizes this grand

16  scheme or complex way of handling things.  Again, we started

17  out, it was an urgency.  The sky is falling.  We've got five

18  debtors.  You turn around, they want to join us with a Southern

19  District of New York case.

20        And Your Honor hit it right on the head.  You can

21  make rulings, the Southern District of New York can make

22  rulings.  They could be, persuasive, but they're not binding,

23  right.  This is in the Third Circuit last time I checked.

24  They're in the Second Circuit.  Courts all the time come to

25  different decisions based on fact patterns that are similar.

1        And, again, I go back to the bottom line.  This is of

2    their own making.  They're a plaintiff and they want to pursue

3    recovery and damages.  They've got to file their claims here to

4    get a recovery here.  They've got to file claims against

5    Genesis to get a Genesis recovery.  They've got to file claims

6    against FTX to get an FTX recovery.  That's what the federal

7    rules and the Bankruptcy Code provide.  And if they don't want

8    a distribution, then none of the parade of horribles that

9    they're talking about will happen to them.  Or they can pick

10    and choose which is a better case to go after.

11        These types of litigation decisions, as Your Honor

12    knows, are decided all the time by plaintiffs.  What we have,

13    unfortunately, is a runaway professional.  They have spent

14    $16.5 million to date, Judge.  Okay.  And they're going to

15    spend millions more doing the things.  And if BlockFi is a half

16    a billion dollar creditor ultimately, because we do get tagged,

17    we're going to want some answers as to what they're doing and

18    what the strategy is behind it.

19        So I come back.  There's a path forward.  Should the

20    parties be talking about resolution?  Absolutely.  Olive branch

21    is always there.  But to come to this Court, seek stay relief

22    with no basis, we ask you to deny it with prejudice.  To ask

23    for coordination that is vague, there's no rules.  There's no

24    understanding of how it's going to proceed, and ask us to be

25    locked down for months, if not years, in somebody else's

1   proceeding.  Just not appropriate given we are poised now with

2   a confirmed plan to move and make distributions to unsecured

3   creditors sooner rather than later.  What they ask is for us to

4   wait until they get ready to prosecute claims against us.

5          So that, Your Honor, is my argument on lift stay as

6   well as coordination.  And obviously, Your Honor, the evidence

7   that they put forward and the cross-examination show the

8   problems that we have with what they're suggesting, both as a

9   lift stay motion, as well as a coordination motion.

10          So, unless you have questions --

11          THE COURT:  Mr. Kanowitz, let me just ask.  So, the

12   basis for the BlockFi debtor to seek, through its motion

13   estimation, is for the most part to allow distributions?

14          MR. KANOWITZ:  Absolutely, because there is a huge

15   difference under the standards as well as even, and we're

16   thinking they're going to appeal.  Like, we know they're going

17   to appeal.  Whatever Your Honor rules, they're going to appeal.

18          But the standards on estimation, really, it's a

19   summary proceeding.  Your Honor could canvass the issues.  You

20   don't need full briefing.  People want to give full, you want

21   full briefing.  You could do basically whatever you'd like,

22   provided you see a contingent unliquidated claim that causes

23   undue delay in distribution.

24          And so that is completely different than the type of

25   trial on the merits of a claim objection with defenses thereto,

1  some of which are their burden under BVI law and some of which,

2  obviously, we will raise as defenses, whether its 546(e),

3  502(d), 502(h).

4      THE COURT:  But another way of looking at estimation

5  is also essentially a hearing to fix a proper reserve, if

6  anything, correct?

7      MR. KANOWITZ:  It's only for distribution purposes.

8  So, again, for example, Your Honor, and again, I'm just

9  throwing it out there.  It's not binding.  I'm not suggesting.

10 Your Honor can say, look, 283 is your top number.  They have

11 140 million.  I don't think you're going to win on preference

12 and the loan documents say what they say.  I'm going to reserve

13 it for a $100 million dollars.  Now, go litigate to get that

14 100 million.

15     You could do that because it's within your discretion

16 to do it.  That is far different than us litigating to the

17 death that they have zero claim, because they don't have the

18 ability to tag us on a preference.  And this is key, Judge, and

19 it's slippery.  They want to challenge liens, okay, on our

20 foreclosure.  They're going to bring other claims, okay.

21 Whatever they filed in their amended proof of claim, we believe

22 is inappropriate.

23     They didn't seek relief from Your Honor.  The initial

24 estimation and claim objection was their original claims filed.

25 They just filed a reply and put new claims in.  So we have that

1  burden to deal with, and we will, but I assume Your Honor may

2  let them amend their claim and get on with it as opposed to the

3  procedural types of things that they just took for granted, and

4  just file claims and now stand up to Your Honor and say, oh, my

5  amended claims support lifting the stay.

6          No, your amended claims were actually in violation of

7  the Bankruptcy Code and our order.  But putting that aside,

8  okay, the answer is, estimation is for a specific purpose that

9  allows us to make distributions to creditors because we box in,

10 box in, our downside risk to Three Arrows.  That's why we want

11 estimation.  You can't estimate a lien challenge.  You can

12 estimate the preference.

13         As to the lien challenge, if they're really asserting

14 it, that goes directly to Your Honor's *in rem* jurisdiction.

15 You said it before with the emergent Robin Hood pledge.  Your

16 Honor has core determination over what is property of the

17 estate, including collateral that served as the underlying loan

18 that we recovered over $800 million before they slipped into

19 bankruptcy.

20         So, I'm a little wary of you just lifting the stay or

21 agreeing to coordination, and the next thing you know, we have

22 a ton of other claims now filed against us because Your Honor

23 allowed it.  If they want -- again, I'll hearken, I'll just

24 keep chirping -- if they want a distribution, they have to

25 abide by the Bankruptcy Code.  They have to abide by the

1   Bankruptcy Rules.  And only if Your Honor wants to abstain or

2   not enforce 502 and the jurisdiction granted to you by

3   Congress, we'll deal with that if Your Honor makes that ruling.

4              THE COURT:  All right.  Thank you.

5              Before you respond, I'll let you respond to anybody

6   else who wants to weigh in for the Committee.

7              MR. WINOGRAD:  Yes, Your Honor.

8              Were you going to say something else, Your Honor?

9              THE COURT:  No.  I was going to see who wants to be

10  heard.  I have a couple of hands up remotely as well.

11             MR. WINOGRAD:  Your Honor, Michael Winograd from

12  Brown Rudnick on behalf of the UCC.

13             Your Honor, I won't repeat the arguments that

14  Mr. Kanowitz made.  I know how slippery that slope can be.

15             The creditors here want their money back.  They want

16  it without any undue delay.  This idea of some open ended

17  concept that maybe we'll figure it out as we go in terms of

18  coordination, and by the way, we just dropped two out of the

19  four parties that were supposed to be part of that

20  coordination, is just going to delay and won't achieve anything

21  now.  I'll talk about that in a moment.

22             And the bifurcation of a single issue.  This is a

23  single issue in a case.  And only a part, a single claim in a

24  case, and only a single issue within that claim, as Your Honor

25  actually pointed out previously, is what they're asking to

1  bifurcate.  None of that is going to be more efficient, it's

2  just going to cause delay.

3          3AC Liquidators, Your Honor, want one court to decide

4  what they claim is the same issue.  When was 3AC insolvent?

5  It's not really the same.  There are different transactions.

6  You'll have to look at each transaction date.  So their whole

7  premise is flawed to begin with.  And again, it's again, not

8  the only issue even with respect to the preference claim.

9          And coincidentally, the liquidators want that one

10 court to be one of their courts.  They suggest not, hey, let's

11 figure out amongst all of us which court should do this.  They

12 coincidentally say it should either be the BVI court or our

13 Chapter 15 court.  They make two arguments, Your Honor.  The

14 first is efficiency.  And the second is consistency.  Neither

15 of them hold water here.

16         And before I get to that, I want to state again,

17 which I think is dispositive here.  Even if you were to accept

18 there were any efficiency, and I think it's the exact opposite,

19 the fact that they've now, on the eve of this argument, dropped

20 two out of the four debtors that were part of this alleged

21 scheme to coordinate defeats the entire purpose of the motion.

22 I don't see how that is in and of itself not dispositive here

23 without even getting to anything else.

