| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>Caption in Compliance with D.N.J. LBR 9004-1(b) | |
|---|---|
| **BROWN RUDNICK LLP**<br>Kenneth J. Aulet, Esq. (admitted *pro hac vice*)<br>Seven Times Square<br>New York, New York 10036<br>(212) 209-4800<br>kaulet@brownrudnick.com<br><br>**BROWN RUDNICK LLP**<br>Tristan Axelrod, Esq. (admitted *pro hac vice*)<br>One Financial Center<br>Boston, MA 02111<br>(617)856-8300<br>taxelrod@brownrudnick.com<br><br>*General Counsel for the Plan Administrator*<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>(973) 230-2095<br>DStolz@genovaburns.com<br>DClarke@genovaburns.com<br><br>*Local Counsel for the Plan Administrator* | **HAYNES AND BOONE, LLP**<br>Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)<br>Lauren M. Sisson, Esq. (NJ Bar No. 394182022)<br>30 Rockefeller Plaza, 26th Floor<br>New York, New York 10112<br>(212) 659-7300<br>richard.kanowitz@haynesboone.com<br>lauren.sisson@haynesboone.com<br><br>*Attorneys for the Plan Administrator* |
| In re:<br><br>BLOCKFI INC., *et al*.,<br><br>        Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br>(Jointly Administered under a Confirmed Plan[2]) |

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Debtors' service address is 100 Horizon Center Blvd., 1st and 2nd Floors, Hamilton, NJ 08691.

[2] On October 3, 2023, the Court entered an order confirming the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications) (the "Plan") [Docket No. 1609]. Unless otherwise indicated, capitalized terms used but not defined in this Reply shall have the meanings ascribed to them in the Plan.

1

**WIND-DOWN DEBTORS' REPLY TO JOHN LYMN'S RESPONSE TO AMENDED ELEVENTH OMNIBUS OBJECTION TO CERTAIN CLAIMS**

TO:    THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

BlockFi Inc. and its debtor affiliates (collectively, "BlockFi" or the "Wind-Down Debtors"), as managed by the Plan Administrator in the above-referenced Chapter 11 cases (the "Chapter 11 Cases"), hereby file this *Wind-Down Debtors' Reply to John Lymn's Response to Debtors' Tenth Omnibus Objection to Certain Claims* (the "Reply") in response to John Lymn's ("Mr. Lymn") *Response to Debtors' Amended Eleventh Omnibus Objection to Certain Claims* (the "Lymn Response") [Docket No. 1667], filed in connection with the *Debtors' Amended Eleventh Omnibus Objection To Certain Claims* (the "Lymn Claim Objection") [Docket No. 1450]. In support of the Reply, the Wind-Down Debtors respectfully represent as follows:

**Preliminary Statement**[3]

Mr. Lymn asks for $500,000 more than he should receive under the Plan. The Lymn Response should be overruled as procedurally inappropriate. Regardless, the Lymn Response is also deficient on the merits and should be overruled as such.

There are two bases for Mr. Lymn's position: first, Mr. Lymn believes his claim for return of deposited Digital Assets should be ascribed the value of such assets at a date later than the Petition Date. But the Plan requires that the assets be valued at the Petition Date, consistent with Section 502(b) of the Bankruptcy Code. Mr. Lymn's position has been ruled upon and found unlawful; in practicality, if Mr. Lymn were correct, it would require the Wind-Down Debtors to completely rewrite their now-effective Plan and delay distributions indefinitely.

---

[3] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings provided in the remainder of this Reply.

2

Second, Mr. Lymn argues that the Plan somehow accidentally deprived the Wind-Down Debtors of the ability to object to Mr. Lymn's proof of claim. Prior to confirmation, Mr. Lymn approached the Debtors and the Official Committee of Unsecured Creditors (the "Committee") regarding this interpretation of the Plan; the Debtors and Committee disabused Mr. Lymn of his misinterpretation, added further precautionary language to the Plan to address the perceived inconsistency on this issue, and offered Mr. Lymn the opportunity to change his vote on the Plan to the extent necessary to correct that misinterpretation. Mr. Lymn declined to change his vote, objected to confirmation, and this Court overruled the objection, noting (as had the Debtors and Committee) that it was inconsistent with the Plan and Disclosure Statement and would produce an absurd and untenable result.

