IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

```
IN RE:                    .    Case No. 22-19361-MBK
                          .    (Jointly Administered)
BLOCKFI INC., et al.,     .
                          .
         Debtors.         .
                          .    November 6, 2023
. . . . . . . . . . . . . .    10:02 a.m.
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT CHIEF JUDGE

APPEARANCES VIA ZOOM VIDEOCONFERENCE:

For the Debtors and        Haynes and Boone, LLP
Debtors-in-Possession:     By: RICHARD KANOWITZ, ESQ.
                               LAUREN SISSON, ESQ.
                           30 Rockefeller Plaza, 26th Floor
                           New York, NY 10112

                           Haynes and Boone, LLP
                           By: AIMEE FURNESS, ESQ.
                               JORDAN CHAVEZ, ESQ.
                               MATT FERRIS, ESQ.
                           2801 N. Harwood Street
                           Suite 2300
                           Dallas, TX 75201


Audio Operator:            Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (CONT'D):

| | |
|---|---|
| For the Plan Administrator: | Brown Rudnick, LLP<br>By: KENNETH AULET, ESQ.<br>Times Square<br>New York, NY 10036 |
| | Genova Burns LLC<br>By: DANIEL M. STOLZ, ESQ.<br>    DONALD W. CLARKE, ESQ.<br>494 Broad Street<br>Newark, NJ 07102 |
| For the U.S. Trustee: | Office of the U.S. Trustee<br>By: JEFFREY M. SPONDER, ESQ.<br>One Newark Center, Suite 2100<br>Newark, NJ 07102 |
| For John Lymn: | Akerman LLP<br>By: JOANNE GELFAND, ESQ.<br>Three Brickell City Centre<br>98 Southeast Seventh Street<br>Suite 1100<br>Miami, FL 33131 |
| For Interested Party George Wynns: | George Wynns, *Pro Se*<br>124 Brewster Street<br>San Francisco, CA 94110 |
| For Brian Graddon: | Brian Graddon, *Pro Se* |
| For Wilson W. Cotrim: | Wilson W. Cotrim, *Pro Se* |

- - -

3

1                    (Proceedings commenced at 10:02 a.m.)

2                    THE COURT:  Okay.  Good morning everyone.  This is

3    Judge Kaplan, and I'm going to start my calendar momentarily.

4    We have a number of BlockFi Inc. matters on for today.  All

5    parties and counsel are appearing remotely.  I have no one in

6    the courtroom.  We are joined by at least two self-represented

7    parties who I will hear when I call their matters, as well.

8    And for those, as a reminder, who wish to be heard who I

9    haven't called, please use the "raise hand" function.

10                   All right.  So let me start with appearances on

11   behalf of I guess both the plan administrator and the debtor

12   who initially filed these motions.

13                   MR. AULET:  Good morning, Your Honor.

14                   This is Kenneth Aulet of Brown Rudnick, general

15   counsel for the plan administrator.  I'm  joined by our local

16   counsel, Genova Burns.  Dan Stolz and Don Clarke I believe are

17   both on the line.  And we are also joined by our co-counsel

18   from Haynes and Boone.

19                   THE COURT:   Good morning everyone.

20                   All right.  I have the agenda.  How does counsel wish

21   to proceed with what matters?

22                   MR. AULET:  So, Your Honor, we thought we'd start

23   with a short status update on the sealing motions.  From there,

24   we'll move -- we'd propose that we'd move on to the claims

25   objections which are essentially the main event of the hearing.

4

1          THE COURT:  That's fine.

2          MR. AULET:  To give Your Honor just a little bit of

3  background, as you know, the plan went effective on October

4  24th and Brown Rudnick and Haynes and Boone have both been

5  retained as counsel of the plan administrator, and that's the

6  role that we are both appearing in today.

7          The plan administrator has succeeded to both the role

8  of the Committee and of the debtors in respect of these plan --

9  claims objections.  The plan administrator's focus is now on

10  preparing for distributions, and a large part of that is

11  cleaning up the claims register.

12          So moving to the sealing motions, based on Your

13  Honor's ruling, we will be getting -- all parties will be

14  getting -- both the debtors, the Committee will be getting

15  unredacted versions of the appropriate affidavits of filings on

16  file.  There's just a lot of paper.  We haven't been able to

17  get that on file yet.  But our view is that as soon as we get

18  those on file, those objections will be mooted.

19          And unless Your Honor has any questions on that, we

20  also informed the U.S. Trustee of that, and they have no

21  objection to proceeding as a status conference on these issues.

22          THE COURT:  All right.  So what's your intention?

23  That we just carry the sealing motions or just do an -- I can

24  mark them order to be entered?

25          MR. AULET:  Our view is that we would carry the

1   motions and then as soon as we file the unredacted versions,

2   those would be withdrawn as moot.  I believe there's one where

3   Genova Burns has asked to seal the monthly fee statement that

4   involves certain personal information of members of the

5   Official Committee of Unsecured Creditors.  We certainly want

6   that carried, and we'd seek to have that entered.

7            But given the number of sealing motions that are on

8   file where we wanted to carry it to moot it out, we figured

9   that we would just carry all of those motions to a later

10  hearing.

11           THE COURT:  All right.  Do we have a date? I know we

12  have a January date.  Is that the date we're looking at?

13           MR. AULET:  I believe that we were trying to set up

14  some additional omnibus objections or omnibus hearing dates.

15  We thought one was the 28th of November, but that's from

16  memory, unfortunately.  So that may not be accurate.

17           UNIDENTIFIED SPEAKER:  That is correct, Your Honor.

18           THE COURT:  All right.  Okay.  So do you want to

19  carry these sealing motions to the 28th for now, and then we

20  set up more dates or how do you wish to --

21           MR. AULET:  Yes, Your Honor.

22           THE COURT:  Why don't we do that.  Tuesday, November

23  28th.  I'm just looking over at my clerk.

24           Becca, does that make sense?

25           THE CLERK:  Sure, yeah.

1         THE COURT:   All right.  Then, we'll do 11/28 at 10

2    a.m.  And we'll mark off all the pending sealing motions.

3    We'll carry it to that date.

4         MR. AULET:  Thank you, Your Honor.

5         THE COURT:  You're welcome.

6         MR. AULET:  Now on the claims objection matters,

7    Lauren Sisson from Haynes and Boone will be handling the

8    objections where there was no response as well as I believe

9    Mr. Cotrim's.  I will then handle Mr. Wynns' response as well

10   as his corresponding motion.  And Mr. Kanowitz will handle the

11   Lymn claim objection, if that works for Your Honor.

12        THE COURT:  That's fine.  Let's proceed.

13        Ms. Sisson?

14        MS. SISSON:  Good morning, Your Honor.

15        Lauren Sisson, Haynes and Boone, for the plan

16   administrator.  I'm  going to be addressing the tenth and

17   eleventh omnibus objections to claims generally.  Those are at

18   Docket Numbers 1437 and 1450.  As an initial matter, we're

19   going to be submitting revised proposed orders on both omnibus

20   ten and omnibus eleven.

21        The proposed order for omnibus ten is going to be

22   revised to reflect that some claimants have withdrawn their

23   proof of claims entirely through the Kroll website.  And so

24   we'll be removing the proposed modifications and expungements

25   of those claims.

7

1          THE COURT:  Just for ease for my court recorder,

2    we're talking about number nine on the agenda?  Is it eight and

3    nine on the agenda?

4          MS. SISSON:  I believe so, Your Honor, yes.  Number

5    -- omnibus ten is Docket 1437 and 11 is 1450.

6          THE COURT:  All right.  Kiya, I'll give you the

7    calendar marked up afterwards.

8          MS. MARTIN:  Okay, thank you.

9          THE COURT:   All right.  Please proceed.  Thank you.

10          MS. SISSON:  And then for the proposed order for

11   omnibus eleven, we had some errors with the surviving claim

12   numbers on about 20 of the claims, and we also had the same

13   situation where a dozen or so claimants withdrew their claims

14   formally with Kroll.

15          And so out of an abundance of caution, we're going to

16   move those creditors where there was an issue with the

17   surviving claim numbers to the next omnibus objection just to

18   ensure that they get notice of exactly what's happening with

19   their claims.  So we will submit those orders after the

20   hearing.

21          THE COURT:  And that is under the eleventh?  Under

22   which omnibus or both?

23          MS. SISSON:  Just eleven.

24          THE COURT:  Just eleven.  So eleven --

25          MS. SISSON:  Yes.

1          THE COURT:  -- apart from what we resolve today or

2    what has been resolved, eleven will continue with respect to

3    certain claims?

