| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br>Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| **BROWN RUDNICK LLP**<br>Kenneth J. Aulet, Esq. (admitted *pro hac vice*)<br>Seven Times Square<br>New York, New York 10036<br>(212) 209-4800<br>kaulet@brownrudnick.com<br><br>**BROWN RUDNICK LLP**<br>Tristan Axelrod, Esq. (admitted *pro hac vice*)<br>One Financial Center<br>Boston, MA 02111<br>(617)856-8300<br>taxelrod@brownrudnick.com<br><br>*General Counsel for the Plan Administrator*<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>(973) 230-2095<br>DStolz@genovaburns.com<br>DClarke@genovaburns.com<br><br>*Local Counsel for the Plan Administrator* | **HAYNES AND BOONE, LLP**<br>Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)<br>Lauren M. Sisson, Esq. (NJ Bar No. 394182022)<br>30 Rockefeller Plaza, 26th Floor<br>New York, New York 10112<br>(212) 659-7300<br>richard.kanowitz@haynesboone.com<br>lauren.sisson@haynesboone.com<br><br>*Attorneys for the Plan Administrator* |

| | |
|---|---|
| In re:<br><br>BLOCKFI INC., *et al.*,<br><br>                Debtors.[1] | Chapter 11<br><br>Case No. 22-19361 (MBK)<br><br>(Jointly Administered under a Confirmed Plan[2]) |

## WIND-DOWN DEBTORS' REPLY TO RESPONSE TO DEBTORS' SEVENTH OMNIBUS OBJECTION TO CLAIM NO. 7233 OF JOHN W. VANTUBERGEN JR.

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Wind-Down Debtors' service address is c/o M3 Partners, 1700 Broadway, 19th Floor, New York, NY 10019.

[2] On October 3, 2023, the Court entered an order confirming the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications)* (the "Plan") [Docket No. 1609].

TO:    THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED
STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

BlockFi Inc., BlockFi Lending, and its debtor affiliates (collectively, "BlockFi" or the

"Wind-Down Debtors"), as managed by the Plan Administrator in the above-referenced Chapter

11 cases (the "Chapter 11 Cases"), hereby file this *Wind-Down Debtors' Reply to John W.*

*VanTubergen Jr.'s Response to Debtors' Seventh Omnibus Objection to Certain Claims* (the

"Reply") in response to Mr. VanTubergen's ("VanTubergen") *Response To Debtors' Seventh*

*Omnibus Objection To Certain Claims* (the "JVT Response") [Docket No. 1496] and *Certification*

*of Claimant John W. VanTubergen Jr. in Support of Response to Debtors' Seventh Omnibus*

*Objection to Certain Claims* (the "JVT Cert.") [Docket No. 1496-1] in connection with the

*Debtors' Seventh Omnibus Objection To Certain Claims* (the "Claim Objection") [Docket No.

1311]. In support of the Reply, the Wind-Down Debtors rely on the *Certification of Flori Marquez*

filed contemporaneously herewith, and respectfully represent as follows:

### Preliminary Statement[3]

1.    Former BlockFi customer John VanTubergen Jr. entered into 37 loan contracts

(each an "LSA", and collectively, the "LSAs") with BlockFi over the course of several years.  The

terms of the LSAs were clear: VanTubergen would pledge cryptocurrency (either bitcoin ("BTC")

or Ethereum "ETH") (as further defined below, the "Collateral") for a loan (each a "Loan," and

collectively, the "Loans") denominated in dollars or stablecoin. To protect BlockFi from the risk

of non-payment if the Collateral declined in value (which cryptocurrency is known to do,

sometimes severely), VanTubergen agreed that if his "loan to value" ratio (the "LTV") exceeded

---

[3] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings provided
elsewhere in this Reply.

70%[4] that BlockFi would issue a margin call and he would pledge additional Collateral, enough to bring the LTV back down to 50%. If the LTV exceeded 80%, then he agreed his Collateral would be immediately liquidated (at current market prices) in an amount needed to bring his loan back to the LTV level designated by the LSA.

2.      In total, VanTubergen borrowed upwards of 40 million dollars—largely while crypto prices were rising. When crypto prices began to decline, VanTubergen was unwilling or unable to uphold his obligations. VanTubergen chose to restructure his loans rather than repaying them. But BlockFi did not take price risk on cryptocurrency, and at all times in its dealings with VanTubergen insisted that his loans be overcollateralized.

3.      Ultimately, VanTubergen's repeated failure to timely meet margin calls culminated in VanTubergen sending new Collateral too late for it to be confirmed by the Blockchain before his loan hit an LTV that required a mandatory liquidation. This resulted in the liquidation of a large portion of VanTubergen's ETH. VanTubergen could have repaid his Loans then but again, he was unwilling or unable to do so.

4.      VanTubergen asked BlockFi for a new Loan that would be used to repurchase the liquidated ETH but VanTubergen did not have enough collateral to do so. As a result, with warnings from BlockFi that doing so was risky, he insisted on entering into a new Loan with BlockFi. VanTubergen used his remaining ETH to refinance and enlarge his Loan. The additional amount would be used to repurchase the ETH that had been liquidated (through BlockFi) and then pledged as collateral for the new Loan.

---

[4] The LTV is calculated by dividing the dollar value of the loan by the dollar value (at current prices) of the collateral pledged.  If the collateral declines in value, the LTV rises – meaning that the lender (BlockFi) is at greater risk that the collateral will not cover the loan value in the event of default. As detailed below, VanTubergen had one bespoke Loan with different LTV requirements than the standard 70%.

5.      BlockFi made very clear this was a very risky loan for VanTubergen. VanTubergen did not have enough collateral to originate this loan at the usual LTV of 50%. It was originated just shy of 80% LTV, and BlockFi made a one-time accommodation to move the mandatory liquidation to 90% LTV. But BlockFi was *exceptionally* clear about the risk that this posed to VanTubergen: he would be under near-immediate margin call at 80% LTV if the price of ETH moved slightly and the collateral would quickly be liquidated if the price of ETH moved down much more than that. VanTubergen knowingly accepted this deal.

6.      Because this was a bespoke uncommon Loan, the LSA prepared erroneously stated that VanTubergen would pledge 4230.120 ETH—the amount that would be required to originate a loan of that size at 50% LTV. VanTubergen did not have 4230.120 ETH to pledge, and did not pledge 4230.120 ETH. Instead, he pledged his remaining ETH 2014.9282 and the ETH purchased by BlockFi as Collateral for this bespoke, risky Loan.

7.      The terms of this new Loan were documented by email. In particular, the email was specific that (a) BlockFi would purchase ETH off the market and VanTubergen would pledge the ETH backing his current Loan; (b) BlockFi would customize the LTV thresholds for this Loan to 80% LTV for margin call and 90% LTV for forced liquidation; (c) VanTubergen understood the risk of an immediate margin call since the LTV for this refinanced Loan would be around 79%, and (d) VanTubergen assumed full responsibility for the new Loan amount and agreed and acknowledged that BlockFi would not be liable for damages or loss.

8.      VanTubergen accepted these terms (with one minor change regarding the timing of repurchase). But VanTubergen created a highly leveraged situation where if the ETH price went up, his gains would be magnified—but it would take only a relatively small decline in the price of

ETH for him to face significant losses. VanTubergen accepted this deal—which he had insisted

on and repeatedly escalated his demands to BlockFi's executive team to obtain.

9.      VanTubergen was wrong about the direction the price of ETH would take over the

short term. His Loan (as BlockFi had warned) was nearly immediately in margin call. Shortly

afterwards, it hit the mandatory liquidation level of 90% LTV and Collateral was liquidated.

10.      Again, VanTubergen could have accepted these losses and walked away. Instead,

over the next few months, VanTubergen repeated his efforts to use BlockFi Loans to create

leveraged bets on the price of cryptocurrency. Ultimately, those bets did not pay off and his losses

mounted.

11.      Making leveraged bets on price movements is always risky, but especially risky on

something as volatile as cryptocurrency. VanTubergen's gamble initially paid off, but ultimately

he lost. VanTubergen, however, sought to require BlockFi to insure his market losses. He

demanded that BlockFi refund the money he lost based on entirely unfounded claims that he was

coerced into making loans, that BlockFi provided "investment advice," or that the contracts were

unconscionable. VanTubergen has provided *no evidence whatsoever* of any of these claims—aside

from his self-serving declaration. VanTubergen also asserts that meeting his obligations under his

contracts was *literally impossible* without providing any explanation of this claim. *See* JVT

Response at 20. Each of these nonsensical claims is made with the goal of requiring BlockFi's

customers to insure VanTubergen for all declines in his highly risky leveraged positions (but,

notably, not share in any of his early gains).

