CONNELL FOLEY LLP
Joao F. Magalhaes, Esq. (NJ Bar No. 004802008)
One Newark Center
1085 Raymond Boulevard, 19th Floor
Newark, NJ 07102
973-436-5800
*Counsel to Claimant John W. Van Tubergen Jr.,*
  *Creditor of BlockFi Lending LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*,[1] | Case No. 22-19361 (MBK) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: January 16, 2024** |
| | **Proof of Claim No. 7233** |

**SUR-REPLY OF CLAIMANT JOHN W. VAN TUBERGEN JR.
TO WIND-DOWN DEBTORS' REPLY TO RESPONSE TO DEBTORS' SEVENTH
OMNIBUS OBJECTION TO CLAIM NO. 7233**

Claimant John W. Van Tubergen Jr. ("Claimant"), creditor of BlockFi Lending LLC ("BlockFi Lending"), respectfully submits this sur-reply to the *Wind-Down Debtors' Reply to Response to Debtors' Seventh Omnibus Objection to Claim No. 7233 of John W. VanTubergen Jr.* (the "Reply")[2] filed by BlockFi Inc. ("BlockFi"), BlockFi Lending, and their related debtors (collectively, the "Wind-Down Debtors," or as referred to herein, the "Debtors") in these jointly administered proceedings. For the reasons set forth herein, Claimant again respectfully submits that the *Debtors' Seventh Omnibus Objection to Certain Claims* (as it pertains to Claimant's

---

[1] Claimant's proof of claim number 7233 is associated with the bankruptcy estate of BlockFi Lending LLC, Bankr. N.J. Case No. 22-19365.
[2] Main Case Docket No. 1963.

14409788-1

proof of claim and related interests, the "Objection")[3] should be overruled as to the subject Claim,[4] and that the Claim should be fixed in the amount sought, or alternatively, that it be permitted to be amended upwards in accordance with the additional analyses and evidentiary material presented by way of the accompanying *Supplemental Certification of Claimant John W. Van Tubergen Jr. In Support of Sur-Reply (etc.)* (the "Supp. J.V.T. Cert.").

**I. BlockFi Lending exceeded its contractual rights and the parties' expectations by conducting the liquidations at issue, which were either unwarranted or excessive.**

1. **Generally.** As previously explained, *see* Response ¶ 6, each of the LSAs for the loans entered into by Claimant provided, in pertinent part, that upon the occurrence of a "Trigger Event," that is, the failure to maintain a Required LTV of seventy percent (70%),[5] Claimant was to be given notice and permitted seventy-two (72) hours to post additional collateral, but that if a LTV of eighty percent (80%) was reached, then "Lender has the right to immediately liquidate Collateral, subject to any required notice, in such an amount as necessary to establish a loan to value ratio . . . equal to or less than seventy percent (70%).[6] J.V.T. Cert., Ex. B § 7(a).

2. Therefore, upon the occurrence of a Trigger Event that was not successfully negated by Claimant, and upon reaching the "Accelerated Maximum Loan to Value Ratio" of either eighty percent (80%)[7] (hereinafter the "Max LTV"), then BlockFi Lending was entitled to liquidate collateral so as to re-establish the Required LTV of either seventy percent (70%) or

---

[3] *Id.* Docket No. 1311.
[4] Any terms not capitalized herein shall have the meanings ascribed to such terms by either Claimant's prior *Response to Debtors' Seventh Omnibus Objection to Certain Claims on Behalf of Claimant John W. VanTubergen Jr.* (the "Response") or his prior *Certification of Claimant John W. Van Tubergen Jr. In Support of Response to Debtors' Seventh Omnibus Objection to Certain Claim* (the "J.V.T. Cert."). *Id.* Docket Nos. 1496, 1496-1.
[5] Or, in the case of Loan No. 1a118e43, a Required LTV of eighty percent (80%). J.V.T. Cert., Ex. H § 7(a).
[6] Again, in the case of Loan No. 1a118e43, back to or below the Required LTV of eighty percent (80%). *Id.*
[7] In the case of Loan No. 1a118e43, the Max LTV was ninety percent (90%). *Id.*

eighty (80%). *Id.* Exs. B § 7(a), Ex. H § 7(a). Such is the clear letter and intent of the LSAs, and this comports with the explanations given to Claimant by BlockFi Lending's agents, who among other representations stated in writing and in plain terms that the LTV needed to be just under the Required LTV, and that to accomplish same a typical liquidation event would be for about ten percent (10%). *See* Supp. J.V.T. Cert. Exs. EE and FF (annexing images of text messages from Agents 3 and 7).

