CONNELL FOLEY LLP
Joao F. Magalhaes, Esq. (NJ Bar No. 004802008)
One Newark Center
1085 Raymond Boulevard, 19th Floor
Newark, NJ 07102
973-436-5800
*Counsel to Claimant John W. Van Tubergen Jr.,*
 *Creditor of BlockFi Lending LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BLOCKFI INC., *et al.*, | Case No. 22-19361 (MBK) |
| Debtors. | (Jointly Administered) |
| | **Proof of Claim No. 7233** |

**SUPPLEMENTAL CERTIFICATION OF**
**CLAIMANT JOHN W. VAN TUBERGEN JR. IN SUPPORT OF**
**SUR-REPLY TO WIND-DOWN DEBTORS' REPLY TO CLAIMANT'S RESPONSE**
**TO DEBTORS' SEVENTH OMNIBUS OBJECTION AS TO CLAIM NO. 7233**
**AND IN FURTHER SUPPORT OF CLAIM**

    I, JOHN W. VAN TUBERGEN JR., being of full age, hereby certify as follows:

    1.    I am a creditor of the bankruptcy estate of BlockFi Lending LLC ("BlockFi Lending"), and I respectfully submit this supplemental certification in support of my sur-reply to the *Wind-Down Debtors' Reply to Response to Debtors' Seventh Omnibus Objection to Claim No. 7233 of John W. VanTubergen Jr.* (the "Reply")[1] filed by BlockFi Inc. ("BlockFi"), BlockFi Lending, and their related debtors (collectively, the "Debtors"), and in further support of my Claim.[2]  I am personally familiar with the facts which are contained herein, except where stated

---

[1] Main Case Docket No. 1963.
[2] With "Claim" referring to my *Proof of Claim No. 7233* (Mar. 15, 2023) against the bankruptcy estate of BlockFi Lending, Bankr. D.N.J. Case No. 22-19365.  Any other terms that are capitalized but not defined

upon information and belief, in which instances my representations are made in good faith following diligent inquiry.

2. Despite whatever the Debtors may seek to argue, it is they who engaged in predatory practices, and their excessive and at times unwarranted liquidations were not the product of market conditions, but rather their manipulation of LSAs and customer collateral rights. Below I also make further clear that they indeed prematurely liquidated my account in connection with BlockFi Loan No. 558207a5, which is the crux of my Claim and which led to damages spiraling and "snowballing" from that misdeed, as effectively admitted by BlockFi Lending through the "Reinstatement" Loan No. 1a118e43 that I was coerced into.

3. This supplemental certification also seeks to assist the Court with understanding the factual record, including its computational aspects in reply to what the Debtors' presented, while also responding to the Debtors' arguments by further documenting BlockFi Lending's range of misconduct, including its failure to honor the terms and intent of the LSAs (as expressly explained by its agents), failing to provide proper notifications, failing to acknowledge additional collateral in my BlockFi account holdings, and failing to maintain proper account information and documentation.

A. **Additional Background of the Claim**

4. To hopefully clarify for the Court the circumstances surrounding the filing of my Claim, I was forced to utilize what was available to me, which was minimal given the failure of BlockFi Lending and its service providers to provide account records. I utilized and annexed to my Claim the Liquidation Summary[3] which was provided directly by BlockFi Lending in June

---

herein shall have the meanings ascribed to such terms by my prior certification. *See Id.* Docket No. 1496-1.

[3] As previously noted, the financial information which was available to me at the time of filing my Claim.

2

2022 and August 2022. Annexed as Exhibit Y is an email exchange of June 28, 2022, between myself and Agent 6[4] whereby Agent 6 annexed a .png file titled "Liquidation Summary" (also annexed), and Exhibit Z which is an email exchange of August 25, 2022, between myself and Agent 7 featuring the Liquidation Summary data as conveyed by Agent 7, and later utilized by me. The Liquidation Summary contains sufficient identifiers of LSAs and key data points regarding the matters which I based my Claim upon: the falsely-declared and predatory liquidations of my property that several of BlockFi Lending's agents knew well-of.

