UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

```
IN RE:                    .      Case No. 22-19361-MBK
                          .
BLOCKFI INC., et al.,     .
                          .      402 East State Street
                          .      Trenton, NJ 08608
          Debtors.        .
                          .      January 16, 2024
. . . . . . . . . . . ..          10:06 A.M.
```

TRANSCRIPT OF TELEPHONIC HEARING ON DEBTORS' SEVENTH OMNIBUS
OBJECTION TO CERTAIN CLAIMS (BOOKS AND RECORDS, AMENDMENTS,
DUPLICATES, INCORRECT/IMPROPER CLASSIFICATION, INSUFFICIENT
DOCUMENTATION, NOT LIABLE, LATE FILED) [DOCKET NUMBER 1311]
SOLELY WITH RESPECT TO CLAIM NUMBER 7233; NOTICE OF THE PLAN
ADMINISTRATOR'S MOTION FOR AN ORDER CAPPING THE MAXIMUM
ALLOWABLE AMOUNTS AND ESTABLISHING A RESERVE FOR ALL CLAIMS TO
ENABLE THE FIRST INTERIM DISTRIBUTION [DOCKET NO. 2006]

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES ON NEXT PAGE.

Audio Operator:        Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Haynes and Boone, LLP<br>By: AIMEE M. FURNESS, ESQ.<br>2801 N. Harwood Street<br>Suite 2300<br>Dallas, TX 75201 |
| For the Official<br>Committee of Unsecured<br>Creditors: | Brown Rudnick, LLP<br>By: KENNETH AULET, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| | Genova Burns, LLC<br>By: DANIEL M. STOLZ, ESQ.<br>494 Broad Street<br>Newark, NJ 07102 |
| For Creditor John W.<br>Van Tubergen, Jr.: | Connell Foley LLP<br>By: JOAO F. MAGALHAES, ESQ.<br>One Newark Center<br>1085 Raymond Blvd, 19th Floor<br>Newark, NJ 07102 |

# **I N D E X**

**PAGE**

**WITNESSES:**

**FOR THE DEBTORS:**

FLORENCIA MARQUEZ
| | |
|---|---|
| Direct Examination by Ms. Furness | 37 |
| Examination by the Court | 47 |
| Cross-Examination by Mr. Magalhaes | 50 |

| **EXHIBITS:** | **ID.** | **EVD.** |
|---|---|---|
| **FOR THE DEBTORS:** | | |
| Declaration of Florencia Marquez | 7 | 8 |
| All of Debtors' Exhibits | 7 | 8 |
| Exhibit J | 37 | 42 |

4

1           (Proceedings commenced at 10:06 a.m.)

2           THE COURT:  I appreciate everybody's accommodations.

3    We've had some weather issues all over, and I think it actually

4    works well that we're handling today's matters remotely.  We

5    will be hearing the BlockFi certain claims objection issues and

6    capping issues with just two matters on the agenda.

7           The first matter -- well, one of the matters, the

8    second matter on the agenda is the plan administrator's motion

9    for an order capping the maximum allowable amounts and

10   establishing a reserve.  The Court has previously indicated

11   that it will be deciding this matter on the papers without

12   further oral argument.

13          But let me turn to debtors' counsel and ask -- first

14   of all, say good morning and then ask if there's anything the

15   Court needs to be aware of with respect to the capping motion.

16   As with all of our remote hearings, should you wish to be

17   heard, please use the "raise hand" function.  We are both

18   recording this on our FTR normal system to record as well as on

19   video.

20          So good morning, Mr. Aulet.

21          MR. AULET:  Good morning, Your Honor.

22          For the record, Kenneth Aulet of Brown Rudnick for

23   the plan administrator.

24          Nothing substantive to highlight on the capping

25   motion except to tell Your Honor we expect to file revised

1 schedules just redacting a few further names.  No substantive

2 changes to the schedules from what was filed at the end of last

3 week.  We just want to remove a few names that were

4 inadvertently left in that were individual names rather than

5 the names of corporations or the like.

6          THE COURT:  All right.

7          MR. AULET:  And --

8          THE COURT:  Go ahead.

9          MR. AULET:  With that, there's nothing else besides I

10 believe the Van Tubergen objection which my co-counsel Aimee

11 Furness is handling.

12          THE COURT:  All right, thank you.

13          So with respect to the second matter on the agenda,

14 the motion we'll mark it on reserve.  The Court will review the

15 matter.  If there are any changes to any proposed order, please

16 advise chambers with respect to that motion.

17          Now let's turn to the objection to the claim of John

18 -- and let me make sure I'm pronouncing it right, Van Tubergen,

19 is that right?

20          Good morning, Mr. Van Tubergen.  Let me have

21 appearances first on behalf of the wind-down debtor.

22          MR. STOLZ:  Yes, good morning --

23          MS. FURNESS:  Good morning, Your Honor.

24          MR. STOLZ:  I'll introduce first.  Good morning, Your

25 Honor.  Daniel Stolz, Genova Burns, local counsel for the plan

1 administrator.

2          THE COURT:  Good morning, Mr. Stolz.

3          MS. FURNESS:  Good morning, Your Honor.

4          Aimee Furness, counsel for the wind-down debtors.

5          THE COURT:  Good morning, Ms. Furness.

6          And now for Mr. Van Tubergen?

7          MR. MAGALHAES:  Good morning, Your Honor.

8          Good morning, everyone.

9          Joao Magalhaes, Connell Foley, on behalf of claimant,

10 John W. Van Tubergen, Jr.

11         THE COURT:  And good morning, Mr. Van Tubergen.  I

12 see you there.

13         Any other appearances?

14              (No audible response)

15         THE COURT:  All right.  Well, the Court's had the

16 benefit of ample time to do reading and you've given me ample

17 reading to do.  So I have reviewed the underlying certification

18 filed by Mr. Van Tubergen as well as his supplemental, the

19 surreply filed by counsel, the wind-down debtors' reply.

20         I believe I have a strong handle on the underlying

21 issues and the facts.  But let me turn to the wind-down

22 debtors' initial motion, although with respect to this claim,

23 certainly, I don't think it's a matter of dispute that Mr. Van

24 Tubergen has the ultimate burden of persuasion on the motion.

25 But let me turn to the debtor and see how you wish to proceed.

7

1              MS. FURNESS:  Your Honor, I have a brief opening

2     argument.  Ms. Marquez is here on the video and is available

3     for  cross-examination on her declaration.  We'd request that

4     her declaration and all of the exhibits be admitted for all

5     purposes.  And then I assume that Mr. Van Tubergen would also

6     be available for cross-examination.

7              THE COURT:  Mr. Magalhaes, does that make sense?

8              MR. MAGALHAES:  Your Honor, I was hoping to get a

9     sense from the Court on how the Court would wish to proceed.

10    Generally speaking, Your Honor, we want to give this matter the

11    fullest light of day.  We want to air it out.  We obviously

12    placed a lot on the record.  I thank the Court for carefully

13    reviewing it.

14             I would like to make my opening presentation and then

15    reserve on whether or not to call Mr. Van Tubergen.  I'd like

16    to sidebar with my client before making that determination.

17             THE COURT:  That's fine.  As far as Ms. Marquez's

18    declaration, the same would hold true obviously for

19    Mr. Van Tubergen's certification.  I see no reason why they

20    shouldn't come in as direct.  If you wish to supplement, you'll

21    tell me after you speak with your client.  And I don't know if

22    there are any objections to the exhibits.  I'd just rather

23    clarify the record.

24             Do you have any objections to the wind-down debtors'

25    exhibits coming in?

1          MR. MAGALHAES:  No, Your Honor.

2          THE COURT:  All right.  Then the exhibits that have

3  been docketed are in as evidence.  And Ms. Marquez's

4  declaration is in as evidence.

5  (Declaration of Florencia Marquez and all of Debtors' Exhibits

6                    admitted into evidence)

7          THE COURT:  We'll turn -- and let me hear an opening

8  from the wind-down debtor.

9          MS. FURNESS:  Thank you, Your Honor.  I'll be brief.

10         In March, Mr. Van Tubergen filed a proof of claim

11  with no legal basis and alleged a $10-million claim based on

12  "false forced liquidation."  As Your Honor has seen,

13  Ms. Marquez in her certification attached to the reply which is

14  now in evidence walks through each of the alleged liquidations

15  step by step and demonstrates that each one of those

16  liquidations complied with the agreement between

17  Mr. Van Tubergen and BlockFi.

18         The LSA, Mr. Van Tubergen agreed that collateral

19  posted for loans would be posted to a specific depository

20  account; two, that the required loan-to-value ratio would be at

21  least 70 percent at all times, and on one of them required 80

22  percent as a low.  The value of collateral there would be

23  determined in two ways.  One is the last trade price on Gemini

24  or the market value as determined by BlockFi in its reasonable

25  discretion.  BlockFi used various paid services to determine

1    value.

2          Key for Ms. Marquez's step-by-step is that the LSAs

3    paid an accelerated maximum LTV or accelerated maximum

4    loan-to-value of 80 percent and when that was reached, under

5    the LSA, it was an event of default.  Again, under the LSAs,

6    which Mr. Van Tubergen agreed to, once that accelerated maximum

7    was hit, an event of default was called and the lender could

8    liquidate the collateral in whole or in part at its discretion.

9          The other important term in the LSA is that when the

10   loan-to-value reached 70 percent or 80 percent on one of them,

11   the borrower had 72 hours to bring that loan-to-value down to

12   50 percent.  Again, Ms. Marquez's declaration demonstrates that

13   each of these events happened related to the complained-about

14   loan and that all the liquidations are proper.

15         Stepping back just for a little bit, Your Honor,

16   Mr. Van Tubergen took out more than $40 million in loans over

17   the course of this relationship from BlockFi.  He was

18   speculating that the price of his collateral, the crpyto, would

19   go up.  And often when it did go up, Mr. Van Tubergen

20   refinanced those loans and took out cash.  When it instead went

21   down, he had options.  One option was to post more collateral.

22   Another option was to repay the debt.  The third option was to

23   do nothing in which the collateral would be liquidated.

24         Six months after the filing of the original claim,

25   Mr. Van Tubergen brought to this Court new theories in response

1  to BlockFi's objections.  He claimed some $10-million value

2  based on the value of the cryptocurrency at the time of the

3  forced liquidation.

4         To be clear, the funds that were received from the

5  liquidation were all applied to the amount that

6  Mr. Van Tubergen owed the wind-down debtors, owed BlockFi.  The

7  collateral is not missing.  It wasn't stolen from him; it

8  wasn't taken.  The collateral that was sold, the dollars from

9  that were directly applied to the amounts he owed.

10         One of the big points of contention here is what he

11  calls the premature liquidation of one certain loan.  That's a

12  loan that has the final three numbers of 7, A as in apple, 5.

13  In the BlockFi documents, we refer to it as Loan Number 3.

14         Ms. Marquez demonstrated that that liquidation was

15  proper.  However, in an effort to accommodate Mr. Van Tubergen,

16  BlockFi agreed to a new loan.  That new loan was the amount

17  still due on that 7a5, Loan Number 3, plus the cost to purchase

18  the ETHs that had been liquidated, which would then be rolled

19  into a new loan.

20         Importantly, Mr. Van Tubergen agreed that BlockFi

21  "shall not be liable for any damages or loss caused as a result

22  of this transaction and providing this one-time accommodation."

23  That's what he agreed to in writing.  Yet, he has brought it

24  here today before Your Honor.

25         The other major point of contention is lost ETHs.

11

1  Mr. Van Tubergen alleges that there was some amount of ETHs

2  that was his that was somehow "lost."  We'd point the Court to

3  the fact that, one, when Mr. Van Tubergen was provided with the

4  liquidation summary, he didn't respond.  And that was in August

5  of 2022.  He didn't respond.  You're missing ETHs.  Nope, he

6  didn't point it out when he filed his March 2023 claim.  It was

7  first mentioned in September of 2023.

8           It is factually false.  What Ms. Marquez swore to in

9  her declaration, she lays out and demonstrates all of the

10  collateral that was provided for that loan.  What we have here

11  is a scrivener's error.  Mr. Van Tubergen's loan was custom.

12  It was not initiated with 60 percent loan-to-value.  What the

13  reality was, Your Honor, was that Mr. Van Tubergen, again, in

14  the email where he in writing agreed to this new loan and said

15  BlockFi was not going to be responsible for any damages that

16  come as a result of it, was that he was initiating this loan

17  with a loan-to-value nearly 80 percent.  There is no missing

18  ears.  BlockFi's books and records demonstrate the exact amount

19  of ETHs that there was.

