NOT FOR PUBLICATION

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY **Caption in Compliance with D.N.J. LBR 9004-2(c)** | Case No. 22-19361 (MBK) |
|---|---|
| In Re:     BlockFi, Inc.,                 Debtors | Hearing Date: January 16, 2024 Chapter 11 Judge: Michael B. Kaplan |

**MEMORANDUM DECISION**

This matter comes before the Court upon Mr. Van Tubergen's ("Van Tubergen") response (ECF No. 1496) to Debtor BlockFi, Inc.'s ("BlockFi") Seventh Omnibus Objection to Certain Claims (ECF No. 1311). In his submission, Van Tubergen asks this Court to overrule BlockFi's objection to his claims. BlockFi responded to Van Tubergen's submission and the parties briefed the issue. The Court fully considered the parties' submissions, as well as the arguments, evidence and testimony presented during the hearing on January 16, 2024. For the reasons set forth below, the Court overrules Van Tubergen's opposition and sustains BlockFi's claim objection. Van Tubergen's claim is reduced to reflect Van Tubergen's true claim amount set forth in BlockFi's books and records in the amount of $19.07.

**I.**   **Jurisdiction**

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The claims review process is a statutory core proceeding and this Court has constitutional authority to enter a final

order. 28 U.S.C. § 157(b)(2)(B). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The following constitutes the Court's finding of fact pursuant to FED. R. BANKR. P. 7052.[1]

## II. Background and Procedural History

The Court limits its recitation of the factual and procedural history of this case to the information pertinent to the matter being presently decided. Beginning on April 17, 2019, BlockFi Lending LLC, and Van Tubergen entered a prepetition lending relationship. *See Wind Down Debtors' Reply to Response to Debtors' Seventh Omnibus Objection to Claim No. 7233 of John V. Van Tubergen Jr.* ("Wind Down Debtors' Reply"), Exhibit I, Flori Marquez Cert., ¶ 5, ECF No. 1963-10. The lending relationship resulted in the issuance of a series of loans (the "Loans") to Van Tubergen. *Id.* Van Tubergen secured the loans by posting collateral in the form of Bitcoin ("BTC") and Etherium ("ETH"), collectively referred to as (the "Collateral"). *See Wind Down Debtors' Reply* ¶¶ 1, 14, ECF No. 1963. Since then, Van Tubergen and BlockFi have entered into thirty-seven (37) separate loan agreements. *Id.* Each of the loans had a one-year term and called for interest payments only until the loan reached maturity. *Id.*

The Loan Service Agreements ("LSA") functioned as the controlling document for all issued loans. *Id.* The LSAs granted BlockFi a security interest in, among other things, Van Tubergen's BTC and ETH. *Id.* The LSAs required Van Tubergen to maintain a Loan to Value ("LTV") ratio where the outstanding principal balance of the loan was less than or equal to a certain percentage of the market value of the collateral. *Id.* at ¶ 1. Significantly, the LSAs established a specific LTV ratio requirement that authorized BlockFi to liquidate the Collateral with seventy-two (72) hours' notice if the LTV ratio of the Collateral rose above 70% ("Triggering Point").[2] *See JVT Cert.*,

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[2] With the exception of Loan No. 1a118e43, which had an 80% Triggering Point.

Exhibit B ¶ 7(a), ECF No. 1496-3. Once BlockFi gave such notice, the LSAs provided that Van Tubergen could avoid liquidation by depositing additional collateral into his account to re-establish an LTV of 50-70%. *Id.* The LSAs additionally gave BlockFi the right to immediately liquidate the loan, without notice, if the LTV ratio rose above 80%. *Id.*

BlockFi's borrowers received separate email notifications when the LTV on their loans approached or surpassed the Triggering Point. *See Flori Marquez Cert*. ¶ 6, ECF No. 1963-10. In addition, BlockFi's borrowers received separate email notifications when BlockFi sold collateral pursuant to the LSA. *Id.* When the LTVs for each of Van Tubergen's respective loans reached their Triggering Points, BlockFi notified Van Tubergen that—because the price of BTC and ETH had dropped—he was required to post additional collateral to avoid liquidation. *See Wind Down Debtors' Reply* ¶¶ 1, 14, ECF No. 1963. Van Tubergen did not timely reply to BlockFi's margin calls and BlockFi liquidated the Collateral to bring the loans into compliance with their required LTV ratios.

