# Exhibit A

## Case Summary

**Case Number:** HUD L-000025-24

**Case Caption:** Blockfi Inc.   Vs Ace American Insuran Ce Compan

| | | |
|---|---|---|
| **Court:** Civil Part | **Venue:** Hudson | **Case Initiation Date:** 01/03/2024 |
| **Case Type:** Other Insurance Claim (Including Declaratory Judgment Actions) | **Case Status:** Active | **Jury Demand:** 12 Jurors |
| **Case Track:** 1 | **Judge:** Jane L Weiner | **Team:** 1 |
| **Original Discovery End Date:** | **Current Discovery End Date:** | **# of DED Extensions:** 0 |
| **Original Arbitration Date:** | **Current Arbitration Date:** | **# of Arb Adjournments:** 0 |
| **Original Trial Date:** | **Current Trial Date:** | **# of Trial Date Adjournments:** 0 |
| **Disposition Date:** | **Case Disposition:** Open | **Statewide Lien:** |

**Plaintiffs**
**Blockfi Inc.**

| | | |
|---|---|---|
| **Party Description:** Corp | | **Attorney Name:** John Gallo Doyle |
| **Address Line 1:** 201 Montgomery Street | **Address Line 2:** Suite 263 | **Attorney Bar ID:** 045872005 |
| **City:** Jersey City    **State:** NJ | **Zip:** 07306 | **Phone:** |
| **Attorney Email:** | | |

**Defendants**
**Ace American Insurance Company**

| | | |
|---|---|---|
| **Party Description:** Corp | | **Attorney Name:** |
| **Address Line 1:** 436 Walnut Street | **Address Line 2:** | **Attorney Bar ID:** |
| **City:** Philadelphia    **State:** PA | **Zip:** 19106 | **Phone:** |
| **Attorney Email:** | | |

**Arch Insurance Company**

| | | |
|---|---|---|
| **Party Description:** Corp | | **Attorney Name:** |
| **Address Line 1:** Harborside 3, Suite 300 | **Address Line 2:** 210 Hudson Street | **Attorney Bar ID:** |
| **City:** Jersey City    **State:** NJ | **Zip:** 07311 | **Phone:** |
| **Attorney Email:** | | |

**Axis Insurance Company**

| | | |
|---|---|---|
| **Party Description:** Corp | | **Attorney Name:** |
| **Address Line 1:** 10000 Avalon Boulevard | **Address Line 2:** Suite 200 | **Attorney Bar ID:** |
| **City:** Alpharetta    **State:** GA | **Zip:** 30009 | **Phone:** |
| **Attorney Email:** | | |

**Berkely Insurance Company**

| | | |
|---|---|---|
| **Party Description:** Corp | | **Attorney Name:** |
| **Address Line 1:** 475 Steamboat Road, | **Address Line 2:** | **Attorney Bar ID:** |
| **City:** Greenwich    **State:** CT | **Zip:** 06830 | **Phone:** |
| **Attorney Email:** | | |

**Berkshire Hathaway Specialty Insurance AKA  Berkshire Hathaway Specialty Insurance Company**

| | | |
|---|---|---|
| **Party Description:** Corp | | **Attorney Name:** |
| **Address Line 1:** 1314 Douglas Street, Suite 1400 | **Address Line 2:** Suite 1400 | **Attorney Bar ID:** |
| **City:** Omaha    **State:** NE | **Zip:** 68102 | **Phone:** |
| **Attorney Email:** | | |

**Endurance American Specialty AKA  Endurance American Specialty Insurance Company**

| | | |
|---|---|---|
| **Party Description:** Corp | | **Attorney Name:** |
| **Address Line 1:** 4 Manhattanville Road | **Address Line 2:** | **Attorney Bar ID:** |

| **City:** Purchase | **State:** NY | **Zip:** 10577 | **Phone:** |
|---|---|---|---|
| **Attorney Email:** | | | |

**National Union Fireins. Co. AKA  National Union Fire Insurance Company Of Pittsburgh, Pa**

| **Party Description:** Corp | | **Attorney Name:** |
|---|---|---|
| **Address Line 1:** 175 Water Street | **Address Line 2:** 18Th Floor | **Attorney Bar ID:** |
| **City:** New York   **State:** NY | **Zip:** 10038 | **Phone:** |
| **Attorney Email:** | | |

**XI Specialty Ins. Co.**

| **Party Description:** Corp | | **Attorney Name:** |
|---|---|---|
| **Address Line 1:** 70 Seaview Avenue, Suite 5, | **Address Line 2:** | **Attorney Bar ID:** |
| **City:** Stamford   **State:** CT | **Zip:** 06902 | **Phone:** |
| **Attorney Email:** | | |

**U.S. Specialty Ins.Co.**

| **Party Description:** Corp | | **Attorney Name:** |
|---|---|---|
| **Address Line 1:** 13403 Northwest Freeway | **Address Line 2:** | **Attorney Bar ID:** |
| **City:** Houston   **State:** TX | **Zip:** 77040 | **Phone:** |
| **Attorney Email:** | | |

**Case Actions**

| Filed Date | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|
| 01/03/2024 | Complaint with Jury Demand for HUD-L-000025-24 submitted by BOREK, JENNIFER , GENOVA BURNS LLC on behalf of BLOCKFI INC. against ACE AMERICAN INSURANCE COMPANY, ARCH INSURANCE COMPANY, AXIS INSURANCE COMPANY, BERKELY INSURANCE COMPANY, BERKSHIRE HATHAWAY SPECIALTY ET AL. | LCV202422299 | 01/03/2024 |
| 01/04/2024 | TRACK ASSIGNMENT Notice submitted by Case Management | LCV202428166 | 01/04/2024 |
| 02/13/2024 | AMENDED COMPLAINT submitted by BOREK, JENNIFER of GENOVA BURNS LLC on behalf of BLOCKFI INC. against ACE AMERICAN INSURANCE COMPANY, ARCH INSURANCE COMPANY, AXIS INSURANCE COMPANY, BERKELY INSURANCE COMPANY, BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY ET AL. | LCV2024391058 | 02/13/2024 |

STEPHEN D. PALLEY, ESQ.,
(*pro hac vice* forthcoming)
DANIEL J. HEALY, ESQ.,
(*pro hac vice* forthcoming)
JOHN G. DOYLE, ESQ.,
Attorney ID No.:045872005
**BROWN RUDNICK LLP**
601 Thirteenth Street NW Suite 600
Washington, D.C. 20005
Telephone: (202) 536-1766
Facsimile: (617) 289-0766
spalley@brownrudnick.com
dhealy@brownrudnick.com
jdoyle@brownrudnick.com

JENNIFER BOREK, ESQ.
Attorney ID No. :041131997
**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 535-7107
iborek@genovaburns.com

KENNETH J. AULET, ESQ.
(*pro hac vice* forthcoming)
**BROWN RUDNICK LLP**
Seven Times Square
New York, NY  10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
kaulet@brownrudnick.com

TRISTAN G. AXELROD, ESQ.
(*pro hac vice* forthcoming)
**BROWN RUDNICK LLP**
One Financial Center
Boston, MA  02111
Telephone: (617) 856-8200
Fax: (617) 856-8201
taxelrod@brownrudnick.com

*Attorneys for Plan Administrator of BlockFi Inc. et al.*

| | |
|---|---|
| BLOCKFI INC. AS THE WIND DOWN DEBTORS,<br><br><br>Plaintiff,<br><br>vs.<br><br>ACE AMERICAN INSURANCE COMPANY; ARCH INSURANCE COMPANY; AXIS INSURANCE COMPANY; BERKLEY INSURANCE COMPANY; BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; U.S. SPECIALTY INSURANCE COMPANY; XL SPECIALTY INSURANCE COMPANY,<br><br>Defendants. | **NEW JERSEY SUPERIOR COURT LAW DIVISION: HUDSON COUNTY**<br><br>DOCKET NO.:<br><br>CIVIL ACTION<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiff, BlockFi Inc. as the Wind Down Debtors (collectively, "BlockFi" or the "Debtors" or the "Company") for their complaint against the above-captioned Defendants) (collectively the "Defendants" or "Insurers")[1], say as follows:

## INTRODUCTION

1.      This case arises out of an eight-figure insurance premium payment made to Defendants during the final days of a New Jersey cryptocurrency company's public and spectacular collapse in late 2022.  With knowledge of Plaintiff company's massive losses, knowledge that the losses and freezing of Plaintiff's platform had deprived thousands of customers of access to their life savings, and knowledge that Plaintiff's prior insurer already had declined coverage, these Defendants offered Plaintiff's directors and officers—not the Plaintiff itself—$30 million in coverage for the staggering sum of $22.5 million.  The payment was unlawful and improper for several reasons alleged herein, but most staggeringly, the policy included a *voidability provision drafted by Defendants*, that obligates Defendants to return the $22.5 million *under conditions that have indisputably now taken place*.

2.      This improper premium payment should be returned to Plaintiff for the benefit of Plaintiff's customers and creditors.

3.      Defendants sold former digital asset lender BlockFi an unreasonably expensive insurance policy that provided little to no insurance to BlockFi, but enormous premiums to the insurance company Defendants, days before BlockFi filed for federal bankruptcy protection.

4.      The Policy[2] is a Side A-Only Directors & Officers ("D&O") liability insurance policy.  Defendants charged BlockFi $22.5 Million for this product.  But the purchase was flawed from the outset, and provided neither risk finance nor risk transfer, which are the purposes of insurance, including the one at issue here.  It was an insurance company cash grab.  As set forth

---

[1] Axis Insurance Company ("Axis"), ACE American Insurance Company ("ACE"), National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Endurance American Specialty Insurance Company ("Endurance"), U.S. Specialty Insurance Company ("U.S. Specialty"), XL Specialty Insurance Company ("XL Specialty"), Arch Insurance Company ("Arch"), Berkshire Hathaway Specialty Insurance Company ("Berkshire") and Berkley Insurance Company ("Berkley").

[2] Policy No. G71101320 001, incepted on November 18, 2022 (hereinafter the "Policy").

in greater detail in the Complaint below, the following flaws, among other things, render the policy fraudulent and illusory:

    a. First, the Policy does not actually insure BlockFi, only the failing Company's directors, officers, and managers.

    b. Second, the policy was written so the insurance companies would never have to pay more than $15 million, many millions of dollars less than the actual premium paid. This was so because, among other things, the policy was drafted in contemplation that BlockFi would seek bankruptcy protection and be afforded risk-minimizing protections. The risk of post-bankruptcy coverage events is customarily very low and customarily priced accordingly; for instance, the Wind-Down Debtors have already purchased post-bankruptcy directors and officers coverage for approximately one-twentieth of the price paid to the Defendants under this Policy.

