UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                          .      Case No. 22-19361-MBK
                                .
BLOCKFI INC., et al.,           .
                                .      402 East State Street
                                .      Trenton, NJ 08608
          Debtors.             .
                                .      February 27, 2024
. . . . . . . . . . . . ..      10:02 A.M.


TRANSCRIPT OF WIND-DOWN DEBTORS' 16TH OMNIBUS OBJECTION TO
CLAIMS [DOCKET NO. 2084];  NOTICE OF PROPOSED COMPROMISE OR
SETTLEMENT OF CONTROVERSY RE: SETTLEMENT OF ADVERSARY
PROCEEDING 23-01175 [DOCKET NO. 2105];  WIND-DOWN DEBTORS'
OBJECTION TO CLAIM FILED BY THE CONNECTICUT DEPARTMENT OF
BANKING [DOCKET NO. 1942];  WIND-DOWN DEBTORS' 14TH OMNIBUS
OBJECTION TO CLAIM NO. 7 [DOCKET NO. 2010];  WIND-DOWN DEBTORS'
15TH OMNIBUS OBJECTION TO CLAIMS [DOCKET NO. 2070]

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE


Audio Operator:            Kiya Martin


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Haynes and Boone, LLP<br>By: MATT FERRIS, ESQ.<br>2801 N. Harwood Street<br>Suite 2300<br>Dallas, TX 75201 |
| For the Official<br>Committee of Unsecured<br>Creditors: | Brown Rudnick, LLP<br>By: KENNETH AULET, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| | Haynes and Boone, LLP<br>LAUREN M. SISSON, ESQ.<br>30 Rockefeller Plaza, 26th Floor<br>New York, NY  10112 |
| For the U.S. Trustee: | Office of the United States Trustee<br>By:  JEFFREY M. SPONDER, ESQ.<br>One Newark Center<br>Newark, NJ  07102 |
| Connecticut Department<br>of Banking: | Pullman & Comley<br>By:  IRVE J. GOLDMAN, ESQ.<br>        KRISTIN B. MAYHEW, ESQ.<br>850 Main Street<br>Bridgeport, CT  06601 |

- - -

1           THE COURT:  Good morning, everyone.  This is Judge

2   Kaplan.

3           UNIDENTIFIED ATTORNEY:  Good morning, Your Honor.

4           THE COURT:  And we'll start our hearings this

5   morning.  Let me get my technology up to speed.  There we go.

6   I could see everyone.

7           Before the Court today are various BlockFi claims,

8   issues.  The Court is in receipt of the agenda.  Who would like

9   to lead off?

10          MR. AULET:  Good morning, Your Honor.  Kenneth Aulet

11  of Brown Rudnick for the Plan Administrator.  First, I'd like

12  to give a status update on the process of distributions, if

13  that's all right with Your Honor.

14          THE COURT:  That's fine.

15          MR. AULET:  Then we'll go through the agenda to note

16  all of the issues that have been resolved or are proposed to be

17  heard on the papers.  And at that point we can get to the one

18  contested matter which is the objection to the claim of the

19  State of Connecticut.

20          THE COURT:  All right, feel free to go ahead.

21          MR. AULET:  Thank you, Your Honor.  So as Your Honor

22  is aware, we announced at the end of January that we were

23  opening up distributions on unsecured claims.  To date

24  virtually all convenience class claims have been opened up for

25  distribution.  These are hundreds of thousands of claims, the

1   large majority of the claims that are going to be receiving at

2   distribution from the BlockFi estate.  Each of those claims is

3   receiving 50 percent of their petition date value on their

4   allowed claim.

5           This week we anticipate opening up significant non-

6   convenience class claims, the larger population claims.  To do

7   that, we expect to file a notice indicating the final

8   distribution percentages for each estate, BlockFi, Inc.,

9   BlockFi International and BlockFi Lending, as well as the

10  Bitcoin and the Theorem price is going to be used for the

11  purposes of distributions.

12          And since there's been a little confusion on that

13  point, I wanted to clarify the estate has conducted a re-

14  balancing to ensure that we have the requisite amount of

15  Bitcoin to do in kind distributions for all claims including

16  claims that are in the dispute claims reserve.  And so any

17  claim will receive Bitcoin or Theorem at the same price

18  regardless of when it receives its distribution which is

19  important as prices have been particularly volatile this month.

20  So, we wanted to make sure that everybody was aware that if you

21  get your distribution today or if you get your distribution in

22  two weeks, obviously everybody would prefer not to wait the two

23  weeks, but they will not be economically prejudiced by being

24  delayed in when they receive their distribution.

25          For these non-convenience class distributions we

1  expect to first open up accounts that have only a single asset

2  class so, for example, only dollars, only Bitcoin, only Theorem

3  and then quickly move to the remaining claims.  And we also

4  expect to allow substantial numbers of filed claims that have

5  either been modified by a previous order of the Court or that

6  upon review, we have determined can be allowed as asserted.

7  And once those claims are allowed, again, we expect to file a

8  notice on the docket indicating the claims numbers to be

9  allowed.  Those claims will participate in the first interim

10 distribution, as well.

11       From that point after every omnibus objection is

12 ruled upon, any claims that have been -- that can then be

13 allowed will become allowed and receive the first interim

14 distribution.

15       THE COURT:  What is the rough, if you can explain it

16 again, the rough percentage for the first interim distribution?

17       MR. AULET:  It's anticipated to be between 20 to 40

18 percent across all estates, BlockFi, Inc. falling on the lower

19 end of the range and BlockFi International and Lending falling

20 on the higher end of the range.

21       THE COURT:  All right.  Thank you.

22       MR. AULET:  One other issue to flag in the process of

23 reconciling claims, we've determined that there's a relatively

24 small number of BlockFi private client accounts where the

25 scheduled amounts were mistaken.  They undercounted the

1  interest that was due to those claimants.

2          We expect to file a motion seeking authority to

3  modify those schedules in the coming days.  The issue being, of

4  course, we're in the middle of a distribution, we can't reopen

5  the claims process so we're going to be seeking relief to make

6  those modifications.  In all cases people will be receiving

7  more than their originally-scheduled amount, but seeking

8  authority to do so without reopening the claims process.

9          THE COURT:  Sounds acceptable.

10          MR. AULET:  And with that, I will turn to the matters

11  that we have going forward today.

12          So, first, we have the 16th omnibus objection to

13  claims where there have been no responses received and so we

14  would propose that that go forward on an uncontested basis on

15  the papers.

16          THE COURT:  All right.  We can mark that motion

17  granted.  Do we have a proposed order or is it just

18  accompanying the motion?

19          MR. AULET:  I'll defer to my co-counsel, Lauren

20  Sisson, for all questions on the omnibus objections.

21          MS. SISSON:  Good morning, Your Honor.  Lauren

22  Sisson, Haynes and Boone.  We'll be submitted revised proposed

23  orders on the 16th, 15th and the remaining claims from the 14th

24  today to chambers.

25          THE COURT:  All right.  So, we'll mark that granted

1  OTBS, order to be submitted.  Thank you, Ms. Sisson.

2        MR. AULET:  Okay.  And then to go through the other

3  omnibus objections -- we're just a little out of order -- on

4  the 14th omnibus objection to Claim Number 7 we have discussed

5  with the claimant and they have withdrawn their response and

6  permitted us to move forward with seeking to modify the claim

7  as requested.  They did ask us to make a confirmation on the

8  record that when we object to claims as being misstated or

9  different priority levels or different asserted against the

10  wrong entity, that's not an accusation that anybody did

11  anything wrong.  We recognize that creditors aren't asking to

12  be part of the bankruptcy process and none of the omnibus

13  objections are intended to impugn the honesty of any of the

14  claimants, merely to correct the claims register.

15        THE COURT:  I think that's fair.  So, we will mark

16  that matter -- is that the last claim on the 14th, or are there

17  additional claims, Ms. Sisson?

18        MS. SISSON:  There's one additional claim that will

19  be on the order that's also being resolved with the creditor

20  but there are no outstanding claims anymore for the 14th.

