# EXHIBIT A

*Strictly Private & Confidential*
*Execution Version*

## MASTER DIGITAL CURRENCY LOAN AGREEMENT

Dated as of: <u>January 5, 2021</u>

Between: <u>BlockFi Lending LLC, a limited liability company organized and existing under Delaware law ("*BlockFi*")</u>

and: <u>QED Capital LLC, a limited liability company organized and existing under Delaware law ("QED", and BlockFi and QED, each a "*party*" and together, the "*parties*").</u>

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Master Digital Currency Loan Agreement (this "<u>Agreement</u>"), Borrower (defined herein) may, from time to time, seek to initiate a transaction pursuant to which Lender (defined herein) will lend certain Digital Currency, Dollars or Alternative Currency (each as defined herein) to Borrower and Borrower will return such Digital Currency, Dollars or Alternative Currency to Lender upon the termination of the Loan pursuant to the terms and conditions in this Agreement or as otherwise set forth herein.

Now, therefore, in consideration of the foregoing, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower and Lender hereby agree as follows:

**I.**        **<u>Definitions</u>.**   For purposes of this Agreement, the following terms shall have the respective meanings set forth in this Article I.  References to any agreements or documents herein shall mean such agreements or documents as amended, restated, amended and restated, modified and/or otherwise supplemented from time to time in accordance with the terms hereof.

"***Additional Collateral***" has the meaning set forth in Section IV(b)(i).

"***Affected Digital Currency***" has the meaning set forth in Section II(f).

"***Alternative Currency***" means (each other currency (other than Dollars) as may be agreed in writing between Borrower and Lender.

"***Applicable Law***" means (regardless of jurisdiction) any applicable (i) federal, national, state and local laws (including common law), ordinances, regulations, orders, statutory instrument, rules, treaties, codes of practice, decrees, injunctions, or judgments and any applicable (ii) ruling, declaration, regulation, requirement, or interpretation issued by any regulatory, judicial, administrative or governmental body or person that, in either case, are applicable to or binding on any person or entity or any of its property or assets or to which such entity or person or any of its property or assets is subject;

"***Authorized Agent***" has the meaning set forth in Exhibit A.

"***Borrow Rate***" has the meaning set forth in the Loan Term Sheet.

"***Borrow Rate Interest***" has the meaning set forth in Section III(a).

"***Borrowed Amount***" has the meaning set forth in Section II(b).

"***Borrower***" has the meaning set forth in the Loan Term Sheet.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which Lender is closed for business. For purposes of this Agreement and the transactions contemplated hereunder, Lender follows the New York Stock Exchange calendar of holidays.

"***Callable Option***" means the option of Lender to recall a portion or the entirety of the Borrowed Amounts during the term of the Loan, subject to the terms of this Agreement.

"***Collateral***" has the definition assigned to such term in Section IV(a).

"***Collateral Requirements***" means the requirements to post Collateral pursuant to Section IV.

"***Confirmation Protocol***" means the requirement that the Transfer of a Digital Currency, may not be deemed settled and completed until (i) the transaction has been recorded in a block and five (5) consecutive subsequent blocks referring back to such block (meaning, for the avoidance of doubt, six (6) blocks in total) have been added to the applicable blockchain; or (ii) the transaction has met a different protocol for a specific Digital Currency agreed to by the parties in writing**.**

"***Default Rate***" has the meaning set forth in Section III(b).

"***Digital Currency***" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), any New Currency and any digital currency that the Borrower and Lender agree upon.

"***Digital Currency Address***" means an identifier of 26-34 alphanumeric characters (or such other market-standard identifier) that represents a possible destination for a Transfer of Digital Currency.

"***Dollars***" and "***$***" mean lawful currency of the United States of America.

"***Effective Date***" has the meaning set forth in Section VIII.

"***Excluded Taxes***" means, with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of Borrower under this Agreement, Taxes imposed on or measured by its overall net income, overall gross income or overall gross receipts (however denominated), and franchise taxes imposed on it (in lieu of net income taxes) or capital taxes, by the applicable jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which it is resident for tax purposes or in which its principal office is located.

"***Governmental Authority***" means the government of any nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

 "***Government Restrictions***" has the meaning set forth in Section II(f).

*Strictly Private & Confidential*

"***Guaranty Agreement***" means that certain Personal Guaranty, dated as of December __, 2020 (as may be amended, restated, supplemented or otherwise modified from time to time), by Sherry Witter in favor of BlockFi.

"***Hard Fork***" means a permanent divergence in the relevant Digital Currency blockchain, that for example commonly occurs when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules or an airdrop or any other event which results in the creation of a new token.

"***Indemnified Taxes***" means Taxes other than Excluded Taxes.

"***Initial Margin Level***" has the meaning set forth in Section IV(a).

"***Lender***" has the meaning set forth in the Loan Term Sheet.

"***Lending Request***" has the meaning set forth in Section II(b).

"***Liquidity Exchange***" means Coinbase, but if for any reason Coinbase is not readily available (whether due to technical maintenance or otherwise), "Liquidity Exchange" shall mean Gemini or any other exchange as may be mutually agreed in writing between Borrower and Lender.

"***Loan***" means a loan of Digital Currency, Dollars or an Alternative Currency made pursuant to and subject to this Agreement.

"***Loan Documents***" shall collectively mean this Agreement, all Loan Term Sheets, the Guaranty Agreement, the Pledge Agreement, all exhibits and schedules hereto and thereto, and any other document jointly identified by the Lender and Borrower as a "Loan Document".

"***Loan Term Sheet***" has the meaning set forth in Section II(b).

"***Loaned Assets***" means any Digital Currency, Dollars or Alternative Currency Transferred from Lender to Borrower pursuant to a Loan Term Sheet and which has not been redelivered to Lender.

"***Margin Call Level***" has the meaning set forth in Section IV(b).

"***Margin Notification***" has the meaning set forth in Section IV(b).

"***Margin Regulation***" means, as applicable, Regulation G, Regulation T, Regulation U or Regulation X, in each case, issued by the Board of Governors of the Federal Reserve System of the United States.

"***Material Adverse Change***" means a material adverse change in the business, operations, prospects or financial condition of the Borrower, taken as a whole.

"***Maturity Date***" means, with respect to a Loan, the pre-determined specified maturity date in the relevant Loan Term Sheet, if any, upon which such Loan will terminate and the Loan becomes due in full (as may be extended as agreed to by the parties), unless such Loan is terminated prior to such maturity date pursuant to Section II(d).

"***New Currency***" has the meaning set forth in Section V(c).

"***Other Taxes***" means all present or future stamp, registration, documentation or other excise or property taxes, or similar taxes, charges or levies imposed by any Governmental Authority, including any interest, additions thereto or penalties applicable thereto.

"***party***" and "***parties***" have the meaning set forth in the introductory paragraph of this Agreement.

"***Pledge Agreement***" means that certain Pledge Agreement, dated as of the date hereof, by and between BlockFi and QED.

"***Prepayment Option***" means the option of Borrower to redeliver to Lender prior to the applicable Maturity Date the Digital Currency, Dollars or Alternative Currency, as applicable, subject to the terms of this Agreement.

"***Proceeds***" has the meaning assigned to such term in the UCC.

"***Restrictive Condition***" means (i) any shareholders' agreement, voting agreement, investor rights agreement, lock-up agreement or any similar agreement relating to the Collateral and (ii) any restriction, condition or requirement (whether or not under any law, rule, regulation, regulatory order or constituent document or contracts) relating to Collateral to which a holder thereof (whether beneficial, constructive or otherwise) or any pledgee thereof would be subject, including, without limitation, any registration requirement, reporting or informational requirement or mandatory redemption or transfer.

