**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(b)

| | |
|---|---|
| **BROWN RUDNICK LLP**<br>Kenneth J. Aulet, Esq. (admitted *pro hac vice*)<br>Seven Times Square<br>New York, New York 10036<br>(212) 209-4800<br>kaulet@brownrudnick.com<br><br>**BROWN RUDNICK LLP**<br>Tristan Axelrod, Esq. (admitted *pro hac vice*)<br>One Financial Center<br>Boston, MA 02111<br>(617)856-8300<br>taxelrod@brownrudnick.com<br><br>*General Counsel for the Plan Administrator*<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>110 Allen Rd., Suite 304<br>Basking Ridge, NJ 07920<br>(973) 230-2095<br>DStolz@genovaburns.com<br>DClarke@genovaburns.com<br><br>*Local Counsel for the Plan Administrator* | **HAYNES AND BOONE, LLP**<br>Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)<br>Lauren M. Sisson, Esq. (NJ Bar No. 394182022)<br>30 Rockefeller Plaza, 26th Floor<br>New York, New York 10112<br>(212) 659-7300<br>richard.kanowitz@haynesboone.com<br>lauren.sisson@haynesboone.com<br><br>*Attorneys for the Plan Administrator* |
| In re:<br><br>BLOCKFI INC., *et al*.,<br>                Debtors.[1] | Chapter 11<br>Case No. 22-19361 (MBK)<br>(Jointly Administered under a Confirmed Plan[2])<br>**Hearing Date: March 27, 2024, 10:00 a.m.**<br>**Response Deadline: March 20, 2024**<br>**Oral Argument Waived Unless Response Timely Filed** |

## THE WIND-DOWN DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING AND APPROVING THE SETTLEMENT AND RELEASE OF CLAIMS AND CAUSES OF ACTION BY AND AMONG THE WIND-DOWN DEBTORS AND FTX DEBTORS AND (II) GRANTING RELATED RELIEF

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Wind-Down Debtors' service address is c/o M3 Partners, 1700 Broadway, 19th Floor, New York, NY 10019.

[2]    On October 3, 2023, the Court entered an order confirming the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications) (the "Plan") [Docket No. 1609].

TO: THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

The estates of BlockFi Inc. and its debtor affiliates (collectively, "BlockFi" or, the

"Debtors" or, the "Wind-Down Debtors" as applicable), by and through undersigned counsel,

hereby file this *Wind-Down Debtors' Motion for an Order (I) Authorizing and Approving the*

*Settlement and Release of Claims and Causes of Action By and Among the Wind-Down Debtors*

*and FTX Debtors and (II) Granting Related Relief* (the "Motion"). In support of the Motion, the

Wind-Down Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.      BlockFi has filed claims against FTX Trading Ltd. and its affiliated

debtors-in-possession (the "FTX Debtors" or "FTX")[3] to recover nearly $900 million in defaulted

loans and frozen deposits.  From the beginning of these chapter 11 cases, BlockFi has known, and

has disclosed to its creditors, that a large portion of their prospective recoveries may be determined

by BlockFi's efforts to recover funds lost to FTX.  FTX, however, has alleged counterclaims and

defenses, and proposed certain bankruptcy plan structures of its own, that stood as barriers to

BlockFi's recoveries.

2.      Today, the BlockFi Wind-Down Debtors and their professionals are pleased to

announce, subject to the approval of this Court, the Delaware bankruptcy court and the Supreme

Court of Bermuda, the consensual and successful resolution of litigation with the FTX Debtors.

In sum, BlockFi's recovery claims will be allowed.  A substantial amount ($250 million plus

interest) will be distributed to BlockFi upon the effective date of the FTX plan of reorganization,

which is currently anticipated in 2024.  The remaining portion ($625 million of claims, plus interest

---

[3]    A complete list of the FTX Debtors may be obtained on the website of the FTX Debtors' claims and noticing
agent at https://cases.ra.kroll.com/FTX. The term "FTX Debtors" does not include jointly administered debtor
Emergent Fidelity Technologies Ltd.

(as applicable)) will be entitled to distributions in the coming months and years.  FTX's claims against BlockFi will be either released or subordinated to all BlockFi customer claims.  And the BlockFi estates will be spared potentially years of value-destructive litigation against FTX.

