| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **DISTRICT OF NEW JERSEY** <br> Caption in Compliance with D.N.J. LBR 9004-1(b) | |
| **BROWN RUDNICK LLP** <br> Kenneth J. Aulet, Esq. (admitted *pro hac vice*) <br> Seven Times Square <br> New York, New York 10036 <br> (212) 209-4800 <br> kaulet@brownrudnick.com <br><br> **BROWN RUDNICK LLP** <br> Tristan Axelrod, Esq. (admitted *pro hac vice*) <br> One Financial Center <br> Boston, MA 02111 <br> (617)856-8300 <br> taxelrod@brownrudnick.com <br><br> *General Counsel for the Plan Administrator* <br><br> **GENOVA BURNS LLC** <br> Daniel M. Stolz, Esq. <br> Donald W. Clarke, Esq. <br> 110 Allen Rd., Suite 304 <br> Basking Ridge, NJ 07920 <br> (973) 230-2095 <br> DStolz@genovaburns.com <br> DClarke@genovaburns.com <br><br> *Local Counsel for the Plan Administrator* | **HAYNES AND BOONE, LLP** <br> Richard S. Kanowitz, Esq. (NJ Bar No. 047911992) <br> Lauren M. Sisson, Esq. (NJ Bar No. 394182022) <br> 30 Rockefeller Plaza, 26th Floor <br> New York, New York 10112 <br> (212) 659-7300 <br> richard.kanowitz@haynesboone.com <br> lauren.sisson@haynesboone.com <br><br> *Attorneys for the Plan Administrator* |
| In re: <br><br> BLOCKFI INC., *et al.*, <br><br>    Debtors.[1] | Chapter 11 <br><br> Case No. 22-19361 (MBK) <br><br> (Jointly Administered under a Confirmed Plan[2]) |

**WIND-DOWN DEBTORS' RESPONSE TO CLAIMANT JOHN W. VAN TUBERGEN JR.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION PURSUANT TO FED. R. BANKR. P. 3008, 8002(b), 8007(a), 9023 AND 9024 TO (A) ALTER AND AMEND THE DECISION AND ORDER SUSTAINING THE WIND-DOWN DEBTORS' OBJECTION TO CLAIM NO. 7233; AND (B) ALTERNATIVELY, SEEK OTHER RELIEF FROM SUCH ORDER**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: BlockFi Inc. (0015); BlockFi Trading LLC (2487); BlockFi Lending LLC (5017); BlockFi Wallet LLC (3231); BlockFi Ventures LLC (9937); BlockFi International Ltd. (N/A); BlockFi Investment Products LLC (2422); BlockFi Services, Inc. (5965) and BlockFi Lending II LLC (0154). The location of the Wind-Down Debtors' service address is c/o M3 Partners, 1700 Broadway, 19th Floor, New York, NY 10019.

[2] On October 3, 2023, the Court entered an order confirming the *Third Amended Joint Chapter 11 Plan of BlockFi Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (Additional Technical Modifications)* (the "Plan") [Docket No. 1609].

TO:   THE HONORABLE CHIEF JUDGE MICHAEL B. KAPLAN UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

BlockFi Inc., BlockFi Lending, and its debtor affiliates (collectively, "BlockFi" or the "Wind-Down Debtors"), as managed by the Plan Administrator in the above-referenced Chapter 11 cases (the "Chapter 11 Cases"), hereby submit this response (the "Response") to *Claimant John W. Van Tubergen Jr.'s Memorandum of Law in Support of Motion Pursuant to Fed. R. Bankr. P. 3008, 8002(b), 8007(a), 9023 and 9024 to (A) Alter and Amend the Decision and Order Sustaining the Wind-Down Debtors' Objection to Claim No. 7233; and (B) Alternatively, Seek Other Relief from Such Order* (the "Motion") [Docket No. 2142]. In support hereof, the Wind-Down Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.  The issues raised in the Motion are not new – they have each been briefed and argued in full. After careful consideration of the evidence presented, the Court issued its *Memorandum Decision* (the "Decision") [Docket No. 2120] and *Order Granting Wind-Down Debtors' Seventh Omnibus Objection to Claim No. 7233 Filed by John W. Van Tubergen Jr.* (the "Order") [Docket No. 2122], modifying the Claim amount from $10 million to $19.07.[3]

2.  Mr. Van Tubergen, dissatisfied with the Court's conclusion, asks the Court to reconsider. However, the Motion does not ask the Court to reconsider based on any new evidence (none is presented), new legal theory (none is presented), or identification of clear error or mistake by the Court. Indeed, the thrust of the Motion is a challenge to the Court's admission of certain evidence that Mr. Van Tubergen agreed would be admitted on the record in open court. The remainder simply regurgitates the record regarding the vagaries of LTV calculation and Michigan

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Decision, Order, and accompanying briefing, as applicable.

