UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                      .     Case No. 22-19361-MBK
                            .
BLOCKFI INC., et al.,       .
                            .     402 East State Street
                            .     Trenton, NJ 08608
           Debtors.         .
                            .     April 25, 2024
. . . . . . . . . . . ..          11:27 A.M.

 TRANSCRIPT OF DEBTORS' EIGHTEENTH OMNIBUS OBJECTION TO CLAIMS
   [DOCKET 2203]; DEBTORS' NINETEENTH OMNIBUS OBJECTION TO
 CLAIMS [DOCKET 2201]; WIND-DOWN DEBTOR'S MOTION FOR ENTRY OF AN
   ORDER EXTENDING THE PERIOD TO FILE AND SERVE OBJECTIONS TO
 CLAIMS [DOCKET 2210]; CLAIMANT JOHN W. VAN TUBERGEN JR.'S (I)
 MOTION PURSUANT TO FED. R. BANKR. P. 3008, 8002(B), 8007(A),
  9023 AND 9024 TO (A) ALTER AND AMEND THE DECISION AND ORDER
 SUSTAINING THE WIND-DOWN DEBTORS' OBJECTION TO CLAIM NO. 7233;
 AND (B) ALTERNATIVELY, SEEK OTHER RELIEF FROM SUCH ORDER; AND
 (II) INVOCATION OF TOLLING OF TIME TO APPEAL PURSUANT TO FED.
  R. BANKR. P. 8002(B) [DOCKET NO. 2142]; DEBTORS' SEVENTEENTH
 OMNIBUS OBJECTION TO CERTAIN CLAIMS 15063, 15069, 18939, 18969,
  18974, 18993, AND 26899 [DOCKET NO. 2169]; WIND-DOWN DEBTOR
 BLOCKFI, INC'S MOTION FOR AN ORDER REMANDING STATE COURT ACTION
  [DOCKET NO. 2181]; MOTION FOR RELIEF FROM STAY FILED BY FLORI
 MARQUEZ AND ZACHARY LEE PRINCE [DOCKET NO. 2219]; AND MOTION TO
  ENFORCE PLAN AND CONFIRMATION ORDER FILED BY ARCH INSURANCE
                COMPANY [DOCKET NO. 2221]

           BEFORE THE HONORABLE MICHAEL B. KAPLAN
           UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES CONTINUED.

Audio Operator:            Kiya Martin


Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

```
APPEARANCES (Cont'd):

For the Plan              Brown Rudnick, LLP
Administrator:            By: KENNETH AULET, ESQ.
                              TRISTAN AXELROD, ESQ.
                              MATTHEW SAWYER, ESQ.
                              DANIEL J. HEALY, ESQ.
                          7 Times Square
                          New York, NY 10036

                          Genova Burns LLC
                          By:  DONALD W. CLARKE, ESQ.
                          110 Allen Road, Suite 304
                          Basking Ridge, NJ 07920

For John W. Van           Connell Foley LLP
Tubergen, Jr.:            By:  JOAO F. MAGALHAES, ESQ.
                          One Newark Center
                          1085 Raymond Boulevard, 19th Fl.
                          Newark, NJ 07102

For Arch Insurance        DLA Piper
Company, Berkley          By:  RACHEL EHRLICH ALBANESE, ESQ.
Insurance Company,             GREGORY JUELL, ESQ.
Berkshire Hathaway        1251 Avenue of the Americas
Specialty Insurance       New York, NY 10020
Company, U.S.
Speciality Insurance      Werner Ahari Mangel LLP
Company, and XL           By:  STACEY RUFE, ESQ.
Specialty Insurance       2112 Pennsylvania Avenue NW, Suite 200
Company:                  Washington, D.C. 20037


For National Union        Kaufman Borgeest & Ryan LLP
Fire Insurance Co. Of     By:  ROBERT BENJAMIN, ESQ.
Pittsburgh PA:            200 Summit Lake Drive, 1st Fl.
                          Valhalla, NY 10595

For Access Insurance      Squire Patton Boggs
Company:                  By:  MARK C. ERRICO, ESQ.
                          382 Springfield Avenue, Suite 300
                          Summit, NJ 07901

For The Insureds:         Shearman & Sterling
                          By:  DAN GOLD, ESQ.
                          The Link at Uptown
                          2601 Olive Street, 17th Fl.
                          Dallas, TX 75201
```

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For Ace Insurance Company: | Duane Morris LLP<br>By:  CATHERINE HEITZENRATER, ESQ.<br>         JESSICA LA LONDE, ESQ.<br>30 South 17th Street<br>Philadelphia, PA 19103 |
| For Endurance American Speciality Insurance Company: | Kaufman Dolowich<br>By:  SETH D. GRIEP, ESQ.<br>         KEVIN J. WINDELS, ESQ.<br>25 Main Street, Suite 500<br>Hackensack, NJ 07601 |

- - -

4

1          THE COURT:  Good morning.  This is Judge Kaplan, and

2    I'll be starting my 11:30 calendar with respect to the BlockFi

3    matters.

4          We have counsel both in court and appearing remotely.

5    For those -- bear with me.  For those appearing remotely, if I

6    have not called upon you, and you wish to be heard, please make

7    sure you use the raise hand function.

8          All right.  Good morning, Mr. Aulet.

9          MR. AULET:  Good morning, Your Honor.  Kenneth Aulet

10   of Brown Rudnick for the plan administrator.  I am joined by my

11   partner, Tristan Axelrod, and Associate Matt Sawyer, as well as

12   my co-counsel from Genova Burns, Don Clarke.  Oh, and my

13   partner Dan Healy as well.

14         THE COURT:  All right.  Thank you.

15         We have several matters on the agenda.  I will ask

16   those who are appearing on these matters to enter their

17   appearances when we get to each particular matter.  I want to

18   make sure -- oh, we're actually a couple minutes early.

19         Do you want to begin setting the stage for this

20   morning, Mr. Aulet?

21         MR. AULET:  Yes.  Thank you, Your Honor.  So this

22   morning, if it works for Your Honor, what I propose is that we

23   give a short status update on the progress of the case.  And

24   then we have essentially two different matters.  We have the

25   Van Tubergen motion, and then we have essentially a number of

1  matters that are all related to the D&O litigation.  And what

2  I'd propose, Your Honor, is that we handle the Van Tubergen

3  motion first.  And then for the D&O litigation, we thought the

4  order that made the most sense would be the motion to enforce

5  the plan, then the motion for remand that was filed by the plan

6  administrator, and then finally the motion to lift the stay

7  that was filed by certain directors and officers.

8       THE COURT:  All right.  I somewhat anticipated

9  hearing them all together.  They're so interrelated.  I think

10  that would make the most sense.

11       What about the omnibus objections?

12       MR. AULET:  So, Your Honor, we have received no

13  responses to the 18th and 19th omnibus objections, and we would

14  propose that those be heard on the papers.

15       THE COURT:  All right.  Now, there was one of the

16  claims for which counsel had requested an adjournment I believe

17  I resolved yesterday -- it was with Mr. Straffi's client -- to

18  hear the matter on the papers.

19       MR. AULET:  Yes, Your Honor.  And you gave us a week

20  to file a reply since I believe his opposition was filed

21  yesterday.

22       THE COURT:  Right.

23       MR. AULET:  So we will get that on file as well.

24       THE COURT:  All right.  So with respect to those

25  motions, the -- what is it -- the 18th and 19th omnibus

6

1  motions, the Court will adjudicate those on the papers, and

2  we'll apprise parties of the resolutions.

3          MR. AULET:  Thank you, Your Honor.  And then there's

4  also one other unopposed motion, the wind-down debtors' motion

5  for the entry of an order extending the period to file and

6  serve objections to claims.  That's Docket 2210.  And, again,

7  there were no objections to that motion, so that we would

8  propose that as well be heard on the papers.

9          THE COURT:  All right.  Let me just check that.

10          Kiya, that's Number 19 on chat.

11          THE CLERK:  Okay.  Thank you.

12          THE COURT:  And that will be granted.

13          So Numbers -- on today's calendar, my calendar, the

14  Court's calendar, 21 and 20 will be on the papers.  Those --

15  with the exception of the single claim that has been carved out

16  for -- well, it's still on the papers, but we're allowing an

17  additional week for the wind-down debtor to respond.

18          And I think that brings us current, correct?

19          MR. AULET:  Correct.  Thank you, Your Honor.

20          THE COURT:  All right.  So we would move to the Van

21  Tubergen --

22          MR. AULET:  If --

23          THE COURT:  Oh, I'm sorry.  You wanted to give the

24  update.  Yes.

25          MR. AULET:  Yes, Your Honor.

1          THE COURT:  Please.

2          MR. AULET:  So the plan administrator has been

3   working to get the first interim distribution out to all

4   customers.  For crypto, as Your Honor knows, we are making

5   distributions of certain crypto currencies through BlockFi's

6   platform and other distributions in cash via a number of

7   partners.  The crypto distributions continue.

8          And we urge that all people who are eligible to

9   withdraw do so as quickly as possible, because the deadline to

10  submit a withdrawal is coming up.  There will be a short window

11  for people to fill out the required identity verification.

12  Which, again, we urge everybody to pay close attention to the

13  emails they receive on identity verification.  They may get one

14  email per withdrawal, not per account.  They need to fill out

15  all of them for certain regulatory reasons.

16         And that's a deadline we're not going to be able to

17  extend further.  We do have plans in the works to transition

18  potentially to a third party to allow further crypto

19  distributions, but there's no guaranty that that will be a

20  quick process.  So we'd like everybody who can submit a

21  withdrawal to do so as quickly as possible, because we will be

22  shutting the platform down and not have the ability to continue

23  to process those claims.

24         With respect to cash distributions, we have run into

25  certain regulatory roadblocks.  They have been quite difficult

1  and, we understand, quite frustrating for a number of

2  customers.  Those can be separated into U.S.-based

3  distributions and international based.

4        With respect to U.S.-based distributions, we have

5  resolved those issues this week.  We expect that withdrawals

6  that had been requested in cash previously will start going out

7  early next week.  Again, we'd urge everyone who is eligible for

8  those withdrawals to submit them as quickly as possible.  But

9  because they're not being done through BlockFi's platform,

10  there is less of a urgency to get those done by the end of the

11  month.

12        With respect to international cash distributions,

13  there are significantly more complex regulatory issues, largely

14  due to non-U.S. law.  We anticipate that we will be able to

15  release a large amount of those in the next -- in the near

16  future, but there will be a certain group of those that we

17  likely need to request re-verify their identity, even for

18  distributions that would seem relatively small.  So we will

19  give creditors further updates on those.

20        There are also a small group of creditors where we

21  have had to freeze distributions for certain more complex

22  regulatory issues.  Claimants who have contacted us, we've been

23  able to tell them the regulatory issues, but we have not been

24  able to go into detail on those.  And for those customers, we

25  are not able to make distributions at all on those until that

1  is resolved.

2          We may be coming to Your Honor with more information

3  on that and a proposal on how to resolve, but certain of those

4  issues appear extremely thorny and may be difficult to resolve.

5  We will, of course, reserve all funds so that anybody who is

6  not able to get their funds now will not be prejudiced by this

7  delay and will be able to receive the same distributions

8  they're entitled to have.

9          THE COURT:  All right.  That's fair enough.

10          MR. AULET:  And with that, I would turn it over to my

11  associate, Matt Sawyer, who has done a great deal of the work

12  in this case that you haven't seen, Your Honor.  And we now

13  would like him to address the Van Tubergen motion.

14          THE COURT:  All right.  Then first let me hear --

15  take the appearance for counsel for Mr. Van Tubergen.

16          Mr. Magalhaes, are you there?

17          MR. MAGALHAES:  Yes, Your Honor.  Good morning.

18          THE COURT:  Good morning.  How are you?

19          MR. MAGALHAES:  Fairly well, Judge.  Thank you.

20          THE COURT:  All right.  This is your motion for

21  reconsideration.  As I've -- often admonish all sides, I've

22  read the motion papers as well as the opposition and the

23  replies and the replies to the replies.  So let me have you

24  supplement or highlight any portions of your motion that you

25  wish.

