UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                      .    Case No. 22-19361-MBK
                            .
BLOCKFI INC., et al.,       .
                            .    402 East State Street
                            .    Trenton, NJ 08608
          Debtors.          .
                            .    September 4, 2024
. . . . . . . . . . . . ..        10:02 A.M.

TRANSCRIPT OF DEBTORS' PROPOSED KYC/AML PROTOCOLS AND THE
OBJECTION AND THE CROSS MOTION FILED ON BEHALF OF MATTHEW
GORDON, AND OBJECTIONS TO THE DEBTORS' PROPOSED CLAIMS RESERVE

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Plan              Brown Rudnick, LLP
Administrator:            By: KENNETH AULET, ESQ.
                               MATTHEW SAWYER, ESQ.
                          7 Times Square
                          New York, NY 10036

                          Genova Burns LLC
                          By:  DONALD W. CLARKE, ESQ.
                          110 Allen Road, Suite 304
                          Basking Ridge, NJ 07920


Audio Operator:           Kiya Martin


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For Matthew Gordon:          Dorf Nelson & Zauderer LLP
                             By:  AARON WEISSBERG, ESQ.
                             555 Theodore Fremd Avenue
                             Rye, NY 10580

For George Gerro:            Gerro & Gerro
                             By:  GEORGE GERRO, ESQ.
                             530 S. Glenoaks Blvd., Suite 200
                             Burbank, CA 91502

For John W. Van              Connell Foley LLP
Tubergen, Jr.:               By:  JOAO F. MAGALHAES, ESQ.
                             One Newark Center
                             1085 Raymond Boulevard, 19th Fl.
                             Newark, NJ 07102


                        -  -  -

1          THE COURT:  Okay.  Good morning, everyone.  This is

2     Judge Kaplan, and let everybody adjust their videos.  We'll

3     start my calendar this morning with respect to the BlockFi Inc.

4     matters.  Okay.  Thank you.

5          As is the norm, to the extent I haven't called upon

6     you and you wish to be heard, please use the raise hand

7     function, otherwise I'll be sure -- I'll do my best to try to

8     make sure everybody gets heard.  All right.

9          Let me turn to debtors' counsel.  I believe we have

10    just essentially a couple of matters on for today.  We have the

11    debtors' proposed KYC/AML protocols and the objection and the

12    cross motion filed on behalf of Matthew Gordon, and then we

13    have motions and cross motions regarding -- I'm sorry, the

14    objections to the debtors' proposed claims reserve.  Mr. Aulet,

15    am I correct?

16         MR. AULET:  Good morning, Your Honor.  Kenneth Aulet

17    of Brown Rudnick for the record.  You are correct, Your Honor.

18    There is only the KYC/AML motion as we refer to it, and the

19    cross motion related to that, and the notice of disputed claims

20    reserve and the two objections to those.

21         THE COURT:  Do you have a preference?

22         MR. AULET:  So, Your Honor, given the status of the

23    case, we'd propose to make sort of a short opening statement on

24    where the case is and the impending final customer

25    distribution, then move to the objections to the disputed

4

1  claims reserve, and then handle the KYC/AML motion last.

2          THE COURT:  All right.  You may begin.  Thank you.

3          MR. AULET:  Thank you, Your Honor.  Your Honor, where

4  we are today was unimaginable when BlockFi filed for

5  bankruptcy, and it was even unimaginable when the plan was

6  confirmed.

7          BlockFi in the lead up to its filing had lent

8  hundreds of millions of dollars, close to a billion dollars

9  worth of crypto currency to Alameda or placed it on its

10 platform, on the FTX platform, and in the wake of FTX's

11 bankruptcy filing that was a big hole to fill.

12         Shortly before the bankruptcy BlockFi in preparation

13 for these cases liquidated a large -- the vast majority of its

14 U.S. based cryptocurrency in the days and weeks before the

15 filing.  So, it entered Chapter 11 with its business, which was

16 frozen, its bank accounts and liquidation of claims against FTX

17 and others.  It's not a good place to be.

18         And BlockFi was essentially a financial company, and

19 Congress has recognized that Chapter 11 is very difficult for

20 financial companies.  Most are now ineligible for Chapter 11

21 because for a financial company the time to sell if you're

22 going bankrupt it's the day before the bankruptcy.

23         You know, a broker-dealer or bank, a commodities

24 futures merchant, all have a regulator that will keep an eye on

25 companies and when they get into trouble.  Broker of sale

1  before the Chapter 11 -- before the filing happens because once

2  a financial company hits bankruptcy it's very, very difficult

3  to save it.  Everybody did the best that they could, but

4  ultimately BlockFi's business could not be sold or saved.

5         So, BlockFi didn't have the ability to hope for a

6  recovery in crypto prices that would bring people back to par

7  on a dollarized basis because it just didn't have enough left,

8  and even a recovery from FTX was doubtful.

9         BlockFi did an excellent job in getting repayment and

10  collateral pledges from FTX before its bankruptcy, but, as Your

11  Honor knows, those are not great facts to be defending when FTX

12  has gone bankrupt and is asserting avoidance claims against

13  BlockFi.  There could have been a situation where although FTX

14  owed BlockFi money, BlockFi wound up paying FTX more than it

15  got.

16         And even when this plan was confirmed, you know,

17  where we are today was (indiscernible).  We had what we

18  believed were strong claims against FTX and strong defenses

19  against FTX's claims, but litigation against an enormous estate

20  like FTX was not going to be cheap.  It was not going to be

21  quick.  We faced the prospect of years of litigation to get a

22  recovery from FTX.  Instead, within a year of the plan

23  administrator being appointed, we're prepared to commence a 100

24  percent final customer distribution.

25         You know, this is the result of just a huge amount of

1  effort by a huge amount of people, and I hesitate to identify

2  them because I'm just going to leave people out, but, you know,

3  there's our planned administrator Mo Meghji, his team at M3

4  Partners that's led by Matt Manning, who have just worked

5  tirelessly from their appointment to get here today.

6          We have a Creditor Oversight Board, three members,

7  Brendan, Elizabeth and Greg, who are creditors in this case.

8  They have had to walk -- you know, it's their life savings at

9  issue.  They have had to watch as their money is spent on this

10 process.  They've had to make the hard decisions knowing just

11 how important the results are for them and for everybody like

12 them.

13         There's the joint liquidators of BlockFi

14 International.  You know, it's a credit to the joint

15 liquidators just how little we've had to discuss that there are

16 parallel proceedings in Bermuda.  Bermuda doesn't have a

17 Chapter 15 equivalent.  These are two sort of main proceedings,

18 and there could have been huge issues between, you know, the

19 U.S. proceeding and the international proceeding, and instead

20 there's been nothing, and that's a testament to the joint

21 liquidators, who have also worked tirelessly from their

22 appointment as joint provisional liquidators, their conversion

23 to joint liquidators and as a member of the Oversight Board as

24 well.

25         There's our co-counsel Haynes and Boone led by Rich

1  Kanowitz's team and our co-counsel Genova Burns led by Dan

2  Stolz.  They've been there every step of the way.  These

3  results could not have been achieved without their efforts.

4       There's the BlockFi team.  Again, could not be here

5  without the BlockFi team's work.  They've worked tirelessly,

6  even though they are essentially working to put themselves out

7  of a job.  We get e-mails from them late at night.  They work

8  hard to respond to every customer inquiry they get, and -- but

9  the distributions that we anticipate going out could not have

10 got -- be ready to go out on this timeline without their work.

11 It's a real credit to them.

12      There's Judge Goldblatt and Judge Drain who

13 negotiated the settlements that got us to this point, resolving

14 what should, could and really should have been incredibly

15 expensive, incredibly lengthy, incredibly difficult litigation

16 with the FTX and Three Arrows Capital estates.

17      And last, but not least, you know, this Court and

18 Your Honor who have made sure that we understood exactly what

19 was at stake, that everybody was directed at getting the best

20 result for BlockFi customers as quickly as possible.  Your

21 Honor has never lost sight that these are real people with real

22 -- with their life savings, and we just don't have the ability

23 to delay getting them their money back.

24      You know, we would never have been happy with any

25 distributions under a hundred percent to customers, though it

1   looked like we were going to be at points of this case just

2   trying to get the best failure we could.  We're really happy to

3   be here with a hundred distribution, but we're even happier to

4   be here so quickly because, again, this should have and could

5   have taken years, and these are people's life savings.  It

6   really, really matters getting them back to people today rather

7   than next year, the year after, the year after.

8          And I want to recognize BlockFi's customers are going

9   to feel that we're grading on a bit of a curve here.  They have

10  suffered tremendously.  They've been separated from their money

11  for quite some time, and they've lost out on investment returns

12  in crypto currency, lost out on interest on dollars, and

13  they're not going to be getting either of those back, and I

14  think that we should keep in mind that we have not been able to

15  bring -- make those people completely whole.