24         I do want to talk about efficiency and consistency.

25 And just a few points on efficiency, Your Honor.  What they are

1  asking for is effectively, and they actually mention this in

2  their brief, a partial MDL.  They call it an MDL, or at least

3  they cite to the MDL statute.  They concede it doesn't apply

4  here.  Talk about that in a moment.  But this again is a

5  partial MDL for one court to review a narrow issue that is one

6  part of one claim in bigger cases.

7          The remainder of that claim, the remainder of the

8  other claims, will continue on in the other courts at whatever

9  pace they continue on in.  That is not efficient, Your Honor.

10         With respect to discovery and briefing, again, it's

11 not exactly the same discovery, so the premise is sort of

12 flawed.  But in any event, the discovery and briefing is the

13 same either way.

14         Each debtor will have the opportunity to serve

15 requests for production and take depositions, whether in one

16 court or multiple courts.  Each debtor will have the

17 opportunity to file its briefs, whether in one court or

18 multiple courts.  There's simply no logic to what the other

19 side is asking for.  A stay or coordination does not solve any

20 of this.  And by the way, all it really does is raise practical

21 questions of if you are going to make discovery more efficient,

22 is there going to be a lead debtor?

23         They reference the MDL.  I've had experience in MDLs,

24 quite a bit of it.  The MDL achieves efficiency because there

25 is an MDL panel that selects which court is going to do that.

1    I don't know if they're going to create their own MDL panel for

2    this to decide which court should hear this.  And within each

3    case, and by the way, it's not issues or claims in a case, it

4    is the entire case that goes to MDL courts.  Within there, you

5    have lead plaintiffs, lead counsel, handling things to try and

6    create efficiency.  There's no process, there's no precedent

7    for any of that.

8            With respect, Your Honor, and again, I will say it

9    again for maybe the third time, none of this is applicable

10   given we're only at two out of the four debtors at this point.

11   With respect to consistency, Your Honor, I'll just take a brief

12   moment on that.

13           This Court is obviously capable of ruling on this

14   issue.  It is not necessarily the same legal issues so you

15   won't necessarily have inconsistent rulings, even if courts

16   look differently.  But either way, as Your Honor said, and I

17   was going to point out as well, the same legal issue is decided

18   in multiple courts all of the time.  And in fact, 3AC

19   Liquidators admit that in their own papers.  In fact, they

20   criticize BlockFi saying BlockFi created a situation where they

21   will necessarily be litigating preference claims simultaneously

22   in multiple forums.

23           Well, apparently it's fine when the shoe's on the

24   other foot.  But the reality is, when litigants file claims in

25   multiple courts, sometimes by choice sometimes by necessity,

1   they are forced to litigate those in multiple fora and you run

2   the risk of inconsistent rulings.  And that is not to say, as

3   Mr. Kanowitz pointed out, that the Court can't reach out and

4   coordinate if it so desires or the subsequent courts can't look

5   at the initial decisions and decide whether they agree or not

6   with those.

7          The last point I want to make, Your Honor, moving

8   from the lack of efficiency and the lack of concerns or risk of

9   inconsistency, what the liquidators are asking for is simply

10  not within the rules.  They have not provided a single case

11  where any court orders what they are asking for, not a single

12  case.  They provide cases on general powers and talk about

13  that.  Nothing is applicable or even analogous to what's going

14  on here.  They cite the MDL statute, but again, they concede

15  that doesn't apply and we talked about how none of that really

16  transfers here.

17         This is just, Your Honor, a pie in the sky fantasy.

18  It's not efficient.  It's not sensible.  And it's actually not

19  practical.  There's no basis to award this extraordinary

20  relief, Your Honor, and we would request that the motions be

21  denied.

22         THE COURT:  Thank you, Mr. Winograd.

23         Let me turn, I see hands raised remotely.  I don't

24  know if they're arguing in support of or in opposition to the

25  relief.  We'll find out.

1         Mr. Barefoot.

2         MR. BAREFOOT:  Good morning, Your Honor.  Luke

3    Barefoot for the Genesis debtors from Cleary Gottlieb.

4         Your Honor, I won't repeat the arguments that have

5    been made by the Committee and the debtors, and I'll be very

6    brief and just want to make two points.  The first is why the

7    Genesis debtors are before Your Honor today.  And that's

8    because we did not want silence before Your Honor to somehow be

9    misconstrued to leave the impression that the Genesis debtors

10   were consenting to the parallel lift stay or coordination

11   relief, such that it was really this Court's determination

12   alone that would either achieve or not achieve the coordinated

13   result that the Three Arrows Liquidators are touting.  That is

14   certainly not the case.

15        The Genesis debtors have fully briefed their

16   opposition to the parallel lift stay motion and intend to

17   vigorously oppose the coordination motion for all the reasons

18   that you've heard today that were in the brief that we filed

19   yesterday with Your Honor.  And all of that will be heard by

20   Judge Lane on October 24th in the Southern District.

21        Second, Your Honor, the second point I wanted to make

22   is the reason that's important is because unless each and every

23   court orders this relief, this stated goal that a centralized

24   determination that the liquidators say it's animating this

25   entire exercise will not be achieved.  And on that point, as

1  you've heard, the revised proposed order now excludes the FTX

2  debtors and the Celsius debtors against whom, with respect to

3  FTX, against whom Three Arrows has asserted parallel preference

4  claims that will require determinations of solvency and all of

5  the other issues that you've heard.  The decision on their part

6  not to pursue coordination relief as to FTX is effectively a

7  concession that the stated goal of the coordination motion will

8  not be achieved.

9        Your Honor, unless you have any questions, that was

10 the reason that we wanted to appear before you today to make

11 clear the Genesis debtors opposition and unless Your Honor has

12 any questions, we reserve all of our rights.

13        THE COURT:  No.  Thank you.  Thank you for appearing.

14        MR. BAREFOOT:  Thank you, Your Honor.

15        THE COURT:  Mr. Latona.

16        MR. LATONA:  Good morning, Your Honor.  Dan Latona of

17 Kirkland and Ellis on behalf of Celsius Network Limited and

18 affiliated debtors.

19        Your Honor, Celsius submitted a very limited

20 reservation of rights to your chambers this morning.  As has

21 been mentioned, the Celsius debtors are mentioned in the motion

22 and included in the definition of debtor defendants, but the

23 motion does not seek relief with respect to the Celsius

24 debtors.

25        Three Arrows also filed a motion in our cases and

1  we're reserving all rights.  Our objection deadline is

2  October 17th.  The reason for our limited appearance today is

3  simply to reserve all rights that, to the extent the motion is

4  granted that Celsius reserves all rights to intervene and/or

5  object to any relief sought, including coordination of the

6  Celsius debtors, either in the BVI proceedings or the

7  Chapter 15 proceedings.

8          That's really all we wanted to say, Your Honor, on

9  the record.  Happy to answer any questions.  Otherwise, we'll

10 cede the virtual lectern.

11         THE COURT:  Thank you very much.

12         Mr. Gluck.

13         MR. GLUCK:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. GLUCK:  And I will also be brief.  Warren Gluck

16 of Holland and Knight.  We are both co-counsel and, under

17 certain circumstances, conflicts counsel to the joint official

18 liquidators of Three Arrows.  The circumstance of Celsius is

19 one of those conflicts items, and therefore, it is our firm

20 that has filed the petition for relief, the motion for relief

21 in the Celsius matter, and it is incumbent upon us to speak

22 regarding Celsius today.

23         I want to simply note our support of the motion

24 because first and foremost, the core and crux of it, the date

25 of solvency under circumstances of a crash in the crypto market

1    is a complex issue.  And it's a complex issue that if our

2    motion for relief in the Celsius matter is granted, will be at

3    least determined in the BVI Court.  I'm in a very luxurious

4    position.  We don't have a lot of the interplay and water under

5    the bridge that exists both in this case and in other cases.

6         In the Celsius matter, I did want to make clear why

7    that matter has been removed from the order and the relief

8    we've sought.  It's a lucky situation.  What we realized in

9    Celsius, and this does go towards efficiency and making good

10   distributions, is that the numbers in relation to the

11   preference claim and Celsius' primary claim in our estate line

12   up almost exactly.  And in BVI there is a set off right, which

13   is the basis of the relief sought in Celsius matter.