The Lymn Response should be overruled, and the Lymn Claim should be allowed in the amount of $716,584.10, per the terms of the confirmed and effective Plan and to ensure the equitable treatment of all BlockFi Lending creditors.

## Factual Background

**I.    The Lymn Proof of Claim and the Proposed Treatment of the Lymn Claim**

1. On the date listed below, Mr. Lymn filed a proof of claim (the "Lymn Proof of Claim") asserting the following claim (the "Lymn Claim"):

| Claim No. | Amount | Status | Date Filed | Filed Debtor Entity |
|---|---|---|---|---|
| 15081 | $1,238,744.31<br>49.67 BTC | Secured | 3/29/2023 | BlockFi Lending LLC |

2. The Lymn Proof of Claim contained an addendum (the "Lymn Rider"), which clarified that the claim amount asserted in USD was based on the price of BTC on March 24, 2023,

3

and stated that "given the fluid nature of cryptocurrency, the value of my claim could increase of decrease depending on the market value of Bitcoin." Lymn Rider at 7, fn 1.

3. The Lymn Claim arises from and relates to a Loan and Security Agreement dated April 12, 2022, by and between John Lymn, as Borrower, and BlockFi Lending LLC ("BlockFi Lending"), as Lender (the "Lymn Loan Agreement"). Pursuant to the Lymn Loan Agreement, Mr. Lymn borrowed $1,005,211.27 of principal from BlockFi Lending and has a total outstanding balance of $458,356.50 as of the date hereof (the "Lymn Loan"). Mr. Lymn initially pledged 49.670 bitcoin ("BTC") as collateral to secure the Lymn Loans. Portions of collateral were returned over the life of the Lymn Loan such that outstanding collateral on the Petition Date was approximately 44.216391 BTC (the "Lymn Collateral"), valued at $716,584.10 on the Petition Date in accordance with the Digital Assets Conversion Table included in the Plan Supplement.

4. Section 4(d) of the Lymn Loan Agreement governs BlockFi Lending's rights with respect to the Lymn Collateral and includes the following provision:

> Borrower agrees that Lender may, for its own account, pledge, repledge, hypothecate, rehypothecate, sell, lend or otherwise transfer or use any amount of such Collateral, separately or together with other property, with all attendant rights of ownership from time to time, without notice to the Borrower any or all of the Collateral and that Lender may do so without retaining in its possession or control for delivery, a like amount of similar Collateral.

Lymn Loan Agreements§ 4(d).

5. On September 6, 2023, BlockFi filed the Lymn Claim Objection, which sets forth the proposed treatment of the Lymn Proof of Claim, as follows:

| Claim No. | Proposed Treatment | Estate Debtor Entity |
|---|---|---|
| 15081 | Allowed as $716,584.10 Class 3-b Claim | BlockFi Lending LLC |

4

## II. Lymn's Objection to Confirmation of the Chapter 11 Plan

6. On September 25, 2023, Mr. Lymn filed the *Objection to Debtors' Notice Of Filing Technical Modifications to Third Amended Joint Chapter 11 Plan of Blockfi and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and to Confirmation of the Plan* (the "Lymn Confirmation Objection") [Docket No. 1600]. The Lymn Confirmation Objection asserted that the following modification made to the Plan as filed at Docket No. 1564 (the "Notice of Plan Modification") was material:

> *For the avoidance of doubt, nothing in this Plan shall release, waive, or otherwise limit the Debtors' or the Wind-Down Debtors' right to object to Claims or Interests* (or to assert affirmative defenses, mandatory counterclaims, rights of setoff or other defenses, arising in connection with such Claims against or Interests in the Debtors or Wind-Down Debtors) Notice of Plan Modification, Ex. B at 74. (emphasis added)

7. Contemporaneously with the Lymn Confirmation Objection, Mr. Lymn contacted the Debtors and Official Committee of Unsecured Creditors (the "Committee") via counsel to inquire regarding the matters raised therein. Counsel informed Mr. Lymn that the Plan did not provide for a release of the Estates' rights to object to Claims or Interests, but offered Mr. Lymn the opportunity to change his vote on the Plan. Counsel later reaffirmed the opportunity on the record before the Court. Transcript of Confirmation Hr'g, Docket No. 1621, 51:20–51:23. Mr. Lymn declined to change his vote or relinquish his objection.