4          MS. SISSON:  That's correct, yeah.  We were planning

5    on just placing those on through omnibus entirely just to kind

6    of clean up the calendar a little bit.  And we can mark exactly

7    what's being removed when we send the order to the Court.

8          THE COURT:  All right.  So we'll mark that 11/28 at

9    10 a.m.  All right.  Thank you.

10         MS. SISSON:  And then to turn briefly to a few of the

11   responses that were filed to omnibus eleven, there were three

12   responses that were filed at Docket Numbers 1647, 1648, and

13   1650.  We filed one reply to those at Docket 1830.  And as we

14   detail in that reply, it's our understanding that those

15   responses were filed mostly to say that they agree with the

16   treatment of their claims or just kind of as a placeholder

17   because counsel had been retained late in the process.

18         So we have reached out to and spoken with counsel for

19   those various responses, and it's our understanding that they

20   don't oppose the treatment of their claims.  Counsel for the

21   creditor who filed the response at Docket 1650 asked me to

22   inform the court that he did withdraw his response this

23   morning.

24         THE COURT:  All right.  Do you have the name on that

25   one?

1          MS. SISSON:  It's going to be Katzenell.

2          THE COURT:  Okay.  That was Mr. --

3          MS. SISSON:  It's actually the Estate of Herman

4   Katzenell.

5          THE COURT:  The Estate, right.

6          MS. SISSON:  Mr. Gorski, yes.

7          THE COURT:  That was Mr. Gorski.  Correct.

8          MS. SISSON:  Yes.

9          THE COURT:  Thank you.

10         MS. SISSON:  We also filed a reply at Docket 1836 to

11  two responses that were filed after the response deadline by

12  Mr. Graddon.  Those were at Dockets 1822 and 1823.  I haven't

13  spoken with the creditor, but it's our understanding that the

14  objection is to the dollarization of his claim at the petition

15  date amount.  And so in our reply, we've simply cited to the

16  plan and the provisions of the Code that provide that a claim

17  is determined in U.S. dollars as of the petition date.

18         THE COURT:  Well, we have Mr. Graddon here.  Should

19  we address that claim now?

20         MS. SISSON:  Sure.

21         THE COURT:  All right.  Mr. Graddon, good morning.

22         MR. GRADDON:  Good morning, Your Honor.  Good morning

23  everyone.

24         THE COURT:  Have you had the opportunity to review

25  the reply that was submitted on behalf of the administrator?

10

1          MR. GRADDON:  Yes, I have, Your Honor.

2          THE COURT:  All right.  And do you wish to add

3   anything to your papers or make further argument?

4          MR. GRADDON:  Well, the one thing I'd say, Your

5   Honor, is that I did -- BlockFi and Kroll somehow have had my

6   email incorrect, although it has been correct throughout the

7   whole operation of BlockFi.  And so the first time I never

8   received the objection until very late which was why I didn't

9   have the opportunity to respond.

10          My most recent reply they state was made on October

11  31st.  That is incorrect.  I submitted that response on Friday,

12  October 27th.

13          THE COURT:  That's fine.  I'm accepting it, and I've

14  reviewed it.  Do you wish to address the response to the reply

15  with respect to basically the plan, the terms of the plan and

16  the terms of the Code under 502(b) requiring the treatment of

17  your claim consistent with the dollarization effort as of the

18  petition date?

19          MR. GRADDON:  Yes, Your Honor.  I would like to make

20  a couple of points.  I know Your Honor has read the response,

21  and my main point would just be that in this case, I think we

22  are moving into a new area of law and I think in the future,

23  these cases, the dollarization of Bitcoin specifically will no

24  longer be an issue.  This is an opportunity for the Court to

25  recognize that now.

1           I would say that BlockFi was a cryptocurrency

2    company.  They presumably believe in cryptocurrency.  They

3    built their business around selling cryptocurrency and loaning

4    out cryptocurrency, earning interest from cryptocurrency,

5    paying interest in cryptocurrency, holding collateral of

6    clients in cryptocurrency.  Of all those cryptocurrencies,

7    BlockFi has by far the strongest case as a worldwide currency.

8    It's currently pulling developing nations out of poverty.  It's

9    the only original fully decentralized cryptocurrency with a cap

10   supply, half-proof, untamperable.

11          There's so many arguments for why with this company

12   in this situation, with Bitcoin specifically, there's no reason

13   why this claim could not be in Bitcoin since that's the

14   collateral that was trusted with them.

15          I'll give one further example.  In my view, this is

16   one more situation where BlockFi is going to be able to do a

17   disservice to their clients in the fact that with, as an

18   example my Bitcoin, 67 Bitcoin, it's currently worth double the

19   amount at the petition date.  So if BlockFi gave me 100 percent

20   payback, I would actually receive 50 percent of the value of my

21   claim and they would be able to walk away saying that they

22   returned 100 percent.  Of course, we know it won't be 100

23   percent.

24          And by the time this is actually paid out, they may

25   be able to say they gave me an 80 percent payback when in fact

1   I'll walk away with a 15 percent value, most likely, of my

2   actual claim.  And that's just -- the argument, Your Honor, is

3   just that this collateral was trusted with BlockFi.  I was told

4   by BlockFi that it was kept secure with Gemini.  And the entire

5   reason for going into this agreement with BlockFi was so that I

6   wouldn't have to sell my Bitcoin.

7           So the argument would be, Your Honor, that this is a

8   new area of law.  This is not -- this is very different from a

9   normal security interest with stock.  There is no reason why a

10  cryptocurrency company such as BlockFi should not honor the

11  claim and the Court should not honor the claim in the currency

12  in which the collateral was trusted to the debtor.

13          THE COURT:  All right.  Thank you.

14          Ms. Sisson, any additional comments or response?

15          MS. SISSON:  Just briefly, Your Honor.

16          We definitely understand where Mr. Graddon is coming

17  from.  You know, there's a lot of similarly-situated creditors.

18  BlockFi did allow a multitude of coins on the platform, dozens

19  of other coins other than Bitcoin and Ethereum.  And so really,

20  you know, the plan is confirmed.  The plan says what it says.

21  And in order to be able to deal with an estate of this size

22  with tens of thousands of creditors, you know, it's something

23  that needed to be done and is supported by the Code.  And so we

24  would just stand by the fact that, you know, we needed to do

25  the dollarization in order to be able to administer the estate

1  properly.

2          THE COURT:  All right.  Thank you.

3          The Court appreciates the arguments raised by

4  Mr. Graddon.  We're addressing the claims with respect to the

5  BlockFi Lending account and the BlockFi Inc., not necessarily

6  the BlockFi Wallet which is Claim Number 29-265.  This Court

7  previously has addressed the differing treatment between Wallet

8  Holders and those holding collateral claims, as well as BlockFi

9  Inc. general claims.

10          The Court has been guided by the terms of service

11  with respect to all of these accounts.  The Court is also

12  guided, of course, by the plan which was consistent with the

13  Code and Section 502(b).  If there needs to be changes, the

14  Court is not in a position to make the changes.  It has to be

15  congressional changes in how claims are treated taking to

16  account new types of claims that arise.

17          502(b) calls for the dollarization of claims as of

18  the petition date.  And the Court is not in a position to pick

19  and choose among creditors, especially with a confirmed plan

20  that dictates the treatment of all creditors holding all types

21  of claims based on all differing types of tokens and coins.

22          So, again, I appreciate the issues that are raised.

23  I don't necessarily disagree in the unfairness of it.  But it

24  would be equally unfair to start picking and choosing which

25  creditors are afforded differing values for their claims based

 1 on the nature of the coins themselves when it's inconsistent

 2 with how Congress has instructed our courts to treat these

 3 claims and the new agreement that has been reached under the

 4 plan.

 5          So I'm going to sustain the plan administrator's

 6 objection.  And thank you for your time.

 7          MR. GRADDON:  Thank you, Your Honor.

 8          THE COURT:  You're welcome.  Thank you.

 9          Ms. Sisson, anything else on your end?

10          MS. SISSON:  The last thing I'll be addressing is

11 going to the objections to Mr. Cotrim's claims.  And they are

12 on the seventh omnibus objection.  They've been carried over a

13 few times.  The seventh omnibus is at Docket 1311, and

14 Mr. Cotrim has a response filed at Docket 1483.

15          THE COURT:  All right.  And, again, Mr. Cotrim, I

16 believe I saw --

17          MR. COTRIM:  Yes, Your Honor.

18          THE COURT:  There you are.  Good morning.

19          MR. COTRIM:  Good morning, sir.

20          THE COURT:  All right.  You had a chance to review

21 the replies filed on behalf of the plan administrator.  Let me

22 hear from you.  Any specific response?