12.      Worse, VanTubergen tries to create an illusion that there is 895 "missing" ETH—

despite contemporaneous documentation showing he never had that ETH, and *he knew* he did not

have that ETH. As a result, VanTubergen is not merely demanding that BlockFi's customers

5

reimburse his market losses (but not benefit from his gains) —he demands money that he had never had at any time.

13.     VanTubergen has offered no evidence for his extraordinary claims, aside from self-serving declarations. Evidence VanTubergen does present often is incomplete, or directly contradicts his claims. BlockFi acted at all times in compliance with the terms of the LSAs that VanTubergen signed. There is not one scintilla of evidence for the extraordinary claims that BlockFi sought to coerce, convince, or otherwise force VanTubergen to enter into any of the 37 LSAs he signed. As such, the JVT Claim should be denied, and proof of claim no. 7233 should be modified to reflect VanTubergen's true claim against BlockFi for $19.07.

## **Factual Background**

### I.     **The Loan Agreements[5] Between VanTubergen and BlockFi**

14.     VanTubergen is a former BlockFi client who entered into a series of 37 LSAs that required him to pledge BTC or ETH as collateral and granted BlockFi a security interest in, among other things, the BTC or ETH and proceeds thereof (the "Collateral") in exchange for a lump sum payment in USD or USDC[6].  VanTubergen's first Loan was originated in April of 2019 and he paid off the final Loans in May of 2022. Certification of Flori Marquez in Support of Reply ("Marquez Cert.") at 5.

---

[5] Any capitalized terms not defined herein shall have the meanings defined in the LSAs.
[6] Retail loan clients could choose to have their lump sum payment in USD or USDC. USDC is a stablecoin pegged to the US dollar on a 1:1 basis.

15.     Each LSA contains the following language:

> Borrower agrees that Lender may, for its own account, pledge, repledge, hypothecate, rehypothecate, sell, lend or otherwise transfer or use any amount of such Collateral, separately or together with other property, with all attendant rights of ownership from time to time, without notice to the Borrower any or all of the Collateral and that Lender may do so without retaining in its possession or control for delivery, a like amount of similar Collateral.

> *See e.g.*, JVT Cert., Ex. B at ¶ 4(d).

16.     The LSAs require the Borrower to maintain an LTV ratio (the "Required LTV")[7] where the outstanding principal balance of the Loan is less than or equal to a certain percentage of the market value[8] (the "Market Value") of the Collateral (either BTC or ETH, depending on the Loan). *Id.* at ¶ 6(a).

17.     If the LTV rose above the Required LTV a "Trigger Event" occurred and the Borrower had 72 hours to deposit additional BTC or ETH to lower the LTV below a specified percentage (the "Reset LTV").[9] *Id.* at ¶ 7(a). If the LTV rose above the "Accelerated Maximum Loan to Value Ratio" (the "Max LTV"),[10] the Borrower agreed that BlockFi could immediately liquidate the Collateral to bring the LTV back below the Required LTV for that particular LSA. *Id.*

18.     Borrowers received email notifications when their Loan was approaching a Trigger Event or one occurred. Marquez Cert. at 6. They also received email notifications when BlockFi sold Collateral in accordance with the Loan's requirements, which included a summary of the

---

[7] The Required LTV is usually 70%, see Section II for the specific requirements of the Loans that Van Tubergen asserts had improper liquidations.

[8] The LSAs define market value as either the product of the amount of the Collateral times the last trade price for that type of Collateral on the Gemini website, or the market value determined by BlockFi in its reasonable discretion.

[9] Usually 50%, see Section II for the specific requirements of the Loans that Van Tubergen asserts had improper liquidations.

[10] Usually 80%, see Section II for the specific requirements of the Loans that Van Tubergen asserts had improper liquidations.

7

amount of Collateral sold, the price at which it was sold, and the amount of USD applied to the outstanding loan balance. *Id*.

## II.   VanTubergen's Proof of Claim and the Wind-Down Debtors' Proposed Modification

19.   VanTubergen filed proof of claim No. 7233 (the "JVT Claim") on March 15, 2023. VanTubergen Cert., Ex. A. The JVT Claim was made against debtor entity BlockFi Lending LLC in the amount of $10MM. The basis of the claim is stated as "[m]y collateral that is owed to me from my loans due to false forced liquidations from BlockFi." JVT Cert., Ex. A at 3. VanTubergen also attached a small chart showing liquidations of Collateral related to 7 different Loans. *Id.* at 8. The proof of claim does not provide the basis for describing the liquidations as "false," does not identify which liquidations are at issue, and does not provide any calculations for the asserted claim amount of $10MM.

20.   BlockFi filed its Claim Objection on August 3, 2023, seeking to modify the JVT Claim to correctly reflect the Wind-Down Debtors' books and records. The books and records reflect that as of the petition date, all of the VanTubergen Loans were closed, and VanTubergen had a claim against BlockFi Inc. for $19.07 in his BlockFi Interest Account ("BIA"). The Claim Objection also contains a note explaining the proposed modification.

21.   Because the process of objecting to hundreds of claims through omnibus objections does not allow for the attachment of additional documentation for both privacy and logistical reasons, the Claim Objection contains the contact information of counsel for creditors to reach out to the request additional information or to discuss their claim and the pending objection. Additionally, each creditor receives the complete written portion of the objection, the full exhibit list with all claims in redacted form, and an unredacted supplemental document that shows just their claim(s) and the proposed treatment. VanTubergen received notice of the objection to the

JVT Claim with all these items on August 4, 2023 by email. *See Affidavit of Service filed by Kroll Restructuring Administration LLC* (the "Claim Objection AOS") [Docket No. 1448] at pp. 1, 18, 30.

### III.    VanTubergen's Response and Certification

22.    VanTubergen filed the JVT Response, JVT Cert., and various exhibits on September 13, 2023. The JVT Response asserts that (i) the Claim Objection was procedurally and substantively deficient, (ii) the Collateral pledged in relation to certain of his Loans was wrongfully or improperly liquidated or was unaccounted for, and (iii) VanTubergen was subject to coercive and predatory lending practices.

23.    VanTubergen alleges wrongful or improper liquidations in connection with 7 of the 37 Loans. The relevant terms of each of these Loans is set forth in the chart below. *Marquez Cert.* at 7.

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|---|---|---|---|---|---|---|---|
| 1 | 250568f4 | 05/03/2021 | $1,856,300.00 | 64.030 BTC | 70% | 50% | 80% |
| 2 | 176fcbc3 | 05/05/2021 | $1,000,300.00 | 34.870 BTC | 70% | 50% | 80% |
| 3 | 558207a5 | 05/12/2021 | $6,300,300.00 | 3047.140 ETH | 70% | 50% | 80% |
| 4 | 1a118e43 | 07/07/2021 | $5,928,830.21 | 3334.93 ETH[11] | 80% | 60% | 90% |
| 5 | 736435a7 | 11/02/2021 | $2,298,300.00 | 72.050 BTC | 70% | 50% | 80% |
| 6 | ce7f64ed | 11/02/2021 | $1,245,949.14 | 39.050 BTC | 70% | 50% | 80% |
| 7 | 5be66333 | 11/02/2021 | $1,622,000.00 | 719.830 ETH | 70% | 50% | 80% |

Each of the above Loans had a term of one year and required payments of interest only until the Maturity Date when the entire outstanding balance was due. *See e.g.*, JVT Cert., Ex. D.

24.    The JVT Cert. also contains allegations related to allegedly improper UCC-1 filings (the "UCC Filings") against a wholly unrelated entity, Scratch Services, LLC ("Scratch"), who

---

[11] As discussed in Section II.D below, the LSA for Loan ID 1a118e43 contained a typographical error in the amount of ETH backing the Loan.

acted as the loan servicing agent for the Loans. Those allegations will be addressed briefly below, but are not the basis for a claim against BlockFi.