3. **Methodology of Collateral Loss Breakdown.** Annexed as Exhibit AA to the Supp. J.V.T. Cert. is a spreadsheet, the "Collateral Loss Breakdown," with information evidencing, among other data points, pre- and post-liquidation collateral balances, the amount and fair market value of cryptocurrency collateral posted on account of such balances, the LTV according to such fair market value, the percentage (%) of collateral liquidated by BlockFi Lending, and the dollar-value of collateral liquidated relative to the outstanding loan amount (both per BlockFi Lending's unknown valuation method and per Claimant's fair market value data). Critically, the Collateral Loss Breakdown is in pertinent part underpinned by the very pricing exchange data associated with Gemini Trust Company, LLC ("Gemini"), which served as the "Depository" under each LSA. Supp. J.V.T. Cert. ¶ 5 (annexing as Exhibit DD the Gemini pricing data, which corresponds to the time stamps featured in the Liquidation Summary, with a chain of custody communication); *see also, e.g.,* J.V.T. Cert. Ex. B § 4(d) (appointing Gemini as Depository).

4. **Unauthorized Liquidations.** The Collateral Loss Breakdown shows that the liquidation points – again, the Max LTV of either eighty percent (80%) or ninety percent (90%) – were not reached in connection with Loan Nos. 558207a5, 250568f4, 176fcbc3, and 1a118e43.

3

More specifically as to each occurrence, as per the Collateral Loss Breakdown and exhibits to the Supp. J.V.T. Cert.:

    a.    **Loan No. 558207a5.**  Preliminarily, it is noted that Claimant asserts that the liquidation took place on May 20, 2021, not (as BlockFi Lending claimed) on May 19, 2021.  *See* Supp. J.V.T. Cert. ¶ 23.  Claimant provides detailed reasons for this assertion, which is potentially material to the Court's findings given that the value of ETH had risen markedly by the morning of May 20.  *Id.*  With that said, and even putting aside the additional collateral posted by Claimant – as defined and explained by Claimant, the "Surplus 558207a5 Collateral," *see* Supp. J.V.T. Cert. ¶ 19[8] – as shown by the Collateral Loss Summary it does not appear that the Max LTV was reached on *either* May 19 (73.74% LTV) or May 20 (70.60% LTV).  Yet once the Surplus 558207a5 Collateral is factored, which it must given that it was procured and posted in discussions with BlockFi Lending, *see Id.* ¶¶ 18-19, Exs. EE and KK, then it becomes clear that there was not even a basis to call a Trigger Event, with potential LTVs dropping down to 60.22% (May 19) and 58.11% (May 20).  As a matter of fact, it fully appeared to Claimant and Agent 3 that by the afternoon of May 19, 2021, any cause for alarm had subsided, with Agent 3 informing Claimant on May 19 that he was still in "safe territory" given the distance to the Max LTV.  *Id.* ¶ 18, Ex. EE (slide 33).  If, however, something were amiss vis-a-vi the Required LTV and Max LTV, Claimant fully and fairly expected that the Surplus 558207a5 Collateral would be tapped-into and swept-over as needed.  *Id.* ¶¶ 18, 20, Ex. EE (slide 33).  And then, on the morning of May 20, 2021, **BlockFi**

---

[8] As explained in greater detail by Claimant, the Surplus 558207a5 Collateral represented additional collateral consisting of 150.57580186 ETH, 914,739.37148790 units of USD Coin, an additional 132 ETH, and 10,000.00 units of Chainlink cryptocurrency, for a total value of approximately $1,917,703.78. Supp. J.V.T. Cert. ¶ 19.

*Lending admitted that everything was fine as to LTVs. Id.* ¶ 21, Ex. EE (slide 38). Yet, incredibly, it proceeded not only to liquidate, but to do so (as further discussed below) in startling fashion.

      b.    **Loan No. 250568f4.** On the date of liquidation, June 22, 2021, the Max LTV had not been reached because the LTV was approximately 75.09%.

      c.    **Loan No. 176fcbc3.** On the date of liquidation, June 22, 2021, the Max LTV had not been reached because the LTV was approximately 74.64%.

      d.    **Loan No. 1a118e43.** There were two offending liquidations as to Loan No. 1a118e43. On July 13, 2021, had the missing ETH been properly posted, the Max LTV would not have been reached, but rather the LTV would have been 72.19%. Yet on July 13, 2021, the missing ETH was not even necessary to avert liquidation because the LTV was approximately 86.99% even absent the missing ETH (again, the Max LTV for Loan No. 1a118e43 was 90%). The missing ETH issue is discussed again in greater detail further below.