5.  As to the stated amount of my Claim, ten million dollars ($10,000,000.00), I respectfully submit that same was and remains a fair and good faith approximation of my damages based upon the forced sale amounts of cryptocurrency pre- and post-liquidation. In response to the Debtors' allegations and calculations I respectfully submit the following:

   a. Claimant's Collateral Loss Breakdown (the "Collateral Loss Breakdown"), annexed hereto as Exhibit AA;

   b. Claimant's Finance Charges Analysis (the "Finance Charges Analysis"), annexed as Exhibit BB; and

   c. Claimant's Collateral Loss Summary (the "Collateral Loss Summary"), annexed as Exhibit CC.

Critically, the foregoing analyses utilize the very pricing exchange data that would be utilized by Gemini Trust Company, LLC ("Gemini"), which served as the "Depository" under each LSA. Such pricing data was obtained by the undersigned from Crypto Data Download ("CDD"),[5] which is a market leading and trusted source of historical cryptocurrency data. Annexed as Exhibit DD is an Excel spreadsheet with pertinent pricing data, *with official pricing corresponding to the time*

---

[4] As with my prior certification, I have annexed hereto certain communications with redactions of the names of the individuals other than myself. Also as with before, BlockFi's agents shall be referred to as "Agent 1," "Agent 2," *etc.*

[5] *See* https://www.cryptodatadownload.com/ (last accessed January 2, 2024).

*stamps of the liquidation events on the Liquidation Summary,*[6] was provided by CDD, together with my email exchange with CDD. Upon information and belief, it is this pricing data that would be on the blockchain for BTC and ETH transactions, and therefore is the controlling pricing data.

6. The Collateral Loss Breakdown shows that staggering amounts of collateral, well in excess of what was needed to accomplish the Required LTV of less than or equal to seventy percent (70%),[7] were sold-off by BlockFi Lending. BlockFi Lending's wrongful conduct is in part evidenced by the "Percentage (%) of Collateral Liquidated" column of the Collateral Loss Breakdown which shows, for example, that the three largest loans, Loan Nos. 558207a5 ($6,300,300.00), 1a118e43 ($5,928,830.21), and 736435a7 ($2,298,300.00) were subjected to tear-down liquidation percentages of (respectively) 47.67%, 53.41%, and 43.52%, **of all collateral,** at times when the LTV percentages were (respectively) 73.4% [60.22%] to 70.60% [58.11%],[8] 91.57% [should have been 72.19% but for the missing ETH],[9] and 82.40%. *See* Collateral Loss Breakdown. A majority of the loans featured major liquidations along these lines, not just a few.

7. The extreme percentages of collateral that were sold-off by BlockFi Lending, in particular relative to the loan balances at the times of liquidation (*see* Collateral Loss Breakdown column "Gemini % of USD Collateral Sold"), flies in the face of not only the letter and spirt of the LSAs, but also what I was being told. Specifically, both Agent 3 and Agent 7 expressly told me at various points in time that the LTV would need to be just below 70% (again, in the case of Loan No. 1a118e43, just below eighty percent (80%)). Annexed as Exhibit EE are images of text

---

[6] Again, the Liquidation Summary comes from BlockFi Lending's own records. *See* Exhibit Y, Exhibit Z.
[7] Or in the case of 1a118e43, eighty percent (80%).
[8] The circumstances surrounding the liquidation of Loan No. 558207a5 are further described herein, but to explain the figures here it is noted that (1) upon information and belief, the liquidation actually took place on May 20, 2021, and not on May 19, 2021, hence the range of LTV percentages presented here for this single loan, and (2) the bracketed figures reflect the LTV percentages once the Surplus 558207a5 Collateral (defined below) is taken into account.
[9] Again, as to Loan No. 1a118e43, the Required LTV was eighty percent (80%).