20           What's interesting, Your Honor, and I'm confident

21  you've picked up on this, is that on one hand, Mr. Van Tubergen

22  is alleging that BlockFi entered into predatory loan practices

23  because it put him in a loan that had nearly 90 percent

24  loan-to-value.  That's the exact same loan that he now alleges

25  had a 60 percent loan-to-value and, therefore, this missing

1  ETHs is somehow missing.

2          You cannot have it both ways.  It is either a 90

3  percent loan-to-value and allegedly predatory -- but again, he

4  took the risk, we warned him of the risk, he agreed to the risk

5  in writing -- or it was starting with a 60 percent.  And we

6  know that the reality is BlockFi's books and records

7  demonstrate there is no missing ETHs.

8          And the final point, Your Honor, relates to another

9  new claim that was completely new, this time in the surreply

10  that was filed on the 10th of January.  And this relates to

11  finance charges.  The argument, frankly, does not make sense.

12  Unfortunately, I think Mr. Van Tubergen has misread the LSA.

13  And when the LSA says except if this loan is made to a borrower

14  in Michigan, X.  Mr. Van Tubergen reads that as if this loan is

15  made to a borrower in Michigan, then X.  And in reality,

16  unfortunately, that means unless the borrower is from Michigan.

17  So that second part of the sentence doesn't happen if you live

18  in Michigan which, by the way, Mr. Van Tubergen does.

19          We think the meaning is clear.  Somehow things have

20  been lost in translation and Mr. Van Tubergen actually reads it

21  the opposite of what the contract itself says.  Again, MS.

22  Marquez set point by point by point through each of these

23  alleged loans demonstrate that each of them was above the

24  required loan-to-value, not only above the required

25  loan-to-value, but above the required loan-to-value that allows

1  BlockFi to immediately liquidate collateral to get the loan

2  back into the face zone.

3          Today, Your Honor, we're asking that you sustain the

4  wind-down debtors' objection, modify the claim.  First, there

5  is no claim against BlockFi Lending for these alleged improper,

6  according to Mr. Van Tubergen's liquidation, and submit the

7  claim against BlockFi, Inc. for $19.07.  And that's for the

8  amount in Mr. Van Tubergen's  interest account.

9          THE COURT:  All right.  Let me turn to Mr. Magalhaes.

10  Do you wish to make your opening statement?

11          MR. MAGALHAES:  Yes, Your Honor.  And I would like to

12  touch upon the key issues, Your Honor.  So maybe a little bit

13  broader than opening statement, but I will work through it

14  expeditiously, Judge.

15          So Mr. Van Tubergen's proof of claim number 7233 was

16  filed to seek recovery against the bankruptcy estate of BlockFi

17  Lending on account of cryptocurrency assets that we indeed

18  believe were wrongfully liquidated through falsely called

19  liquidations and/or liquidations that were excessive, Your

20  Honor.

21          For reasons that we have placed on the record, we do

22  believe that once a proper metric is utilized to determine

23  valuation, it is conclusive that there were unauthorized

24  liquidations.  Also, taking account of the intent of the LSAs

25  and statements made by BlockFi Lending's agents, we also

14

1  believe that it's evident that there were excessive

2  liquidations as an alternative or in addition to the wrongfully

3  unauthorized liquidations.

4       We do raise other serious concerns, Your Honor, which

5  I hope to briefly touch upon.  And I couch the first upon

6  information and belief, just because I understand there is a

7  potential world of implications.  We dub it the finance charges

8  tabulations concerns Your Honor.  I know that opposing counsel

9  refer to the Appendix A language.  There's also Section 1

10 language, which refers to the statement of a loan in a way that

11 is deeply concerning here.

12      We also believe there's notice concerns, Your Honor,

13 for a entity that engaged in, I'm being respectful here.  This

14 is nothing against opposing counsel.  This is against the

15 debtor entity that engaged in the effective strip mining of

16 Mr. Van Tubergen's collateral.  They should be held to every

17 minutia, every formality that is required.  Yet, there are no

18 notices that were placed on the record.  The notices that

19 Mr. Van Tubergen offered up only raise questions, Your Honor,

20 questions about whether or not they could be trusted and

21 questions about whether or not he was actually, as a matter of

22 fact, given the 72-hour period that was required by the LSAs.

23      And as we know, Your Honor, for a variety of reasons,

24 their calculations are either unfounded or cannot be trusted.

25 Your Honor, we were unable to make sense of their underlying

15

1  data.   We were hoping that through their submission, they would

2  kind of part the skies into how they actually formulated their

3  data.   But all we have is charts copied and pasted into a cert

4  that equate to an averment that we don't believe can sustain a

5  theory that they actually processed everything properly as a

6  lending institution.   There's no backup.   All their exhibits

7  are e-mails, Judge, and the certification that purports to

8  justify the liquidation of multiple millions of dollars of

9  collateral.

10        And, yes, Your Honor, we did respectfully allege that

11 BlockFi Lending engaged in predatory practices, but we

12 certainly don't believe that we need to establish that.   That

13 just goes to the totality of the circumstances and colors the

14 case for the Court because, at the end of the day,

15 Mr. Van Tubergen was the customer and BlockFi lending was the

16 multibillion-dollar institution that was -- you know, and the

17 Court can take notice of this -- that was cited by the SEC and

18 other state-based regulatory agencies and now finds itself in

19 bankruptcy.

20        So we don't believe that they can stand on a high

21 horse as against Mr. Van Tubergen.   And, Your Honor, we have

22 sought to establish a record through the analyses we submitted,

23 specifically Exhibit AA, Exhibit BB, Exhibit CC.   And

24 critically, those analyses are underpinned by the official

25 blockchain pricing data.

1        In our exhibits, we have a chain of custody email and

2  the actual Gemini pricing data.  Gemini was the depository that

3  was expressly referenced by the agreements.  So for an entity,

4  Your Honor, in the cryptocurrency sector to not refer to the

5  official blockchain pricing data when calculating the LTVs, we

6  believe that's per se wrong.

7        Now, Your Honor, I want to transition and I'm trying

8  to work through this concisely and expeditiously, Judge, but

9  it's very -- as Your Honor can appreciate, this is a big claim

10  for my client, Judge, and it's important for me to spend a few

11  minutes just to unpack these areas.

12        Three points before we get into the unauthorized

13  liquidations.  Number one, I want to convey, and I know we did

14  this in the papers, Judge, but our plain reading of the LSA

15  terms.  Upon the occurrence of a trigger event under 7A of the

16  LSAs, that is the failure to maintain a required LTV of either

17  70 percent or 80 percent, claimant was to be given notice and

18  permitted 72 hours to post additional collateral.  If during

19  that time, during that phase, the LTV of either 80 percent or

20  90 percent, the max LTV was reached, then in that scenario, the

21  lender had the right to liquidate collateral to establish the

22  required LTV.

23        The debtors are offering a false construct of the

24  reset LTV.  The 50 percent LTV, or in the case of the

25  reinstatement LSA, 60 percent, that was just the initial LTV.

1   That was not the required LTV.  And the liquidation terms

2   reference not the original LTV, but the required LTV.  And this

3   was -- this reading is backed on the record as a matter of

4   evidence by statements made by BlockFi Lending's agents.

5        And specifically, Your Honor, I'll refer to Exhibits

6   EE and FF, which annex text messages from Agents 3 and 7,

7   whereby they state in plain English, again to a customer, Mr.

8   Van Tubergen is not a bank.  He's not some, you know,

9   billion-dollar commercial entity.  They say it needs to be just

10  under the required LTV.  And Agent 7 states that, you know, a

11  reasonable -- and it's in the record, Your Honor, in terms of

12  his precise language, but he states 10 percent in terms of the

13  type of liquidation tranche that would be occasioned if the max

14  LTV was reached.

15       And one final point before I get into the

16  unauthorized liquidations, Your Honor, again, just a word of

17  methodology.  Our collateral loss breakdown, Exhibit AA, is

18  backed by the very pricing exchange data associated with Gemini

19  Trust Company, which was the depository under each LSA.  That

20  data is annexed as Exhibit DD, together with the chain of

21  custody email.  It came from a verifiable and well-known entity

22  that monitors blockchain pricing data.

23       And again, for the debtors to not even offer in their

24  papers an explanation of how they arrived at these LTVs, I

25  don't know.  My light just went off, Judge.  One second.

1          All right, sorry about that, Judge.

2          So, Your Honor, in terms of the unauthorized

3   liquidations, yes, we will begin with what we believe started

4   the snowball effect, started this calamity of unfairness and

5   errors that deprived my client of a million dollars in

6   collateral, Loan number 558207a5.  First, Your Honor, a word on

7   when this liquidation actually took place.

8          The debtors state that it took place on May 19th.

9   For reasons that were articulated, Your Honor read them in the

10  client certification, specifically, Paragraph 23 of the

11  supplemental certification, we state that it actually took

12  place on May 20th.  He was receiving pre-liquidation warnings

13  up until the evening hours of May 19th.  On May 20th, the

14  morning thereof, Agent 3 told him everything's okay.  So it's

15  preposterous for them to continue to allege that it took place

16  on May 19th.

17         The reason why this is material, Judge, is if the

18  Court engages in estimation proceedings, which we are

19  respectfully requesting, then that would have a material impact

20  on the LTV, because the price of ETH went up markedly on the

21  morning of May 20th, when my client was told that everything

22  was okay.

23         With that said, even putting aside the additional

24  collateral posted by claimant, we'll get to that in a moment,

25  Judge.  As shown by the collateral loss summary, it does appear

1   that the max LTV was not reached on either May 19th, it was

2   73.74 percent LTV on May 19th, and on May 20th, the LTV per our

3   calculations, Your Honor, which we welcome the Court to

4   scrutinize during the course of estimation proceedings, the LTV

5   was 70.6 percent. Again, the max LTV was not reached.

6          Yet, once the surplus 558207a5 collateral is factored

7   in, then the LTVs reach the point of not even sustaining a

8   trigger event.  The trigger event was, I think we can say

9   disarmed, right?  That would be appropriate to characterize it

10  as such.  On May 19th, and again, this is backed up by Exhibit

11  AA, Judge, and our papers, the surreply.  On May 19th, the LTV

12  would have been 60.22 percent, and on May 20th, it would have

13  been 51.11 percent.

14         I think it's absurd for the debtors to try to cast

15  aside the surplus collateral as meaningless because my client

16  was working with Agent 3 to post it.  We put on the record

17  confirmations from BlockFi that it was posted, and we have text

18  exchanges from Agent 3 acknowledging that it was posted.  And

19  this is an agent of BlockFi Lending that my client was entitled

20  to rely upon.

21         THE COURT:  Mr. Magalhaes, let me stop you because I

22  want to understand.  The thrust of your position with respect

23  to what the wind-down debtor refers to as Loan number 3, the

24  558207a5, the difference is, you challenge, A, the date of

25  liquidation, correct?

1          MR. MAGALHAES:  Repeat that, Judge.

2          THE COURT:  You're challenging the date of

3    liquidation, correct?

4          MR. MAGALHAES:  It's a preliminary point, Judge, and

5    not dispositive to our argument, but preliminary point that

6    could be material.

7          THE COURT:  And, also, you are challenging whether or

8    not there was additional collateral taken into account.  That's

9    how you come up with the difference in the loan-to-value ratio,

10   correct?  The additional collateral?

11         MR. MAGALHAES:  Not necessarily, Judge.  So, in our

12   Exhibit AA, Judge, and I'll pull it out.  And, Judge, by the

13   way, I had to truncate them to process the electronic filing.

14   I have Excels if the Court wants to look at to manipulate the

15   data.  But if you go to the column, Judge, specifically, we go

16   to the row -- I'll wait, Your Honor.

17         THE COURT:  I have it.

18         MR. MAGALHAES:  Oh, great, Judge.  Thank you, Judge.

19         If we go to the row for 558207a5, and then we go to

20   the column, "loan-to-value at liquidation" -- and we make no

21   bones upon relying upon the Gemini data, the depository data,

22   Judge -- you'll see that there's multiple calculations

23   provided.

24         For the May 19th date, Judge, we have 73.74 percent

25   if the surplus collateral is not taken account of, ergo the max

1  LTV of 80 percent was not reached.  In the brackets, Judge,

2  you'll see the calculation for if the surplus collateral is

3  taken account of.  And then there's the alternative May 20th

4  date.  Again, outside of the brackets is if the surplus

5  collateral is not taken account of.  And in the brackets is if

6  the surplus collateral is taken account of.