After BlockFi filed for bankruptcy, Van Tubergen filed proof of claim number 7233 (the "JVT Claim") on March 15, 2023. Van Tubergen made the claim against the Debtor entity, BlockFi Lending LLC in the amount of $10 million dollars. In the proof of claim, Van Tubergen describes the basis of his claim as "my collateral that is owed to me from my loans due to false force liquidations from BlockFi." *JVT Cert.,* Ex. A at 3, ECF No. 1496-2. BlockFi filed its Seventh Omnibus Claim Objection on August 3, 2023, seeking—in relevant part—to modify the JVT Claim to correctly reflect BlockFi's books and records. Van Tubergen then filed a response to the Debtors' Seventh Omnibus Objection that is the subject of the instant Opinion.

### III. Discussion

Initially, a claimant must allege facts sufficient to support their claim. FED. R. BANKR. P. 3001(f). At the outset, a properly filed proof of claim is prima facie evidence of the validity and the amount of the claim. *Id.* The burden then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *see also In re Saha,* No. 22-15419, 2023 WL 2144437, at *3 (Bankr. D.N.J. Feb. 21, 2023). To successfully object, the objector must produce evidence "which if believed would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Id.* at 174. Once an objector produces sufficient evidence to negate the validity of one or more of the sworn facts in the proof of claim, the burden shifts back to the claimant. *Id.* The claimant then bears the ultimate burden of establishing a valid claim by a preponderance of the evidence. *Id.* Here, BlockFi produced sufficient evidence in its Seventh Omnibus Objection to negate the prima facie validity of the JVT Claim. The burden now shifts back to Van Tubergen to show that his claim is valid by a preponderance of the evidence. Van Tubergen fails to meet this standard.

The instant dispute concerns the LSAs at issue, which individually function as contracts. When the terms of a contract are clear and unambiguous, the Court will interpret such terms according to their ordinary and usual meaning. *In re Hosp. Acquisition LLC*, 625 B.R. 835, 841 (Bankr. D. Del. 2020). In construing the terms of a contract, the Court should look to the language of the contract. *Id.* Contracts should be construed according to their plain and ordinary terms. and the writing as a rule should be enforced according to its terms. *Air Express Int'l v. LOG-NET, Inc.,* 2015 WL 404494, at *3 (D.N.J. Jan. 29, 2015) (quoting *Mollo v. Passaic Valley Sewerage Comm'rs,* No. 07–1655, 2009 WL 5216976, at *16 (D.N.J. Dec. 30, 2009), aff'd, 406 F. App'x 664

4

(3d Cir. 2011)). Van Tubergen raises multiple arguments in support of his position pursuant to the terms of the LSA. The Court will address each in turn.

### A. Finance Charges under the LSA

Van Tubergen first asserts that BlockFi "double dipped" in applying its Finance Charge on the subject loans by deducting from the loan proceeds the Finance Charges at the closing of the loan, but including the Finance Charge in the loan balances to be paid at maturity. Indeed, pursuant to the LSAs, the Lender was authorized to "deduct the Fee from the Loan proceeds and disburse the remaining Loan proceeds to the Borrower *on the Closing Date*." *See JVT Cert.,* Exhibit B, Section 1, ECF No. 1963-2 (emphasis added). Notwithstanding the LSA's terms, the evidence establishes that the Finance Charges were not deducted from the loan proceeds at closing. Nevertheless, the Court finds there was no attempt to double charge Van Tubergen. As seen on the Truth and Lending Statement attached to the LSAs, the Finance Charge only appears once. *See JVT Cert.*, Exhibit B, ECF No. 1963-2. In addition, this Court finds Ms. Flori Marquez's testimony persuasive. Ms. Marquez clarified on the record that: (1) BlockFi would add the Finance Charge to the loan balance; (2) it was common practice to add the Finance Charge in this manner, and (3) this was in fact what BlockFi deemed its customers would prefer so that they would receive at closing the loan amount requested.