    In other words, the millions of BlockFi's dollars purportedly paid for post-bankruptcy coverage under this Policy are a thinly-veiled mechanism for Defendants to charge $22.5 million for $15 million of coverage to protect the Company's directors and officers from their aggrieved clients.

    c. Third, even if the full $30 million of coverage limits were available, the cost of the insurance was still wildly out of proportion to the coverage provided, and inconsistent with market standards and pricing.

    d. Fourth, Defendants drafted a provision tied to the filing of bankruptcy proceedings by the Insured Persons themselves that voids the Policy, thus potentially excusing coverage (although also requiring refunding the $22.5 million premium).

5. In sum, no risk was financed or transferred. Defendants charged $22.5 million for at most $15 million in coverage that did not benefit the Company and would be unlikely to pay out.

6. The egregious nature of Defendants' cash grab is difficult to dispute. Although the Policy Declarations purport to provide $30 million of total insurance, that amount is not recoverable for any insurance Claim.[3] The Policy contains sublimits that cap coverage: (i) at $15 million for loss in connection with claims attributable to pre-bankruptcy petition wrongful acts; and (ii) at $15 million for post-bankruptcy petition wrongful acts—a period from which it was

---

[3] Whether limits were $15 million or $30 million, the $22.5 million premium was so high that no risk was transferred and little to no value was provided, certainly not $22.5 million of value.

extremely unlikely that actionable wrongful acts would arise.

7.      The Policy also states that if any alleged acts took place in part before the bankruptcy petition or relate to any acts that took place before the bankruptcy petition, then any claim alleging such acts is subject to the pre-bankruptcy petition sublimit of $15 million.

8.      The Defendants did not stop there.  They also limited their potential coverage obligations to zero with a special endorsement that states the Policy is void, unless one of the Insureds—meaning a director, officer or manager of BlockFi, but not BlockFi itself—files a petition for bankruptcy before December 9, 2022.  No such bankruptcy was filed and the premium was not returned.

9.      The Defendants also had no reasonable, fair, equitable or rational basis for selling the Policy when they knew BlockFi was insolvent.  Even if $30 million in coverage was available, the premium to coverage ratio of $30 million coverage to a $22.5 million premium (.75) far exceeds industry norms and demonstrates that the transfer of the assets was not made for a reasonably equivalent value.  And considering the endorsements that gutted coverage, there was no transfer of value and the Defendants received $22.5 million while providing nothing of value, or far less in value, in return.  No coverage has been paid under the Policy.

10.     In short, Plaintiff brings this action to recover no less than the $22.5 million in premiums transferred to Defendants, plus interest and costs.  The very terms of the Policy dictate that the Policy shall be void *ab initio* in the event that the defined "Insured" failed to file a bankruptcy petition by December 9, 2022 and that in such an event all premium payments shall be fully refunded.  No Insured filed for bankruptcy by that date and, for that reason alone, the Policy should be declared void and the Defendants should be ordered to repay the premium. Moreover, the premiums also must be returned because the funds transferred were part of transactions that unfairly or improperly depleted the BlockFi-debtor's assets or otherwise unfairly or improperly diluted the claims against those assets.

## THE PARTIES

11.     Each of the Debtors filed for protection under Chapter 11 of Title 11 of the U.S.
Code on November 28, 2022, commencing Jointly Administered Lead Case No. 22-19361 (Bankr.
D.N.J.).  On October 3, 2023, the Court entered an order confirming the *Third Amended Joint
Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the
Bankruptcy Code (Additional Technical Modifications)* (the "Confirmation Order" confirming
and attaching the "Plan") [Docket No. 1660].  The Plan became effective on October 24, 2023
[Docket No. 1788], after which date the BlockFi "Debtors" became the "Wind-Down Debtors"
by operation of the Plan and Confirmation Order.  Pursuant to the Plan, Mohsin Meghji of M3
Partners was appointed as Plan Administrator (the "Plan Administrator") and acts as sole director
and officer of BlockFi as Wind-Down Debtors.  The Wind-Down Debtors' service address is c/o
M3 Partners, 1700 Broadway, 19th Floor, New York, NY 10019.  BlockFi's claims in respect of
the Policy were expressly preserved under the Plan.

12.     BlockFi Inc., is a Delaware corporation, incorporated on August 1, 2017, with its
principal place of business at 201 Montgomery Street, Suite 263, Jersey City, New Jersey.
BlockFi was a financial services company that, through its subsidiaries, generated revenue
through cryptocurrency and other digital asset trading, lending, and borrowing.

13.     BlockFi Trading LLC, is a Delaware limited liability company formed on May 28,
2019, with its principal place of business at 201 Montgomery Street, Suite 263, Jersey City, New
Jersey, and is a wholly owned subsidiary of Block Fi Inc. that accepted money and digital assets
from investors and transferred the funds to BlockFi for investment in BlockFi Interest Accounts
("BIAs").

14.     BlockFi Lending LLC, is a Delaware limited liability company formed on January
11, 2018, with its principal place of business at 201 Montgomery Street, Suite 263, Jersey City,
New Jersey, and is a wholly owned subsidiary of BlockFi Inc. and an affiliate of BlockFi Trading
LLC.  BlockFi Lending LLC offered and sold interest-bearing digital asset accounts known as
BIAs through which investors lent digital assets to BlockFi in exchange for BlockFi's promise to

provide variable monthly interest payments.

15.    Defendant ACE is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 436 Walnut Street, Philadelphia, Pennsylvania 19106 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

16.    Defendant Arch is a corporation organized and existing under the laws of the State of Missouri with its principal place of business at Harborside 3, 210 Hudson Street, Suite 300, Jersey City, New Jersey 07311 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

17.    Defendant Axis is a corporation incorporated under the laws of the State of Illinois with its principal place of business at 10000 Avalon Boulevard, Suite 200, Alpharetta, Georgia 30009 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

18.    Defendant Berkley is a corporation incorporated under the laws of the State of Delaware with its principal place of business at 475 Steamboat Road, Greenwich, Connecticut 06830 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

19.    Defendant Berkshire is a corporation organized and existing under the laws of the State of Nebraska with its principal place of business at 1314 Douglas Street, Suite 1400, Omaha, Nebraska 68102 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

20.    Defendant Endurance is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 4 Manhattanville Road, Purchase, New York 10577 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

21.    Defendant National Union is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business at 175 Water Street, 18th Floor,

New York, New York 10038 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

22.     Defendant U.S. Specialty is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 13403 Northwest Freeway, Houston, Texas 77040 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

23.     Defendant XL Specialty is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 70 Seaview Avenue, Suite 5, Stamford, Connecticut 06902 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter pursuant to New Jersey Rule 4:3.

25.     The venue is proper under New Jersey Rule 4:3-2 as the action arose in the instant venue, various parties to the action reside in, do business in, or are organized in this venue.

26.     Venue in this Court is also consistent with the Policy's choice of forum clause, which mandated that the subject Policy be governed and construed with the laws of New Jersey and that any claims relating to or arising out of the Policy be governed by the laws of New Jersey.

## FACTS

27.     BlockFi was a digital asset lender which offered a variety of services to investors and customers, including interest bearing accounts, credit cards, and the ability to buy, sell, and trade, cryptocurrency.  It was founded in 2017.  BlockFi took cryptocurrency deposits from customers that held interest-bearing accounts and loaned the deposited amounts to third parties at higher interest rates.  There were few counterparties willing to borrow the deposited cryptocurrency in large enough quantities at high interest rates to make BlockFi's business work

and to be profitable.  Two of the largest and most notable counterparties included Three Arrows

Capital and Alameda Research, both of which failed catastrophically.

28.    Alameda Research ("Alameda") was co-founded in November 2017 by Sam

Bankman-Fried and was a quantitative trading firm.  In April 2019, Bankman-Fried founded FTX

Trading Ltd. ("FTX") whose primary operation was a cryptocurrency exchange platform.  FTX

supported   trading   for   popular   cryptocurrencies,   non-fungible   tokens   (NFTs),   and   spot,

derivatives, and leveraged markets.

29.    BlockFi conducted extensive business with FTX and Alameda.  Between 2019 and

March 2022, BlockFi's total trading volume is estimated to have grown from $2 million to more

than $23 billion, while deployable assets grew from $345 million to $14.8 billion, and gross loan

originations expanded from $687 million to more than $47 billion.

30.    During this period, BlockFi loaned increasing amounts to third parties, including

Alameda.  Between July and September 2022, BlockFi lent Alameda nearly $900 million, almost

exclusively collateralized by FTT (FTX's in-house reward token).  Because BlockFi required an

exchange partner to facilitate its trading business and it held significant amounts of FTT as a result

of its lending practices, BlockFi stored much of its FTT on the FTX exchange.  This also allowed

BlockFi to take advantage of yield bonuses from FTX for doing so.

31.    In June 2022, the cryptocurrency market was in turmoil, resulting from a

confluence of events, including the collapse of Three Arrows Capital.  As a result of the market

decline and correlated withdrawals from its own platform, BlockFi sought an injection of liquidity

to stabilize its operations.  FTX offered to supply that liquidity through a loan agreement and an

option agreement for FTX to purchase the equity of BlockFi at a later time.  BlockFi accepted

FTX's offer.  On June 30, 2022, BlockFi Inc., as borrower, entered into a loan agreement with

West Realm Shires Inc. (d/b/a FTX US, "FTX US"), as lender (the "FTX Loan Agreement"),

which provided for loans to be made to BlockFi in an amount of up to $400 million outstanding

at any time.

32.     On November 2, 2022, days before Defendants sold the Policy to BlockFi, CoinDesk, a digital news site specializing in coverage of digital currencies, published an article revealing that of Alameda's $14.6 billion in reported assets, $5.8 billion was comprised of FTT. Shortly thereafter, a major competitor of FTX announced it would liquidate its sizable FTT holdings, and later publicly leaked word of alleged deposit misappropriations at FTX. Public confidence in Alameda and FTX, and in FTT, immediately collapsed, leading to mass liquidations and withdrawals of funds from FTX by consumers.

33.     FTX could not fund the withdrawals, and froze trading on its platform on November 8, 2022, depriving BlockFi of access to its own cryptocurrency deposits then worth approximately $350 million. BlockFi called in loans to Alameda secured by FTT, but after initially meeting margin calls and negotiating forbearance, on November 9, 2023 Alameda defaulted on outstanding loan and security agreements at a dollarized principal value at the time of approximately $700 million. FTX likewise refused to fund an outstanding draw request of $125 million under the FTX Loan Agreement. In sum, the freeze and collapse of the FTX group of companies deprived BlockFi of approximately $1.2 billion of liquidity.

34.     Amidst this market volatility and plummeting crypto asset prices, and with public awareness of the ties between its own liquidity and that of FTX, BlockFi suffered a similar spike in withdrawal requests. By November 9, it was unable to meet the incoming requests, given the loss of its multiple liquidity sources at FTX and Alameda. Contrary to assurances in prior days, on November 10, 2022, BlockFi "paused" its customer platform, halting withdrawals. The Defendants knew, or should have known, that BlockFi was insolvent, or imminently insolvent, on or before this date.