21        THE COURT:  All right, so that resolves the 14th.

22  We'll mark it OTBS.

23        MR. AULET:  And then on the 15th omnibus objection

24  there were a number of creditor responses, but I understand

25  that the Court has asked to have those matters heard on the

8

1  papers so unless Your Honor has any questions, we would rest on

2  our papers on that matter.

3       THE COURT:  That's acceptable.  The Court is still

4  engaged in reviewing the responses, as well as the wind-down

5  debtors' reply.

6       MR. AULET:  Thank you, Your Honor.

7       And next, the proposed settlement of the Vrai Nom

8  adversary proceeding.  The U.S. Trustee filed an objection to

9  the sealing motion for that settlement which, as noted on the

10 objection, has been resolved and so we propose that that

11 similarly be heard on the papers.

12      THE COURT:  I reviewed the order this morning, the

13 proposed order, which reflects I believe the U.S. Trustee's

14 concerns.

15      Mr. Sponder, is that correct?  You've seen the form

16 of order?

17      MR. SPONDER:  Good morning, Your Honor.  Jeff Sponder

18 from the Office of the United States Trustee.  We have seen the

19 form of order and that order is -- can be entered by Your Honor

20 if there aren't any other issues that Your Honor may have.

21 Thank you.

22      THE COURT:  All right, thank you, Mr. Sponder.  The

23 Court will enter the order this afternoon.

24      MR. AULET:  Okay.  And the last matter is the

25 contested matter of the Plan Administrator, the wind-down

1   debtors' objection to the claim of the Connecticut Department

2   of Banking.  My co-counsel, Matt Ferris, will be handling the

3   opening and any witness issues and I will be handling the

4   closing for that.  So, I'll turn it over to Matt.

5              THE COURT:  All right, thank you.

6              Good morning, Mr. Ferris.

7              MR. FERRIS:  Thank you.

8              THE COURT:  Let me have appearances just for the

9   Connecticut Department of Banking.

10                       (No audible response)

11             THE COURT:  Mr. Goldman, I think you need to --

12             MR. GOLDMAN:  Yes, you're quite right, Your Honor.

13  Good morning.  Irve Goldman, Pullman & Comley, representing the

14  Department of Banking of the State of Connecticut.  With me is

15  my colleague, Kristin Mayhew, also from Pullman & Comley.

16             THE COURT:  Good morning.

17             MS. MAYHEW:  Good morning, Your Honor.

18             THE COURT:  All right.  And is there anyone else

19  entering an appearance on this particular objection?

20                       (No audible response)

21             THE COURT:  All right, Mr. Ferris, continue, please.

22  Thank you.

23             MR. FERRIS:  Yes.  Thank you, Your Honor.  For the

24  record, Matthew Ferris with Haynes & Boone on behalf of the

25  wind-down debtors.

1          I also anticipate that my colleague, Jordan Chavez,

2 may present on some of the evidentiary issues.  Your Honor,

3 also just by way of introduction we have appearing virtually

4 two witnesses that we anticipate calling today.  The first is

5 Amit Cheela, the debtors' chief financial officer, and the

6 second is Michael Minaka (phonetic) from Covington & Burling

7 who served as regulatory counsel to the debtors.

8          As noted, Your Honor, we have a contested objection

9 with respect to the proof of claim filed by the Connecticut

10 Department of Banking which I will refer to in short as either

11 the CDOB or the Department.  The objection to the claim was

12 filed by the wind-debtors on December 6th and it's at Docket

13 Number 1942.  That objection was originally set for hearing on

14 January 25th.  Your Honor, at the request of the Department the

15 wind-down debtors agreed to adjourn that hearing to today to

16 allow the Department to engage bankruptcy counsel and provide a

17 neutral time for bankruptcy counsel to respond.

18          We are here prepared to go forward on the merits of

19 the claim objection.  As I noted at the outset, we do have our

20 witnesses here prepared to give testimony.  The wind-down

21 debtors are moving expeditiously to administer claims and the

22 proper resolution of this claim is an important step to winding

23 up these cases.

24          Unfortunately, Your Honor, we have conferred on a

25 number of occasions with the Department's counsel and we hoped

11

1 to reach agreement to streamline some of the evidentiary issues

2 for the hearing this morning but, unfortunately, we weren't

3 able to reach a resolution and so I think we have some gating

4 issues that we're going to need Your Honor's assistance on.  We

5 had requested that the Department agree to the admission of the

6 declarations that were filed in support of the claim objection

7 and the reply.  The Department has declined to do that.

8        As I said, again, Your Honor, our witnesses are here.

9 They're available for cross examination.  You know, for

10 purposes of advancing the hearing, we would propose to admit

11 those two declarations subject to the Department's right to

12 cross examine.  The Department has indicated that they intend

13 to object to that.  But I would note for the Court that the

14 Department has had notice of the claim objection for now nearly

15 three months.  The Department had ample opportunity to conduct

16 discovery had it wanted to which it did not and prepare for

17 this evidentiary hearing.

18        Furthermore, the declarations were filed with both

19 the initial claim objection and the reply.  Also, the Michael

20 Minaka declaration was filed in connection with the adversary

21 proceeding which has now been pending for close to six months.

22 The Department itself filed a declaration in connection with

23 its response so I will allow the Department a chance to respond

24 here.  But any suggestion by the Department in our view that an

25 evidentiary hearing is inappropriate or cannot go forward, in

1  our view, is just not correct.

2          We do recognize that the Department has raised the

3  issue of permissive abstention which we will address as part of

4  our presentation, but it's important to the wind-down debtors

5  that we have a prompt resolution of this claim.  It's also

6  important that we stop expending estate resources litigating

7  with the Department.  And so, if the Court is inclined to

8  overrule the abstention request, which we think the Court

9  should do, and move forward with the claim objection, we don't

10  see any reason not to proceed on the merits today.

11          So, with that, Your Honor, before I turn to my

12  opening, I would go ahead and request admission of Michael

13  Minaka's declaration which is filed as Exhibit B to the wind-

14  down debtors' reply.  That's at Docket Number 2147-2 and the

15  declaration of Amit Cheela in support of the reply which is at

16  Docket Number 2148.

17          UNIDENTIFIED ATTORNEY:  Your Honor?

18          THE COURT:  All right, let me hear from Mr. Goldman.

19          Thank you, Mr. Ferris.

20          MR. GOLDMAN:  Thank you, Your Honor.  So, let me just

21  turn first to the issue of witness testimony, if I may.  Under

22  Local Bankruptcy Rule of 3007-1(a) an objection to the

23  allowance of a claim must be brought by motion or adversary

24  proceeding.  That means in this case the debtors' objection to

25  claim although styled as an objection has to be considered a

1 motion under the Local Rules and, therefore, the motion

2 practice of the Local Rules of this court will govern.

3        Under Local Bankruptcy Rule 9013-3(e) I quote, a

4 party may not without prior court authorization present oral

5 testimony at a hearing on a motion except for a motion under

6 Section 363(b),(c),(f) or Section 364 of the Code.  Obviously,

7 this objection to claim is under any of those sections.  And as

8 far as I'm aware, no court authorization to present oral

9 testimony at this hearing was even sought, let alone obtained

10 by this Court.

11        In addition, under Bankruptcy Rule 9014(e) which

12 applies to this objection to claim proceeding because it is a

13 contested matter, quote, the Court shall provide procedures

14 that enable parties to ascertain at a reasonable time before

15 any scheduled hearing, whether the hearing will be an

16 evidentiary hearing at which witnesses may testify, it would

17 appear that one of those procedures is to obtain court

18 authorization in advance to present oral testimony so that all

19 parties can, quote, ascertain at a reasonable time before any

20 scheduled hearing whether witnesses will be testifying.  I had

21 no such reasonable notice, therefore, any reasonable way to

22 anticipate they would be presenting oral testimony.  I didn't

23 receive notice that they would until last evening.

24        In any event, there are legal gate keeping issues

25 that have to be decided first before the Court embarks on a

1   hearing on the merits of the claim objection.  The issue of the

2   prima facie validity of the claim has been raised and whether

3   the wind-down debtors have effectively rebutted it is an issue

4   before the Court, the issue of whether the administrative

5   proceedings are excepted from the automatic stay under Section

6   362(b)(4) is another one and the issue of abstention.