"***Stablecoin***" means any cryptocurrency pegged to the US Dollar, including, but not limited to the Gemini Dollar (GUSD), USD Coin (USDC) and Paxos Standard (PAX).

"***Taxes***" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to Tax or penalties applicable thereto.

"***Term***" has the meaning set forth in Section XXII.

"***Transaction Payments***" mean all amounts owing hereunder that accrue at the Borrow Rate (including, for the avoidance of doubt, Borrow Rate Interest) and at the Default Rate.

"***Transfer***" means the delivery of Digital Currency, Dollars or Alternative Currency by Lender to the Borrower or the redelivery of Digital Currency, Dollars or Alternative Currency by Borrower to Lender hereunder and the crediting of such Digital Currency, Dollars or Alternative Currency to the recipient's account in accordance with this Agreement.  With respect to Dollars or an Alternative Currency, it shall mean when such funds have been deposited in the applicable bank account.

"***Transfer Restriction***" means, with respect to any security, any condition to or restriction on the ability of the owner or any pledgee thereof to sell, assign, pledge or otherwise transfer such security or enforce the provisions thereof or of any document related thereto whether set forth in such security itself or in any document related thereto, including, without limitation, (a) any requirement that any sale, assignment, pledge or other transfer or enforcement for such security

be consented to or approved by any Person, including, without limitation, the issuer thereof or any other obligator thereon, including the Restrictive Condition, (b) any limitations on the type or status, financial or otherwise, of any purchaser, pledgee, assignee or transferee of such security, or (c) any requirement for the delivery of any certificate, consent, agreement, opinion of counsel, notice or other document of any Person to the issuer of, any other obligor on or any registrar or transfer agent for, such security, prior to the sale, pledge, assignment or other transfer or enforcement of such security.

"*UCC*" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"*Value*" means, with respect to any Collateral consisting of Dollars, the actual Dollar amount thereof, with respect to Collateral consisting of Collateral Shares, as set forth on Schedule A, and with respect to any borrowed Digital Currency, Alternative Currency or any Collateral consisting of Stablecoins, the value of such Digital Currency, Alternative Currency or Stablecoin, as applicable, as determined by Lender in good faith and in its reasonable discretion by reference to the Liquidity Exchange, if applicable, or to recognized pricing sources for the relevant borrowed Digital Currency, Alternative Currency or Stablecoin, as applicable.

## II.    General Operation.

(a) Loans of Digital Currency, Dollars or Alternative Currency

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request for the Lender to Loan to Borrower a specified amount of Digital Currency, Dollars or Alternative Currency, and Lender may, in its sole and absolute discretion, extend, or decline to extend, such Loan in accordance with the terms of this Agreement.

(b) Loan Procedure

During the Term of this Agreement, on a Business Day (the "Request Day") an Authorized Agent may by email directed to the email address indicated in Section XV request from Lender a Loan of a specific amount of Digital Currency, Dollars or Alternative Currency in accordance with the terms of this Section II(b) (a "Lending Request"); provided that, if such Lending Request is received by Lender at or after 1:00 p.m. New York time on a Business Day, then the next Business Day will be deemed to be the Request Day. Lender shall by email at the email address indicated in Section XV inform Borrower whether Lender agrees to make such a Loan. An email is deemed to be received immediately after the time sent (as recorded on the device or system from which the sender sent the email), unless the sender receives an automated message that the email has not been delivered. Once made, Lending Requests may not be amended or withdrawn by Borrower and a Lending Request shall be deemed rejected unless affirmatively accepted by Lender as set forth above on or before 5:00 p.m. New York time on the Request Day.

Unless the parties otherwise agree, each Lending Request submitted by Borrower shall provide the following information:

(i)    The type of Loan (either Digital Currency, Dollars or an Alternative Currency) requested, and, if Digital Currency or an Alternative Currency, specifying the Digital Currency or Alternative Currency, as applicable

(ii)    the amount of Digital Currency, Dollars or Alternative Currency requested;

(iii)   whether the Loan shall have a Callable Option and/or Prepayment Option;

(iv)   the proposed Borrow Rate for such Loan;

(v)    the Maturity Date; and

(vi)   the Collateral Requirements, if applicable.

If Lender agrees to make a Loan on the terms set forth in the Lending Request or as otherwise agreed in writing between Borrower and Lender, the Lender and Borrower shall execute a term sheet using the form of Loan Term Sheet attached hereto as Exhibit B (with respect to a particular Loan, such term sheet, the "<u>Loan Term Sheet</u>").  After execution of such Loan Term Sheet, the Lender shall commence transmission of the Borrower's Digital Currency Address or bank account, as applicable, the amount of Digital Currency, Dollars or Alternative Currency, as applicable, set forth in the Loan Term Sheet (such amount of Digital Currency, Dollars or Alternative Currency, the "<u>Borrowed Amount</u>") on or before 5:00 p.m. New York Time on the Request Day.

In the event of a conflict of terms between this Agreement and a Loan Term Sheet, the terms in the executed Loan Term Sheet shall govern.

Notwithstanding anything to the contrary in this Agreement, if Borrower and Lender agree in writing, with respect to any Borrowed Amount in Dollars, Borrower may satisfy any repayment or redelivery obligations via delivery of Stablecoins in lieu of Dollars.

(c)  <u>Callable Option/Prepayment Option</u>

Applicable solely to Loans with a Callable Option, Lender may at any time (the "<u>Recall Request Time</u>") from 9:00 a.m. until 5:00 p.m. New York time on a Business Day exercise the Callable Option and recall all or any portion of a Digital Currency loaned to Borrower (the "<u>Recall Amount</u>"). Borrower will then have two (2) Business Days from the Recall Request Time (the "<u>Recall Delivery Time</u>") to deliver the Recall Amount.

Applicable solely to Loans with a Prepayment Option, Borrower, in its sole and absolute discretion, may at any time from 9:00 a.m. until 5:00 p.m. New York time on a Business Day (the "<u>Redelivery Day</u>") exercise the Prepayment  Option and deliver all or any portion of any Digital Currency, Dollars or Alternative Currency loaned to Borrower by Lender.  Upon receipt of such return of Digital Currency, Dollars or Alternative Currency, as applicable, Lender will promptly notify Borrower of any amounts that have accrued at the Borrow Rate pursuant to the terms of the Loan Term Sheet on such returned amount accrued (but not yet paid) through such Redelivery Day, and Borrower shall have up to five (5) Business Days to pay such accrued amounts after the Redelivery Day (which due date will be deemed to be an "Invoice Due Date" for purposes of Section (III)(c)).

(d)  <u>Termination of a Loan</u>

A Loan will terminate upon the earliest of:

(i)    The Maturity Date applicable to such Loan;

(ii)   With respect to a Loan with a Prepayment Option but no Callable Option, upon redelivery by Borrower of all Borrowed Amounts such that no such Borrowed

Amount in respect thereof remains undelivered;

(iii)    With respect to a Loan with both a Prepayment Option and a Callable Option, upon redelivery by Borrower of all Borrowed Amounts once the Borrower or Lender exercises the Callable Option such that no such Borrowed Amount in respect thereof remains undelivered; and

(iv)    At the end of the Term as set forth in Section XXII.

(e) <u>Redelivery of Borrowed Amounts</u>

In connection with any termination of a Loan pursuant to the terms of this Agreement, Borrower shall effect redelivery of the relevant amount of borrowed Digital Currency, Dollars or Alternative Currency at or before 5:00 p.m. New York time on the applicable Business Day when due (<u>i.e.</u>, the Maturity Date, the Business Day on which the Recall Delivery Time falls, the Redelivery Day, or such other date of termination pursuant to Section XXII).