3.      The BlockFi Wind-Down Debtors believe that this is very good news for the estates and creditors of BlockFi.  For the reasons additionally provided further herein, the *Global Settlement Agreement* with the FTX Debtors dated February 27, 2024 (the "Settlement Agreement"), attached hereto as **Exhibit A**, should be approved.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered September 18, 2012 (Simandle, C.J.). The Wind-Down Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002(a)(3), 6004, 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002, 9019-3, and rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

## BACKGROUND

### A. BlockFi and FTX Relationship

7.      Beginning in 2019, FTX and certain non-debtor affiliates (the "FTX Group"), under the control of Sam Bankman Fried ("SBF") and certain associates, operated two centralized digital asset exchanges: the "FTX.com Exchange" for non-US customers and the "FTX US Exchange" for US customers (collectively, the "FTX Exchange").  Alameda Research Ltd. ("Alameda") served as the hedge-fund arm of the FTX Group, and was owned by SBF (90%) and Zixiao "Gary" Wang (10%).

8.      Beginning in August 2020 and over the next two years, BlockFi made loans to Alameda, denominated in a variety of fiat and cryptocurrencies, with an aggregate value in the billions of US dollars at the time of origination.  BlockFi also used the FTX.com Exchange for its own trading purposes and held material assets in its accounts thereon.

9.      Amidst the overall crypto market volatility in mid-2022, BlockFi experienced a spike in withdrawals from its platform, resulting in a liquidity shortfall.  In June 2022, the FTX Group agreed to provide $400 million in financing to BlockFi in exchange for an option to acquire BlockFi (together, the "Rescue Loan" from lender/purchaser West Realm Shires Inc. ("West Realm")).  West Realm thereafter provided $275 million in financing to BlockFi pursuant to several draw requests.

### B. FTX Collapse and Subsequent Bankruptcy Filing

10.      On November 2, 2022, an article published on CoinDesk triggered scrutiny of the FTX Group by customers and competitors, and the value of BlockFi's collateral (primarily FTT and SOL) began to decline.  On November 5, 2022, BlockFi issued a margin call to Alameda under the governing loan agreements due to the decline in FTT.

11.     BlockFi thereafter requested additional collateral and repayments as the collateral continued to lose value over the following days.

12.     On November 8, 2022, BlockFi demanded the remaining $125 million draw under the Rescue Loan from West Realm, which request was not honored by West Realm.

13.     On November 9, 2022, Alameda made a total of approximately $125 million in repayments on outstanding loans to BlockFi Lending.

14.     With FTT's value plummeting, Alameda found itself again in breach of the loan covenants on November 9, 2022.  Subsequently, BlockFi, Alameda, and Emergent Fidelity Technologies Ltd. ("Emergent"), an entity wholly owned by SBF and Wang, negotiated a series of agreements: (i) the "Forbearance Agreement"; (ii) the "Alameda Pledge Agreement"; and (iii) the "Emergent Pledge Agreement".  Pursuant to such agreements, the parties agreed that: (i) BlockFi would extend repayment terms to Alameda in exchange for Alameda pledging additional assets as collateral (the "Trust Assets"), and (ii) Emergent would not only guarantee the Alameda loans and all other FTX obligations to BlockFi, but would also pledge additional collateral for the loan, including approximately 56 million shares of common stock of Robinhood Markets Inc. (the "Robinhood Shares"). BlockFi thereafter filed UCC-1 financing statements to perfect its security interests.

15.     On November 10, 2022, BlockFi asserted Alameda was in breach of the loan and forbearance agreements and demanded that the Robinhood Shares be protected.

16.     On November 11 and November 14, 2022, as applicable, each of the FTX Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The FTX Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

17.     On November 14, 2022, BlockFi sought turnover of the Robinhood Shares from Emergent's custodian.  The custodian refused.

**C.  The Chapter 11 Cases**

18.     On November 28, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 cases and the Motion are set forth in greater detail in the *Declaration of Mark Renzi in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 17] (the "First Day Declaration"), which was filed on the Petition Date and is incorporated by reference herein.

19.     That same day, BlockFi commenced an adversary proceeding against Emergent and the custodian in possession of the Robinhood Shares under the Emergent Pledge Agreement, ED&F Man Capital Markets Inc., asserting breach of contract and seeking immediate turnover of the Robinhood Shares. *See BlockFi Inc., v. Emergent Fid. Techs. Ltd. & ED&F Man Cap. Markets, Inc.*, Adv. Pro. No.22-01382, Docket No. 1.[4]

20.     On November 29, 2022, this Court entered an order [Docket No. 42] authorizing the procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  These chapter 11 cases are being jointly administered under lead Case No. 22-19361.

21.     On December 21, 2022, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 130].

---

[4]     No claims against any party other than the FTX Debtors are released by the Settlement Agreement.  Certain claims held by BlockFi against parties other than the FTX Debtors are assigned to the FTX Debtors, as provided in the Settlement Agreement.