2

law, and asks the Court to change its mind.

3. The Motion, therefore, falls far short of the requisite "*cause… according to the equities of the case*" necessary for this Court to reconsider disallowance of the Claim as required under 11 U.S.C. § 502(j), and must be denied. This Court's careful consideration of the ample record before it, and the thoughtful Decision rendered thereon, was not a mistake.

4. In the alternative, the Motion asks the Court to issue a stay pending a hypothetical future appeal, and to require the Wind-Down Debtors to reserve more than $8 million for Mr. Van Tubergen's hypothetical allowed claim. However, Mr. Van Tubergen fails to demonstrate (i) a likelihood that he will succeed on appeal, (ii) irreparable harm he will suffer absent a stay, (iii) lack of harm to BlockFi and its creditors, or (iv) that the public interest is served by the requested stay. Indeed, each of these factors weighs heavily *against* a stay of disallowance and the requested reserve. The Motion, therefore, fails to meet the burden to warrant a stay of this Court's Order, and must be denied.

5. After more than 16 months, BlockFi's innocent customers – largely individuals with retirement and other savings tied up in the defunct exchange – are set to receive their distributions. The Plan Administrator has a duty to reunite creditors with their much-needed assets as expeditiously as possible. The Motion fails all standards of cause, and inhibits the Plan Administrator's efforts to distribute long-awaited estate assets to BlockFi's customers. The Motion should be denied as to all requested relief.

## BACKGROUND

6. The Wind-Down Debtors incorporate by reference herein the background and procedural history as provided in the Court's Decision.

**RESPONSE**

**I.  The Motion Fails To Meet The Legal Standards Required For Reconsideration Of A Disallowed Claim Pursuant To Section 502 Of The Bankruptcy Code.**

7.  Section 502(j) of the Bankruptcy Code provides the statutory basis to reconsider a previously allowed or disallowed claim, stating that "[a] claim that has been allowed or disallowed may be reconsidered *for cause… according to the equities of the case*."  11 U.S.C. § 502(j) (emphasis added); *Peshkopia v. Katz* (*In re Bankruptcy Kara Homes, Inc.*), 2010 WL 2546018 (D.N.J. June 21, 2010).  Fed. R. Bankr. Pro. 3008 provides the procedure for reconsideration of a previously allowed or disallowed claim under section 502(j).  Rule 3008 requires notice and hearing where a motion for reconsideration is granted, but permits the court to decline to reconsider an order of allowance or disallowance without notice and hearing.  *See* 1983 Advisory Committee Note to Fed. R. Bankr. P. 3008.

8.  The Bankruptcy Code does not elaborate upon cause according to the equities of the case, "but [cause] is an adaptable standard reflecting bankruptcy laws' roots in equity jurisprudence." *See* 1983 Advisory Committee Note to Fed. R. Bankr. P. 3008. "[C]ourts have substantial discretion in deciding what constitutes 'cause' when deciding whether to grant a motion for reconsideration under § 502(j)." In determining cause, courts "generally concur that Fed.R.Civ.P. 60(b) helps define 'cause.'" *In re Princeton Office Park, L.P.*, 504 B.R. 382, 392 (Bankr. D.N.J. 2014) (citing *Warren v. PNC Bank, Inc. (In re Warren)*, 499 B.R. 914, 919 (Bankr. S.D. Ga. 2013) (citations omitted); *In re Compass Marine Corp.,* 146 B.R. 138 (Bankr.E.D.Pa.1992) ("[S]ome 'cause' for reconsideration, invoking at least one of the grounds set forth in F.R.Civ.P. 59 or 60(b), must be articulated if [Fed. R. Bankr.P.] 3008 to be successfully invoked.")).

4

9. Fed. R. Civ. Pro. 59, made applicable by Fed. R. Bankr. Pro. 9023, sets forth the procedural grounds for a new trial or to alter or amend a judgment. Courts in this district have required that "[S]uch a motion should be granted only where the moving party shows that at least one of the following grounds is present: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [made its initial decision]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Courtney v. Williams*, No. 15-33283, 2019 WL 328720, at *1 (Bankr. D.N.J. Jan. 23, 2019) (quoting *In re Energy Future Holdings Corp.*, 904 F.3d 298, 311 (3d Cir. 2018) (internal quotations and citations omitted)).