1          MR. MAGALHAES:  I appreciate the opportunity to do

2    that, Judge.  And I came in with that mind set, Your Honor.  I

3    know the Court's time is precious.  This is a big case.  A lot

4    to be heard today.

5          Judge, as I hope we made clear, we're not looking to

6    re-argue.  You know, we explicitly noted that in our memorandum

7    of law.  And I hope that the ensuing framework reflected that,

8    Your Honor.

9          The procedural standards for the motion, they are

10   what they are.  I don't think that's in dispute.  They informed

11   our approach.  We're mindful, Your Honor, that courts should

12   not lightly undo their prior, very recent rulings.  The legal

13   system couldn't function that way.

14         But thankfully, you know, as we say, we have a rule

15   scheme that does take account of situations like we believe are

16   presented by the instant one where there are genuine grounds to

17   alter and amend, whether on the basis of cause under Rule 3008

18   and 502(j) or under -- I'll call it the catchall, any other

19   reason that justifies relief under Federal Rule 60(b)(6).  And

20   the full framework is set forth in the papers, Judge.

21         But my initial point here, Your Honor, is that we're

22   looking to work within the latitude afforded and, equally

23   important, within the reasoning of the decision.  Because we're

24   not looking to re-argue.  And, therefore, our arguments, Judge,

25   have been premised on evidentiary considerations and also other

1  legal theories outside of a breach of contract theory that we

2  believe warrant some additional consideration.

3       And as to our evidentiary points, they were set forth

4  in the papers, Your Honor.  You're aware.  We believe that

5  value was only proven by claimant.  We know that, Your Honor,

6  in the world, cash is king.  But perhaps we can say that in

7  bankruptcy, value is the coin of the realm.  And I believe that

8  my client, Mr. Van Tubergen, is the only party here that proved

9  value.

10       BlockFi spoke as to their general processes, and they

11  did, as we say, you know, somewhat tongue in cheek -- we always

12  keep our humor, Your Honor.  You know, they submitted numbers

13  on a page, but what are they backed by, right?  I'm not

14  insinuating that they made them up.  But we're in a legal

15  proceeding.  They have to prove them.

16       Only Mr. Van Tubergen submitted a verifiable form of

17  market data through the Gemini data, through we've spoken

18  enough about and made the point that they were the depository

19  referenced.  But, you know, my client and I were speaking

20  yesterday, and he made the point to me -- you know, we've read

21  and re-read Ms. Marquez's testimony, which is -- obviously,

22  there -- our other evidentiary argument that she was more of

23  corporate spokesperson, not a fact witness, per se.  And we saw

24  that she said, you know, they took best in class pricing.

25       Well, Gemini is best in class.  And as a matter of

1  justice and equity, capitally, Your Honor, we're the ones

2  seeking to have this Court look to all of the world's major

3  exchange platforms to see what they would have to say about the

4  pricing metrics at the liquidation points in question.

5          As we said in our papers, our pricing metric that we

6  submitted as our evidence was time stamped.  And we -- we'll

7  stand by that.  And I am confident that if the Court were to

8  indulge us and take judicial notice of the information on these

9  other platforms, the Court would find that to be the case.

10         And, also, those other platforms would be able to

11 account for what we believe is a smokescreen being put up by

12 BlockFi that, well, you know, you have to look at the timing,

13 when it was sold.  You have to look at the volume of the sales.

14 As to timing, as I said, our pricing metric was time stamped.

15 And as to the volume, we believe that these other exchange

16 platforms will be able to account for that and support our

17 pricing, our valuation evidence and, at the end, support our

18 contention that the liquidations were not authorized.

19         And just also, Your Honor, as to -- as I said before,

20 as I read the decision, to me it was heavy on the breach of

21 contract theory.  Which we have our disagreements on that

22 front, obviously.  But that will be a matter for appeal and not

23 a reconsideration motion.  And I saw Your Honor's decision, and

24 we cited about how it's not really a reconsideration motion,

25 all that.

1           But we saw very little in the way of the discussion

2    of good faith and fair dealing and unconscionability.  And I

3    get it.  Normally, those types of arguments are after thoughts.

4    And a lot of times, when parties make those arguments, they

5    make them in a almost half-committed fashion.  It's very vague.

6    It's very amorphous.

7           Here, Your Honor, we have statutory complications in

8    Michigan, which their law applies, of good faith and fair

9    dealing and conscionability.  And we have various facets of

10   this case, Your Honor, that I think would be of freestanding

11   significance, meaning even taken in isolation they would be

12   very concerning.  But then when you add them together and you

13   put them under the penumbra of Michigan's statutory

14   complications of good faith and fair dealing and

15   conscionability, that they overwhelmingly warrant a ruling or

16   some kind of relief in Mr. Van Tubergen's favor.

17          And I'm referring, Your Honor, to what is plainly a

18   oppressively one-sided contractual term.  And I'll say

19   something on the record, Your Honor, that I hope is not

20   controversial.  I think that if BlockFi continued business in

21   the manner that they did that these types of contracts would

22   have become an issue at the government agency level.  But,

23   again, that's neither here nor there, because that's not really

24   in play.

25          The manner in which they executed the liquidations,

14

1 Your Honor, was -- I think we called it strip mining. You

2 know, it was just so over the top aggressive. You have agency

3 law considerations, Your Honor, that I didn't really see in the

4 decision in terms of you had multiple BlockFi agents making

5 certain representations as to how the liquidations would be

6 conducted in terms of their extent. Assurances were given.

7 Mr. Van Tubergen, we argued, reasonably relied on thinking that

8 he was good to go with regard to the -- that he was in a safe

9 harbor when he posted that additional collateral in that side

10 account. And that additional collateral was, in fact, posted.

11          We get to the notices, Judge. Even if this Court

12 continues to accept Exhibit J, it doesn't serve to prove the

13 form and content of the underlying notices. And, again, I

14 trust the Court will permit some humor, Judge. I know my

15 client and I need it in this matter. But, again, even if the

16 Court accepts Exhibit J, how do we know that each instance in

17 Exhibit J wasn't BlockFi forwarding a Michael's coupon? You

18 know, we don't. Because the actual stuff wasn't produced.

19          The notices that were produced, however, raised

20 concerns. And we've mentioned this now a couple times, Judge.

21 I don't believe that it was in the decision that the first

22 liquidation that we made a part of our request for relief in

23 connection with Loan Number 55820785, we refer to it loosely as

24 558, we don't believe that a 72-hour notice period was given.

25          We provided a notice that was dated May 18th.

1  BlockFi claims the liquidation occurred May 19th.  We believe

2  it occurred May 20th.  But in either scenario, the 72-hour

3  notice period wasn't met, and that has to be of some

4  consequence, Judge.

5         And then we get to -- and I'll just mention this very

6  briefly, Judge -- our prior attempts to get documents and

7  information.  And we were -- with regards to BlockFi, we

8  resolved those attempts by withdrawing the subpoena.  We then

9  issued a subpoena to their -- to a third-party service provider

10 of theirs, Scratch Services.  They didn't comply.

11        And I think at the last hearing, Your Honor said

12 something to the effect of the music has to stop eventually.

13 And I get it, right?  It's just that when you add all these

14 different things, Judge, and, you know, being mindful that, at

15 the end of the day, Mr. Van Tubergen was a consumer, BlockFi

16 was a behemoth, and you take account that Michigan has codified

17 good faith and fair dealing, codified conscionability, I

18 believe that all that sum and substance warrants

19 reconsideration and a ruling in Mr. Van Tubergen's favor.

20        THE COURT:  All right.  Thank you, Mr. Magalhaes.

21        Let me hear from the wind-down debtors' counsel.

22        MR. SAWYER:  Good morning, Your Honor.

23        THE COURT:  Good morning.

24        MR. SAWYER:  I think it's still morning.

25        THE COURT:  It is.

16

1           MR. SAWYER:  Matthew Sawyer with Brown Rudnick on

2   behalf of the wind-down debtors.  I will take, I think, cues

3   from Your Honor.  I will try to be brief.  There has been a

4   plethora of submissions and argument, and so I will try my best

5   to be short and sweet.

6           Your Honor, we think that this boils down to really

7   one issue.  The issue is what the terms of the agreement that

8   Mr. Van Tubergen and BlockFi entered into say.  Mr. Van

9   Tubergen, as I believe your decision notes, was a sophisticated

10  party.  He sought to make fairly leveraged bets on the price of

11  crypto currencies.

12          BlockFi was willing to lend to Mr. Van Tubergen.

13  BlockFi was not willing to accept the price risk that Mr. Van

14  Tubergen was willing to accept, and BlockFi was not willing to

15  insure those bets.

16          The LSAs that these parties entered into reflect that

17  agreement.  The LSAs provide BlockFi with the ability to

18  liquidate collateral at its discretion upon certain thresholds

19  in the LTVs being met.  And BlockFi did that.

20          The agreements themselves are clear.  BlockFi's

21  compliance with the agreements is evident.  And I believe your

22  decision and your order reflect that and found that.

23          With respect to the Michigan law issue, I believe

24  that the LSAs are, again, informative on that issue.  Michigan

25  doesn't acknowledge a violation of good faith and fair

1  dealing -- excuse me -- where a contracts party followed the

2  contract.  BlockFi followed the contract.  There is no

3  violation of good faith.  There is no violation of fair

4  dealing.

5        In terms of whether the LSAs were unconscionable, the

6  LSAs, again, were entered into by two sophisticated parties.

7  They were clear.  Mr. Van Tubergen wanted to make the kind of

8  bets on crypto that he made.  He could have taken that business

9  elsewhere.  He chose to take it to BlockFi.  And BlockFi was

10 willing to, again, lend but not unconditionally.  And the LSAs

11 are reflective, again, of that agreement that the two parties

12 entered into.

13        And in terms of agency, for fear of beating the

14 proverbial dead horse, the LSAs are clear.  Mr. Van Tubergen is

15 sophisticated.  He can read them.  He knows what he's -- what

16 they said.

17        The LSAs provide a window upon certain thresholds

18 being met in the LTV.  After 72 hours, BlockFi can liquidate

19 collateral.  Upon a higher LTV threshold, BlockFi does not need

20 to provide notice to liquidate collateral.

21        Notwithstanding what the LSAs say, I think the record

22 is pretty clear that Mr. Van Tubergen received adequate notice

23 in every instance prior to the liquidation of the collateral.

24 So not only should he have been on notice based on what the

25 LSAs say, but he received from BlockFi and its employees

1  adequate notice.

2          So again, I think that the record more or less speaks

3  for itself.  I will rest, unless Your Honor has any questions

4  for me.

5          THE COURT:  No.  I understand.  Thank you.

6          MR. SAWYER:  Thank you.

7          THE COURT:  Mr. Magalhaes, anything else you wish to

8  add?

9          MR. MAGALHAES:  No, Your Honor.

10          THE COURT:  All right.  Well, I thank you for your

11  argument.  I'm going to take some time -- not too much time --

12  but I'm going to reserve and consider the argument together

13  with the pleadings that have been filed, the submissions.  And

14  I'll have an order, I would anticipate, in short order.

15          All right.  Thank you.

16          MR. SAWYER:  Thank you, Your Honor.

17          MR. MAGALHAES:  That concludes my involvement, Your

18  Honor.  I wish everyone celebrating Passover a good holiday.

19          THE COURT:  Thank you.  Take care.

20          MR. MAGALHAES:  Bye bye.

21          THE COURT:  All right.  Then that motion is on

22  reserve.  And we can proceed to -- we'll call it generally the

23  D&O issues.

24          And if we have counsel for the carriers and movants

25  come up as well.

19

1          MR. AXELROD:  Thank you.  Tristan Axelrod, Brown

2  Rudnick, for the wind-down debtor.  I believe it's just of one

3  of them, BlockFi, Inc., on these matters.