16         There was in the FTX proceeding Sam Bankman-Fried

17  attempting to justify his actions by saying essentially no

18  harm, no foul to the Court because FTX's customers will get 100

19  percent of the dollar value of their claims or more, but that's

20  not the same as what they lost.  That's not the same as what

21  BlockFi customers lost.

22         But I still think it's important to recognize this

23  truly exceptional result.  It's a truly exceptional result that

24  has been achieved without all the tools that Congress has

25  given, you know, the liquidators of a bank or a broker-dealer

1  or a futures commission merchant.

2          So, we're really happy to be here today, and I know

3  that our customers are very eager to get some of the details of

4  those distributions, a timeline, so I wanted to give that, as

5  well.

6          We have extended the deadline to get a matching

7  Coinbase account to tomorrow the 5th.  Anyone who -- we'll run

8  a test after that, anyone who has a matching Coinbase account

9  at that point will receive in kind distributions.  The plan

10  didn't contemplate in kind distributions after six months

11  because it was understood the BlockFi platform could not be

12  kept alive indefinitely, but by virtue of this agreement with

13  Coinbase we have been able to extend that ability to make this

14  final distribution in kind to people who have a Coinbase

15  account.

16          For those who don't we will make the distribution in

17  cash through Digital Disbursements, our distributions partner.

18  Those will be -- those distributions for U.S. based customers

19  will commence the week of September 16th.  That may be both in

20  kind and cash distributions.  It may be one or the other.  The

21  delay between the 5th and 16th is getting the population of

22  Coinbase customers set, obtaining the necessary assets to make

23  the distribution, and about two weeks to do that, rebalancing

24  and to create the distribution files.

25          I just want reiterate because I've seen some

1   confusion on Reddit on this point, people who do not have a

2   Coinbase account will get their distributions, and they will

3   get them around the same time.  It may not be the exact same

4   date, but it's not going to be a difference of months.  It's

5   going to be a difference of likely days.  They will get their

6   distribution.  They will not lose their entitlement to a

7   distribution because they could not get a Coinbase account.

8          For international distribution the -- we have been

9   working to resolve regulatory issues around Bermuda laws

10  regulating BlockFi International.  We believe that we have

11  gotten to a result on that.  We are going to be commencing a

12  refresh of all remaining international accounts for Know Your

13  Customer, KYC information.  We expect that the e-mails for that

14  will go out by the end of the month.  We're targeting sooner

15  than that, but we want to give a deadline.  We want to be clear

16  that they will go out by the end of the month.

17         Once people have provided the necessary information

18  to meet Bermuda KYC standards, we will release their

19  distributions as quickly as possible.  They also will get

20  matched with a Coinbase account or not by tomorrow, and we will

21  have the necessary reserves to make their distributions in kind

22  or in cash as soon as their KYC update is complete, and anyone

23  who did not get their first interim distribution, they'll get

24  it through -- they'll get it as soon as they complete the KYC

25  process, as well.

1          So with that, unless Your Honor has any questions, I

2    will turn to the notice of the disputed claims reserve.

3          THE COURT:   Thank you, Mr. Aulet.  I appreciate the

4    recap.  The Court wants to extent its gratitude and

5    appreciation to all the professionals who've worked this case

6    so far.  There have been extraordinary results, although

7    clearly parties are still suffering and including parties that

8    are here today on motions, but the speed in which the

9    professionals were able to turn this case around to make these

10   distributions is notable.

11         And I appreciate the efforts of the employees that

12   remain, the stakeholders that worked to support these efforts,

13   and hopefully we can resolve pending issues expediently and

14   ensure that these distributions occur as scheduled.

15         Let's move on to the motions then that are pending

16   before the Court or the matters that are pending before the

17   Court.

18         MR. AULET:   Thank you, Your Honor.  So, as you know,

19   we filed the notice of the disputed claims reserve, and we had

20   two objections, one from Mr. Gerro and one from Mr. Van

21   Tubergen.

22         To be clear at the outset, Your Honor, the estate has

23   sufficient funds after the planned customer distributions are

24   made to -- it will have over $17 million left over.  So, what

25   in our view we are discussing is not should the first -- should

1   the final customer distribution be delayed, but essentially we

2   view what Mr. Gerro and Mr. Van Tubergen are seeking is a stay

3   pending appeal, which they have not sought and which they have

4   not obtained.

5          And at bottom we view this as a simple matter.  Both

6   claims have been objected to and ruled on by this Court

7   disallowing the -- Mr. Gerro's claim in full and disallowing

8   Mr. Van Tubergen claim in the claimed amount of 10 million.

9   There's about $19 which is undisputed.

10         Section 7(c) of the plan is clear on what happens at

11  this point, both have appealed, but if they appeal, claims are

12  estimated at zero dollars for all purposes.  So that we do not

13  believe that the filing of a notice of appeal gives them the

14  right to a disputed claim reserve.  They still must obtain an

15  order of this Court, and we submit, although neither have

16  offered a standard by which this Court should grant their

17  request, that at a bare minimum they need to meet the standard

18  for a stay pending appeal.  Neither of them have even attempted

19  to do so.

20         I would note Mr. Van Tubergen filed an untimely

21  notice -- an untimely attempt to do so before he filed his

22  notice of appeal, but after Your Honor denied that because he

23  hadn't filed a notice of appeal yet, he had filed a motion for

24  reconsideration, no subsequent motion for a stay pending appeal

25  was filed.

1          And, Your Honor, in our view that solves the issue.

2     Mr. Gerro and Mr. Van Tubergen are not entitled to a stay

3     pending appeal unless they file for one, they meet the

4     standard, and they obtain a stay pending appeal either from

5     Your Honor or from (indiscernible).  Neither have done so.

6     There is no such stay pending appeal.

7          Turning to the details of their objection, I'll go to

8     Mr. Gerro's first, Mr. Gerro notes in his objection that he

9     believes a opinion from the district court was imminent, and he

10    was right.  The district court days ago denied Mr. Gerro's

11    appeal.  However, he has filed a notice of appeal to the Third

12    Circuit as of yesterday.  We believe that is exactly why no

13    disputed claims reserve should be set.

14         Now that we're making a 100 percent customer and non-

15    subordinated general creditor claim distribution, our goal is

16    to close these estates expeditiously.  It's not going to be

17    this month.  It's not going to be next month, but we're going

18    to be driving towards the conclusion of these cases, distribute

19    any remaining funds to subordinated creditors and close these

20    cases, and we do not believe that an indefinite stay pending

21    appeal should be granted without meeting the standard while Mr.

22    Gerro pursues an appeal of the Third Circuit.

23         Mr. Gerro notes in his objection that -- look, I

24    interpret his statements about litigations costs is that he

25    will appeal any denial of a disputed claims reserve.  Mr. Gerro

1 had three different cases in California, Gerro 1, Gerro 2,

2 Gerro 3.  There are several appeals in those cases.  Mr. Gerro

3 knows what he has to do to get a stay pending appeal and has

4 not done it.

5         If he appeals this, then so be it, but we want to get

6 this issue resolved expeditiously so that we can give -- close

7 these cases when we're ready and don't have to deal with that

8 issue down the road.

9         Mr. Gerro attempts to assert that he is being treated

10 unfairly.  As we note in our reply, that's not the case.  Every

11 customer who has -- every claimant who has had a claim

12 disallowed by this Court, we set the reserve at the amount that

13 is allowed.  You know, we expect a -- he is being treated

14 exactly the same way.

15         You know, Mr. Main and the other loan claimant who

16 has appealed, we're holding the money that we believe that

17 they're entitled to and that they're entitled to under your

18 order.

19         We're happy to make distributions.  We put it as the

20 reserve, so that we were clear.  Both of them are pro se

21 parties.  We're not seeking to zero out their claim entirely.

22         But to be clear, Mr. Gerro and Mr. Van Tubergen and

23 every other creditor who has filed a claim that has been

24 disallowed by the Court is being treated the same way in the

25 proposed disputed claims reserve.

15

1          Similarly, and just to be clear, both of these claims

2     do not arise out of amounts that were held on the platform at

3     BlockFi's collapse.  At bottom both Mr. Gerro and Mr. Van

4     Tubergen had taken out loans from BlockFi, posted

5     cryptocurrency as collateral.  Prices moved against them.  They

6     didn't post enough new collateral, and their claims were

7     liquidated well before the petition date.

8          So, Mr. Van Tubergen also, as Your Honor is likely

9     aware, asserts missing theorem, that he's never demonstrated he

10    ever deposited on the platform.