14        All that is being requested before Judge Glenn who is

15   coincidentally both the Celsius Chapter 11 judge and the Three

16   Arrows Chapter 15 judge is to release from stay much like here,

17   which is why we do urge coordination, but solely for the

18   purposes of allowing what is going to, what should happen

19   anyway, which is the standard set-off process in the BVI and

20   which this Bankruptcy Code recognizes, in fact, the plan that

21   Celsius supports.  So it is a narrow issue, but I raised my

22   hand toward the sentiment that the withdrawal of Celsius is

23   somehow a concession regarding efficiency.  In fact,

24   coordination is requested.  At least coordination is requested.

25        And as to the issue of stay, there are certain

1  overlaps.  But in terms of efficiency, it is only because of

2  the fortuitous circumstance that this is kind of all handleable

3  within the set off process of the BVI that the Celsius plan

4  envisages anyway that this was removed.  And so I did not think

5  it was appropriate or fair for the withdrawal of the Celsius

6  component of this application to color against its granting as

7  opposed to at minimum being a neutral.

8         But in fact the emphasis here is that it was

9  encouraging to hear counsel in this case talk about

10 presumptions and insolvencies, and we certainly hope those

11 exist one day.  But from the perspective of a debtor faced with

12 an important threshold question under BVI law that, as far as

13 we know, doesn't contain the same sort of conditions.  These

14 are big deal issues, and the numbers are enormous.

15        The sorts of overlap costs, at least from going

16 anywhere other than the BVI, are enormous.  There have been

17 comments, which I would obviously dispute, but comments about

18 the spend-to-date and likely output to the creditors.  This is

19 the sort of thing that will -- a failure rather to coordinate,

20 have these complex issues of data insolvency determined once

21 under circumstances of a market crash, are precisely the sort

22 of thing that would run up costs as opposed to avoid it.  And

23 that is the position of (indiscernible) in respect of our role

24 in the Celsius matter.

25        If the Court has any questions, (indiscernible).

1                THE COURT:  All right.  Thank you.

2                So, in essence, the joint liquidators and Celsius

3    reached an accord similar to the manner in which BlockFi

4    reached an accord with FTX in agreeing to address issues in a

5    particular forum and undertake a netting, or at least reserving

6    their rights, but limiting the issues.  Is that a fair --

7                MR. GLUCK:  I didn't mean to suggest an accord.  I

8    just meant to suggest that the totality of the relief sought

9    was, and is, a setoff that we believe and submit is in accord

10   with both the U.S. Bankruptcy Code and the plan.

11               THE COURT:  Okay.  All right.  Thank you, counsel.

12               Mr. Latona, one quick, and then I'll go back to JL

13   counsel.

14               MR. LATONA:  Yes, briefly, Your Honor.  Dan Latona of

15   Kirkland and Ellis for Celsius Network.

16               Just to address Mr. Gluck, that motion is still set

17   for hearing on October 24th.  Our objection deadline is

18   October 17th.  So, just want to make the record clear that we

19   have not reached an agreement with the joint liquidators.

20   That's all.

21               THE COURT:  All right.  Fair enough.

22               Counsel for the JL, replies.

23               MR. GOLDBERG:  Thank you, Your Honor.  For the

24   record, Adam Goldberg of Latham Watkins.

25               I'd like to begin, somewhat regretfully so, by simply

1   saying that Mr. Kanowitz's remarks about the legal fees

2   incurred by, and the professional fees incurred by the Three

3   Arrows estate are completely inappropriate and reckless.  They

4   completely ignore the amount of work that has gone into an

5   extremely challenged liquidation.

6           The Three Arrows liquidation was thrust upon

7   liquidators on a variety of bases in June 2022.  That process

8   has been going on for a very long time, far longer than these

9   Chapter 11 cases.  It was thrust upon the liquidators in a

10  situation where the founders fled and completely ignored any

11  attempt to engage with them, obtain information about the

12  estate.  The estate comprised digital assets, which are highly

13  movable, extremely difficult to track down.

14          There was an extensive effort they had to undergo to

15  find those assets, secure them, ensure that they are protected

16  for the benefit of creditors, and then go about reconstructing

17  all of the books and records of Three Arrows because there were

18  none.

19          So it is completely reckless and irresponsible to

20  suggest that somehow the amount of fees that Mr. Kanowitz's

21  referenced was related to this case.  There's an incredible

22  amount of work going on in the Three Arrows bankruptcy case.

23  And I must say that, if it's any relative matter, I can assure

24  Your Honor that, although I don't think we've seen the final

25  fee applications yet in this case, the fees of the liquidation

1   process in the BVI case are a fraction of what the fees are for

2   this Chapter 11 process.  And I don't mean to criticize

3   anyone's fees.  But it is completely reckless and irresponsible

4   to criticize those of the liquidators.

5           I'd like to address a couple other points as well.

6           First, the suggestion that somehow we're asking to

7   take away this court's jurisdiction under Section 502.  Mr.

8   Kanowitz did not cite any case that supports that reasoning.

9           Section 362 of the Bankruptcy Code expressly

10  authorizes this court to grant relief from the stay to

11  liquidate a claim, which is what we're seeking to do.  Mr.

12  Kanowitz still has not, and nor has any other party, provided

13  any case in which a preference claim by one bankruptcy estate

14  has not been litigated before the Court of that bankruptcy

15  estate, especially in the context of a foreign bankruptcy case

16  and claims arising under foreign law.

17          I'd also like to address the point that somehow

18  dropping FTX and Celsius from the request for coordination

19  somehow defeats the purpose.

20          Well, on this issue, Your Honor, we're damned if we

21  do and damned if we don't.  If we had them in the motion, we'd

22  be hearing, and we did hear, that the request that we're making

23  is so complex and impossible to administer that it can never be

24  granted.

25          Now that they're out of it, we're hearing that, oh,

1  because those parties aren't included, well, there's no point

2  to coordination.

3       Well, there remains a really good point to this

4  coordination, Your Honor.  We're trying to find the right

5  practical solution balancing the equities and the co-equal

6  rights of these bankruptcy estates in an efficient

7  adjudication.  And just because we have proposed one good

8  solution, the idea of a theoretically perfect solution

9  shouldn't be the enemy of what is a better solution than the

10 current situation of having multiple trials addressing very

11 similar and the same issues in multiple different courts.

12      I'd also like to make clear we are not seeking an

13 MDL.  We mentioned that in our papers simply as an analogy of

14 other circumstances where matters can be coordinated.

15      All we're seeking today, Your Honor, is relief from

16 the automatic stay, although we're actually asking you not to

17 rule on that issue today.  What we're asking for is for this

18 court to have communication and coordination with other courts.

19 And I believe Mr. Kanowitz admitted in his remarks that that is

20 something Your Honor is entitled to do.

21      And I'd like to say there is ample authority that we

22 explained in our papers and that I explained before Your Honor

23 before Mr. Kanowitz and the Committee spoke that the debtors

24 and the Committee simply refuse to recognize and prefer to

25 ignore.

1        There are many precedents for bankruptcy courts in

2   Chapter 11 cases, as well as Chapter 15 cases, to communicate

3   with other Chapter 11 courts, to communicate between Chapter

4   15, Chapter 11, and foreign courts.

5        And yes, we are ultimately seeking consolidation of

6   preference claims, but that is not what's before Your Honor.

7   And contrary to the remarks of the debtors and the Committee,

8   something that they prefer to ignore, there are precedents for

9   that approach that we cited in our papers.  That's at paragraph

10  28 of our motion at Docket No. 1623.

11       We cited the <u>Enron</u> case as an example, of which 32

12  separate preference actions were consolidated for the purposes

13  of determining insolvency.

14       So, yes, there are ample precedents.

15       THE COURT:  But they were within one cases.

16       MR. GOLDBERG:  They were within one case, just as the

17  preference claims of Three Arrows are within one case and could

18  be put before the Chapter 15 case and litigated on a

19  consolidated basis there.

20       You know, I would also make one other point.  Mr.

21  Kanowitz remarked about the claim asserted for $140 million.

22  They've not filed that claim in the BVI.  They filed what they

23  described as a placeholder claim for one dollar.  So, you know,

24  we invite them to bring their claims, and they can be

25  adjudicated in the BVI as well.