8. At the hearing on the Confirmation of the Plan, counsel for the Debtors as well as counsel for the Committee argued that the Plan and Disclosure Statement viewed as a whole made clear that the Debtors were not waiving the right to object to claims, and that the modification could not be material since Mr. Lymn was offered the opportunity to change his vote but chose not to do so.

5

9. The Court overruled the Lymn Confirmation Objection, stating the following:

> [I]f I accepted the analysis proffered by counsel, we would have an absurd result where you would, simply by accepting -- casting an accepting ballot you, in effect, could load up a claim and there could be no objections. FTX could have added hundreds of millions of dollars to a claim and just accepted -- filed an accepting ballot and there could be no objection. The debtor can't negotiate away another party -- their ability to object to a claim. It just -- it's not feasible. It's not likely.
>
> When you read the disclosure statement as a whole, I think it makes it clear -- it's certainly acceptable for approval that the claims process -- the claims resolution process, the ability of the debtor and parties to object continue, notwithstanding the releases, notwithstanding affirmative votes.

Transcript of Confirmation Hr'g, Docket No. 1621, 115:18–116:7.

10. On September 28, 2023, the Committee filed a Joinder to the Wind-Down Debtors' Eleventh Amended Omnibus Objection to Claims [Docket No. 1622].

### III. Lymn's Response to the Tenth Omnibus Objection

11. On October 5, 2023 Mr. Lymn filed his Response to the Lymn Claim Objection. The Lymn Response reasserts the arguments made in the Lymn Confirmation Objection that were overruled by this Court. Lymn Response at ¶¶ 11–15. The Lymn response also claims that the Debtors are equitably estopped from pursuing the Lymn Claim Objection because Mr. Lymn relied on the purported release of claim objections in choosing to vote in favor of the Plan. Lymn Response at ¶¶ 16–19. Finally, Lymn describes the valuation of his claim as of the petition date as "manifestly unfair," asserting that the date of valuation should instead be an unspecified "later date." Lymn Response at ¶ 20.

12. The Lymn Response asks the Court to overrule the Lymn Claim Objection and to allow the Lymn Claim in an amount over $500,000 more than the amount prescribed by the Plan.

## Reply

13. Mr. Lymn's claim is, indisputably, a claim against BlockFi Lending in respect of the Lymn Loan Agreement, which "constitute[] a retail…advance under the Loan Program." In other words, *by definition* under the Plan, Mr. Wynns has a "BlockFi Lending LLC Loan Collateral Claim" entitled to treatment pursuant to Class 3-b and Distribution as otherwise provided therein. *See* Plan Arts. I.53, III.C(4). Mr. Wynns should receive exactly his entitlement under the Plan, nothing more or less.

14. Mr. Lymn objects to his treatment under the Plan, under a misreading of the Plan and an objection to the Plan's valuation of claims at the Petition Date as required by section 502(b) of the Bankruptcy Code. These arguments were previously raised, and Mr. Lymn was even afforded a courtesy opportunity to change his vote on the Plan to correct his prior misinterpretation. Mr. Lymn must now receive the same treatment that all other holders of BlockFi Lending LLC Loan Collateral Claims stand to receive.

**I.    The Confirmed Plan Does Not Waive the Wind-Down Debtors' Rights to Object to Claims.**

    **A.    The Plan and Disclosure Statement Language Clearly Preserve the Right of the Wind-Down Debtors to Object to Claims.**

15. Mr. Lymn is wrong in his interpretation of the Plan. The Wind-Down Debtors herein incorporate the prior briefings and comments of the Debtors and Committee in connection with the Lymn Confirmation Objection.

16. The Plan and Disclosure Statement contain multiple provisions indicating that the Wind-Down Debtors would retain the right to object to Claims. For instance, Article VII.B of the solicited Plan provides that after the Effective Date the Wind-Down Debtors would have the sole authority to file, withdraw or litigate to judgment any objections to Claims or settle or compromise

7

any Disputed Claims with any such objections to be filed before the Claims Objection Bar Date.[4] Plan Art. VII.B.

17. In addition, Article IV.D.6.j and Article IV.D.6.t of the solicited Plan, respectively, provide that the obligations of the Wind-Down Debtors include "reviewing, reconciling, compromising, settling, objecting, or prosecuting Claims or Interests of any kind" and "allowing or objecting to Claims and (if applicable) Interests, and supervising and administering the commencement, prosecution, settlement, compromise, withdrawal, or resolution of all objections to Disputed Claims and (if applicable) Disputed Interests required to be administered by the Wind-Down Debtors." Plan Art. IV.D.6.j, Art. IV.D.6.t.