23          MR. COTRIM:  I read the response.  The reason why I'm

24 thankful for being here is to be pro se, so bring the accurate

25 facts of what has happened to my BlockFi account, what I have

1   seen, what I have done there, Your Honor.

2          I made my millions because I was blessed
3   (indiscernible).  I'm a family man who lives in Arizona with my
4   wife and four children.  I have been the only person authorized
5   and allowed to access my BlockFi account.  My friend Juliermo
6   is also a trader, and the great amount of my crypto on his
7   Kucoin account and he made that transfer starting from his
8   Kucoin account on September 13th of 2022.  And I received 80
9   Bitcoin, 8,000 Ethereum on my BlockFi account on September 15
10  of 2022.

11          There's a screenshot, Your Honor, that I took on the
12  16th of that same month of September 16, 2022 when I was at my
13  home in Arizona where you can see it's 40 Bitcoin in one
14  account, 40 Bitcoin in another account, 4,000 Ethereum and
15  4,000 Ethereum between my Wallet and my Interest Account.
16  Sometime after BlockFi filed bankrupt, Your Honor, I tried to
17  log into my account.  I wasn't unfortunately able to do so.  I
18  waited a while to get back to my account, and I wasn't able to.

19          In February 12th, Your Honor, I received a letter in
20  the mail with bank forms, one for my Wallet, one for my
21  Interest Account.  I filled them both out by my myself and sent
22  them over.  Kroll, the agent, received them on the 23rd of
23  February 2023.  Sometime after that, Your Honor, on June 13th,
24  they emailed me request for more documentation and proofs of
25  claim.  Around that time, I tried to check back in my BlockFi

16

1    account one more time.  I was able to log in finally, and when

2    I saw I was shocked that my Wallet Account had zero on it and

3    all the history had been wiped out.  My Interest Account had

4    four pennies on it, and all the history for 2022 had also been

5    wiped out.

6           On August 3rd of 2023, the debtors filed a motion to

7    expunge one claim and to modify another claim.  And I was

8    blessed enough that on August 21st, I was able to retain

9    Mr. Shapiro to help me with this matter.  Mr. Shapiro requested

10   BlockFi and the debtors' agent, Kroll, for extra information,

11   some relevant information on this.  And they were not giving

12   it.  No relevant information was given to us, nothing regarding

13   hacks or security breaches or internal hack that could have

14   happened.

15          And I also had been advised that the debtors have

16   filed a motion to quash the subpoena, so one more reason they

17   don't want to give out any information regarding relevant

18   information, regarding the hack, cyber hacks (indiscernible).

19          Your Honor, many questions remain unanswered at this

20   point on this.  Once the debtors, they are only saying what

21   they have done but we don't see any documentation from them.

22   We don't see who is doing that research on their end.  And the

23   debtors have not met their burden of proof to sustain their

24   objections to my claim with prima facie evidence of the

25   deposits.

1          I do not know, Your Honor, what happened to the

2   deposits after the petition date because I had no access to my

3   accounts.  I also do not know what happened to my accounts

4   after that.  It's my understanding that during the petition,

5   the bankruptcy, BlockFi and Kroll, its agent, was a victim of a

6   security breach or a hack.  That was a fact.  We got an email

7   from them that Kroll had been the victim of a hack this one

8   time they sent to everybody.

9          And I believe that my concerns about loss of my

10  deposits and those other data hacks breach or inside hack

11  (indiscernible) recovery from the debtors, Your Honor.  Your

12  Honor, it is with the utmost respect that I request this Court

13  to deny the debtors' claims, the claim to modify and the claim

14  to expunge my account.  Thank you, Your Honor.

15          THE COURT:  Thank you, Mr. Cotrim.

16          Ms. Sisson?

17          MS. SISSON:  Yes; thank you, Your Honor.

18          As Mr. Cotrim said, he did file two proofs of claim

19  in the case.  One was asserted against BlockFi Inc. and BlockFi

20  Lending, and the other against BlockFi Wallet.  The Wallet

21  claim is the one that we're seeking to expunge, and we're

22  seeking to modify the other claim to one against BlockFi Inc.

23  in the amount of four cents.

24          Mr. Cotrim submitted an initial affidavit to support

25  the claims to Kroll stating that he deposited 40 Bitcoin and

1   4,000 Ethereum into both his IA and his Wallet accounts in

2   September 2022.  A review of BlockFi's records, which we have

3   provided to counsel for -- former counsel for Mr. Cotrim, show

4   that he made a small deposit of less than two Bitcoin in 2021.

5   He traded that coin for some Ethereum, and then he withdrew the

6   balance a few months later.

7           The four cents that's reflected in the debtors' books

8   and records is basically an accrual of interest that occurred

9   on a fractional portion of the Bitcoin and the Ethereum that

10  was left in the account.

11          We provided Mr. Cotrim a full transaction history for

12  the account.  We also did a full search for emails between

13  Mr. Cotrim and employees of BlockFi, Help Desk tickets, and we

14  also provided identity verification requests showing the emails

15  that Mr. Cotrim received when he sought to withdraw in April of

16  2021.  And he had to upload a selfie and his driver's license

17  in order to initiate that withdrawal.

18          We provided Mr. Cotrim's counsel with all of the

19  evidence that we had in relation to the account the entire time

20  that it was open.  After we provided the records, we then moved

21  to quash the subpoena based on what was remaining that was not

22  relevant to the claim.  That motion to quash was unopposed, and

23  it was granted by this Court on October 10th.  After that time,

24  the Court also granted the withdrawal of Mr. Cotrim's attorney.

25          The second certification that Mr. Cotrim filed in

1  relation to his claim introduces a second individual, Mr. I

2  think it's Vieira.  I'm not sure if I'm pronouncing it

3  correctly.  But the second certification indicates that

4  Mr. Vieira is the one that initiated the deposit in September

5  of 2022, and it states that he doesn't retain any records of

6  the transaction.

7          Mr. Cotrim's response included two screenshots

8  intended to support his claims.  One of the screenshots I

9  believe is showing the withdrawal of the 80 Bitcoin and 8,000

10  Ethereum from Mr. Vieira's account.  But the dates don't match

11  what Mr. Cotrim and Mr. Vieira say when they say that occurred.

12          And then there's a second screenshot that is included

13  which has a couple of discrepancies.  First, it says that the

14  screenshot user has three active crypto balances, but the

15  debtors' books and records and Mr. Cotrim's claims reflect that

16  he only ever put Bitcoin on to the platform and traded it for

17  Ethereum.  So there was never a third crypto balance in his

18  account.

19          The screenshot he provided also shows balances of

20  over $6 million in both his BIA and his Wallet, and that brings

21  me to what I think is the most important point regarding the

22  deposit that Mr. Cotrim is alleging, which is that it is the

23  impossibility.  Per the settlement with the SEC, after February

24  of 2022, U.S.-based BIA clients could no longer put new funds

25  into their BIA whether that was by depositing it directly from

1  an external Wallet or from moving it from their Wallets to

2  their BIA.  And so the transaction that's represented in that

3  screenshot is not possible after February of 2022.

4          I did confirm with BlockFi that Mr. Cotrim never had

5  a non-U.S. address on his account and he never requested a

6  change of address on his account.

7          And then, finally, Your Honor, as Mr. Cotrim said

8  today, the subpoena and his response do allude to the concept

9  of a data hack or a security breach.  BlockFi has not received

10  any reports of anything similar to what Mr. Cotrim is alleging

11  could have happened.  And I think if someone were to be

12  attempting to fraudulently remove his coin into the platform,

13  they would have needed (indiscernible) to remove it and also to

14  wipe out any trace of it ever being on the platform in the

15  first place.

16          The controls that BlockFi had in place for

17  withdrawals means that there's no way someone could take that

18  amount of coin off the platform even if they turned it into

19  cash first, even if they tried to do a wire or an ACH

20  withdrawal rather than just move it to an external Wallet.  All

21  of those occurrences would have prompted an identity

22  verification process that Mr. Cotrim would have had to undergo

23  in order to get that coin off the platform.  And, in fact, we

24  did provide him with records to show that he needed to complete

25  that process when he did the withdrawal of the small quantity

1  of Ethereum in April 2021 which was the last movement that we

2  saw initiated by him on the platform.

3            So, you know, to sum up, Your Honor, I think the

4  books and records of the debtor are very clear.  Mr. Cotrim has

5  a claim of four cents against BlockFi Inc. and nothing more.

6  And if the Court doesn't have any further questions, we would

7  just ask that the Court grant the objection and that the claims

8  be modified and expunged as per the (indiscernible).

9            THE COURT:  All right.  Thank you.

10           Mr. Cotrim, I see your hand raised.

11           MR. COTRIM:  Yes, Your Honor.  I just wanted to

12  address that she mentioned there were three crypto in there.