**Reply**

**I.     The VanTubergen Claim Objection is Procedurally and Substantively Proper.**

     **A.     There Are No Procedural Deficiencies in the Claim Objection.**

     25.     The Claim Objection fully complied with the Bankruptcy Rules and Claims Procedures Order entered by this Court and is not procedurally deficient.

     26.     While VanTubergen complains that he did not receive enough information to recognize that the Claim Objection applied to his claim (JVT Response at 12–13), VanTubergen was served by email at the email address he specified on the JVT Claim with a complete copy of the Claim Objection as well as the "Customized Seventh Omnibus Objection Form," a pdf document which featured his unredacted name, claim information, bases for objection, and additional notes, all enlarged to enhance readability. Claim Objection AOS at 18. There was no need for VanTubergen to search through the filed version of the Claim Objection for his claim number or his name,[12] as both were clearly visible on the email he received as well as on the customized pdf attached.

     27.     The customized pdf provided VanTubergen with more than sufficient information to understand why BlockFi objected to the JVT Claim and BlockFi's proposed modifications.

     28.     The JVT Response argues that because the "unique aspects [of the JVT Claim] were known by many agents of the Debtor," and BlockFi was seeking a "radical reduction" of the JVT

---

[12] The JVT Response appears to take issue with the redaction of creditor's names in the filed version of the Claim Objection. JVT Response at 13. As this Court is well aware, BlockFi sought from the beginning of these Chapter 11 Cases to redact creditor names and other personally identifiable information in order to minimize phishing attempts from bad actors. The Debtors' motion to redact the names of individual creditors was granted (in relevant part) at Docket No. 1757.

10

Claim amount, this somehow increases the burden of proof required by an objection to the JVT

Claim. JVT Response at 15. This is incorrect and illogical. BlockFi does not have a higher level

of responsibility to review and respond to proofs of claim filed by customers who had extensive

communications with BlockFi employees (most of whom were no longer employed by BlockFi

post-petition), nor is there any basis in the Bankruptcy Code or case law to claim that the greater

the discrepancy between an asserted claim amount and BlockFi's books and records, the greater

the evidentiary burden to object to such claim. The Claim Objection complies with the Bankruptcy

Rules and the Claims Procedures Order entered by this Court and is not procedurally deficient.

> **B.    There Are No Substantive Deficiencies in the Claim Objection.**

29.    First, the JVT Claim does not contain sufficient support to be *prima facie* valid. A

claimant's failure to allege facts and to provide sufficient support for a claim deprives the claim of

prima facie validity in the first place. *See, e.g., In re Jorczak*, 314 B.R. 474, 481-82 (Bankr. D.

Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the

allowance of claims). "[I]n certain circumstances claims can be disallowed for failure to support

the claim with sufficient evidence, even if this is not a specifically enumerated reason for

disallowance under 11 U.S.C. § 502(b) . . . ." *In re Mallinckrodt Plc*, Case No. 20-12522-JTD,

2022 WL 3545583, at *4 (D. Del. Aug. 18, 2022); *see also In re O'Brien*, 440 B.R. 654, 667

(Bankr. E.D. Pa. 2010) (finding that lack of *prima facie* evidence pursuant to Bankruptcy Rule

3001(f) and failure of claimant to provide additional evidence warranted disallowance of claim).

30.    The JVT Claim asserts a claim for exactly $10MM and states that the basis for the

claim is "collateral that is owed to me from my loans due to false force liquidations…" JVT Cert.,

Ex. A at 3. The JVT Claim fails to indicate: a) what VanTubergen means by "false" liquidations,

b) which collateral liquidations on the attached chart are implicated, and c) how VanTubergen

arrived at the asserted claim amount of $10MM. The JVT Claim fails to provide any documentation or explanation of the basis of the asserted claim amount, and does not provide any calculations to assist the Wind-Down Debtors in comprehending the $10MM figure. Thus, the JVT Claim is not *prima facie* valid.

31.    As such, "[t]he debtor… 'has no evidentiary burden to overcome' in objecting to a claim that is not prima facie valid." *In re Gilbreath*, 395 B.R. 356, 364 (Bankr. S.D. Tex. 2008) (*citing eCast Settlement Corp. v. Tran (In re Tran)*, 369 B.R. 312, 318 (Bankr. S.D. Tex. 2007)) (holding that debtors' objections alone are sufficient to shift the burden back to claimant when proof of claim had insufficient documentation).

32.    Second, despite the lack of *prima facie* validity of the JVT Claim, the Wind-Down Debtors provided more than sufficient information in the Claim Objection to demonstrate that they reviewed the JVT Claim and were objecting to it because it did not match the books and records as to cryptocurrency or USD amount and that BlockFi was not liable to VanTubergen for $10MM.

33.    The Notes column of the Claim Objection makes clear that BlockFi reviewed VanTubergen's account, as it indicates he had "no loans open at the time of bankruptcy." Because the review of VanTubergen's account demonstrated that he does have a claim against the debtor entity BlockFi Inc. for the $19.07 balance in his BIA, the Claim Objection seeks to modify the JVT Claim to reflect VanTubergen's BIA balance.

34.    BlockFi was not required under the Bankruptcy Code to respond to the bare-bones allegations of the JVT Claim with a full evidentiary record of his account. As outlined in the Claim Objection, BlockFi: a) reviewed VanTubergen's BIA and retail loan accounts, b) determined that all Loans related to the retail loan account were closed and BlockFi held no further Collateral, and c) contested liability for the $10MM asserted in the JVT Claim.

## II.    Blockfi Properly Liquidated VanTubergen's Collateral in Accordance with the LSAs.

35.    The JVT Claim fails to identify which liquidations VanTubergen believes were "false." JVT Cert., Ex A at p. 3. However, the JVT Response and JVT Cert. take issue with 10 liquidations across 7 Loans (the "Disputed Liquidations") triggered by either a) the LTV Ratio for the Loan exceeding the Required LTV and remaining above it for over 72 hours, or b) exceeding the Max LTV. The chart below summarizes those Disputed Liquidations, including the price of BTC and ETH on the day the liquidations were triggered. Marquez Cert. at 8. VanTubergen's claims regarding "wrongful liquidation" are simply breach of contract claims. At all times, BlockFi complied with the terms of the LSAs.

| Loan #[13] | Liq. #[14] | Liquidation Date | Liquidation Price[15] | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 6/22/2021 | $29,052.97 | 83.1 | 6.3257 BTC | $183,780.59 | $28,901.80 |
| 2 | 2 | 6/22/2021 | $29,052.97 | 82.0 | 3.4294 BTC | $99,634.56 | $28,901.80 |
| 3 | 3 | 5/19/2021 | $2,262.00 | 91.4 | 1,565.2442 ETH | $3,540,582.38 | $2,435.65 |
| 4 | 4a | 7/13/2021 | $1,948.82 | 91.2 | 1,781.3053 ETH | $3,471,443.74 | $1,918.67 |
| 4 | 4b | 7/19/2021 | $1,747.20 | 90.5 | 818.4279 ETH | $1,429,954.44 | $1,806.53 |
| 5 | 5a | 1/21/2022 | $38,375.63 | 83.1 | 31.3544 BTC | $1,203,243.90 | $35,503.90 |
| 5 | 5b | 5/9/2022 | $32,442.02 | 82.9 | 17.5577 BTC | $569,607.41 | $30,095.00 |
| 6 | 6a | 1/21/2022 | $38,204.65 | 83.4 | 17.4025 BTC | $664,855.46 | $35,503.90 |
| 6 | 6b | 5/9/2022 | $32,347.57 | 82.7 | 9.2020 BTC | $297,662.82 | $30,095.00 |
| 7 | 7 | 1/22/2022 | $2,323.48 | 92.2 | 363.2473 ETH | 843,997.44 | $2,314.30 |

36.    Additionally, the JVT Response and JVT Cert. allege that approximately 895 ETH pledged as Collateral for Loan #4 is missing and unaccounted for, an allegation that is entirely missing from the JVT Claim. JVT Cert. at 8, JVT Response at 7e.

---

[13] The Loan # corresponds to the chart in Section III of the Factual Background.
[14] Three of the Loans have more than one Disputed Liquidation, indicated by the Liquidation #.
[15] All references to the liquidation price of Collateral are the prices per 1 ETH or 1 BTC.

13

37.    For clarity, the Wind-Down Debtors will address the allegations as to each Loan and its related Disputed Liquidation(s) in turn.