5.    **<u>Excessive Liquidations.</u>** In accordance with the language of Section 7(a) of the LSAs and representations made on behalf of BlockFi Lending, Claimant fully and fairly expected that if the Max LTV was reached such that liquidations were to proceed, that such liquidations would be performed in a reasonable manner to re-establish the Required LTV. *See, e.g.,* Supp. J.V.T. Cert. Exs. EE and FF. Yet when BlockFi Lending did liquidate, staggering amounts of collateral were stripped from Claimant. Simply stated, looking just at the "Percentage (%) of Collateral Liquidated" column of the Collateral Loss Breakdown, some of the figures are genuinely jaw-dropping: 47.67% (May 19 or 20, 2021, liquidation of Loan No. 558207a5), 53.41% (July 13, 2021, liquidation of Loan No. 1a118e43), 52.68% (July 19, 2021,

5

liquidation of Loan No. 1a118e43), 43.52% (January 21, 2022, liquidation of Loan No. 736435a7), *etc*. *See* Ex. AA. The sheer excess and (respectfully) gross nature of BlockFi Lending's conduct is perhaps made even more evident by the "Gemini % of USD Collateral Sold" column, which assesses the ratio, expressed in percentage format, of the fair market value of the collateral sold relative to the pre-liquidation outstanding loan balance: 64.6% or 67.5% (May 19 or 20, 2021, liquidation of Loan No. 558207a5), 58.33% (July 13, 2021, liquidation of Loan No. 1a118e43), 61% (July 19, 2021, liquidation of Loan No. 1a118e43), 52.80% (January 21, 2022, liquidation of Loan No. 736435a7), *etc*. *See Id.* It is further respectfully submitted that the predatory nature of these liquidations is self-evident.

6. **Finance Charges Tabulation Concerns.** Upon information and belief, adding to the material concerns justly raised by Claimant, it appears that BlockFi Lending improperly tabulated finance charges. Section 1 of each LSA provides that "[u]pon disbursement of the Loan proceeds, Lender shall collect the fee applicable to the Loan as shown on the Statement of Loan (referred to herein, the "Fee")[,]" and that "Lender shall deduct the Fee from the Loan proceeds and disburse the remaining Loan proceeds to the Borrower on the Closing Date." *See, e.g.,* J.V.T. Cert. Ex. B § 1. Yet, on the Statement of Loan, it appears that the "Fee," if that is what is set forth on the Statement of Loan as the "Finance Charge," was not deducted from the Loan proceeds pursuant to Section 1, but rather was added to the amount financed. *See Id.,* Statement of Loan. Furthermore, the Debtors can find no solace in arguing that the "Fee" is not meant to correlate with interest, which is set forth as Finance Charges, because as to interest Appendix A, in reference to borrowers in Michigan (of which Claimant was one), provides "then Lender shall deduct all interest due from the Loan proceeds and disburse the remaining Loan proceeds to the Borrower on the Closing Date." *See Id.,* Appendix A. Therefore, however one

6

examines this issue, and however the Fee, Finance Charges, or interest are interpreted/constructed, it appears inescapable that such amounts should have been *backed-out* of the amount financed; not, as BlockFi Lending did, *placed on top* of the amount financed. This has potentially critical implications. In addition to adding to Claimant's damages through potential double-billing, *see* Supp. J.V.T. Cert. ¶¶ 10, 12, Exs. BB (the "Finance Charges Analysis") and CC (the "Collateral Loss Summary"), this had a material impact on LTV calculations because it inflated LTV percentages, as shown by the Finance Charges Analysis, which under the column "Loan-to-Value (LTV) @ Liquidation If Fee/Interest deducted from Loan proceeds (per Gemini pricing data)" shows the LTV percentages as they otherwise would have been, at the liquidation points in time, had BlockFi Lending complied with its own LSAs: 67.76% as to BlockFi Loan No. 250568f4; 67.34% as to BlockFi Loan No. 176fcbc3; 66.54% as to BlockFi Loan No. 558207a5 for May 19 (54.35% factoring the Surplus 558207a5 Collateral); 63.72% as to BlockFi Loan No. 558207a5 for May 20 (or 54.35% factoring the Surplus 558207a5 Collateral); 82.64% as to BlockFi Loan No. 1a118e43 (or 65.15% factoring the missing ETH); 74.35% as to BlockFi Loan No. 5be66333; 74.37% as to BlockFi Loan No. 736435a7; and 74.76% as to BlockFi Loan No. ce7f64ed. *See* Ex. BB.