4

messages between myself and Agent 3 from May 12-20, 2021, and as to the present point, please see slides 34-35, wherein Agent 3 talks about getting the LTV down below 70%. In addition, annexed as Exhibit FF are images of text messages between myself and Agent 7 from June 17 to July 20, 2021, and as to the present point, please see slide 1, wherein Agent 7 in part states that "[w]e just require the LTV to be <70%," and slide 5, wherein Agent 7 indicated to me that a healthy liquidation level was about ten percent (10%). Consequently, it was shocking to me how BlockFi Lending would go "scorched-earth" with massive liquidations at approximately fifty percent (50%) or more of total collateral, and upwards of sixty-seven and-a-half percent (67.5%) of total collateral value relative to the outstanding loan amount. *See* Collateral Loss Breakdown.

8.      BlockFi Lending cannot claim that its egregious liquidation percentages were occasioned by some automatic process outside of their control. There are at least a few reasons for this. First, the liquidation percentages as shown in the Collateral Loss Breakdown are all variable but for the liquidations which took place on June 22, 2021. *See Id.* Second, in some instances, in connection with Loan Nos. 250568f4 and 176fcbc3, very low percentages were sold despite similar (in relative terms) circumstances as to bigger loans such as Loan Nos. 558207a5 and 1a118e43. *Id.* Third and perhaps most importantly, Agent 7 eventually admitted not only that BlockFi Lending kept liquidation transactions off-chain – which I found shocking since by nature cryptocurrency transactions should be recorded on the blockchain[10] – but also that forced liquidations were done manually. *See* Exhibit FF (slides 1-4); also annexed as Exhibit GG is an email exchange of June 28, 2022, wherein I asked Agent 6 about how liquidations were publicly recorded and confirmed on the blockchain, only for Agent 7 to reply by stating that "our transactions are done internally and are not recorded on-chain" (while also contradicting himself

---

[10] Yet this would explain their refusal and/or inability to provide sell books, even in response to a Subpoena in this matter.

and others as to whether liquidations were done manually or automatically). Therefore, contrary to the setup of the Debtors' Reply, BlockFi Lending's excessive liquidations were not the product of market conditions, but rather their own manipulation of LSAs and customer collateral rights.[11]

9. For this and other reasons discussed herein, in my Sur-Reply, and in prior submissions made on my behalf, I again respectfully submit that the LSAs identified by the Claim were breached by BlockFi Lending through forced liquidations that were falsely-called and wrongfully orchestrated.

10. Regarding my damages, and returning to the stated amount of my Claim, ten million dollars ($10,000,000.00), this was initially based upon the Liquidation Summary provided by BlockFi Lending, which was the only information I was given and available to me at that time. Multiple requests by me for proof of payments, sell books, and other records I requested from either BlockFi Lending or its servicer Scratch Services, LLC ("Scratch") were denied. Therefore $10M was an estimated figure. Since then, I have used additional information obtained by myself and my counsel, which has resulted in the Collateral Loss Breakdown, Finance Charges Analysis, and Collateral Loss Summary. In particular Gemini data allowed me to get the actual pricing at the times of each loan liquidation to provide more accurate figures based on actual Blockchain data. To summarize what is shown by the Collateral Loss Summary, my Claim's primary damage theory is based on taking the original totals of the three (3) starting loans of the seven (7) "snowball effected" loans (*i.e.* the loans specifically identified by my Claim that were impaired by the premature liquidation of Loan No. 558207a5) and applying the following:

      a. tabulating 3047.14 ETH multiplied (x) by the per ETH value of $4,135.22 at the time of originating LSAs = $12,600,594.27;