7           THE COURT:  All right, thank you.

8           MR. MAGALHAES:  You got it, Judge.

9           And, therefore, Your Honor, as a matter of fact, and

10  people use that as almost a slogan, but here it's on the record

11  as evidentiary material, Judge, it fully appeared to claimant

12  and Agent 3 that by the afternoon of May 19th, any cause for

13  alarm had subsided, with Agent 3 informing claimant that he was

14  still in safe territory.  That's Exhibit EE, slide 33.

15           If, however, Your Honor, something were amiss via the

16  required LTV, meaning the trigger event not being disarmed or

17  the max LTV being reached, claimant fully and fairly expected

18  that the surplus collateral would be tapped into and swept over

19  as need.  That is in Supplemental Certification Paragraphs 18

20  and 20, and Exhibit EE, slide 33.  Again, this is all cited,

21  Judge, so you don't have to necessarily take notes, although

22  obviously welcome  to do so.

23           And then, Your Honor, we have another admission.  On

24  the morning, I don't mean to get so excited, Judge, but again,

25  this is just so important to us.  On the morning of May 20th,

1   2021, BlockFi Lending through Agent 3 admitted that everything

2   was fine as to LTVs, Exhibit EE, slide 38.  Yet, incredibly,

3   they proceeded to not only liquidate but do so in massive,

4   startling slash-and-burn fashion.

5           So that's why, Judge, we believe that 558207a5 was

6   wrong for liquidating.

7           We move on to loan number 250568f4.  On the date of

8   liquidation, June 22nd, 2021, the max LTV had not been reached

9   because we believe the LTV was approximately 75.09 percent.

10  That's below 80 percent.

11          Next, Your Honor, as to Loan number 176fcbcC3, on the

12  date of liquidation, June 22nd, 2021, the max LTV had not been

13  reached because we calculate the LTV as having been

14  approximately 74.64 percent.

15          As to Loan number 1a118e43, there were two offending

16  liquidations, Your Honor.  On July 13th, 2021, had the missing

17  ETH been properly posted, I understand that's a material issue

18  and dispute.  I'll get there.  The max LTV would not have been

19  reached, but rather the LTV would have been 72.19 percent,

20  below 90 percent.

21          And then later on, my notes have an incorrect date,

22  Your Honor.  Apologies.  On July 19th, the missing ETH was not

23  even necessary to avert liquidation because the LTV was

24  approximately 86.99 percent. Again, the max LTV was 90 percent.

25          Separately, Your Honor, from arguing that these

23

1  unauthorized liquidations took place, we also have the point

2  that there were excessive liquidations that were conducted.

3  For reasons noted, Your Honor, principally our reading of the

4  LSA as only allowing BlockFi Lending to reestablish the

5  required LTV and statements made by BlockFi Lending's agents,

6  we believe that claimant fully and fairly expected that if the

7  max LTV was reached, that such liquidations will be performed

8  in a reasonable manner to reestablish the required LTV.

9          Yet, Your Honor, when we look at the percentage of

10  collateral liquidated column of the collateral loss breakdown,

11  Exhibit AA, we see percentages of, and I'll just rattle off the

12  first three numbers of each loan, and I apologize for not

13  following the nomenclature adopted by the wind-down debtors.

14          For 558, they sold 47.67 percent of the collateral.

15  For Loan 1a11, on July 13th, they sold 53.41 percent of the

16  collateral, on July 13th.  And then on July 19th, again with

17  regard to 1a1, they sold 52.68 percent of the collateral.  As

18  to Loan 736, on January 21st, they sold 43.52 percent of the

19  collateral.  Chart -- Exhibit AA, some other examples, those

20  are the ones I seek to highlight, Judge.

21          And then, perhaps even more interesting, Your Honor,

22  there's a separate way to think about this, and I want to

23  verbalize it because maybe it's not so clear in the papers.  So

24  we first talked about the percentage of the collateral that was

25  sold off.  But also if you look at the "Gemini percent of USD

24

1  collateral sold" column, that is a very interesting data point,

2  Your Honor, because that assesses the ratio expressed in

3  percentage format of the fair market value.  And. indeed,

4  Gemini was the fair market value.  This is the cryptocurrency

5  sector.  What is on the blockchain is the fair market value by

6  definition.

7      It tracks that, again, "Gemini percent of USD

8  collateral sold" column, the ratio of the fair market value

9  relative to the pre-liquidation outstanding loan balance.  And

10  Your Honor, we believe that if the Court engages in estimation

11  proceedings, which we believe it should after this hearing, all

12  these numbers will check out.  Otherwise, we would not have put

13  them in.

14      The numbers we get in this ratio for 558, for May

15  19th, if that's the date, it would have been 64.6 percent.  If

16  May 20th is the date, we get 67.5 percent.  For 1a1, liquidated

17  on July 13th, we get 58.33 percent.  For 1a1, liquidated on

18  July 19th, 61 percent.  And for Loan number 736, liquidated

19  January 21, 2022, 52.8 percent.

20      Those data points in total, Your Honor, evidence

21  that, yes, this was predatory lending.  I see no other

22  interpretation than to say that BlockFi Lending was in the

23  business of wrongfully seizing my client's collateral as a

24  means not to reestablish the required LTV as per the terms of

25  the LSAs and the parties' expectations, but just to gobble up

1 all of their finance charges on an early basis and then thrust

2 my client into another LSA and another LSA.

3 And, Your Honor, I'll touch briefly upon in a moment

4 some of the prior information you put in where they did

5 encourage him, hey, just refinance, man, just do it again.  And

6 that's how we get to, Judge, 35 LSAs.

7 Next, Your Honor, I want to get into the finance

8 charges tabulation concerns.  And, Your Honor, I note that both

9 my client and I submitted these under the ledger of "upon

10 information and belief," because we want to be careful, Judge.

11 You know, we're advocating for our client's claim.  But, you

12 know, a number of aspersions were cast against BlockFi Lending

13 by the SEC and other regulatory bodies.  And so we want to be

14 careful because this argument does implicate other concerns in

15 terms of whether or not BlockFi Lending was, you know,

16 incorrectly tabulating these items for its customer base in

17 large, in mass.

18 And so we submit these points, Your Honor, to the

19 Court with confidence that the Court will know how to interpret

20 them and how to apply them.  We're just noting them, Judge,

21 most respectfully.  So pardon me, Your Honor, I'll just take a

22 water break.

23 Section 1 of each LSA, Judge, provides that "Upon

24 disbursement of the loan proceeds, lender shall deduct the fee

25 applicable to the loan as shown on the statement of loan,

1  referred to herein the fee."  And that, again, "Lender shall

2  deduct the fee from the loan proceeds and disburse the

3  remaining loan proceeds to the borrower on the closing date."

4          Now, one of the problems here, Your Honor, in terms

5  of interpretation is that the fees, it's not extrapolated any

6  further.  We're just referring to the statement of loan.  So

7  let me go to the statement of loan, Your Honor, as a customer,

8  like Mr. Van Tubergen would.  And on the statement of loan, it

9  appears that the fee, in our reading, is that would have set

10  forth thereon as the finance charge.  That finance charge was

11  not, as Section 1 states, deducted from the loan proceeds

12  pursuant to Section 1, but rather was added to the amount

13  financed.

14          Now we get to Appendix A, which separately, Your

15  Honor, has language in reference to borrowers in Michigan after

16  referencing borrowers in Michigan that provides, "then lender

17  shall deduct all interest due from the loan proceeds and

18  disburse the remaining loan proceeds to the borrower on the

19  closing date."

20          Ostensibly, Your Honor, and the Court could take, you

21  know, notice of the Michigan law on this matter, if further

22  briefing is required on that, we'll do it.  But ostensibly,

23  it's because in Michigan, they don't want consumers to get

24  duped by saying, oh, here's a $6.3 million loan, but it's

25  really 6.9 or it's really 7.  That would be the common-sense

1  reading of that.

2          Even if the Court reads it different than us, Judge,

3  then we still have the Section 1 problem.  And that's why in

4  our surreply, Judge, we note that we don't believe the debtors

5  can find solace through an alternative reading of Appendix A,

6  because you revert back to what Section 1 says in terms of the

7  fee shall be deducted.  Then you go to the statement of loan, a

8  Truth in Lending Act disclosure, which doesn't say, here's the

9  fee, here's the finance charges.

10          One would, common sense-reading, say, okay, so the

11  fee, what they're charging is these finance charges.  That's

12  what a lender does, Judge.  You know, we don't have to go back

13  to, you know, Venice in the 1300s to understand how interest is

14  tabulated in customs and trades and practices.  You know,

15  they're charging a fee.  The fee consists of finance charges.

16  Section 1 says they're supposed to be backed out.  They were

17  not, Judge.

18          Then we get to Appendix A, which ostensibly

19  incorporates Michigan law to protect people like my client, by

20  saying, no, you're not going to charge an inflated amount.  You

21  have to back it out.  But they didn't, Judge.

22          And there's critical implications for this.  First of

23  all is the double-dipping concern.  That is, Your Honor, that

24  by not backing it out and adding it on top and still having my

25  client make payments to scratch, ergo, we have double-dip

28

1  payments.  Separately, it's the perverse impact that this could

2  have on LTVs.

3       Now, Your Honor, to be clear, we're trying to stitch

4  this as many ways as we can to the Court finding that there

5  were unauthorized liquidations, there were excessive

6  liquidations.  We used the Gemini data, the surplus collateral,

7  the missing ETH, all these arguments, right, that have to be

8  carefully considered in their place.  But separately, the

9  specter of this finance charges argument hangs over it, because

10 that would further affect the LTVs in a manner favorable to my

11 client.

12       Specifically, Judge, going to the finance charges

13 analysis, Exhibit BB, under the column" Loan-to-value at

14 liquidation if fee/interest deducted from loan proceeds."  And

15 yes, per Gemini pricing data, it shows that the LTV percentages

16 go further down.  And I won't take up the Court's time.  I've

17 already cited the column in Exhibit BB, Judge, but that's our

18 point with regard to finance charges, Your Honor.

19       Next, Your Honor, we do not believe that BlockFi

20 Lending's computations can be relied upon by the Court.  We

21 believe they're questionable at best.  First, Your Honor, as we

22 just spoke about, we have this finance charges argument.  I

23 won't repeat it, Judge.  Second, no method of valuation was

24 identified or utilized in formulating the debtor's proposed LTV

25 percentages.

1            So there to have this Court, I think they're the

2    first secured creditor that I've ever been aware of to say,

3    well, the value is what we say it is after selling it.  That's

4    ridiculous.

5            Whatever type of asset we have, let me restate that,

6    Judge.  Just because we have a new type of asset doesn't mean

7    they get to make up the rules and depart from all precedent

8    that existed before it.  Your Honor, imagine if this asset was

9    real estate, Judge, and they sold it without an appraisal or

10   they sold it without the advice of a competent business broker.

11           Let's say that asset, Judge, was worth approximately

12   10-million plus.  Now we're getting to what happened here.  And

13   they sold it without evaluation.  It appears to me, Judge, that

14   they calculated their LTVs based upon what they sold it for.

15   That's preposterous, Your Honor.  And as a matter of fact, the

16   record is devoid of anything stating what their valuation

17   scheme or method was.

18           Alternatively, Judge, even if they did offer

19   anything, we're the ones offering the depository's pricing

20   data.  This whole sector is predicated on the blockchain.  And

21   I don't mean to get excited, Your Honor, but to us, this is a

22   central point because the Gemini data is per-se accurate.

23           Next, Your Honor, with regard to Loan number

24   558207a5, we do believe that it is a material mistake that the

25   debtor's calculations did not take account of a surplus

30

1  collateral.  I won't belabor the point any further, Judge.

2  It's in our papers and we said it.  But there are

3  communications from one of their agents, essentially -- and

4  it's Exhibit EE -- text messages facilitating, assisting my

5  client in facilitating with posting this collateral.  We then

6  provide the confirmations from BlockFi that it was posted to

7  his account.  They should have looked to that.

8          So now we're going to -- are they trying to say that

9  AI was in charge of everything and they had no say to look to

10  the surplus collateral?  We've posted evidence, I'm sorry,

11  we've filed evidence, Your Honor, that these were manual

12  liquidations.  They can't try to disclaim their responsibility

13  because the Court has evidence that these were manual

14  liquidations.

15          With regard to Loan number 1a118e43, and this is a

16  third point, Judge, as to why their computations are

17  questionable at best.  It expressly called on the face of the

18  document for 4,230.120 ETH.  The notion that you would have a

19  scrivener's error, the equivalent of over 800 ETH is absurd.

20  As someone, Your Honor, that, I'll just say it, this is neither

21  here nor there, as someone that invested a little bit of

22  cryptocurrency, at these times, one ETH was meaningful to the

23  average American.  Five ETH was a European vacation package.