To the extent Van Tubergen suggests that BlockFi should have deducted the Finance Charge from the amount financed (the loan amount), the Court observes practical issues with this approach. For instance, if the Finance Charge were deducted from the loan amount, such deduction would result in borrowers like Van Tubergen receiving in fact *smaller loans* than the loans for which they had applied. For example, Loan 250568f4 lists a loan amount of $1,856,300.00 and a Finance Charge of $181,289.25. *See JVT Response to Debtors' Seventh Omnibus Objection* ("JVT

Response")*.,* Ex. D at 17, ECF No. 1496-5. If the Finance Charge were "backed out of" (or deducted from) the amount financed as Van Tubergen suggests it should have been, the amount of the loan would be reduced to $1,675,010.75, which is less than the parties contemplated. *See JVT Sur-Reply* ¶6, ECF No. 2039. And—because BlockFi calculated the Finance Charge based on the total amount of the loan—a smaller loan amount would impact the precise amount of the Finance Charge and any corresponding LTV calculation likewise would be incorrect.

Notwithstanding considerable effort, the Court is unable to make sense of Van Tubergen's argument regarding the Finance Charge and its placement in the Loan Statement. He does not and cannot contest that the LSA clearly reflects that the amount financed remains unchanged and that the Finance Charge only appears once. *JVT Sur-Reply* ¶6, ECF No. 2039. Van Tubergen has failed to offer any evidence, yet alone establish by a preponderance of the evidence, that BlockFi recovered the Finance Charge on any loan more than once. As a result, the Court determines that BlockFi's inclusion of the Finance Charge in the loan balances payable at maturity did not result in "double-dipping" as Van Tubergen alleges.

Lastly, Van Tubergen's efforts to categorize the Finance Charge as "interest" under Appendix A of the LSA are without merit. Appendix A of the LSAs references in Part I, "interest" and explains how said interest can be affected by a borrower's residency. *See JVT Response,* Ex. B 17, ECF No. 1496-3. However, this Court looks to the plain terms of the LSA and concludes that the Finance Charge is not "interest" and is more appropriately categorized as an "applicable fee." The LSA clearly outlines that upon the final maturity date, the borrower agrees to pay the entire principal amount "which is inclusive of any applicable fee." *Id.*

While BlockFi offers calculations and a comprehensive explanation to support its reasoning for contesting Van Tubergen's claim, successfully shifting the burden back to Van

6

Tubergen, Van Tubergen offers no explanation for his method of calculation and fails to demonstrate to this Court by a preponderance of the evidence that BlockFi improperly applied the Finance Charge, or that he is entitled to any recovery.

### B. The Correct LTV Calculation

Next, Van Tubergen argues that BlockFi improperly liquidated his Collateral because BlockFi erroneously calculated the LTV. In addressing this argument, the Court looks to the LSAs and determines that BlockFi applied an acceptable LTV calculation method to the subject loans. BlockFi employed the market value of the Collateral to determine the proper LTV. The LSAs define market value as either the "product of the amount of the collateral times the last trade price for that type of collateral on the Gemini website *or the market value determined by BlockFi in its reasonable discretion*." *See JVT Reply*, Exhibit B, Section 7, ECF No. 1496-3 (emphasis added). Section 7 of the LSA further states that "Borrower agrees that for the purposes of calculating the Collateral Market Value, Lender may take into account or disregard, *at its sole discretion* the value of any new cryptocurrency held in the Depository Account." *Id.* (emphasis added). Based on the plain language of the LSAs, a determination as to the market value of Van Tubergen's Collateral was left to BlockFi in its own reasonable discretion. Ms. Marquez' testimony clarified that, in light of the significant price swings for digital currency during any given day, BlockFi applied the lowest price point for each digital asset for purposes of valuation and liquidation.

In support of his argument, Van Tubergen offers an alternative method of calculation for collateral market value and the LTV, in which he takes an average of price points based on time stamps from Gemini's database. *See JVT Supplemental Cert.* ¶ 5, ECF No. 2039-1. However, this Court is not inclined to adopt Van Tubergen's calculation, given the discretion the LSAs grant BlockFi to choose the LTV formula calculation. Van Tubergen offers no explanation as to why

BlockFi was obligated to utilize his desired methodology, which calculates values based upon an average of the price points on the liquidation dates, as opposed to a methodology that BlockFi deemed appropriate in its reasonable discretion—something it was explicitly permitted to do pursuant to the terms of the LSA. In its pleadings and testimony, BlockFi explained the basis for its calculations. Nothing in the record suggests that BlockFi's methodology was unreasonable. Accordingly, Van Tubergen fails to establish by a preponderance of the evidence that BlockFi miscalculated the LTV and that BlockFi improperly liquidated his Collateral.