35.     On November 11, 2022, just a week before the Defendants' policy period started, the various FTX entities, including Alameda Research, began to commence voluntary cases under chapter 11 of the Bankruptcy Code in the U.S. District Court for the District of Delaware. These filings were public and garnered international media attention. Within days, BlockFi began preparing its own bankruptcy filing.

36.     But even before making bankruptcy preparations, BlockFi's directors, officers and managers sought to protect and insulate themselves from suit through the purchase of additional D&O insurance coverage, and immediately began to look for coverage.

37.     At 9:30 a.m. (EST) on November 11, 2022, a special meeting of BlockFi's Board was held, wherein the Board discussed obtaining additional D&O coverage and directed BlockFi Company management to discuss the D&O coverage with, and obtain bids through, insurance brokers.

38.     BlockFi's Board met again on November 11, 2022, at 5:30 p.m. (EST).  Among other things, the Board discussed the Alameda loans and the ongoing efforts to solicit bids for the additional D&O coverage.  The Board expected that insurance premium pricing quotes would be received the following week.

39.     BlockFi also attempted to obtain additional D&O coverage from their existing D&O insurance company, Relm Insurance Ltd. ("Relm").  Relm openly stated its concerns that working with BlockFi to transfer company assets in advance of a likely insolvency could be viewed negatively and that the policy premiums could potentially be clawed back by a bankruptcy judge.

40.     On November 15, 2022, Relm declined to offer BlockFi a proposal for additional D&O insurance.

41.     On November 17, 2022, the BlockFi Board discussed the various offers they received from other insurance companies and unanimously approved the purchase of additional D&O insurance in an amount up to $30 million, which was subject to BlockFi's ability to liquidate significant cryptocurrency assets from those it had on hand, in order to pay the premium.  The Board approved the purchase with full knowledge that payment of the additional D&O insurance premium would have an outsized negative impact on BlockFi's liquidity.

42.     The Defendants knew or should have known at the time they made their proposal that BlockFi was insolvent or imminently insolvent.

10

43.     On November 18, 2022, less than a week after starting to request bids for coverage, BlockFi's additional D&O coverage under the Policy was in place and the policy period started. The issued Policy, Policy No. G71101320 001, is a quota share excess layer split among the following insurers facially stating a $30 Million limit shared in the following amounts:

| Quota Share Insurer | Quota Share Insurer Limit of Liability Proportion Underwritten |
|---|---|
| Axis Insurance Company | $2 Million |
| ACE American Insurance Company | $5 Million |
| National Union Fire Insurance | $5 Million |
| Endurance American Specialty | $5 Million |
| U.S. Special Insurance Company | $5 Million |
| XL Special Insurance Company | $2 Million |
| Arch Insurance Company | $2 Million |
| Berkshire Hathaway Specialty Ins. Co. | $2 Million |
| Berkley Insurance Company | $2 Million |

44.     The Policy period ran from November 18, 2022 to November 18, 2023, and BlockFi paid a premium of $22.5 million, a premium paid entirely from BlockFi assets.

45.     The Policy provides Side A-Only coverage that covers individual directors, officers and managers of BlockFi when BlockFi is unable to indemnify those individuals, and provides absolutely no coverage to BlockFi.

46.     Included within the Policy was an endorsement entitled "Sublimit Endorsement." The Sublimit Endorsement sets forth two mutually exclusive sublimits that reduced the $30 million limit stated in the declarations to $15 million.  The endorsement did so by reducing the limits of available coverage: (i) to $15 million for claims arising out of acts committed prior to the bankruptcy petition date; and (ii) to $15 million for claims arising out of acts committed on or after the bankruptcy petition date.

47.     The Endorsement stated:

MUTUALLY EXCLUSIVE SUBLIMITS

(i)     Solely with respect to LOSS in connection with any CLAIM based upon, arising out of, related to, or attributable to, any facts, circumstances, situations or WRONGFUL ACTS committed, attempted, or allegedly committed or attempted, in whole or in part, prior to the FILE DATE, the INSURER'S maximum limit of liability shall be $15,000,000, in the aggregate, regardless of the number of CLAIMS thereunder (the "Pre-File Date Sublimit"). …

(ii)    Solely with respect to LOSS in connection with any CLAIM based upon, arising out of, related to, or attributable to any facts, circumstances or WRONGFUL ACTS committed, attempted, or allegedly committed or attempted in whole, on or after the FILE DATE, the INSURER'S maximum limit of liability shall be $15,000,000, in the aggregate, regardless of the number of CLAIMS thereunder (the "Post-File Date Sublimit"). …

48.     The same endorsement further stated, among other things, that allegations of Wrongful Acts that purportedly "could be construed as" having taken place partially before the File Date or that "that arises out of or relates to the same or series of related facts, circumstances, situations, transactions, events, or Wrongful Acts" from before the File Date, would be deemed to be pre-File Date Claims subject to that sublimit:

(iii)   In the event that any LOSS in connection with any CLAIM involves:

(a) any WRONGFUL ACT that could be construed as having been, in part, committed prior to the FILE DATE and, in part, committed on or after the FILE DATE, or

(b) any WRONGFUL ACT occurring on or after the FILE DATE, that arises out of or relates to the same or series of related facts, circumstances, situations, transactions, events, or WRONGFUL ACTS occurring before the FILE DATE;

such CLAIM shall be subject to the Pre-File Date Sublimit; and in no event shall any CLAIM be subject to more than one sublimit.

49.     The Defendants knew they were essentially eliminating the likelihood of paying money for a Claim arising out of the post-petition period, because they knew that Claims against the existing directors, officers, and managers would most likely be based at least in part on the conduct of those directors, officers, and managers in the pre-petition period or be related to the conduct that led to the filing for bankruptcy.

50.     The Defendants drafted the Policy, including without limitation the Sublimit Endorsement.

51.     When Defendants drafted and issued the Policy, they knew or should have known that BlockFi was inextricably tied to FTX through its rescue loans, that FTX was financially distressed and in bankruptcy proceedings, and that BlockFi was no longer financially stable.

52.     The same Sublimit Endorsement included a further limitation that specifically stated the Policy was void *ab initio* in the event a bankruptcy petition was not filed by the "Insured" by December 9, 2022.  Paragraph 3 of the Sublimit Endorsement states:

> It is understood and agreed that, notwithstanding anything to the contrary in this POLICY, and further, pursuant to the INSURED'S request, in the event that the INSURED fails to file a bankruptcy petition by 12/09/2022 (the "Specified Date"), this POLICY shall be void ab initio, in which case any and all premium payments shall be fully refunded; provided however, that, the INSURER, the INSURED, the all of the Quota Share Insurers, as set forth in the Quota Share Endorsement, may, together, mutually agree in writing to amend the Specified Date, by Endorsement to this POLICY.

53.     The Policy defined "Insured" as "natural persons" who were, *inter alia*, directors, managers, trustees, officers, and others, but did not include within that definition BlockFi or any other "company."  The Policy, states in § 2(k) that Insured means:

> 1. all natural persons who were, now are, or shall be: i. duly elected or appointed directors (including shadow and de facto directors), trustees, governors, officers, management committee members, MANAGERS, in-house general counsel, or comptrollers of the COMPANY; ii. serving as a representative of an entity that serves as a director of the COMPANY; iii. prospective directors of the COMPANY named as such in any listing particulars, prospectus or similar offering document; iv. directors of investor relations, directors of human resources, risk managers or other managers serving in a functionally equivalent or comparable position with the COMPANY; or v. with respect to any COMPANY chartered outside the United States, natural person(s) serving in a position with such COMPANY which is functionally equivalent or comparable to any position described in i through iv above; named as such in any listing particulars, prospectus or similar offering document; iv. directors of investor relations, directors of human resources, risk managers or other managers serving in a functionally equivalent or comparable position with the COMPANY; or v. with respect to any COMPANY chartered outside the United States, natural person(s) serving in a position with such COMPANY which is functionally equivalent or comparable to any position described in i through iv above;

2. all other natural persons not described in 1 above who were, now are, or shall be full-time or parttime, seasonal or temporary employees of the COMPANY, provided coverage for such other persons shall apply only if and while: i. the COMPANY agrees to advance DEFENSE COSTS and indemnify such other persons with respect to the CLAIM to the same extent as the COMPANY agrees to advance DEFENSE COSTS for and indemnify the persons described in 1 above; or ii. the CLAIM is: (A) by securities holders of the COMPANY in their capacity as such, including without limitation any shareholder derivative or securities class action lawsuit; or (B) made and continuously maintained against a person described in 1 above;

3. all natural persons who were, now are, or shall be serving as directors, officers, trustees, governors, or the equivalent thereof, for any OUTSIDE ENTITY if: i. such activity is part of their duties regularly assigned by the COMPANY; or ii. Such activity is at the specific direction or request of the COMPANY; or iii. such persons are a member of a class of persons so directed to serve by the COMPANY; and

4. the estates, heirs, legal representatives or assigns of deceased INSUREDS and the legal representatives or assigns of INSUREDS in the event of their incompetency, insolvency or bankruptcy.

54.    As of the filing of this Complaint, none of the Insureds have filed a petition for bankruptcy and thus have not filed a petition before the specified date (December 9, 2022) under the Policy.

55.    At the time the Defendants drafted and issued the Policy, they knew or should have known that BlockFi was extremely likely to file for bankruptcy protection and that such filing was imminent.

56.    At the time the Defendants drafted and issued the Policy, they knew or should have known that the directors, officers and other Insureds under the Policy would receive releases from many claims, as a result of BlockFi filing a bankruptcy petition.

57.    At the time the Defendants drafted and issued the Policy, they knew or should have known that BlockFi paying a $22.5 million premium significantly depleted BlockFi's assets at a time when it was already insolvent.

58.    Defendants also added policy language that enabled them to declare the Policy void, if an Insured did not file for bankruptcy within three weeks of the commencement of the

policy period.

59.     The Defendants bound coverage, accepted the $22.5 million premium, and the Policy period started on November 18, 2022.

60.     BlockFi filed its petition for bankruptcy protection on November 28, 2022.

61.     No Insured filed a bankruptcy petition by December 9, 2022.

62.     As of the filing of this Complaint, the Defendants have not refunded or returned any portion of the Policy premium payment of $22.5 million.

63.     BlockFi's liquidating plan of reorganization went effective on October 24, 2023. All assets recovered by the Wind-Down Debtors will be used, net of costs of recovery and administration, to increase distributions to BlockFi's customers and creditors.