7           So, I would strongly object to presenting witness

8   testimony which I only received noticing doing, as I've

9   indicated, last evening.

10          As far as the declarations, they don't comport with

11  the local or national bankruptcy rules.  Let me take first the

12  objection of the declaration that was submitted with the

13  objection to claim of I believe it was Florencia Marquez.  Now,

14  under the local rules it is clear that the declarant's

15  testimony has to be based on personal knowledge.  That's

16  consistent with the 2015 comment of Local Bankruptcy Rule

17  9013-3 and the Motion Practice Rule 9013-1 which states that

18  any motion has to contain a certification complying with Local

19  Bankruptcy Rule 7007-1 which requires certifications to be on

20  personal knowledge and not contain any argument on the facts.

21          So, let's turn to Ms. Marquez' declaration.  There's

22  nothing to indicate she has personal knowledge of anything

23  that's stated in that declaration.  She simply claims that she

24  is familiar with the objection and the information on Schedule

25  1 of the proposed order which sets forth no substantive

1  allegations in that schedule.  And then she says that, quote,

2  in consultation with the wind-down debtors' advisors, end

3  quote, she has concluded that the claim is, quote, one for

4  which the wind-down debtors are not liable, end quote.

5       She has testified that she took into account the

6  hearsay statements of the wind-down advisors, not saying what

7  they were.  It's clearly not based on personal knowledge and

8  she certifies none of the facts that are contained in the

9  objection to claim.  So, it's simply an inadequate

10  certification.  Now, I think the wind-down debtors must have

11  recognized the evidentiary gap that was created by that

12  insufficient declaration by submitting two out-of-time

13  declarations on Friday evening.  These are the individuals that

14  they want to appear before the Court for witness testimony.

15       So, with respect to those declarations Bankruptcy

16  Rule 9006 clearly states (d) when a motion is supported by

17  affidavit, the affidavit shall be served with the motion, not

18  the Friday evening before a hearing on Tuesday.  So these

19  declarations were submitted completely out of time and

20  shouldn't be considered at all.  So --

21       THE COURT:  All right.  Let me short circuit this.

22  Thank you, Mr. Goldman.

23       The points are well-taken.  I intend to hear oral

24  argument today on the substance of the issues that are before

25  the Court.

1          There's an additional hurdle with respect to taking

2     testimony remotely.  In the past several months, maybe going on

3     four or five months if not longer, the Judicial Conference has

4     made it clear that while oral argument is acceptable for remote

5     hearings, evidentiary proceedings should not be undertaken

6     remotely absent emergent situations or consent of the parties

7     or where the Court believes it's in the beneficial interest of

8     all the parties.  In other words, it's -- to use colloquially

9     -- frowned upon to undertake an evidentiary hearing remotely

10    absent compelling circumstances.

11         My suggestion is that we undertake oral argument

12    today on the issues that have been presented that you've

13    referenced.  To the extent this Court deems an evidentiary

14    hearing necessary, we'll schedule it live.  Let me comment on

15    that further, after we have the substantive arguments.  I

16    assume the parties are prepared -- I've read the papers, I

17    understand the issues.  You're welcome to supplement the

18    arguments in the papers today and then we will discuss where we

19    go from there, all right?

20         So, why don't we start -- Mr. Ferris, do you want to

21    lead off with argument?

22         MR. FERRIS:  Yes, Your Honor.  Thank you.  Again,

23    Your Honor, for the record, Matthew Ferris on behalf of the

24    wind-down debtors.  Your Honor, we are here primarily because

25    unlike other state regulatory authorities, the Connecticut

1    Department of Banking is unwilling to subordinate its claim to

2    customer recoveries.  The reason for that is because there was

3    a bond in place in the amount of a million dollars issued by

4    Arch and the Department has made it apparent to us that they

5    want to go after that bond.

6          I think you'll hear from the Department's counsel

7    that they should be allowed to proceed with the administrative

8    proceeding that they commenced after the commencement of this

9    bankruptcy was commenced about a year ago, February 2023,

10   because they assert there is no direct impact to the estate

11   because they are not seeking at this point to enforce the claim

12   against the wind-down debtors.

13         This, first of all, completely ignores the fact that

14   the wind-down debtors have and will continue to incur

15   substantial cost of defending this litigation and defending

16   this claim over a potentially protracted administrative

17   proceeding, and I'll talk a little more about this in a second,

18   but the administrative proceeding really has not even started.

19   There has been no substantive briefing in the administrative

20   proceeding.  We have had a number of scheduling conference, but

21   not substantive hearings in the administrative proceeding.

22         More fundamentally though, Your Honor, this position

23   is flawed because Arch asserts indemnification claims against

24   the wind-down debtors on account of payments under that bond.

25   So, any payment of the Connecticut Department of Banking's

18

1  claim from that bond will ultimately affect the estate.  It

2  will result in an indemnification claim back against the estate

3  by Arch and will, ultimately, affect the amount available for

4  distribution of BlockFi customers.

5          I think it's important to note, again, this is a

6  penalty.  This is not some type of restitution claim or

7  anything like that.  This is a penalty that the Department is

8  seeking that it be paid, and so it is a claim that the

9  Department is seeking be paid in lieu of distributions or from

10 estate assets that would otherwise be available to go to

11 BlockFi customers.

12         The second fundamental flaw with the Department's

13 position is that at no point has the Department articulated a

14 basis for the penalty and Mr. Goldman raised the prima facie

15 issue and that is an important gating issue here.  Other than

16 an amorphous reference to the platform pause constituting what

17 the Department calls an unsafe or unsound practice, there has

18 been no description of what the actual violation is or any

19 information provided to support the amount of the claim.

20         Now, we do know from our discussions with the

21 Department's counsel that they are looking for the full amount

22 of the million-dollar bond, but in the course of a year that

23 this matter has been pending in no written correspondence that

24 we've received, in none of our discussions with counsel and

25 certainly not in their reply that was filed to the claim

1   objection has there been any description as to why there is

2   actually a valid claim and why that claim amount is in the

3   amount of a million dollars or any other amount for that

4   matter.

5          Your Honor, this is about the platform pause and

6   whether BlockFi's implementation of the pause forms a basis for

7   a civil penalty under the Connecticut general statutes.  I'd

8   like to ask Ms. Chavez to put up the PowerPoint.  I want to

9   direct Your Honor's attention to a couple of points.

10         So, Your Honor, as I said, there is no detail that

11  has been provided at any point by the Department with respect

12  to this alleged violation other than this general reference to

13  the platform pause constituting an unsafe or an unsound

14  practice.  This is the section of the general statutes, the

15  Connecticut general statutes that defines what an unsafe or an

16  unsound practice is.  So, there's really two potential

17  components, either conduct that is likely to result in a

18  material loss, insolvency or dissipation of the licensee's

19  assets.  I think as Your honor is well aware, the platform

20  pause was the exact opposite of that.  The platform pause was

21  implemented to prevent the withdrawal of Wallet funds that

22  would have potentially resulted in an insufficient amount in

23  the Wallet accounts to make Wallet Holders whole.

24         The second part of the definition of unsafe or

25  unsound practice is that it materially prejudices the interest

1 of purchasers and here, we're talking, or the reference to

2 purchasers in this context would be Connecticut residents that

3 were Wallet Holders.  Next line, please.

4          So, this is, Your Honor, from the notice attached to

5 the Connecticut's proof of claim, the notice that was delivered

6 to BlockFi asserting this violation of the Connecticut general

7 statutes forming the basis for this alleged penalty claim.  And

8 this is the most detail that we can find articulating the basis

9 for their claim.  And, Your Honor, I'll just read you the

10 highlighted language.  Alleged respondent's failure to transmit

11 monetary value received from Connecticut purchasers is conduct

12 that is likely to materially prejudice the interest of

13 purchasers.

14          So, it doesn't appear, Your Honor, that the

15 Department is actually asserting a violation based on the first

16 part of the unsafe or unsound practice definition that I just

17 walked through.  It appears that it's the material prejudice

18 component.  And, Your Honor, the basis for that material

19 prejudice is alleged to be the failure to transmit monetary

20 value back to Wallet Holders.