(f) <u>Acts by Governmental Authorities and Changes in Applicable Laws</u>.

If because of enforcement actions by Governmental Authorities of competent jurisdiction or changes in Applicable Laws (collectively, "<u>Government Restrictions</u>"), a party's ability to transfer or own a certain Digital Currency that has been the subject of a Loan or Loans is eliminated, materially impaired or declared illegal (such Digital Currency, "<u>Affected Digital Currency</u>"):

(1)    then, if legally permissible and/or possible under the Government Restrictions, including, without limitation, during any notice or grace period, Borrower shall repay to the Lender any outstanding balance of such Digital Currency and any accrued but unpaid Transaction Payments, such repayment to be made in the applicable Digital Currency; and

(2)    then. if return is not legally permissible and/or possible under the Government Restrictions (as mutually agreed by Lender and Borrower), Borrower shall repay (to the extent not legally impermissible) to Lender an amount in Dollars equal to the greater of (i) the volume-weighted average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the Affected Digital Currency during the thirty (30) Business Day period prior to the effective date of the relevant Government Restrictions, and (ii) the volume-weighted average price on the Liquidity Exchanges (measured at 4:00 p.m. New York time) of the borrowed Digital Currency during the thirty (30) Business Day period commencing with the relevant day when the parties first entered into the applicable Loan.

## III.   **Borrow Rates and Transaction Payments.**

(a) <u>Borrow Rate Calculation</u>

When a Loan is executed, the Borrower will be responsible to pay the amount accrued on the Borrowed Amount at Borrow Rate (such amount, the "<u>Borrow Rate Interest</u>") as agreed to in the relevant Loan Term Sheet in accordance with subsection (c) below, and the Borrow Rate Interest shall be annualized but calculated daily and is subject to change only if agreed to in writing (email sufficient) by Borrower and Lender. The Borrow Rate Interest shall be payable on the Invoice

*Strictly Private & Confidential*

Due Date, unless otherwise agreed in writing (email sufficient) by the Borrower and Lender, in the Digital Currency, Dollars or Alternative Currency applicable to such Loan; provided that, if agreed by Borrower and Lender, Borrower may satisfy its obligation to pay Borrow Rate Interest in Dollars via payment of Stablecoin.

Lender shall calculate any Borrow Rate Interest owed on a daily basis and promptly provide Borrower with the calculation upon request.  Except as Borrower and Lender may otherwise agree, the Borrow Rate shall accrue from and include the date on which the relevant Digital Currency is Transferred to Borrower to the date on which such Digital Currency is redelivered to Lender.

    (b) <u>Default Rate</u>

For (i) each Business Day after the third (3rd) Business Day following (i) the Maturity Date, (ii) the Recall Delivery Time or (iii) any date on which Lender terminates this Agreement pursuant to Section XXII (whichever is applicable) as of which Borrower has not returned any Digital Currency by the relevant due date, or for each day during any period in which any Event of Default has occurred and is continuing, Borrower shall incur an additional fee (the "<u>Default Rate</u>") that is equal to the sum of (I) the greater of (1) $2000 per day and (2) an amount equal to 1% of the sum of the unreturned Borrowed Amounts and accrued and unpaid Borrow Rate Interest with respect to the applicable Loan per day, in each case, accruing daily until Borrower cures such failure to return Digital Currency, Dollars or Alternative Currency, as applicable, or such other applicable Event of Default (or such Event of Default is waived by Lender), however not higher than the highest rate of interest permitted to be charged under Applicable Law, and (II) any losses, costs, expenses or other damages incurred by Lender (but for the avoidance of doubt, excluding consequential damages) as a result of such late payment or Event of Default, (including, in case of a failure by Borrower to return Digital Currency, Dollars or Alternative Currency by the relevant due date, any relevant and reasonable borrowing costs or hedging costs (including any breakage costs, amounts required to be posted as collateral or borrowing costs incurred in order to borrow required collateral amounts in connection with such hedging arrangements) that are incurred by Lender in order to (x) borrow such Digital Currency, Dollars or Alternative Currency, or (y) synthetically borrow, by purchasing and simultaneously entering into hedging arrangements to minimize its exposure to the purchased position in such Digital Currency, Dollars or Alternative Currency, in each case in clauses (x) and (y), in an amount up to the amount of the relevant insufficiency in such Digital Currency, Dollars or Alternative Currency), which shall be reasonably calculated by Lender and payable by Borrower in addition to the Borrow Rate Interest.

    (c) <u>Payment of Borrow Rate Interest and Default Rates</u>

An invoice for Borrow Rate Interest and any Default Rates (the "<u>Invoice Amount</u>") shall be sent out on the first (1st) Business Day of each month prior to the Maturity Date and shall include any Borrow Rate Interest incurred from the previous month. Borrower shall remit payment in full satisfaction of such invoice within three (3) Business Days after such invoice is sent to Borrower (such due date, the "<u>Invoice Due Date</u>"); provided that, failure of Lender to send an invoice by the Invoice Due Date shall not relieve Borrower of its obligation to pay the Invoice Amount upon delivery of an invoice.  Transaction Payments unpaid by the Invoice Due Date shall also become subject to the Default Rate commencing the day after the Invoice Due Date.

    (d) <u>Application of Payments</u>

*Strictly Private & Confidential*

Borrower shall, at the time of making each payment under this Agreement, specify to the Lender the Loan to which such payment is to be applied.  In the event that the Borrower fails to so specify, or if an Event of Default has occurred and is continuing, the Lender may apply the payment in such manner as it may determine to be appropriate in its sole, reasonable discretion.

(e) <u>Application of Insufficient Payments</u>

If at any time insufficient amounts are received by the Lender to pay fully all amounts of principal, applicable Transaction Payments, and other amounts then due and payable hereunder, the Lender may apply such payment received as it may determine to be appropriate in its sole reasonable discretion.  Lender may, in its reasonable discretion and if there is more than one outstanding Loan between the parties, apply payments by Borrower in one Digital Currency or in Dollars or an Alternative Currency towards the satisfaction of obligations outstanding with respect to a Loan in another Digital Currency, Dollars or an Alternative Currency, provided that Lender will make any conversions between such Digital Currencies, Dollars or Alternative Currencies based upon the applicable market rate at the Liquidity Exchange.

(f) <u>Non-Business Days</u>

If the due date of any payment or delivery or the Maturity Date of any Loan under this Agreement would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day and, in the case of any Transaction Payments, such Transaction Payments shall be payable for the period of such extension.

(g) <u>Computations</u>

Transaction Payments shall be computed on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) occurring in the period for which payable.  For purposes of calculating Transaction Payments, Digital Currencies shall be deemed to have been Transferred by one party to the other when the applicable Confirmation Protocol for the relevant Digital Currency has been completed.  If the requirements of the Confirmation Protocol are not met by 5:00 p.m. New York Time, the Transfer shall be deemed to have been made on the following Business Day.  Calculation of Transaction Payments shall be based on the date when the relevant Transfer is deemed to have occurred.

(h) <u>Taxes</u>

(1) Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower hereunder shall be made free and clear of and without reduction or withholding for any Taxes; provided that if Borrower shall be required by Applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions for Indemnified Taxes or Other Taxes (including deductions for Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section) the Lender shall receive an amount equal to the sum it would have received had no such deductions for Indemnified Taxes or Other Taxes been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(2) Payment of Other Taxes by Borrower. Without limiting the provisions of subsection (1) above, Borrower shall timely pay any Other Taxes that arise from any payment made by it under, or otherwise with respect to, this Agreement to the relevant Governmental Authority if required and in accordance with Applicable Law.