**D.  FTX Claims Against BlockFi**

22.     On January 30, 2023, this Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* (the "Bar Date Order") [Docket No. 440] establishing certain dates and deadlines for filing proofs of claims (collectively, the "Proofs of Claim") in these chapter 11 cases.  The Bar Date Order established March 31, 2023, at 5:00 p.m. (prevailing Eastern Time) as the last date and time for certain creditors other than governmental units to file Proofs of Claim based on prepetition claims against any Debtor (the "General Claims Bar Date").

23.     On the General Claims Bar Date, four FTX debtors filed 36 duplicate proofs of claim[5] on behalf of all FTX Debtors and Emergent, against all nine BlockFi debtors.  An identical claim addendum is attached to each, describing the claims (collectively, the "FTX Claims")

24.     In sum, the FTX Claims consisted of: (i) an unsecured claim of $275 million advanced by FTX under the Rescue Loan (the "FTX Rescue Loan Claim"); (ii) claims for avoidance and recovery of allegedly preferential withdrawals by BlockFi from the FTX Exchange (the "FTX Avoidable Transfer Claims"); and (iii) claims for avoidance and recovery of allegedly preferential loan repayments by Alameda (as borrower) to BlockFi Lending, and preferential pledges of collateral by Alameda and Emergent to BlockFi (together, the "Alameda Loan Preference Claims").  FTX also, in various pleadings and discussions, indicated its intent to raise other affirmative defenses and counterclaims against BlockFi in litigation regarding BlockFi's claims against FTX.

---

[5]     Proofs of Claim Nos. 14607, 14810, 14971, 15184, 15191, 15204, 15025, 15206, 15580, 15595, 15612, 15818, 25986, 26003, 26004, 26005, 26006, 26059, 26060, 26063, 26064, 26066, 26067, 26068, 26070, 26268, 26280, 26313, 26319, 26325, 26342, 26360, 26377, 26386, 26429, 26962.

### E. **BlockFi Claims Against FTX**

25.     BlockFi's claims against the FTX Debtors can be summarized as follows: (i) claims for repayment of various digital asset loans by BlockFi Lending and BlockFi International to Alameda, dollarized as of the FTX petition date at approximately $690 million; (ii) claims for recovery of digital assets held on FTX Exchange accounts, with a dollarized value on the FTX petition date of approximately $445 million, approximately $258 million of which consist of the FTX native token, FTT, which BlockFi held as collateral securing the Alameda loans;[6] (iii) claims arising in connection with the Rescue Loan and West Realm's failure to honor BlockFi's draw request of $125 million thereunder on November 8, 2022; and (iv) claims for recovery of the Robinhood Shares pledged by Emergent[7] in return for the forbearance granted to Alameda under the Forbearance Agreement (such claims described in clauses (i) – (iv), the "BlockFi Claims").[8]

### F. **FTX Estimation Motion and Preliminary Resolution**

26.     On August 11, 2023, BlockFi filed the *Debtors' Motion to Estimate the Amount of the FTX Claims Against the Debtors Pursuant to Sections 105(a) and 502(c) of the Bankruptcy Code* [Docket No. 1347] (the "Estimation Motion"). Through the Estimation Motion, BlockFi sought an order estimating the FTX Claims at $0 for distribution purposes because, among other things: (a) the FTX estates owe the BlockFi estates more than the aggregate value of the FTX

---

[6]    In other words, BlockFi held approximately $187 million of digital assets on its own accounts at FTX. It also held FTT valued at $258 million on the FTX petition date; however, that FTT was held as collateral on the Alameda loans. Recovery of the petition date value of the FTT would be potentially duplicative of other recoveries on the Alameda loans.

[7]    The Robinhood Shares were seized by the US Department of Justice in January 2023 and have since been liquidated. This claim now relates to the proceeds from the liquidated Robinhood Shares.

[8]    Proofs of Claim Nos. 3245, 4052, 4091, 4181, 4214, 4227, 4317, and 4325 (filed in the FTX chapter 11 cases styled as *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. 2022)).

Claims; (b) FTX attached no evidence or documentation supporting the FTX Claims; and (c) liquidation of the FTX Claims would unduly delay the administration of the chapter 11 cases.

27.    The FTX Debtors objected to the Estimation Motion, arguing that the disputed nature of the FTX Claims did not warrant estimation at $0, and that BlockFi had failed to establish that estimation was required to avoid undue delay.  Docket No. 1489.