10. Fed. R. Civ. Pro. 60(b), made applicable by Fed. R. Bankr. Pro. 9024, permits relief from a judgment or order on one of the following grounds: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

11. The Motion identifies two purported bases to find cause to reconsider the Court's Order: (a) the Court's finding in Part III(B) of the Decision that "BlockFi applied an acceptable LTV calculation method to the subject loans" was made in error, and (b) that the Court gave insignificant consideration to Michigan law. Both purported bases for reconsideration fail to meet the standards for relief under Fed. R. Civ. Pro. 59 and 60(b), and are instead little more than unsupported gripes with the Court's well-reasoned prior Decision on these issues.

5

### A. The Court Did Not Err In Finding That The LTV Calculation Utilized By BlockFi In Calculating The Collateral Value Was Acceptable Under The LSA.

12. Mr. Van Tubergen re-asserts his belief that BlockFi employed, and this Court erroneously accepted, a valuation methodology that was "patently unreasonable and uncertain as a matter of fact." Relatedly, Mr. Van Tubergen argues that Ms. Marquez's testimony was inappropriate under Fed. R. Evid. 602, and the Court should not have credited it. Mr. Van Tubergen is incorrect as to both assertions.

#### i. BlockFi's Valuation Methodology Was Not Patently Unreasonable; Rather, It Was Clearly Appropriate Given Its Discretion Under The LSA.

13. The Court (correctly) found that "[b]ased on the plain language of the LSAs, a determination as to the market value of Van Tubergen's Collateral was left to BlockFi in its own reasonable discretion" and that the record did not establish that BlockFi was outside of such discretion. Mr. Van Tubergen's dissatisfaction with the evidence that the Court credited is not a mistake, and therefore not grounds for reconsideration.

14. The term "mistake" as used in Rule 60(b)(1) refers to an excusable litigation mistake or a court's substantive mistake in law or fact. *In re Wassah*, 417 B.R. 175, 183 (Bankr. E.D.N.Y. 2009) (*citing iXL Ents. v. GE Capital Corp.*, No. Civ. A. 301CV2051CFD, 2005 WL 736820 at *2 (D. Conn. Mar. 31, 2005)). The contractual agreement (the LSA) between BlockFi and Mr. Van Tubergen defines market value for purposes of calculating collateral as either the "product of the amount of the collateral times the last trade price for that type of collateral on the Gemini website *or the market value determined by BlockFi in its reasonable discretion*." Mr. Van Tubergen argues, as he did previously, that the Court should adopt his purported LTV calculation methodology (*i.e.*, based on Gemini pricing information), and that any alternative methodology should be deemed unacceptable. The Court disagreed with Mr. Van Tubergen, finding that the

agreement gave BlockFi discretion to use pricing data other than that sourced from Gemini. Mr. Van Tubergen takes issue with the Court's (we submit, correct) conclusion. To the extent that Mr. Van Tubergen does not care for this Court's finding, that dissatisfaction is not a mistake by the Court in law or fact, and is not sufficient grounds for reconsideration.

### ii. The Court Did Not Err In Crediting Ms. Marquez's Testimony.

15. Mr. Van Tubergen also takes issue with Ms. Marquez's testimony, seemingly insofar as the Court credited her testimony in finding that BlockFi was permitted to use the LTV calculation methodology it employed. Specifically, Mr. Van Tubergen maintains that Ms. Marquez lacked personal knowledge of the facts that she testified to in violation of Fed. R. Evid. 602. Mr. Van Tubergen's challenge to Ms. Marquez's testimony on the basis that she does not have personal knowledge misstates the record, does not comport with the law, and was waived when Ms. Marquez testified without objection at the January 16, 2024 hearing.[4]

16. Ms. Marquez is and has been BlockFi's Chief Operating Officer. Ms. Marquez testified that she had familiarity with all of the topics she testified about. With respect to the pricing methodology used to calculate the value of the collateral, Ms. Marquez "explained the basis or benchmark for [BlockFi's] valuation of the Collateral":

> Q. What pricing metric did BlockFi use to make these determinations of whether the loan-to-value was 70 percent, 80 percent? How was that calculation done?
>
> A. We used a variety of best-in-class pricing feeds that were fed in to our institutional team and that was connected to the loan platform, and then LTV values were calculated off of those pricing feeds.
>
> Q. And so was that from Gemini?