4          THE COURT:  All right.

5          MS. ALBANESE:  Good morning, Your Honor.  Rachel

6  Ehrlich Albanese of DLA Piper on behalf of several insurers,

7  which I'll identify once I have my notes and I'm organized.

8          THE COURT:  Absolutely.  Go --

9          MS. ALBANESE:  Thank you.

10          THE COURT:  Take your time.  Thank you.

11          MS. RUFE:  Good morning, Your Honor.  Stacey Rufe on

12  behalf of XL Specialty, U.S. Specialty, Arch Insurance Company,

13  Berkshire Hathaway Specialty, and Berkley Insurance Company.

14          THE COURT:  Thank you.

15          MR. BENJAMIN:  Good morning, Your Honor.  Robert

16  Benjamin, Kaufman Borgeest & Ryan, on behalf of National Union

17  Fire Insurance Company of Pittsburgh, Pennsylvania.

18          THE COURT:  Great.  Thank you.

19          MR. ERRICO:  Good morning, Your Honor.  Mark Errico

20  of Squire Patton Boggs for Access Insurance Company.

21          THE COURT:  All right.  Thank you.  Welcome.

22          And before we start with oral argument, let me first

23  see if -- is there anybody appearing remotely who wishes to

24  enter an appearance at this time on this matter?

25          MS. HEITZENRATER:  Good morning, Your Honor.

1  Catherine Heitzenrater from Duane Morris LLP for Ace American

2  Insurance Company.

3           THE COURT:  All right.  Thank you.

4           MS. LA LONDE:  Good morning, Your Honor.  Jessica La

5  Londe from Duane Morris, also on behalf of Ace American

6  Insurance Company.

7           THE COURT:  All right.  Welcome.  Thank you.

8           MR. GRIEP:  Good morning, Your Honor.  Seth Griep

9  from Kaufman Dolowich for Endurance American Speciality

10 Insurance Company.  And also with me is Kevin Windels, who's

11 our pro hac counsel, also from my office.

12          THE COURT:  Great.  Thank you.  Welcome.

13          Anyone else?  All right.

14          Before we start, there was mention made, I believe,

15 in the last reply on behalf of the insurers that there is a

16 mediation scheduled in May.  And my inquiry -- I always like to

17 make sure that I don't, you know, put my thumb down on the

18 scales one way or the other.  Is this a situation -- and I

19 throw this out collectively to all sides -- where there would

20 be a preference for the Court to reserve on these pending

21 motions pending the mediation, or the contrary?  I don't know

22 if you've discussed it, but it kind of informs me as to how

23 aggressively to start asking questions too without trying to

24 nudge the scales.

25          MR. AXELROD:  Thank you, Your Honor.  We did have a

21

1  meet and confer on these issues yesterday.  We did float that.

2  And the wind-down debtors conferred with their client.

3  Afterwards, we actually feel like a ruling on these issues

4  would be helpful in advance of mediation.

5       THE COURT:  All right.  Do you all concur, or what

6  are your thoughts?

7       MS. ALBANESE:  Your Honor, on behalf of the movant

8  insurers, we do not have authority to agree to an adjournment

9  beyond mediation.  So we'd like to go forward today.

10       THE COURT:  Well, no.  I meant -- I was -- listen to

11  argument.  The question is, do you -- whether I reserve a

12  decision or not pending the mediation.  I'm not -- when is the

13  mediation scheduled for?  I'm not sure I even -- I'll reach a

14  decision in time for the mediation.

15       MS. ALBANESE:  It's --

16       UNIDENTIFIED SPEAKER:  May 22nd.

17       UNIDENTIFIED SPEAKER:  May 22nd.

18       MS. ALBANESE:  May 22nd.

19       THE COURT:  May 22nd.  All right.  So that gives us

20  about three weeks.  Okay.  Then we'll go ahead.  I'm not sure

21  I'm prepared today to issue a ruling on either of the -- or I

22  guess there are three motions.  I might on some of them.  And

23  if not, I'll just move forward with consideration in the

24  ordinary course.

25       If there comes a point in time where the parties

22

1 agree collectively to ask me to defer, so be it.  I usually try

2 to accommodate.  If not, mediation sometimes lasts longer than

3 people anticipate.  Sometimes it takes longer for me to issue

4 rulings than I'd like.  But we'll see where we go.

5        All right.  Counsel?

6        MR. AXELROD:  Thank you, Your Honor.  And I'll give a

7 brief introduction and also reintroduce the facts here as we

8 understand this.

9        MS. ALBANESE:  Excuse me, Your Honor.  We are the

10 movants for the motion to enforce.

11        THE COURT:  And I was wondering, which one are we

12 arguing --

13        MR. AXELROD:  We'd actually like to begin with the

14 remand motion, if that's all right.  But the motions are

15 intertwined.

16                    (Counsel confer)

17        THE COURT:  Well --

18        MR. AXELROD:  Excuse me.

19        THE COURT:  -- I was going to listen to them both

20 collectively.  So we have a remand.  We have the motion to

21 enforce.  I'm not sure it makes a difference to the Court which

22 one we hear first.  You all haven't discussed this, I gather.

23        MR. AXELROD:  We have not discussed with opposing

24 counsel.

25        THE COURT:  All right.  Is there a problem with the

1  wind-down debtor on their motion for remand first?  I'm not

2  going to be deciding it before we hear the motion to enforce.

3        MS. ALBANESE:  We agreed with Your Honor at the

4  beginning when you said that the proposed order that you

5  anticipated was motion to enforce, the remand motion, and then

6  the D&O -- the individual -- the individuals' motions.

7        MR. AXELROD:  Your Honor, maybe some confusion on

8  this issue.  If they would like to be heard first on plan

9  enforcement, we can do that.

10        THE COURT:  Well, why don't we accede to that

11  since -- I'm not -- I don't even think I made an order.  I

12  assumed I would hear them collectively.  So it doesn't make a

13  difference to the Court, but why don't we hear from the

14  insurers on the motion to enforce.

15        MS. ALBANESE:  Thank you, Your Honor.  Again, for the

16  record -- actually, almost good afternoon.

17        THE COURT:  Good afternoon.

18        MS. ALBANESE:  Rachel Albanese of DLA Piper on behalf

19  of Arch Insurance Company, Berkley Insurance Company, Berkshire

20  Hathaway Specialty Insurance Company, U.S. Speciality Insurance

21  Company, and XL Specialty Insurance Company.  I'm here today

22  with my co-counsel, Stacey Rufe, of Werner Ahari Mangel, and

23  Gregory Juell from DLA Piper.

24        Your Honor, the motion -- the movants filed this

25  motion, Docket 2221, to enforce the terms of BlockFi's plan and

24

1  confirmation order.  On the eve of BlockFi's bankruptcy, which

2  was widely and publicly anticipated, BlockFi purchased

3  $30 million of D&O coverage under a policy issued by Ace

4  American Insurance which covered the period November 18, 2022,

5  to November 18, 2023.  Ace American issued the policy, and the

6  movants and several other insurance companies served as --

7  serve as quota share insurers on the policy.

8         The movants seek to enforce the unambiguous language

9  of the plan and the confirmation order which make clear that

10 the debtors' intention to assume all obligations under their

11 insurance contracts are unaltered, including their D&O

12 policies, and to remain fully liable under those policies after

13 the effective date.  The assumption and continuation of the D&O

14 insurance is expressly and carefully spelled out in Article 5F

15 of the plan.

16        Your Honor, it's a long provision, but if the Court

17 will indulge me, I will read the key parts of it, because it's

18 dispositive here.

19        "Notwithstanding anything to the contrary in the

20 disclosure statement, the plan, the plan supplement, the

21 confirmation order, any bar date notice or claim objection or

22 any other document related to any of the foregoing or any other

23 order of the bankruptcy court" -- and here's the key part --

24 "including without limitation any other provision that purports

25 to be peremptory or supervening, grants an injunction,

1    discharge or release, confers bankruptcy court jurisdiction, or

2    requires a party to opt out of any releases, A, each of the

3    insurance contracts, including without limitation any D&O

4    insurance policies which identify one or more of the debtors as

5    first named insured or counterparty thereto shall be assumed in

6    their entirety by the applicable wind-down debtor without the

7    need for any further notice to or action or order or approval

8    of the bankruptcy court as of the effective date pursuant to

9    Sections 105 and 365 of the Bankruptcy Code; B, on and after

10   the effective date, the wind-down debtors shall become and

11   remain liable in full for all of their and the debtors'

12   obligations under the insurance contracts, regardless of when

13   any such obligations arise, and all such insurance contracts

14   shall revest in the applicable wind-down debtors unaltered; C,

15   in all insurance contracts and all legal, equitable, or

16   contractual rights, obligations, and defenses of the insurers,

17   the debtors, or after the effective date, the wind-down

18   debtors, or any other individual or entity as applicable under

19   any insurance contracts, whether arising before or after the

20   effective date, shall survive and shall not be amended,

21   modified, waived, released, discharged, or impaired in any

22   respect; and D, the debtors" -- there's some language, I think,

23   that was ellipsed there -- "and D, the debtors or the wind-down

24   debtors, as applicable, shall not terminate or otherwise reduce

25   the coverage under any D&O liability insurance policy,

1  including without limitation any tail policy, and any current

2  and former directors, officers, managers, and employees of the

3  debtors who served in such capacity at any time before or after

4  the effective date shall be entitled to the full benefits of

5  any such policy for the full term of the policy, subject in all

6  respects to the terms and conditions thereof, regardless of

7  whether such directors, officers, managers, and employees

8  remain in such positions after the effective date."

9        Thank you for that indulgence.  The confirmation

10 order reiterates this protective language in paragraphs 87 and

11 88 and similarly provides that the debtors shall continue to

12 satisfy their obligations under their insurance policies in

13 full and continue such programs in the ordinary course of

14 business.

15        Your Honor, as I mentioned in the lead in to that

16 plan language, it is really important, because it provides

17 that, not withstanding literally anything else, any provision

18 that purports to be peremptory or supervening, simply does not

19 impact the sanctity of insurance contracts, and especially D&O

20 coverage under the plan.  Anything else includes the

21 notwithstanding carve-out language regarding vested causes of

22 action that the wind-down debtors rely on so heavily.

23        This is because the plan's expressed assumption of

24 the insurance contracts, including the policy under Section 365

25 of the Bankruptcy Code, precludes the wind-down debtors from

1  bringing any claims against their insurers, including the

2  movants.  There's no such thing as the conditional assumption

3  that the wind-down debtors argue for here.

4        They're telling the Court that the debtors can assume

5  the policy in the reasonable exercise of their business

6  judgment and obtain its benefits while reserving the right to

7  turn around and sue the insurers months after with claims

8  seeking to rescind the policy and recover the premium as a

9  fraudulent transfer.

10        THE COURT:  Let me ask a question, if I may.

11 Assumption by a debtor or -- well, let's back up.  Rejection

12 serves as a breach of the underlying executory agreement.  I

13 don't think anybody is going to contest that.  It's a

14 rejection.  It's a breach as of the date of the filing.

15        The assumption is intended to allow the debtor to

16 take -- to have the advantages of the contract and, in essence,

17 places that contract as if the bankruptcy did not occur.  In

18 some respects, even better.  All defaults are cured.  You have

19 adequate assurance of future performance, which is something

20 you don't necessarily have outside of a bankruptcy.

21        But the contract continues.  If there's a basis

22 within the contract to rescind or to bring a claim that exists,

23 why is that inconsistent with assumption?  The assumption just

24 puts the contract back in place.  Or in this case, there were

25 no defaults, to my understanding, pre-petition.  The premium

28

1  had been paid.

2        MS. ALBANESE:  There was no monetary cure.

3        THE COURT:  There's no monetary default.  There

4  was -- it's an executory contract, which the debtor has to

5  either assume or reject, one or the other.  It assumed the

6  agreement, which now takes it out of that province of the

7  Bankruptcy Code.  It's now mutual obligations going forward.

8        But why does that mean that within the contract

9  itself there cannot be a basis to rescind?  I'm not ruling one

10 way or the other as to whether there is a basis to rescind.