11         Mr. Van Tubergen also makes no effort to meet the

12    burden to show that he meets -- he merits a stay pending

13    appeal.  Neither Mr. Gerro nor Mr. Van Tubergen wrestle with

14    the plan, cite Section 7(c) or even suggest that they meet the

15    standard for a stay pending appeal.  They simply assert an

16    entitlement to a disputed claim reserve, and we submit that

17    they simply haven't met the standard here.

18         Mr. Van Tubergen separately raises the issue of a

19    required showing of financial data.  To be honest, we're not

20    really sure what Mr. Van Tubergen is getting at with respect to

21    that request.  BlockFi Lending is making 100 percent customer

22    distributions.  For a disputed claims reserve, that means that

23    we hold 100 percent of the dollar value of the disputed claims

24    reserve.

25         To the extent it's a question of are there funds left

1  over, as we said before, there are funds left over.  If, you

2  know, Mr. Van Tubergen's claim is upheld by the district court

3  tomorrow, that money is available, but we submit that the

4  estate should not be required to keep that money in escrow

5  indefinitely if no stay pending appeal has been sought or

6  obtained.

7          You know, when these estates are ready to be closed,

8  the plan administrator intends to distribute all remaining

9  assets to subordinated creditors and seek the closure of these

10 estates.  Setting reserves when no stay pending appeal has been

11 sought or obtained would interfere with that process, would

12 interfere with the distribution of those assets to the

13 subordinated creditors, and I'd note that the FTX estate and

14 the victims of FTX's collapse are the largest subordinated

15 creditors in this case.

16         Keeping these estates open indefinitely would only

17 further diminish the estate -- the assets of this estate by

18 needless professional burn.  We submit that unless either of

19 these claimants seeks a stay pending appeal and obtains it that

20 no reserve should be kept for their claims.

21         With that I will -- unless Your Honor has any

22 questions, I will turn it over to the objectors.

23         THE COURT:  Thank you, Mr. Aulet.  Let me hear from

24 the objectors.  Let me start with Mr. Gerro.  Good morning.

25         MR. GERRO:  Good morning, Your Honor.  George Gerro

1  here.

2          Your Honor, the -- Mr. Aulet and his team over at

3  Brown Rudnick, a very professional team.  We met yesterday, and

4  we were able to attempt to informally resolve the objection.

5  We discussed many different possible ways of doing so, such as

6  holding a lesser amount in reserve, holding it for a shorter

7  amount of time, stipulating to an expedited briefing schedule,

8  so that the account does not have to be held open for as long,

9  perhaps depositing the funds with the Court so that the estate

10 does not have to be held open, and we were not able to come to

11 a resolution.  I was hoping that we would be able to, but

12 that's okay because I'm hoping that we can come to such

13 resolution today during this hearing.

14          As Mr. Aulet mentioned, these are real people with

15 their life savings that have been lost, and I would humbly

16 submit that I'm one of those real people, and sometimes we have

17 favorites, and I think that that's -- having a favorite or, you

18 know -- I'm going to stick to my prepared remarks.  I'm not

19 going to get too off script here.

20          But I would like to recognize that a hundred percent

21 payment on the customer claims is very good, and we're very

22 happy about that, and that the people that don't have Coinbase

23 accounts are not going to lose entitlement to their

24 distribution, but somebody who has an appeal that's pending may

25 lose entitlement to a distribution, which is -- we just ask for

1 similar treatment.

2          And at the end of the day all I've ever requested was

3 to be treated the same as the similarly situated creditors if

4 in the event that the claim is allowed, and I know right now

5 the claim is not allowed, and I accept that.

6          I'm only asking for a reserve of approximately $6.9

7 million to be established, which simply represents the market

8 value of the loan collateral that I sent to BlockFi valued as

9 of the date of the petition filing in dollars, no interest, no

10 penalties, no damages, simply just the value of the

11 cryptocurrency as of the date of filing.

12          The notice of appeal was filed, and it is an appeal

13 by right, and that was conceded in BlockFi's papers that there

14 is a right to an appeal to the Third Circuit.  And when the

15 notice of appeal was filed, the jurisdiction was transferred

16 from the district court to the Third Circuit.

17          BlockFi concedes that they have the money to

18 establish a disputed claims reserve in this matter, and

19 establishing a reserve will do the following.  It will allow my

20 claim to be treated similarly as other creditors if the claim

21 is eventually allowed, and it will allow me to be treated

22 similarly to disallowed claimants if the claim is disallowed,

23 meaning that the reserve will only be paid depending on the

24 ruling of the courts.  And I am not requesting an interim

25 distribution.

1           My understanding is that the clerk has the capability

2    to accept the deposit.  This Court can issue an order which

3    would state how the funds are to be deposited and withdrawn.

4    The funds cannot be withdrawn absent a court order, and the

5    clerk will deposit the funds with the United States Treasury.

6    The funds can be deposited with either the bankruptcy court

7    clerk or the district court clerk, and there is some authority

8    for that, Local Bankruptcy Rule 7067-1(a)(2), also Federal

9    Rules of Civil Procedure 67.

10           BlockFi may stipulate to an expedited briefing

11   schedule without conceding that an expedited briefing schedule

12   is needed.  Because these appeals have been briefed before, we

13   can agree to a very truncated briefing schedule similar to that

14   of actually a motion because the work has already been done,

15   meaning that the delay is not -- does not need to be unduly the

16   delay.

17           BlockFi will likely want to establish a reserve for

18   attorney fees as well pending the Third Circuit appeal, meaning

19   that this will not be the only reserve that will be pending.

20           As mentioned, the funds are going to be distributed

21   very quickly.  We received the district court's ruling last

22   Friday.  It did disrupt some Labor Day plans, but that's okay.

23   The district court order is automatically stayed for 14 days in

24   order to give time for the courts to provide provisional

25   remedies.  We were hoping that a provisional remedy was not

1  required because establishing a fund is a less coercive remedy

2  which could be easily established.  I don't think anybody

3  disputes that this Court has the power to establish the funds.

4       The plan allows for the Court to issue an order.  The

5  plan says that the disallowed claims are estimated -- are

6  deemed estimated at zero, but it does not require that the

7  Court estimate the claims at zero.  Of course something may be

8  deemed one way and ruled another, such as a presumption.

9       So we could say that they are effectively presumed to

10  be estimated at zero, but now that we have found out that the

11  customers are going to be distributed a hundred percent of

12  their funds, I think that that is good cause, and the fact that

13  the estate has enough funds remaining, I think that that is

14  good cause for the establishing of a fund.

15       And the bankruptcy court does have the power to

16  establish such a reserve, and I believe that that's given by

17  Federal Rules of Bankruptcy Procedure 8025(d)(4).

18       And 8025 is a relevant rule.  I have a hard copy in

19  front of me, and I hope that it has not been amended within the

20  past 12 months.  8025, Federal Rules of Civil Procedure, Civil

21  (a) states that the district court's judgment is stayed for 14

22  days after entry, which would be the minimum necessary time for

23  a reserve to be held.

24       The Subsection (c) states that the bankruptcy court's

25  order is stayed -- I'm not reading verbatim by the way.

1          THE COURT:  That's okay.

2          MR. GERRO:  Yes, you're grabbing your book, as well.

3  But the bankruptcy court's order is stayed while the district

4  court's order is stayed.

5          And there's one other rule that I wanted to bring to

6  the Court's attention, and then I will answer any questions

7  that the Court has.  This Court has the power to issue an

8  indicative ruling under Rule 8008, and I'd like to also point

9  out that -- oh, the bankruptcy court's authority -- this is an

10 important rule, 8007(d)(2) that provides the bankruptcy court

11 with the following authority, quote, to issue any other

12 appropriate orders during dependency of an appeal to protect

13 the rights of all parties in interest.

14         So, even though the plan does not include these

15 rules, the Bankruptcy Rules of -- the Rules of Bankruptcy

16 Procedure do provide this Court with the authority to preserve

17 the status quo pending an appeal, and if not for this claimant,

18 I think that it would be a great showing of comity for the

19 Third Circuit to allow them to decide the appeal before

20 distributing the funds.  Thank you, Your Honor.

21         THE COURT:  Thank you, Mr. Gerro.  Let me turn --

22 rather than have Mr. Aulet respond, let me turn to Mr.

23 Magalhaes and hear him on behalf of Mr. Van Tubergen, and then

24 we can have a global response.  Good morning, Mr. Magalhaes.

25         MR. MAGALHAES:  Good morning, Your Honor.  Good

1  morning to everyone else that's present today virtually.

2         So, it's good to now understand that there will be

3  some funds left over after this distribution.  When we said in

4  our papers that there was no financial data, I could have

5  spelled it out more simply I guess.  There's no numbers.