1          I'd also like to just seek some guidance from Your

2    Honor.  Mr. Kanowitz's remarks strayed from time to time into

3    the issues of estimation and the status conference that we had

4    on those matters.  I have some argument to make on those issues

5    as well, but I'm not sure if this is the right time or if we

6    are moving on to that now.

7          THE COURT:  No, I think it would be appropriate.  Let

8    me hear -- I'm addressing all of these collectively.

9          MR. GOLDBERG:  Yes, it definitely seems to be one --

10         THE COURT:  So please let me hear your comments.

11         MR. GOLDBERG:  -- issue.  There are several remarks

12   that Mr. Kanowitz has made.  Essentially he said that they're

13   looking to make distributions sooner rather than later, but we

14   don't know when that will be.

15         And that, I think, is really fatal to the schedule

16   that they're looking for on estimation, because it is the

17   debtor's burden to show undue delay in distributions as a basis

18   for the highly prejudicial relief that they're seeking.

19         Mr. Kanowitz made clear what they're seeking is some

20   kind of summary proceeding that does not involve the Federal

21   Rules of Evidence, that addresses some of the largest assets

22   that our bankruptcy estate has, and they're seeking to box in

23   an amount so that we are essentially, for all practical and

24   equitable purposes, limited in the upward amount of our

25   recovery before a full and fair hearing on those issues and

1 after all of the discovery and evidence can be submitted to

2 Your Honor.

3           That is an extremely prejudicial outcome.  It is not

4 simply available to all debtors in bankruptcy.  They have to

5 show undue delay.

6           And so not only are they seeking -- you know, Mr.

7 Kanowitz said I think $100 million was an example of a number

8 Your Honor could pick, and that would somehow just cap our

9 distributions without all of the evidence.

10          But to be clear, they're seeking to estimate our

11 claims at zero on -- through a summary proceeding without all

12 of the evidence yet.  And we think they've made a number of

13 admissions in their process that is fatal to that request.

14          We don't see how they can meet that burden, because

15 really we have the ongoing claim litigation, which whether

16 that's determined by this court or another court in December,

17 January, or February, it's actually a pretty narrow bandwidth

18 in which those issues could be decided.  And, you know, that

19 does not create an undue delay.

20          What we need to know is when will distributions be

21 made?  In the debtor's motion, they said declining to estimate

22 could materially delay distributions to creditors.  The key

23 there is could, not will, not has.  And that's in paragraph 26

24 of their motion at Docket 1346.  They don't cite any facts or

25 admissible evidence to support such a contention.

1        The debtors also make clear that they are going to

2 change the declarant in favor of their estimation motion to Mr.

3 Meghji.  We haven't yet seen that declaration.  We should have

4 the opportunity to test it.

5        We've not yet seen a single piece of evidence to

6 support any of the debtors' statements regarding undue delay.

7 They don't specify when will they start distributing if

8 estimation is allowed, when will they start distributing if

9 estimation is not allowed, how liquid the estate will be when

10 they do start distributing, how quickly could they distribute

11 the assets of the estate, what type of the reserves are they

12 planning for in the absence of a reserve for Three Arrows, or

13 what portion of a reserve would Three Arrows' claims constitute

14 if they were fully reserved.

15        The limited information that we've seen from Mr.

16 Renzi's declaration on file doesn't address any of these

17 issues.  It simply looks at the time line for confirmation.

18 And as I understand it, that's no longer going to be relevant.

19        More critically, there cannot possibly be undue delay

20 here when BlockFi has proposed a trial on our claims objection

21 going forward on February 5th.

22        We'll get to the details fo the scheduling with Your

23 Honor, but that admission really is fatal to undue delay.

24 We're talking about the difference in one or two months.  And

25 there is no basis to suggest that any of that delay is undue,

1 nor has the debtor presented any case to suggest that that

2 amount of delay is undue delay.

3       So I think, in other words, really what we're talking

4 about is that estimation would occur about a month before a

5 merits determination in the debtor's proposed schedule.  There

6 is simply no evidence to support that.

7       And pardon me.  Obviously, Your Honor, I've covered a

8 lot of ground.  I just want to make sure I've gotten the

9 points.

10       And I'd like to also make the point that as we sit

11 here today, the landscape -- or stand here for myself, the

12 landscape is very different than when the debtors filed the

13 motion.

14       They complain that our claims were not specific

15 enough, but since the motion was filed, we've gotten the

16 discovery, some of the discovery, and we're seeking more.

17 That's allowed us to express our claims, as we did on September

18 13th.

19       But we've not yet seen any substantive response from

20 the debtors.  They actually said in their own papers that

21 they've been too busy to fully review our claims and respond to

22 them.  That's at Docket No. 1688, paragraph 7.

23       If they're too busy to spend time on reviewing the

24 substance of our claim, that really undermines any suggestion

25 that dealing with our claims is somehow causing undue delay to

1 this process because they are not dedicating the resources

2 necessary to address it.

3 So essentially, Your Honor, just to finalize, based

4 on this deeply murky situation as it relates to estimation, if

5 there is going to be any estimation, there should be first a

6 hearing after the debtors file a declaration in support of why

7 estimation is necessary.

8 There should be first a hearing on whether estimation

9 is appropriate after we've had the opportunity to depose their

10 proposed declarant and then determine whether estimation should

11 go forward and, if so, through what procedures.

12 THE COURT:  All right.  Thank you.

13 MR. GOLDBERG:  Thank you, Your Honor.

14 THE COURT:  Mr. Kanowitz.

15 MR. KANOWITZ:  Just briefly, Your Honor, because I

16 believe that some of the discussion that I thought I was having

17 with Your Honor that landed must have landed wrong, exactly

18 what we're going to do.

19 What I said was our initial proposal had two major

20 trials, right?  But they said, we don't want two major trials.

21 We want to put everything in front of Your Honor on an

22 evidentiary basis for estimation and claim objection.

23 Okay.  We'll do that.  The first issue is going to be

24 the legal issue.  We'll provide evidence of why there is undue

25 delay.

1        Your Honor, you know this case well.  We're making --

2   we're going to try to make, if we can, in kind distributions.

3   To make in kind distributions, you need a platform.  To have a

4   platform, you need people.  For people, you need money to pay

5   them.

6        Every day this case continues in terms of litigation

7   to get a final universe of creditor claims so we can make

8   distributions delays it, costs more.  It's undue delay.

9        In any event, we are going to go forward on our

10  estimation, and we're going to provide the appropriate

11  evidence, and we will carry our burdens.

12       So what our schedule was -- and I'm tweaking it.  And

13  Ms. Furness could walk you through all the time lines in

14  detail.  It is exactly what counsel said.  We will put forth a

15  more fulsome determination on undue delay, because that's what

16  they want to have first.

17       We will provide the appropriate witness or witnesses.

18  They can depose them.  We will then come before Your Honor at a

19  hearing.  I believe that hearing in the schedule somewhere, and

20  it's not in front of me, is in December.

21       Your Honor will make a ruling.  Can you go forward on

22  your estimation motion or you can't?  If you can, fine.  When

23  should we have the trial?  We will have the trial not in

24  February as we suggested, because we're taking away the claim

25  objection trial and the estimating trial, we're going to have

1    one trial, the one trial on facts and circumstances where all

2    the evidence goes forth, everything goes to Your Honor, and

3    Your Honor gets to decide estimation for distribution purposes

4    under the law and under the precedents for that completely

5    different than whatever Your Honor decides on the merits of

6    their claim objection.

7              Now, that doesn't prejudice them.  That's exactly

8    what they want.  That's exactly what we want.  And it is a

9    quick time frame.

10             THE COURT:  So you're suggesting estimation hearing

11   itself to be after the New Year, sometime in --

12             MR. KANOWITZ:  In January, to coincide with the

13   merits determination on the objection claim.  It's probably the

14   most efficient way to do it.

15             But once we get that estimation determination -- and

16   we hope Your Honor rules in our favor, and we hope it's a very

17   low numbers, because we don't believe there's any merit

18   whatsoever -- then we can move forward.