18. Article VII.A states that "no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest." There is no language anywhere in the Plan or Disclosure Statement that indicates that proofs of claim filed by creditors who did not opt into the Third-Party Release are deemed Allowed Claims. Plan Art. VII.A.

19. The Disclosure Statement similarly contained language preserving the right to object to Claims to the Wind-Down Debtors. Article XI.A.2(j) and Article XI.A.2(o) of the Disclosure Statement provide "[t]he Debtors reserve the right to object to the amount or classification of any Claim under the Plan" and Article XI.E.4 of the Disclosure Statement

---

[4] "Claims Objection Bar Date" is defined as the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Wind-Down Debtors, as applicable, or by an order of the Bankruptcy Court.

8

provides that "[n]o reliance should be placed on the fact that a particular litigation claim, or projected objection to a particular Claim, is or is not identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims." Disclosure Statement Art. XI.A.2(j), Art. XI.A.2(o), Art. XI.E.4.

20.     The Wind-Down Debtors addition of the language regarding objections to Claims in the Plan at Art. VIII.A was included as a courtesy to Mr. Lymn in the hopes it would resolve the Lymn Confirmation Objection. Given the language cited above throughout the Plan and Disclosure Statement, this was not a material modification to the Plan. In construing the terms of the entire Plan, no reasonable creditor could draw the conclusion that through the Debtor Release, the Debtors were agreeing to relinquish their right to object to Claims or Interests asserted against the Debtors.

        **B.**     **Mr. Lymn is Estopped from Challenging the Confirmed Plan.**

21.     On October 3, 2023, the Court entered its *Revised Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on a Final Basis and (II) Confirming the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications)* [Docket No. 1660] (the "Confirmation Order") confirming the Plan, which went effective on October 24, 2023 [Docket No. 1788].

9

22. As the Court had already noted at that time, the Plan did not waive the Debtors' or Wind-Down Debtors' rights to object to proofs of claim. Transcript of Confirmation Hr'g, Docket No. 1621, 115:18–116:7. This was so by virtue of both the language of the solicited Plan and Disclosure Statement and an express modification introduced as a courtesy to Mr. Lymn (addressed further below). *See* Transcript of Confirmation Hr'g, Docket No. 1621, 51:20–51:23.

23. Moreover, the Confirmation Order expressly incorporated and approved the courtesy modification:

> Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan since the commencement of Solicitation constitute technical changes, changes that improve the treatment of Claims, or changes with respect to particular Claims made pursuant to the agreement of the Holders of such Claims and do not materially and adversely affect the treatment of any Claims or Interests.

Confirmation Order at 16.

24. Mr. Lymn did not object to the entry of the Confirmation Order. Mr. Lymn is bound by the Plan and Confirmation Order.

## II. Lymn Cannot Argue that He Reasonably Relied on an Incorrect Interpretation of the Plan to his Detriment.

25. Setting aside that Mr. Lymn's interpretation of the Plan was manifestly incorrect, as a matter of fact, Mr. Lymn did not reasonably rely upon his interpretation of the Plan in making his vote. Mr. Lymn was repeatedly offered the opportunity to change his vote when his interpretation was corrected. Mr. Lymn declined to change his vote.

26. Mr. Lymn now claims for relief in equity under the theory of equitable estoppel.[5] A claimant for equitable estoppel must show that it was "both natural and probable" that a

---

[5] The Committee, as a party in interest, also objected to the Lymn Claim. [Docket No. 1622]. Art. IV.D of the Plan states that "*[t]he Wind-Down Debtors shall be deemed to be substituted as plaintiff, defendant, or in any other capacity*

10

representation made by the defendant would "induce action." *Miller v. Miller*, 97 N.J. 154, 163 (N.J. 1984). Courts interpret the "natural and probable" element to require that the plaintiff *reasonably* relied upon the representation in taking action. *See Estok Corp. v. O.A. Peterson Const. Co.*, 2010 WL4483352 *5 (N.J. Super Nov. 10, 2010) (comparing to *Miller* and citing *Skulski v. Nolan*, 68 N.J. 179, 198 (1975)).[6]

27.    For the reasons discussed above, Mr. Lymn fails to meet the standard. There was never a representation or promise to release defenses to claims against the Estates. To the contrary, the Plan and Disclosure Statement contained numerous provisions describing the Wind-Down Debtors' authority to object to proofs of claim. Mr. Lymn developed an alternative theory of the Plan, contrary to those provisions, that was not only tortured in its construction but would have resulted in the allowance of proofs of claims of untold number and amount (including outlier claims in amounts so large that, if allowed, would dilute Mr. Lymn's claim beyond compensability).