13  When I filed my claims, I did not have access to my BlockFi

14  account, so I did the best of my ability with what really

15  mattered which was the 80 Bitcoin and 8,000 Ethereum.  The

16  Gemini (indiscernible) is worth $100, just to make that point

17  to the Court.  Thank you for listening, Your Honor.

18           THE COURT:  All right.  Thank you.

19           The Court has considered the issues raised with

20  respect to the objection filed by the plan administrator

21  relative to Mr. Cotrim's Claim Number 5503 for which the

22  administrator seeks to modify.  There's also a claim to expunge

23  under Claim Number 3419.

24           The Bankruptcy Rules and the Bankruptcy Code provide

25  for a shifting of burdens with respect to claims adjudication.

1   Bankruptcy Rule 3001(f) provides that a filed proof of claim

2   that is prepared and complies with the Bankruptcy Rules

3   constitutes prima facie evidence of its validity both in terms

4   of its amount and the basis.  That places the burden upon an

5   objecting party to rebut the prima facie elements of the claim.

6   Once that is done and in order to rebut, the objector must

7   produce evidence which it believed would refute at least one of

8   the allegations that is essential for the legal sufficiency of

9   the claim.

10        If the objecting party produces sufficient evidence

11   to negate one of the -- one or more of the sworn facts

12   underlying the proof of claim, then the burden reverts back

13   upon the claimant to establish by a preponderance of the

14   evidence the validity of the claim as to both its amount and

15   liability.

16        Here, the evidence submitted by the claimant,

17   Mr. Cotrim, is insufficient to overcome the -- or to satisfy,

18   rather, the burdens imposed upon by the Federal Rules of

19   Bankruptcy Procedure and the Code.  The plan administrator has

20   rebutted in their submission the validity of these claims,

21   taking issue with whether or not any of the claimed 80 Bitcoin

22   or 8,000 Ethereum were ever deposited.

23        There is nothing before the Court in the records

24   provided by the claimant apart from a suspect screenshot which

25   would support the existence of these deposits.  There are no

1 email transactions, email records, transactional records, any

2 of BlockFi's own internal documentation which supports any of

3 these deposits.  The Court is not in a position to give

4 credence to screenshots which are inconsistent with the facts

5 that have been laid out in the objection and which have

6 inherent credibility issues relative to contradictions with --

7 that are existing with the facts of record.

8        In essence, Mr. Cotrim has not met his burden by a

9 preponderance of the evidence as required under In re Allegheny

10 International, which is the Third Circuit decision that lays

11 out the shifting burdens.  At this juncture, the Court has no

12 choice but to sustain the objection filed by the plan

13 administrator.  Thank you.

14        MR. COTRIM:  Thank you, Your Honor.

15        THE COURT:   You're welcome.

16        Ms. Sisson, do we move on to other claims?

17        MS. SISSON:  Yes.  And I apologize, Your Honor.  I

18 had meant to move to admit Exhibits A and B to our reply before

19 I began my argument.  So if we could possibly do that now, I

20 would appreciate it.

21        THE COURT:  That's fine.  They were attached to the

22 submission.  They are docketed, and they are of record.

23        MS. SISSON:  Okay.

24        THE COURT:  Thank you.

25        MS. SISSON:  Thank you.  Thank you, Your Honor.

1          I'm  going to cede the podium to Mr. Aulet at this

2   time.

3          THE COURT:  All right.

4          MR. AULET:  Thank you, Your Honor.

5          The next objection is the objection to Mr. Wynns'

6   claims, and I see Mr. Wynns has joined the hearing.  If you

7   would like to turn it over to him or I can give a brief

8   summation of -- he's filed both a motion and a response to our

9   claims objection.

10          THE COURT:  Well, why don't I turn to Mr. Wynns

11   first.

12          Mr. Wynns, good morning.  I have reviewed your motion

13   and your reply that was filed.  Let me give you this

14   opportunity to amplify it.

15          MR. WYNNS:  I appreciate it, Your Honor.  Thank you.

16   Good morning to you, as well.

17          THE COURT:  Good morning.

18          MR. WYNNS:  I have several points to make, if I may.

19   First of all, Mr. Clarke I think said that my motion was not

20   timely, but it was.  It was filed on the 16th of October, 21

21   days past.  It wasn't entered until the 17th apparently, but my

22   copy of the motion is file-stamped the 16th so it was timely.

23          On the other hand, the opposition to the motion was

24   not timely.  According to Local Rule 9013-2(a)(2), it should

25   have been filed and served at least seven days before the

1    hearing and it was not.  And I'd like to ask the Court to treat

2    it as no reply, to disregard the reply and to consider the

3    motion as unopposed in the Court's discretion.

4           And if the motion is unopposed, the Court has the

5    discretion to grant the motion for good cause at the Court's

6    discretion.  And a citation on that is <u>In re Franklin</u> (1997),

7    210 B.R. 560.  So that's about the timeliness.

8           And I checked, and I think Ms. Sisson said when I

9    spoke to her a few weeks ago that BlockFi Inc. does have the

10   Bitcoin to repay my small amount of Bitcoin, 4.22 Bitcoin.  And

11   that is shown by BlockFi's own records attached to an exhibit

12   to my objection and response to the tenth omnibus objection to

13   certain claims.  And according to their assets and liabilities

14   statement on Point 77.3, they mentioned on that place that they

15   had $3,262,500 worth of Bitcoin just there.  And I'm sure they

16   have much more in other places.

17          I also pointed out in my moving papers that our

18   contract with BlockFi agreed that that's my Bitcoin.  I have

19   the ownership and rights to the Bitcoin.  They were only

20   supposed to hold it for security.  And contrary to what I think

21   I saw in Mr. Clarke's proposed opposition, I was never given a

22   margin call on that.  I was always proper and complete on my

23   loan situation with BlockFi.

24          What BlockFi used to do is send its customers a

25   warning that Bitcoin price had dropped and they needed to make

26

1  a further deposit to avoid a margin call.  And I always did

2  that.  I was always in fine status with them and always willing

3  and able to pay that loan off.  I just didn't find it

4  convenient to do so and was taken by surprise when they filed

5  for Chapter 11.  And at that point, they refused to be paid off

6  and said that they were freezing the interest.

7        And I want to do the equitable thing here, Your

8  Honor, and pay them what I owe in principal and interest on my

9  two loans, which at last accounting was approximately $42,000.

10 I don't mind if they add additional interest on that for the

11 intervening months.  I just want to be equitable here, Your

12 Honor.  But according to my moving papers and a few authorities

13 that I cited, I do have the right to get my Bitcoin back.  And

14 I'm simply asking the Court to approve my claim.  I filed my

15 claim in BlockFi Inc. back on January 10th of this year, and I

16 wasn't sure who had the Bitcoin so I filed additional claims

17 against their other entities.

18        But it's a very small amount of Bitcoin, but it's

19 very important to our retirement savings.  I'm 77; my wife is

20 76.  And we cannot wait years to see what happens with this.

21 We need to get our Bitcoin back, and that is why I have made

22 this motion.

23        Your Honor, I don't believe they have presented any

24 evidence ay all.  I appreciate your citing the Allegheny case.

25 I know you're very familiar with it.  I was going to cite it to

1  you, but there's no need for that because you know all about

2  it.  And my claim was specifically that I wanted and was

3  entitled to the return of those 4.22 Bitcoin in specie.

4          The tenth omnibus objection to certain claims

5  mischaracterized my proofs of claim as being for a money

6  amount.  Now I did state the approximately money amount it was

7  worth on a claim at that time as being around $79,000.  But I

8  was very clear in Point 6 and 7 on my attachment to the

9  original proof of claim and the others were basically identical

10  that I was entitled to and was asking for the return of the

11  Bitcoin in specie.

12          So what I'm asking Your Honor to do is approve my

13  claim and/or claims and also direct the debtors' counsel to

14  cooperate with my in deciding how much interest needs to be

15  paid back and make arrangements for returning the 4.22 Bitcoin.

16  Now there's also a little bit of other cryptocurrency.  I don't

17  know if it's in the Wallet or in the Interest Account, but it's

18  about $2,000 worth I think.  And if you could add that to the

19  order too, Your Honor, I'd be grateful.

20          So I think Your Honor is all on top of this, and I

21  probably don't have to say more.  But I wanted to mention also

22  that the Court has brought equitable powers to make an order in

23  the interest of justice.  And that has been upheld both by the

24  Supreme Court in the <u>United States vs. Energy Resources</u>, 495

25  U.S. 545 (1990), as well as in an earlier decision from 1939,

1   308 U.S. 295 at Pages 307-308.