A.    **Loan #1, Disputed Liquidation #1**

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|---|---|---|---|---|---|---|---|
| 1 | 250568f4 | 05/03/2021 | $1,856,300.00 | 64.030 BTC | 70% | 50% | 80% |

38.    The principal amount for Loan #1 was $1,856,300.00. Loan #1 had a Required LTV of 70% and Max LTV of 80%. JVT Cert., Ex. D at ¶¶ 1, 7a. The LSA provided that "if at any time, the outstanding principal balance of the Loan is equal to or greater than 80% of the Collateral Market Value, Lender has the right to immediately liquidate Collateral…in such amount as necessary to establish a loan to value ratio where the total of the outstanding principal balance of the Loan plus all other amounts due is equal to or lesser than 70% of the Collateral Market Value." *Id*. at 7a.

| Loan # | Liq. # | Liquidation Date | Liquidation Price | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 6/22/2021 | $29,052.97 | 83.1 | 6.3257 BTC | $183,780.59 | $28,901.80 |

39.    On June 22, 2021, the LTV Max of 80% was breached. In accordance with the LSA for Loan #1, BlockFi liquidated 6.3257 BTC and applied $183,780.59 to VanTubergen's outstanding Loan balance. Marquez Cert. at 9.

40.    The liquidation reduced the Loan balance to $1,672,519.40 and the Collateral balance to 70.5576 BTC[16]. Therefore, the LTV on that date post-liquidation was 81.59%. *Id*.

---

[16] VanTubergen had deposited additional Collateral between the Loan origination and Disputed Liquidation #1.

41.     VanTubergen does not appear to dispute the propriety of this liquidation per se, rather he seems to take issue with the fact that he was required to pledge additional BTC in response to margin calls between the origination date of this loan in early May 2021 and the liquidation on June 22, 2021, which depleted the additional cryptocurrency reserves he asserts he was holding. JVT Cert. at 6c–d. Notably, VanTubergen does not assert that the Disputed Liquidation was out of compliance with the LSA—because it was not.

42.     VanTubergen's complaint that "BlockFi Lending made me post more collateral to my BTC-related loans instead of having the ability to use my collateral to post against my ETH related loans since they already prematurely liquidated such ETH-related loans" is nonsensical. JVT Cert. at 6d. BlockFi did not make VanTubergen take any action as to any of his Loans— BlockFi simply required VanTubergen to comply with the terms of the LSA.

43.     The market price of BTC fluctuated, as the cryptocurrency market does on a daily basis, and that fluctuation was not in his favor. As to Loan #1 (and all of his Loans), sometimes VanTubergen chose to pledge additional Collateral, and sometimes he did not and his positions were liquidated, as they were on June 22, 2021. Vague statements that "BlockFi Lending did not address my concerns" and speculation about different choices he would have made in strategizing about his Loans are not sufficient support for the JVT Claim. *Id*.

44.     BlockFi complied with the LSA and VanTubergen cannot and has not shown otherwise. Even if the liquidation had not complied with the LSA (it did), VanTubergen cannot show damages, particularly in the amounts asserted, as BlockFi applied the proceeds from liquidation of the Collateral (and all liquidations as to his Loans) to his Loan amount and, therefore, reduced his obligation to BlockFi.

### B.      Loan #2, Disputed Liquidation #2

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|---|---|---|---|---|---|---|---|
| 2 | 176fcbc3 | 05/05/2021 | $1,000,300.00 | 34.870 BTC | 70% | 50% | 80% |

45.      The principal amount of Loan #2 was $1,000,300.00. Loan #2 had a Required LTV of 70% and Max LTV of 80%. JVT Cert., Ex. E at ¶¶ 1, 7a. The LSA provided that "if at any time, the outstanding principal balance of the Loan is equal to or greater than 80% of the Collateral Market Value, Lender has the right to immediately liquidate Collateral…in such amount as necessary to establish a loan to value ratio where the total of the outstanding principal balance of the Loan plus all other amounts due is equal to or lesser than 70% of the Collateral Market Value." *Id*. at 7a.

| Loan # | Liq. # | Liquidation Date | Liquidation Price | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|---|---|---|---|---|---|---|---|
| 2 | 2 | 6/22/2021 | $29,052.97 | 82.0 | 3.4294 BTC | $99,634.56 | $28,901.80 |

46.      On June 22, 2021, the LTV Max of 80% was breached. In accordance with the LSA for Loan #2, BlockFi liquidated 3.4294 BTC and applied $99,634.56 to VanTubergen's outstanding Loan balance. Marquez Cert. at 10.

47.      The liquidation reduced the Loan balance to $900,665.40 and the collateral balance to 38.5652 BTC[17].  Therefore, the LTV on that date post-liquidation was 80.39%.  Marquez Cert. at 10.

48.      The JVT Cert. alleges identical claims regarding Loan #2 as those addressed above for Loan #1. *See* JVT Cert. at 6. As with Loan #1, he *does not* allege that the liquidation of his

---

[17] VanTubergen had deposited additional Collateral between the Loan origination and Disputed Liquidation #2.

Collateral was improper because he was not in violation of the Required LTV, he simply complains

that the margin calls and liquidations of Loan #2 caused his cryptocurrency reserves to be depleted

which in turn prevented him from taking certain actions as to his other Loans. *Id*. at 6c–d.

49.    As with Loan #1, BlockFi complied with the LSA and VanTubergen cannot and

has not shown otherwise. BlockFi is not liable to VanTubergen for the JVT Claim as it relates to

Loan #2.

C.    **Loan #3, Disputed Liquidation #3.**

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|--------|---------|------------------|-------------------|--------------------|--------------|-----------|---------|
| 3 | 558207a5 | 05/12/2021 | $6,300,300.00 | 3047.140 ETH | 70% | 50% | 80% |

50.    The principal amount of Loan #3 was $6,300,300.00. Loan #3 had a Required LTV

of 70% and Max LTV of 80%. JVT Cert., Ex. B at ¶¶ 1, 7a. The LSA provided that "if at any time,

the outstanding principal balance of the Loan is equal to or greater than 80% of the Collateral

Market Value, Lender has the right to immediately liquidate Collateral…in such amount as

necessary to establish a loan to value ratio where the total of the outstanding principal balance of

the Loan plus all other amounts due is equal to or lesser than 70% of the Collateral Market Value."

*Id.* at 7a.

| Loan # | Liq. # | Liquidation Date | Liquidation Price | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|--------|--------|------------------|-------------------|-------|-----------------|------------|--------------------------|
| 3 | 3 | 5/19/2021 | $2,262.00 | 91.4 | 1,565.2442 ETH | $3,540,582.38 | $2,435.65 |

51.    On May 19, 2021, the LTV Max of 80% was breached. In compliance with the LSA

for Loan #3, BlockFi liquidated 1,565.2442 ETH and applied $3,540,582.38 to VanTubergen's

outstanding Loan balance. Marquez Cert. at 11.

17

52.     The liquidation reduced the Loan balance to $2,759,717.60 and the Collateral balance to 1,481.8958 ETH. Therefore, the LTV on that date post-liquidation was 82.33%. Marquez Cert. at 11.

53.     VanTubergen alleges that Liquidation #3 was prematurely and wrongfully initiated because had pledged an additional 236.46 ETH between May 12, 2021 and May 19, 2021 that he asserts had a dollar value of $3,491.10 per 1 ETH. JVT. Cert at 5a–f. VanTubergen is incorrect about the timing and the valuation of the pledges. VanTubergen actually pledged the additional ETH in two separate batches of 150 ETH and 86.46 ETH in the afternoon and late evening of May 19, 2021, but the ETH was not confirmed on the blockchain until after the liquidation occurred. Marquez Cert. at 12. Until a transaction is confirmed on the blockchain it may not be completed, so BlockFi could not consider the additional ETH VanTubergen pledged in its calculation of the LTV until it was a confirmed transaction. Marquez Cert. at 13.