7.      **Notice Issues.** As explained, the LSAs required the issuance of certain notices prior to BlockFi Lending being able to liquidate collateral. *See, e.g.,* Response ¶ 6. Although BlockFi Lending alleges that such notices were properly provided, they are not in evidence. Some of these notices were previously discussed by Claimant in regards to the haphazard nature of BlockFi Lending's operations. *See* J.V.T. Cert. ¶¶ 11-12. Also, some notices, together with his due diligence responses, have been provided by Claimant himself to evidence what transpired as to Loan No. 558207a5. *See* Supp. J.V.T. Cert. ¶¶ 17, 22. Yet the overriding point here is that

7

BlockFi Lending, as an institution, should be forced to produce any and all requisite notices in order to declare that it complied with each LSA. The Debtors have not, and thus the record cannot sustain a theory that BlockFi Lending complied with the LSAs. Particularly when Claimant proffers the credible allegation that the aforementioned 72-hour period required by Section 7(a) of the LSAs was not provided. *Id.* ¶ 24. The Debtors should not be permitted to simultaneously justify their actions, the effective "strip-mining" of Claimant's collateral, while also seeking to escape duties to properly document every step of each forced liquidation.

### II. BlockFi Lending's computations should not be relied-upon by the Court, and the "missing ETH" was indeed missing.

8. While the undersigned has great respect for the Debtors' legal representatives, the data offered by BlockFi Lending is flawed. First, it does not appear that any proper method of valuation was identified or utlizied in formulating the Debtors' proposed LTV percentages. Conversely, as noted, Claimants' responsive analyses – the Collateral Loss Breakdown (Ex. AA), the Finance Charges Analyses (Ex. BB), and the Collateral Loss Summary (Ex. CC) – are in pertinent part built-upon official blockchain pricing data *provided by the Depository appointed by the LSAs, with pricing corresponding to time stamps on the Liquidation Summary, which itself was a document provided by BlockFi Lending.* Supp. J.V.T. Cert. ¶¶ 4 (annexing as Exhibit Y and Exhibit Z communications proving that the Liquidation Summary annexed to the Claim was a document prepared by BlockFi Lending) and 5.

9. Second, with regard to Loan No. 558207a5, the Debtors' calculations do not take account of the Surplus 558207a5 Collateral, which removed any doubt whatsoever as to whether BlockFi Lending was able to rightfully proceed with the liquidation of Loan No. 558207a5 (it was not). Again, the Surplus 558207a5 Collateral is an irrefutable matter of record, *see Id.* ¶ 19,

14409788-1

Ex. KK, and was in part why BlockFi Lending had given Claimant assurances that all was well on May 19 and 20, 2021. *Id.* ¶¶ 18, 21, Ex. EE (slides 23-24, 29, 38).

10.  Third, with regard to Loan No. 1a118e43, the LSA itself expressly called for 4,230.120 ETH, *see* J.V.T. Cert., Ex. H § 5(a)(iv), and while the Debtors offer a negotiation email to attempt to thwart the express terms of the LSA, their explanation defies the basic mechanics of the underlying loan. As explained by Claimant and in this instance set forth at length for unequivocal clarity:

> a.  Loan No. 1a118e43 was in the amount of $5,928,830.21
>
> b.  Apply the 60% LTV entry point, collateral would have to value at least $9,881,383.68
>
> c.  On the date that Loan No. 1a118e43 was created, Gemini pricing was as follows (*see* Exhibit NN), which such times correspond with the opening of Loan No. 1a118e43 (see J's Ex. F Scratch Confirmation of the start . . .) and the accompanying payoff of Loan No. 558207a5 (see J's Ex. E Congrats, you've paid off your loan):
>
> > Date Time UTC Time EST BTC ETH on GEMINI
> > 7/7/2021 16:10 ETH/USD 2336.02
> > 7/7/2021 16:08 ETH/USD 2335.72
> > 7/7/2021 16:07 ETH/USD 2333.63
> > 7/7/2021 16:05 ETH/USD 2341.56
>
> d.  Therefore, to achieve its 60% LTV entry point, Loan No. 1a118e43 required a collateral amount that was in fact configured of 4230.120 ETH × $2335.95 = $9,881,383.68; ***as reflected by the LSA.***
>
> Therefore, the Debtors are not only arguing against myself and the text of the LSA; they are arguing against math. For the Debtors to be correct, not only would (as they claim) the 4230.120 ETH have to be a typo; *the loan amount itself would also have to be a typo.*
>
> [Supp. J.V.T. Cert. ¶ 27.]

Thus, as noted by the header, the "missing ETH" was indeed missing.

14409788-1

11. Third, herein we respectfully incorporate by reference the aforementioned "Finance Charges Tabulation Concerns" section. *Supra* ¶ 6.

12. Fourth, by way of a vastly smaller point that is nevertheless telling, throughout the claims litigation process the Debtors have asserted that only $19.07 remains in Claimant's BlockFi account, yet it appears – as evidenced by an image taken by Claimant upon accessing such account – that such figure should actually be in approximately $1,500. Supp. J.V.T. Cert. ¶ 14, Ex. HH.

### III. Renewed Requests for Statutory and Equitable Relief

13. In Part II of the prior Response to the Objection, Claimant lodged requests for certain statutory and equitable relief, including estimation proceedings under Bankruptcy Code section 502(c), application of Part VII of the Bankruptcy Rules as necessary, and if necessary the right to amend the Claim with relation-back.

14. In renewing requests for such relief as the Court may deem necessary or appropriate, the undersigned respectfully notes that, through the Supp. J.V.T. Cert., Claimant has further shown that he acted reasonably in the course of preparing his Claim, and by way of the Liquidation Summary utilized the core document that BlockFi Lending itself had prepared and provided to capture key issues underlying the Claim, of which agents at the very top of the Debtors were well aware. *See* Supp. J.V.T. Cert. ¶¶ 4-5, Exs. Y and Z.

15. In addition, the Collateral Loss Summary (Ex. CC) shows that not only was the Claim in an amount representing a good faith estimation, ten million dollars ($10,000,000.00), in-depth analysis actually supports an upward adjustment. Specifically, as shown in the Collateral Loss Summary, and as also explained by Claimant in narrative format, utilizing Claimant's first primary damage theory, the potential Claim amounts range from **$11,230,878** (if

14409788-1

the missing ETH is excluded) to **$14,499,393.82** (if the missing ETH is included). *See Id.* ¶ 10, Ex. CC.

16. As a second, alternative primary damages theory, Claimant explains that the amount of separate, non-repeating (*i.e.,* not rolled-over into another LSA) units of cryptocurrency that were wrongly taken from him total 120.05 BTC and 4,300.0618 ETH (or 3,407.87 ETH if the Court does not find that he is entitled to the missing units of 895.1918 ETH), for a total fair market value (per Coinbase as of January 8, 2024) of **$15,532,492** (or **$13,473,551** if the missing ETH is discounted). *See Id.* ¶ 11.

17. As further potential alternative damage considerations, Claimant respectfully submits the "double-dipped" payments totaling **$829,703.13** (which in full disclosure were also computed into the first primary damage theory, *see Id.* ¶ 10(d)), and the difference in fair market value of collateral that is shown by the Collateral Loss Breakdown under the column titled "Dollar ($) Difference of BlockFi Liquidations Vs. Fair Market Value," totaling **$629,335.62.** *See Id.* ¶¶ 12-13.

18. In closing, it is most respectfully submitted that if the Court has any doubts regarding this matter, such doubts should be resolved in favor of Claimant and against the Debtors, who during their times of commercial operation wielded great leverage over everyday people like Claimant. The Claim thus warrants the fullest consideration available under the Bankruptcy Code.

    Respectfully submitted,

    CONNELL FOLEY LLP
    *Counsel to Claimant John W. Van Tubergen Jr.,*
     *Creditor of BlockFi Lending LLC*

Dated: January 10, 2024    */s/ Joao F. Magalhaes*
    Joao F. Magalhaes

14409788-1