---

[11] Of course, market conditions go up-and-down, but never in such a way to justify scorched-earth liquidations, and the market often recovered the following day, as was the case in connection with Loan No. 558207a5, as discussed elsewhere herein, which saw a material market rise by May 20, 2021, specifically, with the per-unit value of ETH rising from $2,602.11 to $2,717.57. *See* Exhibit DD.

 b. adding (+) 98.9 BTC multiplied (x) by the per BTC Value of $57,982.19 at the time of the originating LSAs = $5,734,438.59, for a new running total of $18,335,032.86;

 c. adding (+) the value of additional collateral posted at the original LSA-posted value of $2,799,748.64, for a new running total of $21,134,781.50;

 d. adding (+) payments made to Scratch in the amount of $829,703.13, for a new running total of $21,964,484.63 (NOTE: this does not include all other loans prior to the premature liquidation of Loan No. 558207a5);

 e. subtracting (-) $9,159.600.00, which figure reflects the combined LSA original loan amounts in connection with Loan Nos. 558207a5, 250568f4 and 176fcbc3, for a new running total of $12,804,884.63;

 f. subtracting (-) $396,614.10, representing my final cash-out from BlockFi Lending, resulting in potential alternative total loss calculations as follows:

  i. **$12,408,270.53** (if the missing ETH is excluded) or

  ii. **$14,499,393.82** (if the missing ETH is included);[12]

 g. **alternatively,** if utilizing Gemini price data at the time of liquidation, the totals would change to the following:

  i. again starting with 3047.14 ETH with per ETH Value of $4,135.22 at the time of originating LSAs = $12,600,594.27;

  ii. again adding (+) 98.9 BTC with per BTC Value of $57,982.19 at the time of the originating LSAs = $5,734,438.59, for the same running total of $18,335,032.86;

  iii. however now adding (+) the additional collateral posted using Gemini pricing at liquidation = $1,622,355.88, for a new alternative running total of $19,957,388.74;

  iv. again adding (+) payments made to Scratch in the amount of $829,703.13, for a new alternative running total of $20,787,091.87;

  v. again subtracting (-) $9,159.600.00, reflecting the combined LSA original loan amounts in connection with Loan Nos. 558207a5,

---

[12] As indicated by the Collateral Loss Summary, the missing ETH value utilized reflects the original LSA value of $2,335.95 per ETH (thus 895.1918 units multiplied by $2,335.95 per unit equals $2,091,123.29).

7

14400589-1

        250568f4 and 176fcbc3, for a new alternative running total of $11,627,491.87;

    vi. again subtracting $396,614.10 on account of my final cash-out from BlockFi Lending, resulting in the potential alternative total loss calculations as follows:

1. **$11,230,878** (if the missing ETH is excluded); or

2. **$13,322,002** (if the missing ETH is included).

11. As an alternative method of calculating my primary damages, upon information and belief, the amount of separate, non-repeating (*i.e.,* not rolled-over into another LSA) units of cryptocurrency that were taken from me totals 120.05 BTC and 4,300.0618 ETH.[13] As of January 8, 2024, the value of such units per the Coinbase Cryptocurrency Exchange would be approximately $47,000 per BTC and $2,300 per ETH. Applying these values to the aforementioned quantity of units, I would be owed $9,890,142 on account of ETH,[14] and $5,642,350 on account of BTC, for a total of **$15,532,492.**[15]

12. Alternatively, as informed by the Finance Charges Analysis that is further discussed below, I would separately also assert damages owed to me on the basis of payments that, upon information and belief, reflect double-dipping in the amount of $829,703.13.

13. Alternatively, as informed by the final column of the Collateral Loss Breakdown, I would separately also assert damages owed to me on the basis of my collateral having been sold pursuant to an unknown valuation method at below-market value. Pursuant to the Collateral Loss Breakdown, I respectfully submit that these damages total $629,335.62.