24          More than that was, I mean, you know, potentially a

25  year's college education.  And we're to believe that over 800

31

1  ETH, Your Honor, is a scrivener's error, that's absurd.  They

2  signed the LSA.  They are seeking to hold my client to an

3  offensive reading of the LSA.  Yet, they're trying to get out

4  of one of the most critical terms of one of the most critical

5  LSAs.  That just doesn't pass the smell test, Judge.

6         And on top of that, we have the breakdown that was

7  provided by my client, Mr. Van Tubergen.  It's in a

8  certification.  It's also in Paragraph 10 of the surreply. Your

9  Honor, I'm just going to reference it.  I believe I have that

10  latitude.  I'm not going to put these computations.  I'll lose

11  my breath at this point, Judge.  And again, I'm getting to the

12  end of the tunnel, I promise, Your Honor.  But --

13         THE COURT:  It's been quite an open statement, but go

14  ahead.

15         MR. MAGALHAES:  Yeah, I know.  I know, Judge.  I

16  know, Judge.

17         Yeah, I'm just going to incorporate that by

18  reference, Judge.  You know, it mathematically shows how any

19  notion that this was the intent to not post the 4,230.120, we

20  believe just mathematically bunk.

21         A smaller point that's revealing, Judge, and again,

22  opposing counsel said it, they keep insisting, and this is just

23  revealing that only $19.07 is owed to my client if we're to

24  assume that what's in the BlockFi account is what's owed.  Even

25  that's wrong, Judge.  We have it at about 1,500 bucks.

1   Whatever the precise dollars and cents are, we put a screen

2   capture image of this account.  Even the (indiscernible) that,

3   Judge.

4            And fifth and vitally, Judge, Ms. Marquez's

5   certification is not backed by any underlying data.  We just

6   have charts with her reverence.  That is insufficient to

7   sustain what is being proffered here.

8            And my client and I, in 107 of their reply, Judge,

9   they review the material that was provided to us.  My client

10  went through that material with a fine-tooth comb, and it

11  doesn't make any sense.  There's data missing, Judge.  And we

12  think it's no surprise that that bedrock of data is missing.

13           Judge, similarly, just like their data should not be

14  trusted, Your Honor, and they should not be given the benefit

15  of the doubt, we don't believe they should be given any benefit

16  of the doubt as to whether or not they complied with the LSA

17  notice requirements.  They should be required to put on the

18  record any and all notices that were required by the LSA.  They

19  have not.

20           Standing alone, that should entitle my client to

21  prevail.  Some of these notices were previously discussed and

22  proffered by my client, but that was in regards to the

23  haphazard nature of BlockFi Lending's operations.  I cite the

24  original certification, Paragraph 11 and 12, and the notices

25  that were provided by way of his supplemental certification,

33

1  Paragraphs 17 to 22.  They're just to flesh out his due

2  diligence.  And they show that he was not provided the 72-hour

3  window that was necessary.

4        I'll begin wrapping up, Judge.  We can get into this

5  at another point today, Your Honor, or on another day, but for

6  reasons previously noted, we do believe that the totality of

7  the circumstances established that Mr. Van Tubergen was

8  effectively railroaded.  What I mean by that, Judge, is that

9  everything I've discussed up until now is either a "four

10 corners of the document" argument or referring to documents in

11 record as to why the liquidations were unauthorized or

12 excessive.

13       But there's also facts that show that BlockFi Lending

14 did not treat Mr. Van Tubergen reasonably and effectively

15 violated his rights as a consumer.  That's when we get into the

16 predatory-lending argument, Your Honor.  And one of the first

17 things I said is that, yes, we do allege predatory lending, but

18 that's certainly not the crux of our claim, Judge.  Ergo, I'll

19 just reserve these points for another time, including, for

20 example, that it did look like they were giving him investment

21 advice.

22       And, Judge, finally, we did request certain

23 alternative requests for relief, Judge.  Your Honor, I got

24 involved in this matter at the eleventh hour.  Therefore, I

25 just wanted to make sure that I properly invoked all rights and

34

privileges that one could under the Bankruptcy Code and the

Bankruptcy Rules.  I know the Court's read my papers.

Again, Your Honor, we are requesting estimation

proceedings.  We do believe, Your Honor, for reasons stated in

detail by Mr. Van Tubergen, that his claim was appropriately

filed under the circumstances with information, i.e., the

liquidation summary, capital L, capital S, that was directly

provided by BlockFi Lending's agents.  And we believe that the

analyses that were provided in surreply showed that the 10

million was not just a good-faith estimation, Your Honor.  It

actually warrants an upward adjustment.  We have -- we did

request the right to kind of engage in discovery on that.

I'll say that it was wonderful to work with

Ms. Lauren Fissone (phonetic).  I had an opportunity to speak

with Ms. Furness also at the time that we issued a subpoena.

We did agree not to file a motion to enforce a subpoena, Your

Honor.  That was in connection with their accommodation of

another adjournment that I requested for personal reasons.  I

thank them very much, Your Honor.

But that does not do away with the point that we have

been fighting, and my client has been fighting before the

bankruptcy, during the bankruptcy, for additional account

records.  We were never able to make sense of them, Judge.  To

this day, we're still not able to make sense of BlockFi

Lending's records.

1          We recently -- because they told us that Scratch is a

2     separate company, we believe them.  We went to Scratch.  This

3     is in my client's certification, Judge, but it's such an

4     important point because, to this day, we have not been given

5     full or complete account records.

6          Your Honor, I'll just note to the Court that we did

7     issue a subpoena to Scratch, Your Honor.  The times did not

8     match up in the sense that it is returnable after this hearing

9     but we hope that if the Court engages in estimation

10    proceedings, for that, we have a hearing after this hearing,

11    supplemental hearings, that the subpoena is returnable by such

12    time.

13         That's the case with discovery, Your Honor.  We did

14    ask for Part 7 of the Bankruptcy Rules to be applicable.  Our

15    main point there, Your Honor, was that if the Court finds that

16    the only route is to rescind the LSAs, given the sum and

17    substance, totality of the circumstances, everything going on

18    that we allege, we believe that the Court has the power

19    pursuant to Bankruptcy Rule 9014(c) to rescind the LSAs.

20         And, lastly, Your Honor, and you know, Your Honor, I

21    was going to do this to cover myself.  I did ask the Court for

22    the right to amend with relation back, if the Court finds that

23    such is necessary.  But we believe, Your Honor, that the claim,

24    given everything that was going on, given how my client was

25    placed in the dark, given how my client was not previously

36

1   represented by counsel, we do believe the claim was appropriate

2   in the first instance.

3              Thank you, Your Honor.

4              MR. MAGALHAES:  Thank you, Mr. Magalhaes.

5              All right.  I certainly have enough to chew on.

6              Ms. Furness, how do you wish to proceed?

7              MS. FURNESS:  Your Honor, as you've already admitted,

8   Ms. Marquez's declaration, I just have a couple of questions

9   for her in response to Mr. Magalhaes.

10             THE COURT:  Sure.

11             Ms. Marquez, good morning.  If you would unmute

12  yourself, there you go.  And I'm going to ask you to raise your

13  right hand.

14              FLORENCIA MARQUEZ, DEBTORS' WITNESS, SWORN

15             THE COURT:  All right.  Please state your name and a

16  business address for the record.

17             THE WITNESS:  Florencia Marquez and 561 Fifth Street,

18  Brooklyn, New York, 11215.

19             THE COURT:  All right, thank you.

20             Ms. Furness, you may continue.

21             MS. FURNESS:  Thank you, Your Honor.  May I share my

22  screen, please?

23             THE COURT:  Yes, we'll let you -- and also,

24  Ms. Marquez, let me just confirm, there's no one else in the

25  room with you?

Marquez - Direct/Furness                    37

1              THE WITNESS:  There's no one else in the room.

2              THE COURT:  And you're not reading off any particular

3    sets of materials?

4              THE WITNESS:  I do have the certifications printed

5    out.

6              THE COURT:  All right.  No other handwritten notes

7    apart from what's already on the docket?

8              THE WITNESS:  Correct.

9              THE COURT:  Okay, thank you.

10                        DIRECT EXAMINATION

11   BY MS. FURNESS:

12   Q    Ms. Marquez, I'm going to show you a document.

13             MS. FURNESS:  And Your Honor, we've presented this or

14   we sent this to chambers this morning.

15             THE COURT:  Yes, I have it.

16             MS. FURNESS:  This is a document that

17   Mr. Van Tubergen's counsel received as an Excel a month, two

18   months ago, in connection with the documents that BlockFi

19   produced.  And we have marked it as Exhibit J.

20   BY MS. FURNESS:

21   Q    Ms. Marquez, let me go down.  For the purposes of today's

22   hearing, we put this indicator here, Loan 1, with the loan

23   number.  Can you see, excuse me, the document that has columns

24   and headers?

25   A    Yes, I can.

Marquez - Direct/Furness                               38

1  Q    Are you familiar with this document?  Have you seen it

2  before?

3  A    I believe I have.

4  Q    What is this?

5  A    This is based off of an Excel spreadsheet that the

6  company, I believe, helped put together, which shows customer

7  unique IDs and then timestamps at which certain emails are

8  system sent to the client went out.  And it also includes some

9  of the information that was in those emails.

10 Q    So, for example, on the document that's in front of you,

11 do you know, because of the collection issues, which customer

12 this relates to?

13 A    Yes, it shows the customer ID on the left-hand side.

14 Q    And are you aware this relates to Mr. Van Tubergen?

15 A    Yes.

16 Q    And can you explain to the Court that the fourth column

17 says email type?  For example, what is LTV max?  What does that

18 mean?

19 A    So our system put together a variety of emails that

20 alerted clients to what was happening with the loans that they

21 had in relation to the price of crypto.  So LTV max meant that

22 an email went out to the client letting them know that their

23 max LTV had been breached and, therefore, their loan was likely

24 in the process of having their collateral being sold.

25 Q    And what does LTV reminder mean?

1  A    LTV reminder was an email that went out to clients to let

2  them know that their loan was still in a margin call or at risk

3  of being sold because the client had not posted the sufficient

4  collateral to avoid a sale.

5  Q    And then the final type, at least on this page, seems to

6  be LTV trigger.  What does that mean?

7  A    LTV trigger was, I believe, when a loan hit the 70-percent

8  LTV, which then let them know they had 72 hours to post

9  additional collateral or the loan would be sold.  That email

10 also let the client know that if at any point in time the loan

11 hit 80 percent, the loan would be sold.

12 Q    So, for example, on this one, on 5/19, 1:37,

13 Mr. Van Tubergen received an email that said, your loan has hit

14 the 80 percent, your collateral will be sold?

15 A    Correct.

16 Q    And then he got another similar max email at 14:12 on that

17 same day.

18 A    Correct.

19 Q    Then another one on the 21st?

20 A    Yes.

21 Q    And then another one on the 23rd?

22 A    Yes.

23 Q    And then a bunch of reminders.

24 A    Correct.

25 Q    And then what is the red entry?

Marquez - Direct/Furness                                    40

1  A     This was an email alerting the client of a sale that had

2  already occurred and what the proceeds of that sale were and

3  how the cash that we had raised during that liquidation had

4  been applied to pay down their loan to, therefore, lower their

5  LTV.

6  Q     And so for the purposes of the Court, are these what you

7  would call notices that were provided to Mr. Van Tubergen?

8  A     Yes.

9  Q     And then again, this is a different loan.  Is this also

10 for Mr. Van Tubergen?

11 A     Yes.

12 Q     This loan also had a partial liquidation.  Am I reading

13 that correctly?

14 A     That's correct.

15 Q     And, again, we note that this is Loan number 3.  Are these

16 -- is this an Excel that would demonstrate the emails that were

17 sent to Mr. Van Tubergen on that loan?

18 A     Yes.

19 Q     This is for Loan ID 1a118e43.  This is the liquidation

20 that occurred on July 13.  Are these the emails that were sent

21 to Mr. Van Tubergen on that loan?

22 A     Yes.

23 Q     This is Loan number 5.  Are these the emails that were

24 sent to Mr. Van Tubergen related to this denominated loan of

25 736435a7?

Marquez - Direct/Furness                    41

1   A    Yes.

2   Q    This is for Loan number 6.  Are these the emails that were

3   sent in relation to that loan?

4   A    Yes, they are.

5   Q    And this is on Loan number 7.  Are these the notices sent

6   in relation to that loan?

7   A    Yes.

8   Q    And are these notices automatic?

9   A    Yes.  The majority of the time they're automatic.

10  Q    And when an email is sent, is it logged in this system

11  that allows you to pull it out via the Excel?