The Court also rejects Van Tubergen's argument that Loan No. 558207a5 was improperly liquidated due to BlockFi's failure to factor in certain "Surplus Collateral" when calculating the LTV. Specifically, Van Tubergen maintains that—after receiving a warning that his loan was in danger of a margin call—he posted additional collateral ("Surplus Collateral") to avoid liquidation. He further asserts that he received confirmation from a BlockFi representative that he was in "safe territory"—meaning, not in danger of liquidation. *JVT Sur-Reply* ¶4(a), ECF No. 2039. As a result, Van Tubergen states he "fully and fairly expected that the [Surplus Collateral] would be tapped-into and swept-over as needed [to avoid liquidation of Loan No. 558207a5]." *Id.* Van Tubergen contends that, despite taking these precautions and receiving assurances from BlockFi staff, his Collateral was improperly liquidated.

Again, the Court has reviewed the relevant documents. Pursuant to the LSA, when a Triggering Point is reached, a borrower must "deposit additional collateral into the *Depository Account*" to avoid liquidation. *See JVT Cert.*, Exhibit B, Section 7(a), ECF No. 1496-3 (emphasis added). In addition, the LSA indicates that "any additional collateral posted by the Borrower pursuant to this Section 7 must be based in the same kind of cryptocurrency as the original Collateral." *Id*. Here, the record demonstrates that Van Tubergen had additional funds available as

8

evidenced by several Trade Execution Confirmations. *See JVT Supp. Cert.*, Exhibit KK, ECF No. 2039-14. However, those confirmations further indicate that funds were held in Van Tubergen's "Interest Account." *Id.* Moreover, the Trade Execution Confirmations, upon which Van Tubergen relies, evidence that the available funds were in multiple forms of currency, including ETH, US Dollar, and LINK. *See id.* Van Tubergen presents no evidence suggesting that he deposited the Surplus Collateral "into the *Depository Account*" in the "same kind of cryptocurrency as the original collateral" as required by the terms of the LSA. In fact, the record shows only that additional funds were merely available in his Interest Account *See JVT Supp. Cert.*, Exhibit KK, ECF No. 2039-14. Ms. Marquez confirmed in her testimony that BlockFi did not have the independent authority under the LSA to use funds held in the interest accounts to address margin calls. Given the parties' history and Van Tubergen's prior dealings with BlockFi, the Court finds that Van Tubergen was well aware of how to correctly convert and deposit the Surplus Collateral and he simply failed to do so.

Van Tubergen relies heavily on his allegation that he received assurances from BlockFi representatives that he had posted adequate Surplus Collateral and that "everything was fine as to LTVs." *JTV Sur-Reply* ¶ 4(a), ECF No. 2039. However, a closer examination of the parties' communications reveals that BlockFi agents provided instruction and recommendation rather than confirmation as to the safety of his loan. For example, Van Tubergen cites to Slides 33 and 38 in Exhibit EE for the proposition that the Surplus Collateral would be tapped-into as needed and that the LTV levels were safe. But in Slide 33 the BlockFi Agent merely provides Van Tubergen with the option of "liquidat[ing] some chainlink and convert[ing] it into ETH." *See JVT Supp. Cert.*, Ex. EE (Slide 33), ECF No. 2039-8. Moreover, while Van Tubergen focuses on Slide 38—in which Agent 3 confirms the loan "made it through the night"—Van Tubergen ignores the balance of the

9

conversation in which the BlockFi Agent repeatedly recommended posting additional collateral and explicitly indicated that he could not guarantee there would not be a liquidation. *See, e.g.*, *id.* at Slide 36 (Agent "strongly recommend[s]" posting additional collateral and warns that he cannot "guarantee that it wont [sic] get liquidated"); *id.* at Slide 37 (Agent states that Van Tubergen will "need to convert some more to post against [sic] both loans to bring them below 80% [LTV]"); *id.* at Slide 45 ("[L]ike I stated last night the recommendation was to have the collateral in order to not get liquidated. I could never confirm that it was not going to happen . . . .").