64.     Following the Effective Date, the Wind-Down Debtors purchased directors and officers insurance coverage under a policy providing far more extensive coverage than the Policy, at approximately one-twentieth the cost of the post-bankruptcy coverage purportedly available under the Policy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### (*Declaratory Judgment*)

65.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 64 as if set forth fully herein.

66.     This is a cause of action for declaratory relief pursuant to the Declaratory Judgments Act, N.J. Stat. Ann. §§ 2A:16-51 *et seq*., which authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity.

67.     Plaintiff seeks a judicial determination of its rights and Defendants' duties with respect to an actual controversy arising under the Policy.

68.     Specifically, Plaintiff seeks a declaration that the Policy is void *ab initio* and that Plaintiff, having assumed Defendants' position under the policy, and as fiduciary to, and on behalf of, the unsecured creditors of the Debtors of the BlockFi assets, is entitled to a return of the Policy premium, because BlockFi is not a natural person and was not included in the definition of

"Insureds" and none of the Insured have filed for bankruptcy, thus triggering Paragraph 3 of the Policy Sublimit Endorsement which provides that if the Insured fails "to file a bankruptcy petition by 12/09/2022 (the "Specified Date"), this POLICY shall be void ab initio, in which case any and all premium payments shall be fully refunded."

### SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
*(Avoidance and Recovery of Fraudulent Transfers and N.J.S.A. 25:2-27(a)&(b))*

69.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

70.    As a matter of record in the Debtor's chapter 11 proceedings, at all relevant times prior to the Transfers, Debtor had many thousands of creditors.

71.    Pursuant to 11 U.S.C. § 544(b) and the Debtor's confirmed plan of reorganization, the Wind-Down Debtor has the rights and powers of creditors whose claims arose before the Transfers to bring, among others, causes of action under New Jersey law for the avoidance of fraudulent transfers.

72.    Debtor received less than reasonable equivalent value for the Transfers described above.

73.    The Debtor was insolvent on the dates the Transfers referenced and described above were made or became insolvent as a result of the Transfers.

74.    The Debtor conducted its business in a manner and intent to incur debts beyond its ability to repay.

75.    The Transfers constitute fraudulent transfers pursuant to N.J.S.A. 25:2-27(a) and (b).

76.    The Plaintiff is entitled to avoid and recover the transfers referenced and described above pursuant to N.J.S.A. 25:2-29.

77.    The Defendants are the transferees of the transfer referenced and described above under N.J.S.A. 25:2-30(b)(1) and (2).

78.     The Plaintiff is entitled to recover the value of the Transfers from the Defendants under N.J.S.A. 25:2-30(b).

## THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (*Avoidance and Recovery of Fraudulent Transfers – N.J.S.A. 25:2-25(a)&(b)*)

79.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 78 as if set forth fully herein.

80.     The Transfers referred to hereinabove were made with actual intent to hinder, delay or defraud the Debtor's creditors.

81.     Alternatively, the Transfers referred to hereinabove were made without receiving a reasonably equivalent value in exchange for the transfers and the debtor was either (a) engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

82.     The Transfer referred to hereinabove was made without receiving reasonable equivalent value in that the Debtors transferred $22.5 Million for the equivalent of a self-serving D&O policy that would, in practice and effect, only provide $15 Million of coverage as set forth and described above.

83.     The transfers referred to hereinabove were made with actual fraudulent intent as evidenced by, among other things, the following badges of fraud:

  a.  The debtor made the transfer for the benefit of debtor's board members, directors, and officers;

  b.  The Transfers or obligations were concealed through internal deliberations amongst the very board members who would benefit from the D&O insurance at the expense of, and without the knowledge of, current and future creditors;

  c.  Before the transfer was made, the Debtors knew they would be threatened with suit;

  d.  The Debtor transferred assets to obtain the self-serving D&O policy;

e.    The value of the consideration received was not reasonably equivalent to the value of the asset, the D&O Policy, transferred;

f.    The Debtor was insolvent at the time of the Transfer or became insolvent shortly after the transfer was made or the obligation was incurred; and

g.    The Transfer occurred shortly before or shortly after a substantial debt was incurred.

84.    The Transfers referred to hereinabove constitute fraudulent transfers pursuant to N.J.S.A. 25:2-25(a), or alternatively, N.J.S.A. 25:2-25(b), or both.

85.    The Plaintiff is entitled to avoid the transfers pursuant to N.J.S.A. 25:2-29.

86.    The Plaintiff is entitled to recover the value of the Transfers from the Defendants pursuant to N.J.S.A. 25:2-29.

### IN THE ALTERNATIVE, FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### (*Rescission*)

87.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 64 as if set forth fully herein.

88.    To the extent the Policy is not found to be void *ab initio*, based on its plain wording, Defendants made multiple material misrepresentations to Plaintiff.

89.    Defendants sold the D&O Policy to Plaintiff misrepresenting that it provided $30 million of insurance coverage, when it did not.

90.    Defendants misrepresented the amount of available coverage under the D&O Policy.

91.    Defendants misrepresented that the Policy would be void in a matter of weeks, resulting in the return of the $22.5 million premium.

92.    The Defendants' misrepresentations were material because the amount of coverage under the applicable limits of insurance is at the core of the value of the Policy and the premium payment was based on the amount of coverage available under the Policy.

93.     As a result of the Defendants' misrepresentations, BlockFi was not able to ascertain and value the amount of coverage it was purchasing, which it needed to do in order to assess whether the premium it was paying for that coverage was reasonable or appropriate.

94.     As a result of Defendants misrepresentations, BlockFi expected the Policy to be void *ab initio*, and its entire premium to be returned in weeks, unless an individual insured filed for bankruptcy within 21 days from the inception of the Policy.

95.     To the extent the Policy is not found to be void *ab initio*, based on its plain wording, the Defendants made material misrepresentations in selling the Policy to BlockFi.

96.      Plaintiff is entitled to rescission of the Policy based upon the Defendants' material misrepresentations.

### IN THE ALTERNATIVE, FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (*Illusory Coverage – Unjust Enrichment*)

97.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 64 as if set forth fully herein.

98.     To the extent the Policy is not found to be void *ab initio*, based on its plain language, the Defendants should be ordered to return the premium because they sold illusory coverage and were thereby unjustly enriched.

99.     The Policy fails to provide the amount of coverage stated in the Declarations, $30 million, despite that the Defendants charged $22.5 million as a premium for that coverage.

100.    The Policy provided, at most, coverage for three weeks, based on the wording of the Policy.

101.    Even assuming coverage could ever have been paid under the terms of the Policy, the Policy purports to limit coverage to $15 million, far less than $30 million and less than the premium of $22.5 million.

102.    Paying $22.5 million in premium for coverage that almost certainly would never be paid and, assuming for purposes of argument that it could be paid, was limited to an amount millions of dollars less than the premium, is unrealistic and unreasonable.

103.    The Policy fails to provide protection to BlockFi or any of the Insureds, as defined in the Policy.

104.    BlockFi had a reasonable expectation that it was receiving insurance coverage and that such coverage was in a dollar amount that was higher than the premium it paid.

105.    The premium payment did not secure or purchase insurance coverage for the Insureds or secured an unreasonably narrow and sublimited amount of insurance coverage.

106.    BlockFi received no benefit or received an unreasonably small benefit in return for its $22.5 million premium payment.

107.    The Defendants knew or should have known that BlockFi was insolvent at the time the Defendants sold BlockFi the Policy.

108.    The Defendants received a benefit of $22.5 million and in return for the Policy which does not provide coverage or provides unreasonably narrow and sublimited coverage, such that Defendants' retention of the benefit of the premium they received is unjust.

109.    The Defendants retention of the premium BlockFi paid enriches the Defendants beyond the reasonable or expected amount and beyond their contractual rights.

110.    Plaintiff is entitled to a return of the premium paid for the Policy because the Defendants sold illusory coverage and because their retention of the premium is unjust.

**WHEREFORE,** Plaintiff Wind-Down Debtors' Oversight Committee respectfully requests that the Court enter a judgment in favor of Plaintiff as follows:

1.  Declaring the Policy void *ab initio* and that Defendants must refund the full amount of all premiums paid for the Policy, together with interest thereon;

2.  Voiding the Transfers and awarding Plaintiff the right to recover the value of the Transfers from the Defendants;

3.  In the alternative, rescinding the Policy and ordering the Defendants to pay to Plaintiff the full amount of all premiums paid for the Policy, together with interest thereon;

4.  In the alternative, determining that the Defendants retention of the premium paid for the Policy would be unjust and ordering the Defendants to pay to Plaintiff the full amount of

all premiums paid for the Policy, together with interest thereon;

5. Awarding Plaintiff attorneys' fees, costs, disbursements and expenses that Plaintiff has incurred in prosecuting this action pursuant to statute and common law;

6. Awarding Plaintiff pre- and post-judgment interest; and

7. Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, John G. Doyle, Esq. and Jennifer Borek, Esq. are hereby designated as trial counsel for Plaintiffs in the above matter.

Dated: January 3, 2024                    Respectfully Submitted

                                          **BROWN RUDNICK LLP**

                                          By:    /s/ *John G. Doyle*
                                              STEPHEN D. PALLEY, ESQ.,
                                              (pro hac vice forthcoming)
                                              DANIEL J. HEALY, ESQ.,
                                              (pro hac vice forthcoming)
                                              JOHN G. DOYLE, ESQ.,
                                              Attorney ID No.:045872005
                                              601 Thirteenth Street NW Suite 600
                                              Washington, D.C. 20005
                                              Telephone: (202) 536-1766
                                              Facsimile: (617) 289-0766
                                              spalley@brownrudnick.com
                                              dhealy@brownrudnick.com
                                              jdoyle@brownrudnick.com

                                              KENNETH J. AULET, ESQ.
                                              (pro hac vice forthcoming)
                                              BROWN RUDNICK LLP
                                              Seven Times Square
                                              New York, NY  10036
                                              Telephone: (212) 209-4800
                                              Facsimile: (212) 209-4801
                                              kaulet@brownrudnick.com

TRISTAN G. AXELROD, ESQ.
(pro hac vice forthcoming)
BROWN RUDNICK LLP
One Financial Center
Boston, MA  02111
Telephone: (617) 856-8200
Fax: (617) 856-8201
taxelrod@brownrudnick.com

JENNIFER BOREK, ESQ.
Attorney ID No. :041131997
**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 535-7107
jborek@genovaburns.com

*Attorneys for Plaintiff, Plan Administrator of
BlockFi, Inc. et al.*

## <u>RULE 4:5-1 CERTIFICATION</u>

I, John G. Doyle, certify pursuant to Rule 4:5-1 that, to the best of my knowledge, information and belief, the matter in controversy is not the subject of any other action, tribunal or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action pursuant to Rule 4:28.