21          Your Honor, as you know, that value has now been or

22 is in the process of being returned to Connecticut Wallet

23 Holders and all other Wallet Holders for that matter, and that

24 was only possible, again, as Your Honor well knows, because of

25 the implementation of the platform pause.

1          So, Your Honor, the Department has a burden of

2    supporting the allowance of its claim.  They have failed to do

3    that.  They have not provided any evidence to support the prima

4    facie validity of their claim.  And as I said, none of their

5    correspondence to the debtors or during the course of our

6    discussions has provided any other clarity or enlightenment as

7    to what the basis of their claim is.

8          Your Honor, that brings me to the abstention

9    argument.  And before I turn to abstention specifically, I want

10   to address we do, in fact, think that this action is not

11   excepted from the police power or from the automatic stay by

12   virtue of police power.  Your Honor, we have outlined the

13   procedural history in our papers.  I won't go back through it

14   in detail, but in December, shortly after the commencement of

15   the bankruptcy case and shortly after receipt of a notice of

16   violation by the Department based on the cancellation of the

17   Arch bond, BlockFi attempted to surrender its money transmitter

18   license.  At that point BlockFi was no longer acting as a money

19   transmitter license.  The Department declined to accept the

20   surrender of that license.

21         Notwithstanding the commencement of the Chapter 11

22   case, the Department then proceeded with the commencement of

23   this administrative proceeding in February of 2023, as I noted

24   earlier.  BlockFi, ultimately, had to file an adversary

25   proceeding to stay that proceeding and by agreement between the

22

1   debtors and the Department the parties agreed to stay that

2   action and the adversary proceeding until confirmation of a

3   plan in this case.

4        As soon as the plan went effective, the Department

5   re-commenced this administrative proceeding so the Department

6   has certainly acted as if there has never been a stay in place.

7   But we are now in a situation where for well over a year

8   BlockFi has not acted as a money transmitter.  BlockFi has

9   attempted to surrender the license.  There is, in my view, no

10  more apparent definition of a pecuniary interest than what the

11  Department is now seeking through the continuation of this

12  administrative proceeding.

13       But regardless of whether this action is stayed or

14  not is not determinative as to whether this Court should

15  exercise its discretion to abstain.  Your Honor, there is no

16  dispute -- there can be no dispute that this claim objection is

17  a core proceeding.  There is also no dispute that the

18  Department submitted to this Court's jurisdiction by filing its

19  proof of claim.  And I will quote from the Ossen v. Department

20  of Social Services, 361 F.3d 760 (2d Cir.) which says, quote,

21  once a State has voluntarily submitted itself to the Court's

22  jurisdiction by filing a proof of claim with a view to reaping

23  financial benefit, there is no longer any danger that the State

24  will be subjected to the, quote unquote, indignity of being

25  hailed into court.

1        Your Honor, the Department cannot object to this

2   Court's exercise of its core jurisdiction to determine

3   allowance of their proof of claim.  So, then the only question

4   becomes, Your Honor, whether the Court should exercise its

5   discretion to permissibly abstain.

6        The District Court of New Jersey in Gibbons v.

7   STEMCOR, 186 B.R. 841, articulated the general rule that

8   discretionary abstention should be exercised cautiously and

9   sparingly.  The decision whether to abstain is left to the

10  broad discretion of the Bankruptcy Court.

11       Courts in the 3rd Circuit have used a factors-based

12  analysis to determine whether permissive abstention is

13  appropriate.  There are three factors that Courts have

14  considered to be particularly important and those are the

15  effect on the administration of the estate, whether the

16  proceeding is core or non-core and whether the claim involves

17  only state law issues.

18       I've already addressed the core/non-core, Your Honor.

19  There's no dispute that this is a core proceeding.

20       As far as administration of the estate, I think that

21  there's a number of factors.  As I said, there is an on-going

22  cost here associated with defending against this claim and it

23  is uncertain how long that cost is likely to go if this claim

24  is litigated in the administrative proceeding as opposed to in

25  front of this Court given the status of the administrative

24

1  proceeding.

2          Additionally, as I discussed earlier, there is a

3  direct impact on claims against the estate.  Even if the

4  Department says their intent is just to go against the bond

5  because of the indemnification obligations, that will result in

6  a claim back against the estate and it directly impacts the

7  amount available for distribution to customers.

8          With respect to the third factor, Your Honor, we can

9  see that there are state law issues at play here.  Your Honor

10  would have to determine whether the platform pause constitutes

11  a violation -- constitutes an unsafe or an unsound practice

12  under the Connecticut general statutes.

13          But, Your Honor, the fundamental point here is it's a

14  determination with respect to the platform pause.  First of

15  all, the statute is not complicated.  I walked through what the

16  definition is under the statute of unsafe or unsound practice

17  and the material prejudice standard is clear.  This Court is

18  more than capable of interpreting those state law issues

19  related to that.  But, again, the more fundamental point is

20  this is a question as to whether the platform pause which has

21  been extensively litigated in this court, gave rise to a

22  violation and supports the award of civil penalties against the

23  wind-down debtors.  This Court is in the best position to make

24  that determination.

25          You know, again, this issue has been briefed and

1  litigated before this Court.  The Court has the background, the

2  institutional background and understanding of the platform

3  pause.  The Court also is well-aware of the impact of the

4  platform pause and the fact that it actually prevented a

5  diminution of what was in those Wallet accounts from occurring

6  by virtue of a (indiscernible) bank, and withdrawal from these

7  accounts and instead, allowed an orderly process which is now

8  allowing for the return of the full value of what was in those

9  Wallet accounts as of the time of the platform pause to Wallet

10 Holders, the constituents that are represented in part by this

11 Department.

12       Your Honor, all three of the most important factors

13 we think clearly weigh in favor of the Court not exercising

14 abstention.  But I think there's a few other factors that I

15 think are worth mentioning.  First of all, it would be

16 inefficient to have two proceedings.  The cost is unnecessary

17 and unwarranted.  We also think that there's a high likelihood

18 of inconsistent results here.  Again, many of these issues have

19 not even been addressed at all by the Department and the

20 Department lacks the institutional arch that this Court has

21 with respect to the platform pause.

22       And, finally, Your Honor, there is just no prejudice

23 to the Department.  The Department has competent counsel that

24 has now appeared in the bankruptcy case and is more than

25 capable of defending against the claim objection in this

1  bankruptcy proceeding.

2           Your Honor, for all those reasons we think that the

3  Court should -- and we ask that the Court exercise its

4  discretion not to abstain and to continue hearing this core

5  proceeding in the bankruptcy court.  And I would just

6  reiterate, Your Honor, in wrapping up, I believe there is no

7  other tribunal that is better equipped to determine the effect

8  of the platform pause on customers which is the fundamental

9  issue that is relevant to the determination of this penalty

10 claim.  Thank you, Your Honor.

11          THE COURT:  Thank you, Mr. Ferris.

12          Mr. Goldman or Ms. Mayhew?

13          MR. GOLDMAN:  Yes, that would be me, Your Honor.

14 Thank you.  Your Honor, in the Department's view this objection

15 to claim proceeding is an improper gambit to effectively remove

16 to this Court the administrative enforcement proceedings that

17 were initiated by the Department over a year ago and also to

18 end run the adversary proceeding that the wind-down debtors

19 commenced to determine the applicability of the automatic stay

20 to that proceeding.

21          Now, by way of further procedural background as noted

22 in our papers, we did commence this administrative enforcement

23 proceeding over a year ago in February based on cancellation of

24 the debtors' surety bond and what has been called the platform

25 pause.

1          A hearing was scheduled after the wind-down debtors

2    requested one for July of 2023 and after, we filed our proof of

3    claim on May 30th of 2023.  The wind-down debtors responded not

4    by filing an objection to claim but an adversary proceeding

5    about two weeks later, in June, that had three counts: (1) a

6    request for declaratory judgment the automatic stay applied to

7    the enforcement proceeding, (2) an injunction under Section 105

8    enjoining its prosecution, and (3) a claim for discrimination

9    under Section 525 of the Bankruptcy Code.