(3) Indemnification by Borrower. Borrower shall indemnify the Lender for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section III(h)(3)) attributable to Borrower under this Agreement and paid by the Lender, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority against Lender. A certificate delivered to Borrower by Lender as to the amount of such payment or liability actually paid by Lender to the relevant Governmental Authority shall be conclusive and binding absent manifest error.

(4) Tax Reporting.  Borrower shall file all returns and tax reports, if and/or as required under Applicable Law.

## IV.   **Collateral Requirements**

(a) Collateral

(1) Borrower shall provide as collateral an amount of Digital Currency, Dollars, Alternative Currency or Collateral Shares to be determined (the "Collateral", which shall include any Additional Collateral and excluding any Returned Collateral as defined below) in accordance with the terms of this Section IV and, with respect to Collateral Shares, in accordance with the terms of Schedule A and any other such terms as agreed upon by the Borrower and Lender and memorialized in a Loan Term Sheet;  for the avoidance of doubt, Collateral may include Digital Currency or Alternative Currency purchased with the Borrowed Amount made available in Dollars.  Initially, the amount of Collateral required will be greater than or equal to the product of (i) Initial Margin Percentage as agreed upon in the Loan Term Sheet and (ii) the Value of the borrowed Digital Currency, Dollars or Alternative Currency (such level, the "Initial Margin Level").  Collateral shall be valued in Dollars.  For the avoidance of doubt, upon the return of the Borrowed Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited.  Notwithstanding the foregoing, if mutually agreed in writing by both parties, Borrower may satisfy the Collateral Requirements (in whole or in part) to Lender in Stablecoins in lieu of Dollars or an Alternative Currency.

(2) The Collateral transferred by Borrower to Lender shall be security for Borrower's obligations in respect of the Loans and for any other obligations of Borrower to Lender under this Agreement and the other Loan Documents.  Borrower hereby pledges, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, all of Borrower's right, title and interest in the Collateral and any Proceeds of any of the Collateral, whether now owned by or owing to, or hereafter acquired by or arising in favor of, the Borrower, or in which the Borrower has or at any time in the future may acquire and right, title, or interest, which shall attach upon the transfer of the Borrowed Assets by Lender to Borrower.

*Strictly Private & Confidential*

(3) The pledge, assignment and security interest created by this paragraph shall automatically terminate and all rights to the Collateral shall revert to the Borrower upon termination of the applicable Loan pursuant to the terms of the Agreement. Upon any such termination, the Lender will, at its own expense and without any representations, warranties or recourse of any kind whatsoever, execute and deliver to Borrower such documents as Borrower shall reasonably request to evidence such termination.  In addition to the pledge, assignment and security interest granted pursuant to the foregoing, with respect to Collateral consisting of Collateral Shares, Borrower and Lender have entered into the Pledge Agreement to govern the pledge, assignment and security interest of such Collateral Shares.

(4) In addition to the rights and remedies given to Lender hereunder and the other Loan Documents, Lender shall have all the rights and remedies of a secured party under Applicable Law (including the UCC).  Lender shall be free to pledge, rehypothecate, assign, use, commingle or otherwise dispose of or use the Collateral except for Collateral that consists of Collateral Shares, unless otherwise specified on the applicable Loan Term Sheet.

(b) <u>Margin Calls</u>

(1) If, during the term of a Loan, the sum of the products of (i) Margin Requirement Percentage as set forth in the Loan Term Sheet, and (ii) Value of the Loaned Assets for each Loan exceeds the Value of the Collateral (such product, the "<u>Margin Call Level</u>"), Lender shall have the right to require Borrower to pledge and deliver Dollars or Stablecoins ("<u>Additional Collateral</u>") so that the Value of the Collateral (including the Additional Collateral) is equal to or greater than the Initial Margin Level for each Loan.

(2) If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>Margin Notification</u>") to the Borrower at the email address indicated in Section XV that sets forth the amount of Additional Collateral required. Borrower shall have twenty-four (24) hours from the time Lender sends such Margin Notification to deliver such required Additional Collateral to Lender in accordance with subsection (c) below. Failure by Borrower to timely deliver the relevant amount of Additional Collateral by the time specified in the Margin Notification and in accordance with subsection (c) below shall constitute an Event of Default.

(c) <u>Delivery of Additional Collateral</u>

Borrower's obligation to deliver Additional Collateral to Lender shall be satisfied (i) in the case of Dollars or Alternative Currency, by bank wire to the account specified in the Loan Term Sheet, (ii) by an amount of Stablecoins transferred to the digital wallet address specified in the Loan Term Sheet, (iii) in the case of Digital Currency, by delivery to the Lender's Digital Currency Address or (iv) by delivery of return amounts of borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, to Lender sufficient to cause the Value of the Collateral to be equal to or greater than the Initial Margin Level.

(d) <u>Return of Collateral</u>

(1) If, as of any Business Day, the Value of the Collateral exceeds the sum of the products of (i) the Release Margin Percentage as agreed upon in the applicable Loan Term Sheet, and (ii) Value of the Loaned Assets for such Loan, Borrower shall have the right, in its sole and absolute discretion, to require that Lender return an amount of Collateral, so that the Value of the Collateral is at least equal to the sum of the products of (i) the Release Margin Percentage as agreed upon in the applicable Loan Term Sheet, and (ii) the Value of the Loaned Assets for each Loan (such excess amount, the "<u>Returned Collateral</u>"); provided, however, that Collateral consisting of Collateral Shares shall not be subject to this paragraph and any release of such Collateral Shares shall be governed by Schedule A.

(2) If Borrower requires Lender to repay Returned Collateral, it shall send an email notification (the "<u>Return Notification</u>") to the Lender at the email address indicated in Section XV that sets forth the amount of Returned Collateral. Lender shall return the Returned Collateral to Borrower in accordance with subsection (e) below by 6:00 p.m. New York time on the Business Day on which the Return Notification is received, if received by Lender prior to 10:00 a.m. New York time on a Business Day, or otherwise by 6:00 p.m. New York time on the next Business Day.

(e) <u>Delivery of Returned Collateral</u>

Delivery of the Returned Collateral shall be made by bank wire to the account or a digital wallet address, in both instances specified in the Return Notification by the Borrower, as applicable.

(f) <u>Default or Failure to Return Loan</u>

In the event that Borrower fails to return borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, as and when required hereunder, Lender may transfer that portion of the Collateral to Lender's operating account necessary for the payment of any reasonable liability or obligation or indebtedness created by this Agreement, including, but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency, Dollars or Alternative Currencies.

(g) <u>Return of Collateral</u>

Upon Borrower's redelivery of borrowed Digital Currencies, Dollars or Alternative Currencies, as applicable, under a Loan and acceptance by Lender of the Borrowed Digital Currencies into Lender's wallet address or bank account, as applicable, and, with respect to Digital Currencies, such delivery being confirmed on the relevant Digital Currency blockchain pursuant to the Confirmation Protocol, Lender shall return the relevant amount of Collateral to a bank account in the name of Borrower, or a digital wallet address specified by the Borrower, as applicable.

## V.    **Hard Fork**

(a) <u>Notification</u>

Lender shall not be required to provide notification to Borrower of an upcoming Hard Fork in the Digital Currency of any Borrowed Assets, regardless of whether or not Lender has knowledge of such event.

(b) <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork, the terms set forth on a Loan Term Sheet for any outstanding Loans will not be affected and the Loans will not be immediately terminated as a result of the Hard Fork.