28.    On October 3, 2023, this Court entered an order approving a proposed partial settlement between the FTX Debtors and BlockFi [Docket No. 1644] (as approved, the "September Agreement").  As part of the settlement: (i) BlockFi consented to litigating the allowance of its claims against FTX in the Delaware bankruptcy court; (ii) FTX agreed to waive its rights to any affirmative distribution from the BlockFi estates (but would retain the right allege their claims as counterclaims, defenses and rights of setoff against BlockFi's claims); (iii) West Realm's claim against BlockFi for the $275 million advanced under the Rescue Loan would be subordinated to BlockFi customer claims (the "WRS Allowed Claim"); and (iv) the parties agreed to mediate in good faith the remaining outstanding issues.

### G.  FTX Plan Development

29.    Shortly after the FTX petition date, two separate customer plaintiff groups (the "Ad Hoc Committee" and the "Class Action Claimants") commenced adversary proceedings against the FTX Debtors (and certain executives) alleging that customer assets on the FTX Exchange were effectively held in trust for their benefit and therefore fall outside the scope of estate property.[9]  Relying heavily on the applicable FTX terms of service, the Ad Hoc Committee

---

[9]    *Ad Hoc Committee of Non-U.S. Customers of FTX.com v. FTX Trading Ltd.,* Adv. Pro. No. 22-50514 (JTD) (Bankr. D. Del. Dec. 29, 2022), Docket No. 1 (the "Ad Hoc Committee Adversary Proceeding"); *Onusz, et. al., v. West Realm Shires Inc., et. al.,* Adv. Pro. No. 22-50513 (JTD) (Bankr. D. Del. Dec. 27, 2022), Docket No. 1 (the "Class Action Claimant Adversary Proceeding").

and the Class Action Claimants contended that customers should be entitled to distributions outside the bankruptcy scheme and/or with priority over general unsecured creditors.

30.    On July 31, 2023, the FTX Debtors filed a draft plan "for purposes of aiding discussion and negotiation with their stakeholders." FTX Docket No. 2100.[10]

31.    On October 19, 2023, the FTX Debtors filed a *Notice of Proposed Settlement of Customer Property Issues* and accompanying Settlement and Plan Support Agreement, announcing a potential settlement (the "Proposed Customer Settlement") between the FTX Debtors, the FTX official creditors committee, the Ad Hoc Committee, and the Class Action Claimants. *See* FTX Docket No. 3291.

32.    Features of the Proposed Customer Settlement included, among other things: (a) substantive consolidations of the FTX estates, subject to a few exclusions; (b) three separate and distinct "primary recovery pools" (one attributable each to the FTX.com and FTX US Exchanges, and a remainder "General Pool"); (c) a 66% priority claim against the General Pool for FTX.com and FTX US Exchange customers; and (d) subordination and extinguishment of claims for the value of FTT.  The Proposed Customer Settlement settled the customer groups' arguments that FTX exchange deposits should be excluded from property of the FTX estates, and therefore FTX exchange creditors should receive priority distributions over other FTX/Alameda creditors (such as BlockFi).

33.    As discussions commenced surrounding the FTX draft plan and the Proposed Customer Settlement to be incorporated therein, the FTX Debtors sought several exclusivity extensions, which requests were all later granted. FTX Docket Nos. 846, 1276, 2446, 2698, 4498,

---

[10]    References herein to the "FTX Docket" refer to the FTX chapter 11 cases styled as *In re FTX Trading Ltd*., Case No. 22-11068 (JTD) (Bankr. D. Del. 2022).

6680. Of note, BlockFi filed a reservation of rights to the FTX Debtors' third request, disputing the FTX Debtors' narrative concerning the Proposed Customer Settlement and indicating its likely opposition thereto. FTX Docket No. 4928. BlockFi did not, however, oppose a limited extension in light of its upcoming mediation with the FTX Debtors.

34.    On December 16, 2023, the FTX Debtors filed the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [FTX Docket No. 2861] (the "FTX Plan"), consistent with the parameters outlined under the Proposed Customer Settlement. Contemporaneously therewith, the FTX Debtors filed the *Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. And its Affiliated Debtors and Debtors-in-Possession* [FTX Docket No. 4862] (the "FTX Disclosure Statement"), along with a motion to approve the adequacy thereof and establish solicitation procedures. FTX Docket No. 4863. To date, the FTX Debtors have not set a hearing on the motion to approve the adequacy of the FTX Disclosure Statement.