---

[4] As this Court is no doubt aware, had Van Tubergen lodged an objection to Ms. Marquez's testimony on the basis that she did not have personal knowledge of certain facts, that predicate would have been laid. Failing to object should estop Van Tubergen from now complaining.

> A. It may have been from Gemini at certain points in time, but over time, we used multiple pricing feeds to ensure the data was accurate.

Motion, Exhibit OO, Hearing Transcript 44:24-45:10, Docket No. 2142-3.

17. With respect to the potential reason for discrepancy between amounts that Mr. Van Tubergen presented and what BlockFi used, Ms. Marquez testified:

> A. I think the concept of the price that's used is complicated because typically when a client Google's Ethereum price, you're seeing the spot price for Bitcoin, which could be – it's the last trade that happened and that could have been someone buying 10 cents worth of Ethereum. So that price isn't necessarily what's available to the market, let's say, if you're trying to sell millions of dollars worth of crypto. So I think the idea of spot pricing versus the price that we get when you execute a trade, there's a difference there based on the volume that you're trying to trade and of course every single trade has trading fees.

Motion, Exhibit OO, Hearing Transcript, 45:18-46:3.

> A. So, for example, on one of the days in question, we were talking about the price of Ethereum I believe on May 19, 2021. If you took Ethereum's close that day versus the low, I believe there was a 25 percent difference in price just for that day. And that's because when the price of crypto starts to fall, it falls very drastically in one day, and so not only the pricing source that you're using but exactly which price you're pulling for the day in question matters materially when you're looking at what was the loan's LTV that caused the default on the day in question.

Motion, Exhibit OO, Hearing Transcript, 46:11-20.

18. Ms. Marquez made clear: "In this case, I looked through the loans transaction history and our books and records." Motion, Exhibit OO, Hearing Transcript, 54:2-6. When asked if she prepared the charts that were included in her certification, her response was "Yes. I was part of the team that helped prepare the charts." Motion, Exhibit OO, Hearing Transcript, 54:7-10.

19. Mr. Van Tubergen focuses solely on the fact that Ms. Marquez could not remember the name of certain pricing feeds BlockFi used years ago. A perfect memory is not required for a witness to have "personal knowledge." *M. B. A. F. B. Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 681 F.2d 930, 932 (4th Cir. 1982) ("Rule 602, however, does not require that the witness' knowledge be positive or rise to the level of absolute certainty. Evidence is inadmissible under

8

this rule only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to."); *S.E.C. v. Singer*, 786 F. Supp. 1158, 1167 (S.D.N.Y. 1992) ("Testimony can be admissible under Rule 602 even if the witness has only a broad general recollection of the subject matter."). Ms. Marquez's testimony was clear – BlockFi used pricing feeds. There was no speculation or guessing about that fact.

20. Ms. Marquez's review of documents to prepare for signing the Certification and testifying at the hearing is not disqualifying and does not establish that she did not have personal knowledge. *Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, No. 09-CV-99-JPS, 2011 WL 4478440, at *8 (E.D. Wis. Sept. 23, 2011) (Chief Operating Officer's discussions with sales team and reviewing sales reports established 'personal knowledge'); *Shell Petroleum, Inc. v. United States*, No. 97-945 T, 2001 WL 36142722, at *5 (Fed. Cl. Apr. 12, 2001) (personal knowledge requirement met for CEO that reviewed and understood reserve reports summarized by another; type of information a CEO would typically rely on); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, No. 00 CIV. 4763 RMB JCF, 2006 WL 2136249, at *11 (S.D.N.Y. Aug. 1, 2006), adhered to on reconsideration, No. 00 CIV.4763 RMB JCF, 2006 WL 2556339 (S.D.N.Y. Sept. 5, 2006) (Court refuses to strike certain evidence given by witnesses who obtained his knowledge of events through interactions with other people: "Personal knowledge however, is not so narrowly defined. 'Although first-hand observation is obviously the most common form of personal knowledge, that is not the only basis for it.'" citing 3 J. Weinstein et al., Weinstein's Evidence, § 602.03[1][a]).

21. Ms. Marquez's testimony with respect to the methodology BlockFi used to price Mr. Van Tubergen's collateral under the agreed terms was credible, as found by this Court. Mr. Van Tubergen's assertion to the contrary is incorrect and unsupported by the record, and his

9

request that this Court now take judicial notice of other pricing data – after the evidence has closed –is improper and a waste of resources.