11 But just as there might be breaches post assumption, there's

12 language -- if the -- if there are provisions within the

13 contract or if there's a basis outside of the contract to bring

14 suit for a fraudulent transfer, how is that inconsistent with

15 assumption?

16       MS. ALBANESE:  Your Honor, that answer is easy,

17 because that basis existed prior to assumption.  If they had a

18 problem with the terms -- with the way that the policy was

19 arranged with the cost of the policy, with any of the other

20 arguments that they make, they could have chosen not to assume

21 a contract, to reject it, and pursue those claims.  They could

22 have brought the lawsuit prior to confirmation, which required

23 assumption.

24       They specifically incorporated assumption as an

25 element of their committee settlement.  And assumption, Your

29

1  Honor, the cases are clear, the contract assumption defense is

2  claims that are existing before assumption are waived in

3  connection with assumption.  You can't cure and then pursue

4  claims.

5          And this is actually pretty clearly demonstrated in

6  the <u>Tarricone</u> case that we cited, because there the court

7  refused to allow the debtor to conditionally assume a lease by

8  paying rent into escrow and continuing to litigate fraud and

9  rescission claims against the landlord.  And the court said if

10 the debtor wishes to pursue its cause of action for a recision

11 of the lease, it obviously should not assume this contract in

12 this court.

13         This is exactly the situation.  Different facts, but

14 exactly the same legal principle.  The committee, you know, now

15 the wind-down debtors, were aware of their complaints about the

16 policy early on in the case.  So by choosing to assume the

17 policy, they then gave up the right to pursue those claims.

18         THE COURT:  And that would also apply to fraudulent

19 transfer claims that --

20         MS. ALBANESE:  Correct, Your Honor.  Because in the

21 <u>Network Access Solutions</u> case, the court found that authorizing

22 assumption as an exercise of sound business judgment, as was

23 the case here, was the law of the case, and it demonstrated

24 reasonably equivalent value, which precluded claims for

25 fraudulent transfer.  And the court noted, "If Congress had

1   intended to deprive contracting parties of money and benefits

2   they received" -- I added benefits -- "they received

3   prepetition, why would Congress require that all defaults be

4   cured prior to assumption?"

5        Since 365 requires all amounts due under a contract

6   to be paid in order for the contract to be assumed, the

7   prepetition payment cannot be cured if its avoided.  And there,

8   the payment concept is -- you know, you can substitute

9   "benefit."

10        And the <u>Centrix</u> case makes this clear as well in that

11   the majority of courts have recognized the contract assumption

12   defense as a complete bar to the trustee's avoidance powers and

13   noted that the reasoning behind the defense applies with even

14   greater force to fraudulent conveyance claims.

15        Similarly, in the <u>Vision Metals</u> case, the court would

16   not condone the debtors' fraudulent transfer claims against a

17   counterparty to an assumed contract, because, at the time the

18   contract was assumed, the debtors' right to pursue fraudulent

19   claims had arisen, just as I said before.  And by assumption of

20   the agreement, it waived those claims.

21        THE COURT:  All right.  Thank you.  Continue.

22        MS. ALBANESE:  Okay.  Thank you.  So you actually

23   anticipated the next section of my outline.  But, essentially,

24   it's clear from these cases, Your Honor, that the wind-down

25   debtors' convoluted theory of conditional assumption has no

31

1   merit.  And even if Your Honor were willing to entertain this

2   theory, the carve-out language at the end of Article 5F doesn't

3   help the wind-down debtors.  With respect to the movants, there

4   are no vested or retained causes of action preserved against my

5   clients, the movants.

6         And to the extent the wind-down debtors rely on the

7   general catchall language of the schedule in the retained

8   causes of action, preserving any and all causes of action, it's

9   trumped by the very specific language in the plan requiring the

10  debtors to pay for and maintain their insurance policies in

11  full and to remain liable under those policies.  There's ample

12  and uncontroversial case law supporting this cannon of

13  interpretation.

14        Your Honor recognized this in the Crumbs Bake Shop

15  case.  And Judge Dorsey's Mallinckrodt decision from April 2nd

16  collects cases on this issue, the specific controls over the

17  general.

18        THE COURT:  How do you address the language included

19  in the plan provisions, and the order confirming the plan used

20  the phrase "including," which is not one of limitation.  I can

21  point to most authorities that advise that including -- you

22  don't need to even have the language "but not limited to."  It

23  simply included avoidance actions or the vested causes of

24  action.

25        Does that -- why is that a bar to other types of

1 claims?

2        MS. ALBANESE:  Because, Your Honor, that entire carve

3 out is subject to the initial language in Article 5F of the

4 plan, which says notwithstanding anything else, including

5 anything that purports to be peremptory or supervening.  That

6 carve out says notwithstanding anything else in the plan.  But

7 that's subject to the other language which says that everything

8 has to continue and that the benefits of the policy are there

9 and available for the post-effective date.

10       THE COURT:  And doesn't the language that the

11 wind-down debtors rely upon which preserve their ability to

12 pursue against the insurers relative to the D&O policies or

13 various claims also have the similar "notwithstanding anything

14 in the plan" language?

15       MS. ALBANESE:  Yes.  And --

16       THE COURT:  So we're dealing with two provisions

17 that --

18       MS. ALBANESE:  Two notwithstandings.

19       THE COURT:   -- that say notwithstanding.

20       MS. ALBANESE:  But the language in the lead-in to

21 Article 5F is double supervening, because it says

22 notwithstanding any other language that purports to be

23 supervening, this language takes precedence.

24       But, Your Honor, also, they listed one insurance

25 company -- or two insurance companies in the carve out.  If

33

1  they wanted to list all of them, if they wanted to pursue their

2  claims against all of the insurers, they could have listed

3  them.  This is a classic example of specific controlling over

4  the general.

5       THE COURT:  So and I think in your papers you

6  indicated that it didn't reference your clients.  That's

7  because they didn't identify each and every insurer under the

8  policies?

9       MS. ALBANESE:  They did not identify each and every

10 insurer.

11      THE COURT:  Okay.  Continue.

12      MS. ALBANESE:  May I continue, Your Honor?

13      THE COURT:  Yeah.  Please.

14      MS. ALBANESE:  Thank you.

15      THE COURT:  Your Honor, the wind-down debtors make a

16 big deal about the committee settlement in this context, and

17 they argue that the preservation of these claims against the

18 insurers, including the wind-down debtors' claim to rescind the

19 policy, was central to the committee settlement.  To the

20 contrary, the only mention of the D&O policy at the hearing on

21 the committee settlement and confirmation was when the debtors'

22 independent director, Mr. Vogel, testified in response to

23 Mr. Etkin's questions that the committee settlement

24 contemplated that the D&O policies would be maintained, and the

25 D&Os would retain all rights to coverage.  And that makes

34

1  perfect sense, Your Honor, because why would the individual

2  settlement parties, the debtors, directors, and officers, agree

3  to participate in the committee settlement and help the

4  wind-down debtors after the effective date if these individuals

5  were going to be deprived of their insurance coverage in the

6  future?  They wouldn't.

7         And finally, as a -- or not finally.  Another point.

8  As a practical matter, it's worth noting that even if the

9  wind-down debtors had preserved avoidance action claims,

10  despite assumption, and could somehow avoid the premium payment

11  as a fraudulent transfer, the insurers would be entitled to a

12  claim against the estate for the value of the payment

13  avoided --

14         (Audio malfunction from 12:12 p.m. to 12:14 p.m.)

15         THE COURT:  Do you maybe want to take -- should we

16  take a break for a few minutes?

17         THE CLERK:  No.  It's back recording, Your Honor.

18         THE COURT:  Okay.  You tell us when we're ready to

19  go.

20         THE CLERK:  We can proceed.

21         MS. ALBANESE:  Okay.  Thank you.

22         THE COURT:  Oh, thank you.

23         MS. ALBANESE:  Thank you.

24         Your Honor, the wind-down debtors also argue that

25  they had to assume the policy rather than reject it, because

1    allegedly rejection would have prevented them from asserting a

2    rescission claim, which would have given the insurers a

3    windfall, and rejection would have prevented them from

4    enforcing a provision of the policy that voids it if certain

5    conditions are not met.

6         These arguments are unpersuasive.  The debtors' own

7    schedule of retained causes of action expressly states that all

8    claim -- all causes of action are preserved even for rejected

9    contracts.  Alternatively, as I mentioned before, Your Honor,

10   the debtors could have filed their lawsuit prior to

11   confirmation, or they could have let the policy ride through.

12        A more likely explanation for their failure to reject

13   is that rejection was completely contrary to the committee

14   settlement parties' expectation that the policy would continue

15   to exist with unaltered coverage, consistent with the express

16   language in the plan and the confirmation order.

17        So unless Your Honor has any other questions, for all

18   these reasons, we respectfully request that Your Honor enforce

19   the plan and confirmation order to preclude the claims asserted

20   against the movants by the wind-down debtors.

21        THE COURT:  All right.  Thank you.  Let me ask, are

22   there any other counsel on the -- we'll call them this side,

23   the insurers' side, who wishes to be heard?  Or remotely?

24        Well, we'll turn to the wind-down debtors.  Thank

25   you.

1          MR. AXELROD:   Thank you, Your Honor.   Tristan Axelrod

2    for the wind-down debtor, BlockFi Inc.   And I'll respond to

3    some of the points in the context of a general reintroduction

4    on some of these issues.

5          So we're here on three motions.   They are related.

6    They all relate to this D&O insurance policy that's just been

7    discussed that was issued to the debtors just a few days before

8    the petition date, November 28, 2022.   There's $30 million in

9    nominal coverage for a payment of $22-and-a-half-million

10   dollars in cash, which was the proceeds of deposits for crypto

11   currency that had recently been liquidated by the debtors to

12   fund these cases and fund these policies.

13         So the wind-down debtors, as they've been saying they

14   would do since before the confirmation, are trying to get their

15   $22-and-a-half million back.   And the plan was drafted very

16   intentionally and openly as part of the settlement to allow

17   them to do that.   We filed litigation in state court to that

18   end.

19         So there's three motions we're talking about today.

20   There is the enforcement motion that was just introduced by

21   counsels to the insurers.   There's an action to -- a motion to

22   remove this back to state court -- remand this, excuse me,

23   having been removed from the insureds to this court.   And then

24   there's a stay relief motion basically to determine the

25   benefits that certain insureds could maybe get under the

37

1  policy.  And we actually didn't object to that.  We said just

2  don't enter an order that prejudices state court litigation.

3  There's a dispute on that.  And my colleague, Mr. Aulet, will

4  come back to it in a bit.

5          So I think to reintroduce the record for the benefit

6  of some of our customers and others that are looking at the

7  record in this case.  In early November, FTX collapsed.  Early

8  November 2022.  And notwithstanding some early assurances from

9  the management of BlockFi that everything was okay, very

10 quickly BlockFi had to freeze its platform and prepare for

11 bankruptcy.

12         (Audio malfunction from 12:18 p.m. to 12:18 p.m.)

13            THE CLERK:  Sorry.

14            MR. AXELROD:  Okay.  And at that time, BlockFi had

15 about a billion dollars worth of liquidity --

16         (Audio malfunction from 12:18 p.m. to 12:18 p.m.)

17            MR. AXELROD:  Excuse me.

18            THE CLERK:  Yeah.

19                     (Clerk confers)

20            MR. AXELROD:  Am I okay to --

21            THE COURT:  Yeah.

22            MR. AXELROD:  Okay.  Thank you.

23            THE COURT:  See, this is what happens when you get

24 out of practice in having live -- everything is remote.  We

25 haven't had live argument in a while.  Go ahead.

38

1          MR. AXELROD:  Thank you.  So at that time, BlockFi

2    had nearly a billion dollars in liquidity frozen at FTX between

3    loans to be returned and customer accounts at FTX all frozen.