6  There's no arithmetic.  There's nothing for us to wrestle with

7  to understand the relative equity in making this hundred

8  percent distributions while you still had people pursuing their

9  appellate rights.  So, now that I know that, that's very

10 helpful.  I thank Mr. Aulet for letting me know.

11         Also, we did not have an opportunity to have a

12 discussion before this hearing.  I made passing mention of it

13 in an e-mail, but hearing that Mr. Gerro had that opportunity

14 to have a dialog, certainly I would welcome that, but I'm

15 mindful, Judge, that the day is here, you know.

16         And so, you know, Mr. Aulet also mentioned burdens,

17 and so I -- and I want to get to this like de facto stay

18 argument because it did rankle me, Your Honor.  I think you'll

19 understand why in a moment.  But, you know, as we said in our

20 objection that was filed on August 15th, here, just on the face

21 of things, there is no genuine effort to protect due process

22 rights.

23         So, as I envision a claims reserve, you know --

24 obviously, Your Honor, you ruled against me, right?  So for me

25 to tell you that my appeal has merit, that's like arguing with

1  the king.  It's not something that's easy to do, but be that as

2  it may, I do believe the appeal has merit, and I do believe

3  that some sort of number should have been put on the claim to

4  reflect that, and that wasn't done.  The only amount that's set

5  aside is the amount that's not in controversy, $19 and change.

6       So, I just think as a just literal proposition there

7  is no effort being made to protect Mr. Van Tubergen's appellate

8  rights, and I'll return to that in the end.

9       And as I said, even if a number had been proposed,

10  which one was not, there would have been no way for us to, you

11  know, engage in arithmetic to say, well, really you should put

12  $500,000 more on it because you'll still be able to make such

13  and such distribution.  Now, that we know there's 17 million

14  left over, that's helpful.

15       And I'll just note the elephant in the room, Judge.

16  I believe if you add up Mr. Gerro's claim and Mr. Van

17  Tubergen's claim, I think we get to the balance that will be

18  left over, the 17 million, and I imagine there'll still be some

19  additional professional fees even after the purported final

20  distribution is made.  So, that could be an issue in terms of

21  there being only 17 million left over.

22       In terms of the attack on our position as us seeking

23  a de facto stay, we did previously seek a stay and nothing in

24  the Bankruptcy Rules prevents us from seeking it again.

25       I note, Your Honor, and this was not noted in the

24

1  debtors' papers, that Bankruptcy Rule 8007(a)(2) simply says

2  that a stay can be sought, quote, either before or after the

3  notice of appeal is filed.  Your Honor, when you initially

4  denied my request for a stay, I did disagree with that on that

5  ground because before I made that request in conjunction with

6  our motion for reconsideration, I did check the rules, Your

7  Honor, and I saw that.  I thought it would still be okay to

8  move forward.

9       Once I lost that battle, I'm not going to, you know,

10 seek reconsideration of that.  I just got onto the business of

11 engaging in our appeal, doing the necessary work there.  I'm

12 pleased to say, Your Honor, that as of this past Friday,

13 appellate briefing is concluded.  We filed our reply, and it

14 was my intention all along, my client would back me up if he

15 were here and he were speaking to Your Honor, of reinvigorating

16 that request for a stay once we had appellate briefing

17 concluded.

18      And I would have probably even done that before this

19 hearing, Your Honor, but that will probably come off as like an

20 off putting tactic.  You know, meaning they point something out

21 in their papers, and then I react to it by filing a motion for

22 a stay.  So I didn't do that, but I will say that I do intend

23 to pursue that again if necessary.

24      So, and also with regard to the notion that, you

25 know, we're improperly seeking a de facto stay, I would kind of

25

1  turn on its head and say that, you know, we're entitled as a de

2  jure matter to seek the protections that the plan envisions in

3  terms of, you know, being fair and reasonable about the

4  business of establishing a disputed claims reserve.

5       And so, okay, perhaps there's some element of this

6  that bears upon what we would seek through requesting a stay,

7  but also we're also just trying to play within the framework

8  the Court established through the plan, and for reasons noted

9  in our objection, we don't believe that the debtor is making a

10  genuine effort to protect Mr. Van Tubergen's appellate rights.

11       And on that note, I'll just conclude for now, Your

12  Honor, by saying that -- I mean, I said the other side of the

13  coin in terms of the jury, what's going on.  I think there's

14  also another side of the coin in terms of the speed at which

15  the debtors are seeking.

16       I would, you know, say, Your Honor, that we may be in

17  the last days of the equitable mootness doctrine, and as I read

18  the sum total of the papers presented -- and, in fact, you

19  know, Mr. Aulet said a lot of wonderful things, and I applaud

20  him for the work he's done for his side on this case, but the

21  way we would see it is that the debtors are, you know, seeking

22  the last bullet train out of Dodge to the detriment of folks

23  like Mr. Van Tubergen and also Mr. Gerro.

24       I see no reason why we can't pump the brakes for a

25  moment, and, you know, whether through, you know, establishing

1  a claims reserve or granting a stay or otherwise.  It appears

2  that my client is one of the -- you know, one of the proverbial

3  last men standing.

4         And so we would request either a reasonable claims

5  reserve.  We'll request, you know, an audience, if we have to

6  file that request -- refile the request for a stay, but just in

7  general we don't see the urgent need to expedite the conclusion

8  and closure of these cases.

9         THE COURT:  All right.  Thank you, Mr. Magalhaes.

10  Mr. Aulet, any brief response?

11         MR. AULET:  Sure, Your Honor.  I'll just make a few

12  points.  First, Mr. Gerro cites a number of Bankruptcy Rules,

13  but he doesn't cite a (indiscernible).

14         This Court has the power to grant the stay pending

15  appeal, but he needs to seek one, and he needs to meet the

16  standard.  He hasn't attempted to do so, and the Court should

17  not simply grant one without meeting the standard.

18         Similarly to respond to Mr. Van Tubergen, you know, I

19  think he made two main points.  First, that the debtors are not

20  attempting to protect his client's appellate rights or, you

21  know, seek -- or propose an amount lesser than $10 million, and

22  second, that we're not following sort of the spirit of the

23  plan.

24         As for the spirit of the plan, the plan is very

25  clear.  His claim is disallowed.  It's estimated at zero while

his appeal is pending.  That's what the plan says.  There's not really any ambiguity on that point.

Second, it's not our burden to protect his appellate rights, and it's important to have his request for a stay pending appeal because it's his burden.  He has to show the likelihood of a meritorious appeal.

Mr. Gerro's appeal was just denied, and his appeal is not on all fours with Mr. Van Tubergen's, but is pretty similar.

You know, he shows -- he does not wrestle with the harm to the estate.  The Bankruptcy Code created estimation for a reason.  It's to avoid undue delay in the administration of the estate.

We are absolutely seeking the last train out of Dodge.  It is our job to quickly and fairly administer this estate because administering this estate costs money that should go to the creditors, and those creditors are no less creditors because they're subordinated, instead of the customers.

So Mr. -- both of them have had due process.  They have the right to file for a standing pending appeal, but they have not, and it's not a minor technical matter because they have to meet the burden.  It's not on us to say, all right, you know, you got a 15 percent chance, 25 percent chance.  The plan says it's zero unless they move for a stay -- unless they get

1   -- move for an order of the Court.  We submit that there's no

2   basis to make that standard anything less than a stay pending

3   appeal.

4        And because there is sufficient money, this is not a

5   case where if Your Honor tells them you got to go get a staying

6   pending appeal and meet the standard, we're sending the money

7   out tomorrow.

8        I do want to just clarify one point from Mr.

9   Magalhaes.  We have $17 million left over, not exactly 17

10  million.  We're not exactly sure how much we're going to have

11  for subordinated claims at the end of the day, but it is at

12  least 17 million, exclusive of the anticipated costs of getting

13  to the point of closing the estate.  So, it is not the case

14  that we've got exactly 17 million now, but the next dollar we

15  spend drops it to 16.99.

16       So, at the end of the day, Your Honor, the way our

17  appellate system works is you do not get a free stay pending

18  appeal.  It is not our job to advocate why they're not entitled

19  to one.  They have to meet a high burden to show an entitlement

20  to a stay pending appeal, and then it is our -- then we have

21  the opportunity, knowing what their arguments are, to respond

22  to that and argue why a stay pending appeal is not warranted.

23  So, Your Honor, I'd ask that the Court disallow the objections.

24       THE COURT:  All right.  Thank you.  Thank you, all.

25  There's been much talk this morning regarding stays pending

1   appeal.  Curious because I don't have a motion in front of me

2   seeking a stay pending appeal.  I understand the wind-down

3   debtors argue that the relief sought by the objectors are the

4   equivalent.  When I have a stay pending appeal, and I

5   recognize, Mr. Magalhaes, that there was one filed, and you're

6   correct, Rule eight thousand and -- I believe 8007, maybe it's

7   8002, does it indicate that it can be filed before or after a

8   notice of appeal.