19             Okay.  They can appeal.  They're going to appeal.

20   But the determination on all of these complex issues that

21   you've heard from multiple counsel on 546(e) and 502(h) and

22   502(d) -- and I can go into all of those, why they apply in

23   claim objections but don't apply in estimation -- are not going

24   to be appealable issues.

25             You will have determined, based on the evidence

1  before you, and under the precedents and the standards you are

2  entitled to apply under 502(c) different -- different, okay,

3  than 502(a), objection to claim -- or 502(b), type of

4  objection.

5          So my point is is that we can move forward and we can

6  get creditors their money.  The longer -- the longer litigation

7  happens, the cost this estate incurs, and the less distribution

8  is going to be made available to creditors.

9          It's that simple.  And that is why we want to move

10 forward.  We filed our motions weeks ago.  We accommodated

11 Three Arrows an adjournment professional courtesy.  We've been

12 providing them thousands of pages of documents -- they haven't

13 given us one thing -- to allow them to amend claims without

14 Your Honor's approval.

15         We're ready to go on an appropriate time frame that

16 doesn't prejudice them and doesn't prejudice us and gets Your

17 Honor every piece of evidence and every brief on every legal

18 item that anyone wants to brief in an appropriate fashion and

19 lets us move on.

20         And that's the purpose of the bankruptcy and that's

21 the implementation of the plan.  And that's what we should be

22 focusing on today.  How do we move forward to move this case to

23 implement the plan and creditors their money back.  Thank you.

24         THE COURT:  All right.  Thank you.

25         MR. WINOGRAD:  Your Honor, may I?

1          THE COURT:  Well, in case you're going to respond to

2     both, let me hear.

3          MR. WINOGRAD:  Thank you, Your Honor.  Your Honor,

4     Michael Winograd from Brown Rudnick on behalf of behalf the

5     UCC.  And I really just want to touch on four quick points.

6          One, this idea that the dropping of two out of the

7     four debtors from the motion doesn't really matter because they

8     were damned if they do, they were damned if they didn't is

9     nonsense, Your Honor.

10         All of this, first of all, was their doing.  Their

11    motion as it stood before yesterday should have been denied,

12    because there was no efficiency, it was impractical, and there

13    really wasn't that much of a risk for the reasons several of us

14    have talked about today.

15         When they went ahead and dropped two out of the four

16    debtors, they undercut even their own flawed arguments in a way

17    that I would propose, Your Honor, was dispositive.

18         Number two, counsel for the joint liquidators

19    mentioned, well, we're not asking for an MDL.  Exactly.

20    They're not asking for an MDL in name, because they don't have

21    a right to it.  They're asking for it in substance.  But again,

22    they don't have a right to it.  There is no process for it, and

23    it simply doesn't apply on its face.

24         Number three, this idea that they do have precedent

25    for what they are asking this court to do -- they are the

1   movants -- they cited one case, the <u>Enron</u> case, as Your Honor

2   pointed out, that was all in the same court.

3          If you look at their briefing, all of the cases they

4   cite to where they talk about consolidating preference motions,

5   et cetera, or claims were all in this same court, either the

6   same parties or not, but all within the same court.

7          And number two with respect to precedents, again, you

8   don't need a motion or anything for one phone to pick up the

9   phone and call another court if any court deems that

10  potentially helpful.

11         The last point I want to touch on, Your Honor, is

12  this idea of estimation.  We don't need a date right now, given

13  the variables on when the estimation will actually take place.

14         From the creditors' perspective, estimation needs to

15  happen so money can get out the door to them.  The sooner it

16  happens, the better.  It is a threshold issue.  It cannot be

17  eliminated, as we'll talk about later.  There should be an

18  estimation, and that will enable distributions.

19         Whether, as Mr. Kanowitz said, it is at one hearing

20  or not, we propose and we are perfectly fine with the debtors'

21  proposed order which bifurcates them and says we'll do a

22  summary proceeding early and then when we can actually have a

23  reasonable amount of time to put on the actual merits case,

24  we'll do that.  Whether it's a month or two months later, we'll

25  do it then.

1          But the estimation is a threshold issue.  It should

2   happen so that money can get out the door to the creditors, who

3   still continue to wait.

4          Thank you, Your Honor.

5          THE COURT:  All right.  Thank you.

6          Counsel.

7          MR. GOLDBERG:  Thank you, Your Honor.  Adam Goldberg

8   of Latham & Watkins for the record.

9          I'll be very brief and just want to clarify what it

10  is we're asking for.  I'm not trying to go back and forth and

11  back and forth here.

12         First, we are not seeking one hearing on both

13  estimation and the claim objection.  We think that would be

14  inappropriate.

15         If there is going to be a hearing on the claim

16  objection at the same time of estimation, our view is that that

17  would completely defeat the notion that there is somehow undue

18  delay from -- that requires estimation, because if we're going

19  forward with the claim objection, there is no delay to

20  resolving the claims.

21         And the sole reason in which estimation would

22  therefore be requested at that point would be for an improper

23  litigation advantage to have two bites at the apple to not only

24  seek to contest our claims on the merits, but have somehow some

25  kind of summary proceeding that undermines our ability to

1  recover even if after proper due process the claims are

2  determined to be allowed.

3          So I think -- but what we have heard here, other than

4  continuing to be no evidence about when distributions are

5  occurred and when actually things need to happen, we've heard a

6  lot of "sooner the better," we agree with that.  Let's get on

7  with it.

8          We're ready to go forward with the claim objection.

9  We don't think estimation is needed.  But if Your Honor does

10 think estimation should go forward, we should have a hearing

11 first on whether there is undue delay.

12         Thank you, Your Honor.

13         THE COURT:  All right.  Thank you.

14         Bear with me one second.

15         So let me address the motion to seek -- I'm not going

16 to say consolidation, but coordination and the stay relief

17 motion itself.

18         At this juncture and at the outset, the authority and

19 the jurisdiction of the Court to grant the relief requested in

20 the consolidation is suspect.  I am leery of a process which

21 will cause this bankruptcy estate additional delays as legal

22 interests and facts are pursued involving other defendants,

23 such as Genesis.

24         I don't believe Genesis regards that as appropriate

25 for its bankruptcy estate either.  In other words, a process in

1  which we're layering additional issues which, by necessity and

2  facts -- which by necessity arise from multiple transactions

3  among multiple debtors can only slow this process down for this

4  bankruptcy estate and increase the costs to be incurred by this

5  bankruptcy estate, and that has to be this court's primary

6  focus.

7          The Court is not inclined to handcuff the creditors

8  of this bankruptcy estate with respect to the opportunity to

9  receive distributions while litigation is being pursued against

10  multiple defendants in foreign forum, whether it be the Chapter

11  15 court, whether it be in front of Judge Lane in the Genesis

12  bankruptcy, whether it be in the BVI court.

13          The Court cannot see a pathway to where that is

14  expedient or serves the purposes sought, which would be to

15  reduce the time and costs.  In fact, I think it would increase

16  the burden on this estate.

17          I don't find that the legal issues are so complex and

18  so dependent upon foreign law.  Yes, the insolvency of 3AC is

19  critical in establishing a preference, but there are other

20  issues and other -- there are other issues of law and facts

21  which are important as well which will have to be decided,

22  including the subordination -- potential for subordination,

23  including safe harbor or fact-specific defenses relative to

24  each transaction at issue.

25          The Court is concerned with any coordination which

1    will have the effect of stripping or retarding the ability of

2    the BlockFi debtor to assert defenses or pursue procedures that

3    are available in the ordinary course, and especially simply the

4    fact that even a coordination won't resolve all issues.  Even a

5    coordination of BVI, for instance, will not resolve all issues.

6         At issue here are large sums, by all means.  We're

7    talking about hundreds of millions of dollars in potential

8    preference recoveries, claims by and among these debtors.

9         But what also is a stark reality is that payments

10   against these claims are going to be in fractions of dollars.

11   The money is just not there, whether it be the Genesis

12   bankruptcy, whether it be the Celsius bankruptcy, whether it be

13   BlockFi.

14        These are not situations where creditors are getting

15   paid, at least to this court's understanding, 100 cents on the

16   dollar, or anywhere near that.

17        It's incumbent upon, I think, this court to try to

18   lead the parties to a pathway which will reduce the time and

19   expense in reaching the fair resolution of the claims.