28.    In other words, Mr. Lymn's interpretation of the Plan was not "natural and probable" and reliance upon it was not "reasonable." This is particularly so given that Mr. Lymn's misinterpretation was corrected and he was given an opportunity to change his vote. Having been given that opportunity—and being offered an Allowed Claim in accordance with the Plan,

---

for the Debtors and *the Committee*, as applicable, *in any Causes of Action pending before the Bankruptcy Court* or any other court that relates to a Wind-Down Debtors' Asset without the need for filing any motion for such relief." As such, even if Mr. Lymn could successfully argue that the Debtors are equitably estopped from pursuing the objection to the Lymn Claim, that estoppel would not apply to the Wind-Down Debtors as successors to the Committee's objection.

[6] Likewise, the related doctrine of promissory estoppel requires that a plaintiff promiseee "reasonably rely on the promise." *In re Tri-State Armored Servs., Inc.*, Case No. 01-11917 (JHW), 2006 WL 4452993 *9-10 (Bankr. D.N.J. Mar. 21, 2006) (citing many cases).

receiving treatment equivalent to that of all similarly situated creditors—it cannot be reasonably stated that Mr. Lymn has suffered any detriment at all.

29. Mr. Lymn made a choice informed by discussions with counsel to the Debtors and the Committee and the remarks of this Court on the record. There was no misunderstanding regarding his rights or the effect of the Plan. According Mr. Lymn any treatment different or better than other creditors of the Debtors would be manifestly unjust and contrary to New Jersey law and the Bankruptcy Code.

**III.    The Valuation of Lymn's Claim as of the Petition Date is Proper.**

30. Under the Plan, the Lymn Claims must be determined in U.S. dollars as of the Petition Date. The Plan provides that "[a]s is required by Section 502(b) of the Bankruptcy Code, each Account Holder's Claim is determined by the fair market value of the Digital Assets (based in [USD] pursuant to the Digital Assets Conversion Table) held by the Account Holder at the Debtors as of the Petition Date at 11.59 p.m. UTC." Plan Art. VI § F.

31. Mr. Lymn asks the Court to enter an order valuing his claim in connection with the present (or at least, post-petition) market value of the Digital Assets he deposited. The requested treatment differs from the treatment of other creditor's Class 3-b Claims, thus contradicting both the terms of the Plan and multiple provisions of the Bankruptcy Code. *See id.*; 11 U.S.C. §§ 502(b), 1123(a)(4) (requiring equality of treatment of each claim within a particular class).

32. The Lymn Response asserts that the Debtors are "receiving a windfall" due to the petition date valuation. Lymn Response at 21. What is meant by this accusation is extremely unclear. These Chapter 11 Cases are confirmed under a liquidating Plan wherein the assets will be distributed pro-rata to creditors. If the Plan were somehow altered along a valuation scheme to

12

Mr. Lymn's liking, pro rata returns to creditors would correspond to the whims of the market for Digital Assets; the Wind-Down Debtors would receive no additional assets, and it is entirely possible Mr. Lymn would find his own distributions diluted by those of creditors whose deposited Digital Assets fared better than his own since the Petition Date. The only possible windfall at issue is Mr. Lymn's attempt to assert a claim amount that is over $500,000 more than the appropriate, statutorily supported, valuation of his claim.

### IV. The Loan Agreement Entitles Lymn to an Unsecured Claim for the Return of Deposited Property.

33. As previously noted, according to the definitions stated in the Plan and the undisputed agreement between Mr. Lymn and BlockFi Lending, the Lymn Claim is a BlockFi Lending LLC Loan Collateral Claim entitled to treatment pursuant to Class 3-b and Distribution as otherwise provided therein.