2          The Court has broad equitable powers to make whatever

3   order is right and equitable within the confines of the

4   Bankruptcy Code.  So I would very much appreciate, Your Honor.

5   There's really -- I was really surprised that anybody wanted to

6   reply to my objection because it's such a small amount of

7   Bitcoin and so important to our family and it's so documented

8   by Bitcoin's own statements -- I mean BlockFi's own statements

9   that there really shouldn't be much dispute about it.

10          So I will appreciate it, Your Honor.  I want to

11  mention, too, that I said in my papers I thought I'd filed a

12  notice of appearance and request for documents which I find

13  that I did, Document Number 119 in the record.  And I asked for

14  all notices pursuant to Rule 2002 and also all pleadings and

15  documents, and I don't think I ever got anything.  I don't

16  recall getting anything before I finally a few weeks ago got

17  this omnibus objections, tenth omnibus objections paper.

18          So anyway, that's the situation, Your Honor.  And in

19  the interest of justice, I'd very much appreciate it if you

20  would approve my claim and order that the debtors' counsel work

21  with me for repayment and for provisions to provide my

22  cryptocurrency back to me.  Thank you very much.

23          THE COURT:  Thank you, Mr. Wynns.

24          Mr. Aulet?

25          MR. AULET:  Good morning, Your Honor.

1        So the plan administrator is certainly sympathetic to

2   Mr. Wynns' plight here.  BlockFi owed a great deal of money and

3   crypto to a lot of people, and they are certainly entitled to

4   their money.  The issue, of course, is why we're here that

5   BlockFi simply doesn't have it.

6        As, you know, Mr. Wynns reflected -- said, the

7   debtors originally objected to Mr. Wynns' claim on the tenth

8   omnibus objection as inconsistent with the books and records.

9   There's a couple of key issues here.  I think there's a very

10  minor dispute over the exact amount of Bitcoin.  We think it's

11  4.209 versus Mr. Wynns' calculation of 4.22.  But ultimately,

12  this is a legal question.  What are Mr. Wynns' rights against

13  BlockFi Lending and what is his claim.

14       We've interpreted Mr. Wynns' claim to be a secured

15  creditor as essentially arguing that he has a property interest

16  in the Bitcoins in a manner similar to the BlockFi Wallet

17  rather than an unsecured claim.  Unfortunately, Mr. Wynns is

18  simply not correct.  The key part of his loan agreement is

19  Section 4D, and Mr. Wynns attached his loan agreement to his

20  response.  It's Docket Number 1633.

21       And Page 23 of that PDF begins that section.  The

22  relevant language is on Page 64 where the contract reads that,

23  "Borrower agrees that lender may for its own account pledge,

24  re-pledge, hypothecate, re-hypothecate, sell, lend, or

25  otherwise transfer or use any amount of such collateral

1  separately or together with other property with all attendant

2  rights of ownership from time to time without notice to the

3  borrower or to any of the collateral and that lender may do so

4  without retaining in its possession or control for delivery a

5  like amount of similar collateral."

6          And the issue, Your Honor, is that that makes what

7  Mr. Wynns holds an unsecured claim for the return of his

8  collateral.  Just like every other lending customer, Mr. Wynns

9  pledged his collateral and he has an unsecured claim for its

10  return.  BlockFi Lending LLC does not have the assets to meet

11  those unsecured claims.  That claim, unfortunately, on filing

12  of the petition became an unsecured claim and was converted

13  into dollars pursuant to Section 502(b) of the Bankruptcy Code.

14          I'd note -- and so Mr. Wynns essentially became an

15  unsecured creditor in the amount of approximately 68,000, and I

16  believe that is before the setoff that he is entitled to under

17  the current plan.

18          That language that I just cited is similar to the

19  language that was in the BIA account where Your Honor held that

20  that created an unsecured claim.  And it is similar to language

21  in more traditional finance lending arrangements such as we

22  cited a case from the Lehman Brothers Liquidation where a bank

23  had pledged collateral to a Lehman entity with similar language

24  that Lehman was allowed to re-hypothecate, sell, or otherwise

25  dispose of the collateral.

1          There's a number of factual differences in the

2     setting of that case, but it's specific that when -- that that

3     becomes an unsecured claim for the return of the collateral.

4          And all that is why, Your Honor, the plan treated

5     loan collateral claims in this way.  The loan collateral claims

6     are converted into dollars as of the petition date.  Any

7     creditor will be -- will automatically get the benefit of the

8     setoff.  BlockFi will not be seeking to have Mr. Wynns repay

9     his loan, or Mr. Wynns could have opted into the loan repayment

10    program but that would not have been able to deliver Mr. Wynns

11    the 4.2 Bitcoin he requests because, again, Mr. Wynns is an

12    unsecured creditor and BlockFi Lending simply does not have the

13    assets to make unsecured creditors whole.

14         As a result, the plan is a separate and independent

15    reason for why Mr. Wynns' claim must be modified in the amount

16    specified in the tenth omnibus objection that the plan was

17    confirmed without objection by Mr. Wynns to treat his claim in

18    that way.  But he's a pro se creditor.  We're not trying to

19    have a "gotcha" here.  The plan was right to do what it did.

20    And although it is a severe hardship to Mr. Wynns and every

21    other creditor, that is unfortunately what the facts and

22    circumstances and the Bankruptcy Code require in that

23    situation.

24         The only other thing that I would mention is that

25    Mr. Wynns objects that the plan administrator's response to his

1 motion -- and just to reiterate, the motion essentially

2 duplicates his objection to the tenth omnibus objection, seeks

3 the same relief.  We filed a -- the motion simply refers to his

4 objection.  We filed a relatively perfunctory response that

5 again simply refers to our forthcoming reply to his objection.

6 But that was filed on the 30th, and so it was timely under the

7 Local Rules.

8          Mr. Wynns is a pro se creditor.  If he needed

9 additional time, we would of course have been willing to push

10 this.  But based on Mr. Wynns' presentation, it doesn't appear

11 that he lacked the time to prepare for this hearing.  And so

12 we'd request that that objection to the timeliness of the

13 response to his motion be overruled.

14          And with that, I have no further points, Your Honor.

15          THE COURT:  Thank you, Mr. Aulet.

16          Mr. Wynns, do you wish to respond?

17          MR. WYNNS:  Yes.  Your Honor, concerning the

18 contract, Mr. Aulet is trying to say that because there is some

19 language in the contract that says that BlockFi couldn't

20 dispose of, hypothecate, trade, or whatever Bitcoin, I'd like

21 to point out that Your Honor reads the contract as a whole.

22 And as I pointed out, there was very specific language in that

23 contract stating that I was the owner of the Bitcoin.  It was

24 my Bitcoin, and they were holding it for security.

25          And I would suggest, Your Honor, that the language

1   that Mr. Aulet was referring to is intended for cases where

2   there is a default and that it allowed BlockFi to do what it

3   needed to do or wanted to do in case the borrower defaulted on

4   the loan and they had to sell the Bitcoin or do what they

5   needed to do.  But that never occurred in my case, and there

6   has never been any evidence presented before this Court that

7   anyone ever did sell, pledge, hypothecate, or whatever my

8   Bitcoin.  Now there is simply no evidence of that.

9         So as Your Honor pointed out from the Allegheny case,

10  in order to shift the burden, evidence must be presented to

11  show that the plan is invalid.  And there was certainly no

12  evidence at all presented in the tenth omnibus objections

13  filing.  All it did was refer to my proofs of claim and give

14  them a dollar amount and completely ignore the fact that my

15  claims were very expressive and clear that I was claiming to be

16  a secured creditor and why.  And in my attachment specifically

17  on Point 6 and 7, I stated relevant points to that and said

18  that it was my property and I was intending to pay what was due

19  in order to get my property back and asking the Court to order

20  that the debtors' counsel cooperate with me to see that that

21  happened.

22        So that's a facetious argument pointing to a little

23  bit of language in the contract which is contradictory to other

24  express and specific language that I pointed out in my papers

25  that say that I remain the owner of the Bitcoin and they're

34

1   only holding it for security.  And there is no reason to invoke

2   that language that Mr. Aulet pointed out if there wasn't any

3   default, and there never was.  I kept my agreement perfectly

4   with BlockFi, and I was entitled at any time to pay off my

5   loans and to have my BlockFi [sic] back except that by filing

6   for Chapter 11, the debtor prevented that.