54.     Relying on an invalid valuation method, VanTubergen complains that BlockFi "downgraded" the value of his ETH. JVT Cert. at 5f. According to the JVT Cert., VanTubergen averaged the ETH prices found on Yahoo Finance over the 7-day period ending on the liquidation date to arrive at his asserted dollar value of $3,491.10. JVT Cert. at 5e. This method of randomly picking a time frame (and price source) and averaging the ETH price to assert that the liquidation was improper is deceptive and completely nonsensical. Crypto prices change minute-to-minute, and the LSA allows BlockFi to immediately initiate a liquidation when the outstanding principal balance of the Loan is equal to or greater than the Collateral Market Value, which is determined at a discrete moment in time, not over a random time frame determined by the borrower. JVT Cert., Ex. D at ¶ 7–7a. VanTubergen's motivation to average the price over 7 days to claim his ETH was worth $3,491.10 becomes clear when reviewing historical ETH prices for the period of May 12,

2021 through May 19, 2021 on Yahoo! Finance. The high price for ETH on May 12, 2021 was $4,362.35, while the low on May 19, 2021 was $1,952.46.[18] This significant market downturn caused the value of the ETH backing Loan #3 to drop, the LTV rose well above 80%, and BlockFi properly liquidated Collateral per the terms of the LSA.

55.     VanTubergen makes further claims that BlockFi could have taken BTC collateral worth more than $2MM held in his BlockFi Wallet[19] in order to halt the liquidation. JVT Cert. at 5g. No evidentiary support is provided to demonstrate that VanTubergen held this amount of BTC in his BlockFi account. However, BlockFi was not required to take action to halt any liquidations of Collateral, nor did the terms of the LSA or BIA allow BlockFi to unilaterally transfer funds without authorization from VanTubergen. Marquez Cert. at 14. In fact, in an earlier email exchange related to Loans #1 and #2, BlockFi advised VanTubergen that the "fastest and recommended way to cure your margin is to send additional crypto to your Loan," and provided him with the steps to initiate the movement from his BIA to his loan. **Exhibit A** at 2.

56.     The LSA specifically granted BlockFi a security interest in only the Collateral as defined in ¶ 5, which did not include cryptocurrency held by the Borrower in other accounts. JVT Cert., Ex. B at ¶ 5. There can be no claim against BlockFi for complying with its contractual obligations.

> **D.**     **Loan #4, Allegations of Missing ETH, Disputed Liquidations 4a and 4b**

57.     Loan # 3 was originated with 3047.140 ETH. Following Disputed Liquidation #3, the Collateral supporting Loan #3 was 1481.8958 ETH. Starting on May 19, 2021 with the two deposits of ETH that were not confirmed on the blockchain prior to Disputed Liquidation #3 and

---

[18] YAHOO! FINANCE, Historical ETH prices 5/21/21-5/19/21, https://finance.yahoo.com/quote/ETH-USD/history, last accessed Dec. 19, 2023.
[19] VanTubergen is likely referring to his BIA, rather than the BlockFi Wallet Account product, as BlockFi Wallet had not yet been introduced in May 2021. Marquez Cert. at 15.

continuing through June 26, 2021, VanTubergen made ETH deposits totaling 533.0324. Marquez

Cert. at 16. These deposits brought the total amount of ETH backing Loan #3 to 2014.9282 as of

the date that Loan #4 was originated. *Id.*

58.     Following Disputed Liquidation #3, VanTubergen sought to have the Collateral

that was sold "reinstated". **Exhibit B**. After discussions, BlockFi made a proposal to purchase

ETH Collateral on VanTubergen's behalf and apply it as Collateral for Loan #4. BlockFi's

purchase price would be added to the principal balance of Loan #4 (the "Reinstatement Proposal").

**Exhibit C**. The relevant provisions of the Reinstatement Proposal provided as follows:

- BlockFi would:

  - Purchase 1565.2442 ETH on VanTubergen's behalf at prevailing market prices, which may vary from current prices, inclusive of any trading fees and the cost would be added to the principal for new loan.
  - Refinance the full payoff amount for Loan ID 558207a5 (Loan #3) into a new loan backed by 3,580.172 ETH. This would include both the 1565.2442 ETH purchased by BlockFi plus the existing 2,014.928 ETH on the Loan #3.
  - Determine the exact USD loan amount based on the market price at the time the loan application was submitted. The new loan amount would equal {total cost to acquire the 1565.2442 ETH} + {Payoff amount of existing Loan ID 558207a5 of $2,802,226.45} + {0% waived Origination Fee}
  - Customize the Loan-to-Value (LTV) thresholds to 80% LTV for margin call and 90% LTV for forced liquidation.

- VanTubergen would:

  - Not receive any net new funds in the origination of the loan and the full amount of the loan would be due at time of maturity.
  - Understand the starting Loan-to-Value (LTV) for this refinanced loan would immediately put VanTubergen in risk of margin territory (estimated ~79% LTV)
  - Assume full responsibility for the new loan amount and agree and acknowledge that BlockFi would not be liable for any damages or any loss caused as a result of this transaction and providing this one time accommodation.

      ○ Agree this action was not part of BlockFi's normal procedures and had nothing to do with BlockFi's rights under any agreements (which BlockFi reserved).

      ○ Agree this request is unique and a one-time only accommodation BlockFi was making.

    Ex. C at 1.

59. On June 30, 2021, VanTubergen confirmed his agreement to BlockFi's proposal, but requested that the offer not expire until he identified "a safe purchase price amount" for the ETH. *Id*.

60. To be clear, the Reinstatement Proposal was *not* a proposal that BlockFi would undo the collateral liquidation. Instead, the Reinstatement Proposal allowed VanTubergen to borrow money to purchase the same amount of ETH, *at prevailing market prices*. VanTubergen would use the existing ETH from Loan #3 and the purchased ETH as Collateral to secure Loan #4. It amounted to a leveraged position on ETH that would magnify gains if ETH went up, or magnify losses if ETH went down.

61. Loan #4 was originated per the terms of the Reinstatement Proposal on July 7, 2021, backed by 2014.9282 ETH from Loan #3 and 1320 ETH purchased by BlockFi. VanTubergen initiated the Reinstatement Proposal after ETH prices rose. Marquez Cert. at 17. As a result, the amount of ETH needed to collateralize the Loan was less.

62. The LSA was created by an automated system wherein Collateral amounts were generated based on the typical requirement that loans have a 50% LTV at origination. Marquez Cert. at 17. This resulted in a scrivener's error in the amount of Collateral that backed the Loan. At no relevant point did VanTubergen pledge any additional amounts of ETH to secure Loan #4, all of the Collateral was either rolled over from Loan #3 (2014.9282 ETH) or purchased by BlockFi with the cost added to the principal balance of Loan #4 (1320 ETH).

63.     The chart below summarizes all Collateral activity for Loans #3 and #4. The bolded rows show the 2014.9282 ETH that was moved from Loan #3 to Loan #4, as well as the deposit of the 1320 ETH that BlockFi bought per the Reinstatement Proposal. Marquez Cert. at 18.

| Loan ID | Transaction | Amount | Crypto Type | Time Stamp |
|---|---|---|---|---|
| #3 - 558207a5 | deposit | 3052.28 | ETH | 5/12/2021 18:07 |
| #3 - 558207a5 | withdrawal | -5.14 | ETH | 5/12/2021 18:08 |
| #3 - 558207a5 | withdrawal | -1565.2442 | ETH | 5/19/2021 0:00 |
| #3 - 558207a5 | deposit | 86.4624 | ETH | 5/19/2021 12:44 |
| #3 - 558207a5 | deposit | 150 | ETH | 5/19/2021 21:29 |
| #3 - 558207a5 | deposit | 75 | ETH | 5/21/2021 21:19 |
| #3 - 558207a5 | deposit | 35 | ETH | 5/23/2021 12:51 |
| #3 - 558207a5 | deposit | 22.57 | ETH | 5/23/2021 12:57 |
| #3 - 558207a5 | deposit | 50 | ETH | 5/23/2021 13:05 |
| #3 - 558207a5 | deposit | 45 | ETH | 5/23/2021 16:14 |
| #3 - 558207a5 | deposit | 30 | ETH | 5/23/2021 16:26 |
| #3 - 558207a5 | deposit | 20 | ETH | 5/23/2021 16:37 |
| #3 - 558207a5 | deposit | 7 | ETH | 6/22/2021 12:53 |
| #3 - 558207a5 | deposit | 7 | ETH | 6/22/2021 13:20 |
| #3 - 558207a5 | deposit | 3 | ETH | 6/26/2021 12:51 |
| #3 - 558207a5 | deposit | 2 | ETH | 6/26/2021 12:53 |
| **#4 - 1a118e43** | **deposit** | **2014.9282** | **ETH** | **7/7/2021 17:16** |
| **#3 - 558207a5** | **withdrawal** | **-2014.9282** | **ETH** | **7/7/2021 17:16** |
| **#4 - 1a118e43** | **deposit** | **1320** | **ETH** | **7/7/2021 17:17** |
| #4 - 1a118e43 | withdrawal | -1781.3053 | ETH | 7/13/2021 0:00 |
| #4 - 1a118e43 | withdrawal | -818.4279 | ETH | 7/19/2021 0:00 |
| #4 - 1a118e43 | deposit | 2 | ETH | 7/20/2021 2:30 |
| #4 - 1a118e43 | deposit | 2 | ETH | 7/20/2021 2:47 |
| #4 - 1a118e43 | withdrawal | -739.19501 | ETH | 8/23/2021 17:06 |