14. While the Debtors may contest the foregoing analyses, it is their representations and assumptions which must be challenged. For example, while the Debtors repeatedly and

---

[13] Or, 3,407.87 ETH if the Court does not find that I am entitled to the missing units of 895.1918 ETH.
[14] $7,831,201 if the missing ETH is discounted.
[15] $13,473,551 if the missing ETH is discounted.

confidently assert that only $19.07 remains in my BlockFi Interest Account ("BIA"),[16] even this is wrong because I in fact still have approximately $1,500 in my BIA (Wallet), such value consisting of 0.31903558 ETH and 0.01642789 BTC. *See* Exhibit HH (dashboard image of my BlockFi Wallet account captured December 16, 2023). To be clear as to this point, *I am not suggesting that such amount(s) is what I'm seeking recovery of;* as noted I'm seeking to recapture the value of the cryptocurrency assets that were taken from me, together with related damages pursuant to alternative theories, if so necessary. Rather, here I simply seek to show that the Debtors do not have a command of the facts and record.

   15. Specifically as to the Debtors' LTV calculations, and their arguments that I was not compliant with the Required LTV at critical times, the Debtors cannot be relied upon for the following reasons:

   a. it is unclear what pricing/valuation method they are utilizing, whether on a per-unit basis or otherwise;

   b. the pre-liquidation figures provided by BlockFi Lending, as represented in the Liquidation Summary and ostensibly as part of the figures underlying the Reply, do not take account of all the collateral which I posted, for example as posted in my BlockFi account as discussed further below in connection with Loan No. 558207a5;

   c. as set forth in Part D below, Blocking Lending's "Fee" and any interest charges should have been deducted from each Loan amount, which, as shown by the Finance Charges Analysis, results in changes to LTV that would have made further clear that BlockFi Lending was far outside of its rights when it

---

[16] *See, e.g.,* Reply ¶ 33.

conducted the subject liquidations, and concomitantly, that the LTV calculations advanced by the Reply are erroneous pursuant to the letter of the LSAs.

Yet, as discussed above, even if the LTV trigger thresholds were satisfied pre-liquidation, the amount of collateral liquidated by BlockFi Lending was egregious.

### B. Additional Background Regarding the Loan No. 558207a5 Liquidation Event

16. On May 18, 2021, I received an action required notice from BlockFi Lending in connection with Loan No. 558207a5 and immediately attempted to reach my primary account service contact, Agent 3. Exhibit EE (slide 17).

17. On May 19, 2021, I received a pre-liquidation notice from BlockFi Lending which provided that "[w]e strongly recommend that you deposit additional collateral as soon as possible to help prevent further liquidations if prices continue to drop." *See* Exhibit II (copy of such notice and my response of five (5) minutes later). I immediately made all reasonable efforts to connect and remedy the situation by again reaching out to Agent 3, *see* Exhibit EE (slide 18), and responding to the notice via email with: "Hello. I've been trying to reach out for hours now. I have collateral in my interest account. I do not want to get liquidated. Please assist. Thanks." *See* Exhibit II. I followed-up again via email shortly thereafter, stating: "Trying to reach someone for hours now. Need assistance." *See* Exhibit JJ (copy of such notice and my response of three (3) minutes later).

18. Later on during the day of May 19, 2021, after connecting with Agent 3, I was told that the LTV associated with Loan No. 558207a5 was 74%, but that this was "still safe territory," and that "liquidations start triggering when the loan book is around 80-81%." *See* Exhibit EE (slide 23-24, 29). I was actually also told that even if trigger levels were reached overnight, the

10

result would not be the liquidation of my collateral posted to Loan No. 558207a5, but rather, collateral would be automatically transferred from my BlockFi account. Exhibit EE (slide 33).