12  A    The system keeps a record of which loans -- or sorry,

13  which notices were sent and the time and the template that was

14  used.  And we can export that and put that data into an Excel.

15  Q    And these are the books and records of BlockFi?

16  A    Yes, they are.

17           MS. FURNESS:  Your Honor, we'd move to admit Exhibit

18  J. *

19           THE COURT:  Any objection?

20           MR. MAGALHAES:  Your Honor, I do have some questions

21  about this document.

22           THE COURT:  I'll give you a chance -- well, is it

23  going to go to your cross-examination or as it the admission of

24  the document?

25           MR. MAGALHAES:  As a courtesy, Your Honor, I'll grant

Marquez - Direct/Furness                              42

1  it to be admitted with the right to ask Ms. Marquez some

2  questions.

3          THE COURT:  That's fine.  You have the right to

4  cross.

5          MR. MAGALHAES:  Thank you, Judge.

6          (Debtors' Exhibit J admitted into evidence)

7          THE COURT:  Ms. Marquez, I have a question.  The

8  column that says liquidation dates, there's a date and a time.

9  Where would that be drawn from, that information, at the time

10 of liquidation?

11         THE WITNESS:  It depended on which year you're

12 talking about.  We had two methods of doing liquidation.  So,

13 prior to, I believe, November 2021, our institutional team

14 would process liquidations using over-the-counter trading.  And

15 then the proceeds of those liquidations would be applied to the

16 loans that were in default.

17         When the cash allocation was uploaded into the

18 system, that would be the timestamp, I believe, that you see on

19 liquidation date.  And then after November of 2021, the system

20 started to sell loans on an automated basis.  So, that

21 liquidation time that you see -- so, for example, in the row

22 we're looking at here, that would have been exactly the time

23 that our system automatically traded that specific loan.

24         THE COURT:  So, is that the reason for the difference

25 in nomenclature where it says partial liquidation occurred

Marquez - Direct/Furness                    43

1  versus automated liquidation?  In other words, there's

2  different terminology.

3         THE WITNESS:  Yeah, I think that that's likely the

4  reason for the different terminology.

5         THE COURT:  All right, thank you.

6         Ms. Furness, you can continue.

7         MS. FURNESS:  Thank you.

8  BY MS. FURNESS:

9  Q    Ms. Marquez, you heard the argument related to the finance

10 charge.  Did BlockFi collect the finance charge, in other

11 words, the interest from Mr. Van Tubergen upfront on these

12 loans?

13 A    I think that there is -- can I explain my understanding of

14 the finance charge?

15 Q    Yes.

16 A    Because I think there's a miscommunication here.

17        So the way that we applied the finance charge was in

18 addition to the loan amount applied, there's two different ways

19 to apply finance charges when you're making a loan.  You can

20 either deduct it from the amount that the client applied for or

21 you can add it to the loan amount.

22        We decided as a platform to add it to the loan amount so

23 that clients would receive the exact amount of cash in their

24 bank account that they had applied for.

25        So I was confused by Mr. Magalhaes' description earlier

Marquez - Direct/Furness                    44

1  because there was only ever one finance charge and it was

2  collected at the maturity of the loan or whenever the loan was

3  paid back.

4          MS. FURNESS:  If I may, Your Honor, share my screen.

5          THE COURT:  Yes.

6          MS. FURNESS:  And, Your Honor, for your purposes,

7  this is Exhibit B to Mr. Van Tubergen's response, which is

8  Docket Number 1496-3 and this is the 558207a5 loan.

9  BY MS. FURNESS:

10 Q    And so that we are all clear, Ms. Marquez, are you talking

11 on a finance charge this amount indicated here as $614,579?

12 A    Yeah, so there's -- yeah, the finance charge and this is

13 what's called the TILA.  That's the total amount that will

14 ultimately be paid back to BlockFi if the loan is held to

15 maturity, inclusive of all interest and origination fees.

16 Q    And so the question I have is, did BlockFi collect this

17 $614,000 up front?

18 A    No, it would have been collected when the loan was paid

19 off at maturity.

20 Q    (Audio interference) talk about pricing.  I'm sorry.

21 Please.

22 A    Or when the loan was paid off.

23 Q    Thank you.

24     I want to talk about pricing.  What pricing metric did

25 BlockFi use to make these determinations of whether the loan-

Marquez - Direct/Furness                                    45

1  to-value was 70 percent, 80 percent?  How was that calculation

2  done?

3  A    We used a variety of best-in-class pricing feeds that were

4  fed in to our institutional team and that was connected to the

5  loan platform, and then LTV values were calculated off of those

6  pricing feeds.

7  Q    And so was that from Gemini?

8  A    It may have been from Gemini at certain points in time,

9  but over time, we used multiple pricing feeds to ensure the

10 data was accurate.

11 Q    Mr. Van Tubergen's counsel talked about "official

12 blockchain pricing" and points to CryptoDataDownload.  Prior to

13 Mr. Van Tubergen's dispute here, have you ever heard of

14 CryptoDataDownload?

15 A    No, I have not.

16 Q    Is there anything else discussed in that opening that you

17 think we should clear up factually?

18 A    I think the concept of the price that's used is

19 complicated because typically when a client Google's Ethereum

20 price, you're seeing the spot price for Bitcoin, which could

21 be -- it's the last trade that happened and that could have

22 been someone buying 10 cents worth of Ethereum.  So that price

23 isn't necessarily what's available to the market, let's say, if

24 you're trying to sell millions of dollars worth of crypto.  So

25 I think the idea of spot pricing versus the price that we get

Marquez - Direct/Furness                          46

1  when you execute a trade, there's a difference there based on

2  the volume that you're trying to trade and of course every

3  single trade has trading fees.

4       In addition, I do understand that the loan math is very

5  confusing and I think there might be a miscommunication in

6  terms of how different counsels are calculating LTVs.  I think

7  in one document that I read, there was a mention of the price

8  being used as the average price for that day when in reality,

9  when you're calculating the LTV at which a loan will hit a

10 trigger, you have to look at the low price of that day.

11      So, for example, on one of the days in question, we were

12 talking about the price of Ethereum I believe on May 19, 2021.

13 If you took Ethereum's close that day versus the low, I believe

14 there was a 25 percent difference in price just for that day.

15 And that's because when the price of crypto starts to fall, it

16 falls very drastically in one day, and so not only the pricing

17 source that you're using but exactly which price you're pulling

18 for the day in question matters materially when you're looking

19 at what was the loan's LTV that caused the default on the day

20 in question.

21 Q    Final question.  Your certification, your declaration

22 includes data regarding the liquidation price, the LTV

23 percentage, the trigger price.  Did you look at BlockFi's books

24 and records to set out those charts that are in your

25 certification?

Marquez - Examination/Court                    47

1  A    Yes.  I looked thoroughly at BlockFi's books and records

2  and, in addition, we had our finance team re-review all of the

3  data that was submitted to ensure that it was accurate.

4  Q    Last question relates to the collateral that was posted by

5  or for Mr. Van Tubergen related to what we call Loans Number 3

6  and Number 4.  Did you also look at BlockFi's books and records

7  to confirm that that information is correct?

8  A    Yes, I did.

9  Q    Thank you.

10        MS. FURNESS:  Your Honor, I'll pass Ms. Marquez.

11        THE COURT:  Before I turn the witness over to

12  Mr. Magalhaes, Ms. Marquez, a couple of questions.

13                        *EXAMINATION

14  BY THE COURT:

15  Q    You had referenced certain multiple pricing feeds beyond

16  Gemini.  Can you be more specific?  What would these pricing

17  sources have been to calculate LTVs.

18  A    I can't remember off the top of my head.  There might have

19  been one called Crypto Facilities, but I can't remember off the

20  top of my head.

21  Q    Well, were they industry related?  In other words, who was

22  producing this data for pricing?

23  A    Yes, they were pricing feeds that we contracted out for

24  and that was on the institutional side of the platform that I

25  wasn't as close with but we looked for the most robust data we

Marquez - Examination/Court                         48

1  could find.

2  Q    All right.

3       And when collateral was liquidated to produce the loan-to-

4  value ratio, in looking at your declaration and the wind-down

5  reply, often it seemed after the liquidation of the collateral,

6  the loan-to-value was still somewhat high.  In other words,

7  sometimes over 80 percent or just below 79 percent.

8       Why weren't more funds liquidated, more assets liquidated

9  to bring it down to a more comfortable level?

10 A    So as a business, it was really important for us to do two

11 things.  One, to take into account our client's perspective

12 when possible and also to just have as healthy of a business as

13 possible.  And so our goal was to try to liquidate as few times

14 as possible and avoid a liquidation whenever possible because

15 BlockFi, like Mr. Van Tubergen, we believed in the fact that

16 over -- we thought that crypto would go up over a long period

17 of time.

18      And so, when it came time to liquidate loans, our only

19 goal was to ensure that we always had more collateral than the

20 value of the loan outstanding.  And within that, we preferred

21 to try to do smaller batches of liquidation rather than, let's

22 say, oversell and wipe out much more collateral.  Because we

23 also knew that our clients really -- we thought our clients

24 would prefer that method of operation, even though it was

25 within our rights to, as you said, liquidate far more and bring

Marquez - Examination/Court                                    49

1  them back to a 50 percent LTV.

2  Q    If because of a dramatic drop in the price of certain

3  cryptocurrency the LTV ratio shot up to above 80 percent, or 90

4  percent on a particular loan, was BlockFi required to give the

5  72 hours notice?

6  A    No.  If a client hit an 80 percent LTV, we were allowed to

7  liquidate instantly based on the loan agreement.

8  Q    Can you tell me did that situation occur in any of these

9  loans?  Or was there always advanced warning of the 72-hour

10 requirement met?

11 A    To my knowledge, there was always advanced warning, and

12 it's not only because we had an email at 70 percent, but we

13 also had an automated email at 65 percent LTV that went out to

14 clients letting them know that they were approaching a margin

15 call.  We did that intentionally to make sure that clients

16 would have as much time as possible, knowing that sometimes, as

17 you said, the price would drop precipitously.

18      And so, by setting a LTV warning even before the 70

19 percent, we were making sure that people were getting emails to

20 let them know that the price was dropping.

21 Q    All right.  Thank you.

22           THE COURT:  Mr. Magalhaes.

23           MR. MAGALHAES:  Thanks, Your Honor.

24                     *CROSS-EXAMINATION

25 BY MR. MAGALHAES:

Marquez - Cross/Magalhaes                    50

1   Q    Ms. Marquez, thank you very much for making yourself

2   available.  We really appreciate that.  Just as an aside, I'll

3   say whenever a company goes into bankruptcy, it takes a lot of

4   character to come forward and answer questions, so I appreciate

5   that very much.

6        I'm not going to post it on the screen.  The wind-down

7   debtors attorney shared Exhibit J.  When you were describing

8   Exhibit J, Ms. Marquez, I heard you say, correct me if I'm

9   wrong, that the team prepared it.  Is that correct?

10  A    I can't remember.

11  Q    Okay.

12  A    But I'll take your word for it.

13  Q    No, sure.

14       Do you know who prepared Exhibit J?

15  A    Most work that is put together by the team goes through a

16  review process, so there isn't typically a single individual

17  that prepares data.

18  Q    Do you have personal knowledge of Exhibit J?

19  A    Yes.

20  Q    How?

21  A    I was part of the team that helped pull the information

22  that was provided to the Court.

23  Q    And what were your functions as part of that team?

24  A    The same as my functions in a regular day-to-day capacity

25  helping run the BlockFi team.

Marquez - Cross/Magalhaes                                51

1  Q    Okay.  Could you be a little bit more specific in terms of

2  how you know that that data is accurate?

3  A    So, in general, if we're providing data for the Court, I

4  will ask two separate teams to either one be a maker and one be

5  a checker.  And so you have one team pull the data and then

6  another team review the data through our -- and verify it

7  against our books and records to ensure that it is accurate.

8  Q    And this team, are they employees of BlockFi or BlockFi

9  Lending or its affiliates?

10 A    Depending on what we're working on today, because there

11 are various requests for the Court, the team can include

12 BlockFi employees.  It can also include our outside advisors,

13 including our financial advisors.  And it can also sometimes

14 include attorneys reviewing our work as well.

15 Q    Who did this team include?

16 A    I believe that for the data that was submitted for this in

17 particular, it at least included BlockFi employees and outside

18 attorneys as well.

19 Q    Where are the notices themselves?

20 A    Can you be more specific?

21 Q    So the chart, Exhibit J, and this is my interpretation, it

22 purports to illustrate when notices were issued.  For example,

23 let's say I issue a notice, Ms. Marquez, it's either a letter

24 that's saved to a database or it's an email that I can go into

25 the my outbox and pull up the email.  Where are the actual

1  copies, digital or hard copy, of the actual notices themselves?