Given the record, the Court cannot conclude that Loan No. 558207a5 was improperly liquidated. Therefore, Van Tubergen has failed again to satisfy his burden to establish the validity of his claim as it relates to this loan.

### C. The "Missing" ETH

Van Tubergen also bases his proof of claim on his allegation that approximately 895 ETH went missing or was otherwise unaccounted for with respect to Loan No. 1a118e43. In support of this argument, Van Tubergen relies entirely on Loan No. 1a118e43's LSA, which reflects that the financed amount of $ 5,928,830.21 is backed by Collateral in the form of 4230.120 ETH. *See Van Tubergen Reply*, Ex. H, ECF No. 1496-9. However, when BlockFi liquidated this loan, only 3334.9282 ETH was credited. *JVT Cert.* ¶8(c), ECF No. 1496-1. Thus, Van Tubergen argues 895.1918 ETH is "missing." This Court finds that Van Tubergen has not satisfied his burden of demonstrating, by a preponderance of the evidence, entitlement to this "missing ETH."

As an initial matter, Van Tubergen offers no evidence indicating that he ever deposited, transferred, or otherwise supplied this ETH to his Depository Account. Rather, he bottoms his argument on the amounts reported in the LSA, which indeed states that 4230.120 ETH was posted as collateral for Loan No. 1a118e43. However, BlockFi has placed into evidence documentation

10

that clearly contradicts that such amount of ETH actually was deposited as collateral for Loan No. 1a118e43. Specifically, an email between the parties confirms that "BlockFi will refinance the full payoff amount for [a prior loan] into a new loan backed by 3,580.172 ETH. This includes the 1565.2442 ETH purchased by BlockFi plus the existing 2,014.929 ETH on the loan." *Wind Down Debtors' Reply*, Exhibit C, ECF No. 1963-3. BlockFi further explains that because the value of ETH increased during negotiations, BlockFi did not need to purchase 1,565.2442 ETH as contemplated in the email and, instead, purchased only 1320 ETH. *Wind Down Debtors' Reply* ¶ 61, ECF No. 1963. Accordingly, the total ETH used as collateral for Loan No. 1a118e43 was 3334.9292 consisting of 2014.9282 ETH rolled over from the prior loan, plus an additional 1320 ETH purchased by BlockFi on Van Tubergen's behalf.

BlockFi describes the reason that the LSA listed collateral in the amount of 4230.120 ETH as a scrivener's error. Van Tubergen disputes this theory and offers calculations in support of his contention that 4230.120 ETH must have been posted. Specifically, he uses an ETH value of $2335.95 and an originating LTV of 60%. He contends these figures prove that 4230.120 ETH was, in fact, posted based on the following formula:

$$\text{Dollar Value Loan Amount} = \text{Dollar Value of ETH} * \text{Total ETH Posted} * \text{LTV\%}$$

$$\$5,928,830.21 = \$2,335.95 \; (4230.120 \text{ ETH}) * 60\%$$

While this calculation is mathematically accurate, the LTV used does not align with the parties' negotiations—which contemplated an originating LTV above 70%—nor does this calculation demonstrate that Van Tubergen ever posted the "missing ETH" as Collateral. Given the circumstances, the Court is inclined to believe BlockFi's explanation that the ETH discrepancy is due to a scrivener's error. As indicated in the pleadings and further explained by Ms. Marquez's testimony, when generated, each LSA automatically adopted a 50% LTV. However, Loan No.

11

1a118e43 was a reinstated loan proposal and had a different LTV, with a "unique one-time only accommodation." *See Wind Down Debtors' Reply* at ¶ 64. This unique LTV offered upon reinstatement was approximately 79%. *Id.*; *see also Wind Down Debtors' Reply*, Exhibit C, ECF No. 1963-3. However, when BlockFi reinstated the loan, BlockFi's system automatically defaulted to the 50% LTV, rather than 79% LTV as the parties discussed. *Id.* Consequently, BlockFi contends that the inaccurate LTV resulted in an inaccurate amount of ETH as Collateral listed on the LSA. *Id.* The Court performed its own calculations to further test the credibility of the scrivener's error argument.[3] While BlockFi's explanation was not the model of clarity,[4] the Court bears in mind that the burden rests with the claimant, Van Tubergen, to demonstrate entitlement to these funds by a preponderance of the evidence. Van Tubergen has not satisfied this burden as to his claim for the alleged "missing" ETH.