I further certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Dated: January 3, 2024

Respectfully Submitted

**BROWN RUDNICK LLP**

By: __/s/ *John G. Doyle*_____

STEPHEN D. PALLEY, ESQ.,
(pro hac vice forthcoming)
DANIEL J. HEALY, ESQ.,
(pro hac vice forthcoming)
JOHN G. DOYLE, ESQ.,
Attorney ID No.:045872005
601 Thirteenth Street NW Suite 600
Washington, D.C. 20005
Telephone: (202) 536-1766
Facsimile: (617) 289-0766
spalley@brownrudnick.com
dhealy@brownrudnick.com
jdoyle@brownrudnick.com

JENNIFER BOREK, ESQ.
Attorney ID No. :041131997
**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 535-7107
jborek@genovaburns.com

KENNETH J. AULET, ESQ.
(pro hac vice forthcoming)
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
kaulet@brownrudnick.com

TRISTAN G. AXELROD, ESQ.
(pro hac vice forthcoming)
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Fax: (617) 856-8201
taxelrod@brownrudnick.com

*Attorneys for Plaintiff, Plan Administrator of BlockFi, Inc. et al.*

HUDSON COUNTY SUPERIOR COURT
HUDSON COUNTY
583 NEWARK AVENUE
JERSEY CITY      NJ 07306

                                   TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (201) 748-4400
COURT HOURS  8:30 AM - 4:30 PM

                     DATE:   JANUARY 03, 2024
                     RE:     BLOCKFI INC.   VS ACE AMERICAN INSURAN CE COMPAN
                     DOCKET: HUD L -000025 24


     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 1.


     DISCOVERY IS   150 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.


     THE PRETRIAL JUDGE ASSIGNED IS:  HON JANE L. WEINER


      IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      001
AT:  (201) 748-4400 EXT 60095.


     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                     ATTENTION:
                             ATT: JENNIFER BOREK
                             GENOVA BURNS LLC
                             494 BROAD ST 6TH FL
                             NEWARK          NJ 07102


ECOURTS

STEPHEN D. PALLEY, ESQ.,
(*pro hac vice* forthcoming)
DANIEL J. HEALY, ESQ.,
(*pro hac vice* forthcoming)
JOHN G. DOYLE, ESQ.,
Attorney ID No.:045872005
**BROWN RUDNICK LLP**
601 Thirteenth Street NW Suite 600
Washington, D.C. 20005
Telephone: (202) 536-1766
Facsimile: (617) 289-0766
spalley@brownrudnick.com
dhealy@brownrudnick.com
jdoyle@brownrudnick.com

JENNIFER BOREK, ESQ.
Attorney ID No. :041131997
**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 535-7107
jborek@genovaburns.com

KENNETH J. AULET, ESQ.
(*pro hac vice* forthcoming)
**BROWN RUDNICK LLP**
Seven Times Square
New York, NY  10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
kaulet@brownrudnick.com

TRISTAN G. AXELROD, ESQ.
(*pro hac vice* forthcoming)
**BROWN RUDNICK LLP**
One Financial Center
Boston, MA  02111
Telephone: (617) 856-8200
Fax: (617) 856-8201
taxelrod@brownrudnick.com

*Attorneys for Plan Administrator of BlockFi Inc. et al.*

| | |
|---|---|
| BLOCKFI INC. AS THE WIND DOWN DEBTORS,<br><br><br>Plaintiff,<br><br>vs.<br><br>ACE AMERICAN INSURANCE COMPANY;<br>ARCH INSURANCE COMPANY;<br>AXIS INSURANCE COMPANY;<br>BERKLEY INSURANCE COMPANY;<br>BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY;<br>ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY;<br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA;<br>U.S. SPECIALTY INSURANCE COMPANY;<br>XL SPECIALTY INSURANCE COMPANY,<br><br>Defendants. | **NEW JERSEY SUPERIOR COURT LAW DIVISION: HUDSON COUNTY**<br><br>DOCKET NO.: HUD-L-000025-24<br><br>CIVIL ACTION<br><br>AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiff, BlockFi Inc. as the Wind Down Debtors (collectively, "BlockFi" or the "Debtors" or the "Company") for their amended complaint against the above-captioned Defendants) (collectively the "Defendants" or "Insurers")[1], say as follows:

## **INTRODUCTION**

1.       This case arises out of an eight-figure insurance premium payment made to Defendants during the final days of a New Jersey cryptocurrency company's public and spectacular collapse in late 2022.  With knowledge of Plaintiff company's massive losses, knowledge that the losses and freezing of Plaintiff's platform had deprived thousands of customers of access to their life savings, and knowledge that Plaintiff's prior insurer already had declined coverage, these Defendants offered Plaintiff's directors and officers—not the Plaintiff itself—$30 million in coverage for the staggering sum of $22.5 million.  The payment was unlawful and improper for several reasons alleged herein, but most staggeringly, the policy included a *voidability provision drafted by Defendants*, that obligates Defendants to return the $22.5 million *under conditions that have indisputably now taken place*.

2.       This improper premium payment should be returned to Plaintiff for the benefit of Plaintiff's customers and creditors.

3.       Defendants sold former digital asset lender BlockFi an unreasonably expensive insurance policy that provided little to no insurance to BlockFi, but enormous premiums to the insurance company Defendants, days before BlockFi filed for federal bankruptcy protection.

4.       The Policy[2] is a Side A-Only Directors & Officers ("D&O") liability insurance policy.  Defendants charged BlockFi $22.5 Million for this product.  But the purchase was flawed from the outset, and provided neither risk finance nor risk transfer, which are the purposes of insurance, including the one at issue here.  It was an insurance company cash grab.  As set forth

---

[1] Axis Insurance Company ("Axis"), ACE American Insurance Company ("ACE"), National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), Endurance American Specialty Insurance Company ("Endurance"), U.S. Specialty Insurance Company ("U.S. Specialty"), XL Specialty Insurance Company ("XL Specialty"), Arch Insurance Company ("Arch"), Berkshire Hathaway Specialty Insurance Company ("Berkshire") and Berkley Insurance Company ("Berkley").

[2] Policy No. G71101320 001, incepted on November 18, 2022 (hereinafter the "Policy").

in greater detail in the Complaint below, the following flaws, among other things, render the policy fraudulent and illusory:

> a.  First, the Policy does not actually insure BlockFi, only the failing Company's directors, officers, and managers.
>
> b.  Second, the policy was written so the insurance companies would never have to pay more than $15 million, many millions of dollars less than the actual premium paid.  This was so because, among other things, the policy was drafted in contemplation that BlockFi would seek bankruptcy protection and be afforded risk-minimizing protections.  The risk of post-bankruptcy coverage events is customarily very low and customarily priced accordingly; for instance, the Wind-Down Debtors have already purchased post-bankruptcy directors and officers coverage for approximately one-twentieth of the price paid to the Defendants under this Policy.
>
> In other words, the millions of BlockFi's dollars purportedly paid for post-bankruptcy coverage under this Policy are a thinly-veiled mechanism for Defendants to charge $22.5 million for $15 million of coverage to protect the Company's directors and officers from their aggrieved clients.
>
> c.  Third, even if the full $30 million of coverage limits were available, the cost of the insurance was still wildly out of proportion to the coverage provided, and inconsistent with market standards and pricing.
>
> d.  Fourth, Defendants drafted a provision tied to the filing of bankruptcy proceedings by the Insured Persons themselves that voids the Policy, thus potentially excusing coverage (although also requiring refunding the $22.5 million premium).

5.      In sum, no risk was financed or transferred.  Defendants charged $22.5 million for at most $15 million in coverage that did not benefit the Company and would be unlikely to pay out.

6.      The egregious nature of Defendants' cash grab is difficult to dispute.  Although the Policy Declarations purport to provide $30 million of total insurance, that amount is not recoverable for any insurance Claim.[3]  The Policy contains sublimits that cap coverage:  (i) at $15 million for loss in connection with claims attributable to pre-bankruptcy petition wrongful acts; and (ii) at $15 million for post-bankruptcy petition wrongful acts—a period from which it was

---

[3]  Whether limits were $15 million or $30 million, the $22.5 million premium was so high that no risk was transferred and little to no value was provided, certainly not $22.5 million of value.

extremely unlikely that actionable wrongful acts would arise.

7.     The Policy also states that if any alleged acts took place in part before the bankruptcy petition or relate to any acts that took place before the bankruptcy petition, then any claim alleging such acts is subject to the pre-bankruptcy petition sublimit of $15 million.

8.     The Defendants did not stop there.  They also limited their potential coverage obligations to zero with a special endorsement that states the Policy is void, unless one of the Insureds—meaning a director, officer or manager of BlockFi, but not BlockFi itself—files a petition for bankruptcy before December 9, 2022.  No such bankruptcy was filed and the premium was not returned.

9.     The Defendants also had no reasonable, fair, equitable or rational basis for selling the Policy when they knew BlockFi was insolvent.  Even if $30 million in coverage was available, the premium to coverage ratio of $30 million coverage to a $22.5 million premium (.75) far exceeds industry norms and demonstrates that the transfer of the assets was not made for a reasonably equivalent value.  And considering the endorsements that gutted coverage, there was no transfer of value and the Defendants received $22.5 million while providing nothing of value, or far less in value, in return.  No coverage has been paid under the Policy.

10.     In short, Plaintiff brings this action to recover no less than the $22.5 million in premiums transferred to Defendants, plus interest and costs.  The very terms of the Policy dictate that the Policy shall be void *ab initio* in the event that the defined "Insured" failed to file a bankruptcy petition by December 9, 2022 and that in such an event all premium payments shall be fully refunded.  No Insured filed for bankruptcy by that date and, for that reason alone, the Policy should be declared void and the Defendants should be ordered to repay the premium. Moreover, the premiums also must be returned because the funds transferred were part of transactions that unfairly or improperly depleted the BlockFi-debtor's assets or otherwise unfairly or improperly diluted the claims against those assets.

## THE PARTIES

11.     Each of the Debtors filed for protection under Chapter 11 of Title 11 of the U.S. Code on November 28, 2022, commencing Jointly Administered Lead Case No. 22-19361 (Bankr. D.N.J.).  On October 3, 2023, the Court entered an order confirming the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications)* (the "Confirmation Order" confirming and attaching the "Plan") [Docket No. 1660].  The Plan became effective on October 24, 2023 [Docket No. 1788], after which date the BlockFi "Debtors" became the "Wind-Down Debtors" by operation of the Plan and Confirmation Order.  Pursuant to the Plan, Mohsin Meghji of M3 Partners was appointed as Plan Administrator (the "Plan Administrator") and acts as sole director and officer of BlockFi as Wind-Down Debtors.  The Wind-Down Debtors' service address is c/o M3 Partners, 1700 Broadway, 19th Floor, New York, NY 10019.  BlockFi's claims in respect of the Policy were expressly preserved under the Plan.