10          I mention these counts because two of them relate

11   directly to the point we made in our papers that the objection

12   to claim is improperly repackaging Counts 1 and 3 in the

13   adversary proceeding and asserting them in the context of the

14   claim objection which is not permitted under Bankruptcy Rule

15   3007(b) which says an objector to a claim cannot submit in its

16   objection relief of a kind specified in Rule 7001.

17          BlockFi anomalously contended in its reply that these

18   claims are valid grounds for objecting to the claim even though

19   they themselves had brought them, initially by adversary

20   proceeding.  In any event, those claims are nowhere found as

21   grounds for disallowance under Section 502(b) and, therefore,

22   they can't be used to disallow our claim.

23          As to the -- well, let me first mention, in

24   connection with the adversary proceeding, they also filed a

25   motion to enforce the stay or, in the alternative, to enjoin

1    the administrative enforcement proceeding from going forward.

2    The parties then entered into a standstill agreement on July

3    13th, 2023 pursuant to which BlockFi moved to stay the

4    adversary proceeding representing that its request was, quote,

5    the result of significant good faith arm's length negotiations

6    among counsel for BlockFi and the Department, end quote, and

7    Connecticut at the same time requested the hearing officer to

8    stay the proceedings in Connecticut.  BlockFi also withdrew the

9    motion to enforce the stay it had filed in the adversary

10   proceeding.

11        And then after we received notice of plan

12   confirmation on October 24th, 2023, the hearing officer

13   rescheduled the hearing for December 7th, 2023.  Not

14   coincidentally, one day before that -- that was actually a

15   status conference, on December 6th they filed objection to

16   claim which we view as an attempt to forum shop the issues

17   involved in the state law administrative proceedings to this

18   Court and, as I mentioned, completely does an end run around

19   the adversary proceeding.

20        Now, as to the prima facie evidentiary effect issue

21   that has been raised by the debtors, let me first start by

22   noting that attached to the proof of claim was a six-page

23   notice of automatic suspension.  They projected part of that on

24   the screen and it included a request to impose civil penalties.

25   It specifically cited the statutory sections that BlockFi

1  violated, quotes from them in relevant part and then specifies

2  the grounds for the violations as the platform suspension

3  which, quote, suspended the ability of its customers including

4  Connecticut purchasers to withdraw virtual and fiat currency

5  from its platform and which is conduct that is likely to

6  materially prejudice the interest of purchasers and constitutes

7  an unsafe and unsound practice within the meaning of Section

8  36(a)-608, that would be Connecticut general statutes.

9        So, what BlockFi or the wind-down debtors contend we

10  should be doing to give the proof of claim prima facie validity

11  is to plead argument as to why its actions were unsafe and

12  unsound when according to the objection, they brought about so

13  many wonderful things to the other constituents in this case.

14  That simply is not the standard for pleading a proof of claim.

15        Bankruptcy Rule 3001(f) states that a proof of claim

16  executed and filed in accordance with these rules shall

17  constitute prima facie evidence of the validity and amount of

18  the claim.  Now, in a decision that was cited favorably in the

19  Mallinckrodt decision the wind-down debtors cited in their

20  reply and I'll refer Your Honor to In re F-Squared Investment

21  Management, 546 B.R. 538, Judge Silverstein of the Delaware

22  Bankruptcy Court found that the pleading standard for alleging

23  facts sufficient to stay a claim under the 3rd Circuit's

24  decision in Allegheny is, quote, a relatively low threshold

25  that is less burdensome than the federal pleading standard, end

1  quote, and stated further that as long as a proof of claim

2  provides fair notice and the Court can glean an actionable

3  claim from the complaint, the Court must entertain the party's

4  case.  That was at page 544 of that decision.

5       Now, the wind-down debtors clearly have fair notice

6  of what this claim is because they put together an extensive

7  reply and an objection to claim that goes directly to our claim

8  that there was an unsound and unsafe banking practice.  They

9  submitted or tried to submit two detailed declarations on that

10 topic so they clearly have clear notice of this claim.  And we

11 have clearly met our burden of pleading which doesn't need to

12 satisfy the Rule 12(b)(6) standard that you would have in

13 ordinary civil litigation.  And that would bring into play, of

14 course, the Supreme Court decisions in <u>Iqbal</u> and <u>Twombly</u> in

15 pleading facts.  That's not the standard.

16      And so we believe we clearly met the standard of

17 raising prima facie validity of the claim.  The cases cited by

18 the wind-down debtors in support of their argument are just in

19 opposite.  They deal with the situation for the most part with

20 an assignee of credit card debt fails to attach an assignment

21 for supporting documentation of the claim and that, of course,

22 implicates Bankruptcy Rule 3007(c) which provides that when a

23 claim is based on a writing, the writing has to be attached.

24 But our claim is not based on a writing so those cases just

25 simply don't apply.

1          The other cases they cited are in opposite as well,

2    the Biotech case out of this district concerned a claim filed

3    by the insider of the debtor one day before the bankruptcy

4    filing which was based on an assignment.  It was signed by the

5    principal of the debtor for both parties to the assignment.  It

6    was not notarized or witnessed, clearly not the situation we

7    have here.

8          The Mallinckrodt case dealt with proofs of claim that

9    were filed against 62 debtors that, quote, failed to allege any

10   activity, end quote, by any of them relating to the claim,

11   clearly in opposite to what we have here.

12         And as I pointed out in the initial argument on

13   witness testimony, the declaration they submitted to support

14   the factual allegations in their objection is completely non-

15   compliant with the Federal Rules of Evidence Rule 602 which

16   requires that a witness can only testify on a matter if

17   evidence is introduced sufficient to support a finding that the

18   witness has personal knowledge.  There was no submission of

19   that type of evidence.

20         If you examine further the declaration, and this is

21   what they've got to be relying on to rebut the prima facie

22   validity of our claim because it's the only attempt to submit

23   any evidence, it states that at Paragraph 4, quote, except as

24   otherwise indicated herein, the facts set forth in this

25   certification are based upon my personal knowledge, my review

1 of relevant documents, information provided to me by the

2 professionals in this case and/or employees working under my

3 supervision or my opinion based on my experience, knowledge and

4 information concerning the wind-down debtors' operations, end

5 quote.

6 You can't tell which one of those bases for

7 certification applies because they're all -- they're stated in

8 the disjunctive. So, it's completely inadequate, it's not

9 personal knowledge. It can't be considered as evidence

10 sufficient to rebut the prima facie validity of our claim for

11 that reason. And I've already explained why I don't think the

12 other two declarations do the job.

13 So, as the record stands right now, we have a prima

14 facie evidentiary effect to our proof of claim that hasn't been

15 rebutted by any admissible evidence so the claim should not be

16 disallowed. And what we have are just arguments of counsel

17 contained in their papers and at oral argument as to why the

18 platform pause was not an unsafe and unsound banking practice.

19 Now, as to the exception to the automatic stay, I

20 would maintain that the administrative enforcement proceedings

21 are a classic example of the exercise by state government of a

22 police and regulatory power to enforce consumer protection or

23 similar police and regulatory laws. Here, the banking laws of

24 the State of Connecticut by imposing penalties for their

25 violation, even for past conduct, that case law and other

33

1  authority that we cited in our papers supports that proposition

2  and has not even been challenged in the wind-down debtors'

3  reply papers.

4          THE COURT:  Well, let me stop you there, Mr. Goldman.

5          MR. GOLDMAN:  Yeah.

6          THE COURT:  Let me ask you to articulate for me how

7  the pursuit of a penalty which is not going to be paid by the

8  corporate debtor/defendant but is going to come out of the

9  pockets of all other long-suffering creditors and certainly who

10 view themselves as victims in this case including Connecticut

11 residents.  How is the pursuit of a penalty against a company

12 that is no longer operating, will not be operating a benefit or

13 an action to further the public welfare?  It seems to me to

14 suggest that it's all about dollars for the State of

15 Connecticut.

16         MR. GOLDMAN:  Your Honor, that is not the case.  The

17 interest of the state in seeing that violators of Connecticut

18 banking law are penalized with penalties for past conduct.  It

19 comports with public policy.