(c) <u>Redelivery of Borrowed Digital Currency</u>

On the Maturity Date or other date of termination of a Loan pursuant to the terms of this Agreement, notwithstanding anything to the contrary in the Agreement, (i) Lender will receive the benefit of any incremental tokens generated as a result of any Hard Forks in the relevant Digital Currency protocol with respect to the Digital Currency of any Loaned Amounts during the term of such Loan that result in a new cryptocurrency (each, a "<u>New Currency</u>") being created, provided that the amount of such New Currency will be the appropriate amount of each such New Currency to which a holder of the amount of Digital Currency (as agreed in the Loan Term Sheet) would be entitled in connection with such Hard Forks and (ii) Borrower will receive the benefit of any incremental tokens generated as a result of any New Currency with respect to Digital Currency Transferred as Collateral and not yet returned to Borrower, provided that the amount of such New Currency will be the appropriate amount of each such New Currency to which a holder of the amount of Digital Currency would be entitled in connection with such Hard Fork. The determination of whether a Hard Fork has occurred will be made by the Lender in accordance with the CME CF Cryptocurrency Indices Hard Fork Policy (Version 4) as published by the CME Group in May 2020.

## VI.   **Representations and Warranties.**

(a) (i) On the date hereof, each party represents and warrants that this Agreement and each other Loan Document executed on the date hereof have been duly and validly authorized, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of such party enforceable against the party in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)), and will not contravene (1) its constituent documents, (2) any Applicable Law, (3) any judgment, award, injunction or similar legal restriction binding on it or its property, or (4) any material agreement to which such party is a party; and (ii) on the date of execution of each Loan Term Sheet, the Borrower represents and warrants that such Loan Term Sheet and any Loan Documents executed on such date have been duly and validly authorized, executed and delivered on behalf of each party and constitutes the legal, valid and binding obligations of such party enforceable against the party in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)), and will not contravene (1) its constituent documents, (2) any Applicable Law, (3) any judgment, award, injunction or similar legal restriction, or (4) any material agreement to which the Borrower is a party.

(b) Each party represents that on the date hereof and the Borrower represents on the date of execution of each Loan Term Sheet that no license, consent, authorization or approval or

other action by, or notice to or filing or registration with, any Governmental Authority (including any foreign exchange approval), and no other third-party consent or approval, is necessary for the due execution, delivery and performance by such party of this Agreement or for the legality, validity or enforceability thereof against such party (except as has been made or obtained).

(c) Each party hereto represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan or any Digital Currency or funds received or to be received hereunder.

(d) <u>Eligible Contract Participant</u>

(1) Borrower hereby certifies and represents to Lender and any of its affiliates with which Borrower enters into transactions or agreements ("<u>Transactions</u>") from time to time that it is an "eligible contract participant", as that term is defined in Section 1a(18) of the Commodity Exchange Act and applicable regulations thereunder ("<u>Eligible Contract Participant</u>"), of the type specified in **Exhibit C**.

(2) Each representation made pursuant to this Section VI(d) is deemed repeated by Borrower and Lender is entitled to rely thereon as of the time of execution between each new Transaction between Borrower and Lender and any material amendment or novation of an existing Transaction between Borrower and Lender.

(3) Prior to the execution of any new Transaction or any material amendment or novation of an existing Transaction with Lender, the Borrower covenants and agrees to notify Lender in writing if it no longer qualifies as an "eligible contract participant" or of any material changes to the information or representations made herein, which notification shall become effective one local business day following delivery of such notice. Upon the effectiveness of any notice provided in accordance with this paragraph, the relevant information or representation will be deemed amended in accordance with such notice.

(4) Borrower understands and acknowledges that Lender with which Borrower or any affiliate enters into a transaction or agreement or to which Borrower or any affiliate owes any obligations (from time to time is acting in reliance upon the information, representations and certifications contained herein or made or furnished pursuant to the terms hereof in order to evaluate whether Lender may execute Transactions with Borrower. Borrower hereby represents to Lender (which representation is deemed repeated as of the time of each Transaction and any amendment or modification thereof) that all information furnished by it or on its behalf to Lender is true, accurate and complete in every material respect and no information provided herein or pursuant to the terms hereof is incorrect or misleading in any material respect.

(5) In connection with any Transaction entered into or outstanding between the parties, Borrower hereby agrees to promptly provide Lender any information or written representations or undertakings reasonably requested by Lender necessary for compliance with Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act (as amended and supplemented from time to time) or any other

applicable statute or regulation. If Lender has identified any guarantors, Lender hereby agrees that such requests may include written representations and undertakings from or regarding each guarantor.

(e) Borrower represents and warrants on the date hereof and at the time of return of any Digital Currency, Dollars or Alternative Currency, the right to transfer such Digital Currency, Dollars or Alternative Currency, subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement and that the Digital Currency, Dollars or Alternative Currency that it will return has been acquired in accordance with all Applicable Laws.

(f) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest therein and the right to transfer such Collateral subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement, and that the Collateral that it will transfer has been acquired in accordance with all applicable laws.

(g) Each party hereto represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it is a sophisticated party and fully familiar with the inherent risks involved in the transactions contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(h) Borrower represents and warrants on the date of execution of each Loan Term Sheet that there has been no material adverse change in Borrower's financial condition or business operations since the Effective Date.

(i) Borrower represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that no Event of Default, nor any event or act which with notice or lapse of time would become an Event of Default which has not been remedied or waived, has occurred and is continuing.

(j) Borrower represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that there are no proceedings pending or, to its knowledge, threatened, which could reasonably be expected to have a material adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder.

(k) Borrower represents and warrants on the date hereof and on the date of execution of each Loan Term Sheet that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any Applicable Laws.

(l) On the date of execution of each Loan Term Sheet, Borrower represents and warrants that (i) the exact legal name of Borrower is as set forth in each Loan Term Sheet; (ii) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority, which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the

Collateral; and (iii) there are no liens or encumbrances on the Collateral except in favor of Lender pursuant to the Loan Documents.

(m) Borrower represents and warrants on the date hereof (which representation and warranty will be deemed to be repeated by Borrower at all times when any obligations (actual or contingent) are owed under this Agreement) that:

(i) None of the Borrower, any of its subsidiaries or any director, officer, employee, agent, or affiliate of the Borrower or any of its subsidiaries is an individual or entity that is, or is owned or controlled by persons that are: (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "Sanctions"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (including Crimea, Cuba, Iran, North Korea and Syria); and

(ii) The Borrower, its subsidiaries and their respective directors, officers and employees and, to the knowledge of the Borrower, the agents of the Borrower and its subsidiaries, are in compliance with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA") and any other applicable anti-corruption law, in all material respects. The Borrower and its subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with applicable Sanctions, the FCPA and any other applicable anti-corruption laws.

(n) Borrower represents and warrants that none of the transactions contemplated by the Loan Documents (including the Loans and the use of proceeds therefrom) will violate the Margin Regulations.

(o) Borrower represents and warrants that the pledge of Collateral in the Loan Documents does not require the consent of any Person, except for such consents as have been obtained and are in full force and effect.

(p) Borrower represents and warrants that no Collateral (i) is subject to any Transfer Restriction, (ii) contains any legends or other similar types of restrictions thereon, (iii) requires any opinions of counsel, or the removal of any "stop transfer order" prior to the sale of such Collateral, or (iv) is subject to any shareholders' agreement, investor rights agreements, or other similar agreements or any Restrictive Condition, in each case, except as disclosed to Lender.

## VII.   Agreements.

Borrower agrees that, so long as it has any obligations outstanding under this Agreement or any other Loan Document to which it is a party:

(a) It will comply in all material respects with all Applicable Laws and orders binding on it or its properties.