### H.  BlockFi Confirmation, FTX Claim Estimation, and Mediation

35.    On September 26, 2023, this Court held a hearing on BlockFi's *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications)* [Docket No. 1609] (the "Plan") and announced its intention to confirm the Plan. On October 3, 2023, the Court entered its *Revised Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement Relating to the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on a Final Basis and (II) Confirming the Third Amended Joint Chapter 11 Plan of BlockFi Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications)* [Docket No. 1660] (the "Confirmation Order")

confirming the Plan, which became effective on October 24, 2023 [Docket No. 1788]. The Wind-Down Debtors thereafter commenced preparations for mediation with FTX.

**I.    The FTX Digital Asset Estimation Motion**

36.    On December 27, 2023, the FTX Debtors filed the *Motion of Debtors to Estimate Claims Based on Digital Assets* [FTX Docket No. 5202] (the "Digital Asset Estimation Motion"), through which FTX sought an order estimating digital asset claims (consistent with the proposed digital asset conversion table) for the purposes of voting and plan distribution. Most importantly, the FTX Debtors therein proposed to value FTT and related claims at $0 for all purposes in the FTX Debtors' bankruptcy proceedings. The Wind-Down Debtors viewed this proposal as potentially harmful to the interests of BlockFi customers, and accordingly provided comments and prepared to object to the motion.

37.    The FTX Debtors later filed a series of revised proposed orders to the Digital Asset Estimation Motion, incorporating certain revisions proposed by BlockFi and other objectors (including reserving rights related to various issues surrounding FTT), and consistent with the record at the hearing on January 31, 2024. *See* FTX Docket Nos. 6728-1, 6784, and 6922-1. The Wind-Down Debtors' remaining concerns were thereafter resolved by an amendment to the September Agreement that, among other consideration, waived certain of the FTX Debtors' defenses and counterclaims to the BlockFi Claims in advance of the parties' mediation.

38.    On February 7, 2024, the Delaware bankruptcy court entered an order granting the Digital Asset Estimation Motion [FTX Docket No. 7090] (the "Digital Asset Estimation Order"). This relief prompted re-reconciliation and non-material changes to certain asserted amounts of the BlockFi Claims using the exchange rates established by the Digital Asset Estimation Order.

39.     On February 1, 2024, the Wind-Down Debtors and FTX jointly attended a mediation session with the Hon. Craig T. Goldblatt as mediator, which resulted in the Settlement Agreement reflected herein.

### Relief Requested

40.     By this Motion, the Wind-Down Debtors request entry of an Order, substantially in the form attached hereto: (a) authorizing the Wind-Down Debtors to enter into the Settlement Agreement, (b) approving the Settlement Agreement as fair, reasonable, and in the best interests of the estates, and (c) granting related relief.  The Settlement Agreement has five key components, as discussed below.

41.     *First*, BlockFi would be entitled to three (3) allowed claims against the FTX Debtors: (i) allowed secured claims held by BlockFi Lending LLC and BlockFi International Ltd. against Alameda in the aggregate amount of $250 million; (ii) allowed general unsecured claims against Alameda held by the same entities in the aggregate amount of approximately $440 million;[11] and (iii) an allowed customer claim of BlockFi International Ltd. against FTX Trading for the full amount of its exchange deposits, approximately $185 million (collectively, the "BlockFi Allowed Claims").

42.     *Second*, the FTX Debtors would waive recovery on all of the FTX Claims with the exception of the WRS Allowed Claim.

43.     *Third*, BlockFi would assign to the FTX Debtors all of its rights (if any) to the proceeds of the Robinhood Shares, and would use commercially reasonable efforts to cooperate to promptly obtain the release and return to the FTX Debtors: (i) the proceeds of the Robinhood

---

[11]    Outstanding loans to Alameda on the FTX petition date were held approximately 18% by BlockFi Lending LLC and 82% by BlockFi International Ltd.  The claims allowed under the Settlement Agreement reflect the amounts owed and allocated to these respective Wind-Down Debtors.

Shares; (ii) the Solana tokens held in that certain Coinbase Custody International Limited account

named "Alameda Research Ltd – BlockFi Loan Collateral"**;** and (iii) certain Serum tokens.

44.     *Fourth*, BlockFi would support the FTX plan and the FTX Debtors' related

measures in the FTX proceedings so long as such measures are consistent with the terms of the

Settlement Agreement.

45.     *And fifth*, BlockFi and the FTX Debtors would agree to unconditionally and

irrevocably release each other from, among other things, all past and present claims, counterclaims,

liabilities, debts (whether based in contract, tort, law, or equity) and whether foreseen or

unforeseen, fixed or contingent in connection with the BlockFi Proofs of Claims and the FTX

Proofs of Claim (each as defined in the Settlement Agreement).