**B.    The Court Gave Sufficient Consideration To Michigan Law.**

22.    Mr. Van Tubergen also asserts that the Court gave insignificant consideration to Michigan law with regard to: (i) good faith and fair dealing requirements, (ii) the unconscionability of the LSA, and (iii) agency principles. As set forth below, Mr. Van Tubergen's assertions are incorrect.

### i. There Can Be No Violation Of Good Faith And Fair Dealing Where BlockFi Complied With The Express Terms Of The Contract.

23.    At its core, Van Tubergen's argument is that BlockFi breached the LSAs. Michigan's duty of good faith and fair dealing cannot and does not provide a means to negate express contract terms. *Eastway & Blevins Agency v Citizens Ins. Co. of America,* 520 N.W.2d 640, 642 (Mich. Ct. App. 1994) ("A lack of good faith cannot override an express provision in a contract.") (citing *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1041 (C.A.6, 1990)). Mr. Van Tubergen insists that the only acceptable LTV calculation is one based on Gemini pricing data. However, this assertion, as this Court already found, is negated by the plain terms of the LSA, which provide that market value of collateral is either the "product of the amount of the collateral times the last trade price for that type of collateral on the Gemini website *or the market value determined by BlockFi in its reasonable discretion*." The express language of the contract that Mr. Van Tubergen entered into provides BlockFi with the discretion that Mr. Van Tubergen erroneously asserts BlockFi does not have. BlockFi's adherence to these terms is not (and cannot be) a violation of Michigan's duty of good faith and fair dealing.

### ii. The Motion Fails To Identify Either Procedural Or Substantive Unconscionability As Required Under Michigan Law.

24. Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term. *See Liparoto Constr, Inc v Gen Shale Brick, Inc*, 772 N.W.2d 801, 805-06 (Mich. Ct. App. 2009). Substantive unconscionability exists where the challenged term is not substantively reasonable – where the inequity of the term is so extreme as to "shock the conscience." *Id.* Mr. Van Tubergen was not required to enter into any agreement with BlockFi, and the terms of the LSA are not substantively unreasonable and certainly do not shock the conscience.

25. Mr. Van Tubergen could certainly have taken his business elsewhere. There was no procedural duress in entering into the agreements with BlockFi. Unconscionability must fail on that basis alone.

26. Van Tubergen's complaints about "Percentage (%) of Collateral Liquidated" focus on an inapplicable metric. Nothing in the LSA requires BlockFi to review or address the "units of Collateral sold". Van Tubergen admits that BlockFi could liquidate collateral to re-establish the "Required LTV" of either seventy percent (70%) or eighty percent (80%) depending on the loan. Motion, p. 15.

As established by testimony and written submission, BlockFi acted in compliance with the LSAs:

> COURT: And when collateral was liquidated to produce the loan-to-value ratio, in looking at your declaration and the wind-down reply, often it seemed after the liquidation of the collateral, the loan-to-value was still somewhat high. In other words, sometimes over 80 percent or just below 79 percent. **Why weren't more funds liquidated, more assets liquidated to bring it down to a more comfortable level?**
>
> MARQUEZ: So as a business, it was really important for us to do two things. One, to take into account our client's perspective when possible and also to just have as healthy of a business as possible. And so our goal was to try to liquidate as few

11

times as possible and avoid a liquidation whenever possible because BlockFi, like Mr. Van Tubergen, we believed in the fact that over -- we thought that crypto would go up over a long period of time. And so, when it came time to liquidate loans, our only goal was to ensure that we always had more collateral than the value of the loan outstanding. And within that, we preferred to try to do smaller batches of liquidation rather than, let's say, oversell and wipe out much more collateral. Because we also knew that our clients really -- we thought our clients would prefer that method of operation, even though it was within our rights to, as you said, liquidate far more and bring them back to a 50 percent LTV.

Motion, Exhibit OO, Hearing Transcript, 48:3-49:1.