4    But it also had hundreds of millions of dollars in market value

5    worth of other crypto currency assets held at -- with other

6    vendors or internally.

7          And it made a couple of key decisions in that period

8    of November 10th to November 28th.  One was that it liquidated

9    about $240 million worth of its crypto currency assets at those

10   prices, notably worth considerably more today.  And then it

11   decided to go out and use about 10 percent of that money --

12   well, it decided to go out and purchase as much D&O liability

13   insurance as it possibly could.

14         It approached Relm, which was R-E-L-M, its historic

15   D&O insurer, and asked to increase coverage.  There was a

16   $2 million policy then in place.  And Relm took a look at it

17   and said, no way, can't touch this, refused to increase its

18   coverage.

19         And so they went out to other insurers in the market.

20   And Ace Insurance said, yes, we'll offer a $30 million policy.

21   As counsel mentioned, it's a quota share policy, meaning its an

22   Ace policy, and other insurers sort of volunteer to provide a

23   piece of the coverage under that single policy.  But it is an

24   Ace policy.

25         And my colleague, Mr. Healy, is here today.  And I

1  may introduce him later if Your Honor would like more detailed

2  insurance-related discussion.  I'm a humble bankruptcy lawyer.

3          So $30 million in nominal coverage, but 15 million of

4  that coverage is for post-bankruptcy insurance.  So usually,

5  post-bankruptcy insurance -- D&O insurance is pretty cheap,

6  because there's an expectation that management will be

7  exculpated for bankruptcy-related decision making, that it will

8  be released under a plan.  Typically, the ratio of the premium

9  cost to the coverage cost of post-bankruptcy insurance is very

10 low.

11         But they paid 22-and-a-half million.  The other

12 15 million of that coverage is retroactive.  It's the coverage

13 for past actions, including when directors and officers were

14 telling people it's okay, our platform is functional, right

15 before the platform is frozen, which is, among other things,

16 what directors and officers are now being sued for and making

17 claims under the policy for.

18         And I just want to be very clear here.  I'm not

19 expressing any view on the merits of that.  We work with

20 BlockFi's current and former management routinely, and

21 everything is going well there, as far as I understand from

22 Mr. Aulet.

23         But the point to -- of this is to say, there was

24 really $15 million of coverage that mattered.  And they paid

25 $22-and-a-half million for that.  And it's a weird policy.

40

1   There are -- there were concerns, there are still concerns,

2   whether it's really an effective policy that could pay anything

3   worthwhile.  And it has this avoidability provision that's in

4   the contract that you discussed with counsel briefly before.

5           We would have to go into the details of that

6   contract.  But our view, which we have alleged in the state

7   court, is that they have breached that contract by not making a

8   payment to us of the policy on demand.  So even within their

9   view of what the policy says, and its effect on a rescission

10  claim, when we assumed it, we had a right to recover that

11  payment under certain conditions.  We hadn't made use of that

12  right yet.  We did not relinquish contractual rights by

13  assuming the contract.  So that's the answer to that body of

14  discussion, and I may come back to that in a little bit.

15          But, again, the point is, $15 million of coverage

16  that mattered, $22 million payment for it.  And so then,

17  BlockFi does file bankruptcy, and as this Court recalls,

18  customers were very upset to find out that the company had

19  liquidated hundreds of millions of dollars at historically low

20  prices, and it was using that money to purchase insurance to

21  protect insiders, including this coverage and primarily this

22  coverage.

23          So the first half of 2023, we were before Your Honor

24  taking up with this dispute generally about what was going on

25  with insiders, and it was very ugly.  We don't want to get back

41

1  to it.  But we could not get a plan confirmed because of that

2  issue.  It was remarked on the record multiple times.

3       There was going to be massive litigation and likely

4  appeals if we couldn't make a compromise with insiders and

5  others to get out of bankruptcy.  And so finally, as spring

6  turned to summer and summer was looking at fall, this Court

7  started pushing the parties, make a deal, get creative, and if

8  you don't, we're going to destroy a lot of value in a

9  confirmation trial.

10      So we did get to a deal, and it was pretty creative,

11 but we do want to say it's actually very similar to a deal in

12 so far as insurance goes, that was struck in Voyager.  Voyager,

13 another major crypto bankruptcy that was happening at the time,

14 and in the Voyager plan, it basically says we are assuming

15 these D&O insurance policies, but we're preserving the right to

16 rescind the policy, to make an avoidance action, to recover the

17 policy payments.  Basically, doing the same thing that we're

18 doing here.

19      But it was all part of -- when we reached that deal,

20 it was all part of a grand bargain that had a few different

21 components to it.  One is that the directors and officers of

22 BlockFi would make certain payments and contributions to

23 BlockFi.  If they failed to do that, there would actually be

24 a -- I'm sorry.  And in exchange for that, they would be

25 granted a release.  If they failed to meet their obligations,

42

1   those releases would be unmade.  And then in that case, this

2   policy, we retained the right to enforce it by its terms.

3            And then there would be -- so there would be these

4   releases.  There would be these payments.  The insurance

5   policies would resume and remain in place.  But then we added

6   this paragraph at the end of 5(f), and we understood at the

7   time, we understand it now, it's complicated to have multiple

8   notwithstanding clauses, but we added the clause that says,

9   hey, notwithstanding anything you say about assumption, we're

10  preserving these claims.

11           And it's the claims to recover the policy issued by

12  ACE, and we put ACE in to the plan supplement to say we are

13  preserving these claims to rescind the policy.  You can't

14  rescind it just against ACE.  It's one policy under a quota

15  share.

16           So now there are a few different legal and factual

17  arguments that we can get to today.  But a lot of it has to do

18  with this bargain and essentially whether it holds up.  And so

19  we respectfully say it has to hold up.  To put the deal a bit

20  differently, the directors and officers made this deal because

21  it preserved them some insurance coverage.  They got the realm

22  policy.  They got maybe this policy.  We put that off for

23  another day.  It got them releases.  It let them move on with

24  their lives.

25           And the customers of BlockFi got to say, okay, we're

43

1  not going to sue individuals and directors and officers on a

2  derivative basis.  But if we opt into it, we can sue them

3  directly, and maybe there will be this policy and we can make a

4  deal around it.  BlockFi got out of bankruptcy, and even the

5  insurers didn't have to be involved in a confirmation trial.

6  They didn't challenge this at trial.

7          So skipping ahead to today, insurers have instigated

8  this flurry of activity to bring the anticipated litigation

9  back to this Court and say to Your Honor, you know, we know you

10  approved this language.  It's all over the plan and

11  confirmation order, and it was discussed that this insurance

12  could be subject to challenge.  But, you know what, they used

13  the word "assume" in the plan, and we knew at the time or have

14  discovered now that the "notwithstanding" clause doesn't quite

15  work against what we think is our more powerful

16  "notwithstanding" clause.  And so this grand bargain, you know

17  what, it's really not effective.

18          So, Your Honor, we don't really know what to do with

19  this.  My firm was representing the Creditors Committee at the

20  time.  We worked very hard to reach this deal.  There was

21  negotiation of this specific language.  We did the job that the

22  Court was asking us to do to make a difficult bargain to get

23  out of bankruptcy.  Here we are trying to do exactly what we

24  said we were going to do.  We're trying to do exactly what

25  Voyager was doing.

44

1          And by the way, Your Honor, Voyager, they just

2    announced in a status update, they've settled with their

3    insurers and they're receiving millions of dollars in payment

4    from their insurers.  We don't know the details of it yet, but

5    it seemed like that was a successful option that we were just

6    going to utilize from them in a creative way.  And now we're

7    here being told, oh, actually the plan doesn't permit you to do

8    that.

9          And to be blunt, our feelings are, we think that

10   other cases or other judges, other professionals are certainly

11   watching this because it goes to, you know, what happens when

12   you make a deal?  Should you be watching out for this kind of

13   gotcha behavior?  Or is bankruptcy a forum where deal making is

14   prioritized and effectuated?  And certainly we think that

15   Voyager is watching because, essentially, what the insurers are

16   saying is this Court -- not only can this Court not enforce its

17   plan, but maybe Voyager can't.  And maybe that settlement that

18   was just reached won't get approved.

19         So there are long-term implications here, and that's

20   beyond just the $22 million that we believe should come back to

21   customers of BlockFi in this case.  Your Honor, I have a number

22   of other comments that really go more to remand.  And I would

23   love to just elide these issues, if that works for you.  I

24   think I've addressed a number of the categories of arguments

25   that were addressed with insurance counsel.

45

1       I'll be guided by you where you'd like me to go next.

2       MS. ALBANESE:  Your Honor

3       THE COURT:  Well, let me ask a couple of questions.

4       Counsel, did you want to be heard?

5       MS. ALBANESE:  I just wanted to say, Your Honor, if I

6  may, it would be easier for me to respond contemporaneously to

7  the points that he made and then move on to the remand argument

8  so that I can be done with my piece and Mr. Benjamin can take

9  over.

10       THE COURT:  All right.

11       Before we get to the remand arguments, let me

12  understand what the wind-down debtor's position would be.  If

13  rescission were successful, what is the impact on the

14  underlying contract and the availability of coverage for the

15  officers and directors?

16       MR. AXELROD:  Answer, I might over-complicate this.

17       In our state court action, there are two claims for

18  rescission.  One is rescission under the express terms of the

19  contract, where if certain conditions occur, then you make a

20  demand that the payment should come back.

21       There's another rescission under a concept under New

22  Jersey law, which we generally call illusory coverage, which is

23  basically where you tell the court, this is not insurance

24  because there was no transfer of risk.  And under those

25  conditions, policy can be recovered.

1    What was always contemplated, I think now directly

2  answering your question, if we get the money back, generally.

3  I suppose there's a world where the insureds, the management

4  personnel, would still make a demand against the insurers under

5  the policy and maybe you're considering some world where the

6  insurers have to pay twice.  I don't think that's where we're

7  headed and that seems like a perfect issue for mediation.

8    But, frankly, we don't feel like mediation is

9  fruitful when the parties are saying, oh, you don't have the

10  bargain you thought you had and you have no rights.

11    THE COURT:  Well, I'm trying to understand.  Thank

12  you.  Let me be more specific.  I'm trying to clarify.

13    The language in 5(f), the debtors are required to

14  assume the insurance contract in their entirety, which is, I

15  think nobody's going to argue that that's basic bankruptcy law.

16  And those contracts "shall not be amended, modified, waived,

17  released, discharged, or impaired in any respect," and the

18  debtor or wind-down debtor shall not terminate or reduce the

19  coverage under any D&O liability insurance policy.

20    I mean, a lot of that language wasn't for the benefit

21  of the insurers, needless to say, it was for the benefit of the

22  insureds, the directors and officers.  And I'm concerned with

23  "or impaired."  How do you reconcile rescission of the contract

24  with not impairing the coverage that would be available under

25  the policy?  And that's the hurdle I'd like you to mount.

47

1          MR. AXELROD:  Sure.  I think it's, first of all,

2  expressly modified by the paragraph we added, which I'll quote

3  here.  "Notwithstanding any provision of this plan to the

4  contrary, neither assumption of any insurance contracts nor any

5  outstanding obligation of the debtors or wind-down debtors or

6  insurers shall or shall be deemed or construed to in any way

7  preclude the wind-down debtors from commencing, prosecuting,

8  introducing any evidence or making any argument in connection

9  with, reducing to judgment, or collecting upon any causes of

10  action against any insurers in respect of any vested causes of

11  action, including, but not limited to, any avoidance action."

12          So we felt that that was more powerful than any

13  rights granted to the insureds under the preceding parts of

14  that provision of the plan.

15          THE COURT:  So let's be clear.  What the wind-down

16  debtor is saying is that as part of the bargain, as part of the

17  settlement, we agreed to assume the insurance contract.  There

18  were no cures, defaults to cure, et cetera.  And you would not

19  terminate it, you would not reduce the coverage.  But you were

20  still permitted to take steps such as to bring suit for

21  rescission, which might actually impair the coverage.  I

22  mean --

23          MR. AXELROD:  That's right.

24          THE COURT:  -- certainly rescission is going to

25  impair the coverage if the policy is no longer available to the

48

1   insureds.