9        But, in any event, the Third Circuit made it clear in

10  the Revel decision that came out in 2015 that there are four

11  factors for a stay pending appeal, and when I have one, I will

12  apply those factors, but those factors reflect a hurdle I

13  believe that would have to be overcome by these two objectors.

14  One, of course, and most important, is the likelihood of

15  success on the merits.  With an appeal that's already been

16  denied, in Mr. Gerro's case, and with the motion for

17  reconsideration having been denied, that's a hurdle.

18       The other hurdle of course is you have to establish

19  irreparable harm.  And then you get to the balance of the

20  equities and the public interest.  But, the Revel -- in Revel,

21  the Third Circuit made it clear that you can stop after the

22  first two.  And irreparable harm is rarely ever found when the

23  harm is simply economic injury.  And that's what we're

24  addressing today.  So, those are hurdles.  I offer that just in

25  the event motions are filed that the parties direct their

1  attention to addressing those issues.

2       With respect to the issues today, the Court after

3  reading the submissions, undertook some further review and

4  research and came across the decision of In re: Enron in 2006,

5  Judge Gonzalez at the time.  And I'll give you a cite for it.

6  It's a Westlaw cite, 2006, Westlaw, 544463 -- 544463.  And I

7  bring this case to your attention because it is almost on all

8  fours with the issues and the facts that are presented before

9  the Court today.

10      In Enron, there was a motion to estimate a previously

11 disallowed claim at zero for distribution purposes,

12 notwithstanding a pending appeal, and in the absence of any

13 stays pending appeal.  Specifically, in the Enron decision --

14 Enron case, the plan had provided that the reserve for a

15 disputed claim that was previously disallowed would be zero,

16 even during the pendency of an appeal.  It did provide however

17 that the Court in its sole and absolute discretion could

18 establish a reserve for a disputed claim if necessary to

19 protect the rights of such holder.  The Court noted that this

20 authority to fix a reserve was within its discretion and was

21 not intended as a substitute for a stay pending appeal.

22      Now, in Enron the reorganized debtor argued that

23 maintaining such a reserve would not -- would work at hardship

24 on the general unsecured creditors who are anticipating a

25 distribution, and that estimating at zero would comply with the

1  dictates of the plan.  The claimants on the other hand, among

2  their arguments, contended that the failure to maintain a

3  reserve would undermine their Appellate rights.

4       The Court looked to Section 1142, which authorizes a

5  Court to direct appropriate parties to take all steps necessary

6  to perform any act necessary for a consummation of a plan.  And

7  the Court overruled the objection, noting that it had already

8  reviewed the substance of the claims when it disallowed the

9  claim originally.  And nothing had been presented to compel

10  reconsideration.  The Court also looked to balancing the

11  equities, and determined that the harms caused by a potential

12  deferral of a fair distribution would disrupt plan

13  administration and outweigh the potential harm to claimants who

14  can still seek reconsideration after a successful appeal under

15  502(j).

16       So, let's turn to this case.  We have similar

17  provisions in a plan.  Section 7(c), Roman Numeral VII(c) of

18  the plan, provides that notwithstanding any provision otherwise

19  in the plan, a disputed claim that has been expunged from the

20  claims register, but that either is subject to appeal or has

21  not been the subject of a final order, shall be deemed to be

22  estimated at zero dollars, unless otherwise ordered by the

23  Court.  So, it does give the Court some flexibility.  In the

24  event the bankruptcy court estimates any contingent or

25  unliquidated claim, that estimated amount shall constitute a

maximum limitation on such claim for all purposes under the

plan, including for purposes of distribution.

So, what we have is somewhat similar language in a

situation where the plan dictates that the claims that have

been disallowed be estimated at zero for distribution purposes.

There have been no appeals of the plan or those provisions of

the plan by any of the objectors.  There's been no, at this

point, stays pending appeal entered by this Court or the

district court.  We have the district court already weighing in

on Mr. Gerro's appeal.  And this Court having already denied

reconsideration with respect to Mr. Van Tubergen's claims.

This Court therefore has no basis to believe that

either claimant will succeed on appeal, notwithstanding each

claimant maintains the right to pursue further appeals, and the

Court recognizes that.  And the Court recognized that each of

these claimants have the ability to seek reconsideration under

502(j) if they are successful in their appeals.

More so, the Court recognizes that each of these

claimants can seek to compel the wind-down debtor to claw back

distributions necessary to pay any pro rata amount on allowed

claims, if they would be successful on appeal, and if the wind-

down debtor does not have sufficient funds remaining to satisfy

the pro rata amount.  With these protections, this Court is

compelled to deny the objections, noting that the Court has an

obligation to support, pursuant to Section 1142, and authorize

1  the wind-down debtor to take the steps that are consistent with

2  the plan.

3        The plan provides for estimation at zero for

4  distribution purposes of disallowed claims.  There are avenues

5  of recourse for the objectors.  I am pleased to hear that Mr.

6  Aulet has confirmed that there are, at this point, anticipated

7  to be sufficient funds to satisfy the claims in the event they

8  are upheld on appeal.

9        I will require one additional protective provision to

10  be included in the order overruling the objection.  To the

11  extent the wind-down debtors are in a position to make

12  distributions, which will create an inability to satisfy the

13  claims as sought under the appeal, they are to notify the

14  objectors and provide the objectors with seven days notice to

15  request a hearing before the Court.

16        In other words, if we get to a point where the wind-

17  down debtor is closing these cases and will make distributions,

18  which will leave them without sufficient funds to make the pro

19  rata distribution owed on the claims where they allowed on

20  appeal, the objectors may come back before the Court for the

21  Court to consider either requiring a reserve at that point or

22  other steps.  And the other steps may just be the need to claw

23  back funds.  Although the Court's not ruling on that.

24        But, at this juncture, I'd like to see the

25  distributions made and I'd like to see the appeals pursued.

1  And we may have resolution of the appeals before we need to

2  address where the wind-down debtor will come up with the

3  funding.  Mr. Gerro's, I see your hand raised.

4        MR. GERRO:  Thank you, Your Honor.  I want to be

5  heard regarding your additional order that -- and may I

6  interpret that order as ordering the debtors to establish a

7  reserve unless and until they provide seven days notice and

8  there's an opportunity to be heard on that matter?

9        THE COURT:  No.  It's simply a notice provision.  I'm

10 not requiring the establishment of a reserve.  I simply want,

11 when the time comes, because the Court is in the dark as far as

12 the administration by the wind-down debtor, if there comes a

13 point in time, and I take Mr. Aulet at his word that there are

14 funds now that would satisfy the amounts that would be due if

15 there was success on the appeal, I don't know how long that

16 will be.

17        But, if after distributions or when distributions are

18 finally made and there's no other funds to collect, it appears

19 that there will not be any further additional funds available

20 to pay, he is to provide that notice before making the

21 distribution.  I mean, you can look at it different ways, but

22 I'm not requiring the fixing of the reserve.

23        MR. GERRO:  And may I ask, what would be the remedy

24 or enforcement mechanism, if the notice is untimely provided or

25 distributions are made notwithstanding this order of the Court?

1          THE COURT:  Any -- the remedies are always consistent

2  with enforcement of court orders.  You can seek a contempt

3  order, or you could seek other relief that would be

4  appropriate.  Mr. Aulet, do you have any questions or do I need

5  to clarify anything for your benefit?

6          MR. AULET:  No, Your Honor.  I think that's clear.  I

7  think -- look, our expectation is that a distribution of

8  subordinated creditors would be contemporaneous with the

9  closure of the estate.  So, I would expect, frankly, that

10  they'll get more than seven days notice as a practical matter.

11          MR. GERRO:  I just wanted to confirm.  Is it seven

12  calendar days or seven business days?  I'd assume calendar, but

13  --

14          THE COURT:  Calendar days.  I think the federal rules

15  anticipate calendar days these days.  Any other issues?  Mr.

16  Aulet, I'll have you submit a form of order and notice the

17  objectors?

18          MR. AULET:  Of course.  We will submit a form of

19  order and go from there.

20          THE COURT:  All right.  Thank you.  We can move on to

21  -- thank you, gentlemen.  We can move on to --

22          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.  Have

23  a good day.

24          THE COURT:  Thank you.

25          MR. AULET:  So, I will be turning it over to my

1  colleague, Matthew Sawyer, for the KYC/AML motions.

2          THE COURT:  All right.  Thank you.  Good morning, Mr.

3  Sawyer.

4          MR. SAWYER:  Good morning, Your Honor.  Before I get

5  into the substance, can you hear me okay?