20        I don't see it happening through granting stay relief

21   to pursue claims in the BVI that have not yet even been

22   brought, that cannot be pursued until possibly 2025, nor

23   layering additional proceedings in an existing Chapter 15.

24        I am always open to discussing these issues with

25   Judge Glenn.  I know there are multiple stay relief motions

1  pending on these issues.  This court had the benefit of having

2  Judge Glen go first with respect to property of the estate

3  issues.  So I guess I go first with respect to stay relief.

4  It's only fair.  I don't believe stay relief is appropriate at

5  this juncture.

6       I am willing to carry the motion, because I have some

7  other thoughts in conjunction with where we should go.  In my

8  view, this matter should proceed towards mediation.  It is

9  essentially a dispute between 3AC and BlockFi on reconciling

10 potential claims.  It is fit for mediation.  It makes sense to

11 do so.  It can only happen after appropriate discovery.  So I

12 am looking forward to allowing discovery.

13      The question is how to then progress.  I was inclined

14 to simply have an estimation hearing on that December 18th

15 date, to allow discovery through December 1, allow parties to

16 exchange briefing, exchange exhibits.

17      And when I refer to estimation, I do look at it as --

18 I know it's nomenclature, but I view it as really a hearing to

19 fix the proper reserve, because the number one priority for

20 this court is to facilitate the debtor in its ability to

21 distribute funds to all claimants, which would include 3AC at

22 this point.

23      But there are customers, there are creditors out

24 there who are waiting desperately for every dollar, and

25 resolution of this claim stands in the way at this juncture.

1          So I hear the parties saying that they would like to

2     brief the issue of whether or not there should be estimation

3     first.  I can accommodate that.  I would think that it would be

4     -- and I want to hear from you all, which is why I'm going to

5     be asking.  I would think it would just be part and parcel of

6     the estimation hearing.  It will be one point in the brief.

7     Why make it more complicated?

8          What I intended to do is, once we have the estimation

9     hearing, send you off to mediation.  I would even reserve, if

10    the parties are so inclined on that, to see if there can be a

11    resolution.

12         So the schedule I had in my mind was to have on

13    December 19th the estimation proceeding to fix the reserve if

14    appropriate, to have discovery continue through December 1st,

15    to have exhibits exchanged on December 6th, to have

16    contemporaneous submissions of law and disputed facts on

17    December 11th, with the ability to respond on December 18th.

18         We would have the hearing.  We would probably

19    schedule a conference call in advance, just to have a pretrial,

20    to make sure everything is proceeding, and to have the parties

21    brief the appropriateness of the estimation hearing as part of

22    their briefing.

23         If the Court is persuaded that there is not a need

24    for estimation, we won't have an evidentiary hearing on the

25    19th.  It will be that simple.

1          But I assume it will be briefed and argued as part of

2    the December 19th trial.  That gives ample time to continue

3    discovery.  And then I would send you all to mediation.  So I'm

4    going to ask you all to meet and confer to see if you can agree

5    upon a mediator.

6          Now, I also believe that the joint liquidators are

7    seeking a more amplified objection to their claim in order to

8    guide discovery.  I'm going to direct the debtor to do that in

9    15 days.

10         If there is -- we're not going to schedule a merits

11   hearing at this point.  I'll wait to see how mediation fares.

12   I'm content to carry the stay relief motion to December 18th as

13   well and just to keep that in case -- rather than have to renew

14   it, just to keep it there, because at some point coordination

15   may make sense.  But at least let's get the parties started on

16   discovery and let's get you-all into an attempt at mediation.

17   I think both the states would be served by avoiding unnecessary

18   litigation.  At least we'll give it an opportunity.

19         So those are my thoughts.  And I took a little bit of

20   everybody's schedule.  Let me hear from you all.

21         Mr. Kanowitz?

22         MR. KANOWITZ:  Yes, Your Honor.  That's perfectly

23   acceptable to the debtors, Your Honor, I'm sure with the

24   Committee.  We're ready to move forward.

25         The only question I have for you is, you know, when

1 we talk about briefing and evidence and stuff like that, are we

2 talking about expert reports, for example?

3        Because if we're going to put on an estimation, I'd

4 like to do it in a summary streamlined fashion.  But if you

5 really want to get the full flavor of what reserve to do and

6 understand how strong our defenses are, we might need some

7 expert.  To the extent it's their burden, which it is, under

8 BVI law to prove insolvency, to prove, you know, outside the

9 ordinary course of business, they're going to need to buy

10 expert testimony.

11        That burdens all of us, and that's an expense.  So I

12 just throw it out there, which is we'll do it.  Probably need

13 two or three experts to talk about the safe harbor, among other

14 things.  And it's in process, Judge.  It's not like we haven't

15 thought about it.  It's just can it come together to do this

16 all by December 18th to make it so that the hearing, as well as

17 the potential mediation, because that's really key, right, is

18 fulsome, so that everybody's cards are laid out on the table,

19 as opposed to, oh, we're going to add some more issues later,

20 which defeats the whole purpose.

21        THE COURT:  So what I'm hearing, and I want to hear

22 from you as well, is that we may move back the calendar to

23 allow for experts, if you need it.

24        I don't want to make it into a merits hearing, but I

25 do want to have a fulsome estimation, and I do think it would

1  benefit you all for mediation.

2          But let me hear from you.

3          MS. ALTER-NELSON:  Thank you, Your Honor.

4          THE COURT:  I'm sorry, counsel.

5          MS. ALTER-NELSON:  Thank you, Your Honor.  Marisa

6  Alter-Nelson for Three Arrows.

7          So, you know, we hear Your Honor on wanting to move

8  forward.  We agree with Mr. Kanowitz that --

9          THE COURT:  Stop there.

10         MS. ALTER-NELSON:  Right?  -- that here the best

11 course of action would be to have one hearing, right, rather

12 than estimation and claims objection.

13         Everybody agrees claims objection can be ready to go

14 early next year, right.  And so to do an estimation hearing,

15 which, respectfully, it is our belief that we should have the

16 opportunity to actually put on evidence rather than have

17 lawyers get up here and say what the evidence might be, not

18 have people have the opportunity to raise objections to the

19 evidence, not -- basically not put on the case, right, not have

20 the expert, that we're going to do all the discovery anyway, we

21 would propose that we have one joint hearing on estimation and

22 claims objection, right.

23         And then at that point, the Court can force us into

24 mediation, can make a ruling on estimation, decide not to

25 estimate because the Court has enough information to rule on

1  the claims objection, and that that would be the most efficient

2  path for all, because for Three Arrows to properly be able to

3  demonstrate to this court a proper amount for estimation,

4  right, what that reserve should be set on, we really do need

5  the opportunity to present the evidence not in a summary

6  proceeding, not in lawyers making argument, but really for Your

7  Honor to actually see the evidence, especially on some of the

8  major issues here, like insolvency, safe harbor, ordinary

9  course, and the like.

10         THE COURT:  All right.

11         MS. ALTER-NELSON:  And we would be prepared to work

12  with the debtors on a schedule for that and map out sort of the

13  dates for exchange of legal briefing, experts, fact witnesses,

14  discovery, like the parties are already engaged in discovery

15  and have been moving forward on that.

16         Once we get the new amended claims objection, in 15

17  days we'll certainly be in a position to see what additional

18  discovery needs to be requested, so --

19         THE COURT:  Does it make sense to go through all that

20  if I'm sending you to -- and I am sending you to mediation at

21  some point.

22         MS. ALTER-NELSON:  I think so, Your Honor.

23         THE COURT:  Would it -- I mean, do you need all that,

24  or should we --

25         MS. ALTER-NELSON:  I think we do.

1           THE COURT:  -- do it after -- send you to mediation

2   after discovery --

3           MS. ALTER-NELSON:  So I think, Your Honor, we need --

4           THE COURT:  -- before you start the briefing and the

5   hearing?

6           MS. ALTER-NELSON:  Yeah.  I think, Your Honor, I

7   think we'd be fine with mediation or mediation after the close

8   of discovery and then a hearing on joint estimation and the

9   claims objection.

10          But to save resources of everybody here having two

11  separate -- an estimation, then a mediation and then a claims

12  objection following right behind, we just don't think would be

13  efficient.