34. Mr. Lymn's request for a return of assets at their current market value is akin to a claim for treatment as a secured creditor of BlockFi Lending. But Mr. Lymn is not a secured creditor. Mr. Lymn, and all loan customers, agreed to allow BlockFi Lending to act with all attendant rights of ownership as to their collateral in order to obtain lump sum payments in USD. Under the contract and governing law, upon BlockFi's default such claimants receive an unsecured claim for the return of the collateral. Again, the Plan affords such treatment, and provides the Loan Repayment Treatment as an alternative. That is all Mr. Lymn can receive.

35. The competing property rights of the Debtors and their creditors are determined by state law; in this instance, by the agreements reached between the Debtors and Mr. Lymn concerning the parties' respective rights in deposited Digital Asset collateral. *See In re Celsius Network LLC*, 647 B.R. 631, 651 (Bankr. S.D.N.Y. 2023), *leave to appeal denied*, No. 23-CV-523

(JPO), 2023 WL 2648169 (S.D.N.Y. Mar. 27, 2023); *Secure Leverage Grp., Inc. v. Bodenstein*, 558 B.R. 226, 237 (N.D. Ill. 2016), *aff'd sub nom. In re Peregrine Fin. Grp., Inc.*, 866 F.3d 775 (7th Cir. 2017), *as amended* (Aug. 8, 2017); *see also Butner v. United States*, 440 U.S. 48, 54-55 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"). As discussed below in detail, the Lymn Loan Agreement affords property rights in the collateral to the Debtors such that, upon default, Mr. Lymn is afforded only an unsecured claim for return of such collateral at its value as of the Petition Date.

36. The language of the Lymn Loan Agreement makes abundantly clear that BlockFi Lending possessed the right to "pledge, repledge, hypothecate, rehypothecate, sell, lend or otherwise transfer any amount" of the Lymn Collateral "with all attendant rights of ownership" without notifying Mr. Lymn of such actions and without any requirements to retain the Lymn Collateral or a like amount of the Lymn Collateral in "its possession or control…" Lymn Loan Agreement § 4d.

37. Courts addressing similar issues with respect to rehypothecated collateral deposits have concluded that such posted collateral is property of the estate, and the obligation to return a like amount of cash or property is a monetary debt that entitles the creditor to an unsecured claim against the estate. *See, e.g., FirstBank Puerto Rico v. Barclays Capital Inc. (In re Lehman Brothers Holdings, Inc.)*, 492 B.R. 191, 195 (Bankr. S.D.N.Y. 2013), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 526 B.R. 481 (S.D.N.Y. 2014), as corrected (Dec. 29, 2014), *aff'd sub nom. In re Lehman Bros. Holdings, Inc.*, 645 F. App'x 6 (2d Cir. 2016) (holding the bank could only have pursued a claim for money damages in a breach of contract action, or, in the case of bankruptcy, filed a proof of claim for breach of contract, and that the sales and transfers of the collateral were

14

permissible under the language in the security agreement even if defaults under the swap); *In re MJK Clearing, Inc.*, 286 B.R. 109, 121-23 (Bankr. D. Minn. 2002), *aff'd*, No. 01-4257 RJK, 2003 WL 1824937 (D. Minn. Apr. 7, 2003), *aff'd*, 371 F.3d 397 (8th Cir. 2004) (holding funds held by bankrupt broker were property of the estate and the obligation to return collateral amounted to an unsecured claim for the monetary debt); *Secure Leverage Grp.*, 558 B.R. at 237 (holding that language in a futures contract that granted the merchant the "right to pledge, repledge, hypothecate, sell or purchase, invest or loan" customer property without notice or a requirement to deliver "identical property" did not create a constructive trust that would allow those customers to seek payment in full outside the normal claims process).

38. Other bankruptcy courts overseeing cryptocurrency cases have held that similar language to that found in the Lymn Loan Agreement supported a finding that the cryptocurrency placed into interest-bearing accounts was estate property, and that account holders were thus entitled to unsecured claims against the estate. *See In re Celsius Network LLC*, 647 B.R. at 651 (holding that language that advised Earn account holders that they were granting Celsius the right to "pledge, re-pledge, hypothecate, rehypothecate [their cryptocurrency] …with all attendant rights of ownership" could be read in harmony with references to loans to find that the account holders were general unsecured creditors).