7          So the equitable result here, Your Honor, and I'm

8   trying to be perfectly equitable, is to order that my claim is

9   upheld or my claims.  It seems like Mr. Aulet was suggesting

10  that more of the Bitcoin is held in BlockFi Lending or Trading

11  or something like that.  But I'm sure it's all covered, but

12  it's very little Bitcoin, but as you know, a Bitcoin today is

13  worth about 35,000 per Bitcoin.  That's a very substantial part

14  of our retirement savings.

15         So to be equitable here, Your Honor, I ask that my

16  claims be sustained or such claims as needed to be sustained --

17  I think Ms. Sisson said some of the entities don't have any

18  assets, so that's fine -- and to direct the debtors' counsel to

19  work with me so that I can get my 4.22 Bitcoin back.

20         Thank you, Your Honor.

21         THE COURT:  Thank you, Mr. Wynns.

22         All right.  This matter comes before the Court on the

23  objection by the plan administrator to various claims as part

24  of the seventh -- I'm  sorry, the tenth omnibus objection.  At

25  issue specifically are the claims of Mr. Wynns, Claim Number

1  1324 and Claim Number 3052.  This Court has jurisdiction over

2  this matter pursuant to 28 U.S.C. Section 1334.  This is a core

3  matter under 28 U.S.C. Section 157(b).

4          I've already explained in prior matters the shifting

5  burdens, and Mr. Wynns is very familiar, as he's noted, with

6  the <u>In re Allegheny International</u> case out of the Third Circuit

7  at 954 F.2d. 167.

8          Mr. Wynns implores the Court to use its equitable

9  powers.  And the Court is again, like the plan administrator,

10 sympathetic with the reasons why it should -- it would be

11 appropriate if possible to offer equitable relief.  The problem

12 is it's not possible.  The Supreme Court has made it clear in

13 <u>Law v. Siegel</u> that bankruptcy courts do not possess the power

14 to use its equitable jurisdiction, its equitable authority when

15 it contravenes specific statutory rights or other fundamental

16 rights under the law, and that's what we have here, that as a

17 matter of law, Mr. Wynns, unfortunately, you're not entitled to

18 the return of Bitcoin.

19         This Court has already ruled in this case, it has

20 become law of the case, with respect to BIA accounts that there

21 was a difference in the terms of agreement between the various

22 accounts.  And the Wallet Holders negotiated in their terms of

23 service for certain rights to retain title to the Bitcoin that

24 was entrusted with the debtor.  And this differs significantly

25 from the terms of agreement in both the interest accounts and

1 the loan collateral accounts, the loan accounts.

2          And I have to disagree with your interpretation of
3 the language that was cited, Section 4D of the loan agreement.
4 And I appreciate that your argument is that such language
5 should only come into effect when there's a default, but that's
6 not what the language says.  It says that the lender may for
7 its own account "pledge, re-pledge, hypothecate, re-
8 hypothecate, sell, lend, or otherwise transfer or use any
9 amount of such collateral separately or together" -- and this
10 is where it's important -- "with all attendant rights of
11 ownership from time to time without notice to the borrower."
12 It's not limiting its rights to a default.

13          And it's that language that other courts, and I'll
14 refer to Judge Glenn's opinion in the Celsius Networking matter
15 -- I'm  sorry, In re Celsius Network LLC, 647 B.R. 651, that
16 used comparable language that -- interpreted comparable
17 language to limit the ability of certain accountholders to
18 retain interest in their digital assets.  The fact is that
19 those who are customers as part of the loan accounts and had
20 loan collateral claims are treated differently under the terms
21 of service and also treated differently under the plan, which
22 is a binding agreement between the estate and the creditors and
23 the parties in interest.

24          The plan has been confirmed.  And, indeed, Article 3
25 of the plan, Section C.4 reiterates that loan collateral

1  claimants such as yourself will receive pro rata distributions

2  of the remaining dollarized value of their collateral in either

3  digital assets or cash according to the terms of the confirmed

4  plan and that claimants who do not elect loan repayment

5  treatment will have their outstanding loan balances set off

6  against the dollarized value of their claim, and they will

7  receive pro rata distributions on the remaining claim amount in

8  either digital assets or cash according to the terms of the

9  confirmed plan.

10  The plan does not provide for a return of your

11  specific Bitcoin or other digital assets for those with loan

12  collateral claims.  It provides for a pro rata distribution of

13  either cash or digital assets at a dollarized value as of the

14  petition date.

15  I have accepted the filings.  Even if I were to

16  consider the plan administrator's response to your motion as

17  being late, it wouldn't matter.  As a matter of law, your

18  motion cannot be granted.  The interpretation of the language

19  of the terms of service agreement are consistent with other

20  courts beyond simply digital currency bankruptcy filings.  And

21  this Court is required to enforce the terms of the confirmed

22  plan and to treat all creditors within the class of claims that

23  you hold the same.

24  And the Court's not in a position, even if equity

25  were to compel a different result, to treat creditors

1 separately.  I have to treat all creditors the same across the

2 board.  For those reasons and for the reasons set forth in both

3 the objection to the claim and the reply, the Court denies,

4 Mr. Wynns, your motion for turnover of the Bitcoin and sustains

5 the objection filed by the plan administrator.  Thank you.

6          MR. WYNNS:  Thank you, Your Honor.

7          But just a remark there, there's no evidence, no

8 evidence was presented to the Court that they ever did any of

9 those things, sell, hypothecate, re-pledge, or whatever.  Even

10 granting for the sake of argument that they had the right to do

11 that, and your interpretation of the contract based on other

12 court rulings as well apparently is that they had the right to

13 do that, there's no evidence that they ever did.  And there's

14 clear language in the contract contradicting that that says the

15 Bitcoin belongs to me.

16          THE COURT:  I understand your position.  We'll just

17 have to disagree.  Thank you.

18          MR. WYNNS:  Thank you, Your Honor.

19          THE COURT:  All right.  Thank you.

20          Mr. Aulet, are you continuing with other claims?

21          MR. AULET:  No, Your Honor.  I'm going to cede the

22 virtual podium to Mr. Kanowitz.

23          THE COURT:  Mr. Kanowitz, good morning.

24          MR. KANOWITZ:  Good morning, Your Honor.

25          Richard Kanowitz, Haynes and Boone, for the plan

1    administrator.  Your Honor, this is hopefully going to be very

2    brief.  This is in connection with the eleventh omnibus claim

3    objection.  Mr. Lymn has filed a response.  Your Honor's

4    rulings today as well as in the past dictate the outcome.

5    We're just seeking to reduce an overstated unsecured claim to

6    dollarize it as of the petition date based on the Bitcoin

7    pricing at that time.  It's a reduction of about $500,000.  All

8    of the arguments that were raised in the response have been

9    addressed today, whether you're talking about the plan

10   construct, the Bankruptcy Code construct.  This is an unsecured

11   claim that is entitled to treatment pursuant to the Code and

12   the confirmed plan.

13         The other issue raised in the response, again, you

14   touched on at confirmation was whether or not the plan

15   administrator winddown debtors could bring a claim objection.

16   Your Honor previously ruled on it.  I don't need to rehash Your

17   Honor's verbiage.  That's found in the transcript that we cited

18   to.  But the reality is this.  Under 502(a), any party in

19   interest can object to the claim.  This claim objection was

20   filed on September 6th by the debtors, the Committee.  A party

21   in interest joined.

22         The winddown debtors take from both the debtors

23   and/or the Committee, therefore, the claim objection is still

24   live irrespective of whether Your Honor found -- and I don't

25   think you should find -- a waiver and/or some sort of estoppel.

1  None of the elements for waiver and/or estoppel can be

2  established.  The reality is is that this was a

3  misinterpretation by Mr. Lymn of the plan and how the claims

4  reconciliation process would work.  And we would ask Your Honor

5  to simply reduce this unsecured claim by approximately $500,000

6  as we set forth in the claim objection.

7        And I'll reserve any time for Your Honor's questions

8  or rebuttal.  I believe that Ms. Gelfand is here to argue on

9  behalf of her client.  And he did submit a declaration which we

10 have no objection to being submitted as part of the record, and

11 we have no cross-examination for Mr. Lymn.

12        THE COURT:  All right.  Thank you.

13        Ms. Gelfand, good morning.

14        MS. GELFAND:  Good morning, Your Honor.  Thank you

15 for entertaining us today.  You may recall that at the

16 confirmation hearing, Your Honor indicated that perhaps this

17 matter was more fit and was actually a matter that should be

18 dealt with on the objection to claims.  You invited us back,

19 and all the rights of my client at that time were reserved.

20        I do want to point out a few things; first of all,

21 the proof of claim.  The proof of claim was filed by former

22 counsel, not Akerman.  It was very clear with a rider

23 explaining why and how it was valued.  It was no intention to

24 just use a value and not explain it.  We are actually in a very

25 different position from the other creditors in this case,

1  including the other creditor who just went before us seeking

2  equitable relief.  Only my client has raised the issue of

3  equitable estoppel as to the debtors' objection.