64.     Despite VanTubergen's feigned disbelief and confusion about the amount of ETH backing Loan #4 and the subsequent Disputed Liquidations (4a and 4b) that followed shortly after it was originated, Exhibit C clearly demonstrates that he was aware of and explicitly agreed to the terms of the Reinstatement Proposal, including where the ETH to back Loan #4 would come from and the approximate amounts, as well as the inherent risks of originating a loan at approximately

22

79% LTV. While VanTubergen may currently be asserting that 895 ETH "remains unaccounted for," (JVT Cert. at 8c), he acknowledged as recently as May of 2022 that he only ever had 3000 ETH on BlockFi's platform. **Exhibit D**.

65.     Not only did VanTubergen accept the risks of originating Loan #4 under the terms of the Reinstatement Proposal, he waived any right to assert that BlockFi was "liable for any damages or any loss caused as a result of this transaction and providing this one time accommodation." Ex. C at 1.

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|--------|---------|------------------|-------------------|--------------------|--------------|-----------|---------|
| 4 | 1a118e43 | 07/07/2021 | $5,928,830.21 | 3334.93 ETH | 80% | 60% | 90% |

66.     Loan #4 refinanced Loan #3 in the principal amount of $5,928,830.21. Loan #4 had a Required LTV of 80% and Max LTV of 90%. JVT Cert., Ex. H at ¶¶ 1, 7a.

67.     The LSA provided that "if at any time, the outstanding principal balance of the Loan is equal to or greater than 80% of the Collateral Market Value, Lender has the right to immediately liquidate Collateral…in such amount as necessary to establish a loan to value ratio where the total of the outstanding principal balance of the Loan plus all other amounts due is equal to or lesser than 80% of the Collateral Market Value." *Id*. at 7a.

| Loan # | Liq. # | Liquidation Date | Liquidation Price | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|--------|--------|------------------|-------------------|-------|-----------------|------------|--------------------------|
| 4 | 4a | 7/13/2021 | $1,948.82 | 91.2 | 1,781.3053 ETH | $3,471,443.74 | $1918.67 |
| 4 | 4b | 7/19/2021 | $1,747.20 | 90.5 | 818.4279 ETH | $1,429,954.44 | $1806.53 |

68.     On July 13, 2021, the LTV Max of 90% was breached. In accordance with the LSA for Loan #4, BlockFi liquidated 1,781.3053 ETH and applied $3,471,443.74 to VanTubergen's outstanding Loan balance. Marquez Cert. at 19.

69.     The liquidation reduced the Loan balance to $2,457,386.50 and the collateral balance to 1,553.6229 ETH.   Therefore, the LTV on that date post-liquidation was 81.16%. Marquez Cert. at 19.

70.     On July 19, 2021, the LTV Max of 90% was breached. In accordance with the LSA for Loan #4, BlockFi liquidated 818.4279 ETH and applied $1,429,954.44 to VanTubergen's outstanding Loan balance. Marquez Cert. at 20.

71.     The liquidation reduced the Loan balance to $1,027,432.00 and the collateral balance to 735.1950 ETH.  Therefore, the LTV on that date post-liquidation was 79.99%.  Marquez Cert. at 20.

72.     Disputed Liquidations 4a and 4b were properly executed under the terms of the LSA and were an unfortunate, but entirely foreseeable, result of VanTubergen demanding extraordinary terms for Loan #4 in an attempt to quickly recover the cryptocurrency he had lost because of market fluctuations. BlockFi's attempts to accommodate a demanding customer, while fully informing him of the risk involved, should not subject BlockFi to liability for the JVT Claim.

**E.     Loan #5, Disputed Liquidations 5a and 5b**

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|---|---|---|---|---|---|---|---|
| 5 | 736435a7 | 11/02/2021 | $2,298,300.00 | 72.050 BTC | 70% | 50% | 80% |

73.     The principal amount of Loan #5 was $2,298,300.00. Loan #5 had a Required LTV of 70% and Max LTV of 80%. JVT Cert., Ex. F at ¶¶ 1, 7a. The LSA provided that "if at any time, the outstanding principal balance of the Loan is equal to or greater than 80% of the Collateral Market Value, Lender has the right to immediately liquidate Collateral…in such amount as necessary to establish a loan to value ratio where the total of the outstanding principal balance of

the Loan plus all other amounts due is equal to or lesser than 70% of the Collateral Market Value."

*Id*. at 7a.

| Loan # | Liq. # | Liquidation Date | Liquidation Price | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|---|---|---|---|---|---|---|---|
| 5 | 5a | 1/21/2022 | $38,375.63 | 83.1 | 31.3544 BTC | $1,203,243.90 | $35,503.90 |
| 5 | 5b | 5/9/2022 | $32,442.02 | 82.9 | 17.5577 BTC | $569,607.41 | $30,095.00 |

74.     On January 21, 2022, the LTV Max of 80% was breached. In accordance with the LSA for Loan #5, BlockFi liquidated 31.3544 BTC and applied $1,203,243.90 to VanTubergen's outstanding Loan balance. Marquez Cert. at 21.

75.     The liquidation reduced the Loan balance to $1,095,056.10 and the collateral balance to 40.6956 BTC. Therefore, the LTV on that date post-liquidation was 70.12%. Marquez Cert. at 21.

76.     On May 9, 2022, the LTV Max of 80% was breached. In accordance with the LSA for Loan #5, BlockFi liquidated 17.5577 BTC and applied $569,607.41 to VanTubergen's outstanding Loan balance. Marquez Cert. at 22.

77.     The liquidation reduced the Loan balance to $525,448.70 and the collateral balance to 23.1379 BTC. Therefore, the LTV on that date post-liquidation was 70.00%. Marquez Cert. at 22.

78.     Loan #5 was originated on November 2, 2021 as a refinancing of Loan #1. JVT Cert. at 7c. As with Loans #1 and #2, VanTubergen does not claim that the Disputed Liquidations (5a and 5b) were improperly executed because he was not in violation of the LTV requirement. Rather, he asserts that following the Disputed Liquidation on Loan #1 (which occurred in June 2021) he contacted BlockFi to cash out that Loan and was instead encouraged to refinance into Loan #5 "to recover his losses" (which occurred in November 2021). *Id*. As with all of

VanTubergen's allegations regarding coercion, he provides no evidence whatsoever that any BlockFi employee discouraged, dissuaded, or in any way prevented him from cashing out any of the Loans.

79.     VanTubergen fails to address Disputed Liquidation 5a other than to describe it as a forceful liquidation. *Id*. As to Disputed Liquidation 5b, VanTubergen alleges that he contacted a BlockFi employee by telephone and text message on Friday, May 6, 2022 to cash-out this Loan and "did not receive any clarity on how to cash out" but was told that "BlockFi Lending would cease selling collateral at 5:00 p.m. and that they opened again at 9:00 a.m. on Monday." *Id.* at 7d. Again, no support is provided evidencing that this conversation ever took place, and as addressed further in Section III below, the same BlockFi employee VanTubergen alleges to have had this conversation with had explained how to pay off his Loans by email in February 2021. **Exhibit E** at 2.

80.     Even if VanTubergen's unsupported allegation that he was not able to get his questions about the payoff process answered at the exact moment he wanted to ask them was true, this allegation does not give rise to any claim against BlockFi. The LSA is clear that the Borrower "may prepay the unpaid balance at any time without penalty." JVT Cert., Ex. F at p. 15. While payoff options were available directly through BlockFi, Scratch was the loan servicing agent and fully able to accept a payment in full of the outstanding Loan balance if VanTubergen had truly had the ability and desire to pay off Loan #5 in full. Marquez Cert. at 23. BlockFi complied with Loan #5's LSA and VanTubergen has no claim against BlockFi for the sale of Collateral.