19. Further later on during the day of May 19, 2021, out of abundance of caution, and in reliance upon my discussions with Agent 3, I procured and posted to my BlockFi account the following additional collateral: 150.57580186 ETH (per Gemini pricing, valued at $2,602.11 per unit, or $391,814.798), 914,739.37148790 units of USD Coin (a digital stablecoin which, upon information and belief, tracks the value 1:1 of the United States Dollar), an additional 132 ETH (valued approximately $343,478.52), and 10,000.00 units of Chainlink cryptocurrency (valued at 26.76710991 USD Coin per unit, or approximately $267,671.09), for a total value of approximately **$1,917,703.78** (the "Surplus 558207a5 Collateral"). Annexed as Exhibit KK are official confirmations from BlockFi of my having obtained and posted the Surplus 558207a5 Collateral. After posting additional collateral as requested, I was verbally told by Agent 3 (also on May 19, 2021) that I was safe.

20. In the event that a liquidation event was actually reached, I fully expected that a portion of the Surplus 558207a5 Collateral would be swept over remedy any alleged deficiency.

21. On the morning of May 20, 2021, Agent 3 would repeat in writing that I was safe and not on the list for liquidation. Exhibit EE (slide 38).

22. Incredibly, however, on that same day, May 20, 2021, BlockFi Lending proceeded to liquidate a massive portion of the collateral posted to Loan No. 558207a5. On 12:12 p.m. of that day I received a post-liquidation notice informing that 1,565.24 ETH had been sold. *See* Exhibit LL (copy of such notice and my response). I responded shortly thereafter, stating: "This is an error. I posted the collateral and was on the phone with my rep last night with him on the

11

14400589-1

phone. He confirmed everything was fine and today's market also removed us out of that risk. I need my money returned right away. Please contact me asap." *Id.*

23.     Critically, it must be noted that while the post-liquidation notice (Ex. LL) represented the subject liquidation of Loan No. 558207a5 as having taken place on May 19, 2021, this date is, upon information and belief, erroneous because the liquidation actually took place on May 20, 2021.  Upon information and belief, BlockFi Lending's fabrication can be seen from the fact that BlockFi Lending had issued pre-liquidation notices all the way up to 10:43 p.m. on May 19.  *See* Exhibit MM (copy of such notice).  This, combined with Agent 3 representing on the morning of May 20 that everything was fine, shows that liquidation was forced later on in the day of May 20.  Yet BlockFi Lending's attempt to represent the liquidation as having taken place on May 19 is of great consequence because the market had recovered by May 20, with the value of ETH rising from approximately $2,602.11 per unit to $2,717.57 per unit, *see* Exhibit DD, and thus (as shown by the Collateral Loss Breakdown) the LTV would have been 70% or below even putting aside the sweeping-in of any of the Surplus 558207a5 Collateral.

24.     On top of everything, it is clear that BlockFi Lending did not provide the 72-hour period required by Section 7(a) of the LSAs for me to remedy any LTV concerns given that this chain of events began with my receiving notice on May 18, 2021.

### C. Additional Background Regarding "Reinstatement Loan" No. 1a118e43 & the Missing ETH

25.     Initially, I strongly challenge any notion that I was not coerced into accepting Loan No. 1a118e43.  My plain demand to BlockFi Lending had been to undo and rectify the wrongful forced liquidation detailed above in connection with Loan No. 558207a5.  Unfortunately for me, BlockFi Lending refused to make right, and I saw myself (rightly or wrongly) as having no leverage or means to fight back.  I had been previously lured into entering into multiple

simultaneous LSAs with BlockFi Lending that gave them control and leverage over the vast majority of my cryptocurrency assets.  I was desperate, and candidly dealing with a highly pressurized situation (and the human/personal issues that arise for a person with a family in such circumstances).  And I was not represented by counsel during these times.  Therefore it is offensive for the Debtors to characterize me as having consented to Loan No. 1a118e43 as if it was a fair, arms'-length transaction.