2  A    So the way the system worked is through APIs, and we used

3  a partner called SendGrid.  And so when you see on that Excel

4  spreadsheet, for example, LTV trigger sent, that meant that our

5  system sent API kind of instruction to SendGrid, which then

6  would distribute those emails to all of our clients.  And so

7  Mr. Van Tubergen should, for each of those notices, in his

8  inbox, have a copy of the notice that was sent as well as all

9  of the fields in the email, which would have included the price

10  at the time it was sent, his loan's LTV, the address at which

11  he had to send the crypto, all that other information.

12  Q    You may or may not know the answer to this question.

13      Did the debtors, BlockFi, however you want to refer to it,

14  did they request the notices from SendGrid?

15  A    My understanding is that SendGrid actually didn't keep a

16  copy of the email that you could export themselves.  They just

17  kind of keep similar fields as to what you can see, which is

18  the template, the date that it was sent, and the email that

19  should have received it.

20  Q    So no one kept copies of the notices?

21  A    The client should have a copy of the notice in his inbox.

22  Q    Okay.  But no one at the debtor kept copies of the

23  notices, or its agents?

24  A    I think at some point SendGrid started keeping copies of

25  the emails, but I don't think that they had copies at the time

Marquez - Cross/Magalhaes                          53

1  that we're talking about, no.  And I'm also not sure what sort

2  of contract we have with them in bankruptcy, because that also

3  might limit the amount of data that's available to us given the

4  fact that we've kind of cut down a lot of our costs.

5  Q    Understood.

6       In Paragraph 4 of your certification and in your

7  testimony, you referred that you reviewed books and records.

8  Could you be a little bit more specific?  Because we've been

9  struggling to obtain and review books and records, can you

10 inform me what books and records you reviewed in setting forth

11 the charts that were in your certification?

12 A    Yeah.  So there's records that were exported directly from

13 our system which showed different activities that were

14 happening on the loan system.  We also had a separate system

15 for books and records specifically for loan activity.  And our

16 finance team also has separate accounting that also accounts

17 for loan balances and activity that happens on that end.

18      And I think the client also has access to loan activity by

19 logging into the BlockFi app.  And there, you can navigate to

20 each one of the loans and click on the historical transactions

21 for those loans, which might be helpful.

22      And lastly, I do think the client also should have access

23 to log in to Scratch, which would have information on the cash

24 payments made on the loan.  And Scratch also mirrored our loan

25 accounting books and records to ensure that we were always

1  matched up.

2  Q    Just to be clear on the books and records, Ms. Marquez,

3  was it you that personally looked through them or was it the

4  finance team?

5  A    In this case, I looked through the loans transaction

6  history and our books and records.

7  Q    And did you prepare the charts that were included in your

8  certification?

9  A    Yes.  I was part of the team that helped prepare the

10  charts.

11  Q    Okay.  And who was this team composed of?

12  A    As I said earlier, we had a team composed of people on the

13  operations and the finance team and we had a maker-checker

14  system set up to ensure that the transaction history was

15  accurate.

16  Q    With regard to the finance charges, you stated there was

17  only one finance charge.  Can you explain that a little bit for

18  me?

19  A    I think we might have been using language that might have

20  been a bit confusing.  So I was talking about specifically the

21  origination fee which is the fee that vendors typically use to

22  originate alone.  And our origination fees varied from 0 to 2

23  percent for loans depending on the loan product that the client

24  was using.  As I mentioned earlier, the way that was calculated

25  is, let's say you signed up for a $10,000 loan and there was a

1  $200 origination fee, we structured our loan so that the amount

2  that you applied for as a client would be the amount that you

3  received in your bank account because we thought that was the

4  best client experience.

5       So what would functionally happen is you would apply

6  for a $10,000 loan.  Your total loan amount at payoff, ignoring

7  interest, would be $10,200.  And you would receive $10,000 in

8  your bank account and then when you wanted to pay off your

9  loan, you'd have to pay us back $10,200.

10 Q    Thank you, Ms. Marquez.  Let me just review my notes.

11      Regarding the -- I couldn't tell if you said pricing

12 feeds.  I wasn't sure what terminology you were using there,

13 but whatever pricing metric you were utilizing, did you ever

14 inform Mr. Van Tubergen of the pricing metric that you were

15 utilizing?

16 A    I'm not sure I would have been corresponding with

17 Mr. Van Tubergen directly --

18 Q    Okay.

19 A    -- on this matter.

20      MR. MAGALHAES I have no further questions, Your

21 Honor.

22      THE COURT:  All right.

23      Ms. Marquez, just a couple more follow-up.

24      Would there be, with respect to any of the consumer

25 loans, a situation where the origination fee was taken out on

56

1  the front end, as opposed to being added to the loan?  Did that

2  policy change at any point?

3         THE WITNESS:  I don't think it ever changed to my

4  knowledge, and this was in place since we made our first loan

5  in 2018.

6         THE COURT:  All right.  Thank you.

7         I have no further questions as well.

8         Thank you, Ms. Marquez.  You may virtually step down.

9         Ms. Furness, do you have any other witnesses?

10               (Witness is excused)

11        MS. FURNESS:  We do not, Your Honor.

12        THE COURT:  All right.

13        Mr. Magalhaes, so -- well, actually, before I get to

14 Mr. Magalhaes --

15        MR. MAGALHAES:  You just cut out on my end, Judge.

16        THE COURT:  Okay.

17        Ms. Furness, apart from any closing, is there any

18 further argument or evidence you wish to put in?

19        MS. FURNESS:  No, thank you, Your Honor.

20        THE COURT:  All right.

21        Then, Mr. Magalhaes, do you wish to take that time to

22 speak with your client at this point?

23        MR. MAGALHAES:  I would most welcome that, Judge.  A

24 10-minute break would be wonderful if the Court can afford it.

25        THE COURT:  All right.  It's 11:35.  Why don't we

57

1  reconvene, we'll take a 15 minute, at 11:50.

2         MR. MAGALHAES:  Thank you, Judge.

3         THE COURT:  All right.

4         Thank you.

5      (Recess at 11:35 a.m./Reconvened at 11:50 a.m.)

6         THE COURT:  All right.  We are back on.

7         Mr. Magalhaes, have you spoken with your client and

8  how do you wish to proceed?

9         MR. MAGALHAES:  I have, Your Honor.  And, Your Honor,

10 first just let me confirm out of an abundance of caution,

11 Judge, because who knows where this is going, mindful of appeal

12 and all that.  I just want to confirm that the certification

13 and exhibits are on the record.

14        THE COURT:  Yes.

15        MR. MAGALHAES:  Excellent, Judge.

16        THE COURT:  The certifications that have been -- your

17 client's certification is part of the record.  All exhibits

18 attached to it are part of the record.

19        MR. MAGALHAES:  Excellent, Judge.

20        Your Honor, anything that I would ask

21 Mr. Van Tubergen, it would be redundant.  We've really tried in

22 the papers and in my opening to lay it out there.  I do want to

23 reserve closing, Judge, but the way we will proceed is I have

24 no questions of my client, Judge, but if the Court, *sua sponte*,

25 has any questions, then the Court is free to ask

1  Mr. Van Tubergen.

2           THE COURT:  All right.  Well, I have a question for

3  you.  If you wish to refer it to your client, you may do so and

4  I'll put him under oath.

5           My question goes to the theory of damages because we

6  have a situation where let's assume claimants' arguments the

7  Court accepts and there were improper liquidations.  The

8  proceeds were applied against the loans.  If we rescinded LTVs,

9  it creates a situation, at least to the Court, that for damages

10 we're relying a lot on conjecture as to what would have

11 happened with the proceeds had they not been liquidated.  At

12 what point would loans have been paid off?  Would loans have

13 been paid off?

14          We know the values fluctuated dramatically during

15 this period of time all the way up through the petition date.

16 The one certainty we have is the values on the petition date.

17 So I'm trying to get a handle on how you come up with the claim

18 amount, and I know you've estimated it at 10 million.  But

19 what's the basis for that?  And of course, I'm hoping we all

20 recognize that a $10 million claim here in this case is only

21 being paid a fraction on the dollar as it is.

22          So that being said, do you want to make your

23 argument?

24          MR. MAGALHAES:  Yes, and I just as to that final

25 point, Judge, our claim is as to BlockFi Lending in particular.

1  That was the contractual relationship and I believe it's a

2  higher percentage as to BlockFi Lending than it may be as to

3  vanilla BlockFi.

4          But, Your Honor, we do have a direct answer for that

5  and it's on record, and I'll refer the Court to the

6  supplemental certification, Paragraph 10.  And I can pull it up

7  on my screen, Judge.

8          THE COURT:  I have it in front of me.

9          MR. MAGALHAES:  Okay.

10          THE COURT:  But let's go through it.

11          MR. MAGALHAES:  So as we've articulated, Judge, the

12  10 million was a good faith estimation under the circumstances,

13  and now, as we say, we believe the record substantiates that.

14  The first theory of the potential calculation of damages --

15  and, Judge, let me say, I am mindful of the difficulty here,

16  which is one of the reasons why I expressly request estimation

17  proceedings.  And let me, if you'll allow me, Judge, a couple

18  moments just to wax here.  Claim litigations in bankruptcy are

19  a strange creature.

20          Like all contested matters, I think, Judge, they're

21  not quite full-blown litigations under Part 7 of the Rules.

22  They're not an adversary case.  But they're also not an

23  ordinary motion.  Judge, coming into this, we didn't know if it

24  was a one-stop shop, Judge, today's hearing, or if there was

25  going to be a Part 1 and Part 2.  And when I threw out the

60

1  request for estimation proceedings, I mean that literally,

2  Judge, right.  If the Court finds that there's, so to speak,

3  liability, then we would want a full opportunity to revisit the

4  damages aspect for the Court.  Because going into today, I

5  didn't know where the Court was.  I still don't.  I know Your

6  Honor has not issued anything.  This is just a contingent

7  discussion.

8           But we do have math set forth that me and

9  Mr. Van Tubergen worked through carefully that is set forth in

10  Paragraph 10 and in Exhibit CC.  And I don't want to stumble on

11  the record or have my client stumble on the record.  I'm

12  formally requesting estimation proceedings if Your Honor finds

13  liability to delve into these figures.  And, of course, again,

14  the light of day, to vet them and to ensure that they're

15  accurate.  We believe that they are.  That's Paragraph 10,

16  which is reflected by Exhibit CC.

17           Now, I'll note, Your Honor, there is one concern I

18  have with Exhibit CC.  And Mr. Van Tubergen, who is smart as a

19  whip, picked this up.  It has certain references to Line 8,

20  Line 9.  That's in the Excel file.  So after this hearing, what

21  I'm going to do is I'm going to email to chambers and to

22  opposing counsel copies of the raw Excel files.  That's as to

23  Paragraph 10, Exhibit CC.

24           We then, Your Honor, set forth a separate alternative

25  primary damages theory that's reflected by Paragraph 11, and

1  that speaks to, and I was very clear.  This is attorney-client,

2  but Mr. Van Tubergen will welcome me saying this.  I was very

3  clear that we need to figure out what was the non-repeating

4  collateral that was involved here, because you have refinanced

5  loans and so you can't just simply tabulate with all the

6  obvious, Judge.  You have to figure out what was original

7  collateral, and we tabulated that as 120.05 Bitcoin and

8  4,300.0618 ETH.

9         And we actually have a record, Your Honor.  Hold on

10  one second, let me verify this.  Because I know we put

11  something into the record.  Pardon me, Judge.  Give me all of

12  10 seconds here.

13         Okay.  Yeah, in Exhibit Y, Judge.  Exhibit Y -- there

14  was some debate over where the liquidation summary came from,

15  and I don't want to mischaracterize the reply from the debtors.

16  But I thought there was some kind of feigning ignorance to the

17  liquidation summary that was next to the claim in the first

18  instance.  And we proved in our surreply Exhibits Z and Y that

19  it actually came directly from BlockFi Lending's agents.

20         At the end of Exhibit Y, there's a chart that shows

21  all of the ETH sold and BTC sold by BlockFi Lending.  And so in

22  any event, in Paragraph 11 of the supplemental certification,

23  we come up with this alternative theory of valuating damages in

24  terms of, "but for these liquidations, how much did

25  Mr. Van Tubergen have?"  And we put a value as of January 8,

62

1   2024.