### D. The Alleged Improper Liquidation

Van Tubergen contends that BlockFi engaged in improper liquidations of his Collateral. The LSA for the loans addressed by Van Tubergen provided that, upon the occurrence of a Triggering Point—the failure to maintain the required LTV of seventy percent (70%)[5]—BlockFi

---

[3] As stated, the formula used to generate these loans is:
- Dollar Value Loan Amount = Dollar Value of ETH * Total ETH Posted * LTV%

In the relevant LSA, the Loan amount is $5,928,830.21 and the Total ETH is listed as 4230.120. Using those figures along with the default LTV of 50% alleged by BlockFi reveals that the prevailing market value of ETH applied at the time of the loan was $2,803.15.
- $5,928,830.21 = **$2,803.15** (4230.120 ETH) * 50% LTV

Using that market value and the purported *actual* amount of ETH posted, 3334.9282, reveals that the LTV at the time the loan originated was approximately 63.42%.
- $5,928,830.21 = $2,803.15 (3334.9282 ETH) * **63.42**% LTV

These calculations do not entirely satisfy the Court given that the parties contemplated an LTV closer to 79% in their negotiations. Oddly, if the Court assumes that the originating LTV was 60% (as Van Tubergen did), then the prevailing market value for ETH at the time the LSA was drafted was $2,335.95. If that market value is plugged into the equation with the purported *actual* amount of ETH posted, 3334.9282, the calculation reveals an LTV of 76.1%.
- $5,928,830.21 = $2,335.95 (3334.9282 ETH) * **76.1**% LTV

[4] As the kids say: "The math isn't mathing."
[5] Or, in the case of Loan No. 1a118e43, a required LTV of eighty percent (80%). *JVT Cert.*, Ex. H § 7(a), ECF No. 1496-9.

was to give Van Tubergen notice and seventy-two (72) hours to post additional collateral. However, if the LTV increased to eighty percent (80%), "the lender ha[d] the right to *immediately liquidate* Collateral in such an amount as necessary to establish a loan to value ratio . . . equal to or less than seventy prevent (70%)." *See JVT Cert.*, Ex. B, § 7(a), ECF No. 1496-3 (emphasis added). In other words, once a loan's LTV hit 80%, BlockFi could liquidate the loan without giving notice. Van Tubergen has not presented any evidence that BlockFi failed to provide the requisite notice for all liquidations of his Collateral. Nor has he established any wrongful actions by BlockFi in the manner in which the Collateral was liquidated. In contrast, the record includes evidence that confirms that BlockFi provided timely all such notice in advance of liquating Van Tubergen's Collateral.

Van Tubergen also contends he is entitled to the JTV Claim based on applicable non-bankruptcy law; specifically, Michigan law. However, his state law claims—premised on breach of contract and the covenant of good faith and fair dealing—are bottomed on his contention that BlockFi breached the parties' agreement—the controlling LSA. For reasons previously discussed, this Court determines that the liquidations were conducted properly and that BlockFi effectuated the liquidations in compliance with the terms of the LSA. Thus, Van Tubergen has failed to establish the validity of such breach of contract claims by a preponderance of the evidence.

Lastly, this Court finds no merit in Van Tubergen's argument that BlockFi engaged in predatory lending. Van Tubergen is a sophisticated party who has engaged in at least thirty-seven (37) LSAs with BlockFi. *See Wind Down Debtors' Reply*, Exhibit I, Flori Marquez Cert. ¶ 5, ECF No. 1963-9. He is also an active participant in the cryptocurrency space. This Court finds that along each step of the lending process, BlockFi made the risk level of his transactions expressly clear to him both in their communications and in the terms of the LSAs.

**VI.    Conclusion**

For the aforementioned reasons, the Court reduces Van Tubergen's claims to $19.07. Counsel for the Debtor is directed to submit a form of order consistent with this opinion.

Dated: February 8, 2024

*[signature]*
Honorable Michael B. Kaplan
United States Bankruptcy Judge

14