12.     BlockFi Inc., is a Delaware corporation, incorporated on August 1, 2017, with its principal place of business at 201 Montgomery Street, Suite 263, Jersey City, New Jersey. BlockFi was a financial services company that, through its subsidiaries, generated revenue through cryptocurrency and other digital asset trading, lending, and borrowing.

13.     BlockFi Trading LLC, is a Delaware limited liability company formed on May 28, 2019, with its principal place of business at 201 Montgomery Street, Suite 263, Jersey City, New Jersey, and is a wholly owned subsidiary of Block Fi Inc. that accepted money and digital assets from investors and transferred the funds to BlockFi for investment in BlockFi Interest Accounts ("BIAs").

14.     BlockFi Lending LLC, is a Delaware limited liability company formed on January 11, 2018, with its principal place of business at 201 Montgomery Street, Suite 263, Jersey City, New Jersey, and is a wholly owned subsidiary of BlockFi Inc. and an affiliate of BlockFi Trading LLC.  BlockFi Lending LLC offered and sold interest-bearing digital asset accounts known as BIAs through which investors lent digital assets to BlockFi in exchange for BlockFi's promise to

provide variable monthly interest payments.

15.    Defendant ACE is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 436 Walnut Street, Philadelphia, Pennsylvania 19106 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

16.    Defendant Arch is a corporation organized and existing under the laws of the State of Missouri with its principal place of business at Harborside 3, 210 Hudson Street, Suite 300, Jersey City, New Jersey 07311 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

17.    Defendant Axis is a corporation incorporated under the laws of the State of Illinois with its principal place of business at 10000 Avalon Boulevard, Suite 200, Alpharetta, Georgia 30009 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

18.    Defendant Berkley is a corporation incorporated under the laws of the State of Delaware with its principal place of business at 475 Steamboat Road, Greenwich, Connecticut 06830 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

19.    Defendant Berkshire is a corporation organized and existing under the laws of the State of Nebraska with its principal place of business at 1314 Douglas Street, Suite 1400, Omaha, Nebraska 68102 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

20.    Defendant Endurance is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 4 Manhattanville Road, Purchase, New York 10577 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

21.    Defendant National Union is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business at 175 Water Street, 18th Floor,

New York, New York 10038 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

22.     Defendant U.S. Specialty is a corporation organized and existing under the laws of the State of Texas with its principal place of business at 13403 Northwest Freeway, Houston, Texas 77040 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

23.     Defendant XL Specialty is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 70 Seaview Avenue, Suite 5, Stamford, Connecticut 06902 and is a New Jersey licensed insurance company authorized to issue insurance in New Jersey conducting business in New Jersey.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this matter pursuant to New Jersey Rule 4:3.

25.     The venue is proper under New Jersey Rule 4:3-2 as the action arose in the instant venue, various parties to the action reside in, do business in, or are organized in this venue.

26.     Venue in this Court is also consistent with the Policy's choice of forum clause, which mandated that the subject Policy be governed and construed with the laws of New Jersey and that any claims relating to or arising out of the Policy be governed by the laws of New Jersey.

## FACTS

27.     BlockFi was a digital asset lender which offered a variety of services to investors and customers, including interest bearing accounts, credit cards, and the ability to buy, sell, and trade, cryptocurrency.  It was founded in 2017.  BlockFi took cryptocurrency deposits from customers that held interest-bearing accounts and loaned the deposited amounts to third parties at higher interest rates.  There were few counterparties willing to borrow the deposited cryptocurrency in large enough quantities at high interest rates to make BlockFi's business work

and to be profitable.  Two of the largest and most notable counterparties included Three Arrows Capital and Alameda Research, both of which failed catastrophically.

28.     Alameda Research ("Alameda") was co-founded in November 2017 by Sam Bankman-Fried and was a quantitative trading firm.  In April 2019, Bankman-Fried founded FTX Trading Ltd. ("FTX") whose primary operation was a cryptocurrency exchange platform.  FTX supported trading for popular cryptocurrencies, non-fungible tokens (NFTs), and spot, derivatives, and leveraged markets.

29.     BlockFi conducted extensive business with FTX and Alameda.  Between 2019 and March 2022, BlockFi's total trading volume is estimated to have grown from $2 million to more than $23 billion, while deployable assets grew from $345 million to $14.8 billion, and gross loan originations expanded from $687 million to more than $47 billion.

30.     During this period, BlockFi loaned increasing amounts to third parties, including Alameda.  Between July and September 2022, BlockFi lent Alameda nearly $900 million, almost exclusively collateralized by FTT (FTX's in-house reward token).  Because BlockFi required an exchange partner to facilitate its trading business and it held significant amounts of FTT as a result of its lending practices, BlockFi stored much of its FTT on the FTX exchange.  This also allowed BlockFi to take advantage of yield bonuses from FTX for doing so.

31.     In June 2022, the cryptocurrency market was in turmoil, resulting from a confluence of events, including the collapse of Three Arrows Capital.  As a result of the market decline and correlated withdrawals from its own platform, BlockFi sought an injection of liquidity to stabilize its operations.  FTX offered to supply that liquidity through a loan agreement and an option agreement for FTX to purchase the equity of BlockFi at a later time.  BlockFi accepted FTX's offer.  On June 30, 2022, BlockFi Inc., as borrower, entered into a loan agreement with West Realm Shires Inc. (d/b/a FTX US, "FTX US"), as lender (the "FTX Loan Agreement"), which provided for loans to be made to BlockFi in an amount of up to $400 million outstanding at any time.

32.     On November 2, 2022, days before Defendants sold the Policy to BlockFi, CoinDesk, a digital news site specializing in coverage of digital currencies, published an article revealing that of Alameda's $14.6 billion in reported assets, $5.8 billion was comprised of FTT. Shortly thereafter, a major competitor of FTX announced it would liquidate its sizable FTT holdings, and later publicly leaked word of alleged deposit misappropriations at FTX. Public confidence in Alameda and FTX, and in FTT, immediately collapsed, leading to mass liquidations and withdrawals of funds from FTX by consumers.

33.     FTX could not fund the withdrawals, and froze trading on its platform on November 8, 2022, depriving BlockFi of access to its own cryptocurrency deposits then worth approximately $350 million. BlockFi called in loans to Alameda secured by FTT, but after initially meeting margin calls and negotiating forbearance, on November 9, 2023 Alameda defaulted on outstanding loan and security agreements at a dollarized principal value at the time of approximately $700 million. FTX likewise refused to fund an outstanding draw request of $125 million under the FTX Loan Agreement. In sum, the freeze and collapse of the FTX group of companies deprived BlockFi of approximately $1.2 billion of liquidity.

34.     Amidst this market volatility and plummeting crypto asset prices, and with public awareness of the ties between its own liquidity and that of FTX, BlockFi suffered a similar spike in withdrawal requests. By November 9, it was unable to meet the incoming requests, given the loss of its multiple liquidity sources at FTX and Alameda. Contrary to assurances in prior days, on November 10, 2022, BlockFi "paused" its customer platform, halting withdrawals. The Defendants knew, or should have known, that BlockFi was insolvent, or imminently insolvent, on or before this date.

35.     On November 11, 2022, just a week before the Defendants' policy period started, the various FTX entities, including Alameda Research, began to commence voluntary cases under chapter 11 of the Bankruptcy Code in the U.S. District Court for the District of Delaware. These filings were public and garnered international media attention. Within days, BlockFi began preparing its own bankruptcy filing.

36.     But even before making bankruptcy preparations, BlockFi's directors, officers and managers sought to protect and insulate themselves from suit through the purchase of additional D&O insurance coverage, and immediately began to look for coverage.

37.     At 9:30 a.m. (EST) on November 11, 2022, a special meeting of BlockFi's Board was held, wherein the Board discussed obtaining additional D&O coverage and directed BlockFi Company management to discuss the D&O coverage with, and obtain bids through, insurance brokers.

38.     BlockFi's Board met again on November 11, 2022, at 5:30 p.m. (EST).  Among other things, the Board discussed the Alameda loans and the ongoing efforts to solicit bids for the additional D&O coverage.  The Board expected that insurance premium pricing quotes would be received the following week.

39.     BlockFi also attempted to obtain additional D&O coverage from their existing D&O insurance company, Relm Insurance Ltd. ("Relm").  Relm openly stated its concerns that working with BlockFi to transfer company assets in advance of a likely insolvency could be viewed negatively and that the policy premiums could potentially be clawed back by a bankruptcy judge.

40.     On November 15, 2022, Relm declined to offer BlockFi a proposal for additional D&O insurance.

41.     On November 17, 2022, the BlockFi Board discussed the various offers they received from other insurance companies and unanimously approved the purchase of additional D&O insurance in an amount up to $30 million, which was subject to BlockFi's ability to liquidate significant cryptocurrency assets from those it had on hand, in order to pay the premium.  The Board approved the purchase with full knowledge that payment of the additional D&O insurance premium would have an outsized negative impact on BlockFi's liquidity.

42.     The Defendants knew or should have known at the time they made their proposal that BlockFi was insolvent or imminently insolvent.

43.    On November 18, 2022, less than a week after starting to request bids for coverage, BlockFi's additional D&O coverage under the Policy was in place and the policy period started. The issued Policy, Policy No. G71101320 001, is a quota share excess layer split among the following insurers facially stating a $30 Million limit shared in the following amounts:

| Quota Share Insurer | Quota Share Insurer Limit of Liability Proportion Underwritten |
|---|---|
| Axis Insurance Company | $2 Million |
| ACE American Insurance Company | $5 Million |
| National Union Fire Insurance | $5 Million |
| Endurance American Specialty | $5 Million |
| U.S. Special Insurance Company | $5 Million |
| XL Special Insurance Company | $2 Million |
| Arch Insurance Company | $2 Million |
| Berkshire Hathaway Specialty Ins. Co. | $2 Million |
| Berkley Insurance Company | $2 Million |

44.    The Policy period ran from November 18, 2022 to November 18, 2023, and BlockFi paid a premium of $22.5 million, a premium paid entirely from BlockFi assets.

45.    The Policy provides Side A-Only coverage that covers individual directors, officers and managers of BlockFi when BlockFi is unable to indemnify those individuals, and provides absolutely no coverage to BlockFi.

46.    Included within the Policy was an endorsement entitled "Sublimit Endorsement." The Sublimit Endorsement sets forth two mutually exclusive sublimits that reduced the $30 million limit stated in the declarations to $15 million.  The endorsement did so by reducing the limits of available coverage: (i) to $15 million for claims arising out of acts committed prior to the bankruptcy petition date; and (ii) to $15 million for claims arising out of acts committed on or after the bankruptcy petition date.