20         THE COURT:  But you're not penalizing the conduct of

21 the company.  You're penalizing actually the account holders,

22 many of whom are the very residents that you are directed to

23 protect and pursue.  It seems that -- and it's been brought up

24 and I know you were going to get to it, but it's just startling

25 to me that there's a failure by the Connecticut Department of

34

1  Banking to recognize what virtually every other state including

2  the federal government has recognized that pursuit of penalties

3  shouldn't come at the cost of innocent creditors.

4       MR. GOLDMAN:  Your Honor, penalties are very often in

5  the context of applying the exception to the automatic stay at

6  issue.  The legislative history of 362(b)(4) makes reference to

7  pursuing governmental actions to enforce consumer protection

8  laws or to fix a monetary penalty.  It's stated directly in the

9  legislative history to that section.  And to oppose a penalty

10 -- and I hear, Your Honor, that if this is coming out of the

11 bond, but, you know, that's the purpose of the bond, to cover

12 penalties like this.  And as they note, the surety may make an

13 indemnification claim.

14       THE COURT:  So, when you take it one step further, it

15 still at the end of the day comes out of the other remaining

16 account holders and creditors and customers who are at best,

17 from what I heard earlier today, receiving a distribution of 20

18 to 40 percent.  So, they're already suffering a loss and it

19 seems to me that the other state agencies, virtually every

20 other state agency and also the federal government recognizes

21 the impropriety of pursuing penalties in a situation other than

22 as subordinated claims.

23       MR. GOLDMAN:  But, Your Honor, since penalties like

24 this are so often at play when the Section 362(b)(4) exception

25 is in effect, that is really an argument that would apply to

1  really any type of penalty proceeding.  So, a government's

2  claim for a penalty will always have a diluted effect on

3  unsecured creditors.  So, it seems to me that just swallows the

4  rule.

5        THE COURT:  Well, the rule makes sense when there are

6  ongoing operations or there's a threat of future continuing

7  operations or in those situations where there are sufficient

8  funds to protect the interest of the creditor body.  This is

9  not one of those situations.

10        MR. GOLDMAN:  But even in the operating situation,

11  Your Honor, where creditors are getting some type of

12  distribution and the debtor remains operating, the claim would

13  still have a diluted effect.  And as we know, there is Supreme

14  Court jurisprudence on this that a penalty claim can't

15  automatically be subordinated by virtue of the nature of being

16  a penalty although that's what their plan proposes or actually,

17  provides.  So, my answer to Your Honor is that it is an

18  argument that can be made in every case where these penalty

19  claims are asserted by the government.

20        And the penalty claims were a judgment by the State

21  of Connecticut, that they're necessary to deter would-be

22  violators that they know -- and I recognize that the source of

23  payment is made from the bond or whether it's from the debtors

24  or the bond -- the imposition of these penalties serves a

25  deterrent effect to would-be violators which has also been

1  recognized as a legitimate public policy concern in applying

2  the Section 362(b)(4) exception.

3        THE COURT:  So, how did the Department of Banking

4  calculate that a million-dollar penalty versus a $10,000

5  penalty which will come out of creditor funds and dilute those

6  funds is the right amount to deter conduct that is unlikely to

7  occur again and conduct that this Court hasn't determined,

8  quite the opposite, this Court previously determined was proper

9  and in the best interest of the customer base?

10        MR. GOLDMAN:  So, Your Honor, the million -- first of

11  all, it wasn't accurate to say that we're demanding a million-

12  dollar penalty.  We were engaging in negotiations with the

13  wind-down debtors to resolve this as they themselves

14  acknowledged by representing that in their papers.  So, the

15  million dollars wasn't even a number that we left off with.  It

16  was much lower when we were talking to them.  And we haven't

17  really -- I don't think the State has formulated yet the

18  penalty that they would be seeking.  We are at the

19  investigative stages of that administrative proceeding and we

20  certainly are going to look into that further if we're

21  permitted to go forward with it.

22        So, this million-dollar number that they've thrown

23  about is certainly not absolute.  We never demanded that or

24  pound sand.  We always stated that we were open to negotiations

25  over this and we just couldn't get there.  They wouldn't

37

1  respond to our last proposal which was lower than a million

2  dollars.

3         So, I would also make the point that, you know, I

4  recognize there are a handful of other states that chose to

5  stand down on this and subordinate their claims, but I don't

6  think that's any reason to chastize the State of Connecticut

7  for not doing the same because it just used the policy

8  arguments or issues differently than the other claims.  And

9  then the other states may have different banking laws.  So,

10 this is just a matter of discretion among the states and it is

11 certainly not a ground for disallowance of the claim.  And

12 there is no evidence that this is just for a pecuniary purpose

13 that the debtors maintain it is for.

14        The cases that we cited will challenge the rebutted,

15 all say that penalties for past conduct come within the

16 364(b)(4) exception.  So, the fact that this conduct is no

17 longer occurring is really, really not relevant to the

18 analysis.

19        And let me address further the debtors' argument that

20 we were required to file some sort of separate motion to invoke

21 the 362(b)(4) exception.  I would note it's self-executing.  As

22 one Bankruptcy Court stated, quote, nothing in Section

23 362(b)(4) is police or regulatory power exception to the

24 automatic stay conditions, its application upon the Court

25 making a gate keeping determination as to whether an exercise

38

1  of police and regulatory power is proper in the first instance,

2  end quote.  That was <u>In re Cracked Egg</u>, 624 B.R. 84, 90

3  (W.Pa.), nor has that exception been waived by the filing of a

4  proof of claim.

5          The cases cited by the debtors for that argument did

6  not even involve a governmental unit or the Section 362(b)(4)

7  exception so they can't stand for the remarkable proposition

8  that a governmental unit waives 362(b)(4) rights by the mere

9  act of filing a proof of claim.

10          Let me now turn to abstention, Your Honor.  I would

11 submit that this case is compellingly suited for permissive

12 abstention.  The factors to consider are as set forth in our

13 papers were taken from the New Jersey District Court's decision

14 in <u>G-I Holdings</u> and as noted there, they're applied flexibly

15 and applied for their relevance and importance.  We believe the

16 most salient factors here are the predominance of state law

17 issues, comity and respect for state law and policy and the

18 regulation state banking activities, the lack of relatedness of

19 the administrative proceedings to the main case which the wind-

20 down debtors themselves acknowledge in their objection at

21 Paragraph 41 by stating that, quote, the administrative

22 proceeding is completely unrelated to the Chapter 11 cases, end

23 quote, and the lack of any effect on the efficient

24 administration of the case.

25          As for the state administrative proceeding, the wind-

1 down debtors will have a right to appeal any decision of the

2 hearing officer to the Connecticut Superior Court under

3 Connecticut general statute Section 4-183(a) and from there to

4 the Connecticut appellate courts.

5   The factor of comity is further supported by Section

6 362(b)(4) exception to the automatic stay itself.  As the 9th

7 Circuit best put it in City & County of San Francisco v. PG & E

8 Corp., 433 F.3d 1115, 1127, quote, through various provisions

9 of the Bankruptcy Code, Congress has evidenced its intent that

10 a governmental unit's police or regulatory action not be

11 litigated in federal bankruptcy court, end quote.

12   There will be no adverse effect on the efficient

13 administration of the estate as the resolution of the claim is

14 not going to hold up plan confirmation which already has

15 occurred.  And whatever the amount of the claims is determined

16 to be, it will receive or not receive the treatment as provided

17 for in the plan.  And, as has been noted, that the surety is

18 compelled to pay the claim, they will be become entitled to a

19 treatment as a general unsecured creditor so --

20   THE COURT:  Mr. Goldman?  My apologies.  Just a quick

21 question.  The hearing officer appointed under the Connecticut

22 Administrative Procedures Act, any decision or findings by the

23 hearing officer, am I correct that Commissioner Perez can

24 reject those?

25   MR. GOLDMAN:  (No audible response).

40

1          THE COURT:  In other words, the steps would be the

2    hearing officer makes proposed findings and rulings but the

3    Commissioner can reject those findings and then that ruling,

4    that decision by the Commissioner can be appealed to the

5    Superior Court in Connecticut under an arbitrary or capricious

6    standard?