(b) It shall pay and discharge all Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which the penalties attach thereto, and all lawful claims in respect of any

Taxes imposed, assessed or levied that, if unpaid, could reasonably be expected to become a lien or encumbrance upon any properties of the Borrower, provided that the Borrower shall not be required to pay any such tax, assessment, charge, levy or claim with respect to which the failure to pay would not reasonably be expected to have a material adverse effect on its abilities to repay the Loans and perform all other obligations hereunder and under the other Loan Documents and the Borrower has set aside on its books adequate reserves in accordance with generally accepted accounting principles (or other applicable accounting rules).

(c)   It will maintain in full force and effect all consents and approvals of, and registrations and filings with, any Governmental Authority or otherwise that are required to be obtained by it with respect to this Agreement or any Loan Document or which are necessary to the operation of its business.

(d)   Borrower shall not, without providing Lender thirty (30) calendar days' prior written notice, change (i) its legal name, (ii) its jurisdiction of organization or, if not a registered organization, location for purposes of the UCC, (iii) its type of organization (iv) in the location of its principal place of business or chief executive office or (v) its constituent documents in a manner materially adverse to Lender. Upon making any such change, Borrower shall promptly provide Lender with certified organizational documents reflecting any change in (i)-(v) above.

(e)   It shall comply with the Pledge Agreement and satisfy all agreements listed in Schedule A, if applicable.

(f)   It shall promptly provide such additional information and documents that the Lender may from time to time reasonably request.

(g)   [Reporting covenants TBD]


**VIII.   <u>Conditions Precedent</u>**.

This Agreement and the obligations set forth hereunder shall not become effective until the Business Day on which the following conditions are satisfied in a manner satisfactory to, or waived in writing by, the Lender (such date, the "<u>Effective Date</u>"):

(a)   The Lender's receipt of executed counterparts of this Agreement and the Pledge Agreement, in each case, duly and property executed and delivered by each of the parties hereto or thereto;

(b)   The Lender's receipt of executed counterparts of the Guaranty Agreement and Pledge Agreement, in each case, duly and properly executed and delivered by each of the parties thereto;

(c)   (i) receipt of any other Loan Documents and instruments as may be reasonably required by Lender, including but not limited to, for corporate borrowers, resolutions and incumbency certificates, or other documents evidencing authority to enter into this Agreement and borrow the Loans, (ii) good standing certificates (to the extent such concept exists in the relevant jurisdiction of organization or incorporation) and true and

complete copies of the certificate or articles of formation or incorporation and the bylaws or operating agreement (or equivalent or comparable constitutive documents), (iii) a certificate of an authorized officer dated as of the Effective Date certifying that the documents in clauses (i) and (ii) above are correct and complete and have not been amended or superseded prior to the Effective Date except as disclosed in such certificate and (iv) each other Loan Document required by the Lender to be executed on or prior to the Effective Date, in each case, duly and properly executed by each of the parties thereto; provided that the requirements in clauses (i)-(iii) may be satisfied by delivering a fully executed certificate in form and substance set forth as **Exhibit D**, or as may otherwise be reasonably acceptable to Lender;

(d) The Borrower shall have provided such documentation and other information reasonably requested by the Lender in connection with regulatory requirements under the applicable "know-your-customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act;

(e) Certified copies of UCC, insolvency, tax, judgment lien and execution searches, or equivalent reports or searches, each of a recent date;

(f) The Lender shall have received from Borrower all financing statements and other instruments as it reasonably requests in form appropriate for filing under the Uniform Commercial Code of all jurisdictions or certificated equity interests that the Lender may deem necessary or desirable in order to perfect the security interest in the Collateral; and

(g) The Lender shall have received all such other information with respect to the Borrower and its business as it shall have reasonably requested prior to the Effective Date.

## IX.   <u>Default</u>

It is further understood that the following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to (i) return any Loaned Assets (including any Recall Amount), (ii) pay any Transaction Payments or any other payment required under the Loan Documents, (iii) transfer any required amount of Collateral or Additional Collateral by the time and/or in the manner required under Section IV, or (iv) make any payment or reimbursement specified in Section V(c) in the event of a Hard Fork, in each such case when due and/or required to do so by the time required under this Agreement;

(b) the failure of Borrower to perform or observe any term, condition, covenant, provision, or agreement contained in any of the Loan Documents (other than those described in subsection (a) above) and such default remains outstanding for one (1) Business Day upon receipt of written notice thereof by the Lender;

(c) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower, and (solely in the case of proceedings instituted against the Borrower) shall not be dismissed within thirty (30) days or the applicable statutory time limit of their initiation;

(d) any representation or warranty made by Borrower in any of the Loan Documents proves to be untrue in any material respect as of the date of making or deemed making thereof;

(e) Borrower notifies Lender of its inability to or its intention not to perform any of its obligations hereunder or otherwise disaffirms, rejects or repudiates any of its obligations hereunder;

(f) there occurs, in the reasonable judgment of the Lender, a Material Adverse Change; or

(g) any sale or other transfer, lien or assignment with respect to the Collateral that is prohibited by the Loan Documents.

## X.    <u>Remedies</u>

(a) Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option (subject to the terms and conditions of this Agreement), (a) declare all Loaned Assets outstanding hereunder immediately due and payable, (b) terminate this Agreement and any other agreement or transaction between Borrower and Lender upon written notice to Borrower, and (c) exercise all other rights and remedies available to the Lender hereunder or under any other Loan Document, under Applicable Law (including the UCC), or in equity; provided, that upon any Event of Default described in Section IX(c) above, the amount of any Transaction Payments or any other obligations under any Loan Document then outstanding hereunder shall automatically become and be immediately due and payable. Lender shall also have the right, at any time on or after Borrower fails to make sufficient payments to pay fully all Transaction Payments and other amounts then due and payable hereunder or under any other Loan Document, or on or after the occurrence of an Event of Default, to purchase the relevant Digital Currency in the amount of any such insufficiency in a commercially reasonable manner, or foreclose on, liquidate, sell or collect on the Collateral that Lender or any affiliate may then hold, and apply the proceeds to satisfy any and all obligations of Borrower to Lender or any affiliate, whether arising under the same or a different Loan, or net, set off and/or recoup any and all obligations of Lender or any affiliate of Lender to Borrower, against either the purchase price of such replacement Digital Currency or any such obligations of Borrower to Lender or any affiliate of Lender.  In connection with the exercise of such remedies, Lender and its affiliates are hereby authorized to apply or transfer any Collateral of Borrower interchangeably between Lender and its affiliates solely to satisfy any obligations of Borrower to Lender or its affiliates at any time without prior notice to Borrower.

(b) In addition to its rights hereunder, the Lender shall have any rights otherwise available to it under any Loan Document or Applicable Law.

## XI.    <u>Rights and Remedies Cumulative.</u>

No delay or omission by either party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each party stated herein are cumulative and in addition to all other rights provided by law, in equity.

*Strictly Private & Confidential*

### XII.    <u>Collection Costs.</u>

In the event Borrower fails to pay any amounts due or to return any Loaned Assets hereunder, the Borrower shall promptly pay to the Lender upon demand all costs and expenses, including without limitation, attorneys' fees and court costs incurred by the Lender in connection with the enforcement of its rights hereunder and the other Loan Documents.