### Basis for Relief Requested

**I.     The Settlement Agreement Satisfies the Requisite
Standards of Bankruptcy Rule 9019 and Should be Approved.**

46.     Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court
> may approve a compromise or settlement. Notice shall be given to creditors [and]
> the United States trustee . . . as provided in Rule 2002 and to any other entity as the
> court may direct.

Moreover, section 105(a) of the Bankruptcy Code provides that a bankruptcy court may

"issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

47.     Settlements under Bankruptcy Rule 9019 are favored in bankruptcy because "they

avoid the expenses associated with litigating claims that can prove burdensome and expensive for

the bankruptcy estate."[12]  As a result, when warranted under the circumstances, "courts are able to craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, effect the result the [Bankruptcy] Code was designed to obtain."[13]

48.    The authority to approve a settlement or compromise under Bankruptcy Rule 9019 lies within the sound discretion of the bankruptcy court, which must determine whether the settlement is fair, reasonable, and in the best interests of the estate.[14]  The Third Circuit Court of Appeals, in *In re Martin*, set forth a four-factor balancing test under which bankruptcy courts evaluate proposed settlements.  The factors the Court must consider are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[15]

49.    The Court need not be convinced the settlement is the best possible compromise; instead, the settlement should be approved if it falls "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness."[16]

---

[12]    *In re Legarde*, 654 B.R. 74, 85 (Bankr. E.D. Pa. 2023) (citing   *United States v. Alaska Nat'l Bank of the North (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982); *John S. Marandas, P.C. v. Bishop (In re Sassalos)*, 160 B.R. 646, 653 (D. Or. 1993)).

[13]    *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

[14]    *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005); s*ee also In re Louise's Inc.*, 211 B.R. 798, 801 (D. Del. 1997) ("The decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate."); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

[15]    *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re Nutraquest*, 434 F.3d at 644–45 (applying *Martin's* four-factor test to affirm district court's order approving settlement); *Nebo Ventures, LLC v. Stanziale* (*In re Novapro Holdings, LLC*), No. 18-766-RGA, 2019 U.S. Dist. LEXIS 49047 (D. Del., Mar. 5, 2019) (applying *Martin's* four-factor test to affirm order approving settlement).

[16]    *In re Nortel Networks, Inc*., 522 B.R. 591, 510 (Bankr. D. Del. 2014) (quoting *In re Nutritional Sourcing Corp*., 398 B.R. 816, 833 (Bankr. D. Del. 2008)); *see also In re W.R. Grace & Co*., 475 B.R. 34, 77–78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement under the Martin factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.").

50.      The Settlement Agreement falls well within this range and provides material

benefits to the estates.  The Settlement Agreement provides significant recoveries on the BlockFi

Allowed Claims and spares the estates from continued (and substantial) litigation costs, and paves

the way for the Wind-Down Debtors to expedite enhanced distributions to creditors.  As more fully

articulated below, each of the *Martin* factors weigh squarely and heavily in favor of approving the

Settlement Agreement.  Accordingly, the Settlement Agreement is fair, reasonable, and in the best

interests of the estates.

**A.   Successful Litigation Against FTX is Uncertain.**

51.      The Wind-Down Debtors have evaluated the prospects of recovering on the

BlockFi Claims and concluded that the net benefit of any litigation is quite low, as weighed against

the benefits of the Settlement Agreement.  Under the Settlement Agreement, the bulk of BlockFi's

claims are to be paid in full with interest, with a substantial portion to be paid in the near-term.

52.      In other words, BlockFi is getting nearly everything it asks for, some of it very

quickly.  While some claims are being released – such as smaller claims for recoveries in

connection with the Rescue Loan – litigation of such additional claims would entail significant

outcome risk;[17] meanwhile, BlockFi would be denied any near-term distributions from the FTX

Debtors and face significantly higher timing and execution risks as to any future recoveries on *any*

of its claims.

---

[17]    For instance, recovery under the Rescue Loan-related claims could be construed to require the Delaware
bankruptcy court to find that the FTX Debtors are required to extend credit to BlockFi under the Rescue Loan
agreement.  Generally speaking, a Chapter 11 debtor cannot be required to perform on a prepetition contract to
make a loan.  11 U.S.C. § 365(e)(2)(B).  While the Wind-Down Debtors believe their Rescue Loan claims should
not be so construed, and possess certain compelling theories and potential strategies available with respect to the
Rescue Loan, they believe any recovery on such claims would be entail significant risk, cost, and delay in
litigation.  Accordingly, Rescue Loan claims are waived under the Settlement Agreement, provided among other
things, that the WRS Allowed Claims for repayment of $275 million extended under the Rescue Loan remain
subordinated to claims of BlockFi customers.