27. As demonstrated in Ms. Marquez's certification, BlockFi never liquidated collateral lower than the LTV allowed by the LSAs:

| Loan #[5] | Liq. #[6] | Liquidation Date | Pre-liquidation LTV % | Collateral Sold | Post-liquidation LTV % |
|---|---|---|---|---|---|
| 1 | 1 | 6/22/2021 | 83.1 | 6.3257 BTC | 81.59 |
| 2 | 2 | 6/22/2021 | 82.0 | 3.4294 BTC | 80.39 |
| 3 | 3 | 5/19/2021 | 91.4 | 1,565.2442 ETH | 82.33 |
| 4 | 4a | 7/13/2021 | 91.2 | 1,781.3053 ETH | 81.16 |
| 4 | 4b | 7/19/2021 | 90.5 | 818.4279 ETH | 79.99 |
| 5 | 5a | 1/21/2022 | 83.1 | 31.3544 BTC | 70.12 |
| 5 | 5b | 5/9/2022 | 82.9 | 17.5577 BTC | 70.00 |
| 6 | 6a | 1/21/2022 | 83.4 | 17.4025 BTC | 70.03 |
| 6 | 6b | 5/9/2022 | 82.7 | 9.2020 BTC | 70.00 |
| 7 | 7 | 1/22/2022 | 92.2 | 363.2473 ETH | 84.95 |

Certification of Flori Marquez in Support of Wind-Down Debtors Reply, Docket No. 1963-10, ¶¶ 9-11, 19-22, 24-26.

28. The percentage-of-collateral-liquidated measure simply demonstrates just how much volatility there was in the market between Mr. Van Tubergen's signing of the loan and the time of the properly-conducted liquidations. For example, BTC lost nearly 50% of its value between early-May 2021 when Mr. Van Tubergen entered into Loans #1 and #2 above and June

---

[5] The Loan # corresponds to the chart in Section III of the Factual Background of BlockFi's Reply Docket No. 1963.

[6] Three of the Loans have more than one Disputed Liquidation, indicated by the Liquidation #.

2021 when some collateral was liquidated. ETH lost nearly 50% of its value in the week between Mr. Van Tubergen's entry into Loan #3 and the May 19, 2021 liquidation of some of the collateral.

29. The clauses that (1) allow liquidation of collateral securing significant loan amounts (the complained-of loans here total more than $20M) and (2) allow BlockFi reasonable discretion in determining market value are not unconscionable and certainly don't "shock the conscience." This Court's Decision was correct; Mr. Van Tubergen's Motion to must be denied.

### iii. Michigan Agency Law Does Not Save Mr. Van Tubergen's Claims.

30. Van Tubergen spends time in the Motion outlining Michigan agency law – but the Court's decision based on the evidence Mr. Van Tubergen submitted is correct. BlockFi representatives never promised Mr. Van Tubergen anything (cannot "guarantee that it wont [sic] get liquidated"). Mr. Van Tubergen was repeatedly told exactly how to avoid liquidation – post more collateral, in the same kind as required by the LSA, to the account identified in the LSA. Failing to do so, BlockFi was within its rights under the LSAs to liquidate collateral when the maximum LTV was reached.

### iv. This Court Correctly Found That Mr. Van Tubergen Failed To Present *Any Evidence* That BlockFi Failed To Send Required Notices.

31. The LSAs are clear: "if at any time, the outstanding principal balance of the Loan is equal to or greater than eighty percent (80%)[7] of the Collateral Market Value (the "Accelerated Maximum Loan to Value Ratio"), Lender has the right to immediately liquidate Collateral." As outlined above, each complained-of liquidation occurred after the Accelerated Maximum Loan to Value Ratio was reached.

---

[7] Or 90% LTV on one loan.

13

32. Even if that were not the case, Mr. Van Tubergen has the burden to prove his breach of contract claim. He presented no evidence and submitted no testimony that he did not receive proper notice – counsel's argument is not evidence. The evidence Van Tubergen did present relates to a single loan (Loan #3) and demonstrates that *he received notice* that the loan was in default (greater than 80% LTV) and that his collateral was "Eligible for Sale." Sur-Reply, Exhibit II, Docket No. 2039-12. In compliance with the LSA, BlockFi liquidated some of the collateral securing that loan. Further, BlockFi demonstrated in Exhibit J that it did send multiple emails before the liquidation.

33. Finally, Mr. Van Tubergen's assertion that BlockFi "effectively admitted" to a wrongful liquidation is baseless. Van Tubergen, in accepting BlockFi's proposal, agreed that the reinstatement was a deviation from BlockFi's normal procedures and a one-time only accommodation.