2          MR. AXELROD:  Right.  So, Your Honor, functionally

3   what happened is that this was drafted to be, I think, and we

4   were not debtors' counsel at the time.  But there is language

5   that you often see in bankruptcy plans that conforms to

6   expectations of insurance neutrality, which is to say there's

7   language that says the policies are assumed and they proceed

8   unaffected.  And there's a long doctrine of insurance

9   neutrality.  There's actually, as part of major litigation

10  about this in the Boy Scouts, it doesn't say you have to be

11  insurance neutral.  What it says is that if you have an

12  insurance neutral plan, insurers don't have standing to object

13  to confirmation.

14          And when the deal came together around this, we

15  didn't take out the insurance neutrality language.  We didn't

16  take out a lot of that.  We just added the notwithstanding

17  clause to clearly reflect that we intended to rescind this and

18  that that would have the effect that it had.  And we knew that

19  it would be complicated and there is this potential that we

20  have a three-way issue between ourselves and the insureds and

21  the insurers.  And, again, we think that's a good issue for

22  mediation.

23          THE COURT:  And along similar lines, apart from

24  rescission, the wind-down debtors are pursuing a fraudulent

25  transfer claim under state law --

1          MR. AXELROD:  Yes.

2          THE COURT:  -- for recovery of the premium.  In

3   essence, saying that the insurers received more value than the

4   debtors gave, or you could switch it around.  The debtors did

5   not receive equivalent value for the premium that was paid.

6          If there is a recovery of the premium or a portion of

7   the premium, what is the wind-down debtors' position as to

8   whether or not that impacts whether the policy is still in

9   effect and whether the insurers have obligations under the

10  policy?  Does that impair the coverage for the directors and

11  officers?

12         MR. AXELROD:  Your Honor, we'd like to get the

13  premium back.  We would like that payment or some portion of

14  it.  We don't have a position at this time on how that impacts

15  the insureds.

16         Under fraudulent transfer doctrine, if we don't have

17  to fully avoid the transaction under certain circumstances, we

18  could recover some portion of the payment and let the policy

19  continue to be in effect to benefit the insureds.  There's a

20  lot of different ways that that could work out.

21         THE COURT:  So one doesn't necessarily lead to the

22  other?  Is that --

23         MR. AXELROD:  Not necessarily.

24         THE COURT:  -- a fair statement that the policy can

25  remain in effect even if the insurers are obligated to return a

50

1   portion of the premium?

2         MR. AXELROD:  Yes, Your Honor.  Similarly, we could

3   receive an award of damages for breach of the contract and the

4   contract would remain enforceable otherwise in favor of the

5   insureds.

6         THE COURT:  All right.  Is there anything else you

7   wanted to add in response to my questions?

8         If not, I would be inclined to hear them discuss this

9   issue and then move to the remand.

10        MR. AXELROD:  I yield the floor.

11        Thank you, Your Honor.

12        THE COURT:  Thank you.

13        MS. ALBANESE:  Thank you, Your Honor.  I appreciate

14  the opportunity to respond contemporaneously.  Rachel Albanese,

15  DLA Piper.  There's a few specific points that I wanted to

16  respond to.

17        Your Honor, right off the bat, Mr. Axelrod admitted

18  that they knew about the fraudulent transfer claim since early

19  in the case, and they wanted to try and avoid the premium then.

20  That's a classic example of when the contract assumption

21  defense applies.  I couldn't have said it any better myself.

22        He also mentioned that typically insurance is cheap

23  or something along those lines.  That's not true.  The coverage

24  was purchased on the eve of bankruptcy with the public knowing

25  all about the issues related to BlockFi.  And that meant that

51

1    the policy necessarily would be more expensive than if there

2    weren't all of this hair on the case.

3           He mentioned a similar deal in <u>Voyager</u>, but that is

4    not at all relevant because the insurers in that case were part

5    of the settlement.  There's no grand bargain here with the

6    insurers.  They're not part of the Committee settlement.

7           It doesn't say rescission of the policy anywhere in

8    the plan confirmation order or any other document.  It's

9    deliberately obtuse.  The D&Os, Mr. Axelrod said, the D&Os

10   maybe got this policy.  Talk about a gotcha.  That's the

11   definition of one.  That's not what the confirmation brief says

12   either and it's not what Mr. Vogel said at the confirmation and

13   Committee settlement hearing.

14          Your Honor asked about the impact of rescission and

15   said that you can't reconcile rescission with not impairing

16   coverage under the policy.  That's exactly the point.  The

17   carve out doesn't help them.

18          Lastly, the fraudulent transfer recovery of the

19   premium, Your Honor, you asked would the policy still be in

20   effect and does that impair the coverage?  The answer is yes,

21   it impairs the coverage.  The policy is no longer available to

22   the insureds in that instance.

23          THE COURT:  Why is that?

24          MS. ALBANESE:  Let me confer with my insurance

25   colleague here.

1          All right.  Well, this is going back to law school.

2     It fails for lack of consideration, Your Honor.

3          THE COURT:  Well, isn't the concept underlying a

4     fraudulent transfer is you're getting the excess -- you're

5     recovering the value, the difference between what the debtor

6     should have received in value compared to what it paid out.  It

7     doesn't mean it didn't pay out anything, and it doesn't mean it

8     didn't get some value.

9          There is consideration.  It's just that the value of

10    the policy -- what the wind-down debtors' argument is is that

11    the value of what they paid $22 million for wasn't near $22

12    million.  It can only recover the difference between what value

13    the debtor did receive in having this coverage versus what it

14    should have paid for that coverage.

15         MS. ALBANESE:  Your Honor, their complaint seeks the

16    return of the entire premium, and I think that's more of a

17    substantive question about relative value and whether the

18    policy remains in effect and is available for the insureds.

19    So, I might ask that my colleague, Mr. Benjamin, address that

20    in more detail.

21         THE COURT:  All right.  Did you want to address that

22    at this point?

23         MR. BENJAMIN:  Sure, Your Honor.  Just briefly.

24         MS. ALBANESE:  Or Ms. Rufe.

25         MR. BENJAMIN:  Yes.  (Indiscernible)

53

1          MS. RUFE:  It's probably better since it's our

2    motion.

3          MR. BENJAMIN:  Yeah, it's your motion.  Go ahead.

4          MS. RUFE:  So, good afternoon, Your Honor.  Stacey

5    Rufe, Werner Ahari Mangel, for the movants.

6          Just from the insurance perspective, certainly the

7    rescission, right, a rescission voids the policy *ab initio* as

8    if there never was any policy and there can be no protection

9    and no coverage for D's and O's.  So when in the plan it says

10   the wind-down debtor will take no action to terminate or

11   eliminate coverage available to the D's and O's, that's wholly

12   inconsistent with the rescission cause of action because that

13   unquestionably terminates the coverage available.  So there's

14   just no way to reconcile that.

15         One has to prevail over the other.  And given the

16   language of 5(f), I think it's the language that preserves the

17   coverage, right, that they agree with the D's and O's and

18   they've said these D's and O's are helping them.  And they made

19   an agreement with the D's and O's and part of that agreement

20   was we're not going to impair the coverage.

21         With respect to fraudulent transfer, the

22   consideration was the bargain at the time in the meeting of the

23   minds.  The insurers were willing to issue a policy for the

24   premium given and if that premium was not given, there might

25   not have been a policy.  So there's no meeting of the minds

54

1  there and even a partial refund of the premium would cause the

2  contract to fail for lack of consideration because there was

3  never a meeting of the minds as to what the value of the

4  contract was.

5          THE COURT:  All right.  Thank you.

6          MS. RUFE:  Do you want to add anything?

7          MS. ALBANESE:  Thank you.

8          THE COURT:  Yeah, if somebody --

9          MS. RUFE:  Thank you.

10         THE COURT:  Somebody in the back.

11         MR. GOLD:  Your Honor.  Sorry.  Dan Gold from

12  Shearman and Sterling on behalf of the insureds.  I didn't

13  realize they were going to be delving into all of these issues

14  as part of this first motion, so I didn't appear earlier, but I

15  would like to be heard briefly.

16         THE COURT:  I'll give you an opportunity.  Let me

17  keep the argument back and forth.

18         MR. AXELROD:  Mr. Axelrod, did you want to add?

19  Actually, Mr. Axelrod, I do want to ask, and I'll give you a

20  moment to confer.  If you could respond to the argument raised

21  with respect to the citations or the authority that was given

22  that you cannot assume and then still pursue a fraudulent

23  transfer or a preference with respect to any premiums.

24         MR. AXELROD:  One moment, please.

25         THE COURT:  Sure.

55

1          MR. AXELROD:  Thank you, Your Honor.

2                         (Pause)

3          MR. AXELROD:  Your Honor, to clarify the record,

4   could you repeat the question, please?

5          THE COURT:  I wanted you to address the arguments in

6   the citation to authority that you cannot do both, assume and

7   recover preferences or fraudulent transfers, that assumption

8   precludes the ability to pursue a fraudulent transfer with

9   respect to premiums or obligations.

10         MR. AXELROD:  On that argument, we wrote language

11  into the plan that says here's what assumption means in this

12  case and we're preserving that right.  And so it comes down to

13  them essentially saying either that language in the plan is not

14  effective or this Court can't enforce the bargain that was

15  confirmed.

16         THE COURT:  So your position --

17         MR. AXELROD:  Respectfully, we feel like the language

18  in the plan is quite clear.

19         THE COURT:  Your position would be that the insurers

20  should have objected at the confirmation?

21         MR. AXELROD:  That's right.

22         THE COURT:  And I don't know, I'm almost afraid to

23  ask this, were all the insurers on notice as far as the

24  confirmation hearing and the terms?

25         MR. AXELROD:  We certainly believed so, but also

56

1  they're here in force, trying to enforce the plan.  They're not

2  saying I didn't receive notice of it.

3           THE COURT:  Oh, there's irony.

4           All right.  Continue, please.

5           I didn't know, did you have anything else you wanted

6  to add?

7           MR. AXELROD:  I think we just had to clarify, I mean,

8  there's language in the policy that voids it *ab initio* if

9  certain conditions are met.  We're trying to enforce that.  I

10 think we agreed that's inconsistent with the insurers being

11 obligated to provide coverage thereafter.

12          But there are many ways that a court could rule on

13 our claims, including, for instance, that if they made this

14 policy in bad faith, they could be precluded from denying

15 coverage if part of the premium is returned.  I don't think

16 we're prepared to say that our claims in there entirely are

17 inconsistent with any ongoing coverage to the insureds.  That's

18 never been our view.

19          THE COURT:  All right.  Thank you.

20          MS. ALBANESE:  May I have one moment of surreply?

21          THE COURT:  One last and then I'll hear from counsel

22 for the insureds.

23          MS. ALBANESE:  Thank you, Your Honor.  Rachel

24 Albanese, DLA Piper.

25          He said that the insurers should have objected to the

57

1  plan.  I heard him say moments ago that under the insurance

2  neutrality concept, they might argue that the insurers don't

3  have standing.  But putting that aside, Your Honor, the plan

4  provided very clearly and the insurers reasonably thought that

5  the policy was being assumed and that the debtors would remain

6  fully liable based on the language, the plain language and

7  express language of the plan.  And that's it.

8           Thank you, Your Honor.

9           THE COURT:  All right.  I will note in 18 years or so

10 of experience, I've never had a situation where the insurers

11 are reluctant to object to a plan and see where it falls out.

12          Let me hear from counsel for the insureds.

13          MR. GOLD:  Thank you, Your Honor.  Dan Gold from

14 Shearman and Sterling on behalf of Zac Prince and Floyd

15 Marquez, and I also represent all of the individual defendants

16 in the securities action that is intertwined with some of these

17 issues.