6          THE COURT:  Yes, I can.  Thank you.

7          MR. SAWYER:  Excellent.  For the record, Matthew

8  Sawyer, of Brown Rudnick, on behalf of the plan administrator.

9  As Your Honor is aware, we are before you today on what we sort

10 of have colloquially referred to as the KYC/AML motion.  I will

11 also note that there is a motion pending before Your Honor to

12 seal the associated schedule with that motion, which provides

13 customer information, including account information, names,

14 addresses, and the like.

15         I will also note that we have on the line as it will,

16 Ms. Flori Marquez, BlockFi's COO, who submitted a declaration

17 with the motion, and is available for cross if necessary.

18 Otherwise, we would request that her declaration be submitted

19 into evidence.

20         THE COURT:  All right.  Well, let me hear from

21 counsel.  Let me have an appearance on behalf of Mr. Gordon.

22         MR. WEISSBERG:  Good morning, Your Honor.  My name is

23 Aaron Weissberg.  I'm an attorney from Dorf Nelson & Zauderer,

24 and we represent Matthew Gordon.

25         THE COURT:  Thank you.  Do you have any objection to

1 Ms. Marquez's declaration coming into evidence?

2          MR. WEISSBERG:  Yes, I do object to the -- I don't

3 think that the affidavit is sufficient.  I don't think they've

4 submitted any competent, admissible evidence to this Court to

5 support their motion.  There's no underlying records that were

6 submitted to this Court attached to her affidavit that would

7 demonstrate the validity of their claim of entitlement to

8 restrain any accounts.

9          THE COURT:  All right.  The objection goes, in this

10 Court's view, more to the weight of the affidavit or the

11 declaration.  I'm going to overrule the objection.  Mr.

12 Weissberg, do you wish to cross examine Ms. Marquez?

13          MR. WEISSBERG:  Yes, sure.

14          THE COURT:  You're not required to.  But, if you wish

15 to, I want to give you the opportunity.

16          MR. WEISSBERG:  Yeah, I know.  I appreciate it, Your

17 Honor.

18          MR. SAWYER:  Your Honor, if I might interject for

19 just a moment?  While we're happy to go forward with cross-

20 examination of Ms. Marquez, we would just ask that it be

21 limited to the information contained in her declaration.  To

22 the extent that Mr. Gordon and his counsel request something

23 more of an evidentiary hearing on his objection and cross

24 motion, we would request that that be heard and dealt with at a

25 later date.  Just simply not appropriate, given the turnaround

38

1  time of the cross motion and the like for this hearing.

2         THE COURT:  Let me ask a question before we proceed

3  further.  I need clarity.  How much is the wind-down debtor

4  holding of Mr. Gordon's funds, and seeking to hold pending

5  notification of various parties under its proposed protocols?

6         MR. SAWYER:  Sure, Your Honor.  So, as of now, and as

7  we hopefully made clear in our response to the objection, Mr.

8  Gordon's claim is, I believe, in the $800,000 range of which

9  BlockFi is holding the entirety.  But, is only seeking to

10  withhold the amount that it believes is potentially violative

11  of the Unlawful Gambling Act, which is approximately $5,000.

12  So, we would view the dispute as over approximately $5,000.

13         THE COURT:  We're going on an evidentiary hearing to

14  spend more time and professional fees on all sides over $5,000?

15  This doesn't make sense.  Mr. Weissberg, by the time we -- I

16  have rescheduled an evidentiary hearing.  The notice could have

17  gone out under the protocols, and we probably could of -- your

18  client would have this other $800,000.  You might even have the

19  opportunity just to collect the five thousand.  It seems that

20  we're spinning wheels over a de minimis amount.

21         MR. WEISSBERG:  Your Honor, if I may --

22         THE COURT:  Yes.

23         MR. WEISSBERG:  -- address the Court?  Okay.  Part of

24  the problem is that BlockFi has no legal authority to make this

25  application to this Court.  And this Court doesn't have

1   jurisdiction to grant it.  They're seeking to restrain funds

2   under the Bank Secrecy Act and under the -- with respect to Mr.

3   Gordon, the Unlawful Gambling Act.  But, those statutes do not

4   authorize a financial institution to restrain or freeze a

5   consumer's account.  And so, their application to you is

6   improper.

7        And when you read the statutes that they cite,

8   there's provisions for the U.S. Secretary of the Treasury or

9   the U.S. Attorney General, to bring a forfeiture action in

10  federal district court, which has exclusive and original

11  jurisdiction.  It's cited in the statute.  That's the due

12  process that's provided by Congress under the statute.

13       And there's a case that I cited, <u>U.S. v.</u>

14  <u>$1,399,313.74</u>, which is 594 F. Supp. 2d 365.  It's a Southern

15  District of New York case, 2008.  And it talks about the fact

16  that the attorney -- the Secretary of the Treasury can -- can

17  bring a proceeding.  Under the Bank Secrecy Act it talks about

18  the fact that it -- that deals with transactions more than ten

19  thousand or structured transactions where they can file a SAR,

20  which is a suspicious activity report.  But, it does not

21  authorize BlockFi, who does not have standing, to restrain or

22  freeze consumer's accounts.

23       So, that application, once they file a SAR, is

24  incumbent upon the government to bring a forfeiture action and

25  seek a TRO, which is in the statute itself.  And so, here

40

1  they're making an application to the Court under a statute that

2  they cite that does not authorize the relief that they're

3  seeking.  And they've restrained his funds, almost a million

4  dollars, right, for two and a half years, but they didn't have

5  the authority to restrain.  Frankly, it's a conversion.

6        THE COURT:  Well, wait a minute.  Wait a minute,

7  counsel.  This has been part of a Chapter 11.  They've

8  restrained his funds as part of a Chapter 11 process.

9        MR. WEISSBERG:  Prior to the Chapter 11, Your Honor.

10        THE COURT:  Well then, let's be clear.

11        MR. WEISSBERG:  They restrained his account prior.

12  And then when they were forced into bankruptcy by the

13  government, then the automatic stay went into effect.  But, the

14  fact is, under the plan that was approved by this Court, voted

15  on and approved and Your Honor issued a confirmation order,

16  directed that approved claims be paid on the distribution date.

17  And it says shall be paid on the distribution date.  The

18  distribution date, the initial one, was eight months ago.  But,

19  they haven't paid his claim.  And they admit that the Unlawful

20  Gambling Act, they would only seek to restrain the less than

21  five thousand.  But, what have they done?  They've restrained

22  nearly a million dollars of his money, admittedly, unrelated to

23  that.

24        And when you look at the Unlawful Gambling statute,

25  under Regulation GG of the statute, it specifically talks about

1  restricting -- first of all, he never gambled.  This is an

2  allegation that there were seven or eight prior Wallet accounts

3  not connected to him.  There's no admissible evidence that he

4  owned those prior Wallets.  And the statute, what it regulates,

5  it talks about blocking an account, Regulation GG.  And when

6  they say blocking, they explain what they mean.  That if a

7  gambling website has a bank account and they're trying to take

8  a credit from a consumer for a gambling debt, they're supposed

9  to block, meaning reverse the transaction, credit the money

10  back to the consumer, and then this regulation goes on to say,

11  and you're not supposed to freeze or restrain the consumer's

12  account.  In this case, the consumer is Matthew Gordon.

13         THE COURT:  Well, let's -- let me -- before we get

14  into evidentiary issues, I want to hear the legal -- I want to

15  hear the argument as a matter of law.  Number 1) the Court is

16  confident of its jurisdiction to -- as a core matter to compel

17  compliance with and clarify and interpret the terms of a plan

18  that it confirmed.  I'm not as sanguine with your argument as

19  to jurisdiction.  I'm not ruling on whether or not there are

20  funds underlying the underlying issue or transactions are

21  lawful or not.  I'm simply ruling upon whether or not the

22  debtor is complying with the terms of the plan, and whether the

23  debtor is seeking authority to do so.

24         But, let me hear from debtors' counsel, the wind-down

25  debtors' counsel, with respect to the legal arguments that have

1  been raised as to the capacity of the wind-down debtor to be

2  able to --

3        MR. WEISSBERG:  Your Honor, could I -- I apologize,

4  Your Honor.

5        THE COURT:  I'll let you go -- Mr. Weissberg, I'll

6  let you respond.  Let me hear from the wind-down debtors'

7  counsel.

8        MR. SAWYER:  Sure.  Thank you, Your Honor.  If I

9  might, let me just take a step back and frame for the Court

10  (indiscernible) in interest the situation and sort of thoughts

11  underlying the motion as it was filed and put together.

12  BlockFi pre-petition was subject to a number of federal

13  regulatory constructs that require it to -- to identify and

14  take certain actions with respects to funds that it believed

15  were related to money laundering or identity theft issues.