14          THE COURT:  All right.  Let me hear from counsel.

15  Thank you.

16          MR. WINOGRAD:  Your Honor, Mike Winograd from Brown

17  Rudnick on behalf the UCC.

18          Your Honor, we think that your proposal would work.

19  We don't think that there should be a close of discovery and

20  then some mediation without an actual estimation hearing where

21  there is a number to set aside a reserve to make it real and

22  exert some leverage in the mediation so we all know what we're

23  talking about.  We think that is critical.

24          The federal rules provide for estimation.  It is a

25  simple fact under the rules that you can have a summary

1  proceeding, then complete the expert reports and whatever

2  discovery else is necessary and have a merits hearing.

3       We don't see any reason to eliminate the estimation

4  proceeding or conflate the two.  We think that doing it

5  quicker, as Your Honor proposed, and getting it to mediation

6  with that number will actually help.

7       And if the mediation fails, then a distribution based

8  on that reserve can take place and money can finally get out

9  the door to some of these creditors.

10      THE COURT:  But then in order to do the estimation,

11  and from what Mr. Kanowitz had suggested, we need to build in

12  the opportunity to have experts in discovery.

13      MR. WINOGRAD:  So, Your Honor, not to disagree with

14  Mr. Kanowitz.  I don't know that experts are necessary for the

15  estimation hearing to fix the reserve.

16      You know, these are going to be, you know, points

17  that lawyers can argue in briefs.  The Court can -- the Court

18  can reserve final decision until there's an actual merits

19  hearing.

20      But the idea of estimation in this summary proceeding

21  is to say let's get what we can, get it in front of the Court

22  when we can so that we can fix a number on reserve, mediate --

23  and I think that will help, if the mediation fails, get money

24  out the door.

25      And then, if we need to, we can have a final hearing

1   on the merits with everything that the Court would be

2   accustomed to in terms of experts and full discovery.

3           THE COURT:  Okay.

4           MR. WINOGRAD:  Thank you, Your Honor.

5           THE COURT:  Last comments?

6           MS. ALTER-NELSON:  Yes, if I may, Your Honor.

7           I just want to ensure that we're all talking about

8   the same thing here.  A summary proceeding, what does that look

9   like?  Again, everyone just gets up and presents Your Honor

10  what they think the evidence is going to show, makes legal

11  arguments to Your Honor about that evidence without the

12  evidence being actually properly presented, without

13  admissibility being considered?

14          I mean, this is a massive estate.  This is a massive

15  estimation hearing.  I recently did an estimation hearing

16  before Judge Dorsey on a much, much smaller amount -- I think

17  he estimated it at $25 million -- down in Delaware.  And we had

18  a week-long estimation, traditional evidentiary hearing.

19          Now, there were certainly procedures to cabinet,

20  right, declarations instead of direct testimony, and those type

21  of limitations to keep things tight, which the parties

22  certainly can agree to here.

23          But to prohibit us, as the Committee is suggesting,

24  from putting on actual evidence on a $280 million claim is

25  patently unfair.  It's just -- and, quite frankly, I'm not sure

1   what evidence we could possibly give you for you to make an

2   estimation and set this reserve without Your Honor hearing the

3   underlying evidence.

4          And the easiest way to do that is to have testimony,

5   right, about the documents and information and a submission to

6   the Court on what that means in accordance with the law, right.

7   And so, you know, the Celsius bankruptcy has an estimation

8   hearing that's been scheduled that's a week-long hearing with

9   experts and testimony and the like.

10          We cited in our -- I believe our response Docket 1484

11   at Footnote 2 two similarly situated bankruptcy estates where

12   estimation hearings are proceeding.  One was Celsius.  The

13   other is MatlinPatterson, which is before Judge Jones in the

14   SDNY, and that also has a five-day estimation hearing, which

15   has experts, a Brazilian law expert, fact witnesses, argument,

16   and the like.

17          And so that is the type of hearing that needs to

18   occur here.  Anything less than that would be very prejudicial

19   to Three Arrows.  And why the debtors and the Committee like

20   this is because they think they're going to get away with a

21   lesser standard, right.

22          They can just come in, get a low number, and then,

23   what, two months later do this again where we have to prove our

24   claims and we come in with a much higher number, but there's

25   not money left?

1           So the fact that, one, they don't have to prove undue

2    delay to get estimation, right, is -- is, quite frankly,

3    shocking here, given that we could have this hearing in early

4    next year, but also, two, if we're going to have it, it has to

5    be fair.  We have to be able to present evidence to the Court

6    in connection with any reserve that gets set.

7           THE COURT:  All right.  Thank you.

8           Yes, Mr. Kanowitz.

9           MR. KANOWITZ:  Since I opened Pandora's Box with the

10   expert suggestion, only because I knew -- that's why I said we

11   should have one trial for the merits, because I knew they want

12   to throw the kitchen sink at it.

13          Look, if we're going to mediation, we just should

14   have a fulsome record.  We don't need experts.  You know,

15   again, there could be presumptions made.  And if Your Honor is

16   not ruling on that date anyway until after mediation, if

17   parties believe after the oral argument and Your Honor says,

18   okay, I heard enough, there is grounds for estimation, we can

19   have another potential hearing within a certain period of time

20   if mediation fails with the experts on a time line.

21          So we could do fact discovery.  We could get our case

22   -- prima facie cases and defenses laid out for Your Honor as a

23   matter of law with presumptions of this is how the evidence

24   would go in, and Your Honor could rule on the 18th that I've

25   heard enough, I believe estimation should go forward, but I'm

1  sending you to mediation, and if you fail at mediation, we'll

2  reschedule estimation slash a claim objection on a narrow time

3  frame where you're going to have to take what you learned in

4  fact discovery and get your witnesses lined up on experts and

5  then have a trial.

6      I think that is what I'm hearing, and that makes

7  sense to avoid the burn, to avoid delay, and to give Three

8  Arrows at least the ability to present to Your Honor, you

9  shouldn't go forward with estimation anyway, which is what

10 they're saying.

11     We don't believe that's going to be your ruling, but

12 if we could have the full estimation claim objection hearing

13 after estimation with experts built in after mediation is

14 successful, we don't have to worry about it.  If it fails, that

15 will be the secondary part phase of discovery.

16     THE COURT:  So now we go back, and I have to also

17 build into my calendar what works.  Do we go back to simply

18 having a hearing on December -- in December about whether there

19 should be estimation, legal argument, I send you all -- you

20 have discovery through that, I send you to mediation, and then

21 if the mediation is unsuccessful, I will quickly schedule an

22 estimation hearing?

23     MS. ALTER-NELSON:  Your Honor, we would certainly

24 agree with that schedule.

25     MR. WINOGRAD:  Your Honor, Mike Winograd again from

1 Brown Rudnick, on behalf of the UCC.

2        What I understood Your Honor to be saying, what I

3 think makes more sense in terms of making the prospects of the

4 mediation likely -- more likely to succeed and being in a

5 position where we can then move forward if it doesn't, is --

6 and I don't mean to suggest that there would be no evidence put

7 on at the hearing on the 19th.

8        What I was simply suggesting is document discovery

9 can get done.  We don't need -- if folks want to bring in

10 witnesses, we can bring in witnesses.  As Mr. Kanowitz said, we

11 can probably present the evidence in ways that folks can object

12 if they'd like, but this is how we expect it to come in, but

13 the big piece of this puzzle is experts.

14       Experts -- getting experts done on that time frame,

15 given that we haven't received any documents from the other

16 side, is near impossible.  But we don't think we need experts

17 for an estimation hearing.

18       And so what we would envision is put in the evidence

19 that we have gathered.  We can talk about what we think experts

20 and make legal arguments as to how we think this would play

21 out.  The Court would hear that.  Presumably, if it decided

22 that estimation made sense and it had the authority to do it,

23 it would rule on estimation and give us a number.

24       Without a number, it's hard to imagine how the

25 mediation really will be affected.  And, if the mediation

1  fails, based on that number, we can then go ahead and make a

2  distribution.

3         The second part of that, as I would envision it at

4  least, and I thought I heard Your Honor saying this, was if the

5  mediation fails, we can make whatever distribution we can based

6  on the reserve, but then we can move forward, get expert

7  witnesses, we can all work on that in the meantime so we're not

8  losing time, and work towards a hearing early next year on the

9  merits to determine this fully and finally.