39. This Court has, likewise, repeatedly ruled upon similar issues concerning the extent of claimants' property interests in deposits. For instance, in its oral ruling on *Debtors' Motion For Entry Of An Order (I) Authorizing The Debtors To (A) Honor Withdrawals From Wallet Accounts, (B) Update The User Interface To Properly Reflect Transactions And Assets As Of The Platform Pause, And (C) Conduct Ordinary Course Reconciliation Of Accounts, And (II) Granting Related*

15

*Relief* (the "Wallet Motion") [Docket No. 121] the Court explicitly incorporated by reference the following stipulated fact:[7]

> BlockFi Inc., BlockFi Lending LLC, and BlockFi International Ltd. each separately host and maintain omnibus non-custodial wallets through Fireblocks or other exchanges and custodians for BlockFi's other product offerings, BPC (open and fixed loans) and BIA (the "Rehypothecateable Wallets"). The digital assets in the Rehypothecateable Wallets are free to be pledged, repledged, hypothecated, rehypothecated, sold, lent, or otherwise transferred, invested, or used.

By contrast to this language, participants in the "Wallet Program" entered into an agreement by which title was to remain with the depositor, and rehypothecation, sale or other transfer would not be permitted. The Court has recognized that deposits in the Wallet Program are, with limited exceptions, non-Estate assets to be returned to participants in full. *See id.*; Plan Art. II.D (providing for return of deposits in recognition of "the non-Estate assets contained in such Holders' Account in connection with the Wallet Program").

40.     Indeed, the Court has repeatedly recognized both this distinction in contract language and the likely result that collateral depositors such as Mr. Lymn will not see their deposits returned in full. For instance, in its recent order denying a motion to dismiss filed by the Department of Justice in a seizure warrant adversary proceeding commenced by the Committee, the Court observed that unlike participants in the Wallet Program, "BlockFi customers with BIA

---

[7] Transcript of May 11, 2023 Hr'g, Docket No. 871, 3:7–3:10; Order Granting Wallet Motion, Docket No. 923. The BIA Terms of Service contains similar language to the Lymn Loan Agreements in Section E. Utilization of Assets:

> BlockFi has the right, without further notice to you, to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

https://blockfi.com/interest-account-terms-existing-us/.

16

or Collateral Accounts will be receiving distributions under the Debtors' confirmed plan representing only a fraction of the amounts actually due and owing." Adv. Pro. No. 23-01144, Docket No. 55 at 17.

41. Consistent with the foregoing, the language of the agreement entitles Mr. Lymn to an unsecured claim for the dollarized value of 44.216391 BTC as of the Petition Date, less setoff. Mr. Lymn's contract does not give him any greater or other property right.

## Conclusion

42. This Court entered the Confirmation Order, which confirmed the terms of the Plan, including the treatment of Class 3-b Claims. The Eleventh Amended Omnibus Objection proposes to correct the claims register by treating the Lymn Proof of Claim in accordance with the terms of the Plan. In his pleadings, Mr. Lymn seeks relief that contradicts the terms of the Plan and Confirmation Order and would force the Wind-Down Debtors to treat his claims differently than all other creditors in Classes 3-b. It would also, by implication, force the Wind-Down Debtors to allow fraudulent and wildly-inflated claims against all nine debtor entities as long as they were filed by creditors who voted to accept the Plan. The Court should enter an Order sustaining the Eleventh Amended Omnibus Objection with respect to the Lymn Claim and overruling the Lymn Response.

**WHEREFORE**, the Wind-Down Debtors respectfully request entry of an order modifying Claim No. 15081 to $716,584.

*[remainder of this page intentionally left blank]*

|  |  |
|---|---|
|  | Respectfully Submitted, |
| Dated: November 3, 2023 | /s/ *Daniel M. Stolz* |

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
(973) 230-2095
DStolz@genovaburns.com
DClarke@genovaburns.com

*Local Counsel to the Plan Administrator*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Lauren M. Sisson, Esq. (NJ Bar No. 394182022)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
lauren.sisson@haynesboone.com

*Attorneys for the Plan Administrator*

**BROWN RUDNICK LLP**
Kenneth J. Aulet, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
(212) 209-4800
kaulet@brownrudnick.com

**BROWN RUDNICK LLP**
Tristan Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
(617)856-8300
taxelrod@brownrudnick.com

*General Counsel to the Plan Administrator*