4          As Your Honor appreciates, equitable estoppel has

5  three elements, and we believe they've all been met today.  The

6  first one is a representation made to induce an action.  I

7  don't believe there's any dispute that the purpose of the plan

8  is to induce a creditor from the debtors' standpoint to accept

9  the plan.

10         The second element is reliance.  In his declaration,

11  Mr. Lymn testified that he relied on the representation in the

12  plan that the claim objection to his claim would be released.

13  It appears that the winddown debtors' position is that it was

14  unreasonable for Mr. Lymn to rely on the definition of causes

15  of actions that stated that the debtor was releasing "any right

16  to object to or otherwise contest claims or interests."  That's

17  a definition.

18         It appears that winddown debtors believe that the Mr.

19  Lymn had a duty to go all through the plan, look at every

20  article, determine if these articles contradicted the plan

21  language of the definition of cause of action and, to go even

22  farther, outside the plan to the disclosure statement to see

23  what that was about.  I don't want to re-argue what we argued

24  at confirmation.  A lot of that appears to be re-argued by the

25  winddown debtors.

1          But I do want to point out the debtors painstakingly

2    put in the plan in almost all the articles and in the articles

3    relied upon by the winddown debtors except as provided in the

4    plan.  It always says here's the representation except as

5    provided in the plan.  Again, it's the client's position that

6    the plan provided for this release right in the definitions.

7          As far as changing positions, there's no dispute that

8    Mr. Lymn changed his position, the third element.  It's in his

9    declaration.  The winddown debtors point to a conversation

10   taking place after voting was closed where we were advised it

11   was never the intention to release objections to claim.  Yet,

12   the release was placed in the plan, specifically in the

13   definitions.  The relevant conversation is not what took place

14   after Mr. Lymn relied.  The relevant time is when he was making

15   the decision of what to do, and that was a Friday afternoon.

16   And it is not my favorite day.  I don't like doing these

17   ballots the last day at the last hour in case there's a glitch.

18         But here we found ourselves because the client was

19   struggling.  Should he opt out of the third-party release like

20   a lot of the ad hoc members did -- 10,000 we heard at the

21   confirmation hearing -- or should he vote to accept the plan

22   and not opt out.  And he knew that there was going to be this

23   objection to his claim.  He knew his claim was disputed.  I

24   made a call to the Committee before we voted, and I said I got

25   to tell you guys I think you released objections to claim.  I

1  got a call back later saying we brought it to the debtors'

2  attention, it's going to be fixed.  Well, I'm not going to go

3  back to the fix.  We know that the debtors came to this Court

4  and they did get confirmation and the Court did find that

5  1129(a) had been met.

6          However, at the time that Mr. Lymn voted, it was

7  clear under the plain language of the plan to this creditor

8  that his claims objection was being released.  I want to talk a

9  little bit about accountability.  These crypto cases have been

10  a learning experience for all of us, and it's been incredibly

11  fascinating to watch them travel through the different courts.

12          BlockFi who filed last clearly did a fantastic job of

13  getting this plan confirmed early on.  But that doesn't mean

14  that there's no accountability.  There's no accountability to

15  read the definitions to make sure the general release is

16  correct.  If you're going to read anything, it would be general

17  release and the exculpation clause.

18          And the accountability even goes farther than that

19  because creditors like Mr. Lymn, it's their first interaction

20  with the federal courts.  He's never been in a federal court.

21  And I'm sure there are many many many other creditors in the

22  same situation.  And that's why the Court has painstakingly

23  made this venue friendly to all these pro-se creditors, put

24  special procedures on the webpage, opened up the Zoom because

25  these creditors are coming here and they're going to walk away

44

1  with an impression of what happens in this federal court.

2         And if the debtor is not held accountable at this

3  stage on an equitable estoppel theory for making a promise and

4  then turning around and changing that promise after a creditor

5  relied and changed position, that's the real issue.  And making

6  the debtors accountable on this, it's the little little thing

7  in this case.  They got their confirmation.  They got their

8  technical amendment.  And, you know, you can understand why

9  amendments that are more than technical require resolicitation

10 so we don't find ourselves in these crazy positions that we are

11 in today which is a creditor who relied on a plan, gave up

12 rights, and now is being told, no, you shouldn't have relied on

13 it.  You actually should have read everything and made a

14 decision like Your Honor made.  But the client wasn't the

15 judge.

16        And as far as the joinder, Your Honor, this objection

17 is not going to be alive after today.  It will be res judicata.

18 The Committee made a decision to not file their own objection.

19 Instead, they join in support.  That's their language the

20 debtors' objection.  So the Committee as a joinder, they're

21 joining rises and falls on the debtors' objection.  Your Honor,

22 we ask that you look at this a little differently.

23        My client's equitable request does not contravene the

24 legal rights of others.  No one else is similarly situated.

25 There will be no floodgates on this that will open.  The appeal

1  pending does not address this issue.  My client's in a unique

2  position.  The debtors, Committee, and everyone else who read

3  that plan should be accountable for putting a general release

4  of the objections to claim in the definitions and in the plan

5  itself.  And Mr. Lymn because he relied on it in good faith

6  should be allowed his claim, Your Honor, in the full amount.

7          Thank you.

8          THE COURT:  Let me just clarify before I turn back to

9  Mr. Kanowitz.  Mr. Lymn, when you say he relied and gave up

10  certain rights, what did he give up by voting?

11          MS. GELFAND:  He gave up the -- he voted in favor of

12  the plan --

13          THE COURT:  Right.

14          MS. GELFAND:  -- which he may have done anyway

15  because Mr. Lymn had no desire to delay distribution.  But as

16  his declaration states, he would have opted out of the

17  third-party release.  He would have been in a position to join

18  class actions that may be brought against third parties.  We

19  have 10,000 creditors who opted out.  And now Mr. Lymn --

20          THE COURT:  Well, wasn't he given that opportunity?

21          MS. GELFAND:  He wouldn't get the release, Your

22  Honor.  He wanted the release.  In exchange for the general

23  release of the objections to claims, he had to do two things:

24  vote in favor of the plan and not opt out.  And it was a

25  no-brainer.  At that point, they released it.  Of course, I

1 want that release.  If he had decided to opt out, he would not

2 have been entitled to the release.

3          THE COURT:  But he had that opportunity to decide to

4 opt out?  It didn't change based on the language.  He always

5 had that opportunity, correct?

6          MS. GELFAND:  Yes, Your Honor.  But from an equitable

7 estoppel position, the debtor makes a representation intending

8 that the creditor rely on it.  They represent all claims

9 objections are released in the definition of causes of action

10 right in Article 1.  Mr. Lymn relies on that, and he changes

11 his position.

12          THE COURT:  But he --

13          MS. GELFAND:  He doesn't opt out.

14          THE COURT:  But he's afforded -- before there are any

15 consequences from his decision on how to vote, he's afforded

16 the opportunity to change his vote.  The debtor recognizes that

17 there's a language issue, and before there are any

18 consequences, before a plan is confirmed, before the process is

19 even completed, they come in and they make a modification and

20 they recognize -- they make the modification for clarity.  They

21 recognize that it might have an impact on his choice, and they

22 say go ahead, change your vote.

23          So where has he been prejudiced?

24          MS. GELFAND:  Unfortunately, Judge, the changing of

25 the vote after the fact is not how the damages are looked upon

1  when you have equitable estoppel.  The equitable estoppel

2  arises what did he give up, and then we look back.  We don't

3  look forward and say you could have changed your vote.  He

4  wanted the release.

5       I mean, from a damage standpoint with equitable

6  estoppel, it's not what he gave up as far as the opt-out.  It's

7  what he didn't get.  He --

8       THE COURT:  But what he wanted was something that

9  nobody else could get and would have created as I found earlier

10  an absurd situation where any claim would be valid simply by

11  accepting.  It could have been for billions.

12       MS. GELFAND:  And nobody hopped on the bandwagon.

13  And I really worked with the debtor.  But the fact doesn't

14  change.  The language is in there, and the fact that only

15  Mr. Lymn, number one, caught it and alerted the debtors and,

16  number two, took advantage of his rights.  And that's even

17  perhaps more of a reason when we get back to accountability to

18  give Mr. Lymn this relief because it won't open the floodgates.

19       I think in other jurisdictions and different

20  circumstances, perhaps other creditors would have jumped on

21  this bandwagon.  We cannot change that they put that in their

22  definition, and we cannot change Mr. Lymn's declaration that is

23  not disputed.