F.      **Loan # 6, Disputed Liquidations 6a and 6b**

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|---|---|---|---|---|---|---|---|
| 6 | ce7f64ed | 11/02/2021 | $1,245,949.14 | 39.050 BTC | 70% | 50% | 80% |

81.     The principal amount of Loan #6 was $1,245,949.14. Loan #6 had a Required LTV of 70% and Max LTV of 80%. JVT Cert., Ex. G at ¶¶ 1, 7a. The LSA provided that "if at any time, the outstanding principal balance of the Loan is equal to or greater than 80% of the Collateral Market Value, Lender has the right to immediately liquidate Collateral…in such amount as necessary to establish a loan to value ratio where the total of the outstanding principal balance of the Loan plus all other amounts due is equal to or lesser than 70% of the Collateral Market Value." *Id*. at 7a.

| Loan # | Liq. # | Liquidation Date | Liquidation Price | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|---|---|---|---|---|---|---|---|
| 6 | 6a | 1/21/2022 | $38,204.65 | 83.4 | 17.4025 BTC | $664,855.46 | $35,503.90 |
| 6 | 6b | 5/9/2022 | $32,347.57 | 82.7 | 9.2020 BTC | $297,662.82 | $30,095.00 |

82.     On January 21, 2022, the LTV Max of 80% was breached. In accordance with the LSA for Loan #6, BlockFi liquidated 17.4025 BTC and applied $664,855.46 to VanTubergen's outstanding Loan balance. Marquez Cert. at 24.

83.     The liquidation reduced the Loan balance to $581,093.70 and the collateral balance to 21.7192 BTC.[20] Therefore, the LTV on that date post-liquidation was 70.03%. Marquez Cert. at 24.

84.     On May 9, 2022, the LTV Max of 80% was breached. In accordance with the LSA for Loan #6, BlockFi liquidated 9.2020 BTC and applied $297,662.82 to VanTubergen's outstanding Loan balance. Marquez Cert. at 25.

---

[20] VanTubergen had deposited additional Collateral between the Loan origination and Disputed Liquidation #6a.

85.     The liquidation reduced the Loan balance to $283,430.90 and the collateral balance to 12.5172 BTC.[21] Therefore, the LTV on that date post-liquidation was 70.00%. Marquez Cert. at 25.

86.     Loan #6 was originated on November 2, 2021 as a refinancing of Loan #2. JVT Cert. at 7c. As with Loans #1, #2, and #5, VanTubergen does not claim that the Disputed Liquidations (6a and 6b) were improperly executed because he was not in violation of the LTV requirement. Instead, he asserts identical claims as to Loan #6 as those he asserted for Loan #5— that he was coerced to refinance and wanted payoff information on a particular day and time and was not able to receive that information. *Id.* at 7.

87.     Again, there is no evidence in the record of coercion. BlockFi did not prevent VanTubergen from paying his Loans in full whenever he wanted to do so. VanTubergen was aware of his payoff options through earlier conversations with BlockFi. *See* Ex. E at 2.

88.     BlockFi complied with Loan #6's LSA and VanTubergen has no claim against BlockFi for the sale Collateral.

### G.     Loan # 7, Disputed Liquidation 7

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|---|---|---|---|---|---|---|---|
| 7 | 5be66333 | 11/02/2021 | $1,622,000.00 | 719.830 ETH | 70% | 50% | 80% |

89.     The principal amount for Loan #7 was $1,622,000.00. Loan #7 had a Required LTV of 70% and Max LTV of 80%. JVT Cert., Ex. I at ¶¶ 1, 7a. The LSA provided that "if at any time, the outstanding principal balance of the Loan is equal to or greater than 80% of the Collateral Market Value, Lender has the right to immediately liquidate Collateral…in such amount as necessary to establish a loan to value ratio where the total of the outstanding principal balance of

---

[21] VanTubergen had deposited additional Collateral between the Loan origination and Disputed Liquidation #6b.

the Loan plus all other amounts due is equal to or lesser than 70% of the Collateral Market Value."

*Id*. at 7a.

| Loan # | Liq. # | Liquidation Date | Liquidation Price | LTV % | Collateral Sold | USD Raised | Trigger Price (BTC/ETH) |
|--------|--------|------------------|-------------------|-------|-----------------|------------|-------------------------|
| 7 | 7 | 1/22/2022 | $2,323.48 | 92.2 | 363.2473 ETH | 843,997.44 | $2,314.30 |

90.     On January 22, 2022, the LTV Max of 80% was breached. In accordance with for Loan #7's LSA, BlockFi liquidated 363.2473 ETH and applied $843,997.44 to VanTubergen's outstanding Loan balance. Marquez Cert. at 26.

91.     The liquidation reduced the Loan balance to $778,002.60 and the collateral balance to 394.1807 ETH. Therefore, the LTV on that date post-liquidation was 84.95%. Marquez Cert. at 26.

92.     Loan #7 refinanced Loan #4. VanTubergen does not assert that Disputed Liquidation #7 was improper because the LTV on Loan #7 exceeded the Max LTV, or that BlockFi violated the LSA. Rather, VanTubergen makes the same unsupported allegations that he was coerced to refinance, coerced to meet margin calls, and frustrated from paying off his Loan. JVT Cert. at 9. As with all the prior allegations made as to other Loans, he provides no documentation or evidentiary support for these claims. As such, VanTubergen has no valid claim against BlockFi for the sale of Collateral.

## III.    VanTubergen Presents No Evidence of Coercion or Predatory Lending Practices by BlockFi.

93.     The JVT Response and JVT Cert. contain a myriad of unsupported allegations that VanTubergen entered into 37 LSAs with BlockFi because he was coerced into doing so and that BlockFi provided financial investment advice that he relied upon to his detriment. *See e.g.,* JVT Response at 5, 21 and JVT Cert. at 13–14.

94.     VanTubergen asserts that he "often made [his] desire to pay off accounts known," but "instead was subjected to continuous solicitations to refinance and post additional collateral." JVT Cert. at 13. To support these allegations, he provides two emails. JVT Cert., Exs. P, Q. Exhibit P is an email from VanTubergen to a BlockFi employee that simply states that he wants to speak to him about paying off his account. JVT Cert., Ex. P. The other is an email from a BlockFi employee advising VanTubergen that he does not meet the required volume to utilize BlockFi's OTC (over-the-counter) desk for trading cryptocurrency. JVT Cert., Ex, Q. Neither document provides any evidence that BlockFi coerced VanTubergen to enter into new LSAs or refinance existing ones. In fact, BlockFi provided VanTubergen with an email address that was normally reserved for high-net-worth private clients, advising him that "when [he] was ready to pay off [his] loan" VanTubergen could utilize that email address to reach someone at BlockFi to "take care of [the loan payoff] quite quickly." *Id*.

95.     In truth, VanTubergen was the driving force initiating the refinancings. On December 29, 2020, VanTubergen asked to speak to BlockFi regarding paying off his Loans. **Exhibit F**. Despite VanTubergen's accusations that BlockFi was difficult to reach or slow to respond (JVT Cert. at 16, 19), BlockFi responded to VanTubergen's email less than 2 hours after it was sent, and VanTubergen and BlockFi scheduled a call for 9:30 AM the next morning. *Id*. at 3. That evening around 10:00 PM VanTubergen asked BlockFi to "Please send me an updated loan refinance cash out options. Please separate out by each loan the assets on what I could receive by each separately." *Id*. After the New Year holiday, BlockFi's employee provided options for refinancing VanTubergen's Loans, closing with "Let us know what you think and if you would like to move forward." *Id.* at 2–3. Just 34 minutes later, VanTubergen directs the employee to "proceed with both" *Id*. at 1–2. The new Loans were funded by the end of the day. *Id*.

96.     In February 2021, VanTubergen again initiated the refinance of his loans Ex. E. at 4. VanTubergen sought to combine three of his outstanding Loans into one loan and bring the new loan's LTV to 50% using the existing collateral from the previous Loans as well as ETH in his BIA. *Id.* at 3–4. Less than 24 hours later the BlockFi employee confirmed that the new loan would be funded shortly. *Id.* at 2.