26. Yet it is equally clear that BlockFi Lending's offer of "Reinstatement" Loan No. 1a118e43 was an admission of guilt on their part; but rather than make right, they offered another predatory LSA from which I doubt many customers escaped unharmed.  BlockFi Lending could have easily rectified the situation on May 20, 2021, by simply reversing and/or arranging for the wrongfully liquidated collateral to be replaced then, unfortunately they took approximately two (2) months to come up with Loan No. 1a118e43, and even then failed to honor the terms thereof (as I further explain immediately below).

27. Next, I reiterate that 895.1918 ETH was indeed missing, as clearly and expressly called-for by the collateral clause of the LSA associated with Loan No. 1a118e43. Any negotiation communications which preceded such LSA do not trump that which was finally agreed to and necessary to make the loan work on its own terms as a matter of mathematics.  Specifically:

   a. Loan No. 1a118e43 was in the amount of $5,928,830.21

   b. Apply the 60% LTV entry point, collateral would have to value at least $9,881,383.68

   c. On the date that Loan No. 1a118e43 was created, Gemini pricing was as follows (*see* <u>Exhibit NN</u>), which such times correspond with the opening of Loan No. 1a118e43 (see J's Ex. F Scratch Confirmation of the start . . .) and the accompanying payoff of Loan No. 558207a5 (see J's Ex. E Congrats, you've paid off your loan):

   Date Time UTC Time EST BTC ETH on GEMINI

14400589-1

>       7/7/2021 16:10 ETH/USD 2336.02
>       7/7/2021 16:08 ETH/USD 2335.72
>       7/7/2021 16:07 ETH/USD 2333.63
>       7/7/2021 16:05 ETH/USD 2341.56

   d. Therefore, to achieve its 60% LTV entry point, Loan No. 1a118e43 required a collateral amount that was in fact configured of 4230.120 ETH × $2335.95 = $9,881,383.68; **as reflected by the LSA.**

Therefore, the Debtors are not only arguing against myself and the text of the LSA; they are arguing against math. For the Debtors to be correct, not only would (as they claim) the 4230.120 ETH have to be a typo; *the loan amount itself would also have to be a typo*.

28.  Most respectfully, I urge this Court to hold BlockFi Lending bound to that which a sophisticated actor, Ms. Flori Marquez, acknowledges to accepting and executing. I see no reason why I, a customer who like many was ensnared by their predatory LSAs, should be held to the letter of such predatory LSAs, whereas they could conceivably get off the hook when it so suits them. That strikes me as profoundly unjust. No typo was made, and mathematics proves that BlockFi Lending deprived me of 895.1918 ETH that should presently be returned to me.

   D. **Finance Charges Analysis Issues/Concerns**

29.  Upon information and belief, and as noted above, any "Fee," interest charges, or other finance charges to which BlockFi Lending was entitled should have been deducted from each Loan amount prior to the disbursement of Loan proceeds. Section 1 of each LSA makes this clear as to the "Fee," which is said to be that which is shown on the Statement of Loan[17] that sets forth the Finance Charges that, as to each LSA, were tabulated on top of the Loan proceeds. *See, e.g., prior* Exhibit B § 1, Statement of Loan. Yet, as stated by Section 1, if the "Fee" is that which is

---

[17] Upon information and belief, itself a highly questionable purported "Truth In Lending Disclosure Statement" that I respectfully ask the Court to scrutinize, and if appropriate raise concerns *sua sponte*.

set forth on the Statement of Loan, such amounts should have been *backed-out* of the amount financed; not, as Blocking Lending did, *placed on top* of the amount financed. *Id.*

30. These concerns are further supported by Appendix A, which makes references to borrowers in Michigan, of which I was one, and provides that as to borrowers in Michigan (among other things) "then Lender shall deduct all interest due from the Loan proceeds and disburse the remaining Loan proceeds to the Borrower on the Closing Date." *See Id.,* Appendix A.