2          If the Court were to say what was the value of the

3   bankruptcy filing?  The value would be less, I believe, Judge,

4   but that's up to the Court, right.  Again, we're asking for

5   estimation proceedings, Your Honor.  That's up to the Court

6   what value you want to ascribe to it.  And then, Your Honor, we

7   also know that there's some other factors at play here.

8          In Paragraph 12 of the supplemental certification, we

9   note that we do believe double billing occurred because of the

10  finance charges issue.  The Court will either accept that

11  argument or reject that argument.  If the Court accepts that

12  argument, then we tabulate the double billing as to the LSAs

13  that were implicated at 129,703.13.  Here though, Judge, I have

14  to note, and again, this speaks to, I don't know if Your Honor

15  wants to close up shop today or if he's going to keep going.

16         If Your Honor were to accept the finance charges

17  tabulation issue, then there is the matter that all of his LSAs

18  would have been affected.  And to date, he's not been able to

19  get the payment history on those other LSAs.  We document that

20  in terms of our recent efforts to go to Scratch to get those

21  account records.  And so, Your Honor, just simply stated, if

22  the Court were to accept the finance charges tabulation

23  argument, then we would want to wait for the Scratch subpoena

24  to come current, to review those account records, and tabulate

25  potential double billing as to all the LSAs.

1          Lastly, Your Honor, because we believe that we have

2   proffered the blockchain pricing data from Gemini, and key

3   point here, Judge, it's in the papers.  I want to articulate

4   it.  The liquidation summary that came from BlockFi Lending,

5   again, Exhibit Y and Z, we show the chain of custody that it

6   did actually come from BlockFi Lending.  That has time stamps.

7   The Gemini pricing data that we procured, and again, the

8   CryptoDownload company is just one company that services and

9   can obtain information from the blockchain.  The Court can

10  independently verify if it so seeks.  We believe that we have

11  verified it.

12          But that data was keyed off of the time stamps on the

13  liquidation summary.  I just want to make that point because

14  there was some discussion by Ms. Marquez that, well, you really

15  got to look at the low point and the date.

16          We went to the price at the time stamps.  We thought

17  there was no better figure than what was it actually worth at

18  the time of liquidation on the blockchain from Gemini.  If you

19  utilize that, then as we calculate in Paragraph 13 of the

20  supplemental certification, that's backed up by the final

21  column of Exhibit AA, the collateral loss breakdown.  We

22  tabulate the below fair market value sell-offs of the

23  collateral at 629,000 approximately.

24          With all that said, Judge, we believe that the

25  original amount was a good faith estimate.  We believe that

64

1  it's backed by either of Mr. Van Tubergen's primary damages

2  theories as reflected by, or summarized by Paragraphs 10 and 11

3  of his supplemental certification.  And throughout the analyses

4  that we submitted, we believe there's other factors the Court

5  could look at, other data points rather, in the course of

6  estimation proceedings.

7          THE COURT:  All right.  Thank you.

8          Then I have, at this juncture, no further questions.

9  So let's proceed to closings.

10         Ms. Furness.  And thank you, Mr. Van Tubergen.

11         MS. FURNESS:  Thank you, Your Honor.

12         To start, we don't believe there's a triable issue of

13  fact here with all respect to Mr. Van Tubergen.  The documents

14  and testimony demonstrate there is no claim.

15         Ms. Marquez's testimony, the documents before the

16  Court show that BlockFi absolutely complied with the LSA.  When

17  a loan reaches 80 percent, BlockFi is entitled to liquidate.

18  Period.  No question.  It is entitled to liquidate the

19  collateral under -- well, all but one.  There is one loan that

20  we've been discussing that's a 90 percent.  That 90 percent

21  trigger was hit, and it also had the collateral liquidated.

22         To be clear, Your Honor, I know you have looked

23  through all of these things.  I just want to point to a couple

24  of things that are already in the record.  One is that

25  Mr. Van Tubergen, said that, again, we've got two form-to

1  contrary claims.  One is that ETH is missing because he did

2  some sort of calculation related to a 60 percent loan-to-value.

3  And the other, again, sworn-to alleged fact is that same loan

4  was predatory because it required an initial 90 percent loan-

5  to-value.  You cannot have both of those at the same time.

6       Your Honor, I would point you to, first of all,

7  Exhibit L and the LSA itself.  Again, this is Exhibit L from

8  Mr. Van Tubergen's response, which is Docket 1496-13.  There

9  was some discussion and also in the pleadings about the

10  "supplemental collateral."  The loan documents themselves and

11  those emails to Mr. Van Tubergen by BlockFi, the collateral has

12  to be the same type of collateral on the loan.  Period.  So he

13  talks about Chainlink.  He talked about Bit.  He talked about

14  different types of collateral, and that's not proper under the

15  loans.

16       And the collateral had to be posted to the specific

17  account identified in the LSA.  Mr. Van Tubergen has not put

18  forth any effort, or any evidence that demonstrates that the

19  collateral was actually posted to that account.

20       Another point I just want to focus Your Honor on is

21  Exhibit JJ to Mr. Van Tubergen's surreply, which is Docket

22  Number 2039-13.  That is an email on its face dated May 19,

23  2021, at 8:39 a.m. that his loan had reached an LTV of greater

24  than 80 percent.

25       Again, Your Honor, under the LSA, at the moment a

1   loan reaches that trigger point, then the collateral may be

2   liquidated.  Period.  Even if it somehow bounces under, bounces

3   above, and that's what you saw, Your Honor, on the Excel that

4   Ms. Marquez talked about.  It would go up and down, but once

5   that 80 percent is hit, BlockFi has the legal right under the

6   LSA to liquidate the collateral.

7         I also would like Your Honor to particularly focus on

8   Exhibit C, as in "cat," to BlockFi's reply, which is at

9   Docket 1963-3.  That's the email that lays out this custom

10   loan.  It goes through point by point exactly what would

11   happen.

12         One, the new loan would pay off the old loan at a

13   price of 2.8 million.  Two, BlockFi would purchase ETH and the

14   value of that ETH would be added to the loan amount.  And it

15   specifically says that the client, Mr. Van Tubergen,

16   understands that the starting loan-to-value will immediately

17   put the client in risk of margin territory estimated at

18   approximately 79 percent LTV.

19         One, Mr. Van Tubergen expressly agreed to that.  He

20   says below is confirmed, except for the date.  He expressly

21   agreed to it.

22         And, two, again, this demonstrates this was not

23   initiated with a 60 percent loan-to-value.  It was initiated

24   with almost 80 percent loan-to-value.  There is no missing ETH.

25   Period.

1        Finally, Your Honor, as to the damages, we have had

2   some difficulty, admittedly, trying to make heads or tails of

3   the damages alleged by Mr. Van Tubergen.  But I want to be

4   clear that when these loans were initiated, for example, the

5   first loan, Loan 1, between the time it was initiated and the

6   first liquidation a month and a half later, there was a 43

7   percent drop in the value of Bitcoin.  This is what happened.

8        So what Mr. Van Tubergen is asking for specifically

9   in the paragraph that was pointed to earlier is the value of

10  the collateral as of "originating the LSA."  So what he is

11  asking for is us all to go back in time and for him to get the

12  value as when the loan was originated.  And, again, the numbers

13  of the deltas.  So, for example, that 7a5, that's Loan Number 3

14  that we've been talking about, the liquidation occurred about a

15  week after entry and the price, or the value had dropped by 35

16  percent.

17       At that point, just as we see in the email, as he was

18  warned, the loan-to-value hit 91 percent.  Your Honor, that is

19  the reality of what happened in this case.  Again,

20  Mr. Van Tubergen refinanced his loan based on collateral and

21  pulled out cash.  That worked as the collateral pricing was

22  going up, but it didn't.  The price of value of Bitcoin -- the

23  value of ETH dropped.

24       The damages that he is asking for are related to the

25  original value.  And, first of all, he is not entitled to any

68

1   damages.  BlockFi completely complied with the LSA.  One point,

2   again, I just want Your Honor to be aware of, this

3   CryptoDataDownload, as you know, it's pricing data.

4   Ms. Marquez had never heard of it, and then she's certainly

5   more versed in this than I could ever be.

6          I would also like the Court to note that the data

7   that you have been provided does not include volume.  I've

8   looked at the volume.  The volume for these minutes is teeny

9   tiny.  And, Your Honor, if you would like to see that,

10  Mr. Van Tubergen's Exhibit NN, they keep quoting this as

11  blockchain pricing data.  They demonstrate that the volume on

12  that Exhibit NN to his certification, which is 2039-17, the

13  volumes there, and that's an ETH chart, are tiny.  For example,

14  .39.

15         And what we're talking about here on the sale, for

16  example, of ETH, are 1565.  As, Your Honor, I'm 100 percent

17  confident understands, when you're selling 1565 ETH as opposed

18  to .39 ETH, there may be price differentials.  So, this

19  constant insistence on, again, really an unauthenticated data

20  source, we've got nothing here that would authenticate this

21  information.  But nonetheless, the LSA itself says that BlockFi

22  can reasonably rely on other data points.  Market value

23  determined by BlockFi in its reasonable discretion.  That's

24  the language in the LSA.

25         So, finally in closing, Your Honor, again, we do not

1 believe there is any triable issue with fact.  We believe Your

2 Honor should and could rule today.  The undisputed, frankly,

3 evidence other than a bunch of conjecture and unauthenticated

4 data is that BlockFi properly followed the LSA for each of

5 these liquidations and Mr. Van Tubergen is entitled to.  Again,

6 we would request, the claim against Lending, that there is no

7 claim against Lending and that the claim against ETH for the

8 balance of his BIA of $19.07 is what this Court entered on his

9 claim.

10         THE COURT:  All right.  Thank you, Ms. Furness.

11         Mr. Magalhaes.

12         MR. MAGALHAES:  Thank you, Your Honor.

13         So, obviously, we see the world completely different,

14 Judge, and I don't know how anybody could look at this and be

15 okay with what transpired as to my client Mr. Van Tubergen's

16 property.  There is a lot more here than just conjecture.  And

17 whatever they say about the Gemini data, the Court -- we

18 believe we have authenticated it, Judge, because this

19 CryptoDownload.com it's a company and that's blockchain data.

20 So, to the extent -- it's not Exhibit NN, it's Exhibit DD.

21         Your Honor, to the extent that the Court has any

22 doubts as to the authenticity of Exhibit DD, then pursuant to

23 the Bankruptcy Rules and, specifically, the rules entitling

24 estimation proceedings, I would ask the Court to go on the

25 blockchain and verify that itself because I think it's kind of

1  a -- and I don't mean this in a bad way, Ms. Furness, apology.

2  I think it's a cheap shot just to say, oh, who is this company.

3  I mean, there's a lot of companies that I don't know the name

4  of, Judge.  It doesn't mean that it's not a legitimate company.

5  We provide a link to their website.

6          And, again, the point is no one needs to speculate.

7  It's blockchain data with timestamps matching the liquidation

8  points in time that were received from BlockFi Lending's

9  agents.  So, as to the missing ETH, Your Honor, it's an

10 interesting way that -- because Ms. Furness is obviously a

11 skilled advocate and it's an interesting way that she's trying

12 to approach this.

13         She's trying to put the burden on us on the backend

14 to substantiate why it was 4000 plus ETH instead of the low

15 3000s, because, again, we argue that it's missing 819.  The LSA

16 stated 4200, Judge.  So the burden as to that issue was always

17 on them because we're arguing that the LSA meant what it said.

18 In a negotiation email, parole evidence, when you look at

19 everything, doesn't trump the face of the LSA combined with the

20 mathematics submitted by Mr. Van Tubergen.

21         And one cherry-picked statement from a prior server

22 about how it was 90 percent.  Let's be clear about what he

23 meant.  And, Your Honor, like I'm not testifying for

24 Mr. Van Tubergen.  Again, Your Honor can review the

25 certifications.

1    The point was that rather than reversing the wrongful

2 liquidation of 558, because we say it was premature.  They

3 admitted it by offering a reinstatement loan.  That was that

4 whole exercise.  But rather than simply reverse it, they forced

5 him into a redlined LSA.  That's what we're trying to save it.

6 The cherry-picked, the 90 percent level say, well, how could it

7 be 4200?  It's 4200, Judge.  I'm sorry for getting excited

8 because that's what the LSA said.

9    And parole evidence doesn't trump the LSA when you

10 combine the LSA with the mathematics submitted by

11 Mr. Van Tubergen, and that speaks for itself, Judge.  It's in

12 the sub cert.  It's in the surreply.  Debtors are wrong on

13 this.

14    As a minimum position of damages, my client is owed

15 820 ETH.  And let's get back to the totality of what exactly

16 was going on with reinstatement loan.  When you look at that

17 combined with other indicia of predatory loans, and I kind of

18 backed off this in my opening statement, Judge.  But I said the

19 totality of circumstances evidence that Mr. Van Tubergen was

20 effectively railroaded.