11

47.     The Endorsement stated:

MUTUALLY EXCLUSIVE SUBLIMITS

(i)     Solely with respect to LOSS in connection with any CLAIM based upon, arising out of, related to, or attributable to, any facts, circumstances, situations or WRONGFUL ACTS committed, attempted, or allegedly committed or attempted, in whole or in part, prior to the FILE DATE, the INSURER'S maximum limit of liability shall be $15,000,000, in the aggregate, regardless of the number of CLAIMS thereunder (the "Pre-File Date Sublimit"). …

(ii)    Solely with respect to LOSS in connection with any CLAIM based upon, arising out of, related to, or attributable to any facts, circumstances or WRONGFUL ACTS committed, attempted, or allegedly committed or attempted in whole, on or after the FILE DATE, the INSURER'S maximum limit of liability shall be $15,000,000, in the aggregate, regardless of the number of CLAIMS thereunder (the "Post-File Date Sublimit"). …

48.     The same endorsement further stated, among other things, that allegations of Wrongful Acts that purportedly "could be construed as" having taken place partially before the File Date or that "that arises out of or relates to the same or series of related facts, circumstances, situations, transactions, events, or Wrongful Acts" from before the File Date, would be deemed to be pre-File Date Claims subject to that sublimit:

(iii)   In the event that any LOSS in connection with any CLAIM involves:

(a) any WRONGFUL ACT that could be construed as having been, in part, committed prior to the FILE DATE and, in part, committed on or after the FILE DATE, or

(b) any WRONGFUL ACT occurring on or after the FILE DATE, that arises out of or relates to the same or series of related facts, circumstances, situations, transactions, events, or WRONGFUL ACTS occurring before the FILE DATE;

such CLAIM shall be subject to the Pre-File Date Sublimit; and in no event shall any CLAIM be subject to more than one sublimit.

49.     The Defendants knew they were essentially eliminating the likelihood of paying money for a Claim arising out of the post-petition period, because they knew that Claims against the existing directors, officers, and managers would most likely be based at least in part on the conduct of those directors, officers, and managers in the pre-petition period or be related to the conduct that led to the filing for bankruptcy.

50.     The Defendants drafted the Policy, including without limitation the Sublimit Endorsement.

51.     When Defendants drafted and issued the Policy, they knew or should have known that BlockFi was inextricably tied to FTX through its rescue loans, that FTX was financially distressed and in bankruptcy proceedings, and that BlockFi was no longer financially stable.

52.     The same Sublimit Endorsement included a further limitation that specifically stated the Policy was void *ab initio* in the event a bankruptcy petition was not filed by the "Insured" by December 9, 2022.  Paragraph 3 of the Sublimit Endorsement states:

> It is understood and agreed that, notwithstanding anything to the contrary in this POLICY, and further, pursuant to the INSURED'S request, in the event that the INSURED fails to file a bankruptcy petition by 12/09/2022 (the "Specified Date"), this POLICY shall be void ab initio, in which case any and all premium payments shall be fully refunded; provided however, that, the INSURER, the INSURED, the all of the Quota Share Insurers, as set forth in the Quota Share Endorsement, may, together, mutually agree in writing to amend the Specified Date, by Endorsement to this POLICY.

53.     The Policy defined "Insured" as "natural persons" who were, *inter alia*, directors, managers, trustees, officers, and others, but did not include within that definition BlockFi or any other "company."  The Policy, states in § 2(k) that Insured means:

> 1. all natural persons who were, now are, or shall be: i. duly elected or appointed directors (including shadow and de facto directors), trustees, governors, officers, management committee members, MANAGERS, in-house general counsel, or comptrollers of the COMPANY; ii. serving as a representative of an entity that serves as a director of the COMPANY; iii. prospective directors of the COMPANY named as such in any listing particulars, prospectus or similar offering document; iv. directors of investor relations, directors of human resources, risk managers or other managers serving in a functionally equivalent or comparable position with the COMPANY; or v. with respect to any COMPANY chartered outside the United States, natural person(s) serving in a position with such COMPANY which is functionally equivalent or comparable to any position described in i through iv above; named as such in any listing particulars, prospectus or similar offering document; iv. directors of investor relations, directors of human resources, risk managers or other managers serving in a functionally equivalent or comparable position with the COMPANY; or v. with respect to any COMPANY chartered outside the United States, natural person(s) serving in a position with such COMPANY which is functionally equivalent or comparable to any position described in i through iv above;

2. all other natural persons not described in 1 above who were, now are, or shall be full-time or parttime, seasonal or temporary employees of the COMPANY, provided coverage for such other persons shall apply only if and while: i. the COMPANY agrees to advance DEFENSE COSTS and indemnify such other persons with respect to the CLAIM to the same extent as the COMPANY agrees to advance DEFENSE COSTS for and indemnify the persons described in 1 above; or ii. the CLAIM is: (A) by securities holders of the COMPANY in their capacity as such, including without limitation any shareholder derivative or securities class action lawsuit; or (B) made and continuously maintained against a person described in 1 above;

3. all natural persons who were, now are, or shall be serving as directors, officers, trustees, governors, or the equivalent thereof, for any OUTSIDE ENTITY if: i. such activity is part of their duties regularly assigned by the COMPANY; or ii. Such activity is at the specific direction or request of the COMPANY; or iii. such persons are a member of a class of persons so directed to serve by the COMPANY; and

4. the estates, heirs, legal representatives or assigns of deceased INSUREDS and the legal representatives or assigns of INSUREDS in the event of their incompetency, insolvency or bankruptcy.

54.      As of the filing of this Complaint, none of the Insureds have filed a petition for bankruptcy and thus have not filed a petition before the specified date (December 9, 2022) under the Policy.

55.      At the time the Defendants drafted and issued the Policy, they knew or should have known that BlockFi was extremely likely to file for bankruptcy protection and that such filing was imminent.

56.      At the time the Defendants drafted and issued the Policy, they knew or should have known that the directors, officers and other Insureds under the Policy would receive releases from many claims, as a result of BlockFi filing a bankruptcy petition.

57.      At the time the Defendants drafted and issued the Policy, they knew or should have known that BlockFi paying a $22.5 million premium significantly depleted BlockFi's assets at a time when it was already insolvent.

58.      Defendants also added policy language that enabled them to declare the Policy void, if an Insured did not file for bankruptcy within three weeks of the commencement of the

14

policy period.

59.     The Defendants bound coverage, accepted the $22.5 million premium, and the Policy period started on November 18, 2022.

60.     BlockFi filed its petition for bankruptcy protection on November 28, 2022.

61.     No Insured filed a bankruptcy petition by December 9, 2022.

62.     Plaintiff has demanded that the Policy premium be returned, pursuant to the terms of the Policy.

63.     As of the filing of this Amended Complaint, the Defendants have not refunded or returned any portion of the Policy premium payment of $22.5 million, despite Plaintiff's demand that they do so.

64.     BlockFi's liquidating plan of reorganization went effective on October 24, 2023. All assets recovered by the Wind-Down Debtors will be used, net of costs of recovery and administration, to increase distributions to BlockFi's customers and creditors.

65.     Following the Effective Date, the Wind-Down Debtors purchased directors and officers insurance coverage under a policy providing far more extensive coverage than the Policy, at approximately one-twentieth the cost of the post-bankruptcy coverage purportedly available under the Policy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### (*Declaratory Judgment*)

66.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 64 as if set forth fully herein.

67.     This is a cause of action for declaratory relief pursuant to the Declaratory Judgments Act, N.J. Stat. Ann. §§ 2A:16-51 *et seq*., which authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity.

68.     Plaintiff seeks a judicial determination of its rights and Defendants' duties with respect to an actual controversy arising under the Policy.

69.     Specifically, Plaintiff seeks a declaration that the Policy is void *ab initio* and that

Plaintiff, having assumed Defendants' position under the policy, and as fiduciary to, and on behalf of, the unsecured creditors of the Debtors of the BlockFi assets, is entitled to a return of the Policy premium, because BlockFi is not a natural person and was not included in the definition of "Insureds" and none of the Insured have filed for bankruptcy, thus triggering Paragraph 3 of the Policy Sublimit Endorsement which provides that if the Insured fails "to file a bankruptcy petition by 12/09/2022 (the "Specified Date"), this POLICY shall be void ab initio, in which case any and all premium payments shall be fully refunded."

### SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
*(Avoidance and Recovery of Fraudulent Transfers and N.J.S.A. 25:2-27(a)&(b))*

70.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if set forth fully herein.

71.     As a matter of record in the Debtor's chapter 11 proceedings, at all relevant times prior to the Transfers, Debtor had many thousands of creditors.

72.     Pursuant to 11 U.S.C. § 544(b) and the Debtor's confirmed plan of reorganization, the Wind-Down Debtor has the rights and powers of creditors whose claims arose before the Transfers to bring, among others, causes of action under New Jersey law for the avoidance of fraudulent transfers.

73.     Debtor received less than reasonable equivalent value for the Transfers described above.

74.     The Debtor was insolvent on the dates the Transfers referenced and described above were made or became insolvent as a result of the Transfers.

75.     The Debtor conducted its business in a manner and intent to incur debts beyond its ability to repay.

76.     The Transfers constitute fraudulent transfers pursuant to N.J.S.A. 25:2-27(a) and (b).

77.     The Plaintiff is entitled to avoid and recover the transfers referenced and described above pursuant to N.J.S.A. 25:2-29.

78.     The Defendants are the transferees of the transfer referenced and described above

under N.J.S.A. 25:2-30(b)(1) and (2).

79.     The Plaintiff is entitled to recover the value of the Transfers from the Defendants under N.J.S.A. 25:2-30(b).

**THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS**
*(Avoidance and Recovery of Fraudulent Transfers – N.J.S.A. 25:2-25(a)&(b))*

80.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 78 as if set forth fully herein.

81.     The Transfers referred to hereinabove were made with actual intent to hinder, delay or defraud the Debtor's creditors.

82.     Alternatively, the Transfers referred to hereinabove were made without receiving a reasonably equivalent value in exchange for the transfers and the debtor was either (a) engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

83.     The Transfer referred to hereinabove was made without receiving reasonable equivalent value in that the Debtors transferred $22.5 Million for the equivalent of a self-serving D&O policy that would, in practice and effect, only provide $15 Million of coverage as set forth and described above.

84.     The transfers referred to hereinabove were made with actual fraudulent intent as evidenced by, among other things, the following badges of fraud:

    a.  The debtor made the transfer for the benefit of debtor's board members, directors, and officers;

    b.  The Transfers or obligations were concealed through internal deliberations amongst the very board members who would benefit from the D&O insurance at the expense of, and without the knowledge of, current and future creditors;

    c.  Before the transfer was made, the Debtors knew they would be threatened with suit;

17

    d.   The Debtor transferred assets to obtain the self-serving D&O policy;

    e.   The value of the consideration received was not reasonably equivalent to the value of the asset, the D&O Policy, transferred;

    f.   The Debtor was insolvent at the time of the Transfer or became insolvent shortly after the transfer was made or the obligation was incurred; and

    g.   The Transfer occurred shortly before or shortly after a substantial debt was incurred.