7          MR. GOLDMAN:  Well, it is subject to appeal, yes, on

8    that standard.

9          THE COURT:  I mean, so that's a higher threshold.  So

10   I guess my concern is that what we have is the claimant, the

11   Commissioner of Banking who's the claimant in this case

12   actually the one to decide whether or not the hearing officer's

13   ruling goes into effect, that seems to certainly counter the

14   competing shifting of burdens that we find under Allegheny in

15   the Circuit and it doesn't reflect a neutrality with respect to

16   many of the cases where it was a neutral -- it was either a

17   Court or an arbitration tribunal.

18         But we have a hearing officer that, my understanding,

19   is employed by the Executive Branch within Connecticut, and

20   with an ultimate ruling determined by the Commissioner.  Why

21   should a Bankruptcy Court give comity to such a process when

22   there lacks the neutrality that a court, whether it be a state

23   court or here the federal court, can offer?

24         MR. GOLDMAN:  Well, that standard, Your Honor, I

25   believe comes from the Uniform Administrative Procedures Act

1  which is adopted by many states, and so I would think that this

2  is a common standard for administrative proceedings of this

3  nature and so that gets back to the very point of deferring

4  under 362(b)(4) exception to police power claims and fixing the

5  amount of penalties.  Whatever procedures come with that under

6  state law, they come with it.  And the very nature of comity is

7  to recognize the laws of another sovereign such as the State of

8  Connecticut, whatever those laws may be.  So, that would be my

9  response to Your Honor's inquiry.

10          You know, as to the merits of the claim, my

11  understanding is that Your Honor's ruling on this withdrawal

12  motion did not address at all whether the terms of service that

13  the debtors were relying on in getting authority to withdraw as

14  they did in the withdrawal order, Your Honor was not presented

15  with whether those terms of service and what they did actually

16  complied with any state banking laws.  That simply wasn't an

17  issue before the Court.  So, I don't see how there could be any

18  inconsistent results on an issue that the Court did not decide.

19          You know, as to the additional burden that they claim

20  they will have in litigating before the administrative

21  enforcement proceeding, they've already articulated and framed

22  out and flushed out all of their arguments on this which can

23  easily be repackaged in the context of the administrative

24  proceeding.  So, that claim I don't think is valid.

25          The proceeding is not in any way protracted.  I would

1 say it's more in the nature of like an arbitration proceeding.

2 We don't see it as being protracted at all.  There is a right

3 of discovery as there would be in connection with this

4 objection to claim, but we don't see this taking any

5 significant amount of time to complete.

6          And I don't think you can divorce what occurred with

7 respect to the platform pause as being an unsafe and unsound

8 practice from the actions of the debtor that were taken that

9 led to that platform pause.  The report of the Unsecured

10 Creditors Committee covers this in some detail.  It was in

11 large part based on the irresponsible activities of these

12 debtors in connection with FTX and their inadequate safeguards

13 as to how the cryptocurrency was kept in these various accounts

14 that were apparently co-mingled and which led to the need to

15 initiate the platform pause to begin with.  So, you can't

16 divorce the activities that occurred that led to that platform

17 pause from the calculus of whether what they did was unsafe and

18 unsound.

19          So, with that, Your Honor, I would conclude my

20 remarks unless Your Honor has any other questions.

21          THE COURT:  No.  I thank you, Mr. Goldman.

22          MR. FERRIS:  Thank you, Your Honor.

23          THE COURT:  Mr. Ferris?

24          Any response from Mr. Aulet?

25          MR. AULET:  Yes, Your Honor.  So, I'd like to address

43

1  Mr. Goldman's remarks and I think they fall into two main

2  categories that we need to discuss.  First, permissive

3  abstention.  Should you, Your Honor, deal with this core matter

4  of how much money is the State of Connecticut entitled to from

5  the BlockFi estate.

6          Mr. Goldman spent a lot of time discussing the

7  various other issues, for example, the automatic stay, but

8  we've tried to cut through those issues to bring this to Your

9  Honor for a merits ruling today and we are not seeking

10  sanctions for violation of the automatic stay.  We're not

11  seeking to enforce the automatic stay.  But those are all key

12  issues that go to should this matter be heard before Your Honor

13  or should this matter be heard before the hearing officer in

14  Connecticut.  And there, the Department has just failed to meet

15  its burden of showing that this Court should permissively

16  abstain over a core matter in this case.

17          BlockFi is a liquidating entity.  Every dollar that's

18  spent on this hearing, on the hearings in Connecticut is a

19  waste of money that ought to go to customers.  This Court --

20  the bankruptcy courts exist to centralize these disputes so

21  that they can be resolved efficiently and needing to go out to

22  Connecticut to re-litigate all of these issues when Your Honor

23  at great expense to the estate spent a great deal of time

24  delving into the exact issue here, the platform pause, is

25  simply not in the interests of the estate.

44

1          The State of Connecticut alleges essentially two main

2     factors, that state law is at issue.  State law is at issue in

3     virtually every single proof of claim that's resolved.  State

4     law is the default.  It's not really a strong factor here.

5          And, second, the issue of comity.  I think that folds

6     back into the issue of public policy.  What is the State of

7     Connecticut really looking to do here?  It's not to seize

8     BlockFi's license.  BlockFi offered to surrender the license.

9     It's not to issue a ruling that something improper happened

10    here.  It's to get money and that is not a valid basis for this

11    Court to grant comity to the Connecticut proceeding because the

12    issue to be centralized in this court is where should the money

13    of the debtors go.

14         And that brings me to the issue of the prima facie

15    case of the claim of the State of Connecticut.  Mr. Goldman

16    argued that essentially the standard is below the federal

17    pleading standard which in practice means that it doesn't

18    involve plausibility, that Mr. Goldman asserts that the State

19    of Connecticut was not required to show that it has a plausible

20    claim besides simply asserting a claim.  And for the reasons we

21    set forth in our papers I don't think that's correct.

22         But I'll go into the argument he tried to make for

23    why a prima facie case is made here.  First, the only actual

24    allegation made by the State of Connecticut relates to the

25    platform pause.  Mr. Goldman attempts to import in the issues

1   identified in the UCC report, but the UCC report does not

2   challenge the platform pause and Mr. Goldman's efforts to

3   import those issues into the platform pause fail because, as

4   Your Honor is aware, this is about Wallet accounts.

5        The State of Connecticut is regulating the Wallet

6   accounts.  The allegations in their proof of claim are clear

7   that what they are challenging is the denial of the ability of

8   Wallet accounts to withdraw.  It is not the DIA accounts now

9   are unsecured claims and are unlikely to receive full

10  distributions in kind like Wallet accounts have including every

11  single Connecticut resident who, just like everybody else aside

12  for the handful of Wallet claims that have remained frozen

13  because of preference liability, Wallet accounts are open for

14  withdrawal and everybody who has submitted a request and filled

15  out the necessary paperwork has gotten their Wallet back.

16       So, what we have is we have the State of

17  Connecticut's bare assertion that this platform pause

18  constitute an unsafe business practice.  And, you know, the

19  State of Connecticut is seeking to block us from introducing

20  the evidence today but I will point to Your Honor's fact

21  finding in the Wallet motion where Your Honor discussed how you

22  were essentially being asked to find winners and losers with

23  regard to the post-pause transfers because what was at issue

24  was did the people who transferred assets after the pause was

25  implemented into Wallet, were they entitled to share in the

1  segregated funds of that Wallet?

2          They would have been winners because they would have

3  had access to funds that had been segregated.  The existing

4  Wallet Holders would have been the losers because there would

5  have been insufficient assets to satisfy their claims.  That

6  was a key factual finding of the Court in the Wallet motion.

7          And, finally, Mr. Goldman discusses the amount of

8  penalty.  I'm not going to go into the confidential settlement

9  negotiations.  What I will say is they've asserted a claim for

10  a million dollars and the amounts that they've pointed to in

11  the statute are $100,000 per violation.  They've identified one

12  alleged violation, the platform pause.  They have not -- even

13  if you ignore they have to assert a plausible claim, they have

14  not asserted nine additional violations.