### XIII.    <u>Passwords and Security.</u>

Each party is responsible for maintaining adequate security and control of any and all passwords, private keys, and any other codes that it uses to Transfer or receive Digital Currencies hereunder. Each party will be solely responsible for the private keys that it uses to make the Transfers and maintaining secure back-ups. Each party will promptly notify the other party of any security breach of its accounts, systems or networks as soon as possible. Each party will reasonably cooperate with the other party in the investigation of any suspected unauthorized Transfers or attempted Transfers using a party's account credentials or private keys, and any security breach of a party's accounts, systems, or networks, and provide the other party with the results of any third-party forensic investigation that it may undertake. Each party will be responsible for any unauthorized Transfers made utilizing its passwords, private keys, and any other codes it uses to make or receive Transfers, except to the extent caused by the other party's gross negligence or willful misconduct.

### XIV.    <u>Governing Law; Dispute Resolution; Waiver of Consequential Damages; Indemnification.</u>

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New Jersey applicable to contracts made and to be performed wholly within such State, without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of Hudson, State of New Jersey by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

Borrower shall indemnify and hold harmless Lender, its affiliates, and each such party's officers, directors, employees, representatives, and agents from and against any and all claims, demands, losses, expenses, obligations, damages, penalties, actions and liabilities of any and every nature (including attorneys' fees of an attorney (or to the extent multiple attorneys are required in Lender's sole reasonable discretion, attorneys' fees of such attorneys) of Lender's choosing to defend against any such claims, demands, losses, expenses and liabilities) that Lender may sustain or incur or that may be asserted against Lender arising out of Lender's lending of Digital Currency, Dollars or Alternative Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Lender's bad

*Strictly Private & Confidential*

faith, gross negligence or willful misconduct in the performance of its duties under this Agreement. This indemnity and the provisions of this paragraph continuing obligations of Borrower, its successors and assigns, and shall survive termination of this Agreement.

## XV.    <u>Notices.</u>

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or the respective address set forth below:

BlockFi:
> BlockFi Lending LLC
> 201 Montgomery St., Suite 263
> Jersey City, NJ 07302
> Attn: Zac Prince
> Email: institutions@blockfi.com

QED Capital LLC:
> 135 East 57th Street, 23rd Fl. New York, NY 10022
> Attn: Francis Frecentese
> Email: fxf@753capital.com

Either party may change its address or other notice information by giving the other party written notice of its new address or other notice information as herein provided.

## XVI.    <u>Modifications.</u>

All modifications or amendments to this Agreement and the other Loan Documents shall be effective only when reduced to writing and signed by both parties hereto or thereto.

## XVII.    <u>Entire Agreement.</u>

This Agreement and each exhibit referenced herein constitutes the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.

## XVIII.    <u>Successors and Assigns.</u>

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that neither party may assign this Agreement or any rights or duties hereunder without the prior written consent of the other party. No person (other than the parties) shall have any right, benefit, priority or interest under, or because of the existence of this Agreement.

*Strictly Private & Confidential*

## XIX.    Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XX.    Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XXI.    Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXII.    Term and Termination.

The term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides written notice (email sufficient) of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period (the "Term"). The foregoing notwithstanding, this Agreement may be terminated (i) as set forth in Section X or (ii) upon 30 days' written notice (email sufficient) by either party to the other.  Notwithstanding the foregoing, if there are any Loans outstanding at the time either party sends a notice of termination pursuant to this Section XXII, such termination of this Agreement will not be effective until all Loans are terminated on the relevant Maturity Date or pursuant to Section (II)(d).

## XXIII. Miscellaneous.

 If an error is made hereunder in connection with a payment under any Loan Document, and such payment is an overpayment or a payment not anticipated thereunder, the party receiving the payment in error shall refund the mistaken amount to the paying party as promptly as is commercially practicable; provided that the paying party may, in its sole discretion and upon written notice of the amount and basis for such offset, elect to set-off such amounts against future payments hereunder.

*Strictly Private & Confidential*

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The parties acknowledge and agree that this Agreement and the other Loan Documents are the result of negotiation between the parties which are represented by sophisticated counsel and shall be construed as though all parties participated equally in the drafting thereof.   Therefore, none of the provisions of this Agreement or any other Loan Document will be construed against the drafter hereof or thereof.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

[Signature Pages Follow]

*Strictly Private & Confidential*

BLOCKFI LENDING LLC

By: _____
Name:
Title:

QED CAPITAL LLC

By: _____
Name: Sherry P. Witter
Title:    Managing Member

*Strictly Private & Confidential*

# EXHIBIT A

Authorized Agents. The following persons (the "<u>Authorized Agents</u>") are authorized to deliver Lending Requests on behalf of QED Capital LLC in accordance with Section II hereof:

Name: Francis Frecentese
Email: fxf@753capital.com

Authorized Agents. The following are authorized to deliver Lending Requests on behalf of BlockFi in accordance with Section II hereof:

Name: Zac Prince
Email: zac@blockfi.com

Name: Rene van Kesteren
Email: rene@blockfi.com

Name: Chris Yeung
Email: chris@blockfi.com

Name: Jason Wilkinson
Email: jason@blockfi.com

Name: Jessica Raybeck
Email: jessica@blockfi.com

Name: Yevgeniy Feldman
Email: yev@blockfi.com

Either party may change its Authorized Agents by notice given to the other party as provided in Section XV.

*Strictly Private & Confidential*

## EXHIBIT B LOAN TERM SHEET

The following Loan Term Sheet dated [*insert date*] incorporates all of the terms of the Master Digital Currency Loan Agreement entered into by QED Capital LLC and BlockFi Lending LLC on [*insert date*] and the following specific terms:

| | |
|---|---|
| **Borrower:** | QED CAPITAL LLC |
| **Lender** | BLOCKFI LENDING LLC |
| **Digital Currency / Dollars / Alternative Currency** | BTC |
| **Amount** | [ ] |
| **Borrow Rate** | [ ] |
| **Callable Option** | [Yes][No] |
| **Prepayment Option** | [Yes][No] |
| **Maturity Date** | [Insert date][None] |
| **Loan Type** | [ ] |
| **Loan Term** | [ ] |
| **Initial Margin Percentage** | [ ]% |
| **Margin Requirement Percentage** | [ ]% |
| **Release Margin Percentage** | [ ]% |
| **Allowable Stablecoin Collateral** | [GUSD][USDC][PAX] |
| **Digital Currency Payment to Lender** | [insert Lender's Digital Currency Address] |
| **Dollar Payment to Lender** | [insert Lender's Bank Details and stable coin blockchain address] |

QED CAPITAL LLC                    BLOCKFI LENDING LLC


By:_____        By: _____
Name:                           Name:
Title:                          Title:

*Strictly Private & Confidential*

## EXHIBIT C

### Eligible Contract Participant

Borrower hereby certifies and represents to Lender that it is an Eligible Contract Participant within the category or categories specified below:

[*Please indicate (by placing an X in the bracket) which of the following subsections is applicable. You may, but are not required to, indicate more than one of the following subsections as being applicable.*]

[   ]    Individual with $10 million invested:  Borrower is an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10,000,000.]

[   ]    Hedging Individual with $5 million invested:  Borrower is an individual (1) who has amounts invested on a discretionary basis, the aggregate of which is in excess of $5,000,000 and (2) that enters into Transactions in order to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by it.

[ X ]    Entity with $10 million total assets: Borrower is a corporation, partnership, limited liability company, proprietorship, organization, business trust, or other entity with total assets exceeding $10,000,000.

[   ]    Entity with a Guarantor Entity with $10 million total assets: Borrower is a corporation, partnership, limited liability company, proprietorship, organization, business trust, or other entity whose obligations to BlockFi under the Transactions are guaranteed or otherwise supported by a letter of credit, keepwell, support, or other agreement by a financial institution or by a corporation, partnership, proprietorship, organization, trust, or other entity with total assets exceeding $10,000,000.