53.     The only guarantee is that further litigation would necessitate substantial discovery, depositions, expert reports, briefing and argument.  Litigation would take significant time; where the litigation concerns BlockFi's secured status (and attendant priority recoveries), the delay caused by litigation would obliterate the benefit of any victory.  Of course, litigation would also entail significant additional costs, and ultimately subject the estates to the possibility of an adverse ruling.

54.     Moreover, BlockFi remains cognizant of the FTX Debtors' various defenses to its claims, including FTX's contentions that certain loan repayments from Alameda and withdrawals from the FTX Exchange constituted preferential transfers subject to avoidance.  Notwithstanding the Wind-Down Debtors' rebuttal arguments, these defenses introduce another layer of uncertainty and cost.

**B. The Wind-Down Debtors Would Likely**
**Face Difficulties in Collection on the BlockFi Claims.**

55.     As noted above, BlockFi has secured a favorable settlement with the FTX Debtors, given that a substantial amount of its claims will be allowed – and a sizable portion thereof is expected to be recovered in the near-term in connection with FTX's plan confirmation.

56.     Again, BlockFi could attempt to extract slightly more value from the FTX Debtors. However, any additional value BlockFi may obtain in litigation (e.g., slightly higher allowed claim amounts or more value on a secured basis) would likely be offset by the attendant costs (in both time and money) of litigation of both the claims and the distribution mechanism through the FTX plan.

57.     Entry    into    the    Settlement    Agreement    provides    certainty    to    the Wind-Down Debtors with respect to the BlockFi Allowed Claims and likely maximizes all potential recoveries.

19

**C.  Litigation Against FTX Would Be**
   **Complex, Expensive, and Inconvenient.**

58.     For the same reasons that successful litigation against the FTX Debtors is uncertain and collection on the BlockFi Claims would be difficult, litigation would also be complex, expensive, inconvenient, and protracted.

59.     If the Wind-Down Debtors were to litigate the BlockFi Claims, significant estate resources would be diverted to engage in extensive discovery, depositions, expert reports, expert discovery, briefing, and ultimately a full trial on the merits on issues including, but not limited to: (a) the confirmability of the proposed FTX plan, with attendant sub-issues concerning substantive consolidation, constructive trust, and subordination of FTT, (b) whether the Alameda Pledge Agreement and Emergent Pledge Agreement were subject to avoidance and/or whether the Wind-Down Debtors are secured creditors of the FTX estates, (c) the applicability of several defenses to avoidance, including safe harbor, ordinary course, and contemporaneous new value, and (d) BlockFi's legal entitlements to the proceeds of the Robinhood Shares.

60.     The Wind-Down Debtors estimate the costs of discovery and trial in the many millions of dollars – indeed, BlockFi had previously disclosed a potential budget in the tens of millions of dollars for this litigation.   Instead, the Settlement Agreement brings finality on favorable terms, and avoids costly, time-consuming, and uncertain litigation.  This factor similarly militates in favor of approval of the Settlement Agreement.

**D.  The Paramount Interests of Creditors**
   **Weighs Heavily in Favor of Approving the Settlement Agreement.**

61.     The Settlement Agreement inures to the benefit of, and is in the paramount interests of, creditors of the BlockFi estates.  The Settlement Agreement unlocks material value for the benefit of BlockFi customers, and alleviates the burden, cost, and attendant delay associated with

litigating against FTX in the Delaware bankruptcy court. Moreover, the BlockFi Allowed

Claims result in more money going to BlockFi customers, and faster.

**II.      Entry Into the Settlement Agreement is a Sound Exercise of the
Debtors' Business Judgment Under Section 363(b)(1) of the Bankruptcy Code.**

62.      Section 363(b)(1) of the Bankruptcy Code provides that "after notice and a hearing

[a debtor] may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).