C. **Evidentiary Issues.**

34. Mr. Van Tubergen requests that this Court now, after evidence has been admitted and the evidence is closed, "exclude" Exhibit J. Mr. Van Tubergen wants a "do over" for evidence his counsel did not object to and stated, "I'll grant it to be admitted with the right to ask Ms. Marquez some questions." Motion to Reconsider, Exhibit OO, Hearing Transcript, 41:25-42:2, Docket No. 2142-3.[8]

35. The foundation for Exhibit J was well laid – Ms. Marquez testified she had personal knowledge of it (Hearing Transcript 50:18-19), she explained what the entries on Exhibit J meant (Hearing Transcript 38:5-41), and she explained the process that initiated the sending of notices

---

[8] "Initial arguments are *not* to be treated as a dress rehearsal for a second attempt to prevail on the same matter. Counsel is also expected to 'get it right' the first time and to present all the arguments which counsel believes support its position." *In re Armstrong Store Fixtures Corp.,* 139 B.R. 347, 350 (Bankr. W. D. Pa. 1992).

14

(Hearing Transcript 52:2-11). If Mr. Van Tubergen's counsel believed that the foundation for admission of Exhibit J had not been established, the time to assert that was on January 16 – not two months later. Having agreed to the admission of Exhibit J and the Court's actual admission of Exhibit J, Mr. Van Tubergen cannot now be heard to complain. Mr. Van Tubergen waived any objection to the admission of the evidence.

## II. Mr. Van Tubergen Has Not Met His Burden To Warrant A Stay.

36. In the alternative to reconsideration, Mr. Van Tubergen requests that this Court stay disallowance of the Claim pending the resolution of a potential subsequent appeal. A request for stay pending appeal in the Third Circuit is reviewed under the following four-factor test: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (*citing Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)). The first two factors are "the most critical." *In re Revel AC, Inc.*, 802 F.3d at 568 (citing *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749, 1761, 173 L. Ed. 2d 550 (2009)). Each of the four factors weighs against a stay of disallowance, and the Court should deny Mr. Van Tubergen's request.

### A. Mr. Van Tubergen Has Not Demonstrated A Likelihood Of Success On The Merits.

37. Mr. Van Tubergen asserts "that there exists a high likelihood that Claimant will prevail on appeal given his case-in-chief as presented by way of written briefing, certifications, exhibits on the record, and at the hearing held in this matter, together with foregoing contentions made in support of the Motion." As Mr. Van Tubergen's Motion for reconsideration largely repeats the same arguments raised on the record, without adding any additional evidence or

15

support, his success on the merits depends on a trier of fact coming to the opposite conclusion as this Court with the same information. The likelihood of success, therefore, cannot be said to be high, let alone satisfactory to carry Mr. Van Tubergen's burden.

38. As the record reflects and as this Court has already determined, the plain language of the contract that BlockFi and Mr. Van Tubergen executed afforded BlockFi discretion in the methodology used to calculate market value of collateral. This Court found that BlockFi's methodology was reasonable, and that Mr. Van Tubergen failed to establish that BlockFi miscalculated the LTV. Mr. Van Tubergen fails to show that any other court would reach a different conclusion.

### B. Mr. Van Tubergen Will Not Suffer Irreparable Harm If The Stay Is Denied.

39. As the Third Circuit has made clear, harm that is purely monetary does not constitute irreparable harm. *See Randolph Township Board of Education, Morris County, New Jersey v. M.T.*, 2023 WL 4265760 (3d. Cir. June 29, 2023) (upholding District Court's denial of stay request finding "[a]s the District Court explained, the [] order primarily awards… compensatory damages [and] '[T]he availability of money damages for an injury typically will preclude a finding of irreparable harm'") (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 n.4 (3d Cir. 2017)); *see also Cobalis Corp. v. Cornell Capital Partners, LP*, 2011 WL 4962188, *7 (D.N.J. Oct. 18, 2011) ("It is well settled that "an injunction will not be upheld where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law.") (quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1145 (3d. Cir. 1982); *In re Frascella Enterprises, Inc.*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) ("it is well-established that economic loss alone is not irreparable harm. 'Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it.'") (quoting *Kos Pharma., Inc. v. Andrx*

16

*Corp.*, 369 F.3d 700 (3d. Cir. 2004). Indeed, such purely monetary harm does not constitute irreparable harm even where there is a risk that the movant will be unable to recover the funds upon a reversal on appeal. *See Susquenita School Dist. V. Raelee S. By and Through Headi S.*, 96 F.3d 80-81 (3d. Cir. 1996) (affirming the denial of a stay based on lack of irreparable harm where movant "would not be entitled to recover funds… even if it were to prevail on appeal.").