18          There were just, I think, two points on this that I

19 wanted to make sure to raise from the perspective of the

20 insureds.  The first was that there's been a lot of talk about

21 assumption, but as Your Honor noted, the plan, it doesn't only

22 involve assumption of the policy.  There's language about, as

23 Your Honor noted, the coverage not being reduced or impaired.

24 And there's also language that the former directors, officers,

25 managers, and employees of the debtors who served in such

1  capacity at any time before or after the effective date shall

2  be entitled to the full benefits of any such policy or the term

3  of such policy subject in all respects to the terms and

4  conditions thereof.

5          So from the perspective of the insureds, that

6  language is important, has meaning, is part of the bargain.

7  And any cause of action that's been brought that seeks to or

8  that would result in eliminating coverage for the insureds is,

9  from our perspective, inconsistent with the plan.

10         And sort of putting the cart before the horse a

11  little bit to sort of, I think, maybe talk through how

12  different theories might impact the coverage, but from the

13  insureds' perspective, we are under the plan, under the

14  confirmation order entitled to the full benefits of the policy,

15  regardless for what happens in the other lawsuit.  I know my

16  friends on the carrier side don't agree with that.  I don't

17  think that's an issue for today, but I want the insureds'

18  perspective to be clear on the record.

19         THE COURT:  All right.  Thank you.

20         Let's move, if we may, to remand.

21         Let me hear from the wind-down debtors.

22         MR. AXELROD:  Thank you, Your Honor.

23         I will, just one quick note on what was said.  He did

24  say, subject to the terms and conditions thereof.  So if a

25  state court were to find that the terms of that policy voided,

1   it would seem that they're not entitled to coverage.

2          Let's talk about the remand motion, as Your Honor

3   requested.  The state court action that we filed, it's

4   HUD, Hudson, it's New -- excuse me.  New Jersey Superior Court

5   for Hudson County, HUDL25-24.  And there has been a jury demand

6   in that case which is important for reasons I'll get to.

7          There's six causes of action in our amended

8   complaint.  There's really three categories of claims.

9          One is, as we've mentioned, there's claims for breach

10  of contract and for enforcement of the voidability provision of

11  the policy itself.  There are fraudulent transfer claims under

12  New Jersey law via Section 544 of the Bankruptcy Code.  And

13  then there is a rescission claim on the basis of illusory

14  coverage.  So really three buckets of claims.

15         There's contract claims.  There is illusory coverage.

16  And there's fraudulent transfer.

17         These are all state law claims.  And very notably,

18  for decades, insurance companies in this country have advocated

19  before Congress, before many regulatory bodies, that the

20  insurance regulation should be a state law issue.  The result

21  is that all of these claims, mostly they're state common law,

22  but some are state statutory law.

23         The idea of what is reasonably equivalent value for

24  the purchaser that purchases an insurance policy, that is a

25  state law issue.  The idea of whether this is really insurance

60

1  at all, that's illusory coverage, whether there has been a

2  transfer of risk such that an insurer can fairly be entitled to

3  keep its policy, that is a state law issue.

4         The only part of these claims, and of course there's

5  the contract interpretation, that's a state law issue usually

6  reserved for the state coverage courts.  So the only part of

7  this litigation that derives from federal law is the wind-down

8  debtors' authority to bring what is ordinarily a state court

9  fraudulent transfer claim brought by a creditor to stand in

10 that creditor's shoes as with the powers of a trustee or a

11 debtor under the Bankruptcy Code.  I'm going to come back to

12 that in a minute.

13        So as a preface to all this discussion, removal

14 statutes are to be strictly construed against removal and all

15 doubts are to be resolved in favor of remanding back to the

16 state court, which is to say all doubts should be resolved in

17 favor of this Court abstaining from the exercise of

18 jurisdiction so that litigation can proceed in state court

19 where it began.  The insurers filed a notice of removal

20 basically saying that because of the Section 544 issue and

21 later they asserted these plan enforcement claims that makes it

22 a bankruptcy law issue.

23        Notably their notice of removal also does not consent

24 to this Court entering a final order and they have not

25 consented to this Court hearing a jury trial nor has the

61

1 district court under what I understand are applicable rules

2 here.  So when we talk about abstention, abstention can be

3 mandatory or discretionary.

4       I won't rehash all the legal standards that are in

5 the paper but they cover a lot of the same ground and if this

6 Court were to observe that a party fails to satisfy one element

7 of the mandatory abstention standard, we would simply point to

8 the discretionary standard.  Either way, the core question that

9 comes up on abstention is, are these really bankruptcy claims

10 or are they state law litigation?

11       And we think that it's very clear that this is state

12 law, state court litigation.  Again, contract claims, state

13 law; illusory coverage, state doctrine; fraudulent transfer,

14 these are state claims.  We're bringing them because we're

15 entitled to do so on behalf of the creditors who ordinarily

16 would bring those claims.

17       Then there's the fact that we've made a jury demand

18 and neither party consented to a jury trial.  Not a typical

19 bankruptcy court practice with all respect to Your Honor to

20 hold a jury trial and the cases are very clear that even the

21 right to a jury trial points to the exercise of discretion to

22 abstain from jurisdiction.

23       The argument from the insureds seems to be everything

24 around the plan.  I don't want to rehash that.  We think the

25 plan plainly allows us to prosecute this litigation per se.

62

1    And getting past that, they argue that the Section 544 claim

2    makes this more of a bankruptcy feeling litigation.  We think

3    that that's just wrong.  The circumstances of the bankruptcy

4    actually ease the fact-finding in some ways for the state

5    court.  It would be pretty tough to argue that on November 17,

6    2022, BlockFi was a solvent entity for purposes of a fraudulent

7    transfer dispute.

8            And, again, what does this litigation come down to?

9    It comes down to what does the contract say?  What does an

10   insurer fairly need to provide in exchange for a premium?  And

11   was this a fraudulent transfer under state law?

12           These just aren't questions of federal law.  They

13   aren't questions of bankruptcy law unless you get to the plan

14   enforcement issues, which again, I'm not going to go back to.

15           So mandatory and discretionary abstention.  I'll just

16   talk through the factors with mandatory abstention first.

17           First, that these are state law claims.  I think I've

18   done that.  Second, is that jurisdiction does not arise in or

19   arise under the Bankruptcy Code.  These are technical terms, as

20   Your Honor is well aware, I'm sure.  In our motion, at

21   Footnote 6, we cite some cases where bankruptcy courts have

22   said, if all you got is 544(b) and everything else is state

23   law, we're not going to exercise jurisdiction.  And some of

24   them say it's not really arising under.  Some of them don't go

25   into that.  They just say, I don't want this case.

63

1          We could cite more cases to that effect.  The bottom

2   line is when we're looking at cases where, again, a lot of

3   state court claims and the only tie is 544(b), the bankruptcy

4   courts don't, under either standard, don't like to take that

5   for very good reasons.

6          At any rate, doubts are to be resolved in the favor

7   of remand, and we think if, under the circumstances, if that's

8   what's tying us to the bankruptcy, the fact that we're

9   collecting under 544(b) of the Bankruptcy Code, it does not

10  need to be in bankruptcy court just for that reason.

11         The third element of mandatory abstention is that the

12  federal courts would not have jurisdiction over the claim but

13  for its relation to a bankruptcy case, relation to being the

14  third category of bankruptcy jurisdiction.  We think that if

15  there's jurisdiction here at all, it's related to we're trying

16  to collect money for creditors in a post-bankruptcy scenario.

17         There are actually cases that say that's not even

18  related-to jurisdiction.  There are cases that say it is.  We

19  don't need to get into that.  We feel if we're in bankruptcy

20  land at all, it's for that.  It's to collect money for

21  customers.

22         The fourth element of the standard is that we've

23  commenced the case in a state forum of appropriate

24  jurisdiction.  I don't believe that's disputed here.

25         And then the fifth is that the action can be timely

64

1  adjudicated in a state forum.  There seems to be a dispute

2  here.  I'd love to come back to this if we have to.  But

3  basically, there wasn't an evidentiary showing that that's not

4  the case.  We haven't compared backlogs.  They did cite to a

5  website that's unsubstantiated that actually showed that there

6  was at least a pandemic year of backlog in Hudson County, but

7  it seems to be reducing quite rapidly.

8       We don't think that there's a fair assertion that the

9  state court cannot timely adjudicate this matter.  And as we've

10 said endlessly, I think this is a state court type of matter.

11 The state courts are very used to hearing insurance litigation.

12      So those are the five factors for mandatory

13 abstention.  We think we've met them.  If not, discretionary

14 abstention comes into play.  There are numerous factors.  There

15 isn't a single Third Circuit standard that can be delineated in

16 a tight number, but basically it comes down to, is this state

17 law?  Is it federal law?  Again, we think it's really clear.

18 One of those factors is, is there a right to a jury trial?  Not

19 only do we have that right, which is quite important, but we're

20 exercising it.  We want this before a jury.

21      So we think that the insureds -- excuse me.  If

22 you'll give me one moment.

23      THE COURT:  Sure.

24      MR. AXELROD:  I'm losing my voice, Your Honor.  I

25 apologize.

65

1          THE COURT:  Take your time.

2          MR. AXELROD:  So we think that looking at these

3   factors and when we filed the remand motion, it really

4   necessitated the question of why we're even here because the

5   factors point so squarely to this being state court litigation.

6          And the answer is really presented in the enforcement

7   motion.  That's what ties all of this together.  And in the

8   remand response, what the insurers say is, well, look at what

9   the plan says.  There's all of this dispute about whether they

10  can bring these claims at all.

11         Well, Your Honor, we're here about what the plan

12  says.  And we'd like a decision on that.  So we don't

13  appreciate the implication that this Court could rule on the

14  enforcement motion in our favor and then they'd go back to

15  state court and somehow argue all of that again as a defense to

16  the substantive claims.  We think this will be resolved and

17  that that shouldn't be a basis to keep this litigation in the

18  bankruptcy court itself.

19         So I think that brings me to the end of my comments.

20  I don't want to re-argue the plan enforcement motion, but we

21  felt that the deal was very clear what our claims were, what

22  we'd be bringing, what the effect would be.  We're trying to

23  get this $22 million back so that it can be distributed to

24  customers.  But otherwise, we think this is a classic state

25  court coverage and policy litigation that should be in the

66

1  state court for all the reasons I've just said.

2          And I'll reserve the balance of my time.

3          Thanks, Your Honor.

4          THE COURT:  All right.  Thank you.

5          Counsel.

6          Now insurers never want to stay in bankruptcy court.

7  You're always looking to run back to state court.  What's

8  different now?

9          MR. BENJAMIN:  What does that tell you, Your Honor,

10 about how we feel about this?

11         Robert Benjamin, Kaufman Borgeest and Ryan, of

12 counsel to National Union Fire Insurance Company of Pittsburgh,

13 PA, and I know that we're the ones who filed the opposition to

14 remand and the other insurers have all joined in that one

15 brief.

16         Your Honor is exactly correct, we never want to be in

17 bankruptcy court, but this is where this case belongs.  What

18 the wind-down debtors have done is they have drafted a

19 complaint in state court that they absolutely must know is

20 violative of Your Honor's confirmation order and the plan and

21 that it seeks in a state court proceeding, to which none of the

22 directors and officers are parties, to remove their coverage.

23         That's what that seeks to do.  It seeks to rescind

24 the policy.  It seeks to remove the consideration for the

25 policy.  It seeks to amend the policy.  It seeks to do all the

1  things that the plan says that they're not allowed to do.  So

2  it's really not a surprise that they don't want to be here.

3        Your Honor, it's important to remember for purposes

4  of jurisdiction who all these parties are and what is it that

5  we're talking about litigating.  We're talking about a wind-

6  down debtor created by this Court through the plan for the

7  purpose of affecting the plan.  That's their entire purpose is

8  to affect the plan and this Court, of course, retains

9  jurisdiction over disputes under the plan.  We've just spent an

10  hour or so discussing all these issues of what the plan covers,

11  doesn't cover, what does it prohibit, what does an assumption

12  under bankruptcy law mean for purposes of pre-petition,

13  post-petition.  This is all bankruptcy stuff, to steal your

14  phrase.  As a humble insurance lawyer, that's all bankruptcy

15  stuff, that's not insurance and that's what we've been talking

16  about for an hour in this case.