16        BlockFi utilized several software applications and

17  other processes to go through that process.  Where issues were

18  raised, BlockFi's compliance team would review the issues and

19  make a risk-based, which is to say not a fail proof or perfect

20  assessment, but a judgment call, as to the severity of the

21  issues that were raised.  And from there take, you know, any of

22  a number of different courses of action, including freezing

23  accounts.

24        When BlockFi filed, we believe that BlockFi's

25  obligations remained under the applicable regulatory schemes.

43

1  And so we now find ourselves with a number of accounts that

2  have been flagged for KYC or AML issues.  We have certain

3  information in BlockFi's records that suggest the nature or

4  basis for the flag, and we have, you know, a compliance team

5  that is significantly smaller today than it was prior to the

6  petition date.

7          So, with that being the set of circumstances that the

8  plan administrator is operating under, we put forth the

9  protocols that were identified in the motion for this Court's

10 consideration to deal with what we think is a bit of a thorny

11 circumstance.  The protocols seek to provide a number of

12 protections, including notice, what we believe is sufficient

13 due process, and is otherwise, we believe, in compliance with

14 the plan.

15         And on that note, I would just add that the plan does

16 not set forth required distribution dates or the like.  So, to

17 the extent that Mr. Gordon is arguing that he had to receive

18 some subset of his funds by a certain date, we don't agree with

19 that assertion.  I'll pause there to see if the Court has any

20 questions.

21         THE COURT:  No.  I'll turn back to Mr. Weissberg, if

22 he wants to respond.

23         MR. WEISSBERG:  Yes, Your Honor.  Thank you.  As to

24 the non -- as -- I know Your Honor respectfully talked about

25 core proceedings.  But, this concerns potential claims of the

1  U.S. government against non-debtor creditors, which is non-core

2  by definition.  And the Court cannot enter a final judgment in

3  non-core matters without the party's consent.  And Matthew

4  Gordon does not consent.

5          So, as far as the jurisdiction of the Court, I also

6  refer to the statute and the due process that's defined by the

7  statute, which gives exclusive jurisdiction to the federal

8  government, original and exclusive.  And also, BlockFi lacks

9  standing because to seek a restraint under the statute requires

10 the U.S. Secretary of the Treasury or the Attorney General to

11 bring a forfeiture proceeding and seek a TRO to restrain the

12 funds.  But, nowhere in the statute that they cited is their

13 authority for a bank or a financial institution to restrain

14 funds in an account.  And so on that basis, I believe, that the

15 Court would not have jurisdiction to entertain the application.

16 But, also fundamental principals of due process are turned on

17 its head.  And I say that because they want to send out freeze

18 notices and the onus and the burden is on the creditor to prove

19 that they've not committed a crime.

20         And if you take a look at the case that I cited,

21 which was U.S. v. $1,399,313, that I cited before, that talks

22 about the burden of proof being on the Attorney General and the

23 U.S. government to prove that a crime has been committed by a

24 preponderance of the evidence.  And that it relates directly to

25 the funds, directly traceable to the funds in the account, and

1  they have a one-year statute of limitations from the date of

2  the transaction.

3        In Matthew Gordon's case, the transaction is two and

4  a half years ago.  And the federal government will be time

5  barred from even seeking an application, even if they were

6  standing before you today, which they're not.  And so, there's

7  no basis to restrain Matthew Gordon's funds under the Gambling

8  Act, no jurisdiction or basis.  And -- and I would argue also

9  the jurisdictional -- even the statute of limitations was also

10  -- creates a lack of jurisdiction.

11        But, I think that there's no evidence, competent,

12  admissible evidence with underlying business records or -- that

13  would show or demonstrate any transaction between Matthew

14  Gordon and a gambling website.  In fact, their opposition

15  admits that they have incomplete transaction history relating

16  to Mr. Gordon.  So, they cannot trace or demonstrate that he

17  had any involvement with a website that involved gambling.  So,

18  it's just pure conjecture.

19        And in fact, their Footnote 6 in their papers say

20  that they take no position whether Matthew Gordon had violated

21  the law, the Unlawful Gambling Act.  So, there is no basis and

22  no evidentiary proof to warrant restraining his funds.  And

23  under the plan, as per the distribution date, at least there

24  was an initial distribute date in January, those funds should

25  have been distributed.

1          But, I don't think the burden should be shifted to

2    Matthew Gordon to prove his innocence, which is what they're

3    asking the Court to do.  That has to violate due process under

4    the Fifth and Fourteen Amendment of the Constitution.  It

5    violates the statute that they cite, which puts the onus on the

6    Attorney General to bring proceedings, and only they have

7    authority and standing to restrain funds.  And so I think the

8    application is improper and should be denied.  I don't think

9    that there's any jurisdiction.

10          THE COURT:  All right.  Thank you.  Mr. Sawyer, wish

11   to respond?

12          MR. SAWYER:  Sure.  Thank you, Your Honor.  The --

13   with respect to the Unlawful Gambling Act, which is at issue

14   here, the act prohibits the knowing acceptance of funds tied to

15   illegal gambling.  BlockFi has in its records, while not

16   complete, evidence -- and this is where we get into an

17   evidentiary hearing, which I'm hoping to sort of put off until

18   the time is necessary.  But, BlockFi has evidence to suggest

19   that $5,000 that were deposited into Mr. Gordon's account

20   relates to unlawful gambling activity that would be subject to

21   the Unlawful Gambling Act.

22          Because it is a violation of the act to knowingly

23   accept funds that were related to unlawful gambling, the wind-

24   down debtors' position, and it may be a conservative position,

25   but the wind-down debtors' position is that distributions of

1   those funds and Mr. Gordon's knowing acceptance, would be a

2   violation under the statute, and that therefore our

3   facilitation of that would be similarly violative.  So, that's

4   the statutory construct as the wind-down debtors see it.  I'm

5   not sure if that is helpful or answers Your Honor's question.

6           THE COURT:  So, under the protocols, what do you

7   anticipate the wind-down debtor -- what are the next steps --

8           MR. SAWYER:  Sure.

9           THE COURT:  -- with respect to Mr. Gordon's funds?

10          MR. SAWYER:  Sure.  So, the -- part of Mr. Gordon's

11  funds that are not subject to the motion, again the vast

12  majority of Mr. Gordon's funds, would be distributed upon -- in

13  a similar fashion to other allowed claims not subject to KYC or

14  AML issues.

15          With respect to the $5,000 at issue here, we would

16  issue to Mr. Gordon a freeze notice.  The freeze notice would

17  indicate that Mr. Gordon's $5,000 were flagged for a potential

18  KYC or AML issue.  It would attach with it the protocols.  Mr.

19  Gordon would have six months following receipt and service of

20  the freeze notice to move this Court for alternative relief.

21  That is the procedure as outlined in the -- in the motion.

22          THE COURT:  All right.  Mr. Weissberg?

23          MR. WEISSBERG:  Yes.  Thank you, Your Honor.  I just

24  would like to cite Paragraph 8 of the debtors' opposition

25  papers that says, if this Court approves the motion, the wind-

48

1  down debtors would issue the freeze notice concerning the

2  portion of the objectors' account believed linked to

3  (indiscernible).  And it goes on to say, the objector would

4  have an opportunity to introduce evidence that the wind-down

5  debtors are incorrect in their accounting of the source of

6  funds or argue for alternative interpretations.  So, they

7  basically want to be able to issue a freeze notice, and he's

8  presumed guilty, and now has to prove he hasn't committed a

9  crime.  This is the opposite of due process.  It cannot be the

10 process.

11         And there's a statute that deals with it.  They're

12 asking you to reinvent the due process procedure, but there's a

13 statute that specifically talks about it under the Unlawful

14 Gambling Act that refers to -- under the civil remedies that

15 you can seek to restrain it, but it's got to be the U.S.

16 Attorney General.  And it's got to be in a plenary action in

17 federal district court that has exclusive jurisdiction.  And

18 so, trying to preserve claims of the United States government

19 against a creditor is non-core and I don't think that there's a

20 basis for it.

21         We asked if they would issue a check for the money,

22 but they didn't commit to that.  They don't intend to restrain

23 the rest of the funds, but that's, you know, I don't have a

24 stipulation and I don't have a check.  And so -- but, I do have

25 -- the debtor is trying to implement what I perceive to be an

1  unconstitutional -- an application for an unconstitutional

2  process to flip the burden on my client.  And if we're going to

3  have an evidentiary hearing, the onus would be on BlockFi to

4  present admissible, competent, admissible evidence that he has

5  interacted with a gambling website.

6          And when you read their papers, they talk about the

7  fact that -- this transaction was not from his Wallet account.