10        But I think it's important at that estimation

11  hearing, if Your Honor moves forward with estimation, to

12  provide a number to enable mediation and a distribution if the

13  mediation fails.

14        Thank you, Your Honor.

15        THE COURT:  All right.  Give me ten minutes.  I want

16  to review it with my law clerk.  All right.  We'll come back in

17  10, 15 minutes.  Thank you.

18        (Recess)

19        THE COURT:  All right.  Thank you.

20        Please, counsel.

21        MR. GOLDBERG:  Your Honor, Adam Goldberg of Latham &

22  Watkins for the record.

23        I just wanted to make one quick comment in case

24  there's any ambiguity as it relates to the need for a reserve

25  to permit distributions.

1          THE COURT:  Yes.

2          MR. GOLDBERG:  From our perspective, we are fine with

3     having a reserve in the amount of our claim of $284 million, a

4     claim amount of $284 million used the basis to set a reserve.

5          THE COURT:  I'm sure you are.

6          MR. GOLDBERG:  Yes.  I just wanted to make that clear

7     in case that was somehow not -- in case there was a thought

8     that there needed to be some other amount that was used as the

9     basis for a reserve.

10         THE COURT:  Okay.  I'm not sure how helpful that is

11    for them, but they'll decide.  But I appreciate it.  Thank you.

12         I've done my best probably to try to make you all

13    happy.  It's my job.  But also, and I will be quite candid,

14    part of what I had to build in is the Christmas holidays, but

15    also, I'm traveling a good deal of January, so it makes it

16    difficult.

17         I also believe that mediation without sufficient

18    factual information as been discussed won't be productive.

19    Everybody needs to know the strengths and weaknesses of their

20    cases.

21         So I'm going to, first off, deny the consolidation

22    motion or a coordination motion without prejudice.

23         I'm going to carry the stay relief motion.  And,

24    ultimately, it's going to be carried to Monday, February 5th.

25    That is the date we're going to have a combined estimation

1  hearing and merits hearing.

2      If the Court at that point, after hearing -- we'll

3  start it.  I'll give two days for it, 5th and 6th, and we'll go

4  from there.  The Court may be in a position to estimate, even

5  if the trial needs to be continued after that.

6      I'm going to direct mediation to take place -- moving

7  backwards -- the week of January 8th.  I had to build in time

8  for you all, in case mediation is unsuccessful, to do the

9  briefing and get ready for the trial, for the actual hearing.

10  I'm going to have a discovery deadline of January 5th.

11      So you'll go into the mediation armed with discovery,

12  armed with information that will hopefully assist you all in

13  reaching a resolution.  If there's no resolution, well, then

14  we'll continue -- then you'll have the briefing.

15      As far as briefing, I'm going to have contemporaneous

16  submissions on January 26th and replies -- contemporaneous

17  replies close of business February 2nd.  It will give me the

18  weekend to read.

19      It's longer than -- it's pushed out further than I

20  would like.  As I said, I am concerned with the ability of the

21  debtor to make distributions, but I'm not -- I'm not persuaded

22  that the debtor is going to be in a position to make

23  distributions in the month of January as it is, but I am

24  committed to getting this resolved.

25      So we'll get it resolved by that first week in

1   February.  At a bare minimum, I'm pretty confident I'll be able

2   to estimate the claim after the February 5th hearing, if not

3   resolve the merits.

4           If you all want to meet and confer and discuss a

5   schedule for depositions and experts and the like, you can

6   layer that on top.  I'll ask debtor's counsel to submit a

7   scheduling order.  But, frankly, this is the best I can do to

8   accommodate.

9           I want to make mediation fruitful.  I want to give

10  the parties time.  And we're dealing in a very difficult period

11  between holidays coming up and December travels and my travels

12  and the like.

13          So, counsel.

14          MR. KANOWITZ:  Thank you, Your Honor.  We do

15  appreciate your guidance and the time you spent with us.

16          One question.  The 15 days to object to the amended

17  claim still stands.  We're happy to do it.  We'll put out

18  another pleading.

19          And then just some cleanup.  We have various

20  different motions that are circulating on the docket today.

21  And, in fact, I saw earlier today, while we adjourned the FTX

22  estimation hearing, objection to claim hearing to the 11/6

23  hearing, because we are expecting Judge Dorsey to grant it on

24  October 19th, it also picked up the Three Arrows motions.

25          So all I'll say is, based on your ruling, I won't

1  submit, like I said, the scheduling order and proposed order,

2  coordination motion denied, stay relief motion carried to the

3  2/5 date, we'll grant the other miscellaneous ceiling motions

4  and stuff like that.

5        We'll carry the estimation motion, the claim

6  objection motion to 2/5.

7        THE COURT:  Correct.

8        MR. KANOWITZ:  And that should encompass everything.

9  And then, of course, we'll meet and confer on depositions and

10 experts and time frames for that.

11       THE COURT:  Just to clarify, I'm not hearing oral

12 argument on whether or not estimation is appropriate.  You can

13 build that into the briefs for the February 5th hearing.

14       MR. KANOWITZ:  It will be the whole thing.

15       THE COURT:  The whole package.

16       MS. ALTER-NELSON:  Thank you very much, Your Honor.

17 I really appreciate your time in figuring out that schedule.

18       I believe there's just one pending motion that was on

19 the calendar for today, which I think is moot, but that was a

20 motion to quash for a protective order on the deposition

21 notices issued by Three Arrows to debtors.

22       THE COURT:  Why don't we just have that motion

23 withdrawn, and you'll work out a schedule.

24       MR. KANOWITZ:  Provided deposition notices are

25 withdrawn having this new schedule that we're going to have to

1  meet and confer on.

2         THE COURT:  Can the parties agree to meet and confer

3  on a deposition schedule?

4         MS. ALTER-NELSON:  Absolutely, Your Honor.  We just

5  wanted to make sure that that was noted as put in abeyance or

6  however we're going to --

7         MR. KANOWITZ:  We can move it, Judge.  Thank you.

8         THE COURT:  Thank you.

9         MS. ALTER-NELSON:  Thank you, Your Honor.

10        THE COURT:  Counsel?

11        MR. NEVE:  Yes, Your Honor, there are -- Brett Neve

12 of Latham & Watkins, for the record.

13        There are just three more items, I believe, on the

14 agenda, and I promise to be very, very brief.  Those are the

15 motions to seal filed by Three Arrows.

16        THE COURT:  Granted.

17        MR. NEVE:  Okay.  Done.

18        THE COURT:  I'm not sure -- I'm sorry.  I've got to

19 apologize to Mr. Sponder with the hand raised.

20        MR. Sponder?

21        MR. SPONDER:  Thank you, Your Honor.

22        I believe counsel was standing up with respect to the

23 sealed motions to advise that we've reached some alternate

24 language to be included in the sealing orders.

25        MR. NEVE:  That's correct, Your Honor.  We'll submit

117

1  it.

2          THE COURT:  Granted.  Order to be submitted.

3          MR. SPONDER:  Thank you, Your Honor.

4          MR. NEVE:  We'll submit a revised order.  Thank you.

5          THE COURT:  Mr. Sponder, thank you.

6          MR. SPONDER:  Thank you, Your Honor.

7          THE COURT:  You're welcome.

8          Does that take care of it?

9          MR. NEVE:  I believe it does, Your Honor.

10         MS. ALTER-NELSON:  Yes.  Thank you, Your Honor.

11         THE COURT:  All right, folks.  Have a good weekend or

12  week or -- oh, it's only the beginning of the week.  All right.

13  Take care.  We are adjourned.

14                         * * * * *

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T I O N**

2            WE, DIPTI PATEL, KAREN WATSON and LORI KNOLLMEYER,

3   court approved transcribers, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   of the proceedings in the above-entitled matter and to the best

6   of our ability.

7

8   /s/ Dipti Patel

9   DIPTI PATEL

10

11  /s/ Karen Watson

12  KAREN WATSON

13

14  /s/ Lori Knollmeyer

15  LORI KNOLLMEYER

16  J&J COURT TRANSCRIBERS, INC.    DATE:  October 11, 2023

17

18

19

20

21

22

23

24

25