24       THE COURT:  All right.  Thank you.  Let me hear from

25  Mr. Kanowitz.  I appreciate it.

1          MR. KANOWITZ:  Your Honor, you have it right.  Let me
2    break this down. The issue today is whether Mr. Lymn has an
3    excessive claim; he does, period, end of story.  As a matter of
4    law, it should be reduced.  The question of voting or not
5    voting has nothing to do with whether or not the winddown
6    debtors can bring a claim objection.  It's just that simple.
7    One issue has nothing to do with the other.

8          If a creditor didn't vote at all but still has an
9    excessive clam, the winddown debtors get to bring a claim
10   objection.  Okay, so they're separate and apart.  The idea that
11   Mr. Lymn gave up something by voting one way or another, he
12   didn't.  He can't rely on his own imagination and say I'm
13   going to interpret language this way, I'm going to vote a
14   certain way, and then I'm going to give up rights.  He didn't
15   give up any rights.  All he gave up was any voting to approve
16   or reject -- he voted to approve -- or opting in or opting out
17   of a third-party release.  And he made decisions, nothing to do
18   with his claim objection.

19         What he wants you to do is to actually believe that
20   the debtors wrote in in the first instance a waiver.  That's
21   not what we wrote in.  That's not what this Court found.  We
22   clarified it.  We told him about it, and he still wants to go
23   down this route saying, oh my vote impacted the ability to
24   object to a claim.  And that's not true.  They're separate and
25   distinct.

1          And getting back to the issue of who could bring a

2     claim objection, the Committee raised this issue.  It's live in

3     front of Your Honor, okay, so you have parties in interest

4     protecting the estate from excessive claims.  That's all we

5     have here, okay.  You don't even have to reach the issue of

6     voting, not voting, and what that meant.  You could just see

7     that there was an outstanding claim objection by the debtors

8     that was joined by the Committee that has to be upheld in

9     accordance with 502(a) and the way the plan has been written

10    and construed by Your Honor.

11          THE COURT:  All right.  Thank you, Mr. Kanowitz.

12          Ms. Gelfand, any response?

13          MS. GELFAND:  I would just say that this is not a 502

14    issue at this point.  Yes, they brought the objection under

15    502, but the creditor has brought a defense, an equitable

16    defense saying they put a general release in the Article 1

17    definition of causes of action.  I relied on it, no one

18    disputes it.  I changed my position by giving up third-party

19    claims, no one disputes it.

20          That's what this is about.  I recognize and concede

21    that the proof of claim filed by former counsel, by the way,

22    not Akerman LLP, the proof of claim did not value on the day of

23    the November filing and there was a whole rider attached as to

24    their thinking.  And we just heard from a creditor his

25    thinking, but we're different than that creditor.  And I think

1  it's a good thing no one else jumped on it.  But I do think

2  accountability, just a little accountability says you put it in

3  there, it's not the creditor's job to go to disclosure

4  statements and all these paragraphs and say they didn't mean to

5  release it.

6        And that would be really where we would rest, Your

7  Honor.  Thank you.

8        THE COURT:  Thank you.

9        The Court is familiar with the issues that have been

10 raised.  Obviously, the Court addressed it as part of the plan

11 confirmation process and found that the interpretation of the

12 language when this Court took the disclosure statement and the

13 plan as a whole as well as in the context of how Chapter 11 are

14 prosecuted and the claims allowance procedures that are

15 recognized, viewed the interpretation of Mr. Lymn as being

16 untenable as far as what the impact would be.  It could

17 possibly lead to absurd results.

18        The Court is cognizant of the argument of equity.

19 The Court is familiar with case law that repeat that equitable

20 maxims must be applied flexibly so that you cannot apply an

21 equitable rule in a fashion that will operate inequitably.  And

22 if we were to do so here to allow this claim in this amount in

23 this fashion as sought by Mr. Lymn, it would in effect impair

24 the rights of other creditors who are going to receive less

25 than they're entitled to necessarily.  That's not equitable,

1 | either.

2 | Mr. Lymn had the opportunity to adjust his actions

3 | prior to any consequences from his voting.  He was well aware

4 | of the position that the debtor would take with respect to his

5 | interpretation.  He was well aware that the Committee and

6 | ultimately the plan administrator would take opposing view.  He

7 | had the opportunity to adjust his actions in such a fashion

8 | that he would be treated like all other claimants holding the

9 | same type of claims in his class.

10 | The Court is going to sustain the objection of the

11 | plan administrator.  It's a creative and certainly an objection

12 | which I believe will probably be instructive in other cases

13 | when drafting language.  But at the end of the day, Mr. Lymn is

14 | not being prejudiced in any other fashion as compared to other

15 | creditors with the same types of claim.  And we can't use an

16 | equitable rule that will in effect treat others inequitably.

17 | So the objection is sustained.

18 | Thank you, Ms. Gelfand.

19 | MS. GELFAND:  Thank you, Your Honor.

20 | THE COURT:  Mr. Kanowitz or Mr. Aulet, do we have any

21 | other matters?

22 | MR. KANOWITZ:  Yeah, I think Mr. Aulet was going to

23 | address some open matters with the Court.

24 | THE COURT:  All right.  Thank you.

25 | MR. AULET:  Yes, Your Honor.  We just wanted to

1  preview for you where the Three Arrows objection is at.  We

2  have agreed on a mediator and expect to submit an agreed-on

3  mediation order to Your Honor shortly.

4             THE COURT:  All right.

5             MR. AULET:  Most likely later this week.  We have for

6  the most part agreed on a schedule with one open issue that we

7  are likely to submit to Your Honor for resolution this week.

8  But we believe that we've got all of the dates agreed to.  That

9  said, of course, there are discovery issues and if any of those

10 discovery issues on either side require the Court's

11 intervention, we will bring those to Your Honor at that time.

12            THE COURT:  Thank you.  Where do we stand with the

13 FTX claim?  That's going to be resolved in Delaware?

14            MR. AULET:  It's going to be resolved in Delaware,

15 Your Honor.  We're working with the FTX debtors on the motion

16 to lift the automatic stay that was provided for in the

17 settlement agreement with the FTX debtors and the BlockFi

18 debtors as well as working out the schedule for mediation

19 that's called for under that settlement.

20            THE COURT:  What will we be doing with the objection,

21 I think it's at 1376 on the docket, to the FTX claim?  Am I

22 carrying it for now or will we be -- or will you all be

23 withdrawing it?

24            MR. AULET:  We would like it carried for now.  Once

25 the order lifting the automatic stay is entered, at that point

1  we would -- we believe it should be withdrawn.  But until that

2  order lifting the automatic stay and implementing the mediation

3  is entered, it should be carried, Your Honor.

4        THE COURT:  Then we'll just carry it to the 28th

5  date.  I believe we have a date -- do we have the 28th?  I

6  think we have a January date.  We're probably going to need to

7  come up with some additional dates, correct?

8        MR. AULET:  Correct, Your Honor.  I believe that we

9  also submitted a proposed December omnibus date.  I don't

10 unfortunately remember what it is off the top of my head.

11       THE COURT:  Let me take --

12       MR. AULET:  But we can get in touch with your

13 chambers and set a number of upcoming omnibus dates if that

14 would work for Your Honor.

15       THE COURT:  I think it always works best when they

16 leave me out of it.  So I'll let you speak with my chambers and

17 Becca Earl.

18       All right.  Just for the record, I note we do have

19 Mr. Sponder, the U.S. Trustee sitting here.  He couldn't resist

20 coming down.  Are there any other issues that anyone wishes to

21 address?  Mr. Sponder?

22       MR. SPONDER:  Thank you, Your Honor.

23       Jeff Sponder from the Office of the United States

24 Trustee.  The issue that I was here for thankfully Ms. Bielskie

25 was on earlier with respect to the redactions, so that was

54

1  taken care of.  But we have no other issues, Your Honor.  Thank

2  you.

3          THE COURT:  All right.  Thank you.

4          Any other counsel or party?

5                  (No audible response)

6          THE COURT:  Then I appreciate your time and the

7  arguments.  Thank you very much.  We're adjourned.

8          MR. AULET:  Thank you, Your Honor.

9          (Proceedings adjourned at 11:29 a.m.)

10                 * * * * *

11

12          **C E R T I F I C A T I O N**

13          I, DIPTI PATEL, court approved transcriber, certify

14  that the foregoing is a correct transcript from the official

15  electronic sound recording of the proceedings in the above-

16  entitled matter and to the best of my ability.

17

18  /s/ Dipti Patel

19  DIPTI PATEL, CET-997

20  J&J COURT TRANSCRIBERS, INC.   DATE:  November 8, 2023

21

22

23

24

25