97.     VanTubergen requested information on loan payoffs, whether he could perform them without BlockFi's assistance, and the timing to complete the process. *Id*. at 3. Contrary to VanTubergen's allegations that he was "always diverted to refinance options" (JVT. Cert at 13), the BlockFi employee promptly responded to VanTubergen and immediately scheduled a call. *Id.* at 2. BlockFi's employee explained the payoff process and the timeline of various payoff options *Id.*

98.     On multiple occasions VanTubergen initiated the refinance or origination of new loans without input or discussion with any BlockFi employees. *See* **Exhibit G**, **Exhibit H**. He directed BlockFi to originate a new loan using 650 ETH he was holding in his BlockFi collateral account (Ex. G at p. 1) and about a month later suggested two separate options to refinance one or two of his Loans in order to obtain an additional lump sum of around $400,000 to $500,000 USDC. Ex. H at p. 2.

99.     VanTubergen has submitted no evidence that BlockFi employees used coercive tactics to encourage VanTubergen to obtain new Loans or refinance existing ones. As outlined above, VanTubergen was the driving force behind the initiation and refinancing of the multitude of Loans he voluntarily chose to enter into with BlockFi.

100.     The JVT Response alludes to the doctrine of unconscionability as to the LSAs and supervening impossibility of performance by VanTubergen (JVT Response at 18, 20). The JVT

Response cites to Michigan case law on unconscionability but fails to identify what clause or clauses "are so one-sided as to be unconscionable at the time of the making of the contract." JVT Response at 20, n. 10 (citing to *Gianni Sport, Ltd. v. Gantos, Inc.*, 391 N.W.2d 760, 761 (Mich. Ct. App. 1986).

101.    Similarly, the JVT Response fails to elaborate how VanTubergen's entirely unsubstantiated complaints that he sometimes had trouble reaching BlockFi or accessing the BlockFi website could even come close to approaching the standard for impossibility. "Subsequent events which in the nature of things do not render performance impossible, but only render it more difficult, burdensome, or expensive, will not operate to relieve [a party of its contractual obligations]." *Karl Wendt Farm Equip. Co. v. Int'l Harvester Co.*, 931 F.2d 1112, 1116 (6th Cir. 1991).

102.    The JVT Claim, JVT Cert. and accompanying exhibits, and JVT Response provide no evidence to support VanTubergen's allegations of coercion, predatory lending, or attempts to divert or dissuade VanTubergen from paying off his Loans.

103.    Further, VanTubergen has not outlined any damage he incurred even if he could prove coercion or predatory lending. Because nothing substantiates these claims, the Court should reject them.

## IV.    The Allegations Against Scratch Services LLC are False and Irrelevant to the VanTubergen Claim.

104.    While the JVT Claim and JVT Response are devoid of any mentions of Scratch, the JVT Cert. alleges that improper UCC Filings were placed on VanTubergen's "personal property." JVT Cert. at 10c. VanTubergen falsely asserts that: a) Scratch is owned by BlockFi, b) the UCC Filings were unauthorized, and c) Scratch admitted that the UCC Filings were "their mistake" and terminated them.

32

105.    First, Scratch is a loan servicing company that has no affiliation with BlockFi. Second, every single one of the 37 LSAs VanTubergen signed explicitly provides that BlockFi is authorized to file UCC-1 Financing Statements. *See e.g.*, JVT Cert., Ex. B at ¶¶ 2, 5d. Finally, despite VanTubergen's claim that Exhibit K to the JVT Cert. demonstrates that Scratch admitted that the UCC Filings were improper, a review of the email chain instead shows that Scratch repeatedly explained the basis of the UCC Filings, cited to ¶ 5d of the LSAs in support of the filings, and explained that the UCC Filings were not "blanket liens nor do they perfect liens in property or affect property that is not identified in the collateral description." JVT Cert., Ex. K at p. 3. VanTubergen's counsel provided several UCC-1 Financing Statements filed by Scratch on BlockFi's behalf. A true and correct copy of one of these filings is attached **as __Exhibit I__**. The description of collateral covered by the financing statement is identical to the definition of Collateral provided in the LSAs. Ex. I at 4.

106.    In short, VanTubergen makes several false claims about the UCC Filings while attaching documentary evidence that directly contradicts his assertions. The UCC Filings were proper and do not relate to the JVT Claim in any way.

## V.    The Wind-Down Debtors Have Provided VanTubergen with Ample Documentation to Disprove his Allegations.

107.    Counsel for the Wind-Down Debtors have worked with VanTubergen's counsel since they were first contacted. After the receipt of some initial documents, VanTubergen issued a Subpoena requesting additional information. The following documents have been produced to VanTubergen in an effort to clear up any misconceptions VanTubergen has about the JVT Claim and resolve this matter without protracted litigation.

- A transaction history for all 37 of VanTubergen's Loans, including deposits, withdrawals, and liquidations;
- All of the LSAs entered into between VanTubergen and BlockFi;

- A copy of the unredacted supplemental document served on VanTubergen with the Claim Objection listing just his claim information;
- A spreadsheet showing the date, time, and type of the automated emails VanTubergen received in regard to the Loans that had disputed liquidations, along with templates of each of those email types;
- Screenshots of VanTubergen's BIA and Wallet accounts;
- All emails between VanTubergen and each of the BlockFi employees he identified in the exhibits to the JVT Cert.;
- All internal Slack messages between BlockFi employees related to VanTubergen;
- A spreadsheet containing all pre-liquidation balances, liquidation information (including amount of Collateral sold and price), and post-liquidation balances.
- A spreadsheet showing the times of all liquidation triggers and the associated BTC and ETH prices that day; and
- Information on the exchanges used to determine BTC and ETH pricing for liquidations.

## VI.    The Court Should Reject VanTubergen's Alternative Requests for Relief.

108.    The JVT Response makes several requests for alternative relief that should be denied or are now moot: a) estimation of the JVT Claim, b) allowance of discovery, c) the right to seek relief under Bankruptcy Rule 7001, d) the right to amend the claim with relation-back, e) temporary allowance of the JVT Claim for voting, and f) right to file a sur-reply[22].

109.    At this point in these Chapter 11 Cases, the Plan has been confirmed and the Wind-Down Debtors are preparing to make distributions to creditors in the coming months. The Wind-Down Debtors have provided records to VanTubergen, and this Reply more than adequately addresses the specifics of the allegations made in the JVT Response and Certification.

110.    As such, estimating the JVT Claim is moot as the adjudication of the Claim Objection will fix VanTubergen's claim amount. The parties have already exchanged documents, and VanTubergen has had time to seek leave of this Court to amend the JVT Claim or file an adversary proceeding. The Plan was overwhelming confirmed by BlockFi's creditors.

---

[22] This Court has already granted VanTubergen's request to file a sur-reply, which is due on December 17, 2023.

## Conclusion

111. BlockFi has more than amply discharged any burden it has to provide VanTubergen with information as the JVT Claim. BlockFi has demonstrated that VanTubergen entered into the LSAs knowingly and without coercion. BlockFi has demonstrated that the Collateral backing VanTubergen's Loans was fully accounted for and liquidated per the terms of the LSAs.

112. VanTubergen, like many other BlockFi creditors, was the unfortunate victim of market fluctuations in the prices of BTC and ETH. He was not, however, the victim of coercion or improper liquidations of his Collateral by BlockFi, and he holds no claim against BlockFi's estate other than the balance of his BIA.

**WHEREFORE**, the Wind-Down Debtors respectfully request entry of an order modifying the JVT Claim to reflect the correct debtor entity and amount of VanTubergen's BIA claim.

*[remainder of this page intentionally left blank]*

Dated: December 12, 2023                    /s/ Daniel M. Stolz

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
(973) 230-2095
DStolz@genovaburns.com
DClarke@genovaburns.com

*Local Counsel to the Plan Administrator*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No.
047911992)
Lauren M. Sisson, Esq. (NJ Bar No. 394182022)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
lauren.sisson@haynesboone.com

*Attorneys for the Plan Administrator*

**BROWN RUDNICK LLP**
Kenneth J. Aulet, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
(212) 209-4800
kaulet@brownrudnick.com

**BROWN RUDNICK LLP**
Tristan Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
(617)856-8300
taxelrod@brownrudnick.com

*General Counsel to the Plan Administrator*