31. The sum result of Blocking Lending's conduct is, upon information and belief, that it further breached the LSA by inflating LTV percentages, as shown by the Finance Charges Analysis, which under the column "Loan-to-Value (LTV) @ Liquidation If Fee/Interest deducted from Loan proceeds (per Gemini pricing data)" shows the LTV percentages as they would have been, at the liquidation points in time, had BlockFi Lending complied with their own LSAs.

32. Furthermore, I believe that the payments which I made to BlockFi Lending's servicer, Scratch, should be returned to me due to the foregoing since the amounts that BlockFi Lending was permitted to collect should have been deducted by the Loan, yet instead they piled their finance charges on top, while separately also having me pay Scratch, hence, upon information and belief, the payments I made to Scratch were double-payments.

33. Critically, and further upon information and belief, the concerns raised in this Part D would be true for each and every Loan that I entered into with BlockFi Lending,[18] however for present purposes I was only able to tabulate payments and the impact on LTVs as to the LSAs specifically identified in my Claim.

E. **Continued Account Records Concerns**

---

[18] Related to this, I previously stated that I was coerced to enter into thirty-seven (37) separate lending transactions (LSAs) with BlockFi Lending. I utilized this figure (37) because that is what BlockFi Lending showed. However, upon further review, I believe that the total number of LSAs was actually thirty-five (35).

15

34. As previously noted, I have had tremendous difficulty in obtaining full and accurate records relating to my accounts with BlockFi Lending. Following the service of Subpoenas to the Debtors, and related follow-up between my attorney and the Debtors' counsel, we sought to obtain additional information from Scratch. Yet Scratch proceeded to give me the "run-around," and I was not able to access my account portal that they maintained. Eventually I was able to obtain access, but there were no documents available. Then, after emailing Scratch about this, they told me that they had checked my account and it seemed to be working. I then checked again, and this time there were some documents available in the portal. Yet once again vital loan information was missing, such as proof of all payments, and I was unable to find payoff letters. When I again followed-up with Scratch, and insisted that I needed full and complete records for my account, all of sudden they told me that I needed to contact BlockFi for any further documentation; yet, I had reached out to them (Scratch) because my counsel and I had exhausted our efforts to obtain records from the Debtors.

35. I can provide the Court with my email communications to prove the above-referenced back-and-forth; for present purposes, however, I simply seek to respectfully convey to the Court the great difficulty that my attorney and I have had in simply obtaining account records. I'm mindful that BlockFi Lending is in bankruptcy, and my legal team respects their legal teams very much, however BlockFi Lending itself should not be afforded the benefit of any doubts given their conduct and the overall circumstances.

F. **Concerns Raised by Off-Chain Nature of Transactions**

36. I further most respectfully submit to the Court that I was in the process of preparing a lawsuit against BlockFi Lending prior to its declaration for bankruptcy. One of my concerns, upon information and belief, was that BlockFi Lending was taking advantage of borrowers like

16

14400589-1

me to fund their behind-the-scenes operations in coordination with companies such as FTX and Alameda Research; while at that time BlockFi may have scoffed at this, the passage of time has revealed that such concerns were not unfounded.[19] Upon information and belief, by not posting on the blockchain, it allowed BlockFi Lending wide latitude to escape public view of the cryptocurrency transactions that they engaged in, and to potentially sell in bulk, thereby effectively inducing liquidation points and jeopardizing all of their clients individual portfolios. Ultimately, I fear that I may never know the truth as to what really transpired that caused them to effectively wipe-out the majority of my cryptocurrency assets, and I most respectfully and humbly, again upon information and belief, submit these concerns to the Court for whatever weight they are worth.

37.    I certify that the foregoing statements made by me are true to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: January 10, 2024                                  JOHN W. VAN TUBERGEN JR.

---

[19] *See, e.g.,* "BlockFi's Lending Relationship With FTX and Alameda Research Hastened Its Downfall," Oct. 17, 2023, available at https://www.inc.com/sam-blum/blockfi-lending-relationship-ftx-alameda.html (last accessed Jan. 9. 2024).

17

14400589-1