21    In his prior cert, in his supplemental cert, and

22 throughout, we've documented, I believe, Judge, and you're

23 right, it's up to the Court, obviously, lack of access and

24 control over his accounts, constant pressure to refinance,

25 including express statements urging him to refinance along the

1  lines of myriad financial advice, inconsistent standards and

2  protocols, understaffed customer support, the inability to make

3  changes off hours yet they reserve the right to liquidate off

4  hours, myriad technical system errors.  That's in the cert.

5        And so when you combine that with the fact that they

6  did not give him an out when they unequivocally prematurely

7  liquidated 558, that's what we're referring to when we speak to

8  the 90 percent red line reinstatement loan.  They should have

9  just reversed the liquidation.  And, in fact, Your Honor, I

10  found these nuggets from the prior cert that I'm glad I recall.

11        They had the ability to reverse and they chose not

12  to.  Specifically, Your Honor, we previously, in the original

13  cert, annexed an Exhibit N, not NN, single N, which was a

14  March 13, 2020, email from Agent 2 admitting that the

15  liquidation in connection with a separate loan that we haven't

16  spoken about, but it's so interesting how it becomes comes

17  relevant.  It was loan number 24f055b9.

18        Essentially, he indicated that it could be reversed.

19  And lo and behold, it was reversed.  And we submitted some

20  additional emails, specifically Exhibit O and Exhibit R, around

21  that time, when they did execute an erroneous liquidation and

22  they reversed it.  Yet in 558, when they liquidate, and again,

23  this speaks to Ms. Marquez's point that we always wanted to

24  liquidate as least as possible.  I just don't know how we can

25  take that seriously, because with 558, this is our math, Judge,

73

1  we implore the Court, respectfully implore, right, got to be

2  careful of that word, but we respectfully implore the Court to

3  look at it in connection with estimation proceedings.

4          On May 19, 2021, at 3:39 p.m., and, again, we've got

5  the timestamp Gemini data that we asked the Court to verify on

6  blockchain, they liquidated 47.67 percent of his collateral.

7  Using their figures of USD percent, this is a USD percent of

8  collateral sold versus loan amount.  This is per BlockFi's

9  unknown valuation.  Side note, they're taking shots at our

10  valuation.  They've offered none.  It's not on the record.  To

11  date, still not on the record.  We knew we were going to have

12  this hearing.  No specific metrics were provided.  That ratio

13  was 56.2 percent.

14          Using Gemini data, the percent of collateral sold

15  versus the loan balance was 64.6 percent that was executed on

16  May 19th, and 67.5 percent was executed on May 20th.  And this

17  is the loan that they implicitly admit to prematurely

18  liquidating by offering a reinstatement loan.  So, these

19  arguments to me, they don't add up, Judge.  But, obviously, I'm

20  not the jurist here.

21          As to the supplemental collateral, Judge, my client

22  worked with an agent of BlockFi Lending to post it and it was

23  posted to a BlockFi account, acknowledged by Agent 3, and, Your

24  Honor, Ms. Furness said that it had to be the same type of

25  collateral.  She mentioned, oh, there was some kind of

74

1  Chainlink.  Yes, there was chainlink.  There was USD coin,

2  which tracks the United States dollar, but there was also ETH

3  in the surplus collateral.

4          And the Loan Number 55820a5, in connection with which

5  the surplus collateral was posted, was a loan where the

6  collateral was ETH.  And specifically in terms of how much

7  surplus collateral was posted, it was, Your Honor -- bear with

8  me.  I know I have this in a footnote here.  There was two

9  traunches of ETH placed in the supplemental collateral and this

10 is in the supplemental certification and in our surreply.

11         First, there was over 150 ETH and then there was 132

12 ETH.  And no matter how you slice it and dice it, just round

13 numbers, Judge, when we're talking ETH, we're always talking

14 something, 1500 to 2000 plus.  From then until the years have

15 passed.  So that's not inconsequential.  That surplus

16 collateral, had it been tapped into, would have obviated even

17 the LTV trigger, let alone the max LTV.

18         In conclusion, Your Honor, we ask the Court to,

19 again, carefully scrutinize our documents.  We welcome that.

20 Carefully scrutinize what was placed on the record.  And, Your

21 Honor, we know that we were dealing with an asset that was

22 going up and down.  That's a red herring though.  Every asset

23 goes up and down in value.  In 2024, the question is going to

24 be perhaps not about crypto, but perhaps about loans that are

25 backstopped by commercial properties like Your Honor sees

1    outside my window.

2          The question is not whether they fluctuate in value.

3    The question is whether or not the secured lender operated

4    reasonably in connection with the governing documents.  And to

5    that point, Your Honor, we invoked Michigan law in terms of

6    breach of contract.  It statutorily codified applied covenant

7    of good faith and fair dealing.  It's the doctrines of

8    impossibility and unconscionability to frame an argument that

9    no reasonable reading of the LSA would allow them to do what

10   they did, that the notion of a reset LTV is a farce, that the

11   parties' expectations were breached.

12         The words that came out and the written messages that

13   came out from their agents are evidence and they have to count

14   for something.  They have made no arguments that these folks

15   did not have authority.  That has not been made.  They were

16   agents and employees of BlockFi Lending.  And, Your Honor, we

17   at least offered a methodology to our evaluations.  They did

18   not.

19         Therefore, Your Honor, what we have here is not a

20   case of the markets going down.  We know they went down a

21   little bit, Judge.  They've recovered since, by the way.  I

22   believe the Court can take judicial notice of this or do its

23   own due diligence in connection with estimation proceedings.

24   The value of ETH is up vis-a-vis these points in time.

25         What we have is a lender that abused its rights under

1  the LSA, abused the parties' expectations, and in some respects

2  did engage in predatory lending.  That's our argument, Your

3  Honor.

4         Thank you for the Court's time.  I thank everyone for

5  their patience.  I know we have some folks watching.  Sorry for

6  going long.

7         Thank you.

8         THE COURT:  Thank you, Mr. Magalhaes.

9         I do want to delve a little bit further.  I'm going

10  to turn to Ms. Furness.

11        The issue that was raised about the posting of

12  additional collateral, and I don't believe there's a dispute

13  that additional collateral was available in other accounts held

14  by Mr. Van Tubergen, and I'm sorry for mispronouncing the name.

15  I'm butchering the name, Mr. Van Tubergen.  Did the LSAs have a

16  methodology or mechanism that was required for posting

17  additional collateral?  How it was to be posted?  What accounts

18  it was supposed to be posted in?  What ability did the debtor

19  have to tap into other non-loan accounts, et cetera?

20        MS. FURNESS:  Your Honor, under the LSA, it

21  specifically says borrows in Section 4 of the LSA, and for Your

22  Honor's information, I am looking at Exhibit B to

23  Mr. Van Tubergen's response, which relates to BlockFi

24  Loan 558207a5.  It specifically says under 4(d), the "Borrower

25  shall have transferred the Collateral into Lender's digital

1  depository account at Gemini Trust Company," then it's defined,

2  "deposit address blank."  So there is, on the filed version

3  with the Court, that deposit address is redacted.  But on the

4  actual document itself, it has a bunch of letters and numbers,

5  which indicates, and you can go look at it on the blockchain, a

6  specific address.

7          So under the LSA, under the strict terms of the LSA,

8  absolutely.  It requires that the collateral, first of all, be

9  in that account.  And then if, for example, it discusses "at

10 any time," this is, again, Section 7 of the same LSA, "the

11 market value of the Collateral in the Depository Account," and

12 it discusses how to do that.  And then if there is a trigger

13 event that we've discussed with the 72-hour notice period, the

14 borrower shall promptly "deposit additional Collateral into the

15 Depository Account."

16         So, yes, Your Honor, it was required to be in the

17 account.  But I want to move it even separate and apart from

18 that.  One, once the account reaches 80 percent, BlockFi had

19 the right to liquidate collateral.  Two, even if you include

20 this extra collateral, the account was still out of compliance

21 with the loan-to-value ratio.

22         THE COURT:  All right.

23         Mr. Magalhaes, is there anything you want to respond

24 to?

25         MR. MAGALHAES:  Yeah, absolutely, Judge.

1          Exhibit EE speaks for itself, Your Honor.  And my

2     client is certified and it was backed up by communications from

3     a BlockFi Lending agent that he posted additional collateral as

4     directed.  And they were aware.  Agent 3 acknowledged it and

5     Agent 3 told him he was in safe territory.  And the next day,

6     Agent 3 told him everything was okay.  And by Agent 3, I mean

7     BlockFi Lending, if you obviously catch my meaning, Judge.

8          THE COURT:  Yes.

9          All right.  Thank you.

10         Is there anything else either counsel wishes to put

11    before the Court or include in the record?

12                    (No audible response)

13         THE COURT:  So here's where --

14         UNIDENTIFIED SPEAKER:  Yes, Your Honor.

15         THE COURT:  Thank you.  Thank you both.  Thank you

16    for facilitating this hearing in this manner as a virtual

17    hearing.

18         Here's where we're going.  It is not my intention to

19    do an estimation hearing.  I do not see a purpose under the

20    Code or the Rules for an estimation hearing per se.  First

21    step, we're past confirmation of a plan.  We're at the

22    distribution stages, or the anticipated distribution stages.

23    We need to resolve claims.

24         Now, in doing so, the first step will be to determine

25    whether or not claimant has met its burden with respect to

1　establishing liability on a claim.  In other words, in this

2　situation, is the claimant entitled to a recovery greater than

3　the $19 and change that has been put forward by the wind-down

4　debtor based on the debtor's books and records?

5　　　　　If the Court is to determine that there is a basis

6　for a claim, that there is liability over and above the $19,

7　and the Court requires a further hearing to quantify the claim,

8　the Court will schedule further proceedings and we'll have a

9　conference call and we'll discuss what's required.  If, based

10　on this record, the Court can quantify the claim, the Court

11　will do so.  But first, there has to be a determination that

12　there is liability on a claim.  In other words, put simply, the

13　debtor's actions in administering loans give rise to liability

14　over and above the $19 that's asserted.

15　　　　　So I'm going to reserve, because I want to take,

16　obviously, a further look at all of the exhibits and the

17　supplemental certifications.  I will first determine whether or

18　not I believe the debtor, I'm sorry, the claimant has met its

19　burden by a preponderance of evidence to establish a claim and

20　whether or not the record, which is closed at this juncture, is

21　sufficient in the Court's view to quantify the claim.

22　　　　　If the Court does not believe it has the capacity to

23　do so, and if there is a claim, the Court will contact the

24　parties to determine the next steps in continued hearings.

25　　　　　I urge the parties not to spend more dollars now on

1  discovery and litigation because no matter what you anticipate

2  BlockFi Lending is paying, it's not going to be enough to

3  continue to spend the actual dollars compared to the fractions

4  of dollars that will be paid.  I also urge the parties to

5  continue discussions as to an amicable resolution, a reasonable

6  resolution, in advance of my making a determination or ruling.

7           I certainly am going to turn my attention to this

8  matter sooner than later because I want to facilitate

9  distributions, so there's not a lot of time.  But honestly, I

10 think we're all sophisticated and experienced enough in

11 Chapter 11 practices to understand when it makes sense to

12 negotiate an amicable resolution rather than run the risk of a

13 judicial determination one way or the other.  So with that, I'm

14 going to mark this matter on reserve subject to reopening for

15 continued damage hearings, if warranted.

16           Any questions or concerns?

17           MR. MAGALHAES:  No, Your Honor.

18           THE COURT:  All right.

19           And everybody take care.  Be well.

20           Thank you.

21           MR. MAGALHAES:  Thank you, Your Honor.

22           MR. STOLZ:  Thank you, Judge.

23           MS. FURNESS:  Thank you.

24           MR. MAGALHAES:  Take care, Ms. Furness.

25           Have a nice day, everyone.

1          MS. FURNESS:  Thank you.

2          THE COURT:  All right.  And we are done.

3             (Proceedings concluded at 12:34 p.m.)

4                    * * * * *

### C E R T I F I C A T I O N

We, DIPTI PATEL and KAREN WATSON, court-approved

transcribers, hereby certify that the foregoing is a correct

transcript from the official electronic sound recording of the

proceedings in the above-entitled matter, and to the best of

our ability.


/s/ Dipti Patel
DIPTI PATEL, AAERT CET-997


/s/ Karen Watson
KAREN WATSON, AAERT CET-1039      DATE:   January 18, 2024

J&J COURT TRANSCRIBERS, INC.