85.    The Transfers referred to hereinabove constitute fraudulent transfers pursuant to N.J.S.A. 25:2-25(a), or alternatively, N.J.S.A. 25:2-25(b), or both.

86.    The Plaintiff is entitled to avoid the transfers pursuant to N.J.S.A. 25:2-29.

87.    The Plaintiff is entitled to recover the value of the Transfers from the Defendants pursuant to N.J.S.A. 25:2-29.

### FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
*(Breach of Contract)*

88.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 86 as if set forth fully herein.

89.    The Policy constituted a valid and enforceable contract between BlockFi and defendant insurers.

90.    Plaintiff, pursuant to sections 105 and 306 of the Bankruptcy Code has assumed each of the Insurance Contracts, including the subject D&O policy, and, further as fiduciary to the unsecured creditors of the Debtors of the BlockFi assets has standing to seek enforcement of that contract.

91.    Defendants have wrongfully failed to return the premiums to which Plaintiff is entitled under the terms of the Policy, despite Plaintiff's demands for their return.

92.    Paragraph 3 of the Policy Sublimit Endorsement provides that if the Insured fails "to file a bankruptcy petition by 12/09/2022 (the "Specified Date"), this POLICY shall be void ab initio, in which case any and all premium payments shall be fully refunded."

93.    In consideration of the Policy issued, BlockFi paid Defendants the full premium

of $22.5 Million.  Defendants are in possession of that premium and have not refunded BlockFi, the Wind-Down Committee, or any representatives thereof any portion of the $22.5 Million premium.

94.    BlockFi is not a natural person and was not included in the definition of "Insureds."

95.    As of the filing of this Complaint, none of the Insureds has filed a petition for bankruptcy and thus none filed a petition before the specified date (December 9, 2022) under the Policy.

96.    Because none of the Insureds has filed for bankruptcy, under Paragraph 3 of the Policy Sublimit Endorsement, Defendants were obligated to fully return the premium payment of $22.5 Million.

97.    Plaintiff has demanded the return of the full premium amount but Defendants have not returned any portion of it.

98.    Defendants' failure to return the premium payment is a breach of their duties under the Policy.

99.    Plaintiff Wind-Down Committee and BlockFi's unsecured creditors, have sustained damages which were proximately caused by Defendants' breach and in an amount to be proven at trial, including without limitation the amount of the Policy premium, compensatory damages, consequential damages, pre- and post-judgment interest, fees, and costs.

### IN THE ALTERNATIVE, FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### (*Rescission*)

100.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 64 as if set forth fully herein.

101.    To the extent the Policy is not found to be void *ab initio*, based on its plain wording, Defendants made multiple material misrepresentations to Plaintiff.

102.    Defendants sold the D&O Policy to Plaintiff misrepresenting that it provided $30 million of insurance coverage, when it did not.

103.    Defendants misrepresented the amount of available coverage under the D&O

19

Policy.

104. Defendants misrepresented that the Policy would be void in a matter of weeks, resulting in the return of the $22.5 million premium.

105. The Defendants' misrepresentations were material because the amount of coverage under the applicable limits of insurance is at the core of the value of the Policy and the premium payment was based on the amount of coverage available under the Policy.

106. As a result of the Defendants' misrepresentations, BlockFi was not able to ascertain and value the amount of coverage it was purchasing, which it needed to do in order to assess whether the premium it was paying for that coverage was reasonable or appropriate.

107. As a result of Defendants misrepresentations, BlockFi expected the Policy to be void *ab initio*, and its entire premium to be returned in weeks, unless an individual insured filed for bankruptcy within 21 days from the inception of the Policy.

108. To the extent the Policy is not found to be void *ab initio*, based on its plain wording, the Defendants made material misrepresentations in selling the Policy to BlockFi.

109. Plaintiff is entitled to rescission of the Policy based upon the Defendants' material misrepresentations.

### IN THE ALTERNATIVE, SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (*Illusory Coverage – Unjust Enrichment*)

110. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 64 as if set forth fully herein.

111. To the extent the Policy is not found to be void *ab initio*, based on its plain language, the Defendants should be ordered to return the premium because they sold illusory coverage and were thereby unjustly enriched.

112. The Policy fails to provide the amount of coverage stated in the Declarations, $30 million, despite that the Defendants charged $22.5 million as a premium for that coverage.

113. The Policy provided, at most, coverage for three weeks, based on the wording of the Policy.

114.    Even assuming coverage could ever have been paid under the terms of the Policy, the Policy purports to limit coverage to $15 million, far less than $30 million and less than the premium of $22.5 million.

115.    Paying $22.5 million in premium for coverage that almost certainly would never be paid and, assuming for purposes of argument that it could be paid, was limited to an amount millions of dollars less than the premium, is unrealistic and unreasonable.

116.    The Policy fails to provide protection to BlockFi or any of the Insureds, as defined in the Policy.

117.    BlockFi had a reasonable expectation that it was receiving insurance coverage and that such coverage was in a dollar amount that was higher than the premium it paid.

118.    The premium payment did not secure or purchase insurance coverage for the Insureds or secured an unreasonably narrow and sublimited amount of insurance coverage.

119.    BlockFi received no benefit or received an unreasonably small benefit in return for its $22.5 million premium payment.

120.    The Defendants knew or should have known that BlockFi was insolvent at the time the Defendants sold BlockFi the Policy.

121.    The Defendants received a benefit of $22.5 million and in return for the Policy which does not provide coverage or provides unreasonably narrow and sublimited coverage, such that Defendants' retention of the benefit of the premium they received is unjust.

122.    The Defendants retention of the premium BlockFi paid enriches the Defendants beyond the reasonable or expected amount and beyond their contractual rights.

123.    Plaintiff is entitled to a return of the premium paid for the Policy because the Defendants sold illusory coverage and because their retention of the premium is unjust.

**WHEREFORE,** Plaintiff Wind-Down Debtors' Oversight Committee respectfully requests that the Court enter a judgment in favor of Plaintiff as follows:

1. Declaring the Policy void *ab initio* and that Defendants must refund the full amount of all premiums paid for the Policy, together with interest thereon;

2.  Voiding the Transfers and awarding Plaintiff the right to recover the value of the Transfers from the Defendants;

3.  In the alternative, rescinding the Policy and ordering the Defendants to pay to Plaintiff the full amount of all premiums paid for the Policy, together with interest thereon;

4.  In the alternative, determining that the Defendants retention of the premium paid for the Policy would be unjust and ordering the Defendants to pay to Plaintiff the full amount of all premiums paid for the Policy, together with interest thereon;

5.  Awarding Plaintiff compensatory and consequential damages resulting from Defendants' breach of the Policy including ordering the Defendants to pay to Plaintiff the full amount of all premiums paid for the Policy, together with interest thereon;

6.  Awarding Plaintiff attorneys' fees, costs, disbursements and expenses that Plaintiff has incurred in prosecuting this action pursuant to statute and common law;

7.  Awarding Plaintiff pre- and post-judgment interest; and

8.  Awarding such other and further relief as the Court deems just and proper.


## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

## <u>DESIGNATION OF TRIAL COUNSEL</u>

Pursuant to <u>R.</u> 4:25-4, John G. Doyle, Esq. and Jennifer Borek, Esq. are hereby designated as trial counsel for Plaintiffs in the above matter.

Dated: February 13, 2024                    Respectfully Submitted

                              **BROWN RUDNICK LLP**


                    By:___/s/ *John G. Doyle*_____
                           STEPHEN D. PALLEY, ESQ.,
                           (pro hac vice forthcoming)
                           DANIEL J. HEALY, ESQ.,
                           (pro hac vice forthcoming)
                           JOHN G. DOYLE, ESQ.,
                           Attorney ID No.:045872005
                           601 Thirteenth Street NW Suite 600
                           Washington, D.C. 20005
                           Telephone: (202) 536-1766
                           Facsimile: (617) 289-0766
                           spalley@brownrudnick.com
                           dhealy@brownrudnick.com
                           jdoyle@brownrudnick.com

                           KENNETH J. AULET, ESQ.
                           (pro hac vice forthcoming)
                           BROWN RUDNICK LLP
                           Seven Times Square
                           New York, NY  10036
                           Telephone: (212) 209-4800
                           Facsimile: (212) 209-4801
                           kaulet@brownrudnick.com

                           TRISTAN G. AXELROD, ESQ.
                           (pro hac vice forthcoming)
                           BROWN RUDNICK LLP
                           One Financial Center
                           Boston, MA  02111
                           Telephone: (617) 856-8200
                           Fax: (617) 856-8201
                           taxelrod@brownrudnick.com

                           JENNIFER BOREK, ESQ.
                           Attorney ID No. :041131997
                           **GENOVA BURNS LLC**
                           494 Broad Street
                           Newark, New Jersey 07102
                           Telephone: (973) 533-0777
                           Facsimile: (973) 535-7107
                           jborek@genovaburns.com


                           *Attorneys for Plaintiff, Plan Administrator of*
                           *BlockFi, Inc. et al.*

## <u>RULE 4:5-1 CERTIFICATION</u>

I, John G. Doyle, certify pursuant to Rule 4:5-1 that, to the best of my knowledge, information and belief, the matter in controversy is not the subject of any other action, tribunal or arbitration proceeding, now or contemplated, and that no other parties should be joined in this action pursuant to Rule 4:28.

I further certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Dated: February 13, 2024

Respectfully Submitted

**BROWN RUDNICK LLP**

By:   /s/ *John G. Doyle*

STEPHEN D. PALLEY, ESQ.,
(pro hac vice forthcoming)
DANIEL J. HEALY, ESQ.,
(pro hac vice forthcoming)
JOHN G. DOYLE, ESQ.,
Attorney ID No.:045872005
601 Thirteenth Street NW Suite 600
Washington, D.C. 20005
Telephone: (202) 536-1766
Facsimile: (617) 289-0766
spalley@brownrudnick.com
dhealy@brownrudnick.com
jdoyle@brownrudnick.com

JENNIFER BOREK, ESQ.
Attorney ID No. :041131997
**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 535-7107
jborek@genovaburns.com

KENNETH J. AULET, ESQ.
(pro hac vice forthcoming)
BROWN RUDNICK LLP
Seven Times Square
New York, NY  10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
kaulet@brownrudnick.com

TRISTAN G. AXELROD, ESQ.
(pro hac vice forthcoming)
BROWN RUDNICK LLP
One Financial Center
Boston, MA  02111
Telephone: (617) 856-8200
Fax: (617) 856-8201
taxelrod@brownrudnick.com

*Attorneys for Plaintiff, Plan Administrator of BlockFi, Inc. et al.*