15          We have a claim for one violation which, based on

16  Department of Connecticut's own pleadings, has a maximum fine

17  of $100,000.  So, we've got this claim for a million dollars.

18  It simply fails to even establish an entitlement to that

19  million dollars.  But, again, it doesn't establish, based on

20  the previous factual findings and rulings of this Court, a

21  plausible or a prima facie case that the platform pause

22  entirely divorced from the losses to beyond Wallet customers

23  constitute an unsafe business practice with respect to Wallet

24  customers.  We protected Wallet customers and that we can

25  establish from the previous findings of this Court.

1          Your Honor, I just want to reiterate we represent the

2    plan administrator.  We are not here to defend the honor of

3    pre-petition BlockFi.  We are trying to maximize the return for

4    creditors.  This is all just a waste of creditor money and for

5    that reason we urge the Court to decline the invitation to

6    permissively abstain and require the wind-down debtors to

7    litigate this in front of a hearing officer who will need to

8    have the distinction between DIA and Wallet accounts explained,

9    will require us to re-prove all of the issues that were

10   involved in this Court's previous ruling.

11         We'll risk inconsistent findings with respect to

12   (indiscernible), and simply waste additional money or somehow

13   deterring other potential violators of Connecticut law.  And

14   the State of Connecticut has given no rational reason why any

15   company in business is going to look at BlockFi, a liquidating

16   company, a company that is out of business, will never go back

17   into business and say, well, that was all fine, but when they

18   took a million more dollars away from the creditors, that's

19   what deters me.  Thank you, Your Honor.

20         THE COURT:  All right, Mr. Goldman, anything you

21   wanted to respond to?

22         MR. GOLDMAN:  Yes, Your Honor, just a few points.

23   This idea that we've asserted a million-dollar claim is just

24   simply not correct.  The claim was filed as an unliquidated

25   claim.  We are still not through with the investigation and the

48

1  enforcement proceeding hasn't been heard so it simply is

2  inaccurate to state that it's a million-dollar claim that we've

3  asserted.

4          There are -- as to the number of violations, I would

5  disagree.  It's one based on the single platform pause.  There

6  were a number of Connecticut purchasers involved that could

7  potentially serve as a basis for multiple violations.  I would

8  also note in terms of the pleading requirements that the notice

9  that the State served is in compliance with the applicable

10  section of the Uniform Administrative Procedures Act which is

11  Connecticut general statute Section 4-177.

12          I would again make the point that there is a public

13  policy benefit to imposing a penalty so that other would-be

14  violators are aware that if they engage in this type of

15  misconduct, they will be penalized.  Even if the company later

16  has to file a Chapter 11 and we disagree with the point that

17  anybody looking at this from the outside would just dismiss it

18  as nothing they need to be concerned about, that is a

19  compelling public policy determination that was made by the

20  State that I believe should be given deference by the Court.

21  And that is all I have, Your Honor, at this time.

22          THE COURT:  Thank you, counsel.

23          I believe there's no one else looking to argue?

24                  (No audible response)

25          THE COURT:  So, I appreciate the arguments.  Well

49

1 done.  You certainly put a lot on my plate.  Let me see if I

2 can cut through some of the issues.

3          Number one, the Court is not in a position based on

4 this record to make a merits resolution of this claim by the

5 Department of Banking.  The claim is bottomed on the act in

6 pausing the platform and the cancellation of the surety bond

7 and whether those acts contravene the applicable statutes and

8 regulations.  The Court has no difficulty finding that there's

9 a prima facie case established.  But, likewise, the Court has

10 no difficulty in determining that based on prior findings by

11 this Court in related proceedings, based on the declaration

12 submitted, that the prima facie aspects -- the prima facie

13 nature of the claim has been rebutted and that there has to be

14 a resolution of the claim.

15          The resolution of the claim is going to be pursued

16 before this Court.  This Court is not inclined to abstain

17 permissively from hearing a core matter in a situation where

18 the claimant has certainly subjected itself to the Court's

19 jurisdiction by filing a proof of claim.  There could be no

20 argument that there's prejudice to proceeding in the federal

21 court, that there is certainly a risk of inconsistent results

22 given this Court's prior rulings.

23          Most importantly, this Court does not find that

24 allowing this matter to be resolved before a hearing officer

25 which would at best give rise to multiple appeals in the state

1  court is the most efficient manner to administer the estate for

2  the benefit of creditors.  The Court has concerns that any

3  hearing officer is equipped with the knowledge factually but,

4  more importantly, also the knowledge as to the impact of the

5  bankruptcy laws.

6       The pause that was undertaken by BlockFi in some

7  respects it is clear prevented certain withdrawals and

8  transfers that would be recoverable as preferential transfers

9  that has to be taken into account as to the propriety of the

10  action.  I'm not convinced that a hearing officer employed by

11  the Department of Banking and reportable to the Commissioner is

12  in the best position to gauge the propriety of the actions.

13       The issues are, of course, state law but that is not

14  uncommon before the bankruptcy courts and the laws are

15  certainly not complex.  The Court is well equipped to interpret

16  and apply the state law.  This Court does it virtually every

17  day.  And overall the standards that have been laid out in both

18  pleadings have not been met to warrant permissive abstention.

19  This Court is not inclined to do that.  Recognize, of course, I

20  don't have an actual motion for abstention, but I am not

21  inclined to abstain.

22       The Court recognizes that there was a pending action

23  in motion to enforce the stay and enjoin the hearing under

24  Section 105.  If the parties need, the Court can take that

25  matter up on short notice.  I don't believe there's a need to

1    do that.  What we need is to have a hearing on the merits.  The

2    Court will consult in chambers first with my staff to see

3    available dates in the next few weeks.

4           In the interim the Court would make a plea to counsel

5    for both parties to sit down.  You've hashed out the issues.

6    You certainly have commentary from the Court.  It would seem

7    that there is a viable pathway for the Department of Banking to

8    enforce its regulations but not to the prejudice and harm of

9    other customers and creditors, unsecured creditors of this

10   estate who are already seeing their recoveries diminish and

11   will continue to see them diminish every day we have to spend

12   more time litigating these issues.

13          So, you have a few weeks to continue the discussions

14   that you have started.  The Court is always happy to assist in

15   a mediation or to -- I'm looking to ensure that we don't spend

16   unnecessary dollars but that the State of Connecticut can

17   preserve its interest but, again, not to the prejudice of

18   innocent parties.

19          So, with that, the Court will advise the parties of a

20   date for a live, in-person hearing.  The parties, of course,

21   are free to take discovery.  I would suggest that before you do

22   that, you sit down and talk and try to pursue a viable -- a

23   resolution that probably fails to meet the expectations of both

24   sides.

25          So, with that, Mr. Aulet, is there anything else we

52

1  need to address on these matters?

2          MR. AULET:  No, Your Honor.  Thank you.

3          THE COURT:  All right, Mr. Goldman?

4          MR. GOLDMAN:  Yeah.  I'm sorry, Your Honor.  I would

5  ask when Your Honor considers the date to give us --

6          THE COURT:  Yes?

7          MR. GOLDMAN:  -- we may, in fact, want to take some

8  discovery.  I'm not suggesting there's going to be an onslaught

9  of discovery here, but I would just ask Your Honor to consider

10 that when you're setting the date.

11         THE COURT:  Fair enough.  If the parties need -- one

12 benefit of having live hearings is that I could drag you all

13 back into chambers and we can talk and hash out some of these

14 issues.  We can't do that as easily remotely.  But if the

15 parties need to discuss the direction of the case for timing

16 and process, feel free.  We can have more limited telephone

17 conference or remote call off record, all right?

18         Thank you.  And I think we're done for this morning.

19 Thank you, counsel.

20         ALL ATTORNEYS:  Thank you, Your Honor.

21         THE COURT:  You're welcome.  Take care.

22                    *  *  *  *  *

23

24

25

# **C E R T I F I C A T I O N**

I, MARY POLITO, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Mary Polito
MARY POLITO

J&J COURT TRANSCRIBERS, INC.    DATE: February 29, 2024