[   ]    Hedging Entity with $1 million net worth: Borrower is a corporation, partnership, limited liability company, proprietorship, organization, business trust, or other entity (1) with a net worth exceeding $1,000,000 and (2) that enters into Transactions in connection with the conduct of its business or to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by it in the conduct of its business

[   ]    Hedging Entity with $1 million combined net worth: Borrower is a corporation, partnership, limited liability company, proprietorship, organization, business trust, or other entity (1) whose owners are each an Eligible Contract Participant, (2) with an aggregate net worth (when combined with the net worth of its owners) exceeding $1,000,000 and (3) that enters into Transactions in connection with the conduct of its business or to manage the risk associated with an asset or liability owned or incurred or reasonably likely to be owned or incurred by it in the conduct of its business.

*Strictly Private & Confidential*

# EXHIBIT D

## Corporate Resolutions and Incumbency Certification

I certify that I am the duly elected and qualified President of QED Capital LLC, a limited liability company organized under the laws of Delaware  (the "Company") and the keeper of the records of the Company; that the following is a true and correct copy of resolutions duly adopted by the managing members of the Company in accordance with its LLC Agreement as of December 4, 2020.

Reference is made to that certain Master Digital Currency Loan Agreement entered into by QED Capital LLC and BlockFi on January 5, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Master Loan Agreement").  Terms capitalized but not defined herein shall have the meanings set forth in the Master Loan Agreement.

**Be it resolved** that:

1.  The Company be, and hereby is, authorized to enter into the Master Loan Agreement, and any other documents, agreements, instruments and amendments related thereto or required thereby containing such terms and conditions, setting forth such rights and obligations and otherwise addressing or dealing with such subjects or matters determined to be necessary, reasonable or desirable by such managing member executing the same, the execution thereof by such managing member to be conclusive evidence of such approval and determination.

2.  The Company be, and hereby is, authorized to extend and/or borrow the Borrowed Amounts under each Loan pursuant to the Agreement pursuant to the terms of the Agreement, having such terms and conditions as are approved or deemed necessary, appropriate or desirable by the managing member executing the same, the execution thereof by such managing member to be conclusive evidence of such approval and determination.

3.  The Company be, and hereby is, authorized to (i) secure payment of any Loans under the Agreement, interest thereon, and fees and expenses related thereto, and payment and performance of all other obligations and liability of the Company arising under, out of, or in connection with, the Agreement (collectively, the "Obligations") by pledging or granting a lien on, or security interest in, any or all portion of Company's assets (whether now owned or hereafter acquired) and (ii) enter into or cause to be entered into such security agreements, pledge agreements, mortgages, deeds of trust and other agreements as are necessary, appropriate or desirable to effectuate the intent of, or matters reasonably contemplated or implied by, these resolutions, in such form, covering such collateral and having such other terms and conditions as are approved or deemed necessary, appropriate or desirable by the officer executing the same (collectively, the "Security Agreements"), the execution thereof by such officer to be conclusive evidence of such approval or determination.

4.  The Company be, and hereby is, authorized to perform fully its obligations under the Master Loan Agreement, all Loan Requests and other Loan Documents, and any such other documents, agreements, instruments or amendments and to engage without limitation in such other transactions, arrangements or activities ("Activities") as are reasonably related or incident to, or which will serve to facilitate or enhance for the benefit of the Company and its subsidiaries the transactions contemplated by these resolutions, including without limitation any modification, extension or expansion (collectively, the "Changes") of any Activities or of any other transactions, arrangements or activities resulting from any of the Changes and to enter into such other agreements or understandings as are necessary, appropriate or desirable to effectuate the intent of, or matters reasonably contemplated by, this resolution and each of the foregoing resolutions.

5.  All documents, agreements and instruments previously executed and delivered, and any and all actions previously taken by any officer, managing member, employee or agent of the Company in connection with or related to the matters set forth in, or reasonably contemplated or implied by, the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects and for all purposes as the acts and deeds of the Company.

6. An executed copy of these resolutions shall be filed with the minutes of the proceedings of the managing member of the Company.

7. These resolutions shall continue in force, and BlockFi may consider the holders of said offices and their signatures to be and continue to be as set forth in a certified copy of these resolutions delivered to BlockFi, until notice to the contrary in writing is duly served on BlockFi (such notice to have no effect on any action previously taken by BlockFi in reliance on these resolutions).

I further certify that the above resolutions are in full force and effect as of the date hereof, that the transactions contemplated hereby have not been rescinded, annulled, revoked or modified; that neither the foregoing resolutions nor any actions to be taken pursuant to them are or will be in contravention of any provision of the articles of incorporation or LLC agreement or of any agreement or instrument to which the Company is a party or by which it is bound; and that neither the articles of incorporation nor LLC agreement of the Company nor any agreement or instrument to which the Company is a party or by which it is bound require the vote or consent of shareholders of the Company to authorize any act, matter, or thing described in the foregoing resolutions.

I further certify that the following named persons have been duly elected to the offices set opposite their respective names, that they continue to hold these offices at the present time, and that the signatures which appear below are genuine, original signatures of each respectively:

(PLEASE SUPPLY GENUINE SIGNATURES OF AUTHORIZED SIGNERS BELOW)

_____          _____
Sherry P. Witter                   Signature

_____          _____
Francis X. Frecentese              Signature

**In Witness Whereof**, I have affixed my name as Secretary and caused the corporate seal of said Corporation to be affixed as of the date first above referenced.

                                   _____
                                   Sherry P. Witter, President

_____
SIGNATURE OF SHERRY P. WITTER MANAGING MEMBER

_____
SIGNATURE OF FRANCIS X. FRANCETESE - MEMBER

*Strictly Private & Confidential*

## SCHEDULE A

### Agreements

**"*Collateral Shares*"** shall mean any Collateral subject to the Pledge Agreement.

"***Value***" with respect to any Collateral Shares shall be determined by Lender in its sole discretion, with reference to the publicly disseminated net-asset-value of such Collateral Shares. Borrower may request the release of Collateral Shares from time to time, as long as:

a) the Collateral Shares are being released for the sole purpose of Borrower selling such Collateral Shares on an arm's length basis (any such sale, a "***Permitted Sale Transaction***").

b) (i) all of the cash proceeds of each Permitted Sale Transaction, to the extent such proceeds do not exceed total Borrowed Amount, shall be posted as Collateral or used to prepay Borrowed Amounts or (ii) Borrower may post an additional amount of Collateral of a type acceptable to Lender in an amount equivalent to the Value of the Collateral Shares subject to the applicable Permitted Sale Transaction at the time such Collateral Shares were released.

c) From the date that is twenty (20) Business Days after the date any Collateral Shares are released pursuant to this Schedule A and thereafter, such released Collateral Shares shall be deemed to have Value of zero dollars ($0) for all purposes under this Agreement (including, for the avoidance of doubt, all calculations under Section IV).

d) Lender will not be obligated to release Collateral Shares if such release would cause the aggregate Value of released Collateral Shares to exceed $15,000,000 at such time (such calculation to exclude Collateral Shares which have been sold and proceeds of which have been used to prepay Borrowed Amounts).

e) (i) No Event of Default or any event that would become an Event of Default upon solely the lapse of time shall have occurred and be continuing or would result from such release and (ii) immediately after giving effect to such release and the application of the relevant cash proceeds of such Permitted Sale Transaction, the Value of the Collateral shall be equal to or greater than the Initial Margin Level for each Loan.

f) For the avoidance of doubt, upon such a release of Collateral Shares, Lender's security interest in such Collateral Shares and any proceeds thereof pursuant to the Pledge Agreement will be undisturbed and continue until terminated pursuant to the terms thereunder.