63.      A settlement of claims and causes of action by a debtor constitutes a use of estate

property.[18] Accordingly, if a settlement falls outside the ordinary course of business of the debtor,

the settlement may require approval of the bankruptcy court pursuant to section 363(b) of the

Bankruptcy Code.[19]

64.      Courts in the Third Circuit hold that a debtor may use estate property outside of the

ordinary course of business under section 363(b) if there exists a sound business purpose justifying

such action.[20] Generally speaking, a strong presumption exists "that in making a business decision

the directors . . . acted on an informed basis, in good faith and in the honest belief that the action

---

[18]      *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 350–51 (3d Cir. 1999) ("[t]he scope of [11 U.S.C. § 541] is broad. It includes all kinds of property, including tangible or intangible property, *causes of action* . . . and all other forms of property currently specified in section 70a of the Bankruptcy Act . . . ." (quoting H.R.Rep. No. 95–595, at 367 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6323) (emphasis added).

[19]      *See id.*; *see also Martin*, 91 F.3d at 395 n.2 ("Section 363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a controversy."). Notwithstanding the foregoing, the Wind-Down Debtors and Plan Administrator reserve and do not waive the "exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, *settle, compromise, release*, withdraw, or litigate to judgment [Vested Causes of Action, including but not limited to the BlockFi Claims]…or to decline to do any of the foregoing…without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court in accordance with the Plan." *See* Plan Art. IV.L (emphasis added).

[20]      *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citing cases); *see also In re Primel*, 629 B.R. 790, 798 (Bankr. W.D. Pa. 2021) ("To obtain court approval of a transaction outside the ordinary course, the debtor must "show that a sound business purpose justifies the debtor's contemplated actions." The standard is deferential, and a court should accept the debtor's justification unless there is evidence of bad faith.").

taken was in the best interests of the company."[21]  This deference to a debtor's business judgment in such circumstances shields a debtor's decisions from second-guessing in ordinary circumstances.[22]

65.    For all the reasons previously stated in connection with the *Martin* factors, the Wind-Down Debtors' entry into the Settlement Agreement is a reasonable exercise of the Debtors' business judgment and should be approved.  The Settlement Agreement resolves highly complex and expensive litigation, and represents a monumental step in returning additional value to BlockFi creditors.  The benefits to the Wind-Down Debtors and their constituents are many and manifest.

## **Conclusion**

66.    For the reasons set forth herein, authorizing the Wind-Down Debtors to enter into the Settlement Agreement is in the best interest of the Wind-Down Debtors, their estates, creditors and all parties in interest in these chapter 11 cases. Furthermore, the Wind-Down Debtors have demonstrated that the Settlement Agreement satisfies the applicable standard of reasonableness as required under Third Circuit precedent.  Accordingly, the Wind-Down Debtors request the Court grant the Motion and approve the Settlement Agreement.

## **Request of Waiver of Stay**

67.    To the extent that the relief sought in the Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Wind-Down Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). As explained herein, the relief requested in this

---

[21]  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted)).

[22]  *See In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted)).

Motion is immediately necessary for the Wind-Down Debtors to be able to continue to preserve the value of their estates for the benefit of all stakeholders.

**Waiver of Memorandum of Law**

68.     The Wind-Down Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Wind-Down Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

**Reservation of Rights**

69.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim, (b) a waiver of the Wind-Down Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver or limitation of the Wind-Down Debtors' rights under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Wind-Down Debtors' rights to subsequently dispute such claim.

**No Prior Request**

70.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

## **Notice**

71.     The Wind-Down Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102; (b) the United States Attorney's Office for the District of New Jersey; (c) the Internal Revenue Service; (d) the attorneys general in the states where the Debtors conduct their business operations; (e) the Settlement Agreement Parties; and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Wind-Down Debtors submit that, in view of the facts and circumstances, such notice is sufficient, and no other or further notice need be provided.

**WHEREFORE**, the Wind-Down Debtors respectfully request entry of the Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

*[Remainder of page intentionally left blank]*

Respectfully Submitted,

Dated: March 6, 2024

/s/ *Daniel M. Stolz*

**GENOVA BURNS LLC**
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Rd., Suite 304
Basking Ridge, NJ 07920
(973) 230-2095
DStolz@genovaburns.com
DClarke@genovaburns.com

*Local Counsel to the Plan Administrator*

**HAYNES AND BOONE, LLP**
Richard S. Kanowitz, Esq. (NJ Bar No. 047911992)
Lauren M. Sisson, Esq. (NJ Bar No. 394182022)
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300
richard.kanowitz@haynesboone.com
lauren.sisson@haynesboone.com

*Attorneys for the Plan Administrator*

**BROWN RUDNICK LLP**
Kenneth J. Aulet, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, New York 10036
(212) 209-4800
kaulet@brownrudnick.com

**BROWN RUDNICK LLP**
Tristan Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
(617)856-8300
taxelrod@brownrudnick.com

*General Counsel to the Plan Administrator*