40. Mr. Van Tubergen asserts that he will be irreparably harmed if a reserve for his Claim is not established given the potential for the estate to be depleted (presumably to an extent insufficient to cover the amount of the Claim if Mr. Van Tubergen is successful on appeal) during the pendency of a hypothetical future appeal. Mr. Van Tubergen's purported injury is purely monetary in nature. As such, Mr. Van Tubergen's purported harm does not satisfy the standard for irreparable harm, even if there is a risk that Mr. Van Tubergen would be unable to recoup funds if disallowance of the Claim is reversed on appeal.

41. Moreover, and as discussed above, Mr. Van Tubergen has offered no new information or evidence beyond that which this Court previously considered in rendering its Decision. Mr. Van Tubergen is unlikely to prevail on appeal and, as such, is unlikely to be harmed to any extent by the absence of a reserve for his Claims. Mr. Van Tubergen has failed to meet the standard under the second factor.

### C. Meanwhile, A Stay Will Harm The Wind-Down Debtors And Their Innocent Creditors.

42. Conversely, a stay and establishment of a reserve of $8.16 million will undoubtedly harm BlockFi's other creditors. The assets tied up in this bankruptcy case represent savings and retirement funds of hundreds of thousands of BlockFi customers. These Chapter 11 cases have been pending for over a year. The Wind-Down Debtors and the Plan Administrator are close to making distributions – reuniting BlockFi's customers with assets critically important to them. The

17

amount that Mr. Van Tubergen requests be reserved for his claim and that would not be distributed, is substantial. Such a reserve would serve to prolong the separation of BlockFi Lending's creditors from a meaningful portion of their value entitlements.

43. Contrary to Mr. Van Tubergen's assertion, the Order disallowing the Claim does not solely affect Mr. Van Tubergen. It affects all of BlockFi Lending's customers, and in a meaningful way. Although Mr. Van Tubergen cannot envision how further separation of BlockFi Lending's clients from their assets may be harmful to them, the record established in this case, including customers continuous plea for distributions, makes this harm clear.

### D. The Public Interest Weighs Against Staying The Disallowance Of Mr. Van Tubergen's Claim.

44. Mr. Van Tubergen does not offer any argument as to the weight of the public interest in granting a stay. Notwithstanding, the Wind-Down Debtors respectfully submit that there is substantial public interest in denying frivolous motions for stay on substantially the same set of facts already on the record and where such a stay would significantly harm thousands of innocent natural persons.

45. Each factor therefore weighs against a stay and establishment of any reserve amount. Accordingly, the Wind-Down Debtors respectfully request that this Court deny the request for such relief.

### CONCLUSION

46. Wherefore, based on the foregoing, the Plan Administrator respectfully requests that the Court (i) deny the Motion and (ii) grant such other and further relief as it deems proper.

*[Remainder of page intentionally left blank.]*

Respectfully Submitted:

Dated: April 18, 2024                     /s/ *Daniel M. Stolz*
                                          _____
                                          **GENOVA BURNS LLC**
                                          Daniel M. Stolz, Esq.
                                          Donald W. Clarke, Esq.
                                          110 Allen Rd., Suite 304
                                          Basking Ridge, NJ 07920
                                          (973) 230-2095
                                          DStolz@genovaburns.com
                                          DClarke@genovaburns.com

                                          *Local Counsel to the Plan Administrator*

                                          **BROWN RUDNICK LLP**
                                          Kenneth J. Aulet, Esq. (admitted *pro hac vice*)
                                          Seven Times Square
                                          New York, New York 10036
                                          (212) 209-4800
                                          kaulet@brownrudnick.com

                                          **BROWN RUDNICK LLP**
                                          Tristan Axelrod, Esq. (admitted *pro hac vice*)
                                          One Financial Center
                                          Boston, MA 02111
                                          (617) 856-8300
                                          taxelrod@brownrudnick.com

                                          **BROWN RUDNICK LLP**
                                          Stephen D. Palley, Esq. (admitted *pro hac vice*)
                                          Daniel J. Healy Esq. (admitted *pro hac vice*)
                                          601 13th St. NW Suite 600
                                          Washington, D.C. 20005
                                          (202) 536-1766
                                          spalley@brownrudnick.com
                                          dhealy@brownrudnick.com

                                          *General Counsel to the Plan Administrator*