17        What is it that we're talking about litigating over?

18  We're talking about litigating over property of the estate.

19  The insurance policy, and I think the case law is fairly clear

20  that the policy itself is property of the estate.  Different

21  courts and insurers can certainly have disputes and I've been

22  counsel on several of them over whether the proceeds are

23  property of the estate and I'm sure that that's something that

24  maybe comes up when we start talking about the stay-lift aspect

25  of today's proceeding.

68

1        But the policy itself is property of the bankrupt

2   estate.  That's unquestionable.  And that is something that the

3   wind-down debtor assumed under the plan.  So, what they are

4   seeking to do is to litigate whether there is "in the amount

5   of" property of the estate.  I think they just said they want

6   to bring proceeds of the policy, the premium, excuse me, the

7   premium under the policy back into the estate.  That's through

8   a rescission action.

9        They want to, and there's a very big difference

10  between rescission and the operation of the policy.  They argue

11  about a provision in the policy, we disagree, that entitles

12  them to, under the terms of the policy, enforce the terms of

13  the policy and void the policy.  That's pursuant, that would be

14  pursuant to the policy's terms, that's not rescission.

15       They're also seeking, separately, to rescind the

16  policy.  And I'm not sure what the standard was that counsel

17  referenced in terms of rescission of the policy.  But

18  rescission of the policy is based on a misrepresentation during

19  the underwriting, which of course, all of that would have been

20  waived once they assumed the policy under the plan.

21       So, Your Honor, we can go through the various factors

22  as they are for mandatory abstention in the Court's bankruptcy.

23  I know that they've been well briefed.  We obviously disagree

24  with the majority of those factors.  The complaint certainly

25  does not arise solely in state court claims.  They use 550 and

69

other bankruptcy provisions, while other courts have hesitated

in finding that those provisions alone are sufficient to have a

rising in or a rising under, excuse me, a rising in or rising

under jurisdiction.  I want to make sure I had it right in my

head.  As I said, I'm just an insurance lawyer.

They want to make sure that they have that

jurisdiction.  Those are not cases brought by a wind-down

debtor over property of the estate.  Those are cases that deal

with employment disputes and other types of litigation that

have nothing to do with the property of the estate and are not

being brought for purposes of enforcing the plan and recovering

for the plan.

The other factors, again, all of those factors that

were referenced, it's their burden to establish those factors.

It's not ours.  They've not done it.  And we've gone through

the various pieces in our brief.  I don't know, I think we've

been here for quite a while.  We can go through them all if

you'd like, but if you have specific --

THE COURT:  No, the Court has --

MR. BENJAMIN:  -- questions, I'm happy to.

THE COURT:  The Court has both published and

unpublished decisions on abstention, mandatory and

discretionary.  I know the standards and the various factors.

Post-confirmation, isn't the threshold for related

jurisdiction even higher under Resorts International?

1          MR. BENJAMIN:  It sure is, Your Honor.  Your

2     jurisdiction, the jurisdiction of this Court is narrowed

3     post-confirmation, but it doesn't modify the aspects of

4     jurisdiction that are important here, which are the enforcement

5     interpretation of the plan.  And that's what we've been talking

6     about for over an hour here now, is what does this plan mean?

7          What do all these various notwithstanding clauses

8     mean?  Does the specific statement that they will not do

9     anything to terminate or otherwise reduce the coverage under

10    any D&O liability insurance policy?  And that's a pretty clear

11    statement.  I don't know what that means if you're then going

12    to say, well, actually, we can maybe do other things under

13    other policies or other vague causes of action.  You're really

14    undercutting what that -- that statement must mean nothing.

15    It's totally illusory if they want to talk about illusory.

16    And, again, I'm sure that the D's and O's would have quite a

17    lot to say about that and whether they got the benefit of their

18    bargain when they joined in on this plan and not objecting to

19    this plan.

20          So I think Your Honor certainly has the jurisdiction

21    to retain jurisdiction and that the claims that the wind-down

22    debtors bring both arise in and arise under the bankruptcy.

23          THE COURT:  All right.  Thank you.

24          Response.

25          MR. AXELROD:  Thank you, Your Honor.  I'll respond to

71

1   three particular comments that were made.

2            First, the general point.  Who are these parties?

3   What's going on?  Is this really a bankruptcy issue?  I agree.

4   There are bankruptcy plan issues.  They've brought them up.

5   Let's have a ruling now.  Let's get this Court's view on what

6   the plan requires of the parties and take that to the state

7   court.  I think that we can resolve that kind of issue today or

8   through an order of this Court, and we felt it shouldn't even

9   be an issue, but we're happy to be here today to talk about the

10  plan.

11           The next argument seems to be that because the policy

12  itself is property of the estate, there's bankruptcy

13  jurisdiction.  Probably, yeah, it's related-to jurisdiction.

14  These are causes of action that belong to the bankruptcy

15  estate.  We're trying to get money that we believe should come

16  into the bankruptcy estate as a proceed of the cause of action.

17  That's very separate from whether this type of action arises

18  under the Bankruptcy Code.  It's very different from -- it's

19  certainly not dispositive of all the factors of abstention.

20           There was a comment that there are cases about

21  Section 544 that are not really avoidance actions where you're

22  trying to recover money.  They're more about employment

23  disputes.  I don't know what that's about.  I can tell you

24  Stoe, S-T-O-E, is the Third Circuit formative case that lays

25  out the factors for abstention, and that was a case that

1  involved, I think, an employment dispute.

2        But we cited a case called Coopers & Librand in our

3  motion.  That's where the court said, if all you got is 544, go

4  back to state court.  Since you brought it up, here are a few

5  more citations for the record.  Hopkins v. Plant Insulation

6  Company, 342 B.R. 703 (D. Del. 2006); Breed Technologies v.

7  Allied Signal, Inc., 128 F.Supp.2d 743 (D. Del. 2001).  It was

8  reversed on other grounds by the Third Circuit at 298 F.3d 263,

9  but the Third Circuit in that decision actually said that the

10 bankruptcy court was well within its authority to remand on the

11 basis that 544 was an insufficient exercise of jurisdiction to

12 stay in bankruptcy court.

13       There are many cases where courts declined to

14 exercise jurisdiction simply on the basis of a 544 and 550

15 claim.  And since counsel brought it up, 550 is the section of

16 the Bankruptcy Code that actually says you can recover once you

17 void a transaction under 544 or 547 or 548.  They go hand in

18 hand.  Those are the only Bankruptcy Code sections that are

19 cited in our complaint, I'm fairly certain.

20       Your Honor, I think I've responded to Counsel's

21 comments.  Unless you have anything further, I'll rest.

22       THE COURT:  I do not.  Thank you, Counsel.

23       MR. AXELROD:  Thank you.

24       THE COURT:  I thank all counsel for argument.

25       With respect to the remand motion and the motion to

73

1  compel compliance with the confirmation order to enforce the

2  confirmation order, as I've indicated, I'm going to reserve,

3  consider the arguments that have been raised, and come out with

4  a decision hopefully in the next few weeks.

5         With respect to the third motion on stay relief, bear

6  with me one second.  There we are.

7         I've read the motion, the limited objection, and the

8  response to the limited objection.  Here's where I'm coming

9  down on it, and I'll throw out.  I tried my hand at some

10  language that I thought would work.  In other words, I would

11  grant the motion as requested, and then add a paragraph.

12         You'll tell me by jumping up and down whether this

13  paragraph works or not, assuming the motion is granted.

14         For purposes of clarity, the Court notes that it is

15  not ruling on any assertion of coverage and that the ruling is

16  limited to authorizing movants only to assert such rights, if

17  any, to access the reference excess director and officers

18  policies for defense costs.  Moreover, wind-down debtors

19  reserve their rights, if any, to the excess policy.

20         Let me suggest this.  Think about it.  If you all can

21  come to differing language, I'll read it one more time for

22  everybody's benefit.  We can try to avoid you having to pay for

23  a transcript, although we know you're ordering the transcript

24  anyway today.

25         For purposes of clarity, the Court notes that it is

74

1  not ruling on any assertions of coverage, and that the ruling

2  is limited to authorizing movants only to assert such rights,

3  if any, to access the reference excess director and officers

4  policies for defense costs.  Moreover, the wind-down debtors

5  reserve their respective rights, if any, to the excess policy.

6         It was my attempt to be as vanilla as possible and to

7  include reservation of rights.  But we're here.  You've come.

8  So if you want to add or take issue with.

9         MR. AULET:  Thank you.  For the record, Kenneth Aulet

10  of Brown Rudnick.

11         Your language does solve a large number of our

12  issues.  I think there was one key issue we were a little bit

13  concerned about that we wanted to make sure we -- look, we just

14  spent the last hour and a half over dickering, and I just want

15  everything to be very clear and avoid any sort of implications.

16         We want to make sure that there's not an implication

17  that we are agreeing that the policy exists because we were

18  concerned about a certain argument that might be raised, which

19  is our non-opposition was taken as the D&O carriers make

20  payments to the D&O insurers and we are now estopped because we

21  didn't object to those payments.  We want to make sure that --

22  I think what Your Honor laid out is what we were trying to get

23  at.  And under the circumstances, we spilled a great deal of

24  ink trying to get to it to, to avoid another hearing like we

25  just had.

1          But we want to make sure that there's no suggestion

2    that we are estopped by anything by agreeing to the order or

3    not opposing the order, that anything the D&O carriers do in

4    response to an assertion of coverage somehow limits our rights.

5          THE COURT:  All right.

6          Let me hear from the movant on the motion.  Counsel

7    for --

8          MR. GOLD:  Your Honor, I think your language may

9    accomplish what we were hoping to collectively accomplish.  I

10   hear some concerns perhaps being raised from the carrier side,

11   but I think the language you read would be acceptable to

12   movants.

13         THE COURT:  Let me hear from the carrier.  Thank you.

14         MR. BENJAMIN:  Again, Robert Benjamin, Kaufman

15   Borgeest and Ryan, counsel to National Union.

16         The only amendment that we would seek is the

17   insertion of the word "covered" before "defense costs" in your

18   proposed language.

19         THE COURT:  Policies for "coverage defense costs"?

20         MR. BENJAMIN:  Covered.

21         THE COURT:  Covered.

22         MR. BENJAMIN:  Covered, c-o-v-e-r-e-d.

23         THE COURT:  Let me suggest this, all right.

24         I'm going to ask movant's counsel to submit a

25   proposed form of order, including the language.  In the

1  interim, the wind-down debtors' counsel, insurers' counsel, if

2  you want to suggest modifications to each other, circulate it.

3           If you can't agree on it, we'll have a call, it'll

4  take five minutes, and I'll just call it depending upon what

5  the remaining language dispute is.  I just wanted to try to cut

6  off argument on it.

7           So work with what I have, add the word "covered,"

8  fight about it among yourselves in a few emails.  If you can't

9  agree, just come back to me quickly and we'll have a call on

10 it.  All right.

11          Other than that, I thank you for argument.  I don't

12 see any hands raised for those watching in remotely, so we are

13 concluded.

14          Thank you.

15          MS. ALBANESE:  Thank you, Your Honor.

16          MR. AXELROD:  Thank you, Your Honor.

17          MR. GOLD:  Thank you, Your Honor.

18               (Proceedings concluded at 1:16 p.m.)

19                    *  *  *  *  *

20

21

22

23

24

25

# C E R T I F I C A T I O N

      We, LIESL SPRINGER and KAREN K. WATSON, court-approved transcribers, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Liesl Springer
LIESL SPRINGER, AAERT CET-685


/s/ Karen K. Watson
KAREN K. WATSON, AAERT CET-1039   DATE: April 29, 2024

J&J COURT TRANSCRIBERS, INC.