8  This was prior -- seven or eight Wallet accounts before it got

9  to his Wallet.  And so, they're looking at the cryptocurrency

10  down the chain.  If somebody in Germany or the UK gambled on

11  the website and then they sold their crypto on BlockFi's

12  platform, and then you or me or someone else comes and buys the

13  cryptocurrency on BlockFi's platform, we haven't committed a

14  crime.  We haven't gambled.

15          The mere fact that you can trace in the crypto the

16  prior Wallets that owned it from previous owners and what they

17  might have done or not done, that doesn't mean he's committed a

18  crime.  And there's no basis to restrain it.  I mean, even if

19  there was an alleged -- when you look at the statute, it talks

20  about they can -- they're supposed to credit the money back

21  from the gambling website to the consumer, and they're not

22  supposed to freeze or restrain a consumer's account.

23          In this case, they're not supposed to restrain his

24  money at all under the statute.  So, to ask this Court to

25  restrain his money, under the statute which is time barred

1    under the one-year statute of limitations, makes no sense.   And

2    I'm just speaking with respect to Mr. Gordon.   I see no reason

3    to restrain his money, which is already restrained, Your Honor.

4    They're just asking the Court to continue the restrain, because

5    they've already restrained and withheld it and froze it by not

6    distributing it.   And so, I don't think there's a legal basis

7    to do that, and I think our cross motion should be granted.

8            I don't think that there's anything in Ms. Flori

9    Marquez's affidavit that speaks to Matthew Gordon at all.   His

10   name's not even mentioned.   And there's no evidence; she

11   attaches her affidavit to demonstrate he's committed a crime.

12   Whatever Mr. Sawyer says is from a lawyer's inadmissible

13   hearsay.   There's no evidence that ties a direct connection

14   between the gambling -- some gambling website and Matthew

15   Gordon.   It's -- there's just nothing there.

16           So, I don't see a basis with respect to Mr. Gordon to

17   restrain his funds further.   And I would ask the Court to allow

18   the distribution of his approved claims.   They should not be

19   part of an opportunity to flip due process on its head and make

20   him now have to prove he hasn't committed some crime.   First of

21   all, the one with the records is BlockFi, and now they admit to

22   you they don't even have the records.   They have an incomplete

23   transaction history.

24           THE COURT:   All right.   Thank you, Mr. Weissberg.

25   Mr. Aulet?

1          MR. AULET:  Yeah.  I just wanted to clarify one

2    point.  Look, we are happy to bear the burden on demonstrating,

3    you know, why BlockFi thinks that it needs to withhold those

4    funds.  What we're trying to do here, and I think Mr. Weissberg

5    is not being particularly clear on this point, we're trying to

6    avoid committing a crime.  We're not keeping Mr. Gordon's

7    funds.  We need to make sure that the plan administrator, when

8    he sends out distributions of estate assets Mr. Gordon does not

9    have.  These are not Mr. Gordon's funds, they're estate assets,

10   and want to distribute them.  We do not interpret Your Honor's

11   order to tell us to do something that we are concerned as mia

12   culpa.

13          For the KYC/AML motion, we're trying to make sure

14   that we -- we've noticed every government agency, so that they

15   could show up and object, and we're pleased that they haven't.

16   Mr. Gordon, look, I think if he wants to have a hearing on his

17   four or five thousand dollars, we're happy to do so, and that

18   that should be at an appropriate time.  But, I just want to be

19   clear on this point.  We're trying to avoid a plan

20   administrator or BlockFi committing a crime.  Nobody is going

21   to be pocketing the money.

22          And Mr. Weissberg keeps mixing up the Bank Secrecy

23   Act and the Unlawful Internet Gambling Act.  The Unlawful

24   Internet Gambling Act says, we can't return, we cannot process

25   the transaction.  If his client denies being the source of the

1   funds, we have to return it to there, arguably under the law.

2   It's not actually super clear how we deal with that in this

3   situation, and it may be that there are more of those than just

4   his client when we dig into it.

5          But, Your Honor, I think that Mr. Sawyer should be

6   allowed to argue the point for the global procedures, and if

7   there's anything wrong with the global procedures.  And for Mr.

8   Gordon, specifically, if he wants to takes discovery, we'll

9   provide the documents underlying why we're concerned about his

10  claim.  We will have to redact those, because one of the points

11  under the Bank Secrecy Act and one of the problems with this

12  whole issue is, it's illegal for us to tell him, if a SAR was

13  filed, or anybody else.  So, if anything related to these

14  documents mentions a SAR, we are committing a crime if we give

15  it to them.

16         It's -- this is a huge issue just because of that

17  point.  But, we're happy to have that.  It just shouldn't be

18  today, because if he wants to have an evidentiary hearing on

19  $5,000, it's his due process rights.  But, we'll have that

20  hearing, but we want to get everybody else's money out.  And

21  frankly, we want to get the rest of his money out.  We just

22  don't want to commit a crime doing it.

23         THE COURT:  All right.  Thank you, all.  Let me start

24  with, this is not -- contrary -- in my view, respectfully Mr.

25  Weissberg, it's not an issue of jurisdiction.  Core or non-core

53

1  is not a jurisdiction issue.  It's the authority of the Court.

2  And this -- the District of New Jersey, as in virtually every

3  other of the 93 districts, have adopt rules that, to the extent

4  the Court makes a finding that it's a core matter and it turns

5  out to be non-core, the Court's ruling can be accepted as a

6  proposed finding of fact and conclusion of law for the benefit

7  of the district court.

8         But notwithstanding, the Court maintains

9  jurisdiction, especially over implementation and clarification,

10  interpretation of the plan.  This plan confirmed in the BlockFi

11  case requires the wind-down debtor and the reorg -- requires

12  the wind-down debtor to comply with all federal and state laws.

13  And the question before this Court is whether the proposed

14  protocols are reasonable steps necessary for the administrator

15  to comply with the plan and comply with the federal and state

16  laws.  And this Court does believe it is reasonable.

17         The Court is not making a ruling on the merits of the

18  underlying transaction and whether Mr. Gordon properly or

19  improperly transferred funds to BlockFi.  The Court is going to

20  direct BlockFi in partial granting of the cross motion to remit

21  and distribute to Mr. Gordon all of the funds that are -- that

22  are being held by BlockFi on his allowed claims, with the

23  exception of the flagged amount.  Those funds are to be

24  distributed, along with all other distributions, at the next

25  point in time where the wind-down debtor makes distributions,

54

1  consistent with all other creditors.

2       With respect to the funds that have been flagged, the

3  Court adopts, approves, and authorizes the wind-down debtor to

4  pursue these protocols, give the notice.  At that hearing,

5  clearly the burden, it's a shifting burden, the burden is going

6  to be on BlockFi to continue any restraints.  Mr. Gordon can

7  simply file the appropriate request with this Court by motion,

8  a relatively straightforward motion, pretty much including

9  everything that's been argued today, Mr. Weissberg, as to why

10 the funds should be released.

11      But, at least the process will protect the wind-down

12 debtors' administrator from –– from any accusation that they

13 have not complied with the law, has given proper notice to the

14 pertinent authorities who in all likelihood given the amount

15 and given the issues, will sit on our hands and nothing will

16 come of this, other than a delay with respect to the $5,000.  I

17 would urge the parties to try to avoid a further evidentiary

18 hearing on the underlying transactions, because I think that's

19 just going to cost more than the amount at issue.

20      But, I want to be clear that there is no reason to

21 treat Mr. Gordon differently, but he's not to be treated in a

22 priority position.  He is to receive his distribution when the

23 other distributions are being made, absent the flagged amount.

24 And then the parties can pursue an evidentiary hearing at a

25 later date on the merits of further restraints with respect to

55

1 the $5,000, and I give that as an approximate amount.

2          Mr. Sawyer, will you submit a form of order on notice

3 to Mr. Weissberg?  And the Court is always available for a

4 conference call if we can meet to address any matters to avoid

5 further time and expense on both sides.

6          MR. SAWYER:  We will do so.  Thank you, Your Honor.

7          UNIDENTIFIED ATTORNEY:  Your Honor --

8          THE COURT:  Thank you.  Thank you, counsel.  I think

9 -- thank you, Ms. Marquez.  I think we're -- for the record,

10 the declaration remains in over the objection.  But, of course,

11 Mr. Weissberg reserves his right to pursue discovery and

12 further examination at a later point in time if it becomes

13 necessary.  Thank you.

14          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16                         * * * * *

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

We, COLETTE MEHESKI and KIM WEBER, court-approved transcribers, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Colette Meheski
COLETTE MEHESKI

/s/ Kim Weber
KIM WEBER

J&J COURT TRANSCRIBERS, INC.      DATE: September 6, 2024